UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————— x
                                                    :    Civil Action No. 1:23-cv-10488-DLC
                                                    :
IN RE NATIONAL INSTRUMENTS                          :
CORPORATION SECURITIES LITIGATION                   :    <u>CLASS ACTION</u>
                                                    :
———————————————— x    <u>DEMAND FOR JURY TRIAL</u>

**AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Wayne County Employees' Retirement System ("Lead Plaintiff") by and through the undersigned counsel, alleges the following based upon personal knowledge as to Lead Plaintiff's own acts, and upon information and belief as to all other matters, based on the investigation conducted by and under the supervision of Lead Plaintiff's counsel, which included, among other things, a review of public documents, conference call transcripts, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases of National Instruments Corporation ("National Instruments" or the "Company"), industry and analysts' reports about the Company, and publicly available information about Emerson Electric Co. ("Emerson") and its senior executives.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all sellers of National Instruments common stock between May 16, 2022 and January 17, 2023, both dates inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against National Instruments, and certain of the Company's senior officers and directors during the Class Period ("Defendants," defined fully below).

2.     This action arises from Defendants' material omissions and misrepresentations concerning Emerson's offer to purchase National Instruments' outstanding common stock at a material premium far above the Company's stock price.

3.     In May 2022, Emerson approached National Instruments with an offer to acquire the Company's outstanding stock.  Emerson offered a significant cash premium and substantial transactional certainty – Emerson had the funds, there was no financing contingency, acquiring National Instruments was Emerson's "highest strategic priority," and Emerson was "prepared to move very quickly" on its offer.  This was highly material information.

4.     National Instruments made no disclosure concerning Emerson's offer for approximately eight months, during which National Instruments purchased millions of its own shares at prices far below Emerson's offer, while engaging in a deliberate pattern of behavior to delay, impede, and obstruct Emerson's efforts to acquire National Instruments.  As a result, National Instruments omitted material information it had a duty to disclose and made material misrepresentations to its investors in violation of the federal securities laws.

5.     When investors learned the truth that Emerson was willing to buy the Company's stock for a material premium above the trading price, the stock price climbed sharply.

6.     This action seeks damages on behalf of sellers of National Instruments' stock harmed as a result of these violations of the federal securities laws.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the 1934 Act, 15 U.S.C. §78aa.

8.     Venue is proper in this District pursuant to Section 27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Certain of the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this District, including trades based on material, non-public information.  Those trades were made either by traders working in this District or through broker-dealers and/or securities exchanges based in this District including the Nasdaq exchange.  In addition, many of the acts charged herein, including the dissemination of materially false and misleading information occurred in this District.

## PARTIES

9.      Lead Plaintiff Wayne County Employees' Retirement System sold National Instruments common stock as set forth in the previously filed certification (ECF No. 19-2) and was damaged thereby.

10.      Defendant National Instruments produced automated test equipment and virtual instrumentation software.  During the Class Period, National Instruments common stock traded in an efficient market on the Nasdaq under the ticker symbol "NATI."  As of February 13, 2023, there were approximately 131.5 million shares of National Instruments common stock issued and outstanding.  On October 11, 2023, Emerson acquired National Instruments and its obligations.

11.      Defendant Eric Starkloff ("Starkloff") was, at all relevant times, the Chief Executive Officer ("CEO") and President of National Instruments, and a member of the National Instruments Board of Directors (the "Board").

12.      Defendant Karen Rapp ("Rapp") was an Executive Vice President and the Chief Financial Officer ("CFO") of National Instruments.  On September 13, 2022 National Instruments issued a press release announcing that Rapp planned to retire in May 2023.  Rapp stepped down as CFO on January 9, 2023 and assumed an advisory role with the Company until her retirement.

13.      Defendant Michael McGrath ("McGrath") was, at all relevant times, Chairman of the Board of National Instruments.  McGrath was also a member of the Board's "transaction working group" concerning Emerson's offers to purchase National Instruments.

14.      The defendants referenced above in ¶¶11-13 are collectively referred to herein as the "Individual Defendants."

15.      Defendant National Instruments and the Individual Defendants are sometimes referred to herein collectively as "Defendants."

16.    Defendants are liable for, *inter alia*: (i) failing to disclose non-public facts known to them about Emerson's offers to purchase National Instruments, National Instruments' stock repurchases, and the true value of National Instruments' common stock; and (ii) making materially false and misleading statements concerning these same matters, as alleged herein.  In addition, Defendants' fraudulent scheme and course of business operated as a fraud or deceit on sellers of National Instruments' common stock and: (i) deceived the investing public regarding National Instruments' prospects; (ii) artificially deflated the market price of National Instruments' common stock; and (iii) caused Lead Plaintiff and other members of the Class to sell National Instruments' common stock at artificially deflated prices.

17.    The Individual Defendants made, or caused to be made, omissions of material information and/or false statements that caused National Instruments' common stock to trade at artificially depressed or deflated levels during the Class Period.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of, and had the ability and opportunity to prevent the issuance or cause the correction of, National Instruments' public statements, as alleged herein.  Because of their positions with the Company and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the facts specified herein had not been disclosed to and were being concealed from the market and that National Instruments' representations were materially false and misleading at the time they were made.  The Individual Defendants are liable for the material omissions and/or false and misleading statements pled herein.

## RELEVANT NON-PARTIES

18.    Emerson Electric Co. manufactures products and provides engineering services for industrial, commercial, and consumer markets.  On October 11, 2023, Emerson acquired all of the common stock of National Instruments and as a matter of law assumed the Company's legal

obligations.  As of October 2023, National Instruments became Emerson's Test and Measurement business unit.

19.     Lal Karsanbhai ("Karsanbhai") has served as Emerson's President and CEO since February 2021.

## SUBSTANTIVE ALLEGATIONS

### A.    Background and Overview of the Action

20.     National Instruments was a publicly-traded producer of automated test equipment and virtual instrumentation software.  Emerson is a Fortune 500 multinational engineering corporation. Emerson completed its acquisition of National Instruments in October 2023.

21.     As detailed herein, in May 2022, Emerson approached National Instruments with an offer to acquire the Company for cash at a material premium far above the Company's stock price. National Instruments made no disclosure concerning Emerson's approach for approximately eight months, during which time National Instruments purchased millions of its own shares at prices far below Emerson's offer.

22.     On January 19, 2022, National Instruments' Board approved a stock repurchase program authorizing National Instruments to repurchase up to $250 million worth of common stock, effective immediately (the "2022 Program").[1]  As detailed herein, after Emerson approached National Instruments with its offer in May 2022, National Instruments repurchased over 2 million shares pursuant to the 2022 Program at prices materially below Emerson's offer before any public disclosure concerning Emerson's offer occurred.

---

[1]     The Board had previously authorized a stock repurchase program in 2019 (the "2019 Program").  By the end of March 2022, there were no more share repurchases authorized under the 2019 Program.

23.     As also detailed herein, while concealing Emerson's offer and repurchasing millions of shares at artificially low prices during this eight-month period, National Instruments engaged in a deliberate pattern of behavior to delay, impede, and obstruct Emerson's efforts to acquire National Instruments.

24.     In February 2022, National Instruments warned investors in broad terms that the Company's certificate of incorporation and bylaws, as well as Delaware law in general, "contain provisions that could make it more difficult for a third party to acquire us without the consent of our Board of Directors." National Instruments reiterated this generic warning with each of its quarterly SEC filings in April, July, and October 2022. Despite repeatedly issuing this generic warning that Delaware law "could make it more difficult for a third party to acquire us," National Instruments made no disclosure concerning the fact that a specific third party – Emerson – was offering to acquire the Company at a significant premium, nor of the reality that National Instruments was, in fact, going out of its way to delay, impede, and otherwise obstruct Emerson's efforts to acquire National Instruments.

25.     Shortly before Emerson approached National Instruments with its high-premium offer in May 2022, National Instruments reported disappointing financial results and pessimistic guidance. On April 28, 2022, National Instruments disclosed that first quarter 2022 revenue was $385 million, which was the low point of the Company's previously stated guidance for the quarter, and was below consensus expectations. The Company also announced lower-than-expected revenue forecasts of $370 million to $410 million for the second quarter, significantly below consensus estimates.

26.     In light of these headwinds, Rapp (the Company's CFO) also stated that National Instruments would expand operating margins by a modest "100 bps each year starting this year through 2025." Starkloff (the Company's CEO) added that National Instruments expected to meet

the 100 bps target "in a range of revenue scenarios . . . including a meaningful downturn." As detailed below, after Emerson made its high-premium offer, and consistent with instructions from National Instruments' Board, National Instruments announced a sudden and substantial improvement in guidance, including by tripling its operating margin expectations for 2023.

