**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NATIONAL INSTRUMENTS CORPORATION SECURITIES LITIGATION | Case No. 1:23-cv-10488 (DLC)<br><br>**Oral Argument Requested** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S PUTATIVE CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**PAGE**

Preliminary Statement................................................................................................................ 1

The Allegations of The Amended Complaint............................................................................. 3

Standard of Review.................................................................................................................... 6

Argument ................................................................................................................................... 7

    I.   Not Disclosing Unsolicited Non-Public Merger Offers That National Instruments
       Rejected was Not an Actionable Omission Under Section 10(b) or Rule 10b-5................... 7

       A.  There Can Be No Liability for a Pure Omission.............................................................. 8

       B.  Where the Offer is Made and Rejected, the Merger is Not Probable and Thus the
           Offer is Not *Material* Information the Company Has a Duty to Disclose..................... 10

       C.  National Instruments's Buyback of Its Stock Was Conducted Pursuant to a
           Pre-Existing Repurchase Plan, and the Company Had No Obligation to Disclose
           Non-Material Information About Emerson's Three Offers When It Bought Stock
           Pursuant to the Plan ....................................................................................................... 15

    II. The Amended Complaint Fails to Plead How National Instruments's Forward-
       Looking Projections Were False or Misleading and Thereby Caused Plaintiff's
       Damages........................................................................................................................... 16

    III.  The Amended Complaint Fails to Plead Scienter Adequately, Particularly with Respect to
       the Individual Defendants ................................................................................................ 20

Conclusion .............................................................................................................................. 24

Certificate of Service .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anschutz Corp. v. Merrill Lynch & Co.*,
690 F.3d 98 (2d Cir. 2012) ............................................................................................ 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................... 6

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir.2007) ................................................................................. 7, 20, 21

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .................................................................................................. 9, 10

*Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzo*,
346 F.Supp.3d 432 (S.D.N.Y. 2018) ........................................................................ 6-7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................................... 7

*C.D.T.S. v. UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ............................................................. 16

*Chiarella v. U.S.*,
445 U.S. 222 (1980) ..................................................................................................... 10

*City of Roseville*,
814 F.Supp.2d ............................................................................................................... 21

*Colbert v. Rio Tinto PLC*,
824 F.App'x 5 (2d Cir. 2020) ...................................................................................... 16

*Doscher v. Sobel & Co.*,
2015 WL 774695 (S.D.N.Y. Feb. 11, 2015) ............................................................... 23

*ECA & Local 134 IBEW Joint Pension Tr. Of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ........................................................................................ 21

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
343 F.3d 189 (2d Cir. 2013) ........................................................................................ 23

*Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) ..................................................................................... 17

*Garcia v. Kings Cnty. Hosp. Ctr.*,
2018 WL 389212 (S.D.N.Y. Jan. 11, 2018) ................................................................. 6

*Gissin v. Endres*,
739 F.Supp.2d 488 (S.D.N.Y. 2010) .......................................................................... 19

*Glazier v. Formica Corp.*,
964 F.2d 149 (2d Cir. 1992)....................................................................................... 12

*Harrison v. Rubenstein*,
2007 WL 582955 (S.D.N.Y. Feb. 26, 2007) .............................................................. 23

*Hell's Kitchen Neighborhood Ass'n v. Bloomberg*,
2007 WL 9818939 (S.D.N.Y. Mar. 19, 2007)............................................................. 6

*In re Alstom SA*,
406 F.Supp.2d 433 (S.D.N.Y. 2005) .......................................................................... 21

*In re AMDOCS Ltd. Sec. Litig.*,
390 F.3d 542 (8th Cir. 2004)...................................................................................... 17

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013) .................................................................. 11, 22

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F.Supp.3d 65 (S.D.N.Y. 2017) ............................................................................ 17

*In re China N.E. Petrol. Holdings, Ltd. Sec. Litig.*,
2014 WL 7236914 (S.D.N.Y. Dec. 11, 2014)............................................................ 23

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016)............................................................ 19

*In re CRM Holdings, Ltd. Sec. Litig.*,
2012 WL 1646888 (S.D.N.Y. May 10, 2012)..........................................................22-23

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009)....................................................................................... 22

*In re Donald J. Trump Casino Sec. Litig.*,
7 F.3d 357 (3d Cir. 1993)........................................................................................... 17

*In re eSpeed Inc. Sec. Litig.*,
457 F.Supp.2d 266 (S.D.N.Y. 2006) .......................................................................... 17

*In re General Motors Class E Stock Buyout Sec. Litig.*,
694 F.Supp. 1119 (D. Del. 1988)............................................................................... 13

iii

*In re GeoPharma, Inc. Sec. Litig.*,
  411 F.Supp.2d 434 (S.D.N.Y. 2006) ...................................................................... 22

*In re GPC Biotech AG Sec. Litig.*,
  2009 WL 5125130 (S.D.N.Y. Dec. 29, 2009) ........................................................ 17

*In re Lions Gate Ent. Corp. Secs. Litig.*,
  165 F.Supp.3d 1 (S.D.N.Y. 2016) ................................................................... Passim

*In re Lululemon Sec. Litig.*,
  14 F.Supp.3d 553 (S.D.N.Y. 2014) ....................................................................... 17

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F.Supp.3d 278 (S.D.N.Y. 2014) ......................................................................... 7

*In re Marsh & McLennan Cos. Sec. Litig.*,
  501 F.Supp.2d 452 (S.D.N.Y. 2006) ...................................................................... 23

*In re Nokia Corp. Sec. Litig.*,
  2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ....................................................... 17

*In re Nokia Oyj Sec. Litig.*,
  423 F.Supp.2d 364 (S.D.N.Y. 2006) ...................................................................... 19

*In re Optionable Sec. Litig.*,
  577 F. Supp. 2d 681 (S.D.N.Y. 2008) .................................................................... 11

*In re Refco, Inc. Sec. Litig.*,
  503 F.Supp.2d 611 (S.D.N.Y. 2007) ...................................................................... 21

*In re Sanofi Sec. Litig.*,
  155 F.Supp.3d 386 (S.D.N.Y. 2016) ...................................................................... 20

*In re Sec. Capital Assur. Ltd. Sec. Litig.*,
  729 F.Supp.2d 569 (S.D.N.Y. 2010) ...................................................................... 23

*In re Time Warner, Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ....................................................................................... 11

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) .................................................................................................. 8

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ................................................................................... 22

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991)..................................................................................... 14

*Levitt v. J.P. Morgan Sec., Inc.*,
  710 F.3d 454 (2d Cir. 2013) .................................................................................... 10

