UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                                                   :   Civil Action No. 1:23-cv-10488-DLC
IN RE NATIONAL INSTRUMENTS                         :
CORPORATION SECURITIES LITIGATION :   <u>CLASS ACTION</u>
                                                   :
———————————————————— x

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT ................................................................................1

II.    FACTUAL BACKGROUND.................................................................................6

III.   ARGUMENT........................................................................................................8

    A.    The Amended Complaint Pleads Actionable Omissions and Misrepresentations ...........................................................................................8

        1.    *Macquarie* Supports Lead Plaintiff's Claims .............................................8

        2.    Emerson's Offer Was Material Information that Defendants Had a Duty to Disclose.................................................................................11

            a.    Defendants' Duty to Disclose .........................................................12

            b.    Emerson's Material Offer ...............................................................15

        3.    Defendants' Repurchase Plan Argument Is Baseless ................................20

    B.    The Amended Complaint Does Not Allege that National Instruments' Guidance Is Actionable.................................................................................21

    C.    The Amended Complaint Alleges Scienter...........................................................21

    D.    Defendants' Failure to Respond to Allegations Constitutes Waiver .....................24

IV.    CONCLUSION....................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*,
2020 WL 3318029
(S.D.N.Y. June 18, 2020)......................................................................................4, 20

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) .......................................................................................15

*Basic v. Levinson*,
485 U.S. 978 (1988)............................................................................................ *passim*

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2011).......................................................................................19

*Chiarella v. U.S.*,
445 U.S. 222 (1980)...................................................................................................10

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020).......................................................................24

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018).......................................................................25

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015).......................................................................................24

*Green v. Hamilton Int'l Corp.*,
437 F. Supp. 723 (S.D.N.Y. 1977).............................................................................12

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021)........................................................................23

*In re Columbia Sec. Litig.*,
155 F.R.D. 466 (S.D.N.Y. 1994) ...............................................................................17

*In re Gen. Motors Class E Stock Buyout Sec. Litig.*,
694 F. Supp. 1119 (D. Del. 1988)..............................................................................19

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009)........................................................................23

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985
(S.D.N.Y. Mar. 28, 2018) ..........................................................................................14

**Page**

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014)...............................................................................25

*In re Perrigo Co. PLC Sec. Litig.*,
435 F. Supp. 3d 571 (S.D.N.Y. 2020)..............................................................................23

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
2000 WL 1234601
(S.D.N.Y. Aug. 31, 2000) ...........................................................................13, 14, 22, 23

*In re Take-Two Interactive Securities Litigation*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008)..............................................................................10

*In re WorldCom, Inc. Sec. Litig.*,
352 F. Supp. 2d 472 (S.D.N.Y. 2005)..............................................................................24

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
601 U.S. 257 (2024)............................................................................................... *passim*

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018), *aff'd in part, vacated in part, remanded
sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020).......................20

*Penn. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
939 F. Supp. 2d 445 (S.D.N.Y. 2013)..............................................................................23

*Phillips v. LCI International, Inc.*,
190 F.3d 609 (4th Cir. 1999) ...........................................................................................20

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004).............................................................................................15

*S.E.C. v. Aly*,
2018 WL 1581986
(S.D.N.Y. Mar. 27, 2018) .............................................................................3, 16, 17, 19

*S.E.C. v. Geon Industries, Inc.*,
531 F.2d 39 (2d Cir. 1976)..........................................................................................19, 20

*S.E.C. v. Mayhew*,
121 F.3d 44 (2d Cir. 1997)...............................................................................................16

**Page**

*S.E.C. v. Sekhri*,
2002 WL 31100823
(S.D.N.Y. July 22, 2002) ...................................................................................................16

*S.E.C. v. Shapiro*,
494 F.2d 1301 (2d Cir. 1974)............................................................................................19

*S.E.C. v. Suman*,
684 F. Supp. 2d 378 (S.D.N.Y. 2010)...........................................................................3, 16

*S.E.C. v. Warde*,
151 F.3d 42 (2d Cir. 1998)............................................................................................3, 16

*S.E.C. v. Wyly*,
788 F. Supp. 2d 92 (S.D.N.Y. 2011)..............................................................................4, 19

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
2024 WL 1898512
(S.D.N.Y. May 1, 2024).................................................................................................16, 25

*Shaw v. Digit. Equip. Corp.*,
82 F. 3d 1194 (1st Cir. 1996)............................................................................................24

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
2024 WL 2124504
(S.D.N.Y. May 10, 2024)......................................................................................................9

*Steginsky v. Xcelera Inc.*,
741 F.3d 365 (2d Cir 2014)..........................................................................................12, 24

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)............................................................................................3, 17

*Taylor v. First Union Corp. of South Carolina*,
857 F.2d 240 (4th Cir. 1988) ............................................................................................20

*U.S. v. O'Hagan*,
521 U.S. 642 (1997)....................................................................................................10, 11

*U.S. v. Rajaratnam*,
802 F. Supp. 2d 491 (S.D.N.Y. 2011).................................................................................12

**Page**

*Vladimir v. Bioenvision Inc.*,
  606 F. Supp. 2d 473 (S.D.N.Y. 2009) ..................................................................................14

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78j ........................................................................................................................................10

17 C.F.R.
  §240.10b–5 ...................................................................................................................... *passim*
  §240.10b–5(a) .......................................................................................................................10
  §240.10b-5(b) .................................................................................................................. *passim*
  §240.10b-5(c) .................................................................................................................. *passim*
  §240.10b5-1 ...........................................................................................................................10
  §240.10b-18 ...........................................................................................................................21

## I.     PRELIMINARY STATEMENT

This action arises from Defendants' omissions and misrepresentations concerning Emerson's high-premium offer to acquire National Instruments' outstanding shares while National Instruments was actively buying its own shares from the investing public.  As alleged in the Complaint, in May 2022 Emerson approached National Instruments with an offer to acquire the Company's shares for a significant cash premium well above market prices.[1]  While in possession of this material nonpublic information concerning Emerson's offer, and without disclosure of any information concerning that offer for approximately 8 months, beginning in May 2022 National Instruments purchased over 2 million of its own shares on the open market at prices far below Emerson's offer.  This conduct was in clear violation of Defendants' well-established duty under Rules 10b-5 (a) and (c) to disclose this material information or abstain from trading in the Company's securities.

