**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE NATIONAL INSTRUMENTS CORPORATION
SECURITIES LITIGATION

Case No. 1:23-cv-10488 (DLC)

**Oral Argument Requested**

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION TO DISMISS**

James F. Bennett MO 46826
J. Russell Jackson MO 65689
Dowd Bennett LLP
7676 Forsyth Blvd., Ste. 1900
Saint Louis, MO 63105
(314) 889-7300
jbennett@dowdbennett.com
rjackson@dowdbennett.com

Andrew Ditchfield
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
andrew.ditchfield@davispolk.com

Attorneys for Defendants

## TABLE OF CONTENTS

PAGE

Table of Authorities.................................................................................................................ii

Preliminary Statement ...........................................................................................................1

Argument ...............................................................................................................................2

    I.    Plaintiff Jettisoned Allegations of "Rosy Projections" and Pure Omissions .......................2

    II.   The Affirmative Misrepresentation Claims are Limited to Late July and Late October .......................3

    III.  For All of Plaintiff's Claims, the Information Plaintiff Contends Should Have Been Publicly Disclosed Simply Was Not Material .................................................................4

    IV.  Plaintiff's Allegations Also Fail to Meet the Heightened Pleading Requirements................................7

Conclusion.............................................................................................................................10

Certificate of Service.............................................................................................................11

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.,
  2020 WL 3318029 (S.D.N.Y. June 18, 2020).................................................................7

Basic Inc. v. Levinson,
  485 U.S. 224 (1988).................................................................................................1

Castellano v. Young & Rubicam, Inc.,
  257 F.3d 171 (2d Cir. 2001).....................................................................................7

Glazer v. Formica Corp.,
  964 F.2d 149 (2d Cir. 1992)..................................................................................4, 7

In re Aegean Marine Petroleum Network Inc. Securities Litigation,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021) ......................................................................8

In re Columbia Sec. Litig.,
  155 F.R.D. 466 (S.D.N.Y. 1994) ..............................................................................6

In re Lions Gate Ent. Corp. Sec. Litig.,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016) .....................................................................8, 10

In re Magnum Hunter Res. Sec. Litig.,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014) ........................................................................7

In re Mylan N.V. Sec. Litig.,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ..........................................................4

Intellipharmaceutics Int'l Inc.,
  2020 WL 3318029 (S.D.N.Y. June 18, 2020)...........................................................7

Macquarie Infrastructure Corp. v. Moab Partners, L.P.,
  601 U.S. 257 (2024)................................................................................................3

Reiss v. Pan Am. World Airways, Inc.,
  711 F.3d 11 (2d Cir. 1983)......................................................................................7

Rombach v. Chang,
  355 F.3d 164 (2d Cir. 2004)....................................................................................9

S.E.C. v. Aly,
  2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018) ..........................................................5

S.E.C. v. Mayhew,
   121 F.3d 44 (2d Cir. 1997) ................................................................................................. 5, 6

S.E.C. v. Sekhri,
   2002 WL 31100823 (S.D.N.Y. July 22, 2002) ...................................................................... 5

S.E.C. v. Suman,
   684 F. Supp. 2d 378 (S.D.N.Y. 2010) .................................................................................. 5

S.E.C. v. Warde,
   151 F.3d 42 (2d Cir. 1998) ................................................................................................... 5

S.E.C. v. Wyly,
   788 F. Supp. 2d 92 (S.D.N.Y. 2011) .................................................................................... 6

Staffin v. Greenberg,
   672 F.2d 1196 (3d Cir. 1982) ............................................................................................... 7

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
   551 U.S. 308 (2007) ........................................................................................................... 10

## PRELIMINARY STATEMENT

Plaintiff's Opposition has narrowed the scope of Plaintiff's claims, making clear that this lawsuit involves exclusively stock repurchases in May, August, and September 2022 (alleged insider trading) and certain specified public statements made in late-July 2022 and late-October 2022 (alleged misleading statements). Plaintiff disclaims any intent to impose liability for Defendants' projections of future performance, which are mentioned throughout the Amended Complaint. (Pl. Opp. at 21.)

