UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
IN RE NATIONAL INSTRUMENTS CORPORATION  :
SECURITIES LITIGATION                   :        23-cv-10488
                                        :           (DLC)
                                        :
                                        :        OPINION AND
--------------------------------------- X        ORDER

APPEARANCES:

For Lead Plaintiff:
Chad Johnson
Noam Mandel
Desiree Cummings
Jonathan Zweig
Christopher Gilroy
Robbins Geller Rudman & Dowd LLP
420 Lexington Avenue, Suite 1832
New York, NY 10170

For defendants:
James F. Bennett
J. Russel Jackson
Dowd Bennett LLP
7676 Forsyth Blvd, Ste. 1900
St. Louis, MO 63105

Andrew Ditchfield
Davis Polk & Wardwell LP
450 Lexington Avenue
New York, NY 10017

DENISE COTE, District Judge:

    National Instruments Corporation ("NI" or the

"Corporation") has been sued by shareholders who sold their

stock in 2022.  Lead plaintiff alleges that NI and three of its

senior executives violated the securities laws by failing to

disclose that NI had received an offer to purchase the company.

After receiving the offer, NI continued to engage in a stock buyback program that it had begun earlier that year.  Because of the omission of the offer, shareholders assert that they sold their common stock at artificially depressed prices, including selling stock back to NI.

The defendants have moved to dismiss the complaint.  For the following reasons, the defendants' motion to dismiss is granted in part.

## Background

The following facts are taken from the complaint and documents incorporated therein.  For the purposes of deciding this motion, the complaint's factual allegations are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor.

NI produced automated test equipment and virtual instrumentation software.  Defendant Eric Starkloff was the Chief Executive Officer and President of NI and a member of NI's Board of Directors (the "Board").  Defendant Michael McGrath was the Chairman of the Board.  Defendant Karen Rapp was an Executive Vice President and the Chief Financial Officer of NI.  Rapp stepped down as CFO on January 9, 2023, and assumed an advisory role with NI until her retirement in May of 2023.

On January 19, 2022, NI's Board approved a stock repurchase program authorizing NI to repurchase up to $250 million worth of common stock from shareholders, effective immediately (the "2022 Stock Repurchase Plan").  This plan represented the largest stock buyback in the company's history.  NI had previously authorized a stock repurchase plan in 2010, which was amended in 2019 to increase the number of shares that may be repurchased (the "2019 Stock Repurchase Plan").

NI repurchased stock throughout 2022.  In January and February, NI repurchased 270,445 shares under the 2019 Stock Repurchase Plan at an average price of $41.10.  These repurchases accounted for all of the remaining shares available for repurchase under the 2019 Stock Repurchase Plan.  Also in February, NI purchased 337,541 shares under the 2022 Stock Repurchase Plan at an average price of $41.14.  In March, NI purchased 164,066 shares at an average price of $39.34.  NI repurchased 702,506 shares in April at an average price of $40.63; 284,370 shares in May at an average price of $35.17; 520,902 shares in August at an average price of $41.91; and 1,512,233 shares in September at an average price of $39.68.  NI did not repurchase any shares in June, July, October, November, or December.  Altogether, NI repurchased 3,792,063 shares in 2022, 3,521,618 of which were repurchased under the 2022 Stock

Repurchase Plan.  NI disclosed the repurchases in its quarterly filings with the SEC on Forms 10-Q and in its quarterly investor conference calls.

On October 11, 2023, Emerson Electric Co. ("Emerson"), a company that manufactures and provides engineering services for industrial, commercial, and consumer markets, acquired NI. Emerson began making overtures to purchase NI in May of 2022. On May 25, Emerson's CEO emailed a letter to Starkloff that detailed Emerson's initial offer to acquire 100% of the outstanding common stock of NI for $48 in cash per common share (the "May 25 Letter").  NI's stock closed that day at $34.35 per share.  The May 25 Letter stated that Emerson was "very excited" about the possibility of a merger, was "prepared to move very quickly" toward a definitive merger statement, and preferred to negotiate in private.  On June 14, NI's Board rejected Emerson's offer.  The Board concluded that Emerson's proposal "substantially undervalued" NI.  On June 16, Starkloff and McGrath notified Emerson of the rejection.

