O94HNatC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE NATIONAL INSTRUMENTS
SECURITIES LITIGATION,

                                    23 Civ. 10488 (DLC)


                                    Conference
------------------------------x
                                    New York, N.Y.
                                    September 4, 2024
                                    11:05 a.m.


Before:

                    HON. DENISE COTE,

                                    District Judge


                        APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
        Attorneys for Plaintiff
BY:  NOAM NOAH MANDEL
        CHAD JOHNSON

DOWD BENNETT LLP
        Attorneys for Defendants
BY:  JAMES F. BENNETT
        -and-
DAVIS POLK & WARDWELL
BY:  ANDREW DITCHFIELD

O94HNatC

(Case called)

THE DEPUTY CLERK:  Who's appearing for the plaintiff?

MR. MANDEL:  Noam Mandel, Robbins Geller, for the plaintiff.

THE DEPUTY CLERK:  For the defendant?

MR. BENNETT:  Jim Bennett.

THE COURT:  Thanks so much, counsel, for being here.

I'm going to ask Mr. Whertvine to help you figure out how to use the microphone system because I don't want counsel to feel they have to lean over.  You move that right up to the — then when you stand, you don't have to lean over at all.  It will pick up your voice.

MR. MANDEL:  Thank you, your Honor.

THE COURT:  Good.

So I really appreciate counsel coming in on somewhat short notice.  I hope you had a good Labor Day break.

I have turned to the motion to dismiss in this case, and it presents some problems that are unusual because of the context in which the law has evolved while this case was proceeding, at least that's my assessment of what's happened here.

This litigation was filed in 2023, some time ago, and an amended complaint was filed in late March of this year.  And then in April of this year, the Supreme Court issued its ruling in *Macquarie*, and just after that ruling, the motion to dismiss

O94HNatC

was briefed.  The plaintiffs declined to amend their complaint, even though I gave them that opportunity, and as a result, the defendants' original motion was largely built on a theory that did not address what the plaintiffs chose to emphasize in their opposition to the motion, or at least one of the things that the plaintiffs chose to emphasize.

The original motion to dismiss did not understand —— and I think it's a fair reading of the complaint —— that there was an insider trading claim brought against the corporation, but the opposition to the motion to dismiss relied on, among other things, an insider trading claim based on the corporation's buy back of stock.  And the critical dates —— I know there are other dates, but the critical dates, I think, are the following:

Emerson provided a letter on May 25 that made an offer to purchase all of the stock —— this is May 25 of 2022 —— of the target company, and that was fairly promptly rejected, rejected on June 19.  Emerson made another offer in a letter of June 22, and that was also fairly promptly rejected on July 22 with an internal decision and on August 2 with notice to Emerson.

So there was no trading in June or July while these events were unfolding.  There is some buyback by National Instruments in May, but the materials provided to me, I don't think, provide those specific dates in May.  And there were

buybacks in August, and, again, I don't think the materials provided to me identify the specific dates.  But, nonetheless, the defendants have represented in their reply brief —— which was essentially the first brief in which the defendants spoke to this insider trading claim in the kind of detail and focus that is helpful for me to address a motion to dismiss —— they represent two points at least, pages 1 and 2 of the reply brief, that there was no live offer when the Emerson stock was repurchased.

Now, I can't go outside the pleadings and the documents that are integral to the complaint in assessing a motion to dismiss.  So I can make some assumptions.  I can construe the pleadings in certain ways.  I have some decisions to make.  But as part of the analysis, there are really only a handful of dates that are material here, and I identified them in my order of August 27.  I realize I shouldn't have listed May 30 of 2022.  That was Memorial Day, and I don't think the buyback would have occurred on that day.  And I don't actually have the timing, I believe, of the May 25 letter or the August 2 notification to Emerson.

