UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| In re NATIONAL INSTRUMENTS CORPORATION SECURITIES LITIGATION | : Civil Action No. 1:23-cv-10488-DLC |
|  | : |
|  | <u>CLASS ACTION</u> |

x

x

---

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS
REPRESENTATIVE AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

I. PRELIMINARY STATEMENT ...................................................................................1

II. CLASS DEFINITION .................................................................................................2

III. FACTUAL BACKGROUND ......................................................................................3

IV. THE PROPOSED CLASS SATISFIES RULE 23 .....................................................4

    A. The Proposed Class Satisfies Rule 23(a)'s Requirements .......................................5

        1. Numerosity: The Proposed Class Is So Numerous that Joinder of All Members Is Impracticable .........................................................................5

        2. Commonality: There Are Questions of Law and Fact Common to the Class .................................................................................................6

        3. Typicality: Lead Plaintiff's Claims Are Typical of the Class's Claims .....................................................................................................7

        4. Adequacy: Lead Plaintiff Will Fairly and Adequately Protect the Class ......................................................................................................8

    B. Certification Is Proper Under Rule 23(b)(3) .............................................................9

        1. Predominance: Common Questions of Law and Fact Predominate Over Individual Questions .............................................................................9

            a. *Affiliated Ute*: Lead Plaintiff and the Class Are Entitled to a Presumption of Reliance ................................................................10

            b. Fraud-on-the-Market: Reliance Is Presumed Under *Basic* Because the Stock Traded in an Efficient Market ........................11

                (1) *Cammer* Factor 1: The Stock Experienced a High Volume and Frequency of Trading .....................................13

                (2) *Cammer* Factor 2: Extensive Analyst Coverage ................14

                (3) *Cammer* Factor 3: Market Makers .....................................14

                (4) *Cammer* Factor 4: Form S-3 Eligibility .............................15

                (5) *Cammer* Factor 5: The Stock Reacted to Company-Specific Information ........................................................15

**Page**

(6)     *Krogman* Factor 1: Market Capitalization ..........................16

(7)     *Krogman* Factor 2: Narrow Bid-Ask Spread .....................17

(8)     *Krogman* Factor 3: Float.....................................................17

b.     Damages Are Measurable on a Class-Wide Basis .........................17

2.     Superiority: A Class Action Is Superior to Other Available
Methods for the Fair and Efficient Adjudication of This Action...............18

C.     The Court Should Appoint Robbins Geller as Class Counsel ...............................19

V.     CONCLUSION.................................................................................................................20

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Affiliated Ute Citizens of Utah v. United States,*
406 U.S. 128 (1972)..................................................................................................1, 10, 11

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)........................................................................................................18, 19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
568 U.S. 455 (2013)....................................................................................................10, 11, 12

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)..................................................................................... *passim*

*Billhofer v. Flamel Techs., S.A.,*
281 F.R.D. 150 (S.D.N.Y. 2012) .......................................................................................15

*Brecher v. Republic of Arg.,*
806 F.3d 22 (2d Cir. 2015)..............................................................................................9

*Cammer v. Bloom,*
711 F. Supp. 1264 (D.N.J. 1989) ............................................................................. *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
310 F.R.D. 69 (S.D.N.Y. 2015) .......................................................................................9, 14, 18

*Erica P. John Fund, Inc. v. Halliburton Co.,*
563 U.S. 804 (2011).........................................................................................................10

*Erickson v. Jernigan Cap., Inc.,*
692 F. Supp. 3d 114 (S.D.N.Y. 2023)..................................................................................9

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.,*
594 U.S. 113 (2021)..........................................................................................................12

*Gruber v. Gilbertson,*
No. 16-cv-9727, 2019 WL 4439415
(S.D.N.Y. Sept. 17, 2019)............................................................................................. *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.,*
573 U.S. 258 (2014)........................................................................................................11, 12

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.,*
338 F.R.D. 205 (S.D.N.Y. 2021) ......................................................................................6, 10

**Page**

*In re Allergan PLC Sec. Litig.*,
   No. 18 Civ. 12089 (CM), 2021 WL 4077942
   (S.D.N.Y. Sept. 8, 2021) .................................................................................................15

*In re Am. Bus. Computs. Corp. Sec. Litig.*,
   MDL No. 913, 1994 WL 848690
   (S.D.N.Y. Feb. 24, 1994) ...................................................................................................3

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................................................17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) .............................................................................................7, 8

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
   310 F.R.D. 230 (S.D.N.Y. 2015) ........................................................................................5

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017) ...................................................................................9, 12, 16

*In re Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016) ................................................................................13, 15

*In re SCOR Holding (Switzerland) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008) ............................................................................6, 19

*In re Shanda Games Ltd. Sec. Litig.*,
   No. 1:18-cv-2463-ALC, 2022 WL 992794
   (S.D.N.Y. Mar. 31, 2022) ..............................................................................................2, 3

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) ........................................................................................11

*In re Waste Mgmt. Sec. Litig.*,
   No. 22 Civ. 4838 (LGS), 2025 WL 958467
   (S.D.N.Y. Mar. 31, 2025) ..............................................................................................7, 9

