# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NATIONAL INSTRUMENTS CORPORATION SECURITIES LITIGATION | Case No. 1:23-cv-10488-DLC<br><br>CLASS ACTION |

EXPERT REPORT OF MATTHEW D. CAIN, PH.D.

May 2, 2025

**Table of Contents**

I.      **Scope of Report and Opinions** ..................................................................**2**

II.     **Qualifications**.............................................................................................**3**

III.    **Case Background** ........................................................................................**5**

IV.     **Bases for Opinions on Market Efficiency** .................................................**6**

V.      **Evaluation of Market Efficiency Factors for National Instruments' Common Stock 9**

    A.    *Cammer* Factor 1: Average Weekly Trading Volume ................................ 11

    B.    *Cammer* Factor 2: Analyst Coverage .......................................................... 13

    C.    *Cammer* Factor 3: Market Makers .............................................................. 15

    D.    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ................................... 18

    E.    *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices........................................................ 19

    F.    *Krogman* Factor 1: Market Capitalization .................................................. 28

    G.    *Krogman* Factor 2: Bid-Ask Spread............................................................ 29

    H.    *Krogman* Factor 3: Public Float .................................................................. 30

    I.    Additional Factor: Institutional Ownership................................................... 31

VI.     **Ability to Calculate Damages on a Class-Wide Basis**....................................**32**

    A.    Calculation of Damages for Violation of Section 10(b) of the Exchange Act .............................................................................................. 32

    B.    Damages Methodology Is Flexible and Can Incorporate Alternative Findings.................................................................................... 35

VII.    **Conclusion** ..................................................................................................**37**

## I.    Scope of Report and Opinions

1.    Court-appointed Lead Plaintiff Wayne County Employees' Retirement System ("Plaintiff"), through its attorneys, has asked me to determine whether the market for National Instruments Corporation ("National Instruments", or the "Company") common stock ("Common Stock") was efficient during the period August 12, 2022 to September 30, 2022, inclusive (the "Class Period").[1]

2.    In addition, Plaintiff has asked me to opine on whether damages for investors who sold National Instruments' Common Stock during the Class Period can be calculated using a common methodology for all Class members that is consistent with Plaintiff's insider trading claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§10(b) claims").

3.    Based on my analysis to date and the evaluation of the factors described throughout this Report, I have formed the following opinions:

    a.    The market for National Instruments' Common Stock was efficient throughout the Class Period.

    b.    The *Cammer* and *Krogman* factors accepted and applied by courts to assess market efficiency corroborate that National Instruments' Common Stock traded in an efficient market.

    c.    Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting Common Stock price movements (which I analyze under the fifth *Cammer* factor) supports that National Instruments' Common Stock traded in an efficient market throughout the Class Period.

    d.    Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for Plaintiff's pending claims. In particular, the out-of-pocket damages methodology, which is used in virtually all Section 10(b) securities class actions, is appropriate and

---

[1] *See* Amended Complaint for Violations of the Federal Securities Laws (Doc. 29) ("Complaint") and Opinion and Order (Doc. 42) ("MTD Opinion").

applicable here.

4.      The remainder of my Report is organized as follows: **Section II** describes my qualifications. **Section III** summarizes the case background. **Section IV** briefly explains the bases for the reliance requirement and the "fraud-on-the-market" theory relating to market efficiency. **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period. **Section VI** addresses how damages can be calculated on a class-wide basis subject to a common methodology under Section 10(b). **Section VII** summarizes my conclusions.

## II.     Qualifications

5.      I hold a Ph.D. in Finance from Purdue University and am a Senior Fellow at the New York University School of Law. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.

6.      My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held fellowships with the Berkeley Center for Law and Business at UC Berkeley, Vanderbilt Law School, and the Harvard Law School Program on Corporate Governance, where I participated in teaching, research, and academic seminars.

7.      Before my current roles, I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, improper revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including

3

securities law violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

8.       Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

9.       Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

10.      In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

11.      I have published research in leading peer-reviewed journals in the fields of finance, accounting, law, and economics, including: *Journal of Financial Economics, Journal of Law and Economics*, *Journal of Accounting and Economics, Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications.

4

12.     In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters. As an expert in financial economics, I have conducted analyses or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation/damages in over 60 cases. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

13.     The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $1,100 per hour for my work on this matter. I have been assisted in this matter by my staff at Cleveland Analytics, LLC working under my direction, and I receive additional compensation based upon their billings. My compensation is in no way contingent on the outcome of this case.

14.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

## III.    Case Background

15.     National Instruments was founded over 40 years ago for the purpose of creating "technology to connect instruments to computers in order to accelerate the testing and measurement of innovative technology."[2] National Instruments was publicly traded on the NASDAQ stock exchange under the trading symbol "NATI."[3]

16.     The Complaint alleges that in May of 2022, Emerson Electric Co. ("Emerson") approached National Instruments with an offer to acquire the Company at a significant premium

---

[2] National Instruments Corp, SEC Form 10-K, Feb. 21, 2023, p. 3, available at: https://www.sec.gov/Archives/edgar/data/935494/000093549423000008/0000935494-23-000008-index.htm.

[3] *Id.*, at p. 1

and with substantial deal closing certainty.[4] National Instruments allegedly made no public disclosure of this offer for eight months, but engaged in a scheme to repurchase millions of shares of its own Common Stock in August and September of 2022, while delaying Emerson's efforts to acquire the Company.[5]

17.    The Complaint alleges that Defendants' fraudulent scheme caused National Instruments' Common Stock price to be artificially deflated, which led Plaintiffs to sell their National Instruments Common Stock at artificially deflated prices, causing investor losses.[6] On January 13, 2023, National Instruments announced a strategic review to consider a sale of the Company, and on January 17, 2023, Emerson publicly announced an offer to acquire National Instruments.[7] Both of these disclosures allegedly revealed the relevant truth to investors and caused National Instruments' Common Stock price to increase significantly.[8]

18.    The Complaint alleges that, as a result of Defendants' scheme, investors traded National Instruments' Common Stock at artificially deflated prices during the Class Period.[9] **Exhibit 1** graphs the closing stock price and trading volume for National Instruments' Common Stock shares throughout the Class Period.

