UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

In re NATIONAL INSTRUMENTS          :         Civ. A. No. 1:23-cv-10488-DLC
CORPORATION SECURITIES LITIGATION   :

_____ x     <u>CLASS ACTION</u>

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL [ECF 64]

James F. Bennett (*pro hac vice*)
J. Russell Jackson
Jenny E. Braun (*pro hac vice*)
DOWD BENNETT LLP
7676 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone: (314) 889-7300
Facsimile:  (314) 863-2111
jbennett@dowdbennett.com
rjackson@dowdbennett.com
jbraun@dowdbennett.com

Andrew Ditchfield
Davis Polk & Wardwell LLP
450 Lexington Ave
New York, New York 10017
Telephone: (212) 450-4000
andrew.ditchfield@davispolk.com

*Counsel for Defendants National Instruments Corporation, Michael McGrath, and Eric Starkloff*

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES....................................................................................................................ii

PRELIMINARY STATEMENT............................................................................................................ 1

ARGUMENT ........................................................................................................................................ 4

    I.    Plaintiff Failed to Meet Its Burden to Establish with Evidence that Common Issues Predominate over Individualized Issues........................................................................................ 4

        A.    Plaintiff has not presented a methodology capable of measuring damages on a classwide basis consistent with its theory of liability. ............................................................. 4

        B.    Reliance is *not* a common issue because Plaintiff failed to present evidence of materiality—a prerequisite to the *Affiliated Ute* presumption of classwide reliance. ........... 16

        C.    Plaintiff is not entitled to *Basic*'s presumption of classwide reliance........................... 21

    II.    Plaintiff's Class Definition Is Overbroad and Includes Uninjured Class Members Who Did Not Sell Contemporaneously With NI's Repurchases........................................................ 24

CONCLUSION.................................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States,*
  406 U.S. 128 (1972) .................................................................................................. passim

*Amchem Prod., Inc. v. Windsor,*
  521 U.S. 591 (1997) ......................................................................................................... 4

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,*
  568 U.S. 455 (2013) ....................................................................................................... 21

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.,*
  77 F.4th 74 (2d Cir. 2023) ........................................................................................ 13, 18

*Basic v. Levinson,*
  485 U.S. 224 (1988) ...................................................................................... 18, 21, 22, 23

*Berks Cnty. Emp.' Ret. Fund v. First Am. Corp.,*
  734 F. Supp. 2d 533 (S.D.N.Y. 2010) ........................................................................... 17

*Calvo v. City of N.Y.,*
  2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017) ............................................................... 25

*Cammer v. Bloom,*
  711 F. Supp. 1264 (D.N.J. 1989) ................................................................................... 23

*Castellano v. Young & Rubicam, Inc.,*
  257 F.3d 171 (2d Cir. 2001) .......................................................................................... 20

*Chamber of Com. of United States v. S.E.C.,*
  85 F.4th 760 (5th Cir. 2023) .......................................................................................... 11

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) ............................................................................................ 3, 4, 5, 12

*Dakota Granite Co. v. BSNF Ry. Co.,*
  934 F.3d 619 (D.C. Cir. 2019) ......................................................................................... 6

*Denney v. Deutsche Bank AG,*
  443 F.3d 253 (2d Cir. 2006) .......................................................................................... 25

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.,*
  2024 WL 1115944 (S.D.N.Y. Mar. 14, 2024) ............................................................... 15

*duPont v. Brady*,
  828 F.2d 75 (2d Cir.1987)................................................................................................17-18

*Elisa W. v. City of New York*,
  82 F.4th 115 (2d Cir. 2023)................................................................................................. 3

*Erickson v. Jernigan Cap., Inc.*,
  692 F. Supp. 3d 114 (S.D.N.Y. 2023) ................................................................................ 5

*Flecha v. Medicredit*,
  946 F.3d 762 (5th Cir. 2020)............................................................................................. 25

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ....................................................................................... 7

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
  594 U.S. 113 (2021)........................................................................................... 13, 18, 23

*Gordon v. Sonar Cap. Mgmt. LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015) .......................................................................... 10, 24

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .............................................................................................. 3, 21, 22, 23

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
  2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ................................................................... 22

*In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021) .............................................................................. 24

*In re BP p.l.c. Sec. Litig.*,
  2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ................................................................ 6, 16

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014)........................................................................................ 7

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
  252 F. Supp. 2d. 1005 (C.D. Cal. 2003) .......................................................................... 15

*In re IPO Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)................................................................................................. 3

*In re Moody's Corp. Sec. Litig.*
  274 F.R.D. 480 (S.D.N.Y. 2011)...................................................................................... 17

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010).........................................................................................14-15

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017) ........................................................................................ 23

*In re Vivendi Universal, S.A. Sec. Litig.*,
    634 F. Supp. 2d 352 (S.D.N.Y. 2009) ........................................................................ 15

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) .......................................................................................... 3

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
    40 F. Supp. 3d 332 (S.D.N.Y. 2014) ........................................................................... 8

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ............................................................................. 23

*Lab. Corp. of Am. Holdings v. Davis*,
    2025 WL 1583302 (U.S. June 5, 2025) ..................................................................... 25

*Loritz v. Exide Techs.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015) ............................................................ 16

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
    601 U.S. 257 (2024) .................................................................................................... 11

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) ............................................................................................ 8

*Newby v. Enron Corp.*,
    188 F. Supp. 2d 684 (S.D. Tex. 2002) ......................................................................... 8

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ..................................................... 15-16

*Parko v. Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) ...................................................................................... 4

*Puddu v. NYGG (Asia) Ltd.*,
    2022 WL 2304248 (S.D.N.Y. June 27, 2022) ............................... 3-4, 16-17, 21-22

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) .......................................................................................... 5

*Roth v. LAL Family Corp.*,
    2025 WL 1479729 (2d Cir. May 23, 2025) ................................................................ 9

*Sicav v. James Jun Wang*,
  2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ........................................................................ 7, 17

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................................................. 23

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008) ................................................................................................ 3-4, 4

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ................................................................................................... 16, 23

*Wal-Mart Stores, Inc. v. Dukes*
  564 U.S. 338 (2011) .............................................................................................................. 2-3, 3

*Ward v. Apple, Inc.*,
  784 F. App'x 539 (9th Cir. 2019) ............................................................................................... 5

*Werdebaugh v. Blue Diamond Growers*,
  2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ............................................................................ 5

