# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re NATIONAL INSTRUMENTS CORPORATION SECURITIES LITIGATION | Civil Action No. 1:23-cv-10488-DLC |

**EXPERT REPORT OF SHANE GOODWIN**

**June 16, 2025**

**TABLE OF CONTENTS**

I.      Introduction................................................................................................................1

        A.      Qualifications...............................................................................................1

        B.      Background....................................................................................................3

        C.      Assignment ...................................................................................................5

        D.      Compensation ...............................................................................................5

II.     Summary of Opinions.................................................................................................6

III.    The Probability Of Emerson Acquiring NI Was Negligible As Of The Start Of
        The Proposed Class Period Because NI's Actions In Response To Emerson's May
        And June 2022 Proposals Were Clearly Inconsistent With The Steps That Parties
        Take In A Merger Process When Both Are Seriously Interested In Closing A Deal..........9

IV.     The Steps That Emerson And NI Took After Emerson Sent A Hostile Proposal on
        November 3, 2022 Are Consistent With The Steps That Parties Take In A Merger
        Process When Both Are Seriously Interested In Closing A Deal......................................24

Exhibit 1: Timeline Of NI-Emerson Discussions Through January 17, 2023 ..............................32

**I.      Introduction**

**A.      Qualifications**

1.      I am Shane Goodwin. I have over 30 years of experience in corporate finance, mergers and acquisitions ("M&A"), and investment banking, as an academic, investment banker, board member and investor.

2.      I currently serve as the Associate Dean of Graduate Programs and Executive Education at the Cox School of Business at Southern Methodist University ("Cox School of Business"). Since 2018, I also serve as a Professor of Practice in the Department of Finance at the Cox School of Business. At the Cox School of Business, I teach graduate level courses on global M&A, corporate governance, private equity, strategic consulting, transformational leadership, ethics and compliance. Additionally, I serve as an Adjunct Professor at Dedman School of Law at Southern Methodist University, where I teach courses on corporate and business law.

3.      I previously served as a Senior Fellow and Director at the Richman Center for Business, Law, and Public Policy at Columbia University, a research institute established by Columbia Business School and Columbia Law School. I also served as a Post-Doctoral Fellow at Harvard University, where I conducted research on M&A, corporate governance, and financial policy at the Harvard Law School Forum on Corporate Governance.

4.      I have nearly 25 years of professional experience in investment banking and corporate finance, with senior roles at firms such as Goldman Sachs, Citigroup, and Wells Fargo Securities. In my professional career, I have advised on over 250 M&A transactions exceeding $50 billion in

1

combined value and executed over 100 public and private debt and equity investments totaling more than $40 billion. Most recently, I served as the Managing Director and Head of Investment Banking for the Southwest U.S. at Wells Fargo Securities. At Goldman Sachs, I advised boards of directors, corporate clients, and private equity firms on complex strategies, including M&A, takeover defenses, shareholder activism, and corporate restructuring.

5.      In 2009, I founded Argus Capital Partners, a merchant banking firm which provided private equity solutions and corporate finance advisory services and invested in leveraged buyouts. I am also an investor in alternative assets, including private equity funds.

6.      I also have extensive board experience. I currently serve as Chair of the Audit Committee for two SEC-registered Principal Financial Group 1940 Act funds: the Principal Private Credit Fund (PPAC.X) and the Principal Diversified Select Real Asset Fund (PDSK.X). I also serve on advisory boards for Crystal Clearwater Resources, Truist Financial Corporation (NYSE: TFC) and on the investment committee for the Dallas Regional Chamber.

7.      I am a board leadership fellow at the National Association of Corporate Directors ("NACD"), hold the NACD Directorship Certification and founded and lead The Applied Corporate Governance Institute at The Center for Global Enterprise, a nonprofit, nonpartisan research institution dedicated to the study and application of responsible corporate governance principles through the use of proprietary predictive analytics.

8.      I hold a Ph.D. degree in Business Administration from the Spears School of Business at Oklahoma State University and an LL.M. degree from SMU Dedman School of Law. I also hold

an MBA degree in finance from Northwestern University's Kellogg School of Management, and a bachelor's degree in Business from the University of Tulsa.

9.    My complete curriculum vitae, which includes a list of my publications and my consulting and testifying experience, is attached as **Appendix A** to this report.

### B.    Background

10.    This is a class action brought by Lead Plaintiff Wayne County Employees' Retirement System against the Defendants, National Instruments ("NI" or "Company")[1] and certain of its senior officers and directors ("Individual Defendants").[2] I understand that *inter alia* the Plaintiff alleges that NI "violated §10 (b) and Rule 10b-5 by failing to either abstain from trading in NI's securities" or to disclose material non-public information," *i.e.,* that it had "offers" from Emerson Electric Co. ("Emerson")[3] "while buying back NI's securities."[4]

---

[1]    The Company "produced automated test equipment and virtual instrumentation software." (*In Re National Instruments Corporation Securities Litigation*, United States District Court Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Amended Complaint for Violations of the Federal Securities Laws, filed March 29, 2024 ("Amended Complaint"), ¶10).

[2]    The Company's senior officers and directors named as Defendants (collectively referred to as "Individual Defendants") are: (1) Eric Starkloff the Company's CEO and President, and a member of the Company's Board of Directors ("Board"); (2) Karen Rapp who was an Executive Vice President and the Company's Chief Financial Officer ("CFO") through January 9, 2023 and then served as an advisor to the company until her retirement in May 2023; (3) Michael McGrath, the Chairman of the Board of National Instruments and a "member of the Board's 'transaction working group' concerning Emerson's offers to purchase National Instruments." (Amended Complaint, ¶¶10-14). The Company and the Individual Defendants are collectively referred to as "Defendants." (Amended Complaint, ¶15).

[3]    "Emerson is the global technology, software and engineering powerhouse driving innovation that makes the world healthier, safer, smarter and more sustainable." *See* "Advancing the World's Most Essential Industries," *Emerson*, available at https://www.emerson.com/en-us.

[4]    *In Re. National Instruments Corporation Securities Litigation*, United States District Court, Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Opinion and Order filed September 6, 2024 ("Opinion and Order"), p. 15.

11.    I understand from Dowd Bennett LLP ("Counsel"), counsel for Defendants, that "material non-public information" refers to confidential, nonpublic information, which, in the traditional insider trading context, corporate insiders "obtained […] by reason of their position with that corporation."[5] I further understand from counsel that for the omitted information to be "material," there must be a "substantial likelihood" that the information "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[6] In the context of contingent or speculative events, such as a merger, materiality "depends on the probability that the event will be consummated, and its significance to the issuer of the securities."[7] Additionally, "[t]he probability of a transaction occurring must be considered in light of the facts as they then existed" at the time of the trading, "not with the hindsight knowledge that the transaction was or was not completed."[8]

12.    Lead Plaintiff and class counsel have submitted a motion for class certification requesting the Court to issue an order certifying "this action to proceed as a class action on behalf of the following class:

> All persons who sold National Instruments common stock between **August 12, 2022 and September 30, 2022**, inclusive …["Proposed Class Period"] and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs,

---

[5]    *United States v. Chow*, 993 F.3d 125, 136 (2d Cir. 2021), at p. 25 (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).

[6]    *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015), at p. 11 (internal quotation omitted).

[7]    *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d. Cir. 2001) ("Castellano, 257 F.3d") (citing *Basic, Inc. v. Levenson*, 485 U.S. 224, 250 (1988)).

[8]    *Castellano*, 257 F.3d (quoting *In re Gen. Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1127 (D. Del. 1988)).

successors, or assigns and any entity in which Defendants have or had a controlling interest." (emphasis added)[9]

## C.    Assignment

13.    I have been asked by Counsel to:

(i)    Describe generally, based on my experience, the process and potential outcomes when a potential target is approached by an acquirer expressing interest in acquiring the target; and

(ii)    Analyze the indicia of probability and assess the probability of Emerson acquiring NI after NI sent its letter on August 2, 2022 rejecting Emerson's second proposal and whether this probability was higher than it was before on May 16, 2022, when Emerson first contacted NI with an unsolicited proposal to acquire all of NI's shares at $48 per share.

## D.    Compensation

14.    I bill on a time and materials basis in connection with this assignment. My hourly rate is $1,300 per hour. Employees of Analysis Group, Inc., working under my direction and supervision, have assisted me in this assignment.

15.    Payment for my services and the services of Analysis Group staff working under my direction and supervision does not depend in any way on the opinions I form or the outcomes in this matter.

---

[9]    *In Re National Instruments Corporation Securities Litigation*, United States District Court, Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, filed May 2, 2025. ("Lead Plaintiff's Class Certification Motion"). Lead Plaintiff's Class Certification Motion also seeks an order from the Court "[a]ppointing Lead Plaintiff Wayne County Employees' Retirement System to serve as Class Representative of the Class; and "[a]ppointing Robbins Geller Rudman & Dowd LLP as Class Counsel." Lead Plaintiff's Class Certification Motion, p. 2.

16.    The materials that I have considered in reaching my conclusions are listed in **Appendix B** of this report.

17.    My work on this matter is ongoing, and I may review additional materials or conduct further analysis, including additional materials that may be produced in discovery after the filing of this report. To the extent that additional information comes to my attention, I reserve the right to update, refine, and/or revise my opinions.

## II.    Summary of Opinions

18.    As I discuss in detail in this report, based on my experience, and my review and analysis, I have reached the following opinions.

1) Although Emerson had submitted two unsolicited, non-binding, and contingent proposals in May and June 2022 to acquire National Instruments at $48 per share, the probability of an acquisition occurring as of the start of the Proposed Class Period was negligible. By that time, NI's Board had already rejected both proposals—on June 16 and again on August 2, 2022—after comprehensive review and deliberation with its legal and financial advisors. In both instances, NI's Board voted unanimously to decline the proposals and NI clearly communicated to Emerson that it did not wish to engage in any further discussions. These unequivocal rejections constituted classic "Just Say No" responses, signaling the absence of any meaningful engagement or likelihood of a transaction under the terms offered.

2) Emerson's proposals were not definitive offers. Instead, they are examples of the typical unsolicited preliminary proposal that a potential acquirer's Chief Executive Officer ("CEO") makes confidentially to a potential target's CEO, inviting him/her and the target's board of directors to engage in further confidential discussions. Before a potential acquirer can make a definitive offer to acquire a public company in a friendly, negotiated merger, both parties typically follow a standard multi-phase process designed to ensure regulatory compliance, fiduciary diligence, and refined price discovery. But if the target's board "Just Says No," (*i.e.,* refuses to engage in further discussions) as NI's Board did twice, then the friendly merger process stops, absent further developments. The probability of an acquisition thereafter is negligible, and the target continues its normal course of business.

3) Other corroborating facts also confirm that NI's Board was not interested in pursuing further discussions about a merger at the start of the Proposed Class Period, and the probability of an acquisition thereafter was negligible. Such facts include:

   i.   NI retained Bank of America ("BofA") as a financial advisor defensively to assist its Board to evaluate acquisition attempts only, not seek out prospective buyers;

   ii.   NI's Board unanimously decided not to engage with Emerson because it considered Emerson's proposals "opportunistic" and significantly undervalued the Company (relative to its stand-alone basis) given *inter alia* its financial advisor's valuations of NI's stand-alone value, and the Company's transformational plans.

   iii.   NI and Emerson did not take the customary next steps typical in a friendly merger process, *e.g.*, the parties did not sign a non-disclosure agreement ("NDA") and Emerson was not granted access to confidential information about NI to conduct its due diligence.

