# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NATIONAL INSTRUMENTS CORPORATION SECURITIES LITIGATION | Case No. 1:23-cv-10488-DLC |

**EXPERT REPORT OF DAVID J. DENIS**
JUNE 16, 2025

**TABLE OF CONTENTS**

I.    **Introduction**.............................................................................................................................1

    A.    Qualifications...............................................................................................................1

    B.    Parties and Lead Plaintiff's Class Allegations.............................................................2

        1.    Parties................................................................................................................2

        2.    Lead Plaintiff's Class Allegations ....................................................................3

    C.    Summary of the Cain Report .......................................................................................4

    D.    Assignment ..................................................................................................................5

II.   **Summary of Opinions**.............................................................................................................5

III.  **Background** ..............................................................................................................................6

    A.    Overview of Emerson's Acquisition of National Instruments.....................................6

    B.    National Instruments' Share Repurchase Programs .....................................................9

IV.   **National Instruments Did Not Profit From Its Share Repurchases**............................10

V.    **Lead Plaintiff Gained on Its NI Transactions** ..................................................................14

VI.   **The Damages Methodology Provided in the Cain Report is Incomplete and Does Not Address the Circumstances of This Matter**............................................16

    A.    Dr. Cain Fails to Describe a Methodology to Measure Deflation ...............................17

    B.    Additional Shortcomings of Dr Cain's Damages Methodology...................................19

## I.        Introduction

### A.        Qualifications

1.        My name is David J. Denis. I am the Terrence P. Laughlin Chair in Finance at the University of Pittsburgh School of Business. I received a B.S. in finance and managerial statistics from Syracuse University (1982), an M.B.A. from the University of Michigan (1984), and a Ph.D. in finance from the University of Michigan (1988). I have also been employed as an assistant professor at the University of Toledo (1988–1989), an assistant and associate professor (with tenure) at Virginia Tech (1989–1995), and a tenured associate professor, full professor, and chaired professor at Purdue University (1995–2011). I have taught courses in corporate finance, investments, and capital markets in the graduate, undergraduate, and executive education programs of these universities. Many of these courses have contained components that analyze stock price valuation and corporate financial policies.

2.        I have served as a member of the Board of Directors of FuturaGene Corporation (2002–2003) and have served as a consultant to law firms, corporations, and government agencies on various aspects of financial markets and securities including corporate valuation, corporate financial policies, corporate governance, capital acquisition, credit quality, bankruptcy and solvency, stock prices, executive compensation, mortgage backed securities (MBSs), collateralized mortgage obligations (CMOs), and swap transactions.

3.        I have published over 50 articles in leading peer-reviewed finance, economics, and management journals, have edited the *Handbook of Corporate Finance*, and have co-edited a book on corporate restructuring. I have served as an Editor of the *Review of Financial Studies* and the *Journal of Corporate Finance*. In this capacity, I have reviewed and edited a large number of academic studies on the topics of market efficiency, corporate financial policies, and stock price valuation. I have also served as an Associate Editor of the *Journal of Finance, Journal of Financial Research, Financial Review*, and *Annals of Finance*. I served a term as President of the Financial Management Association and served for seven years as a member of the Board of Trustees of that organization.

1

4.      A detailed list of my experience, research publications, and prior expert work is included in my *curriculum vitae*, which is attached to this report as **Appendix A**. A list of my expert testimony in the past four years is attached to this report as **Appendix B**.

5.      I am being compensated at my standard rate of $1,100 per hour for my time spent on this matter. Employees of Analysis Group, Inc. ("Analysis Group") working under my direction have assisted me in preparing this report. I also receive a portion of the professional fees received by Analysis Group for their work performed in conjunction with my assignment in this matter. Neither my compensation nor the compensation paid to Analysis Group is dependent on my findings or the outcome of this case.

## B.      Parties and Lead Plaintiff's Class Allegations

### 1.      Parties

6.      Lead Plaintiff Wayne County Employees' Retirement System filed its initial complaint in this matter on November 30, 2023.[1] The "Defendants" are:

a.   National Instruments Corporation ("NI" or the "Company"), which "produce[d] automated test equipment and virtual instrumentation software," traded on the Nasdaq under the ticker symbol NATI, and was acquired by Emerson Electric Co. ("Emerson") on October 11, 2023.

b.   "Individual Defendants," including:

    i.   Eric Starkloff, CEO, President, and board member of National Instruments; and

---

[1]   Amended Complaint for Violations of the Federal Securities Laws, *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, March 29, 2024 ("Amended Complaint"), ¶ 9; Declaration of Chad Johnson in Support of Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel, *Waterford Township Police & Fire Retirement System v. National Instruments Corporation, Emerson Electric Co., Eric Starkloff, Karen Rapp, and Daniel Berenbaum*, No. 1:23-cv-10488-DLC, January 29, 2024, Exhibit B ("Lead Plaintiff's Sworn Certification"); Class Action Complaint for Violations of the Federal Securities Laws, *Waterford Township Police & Fire Retirement System v. National Instruments Corporation, Emerson Electric Co., Eric Starkloff, Karen Rapp, and Daniel Berenbaum*, No. 1:23-cv-10488, November 30, 2023.

ii. Michael McGrath, Chairman of the Board of National Instruments.[2]

### 2. *Lead Plaintiff's Class Allegations*

7. Lead Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.[3] Lead Plaintiff alleges an "insider trading theory of liability... based on the Company's 'failing… to disclose Emerson's offers while buying back NI's securities.'"[4] Specifically, Lead Plaintiff alleges that NI "repurchased millions of shares with no disclosure concerning Emerson's high-premium offer" during the proposed Class Period from August 12, 2022 through September 30, 2022.[5,6]

8. Lead Plaintiff seeks certification of the following class:

> All persons who sold National Instruments common stock between August 12, 2022 and September 30, 2022, inclusive (the "Class Period") and were damaged thereby (the "Class").[7]

---

[2]  Amended Complaint, ¶¶ 10 – 15. I understand that Lead Plaintiff's Amended Complaint also named Karen Rapp, former Executive Vice President and CFO of National Instruments, as an individual defendant, but that all claims against her have since been dismissed. *See also* Opinion and Order, *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, September 6, 2024 ("MTD Opinion and Order"), p. 23 ("All claims against defendant Karen Rapp are dismissed.").

[3]  Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, May 2, 2025 ("Memorandum in Support of Motion for Class Certification"), p. 1.

[4]  Memorandum in Support of Motion for Class Certification, p. 1.

[5]  Memorandum in Support of Motion for Class Certification, p. 1. *See also* Amended Complaint, ¶¶ 28, 82 ("Beginning in May 2022, Defendants were aware of material information concerning Emerson's offer to acquire National Instruments […] Defendants concealed […] these facts for approximately eight months. During that time, National Instruments repurchased over 2.3 million of its shares at prices well below Emerson's offer – including the largest quarterly expenditure on share repurchases in the Company's history – while failing to disclose any information concerning Emerson or its offer, […] while in possession of material non-public information about that offer.").

[6]  For simplicity, I refer to the information concerning Emerson's purported high premium proposal as "alleged material non-public information" or "alleged MNPI."

[7]  Memorandum in Support of Motion for Class Certification, p. 2 (also noting that "[e]xcluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest," and that "[t]he dates of the proposed Class Period – which runs from August 12,

9.      I understand that § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, "are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information," and that "a corporation is subject to the same duty as individual insiders to disclose material non-public information before trading in its own shares."[8] Counsel has informed me that damages for insider trading shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the insider trading violation—in other words, damages for insider trading claims are limited to the insider's allegedly ill-gotten gains.[9] I further understand from counsel that courts recognize the "profits gained or loss avoided" as the measure, and not just the limitation, of damages owed to private plaintiffs from a Section 10(b) insider trading violation. I also understand from counsel that measuring damages by the ill-gotten gains is consistent with an "insider trading" theory of liability.

## C.      Summary of the Cain Report

10.      In support of its Motion for Class Certification, Lead Plaintiff submitted the Expert Report of Dr. Matthew D. Cain, Ph.D. ("Cain Report").[10] Dr. Cain opines that "National Instrument's Common Stock traded in an efficient market throughout the Class Period" and that "damages in this matter for Plaintiff's Section 10(b) and 20(a) claims can be calculated on a Class-wide basis utilizing the common out-of-pocket damages methodology."[11]

---

2022 through September 30, 2022 – flow from the Section 10(b) insider trading theory of liability that this Court sustained.").

[8]    MTD Opinion and Order, pp. 15 – 16.

[9]    I understand from counsel that the parties dispute whether this damages cap applies to Plaintiff's claim that NI violated Section 10(b) and Rule 10b-5 by repurchasing stock while in possession of allegedly material non-public information, whether by operation of Section 20A and/or common law damages caps that predated Section 20A. *See* Memorandum in Support of Motion for Class Certification, pp. 6 – 7 (describing Lead Plaintiff's legal theories of liability). I am not offering a legal opinion as to that question.

[10]   Expert Report of Matthew D. Cain, Ph.D., *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, May 2, 2025 ("Cain Report"); Memorandum in Support of Motion for Class Certification, p. 2.

[11]   Cain Report, ¶¶ 107 – 108.

4

### D.    Assignment

11.    I have been engaged by Dowd Bennett LLP, counsel for the Defendants, to evaluate the following issues in this matter:

    a.    Assuming NI is liable for failing to make a disclosure concerning the receipt and rejection of Emerson's purported high-premium proposal while engaging in share repurchases in August and September 2022 or assuming NI is liable for engaging in the share repurchases while in possession of this information, whether NI profited or avoided losses from its share repurchases;[12]

    b.    Lead Plaintiff's gains and losses from its transactions in NI's stock;

    c.    Dr. Cain's proposed class-wide damages methodology.[13]

## II.    Summary of Opinions

12.    Based on my expertise and my review of the materials in this matter, I have reached the following opinions:

    a.    Share repurchases distribute excess cash to shareholders and are functionally equivalent to dividends in that sense. NI did not profit from its share repurchases, even assuming the repurchases occurred while NI was in possession of material non-public information ("MNPI"). This implies that damages to the proposed Class are zero, given my understanding that damages are either measured by or limited to NI's ill-gotten gains. *See* **Section IV**.

    b.    Lead Plaintiff's produced account statement demonstrates that it gained on its transactions in National Instruments stock. *See* **Section V**.

---

[12]    I understand counsel and Defendants do not accept the allegations that Defendants are liable for failing to disclose information regarding the receipt and rejection of Emerson's proposal. I also understand from counsel that for insider trading, damages are capped at gains obtained from insider trades, defined as the profit gained or loss avoided in the transaction or transactions.

