# EXHIBIT 2
# FILED UNDER SEAL

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1:23-cv-10488 (DLC)

-------------------------------------------x

IN RE NATIONAL INSTRUMENTS

CORPORATION SECURITIES LITIGATION

-------------------------------------------x

June 3, 2025

10:00 a.m.

DEPOSITION of MATTHEW CAIN, PhD, taken by the Plaintiffs, pursuant to Notice, held at the offices of Robbins Geller Rudman & Dowd, LLP, 420 Lexington Avenue, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

CAIN

of the question.

A.    No, I am not offering any I think legal opinions or opinions that would pertain to the legal requirements for the Affiliated Yute presumption.

Q.    Okay.  Do you opine as to whether there was a material omission in this case?

A.    I am --

MR. MANDEL:   Object to the form.

A.    I am not offering any opinions on whether there were in fact material omissions or material misstatements but rather just taking the plaintiffs allegations at face value.

Q.    Okay.  And so if Affiliated Yute requires material omission and you are not opining as to materiality in this --

MR. BRAUN:  Actually withdrawn.  I am going to rephrase that.

Q.    So are you opining as to materiality in any respect in this report?

CAIN

A.    No, I am not offering any assessments of materiality at this point in time.

Q.    So if Affiliated Yute requires material omission, you are not -- you would say the content of your report is not relevant to Affiliated Yute?

MR. MANDEL:    Object to form.

Q.    Is that correct?

A.    I think the content is still relevant within the damages methodology, but I would agree with you that I am not offering any opinions to the court on whether or not there were in fact material omissions and whether or not in fact the Affiliated Yute presumption should apply. I would defer to the court on those questions.

Q.    Okay.  So you are -- you kind of then moved on to discuss the fraud on market theory; is that correct?

A.    Yes.

Q.    And you provide then a couple of paragraphs that describe the fraud of the

CAIN

but --

A.    What I said is a lot of the cases, a lot of them have both alleged misstatements as well as omissions. Sometimes they occur simultaneously and sometimes at different points in time.  So you could have certain pure omissions that are alleged, but again like I said in those instances we would typically look at the -- in the future when information does come out if like I said defendants are challenging price impact.

Q.    And have you looked at the impact of any misrepresentations in this case?

MR. MANDEL:    Object to form.

A.    I have not sought out to answer any questions along those lines but in the context of my Cammer Factor analysis, I did end up pulling in some information that could be relevant to those types of questions, but like I said at this point in time I have not attempted to answer any questions about the price impact of the

CAIN

alleged misrepresentations.

Q.    Are there alleged misrepresentations in this case?

A.    My understanding is that the operative complaint as narrowed by the motion to dismiss opinion focused on alleged omissions as of the start of the repurchase activity in mid August 2022.

Q.    We might come back to some of this in a bit.

How would you -- if you were asked to calculate a pure omission, how would you do that?

MR. MANDEL:  Object to the form.

A.    It probably would depend on the context of what I was being asked to do and why.  So, for example, is it -- if I got a rebuttal report raising certain arguments about price impact or -- so there would be a certain type of analysis involved in responding to the argument that we raised in that rebuttal report versus if I were being asked to work on a loss causation of damages report to

CAIN

channel stuffing even though they don't admit why the earnings dropped off.  So again that is -- when I talk about understanding the information at that stage of a case, it can also include or it can sometimes benefit from the discovery phase of a case with internal company documents.

Q.    So in this case I think -- actually in this case, what would you be looking for in discovery if you were to calculate the impact of the omission of the news about an Emerson proposal?

MR. MANDEL:   Object to form.

A.    At this point I have not formed any opinions about that question.   I have not attempted to quantify the impact on the stock price of the omissions at this point in time.

Q.    In paragraph 94 --

A.    Which paragraph?

Q.    Paragraph 94 of your report.

A.    Okay.

CAIN

Q.    Skipping ahead a little bit at this moment to how you were calculating class damages, and you did say you've not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery.  So what type of information would you need in this case to perform a loss causation analysis?

MR. MANDEL:    Object to the form.

