UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

In re NATIONAL INSTRUMENTS            :    Civil Action No. 1:23-cv-10488-DLC
CORPORATION SECURITIES LITIGATION :

—————————————————————— x    <u>CLASS ACTION</u>


**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS
REPRESENTATIVE AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

I.  Lead Plaintiff's Damages Methodology Satisfies Comcast..................................................2

II.  The Affiliated Ute and Basic Presumptions of Classwide Reliance Apply.........................6

III.  Lead Plaintiff Alleges the Proper Class Definition...............................................................9

IV.  CONCLUSION....................................................................................................................11

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)..........................................................................................................1, 6

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)................................................................................................................7

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...........................................................................................................6, 8

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ..............................................................................................3

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
284 F.R.D. 173 (S.D.N.Y. 2012) ............................................................................................6

*Elkind v. Liggett & Myers, Inc.*,
635 F.2d 156 (2d Cir. 1980)....................................................................................................4

*Gordon v. Sonar Cap. Mgmt. LLC*,
962 F. Supp. 2d 525 (S.D.N.Y. 2013)......................................................................................4

*In re Am. Bus. Computs. Corp. Sec. Litig.*,
1994 WL 848690
(S.D.N.Y. Feb. 24, 1994)....................................................................................................9, 10

*In re GPC Biotech AG Sec. Litig.*,
597 F. Supp. 2d 412 (S.D.N.Y. 2009)....................................................................................10

*In re GPC Biotech AG Sec. Litig.*,
2009 WL 5125130
(S.D.N.Y. Dec. 29, 2009) .....................................................................................................10

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084
(S.D.N.Y. July 10, 2019) .........................................................................................................6

*In re Upstart Holdings, Inc. Sec. Litig.*,
348 F.R.D. 612 (S.D. Ohio 2025)............................................................................................2

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) .............................................................................................8

**Page**

*In re Worlds of Wonder Sec. Litig.*,
  1990 WL 61951
  (N.D. Cal. Mar. 23, 1990)................................................................................................10, 11

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
  40 F. Supp. 3d 332 (S.D.N.Y. 2014).................................................................................4

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
  734 F. Supp. 1071 (S.D.N.Y. 1990)..................................................................................2

*O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*,
  559 F. Supp. 800 (S.D.N.Y. 1983).....................................................................................9

*Pearlstein v. Blackberry Ltd.*,
  2021 WL 253453
  (S.D.N.Y. Jan. 26, 2021)....................................................................................................6

*Puddu v. NYGG (Asia) Ltd.*,
  2022 WL 2304248
  (S.D.N.Y. June 27, 2022).................................................................................................6, 7

*Rosen v. Textron, Inc.*,
  369 F. Supp. 2d 204 (D.R.I. 2005).....................................................................................3

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
  2024 WL 1497110
  (S.D.N.Y. Apr. 5, 2024).......................................................................................................3

*Veleron Holding, B.V. v. Morgan Stanley*,
  117 F. Supp. 3d 404 (S.D.N.Y. 2015).................................................................................2

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)..................................................................................................3

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
  §78j(b)..........................................................................................................................2, 4, 5
  §78t-1 ...............................................................................................................................4, 5
  §78t-1(d) ..............................................................................................................................4

Federal Rules of Civil Procedure
  Rule 23 .................................................................................................................................3
  Rule 23(b)(3).........................................................................................................................3

Lead Plaintiff Wayne County Employees' Retirement System ("Lead Plaintiff" or "WCERS") respectfully submits this memorandum of law in further support of its Motion for Class Certification and Appointment of Class Representative and Class Counsel (the "Motion").[1]   In addition, and in accordance with the Court-ordered schedule (ECF 63), Lead Plaintiff respectfully submits herewith the Expert Report of Dr. Mathew D. Cain (the "Merits Report"), setting forth detailed expert evidence concerning, *inter alia*, materiality, loss causation, and damages.[2]

Lead Plaintiff has established all of the elements of class certification, and Defendants have raised no legitimate argument to the contrary.  Defendants concede that numerosity, commonality, typicality, adequacy, and superiority are satisfied here.  Defendants admit that the presumption of classwide reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) applies to cases that (like this one) arise from material omissions.  Defendants raise no challenge to market efficiency and fail to identify any serious legal or factual issue that is not common to all Class members.  Defendants do not (and cannot) dispute that Lead Plaintiff has proposed a damages methodology that applies in common to all Class members and – although Defendants wrongly advance an alternative and incorrect view of damages – Defendants admit that their alternative approach is likewise common to all Class members.  Accordingly, this case should be certified as a class action.

