# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE NATIONAL INSTRUMENTS CORPORATION SECURITIES LITIGATION | Case No. 1:23-cv-10488-DLC CLASS ACTION |

EXPERT REPORT OF MATTHEW D. CAIN, PH.D.

July 28, 2025

**<u>CONFIDENTIAL</u>**

**Table of Contents**

I.    Introduction ................................................................................................................. 1

II.   Qualifications .............................................................................................................. 2

III.  Summary of Opinions ................................................................................................. 5

IV.   Relevant Background .................................................................................................. 7

    A.    Overview of National Instruments ................................................................... 7

    B.    Summary of the Alleged Omissions and Plaintiff's Related Claims .............. 9

    C.    Market Efficiency and Damages on a Class-Wide Basis ............................... 10

V.    Economic Importance of the Alleged Omissions ..................................................... 11

    A.    Timeline of M&A-Related Events Associated with Emerson's Offers to Acquire National Instruments Common Stock ................................................ 12

    B.    Fundamental Principles of Finance, Valuation, and Mergers & Acquisitions Analysis ............................................................................................................ 42

    C.    Event Study .................................................................................................... 47

    D.    Financial Analyst and Media Commentary ................................................... 50

VI.   Measuring the Economic Link Between the Alleged Omissions and NI's Common Stock Prices (Loss Causation) ................................................................................... 53

    A.    The Economic Link ........................................................................................ 53

    B.    Measuring Economic Losses ......................................................................... 55

    C.    Artificial Deflation in NI's Common Stock Prices ........................................ 56

VII.  Damages .................................................................................................................... 58

    A.    Sections 10(b) and 20(a) Damages for Common Stock .................................. 58

    B.    Adaptation to Alternative Findings ................................................................ 62

Appendix C. Replies to the Goodwin Report and the Denis Report ................................ 78

## I.    Introduction

1.    In connection with Plaintiff's motion for class certification, on May 2, 2025, I submitted an expert report in this matter (my "Efficiency Report") in which I concluded that:

(a)    National Instruments Corporation ("National Instruments," "NI," or the "Company") Common Stock traded in an efficient market throughout the Class Period; and

(b)    Damages in this matter for National Instruments Common Stock can be calculated on a class-wide basis subject to a common methodology for Plaintiff's Section 10(b) and 20(a) claims.

2.    For the merits issues in this case, Plaintiff's Counsel have asked me to assess:

(a)    whether the omissions alleged in this matter pertained to value-relevant information that investors would consider economically material;[1]

(b)    whether there is an economic link, which can be reliably measured, between the alleged omissions and NI's Common Stock prices, which allegedly caused losses to Class members (*i.e.*, loss causation);

(c)    whether the alleged omissions caused any artificial deflation[2] in the price of National Instruments Common Stock;

(d)    what was the quantity of any artificial deflation for National Instruments Common Stock on a per-share basis for each day of the Class Period caused by the alleged omissions; and

(e)    what methods can appropriately quantify Sections 10(b) and 20(a) class-wide damages for National Instruments Common Stock in this matter.

3.    In addition, I have received the June 16, 2025 expert reports of Prof. David J. Denis ("Denis Report") and Prof. Shane Goodwin ("Goodwin Report"). Plaintiff's Counsel have asked me to review, evaluate, and respond to those reports.

---

[1] As discussed herein, the terms "materiality" or "importance," as used in my testimony, refer to the concepts of "economic materiality" and "economic importance" from the perspective of a financial economist who has empirically examined the Common Stock prices of National Instruments, along with an examination of analysts' commentary, media discussion, and academic research.

[2] Throughout this Report, I refer to artificial "deflation" – which indicates a negative amount of artificial inflation, *i.e.*, artificially depressed or lowered stock prices.

1

4.      This Report does not contain a verbatim account of every detail of my expected testimony, and I may address additional topics in response to arguments or assertions offered by Defendants and their experts during this action. Additionally, the analysis and opinions contained in this Report are based on information available as of the date of the Report. I understand that discovery is ongoing. I thus reserve the right to amend, refine, or supplement this Report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

5.      The remainder of this Report is organized as follows: **Section II** states my qualifications as an expert. **Section III** summarizes my opinions in this Report. **Section IV** provides an overview of the relevant background in this matter. **Section V** assesses the economic importance of the alleged omissions in this matter. **Section VI** measures the economic link between the alleged omissions and NI's Common Stock prices (loss causation), and presents my calculation of artificial deflation in NI's Common Stock prices during the Class Period. **Section VII** presents the calculation of damages for Class members. I discuss my consideration and response to the Denis Report and Goodwin Report in **Appendix C**.

## II.    Qualifications

6.      I hold a Ph.D. in Finance from Purdue University and I am a Senior Fellow at the New York University School of Law. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.

7.      My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and

2

shareholder activism. I previously held fellowships with the Berkeley Center for Law and Business at UC Berkeley, Vanderbilt Law School, and the Harvard Law School Program on Corporate Governance, where I participated in teaching, research, and academic seminars.

8. Before my current roles, I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, improper revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities law violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

9. Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

10. Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements

3

of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

11. In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as Appendix A.

12. I have published research in leading peer-reviewed journals in the fields of finance, accounting, law, and economics, including: *Journal of Financial Economics*, *Journal of Law and Economics*, *Journal of Accounting and Economics*, *Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications.

13. In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters. As an expert in financial economics, I have conducted analyses or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation/damages in over 60 cases. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

14. The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $1,100 per hour for my work on this matter. I have been assisted in this matter by my staff at Cleveland Analytics, LLC working under my direction, and I receive additional compensation based upon their billings. My compensation is in no way contingent on the outcome of this case.

15.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III.    Summary of Opinions

16.     As stated in my Efficiency Report, it is my opinion that: (a) the market for shares of National Instruments Common Stock was efficient throughout the Class Period, meaning that widely available public information was quickly incorporated into stock prices; (b) damages in this matter for National Instruments Common Stock can be calculated on a class-wide basis subject to a common methodology.[3] I continue to hold the opinions expressed in my Efficiency Report and reiterate them herein.

17.     Based on my further analysis to date, I have reached the following, additional opinions:

18.     *Opinion 1:* The alleged omissions in this matter were economically material, in that they relate to information that would affect a reasonable investor's investment decisions, including the prices at which they traded NI's Common Stock. I base my opinion on the importance of this information on: (A) details regarding the timeline of M&A-related events associated with Emerson Electric Co.'s ("Emerson") offers to acquire National Instruments Common Stock prior to and during the Class Period; (B) the application of fundamental principles of finance, economics, valuation, and M&A analysis; (C) my event study analysis, which establishes statistically significant increases in the prices of National Instruments Common Stock following the post-Class

---

[3] Efficiency Report ¶3. Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for Plaintiff's pending claims. In particular, the out-of-pocket damages methodology, which is used in virtually all Section 10(b) securities class actions, is appropriate and applicable here.

Period M&A disclosures; and (D) evidence that financial analysts and media consider M&A developments to be value-relevant for investors.

19.    ***Opinion 2:*** There is an economic link, which can be reliably measured, between the alleged omissions and NI's Common Stock prices. I establish this link and measure damages based on the tools and fundamental principles of finance, economics, valuation, and mergers & acquisitions analysis, and financial analyst and media commentary. My event study documents that the January 13, 2023 and January 17, 2023 disclosures elicited statistically significant market reactions, consistent with the market's reassessment of NI's value upon learning of credible acquisition interest. These reactions, along with the other tools and principles summarized above provide a reliable basis for quantifying the economic impact of the alleged omissions.

20.    ***Opinion 3:*** The alleged omissions introduced artificial deflation into the prices of National Instruments Common Stock, causing investors to sell their stock at artificially depressed prices during the Class Period. To reach this conclusion, I have analyzed the timing and content of the alleged omissions, considered relevant internal documents leading up to and during the Class Period, and applied economic theory and event study methodology to assess how the allegedly omitted information would have affected stock prices had it been timely disclosed.[4]

21.    ***Opinion 4:*** Based on my loss causation analysis, I calculate the amount of artificial deflation in National Instruments Common Stock. Based on a common formula, which can accommodate any modification deemed necessary by a factfinder, at any point during the Class Period, the level of artificial deflation was equal to the difference between $48.00 per share and the actual sale price at the time an investor sold his, her, its, or their National Instruments Common Stock. This calculation is based on Emerson's first and second offers to acquire NI, both of which

---

[4] I note that my artificial deflation estimate is not calculated as the amount of the stock price increase following the January 13, 2023 and January 17, 2023 disclosures. *See* **Sections V-VI**.

6

were for $48.00 per share in cash, and it is therefore conservative, including because NI's management and Board stated that Emerson's $48.00 offers undervalued the Company, Emerson indicated that it was willing to raise its offer (as it indeed did), and public disclosure of Emerson's offer was likely to prompt competing, higher offers (as it indeed did).

22.    ***Opinion 5:*** I provide a method for calculating Section 10(b) and 20(a) damages on a per share basis for each Class member using the standard out-of-pocket methodology. This method measures damages as the artificial deflation per share at the time of sale on shares purchased prior to the start of the Class Period (subject to additional limitations explained in **Section VII**), as determined by the factfinder. An investor's total damages would equal the aggregate of their per-share damages. This methodology can be applied mechanically on a Class-wide basis to each Class member's trading data to calculate each Class member's damages at the claims stage of the litigation.

23.    This Section 10(b) and 20(a) damages formula is flexible and able to incorporate alternative findings regarding the quantification and timing of artificial deflation, including how it evolved over the Class Period.

24.    ***Opinion 6:*** Nothing in the Denis Report or Goodwin Report disturbs my Efficiency Report opinions. Moreover, I document several flaws in both the Denis Report and Goodwin Report, rendering their conclusions unreliable and irrelevant.

## IV.    Relevant Background

### A.  Overview of National Instruments

25.    National Instruments, founded over 40 years ago, was built on a mission to develop "technology to connect instruments to computers in order to accelerate the testing and

7

measurement of innovative technology."[5] The Company grew into a global player in automated test and measurement systems and was publicly traded on the NASDAQ stock exchange under the trading symbol "NATI."[6]

26.    After decades as a publicly traded company, National Instruments entered a new strategic chapter in 2022 via merger discussions with Emerson. This process was set in motion on May 16, 2022, when Emerson CEO Surendralal ("Lal") Karsanbhai ("Karsanbhai") contacted National Instruments CEO Eric Starkloff ("Starkloff") to express interest in a potential acquisition. On May 25, 2022, Emerson followed up with a formal non-binding all-cash proposal of $48 per share, emphasizing no financing contingency, parallel due diligence, and transaction certainty. After engaging BofA Securities, Inc. ("Bank of America" or "BofA") on June 10 for valuation and strategic advice, and with legal counsel from Wachtell, Lipton, Rosen & Katz ("Wachtell"), NI's Board rejected Emerson's offer on June 16, concluding it significantly undervalued the Company.[7]

27.    On June 22, 2022, Emerson reaffirmed its $48 proposal. NI's Board held two meetings in July where the Board considered Emerson's offer and strategized on communications and momentum ahead of earnings. On November 3, 2022, Emerson increased its offer to $53 per share, disclosed that it had acquired 2.3 million National Instruments shares in the open market, and signaled its intent to purchase additional shares. Emerson also threatened to nominate its own slate of directors at NI's upcoming annual meeting.

28.    On January 13, 2023, National Instruments publicly announced a strategic review process. On January 17, 2023, Emerson publicly announced an offer of $53.00 per share for

---

[5]    National    Instruments,    SEC    Form    10-K,    Feb.    21,    2023,    p.    3,    available    at: https://www.sec.gov/Archives/edgar/data/935494/000093549423000008/0000935494-23-000008-index.htm.
[6] *Id*., p. 1.
[7]    National    Instruments,    SEC    Schedule    14A,    May    25,    2023,    available    at: https://www.sec.gov/Archives/edgar/data/935494/000114036123026665/0001140361-23-026665-index.html    ("NI Proxy"), pp. 25-26.

National Instruments. On April 12, 2023, the National Instruments Board unanimously approved an acquisition of the Company by Emerson for $60.00 per share, and executed the merger agreement with Emerson. On October 11, 2023, the merger closed, and National Instruments became a wholly owned subsidiary of Emerson. Shareholders received $60 per share in cash, NI's stock was delisted from NASDAQ, and the Company ceased SEC reporting. The $8.2 billion deal marked NI's integration into Emerson's Test & Measurement segment.[8]

### B. Summary of the Alleged Omissions and Plaintiff's Related Claims

29.     This section summarizes Plaintiff's allegations, which focus on claims that National Instruments and its executives concealed a premium acquisition offer from Emerson while repurchasing stock at depressed prices. Plaintiff argues these actions violated federal securities laws and harmed shareholders who sold at artificially deflated prices.

30.     The Complaint alleges that in May of 2022, Emerson approached National Instruments with an offer to acquire all outstanding shares of NI's Common Stock for $48 per share in cash, a significant premium and with high transaction certainty.[9] Emerson subsequently stated its willingness to increase its offer above $48 in late June of 2022.[10] National Instruments allegedly engaged in a scheme to repurchase millions of shares of its own Common Stock in August and September of 2022 while failing to publicly disclose this offer.[11]

31.     The Complaint alleges that Defendants' fraudulent scheme caused NI's Common Stock price to be artificially deflated, which led Plaintiff to sell their National Instruments Common Stock at artificially deflated prices, causing investor losses.[12] On January 13, 2023,

---

[8] "Emerson Completes Acquisition of NI, Advancing Global Automation Leadership," Emerson, October 11, 2023. Available at: https://www.emerson.com/en-us/news/2023/emerson-completes-ni-acquisition.
[9] Complaint ¶¶ 3, 31.
[10] NAT-SL-00002992.
[11] Complaint ¶¶ 4, 53-54.
[12] Complaint ¶¶ 16, 97, 101, 115.

National Instruments announced a strategic review to explore a sale of the Company, and on January 17, 2023, Emerson publicly announced its offer to acquire National Instruments Common Stock.[13] Both of these disclosures allegedly revealed the relevant truth to investors and caused a significant increase in NI's Common Stock price.[14]

32.    **Exhibit 1** illustrates the closing stock price and trading volume for shares of National Instruments Common Stock during this period.

### C. Market Efficiency and Damages on a Class-Wide Basis

33.    In my Efficiency Report, I empirically analyzed the Common Stock of National Instruments using the *Cammer* and *Krogman* factors that are regularly used by courts to gauge market efficiency. Taken together, these metrics provide strong economic evidence that supports my opinion that National Instruments Common Stock traded in an efficient market throughout the Class Period.[15] Neither Defendants nor their experts have offered any rebuttal to my efficiency analysis, and no contrary evidence has been presented challenging the efficiency of National Instruments Common Stock during the Class Period.

34.    I also described in my Efficiency Report how the "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act.[16] I concluded that National Instruments Common Stock damages in this matter can be calculated on a class-wide basis utilizing a common methodology.[17] As discussed in **Appendix C**, nothing in the Denis Report or Goodwin Report disturbs this opinion.

---

[13] Complaint ¶¶ 27-28.
[14] Complaint ¶¶ 72-81.
[15] Efficiency Report ¶ 3.
[16] Efficiency Report ¶¶ 90-107.
[17] *Id.*

## V.    Economic Importance of the Alleged Omissions

35.    As a financial economist, I consider economic materiality to relate to information, news, announcements, or other events that would impact the valuation of a company and its securities, and thus, investors' demand for those securities. As such, my opinions in this Report regarding economic materiality are based upon my analysis of such information as it pertains to finance, economics, and valuation, and are not intended to represent legal analyses or conclusions.

36.    An element of the loss causation analysis involves an examination of fundamental principles of finance, economics, valuation, and mergers and acquisitions analysis, to assess whether the subject matter of the alleged omissions is economically material, and thus, value-relevant to investors. While I understand that materiality has a legal definition in matters such as this one, for the purposes of my Report, the term "economic materiality" means the importance of information to the market (and thus, investors), such that it would affect the valuation of a security and investors' decisions to buy or sell the security. Therefore, the relevant question is whether the allegedly omitted information about Emerson's offers to acquire NI Common Stock would have been expected to alter investors' assessment of NI's value, and thereby influence investors' trading decisions and their sale prices.

37.    For purposes of this Report, I assume that the omissions Plaintiff alleges in this matter misinformed investors relating to Emerson's offer to acquire NI Common Stock. I conclude that the omissions alleged in this matter were economically material to investors in National Instruments Common Stock. I base my opinion of the importance of this information on: (A) details regarding the timeline of M&A-related events associated with Emerson's offers to acquire National Instruments Common Stock prior to and during the Class Period; (B) the application of fundamental principles of finance, economics, valuation, and M&A analysis; (C) my event study analysis, which establishes statistically significant increases in the prices of National

11

Instruments Common Stock following the post-Class Period M&A disclosures; and (D) evidence

that financial analysts and media consider M&A developments to be value-relevant for investors.

### A. Timeline of M&A-Related Events Associated with Emerson's Offers to Acquire National Instruments Common Stock

38.    On May 16, 2022, Karsanbhai, Emerson's CEO, contacted Starkloff, NI's CEO, to request an in-person meeting to discuss a potential all-cash acquisition of NI by Emerson.[18] National Instruments declined to meet in person and offered a phone call instead.

39.    On May 25, 2022, Emerson submitted a written, non-binding proposal to acquire National Instruments for $48 per share in cash. The letter emphasized deal certainty, noting that the offer was not subject to financing contingency.[19]

40.    On May 26, 2022, Wachtell, NI's legal counsel, circulated a slide deck titled ████████████████████████████████████████████████████, outlining legal and strategic considerations in the event of a takeover. The materials addressed directors' fiduciary duties and takeover response tactics. Among the recommended actions were to "████████ ███████████████████████" and to "████████████████████████████████████."[20] The presentation also included a ████████████████████████████, listing 12 governance-related features relevant to takeover defense. ██████████████████████████████ ███████████████████████████████.[21]

41.    Between May 26 and June 10, 2022, National Instruments retained BofA as its financial advisor to assist with an evaluation of Emerson's offer.[22] On June 10, National Instruments executed an engagement letter stating that BofA would "██████████████████

---

[18] NAT-SL-00001267, p. 1.
[19] NAT-SL-00001114.
[20] NAT-SL-00025289.
[21] NAT-SL-00025292-25294.
[22] NAT-SL-00001554-566.



" and "

." The agreement included

. It also granted BofA "                           ," to serve as

financial advisor in any change-of-control transaction related to an acquisition attempt, with

"

"[23] The structure and terms of the engagement letter provided for BofA to be compensated

for their continued assistance with merger negotiations over the coming quarters, as well as upon

a successful acquisition of National Instruments.

42.    On June 10, 2022, internal communications reflected increasing operational

coordination around a potential transaction codenamed "Project Wolverine." An email assigning

code names—"Nuthatch" for Emerson and "Swift" for National Instruments—circulated to Bank

of America, NI's external financial advisor.[24] The involvement of outside advisors and use of code

names are consistent with the formal protocols typically used during confidential M&A

discussions.[25]

43.    During June 12-16, 2022, internal emails show National Instruments executives'

active evaluation of how much capital to reserve for additional share repurchases in the second

half of the year.[26] By then, the Company had already repurchased $70 million of the $100 million

authorized for 2022.[27] Management discussed converting its revolving line of credit into a term

---

[23] *Id.*
[24] NAT-SL-00006807.
[25] Bruner, R. F. (2004), *Applied Mergers & Acquisitions*, John Wiley & Sons, Inc. ("Bruner"), p. 736.
[26] NAT-SL-00002988.
[27] *Id.*

loan facility, in part to provide flexibility for future buybacks.[28] The strategy was described as opportunistic, targeting periods when the stock appeared undervalued.[29]

44.    On June 14, 2022, Wachtell, NI's outside counsel, delivered a presentation to the Board regarding Project Wolverine.[30] The presentation covered legal obligations and strategic considerations in evaluating and responding to takeover proposals, including illustrative response options to Emerson's May 25 letter. The slides noted that an ███████████████████████ ███████████████████████████████████" and that "███████████████████████████ ███████████████████"[31] Notably, the materials included ███████████████████ ████████████████████████████████████████████████████ ███████████████████████████—both of which involved transitions from friendly to hostile engagement.[32]

45.    That same day, Bank of America presented its strategic analysis of Project Wolverine to the Board.[33] The deck included NI's financial perspective, a preliminary valuation overview, and a pro forma analysis of Emerson. As part of the valuation section, Bank of America prepared a "Standalone Valuation Summary" for National Instruments based on adjusted EBITDA and earnings multiples.[34] Using internal management forecasts, the implied valuation ranged from ████████████████████, depending on the methodology. A separate analysis based on analyst forecasts yielded a narrower range of ████████████ per share. As part of the pro forma section, Bank of America conducted a Debt Capacity Analysis assessing ████████████████████

---

[28] *Id.*
[29] *Id.*
[30] NAT-SL-00022986.
[31] NAT-SL-00022991.
[32] NAT-SL-00022998; NAT-SL-00023001.
[33] NAT-SL-00001513.
[34] NAT-SL-00001522.

