UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————— x

In re NATIONAL INSTRUMENTS            :        Civ. A. No. 1:23-cv-10488-DLC
CORPORATION SECURITIES LITIGATION     :

——————————————————————————— x        CLASS ACTION


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PAGE

Table of Authorities ...................................................................................................... iii

Preliminary Statement .................................................................................................... 1

Background ..................................................................................................................... 2

Legal Standard ............................................................................................................... 5

Argument ........................................................................................................................ 6

   I.    Plaintiff cannot establish scienter ........................................................................ 6

       *a.*  *Plaintiff cannot establish materiality* ...................................................... 7

       *b.*  *There is no evidence Defendants knowingly possessed material non-public information during the Class Period* ........................................... 12

       *c.*  *Defendants relied in good faith on the advice of disinterested counsel* ........................ 14

  II.   Plaintiff cannot establish loss causation ............................................................ 17

 III.   Plaintiff cannot establish entitlement to damages and has not put forth a reliable basis for calculating damages ........................................................................ 20

       *a.*  *Should this Court exclude Dr. Cain's testimony, Plaintiff offers no basis for finding damages or calculating the amount of damages* ........................... 21

       *b.*  *There is no evidence supporting a but-for price above $48* ........................... 21

       *c.*  *Damages must be further limited in ways not accounted for by Plaintiff's proposed model* ........................................................................ 22

 IV.  Defendants have established the elements of its 10b5-1 trading plan affirmative defense ........................................................................................................ 25

  V.   Plaintiff's Section 20(a) "control person" claim fails absent a primary violation of Section 10(b) ........................................................................................ 26

Conclusion .................................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

PAGE

CASES

*Aetna Life Ins. Co. v. Big Y Foods, Inc.*,
  52 F.4th 66 (2d Cir. 2022) ................................................................................................. 6

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ........................................................................................................... 8

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................... 6

*Basic v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................... 7, 8, 9

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
  752 F.3d 82 (1st Cir. 2014) ............................................................................................. 18

*Castellano v. Young & Rubicam, Inc.*,
  257 F.3d 171 (2d Cir. 2001) ........................................................................................ 8, 12

*Chiarella v. United States*,
  445 U.S. 222 (1980) ........................................................................................................... 6

*Citibank, N.A. v. K-H Corp.*,
  968 F.2d 1489 (2d Cir. 1992) .......................................................................................... 18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
  632 F.3d 751 (1st Cir. 2011) ........................................................................................... 12

*Dirks v. S.E.C.*,
  463 U.S. 646 (1983) ................................................................................................... 24, 25

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................................... 18, 25

*Elkind v. Liggett & Myers, Inc.*,
  635 F.2d 156 (2d Cir. 1980)............................................................................................. 24

*Glazer v. Formica Corp.*,
  964 F.2d 149 (2d Cir. 1992) ............................................................................................ 11

*Goenaga v. March of Dimes Birth Defects Found.*,
  51 F.3d 14 (2d Cir. 1995)................................................................................................... 6

*Gordon v. Sonar Cap. Mgmt. LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015) ................................................................................. 23

*Gross v. GFI Grp., Inc.*,
  310 F. Supp. 3d 384 (S.D.N.Y. 2018) ............................................................................... 20

*Gruber v. Gilbertson*,
  628 F. Supp. 3d 472 (S.D.N.Y. 2022) ................................................................... 14, 15, 17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ............................................................................................................ 6

*In re Carter–Wallace, Inc., Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000) ............................................................................................... 12

*In re Exec. Telecard, Ltd. Sec. Litig.*,
  979 F. Supp. 1021 (S.D.N.Y. 1997) ................................................................................. 21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) ............................................................................................... 18

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
  252 F. Supp. 2d. 1005 (C.D. Cal. 2003) ........................................................................... 21

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) ................................................................... 14, 19, 20

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008) ............................................................................... 20

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ............................................................................................. 19

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014) .............................................................................. 6, 27

*In re Warner Commc'ns Sec. Litig.*,
  618 F. Supp. 735 (S.D.N.Y. 1985) ................................................................................... 21

*In re Williams Sec. Litig.*,
  496 F. Supp. 2d 1195 (N.D. Okla. 2007) .......................................................................... 21

*Jackvony v. RIHT Fin. Corp.*,
  873 F.2d 411 (1st Cir. 1989) ............................................................................................. 11

*Kaplan v S.A.C. Cap. Advisors, L.P.*,
  40 F. Supp. 3d 332 (S.D.N.Y. 2014) .............................................................................. 23, 24

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007) ................................................................................... 19, 20

*Levie v. Sears Roebuck & Co.*,
   676 F. Supp. 2d 680 (N.D. Ill. 2009) ............................................................................ 11

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
   601 U.S. 257 (2024) ....................................................................................................... 24

*Mill Bridge V, Inc. v. Benton*, No. CIV.A.,
   08-2806, 2010 WL 5186078 (E.D. Pa. Dec. 21, 2010) ................................................. 11

*Miller v. Asensio & Co.*,
   364 F.3d 223 (4th Cir. 2004) ........................................................................................ 21

*Newby v. Enron Corp.*,
   188 F. Supp. 2d 684 (S.D. Tex. 2002) ..................................................................... 23, 24

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ........................................................................................... 6

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
   185 F. Supp. 2d 389 (S.D.N.Y. 2002) ........................................................................... 24

*S.E.C. v. Obus*,
   693 F.3d 276 (2d Cir. 2012) ........................................................................................... 6

*SEC v. Wyly*,
   950 F. Supp. 2d 547 (S.D.N.Y. 2013) ........................................................................... 12

*Taylor v. First Union Corp.*,
   857 F.2d 240 (4th Cir. 1988) ........................................................................................ 11

*Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*,
   736 F. Supp. 511 (S.D.N.Y. 1990) ................................................................................ 22

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008) ........................................................................................... 7

*United States v. Scully*,
   877 F.3d 464 (2d Cir. 2017) ......................................................................................... 15

*United States v. Teicher*,
   987 F.2d 112 (2d Cir. 1993) ...................................................................................... 7, 12

*Williams Sec. litigation-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) .................................................................................... 18

STATUTES

15 U.S.C. § 78bb(a)(1)..................................................................................................... 22

RULES

Fed. R. Civ. P. 56................................................................................................... 1, 5, 27

OTHER AUTHORITIES

17 C.F.R. § 240.10b5-1(b) ................................................................................................ 7

17 C.F.R. § 240.10b5-1(C)(1)(i).................................................................................... 26

Defendants National Instruments Corporation ("NI"), Eric Starkloff, and Michael McGrath (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## PRELIMINARY STATEMENT

