UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

In re NATIONAL INSTRUMENTS          :          Civ. A. No. 1:23-cv-10488-DLC
CORPORATION SECURITIES LITIGATION   :
_____x          CLASS ACTION

**DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1

Pursuant to Local Rule 56.1, Defendants submit the following statement of undisputed material facts in support of their motion for summary judgment.

1.      Up to and during the Class Period, [1] Defendant National Instruments Corporation ("NI") was a producer of automated test equipment and virtual instrumentation software. Ex. 1, NI Proxy Statement (May 25, 2023), at 11; Ex. 2, Starkloff Dep., at 159:4-16. [2]

2.      Up to and during the Class Period, NI was a publicly traded corporation. Ex. 1, NI Proxy Statement (May 25, 2023).

3.      Defendant Eric Starkloff was the Chief Executive Officer of NI from 2020 to October 2023. Ex. 2, Starkloff Dep., at 8:10-22.

4.      Defendant Michael McGrath was the Chairman of the Board of NI beginning October 2018 through at least May 2023. Ex. 3, McGrath Dep., at 24:12-16; Ex. 1, NI Proxy Statement (May 25, 2023), at 4.

5.      In 2019, NI's Board authorized a stock repurchase program. Amended Complaint ("Compl.") ¶ 22 n.1; Ex. 4, January 2022 Board Meeting Minutes and Exhibit G, at 15.

6.      That stock repurchase program authorized NI to "repurchase shares of [NI's] common stock . . . from time to time up to a maximum number of shares of 3,794,324 shares." *Id.*

7.      By January 19, 2022, only 270,445 shares remained available for repurchase under this stock repurchase program. *Id.*

8.      On January 19, 2022, NI's Board approved a new stock repurchase program authorizing NI to repurchase up to $250 million worth of common stock, effective immediately

---

[1] The "Class Period" refers to the Court's definition of the Class Period in its September 19, 2025, Opinion and Order, ECF 105—"between August 12, 2022 and August 30, 2022 and/or between September 12, 2022 and September 28, 2022."
[2] Exhibits citations refer to exhibits to the Declaration of James F. Bennett filed in support of Defendants' Rule 56.1 Statement of Undisputed Material Facts.

(the "2022 Program"). Ex. 4, January 2022 Board Meeting Minutes and Exhibit G, at 6, 15; Ex. 45, Percival Decl. ¶ 9.

9.      NI publicly disclosed the 2022 Program in its SEC Form 10-K for the fiscal year ended December 31, 2021. Ex. 5, NATI Form 10-K (February 22, 2022), at 26 n.1.

10.      In approving the 2022 Program, the Board stated it "believes it would be in the best interests of the Company [NI] and the stockholders for the Company to repurchase additional shares of the Common Stock in the open market for the following reasons among others: 1. Partially offsetting dilution to stockholders resulting from issuance of Common Stock under the Company's equity incentive plans; 2. Increasing earnings per share; and 3. Utilizing the Company's cash flow from operations." Ex. 4, January 2022 Board Meeting Minutes and Exhibit G, at 15.

11.      The 2022 Program, as approved by the Board, "authorized, empowered and directed" the "Authorized Officers" to "determine and approve the quantity, timing, price and other terms" of the 2022 Program. *Id.* at 16. "Authorized Officers" included NI's President, Chief Executive Officer, Chief Financial Officer, and "such other officers of [NI] as may be designated by the President and Chief Executive Officer or the Chief Financial Officer." *Id.*

12.      Under the 2022 Program, decisions by NI's management about "the amount that [NI] spent on share buybacks" were "correlated . . . to a longer term view of cash generation," focused on NI's access to cash over a year or two years. Ex. 2, Starkloff Dep., at 22:17-23:19. NI's available cash in a quarter was only a "very minor factor" for management when determining the amount of buybacks to conduct. *Id.*

13.      In the view of NI's Chief Financial Officer, Karen Rapp, NI's repurchases of its own Common Stock caused shareholders' stakes in NI to increase, and NI did not benefit as a

company when it repurchased its own shares because repurchased shares became treasury shares, and thus NI was not an owner of its own Common Stock. Ex. 6, Rapp Dep., at 165:1-166:9.

14.     In 2022, up to and during the Class Period, NI had an Insider Trading Policy. Ex. 7, Dixon Dep., at 70:12-71:7; Ex. 8, Insider Trading Policy.

15.     NI's Insider Trading Policy stated it "is illegal for anyone to trade in securities on the basis of material nonpublic information." Ex. 8, Insider Trading Policy, at 1. It also stated that officers, directors, employees, and other NI representatives covered by the policy could not use material nonpublic information to transact in securities of NI or to express an opinion or make a recommendation about trading in NI's securities. *Id.*

16.     In the view of NI's Board Chair, Michael McGrath, NI's directors, officers, employees, and other representatives were all advised of this prohibition on trading on material nonpublic information. Ex. 3, McGrath Dep., at 28:5-10.

17.     NI's Insider Trading Policy listed as an example of "material" information, "significant corporate events, such as a pending or proposed merger, joint venture or tender offer, a significant investment, the acquisition or disposition of a significant business or asset or a change in control of" NI. Ex. 8, Insider Trading Policy, at 2-3.

18.     NI worked to "ensure that [it was] compliant with all insider trading laws" and took "a very stark and strong approach to . . . being compliant with the law and ensur[ed] that all [NI] employees did the same." Ex. 7, Dixon Dep., at 306:19-307:3.

19.     In 2022, NI's Board Chairman and management viewed NI as undervalued in part because there was a supply chain crisis in 2021 and 2022. Ex. 3, McGrath Dep., at 101:18-103:9; Ex. 2, Starkloff Dep., at 22:17-23:13, 90:17-91:12.

20.    In 2022, NI's revenue was suppressed because NI had strong demand for its products and received orders from customers but could not ship sufficient product to fulfill these orders and generate the corresponding revenue. Ex. 3, McGrath Dep., at 101:18-103:9; Ex. 2, Starkloff Dep., at 90:17-91:12.

