# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:23-cv-10488-DLC

IN RE: NATIONAL INSTRUMENTS CORPORATION
      SECURITIES LITIGATION


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED ORAL DEPOSITION OF

ERIC STARKLOFF

OCTOBER 23, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF ERIC STARKLOFF, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on October 23, 2025, from 9:08 a.m. to 3:07 p.m., before Kimberly Wheelis, CSR, RPR, CRR, in and for the State of Texas, reported by computerized stenotype machine, 3800 North Lamar Boulevard, Suite 200, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 5

THE VIDEOGRAPHER: Here begins the deposition of Eric Starkloff. Today's date is October 23rd, 2025. And the time is 9:08 a.m. Will counsel please identify themselves for the record, after which the court reporter will swear in the witness.

MR. JOHNSON: Chad Johnson of Robbins Geller on behalf of the Plaintiffs. And also present are colleagues of mine; we can identify them later for the record.

MR. COMERFORD: John Comerford, Dowd Bennett, LLP representing the Defendants. I'm here in Austin, Texas with the witness. And attending by Zoom is my colleague Jeremy Hoffman.

ERIC STARKLOFF, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. JOHNSON:

Q. Good morning, Mr. Starkloff.

A. Good morning.

Q. We've met briefly by this Zoom means, but I'm a lawyer -- one of the lawyers representing investors in this case.

Where did you go to college?

A. At University of Virginia.

Q. And did you obtain a degree there?

Page 6

A. I did.

Q. And what was that in?

A. B.S. of electrical engineering.

Q. And did you study business at all as part of your studies at the University of Virginia?

A. I didn't have a degree in business. I took some courses, but no degree.

Q. And did those courses cover fiduciary duty concepts?

A. Not that I recall. I think I learned those on the job.

Q. And when did you graduate from University of Virginia?

A. 1997.

Q. And what did you do after that?

A. Actually came directly to work for National Instruments in Austin.

Q. And what position did you start out in?

A. Application engineer.

Q. And how long were you in that position approximately?

A. Approximately, probably a year.

Q. And maybe, maybe it's easier if I just ask you to briefly identify the positions you held at National Instruments up until the time you became CEO. If you

Page 7

want I can run you through every one, but it might just get easier if I ask that way.

A. We'll see how good my recall is. Let me try. So, application engineer, then I was a product marketing manager. Then I was --

Q. And that was approximately '98 when you --

A. Yeah, '98, '98.

Q. Around that.

A. Yeah. Then I was a product marketing group manager, managed a team. Then at some point I became a director of marketing where I had several teams.

Q. And that was approximately when?

A. I believe that was 2004, because I think it coincided with the birth of my first daughter.

Q. Congratulations on that --

A. That's how I remember these things.

Then sometime after that I became vice president of marketing. I might miss a couple. Cause there's probably 20 different titles in there. Platform manager, maybe that was, sort of before, I probably got that one out of order, then vice president of marketing. Then probably senior vice president of marketing. Led the entire marketing --

Q. Do you know when that was, approximately?

A. Oh, gosh, that might have been sometime

Page 8

between '07 and 2010, perhaps. Long time ago.

And then I became senior vice president of sales and marketing, global sales and marketing, I think was that title. Then, I don't recall the title -- let's see...

At some point I took on additional responsibility for research and development, I don't know if my title changed or what title I used, is not -- I don't recall.

Q. Approximately when?

A. That was probably, maybe '14 or '15, 2014 or 2015, perhaps. Then it was 2017 I became president and chief operating officer. And then in 2020 chief executive officer, sometimes president and CEO is often the title.

Q. All right. And you continued on as the company's CEO until it was acquired in 2023; is that right?

A. Correct. So I think I transitioned from that role on closing of that transaction, which if I recall was in October of 2023. And then I was an adviser and left the company in beginning of 2024.

Q. And since then, have you had a different job or jobs?

A. I've been an adviser for multiple different

Page 21

don't recall the amount.

Q. (BY MR. JOHNSON) What was Karen Rapp's role in the company in 2022?

A. Chief financial officer.

Q. And did she report directly to you?

A. She did.

Q. And did she interact regularly with you about business matters?

A. Yes.

Q. Now, let's pull document, the file -- the document in the file numbered 3. And that can be marked as Exhibit 2.

(Exhibit 2 marked for identification.)

(Discussion off record.)

Q. (BY MR. JOHNSON) This is an email chain from May 3rd, 2022. Take whatever time you need to take a look at this. The first question I'm going to ask is whether you recognize it.

A. Do I recognize it... I, I assume it's correct, it's from my email. Do I remember this specific conversation? I mean, vaguely. Vaguely, three years ago -- three and a half.

Q. Okay. You don't remember it in particular, but you don't have reason to suggest this is anything other than what it appears to be, is that?

Page 22

A. No, no, correct. I guess my comment was more, I had many of these conversations. This was in the regular course of business.

Q. Fair enough. On the page with the letters and numbers at the bottom NAT-SL-00005984, which I think is the third page of this document.

A. Oh, okay. Email from Karen to Pedro and Chris?

Q. Exactly.

A. Okay.

Q. Do you see in that email that right near the end of her communication she refers to still $100 million total for the year?

A. Uh-huh.

Q. You see that?

A. I do.

Q. Okay. And is it fair to say that the amount that the company spent on share buybacks would depend, at least in part, on the cash position of the company at any given point?

A. Only modestly correlated to that.

Q. What else was it correlated to?

A. It would be correlated to a long-term -- longer term view of cash generation, for example. We didn't tend to make decisions like this, just based --

Page 23

there were oftentimes, and it was very much the case in 2022 more than any other time in our company's history, that the cash generation was displaced in time, because if you'll recall, 2022 was a year of a very unusual once in a century supply chain disruption where cars were sitting on lots without chips, so they couldn't ship. And we had the same challenge.

So our cash generation in any given quarter was affected by that. So we would be thinking more about cash over, maybe a year, or two years. We had dead instruments that could easily give us the flexibility in a given quarter to do something that was in the best interest of shareholders in that quarter.

The other factor would be acquisitions, for example. If we decided to acquire a company, or not, that would be an impact to how much we would maybe allocate to this, perhaps. So a number of different factors. Cash in a quarter would be a very minor factor, actually.

Q. And so then, at least in this email chain, are you indicating that you supported using $10 million in the coming weeks for buybacks?

A. It seems that the -- on the first page that I do say that I support the $10 million, yes. I also note to the point I was just making that cash flow will be

Page 24

changing quite a bit during the year.

Q. At some point in May of 2022 you were contacted by Mr. Karsanbhai, the CEO of Emerson, right?

A. Yes, I was.

Q. And prior to his outreach to you in May of 2022 had you ever had any contact with Mr. Karsanbhai previously?

A. No.

Q. Had you on behalf of National Instruments had any prior business dealings with Emerson?

MR. COMERFORD: Form.

A. Had we had any -- I'm -- we sold to about 35,000 companies. I -- well, I'm certain that Emerson was a company that we sold to. We also had a former board member and a personal mentor that was a leader at Emerson, named John Barra. So I had some familiarity with the company.

