# EXHIBIT 3

UNITED STATES DISTRICT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:23-cv-10488-DLC

IN RE: NATIONAL INSTRUMENTS CORPORATION

SECURITIES LITIGATION

_____/

VIDEOTAPED DEPOSITION OF MICHAEL McGRATH

APPEARING REMOTELY

Tuesday, September 30, 2025

9:46 a.m. Eastern Time

REPORTED BY:

Cheri L. Poplin, CSR-5132, RPR, CRR

APPEARING REMOTELY FROM WAYNE COUNTY, MICHIGAN

Deposition of Michael McGrath     In Re National Instruments Corporation Securities Litigation

Page 24

the first document is not a Bates labeled document, the first exhibit.

BY MR. MANDEL:

Q. So here we are in Exhibit 2. Mr. McGrath, have a moment to look at the document, and when you're through, let me know if you recognize any of it.

A. Okay. I believe this is the typical document from Albert Percival to the executives and board members regarding the window of trading for insider trading, when it opens and when it closes. I believe this is the email on when it opened Friday, July 29th.

Q. Now, I might have already asked. When did you become the Chairman of The board of National Instruments? Do you recall the date?

A. I became the chairman in the fall. I believe it was October of 2018.

Q. October of 2018. Okay. Now, if we take a look at this document and we go to I guess it's -- after the email you'll see an Insider Trading Q&A followed by a document beginning at Bates 21247 entitled "National Instruments Corporation Insider Trading Policy." Why don't we scroll to that page.

A. I'm trying to.

MR. MANDEL: Does the witness have control?

A. Okay. I'm trying to. Okay? It's the Insider

Page 25

Trading Q&A?

BY MR. MANDEL:

Q. No, no, no. If you keep going two or three pages, you'll get to another attachment to the email, which is "National Instruments Corporation Insider Trading Policy."

A. I'm trying to get it. Who's -- somebody else is controlling it?

MR. MANDEL: Does the witness have control or, Alex, do you?

EXHIBIT TECHNICIAN: The witness has control.

BY MR. MANDEL:

Q. So if you just scroll down, sir, to the page with the Bates number 21247. There you go. There's 21247 is the upper page there. Yep. Scroll up a little more.

A. Is it -- I'm trying to get through it. Exhibit A? No?

Q. No. It's before Exhibit A. If you go back a couple of more pages.

A. Okay. Somebody else is --

Q. Do you see on the bottom right there are numbers? Those are called Bates numbers. We sort of use them as litigators. We use them as page numbers. So you see this is 21255. You've got to go up to 21247. And

Page 26

if I could make a recommendation, near the top of the page you'll see there's arrows.

A. 212 --

Q. If you use those arrows, you can skip page by page without scrolling. Yep. Go up one, up one, and it'll get you there.

A. Now I can't find the page number.

Q. This is 21251.

A. I can't find the page -- I'm trying to scroll. I can't get it. I'm sorry.

MR. MANDEL: Can we give -- can we give Alex control? I'm sure he can get you to the right page. Alex, do you mind?

EXHIBIT TECHNICIAN: Yep. I have it here now.

A. Okay.

BY MR. MANDEL:

Q. Yes. This is the page.

A. Okay.

Q. So this is the first page of National Instruments Corporation Insider Trading Policy.

A. Right.

Q. You see the -- there's a line there that says "Sponsor." Do you see -- who sponsors this policy?

A. Yep. Board of Directors of National Instruments

Page 27

Corporation.

Q. Right. And the effective date of this policy is April 29th, 2020; is that right?

A. Yep.

Q. So this is the Board of Directors of National Instruments Corporation Insider Trading Policy from April 29th, 2020; is that right?

A. Yep.

Q. And you were the Chairman of the Board at this time; is that right?

A. Correct.

Q. So is it fair to say that this is your insider trading policy?

MR. COMERFORD: Form.

A. It's the -- it's the board's policy.

BY MR. MANDEL:

Q. And you were the Chairman of the Board?

A. Correct.

Q. Okay. If we look down on B right there. You see where it says "Policy Statement"? It says, "No Trading on Material Nonpublic Information."

Do you see that?

A. I see the "Policy Statement." Yeah. I see the headline, but I don't see the text, but . . . That's correct.

Page 28

Q. Well, right under the "Policy Statement" there's an underlined phrase that says "No Trading" --

A. I see -- I see -- I see the underlined phrase, yes. I can't --

Q. Yeah. And it says -- so you understood that there was no trading on material nonpublic information; correct?

A. Correct.

Q. And you advised everyone in the company of this reality; is that right?

A. Yes.

Q. And your policy goes on to say or the board's policy goes on to say, "It is illegal for anyone to trade in securities on the basis of material nonpublic information."

Do you see that?

A. I don't see it, but I believe it.

Q. Can we zoom in a drop?

A. I'm trying to get down to it.

Q. Oh, no, no. You're already on the next page. We're still on the same page.

A. Okay.

Q. There we go. See that? "It is illegal for anyone to trade in securities on the basis of material nonpublic information."

You see that; is that right?

Page 29

A. Yes.

Q. So you understood at this time that it was illegal for anyone to trade in securities on the basis of material nonpublic information; is that right?

A. That's correct.

Q. And I note that this document is attached to an email dated July 28th, 2022. So at that time did you understand that it was illegal for anyone to trade in securities on the basis of material nonpublic information?

A. Yes.

Q. Let's move to the next page. Now, in the middle of the next page at Number -- Paragraph Number 3 is a section called "Definition of Material Nonpublic Information."

Do you see that?

A. Um-hmm. Yes.

MR. COMERFORD: Let me just object that the document's only partially readable based on how it's displayed on the screen. Thank you.