27.    On January 13, 2023 – after repurchasing millions of shares while concealing and impeding Emerson's offer for eight months – National Instruments announced a strategic review to consider a sale of the Company, but continued to make no disclosure concerning Emerson or the valuable premium it was offering.

28.    In response, on January 17, 2023, Emerson announced its offer publicly and published (including by filing with the SEC) its extensive, previously private correspondence with National Instruments since May 2022, showing the undisclosed reality that National Instruments had concealed and materially misled investors about Emerson's high-premium offer while repurchasing millions of its own shares based on undisclosed material inside information.

29.    Thereafter, on May 25, 2023, National Instruments filed its definitive proxy statement (the "Proxy") concerning its acquisition by Emerson. The Proxy included a "Background of the Merger" section setting forth additional detail showing that National Instruments concealed and materially misled investors regarding Emerson's valuable offer, the Company's response to it, and the Company's purchases of millions of shares of its own stock while in possession of material non-public information.

**B.    Defendants Conceal and Impede Emerson's High-Premium Offer While Repurchasing Millions of Shares**

30.    In May 2022, Emerson approached National Instruments with an offer to acquire all of National Instruments' outstanding shares of common stock for a material premium well above the Company's stock price. Emerson offered cash and certainty: Emerson had the funds and its offer

came with no financing contingency; there were no regulatory concerns; and acquiring National Instruments was Emerson's "highest strategic priority" and it was "prepared to move very quickly." Defendants concealed and misrepresented this highly material information for approximately eight months, during which National Instruments repurchased millions of shares of the Company's common stock at prices well below Emerson's offer while engaging in a deliberate effort to delay, impede, and otherwise obstruct Emerson's attempts to acquire the Company.

### 1. National Instruments Conceals and Rebuffs Emerson's May 2022 Offer While Repurchasing Shares

31.    Emerson began outreach to National Instruments concerning its initial $48 per share all-cash offer to acquire the Company on May 16, 2022.[2]  On that date, Emerson-CEO Karsanbhai attempted to arrange an in-person meeting with Starkloff and McGrath (National Instruments' CEO and Board Chairman, respectively) "to introduce [him]self and shape a compelling all-cash offer for [National Instruments] shareholders," but "was surprised that [Starkloff and McGrath] would not meet with [him] and instead offered a phone call."

32.    Days later, on May 22, 2022, in another "extremely brief phone call," Starkloff and McGrath "reiterated [they] would not engage and suggested we send a letter if Emerson should want to acquire NI."

33.    On May 25, 2022, Karsanbhai spoke by telephone again with Starkloff, "during which Mr. Karsanbhai indicated that Emerson was interested in a potential acquisition of NI."

34.    Also on May 25, 2022, Karsanbhai emailed a letter (the "May 25 Letter") to Starkloff detailing Emerson's "all-cash offer at a significant premium to NI's current and historical trading levels."  Thus, as Karsanbhai later summarized, "Emerson's first outreach to NI regarding a potential all-cash acquisition was on May 16, 2022, and Emerson's initial $48 per share proposal was

---

[2]    On May 16, 2022, National Instruments' stock closed at $33.50 per share.

formalized in a letter on May 25, 2022." As Karsanbhai would summarize further, "[f]or eight months, NI delayed and refused to engage meaningfully with Emerson" and "after receiving the initial May 25, 2022 proposal from Emerson, NI not only refused to engage with Emerson – it repurchased more than 2 million shares[,] depriving its shareholders of the opportunity to realize immediate cash value through the transaction price, which is significantly above the repurchase price."

35.    Emerson's May 25 Letter offered to purchase all of the Company's outstanding common stock for $48 in cash per share. The May 25 Letter emphasized the large premium Emerson offered – *e.g.*, nearly 40% above the previous day's closing price.[3] The May 25 Letter also emphasized the "significant value and certainty" that Emerson was offering, including because Emerson had the necessary funds, expected no regulatory hurdles, and was "highly enthusiastic" and "prepared to move very quickly" toward a definitive merger agreement, which Emerson expected could be announced within just 4 to 6 weeks. The May 25 Letter also expressed Emerson's preference to negotiate in private rather than announcing its offer publicly, stating that Emerson had "no current plan to disclose this letter and assume that you do not intend to either. Our strong preference is to work constructively and expeditiously with you and your board to announce" a definitive agreement.

36.    The May 25 Letter stated:

Further to my recent discussions with you*,* I am excited to present you with this proposal (the "Proposal") for the acquisition of all outstanding shares of National Instruments Corporation ("NI") by Emerson Electric Co. ("Emerson").

We are very excited about the combination of our two firms and the potential we can achieve together. Emerson has long admired NI as a technology leader in the electronic test and measurement industry[.] Combining NI with Emerson would lead

---

[3]    On May 25, 2022, National Instruments' stock closed at $34.35 per share.

to significant opportunities for both of our teams and further develop our position as a premier global automation company.

*       *       *

With that backdrop, I am pleased to present you and your Board with this Proposal:

**<u>Valuation</u>**  Emerson proposes to purchase 100% of the outstanding common stock of NI for $48 in cash per common share, which implies an equity value of $6.49 billion and an enterprise value of $6.67 billion.   We believe our Proposal provides significant value to your shareholders:

- A 39% premium to NI's closing share price as of May 24, 2022;

- A 36% premium to the volume weighted average price for the last 30 trading days ending May 24, 2022;

- A 4% premium to the 52 week high trading price as of May 24, 2022

**<u>Financing</u>**  Our Proposal is not subject to any financing condition and would be financed from cash on hand, committed lines of credit and/or other available sources of financing.

**<u>Regulatory</u>**  While applicable regulatory approvals will be required, we do not expect there to be substantive impediments to closing.  We note the complementary nature of our respective businesses.

**<u>Due Diligence</u>**  This Proposal is based on publicly available information under the assumption that it presents fairly and completely NI and its businesses and its outstanding debt and share count.  It is subject to the completion of customary and confirmatory due diligence (e.g., tax, environmental, legal, etc.).  We are prepared to move quickly to complete such due diligence when appropriate.

**<u>Timing</u>**  Emerson is prepared to proceed immediately to work with NI and its advisors to complete due diligence and to negotiate a mutually agreeable merger agreement (the "Definitive Agreement") in parallel.  It is our expectation that the signing of the Definitive Agreement and announcement can be achieved in 4-6 weeks.

We have no current plan to disclose this letter and assume that you do not intend to either.  Our strong preference is to work constructively and expeditiously with you and your board to announce a Definitive Agreement.

**<u>Board Review</u>**  This Proposal has been reviewed with Emerson's board of directors who support the proposed transaction.  The final approval of Emerson's board of directors would be required prior to entering into the Definitive Agreement.

**Other** The Definitive Agreement would be negotiated and executed by Emerson and NI and closing would be conditioned upon required NI shareholder approval, required regulatory approvals and other customary conditions.  Emerson shareholder approval will not be required.

To reiterate, our Proposal – all cash consideration with no financing contingency and no substantive regulatory impediments – provides both significant value and certainty to NI's shareholders.  We are prepared to move very quickly to complete our due diligence and sign definitive agreements.

We are highly enthusiastic about the prospects of what we can achieve together.  On behalf of Emerson, I thank you again for the dialogue thus far and for your consideration of this Proposal.  We look forward to hearing from you.

37.     In May 2022, National Instruments repurchased 284,370 shares at an average price of $35.17 per share.  National Instruments carried out these transactions with no disclosure of any information concerning Emerson's offer to acquire National Instruments' outstanding shares at a materially higher price.

38.     Thereafter, on June 14, 2022, National Instruments' Board determined to rebuff Emerson's $48 per share offer because, according to the Company's Proxy, the Board concluded that "Emerson's proposal substantially undervalued NI[.]"[4]  As detailed in the Proxy, on that date, in consultation with legal and financial advisors:

> [T]he Board and management further discussed the May 25 Letter, NI's strategy, performance and valuation considerations, and potential responses to Emerson.  The Board discussed the timing of Emerson's proposal, taking into account broader market and industry volatility and company-specific circumstances, such as, among others, that NI's strategic plan was in the early stages of realization. The Board members concluded that Emerson's proposal substantially undervalued NI, including relative to the potential value that could be realized and unlocked from execution of NI's strategic plan and relative to the valuation methodologies presented [to] and discussed with the Board.

The Board thus "determined to reject Emerson's proposal and directed management to convey this determination to Emerson."

---

[4]     On June 14, 2022, National Instruments' stock closed at $32.06 per share.

39.     On June 16, 2022, consistent with the Board's instructions, Starkloff and McGrath emailed a "curt" letter to Karsanbhai (the "June 16 Letter") stating that Emerson's May 25 Letter "does not provide a basis for further discussions."  The June 16 Letter stated further that "NI's board and management team will remain focused, without distraction, on executing our strategies that are producing a significant and steady increase in bookings and revenue, strengthened operational performance, and advances in technology."