*Lipow v. Net1 UEPS Techs., Inc.*,
  131 F.Supp.3d 144 (S.D.N.Y. 2015) ....................................................................... 23

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. ----, 144 S. Ct. 885 (2024) .................................................................... 1, 9

*Matrixx Initiatives v. Siracusano*,
  563 U.S. 27 (2011)...............................................................................................20-21

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2001).................................................................................... 21

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry*,
  575 U.S. 175, 135 S. Ct. 1318 (2015) ...................................................................... 9

*Phillips v. LCI Int'l, Inc.*,
  190 F.3d 609 (4th Cir. 1999).................................................................................. 14

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc.*,
  741 F. Supp. 2d 474 (S.D.N.Y. 2010) ................................................................... 21

*Reiss v. Pan Am. World Airways, Inc.*,
  711 F.2d 11 (2d Cir. 1983)...................................................................................... 12

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004).................................................................................... 17

*S.E.C. v. U.S. Env't, Inc.*,
  82 F.Supp.2d 237 (S.D.N.Y. 2000) ........................................................................... 7

*SEC v. Geon Indus., Inc.*,
  531 F.2d 39 (2d Cir. 1976)...................................................................................... 12

*SEC v. Merchant Capital, LLC*,
  483 F.3d 747 (11th Cir. 2007)................................................................................. 17

*Sfiraila v. Deutsche Bank Aktiengesellschaft*,
  729 F.App'x 55 (2d Cir. 2018)................................................................................ 23

*Shemian v. Research in Motion Ltd.*,
  2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013)........................................................ 17

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010).................................................................................... 21

*Staffin v. Greenberg*,
  672 F.2d 1196 (3d Cir. 1982)................................................................................... 12

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
  552 U.S. 148 (2008) .................................................................................................. 8

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)................................................................................... 8, 10

*Taylor v. First Union Corp.*,
  857 F.2d 240 (4th Cir. 1988).............................................................................. 12, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................... 7, 20, 21

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016).................................................................................16-17

*Triano v. Town of Harrison*,
  895 F.Supp.2d 526 (S.D.N.Y. 2012) ......................................................................... 6

*Vladimir v. Bioenvision Inc.*,
  606 F.Supp.2d 473 (S.D.N.Y. 2009) ....................................................................... 12

*Walzer v. UAL Corp.*,
  351 Fed.Appx. 551 (2d Cir. 2009)........................................................................... 10

*WEBMD Health Corp. Sec. Litig.*,
  2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ................................................................ 19

*Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*,
  474 F.Supp.2d 505 (S.D.N.Y. 2007) ......................................................................... 7

**Statutes**

15 U.S.C. §78u-4(b)............................................................................................. 7, 20, 23

15 U.S.C. § 78u-5(c)...................................................................................................... 17

**Rules**

Fed. R. Civ. P. 9(b) .......................................................................................................... 7, 8, 10

Fed. R. Civ. P. 12(b)(6) ......................................................................................................... 1, 6

Fed. R. Evid. 201 .................................................................................................................... 14

**Regulations**

17 C.F.R. § 240.10b-5(b) (2022) ............................................................................................. 8

SEC, Exchange Act Release No. 6835 ................................................................................... 11

Defendant National Instruments Corporation ("National Instruments"), and Defendants Eric Starkloff, Karen Rapp, and Michael McGrath (the "Individual Defendants") submit this memorandum of law in support of their Motion to Dismiss the Amended Complaint of Plaintiff Wayne County Employees' Retirement System ("Plaintiff") pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiff's suit is premised on the notion that National Instruments committed securities fraud under Section 10(b) and Rule 10b-5(b) because it did not publicize the fact that in May, June, and November of 2022 it received non-public offers to acquire its stock—which it viewed as inadequate and rejected—from Emerson Electric Company ("Emerson"). Specifically, Plaintiff claims that National Instruments, by not publicizing these facts: (1) depressed the market price of National Instruments stock, (2) made its repurchase of stock as authorized by a prior Board-approved repurchase plan fraudulent for trading while in possession of undisclosed non-public material information, and (3) somehow made its disclosures of its stock repurchases and its performance projections misleading.

This suit must be dismissed for at least five reasons. First, this suit is actually premised on pure omissions and, as the U.S. Supreme Court held in a unanimous opinion two weeks ago, pure omissions are not actionable under Rule 10b-5. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. ___, 144 S. Ct. 885, slip op. at *2, *6 (Apr. 12, 2024).

Second, Emerson's unsolicited and non-public offers were not material because no merger was reasonably likely to occur at the time. There was no agreement between the parties as to price or structure. In fact, the Amended Complaint pleads that Emerson's first two offers were viewed as wholly inadequate by the National Instruments Board, and it instructed management to reject both offers and not engage in due diligence on them. Thus, by August 2, 2022, there was no offer

1

on the table at all, and then nothing happened between the parties for *three months*. By the time Emerson made its third offer, which raised the offer price by $5 per share, it was November 2022. For that offer, the National Instruments Board formed a committee to evaluate Emerson's offer and other potential suitors. But as the Amended Complaint pleads, even for that offer there were none of the indicia of "reasonable likelihood" that courts require to find materiality: there was no due diligence, no draft agreements, no negotiations on this offer. Plaintiff made its major sale of National Instruments stock on January 13, 2023 [Dkt. 19, Ex. B]—the day National Instruments announced it was considering potential acquisition strategies and multiple suitors. Emerson ultimately went public with its offer a few days later—but even then, it had to raise its offer price another $7 per share to complete the acquisition of the company. Viewed by the facts known at the time and without hindsight—as is required here—it is clear that no merger was "reasonably likely" to occur during the class period, and thus the offers were not material non-public information.

Third, National Instruments's repurchase of its stock was conducted pursuant to a previously-approved stock repurchase plan, and the company had no legal obligation to disclose non-material information about Emerson's three non-public offers when it bought stock pursuant to its previously-approved plan. Plaintiff pleads that the challenged stock buybacks were made in May, August, and September. National Instruments did not even receive Emerson's first offer letter until May 25, 2022, and it rejected Emerson's two $48-per-share offers out of hand with no negotiation. In August and September (when the bulk of the buybacks were made), there was no offer on the table and the two companies were not even talking. There can be no liability here for National Instruments's stock repurchases.