As also alleged in the Complaint, Defendants made numerous affirmative statements that were materially misleading because they failed to disclose any information concerning Emerson's offer.  The Complaint alleges that Defendants made multiple specific disclosures concerning National Instruments' purchases of millions of shares of Company stock during the Class Period (including the amounts and average prices), which were materially misleading because they failed to disclose Emerson's offer and thus concealed that the purchases were at prices materially below that offer.  The Complaint alleges further that National Instruments affirmatively issued risk disclosures warning of the possibility that the Company's charter documents and Delaware law

---

[1]     The "Complaint" and "¶" refer to the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 29).  All capitalized terms not defined herein have the same meanings as in the Complaint.  All emphasis is added and internal quotations are omitted unless otherwise noted.  "Br." refers to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Putative Class Action Complaint (ECF No. 34).

might "make it more difficult for a third party to acquire us," which was materially misleading because it failed to disclose that a third party, Emerson, was actively attempting at that time to acquire the Company for a significant premium (and that Defendants were actively attempting to obstruct that offer). These material misrepresentations violated Rule 10b-5(b)'s prohibition against "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Rule 10b-5(b); *see also Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 261-64 (2024).

Defendants raise meritless arguments while evading and failing to address or even acknowledge the principal allegations of the Complaint. Defendants never address the Complaint's allegations concerning National Instruments' failure to "disclose or abstain" in violation Rules 10b5 (a) and (c), instead insisting incorrectly that "[h]ere, there are no allegations of insider trading." Br. at 8; *cf.* ¶83. Defendants likewise never address the Complaint's numerous specific allegations concerning affirmative representations that were rendered materially misleading because they omitted any disclosure regarding Emerson's high-premium offer. *See, e.g.*, ¶¶84-90. Defendants therefore waive any response to these allegations, and instead attempt to distract with a series of inapposite and incorrect contentions.

*First*, Defendants attempt to argue that the Supreme Court's recent *Macquarie* decision somehow bars liability here. That is wrong. *Macquarie* strongly supports the Complaint's allegations concerning Defendants' numerous affirmative materially misleading statements. *See*, *Macquarie*, 601 U.S. at 264. And, *Macquarie* says nothing about Defendants' liability for failing to "disclose or abstain" under Rules 10b-5 (a) or (c). Indeed, *Macquarie* expressly excludes Rules 10b-5 (a) and (c) claims from its holding (and its reasoning, which is based on the specific

language of Rule 10b-5(b), therefore does not apply to such claims in all events).  *See, Macquarie*, 601 U.S. at 266 n.2.

*Second*, Defendants contend that information concerning Emerson's high-premium offer was not material information subject to a disclosure duty.  This argument fails.  Defendants' own citations show that a duty to disclose arises "when there is a corporate insider trad[ing] on confidential information . . . or a corporate statement that would otherwise be inaccurate, incomplete, or misleading."  Br. at 8 (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)).  Moreover, "[s]pecific information pertaining to a proposed corporate acquisition, tender offer, or merger is quintessentially material," *S.E.C. v. Aly*, 2018 WL 1581986, at *20 (S.D.N.Y. Mar. 27, 2018), and any reasonable investor would have regarded the fact that Emerson was offering to acquire the Company for a sizeable premium as critical to the "total mix" of information, including because "[a] reasonable investor would have wanted information about the merger, if only to take advantage of the likelihood that the news would increase the share price as, in fact, it did." *S.E.C. v. Suman*, 684 F. Supp. 2d 378, 388 (S.D.N.Y. 2010).  The significant and immediate increase in National Instruments' stock price when Emerson announced its offer at the end of the Class Period, *see* ¶81, further demonstrates that materiality is "not open to doubt . . . as confirmed by the fact that the stock price jumped when this information was made public." *S.E.C. v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998).

Defendants urge the Court to apply *Basic*'s "magnitude" and "probability" test.  As a threshold matter, it is not clear that *Basic*'s test for "contingent or speculative information or events" even applies to the non-speculative fact that Emerson was offering a large premium for the Company's shares. *Basic v. Levinson*, 485 U.S. 978, 984 (1988).  But even under that test, Emerson's high-premium offer was unquestionably material.  Defendants ignore (but cannot deny)

the magnitude of the premium Emerson was offering and disregard the significant indicia of transactional certainty detailed in the Complaint – including that Emerson was offering a cash premium, had the funds, wanted no financing contingency, and indicated that acquiring National Instruments was its "highest strategic priority," that it was "prepared to move very quickly," (¶3) and that it was willing to take its offer directly to stockholders.  Numerous cases have held that omitted information was material where the potential transactions were far less certain than Emerson's offer here.  *See, e.g.*, *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 122-24 (S.D.N.Y. 2011) (information concerning possibility of merger was material despite no specific transaction, counterparty, or consideration).  Regardless, materiality is an improper basis for dismissal unless the omitted information is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at \*3 (S.D.N.Y. June 18, 2020).  Defendants' arguments come nowhere close to this standard.

*Third*, Defendants point out that – as is alleged in the Complaint and is evident from the Company's SEC filings – the stock repurchases at issue in this case were conducted pursuant to a stock repurchase program approved in January 2022 that authorized the Company to repurchase up to $250 million worth of its common stock.  ¶22 (defining the "2022 Program"); Br. at 15.  Defendants do not, however, explain what this fact has to do with their motion to dismiss.  Nor can they, as there is no allegation (or other reason to believe) that the 2022 Program was a non-discretionary plan trading fixed quantities of stock on pre-scheduled dates pursuant to Rule 10b5-1 or other any other provision of law.  To the extent Defendants are attempting to imply that the repurchases carried out pursuant the 2022 Program were protected by some unspecified safe harbor (under Rule 10b5-1 or otherwise) that suggestion is misplaced.

- 4 -

*Fourth*, Defendants argue that the Complaint does not explain how certain projections discussed in the Complaint are actionable. But the Complaint does not allege that any such projections are actionable in the first place. The Complaint contains a helpful section titled "Material Omissions and Misrepresentations" in which Lead Plaintiff lists the material omissions and misrepresentations alleged in the Complaint. The projections that Defendants discuss at great length in their papers are not pleaded there. In contrast, Defendants ignore numerous material misrepresentations that are particularized in this section of the Complaint.

*Fifth*, Defendants advance a half-hearted scienter argument, but Defendants do not – and cannot – raise any legitimate argument that the National Instruments corporation itself lacked scienter, and the Complaint is filled with specific allegations concerning the Individual Defendants' personal involvement in the discussions, correspondence, board meetings, and public disclosures concerning Emerson's offer and National Instruments' response.