The fundamental defect in Plaintiff's claims is materiality. There was no live offer from Emerson when the stock was repurchased, nor was there one when the public statements were made. At the time, National Instruments had exhibited no interest in putting itself up for sale. It rejected Emerson's offer twice, and Emerson made no further overtures for three months. Thus, the proposed merger was not at all probable when the repurchases and the public statements were made. Plaintiff says nothing about these facts.

Plaintiff's entire suit is premised on the notion that Defendants had an alleged duty to disclose to the public a private, twice-rejected offer Emerson made to buy National Instruments at $48/share. At the time, National Instruments had conducted no negotiations, prepared no term sheet, formed no special board committee, and produced no due diligence materials. Emerson's two $48/share offers were non-starters because National Instruments' board of directors believed they seriously undervalued their company, and they preferred to vigorously pursue their business plan rather than preparing to put their company up for sale. (Am. Compl. ¶¶ 44, 51.) Plaintiff has not cited a single case in which a company was held to have an obligation to disclose an unsolicited, rejected offer where the company had determined it had no interest in exploring even the prospect of a deal. Such extremely "preliminary discussions" obviously fail the probability prong of the materiality test in Basic Inc. v. Levinson, 485 U.S. 224 (1988).

Desperate to argue that Emerson's low-ball offer somehow rose to the level of "material" information, Plaintiff focuses exclusively on Emerson's alleged interest in acquiring National Instruments, portraying its offer as a juggernaut. But the target had no interest in selling for $48/share, which was only a 4% premium

1

to the company's 52-week high trading price, and thus no merger was probable at the time. (Am. Compl. ¶ 36.) Emerson first made its offer on May 25, 2022; National Instruments rejected it on June 16, stating that it "does not provide a basis for further discussions." (Id. ¶ 39.) Emerson made the same offer again on June 22; and the National Instruments board rejected it again on July 19 and 20 at its next meeting, instructing management "not to provide any diligence materials to Emerson." (Id. ¶ 44.) The proposal was dead on August 2, 2022 when National Instruments sent Emerson its second letter rejecting the offer. (Id. ¶ 51.)

Plaintiff says the deal was probable because buying National Instruments was Emerson's "highest strategic priority" and it was "prepared to move very quickly." (Pl. Opp. at 4.) The facts pled belie this rhetoric: twice rebuffed, Emerson withdrew for the next three months—when the bulk of the repurchases and challenged public statements occurred. During this time Emerson did not offer more money, nor did it make its offer publicly to the shareholders. So there was no live offer on the table when National Instruments made its previously-planned stock repurchases in August and September 2022, nor when it made the challenged statements in late-July and late-October. Plaintiff's complete silence about these facts speaks volumes.

## ARGUMENT

### I.    Plaintiff Jettisoned Allegations of "Rosy Projections" and Pure Omissions

The Amended Complaint is filled with quotations from the Defendants' projections regarding future financial performance. But this Court must ignore them because Plaintiff has conceded that "the Amended Complaint does not allege that National Instruments' guidance is actionable." (Pl. Opp. at 21.) Indeed, Plaintiff instructs that the only allegedly actionable statements are those in paragraphs 82-90 of its pleading, which include no "guidance or statements involving projected financial performance." (Id.) Apparently the future performance statements pled were merely color commentary and cannot serve as the basis for legal liability here. Moreover, Plaintiff has no response to Defendants' authorities on projected financial performance, the bespeaks caution doctrine, and the statutory safe harbor. (See Defs. Br. at 16-20.)

Moreover, because <u>Macquarie Infrastructure Corp. v. Moab Partners, L.P.</u>, 601 U.S. 257 (2024), recently held that Rule 10b-5(b) does <u>not</u> provide a cause of action for pure omissions and provides a claim "only if the omission renders affirmative statements made misleading," Plaintiff's Opposition denies that pure omissions are covered by its complaint, instead urging that five affirmative statements listed in paragraphs 82-90 are the sole bases for their misrepresentation claims.