On June 22, Emerson renewed its offer at $48 per share, but represented that "with access to limited non-public information after signing an NDA, we could work with you to find additional value" (the "June 22 Letter").  Emerson expressed that it was "very motivated to conclude a transaction" and that acquiring NI

was Emerson's "highest strategic priority."  At the Board
meeting on July 19 and 20, NI's Board and management again
rejected the offer as "inadequate."  The Board discussed with
management and advisors the potential for Emerson to change its
offer and steps that NI could take to highlight its momentum and
financial performance.  At the same time, the Board instructed
management not to provide diligence materials to Emerson.  On
August 2, Starkloff and McGrath advised Emerson that "the Board
remains unanimously of the view that your proposal is not in the
best interests of NI and its shareholders."

On July 28, NI issued a press release, filed on Form 8-K,
announcing its second quarter 2022 financial results.  The
release announced substantially improved financial guidance over
the projections from the first quarter of 2022.  The release
quoted Starkloff as stating that the second quarter's results
brought "increased confidence in achieving revenue growth and
earnings per share in line with current consensus estimates."

On November 3, having had no contact with NI since August
2, Emerson made an offer to purchase NI at $53 per share and
reiterated its desire to move quickly to complete the
transaction (the "November 3 Letter").  The November 3 Letter
warned that Emerson was willing to bring its offer directly to
shareholders if NI continued in its refusal to engage.  In

response, NI established a working group of the Board to examine the proposal.

On January 13, 2023, prior to the opening of trading, NI issued a press release announcing that its Board had initiated a review and evaluation of strategic options, including solicitation of interest from potential acquirors and other transaction partners, "some of whom have already approached the Company." The press release stated that there was "no deadline or definitive timetable set for completion of the strategic review" and "no assurance" that the process would "result in any specific transaction." It also announced the implementation of a "limited duration shareholder rights plan" that was intended to "reduce the likelihood that any person or group gains control of the Company through open market accumulation or other tactics and reduce the likelihood that actions are taken by third parties that are not in the best interest of the Company and all of its shareholders." NI's statement did not mention Emerson or any of Emerson's offers to acquire NI. NI's stock price surged from the previous day's close of $40.17 per share to a high of $47.95 per share and closed at $46.50 per share on January 13, on unusually high trading volume of over 7.7 million shares.

On January 17, prior to the opening of trading, Emerson issued a press release announcing that it had made an all-cash

offer to purchase all of the shares of NI for $53 per share.
Emerson also stated that in response to an initial offer, NI had
chosen to conceal the offer from the investing public and had
instead undertaken a large stock buy-back.  The press release
further stated that Emerson had been forced to take its offer
public after NI had delayed engagement with the offer.

On February 21, NI filed with the SEC its annual report on
Form 10-K for 2022.  According to this filing, NI had
repurchased 1,390,057 shares of common stock during the year
ended December 31, 2020; 1,339,498 shares of common stock during
the year ended December 31, 2021; and 3,792,063 shares of common
stock during the year ended December 31, 2022.  The Form 10-K
also disclosed that no shares of common stock were repurchased
between October and December of 2022, and that as of December of
2022, $109,281,700 in dollar value of shares of common stock
remained eligible for repurchase under the 2022 Stock Repurchase
Plan.  On October 11, 2023, Emerson acquired all of NI's stock
at a price of $60 per share.

This action was filed on November 30, 2023 as a putative
class action.  On February 16, 2024, Wayne County Employees'
Retirement System was appointed as lead plaintiff.  Also on that
day, a schedule was set for filing amended pleadings.  The
schedule instructed the lead plaintiff to file an amended

complaint by March 29 and, in the event a motion to dismiss was filed, to inform the Court by May 10 if it wished to further amend the complaint. The parties were informed that it was unlikely that the lead plaintiff would be granted any further opportunity to amend.