But, in any event, I want to understand from the defendants if, when they made that representation in their reply brief, they were focused with care on the dates that I would be focused with care on when assessing the legal arguments, and that would be whether any of the buyback

occurred on May 25, 26, 27, or 31 of 2022 or August 1 and 2 of 2022, because that's how I read the reply. And the reply, of course, is not evidence, and I can't issue a decision on the motion to dismiss based on a factual representation outside the record I can properly consider under 12(b)(6) jurisprudence. Nonetheless, I want to give both the plaintiff and the defendant an opportunity to address, in this unusual procedural situation, that representation of those facts.

So first I'll hear from you, Mr. Bennett, and then, of course, from Mr. Mandel.

MR. BENNETT: Thank you, your Honor.

I have the records, if it's helpful in any way. But the buybacks in May were May 3 through 6. 284,370 shares were purchased on May 3 through 6 and there were no other purchases in May. And in August and September, the first date of any repurchase was August 12, and repurchases were August 12, 18, 19, and 26 in August.

THE COURT: Is that publicly available information or not?

MR. BENNETT: I don't believe it to be. I looked through our public filings, and I think what the plaintiffs relied on was a 10-Q statement that said for the whole month, this is what we had. I think from a 12(b)(6) context, from our perspective, this would be an important fact to allege. They don't allege those dates. And as a practical matter, they

O94HNatC

can't, based on our records.

THE COURT:  Thank you.  So, Mr. Bennett, I want to thank you.

Mr. Mandel, did you want to be heard?

MR. MANDEL:  Yes, your Honor.  Thank you.

If the facts are that in May the transactions occurred in the early part of the month, then, obviously, those transactions could not have triggered a duty to disclose later in the month of May, and the class period we allege could obviously not begin at that point in time.  We submit that the class period in such an instance would begin in July when the statements were —— the alleged material misrepresentations in the Q were issued and would run through January 17 where the class period presently ends, and in ——

THE COURT:  I would like you to focus first on just the insider trading theory.  OK?

So the insider trading theory, which is part of the buyback, couldn't exist earlier than August 12?

MR. MANDEL:  Based on what Mr. Bennett has just said, based on these facts, August 12 would be the first post-August 2 purchase that would trigger such a duty to disclose.  It would be the first transaction, well, during which there was material nonpublic information live in the marketplace, we allege, that would have triggered the duty to disclose.

O94HNatC

We submit, your Honor, that the material information concerning Emerson's intentions to attempt to acquire National Instruments did not stop being material information on August 2 when defendants wrote a letter saying that they were not interested in the transaction, and that's for two principal reasons.

THE COURT:  OK.  But to just shut down the insider trading theory, I mean, there was no buyback —— there were buybacks in August and September.  There were none in October, November, or December.  So on the insider trading theory, you would argue that all of the August and September buyback transactions constituted insider trading and are illegal?

MR. MANDEL:  That's exactly right, your Honor.  We would allege that those trades in August/September, which were the largest such trades in the company's history, triggered the duty to disclose from the perspective of the insider trading claim, separate from the statements, yes, your Honor.

THE COURT:  So that's the issue for me legally, which is whether the May 25 letter and the June 22 letter, which were rejected on notice to Emerson on June 16 and August 2, were material such that National Instruments had to refrain from its buyback program or disclose to the marketplace before it continued its buyback program on August 12 and made purchases in the market, repurchases of its stock, in August and September.  Is that correct?

O94HNatC

MR. MANDEL:  I think that's largely correct, your Honor.  I would say that, from our perspective, material information sort of was born, came into existence, certainly, as of May 25 when Emerson sends a letter with its offer, and so on and so forth.  And it is our position that defendants, National Instruments, saying that they're not interested in the deal or that they're rejecting the deal or otherwise, couldn't prevent —— couldn't take that material information and cause it to cease being material because what was material, principally, was Emerson's intentions, Emerson's intentions to try to buy this company at a premium and, critically, to take the offer directly to stockholders.

THE COURT:  Well, it only said it was going to do that in its December letter.