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ..........................................................................12, 13, 17

*McIntire v. China MediaExpress Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014) .................................................................................14

**Page**

*O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*,
    559 F. Supp. 800 (S.D.N.Y. 1983) ........................................................................3

*Pearlstein v. BlackBerry Ltd.*,
    No. 13 Civ. 7060 (CM), 2021 WL 253453
    (S.D.N.Y. Jan. 26, 2021)...........................................................................15, 17

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ..........................................................................14

*Puddu v. NYGG (Asia) Ltd.*,
    No. 15-cv-8061 (DLC), 2022 WL 2304248
    (S.D.N.Y. June 27, 2022)............................................................... *passim*

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015).................................................................................17

*Scheufele v. Tableau Software, Inc.*,
    No. 17-cv-5753 (JGK), 2020 WL 2553100
    (S.D.N.Y. Feb. 13, 2020) ....................................................................................9

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
    659 F.3d 234 (2d Cir. 2011).............................................................................5, 6

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008).............................................................................................10

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) ....................................................12, 13, 14, 15

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ...........................................................................9

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017).................................................................5, 11, 12, 13

*Wilson v. Comtech Telecommc'ns Corp.*,
    648 F.2d 88 (2d Cir. 1981)....................................................................................3

*Wilson v. LSB Indus., Inc.*,
    No. 15 Civ. 7614 (RA), 2018 WL 3913115
    (S.D.N.Y. Aug. 13, 2018) .......................................................................14, 15, 17

**Page**

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
  §78j(b)............................................................................................................... *passim*
  §78t(a) ........................................................................................................................1, 7

Federal Rules of Civil Procedure
  Rule 23 .....................................................................................................................1, 4, 5
  Rule 23(a)..............................................................................................................1, 2, 4, 5
  Rule 23(a)(1) .................................................................................................................5
  Rule 23(a)(2) .................................................................................................................6
  Rule 23(a)(3) .................................................................................................................7
  Rule 23(a)(4) .................................................................................................................8
  Rule 23(b) ...................................................................................................................20
  Rule 23(b)(3)....................................................................................................... *passim*
  Rule 23(g) ................................................................................................................1, 20
  Rule 23(g)(1)........................................................................................................19, 20

17 C.F.R.
  §240.10b-5 ..............................................................................................................1, 12

Lead Plaintiff Wayne County Employees' Retirement System ("Lead Plaintiff" or "WCERS") respectfully submits this memorandum of law in support of its motion pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure to certify this action as a class action and to appoint Lead Plaintiff as Class Representative, and pursuant to Rule 23(g), to appoint Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.[1]

## I.    PRELIMINARY STATEMENT

The Court should certify this securities case as a class action under Rule 23 of the Federal Rules of Civil Procedure.  This action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of sellers of National Instruments ("NI") common stock.  On September 6, 2024, the Court sustained plaintiff's insider trading theory of liability under Section 10(b) and Rule 10b-5 based on the Company's "failing . . . to disclose Emerson's offers while buying back NI's securities."  ECF 42 (the "Order") at 15.  In accordance therewith, Lead Plaintiff now respectfully seeks certification of a class of sellers of NI common stock during the period from August 12, 2022 through September 30, 2022, the period during which NI repurchased millions of shares with no disclosure concerning Emerson's high-premium offer.

This action satisfies each of the requirements of Rule 23(a) and Rule 23(b)(3) for certification, *see* Fed. R. Civ. P. 23(a), (b)(3), including, because class members here are entitled to the presumption of class-wide reliance under both *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) and *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  The Court should therefore grant the Motion.

---

[1]    All defined terms have the same meanings as in the Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF 29) unless otherwise noted.  References to "¶" and "¶¶" are to the Complaint.  All emphasis is added and all internal citations and quotation marks are omitted unless otherwise noted.  "Rule" refers to the Federal Rules of Civil Procedure.

In support of the Motion, Lead Plaintiff respectfully submits the Declaration of Gerard Grysko, Deputy Director of WCERS, attesting to Lead Plaintiff's oversight of and commitment to prosecuting this action in the interests of all class members.[2]  Lead Plaintiff also respectfully submits the Expert Report of Matthew D. Cain,[3] demonstrating, *inter alia*, that the market for NI common stock was efficient at all relevant times.

For these reasons, and those set forth below, Lead Plaintiff respectfully asks the Court to grant the Motion.

## II.    CLASS DEFINITION

As set forth in the Notice of Motion for Class Certification, Lead Plaintiff respectfully requests an order certifying this action as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class as defined below (the "Class Definition"):

> All persons who sold National Instruments common stock between August 12, 2022 and September 30, 2022, inclusive (the "Class Period") and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

The dates of the proposed Class Period – which runs from August 12, 2022 through September 30, 2022 – flow from the Section 10(b) insider trading theory of liability that this Court sustained.  Order at 15-21.  In Section 10(b) claims arising from insider trading, the "duty of disclosure is owed only to those investors trading contemporaneously with the insider[.]" *In re Shanda Games Ltd. Sec. Litig.*, No. 1:18-cv-2463-ALC, 2022 WL 992794, at *7 (S.D.N.Y.