## IV.    Bases for Opinions on Market Efficiency

19.    I understand that, with respect to their claims under §10(b), Plaintiff asserts the presumption of reliance under *Affiliated Ute*.[10] I understand that Plaintiff also asserts the "fraud-

---

[4] Complaint ¶ 3.

[5] Complaint ¶¶ 4, 53-54.

[6] Complaint ¶¶ 16, 97, 101, 115.

[7] Complaint ¶¶ 27-28.

[8] Complaint ¶¶ 72-81.

[9] Complaint ¶¶ 16, 97, 101, 115.

[10] Complaint ¶ 99.

on-the-market" theory of class-wide reliance, *i.e.*, that all National Instruments shareholders relied on the alleged scheme through its effect on stock prices in an informationally efficient market.[11]

20.    As courts, including the Supreme Court, have repeatedly explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors who purchase or sell securities traded in an informationally efficient market during a class period rely on any schemes, public misrepresentations, and/or material omissions of fact made during the class period because those statements or material omissions of fact are incorporated into the value of each class member's purchase or sale price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[12]

21.    The Supreme Court reaffirmed the availability of this theory to satisfy Section 10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[13]

22.    A market is considered informationally efficient when the market price of securities

---

[11] *Id.*, ¶¶ 100-102.

[12] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[13] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

begins to respond quickly to publicly available information.[14] Economic research and literature support the concept of market efficiency for publicly traded securities. For example, Nobel Prize winner Eugene Fama has observed that "[t]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse,"[15] and that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[16]

23.    Indeed, research continues to support the empirical soundness of the efficient market hypothesis, as modern scholars have concluded that, in fact, "capital markets are more efficient than previously recognized."[17] Academic research thus provides ample support for the concept of market efficiency for public exchange-traded securities.

24.    Markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, are frequently granted a presumption of efficiency for virtually all securities traded on them.[18] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other rules for these

---

[14] Academics often consider more stringent forms of market efficiency, *e.g.*, defining an efficient market as one in which prices reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs. Eugene F. Fama, 1991, *Efficient Capital Markets: II*, Journal of Finance 46, at 1575 (1991).

[15] Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, Journal of Finance 25, at 383, 416 (1970).

[16] Eugene F. Fama, *Efficient Capital Markets: II*, Journal of Finance 46, at 1575, 1576 (1991).

[17] *See, e.g.*, Kewei Hou, Chen Xue, and Lu Zhang, *Replicating Anomalies*, Review of Financial Studies 33, at 2071 (2020).

[18] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*") ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'") (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, §8.6 (Aug. 1988)).

exchanges practically guarantee a liquid market for securities traded on these exchanges.[19] The fact that National Instruments' Common Stock traded on the NASDAQ leads to a strong presumption of market efficiency.

25.     In securities fraud cases, courts have endorsed the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purpose of establishing the presumption of class-wide reliance.[20] Courts also accept additional factors for evaluating market efficiency, such as those in the widely-cited *Krogman v. Sterritt* opinion.[21]

26.     Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.[22] However, as explained below, it is important to understand that an assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.[23]

## V.     Evaluation of Market Efficiency Factors for National Instruments' Common Stock

27.     In the following section, I discuss the *Cammer*, *Krogman*, and other factors and evaluate them in relation to National Instruments' Common Stock.[24] In doing so, I compare the factors' application to National Instruments' Common Stock against: (1) benchmarks established

---

[19] *Id.*

[20] *Cammer*, 711 F. Supp. at 1264, 1286 – 1287.

[21] 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[22] *See, e.g.*, Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

[23] *Id.*, at 204-205.

[24] In addition to the *Cammer* and *Krogman* factors, I also note that the Company a) had call and put options traded on the Common Stock, and b) did not have a statistically significant autocorrelation coefficient on abnormal stock returns during the Class Period from my event study in Section V.E. These findings further support my conclusion that National Instruments' Common Stock traded in an efficient market throughout the Class period.

by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

28.    As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that National Instruments' Common Stock traded in an efficient market throughout the Class Period.

29.    One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[25] In this peer-reviewed study, these authors examined two samples of firms. One sample included companies that eventually lost all analyst coverage (the "MRK Previously Covered Companies"); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered Companies"), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[26]

30.    The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock. . . . Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading

---

[25] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, *Is There Life After the Complete Loss of Analyst Coverage?*, Accounting Review 88, at 667-705 (2013).

[26] MRK Study at 678, 681-682.

volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[27]

31.    The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[28] Therefore, I interpret the sample of MRK Covered Companies as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets.

32.    Below, I compare several of National Instruments' market efficiency factors to the samples of firms in the MRK Study, to samples of firms in other academic studies, and to the benchmarks set forth by courts, to assess whether National Instruments' characteristics are consistent with firms operating in efficient markets.

### A.    *Cammer* Factor 1: Average Weekly Trading Volume

33.    Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity in a security, the more likely it is that new information will be quickly incorporated into the price of that security.[29] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[30] Similarly, "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion

---

[27] MRK Study at 667.

[28] MRK Study at 681 (footnotes omitted).

[29] *See, e.g.*, Bharat Bhole, Sunita Surana, and Frank Torchio, *Benchmarking Market Efficiency Indicators for Securities Litigation*, University of Illinois Law Review Online, at 101-102 (2020) (the "Bhole Study"); Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63, at 108 (2000); MRK Study at 681.

[30] *Id.*

for investment analysts in deciding which stocks to follow."[31]

34.    The first *Cammer* factor, stock trading volume, was defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[32]

35.    **Exhibit 2** graphs National Instruments' Common Stock weekly trading volume as a percentage of shares outstanding throughout the Class Period.[33] The average weekly trading volume was 2.9% of National Instruments' Common Stock outstanding over the Class Period. This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court. As a result, National Instruments' level of stock trading volume throughout the Class Period supports the conclusion that National Instruments' Common Stock traded in an efficient market throughout the Class Period.

36.    I also note that the average weekly trading volume of National Instruments' Common Stock over the Class Period was 3.8 million shares on the NASDAQ. This is a far larger weekly trading volume than was found for the MRK Previously Covered Companies (just 0.034 million shares), as well as the MRK Covered Companies (0.215 million shares).[34] Additionally, National Instruments' daily turnover rate of 0.6% during the Class Period placed it between the

---

[31] Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63, at 108 (2000).

[32] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, §8.6).