*Wilson v. Comtech Telecom. Corp.*,
  648 F.2d 88 (2d Cir. 1981) ................................................................................................... 24, 25

## Statutes and Rules

15 U.S.C. § 78t-1 ...................................................................................................................... 8, 24

Federal Rule of Civil Procedure 23 ........................................................................................ passim

## Regulations

Share Repurchase Disclosure Modernization,
  88 FR 36002-01 ..................................................................................................................... 10-11

## Other Authorities

Christine J. Chen, Y. Carson Zhou, Tooley *Brooks No Exceptions--Equity Dilution Is Direct*,
  26 U. PA. J. BUS. L. 1 (2023) ..................................................................................................... 9

Defendants National Instruments Corporation, Michael McGrath, and Eric Starkloff ("Defendants") respectfully submit this memorandum of law in opposition to Lead Plaintiff Wayne County Employees' Retirement System ("Plaintiff") motion for class certification and appointment of class representative and class counsel (ECF 64).[1]

## PRELIMINARY STATEMENT

This is *not* a garden variety securities class action. Because this Court previously held that Defendants did not make affirmative misrepresentations and dismissed those claims, this is an "insider trading" case premised on a theory that National Instruments Corporation ("NI") violated a duty to abstain from trading or disclose theoretically positive information about NI. When NI engaged in stock buybacks, it knew and did not disclose that it had received and flatly rejected two private, unsolicited, identically-priced lowball offers from Emerson Electric Co. ("Emerson"). According to Plaintiff, those who sold stock contemporaneously with NI's buybacks were "damaged thereby." Plaintiff contends that NI's omission artificially deflated NI's stock price.

Plaintiff does not cite a single case like this one. And Plaintiff's expert, Dr. Cain, admits that he has not rendered an opinion in a case like this one before, or tried to calculate damages in a class action like this one. Yet Plaintiff has insisted both that reliance can be presumed, and that damages will be a "mechanical arithmetic exercise" "readily applicable" classwide.

Plaintiff's putative class action should be denied certification for the following independent reasons. First, there is no predominance because Plaintiff has not shown that damages are capable of being calculated classwide on a basis consistent with the theory of liability because Plaintiff has not proposed such a damages methodology. Plaintiff bears the burden of proof on Rule 23's

---

[1] Plaintiff's memorandum of law in support of its motion to certify, ECF 65, is hereinafter referred to as "Pl. Br." in citations, which use ECF pagination.

prerequisites, and here Plaintiff fails to establish that out-of-pocket damages can measure harm attributable to the insider trading conduct. To the extent that Plaintiff plans to rely on event studies and the finding of an efficient market to determine the price impact of the alleged scheme, Plaintiff has not explained how a reliable event study could be conducted, or even whether there would be a non-speculative, class-wide method of calculating losses *without* the aid of an event study.

Second, individualized issues of reliance predominate because Plaintiff cannot invoke the *Affiliated Ute* presumption of classwide reliance. Plaintiff has proffered no evidence of materiality, whereas *Affiliated Ute* only applies when the alleged omission was material.

Third, individualized issues predominate because the *Basic v. Levinson* presumption of a fraud-on-the-market theory of reliance cannot apply here, where there was no misrepresentation. Banking on *Affiliated Ute* but invoking the fraud-on-the-market theory as a backup, Plaintiff cannot show that the alleged "omission" or "scheme" had a price impact. Among other problems, Plaintiff fails to address the mismatch between the alleged omission in August 2022 and the so-called "corrective disclosures" or leaks of January 2023. The events of January 2023 do not show that NI artificially depressed the stock price months earlier.

Finally, Plaintiff's class definition is overbroad. It includes uninjured class members who did not sell NI stock contemporaneously with NI's trades. If anything, there should be two classes.

## STANDARD OF REVIEW

For starters, Plaintiff misstates the standard by which this Court should evaluate its class certification motion. Citing a few district court decisions, Plaintiff asserts that Rule 23 should be interpreted liberally, and courts should err in favor of certification because errors can be fixed if later developments require it. Pl. Br. at 12. But that is precisely the sort of *certify now, worry later* approach that the U.S. Supreme Court flatly rejected in *Wal-Mart Stores, Inc. v. Dukes*, which

2

instructed that the proponent of class certification must "*affirmatively* demonstrate … compliance" with Rule 23's requirements. 564 U.S. 338, 350 (2011) (emphasis added). The certification inquiry is *not* a mere pleading standard, the Court said. Rather, trial courts must give "rigorous scrutiny" to determine if the proponent of class certification has established with sufficient *evidence* that Rule 23's prerequisites have actually been met. *Id.* at 348; *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275–76 (2014) ("*Halliburton II*") ("[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including … the predominance requirement of Rule 23(b)(3)," and must carry their burden of proof "before class certification"); *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ("The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met."); *Elisa W. v. City of New York*, 82 F.4th 115, 127 (2d Cir. 2023) (quoting *Nextel*).

As Justice Scalia explained, a "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 564 U.S. at 348. To fall within the class action exception, "a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 35 (2013) (internal quotations omitted). This means that the trial court must "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met." *In re IPO Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006). This is true even if it requires determination of a merits issue. *Id.* at 41; *Dukes*, 564 U.S. at 351. The preponderance of the evidence standard applies to each of the class certification prerequisites, and if Plaintiff has not proffered evidence on a requirement, no "presumption" can justify certification. *See Puddu v. NYGG (Asia) Ltd.*, 2022 WL 2304248, at *2 (S.D.N.Y. June 27, 2022) ("[T]he district judge must

'receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met.'") (quoting *Teamsters Local 445 Freight Div. v. Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008)).[2]

## **ARGUMENT**

### I.   **Plaintiff Failed to Meet Its Burden to Establish with Evidence that Common Issues Predominate over Individualized Issues**

Because Rule 23(b)(3) is an "adventuresome innovation" that binds absent class members, the "predominance criterion is even more demanding than Rule 23(a)," and the Court has a "duty to take a close look at whether common questions predominate over individual ones." *Comcast*, 569 U.S. at 34 (internal quotations omitted).