7

    iv.    The parties had no further discussions until November 3, 2022 when Emerson sent a third proposal to acquire all NI shares for $53 per share.

    v.    After rejecting Emerson's second proposal, NI did not adopt any anti-takeover defenses such as a shareholder rights plan ("poison pill") before the start of the Proposed Class Period which potential targets commonly do when they anticipate that the potential acquirer may attempt a hostile takeover. This suggests—and would suggest to a reasonable investor—that the Board and NI did not perceive a substantial threat that Emerson would return with a hostile bid.

4) As the probability of Emerson acquiring NI was negligible as of the start of the Proposed Class Period given the facts at the time, Plaintiff's claim that NI possessed "material non-public information" about Emerson's offers over the Proposed Class Period is speculative and flawed.[10]

5) If hypothetically, NI had disclosed at the start of the Proposed Class Period that it had received two unsolicited non-binding proposals to acquire all NI shares at $48 per share in May and June, 2022, both of which the Board had unanimously rejected after careful consideration and advice from its legal and financial advisors as not in the best interests of NI's shareholders, and both of which the Board had determined did not provide a basis for further discussions with the unsolicited suitor, such a disclosure would have been economically immaterial and would not have had a significant impact on NI's stock price.

6) NI's actions from November 2022 through April 2023, which followed the typical merger process when a target is interested in closing a deal, were in stark contrast to NI's actions after receiving Emerson's May 2022 and June 2022 proposals.

---

[10] Amended Complaint, ¶83.

7) Based on my experience, when a company receives an unsolicited, non-binding acquisition proposal in the ordinary course of business—particularly when it is not actively pursuing a sale process—and summarily rejects the proposal while explicitly declining to engage in further discussions, it is not customary for the company to publicly disclose the existence or rejection of that proposal.

8) Even when the target is interested in completing a deal, and engages in merger discussions, the multi-stage merger process can stall or fail at any point. Accordingly, a target company typically refrains from disclosing unsolicited proposals unless merger discussions have advanced significantly. Thus, it is speculative to assume that because information regarding advanced discussions is material, a reasonable investor would have viewed the information available as of the start of the Class Period (of preliminary, brief interactions between NI and Emerson that did not advance and were not advancing) as significantly altering the total mix of information available.

### III. The Probability Of Emerson Acquiring NI Was Negligible As Of The Start Of The Proposed Class Period Because NI's Actions In Response To Emerson's May And June 2022 Proposals Were Clearly Inconsistent With The Steps That Parties Take In A Merger Process When Both Are Seriously Interested In Closing A Deal

19.     In my experience, it is common for public companies to receive unsolicited proposals, mainly through confidential CEO outreach, from other companies expressing an interest in acquiring them and requesting the potential target firm's management to engage in further discussions about the proposal. However, based on my experience, such outreaches fail to advance

9

when the target has no interest in pursuing a transaction, like NI's lack of interest in engaging with Emerson after it had considered Emerson's May and June 2022 proposals as I discuss below.

20.     On May 16, 2022, Lal Karsanbhai, Emerson's President and Chief Executive Officer ("CEO") spoke with Eric Starkloff, NI's President and CEO, regarding Emerson's potential interest in acquiring NI.[11] Such a confidential outreach, usually via CEO-to-CEO call by which the prospective buyer seeks permission to engage in further discussions, is common in the industry when the prospective buyer is interested in acquiring a company through friendly private negotiations.

21.     On May 25, 2022, Mr. Karsanbhai sent Mr. Starkloff, an unsolicited "proposal"[12] to acquire all of NI's shares for $48 per share in cash ("May 25 Letter").[13] The May 25 Letter was not a definitive acquisition offer. Instead, it was merely an unsolicited, non-binding contingent proposal. The letter made clear that before a "Definitive Agreement" could be reached between the parties, Emerson would have to complete "customary and confirmatory due diligence (*e.g.*, tax, environmental, legal, etc.)" and get Emerson's Board of Directors' final approval.[14] To then "close" the transaction, additional steps would have to be completed (*e.g.*, obtain regulatory approvals, and the approval of NI's shareholders).[15]

---

[11]    National Instruments Corporation, Schedule 14A, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, May 11, 2023 ("NI Proxy Statement") p. 25. *See also*, Email from Mr. Lal Karsanbhai, CEO of Emerson to Mr. Eric Starkloff, CEO of NI, dated May 16, 2022 (NAT-SL-00001267).

[12]    Letter from Mr. Lal Karsanbhai, CEO of Emerson to Mr. Eric Starkloff, CEO of NI, dated May 25, 2022 (NAT-SL-00001263-266) ("May 25 Letter").

[13]    May 25 Letter.

[14]    May 25 Letter.

[15]    May 25 Letter.

10

22.     Consistent with my experience, NI's Board and management promptly reviewed Emerson's proposal with the assistance of the Company's financial and legal advisors, as I discuss below.

23.     The next day, May 26, 2022, NI's Board held a special meeting at which representatives from NI's outside legal counsel, Wachtell, Lipton, Rosen & Katz ("WLRK") "outlined the Board's fiduciary duties in this context, various legal and practical considerations in the context of receiving [Emerson's] proposal and potential go-forward scenarios."[16] The Board and management also discussed "the proposal […], current Company strategy and business performance as well as prior discussions that had been had with the Board regarding the Company's strong prospects and positioning, engagement of related outside advisors and other next steps."[17]

24.     On June 10, 2022, NI's Board retained Bank of America Securities ("BofA Securities" or "BofA") to provide NI "with financial advice and assistance as part of the Company's review, consideration and analysis of an Acquisition Attempt and potential responses thereto," and "assist the Company in its review of strategic alternatives available to the Company."[18] In my experience, the terms of the BofA engagement letter suggest that, at the time, NI was not interested in engaging actively with prospective buyers.

---

[16]   NI Board of Directors Meeting Minutes, May 26, 2022 (NAT-SL-00001449).

[17]   NI Board of Directors Meeting Minutes, May 26, 2022 (NAT-SL-00001449).

[18]   Bank of America Securities Engagement Letter, June 10, 2022 (NAT-SL-00001554-566). "BofA Securities was selected based on its qualifications, experience and reputation in the technology sector and its knowledge of NI's business and affairs." (NI Proxy Statement, p. 25).

11

25.    According to the letter, as "lead financial advisor to NI," BofA would:

> provide the Company with financial advice and assistance as part of the Company's review, consideration and analysis of an Acquisition Attempt and potential responses thereto, and BofA Securities will assist the Company in its review of strategic alternatives available to the Company.[19]

26.    In a typical "sell-side engagement"[20] a motivated seller retains a financial advisor to identify prospective buyers and specifies that the advisor would receive a "success" fee (typically the largest component of the financial advisor's fee) if a transaction is successfully completed with a prospective buyer that the financial advisor had identified.[21] In contrast, in a defensive engagement, which in my view the BofA engagement letter was, a company is not interested in selling itself to a prospective buyer, and the financial advisor is not incentivized through a success fee to identify prospective buyers. Instead, in a defensive engagement, the financial advisor is typically paid a flat retainer fee at regular intervals during the course of the engagement, as was the case here.[22]

27.    At a June 14, 2022 meeting with NI's Board and its legal advisor (WLRK), BofA presented its valuation analyses to the Board ("BofA June 14 Board Presentation").[23] The BofA June 14 Board Presentation included a range of (undiscounted) analysts' price targets for the Company's

---

[19]    Bank of America Securities Engagement Letter, June 10, 2022 (NAT-SL-00001554-566).

[20]    Schmelter, Joseph C., Lauren Fields, and Daria Ivanova, "Engagement Letters with Investment Bankers," *Venable LLP*, September 13, 2021, available at https://www.venable.com/insights/publications/2021/09/engagement-letters-with-investment-bankers.

[21]    Schmelter, Joseph C., Lauren Fields, and Daria Ivanova, "Engagement Letters with Investment Bankers," *Venable LLP*, September 13, 2021, available at https://www.venable.com/insights/publications/2021/09/engagement-letters-with-investment-bankers.

[22]    BofA would only receive a fixed retainer fee for its services of $250,000 per quarter for the duration of its engagement, Bank of America Securities Engagement Letter, June 10, 2022 (NAT-SL-00001554-566 at 554).

[23]    "Project Wolverine: Discussion Materials," June 2022 (NAT-SL-00001513-545 at 522) ("BofA June 14 Board Presentation").

stock which ranged from $42 to $50 per share,[24] and BofA's own valuations of the Company on a stand-alone basis using three different well-accepted valuation methods according to which the Company's valuation "exceeded [Emerson's] offer."[25]

28.    The methods that BofA used to value NI as a "stand-alone" company were the "Selected Publicly Traded Companies," "Precedent Transaction Premiums," and a "Discounted Cash Flow ['DCF'] Analysis, Excl. Synergies."[26] In the first two methods, BofA calculated NI's value as a multiple of its 2022 or 2023 estimated EBITDA[27] based on the multiple implied by the enterprise values of comparable public companies, or by precedent transactions.[28] BofA conducted a sensitivity analysis by generating a range of values for NI (and its share price) under each valuation method by changing the underlying assumptions. The resulting "low" and "high" values estimates for NI that BofA calculated using each method are reported in **Table 1** below.

---

[24]    BofA June 14 Board Presentation (NAT-SL-00001513-545 at 522). An analyst's "undiscounted" price target is the analyst's assessment of a stock's future stock price (typically a year from the date of the analyst report). As it typically takes several months to a year to complete a merger even after parties engage in active merger negotiations, BofA's consideration of analysts' undiscounted price targets as a benchmark to evaluate Emerson's contingent acquisition proposal of $48 per NI was reasonable.

[25]    National Instruments June 14, 2022, Board of Directors Meeting Minutes (NAT-SL-00001447-448) ("June 14 Board Meeting").

BofA also compared NI's stock performance against the Nasdaq, "Test and Measurement Peers," and Industrial Software Peers." BofA's analysis showed that NI's performance was worse than these benchmarks over the prior twelve months, but had improved over time, *e.g.*, over the last one month, NI's stock return (7.4%) was higher than two of the three benchmarks (the Nasdaq, "Test and Measurement Peers"). BofA June 14 Board Presentation (NAT-SL-00001513-545 at 517).

[26]    BofA June 14 Board Presentation (NAT-SL-00001513-545 at 522).

[27]    EBITDA is an acronym for Earnings Before Interest, Taxes, Depreciation, and Amortization.

[28]    In the Selected Publicly Traded Companies valuation method, BofA also calculated NI's value using the price to earnings per share (P/E) multiple. *See* BofA June 14 Board Presentation (NAT-SL-00001513-545 at 522).