[13]    I understand from counsel that the actual calculation of damages, if any, is reserved for a later phase, but at the class certification phase, Lead Plaintiff must present a methodology for calculating damages that is common to the proposed class and capable of measuring damages consistent with its theory of liability.

    c.   The out-of-pocket damages methodology provided in the Cain Report is incomplete and does not address the circumstances of this matter, and, as a result, fails to provide an appropriate and applicable methodology for calculating class-wide damages. *See* **Section VI**.

13.    The documents, materials, and other information I have considered in conducting my analysis and in forming these opinions are cited throughout this report and listed in **Appendix C**. My analysis and conclusions to date are based on the information available when this report was submitted. I reserve the right to amend my report and may modify, refine, or revise my opinions if new information is identified or otherwise becomes available.

## III.    Background

### A.    Overview of Emerson's Acquisition of National Instruments

14.    National Instruments Corporation was an Austin, Texas-based public company founded in 1976 that provided software-connected automated test and measurement systems.[14] NI was acquired for $8.2 billion by Emerson, a global automation engineering company, in an all-cash transaction that closed October 11, 2023.[15] Following the close of the acquisition, National Instruments became a wholly-owned subsidiary of Emerson and, as of October 2023, was reorganized as Emerson's Test and Measurement business unit.[16]

15.    Emerson first approached NI about a potential acquisition on May 16, 2022, and formally made an unsolicited proposal to buy NI at $48 per share on May 25, 2022.[17] On

---

[14]   "About NI," National Instruments, available at https://www.ni.com/en/about-ni.html, accessed on May 29, 2025. *See also* National Instruments Corporation, Form 10-Q for the quarterly period ended March 31, 2022, filed April 29, 2022 ("NI 2022Q1 10-Q"), pp. 1, 32.

[15]   "Emerson Completes Acquisition of NI, Advancing Global Automation Leadership," Emerson, October 11, 2023 ("Announcement of Merger Completion"), available at https://www.emerson.com/en-gb/news/2023/emerson-completes-ni-acquisition.

[16]   Announcement of Merger Completion. *See also* Amended Complaint, ¶ 18.

[17]   "Immediate, Compelling And Certain Value For NI Shareholders," Emerson, January 17, 2023 ("Emerson Public Offer"), available at https://www.emerson.com/documents/corporate/immediate-compelling-certain-value-for-ni-shareholders-en-us-8730600.pdf.

June 16, 2022, NI rejected Emerson's proposal, stating in a brief letter that its Board had determined the May 25 proposal "did not provide a basis for further discussion."[18]

16.     Emerson reiterated its initial $48 per share proposal on June 22, 2022. NI rejected Emerson's proposal a second time on August 2, 2022, stating in another brief letter that its "Board remained unanimously of the view that Emerson's proposal was not in the best interests of NI and its stockholders."[19] There were no acquisition offers during the proposed Class Period (August 12 – September 30, 2022).

17.     Three months later and after the proposed Class Period, on November 3, 2022, Emerson contacted NI with a revised acquisition proposal of $53 per share. NI responded to Emerson on November 15, 2022, stating that NI would "take Emerson's proposal seriously."[20]

18.     On January 13, 2023, National Instruments announced a strategic review to consider a sale of the Company, "with the intent to unlock and maximize shareholder value."[21] NI disclosed that the "comprehensive review" would include "consideration of a full range of available strategic, business, and financial alternatives, including solicitation of interest from potential acquirors and other transaction partners, some of whom have already approached the Company."[22]

19.     NI also announced on January 13, 2023 that the Board declared a dividend "of one preferred share purchase right […] for each outstanding share of common stock," and adopted a stockholder rights plan.[23]

20.     Following this, on January 17, 2023, the next trading day, Emerson made public its proposal to acquire National Instruments at $53 per share.[24] Emerson explained that "[t]he

---

[18]    National Instruments Corporation, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed May 25, 2023 ("Merger Proxy Statement"), pp. 25 – 26.

[19]    Merger Proxy Statement, p. 26.

[20]    Merger Proxy Statement, p. 27.

[21]    "NI Announces Commencement of Strategic Review Process," *Businesswire*, January 13, 2023 ("Strategic Review Announcement"), available at https://www.businesswire.com/news/home/20230113005094/en/NI-Announces-Commencement-of-Strategic-Review-Process, accessed on May 29, 2025. *See also* Merger Proxy Statement, p. 30.

[22]    Strategic Review Announcement.

[23]    Strategic Review Announcement; National Instruments Corporation, Form 8-K, filed January 13, 2023.

[24]    Emerson Public Offer.

proposal, which is not subject to any financing conditions, was submitted to NI on November 3, 2022, and represents an improvement over an initial $48 per share proposal submitted on May 25, 2022."[25] In addition to a press release, Emerson launched a website to solicit NI's stockholders, entitled "www.MaximizingValueAtNI.com," issued an investor presentation regarding the Company, and posted to the website an "infographic" summarizing its proposal.[26] The website included a timeline with the history of communication between NI and Emerson, beginning with the May 25, 2022, $48 proposal (which Emerson called "Emerson's First Offer Letter to NI"), through events of January 11, 2023 (with what Emerson called, "Emerson's Fourth Offer Letter to NI").[27] Emerson also held an investor conference call before the market opened on the morning of January 17, 2023.[28]

21.    On the afternoon of April 11, 2023, Emerson revised its proposal once more, raising its price to $60 per share.[29] NI and Emerson entered into the Merger Agreement and issued a press release announcing the merger before the market opened on April 12, 2023.[30] Shareholders approved the acquisition in a special meeting on June 29, 2023[31]; the acquisition was completed on October 11, 2023.[32]

---

[25]    Emerson Electric Company, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed January 17, 2023 ("Emerson Proxy Statement"), Exhibit 1.

[26]    Emerson Proxy Statement, Exhibits 1 – 4. *See also* "Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share," Emerson, January 17, 2023, available at https://web.archive.org/web/20230127212705/https://www.maximizingvalueatni.com/, accessed on June 12, 2025.

[27]    Emerson Proxy Statement, Exhibit 2.

[28]    Emerson Proxy Statement, Exhibit 1.

[29]    Merger Proxy Statement, p. 35.

[30]    "Emerson to Advance Global Automation Leadership Through Acquisition of NI," Emerson, April 12, 2023, available at https://www.emerson.com/en-us/news/2023/04-emerson-ni-acquisition. *See also* Merger Proxy Statement, p. 36.

[31]    "NI Stockholders Approve Transaction with Emerson," *Businesswire*, June 29, 2023, available at https://www.businesswire.com/news/home/20230629201570/en/NI-Stockholders-Approve-Transaction-with-Emerson, accessed on May 29, 2025.

[32]    Announcement of Merger Completion.

### B.    National Instruments' Share Repurchase Programs

22.    National Instruments had a long-standing practice of distributing cash to its shareholders through share repurchase programs.[33] NI's Board of Directors authorized its first repurchase program on April 21, 2010 (the "2010 Program"), authorizing the Company to repurchase shares of common stock "depending on market condition and other factors."[34] NI's Board later amended its 2010 Program on October 23, 2019, increasing by 3 million the number of shares authorized for repurchase (the "2019 Program").[35] The final 270,445 shares authorized under the 2019 Program were repurchased by NI in January and February 2022.[36] National Instrument's Board approved "a new stock repurchase plan for up to $250 million of common stock" (the "2022 Program") on January 19, 2022.[37] During February 2022, NI repurchased an additional 337,541 shares newly authorized under the 2022 Program.[38] NI continued repurchasing shares during the rest of 2022, making repurchases in March, April, May, August, and September.[39]

23.    In total, National Instruments repurchased 3,792,063 shares during 2022. Roughly half of these share repurchases, totaling 1,758,928 shares, were conducted prior to Emerson's initial outreach in May 2022 regarding a potential acquisition.[40] No shares were repurchased between May 6, 2022 and August 12, 2022, which includes the period in which NI's Board was considering Emerson's acquisition proposal.[41] A further 2,033,135 shares were repurchased between August 12, 2022 and September 26, 2022, during the proposed Class Period, after NI

---

[33]    See **Section IV** for a review of the economic literature on share repurchases and their use in returning cash to shareholders.

[34]    NI 2022Q1 10-Q, pp. 24 – 25.

[35]    NI 2022Q1 10-Q, pp. 24 – 25.

[36]    NI 2022Q1 10-Q, p. 50.

[37]    NI 2022Q1 10-Q, pp. 24 – 25.

[38]    NI 2022Q1 10-Q, p. 50.

[39]    In March 2022, NI repurchased 164,066 shares at an average price of $39.34. In April 2022, NI repurchased 702,506 shares at an average price of $40.63. In May 2022, NI repurchased 284,370 shares at an average price of $35.17. In August 2022, NI repurchased 520,902 shares at an average price of $41.91. In September 2022, NI repurchased 1,512,233 shares at an average price of $39.68. *See* MTD Opinion and Order, p. 3.

[40]    MTD Opinion and Order, pp. 3 – 4. *See also* National Instruments Corporation, Form 10-Q for the quarterly period ended June 30, 2022, filed July 29, 2022, p. 25.

[41]    MTD Opinion and Order, pp. 8 – 9.

9

had twice rejected Emerson's repeated $48 per share acquisition proposals and prior to any new proposal being made by Emerson.

## IV.    National Instruments Did Not Profit From Its Share Repurchases

24.    As discussed above, I understand from counsel that by statute and caselaw, damages for insider trading are measured by and shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the insider trading violation. In other words, I understand damages from allegedly improper insider trades are capped at the trader's ill-gotten gains.

25.    As I describe below, because share repurchases distribute excess cash to shareholders and are functionally equivalent to dividends in that respect, NI (as a company) did not profit from its share repurchases, even assuming the repurchases occurred while NI was in possession of MNPI that indicated the firm's share price was undervalued. This implies that damages are zero to the Class, given my understanding that damages are measured by and limited to NI's ill-gotten gains.

26.    A firm repurchasing its own shares (such as NI did during the proposed Class Period) is an economically different transaction from an individual purchasing a firm's shares for the individual's gain. An individual purchasing a share is buying an asset with a value that may increase or decrease over time. An individual that purchases a firm's shares while possessing MNPI may receive economic benefit. For example, an individual with positive MNPI (*i.e.*, indicating the shares are undervalued in the market) gains when the share price increases once the MNPI is revealed. If the MNPI had instead been disclosed before the individual traded or if the individual had refrained from trading, the individual would not have received the gains from the share price increase.