A.    Well, it is the same answer I gave before.  I have not formed any opinions on what information I will need if I am asked to perform a loss causation analysis.

Q.    Have you looked at any documents from discovery, and I am not asking about any -- if there is any privileged communications you have had with counsel about documents.

A.    I don't recall seeing any discovery-related documents in this case up to this point in time.

Page 46

CAIN

A.    I believe that I have.  Yes.   I believe one example would be a case involving Under Armour.  My recollection is that included 20 capital A claims at least against the founder and CEO of Under Armour.

Q.    Have you ever done other 20A cases?

A.    20 Capital A.

Q.    Yes, rather than little A parenthetically.

A.    Yes, I have.

Q.    Do you know how many?

A.    I don't know the exact number, but I would guess that it is probably somewhere between five and ten would be my best guess.

Q.    And were some of those -- I think I am -- at the class certification stage were you engaged?

A.    Yes.

Q.    Okay.  Do you recall what work you did at the class certification stage in relation to 20A, capital A?

CAIN

A.    Typically I would basically copy and paste the language from the statute that describes the profits gained or losses avoided calculation for 20A and just explain that is my understanding of how the statute is written, and that my understanding is that defendants could be liable to investors who traded contemporaneously with their trading under the statute, and that is typically the way that -- that is typically all I would lay out in an opening class certification report pertaining to 20 Capital A.

Q.    So you wouldn't -- actually describe how you would calculate the profits gained or losses avoided?

MR. MANDEL:    Object to form.

A.    No.  I would have -- I think that falls under what I was talking about, the profit gains or losses avoided calculation, so I would -- I would copy -- typically I would copy and paste the statute and then just explain that, you know, you can calculate -- there are

CAIN

different ways to calculate losses gained -- sorry.  Losses avoided or profits gained.  You can use actual trading prices.  You could use artificial inflation, but I think that it would probably be typically limited to that very simple description.  I think there may have been one or two reports where I actually did the calculation where it was relatively straightforward for a given case, but often particularly for longer class periods with a lot of trading it is typically a lot of data.  So I would typically not do the calculation in the opening report.

Q.   So what makes that type of calculation relatively straightforward in your phrasing?

A.    I think the formula is pretty straightforward.   Like I said, it is looking at the difference between the price paid versus the price at which the securities are sold or instead of using market price you could use artificial

CAIN

inflation levels.  So it is fairly straightforward once you match up purchases and sales.

Q.    And whose purchases and sales would you be matching up?

A.    It would be the defendants -- my recollection is it would be the defendants that are subject to those 20 capital A claims.

Q.    Have you ever done that calculation where the defendant was the issuer of the stock that was being traded?

MR. MANDEL:    Object to form.

A.    I don't believe I ever applied a 20 capital A calculation to an issuer. No.  My recollection is that all of 20 capital A claims have been tied to individual defendants and not company issuers.

Q.    And have you done -- do you recall ever working on an insider trading case in a plaintiff's side action that involved insider trading allegations but no 20A?

CAIN

A.    Yes.    I have used that quite frequently.

Q.    Have you used out of pocket methodology to calculate damages for a deflation case?

MR. MANDEL:    Object to the form.

A.    Again, like I described earlier I don't recall -- I am not able to recall off the top of my head any merits reports that were tied to artificial deflation, so I don't recall executing any publically available reports involving stock deflation ribbons.

Q.    And the class certification stage where you say that likely out of -- at the class certification stage where you are discussing the class-wide methodology for calculating damages, have you done that in a deflation case?

MR. MANDEL:    Object to form.

A.    Again, I think it is similar to the previous answer.    I don't recall executing any reports on -- in securities

CAIN

based on your opinion that the stock price reflected -- sorry.

We could presume based on your opinion that known information about National Instruments was determining that stock price?

MR. MANDEL:    Object to the form.

A.    Well, it was -- like I said it was incorporated into the stock price. There could be other factors that were also affecting stock price, but yes.

Q.    So did you account for those other factors?

MS. BRAUN:    Sorry.    Withdrawn.