---

[1] *See* Declaration of Noam Mandel in Support of the Motion ("Mandel Decl."). References to the exhibits attached thereto appear herein as "Ex."  Defendants' memorandum of law in opposition to the Motion is cited herein as "Opp. Br."  ECF 71.  All terms not defined herein have the same meanings as ascribed to them in Lead Plaintiff's opening brief.  ECF 65.

[2] The Merits Report is attached hereto as Ex. A.  The Merits Report, including Appendix C thereof, also serves as Dr. Cain's reply to the reports of Drs. Denis and Goodwin, submitted by Defendants in opposition to class certification (ECF 70-1, 70-6), and fully incorporates and reiterates the opinions expressed in Dr. Cain's opening report, submitted on May 2, 2025, in support of class certification (ECF 66-2) (the "Efficiency Report").

## I.    Lead Plaintiff's Damages Methodology Satisfies *Comcast*

Lead Plaintiff proposes to calculate damages using the standard "out-of-pocket" measure applicable in Section 10(b) securities class actions.  *See, e.g.*, *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 428 (S.D.N.Y. 2015) ("Damages under the securities fraud statute are determined by use of the 'out-of-pocket' measure for damages.  []The Supreme Court adopted the out-of-pocket measure of damages in *Affiliated Ute* [and] held that 'the correct measure of damages . . . is the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct.'").[3]

This methodology would measure damages as the difference between prices at the time of Class members' sales during the Class Period and $48 per share, the price of Emerson's undisclosed offers at that time.  *See* Ex. A, Merits Report ¶¶21, 134.  This approach to damages applies on a common basis to all Class members and flows directly and exclusively from Lead Plaintiff's theory of liability, which the Court has explained is that Defendants failed "to disclose Emerson's offers while buying back NI's securities" and that "[b]ecause of the omission of the offer, shareholders assert that they sold their common stock at artificially depressed prices."  MTD Order (ECF 42) at 2, 15; *see also* Ex. A, Merits Report ¶¶29-31.  Lead Plaintiff's "out-of-pocket" methodology would compensate investors for that specific harm – *i.e.*, the proposed methodology measures damages based only on the degree to which Class members sold shares during the Class Period at artificially depressed prices due to the omission at that time of Emerson's higher $48 per

---

[3] *See also Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1075 (S.D.N.Y. 1990) ("With respect to defrauded sellers under Rule 10b–5, the Supreme Court has recognized that the proper measure of out-of-pocket loss is the difference between the value of what the seller received and the value of what the seller would have received had there been no fraudulent conduct."); *In re Upstart Holdings, Inc. Sec. Litig.*, 348 F.R.D. 612, 629 (S.D. Ohio 2025) ("The out-of-pocket damages model 'is the standard measurement of damages in Section 10(b) securities cases . . . *Comcast* did not change this.") (citation modified).

share offer. *Id.* ¶¶21, 134. Lead Plaintiff's proposed damages methodology therefore satisfies *Comcast*. *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) ("*Comcast* held that a model for determining classwide damages . . . must actually measure damages that result from the class's asserted theory of injury."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015) ("Plaintiffs' model survives the minimal scrutiny required under *Comcast* and Rule 23(b)(3)—their theory of liability matches their theory of damages[.]").

Defendants nevertheless assert three baseless arguments under *Comcast*.