███████████████. Based on this analysis, the presentation indicated that "████████████████

██████████████."[35]

46.　　　Later that day, on June 14, 2022, NI's Board rejected Emerson's $48 offer, stating that it "substantially undervalues the Company, including relative to the value able to be realized and unlocked from execution of the Company's strategic plan and relative to the valuation methodologies presented by BofA."[36] At the same board meeting, directors discussed "potential courses of action in the event Wolverine were to escalate the matter publicly or otherwise, respond with a higher offer or if other scenarios were to occur," according to the meeting minutes.[37] The record indicates that, despite NI's formal rejection of the proposal, the Board was actively preparing for further developments with Emerson.

47.　　　On the same day, Karen Rapp ("Rapp"), NI's Chief Financial Officer ("CFO"), and Kevin Ilcisin ("Ilcisin"), NI's Senior Vice President of Strategy and Corporate Development ("SVP of Strategy & Corp. Development"), exchanged internal notes that appear to outline alternative scenarios for how the transaction might progress.[38] Their forecasts included the initial rejection of Emerson's $48 offer, the anticipated timing and pricing of a revised offer, potential public disclosure of the proposal by Emerson, and targeted outreach to institutional shareholders. Notably, the forecasts explicitly contemplated a second rejection of an improved private offer, followed by the possibility of a public bid. While the predicted timelines and tactical steps varied, the notes assumed that Emerson would increase its offer, culminating in a transaction. The

---

[35] NAT-SL-00001528.
[36] NAT-SL-00001448.
[37] *Id.*
[38] NAT-SL-00008520-21. I understand that the metadata produced with this document indicates that the file name associated with this document was "Wolverine Karen-Kevin Wine Bet".

15

exchange concluded with a wager — "loser buys wine, winner chooses" — further underscoring

that the proposed deal remained active and unresolved:[39]

---

[39] *Id*. *See also* NAT-SL-00023530, September 13, 2022 Email from Ilcisin, NI's SVP of Strategy & Corp. Development, to Rapp, NI's CFO (stating "Next wine night is on me, regardless of what nuthatch does to both of our paths.").

16

X WINNER CHOOSES WINE
X LOSER BUYS


2022-06- 14        WOLVERINE

TODAY                  RE JECTION    NOTICE


LATE  JUNE  →  (written) small increu $ 51
                    "ANNOUNCE Before or with earnings

→ WAIT for EARNINGS call


EARLY  ANGUST →    MESSAGE  LT challenge
                        RECENT performance
                        $ 51 is a great premium
                        if we miss
                        $ 55  t THREAT of public


REJECT


+ LATE  AUGUST  →  public letter ahead of Q3
                        Earnings consensu
                        $ 55


FINAL price  $ 61

NAT-SL-00008520

CONFIDENTIAL

17

Morgan Stanley

1. New private offer # 52
              before June 30

~~strikethrough~~

   we reply no by July 15

2. public w/ #52 by July 31

3. all top shareholders signup

$58.50

Loser buys wine
winner chooses

NAT-SL-00008521

CONFIDENTIAL

18

48.    On June 15, 2022, internal emails show that National Instruments and its financial advisor, Bank of America, were actively preparing for continued engagement with Emerson.[40]

████████████████████████████████████████████████

████████████████████████████████████████████████

████████."[41]

49.    On June 16, 2022, National Instruments sent a letter to Emerson stating the offer did not provide a basis for further discussions, offering little explanation of the Board's underlying rationale.[42]

50.    On June 22, 2022, Emerson sent a follow-up letter reiterating its $48 offer, emphasizing it was their "highest strategic priority."[43] It also stated: "***We look forward to learning more about your internal plan and are confident that with access to limited non-public information after signing an NDA, we could work with you to find additional value that would allow us to increase our Proposal***."[44] The letter emphasized that Emerson did not foresee any regulatory issues and that the proposed transaction had "[c]ertainty."[45] Emerson also disclosed that it had retained Goldman Sachs & Co. LLC and Centerview Partners LLC as financial advisors and Davis Polk & Wardwell LLP as legal counsel.[46]

51.    On June 23, 2022, following Emerson's second offer, R. Eddie Dixon, Jr. ("Dixon"), NI's Chief Legal Officer ("CLO"), internally acknowledged that the renewed proposal reflected "a significant level of D[ue] D[iligence]."[47]

---

[40] NAT-SL-00007093.
[41] *Id.*
[42] NAT-SL-00001255.
[43] NAT-SL-00002992.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] NAT-SL-00016089.

52.     On June 28, 2022, shortly after Emerson's second offer, MacKenzie Partners, Inc. ("MacKenzie Partners"), a proxy solicitation, investor relations, and corporate governance firm, ███████████████████████████████████████████████████████████████.[48] MacKenzie Partners specializes in "mergers-and-acquisitions related transactions,"[49] and its proposal outlined a range of services, including ███████████████████████████████████ ████████████████████████████ The scope of services also included access to MacKenzie Partners' ███████████████████████████████

53.     In early July 2022, National Instruments and its advisors circulated a draft scenario plan titled "Project Wolverine Scenario Planning Materials," outlining communications strategies in the event Emerson's acquisition interest became public.[50] The draft included talking points, press release language, and framing options for investor outreach. A related internal presentation, titled "Project Wolverine," further emphasized scenario planning around a public bid.[51]

54.     On July 6, 2022, National Instruments replied to Emerson that it could not meet the July 11 deadline and would respond after its Q2 earnings call at the end of the month.[52]

55.     On July 7, 2022, Emerson CEO Karsanbhai responded directly to NI CEO Starkloff, expressing disappointment with the delayed timeline and encouraging greater urgency. He emphasized Emerson's preference to "keep our conversations private," noting that "for that to remain feasible we need relative expedience from NI's Board."[53]

---

[48] NAT-SL-00001428-1429.
[49] https://www.mackenziepartners.com/
[50] *See, e.g.*, NAT-SL-00016315; NAT-SL-00022026-2066; NAT-SL-00020476.
[51] NAT-SL-00020476.
[52] "Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share," Emerson January 17, 2023, available at: https://www.emerson.com/documents/corporate/emerson-announces-premium-all-cash-proposal-to-acquire-national-instruments-for-53-per-share-en-us-8730574.pdf.
[53] NAT-SL-00001260.

20

56.    On the same day, July 7, 2022, Ilcisin, NI's SVP of Strategy & Corp. Development, commented on internal Board materials related to the Company's financing strategy. In response to a draft slide labeling M&A and opportunistic buybacks as a "Problem Statement," Ilcisin suggested rephrasing the section as "Context," noting that "[r]ecurring M&A and opportunistic buy-backs are better not framed as a 'problem.'" In a follow-up email to Rapp, NI's CFO, and Dixon, NI's CLO, Ilcisin added that he had not explained the rationale to the original author because "[t]his could be nuthatch discoverable" and that he "[didn't] want these listed as problems."[54] This exchange indicates that National Instruments was discussing repurchases and potential M&A activity in parallel, and that these were being discussed at the Board level.

57.    On July 14, 2022, NI's executives discussed how Emerson's acquisition interest could interfere with the Company's ability to pursue its own transformational M&A.[55]  A slide summarizing the discussion explicitly referenced a "resulting stock price increase" if Emerson's offer were to be made public. The internal recognition that public disclosure of Emerson's interest would increase NI's stock price is direct evidence of economic materiality (*i.e.*, information a reasonable investor would consider important in making investment decisions). The slide also emphasized that, until Emerson's proposal was fully withdrawn or terminated, engaging in separate transactions could be difficult, underscoring that the threat posed by Emerson's interest remained live unless and until it was formally resolved.[56] Finally, it warned that even pursuing another deal could be used by Emerson to strengthen its public narrative:

---

[54] NAT-SL-00023205.
[55] NAT-SL-00025703.
[56] *Id.*

**Email from Albert Percival ("Percival"), Legal Senior Director of Corporate ("Legal Sr. Dir. of Corporate"), at NI to Ilcisin (SVP of Strategy & Corp. Development) at NI; Rapp (CFO) at NI; and Dixon (CLO) at NI:**

- "There is a relatively aligned consensus that an investment in NI will become unattractive to SL if Nuthatch goes public before the deal is inked (based on resulting stock price increase)."
  - "There is the added consideration that until the Nuthatch or alternative offer was fully withdrawn/terminated, that our own transformational M&A could be difficult to transact."
- "There is an aligned consensus that if we close/announce a SL Pipe, then Nuthatch has a way to use this to offensively in strengthening their narrative to shareholders.
  - They would frame it as a poison 'put[.]'" [57]

58.     In July 2022, National Instruments created a "*Nuthatch Defense Strategy*" presentation, which included a slide titled *"OST [T]houghts*."[58] The first objective outlined in the slide was to delay Emerson ("Nuthatch") from going public with its acquisition proposal prior to NI's Q2 earnings call. The slide laid out specific strategies and tactics designed to achieve this goal. This internal planning illustrates NI's proactive attempts to shape the deal timeline and keep M&A-related communications private as of July 2022. This slide is reported below:

---

[57] *Id.*
[58] NAT-SL-00019759.

22

## OST thoughts

| Objectives | Key misalignments between Nuthatch and NI's objectives | Strategies (Close the misalignments and reduce their interest) | Tactics |
|---|---|---|---|
| Delay Nuthatch from going public prior to earnings | Given the outside-in perspectives Nuthatch has likely developed, they have conviction that acquiring NI is positive. Their only hesitation is the risk of becoming the "anyone but them buyer" | Give Nuthatch a reason to believe there is material information NI can share that will influence their perspective that will be shared after earnings and would enable a constructive dialogue | Communication B/W Eric and Lal, expressing the fact that there is material information, not related to earnings, that we would have time to assemble and present post earnings call |
| Convince Nuthatch Mgmt team:<br><br>1) This will only trade at a higher price and<br>2) There is insufficient synergy to met their ROIC threshold at the higher price | 1) Nuthatch doesn't have our financial model with our upside potential<br><br>2) Nuthatch is likely assuming (like the activist screens) there is significant OpEx cuts available while still achieving our revenue and profit targets, thus significant synergy and additional FCF is available to pay for deal | 1) Give Nuthatch just enough information on our upside potential to influence their pricing range<br><br>2) Give Nuthatch enough operational detail to understand that rapidly changing our OpEx will likely have downside risk. Thus the lack of synergy will make the leverage they need to assume risky in today's environment | 1) In a small private setting (Under NDA and with a stand still) communicate the bare minimum on why our revenue model is achievable<br><br>2) Communicate why there is limited synergy beyond public company costs:<br>• Innovation Deficit<br>• Turning over our customer base.<br>• Risk that gross margins reduce if you don't maintain investment profile<br>• SW growth timescales |

Other things that will make them go away would be externalities that get worse leading to the CEO cooling to the deal
• Macro environment including further SW valuation reduction ,
• Continued credit market contraction/rate increase,
• Regulatory environment getting worse

These would likely be hard on us as well, and may further depress our share price which would affect the premium optics

ni.com

NI CONFIDENTIAL  2

59. On July 15, 2022, NI's senior leadership exchanged emails preparing for an upcoming Board discussion on how to manage Emerson's ongoing acquisition interest. The conversation focused on maintaining private engagement with Emerson as a strategy to delay any public announcement and preserve the Company's ability to pursue alternative transactions. Executives discussed the advantages of appearing receptive while intentionally slowing the process. As reflected in the exchange below, they discussed continuing private dialogue as a means to "string [Emerson] along" while evaluating other opportunities:[59]

**Starkloff (CEO) at NI to Dixon (CLO), Rapp (CFO), and Ilcisin (SVP of Strategy & Corp. Development) at NI**:
"I've been thinking about how to simplify the options for the discussion I am having with the board on Tuesday evening.…"

**Dixon at NI to Starkloff, Rapp, and Ilcisin at NI**:
"If we do not believe [Nuthatch will go public] (probably not where we stand at this point), then another option would be string them along in private conversations while we assess our transformational opportunities and take more time to negotiate the best deal we can …."

---

[59] NAT-SL-00016977.

**Rapp at NI to Dixon, Starkloff, and Ilcisin at NI**:
"Eddie's point is valid – there's a 4th option – 'open the door' and keep [Redacted] and Nuthatch both moving forward in tandem." "Pro: Likely keeps Nuthatch from going public while we work…"[60]

60.     In preparation for the July 19, 2022, Board meeting, McGrath, NI's Chairman of the Board, prepared a presentation titled "Board Discussion of Project Wolverine."[61] The deck characterized Emerson's response on July 7 as an "intention/threat to go public with its offer," prompting a four-hour Board meeting block of time to evaluate potential responses. The presentation also examined Emerson's likely strategy to acquire National Instruments and generate substantial financial gains, estimated at $3 to $5.5 billion, by "drastically reduc[ing] operating expenses" to align NI's cost structure with its own. McGrath suggested that Emerson, if it went public, "could argue that NI (its leadership and board) has not been able to manage its operating expenses to competitive levels." He cautioned that "[d]efending the offer publicly… is different than rejecting the offer privately," and that "If [Emerson] uses the argument that we have not managed operating expenses sufficiently, it will be a significant embarrassment." McGrath further emphasized that "[n]othing is more important than defending this for our shareholders' benefit," urging that "[w]e need to go 'all in'" and cautioning that "[d]elaying revenue or investing more in the future is not as important." The Board discussed several defensive measures, including accelerating cost reductions, disclosing its valuation analysis, and adopting a poison pill. The presentation concluded with three detailed slides outlining the proposed financial plan, which featured an "Aggressive Backlog Drain" and a "Proposed Cost Reduction Plan."[62]

---

[60] *Id.*
[61] NAT-SL-00020796-807.
[62] *Id.*

61.     On July 19, 2022, NI's Board reaffirmed that the $48 offer was inadequate and refused to provide due diligence access.[63] During the same meeting, the Board met with management and Wachtell, NI's legal counsel, to discuss "the potential for Emerson to change its offer and the degree to which Emerson would pursue the potential transaction."[64] The Board also discussed how best to "highlight NI's momentum, prospects, margin priorities and other financial and operating performance matters" during the upcoming earnings call.[65]

62.     In line with the Board's discussion, internal emails from the same day show that National Instruments worked with its advisors to shape investor-facing communications in response to Emerson's continued interest.[66] In discussing plans for a potential investor conference, one executive noted that both Bank of America and FGS Global ("FGS"), a strategy firm retained to assist National Instruments with scenario planning related to Project Wolverine,[67] had advised that an "███████████████████████████████████████████

███████████████████████████████"[68] Starkloff, NI's CEO, responded that the Company should move forward with planning the conference for late August or early September and announce it during the upcoming earnings call, noting that this would position National Instruments well regardless of whether Emerson acted publicly:

> **Starkloff (CEO) at NI to Marissa Vidaurri ("Vidaurri"), Head of Investor Relations, at NI; Rapp (CFO) at NI:** "Thinking more about this, and preparing for discussion with the board this afternoon, I'd like to plan for an investor conference in Late Aug/early Sept and I think we need to announce that on the call. This is also advantageous should nuthatch go public as we'd already have the conference planned as we've done in past years."

---

[63] NI Proxy, p. 26.
[64] *Id.*
[65] *Id.*
[66] NAT-SL-00006205.
[67] NAT-SL-00012657-658.
[68] NAT-SL-00006205.

**Vidaurri at NI to Rapp at NI:**



[69]

63.     On July 25, 2022, shortly after the regular Board meeting held on July 20, National Instruments convened a special Board meeting during which the CEO and CFO presented updated financial planning materials and investor communication strategies.[70] All financial scenarios included an aggressive backlog reduction in 2023 and expense reductions. One slide, titled "2022 to 2023 Expense Bridge," detailed the Company's plan to reduce operating expenses from 51% of revenue in 2022 to 47% in 2023. The presentation continued with "Key Investor Points" for the messaging for the upcoming earnings call, projecting 2023 outperformance driven by record backlog in 2022, margin expansion, and expense management.

64.     Following the Board meeting, between July 26 and July 28, 2022, leading up to the July 28 earnings call, NI's leadership, in-house counsel, and outside legal counsel from Wachtell coordinated ████████████████████████████████████████ ████████████████████████████████████████.[71] McGrath, NI's Chairman of the Board, emphasized that the primary purpose of the July 25 Special Board of Directors meeting was to prepare a strong public-facing narrative around NI's updated financial plan as a basis for rejecting Emerson's bid. Dixon, NI's CLO, expressed concern over how references to "Nuthatch" might be viewed in a discovery context and stressed the need for caution:

---

[69] *Id.*
[70] NAT-SL-00025801.
[71] NAT-SL-00020751-4.

**McGrath (Chairman of the Board) to Dixon (CLO):** "The purpose of tonight's board meeting is to discuss our primary argument against the acquisition offer from Nuthatch, which is sharing our positive outlook for the next 18 months with our shareholders and analysts. Eric will be reviewing his plans to do this on Thursday's Earnings Call and our subsequent investor presentation."

**Dixon to McGrath:** "Thanks for sending. I'd like to confer with Sabastian [Niles, a lawyer at Wachtell] as a sanity check to make sure any reference to Nuthatch does not inadvertently put us in a difficult position should the minutes be discoverable. Should Nuthatch go public, the minutes will be critical in communicating our position. In my view, the minutes should primarily be about earnings prep, communications strategy, financial planning scenarios, etc. - and no real need to show any defensiveness regarding the decision of the board to reject the offer. The decision to reject the offer (a second time) was made in the board meeting and that will be reflected in those minutes. In any event, just wanted to provide a different perspective and to share a revised opening for the minutes (I have not discussed with Sabastian yet, but I will do so)."

**McGrath to Dixon:** "Eddie I think it's important to show that we discussed these updated financial plans in light of the offer and it's a primary reason we are rejecting the offer. If discoverable, the plans support our argument that the offer is inappropriate." [72]

65.    The minutes of the July 25, 2022 Special Board of Directors' Meeting state:

**"Investor Messaging and Conference (Agenda Item 2)**

Mr. Starkloff led a discussion of key points to be communicated in the upcoming Company earnings call and follow-on investor conference in New York City.

It was noted that of particular interest was the very positive outlook for the next 18 months and beyond, which will be a core component of the earnings-call script (with the Board affirming its support for management to provide this confidence and information to the market). The Board noted that, as per prior discussions among the Board, management's strong outlook and the related underpinnings for such confidence and the Company's very positive outlook were also factors considered in the Board's recent unanimous (and unanimously reaffirmed) decision to reject the Wolverine offer."[73]

---

[72] *Id.*
[73] NAT-SL-00001455.