This is a securities "fraud" action—premised on alleged "insider trading" by Defendant NI in August and September 2022 when NI repurchased shares of its own Common Stock after it received, considered, and rejected two proposals by Emerson Electric Co. ("Emerson") to acquire NI at the same price of $48 per share—with no evidence of "fraud." Instead, the undisputed factual record shows that NI acted at all times with rigor and care to ensure the lawfulness of its conduct. Specifically, once NI received Emerson's proposals, it issued a trading restriction, paused its share repurchasing program—a key component of NI's capital allocation strategy—and did not resume repurchases until after: NI's Board, recognizing its fiduciary duties to shareholders, considered the proposals in connection with financial and legal advisors; NI's Board voted unanimously to reject the proposals and concluded they did not provide a basis for further discussions; NI communicated its firm rejections to Emerson with the specific intention of preventing any further engagement; NI's management genuinely and reasonably concluded NI did not possess material non-public information after rejecting the proposals; and NI received legal advice from both in-house counsel and outside counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell"), that NI was not in possession of material non-public information and could resume repurchases. Plaintiff cannot establish that Defendants possessed material non-public information when repurchasing stock during the Class Period, let alone that Defendants knowingly possessed material non-public information, as is required to prove scienter.

The fatal deficiencies in Plaintiff's atypical insider trading claim, however, extend beyond materiality and scienter. Plaintiff has put forth no evidence establishing damages, a reliable means of calculating any damages, or loss causation—i.e., that its alleged economic harm resulted from the alleged fraud. Plaintiff offers only the testimony of Dr. Matthew Cain to establish loss causation and damages, but his opinions should be excluded as unreliable and irrelevant for the reasons described in Defendants' motion to exclude his testimony, filed contemporaneously herewith. Even with Dr. Cain's testimony, Plaintiff has no evidence connecting the alleged insider trading to losses alleged by the Class. And Plaintiff certainly has not put forth any reliable basis to quantify, or go about calculating, any such loss. Even if Plaintiff could establish a basis for calculating damages, its only proposed methodology—a basic "out-of-pocket" methodology described by Dr. Cain—ignores important limitations on damages in this insider trading case.

Defendants have also established the elements of their 10b5-1 Trading Plan affirmative defense, confirming the lawfulness of NI's September 2022 repurchases. Finally, absent primary liability for securities fraud, Plaintiff's "control person" claim under Section 20(a) against Defendants Eric Starkloff and Michael McGrath also fails.

### BACKGROUND

On January 19, 2022, NI's Board approved a stock repurchase program authorizing NI to repurchase up to $250 million worth of common stock, effective immediately (the "2022 Program"). Defendants' Rule 56.1 Statement of Undisputed Material Facts ("56.1") ¶ 8. The Board believed repurchases "would be in the best interests of the Company [NI] and the stockholders . . . for the following reasons among others: 1. Partially offsetting dilution to stockholders resulting from issuance of Common Stock under the Company's equity incentive plans; 2. Increasing earnings per share; and 3. Utilizing the Company's cash flow from operations." 56.1 ¶ 10. The

2

2022 Program authorized NI's management to execute the program, which included determining the quantity, timing, and price of repurchases. 56.1 ¶ 11.

On May 16, 2022, Emerson's CEO, Lal Karsanbhai, first contacted NI's CEO, Eric Starkloff, regarding Emerson's potential interest in acquiring NI. 56.1 ¶ 23. On May 25, 2022, Karsanbhai and Starkloff spoke by phone, during which Karsanbhai indicated Emerson's interest in a potential acquisition. 56.1 ¶ 24. Later that day Emerson sent a "STRICTLY PRIVATE AND CONFIDENTIAL" letter, (the "May 25 Letter"), proposing to acquire 100% of NI's outstanding Common Stock for $48 per share in cash, while expressly stating it had no current plan to disclose the letter and that the proposal was not an offer. 56.1 ¶¶ 26-29. Emerson's outreach and proposal were unsolicited. 56.1 ¶ 30. Michael McGrath—NI's Board Chairman—and NI's management believed the $48 price substantially undervalued NI and reflected a bargain-seeking effort. 56.1 ¶ 31.

NI engaged Wachtell to advise on NI's defense against Emerson's approach. 56.1 ¶ 33. NI was not interested in being acquired in 2022, up to and throughout the Class Period. 56.1 ¶¶ 21, 119. Nonetheless, NI's Board members understood they had a responsibility to shareholders to consider and evaluate Emerson's proposal. 56.1 ¶ 32. On May 26, 2022, NI's Board held a special meeting with Wachtell, where the outreach and proposal were presented, Wachtell advised on fiduciary duties and potential response options, and the Board planned to reconvene in June with financial advisors. 56.1 ¶¶ 42-54. The next day, NI's Chief Legal Officer, Eddie Dixon, implemented a "Project Wolverine" trading restriction for those aware of the approach— "Wolverine" was a term used by NI to refer to Emerson and the "project" regarding NI's review of Emerson's proposals. 56.1 ¶¶ 45, 55-56.

On June 10, 2022, NI engaged BofA as its financial advisor under a "████████ ████████" 56.1 ¶¶ 57-58, 62-63. On June 14, NI's Board held a special meeting, attended by representatives of Wachtell and BofA. 56.1 ¶¶ 64-65. Wachtell again advised on fiduciary duties and response options, BofA presented valuation analyses showing NI's value exceeded the $48 per share proposal price, BofA confirmed Emerson's ample capacity to pursue M&A, and the Board concluded the $48 proposal did not provide a basis for further discussions given NI's prospects, thus unanimously determining to reject the proposal. 56.1 ¶¶ 66-78. On June 16, NI sent a letter rejecting the proposal (the "June 16 Letter"), stating the Board had carefully reviewed Emerson's May 25 Letter with its advisors and that the proposal did not provide a basis for further discussions. 56.1 ¶¶ 80-83.

Emerson sent NI a June 22 letter reiterating its proposal at the same $48 per share price (the "June 22 Letter"), which NI and its advisors viewed as indicating Emerson was not serious and that an acquisition was unlikely, particularly because Emerson did not raise its price. 56.1 ¶¶ 84-93. NI's Board held a meeting on July 19-20, where it reaffirmed that the proposal was not in NI's or its shareholders' best interests, declined to provide diligence, and authorized communication of a reaffirmed rejection to Emerson. 56.1 ¶¶ 101-06. Sabastian Niles, a Wachtell attorney, was present at the July 19-20 meeting and provided legal perspectives to the Board. 56.1 ¶¶ 102, 107-08. Wachtell attorneys also advised NI's Board the company should "return to business as usual" after rejecting Emerson's $48 per share acquisition proposal from the June 22 Letter and that "business as usual" included NI resuming share repurchases. 56.1 ¶¶ 109-10.