21.    In 2022, up to and throughout the Class Period, NI was not interested in being acquired by another company. Ex. 2, Starkloff Dep., at 160:15-21; Ex. 9, Ilcisin Dep., at 240:15-18; Ex. 7, Dixon Dep., at 52:24-53:8, 246:15-25, 298:16-20.

22.    Prior to May 16, 2022, NI's CEO at the time, Eric Starkloff, and Board Chair at the time, Michael McGrath, were not aware of any interest from Emerson Electric Co. ("Emerson") in acquiring NI. Ex. 2, Starkloff Dep., at 161:22-162:1; Ex. 3, McGrath Dep., at 333:16-20.

23.    On May 16, 2022, Emerson's CEO Lal Karsanbhai contacted Starkloff regarding Emerson's potential interest in an acquisition of NI. Ex. 1, NI Proxy Statement (May 25, 2023), at 35.

24.    On May 25, 2022, Karsanbhai and Starkloff spoke by phone, and Karsanbhai indicated Emerson was interested in a potential acquisition of NI. *Id.*; Ex. 10, May 25 Letter.

25.    After the May 25, 2022 call between Karsanbhai and Starkloff, there were no phone calls between Karsanbhai and Starkloff until at least November 3, 2022, which is after the Class Period. Ex. 2, Starkloff Dep., at 28:18-29:15.

26.    Also on May 25, 2022, Karsanbhai emailed a letter (the "May 25 Letter") to Starkloff. Ex. 10, May 25 Letter.

27.    The top of the first page of the May 25 Letter stated, "STRICTLY PRIVATE AND CONFIDENTIAL." *Id.* Emerson's May 25 Letter also stated, "[w]e have no current plan to disclose this letter and assume that you do not intend to either." *Id.* at 1-2.

28.    The May 25 Letter stated, "Emerson proposes to purchase 100% of the outstanding common stock of NI for $48 in cash per common share." *Id.*

29.    Further, the May 25 Letter stated, "This Proposal constitutes neither an offer nor evidence of the existence of an offer, and is not intended to be and does not create a binding legal obligation on any party and no party will have any obligation or liability with respect to the Proposal, unless and until the execution of the Definitive Agreement by the parties hereto and then subject to the terms thereof." *Id.*

30.    Emerson's May 2022 proposal to acquire NI was unsolicited. Ex. 3, McGrath Dep., at 333:3-7; Ex. 2, Starkloff Dep., at 162:2-5; Ex. 9, Ilcisin Dep., at 241:14-19; Ex. 7, Dixon Dep., at 298:21-299:1.

31.    NI's Board Chairman and CEO believed Emerson's $48 per share proposal price in the May 25 Letter was not credible, substantially undervalued NI, and was "just an attempt to look for a bargain in the market." Ex. 3, McGrath Dep., at 101:11-103:19; Ex. 2, Starkloff Dep., at 162:6-17.

32.    NI's Board members understood they had a responsibility to shareholders to consider and evaluate Emerson's acquisition proposal. Ex. 3, McGrath Dep., at 99:9-20.

33.    After Emerson's initial outreach to NI in May 2022, NI engaged the law firm Wachtell, Lipton, Rosen & Katz ("Wachtell") to give legal advice to NI in connection with Emerson's unsolicited offer. Ex. 7, Dixon Dep., at 303:19-304:13; Ex. 45, Percival Decl. ¶ 11.

34.    In executing their roles and providing advice to employees, officers, and directors at NI, NI's Chief Legal Officer, Eddie Dixon, and Legal Senior Director of Corporate, Albert Percival, frequently engaged with outside counsel and relied on their expertise and advice, including oral advice. Ex. 7, Dixon Dep., at 210:1-12; Ex. 45, Percival Decl. ¶ 10.

35.    NI engaged Wachtell in May 2022 to "defend against an acquisition" and "because [NI] had no interest in selling and [NI] wanted to engage a firm that provided that sort of expertise in defense of an unsolicited offer." Ex. 7, Dixon Dep., at 303:19-305:2.

36.    NI's Chief Legal Officer, Eddie Dixon, viewed Wachtell as "the absolute best firm" with "expertise in defense of an unsolicited offer." Ex. 7, Dixon Dep., at 21:6-17, 302:25-303:11, 303:19-304:13.

37.    NI's Legal Senior Director of Corporate, Albert Percival, referred to Wachtell as "the guru here" in an email exchange with Dixon discussing potential responses by NI to Emerson's May 2025 Letter. Ex. 11, Percival Email (June 8, 2022).

38.    Percival believed Wachtell and its attorneys had experience and expertise in advising companies in receipt of unsolicited acquisition offers and they were retained based on this experience and expertise. Ex. 45, Percival Decl. ¶ 12.

39.    On May 20, 2022—four days after Emerson's initial outreach to NI—Dixon emailed Sabastian Niles, an attorney at Wachtell, about a draft shareholder rights plan previously reviewed by NI's Board so NI had a "draft plan on the shelf." Ex. 7, Dixon Dep., at 314:1-3; Ex. 12, Dixon and Niles Email Chain (May 25, 2022).

40.    In response, Niles noted potential legal issues with the draft sent by Dixon, and wrote to Dixon, "we can talk through it later (will have a full pill package if we ever actually need it)." *Id.*

41.    On May 25, 2022, prior to the call between Karsanbhai and Starkloff on that date, Niles sent an email to NI executives, including Starkloff and Dixon, with "███████████████ ██████████████████████████. Ex. 13, Niles Email (May 25, 2022). In that email, Niles wrote, "██████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████.” *Id.*

42.     On May 26, 2022, NI's Board of Directors held a special meeting via video conference. Ex. 14, Board Meeting Minutes (May 26, 2022).

43.     Present at the May 26 special meeting were all of NI's Directors—including Eric Starkloff—as well as Eddie Dixon, and two Wachtell partners—Adam O. Emmerich and Sabastian Niles. *Id.*

44.     At the May 26 special meeting, Eric Starkloff "outlined the outreach from Wolverine and the contents of the subsequently received related letter from Wolverine," the May 25 Letter, "which letter had been provided to the Board." *Id.*

45.     "Wolverine" was a term used by NI and its advisors to refer both to Emerson and to the "project" regarding NI's review of Emerson's acquisition proposals to NI. Ex. 3, McGrath Dep., at 100:19-101:10; Ex. 2, Starkloff Dep., at 48:20-23.