Q. (BY MR. JOHNSON) John Barra had been what at Emerson, to your understanding?

A. John Barra was like a divisional president of the division that was headquartered in Austin. Divisions have changed since then, so I think it's not a division that's currently still called the same thing. And while he was --

Q. And -- sorry, go ahead?

Page 25

A.   And this is -- I think he still had that position when he joined our board.  For much of his board service he was retired from that position and retired from Emerson.  And then he left our board in, I believe 2017, if I'm not mistaken, or thereabouts.  And then I still had a relationship with him after that as a mentor.

Q.   Now, at any point -- well, let me ask something else first.

From Mr. Barra did you have any impressions at all about Emerson?

MR. COMERFORD:  Form.

A.   Sure, I had a number of impressions.  We talked about his history with the company, and working for Chuck Knight, he had a lot of colorful stories about their previous, and legendary, CEO, so yeah.

Q.   (BY MR. JOHNSON) That was pre-dating Mr. Karsanbhai in his time as CEO?

A.   Yes, by quite some time.

Q.   And when -- at any point after Emerson, through Mr. Karsanbhai, approached you in May of 2022, did you reach out to Mr. Barra to discuss anything related to Emerson?

MR. COMERFORD:  Form.

A.   No, no, I don't believe -- no, I don't believe

Page 26

so.  Not that I recall certainly.

Q.   (BY MR. JOHNSON) Okay, so the first contact that you had with Mr. Karsanbhai was an email from him asking to talk by phone; is that right?

A.   That is correct.

Q.   And did you ultimately talk with him by phone at all --

A.   I did.

Q.   -- in that period?

A.   I did.

Q.   Okay.  And what was the gist of the conversation you had with Mr. Karsanbhai -- by the way, just to be clear, is that still in May of 2022?

A.   It was.  I recall that was in May, because it was during our NI week user conference, which is late May.

MR. COMERFORD:  So, I'll object to the form.  I don't think there's a question -- let him ask a question.

A.   Okay, yeah, so what is the question?

Q.   (BY MR. JOHNSON) Yeah, it was just, was that conversation in May, and I heard you to say --

A.   Yes.

Q.   -- it was late May.

A.   Yes.

Page 27

Q.   Okay.  And what was the substance of that conversation?

MR. COMERFORD:  Form.

A.   What do you mean by substance?

Q.   (BY MR. JOHNSON) I'm not asking for small talk, you know, what was, what was communicated in that conversation?

MR. COMERFORD:  Form.  Go ahead.

A.   Yeah, I was clarifying because it was mostly small talk.  So I'll just tell you my recollection.  He talked about how much he admired NI and what a great company we were and how good our software was.  And then talked about, like, working together, and only at the very end of the call made sort of a comment that made it sound like there might be an offer coming for the company.

Q.   What was that comment?

A.   I don't remember the comment, but it was sort of vague, so, by counsel, Eddie was on the call as well.  So afterwards we were, hey, I think, I think what's going to happen is we're going to get a letter with interest in the company.  Yeah, that's my recollection.  And then of course we did.  But the call was fairly general.

Q.   And so it was that same day that you received

Page 28

by email a letter of interest from Mr. Karsanbhai; is that right?

MR. COMERFORD:  Form.

A.   I don't remember if it was that day or the next day, but yes, it was certainly short -- sometime after the call.

Q.   (BY MR. JOHNSON) Okay.  Let's, let's look at what's in the file number 5, this can be numbered Exhibit 3.

(Exhibit 3 marked for identification.)

Q.   (BY MR. JOHNSON) And after you get the document, Mr. Starkloff, take a look at it as much as you want.  The first question I'm going to ask is whether you recognize it.

(Discussion off record.)

Q.   (BY MR. JOHNSON) NAT-SL-00001263 through 1266.

A.   I've got it.

Q.   Okay.  So the cover email references a call that afternoon, is that the call you were talking about previously?

A.   Yeah, yeah, there's only one call.  So this -- yeah, this must have been the same day then.

Q.   Okay.  Was that the only call you had with Mr. Karsanbhai in the year 2022?

A.   No.

Page 29

Q.  When was the next call?

A.  I believe the next call was in either November or December.  It was late that year.

Q.  Was that after -- or around the time when Emerson came back with the higher offer?

MR. COMERFORD:  Form.

A.  Yeah, it's possible that that next call was even in January, to be honest.  I don't recall if it was -- I believe we had a call in November, December.  And then in January.  It was later in the year, and it was certainly after the higher offer, yes.

Q.  (BY MR. JOHNSON) Okay.  From -- so from May through at least October, this is the only call you had with Mr. Karsanbhai; is that fair?

A.  Yes, I believe that's correct.

Q.  All right.  Then after the cover email is the letter --

A.  Uh-huh.

Q.  -- from Mr. Karsanbhai on behalf of Emerson expressing Emerson's interest in purchasing National Instruments for $48 in cash per common share; is that right?

A.  Yes, that's correct.

Q.  And in the letter Mr. Karsanbhai indicates that their proposal would not be subject to any

Page 30

financing condition, and would be financed from cash on-hand.  Do you see that?

A.  I see that.

Q.  And that as far as timing was concerned, Emerson was prepared to proceed immediately, to complete due diligence and the like.  Do you see that?

A.  I do.

Q.  The letter also indicates that Emerson had no plan, no current plan to disclose this letter and assume that you do not intend to either.  And the letter indicates that Emerson's strong preference was to work with you and your board to announce a definitive agreement.  And I've taken a few words out, really for efficiency, but do you see what I'm talking about?

A.  I do.

Q.  Okay.  And, Mr. Karsanbhai also indicates in the letter that, the Emerson board supported this proposed transaction.  Do you see that?

A.  I do.

Q.  Did you view this as a, an expression of sincere interest in Emerson purchasing National Instruments?

MR. COMERFORD:  Form.

A.  I viewed it as -- let's see, I viewed it as sincere interest, but not a serious offer.

Page 31

Q.  (BY MR. JOHNSON) So you viewed Emerson's interest as sincere, but the price offered as not sufficient; is that fair?

MR. COMERFORD:  Form.

A.  Yeah, I thought nowhere near sufficient, correct.  Happened to be at a time when the stock market was at a historic low, so.  We perceived this to be bargain hunting.

Q.  (BY MR. JOHNSON) Did you view Emerson as a company that was capable of purchasing National Instruments at the price it was offering?

MR. COMERFORD:  Form.

A.  I mean, that depends on your definition of capable.  It was clear that they -- I didn't doubt that they had the financial capability.  But as also a public company CEO, I understood that you also needed to have shareholder support.  So I -- it wasn't clear to me the strategic fit and if Emerson would be able to pay a reasonable price that would be attractive to NI.  It seemed unlikely at the time.