MR. MANDEL: What do you mean the document's only partially readable as displayed on the screen? We're zooming in and out so the witness can see the letters better. The entire document and the exhibit are right there. What is your objection?

Page 30

MR. COMERFORD: Yeah. It was -- it was -- I was just saying, Mr. Mandel, it was zoomed in too much and words were cut off.

MR. MANDEL: I see. Well, let's zoom to the witness's comfort letter -- comfort. Level.

BY MR. MANDEL:

Q. And, Mr. McGrath, are you able to see Paragraph 3?

A. Yes. I can't read it clearly, though, because it's too small.

Q. Okay. Well, we can zoom in so you can see the words.

A. Right. Okay. Could you zoom in to whatever you're talking about when you talk about it?

Q. Yeah. It's right there. Do you see Number 3?

A. I see it.

Q. Is this large enough for you to see, sir?

A. I see it, yes.

MR. COMERFORD: Okay. But -- but it's zoomed in so far now that some of the words are not readable, so we're -- I'm just pointing that out. We have to kind of strike a balance of making it readable but also not cutting off any words.

MR. MANDEL: Pause. What is not --

BY MR. MANDEL:

Q. Mr. McGrath, are you having trouble reading any of the words on the screen right now?

Page 31

A. I can read the words on the screen, but I can't see the whole -- all of 3, so I can only see 3-A through C, so . . .

Q. Oh, I understand that.

MR. MANDEL: So, Mr. Comerford, is your objection that when we zoom in on a certain part we can't see the other part of the page?

MR. COMERFORD: Yep.

MR. MANDEL: Okay. That's a ridiculous objection. We're just going to proceed.

MR. COMERFORD: I cannot see part -- some of the words on -- that are -- of this document.

MR. MANDEL: Okay. You can't? I remember at the beginning of this deposition Alex explained to you that you have an independent link where you can view all of these exhibits in their entirety independently. So, Mr. Comerford, please, let's not distract from the substance here.

MR. COMERFORD: I'm looking at Alex Held Tech Screen, and it's zoomed in so much that I can't see some of the words. Some of the words on the side of the document are cut off. I'm just pointing this out. I would appreciate it if Alex Held would zoom so that the document is readable. On the right side of the document the words are cut off. Is Alex Held --

Page 80

inaccurate?

A.   Yes.  Yes.  Yes.  Were accurate.  Yes.  Did you say accurate or inaccurate?

Q.   Well, here, let me ask the question again because I think we had like some maybe triple negatives built into there.  But . . .

The question was, I mean, your testimony is that National Instruments' minutes approved by the board are generally accurate; is that right?

A.   Yes.

Q.   And at this meeting you received a presentation from Wachtell and ultimately agreed to reconvene in June to continue the discussion; is that right?

A.   Yes.

Q.   Okay.

MR. MANDEL:  Let's go to our next document.  This is our Exhibit 10.  This will be Tab M-6.

(Marked EXHIBIT 10 for identification)

BY MR. MANDEL:

Q.   Okay.  For the record, this is Bates NAT-SL-16112.  There's a cover email from Mr. Niles of Wachtell to Mr. Dixon and others; is that right?

A.   It looks that way, yes.

Q.   And attached to the email is a set of Wachtell slides; is that right?

Page 81

A.   I assume so.  I can't see them, but yes, I assume so.

Q.   If you -- sorry.  If you go to the next page, it begins -- or sorry, two pages later it begins a Wachtell presentation, "██████████████" --

A.   Yes.

Q.   -- "██████████████" --

A.   Yes.

Q.   -- "████████████████"; is that right?

A.   That's correct.

Q.   And it says that on the first email "(Will refer to the attached slides . . ."

Do you see that?

A.   Yes.  Yep.

Q.   Okay.  So do you recognize this as the presentation from the May 26th meeting that Wachtell gave the board?

A.   Yes.  An important presentation.

Q.   Now, if we can go to Page 6 of this presentation, which is Bates 6120.  Now, it just says there, we'll just touch upon this, it says, "██████████ ████████████████████████████████ ████████████████."

Do you see that?

A.   Yep.

Q.   You see the third bullet there says, "█████████

Page 82

██████ . . ."

Do you see that?

A.   Yes.  Again, I already said yes.

Q.   Oh, no.  But it repeats it.  That's why I'm asking.

A.   Okay.

Q.   It repeats it down to the third bullet.  "████ ██████████████████"

A.   Yeah.

Q.   So, and there are various other examples of this in the document.  I don't need to take you all through them.  I just want to establish the CEO, Mr. Starkloff, consulted with you, the chair, throughout this process; is that right?

A.   Yes.

Q.   Is it fair to say you consulted closely -- Mr. Starkloff consulted closely with you throughout this process?

A.   Yes.

Q.   Now, let's go to the next page.  Do you remember this document?  Do you remember this slide?

A.   Yes.

Q.   Okay.  This slide is entitled "███████████ ████████████████████████████ ████████"

Do you see that?

Page 83

A.   Yes.

Q.   And the document essentially shows a spectrum of less coercive to more coercive steps that a hostile acquiror could take; is that right?

A.   That's correct.

Q.   And it says Number -- Number 3 there is "████ ████████████████████"

Do you see that?

A.   Yes.

Q.   And do you see that the next step up on this escalatory ladder is "████████████████████ ████████████████████████████."

Do you see that?

A.   Yes.

Q.   Okay.  So did you understand that the ██████████ ██████████████████████████ ████████████████████████████████████ ████████████████████

A.   Correct.

Q.   Okay.  Now, if we go to the next page.  You see there's a -- the page is labeled "████████████."

Do you see that?

A.   Yep.

Q.   You see there's a column for "████████████."

Do you see that?