### 2.     National Instruments Conceals and Impedes Emerson's June 2022 Offer While Effecting the Largest Share Repurchase in the Company's History

40.     Karsanbhai responded by letter to Starkloff and McGrath on June 22, 2022 (the "June 22 Letter").  The June 22 Letter reiterated Emerson's $48 per share offer and again emphasized the significant premium Emerson was offering – e.g., over 50% above the previous day's closing price.[5] The June 22 Letter also expressed Emerson's strong commitment to pursuing an acquisition of National Instruments, stating that Emerson was "very motivated to conclude a transaction" and was "prepared to engage immediately and ha[d] organized the resources to move towards a transaction expeditiously," and that acquiring the Company was Emerson's "highest strategic priority."

41.     The June 22 Letter stated further that Emerson would consider raising its offer if provided information about the supposed "significant and steady increases in bookings and revenue" and "strengthened operational performance and advances in technology" referenced in Starkloff's June 16 Letter, stating that Emerson "look[ed] forward to learning more about your internal plan and are confident that with access to limited non-public information . . . we could work with you to find additional value that would allow us to increase our Proposal."  The June 22 Letter again noted that Emerson preferred to negotiate in private rather than taking its offer public, explaining that "[w]e

---

[5]     On June 22, 2022, National Instruments' stock closed at $31.43 per share.

prefer to engage in collaborative, bilateral discussions with minimal distraction to your management team to reach an agreement privately."

42.   The June 22 Letter stated in full:

I received your letter dated Thursday, June 16th, responding to our proposal from Wednesday, May 25th (the "Proposal") for the acquisition of all of the outstanding shares of National Instruments Corporation ("NI") by Emerson Electric Co. ("Emerson").  I am disappointed in your response and the lack of engagement from you and your Board to what is an extremely attractive Proposal for the shareholders of NI.

We have followed NI for many years and believe that the Proposal is a unique opportunity for NI shareholders to realize a certain cash value and to accelerate the execution of your vision to automate test across the product lifecycle.  We are offering an immediate financial benefit to your shareholders, and a high-quality home for NI, benefiting your employees, customers, suppliers and communities.

Our Proposal to acquire all of NI's outstanding shares at $48 per share in cash offers significant value to your shareholders measured against both short and longer-term metrics, specifically a:

- 51% premium to NI's closing share price as of June 21, 2022;

- 41% premium to the volume weighted average price for the last 30 trading days ending June 21, 2022;

- 39% premium to NI's closing share price as of May 24, 2022 (the day prior to when we made the Proposal); and

- 4% premium to the 52 week high trading price as of June 21, 2022.

We are highly confident your shareholders would view our cash offer favorably and recent market data points reinforce this view, including:

- The last time NI's share price closed above $48 was on December 6th, 2018. NI's share price has underperformed both the broader market and its key peer, Keysight, since then, with the stock down 34% in a period where the NASDAQ Index gained 54% and Keysight gained 125%;

- Four of the six brokers who cover NI have reduced their 12 month forward price targets following your Q1 earnings with the median price target being reduced from $50 to $43.50; and

- The top 10 active shareholders as of the end of Q1 2021 owned approximately 19% of the company with an estimated weighted average cost

basis of $35. Over the past year, 8 of those 10 shareholders have reduced their positions and sold stock materially below the price we are offering.

We prefer to engage in collaborative, bilateral discussions with minimal distraction to your management team to reach an agreement privately. Your letter referenced "significant and steady increases in bookings and revenue" as well as "strengthened operational performance and advances in technology". We look forward to learning more about your internal plan and are confident that with access to limited non-public information after signing an NDA, we could work with you to find additional value that would allow us to increase our Proposal.

We are prepared to engage immediately and have organized the resources to move towards a transaction expeditiously, including:

- *Diligence:* We have performed extensive outside-in due diligence on NI over an extended period. As a result, we have limited and specific confirmatory due diligence requirements.

- *Timing:* We are ready to begin our confirmatory due diligence exercise and we would work towards signing and announcing a definitive agreement within four weeks.

- *Regulatory:* We do not anticipate any significant regulatory risks or delays given the complementary nature of our businesses.

- *Financing:* Our Proposal is not subject to any financing condition and would be financed from cash on hand, committed lines of credit and/or other available sources of financing. Emerson is an A2/A rated company with a strong balance sheet. We have obtained a Highly Confident Letter from Goldman Sachs.

- *Advisors:* We have engaged Goldman Sachs & Co. LLC and Centerview Partners LLC as our financial advisors and Davis Polk Wardwell LLC as our legal counsel.

- *Certainty:* Our Board of Directors has reviewed and supports the proposed transaction.

Emerson shareholder approval will not be required. Emerson considers this Proposal to be of the highest strategic priority. We are very motivated to conclude a transaction that benefits both companies as well as our respective shareholders. Please confirm receipt of this letter. Given the upcoming July 4th holiday, we recognize you may not be able to get back to us until the week of July 11th. I look forward to hearing from you by then at the latest.

43.     On July 6, 2022, Starkloff responded to the June 22 Letter via email to Karsanbhai, stating that "I wanted to let you know that we will be discussing your follow-up letter at our regularly scheduled bo[a]rd meeting at the end of this month.  I will be in touch with you after the board meeting to discuss."

44.     Thereafter, as described in the Company's Proxy, on July 19 and 20, 2022, National Instruments' Board and management again resolved that Emerson's $48 per share premium cash offer was "inadequate" and "did not reflect the value expected to be generated by NI's business strategies."[6]  At the same time, the Board instructed management not to provide any diligence materials to Emerson (despite Emerson's request for more information) but to publicly "highlight" the Company's supposed business momentum and performance.  As detailed in the Proxy, on July 19 and 20, 2022:

> [T]he Board and management discussed the June 22 Letter and various aspects of Emerson's outreach, including that the June 22 Letter reaffirmed Emerson's prior inadequate proposal, the potential for Emerson to change its offer and the degree to which Emerson would pursue the potential transaction, the potential for entry into a confidentiality agreement and engaging in due diligence and negotiations with Emerson, and various strategic and financial alternatives.  The Board reaffirmed its view that Emerson's proposal was not in the best interests of NI and its stockholders and did not reflect the value expected to be generated by NI's business strategies.

Accordingly, the Proxy states: "the Board concluded that the proposal from Emerson did not merit engaging in further discussions with or providing diligence materials to Emerson."  Nevertheless, the "Board also discussed with management and its advisors the potential steps NI could take at the upcoming earnings call to highlight NI's momentum, prospects, margin priorities and other financial and operating performance matters."

---

[6]     On July 19, 2022, National Instruments' stock closed at $33.30 per share.  On July 20, 2022 National Instruments' stock closed at $33.88 per share.

45.     On July 28, 2022, National Instruments issued a press release, filed on Form 8-K, announcing its second quarter 2022 financial results and updating its financial guidance. Consistent with the Board's directive to "highlight NI's momentum, prospects, margin priorities and other financial and operating performance matters," the release announced increased confidence in the Company's performance and substantially improved financial guidance, including a 300 bps increase in the Company's operating margin in 2023.

46.     The release quoted Starkloff as stating:

> NI has delivered strong performance over the last several quarters, driven by our highly differentiated technologies and offerings targeted at segments with powerful growth drivers, including electric and autonomous vehicles, wireless communication, and new space technology. We believe our focused strategy is leading to ongoing share gains . . . . Momentum continued in the second quarter with orders up 20 percent year over year and revenue up 14 percent year over year. These results bring us increased confidence in achieving revenue growth and earnings per share in line with current consensus estimates.

47.     The release also quoted Rapp disclosing substantially stronger guidance for 2023 through 2025, stating:

> We continue to see the benefits of the actions we have taken to increase scale into our business model. Despite the temporary headwinds to gross margin, we have improved diluted non-GAAP EPS by 15 percent year over year in the first half of 2022. . . . With many key initiatives underway, we are confident in our ability to deliver on our commitment to non-GAAP operating margin improvement. Even in a potential recessionary environment, we now expect to increase our non-GAAP operating margin by 300 basis points in 2023, followed by 100 basis points of additional improvement each year through 2025.

48.     Later that day, National Instruments conducted a conference call with investors providing further positive commentary attempting to justify the increased financial guidance. Rapp and Starkloff spoke on the call, expanding upon the increased guidance. For example, Starkloff stated:

> Now look ahead to 2023. We remain confident in our ability to meaningfully increase our operating margins. It's a top priority for me and my team, and there are many key initiatives underway to ensure we deliver on our commitments to expand

margins. . . . In fact, even though we are currently planning for a weaker macro entering 2023, we expect to deliver revenue growth on the order of 2022's growth rate, an operating margin well above our previous expectation with approximately a 300 basis point increase over 2022.