Fourth, although the Amended Complaint quotes extensively from National Instruments's statements about future earnings and its disclosure of how many shares it had repurchased, it

2

cannot explain how not publicizing Emerson's offers makes those statements false or misleading. The PSLRA and Rule 9(b) require particularity on this point. The Amended Complaint provides none—revealing that Plaintiff's case is wholly based on pure omissions about Emerson's offers. Plaintiff does not plead that statements of prior performance were false, nor does it plead that the future projections were false or misleading themselves. The law allows optimism and puffery in future projections. Moreover, National Instruments's statements about future performance were accompanied by detailed disclaimers that provide a safe harbor.

Fifth, the Amended Complaint fails to adequately plead the elements of control person liability, scienter, and loss causation with the particularity required by the PSLRA and the case law. It lumps the Individual Defendants into group allegations, and merely pleads each Individual Defendant's position, which statement he or she made, and his or her presumed knowledge. It certainly does not plead facts to overcome the "competing inference"—which is right there in the language of the pleading—that the Individual Defendants believed Emerson's offers significantly undervalued the company and would not be in the best interest of shareholders. As such, they would have no justification for publicizing such offers. Plaintiff fails to meet the pleading standard for fraud and control person liability for the Individual Defendants.

## THE ALLEGATIONS OF THE AMENDED COMPLAINT

National Instruments makes automated test equipment and virtual instrumentation software. (Am. Compl. ¶ 10.) On May 16, 2022, Emerson's CEO spoke with National Instruments's CEO and Board Chair to arrange an in-person meeting to discuss an offer Emerson wanted to make to acquire National Instruments. (*Id.* ¶ 31.) On May 25, 2022, Emerson emailed a letter detailing Emerson's offer to acquire National Instruments at a price of $48 per share. (*Id.* ¶ 34.) This represented only a 4% premium to National Instruments stock's 52-week high trading

3

price. (*Id.* ¶ 36.) The National Instruments Board "concluded that Emerson's proposal substantially undervalued [National Instruments], including relative to the potential value that could be realized and unlocked from execution of [National Instrument's] strategic plan and relative to the valuation methodologies presented [to] and discussed with the Board." (*Id.* ¶ 38.) National Instruments rejected Emerson's offer by letter dated June 16, 2022, stating that Emerson's offer "does not provide a basis for further discussions" and vowing to remain focused "on executing our strategies that are producing a significant and steady increase in bookings and revenue, strengthened operational performance, and advantages in technology." (*Id.* ¶ 39.)

Not to be deterred, Emerson reiterated its $48-per-share offer on June 22, 2022, stating its preference to keep the offer and any negotiations private. (*Id.* ¶ 40.) National Instruments responded that it would discuss this second offer at its upcoming regularly-scheduled Board meeting. (*Id.* ¶ 43.) The Board once again concluded the $48-per-share "offer was 'inadequate' and 'did not reflect the value expected to be generated by [National Instruments's] business strategies,'" and that it "was not in the best interests of [National Instruments] and its stockholders." (*Id.* ¶ 44.) The Board then "instructed management not to provide any diligence materials to Emerson … but to publicly 'highlight' the Company's … business momentum and performance." (*Id.*) Thus, on August 2, 2022, National Instruments once again rejected Emerson's offer, explaining that "[t]he Board remains unanimously of the view that your proposal is not in the best interests of [National Instruments] and its shareholders." (*Id.* ¶ 51.)

For the next three months, there was no offer on the table and no further discussions between Emerson and National Instruments. In August and September 2022, National Instruments repurchased 2,033,135 shares of its common stock at an average price of $40.25 per share. (*Id.*

4

¶ 53.) This was done pursuant to a stock repurchase plan the company had adopted on January 19, 2022 (*id.* ¶¶ 22, 85-86)—some four months *before* Emerson made its May 25 offer.[1]

In September 2022, National Instruments discussed at an investor conference its targets to expand its margins by "300 bps in 2023 and an additional 200 bps by 2025." (*Id.* ¶ 52.) After National Instruments filed its Form 10-Q for the third quarter of 2022 at the end of October (*id.* ¶ 54), Emerson decided to submit an "Improved Proposal," raising its offer price by $5 per share, to $53 per share. (*Id.* ¶ 55.) Emerson's CEO made this third offer in a November 3, 2022 letter. (*Id.*)

On November 15, 2022, National Instruments advised Emerson that the company and its Board "take your proposal seriously" and had "established a working group of the Board to examine your proposal in greater detail, as we examine and evaluate options with the assistance of our advisors, inclusive of other prospective purchasers and transaction partners." (*Id.* ¶ 58.) Emerson asked to meet before Thanksgiving, but National Instruments said that would be premature, suggesting a meeting after Thanksgiving. (*Id.* ¶¶ 59-60.) On December 7, 2022, Emerson complained that the meeting had not yet happened (*id.* ¶ 63); on December 14, 2022, Emerson filed a stockholder demand to inspect the National Instruments books. (*Id.* ¶ 64.) On December 16, the companies confirmed a meeting to be held in Austin, Texas on January 4, 2023. (*Id.* ¶ 65.) They executed a non-disclosure agreement on December 23, 2022. (*Id.*)

After the January 4 meeting in Austin, Emerson sent National Instruments a letter revealing that most of the indicia of probability the merger would occur were lacking. (*Id.* ¶ 69.) Emerson called the confidential information National Instruments had shared to date "superficial," indicating due diligence materials had not been exchanged, the teams of investment bankers had not aligned, and no draft merger agreement had been exchanged. (*Id.* ¶ 70.)

---

[1] National Instruments had also repurchased 284,370 shares in May 2022 pursuant to the same stock repurchase plan. (*Id.* ¶ 37.)

The Amended Complaint alleges that the stock price soared more than $7 per share when National Instruments announced on January 13, 2023, its plan to solicit "interest from potential acquirors and other transaction partners, some of whom have already approached the Company." (*Id.* ¶¶ 72, 75.) On January 17, 2023, Emerson issued a press release and slide presentation detailing the history of the companies' non-public discussions, expressing its dismay at the "very limited, high-level information" divulged by National Instruments at the January 4 meeting and National Instruments's statement that "this would be the extent of its engagement" on Emerson's $53-per-share proposal. (*Id.* ¶¶ 76, 80.) Once again, Emerson's offer had been rejected.

As is revealed in the proxy statement referenced in the Amended Complaint, Emerson ultimately acquired all of National Instruments's stock at a price of $60 per share—$12 over its first two rejected offers and $7 over its third rejected offer. (*Id.* ¶ 29.) The transaction closed on October 11, 2023.

## STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must include "sufficient factual matter . . . to state a claim that is plausible on its face." *Triano v. Town of Harrison*, 895 F.Supp.2d 526, 536 (S.D.N.Y. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Garcia v. Kings Cnty. Hosp. Ctr.*, 2018 WL 389212, at *3 (S.D.N.Y. Jan. 11, 2018) (citing *Iqbal*, 556 U.S. at 678). "Rule 12(b)(6) requires that plaintiffs state a non-conclusory claim against each defendant named in the action." *Hell's Kitchen Neighborhood Ass'n v. Bloomberg*, 2007 WL 9818939, at *2 (S.D.N.Y. Mar. 19, 2007). If a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed[.]" *Bd. of Managers of Trump*

*Tower at City Ctr. Condo. by Neiditch v. Palazzo*, 346 F.Supp.3d 432, 452 (S.D.N.Y. 2018) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Securities claims, in particular, face "exacting pleading requirements." *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Both Rule 9(b) and the PSLRA apply to a

Section 10(b) fraud claim.[2] *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir.

2012); *S.E.C. v. U.S. Env't, Inc.*, 82 F.Supp.2d 237, 239 (S.D.N.Y. 2000). As one court has noted:

> "Securities fraud claims are subject to heightened pleading requirements that the
> plaintiff must meet to survive a motion to dismiss." *ATSI Communications, Inc. v.*
> *Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007). First, plaintiffs must satisfy Rule
> 9(b), which requires that they "state with particularity the circumstances
> constituting fraud or mistake." Fed.R.Civ.P. 9(b). The Private Securities Litigation
> Reform Act ("PSLRA") further requires that a securities complaint "specify each
> statement alleged to have been misleading, the reason or reasons why the statement
> is misleading, and, if an allegation regarding the statement or omission is made on
> information and belief, ... all facts *on* which that belief is formed." 15 U.S.C. §
> 78u–4(b)(1)(B); *see also ATSI,* 493 F.3d at 99 (explaining that plaintiffs "must (1)
> specify the statements that the plaintiff contends were fraudulent, (2) identify the
> speaker, (3) state where and when the statements were made, and (4) explain why
> the statements were fraudulent").

*In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F.Supp.3d 278, 289 (S.D.N.Y. 2014).

## ARGUMENT

I.    **NOT DISCLOSING UNSOLICITED NON-PUBLIC MERGER OFFERS THAT
NATIONAL INSTRUMENTS REJECTED WAS NOT AN ACTIONABLE
OMISSION UNDER SECTION 10(b) OR RULE 10b-5**

Rule 10b-5 makes it unlawful for issuers of registered securities to "make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading."

---

[2] Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*, 474 F.Supp.2d 505, 516 (S.D.N.Y. 2007).

17 C.F.R. § 240.10b-5(b) (2022). To state an actionable claim under Section 10(b) and Rule 10b-5, the complaint must allege, among other things, (1) "a material misrepresentation or omission by the defendant," (2) "scienter," and (3) "loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta Inc.*, 552 U.S. 148, 157 (2008). A defendant can only be liable if he is the "maker" of the challenged statement. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

## A. There Can Be No Liability For a Pure Omission

The Second Circuit has instructed that there are three ways in which a duty to disclose may arise in the 10(b) context:

> Such a duty may arise when there is "a corporate insider trad[ing] on confidential information," a "statute or regulation requiring disclosure," or a corporate statement that would otherwise be "inaccurate, incomplete, or misleading."

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). Here, there are no allegations of insider trading. And the Amended Complaint points to no statute or regulation requiring disclosure of a rejected non-public merger offer. Moreover, the Amended Complaint does *not* identify any statement made by National Instruments that was made false or misleading by not disclosing Emerson's three non-public offers when they were made.[3] (Rule 9(b) and the PSLRA require this to be pled specifically.)

Rather, Plaintiff's Amended Complaint pleads three *pure omissions*: not disclosing each of Emerson's three non-public offers to acquire National Instruments. (Am. Compl. ¶ 17.) Plaintiff's

---

[3] The Amended Complaint does plead that National Instruments made misleading rosy forecasts about future earnings that were intended to drive its stock price higher (Am. Compl. ¶ 16), but it does not (and cannot) allege that those statements were made false by not disclosing Emerson's non-public offers to acquire National Instruments, or that these "rosy" projections damaged Plaintiff. With respect to the undisclosed merger offers, what Plaintiff alleges are pure omissions.

theory is that if this information had been known by the public, National Instruments stock would have traded at a higher price than it did when Plaintiff sold it. (*Id.* ¶¶ 97-98.)

Just two weeks ago the Supreme Court unanimously confirmed that "[p]ure omissions are not actionable under Rule 10b-5(b)." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. ----, slip op. at *2, *6 (Apr. 12, 2024). In holding that a 10b-5 claim did not lie even where the defendant was alleged to have withheld information actually required to be disclosed by SEC Regulation S-K, Item 303, the Supreme Court explained:

> Rule 10b-5(b) does not proscribe pure omissions. The Rule prohibits omitting material facts necessary to make the "statements made … not misleading." Put differently, it requires disclosure of information necessary to ensure that statements already made are clear and complete. . . . This Rule therefore covers half-truths, not pure omissions. Logically and by its plain text, the Rule requires identifying affirmative assertions (*i.e.*, "statements made") before determining if other facts are needed to make those statements "not misleading." It once again "bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under those provisions only when necessary 'to make … statements made, in the light of the circumstances under which they were made, not misleading.'"

> Statutory context confirms what the text plainly provides. Congress imposed liability for pure omissions in § 11(a) of the Securities Act of 1933. . . . By its terms, in addition to proscribing lies and half-truths, this section also creates liability for failure to speak on a subject at all. *See Omnicare*, 575 U.S. at 186, n.3 135 S. Ct. 1318 ("Section 11's omissions clause also applies when an issuer fails to make mandated disclosures—those required to be stated—in a registration statement"). There is no similar language in § 10b or Rule 10b-5(b). Neither Congress in § 10(b) nor the SEC in Rule 10b-5(b) mirrored § 11(a) to create liability for pure omissions. That omission (unlike a pure omission) is telling.

> "Silence, absent a duty to disclose, is not misleading under 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 … (1988). Even a duty to disclose, however, does not automatically render silence misleading under Rule 10b-5(b). Today this Court confirms that the failure to disclose information required by Item 303 can support a Rule 10b-5(b) claim only if the omission renders affirmative statements made misleading.

*Id.*, slip op. at *5-*7 (citations largely omitted).

9

Because Plaintiff's Amended Complaint fails to identify any statement that is made fraudulent by the challenged omissions—as is clearly required by both Rule 9(b) and the PSLRA—its Section 10(b) and Rule 10b-5(b) claims must be dismissed. Pure omissions do not violate Section 10(b) or Rule 10b-5(b).