*Finally*, Defendants' failure to respond to obviously inculpatory allegations in the Complaint waives any argument concerning those allegations for purposes of this motion, creating an additional independent basis for denying it. Defendants do not address the allegations of the Complaint concerning the Company's failure to disclose or abstain from trading in its own securities. Defendants likewise do not address the numerous materially misleading statements specifically pleaded in the Complaint. Defendants similarly fail to address National Instruments' scienter. Defendants have therefore waived any arguments concerning these allegations. Thus, in addition to denying Defendants' motion to dismiss because their arguments lack merit, the Court may also deny Defendants' motion for the independent reason that Defendants have waived any challenge to allegations that are sufficient on their own to plead Defendants' liability here.

For these reasons and those detailed below, the Court should deny Defendants' motion.

## II.    FACTUAL BACKGROUND

National Instruments was a publicly-traded producer of automated test equipment and virtual instrumentation software. ¶20.  Emerson completed its acquisition of National Instruments in October 2023.  *Id.*

On May 16, 2022 (the start of the Class Period), Emerson's CEO Karsanbhai contacted CEO Starkloff and Board Chairman McGrath concerning "a compelling all-cash offer for [National Instruments] shareholders."  ¶31.  On May 25, Emerson emailed a formal acquisition letter to Starkloff, (the "May 25 Letter"), offering to purchase all of National Instruments' outstanding common stock for $48 per share – a significant premium to the prevailing market price of the Company's stock – in an all-cash transaction with no financing-contingency and no anticipated regulatory hurdles.  ¶¶33-36.  The May 25 Letter expressed Emerson's enthusiasm for the acquisition, its determination to complete it, including a plan to announce in as little as one month, and a *preference* to negotiate privately to achieve the transaction.  *Id.*

National Instruments purchased its own stock while in possession of and without disclosing any information concerning Emerson's high-premium offer during May 2022.  ¶30.  In total, during May 2022, National Instruments purchased 284,370 of its shares at an average price of $35.17 per share, well below Emerson's premium offer.  ¶37.

Emerson sent a second letter reiterating its $48 per-share offer to Starkloff and McGrath on June 22, again expressing Emerson's determination to complete the acquisition, and even expressing its willingness to raise its offer.  ¶¶39-42.  Emerson repeated its *preference* to negotiate privately.  *See id.*

On July 29, 2022, National Instruments issued the 2Q 10-Q disclosing the May repurchases but made no disclosure of any information concerning Emerson's materially higher offer.  ¶85. Defendants made similar misleading disclosures on a conference call on July 28, 2022.  ¶86.

National Instruments continued to purchase its own stock while in possession of and without disclosing any information concerning Emerson's high-premium offer during August and September 2022, representing the largest stock repurchases in any comparable period in the Company's history (eclipsing the number of repurchases the Company made in the preceding two years). ¶53. In total, during August and September 2022, National instruments purchased 2,033,135 shares of common stock at an average price of $40.25 per share, well below Emerson's premium offer. *Id.*

On October 28, 2022, National Instruments issued the 3Q 10-Q disclosing the August and September repurchases but made no disclosure of any information concerning Emerson's materially higher offer. ¶85. Defendants made similar misleading disclosures on a conference call on October 27, 2022. ¶86.

The 2Q 10-Q and the 3Q 10-Q each also contained materially misleading representations concerning the Company's acquisition prospects. ¶¶87-90. As the investing public would learn at the end of the Class Period, these representations were materially misleading not only because they failed to disclose Emerson's offer, but also because they concealed Defendants' efforts to impede and obstruct Emerson's acquisition. *Id.*

On November 3, Emerson emailed a third letter to Starkloff and McGrath, increasing Emerson's offer price from $48 to $53 per share. ¶¶55-56. Emerson then explicitly threatened to take its offer public, advising that it had accumulated 2.3 million shares on the open market and was prepared to run a new slate of directors to replace the Board. ¶¶56-57.

On January 13, 2023, Defendants issued a press release stating that the Company was beginning a strategic review to explore a sale – while continuing to remain silent about Emerson. ¶¶71-73. On this news, National Instruments stock skyrocketed to as high as $47.95 per share on

- 7 -

heavy trading volume. ¶75. Days later, on January 17, 2023 (the end of Class Period), Emerson finally announced its offer publicly with a press release, conference call, and detailed presentation revealing for the first time Emerson's vigorous efforts to acquire the Company since May 2022, and the Defendants' delay tactics in response. ¶¶76-80. On this news, National Instruments' stock surged to as high as $54.69, on extraordinarily high trading volume. ¶81.

## III.    ARGUMENT

### A.    The Amended Complaint Pleads Actionable Omissions and Misrepresentations

#### 1.    *Macquarie* Supports Lead Plaintiff's Claims

The Complaint asserts claims arising from (i) Defendants' misrepresentations and omissions concerning Emerson's high-premium offer (*i.e.*, claims based on affirmative statements under Rule 10b-5(b)), as well as from (ii) the Company's failure to disclose Emerson's offer while acquiring shares at artificially deflated prices (*i.e.*, claims based on insider trading under Rules 10b-5 (a) and (c)). The Supreme Court's recent *Macquarie* decision strongly supports the former and is irrelevant to the latter. Defendants' brief ignores both theories of liability while mischaracterizing *Macquarie* and the allegations of the Complaint.

The question presented in *Macquarie* was whether so-called "pure omissions" – *i.e.*, freestanding omissions independent of any alleged affirmative statements – are actionable under Rule 10b-5(b). *See Macquarie*, 601 U.S. at 259-63.[2] Writing for a unanimous Supreme Court, Justice Sotomayor explained that "[p]ure omissions are not actionable under Rule 10b–5(b)," while reaffirming long-standing precedent that "Rule 10b-5(b) . . . prohibits omitting a material fact necessary to make the statements made . . . not misleading." *See id*. at 259-66.

---

[2]    Specifically, as Justice Sotomayor wrote, "[t]he question in this case is whether the failure to disclose information required by Item 303 can support a private action under Rule 10b–5(b), even if the failure does not render any 'statements made' misleading." *Macquarie*, 601 U.S. at 259-60.