## II.      The Affirmative Misrepresentation Claims Are Limited to Late July and Late October

So what do paragraphs 82-90 actually plead? They list only five affirmative statements occurring in late July and late October 2022 that Plaintiff alleges were misleading because they lacked information about Emerson's two rejected $48/share offers:

- The 7/29/22 2Q 10-Q, which stated that "National instruments repurchased 284,370 shares at an average price of $35.17 per share during May 2022." (Am. Compl. ¶ 85.)

- The 7/28/22 Q2 Conference Call, in which Defendant Rapp stated: "We repurchased approximately 1 million shares at an average price of $39.06, keeping our share count flat to Q2 2021." (<u>Id.</u> ¶ 86.)

- The 10/28/22 3Q 10-Q, which stated that "during August and September 2022, National Instruments repurchased 2,033,135 shares of common stock at an average price of $40.25 per share." (<u>Id.</u> ¶ 85.)

- The 10/27/22 Q3 Conference Call, in which Defendant Rapp stated: "We repurchased approximately 2 million shares at an average price of $40.25." (<u>Id.</u> ¶ 86.)

- The 7/29/22 2Q 10-Q and the 10/28/22 3Q 10-Q, in their discussions of risk factors, also "referred investors to the risk factors in the Company's Form 10-K, filed with the SEC on February 22, 2022," which advised that "[o]ur certificate of incorporation and bylaws contain provisions that could make it more difficult for a third party to acquire us without the consent of our Board of Directors." (<u>Id.</u> ¶¶ 87-89; <u>see especially</u> ¶ 89, which quotes the 10-K's list of specific provisions of Delaware law and the company's certificate and bylaws that might delay or impede a hostile takeover.)

To be clear—and Plaintiff did not dispute this—<u>there was no live offer when these statements were made.</u>

On the dates of the specific statements listed above—which are the only particularized ones Plaintiff identifies as allegedly actionable—there simply was no information that was material to disclose. Merely

reporting the amounts and price of those repurchases simply cannot create a legal duty to disclose or refrain related to a twice-rejected acquisition offer.[1]

### III.    For All of Plaintiff's Claims, the Information Plaintiff Contends Should Have Been Publicly Disclosed Simply Was Not Material

Materiality is a necessary element of all of Plaintiff's claims (insider trading and misrepresentation) under Section 10b and Rule 10b-5. The duty to "refrain or disclose" does not arise for non-material non-public information. And the failure to disclose non-material non-public information when repurchasing stock violates no legal duty. As noted in Defendants' opening brief, Basic instructs that when evaluating the materiality of preliminary merger discussions, a court must evaluate the probability (i.e., likelihood) that the merger will actually occur:

> The mere fact that a company has received an acquisition overture or that some discussion has occurred will not necessarily be material. "Those in business routinely discuss and exchange information on matters which may or may not eventuate in some future agreement." … Basic instructed courts to assess the probability of an event by looking at the "indicia of interest in the transaction at the highest corporate levels" and by considering, inter alia, "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries … as indicia of interest."

Glazer v. Formica Corp., 964 F.2d 149, 155 (2d Cir. 1992). Here, Emerson's proposal was dead in the relevant late-July to late-October timeframe. National Instruments had categorically rejected Emerson's offers, said there was no basis for discussion, and instructed management not to participate in due diligence. National Instruments was not going to even discuss a $48/share deal, and Emerson—which made no further overtures for three months—was not taking the offer to the shareholders or raising its offer.

Plaintiff cites a few cases to urge that information about an offer to acquire a company is always material because investors will always want to know it. But Plaintiff's cases are inapposite and fail to address

---

[1] One of Plaintiff's own cases recognizes that "the mere statement of historical financial information does not give rise to a duty to disclose illegal conduct that may have contributed to that performance." In re Mylan N.V. Sec. Litig., 2018 WL 1595985, at *5 (S.D.N.Y. Mar. 28, 2018) (Pl. Opp. at 14) (defendant was not "liable for statements of income made in its Forms 10-K and 10-Q; nor is it liable for failing to disclose an 'acute risk' of fines in its Forms 8-K").