Lead plaintiff filed its amended complaint on March 29. On April 26, the defendants moved to dismiss the amended complaint. Lead plaintiff did not seek to amend further and instead opposed the motion. The motion to dismiss became fully submitted on May 31.

The defendants' original filing in support of their motion to dismiss did not address a claim that NI had engaged in insider trading. In their opposition to the motion to dismiss, the lead plaintiff took the position that the amended complaint does allege insider trading under § 10(b) and Rule 10b-5. In their reply, therefore, the defendants addressed the insider trading claim for the first time and argued that the materiality and scienter elements of the claim were not adequately pleaded. In support of that argument, the defendants represented that NI did not buy back any of its stock while any "live offer" was pending.

The defendants' representation was addressed at a September 4 conference with the parties. The defendants disclosed at the

conference that no repurchases of NI stock occurred, as relevant here, between May 6 and August 12, 2022.  The plaintiffs agreed that the Court may consider that information, which is not public, in addressing the pending motion.  This Opinion construes the complaint as pleading an insider trading claim.

## Discussion

The plaintiffs assert one cause of action against all defendants pursuant to § 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder, and one cause of action for control person liability against the individual defendants pursuant to § 20(a) of the Securities Exchange Act.  The defendants have moved to dismiss both claims.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a party "must plead enough facts to state a claim that is plausible on its face."  Green v. Dep't of Educ. of N.Y., 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Ashcroft v. Iqbal, 566 U.S. 662, 678 (2009)).  "In determining if a claim is sufficiently plausible to withstand dismissal," a

court "accept[s] all factual allegations as true" and "draws all reasonable inferences in favor of the plaintiffs." Melendez v. City of N.Y., 16 F.4th 992, 1010 (2d Cir. 2021) (citation omitted). When assessing the pleadings on a motion to dismiss, a court

> may review only a narrow universe of materials, which includes facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, matters of which judicial notice may be taken, as well as documents not expressly incorporated by reference in the complaint that are nevertheless integral to the complaint.

Clark v. Hanley, 89 F.4th 78, 93 (2d Cir. 2023) (citation omitted).

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the sale of any security . . . any manipulative or deceptive device in contravention of" SEC rules. 15 U.S.C. § 78j(b).

Rule 10b-5, in turn, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a)  To employ any device, scheme, or artifice to defraud,
>
> (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c)  To engage in any act, practice, or course of
> business which operates as a fraud or deceit upon
> any person,
> in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5.

The plaintiff alleges that NI violated § 10(b) and Rule 10b-5 in two ways.[1] First, it alleges that it violated § 10(b) and Rule 10b-5(b) by disclosing NI's stock repurchases in its 2Q Form 10-Q, 3Q Form 10-Q, and the conference calls that accompanied the filing of those quarterly reports without also disclosing that Emerson had offered to purchase the Corporation. Next, it alleges that NI violated § 10(b) by proceeding with the stock repurchase plan without disclosing Emerson's offers.  Each claim is addressed in turn.

I.  Material Omissions and Misrepresentations Under Rule 10b-5(b)

Complaints brought by private plaintiffs under § 10(b) and Rule 10b-5(b) are subject to a heightened pleading standard pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 9(b), Fed. R. Civ. P.  To state a claim

---

[1] The plaintiffs bring their claim under § 10(b) and Rule 10b-5 against all defendants.  The plaintiffs do not allege that any individual defendant sold or purchased NI securities during a relevant period of time; instead, the claim against the individual defendants stems from their alleged participation in NI's activities.

for material misrepresentations or omissions, a plaintiff must
plead

> (1) a material misrepresentation or omission by the
> defendant; (2) scienter; (3) a connection between the
> misrepresentation or omission and the purchase or sale
> of a security; (4) reliance upon the misrepresentation
> or omission; (5) economic loss; and (6) loss
> causation.