MR. MANDEL:  Well, if I could —— in the early letters, Mr. Karsanbhai is repeatedly saying that Emerson prefers to negotiate directly and not to take the matter to stockholders, which is very clearly an implication of a willingness to take it to stockholders.  There's a "I prefer to talk to you."  If you're not going to talk to me, I have other options.  This is implicit in  Mr. Karsanbhai's correspondence from May 25, certainly, and he makes that much more explicit as time goes on, for sure.

So that's a critical point here, the fact that Emerson is signaling from the outset, and reasonable jurors could infer

that Emerson is signaling from the outset, a willingness to go directly to the stockholders, and as a result, whether National Instruments was interested in the deal or not, that doesn't lessen the significance of this information to stockholders or the market, doesn't make it any more or less likely that the stock would jump up to meet the offer price, and so forth. That information remains material.  I'd analogize it to some of the tender offer cases we cite, such as *SEC v. Mayhew*, where the analysis of a tender offer, like this situation, involves going directly to the stockholders, around management, around the board.  And in those instances, materiality is determined without reference at all to whether the target company wants to play ball or not because it's irrelevant.

I would say, in this particular instance, August 2 particularly doesn't do away with the material information in the marketplace because, as pled in the complaint, the August 2 letter is part of a larger concerted effort to try to puff up the price of the stock to try to get Emerson to pay more.  In late June —— this is in paragraph 44 of the complaint —— in late June the board, with defendants, has a meeting where they're specifically discussing "the potential for Emerson to change its offer," and in that meeting that they decide that National Instruments should tell Emerson that they're not interested in the deal, but that the company should go out and highlight its financial —— it's allegedly improved financial

O94HNatC

performance.

So what do they do?  They don't right away go out and tell Emerson, no, we're not interested.  They wait until August, even though they've made this decision in June.  In the last business days of July, they issue suddenly far more optimistic projections.  Two business days or so later, on August 2, they issue this letter saying we're not interested in the deal, and then turn around and do 2 million shares' worth of buybacks, the largest in the company's history.  The fair inference of all of these things is these are all part of a concerted effort to drive up the stock price.  The August 2 rejection letter, so to speak, is not genuine, is not a good faith rejection of the letter but is part of the plan that's laid out in the board's —— the description from the proxy of the board's meeting in paragraph 44 where they're trying to see if Emerson will pay more.

So Emerson's intentions remain material through the end of the class period.  And it's noteworthy here that the ultimate corrective disclosure here comes from Emerson, not from the company.  Emerson comes out on its own and says, this is our intention, and that's what causes the price to jump up to the level that they're offering.  And interestingly, in that same disclosure at the end of the class period, Emerson lays bare all of the facts showing that National Instruments had been resistant to the deal.  It doesn't make it any less

O94HNatC

material.  The stock still jumped up on the information.  It's very clear that it is material information in the market regardless of National Instruments' intentions.

THE COURT:  Well, there was a different price quoted in the December disclosures.

MR. MANDEL:  Just as the board intended in their June meeting when they said, let's see if we can get them to pay more.

THE COURT:  But I can't judge this by hindsight anyway.

So this has all been very helpful, and I thank you.

MR. MANDEL:  Thank you, your Honor.

THE COURT:  It seems to me, though, on the insider trading theory, that the class period would only be September —— I'm sorry, August and September.  Those would be the only repurchases at issue on an insider trading theory.

MR. MANDEL:  I think that's correct, your Honor, on a pure insider trading theory, the class period would run August 12 based on the facts we heard this morning through its current conclusion.

THE COURT:  So, Mr. Mandel, I know that this procedural posture is unusual, but do the plaintiffs object to me considering, as I address the motion to dismiss, the representations of defense counsel today about the dates of the buyback?

O94HNatC

MR. MANDEL:  No, your Honor.  Those are facts, and if we had those facts, we would have pled them in the complaint. And if your Honor would like me, we'd replead them and put them into a complaint so it would be procedural appropriate.

THE COURT:  Thank you.  I very much appreciate that, Mr. Mandel.

OK.  There we are.  I have a legal decision to make. Thank you all.

MR. MANDEL:  Thank you, your Honor.

(Adjourned)