---

[2]    *See* Declaration of Gerard Grysko in Support of Lead Plaintiff's Motion for Class Certification, attached hereto as Exhibit A to the Declaration of Noam Mandel in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel ("Mandel Decl.").  References to the exhibits attached thereto appear herein as "Ex."

[3]    *See* Expert Report of Matthew D. Cain, Ph.D. ("Cain" or "Cain Report"), Ex. B.

Mar. 31, 2022) (citing *Wilson v. Comtech Telecommc'ns Corp.*, 648 F.2d 88, 94-95 (2d Cir. 1981)).[4]  Here, National Instruments repurchased shares on 15 different dates spread throughout the Class Period, repurchasing a total of over 2 million shares during this time.  *See* ECF 47. Defendants thus owed (and breached) a duty of disclosure to all sellers of NI common stock during the proposed Class Period.  This proposed Class Period is consistent with the Court's insight at the motion to dismiss stage that the Class "can only be composed of those who sold their stock [in] August and September."  Order at 21, n.2.

## III.    FACTUAL BACKGROUND

In May and June of 2022, Emerson approached Defendants with an all-cash offer to buy the outstanding National Instruments shares for $48 per share, a significant premium to the market price at that time.  ¶35.  Emerson expressed a serious commitment to proceeding with the transaction, indicating that it had the necessary funds and wanted no financing contingency, that acquiring National Instruments was its "highest strategic priority," that it was "very motivated to conclude a transaction" and "prepared to move very quickly," and even stated a willingness to "work with [Defendants] to find additional value that would allow us to increase our Proposal." ¶¶30, 40, 41.

National Instruments proceeded to carry out the largest share repurchase in the company's history for any comparable period in August and September of 2022 without disclosing these high-

---

[4]    *See also In re Am. Bus. Computs. Corp. Sec. Litig.*, MDL No. 913, 1994 WL 848690, at *4 (S.D.N.Y. Feb. 24, 1994) ("[A] class action may be maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information[.]"); *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 559 F. Supp. 800, 803, 805 n.5 (S.D.N.Y. 1983) ("[T]he duty to 'disclose or abstain' is owed . . . to those who trade 'during the same period' as, or 'contemporaneously' with, the possessor of inside information.").

premium offers.  ¶53. As the Court explained, Defendants "fail[ed] to either abstain from trading in NI's securities or to disclose Emerson's offers while buying back NI's securities."  Order at 15.

Although Defendants communicated an ostensible rejection of the May and June offers to Emerson on the ground that $48 per share was "inadequate," Defendants nevertheless decided to publicly "highlight NI's momentum" in connection with considering "the potential for Emerson to change its offer and the degree to which Emerson would pursue the potential transaction."  ¶44 (quoting Defendants).  In other words, as the Court explained, "although Emerson's two offers were quickly rejected by NI, NI was aware that Emerson might return with an improved offer. Indeed, the amended complaint pleads that NI decided to speak optimistically about its future so that any renewed offer from Emerson would be at a higher price."  Order at 20-21; *see also id*. at 19 ("[T]he amended complaint asserts that NI's Board considered the potential for Emerson to improve its offer and decided to highlight NI's financial 'momentum' in upcoming earnings calls to encourage an improved bid from Emerson[.]").

In November 2022, Emerson increased its (still undisclosed) offer to $53 per share, leading to a further series of negotiations.  ¶¶55-70.  On January 13, 2023, while negotiations were ongoing and Emerson was bound to a standstill, National Instruments announced a generic "strategic" review to consider "potential acquirors" but made no mention of Emerson's offer, causing the stock price to increase to approximately $48 per share.  ¶¶71-72, 75.  On January 17, 2023, Emerson publicly announced its $53 per share offer and published its previously undisclosed correspondence with Defendants.  ¶¶76-78.  This disclosure caused National Instruments stock price to increase to approximately $53 per share.  ¶81.

## IV.    THE PROPOSED CLASS SATISFIES RULE 23

The Court should certify the proposed Class because the requirements of Rule 23 are readily satisfied in this case.  *See* Fed. R. Civ. P. 23(a), (b)(3).  Rule 23(a) has four prerequisites:

"numerosity, commonality, typicality, and adequacy of representation." *Puddu v. NYGG (Asia) Ltd.*, No. 15-cv-8061 (DLC), 2022 WL 2304248, at *2 (S.D.N.Y. June 27, 2022). In addition, under Rule 23(b)(3), a class should be certified where a plaintiff shows that "questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting Fed. R. Civ. P. 23(b)(3)). The court must find these requirements established by at least a preponderance of the evidence. *See Puddu*, 2022 WL 2304248, at *2.

The Second Circuit has instructed district courts "to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to both private parties and to the public provided by class actions." *Gruber v. Gilbertson*, No. 16-cv-9727, 2019 WL 4439415, at *2 (S.D.N.Y. Sept. 17, 2019) (quoting *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 235 (S.D.N.Y. 2015)). Moreover, courts have consistently held that claims alleging violations of Section 10(b) of the Exchange Act are especially amenable to class certification and that the Rule 23 factors should be construed liberally: "[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Gruber*, 2019 WL 4439415, at *2.