[33] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[34] MRK Study at 678 (Table 3). The median annual trading volume for MRK Previously Covered Companies was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK Covered Companies was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

25th and 50th percentiles of all companies listed on the NYSE and the NASDAQ.[35] In total, during the Class Period, 26.66 million shares traded; in other words, 26.66 million shares were sold by investors from August 12, 2022 through September 30, 2022. This further supports the conclusion that National Instruments' Common Stock traded in an efficient market throughout the Class Period.

### B.    *Cammer* Factor 2: Analyst Coverage

37.    The second *Cammer* factor looks at the amount of analyst coverage the company at issue receives. An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry. Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.

38.    Analyst coverage can be indicative of market efficiency since research analysts help to disseminate new important company-specific information to investors, thus impounding new information into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[36]

39.    In **Exhibit 3,** I review the analyst coverage of National Instruments over the Class

---

[35] According to the Bhole Study at 102, the 25th percentile of daily turnover for the 2016-2018 sample period is 0.39%; 50th percentile is 0.71%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[36] *Cammer*, 711 F. Supp. at 1286.

Period. I identified a total of 19 reports issued by analysts at 11 separate firms during that period.[37] The list of analyst reports that I was able to identify includes reports by firms such as J.P. Morgan, Morgan Stanley, Morningstar, and Susquehanna, among others. Collectively, this is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

40.    Empirically, this degree of analyst coverage is greater than that of most other publicly traded firms as documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S (the Institutional Brokers' Estimate System) received no analyst coverage in a given year.[38] Charles M.C. Lee and Eric So documented that, on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[39] Barber et al. found that coverage by one or two analysts strengthened the presumption of market efficiency.[40] Moreover, National Instruments' level of analyst coverage also placed it above the 50th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[41] The significant analyst coverage of National Instruments during the Class Period supports the conclusion that National Instruments Common

---

[37] Plaintiff's Counsel provided me with analyst reports. I also obtained a cite list of analyst reports from LSEG Refinitiv. These statistics represent a lower bound of the analyst coverage of National Instruments because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

[38] MRK Study at 668.

[39] Charles M.C. Lee and Eric C. So, *Uncovering Expected Returns: Information in Analyst Coverage Proxies*, Journal of Financial Economics 124, at 336 (see Table 1, Panel B – "COV") (2017).

[40] Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, Journal of Corporate Law 19, at 302 and 310-311 (1994).

[41] Bhole Study at 104 (50th percentile defined as 6.2 analysts). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

Stock traded in an efficient market throughout the Class Period.

41.     National Instruments also produced numerous filings containing Company information that were immediately disseminated to the public through the SEC's online database, EDGAR, before, during, and after the Class Period. The Company also received coverage from financial media and other press during this time period, which provided further dissemination of information about the Company to investors.

42.     As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about National Instruments supports the conclusion that its Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### C.     *Cammer* Factor 3: Market Makers

43.     The third *Cammer* factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[42] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[43]

44.     In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market

---

[42] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[43] Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, Journal of Corporate Law 19, at 291 (1994).

> makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[44]

The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

45.     National Instruments had at least 45 market makers and brokers providing similar activity over the Class Period.[45] Further, National Instruments' Common Stock traded on the NASDAQ throughout the Class Period. Similar to other large, national exchanges, the NASDAQ reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient.[46] The *Cammer* court stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago

---

[44] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

[45] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact . . . RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow.").

[46] *See*: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."

16

Board Options Exchange and the NASDAQ National Market System.[47]

46.     I understand that courts typically view large, established stock exchanges with market makers (such as the NYSE and NASDAQ) as being informationally efficient.[48] National Instruments' public listing on the NASDAQ, a well-developed and established national exchange, thus satisfies this market maker *Cammer* factor.

47.     Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading.[49] Academic research has similarly found that institutional investors can facilitate trading liquidity. National Instruments' Common Stock was held by over 400 unique institutional investors during the Class Period, who owned an average total of 124.6 million, or 94.5% of National Instruments' Common Stock outstanding.[50]

48.     In sum, National Instruments easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the

---

[47] *Cammer*, 711 F. Supp. at 1292.

[48] *See, e.g.*, *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (citation omitted); *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").

[49] *See, e.g.*, *In re Countrywide Fin'l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading." (citations omitted)); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

[50] *See* **Exhibit 10**. By comparison, the MRK Study found that the MRK Previously Covered Companies had a median of only nine institutional investors while the MRK Covered Companies had a median of 40 institutional investors (p. 678 – Table 3). National Instruments' institutional ownership base greatly exceeds both of these levels.

efficiency of the market for National Instruments' Common Stock throughout the Class Period.

**D.      *Cammer* Factor 4: SEC Form S-3 Filing Eligibility**

49.      The fourth *Cammer* factor is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, ***such ineligibility was only because of timing factors*** rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[51]

50.      Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has a float of at least $75 million, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[52] The logic and intuition behind this factor, as discussed by the *Cammer* court, is that investors in a company that makes timely financial filings with regulators will have ready and ample access to publicly available information about the issuer.

51.      As shown in **Exhibit 8**, National Instruments' market capitalization averaged $5.3 billion over the Class Period. Moreover, **Exhibit 10** demonstrates significant public float of National Instruments' public shares available for trading, with the number of shares held by investors other than insiders averaging 133.2 million on the quarters ending before and after the Class Period. Multiplying these shares by National Instruments' closing stock price on each

---

[51] *Cammer*, 711 F. Supp. at 1287 (emphasis added).

[52] *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf.

quarter-end date indicates that National Instruments had a public float ranging from $4.0 billion to $4.9 billion during the Class Period, with an average of $4.5 billion. Thus, at all times during the Class Period, National Instruments' public float far exceeded the S-3's minimum eligibility requirement of $75 million.

52.     National Instruments also regularly filed financial reports with the SEC throughout the Class Period. The financial information in National Instruments' SEC filings, supplemented by information conveyed by research analysts and news coverage, provided investors with access to financial information about National Instruments on a continuous basis throughout the Class Period. Based on my research, National Instruments made required filings with the SEC in a timely manner and satisfied the other Form S-3 requirements throughout the Class Period. As a result, this factor is consistent with the efficiency of the market for National Instruments' Common Stock throughout the Class Period.