### A. **Plaintiff has not presented a methodology capable of measuring damages on a classwide basis consistent with its theory of liability.**

Under Rule 23(b)(3), Plaintiff must establish that damages are "susceptible of measurement across the entire class" and that "a model purporting to serve as evidence of damages in [a] class action" "measure[s] only those damages attributable to [Plaintiff's] theory." *Id.* at 35. Although "[c]alculations need not be exact" at this stage, *id.*, Plaintiff's methodology must show that the "proposed class[] [is] sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Courts do not accept just "*any* method of measurement" "so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Comcast*, 569 U.S. at 36. Otherwise, "Rule 23(b)(3)'s predominance requirement" would become "a nullity," *id.*, and "the complications, the unwieldiness, the delay, and the danger that class treatment would expose the … defendants to settlement-forcing risk are not costs worth

---

[2] *See, e.g.*, *Teamsters Local 445*, 546 F.3d at 202 (holding that "the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements").

incurring." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).

Plaintiff has failed to meet its burden for several reasons.

**1. Plaintiff invokes but fails to proffer an actual damages model—let alone one that is tailored to Plaintiff's legal theory.**

Under *Comcast*, at certification, Plaintiff must provide evidence of a damages model "establishing that damages are capable of measurement on a classwide basis," because otherwise, "questions of individual damage calculations will inevitably overwhelm questions common to the class," and the class will fail to meet the standards of predominance required for certification under Rule 23(b)(3). *Comcast*, 569 U.S. at 34-35. Plaintiff purports to rely on a damages model, *see* Pl. Br. at 25, and thus bears the burden under *Comcast* to establish that its "model" measures *only* those damages attributable to the alleged misconduct—and not extraneous factors. *See Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 122 (S.D.N.Y. 2023) ("The relevant question, then, is whether Plaintiff's theory would 'actually measure damages' caused by the conduct that it claims should not have occurred.") (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015)); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *8, 14 (N.D. Cal. Dec. 15, 2014) (decertifying class due to flaws with regression damages model). Establishing that common issues of damages predominate requires more than a "promise of a model to come." *Ward v. Apple, Inc.*, 784 F. App'x 539, 541 (9th Cir. 2019) (affirming denial of class certification).

And yet the mere promise of a damages model to come is precisely *all* that Plaintiff proffers. Although Dr. Cain says there are "standard and well-accepted" or "widely employed" methodologies that theoretically could calculate damages in accordance with sellers' alleged out-of-pocket losses, *e.g.*, Cain Rep. ¶¶ 92, 94, he does not commit to a specific method to calculate those losses in this case, which is not a standard Section 10(b) misrepresentations case. Rather than identify how to measure the alleged deflation of the insider trading scheme, he "vaguely and

incompletely describes several potential approaches to doing so, including 'event study analysis, valuation analysis, M&A analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research.'" Jackson Decl. Ex. 1, Report of Dave Denis ("Denis Rep.") ¶ 43; *see* Decl. Ex. 2, Cain 6/3/25 Dep. ("Cain Dep") at 105-108; Cain Rep. ¶ 96. As a result, Dr. Cain fails to address potentialities that could affect class member recovery.[3] He does not even identify what information NI exactly was obliged to disclose in the class period, and by failing to tie his methodology to the facts and circumstances of this case, Dr. Cain "fails to provide any description to understand his approach let alone a reliable and accurate method for estimating price impact of the allegedly undisclosed MNPI" and trading, thus foregoing any explanation for how out-of-pocket calculations would measure the injury attributable to the fraud. Denis Rep. ¶ 43.

To satisfy the "rigorous analysis" standard that applies to this class certification motion, Plaintiff cannot rely *on the idea* of a model that Plaintiff just insists will be capable of measuring damages attributable to the alleged fraudulent scheme.[4] Plaintiff "cannot avoid this hard look by refusing to provide the specifics of their proposed methodology." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013). Indeed, "[w]hen considering whether damages are amenable to classwide resolution, Rule 23, as construed in *Comcast*, requires a hard look at the soundness of statistical models that purport to show predominance." *Dakota Granite Co. v. BSNF Ry. Co.*, 934 F.3d 619, 621 (D.C. Cir. 2019) (internal quotations omitted). Where an expert

---

[3] For example, Dr. Cain ignores how a class member's purchase of NI stock at allegedly deflated prices during the class period (from which they would have benefitted, particularly if they sold some of it after the January disclosures, and thereby offset any alleged loss from sales in the class period) might affect their damages, or what is properly considered a "contemporaneous" sale of NI stock when NI did not repurchase on every day of the class period. *See* Denis Rep. ¶¶ 49-52.

[4] *See* Pl. Br. at 25 (positing that "the out-of-pocket damages methodology" is the "appropriate damages model" for calculating class-wide damages in this action).

like Dr. Cain "fails to provide a concrete methodology" to calculate damages, this amounts to "provid[ing] no damages model at all." *In re ConAgra Foods*, 302 F.R.D. 537, 551-52 (C.D. Cal. 2014); *see Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) ("[W]ithout assurance beyond [the expert's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis.") (certifying for purposes of liability only). Dr. Cain ███████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████[5] Thus, Plaintiff cannot claim that because there will be a "model," "damages can be proven on a classwide basis," when the nature of that model remains speculative. *See Sicav v. Wang*, No. 12 CIV. 6682 PAE, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (denying certification where "plaintiffs have not shown or explained, concretely, how damages would be calculated as to any individual purchaser").

2. **Dr. Cain's future model does not match Plaintiff's legal theory.**

Although Dr. Cain's failure to commit to a specific damages model is an independent

---

[5] *See, e.g.*, Cain Dep. at ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

reason to deny certification, he asserts that class members' damages should be measured only by "out-of-pocket" loss, which in and of itself is inconsistent with the insider trading theory that Plaintiff actually asserts in this case.

First, Plaintiff ignores the common-law and statutory cap on insider trading damages. In insider trading cases, "[d]amages are limited to profits gained and losses avoided based on the defendant's unlawful acts." *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 40 F. Supp. 3d 332, 344 (S.D.N.Y. 2014); *see Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 700 (S.D. Tex. 2002) ("A number of cases also affirm the enforcement of section 10(b) liability through disgorgement of defendant's insider trading profits to private plaintiffs, a remedy different from obtaining damages measured by plaintiff's out-of-pocket losses.") (collecting cases).[6]  And yet Plaintiff's future model would *not* measure alleged profits gained or losses avoided by the Defendants at all.