**Table 1**
**Summary of BofA's Valuations Of NI's Share Price On A Stand-Alone Basis[29]**

| Valuation Method | | Low | High | Mid-Point |
|---|---|---|---|---|
| Selected Publicly Traded Companies | EV / '22E Adj. EBITDA Multiple | $38.50 | $47.00 | $42.75 |
| | EV / '23E Adj. EBITDA Multiple | $52.00 | $65.00 | $58.50 |
| | Price / '22 Earnings Multiple | $34.75 | $45.00 | $39.88 |
| | Price / '23 Earnings Multiple | $46.00 | $63.50 | $54.75 |
| | **Average** | **$42.81** | **$55.13** | **$48.97** |
| | | | | |
| Precedent Transaction Premiums | EV / LTM Adj. EBITDA Multiple | $49.75 | $58.75 | $54.25 |
| | EV / NTM Adj. EBITDA Multiple | $50.00 | $62.75 | $56.38 |
| | **Average** | **$49.88** | **$60.75** | **$55.31** |
| | | | | |
| Discounted Cash Flow Analysis, Excl. Synergies | Implied Terminal LTM Adj. EBITDA Multiple | **$50.75** | **$78.50** | **$64.63** |

29.     As **Table 1** indicates, the average of the mid-point estimates under the first two methods, and the mid-point of the valuation using the DCF method ($48.97, $55.31 and $64.63 per share, respectively) were all above Emerson's proposed consideration of $48 per share.

30.     Note also that while financial advisors typically include a target's valuations using these three alternative methods, the only method that explicitly reflects the control premium that acquirers pay to acquire a target is the Precedent Transaction Premiums method.[30] NI's valuation under this method according to BofA ranged from a low of $49.75 to a high of $62.75. Thus, Emerson's proposal of $48 per share was lower than even the low end of NI's estimated valuation range in a transaction that involves a change of control.

---

[29]    BofA June 14 Board Presentation (NAT-SL-00001513-545 at 522).

[30]    The Selected Publicly Traded Companies method is based on selected public peer companies' observed stock prices on a minority basis and the DCF reflects BofA's assessment of NI's intrinsic value on a stand-alone basis, which does not reflect any premium that an acquirer may pay to get controlling interest in NI.

31.     Based on my experience, given these valuation reference ranges, it is highly unlikely that NI's Board would have approved (or even recommended to NI's shareholders to vote in favor of) an acquisition of the Company by Emerson for $48 per share, or that BofA would have issued a fairness opinion confirming that Emerson's proposed price of $48 per share was fair "from a financial point of view."[31]

32.     At the June 14, 2022 Board meeting, NI's directors discussed "Emerson's [which the Board referred to as 'Wolverine' in its discussions] proposal, the Company's strategy, performance and valuation considerations, and potential responses."[32] At this Board meeting:

> Directors referenced prior meetings of the Board where the Company's business, prospects, opportunities and risks had been throughly [*sic*] discussed, **noted that the strength of the Company's performance and prospects** and highlighted that supply chain challenges have been hampering translation of increased bookings into revenue and that the results of the Company's strategic plan have yet to be realized.
>
> Directors also discussed that **the proposal did not provide a basis for further discussions** and how the timing of the proposal was opportunistic, including taking into account broader market and industry volatility and especially company-specific circumstances, such as, among others, that the Company's strategic plan is in the early stages of realization and **that the proposal substantially undervalues the Company, including relative to the value able to be realized and unlocked from execution of the Company's strategic plan and relative to the valuation methodologies presented by BofA and discussed with the Board.**
>
> In addition, the directors discussed the **lack of apparent synergies** for Wolverine with respect to the Company, especially relative to other potential strategic partners.

---

[31]  Houlihan Lokey Response To Request For Comments By The Securities And Exchange Commission (The "Commission") On File No: S7-03-22; Release, p.2, available at https://www.sec.gov/comments/s7-03-22/s70322-20126403-287074.pdf

[32]  June 14 Board Meeting (NAT-SL-00001447-448 at 448). Note that BofA referred to Emerson as "Nuthatch" in its presentation. *See* BofA June 14 Board Presentation (NAT-SL-00001513-545 at 526-529).

15

> Upon conclusion of discussion, **the directors unanimously determined to reject Wolverine's proposal** and that it would direct management to convey this determination to Wolverine.[33] (emphasis added)

33.    Typically, *if* the potential target wished to engage in a friendly merger discussion with the potential acquirer, after receiving an unsolicited confidential proposal, the next steps in a merger discussion[34] would be for the parties to enter into an NDA[35] after which the potential buyer would be given access to confidential material about the target through a "data room" to conduct customary due diligence.[36] In this case, NI's Board refused to enter into an NDA with Emerson and grant it access to confidential information to conduct its due diligence. Instead, NI's Board's decision on June 14, 2022 foreclosed any further discussion with Emerson regarding its acquisition proposal. In my experience, NI's Board's unanimous vote to reject Emerson's proposal is as clear a "No" decision as a company's board could make.

---

[33]   June 14 Board Meeting (NAT-SL-00001447-448 at 448).

[34]   Before a potential acquirer can make a definitive offer to acquire a public company in a friendly, negotiated merger, the parties typically engage in a multi-phase process, which includes: (1) *Confidential Outreach*: the acquirer's CEO contacts the target's CEO to express non-binding interest, often accompanied by a preliminary indication of interest; (2) *Mutual Confidentiality Agreement*: if the target agrees to engage, both parties enter into an NDA, often including a standstill provision; (3) *Data Room and Initial Due Diligence*: the target provides access to confidential information while the acquirer begins diligence; (4) *Preliminary Valuation and Indicative Offer*: the acquirer submits a revised, non-binding offer with proposed pricing and structure; (5) *Target Board Review and Response*: the target's board evaluates the proposal and may negotiate terms or decline to proceed; (6) *Final Due Diligence and Negotiation of Terms*: if negotiations continue, the parties finalize diligence, draft transaction documents, and secure financing; (7) *Acquirer Board Approval*: the acquirer's board formally approves the merger agreement; (8) *Signing and Public Announcement*: both boards approve and sign the agreement, followed by a joint public announcement and SEC filing; (9) *Shareholder and Regulatory Approvals*: the target's shareholders and relevant regulators review and approve the transaction; and (10) *Closing*: upon satisfaction of all conditions, cash and stock consideration is paid and the merger is completed. *See* DePamphilis, *Donald M., Mergers, Acquisitions, and Other Restructuring Activities*, 9th Edition, Elsevier, 2018 ("DePamphilis (2018)"), Chapter 5, Implementation: Search Through Closing, pp. 165-192.

[35]   DePamphilis (2018), pp. 175-176.

[36]   DePamphilis (2018), p. 182.

34. On June 16, 2022, Mr. Starkloff and Mr. Michael McGrath, the Chairman of NI's Board of Directors, sent a letter to Emerson's CEO, Mr. Karsanbhai ("June 16 Letter") which stated that after "carefully review[ing]" Emerson's proposal with the "assistance of [its] financial and legal advisors," NI's Board:

> …has **unanimously determined that your [May 25, 2022] letter does not provide a basis for further discussions**.
>
> NI's Board and management team will remain focused, without distraction, on executing our strategies that are producing a significant and steady increase in bookings and revenue, strengthened operational performance, and advances in technology.[37] (emphasis added)

35. On June 22, 2022, Mr. Karsanbhai replied to NI's June 16 Letter ("June 22 Letter")[38] stating that he was "disappointed in [NI's] response and the lack of engagement from [NI and its] Board to what is an extremely attractive Proposal for the shareholders of NI" and repeated Emerson's earlier proposal to acquire all of NI's shares at $48 per share in cash.[39] On July 6, 2022, Mr. Starkloff informed Mr. Karsanbhai that NI's Board would discuss Emerson's June 22 Letter at its "regularly scheduled board meeting" at the end of the month.[40]

---

[37] Letter from Mr. Eric Starkloff, CEO of NI and Mr. Michael McGrath, Chairman of NI's Board of Directors to Mr. Lal Karsanbhai, CEO of Emerson, dated June 16, 2022 (NAT-SL-00001254-255). ("June 16 Letter").

[38] Letter from Mr. Lal Karsanbhai, CEO of Emerson to Mr. Eric Starkloff, CEO of NI and Mr. Michael McGrath, Chairman of NI's Board of Directors dated June 22, 2022 (NAT-SL-00002991-994). ("June 22 Letter").

[39] June 22 Letter. According to NI Proxy Statement: "The June 22 Letter noted that Emerson had engaged advisors and was prepared to work with NI and its advisors to complete due diligence and negotiate a mutually agreeable merger agreement. Emerson also requested access to limited nonpublic information subject to a non-disclosure agreement." NI Proxy Statement, p. 26.

[40] Email from Mr. Eric Starkloff, CEO of NI to Mr. Lal Karsanbhai, CEO of Emerson, dated July 6, 2022 (NAT-SL-00001260-261).

36.    NI's Board and legal advisors met on July 19 and 20, 2022 to discuss, among other topics,

Emerson's "reaffirmation of its prior inadequate offer" in the June 22 Letter.[41] At this meeting, the

Board discussed among other topics:

> … the potential for wolverine [or Emerson] to change its offer and the degree to which Emerson would pursue the potential transaction, the potential for entry into a confidentiality agreement and engaging in due diligence and negotiations with Emerson, and various strategic and financial alternatives.
>
> The Board reaffirmed its view that Emerson's proposal was not in the best interests of NI and its stockholders and did not reflect the value expected to be generated by NI's business strategies.
>
> **Following discussion, the Board concluded that the proposal from Emerson did not merit engaging in further discussions with or providing diligence materials to Emerson.**
>
> The Board also discussed with management and its advisors the potential steps NI could take at the upcoming earnings call to highlight NI's momentum, prospects, margin priorities and other financial and operating performance matters.[42] (emphasis added)

37.    On August 2, 2022, NI rejected Emerson June 22 proposal. NI's letter ("August 2 Letter")

informed Emerson that the Company's Board:

> … has carefully reviewed your letter dated June 22, 2022, with the assistance of our financial and legal advisors. The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders.[43]

38.    Based on my experience, it is evident from NI's Board discussions and NI's second "Just

Say No" response on August 2, 2022, that NI's Board had firmly decided not to engage in further

merger discussions with Emerson as of August 2, 2022, ten days before the beginning of the

---

[41]   NI Board of Directors Meeting Minutes, July 19-20, 2022 (NATL-SL-00001457-509 at 460).

[42]   NI Proxy Statement, p. 26.

[43]   Letter from Mr. Eric Starkloff, CEO of NI, and Mr. Michael McGrath, Chairman of NI's Board of Directors to Mr. Lal Karsanbhai, CEO of Emerson, dated August 2, 2022 (NAT-SL-00001239-40) ("August 2 Letter").

18

Proposed Class Period.[44] The Company's *repeated* rejection of Emerson's proposals are classic examples of the "Just Say No" response that target companies have often successfully used to thwart takeover attempts.[45] In my experience, after a "Just Say No" response ruling out further merger discussions, the probability of a merger is negligible, and the target firm typically continues with its normal course of business. In my experience, when a company receives and rejects an unsolicited, non-binding acquisition proposal in the ordinary course of business—particularly when it is not actively exploring strategic alternatives—it is generally not customary for the company to publicly disclose the proposal or its rejection.