27.    Unlike an individual who uses cash (an asset) to buy shares (another asset), corporate share repurchases (such as those authorized by NI) are a means of distributing cash to a firm's shareholders, analogous to dividends, that reduces the company's assets.[42] After a

---

[42]    *See*, *e.g.*, Brealey, Richard A., *et al.*, *Principles of Corporate Finance*, Tenth Edition (McGraw-Hill, 2010) ("Brealey *et al.* (2010)"), p. 391 ("Corporations can pay out cash to their shareholders in two ways. They can pay a dividend or they can buy back some of the outstanding shares."); Berk, Jonathan and DeMarzo, Peter,

company repurchases its shares, the repurchased shares become treasury shares and subsequently may be canceled (retired).[43] If held by the company, treasury shares do not entitle the company to many of the typical rights granted to common stock holders, including the right to vote at stockholder meetings or the right to receive dividends.[44] As a result, such repurchase transactions render these shares valueless, effectively the same as unissued shares.[45]

28.    While there are differences between a repurchase and a dividend, the impact on the present value of the firm's cash flows (*i.e.*, the firm value) is the same for a repurchase and a dividend.[46] However, repurchases typically represent less of a future commitment than dividends. Repurchases can be one-off events, the actual amount repurchased may be far less than the announced amount, and it may take several years to complete the announced

---

*Corporate Finance: The Core*, Second Edition (Prentice Hall, 2011), ("Berk and DeMarzo (2011)"), p. 551 ("When a firm has excess cash, it can hold those funds as part of its cash reserves or pay the cash out to shareholders. If the firm decides to follow the latter approach, it has two choices: It can pay a dividend or it can repurchase shares from current owners. These decisions represent the firm's payout policy.").

[43]    Ross, Stephen A., *et al.*, *Corporate Finance*, Tenth Edition (McGraw-Hill, 2012), ("Ross *et al.* (2012)"), p. 581 ("An alternative form of cash payout is a stock repurchase. […] The shares are held by the corporation and accounted for as treasury stock.").

[44]    Kiseo, Donald E., *et al.*, *Intermediate Accounting*, Seventeenth Edition (John Wiley & Sons, 2019) ("Kiseo *et al.* (2019)"), Chapter 15, pp. 13 – 14 ("The possession of treasury stock does not give the corporation the right to vote, to exercise preemptive rights as a stockholder, to receive cash dividends, or to receive assets upon corporate liquidation.").

[45]    Kiseo *et al.* (2019), Chapter 15, p. 14 ("Treasury stock is essentially the same as unissued capital stock.").

[46]    Berk and DeMarzo (2011), pp. 559 – 560 ("Regardless of the amount of cash the firm has on hand, it can pay a smaller dividend (and use the remaining cash to repurchase shares) or a larger dividend (by selling equity to raise cash). Because buying or selling shares is a zero-NPV transaction, such transactions have no effect on the initial share price. […] As Modigliani and Miller make clear, the value of a firm ultimately derives from its underlying free cash flow. A firm's free cash flow determines the level of payouts that it can make to its investors. In a perfect capital market, whether these payouts are made through dividends or share repurchases does not matter."); Brealey *et al.* (2010), pp. 401 – 402 ("[S]witching from cash dividends to share repurchase has no effect on shareholders' wealth. […] [O]ther things equal, company value is unaffected by the decision to repurchase stock rather than to pay a cash dividend."); Ross *et al.* (2012), p. 589 ("[I]n a perfect market, the firm is indifferent between a dividend payment and a share repurchase. This result is quite similar to the indifference propositions established by MM for debt versus equity financing and for dividends versus capital gains.").

11

repurchase.[47] For example, NI disclosed that its 2022 repurchase program authorized a total maximum dollar amount, without a specific timeline.[48]

29.     If a firm (such as NI) repurchases its shares in the market—for example, by purchasing $100 million worth of shares—it distributes $100 million in cash to the selling shareholders. As a result of the repurchase, the number of shares outstanding is reduced. If the firm instead paid a dividend of $100 million, it would similarly distribute $100 million to all shareholders, but in this scenario, the number of shares outstanding would remain unchanged. In both cases, however, the firm would end up in the same economic position. The firm would have $100 million less cash, reflecting the amount distributed to shareholders, although potentially different subsets of shareholders.

30.     Because repurchases are simply a means of distributing cash to shareholders, similar to dividends, it follows that a firm (such as NI) does not receive an economic benefit from repurchasing its own shares, even assuming that its repurchases occurred while the firm possessed MNPI indicating that the firm's share price was undervalued. Had the firm refrained from conducting the repurchase transaction(s), it would have retained $100 million in cash, along with a higher number of shares outstanding. In this scenario, the firm itself would not have been economically worse off.

31.     While a firm (such as NI) itself does not receive any economic benefit from repurchasing shares while possessing MNPI, it should be noted that in such a scenario, shareholders that sold undervalued shares as part of the repurchase transaction(s) are economically worse off on the shares that they sold. Conversely, shares that are retained by

---

[47]   *See*, *e.g.*, Brealey *et al.* (2010), p. 396 ("[U]nlike dividends, share repurchases are frequently a one-off event. So a company that announces a repurchase program is not making a long-term commitment to distribute more cash. The information in the announcement of a share repurchase program is therefore different from the information in a dividend payment."); Berk and DeMarzo (2011), p. 577 ("[S]everal important differences distinguish share repurchases and dividends. First, managers are much less committed to share repurchases than to dividend payments. As we noted earlier, when firms announce authorization for an open market share repurchase, they generally announce the maximum amount they plan to spend on repurchases. The actual amount spent, however, may be far less. Second, unlike with dividends, firms do not smooth their repurchase activity from year to year. As a result, announcing a share repurchase today does not necessarily represent a long-term commitment to repurchase shares. In this regard, share repurchases may be less of a signal than dividends about future earnings of a firm.").

[48]   NI 2022Q1 10-Q, p. 25 ("On January 19, 2022, our Board of Directors approved a new stock repurchase plan for up to $250 million of our common stock, which is in addition to the existing program […]. The new stock repurchase plan does not have an expiration date.").

shareholders following the repurchase transaction(s) experience economic gains. As a result, the firm's repurchase of undervalued shares does not result in the firm itself receiving an economic benefit but rather results in a wealth transfer from the selling shareholders to the retaining shareholders (some of whom may be the same individuals).[49]

32.    During the proposed Class Period, NI repurchased 2,033,135 shares at an average price of $40.25. *See* **Exhibit 1** with repurchase dates, amounts, and prices.

33.    Analysts covering NI discussed information about repurchases alongside dividends. For example, Susquehanna Financial Group commented in July 2022 "[t]he company paid $37m in dividends and repurchased 987k shares at an average price of $39.06."[50] In October 2022, Susquehanna Financial Group also discussed NI's progress with repurchases authorized under the 2022 Program: "NI paid $37 million in dividends and repurchased approximately 2 million shares of its common stock at an average price of $40.25 per share. About $109M remains on their share purchase authorization."[51] Such analyst commentary is consistent with how market participants would generally view open-market repurchases that represent a continuation of a previous repurchase program (such as NI's repurchases during the proposed Class Period).[52]

34.    Because of the economics of repurchases and the evidence I discuss above, NI did not profit or receive ill-gotten gains from these repurchases even assuming the repurchases took

---

[49]    *See*, *e.g.*, Berk and DeMarzo (2011), p. 578 ("If managers believe the stock is currently overvalued, a share repurchase will be costly to the shareholders who choose to hold onto their shares because buying the stock at its current (overvalued) price is a negative-NPV investment. By contrast, repurchasing shares when managers perceive the stock to be undervalued is a positive-NPV investment for these shareholders. Thus, if managers are acting in the interest of long-term shareholders and attempting to maximize the firm's future share price, they will be more likely to repurchase shares if they believe the stock to be undervalued. (If, on the other hand, managers act in the interest of all shareholders—including those who sell—then there is no such incentive: Any gain to those who remain is a cost to those who sell at the low price.)").

[50]    "National Instruments: Rev Diversification Away From Portfolio Mix Continues, OM Expansion Playing Out," Susquehanna Financial Group, July 28, 2022.

[51]    "National Instruments: Earnings Review - A Mixed Bag as Semi/Portfolio Weakening," Susquehanna Financial Group, October 27, 2022.

[52]    It should be noted that the repurchase itself has no mechanical effect on the stock price. *See*, *e.g.*, Berk and DeMarzo (2011), p. 557 ("When a firm repurchases its own shares, two things happen. First, the supply of shares is reduced. At the same time, however, the value of the firm's assets declines when it spends its cash to buy the shares. If the firm repurchases its shares at their market price, these two effects offset each other, leaving the share price unchanged."). There is no evidence that the market would view NI's repurchases, which were conducted on the open market and as a continuation of a previous repurchase program, as a signal of

place while NI was in possession of MNPI.[53] The implication of this is that, given my understanding from counsel that Lead Plaintiff's theory of liability means that damages are capped at the insider trader's alleged gains or avoided losses, there are no damages to the sellers of NI stock during the proposed Class Period.

## V.    Lead Plaintiff Gained on Its NI Transactions

35.    Lead Plaintiff defines the proposed class as those who sold NI stock during the proposed Class Period and "were damaged thereby."[54]

36.    However, Lead Plaintiff's produced account statement (shown in **Table 1)**, demonstrates that it *gained* on its transactions in National Instruments stock overall.[55]

**Table 1: Lead Plaintiff 's NI Stock Transaction History**

| Trade Date | Shares Traded | Transaction Type | Price/Share | Broker Commission | Other Charges |
|---|---|---|---|---|---|
| 2/18/2022 | 32,140 | Purchase | $39.7002 | $964.20 | |
| 5/5/2022 | 6,660 | Purchase | $35.0762 | $199.80 | |
| 9/22/2022 | 2,650 | Sale | $39.0517 | $79.50 | $2.37 |
| 1/13/2023 | 12,305 | Sale | $46.9458 | $369.15 | $13.23 |
| 3/3/2023 | 7,550 | Sale | $51.1771 | $226.50 | $3.10 |
| 3/6/2023 | 4,785 | Sale | $51.2090 | $143.55 | $1.97 |
| 3/13/2023 | 11,510 | Sale | $48.7047 | $345.30 | $4.49 |

---

managers possessing inside information about the future earnings of the firm. *See*, *e.g.*, Miller, Merton H. and Rock, Kevin, "Dividend Policy under Asymmetric Information," *The Journal of Finance*, vol. 40, no. 4, September 1985; Bonaimé, Alice and Kahle, Kathleen, "Share Repurchases," Chapter 4 in Denis, David J. (Ed.), *Handbook of Corporate Finance*, (Edward Elgar Publishing, 2024); NI 2022Q1 10-Q, pp. 24 – 25. Even if NI's repurchases would have had any kind of impact on stock price from a signaling theory perspective—those repurchases would have increased the stock price, if anything, rather than depressed it.