Q.    What other factors specifically for National Instruments would be affecting the stock price?

MR. MANDEL:    Object to form.

A.    Ultimately I have not tried to answer that question in the report, but it could include purchase or sale activity. It could include any -- a wide variety of pieces of information, but ultimately the

CAIN

question I am trying to answer was the market efficient during the period it reacted to the information by evaluating Cammer and Krogman. I think the specific question was on any given day what was the stock price reflecting in terms of the information set which is I think kind of a separate question.

Q. Did you consider whether repurchasing was having an affect on the stock price during the class period?

MR. MANDEL: Object to form.

Q. I should clarify. Repurchasing of National Instruments' stock to have an affect on the stock price.

MR. MANDEL: Object to form.

A. That would be the trading that I analyzed. Like I said before, I am not attempting to answer -- I think you are asking about something that is outside the scope of the market efficiency question, which is a different question of what exactly was affecting the stock price on a given day, which is not a question that is

CAIN

asked in a market efficiency report.

Q.    But would it be a question that is asked when we are looking at the level of deflation to the class period?

MR. MANDEL:   Object to form.

A.    In this case?

Q.    In this case, yes.

A.    I have not formed an opinion one way or another on what -- what I will evaluate to determine the level of deflation in the stock price during the class period.

Q.    And you have no opinion as to whether the level of deflation was constant during the class period?

MR. MANDEL:   Object to form.

A.    I have not formed an opinion at this point in time whether it was constant or fluctuated throughout the class period.

Q.    I know I am jumping around a little bit, but you previously used the word contemporaneous and contemporaneously.  Do you recall that?

A.    Yes.

CAIN

is -- the class period is limited to investors who sold during this time period.   That is my understanding.

Q.   Did you hesitate just now because of the word contemporaneous? Is that --

MR. MANDEL:   Object to the form.

A.   I don't think I hesitated, but I think I qualified because I know that generally there are questions about how courts define that word, what it means for someone to trade contemporaneously with someone else or an entity, and I am not offering any opinions on how courts either do or should define that.

Q.   Did you look at the trading days of National Instruments -- sorry.

Did you specifically look in your analysis at the days that National Instruments was repurchasing stock?

A.   No, I have not studied their specific repurchases on each trading day during the class period.

CAIN

have been disclosed.  So it just kind of depends on the nature of how the information environment evolved over the course of a class period.

Q.    And so in this case if the information about Emerson's rejected offers was fresh on August 12 but there had been no more information about Emerson or rejected offers by September 30, would you expect to see a constant rate of deflation from August 12 to September 30?

MR. MANDEL:   Object to the form.

A.    I have not tried to answer that question at this point in time, so I have not formed any opinions on that question.

Q.    Have you calculated out-of-pocket damages for a class that did not suffer any actual loss?

MR. MANDEL:   Object to the form of the question.

A.    I am not really sure -- do you mean I concluded that there were no -- there was no inflation or no damages

CAIN

really affect the out of pocket damages methodology or the artificial inflation calculation.

Q.    I am going to go into some of specifics of the efficiency factors, which we have been dancing around a little bit.

Specifically I want to start with Cammer Factor 55.  So that is cause and affect relationship between company information and stock prices, and you selected a two-year analysis period; is that correct?

A.    Yes.

Q.    Why did you select a two-year analysis period?

A.    I often do a longer analysis period such as two years to get enough data points to test a group of news days versus a group of no news days.  So a common definition of -- of information disclosure events or news days, earnings announcements, which I included here, and you typically have about seven or eight earnings announcements over a two-year

CAIN

period.  So that is typically a large enough sample to have enough statistical power to detect whether there is a difference between news days and no news days.  If we limited -- in this case, if we limit it to only the class period I think you have a sample size of zero earnings announcements.  So you have to come up with or I have to come up with a longer analysis period in order to have the statistical power to run the test itself.