*First*, Defendants argue that the damages methodology discussed in Dr. Cain's Efficiency Report is insufficiently detailed. *See* Opp. Br. at 3-7. This argument ignores that Rule 23 "does not require a plaintiff to set forth a detailed model for calculating damages at the class certification stage" but rather only requires showing that the "damages model 'measure[s] damages that result from the class's asserted theory of injury.'" *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc*., 2024 WL 1497110, at *24 (S.D.N.Y. Apr. 5, 2024) (citation omitted). This argument also ignores that the deadline for opening merits expert reports – which would include a detailed opinion on damages – is July 28, 2025, the date of this reply brief. That Merits Report presents a detailed damages analysis and methodology common to all Class members.[4] Ex. A, Merits Report ¶¶134-141.

---

[4] Defendants also argue that Dr. Cain "ignores how a class member's purchase of NI stock at allegedly deflated prices" would impact damages if they sold after the corrective disclosures. Opp. Br. at 6 n.3; *see also id.* at 10 ("repurchases might have raised the sale price"). But investors' post-class period transactions after full disclosure are "essentially irrelevant" to this action, *Rosen v. Textron, Inc.*, 369 F. Supp. 2d 204, 209 (D.R.I. 2005), and Defendants provide no explanation or authority regarding how or why such post-class period developments should impact damages or class certification here. Regardless, any such limitation imposed by the Court would be applied in a routine and arithmetic fashion at the claims stage. *See, e.g.*, Ex. A, Merits Report, ¶¶139 n.179, 142, Appendix C, ¶54.

*Second*, Defendants attempt to conjure a *Comcast* argument by wrongly imposing an inapplicable damages "cap" imported from Section 20A of the Exchange Act, a different cause of action not implicated in this Section 10(b) case. *See* Opp. Br. at 7-12. This argument ignores that "section 20A places no 'limit or condition' on the plaintiffs' right to damages under section 10(b)." *Gordon v. Sonar Cap. Mgmt. LLC*, 962 F. Supp. 2d 525, 532 (S.D.N.Y. 2013) (quoting 15 U.S.C. §78t-1(d)). Indeed, the Second Circuit has expressly held that the "out-of-pocket" measure applies in Section 10(b) insider-trading claims against fiduciaries like Defendants (in contrast to claims against "tippees" against whom disgorgement may apply). *See Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 168 (2d Cir. 1980) ("In such cases of fraud by a fiduciary intended to induce others to . . . sell stock the accepted measure of damages is the 'out-of-pocket' measure.").[5] Regardless, Defendants' own expert admits that even if damages were limited to disgorgement – and they are not – this measure of damages would likewise apply in common to all Class members. *See* Ex. B, Denis Tr. at 36:25-38:6.[6]

---

[5] *Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 344 (S.D.N.Y. 2014), cited at Opp. Br. at 8, is in *accord*. *See id*. at 340 ("[W]hen only a disgorgement measure of damages is used, a tippee who trades is liable for the entire difference between the price at which he sold and the price the stock reached after the tip became known.") (quoting *Elkind*, 635 F.2d at 173 n.29). *Kaplan* involved Section 10(b) and 20A claims arising from an insider trading scheme by a tippee hedge fund. *Id*. *Kaplan* is Defendants' leading (and only in-circuit) authority for their argument that Section 20A damages apply in Section 10(b) cases, but *Kaplan* says no such thing, and the full quote without Defendants' editing states: "**in claims under Section 20A**, damages are limited to profits gained and losses avoided based on the defendant's unlawful acts." *Id*. at 344 (emphasis added); *cf.* Opp. Br. at 8.

[6] Defendants place substantial emphasis on their tangential contention that, according to Dr. Denis, a corporation by definition cannot "profit" from share repurchases under Section 20A, which is irrelevant to Class members' damages under Section 10(b). Opp. Br. at 9-10. Dr. Cain refutes this contention in Appendix C of the Merits Report, and Dr. Denis himself admits that this contention ███████████████████████████████████████████████. Ex. B, Denis Tr. at 65:21-66:4; 66:10-18.