66.     On July 28, 2022, National Instruments announced its Q2 Earnings. Despite underwhelming financial performance, National Instruments raised full-year guidance significantly. This included mid-teens revenue growth and 300 basis points of operating margin expansion—triple the guidance issued in Q1, prior to Emerson's approach.[74]

67.     On August 2, 2022, National Instruments sent a second letter rejecting Emerson's offer, stating: "The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders."[75]

68.     Two days later, on August 4, 2022, internal Company emails show that National Instruments executives were actively discussing whether the ongoing interest from Emerson constituted material nonpublic information ("MNPI") in the context of adopting a stock repurchase plan.[76] They debated whether the Nuthatch engagement had become "stale" enough to argue that MNPI no longer existed, while acknowledging that the situation remained in a "gray area" due to the lingering "letter 'overhang.'" Rapp, NI's CFO, recommended putting a plan in place promptly, citing a 30- to 60-day waiting period before purchases could begin:

> **Rapp (CFO) at NI to Percival (Legal Sr. Dir. of Corporate) at NI; Dixon (CLO) at NI**: "Hi Albert, Can you please let me know what we can do to put a plan in place for stock repurchases given the current situation. Thanks, Karen"
>
> **Percival at NI to Rapp at NI; Dixon at NI**: "I'll need to discuss with WLRK. We still have the Nuthatch letter 'overhang' or perhaps 'hangover', so I believe we are in a gray area."
>
> **Dixon at NI to Percival at NI; Rapp at NI**: "FYI - the 'reconfirmed' rejection was sent on Tuesday, so hopefully we can do something near the end of the open window if no further engagement by nuthatch. I believe that is what we discussed before, but as you noted, let's get WLRK's take in the timing."

---

[74] National Instruments, SEC Schedule 14A, Jan. 17, 2023, available at: https://www.sec.gov/Archives/edgar/data/32604/000095010323000538/dp187067_dfan14a.htm.
[75] NAT-SL-00001240.
[76] NAT-SL-00009611.

28

**Rapp at NI to Dixon at NI; Percival at NI**: "I was thinking maybe now is the time to put a plan in place since we sent the letter. I know we have to wait 30 or 60 days from when it's implemented to start the repurchases so the sooner the better if possible."

**Dixon at NI to Rapp at NI; Percival at NI**: "I think the question is when does the nuthatch engagement become stale so legitimate argument that we don't have MNPI when the plan is put in place, but will let Albert confirm with WLRK."[77]

69.    On August 7, 2022, McGrath, NI's Chairman of the Board, raised board member concerns about the Company's negative cash flow and limited liquidity, including that the Company "sure the hell shouldn't be buying back stock":[78]

**McGrath (Chairman of the Board) at NI to Starkloff (CEO) at NI**: "Eric Go ahead with what you are planning. We can discuss it at the retreat as a group. But I'll reach [out] to a couple [of] them in the meantime. The reaction was to the negative cash flow from operations and our precarious cash position at the end of the quarter. The comment was 'With almost no cash and negative cash flow, we sure the hell shouldn't be buying back stock to making a $10M donation.['] And there was several strong agreements. It was a thoughtful review of cash projections. We can do that at the retreat."[79]

70.    On August 8, 2022, Bank of America, NI's financial advisor, informed NI executives that Emerson had agreed to sell its InSinkErator business to Whirlpool for $3 billion, with the deal expected to close in Q4. Ilcisin noted that the sale "[s]ort of reduces [Emerson's] dependency on the credit markets," and, in light of BofA's observation that the deal would not close until Q4, added, "Neither would something with us presumably?"[80] According to Ilcisin,

████████████████████████████████████████████████ leading NI executives to

schedule a meeting with advisors to evaluate the transaction's implications.[81] Dixon circulated the announcement internally, sharing it with NI's CEO, CFO, and Chairman of the Board.[82]

---

[77] *Id.*
[78] NAT-SL-00001276.
[79] *Id.*
[80] NAT-SL-00018186.
[81] NAT-SL-00017263.
[82] NAT-SL-00020681-82; NAT-SL-00021472-21474.

71.    On August 9, 2022, Starkloff, NI's CEO, and McGrath, NI's Chairman of the Board, exchanged views via emails on Emerson's Q3 earnings performance.[83] Starkloff described the results as "a modest disappointment overall," adding that Emerson's stock declined 4% and dropped further after hours. In response, McGrath asked, "Think that will make them more or less eager?"[84] This indicates that internally, National Instruments executives continued to discuss the next steps regarding Emerson's acquisition strategy for the Company.

72.    On the same day, Rapp, NI's CFO, contacted JPMorgan Securities Inc. ("JPM") to initiate the process of entering into a new Rule 10b5-1 repurchase plan and inquired about making additional open-market purchases outside the plan.[85] She indicated that the Company hoped to implement the new plan "in the next week or so."[86] This outreach occurred while internal legal and strategic discussions regarding the status of the Emerson engagement were ongoing.

73.    Internal records show ongoing coordination around Project Wolverine during this period. Calendar invites and meeting notes indicate that senior National Instruments executives, legal counsel at Wachtell, and financial advisors at Bank of America planned multiple meetings about Project Wolverine, including on June 20, July 6, July 8, August 1, August 5, and August 9.[87] The August 9 meeting agenda included discussion of "█████████████████████████████████████" and ████████████████████████████████████████████████ ██████.[88] The meeting also addressed ████████████████████████████████ ████████████████████████████████ These meetings indicate that National Instruments

---

[83] NAT-SL-00023501.
[84] *Id.*
[85] NAT-SL-00001160.
[86] *Id.*
[87] NAT-SL-00010389; NAT-SL-00010395; NAT-SL-00001569; NAT-SL-00001579; NAT-SL-00008684; NAT-SL-0008685; NAT-SL-00022476; NAT-SL-00010395.
[88] NAT-SL-00008607; NAT-SL-00010395.

and its advisors remained actively engaged in connection with a potential transaction with Emerson during the same period in which the Company was preparing to repurchase shares.

74.    On August 10, 2022, National Instruments was informed by MacKenzie Partners that Emerson ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.[89] This development indicated that Emerson was continuing to pursue the Company via open-market accumulation of a "toehold."[90] In the M&A context, a "toehold" represents a bidder's acquisition of an ownership stake in the target in connection with a potential acquisition. The toehold update was shared with NI's financial advisor at Bank of America, accompanied by the comment, "This just got interesting!!"[91] National Instruments subsequently scheduled a meeting on the same day with Bank of America to discuss the development.[92]

75.    Later that day, an internal memo from Dixon, NI's CLO, ██████████████████ ████████████████████████████████████████████████.[93] The memo characterized the activity as "unusual" and stated that the "[p]robability of going public is much higher now."[94] It recommended increasing operational preparedness, engaging the Board, and reviewing the communications plan. However, also on the same day, internal correspondence noted that "we have not exposed Mackenzie to Nuthatch,"[95] reflecting that the details of Emerson's acquisition

---

[89] NAT-SL-00011768.
[90] Betton and Eckbo (2000) report that "the probability of a successful single-bid contest increases with… the toehold." Walkling (1985) similarly concludes that "[i]ncreased ownership of target firm shares by the bidder… increases the probability of success." *See* Betton, S., & Eckbo, B. E. (2000), Toeholds, Bid Jumps, and Expected Payoffs in Takeovers; *The Review of Financial Studies*, 13(4), p. 844 ("Betton and Eckbo (2000)"); Walkling, R. A. (1985), Predicting Tender Offer Success: A Logistic Analysis, *Journal of Financial and Quantitative Analysis*, 20(4), p. 461 ("Walkling, R. A. (1985)").
[91] NAT-SL-00011768.
[92] NAT-SL-00009678.
[93] NAT-SL-00008756; *see also* NAT-SL-00009678; NAT-SL-00008683.
[94] NAT-SL-00008756.
[95] NAT-SL-00008750.

interest had not yet been shared beyond a limited circle, indicating the information was continuing to be treated as highly confidential.

76.    On the same day, August 10, 2022, Starkloff, NI's CEO, drafted an internal message to NI employees preparing to respond in the event Emerson made its offer public. The message emphasized that the offer was unsolicited, that the Board would evaluate it in accordance with its fiduciary duties, and that the Company would issue a press release, CEO video, and internal FAQs later that day. The message stated:

> **Starkloff (CEO) at NI "Team"**:
>
> "As you may have seen, a non-solicited offer was made public today by [Nuthatch]. I want you to know that we did not solicit this offer, and the board has not been trying to sell the company. The board, consistent with their fiduciary responsibilities, will review and respond appropriately. I want to emphasize my own focus and commitment to our strategy and the opportunity I see for us to deliver meaningful shareholder returns by executing to it. This has been the focus of our team and we've built real momentum in the last 18 months. Of course, this news will cause concern and create questions across our teams. It's important that this leadership team stays focused and keeps our teams focused on delivering for our business and for our customers. We will be issuing a press release later today, I will be filming a short video for employees, and we will follow up with a set of FAQs. This is a fluid situation and I will keep this team informed as we know more. In the meantime, please refer any contacts you get externally to Marissa so that we remain coordinated in our response."[96]

77.    On August 11, 2022, Percival, NI's Legal Sr. Dir. of Corporate, lifted the trading restriction associated with Project Wolverine. In an email to the Board, Percival stated that the restriction was "lifted, effective immediately," but reminded directors that, before trading, they should still consider whether they were in possession of any other material nonpublic information.[97]

---

[96] NAT-SL-00021470.
[97] NAT-SL-00009179.

78.    On the same day, August 11, 2022, National Instruments adopted a 10b5-1 repurchase plan that was explicitly structured to increase buyback volume as the stock price declined. The plan, which went into effect on September 12, 2022, prohibited any repurchases at or above $45 per share but authorized up to $8 million in daily repurchases if the stock traded below $37.[98]

79.    Also, on August 11, 2022, National Instruments announced it would hold its annual Investor Day on September 15, 2022.[99]

80.    Throughout the Class Period, National Instruments, through its engagement with Mackenzie Partners, ████████████████████████████████████████████ ██████[100] By August 29, Emerson's stake had grown to ██████████████████ ████████████████████████████████████[101]

81.    Between August 12 and August 26, 2022, shortly after lifting the Project Wolverine trading restriction, National Instruments proceeded with discretionary share repurchases outside of a 10b5-1 plan.[102] For example, on August 13, 2022, Rapp, NI's CFO, noted that she had spent $9 million on the previous day on open market purchases, and "committed $60 m[illion] on the 10b51" plan that was not yet in effect.[103] On August 14, Rapp directed JPM to buy back in the open market "up to $5m[illion] per day this week" (only if the stock was trading under $40).[104] On

---

[98] NAT-SL-00005642-648.

[99] "NI to Host Annual Investor Conference in San Francisco on September 15th," Business Wire, Aug. 11, 2022, available at: https://www.businesswire.com/news/home/20220811005124/en/NI-to-Host-Annual-Investor-Conference-in-San-Francisco-on-September-15th.

[100] NAT-SL-00012665; NAT-SL-00010806; NAT-SL-00010427; NAT-SL-00010399; NAT-SL-00008467.

[101] NAT-SL-00010806.

[102] On January 19, 2022, NI's Board approved a stock repurchase program that authorized National Instruments to repurchase up to $250 million worth of the Company's Common Stock. National Instruments, SEC Form 10-K, Feb. 21, 2023, p. 24 n.1, available at: https://www.sec.gov/Archives/edgar/data/935494/000093549423000008/0000935494-23-000008-index.htm.    NI's plan was to repurchase $100 million worth of shares in 2022, and the remaining $150 million worth of shares in 2023. NAT-SL-00026027, p. 7, p.10; NAT-SL-00002988.

[103] NAT-SL-00006245.

[104] Id.

August 17, internal emails show that $182 million in buyback capacity remained and that senior executives, including the CEO, were actively discussing their repurchase strategy.[105] The next day, National Instruments confirmed a $5 million repurchase order for August 19.[106] On August 26, JPM confirmed NI's order to repurchase $4 million worth of the Company's Common Stock.[107] These coordinated purchases occurred while Emerson's nonpublic interest in acquiring National Instruments remained undisclosed to the market.

82.    On August 19, 2022, the same day National Instruments executed a $5 million discretionary repurchase, NI's external advisors at Bank of America and FGS continued to strategize around ███████████████████████████████████████████████ ██████.[108] In an email to FGS, Bank of America inquired about "████████████████████ ████████████████████████████████████████████████████████" FGS's response ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████"[109]

83.    On August 25, 2022, Vidaurri, NI's Head of Investor Relations, circulated a summary of MacKenzie Partners' perspective on accumulation activity in National Instruments Common Stock.[110] Although MacKenzie Partners had not been briefed on the Emerson engagement, they indicated that the accumulation "█████████████████████████████" and described it as a ████████████████████████████████████████████

84.    Between August 29 and September 1, 2022, after MacKenzie Partners informed National Instruments that ████████████████████████████████████████████████

---

[105] NAT-SL-00001156.
[106] NAT-SL-00001152.
[107] NAT-SL-00009596-957.
[108] BofA_000803-805.
[109] *Id.*
[110] NAT-SL-00017309.

 — National Instruments executives and legal counsel at Wachtell discussed ██████ ████████████████████████████.[111] As part of that exchange, Dixon, NI's CLO, performed a back-of-the-envelope calculation using an assumed average purchase price. In parallel, Vidaurri, NI's Head of Investor Relations, circulated ██████████████

████████████████████████████████

██████████████████████████. This exchange highlights the Company's focus on both the size and financial significance of Emerson's position during the repurchase period:

> **Dixon (CLO) at NI to NI executives**: "I don't know other than using simple math with an assumption of average price they may have paid – let's say the average price is $36 then 2,288,324 x 36 = 82,379,664 so call it $80M ish. Likely somewhere between $70M - $85M."

> **Vidaurri (Head of Investor Relations) at NI to NI executives:**



[112]

85. In parallel, on September 1, 2022, NI's executives discussed ████████████ ██████████████████.[113] Starkloff, NI's CEO, noted that "the new data" warranted consideration of adopting a shareholder rights plan.[114] He suggested revisiting the topic the

---

[111] NAT-SL-00017322; NAT-SL-00022130; NAT-SL-00023790.

[112] NAT-SL-00023790. "NOBO" stands for non-objecting beneficial owner, *i.e.*, a stockholder that allows the financial intermediaries through which it owns stock to report its ownership position to the issuer.

[113] NAT-SL-00023453.

[114] *Id.*

following day and incorporating a discussion with advisors during the upcoming leadership retreat.[115]

86.    On September 8, 2022, in the lead-up to NI's September 15 Investor Day, the Company's advisors continued refining the potential external messaging plan in response to Emerson's acquisition of National Instruments Common Stock and the possibility that Emerson might go public with its offer.[116] According to internal correspondence, FGS "████████████ ██████████" and updated talking points, opening remarks, and Q&A materials in the event that "████████████████████████████████████" FGS shared its thoughts with Bank of America, who suggested ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████.[117]

87.    On September 9, 2022, following circulation of updated Wolverine scenario planning materials, Vidaurri, NI's Head of Investor Relations, emphasized the importance of staying "connected" in the event that Emerson's acquisition interest became public ahead of the Company's scheduled Investor Day.[118] The message, sent to the broader advisor team, underscores that National Instruments and its advisors were preparing for a public bid by Emerson.

88.    On September 15, 2022, during NI's Investor Day, the Company reaffirmed its Q2 2023 guidance and added a long-term goal of an additional 200 bps of operating margin expansion by 2025.[119]

---

[115] *Id.*
[116] BofA_000806-808.
[117] *Id.*
[118] NAT-SL-00022116.
[119] NATI Annual Investor Conference, Final Transcript, September 15, 2022, pp. 2, 20.

89.    On September 16, 2022, Dixon, NI's CLO, indicated that the Company was preparing for an upcoming board update on Project Wolverine. In an email to outside counsel, Dixon noted that it was "probably worth touching base prior to the board Wolverine update."[120]

90.    On September 19, 2022, National Instruments executives and advisors coordinated on how to present the status of Emerson's acquisition interest to the board.[121] A summary circulated by Dixon, NI's CLO, to Starkloff, NI's CEO, Rapp, NI's CFO, Ilcisin, NI's SVP of Strategy & Corp. Development, Wachtell, and BofA emphasized that ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████ Notably, the communication also noted that ██████████████████ ████████████████████ " consistent with Emerson's acquisition interest remaining strong:

> **Dixon (CLO) at NI to Starkloff (CEO) at NI; Ilcisin (SVP Strategy & Corp. Development) at NI; Rapp (CFO) at NI; Wachtell (Legal Counsel); and Bank of America (Financial Advisor)**:
>
> Team,
>
> Eric, Kevin, and I spoke this afternoon regarding the general message/Wolverine update to the board on Wednesday. The key points are as follows:
>
> ███████████████████████████ , ████████████████████
>
> - Wolverine's ownership does not provide it any meaningful rights that would assist in their effort to acquire
>
> ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ Evidence might be, for example, ███████ or announcing another large acquisition making NI unaffordable ████████████████████████████████████████████

---

[120] NAT-SL-00023183.
[121] NAT-SL-00023189.

- We are in a wait and see mode, but we should continue to monitor the situation and be well prepared should Wolverine go public (which we are with Comms plans for both external and internal purposes).

91.    On September 21, 2022, Bank of America delivered two presentations to NI's Board as part of its ongoing evaluation of Emerson's acquisition interest. The first, titled ████████████████████████████████████████████████████.[122] The second, ██████████████████████████████████████████████████████████.[123] These materials reflect that National Instruments and its advisors continued to actively evaluate Emerson's acquisition interest and preparedness throughout this period.

92.    At the same board meeting, Wachtell, NI's legal counsel, and Bank of America, NI's financial advisor, "████████████████████████████████████████████████████████████████████"[124] During the same board meeting, Starkloff, NI's CEO, and Vidaurri, NI's Head of Investor Relations, also delivered a "Shareholder Update" presentation.[125] Starkloff and Vidaurri highlighted positive reactions to the Company's prior repurchasing activity.[126] However, they also summarized analyst concerns regarding the use of cash for repurchases rather than for potentially more value-accretive opportunities:

**Dixon (CLO) at NI to Starkloff (CEO) at NI; Ilcisin (SVP of Strategy & Corp. Development) at NI; Rapp (CFO) at NI; Wachtell (Legal Counsel); and Bank of America (Financial Advisor):**

"Some concerns were expressed about distributing too much capital to investors

- MorningStar 10 Aug 2022 Bears Say William Kerwin, Analyst, 29 Jul 2022: We fear that NI sends too much capital back to shareholders,

---

[122] BofA_000824.
[123] BofA_000821.
[124] NAT-SL-00001450 at p. 53.
[125] NAT-SL-00015951.
[126] *Id*., at p.11.

38

potentially at the expense of growth opportunities. The firm maintains a regular dividend and, combined with opportunistic repurchases, has returned more than 100% of cumulative free cash flow back to shareholders over the last five years. We would normally applaud such a strong return profile, but we think NI is likely to have other targets for investment dollars that may be more value-accretive than share buybacks. We hope that more aggressive M&A recently implies a shift in management's conduct in this realm."[127]

93. On September 27, Bank of America sent a list of financial diligence questions to National Instruments.[128] Internal emails show that the questions were forwarded to Rapp, NI's CFO, for review, and that a meeting with Bank of America about Wolverine was requested.[129]

94. On September 20 and 27, 2022, MacKenzie Partners ███████████████████████ ████████████████████████████████████████████████████ ████ .[130] ████████████████████████████████████████████ ████████████████████████████████████ . On October 4, a news article about Blackstone's potential acquisition of Emerson's asset portfolio was circulated internally, reflecting monitoring of Emerson's broader M&A activity and its implications for cash availability.[131]

95. In total, during August and September 2022, National Instruments repurchased 2,033,135 shares at an average price of $40.25/share for $81.83 million, the largest quarterly repurchase in its history, without disclosing Emerson's ongoing interest.[132]

96. In an October 14, 2022 internal email, Rapp, NI's CFO, noted that the Company had repurchased $160 million in stock, exceeding the original $100 million plan, based on the belief that the stock was undervalued:

---

[127] *Id.*, at p.12.
[128] NAT-SL-00006116.
[129] *Id.*
[130] NAT-SL-00010427-28; NAT-SL-00010429-30; NAT-SL-00010431; NAT-SL-00010399-10400.
[131] NAT-SL-00008468.
[132] NAT-SL-00000772; NAT-SL-00008757; NAT-SL-00008758; National Instruments, SEC Schedule 14A, Jan. 17, 2023, available at: sec.gov/Archives/edgar/data/32604/000095010323000538/dp187067_dfan14a.htm.