On August 2, 2022, NI sent Emerson a letter (the "August 2 Letter") reiterating that the Board remained unanimously of the view the proposal was not in the best interests of NI and its shareholders. 56.1 ¶¶ 115-18. Following the August 2 Letter, NI believed there was no prospect of

a deal with Emerson. 56.1 ¶ 122. There were no direct communications between NI and Emerson after August 2 until November 3, 2022. 56.1 ¶ 124. Consistent with NI's "return to business as usual," NI sought advice from Wachtell on resuming share repurchases. 56.1 ¶ 127-32, 135-39, 143-46. Between August 4 and 10, NI consulted Wachtell regarding whether NI possessed material non-public information and, after learning on the morning of August 10 that ███████████████████ ████████████████████████████████████, NI received advice from Wachtell that NI was not in possession of material non-public information and could proceed with repurchases. *Id.* On August 11, NI lifted the "Project Wolverine" trading restriction. 56.1 ¶ 149. Also on August 11, NI executed a Rule 10b5-1 repurchase plan with JPMorgan, under which JPMorgan would purchase NI Common Stock beginning on September 12, 2022, with a maximum authorized spend of $60 million. 56.1 ¶¶ 153, 157-59.

NI made no repurchases between May 6 and August 12, 2022. 56.1 ¶ 161. Then, after receiving advice from Wachtell and lifting the trading restriction on August 11, NI repurchased shares of its Common Stock on the open market on August 12, 18, 19, and 26, 2022. 56.1 ¶¶ 162, 166-68. On August 15, 2022, Defendant Starkloff sold some of his personal shares of NI stock at prices well below Emerson's proposed acquisition price. 56.1 ¶ 163-65. From September 12 to 23, 2022, JPMorgan purchased NI shares pursuant to the 10b5-1 Plan, utilizing $59,999,992.63 of the $60 million maximum. 56.1 ¶ 171.

## LEGAL STANDARD

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs 'if the evidence is such that a reasonable [factfinder] could

return a verdict for the nonmoving party.'" *Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 72 (2d Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). Defendants' burden on summary judgment will be satisfied if they "can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 have been held to prohibit "a corporate insider" from "trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders." *S.E.C. v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012) (citing *Chiarella v. United States,* 445 U.S. 222, 228 (1980)). An insider trading theory is premised on the assertion that a corporate insider in possession of alleged material non-public information has a duty to disclose the information *or* to abstain from trading. *Id.* at 284-85. "To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (cleaned up). Absent primary liability under Section 10(b), control person claims under Section 20(a) also fail. *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 631 (S.D.N.Y. 2014).

## ARGUMENT

### I.    Plaintiff cannot establish scienter.

To establish liability under Section 10(b) and Rule 10b-5, Plaintiff must prove Defendants acted with scienter—"intent to deceive, manipulate, or defraud." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (citation omitted). For insider trading liability, the Second Circuit has adopted

6

the "knowing possession" standard. *United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008) (citing *United States v. Teicher*, 987 F.2d 112, 119-21 (2d Cir. 1993)). *See also* 17 C.F.R. § 240.10b5-1(b) (knowing possession standard under Rule 10b-5). Plaintiff must therefore prove Defendants knowingly possessed material non-public information when trading. *Teicher*, 987 F.2d at 121 (scienter established for insider trading where defendant "traded while possessing information he . . . knew to be material [and] knew to be nonpublic").

Plaintiff cannot establish Defendants knowingly possessed material non-public information when implementing the Rule 10b-5 Plan on August 11, 2022, and when repurchasing its own Common Stock throughout the Class Period. Crucially, the information possessed by Defendants at the time—two rejections of a repeated acquisition proposal from Emerson, which Defendants viewed as "dead" after August 2—was not material. Plaintiff's inability to establish materiality is an independent basis for summary judgment. Regardless, there is no evidence Defendants believed the information they possessed at the time was material. Instead, the evidence proves the opposite—Defendants genuinely believed they were not in possession of material non-public information when trading, behaved as if they believed they were not in possession of material non-public information, and exercised caution by seeking and following in good faith the advice of "the absolute best firm" about whether they were in possession of material non-public information and could conduct repurchases. Plaintiff cannot prove scienter, and the Court should grant summary judgment on this basis.

### a.  Plaintiff cannot establish materiality.

"Materiality" requires a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988). In the M&A context, materiality turns in part on the probability that the transaction or

event will occur. *Id.* at 238. The Supreme Court has explained that an analysis of probability must focus on "indicia of interest in the transaction at the highest corporate levels." *Id.* at 239. Relevant factors include "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries." *Id.* "The probability of a transaction occurring must be considered in light of the facts as they then existed [at the time of the securities purchase], not with the hindsight knowledge that the transaction was or was not completed." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 185 (2d Cir. 2001) (cleaned up). While a plaintiff generally need not prove materiality to establish predominance for class certification, the Supreme Court has explained materiality can be "properly addressed . . . in a ruling on a summary-judgment motion." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013).

Application of the *Basic* factors here without the benefit of hindsight supports only one conclusion—during the Class Period, the prospect of a transaction between Emerson and NI was dead, and Emerson's overtures and NI's responses were immaterial. *Basic*, 485 U.S. at 239. In response to Emerson's May 25 Letter, and again to Emerson's June 22 Letter—both of which proposed the same $48 per share acquisition price—NI's Board voted unanimously to reject the proposal and concluded the $48 proposal did not provide a basis for further discussions. 56.1 ¶¶ 26, 28, 74-75, 84-85, 105-06. To review the proposals, NI engaged BofA as its investment banker in a defensive posture, executing a " █████████████████████████████████ ████████████████████████████████████████████ ███████████████ ." 56.1 ¶¶ 62-63. ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████████████████████████████████████. 56.1 ¶ 119-21; *Basic*, 485 U.S. at 239 (factor in assessing materiality is "instructions to investment bankers").

Applying another of the *Basic* factors, there were never "actual negotiations" between Emerson and NI. *See Basic*, 485 U.S. at 239; ECF 29, Amended Complaint ¶ 34 (NI "refused to engage meaningfully with Emerson" for eight months following May 25). NI never negotiated with Emerson before or during the Class Period; it simply reviewed and firmly rejected Emerson's May 25 and June 22 Letters. There were no calls between representatives of NI and Emerson between May 25 and November 2022—months after the Class Period. 56.1 ¶¶ 25, 124. Further, NI's management and advisors did not perceive Emerson as serious about an acquisition attempt after Emerson sent NI the June 22 Letter reiterating its previously rejected $48 proposal. 56.1 ¶¶ 92-93. Emerson's decision to list its advisors and suggest a willingness to increase its proposal price did not change NI's perception, as NI already assumed Emerson was working with advisors and understood from counsel that statements suggesting a willingness to possibly increase price are often included in proposal letters but cannot be relied upon. 56.1 ¶¶ 88-91. *See also* Memo in Support of Motion to Exclude ("MIS Mot. Exclude"), Ex. E, Expert Report of Shane Goodwin (August 27, 2025) ("Goodwin Report"), ¶ 197 (citing literature supporting proposition that language suggesting urgent desire to deal is "classic 'cheap talk,'" not "a pre-commitment to submitting a higher bid.").