46.     At the May 26 special meeting, Wachtell attorneys "outlined the Board's fiduciary duty in [the] context" of Emerson's outreach and May 25 Letter, "various legal and practical considerations in the context of receiving Wolverine's proposal and potential go-forward scenarios." Ex. 14, Board Meeting Minutes (May 26, 2022).

47.     At the May 26 special meeting, Wachtell attorneys gave a presentation titled, "████████████████████████████████████████.” Ex. 3, McGrath Dep., at 81:2-17; Ex. 15, Wachtell Presentation (May 26, 2022).

48.     Wachtell's presentation at the May 26 special meeting addressed Directors' fiduciary duties under Delaware law in the "████████████████.” *Id.* at 2-3. The presentation advised the Board, "[██████████████████████████████████

████████████████████████████████████████████████████████████

██████." *Id.* at 4.

49.    Wachtell's presentation at the May 26 special meeting also advised the Board, ████

████████████████████████████████████████████." *Id.* at 6.

50.    Wachtell's presentation at the May 26 special meeting also described tactics that may be taken by potential acquirers towards a target. *Id.* at 7-9.

51.    Dixon understood the "purpose" of Wachtell's presentation to be "educating NI's board once [NI] got an unsolicited offer," as opposed to determining where NI stood with respect to Emerson and whether Emerson was deploying any of the listed tactics. Ex. 7, Dixon Dep., at 93:3-20.

52.    Wachtell's presentation at the May 26 special meeting described multiple "█████

████████." Ex. 15, Wachtell Presentation (May 26, 2022), at 8-9. One listed "███████

████████████████████████████████████████████████████

████████████████████████████████." The presentation described the "███████████████

████████████████████████████████████████████████████

████████████████████████████." *Id.* at 8. Another listed "███████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████." The

presentation described the "██████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████." *Id.* The presentation also described

"█████████████████████████████████████████████████████████

████████████████████████████████." *Id.* at 9. The presentation described the "████

████████████████████████████████████████████████████████

████████████████████████████." *Id.*

53.    At the May 26 special meeting, "[t]he Board and management discussed the proposal from Wolverine, current Company strategy and business performance as well as prior discussions that had been had with the Board regarding the Company's strong prospects and positions, engagement of outside advisors and other next steps." Ex. 14, Board Meeting Minutes (May 26, 2022).

54.    At the May 26 special meeting, "[t]he Board agreed to reconvene in June to continue the discussion, including with the assistance of outside financial advisors and its legal advisors at [Wachtell], and make related determinations." *Id.*

55.    After receiving the May 25 Letter, and before there was any "other engagement" between NI and Emerson, NI's Chief Legal Officer, Eddie Dixon, concluded that those who were aware of "Project Wolverine" were in possession of material non-public information. Ex. 7, Dixon Dep., at 108:2-6.

56.    On May 27, 2022, Eddie Dixon sent an email to NI's Directors, Officers, and employees who were aware of "Project Wolverine" announcing a "Project Wolverine trading restriction," and directing the recipients "not [to] trade in NATI Common Stock until [the recipient] receive[s] a notification from" Dixon lifting the restriction. Ex. 16, Dixon Email (May 27, 2022).

57.    NI executed an Engagement Letter with BofA Securities, Inc. ("BofA"), dated June 10, 2022. Ex. 17, BofA Engagement Letter.

58.    NI engaged BofA to "████████████████████████████

████████████████████████████████████████████████████████

██.” Ex. 17, BofA Engagement Letter, at 1; Ex. 9, Ilcisin Dep., at 242:4-10; Ex., 7, Dixon Dep., at 300:2-13.

59.    Under the June 10 Engagement Letter, NI agreed to pay BofA a ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████. Ex. 17, BofA Engagement Letter, at 1.

60.    Under the June 10 Engagement Letter, BofA ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. The Engagement Letter explained, under such circumstances, BofA would ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████.” *Id.* at 2.

61.    The "████████████████████████████████████████████

████████████████████████████████████████████████████████

████. *Id.*; Ex. 18, BofA Dep., at 58:5-9.

62.    The June 10 Engagement Letter ████████████████████████

████████████████████████████████████.” Ex. 18, BofA Dep., at 55:25-56:21, 156:18-23.

63.    Sabastian Niles of Wachtell advised Eddie Dixon on June 3, 2022 that a draft of BofA's June 10 Engagement Letter "████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ [.]" Ex. 19, Niles Email Chain (June 3, 2022).

64.    On June 14, 2022, NI's Board of Directors held a special meeting. Ex. 20, Board Meeting Minutes (June 14, 2022).

65.    Present at the June 14 special meeting were all of NI's Directors—including Eric Starkloff—as well as Eddie Dixon, Kevin Ilcisin (NI's Senior Vice President, Corporate Strategy), Karen Rapp (NI's Chief Financial Officer), two Wachtell partners—Adam O. Emmerich and Sabastian Niles—and four representatives of BofA, including Shawn Liu. *Id.* at 1.

66.    At the June 14 special meeting, Wachtell again advised the Board on its "fiduciary duties . . , legal and practical considerations in the context of receiving Wolverine's proposal and potential go-forward scenarios." Wachtell's attorneys also responded to questions from members of NI's Board. *Id.* at 1.

67.    Wachtell's presentation to the Board at the June 14 special meeting included a slide titled, "████████████████████████████████████████████." Ex. 21, Wachtell Presentation (June 14, 2022), at 5. That slide stated, "[████████████████████████████████████ ████████████████████████." That slide also included three columns, each describing a different "████████████." The enumerated "████████████" were "████████ ████████████████████████████████████████████████████████ ████████." The description of "████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████." *Id.*

68.     "Nuthatch" is another term that NI used to refer to Emerson. Ex. 3, McGrath Dep., at 113:13-15.