Q.  (BY MR. JOHNSON) And the shareholder support you're referring to is shareholders of National Instruments?

A.  Well, both.  I was actually referring to Emerson, meaning, you may have the cash to do something

Page 32

as a public company CEO, but you're accountable to the owners of the company, so you can't just do anything.  You have to --

Q.  You're not saying that Emerson had to get a shareholder vote through in order to acquire --

A.  No, no.

Q.  -- national Instruments --

A.  No, it's not about a shareholder vote.  It's about the accountability that the CEO has to their shareholders and -- to give you a simple example, if the price was twice this much, still wouldn't need shareholder approval, but probably would not be able to pull off the transaction.  That's what I'm referring to.  So when you asked, are they capable, the base level of cash and financing, I assumed they were -- had the firepower to, but I believe there's other ingredients to being able to do a transaction.

Q.  Did you have any reason to doubt that Emerson would have adequate shareholder support to purchase National Instruments at the price it was offering?

MR. COMERFORD:  Form, foundation.

A.  I don't think I had opinion on that one way or the other.  The price offered was not a serious price, so.

Q.  (BY MR. JOHNSON) And in the, in the -- in

Page 45

that an offerer would have, fair?

A.  Correct.

Q.  And it's identifying them as, you know, on this spectrum of less coercive to more coercive, fair?

A.  Roughly ordered in that, in that way, correct.

Q.  And on the next slide, numbered eight, among other things there are, in the middle basically, two columns, one is weak bear hug, the other is strong bear hug.  Do you see those?

A.  Yes.

Q.  And under strong bear hug, in addition to private letter, it adds, requesting timely response and possibly threatening public disclosure.  Do you see that?

A.  Yeah, I do.

Q.  Now, Emerson had not done that in their May 2022 letter to you, right?

A.  No, incorrect.

Q.  I'm sorry, what do you mean?

A.  I think they did allude to that in the May letter.

Q.  Well, let's go back to Exhibit 3.

A.  Sure.

Q.  And understand what you're referring to.

A.  Do you have a question?

Page 46

Q.  I want to understand what in this letter you interpreted to be Emerson requesting timely response and possibly threatening public disclosure?

A.  Yeah.  Under timing, second paragraph, we have no current plan to disclose this letter and assume that you do not intend to either.  Our strong preference is to work constructively and expeditiously.

We took that to be a coded statement of a public disclosure threat.

Q.  Okay.

A.  And that was counsel's interpretation as well, and my understanding was that Wachtell had been presented to me as sort of the world's greatest attorneys in this category, so I trusted their judgment.

Q.  Okay.  So even in their first letter, Emerson was, as you understood it, threatening to go public with their offer; is that right?

MR. COMERFORD:  Objection, form, mischaracterizes testimony.

A.  Yeah.  They had some allusion to that, or -- well, I read this statement and mentioned our interpretation.

Q.  (BY MR. JOHNSON) Which was that it was a threat, right?

A.  Perhaps.  I should say -- let me say, that

Page 47

could have been their intent.  We were trying to interpret what could possibly be their intent.  We didn't have the -- we didn't discuss it with them.  So I didn't know their exact intent, but we were trying to ascertain what their intent might be.

Q.  You understood that their intent might include a threat to go public with their offer; is that fair?

MR. COMERFORD:  Objection, form, mischaracterizes prior testimony.

A.  Yeah.  It might be.  I didn't think they would actually do it, though.

Q.  (BY MR. JOHNSON) Okay.  On slide -- sorry, going back to Exhibit 4, on slide 10 towards the bottom, on the left-hand column.  One item there is monitor trading of company stock for accumulation.  Do you see that?

A.  I do.

Q.  And that's under a column labeled what to do, right?

A.  Yes.

Q.  Did National Instruments begin monitoring trading of its stock for the possibility of accumulation by Emerson?

A.  At some point we did.  I don't recall the exact day that we did that.  But at some point in this

Page 48

period, we did.

Q.  Did, did that begin before you got Emerson's next letter?

A.  I think so.  I don't recall exactly.  Again, this is the difference between May and June three and a half years ago, I don't recall exactly when we engaged the firm that did that surveillance.

Q.  Let's look at what's in folder 7, and this I think can be labeled Exhibit 5.  It's a one page document --

COURT REPORTER:  One second, please.

(Exhibit 5 marked for identification.)

(Discussion off record.)

Q.  (BY MR. JOHNSON) NAT-SL-000016270 through 271.  When you've had a chance to look this over, I'm first going to ask if you recognize it.

A.  Yep, I do.

Q.  You received this email?

A.  Yes, it was sent to all board members.

Q.  And the subject line, Project Wolverine, that was, what, a code name for Emerson's approach to National Instruments?

A.  Correct.

Q.  And another code name that was used was Nut Hatch; is that right?

Deposition of Eric Starkloff

Page 73

MR. COMERFORD: Yeah, same objections.

A. Yeah, same answer.

Q. (BY MR. JOHNSON) What is the answer?

MR. COMERFORD: Same objections, it's been asked and answered.

A. We viewed this offer as the same as the offer that had been made and rejected a few days prior.

Q. (BY MR. JOHNSON) So you are incapable of answering yes or no, whether $48 a share is materially higher than $31 per share?

MR. COMERFORD: Objection, it's argumentative, form, asked and answered.

A. I find the comparison to an arbitrary price you're choosing to be not relevant.

Q. (BY MR. JOHNSON) You, of course, agree 48 is itself higher than 31, right?

A. It is both higher than 31 and the same as 48.

Q. And is it materially higher than 31?

MR. COMERFORD: Objection, form. Calls for a legal conclusion, calls for expert opinion, asked and answered.

A. Yeah. I've answered this question.

Q. (BY MR. JOHNSON) So remind me what your answer is?

MR. COMERFORD: Same objections.

Page 74

A. My answer is that the $48 share offer is the same as the previous $48 share offer that we rejected on January -- or sorry, June 16.

Q. (BY MR. JOHNSON) Okay. You're going to try that in front of the Court, too? You're going to stick with that answer in front of the Court?

MR. COMERFORD: Objection --

Q. Because I'm going to ask you this same question in front of the jury and the Judge.

MR. COMERFORD: Objection, argumentative.

MR. JOHNSON: Yeah, it is.

MR. COMERFORD: Form.

A. Did you ask me a question?

Q. (BY MR. JOHNSON) Yeah, are you going to stick with this in front of the jury?

MR. COMERFORD: Objection, form, argumentative, asked and --

Q. (BY MR. JOHNSON) Because if you don't, I'm going to play that point, okay. So tell me, are you -- is this your answer today, and in front of a jury?

MR. COMERFORD: Same objections.

A. I've given you my answer.

Q. (BY MR. JOHNSON) Now, in this second letter from Emerson, dated June 22, second offer letter from Emerson, Emerson says, and I'm reading on the second

Page 75

page in about the middle, we could work with you to find additional value that would allow us to increase our proposal. Do you see that? I can help you find it if you need.

A. Yeah, I'm looking for it, I vaguely remember that but where is that?

Q. It's the end of the paragraph that begins we prefer to engage.

A. Yes, I see it now.

Q. Okay. So you understood that to mean that Emerson was communicating a willingness to quite possibly raise their offer price, correct?

MR. COMERFORD: Form, calls for speculation.