Page 96

understand that you had nonpublic infor -- material nonpublic information in your possession at that time?

A. We did. We understood that we had it until we made a decision on the offer and rejected the offer.

Q. Okay. What was the basis of your understanding that at this time you had material nonpublic information?

A. I -- isn't that obvious? There was an offer outstanding that the board had to decide on, and -- and during that period of time it was material information that was not public.

Q. There was an offer outstanding; right?

A. Right.

Q. There was a proposal to acquire the company; right?

A. Yes.

Q. We saw in your insider trading policy that a proposed acquisition was material information; correct?

A. While it -- yes. While it was open, yes.

Q. But did your -- did the M&A -- did your insider trading policy add that little wrinkle that while it was open or anything? It just referred to a proposed acquisition, didn't it? We saw it today.

A. Yes. And there's no proposed acquisition after we rejected the offer, so I want to be very clear about that. All right? While we were considering the offer, it was material information. Once we rejected

Page 97

the offer, there was no offer outstanding, there was no material information. We did not expect Emerson to continue to make an offer. We wanted -- we went back to conducting business as usual. And we never heard from them for months. So if you're trying to get me to say that after we rejected the offer it was material information, I'm not going to say that.

Q. I'm trying to understand why you understood that there was material information in your possession at this time, and I understand you telling me because there was a proposed acquisition of National Instruments.

A. There was an open offer for an acquisition that had not been determined by the board yet, yes.

MR. MANDEL: Okay. Let's look very quickly at -- this will be Exhibit 11. This is our Tab Z-3.

(Marked EXHIBIT 11 for identification)

MR. MANDEL: For the record, this is email Bates number beginning NAT-SL-16270.

BY MR. MANDEL:

Q. And this is an email from Mr. Dixon to you and others informing you that you have material nonpublic information concerning Project Wolverine; is that correct?

A. Can I see the date of that?

Q. The date of the document is May 27th, 2022.

Page 98

A. Yes.

Q. And you received this at the time?

A. Yes.

Q. And so certainly by this time there's no question in your mind that you had material nonpublic information in your possession; is that right?

A. Correct. And as long as the offer was open. Correct.

Q. You keep adding that little self-serving --

A. Well, I don't want you to put words in my mouth to say that it went on forever for 20 years. I --

Q. I didn't ask you about that.

A. Okay. All right. All right. But I want to be clear that our understanding all the time was we had material nonpublic information while we were considering the offer, and that's what that memo refers to the event that we had to be aware of.

MR. MANDEL: Okay. Let's look at our next document, which is -- will be our Exhibit 12, and this is the -- our Exhibit 12 is Tab M-7. And this will be the meetings of the June 14th board of directors.

(Marked EXHIBIT 12 for identification)

BY MR. MANDEL:

Q. I want to actually take a step back because this question I'm going to ask also relates to May 25th. I just forgot to ask it before. This is a special

Page 99

meeting of the board of directors; is that right?

A. The May -- which one? The previous one.

Q. The June 14th but also the May 1 was labeled special meeting.

A. Yes. Correct. Yes. Right.

Q. So these are not regularly scheduled meetings; is that right?

A. That's correct.

Q. What makes a meeting special?

A. We had an offer outstanding to acquire the company, and we had to -- and it was our responsibility as board members to exercise our duty of care and loyalty, consider the offer, evaluate it, okay, listen to the advice of our legal counsel, we retained BofA for their, you know, financial advice, and we did our job as a board to consider the offer, and then we rejected it as not being credible. So these special meetings in May and June 14th were to react to their offer. We had a responsibility to shareholders to evaluate the offer and we did.

Q. So a special meeting is to deal with an extraordinary circumstance like a proposed acquisition; is that right?

A. Yes. Obviously.

Q. Now, you see these minutes of the June 14th special

Page 100

meeting.  You attended this meeting; correct?

A.  Yes.

Q.  Now, at this meeting Bank of America representatives attended as well as Wachtell representatives; is that right?

A.  That's correct.

Q.  And the Wachtell representatives gave another presentation concerning the board's fiduciary duties and various legal and practical situations and potential go-forward scenarios; is that correct?

A.  Correct.

Q.  And also Bank of America gave a presentation in which they presented values for the company that exceeded Wolverine's offer; correct?

A.  Correct.

Q.  And they also presented the board with a financing capacity analysis of Wolverine; is that correct?

A.  Correct.

Q.  You understand Wolverine in this context to refer to Emerson; right?

A.  Yes.

Q.  Okay.

A.  Yeah.  Okay.  Go ahead.  Right.  The project, yes.  The acquisition project.  It's a project name, not a company name, but Project Wolverine.

Page 101

Q.  Well, I mean, it seems to me and, I mean, there's evidence stating that the terms were used interchangeably.  We can find it and show it to you.

A.  Okay.

Q.  But if you look here, it says "presented values for the Company that exceeded Wolverine's offer."

A.  Yeah.

Q.  Clearly it's not referring to the project name but to Emerson; right?

A.  Okay.  Yep.  Okay.  Yep.  Both.  I agree.

Q.  Okay.  Thank you, Mr. McGrath.  Now, going to the next page, and we'll look at the BofA presentation and we'll look at the Wachtell presentation in a moment, but your conclusion, the board's conclusion was that the $48 proposal substantially undervalued the company; is that right?

A.  Yes.

Q.  And your belief was that the company had a strategic plan that had yet to be realized; is that right?

A.  Can I -- can I explain it in detail?

Q.  Please go ahead.

A.  Okay.  There were -- we believed strongly that the company's potential had not been realized for several very important reasons.  Okay?  First was that we had a major strategic change of the company in 2018, 2019

Page 102

and that we were just beginning to realize the benefits of it.