Rapp also stated:

> Looking ahead, we will continue to sharpen our streamlining processes for greater efficiency. With many key initiatives underway, we are confident in our ability to deliver on our commitment to non-GAAP operating margin improvement. Even in a potential recessionary environment, we now expect to increase our non-GAAP operating margin by 300 basis points in 2023, followed by 100 basis points of additional improvement each year through 2025.

49.     In later correspondence, Karsanbhai raised serious questions about the credibility of the Company's abruptly improved guidance, pointing out (for example) that despite strong headwinds and weak performance, the Company had trebled its margin guidance from three months earlier, just before Emerson had offered to acquire the Company. As Karsanbhai would later summarize: "With the knowledge of our approach (that you did not disclose to your shareholders), and despite the headwinds and weak financial performance, you substantially increased your outlook for 2023, guiding to a mid-teens topline growth rate and 300 basis points of margin improvement," which was "three times larger than your prior guidance only three months earlier when you released 1st quarter earnings, at a time when you were not aware of Emerson's interest in acquiring NI."

50.     On July 29, 2022, National Instruments filed its quarterly report on Form 10-Q for the second quarter of 2022 (the "2Q 10-Q"), disclosing that during May 2022, National Instruments had repurchased 284,370 shares at an average price of $35.17 per share.[7] The 2Q 10-Q made no disclosure of any information concerning Emerson, its offer to acquire the Company at a substantial premium, or National Instruments' efforts to impede Emerson's acquisition (even as the 2Q 10-Q

---

[7]     On July 29, 2022, National Instruments stock closed at $38.00 per share.

warned in general terms that Delaware law "could make it more difficult for a third party to acquire us").

51.     On August 2, 2022, after "highlighting" the Company's supposedly improved financial outlook in accordance with the Board's instructions, Starkloff and McGrath responded to Karsanbhai's June 22 Letter with another "curt" letter.  Consistent with the Board's instructions, the letter informed Emerson that "[t]he Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders."[8]

52.     On September 15, 2022, at an investor conference, National Instruments continued to highlight its suddenly improved expectations, repeating its guidance regarding margin expansion of 300 bps in 2023 and an additional 200 bps by 2025.  In pertinent part, Rapp stated:

> All right.  Now I'm going to move to operating margin and give you a little bit of insight on when I look at this and how it flows through what to expect from that perspective.  Our target here is 25% operating margin by 2025 with the majority of that happening next year in the near term, 300 basis points next year, followed by 100 basis points in 2024 and another 100 basis points in 2025.

Starkloff similarly reiterated the guidance raise from the July 28 conference call:

> In our last call, we shared that we expect a similar level of top line growth in 2023 and a 300 basis point improvement in operating margin.  And that's in contemplating the potential of a meaningful downturn.

53.     In the meantime, in August and September 2022, National Instruments repurchased 2,033,135 shares of common stock at an average price of $40.25 per share.  These repurchases represented the largest quarterly expenditure on stock repurchases in any comparable period in the Company's history, and eclipsed in a single quarter the number of repurchases the Company carried out in either of the prior two years.[9]  National Instruments carried out these transactions with no

---

[8]     On August 2, 2022, National Instruments' stock closed at $38.33 per share.

[9]     On February 21, 2023, after the Class Period, National Instruments filed with the SEC its annual report on Form 10-K for 2022.  According to this filing, National Instruments repurchased

disclosure of any information concerning Emerson's offer to acquire National Instruments outstanding shares for a materially higher price.

54.     On October 28, 2022, National Instruments filed its quarterly report on Form 10-Q for the third quarter of 2022 (the "3Q 10-Q"), disclosing that during August and September 2022, National Instruments had repurchased 2,033,135 shares of common stock at an average price of $40.25 per share.[10]  The 3Q 10-Q continued to make no disclosure of any information concerning Emerson, its offer to acquire the Company at a substantial premium, or National Instruments' efforts to impede Emerson's acquisition.  As with its previous quarterly report, the 3Q 10-Q again warned in misleading terms that Delaware law "could make it more difficult for a third party to acquire us" without disclosing any information about Emerson's effort to acquire the Company.

### 3.     National Instruments Continues to Conceal and Obstruct Emerson's Offer Until the End of the Class Period

55.     Less than a week later, on November 3, 2022, Karsanbhai emailed a third letter offering to acquire National Instruments to Starkloff and McGrath (the "November 3 Letter").  The November 3 Letter increased the offer price from $48 to $53, and again emphasized the sizeable premium being offered, as well as Emerson's certainty and desire to move quickly to complete the transaction.[11]  The November 3 Letter noted that "[o]ver a period starting almost 6 months ago, we have consistently been prepared to provide your shareholders an all-cash offer at a meaningful premium, which your Board has repeatedly rebuffed and refused to provide even limited financial information."  The November 3 Letter proceeded to set forth a detailed timeline of Emerson's efforts

---

1,339,498 shares of common stock during the year ended December 31, 2021, and repurchased 1,390,057 shares of common stock during the year ended December 31, 2020.

[10]     On October 28, 2022, National Instruments' stock closed at $38.72 per share.

[11]     On November 3, 2022, National Instruments' stock closed at $36.51 per share.

to pay a material premium for National Instruments stock since May 2022, summarizing "the context of our outreach, your Board's refusal to engage, and NI's investor communications since receiving our first offer" in May 2022.

56.    The November 3 Letter also raised suspicions about National Instruments' improved guidance and warned that Emerson was willing to bring its increased $53 offer directly to shareholders.  The November 3 Letter stated that "[f]rom our first outreach, we have preferred to engage with you privately and have been committed to improving our offer to reflect the outlook for your company incorporating the latest financial information" and that, "[a]lthough we question the motivations for your updated guidance . . . in the spirit of achieving engagement, we are willing to incorporate your updated outlook to improve our offer . . . from $48 per share to $53 per share."  The November 3 Letter noted further that Emerson "remain[ed] fully committed to pursuing this transaction" and expressed the "sincere hope" that National Instruments would view the $53 offer "favorably and now engage with us in a constructive dialogue."  Nevertheless, the November 3 Letter advised that National Instruments' continued refusal to engage would force Emerson to take its offer directly to National Instruments shareholders, stating that "[w]hile it is our preference to work with your Board privately and collaboratively towards a potential transaction, another refusal to engage will force us to ensure your shareholders can assess our Improved Proposal directly."  In that regard, the November 3 Letter also pointed out that "[i]n preparation for all options," Emerson had accumulated 2.3 million shares of National Instruments common stock on the open market, intended to seek regulatory approval under the Hart-Scott-Rodino Act to acquire additional shares, and was prepared to run a new slate of directors to replace existing Board members.

57.    The November 3 Letter stated in full:

I am writing to follow up on your August 2nd response to our June 22nd letter which reiterated our proposal for the acquisition of all of the outstanding shares of National

Instruments Corporation ("NI") by Emerson Electric Co. ("Emerson").  After receiving your terse response and continued refusal to engage with Emerson for the benefit of NI's shareholders, we decided to wait to see if your revised guidance, investor day communication, and Q3 results might fundamentally alter investors' views of NI's value or signal an acceleration in NI's outlook that we could incorporate into our thinking before reaching out to you again.

### Recap of Events of the Past Six Months

Over a period starting almost 6 months ago, we have consistently been prepared to provide your shareholders an all-cash offer at a meaningful premium, which your Board has repeatedly rebuffed and refused to provide even limited financial information.  Given the time that has elapsed, we believe the context of our outreach, your Board's refusal to engage, and NI's investor communications since receiving our first offer are important to summarize:

- *May 16th:* My initial outreach to you was premised on meeting in person to introduce myself and shape a compelling all-cash offer for your shareholders. I was surprised that you would not meet with me and instead offered a phone call.

- *May 22nd:* In an extremely brief phone call, you reiterated you would not engage and suggested we send a letter if Emerson should want to acquire NI.

- *May 25th:* I sent you a letter describing our all-cash offer at a significant premium to NI's current and historical trading levels.  The offer was based on public information and outlined key terms related to deal certainty, including no financing contingency.

- *June 16th:* You sent a very short response letter refusing to engage, with limited elaboration to your Board's reasons.

- *June 22nd:* After your negative response on June 16th, I again attempted to engage with you with a second letter describing our all-cash offer on June 22nd in which I requested access to limited additional information to help find additional value to improve our proposal and asked for a response by July 11th.

- *July 6th:* You responded that you could not get back to me by July 11th, and instead would get back to me after your earnings call at the end of the month.