**B. Where the Offer Is Made and Rejected, the Merger Is Not Probable and Thus the Offer Is Not *Material* Information the Company Has a Duty To Disclose**

Omissions are not "actionable under the securities laws" absent "a duty to disclose" the omitted information. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *see also Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) ("[F]or an omission to be considered actionable under § 10(b), the defendant must be subject to an underlying duty to disclose."); *Walzer v. UAL Corp.*, 351 Fed.Appx. 551, 553 (2d Cir. 2009) (Silence, without a duty to disclose, does not give rise to securities fraud.); *cf. Chiarella v. U.S.*, 445 U.S. 222, 228 (1980) ("Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud. When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

In *Basic v. Levinson*, the Supreme Court faced the question whether preliminary merger discussions were material under Rule 10b-5. The *Basic* Court instructed:

> . . . [M]ateriality "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." …
>
> Whether merger discussions in any particular case are material therefore depend on the facts. Generally, in order to assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels. Without attempting to catalog all possible factors, we note by way of example that board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest. … No particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material.

485 U.S. 224, 238-39 (1988).

10

The SEC's guidance on Item 303 is also instructive here; disclosure is only required where an event is both presently known to management *and* "reasonably likely to have material effects on the registrant's financial conditions or results of operations." SEC, Exchange Act Release No. 6835.

As Judge Koeltl recently explained:

> "An omission is actionable under federal securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). . . . [C]orporations are "not required to disclose a fact merely because a reasonable investor very much would like to know that fact." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner*, 9 F.3d at 267); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013), *aff'd*, 566 Fed. Appx. 93 (2d Cir. 2014).

*In re Lions Gate Ent. Corp. Secs. Litig.*, 165 F.Supp.3d 1, 11 (S.D.N.Y. 2016) (issuer did not have a generalized duty to disclose a government investigation, and mere investigation notices were not the commencement of litigation that might make the subject material).

National Instruments and the Individual Defendants did not have a duty to disclose Emerson's non-public merger offers; there was no agreement as to price or structure, and the Amended Complaint does not plead one. Rather, Emerson's first $48-per-share offer in May 2022 was rejected out of hand by National Instruments because the company felt the price was too low. (Am. Compl. ¶¶ 38-39.) National Instruments did not form a board committee to evaluate the offer; there were no draft merger agreements or due diligence meetings between National Instruments and Emerson. (*Id.*) Emerson's second offer in June 2022 was the *same* price per share that National Instruments already had categorically rejected. (*Id.* ¶ 40.) National Instruments rejected it again on August 2, 2022, without draft merger agreements, due diligence, or negotiations. (*Id.* ¶¶ 44, 51.) At that point there was no offer on the table, and Emerson made no further overtures for three months.

Thus, from the beginning of the class period (May 16, 2022) to November 3, 2022, it is plain that there simply was no "offer" that was "reasonably likely" to lead to a merger. And therefore, there was no "material" non-public information that should have been disclosed to shareholders. *See, e.g., Glazier v. Formica Corp.*, 964 F.2d 149, 155 (2d Cir. 1992) ("The mere fact that a company has received an acquisition overture or that some discussion has occurred will not necessarily be material."); *Taylor v. First Union Corp.*, 857 F.2d 240, 244 (4th Cir. 1988) ("Those in business routinely discuss and exchange information on matters which may or may not eventuate in some future agreement."); *Vladimir v. Bioenvision Inc.*, 606 F.Supp.2d 473, 485 (S.D.N.Y. 2009) ("General statements about a company's financial projections or activities that do not address the prospects for a merger do not give rise to a duty to disclose a potential merger.").[4] As the Second Circuit has explained:

> It does not serve the underlying purposes of the securities acts to compel disclosure of merger negotiations in the not unusual circumstances before us. Such negotiations are inherently fluid and the eventual outcome is shrouded in uncertainty. Disclosure may in fact be more misleading than secrecy so far as investment decisions are concerned. … [W]e deal with complex bargaining between two (and often more) parties which may fail as well as succeed on terms which vary greatly from those under consideration at the time of disclosure. We have no doubt that had Pan Am disclosed the existence of negotiations on August 15 and had those negotiations failed, we would have been asked to decide a section 10b-5 action challenging that disclosure.

*Reiss v. Pan Am. World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir. 1983); *cf. Staffin v. Greenberg*, 672 F.2d 1196, 1205-07 (3d Cir. 1982) (observing that disclosure of preliminary merger discussions may harm shareholders and leave those who buy stock based on them holding the bag if the merger does not happen).

---

[4] *See also id.* at 485 ("There is no specific duty to disclose merger negotiations under SEC rules until they become definitive agreements. If there is no other duty to disclose, silence on the issue of merger discussions is not misleading.") (citations omitted); *cf. SEC v. Geon Indus., Inc.*, 531 F.2d 39, 48 (2d Cir. 1976) ("the mortality rate of mergers in such formative stages is doubtless high," explaining considerations weighing against disclosure, such as building hope in stockholders that might prove totally unjustified).

In analyzing materiality, one court has wisely cautioned, "[t]he probability of a transaction occurring must be considered in light of the facts as they existed, not with the hindsight knowledge that the transaction was or was not completed," and thus the court "cannot consider the fact that a sale or buyout occurred as determinative of the materiality of the negotiations and discussions." *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F.Supp. 1119, 1128 (D. Del. 1988). Where, as here, the first two offers were rejected without negotiation and there subsequently was a period of three months without even an offer on the table, no merger was "reasonably likely" to occur, and thus the offers were not material.

On November 3, 2022, Emerson made a third non-public offer, increasing the offer price by five dollars to $53 per share. (Am. Compl. ¶ 55.) But even this offer did not have the indicia of probability that the case law requires to establish sufficient probability to be "material." There were no serious negotiations, no competing draft agreements, and no substantial exchange of information. *See supra* at 5-6. Indeed, the Amended Complaint highlights Emerson's protestations that National Instruments was not taking its third offer seriously, and was not providing Emerson with the due diligence it had requested. (Am. Compl. ¶ 63.) After meeting with Emerson in January 2023, National Instruments publicly announced that it was exploring merger options, including offers from multiple companies. (*Id.* ¶¶ 72-73.) Shortly thereafter, Emerson went public with its three offers (and the class period ended). (*Id.* ¶ 76.) But even the allegations in the Amended Complaint reflect that there were no indicia of probability from the time of Emerson's third non-public offer until it went public with the offer on January 17, 2023 because National Instruments thought the price offered undervalued the company. And apparently National Instruments was right, as the price Emerson ultimately paid for National Instruments was $60 per share—$12 per