The Complaint pleads numerous affirmative "statements made" by Defendants that were misleading under Rule 10b-5(b) due to the omission of material information concerning Emerson's offer. ¶¶82-90. As alleged in the Complaint, Defendants made numerous specific disclosures concerning the prices and amounts of the Company's millions of stock repurchases during the Class Period without disclosing any information concerning Emerson's offer to buy those shares at materially higher prices, which concealed and misrepresented the reality that National Instruments' purchases were at materially lower prices. *See* ¶¶84-87. As also alleged in the Complaint, Defendants issued materially misleading risk disclosure warnings in general terms that the Company's charter documents and Delaware law could increase the difficulty of acquisitions by third parties, while failing to disclose not only that Emerson was actively attempting to acquire the Company at a high premium, but also that Defendants themselves were actively impeding those attempts. *See* ¶¶89-90. Defendants do not address these affirmative material misrepresentations and omissions alleged in the Complaint, which are readily actionable under *Macquarie* and Rule 10b-5(b). *See, e.g.*, *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2024 WL 2124504, at *1 (S.D.N.Y. May 10, 2024) (applying *Macquarie*'s "exceedingly narrow" holding to sustain claims based on affirmative statements that were misleading by omission).

The Complaint also pleads that Defendants failed to disclose material information concerning Emerson's offer even though the Company purchased millions of its own shares on the open market while in possession of that information, a clear violation of the duty to disclose material information or abstain from trading (*i.e.*, insider trading). *See* ¶¶89-90. Although Defendants ignore these allegations too – even declaring that there are "no allegations of insider trading" in this case (Br. at 8) – it is well-established that claims concerning such insider trading arise under Rules 10b-5 (a) and (c) (not under Rule 10b-5(b) to which *Macquarie* applies). *See,*

*e.g.*, *U.S. v. O'Hagan*, 521 U.S. 642, 651-52 (1997) (applying Rules 10b-5 (a) and (c) and holding that trading based on material nonpublic information "qualifies as a 'deceptive device' under § 10(b)") (citing *Chiarella v. U.S.*, 445 U.S. 222, 228 (1980)).[3]   Accordingly, *Macquarie*'s conclusion that "[p]ure omissions are not actionable under Rule 10b–5(b)" is inapplicable to the insider trading claims under Rule 10b-5 (a) and (c) at issue here. *Macquarie*, 601 U.S. at 259-61.

The Court should reject Defendants' attempt to mischaracterize *Macquarie*. Defendants cannot deny that *Macquarie*'s holding concerning "pure omissions" applies only to claims under Rule 10b-5(b). *See, e.g.*, Br. at 9 (quoting *Macquarie*).  Nor can Defendants deny that, as their brief fails to point out, *Macquarie* expressly excluded Rules 10b-5 (a) and (c) from its holding. *Macquarie*, 601 U.S. at 266, n.2 ("The Court does not opine on issues that are either tangential to the question presented or were not passed upon below, including . . . whether Rules 10b–5(a) and 10b–5(c) support liability for pure omissions").  Moreover, the Supreme Court's reasoning in *Macquarie* is based on the specific language of Rule 10b-5(b), which expressly prohibits untrue statements and affirmative misstatements that are misleading by omission, but does not mention omissions in the absence of any affirmative statements.  *Id*. at 263-65.[4]  In contrast, Rules 10b-5 (a) and (c) have no comparable language, and insider trading claims under these provisions – such as those at issue here – are based principally on conduct (such as the "deceptive device" of trading

---

[3]   *See also In re Take-Two Interactive Securities Litigation*, 551 F. Supp. 2d 247, 309–10 (S.D.N.Y. 2008) ("Under the traditional or classical theory of insider trading liability, a corporate insider violates Section 10(b) and Rule 10b–5 if he trades in the securities of his corporation on the basis of material, nonpublic information.  Such trading violates Rule 10b–5(a) because it qualifies as a deceptive device."); 17 C.F.R. §240.10b5-1 ("The 'manipulative or deceptive device[s] or contrivance[s]' prohibited by Section 10(b) of the Act (15 U.S.C. 78j) and § 240.10b–5 (Rule 10b–5) thereunder include, among other things, the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer[.]").

[4]   For example, the court contrasted the language of Section 10(b) Rule 10b-5 to that of Section 11(a) of the Securities Act of 1933, which "in addition to proscribing lies and half-truths . . . also creates liability for failure to speak on a subject at all." *Macquarie*, 601 U.S. at 264.

while in possession of material nonpublic information) and therefore do not arise from "pure omissions" at all.  *O'Hagan*, 521 U.S. at 651-52.

The Court should likewise reject Defendants' misconstruction of the Complaint.  The Complaint plainly asserts claims under Rules 10b-5(a) and (c), as well as under Rule 10b-5(b), ¶¶114-116, and pleads that National Instruments engaged in insider trading,[5] and that Defendants made statements that were materially misleading by omission.  ¶¶82-90.  Despite this reality, Defendants' brief pretends that the Complaint only asserts claims under Rule 10b-5(b) (*e.g.*, Br. at 1, 10), never addresses the actual statements alleged as misleading in the Complaint, and never even mentions Rules 10b-5 (a) or (c) (while making the obviously untrue assertion that there are "no allegations of insider trading" (Br. at 8)).  The Court should reject these arguments and sustain the Complaint's well-pled claims.

### 2.    Emerson's Offer Was Material Information that Defendants Had a Duty to Disclose

Emerson's high-premium offer was material information that Defendants had a duty to disclose.  Information concerning Emerson's offer was highly material to the investing public because its disclosure would naturally increase the stock price – as in fact happened here when investors learned of Emerson's offer – and any reasonable investor would therefore view the information as significantly altering the total mix of information concerning National Instruments.  Defendants had a duty to disclose this material nonpublic information because National Instruments purchased millions of shares of its own stock during the Class Period while in possession of this information.  Defendants also had a duty to disclose this material information because doing so was necessary to make Defendants' other statements not misleading.  Although

---

[5]    *See, e.g.*, ¶28 (National Instruments "concealed and materially misled investors about Emerson's high-premium offer while repurchasing millions of its own shares based on undisclosed material inside information").

Defendants fail to distinguish between: (a) their *duty to disclose*; and (b) the element of *materiality*, Defendants' argument is wrong as to both.  Lead Plaintiff addresses each in turn below.

a.        **Defendants' Duty to Disclose**

Defendants had a duty to disclose Emerson's offer to acquire National Instruments for a significant premium because National Instruments traded in the Company's securities while in possession of that information – a classic example of insider trading.  As the Second Circuit has explained:

> Under the "traditional" or "classical theory" of insider trading liability, §10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information.  Thus, a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him.   [I]f disclosure is impracticable or prohibited by business considerations or by law, the duty is to abstain from trading.

*Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir 2014).  A corporation is subject to the same duty as its insiders to refrain from insider trading.  *See U.S. v. Rajaratnam*, 802 F. Supp. 2d 491, 517 (S.D.N.Y. 2011) ("A corporation has the same duty . . . to disclose material non-public information about the company before trading in its own shares."); *Green v. Hamilton Int'l Corp.*, 437 F. Supp. 723, 728 (S.D.N.Y. 1977) ("[T]here can be no doubt that the prohibition against 'insider' trading extends to a corporation.").

As alleged in the Complaint, National Instruments began purchasing its own shares in May 2022, after Emerson approached National Instruments with an offer to acquire its outstanding shares for a material premium.  ¶¶76, 82.  National Instruments was thus in possession of material nonpublic information concerning Emerson's offer to acquire the Company's outstanding shares (for prices substantially higher than market prices) when National Instruments began purchasing its shares at the outset of the Class Period.  *Id.*  National Instruments proceeded to purchase over

- 12 -

two million of its own shares (at prices substantially below Emerson's offer) before Emerson's offer was disclosed to the investing public. *Id.* These facts constitute insider trading.

Defendants also had a duty to disclose Emerson's material offer because disclosure was "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). In articulating this rule for a unanimous Supreme Court in *Macquarie*, Justice Sotomayor analogized the "half-truths" that Rule 10b-5(b) prohibits to a child "telling [his parents that] he had dessert" when, in reality, "he ate a whole cake." *Macquarie*, 601 U.S. at 264. As Justice Sotomayor summarized: "Put differently, [Rule 10b-5(b)] requires disclosure of information necessary to ensure that statements already made are clear and complete (*i.e.*, that the dessert was, in fact, a whole cake)." *Id*.

As alleged in the Complaint, Defendants' disclosed selected information concerning National Instruments' stock repurchases – including the number of shares purchased and the average prices of those transactions – without disclosing that, in fact, Emerson was offering to buy those shares at far higher prices, which concealed that National Instruments was, in fact, buying those shares at a significant discount (while in possession of material nonpublic information). ¶¶84-86. As the Complaint details, in July and October 2022, National Instruments disclosed that it had acquired its own shares during May 2022 for an average price of $35.17 per share, and in August and September 2022 for an average price of $40.25, without disclosing that, in fact, at that time National Instruments was offering to pay $48 per share – a significant omission that rendered the statements materially incomplete and misleading, akin to disclosing that Defendants had dessert without mentioning "that the dessert was, in fact, a whole cake." *Macquarie*, 601 U.S. at 264; *see also In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *4 (S.D.N.Y.

Aug. 31, 2000) ("[W]hen a corporation does make a disclosure-whether it be voluntary or required–there is a duty to make it complete and accurate.").

As also alleged in the Complaint, National Instruments issued misleading risk disclosures specifically addressing possible mergers and acquisitions, without disclosing the true then-existing facts concerning Emerson's acquisition offer. ¶87.  In particular, the two quarterly reports National Instruments issued during the Class Period warned that the Company's certificate of incorporation, bylaws, and Delaware law in general "May Delay or Prevent an Acquisition of Us" and "contain provisions that could make it more difficult for a third party to acquire us," without disclosing that, in fact, at that time Emerson was offering to acquire the Company for a significant premium.  ¶89. "If a public company elects to speak publicly about mergers or acquisitions . . . it must speak truthfully and completely."  *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009) (Stein, J.).  Having raised the subject of third-party acquisitions of National Instruments, Defendants had a duty to "ensure that statements already made are clear and complete." *Macquarie*, 601 U.S. at 264.

Thus, it was misleading for Defendants to issue risk disclosures stating that a third party "may" or "could" have difficulty acquiring National Instruments, without disclosing the fact that, at that time, a specific third party – Emerson – was in reality attempting to acquire the Company, or that Defendants were putting roadblocks in Emerson's path.  "[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."  *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018) (holding risk disclosure concerning possible regulatory action was misleading where regulatory action had already occurred, because "[a] reasonable investor could have concluded from Mylan's statement that although the government

- 14 -

'may' disagree with Mylan, and 'could' open an investigation, such unfavorable events had not yet occurred."); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

### b.    Emerson's Material Offer

Emerson's offer to acquire the outstanding shares of National Instruments for a significant premium was material information because there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231-32; *see also Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021) (same).

At all relevant times during the Class Period, Emerson was offering to acquire National Instruments' outstanding shares for a price that was well above the trading price of those shares. For example: National Instruments stock closed at $33.50 per share on May 16, 2022 (the start of the Class Period), when Emerson first contacted Defendants about its $48 per share offer; National Instruments stock closed at $31.43 per share when Emerson reiterated (as it did several times) its $48 per share offer on June 22, 2022; and National Instruments' stock closed at $36.51 per share when Emerson raised its offer to $53 per share on November 3, 2022. ¶¶31 n.2, 40 n.5, 55 n.11.[6] Moreover, Emerson offered substantial transactional certainty, including because it had the necessary funds, sought no financing contingency, saw no legal or regulatory impediments, and from the outset made clear that acquiring National Instruments was Emerson's "highest strategic priority," that it was "prepared to move very quickly," and that it was willing to take its offer directly to the Company's stockholders if necessary. ¶¶36, 40, 42, 57, 70.

---

[6]    The Complaint contains extensive quotation from Emerson's letters demonstrating the significant premium Emerson was offering. *See, e.g.*, ¶¶36, 42, 57, 70.

This was material information. Any reasonable investor would have placed great significance on the facts concerning Emerson's high-premium all-cash offer because that information was very likely to cause the stock price to increase substantially, which is exactly what happened at the end of the Class Period when Emerson announced its offer directly to stockholders (as it had said it was prepared to do). ¶¶70, 76-81.[7] These facts are conclusive for pleading materiality. *See Warde*, 151 F.3d at 47 (information concerning acquisition offer material because it "had a very high likelihood of affecting the price of [the company's] stock, as confirmed by the fact that the stock price jumped when this information was made public"); *Suman*, 684 F. Supp. 2d at 388 (information concerning acquisition offer material "[u]nder any definition" because "[a] reasonable investor would have wanted information about the merger, if only to take advantage of the likelihood that the news would increase the share price as, in fact, it did"); *S.E.C. v. Sekhri*, 2002 WL 31100823, at *14 (S.D.N.Y. July 22, 2002) ("Moreover, the materiality of the information is confirmed by the substantial increase in the stock price upon the public announcement of the merger."); *see also S.E.C. v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) ("Material facts include those which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities. They include any fact which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities.") (emphasis in original).