Defendants' cases, which clearly hold that not all preliminary merger discussions are material. (See Defs. Br. at 12-13.) Plaintiff cites S.E.C. v. Aly, 2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018) (Pl. Opp. at 3, 16, 19), but the Court in Aly merely held that where an individual falsified a draft merger agreement and attached it to a publicly-filed Schedule 13D falsely representing that he was part of a group making an offer to acquire a publicly-traded company in order to drive up the stock price, that was a material misrepresentation. Aly did not involve a situation where a legitimate offer was made and rejected by the target, or whether the target was holding material non-public information as a result.

S.E.C. v. Suman, 684 F. Supp. 2d 378 (S.D.N.Y. 2010) (Pl. Opp. at 3, 16) is similarly inapposite. It involved an IT employee who became aware of his employer's non-public bid to acquire a publicly-traded target, after which he bought a majority of all outstanding options and 12,000 equity shares of the target. Suman did not involve a failed deal where the offer already had been rejected by the target, or consider whether such information held by the target was "material."

Similarly, S.E.C. v. Warde, 151 F.3d 42 (2d Cir. 1998) (Pl. Opp. at 3, 16) involved an investor who was tipped off to inside information from the target's Chairman that multiple potential bidders were accumulating the target's stock and contemplating tender offers, and that the target's management was contemplating a leveraged buyout. Warde did not involve rejected merger offers, nor did it consider whether rejected offers were subsequently material when the target made quarterly disclosures months later.

Plaintiff also cites S.E.C. v. Sekhri, 2002 WL 31100823 (S.D.N.Y. July 22, 2002) (Pl. Opp. at 16), but it, too, does not stand for the proposition that all preliminary merger offers are material. Sekhri involved a defendant who received tips from an investment banker before a number of merger announcements. It does not analyze the materiality of twice-rejected acquisition offers after preliminary discussions have ended.

Plaintiff also cites S.E.C. v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997) (Pl. Opp. at 16). But it, too, sheds no light on the materiality of a twice-rejected offer. Mayhew involved a securities trader who received a tip from a corporate insider prior to the announcement of the merger of two pharmaceutical companies.

The court found the tip was material even though it did not include specific details of the merger because the defendant "knew the information came from an insider <u>and that the merger discussions were actual and serious</u>." <u>Id.</u> at 52 (emphasis added). "Actual and serious" hardly describes the silence between Emerson and National Instruments in August and September (when National Instruments completed the majority of its repurchases) and on the dates of the statements in the 10-Qs identified in the Amended Complaint.

Plaintiff suggests that "numerous" cases have found omitted information material where the proposed transactions were more uncertain than Emerson's offer here, but the case it cites does not involve a twice-rejected offer and three months of inaction. <u>See</u> <u>S.E.C. v. Wyly</u>, 788 F. Supp. 2d 92, 122-24 (S.D.N.Y. 2011) (Pl. Opp. at 4, 19). Rather, in <u>Wyly</u>, two billionaire brothers who were Chairman and Vice-Chairman of a publicly-traded company's board decided that the company should be sold; they then engaged in insider trading to profit from it. The defendants argued that their knowledge was not "material" under the <u>Basic</u> standard because their plan had not "ripened into relevant corporate activity." <u>Id.</u> at 122. Notably, the court in Wyly used <u>Basic</u>'s materiality standard of whether "there was a high 'indicated probability that the event [would] occur'—namely, that Sterling Software would be acquired." <u>Id.</u> (citation omitted; bracket in original). And the court concluded that, despite the company's lack of formal preparations for the deal, there was a high indicated probability the merger would occur because the two billionaires had developed a plan to sell the company and were the founders of the company, comprised two-thirds of the board's executive committee and, with family, held half of the board's seats. In contrast, here Plaintiff pleads that the target's board twice rejected Emerson's offer, believed that it significantly undervalued the company, and the suitor (Emerson) retreated and for three months did not pursue a deal with National Instruments at all. There simply is no way to find on these allegations that "there was a high probability" that National Instruments would be acquired or that the company had exhibited any interest at all in consummating a merger.[2] And thus, under <u>Basic</u>, the