In re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th 408, 417
(2d Cir. 2023) (citing Stoneridge Inv. Partners, LLC v. Sci.
Atlanta, Inc., 552 U.S. 148, 157 (2008)).  "[B]ecause such a
claim sounds in fraud, the plaintiff must state with
particularity the circumstances constituting fraud."  Altimeo
Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd., 19 F.4th 145, 150
(citation omitted).  The PSLRA requires that a complaint "state
with particularity facts giving rise to a strong inference that
the defendant acted with the required state of mind."  In re
Synchrony Fin. Sec. Litig., 988 F.3d 157, 167 (2d Cir.
2021)(citation omitted).

Rule 10b-5(b) makes it unlawful to "omit material facts in
connection with buying or selling securities when that omission
renders statements made misleading."  Macquarie Infrastructure
Corp. v. Moab Partners, L.P., 601 U.S. 257, 259 (2024).  Rule
10b-5(b) does not apply to "pure omissions," which occur "when a
speaker says nothing, in circumstances that do not give any
particular meaning to that silence."  Id. at 263.  Even "a duty

to disclose" certain information "does not automatically render silence misleading under Rule 10b-5(b). Id. at 265. Rather, Rule 10b-5(b) requires "identifying affirmative assertions" before "determining if other facts are needed to make those statements 'not misleading.'" Id. at 264.

None of the statements that the plaintiffs have identified was rendered misleading by NI's omission of facts regarding Emerson's offer. The identified statements were made on July 28, July 29, October 27, and October 28, 2022. NI stated in two quarterly reports and two investor calls that it had repurchased stock from shareholders. These statements were true and were not rendered misleading by the failure to disclose offers that NI had received from Emerson.

The plaintiffs argue that NI's disclosure of the stock repurchases was made misleading by the omission because they misrepresented the reality that NI's stock repurchases were at materially lower prices than that offered by Emerson. But NI's statements simply summarized transactions that had already occurred. They did not imply, for instance, that these repurchases occurred at the highest possible price offered by any market participant. Therefore, the omission of Emerson's offers did not render the disclosure of the stock repurchases misleading.

The plaintiffs also argue that NI's risk disclosure warnings were misleading because they stated in general terms the potential obstacles to an acquisition by a third-party without disclosing that NI was in fact impeding a third-party's acquisition attempts.  NI's quarterly reports of July 29 and October 28 of 2022 incorporated the risk disclosures in NI's annual report for the year 2022, filed on Form 10-K.  The annual report contained disclosures of multiple risks that could affect the company.  The plaintiffs focus on one, which reads as follows:

> **Provisions in Our Charter Documents and Delaware Law May Delay or Prevent an Acquisition of Us.**  Our certificate of incorporation and bylaws and Delaware law contain provisions that could make it more difficult for a third party to acquire us without the consent of our Board of Directors.  These provisions include a classified Board of Directors, prohibition of stockholder action by written consent, prohibition of stockholders to call special meetings and the requirement that the holders of at least 80% of our shares approve any business combination not otherwise approved by two-thirds of our Board of Directors.  Delaware law also imposes some restrictions on mergers and other business combinations between us and any holder of 15% or more of our outstanding common stock.  In addition, our Board of Directors has the right to issue preferred stock without stockholder approval, which could be used to dilute the stock ownership of a potential hostile acquirer.

By identifying the risk that its corporate charter documents and Delaware law could make an acquisition more difficult, NI did not imply that no other possible barriers to

an acquisition existed.  It simply stated the fact that certain
rules may delay or impede a potential offer to acquire the
company.  The plaintiffs have not sufficiently explained why
these statements were rendered misleading by NI's failure to
disclose the Emerson offers.  Therefore, to the extent that the
plaintiff claims that NI violated Rule 10b-5(b) by making
statements about the stock buybacks and certain acquisition
risks without also disclosing the Emerson offers, this claim is
dismissed.

II.  Insider Trading

The plaintiff also alleges that NI violated § 10(b) and
Rule 10b-5 by failing to either abstain from trading in NI's
securities or to disclose Emerson's offers while buying back
NI's securities.  This theory of lability survives.