As explained below, all of Rule 23(a) and Rule 23(b)(3)'s requirements are satisfied here.

**A.    The Proposed Class Satisfies Rule 23(a)'s Requirements**

**1.    Numerosity: The Proposed Class Is So Numerous that Joinder of All Members Is Impracticable**

This action satisfies Rule 23(a)(1)'s numerosity requirement because the proposed Class is "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). The Second Circuit has found that numerosity is presumed for a class of forty or more plaintiffs. *See Shahriar*

*v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011).  Here, Dr. Cain's Report estimates that there were between 131.17 million and 132.32 million shares of NI common stock outstanding during the Class Period, and that over 400 institutions held the stock at some point during the Class Period.  Cain ¶¶86, 89.  Moreover, the high volume of trading during the Class Period indicates that a significant quantity of NI shares were sold during the Class Period.  *Id*. ¶36 (estimating that over 26 million shares were sold during the Class Period).  Numerosity is therefore satisfied here.  *See, e.g.*, *Puddu*, 2022 WL 2304248, at *3 ("The numerosity requirement is satisfied, as there were around 19.5 million shares . . . held by the public at the end of the class period."); *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 211 (S.D.N.Y. 2021) (numerosity satisfied where between 34.3 million and 55.1 million shares were issued and outstanding).

### 2.    Commonality: There Are Questions of Law and Fact Common to the Class

Rule 23(a)(2)'s commonality requirement is satisfied here because "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact," and "[e]ven a single common legal or factual question will suffice."  *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 571 (S.D.N.Y. 2008).  The "satisfaction of this requirement has been described as a 'low hurdle.'"  *Gruber*, 2019 WL 4439415, at *3.

This action involves questions of law and fact that are common to all Class members because the Class members' claims are based on the same legal theories and arise out of the same course of conduct.  These questions include, *inter alia*: (i) whether Defendants violated the Exchange Act; (ii) whether Defendants' stock repurchases were made while in possession of material non-public information; (iii) whether Defendants' acted knowingly or recklessly in

effectuating the Company's stock repurchases in light of the material non-public information they possessed; and (iv) whether Class members sustained damages and the proper measure of those damages. The commonality requirement is therefore satisfied. *See, e.g.*, *Gruber*, 2019 WL 4439415, at *3 (commonality "satisfied because the class proceeding will generate common answers to several key questions, including whether defendants engaged in deceptive conduct and omitted the disclosure of material facts, whether there was scienter, and whether insider trading occurred"); *In re Waste Mgmt. Sec. Litig.*, No. 22 Civ. 4838 (LGS), 2025 WL 958467, at *3 (S.D.N.Y. Mar. 31, 2025) ("[T]he issues of misrepresentation, materiality, scienter and causation are common to all putative class members[.]").

### 3. Typicality: Lead Plaintiff's Claims Are Typical of the Class's Claims

Typicality is also satisfied here because "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied where "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). The typicality "standard is not demanding because the claims only need to share the same essential characteristics, and need not be identical." *Gruber*, 2019 WL 4439415, at *3.

Lead Plaintiff's claims are based on the same course of events and involve the same legal theories as every other Class member's claims. Like all other members of the Class, Lead Plaintiff sold common stock during the Class Period at artificially depressed prices, while NI repurchased more than 2 million shares of the Company's common stock and failed to disclose material information concerning Emerson's offers, in violation of Sections 10(b) and 20(a) of the Exchange Act, which caused damage to Lead Plaintiff and the other Class members. ¶¶98, 106, 108; *see,*

*e.g.*, *Puddu*, 2022 WL 2304248, at \*3 ("The plaintiffs' claims are also typical of those of the class, as the class's claims all derive from the same alleged omissions of material fact."); *Gruber*, 2019 WL 4439415, at \*3 (typicality satisfied where the representative plaintiff "and any class members . . . will make 'similar legal arguments to prove the defendant's liability[,] . . . irrespective of minor variations in the fact patterns underlying the individual claims'"). Accordingly, typicality is satisfied.

### 4.    Adequacy: Lead Plaintiff Will Fairly and Adequately Protect the Class

Lead Plaintiff "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy analysis "entails two factors: (1) the interests of the named plaintiffs cannot be antagonistic to those of the remainder of the class and (2) class counsel must be qualified, experienced, and generally able to conduct the litigation." *Gruber*, 2019 WL 4439415, at \*4; *see also Flag Telecom*, 574 F.3d at 35 (same).

As a seller of common stock at artificially low prices who suffered damages as a result of Defendants' failure to disclose during the Class Period, Lead Plaintiff's interests are directly aligned with those of all Class members and are in no way antagonistic to those interests. Moreover, Lead Plaintiff respectfully submits herewith the Declaration of Gerard Grysko, Deputy Director of WCERS, which demonstrates that Lead Plaintiff stands ready to protect the interests of all Class members, and to continue to monitor, oversee, and participate in this litigation as it has done throughout. *See* Ex. A.