### E.     *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

53.     The fifth *Cammer* factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information. The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[53]

54.     Below, I summarize my empirical analysis, which finds that National Instruments' Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*. As part of my analysis, I compared the behavior of National Instruments' Common Stock on days when potential value-relevant news was issued via earnings releases or merger and acquisition ("M&A") related information with its

---

[53] *Cammer*, 711 F. Supp. at 1291.

behavior on days when no such news was issued. This analysis demonstrates that National Instruments' Common Stock price reacted to company-specific news, and thus further supports the conclusion that National Instruments' Common Stock traded in an efficient market throughout the Class Period.

        *i.      Event Study Methodology*

55.      To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study.

56.      Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[54] As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[55]

57.      To determine whether National Instruments' Common Stock price movements on

---

[54] *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 13 (1997).

[55] Eugene F. Fama, *Efficient Capital Markets: II*, Journal of Finance 46, at 1607 (1991).

any given date are statistically significant, I performed an event study using generally accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

58.    Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

59.    I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, in order to isolate the impact of company-specific news on National Instruments' Common Stock price during the Class Period, I performed regression analyses to measure the relationship between National Instruments' Common Stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in National Instruments' industry. By modeling how National Instruments' Common Stock price returns moved relative to an overall market index and an industry index, I was also able to measure the response of National Instruments' Common Stock to announcements of company-specific news.

60.    Due to the short Class Period (seven weeks), I performed this test over a two-year "Analysis Period" leading up to the end of January 2023, following the public disclosure of

21

Emerson's offer to acquire National Instruments (2/1/2021 – 1/31/2023).[56] I conducted my regression analysis over this Analysis Period. For each trading day, I constructed a regression model using data from the prior 120 trading days (*i.e.*, six calendar months) of trading days (the "Estimation Window").[57]

61.    To study the relationship between National Instruments' Common Stock price returns and overall market factors, I used the NASDAQ Composite Total Return Index (the "Market Index"). To study the relationship between National Instruments' Common Stock price returns and changes in industry-wide factors that would be expected to impact all stocks in National Instruments' particular industry, I constructed an "Industry Index" comprised of the 19 companies in National Instruments' 2022 peer group.[58]

62.    I established the relationship between the daily return of National Instruments' Common Stock, the daily return on the Market Index, and the daily return on the Industry Index

---

[56] Complaint ¶¶ 27-28.

[57] I utilized an Estimation Window of 120 trading days, which equates to approximately six calendar months. This allowed my regression approach to adapt to the changing volatility of stock returns over time. *See, e.g.*, Mark L. Mitchell and Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, The Business Lawyer 49 (1994); A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 35, at 15 (1997) ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[58] See National Instruments Corp, SEC Form DEF 14A, Mar. 27, 2023, at p. 29. Available at: https://www.sec.gov/Archives/edgar/data/935494/000114036123013880/0001140361-23-013880-index.htm. I constructed an equal-weighted index using the 19 peers in this group with available daily returns. The Company noted three additions to this group in 2022 based on firms that "fit [National Instruments'] business model" and reflecting the Company's [transition to a software-oriented business model."

over the Estimation Window.[59] As shown in **Exhibit 4**, the event study models revealed an evolving relation between the daily returns of National Instruments' Common Stock and those of the overall stock Market and Industry Indices throughout the Analysis Period. In other words, movements of the Market Index and the Industry Index help explain movements in National Instruments' Common Stock price.

63.    Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of National Instruments' Common Stock on any given date within the Analysis Period that controlled for that day's market and industry returns. Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

64.    Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in National Instruments' Common Stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of National Instruments' Common Stock after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Analysis Period.

        *ii.*    *Cause and Effect Analysis Comparing National Instruments' Common*

---

[59] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 35 (1997); Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, *Good News, Bad News, Volatility, and Betas*, Journal of Finance 50, at 1597 (1995).

*Stock Price Behavior on News Days versus No News Days*

65.    A generally accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on days when potential value-relevant company-specific news is disclosed ("news days") with its behavior on other days with relatively little or no such news.[60] A showing that a security's price is statistically significantly more volatile on "news days" than on "no news days" is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding of efficiency.[61] In this case, I considered National Instruments' earnings announcements and M&A-related announcements as the "news days."[62]

66.    Importantly, research has shown that in an efficient market, it is possible for a security to exhibit some large price movements despite the absence of news and, conversely, for one to observe news without large price movements.[63] For instance, a company may announce earnings (or a lack thereof) that are in line with investor expectations – and while such an expected announcement is clearly important to investors, it may not elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again could result in no statistically significant

---

[60] Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

[61] *Id.*

[62] *See, e.g.*, Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021); Robert F. Bruner, *Applied Mergers & Acquisitions*, John Wiley & Sons (2004), at pp. 36-44, 734: "Merger negotiations are *highly* material for every target firm." (I note that Bruner is referring to economic, not legal, materiality).

[63] *See* Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, *Information, Trading, and Volatility: Evidence from Firm-Specific News*, Review of Financial Studies 32, at 1004 (2019); Ray Fair, *Events That Shook the Market*, Journal of Business 75, at 713, 714 (2002).

price movement. Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level.

67.    Accordingly, a generally accepted, peer-reviewed methodology also accepted by numerous courts is to compare (i) a subject company's stock price behavior on a *group* of "news days" to (ii) its stock price behavior on a *group* of "no news days."[64]

68.    Here, I performed such an analysis comparing the behavior of National Instruments' Common Stock on news versus no news days. My analysis demonstrates that the price of National Instruments' Common Stock was statistically significantly more volatile on news than on no news days. This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price"[65] for National Instruments' Common Stock during the Class Period and, thus, further supports a finding of market efficiency.