The disregard for a damages cap presents a predominance issue under *Comcast* because, in this case, it is unclear how ill-gotten gains could be calculated (and thus distributed) at all. Put simply, Plaintiff's promised future damages model for calculating "out-of-pocket loss" for each putative class member does not purport to answer the question of *which* class members will get *how much* if the alleged "profits gained or losses avoided" are *less* than the class's claimed "out-of-pocket" losses. This is hardly an unlikely scenario, since both the law and basic finance

---

[6] Section 20A of the Securities and Exchange Act of 1934 provides that a person who violates Section 10(b) and Rule 10b-5 promulgated thereunder "by purchasing … a security while in possession of material, nonpublic information shall be liable … to any person who contemporaneously with the purchase … of securities that is the subject of such violation has … sold … securities of the same class," but "the total amount of damages imposed … shall not exceed the profit gained or loss avoided in the … transactions" at issue.  15 U.S.C. § 78t-1. Moreover, Second Circuit case law, which Congress expressly endorsed when it enacted Section 20A, also establishes that even if out-of-pocket damages would be an appropriate *measure* of damages, the appropriate *cap* is the "unjust enrichment" or disgorgement of the ill-gotten gains from the alleged insider trading. *See Neubronner v. Milken*, 6 F.3d 666, 670 n.5 (9th Cir. 1993) (listing cases Congress cited in the House Report).

principles lead to the conclusion there was *zero* profit gained by the only Defendant that actually purchased NI stock during the class period: the *issuer* of that stock, NI.

As the Second Circuit explained just two weeks ago in the context of a Rule 16(b) analysis, "equity securities personally sold by an insider differ in important ways from the equity securities an issuer may repurchase," and "these substantive differences preclude the realization of any profit" from an issuer's repurchase of its own stock on the open market. *Roth v. LAL Family Corp.*, 2025 WL 1479729, at *3 (2d Cir. May 23, 2025). As Judge Jacobs instructed:

> Share repurchases operate differently. Under relevant state corporate law, shares repurchased by an issuer become treasury shares at the moment of repurchase.… No right of ownership passes to a repurchasing issuer.… Treasury shares are, as a matter of law, valueless.… "A company is not worth more because it holds its own (treasury) stock[,] and it is not worth less if it gives out that stock for free." Christine J. Chen, Y. Carson Zhou, Tooley *Brooks No Exceptions--Equity Dilution Is Direct*, 26 U. PA. J. BUS. L. 1, 29 (2023) .… Because a transaction in these "subject securities" renders those shares valueless, no one has an opportunity to profit from any such transaction.…

*Id.* at *5-6 (internal citations omitted). Thus, when an issuer buys back its shares on the open market, they are "removed from circulation," resulting in "a *pro rata* change to the ownership interest of each remaining outstanding share of the issuer." *Id.* at *6.

Because "share repurchases distribute excess cash to shareholders and are functionally equivalent to dividends, NI (as a company) did not profit from its share repurchases, even assuming the repurchases occurred while NI was in possession of MNPI that indicated the firm's share price was undervalued." Denis Rep. ¶ 25. The issuer does not receive an economic benefit from repurchasing shares because, had "the firm refrained from conducting the repurchase transaction(s), it would have retained [the cash], along with a higher number of shares outstanding," and thus "would not have been economically worse off." ¶ 30. "The implication of this," Dr. Denis explains, "is that there are no damages to the sellers of NI stock during the

9

proposed Class Period," if damages are capped at the insider trader's alleged gains or avoided losses. ¶ 34. Thus, as a matter of law and basic financial principles, NI could not have profited from the repurchase of its own stock at any price, and because the law limits the class recovery in an insider trading case to the profit realized by the alleged insider, any classwide damages model would have to account for this fact—not just ignore it. Dr. Cain's promised future model does not, and thus it fails the rigorous scrutiny of the predominance requirement. Reciting the general "standard" approach in Section 10(b) cases does not suffice here.[7]

Second, a damages model consistent with the theory of liability must account for whether the "scheme" increased the stock price (a positive event for the seller class). *See Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 205 (S.D.N.Y. 2015) ("[I]n securities fraud cases brought under Section 10(b) … the prevailing approach is to offset the plaintiff's losses by any gains that are attributable to the same conduct.") (finding plaintiff who may only have benefitted from alleged conduct inadequate to serve as class representative). The repurchases might have raised the sale price: As the SEC has explained, "because investors understand that repurchases reflect managers' judgment about whether current prices accurately reflect the issuer's fundamental value, and consume cash that could otherwise be used for other purposes, repurchases can provide a relatively credible signal of the issuer's view that its stock is undervalued," as well as an anti-dilutive effect that boosts stock value. Share Repurchase Disclosure Modernization, 88 FR 36002-01; *see* Denis Rep. ¶ 33.[8] Plaintiff's damages model does not address that issue.

---

[7] Cain Dep. at 46:8-49:20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.");
56:4-15; 108:3-15; 120:16-122:14.

[8] *See Chamber of Com. of United States v. S.E.C.*, 85 F.4th 760, 766 (5th Cir. 2023) (discussing when a company might repurchase "for the benefit of shareholders, as when a company repurchases its own shares because it believes they are undervalued"). As Dr. Denis observed, "[a]nalysts covering NI discussed information about repurchases alongside dividends." ¶ 33.

Nor does Plaintiff address whether any class members benefited from the purported scheme to raise Emerson's deal price. That issue demands a formula to offset the effect of those who gain from the alleged fraud, and that depends on when the investors sold, how much they divested or retained, and what stock they continued to retain past the January 2023 disclosures, if not the ultimate merger in October 2023. If NI's alleged scheme benefitted the class by raising the offer and the sale price, then certain class members may have benefitted from the trading more than others, depending on how long they held stock past the proposed class period. For example, Plaintiff held onto NI stock well past the January 2023 disclosures. *See* Denis Rep. ¶ 36.

Third, a damages model consistent with the theory of liability should recognize that the "omission" is not the gravamen of the alleged fraudulent conduct; rather, Plaintiff's theory of liability is that NI had a duty to disclose the alleged MNPI *or* abstain from trading. *See* Pl. Br. at 9-11; ECF 42 at 15 (ordering survival of "theory of liability" that "NI violated § 10(b) and Rule 10b-5 by failing to either abstain from trading in NI's securities or to disclose Emerson's offers while buying back NI's securities"). In the but-for world of no Section 10(b) violation, one scenario is that there was no trading and no disclosure. *Cf. Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 266 (2024) ("Pure omissions are not actionable under Rule 10b–5(b)."). In that scenario, the stock price would still have been what it was, if not lower—how then would the class calculate out-of-pocket damages on a classwide basis? What would be the inputs for the out-of-pocket formula? Because the "scheme" at issue involved trading, the damages methodology cannot treat the source of the injury as solely non-disclosure.