39.     NI's Board had authorized a share repurchase program in 2010 which had subsequently been extended to allow the Company to continue to buy back shares.[46] The Company did not

---

[44]  Emerson also viewed NI's June 16 and August 2 letters as "curt response letter(s) refusing to engage." *See* Emerson January 17, 2023 Press Release, p. 12.

[45]  The "Just Say No Response" has been used multiple times successfully (*i.e.*, target companies have successfully thwarted a hostile takeover after just saying no) since it was first used by McGraw-Hill in January 1979 to reject an acquisition offer by American Express. (Lipton, M. *et al.,* "Just Say No," *Harvard Law School Forum on Corporate Governance*, December 9, 2014, available at https://corpgov.law.harvard.edu/2014/12/09/just-say-no/).

"The Universal Foods Corporation, a manufacturer of products such as french fries and cheese, used the just say no defense in 1989, when it turned down an offer from the High Voltage Engineering Corporation. When High Voltage Engineering offered $38 per share, Universal responded that its investment banker, Goldman Sachs, had determined that this offer was inadequate. Universal's board of directors decided that profits were rising and that this was not the time to sell the company. Martin Lipton, the originator of the just say no defense, advised his client, Universal Foods, to reject the offer and not take any other action. Universal compromised by raising its dividend from 18 cents per share to 22 cents. The company's defense, especially its poison pill, was challenged in court. In March 1989, a federal court judge in Wisconsin ruled that if the company's executives believed that the offer was inadequate, they were in a position to determine an accurate value for the company." (Gaughan, Patrick A., *Mergers, Acquisitions, and Corporate Restructurings*, 4th Edition, John Wiley & Sons, 2007 ("Gaughan (2007)"), p. 230).

[46]  National Instruments had authorized a share repurchase plan in 2010, which it amended in 2019 to increase the number of shares that could be repurchased under the plan (the "2019 Program"). On January 19, 2022, NI's Board authorized the Company to repurchase up to $250 million worth of common stock, effective immediately (the "2022 Program"). The share repurchases over the Proposed Class Period were authorized under the 2022 Plan. (United States Securities and Exchange Commission, National Instruments Corporation, Form 10-Q, Quarter Ending September 30, 2022).

19

repurchase shares between May 7, 2022 and August 11, 2022,[47] which includes the period when NI's Board evaluated and eventually rejected Emerson's May and June 2022 proposals. After rejecting Emerson's proposal, NI resumed its repurchases under an automatic Rule 10b5-1 plan adopted on August 11, 2022.[48]

40.    Plaintiff's claim that NI's repurchase transactions over the Proposed Class Period were completed while Defendants possessed "material non-public information" (*i.e.,* knowledge of the two Emerson proposals in May and June 2022) is speculative and fundamentally flawed because by August 12, 2022, the start of the Proposed Class Period, NI had flatly rejected Emerson's first proposal to acquire all NI shares for $48 per share, and Emerson's second proposal in which Emerson did not increase its proposed acquisition price.

41.    Based on my experience, after NI had clearly and unconditionally rejected Emerson's repeated offers to acquire NI at the same price, it would be reasonable to conclude that the probability of Emerson acquiring NI was negligible as of August 12, 2022. This conclusion is supported by several other corroborating facts known to Defendants at the time, including:

1) NI retained BofA as a financial advisor defensively to assist its Board to evaluate acquisition attempts only, not seek out prospective buyers;

---

[47]    National Instruments Corp, Trade Confirmation Activity Sheet (NAT-SL-00009178).

[48]    The share repurchases over the Proposed Class Period were authorized under the 2022 Plan. (United States Securities and Exchange Commission, National Instruments Corporation, Form 10-Q, Quarter Ending September 30, 2022). Over the Proposed Class Period, NI repurchased 2,033,135 shares at a weighted-average price of $40.23 per share. National Instruments Corp, Trade Confirmation Activity Sheet (NAT-SL-00009178).

2) The Board's unanimous decision not to engage with Emerson was based on its view that Emerson's proposals were "opportunistic"[49] and "substantially undervalued" the Company (relative to its stand-alone basis) given, among other things, its financial advisor's valuations of NI's stand-alone value, and the Company's transformational plans.[50]

3) NI and Emerson did not take the customary next steps typical in a friendly merger process, *e.g.,* sign an NDA to give the potential acquirer access to confidential information about the target stored in a data room.

4) The parties had no further discussions until November 3, 2022, more than a month after the end of the Proposed Class Period, when Emerson sent a third proposal to acquire all of NI shares for $53 per share in cash ("November 3 Letter").[51]

5) After rejecting Emerson's second proposal, NI did not adopt any anti-takeover defenses such as a shareholder rights plan ("poison pill"[52]) before the start of the Proposed Class Period, which potential targets commonly do when they anticipate that the potential

---

[49]    June 14 Board Meeting (NAT-SL-00001447-448).

[50]    NI Proxy Statement, p. 25.

[51]    NI Proxy Statement, p. 26. Emerson disclosed its communications to date with NI, including the November 3 Letter in its January 17, 2023 press release, "Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share," Emerson, January 17, 2023 ("Emerson January 17, 2023 Press Release") available at https://www.emerson.com/documents/corporate/emerson-announces-premium-all-cash-proposal-to-acquire-national-instruments-for-53-per-share-en-us-8730574.pdf ("November 3 Letter").

The November 3 Letter is provided in Emerson's January 17, 2023 Press Release at pp. 11-15.

[52]    "A poison pill involves a board issuing rights to current shareholders, with the exception of an unwanted investor, to buy the firm's shares at an exercise price well below their current market value. Because they are issued as a dividend and the board usually has the exclusive authority to declare dividends, a pill can be adopted without a shareholder vote and implemented either before or after a hostile bid." DePamphilis (2018), p. 106.

21

acquirer may attempt a hostile takeover. This suggests—and would suggest to a reasonable investor—that the Board and NI did not perceive a substantial threat that Emerson would return with a hostile bid. This contrasts with NI's and the Board's decision to adopt a poison pill provision in January 2023 as I discuss below.

42.     I understand that NI learned from MacKenzie Partners on August 10, 2022 that Emerson [as a NOBO[53]] had bought 1.26 million NI shares, or 0.97% of the Company's outstanding shares which placed Emerson "within the Top 25 shareholders [of NI]."[54] According to Emerson's public January 2023 investor presentation, Emerson began acquiring NI shares on July 12, 2022. (*See* **Exhibit 1**)[55] Despite Emerson's acquisition of NI shares, the fact that NI did not adopt a poison pill at the time indicates that NI did not expect Emerson would subsequently launch a hostile takeover attempt. Therefore, notwithstanding MacKenzie's notification of Emerson's share purchases, in my opinion it would be speculative and incorrect to assume that the probability (assessed as of August 12, 2022) of Emerson ultimately acquiring NI was anything but negligible given the facts at the time.

---

[53]   A public company's shareholder can hold shares directly or indirectly through an intermediary such as a bank or broker-dealer. Beneficial owners can be either "objecting" or "non-objecting." Under SEC rules, the intermediary cannot reveal the identity of objecting beneficial owners ("OBOs") to the company, but can reveal the identity of non-objecting beneficial owners ("NOBOs") to the company (Price, Thomas F., "Non-Objecting Beneficial Owners & Objecting Beneficial Owners, Explained," *SIFMA*, May 20, 2021, available at https://www.sifma.org/resources/news/blog/non-objecting-beneficial-owners-objecting-beneficial-owners-explained/).

[54]   Email from Kevin Ilcisin to Shawn Liu, Re: "National Instruments - NOBO List (8-5-22)," August 10, 2022 (NAT-SL-00011768). *See also* "National Instruments - NOBO List (8-5-22)" (NAT-SL-00011769).

[55]   "Immediate, Compelling And Certain Value For NI Shareholders," *Emerson,* January 17, 2023, at p. 6, available at https://www.emerson.com/documents/corporate/immediate-compelling-certain-value-for-ni-shareholders-en-us-8730600.pdf.

43.    In my opinion, as an investment professional, even if NI had hypothetically disclosed at the beginning of the Proposed Class Period that it had received two unsolicited, non-binding proposals in May and June 2022 to acquire all outstanding shares of NI at $48 per share and NI's Board had rejected both proposals after careful review with its financial and legal advisors, and also informed the suitor twice that it did not wish to engage in further discussions, such a disclosure would not have been economically material. The difference in the total mix of information then available to investors without or without the hypothetical disclosure would be negligible for at least three reasons. First, the hypothetical disclosure would have confirmed that NI had not only rejected both proposals but had also made clear to the bidder that it saw no basis for further engagement. That kind of unequivocal "Just Say No" posture would have signaled to a reasonable investor that the probability of a transaction being consummated was remote. Second, a reasonable investor would be aware that mergers customarily take several months to close. Thus, even assuming *arguendo* that reasonable investor (incorrectly) considered the probability of the merger's completion not negligible, that investor would also recognize that by the time the proposed acquisition closed, the difference between the proposed acquisition price of $48 per share and NI's market price would likely be negligible because the proposed acquisition price was within the NI's future stock price range (or the range of undiscounted price targets) that equity analysts had provided in contemporaneous publicly available analyst reports.[56] Third, while a stock's current price reflects the investors' consensus view of its current value, its estimated value across investors has a wide range because different investors assess a company's value significantly

---

[56]    BofA June 14 Board Presentation (NAT-SL-00001513-545 at 522).

differently.[57] Therefore, a hypothetical disclosure that one unnamed entity had valued NI at $48 per share would not have significantly altered the total mix of information available to a reasonable investor and would not have had a material impact on NI's stock price.[58]

**IV.    The Steps That Emerson And NI Took After Emerson Sent A Hostile Proposal on November 3, 2022 Are Consistent With The Steps That Parties Take In A Merger Process When Both Are Seriously Interested In Closing A Deal**

44.    As I discuss below, NI's actions from November 2022 through April 2023 follow the typical merger process when a target is interested in closing a deal, were in stark contrast to NI's actions after receiving Emerson's May 2022 and June 2022 proposals.

45.    The steps that parties take in merger negotiations depend on whether the potential acquirer's interest is friendly or hostile. After its friendly outreach had failed, on November 3, 2022, Emerson sent a third unsolicited non-binding contingent proposal to NI. In its November 3 Letter, Emerson increased its offer from $48 per share to $53 per share and also stated that it "was prepared to run a slate of directors targeting the two members of the Board up for re-election at

---

[57]    Black, Fischer, (1986), "Noise," *The Journal of Finance* 41(3), pp. 529-543 at 533.

[58]    A stock's price reflects the sum of the present values of its expected future cash flows to equity, discounted by the risk and delay associated with these future uncertain cash flows. *See* Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, Third Edition, John Wiley & Sons, Inc., 2012, Chapter 14: Free Cash Flow to Equity Discount Models, pp. 351-379.A reasonable investor's assessment of a stock's value thus changes when he gets new value-relevant or economically material information that alters his assessment of the stock's expected future cash flows of the risk and delay associated with these cash flows. News that is not economically material does not affect a reasonable investor's valuation.