[53]    I note that neither Lead Plaintiff nor the Cain Report offers any analysis showing NI actually economically benefited by buying at allegedly depressed prices.

[54]    Memorandum in Support of Motion for Class Certification, p. 2.

[55]    "Lead Plaintiff's Account Statement," WCERS_00001-162, at -033, -034, -039, -046, -048, -049, -098, and -134. *See also* Lead Plaintiff's Sworn Certification.

37.     Lead Plaintiff's account statement reports gains for each of Lead Plaintiffs' sales of NI stock.[56] Over all of Lead Plaintiff's sales of NI stock reported in its account statements, Lead Plaintiff gained over $360,000, a nearly 24 percent return on its investment in just over one year.[57] When looking only at the one sale that occurred during the proposed Class Period (on September 22, 2022), Lead Plaintiff's account statement reports a realized gain of $223.43, representing a 0.22 percent gain.[58] *See* **Table 2**.

**Table 2: Lead Plaintiff's Gains From NI Stock Transactions
Reported on Brokerage Account Statement Using Weighted Average Cost Method**

| Sale Date | Gain (After Fees) |
|---|---|
| 9/22/2022 | $0.2 K |
| 1/13/2023 | $98.2 K |
| 3/3/2023 | $92.2 K |
| 3/6/2023 | $58.6 K |
| 3/13/2023 | $112.1 K |
| **Total** | **$361.2 K** |

38.     Using the produced transaction data shown on the account statement, I performed my own calculations of Lead Plaintiff's realized gain on each of its individual sales of NI stock under three common accounting methods: weighted average cost; last-in, first-out ("LIFO"); and first-in, first-out ("FIFO").[59] For each accounting method, I have calculated the realized gain first

---

[56]    WCERS_00001-162, at -134. These gains account for broker commissions and other fees and are calculated using a weighted average cost approach.

[57]    Calculation: Total Amount Paid by Lead Plaintiff = $1,276,928.63 + $233,807.29 = $1,510,735.92. 23.9% = ($1,871,979.20 - $1,510,735.92) / $1,510,735.92. *See* "Lead Plaintiff's Account Statement," WCERS_00001-162, at -033, -034, and -134.

[58]    Calculation: Total Shares Purchased and Sold By Lead Plaintiff = 32,140 + 6,660 = 38,800 Shares. 0.22% = $223.43 / (($1,510,735.92 / 38,800) × 2,650). *See* "Lead Plaintiff's Account Statement," WCERS_00001-162, at -064 and -134; Footnote 57.

[59]    *See, e.g.*, Albrecht, W. Steve, *et al.*, *Financial Accounting*, Eleventh Edition (South-Western Cengage Learning, 2011), p. 269 ("With FIFO, the oldest units are assumed to be sold first. With LIFO, the newest units are assumed to be sold first. With the average cost assumption, all units are assigned the same average cost, independent of their specific actual cost.").

without accounting for broker commissions paid to conduct the transactions ("before fees"), and then "after fees."[60] The results of these calculations are summarized in **Exhibit 2**.[61]

39.      For the sale of NI stock on September 22, 2022, which was the only transaction during the proposed Class Period, Lead Plaintiff gained $385-$10,535 based on two accounting methods (weighted average cost and LIFO). Only under one accounting method (FIFO) did Lead Plaintiff suffer losses during the proposed Class Period, and even then, this calculated loss was *de minimis* at $1,719 (before fees) and $1,880 (after fees).

## VI.    The Damages Methodology Provided in the Cain Report is Incomplete and Does Not Address the Circumstances of This Matter

40.      As an initial matter, the methodology for "calculation of damages for violation of Section 10(b) of the Exchange Act" that is provided in the Cain Report focuses on NI's alleged lack of disclosure of Emerson's proposal.[62] Dr. Cain fails to discuss a methodology that would apply had NI abstained from repurchases during the proposed Class Period.[63] As I discuss above in **Section IV**, had NI refrained from conducting the repurchase transaction(s), NI would have retained the cash it spent on repurchases, along with a higher number of shares outstanding, and the firm itself would not have been economically worse off.

41.      The Cain Report asserts that "damages for Plaintiff's claims can be calculated on a class-wide basis through a common methodology, the out-of-pocket damages methodology, which is also consistent with Plaintiff's liability theory."[64] In this case, the out-of-pocket damages to members of the proposed class are different from profits gained or loss avoided by

---

[60]   Lead Plaintiff's broker commissions totaled approximately $2,400 across all transactions. *See* "Lead Plaintiff's Account Statement," WCERS_00001-162, at -098 and -134.

[61]   *See* "Lead Plaintiff's Account Statement," WCERS_00001-162, at -098 and -134. Both the reported and calculated gains and losses also exclude all Lead Plaintiff earnings from National Instruments' dividend payments.

[62]   Cain Report, ¶¶ 16, 91 – 101.

[63]   For example, Dr. Cain testified that he had not studied any of NI's specific share repurchases during the proposed Class Period and therefore he has no way of knowing any alleged price impact they may have had (or allegedly would not have had if not conducted). *See* Transcript of Deposition of Matthew Cain, Ph.D., June 3, 2025 ("Cain Deposition"), p. 72 ("Q. Did you specifically look in your analysis at the days that National Instruments was repurchasing stock? A. No, I have not studied their specific repurchases on each trading day during the class period.").

[64]   Cain Report, ¶ 90.

NI, which as I discuss above are zero, [65] and which I understand from counsel is the measure of damages owed to private plaintiffs from a Section 10(b) insider trading violation that is consistent with an "insider trading" theory of liability. NI (as a company) did not profit from its share repurchases, which implies that there are no recoverable damages to sellers of NI stock during the proposed Class Period.

42.    The out-of-pocket damages methodology described in the Cain Report "calculates investor damages formulaically as the artificial inflation or deflation in the stock price at the time of sale minus the artificial inflation or deflation in the stock price at the time of purchase."[66] Even if the out-of-pocket damages framework applies to insider trading claims in this case,[67] the Cain Report's suggested application of this common approach is incomplete and fails to account for the facts and circumstances relevant in this matter and, as a result, fails to provide an appropriate and applicable methodology for calculating class-wide damages.

### A.    Dr. Cain Fails to Describe a Methodology to Measure Deflation

43.    Dr. Cain's proposal to "calculate[] investor damages formulaically" requires "quantification of an artificial inflation or deflation per share, […] based upon a detailed loss causation analysis" as one "input to the formula."[68] The Cain Report does not include any type of quantification and only vaguely and incompletely describes several potential approaches to doing so, including "event study analysis, valuation analysis, M&A analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research."[69] The Cain Report does not, however, address what, exactly, NI was allegedly obligated to disclose to the market by the start of the proposed Class Period. By failing to sufficiently tie the analysis set forth in the Cain Report to the facts and circumstances of this matter, Dr. Cain fails to provide any description to understand his approach let alone a reliable and accurate method for estimating the price impact of the allegedly undisclosed MNPI.

---

[65]    *See* **Section IV**.

[66]    Cain Report, ¶ 92.

[67]    I am not offering an opinion to this legal question.

[68]    Cain Report, ¶ 94.

[69]    Cain Report, ¶ 96.

44.     A typical methodology in securities cases is to use the stock price reaction when the alleged misstatements or omissions are corrected as the starting point to measure the inflation (or deflation) before that correction. However, in this instance there is no such correction. The market did not become aware of the Emerson's rejected proposals until January 2023, months after the end of the proposed Class Period. However, the information known to NI during the proposed Class Period, *i.e.*, the information that it could have disclosed to the market, was that NI had rejected two unsolicited acquisition proposals from Emerson, both proposing the same $48 per share price. This information that NI allegedly should have disclosed was substantially different from the information that was disclosed in the January 2023 announcements. The January 2023 announcements included, among other things, information that NI was seriously considering a sale of the Company, that Emerson had made a $53 per share proposal to acquire NI in November 2022, and that NI had executed a shareholder rights' plan.[70]

45.     On the other hand, during the proposed Class Period, I understand the Company had not established a strategic review committee, was not negotiating with Emerson, and did not know that Emerson would make another acquisition proposal (which Emerson did not do until more than a month after the end of the proposed Class Period), what price this possible proposal would be (which Emerson had not changed between the two rejected proposals), or whether NI would consider proceeding with a hypothetical future proposal.

46.     Because the information that came out in January 2023 was different from what could and allegedly should have been disclosed, the price movements in January 2023 cannot be used as a proxy for the value of the allegedly corrective information. Insofar as the market reacted to the information disclosed in January 2023, it cannot be assumed that the market would have similarly reacted to the information that existed as of the Class Period, if NI disclosed that information prior to repurchasing its shares. Likewise, the market's reaction in January 2023 cannot be attributed to information dating from August–September 2022.

47.     The Cain Report suggests that such "confounding information" and "degree of confounding information versus corrective information" can be accounted for through "various accepted methodologies,"[71] but does not explain how such an analysis could determine the

---

[70]     Strategic Review Announcement; Emerson Public Offer.

[71]     Cain Report, ¶¶ 96, 102 – 103.

deflation in NI's stock price specifically attributable to the information NI allegedly failed to disclose to the market during the proposed Class Period. To the extent that the Cain Report's proposed methodology relies on measuring deflation based on alleged "corrective" disclosures, that is not an appropriate methodology here because the actual disclosures of the merger do not match the disclosures that NI could have made at the time of its repurchases.

### B.      Additional Shortcomings of Dr Cain's Damages Methodology

48.      The Cain Report's proposed methodology is also incomplete in several ways.

49.      First, Dr. Cain does not discuss that members of the proposed class (*i.e.*, those who sold NI stock during the proposed Class Period and were "damaged thereby") could have also bought NI stock at various points in time and benefitted from purchasing at allegedly deflated prices. Dr. Cain's Report does not explain whether his proposed method is applicable to long sellers (who buy shares first, and then sell them, such as the Lead Plaintiff), short sellers (who sell shares first, by borrowing them, and then buy them back when they close their short positions), or both types of sellers.