Q.    And why did you pick those dates specifically? So that is February 1, 2021 to January 31, 2023.

A.    Yes.  So I think my recollection is that I started with the end of January 2023 and just worked backwards two years, and there is a couple of reasons for that. I also included the merger and acquisitions announcement in 2023 based on my professional experience and academic experience in mergers and acquisitions. Information about an acquisition is very

CAIN

frequently some of the important information that could affect the stock price of a target company.

Q.   What information --

MR. MANDEL:  Let him finish. Go ahead.

A.   That is what defined the end date of January 2023.  Once you've -- I have a company that is -- its stock price is trading under the overhang of an acquisition offer.  Then it is very common that other pieces of information no longer have as impactful an affect on the stock price because the merger offer may be driving trading price, and then I just worked back two years prior to that to get roughly seven or eight earnings announcements within the sample.

Q.   What M&A announcements are you referring to?

A.   I identified two.  Those are listed in Exhibit 6.  So the physical one is on January 13, the strategic review process in which the company announced

CAIN

that they would consider offers for the company, and then January 17 in which Emerson went public with their proposal to acquire National Instruments.

Q.   Okay.  You established that National Instruments' stock reacted to National Instruments' specific news by comparing the percentages of all news and non-news days for this analysis period of February 1, 2021 to January 31, 2023; is that correct?

MR. MANDEL:   Object to form.

A.   That is correct.

Q.   And how did you determine news versus non-news days?

A.   Yes.  So for the news days sample, I described that previously.  That was any earnings announcements of the company or merger and acquisition related announcements, and then the no news days essentially are days in which there are no such news disclosures about earnings announcements or M&A announcements, but also I excluded days in which there were

Page 84

CAIN

alleged revelations of the relevant truth, which basically overlaps with those merger and acquisition announcements in January 2023, and also no SEC filings except that I ignore Form 4 filings because you typically have a lot of Form 4 filings day to day for companies, and that constituted the sampling of no news days that I was testing against.

Q.    So when you say you excluded those days, you put them into the non-news days category; is that correct?

A.    So you could think of this as three buckets.  There is news days, and then there is no news days, and then there are some days that sort of fall somewhere in between, and that third bucket I just ignored completely.  So let's say that a company -- let's say that National Instruments had an 8K filing announcing a press release, and it is not related -- it is not a press release related to a strategic review.  It is not an earnings announcement.  It is just another press

CAIN

release that would go into the bucket that is excluded from the no news and news day buckets.

Q.    Do you know how many days were in that third bucket?

A.    If you look at footnote 69 of my report on the bottom of page 26, I say that the -- there were nine news days, there were 464 no news days. That adds up to 473 that are in those two buckets, and there were 504 trading days within the analysis period.  So that is about roughly 31 trading days that fall into that bucket or 6 percent trading days that are excluded from either one of those buckets.

Q.    That is what I was going to ask next, so you answered my question.

A.    Great.

Q.    And there is -- I just want to make sure that I am looking at this correctly.

Would you please read the Bates number at the bottom of the cover sheet of what I just handed you?

CAIN

A.    It is CAIN 00009249.

MR. BENNETT:  Do you want that marked?

MS. BRAUN:   Yes.

(Cain Exhibit 2 marked for identification.)

Q.    Do you recognize this as one of your backup files?

A.    Yes.

Q.    I know the print is very small, but that is the nature of getting Excel on to paper sometimes.

The 31 excluded days are generally days where there is an SEC filing; is that correct?

MR. MANDEL:   Object to the form.

A.    Most of those were driven by the fact that there was an SEC filing on that day or, yes, that market impacted date.  I consider that a timestamp of the SEC filing, but yes.

Q.    Did you evaluate whether they had news by actually looking at the

Page 87

CAIN

filings?

A.    No.  I did not examine the filings.  Of course some of these may overlap with the news days, the earnings announcements.  So those would still be in the news days category, but outside of those news day events I did not consider the content of these SEC filings when excluding them from the two buckets.

Q.    Do you agree that your finding of market informational efficiency depends on how you are classifying news and non-news days?

MR. MANDEL:   Object to form.