Defendants also ignore that their proposed disgorgement remedy is itself inconsistent with Lead Plaintiff's theory of liability here.  This case asserts claims on behalf of investors who sold their shares at artificially low prices and alleges that Class members' sales would have occurred at substantially higher prices if Defendants had complied with their disclosure obligations and informed the investing public about Emerson's premium offer.  As Gerard Grysko, Deputy Director of WCERS, testified:

> [T]he system's responsible for paying pensions.  []So we need investment income, and we need all the income.  [S]o if we didn't get the maximum amount we could have got absent those disclosures, we were damaged, but -- because we owe -- we owe the pension -- we have a fiduciary responsibility to pay these pensioners every month[.]

Ex. C, Grysko Tr. at 42:3-12.  Defendants' own expert acknowledges this harm to Class members, explaining that "shareholders that sold undervalued shares as part of the repurchase transaction(s) are economically worse off on the shares that they sold," and describing this harm as a "wealth transfer from the selling shareholders."  ECF 70-1 ¶31.[7]  This case seeks to recover that "out-of-pocket" damage to investors, and Defendants' proposed Section 20A disgorgement remedy is inconsistent with Class members' Section 10(b) claims.

*Third*, Defendants argue that it would be improper to measure artificial deflation by analyzing the corrective disclosures that occurred on January 13 and 17, 2023 because, according to Defendants, there is a "mismatch" between these corrective disclosures and the information Defendants concealed during the Class Period.  Opp. Br. at 12-16.  This argument is irrelevant because Dr. Cain does not measure artificial deflation in this way (and has never indicated he

---

[7] *See also* Ex. B, Denis Tr. at 75:2-5.

would).[8]  By contrast, Defendants' expert admitted that event studies and other standard economic tools *can* be used to measure the impact on a stock price of a potential merger or acquisition offer. *See* Ex. B, Denis Tr. at 45:16-21; 46:14-20; 47:5-12; 48:6-12; 48:18-22.  Dr. Cain's Merits Report uses such methodologies to measure artificial deflation and to conclude that the but-for price would have been at least $48 per share had Defendants disclosed Emerson's offers.  *See* Ex. A, Merits Report ¶¶134-138.

## II.    The *Affiliated Ute* and *Basic* Presumptions of Classwide Reliance Apply

Lead Plaintiff and Class members are entitled to a presumption of classwide reliance. Defendants assert that Lead Plaintiff has not sufficiently demonstrated the materiality of Defendants' omissions to invoke the *Affiliated Ute* presumption.  That is wrong.  "To invoke the *Affiliated Ute* presumption, the plaintiffs need only show that the omissions were material -- a question of fact common to the entire class." *Puddu v. NYGG (Asia) Ltd.*, 2022 WL 2304248, at *3-*5 (S.D.N.Y. June 27, 2022).  Here, the materiality of the omitted information concerning Emerson's credible high-premium offer is evident from facts already before the Court, such as Emerson's May and June 2022 offer letters and the Proxy concerning the Emerson acquisition (which are quoted extensively in the Complaint and are otherwise publicly available).  ECF 29 ¶¶3, 29, 34-36, 38, 40-42, 44; *see also Puddu*, 2022 WL 2304248, at *4 (finding materiality satisfied for purposes of *Affiliated Ute* based on allegations in amended complaint); *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 184 (S.D.N.Y. 2012) ("[T]he Court reiterates its previous finding and, on the facts before it, concludes that the alleged misrepresentations or omissions . . . were material.").

---

[8] There is no requirement that a corrective disclosure be a "mirror image" of the alleged omissions. *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *14 (S.D.N.Y. July 10, 2019); *see also Pearlstein v. Blackberry Ltd.*, 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021) (same).

Moreover, Dr. Cain's Merits Report contains powerful evidence of materiality, including his expert opinion that the omitted information concerning Emerson's offers was material information during the Class Period, as well as supporting citations and quotations from over 80 internal National Instruments documents.  Ex. A, Merits Report ¶¶35-94.  For example, Defendants' documents show that on August 10, 2022 – just two days before the Company began its buyback spree – ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████ – clearly indicating Emerson's strong and continuing acquisition interest at that time, and prompting National Instruments's Chief Legal Officer, Eddie Dixon, to note that the ████████████████████████████████████████ *Id*. ¶¶4, 74-75.  As Mr. Dixon stated later in the Class Period, "████████████████████████████████ ████████████████████████████████████████████." *Id.* ¶90.