**Rapp (CFO) at NI to Treva Rumbeck at NI; Cate Prescott at NI**: "We've also done $160M in share repurchases because we believe our stock has been undervalued. Our planned repurchase amount was $100M so we did more this year than our original plan."[133]

97.    On October 27, 2022, National Instruments reported record Q3 revenue, but the stock fell 3.0% the following day despite a 2.9% rise in the NASDAQ. Analysts cited decelerating orders, supply chain concerns, and weak Q4 guidance. Margin targets for 2023 were reaffirmed, but market commentary remained cautious. Many analysts revised their Q4 and FY2023 estimates downward, along with target prices.[134]

98.    On October 28, 2022, National Instruments filed its Q3 10-Q, disclosing the August through September 2022 repurchases, but made no mention of Emerson's interest in acquiring the Company.[135]

99.    Following NI's rejection of Emerson's second offer, internal records indicate that the Company and its advisors continued to plan regular meetings to discuss Project Wolverine. Internal records reflect Wolverine-related meetings on August 5, August 9, August 10, September 2, September 13, October 10, October 27, and October 31. These repeated touchpoints demonstrate that National Instruments continued to treat the matter as active throughout this period.[136]

100.    On November 3, 2022, Emerson, consistent with its earlier indication that it was willing to raise its bid, increased its offer to $53 per share, citing NI's updated guidance as part of its valuation.[137] The offer represented a 38% premium to the volume weighted average price

---

[133] NAT-SL-00006122.
[134]    National    Instruments,    SEC    Schedule    14A,    Jan.    17,    2023,    available    at: sec.gov/Archives/edgar/data/32604/000095010323000538/dp187067_dfan14a.htm.
[135]    National    Instruments,    SEC    Form    10-Q,    Oct.    28,    2022,    available    at: https://www.sec.gov/Archives/edgar/data/935494/000093549422000039/0000935494-22-000039-index.htm.
[136] NAT-SL-00008684; NAT-SL-00010395; NAT-SL-00008683; NAT-SL-00016269; NAT-SL-00023536; NAT-SL-00006980; NAT-SL-00006977; NAT-SL-00003018.
[137]    Emerson    Electric,    National    Instruments,    SEC    Schedule    14A,    Jan.    17,    2023,    available    at: www.sec.gov/Archives/edgar/data/935494/000095010323000568/0000950103-23-000568-index.html.

40

(VWAP) for the last 30 trading days ending November 3, 2022. This premium was nearly identical to the premium implied by Emerson's initial $48 per share offer, which reflected a 36% premium to NI's 30-day VWAP at the time. Emerson indicated it remained willing to engage privately but could take the proposal directly to shareholders if National Instruments refused to cooperate.[138] The November 3 offer reiterated that Emerson's interest had been consistent throughout the class period:

> **Emerson:** "Over a period starting almost 6 months ago, we have consistently been prepared to provide your shareholders an all-cash offer at a meaningful premium, which your Board has repeatedly rebuffed and refused to provide even limited financial information."[139]

101.    Following Emerson's increased offer of $53 per share, on November 10, 2022, National Instruments formed a Transaction Evaluation Committee and began evaluating strategic alternatives, including a potential sale.[140] Throughout November and December 2022, the Transaction Evaluation Committee met regularly to assess options and prepare for a formal process.[141]

102.    On the morning of January 13, 2023, National Instruments announced the strategic review via press release, stating that it would evaluate a full range of business and financial alternatives to maximize shareholder value.[142] The announcement confirmed that National Instruments had already received inbound interest and was formally initiating outreach to potential acquirers.

---

[138] *Id.*
[139] *Id.*
[140] NI Proxy, p. 26.
[141] *Id.*
[142] National Instruments, SEC Form 8-K, Jan. 13, 2023, available at: www.sec.gov/Archives/edgar/data/935494/000114036123001557/0001140361-23-001557-index.html.

103.    Just days later, on January 17, 2023, Emerson publicly disclosed its $53 per share proposal via press release, revealing that it had initially submitted the offer back on November 3. Emerson also outlined its engagement with National Instruments as of that date, including the prior $48 per share proposals and its open-market share accumulation.

104.    Over the following months, NI invited multiple parties to participate, entered into confidentiality agreements, and evaluated several competing bids. After multiple rounds of bidding and due diligence, both Emerson and another party submitted final offers of $60 per share. National Instruments ultimately selected Emerson's offer based on its stronger regulatory commitments, and the companies signed a merger agreement on April 12, 2023.[143]

### B. Fundamental Principles of Finance, Valuation, and Mergers & Acquisitions Analysis

105.    A fundamental principle of financial economics holds that the value of a company's stock reflects the net present value of its expected future cash flows, discounted at a rate that accounts for their risk. Any information that changes investor expectations about those future cash flows—whether by altering anticipated operating performance, capital structure, or the likelihood of a corporate transaction—can affect the value investors assign to the stock. In the case of National Instruments, the existence of a credible acquisition proposal would directly impact how investors assessed the firm's future value and strategic trajectory. Accordingly, the academic literature discussed below provides a basis for concluding that such information is economically material under standard valuation principles.

106.    Mergers and acquisitions (M&A) are pivotal corporate events with the potential to affect a firm's valuation. In corporate finance, credible acquisition offers are widely recognized as

---

[143] NI Proxy, pp. 31-36.

economically material because they serve as external market signals, revealing how third parties assess the target's underlying value. Markets react strongly to such offers, particularly because acquirers are typically willing to pay a premium above the target's prevailing market price.

107.    A substantial body of academic research supports this view. Summarizing the findings from 25 academic studies, Bruner (2004) states: "Target firm shareholders enjoy returns that are significantly and materially positive,"[144] and concludes that these studies "reveal returns that are material and significant, despite variations in time period, type of deal (merger vs. tender offer), and observation period. In short, the M&A transaction delivers a premium return to target firm shareholders."[145] In my own research (Cain and Denis, 2013), we report similar takeover premiums, with an average initial announced offer premium of 36.2%.[146]

108.    This expectation of market revaluation in response to acquisition interest is further reinforced by the findings of Jindra and Walkling (2004).[147] Their study shows target stock prices frequently rise above the initial offer price—a phenomenon known as a negative arbitrage spread—indicating that investors anticipate increased offers or competing bids. Specifically, they show that on average, 23% of targets have a negative spread, with the rate exceeding 40% in certain years.[148] These market dynamics reflect investors' expectations that the initial offer may undervalue the firm and that additional bids or improvements are likely. The authors also find that this effect is more pronounced in hostile deals and when bidders employ toehold strategies.[149]

---

[144] Bruner, p. 36.
[145] Bruner, pp. 36-38.
[146] Cain, M. D., & Denis, D. J. (2013), Information Production by Investment Banks: Evidence from Fairness Opinions, *The Journal of Law and Economics*, 56(1), 245-280, p. 254.
[147] Jindra, J., & Walkling, R. A. (2004), Speculation spreads and the market pricing of proposed acquisitions, *Journal of Corporate Finance*, 10(4), 495-526.
[148] *Id*., p. 502 (Table 1).
[149] *Id*., p. 516 (Table 6).

These findings underscore the importance of acquisition offers, not only as standalone valuation events, but also as signals that initiate further market activity and repricing.

109.    Toeholds also play a meaningful role in the probability of deal completion. Academic research finds that when a bidder holds an ownership stake in the target prior to or during negotiations, the likelihood of a successful acquisition increases. Betton and Eckbo (2000) report that "the probability of a successful single-bid contest increases with… the toehold."[150] Similarly, Walkling (1985) concludes that "[i]ncreased ownership of target firm shares by the bidder… increases the probability of success."[151]

110.    Toehold investments also provide bidders with strategic advantages: they can acquire shares at a lower average price before a formal bid is made, and gain voting rights to influence corporate governance. Emerson's accumulation of a toehold in National Instruments is therefore not only consistent with these findings but also would enhance the credibility of its offer by signaling serious intent and increasing the likelihood of successful engagement.

111.    The type of payment offered in a takeover proposal also influences both deal outcomes and market perceptions. Academic research finds that cash offers are associated with a higher probability of completion relative to stock or mixed consideration. As Fishman (1989) observes: "[t]he probability that target management will reject an offer is higher if the medium of exchange is securities as compared to cash," indicating that cash offers tend to face less resistance and are perceived as more credible.[152] Similarly, Branch and Yang (2003) conclude that "a cash payment is likely to improve the probability of merger completion/success, as compared with a

---

[150] Betton and Eckbo (2000), 841-882, p. 844.
[151] Walkling, R. A. (1985), 461-478, p. 461.
[152] Fishman, M. J. (1989), Preemptive Bidding and the Role of the Medium of Exchange in Acquisitions, *The Journal of Finance*, 44(1), 41-57, p. 42.

stock payment offer."[153] From an economic perspective, cash provides immediate and certain value to shareholders and reduces concerns related to adverse selection that can arise with stock consideration. These findings are directly relevant to the circumstances of Emerson's proposals to acquire National Instruments, which were structured as an all-cash transaction.

112.    Another indicator supporting the credibility and likelihood of Emerson's acquisition proposal is its pricing relative to NI's trading history. Academic research by Baker, Pan, and Wurgler (2012) shows that "the probability of deal success increases discontinuously by 4.4–6.4% when the bidder makes an offer price even slightly above the target's 52-week high."[154] Emerson's offers satisfied this condition, exceeding NI's 52-week high at the time.[155] Additionally, Emerson's May 25, 2022 and June 22, 2022 offers included a 36% and 41% premium, respectively, over NI's unaffected share price—greater than both the 29.19% median premium reported across more than 7,000 deals in the Baker, et al. sample, and the 34% average premium noted by Cain, et al. (2020). Taken together, the above-threshold pricing and generous premium further affirm that Emerson's proposal aligned with historical patterns of successful, value-maximizing acquisitions.

113.    The possibility of revised or improved bids is not merely theoretical; it reflects the well-documented reality that M&A negotiations often unfold over multiple stages. In a large sample evaluating private merger negotiations, Cain, Griffith, Jackson, and Solomon (2020) found that announced transactions typically involve extensive back-and-forth, with an average of 5.4

---

[153] Branch, B., & Yang, T. (2003), Predicting Successful Takeovers and Risk Arbitrage, *Quarterly Journal of Business and Economics*, 3-18, p. 12.

[154] Baker, M., Pan, X., & Wurgler, J. (2012), The effect of reference point prices on mergers and acquisitions, *Journal of Financial Economics*, 106(1), 49-71, pp. 50, 64.

[155] Source: Bloomberg. NI's 52-week closing high price leading up to Emerson's $48 offer on May 25, 2022 was $45.39.

rounds of bidding.[156] This iterative process, where targets initially reject offers and negotiate for better terms, is common and consistent with the goal of maximizing shareholder value.

114.    In the case of National Instruments, the timeline from Emerson's initial approach in May to the end of the Class Period in September 2022 reflects this broader pattern unfolding over time. Moreover, because NATI was incorporated in Delaware and Emerson's proposal was an all-cash offer, the transaction implicated potential *Revlon* duties, which require boards to focus on maximizing short-term shareholder value in change-of-control scenarios. Cain, et al. (2020) find that these negotiation patterns are especially pronounced in Delaware-based deals.[157] They also show that hostile transactions typically involve more rounds of bidding,[158] longer timelines,[159] and higher final offers.[160] These findings support the view that rejecting an initial offer is not necessarily a refusal, but rather is commonly part of a deliberate and strategic negotiating process, intended to invite competing offers or improved terms that enhance shareholder value. For these reasons, Bruner (2004) ultimately concludes that "Merger negotiations are *highly* material for every target firm."[161]

115.    In sum, academic literature consistently supports the conclusion that credible acquisition proposals are economically material events. Takeover bids with the types of characteristics documented in the Emerson offers to acquire National Instruments Common Stock and the M&A events associated with those offers, including meaningful offer premiums, toehold accumulation, initial target resistance, and all-cash consideration, have been repeatedly shown to

---

[156] Cain, M. D., Griffith, S. J., Jackson, Jr., R. J., & Solomon, S. D. (2020), Does *Revlon* Matter? An Empirical and Theoretical Study, *Calif. L. Rev.*, *108*, 1683-1731, p. 1705.
[157] *Id*., at p. 1713.
[158] *Id*., at p. 1708.
[159] *Id*., at p. 1709.
[160] *Id*., at p. 1712.
[161] Bruner, p. 734 (emphasis in original quote). As a financial economist, Bruner uses the term "materiality" here to indicate that the information would affect the stock price of the target firm if it were to become public.

influence investor expectations and firm valuation. These features not only signal offeror seriousness but also increase the probability of successful deal completion and raise investor expectations of potential offer values. If Plaintiff ultimately proves their allegation that material information regarding Emerson's proposal and related developments was withheld from the market during a period in which National Instruments was repurchasing its own shares, then based on fundamental valuation principles, investors would have viewed that information as value-relevant and thus, material from an economic perspective.

## C. Event Study

116.    To study and opine on the stock price movements for National Instruments on relevant days, I performed an event study. As discussed in my Efficiency Report, the event study methodology examines the security price reaction to an "event" such as the information released in a press release or a corrective event. Event studies employ statistical analysis and other scientific approaches to examine price movements following certain events to determine within a specified degree of certainty whether they are caused by the event being studied.

117.    Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency, loss causation, and damages in securities litigation.[162] As Professor Fama has explained:

> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our

---

[162] MacKinlay, A. C. (1997), Event Studies in Economics and Finance, *Journal of Economic Literature*, *35*(1), 13-39, p. 13.

understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[163]

118.    To determine whether NI's Common Stock price movements on any given date are statistically significant, I performed an event study using generally accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

119.    Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the typical volatility such that simple random movement can be rejected as the cause.

120.    I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, to isolate the impact of company-specific news on NI's Common Stock price, I performed regression analyses to measure the relationship between NI's Common Stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in NI's industry. By modeling how NI's Common Stock price returns moved relative to an overall market index and an industry index, I was also able to measure the response of NI's Common Stock to announcements of company-specific news.

---

[163]  Fama, E. F. (1991), Efficient Capital Markets: II, *The Journal of Finance*, *46*(5), 1575-1617, p. 1607.

121.    I previously performed an event study in my Efficiency Report to evaluate whether NI's Common Stock responded to relevant information and together with other supporting factors as listed in my Efficiency Report, I reached the conclusion that NI's Common Stock traded in an efficient market.[164]

122.    After carefully reviewing and considering the relevant information environment for purposes of assessing loss causation and damages in this Report, I have utilized the same event study methodology as that performed in my prior Efficiency Report. For brevity, I repeat the key parameters of this event study below, but refer to my Efficiency Report for a more lengthy discussion of my event study process.[165]

123.    My event study incorporates a rolling six-month (120 trading day) estimation window, the NASDAQ Composite Total Return Index (the "Market Index"), and an equal-weighted Industry Index comprised of the 19 companies in NI's 2022 peer group (the "Industry Index").

124.    **Exhibit 2,** attached hereto, reports the event study results for January 13, 2023 and January 17, 2023. I note that both the announcement of NI's strategic review on January 13, 2023, and Emerson's public offer on January 17, 2023, resulted in statistically significant increases in National Instruments Common Stock prices – *i.e.*, the release of information concerning potential M&A in general, and concerning a potential acquisition by Emerson specifically, each resulted in significant stock price increases, reflecting the economic materiality of such information. Accordingly, and for the reasons discussed above, a reasonable investor would have viewed the alleged omissions concerning Emerson's offers as economically material, thus affecting their investment decisions and the prices at which they sold their NI Common Stock. Thus, I conclude

---

[164] Efficiency Report ¶3.  The event study I employ in this Report remains unchanged from my Efficiency Report.
[165] *See* Efficiency Report Section V.E.

49

that the alleged omissions in this case were important, value-relevant, and economically material to investors.

### D. Financial Analyst and Media Commentary

125.    As further evidence of the importance of information about M&A developments, multiple securities analysts and the financial press issued commentary and analysis in response to post-Class Period disclosures of M&A developments at National Instruments. First, on January 13, 2023, the Company announced a strategic review to explore a potential sale, prompting significant stock movement and extensive research analyst and financial media commentary. For example:

> **Dow Jones Institutional News**: National Instruments Corp. said Friday that its board of directors has initiated a review and evaluation of strategic options, in consultation with its financial and legal advisors.

> The Texas-based equipment and instrumentation company said the comprehensive review would consider a full range of available strategic, business and financial alternatives, including solicitation of interest from potential acquirers and other transaction partners, some of whom have already approached the company.

> …

> *National Instruments shares were up 13%, to $45.50, in premarket trading Friday*.[166]

> **Investing.com**: National Instruments Corporation (NASDAQ: NATI), which goes by NI, is starting a strategic review aiming to maximize shareholder value, saying in a press release that it would consider soliciting interest from potential suitors and other possible transactions.

> Some potential partners have already approached it, NI said.

> *Shares of Austin, Tex.-based NI jumped 17%*.[167]

---

[166] Dow Jones Institutional News, "*National Instruments to Undergo Strategic Review*," January 13, 2023.
[167] Investing.com, "*National Instruments announces strategic review, eyeing shareholder value*," January 13, 2023.

**Benzinga.com**: National Instruments Corporation (NASDAQ: NATI) *rose 17.4% to $47.14 after the company announced it has initiated a review and evaluation of strategic options, including interest from 6 potential acquirers*.[168]

**Morgan Stanley**: NATI announced this AM commencement of strategic review of business. Given the transformation the business has been in process with over the past few years, we are not surprised by interest.[169]

**Jefferies:** We view Friday's announced strategic review as evidence of NATI's strong positioning as an R&D & validation supplier to transforming auto & semis industries. *A strategic buyer, in our view, represents a more likely scenario than a financial partner or activist*. We remove NATI from our Connectivity Solutions' top pick list following Friday's +17% move, but remain bullish on longer-term positioning. Raise PT 10% to $55; maintain Buy rating.[170]

**J.P. Morgan:** National Instruments announced that its Board of Directors has begun a review of strategic options, including a solicitation of interest from potential acquirers (link). In line with the indications from the press release, *our conversations with the company confirmed that the timing of the Strategic review has been driven by potential interest from external parties, including Reuters indicating one of the interested companies being Emerson*.

…

Realistic price multiples for a potential sale can be well north of NATI's recent trading multiples.[171]

**UBS:** Last Friday, NATI announced that the company is exploring a full range of available strategic, business and financial alternatives to unlock/maximize shareholder value, *including solicitation of interest from potential acquirers/ transaction partners (some of whom have already approached the company). This news resulted in a 17% stock rally Friday. Further developments over the weekend including a Reuters article that EMR (covered by Chris Snyder) is one of the companies exploring potential NATI acquisition*.[172]

126.    The second key public M&A development occurred on January 17, 2023, when

Emerson publicly disclosed its $7.6 billion acquisition proposal for National Instruments. This

---

[168] Benzinga, "*National Instruments, Virgin Galactic And Other Big Stocks Moving Higher On Friday*," January 13, 2023.

[169] Morgan Stanley, "*NATI Initiates a Strategic Review*," Analyst Report (January 13, 2023), at p. 1.

[170] Jefferies, "*Takeaways from NATI's Announced Strategic Review*," Analyst Report (January 17, 2023), at p. 1.

[171] J.P. Morgan, "*Strategic Review to Fast Charge Shareholder Value Creation*," Analyst Report (January 17, 2023), at p. 1.