Emerson's lack of seriousness about an acquisition before and during the Class Period was corroborated by its response (or, crucially, the lack thereof), to NI's August 2 Letter rejecting Emerson's reiterated $48 proposal. After NI sent the August 2 Letter—drafted with the intention of indicating to Emerson that NI was not interested in being acquired—neither Emerson nor NI initiated any direct communication with the other company until Emerson sent a new, higher

9

proposal to NI on November 3, 2022, months after the Class Period. 56.1 ¶¶ 118, 124, 172. This contrasts with Emerson's reaction to NI's first rejection letter on June 16, 2022, to which Emerson responded with its June 22 Letter just six days later. 56.1 ¶¶ 81, 84-85. Given these developments after August 2 (or, again, the lack thereof), NI believed the prospect of a transaction with Emerson was dead. 56.1 ¶ 122.

NI's view that Emerson was not serious about an acquisition is further corroborated by NI's decision not to adopt a shareholder rights plan (i.e., a "poison pill") before or during the Class Period. 56.1 ¶ 173. NI's counsel at Wachtell advised Eddie Dixon on May 20, 2022, that they "will have a full [poison] pill package if we ever actually need it." 56.1 ¶ 40. Wachtell also provided NI's Board with materials regarding a potential shareholder rights plan at the June 14 special Board meeting. 56.1 ¶ 78. Nonetheless, NI did not adopt a shareholder rights plan before or during the Class Period, despite its clear desire not to be acquired and to instead fight vigorously against an acquisition attempt. 56.1 ¶¶ 21, 119-21. *See* MIS Mot. Exclude, Ex. E, Goodwin Report, ¶¶ 230-33 (NI's decision not to adopt a poison pill after rejecting Emerson's second proposal "would suggest to a reasonable investor" that NI "did not perceive a substantial threat that Emerson would return with a hostile bid").

Ultimately, Plaintiff cannot establish materiality of the information allegedly omitted during the Class Period.[1] As a general matter, courts addressing the materiality of a proposed acquisition have been careful to draw the line in a way that recognizes the reality that "'[t]hose in business routinely discuss and exchange information on matters which may or may not eventuate in some future agreement,'" and therefore "[t]he mere fact that a company has received an

---

[1] For the reasons explained in Defendants' Motion to Exclude Expert Testimony of Dr. Matthew Cain and Memorandum in Support, filed contemporaneously herewith, Dr. Cain's opinions on the materiality of "allegedly omitted information" are unreliable, should be excluded, and do not support materiality in this case. *See* MIS Mot. Exclude, Section I, II.

10

acquisition overture and that some discussion has occurred will not necessarily be material." *Glazer v. Formica Corp.*, 964 F.2d 149, 155 (2d Cir. 1992) (quoting *Taylor v. First Union Corp.*, 857 F.2d 240, 244 (4th Cir. 1988)). *See also Taylor*, 857 F.2d at 244-45 ("[T]he more tentative the discussions the less useful such information will be to a reasonable investor in reaching a decision. . . . To hold otherwise would result in endless and bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to 'bury the shareholders in an avalanche of trivial information'; the very perils that the limit on disclosure imposed by the materiality requirement serves to avoid." (citation omitted)); *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 415 (1st Cir. 1989) (finding immaterial "the type of concern about possible acquisition that many large companies frequently express").

Courts assessing materiality on a motion for summary judgment under analogous factual circumstances—indicating that acquisition interest was not yet serious and any acquisition was not yet likely—have found such information immaterial as a matter of law. *See, e.g.*, *Mill Bridge V, Inc. v. Benton*, No. CIV.A. 08-2806, 2010 WL 5186078, at *12 (E.D. Pa. Dec. 21, 2010), *aff'd*, 496 F. App'x 170 (3d Cir. 2012) (granting summary judgment for defendants on claim alleging trading on basis of material non-public information, concluding discussions regarding a "possible merger were far from material" where companies had not met to discuss due diligence and target had not formed strategic committee, even though companies entered confidentiality agreement and had in-person meeting); *Levie v. Sears Roebuck & Co.*, 676 F. Supp. 2d 680, 687-88 (N.D. Ill. 2009) (granting summary judgment for defendants, concluding "merger negotiations" were not material where there were "no actual negotiations and no instructions to investment bankers to facilitate and explore a merger," even where "senior management of the two companies held discussions about strategic combinations" and "each company had raised the subject with outside advisors").

11

*Cf. SEC v. Wyly*, 950 F. Supp. 2d 547, 561 (S.D.N.Y. 2013) (finding evidence of materiality where defendant *agreed* to pursue sale of company); *Castellano*, 257 F.3d at 180-82 (failed merger negotiations could be found material where company's active participation in negotiations "signaled [the company's] interest in restructuring," and signal was corroborated by fact company "did not give up its consideration of corporate restructuring" after negotiations failed).

Summary judgment is warranted on Plaintiff's failure to establish materiality, alone.

**b. There is no evidence Defendants knowingly possessed material non-public information during the Class Period.**

Even assuming counterfactually that there was evidence of materiality, Plaintiff still must prove Defendants knowingly possessed material non-public information. *Teicher*, 987 F.2d at 121. There is no evidence suggesting any such knowledge. *See, e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 757-58 (1st Cir. 2011) ("If it is questionable whether a fact is material or its materiality is marginal, that tends to undercut the argument that defendants acted with the requisite intent or extreme recklessness in not disclosing the fact." (citing *In re Carter–Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000)). The undisputed facts show that Defendants acted at all times with the intention to fully comply with the law and did not resume repurchases until after they genuinely believed they were no longer in possession of material non-public information. Further, as detailed above, Defendants did not believe Emerson had serious interest in acquiring NI after Emerson reiterated its previously rejected $48 per share proposal. And the proposition that Defendants believed there was a material prospect of an acquisition by Emerson during the Class Period is undermined by Defendant Starkloff's trading activity.