69.     Also at the June 14 special meeting, representatives of BofA "presented the Board various financial analyses concerning the Company and the proposal from Wolverine." Ex. 20, Board Meeting Minutes (June 14, 2022), at 1.

70.     At the June 14 special meeting, "BofA provided their assessment of the Wolverine proposal, including as to how the various valuation frameworks and methodologies used by BofA presented values for [NI] that exceeded Wolverine's offer." *Id.* at 1.

71.     BofA also presented the Board with "financing capacity analyses of Wolverine," including BofA's conclusion that Emerson had "ample capacity to pursue M&A." *Id.* at 1; Ex. 3, McGrath Dep., at 113:23-114:10.

72.     As part of the financing capacity analyses, BofA presented a slide showing that, if Emerson sold a business it owned called InSinkErator, that sale would increase Emerson's capacity to do M&A. Ex. 3, McGrath Dep., at 115:15-22.

73.     After receipt of Emerson's May 25 Letter, representatives of NI, including Eric Starkloff and Michael McGrath, did not "question[ Emerson's] ability to have the capital to do a deal" with NI. Ex. 2, Starkloff Dep., at 132:6-21; Ex. 3, McGrath Dep., at 114:7-10.

74.     At the June 14 special meeting, following the presentations by Wachtell and BofA, the Board discussed

> Wolverine's proposal, [NI's] strategy, performance and valuation considerations, and potential responses. Directors referenced prior meetings of the Board where [NI's] business, prospects, opportunities and risks had been thoroughly discussed, noted that the strength of [NI's] performance and prospects and highlighted that

13

supply chain challenges ha[d] been hampering translation of increased bookings into revenue and that the results of [NI's] strategic plan ha[d] yet to be realized. Directors also discussed that the proposal did not provide a basis for further discussions and how the timing of the proposal was opportunistic, including taking into account broader market and industry volatility and especially company-specific circumstances, such as, among others, that [NI's] strategic plan [wa]s in the early stages of realization and that the proposal substantially undervalue[d] [NI], including relative to the value able to be realized and unlocked from execution of [NI's] strategic plan and relative to the valuation methodologies presented by BofA and discussed with the Board. In addition, the directors discussed the lack of apparent synergies for Wolverine with respect to [NI], especially relative to other potential strategic partners.

Ex. 20, Board Meeting Minutes (June 14, 2022), at 2.

75.    "Upon conclusion of discussion, the directors unanimously determined to reject Wolverine's proposal and that it would direct management to convey this determination to Wolverine." *Id.* at 2.

76.    "The directors then discussed the potential response to Wolverine and authorized Messrs. McGrath, Starkloff, Dixon and representatives of [Wachtell] to prepare and deliver a responsive letter to Wolverine." *Id.* at 2.

77.    "The directors then discussed potential courses of action in the event Wolverine were to escalate the matter publicly or otherwise, respond with a higher offer or if other scenarios were to occur and determined that any material developments could be discussed at the regularly scheduled meeting of the Board in July." *Id.* at 2.

78.    Further, "[m]aterials regarding a potential shareholder rights plan were provided to the Board by [Wachtell] and referenced by representatives of [Wachtell] in the discussion." *Id.* at 2.

79.    Representatives of NI worked with attorneys at Wachtell to prepare a response to the May 25 Letter. Ex. 22, Dixon and Niles Email Chain (June 14, 2022).

14

80.     In drafting NI's response to the May 25 Letter, NI and its outside counsel at Wachtell intended to send the message to Emerson that NI was not interested in engaging and intended to avoid language or content that Emerson would construe as an invitation to re-bid or as a suggestion that NI was for sale. *Id.*; Ex. 11, Percival Email (June 8, 2022); Ex. 45, Percival Decl. ¶ 14.

81.     On June 16, 2022, NI responded to Emerson's May 25 Letter with a letter to Lal Karsanbhai signed by Eric Starkloff and Michael McGrath rejecting Emerson's acquisition proposal ("June 16 Letter"). Ex. 23, June 16 Letter.

82.     The June 16 Letter stated, "The Board of Directors (the 'Board') of National Instruments Corporation ('NI') has carefully reviewed your letter dated May 25, 2022, with the assistance of our financial and legal advisors. The Board has unanimously determined that your letter does not provide a basis for further discussions. NI's Board and management team will remain focused, without distraction, on executing our strategies that are producing a significant and steady increase in bookings and revenue, strengthened operational performance, and advances in technology." *Id.*

83.     NI's statement in the June 16 Letter that the May 25 Letter did "not provide a basis" for further discussions matches ███████████████████████████████████ ███████████████████████████████████████████." Ex. 21, Wachtell Presentation (June 14, 2022), at 5.

84.     On June 22, 2022, Lal Karsanbhai emailed Eric Starkloff and Michael McGrath with Emerson's response to NI's June 16 Letter. That email attached a letter addressed to Starkloff and McGrath from Karsanbhai dated June 22, 2022 (the "June 22 Letter"). Ex. 24, June 22 Letter.

85.     The June 22 Letter reiterated Emerson's proposal to acquire all of NI's outstanding shares at $48 per share in cash. *Id.* at 1.

86.    The top of the June 22 Letter stated, "<u>STRICTLY PRIVATE AND CONFIDENTIAL</u>." *Id.*

87.    Further, the June 22 Letter stated, "This Proposal constitutes neither an offer nor evidence of the existence of an offer, and is not intended to be and does not create a binding legal obligation on any party and no party will have any obligation or liability with respect to the Proposal, unless and until the execution of the Definitive Agreement by the parties hereto and then subject to the terms thereof." *Id.* at 3.

88.    The June 22 Letter stated, "[we] are confident that with access to limited non-public information after signing an NDA, we could work with you to find additional value that would allow us to increase our Proposal." *Id.* at 2.

89.    NI's CEO understood from counsel that this type of statement is often included in proposal letters but cannot be relied upon. Ex. 2, Starkloff Dep., at 75:10-18.