A. Yeah, I didn't know what -- I didn't know what their real intent was there. I understood from counsel that's kind of a statement often, often put in, but not something I could really count on.

Q. (BY MR. JOHNSON) You, you see in the letter that they -- that Emerson notes that they've engaged Goldman Sachs, Centerview Partners, Davis Polk. Do you see that towards the bottom of this page?

A. I do.

Q. Those are reputable organizations, right?

MR. COMERFORD: Form.

Page 76

A. Yeah, two out of three.

Q. (BY MR. JOHNSON) As best you know, as best you know?

A. As best I know, sure.

Q. And in the world of mergers and acquisitions, those are credible organizations, fair?

MR. COMERFORD: Form.

A. Sure.

Q. (BY MR. JOHNSON) So on the whole, did you continue to believe that Emerson was sincere in its interest to acquire National Instruments?

MR. COMERFORD: Form, foundation, calls for speculation.

A. We didn't view this letter as having really any changes from the first one. I, for example, assume they already had all of those partners previously. So I didn't find any new information to be presented in this letter.

Q. (BY MR. JOHNSON) Certainly didn't see anything that indicated less seriousness on Emerson's part in its interests to acquire National Instruments, right?

A. Actually -- in some ways the fact that they just restated the same number after a rejection did make me question the seriousness of the offer, so yes -- so I disagree with your point.

Page 77

Q.  The end of the letter, Emerson -- or Mr. Karsanbhai, on behalf of Emerson says, I look forward to hearing from you by then at the latest, and he was referring to July 11th.  Do you see that?

A.  Yep, I see that.

Q.  Do you recall that Wachtell had advised that an offer letter seeking a response by a particular date suggested more aggressiveness?

MR. COMERFORD:  Form.

A.  I don't, I don't recall that.  I know you showed that slide.  I don't doubt that that may have been a point.  I don't think that's the immediate conclusion I had at the time from reading this, but...

Q.  (BY MR. JOHNSON) Did you --

A.  In fact, if I may, at the time we thought that was a fairly long period.  They didn't seem to have a lot of urgency actually, the way I interpreted it.

Q.  What is that three weeks, three-ish weeks away?

A.  Yeah.  I had been -- previously had had experience being on the other side, where I was giving an unsolicited offer.  I typically gave 24 to 48 hours response time, something like that.  So this seemed not particularly urgent on their part.  That's how we interpreted it at the time.

Page 78

Q.  So you thought they were less serious about their interest in acquiring National Instruments?

A.  I think that's accurate.  Because they restated the same number, so that didn't seem like it had much likelihood of going anywhere since we had already rejected this offer a few days prior.

Q.  So then did you advise the board of your view about that?

A.  We collectively discussed this with the board and advisers.

Q.  And given your view that this second letter from Emerson suggested less seriousness on Emerson's part, did you express that view to the full board?

A.  I think as a full board we considered a range of interpretations that would range from less serious, about the same, to potentially more serious, as sort of a range of interpretations of this.  But at the headline we viewed it as substantially the same offer that had been presented before, and rejected.

Q.  So did you in effect stop thinking about the possibility that Emerson would come back with a third approach?

MR. COMERFORD:  Form.

A.  I mean, we continued to -- I viewed my job, not just in this context, but in general, as being

Page 79

prepared for all kinds of opportunities and challenges that would face the business.  So in that context I believe we continued to think about in various different ways preparedness for this scenario, as well as many other scenarios, many others, as we had done before, while at the same time viewing this as sort of low probability of happening, because it was an offer that we had rejected once, and as you know, we would come to reject this one as well.

Q.  (BY MR. JOHNSON) And so did you take any affirmative steps to help position the company for the possibility that Emerson continued to be interested in acquiring National Instruments?

MR. COMERFORD:  Form.

A.  I don't, I don't know what you mean by that.  What do you mean?

Q.  (BY MR. JOHNSON) What's complicated about the question?

MR. COMERFORD:  Form.

A.  You're asking if we took any affirmative steps -- I honestly do understand what you're getting at.

Q.  (BY MR. JOHNSON) Did you do anything to prepare for the possibility that Emerson would come back with a third communication about buying National

Page 80

Instruments?

A.  Yeah, I think I already said that we did a range of activities, for that possibility, for many other possibilities, so, yeah, of course.

Q.  And that included -- and that included changing your approach to your cost cutting plans, right?

MR. COMERFORD:  Form.

A.  No.  We had a debate happening, as is normal, I think, in a corporation like this, that predated all of this timeline that we've been discussing by a long time, about cost structure of the organization.  Myself and the chairman had debated that quite a bit, and had sort of differing opinions.

And that debate was primarily exacerbated by the market conditions at the time that included the inability to obtain semi-conductors, and ship product, which resulted in large amounts of backlog and a reduction in short-term profit.  So there was a very active debate about that that had predated all of the approach by Emerson.  And it continued throughout this time vigorously.

Q.  (BY MR. JOHNSON) And because of Emerson's interest in buying National Instruments, you accelerated the plans to engage in cost cutting, right?

Page 89

say if anything was not represented correctly, and then at the next meeting we would, we would approve them. So I, like all other directors, participated in that review and approval process.

Q. Got it. You see on page 4 or 1460. There's a section that begins at the bottom of that page, summary and actions, agenda item six taken out of order?

A. Yeah, it's right under the supply chain update that's above it, correct.

Q. And this section is related to Emerson's response to the company, in other words, their second offer letter, right?

A. Uh-huh, correct.

Q. And as part of that the minutes note that -- and I'm reading on the top of the next page -- the board concluded that the proposal from Emerson did not merit engaging in discussions with or providing diligence materials to Emerson. Do you see that?

A. Yeah, I do.

Q. And then the minutes note the board also discussed with management the potential steps the company could take of the upcoming earnings call to highlight the company's strong momentum, prospects, margin, priorities and other financial and operating performance matters. Do you see that?

Page 90

A. Yes.

Q. So, do you agree that a part of National Instruments' efforts to defend against the Emerson interest in buying the company included emphasizing to the public the company's supposed improving prospects?

MR. COMERFORD: Form.

A. No.

Q. (BY MR. JOHNSON) And you, you wanted to have an investor conference in or around this time in part because of Emerson's interest in buying National Instruments, right?

MR. COMERFORD: Form.

A. It was pretty typical for us to have investor conferences like that. And I just want to note, you went over it quickly, I disagreed with your last statement, but -- with your last question.

Q. (BY MR. JOHNSON) You, you -- one of the reasons you wanted to have that investor conference in 2022 was to help defend the company against a possible further approach by Emerson, right?

MR. COMERFORD: Form, asked and answered.

A. Yeah, I don't recall all the, all the reasoning that went into the investor conference. I just made the point that was pretty typical.

And again, the biggest challenge we were

Page 91

having during this period, and the context that underlies a lot of the discussion I think that was happening in this period was the fact that because of the supply chain disruption, our revenue was suppressed compared to the very, very strong demand we had for our products, given our inability to ship them. And we were working very hard to make sure that the market understood.