Another very important factor was that during this period of time, '21 to '22, coming out of Covid we faced very severe supply chain disruptions, and so we had a period of time where our bookings, our sales far exceeded our ability to book them as revenue because we couldn't ship the product.  All right.  So we had a -- we were coming out of a period of time where we felt the company was significantly undervalued because our financial reports couldn't reflect the -- couldn't reflect the actual sales of the company and we were building up a big backlog.  That backlog would then become revenue in the future that would exceed our ability to sell.  So we had a big opportunity ahead of us.  Our stock we felt was undervalued because of the supply chain crisis.  In addition, we had significantly higher cost of goods sold because we had to play brokers for components in order to ship products, so our profits were depressed during '21 and '22 and the first half of '22 because we had to pay two or three percent higher as a percentage of revenue, not percentage of components, to brokers to get the components to ship to our customers.

Page 103

And then, thirdly, we had a major program underway to look at reducing our operating expenses and increasing our operating income over the next several years which would significantly increase our profits.  So there were some very major substantiated drivers that we had -- we wanted to realize for the benefit of our shareholders and that the offer in that regard was not credible, and that's why we rejected the offer.

Q.  So for all the reasons you just summarized, $48 was way too low a price for this company in your view; is that right?

A.  Yes.  Did you say $38 or 28?

Q.  I said 48.

A.  Oh, 48.  Okay.  48.  Right.  I couldn't hear you.

Q.  48 which was the offer price at this time.

A.  Right.  Right.  Correct.  Right.

Q.  That was way too low; right?

A.  Right.

Q.  And the board decided -- determined to reject the proposal on that basis; is that right?

A.  Yes.  Correct.

Q.  Says it right there.  "Determined to reject Wolverine's proposal."

Now, if you had disclosed this rejection,

Deposition of Michael McGrath

In Re National Instruments Corporation Securities Litigation

Page 104

would you have explained why you were rejecting it?

A.  If we had --

Q.  If you had disclosed this, --

A.  Right.

Q.  -- if you had disclosed that you'd received a $48 offer and were rejecting it, would you have disclosed the reasons for the rejection?

A.  We did disclose -- we did disclose all those three things I just mentioned in our earnings call on July 28th.

Q.  No, no, no, no, no.  That's not my question.

A.  Okay.

Q.  My question is, if you had told investors at this time that you had received an offer from Emerson of $48 and you had disclosed to investors that the board had determined to reject that offer, would you have provided the market with a reason for that rejection?

A.  We -- we felt -- you're asking me a question that we -- that -- we didn't believe -- we didn't believe we had to disclose it.  We didn't -- we felt that it was inappropriate to disclose it.  So I don't know what we would have disclosed if we did something inappropriate.  Okay?  We didn't disclose the offer.  We didn't disclose that we rejected it, for several reasons.  Okay?  One is that it wasn't a credible

Page 105

offer, so we had no obligation under the law to -- to disclose it.  Secondly, okay, Emerson, as you can see in the previous letter, had asked us to keep it confidential.  We felt if we had disclosed that they made an offer, it would probably harm their stock and we would probably be sued.  Third, once we rejected the offer, there was no expectation that Emerson would continue to make another offer.  In fact, they didn't make an increased offer.  Okay?  And we had no expectation of negotiating with them.  We had no obligation to negotiate with them.  And we felt that if we were to simply say we had an offer and rejected it because we think the company's worth a lot more, okay, that would be simply hyping the company's stock, which is in violation of SEC regulations and we don't go there.  So we weren't going to just do it to hype the value of the stock.  There was no offer outstanding after we rejected it.  And so we had no obligation and we thought that it would be inappropriate, potentially illegal for us to say we disclosed it, that the company was for sale when the board had specifically said the company was not for sale.

Q.  So as a result of this, the board directed or I guess the word in the minutes is authorized you,

Page 106

Mr. Starkloff, and Mr. Dixon and representatives of Wachtell to inform Emerson that the board had determined to reject --

A.  Yes.

Q.  -- its proposal; is that correct?

A.  Correct.

Q.  Okay.  And it goes on to state here in the minutes that "The directors then discussed potential courses of action in the event wolverine were to escalate the matter publicly or otherwise, respond with a higher offer or if other scenarios were to occur . . ."

    Do you see that?

A.  Yes.

Q.  So the board at this time discussed the possibility that Wolverine could escalate the matter publicly; is that right?

A.  Obviously.

Q.  And the board understood that Emerson could respond with a higher offer; is that right?

A.  They could, but they didn't.

Q.  Well, we'll get to that.  But the point is at this point the board understood that they might respond with a higher offer; is that right?

A.  I guess so, yes.  That's what it says.  But we didn't -- we didn't -- I mean, that's logical that we

Page 107

would --

Q.  It was simply logical that they might respond with a higher offer; right?

A.  Correct.

    MR. MANDEL:  Now, let's move on to our Exhibit 13, which is going to be our Exhibit M-7A, Alex.

    (Marked EXHIBIT 13 for identification)

BY MR. MANDEL:

Q.  Now, for the record, this is Bates WLRK-913.  This is a cover email from Mr. Dixon to folks at Wachtell attaching a board book from the June 14th meeting.  If you look to the next page, you'll see the agenda page.

A.  Okay.

Q.  Sorry.  There you go.  That's the cover agenda page.  You recognize a page like this; right?

A.  Yes.  Yes.

Q.  And as usual with these types of documents, like we established earlier, there are materials attached behind the agenda; is that right?  You can scroll --

A.  Yes.  Yes.

Q.  Okay.  I just want to note that this board book was produced by Wachtell, not by defendants, who failed to produce this obviously relevant and responsive document, and, you know, just an example of many of

Page 112

Q.  And essentially the same analysis is being applied here with respect to the price versus 2023 earnings multiple; is that right?