- *July 28th Q2 Earnings Call*: Despite solid order momentum, NI's performance demonstrated continued challenges to expanding margins, with gross margins down year-over-year by more than 400 bps and only a 2% incremental margin on 14% sales growth.  With the knowledge of our approach (that you did not disclose to your shareholders), and despite the headwinds and weak financial performance, you substantially increased your

outlook for 2023, guiding to a mid-teens topline growth rate and 300 basis points of margin improvement, a margin improvement three times larger than your prior guidance only three months earlier when you released 1st quarter earnings, at a time when you were not aware of Emerson's interest in acquiring NI.

- *August 2nd:* You sent a second, similarly curt response letter refusing to engage.

- *August 11th:* You announced you would hold your annual investor day on September 15th.

- *September 15th Investor Day:* You reaffirmed the same 2023 guidance as provided with Q2 earnings and provided additional guidance to achieve a further 200 bps operating margin expansion by 2025. Despite your positive tone, your shares fell 3.2% on the day, underperforming the market as investors and analysts continue to doubt NI's ability to execute and deliver these results given its historical track-record and the current operating environment. In particular, the market remains unconvinced about NI's ability to expand EBIT margins through software and system-level solutions as well as the sustainability of order trends and NI's ability to capitalize on secular opportunities in ADAS/EVs/5G.

- *October 27th Q3 Earnings:* Despite achieving record quarterly revenue, NI's share price declined 3.0% the next day (a day in which the NASDAQ Index was up 2.9%) given decelerating order rates, as well as continued supply chain challenges and the potential impact of a deteriorating macro. NI's Q4 guidance was below street expectations, despite reaffirming the margin expansion guidance for 2023. Since your announcement, research has highlighted how NI continues to be a "wait and see" company as evidence of margin expansion was pushed out once again. The market is particularly concerned about your ability to achieve your expected growth in the face of a worsening economic outlook in many markets, particularly in your portfolio businesses. Factoring in these uncertainties, almost all brokers revised their estimates for both Q4 and 2023 downwards as well as their target prices[.]

**Improved Proposal**

From our first outreach, we have preferred to engage with you privately and have been committed to improving our offer to reflect the outlook for your company incorporating the latest financial information. Although we question the motivations for your updated guidance, we do believe in the long-term potential of the NI business under Emerson's leadership and, in the spirit of achieving engagement, we are willing to incorporate your updated outlook to improve our offer. As such, we are increasing our Proposal, from $48 per share to $53 per share (our "Improved Proposal").

Under our Improved Proposal, Emerson proposes to purchase 100% of the outstanding common stock of NI for $53 in cash per common share which implies an equity value of $7.1 billion and an enterprise value of $7.6 billion. Our Improved Proposal delivers compelling all cash value and provides credit for significant future earnings, including your recently updated guidance. Rather than wait for you to achieve an uncertain 2023, our cash offer gives your shareholders immediate credit today. The offer provides substantial premiums to both current and historical metrics, specifically:

- 45% premium to NI's closing share price as of November 3, 2022;

- 37% premium to the volume weighted average price for the last 30 trading days ending November 3, 2022;

- 53% premium to NI's closing share price as of May 24, 2022 (the day prior to when we made the original Proposal).

For reference, the last time NI's share price closed above $53 was on March 12th, 2018. Since then, NI's share price has underperformed both the broader market and its key peer, Keysight, with the stock down 31% in a period where the NASDAQ Index gained 36% and NI's closest peer Keysight gained 206%.

**Emerson is Prepared to Move Quickly**

We believe this Improved Proposal presents the best and most certain path to maximize value for NI shareholders. We are prepared to engage with NI's Board and management team immediately and have organized the resources to work towards a transaction expeditiously.

To emphasize the level of work completed and ability to move with certainty and speed, we reiterate to you our proposed next steps consistent with our prior letters:

- *Diligence:* We have performed extensive outside-in due diligence on NI over an extended period. As a result, we have limited and specific confirmatory due diligence requirements only.

- *Timing:* We are ready to begin our confirmatory due diligence exercise and we would work towards signing and announcing a definitive agreement within four weeks.

- *Regulatory:* We do not anticipate any significant regulatory risks or delays given the complementary nature of our businesses.

- *Financing:* Our Proposal is not subject to any financing condition and would be financed from cash on hand, committed lines of credit and/or other available sources of financing. Emerson is an A2/A rated company with a

strong balance sheet.  We have obtained a Highly Confident Letter from Goldman Sachs.

- *Advisors:* We have engaged Goldman Sachs & Co. LLC and Centerview Partners LLC as our financial advisors and Davis Polk & Wardwell LLP as our legal counsel.  We have also engaged Joele Frank on public relations and Innisfree as our proxy solicitor.

- *Certainty:* Our Board of Directors has reviewed and supports the proposed transaction.  Emerson shareholder approval will not be required.

## **Next Steps**

We have invested considerable time and resources and remain fully committed to pursuing this transaction.  It is our sincere hope that your Board—having had multiple opportunities to communicate its strategy and outlook to the market with no material change in NI's share price—will view this Improved Proposal favorably and now engage with us in a constructive dialogue.  While it is our preference to work with your Board privately and collaboratively towards a potential transaction, another refusal to engage will force us to ensure your shareholders can assess our Improved Proposal directly.  In preparation for all options, we would note:

- We have accumulated 2.3 million NI shares in the open market and intend to file for HSR approval to facilitate additional purchases; and

- Given your Board's repeated attempts to move NI's share price higher have been unsuccessful, your remaining defense is neither your operational strategy nor shareholder support for management but rather NI's staggered board.  As such, we are prepared to run a slate of directors specifically targeting the two members up for re-election, your Chairman and former CEO, which will provide NI's shareholders with an opportunity to express their views to your Board on its refusal to engage with us.

I continue to be available to meet with you at your convenience and have also instructed our financial and legal advisors to make themselves available to meet with your advisors.  Given you have now been in possession of a Proposal from Emerson since May, and now an Improved Proposal, I request that you respond promptly to this letter.  I look forward to hearing a more constructive answer and stand ready to engage.

58.    On November 15, 2022, Starkloff and McGrath responded to the November 3 Letter, advising Emerson that "NI and its Board of Directors take your proposal seriously, in accordance with our fiduciary duties.  We have established a working group of the Board to examine your proposal in greater detail, as we examine and evaluate options with the assistance of our advisors,

inclusive of other prospective purchasers and transaction partners."    Nevertheless, National Instruments would continue to delay and obstruct Emerson's efforts.

59.    On November 16, 2022, Karsanbhai responded to National Instruments requesting to arrange for "our respective advisors to speak before Thanksgiving."  Karsanbhai also reiterated that "Emerson will be filing for HSR approval to acquire additional shares of National Instruments Corporation" and informed National Instruments that Emerson intended to acquire 50% or more of National Instruments' voting securities.

60.    On November 21, 2022, Starkloff responded to Karsanbhai that "it would be premature for our advisors to meet at this time" but that National Instruments "will consider a future meeting with representatives from the working group and management after the Thanksgiving holiday."

61.    On November 23, 2022, Board members met with National Instruments management to discuss responses to a potential tender offer and proxy contest by Emerson.  At this meeting, participants discussed "the timing and steps of a typical tender offer and response and the process of a typical proxy fight, key dates leading to NI's annual meeting, including NI's and Emerson's earnings releases, NI's nomination window for stockholder director nominations, illustrative timing for filing proxy statements in a potential proxy fight, and related SEC deadlines," as well as the "potential adoption of a shareholder rights plan."

62.    On December 6, 2022, Starkloff participated in the Nasdaq Investor Conference, where he once again reiterated National Instruments' guidance raise for 2023-2025.

63.    On December 7, 2022, Karsanbhai emailed Starkloff to take issue with National Instruments' delay in responding to Emerson and to again press Emerson's request for a meeting between the company's financial advisors.  The email stated that Emerson was following up on its

earlier "request[] that our advisors meet before Thanksgiving," as well as National Instruments' response that "it would be premature for our advisors to meet at that time." It continued: "You have had our Revised Proposal since November 3rd and over two weeks have passed since your last communication," wrote Karsanbhai. "Please provide an update on your process and advise when the advisors can connect, as well as timing for the meeting with the working group and management." Karsanbhai also requested documents necessary to nominate new directors for election at the Company's next annual general meeting.

64.    On December 14, 2022, Emerson served a stockholder demand to inspect the books and records of National Instruments pursuant to Section 220 of the Delaware General Corporate Law. Emerson's letter also raised concerns about National Instruments' delay in responding to Emerson's request for documentation necessary to nominate new directors: "We are concerned that NI's delay in responding to this straightforward request will frustrate or impair Emerson's ability to nominate directors."