13

share more than the first two offers, and $7 per share more than the third offer. (*Id.*; *see also* Declaration of Russell Jackson, Ex. A (Merger Agmt.).)[5]

Courts have long recognized that where there is no agreed price, no negotiations, no due diligence, and no competing draft agreements, a non-public merger offer is not material and there is no obligation to disclose it. *See, e.g., Taylor,* 857 F.2d at 244 (because "the discussions ... were preliminary, contingent, and speculative," there "was no agreement as to the price or structure of the deal," and "neither the factual nor the legal predicates for a merger were in place," they were not material and not required to be disclosed); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 612-13, 615-16 (4th Cir. 1999) (where a corporation publicly announced "[w]e're not a company that's for sale" after rejecting bid as too low, but negotiations resumed two days later, resulting in merger at higher offer, the court upheld dismissal of shareholders' claim that they had "sold their stock at the artificially depressed price;" the company's statement was not a "blanket denial of awareness of any merger negotiations, let alone, any explicit assertion that the company was not presently engaged in such negotiations"). Indeed, "[t]o hold otherwise would result in endless and bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to bury the shareholders in an avalanche of trivial information; the very perils that limit on disclosure imposed by the materiality requirement serves to avoid." *Taylor*, 857 F.2d at 244-45.

---

[5] The court can take judicial notice of the final merger agreement. When deciding a Rule 12(b)(6) motion to dismiss, courts may consider matters of which judicial notice may be taken under Federal Rule of Evidence 201. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). A court may take judicial notice of public disclosure documents required to be filed by the SEC. *Id.* at 774. Here, the final merger agreement was attached as Exhibit 2.1 to Emerson's Current Report on Form 8-K filed with the SEC on April 12, 2023.

14

Because a merger from Emerson's three non-public offers within the class period was not reasonably likely at the time (or ever, as the final merger price demonstrates)—and thus not material—the Amended Complaint should be dismissed in its entirety.

## C. National Instruments's Buyback of Its Stock Was Conducted Pursuant to a Pre-Existing Repurchase Plan, and the Company Had No Obligation To Disclose Non-Material Information About Emerson's Three Offers When It Bought Stock Pursuant to the Plan

As is established above, the existence of non-public offers that were rejected outright was not material non-public information that would give rise to a duty to disclose or to refrain from trading. Moreover, even the Amended Complaint acknowledges that the repurchases of stock were conducted pursuant to a repurchase plan that was adopted in January 2022 to significantly increase the amount of stock to be repurchased. (Am. Compl. ¶ 22.) Notably, that amendment was *four months* before Emerson even made an offer for the company. As National Instruments described it in its Form 8-K (1/27/2022):

> NI also announced that its Board of Directors authorized a new stock repurchase program for up to $250 million of NI's common stock. The new stock repurchase program is effective immediately and is in addition to the previously authorized stock repurchase program. Under the new stock repurchase program, shares may be repurchased from time to time in open market transactions, in privately negotiated transactions or otherwise.

Here, where there was no term sheet, no "deal," and no serious negotiations that would make Emerson's offers "material," the stock buybacks conducted pursuant to a previously-adopted plan cannot be the basis of liability. Importantly, the Amended Complaint does not allege that *any* of the company's repurchases were conducted in violation of the plan. Nor does it plead that any of the Individual Defendants personally traded stock. Plaintiff's sole allegation with respect to repurchases is that National Instruments had material non-public information that gave rise to a duty to refrain from trading its own stock.

15

But that information—about the categorically-rejected merger offers—simply was not material (as shown above) and did not restrict National Instruments from trading its own stock in conformance with its January 2022 plan. Moreover, as even the Amended Complaint itself establishes, National Instruments completed the sale of 284,370 shares in the month of May (Am. Compl. ¶ 37); it did not even receive Emerson's (categorically rejected) offer until May 25 (*id.* ¶¶ 35-36). And the majority of its calendar 2022 repurchases were conducted in August and September 2022, *after* it had summarily rejected Emerson's two lowest offers and during a period when there were no offers on the table and no discussions between the companies. (*Id.* ¶¶ 37, 53.) This simply cannot support a conclusion that those non-public offers were material or gave rise to a duty for National Instruments to abandon its previously-approved stock repurchase plan. The claims based on stock repurchases must be dismissed.

## II. THE AMENDED COMPLAINT FAILS TO PLEAD HOW NATIONAL INSTRUMENTS'S FORWARD-LOOKING PROJECTIONS WERE FALSE OR MISLEADING AND THEREBY CAUSED PLAINTIFF'S DAMAGES

It is hornbook law that "[a] violation of Rule 10b-5 cannot occur unless an alleged material misstatement or omission was false at the time it was made." *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at \*3 (S.D.N.Y. Dec. 13, 2013) ("Without contemporaneous falsity there simply is no fraud."). The Amended Complaint quotes so-called "abruptly improved" projections made by National Instruments regarding anticipated future performance, but does not state for each one what makes it false or misleading, or explain how it caused Plaintiff loss. Instead, the pleading merely implies that the projections were inflated to raise the price of the company's stock.

This is insufficient to meet the rigorous pleading standard under Rule 9(b) and the PSLRA. *See, e.g., Colbert v. Rio Tinto PLC*, 824 F.App'x 5, 10-11 (2d Cir. 2020) (statements about "ramp up" not misleading for omitting "serious issue" and devaluation of business); *Tongue v. Sanofi*,

16

816 F.3d 199, 211-12 (2d Cir. 2016) ("optimism, even exceptional optimism" is not actionable even where a regulator had expressed concerns about drug); *In re Lululemon Sec. Litig.*, 14 F.Supp.3d 553, 572 (S.D.N.Y. 2014) ("'[R]osy predictions,' or statements that are loosely optimistic regarding a company's well-being, have been found to be too vague and general to be actionable."); *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *18 (S.D.N.Y. Mar. 29, 2021) (statements about "progress" were not misleading despite the existence of "significant problems"); *In re GPC Biotech AG Sec. Litig.*, 2009 WL 5125130, at *6 (S.D.N.Y. Dec. 29, 2009) (allegedly misleading statement that clinical trial "was going well" was immaterial puffery); *Shemian v. Research in Motion Ltd.*, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) (statement that "I feel very, very good about the U.S." was "non-actionable corporate puffery").