Indeed, "[f]ew matters are more material than a corporation's involvement in a possible merger or acquisition." *Sekhri*, 2002 WL 31100823, at *14; *Aly*, 2018 WL 1581986, at *20 ("specific information pertaining to a proposed corporate acquisition, tender offer, or merger is

---

[7]    Because of this stock price spike, loss causation is readily satisfied. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *12 (S.D.N.Y. May 1, 2024) ("Plaintiffs' burden [on loss causation] is not a heavy one.").

quintessentially material"); *see also Basic*, 485 U.S. at 238 ("Since a merger in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information, as regards a merger of this sort, can become material at an earlier stage than would be the case as regards lesser transactions—and this even though the mortality rate of mergers in such formative stages is doubtless high.").

The Court should reject Defendants' meritless contention that Emerson's offer was not material because, according to Defendants, it was not "reasonably likely" to lead to a transaction.[8] Br. at 10-15. Not only does this argument ignore the "anticipated magnitude" of Emerson's high-premium offer, *Basic*, 485 U.S. at 238, but it also disregards the significant indicia of transactional certainty alleged in the Complaint.[9] For example, Defendants' argument ignores allegations that: (i) Emerson was firmly committed to concluding an acquisition of National Instruments (¶¶36, 42, 57, 70) ("very excited about the combination of [the] two firms"; "very motivated to conclude a transaction"; "highest strategic priority"; "[its board] reviewed and support[ed] the proposed

---

[8] The Court should also reject Defendants' invented "reasonably likely" materiality standard. Defendants' brief invokes this supposed standard no less than a half-dozen times, and it is the unmistakable lynchpin of their materiality argument. Br. at 1-2, 11-15. But Defendants provide no case law to support this supposed standard, and a close review of their brief reveals that the "reasonably likely" language is drawn from an SEC "interpretive release regarding the disclosure required by Item 303 of Regulation S-K, Management's Discussion and Analysis of Financial Condition and Results of Operations ('MD&A')" SEC, Exchange Act Release No. 6835. (the "Item 303 Guidance"). In a section titled "Prospective Information" concerning "specific provisions in Item 303 requir[ing] disclosure of forward-looking information," the SEC's Item 303 Guidance states (in full): "A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation." *Id*. Defendants do not explain the relevance of this release to the materiality of Emerson's high-premium offer. Indeed, Defendants even cite Second Circuit case law (Br. at 8, 10) holding that whether Item 303 requires disclosure of information is a distinct question from whether information is material under the federal securities laws. *See Stratte-McClure*, 776 F.3d at 102.

[9] It is not clear that *Basic*'s test for "contingent or speculative information or events" applies to the allegations in this case, which concern the non-speculative fact that Emerson was offering to acquire National Instruments' outstanding stock for a significant premium – *i.e.*, then-existing information that was highly significant to any reasonable investor regardless of any future contingency. *See, e.g.*, *Stratte-McClure*, 776 F.3d at 102-03 (emphasis in original) ("In *Basic* . . . the Supreme Court concluded that, in securities fraud cases under Section 10(b) and Rule 10b–5, the materiality of an allegedly required forward-looking disclosure is determined by 'a *balancing* of both the *indicated* probability that the event will occur and the *anticipated magnitude* of the event in light of the totality of the company activity."). Significantly, "the mere possibility of a merger may have significance for investors; whether or not a merger eventually takes place." *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483-84 (S.D.N.Y. 1994).

transaction"; "from [its] first outreach" was "committed to improving [its] offer"; "accumulated 2.3 million NI shares in the open market and intend[ed] to file for HSR approval to facilitate additional purchases"; "prepared to run a slate of directors specifically targeting the two members up for re-election"); (ii) Emerson was eager to proceed quickly (*id*.) ("prepared to engage immediately and has organized the resources to move towards a transaction expeditiously"; "prepared to proceed immediately to work with NI and its advisors to complete due diligence and to negotiate a mutually agreeable merger agreement . . . in parallel"; "prepared to move very quickly to complete [its] due diligence and sign definitive agreements"; "would work towards signing and announcing a definitive agreement within four weeks"); (iii) Emerson had the funds for the transaction and needed no financing contingency (¶¶36, 42, 57, 70); (iv) Emerson expected no regulatory or other legal hurdles (¶¶36, 42, 57); and (v) Emerson was prepared to take its high-premium all-cash offer directly to National Instruments stockholders (¶¶36, 42, 57, 70) ("we prefer . . . to reach an agreement privately;" "from our first outreach, we have preferred to engage with you privately;" "provide NI's shareholders with an opportunity to express their views to [NI's] Board on [your] refusal to engage;" "another refusal to engage will force us to ensure your shareholders can access our [proposal] directly;" "[i]f you are not willing to share the information requested, it will require us to reach out to your shareholders directly").

Defendants attempt to argue that the specific factors that *Basic* identified as indicative of probability – *i.e.*, "board resolutions, instructions to investment bankers, and actual negotiations between principals" – are supposedly not present here.  Br. at 10-15.  The premise is false because the Complaint contains specific allegations about all three.  ¶¶36, 42, 57 (Emerson's board approvals); *id*; ¶¶38, 44 (Emerson's investment bankers and legal counsel and National Instruments' financial and legal advisors); ¶¶31-36, 38-44, 51, 55-70, 76-80 (negotiations between

- 18 -

the principals).  But even if these allegations were truly absent from the Complaint as Defendants wrongly assert, "the absence of these factors, enumerated by the Supreme Court in *Basic*, is not dispositive of materiality, especially on a motion to dismiss."  *Wyly*, 788 F. Supp. 2d at 122.  Here, Defendants ignore the Complaint's allegations demonstrating the significant indicia of transactional certainty that – combined with the high magnitude premium – are more than sufficient to plead materiality.