---

[2] Plaintiff cites <u>In re Columbia Sec. Litig.</u>, 155 F.R.D. 466, 483-84 (S.D.N.Y. 1994) (Pl. Opp. at 17 n.9) for the proposition that the mere possibility of a merger can be material. But even there, the court, applying *Basic*'s test, focused on indicia of the target's

nonpublic information simply was not material.[3] Not with respect to stock repurchases, and not with respect to public statements.

### IV.    Plaintiff's Allegations Also Fail To Meet the Heightened Pleading Requirements

Plaintiff does not contest in its Opposition that both Rule 9(b) and the PSLRA apply to its claim, nor does it distinguish Defendants' authorities detailing the "exacting pleading requirements" these rules require. (*See* Defs. Br. at 6-7; 20-23.) Rule 9(b) requires a plaintiff in a securities fraud complaint to "state with particularity the circumstances constituting fraud," and the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." In re Magnum Hunter Res. Sec. Litig., 26 F. Supp. 3d 278, 289 (S.D.N.Y. 2014) (emphasis added). The complaint also must plead a "strong inference of scienter with respect to each defendant," and courts require

---

interest in the transaction, noting the target's board determination to pursue negotiations, formal resolutions, actual negotiations over price, "the provision of a continuous stream of [the target's] non-public business information," substantial and direct participation of the target's financial and legal advisors, efforts to hire managers for the target, efforts to secure financing for the deal, and preparation of the merger agreement and related filings. Id. at 484. Not only is that not alleged here, Plaintiff alleges the target affirmatively rejected the offers and decided not to provide confidential due diligence materials. Similarly, Plaintiff cites Castellano v. Young & Rubicam, Inc., 257 F.3d 171 (2d Cir. 2001) (Pl. Opp. at 19) for the proposition that merger negotiations were material even where the deal was dead. But Castellano is wholly inapposite. It involved a closed company that was seeking a merger partner while at the same time negotiating the departure of one of its employees (who was a major shareholder) and its acquisition of his shares. He alleged the employer's failed merger negotiations were material because they evidenced the employer's desire to merge with someone. The court held that where the defendant's actions corroborated an ongoing intention to seek an infusion of outside capital through corporate restructuring, the failed merger negotiations were not immaterial. 257 F.3d at 182. Of course the Amended Complaint here alleges the opposite—namely, that National Instruments consistently was not interested in completing a merger and had rejected Emerson's unsolicited offer out of hand as significantly undervaluing the company. These facts establish there was no probability of a merger, and thus no materiality.

[3] Plaintiff also cites Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc., 2020 WL 3318029 (S.D.N.Y. June 18, 2020) (Cote, J.) (Pl. Opp. at 4, 20) as requiring a defendant to establish the omitted information was "so obviously unimportant to a reasonable investor that reasonable minds could not differ." But Alpha Cap. was a Section 11 case involving a company's failure to disclose a key executive's imminent departure in a registration statement; it did not involve a twice-rejected merger offer, and that is not the standard articulated in Basic to assess the materiality of preliminary merger discussions. Moreover, Plaintiff ignores the cases cited in Defendants' motion recognizing that the mere fact a company received an acquisition offer is not automatically material—even though an investor might want to know it. (See Defs. Br. at 12 (citing, *inter alia*, Glazer v. Formica Corp., 964 F.2d 149, 155 (2d Cir. 1992)).) The question is whether there was a high probability the acquisition would occur. Here, of course, the $48/share offers were rejected—twice—and no negotiations followed for three months. That does not meet Basic's probability standard as a matter of law. Moreover, Plaintiff fails to address Defendants' cases instructing that a legal rule that would effectively require the disclosure of all preliminary merger discussions would do significant harm to investors. (See Defs. Br. at 12 (citing, *inter alia*, Reiss v. Pan Am. World Airways, Inc., 711 F.3d 11, 14 (2d Cir. 1983); Staffin v. Greenberg, 672 F.2d 1196, 1205-07 (3d Cir. 1982)).) Even the SEC imposes no duty to disclose merger negotiations until they become definitive agreements. (Def. Br. at 12 n.4.)