Section 10(b) and Rule 10b-5 "are violated when a corporate
insider trades in the securities of his corporation on the basis
of material, nonpublic information."  United States v. Chow, 993
F.3d 125, 136 (2d Cir. 2021) (citing Chiarella v. United States,
445 U.S. 222, 228 (1980)).  Because "a relationship of trust and
confidence exists between the shareholders of a corporation and
those insiders who have obtained confidential information," the
corporate insider has "a duty to disclose or to abstain from
trading because of the necessity of preventing a corporate
insider from taking unfair advantage of uninformed

stockholders." Id. (citing Chiarella, 445 U.S. at 228-29). A corporation is subject to the same duty as individual insiders to disclose material non-public information before trading in its own shares. See, e.g., Shaw v. Digit. Ent. Grp., 82 F.3d 1194, 1203 (1st Cir. 1996), abrogated on other grounds by 15 U.S.C. § 78u-4(b)(2); McCormick v. Fund Am. Cos., Inc., 26 F.3d 869, 876 (9th Cir. 1994); Jordan v. Duff & Phelps, Inc. 815 F.2d 429, 435 (7th Cir. 1987), cert. denied, 485 U.S. 901 (1988); Green v. Hamilton Int'l Corp., 437 F.Supp. 723, 728 (S.D.N.Y. 1977).

An undisclosed fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Altimeo, 19 F.4th at 151 (citing Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38 (2011)). Materiality is assessed in light of what was known at the time of the purchase or sale of the security. Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 181-82 (2d Cir. 2001). At the pleading stage, the materiality standard is met if "a reasonable investor would have considered [the omitted information] significant in making investment decisions." New England Carpenters Guaranteed Annuity and Pensions Funds v. DeCarlo, 80 F.4th 158, 182 (2d Cir. 2023)

(citing Basic v. Levinson, 485 U.S. 224, 231-32 (1988)).
"Because the materiality element presents a mixed question of
law and fact, it will rarely be dispositive in a motion to
dismiss." Altimeo, 19 F.4th at 151 (citation omitted). A
complaint "may not properly be dismissed" on the grounds that
the nonpublic information was "not material" unless it is "so
obviously unimportant to a reasonable investor that reasonable
minds could not differ" on its importance. Id. (citation
omitted).

When contingent or speculative events are at issue, such as
the potential acquisition of a company, "materiality will depend
at any given time upon a balancing of both the indicated
probability that the event will occur and the anticipated
magnitude of the event in light of the totality of the company
activity." Id. (citing Basic, 485 U.S. at 238). In other
words, the materiality of speculative events "depends on the
probability that the event will be consummated, and its
significance to the issuer of the securities." Castellano, 257
F.3d at 185 (citing Basic, 485 U.S. at 250). "The mere fact
that a company has received an acquisition overture or that some
discussion has occurred will not necessarily be material." Id.
(citation omitted). "[B]ecause a merger is one of the most
important events" that can occur for a company, however,

17

"information regarding a merger can become material at an earlier stage than would be the case as regards lesser transactions." S.E.C. v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997). To determine materiality, courts are instructed to examine "indicia of interest in the transaction at the highest corporate levels," including but not limited to "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries." Castellano, 257 F.3d at 185 (citing Basic, 485 U.S. at 239). The probability of a transaction occurring must be considered "in light of the facts as they then existed at the time of the securities purchase," not in hindsight. Id. (citation omitted).

Materiality is usually decided at the summary judgment stage or at trial, rather than on a motion to dismiss. This case is no exception.

The amended complaint adequately pleads that the magnitude of the proposed transaction, to wit, Emerson's purchase of all of NI's stock, would be significant. It also plausibly pleads the other element of materiality in connection with this contingent event, which is the probability of the event occurring.

Emerson indicated its serious interest in acquiring NI in both its May 25 and June 22 Letters. The letters explained that

the offer was not subject to financing since Emerson had the cash on hand to purchase the NI stock.  They added that Emerson was prepared to move quickly and did not expect regulatory impediments.  While Emerson made clear that it preferred to work privately with NI, it noted in its June 22 Letter that it was confident NI shareholders would view the cash offer favorably.