Lead Plaintiff has also engaged competent and experienced counsel to represent the Class. The Robbins Geller firm has an extensive and successful record litigating securities class actions

in courts throughout the country, including in this District.[5]  In light of this record, "[c]ourts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. 2015) (collecting cases).[6]  Lead Plaintiff therefore satisfies the adequacy requirement.

### B.      Certification Is Proper Under Rule 23(b)(3)

Class certification is also proper under Rule 23(b)(3) because common questions of law or fact predominate and a class action is the superior method for bringing the claim.  *See* Fed. R. Civ. P. 23(b)(3); *Gruber*, 2019 WL 4439415, at *5.[7]

### 1.      Predominance: Common Questions of Law and Fact Predominate Over Individual Questions

The predominance requirement is satisfied in this case because questions of law and fact common to Class members "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *see also Puddu*, 2022 WL 2304248, at *3.  "In a securities fraud case,

---

[5]      *See* Robbins Geller Firm Résumé, Ex. C.

[6]      *See also Waste Mgmt.*, 2025 WL 958467, at *14 ("Robbins Geller has substantial experience in prosecuting securities fraud class actions[.]"); *Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 127 (S.D.N.Y. 2023) ("The firm has substantial experience in securities class actions, including in this District, and has been found adequate in a multitude of cases."); *Scheufele v. Tableau Software, Inc.*, No. 17-cv-5753 (JGK), 2020 WL 2553100, at *3 (S.D.N.Y. Feb. 13, 2020) (Robbins Geller is "a firm that courts within this circuit have found to be adequate and well qualified."); *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040-AKH, ECF 1316 at 55:14-18 (S.D.N.Y. Jan. 21, 2019) ("[T]he role of lead counsel was fulfilled in an extremely fine fashion by [Robbins Geller]. At every juncture, the representations made to me were reliable, the arguments were cogent, and the representation of their client was zealous."); *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 59 (S.D.N.Y. 2019) ("[Robbins Geller] has extensive experience in securities class actions and complex litigation, as well, indicating its ability to manage this litigation and ably apply the applicable law.").

[7]      The Second Circuit has also recognized an implied requirement that the proposed Class be sufficiently ascertainable.  *See Puddu*, 2022 WL 2304248, at *2 (citing *Brecher v. Republic of Arg.*, 806 F.3d 22, 24 (2d Cir. 2015)).  Here, the Class consists of sellers of National Instruments common stock during a defined trading period, fitting within objective criteria and subject to definite boundaries.  *See, e.g.*, *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017) ("*Petrobras I*") ("This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way.").

elements such as materiality, loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified." *Puddu*, 2022 WL 2304248, at \*3. "[T]he Supreme Court has noted that the predominance requirement is a test readily met in certain cases alleging . . . securities fraud." *Hawaii Structural Ironworkers*, 338 F.R.D. at 214.

The elements of materiality, loss causation, falsity, and scienter are all common questions that predominate over individualized ones and are therefore not at issue on class certification. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 473-74 (2013) (materiality); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) ("*Halliburton I*") (loss causation); *Basic*, 485 U.S. at 242 (falsity and scienter). Accordingly, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810.

Reliance in this case is established under the *Affiliated Ute* presumption because Lead Plaintiff's and the Class's claims all arise primarily from Defendants' material omissions. Reliance in this case is further established on a class-wide basis under the "fraud on the market" presumption because the stock traded in an informationally efficient market in which its prices promptly reflected public information.

<b>a. <i>Affiliated Ute</i>: Lead Plaintiff and the Class Are Entitled<br>to a Presumption of Reliance</b>

The Class is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because this case primarily concerns omissions. *See Gruber*, 2019 WL 4439415, at \*6 ("*Affiliated Ute* presumption applies only where 'there is an omission of a material fact by one with a duty to disclose.'") (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008)). Under *Affiliated Ute*, "positive proof of

- 10 -

reliance is not a prerequisite to recovery." *Id.*; *see also Waggoner*, 875 F.3d at 95.  This is because "[w]hen a defendant's fraud consists primarily of omissions, '[r]equiring a plaintiff to show a speculative set of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff.'"  *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013).  Thus, "when a securities fraud claim is premised on an omission rather than a false statement, reliance on the omission can be presumed from its materiality."  *Puddu*, 2022 WL 2304248, at *3.  "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their investment] decision[s]."  *Affiliated Ute*, 406 U.S. at 153-54. This Court has already held that materiality is satisfied here.  Order at 19-20.  The Court has likewise already noted that the claims arise from the omission of material information – *i.e.*, from Defendants "failing . . . to disclose Emerson's offers while buying back NI's securities."  *Id*. at 15; *see also id*. at 2 ("Because of the omission of the offer, shareholders assert that they sold their common stock at artificially depressed prices[.]").  Accordingly, the *Affiliated Ute* presumption of class-wide reliance applies here.  *See, e.g.*, *Puddu*, 2022 WL 2304248, at *5 (applying *Affiliated Ute* in omissions case); *Gruber*, 2019 WL 4439415, at *6-*7 (same).