69.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I identified National Instruments' earnings releases and M&A-related disclosures during the Analysis Period (the "News Days"). These types of announcements represent a potential opportunity for the public release of new value-relevant Company information to investors. As shown in **Exhibit 6**, in total, National Instruments issued seven earnings releases during the Analysis Period, and there were also two disclosures of M&A-

---

[64] Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021). This approach has been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, e.g.*, *In re: Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022); *Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, at *22 (M.D. Tenn. Feb. 14, 2023); *In re: QuantumScape Sec. Class Action Litig.*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

[65] *Cammer*, 711 F. Supp. at 1291.

related news.[66] I then classified each day on which such news was first issued as a News Day.[67]

70.    I then compared the stock returns and trading volume of National Instruments' Common Stock on these News Days versus those metrics on trading days that contained the least news during the Analysis Period (the "No News Days"). I identified No News Days as days on which there were no News Day events, no alleged revelations of the relevant truth, and no SEC filings (such as other Company press releases filed on Form 8-K).[68] The No News Days provide a benchmark measurement of days in which relatively little or no new National Instruments-specific information was provided to the market. If National Instruments' Common Stock prices tend to move more significantly on News Days than on No News Days, this would support a conclusion of market efficiency. As discussed below, there were 464 No News Days during the Analysis Period.[69]

71.    **Exhibit 6** reports the list of nine News Days – *i.e.*, their market impact dates and corresponding earnings releases. It also reports the results of my event study using National Instruments' Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study,

---

[66] Complaint ¶¶ 27-28; National Instruments Corp, SEC Form 8-K, Jan. 13, 2023, available at: https://www.sec.gov/Archives/edgar/data/935494/000114036123001557/0001140361-23-001557-index.htm; National Instruments Corp, Emerson Electric Co, SEC Form DFAN14A, Jan. 17,    2023,    available    at: https://www.sec.gov/Archives/edgar/data/32604/000095010323000538/0000950103-23-000538-index.htm; National Instruments Corp, Emerson Electric Co, SEC Form DFAN14A, Jan. 17, 2023, available    at: https://www.sec.gov/Archives/edgar/data/32604/000095010323000568/0000950103-23-000568-index.htm.

[67] If the release was issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day.

[68] I ignore SEC Form 4 filings for purposes of identifying the No News Days.

[69] The 9 News Days and 464 No News Days combined cover 94% of the trading days (473 of 504) in the Analysis Period.

the t-statistic, and the p-value corresponding to statistical significance. Overall, nine out of nine National Instruments' News Days caused stock price movements that were statistically significant at the 95% confidence level or better. I compare this rate with that on the No News Days in **Exhibit 7**.

72.      **Exhibit 7** summarizes the statistical comparison of National Instruments' Common Stock returns and trading volume on the 9 News Days versus these metrics as measured on the 464 No News Days. As shown in **Exhibit 7**, 100% of the News Day disclosures caused stock movements that were statistically significant at the 95% level. This compares to 4.5% of the No News Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at a level of greater than 99%.[70]

73.      These results provide strong evidence of a cause-and-effect relationship between new information and National Instruments' Common Stock price movements. Moreover, relative to the No News Days, the News Days had a higher average absolute abnormal return and greater trading volume, with these differences being statistically significant at a level greater than 99%.[71]

74.      In summary, relative to No News Days, National Instruments' News Days resulted in a greater proportion of statistically significant stock price movements at the 95% confidence level, higher absolute abnormal returns, and greater trading volumes, and these differences are statistically significant. These results establish a clear cause-and-effect relationship between the release of new company-specific information and National Instruments' Common Stock price movements. Moreover, I note that the M&A-related disclosures, including National Instruments' strategic review announcement and Emerson's public offer to acquire the Company, resulted in statistically significant increases in National Instruments' Common Stock prices. These findings

---

[70] Based on a Fisher's Exact Test.

[71] Based on a t-test for difference of means.

27

provide additional support of a cause-and-effect relationship between company disclosures and resulting movements in stock price. As a result, this *Cammer* factor five analysis supports the conclusion that National Instruments' Common Stock traded in an efficient market during the Class Period.

### F. *Krogman* Factor 1: Market Capitalization

75.    I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[72]

76.    Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors – such as relatively small market capitalization – that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Previously Covered Companies – those that eventually lost all analyst coverage – was $27.91 million.[73] By contrast, the MRK Covered Companies – those with analyst-coverage – had a median market capitalization of $243.97 million.[74] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

77.    **Exhibit 8** reports National Instruments' market capitalization throughout the Class Period.[75] This market capitalization averaged $5.3 billion over the Class Period. National Instruments' total market capitalization places it above the 75th percentile of all companies listed

---

[72] *Krogman*, 202 F.R.D. at 478.

[73] MRK Study at 678 (Table 3).

[74] MRK Study at 678 (Table 3).

[75] Source: Bloomberg.

on the NASDAQ and the NYSE from 2016-2018.[76] National Instruments' market capitalization also exceeded the median MRK Previously Covered Companies and Covered firms on an inflation-adjusted basis.[77]

78.     National Instruments' market capitalization, shares outstanding available for trading, and its sizeable float, as discussed below, are consistent with the conclusion that the Common Stock traded in an efficient market during the Class Period.

### G.     *Krogman* Factor 2: Bid-Ask Spread

79.     The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[78]

80.     The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example, relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

81.     I analyzed the bid-ask spread of National Instruments' Common Stock during the Class Period. **Exhibit 9** reports National Instruments' bid-ask spread as a percentage of the bid-

---

[76] Bhole Study at 107 (75th percentile of market capitalization defined as $3.2 billion). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[77] U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm.

[78] *Krogman*, 202 F.R.D. at 478.

29

ask midpoint.[79] This spread averaged 0.07% over the Class Period.

82.    By way of comparison, the MRK Study found that the MRK Previously Covered Companies had a median bid-ask spread of 4.55%, while the MRK Covered Companies had a median bid-ask spread of 1.69%.[80] National Instruments' bid-ask spread was significantly smaller than both of these values, indicating that investors could trade National Instruments' Common Stock at very low relative cost. Additionally, National Instruments' average bid-ask spread over the Class Period places it below the 50th percentile of all companies listed on NASDAQ and the NYSE from 2016-2018 (lower percentile rankings correspond to smaller bid-ask spreads).[81]

83.    As a result, National Instruments' bid-ask spread also supports the conclusion that National Instruments' Common Stock traded in an efficient market throughout the Class Period.

### H.    *Krogman* Factor 3: Public Float

84.    The *Krogman* court also considered the public float of a company in weighing market efficiency.[82]

85.    The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its c-suite employees and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

86.    **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for National Instruments' Common Stock on the quarters ending immediately before and after the

---

[79] Source: Bloomberg.

[80] MRK Study at 678 (Table 3).