In sum, Plaintiff has not demonstrated by the preponderance of the evidence that it can apply a non-arbitrary formula to determine the loss actually attributable to the alleged fraudulent conduct. "If the model does not even attempt to" measure only those damages attributable to the

11

alleged injury, then "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35.

**3. Plaintiff fails to address how out-of-pocket damages could be calculated without a reliable way to show the value of undisclosed information during the class period.**

Plaintiff assumes that eventually it will be able to calculate what the NI stock price should have been throughout the Class Period had the market incorporated the value of the non-disclosed information. *See* Cain Rep. ¶ 92 ("This [out-of-pocket] approach calculates investor damages formulaically as the artificial inflation or deflation in the stock price at the time of sale minus the artificial inflation or deflation in the stock price at the time of purchase."). Although the inputs of the formula will be based on a "detailed loss causation analysis," no such analysis has been performed yet. ¶ 94. And although event studies are "widely employed to calculate artificial inflation or deflation," *id.*, leading Plaintiff to insist that an event study will be performed here, *see* Pl. Br. at 24-25 (emphasizing the role of a future event study in calculating out-of-pocket damages), Plaintiff has proffered no evidence as to whether an event study could be performed reliably in this case to calculate the impact of the relevant truth on the stock price when the proposed class sold.

Plaintiff cannot peg its model on traditional event studies to show how and to what extent the alleged nondisclosure depressed the stock's market price during the class period. The mismatch between the so-called "corrective disclosures" on January 13 and 17, 2023 and the information NI did not publicize four months earlier is substantial. As the Supreme Court has explained, "corrective disclosures" must actually address the alleged misrepresentation in order to permit the inference that a stock price event following the disclosure reveals the price impact of the fraud:

> Plaintiffs typically … point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation. But that

12

> final inference…starts to break down where there is a mismatch between the contents of the misrepresentation and the corrective disclosure. …

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021); *see also Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99 n.11 (2d Cir. 2023) ("whether there is a basis to infer that the back-end price equals front-end inflation—is a different question than loss causation" and "requires a closer fit (even if not precise) between the front- and back-end statements").

The stock price increases in response to the disclosures made by NI on January 13, 2023, and Emerson on January 17, 2023, cannot reliably indicate the but-for price of NI's stock during the class period. Those public statements contained much more information that NI *did not know* in August 2022 when it resumed its repurchase program. In August 2022, NI knew: (i) that a potential suitor said it would be willing to pay $48/share to acquire the company, (ii) NI's Board, after consulting with advisors, viewed that amount as so substantially undervaluing the company that it rejected the proposal out of hand, with no negotiation or due diligence, (iii) the suitor did *not* raise its offer, but came back shortly thereafter at the same price, (iv) the Board remained firm in its belief that the proposal substantially undervalued the company and instructed management to reject it—again—without negotiation or due diligence, and (v) NI did not hear again from the suitor throughout the period during which it conducted its stock repurchases.

In contrast, NI's January 13, 2023, statement indicated that the Board was interested in exploring solicitations of interest from potential acquirors. Decl. Ex. 3. It also stated that the Board had adopted a shareholder rights plan to reduce the likelihood of a hostile takeover. *Id.* Those are *very* different facts from what NI actually knew in August when it had twice rejected Emerson's $48/share proposal and Emerson went silent, in the face of NI's indications that it was steadfast in not pursuing a deal.

Then, the January 17, 2023, Emerson statement disclosed that Emerson had proposed

13

acquiring NI at $53/share ($5/share more than its prior two proposals), and that NI had refused to work with Emerson to complete that transaction. Decl. Exs. 4, 5. That, too, is different information from what NI had in August 2022. It is in this context that Emerson disclosed the events of May through August 2022; although the state of the world as it was on August 12, 2022, hit the market on January 17, 2023, it did so only as part of a broader narrative and timeline, in which other fresher, material events shaped the NI news cycle and investor sentiment. When information hit the market as to the rejected $48 proposals, the $53 proposal was pending, and both NI and Emerson had taken steps to escalate the probability of a deal—including Emerson's tactical move of appealing directly to NI's shareholders. As Dr. Denis explained in his expert report, "the price movements in January 2023 cannot be used as a proxy for the value of the allegedly corrective information." Denis Rep. ¶ 46; *see* Decl. Ex. 6, Expert Report of Shane Goodwin ("Goodwin Rep.") ¶ 8(5).

Dr. Cain's report, however, does not explain how an analysis of the "confounding information" versus "corrective information" could determine the deflation in NI's stock price specifically attributable to the information NI allegedly failed to disclose to the market during the class period. In sum, the relevant information—outdated and moot as of January 2023—was disclosed bundled with new, more dramatic information. *See* Exs. 4, 5 (Proxy materials). With this bundling and no clean event window for the event study, only speculation could isolate the extent to which news of the rejected $48 offers caused price movement on January 13 and 17 that would have also occurred in the prior August and September. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (no causal connection of price drop to fraud where "event study merely links the decline in the value of the company's stock to various events") (cleaned up).

14

Without an "almost obligatory" event study (*In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009)), it is unclear what other nonspeculative methods could be used to indicate the non-deflated stock price at the time of the class period. Plaintiff might attempt to build a "formula" that rests on theoretical corporate finance literature or academic studies, but that would render the model unreliable and inadmissible. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17CV4576DEHBCM, 2024 WL 1115944, at *9 (S.D.N.Y. Mar. 14, 2024) (discussing cases in which lack of an event study resulted in exclusion of damages expert); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d. 1005, 1014–15 (C.D. Cal. 2003) ("[C]ourts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar.") (collecting cases). Speculation is particularly high here, since Plaintiff's theory requires hypothetical, retrospective reconstruction of market behavior. Plaintiff must project a positive price path that never occurred— with no contemporaneous evidence of an abnormal return during the class period. As Plaintiff's gains from its own sale of NI stock suggest, determining "loss" is not just an act of tracing an actual price change to its cause, but rather requires a series of counterfactual assumptions about a but-for *higher* sale price that must apply classwide. *See* Denis Rep. ¶¶ 35-39.