24

NI's next annual meeting"[59] which was scheduled for May 9, 2023.[60] While Emerson's third proposal was confidential, indicating Emerson's continued interest in a friendly acquisition, it also indicated Emerson's willingness to go public with its offer[61] and take a hostile stance by nominating its representatives to serve on NI's Board. NI took several steps that target companies typically take when they consider a hostile offer seriously.

46.     Within a week, NI's Board set up a committee (the "Transaction Evaluation Committee" or the "TEC") which would meet regularly *solely* to "evaluate" proposals by Emerson, "other potential strategic partners and synergies with such potential partners."[62] The TEC possessed no decision-making authority which remained with the full Board.[63] On November 15, 2022, NI informed Emerson that NI and its Board was considering Emerson's proposal "seriously" and "had established a working group of the Board to examine Emerson's proposal in greater detail."[64] NI also informed Emerson that it would examine other options including "other prospective purchasers and transaction partners."[65]

---

[59]   The November 3 Letter stated: "[I]n preparation for all options, Emerson had accumulated 2.3 million NI shares in the open market and intended to file for approval under the Hart-Scott-Rodino Antitrust Improvements Act (the "HSR Act") to facilitate additional purchases, and that Emerson was prepared to run a slate of directors targeting the two members of the Board up for re-election at NI's next annual meeting." (NI Proxy Statement, p. 26, and Emerson January 17, 2023 Press Release at p. 14).

[60]   National Instruments Corporation, Schedule 14-A, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, March 27, 2023.

[61]   The November 3 Letter stated: "While it is our preference to work with your Board privately and collaboratively towards a potential transaction, another refusal to engage will force us to ensure your shareholders can assess our Improved Proposal directly." *See* Emerson January 17, 2023 Press release at p. 14.

[62]   NI Proxy Statement, p. 26.

[63]   NI Proxy Statement, p. 26.

[64]   NI Proxy Statement, p. 27.

[65]   NI Proxy Statement, p. 27.

25

47.     Later in November and December 2022, NI's TEC, management, Board and financial and legal advisors met frequently to discuss how to address Emerson's proposal, as target companies typically do in my experience. Among other topics, such discussions included:

1) the actions that NI could take to "protect the interests of NI and its stockholders, (*e.g.,* the potential adoption of a shareholder rights plan" or "poison pill provision"), or NI's response if Emerson started a proxy fight;[66]

2) Its financial advisor's updated valuation of the Company on a stand-alone basis;[67] and

3) NI's strategic options including seeking other potential buyers to make offers.[68]

48.     As is customary when parties are engaged in merger negotiations, to facilitate the sharing of confidential information, NI and Emerson entered into an NDA with a "stand-still" clause on December 23, 2022, less than two months after Emerson had sent its November 3 Letter.[69] In addition, consistent with the typical merger process when the target company is actively engaged

---

[66]    This issue was discussed in a November 23, 2022 TEC meeting. *See* NI Proxy Statement, p. 27.

A proxy fight is a "technique used by an acquiring company to attempt to gain control of a takeover target. The acquirer tries to persuade the shareholders of the target company that the present management of the firm should be ousted in favor of a slate of directors favorable to the acquirer, thus enabling the acquiring company to gain control of the company without paying a premium price." *See* Harvey, Campbell, "Hypertextual Finance Glossary: Proxy Fight," available at https://people.duke.edu/~charvey/classes/wpg/bfglosp.htm.

[67]    At a Board meeting on December 11, 2022, "Mr. Starkloff and other members of NI's management presented to the Board an overview of NI's updated strategic plan." NI Proxy Statement, p. 28.

[68]    On December 10, 2022, "[t]he TEC considered potential strategic partners that might engage with NI in a strategic review process, possible synergies with these partners, and the use of clean team arrangements with certain counterparties if needed." NI Proxy Statement, p. 28.

[69]    A standstill agreement is a "[c]ontract by which the bidding firm in a takeover attempt agrees to limit its holdings of another firm." *See* Harvey, Campbell "Hypertextual Finance Glossary: Standstill Agreement," available at https://people.duke.edu/~charvey/classes/wpg/bfgloss.htm.

The NI-Emerson NDA executed on December 23, 2022 had a standstill lasting until 11:59pm ET on January 6, 2023. (NI Proxy Statement, p. 29) On January 5, 2023, both NI and Emerson extended the standstill from January 6, 2023 at 11:59pm ET to January 13, 2023 at 11:59pm ET. *See* NI Proxy Statement, p. 29.

26

in seeking a buyer, NI continued to engage in discussions with Emerson, but also began discussions about a possible merger with other parties.

49.     On January 4, 2023, NI and Emerson representatives met in person and presented materials about their respective businesses—a significant milestone in merger discussions.[70] However, despite discussions between the companies' CEOs about the possibility of Emerson offering a higher acquisition price,[71] on January 11, 2023, Emerson formally informed NI that it would not change its offer price of $53 per share.[72] The same day, the CEO of another company expressed an interest in "a potential business combination with NI."[73]

50.     At a Board meeting the next day, NI's Board decided to adopt a "shareholder rights plan" (or poison pill) and initiate a strategic review seeking bids from other interested buyers.[74] NI publicly announced its rights plan and strategic review on the morning of January 13, 2023.[75] Also,

---

[70]   NI Proxy Statement, p. 29.

[71]   NI Proxy Statement, pp. 29-30.

[72]   Mr. Karsanbhai informed Mr. Starkloff on a phone call that Emerson would not be revising its offer price, and Emerson later emailed a letter to NI (the "January 11 Letter") "reiterating Emerson's proposal to purchase 100% of the outstanding common stock of NI for $53 per share in cash and offering to extend the standstill by one week. Following delivery of the January 11 Letter to Mr. Starkloff and Mr. McGrath, DPW [Emerson's legal advisor] sent a draft merger agreement to Wachtell Lipton." NI Proxy Statement, p. 30.

[73]   NI Proxy Statement, p. 30.

[74]   At a January 12, 2023 meeting, the Board discussed the developments on January 11, 2023 and "the shareholder rights plan that it planned to adopt in connection with initiating a strategic review process to ensure an even playing field and that no potential participant would have an unfair advantage in the process by accumulating a large number of shares of NI without paying a premium and using such stake holding to put pressure on NI." NI Proxy Statement, p. 30.

[75]   The press release stated: "[NI's] Board had initiated a review and evaluation of strategic options, in consultation with its financial and legal advisors, with the intent to unlock and maximize shareholder value and that the comprehensive review would include consideration of a full range of available strategic, business and financial alternatives, including solicitation of interest from potential acquirers and other transaction partners, some of whom had already approached NI. NI also announced in the press release that the Board had adopted a limited duration shareholder rights plan and authorized a dividend distribution of one right for each outstanding share of common stock." NI Proxy Statement. p. 30.

over the following days, NI's CEO and BofA "reached out to and received inbound communications from parties interested in participating in the process."[76]

51.      By publicly stating its interest to seek offers from interested parties and adopting a rights plan (or poison pill provision) NI's actions at this stage were typical of a target company's board that seeks to take control of the merger process and maximize value for its shareholders rather than allow a single hostile potential acquirer dictate the acquisition terms before an anticipated a proxy fight, as NI anticipated Emerson might launch.[77]

52.      Following NI's public announcement, Emerson issued its own press release on January 17, 2023 disclosing that it had made a proposal to NI's Board to acquire NI for $53 per share on November 3, 2022 and describing its "prior engagement" with NI, which confirmed that the parties had not engaged in any discussions over the Proposed Class Period.[78] Emerson's press release quoted its CEO as stating:

> Although Emerson would have preferred to reach an agreement privately, given NI's announcement that it is undertaking a strategic review, and after refusing to work with us toward a premium cash transaction over the past eight months, we are making our interest public for the benefit of all NI shareholders.[79]

---

[76]    Also, over the following days, NI's CEO and BofA "reached out to and received inbound communications from parties interested in participating in the process." NI Proxy Statement. p. 30.

[77]    NI's Board had discussed with WLRK the possible "timing" of a proxy fight on November 10, 2022 and the TEC had discussed the "process of a typical proxy fight" on November 23, 2022. NI Proxy Statement, pp. 26-27.

[78]    NI Proxy Statement, p. 31.

[79]    Emerson January 17, 2023 Press Release.

The same day, NI publicly confirmed that it had received Emerson's proposal which it would evaluate as part of its ongoing strategic review process.[80] NI's and Emerson's negotiations at this stage were public.

53.    Following subsequent discussions,[81] Emerson agreed to participate in NI's strategic review process. The company issued a press release on January 23, 2023 stating it was "pleased to see engagement over the course of the previous week between the [two companies'] management teams and advisors," and "had decided to proceed in its pursuit of acquiring NI without nominating its selected independent directors for election to NI's Board at NI's upcoming annual meeting."[82]

54.    Thereafter, NI's merger discussion with Emerson and other interested parties continued in the typical manner. As is customary in the first phase of such a merger process, by February 10, 2023, NI had signed confidentiality agreements with standstill provisions with seven parties (including Emerson) and by February 14, 2023, provided them access to confidential information through a data room to allow them to conduct due diligence.[83] In my experience, until parties have reached this stage in a friendly merger process, merger talks remain preliminary, and the probability of a merger remains low.

---

[80]    The same day, "following several rounds of comments and discussion over the prior weeks, NI and Emerson executed the 220 NDA." NI Proxy Statement, p. 31.

[81]    NI and Emerson's CEOs spoke by phone on January 18, 2024 and Mr. Starkloff "described the strategic review process and his hope that Emerson would participate in the process, noting that he had instructed BofA Securities to reach out to Emerson's financial advisors to discuss next steps." NI Proxy Statement, p. 31.

[82]    NI Proxy Statement, p. 31.

[83]    NI Proxy Statement, p. 32.

29

55.     Four parties (including Emerson) then submitted "non-binding indications of interest" on February 23, 2023. After discussions about these indications of interest and related terms with its advisors, the Board authorized management and its advisors to invite the four parties to participate in the second round of the strategic review in which the interested parties would conduct additional due diligence and submit fully financed definitive offers and comments on the draft merger agreement.[84] As is typical in this second phase of merger negotiations, some of the interested parties withdrew from bidding and the Board continued to negotiate with the two remaining parties (Emerson and Party A) until April 11, 2023.[85] After considering Emerson's and Party A's offers on April 11, 2023[86] NI's Board concluded that "an acquisition of NI by Emerson would provide higher deal certainty than a potential transaction with Party A and that such a transaction would be superior to remaining an independent company and in the best interests of NI's stockholders."[87] After further discussions with Emerson, NI and Emerson entered into the Merger Agreement more than six months after Emerson sent NI the November 3 Letter on April 12, 2023. Early that

---

[84]   NI Proxy Statement, pp. 32-33.

[85]   By April 5, 2023 only Emerson and one other party (Party A) had submitted competing offers to acquire NI for $57 and $56 per share, respectively. Following a Board meeting discussing the offers on April 7, 2023, based on the Board's instructions, BofA asked each party to "submit a revised proposal, putting its best foot forward on value and deal certainty by Monday, April 10. The parties revised offers on April 10 were rejected by the Board and BofA again asked the parties to submit revised proposals "putting forward the maximum value they were prepared to offer to acquire NI, as well as how each should improve its contractual terms." NI Proxy Statement, pp. 33-35.