50.      Second, Dr. Cain fails to describe a reliable and accurate method to account for benefits that could offset any damages, given the facts and circumstances of this matter. The Cain Report appears to acknowledge the need to offset the damages of a member of the proposed class with any gains of that member due to the alleged artificial deflation in the stock price at the time of purchase.[72] Under the Plaintiffs' theory that the MNPI regarding Emerson's proposals deflated the NI stock price, members of the proposed class who also purchased NI stock (either during the proposed Class Period, or after) would have benefitted from purchasing at allegedly deflated prices. Further, as I describe in **Section IV** above, if repurchases take place at artificially deflated prices, the remaining (unsold) shares will increase in price once the alleged MNPI is revealed to the market. Thus, the same shareholder could be, on net, either better or worse off from the repurchase transaction depending on the proportion of their shares sold in the repurchase vs. unsold. Dr Cain's proposed methodology does not account for this wealth transfer effect.

---

[72]      Cain Report, ¶ 92.

19

51.     Moreover, in this matter, the market was not aware of Emerson's interest in acquiring NI until several months after the end of the proposed Class Period, and so under the Plaintiffs' theory, NI's stock price would have continued to be deflated during this time. The Cain Report does not propose any methodology to identify and calculate damages (if any) for Class members who bought after the end of the Class Period and before the alleged corrective disclosures (when the news about the acquisition came out) ("October–January Period"). Dr. Cain fails to explain how he would quantify any alleged deflation in NI's stock price, during the October–January Period, due to NI's non-disclosure(s). Dr. Cain therefore fails to describe how he would account for benefits (if any) that a member of the proposed class may have received as a result of purchasing NI stock at allegedly deflated prices during the October–January Period that could offset any damages to that member from selling NI stock at allegedly deflated prices during the proposed Class Period.

52.     As a third matter, counsel has informed me that insider trading damages are limited to those who traded "contemporaneously" with the alleged insider trader. As **Exhibit 1** shows, NI's share repurchases which are alleged to be improper insider trades did not occur on a daily basis during the proposed Class Period. Dr. Cain fails to describe how he would define "contemporaneous" and how he would identify Class members who sold contemporaneously with NI's repurchases.[73]

David J. Denis<br>
June 16, 2025

---

[73]  *See*, *e.g.*, Cain Deposition, pp. 70 – 74 ("Q. So if a court were to say that let's say September 1 was not a date in which there was contemporaneous trading, how would that affect your conclusion that class-wide damages are able to be calculated consistently? A. […] I think you were sort of hinting at questions of what does it actually mean to trade contemporaneously. Does it have to be on the same exact day as the repurchase by the company, and ultimately I am not offering any interpretation on that question at this point in time.").

**Exhibit 1**
**National Instruments' Share Repurchases During the Proposed Class Period**
*August 2022 - September 2022*

| Trade Date | Shares Repurchased | Price Per Share |
|---|---|---|
| 8/12/2022 | 218,623 | $41.41 |
| 8/18/2022 | 87,859 | $43.01 |
| 8/19/2022 | 117,850 | $42.43 |
| 8/26/2022 | 96,570 | $41.41 |
| 9/12/2022 | 97,260 | $41.11 |
| 9/13/2022 | 140,682 | $40.14 |
| 9/14/2022 | 140,806 | $39.87 |
| 9/15/2022 | 140,806 | $39.43 |
| 9/16/2022 | 140,806 | $38.88 |
| 9/19/2022 | 150,200 | $39.94 |
| 9/20/2022 | 150,550 | $39.85 |
| 9/21/2022 | 148,466 | $40.28 |
| 9/22/2022 | 153,020 | $39.21 |
| 9/23/2022 | 154,575 | $38.82 |
| 9/26/2022 | 95,062 | $39.29 |
| *Overall* | *2,033,135* | *$40.25* |

**Note:**

[1] Price Per Share includes broker commissions of $0.02 per share paid by NI.

**Source:**

[A] "National Instruments Corp Trade Confirmation Activity Sheet," National Instruments, NATI Summary_Native_NAT-SL-00009178.xlsx, at "Summary" tab.

**Exhibit 2**
**Lead Plaintiff's Realized Gains (Losses) From All Sales of National Instruments Stock**
*February 2022 - March 2023*

| Sale Date | Purchase Date | Shares Sold | Before Fees | | | After Fees | | |
|---|---|---|---|---|---|---|---|---|
| | | | Sale Price | Purchase Price | Realized Gains | Sale Price | Purchase Price | Realized Gains |
| *Weighted Average Cost* | | | | | | | | |
| 9/22/2022 | - | 2,650 | $39.05 | $38.91 | $385 | $39.02 | $38.94 | $223 |
| 1/13/2023 | - | 12,305 | $46.95 | $38.91 | $98,924 | $46.91 | $38.94 | $98,172 |
| 3/3/2023 | - | 7,550 | $51.18 | $38.91 | $92,643 | $51.15 | $38.94 | $92,187 |
| 3/6/2023 | - | 4,785 | $51.21 | $38.91 | $58,867 | $51.18 | $38.94 | $58,578 |
| 3/13/2023 | - | 11,510 | $48.70 | $38.91 | $112,777 | $48.67 | $38.94 | $112,082 |
| *Total* | | *38,800* | | | *$363,596* | | | *$361,243* |
| *Last-in, First-out (LIFO)* | | | | | | | | |
| 9/22/2022 | 5/5/2022 | 2,650 | $39.05 | $35.08 | $10,535 | $39.02 | $35.11 | $10,374 |
| 1/13/2023 | 5/5/2022 | 4,010 | $46.95 | $35.08 | $47,597 | $46.91 | $35.11 | $47,352 |
| 1/13/2023 | 2/18/2022 | 8,295 | $46.95 | $39.70 | $60,102 | $46.91 | $39.73 | $59,596 |
| 3/3/2023 | 2/18/2022 | 7,550 | $51.18 | $39.70 | $86,651 | $51.15 | $39.73 | $86,194 |
| 3/6/2023 | 2/18/2022 | 4,785 | $51.21 | $39.70 | $55,070 | $51.18 | $39.73 | $54,781 |
| 3/13/2023 | 2/18/2022 | 11,510 | $48.70 | $39.70 | $103,642 | $48.67 | $39.73 | $102,947 |
| *Total* | | *38,800* | | | *$363,596* | | | *$361,243* |
| *First-in, First-out (FIFO)* | | | | | | | | |
| 9/22/2022 | 2/18/2022 | 2,650 | $39.05 | $39.70 | -$1,719 | $39.02 | $39.73 | -$1,880 |
| 1/13/2023 | 2/18/2022 | 12,305 | $46.95 | $39.70 | $89,157 | $46.91 | $39.73 | $88,406 |
| 3/3/2023 | 2/18/2022 | 7,550 | $51.18 | $39.70 | $86,651 | $51.15 | $39.73 | $86,194 |
| 3/6/2023 | 2/18/2022 | 4,785 | $51.21 | $39.70 | $55,070 | $51.18 | $39.73 | $54,781 |
| 3/13/2023 | 2/18/2022 | 4,850 | $48.70 | $39.70 | $43,672 | $48.67 | $39.73 | $43,379 |
| 3/13/2023 | 5/5/2022 | 6,660 | $48.70 | $35.08 | $90,766 | $48.67 | $35.11 | $90,364 |
| *Total* | | *38,800* | | | *$363,596* | | | *$361,243* |

**Notes:**

[1] For each accounting method, realized gains (or losses) are calculated both before and after accounting for broker commissions and other transaction-related fees. These are referred to as "Before Fees" and "After Fees," respectively.

[2] Lead Plaintiff purchased a total of 38,800 shares of NI stock (32,140 shares on February 18, 2022, and 6,660 shares on May 5, 2022) and sold all shares by March 13, 2023.

[3] Shading indicates the single sale date during the proposed Class Period.

**Source:**

[A] "Lead Plaintiff's Account Statement," WCERS_00001-162, at -039, -046, -048, -049, -098 and -134.

**Appendix A**
**Curriculum Vitae**


# DAVID J. DENIS

Office Address
University of Pittsburgh
Joseph M. Katz Graduate School of Business
278B Mervis Hall
Pittsburgh, PA 15260
(412) 648-1708
e-mail: djdenis@katz.pitt.edu

Home Address

5536 Northumberland
Pittsburgh, PA  15217
(765) 491-2824

SSRN Author page: http://ssrn.com/author=17040

---

**EDUCATION**

Ph.D, Finance, The University of Michigan, 1988.

M.B.A., Finance, The University of Michigan, 1984.

B.S., Finance and Managerial Statistics, Syracuse University, 1982.


**PROFESSIONAL EXPERIENCE**

Terrence P. Laughlin Chair in Finance, University of Pittsburgh, 2024-

Roger S. Ahlbrandt, Sr. Chair and Professor of Finance, University of Pittsburgh, 2011 – 2024.

Burton Morgan Chair of Private Enterprise, Purdue University, 2003-2011.

Professor of Finance, Purdue University, 1999-2003.

Associate Professor of Finance, Purdue University, 1995-1999.

Associate Professor of Finance, Virginia Polytechnic Institute and State University, 1994-1995.

Assistant Professor of Finance, Virginia Polytechnic Institute and State University, 1989-1994.

Visiting Assistant Professor of Finance, University of Toledo, 1988-89.

Lecturer, The University of Michigan, 1986.


**BOOKS**

"Corporate Restructuring," Edward Elgar Publishing (2005), two-volume compilation, edited with John J. McConnell.

"Handbook of Corporate Finance," Edward Elgar Publishing (2024), editor. Handbook of Corporate Finance | Elgar Online: The online content platform for Edward Elgar Publishing.

## PUBLISHED ARTICLES

"Corporate Social Responsibility and the Shareholder Primacy Paradigm," *Journal of Applied Corporate Finance* (2024), 1-6.

"Is Corporate Finance Research in Decline?" *Financial Review* 59 (2024), 257-264.

"Corporate Cash Holdings," *Handbook of Corporate Finance*, Edward Elgar Publishing (2024), with Luxi Wang.

"Rising Intangibles, Negative Cash Flows, and Corporate Funding Practices," *Journal of Applied Corporate Finance* 34 (4), Fall, 2022, 17-26.

"The SEC's Misguided Climate Disclosure Rule Proposal," *Banking and Financial Services Policy Report* 41 (10) (2022), 1-9.

"Persistent Negative Cash Flows, Staged Financing and the Stockpiling of Cash Balances," *Journal of Financial Economics*, 142 (2021), 293-313, with Stephen McKeon.

"Is Managerial Myopia a Persistent Governance Problem?" *Journal of Applied Corporate Finance* 31 (3), Summer, 2019, 74-80.

"Financing Investment Spikes in the Years Surrounding World War I," *Journal of Financial Economics*, 130 (2) (2019) 215-236, with Leonce Bargeron and Kenneth Lehn.