A.    I am not aware of any difference in conclusions.  I used a different approach.

Q.    Can you explain that a little bit?

A.    Sure.  So, you know, one thing I guess that I have done a lot of is market efficiency reports, and I've had multiple court opinions that have cited to case precedent that says when there is no

CAIN

dispute about all other factors outside of Cammer Factor 5 then the courts don't even have to look at Cammer Factor 5. They have got enough information from the other factors to conclude that the market was efficient.

So that is I think one reason that my conclusion of market efficiency is not contingent on Cammer Factor 5 here, and then the other reason would be that if you look at my test results themselves in Exhibits 6 and 7 I have got 100 percent of news days statistically abnormal returns, and then I have 4 and a half percent in no news days that had statistically significant returns, and that is a massive difference in rates of stock price reactions.

So it is unlikely that a slightly different approach in terms of kicking events out of the no news days bucket, it is unlikely to have a meaningful difference on the results of the test given the strong results in

CAIN

Exhibit 7.

Like I said, I didn't try alternative approaches because I think this approach is very reasonable and objective. There is no subjectivity on my part in terms of including one 10K and excluding another 10K, you know, where I would go back and look at stock price reactions and then decide to include or exclude. I don't follow any sort of subjective process but rather set up the criteria, steps ex ante or up front. I follow those steps, and then it produces the results of the test to interpret.

Q. So according to your Exhibit 6, none of the non -- sorry, non-news days you have analyzed are within this class period; is that correct?

A. Right. They are all either before or after the class period given the shortening of the class period.

Q. So do you have evidence that NI's stock reacted quickly to any news day during the proposed class period?

CAIN

MR. MANDEL:   Object to form.

A.    Well, the test -- if you look at Exhibit 7, the test includes no news days that are during the class period.  So that is still -- there are still many, many days within the class period that are part of the test, but there were no earnings announcements.  There was no merger related announcement during the class period as we discussed earlier.   There is allegations of omissions about that information.  And you see a price reaction with information related to the M&A details was later disclosed after the end of the class period, but because none of those announcements occurred during the class period there are no news days during the class period.

I think that, back to your question, the evidence of market efficiency in terms of stock price movements during the class period is also dependent on all other tests that are focused exclusively on the class period,

CAIN

the other Cammer and Krogman Factors during the class period.

Q.   So can you point me to specific evidence that National Instrument's stock reacted quickly to news on any day during the proposed class period?

A.   Yes.  So I think it is the same answer as before.   There is analyst coverage during the class period.  There is trading volume.  There is narrow bid/ask spread.  There is institutional ownership.  There is all these other factors, but ultimately the company did not make any M&A news during the class period.  So there is nothing to point to in terms of NI disclosures during the class period.

Q.   And the disclosure -- the M&A news you were referring to in your previous answer, that was information that was disclosed in January 13 to January 17. Is that what you were referring to?

A.   Yes.

Q.   Okay.  Have you looked at the

Page 92

CAIN

content of those disclosures?

MR. MANDEL:    Object to form.

A.    Yes.  I reviewed each of the disclosures in Exhibit 6.

Q.    Actually continuing to talk a little about news, in addition to announcements made directly by the company do you agree that value relevant information may also be released publically through credit rating reports?

MR. MANDEL:    Object to form.

A.    I have seen instances of credit rating reports providing new information at least for bonds or fixed income securities.  Often though credit rating reports just follow other disclosures. Often you'll have an earnings announcement, and then two weeks later a credit upgrade or downgrade can occur for a company.  Sometimes it lags, but there can be times when credit rating reports could provide new information or analyst reports.  With any analyst report I've worked on cases in which analyst reports

CAIN

provided allegedly corrective information.

Q.    And newspaper articles, have they also provided informations that is value relevant?

A.    Yes, similarly I've worked on cases in which that was the case.  Yes.

Q.    In your classification news and non-news days, did you consider credit rating reports, analyst reports or news reports?

MR. MANDEL:    Object to form.

A.    No.  Those are not part of the Cammer Factor 5 test here.

Q.    Okay.  Are you aware that in academic studies economists, researchers wouldn't necessarily restrict themselves only to news released by the company if they were considering efficiency based on classifying news days and non-news days?