The Court should reject Defendants' invitation to adjudicate materiality at class certification.  A plaintiff "must prove materiality to prevail on the merits [but] such proof is not a prerequisite to class certification." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013); *see also Puddu*, 2022 WL 2304248, at *3 ("In a securities fraud case, elements such as materiality . . . are common questions that need not be adjudicated before a class is certified.") (quotation modified); MTD Order (ECF 42) at 18 ("Materiality is usually decided at the summary judgment stage or at trial[.]").  Defendants' brief is replete with unsupported and untrue factual assertions – *e.g.*, Opp. Br. at 18 ("As of August 2, 2022, the prospects of a deal with Emerson were dead").  And the Goodwin report is a premature and inadequate attempt to "prebut" materiality.  Indeed, Dr. Goodwin formed his "opinion" by reviewing roughly a dozen documents produced in this case, even though the same documents that Dr. Cain reviewed (and many more) were

presumably available to Dr. Goodwin. The Court should disregard Defendants' flimsy effort to cut short Class members' claims with baseless factual findings at class certification.[9]

Class members are also entitled to the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988*).* This case involves Class members' common reliance on a properly functioning efficient market. *Basic* presumes "reliance on a market that fully digests all available material information about a security and incorporates it into the security's price[.]" *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 291 (S.D.N.Y. 2003). Class members here sold their shares at artificially low prices in reliance on a market that was efficiently factoring all available public information into the prices at which Class members sold, and if Defendants had complied with their disclosure obligations and informed investors of Emerson's high premium offer, the Company's stock price would have – by operation of the efficient market for National Instruments common stock – risen substantially, such that Class members would have sold at higher prices. This is the essence of the fraud-on-the-market presumption under *Basic*, and Defendants do not identify a single individualized issue that would predominate over common questions of classwide reliance on the same efficient market. "Courts presume reliance where it is logical to presume that reliance in fact existed." *Id.* at 292 (citation modified). The logic of this case dictates that Class members sold their shares in common reliance on the efficient market for National Instruments common stock and are also entitled to the *Basic* presumption.

---

[9] Defendants failed to make Dr. Goodwin available for a deposition before the deadline for this reply brief. Lead Counsel anticipates taking Dr. Goodwin's deposition in the coming weeks and reserves all rights concerning Dr. Goodwin and his testimony, including the right to seek the exclusion of his testimony from evidence at the appropriate time. Dr. Cain refutes Dr. Goodwin in his Merits Report. *See, e.g.*, Ex. A, Merits Report, Appendix C ¶¶1-34.

### III.   Lead Plaintiff Alleges the Proper Class Definition

Lead Plaintiff alleges a Class Period from August 12, 2022 to September 30, 2022, the period during which Defendants carried out their insider-trading scheme.  The Court should certify this Class Period.  The evidence shows a concerted insider-trading scheme by Defendants that occurred throughout this period, and a factfinder could readily conclude that Defendants owed a duty of disclosure to their shareholders during this entire time.  *See, e.g.*, *In re Am. Bus. Computs. Corp. Sec. Litig.*, 1994 WL 848690, at *4 (S.D.N.Y. Feb. 24, 1994) ("[A] class action may be maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information[.]"); *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 559 F. Supp. 800, 803, 805 n.5 (S.D.N.Y. 1983) ("[T]he duty to 'disclose or abstain' is owed . . . to those who trade 'during the same period' as, or 'contemporaneously' with, the possessor of inside information.").