[172] UBS, "*NATI exploring strategic options. How much might potential buyers pay?*," Analyst Report (January 17, 2024), at p. 1.

resulted in another significant stock price increase and prompted broad commentary from research

analysts and financial media:

> **Associated Press**: Emerson Electric Co. is going public with its $7.6 billion bid for National Instruments, saying the company has avoided serious buyout negotiations since early last year.
>
> Emerson bumped up its cash offer for the maker of scientific measuring equipment and software to $53 per share in November, up from a per-share offer of $48 that it had made back in May.
>
> ***Shares of National Instruments jumped, closing Tuesday up nearly 11%***.[173]
>
> **Dow Jones Institutional News**: Emerson Electric Co. has submitted a bid to acquire National Instruments Corp. for $53 a share at an implied enterprise value of $7.6 billion.
>
> The St. Louis-based technology and engineering company said Tuesday that the all-cash offer provides a 32% premium over National Instruments' closing price from last Thursday, the day before National Instruments said its board was evaluating strategic alternatives and had already been approached by potential acquirers.
>
> …
>
> ***Shares of National Instruments jumped 14% to $53.73 in premarket trading***.[174]
>
> **The Wall Street Journal**: Emerson, a St. Louis-based technology and engineering company, said it was offering $53 a share in cash for National Instruments, which it said represents an enterprise value of $7.6 billion.
>
> The offer represents a 32% premium over National Instruments' closing price from last Thursday, the day before the Texas-based equipment and instrumentation company said its board was evaluating strategic alternatives and had been approached by potential acquirers.
>
> …

---

[173] Associated Press, "*Emerson reveals $7.6 billion bid for National Instruments*," January 17, 2023.

[174] Dow Jones Institutional News, "*Emerson Electric Offers to Buy National Instruments in $7.6 Billion Deal*," January 17, 2023.

***National Instruments' shares jumped more than 10% to $52.04 by the close of the Tuesday market***. Emerson's shares fell almost 7% to a low of nearly $91 in one of their steepest drops since June 2020, according to Dow Jones Market Data.[175]

**Oppenheimer:** EMR detailed a proposed all cash offer for NATI at $53/share (38% premium to 30-day VWAP) and ~$7.6B EV (including $432M net debt). The offer reflects 18x NATI's '23E consensus EBITDA at 23.6% EBITDA margin (+350 bps y/y; '22E EBITDA margin at 20.1%/+420 bps). Recent GM levels (~70%) include pressures of supply-chain constrained environment; EMR sees headroom to 75%-plus (was 74–75% during 2014–19). EMR notes 8% G&A/sales includes public company costs, combining with GM rebound view for high-confidence path to ~30% interim EBITDA margin, timeframe TBD, but notes current bid well within financial returns objectives.[176]

127.    As documented above, analysts and the financial press relied upon public disclosures of M&A developments at National Instruments. This evidence strongly suggests that the alleged omissions regarding Emerson's offers to acquire National Instruments Common Stock were important, value-relevant, and economically material to investors in National Instruments Common Stock. Therefore, it stands to reason that the alleged omissions would be considered economically material to investors.

## VI.    Measuring the Economic Link Between the Alleged Omissions and NI's Common Stock Prices (Loss Causation)

### A.    The Economic Link

128.    To establish loss causation, I assess the economic impact of the allegations and determine whether there is economic evidence indicating that the alleged omissions were a substantial factor affecting the Common Stock prices of National Instruments.

129.    As explained in **Section IV.B**, Plaintiff alleges that National Instruments and its senior executives failed to disclose Emerson's offers to acquire National Instruments Common

---

[175] The Wall Street Journal, "*In Pursuit of National Instruments, Emerson Electric Bids Nearly $7 Billion*," January 18, 2023.
[176] Oppenheimer, "*NATI Suited to EMR's Strengths*," Analyst Report (January 17, 2024), at p. 1.

Stock while NI was repurchasing shares of the Company's stock. Plaintiff contends that the omission of this material information rendered the Company's stock price artificially low during the Class Period, causing investors to sell at prices that did not reflect the true value of the undisclosed information about Emerson's offers to acquire National Instruments Common Stock. The Complaint further alleges that the eventual disclosure of the strategic review and Emerson's offer in January 2023 revealed the previously concealed information, resulting in a sharp increase in the Company's stock price.

130.    A generally accepted economic principle is that the value of a security is directly related to expectations about the future cash flows to holders of that security.[177] This includes potential acquisition offers at a premium to a target's current trading price. As discussed above in **Section V**, there is an economic, financial, and valuation link between the alleged omission of Emerson's offers to acquire National Instruments Common Stock and the price at which NI's Common Stock traded. Because of the link between a potential premium acquisition offer and the market value of National Instruments Common Stock, there is thus a clear economic link between the nondisclosure of Emerson's premium offer and the artificially deflated prices at which NI's shareholders sold their stock during the Class Period.

131.    If, as the Complaint alleges, Defendants knowingly withheld information about Emerson's offers to acquire National Instruments Common Stock while engaging in stock repurchases at prevailing market prices, then it was foreseeable at the time of the omissions that such conduct could mislead investors about the fair value of the Company's shares and cause them

---

[177] *See, e.g.*, David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," In Litigation Services Handbook, The Role of the Financial Expert, *John Wiley & Sons, Inc.*, Third Edition, 2001, p. 2 ("the price of an efficiently traded stock is equal to the present value of the discounted future stream of free cash flow"); *see also* Aswath Damodaran, "Investment Valuation: Tools and Techniques for Determining the Value of Any Asset," *John Wiley & Sons, Inc.*, 1996, at pp. 9-10 ("This [DCF] approach has its foundation in the 'present value' rule, where the value of any asset is the present value of expected future cashflows on it.").

to sell at artificially deflated prices. As such, investors who sold National Instruments Common Stock while Defendants concealed this information suffered losses. Therefore, these alleged omissions represent the cause of the economic losses suffered by Plaintiff and the other Class members.

132.    Accordingly, it is my opinion that there is a direct economic link between the alleged omissions and the subsequent economic losses that occurred when Class members sold their National Instruments Common Stock at artificially depressed prices. As discussed elsewhere in this Report, while the ultimate offer disclosed in January 2023 was higher than the initial $48 proposal, the market's reaction nonetheless confirms that earlier disclosure of Emerson's interest in acquiring National Instruments at a premium to prevailing market prices would have been economically material and value-relevant to investors.

## B.  Measuring Economic Losses

133.    In this matter, the measurement of economic losses is straightforward. Investors who purchased shares of National Instruments Common Stock prior to the start of the Class Period and who sold those shares during the Class Period suffered economic losses because their sale prices did not reflect the allegedly omitted information about Emerson's offers to acquire National Instruments Common Stock. Thus, these investors sold their shares at artificially deflated prices. If the allegedly omitted information had been publicly known, these investors would have sold their shares at higher prices. Thus, the measurement of economic losses is connected to the valuation impact of the allegedly omitted information. In the following section, I calculate the value of this artificial deflation in NI's Common Stock prices.

## C. Artificial Deflation in NI's Common Stock Prices

134.    Based on my review of the relevant information environment, and assuming that Plaintiff proves that National Instruments omitted material nonpublic information about Emerson's offers to acquire National Instruments Common Stock, I conclude that the Common Stock prices of National Instruments were artificially deflated throughout the Class Period. Based on the relevant information environment summarized in **Section V**, I conclude that, had the relevant truth been disclosed as of the start of the Class Period, NI's Common Stock would have traded at or above $48 per share throughout the Class Period. In other words, the "but-for" price equals at least $48 per share. Because my analysis in **Section V** clearly supports an implied value of at least $48 per share, I thus base my calculation of artificial deflation on a but-for implied valuation of $48 per share. The calculation of artificial deflation during the Class Period equals the difference between $48 and an investor's sale price.[178] In other words, assuming Plaintiff proves that National Instruments misled investors by failing to disclose material nonpublic information about Emerson's offers to acquire National Instruments Common Stock, investors suffered economic losses by selling their National Instruments shares during the Class Period at prices below $48 per share. This measure of an investor's damages is conservative, including because NI's Board stated that Emerson's initial $48 offer undervalued NI stock, Emerson stated its willingness to increase its offer, and public disclosure of Emerson's offer was likely to prompt other, higher offers.

---

[178] Artificial deflation is $0 prior to the start of the Class Period – *i.e.*, prior to the start of the actionable alleged omissions. NI's Common Stock prices remained artificially deflated until the January 17, 2023 disclosure described in **Sections IV** and **V**.

135.    This but-for implied value of $48 per share, as well as the economic materiality of Emerson's offers to acquire National Instruments Common Stock, is illustrated by the evidence detailed in **Section V**. This includes the following:

(a)    As of the start of the Class Period, Emerson executives had offered $48 per share and indicated their willingness to work with National Instruments "to find additional value that would allow [Emerson executives] to increase [their] Proposal."

(b)    Emerson's offer was all-cash, not contingent on financing, and not expected to encounter regulatory resistance. National Instruments tracked Emerson's financial capacity to complete a transaction. Moreover, NI executives expressed concern that Emerson would take its offer public and acknowledged this would cause NI's Common Stock price to increase.

(c)    The offer represented a significant premium to the current trading prices of NI's Common Stock.

(d)    The timeline of the transaction, including initial target resistance and rejection of an offer as inadequate, is consistent with the typical M&A process documented by peer-reviewed published academic research (including my own).

(e)    Academic research documents that target stock prices frequently trade above offer prices, and this effect is more pronounced in hostile transactions and when bidders accumulate target share ownership (*i.e.*, toeholds).

(f)    National Instruments had retained MacKenzie Partners to monitor the accumulation of a toehold in the Company's shares.

(g)    National Instruments continued to refer to Emerson and the proposed transaction using code names, and did not expose MacKenzie Partners to Emerson's identity.

(h)    National Instruments had retained Bank of America, providing ████████ ████████████████████████████████████████ ████████████

(i)    NI's Common Stock prices increased by statistically significant amounts following the January 13, 2023 and January 17, 2023 M&A disclosures, and research analysts commented on these important Company developments.

136.    I also carefully evaluated whether there was any confounding information that necessitates disaggregation from my calculation of artificial deflation. Because my calculation

57

above subtracts an investor's sale price from the but-for price of $48 per share, the formula removes any confounding information from the artificial deflation. As a result, no further disaggregation of confounding information is required. For example, if the Common Stock prices for National Instruments increased during the Class Period due to the Company's repurchase activity, macroeconomic trends such as inflation or interest rates, or other non-fraud-related Company-specific information, the value impact of such confounding information would be reflected in NI's Common Stock prices. Because I subtract this from $48 in the artificial deflation calculation, this confounding information is automatically disaggregated and removed from the calculation of artificial deflation.

137.    As a result of the foregoing, and assuming Plaintiff proves that National Instruments failed to disclose material nonpublic information about Emerson's offers to acquire National Instruments Common Stock, I find no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from my estimates of artificial deflation.

138.    Based on my analysis in **Section V**, I also find no economic evidence to indicate that the but-for price of $48 per share, and thus the calculation of artificial deflation, would vary throughout the Class Period. As a result of the foregoing, I find no economic reason to believe that the calculation of artificial deflation would have been any different at any point in the Class Period, and thus I conclude that the but-for price of $48 per share, and the calculation of artificial deflation as $48 minus each investor's sale price, remained constant throughout the Class Period.

## VII.    Damages

### A. Sections 10(b) and 20(a) Damages for Common Stock

139.    The standard and well-settled formula for assessing damages for each Class member under Section 10(b) is the "out-of-pocket" method. This method measures damages as the

artificial deflation per share at the time of sale less the artificial deflation per share at the time of purchase. If the security was purchased prior to the start of the Class Period – *i.e.*, prior to the alleged omissions, and then sold during the Class Period while the Common Stock price was artificially deflated, then damages would be equal to the artificial deflation at the time of sale minus the artificial deflation at the time of purchase. Because the amount of artificial deflation prior to the alleged omissions equals zero, the formula as applied to calculating damages in this matter simplifies to the amount of artificial deflation at the time of sale. I understand that only Class members who purchased or otherwise acquired National Instruments Common Stock prior to the start of the Class Period and who sold those shares during the Class Period are eligible to recover damages.[179]

140. For example, assume that Investor A purchased shares of National Instruments Common Stock on July 29, 2022 and sold those shares for $41 on August 12, 2022. This investor purchased the shares with no artificial deflation and sold the shares with $7 of artificial deflation ($48 minus $41). Investor A would then have $7 of damages per share on this transaction.

141. In addition, the calculation of damages incorporates the application of a statutory cap on recovery in federal securities cases brought under Section 10(b) and Rule 10(b)-5 (the 90-day lookback provision of the Private Securities Litigation Reform Act of 1995 codified at 15 U.S.C. §78u–4(e)(1)). While I defer to the Court and/or finder of fact regarding the question of whether this provision would apply to Class Period sales in this matter, I note that if applicable, this limitation provides that damages calculated on National Instruments Common Stock may not exceed the difference between the average closing price over the 90 days following the date of the

---

[179] I understand that, as in other securities class actions, the Court may impose additional limitations on the calculation of individual investor damages, such as offsetting gains generated on other trades (*e.g.*, purchasing shares during the Class Period at deflated prices and selling those shares after the alleged revelation of the truth).

revelation of the relevant truth and investors' sale price. **Table A** below shows the 90-day lookback

price for National Instruments Common Stock for each day starting on January 17, 2023.[180]

---

[180] I note that because all of the 90-day lookback prices in **Table A** exceeded $48 per share, this provision would not limit damages based on my estimate of artificial deflation.

**Table A.**
**National Instruments Common Stock Closing Price and Average Closing Price**
**January 17, 2023 – April 14, 2023**

| Date | Closing Price | Average Closing Price Between Jan. 17 and Date Shown | Date | Closing Price | Average Closing Price Between Jan. 17 and Date Shown |
|---|---|---|---|---|---|
| 1/17/23 | $52.04 | $52.04 | 3/2/23 | $50.62 | $52.77 |
| 1/18/23 | $52.50 | $52.27 | 3/3/23 | $51.25 | $52.73 |
| 1/19/23 | $53.77 | $52.77 | 3/6/23 | $50.83 | $52.67 |
| 1/20/23 | $54.25 | $53.14 | 3/7/23 | $50.84 | $52.62 |
| 1/23/23 | $53.83 | $53.28 | 3/8/23 | $50.76 | $52.57 |
| 1/24/23 | $54.16 | $53.43 | 3/9/23 | $50.29 | $52.51 |
| 1/25/23 | $54.35 | $53.56 | 3/10/23 | $49.66 | $52.43 |
| 1/26/23 | $54.45 | $53.67 | 3/13/23 | $48.82 | $52.34 |
| 1/27/23 | $54.51 | $53.76 | 3/14/23 | $49.92 | $52.28 |
| 1/30/23 | $54.25 | $53.81 | 3/15/23 | $49.71 | $52.22 |
| 1/31/23 | $54.00 | $53.83 | 3/16/23 | $50.40 | $52.17 |
| 2/1/23 | $54.49 | $53.88 | 3/17/23 | $50.57 | $52.14 |
| 2/2/23 | $53.85 | $53.88 | 3/20/23 | $50.64 | $52.10 |
| 2/3/23 | $53.50 | $53.85 | 3/21/23 | $51.23 | $52.08 |
| 2/6/23 | $53.00 | $53.80 | 3/22/23 | $50.86 | $52.06 |
| 2/7/23 | $53.70 | $53.79 | 3/23/23 | $51.91 | $52.05 |
| 2/8/23 | $53.22 | $53.76 | 3/24/23 | $52.15 | $52.05 |
| 2/9/23 | $52.87 | $53.71 | 3/27/23 | $52.01 | $52.05 |
| 2/10/23 | $53.03 | $53.67 | 3/28/23 | $51.98 | $52.05 |
| 2/13/23 | $52.69 | $53.62 | 3/29/23 | $51.79 | $52.05 |
| 2/14/23 | $52.60 | $53.57 | 3/30/23 | $51.75 | $52.04 |
| 2/15/23 | $52.42 | $53.52 | 3/31/23 | $52.41 | $52.05 |
| 2/16/23 | $52.29 | $53.47 | 4/3/23 | $52.69 | $52.06 |
| 2/17/23 | $52.15 | $53.41 | 4/4/23 | $52.42 | $52.07 |
| 2/21/23 | $52.01 | $53.36 | 4/5/23 | $52.49 | $52.07 |
| 2/22/23 | $51.70 | $53.29 | 4/6/23 | $52.36 | $52.08 |
| 2/23/23 | $51.05 | $53.21 | 4/10/23 | $52.47 | $52.09 |
| 2/24/23 | $50.36 | $53.11 | 4/11/23 | $52.58 | $52.09 |
| 2/27/23 | $50.48 | $53.02 | 4/12/23 | $57.68 | $52.19 |
| 2/28/23 | $50.51 | $52.93 | 4/13/23 | $58.06 | $52.28 |
| 3/1/23 | $50.12 | $52.84 | 4/14/23 | $58.13 | $52.38 |

## B. Adaptation to Alternative Findings

142. The damages methodology I have laid out above for Sections 10(b) and 20(a) is flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial deflation and how it evolves over the Class Period. The methodologies can be modified based on alternative findings that the Court and/or finder of fact may determine, including, but not limited to any: (1) confounding information versus corrective information; (2) how deflation evolved over the Class Period; (3) the date of the first actionable omission; and (4) the latest date for eligible Class damages. Below I describe additional details concerning each of these potential variations.

143. First, irrespective of what the Court and/or finder of fact ultimately determines, the appropriate amount of artificial deflation after controlling for any confounding information can be easily inserted into the standard damages model that I have already described—the out-of-pocket damages methodology. Thus, regardless of how the jury weighs the evidence, their findings can simply be incorporated into the damages calculations.

144. Second, should the Court and/or finder of fact determine that the true economic deflation evolved over the Class Period in a different way, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis. If the Court and/or finder of fact determines that deflation was less than the amount I have calculated, then the deflation calculation presented above can be adjusted to incorporate this alternative finding.[181] Damages calculations using the out-of-pocket method (deflation at the time of sale minus deflation at the time of purchase) will still result in an appropriate and accurate assessment of damages. This is true even if the Court and/or finder of fact were to reach different findings on

---

[181] As an alternative hypothetical example, should the jury decide that the first actionable omission happened at a date later than August 12, 2022, prior to that date, fraud-related deflation could simply be set to zero.

artificial deflation each day. Those findings can simply be plugged into the out-of-pocket damages methodology to calculate any Class Member's per share damages (based on artificial deflation).

145.    These hypothetical examples illustrate how artificial deflation need not be constant during the Class Period for the out-of-pocket damages methodology to be applied on a class-wide basis.

146.    Finally, should the Court and/or finder of fact determine that the Class Period must be adjusted in any way to account for the timing of Class members' trading relative to the Company's repurchase activity, then the artificial deflation ribbon would simply occur over this different time interval.

147.    The examples I have described above clearly demonstrate the flexibility of the out-of-pocket damages model.

148.    I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

_Matthew D. Cain_

Matthew D. Cain

63

**Appendix A**

# Matthew D. Cain, Ph.D. July 2025

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

## Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                          Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

## **Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School

- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania; Napa
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance*, *Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2025

    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business

    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
MGMT 610: Financial Management I (MBA Core), Fall: 2007

## Expert Witness Experience

- *In re The Estee Lauder Co., Inc. Securities Litigation*, Case No. 1:23-cv-10669 (S.D. N.Y.). Report July 2025.

- *Genesee County Employees' Retirement System, et al., v. DocGo Inc., et al.*, Case No. 1:23-cv-09476 (S.D. N.Y.). Report July 2025.

- *YVONNE DOLBEC c. BANK OF MONTREAL, et al.*, Case No. 500-06-001335-245 (Province of Quebec, District of Montreal). Report May 2025.

- *In re National Instruments Corporation Securities Litigation*, Case No. 1:23-cv-10488 (S.D. N.Y.). Report May 2025. Deposition June 2025.

- *MOUVEMENT D'ÉDUCATION ET DE DÉFENSE DES ACTIONNAIRES c. CAE INC., MARC PARENT, and SONYA BRANCO*, Case No. 500-06-001312-244, (Province of Quebec, District of Montreal). Report April 2025.

- *In re StoneCo Ltd. Securities Litigation*, Case No. 1:21-cv-09620 (S.D. N.Y.). Report April 2025.

- *In re UiPath, Inc. Securities Litigation*, Case No. 1:23-cv-07908 (S.D. N.Y.). Report February 2025.

- *Ali Diabat, et al., v. Credit Suisse Group AG, et al.*, Case No. 1:23-cv-5874 (S.D. N.Y.). Report December 2024. Rebuttal Report January 2025.