NI worked to ensure compliance with all insider trading laws and took a "very stark and strong approach" to compliance. 56.1 ¶ 18. In 2022, up to and during the Class Period, NI had an

insider trading policy that covered NI's directors, officers, and employees. 56.1 ¶¶ 14-15. The policy explained that it is illegal to trade on the basis of material non-public information, and listed as an example of such information, "significant corporate events, such as a pending or proposed merger, joint venture or tender offer, a significant investment, the acquisition or disposition of a significant business or asset or a change in control of" NI. 56.1 ¶¶ 15-17. The day after the May 26 special board meeting, at which NI's Board first considered Emerson's May 25 Letter, NI's CLO Eddie Dixon emailed the NI directors, officers, and employees who had knowledge of Emerson's approach and announced a trading restriction based on his conclusion that such individuals possessed material non-public information. 56.1 ¶¶ 55-56. This trading restriction remained in place until NI's Legal Senior Director of Corporate, Albert Percival, sent an email lifting the restriction on August 11, 2022—after Emerson reiterated its previously rejected $48 proposal on June 22 and NI reiterated its rejection of that proposal on August 2. 56.1 ¶ 34, 149. Between the time Emerson first approached NI and the Class Period, NI did not engage in repurchases. 56.1 ¶ 161.

After NI sent its August 2 Letter to Emerson reiterating its rejection of the $48 proposal, NI believed that there was no prospect of a transaction with Emerson. 56.1 ¶ 122.[2] NI believed it would have been inappropriate to disclose Emerson's proposals and NI's rejections at this time because it believed Emerson's acquisition proposal did not present a credible offer, there was no offer outstanding after NI rejected Emerson's proposal, NI had no expectation of Emerson returning with another offer, NI had no expectation of negotiating with Emerson and understood it was not obligated to negotiate with Emerson, and Emerson requested that NI keep its proposals

---

[2] Again, this belief is evinced by NI's decision not to adopt a shareholder rights plan at the time, even though NI did not want to be acquired and had received communications from Wachtell discussing the poison pill and indicating an intention to have one ready if it were to be needed. 56.1 ¶¶ 21, 40, 78, 119-21, 173.

confidential. 56.1 ¶ 123. Ultimately, NI's executives believed NI was not in possession of material non-public information by August 11, 2022. 56.1 ¶ 147. NI decided to resume repurchases—a key tenet of NI's capital allocation strategy that was favored by its shareholders, who were aware of the Board's broad January 2022 authorization of $250 million in repurchases after it was announced in February 2022. 56.1 ¶¶ 8-9, 126. NI's CLO, Dixon, would not have allowed NI to engage in repurchases after August 10, 2022, if he had any concern that NI was in possession of material non-public information at that time. 56.1 ¶ 148.

Notably, NI's CEO, Defendant Starkloff—NI's representative with the most knowledge about Emerson's approach and proposals based on his direct involvement—*sold shares* of NI Common Stock on August 15, 2022, which was *during the Class Period*. 56.1 ¶ 163. It is hard to square Plaintiff's theory in this case—that Defendants believed they were in possession of information that would have caused NI's share prices to increase if disclosed and engaged in a fraudulent scheme to conceal that information so NI could repurchase shares at prices Defendants knew to be artificially deflated—with the decision by Starkloff, a key player in this alleged scheme, to keep in place his trading plan and *sell his own shares at the same time*. *See, e.g.*, *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) (granting summary judgment for defendants based in part on failure to prove scienter in case alleging stock price inflation by fraudulent scheme, explaining "[t]he absence of stock sales by insiders or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders").

### c. Defendants relied in good faith on the advice of disinterested counsel.

In a securities fraud action, the defendant's good faith reliance on the advice of counsel tends to negate scienter. *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 492 (S.D.N.Y. 2022). The

14

undisputed facts in this case establish that Defendants: (1) "honestly and in good faith sought the advice of counsel," (2) "fully and honestly laid all the facts before his counsel," and (3) "in good faith and honestly followed counsel's advice." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). *See also Gruber*, 628 F. Supp. 3d at 492 (reviewing whether counsel was "'disinterested and independent'" (citation omitted)).

It cannot be seriously disputed that NI "fully and honestly laid all the facts before" Wachtell when seeking Wachtell's advice about whether NI was in possession of material non-public information before the Class Period. Wachtell advised NI regarding Emerson's approach and proposals starting before Emerson's May 25 Letter and was consistently involved in all subsequent Emerson-related developments. 56.1 ¶¶ 35, 39, 134. Wachtell attorneys were present and provided advice at NI's May 26, June 14, and July 19-20 meetings, where Emerson's proposals were discussed and voted on. 56.1 ¶¶ 43, 65, 102. Wachtell attorneys also advised NI in drafting its June 16 and August 2 Letters rejecting Emerson's proposal. 56.1 ¶¶ 79-80, 117. When Emerson announced the sale of its InSinkErator business on August 8, it was Sabastian Niles of Wachtell who noted the announcement and sent it to NI. 56.1 ¶ 140. Further, it was NI's goal to ensure that Wachtell was aware of all potentially relevant facts to assess whether NI possessed material non-public information before the Class Period. 56.1 ¶ 142. Therefore, when NI learned from MacKenzie Partners on August 10 that ████████████████████████████ ██████, Kevin Ilcisin—NI's Senior Vice President, Corporate Strategy—forwarded the information to Niles and Adam Emmerich, another Wachtell attorney. 56.1 ¶ 141.

The evidence also makes clear that NI "honestly and in good faith sought the advice of counsel." Before NI resumed its stock repurchasing program during the Class Period, NI's executives believed NI was not in possession of material non-public information. 56.1 ¶ 147. This

15

includes in-house counsel Dixon and Percival, who also provided advice to NI's business leaders, including Karen Rapp, that NI could resume repurchases as of August 11, 2022. 56.1 ¶¶ 148-52. Counsel expected this advice to be relied upon and would not have provided this advice if they had any concerns that NI was still in possession of material non-public information. *Id.* Further evincing NI's good faith and diligence, the company did not lift its trading restriction and resume repurchases before receiving advice on multiple occasions from counsel at Wachtell, who NI viewed as "the absolute best firm," and a firm with "expertise" on proposals like Emerson's. 56.1 ¶¶ 36-38. At the Board's July 19-20 meeting, where the Board determined to reiterate its rejection of Emerson's $48 proposal, Niles responded to questions from the Board and provided perspectives on legal issues. 56.1 ¶¶ 106-08. Wachtell attorneys advised the Board to return to "business as usual" after rejecting Emerson's June 22 proposal, and, when asked whether this included resuming NI's repurchasing program, Wachtell's advice indicated that it did. 56.1 ¶¶ 109-110. After NI sent the August 2 Letter reiterating its rejection of Emerson's proposal, NI wanted to resume repurchases for a series of legitimate business purposes, and NI's CFO, Karen Rapp, emailed Dixon and Albert Percival—NI's Senior Legal Director of Corporate—on August 4 asking about NI's ability to do so. 56.1 ¶¶ 126-27. In response, Percival identified the question as a "gray area"—meaning he would consider the situation carefully before reaching a decision that would be communicated to NI's business leaders—and Dixon indicated they needed to determine when Emerson's engagement would be "stale" such that NI could legitimately argue it no longer possessed material non-public information. 56.1 ¶ 128-30. Dixon and Percival agreed they should discuss the issue with Wachtell, and Percival emailed Wachtell attorneys asking for advice about NI implementing a stock repurchasing plan. 56.1 ¶¶ 131-32, 135. NI representatives then had a

16

call with Wachtell attorneys during which it was decided NI would consider resuming repurchases on August 15 so long as there was no further communication from Emerson. 56.1 ¶¶ 137-39.