90.    The June 22 Letter also stated, "[w]e have engaged Goldman Sachs & Co. LLC and Centerview Partners LLC as our financial advisors and Davis Polk Wardwell LLC as our legal counsel." Ex. 24, June 22 Letter, at 2.

91.    NI's CEO assumed before the June 22 Letter that Emerson was working with advisors, and he did not view the June 22 Letter as providing any new information. Ex. 2, Starkloff Dep., at 76:9-18.

92.    When Emerson reiterated its $48 per share acquisition proposal, it caused NI's CEO and Chief Legal Officer to believe that $48 was the maximum price Emerson would offer to acquire NI, that Emerson was less serious about the prospects of acquiring NI on June 22 than it was on May 25, and that an acquisition of NI by Emerson was not likely. Ex. 2, Starkloff Dep., at 75:10-76:25, 78:1-6, 170:4-171:6; Ex. 7, Dixon Dep., at 191:21-192:11, 309:1-11.

16

93.    Shawn Liu of BofA, who advised NI at the time, believed Emerson was "████ ████████████████████" because the June 22 Letter contained the same proposed acquisition price as the May 25 Letter. Ex. 18, BofA Dep., at 208:18-209:22.

94.    NI worked with its advisors, including Wachtell, BofA, and FGS Global, to be prepared for various possible scenarios regarding Emerson, including ensuring NI was prepared "should [Emerson] cho[o]se to go public." Ex. 25, Starkloff Email (June 30, 2022).

95.    NI engaged FGS Global to advise NI on strategic communications related to Emerson. Ex. 26, FGS Memorandum.

96.    As of July 18, 2022, FGS worked with NI, Wachtell, and BofA to develop a scenario plan for NI related to Emerson. *Id.*

97.    FGS described its work for NI as "████████████████," during which FGS anticipated "████████████," "████████████████" related to strategic communications, and "████████████████████████████" *Id.*

98.    FGS also indicated on July 18, 2022 that, if Emerson ████████████," then ████████████████████████████." *Id.*

99.    After receiving the June 22 Letter, around June 28, 2022, NI engaged MacKenzie Partners, Inc., a company that does stock surveillance, to monitor NI's Common Stock for changes, including accumulations, and report on such changes to NI. Ex. 27, MacKenzie Partners Engagement Letter.

100.   On July 6, 2022, Starkloff responded to Karsanbhai's June 22 email and stated that NI would be discussing the June 22 Letter at its regularly scheduled Board meeting at the end of July. Ex. 28, Karsanbhai and Starkloff Email Chain (July 6, 2022).

17

101.    On July 19 and 20, 2022, NI's Board of Directors held a regularly scheduled meeting. Ex. 29, Board Meeting Minutes (July 19, 2022).

102.    Attendees of the July 19 and 20 meeting included all of NI's Directors—including Eric Starkloff—as well as Eddie Dixon, Karen Rapp, and Albert Percival of NI, and Sabastian Niles of Wachtell. *Id.*; Ex. 45, Percival Decl. ¶ 15.

103.    At the meeting, on July 19, Starkloff led a discussion of Emerson's June 22 Letter. "It was noted that the letter from Wolverine did not present an increased offer and the letter proposed the same pricing and terms as had been previously reviewed and rejected, unanimously, by the Board." Ex. 29, Board Meeting Minutes (July 19, 2022), at 1.

104.    On July 20, "Board members discussed various aspects of Wolverine's outreach, including Wolverine having simply reaffirmed their prior inadequate offer, the potential for Wolverine to change their offer and the degree of seriousness with which Wolverine would pursue the potential transaction, the potential for entry into an NDA and engaging in due diligence and negotiations with Wolverine, and various strategic and financial alternatives." *Id.* at 4.

105.    Also on July 20, "[t]he Board members reaffirmed their view that the Wolverine proposal is not in the best interests of [NI] and its shareholders, does not reflect the value that is expected to be generated by [NI's] businesses strategies, which continues to show positive momentum and that the timing was inopportune for such a proposal from [NI's] perspective, including taking into account how supply chain constraints were impacting backlog and revenue conversion and [NI's] plans for addressing such matters. The Board also concluded following discussion that the proposal from Wolverine did not merit engaging in discussions with or providing diligence materials to Wolverine." *Id.* at 4-5; Ex. 45, Percival Decl. ¶ 16.

106.    "Following discussion, upon a motion duly made and seconded, the Board unanimously voted to reaffirm their continued rejection of the Wolverine proposal and authorized Mr. McGrath, Mr. Starkloff and Mr. Dixon to determine the precise manner and content for communicating the reaffirmed rejection to Wolverine." Ex. 29, Board Meeting Minutes (July 19, 2022), at 5.

107.    As part of the Board's discussion on July 20, "[r]epresentatives of [Wachtell] provided perspectives, including as to legal matters." *Id.* at 5.

108.    During the Board's discussions regarding Emerson on both July 19 and July 20, Sabastian Niles of Wachtell "responded to questions from members of the Board." *Id.* at 1, 5.

109.    At a Board meeting, NI's Board was advised by outside counsel at Wachtell to "return to business as usual" after rejecting Emerson's $48 per share acquisition proposal from the June 22 Letter. Ex. 3, McGrath Dep., at 283:24-284:20; 286:12-16.

110.    At the Board meeting, Wachtell was asked whether the "business as usual" advice included NI conducting stock repurchases, and Wachtell's advice indicated to NI's Board that NI should continue stock repurchases as part of "business as usual" after rejecting Emerson's proposal in the June 22 Letter. Ex. 3, McGrath Dep., at 283:24-284:20; 285:24-286:11.

111.    Based on Wachtell's "business as usual" advice, the Board understood that NI was cleared to conduct repurchases after rejecting Emerson's proposal in the June 22 Letter, and that NI had an obligation to return to usual business practices, including conducting repurchases, after such rejection. Ex. 3, McGrath Dep., at 283:24-284:20; 286:4-11.

112.    On July 25, 2022, NI's Board of Directors held a special meeting via video conference. Ex. 30, Board Meeting Minutes (July 25, 2022).