It was difficult to get that message across in the market, these unusual circumstances. We weren't alone in that; GM and Apple and every other company was having the same struggle, but we were talking a lot about how to convey that --

Q. What question are you answering?

MR. COMERFORD: Counsel, I think you interrupted him mid answer.

MR. JOHNSON: I did interrupt him because there's no question that would remotely involve this speech.

A. You were asking why we had an investor conference.

Q. (BY MR. JOHNSON) No, it was much more pointed than that.

A. I said there was a -- I don't recall all the specific reasons for having investor conference, but I do recall the number one reason and that's what I was

Page 92

describing.

Q. Let's look at what's in folder 17. This I think is Exhibit 13. NAT-SL-7815 to 7816.

(Exhibit 13 marked for identification.)

Q. (BY MR. JOHNSON) After you've had a chance to look at this, Mr. Starkloff, first want to know if you recognize it.

A. Yeah, I recall these discussions.

Q. So this is in late July of 2022, right?

A. July 19th, yes.

Q. Yep. And this is at about the same time that the board was determining to reject Emerson's second offer, right?

A. Yeah, that's correct.

Q. And one of the things you say in your email, at the bottom of the first page is I'd like to plan for investor conference in late August, slash early September, and I think we need to announce that on the call. First, you're referring to the earnings call?

A. That would have been the earnings call, correct.

Q. Yeah. And you go on and say, this is also advantageous should not attach, meaning Emerson, go public as we already have the conference planned as we've done in past years. Do you see that?

Page 129

Q. (BY MR. JOHNSON) When I asked you about whether it was entirely plausible that Emerson would come back, you said you'd agree it was possible, right?

A. Sure.

Q. What's the distinction you're using between plausible and possible?

MR. COMERFORD: Form.

A. Yeah, my impression is that you're insinuating that it was likely, which I did not agree -- which I do not agree with, or certainly didn't at that time. I do agree that it's -- it was possible. It was possible for a whole range of things to happen, that among them. I thought the most likely thing was not that. Which turned out to be the case for many months.

Q. (BY MR. JOHNSON) And it wasn't so implausible that you just turned your attention entirely away from Emerson, right?

MR. COMERFORD: Form.

A. What's your -- sorry, can you restate that question?

Q. (BY MR. JOHNSON) The likelihood that Emerson would come back wasn't so low that you turned your attention entirely away from Emerson?

MR. COMERFORD: Form.

A. The vast majority of my attention was not on

Page 130

that. I was spending my time on the business, on other merger possibilities, a lot of other possibilities were more, more front of mind at that time.

Q. (BY MR. JOHNSON) But on your list of things to do, included take steps to help prepare for the very real possibility that Emerson would come back, right?

MR. COMERFORD: Form, assumes facts not in evidence.

A. I had some team members that were spending some time on that.

Q. (BY MR. JOHNSON) Okay. How about you --

A. Most of, most of it we had already done -- sorry -- in terms of putting in a communication plan for that possibility had already been done at this point.

Q. Well, we've been talking about the fact that you yourself listened in on Emerson's earnings call, right?

A. Correct. I -- for context, I probably listened to a dozen earnings calls or more in that cycle.

Q. And Emerson was one of them?

A. Sounds like it was.

Q. All right. Didn't delegate that to somebody else, right?

A. I didn't delegate the other dozen either.

Page 131

Although many of my team members would also be listening to various earnings calls.

Q. So did other team members of yours listen in on that Emerson earnings call with you?

A. I don't know.

Q. And in the first half of August you also went to the trouble of drafting an email to the company responding to that hypothetical possibility that Emerson went public with an offer for National Instruments, right?

A. Yeah, I think I did.

Q. So it was plausible enough that Emerson would come back that you went to the trouble to do that, right?

A. Yeah, I was in the habit at that time when I had something that I was thinking of, or maybe that I was -- yeah, I had a thought, or a concern or whatever that I -- it helped me to sort of write it down, sometimes in a draft email, and then move on. And I think that's the context with which I did that.

Q. You weren't so occupied with your other responsibilities that you couldn't make time to draft this email that wasn't even yet needed, because the facts hadn't developed yet, you weren't so busy with other things that you couldn't find time to do that,

Page 132

right?

MR. COMERFORD: Object to the form, it's argumentative.

A. No, obviously I found time to do that. I -- yeah, among many, many other things I was doing.

Q. (BY MR. JOHNSON) You also learned in the early half of -- sorry, the first half of August of 2022 that Emerson had sold the company and thereby raised additional capital. Do you remember that?

MR. COMERFORD: Form, foundation.

A. Yeah, I think you're probably referring to Insinkerator, garbage disposal company. I think it had been the case that we always expected, I think they had been public but that was always expected, so I didn't think the actual transaction was big news. We never questioned their ability to have the capital to do a deal.

Q. (BY MR. JOHNSON) Okay, you never questioned Emerson's ability to have the capital to buy National Instruments?

A. Correct, we discussed that before.

Q. Uh-huh. And the fact that Emerson raised additional capital was interesting enough for you to discuss that with your team, right?

A. Perhaps.

Page 137

discussion. I don't, I don't recall that a firm cost reduction plan was specifically tied to this. Again, I know we made multiple iterations to our cost plan as we went through 2022. And I don't know that they were in response to this specific discussion that McGrath led.

Q. (BY MR. JOHNSON) Now, in addition to the other things we've already talked about that you were doing in the first half of August, you also pushed to have the company engage in further share repurchases, right?

MR. COMERFORD: Form.

A. I believe you're referring to when we -- at some point in August we lifted the trading restriction and we resumed buybacks.

Q. (BY MR. JOHNSON) In August you were in favor of engaging -- having the company engage in more buybacks than it had already completed to that point in the year, right?

A. We continued to want to execute on a buyback plan as a way to return capital to shareholders. We had paused it while we had a trading restriction. So we definitely had conversations and counsel about the trading restriction. And then once there wasn't a trading restriction, we did resume buybacks because the intent was still to do buybacks, yes.

Q. All this we talk, what was your position about

Page 138

resuming buybacks?

MR. COMERFORD: Form.

A. In general, I was in favor of buybacks for a couple of reasons. One is in hundreds of meetings with shareholders, they were broadly in favor of more buybacks and --

Q. (BY MR. JOHNSON) And you were in favor of them then, right, in the first half of August in particular?

A. Say in favor of them... I don't think my position on buybacks in a broad sense changed during this period. I continued to be in favor of buybacks. And we publicly stated that they were a key tenet of our capital allocation strategy.

Q. And you, you faced some pushback from some within the board on whether to resume buybacks at that time, right?

MR. COMERFORD: Form.

A. Yeah. Mainly Michael, he preferred that we use cash for acquisitions. And many other board members and shareholders preferred buybacks, almost all shareholders that I talked to preferred buybacks.

So we were trying to strike an appropriate balance between dividend buybacks and M and A. But certainly Michael was more in favor of the M and A, and therefore less in favor of buybacks as a consequence of

Page 139

that.

Q. (BY MR. JOHNSON) Well, you heard from Mr. McGrath that he wasn't the only board member who was not in favor of reengaging in buybacks in August of 2022, right?