A.  Yes.

Q.  You're taking a multiple, you're multiplying it by earnings per share to get a potential stock price; is that right?

A.  Yep.

Q.  So every penny higher of earnings per share would directly translate into a higher stock price under this method; is that right?

A.  Yes.

Q.  Okay.

MR. COMERFORD:  Mr. Mandel, could we take a very brief break?

MR. MANDEL:  Yeah.

THE WITNESS:  I need a toilet break.  I'm sorry.

MR. MANDEL:  No.  Let's do it.  It's a good moment.  Yeah.  I'll return back to this document when we return, but yeah, we can break for five.

MR. COMERFORD:  Thanks.

VIDEO TECHNICIAN:  Going off at 12:05.

(Recess taken at 12:05 p.m.)

(Back on the record at 12:16 p.m.)

Page 113

VIDEO TECHNICIAN:  Going back on record at 12:16.

BY MR. MANDEL:

Q.  Welcome back, Mr. McGrath.

MR. MANDEL:  Alex, can we put Exhibit 13 back up?  Thank you.

BY MR. MANDEL:

Q.  And, now, I think we were done with this page.  If we could go to page beginning with Bates 936.  Now, you'll see here from this point forward this provides a Nuthatch Pro Forma Analysis.  Do you see that?

A.  Yes.

Q.  Nuthatch was another code name used for Emerson in this case; is that right?

A.  Yes.

Q.  But occasionally where it says Nuthatch I will just say Emerson.  Is that all right with everyone?

A.  That's fine.

Q.  Thank you.  So if we go to the Page 938, Bates ending 938.  You see here it's discussing Emerson's capacity to pursue M&A; is that correct?

A.  It looks that way, yes.

Q.  And just to quote from the minutes which we read earlier, it says, "BofA also presented the board with financing capacity analysis of Wolverine."

Page 114

Is that what this is?

A.  Yes.

Q.  Okay.  So this shows essentially how much money they have and how much ability they have to take on debt to acquire National Instruments; is that right?

A.  Correct.

Q.  And the conclusion here is that they have, on this page, is that they have ample capacity to pursue M&A; right?

A.  Yes.  It was never in question.

Q.  Now, if we look at the next page, it describes a debt capacity analysis in the event of an InSinkErator divestment.  Do you see that?

A.  Yes.

Q.  Now, Emerson at this time owned an InSinkErator business; is that right?

A.  I believe so.  It may have been in the process of being sold at the time, but . . .

Q.  Yes.  Emerson was in the process of selling its -- of divesting itself of the InSinkErator business; is that right?

A.  Right.  Right.  Right.

Q.  And what this is going through is Emerson's capacity to do M&A in the event that the InSinkErator transaction occur; is that right?

Page 115

A.  Yes.

Q.  And it was selling InSinkErator for approximately $3 billion; is that right?

A.  I don't -- I don't recall, but . . .

Q.  Well, if we look at the first bullet there, it says, "Nuthatch divests InSinkErator for 3 billion . . ."

A.  Whatever it says.  That's correct.  Yeah.

Q.  So, and we can see a document later that was the approximate price of the deal.  So what this is showing, the first slide we looked at, the last page ending -- ending Bates 938 shows its debt capacity analysis irrespective of the InSinkErator transaction; is that right?

A.  Yes.

Q.  And then the page ending 939, the subsequent page, shows its debt capacity analysis in the event it successfully sold the InSinkErator asset; is that right?

A.  Yes.

Q.  So if it sold the InSinkErator asset for about $3 billion, that would tend to even strengthen its capacity to pursue M&A; is that right?

A.  Obviously, yes.

Q.  And that's what this slide shows; is that right?

A.  Correct.

Deposition of Michael McGrath

In Re National Instruments Corporation Securities Litigation

Page 280

Q.   This is an email from Albert Percival --

A.   Yep.

Q.   -- to Mr. McGrath, Mr. Starkloff, and it appears other board members; is that right?

A.   Yes.  Yep.

Q.   All right.  And the email is addressed to "Board Members"; correct?

A.   Correct.

Q.   And it states that "You are receiving this email to inform you that the Project Wolverine trading restriction is lifted, effective immediately."

     See that?

A.   Yep.

Q.   This doesn't make reference to removing any other restriction, does it?

A.   It's simultaneous with that, though, yes.  But you're right.

Q.   This doesn't make any reference to removing any restriction post earnings conference, does it?

A.   I just answered that question.  I said you're right, it doesn't.

Q.   So on August 11th is when the trading restriction concerning Project Wolverine was lifted; is that correct?

A.   That's correct.

Page 281

Q.   And so on August 7th you authorized Mr. Starkloff's plan to repurchase 60 million in additional shares while a material nonpublic information trading restriction concerning Wolverine was still in place; is that correct?

A.   Not -- I didn't authorize him to do it during the trading restriction.

Q.   Your authorization came at the time of the trading restriction was in place; is that right?

A.   The authorization did, but not the authorization to do it within the restriction.  Any restriction.  The quarterly restriction or -- or any -- or the Wolverine restriction.  So there's -- there was -- I didn't authorize him to buy within the restricted period.  I want to make it clear.  All right?  And don't imply that I did.

Q.   You told him to go ahead with what he was planning at a time when there was a material nonpublic information trading restriction in place concerning Wolverine; true?

     MR. COMERFORD:  Form.  Mischaracterizes the evidence.