65.    Thereafter, Starkloff agreed to a meeting with Emerson. On December 15, 2022, Starkloff and Karsanbhai spoke by phone to discuss arranging a meeting and, on December 16, 2022, Starkloff confirmed a January 4, 2022 meeting in Austin, Texas. On December 23, 2022, in advance of the planned January 4, 2023 meeting, National Instruments and Emerson executed a non-disclosure agreement, which included a standstill lasting until 11:59 p.m. Eastern Time on January 6, 2023.

66.    On January 4, 2023, Starkloff, Karsanbhai, and members of their respective teams met in Austin, Texas as planned. Representatives of National Instruments and Emerson each provided presentations. At the conclusion of the meeting, Starkloff proposed to extend the standstill

agreement for one week "so that Emerson could consider revising its proposal to acquire NI in the context of the nonpublic information it had just received."

67.    Also on January 4, 2023, after the meeting with Emerson representatives, the Board and members of National Instruments' management met and discussed "the key questions that the representatives from Emerson had raised during NI's presentation." The Board and management also discussed adopting a shareholder rights plan.

68.    On January 5, 2023, Starkloff and Karsanbhai spoke by telephone. Karsanbhai reiterated Emerson's $53 per share offer "but stated that there could be an opportunity for a modest increase if NI provided Emerson with additional information." Later on January 5, 2023, Emerson and National Instruments extended the standstill from January 6, 2023 to January 13, 2023.

69.    On January 11, 2023, Karsanbhai sent another letter to Starkloff and McGrath (the "January 11 Letter") reiterating Emerson's $53 per share offer to acquire all of National Instruments' outstanding stock.[12] The letter again emphasized the sizeable premium offered by Emerson, as well as Emerson's certainty about proceeding quickly with the transaction, noting that "[f]rom our first outreach in May 2022, we have attempted to work with you privately to see if we could reach a deal and we are highly confident we could announce a deal within days[.]" The January 11 Letter also noted National Instruments' continued failure to provide information to Emerson, stating that although it had "been helpful to receive some additional information on your business and plans, the superficial information your team shared has not addressed the 30 focused questions that we provided ahead of time, and as such we are not yet able to change our view on the financial outlook" for National Instruments. Accordingly, the January 11 Letter concluded that failing to provide the requested information would compel Emerson to take its offer public. As the letter stated, Emerson

---

[12]    On January 11, 2023, National Instruments' stock closed at $38.86 per share.

was "in a position to move very quickly . . . and subject to receiving the information requested, may

see the potential for a very modest increase in value.  However, if you are not willing to share the

information requested, it will require us to reach out to your shareholders directly."

70.    The January 11 Letter stated in full:

I am writing to follow up on our November 3rd letter which outlined our improved proposal for the acquisition of all of the outstanding shares of National Instruments Corporation ("NI") by Emerson Electric Co. ("Emerson").

We appreciate you and your team hosting us in Austin on January 4th and the one follow-up call between the teams on January 9th.  As you have seen through our discussions, we have a deep understanding of the test and measurement sector and specifically NI.  While it has been helpful to receive some additional information on your business and plans, the superficial information your team shared has not addressed the 30 focused questions that we provided ahead of time, and as such we are not yet able to change our view on the financial outlook for NI.

Based on what you have shared to date, we reiterate our proposal for Emerson to purchase 100% of the outstanding common stock of NI for $53 in cash per common share.  Our offer provides shareholders with credit today for significant future earnings, including your recently updated guidance at attractive premiums:

• 37% premium to NI's closing share price as of January 10, 2023; and

• 45% premium to NI's closing share price as of November 3, 2022 (when we increased our proposal to $53 a share).

From our first outreach in May 2022, we have attempted to work with you privately to see if we could reach a deal and we are highly confident we could announce a deal within days and by no later than your Q4 results on January 31st.  To that end, we would be willing to extend the standstill agreement by one week and may see the potential for a very modest increase in value, subject to the following:

• Receiving the outstanding business diligence responses to our prioritized list of 30 questions that we shared on January 6th, as outlined in Annex A;

• Receiving details on all changes in compensation and benefits, equity awards (regular or special) made and anticipated, beyond what has previously been disclosed in NI's SEC filings so we can determine if there are meaningful new costs incurred that may impact our ability to modestly increase our offer;

• Davis Polk will share with Wachtell a draft merger agreement reflective of our proposal and we expect meaningful engagement on negotiating the agreement and aligning on key deal terms;

- Arranging discussions between bankers to agree and align on the process and timeline to announcing a transaction by your Q4 results, and;

- Receiving a full response from your outside counsel to the information requested pursuant to the Section 220 Demand for Stockholder Information which we are entitled to as holders of 2.3 million shares of NI.

We believe our offer is compelling and that there is a path to working with your Board privately and collaboratively towards a potential transaction. We are in a position to move very quickly to finalize customary confirmatory diligence and negotiate the merger agreement, and subject to receiving the information requested, may see the potential for a very modest increase in value. However, if you are not willing to share the information requested, it will require us to reach out to your shareholders directly.

I look forward to hearing from you promptly.

71.     Just days later, with Emerson still bound to the standstill, National Instruments would announce a generic "strategic" review to consider a sale of the Company, while continuing to remain silent – as it had for approximately 8 months – about Emerson's high-premium offer.

**C.     National Instruments' Stock Soars When Emerson's Offer Is Finally Revealed**

72.     On January 13, 2023, prior to the opening of trading and two days after receiving the January 11 Letter, National Instruments issued a press release announcing that "its Board . . . [had] initiated a review and evaluation of strategic options, in consultation with its financial and legal advisors, with the intent to unlock and maximize shareholder value," adding that the "comprehensive review [would] include consideration of a full range of available strategic, business and financial alternatives, including solicitation of interest from potential acquirors and other transaction partners, some of whom have already approached the Company."

73.     The press release further stated that "[t]here is no deadline or definitive timetable set for completion of the strategic review, and there is no assurance that this process will result in any specific transaction, including a business combination or acquisition of NI," that "[t]here is also no assurance as to the specific terms or timing for any agreed transaction if one were to result," and that

- 29 -

"[t]he Company does not plan to make further comment or disclosures regarding this review until such time as required by law or otherwise deemed appropriate."

74.     The press release also announced the implementation of a "shareholder rights plan" that National Instruments said was intended to, among other things, "reduce the likelihood that actions are taken by third parties that are not in the best interests of the Company and all of its shareholders."

75.     Notably absent from the Company's statement was any mention of Emerson, its material offer, or the months Emerson had just spent attempting to negotiate with the Company. Nevertheless, the mere possibility of an acquisition or other strategic transaction caused a significant increase in the trading price of National Instruments' stock, which surged (from the previous day's close of $40.17 per share) to as high as $47.95 per share and closed at $46.50 per share on January 13, 2023, on unusually high trading volume of over 7.7 million shares.

76.     Then, on January 17, 2023, prior to the opening of trading, Emerson issued a press release (the "January 17 Emerson Release") announcing that it had made an all-cash offer to purchase all of the shares of National Instruments for $53 per share.  There were no financing contingencies or anticipated regulatory concerns, and Emerson remained eager to move "expeditiously toward a transaction with NI" and was "prepared to transact promptly[.]"  Emerson also emphasized that in response to the initial offer, National Instruments chose to conceal Emerson's all-cash high-premium offer from the investing public, while undertaking the largest stock buy-back in its history:

**Emerson's Public Proposal Follows Eight Months of Delay and Lack of Engagement**

Emerson's first outreach to NI regarding a potential all-cash acquisition was on May 16, 2022, and Emerson's initial $48 per share proposal was formalized in a letter on May 25, 2022.  For eight months, NI delayed and refused to engage meaningfully with Emerson[.]  In addition, after receiving the initial May 25, 2022 proposal from

Emerson, NI not only refused to engage with Emerson – it repurchased more than 2 million shares at an average weighted price of $40.25, the largest quarterly repurchase in its history on a dollar basis, depriving its shareholders of the opportunity to realize immediate cash value through the transaction price, which is significantly above the repurchase price.

In a November 3, 2022 letter, Emerson outlined the terms of an improved all-cash proposal of $53 per share and highlighted its numerous attempts to engage with NI to that date. On November 15, 2022, NI responded to Emerson, indicating that it had created a working group of its Board to examine Emerson's proposal in greater detail, as well as evaluate options with the assistance of advisors.

In the more than two months since, NI continued to resist engaging meaningfully with Emerson to work toward an agreement. Eight months after Emerson's approach, NI agreed to a January 4, 2023 meeting with representatives from Emerson, which was followed by one additional conference call. During these discussions, NI shared very limited, high-level information about its business and continued to demonstrate its unwillingness to provide more detailed information, including refusing to respond to key diligence questions provided ahead of the meeting. NI then informed Emerson that this would be the extent of its engagement. In a letter dated January 11, 2023, Emerson reiterated its $53 per share proposal to acquire NI.