Expressions of puffery and corporate optimism simply cannot give rise to liability under the securities laws because no reasonable investor would rely on them. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (companies should be able to make projections with appropriate disclaimers without fear of liability should those projections not come to pass); *In re eSpeed Inc. Sec. Litig.*, 457 F.Supp.2d 266, 286 (S.D.N.Y. 2006) (statements that "[w]e're excited about the prospects" and "[e]verybody has been anxiously using it" were "mere puffery upon which no investor could have reasonably relied").

Moreover, the "bespeaks caution" doctrine[6] and the statutory safe harbor for forward-looking statements (15 U.S.C. § 78u-5(c)) also preclude liability here. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F.Supp.3d 65, 84 (S.D.N.Y. 2017) (applying PSLRA safe harbor based on

---

[6] The "bespeaks caution" doctrine is a court-made doctrine that gives certain forward-looking statements immunity from liability if they are accompanied by adequate disclaimers. *See In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, 548 (8th Cir. 2004) (a disclaimer that "bespeaks caution" makes the statement immaterial as a matter of law). *Accord*, *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 767 (11th Cir. 2007); *Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1131-32 (9th Cir. 2004); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1993) (the doctrine is a corollary of the contextual nature of materiality).

17

disclaimer). For each of its financial projections cited in the Amended Complaint, National

Instruments had disclaimers that Plaintiff's pleading conveniently omits. *See* Decl. of Russell

Jackson (attaching documents).[7] The company's third quarter 10-Q contained the following

disclaimer, which exemplifies the other disclaimers quoted in the declaration, which are contained

in the documents attached to the declaration:

> *National Instruments Corporation and its subsidiaries (referred to as the "Company," "we," "us," "our," "National Instruments "or "NI") has made forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), that are subject to risks and uncertainties. Any statements contained herein regarding our future financial performance, operations, plans, investments, expected effects of investments, or other matters (including, without limitation, statements to the effect that we "believe," "expect," "plan," "intend to," "may, "could," "can," "will," "project," "predict," "anticipate," "continue," "strive to," "endeavor to," "seek to," "are committed to, "remaining committed to," "are encouraged by," "remain cautious," "remain optimistic," "estimate", "focus on"; statements of "goals," "commitments," "strategy," "opportunities" or "visions"; or other variations thereof or comparable terminology or the negative thereof) should be considered forward-looking statements. All forward-looking statements are based on current expectations and projections of future events. **We claim the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995 for all forward-looking statements.***
>
> *Although we believe that the expectations reflected in the forward-looking statements are reasonable, forward-looking statements are not guarantees of performance and actual results could differ materially from those projected in the forward-looking statements as a result of a number of important factors, including those set forth under the heading "Risk Factors" below and in "Part 1, Item 1A.Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2021 (the "Form 10-K") filed with the U.S. Securities and Exchange Commission (the "SEC"). Actual results could differ materially from those stated or implied by our forward-looking statements, due to risks and uncertainties associated with our business or under different assumptions or conditions. You should not place undue reliance on any of these forward-looking statements. Any forward-looking statement speaks only as of the date on which it is made, and we*

---

[7] By quoting the projections in the Amended Complaint, Plaintiff has incorporated the documents by reference and the Court may consider them on a motion to dismiss without converting the motion to one for summary judgment. *Lions Gate*, 165 F.Supp.3d at 6.

> *disclaim any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

National Instruments Corporation Form 10-Q at 50 (Q3 2022) (bold emphasis added).

Furthermore, the Amended Complaint is devoid of the required particularity to explain why a guidance "regarding margin expansion of 300 bps in 2023 and an additional 200 bps by 2025" (Am. Compl. ¶ 52) was somehow made false by the omission of Emerson's rejected offers.[8] Financial projections are the prototypical forward-looking statements entitled to safe harbor protection. *See, e.g., WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at *5 (S.D.N.Y. Jan. 2, 2013) ("At its core, a forward-looking statement is one that contains a projection of income or earnings, or one of 'future economic performance.'"). Courts in the Second Circuit consistently recognize that cautionary language of the kind National Instruments used here shields a company from liability for routine projections. *See, e.g., Gissin v. Endres*, 739 F.Supp.2d 488, 511 (S.D.N.Y. 2010).

In addition, to the extent the Amended Complaint seeks to premise liability on accurate statements of historical fact, it falls short because it fails to identify anything omitted that would make those facts misleading. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) (the "disclosure of accurate historical data does not become misleading even if [the company might predict] less favorable results . . . in the future"); *In re Nokia Oyj Sec. Litig.*, 423 F.Supp.2d 364, 395 (S.D.N.Y. 2006) ("Defendants may not be held liable under the securities laws

---

[8] The Amended Complaint also seems conflicted on the Defendants' motive or scienter with respect to these forward-looking statements. On the one hand, Plaintiff seems to suggest that Defendants were "concealing" Emerson's offers to artificially *depress* the price of National Instruments's stock; but on the other hand, Plaintiff seems to suggest that Defendants were trying to artificially *inflate* the stock price with "rosy" projections. Simply put, Plaintiff's allegations about Defendants' forward-looking statements undercut its allegations of scienter for Defendants' non-disclosure of Emerson's prior offers. Moreover, to the extent Plaintiff seeks to imply that Defendants' forward-looking statements were false or misleading, they are undercut by Emerson's bid history. As the Amended Complaint reflects, Emerson expressly credited management's views on the future outlook, first increasing its offer from $48 per share to $53 per share, and then ultimately paying $60 per share—which is an aggregate increase of more than $1 billion in consideration.

for accurate reports of past successes, even if present circumstances are less rosy."); *In re Sanofi Sec. Litig.*, 155 F.Supp.3d 386, 404 (S.D.N.Y. 2016) ("Absent an allegation that [the company] reported income that it did not actually receive or sales growth that did not actually occur . . . 'a violation of federal securities laws cannot be premised on a company's disclosure of accurate historical data.'" (citation omitted)).

### III. THE AMENDED COMPLAINT FAILS TO PLEAD SCIENTER ADEQUATELY, PARTICULARLY WITH RESPECT TO THE INDIVIDUAL DEFENDANTS

To plead a prima facie case of control person liability under Section 20(a), Plaintiff must allege (1) a primary violation by the corporation, (2) control of the corporation by that defendant, and (3) that the defendant was "in some meaningful sense a culpable participant" in the corporation's fraud. *ATSI Comm'cns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Because the Amended Complaint here does not properly plead a primary violation of Section 10(b) and Rule 10b-5 by National Instruments, it fails to plead the first element of a Section 20 claim against the Individual Defendants and must be dismissed. *See Lions Gate*, 165 F.Supp.3d at 25.