Defendants also overlook numerous cases holding the materiality element satisfied under circumstances involving potential transactions that were far less developed than Emerson's high-premium all-cash offer.  In *Wyly*, the court held that a decision by insiders to seek a buyer for their corporation was material (and the insiders could therefore be liable for insider trading) even though there was no specific transaction, buyer, price, or terms on the horizon.  In *Aly*, the court held that information concerning a potential merger was material even though the target company had not yet been approached with a merger proposal.  In *Castellano v. Young & Rubicam, Inc.*, the Second Circuit held that merger negotiations were material even though "there was no likelihood that [the companies] would merge."  257 F.3d 171, 181 (2d Cir. 2011).  Similarly, in *S.E.C. v. Shapiro*, the Second Circuit held merger negotiations were material "[a]lthough the negotiations had not jelled to the point where a merger was probable."  494 F.2d 1301, 1306 (2d Cir. 1974).  In a case Defendants cite, *In re Gen. Motors Class E Stock Buyout Sec. Litig.* (Br. at 13), the court found that information concerning a potential acquisition was material even though the "complaint d[id] not state the level of corporate involvement, who did the negotiating and whether the Board was involved.  Hence, at the time of the discussion, the probability of [the] purchase occurring [was] unclear."  694 F. Supp. 1119, 1128 (D. Del. 1988).[10]  In contrast to these cases, Emerson's all cash

---

[10]       Defendants cite numerous cases that disprove their materiality argument.  In *S.E.C. v. Geon Industries, Inc.*, 531 F.2d 39 (2d Cir. 1976), the Second Circuit held that preliminary merger negotiations were material, rejecting the

offer was accompanied with significant indicia of transactional certainty – including Emerson's

clearly expressed willingness to bring its offer directly to National Instruments' stockholders – and

it is clear that Emerson's offer was probable and material.

In all events, "[t]he Second Circuit has repeatedly held that a complaint may not properly

be dismissed on the ground that the alleged misstatements or omissions are not material unless

they are so obviously unimportant to a reasonable investor that reasonable minds could not differ

on the question of their importance." *Alpha Cap.*, 2020 WL 3318029, at *3.  The Court should

deny Defendants' motion because they cannot meet that high standard.

### 3.    Defendants' Repurchase Plan Argument Is Baseless

Defendants' argument concerning the 2022 Plan has no bearing on this motion.  As alleged

in the Complaint, National Instruments' millions of stock repurchases during the class period were

authorized by the 2022 Plan, which was approved in January 2022.  There is no allegation or reason

to believe that the 2022 Plan was a "non-discretionary trading plan that [purchases or] sells fixed

quantities of stock on pre-scheduled dates" pursuant to Rule 10b5-1 or any similar rule.  *Nguyen*

*v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 494 (S.D.N.Y. 2018), *aff'd in part, vacated in*

*part, remanded sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020).  There

is likewise no allegation or other reason to believe that the stock repurchases at issue fit within any

---

argument that the discussions "could not have been material because the merger . . . was in such a embryonic stage," explaining "that a fact which in reasonable and objective contemplation might affect the value of the corporation's stock or securities . . . is material," and emphasizing the materiality of "negotiations with respect to the type of merger which will result in a company's ceasing to exist as such."  *Id*. at 47-48.  In contrast, in *Taylor v. First Union Corp. of South Carolina*, the Fourth Circuit held immaterial discussions concerning a possible merger that could not even be consummated at that time because it was illegal.  857 F.2d 240, 243-44 (4th Cir. 1988).  *Id*. at 243 (defendants discussed the "possibility of a merger . . . in the event interstate banking became legal" and developed "a relationship, described as similar to 'pinning' as that term was used socially thirty years ago, and agreed in principle to merge when interstate banking became permissible.").  In *Phillips v. LCI International, Inc.*, the Fourth Circuit held immaterial a single statement – that the company was "not a company that's for sale" – where the court found that plaintiffs "mischaracterizations and exaggeration" took the statement out of context and that no reasonable investor would find the statement misleading "in its true context."  190 F.3d 609, 617 (4th Cir. 1999).

other "safe harbor" or similar protection (such as under Rule 10b-18).[11]  The Court should reject this argument.

**B.      The Amended Complaint Does Not Allege that National Instruments' Guidance Is Actionable**

Defendants assert that certain projections regarding the Company's financial performance (discussed in the Complaint ¶52) are not actionable.  Br. at 16-20.  The Complaint does not plead that any such statements are actionable.  Rather, the Complaint discusses such projections, and the suspicious timing of their revision, to set out the facts concerning Defendants' attempt to obstruct Emerson's offer.  *See, e.g.*, ¶¶25-26, 45-49, 57, 79-80.  The Complaint pleads with particularity all statements alleged as actionable in the section called "Material Omissions and Misrepresentations."  ¶¶82-90.  There are no guidance or statements involving projected financial performance in that section of the Complaint, and the Court can reject this argument as well.

**C.      The Amended Complaint Alleges Scienter**

The Complaint raises a strong and compelling inference of Defendants' scienter.  The Individual Defendants were National Instruments' CEO (Starkloff), CFO (Rapp), and Board chairman (McGrath), and the Complaint pleads with particularity their direct involvement in and access to information concerning Emerson's offer (including through direct participation in communications with Emerson and Board meetings concerning Emerson's offer).  Defendants do not even contest National Instruments' scienter and have no basis to do so, including because the Individual Defendants' scienter is attributed to the Company, as well as because the Company's possession of material nonpublic information while trading in its own securities establishes its scienter.

---

[11]      Rule 10b-18 "provides an issuer . . . with a 'safe harbor' from liability for manipulation under [Rule 10b-5] 10b-5 under the Act solely by reason of the manner, timing, price, and volume of their repurchases[.]"  17 C.F.R. §240.10b-18.

The Complaint sets forth specific allegations demonstrating the Individual Defendants' direct knowledge of Emerson's offer and involvement in the Company's response, raising a strong inference of scienter. "[T]he Second Circuit [has] explained that a complaint pleads facts sufficient to raise a 'strong inference' of fraudulent intent where it sufficiently alleges that a defendant . . . knew facts or had access to information suggesting that [her] public statements were not accurate." *Sotheby's*, 2000 WL 1234601, at \*6-\*7 (scienter "sufficiently pled where there are specific allegations that a defendant knew of facts or had access to information contradicting his public statements, or where he failed to review information that he had a duty to monitor, or where he ignored obvious signs of fraud").

The Complaint alleges that Defendants Starkloff and McGrath were personally and directly involved in the negotiations with Emerson: they received Emerson's correspondence concerning its offer, answered with their own correspondence, and participated in meetings and telephone calls about Emerson's offer directly with Emerson's senior management. ¶¶31-36, 39-43, 55-60, 66-70, 92. The Complaint also alleges multiple National Instruments Board meetings at which (according to the Proxy) the Board and National Instruments' management discussed Emerson's offer. ¶¶38, 44, 58, 61, 67, 92. It is likewise obvious that the Individual Defendants knew or had access to the facts concerning National Instruments' millions of stock repurchases, including the prices paid for those repurchases and the material discrepancy between those prices and Emerson's offer. Indeed, Defendants Starkloff and Rapp each certified the accuracy of SEC filings discussing those repurchases (but omitting any mention of Emerson's higher-priced offer).[12]

---

[12]    With respect to the materially misleading risk disclosure alleged in the Complaint concerning the "difficulty" third-party buyers "could" have in acquiring the Company, the Individual Defendants obviously knew of their own obstructive response to Emerson's offer. ¶¶76-80; 89-90.