7

for "motive and opportunity" allegations that the complaint allege each defendant "benefitted in some concrete and personal way," typically by selling their own shares at a profit. In re Lions Gate Ent. Corp. Sec. Litig., 165 F. Supp. 3d 1, 22-23 (S.D.N.Y. 2016).[4] Notably, no Individual Defendant is alleged to have sold their own personal shares at a profit here. Where fraudulent omissions are alleged, "it is especially important to rigorously apply the standard for pleading intent." Id.

The Amended Complaint does not plead with particularity the necessary elements of Plaintiff's claims. The gist of Plaintiff's Amended Complaint is that not disclosing two quickly-rejected acquisition offers amounted to fraud under the securities laws. To the extent Plaintiff asserts that the non-disclosure made affirmative statements misleading, the Amended Complaint utterly fails to plausibly plead why such statements are misleading. For the 10-Q statements stating how many shares of stock it bought and at what price, the mere fact that Emerson previously had made a private offer to acquire the entire company for a higher stock price (that was quickly rejected before the stock repurchases) does not make the Defendants' price/quantity disclosure false or misleading. In fact, the disclosures reflect that National Instruments generally paid a higher average price than the Amended Complaint's various citations of stock price at various times. (See, e.g., Am. Compl. n.3 ($34.35/share on 5/25/22), n.8 ($38.33/share on 8/2/22), n.10 ($38.72/share on 10/28/22).) And although Plaintiff has now abandoned any claim that National Instruments was attempting to artificially raise its stock price with "suspicious" improved projections of future performance (Pl. Opp. at 21), those allegations in the Amended Complaint directly contradict both scienter and Plaintiff's theory of fraud here. (See Def. Br. at 19 n.8.)

Moreover, to the extent Plaintiff claims the risk disclosure regarding the company's bylaws was misleading, the Amended Complaint fails to plead a plausible theory as to why. The two quarterly reports

---

[4] Indeed, that was the case in Plaintiff's authority, In re Aegean Marine Petroleum Network Inc. Securities Litigation, 529 F. Supp. 3d 111 (S.D.N.Y. 2021) (Pl. Opp. at 23). There, the court held the plaintiff had failed to plead scienter with respect to another executive and outside directors, but the scienter requirement was adequately pled for the CFO, who was alleged to have sold his own personal shares. Id. at 173-74.

reference the 10-K's standard disclosure that certain aspects of the National Instruments bylaws and aspects of Delaware law may delay or impede any acquisition that is not approved by the company's board. Plaintiff's Opposition argues these references were somehow made misleading by not also disclosing that Emerson previously had made two offers that the National Instruments board rejected as inadequate. (See Pl. Opp. at 15 (citing Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004)).) But Plaintiff's own authority dismissed claims for failing to adequately explain why a statement was fraudulent or misleading:

> Plaintiffs sufficiently allege that defendants intentionally fostered the mistaken beliefs expressed in the [analysts'] reports. . . . But the complaint fails to explain why the information in the analysts' reports was, in fact, fraudulent. . . . To meet the pleading requirement of Rule 9(b), plaintiffs cannot rest on their say-so that these statements are fraudulent; they must explain why. Having neglected to do so, they fail to plead with the requisite particularity.

Rombach, 355 F.3d at 175.

The same is true here. Plaintiff does not allege the 10-K's statements were false; there actually were aspects of the National Instruments bylaws and Delaware law that could have delayed or impeded a hypothetical hostile takeover bid. But there was no hostile takeover bid—not when Emerson's offers were made, and not on July 29, 2022 or October 28, 2022, when the 10-Qs referred to the February 2022 10-K's risk disclosure. Rather, Emerson had sought to interest the National Instruments board in a $48/share merger, and the board said no. Twice. Afterwards, Emerson made no further overtures. For three months. Plaintiff does not plausibly plead how not disclosing these facts on July 29 or October 28 made the 10-Qs' reference to the 10-K's risk disclosure about hypothetical hostile takeover offers false or misleading when they were made.[5] As the Second Circuit held in Rombach, Rule 9(b)'s particularity requirement provides important protections to defendants (355 F.3d at 171), and it should be applied here to dismiss this claim.