The defendants argue that NI did not demonstrate any of the "indicia of interest" set forth in Basic in response to Emerson's offers.  NI rejected Emerson's May 25 offer on June 16 after concluding that the proposal "substantially undervalued" NI.  Emerson's June 22 offer, which was at the same price per share as the May 25 offer, was also promptly rejected.  NI's Board and management rejected these offers without consulting investment bankers, forming committees, or negotiating with Emerson.  Unlike in SEC v. Shapiro, NI did not give non-public information to Emerson or commence negotiations with it.  494 F.2d 1301, 1306 (2d Cir. 1974).  But the amended complaint asserts that NI's Board considered the potential for Emerson to improve its offer and decided to highlight NI's financial "momentum" in upcoming earnings calls to encourage an improved bid from Emerson.  Taken together with the magnitude of the proposed transaction, the credibility of bidder, and the degree

of interest shown by the bidder, this adequately pleads materiality.

The amended complaint also plausibly pleads NI's scienter. Scienter may be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." New England Carpenters, 80 F.4th at 177 (citation omitted). When scienter is based on conscious misbehavior, the plaintiff must show "deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." Id. at 178 (citation omitted). Recklessness refers to conduct which "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." S. Cherry St., LLC v. Hennessee Grp., 573 F.3d 98, 109 (2d Cir. 2009) (citation and emphasis omitted).

According to the amended complaint, NI decided to continue with its stock repurchases during August and September of 2022 with knowledge that a significant corporate transaction had been proposed by a serious bidder. Although Emerson's two offers were quickly rejected by NI, NI was aware that Emerson might return with an improved offer. Indeed, the amended complaint

pleads that NI decided to speak optimistically about its future so that any renewed offer from Emerson would be at a higher price.  While these optimistic statements may have made the repurchase of stock more expensive, it can be inferred that the repurchase was expected to be at a lower price than it would have been had NI disclosed the existence of the Emerson offers.[2]

III. Control Person Liability

The plaintiffs also bring a claim under § 20(a) of the Exchange Act for control person liability against defendants Starkloff, McGrath, and Rapp.  Section 20(a) of the Exchange Act imposes joint and several liability on "every person who, directly or indirectly, controls any person liable under any provision of the Exchange Act or of any rule promulgated thereunder."  15 U.S.C. § 78t(a).  To establish a prima facie case of liability under § 20(a), a plaintiff must show:

> (1) a primary violation by the controlled person;
> (2) control of the primary violator by the defendant; and (3) that the controlling person was, in some meaningful sense, a culpable participant in the controlled person's fraud.

---

[2] The dismissal of the misrepresentation claim has implications for the class definition for the surviving insider trading claim.  The parties will be given an opportunity to address whether the class can only be composed of those who sold their stock to NI during the months of August and September 2022.

Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (citation omitted).  Control "may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person."  S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996) (citing 17 C.F.R. § 240.12b-2).

The amended complaint has adequately pleaded control person liability as to defendants Starkloff and McGrath.  Defendants Starkloff and McGrath were members of the Board and directly communicated with Emerson regarding the offers.  At the pleading stage, this is sufficient to allege that they were, in some meaningful sense, culpable participants in NI's insider trading. See, e.g. Suez Equity Invs., L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001); First Jersey, 101 F.3d at 1472.

The amended complaint, however, does not allege any culpable participation on the part of defendant Rapp.  Rapp was not a member of the Board and there is no allegation that she communicated with Emerson or participated in the relevant Board meetings.  Rapp is only alleged to have made non-actionable statements regarding NI's improved guidance, risk disclosures, and share repurchases.

## Conclusion

The defendants' April 26, 2024 motion to dismiss is granted in part. All claims against defendant Karen Rapp are dismissed. All claims based on a violation of § 10(b) and Rule 10b-5(b) pursuant to a misrepresentation or omission theory are dismissed. The claim against NI for a violation of § 10(b) and Rule 10b-5 on a theory of insider trading during August and September of 2022 survives. The claims against Eric Starkloff and Michael McGrath for control person liability in connection with that insider trading claim also survive.

Dated:    New York, New York
          September 6, 2024

                            _____
                                 DENISE COTE
                        United States District Judge