### b. Fraud-on-the-Market: Reliance Is Presumed Under *Basic* Because the Stock Traded in an Efficient Market

Alternatively, Lead Plaintiff and the Class are entitled to the fraud-on-the-market presumption of reliance under *Basic*.

The fraud-on-the-market doctrine establishes "a rebuttable presumption of reliance on material misrepresentations aired to the general public."  *Amgen*, 568 U.S. at 461 (citing *Basic*, 485 U.S. at 241-49).  The rationale for this presumption is that "market prices generally respond to new, material information."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272

- 11 -

(2014) ("*Halliburton II*").  The Supreme Court has recognized that plaintiffs are typically entitled to a rebuttable presumption based on the fraud-on-the-market theory, which finds that "the market price of shares traded on well-developed markets reflect all publically available information, and, hence, any material misrepresentations." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 314 (S.D.N.Y. 2016) (citing *Halliburton II*, 573 U.S. at 277).

"Although the *Basic* presumption can be invoked by any Rule 10b–5 plaintiff, it has particular significance in securities-fraud class actions," where it allows plaintiffs to prove reliance through evidence common to the class. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) (citing *Amgen*, 568 U.S. at 462).  "To invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Strougo*, 312 F.R.D. at 314 (citing *Halliburton II*, 573 U.S. at 277).

There can be no reasonable dispute that the *Basic* presumption is satisfied here.  Lead Plaintiff respectfully submits herewith the Cain Report, which demonstrates that the market for the common stock was efficient by every applicable measure.  Ex. B.

The burden to prove market efficiency "is not an onerous one." *Petrobras I*, 862 F.3d at 278.  To determine market efficiency, district courts in this and other Circuits consider several factors first enumerated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*"), and supplemented by *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*").  *See Waggoner*, 875 F.3d at 94.  The *Cammer* and *Krogman* factors are "simply tools" for analyzing market efficiency, and must be viewed "holistic[ally]" and not as a checklist of "distinct requirements[.]" *Id*. at 97-98.  The *Cammer* and *Krogman* factors include: (1) the average weekly

- 12 -

trading volume of the security; (2) the number of securities analysts following and reporting on it; (3) the extent to which market makers traded in the security; (4) the issuer's eligibility to file an SEC registration Form S-3; (5) the demonstration of a cause-and-effect relationship between unexpected, material disclosures and changes in the security price; (6) market capitalization; (7) the bid-ask spread; and (8) the percentage of the security not held by insiders (*i.e.*, the "float"). *See id.* at 94-98.

An evaluation of these factors overwhelmingly supports a finding that National Instruments common stock traded in an efficient market during the Class Period. Lead Plaintiff and the proposed Class are therefore entitled to the fraud-on-the-market presumption.

### (1)    *Cammer* Factor 1: The Stock Experienced a High Volume and Frequency of Trading

National Instruments' high trading volume supports a finding of market efficiency. Cain ¶¶35-36. The existence of an actively traded market, as evidenced by large weekly trading volume, "suggests efficiency 'because it implies significant investor interest in the company . . . [which], in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.'" *Strougo*, 312 F.R.D. at 316. "[A]verage weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 365 (S.D.N.Y. 2016) ("*Petrobras II*") (quoting *Cammer*, 711 F. Supp. at 1286).

During the Class Period, National Instruments' common stock weekly trading volume was 2.9% of the outstanding common stock over the Class Period. Cain ¶35. The average weekly trading volume was 3.8 million shares on the NASDAQ. *Id.* ¶36. Additionally, the daily turnover rate of 0.6% placed it between the 25th and 50th percentiles of all companies listed on the New

York Stock Exchange and the NASDAQ. *Id.* This trading volume supports a finding of market efficiency. *See, e.g.*, *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (average weekly trading volume of 2.5% supported "a strong presumption of efficiency").

### (2)    *Cammer* Factor 2: Extensive Analyst Coverage

Coverage of a security by a "significant number of analysts" indicates efficiency because it implies that "investment professionals are following the company and making buy/sell recommendations to investors." *Strougo*, 312 F.R.D. at 316; *see also* Cain ¶38.

Dr. Cain identified at least 19 analyst reports issued during the Class Period by 11 separate firms – including J.P. Morgan, Morgan Stanley, Morningstar, Susquehanna, and others. Cain ¶39. This level of analyst coverage supports a finding of efficiency. *See Cammer*, 711 F. Supp. at 1283 n.30 (finding 15 reports sufficient); *Wilson v. LSB Indus., Inc.*, No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115, at *11 (S.D.N.Y. Aug. 13, 2018) (finding that one large brokerage firm publishing reports "strongly supports the notion of a functioning market," where five total firms published reports during the class period).[8]

### (3)    *Cammer* Factor 3: Market Makers

At least 45 market makers and brokers covered National Instruments common stock during the Class Period. Cain ¶45. This level of coverage by market makers and brokers indicates an efficient market. *Id*. ¶44; *see also McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y. 2014) (average of 20 registered market makers throughout the class period supported efficiency); *Strougo*, 312 F.R.D. at 316 (finding that the existence of market makers