[81] Bhole Study at 105 (50th percentile of bid-ask spread defined as 0.14%). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[82] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

Class Period. During the Class Period, National Instruments had between 131.17 million and 132.32 million shares of Class A Common Stock outstanding. As shown in the exhibit, National Instruments insiders held 0.8% of the Common Stock during the Class Period, meaning that over 99% of National Instruments' Common Stock was held by non-insiders. This equates to an average public float of $4.5 billion during the Class Period. Overall, between 132.27 million and 134.13 million shares of National Instruments Common Stock were available for trading in the public float during the Class Period. Moreover, National Instruments' public float greatly exceeded the $75 million minimum set by the SEC for S-3 eligibility.[83]

87.     This large degree of public float for National Instruments' Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.

### I.     Additional Factor: Institutional Ownership

88.     I also analyze an additional indicator of market efficiency: the presence of institutional investors.[84] Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

89.     I report the total institutional ownership of National Instruments Common Stock in **Exhibit 10,** which shows that at least 416 institutions held the stock at some point during the Class

---

[83] *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf.

[84] *See*, *e.g.*, *In re Countrywide Fin'l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

Period. By comparison, the MRK Study found that the MRK Previously Covered Companies had a median of only 9 institutional investors while the MRK Covered Companies had a median of 40 institutional investors.[85] National Instruments' institutional ownership base greatly exceeds both of these levels. On average, institutional investors held 94.5% of National Instruments' Common Stock outstanding during the Class Period. This level exceeds the 75th percentile of NYSE and NASDAQ traded companies.[86] Thus, the significant institutional ownership base for National Instruments' Common Stock supports the conclusion that National Instruments traded in an efficient market throughout the Class Period.

## VI.    Ability to Calculate Damages on a Class-Wide Basis

90.    I have also been asked to opine on whether per-share damages for traders of National Instruments' Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiff's theory of liability. As discussed below, damages for Plaintiff's claims can be calculated on a class-wide basis through a common methodology, the out-of-pocket damages methodology, which is also consistent with Plaintiff's liability theory.

### A.    Calculation of Damages for Violation of Section 10(b) of the Exchange Act

91.    The Complaint alleges that, as a result of Defendants' insider trading scheme, investors traded National Instruments' Common Stock at artificially deflated prices during the Class Period.[87]

92.    The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates investor

---

[85] MRK Study at 678 (Table 3).

[86] Bhole Study, at 106: 75th percentile defined as 88.89%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[87] Complaint ¶¶ 16, 97, 101, 115.

damages formulaically as the artificial inflation or deflation in the stock price at the time of sale minus the artificial inflation or deflation in the stock price at the time of purchase. If shares are not sold prior to the full revelation of the fraud, then the Private Securities Litigation Reform Act of 1995 caps these investors' damages at the difference between the sale price for the security and the "mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement, or omission that is the basis for the action is disseminated to the market."[88] This cap on damages is also applied class-wide.

93.    The claims process produces information necessary for the calculation of damages for each Class member as inputs to the formula above, including the purchase and sale information for each Class member's trades (including transaction dates and quantity of shares traded). This information is available from brokerage statements, trade blotters, and/or other documentation of securities transactions.

94.    Another input to the above formula, the quantification of an artificial inflation or deflation per share, is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery. Nonetheless, the method employed to eventually calculate artificial inflation or deflation can be applied Class-wide as an input to the out-of-pocket formula. For example, event studies are also widely employed to calculate artificial inflation or deflation. Event studies measure stock price reactions to corrective disclosures and materializations of the risks which revealed the relevant truth that was concealed by alleged fraudulent misrepresentations or omissions and/or schemes, and do not rely on individual class member-specific information.[89]

---

[88] 15 U.S.C. § 78u-4(e)(1).

[89] For purposes of this Report, I conducted an event study to assist with the evaluation of market efficiency. My event study in this Report was not intended to quantify artificial inflation or deflation.

95.     Relatedly, fundamental principles of finance, economics, and valuation analysis can also be relied upon to estimate artificial inflation or deflation. For example, mergers and acquisitions ("M&A"), arbitrage spreads, and/or offer premiums analyses can be used to assess the impact on a stock price of merger negotiations and an acquisition offer premium.[90]

96.     To the extent that reliable evidence is introduced to show that a significant portion of the difference in the artificial inflation or deflation between the purchase and sale of the securities may be attributed to non-fraud-related factors, the impact of such "confounding information" on the price of National Instruments' Common Stock can be determined on a common, Class-wide basis using various accepted methodologies, such as event study analysis, valuation analysis, M&A analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation or deflation. This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances present in the case.

97.     A loss causation analysis also documents how artificial inflation or deflation per share evolved throughout the Class Period. That analysis and determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery. Regardless of how artificial inflation or deflation is quantified, the level of artificial inflation or deflation remains the same across all Class members at any given point in time.

98.     One frequent method for modeling the evolution of inflation or deflation is to assume "constant dollar" inflation or deflation. This assumes that per-share inflation or deflation

---

[90] *See, e.g.*, Robert F. Bruner, *Applied Mergers & Acquisitions*, John Wiley & Sons (2004), pp. 36-44, 734; Joshua Rosenbaum and Joshua Pearl, *Investment Banking*, John Wiley & Sons (2009), pp. 1-157.

equaled a constant dollar amount above the correct share price over the Class Period. This input to the out-of-pocket damages formula often calculates artificial inflation or deflation based upon the abnormal dollar value of a stock price decline utilizing an event study conducted around one or more corrective disclosures.

99. Alternatively, one can measure "constant percentage" inflation or deflation, which assumes that each day's share price was inflated or deflated by a constant percentage amount above the correct stock price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation or deflation based upon the abnormal percentage return in the stock price as calculated through an event study around one or more corrective disclosures.

100. In other instances, artificial inflation or deflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculations of artificial inflation or deflation and any potential disaggregation of confounding information are based on the specific set of facts and circumstances in a given case and can involve valuation techniques, M&A analyses, event studies, published academic research studies, analyst research, or other case-specific documents.

101. All of these loss causation calculations can be performed on a Class-wide basis and are not dependent upon individual Class member identities or circumstances. This is because, as noted above, the level of artificial inflation or deflation remains the same across all Class members at any given point in time, regardless of how it is calculated.