Because Dr. Cain has not analyzed or purported to answer these threshold issues of how to calculate the but-for price of stock sold during the class period, this Court should follow other courts in rejecting an expert's blind assurance that an "event study" ultimately *will* be used to calculate securities class members' alleged damages consistent with the plaintiff's theory of liability, despite "common sense" evidence to the contrary. *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) (denying certification where expert's proposed damages approach is "general and vague, and it fails to

15

account for issues presented by [plaintiff's] theories of damages"), *rev'd on other grounds*, 64 F.4th 731 (6th Cir. 2023); *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (denying certification of damages class where expert "fails to propose one model explaining how he would use these techniques in concert to calculate damages in this case"); *BP*, 2013 WL 6388408, at *16-17 ("Without a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability, the Court cannot certify this litigation for class action treatment."). The out-of-pocket damages model requires an empirical basis from which to infer what the price would have been when the class members sold. *Comcast* requires a method consistent with the theory of liability in the case at bar. Although "*Comcast* does not suggest that damage calculations must be so precise at this juncture," *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017), the flaws in Plaintiff's "method" go to whether Plaintiff can satisfy its burden to show the Rule 23 requirements in this *sui generis* insider-trading, repurchases, artificial-deflation-via-omission case. Where, as here, it is unclear how anyone could reliably determine the impact of the omitted information during the class period, then the mere aspiration of a damages "model" to come cannot carry the day.

**B. Reliance is *not* a common issue because Plaintiff failed to present evidence of materiality—a prerequisite to the *Affiliated Ute* presumption of classwide reliance.**

Plaintiff asserts that reliance is a common issue and that it predominates over individual issues because there is a presumption of classwide reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Pl. Br. at 17-18. As even Plaintiff recognizes, before an *Affiliated Ute* presumption of reliance may be invoked, "the plaintiffs need only show that the omissions were material," *i.e.*, that a reasonable investor would consider what was withheld important to making a decision on the security. *Puddu*, 2022 WL 2304248, at *5; *see id.* at *3

16

("[R]eliance on the omission can be presumed from its materiality.") (citing *Affiliated Ute*, 406 U.S. at 153-54). However, Plaintiff relies exclusively on the Amended Complaint and this Court's order on the motion to dismiss to show materiality of the omission.[9]

Plaintiff's conclusory assertions in its brief that "this Court has already held that materiality is satisfied here," Pl. Br. at 18, are inadequate to discharge its burden under Rule 23 to come forward with actual *evidence* of materiality. On a motion for class certification, this Court must credit evidence—*not* the pleadings, as it did in deciding the motion to dismiss—when it rigorously analyzes materiality in determining whether common issues predominate. Mere pleadings are not enough to discharge the rigorous analysis duty at this stage.

The court rejected an argument similar to Plaintiff's in *In re Moody's Corp. Sec. Litig.*:

> Plaintiffs contend that materiality is demonstrated, in part, because Judge Kram previously determined that the statements in the complaint were material. . . The burden on a 12(b)(6) motion to dismiss is different than a motion for class certification. On a motion for class certification, a court must make "findings" based on introduced evidence.

274 F.R.D. 480, 489 n.4 (S.D.N.Y. 2011) (citation omitted); *see Sicav*, 2015 WL 268855, at *6 (denying certification in part because "the authority cited for virtually all factual representations in plaintiffs' class certification papers are the allegations made in plaintiffs' class action complaint"); *see also Berks Cnty. Emp.' Ret. Fund v. First Am. Corp.*, 734 F. Supp. 2d 533, 538-41 (S.D.N.Y. 2010) ("It is the plaintiff's burden to "establish [] the materiality of the omission.") (citing *duPont v. Brady*, 828 F.2d 75, 78 (2d Cir.1987)) (denying certification). Here, Plaintiff was required to proffer evidence of materiality to invoke the *Affiliated Ute* presumption. This is true

---

[9] Notably, Plaintiff's expert, Dr. Cain, testifie ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

even though such evidence might touch on a merits issue. *Ark. Tchr. Ret. Sys.*, 77 F.4th at 103 n.15 ("*Goldman* directs courts to consider '*all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue.'") (quoting *Goldman*, 594 U.S. at 122). Plaintiff did not offer such evidence and thus has failed its burden of proof.[10]

The undisputed evidence shows that the information that could have been disclosed as of August 12, 2022 (the start of NI's trading and start of the proposed class period), was immaterial. "Materiality" requires a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988). In the M&A context, materiality requires a significant probability that the transaction or event will occur. *Id.* Here, there were no indicia of probability that a deal would occur.

As of August 2, 2022, the prospects of a deal with Emerson were dead, since NI had *twice* definitively rejected Emerson's unsolicited, nonbinding proposal with no due diligence, negotiation, or even discussion. Dr. Shane Goodwin, an expert in corporate finance, mergers and acquisitions, and investment banking—with varied experience as an academic, investment banker, corporate board member, and investor—concluded that as of NI's resumption of its repurchase program, the information about Emerson's proposals did not indicate that a deal was probable. Goodwin Rep. ¶ 18. As Dr. Goodwin explains, after a target's board "Just Says No" twice to a preliminary proposal inviting further discussions, the friendly merger process typically stops and the "probability of an acquisition thereafter is negligible, and the target continues its normal course of business."[11] ¶ 18(2).

---

[10] Even if, arguendo, Plaintiff's quotations from the motion to dismiss order were sufficient to show *Affiliated Ute* applies, then Defendants have rebutted that "evidence."

[11] That is, in fact, what happened here. After having rejected Emerson's second proposal again on August 2, 2022, NI consulted counsel about when the "engagement [would] become stale so [there was a] legitimate argument that we don't have MNPI" when a repurchase program "is put in place,

18

The behavior of both NI and Emerson prior to and during the class period reflected low probability as of August 12 that a deal would occur. A number of facts corroborate the low likelihood of a deal. *See id.* ¶ 18(3) (listing facts). Dr. Goodwin considers NI's steps to be inconsistent with parties who are interested in closing a deal. ¶ 19. Moreover, CEO outreach with unsolicited acquisition proposals is common, and typically they fail to advance where the target has no interest in being acquired. Therefore, companies typically do not disclose the mere receipt of a preliminary unsolicited acquisition proposal immediately upon receipt. ¶ 57.