[86]   As of April 11, 2023, Emerson's offer was for $59.50 per share, which later the same day Emerson increased to $60 per share, and permitted NI to continue paying its quarterly dividends. The other party ("Party A") offered $60 per NI share and also permitted NI to continue paying its quarterly dividends, but offered less deal certainty than Emerson. NI Proxy Statement, p. 35.

[87]   NI Proxy Statement, p. 36.

morning, the two parties issued a press release announcing the transaction at a price that was more than 13% higher than Emerson's November 3 proposed price of $53 per NI share.[88]

56.     In summary, NI's actions from November 2022 through April 2023 followed the typical merger process when a target is interested in closing a deal. These actions were in stark contrast to its refusal to engage with Emerson in any merger-related discussions following Emerson's May 2022 and June 2022 proposals.

57.     In my experience, even when a target company is open to exploring a transaction, the multi-stage merger process is inherently uncertain and can stall or terminate at any point. As a result, target companies typically do not disclose unsolicited, non-binding acquisition proposals unless merger discussions have advanced significantly. Thus, it would be speculative to assume that the preliminary and limited nature of interactions between NI and Emerson—none of which progressed to active or ongoing negotiations—would have significantly altered the total mix of information available to a reasonable investor at the start of the Class Period, merely because advanced merger discussions might be considered material in other contexts.

Respectfully,

_Shane C. Goodwin_
_____
Shane Goodwin, Ph.D.

---

[88]    NI Proxy Statement, p. 36.

31

**EXHIBIT 1: Timeline Of NI-Emerson Discussions Through January 17, 2023[89]**



---

[89] "Immediate, Compelling and Certain Value for NI Shareholders," *Emerson*, January 17, 2023, available at https://www.emerson.com/documents/corporate/immediate-compelling-certain-value-for-ni-shareholders-en-us-8730600.pdf

# Appendix A

## Shane Goodwin, PhD

(917) 405-8430 | sgoodwin@smu.edu

### EXECUTIVE OVERVIEW

**30+ years of higher education, investment banking, private equity, and board leadership**

| HIGHER EDUCATION | CORPORATE & INVESTMENT BANKING | CORPORATE DIRECTORSHIPS |
|---|---|---|
| *2013 – Present* | *1993 – 2015* | *2009 – Present* |
| • Southern Methodist University | • Goldman, Sachs & Co. | • Principal Financial Group |
| • Columbia University | • Citigroup | • OrthoMed Anesthesia |
| • Harvard University | • Wells Fargo Securities | • Crystal Clearwater Resources |
| • University of Texas at Dallas | • DLJ/Credit Suisse | • Truist Financial Corporation |
| | • GE Capital | • Big Red and All Sports |

- **Associate Dean at SMU Cox School of Business**. Lead and manage all facets of 16 graduate programs serving **1,300+ students** and executive education initiatives, reaching **10,000+ corporate executives** annually. **$65M+ P&L** responsibility. Spearheaded cultural transformation and curriculum innovation with fiscal discipline, significantly enhancing brand and school reputation, student outcomes, and financial growth by emphasizing interdisciplinary and cross-campus collaboration.

  - **Led the comprehensive strategic realignment** of graduate programs and executive education that resulted in an increase in *MBA rankings* to **#26** from #48[1], improvement in *student quality* (**712 GMAT** and **3.6 GPA** for 2024 cohort)[2] and **financial impact of $130M+**[3], including a **2.7x increase in revenue** for executive education.[4]

- **Finance Professor of Practice at SMU Cox**, Adjunct Professor at SMU Dedman Law, and Adjunct Faculty at SW Graduate School of Banking at SMU Cox. Focus on M&A, Corporate Governance, Leadership, Ethics, and Corporate Law. Taught **40+ graduate courses**; **evaluations consistently exceed peers**.

- **Strongly connected to the Dallas business community for 25+ years** as an investment banker and investor in Dallas and current corporate board member with several Dallas-based companies.

- **Corporate board director and audit committee chair** of multiple financial institutions, healthcare, and cleantech companies. **SEC Audit Committee Financial Expert** for Principal Private Credit Fund and Principal Real Asset Fund, part of Principal Financial Group (Nasdaq: PFG) with $700Bn+ AUM.

- **Retained as an expert witness** by prestigious private equity firms, companies, and law firms on corporate governance, private equity, M&A, and capital market issues and a frequent news contributor[5].

- **Awarded Postdoctoral Fellowship at Harvard University** and Senior Fellow at Harvard Law School Program on Corporate Governance and Financial Regulation.

- **15+ years of investing in and supporting SMU** as a Cox Associate Board member, as an alumnus[6], and as a parent of two SMU Cox undergraduate students.

- **First-generation college student** and Division I student-athlete (football).

---

1. 2025 Bloomberg Businessweek Best Business School Rankings (+**22 spots** since 2018)*.
2. Compared to a 652 GMAT and 3.3 GPA in 2019 for Full-time Two-year MBA.
3. 2018-24: **$420M** total revenue vs. 2011-17: **$288M** total revenue. Increased average annual revenue to **$60M** (2019–2024) from **$41M** (2011–2017), generating **1.5x growth** and yielding a **6.2% CAGR**.
4. **$8M Revenue** in FYE 2023, achieving a **21% operating margin** compared to $3M average revenue with a 4% operating margin for the previous 16 years (2004–2019).
5. SMU Cox **Media Expert** of the Year Award (2022 & 2023).
6. LL.M., SMU Dedman School of Law, December 2024.

### ACADEMIC APPOINTMENTS

**Recognized scholar and expert witness on corporate governance, M&A, private equity, capital markets, and financial economic issues:**

- Associate Dean and Professor of Practice, SMU Cox School of Business (2018–present)
- Adjunct Professor of Law, SMU Dedman Law School (2023–present)
- Adjunct Faculty, SW Graduate School of Banking, SMU (2020–present)
- Senior Fellow and Director, Columbia Business School and Columbia Law School (2016–2018)
- Senior Fellow, Harvard Law School Program on Corporate Governance (2016–2018)
- Postdoctoral Visiting Fellow, Harvard University (2016)
- Adjunct Finance Professor, The University of Texas at Dallas (2013–2016)

**SOUTHERN METHODIST UNIVERSITY**                                        **Dallas, TX (2018-Present)**
**THE COX SCHOOL OF BUSINESS**
*Associate Dean, Graduate Programs and Executive Education*
*Professor of Practice, Department of Finance*
*Adjunct Faculty, SMU Dedman School of Law*
*Adjunct Faculty, SW Graduate School of Banking*

**Lead all facets of Graduate Programs and Executive Education**, strongly emphasizing interdisciplinary and cross-campus collaboration. **Set a clear vision focused on Rigor, Relevance, and Impact** and employ a shared leadership approach to drive the overall impact of Graduate Programs and Executive Education at SMU Cox.

- **Strategic Leadership and Culture Building:** Oversee **16 graduate degree programs** focusing on culture, strategy, curriculum innovation, experiential learning, marketing, and student recruitment while maintaining AACSB and SACSCOC accreditation compliance.

- **Ensure Student Success:** Oversight of **1,300+ graduate students**, fostering a holistic learning environment with comprehensive support, including mentorship programs, career coaching, and tailored academic services.

- **Team Mentorship:** Lead a team of **75+ executives and professionals** across six departments, ensuring alignment with strategic goals and fostering collaboration with 150+ faculty.

- **Executive Education Leadership:** Lead a team of 15+ professionals who develop and deliver 85+ executive development programs that reach **10,000+ executives** annually.

- **Talent Management:** Recruit, retain, and develop top talent in an inclusive environment that values diversity of thought and ideas.

- **Financial Stewardship:** Hold full P&L responsibility for a **$65M+ budget,** ensuring the financial health and sustainability of all graduate and executive education programs.

- **Corporate Engagement and Partnerships:** Forge strategic partnerships and drive corporate engagement, ensuring alignment with the school's vision and objectives for clients, including AT&T, Baylor Scott & White, McKesson, and Toyota.

- **Teaching and Mentorship:** Teach courses in Global Mergers & Acquisitions, Corporate Governance, Private Equity, Transformational Leadership, Global Strategy, and Ethical Decision-Making. **Evaluations consistently exceed** departmental and overall SMU Cox School averages.

## TEACHING EXCELLENCE AND MENTORSHIP

**Impactful Teaching Record:** Since 2018, taught **40+ graduate courses** and one undergraduate course at SMU Cox, influencing the academic journey of 1,500+ students.  My teaching **evaluations consistently exceed** both the departmental and overall SMU Cox School averages.

Additionally, teach several courses in **SMU Cox Executive Education** and served as the academic director for the Cox Leadership Academy.  Courses include *Transformational Leadership, AI in Healthcare, Mergers & Acquisitions, Private Equity, Corporate Governance, and Ethical Decision-Making.*

**Course Creation and Development:**

- *Global M&A and Corporate Governance* (MBA, EMBA, OMBA)
- *Ethical Leadership and Corporate Social Responsibility* (MBA, MS)
- *Unbridled Venture Project* (MBA)

**Course Revitalization:**

- *International Strategy*, *Global Leadership Program* (MBA)
- *Strategic Consulting & Global Leadership Project* (EMBA)

**Cross-Campus Collaboration:**

- *Business Law Boot Camp* in partnership with SMU Dedman Law School (JD, LLM)
- *Ethics & Compliance Certificate* in collaboration with the Cary M. Maguire Center for Ethics and Public Responsibility and SMU Dedman Law School

**Non-SMU Teaching:**

- *Harvard Alumni for Climate and Environment, Climate Boot Camp.* Sustainability training program

## SMU COX SERVICE

- SMU Cox Graduate Policy Committee (2018–present)
- SMU Cox NextGen Curriculum Committee (2018–2020)
- SMU Cox Strategic Planning Committee (2021–2022)
- SMU Cox New Building Committee (2021–2024)
- Numerous Search Committees (2018–present)
- AACSB Accreditation Committee (2022)

## SMU CAMPUS SERVICE

- Co-Chair of International Student Recruitment and Support Subcommittee (2022–2024)
- Co-Chair of SMU Community Action Network (2020–2021)
- SMU Innovation Council (2024–present)
- Academic Program Review Committee (2022–present)
- Student-Athlete Academic Support Committee (2019–present)
- Internationalization Steering Committee (2022–2024)
- Faculty Extra Compensation Committee (2024)
- Master of Healthcare Administration Steering Committee (2024–present)
- SMU+GSV Mission Summit (2022–2023)
- SACSCOC Accreditation, SMU Cox Representative (2021)

## PROFESSIONAL EXPERIENCE

**THE CENTER FOR GLOBAL ENTERPRISE**                                      **New York, NY (2016–2020)**
*Managing Director, Head of The Applied Corporate Governance Institute*

The Center for Global Enterprise is a nonprofit, nonpartisan research institution devoted to studying global management best practices, the contemporary corporation, economic integration, and their impact on society.