"Proactive Leverage Increases and the Value of Financial Flexibility," *Journal of Applied Corporate Finance* 28 (4) (2016), 17-28, with Stephen McKeon.

"CEO Assessment and the Structure of Newly Formed Boards," *Review of Financial Studies* 28 (2015), 3338-3366, with Diane Denis and Mark Walker.

"Corporate Payout, Cash Retention, and The Supply of Credit: Evidence from the 2008-09 Credit Crisis," *Journal of Financial Economics* 115 (2015), 521-540, with Barbara Bliss and Yingmei Cheng.

"Debt Covenant Renegotiations and Creditor Control Rights," *Journal of Financial Economics* 113 (2014), 348-367, with Jing Wang.

"Insider Trading Restrictions and Top Executive Compensation," *Journal of Accounting and Economics* 56:1 (2013), with Jin Xu.

"The Persistent Puzzle of Corporate Capital Structure: Current Challenges and New Directions," *Financial Review* 47 (2012), 231-243. Keynote Speech from Eastern Finance Association Annual Meeting, Boston, MA.

"Information Production by Investment Banks: Evidence from Fairness Opinions," *Journal of Law and Economics* 56 (2013), 245-280, with Matt Cain.

"Material Adverse Change Clauses and Acquisition Dynamics," *Journal of Financial and Quantitative Analysis* 48:3 (2013), 819-847, with Antonio Macias.

"Debt Financing and Financial Flexibility: Evidence from Pro-Active Leverage Increases," *Review of Financial Studies* 26 (6) (2012), 1897-1929, with Steve McKeon.

"Financial Flexibility and Corporate Liquidity," *Journal of Corporate Finance* 17:3 (2011), 667-684.

"Earnouts: A Study of Financial Contracting in Acquisition Agreements," *Journal of Accounting and Economics* 51 (2011), 151-170, with Matt Cain and Diane Denis.

"Financial Constraints, Investment, and the Value of Cash Holdings" *Review of Financial Studies* 23 (January, 2010), 247-269, with Valeriy Sibilkov.

"Factors Influencing Dividends," chapter in *Blackwell Companion on Dividends and Dividend Policy*, H. Kent Baker, ed. (May, 2009), John Wiley and Sons, with Gohar Stepanyan.

"Why Do Firms Pay Dividends? International Evidence on the Determinants of Dividend Policy," *Journal of Financial Economics* 89 (July, 2008), 62-82, with Igor Osobov.

"Do Firms Manage Earnings to Meet Dividend Thresholds?" *Journal of Accounting and Economics* 45 (March, 2008), 2-26, with Naveen Daniel and Lalitha Naveen.

"Dividend Policy," in The New Palgrave Dictionary of Economics, 2nd Edition, (2008) Steven Durlauf and Lawrence Blume, eds., Palgrave Macmillan Ltd., with John McConnell.

"Is There a Dark Side to Incentive Compensation?", *Journal of Corporate Finance* 12 (June, 2006), 467-488, with Paul Hanouna and Atulya Sarin.

"How Do IPO Issuers Pay for Analyst Coverage?" *Journal of Investment Management* 4 (2006), 48-61, with Mike Cliff.

"Leverage and Investment in Diversified Firms," *Journal of Financial Economics* 79 (February, 2006), 317-337, with Seoungpil Ahn and Diane Denis.

"Introduction to Corporate Restructuring," in *Corporate Restructuring*, edited by David J. Denis and John J. McConnell, Edward Elgar Publishing, 2006, with John J. McConnell.

"Do IPO Firms Purchase Analyst Coverage With Underpricing?" *Journal of Finance* 59 (December, 2004), 2871-2902, with Mike Cliff.

"Entrepreneurial Finance: An Overview of the Issues and Evidence," *Journal of Corporate Finance* 10 (March, 2004), 301-326.

"Internal Capital Markets and Investment Policy: Evidence From Corporate Spinoffs," *Journal of Financial Economics* 71 (March, 2004), 489-516, with Seoungpil Ahn.

"Mean Reversion in Earnings and the Use of E/P Multiples in Corporate Valuation," *Journal of Applied Finance* (Spring/Summer 2004), 4-10, with Mukesh Bajaj and Atulya Sarin.

"The Choice Among Bank Debt, Non-Bank Private Debt and Public Debt: Evidence From New Corporate Borrowings," *Journal of Financial Economics* 70 (2003), 3-28, with Vassil Mihov.

"Taxes and the Relative Valuation of S Corporations and C Corporations," *Journal of Applied Finance*, Vol. 12, No. 2 (Fall/Winter 2002), with Atulya Sarin.

"Global Diversification, Industrial Diversification, and Firm Value" *Journal of Finance* 57 (2002), 1951-1980, with Diane Denis and Keven Yost.

"Firm Value and Marketability Discounts," *Journal of Corporation Law* 27 (2001), 89-116, with Mukesh Bajaj, Steve Ferris, and Atulya Sarin,

"Is the Market Surprised by Poor Earnings Realizations Following Seasoned Equity Offerings?" *Journal of Financial and Quantitative Analysis*, 36 (2001), 169-193, with Atulya Sarin.

"Managerial Discipline and Corporate Restructuring Following Performance Declines," *Journal Financial Economics* 55, (2000), 391-424, with Timothy Kruse. Reprinted in "Corporate Takeovers: Modern Empirical Developments," Vol. 1, B.Espen Eckbo, ed., Academic Press, 2010.

"CEO Compensation and Managerial Decisions: Evidence From Acquisitions," *Research in International Business and Finance*, Special Volume on Issues in International Corporate Control and Governance, Vol. 15, 23-47, (2000),with Eric Blazer.

"Agency Theory and the Influence of Equity Ownership Structure on Corporate Diversification Strategies," *Strategic Management Journal* 20 (1999), 1071-1076, with Diane Denis and Atulya Sarin.

"Ownership and Board Structures in Publicly Traded Corporations," *Journal of Financial Economics* 52 (1999), pp. 187-224, with Atulya Sarin.

"Managerial Incentives and Corporate Diversification Strategies," *Journal of Applied Corporate Finance*, (Summer 1997), pp. 72-80, with Diane Denis and Atulya Sarin.

"Ownership Structure and Top Executive Turnover," *Journal of Financial Economics* 45 (1997), pp. 193-221, with Diane Denis and Atulya Sarin.

"Agency Problems, Equity Ownership, and Corporate Diversification," *Journal of Finance* 52 (1997), 135-160, with Diane Denis and Atulya Sarin. Abstracted in Contemporary Finance Digest, Autumn 1997, pp. 29-30.

"Leveraged Recaps and the Causes of Financial Distress," *Journal of Applied Corporate Finance*, Winter 1996, pp. 84-98, with Diane Denis.

"Active Investors and Management Turnover Following Unsuccessful Control Contests," *Journal of Financial Economics* 40 (1996), 239-266, with Jan Serrano.

"The Benefits of High Leverage: Lessons From Kroger's Recapitalization and Safeway's LBO," *Journal of Applied Corporate Finance*, Winter 1995, pp. 38-52.

"Performance Changes Following Top Management Dismissals," *Journal of Finance* 50, (1995), pp. 1029-1057, with Diane Denis.

"Causes of Financial Distress Following Leveraged Recapitalizations," *Journal of Financial Economics* 37 (1995), 129-158, with Diane Denis.

"Corporate Events, Trading Activity, and the Estimation of Systematic Risk: Evidence From Equity Offerings and Share Repurchases," *Journal of Finance*, December, 1994, with Greg Kadlec.

A-4

"The Information Content of Dividend Changes: Cash Flow Signaling, Overinvestment, and Dividend Clienteles," *Journal of Financial and Quantitative Analysis* 29, December 1994, 567-587, with Diane Denis and Atulya Sarin.

"Organizational Form and the Consequences of Highly Leveraged Transactions: Kroger's Recapitalization and Safeway's LBO," *Journal of Financial Economics* 36 (1994), 193-224.

"Investment Opportunities and the Market Reaction to Equity Offerings", *Journal of Financial and Quantitative Analysis* 29 (1994), 159-177.

"Majority Owner-Managers and Organizational Efficiency", *Journal of Corporate Finance* 1 (1994), 91-118, with Diane Denis.

"Leveraged Recaps and the Curbing of Corporate Overinvestment", *Journal of Applied Corporate Finance*, Spring, 1993, pp. 60-71, with Diane Denis.  Reprinted in The New Finance: Where Theory Meets Practice, Donald Chew ed., Irwin/McGraw-Hill.

"The Costs of Equity Issues Since Rule 415: A Closer Look", *Journal of Financial Research*, Spring, 1993.  Abstracted in Bowne and Company's *Review for CFOs and Investment Bankers*, June 1993.

"Managerial Discretion, Organizational Structure, and Corporate Performance: A Study of Leveraged Recapitalizations", *Journal of Accounting and Economics*, January, 1993, pp. 209-236, with Diane Denis.

"Corporate Investment Decisions and Corporate Control: Evidence From Going Private Transactions", *Financial Management*, Autumn, 1992.  Abstract reprinted in *Financial Management Collection*, Winter 1991.

"Shelf Registration and the Market for Seasoned Equity Offerings", *Journal of Business*, April, 1991.  Abstracted in Bowne and Company's *Review for CFOs and Investment Bankers*, October, 1991.

"Defensive Changes in Corporate Payout Policy: Share Repurchases and Special Dividends", *Journal of Finance*, December, 1990.


**WORKING PAPERS**

 "Unraveling the Mystery of Zero Leverage Firms," with Jared Smith.

"CEO Compensation ChangesFollowing Acquisitions," with Leonce Bargeron.