MR. MANDEL:    Object to the form.

A.    I think the academic studies that I have studied on Cammer Factor 5 tests tend to focus on earnings

CAIN

announcements, but I would agree that is certainly not the only reasonable testing ground for looking at information that is disclosed and running a Cammer Factor 5 test.  I've worked on other cases in which I determined that earnings announcements were not the best testing ground for constructing a sample of news days, but there are many academic studies that show that earnings announcements and merger and acquisition announcements due tend to provide new value relevant information to investors, but I am certainly not opining that those studies or that my report here would say that those are the only ways in which new value relevant information comes out to investors.

I would certainly agree that there could be many other company disclosures or company statements or analysts' reports or news articles or means in which new value relevant information can be disclosed to investors.

CAIN

as another factor that could indicate market efficiency.  So if it is a very large bid/ask spread, if it was very expensive to trade stock, then that could weigh against market efficiency as one example.

Q.   So it is not a direct test but rather it is a factor to consider in looking at the whole?

MR. MANDEL:   Object to form.

A.   I think all of these are factors to consider.  I don't really consider any of them either direct or indirect.   Yes.

Q.   Moving away from some of these factors, did you investigate whether there was any public information available during the class period that included discussions of National Instruments as a potential acquisition target?

A.   There was -- an element of that falls in the Cammer Factor analysis of those disclosures in January of 2023, but outside of that I was not -- and obviously considering Plaintiff's theory of

CAIN

liability in this case but beyond that I was not attempting to assess the extent to which anyone was speculating reporting on the possibility of National Instruments being an acquisition target.

Q. And when you just referred to the M&A related information, that was in January 2023, correct?

A. Yes.

Q. Okay. So you did not consider any M&A related information that was publically available for August or September 2022?

MR. MANDEL: Object to form.

A. I considered whether there were any disclosures that met that news day criteria during the full two-year analysis period, and I did not identify any public company disclosures other those that were identified in January of 2023.

Q. And so you did not look kind of further into newspaper articles or similar sources, journalistic sources for August and September 2022 specifically for

CAIN

whether there was any discussions of National Instruments' potential acquisition target?

MR. MANDEL:    Object to the form.

A.    Not outside of the scope of the Cammer Factor 5 analysis that I did.   No.

Q.    Did you evaluate analyst valuations for National Instruments at the time for August and September of 2022?

A.    No.  I have not considered what their recommendations or price targets or valuation models showed at any point in time.

Q.    Did you consider whether there is any difference in valuation between Emerson's proposals in May and June 2022, which you've mentioned a couple of times when you've described the theory of liability and analyst valuation, that was publically available at the time?

A.    No.  I have not considered any of those pieces of information at this point in time.

Page 105

CAIN

A F T E R N O O N   S E S S I O N

1:05  p.m.

M A T T H E W   C A I N,

having been previously duly sworn,

testified further as follows:

CONTINUED EXAMINATION

BY MS. BRAUN:

Q.    I am going to do my best not to repeat some of the questions from this morning, but we are going to sort of revisit some topics quickly.

So back to the question of the ability to calculate damages on a class-wide basis, I am looking at paragraph 94 of your report, and just for the record again the report is Exhibit 1.

A.    Okay.

Q.    You say "Event studies are widely employed to calculate artificial inflation or deflation."

Can you calculate artificial deflation during the class period without an independent study?

A.    In -- are you talking about this

                    CAIN
particular case or just generally?

    Q.    Let's do both.

    A.    Okay.

    Q.    So you could start with
generally.

    A.    Okay.   So generally the answer
is yes.   There are times when inflation
or deflation could be calculated without
using an event study, and then
specifically in this case the answer could
also be yes.

          So, for example, one possible
approach would be to look within the
mergers and acquisitions framework and ask
well if -- suppose that relevant truth
would have communicated to investors the
interest of an outside party in acquiring
the company for $48 per share for example.
You could look at mergers and acquisition
textbooks and academic peer reviewed
published studies on what would that mean
for the stock price in the absence of an
event study.   So there can be times when
an event study is not necessary and not

CAIN

required in the process of calculating artificial inflation or deflation.