The Court should reject Defendants' baseless effort to split and truncate the Class Period. The evidence shows that Defendants' Class Period repurchases were part of a single insider-trading scheme launched at the outset of the Class Period and carried out as planned over the ensuing five-week period.  On July 19, 2022, Defendant McGrath wrote that ███████████████ ████████ against a potential acquisition by Emerson and that ██████████████ to do so. Ex. A, Merits Report ¶60.  By August 4, the Company's Chief Legal Officer was searching for a "████████████████████████████████," and by August 7, 2022, Defendant McGrath specifically ███████████████, telling Defendant Starkloff to ████████████ ██████" despite ██████████████████████████████████████████ ██████████." *Id*. ¶¶68-69.  As McGrath summarized the views of board members: "████████ ████████████████████████████████████████████████████[.]" *Id*. ¶69.  As noted above, by August 10, 2022, ████████████████████████████████

- 9 -

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████. *Id.* ¶¶74-75.

Nevertheless, while in possession of material non-public information concerning Emerson's offers, on August 11, 2022, Defendants established a manipulative ██████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████. *See* Ex. A, Merits Report ¶¶78, 81; Opp. Br. at 24.  These facts reflect one continuous scheme of insider trading throughout the Class Period.

Defendants ask the Court to hold as a matter of law that they owed no disclosure duty to investors who sold shares during the nine market days between National Instruments' August open-market repurchases and the commencement in September of repurchases under the August 11th 10b5-1 plan.  This argument ignores that "the length of time constituting 'contemporaneous trading' is not a fixed period but must be determined on a case by case basis," and that the period at issue here is within the bounds courts have found acceptable.  *In re Worlds of Wonder Sec. Litig.*, 1990 WL 61951, at *8 (N.D. Cal. Mar. 23, 1990); *see also In re GPC Biotech AG Sec. Litig.*, 597 F. Supp. 2d 412, 427 (S.D.N.Y. 2009) ("Sales within six days or even ten days may be 'contemporaneous'"), *vacated on other grounds*, 2009 WL 5125130 (S.D.N.Y. Dec. 29, 2009).

The record thus supports the continuous five-week Class Period that Lead Plaintiff proposes and, in all events, the contemporaneous-trading issue may be decided later and on a full record.  *See Am. Bus. Computs.*, 1994 WL 848690, at *4 (trading's contemporaneousness "is an issue appropriately reserved for the trier of fact"); *Worlds of Wonder*, 1990 WL 61951, at *8 ("[I]t would be premature for the court to determine conclusively the parameters of the 'contemporaneous trading' window . . . If Plaintiffs establish that Defendants violated the insider

trading laws then the issue concerning the 'contemporaneousness' of . . . class members' purchases . . . can be addressed separately.").

## IV.    CONCLUSION

The Court should certify the proposed class.

DATED:  July 28, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON
NOAM MANDEL
DESIREE CUMMINGS
JONATHAN ZWEIG
JAI CHANDRASEKHAR
CHRISTOPHER T. GILROY
ALYSSA H. PLASCOFF


*/s/ Noam Mandel*

NOAM MANDEL
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone:  (212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcummings@rgrdlaw.com
jzweig@rgrdlaw.com
jaic@rgrdlaw.com
cgilroy@rgrdlaw.com
aplascoff@rgrdlaw.com

*Lead Counsel for the Class*

WOLF POPPER LLP
ROBERT C. FINKEL
JOSHUA W. RUTHIZER
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone:  (212) 759-4600
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com

*Additional Counsel*

- 11 -

## CERTIFICATE OF WORD COUNT

1.      Pursuant to Rule 7.1 of the United States District Court for the Southern District of New York, the undersigned counsel certifies that the foregoing brief was prepared on a computer using Microsoft Word.  A proportionally spaced typeface was used as follows:

> Name of Typeface: Times New Roman
> Point Size in Body: 12 (footnotes, 12)
> Line Spacing in Body: Double (footnotes, single)

2.      The total number of words in the brief, inclusive of point headings and footnotes and exclusive of the caption, table of contents, table of authorities, signature block, and this Certification, is 3,492 words.  By operation of Microsoft Word's word count function, this number includes legal citations and certain forms of punctuation.

_/s/ Noam Mandel_
NOAM MANDEL