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv-06339 (S.D. N.Y.). Report November 2024. Rebuttal Report February 2025.

- *Steven Leventhal, et al. v. Chegg, Inc., et al.*, Case No. 5:21-cv-09953 (N.D. Ca.). Declaration November 2024.

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024. Rebuttal Report October 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024. Declaration November 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024. Rebuttal Report October 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024. Rebuttal Report October 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024. Rebuttal Report December 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024. Report February 2025.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023. Report December 2024. Deposition March 2025.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024. Rebuttal Report November 2024. Deposition January 2025.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

68

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

69

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024. Report September 2024. Deposition November 2024. Rebuttal Report January 2025.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**Appendix B**

## Documents Considered

**Court Filings, Prior Reports, and Depositions in this Matter:**

- Amended Complaint for Violations of the Federal Securities Laws (Doc. 29), 1:23-cv-10488

- Deposition Transcript of David J. Denis, Ph.D., July 21, 2025

- Opinion and Order (Doc. 42), 1:23-cv-10488

- Expert Report of David J. Denis, Ph.D., June 16, 2025, and Backup Materials

- Expert Report of Shane Goodwin, Ph.D., June 16, 2025, and Backup Materials

- Expert Report of Matthew D. Cain, Ph.D., May 2, 2025, and Backup Materials

**Other Court Decisions and Documents:**

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv-06339 (S.D.N.Y.), Opinion and Order (Doc. 153), dated July 10, 2025

**Academic Literature:**

- Baker, M., Pan, X., & Wurgler, J. (2012). The effect of reference point prices on mergers and acquisitions. *Journal of Financial Economics*, 106(1), 49-71

- Bens, D. A., Nagar, V., Skinner, D. J., & Wong, M. F. (2003). Employee stock options, EPS dilution, and stock repurchases. *Journal of Accounting and Economics*, *36*(1-3), 51-90

- Betton, S., & Eckbo, B. E. (2000). Toeholds, Bid Jumps, and Expected Payoffs in Takeovers. *The Review of Financial Studies*, 13(4)

- Bond, P., & Zhong, H. (2016). Buying High and Selling Low: Stock Repurchases and Persistent Asymmetric Information. *The Review of Financial Studies*, *29*(6), 1409-1452

- Bradley, M., & Rosenzweig, M. (1986). Defensive Stock Repurchases. *Harvard Law Review*, 1377-1430

- Branch, B., & Yang, T. (2003). Predicting Successful Takeovers and Risk Arbitrage. *Quarterly Journal of Business and Economics*, 3-18

- Brav, A., Graham, J. R., Harvey, C. R., & Michaely, R. (2005). Payout policy in the 21st century. *Journal of Financial Economics*, *77*(3), 483-527

- Bruner, R. F. (2004). *Applied mergers and acquisitions,* John Wiley & Sons, Inc.

- Cain, M. D., & Denis, D. J. (2013). Information Production by Investment Banks: Evidence from Fairness Opinions. *The Journal of Law and Economics*, *56*(1)

- Cain, M. D., Griffith, S. J., Jackson Jr, R. J., & Solomon, S. D. (2020). Does *Revlon* matter? An empirical and theoretical study. *Calif. L. Rev.*, *108*, 1683-1731

71

- Chopra, V. K. (1998). Why So Much Error in Analysts' Earnings Forecasts? *Financial Analysts Journal*, *54*(6), 35-42

- Damodaran, A. (1996). *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*. John Wiley & Sons, Inc.

- Denis, D. J. (1990). Defensive Changes in Corporate Payout Policy: Share Repurchases and Special Dividends. *The Journal of Finance*, *45*(5), 1433-1456

- Fama, E. F. (1991). Efficient Capital Markets: II. *The Journal of Finance*, *46*(5), 1575-1617

- Fishman, M. J. (1989). Preemptive Bidding and the Role of the Medium of Exchange in Acquisitions. *The Journal of Finance*, 44(1), 41-57

- Hribar, P., Jenkins, N. T., & Johnson, W. B. (2006). Stock repurchases as an earnings management device. *Journal of Accounting and Economics*, *41*(1-2), 3-27

- Ikenberry, D. L., & Vermaelen, T. (1996). The option to repurchase stock. *Financial Management*, 9-24

- Jindra, J., & Walkling, R. A. (2004). Speculation spreads and the market pricing of proposed acquisitions. *Journal of Corporate Finance*, 10(4), 495-526

- Joos, P. R., & Piotroski, J. D. (2017). The best of all possible worlds: unraveling target price optimism using analysts' scenario-based valuations. *Review of Accounting Studies*, *22*(4), 1492-1540

- MacKinlay, A. C. (1997). Event Studies in Economics and Finance. *Journal of Economic Literature*, *35*(1), 13-39

- Senchack, A. J., Bruner, R. F., & Martin, J. D. (1991). *The Poison Pill Anti-takeover Defense: The Price of Strategic Deterrence*. Research Foundation of the Institute of Chartered Financial Analysts

- Tabak, D. I. & Dunbar, F. C. (2001). *Materiality and Magnitude: Event Studies in the Courtroom, In Litigation Services Handbook, The Role of the Financial Expert* (Third Ed.). John Wiley & Sons, Inc.

- Vermaelen, T. (2005). Share repurchases. *Foundations and Trends in Finance*, *1*(3), 171-268

- Walkling, R. A. (1985). Predicting Tender Offer Success: A Logistic Analysis. *Journal of Financial and Quantitative Analysis*, 20(4)

- Zha Giedt, Z. J. (2023). Economic consequences of announcing strategic alternatives: A voluntary disclosure's benefits and costs. *Contemporary Accounting Research*, *40*(4), 2446-2476

**SEC Filings:**

- National Instruments Corp, SEC Form 10-Q, Oct. 28, 2022

- National Instruments Corp, SEC Form 8-K, Jan. 13, 2023

- National Instruments Corp, Emerson Electric Co, SEC Form DFAN14A, Jan. 17, 2023

- National Instruments Corp, SEC Form 10-K, Feb. 21, 2023
- National Instruments Corp, SEC Form DEFM14A, May. 25, 2023
- National Instruments Corp, SEC Form 8-K, Oct. 11, 2023

**Documents Produced in Discovery:**

- BofA_000803-805
- BofA_000806-808
- BofA_000821-823
- BofA_000824-826
- BofA_001008-025
- BofA_003250-293
- NAT-SL-00000070-365
- NAT-SL-00000541-689
- NAT-SL-00000765-771
- NAT-SL-00000772
- NAT-SL-00001113-116
- NAT-SL-00001152-153
- NAT-SL-00001154
- NAT-SL-00001156-157
- NAT-SL-00001160-167
- NAT-SL-00001185-188
- NAT-SL-00001239-240
- NAT-SL-00001254-255
- NAT-SL-00001260-261
- NAT-SL-00001263-266
- NAT-SL-00001267
- NAT-SL-00001276-278
- NAT-SL-00001309
- NAT-SL-00001428-429
- NAT-SL-00001447-448
- NAT-SL-00001449
- NAT-SL-00001450-454
- NAT-SL-00001455-456
- NAT-SL-00001457-509
- NAT-SL-00001513-545
- NAT-SL-00001547-553
- NAT-SL-00001554-566
- NAT-SL-00001569
- NAT-SL-00001579
- NAT-SL-00001609-612
- NAT-SL-00001699-702
- NAT-SL-00002967-968
- NAT-SL-00002988-990

- NAT-SL-00002991-994
- NAT-SL-00003018
- NAT-SL-00003088-089
- NAT-SL-00005642-648
- NAT-SL-00005982-984
- NAT-SL-00006116-117
- NAT-SL-00006122-123
- NAT-SL-00006205-206
- NAT-SL-00006245
- NAT-SL-00006441-442
- NAT-SL-00006579-581
- NAT-SL-00006677-678
- NAT-SL-00006681
- NAT-SL-00006732
- NAT-SL-00006807-810
- NAT-SL-00006833
- NAT-SL-00006846-847
- NAT-SL-00006940
- NAT-SL-00006968-969
- NAT-SL-00006971
- NAT-SL-00006972-973
- NAT-SL-00006977
- NAT-SL-00006978-979
- NAT-SL-00006980-981
- NAT-SL-00007093
- NAT-SL-00007152
- NAT-SL-00007159-192
- NAT-SL-00007310-311
- NAT-SL-00007475-476
- NAT-SL-00007779
- NAT-SL-00008139-140
- NAT-SL-00008467
- NAT-SL-00008468-469
- NAT-SL-00008520-521
- NAT-SL-00008607-609
- NAT-SL-00008644
- NAT-SL-00008683
- NAT-SL-00008684
- NAT-SL-00008685
- NAT-SL-00008750-755
- NAT-SL-00008756
- NAT-SL-00008757-840
- NAT-SL-00009178
- NAT-SL-00009179
- NAT-SL-0009242-243

- NAT-SL-00009244-245
- NAT-SL-00009246-247
- NAT-SL-00009535-537
- NAT-SL-00009596-957
- NAT-SL-00009611-612
- NAT-SL-00009678
- NAT-SL-00009729-765
- NAT-SL-00010389
- NAT-SL-00010393
- NAT-SL-00010395-396
- NAT-SL-00010399-403
- NAT-SL-00010408-409
- NAT-SL-00010410-413
- NAT-SL-00010427-431
- NAT-SL-00010806-808
- NAT-SL-00010835
- NAT-SL-00011283-287
- NAT-SL-00011412-413
- NAT-SL-00011768-769
- NAT-SL-00012292-295
- NAT-SL-00012657-658
- NAT-SL-00012665-667
- NAT-SL-00014971-972
- NAT-SL-00015038-045
- NAT-SL-00015046-053
- NAT-SL-00015951
- NAT-SL-00016089
- NAT-SL-00016112-145
- NAT-SL-00016269
- NAT-SL-00016314-325
- NAT-SL-00016465
- NAT-SL-00016977-978
- NAT-SL-00017263-267
- NAT-SL-00017309-310
- NAT-SL-00017322-323
- NAT-SL-00018186-187
- NAT-SL-00018398-400
- NAT-SL-00018401
- NAT-SL-00018628-631
- NAT-SL-00019631-633
- NAT-SL-00019634
- NAT-SL-00019635
- NAT-SL-00019636-641
- NAT-SL-00019642-644
- NAT-SL-00019645-647

- NAT-SL-00019909
- NAT-SL-00019759
- NAT-SL-00019760-761
- NAT-SL-00020474-494
- NAT-SL-00020681-682
- NAT-SL-00020751-754
- NAT-SL-00020795-819
- NAT-SL-00021442-444
- NAT-SL-00021470
- NAT-SL-00021472-474
- NAT-SL-00022026-066
- NAT-SL-00022116-117
- NAT-SL-00022130-131
- NAT-SL-00022476-477
- NAT-SL-00022536-539
- NAT-SL-00022559-561
- NAT-SL-00022986-3006
- NAT-SL-00023167-168
- NAT-SL-00023183-184
- NAT-SL-00023189-190
- NAT-SL-00023205-206
- NAT-SL-00023453-454
- NAT-SL-00023501-529
- NAT-SL-00023530-532
- NAT-SL-00023536
- NAT-SL-00023790-791
- NAT-SL-00024106-255
- NAT-SL-00025277-308
- NAT-SL-00025703-704
- NAT-SL-00025801
- NAT-SL-00026027
- NAT-SL-00026862-863
- NAT-SL-00027226-239
- NAT-SL-00027240-242
- WCERS_0000001-162

**Analyst Reports:**

- Morgan Stanley, "NATI Initiates a Strategic Review," (January 13, 2024)
- Jefferies, "Takeaways from NATI's Announced Strategic Review," (January 17, 2023)
- J.P. Morgan, "Strategic Review to Fast Charge Shareholder Value Creation," (January 17, 2023)
- UBS, "NATI exploring strategic options. How much might potential buyers pay?,"

(January 17, 2023)

- Oppenheimer, "NATI Suited to EMR's Strengths," (January 17, 2023)

**Press Releases and Transcripts:**

- Emerson Electric Co., "Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share," January 17, 2023

- Emerson Electric Co., "Emerson Completes Acquisition of NI, Advancing Global Automation Leadership," October 11, 2023

- NATI Annual Investor Conference, Final Transcript, September 15, 2022

**Media:**

- Matthew Levine, "Allergan Is Open to Alternatives That Aren't Valeant," Bloomberg, October 7, 2014

- Business Wire, "NI to Host Annual Investor Conference in San Francisco on September 15th," August 11, 2022.

- Dow Jones Institutional News, "National Instruments to Undergo Strategic Review," January 13, 2023.

- Investing.com, "National Instruments announces strategic review, eyeing shareholder value," January 13, 2023.

- Benzinga, "National Instruments, Virgin Galactic And Other Big Stocks Moving Higher On Friday," January 13, 2023.

- Associated Press, "Emerson reveals $7.6 billion bid for National Instruments," January 17, 2023

- Dow Jones Institutional News, "Emerson Electric Offers to Buy National Instruments in $7.6 Billion Deal," January 17, 2023

- The Wall Street Journal, "In Pursuit of National Instruments, Emerson Electric Bids Nearly $7 Billion," January 18, 2023

**Data Sources:**

- Bloomberg
- Factiva
- SEC filings on EDGAR

**Other:**

- https://www.mackenziepartners.com/
- https://www.merriam-webster.com/dictionary/de%20minimis
- All other documents cited throughout this report and my Efficiency Report in this matter

77

**Appendix C. Replies to the Goodwin Report and the Denis Report**

1.      The Goodwin Report and Denis Report make several claims in their summary of opinions. Below, I respond to those claims and refer to each claim according to the paragraph references within each of these reports (*e.g.*, Claim 18.1 references Prof. Goodwin's opinion summarized in paragraph 18.1 of the Goodwin Report).

### A.      Responses to the Goodwin Report

- Claim 18.1: "These unequivocal rejections constituted classic 'Just Say No' responses, signaling the absence of any meaningful engagement or likelihood of a transaction under the terms offered."

- Claim 18.2: "[I]f the target's board 'Just Says No,' (*i.e.,* refuses to engage in further discussions) as NI's Board did twice, then the friendly merger process stops, absent further developments. The probability of an acquisition thereafter is negligible, and the target continues its normal course of business."

- Claim 18.3: "NI's Board was not interested in pursuing further discussions about a merger at the start of the Proposed Class Period…"

- Claim 18.3.ii: "NI's Board unanimously decided not to engage with Emerson because it considered Emerson's proposals 'opportunistic' and significantly undervalued the Company…"

- Claim 18.4: "As the probability of Emerson acquiring NI was negligible… Plaintiff's claim that NI possessed 'material non-public information' … is speculative and flawed."

2.      As an initial matter, I note that Prof. Goodwin purports to opine on the state of mind of NI's management and board of directors (the "Board") by claiming they were "not interested in pursuing further discussions about a merger…"[182] As noted throughout this Report, Prof. Goodwin ignores internal documents that provide evidence contradicting his opinions. Moreover, the Goodwin Report attempts to present fact-finding conclusions regarding management's and the

---

[182] Goodwin Report ¶18.3; *see also* ¶38 "NI's Board had firmly decided not to engage in further merger discussions with Emerson as of August 2, 2022…"; ¶41.5 "the Board and NI did not perceive a substantial threat that Emerson would return with a hostile bid."

78

Board's thinking during the Class Period. Because these represent opinions that are not grounded in expert analysis, I do not accept them, yet I do not attempt to respond to them in this Report.

3.      Prof. Goodwin's claims rest on a common but flawed premise: that NI's rejections of Emerson's offers marked a definitive end to engagement, rendering the likelihood of a transaction "negligible" at the start of the Class Period. This conclusion is flawed because it overlooks multiple pieces of evidence, including internal documents, showing that National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period. It also ignores internal assessments that the probability of Emerson taking its offer public had increased significantly—a development which carried market implications regardless of whether the Board was engaged in formal negotiations. Finally, it disregards well-established academic research on the structure and dynamics of merger negotiations.

4.      As detailed in **Section V** of this Report, internal documents confirm that a potential deal with Emerson remained under active consideration throughout the Class Period. On August 10, 2022, after learning that ████████████████████████████████████████ ████████████, Ilcisin, NI's SVP of Strategy & Corp. Development, flagged the development for Bank of America with the comment, "This just got interesting!!", which triggered a same-day meeting with advisors.[183] Dixon, the Company's CLO, summarized that meeting in a memo noting that the "[p]robability of going public is much higher now," and recommending board engagement, operational preparedness, and a revised communications strategy.[184] Consistent with this view, Starkloff, the Company's CEO, drafted an internal message preparing for the possibility of a public announcement.[185] These actions occurred just one day before National Instruments created a 10b5-

---

[183] NAT-SL-00011768.
[184] NAT-SL-00008756.
[185] NAT-SL-00021470.

1 plan, which was to take effect on September 12, 2022, and lifted trading restrictions on August 11, and they frame the heightened probability of a public bid that NI and its advisors continued to monitor throughout the Class Period.

5.     Internal documents (as summarized above in **Section V**) confirm that this coordination continued throughout the Class Period. National Instruments and its advisors ███████████████████████████████████████████████████████████ ███████████. For example, on August 19, National Instruments and its advisors deliberated ███████████████████████████████████████████████.[186] On August 25, 2022, MacKenzie Partners advised that ███████████████████████████████████████████ ██████████ ███████████████████."[187] Between August 29 and September 1, 2022, NI's executives worked to ███████████████████████████████████████████████████████████ ███████████████████████████████████████.[188] In preparation for the September 15, 2022 Investor Day, National Instruments and its advisors ███████████████████████████████ ███████████████████████████████[189] On September 19, 2022, executives internally reaffirmed that "███████████████████████████████████████," and further noted that "███████████████████████████████████████."[190] On September 21, 2022, Bank of America delivered ███████████████████████████████████████ ██████████████████.[191] Collectively, these records contradict Prof. Goodwin's assertion that the likelihood of a deal was "negligible," and show that NI prepared for a public bid by Emerson as a serious possibility throughout the Class Period.

---

[186] BofA_000803-804.
[187] NAT-SL-00017309.
[188] NAT-SL-00017322-323; NAT-SL-00022130-131; NAT-SL-00023790.
[189] BofA_000806-808.
[190] NAT-SL-00023189.
[191] BofA_000821-823.

6.      This sustained engagement contradicts Prof. Goodwin's portrayal of NI's response as a definitive rejection with negligible likelihood of a transaction, and is consistent with well-established academic findings that initial rejections often precede continued negotiation. As discussed in **Section V** and in my own published research, Cain, et al. (2020), private merger negotiations typically involve multiple rounds—on average 5.4 rounds of rejections and subsequent offers—and take over four months (and frequently many more months) for the negotiating process to unfold.[192] Initial proposals are frequently rejected, only to be revised and eventually accepted. NI's engagement timeline and planning are fully consistent with this pattern and further undermine Prof. Goodwin's claim that the probability of a transaction was negligible at the start of the Proposed Class Period.

7.      In addition, as discussed in **Section V**, academic research identifies several features of Emerson's proposal that increased the likelihood of a successful acquisition. First, Emerson's offer was all-cash, a form of consideration that academic research has shown to be associated with a higher probability of merger completion. Fishman (1989) finds that "[t]he probability that target management will reject an offer is higher if the medium of exchange is securities as compared to cash."[193] Branch and Yang (2003) reach a similar conclusion, noting that "a cash payment is likely to improve the probability of merger completion/success, as compared with a stock payment offer."[194]

8.      Second, Emerson began acquiring a toehold in National Instruments prior to publicly disclosing its interest, a move that has been shown to increase the likelihood of deal

---

[192] Cain, M. D., Griffith, S. J., Jackson, R. J., Jr., & Solomon, S. D. (2020), Does *Revlon* matter? An empirical and theoretical study, *California Law Review, 108*, 1683-1731, p. 1705.

[193] Fishman, M. J. (1989), Preemptive Bidding and the Role of the Medium of Exchange in Acquisitions, *The Journal of Finance, 44*(1), 41–57, p. 42.