On August 10, after NI received information about ███████████████ and sent the information to Wachtell, NI's management had a call with Niles, Emmerich, and Wayne Carlin of Wachtell. 56.1 ¶¶ 141-44. The three Wachtell attorneys advised NI's management that NI was not in possession of material non-public information, and therefore NI could conduct repurchases. 56.1 ¶¶ 144-46. NI had every reason to trust Wachtell's expertise and rely on this advice—Wachtell clearly understood that some information about proposed acquisitions is material, having previously given a presentation to NI's Board advising that ████████████████████ ██████████████████████████████.″ 56.1 ¶ 52.

Throughout these events, NI "in good faith and honestly followed counsel's advice." NI did not lift its trading restriction and resume repurchases pursuant to the Board's January 2022 authorization until after Wachtell advised multiple times that NI was no longer in possession of material non-public information, including after new, potentially relevant information became available on August 10. 56.1 ¶¶ 138-39, 141-44. Further, Wachtell was disinterested and independent regarding NI's repurchases—the structure and amount of Wachtell's compensation from NI was not impacted by NI's share repurchases or NI's decision to, or decision not to, repurchase its Common Stock. 56.1 ¶ 133. *Cf. Gruber*, 628 F. Supp. 3d at 492.

Ultimately, Plaintiff cannot establish scienter, as there is no evidence Defendants knowingly possessed material non-public information when engaging in repurchases. That Defendants did not possess any such knowledge is confirmed by their good faith reliance on advice from in-house counsel and Wachtell.

## II.    Plaintiff cannot establish loss causation.

Plaintiff bears the burden of proving loss causation, i.e., "that the economic harm that it suffered *occurred as a result of* the alleged" fraud. *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992) (emphasis in original). "[T]o establish loss causation, [the Supreme Court's decision in] *Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005)).

Plaintiff relies on the testimony of Dr. Cain to establish loss causation. The gist of Dr. Cain's loss-causation opinions is that disclosure of Emerson's acquisition proposals would have impacted the value of NI Common Stock, and therefore the information allegedly omitted by NI during the Class Period was "economically material" and caused "artificial deflation." *See* MIS Mot. Exclude, Ex. A (Expert Report of Matthew D. Cain, PhD, July 28, 2025) ("Merits Report"). For the reasons described in Defendants' motion to exclude Dr. Cain's testimony, filed contemporaneously herewith, Dr. Cain's analysis should be excluded as unreliable and irrelevant. *See* MIS Mot. Exclude, Section I, II.

Should this Court exclude Dr. Cain's testimony, Plaintiff would be left with no evidence to support loss causation, and summary judgment should be granted. *See Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009) (affirming summary judgment on loss-causation grounds after affirming exclusion of expert, rejecting argument that exclusion did not require summary judgment because "the jury could have reasonably drawn the very conclusions that [the expert] did," and concluding, "[t]hese conclusions, however, would be no less speculative and unreliable if reached by jurors than when reached by [the expert]."); *Bricklayers & Trowel*

18

*Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 97 (1st Cir. 2014) ("To sustain this suit, the shareholders needed to show a connection between CSFB's deceptive practices and the drop in AOL's stock price. The shareholders relied solely on [the expert's] event study to satisfy this element. Without it, they cannot show a genuine dispute as to this issue."). *See also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("Summary judgment is appropriate here because [the expert's] testimony does not suffice to draw the requisite causal connection between the information in the [purported corrective disclosure] and the fraud alleged in the complaint.").

Even if this Court were to conclude that Dr. Cain's testimony is admissible, Plaintiff still would have no evidence establishing loss causation. Plaintiff's only loss-causation evidence—Dr. Cain's testimony, based largely upon his "event study," hedged with other unreliable testimony—does not provide the requisite basis for drawing a causal connection between the allegedly omitted information and Plaintiff's alleged loss. *See, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (affirming dismissal of 10(b) and Rule 10b-5 claim for failure to allege loss causation, concluding, "Plaintiffs have not alleged facts to show that [Defendant']s misstatements, among others (made by [another entity]) that were much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [Defendant]'s misstatements."); *In re N. Telecom*, 116 F. Supp. 2d at 461-62 (holding "plaintiffs have failed to raise a disputed issue of fact as to the causation element" and granting summary judgment where plaintiff's expert was "not prepared to rule out . . . alternative causes"). First, Dr. Cain's opinions about NI's omission during the Class Period of Emerson's May 25 and June 22 proposals do not connect any alleged loss to the information that actually existed and could have been disclosed

during the Class Period. Crucially, Dr. Cain's conception of the "allegedly omitted information," while not clearly defined, does not appear to include NI's Board's rejection of the proposals after careful review with its financial and legal advisors, and NI's message to Emerson that the proposals did not provide a basis for further discussions. *See* MIS Mot. Exclude, Section II(a)-(b). In addition, Dr. Cain's analysis of his event study does not reliably disaggregate losses caused by the alleged fraud from those caused by other, non-fraud-related causes. *See id.*, Section II(c). In fact, Dr. Cain does not even acknowledge the existence of non-fraud-related causes, despite his deposition testimony ███████████████████████████████████████, and despite his admission that ███████████████████████████████████ ███████████████████████████████████████. *See id. See also In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) ("Because the law requires the disaggregation of confounding factors, disaggregating only *some* of them cannot suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss." (emphasis in original)); *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 398-99 (S.D.N.Y. 2018), *aff'd*, 784 F. App'x 27 (2d Cir. 2019) (where expert failed to disaggregate confounding information, but instead ignored other news released on the event date, concluding, "a jury would not be able to disaggregate that portion of the increase in . . . share price attributable to a correction of [the alleged mis]statement from that portion of the increase attributable to the other information simultaneously disclosed to the market").