113.    Present at the July 25 special meeting were all of NI's Directors—including Eric Starkloff—as well as Eddie Dixon and Karen Rapp. *Id.*

114.    At the July 25 special meeting, the Board discussed NI's "very positive outlook for the next 18 months" and that NI's positive outlook was a factor considered by the Board in its decision on July 20 to unanimously reaffirm its rejection of Emerson's $48 proposal. *Id.*

115.    On August 2, 2022, Eric Starkloff sent an email to Lal Karsanbhai attaching a letter from Starkloff and Michael McGrath (the "August 2 Letter") in response to Emerson's June 22 Letter. Ex. 31, August 2 Letter.

116.    The August 2 Letter stated, "Our Board of Directors has carefully reviewed your letter dated June 22, 2022, with the assistance of our financial and legal advisors. The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders." *Id.*

117.    NI was advised by Wachtell attorneys in drafting the August 2 Letter. Ex. 32, Niles Email (July 26, 2022).

118.    NI intended for the August 2 Letter to indicate to Emerson that NI was not interested in being acquired. Ex. 7, Dixon Dep., at 308:7-25; Ex. 2, Starkloff Dep., at 169:8-170:3.

119.    During 2022, ███████████████████████████████ ██████. Ex. 18, BofA Dep., at 212:10-15.

120.    Representatives of NI, including Eric Starkloff, Kevin Ilcisin, Eddie Dixon, Karen Rapp, and Michael McGrath, instead ████████████████████████ ██████ NI. *Id.* at 213:5-23.

121.    These representatives of NI also told BofA ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 212:17-213:11.

122.    After NI sent the August 2 Letter to Emerson, NI believed that there was no prospect of a deal wherein Emerson would acquire NI and NI "assumed that [the prospect of a transaction with Emerson] was dead." Ex. 7, Dixon Dep., at 177:20-178:14, 309:12-16; Ex. 2, Starkloff Dep., at 171:7-19; Ex. 3, McGrath Dep., at 104:18-105:23.

123.    After NI sent the August 2 Letter to Emerson, NI believed it would have been inappropriate to disclose Emerson's proposals and NI's rejections because NI believed Emerson's acquisition proposal did not present a credible offer, there was no offer outstanding after NI rejected Emerson's proposal, NI had no expectation of Emerson returning with another offer, NI had no expectation of negotiating with Emerson and understood it was not obligated to negotiate with Emerson, and Emerson requested that NI keep its proposals confidential. Ex. 3, McGrath Dep., at 104:18-105:23.

124.    After NI sent the August 2 Letter to Emerson, there was no direct communication between NI and Emerson until November 3, 2022, which is after the Class Period. Ex. 3, McGrath Dep., at 317:2-10; Ex. 7, Dixon Dep., at 311:8-12.

125.    After NI sent the August 2 Letter to Emerson, NI continued to pay attention to Emerson by, for example, watching or reading the transcript of Emerson's earnings call, consistent with NI's practice of monitoring competitors and being "prepared for anything." Ex. 7, Dixon Dep., at 190:16-192:11; Ex. 2, Starkloff Dep., at 130:15-131:2.

126.    NI wanted to resume repurchases after sending the August 2 Letter because shareholders were in favor of repurchases, repurchases were a key tenet of NI's capital allocation

strategy, and NI wanted to offset dilution caused by share grants to employees. Ex. 2, Starkloff Dep., at 137:14-24; Ex. 3, McGrath Dep., at 342:5-19.

127.    On August 4, 2022, Karen Rapp emailed Albert Percival and Eddie Dixon asking what NI could do to "put a plan in place for stock repurchases given the current situation," meaning the situation involving NI's recent August 2 Letter which rejected Emerson's $48 per share proposal for a second time. Ex. 33, Dixon, Rapp, and Percival Email Chain (August 4, 2022); Ex. 7, Dixon Dep., at 177:11-178:14; Ex. 45, Percival Decl. ¶ 18.

128.    In response to Karen Rapp's email on August 4, Eddie Dixon stated that the question was when the "nuthatch engagement become[s] stale so [there is a] legitimate argument that" NI did not possess material non-public information. Ex. 33, Dixon, Rapp, and Percival Email Chain (August 4, 2022).

129.    In response to Karen Rapp's email on August 4, Albert Percival at first believed that NI was in a "gray area" regarding when it could resume stock repurchases after sending the August 2 letter to Emerson. *Id.*; Ex. 45, Percival Decl. ¶ 20.

130.    Thus, Percival was going to carefully consider the situation before coming to a final conclusion that would be communicated to the business leaders of NI. Ex. 45, Percival Decl. ¶ 20.

131.    In response to Karen Rapp's email on August 4, Albert Percival decided to seek the advice of Wachtell attorneys about NI's ability to resume repurchases. Ex. 33, Dixon, Rapp, and Percival Email Chain (August 4, 2022); Ex. 45, Percival Decl. ¶ 21.

132.    Dixon agreed Percival should discuss the issue with Wachtell, and that the purpose of the discussion would be obtaining "advice from Wachtell whether [NI] could implement [repurchases] or not." Ex. 33, Dixon, Rapp, and Percival Email Chain (August 4, 2022); *see also* Ex. 7, Dixon Dep., at 182:23-183:18.

133. The structure and amount of Wachtell's compensation from NI was not impacted by NI's share repurchases or NI's decision to, or decision not to, repurchase its Common Stock. Ex. 45, Percival Decl. ¶ 22.

134. Percival viewed Wachtell as the appropriate firm for NI to consult due to their experience in situations such as that facing NI. Wachtell was the law firm retained to address any issues related to Emerson. Ex. 45, Percival Decl. ¶ 22.

135. On August 4, 2022, Albert Percival emailed Wachtell attorneys Sabastian Niles and Kwon-Yong Jin, stating that NI sent its rejection letter to Emerson two days earlier and asking for advice from Wachtell about NI implementing a repurchase plan. Ex. 34, Wachtell, Dixon, and Percival Email Chain (August 4-9, 2022); Ex. 45, Percival Decl. ¶ 23.