A. Yes, and I recall questioning him on that statement, and asking him to have those board members contact me directly because I was skeptical that it wasn't just him. And I don't believe I ever heard from the other board members, leaving me with the conclusion that it was him.

Q. And although in the second half of July, the forecast was for the company to spend $10 million on buybacks during the third quarter of 2022, how much was, in fact, spent on buybacks in the third quarter of 2022?

A. I know it was significantly more than that. I don't recall the number. And that was driven by the fact that the stock market remained at a low point. So we felt like it was quite an advantageous time to buy back stock.

And also that we had a trading plan that contemplated different volume of stock purchases at different prices, which again is a very shareholder friendly way to buy back stock. And because the stock price and the stock market remained low, it maximized the

Page 140

purchases through that plan.

Q. In the third quarter of 2022 the company bought or spent over $80 million on buybacks, right?

A. That sounds right.

Q. And you were in favor of the company doing that, right?

A. I was.

Q. And obviously you were well aware of all the dealings with Emerson about them possibly buying the company, right?

MR. COMERFORD: Form, vague, ambiguous.

A. Yeah, I think we've established my awareness of that, yes.

Q. (BY MR. JOHNSON) And the public wasn't aware of Emerson's approaches to National Instruments and its offers to buy National Instruments, right?

MR. COMERFORD: Form, timeframe.
You can answer.

A. Not that I know of at that time.

Q. (BY MR. JOHNSON) If the fact of Emerson's offers to buy the company for $48 a share had become public in August of 2022, what's the logical expectation as to what the share price would have done in response, given that then it was trading below $40 a share?

MR. COMERFORD: Form, foundation, calls

Page 157

Q.   Did that lawsuit require you to testify at deposition or trial or otherwise?

A.   I did a deposition for that, I recall; that's I think the only other deposition I've ever done.

Q.   And you never previously testified in court; is that right?

A.   Correct, correct.

Q.   Okay.  Nothing further.  Thank you very much, Mr. Starkloff.

A.   Okay.

EXAMINATION
BY MR. COMERFORD:

Q.   Mr. Starkloff, my name is John Comerford.  I represent the Defendants in this case, which are National Instruments and you and Mr. McGrath, okay?

A.   Uh-huh.

Q.   And I'd like to ask you a series of questions for the jury so they understand your background --

A.   Sure.

Q.   -- and where you're from.

Let me begin by asking you, where are you from originally, sir?

A.   I grew up in, kind of suburban Washington, D.C. area, and then in Virginia.

Q.   And can you trace your education after high

Page 158

school, please?

A.   Yeah, went to University of Virginia, in engineering, electrical engineering.

Q.   And then what year did you graduate?

A.   1997.

Q.   And do you have any other formal education after the electrical engineering degree from the University of Virginia?

A.   No.  Some classes here and there, and I guess little certificates, but not, not formal study like that, no.

Q.   Okay.  What was your first job after graduating from college?

A.   National Instruments.

Q.   All right.  And what was your first role?

A.   Application engineer, entry level position at NI.

Q.   Okay.  And then in what role were you when you left National Instruments?

A.   CEO.  I left as an adviser for the last three months, but I think you're getting at I was CEO at the end, yes.

Q.   Okay.  And did you also serve on the board of directors of National Instruments?

A.   I did.  I was the director from 2000 through

Page 159

2003, yeah -- sorry, 2020 through 2023.  Little off.

Q.   You saw my confusion there.

A.   Director from 2020 through 2023.

Q.   Okay.  What is the business of National Instruments in terms of the industry, and the products of the company?

A.   Yeah, the easiest way to think of NI is we test electronic systems.  And so engineers and scientists use NI hardware and software to make sure the thing they're building works correctly and has quality.  And it's primarily any kind of electronics that you use in your everyday life use NI's products.

Q.   Okay.  And it's testing for those -- for electronic products?

A.   Yeah, testing the performance of those products, correct.

Q.   All right.  I want to ask you to focus on 2022, if we just orient ourselves there.  How was the business of National Instruments doing in terms of the revenue and the financial performance of the company, just in general terms?

A.   Sure.  2022 was a bit of a strange year.  It was the year of the supply chain disruption that affected the whole world, I'm sure everyone read about it in the papers or experienced it.  You couldn't buy a

Page 160

car because they didn't have enough chips for it.  And so that affected our business as well.

So on one hand we had some of the highest demand that we've ever had for the company.  We had recently transformed our strategy.  It was working.  And our bookings, the amount of orders we were getting were growing very strongly like 20 plus percent, I believe.

But, we couldn't get enough semi-conductors to ship our products, so it was difficult to keep up the revenue of the company with the bookings.  So it was a challenging year.  Demand was very high.  But it was difficult to ship, and customers were calling me wanting products and I was calling semi-conductors asking for chips throughout that year.

Q.   Okay.  In 2022 were you, as the CEO of National Instruments, interested in seeing National Instruments be acquired by another company?

A.   No, that wasn't my -- that wasn't my objective.  We had a long-term plan for the company, a hundred year plan, and a ten year plan, and focused on long-term value creation.

Q.   Okay.  In 2022, had National Instruments recently before that gone through a process where it had expressed interest in buying another company?

A.   Yes.  We were, we were doing more acquisitions

Page 161

in that time period and looking at a number of companies and we bought some in that time period as well.

Q.   Now, the jury understands that Emerson Electric Company approached National Instruments in May of 2022, correct?

A.   Correct, correct.

Q.   How did the National Instruments' acquisition activity in the recent past, prior to 2022 affect your thinking about Emerson's approach to National Instruments?

A.   Yeah, so, one acquisition in particular affected my sort of thinking, I think on that. We had been trying to acquire another public company. And we had been using -- it was an unsolicited offer. So we had approached that company, we had ended up writing letters to that company, and their board, making an offer for the stock of that company. And this went through several iterations. And in the end resulted in us not buying the company. And -- but I'd been on that side of the experience, trying to buy a company through an unsolicited public to public transaction.

Q.   Prior to Mr. Karsanbhai, the CEO of Emerson reaching out to you in May of 2022, did you have any idea that Emerson might be interested in acquiring National Instruments?

Page 162

A.   No, not at all.

Q.   Was Emerson's offer, or proposal I should say, to National Instruments in 2022, was that solicited or unsolicited?

A.   Totally unsolicited.

Q.   Okay. And so what was your reaction as the CEO when Emerson made a proposal of $48 per share on May 25th, 2022?

A.   Yeah, I perceived this to be -- I described it at the time to others as like bargain hunting. We -- like the stock market was down significantly in 2022, because of that supply chain disruption, post COVID supply chain disruption. And so I thought that reaching out to NI with a $48 price, which was a premium to that day's price, but was not -- it was still sort of discounted to the long-term value of the company, was just an attempt to look for a bargain in the market.

Q.   And you, you mentioned the stock market, I believe?

A.   Uh-huh.

Q.   What's your recollection of the market and National Instruments' place in the stock market at that point in time?

A.   Yeah, I think --

MR. JOHNSON:  Objection, form.