A.   I never gave him the authorization to buy within a restricted window.  Okay?  So I gave him the go-ahead for the 60 million over a period of time.  We never --

Page 282

the policy that he was operating under prohibits us from doing any stock buyback during a restricted trading period, so I didn't override that.  Okay?

BY MR. MANDEL:

Q.   You told him to go ahead with what he was planning; right?

A.   Which wasn't to buy within a restricted window.

Q.   Well, did his email say anything about that?

     MR. COMERFORD:  Oh, for God's sakes.

BY MR. MANDEL:

Q.   Why are we even talking about restricted windows?  This is a case about material nonpublic information concerning Wolverine.

     MR. COMERFORD:  Look, it's been asked and answered.  He answered you, Mr. Mandel.

A.   I'll make it clear.  We have -- we -- we were -- never felt that we were restricted from buying back stock.  Our legal counsel made that very clear to us.  We asked several times.  We said -- they said we have an obligation to do business as usual once we rejected the offer, and they kept saying you have to do business as usual, and when somebody asked does that include buying back stock, they said business as usual.  So we were under complete guidelines from our legal counsel that we had no restrictions on buying

Page 283

back stock and it was business as usual, and obviously we have a trading window.  We lifted the trading window, and we didn't buy stock during the restriction of the trading window, and nobody ever authorized buying back during the trading window.

BY MR. MANDEL:

Q.   Are you through?

     MR. MANDEL:  Okay.  Let's take a five-minute break.  I can try to organize some of what's left.  I think I can maybe do it quicker than I expected.

     THE WITNESS:  How much time -- do you think you're going to do it in the next hour or two?

     MR. MANDEL:  I can't make any promises, but I will do my best.

     THE WITNESS:  Thank you.

     VIDEO TECHNICIAN:  All right.  Going off record.  The time is 4:19.

     (Recess taken at 4:19 p.m.)

     (Back on the record at 4:25 p.m.)

     VIDEO TECHNICIAN:  Going back on record at 4:25.

BY MR. MANDEL:

Q.   Mr. McGrath, you testified that the company had received some sort of legal advice to the effect that

Page 284

after August 2nd there was no more material nonpublic information; is that right?

A.   I can tell you specifically what I said if that matters. I said that we were instructed by our legal counsel very clearly that after we rejected the offer we had to return to business as usual. Over and over again they told us business as usual. And during that discussion they were asked does that include stock buybacks, and they said business as usual, which was, yes, that's business as usual. If it was usual business, then we had to return to business as usual, and that included buying back stock. It was to me very clear that they made no exception for stock buybacks and business as usual or they would have responded and said, you know, wow, let's talk about that more or no or something. They said no, business as usual, so . . . And that was business as usual, so . . . We felt that that was not only something that we were cleared to do but we actually had some obligation to continue business as usual that way.

Q.   Did you ever see this legal advice in writing?

A.   No.

Q.   This is legal advice about insider trading you understand; right?

            MR. COMERFORD: Foundation. Calls for

Page 285

legal conclusions.

A.   Insider -- it was -- it was a broad base of the response to the question what about stock buybacks. They said business as usual, which means you can continue to do stock buybacks. That didn't broadly affect any insider trading among other restrictions or anything like that or -- or by individuals, and we had no -- we had no individuals that bought stock in the company during the period in question either, so . . . It doesn't -- it wasn't a broad-based insider trading opinion. It was based on the opinion that we could continue and we should continue to buy back stock as usual.

BY MR. MANDEL:

Q.   Who advised the company of this?

A.   Wachtell.

Q.   And Wachtell gave that advice not in writing? Is that your testimony?

A.   Yes.

Q.   Who did Wachtell give that legal advice to?

A.   The board. The board.

Q.   To the board.

A.   Yep.

Q.   So you spoke directly to Wachtell?

A.   Yes. I spoke -- I was there. I -- you know, somebody

Page 286

asked the question, I don't know who asked the question, what about share buybacks, and they said business as usual.

Q.   Business as usual.

A.   Yep. Which is a very firm response to say we should continue stock buybacks as business as usual. They didn't respond you can't. They didn't respond let's talk about it or anything like that. They said business as usual, and that was our business as usual, so we continued doing it under their legal -- legal guidance.

Q.   When -- when was this legal advice received from Wachtell?

A.   During one of our board meetings. I don't recall which one. But prior to what you're talking about now. Prior to any stock buybacks obviously.

Q.   Was it at the July 25th meeting?

A.   It was either -- it was -- it was probably the July 25th meeting. Or -- yeah. It was probably the July 25th meeting.

Q.   So at the July 25th meeting you wrote -- you wrote earlier, we saw an email that the primary purpose of that meeting was to talk about the strategy for defending against Emerson; is that right?

A.   Right. Right.

Page 287

Q.   And it's at that meeting --

A.   I don't recall -- I don't -- I'm sorry, but I'm not gonna -- I don't recall --

Q.   -- share buybacks?

A.   I don't recall if it was that meeting. Okay? It was -- it was their advice in a board meeting, and I don't recall which one, but it was obviously prior to any of the stock buybacks we did.

Q.   And is there a reason that this discussion you're telling us about doesn't appear in any of the minutes?

A.   No. The reason was it was just so obvious to them that it wasn't even a point to discuss or vote on or anything else. It was -- it was obvious --

Q.   So this is -- so this is legal advice that was not in writing, that is not reflected in the board's minutes; is that right?

A.   Yes.

Q.   And your testimony is that they said business as usual?

A.   Yep.

Q.   Is that right?

A.   Yep.

Q.   And you understood this to mean that you were no longer in possession of MNPI?

A.   I understood it to mean that we had no restrictions on

Page 316

A.  I see that.  There's been -- I would argue over the consistency point since we didn't hear from him after we rejected the first offer twice.  We hadn't -- didn't hear anything until -- till now, so several months have gone by without hearing anything from him, so by saying consistently, if you're implying that he was consistently making offers to us, that's not the case.  He made an off --

Q.  Well, let's just read what he wrote.

A.  -- he made an offer -- he made an offer in May, reiterated that offer, and then went silent when we rejected it the second time.