77.    The January 17 Emerson Release also noted that Emerson had been forced to take its offer public after National Instruments' extensive delay tactics: "'Although Emerson would have preferred to reach an agreement privately, given NI's announcement that it is undertaking a strategic review, and after refusing to work with us toward a premium cash transaction over the past eight months, we are making our interest public for the benefit of all NI shareholders,' said Lal Karsanbhai, President and Chief Executive Officer of Emerson." The January 17 Emerson Release continued:

**NI Shareholders: Stop Your Board's Delay Tactics**

Emerson is disappointed that NI chose to announce a strategic review and put in place a poison pill on January 13, 2023, rather than engaging privately and constructively. NI did not respond to Emerson's latest letter sent on January 11 before its public announcement.

NI's strategic review announcement comes more than two months after the NI Board purportedly formed a working group to evaluate options with its advisors – with no results.

NI shareholders should understand that for eight months they have been deprived of the opportunity to realize certain cash value at a significant premium. Emerson urges NI shareholders to engage with their Board to ensure this public strategic review process is not merely another delay tactic.

78.     Emerson also issued a slide presentation on January 17, 2023, including several slides demonstrating Emerson's numerous offers and extensive efforts to engage with National Instruments, which Defendants concealed. One slide provided a graphic timeline, including Emerson's multiple undisclosed offers:



79.     Another slide provided a graphic demonstrating National Instruments remarkably improved guidance after Emerson's offer:



80.     On the morning of January 17, 2023, Emerson also conducted a conference call to announce its "All-Cash Proposal to Acquire National Instruments." Mr. Karsanbhai spoke at length:

Thank you for joining us to discuss our proposal to acquire National Instruments for $53 per share in cash. Today, we'll speak in detail about our numerous attempts to engage with NI, and our belief that NI shareholders have an opportunity to realize immediate and significant value.

*        *        *

Beyond the compelling premium and all-cash value for NI shareholders, we have no financing contingency or expected regulatory concerns, and we are eager to pursue an expedited timeline where we can be ready to sign and announce quickly. We have been at this since May, with repeated attempts since, which we outlined in our announcement this morning. Despite these efforts, our attempts to engage privately have only been met with limited engagement by NI over the last 8 months.

In November, after months of delay, NI told us that it had formed a working group of its Board to evaluate Emerson's proposal and strategic options. And then last Friday, more than 2 months later, NI publicly announced that it is initiating a review and evaluation of strategic options with its advisers . . . Emerson urges NI shareholders to engage with their Board to ensure this public strategic review process is not merely another delay tactic.

*        *        *

- 33 -

In May, we proposed an initial all-cash offer of $48 per share and we were rebuffed. In the interim, we reiterated our offer and requested access to information, but were rejected. In November, we increased our all-cash offer to $53 per share, providing NI shareholders with even greater value and again, saw no engagement from NI despite its claims about forming a strategic transaction committee to evaluate Emerson's proposals and NI's strategic focus – strategic options, I should say.

In January, NI gave the illusion of engagement, only to provide high-level responses to reasonable questions and then publicly announced a strategic review. Leading up to NI's strategic review announcement, we received no update on our proposal or the options the Board was supposedly evaluating. Meanwhile, over the past 8 months, NI shareholders have been unaware of this opportunity to realize an immediate cash premium.

* * *

We think it is important for NI shareholders to understand the timeline and our numerous attempts to engage with NI to reach a friendly transaction agreement. Over the last 8 months, NI has consistently delayed and refused to engage with Emerson, and then has rejected our approaches. NI has also tried to buy time as they materially increase their guidance in an apparent attempt to support the stock, despite deteriorating market conditions. As I mentioned in November, NI claimed it had formed a working group of the Board to examine our proposal, as well as other strategic options and potential transaction partners.

Despite claims of running a process, NI did not engage with Emerson until mid-December, at which point it agreed to a January 4th meeting. While initially, we were encouraged by NI's offer of a meeting, during these discussions, NI shared only high-level information about its business, and refused to respond to key diligence questions provided ahead of the meeting. NI then told us that this would be the extent of their engagement and asked us for a revised view of value, after which we reiterated our $53 per share proposal. The strategic review process NI announced continues the track record of delay and evasion. What was NI's Board doing privately for 2 months as it evaluated options and continued to avoid engagement with Emerson? Why did NI choose to wait until now to announce the review publicly?

We feel that NI shareholders are due the transparency their Board has denied them. So today, we are disclosing all of our correspondence with NI beginning in May 2022 to make public our sustained track record of attempted engagement with NI without any meaningful or constructive response.

81.    On this news, the market price of National Instruments common stock surged (from a previous close of $46.97 per share on January 13, 2023) to as high as $54.69 per share and closed at $52.04 per share on January 17, 2023, on extraordinary volume of nearly 17 million shares.

## MATERIAL OMISSIONS AND MISREPRESENTATIONS

82.    Beginning in May 2022, Defendants were aware of material information concerning Emerson's offer to acquire National Instruments, including that Emerson was offering a large premium for the Company's shares and that Emerson's all-cash offer came with substantial certainty from a highly motivated buyer with the funds to complete the transaction.  Defendants concealed and materially misrepresented these facts for approximately eight months.  During that time, National Instruments repurchased over 2.3 million of its shares at prices well below Emerson's offer – including the largest quarterly expenditure on share repurchases in the Company's history – while failing to disclose any information concerning Emerson or its offer, and otherwise materially misrepresenting the reality concerning Emerson's offer, National Instruments' response to that offer, and the Company's millions of stock repurchases while in possession of material non-public information about that offer.

83.    Under Section 10(b) and Rule 10b-5, National Instruments was required to abstain from trading in National Instruments' securities or to disclose this material information concerning Emerson's offer.  National Instruments did not abstain from trading in its own securities while in possession of this material information, and repurchased millions of common shares during the Class Period.  National Instruments therefore had an unequivocal duty to disclose the material non-public information in its possession concerning Emerson and its offer.  National Instruments violated this duty to disclose because it made no such disclosure.[13]

84.    Defendants also violated Section 10(b) and Rule 10b-5 by affirmatively disclosing selected information about National Instruments' share repurchases without disclosing the whole

---

[13]    In fact, National Instruments' duty to disclose this information was not discharged until Emerson disclosed the material facts on January 17, 2023 at the end of the Class Period.

truth about Emerson's offer or the fact that such transactions occurred while National Instruments was in possession of undisclosed material non-public information about that offer.

85.     In particular, the 2Q 10-Q, issued on July 29, 2022, specifically disclosed that National Instruments repurchased 284,370 shares at an average price of $35.17 per share during May 2022 but made no disclosure of any information concerning Emerson's materially higher offer. Similarly, the 3Q 10-Q, issued on October 28, 2022, specifically disclosed that during August and September 2022, National Instruments repurchased 2,033,135 shares of common stock at an average price of $40.25 per share but made no disclosure of any information concerning Emerson's materially higher offer. Rapp signed both the 2Q 10-Q and the 3Q 10-Q. Starkloff and Rapp also provided signed certifications attesting to the accuracy and completeness of both the 2Q 10-Q and the 3Q 10-Q.

86.     Likewise, on July 28, 2022, National Instruments conducted a conference call with investors to discuss its financial results for the second quarter (the "Q2 Conference Call"). During the Q2 Conference Call, Rapp stated in relevant part: "We repurchased approximately 1 million shares at an average price of $39.06, keeping our share count flat to Q2 2021. Approximately $190 million remains on the repurchase authorization approved by our Board of Directors on January 19, 2022." And on October 27, 2022, National Instruments conducted a conference call with investors to discuss its financial results for the third quarter (the "Q3 Conference Call"). During the Q3 Conference Call, Rapp stated in relevant part: "We repurchased approximately 2 million shares at an average price of $40.25. Approximately $109 million remains on the repurchase authorization approved by our Board of Directors on January 19, 2022." These statements were materially misleading because they also omitted any information concerning Emerson's offer or the fact that

these repurchases of millions of shares of the Company's common stock were carried out while in possession of material non-public information about a materially higher offer.

87.    National Instruments also issued materially misleading risk disclosures that discussed in general terms the possibility that the Company's "certificate of incorporation and bylaws and Delaware law contain provisions that could make it more difficult for a third party to acquire us," which was highly misleading because it failed to disclose that there was in fact, at that time, a well-financed third party offering to acquire the Company at a material premium.  Further, this representation was also misleading because it failed to disclose that National Instruments, its Board, and senior management were at that time engaged in a concerted effort to "make it more difficult for a third party to acquire" the Company.