The PSLRA requires that a complaint alleging securities fraud and control person liability "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). Under Section 10(b), a plaintiff must prove that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The court, on a motion to dismiss, must consider all "plausible, nonculpable explanations for the defendant's conduct." *Id.* Moreover, the court must look at the facts holistically, and not in isolation. *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 48 (2011). As the *Matrixx* Court instructed, "A complaint adequately pleads scienter under the PSLRA only if a reasonable person would deem the inference of scienter

20

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (internal quotations marks omitted).

Scienter may be inferred from (1) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (2) facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99; *see also City of Roseville*, 814 F.Supp.2d at 418-19. Recklessness in this context is a high standard; the conduct must be "highly unreasonable, representing an extreme departure from the standards of ordinary care." *In re Alstom SA*, 406 F.Supp.2d 433, 490 (S.D.N.Y. 2005) (internal quotation marks omitted). The "[m]ere membership in a committee with oversight responsibilities, however, is not enough to give rise to an inference of recklessness." *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 653 (S.D.N.Y. 2007).

As Judge Koeltl has explained, this scienter requirement requires very specific pleading, and it is rigorously scrutinized where a person is alleged to have *omitted* material information:

> In order to plead scienter adequately, Plaintiff must allege facts supporting a strong inference *with respect to each defendant*. *See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc.*, 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). A complaint sufficiently alleges scienter when a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324; *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

> To raise a strong inference of scienter through motive and opportunity to defraud, a plaintiff must allege that the defendants "'benefitted in some concrete and personal way from the purported fraud.'" [*ECA & Local 134 IBEW Joint Pension Tr. Of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)] (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2001)). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.* Motive is generally shown by alleging that corporate insiders made the misrepresentation in order to sell their own shares at a profit. *Id.*

21

> \* \* \*
>
> Because the plaintiffs allege fraudulent omissions, rather than false statements, it is especially important to rigorously apply the standard for pleading intent. *In re GeoPharma, Inc. Sec. Litig.*, 411 F.Supp.2d 434, 437 (S.D.N.Y. 2006); *see also Bank of Am.*, 980 F.Supp.2d at 586.

*Lions Gate*, 165 F.Supp.3d at 22-23 (mere allegation that defendant omitted material information is not enough to plead scienter in a securities case, and because no clear case law required disclosure of investigation, "plaintiffs cannot show that the defendants acted in reckless disregard of the securities laws").

The Amended Complaint here does not allege that *any* of the Individual Defendants made misrepresentations in order to sell their own shares at a profit. Rather, it pleads primarily "knowledge" of certain facts, the individual's position, and then that "the inference of scienter is enhanced further by the financial motive the Defendants had for National Instruments to repurchase millions of its shares at prices artificially deflated by Defendants' failure to disclose Emerson's offer to acquire those shares at materially higher prices." (¶ 96.) This, of course, is precisely the sort of "desire for the corporation to be profitable" that the *Lions Gate* court held was insufficient to meet the PSLRA pleading standard. *See also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (motives "common to all corporate executives" cannot constitute scienter).

Although the Amended Complaint is lengthy and convoluted, it makes no specific allegations about any of the Individual Defendants or their scienter. One simply cannot meet the pleading standard in the Second Circuit by lumping individual defendants together and pleading scienter generically as to all of them. *See, e.g.*, *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) (where there are multiple defendants, the complaint must plead "a factual basis for scienter for each defendant; guilt by association is impermissible"); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at \*30 (S.D.N.Y. May 10, 2012) (dismissing

22

"lengthy and convoluted" complaint that "fail[ed] to allege facts that adequately address the scienter element with respect to each of the Individual Defendants—an element that cannot be satisfied through group pleading").[9]

Assumptions about what "the individual defendants 'must have been aware' of," even if tied to "a litany of publicly disclosed fines and enforcement actions," cannot establish scienter. *Sfiraila v. Deutsche Bank Aktiengesellschaft*, 729 F.App'x 55, 59 (2d Cir. 2018). Similarly, Plaintiff cannot meet the scienter pleading burden "simply by [pleading Defendants'] high-level positions," as Plaintiff does here. *Lipow v. Net1 UEPS Techs., Inc.*, 131 F.Supp.3d 144, 163 (S.D.N.Y. 2015); *In re China N.E. Petrol. Holdings, Ltd. Sec. Litig.*, 2014 WL 7236914, at *3 (S.D.N.Y. Dec. 11, 2014) (scienter burden not met by merely pleading defendant was "Chairman of the Audit Committee"); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F.Supp.2d 452, 488 (S.D.N.Y. 2006) (scienter burden not met by pleading directors had a "legal duty to monitor regulatory and legal compliance").

Similarly, Plaintiff fails to plead how the conduct of each Individual Defendant actually caused its damages. The loss causation requirement is codified in the PSLRA, requiring Plaintiff to plead and prove that the "act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. §78u-4(b)(4); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2013) (loss causation is the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff"). To the extent Plaintiff bases its claim against the Individual Defendants

---

[9] *See also Doscher v. Sobel & Co.*, 2015 WL 774695, at *3 (S.D.N.Y. Feb. 11, 2015) ("[W]hen fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant."); *Harrison v. Rubenstein*, 2007 WL 582955, at *12 (S.D.N.Y. Feb. 26, 2007) (pleadings where "defendants are clumped together in vague allegations" fail to state a claim); *In re Sec. Capital Assur. Ltd. Sec. Litig.*, 729 F.Supp.2d 569, 593 (S.D.N.Y. 2010) (the elements of securities fraud must be pled against each defendant).

on the company's forward-looking statements alleged in the Amended Complaint, it does not plead how those forward-looking statements were false or misleading and how they caused Plaintiff's loss. To the extent Plaintiff's claim against the Individual Defendants is based on the pure omission of information about the rejected merger offers, there can be no liability for the reasons described above.

## CONCLUSION

For the foregoing reasons, Defendants National Instruments and the Individual Defendants respectfully request that this Court dismiss Plaintiff's Amended Complaint, and for such other relief as the Court deems just and proper.

24

Dated: April 26, 2024

Respectfully submitted,

  /s/ James F. Bennett

James F. Bennett MO 46826
J. Russell Jackson MO 65689
DOWD BENNETT LLP
7676 Forsyth Blvd., Ste. 1900
Saint Louis, MO 63105
(314) 889-7300
jbennett@dowdbennett.com
rjackson@dowdbennett.com

Andrew Ditchfield
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
andrew.ditchfield@davispolk.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 26, 2024, a true and correct copy of the foregoing was filed electronically using the Court's electronic filing system. By operation of that system a notice of electronic filing will be served upon all counsel of record in the case.

/s/ *James F. Bennett*

25