These allegations demonstrate the Individual Defendants' scienter. "Allegations that defendants had actual knowledge that their statements were false or misleading are sufficient to plead scienter." *Sotheby's*, 2000 WL 1234601, at *8; *see also Penn. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 939 F. Supp. 2d 445, 451 (S.D.N.Y. 2013) (CEO had scienter where he received a letter containing the true information). Moreover, breaching (or causing the corporation to breach) "known or obvious" disclosure duties (like the duty to abstain or disclose) constitutes scienter because it represents a "highly unreasonable" and "extreme departure from the standards of ordinary care." *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 587-88 (S.D.N.Y. 2020). Further, the Individual Defendants were necessarily aware of the suspicious timing of the Company's Class Period repurchases – including the largest share repurchases in the Company's history not long after Emerson began pushing to buy the Company for a premium – which further supports the strong inference of the Individual Defendants' scienter. *See, e.g., In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 173 (S.D.N.Y. 2021) (sustaining an "inference of bad faith and scienter" where insider sales were suspiciously timed).[13]

Defendants do not contest that the Complaint also pleads a strong inference of National Instruments' scienter. Nor could they, as the Individual Defendants' scienter is readily attributed to the Company. *See, e.g.*, *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009) ("scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants"). Moreover, even if the Complaint did not plead scienter as to any individual (which it does), the Complaint would still be sufficient as to the Company because "[t]o carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities

---

[13]     The Complaint also pleads control person liability as to each of the Individual Defendants. Defendants argue only that the Complaint does not plead a primary violation of Section 10(b) and Rule 10b-5. Br. at 20. That argument fails for the reasons stated herein. The remaining elements of control person liability – "control" and "culpable participation" – are readily satisfied by the allegations of the Complaint. *Sotheby's*, 2000 WL 1234601, at *8.

fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter.  Proof of a corporation's collective knowledge and intent is sufficient."  *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497-500 (S.D.N.Y. 2005) ("swiftly reject[ing]" defendant's "argument that the Lead Plaintiff must show that at least a single . . . employee acted with the requisite scienter" and holding that the plaintiff was "entitled to show that . . . a firm was reckless . . . through the sum of its employees' activities and knowledge").  This conclusion is particularly apt with respect to the Complaint's insider trading claims because "[t]o establish an insider trading claim, it is not necessary to show that corporate insiders *used* the nonpublic information; it is sufficient to prove that they traded their corporation's securities while knowingly in possession of the material nonpublic information."  *Steginsky*, 741 F.3d at 370 (emphasis in original); *see also Shaw v. Digit. Equip. Corp.*, 82 F. 3d 1194, 1224 (1st Cir. 1996) (a company possessing material non-public information while trading its stock is "presumptively probative of bad faith and scienter").  There is no reasonable dispute that National Instruments was knowingly in possession of inside information concerning Emerson's offer when it purchased millions of its own shares from the investing public.[14]

The Complaint's allegations raise a strong inference of scienter.

### D. Defendants' Failure to Respond to Allegations Constitutes Waiver

Although Defendants' arguments fail on their own terms, Defendants' also fail to address or even acknowledge key allegations of the Complaint and waive any argument concerning those

---

[14]  The Company also had a clear motive to purchase its shares without disclosing Emerson's offer, because doing so allowed the Company to purchase its shares at materially lower prices than would have been possible if Defendants had disclosed the truth. *See, e.g.*, ¶96; *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 138 (S.D.N.Y. 2020) (allegations of motive and opportunity, combined with actual knowledge, "perfectly [and] plausibly supports an inference of scienter"); *see also Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 308-09 (2d Cir. 2015) (allegations of  the unusual volume and profit of insider trading sufficient to establish corporate scienter).

theories. Defendants do not address the Complaint's allegations concerning the Company's insider trading. *See, e.g.*, ¶¶83-86. Defendants likewise do not address any of the materially misleading statements specifically pleaded in the Complaint. ¶¶84-90, and even lead their brief with a facially inapplicable "pure omissions" argument. Defendants also do not address the Complaint's allegations concerning National Instruments' scienter, *id.*, even though National Instruments' insider trading and misleading statements are central subjects of the Complaint. Defendants do not – and cannot – contest liability for their insider trading and misleading statements by pretending that those allegations do not exist.

By failing to respond to these critical allegations in their opening brief, Defendants have waived any such response, and have conceded those allegations for motion to dismiss purposes. *See, e.g.*, *Dentsply Sirona Inc.*, 2024 WL 1898512, at *4 (defendants "forfeited" any argument concerning liability under 10b-5(a) and (c) by raising it the first time on reply); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 450 (S.D.N.Y. 2018) (collecting cases) ("Defendants do not move in their opening brief to dismiss any claims based on this statement. [] Therefore, Defendants have waived the argument raised in their reply."); *see also In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 (S.D.N.Y. 2014) ("Defendants had ample notice from the Complaint" yet "failed to address the theory in their opening memorandum of law" but "[e]ven if not waived, however, Defendants' arguments fail on the merits"). Lead Plaintiff respectfully submits that Defendants' broad waiver of arguments concerning material portions of the Complaint constitutes an independent basis for denying Defendants' motion.

## IV.    CONCLUSION

For the foregoing reasons, Lead Plaintiff asks the Court to deny the motion in its entirety.

DATED: May 17, 2024

ROBBINS GELLER RUDMAN
 & DOWD LLP
CHAD JOHNSON
NOAM MANDEL
DESIREE CUMMINGS
JONATHAN ZWEIG
CHRISTOPHER GILROY

*/s/ Noam Mandel*
NOAM MANDEL

420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: (212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcummings@rgrdlaw.com
jzweig@rgrdlaw.com
cgilroy@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

VANOVERBEKE, MICHAUD
 & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
tmichaud@vmtlaw.com

*Counsel for Wayne County Employees' Retirement System*

WOLF POPPER LLP
ROBERT C. FINKEL
JOSHUA W. RUTHIZER
ADAM SAVETT
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: (212) 759-4600
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com
asavett@wolfpopper.com

*Additional Counsel*

- 26 -