---

[5] Plaintiff alleges that it was misleading to fail to disclose that Emerson "was at that time actually attempting to acquire the Company at a premium" (Am. Compl. ¶ 90), but this allegation is proven false by the other allegations establishing that at the time of the disclosures, there were no offers on the table. And there certainly was no hostile takeover bid. Plaintiff also alleges that it was misleading to make the risk disclosure without disclosing that National Instruments was "at that time engaged in an effort to impede Emerson's acquisition." (Id.) But that, too, is proven false by the allegations in the Amended Complaint. National Instruments had merely rejected an inadequate offer. Emerson retreated, and then there was no offer on the table.

Besides not being able to plead with particularity <u>why</u> not disclosing Emerson's rejected offers was misleading, Plaintiff also fails to address its failure to adequately plead scienter <u>for each defendant</u>. Plaintiff utterly ignores Defendants' authorities rejecting lumping defendants together, merely focusing on their titles, or implying knowledge because of their position. (Def. Br. at 20-23).

Plaintiff also criticizes Defendants for citing the stock repurchase plan National Instruments adopted in February 2022. But Plaintiff ignores the Supreme Court's admonitions that in evaluating scienter on a motion to dismiss, the court must consider all "plausible, nonculpable explanations for the defendant's conduct" and look at the facts "holistically, and not in isolation." (Defs. Br. at 20-21.)

Here, Plaintiff alleges unlawful intent merely because National Instruments bought back a large volume of its stock, calling it "suspicious timing" (Pl. Opp. at 23). But National Instruments already had <u>planned and authorized</u> a buy back of millions of its shares for legitimate reasons <u>long before Emerson made its first offer</u>. (Am. Compl. ¶ 22.) Each of the individual defendants knew this, too. Plaintiff ignores Defendants' authorities holding that motives common to corporate officers, such as keeping stock prices high, do not raise a strong inference of scienter sufficient to survive a motion to dismiss. <u>See, e.g.</u>, <u>In re Lions Gate Ent. Corp. Sec. Litig.</u>, 165 F. Supp. 3d at 21-22. In light of the plausible, non-culpable explanation for the stock repurchases pled in Plaintiff's Amended Complaint, Plaintiff has failed to adequately plead scienter.

Plaintiff's failures to satisfy the heightened pleading standards requires dismissal because Congress intended these "[e]xacting pleading requirements" to be "control measures" to prevent abusive securities fraud actions. <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 313 (2007).

## <u>CONCLUSION</u>

For the foregoing reasons and those stated in their opening brief, Defendants National Instruments and the Individual Defendants respectfully request that this Court dismiss Plaintiff's Amended Complaint.

10

Dated: May 31, 2024                                      Respectfully submitted,

                                                         /s/  James F. Bennett

                                                        James F. Bennett MO 46826
                                                        J. Russell Jackson MO 65689
                                                        DOWD BENNETT LLP
                                                        7676 Forsyth Blvd., Ste. 1900
                                                        Saint Louis, MO 63105
                                                        (314) 889-7300
                                                        jbennett@dowdbennett.com
                                                        rjackson@dowdbennett.com

                                                        Andrew Ditchfield
                                                        Davis Polk & Wardwell LLP
                                                        450 Lexington Avenue
                                                        New York, New York 10017
                                                        (212) 450-4000
                                                        andrew.ditchfield@davispolk.com

                                                        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 31, 2024, a true and correct copy of the foregoing was filed electronically using the Court's electronic filing system. By operation of that system a notice of electronic filing will be served upon all counsel of record in the case.

                                                        /s/ *James F. Bennett*

11