---

[8]    National Instruments also was covered by financial media and other press during the Class Period. Cain ¶41. Some courts recognize that significant media coverage supports a finding of market efficiency. *See Barclays*, 310 F.R.D. at 92 ("regular press coverage throughout the Class Period" weighed in favor of finding market efficiency); *Wilson*, 2018 WL 3913115, at *11 ("[W]e agree that the many news articles support a finding that 'financial statements relating to a security are closely reviewed by investment professionals'").

provides "reasonable guidance in determining" whether *Basic* applies).  In addition, the common stock traded on the NASDAQ throughout the Class Period.  Cain ¶45.  Trading on large stock exchanges generally supports a finding of efficiency.  *See Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) ("If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient."). NI common stock was held by over 400 unique institutional investors during the Class Period, who owned an average total of 124.6 million shares, or 94.5% of the common stock outstanding.  Cain ¶47.  These facts support a finding of market efficiency.  *See Wilson*, 2018 WL 3913115, at *12 (finding 251 major institutions owning stock supported efficiency); *see also Pearlstein v. BlackBerry Ltd.*, No. 13 Civ. 7060 (CM), 2021 WL 253453, at *16 (S.D.N.Y. Jan. 26, 2021) (finding efficiency where more than 400 institutions held stock).

### (4)     *Cammer* Factor 4: Form S-3 Eligibility

A company is eligible for S-3 registration when, among other things, it files Exchange Act reports for a specified length of time and has an outstanding float above a certain sizable value. *See Petrobras II*, 312 F.R.D. at 365.  National Instruments' public float far exceeded the size required for S-3 eligibility, at an average of $4.5 billion compared to the required $75 million. Cain ¶51.  National Instruments thus was eligible to file Form S-3 during the Class Period, further demonstrating that the Stock traded in an efficient market.  *See In re Allergan PLC Sec. Litig.*, No. 18 Civ. 12089 (CM) (GWG), 2021 WL 4077942, at *10 (S.D.N.Y. Sept. 8, 2021) (S-3 eligibility and filing prior and during class period supported efficiency).

### (5)     *Cammer* Factor 5: The Stock Reacted to Company-Specific Information

The market for National Instruments' common stock displayed a strong cause-and-effect relationship between the release of new company-specific information and the price of the stock.

Cain ¶74.  The fifth *Cammer* factor "invites plaintiffs to submit direct evidence, consisting of empirical facts showing a cause and effect relationship between unexpected corporate events" and a change in the price of securities.  *Petrobras I*, 862 F.3d at 276.  Dr. Cain conducted an event study to test whether there was a cause-and-effect relationship between unexpected material company-specific information and the prices of the stock.  Cain ¶54.

Dr. Cain's analysis demonstrates at a 95% confidence level that days with significant news released about the Company resulted in a greater proportion of statistically significant stock price movements, higher absolute abnormal returns, and greater trading volumes.[9]  Cain ¶74.  His analysis revealed that, of the nine News Days he identified, all nine dates reflected stock price movements that were statistically significant at the 95% confidence level or better.  *Id*. ¶71.  This stood in contrast to his analysis of days without events, which revealed significant stock price movements on only 4.5% of the days analyzed.  *Id*. ¶¶70, 72.  The difference between these two percentages is statistically significant at a confidence level greater than 99%.  *Id*. ¶72.

Dr. Cain's direct showing of a cause-and-effect relationship between new material information and the prices of the stock is strong *prima facie* evidence of market efficiency here.

### (6)    *Krogman* Factor 1: Market Capitalization

National Instruments' market capitalization averaged $5.3 billion over the Class Period, placing it in the 75th percentile of all companies listed on the NASDAQ or NYSE from 2016 to 2018, indicating an efficient market.  Cain ¶77; *see also Wilson*, 2018 WL 3913115, at *15 (market capitalization of $751.3 million favored finding of efficiency).

---

[9]    Dr. Cain defined days with significant news released ("News Days") as days with National Instruments' earnings releases and M&A-related disclosures during the period he analyzed.  Cain ¶69.  Whereas here, the Class Period was only seven weeks, Dr. Cain performed his test over a two-year period leading up to the public disclosure of Emerson's offer in order to adapt his analysis to the changing volatility of the stock over time.  *Id*. ¶60.

### (7)    *Krogman* Factor 2: Narrow Bid-Ask Spread

National Instruments' bid-ask spread averaged 0.07% during the Class Period.  Cain ¶81. This narrow bid-ask spread is indicative of an efficient market.  *See Pearlstein*, 2021 WL 253453, at *16 (spread of 0.09% supported efficiency); *Wilson*, 2018 WL 3913115, at *15 (spread of 0.07% supported efficiency).

### (8)    *Krogman* Factor 3: Float

National Instruments had between 131.17 million and 132.32 million shares of Class A Common Stock outstanding during the Class Period, with only 0.8% held by insiders, with over 99% of NI common stock held by non-insiders, resulting in a public float of $4.5 billion during this period.  Cain ¶86.  A security's public float is the number of securities outstanding, excluding securities held by insiders and affiliated corporate entities, and a higher float indicates greater market efficiency.  *See Krogman*, 202 F.R.D. at 478; *Wilson*, 2018 WL 3913115, at *15 (finding float of 82.41% of shares held by non-insiders sufficient to support efficiency); *Pearlstein*, 2021 WL 253453, at *16 (float of $5.44 billion average and 84.4% of shares outstanding "weigh[ed] heavily" in favor of efficiency).