**B. Damages Methodology Is Flexible and Can Incorporate Alternative Findings**

102. The damages methodology I have laid out above is flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation or deflation, and how it evolves over the Class Period. The methodology can be modified based on the specific findings the finder of fact may make, including, but not limited to: (1) the presence

35

and degree of confounding information versus corrective information; (2) how to back-cast inflation or deflation over the Class Period; and (3) when the first actionable fraudulent conduct or misstatement or omission occurred.

103.     First, irrespective of what the jury ultimately determines is the appropriate amount of abnormal return that can be attributed to the release of corrective versus confounding information, that percentage can easily be inserted into the standard out-of-pocket damages model that I have described above. Thus, regardless of whether a jury finds that the analysis I may conduct results in the most appropriate inflation or deflation figure, or they determine that based upon the evidence, a different amount is more appropriate, that finding can and will be an input into the formulaic out-of-pocket damages calculation.

104.     Second, should the jury determine that the true economic inflation or deflation in National Instruments' Common Stock price evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a Class-wide basis.

105.     Third, should the jury decide that the first actionable misstatement or omission otherwise actionable fraudulent conduct happened at an alternative date other than the current start of the Class Period, this is easily accounted for in an out-of-pocket damages calculation. Prior to such date, inflation or deflation in the stock price could simply be set to zero.

106.     Additionally, if the jury determines that a change to inflation or deflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

107.     To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of the claims in this matter, however, I conclude that National Instruments' Common Stock damages in this case

can be calculated using a standard and well-established methodology applied on a Class-wide basis.

## VII.   Conclusion

108.   Based on my analyses of the market efficiency factors considered by courts, economists, and in academia, it is my opinion that National Instruments' Common Stock traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter for Plaintiff's Sections 10(b) and 20(a) claims can be calculated on a Class-wide basis utilizing the common out-of-pocket damages methodology.

I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

Matthew D. Cain

37

**Appendix A**

# Matthew D. Cain, Ph.D. <span style="float:right">May 2025</span>

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

## Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                         Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group

A-2

- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania; Napa
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2025

LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business

    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007

## **Expert Witness Experience**

- *MOUVEMENT D'ÉDUCATION ET DE DÉFENSE DES ACTIONNAIRES c. CAE INC., MARC PARENT, and SONYA BRANCO*, Case No. 500-06-001312-244, (Province of Quebec, District of Montreal). Report April 2025.

- *In re StoneCo Ltd. Securities Litigation*, Case No. 1:21-cv-09620 (S.D. N.Y.). Report April 2025.

- *In re UiPath, Inc. Securities Litigation*, Case No. 1:23-cv-07908 (S.D. N.Y.). Report February 2025.

- *Ali Diabat, et al., v. Credit Suisse Group AG, et al.*, Case No. 1:23-cv-5874 (S.D. N.Y.). Report December 2024. Rebuttal Report January 2025.

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv-06339 (S.D. N.Y.). Report November 2024. Rebuttal Report February 2025.

- *Steven Leventhal, et al. v. Chegg, Inc., et al.*, Case No. 5:21-cv-09953 (N.D. Ca.). Declaration November 2024.

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024. Rebuttal Report October 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024. Declaration November 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024. Rebuttal Report October 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024. Rebuttal Report October 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

A-4

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024. Rebuttal Report December 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024. Report February 2025.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023. Report December 2024. Deposition March 2025.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024. Rebuttal Report November 2024. Deposition January 2025.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024. Report September 2024. Deposition November 2024. Rebuttal Report January 2025.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

A-6

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**Appendix B**

**Documents Considered**

**Court Documents:**

- Amended Complaint for Violations of the Federal Securities Laws (Doc. 29), 1:23-cv-10488-DLC.
- Opinion and Order (Doc. 42), dated September 26, 2024, 23-cv-10488 (DCL).

**Court Decisions and Securities Law:**

- *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).
- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).
- *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012).
- *Bromberg & Lowenfels*, 4 *Securities Fraud and Commodities Fraud*, §8.6. (Aug. 1988).
- *Bond v. Clover Health Investments, Corp., et al.*, 2023 WL 1999859, at *22 (M.D. Tenn. Feb. 14, 2023).
- *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-1287, 1291-1293 (D.N.J. 1989).
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).
- *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. 2016).
- *In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009).
- *In re HealthSouth Corp. Sec. Litig.,* 257 F.R.D. 260, 281 (N.D. Ala. 2009*)*.
- *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008).
- *In re QuantumScape Sec. Class Action Litig.*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).
- *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022).
- *In re Winstar Commc'ns Sec. Litig.,* 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).
- *Krogman v. Sterritt*, 202 F.R.D. 467, 477, 478 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995 dated December 22, 1995.

**Academic Literature:**

- A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 13 (1997).
- Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, Journal of Corporate Law 19 (1994).

B-1

- Bharat Bhole, Sunita Surana, and Frank Torchio, *Benchmarking Market Efficiency Indicators for Securities Litigation*, University of Illinois Law Review Online (2020).

- Charles M.C. Lee and Eric C. So, *Uncovering Expected Returns: Information in Analyst Coverage Proxies*, Journal of Financial Economics 124 (2017).

- Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, Journal of Finance 25 (1970).

- Eugene F. Fama, *Efficient Capital Markets: II*, Journal of Finance 46 (1991).

- Eugene F. Fama and Kenneth R. French, 2004, *The Capital Asset Pricing Model: Theory and Evidence*, Journal of Economic Perspectives 18 (2004).

- Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, *Information, Trading, and Volatility: Evidence from Firm-Specific News*, Review of Financial Studies 32 (2019).

- Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, John Wiley & Sons, Inc. (2009).

- Kewei Hou, Chen Xue, and Lu Zhang, *Replicating Anomalies*, Review of Financial Studies 33 (2020).

- Mark L. Mitchell and Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, The Business Lawyer 49 (1994).

- Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

- Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, *Good News, Bad News, Volatility, and Betas*, Journal of Finance 50 (1995).

- Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63 (2000).

- Ray Fair, *Events That Shook the Market*, Journal of Business 75 (2002).

- Robert F. Bruner, *Applied Mergers & Acquisitions*, John Wiley & Sons (2004).

- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, *Is There Life After the Complete Loss of Analyst Coverage?*, Accounting Review 88 (2013).