Emerson's opening proposal went nowhere beyond a conversation starter—there was no "conversation" at all, other than "no." There simply was no transactional momentum; NI had no interest in signing an NDA or giving Emerson access to its confidential information. *See* ¶ 33. Faced with an offer price below three valuation estimates, ¶¶ 27-32, the Board was unanimous in its rejection of the first proposal, and "NI's Board's unanimous vote to reject Emerson's proposal is as clear a 'No' decision as a company's board could make." ¶¶ 33, 38. Once curtly rejected, Emerson responded with another nonbinding proposal that did not increase the price, ¶ 35, and then it was rejected again; there was no binding offer, no discussions, no exchange of documents, no drafting of terms, no negotiation, no due diligence.

Emerson and NI had a completely different pattern of engagement starting November 2022—over a month *after* the end of the proposed class period. *See* Decl. Ex. 5. Once Emerson communicated an improved proposal at $53/share, NI set up a committee to evaluate the proposal, held frequent meetings, entered into an NDA with a stand-still clause, and "consistent with the

---

but will let [inside counsel] confirm with [outside counsel]." Decl. Ex.7, NAT-SL-00009611. Having heard nothing more from Emerson, NI's inside counsel lifted the trading restriction for knowledgeable individuals on August 11, and the repurchase program renewed operations on August 12. *Id.*, NAT-SL-00009179.

typical merger process when the target company is actively engaged in seeking a buyer, NI continued to engage in discussions with Emerson, but also began discussions about a possible merger with other parties." Goodwin Rep. ¶ 48; *see* ¶¶ 44-48. NI met with Emerson on January 4, 2023; that "same day, the CEO of another company expressed an interest in 'a potential business combination with NI,'" and the following day NI adopted a poison pill. ¶¶ 49-50; *see* Decl. Ex. 3.

The changed dynamic of the parties' interactions from November 2022 onward to mid-January 2023 should not be imputed to their chilly pre-November dealings. There were no indicia that a merger was probable in August and September of 2022, and as Dr. Goodwin explained, because "the muti-stage merger process can stall or fail at any point," the target typically does not publicly disclose the fact that it has received an unsolicited proposal from an interested buyer "unless merger discussions have advanced significantly." Goodwin Rep. ¶ 57. In contrast, *later*, Emerson was escalating its efforts to acquire NI, the offer price went up more than 10 percent from the summer price, and NI did not "just say no," as it had twice before. The "probability of a transaction occurring must be considered in light of the facts as they then existed" at the time of the repurchases—starting in August—"not with the hindsight knowledge" of events months later. *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 185 (2d Cir. 2001).

In the face of this evidence that a merger was not probable as of August 2022, and in the absence of any actual evidence (or analysis) submitted by Plaintiff to the contrary, Plaintiff is not entitled to invoke *Affiliated Ute* to presume reliance on the alleged omission on a classwide basis. Because reliance is an individual issue, Plaintiff's proposed class fails the predominance requirement and class certification should be denied.

C. **Plaintiff is not entitled to *Basic*'s presumption of classwide reliance.**

Although Plaintiff's insider trading theory does not involve misrepresentation, it nevertheless claims entitlement to the benefit of the classwide presumption of reliance articulated in *Basic Inc. v. Levinson*. *See* Pl. Br. at 8, 18-25. Under *Basic*, "reliance of individual plaintiffs on the integrity of the market price may be presumed" if—at the time the alleged misrepresentations were made—the stock traded in an informationally efficient market that "reflects all publicly available information, and, hence, any material misrepresentations." 485 U.S. at 246-47. The *Basic* presumption is premised on the notion that the stock price incorporated the price of a *misrepresentation*, since "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Halliburton II*, 573 at 272 (quoting *Basic*, 485 U.S. at 247 n.24). The presumption is warranted when "most investors" "rely on the security's market price as an unbiased assessment of the security's value in light of all public information." *Amgen*, 568 U.S. at 462. Accordingly, investors who traded in the stock following a publicly known misstatement can be presumed to have relied on a price affected by fraud, the market having incorporated the value of the fraudulent information.

Plaintiff has not even attempted to meet the prerequisite of showing that "alleged misrepresentations were publicly known" during the class period. *Halliburton II*, 573 U.S. at 277-78. In result, in this case, even assuming the market were informationally efficient, the stock price during the class period would only have reflected *non-fraudulent* public information. If Dr. Cain's event study were credited, it would only show that the class relied on accurate representations when it sold. The fraud-on-the-market theory is thus inapposite to the facts of this case, as is the market efficiency study. *See Puddu*, 2022 WL 2304248, at *4 ("[T]he *Affiliated Ute* presumption does not depend on an efficient market, because it does not infer reliance from a change in a share's

21

market price."). Because affirmative statements by NI are *not* at issue in Plaintiff's theory of liability, Plaintiff cannot invoke *Basic* to presume class-wide reliance. With *Affiliated Ute* also inapplicable because of a failure to show materiality, individual issues of reliance will overwhelm common ones, which effectively prevents a plaintiff from proceeding under Rule 23(b)(3). *See Basic*, 485 U.S. at 242.

Even if somehow the *Basic* presumption were pertinent here, Plaintiff has not proffered sufficient evidence to make a prima facie case. *Basic* is "modest," but not "binary." *Halliburton II*, 573 U.S. at 272. *Basic* "recognized that market efficiency is a matter of degree and accordingly made it a matter of proof" for which Plaintiff bears the burden. *Id.* Thus, to "defeat the presumption of reliance, defendants do not … have to show an inefficient market"; "they must demonstrate that plaintiff's proffered proof of market efficiency falls short of the mark." *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *20 (S.D.N.Y. Oct. 29, 2013).