- Led all aspects of the Institute, including research, data analytics, and advisory services
- ***Research Agenda***: Investor Engagement, Hedge Fund Activism, International Corporate Stewardship, ESG and Sustainability, Long-term Investing and M&A
- ***Data and Analytics:*** Developed multiple predictive analytic models and proprietary algorithms, including the *Stewardship Investor Vulnerability Index™* to predict shareholder activism and investor engagement
- ***Advisory:*** Advised companies to understand, engage, and succeed with their investors in complex and contested shareholder matters by developing insightful strategies and practical tactics

**COLUMBIA LAW SCHOOL & COLUMBIA BUSINESS SCHOOL**            **New York, NY (2016–2018)**
**RICHMAN CENTER FOR BUSINESS, LAW & PUBLIC POLICY**
*Senior Fellow and Project Director*

Led shareholder engagement research project in partnership with The Center for Global Enterprise.

- Author of *"Management Practices in an Age of Engaged Investors"* – Columbia University publication
- Developed a framework for companies to respond to investor challenges that promote long-term investment decision-making to enhance sustainable, long-term value creation
- Collaborated with Professor Wei Jiang, Vice Dean and Arthur F. Burns Professor of Free and Competitive Enterprise, and Professor Jeffrey Gordon, Richard Paul Richman Professor of Law

**WELLS FARGO SECURITIES**                                               **Dallas, TX (2010–2015)**
*Managing Director, Head of Investment Banking – Southwest U.S.*

Led investment banking and capital markets franchise for select corporate clients in the Southwest U.S.

- Founded the Southwest Investment Banking Group
- Responsible for providing M&A, shareholder activism, corporate finance, and capital market advisory
- Increased investment banking revenue by over 400% since inception
- Closed over 50 M&A and capital markets transactions

**ARGUS CAPITAL PARTNERS**                              **New York, NY and Dallas, TX (2010–2010)**
*Co-founder and Managing Partner*

- Founded Argus Capital Partners, an independent merchant banking firm, to provide principal investments and strategic advisory services
- Completed first investment in May 2009. Partnered with two investment firms to acquire a majority stake in Big Red, Inc. and AllSport, a Texas-based soft drink company, from Citigroup Venture Capital
- Advised the founder and largest shareholder of a public Consumer Product company on strategic alternatives, ranging from a take private to a proxy contestFounded the Southwest Investment Banking Group

## PROFESSIONAL EXPERIENCE – CONTINUED

### GOLDMAN, SACHS & CO.                                          Dallas, TX (2006–2009)
*Senior Investment Banking Executive*

Maintained strategic advisory dialogue and client relationship responsibilities for various corporate clients in the Southwest U.S.

- Trusted advisor to Boards of Directors and CEOs with respect to M&A, takeover defense, shareholder activism, and other corporate finance matters
- Senior team leader for over 75 corporate clients and private equity firms based in the Southwest US
- Successfully transitioned over 60% of new clients to either *"Principal Banker"* or *"Very Strong"* Relationship Status in less than two years
- Generated several M&A, financing, and principal investment engagements that had incremental fee potential of over $50 million
- Generated several principal investment opportunities for GS Capital Partners

### CITIGROUP CORPORATE AND INVESTMENT BANKING                    New York, NY (2000–2004)
*Director, Global Mergers & Acquisitions Group*                   **Dallas, TX (2004–2006)**
*Co-founder of Southwest Investment Banking Practice*

Maintained strategic advisory dialogue and client relationships with CEOs, CFOs, and Boards of Directors.

- M&A partner for Southwest Investment Banking practice
- Responsible for M&A training and taught advanced valuation course for Associate training program
- Promoted early to Vice President

### CREDIT SUISSE / DONALDSON, LUFKIN & JENRETTE                  Dallas, TX (1999–2000)
*Associate, Investment Banking Division*

Executed strategic and capital-raising alternatives for clients across various industries and geographies.

- Completed $100M+ private equity investment for DLJ Merchant Banking
- Executed numerous M&A, High Yield, IPO, and principal investments across various industries

### GE CAPITAL                                                     Chicago, IL (1996–1999)
*Assisted Vice President, Corporate Finance Group*

Responsible for private equity and debt investment opportunities for middle-market companies in the Central U.S. and Canada.

- Completed Leadership Development, Financial Management, and Six Sigma (Green Belt) training
- Initiated the debt and equity principal investment business in Western Canada
- Led financial and operational due diligence teams and supervised junior staff
- Select member of Montgomery Ward bankruptcy and restructuring team, led by Jack Welch and Gary Wendt
- Twice awarded GE Capital's Prism Award for outstanding performance and promoted twice in one year

### BANK OF OKLAHOMA                                               Tulsa, OK (1993–1995)
*Credit Analyst, Commercial Bank*

Determine creditworthiness, underwrote and analyzed corporate loans.

- Completed credit training, financial management, and leadership development programs

## EDUCATION – LIFELONG LEARNING

**SMU DEDMAN SCHOOL OF LAW**                                                 **Dallas, TX (2024)**
*Master of Laws (LLM)*

- Concentration: Corporate and Commercial Law
- Master's Thesis: *"The Lone Star Docket: How the Texas Business Court Will Shape the Corporate Landscape"*
- Advisor: Professor Marc Steinberg, Rupert and Lillian Radford Professor of Law

**HARVARD UNIVERSITY**                                                       **Cambridge, MA (2016)**
*Postdoctoral Visiting Fellow*

- Awarded Postdoctoral Visiting Fellowship to conduct M&A, corporate governance, and financial policy research at Harvard Business School and Harvard Law School (Program on Corporate Governance)
- Advisor: Professor Lucian Bebchuk, James Barr Ames Professor of Law, Economics, and Finance, Harvard Law School
- Best Paper award for *"Myopic Investor Myth Debunked: The Long-term Efficacy of Hedge Fund Activism in the Boardroom"* (International Conference on Engaged Management Scholarship)

**OKLAHOMA STATE UNIVERSITY, SPEARS SCHOOL OF BUSINESS**                      **Stillwater, OK (2015)**
*Doctor of Philosophy (PhD), Business Administration*

- Concentration: Finance
- Dissertation: *"Corporate Governance and Hedge Fund Activism"* (30+ citations)
- Committee: Dr. Ramesh Rao, Adviser; Dr. Gary Trennepohl; Dr. Indraneel Chakraborty; Dr. Aaron Hill
- Beta Gamma Sigma, Phi Kappa Phi, and Golden Key International Honor Society

**NORTHWESTERN UNIVERSITY, KELLOGG SCHOOL OF MANAGEMENT**                     **Evanston, IL (1999)**
*Master of Business Administration (MBA)*

- Concentration: Finance
- Co-Chair of Business School Olympics, Investment Banking Club
- Project Leader for Global Initiatives trip to China

**THE UNIVERSITY OF CHICAGO, BOOTH SCHOOL OF BUSINESS**                       **Chicago, IL (1997)**
*Graduate Student*

- Completed graduate courses in finance and economics while working full-time

**THE UNIVERSITY OF TULSA, COLLINS COLLEGE OF BUSINESS**                      **Tulsa, OK (1993)**
*Bachelor of Science in Business Administration (BSBA), Departmental Honors*

- *Cum Laude* Graduate, Jess Chouteau Outstanding Senior Award, Mortar Board, Who's Who Among College Students, President's and Dean's Lists, Outstanding Alumni Award
- NCAA Division I Varsity Football Scholarship, All-American Scholar, Student-Athlete of the Year, Freedom Bowl (1991) and Independence Bowl (1989)

## CORPORATE BOARD DIRECTORSHIPS

**Principal Diversified Select Real Asset Fund (MutualFund: PDSK.X) (2024–present)**

*Board Trustee | Chair of the Audit Committee (SEC Audit Committee Financial Expert) | Nominating and Governance Committee*

- A multi-asset, multi-manager portfolio with exposure to private and public real assets designed to provide investors with enhanced risk-adjusted returns through various economic cycles, income, and mitigation against the impact of inflation.
- Principal Financial Group (Nasdaq: PFG) is a global financial company with 20,000 employees, ~$1.6 trillion of assets under administration and ~$700Bn of assets under management.

**Principal Private Credit Fund (MutualFund: PPAC.X) (2023–present)**

*Board Trustee | Chair of the Audit Committee (SEC Audit Committee Financial Expert) | Nominating and Governance Committee*

- Principal Private Credit Fund (PPCYX:US) is a non-diversified, closed-end management investment company that continuously offers its shares of beneficial interest. The Fund seeks to achieve its investment objective by opportunistically allocating assets across various credit strategies.
- Principal Financial Group (Nasdaq: PFG) is a global financial company with 20,000 employees, ~$1.6 trillion of assets under administration and ~$700Bn of assets under management.

**OrthoMed Anesthesia (2022–2024)**

*Board Member | Chair of Audit Committee | Nominating & Governance Committee*

- OrthoMed Anesthesia is a physician-owned medical services corporation that provides high-quality anesthesia services.
- Advised founder and CEO on a successful sale to a private equity firm in 2024.

**Crystal Clearwater Resources (2022–present)**

*Advisory Board Member*

- Crystal Clearwater Resources ("CCR") is a "clean tech" company dedicated to providing patented advanced technology to its customers to help improve their ESG and sustainability objectives to advance their long-term ethical impact. CCR uses leading-edge Spontaneous Evaporation and Condensation (SPEC) technology to challenge wastewater streams across multiple industries.

**Truist Financial Corporation (NYSE: TFC) (2020–present)**

*Advisory Board Member (North Texas)*

- Truist Financial Corporation is the sixth-largest commercial bank in the U.S., with total assets of $520 billion as of June 30, 2024. Truist serves approximately 10 million households with a leading market share in many high-growth markets in the U.S.

**Big Red and All Sports, Inc. (2009)**

*Board of Directors | Investor*

- As founder of Argus Capital Partners, we acquired a stake in Big Red and All Sports, Inc. (with other investors) in a secondary Leveraged Buyout from Citicorp Venture Capital.
- Sold to Dr. Pepper Snapple (Nasdaq: KDP) in August 2018 for $282mm (4.7x MOIC).

## NOT-FOR-PROFIT BOARD DIRECTORSHIPS

**National Association of Corporate Directors (North Texas) (2022–present)**
*Board Member | NACD Board Leadership Fellow | NACD Certified Director*

**Dallas Regional Chamber (2019–present)**
*Investment Committee*

**Harvard University Club of Dallas (2021–2024)**
*Board of Directors*

**SMU Cox School of Business (2008–2015)**
*Associate Board of Directors*

**The University of Tulsa Collins College of Business (2002–2009)**
*Board of Directors*

## ATHLETIC HONORS

- Athletic Hall of Fame, The University of Tulsa (2013)
- Drafted by Winnipeg Blue Bombers of the Canadian Football League (1992)
- Sport's Hall of Fame, Province of Saskatchewan, Canada (1986)
- Canadian National Champions, Regina Rams (1986)

## SELECT MEDIA MENTIONS

**Media Appearances**

- **Bloomberg:** Appeared in a Bloomberg Markets television segment on January 8, 2018, discussing U.S. activist investors expanding their influence internationally.

- **Dallas Morning News:**
  - Quoted in a December 2, 2024 article about the new Texas Business Court and its impact on the corporate governance landscape in the U.S.
  - Quoted in an October 11, 2020 article discussing the pandemic's impact on work environments in North Texas.