**PRESENTATIONS OF RESEARCH**

Invited Seminars

| | |
|---|---|
| Southern Methodist University | Syracuse University |
| University of Virginia (Darden) | University of Miami |
| University of Michigan | University of Kentucky |
| George Mason University | University of Notre Dame |
| University of Delaware | Vanderbilt University (Law and Business) |

A-5

| | |
|---|---|
| University of Colorado | University of Iowa |
| Ohio University | University of Western Ontario |
| INSEAD | London Business School |
| SUNY Binghamton | Concordia University |
| Michigan State University | University of Pittsburgh |
| University of Arkansas | DePaul University |
| Penn State University | Rutgers University |
| Ohio State University | University of Texas-Dallas |
| Tulane University | University of Missouri |
| Indiana University | University of Illinois |
| Stockholm School of Economics | University of Oregon |
| University of Washington | Virginia Tech |
| Loyola University | Michigan State University |
| Harvard Business School | Northeastern University |
| North Carolina State University | Purdue University |
| University of Houston | Texas A&M University |
| University of California-Davis | University of Utah |
| University of Florida | University of Pittsburgh |
| University of North Carolina | Texas Tech |
| University of Alabama | Louisiana State University |
| Florida State University | University of Illinois |
| University of Missouri | The College of William and Mary |
| Georgetown University | Drexel University |
| Chinese University of Hong Kong | University of Waterloo |
| University of Notre Dame | University of Pittsburgh |
| Virginia Tech | North Carolina State |
| Tulane University | Northeastern University |
| Duquesne University | Singapore Management University |
| Nanyang Technological University | National University of Singapore |
| Hong Kong Universtiy of Science and Tech. | Carnegie Mellon University |
| Penn State University | Temple University |
| University of Arizona | Georgia Tech |
| Case Western Reserve | University of Exeter |
| University of Amsterdam | Rice University |
| Wayne State University | University of South Florida |
| Ohio State University | Texas A&M University |
| Wilfrid Laurier University | University of Michigan |
| York University | University of Alberta |
| University of Illinois | Indiana University |
| University of Bristol | Warwick Business School |
| Manchester Business School | Bentley University |
| Michigan State University | Boston College |
| HEC-Paris | Lehigh University |
| University of Adelaide | University of Oklahoma |
| North Carolina State | Baruch College |
| Texas Christian University | Babson College |
| University of Utah | HKUST |
| Arizona State | University of Colorado |
| BI Norweigan Business School | Erasmus University |
| Nova-Lisbon | University of Porto |
| Tsinghua University | University of Delaware |
| Mississippi State University | University of Buffalo |
| University of British Columbia | Vanderbilt University |
| London Business School | UT-Dallas |

A-6

George Washington University     Rutgers University
University of Miami     Georgetown University
Australian National University     SMU
Tulane University     Lancaster University
University of Nebraska     University of Virginia – Darden
Iowa State     St. John's
Aalto     Western Ontario
Virginia Tech     University of Mississippi
Louisiana State University     Kent State University
American College of Beirut     UMass-Amherst

**BOOK REVIEW**

Review of "Corporate Restructuring: Managing the Change Process From Within" by Gordon Donaldson, Harvard Business School Press. *Journal of Finance*, June, 1995.

**HONORS**

Keynote Speaker, Conference on Ownership and Corporate Sustainable Policies, Hanken School of Economics, 2023.

Distinguished Scholar, Drexel University Center for Corporate Governance, 2019.

Katz Excellence in Research Award, 2012, 2013, 2014.

Katz Excellence in Service Award, 2014, 2015, 2022.

Keynote Speaker, Australasian Banking and Finance Conference, Sydney, December, 2019.

Keynote Speaker, Financial Management Association Asia/Pacific Meeting, Hong Kong, May, 2018.

Keynote Speaker and Distinguished Scholar, Eastern Finance Association Annual Meeting, April, 2012.

Excellence in Teaching Award, Executive MBA Program, 2010.

Fellow, Center for Corporate Governance, Drexel Univesity.

Co-Chair, Financial Management Association European Meeting, Hamburg, Germany, June 2010.

Keynote Speaker and Distinguished Scholar, Southern Finance Association Annual Meeting, November, 2008.

Keynote Speaker, MidEast Research Conference in Finance, 2006

Distinguished Guest Speaker, California Corporate Finance Conference

University Faculty Scholar, 2000-2005.

Dean's Office Special Faculty Service Award, 2000

Krannert Faculty Fellow, 2007

Best Paper Award, Corporate Governance Symposium, Weinberg Cener for Corporate Governance, University of Delaware.

Best Paper Award, Financial Management, Financial Management Association Annual Meetings, San Francisco, 1992.

Best Paper Award, Financial Management, Financial Management Association Annual Meetings, Orlando, Florida, 1990.


**PROFESSIONAL SERVICE**

Editor, *Review of Financial Studies*, 2013 – 2019.
Co-Editor, *Journal of Corporate Finance*, 2001–2011.
Editor, *Journal of Corporate Finance*, special issue on Venture Capital and Entrepreneurial Finance, 2002.
Editor, *Journal of Corporate Finance*, special issue on Financial Flexibility and Corporate Liquidity, 2011.
Associate Editor, *Journal of Finance*, 2000-2003.
Associate Editor, *Review of Financial Studies*, 2010-2013.
Associate Editor, *Journal of Financial Research,* 1996-2015; 2024 - .
Associate Editor, *Financial Review,* 1998-2015; 2024 -.
Associate Editor, *Journal of Applied Finance*, 2002-2006.
Associate Editor, *Annals of Finance*, 2004-2016.
Academic Director, Financial Management Association, 2006-2008.
VP-Program, Financial Management Association, 2013 meeting.
President, Financial Management Association, 2015-16.
President-elect, Financial Management Association, 2014-15.
Board of Trustees, Financial Management Association, 2017-2023
Fellow, Center for Corporate Governance, Drexel University, 2010-
Nominating Committee, American Finance Association, 2003.
Nominating Committee, Financial Management Association, 2007-08.
Co-Coordinator, Doctoral Consortium, Financial Management Association European Meeting, Istanbul, 2012.
Fellows Committee, Financial Management Association, 2007-08.  Chair in 2008.
Faculty Participant, FMA Doctoral Consortium, 2000, 2003.
Program Committee, Yale Conference on Entrepreneurship, Venture Capital, and Initial Public Offerings, 2002.
Program Committee, American Finance Association Annual Meeting, 1999.
Program Committee, Western Finance Association Annual Meeting, 1998-2011.
Program Committee, Financial Management Association Annual Meeting, 1992, 1993, 1995, 1996, 1998, 1999, 2000, 2009, 2010.
Program Committee, Drexel Conference on Corporate Governance, 2009-12.
Referee, *Journal of Financial Economics*, *Journal of Finance*, *Review of Financial Studies*, *Journal of Business*, *Journal of Accounting and Economics*, *Journal of Financial and Quantitative Analysis*, *Journal of Economics and Management Strategy*, *The Accounting Review*, *Review of Economics and Statistics*, *Journal of Empirical Finance, Journal of Corporate Finance*, *Journal of Banking and Finance*, *Financial Management*, *Journal of Financial Services Research*, *Journal of Financial Research*, *Financial Review*, *Quarterly Journal of Business and Economics*, *Journal of Applied Business Research, Harvard Business School Press, Strategic Management Journal, Review of Financial Economics, Journal of Applied Finance, Journal of Comparative Economics.*

**ADMINISTRATIVE**

University Service
        Provost Advisory Committee on Tenure and Promotion, 2021-22.
        Chancellor's Distinguished Research Award Committee, 2020-22.
        Chair, Socially Responsible Investment Committee, 2018-19.
        Search committee for Director, Burton D. Morgan Center for Entrepreneurship, 2006-07.
        Planning Committee, Pioneering Biotechnology Forum, 2006.
        Graduate Council, 1999-2002.  (Area Chair:  2000-2001).
        Counselor, University Honors System, 1990-1995.
        United Way Team Captain, 1996, 1997,1999.
        Horizons Mentoring Program, 2000, 2002.
        Judge, Life Sciences Business Plan Competition, 2003-2006, 2008, 2009.
        Advisory Committee, Burton D. Morgan Center for Entrepreneurship.
        Retirement Plan Review Task Force, 2008-10.

College Service
        Search Committee for Dean of Katz School of Business, 2021-22.
        Diversity and Inclusion Committee, 2020-24
        Chair, Search Committee for Director of Executive Education, 2019-20.
        Chair, Strategic Plan Planning and Development Team, 2019.
        Search Committee for Dean of Katz School of Business, 2014-15.
        Katz Executive Committee, 2015 – 2018.  Chair, 2017-18, 2022- 2025.
        Chair, Masters Program Committee, 2014-17.
        Finance Area Director, 2012-2014.
        Promotion and Tenure Committee, 2012-2014, 2016-2019, 2021-2023.
        Masters Programs Committee, 2013-14.
        Accounting Core Course Review Committee, Chair, 2011-12.
        MACC Governance Committee, 2011-12.
        Search Committee for Dean of Krannert School, 2010-11.
        Masters Program Advisory Committee, 2010-11.
        Management Executive Committee, 2009-10.
        Strategic Plan Task Force, 2008-09
        Management Head Selection Advisory Committee, 2008.
        Executive Education Program Review Committee, 2007-08.
        Executive Education Program Advisory Committee, 2008-09.
        Krannert Strategy and Structure Task Force, 2006-07.
        International Programs Council
        Search Committee for Duke Realty Chair in Finance, 2006.
        Search Committee for Hanna Chair in Entrepreneurship (Chair), 2005-2007.
        Search Committee for Blake Chair in Strategic Management, 2006-2007.
        Career Services Task Force
        Data Purchases Review Committee
        Committee on PhD Funding and Bonuses, 2002-2003.
        Faculty Relations Committee, 2002-2005. (Chair, 2004-2005)
        Advisory Committee for Executive Education Programs, 2001-2006.
        Judge, Krannert Venture Capital Competition, 2002
        Strategy and Structure Task Force (Chair) 1999-2000
        Promotion and Tenure Area Committee 1999-2002, 2005-2008.
        Area Coordinator, Finance, 1998-2006, 2008, 2009.
        Management Policy Committee, 1997-1999, 2008-2010.
        Faculty Advisory Committee, 1999-2006.
        Grade Appeals Committee, 1999-2001.

A-9

STAR Committee, 1999 - present (Chair from 2001-2009).
M.S. Steering Committee, 1996-1997.
Undergraduate Program Advisory Committee, 1995-1996.
Reviewer, Purdue Research Foundation research grant proposals, 1995-1998.
Reviewer, CIBER Faculty summer research grant proposals, 1999.
Faculty Adviser to Finance PhD students, 1995-1999.
Admissions Committee - PhD Program in Finance, 1996-present.
College of Business Faculty and Student Awards Committee, 1990-1992.
MBA Advisory Committee, 1992-1993.

Department Service (Virginia Tech)
Faculty and Student Awards Committee, 1989-1992.  Chair (1990-92)
Ph.D Policy Committee, 1991-1995. Interim Director, Winter, 1994.
Visiting Speaker Committee, 1990-1995. Chair (1994-95)
Faculty Recruiting Committee, 1991-1992, 1993-1994.
Graduate Curriculum Committee, 1993-1994.