Q.    And that would largely require academic literature; is that correct?

A.    Well, it could -- it could rely on academic studies like mergers and acquisition studies or textbooks as one example, the theory of mergers and acquisitions and what that means for stock prices.  Yes.

Q.    And have you ever calculated artificial deflation without an event study?

A.    I know that I have -- when I have done calculations of inflation that I used other tools and techniques as part of that process.  I've used academic research.  I've used analyst reports.  I have used leakage models.  So I have definitely done it without relying exclusively on event studies.  Yes.

Q.    So by other than you mean in addition to?

A.    I've often done it in addition

                    CAIN

to an event study.  Yes.

     Q.    So have you ever calculated artificial deflation without any event study at all?

     A.    Like I said earlier, I think -- I don't recall constructing an artificial deflation ribbon in any cases where I authored or executed a report that is publically available, but beyond that I would just have to go back and review my work.  I've done a lot of academic work on mergers and acquisitions and corporate disclosures, and again some of that relies on event studies, and some of it doesn't.

          So in my academic experience, I've used these types of tools and techniques other than event studies, but in terms of a loss causation damages merit report I would have to go back and review those and see different techniques to see if there are calculations that I have done without the use of an event study.  I just don't recall off the top of my head.

     Q.    And that also applies to cases

Page 110

CAIN

the affect of confounding information.

Q.    Have you analyzed whether this case and the facts in this case present circumstances in which you would not be able to isolate the confounding information?

A.    Well, I have not done any sort of loss causation analysis, but I have concluded that the out of pocket damages methodology will work in this case, but I've not actually calculated the level of artificial inflation which means I've also not considered the impact of confounding information at this point in time.

Q.    And you've concluded the out of pocket methodology will work because that is what you have done in the past for 10(b) cases?

MR. MANDEL:    Object to form.

A.    Like I said when you asked that question this morning, I considered my professional experience but also Plaintiff's theory of liability in this case, and I've concluded that the out of

CAIN

Q.   So are there -- is there material in this report that is there because you are discussing generally how out-of-pocket damages or market efficiency would work or what those -- the concepts and premises are, but you haven't considered whether it is actually applicable to the case?  So whether -- sorry.   I am going to rephrase that.

Is this an instance in which you are explaining -- by this I am referring to the sentence we have been discussing with starts on the second line from the top "You are reciting information about an out-of-pocket damages calculation on a class-wide basis, but you have not considered whether that would be applicable to this class?

MR. MANDEL:   Object to form.

A.   So there is a lot of discussion and description in this section about how the methodology works at a general level without actually applying the methodology

CAIN

and calculating inputs.  So that would include the questions about whether the 90-day look-back cap is applied.  That would include my discussion about confounding information.  I've not conducted any loss causation analyses yet to determine whether I need to disaggregate confounding information or how I would measure inflation.  I discussed general tools and techniques for how that is done, but I -- I think is what you are asking ultimately.  I have not carried out any of those calculations at this point in time.  So there could be certain aspects or elements to the general framework that come into play, and some that may not come into play once I get to the loss causation stage.

Q.    So we have discussed that you looked at the two disclosures that you cite in your report, the January 13 disclosures and the January 17 disclosures, and does that include -- are you including in that both disclosures

CAIN

from Emerson and disclosures from National Instruments about Emerson?

MR. MANDEL:    Object to form.

A.    So these are both disclosures that met the criteria for Cammer 5 analysis in terms of information that could have a potential impact on National Instruments' stock price, and, yes, the first one I believe came from National Instruments, and the second one came from Emerson.

Q.    And so I am still thinking of kind of the question of -- the role of events in calculating artificial inflation or deflation, so not the Cammer 5.

A.    Okay.

Q.    But do you know if the information that you are referring to that was disclosed in January of 2023 would have been accurate to disclose in August of 2022 at the start of the class period?

MR. MANDEL:    Object to the form.

A.    I have not tried to answer that

CAIN

question at this point in time.