[194] Branch, B., & Yang, T. (2003), Predicting Successful Takeovers and Risk Arbitrage, *Quarterly Journal of Business and Economics*, 3-18, p. 12.

success. Betton and Eckbo (2000) find that "the probability of a successful single-bid contest increases with … the toehold",[195] and Walkling (1985) concludes that "[i]ncreased ownership of target firm shares by the bidder… increases the probability of success."[196]

9.    Third, Emerson's $48 per share offers, submitted on May 25, 2022 and June 22, 2022, represented a premium over NI's 52-week high and a sizeable 36% and 41% premium, respectively, over the stock's closing price prior to the offers—figures well within the range of credible acquisition proposals. As I discuss in **Section V**, Baker, Pan, and Wurgler (2012) find that the probability of deal success increases significantly when the offer exceeds the 52-week high, and that such pricing is perceived by boards and shareholders as a strong valuation signal. Moreover, the 36% and 41% premiums in Emerson's May 25, 2022 and June 22, 2022 offers exceed the median premium of 29.19% observed across more than 7,000 merger attempts in the Baker, et al. sample.

10.    Finally, Prof. Goodwin overlooks the fact that Emerson explicitly signaled a willingness to increase its offer. In its June 22, 2022 offer letter, Emerson reaffirmed that acquiring National Instruments was its "highest strategic priority" and stated: "We look forward to learning more about your internal plan and are confident that with access to limited non-public information after signing an NDA, we could work with you to find additional value that would allow us to increase our Proposal."[197] This language indicates that the $48 per share figure was not Emerson's final offer, but rather an opening bid, undermining Prof. Goodwin's claim that the proposals lacked seriousness or were categorically undervalued.

---

[195] Betton and Eckbo (2000), 841-882, p. 844.
[196] Walkling, R. A. (1985), 461-478, p. 461.
[197] NAT-SL-00010411, pp. 2-3.

11.      Taken together, internal documents and academic literature lead to a clear conclusion: National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period, including sustained internal assessments that Emerson might make its offer public. The structure of Emerson's proposal also aligned with established indicators of credible and economically meaningful acquisition interest. These facts directly contradict Prof. Goodwin's assertion that the likelihood of a transaction was "negligible."

- Claim 18.3.i: "NI retained Bank of America ('BofA') as a financial advisor defensively to assist its Board to evaluate acquisition attempts only, not seek out prospective buyers."

12.      Prof. Goodwin characterizes NI's engagement of Bank of America (BofA) as merely "defensive," pointing to the absence of a success-based fee and the use of a flat retainer structure, which could indicate that a company is not considering a sale but instead merely seeks limited guidance. This conclusion is flawed because it misrepresents the engagement letter and overlooks academic research on how firms engage financial advisors in the context of anticipated or ongoing M&A activity. As discussed in **Section V**, both the June 10, 2022 engagement letter with BofA and NI's contemporaneous actions suggest a broader and more strategic mandate.

13.      First, the engagement letter was executed just four days before National Instruments formally rejected Emerson's $48 proposal, yet it committed National Instruments to a ███████████████████████████████. Had National Instruments viewed the matter as concluded, as Prof. Goodwin claims, there would have been little rationale for entering into an ongoing advisory arrangement. Second, the engagement letter explicitly states that ████ ████████████████████████████████████████████████████ ████████████████████████████████" As Zha Giedt (2023)[198] notes,

---

[198] Zha Giedt, J. (2023), Economic consequences of announcing strategic alternatives: A voluntary disclosure's benefits and costs, *Contemporary Accounting Research*, *40*(4), 2446-2476, p. 2477.

this language is commonly used when a company is exploring a potential sale or merger during preliminary stages.[199] This phrasing is consistent with continued exploration of potential transactions. Third, the letter ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████.”[200]

14.     The fee structure is consistent with the compensation arrangements documented in my own published research with Prof. Denis (2013).[201] We show that approximately 18% of target-side financial advisors assist on M&A transactions without any contingent compensation. Thus, the absence of an upfront success fee does not indicate that a firm lacked interest in pursuing a transaction. In fact, National Instruments ultimately paid BofA approximately $51 million.[202] As disclosed in NI's proxy, "a portion of [the fee] was payable in connection with its opinion and a significant portion of [the fee] is contingent upon the completion of the Merger."[203] This structure aligns with common industry practice and further undermines the claim that BofA's engagement was merely defensive.

15.     Even if Prof. Goodwin's characterization of the BofA engagement as merely "defensive" were accurate, this fact alone would suggest that Emerson's proposal remained a credible threat. Defensive advisory mandates are typically adopted when a company believes a public offer is possible and wishes to prepare for that eventuality. The existence of detailed scenario planning, communications strategies, and board-level coordination throughout the Class

---

[199] *Id.* "As a company, you're not really supposed to say, 'We're trying to sell ourselves,' because if you don't find a buyer then you look a bit desperate. But you can say, 'We're exploring strategic alternatives,' which means the same thing." Matthew Levine, "Allergan Is Open to Alternatives That Aren't Valeant," Bloomberg, October 7, 2014.
[200] NAT-SL-00001554-1566
[201] Cain, M. D., & Denis, D. J. (2013), Information Production by Investment Banks: Evidence from Fairness Opinions, *The Journal of Law and Economics*, 56(1), 245-280.
[202] NI Proxy, p. 46.
[203] *Id.*

Period underscores that National Instruments was not treating the transaction as having a "negligible" probability. Rather, the Company's engagement of BofA reflects a proactive effort to manage the risks and implications of an unsolicited proposal with a high probability of public escalation. This is inconsistent with Prof. Goodwin's opinion that the likelihood of a transaction was "negligible."

- Claim 18.3.v: "NI did not adopt any anti-takeover defenses … suggest[ing] … the Board and NI did not perceive a substantial threat…"

16.     Prof. Goodwin's conclusion that the absence of a poison pill signals that National Instruments did not perceive a substantial threat is flawed because it overlooks both academic literature on anti-takeover defenses and the practical steps the Company took in response to Emerson's approach. Academic research recognizes that firms may rationally choose not to adopt a poison pill immediately, even when facing a credible takeover threat.

17.     As Senchack, et al. (1991) explain, poison pills are powerful deterrents, but "the informed and prudent manager and director… should carefully weigh the purported benefits of the poison pill defense against its costs."[204] Reviewing empirical evidence, Senchack, et al. find that poison pill adoption is frequently associated with negative stock price reactions.[205] This literature suggests that the decision to delay adoption may reflect strategic timing and valuation concerns, rather than a lack of perceived threat.

18.     In this case, and as discussed in **Section V**, leading up to the start of the Class Period, National Instruments took a range of defensive and preparatory steps that reflected concern about a potential hostile bid, even without enacting a poison pill. This included retaining Bank of America as a financial advisor on June 10, 2022, with a mandate that extended beyond simply

---

[204] Senchack, A. J., Bruner, R. F., & Martin, J. D. (1991), *The Poison Pill Anti-takeover Defense: The Price of Strategic Deterrence,* Research Foundation of the Institute of Chartered Financial Analysts, p. 3.
[205] *Id.*, p. 24.

85

evaluating Emerson's proposal. In the weeks following the second rejection and during the Class Period, Bank of America continued to advise the Company. Internal documents show that, with BofA's assistance, National Instruments evaluated Emerson's capacity to finance a potential acquisition, including reviews of its balance sheet strength and available cash resources.[206] These actions confirm that National Instruments remained actively engaged with the likelihood of a potential transaction.

19.    On June 14, 2022, just prior to NI's formally rejecting Emerson's first offer, Rapp, NI's CFO, and Ilcisin, NI's SVP of Strategy & Corp. Development, exchanged internal forecasts that appear to map out possible negotiation scenarios, including the likelihood of a revised offer followed by a public campaign.[207] One forecast noted: "$55 & threat of public" and "Public w/$52 by July 31,"[208] suggesting that NI was addressing a possible public bid as a factor in its strategic planning. As part of that strategic planning, the Board met again on July 19 and 20, 2022 to consider Emerson's second proposal and discussed how to frame NI's financial outlook at the upcoming earnings call in light of the offer.[209] That same day, Starkloff, NI's CEO, proposed organizing an investor conference as part of NI's broader efforts to proactively shape external messaging in the event Emerson pursued a public campaign.[210] These communications show that National Instruments was preparing a public-facing strategy and actively managing its external positioning in anticipation of further developments.

20.    On August 10, 2022, National Instruments was informed ███████████ ███████████████████████████████ prompting immediate internal and external

---

[206] NAT-SL-00012292-2295.
[207] NAT-SL-00008520, p. 1.
[208] *Id*. at pp. 1-2.
[209] NAT-SL-00001460-1.
[210] NAT-SL-00006206.

engagement.[211] That same day, Bank of America was notified, and a senior executive at National Instruments remarked, "This just got interesting!!"[212] Dixon, NI's CLO, also summarized notes from the "Wolverine" meeting held with Bank of America, emphasizing that the "[p]robability of going public is much higher now" and recommending operational preparedness, increased board engagement, and a revised communications strategy.[213] The memo advised against definitive public statements—such as declaring that the Company was not for sale—and warned of the risks of "moving into arb hands," indicating that National Instruments was actively preparing for a potential hostile escalation and closely monitoring the implications for its shareholder base.

21.    During the Class Period, National Instruments continued to prepare for potential escalation. On August 19, 2022, the Company and its advisors discussed ██████████████ ████████████████████████ On August 25, 2022, MacKenzie Partners advised that the accumulation ████████████████████████████." By early September, National Instruments revisited the potential adoption of a shareholder rights plan and worked with its advisors to update messaging in anticipation of a public offer. These coordinated actions reflect the economic importance of Emerson's interest in acquiring the Company.

22.    In sum, the absence of a poison pill during the Class Period does not indicate that National Instruments was not then actively preparing to respond to Emerson's ongoing acquisition interest, as evidence discussed above shows NI was doing during the Class Period. Academic literature cautions that premature adoption of overt anti-takeover measures can be counterproductive, and internal documents show that National Instruments took a series of substantive defensive actions in response to Emerson's approach. These included hiring Bank of

---

[211] NAT-SL-00012665.
[212] NAT-SL-00011768.
[213] NAT-SL-00008756.

America with a broad strategic advisory mandate, evaluating Emerson's financing capacity, preparing public-facing communications in anticipation of a hostile bid, and coordinating closely with advisors as the perceived risk of a public campaign grew.[214] Taken together, these steps reflect active and ongoing engagement with the threat, contradicting Prof. Goodwin's claim that the Company viewed Emerson's proposals as unlikely to escalate.

- Claim 18.3.iii: "NI and Emerson did not take the customary next steps typical in a friendly merger process…"

- Claim 18.3.iv: "The parties had no further discussions until November 3, 2022 when Emerson sent a third proposal to acquire all NI shares for $53 per share."

23.     Prof. Goodwin's conclusion is flawed because it mischaracterizes both the nature of the M&A-related events associated with Emerson's offer to acquire NI Common Stock and the empirical norms surrounding M&A negotiations. Internal documents demonstrate that the Company and its advisors ███████████████████████████████████████████████, consistent with a strategic and measured approach to unsolicited interest. As detailed in **Section V**, National Instruments retained Bank of America in early June 2022, ███████████████ ██████████████████████████████████████████████████████ ████████████████████████████████.

24.     Documents from June 14, 2022 confirm that National Instruments was actively preparing for further developments beyond the initial offer. Executives exchanged internal forecasts that appear to outline likely next steps, including a revised private offer followed by a public escalation. One scenario projected: "$55 & threat of public" and "Public w/$52 by July

---

[214] ██████████████████████████████████████████████████ █████████████████████████████████████████████████████ ██████ NAT-SL-00025292-25294.

31,"[215] reflecting management's expectation that Emerson would increase its offer and go public, further evidence that National Instruments was preparing for continued engagement. These internal forecasts were followed by sustained Board-level engagement throughout July. On July 19, 2022, for example, the Board scheduled a four-hour meeting to evaluate strategic options in light of Emerson's stated intention to make its offer public.[216] Board materials analyzed Emerson's likely cost-synergy-driven strategy and explored defensive responses, including shareholder communications, cost reductions, and the potential adoption of a poison pill.[217] Additional internal documents show that NI and its advisors coordinated extensively on investor messaging and repurchase strategy during this period, further underscoring that the Company continued to monitor, evaluate, and prepare for the Emerson proposal across all levels of governance.[218]

25.     Contrary to Prof. Goodwin's claim, the absence of a formal counteroffer by NI or direct communication between Emerson and NI during August and September 2022 does not imply disengagement. As documented in **Section V**, National Instruments and its advisors continued to treat the Emerson proposal as an active strategic consideration throughout this period. Internal records confirm the planning of regular "Project Wolverine" meetings, updates on Emerson's accumulating toehold, scenario planning in anticipation of a public bid, and continued communications with advisors regarding deal messaging and defensive options.

26.     Moreover, academic literature recognizes that friendly merger processes frequently unfold over multiple rounds of offers and rejections before formal engagement begins. As

---

[215] NAT-SL-00008520-8521.

[216] NAT-SL-00020796-807.

[217] *Id.*

[218] NAT-SL-00002988-2989; NAT-SL-00009611; NAT-SL-00001276; NAT-SL-00001160; NAT-SL-00009179; NAT-SL-00005642-648; NAT-SL-00026027, pp. 7, 10; NAT-SL-00006245; NAT-SL-00001156; NAT-SL-00007093; NAT-SL-00016315-16325; NAT-SL-00022026-2066; NAT-SL-00020476; NAT-SL-00006205-6206; NAT-SL-00025801; NAT-SL-00020751-20754; NAT-SL-00010395; NAT-SL-00021470; BofA_000803-804; BofA_000806-808; NAT-SL-00015951.

discussed in **Section V**, Cain, et al. (2020) find that private merger negotiations average 5.4 bidding rounds and typically span multiple months. It is common for target firms to initially reject an offer while continuing to evaluate strategic alternatives in parallel, especially when anticipating the risk of a public campaign. Prof. Goodwin's interpretation relies on a subjective, flawed, and unsupported characterization of "customary" merger negotiating behavior, overlooking both the strategic dynamics observed in practice and the empirical evidence documented in academic research.

- <u>Claim 31</u>: "Based on my experience, given these valuation reference ranges, it is highly unlikely that NI's Board would have approved (or even recommended to NI's shareholders to vote in favor of) an acquisition of the Company by Emerson for $48 per share, or that BofA would have issued a fairness opinion confirming that Emerson's proposed price of $48 per share was fair 'from a financial point of view.'"

27.    Prof. Goodwin speculates that NI's Board would not have approved, and that BofA would not have issued a fairness opinion, for an acquisition at $48 per share. However, Prof. Goodwin provides no empirical support or citation to standard fairness opinion practices to substantiate this claim. In contrast, my published research with Prof. Denis (2013) analyzed fairness opinions in a sample of over 500 negotiated merger transactions. We found that the transactions in our sample had a mean offer premium of 36.18% and a median of 27.27%, both consistent with the 36% premium embedded in Emerson's May 25, 2022 $48 proposal to National Instruments. Notably, we report that "every fairness opinion in the sample deems the respective transaction fair," providing clear evidence that fairness opinions routinely support transactions with comparable or even lower premiums than the one Emerson made to National Instruments. As a result, Prof. Goodwin's assertion is speculative and inconsistent with actual market practice.

- <u>Claim 18.7</u>: "Based on my experience, when a company receives an unsolicited, non-binding acquisition proposal in the ordinary course of business— particularly when it is not actively pursuing a sale process—and summarily

rejects the proposal while explicitly declining to engage in further discussions, it is not customary for the company to publicly disclose the existence or rejection of that proposal."

- Claim 18.8: "Even when the target is interested in completing a deal, and engages in merger discussions, the multi-stage merger process can stall or fail at any point. Accordingly, a target company typically refrains from disclosing unsolicited proposals unless merger discussions have advanced significantly. Thus, it is speculative to assume that because information regarding advanced discussions is material, a reasonable investor would have viewed the information available as of the start of the Class Period (of preliminary, brief interactions between NI and Emerson that did not advance and were not advancing) as significantly altering the total mix of information available."

28. Prof. Goodwin's characterization is flawed because it misrepresents both the economic relevance of the alleged omissions and NI's internal conduct during the Class Period. The question is not whether the mere receipt of an unsolicited proposal requires public disclosure, but whether the Company was in possession of material nonpublic information at the time it repurchased shares—specifically, whether a credible and value-relevant acquisition remained under active internal evaluation. While I defer to the Court's and/or factfinder's conclusions concerning this question, below I highlight multiple pieces of evidence that undermine Prof. Goodwin's claims.

29. As detailed in **Section V**, NI's internal actions do not reflect a summary rejection of Emerson's offer. Rather, the Company retained BofA, assessed Emerson's capacity to finance a transaction, modeled the likelihood of a revised or public bid, and coordinated external messaging in anticipation of further escalation. These actions reflect continued internal engagement and show that the acquisition proposal remained strategically significant. The Company also retained MacKenzie Partners to monitor stockholder accumulation of National Instruments Common Stock.

30. As discussed in **Section V**, a credible all-cash offer at a 36% or 41% premium, as provided for in the May 25, 2022 and June 22, 2022 Emerson offers, respectively, constitutes

91

information that a reasonable investor would consider economically material. Internal records confirming that National Instruments executives anticipated a "resulting stock price increase" if Emerson's interest became public also support the information's economic materiality.[219] Repurchasing shares while in possession of such information creates an information asymmetry, regardless of whether formal negotiations had "advanced significantly." Prof. Goodwin ignores the fact that a question about economic materiality must grapple with whether the allegedly omitted information would affect the buying and selling decisions of a reasonable investor, including the prices at which they would have sold their NI Common Stock. In this case, both the internal conduct and the nature of Emerson's proposal indicate that it would.

- Claim 27: "BofA's own valuations of the Company on a stand-alone basis using three different well-accepted valuation methods" indicated that NI's valuation "exceeded [Emerson's] offer."

31.    Prof. Goodwin's claim that "BofA's own valuations of the Company on a stand-alone basis … exceeded [Emerson's] offer" is inaccurate and mischaracterizes the nature of the analysis presented to the Board. In Table 1 of his report, Prof. Goodwin selectively highlights valuation figures that were not based on Bank of America's independent assessments, but rather derived from inputs provided by NI's management. However, these projections were considerably more optimistic than market expectations at the time. In the very same slide from BofA's June 14, 2022 presentation (the source of Prof. Goodwin's Table 1), BofA also provided ███████████ ████████████████████████████████████ —a benchmark that better reflected prevailing market expectations.[220] As shown in **Table B** below, these consensus-based forecasts yielded ███████████████████████████████████████████████ , depending on the methodology and time horizon used, placing even the high end of the range

---

[219] NAT-SL-00023167.
[220] NAT-SL-00001522.

below Emerson's $48 per share offer. It is also worth noting that academic research has consistently found analysts' earnings forecasts to be systematically optimistic, suggesting that even consensus estimates may overstate true expectations (Chopra, 1998).[221] Even the Company's 2022 internal projections, ███████████████████████████████████ ████████████████████████████, still below the $48 offer.

**Table B**[222]

| | Based on NI Consensus Projections | | | |
|---|---|---|---|---|
| | '22E Adj. EBITDA | '23E Adj. EBITDA | '22E EPS | '23E EPS |
| | $330 | $384 | $2.02 | $2.32 |
| Implied Price/Share (Low - High) | $32.50 - $39.75 | $33.75 - $42.25 | $34.25 - $44.50 | $33.50 - $46.25 |

32.    To illustrate how optimistic NI's internal projections were relative to market expectations, management projected $581 million in 2023 adjusted EBITDA, while the consensus of analysts' estimates cited by BofA was only $384 million.[223] Moreover, the trading multiples used to derive implied valuations from peer companies were themselves based on analysts' consensus estimates of those firms' adjusted EBITDA, reinforcing that the lower valuations based on consensus inputs reflect prevailing market beliefs. Prof. Goodwin's selective reliance on higher valuations derived from management's projections presents a misleading picture of how Emerson's $48 offer compared to NI's contemporaneous standalone value.