Ultimately, Plaintiff has put forth no evidence that would "allow a factfinder to ascribe some rough proportion of the whole [alleged] loss" to Defendants' alleged fraud. *Lattanzio*, 476 F.3d at 158. Plaintiff cannot establish loss causation.

**III.    Plaintiff cannot establish entitlement to damages and has not put forth a reliable basis for calculating damages.**

20

**a. Should this Court exclude Dr. Cain's testimony, Plaintiff offers no basis for finding damages or calculating the amount of damages.**

Exclusion of Dr. Cain's testimony would also leave Plaintiff without any evidentiary basis for establishing damages. *See In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d. 1005, 1014-15 (C.D. Cal. 2003) (where plaintiff's "expert report on damages . . . [wa]s deficient for failure to provide an 'event study' or similar analysis," holding "there is no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs as to the existence of loss causation and damages"); *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1295 (N.D. Okla. 2007), *aff'd sub nom. In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) ("The court has excluded [plaintiff's expert's] testimony as to each of his damage scenarios. The conclusion follows that plaintiffs cannot satisfy their burden of establishing the fact of damages and the means of calculating damages."); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744 (S.D.N.Y. 1985), *aff'd,* 798 F.2d 35 (2d Cir. 1986) ("Undoubtedly, expert testimony would be needed to fix not only the amount, but the existence, of actual damages.").

Even if this Court were to find Dr. Cain's testimony admissible, his damages opinions are speculative and wholly unsupported by any reliable methodology or analysis. *See* MIS Mot. Exclude, Section III. Therefore, Plaintiff has provided no basis for isolating the part of Plaintiff's alleged loss solely caused by the alleged fraud, as is required to prove and recover damages. *Miller v. Asensio & Co.*, 364 F.3d 223, 232-33 (4th Cir. 2004) (citing *In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997)). Plaintiff's failure to provide any basis for proving damages is an independent, sufficient basis for summary judgment.

**b. There is no evidence supporting a but-for price above $48.**

21

Even if the Court denies Defendants' request to exclude Dr. Cain's testimony, Dr. Cain himself effectively sets $48 as the upper limit for the but-for price of NI's Common Stock—the price at which NI's stock would have traded during the Class Period if NI had disclosed the allegedly omitted information. *See* MIS Mot. Exclude, Ex. A (Merits Report) ¶ 138 ("I find no economic reason to believe that the calculation of artificial deflation would have been any different at any point in the Class Period, and thus I conclude that the but-for price of $48 per share . . . remained constant throughout the Class Period."). While Dr. Cain's opinion setting the but-for price at $48 is unreliable, unfounded, and unsupported by any analysis or methodology, *see* MIS Mot. Exclude, Section III, his own admission that there is no "economic reason" supporting a but-for price besides $48 confirms Plaintiff has no basis for recovering damages based on a but-for price above $48. Therefore, even if the Court denies Defendants' motion for summary judgment with respect to liability, Defendants request that the Court enter partial summary judgment and hold that Plaintiff cannot recover damages based on an artificial deflation calculation using a but-for price above $48 throughout the Class Period. *See* 15 U.S.C. § 78bb(a)(1) ("No person permitted to maintain a suit for damages under the provisions of this chapter shall recover . . . a total amount in excess of the actual damages to that person on account of the act complained of."); *Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 736 F. Supp. 511, 523 (S.D.N.Y. 1990) (granting partial summary judgment with respect to impermissibly speculative portions of damages).

### c. Damages must be further limited in ways not accounted for by Plaintiff's proposed model.

The only damages model proposed by Plaintiff is that presented by Dr. Cain. Dr. Cain's model would calculate damages as the amount of artificial deflation at the time of sale for Class members who purchased or otherwise acquired NI Common Stock prior to the start of the Class Period and who sold those shares during the Class Period. *See* MIS Mot. Exclude, Ex. A (Merits

Report) ¶ 139. Dr. Cain's model, however, does not account for multiple applicable limitations on damages.

First, Dr. Cain's model does not even attempt to determine whether the alleged "scheme" increased the price at which the Class sold stock during the Class Period, thus offsetting some of the loss allegedly caused by artificial deflation. *See Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015) ("[I]n securities fraud cases brought under Section 10(b) . . . the prevailing approach is to offset the plaintiff's losses by any gains that are attributable to the same conduct."). Dr. Cain's deposition testimony ███████████████████████████ ███████████████████████████—implicitly conceding that the damages model does not account for the impact of NI's repurchases. *See* MIS Mot. Exclude, Ex. B (Cain Dep., November 14, 2025) at 103:18-104:6.

Second, any damages to the Class must account for Class members that on net benefitted from the challenged conduct in other ways depending on individualized facts regarding their trading activity, such as by buying NI stock at the allegedly "deflated price" and later selling for a profit. *See Gordon*, 92 F. Supp. 3d at 205 ("anyone who traded in the same direction as defendants" would have benefitted). Plaintiff provides no formula to offset the effect of investors who gained from the alleged fraud. This issue is not speculative—Lead Plaintiff itself had a net gain from its investment in NI. *See* ECF 71-1, Expert Report of David J. Denis, ¶ 36.

Finally, Defendants maintain that insider trading damages in this case must be limited "to profits gained and losses avoided based on the defendant's unlawful acts." *Kaplan v S.A.C. Cap. Advisors, L.P.*, 40 F. Supp. 3d 332, 344 (S.D.N.Y. 2014); *see Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 700 (S.D. Tex. 2002) ("A number of cases also affirm the enforcement of section 10(b) liability through disgorgement of defendant's insider trading profits to private plaintiffs, a remedy

23

different from obtaining damages measured by plaintiffs out-of-pocket losses." (collecting cases)). Defendants rely not only on Section 20A, but also on the common law and the rationales courts have set forth when concluding that disgorgement is the appropriate measure of damages for a Section 10(b) insider trading claim.

For decades, the Second Circuit and other courts have recognized that disgorgement—or return of ill-gotten gains—is a proper measure of damages for insider trading claims. *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 172 (2d Cir. 1980); *Kaplan*, 40 F. Supp. 3d at 344; *Newby*, 188 F. Supp. 2d at 700-01 (collecting cases). The essence of insider trading is the use of superior access to knowledge for an unfair advantage in trading to make "secret profits." *Dirks v. S.E.C.*, 463 U.S. 646, 654 (1983). This is in contrast to Section 10(b) claims alleging material misrepresentations or omissions, where recovery is premised on the proposition that "misleading statements can affect the price of the company's stock" and "defraud[] purchasers of the stock even if they do not rely on the misstatements." *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 404 (S.D.N.Y. 2002). This Court has dismissed Plaintiff's "misrepresentation or omission theory." ECF 42, at 23. *See Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 266 (2024) ("Pure omissions are not actionable under Rule 10b–5(b)."). Nonetheless, the relief sought by Plaintiff here is the broad relief it would have been able to pursue prior to *Macquarie* and completely ignores the difference between the omission theory Plaintiff is now precluded from pursuing and the insider trading theory upon which Plaintiff relies.