136. On August 5, 2022, Albert Percival sent a Microsoft Teams Meeting invitation to Sabastian Niles, Kwon-Yong Jin, and Wayne Carlin of Wachtell and Eddie Dixon of NI. Ex. 35, Percival Email (August 5, 2022); Ex. 45, Percival Decl. ¶ 24. The subject of the email stated, "NI Stock Trading Plan." Ex. 35, Percival Email (August 5, 2022).

137. On August 4 and 5, 2022, Wachtell attorneys sent emails discussing a call with NI to discuss Percival's August 4 email. Ex. 34, Wachtell, Dixon, and Percival Email Chain (August 4-9, 2022). Kwon-Yong Jin ████████████████████████████████ ████████████████████████████████████████████████ *Id.*; Ex. 7, Dixon Dep., at 208:4-6.

138. On a subsequent call, Percival was part of a conversation with Jin wherein it was discussed that NI would consider resuming repurchases by August 15, so long as NI did not receive further outreach from Emerson. Ex. 45, Percival Decl. ¶ 26.

139.     Sabastian Niles asked Kown-Yong Jin on August 9, 2022, "███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████." Ex. 34, Wachtell,

Dixon, and Percival Email Chain (August 4-9, 2022).

140.     On August 8, 2022, it was announced that Emerson was selling its InSinkErator

business. Sabastian Niles emailed the announcement to Eric Starkloff, Eddie Dixon, Karen Rapp,

Kevin Ilcisin, and Albert Percival, and copied other Wachtell attorneys, including Adam Emmerich

and Kwon-Yong Jin. Ex. 36, Niles Email (August 8, 2022); Ex. 45, Percival Decl. ¶ 27.

141.     On the morning of August 10, 2022, NI learned from MacKenzie Partners that

Emerson had ████████████████████████████████████████████████.

Ex. 37, Ilcisin Email (August 10, 2022). That same morning, Kevin Ilcisin forwarded this

information to Sabastian Niles and Adam Emmerich at Wachtell. *Id.*

142.     In seeking advice from Wachtell attorneys regarding whether NI was in possession

of material non-public information that would prevent it from conducting repurchases without

public disclosure, NI provided Wachtell with all relevant information about Emerson, its outreach

to NI, and Emerson's rejected, proposed acquisition of NI, with the goal of ensuring that Wachtell

had all potentially relevant information to assess whether NI possessed material non-public

information. Ex. 7, Dixon Dep., at 221:17-222:7, 317:4-9; Ex. 2, Starkloff Dep., at 175:7-23; Ex.

45, Percival Decl. ¶ 25.

143.     A Microsoft Teams call was scheduled for the afternoon of August 10, 2022, with

"required attendees" including Eric Starkloff, Eddie Dixon, Karen Rapp, representatives of BofA,

and Sabastian Niles and Adam Emmerich of Wachtell. Ex. 38, Microsoft Teams Invite (August 10,

2022).  The subject of the call invite was, "Wolverine Call-Mackenzie Update." *Id.*

144.   On an August 10, 2022 call, Sabastian Niles, Adam Emmerich, and Wayne Carlin of Wachtell advised NI's management that NI was not in possession of material non-public information, and therefore NI could conduct repurchases. Ex. 7, Dixon Dep., at 217:16-218:2, 315:18-23; Ex. 2, Starkloff Dep., at 176:6-16.

145.   Eddie Dixon documented the statements made by Wachtell on the August 10 call in an email memorandum to himself, which he sent to himself on August 10, 2022. Ex. 39, Dixon Email (August 10, 2022); Ex. 7, Dixon Dep., at 206:5-208:9.

146.   Dixon's email memorandum notes that Adam Emmerich, Wayne Carlin, and Sabastian Niles of Wachtell advised NI regarding "buy back," "no material change to situation, implement if desired." Ex. 39, Dixon Email (August 10, 2022).

147.   NI's executives and Board Chair believed that NI was not in possession of material non-public information on August 10, 2022. Ex. 7, Dixon Dep., at 315:24-316:8; Ex. 2, Starkloff Dep., at 177:7-178:5; Ex. 3, McGrath Dep., at 96:18-97:7; Ex. 45, Percival Decl. ¶ 28.

148.   NI's Chief Legal Officer, Eddie Dixon, would not have allowed NI to engage in stock repurchases after August 10, 2022, if he had any concern that NI was in possession of material non-public information. Ex. 7, Dixon Dep., at 317:11-19.

149.   On August 11, 2022, Albert Percival sent an email to NI's Board members announcing that the Project Wolverine trading restriction was lifted. Ex. 40, Percival Email (August 11, 2022); Ex. 45, Percival Decl. ¶ 30.

150.   Through his August 11 email lifting the trading restriction, Percival provided his legal advice that it was appropriate for NI and its Board and officers to engage in open market transactions in NI Common Stock. Percival expected the officers and directors to rely on that advice. Ex. 45, Percival Decl. ¶ 31.

151. Percival would not have sent the August 11, 2022 email lifting the trading restriction unless he personally believed based on his own experience and consultation with Wachtell, as outside counsel, that NI was not in possession of material non-public information. Ex. 45, Percival Decl. ¶ 31.

152. Percival also would not have sent the email had attorneys from Wachtell not advised NI's management on August 10, 2022 that NI did not possess material non-public information that would affect the repurchases. Ex. 45, Percival Decl. ¶ 31.

153. On August 11, 2022, NI executed a 10b5-1 Repurchase Plan Agreement with J.P. Morgan Securities LLC ("JPMorgan"). Ex. 41, 10b5-1 Plan Agreement; Ex. 45, Percival Decl. ¶ 32.

154. Percival advised Rapp in connection with the finalization and execution of the 10b5-1 Repurchase Plan Agreement. Ex. 45, Percival Decl. ¶ 33.

155. Percival advised Rapp it was appropriate to execute the 10b5-1 Repurchase Plan Agreement under the securities laws. Ex. 45, Percival Decl. ¶ 33.