Page 163

A.   -- I think the stats were that, from the peak to the valley, which happened at approximately that timeframe. Again, remember, COVID it went way a down, but then it recovered. And then the supply chain disruption happened and the market had another big disruption, down 40 or 50% is my recollection, so significantly down. And then also subsequently recovered in sort of 2023, and 2024, of course. But -- so it was a challenging time for the market, because of this semi-conductor crises that happened.

Q.   (BY MR. COMERFORD) Okay. Was National Instruments also going through a strategic transformation at this time?

A.   We, we had been. And we were in -- we were still in it, in the latter stages. We were kind of in the stage of that strategic transformation where it was starting to pay -- kind of come to fruition, as I mentioned. The bookings or the demand for the company was starting to really inflect and we viewed that as a very positive sign that we were on a significant growth trajectory.

Q.   Did you think that National Instruments, based on the nature of its business, would be a natural fit with Emerson?

A.   No.  I was pretty surprised at the approach

Page 164

from Emerson because I always understood Emerson to be in the industrial automation business. And NI was a test of measurement company, which is quite different, and then when I, when I learned a little bit more, after the approach, Emerson was talking about being a pure play automation business, which seemed even more far afield to our, our business than, than even what I initially understood.

So at that time I thought it was, you know, a pretty big diversification for Emerson, which was a surprise.

Q.   Okay. I want to ask you to pull up Exhibit No. 3 --

A.   Sure.

Q.   -- to your deposition. Which is a May 25th, 2022 cover email and letter from Mr. Karsanbhai, the CEO of Emerson to you?

A.   Got it here, yep, I've got it.

Q.   Okay. My first question is, I'd like you to look at page three of Mr. Karsanbhai's May 25th, 2022 letter after his signature.

A.   Uh-huh.

Q.   And at the bottom of the page, do you see where his letter says:  This proposal constitutes neither an offer, nor evidence of the existence of an

Deposition of Eric Starkloff                    In Re National Instruments Corporation Securities Litigation

Page 169

perceived by sort of external adviser. That was an important part of the decision. And it indicated a much higher value for the company.

And then they did some other analysis on other strategic alternatives. We were also working with them on looking at buy side acquisitions and stuff as well.

Q. Okay. You were asked questions today about the fact that National Instruments sent communications to Emerson on June 16th, 2022, and August 2nd, 2022?

A. Correct.

Q. Which indicated that it was rejecting proposals from Emerson on both those occasions; do you recall that?

A. Yes, I do.

Q. Okay. What was the intention of you and the company when those communications were sent to Emerson?

A. Yeah, we wanted --

MR. JOHNSON: Objection, form.

A. We wanted a firm and unambiguous rejection of the offer.

Q. (BY MR. COMERFORD) Okay, were you trying to hint in any way that National Instruments was open to further discussions or to a higher price?

A. We were specifically trying to make sure we

Page 170

did not inadvertently hint that we were open to additional discussions or a higher price. That's why the letters were quite short.

Q. And is it your understanding that Emerson offered $48 per share -- or proposed $48 per share twice?

A. The same offer twice, correct, $48 per share.

Q. How did the fact that Emerson proposed $48 per share twice impact your thinking about whether an acquisition by Emerson was going to happen eventually?

A. Yeah, when we got the second offer that was sub -- the same as the first offer, it was -- in some ways a little surprising that it was just reiterating the same offer. I didn't know what to make of that. Maybe that was the most they could possibly pay, was one theory.

And so the fact that they offered it again seemed less likely that any transaction was going to happen with Emerson. Because we knew that that was not a compelling offer.

Q. When Emerson offered $48 per share for the second time --

A. Uh-huh.

Q. -- in June of 2022, did you view that as an improved offer over the first $48 per share offer?

Page 171

A. No. And, in fact, the -- we viewed it as substantially the same offer, and our minutes from our board discussions, and even, I believe some of the tone of the letter that we sent back to Emerson indicated our position that we were rejecting what was substantially the same offer that we had previously rejected.

Q. After National Instruments sent a second rejection letter to Emerson on August 2nd, 2022, what was your view of the prospect of a transaction happening with Emerson?

A. Yeah, I thought it was very unlikely on that day. And then it also, as time went on, we had -- when we sent the previous letter we got a pretty quick response to that. This time as time went on, you know, after a week or so, it seemed unlikely that they were going to come back. And, of course, who knows the time, but, in fact, they didn't, for many months. So we assumed that this was dead, frankly. That this wasn't going anywhere.

Q. Okay. I want to ask you some questions about the advice that National Instruments received and that you received from the Wachtell, Lipton, Rosen, Katz law firm. Why did National Instruments want to resume share purchases after rejecting Emerson's offer for the second time?

Page 172

A. Yeah, there's two things. One is, we had a trading restriction in place that applied to directors, personally, as well as we viewed it as applying to the company as well. So, we were thinking about well, how long is it appropriate to keep that in place. Like, what are the triggers?

And so we had a point of view that this was no longer -- this offer was sort of -- had been rejected twice and it was no longer sort of a live offer. But we wanted to get counsel to re -- to sort of understand their point of view on that. And so we did. And they affirmed for us that it was no longer a live offer. We had clearly rejected it multiple times. And so that allowed us to release the trading restriction.

To the other part of the company, we did have a authorization for share repurchase, which we had paused because of the trading restriction. And ultimately, you know, we used that to help return value to shareholders. And so, in the absence of a trading restriction, business as usual for us was to execute on the buyback program.

Q. So you, you referred to an authorization to do share repurchases?

A. Yes.

Q. What was the authorization in substance?

Page 173

A.   Yeah, so we had had multiple authorizations over the years.  This was common practice for us.  In January of 2022 we had -- the newest authorization at that time was a $250 million authorization, which enabled the management team under that authorization to buy back up to $250 million of, of stock, and could be at any time during that two year period.  So it was understood that we could do that in any timing that was advantageous to shareholders.

Q.   Okay.  At certain points today I think the phrase capital allocation strategy was used?

A.   Yes.

Q.   Can you tell, tell the jury what is a capital allocation strategy?

A.   Yeah, it's just a fancy term for something really simple.  It's about what you do with money that is ultimately the shareholder's money and how you allocate it.  And so we had a very consistent strategy.  We had three priorities and we're always balancing among these three priorities.  One was the dividend, where you pay cash back to shareholders on a quarterly basis in our case.

The second was buyback, when you buy back stock and that returns -- it's a very efficient way to return cash back to shareholders of that stock.  And the

Page 174

third was mergers and acquisitions, where you're buying other companies to increase the value of your company.

So we were constantly thinking about how to balance across those priorities, and taking input, frankly, from shareholders about those priorities.

Q.   When, when the board of National Instruments was meeting in July 2022 --

A.   Uh-huh.

Q.   -- I think we looked at documents that said it was July 19th and 20th --

A.   Correct.

Q.   -- 2022.  Did the -- did lawyers from the Wachtell, Lipton, Rosen, Katz law firm speak to the board at that meeting?