Q.  Okay.  But --

A.  So consistently is not -- that's his opinion of what the word is.  You can ask him why he used that word.  I don't know what he means by it.

Q.  I would love to.

A.  But -- but that's not my opinion.

Q.  But he wrote -- he wrote that during the preceding six months Emerson has been consistently prepared to provide National Instruments' shareholders an all cash offer at a meaningful premium; right?

A.  He's saying that.  Correct.

Q.  That's what he wrote.  You can't get in his head, but that's what he wrote; right?

Page 317

A.  Right.

Q.  Okay.  The six-month period preceding this letter, does that encompass the period of time after August 2nd when you sent your letter to Mr. Karsanbhai?

     MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  Are you saying that August 2nd -- we had no communication with him or any discussion after August 2nd if that's what you're asking.  We had none.

BY MR. MANDEL:

Q.  That's not what I'm asking.  What I'm asking is he says that over a period starting almost six months preceding this November 3rd letter that Emerson was consistently prepared to provide National Instruments' shareholders an all cash offer at a meaningful premium.

     Do you have any reason to say that that statement by Mr. Karsanbhai is false?

     MR. COMERFORD:  Foundation.  Calls for speculation.

A.  There's been no indication that they budged off of the offer that we rejected at $48 a share during that period of time, and this is evidence that now they're willing to come up with a more meaningful price, but

Page 318

before this letter there was no indication that they were still interested, that they were interested at a higher price than what we rejected, and this -- this is, you know, the transition point here at $53 a share.

BY MR. MANDEL:

Q.  The buybacks at issue in this case took place in August and September of 2022; is that correct?

A.  Yes.

Q.  August, September '22 were within the period of six months preceding this letter; is that correct?

A.  I can look at a calendar.  Can we take a break and I'll look at a calendar?  Of course it is.

Q.  Of course it is.

A.  But now I'm not going to say that his -- I'm in agreement that he consistently offered during that period of time a premium offer.  He didn't.  Okay?  So . . .  That's his wording.

Q.  Well, it doesn't say that he made such an offer.  It says that Emerson was consistently prepared to provide such an offer.

A.  Right.  And we were consistently --

Q.  Do you dispute that?

A.  I have no idea.

Q.  You don't know.

Page 319

A.  I don't know -- I don't know if they --

Q.  But you know that the buybacks were during the six months preceding this; right?

A.  I don't know why -- I don't know why they went away for four months if they were -- you know, they weren't consistently ready to offer more than $48 a share.  We were consistently prepared to defend not selling the company at $48 a share, and this proves that we were on the right track.  So . . .

Q.  So is it your testimony that what Mr. Karsanbhai wrote here wasn't true?

A.  I have no idea.  It's his opinion.  My testimony is he's giving his opinion.

Q.  His opinion about what?

A.  Consistency.

Q.  Isn't he giving you his opinion about what Emerson was prepared to do during the six months before November 3rd?

     MR. COMERFORD:  Objection.  Form.  Foundation.  Calls for speculation.  The document speaks for itself.

A.  I have no idea.  He's saying that.  If you're asking me to repeat the words he's saying, I can tell you this is what he said.  I can't tell you that he's lying or telling the truth or what that means or what

Page 332

that the board approached me and asked if I would join the board.

Q. And I think you already said you were invited to join the board around May of 2014?

A. Right. I think that was the official -- 2014, yes.

Q. And at a high level, can you describe the business of National Instruments? What does the company -- what did the company do?

A. The company made a very serious transition around 2018, 2019, so it primarily provided tools for engineers for test and measurement, and then around that time frame we changed CEOs. Alex Davern became the CEO. We went through a reset of our strategy to go from selling tools which had sales values of about $1500 each and selling them on a -- a basis where we tried to get as many leads as possible. We shifted to selling total solutions, which were multimillion dollar sales to major accounts. So it was a major change built around a redo of our core strategic vision, which is also another concept in my book that they followed to change their core strategic vision, and then that ended up changing our R&D strategy, our go-to-market strategy, our sales strategy, our organization structure, et cetera, which was unfolding when we hit Covid, and then we hit the Covid supply

Page 333

chain crisis, so it was still unfolding at this time in '22.

Q. So I want to fast forward to May of 2022. The company received an offer from the CEO of Emerson.

A. Um-hmm.

Q. Was that offer from Emerson solicited or unsolicited?

A. Unsolicited and a complete surprise.

Q. When Mr. Karsanbhai from Emerson reached out to Eric Starkloff, the CEO of National Instruments, did you know that Emerson might be making an offer to buy the company?

A. When he reached out to Eric?

Q. The first time.

A. I speculated that that could be one of the reasons he wanted to reach out to him.

Q. And before that initial reach-out in May of 2022, did you have any idea that Emerson might be interested in buying National Instruments?

A. No. We -- we probably thought other companies might, but not Emerson.

Q. As you considered Emerson's offers from May 2022 all the way through when the transaction was consummated at $60 a share, how did you take into account the best interest of the shareholders of National Instruments?

A. Very thoroughly. You know, as chairman of the board,

Page 334

we had a board that was a highly experienced board that was experienced in these situations. We had very good legal counsel. We were very aware of our -- our duty of care, of our duty of loyalty. We were briefed on that. We took it very seriously. We hired BofA as our advisor, financial advisor on it. We spent a lot of time. We were very thorough. We thought it was important to exercise our responsibility for the shareholders, and I believe that we did, and I think the final progression shows that.