88.    The two quarterly reports issued during the Class Period (the 2Q 10-Q and the 3Q 10-Q) included discussion of "risk factors" that "could materially and adversely affect our business . . . and stock price," and referred investors to the risk factors in the Company's Form 10-K, filed with the SEC on February 22, 2022 (the "Form 10-K").

89.    The risk factor from the Form 10-K reads as follows:

> ***Provisions in Our Charter Documents and Delaware Law May Delay or Prevent an Acquisition of Us***.  Our certificate of incorporation and bylaws and Delaware law contain provisions that could make it more difficult for a third party to acquire us without the consent of our Board of Directors.  These provisions include a classified Board of Directors, prohibition of stockholder action by written consent, prohibition of stockholders to call special meetings and the requirement that the holders of at least 80% of our shares approve any business combination not otherwise approved by two-thirds of our Board of Directors.  Delaware law also imposes some restrictions on mergers and other business combinations between us and any holder of 15% or more of our outstanding common stock.  In addition, our Board of Directors has the right to issue preferred stock without stockholder approval, which could be used to dilute the stock ownership of a potential hostile acquirer.

90.    To warn investors in general terms that "Delaware law" could make it difficult for third parties to acquire the Company, but fail to disclose that a third party – Emerson – was at that

time actually attempting to acquire the Company at a premium was materially misleading. To set forth a laundry list of legal provisions that could theoretically impede a third party's acquisition efforts, without disclosing that the Company, its Board, and management were at that time engaged in an effort to impede Emerson's acquisition was likewise misleading. Not only was this "risk disclosure" insufficient to warn investors of the reality that National Instruments would conceal material acquisition offers from them (as it did here) but it was also misleading because it concealed the true facts concerning Emerson's offer while warning about generalities that "could make it more difficult for a third party to acquire" National Instruments.

## DEFENDANTS ACTED WITH SCIENTER

91. National Instruments and the Individual Defendants acted with scienter because the Defendants had actual knowledge of the material facts that they failed to disclose and that rendered their representations materially false and misleading.

92. Defendants were aware of the details and timing of Emerson's offers. Emerson communicated its offers to the highest executive level of National Instruments – sending its offer letters directly to Defendants Starkloff and McGrath – and its offers were discussed at multiple Board meetings, which were chaired by McGrath and attended by Starkloff, and in which the Company's senior management participated.

93. Defendants were aware of National Instruments' repurchases of millions of shares of its own stock. Among other things, Defendants disclosed these repurchases in the 2Q 10-Q and 3Q 10-Q, filed in July and October, 2022 respectively. Defendant Rapp signed these filings and Defendants Starkloff and Rapp both certified their completeness and accuracy.

94. Defendants were aware of the market price of National Instruments' stock, and were therefore aware that Emerson's offers were at prices materially above the market price, as well as that National Instruments' repurchases were at prices well below Emerson's offers.

95.     Defendants were aware of National Instruments' efforts to delay and obstruct Emerson's offer because these efforts were discussed, planned, and carried out by the Board and senior managers of the Company, including directly by the Individual Defendants, as detailed in the Proxy and the direct communications between Defendants Starkloff and McGrath and Emerson, as alleged herein.  In light of these facts, Defendants' material omissions and misrepresentations were knowing and reckless.

96.     In addition to Defendants' actual knowledge of the undisclosed material facts, the inference of scienter is enhanced further by the financial motive Defendants had for National Instruments to repurchase millions of its shares at prices artificially deflated by Defendants' failure to disclose Emerson's offer to acquire those shares at materially higher prices.

## LOSS CAUSATION AND ECONOMIC LOSS

97.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the prices of National Instruments common stock and operated as a fraud or deceit on sellers of National Instruments common stock.  As detailed above, when material undisclosed information emerged and the truth was revealed concerning, *inter alia*, Emerson's offers, National Instruments' response to those offers, and National Instruments' repurchases while in possession of material non-public information concerning those offers, the price of National Instruments common stock increased as the prior artificial depression or deflation was removed.  The increase in the price of National Instruments common stock was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the share price increase negates any inference that the losses suffered by Lead Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and

other Class members was a direct result of Defendants' fraudulent scheme to artificially depress or deflate the prices of National Instruments common stock and/or to maintain the stock at artificially depressed or deflated levels, and the subsequent significant increase in the value of National Instruments common stock when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed.

98.    At all relevant times, Defendants' omissions or materially false and misleading statements alleged herein directly or proximately caused the damages suffered by Lead Plaintiff and other Class members.  Those omissions and statements were materially false and misleading through their failure to disclose a true and accurate picture of the material facts concerning the market for National Instruments' shares, and its business, operations, and financial prospects, as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, and otherwise failed to disclose information they had a duty to disclose, causing the price of National Instruments' common stock to be artificially depressed or deflated.  Lead Plaintiff and other Class members sold National Instruments' common stock at those artificially low prices, causing them to suffer damages as complained of herein.

## PRESUMPTION OF RELIANCE

99.    Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

100.    Lead Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for National Instruments' common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    National Instruments' common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient market;

(b)    National Instruments regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)    National Instruments was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

101.    As a result of the foregoing, the market for National Instruments' common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the Company's stock.  Under these circumstances, all sellers of National Instruments' common stock during the Class Period suffered similar injury through their sales of National Instruments' common stock at artificially depressed or deflated prices and a presumption of reliance applies.

102.    Without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and other Class members sold National Instruments' common stock between the time Defendants omitted, misrepresented, and failed to disclose material facts and the time the true facts were disclosed.  Accordingly, Lead Plaintiff and other Class members are entitled to a presumption of reliance upon the integrity of the market.

**NO SAFE HARBOR**

103.    The statutory safe harbor provided for forward-looking statements does not apply to the allegedly false statements and omissions pled in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pled herein, the Company and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false and misleading when made.

**CLASS ACTION ALLEGATIONS**

104.    Lead Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all sellers of National Instruments' common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are Defendants, Emerson, the officers and directors of the Company and Emerson ("Excluded D&Os"), the Defendants' and the Excluded D&Os' immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any of the foregoing have or had a controlling interest.

105.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, National Instruments' common stock was actively

traded on the Nasdaq.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by National Instruments or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon information and belief, these shares were held by hundreds or thousands of individuals located geographically throughout the country. Joinder would be highly impracticable.

106.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sold shares of National Instruments during the Class Period and sustained damages from Defendants' wrongful conduct in violation of the federal laws complained of herein.

107.    Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel who are competent and experienced in securities class action litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

108.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the 1934 Act as alleged herein;

(b)    whether Defendants' omitted and/or misrepresented material facts;

(c)    whether Defendants acted knowingly or recklessly in issuing false and/or misleading statements;

(d)      whether the prices of National Instruments' common stock during the Class Period were artificially depressed or deflated because of Defendants' conduct complained of herein; and

(e)      whether the members of the Class have sustained damages and, if so, the proper measure of damages.

109.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

110.     Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

111.     Lead Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

112.     Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

113.     Section 10(b) of the 1934 Act provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any

national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement [1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

114.    SEC Rule 10b-5 provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

115.    During the Class Period, Defendants engaged in a plan, scheme, and course of conduct that was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and the Class, as alleged herein; and (ii) cause Lead Plaintiff and the Class to sell Company common stock at artificially depressed or deflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

116.    Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiff and others similarly situated in connection with their sale of the Company's common stock.

117.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective sales of the Company's common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

118.    Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

119.    During the Class Period, Defendants acted as controlling persons of National Instruments within the meaning of Section 20(a) of the 1934 Act.  By virtue of their positions with the Company, the Individual Defendants had the power and ability to control the actions of National Instruments and its employees.  National Instruments controlled the Individual Defendants and its other officers and employees.  Defendants each participated in and are culpable for and by virtue of the acts alleged herein.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully demands relief as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Defendants are liable pursuant to the 1934 Act;

C.    Awarding damages in favor of Lead Plaintiff and other members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Lead Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses and expert fees; and

E.    Directing such further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  March 29, 2024

ROBBINS GELLER RUDMAN
   & DOWD LLP
CHAD JOHNSON
NOAM MANDEL
DESIREE CUMMINGS
JONATHAN ZWEIG
CHRISTOPHER GILROY


*/s/ Noam Mandel*
NOAM MANDEL

420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  (212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcummings@rgrdlaw.com
jzweig@rgrdlaw.com
cgilroy@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

VANOVERBEKE, MICHAUD
   & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  (313) 578-1200
tmichaud@vmtlaw.com

*Counsel for Wayne County Employees' Retirement
System*

WOLF POPPER LLP
ROBERT C. FINKEL
JOSHUA W. RUTHIZER
ADAM SAVETT
845 Third Avenue, 12th Floor
New York, NY  10022
Telephone:  (212) 759-4600
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com
asavett@wolfpopper.com

*Additional Counsel*