### b.    Damages Are Measurable on a Class-Wide Basis

Courts in this Circuit routinely find that the calculation of damages in securities fraud actions is common to all class members, as damages can be calculated on a class-wide basis through the application of the "out-of-pocket" damages methodology and an "event study" to measure the price impact of company-specific information disclosed to the public.  *See, e.g.*, *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016).  Moreover, where, as here, liability can be proven on a class-wide basis, "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)."  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).  *See also Gruber*, 2019 WL 4439415, at *8

(finding damages model based on inflated price minus actual price sufficient for class certification); *Barclays*, 310 F.R.D. at 74 ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases.").

Lead Plaintiff has presented a method for determining damages for all Class members that is consistent with its theory of liability. Dr. Cain opines that the out-of-pocket damages methodology – which has been acknowledged as the appropriate damages model in case law and published legal scholarship – is used to compute damages in virtually all securities class action cases, and in particular, cases such as this one addressing Section 10(b) liability. Cain ¶¶92-94. Under the out-of-pocket methodology, class-wide damages can be calculated in a straightforward manner common to all Class members. Dr. Cain explains further that economic analyses, including valuation and empirical event study analysis, can be used to estimate the relationship between specific omissions and their effect on securities prices, and opines that an event study can quantify the amount of artificial inflation that existed in the prices of the stock on each day of the Class Period, which can then be used to calculate out-of-pocket damages for each Class member. *Id*. ¶94.

In sum, the calculation of each Class member's damages will be a mechanical arithmetic exercise for all Class members who sold the stock during the Class Period, and thus is readily applicable on a Class-wide basis.

### 2. Superiority: A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Adjudicating Class members' claims as "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Class action treatment is superior if it will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural

fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). "Generally, securities actions easily satisfy the superiority requirement because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Gruber*, 2019 WL 4439415, at *9.

Here, joinder of all Class members is impracticable because the proposed class – which comprises hundreds if not thousands of individual sellers – is numerous and geographically dispersed. *See, e.g.*, Cain ¶51. Certifying this Class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. *Id*. The superiority requirement is therefore satisfied in this case. *See, e.g., SCOR Holding (Switzerland)*, 537 F. Supp. 2d at 579 (superiority satisfied where "the proposed class. . . potentially includes hundreds, if not thousands of plaintiffs. Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources. In addition, many investors will be unable to seek redress of their claims except through the class action device. Forcing each investor to litigate separately would also risk disparate results among those seeking redress.").

### C.    The Court Should Appoint Robbins Geller as Class Counsel

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). Lead Plaintiff respectfully requests that the Court appoint Robbins Geller as Class Counsel. In appointing Class Counsel, the Court should consider counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). As discussed *supra*, Robbins Geller

is well qualified to prosecute this case on behalf of Lead Plaintiff and the other members of the Class, and has already undertaken a vigorous prosecution of this action, including conducting an extensive investigation of the claims, defeating Defendants' motion to dismiss in relevant part, commencing discovery, and pursuing class certification. Robbins Geller thus fulfills the requirements of Rule 23(g). The Court should appoint Robbins Geller as Class Counsel.

## V.    CONCLUSION

This action satisfies the requirements of Rules 23(a) and (b), and Lead Plaintiff and Robbins Geller will vigorously advocate for all Class members. The Court should therefore grant the Motion in full.

DATED: May 2, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON
NOAM MANDEL
DESIREE CUMMINGS
JONATHAN ZWEIG
CHRISTOPHER T. GILROY

_/s/ Noam Mandel_

NOAM MANDEL

420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  (212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcummings@rgrdlaw.com
jzweig@rgrdlaw.com
cgilroy@rgrdlaw.com

_Lead Counsel for the Class_

- 20 -

WOLF POPPER LLP
ROBERT C. FINKEL
JOSHUA W. RUTHIZER
ADAM SAVETT
845 Third Avenue, 12th Floor
New York, NY  10022
Telephone:  (212) 759-4600
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com
asavett@wolfpopper.com

*Additional Counsel*

## CERTIFICATE OF WORD COUNT

1.      Pursuant to Rule 7.1 of the United States District Court for the Southern District of New York, the undersigned counsel certifies that the foregoing brief was prepared on a computer using Microsoft Word.  A proportionally spaced typeface was used as follows:

> Name of Typeface: Times New Roman
> Point Size in Body: 12 (footnotes, 10)
> Line Spacing in Body: Double (footnotes, single)

2.      The total number of words in the brief, inclusive of point headings and footnotes and exclusive of the caption, table of contents, table of authorities, signature block, and this Certification, is 6,355 words.  By operation of Microsoft Word's word count function, this number includes legal citations and certain forms of punctuation.

*/s/ Noam Mandel*
NOAM MANDEL