**Analyst Reports:**

- Analyst Reports from Plaintiff's Counsel.
- Analyst Report Cite List from LSEG Refinitiv.

**Data Sources:**

- Bloomberg Terminal
- Dow Jones Factiva News
- S&P Capital IQ
- SEC Edgar Online
- National Instruments Earnings Releases and SEC Filings

**Other:**

- https://www.bls.gov/data/inflation_calculator.htm
- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers
- http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess
- https://www.sec.gov/files/forms-3.pdf
- All data and documents cited throughout this report

**Exhibit 1**



**National Instruments Common Stock Closing Stock Price and Daily Volume
August 12, 2022 – September 30, 2022**

Data source: Bloomberg.

E-1

**Exhibit 2**



**National Instruments Weekly Trading Volume**
**August 12, 2022 – September 30, 2022**

Class Period: August 12, 2022 -
September 30, 2022

Average Weekly Volume: 2.9%

■ Weekly Volume as % of Shares Outstanding

Data source: Bloomberg. Note: Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period.

E-2

**Exhibit 3**

**Analyst Coverage**
**Class Period: August 12, 2022 – September 30, 2022**

|  | Contributor Name | Reports Issued |
|---|---|---|
| [1] | Stock Traders Daily Research | 5 |
| [2] | BuySellSignals Research | 3 |
| [3] | The Insight Partners | 2 |
| [4] | Wright Reports | 2 |
| [5] | CapitalCube | 1 |
| [6] | GlobalData | 1 |
| [7] | J.P. Morgan | 1 |
| [8] | Marktfeld | 1 |
| [9] | Morgan Stanley | 1 |
| [10] | Morningstar | 1 |
| [11] | Susquehanna Financial Group | 1 |
| | **Total Reports Issued** | **19** |

Source: LSEG (Refinitiv), Counsel.

E-3

**Exhibit 4**



**Coefficients from Rolling Event Study Regressions**
**Analysis Period (February 1, 2021 – January 31, 2023)**

Data sources: Bloomberg, SEC filings, Factiva, Complaint. Note: Regression models described in notes below Exhibit 7.

E-4

**Exhibit 5**



**Root Mean Squared Error (RMSE) from Rolling Event Study Regressions
Analysis Period (February 1, 2021 – January 31, 2023)**

Data sources: Bloomberg, SEC filings, Factiva, Complaint. Note: Regression models described in notes below Exhibit 7.

E-5

**Exhibit 6**

### National Instruments News Days and Common Stock Abnormal Returns

|  | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($USD) | t-Statistic | p-Value | News Day Description |
|---|---|---|---|---|---|---|---|
| [1] | 4/30/2021 | -9.5% | -7.5% | -$3.20 | -6.76 | (0.000) | 1Q 2021 Earnings Release |
| [2] | 7/30/2021 | 4.7% | 3.5% | $1.41 | 3.69 | (0.000) | 2Q 2021 Earnings Release |
| [3] | 10/29/2021 | 3.9% | 3.2% | $1.26 | 3.53 | (0.001) | 3Q 2021 Earnings Release |
| [4] | 1/28/2022 | 5.2% | 2.6% | $0.96 | 2.47 | (0.015) | 4Q 2021 Earnings Release |
| [5] | 4/29/2022 | -9.4% | -7.1% | -$2.73 | -7.59 | (0.000) | 1Q 2022 Earnings Release |
| [6] | 7/29/2022 | 6.9% | 5.8% | $1.99 | 4.46 | (0.000) | 2Q 2022 Earnings Release |
| [7] | 10/28/2022 | -2.9% | -5.7% | -$2.24 | -4.97 | (0.000) | 3Q 2022 Earnings Release |
| [8] | 1/13/2023 | 16.9% | 16.3% | $6.46 | 16.14 | (0.000) | NI Announces Commencement of Strategic Review Process |
| [9] | 1/17/2023 | 10.8% | 10.4% | $4.82 | 10.27 | (0.000) | Emerson's Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share |

Data sources: Bloomberg, SEC filings, Complaint. Note: Regression models described in notes below Exhibit 7.

**Exhibit 7**

**Comparison of Statistical Significance on National Instruments Common Stock
for News Days vs. No News Days During the Analysis Period**

| Statistic | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 9 | 464 | |
| Significant Days at 95% Confidence Level | 9 | 21 | |
| % Significant Days at 95% Confidence Level | 100.0% | 4.5% | 0.000 |
| Average Absolute Abnormal Return | 6.9% | 0.8% | 0.000 |
| Average Volume (Millions) | 4.3 | 0.7 | 0.000 |

Data sources: Bloomberg, SEC filings, Factiva. Notes: The event study estimations are based on rolling regressions of the 120 trading days preceding each date of analysis. The regression models control for the NASDAQ Composite Total Return Index ("Market Index") and an equal-weighted "Industry Index" comprised of the 19 companies in National Instruments' 2022 peer group. The estimations exclude the News Days identified in Exhibit 6. The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test. The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume (Millions)" are based on t-tests for difference of means.

**Exhibit 8**



**National Instruments Common Stock Market Capitalization**
**August 12, 2022 – September 30, 2022**

Data source: Bloomberg.

**Exhibit 9**

### National Instruments Common Stock Average Bid-Ask Spread
### August 12, 2022 – September 30, 2022



Data source: Bloomberg.

**Exhibit 10**

**National Instruments Common Stock Public Float, Insider Holdings, and Institutional Ownership**

| Quarter End | Shares Outstanding (mm) | Institutions (#) | Insider Holdings (mm) | Short Interest (mm) | Public Float (mm) | Insider Holdings % of Shares Outstanding | Inst. Holdings (mm) | Inst. Holdings % of Shares Outstanding | Inst. Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2]+[5]−[4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 6/30/2022 | 131.17 | 369 | 1.06 | 2.16 | 132.27 | 0.8% | 123.84 | 94.4% | 93.6% |
| 9/30/2022 | 132.32 | 373 | 1.05 | 2.86 | 134.13 | 0.8% | 125.26 | 94.7% | 93.4% |
| **Average:** | 131.75 | | 1.05 | | 133.20 | 0.8% | 124.55 | 94.5% | 93.5% |
| **Total Unique Institutions:** | | 416 | | | | | | | |

Data sources: Bloomberg, S&P Capital IQ.