Plaintiff points to an event study conducted by its expert, Dr. Cain, that purports to show that NI's stock price incorporated and was affected by value-relevant information. But the "study" has no probative value because Dr. Cain put minimal effort into it. The cause-and-affect analysis did not cover the class period.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

Further, the mismatch between the disclosed information in January 2023 and the alleged omitted information destroys any *Basic* presumption of classwide reliance: "[A]ny showing that severs the link between the alleged misrepresentation and the price received (or paid) by the plaintiff will be sufficient to rebut the presumption of reliance because the basis for finding that the fraud had been transmitted through market price would be gone." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 314 (S.D.N.Y. 2016), *aff'd but crit'd on other grounds*, *Waggoner*, 875 F.3d 79. A defendant may rebut the presumption in a number of ways even if Plaintiff meets its prima facie burden. One way is to demonstrate that the misrepresentation did not actually affect the stock's price. *Halliburton II*, 573 U.S. at 263-64. "In assessing price impact at class certification, courts should be open to all probative evidence on that question—qualitative as well as quantitative— aided by a good dose of common sense." *Goldman Sachs*, 594 U.S. at 122. Plaintiff cannot show that the market incorporated omitted information during the proposed class period, so the *Basic* presumption does not apply.

---

[12] Plaintiff justifies its claim of market efficiency using factors outlined in a pair of district court cases, neither of which have been mentioned by the Supreme Court or adopted by the Second Circuit: *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). *See In re Petrobras Sec.*, 862 F.3d 250, 276 (2d Cir. 2017) ("This Court has not adopted a test for the market efficiency of stocks or bonds.") (internal quotation omitted). In doing so, Plaintiff asserts a "binary" view of market efficiency that was repudiated by the Supreme Court. *See Halliburton II*, 573 U.S. at 272. It thereby reduces law and economics to a box-checking exercise that ignores the nuances of the full informational environment, as well as the fundamental difference between the alleged omission and the so-called "corrective disclosures."

## II.    Plaintiff's Class Definition Is Overbroad and Includes Uninjured Class Members Who Did Not Sell Contemporaneously With NI's Repurchases

Finally, even if this Court were to certify a class, Plaintiff has not demonstrated its purported class is proper. Plaintiff defines the class as all investors who sold between August 12 and September 30, 2022 "and were damaged thereby." But the evidence reflects that NI did not repurchase stock for the entirety of that period. *See* Denis Rep. Ex. 1. Inclusive of settlement dates, NI repurchased stock from August 12-30, 2022, and then again from September 12–28, 2022.

As Plaintiff recognizes in its class definition, only those investors who sold stock "contemporaneously" with NI's repurchases can belong in the class. The common law recognition of the implied Section 10(b) cause of action for insider trading requires contemporaneousness, as does the express cause of action that Congress provided in Section 20A for a 10(b) violation by way of insider trading. 15 U.S.C. § 78t–1 (statutory requirement of "contemporaneousness"); *Wilson v. Comtech Telecom. Corp.*, 648 F.2d 88, 94–95 (2d Cir. 1981) ("Any duty of disclosure is owed only to those investors trading contemporaneously with the insider."). The contemporaneous requirement is an important proxy for those who could have been in privity with the insider trades. *See Gordon*, 92 F. Supp. 3d at 203 (discussing purpose of contemporaneousness). In keeping with this concept, in the Second Circuit, "contemporaneous" trades are, at most, a few days apart. *See, e.g.*, *Wilson*, 648 F.2d at 95 (plaintiff's trade within one month of defendants' was not contemporaneous); *In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 176 (S.D.N.Y. 2021) (20A requires that "the defendants' sales and the plaintiffs' purchases fall within a reasonable period of time, usually limited to a few days, of each other") (cleaned up). Particularly when the settlement dates of trades are known, there is no rationale for expanding the scope of contemporaneousness (and thus the scope of the class) beyond the actual trading/closing days. A more accurate class definition would involve sellers for two shorter periods: between August 12

24

and 30, 2022, and then between September 12 and 28, 2022.

Sellers from August 31 through September 11 were *not* contemporaneous with NI's buybacks and could not have been in privity with them; thus, they suffered no injury. "[N]on-contemporaneous traders do not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information." *Wilson*, 648 F.2d at 94 (affirming dismissal for lack of standing). As Justice Kavanaugh made plain just two weeks ago, "a federal court may not certify a damages class that includes both injured and uninjured members," and "when a damages class includes both injured and uninjured members, common questions do not predominate." *Lab. Corp. of Am. Holdings v. Davis*, 2025 WL 1583302, at *1 (U.S. June 5, 2025) (dissenting from dismissal of writ as improvidently granted); *see also id.* at *3 ("if there are members of a class that aren't even injured, they can't share the same injury with the other class members") (agreeing with the Government's argument). It follows that "unnamed class members" who have not suffered an injury-in-fact "lack a cognizable injury under Article III." *Flecha v. Medicredit*, 946 F.3d 762, 768 (5th Cir. 2020). Because the constitutional requirement of standing applies to class actions, "no class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).[13]

This Court should not certify the deliberately overbroad class that Plaintiff has proposed.

**CONCLUSION**

For each of the foregoing independent reasons, Defendants respectfully request that the Court deny Plaintiff's Motion for Class Certification.

---

[13] *See Calvo v. City of N.Y.*, 2017 WL 4231431, at *3, 7 (S.D.N.Y. Sept. 21, 2017) ("a class cannot be certified if any person captured within that definition lacks Article III standing").

Dated:  June 16, 2025                                    By: /s/ *James F. Bennett*

James F. Bennett (*pro hac vice*)
J. Russell Jackson
Jenny E. Braun (*pro hac vice*)
DOWD BENNETT LLP
7676 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone:  (314) 889-7300
Facsimile:   (314) 863-2111
jbennett@dowdbennett.com
rjackson@dowdbennett.com
jbraun@dowdbennett.com

Andrew Ditchfield
Davis Polk & Wardwell LLP
450 Lexington Ave
New York, New York 10017
Telephone: (212) 450-4000
andrew.ditchfield@davispolk.com

*Counsel for Defendants National Instruments
Corporation, Michael McGrath, and Eric
Starkloff*

26

**CERTIFICATE OF WORD COUNT**

Pursuant to Rule 7.1 of the United States District Court for the Southern District of New York, the undersigned counsel certifies that the foregoing brief was prepared on a computer using Microsoft Word.

The following proportionally spaced typeface was used: Times New Roman point size 12, including in footnotes; line spacing of double in body (excluding block quotations) and single in footnotes.

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of the caption, table of contents, table of authorities, signature block, and this Certification, is 8,746. By operation of Microsoft Word's word count function, this number includes legal citations and certain forms of punctuation.

/s/ *James F. Bennett*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing memorandum of law was served via ECF upon all counsel of record.

/s/ *James F. Bennett*