- **Fortune:**
  - Mentioned in a March 6, 2023 article discussing trends in the 2023 proxy season in U.S.
  - Quoted in a June 23, 2022 article regarding EY's decision to split its audit and consulting businesses.
  - Mentioned in a February 3, 2022 article about activist investors targeting public companies.
  - Quoted in a November 8, 2022 article analyzing the implications of the Tyson Foods CFO arrest for corporate governance.
  - Quoted in a June 29, 2022 article exploring EY's ethical dilemmas.

## PUBLICATIONS AND WORKING PAPERS

1. Goodwin, Shane, *The Texas Two-Step: Rewriting the Rules in the Battle for Corporate Domicile, Securities Regulation Law Journal* (forthcoming Fall 2025).

2. Goodwin, Shane, *How Texas Is Rewriting the Rules of Corporate Domiciles, Columbia Law School's Blog on Corporations and the Capital Markets* (May 29, 2025) available here.

3. Goodwin, Shane, *Texas vs. Delaware: Who Will Shape the Future of Corporate Law?, Columbia Law School's Blog on Corporations and the Capital Markets* (Jan. 15, 2025) available here.

4. Goodwin, Shane, *Texas Business Court is a Bold Experiment in Corporate Governance*, *Dallas Morning News* (Dec. 2, 2024) available here.

5. Goodwin, Shane, *The Lone Star Docket: How the Texas Business Court Will Shape the Corporate Landscape* (Nov. 18, 2024) available at SSRN.

6. Goodwin, Shane, *Forging the Future of Business Education: Rigor, Relevance, and Impact in a Changing World* (Nov. 9, 2024) available at SSRN.

7. Goodwin, Shane, *Disrupt or Disappear: Why Business Schools Must Evolve or Become Obsolete,* *Poets & Quants* (Nov. 15, 2024) available here.

8. Goodwin, Shane, *Corporate Governance and Hedge Fund Activism*; *SMU Cox School of Business Research Paper No. 24-1* (Feb. 12, 2024) available at SSRN

9. Goodwin, Shane, *The Efficacy of Activist Directors* *Columbia Law School Corporations and the Capital Markets* (Mar. 14, 2016) available here.

10. Goodwin, Shane, *Management Practices in an Age of Engaged Investors* *Columbia Business School Research Paper No. 17-97*, (Dec. 14, 2017) available at SSRN.

11. Goodwin, Shane, *The Long-Term Efficacy of Activist Directors* (Feb. 19, 2016) available at SSRN.

12. Goodwin, Shane; *Hedge Fund Activists That Seek Board Seats Generate Long-Term Value*, *Bloomberg* (Aug. 2015)

13. Goodwin, Shane; Rao, Ramesh; Slipetz, Walter; Singh, Akshay, *Myopic Investor Myth Debunked: The Long-Term Efficacy of Shareholder Advocacy in the Boardroom*, *Fourth Annual International Conference on Engaged Management Scholarship*, (Sep. 14, 2014), available at SSRN.

14. Goodwin, Shane; *Why the 'Glass Cliff' May Not Be Real (and What We Should Focus on Instead)* *Business & Learning Resources (BLR)* (Jul. 9, 2021), available here.

15. Goodwin, Shane; *Leading in Unprecedented Times: A Mandate to be Bold - and Remain Bold*, *SMU Cox School of Business*, (May 7, 2020) available here.

16. Goodwin, Shane; *Corporate Governance and Hedge Fund Activism*, (Jun. 26, 2016) available at SSRN.

17. Goodwin, Shane; *Leadership: Set the Trail for Others to Follow* (Aug. 11, 2020) Click here.

18. Goodwin, Shane; *Reimagine the Future: From Surviving to Thriving* (Jun. 13, 2020) Click here.

**EXPERT TESTIMONY**

1. *VLSI Technology LLC v. Intel Corporation*, United States District Court for the Western District of Texas, Case No. 1:19-cv-00977, Deposition: February 2025, Testified at Jury Trial: May 2025.

   - Retained by counsel representing *VLSI Technology LLC* in this patent infringement case. Provided expert testimony regarding alternative assets, private equity, M&A, and corporate governance, including board fiduciary duties.

2. *Omni Newco, Plaintiff, v. Forward Air Corporation*, Central States Logistics, Inc., Clue Opco LLC, Clue Blocker Merger Sub 1 Inc., Clue Blocker Merger Sub 2 Inc., Clue Blocker Merger Sub 3 Inc., Clue Parent Merger Sub LLC, Clue Opco Merger Sub LLC, and Clue Management Merger Sub LLC. Court of Chancery of the State of Delaware. C.A. No. 2023-1104-KSJM, Deposition, December 2023.

   - Retained by counsel representing Forward Air Corporation (Nasdaq: FWRD) in dispute regarding termination of the Merger Agreement with Omni Logistics LLC in Delaware Chancery Court.

3. *United States of America, ex rel. Christine Martino-Fleming, Relator, and Commonwealth of Massachusetts ex rel. Christine Martino-Fleming, Relator, v. South Bay Mental Health Center, Inc.;* Community Intervention Services, Inc.; Community Intervention Services Holdings, Inc.; H.I.G. Growth Partners, LLC; H.I.G. Capital, LLC; Peter J. Scanlon; and Kevin P. Sheehan; United States District Court for the District of Massachusetts; Civil Action No. 15-CV-13065-PBS. Deposition, February 2020.

   - Retained by counsel representing Private Equity Firm in a Healthcare False Claims Act case against the United States of America and the Commonwealth of Massachusetts. Provided expert testimony regarding fiduciary duties, roles, and responsibilities of board members serving on the board of a portfolio company in which their private equity employer owns a majority interest.

June 2025

**Appendix B: Materials Considered**

Legal Filings

- *In Re National Instruments Corporation Securities Litigation*, United States District Court Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Amended Complaint for Violations of the Federal Securities Laws, filed March 29, 2024

- *In Re. National Instruments Corporation Securities Litigation*, United States District Court, Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Opinion and Order filed September 6, 2024

- *In Re National Instruments Corporation Securities Litigation*, United States District Court, Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, filed May 2, 2025

- *In Re National Instruments Corporation Securities Litigation*, United States District Court, Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, filed May 2, 2025

Legal Opinions Regarding Definition of Materiality

- *United States v. Chow*, 993 F.3d 125, 136 (2d Cir. 2021)

- *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015)

- *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 185 (2d. Cir. 2001)

National Instruments SEC filings

- United States Securities and Exchange Commission, National Instruments Corporation, Form 10-Q, Quarter Ending September 30, 2022

- National Instruments Corporation, Schedule 14-A, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, March 27, 2023

- National Instruments Corporation, Schedule 14A, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, May 11, 2023

Emerson Public Disclosures

- "Advancing the World's Most Essential Industries," *Emerson*, available at https://www.emerson.com/en-us.

- "Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share," *Emerson*, January 17, 2023, available at https://www.emerson.com/en-us/news/2023/emerson-national-instruments-announcement.

- "Immediate, Compelling and Certain Value for NI Shareholders," *Emerson*, January 17, 2023, available at https://www.emerson.com/documents/corporate/immediate-compelling-certain-value-for-ni-shareholders-en-us-8730600.pdf.

Emerson-National Instruments Communications

- Email from Mr. Lal Karsanbhai, CEO of Emerson to Mr. Eric Starkloff, CEO of NI, dated May 16, 2022 (NAT-SL-00001267)

- Letter from Mr. Lal Karsanbhai, CEO of Emerson to Mr. Eric Starkloff, CEO of NI, dated May 25, 2022 (NAT-SL-00001263-266)

- Letter from Mr. Eric Starkloff, CEO of NI and Mr. Michael McGrath, Chairman of NI's Board of Directors to Mr. Lal Karsanbhai, CEO of Emerson, dated June 16, 2022 (NAT-SL-00001254-255)

- Letter from Mr. Lal Karsanbhai, CEO of Emerson to Mr. Eric Starkloff, CEO of NI and Mr. Michael McGrath, Chairman of NI's Board of Directors, dated June 22, 2022 (NAT-SL-00002991-994)

- Email from Mr. Eric Starkloff, CEO of NI to Mr. Lal Karsanbhai, CEO of Emerson, dated July 6, 2022 (NAT-SL-00001260-261)

- Letter from Mr. Eric Starkloff, CEO of NI, and Mr. Michael McGrath, Chairman of NI's Board of Directors to Mr. Lal Karsanbhai, CEO of Emerson, dated August 2, 2022 (NAT-SL-00001239-240)

National Instruments Internal Documents

- NI Board of Directors Meeting Minutes, May 26, 2022 (NAT-SL-00001449)

- Bank of America Securities Engagement Letter, June 10, 2022 (NAT-SL-00001554-566)

- National Instruments June 14, 2022, Board of Directors Meeting Minutes (NAT-SL-00001447-448)

- "Project Wolverine: Discussion Materials," June 2022 (NAT-SL-00001513-545)

- "Financial Plan of Record," National Instruments, June 2022 (NAT-SL-00008644)

- Email from Kevin Ilcisin to Shawn Liu, Re: "National Instruments - NOBO List (8-5-22)," August 10, 2022 (NAT-SL-00011768)

- "National Instruments - NOBO List (8-5-22)" (NAT-SL-00011769)

- National Instruments Corp, Trade Confirmation Activity Sheet (NAT-SL-00009178)

Publicly Available Materials

- Black, Fischer, (1986), "Noise," *The Journal of Finance* 41(3)

- Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, Third Edition, John Wiley & Sons, Inc., 2012

- DePamphilis, Donald M., *Mergers, Acquisitions, and Other Restructuring Activities,* 9th Edition, Elsevier, 2018

- Gaughan, Patrick A., Mergers, *Acquisitions, and Corporate Restructurings*, 4th Edition, John Wiley & Sons, 2007

- Harvey, Campbell, "Hypertextual Finance Glossary: Proxy Fight," available at https://people.duke.edu/~charvey/classes/wpg/bfglosp.htm.

- Harvey, Campbell "Hypertextual Finance Glossary: Standstill Agreement," available at https://people.duke.edu/~charvey/classes/wpg/bfgloss.htm.

- Houlihan Lokey Response To Request For Comments By The Securities And Exchange Commission (The "Commission") On File No: S7-03-22; Release, available at https://www.sec.gov/comments/s7-03-22/s70322-20126403-287074.pdf

B-2

B-3

- Lipton, M. *et al.,* "Just Say No," *Harvard Law School Forum on Corporate Governance*, December 9, 2014, available at https://corpgov.law.harvard.edu/2014/12/09/just-say-no/

- Price, Thomas F., "Non-Objecting Beneficial Owners & Objecting Beneficial Owners, Explained," *SIFMA*, May 20, 2021, available at https://www.sifma.org/resources/news/blog/non-objecting-beneficial-owners-objecting-beneficial-owners-explained/

- Schmelter, Joseph C., Lauren Fields, and Daria Ivanova, "Engagement Letters with Investment Bankers," *Venable LLP*, September 13, 2021, available at https://www.venable.com/insights/publications/2021/09/engagement-letters-with-investment-bankers.

-