**CONSULTING**
Ropes and Gray LLP
Cleary, Gottlieb, Steen, and Hamilton LLP
Milbank LLP
Hughes, Hubbard, and Reed LLP
Simpson, Thacher, and Bartlett LLP
Kirkland and Ellis LLP
Berger Montague PC
Schneider Wallace Cottrell Konecky Wotkyns LLP
Chimicles, Schwartz, Kriner, & Donaldson-Smith LLP
Ballard Spahr
USBank
Cohen and Grigsby
Cahill Gordon & Reindel LLP
McGraw Hill Financial Inc.
Fabian and Clendenin
Jones Day, LLP
American Greetings Corp.
Credit-Suisse Securities LLC
Xerox Corporation
Cravath, Swaine, and Moore, LLP
Merrill Lynch
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
Shook, Hardy & Bacon, LLP
Lite Machines Inc.
Pepe and Hazard LLP
Davis, Polk, and Wardwell
Quinn, Emanuel, Urquhart, Oliver, & Hedges, LLP
Law and Economics Consulting Group (LECG)
Analysis Group
Cornerstone
Internal Revenue Service
West Marine Inc.
FuturaGene Corp

**DISSERTATIONS CHAIRED**

| Student Name | Completion Date |
|---|---|
| Lucy Wang | July, 2023 |
| Lei Qin | In progress |
| Xin Fan | July, 2021 |
| Pengcheng Zhu | July, 2019 |
| Lin Ge | July, 2018 |
| Thuy Bui | July, 2017 |
| Jared Smith | July, 2014 |
| Jing Wang | July, 2013 |
| Stephen McKeon | June, 2011 |
| Craig Everett | May, 2011 |
| Amanda Thompson | November, 2010 |
| Rachel Diana | July, 2009 |
| Antonio Macias | June, 2008 |
| James Garrett | March, 2008 |
| Matt Cain | July, 2007 |
| Mira Straska | July, 2007 |
| Valeriy Sibilkov | July, 2005 |
| Paul Hanouna | July, 2005 |
| Matt Barcaskey | July, 2004 |
| Igor Osobov | July, 2004 |
| Nilanjan Basu | July, 2003 |
| Keven Yost | November, 2002 |
| Mark Walker | July, 2001 |
| Seoungpil Ahn | July, 2001 |
| Vassil Mihov (co-chair) | August, 2000 |
| Kimberly Rodgers (co-chair) | December, 1999 |
| Bharathram Thothadri (co-chair) | December, 1998 |
| Tim Kruse | June, 1997 |
| Eric Blazer | May, 1996 |
| Doug Eckel (co-chair) | March, 1996 |

**SERVICE ON DISSERTATION COMMITTEES**

| Student Name | Completion Date |
|---|---|
| Madeline Scanlon | July, 2024 |
| Chang Suk Bae | May, 2021 |
| Tianyue Zhao | July, 2020 |
| Majid Darvishan | July, 2020 |
| Yanran Liu | July, 2020 |
| Arup Ganguly | July, 2018 |
| Tom Shohfi | July, 2015 |
| Torsten Jochem | May, 2013 |
| Rahsan Inget | November, 2009 |

A-11

| | |
|---|---|
| Gohar Stepanyan | July, 2009 |
| Hugo Tang | November, 2008 |
| Dinesh Iyer | 2007 |
| Greg Waller | August, 2006 |
| Sandipan Mullick | June, 2006 |
| David Offenberg | October, 2005 |
| Alexei Ovtchinnikov | June, 2004 |
| Arun Khanna | August, 2003 |
| Muge Tiryakioglu | August, 2002 |
| Orlin Dimitrov | July, 2002 |
| Huseyin Gulen | June, 2000 |
| Yun Yu | May, 2000 |
| Matthew Flynn | June, 1998 |
| Heidi Dybevig | September, 1997 |
| Erik Lie | July, 1996 |
| David Haushalter | July, 1996 |
| Dee Ann Ellingson | March, 1996 |
| Don Rich | Summer, 1994 |
| Sudhir Singh | Summer, 1992 |
| Atulya Sarin | Summer, 1992 |
| John Shao | Summer, 1991 |
| Nilanjan Sen | Summer, 1990 |

A-12

# Appendix B
# List of Expert Testimony in Last Four Years

1. Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated v. Forescout Technologies, Inc., Michael DeCesare, and Christopher Harms, United States District Court, Northern District of California, Expert Reports (April and May, 2025), Deposition (May, 2025).

2. Local 295 IBT Employer Group Welfare Fund v. Compass Minerals International, United States District Court for the District of Kansas, Expert Report (December, 2024), Deposition (January, 2025).

3. International Brotherhood of Electrical Workers Local 98 Pension Fund v. Deloitte & Touche LLP, United States District Court for the District of South Carolina, Expert Report (November, 2024), Deposition (January, 2025).

4. United States of America v. Nader Pourhassan, United States District Court for the District of Maryland, Declaration (July, 2024), Hearing Testimony (September, 2024).

5. SoClean Inc. Marketing, Sales Practices and Products Liability Litigation, United States District Court for the Western District of Pennsylvania, Expert Report (October, 2024), Deposition (October, 2024), Hearing Testimony (November, 2024).

6. Nikola Corporation v. Trevor Milton, American Arbitration Association.  Expert Report (July, 2023), Deposition (July, 2023).

7. Endless River Technologies LLC v. TransUnion LLC, United States District Court for the Northern District of Ohio Eastern Division.  Expert Report (June, 2021), Trial Testimony (September, 2022).

8. Latasha Davis et al. v. Washington University in St. Louis et al. United States District Court for the Eastern District of Missouri.  Expert Report (August, 2021); Deposition (September, 2021).

9. Joseph C Bamford and Young Min Ban v. Penfold L.P.; Delaware Valley Regional Center LLP; West 36th Inc.; Joseph Manheim' and Reath & Co. LLC, Court of Chancery of the State of Delaware.  Expert Report (January, 2021), Deposition (February, 2021) and Trial testimony (June, 2021).

## Appendix C
## Documents Considered

***Legal Documents***

Amended Complaint for Violations of the Federal Securities Laws, *In Re National Instruments Corporation Securities Litigation* , No. 1:23-cv-10488-DLC, March 29, 2024.

Class Action Complaint for Violations of the Federal Securities Laws, *Waterford Township Police & Fire Retirement System v. National Instruments Corporation, Emerson Electric Co., Eric Starkloff, Karen Rapp, and Daniel Berenbaum* , No. 1:23-cv-10488, November 30, 2023.

Declaration of Chad Johnson in Support of Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel, *Waterford Township Police & Fire Retirement System v. National Instruments Corporation, Emerson Electric Co., Eric Starkloff, Karen Rapp, and Daniel Berenbaum* , No. 1:23-cv-10488-DLC, January 29, 2024, Exhibit B.

Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, *In Re National Instruments Corporation Securities Litigation* , No. 1:23-cv-10488-DLC, May 2, 2025.

Opinion and Order, *In Re National Instruments Corporation Securities Litigation* , No. 1:23-cv-10488-DLC, September 6, 2024.

***Expert Report***

Expert Report of Matthew D. Cain, Ph.D., *In Re National Instruments Corporation Securities Litigation* , No. 1:23-cv-10488-DLC, May 2, 2025.

***Deposition Testimony***

Transcript of Deposition of Matthew Cain, Ph.D., June 3, 2025.

***Produced Documents***

"10b5-1 Repurchase Plan Agreement," August 11, 2022, NAT-SL-00005642-648.

"Lead Plaintiff's Account Statement," WCERS_00001-162.

"National Instruments Corp Trade Confirmation Activity Sheet," National Instruments, NATI Summary_Native_NAT-SL-00009178.xlsx.

***Academic Literature***

Albrecht, W. Steve, *et al.* , *Financial Accounting* , Eleventh Edition (South-Western Cengage Learning, 2011).

Berk, Jonathan and DeMarzo, Peter, *Corporate Finance: The Core* , Second Edition (Prentice Hall, 2011).

Bonaimé, Alice and Kahle, Kathleen, "Share Repurchases," Chapter 4 in Denis, David J. (Ed.), *Handbook of Corporate Finance* , (Edward Elgar Publishing, 2024).

Brealey, Richard A., *et al.* , *Principles of Corporate Finance* , Tenth Edition (McGraw-Hill, 2010).

Kiseo, Donald E., *et al.* , *Intermediate Accounting* , Seventeenth Edition (John Wiley & Sons, 2019).

Miller, Merton H. and Rock, Kevin, "Dividend Policy under Asymmetric Information," *The Journal of Finance* , vol. 40, no. 4, September 1985.

Ross, Stephen A., *et al.* , *Corporate Finance* , Tenth Edition, Volume 1 (McGraw-Hill, 2012).

***Publicly Available Materials***

"About NI," National Instruments, available at https://www.ni.com/en/about-ni.html, accessed on May 29, 2025.

## Appendix C
## Documents Considered

"Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share," Emerson, January 17, 2023, available at https://web.archive.org/web/20230127212705/https://www.maximizingvalueatni.com/, accessed on June 12, 2025.

"Emerson Completes Acquisition of NI, Advancing Global Automation Leadership," Emerson, October 11, 2023, available at https://www.emerson.com/en-gb/news/2023/emerson-completes-ni-acquisition.

"Emerson to Advance Global Automation Leadership Through Acquisition of NI," Emerson, April 12, 2023, available at https://www.emerson.com/en-us/news/2023/04-emerson-ni-acquisition.

"Immediate, Compelling And Certain Value For NI Shareholders," Emerson, January 17, 2023, available at https://www.emerson.com/documents/corporate/immediate-compelling-certain-value-for-ni-shareholders-en-us-8730600.pdf.

"National Instruments: Earnings Review - A Mixed Bag as Semi/Portfolio Weakening," Susquehanna Financial Group, October 27, 2022.

"National Instruments: Rev Diversification Away From Portfolio Mix Continues, OM Expansion Playing Out," Susquehanna Financial Group, July 28, 2022.

"NI Announces Commencement of Strategic Review Process," *Businesswire*, January 13, 2023, available at https://www.businesswire.com/news/home/20230113005094/en/NI-Announces-Commencement-of-Strategic-Review-Process, accessed May 29, 2025.

"NI Stockholders Approve Transaction with Emerson," *Businesswire*, June 29, 2023, available at https://www.businesswire.com/news/home/20230629201570/en/NI-Stockholders-Approve-Transaction-with-Emerson, accessed on May 29, 2025.

Emerson Electric Company, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed January 17, 2023.

National Instruments Corporation, Form 10-Q for the quarterly period ended June 30, 2022, filed July 29, 2022.

National Instruments Corporation, Form 10-Q for the quarterly period ended March 31, 2022, filed April 29, 2022.

National Instruments Corporation, Form 8-K, filed January 13, 2023.

National Instruments Corporation, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed May 25, 2023.