Q.    If there is information in those January 2023 disclosures that occurred after the class period, then would it be accurate to say that that information could not have been disclosed prior to the class period?

MR. MANDEL:   Object to form.

A.    It probably depends.

Q.    How would it depend?

A.    So I guess if we are thinking about artificial inflation in a loss causation report, sometimes we will look at corrective disclosures.  Let's say it might be an earnings announcement, and we would all agree that the company could not have made the exact same earnings announcement at the beginning of the class period.  So I have a two-year class period, and the corrective information comes out in an earnings analysis at the end of the class period.  So certainly the company could not have made that announcement in the beginning, but the

CAIN

question what is the relevant truth. Did it come out in disclosures?  Was there other information that moved that earnings announcement that moved the stock?  That couldn't have been disclosed on day one. There is some confounding information, but the key is what is the relevant truth that allegedly should have been disclosed at the start of the class period.

So that is what I was talking about earlier where we frequently don't have a mirror image, and yet the key question is focused on that relevant truth and how that came out.

Q.    Do you cite any case in your report in which the issuer of stock was accused of insider trading its own repurchases?

MR. MANDEL:   Object to form.

A.    I would have to go back and look at the previous cases that I have worked on, but I don't recall off the top of my head working on a specific case that met that description.  So I don't recall any

Page 121

CAIN

citations that would be responsive to that question.

Q.    And I asked about cases that you cite, not necessarily cases that you worked on.  Is your answer the same?  You don't recall?

A.    Right.    I don't believe that I have cited to any other cases relating to my opinions that I have provided at this point in time.

Q.    Are you aware -- have you cited any academic authorities that say that insider trading -- sorry.

Have you cited any academic authorities that say that out-of-pocket damages methodologies, the appropriate way to calculate insider trading -- to calculate damages on a class-wide basis for an insider trading case?

MR. MANDEL:    Object to form.

A.    I don't believe that I have cited to any academic authorities on the out-of-pocket methodology itself.  I do cite to some mergers and acquisition

CAIN

textbooks, but beyond those I don't believe I've cited any other references on the out-of-pocket methodology.

Q.    Do you rely on any specific authorities that discuss the use of out-of-pocket damages methodology to calculate damages for a scheme that involved repurchases?

MR. MANDEL:  Object to form.

A.    I think it would be the same answer as before. I am not citing to any specific authorities on the out-of-pocket methodology in this report.

Q.    And it is not your opinion that the way to calculate damages would be to look at the affect of the repurchases itself on the stock price?

MR. MANDEL:  Object to form.

A.    Ultimately I am not offering an opinion on when -- when I ultimately calculate -- if I am asked to calculate artificial inflation as input to the methodology, I've not yet evaluated or reached any conclusions about the extent

Page 125

CAIN

A.    Yes, it can.    I have read academic articles that it can increase stock prices.

Q.    But you did not take any of that into consideration before you finished this report?

A.    Well, again, I have my qualificationS at the start of my report, so I would say my expertise is based on all of those qualifications, which includes my academic work.  So I am essentially aware of a wide variety of materials that I have reviewed over the years, but the questions that I am answering in this report are -- was the market efficient and is there a damages methodology that works.  So there was no need for me to go back and review any of those other publications in order to answer those two questions in this report.

Q.    And the damages methodology that you say works here, would that take into consideration the affect of your repurchases on the stock price if there

CAIN

were such an affect?

MR. MANDEL: Object to form.

A. It certainly can if that is relevant and reasonable to do so. Again, that is part of the questions of the specific calculation of artificial inflation as the input into the methodology, which I have not calculated artificial inflation at this point in time.

Q. Did anyone assist you in preparing for this report -- in preparing this report?

A. No. I believe I prepared it on my own to the best of my recollection.

Q. Are you still the principal manager of -- I am sorry. You could correct me if I am misstating your role -- of Cleveland Analytics.

A. I still have the LLC of Cleveland Analytics, yes.

Q. But you didn't use any whether contractors or consultants with Cleveland Analytics in preparing this report?