33.    Prof. Goodwin specifically emphasizes the valuation range produced under the Precedent Transaction Premiums method, stating that it "explicitly reflects the control premium that acquirers pay to acquire a target" and that "NI's valuation under this method according to BofA ranged from a low of $49.75 to a high of $62.75. Thus, Emerson's proposal of $48 per share

---

[221] Chopra, V. K. (1998), Why So Much Error in Analysts' Earnings Forecasts?, *Financial Analysts Journal*, *54*(6), 35-42.
[222] NAT-SL-00001522.
[223] NAT-SL-00001518-1522.

93

was lower than even the low end of NI's estimated valuation range in a transaction that involves a change of control."[224] However, this analysis is incomplete. Importantly, the precedent transactions cited by BofA implied a ███████████████████████████████████ ██████████████████████████████████████.[225] While absolute valuation ranges can vary depending on assumptions, a relevant benchmark in change-of-control transactions is often the offer premium itself. On that basis, Emerson's May 25, 2022 offer at a 36% premium was consistent with the average observed in precedent deals, placing the offer well within the typical range for acquisition premiums and supporting its credibility.[226] As discussed in **Section V**, academic research consistently reports control premiums in the range of 30–40%, consistent with Emerson's offer (*e.g.*, Cain and Denis, 2013).[227]

34.     Prof. Goodwin argues that even if National Instruments had disclosed Emerson's proposals, the information would not have been economically material because "the proposed acquisition price was within the NI's future stock price range (or the range of undiscounted price targets) that equity analysts had provided in contemporaneous publicly available analyst reports." This reasoning is flawed. Academic research has consistently documented that analysts' price targets are systematically optimistic. As Joos and Piotroski (2017) summarize prior work, "the average firm's stock price is forecasted to appreciate by approximately 25%–35% over the next year yet will ultimately underperform the analyst's target price by 10%–15% over that horizon."[228]

---

[224] NAT-SL-00001522; Goodwin Report ¶30.
[225] NAT-SL-00001538.
[226] Emerson's $48 per share offer represented a 36% premium to NI's 30-day VWAP as of May 25, 2022—the date of the initial proposal. This is nearly identical to the 38% premium embedded in Emerson's later $53 offer as of November 3, 2022. Both figures are consistent with the median control premium observed in precedent transactions cited by BofA, supporting the economic reasonableness of the initial $48 proposal.
[227] Cain, M. D., & Denis, D. J. (2013), Information Production by Investment Banks: Evidence from Fairness Opinions, *The Journal of Law and Economics*, 56(1), 245-280.
[228] Joos, P. R., & Piotroski, J. D. (2017), The best of all possible worlds: unraveling target price optimism using analysts' scenario-based valuations, *Review of Accounting Studies, 22(4)*, 1492-1540.

Therefore, the fact that Emerson's $48 offer fell within the range of analysts' price targets does not undermine its significance. As discussed in **Section V**, Emerson's all-cash offers at a 36% or 41% premium represent a significant economic event, regardless of whether that price overlaps with optimistic sell-side forecasts. Internal documents confirm that the offers were value-relevant: a July 14, 2022 internal slide presentation discussing the Emerson proposal explicitly warned that if Emerson "goes public," a "resulting stock price increase" was expected.[229] This statement by the Company's own executives directly contradicts Prof. Goodwin's claim and underscores that the information would have been economically material to a reasonable investor.

### B.    Responses to the Denis Report

- Claim 9: "[D]amages for insider trading claims are limited to the insider's allegedly ill-gotten gains."

35.    Prof. Denis asserts that "damages for insider trading shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the insider trading violation—in other words, damages for insider trading claims are limited to the insider's allegedly ill-gotten gains."[230] The Denis Report is referring to Section 20A, under which damages may be capped at the insider's profits gained or losses avoided.[231] However, my understanding is that this case does not allege a Section 20A claim. Instead, it alleges a violation of Rule 10b-5 based on NI's repurchases while in possession of MNPI concerning Emerson's offers to acquire the Company's Common Stock.[232] As a result, Prof. Denis's damages-related opinions are irrelevant.

36.    Under Rule 10b-5 as applied to this matter, my understanding is that damages will be assessed based on the economic harm to investors who sold shares at prices that failed to reflect

---

[229] NAT-SL-00025703.
[230] Denis Report ¶9.
[231] 15 U.S.C. §78t-1(b)(1).
[232] Denis Report ¶12a.

material information—not on whether the Company profited from its share repurchases. As Prof. Denis concedes in his report, repurchases executed while a firm possesses material nonpublic information may result in a redistribution of value between shareholders. He explains that "shareholders that sold undervalued shares … are economically worse off," while "shares that are retained … experience economic gains."[233] This redistribution of wealth reflects a real and measurable economic harm to selling shareholders, caused by a firm's repurchases while withholding material nonpublic information.

37.     Even if the Company did not directly profit from these repurchases—a claim I address below—the relevant economic harm stems from the Company's decision to trade while allegedly in possession of material nonpublic information concerning Emerson's offers to acquire National Instruments Common Stock. Prof. Denis's focus on firm-level profits fails to grapple with this matter's core allegation: that the Company's informed trading activity disadvantaged uninformed sellers, creating a measurable transfer of value that Rule 10b-5 is explicitly designed to address.

- Claim 12.a: "NI did not profit from its share repurchases, even assuming the repurchases occurred while NI was in possession of material non-public information ("MNPI"). This implies that damages to the proposed Class are zero…"

38.     Prof. Denis's assertion that "the impact on the present value of the firm's cash flows (*i.e.*, the firm value) is the same for a repurchase and a dividend"[234] is economically flawed. As he notes, this claim is derived under *perfect capital market* assumptions. However, as referenced in his own report, sources such as Berk and DeMarzo (2011), Brealey, et al. (2010), and Ross et al. (2012) emphasize that the equivalence between repurchases and dividends holds only in

---

[233] Denis Report ¶31; *see also* Deposition Transcript of Dr. David J. Denis (July 21, 2025) ("Denis Tr.") at 75:2-5.
[234] Denis Report ¶28.

frictionless environments—specifically, those without taxes, transaction costs, agency conflicts, or asymmetric information.

39.    Importantly, repurchases and dividends can have materially different implications for firm value. For example, Bond and Zhong (2016) develop a theoretical model in which firms with private information about undervaluation repurchase shares in advance of a seasoned equity offering (SEO).[235] In their framework, the repurchase serves as a signal of private information, reducing perceived mispricing, and increasing investor confidence. As a result, the firm is able to issue new equity on more favorable terms, with proceeds exceeding the cost of the prior repurchase. This sequence generates a positive net cash inflow and improves firm value—an outcome that would not be achievable under a dividend strategy. Thus, under realistic conditions involving asymmetric information and capital market frictions, repurchases can function as value-enhancing corporate actions, distinct from pro rata cash distributions.

40.    In addition to the SEO channel, repurchases can also increase firm value via tax-efficient capital structure optimization. Academic research highlights that repurchases offer distinct corporate tax advantages over dividends, particularly when used to increase leverage. As Vermaelen (2005) notes, firms with excess debt capacity can borrow to fund repurchases, thereby lowering their tax burden, since interest payments on debt are tax-deductible whereas equity financing costs are not.[236]

41.    As discussed in **Section V**, internal communications from mid-June 2022 show that National Instruments management discussed converting its variable-rate revolver into a fixed-rate Term Loan A to secure more favorable borrowing terms and preserve "firepower" for continued

---

[235] Bond, P., & Zhong, H. (2016), Buying High and Selling Low: Stock Repurchases and Persistent Asymmetric Information, *The Review of Financial Studies*, *29*(6), 1409-1452.
[236] Vermaelen, T. (2005), Share Repurchases, *Foundations and Trends in Finance*, *1*(3), 171-268.

repurchases. Starkloff, NI's CEO, noted that the Company should "move on this relatively quickly given [the] environment of rising rates."[237] Such a strategy would reflect an effort to sustain repurchases while locking in favorable borrowing terms. Because interest payments on debt reduce taxable income, financing repurchases through borrowing increases after-tax cash flows available to the firm. This type of benefit is not available under a dividend strategy and directly undermines Prof. Denis's claim that repurchases and dividends have the same effect on the present value of the firm's cash flows.

- Claim 30: "[R]epurchases are simply a means of distributing cash to shareholders, similar to dividends…"

42.      Prof. Denis's assertion that "repurchases are simply a means of distributing cash to shareholders"[238] overlooks the well-established strategic functions that repurchases serve beyond mere cash distribution. Academic research demonstrates that, unlike dividends, share repurchases can play a central role in defending corporate control. For example, Bagwell (1991) shows that when shareholders have heterogeneous reservation prices, repurchase offers selectively remove lower-valuation shareholders, leaving behind a more concentrated and expensive shareholder base. This increases the marginal cost of acquiring control and can render a hostile bid uneconomical. Similarly, Bradley and Rosenzweig (1986), in a publication titled "Defensive Stock Repurchases," find that repurchases are frequently used as a defensive tactic to increase insider ownership and raise the effective acquisition price, making a bid less attractive.[239] These strategic uses provide another mechanism through which repurchases can confer firm-level benefits.

43.      Notably, Prof. Denis himself reaches a similar conclusion in his own research. In Denis (1990), he finds that firms facing takeover threats often initiate share repurchase programs

---

[237] NAT-SL-00002988.
[238] Denis Report ¶30.
[239] Bradley, M., & Rosenzweig, M. (1986), Defensive Stock Repurchases. *Harvard Law Review*, 1377-1430, p. 1378.

or special dividends explicitly as part of a broader defense strategy—providing direct evidence that repurchases can be used to deter hostile bids and alter control dynamics.[240] Thus, Prof. Denis's claim that repurchases are "simply" a method of cash distribution fails to capture their broader economic functions and mischaracterizes their role in corporate strategy.

44.     Repurchases also serve a distinct function that dividends cannot: managing share count and preserving earnings per share (EPS) in the presence of employee stock option dilution. Bens, et al. (2003) show that executives are more likely to increase stock repurchases when outstanding stock options create greater dilution to EPS, or when reported earnings fall short of internal EPS targets.[241] Similarly, Hribar, Jenkins, and Johnson (2006) find that firms increase repurchase activity in quarters when they would otherwise miss consensus EPS forecasts, consistent with using buybacks to support reported performance metrics.[242] In both studies, repurchases are not merely viewed as a way to return capital, but as a strategic mechanism for mitigating dilution and managing financial metrics. Supporting this, Brav, et al. (2005) report that two thirds of executives "feel that offsetting dilution is an important or very important factor affecting their repurchase decisions."[243]

45.     Finally, managerial behavior and real-world implementation further underscore that repurchases are not simply equivalent to dividends. Managers frequently initiate stock repurchase programs when they perceive their firm's shares to be undervalued. Ikenberry and Vermaelen (1996) show that this managerial discretion functions like an exchange option, allowing

---

[240] Denis, D. J. (1990), Defensive Changes in Corporate Payout Policy: Share Repurchases and Special Dividends, *The Journal of Finance*, *45*(5), 1433-1456; *see also* Denis Tr. at 69:9-23.

[241] Bens, D. A., Nagar, V., Skinner, D. J., & Wong, M. F. (2003), Employee stock options, EPS dilution, and stock repurchases, *Journal of Accounting and Economics, 36(1-3)*, pp. 51-90.

[242] Hribar, P., Jenkins, N. T., & Johnson, W. B. (2006), Stock repurchases as an earnings management device, *Journal of Accounting and Economics, 41(1-2)*, pp. 3-27.

[243] Brav, A., Graham, J. R., Harvey, C. R., & Michaely, R. (2005), Payout policy in the 21st century, *Journal of Financial Economics, 77(3)*, pp. 483-527.

firms to repurchase stock when market prices fall below intrinsic value, thereby capturing rents from mispricing opportunities.[244] Supporting this, Brav, et al. (2005) report that 86.4% of executives cite the belief that their firm's stock is a good value relative to its true worth as a key driver of repurchase activity—the single most common motivation reported. In contrast, only 34.8% of dividend-paying firms indicate that stock price significantly influences dividend decisions.[245]

46.    Consistent with these findings, National Instruments structured its August 11, 2022, 10b5-1 repurchase plan to increase buyback volume as the stock price declined. The plan authorized no repurchases when the stock traded at or above $45 per share but permitted up to $8 million per day in repurchases if the price fell below $37.[246] This stark difference in repurchase activity based solely on share price suggests a strategy of taking advantage of underpricing in NI's Common Stock.

47.    Internal communications further underscore that NI's repurchase decisions were tied to strategic financial objectives, distinct from dividend policy. In a January 2022 email exchange between Pedro Andrade, NI's Treasurer, and Karen Rapp, the Company's CFO, Andrade stated, "I would not want to reduce share buyback because we'd go below 100% return of FCF in that year and it could reduce the EPS improvement."[247] This statement makes clear that repurchases were used not merely to return excess cash but to influence reported performance metrics like EPS—a motivation absent from standard dividend policy. This distinction further undermines the claim that repurchases are "simply" a means of cash distribution.

---

[244] Ikenberry, D. L., & Vermaelen, T. (1996), The Option to Repurchase Stock, *Financial Management*, pp. 9-24.
[245] Brav, A., Graham, J. R., Harvey, C. R., & Michaely, R. (2005), Payout policy in the 21st century, *Journal of Financial Economics*, 77(3), pp. 483-527.
[246] NAT-SL-00005642-648.
[247] NAT-SL-00001610.

48.     Similarly, in a presentation titled "NATI Capital Allocation Strategy," National Instruments explicitly adopted the assumption to "Repurchase shares to offset dilution (~2.2M shares/yr)" and modeled that a "Steady-state with stable dividend and return of excess cash through share repurchase = increase EPS."[248] This internal presentation reinforces that the Company described repurchases as a discretionary tool for managing capital structure and mitigating dilution, which is distinct from dividends.

49.     Finally, in an October 14, 2022 internal email, Rapp explained that, "We've also done $160M in share repurchases because we believe our stock has been undervalued. Our planned repurchase amount was $100M so we did more this year than our original plan." This communication further confirms that National Instruments executed discretionary repurchases in excess of its prior plan based on what it described as undervaluation—again contradicting Prof. Denis's claim that the repurchase program was a mechanical or dividend-like cash distribution. [249]

- Claim 12.b: "Lead Plaintiff's produced account statement demonstrates that it gained on its transactions in National Instruments stock."

50.     Prof. Denis opines that Lead Plaintiff "*gained* on its transactions in National Instruments stock overall."[250] He calculates a gain of "over $360,000, a nearly 24 percent return on its investment in just over one year."[251] However, every sale except for one in Prof. Denis's calculations occurred after the end of the Class Period and after one or more alleged corrective disclosures.[252] I understand that such sales are not eligible for damages under Plaintiff's theory of liability.

---

[248] NAT-SL-00001612.
[249] NAT-SL-00006122.
[250] Denis Report ¶36 (emphasis in original).
[251] *Id.*, at ¶37.
[252] Denis Tr. at 77:9-22; 78:6-79:1; 79:18-80:14.

101

51.     When limiting Prof. Denis's calculations to the sale occurring during the Class Period, under the First-in-First-out ("FIFO") approach, Prof. Denis's calculations reveal a loss of $1,880.[253] I further note that none of the purchases in Prof. Denis's calculations occurred during the Class Period, undermining his conjectures about the need to "account for benefits that could offset any damages" on their subsequent sales.[254]

52.     Moreover, I note that applying my artificial inflation ribbon to the Class Period sale of shares by Lead Plaintiff results in a damages estimate of $23,717.50 (= 2,650 shares sold multiplied by $48.00 minus $39.05). This is inconsistent with Prof. Denis's characterization of Lead Plaintiff's loss as "*de minimis*."[255]

- Claim 12.c: "The out-of-pocket damages methodology provided in the Cain Report is incomplete and does not address the circumstances of this matter, and, as a result, fails to provide an appropriate and applicable methodology for calculating classwide damages."

53.     Prof. Denis opines that "[t]he out-of-pocket damages methodology provided in the Cain Report is incomplete and does not address the circumstances of this matter, and, as a result, fails to provide an appropriate and applicable methodology for calculating classwide damages."[256] In particular, he opines that I fail "to discuss a methodology that would apply had NI abstained from repurchases during the proposed Class Period."[257] I understand that had NI abstained from repurchase activity during the Class Period, Plaintiff's Complaint would not contain allegations of a securities law violation in this matter. I am not aware of any requirement or historical precedent for a damages expert proposing a damages methodology to address a situation where there is no

---

[253] Denis Report, at ¶37, Table 2; *see also* Denis Tr. at 82:20-23.
[254] Denis Report, at ¶50.
[255] *Id.*, at ¶39. Merriam-Webster dictionary defines de minimis as "lacking significance or importance: so minor as to merit disregard." Available at: https://www.merriam-webster.com/dictionary/de%20minimis.
[256] Denis Report, at ¶12.c.
[257] *Id.*, at ¶40.

alleged violation of the law. As a result, Dr. Denis's opinions about my damages methodology are irrelevant.

54.     Prof. Denis does not dispute that the out-of-pocket methodology is a standard and common damages methodology that is routinely applied to assess class-wide damages in 10b-5 matters.[258] However, Prof. Denis claims that I have failed to sufficiently articulate how it will be implemented in this case.[259] For example, he questions how I would deal with any mismatch between the corrective disclosures and the information that allegedly should have been disclosed at the start of the Class Period,[260] how I would account for potential confounding information,[261] and ultimately what method I would use to calculate "the price impact of the allegedly undisclosed MNPI."[262] He also raises questions about the legal treatment of Class members with offsetting gains or benefits on other trades,[263] as well as the legal definition of what is meant by trading "contemporaneously" with NI's repurchases.[264] I note that for these latter legal questions, I defer to the Court and/or finder of fact, but note that these questions commonly arise in securities litigation matters and are commonly addressed at trial and, in the event of an award at trial or in a settlement, in the claims administration and plan of allocation.

55.     Regarding Prof. Denis's desire for a more detailed damages calculation, I note that his questions are addressed by my damages calculations in the preceding sections. Moreover, I understand that such details and conclusions are not required at the Class certification stage. It is important to draw a distinction between two concepts that are part of a damages methodology: the

---

[258] Denis Tr. at 41:16-22; 42:18-43:10.
[259] Denis Report ¶43.
[260] Denis Report ¶47.
[261] Denis Report ¶47.
[262] Denis Report ¶43.
[263] Denis Report ¶¶49-51.
[264] Denis Report ¶52.

damages methodology itself and the *inputs* to the damages methodology. In my Efficiency Report, I present the standard well-accepted out-of-pocket damages methodology. Further, I make clear in my Efficiency Report that calculations of artificial deflation per share for each day in the Class Period – the *inputs* to the damages methodology – are questions separate and apart from whether there is a common, class-wide method for computing damages. As discussed in my Efficiency Report and this Report, there are a number of tools and techniques that can be employed to conduct such an evaluation of inputs ultimately used in the damages methodology.[265]

56.     For this reason, the methodology summarized in my Efficiency Report and presented in detail in this Report is sufficient to demonstrate that damages can be calculated class-wide using a common methodology in this matter. Courts routinely accept this methodology in matters such as this.[266]

---

[265] Efficiency Report, Section VI.

[266] *See, e.g.*, *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al*., Case No. 1:22-cv-06339 (S.D.N.Y.), Opinion and Order (Doc. 153), dated July 10, 2025, at p. 3 concluding that "Plaintiffs' damages model suffices under *Comcast*."

**Exhibit 1**

**National Instruments Common Stock Closing Stock Price and Daily Volume**
**May 1, 2022 – October 10, 2023**



Data source: Bloomberg dividend-adjusted daily closing stock prices, and trading volume.

**Exhibit 2**

**Event Study Results**

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($USD) | t-Statistic | p-Value | News Day Description |
|---|---|---|---|---|---|---|---|
| [1] | 1/13/2023 | 16.9% | 16.3% | $6.46 | 16.14 | (0.000) | NI Announces Commencement of Strategic Review Process |
| [2] | 1/17/2023 | 10.8% | 10.4% | $4.82 | 10.27 | (0.000) | Emerson's Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share |

Data sources: Bloomberg, SEC filings, Factiva, Complaint