In adopting the disgorgement measure of damages for tipper-tippee insider trading claims in *Elkind*, the Second Circuit recognized that disgorgement results in damages that are more "commensurate to the actual harm caused." 635 F.2d at 172. This is because damages are tied directly to the actual source of the fraud—the Defendants' ***trading*** while in possession of material

24

non-public information. Failure to apply the disgorgement remedy to insider trading cases, including those alleging unlawful trading by the "insiders" themselves, would broadly expand liability beyond what is proportional to the alleged harm and serve to undermine the purposes of the securities statutes. *Dura*, 544 U.S. at 345 (it is not purpose of securities statutes "to provide investors with broad insurance against market losses"). This case provides an illustrative example. Under Plaintiff's proposed damages model, Defendants would be liable to contemporaneous traders for the same amount of damages no matter how many shares NI repurchased—whether it repurchased a single share or millions. This measure of recovery bears no relation to the essence of insider trading claims or the harms caused thereby. *See Dirks*, 463 U.S. at 654.

Ultimately, Plaintiff should be barred from recovering damages in excess of these limitations, including the damages cap applicable in Section 10(b) insider trading cases.[3]

## IV.    Defendants have established the elements of its 10b5-1 trading plan affirmative defense.

Rule 10b5-1 creates an affirmative defense to insider trading. That Rule provides, "a person's purchase or sale is not on the basis of material nonpublic information if the person making the purchase or sale demonstrates that:

> (A) Before becoming aware of the information, the person had:
> [. . .]
> (3) Adopted a written plan for trading securities;
> (B) The contract, instruction, or plan described in paragraph (c)(1)(i)(A) of this section:
> [. . .]
> (2) Included a written formula or algorithm, or computer program, for determining the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold; or

---

[3] Summary judgment is further warranted by Plaintiff's inability to prove damages, as damages should be limited to "profits gained or losses avoided" by Defendants, and NI did not profit from its share repurchases. *See* ECF 71, Defendants' Opposition to Lead Plaintiff's Motion for Class Certification, at 9-10; ECF 71-1, Expert Report of David J. Denis, ¶¶ 25, 30, 34. Nonetheless, even if the Court does not believe summary judgment is warranted on this ground, Defendants respectfully request that the Court recognize the damages cap applicable in this insider trading case and bar Plaintiff from recovering damages in excess of that cap.

(3) Did not permit the person to exercise any subsequent influence over how, when, or whether to effect purchases or sales; provided, in addition, that any other person who, pursuant to the contract, instruction, or plan, did exercise such influence must not have been aware of the material nonpublic information when doing so; and

(C) The purchase or sale that occurred was pursuant to the contract, instruction, or plan."

17 C.F.R. § 240.10b5-1(C)(1)(i). Further, the defendant must have adopted the trading plan "in good faith and not as part of a plan or scheme to evade the prohibition[]" on trading on the basis of material non-public information. *Id.* § 240.10b5-1(C)(1)(ii)(a).

NI's 10b5-1 Trading Plan, adopted on August 11, 2022, establishes the elements of the affirmative defense. 56.1 ¶¶ 153, 157-60, 171. The Trading Plan was written and included a formula for determining the amount of securities to be purchased, and JPMorgan purchased NI stock pursuant to the Trading Plan. *Id.* And as detailed herein, Defendants were not in possession of material non-public information when they adopted the Trading Plan on August 11, 2022—Defendants in fact went to great lengths to confirm they did not possess material non-public information at the time—and therefore the Trading Plan was adopted in good faith and not for the purpose of evading prohibitions on insider trading. *See* Section I, *supra.* At the very least, even if the Court were to conclude summary judgment is not warranted on materiality, Defendants respectfully request that the Court enter partial summary judgment on their 10b5-1 Trading Plan affirmative defense, recognizing that the lawfulness of Defendants' trades pursuant to the Trading Plan turns only on whether they possessed material non-public information when they adopted the Plan on August 11, 2022.[4]

**V.    Plaintiff's Section 20(a) "control person" claim fails absent a primary violation of Section 10(b).**

---

[4] For the same reason, any evidence related to materiality from after NI's last open market repurchases on August 26, 2022, is irrelevant. The only repurchases by NI after August 26 were executed by JPMorgan pursuant to the 10b5-1 Plan, and therefore materiality with respect to those repurchases turns on the information possessed by Defendants on August 11, 2022. 56.1 ¶¶ 168, 171.

26

For the reasons described herein, Plaintiff cannot prove an insider trading claim against Defendants under Section 10(b). Therefore, Plaintiff's "control person" claim under Section 20(a) also fails as a matter of law. *In re OSG*, 12 F. Supp. 3d at 631.

## CONCLUSION

For the reasons stated herein, Defendants respectfully request that this Court grant their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

Dated: December 22, 2025

By: /s/ *James F. Bennett*

James F. Bennett (*pro hac vice*)
John D. Comerford (*pro hac vice*)
Jeremy M. Hofman (*pro hac vice*)
Dowd Bennett LLP
7676 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone: (314) 889-7300
Facsimile: (314) 863-2111
jbennett@dowdbennett.com
jcomerford@dowdbennett.com
jhofman@dowdbennett.com

Andrew Ditchfield
Davis Polk & Wardwell LLP
450 Lexington Ave
New York, New York 10017
Telephone: (212) 450-4000
andrew.ditchfield@davispolk.com

*Counsel for Defendants National Instruments Corporation, Michael McGrath, and Eric Starkloff*

27

**CERTIFICATE OF WORD COUNT**

1.      Pursuant to Rule 7.1 of the United States District Court for the Southern District of New York, the undersigned counsel certifies that the foregoing brief was prepared on a computer using Microsoft Word. A proportionally spaced typeface was used as follows:

> Name of Typeface: Times New Roman Point
> Size in Body: 12
> Line Spacing in Body: Double (footnotes, single)

2.      The total number of words in the brief as determined by Microsoft Word's word count function, inclusive of point headings and footnotes and exclusive of the caption, table of contents, table of authorities, signature block, and this Certification, is 8,643 words.

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 22, 2025, a true and correct copy of the foregoing was filed electronically using the Court's electronic filing system. By operation of that system a notice of electronic filing will be served upon all counsel of record in the case.

/s/ *James F. Bennett*

29