156. Percival would not have advised Rapp or anyone at NI to execute a 10b5-1 Repurchase Plan Agreement if he did not personally believe that NI was not in possession of material non-public information or understand that attorneys from Wachtell advised NI's management on August 10, 2022 that NI did not possess material non-public information. Ex. 45, Percival Decl. ¶ 34.

157. Under the 10b5-1 Plan, NI appointed JPMorgan as its exclusive agent to purchase NI's Common Stock pursuant to the plan. The 10b5-1 Plan authorized JPMorgan to begin purchases of NI's Common Stock on September 12, 2022, and was set to terminate upon the

earliest of certain enumerated events, including "the completion of all purchases contemplated" under the 10b5-1 Plan. Ex. 41, 10b5-1 Plan Agreement, at 1.

158.    The 10b5-1 Plan provided that, on each Trading Day, JPMorgan was to "use commercially reasonable efforts to purchase as agent for [NI] and for the account of [NI] the lesser of (i) the maximum number of [shares of NI Common Stock] that [NI] could purchase on such Trading Day in accordance with the volume condition set forth in Rule 10b-18 and (ii) the number of [shares of NI Common Stock] that JPMS is able, subject to market conditions and principles of best execution, to purchase as agent for [NI] and for the account of [NI] on such Trading Day using commercially reasonable means in accordance with the Plan guidelines set forth below." *Id.* at A-1. The referenced "Plan guidelines" set a price schedule, indicating the "daily purchase amount" based on NI's share price on any respective day. *Id.*

159.    Under the 10b5-1 Plan, the maximum amount JPMorgan was to spend was $60,000,000. *Id.*

160.    In the 10b5-1 Plan Agreement, NI warranted that, as of August 11, 2022, it was "not aware of any material nonpublic information concerning [NI's Common Stock] or the business, operations or prospects of [NI]." NI also warranted that NI was "engaging [JPMorgan] and entering into this [Plan] Agreement and the Plan in good faith and not as part of a plan or scheme to evade compliance with the federal securities laws, including, without limitation, Rule 10b-5 under the Exchange Act." *Id.* at 3.

161.    NI did not repurchase any shares of NI Common Stock between May 6, 2022—before Emerson's initial May 16, 2022 outreach to NI—and August 12, 2022. Ex. 42, Trade Confirmation Activity Sheet.

162. On August 12, 2022, NI repurchased 218,623 shares of its Common Stock on the open market at a price per share of $41.3852. Ex. 42, Trade Confirmation Activity Sheet.

163. On August 15, 2022, Eric Starkloff sold 900 shares of NI Common Stock at a price per share of $42. Ex. 43, Starkloff SEC Form 4.

164. Starkloff sold these shares pursuant to a trading plan that would execute sales at certain price points. Starkloff was advised and understood that he could have chosen to cancel the plan, but he chose not to cancel the plan. Ex. 2, Starkloff Dep., at 178:6-179:1.

165. The $42 price at which Starkloff sold shares on August 15, 2022 was $6 less than Emerson's rejected proposal price of $48 per share. *Id.* at 179:2-6.

166. On August 18, 2022, NI repurchased 87,859 shares of its Common Stock on the open market at a price per share of $42.9920. Ex. 42, Trade Confirmation Activity Sheet.

167. On August 19, 2022, NI repurchased 117,850 shares of its Common Stock on the open market at a price per share of $42.4127. Ex. 42, Trade Confirmation Activity Sheet.

168. On August 26, 2022, NI repurchased 96,570 shares of its Common Stock on the open market at a price per share of $41.3856. Ex. 42, Trade Confirmation Activity Sheet.

169. On August 29, 2022, MacKenzie Partners informed NI that ███████████ ████████████████████████, and that Emerson ██████████████████████ ████████████. Ex. 44, Dixon Email Chain (Sept. 1, 2022).

170. In response to the email from MacKenzie Partners, Eddie Dixon recommended a call with NI's advisors to discuss. Eric Starkloff responded to Dixon, "I agree. In particular, when I brought up shareholder rights plans previously the idea that they'd get to 5-10% was perceived as so incredibly unlikely as to not be relevant, but we should ask that question again in light of the

new data." *Id.* Dixon responded that he would reach out to Wachtell to schedule a time to discuss with them. *Id.*

171.    On September 12, 13, 14, 15, 16, 19, 20, 21, 22, and 23, 2022, JPMorgan purchased shares of NI Common Stock pursuant to NI's 10b5-1 Plan, executed August 11, 2022. Ex. 42, Trade Confirmation Activity Sheet. $59,999,992.63 of the $60,000,000 maximum authorized spend was spent in making these purchases pursuant to the 10b5-1 Plan. *Id.*

172.    On November 3, 2022, Emerson emailed a letter to NI proposing to acquire NI for $53 per share. Ex. 1, NI Proxy Statement (May 25, 2023), at 36.

173.    NI did not adopt a shareholder rights plan in 2022. Ex. 1, NI Proxy Statement (May 25, 2023), at 40.

174.    On January 13, 2023, NI announced the adoption of a shareholder rights plan in connection with a strategic review process, through which it would solicit interest from potential acquirers. *Id.*


Dated: December 22, 2025

By: /s/ *James F. Bennett*

James F. Bennett (*pro hac vice*)
John D. Comerford (*pro hac vice*)
Jeremy M. Hofman (*pro hac vice*)
Dowd Bennett LLP
7676 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone:  (314) 889-7300
Facsimile:   (314) 863-2111
jbennett@dowdbennett.com
jcomerford@dowdbennett.com
jhofman@dowdbennett.com

Andrew Ditchfield
Davis Polk & Wardwell LLP
450 Lexington Ave
New York, New York 10017

29

Telephone: (212) 450-4000
andrew.ditchfield@davispolk.com

*Counsel for Defendants National
Instruments Corporation, Michael McGrath,
and Eric Starkloff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 22, 2025, a true and correct copy of

the foregoing was filed electronically using the Court's electronic filing system. By operation of

that system a notice of electronic filing will be served upon all counsel of record in the case.

/s/ *James F. Bennett*