A.   They did.

Q.   Okay.  And what was -- how did that relate to the share repurchase or the buyback issue that the company was looking at?

A.   Yeah, we'd had multiple conversations I think at that board meeting as well.  And their position was that after, you know, after the second rejection, that we would be clear to lift the trading restriction at some point.

So they were -- at that time we still had a few more discussions, because that was July 20th, we

Page 175

didn't make that decision for a little bit.  But we were starting to talk about, you know, we knew that we weren't going to keep that share restriction in place indefinitely.  We had to think about what are the criteria with which we would remove it.  And so we were talking about that and getting their advice on that.

Q.   Do you feel that you and the rest of the management team at National Instruments provided the lawyers at Wachtell with all of the pertinent information about what was going on with discussions with Emerson and communications with Emerson --

A.   Yeah.

Q.   -- in 2022?

MR. JOHNSON:  Objection, form.

A.   Absolutely.

Q.   (BY MR. COMERFORD) Do you think there's any reason why the lawyers at Wachtell didn't know something that was relevant to the question of whether National Instruments could resume share repurchasing?

A.   No, I think --

MR. JOHNSON:  Objection, form.

A.   No, I think they had the whole picture.  They were almost like a member of our team in that period.

Q.   (BY MR. COMERFORD) Okay.  Was it fair to say that National Instruments was in very close contact with

Page 176

the Wachtell lawyers in 2022?

A.   Yeah, that's what I meant.  When I say a member of their team, not that -- they were still independent counsel, but we were in very frequent commune with them, yes.

Q.   And the advice that you received from them about the issue of whether National Instruments could resume share repurchases, or buybacks, in this July, August, September '22 timeframe was what; what was the advice from them?

A.   That we were in the clear, meaning we were no longer in possession of material non-public information, we could lift the trading restriction and resume buybacks; I think we made that determination in early August.  And they confirmed that they -- they made that recommendation, I should say, in early August.

Q.   Aside from the advice that you received from the outside lawyers at Wachtell, did you also receive advice from in-house lawyers at National Instruments about this issue?

A.   Yes, I was talking frequently.

Q.   Aside from advice you received from lawyers and opinions you received from lawyers, did you have your own personal view of whether National Instruments was in possession of material non-public information

Page 177

that should prevent it from trading?

A. Yes, I have an opinion as well.

Q. Okay, and so if you're clear about the timeframe, and let's just focus on the timeframe of August -- early August.

A. Sure.

Q. August 3rd, 2022, what was your opinion about whether National Instruments was in possession of material non-public information that should preclude it from trading?

A. My, my opinion at that time was that we were not in possession of material non-public information as we had twice rejected the same offer.

Q. And then after August 2nd or 3rd, we move forward a few days, and ████████████████████████ ██ ████████████████████████

A. We did, we did.

Q. And then did the advice from -- did you go back to Wachtell and receive new or refreshed advice at that point?

A. We absolutely did.

Q. Okay. And what was the -- was the advice any different than you had already received?

A. The advice, the advice did not change.

Q. Okay. And then did, did the fact that you

Page 178

learned that ██████████████████████████ ██████████████████, did that change your opinion about whether National Instruments was in possession of material non-public information?

A. No, I still hold the same opinion.

Q. Okay. Did you personally buy or sell shares of National Instruments stock in between the dates of August 12th, 2022 and September 26th, 2022?

A. I did.

Q. Okay. And can you describe that as best you can recall?

A. Yeah, I had a trading plan that would execute sales at certain price points. And one of those price points was achieved in that period and I sold some shares per that trading plan.

I had that trading plan, by the way, just to sort of remove -- as a CEO of a public company, you're kind of -- you just want to remove yourself and make it as clean as possible when you're buying or selling shares, so I did that. I didn't have to do that, but I did that for that reason.

Now, at the time I could have canceled that plan and I was advised that it was within my rights to cancel the plan. I did not cancel the plan. I went forward and it sold, I believe at $42, if I'm not

Page 179

mistaken was the share price that it sold at.

Q. And so if it was indeed a sale at -- of your personal stock at $42 per share, how much less than Emerson's offer of $48 per share was that?

A. Yeah, so that was, that was at $6 less than Emerson's previous rejected offer.

Q. Okay. Those are all the questions I have for you, sir. I appreciate it.

A. Okay, thanks, John.

MR. JOHNSON: Just one or two real quick.

FURTHER EXAMINATION

BY MR. JOHNSON:

Q. Which Wachtell lawyers were at the July 19, 20, 2022 meeting and giving advice there to the board?

A. I believe that would have been Sebastian Niles was at sort of all of those meetings. And Adam Emmerick was likely at that meeting as well, would be my recollection is that Sebastian and Adam were the principal people. There could have been others, but those were the two people that were frequently in communication, and we would have consulted on that topic.

Q. And who did the talking for them?

A. I would expect both of them would have talked, and, in fact, both rendered their opinions, sort of

Page 180

independently was their style, frankly. But I don't recall specifically this conversation, but it was typically the case that, you know, both of them would, would render their, their kind of advice, you know, together and independently. So we were talking to both of them, yeah.

Q. And did any of their advice include words to the effect, or actual words, of conduct business as usual?

A. I don't remember if they used that phrase.

Q. When was your 10B5 plan put in place?

A. I think it was put in place -- mine personally, or you mean the company's?

Q. Yeah -- no, yours, your personal one.

A. I believe it was early -- it was early in 2022, I believe.

Q. Before --

A. Yeah.

Q. -- the approach by Emerson?

A. I believe so, yeah, I think it would have been before that.

MR. JOHNSON: Okay, that's all.

MR. COMERFORD: I'm just going to ask two or three questions about the questions you just received from Mr. Johnson and then that's all I will ask.

ERIC STARKLOFF

OCTOBER 23, 2025

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 23 | 11 | "dead" should be "debt" | typo |
| 24 | 16,20 | "Barra" should be "Berra" | misspelling |
| 25 | 10,22 | same as above | misspelling |
| 27 | 19 | "by" should be "my" | typo |
| 64 | 25 | "objection" should be "rejection" | typo |
| 92 | 23 | "not attach" should be "Nuthatch" | typo |
| 142 | 7 | "inequity" should be "an equity" | typo |
| 168 | 3 | "talk" should be "took" | typo |
| 176 | 5 | "commune" should be "communication" | typo |
| 177 | 2 | "have" should be "had" | typo |
| 178 | 5 | "hold" should be "held " | typo |
| 179 | 16 | "Emmerick" is "Emmerich" | misspelling |
| 181 | 18 | Same as above | misspelling |

I, ERIC STARKLOFF, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

11/11/2025

ERIC STARKLOFF

THE STATE OF Texas )

COUNTY OF Travis )

Before me, Possible Chinaka , on this day 11/11/2025 personally appeared ERIC STARKLOFF, known to me or proved to me on the oath of                or through License (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this day of 11 November , 2025.

NOTARY PUBLIC IN AND FOR

THE STATE OF Texas

My Commission Expires: April 3, 2029

POSSIBLE CHINAKA
My Notary ID # 135509655
Expires April 3, 2029