Q. Emerson offered $48 per share to buy National Instruments twice. When they -- when the company, Emerson, offered $48 per share the second time, how did that fact impact your thinking about a potential transaction with Emerson?

A. It solidified our thinking that 48 was their max and that 48 was not a credible offer and that they may try to make a hostile takeover at $48 a share, and so it kind of solidified that. There was no indication that they came back at 50 or 55 or something from that. They -- they stayed at 48.

Q. In May and June of 2022 and really all through 2022, why did you feel that National Instruments was worth more than what Emerson was offering?

A. We had -- we had very -- several very important things

Page 335

that were happening at National Instruments. The first was that our stock price we believed was depressed at the time because of the supply chain crisis we were facing, so we had an unusual situation coming out of Covid. Obviously in Covid, companies' shares were down. We had a longer period of time in '21 going into '22 where we could not get the components that we needed to ship our systems, so we had a period where we had a significant higher sales than we had revenue because we couldn't ship the product, so we had very -- traditionally had very low backlog and we built a big backlog, and so we had unrecognized revenue sitting there to be taken, so there's a two-step thing. We had -- we were being penalized for not getting credit for what we were selling. We did disclose bookings in our earnings calls. And then we knew we had revenue that could come in so that we would have a period of -- a grace period where we could have higher revenue than sales, higher revenue than bookings. Bookings equals sales. So we had a favorable period we had coming up and we had an unfavorable period that we were dealing with.

We also were going through the process, and it's a continuation of something that I've been pushing for several years, which was to realign our

Page 340

of our strategy. We had much longer term relationships in terms of tens of millions, $50 million of long-term relationships with our customers under our new strategy.

Q. Okay. So we've -- we've discussed the fact that Emerson approached National Instruments with a $48 per share offer in May of 2022, --

A. Um-hmm.

Q. -- repeated the $48 per share offer in June of 2022, --

A. Um-hmm.

Q. -- then raised the offer to $53 per share in November of 2022.

A. Right.

Q. And then what did Emerson ultimately pay per share for National Instruments?

A. $60 a share after a competitive process. We had three other companies -- four other companies initially bidding on National Instruments, and then to the end there was three and two, and they were all up into the close to $60 share range, and then Emerson and one other company were at 60 at the end, and we decided Emerson was the best selection for a variety of reasons.

Q. Did the board of National Instruments ultimately vote

Page 341

to approve a transaction to be acquired by Emerson at $60 per share?

A. Yes.

Q. And tell me why you voted to approve that, that $60 per share.

A. It's a good question. We felt that there was still long-term potential beyond $60 a share, and we always kept open the option that we -- when we were getting bids on the company that we kept the option of not selling it. We always made that clear that we're not committed to selling the company. At $60 a share it got into the threshold of us really realizing -- at that point in time we had several other companies that looked at our plans because during that period from November 2nd to the final offers we shared our plans, the plans that you've seen, and other -- other ideas and thoughts on our long-term strategy with other companies, so we had other people that bid around $60 a share after being exposed to those plans, and we also had to understand that there was an execution risk that if we held out for another two or three years to get 75 or $80 a share, there was a risk that we had to execute against our plan, and that's not always a no-brainer, so we had to weigh that risk. In the end $60 a share was -- was the right thing to do.

Page 342

Q. The -- the focus of this case is that National Instruments repurchased its own shares in August and September of 2022.

A. Um-hmm.

Q. What is your understanding of the financial impact on National Instruments when it repurchased its own shares in that time period?

A. The --

        MR. MANDEL: Object to the form.

A. The -- we repurchased the shares for -- because that was part of our return of capital to shareholders, which we were committed to doing, that's a good governance practice, and we also wanted to offset the share repurchases over a -- share grants over a long period of time that we gave employees under the incentive program so we didn't dilute our shareholders with that, so at that point in time it was an important act that we did on behalf of our shareholders, the return of capital.

        MR. COMERFORD: I'm going to ask that Exhibit 35 be displayed again by the tech. Thank you.

BY MR. COMERFORD:

Q. This is Exhibit 35 to your deposition. This is the August 11th, 2022, email from Albert Percival to you, and who are the other people who received this?

Page 343

A. Yeah. All the board members.

Q. Okay. And then carbon copied is Eddie Dixon --

A. Yep.

Q. -- and Albert Percival. Who is Albert Percival?

A. Albert Percival worked for Eddie in our legal department, and his responsibility was monitoring all the trading, the trading windows, when they're open, when they're closed, the point -- first point of contact if a director wanted to sell or buy stock during a non-trading window.

Q. And Eddie Dixon was also an inhouse attorney for National Instruments?

A. Yes.

Q. Okay. And so you received this email from an inhouse attorney for National Instruments, and he writes, "Board Members, You are receiving this email to inform you that the Project Wolverine trading restriction is lifted, effective immediately. As always, before trading in NATI stock you should still consider whether you are in possession of any material-nonpublic information related to any other matter. Thank you, Albert Percival."

        Do you see all that?

A. Um-hmm. Yep. No, I can't, but --

Q. Okay. And --

IN RE: NATIONAL INSTRUMENTS CORPORATION

SECURITIES LITIGATION.

Nov 13 / 2025

_____

VERIFICATION OF DEPONENT

I, having read the foregoing deposition

consisting of my testimony at the aforementioned time

and place, do hereby attest to the correctness and

truthfulness of the transcript.

_____

MICHAEL McGRATH

Dated:  11/13/2025

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

ERRATA SHEET

PAGE     LINE     CORRECTION

_____    _____    _____ NONE _____