# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE NATIONAL                    §   CIVIL ACTION
INSTRUMENTS CORPORATION     §   NO. 1:23-CV-10488-DLC
SECURITIES LITIGATION        §


ORAL AND VIDEOTAPED DEPOSITION OF
EDDIE DIXON
OCTOBER 9, 2025


ORAL AND VIDEOTAPED DEPOSITION OF EDDIE DIXON, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above styled and numbered cause on Thursday, October 9, 2025, from 9:22 a.m. to 5:46 p.m., before TAMARA CHAPMAN, CSR, RPR-CRR in and for the State of Texas, reported by computerized stenotype machine, at Regus, 901 Mopac Expressway South, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Job No. 45924

Page 18

discussions took place is not privileged.

Q.   I'm curious whether you had discussions with your counsel in which deposition testimony from Mr. McGrath or Ms. Rapp were summarized.

MR. COMERFORD:  So that's a "yes" or "no" question.  And you can answer it "yes" or "no" only.

A.   Yes.

Q.   So your counsel summarized those depositions for you.  Is that correct?

A.   No.

Q.   Your counsel relayed information to you about those depositions.  Is that correct?

MR. COMERFORD:  I'm going to object. I think that calls for attorney-client privileged information.  I think that's over the line.  I'm going to instruct you to not answer.

Q.   Mr. Dixon, you were an attorney.  Is that right?

A.   That is correct.

Q.   When did you graduate from law school?

A.   1990.  I believe I was licensed in '91 after the bar, Texas bar.

Q.   And at that point you were in private practice for a few years.  Is that correct?

Page 19

A.   That's right.

Q.   At a law firm?

A.   That's right.

Q.   What was your area of practice during those years?

A.   I started doing bankruptcy work, but ultimately it was technology, corporate technology law, primarily technology commercial law.

Q.   And then after that time at a firm you went in-house.  Is that right?

A.   That's right.

Q.   And you were in-house at Dell.  Is that correct?

A.   Yes.

Q.   And you were at Dell in the -- you know, holding various positions in the legal department until approximately 2010.  Is that right?

A.   Yeah, late 2010.  Correct.

Q.   So approximately 15 years at Dell in the corporate legal department.  Is that right?

A.   Right.

Q.   And after that, you went to National Instruments.  Correct?

A.   Yes.

Q.   And you were the deputy general counsel

Page 20

of National Instruments in the first instance.  Is that right?

A.   Yes.

Q.   And then ultimately you were elevated to the general counsel position of National Instruments?

A.   Yes.

Q.   And that was in January of 2019.  Is that correct?

A.   I thought it was 2018, but I -- I don't know the exact date.  But thereabouts, yes.

Q.   I'll just tell you I'm looking here at your LinkedIn.  It says January 2019.  So either in -- in 2018 or 2019, you became the general counsel of National Instruments.  Correct?

A.   Yes.

Q.   And served in that capacity until October of 2023.  Is that correct?

A.   Yes.

Q.   And October '23 -- 2023 is when National Instruments was acquired by Emerson.  Is that right?

A.   Yes.

Q.   So at that point, you left National Instruments.  Is that right?

A.   Yes.

Page 21

Q.   And are you retired?

A.   Yes.

Q.   Then after you left National Instruments, you retired.  Correct?

A.   Yes.

Q.   Okay.  I see sometimes the term "chief legal officer" used rather than "general counsel." Were -- did you sort of use those terms interchangeably?

A.   Yeah -- essentially.  I mean, I took on some additional responsibilities of government affairs and so, yeah, it was expanded and I think maybe more aligned with the titles for chief legal counsel in publicly traded entities.

Q.   But it's fair to say general counsel or chief legal officer.  Is that right?

A.   That's fine.  Yes, that's fine.

Q.   I'll -- I'll -- I'll use the terms.

Now, in your capacity as National Instruments general counsel, did you work with outside counsel?

A.   Yes.  Absolutely.

Q.   Outside law firms providing legal services to National Instruments.  Correct?

A.   Yes.

Page 50

Q.    Understood.  Here you say -- you write that: While the fee structure proposal may not be a top priority for WLRK, it is important for NI, as we need to understand possible impact to our budget.

Do you see that?

A.    Yes.

Q.    And you go on in the subsequent sentence to refer to a "possible success fee structure."

Do you see that?

A.    Yes.

Q.    Now, had you asked Wachtell for a fee structure proposal before this email?

A.    I'm sorry.  Repeat the question.

Q.    Had you asked Wachtell for a fee structure proposal before this email?

A.    I believe I had sent a couple of emails requesting that, but I don't know the timing relative to this email.

Q.    Right.  I mean, it says -- you're writing that you understand the fee proposal may not be top priority for WLRK.  Why did you believe it was not top priority for WLRK?

A.    I -- I can't assess that.  The point was it was important to us.  I don't know whether it was a top priority to them.  I obviously hadn't received

Page 51

a response yet, so...

Q.    Well, right.  Is that it -- is that the point, you had asked for a fee structure proposal previously and not received it and you're writing here you understand maybe it's not Wachtell's top priority, but National Instruments needs to know?  Is that right?

A.    That would seem appropriate, yes.

Q.    Okay.  Now, was there discussion concerning possible success fee structure with Wachtell at around this time?

A.    We had not discussed any fee structure that was -- appears the reason I was sending this.  We need to understand what it might be.

Q.    You understood as of this time that there would be a possible success fee structure.  Is that right?

A.    At this time, there could be any type of structure.  We didn't know what was going to happen.

Q.    Well, you specifically referenced a possible success fee structure.  Correct?

A.    It appears I did, yes.  That could be --

Q.    Did you --

A.    -- a structure.

Q.    Did you reference a possible success fee

Page 52

structure because it was possible that Wachtell was going to be compensated with a success fee structure for its work in connection with the Emerson proposal?

A.    It's possible that anything could have been structured at that point.

Q.    So at this time, it was possible that they would receive a success fee.  Correct?

A.    It is possible.

Q.    Okay.  And did they ultimately receive a success fee?

MR. COMERFORD:  I think you can -- I think you can answer that yes or no.

Q.    The question was, did Wachtell ultimately receive a success fee?

MR. COMERFORD:  Ever?  So I'm going to object to the lack of time frame.

Q.    Did Wachtell ultimately receive a success fee for its work for National Instruments in connection with the Emerson transaction?

A.    Wachtell received a value-based fee that we negotiated ultimately for the work that they did for NI.

Q.    Can you explain what you mean by "value-based fee"?

Page 53

A.    I don't -- in this context, success fee could mean a variety of different things.  In particular, we were not at all interested in selling the company.  Success could be not selling.  Success would be, well, do we end up selling.  But at the -- ultimately, you've got to understand how Wachtell bills, which is primarily value-based billing, and that's what we negotiated.

Q.    Can you explain to me when you say you have to understand how Wachtell billed which is primarily value-based billing, what is value-based billing?

A.    Parties agree on what the value of the work was.

Q.    How is the value of the work determined?

A.    The way I determined it at the time is I used an average hourly rate, assumed how many hours the various levels were working, figured out a number, they came back with a number, and ultimately we agreed on the appropriate value for the work.

Q.    When did you come to this agreement?

A.    I don't know the exact date, but it would be sometime around the close of the transaction.  But I don't know.  I don't know the exact date.

Q.    So Wachtell's fees were not determined

Page 70

to ask you about the attachments which are the insider trading policy and the Q&A. Do you want to have a look --

A.    Sure.

Q.    -- real quick? I'll begin my questions in a moment.

A.    (Pause.)

Q.    And my first question will be are you familiar with this attached insider trading policy that begins on Bates 21247?

A.    Yes. Generally familiar, yes.

Q.    Right. So I see on the screen now you're looking at the Q&A. If you scroll down a little more, you'll get to -- to the page beginning 2437 is the next attachment to the email, which is the insider trading policy. The first document is a Q&A about that policy.

All right. There's the first page of the policy.

A.    Yeah.

Q.    You're familiar with this document?

A.    Yes.

Q.    Did you help develop this policy?

A.    I would review the policy for sure, yes.

Q.    If you scroll up, it states its effective

Page 71

date is April 9th, 2020. Do you see that?

A.    April 29th, 2020.

Q.    Yes, April 29th, 2020. Oh, I'm sorry. I must have misstated that. April 29th, 2020.

You were the general counsel of National Instruments at that time. Correct?

A.    Correct.

Q.    Now, in the first paragraph there that begins: It's your responsibility to understand and follow this policy.

You identify very serious consequences that can come from insider trading. Is that right?

A.    Correct.

Q.    You identify criminal and civil liability as a possibility. Correct?

A.    Yes.

Q.    Damages and fines and imprisonment are identified on this policy. Is that right?

A.    Yes.

Q.    You mention here that insider trading could cause irreparable damage to the company's reputation. Do you see that?

A.    Yes.

Q.    All right. Now, the next paragraph beginning "for purposes of this policy" states that:

Page 72

The company's general counsel serves as the compliance officer.

Do you see that?

A.    Yes.

Q.    That was you. Correct?

A.    Correct.

Q.    So you were the compliance officer for the insider trading policy of National Instruments?

A.    Correct.

Q.    Does that mean it was your responsibility to ensure compliance with this insider trading policy?

A.    That is correct.

Q.    And otherwise to ensure compliance with insider trading law?

A.    That is correct.

Q.    And if we move on from there on the policy statement, you state very clearly that it is illegal for anyone to trade securities on the basis of material nonpublic information. Correct?

A.    That is correct.

Q.    Do you agree with that statement of the law?

A.    Absolutely.

Q.    Let's move on to the next page, please.

Page 73

If we look at the definition of "material nonpublic information," do you see that right there in the middle of the page?

A.    Yes.

Q.    And you define "material information" here. Is that right?

A.    Yes.

Q.    And you define it, you write: Material information means information that a reasonable investor would be substantially likely to consider important in deciding whether to buy, hold, or sell securities of the company.

Is that right? I'll read -- I'll ask you about the second part of the sentence later.

But did I read that correctly?

A.    Yeah, I don't recall. What -- what -- what subsection are you looking at?

Q.    Oh, if we look right there, if you look at No. 3, definition of "material nonpublic information." Do you see that?

A.    Yeah.

Q.    So if we go on from there, you write --

A.    Oh, okay.

Q.    -- "material information means" --

A.    Yeah, I see it.

Page 90

substantive regulatory impediments provides both significant value and certainty to NI shareholders. We're prepared to move very quickly to complete our due diligence and sign definitive agreements.

Do you see that?

A.   Yes.

Q.   And you read that at the time.  Right?

A.   Yes.

Q.   And it -- and the letter concludes in the concluding paragraph:  That Emerson is highly enthusiastic about the prospects of what we can achieve together.

Do you see that?

A.   That's what they stated, yes.

Q.   Okay.  But you understood that Emerson was highly enthusiastic about a potential combination with National Instruments.  Correct?

MR. COMERFORD:  Objection; asked and answered.

A.   I understand what the letter says, yes.

Q.   Okay.  Now, did --

MR. MANDEL:  Let's put up our next document.  Our next document is going to be Tab D2, that's going to be our Exhibit 9.

(Exhibit 9 was marked.)

Page 91

Q.   Now, there was a -- there was a May 26th board meeting of the National Instruments board.  Do you recall that?

A.   Yeah.

Q.   And this is an email to you attaching the slides for the May 26th board meeting.  Is that right?

A.   Slides prepared by Wachtell.  Yes.

Q.   Correct.  Slides prepared by Wachtell.  And let's look at those slides.  If you want to just have a little look at the document, I'll refer you to some language in there.

MR. MANDEL:  So if we could turn to the seventh page of the document, that will be Bates ending in 16121.

THE WITNESS:  Alex, I don't know if you're doing that or if I'm supposed to be doing that.

Q.   I think Alex will do that.

MR. MANDEL:  Go two more.  Here we go.

Q.   Do you remember this slide?

A.   Yeah, I'm sure I've -- I've seen this slide.  So yes.

Q.   Now this slide is showing a spectrum of

Page 92

more or less coercive steps that a potential acquirer might take.  Is that right?

A.   Yes, that appears to be the case.

Q.   And ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ Correct?

A.   Yes.

Q.   And, of course, National Instruments had already received such a letter.  Is that right?

A.   We received the letter, yes.

Q.   That was a private letter from the offerer to the offeree.  Right?

A.   Yes.

Q.   Okay.  So you understood at least you're at least in that zone, No. 3, there.  Right?

A.   Yes.

Q.   And No. 4, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Do you see that?

A.   Yes.

Q.   So this is expressing that the next step of the escalatory ladder would be Emerson acquiring National Instruments' stock without public disclosure.  Is that what that means?

MR. COMERFORD:  Form.

Page 93

Q.   Mr. Dixon?

A.   What was your question?

Q.   The question was, looking at this document, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮.

We agreed you saw that.  My question is whether this is indicating that the next step up the escalatory ladder from a private letter would be Emerson acquiring shares of National Instruments without public disclosure?

MR. COMERFORD:  Object; form, foundation, mischaracterizes the documents.

MR. MANDEL:  Let's let the witness --

A.   The purpose of this document was educating our board once we got an unsolicited offer.  That was the sole purpose of this.  Not to determine where we were, it was to educate our board.

Q.   Okay.  And in the process of educating your board, this document identifies an escalator ladder.  You agreed with me that the company was at Point 3 in the ladder and I'm asking you about the next step up.  And is the next step up on this

Page 106

do you?

A. I can't assume what their mindset was at the time. I don't recall -- if we did, I don't recall what it was.

Q. Fair enough. Do you see here the second bullet on this page says: ████████ ████████████████████████ ████████████████████ ████████████████████ ████████████████████████ ████████.

Do you see that?

A. Uh-huh. Yes.

Q. So did Wachtell advise you that share repurchases were an example of often short-term-oriented value-maximizing activity?

A. I don't know the context you're talking about. They provided this slide, but we didn't have any discussion about share repurchases and value maximization that I recall specifically.

Q. Well, this slide discusses share repurchases. Correct?

A. Yes, it absolutely does.

Q. And it gives them, as an example, of an often short-term-oriented value-maximizing activity.

Page 107

Correct?

A. That's what it says.

MR. MANDEL: Let's look at the document -- it's Tab D6. It will be Exhibit 10.

(Exhibit 10 was marked.)

MR. MANDEL: This is, for the record, Bates NAT-SL-16270.

Q. Do you recognize this document?

A. Yes.

Q. What is this document?

A. It would be our typical restriction on trading notification.

Q. Is this a restriction on trading due specifically to Project Wolverine?

A. Yes, the inquiry -- the unsolicited offer we had received from Emerson, yes.

Q. Project Wolverine referred to Emerson's potential acquisition of National Instruments. Right?

A. Yes. I believe we had a couple of different names, but I think that was ultimately the name that -- the project name that we used, yeah.

Q. And you advised here that the recipients of this email have material nonpublic information concerning Project Wolverine. Correct?

Page 108

A. At that time, yes.

Q. Was it your conclusion that at this time there was material nonpublic information concerning Project Wolverine?

A. Having received that letter and -- yeah, no other engagement, yes.

Q. Now, at the May 26th meeting of the board there was a determination made to have another meeting in June to further consider Emerson's proposal. Do you recall that?

A. Yeah, I don't -- obviously we had a number of meetings around this time. I don't recall the exact date, but, yes, I'm sure we had another meeting on the topic.

Q. Right. There was a May 26th meeting and the minutes of that meeting reflect -- I mean, I can show them to you, but to not waste time, reflect a decision to meet again mid-June to further consider Emerson's proposal.

So I'm going to ask you, stop, jump forward a little bit to that June meeting.

MR. MANDEL: Now our next document, if we could look at this, will be Tab M7A.

(Exhibit 11 was marked.)

MR. MANDEL: This will be our

Page 109

Exhibit 11.

Q. Now, this is beginning Bates WLRK-913. And it's an email between you and Sabastian Niles of Wachtell and others, but principally I'll direct you to the attachment, if you go to the next page.

I think you'll recognize this is a cover sheet, typical board agenda like was used within National Instruments. Do you see that?

A. Yep.

Q. And behind it are several attachments.

A. Okay.

Q. And if we go to the page beginning Bates 923, this is a cover page of Bank of America's presentation at the June 14th meeting of National Instruments' board of directors. Do you see that?

A. Yes.

Q. Now, if we go to the page beginning 936, Bates ending 936, you see first Nuthatch pro forma analysis.

Nuthatch was another code name used for Emerson. Is that right?

A. Yes.

Q. Okay. So if we go two pages ahead to the Bates beginning 938, right, we see this document called "Nuthatch Debt Capacity Analysis."

Page 174

MR. COMERFORD: Form, foundation, calls for speculation.

A. Yeah. As I said, I don't know. I don't know. That was not my responsibility. Karen would work with her on that so I don't know what the number was.

Q. So the amount of repurchases done was something not within your authority. Is that correct?

A. That's correct.

Q. And -- and you would have no idea what amount of repurchases were planned. Is that right?

MR. COMERFORD: Form.

A. I mean, in -- in general, that -- that would be correct. We would confirm what -- what the board had given authority to and we would ensure that we're doing everything compliant with the law and then finance would execute on that with their and obviously the board's approval.

Q. Did Ms. Rapp ever tell you of a plan to do $80 million worth of stock repurchases during the third quarter of 2022?

A. I don't recall that, no.

Q. Did you know that National Instruments was planning to do $80 million worth of share

Page 175

repurchases during the third quarter of 2022 --

A. Did not know --

Q. -- at any --

A. -- the number that we were going to execute on. I knew that we were interested in doing share buybacks after we had rejected the offer twice and had -- which had not changed over a period of months thinking this deal was done and so we engaged with Wachtell and got advice from Wachtell that we could continue forward.

Q. Okay. Now, after --

MR. MANDEL: We could -- oh, we can put this document down.

Q. After July 19, there was another board meeting on July 25th. Do you recall that?

A. No.

Q. That's fine.

A. You keep asking me that. I'm going to tell you the same. I don't remember everything --

Q. I understand.

A. -- that happened three years ago.

Q. I understand. I still got to ask the question.

A. Yeah.

Q. I'm sure you understand --

Page 176

A. Yeah.

Q. -- that.

The -- so I'll -- so I'll represent to you there was a July 25th meeting, and ultimately, is it correct that there was a decision made to respond to Emerson's most recent offer which had been on June 22nd with a no? Is that right?

A. Yeah, I mean, realistically, the answer was no long before that. We were not interested in selling at $48 a share or anywhere close to that.

Q. Understood.

And on August 2nd, 2022, National Instruments sent a letter back to Emerson saying no to their most recent proposal. Correct?

A. Correct.

Q. Now, if we could look, please, at Document D67.

(Exhibit 24 was marked.)

MR. MANDEL: It's an email Bates NAT-SL-9611.

Q. It is an email chain amongst you, Mr. Dixon, Ms. Rapp, and Mr. Percival. Do you remember this email?

A. Yeah, I mean, again, looking at it now, certainly I do.

Page 177

Q. Have you reviewed this email recently?

A. Yeah, I did -- I did take a look at this with --

Q. When?

A. -- counsel.

Q. When did you look at it last?

A. A couple of days ago. I don't recall exactly when you walked me through the deposition process.

Q. That's fine.

So if we go to the bottom of this email, which is the chronologically first-in-time email, on August 4th, two days after the letter to Emerson saying no to their most recent proposal, Ms. Rapp wrote to you and Mr. Percival asking: Can you please let me know what we can do to put in place for stock repurchases given the current situation?

You see that?

A. Yeah.

Q. Do you have an understanding of what Ms. Rapp meant by "given the current situation" --

A. Yeah.

Q. -- in this email?

A. Yeah, given the fact that we've rejected the, frankly, offending same offer of $48 over a

Page 178

period of months, we've gone through our earnings call. Quite frankly, the initial unofficial discussion that Lal had with Eric was in the 30s, so having seen the same number twice now, our view was this thing is -- they're not serious; we need to move forward and run our business. So Karen, obviously, who's responsible for capital management was reaching out to ask Albert who was honestly the one who would work with her. He was my SEC finance-related legal guy and he would work with her so that's why she was reaching out and I'm sure, to ask him what the -- you know, what the status is, given that we had now rejected a second time, no new information, et cetera, so...

Q. So Ms. Rapp was asking whether she could go ahead and execute buybacks for National Instruments. Is that right?

A. It appears she was wanting to put in place a plan, yes.

Q. And asking in light of the Emerson situation whether she could proceed to do that. Is that right?

A. In light of the fact that we've rejected Emerson twice on the same price over a period of months and no -- no change in anything from Emerson

Page 179

so --

Q. Right. In light of the facts at that moment regarding Emerson, she's asking whether she can go ahead and do buybacks on behalf of National Instruments. Right?

A. Correct.

Q. So you understood that Ms. Rapp wanted to do buybacks. Correct?

A. Yeah, I mean, that's what I would read out of this, that she would, yes.

Q. Right. And was seeking authority to do so. Correct?

A. Yes.

Q. Okay. And --

A. To confirm that we -- we are okay to do that which we would run by outside counsel. Right.

Q. So if we scroll up, Mr. Percival wrote that he would need to discuss with WLRK. Right?

And he goes on to cite that: We still have the Nuthatch letter overhang or perhaps hangover so I believe we're in a gray area.

Is that right?

A. That's what it states, yes.

Q. So Mr. Percival's view was that National Instruments was in a gray area as to whether it

Page 180

could do these buybacks. Is that correct?

A. Well, I -- I don't want to speculate as to what Albert was thinking, but the reality is, yeah, we -- we rejected a letter twice. At some point which we believe had happened at that point since it was over a period of months and no change, we rejected. We had no interest in selling, that it becomes stale as -- as I think I say up here, maybe not. And so --

Q. It's a later email. We'll get to it in a second. Yeah.

A. Yeah. So, yeah, I think our view was then we need to confirm that we are good and so that's what we would do. We would go work with WLRK and confirm with all the facts where we are and whether or not we were okay to implement buybacks.

Q. So Mr. Percival wrote that this question is a gray area and you read that he had written that. Correct?

A. Yeah.

Q. And you understood in Mr. Percival's view was this was a gray area right now. Correct?

MR. COMERFORD: Asked and answered, form.

A. Yeah, I mean, you -- you can read the

Page 181

email. So that's what I read as well. So...

Q. And Ms. Rapp writes about the reconfirmed rejection sent on Tuesday that's obviously a reference to the August 2nd letter to Emerson saying no. Right?

MR. COMERFORD: Form.

A. So -- so, yeah, I -- I missed the question. Can you scroll -- this is from me?

Q. Oh, I'm sorry, no.

A. You said Ms. Rapp --

(Simultaneous speaking.)

Q. You wrote -- I'm sorry. I think I misspoke.

You wrote: The reconfirmed, in quotes, rejection was sent on Tuesday.

And by that you're referring to the August 2nd letter saying no to Emerson. Correct?

A. Yes.

Q. Right. And so you're saying hopefully we can do something near the end of an upcoming period. You're saying: Hopefully given that we have said no to Emerson that we could maybe do these stock buybacks that Ms. Rapp was asking to do.

Is that right, is that the meaning of your email?

Page 182

A.   Yeah, we needed to run our business as usual.  We rejected it twice.  No -- no reason to believe anything was going to happen.  So we needed to move forward but not without getting advice of Wachtell at what we could do or not do.

Q.   Did you receive any advice regarding some obligation to do business as usual?

A.   I mean, the conversations we would have with Wachtell would be yeah, we need to run our business.  This is not moving forward.  We have no interest, we said no.  Can we move our business.  But I -- I can't recall explicitly whether we used those phrases or not.

Q.   Now, you in the ultimate email here all the way at the top, you write -- I'm just going to read:  I think the question is when does the Nuthatch engagement become stale so legitimate argument that we don't have MNPI when the plan is put in place, but will let Albert confirm with WLRK.

Is that what you wrote?

A.   Yeah, good for me.  That's exactly what I would write.

Q.   So, again, you understood that management wanted to do buybacks.  Is that right?

A.   Yes.

Page 183

Q.   And you understood that in order to authorize such buybacks you needed a, quote, legitimate argument that we don't have MNPI.

Is that correct?

A.   Correct.  That we didn't have MNPI.  Right.

Q.   So you were looking for a legitimate argument that we don't have MNPI to give management the authorization to do buybacks they were seeking.  Is that correct?

MR. COMERFORD:  Form, foundation, mischaracterizes the document.

A.   Yeah, what I was looking for would be advice from Wachtell whether we could implement or not that's the bottom line.  It's no less or more clear than that.  I would not make a decision absent Wachtell approving the moving forward with absent Wachtell's advice that we were okay.

Q.   So you identified the question as whether the engagement with Emerson had become stale.  Is that right?

MR. COMERFORD:  Object to the form, asked and answered, the document speaks for itself.

A.   Yeah, I mean, I -- that's what I've stated in the email which is the question.  Right.

Page 184

What are the facts.

Q.   So if -- so if Emerson's engagement was not stale, there would be no legitimate argument --

A.   No.

Q.   -- that National Instruments did not have MNPI.  Is that correct?

MR. COMERFORD:  Form.

A.   Yeah, I -- I'm not going to answer that because everything is based upon the facts of the situation.  So clearly what we wanted to confirm was we didn't have MNPI, we did that with Wachtell, and that's why we made the decision.

Q.   Again, I just want to go back to your words here.  You wrote I think the question is that you were identifying a question here and the question was does Emerson's engagement become stale so there is a legitimate argument that we don't have MNPI?

MR. COMERFORD:  Object to the form, it's been asked and answered.  The document speaks for itself.  You're trying to change the meaning of the document.  I object to it.

Q.   Well, my question is, is it true that you understood that if Emerson's engagement was not stale that National Instruments would have no

Page 185

legitimate argument that it did not have MNPI?

MR. COMERFORD:  Objection; form.

A.   Yeah, and that's not true because I didn't know all of the -- all of the facts.  That's why we engaged Wachtell.  Ultimately any decision was going to be made with the advice of counsel regardless of what, you know, I stated or not.  In this case, this was one of the questions that we would want to ask.

Q.   So you identified it as "the" question.  Right?

A.   Say that again.

Q.   You identified it as "the" question.  Correct?  The question was whether Emerson's engagement with National Instruments had become stale.  Correct?

MR. COMERFORD:  Objection; form, foundation.

A.   No. 1, I said I think that's not my area of expertise.  That's why I engaged Wachtell.  So it could very well could not be that question.  It could be many other questions which was the point.  At this point, that's what I was thinking was the question that we needed to get clarity on.

Q.   This was your view that this was the

Deposition of Eddie Dixon

In Re National Instruments Corporation Securities Litigation

Page 190

A.   I don't know.

MR. COMERFORD:  Yeah, I'm going to object to the form and foundation.

A.   I mean --

Q.   Is it --

A.   -- you can ask Kevin what he intended. Right?

Q.   Well, did you have an understanding of what he intended?

A.   I mean, three years later, no, I can't tell you I know exactly what he was intending, but if -- you can read just as well as I can that it says we should do an earnings call party if the timing works.  It makes some sense, but you'd have to ask Kevin.

Q.   Well, would it make sense at this time to be watching Emerson's earnings?

MR. COMERFORD:  Foundation, form.

A.   Sure.

Q.   Why?

A.   Well, we had received an unsolicited offer that we rejected twice.  You always want to pay attention.  You got to be prepared for anything.

Q.   You'd sent the letter two days earlier -- three days earlier, I'm sorry, saying no to Emerson.

Page 191

Right?

A.   Absolutely.

Q.   And the defendant's position in this case is that after that there was no more material information to do with Emerson.

Do you understand that?

A.   We didn't have any material information at that point.  Right.

Q.   Why then were you watching Emerson's earnings call?  If you said no, and so Emerson's proposal was no longer material, why would you-all be planning a party to watch Emerson's earnings?

MR. COMERFORD:  Form.

A.   I mean, we virtually followed all competitors.  Obviously, anytime we had received something like this, it would behoove us.  It would only be prudent of us, in fact, to pay attention, regardless of where we were, because we owe a duty to our shareholders to do the right thing and be prepared.

Q.   Were you paying attention to this because you understood Emerson might return with another offer?

A.   Our view was we reject -- they came back with the same offer twice over a period of months,

Page 192

which, frankly, was, again, offensive in many ways, taking advantage of a seriously depressed market while we were in the position of doing a transformation -- a strategic transformation of our business.  We were not interested.  They had the opportunity to change.  They did not do that.

So, no, our view was this is done, we're not interested, we were never interested at that price.  And they could have changed the number if they were really interested in showing that they were interested in doing the deal, so...

Q.   Would Emerson -- would Emerson's earnings tell you anything about their firepower?

MR. COMERFORD:  Form, foundation, calls for speculation, incomplete hypothetical.

Q.   Please answer.

A.   I don't know.  I don't know what their earnings call might suggest.

Q.   Well, you guys were watching their earnings call aware that their capacity to carry out M&A was important to National Instruments.

Is that true?

A.   I --

MR. COMERFORD:  Form.

A.   -- I don't recall what -- and, again,

Page 193

you'd have to talk to Karen and Kevin.  I don't recall why we would be watching this.  We'd just obviously be interested in seeing what they're saying.  I don't know there was any particular purpose.  I mean, we just rejected, so...

Q.   Okay.  Did you actually watch the earnings call?

A.   I honestly don't recall whether we did or not.

Q.   Okay.  So after -- your testimony is that after August 2nd you were paying attention to Emerson's earnings, but you don't know why.

Is that right?

A.   We would pay attention to Emerson because we had been -- we had received an unsolicited offer which we rejected twice.  Absolutely.  And -- yeah, I mean, clearly what would they say about that.  So anyway...

MR. MANDEL:  Let's look at Document D75.

(Exhibit 26 was marked.)

Q.   This is Bates NAT-SL-18178.  I think this is Exhibit 26.

A.   Yeah.

Q.   If you can go to the page beginning

Deposition of Eddie Dixon

In Re National Instruments Corporation Securities Litigation

Page 206

either real-time and saved it in draft or whatever. Went back and take a look at it and sent it to myself so we could document it, yes, the conversation, right.

Q. So -- and this notes that -- it says: Putting money where mouth is messaging.

Is -- is that saying that by buying National Instruments' shares, Emerson was putting its money where its mouth is?

A. This was a -- basically a recapturing of the conversation and input that we had received from our counsel. And clearly, that is a possibility, but, again, speculating exactly what was intended by that, we don't know.

Q. Well, you wrote these words. Right?

A. I was capturing what Wachtell was periodically saying to us, yes. I mean saying to us as part of that --

Q. So you were advised --

A. -- conversation, yeah.

Q. So were you advised that Emerson's acquisition of National Instruments' shares was an example of its putting its money where its mouth is?

A. I would think they would use that phrase potentially, yes, but I don't recall exactly how

Page 207

they said it. All I can recall was just what I captured from their discussion.

Q. And you note: Probability of going public is much higher now.

You see that?

A. Yeah.

Q. Do you believe that to be true?

A. We had no idea. They -- again, we're just capturing what the communication advice from Wachtell was, that that is a possibility. We don't know what they're doing, especially considering we rejected the same offer over multiple months and had no interest in moving forward.

Q. So according to your notes, Wachtell advised that the probability of Emerson going public is much higher now. Is that correct?

A. That would be a communication point that they likely made because I would just capture what they were telling us, yes.

Q. Okay. Now, the last bullet in this list -- I'm just going to read it and we'll talk about it.

"Adam, Wayne, Sabastian re-buyback, no material change situation implement if desired."

Did I read that correctly?

Page 208

A. Yes.

Q. Okay. And you wrote that?

A. I wrote that, yes.

Q. Adam, Wayne, and Sabastian are Wachtell lawyers. Is that right?

A. All Wachtell lawyers, correct.

Q. And does this note indicate that they said to implement buyback if desired?

A. Correct. That was the intent.

Q. Okay. Now, did Wachtell provide any written legal analysis on this point?

A. I -- I don't recall any. No. That's why.

Q. For example, did you read any memos from Wachtell?

A. I don't recall reading any memos on it.

Q. Did you do any independent research with respect to this question?

A. I worked with Wachtell on it. Albert may have done some additional, but the reality is we're relying on the experts on this, which was Wachtell, after providing them all the information and facts relevant with the case. So again --

Q. Did you --

A. -- they do this every day.

Page 209

Q. But --

A. I don't do this every day. This was their position. I captured their position following the call.

Q. Did you read any case law on this question?

A. I can't recall whether I read any specific case law on it.

Q. Do you recall doing any independent diligence with respect to this question?

A. Don't recall.

Q. Now, we saw the insider trading policy earlier today. Do you remember that?

A. Uh-huh.

Q. The insider trading policy really emphasized the gravity of insider trading. Is that right?

A. Correct.

Q. It noted criminal liability as a possibility. Correct?

A. That's what the policy said, yes.

Q. Noted irreparable reputational harm. Noted potential civil liability. All that is correct?

A. Yes.

Deposition of Eddie Dixon                In Re National Instruments Corporation Securities Litigation

Page 210

Q.   Was it your custom to make decisions about potential criminal matters without receiving any written legal advice?

A.   It didn't see this is a criminal matter, but absolutely it is very common to get legal advice from your counsel not necessarily requesting any written documentation on it, particularly in a sensitive time like this where we don't want discovery of -- of documents.

So yeah, I'm very comfortable with making the decision based upon the analysis and advice of our counsel which are the experts in this area.

Q.   So you made this determination that the company could proceed with buybacks without reviewing any legal analysis in writing whatsoever.

Is that true?

MR. COMERFORD:  Form.

A.   I -- I don't recall whether I did any additional research myself, but ultimately I would absolutely rely on our outside counsel that we engaged for the specific person -- purpose of this, you know, unsolicited offer.  That's what they do.  That's not what I do every day.  So it would behoove me to rely on the experts, not on someone who would be doing it on a whim.  And I felt like that was in

Page 211

the best interest of our company, of our shareholders, and of myself to follow the advice of counsel.

Q.   Now, we discussed before in August and September of 2022 National Instruments did over $80 million worth of buybacks.

Do you remember that conversation?

A.   I didn't testify to that.  That's what you said.  And, again, I didn't disagree.  I don't know.  I didn't see the number.  I wasn't aware of the number at the time.

Q.   Understood.  Did you tell Wachtell that National Instruments planned on doing $80 million worth of buybacks in the third quarter?

A.   I don't recall what we communicated to Wachtell on the specific number.

Q.   But you didn't even know the $80 million figure.  Correct?

A.   Karen would be engaging on the -- and executing on any buyback.  Albert may have been aware because he would be the one responsible for working with Karen on that.

Q.   You didn't even know it.  Right?  You didn't know the plan to spend $80 million --

A.   No.

Page 212

Q.   -- on buybacks during that quarter.  Correct?

A.   That's right.  I didn't know everything because that was impossible to know everything.

Q.   So you could not have told Wachtell that fact.  Is that right?

A.   Yeah, I would not have told them that.

Q.   Now, at the time you say you sought this advice from Wachtell, Wachtell's fee had not yet been set.  Is that right?

A.   Likely the case, yeah, because I believe it was near closed.  Right.

Q.   So at this time Wachtell wanted a success fee but it hadn't been set yet.  Is that correct?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   We weren't -- yeah, we were not discussing that.  We were doing what was in the best interest of our shareholders based upon what we valued the company at and that's what we were getting advice from Wachtell on.

Q.   So their fee agreement had not been set as of this time, just to be clear?

A.   Correct.

Q.   And they were still waiting for an

Page 213

agreement about their fees from National Instruments.  Correct?

A.   Yeah.  To be honest, we were not talking about fees.  We were focused on what we needed to do for our company.  That was the priority on what we would do for our company.

How to ensure that we're following the law, how to ensure that we're protecting our shareholders the best possible and getting the maximum value out of our company, including executing on our strategic plan.

Q.   I've shown you numerous emails today, in which you raised their fee structure.

When you say "to be honest, we were not talking about the fees," you mean in this conversation on August 10th fees didn't come up?

A.   Yeah.

Q.   Is that what you mean?

A.   I mean, I'd asked on a couple of occasions to give me a general fee structure because that was the way I worked generally.

Again, after having sent that, I had a conversation with, I suspect, Sabastian, and I suspect Adam was on there as well, around the general process and that we would -- we would

Page 214

discuss that at a later time. But we did not continue to talk about, you know, fees. We were focused on doing what was in the best interest of our company and our shareholders.

Q. Okay. I can't remember if you agreed to answer this question before based on some of Mr. Comerford's objections. So I apologize if I'm retreading ground. But the fee -- the success fee that Wachtell was ultimately paid, did the fee that they received increase if the value of the transaction increased?

A. The answer to that -- I can tell you the answer to that. That would be no. It wasn't a success fee. It was a value based on what we felt like we were getting in terms of service from Wachtell, period. And we -- yeah, and we would just negotiate what that would be.

Q. So it's a value of the transaction?

A. No, it wasn't. It was the value of the --

Q. Was that more value?

A. -- it was the value of the services provided. If we didn't close on a transaction there would be value still and we would determine what that would be. So it was the value of the legal

Page 215

services provided by Wachtell.

Q. So if there was ultimately a transaction, would the value that Wachtell delivered be determined through reference to the sale price?

A. I've answered the question. I told you it would be a value-based discussion we would have directly with counsel.

Q. And so ultimately in a situation like this, where there was actually a sale, a bigger value sale would yield a bigger attorney fee for Wachtell.

MR. COMERFORD: Form.

A. But not necessarily.

MR. MANDEL: Correct or incorrect?

A. You can keep trying to put words in my mouth. I've told you how we would do it. We would base it on the value of the legal services.

Q. At the end of the day was the size, the value of the deal irrelevant to Wachtell's compensation?

MR. COMERFORD: Object.

A. I've answered the question. I've told you exactly how we would value the services. I said regardless --

Q. Was this --

Page 216

A. -- of whether we did a deal --

Q. -- was this --

A. -- or whether we didn't do a deal. We would have a discussion on what we felt like was the value of the services provided by Wachtell. And that's exactly what we did.

Q. And ultimately did the deal price play a role in determining what that value was?

MR. COMERFORD: Asked and answered.

MR. MANDEL: It hasn't been answered, Mr. Comerford.

MR. COMERFORD: It has.

MR. MANDEL: That's a "yes" or "no" question.

Q. Was the deal value part of a consideration of Wachtell's ultimate fee or not?

MR. COMERFORD: Asked and answered.

Q. Mr. Dixon?

MR. COMERFORD: You can answer again. Answer again.

A. It was based on the value of what we thought we were getting. It wouldn't be based on a transaction, not a transaction. It would be based on what we got from our -- in terms of legal services from Wachtell.

Page 217

Q. Earlier when I was asking you about the phrase "putting money where mouth is" at the second bullet of this document, you noted that you were -- these were the words Wachtell would have said that you wrote down. Is that right?

A. Yeah. I believe that would be the case, yeah.

Q. And so the same with like -- we read about probability of going public is much higher now. What you're saying is you were jotting down, in effect, words Wachtell lawyers were saying.

Is that right?

A. That would be the purpose of this memo to myself, was to capture what was discussed in that meeting, yes.

Q. And the same is true with regard to implement if desired. Is that correct?

A. Correct.

Q. So Wachtell said to you implement if desired. Is that right?

A. Again, I can't say those were the absolute exact words, but that was the -- the message was if we wanted to move forward, then we could do that. There was no reason we shouldn't because we were not in possession of MNPI and there

Deposition of Eddie Dixon                                    In Re National Instruments Corporation Securities Litigation

Page 218

was no reason to not continue to just manage our business then.

Q.   So this note doesn't indicate that Wachtell advised you that if you were to buy back shares, there would be no disclosure obligation concerning Emerson.  Is that right?

MR. COMERFORD:  Form.

A.   Yeah, repeat the question.  What was the question?

Q.   Your note here from the August 10th call does not indicate that Wachtell advised you that if National Instruments bought back shares, there would be no disclosure obligation concerning Emerson.

Is that correct?

MR. COMERFORD:  Form.

A.   You see what's in the memo, but obviously I would have captured anything that Wachtell had said that was of substance and what we would have to do or not do.

Q.   Right.  So Wachtell did not advise you that you had no disclosure obligation if you bought back shares?

A.   That would be --

Q.   Is that right?

A.   -- that would be implicit in this.  I

Page 219

would -- if we had an obligation, I would have noted that we would have to do that.

Q.   Well, this doesn't note any discussion of disclosure obligations, does it?

MR. COMERFORD:  It's been asked and answered.

A.   Yeah.  I -- I -- you can read the memo as well as I can.  I captured our actions, what we had discussed, and obviously if there were any other obligations or concerns, it would have been captured in here.

Q.   And to be clear, you did no other diligence than this phone call for determining whether if you bought back shares, you had a disclosure obligation concerning Emerson.

Is that correct?

A.   What's correct is I cannot recall.  I can't tell you that I didn't have Albert do something.  I can't recall at all what we may have done other than that.

At the end of the day I relied on my experts.  That's why I paid them, to give us this advice, to make sure we were aligned.

If I didn't do that, I would be remiss to our company, to our shareholders, to be making

Page 220

decisions without involving the experts, such as Wachtell.

Q.   Before, we saw that Ms. Rapp had sent an email to you on August 4th asking for authority to do buybacks.  Do you remember that?

A.   I don't recall exactly.  I thought she had sent a message to Albert and copied me on something to that effect.

Q.   Sure.  You -- that's the email chain I'm talking about.  There was an August 4th email where Ms. Rapp included you on the communication was seeking authority to do buybacks, and you identified the question of whether we had MNPI.

MR. COMERFORD:  I'm going to object.

Q.   Do you remember the email I'm talking about?

MR. COMERFORD:  I'm going to object to the extent that mischaracterizes the document.  The document speaks for itself.

Q.   Do you recall the email I'm talking about?

A.   I recall the email string, yeah.

Q.   Okay.  Before receiving that email, had you taken any steps to determine whether National Instruments was still in possession of MNPI?

Page 221

A.   Well, clearly, we were -- we would talk to our board.  We advised our board if anybody was aware of anything, but -- but, I mean, I -- I don't know how to answer that question.  We clearly would have reviewed whether we had anything and that's why we would have a discussion with counsel on the facts, that information that we knew in order to get proper advice.

Q.   So before you were asked for authority regarding buybacks, did you do any analysis concerning whether you were in possession of MNPI?

A.   Well, we -- we would gather the information that we have and that we would go to counsel to share that information with them to help make a decision, provide us advice based upon their expertise.

Q.   So on August 2nd when you sent -- when National Instruments sent a letter saying no to Emerson, you began an analysis concerning whether National Instruments no longer had MNPI?

MR. COMERFORD:  Form.

A.   I would say we didn't necessarily do anything until Karen asked us the question.  So I wouldn't say immediately after August 2nd, no, we wouldn't do that.  It was only when Karen in her

Page 222

role as CFO making a determination of how she would utilize our capital, ask the question, then we would do an analysis of, hey, here's the information we have. We would share everything. Literally everything -- every piece of information we had would go to Wachtell. They were hand-in-hand with us throughout this process.

Q. Let's have a look at Document D85, which will be our Exhibit 29.

MR. MANDEL: This is NAT-SL-9535. And I think I said this is probably -- yeah, our Exhibit 29.

(Exhibit 29 was marked.)

Q. This is an email -- it's an email chain. The email at the top is written by you to Albert Percival cc'g yourself. There are other emails below.

So just for the record, the last email that we looked at was dated August 10th, 2022, and you sent it to yourself at 7:39 p.m. and 34 seconds according to the cover of the previous document we just looked at. This email you sent a little over ten minutes later on August 10th, 2022, at 7:51 p.m.

Do you see that?

A. Uh-huh. Yes.

Page 223

Q. So about ten minutes after you wrote an email to yourself --

A. Well, again, I don't know when I -- I likely created a draft of that on the call and then sent it to myself later in that evening. Right.

Q. Fair enough. I'll -- I'll rephrase it.

So about ten minutes after you hit send on that email to yourself on August 10th, you wrote the email that we see here on the screen beginning with the words "FYI." Correct?

A. Yes.

Q. And you wrote: Eric and Karen are calling board members to let them know the plans re: Buyback and lifting the restriction.

You see that?

A. Yeah.

Q. What plan is being referred to here?

A. What do you mean? The plans regarding a buyback? That would be Karen and Eric made a decision they were going to implement share buyback after we got advice from counsel confirming that day that it would be okay.

Q. So there was a plan re: Buyback and lifting the restriction.

You see that?

Page 224

A. We would -- yeah, we would clearly lift the restriction before the -- before the buybacks were made, but...

Q. Why would it be necessary to lift the restrictions before the buybacks were made?

MR. COMERFORD: Form.

A. Yeah, I -- that seems kind of self-evident. We would want to lift the restriction if we had a trading restriction in place before we actually implemented a buyback or anyone else was allowed to buy because there was no longer any MNPI in possession. So we would lift the restriction like we did any other time.

Q. Did the restriction you had issued apply to National Instruments?

A. Did the -- say that again. Did the restriction apply to National Instruments?

Q. Yes.

A. We would operate as if it did, but I don't know that the restriction that we sent explicitly stated something about the company.

Q. Right. This was a restriction you were lifting regarding the board members trading because they were aware of Wolverine. Is that right?

A. Clearly, we would be lifting it for the

Page 225

board members as well as -- as we would everyone else associated with Wolverine.

Q. So the -- you didn't need to lift the restriction on board members in order for National Instruments to do buybacks. Is that right?

A. We would always look -- the -- if we had a restriction in place, we would not expect our board to be trading.

Q. I understand.

In the buybacks, was your board trading?

A. No, not that I'm aware of, but I -- I --

Q. Right. The buybacks were carried out by National Instruments. Correct?

A. Correct. Correct.

Q. But you're lifting a restriction that doesn't apply to National Instruments here. Do you see that?

A. I'm lifting a restriction because we no longer possess MNPI and there was no reason to have a restriction in place for anyone.

Q. Well, you're lifting the restriction to enable buybacks. Correct?

MR. COMERFORD: Asked and answered.

A. We're lifting the restriction to no longer have a trading restriction in place, period.

Page 246

Q.   Well, if it's true that there was no more material information concerning Emerson's potential acquisition of National Instruments at this time, why was the board meeting with lawyers and bankers about that potential transaction?

A.   It would be appropriate to always keep our board informed.  When you get something like an unsolicited offer, you don't, like, treat it willy-nilly and just toss it aside.  You stay informed, stay up to speed, keep the board informed.

The last thing you ever want to do is have a board surprise plan anything.  So we would keep giving them periodic updates on this, along with many other opportunities that we might have.

Q.   You were giving them periodic updates about Emerson's potential acquisition of National Instruments.  Is that what you're saying?

A.   We would give them periodic updates around the situation that we had been involved in and what the status was as of that day.

Q.   But I thought when you sent the letter --

A.   We didn't see it as an acquisition.  We were not interested in being acquired.  We didn't look to sell the company.  So we just needed to keep the board informed, and that's what we would do.

Page 247

Q.   You're keeping the board informed about this because it's important information.

Is that right?

A.   No.  If there were important -- new important information that the board needed to be informed of, we absolutely would want to.  It would be very much the case if we were going to communicate to them that there was no new information, that we would communicate that as well.

Q.   So you invited bankers and lawyers to a board meeting to inform your board that there was nothing to inform them about?  Is that what you're saying?

A.   Our board would want to hear from our bankers and from our lawyers periodically on this transaction.  This was --

Q.   What transaction?  I thought you said no and there was nothing material left?  Why are you --

A.   On the unsolicited offer --

Q.   -- meeting about this if there's nothing of a transaction?

(Simultaneous speaking.)

A.   -- on the unsolicited offer that we had received.  They would want to stay up to speed if anything had changed.

Page 248

Q.   But you invite -- just to be clear, you invite your lawyers, your bankers to a board meeting to tell your board nothing has changed.

Is that your testimony?

A.   I'm telling you we invited them to this meeting.  We had this executive session.  And what was discussed was what was discussed, as noted in the minutes.

Q.   It says there that Wachtell and B of A provided their perspectives on the potential go-forward scenarios with Wolverine.

Do you see that?

A.   Yeah.

Q.   What potential go-forward scenarios were discussed here?

A.   I think it's clear regarding the small toehold position that they had taken, any public commentary that they might have regarding their priorities.  Exactly what's stated.  That was what Wachtell communicated and discussed with the board.

Q.   So it was clear at this time that Emerson remained potentially interested in acquiring National Instruments.  Is that right?

MR. COMERFORD:  Form, foundation, calls for speculation.

Page 249

A.   We had no idea what Emerson would do.  It's not my job to figure out and anticipate what Emerson would do.  It's my job to make sure our board is fully informed and that we're prepared for anything.  But we didn't know what they were going to do.  What we knew was we were not interested in selling the company at $48 a share.  And that's all the information we had at that time.

Q.   You knew at this time that there were potential go-forward scenarios with Wolverine.

Correct?

A.   I don't know exactly what -- what was discussed in that particular meeting, but clearly you had to anticipate anything that potentially could happen.  Not that, again, we expected anything to happen.

Q.   So there were potential go-forward scenarios involving Emerson.  Is that right?

A.   I don't know exactly what was communicated by Wachtell at this -- in this meeting.  I don't recall.

Q.   Do you have an understanding of why -- why you were using code names at this point?

A.   When we received the unsolicited offer, we would provide -- in any particular case, whether

Page 298

fact that our products were -- we called them modular flexible, if you will, so you could get a chassis with multiple different devices within that chassis and used for different purposes, and then change the purpose of that later versus a single-function product that maybe our competitors might be selling.

Q.   I think we've mentioned that you're retired now as of late 2023?

A.   Correct.

Q.   And where do you reside at this time?

A.   Austin, Texas.

Q.   Okay.  I want to ask you about the -- the idea of material information.  And so we'll kind of lead up to that.  But that's just to orient you.

My first question is, in May of 2022, when the CEO of Emerson first approached National Instruments, was the management of National Instruments interested in selling the company?

A.   Absolutely not.

Q.   Okay.  And so would you say that the interest from Emerson was solicited or unsolicited?

A.   Oh, it was clearly unsolicited.

Q.   Okay.  Did National Instruments ever ask Emerson to make an offer?

Page 299

A.   No.

Q.   Okay.  What was your reaction to Emerson's $48 per share offer that it conveyed in that letter of May 25th, 2022?

A.   We were uninterested.  It was -- from our perspective, did not at all value the company based upon our plans for -- our strategic plan, transformation plans.

And, quite frankly, the initial call, from my understanding with Eric, was Lal had had a conversation with Eric and he first threw -- our stock was depressed like everybody else's was in May of 2022.

I don't recall.  But it was probably in the low 30s.  So we honestly felt like they were trying to take advantage of an overall depressed market to acquire the stock at a -- a company at a cheap price.

They -- he had actually thrown out a number in the 30s verbally.  It was never an official offer.  We assumed that was strategically done so that when he came back at 48, that it might come across as like, oh, no, they really upped it, when the reality is -- again, we still saw that as significantly undervaluing the company.  So we were

Page 300

not interested.

Q.   What was the purpose of National Instruments engaging Bank of America shortly after May 25th, 2022?

A.   So, again, our ultimate responsibility is to our shareholders and ensuring we, you know, maximize value for our shareholders.  So once we received that unsolicited offer, we -- we thought prudent was work with bankers to kind of look and assess at what our future growth plans are, what our value, you know, cohesion might be relative to, you know, certainly the unsolicited offer, but just generally where are we going as a company.

Q.   Okay.  What was National Instruments' purpose in engaging the Wachtell Lipton Rosen & Katz law firm in May of 2022?

A.   We received an unsolicited offer. Wachtell Lipton is known as the best, if not the best, at least one of the top three or four activist defense firms.  We obviously owed a duty to our shareholders to engage the best.  Our board was obviously very interested in that.  I had a team member in Albert Percival, who had worked with Wachtell in a prior acquisition.  He had worked at Whole Foods, which ultimately was acquired by

Page 301

Amazon, and worked with Wachtell during that process.  We interviewed them.  They were outstanding, very responsive, a top-notch firm.

Q.   Okay.

MR. COMERFORD:  I would like to introduce an exhibit.  This will be Exhibit 40.  And the Bates number is NAT-SL-16470.

And, Mr. Hofman, can you share your screen and pull that document up, 16470?

MR. HOFMAN:  Yeah, let me pull that up in one moment.

MR. MANDEL:  Can I just raise a question here.  Doesn't Everest need the exhibit so that they can download it and mark it rather than Jeremy doing it via screen share?

MR. COMERFORD:  We can send it to Everest after the deposition, certainly.  We won't have many of these, but just a few we'd like to share.

MR. MANDEL:  Yeah, no, no.  I'm not trying to stop you.  I'm just trying to make sure we're just doing this so that we don't have problems later.

Q.   Yeah.

Okay.  I only want to ask you about

Page 302

the -- that top exchange between you and Albert Percival June 8th, 2022?

(Exhibit 40 was marked.)

Q.   Really just the top.  Albert Percival, who is that person?

A.   Who is Albert?

Q.   Yes.

A.   He was the VP of legal reporting to me, primarily responsible for securities matters, M&A, et cetera.

Q.   Okay.  And you and Mr. Percival, as lawyers at National Instruments, were discussing something and then Mr. Percival writes:  Well, WLRK is the guru here.  I stand corrected.

Do you see that?

A.   I see that.

Q.   And so I'm showing this to you to ask you about that phrase that was used by Mr. Percival calling the Wachtell law firm "the guru."  What do you think that term means?

A.   That's a technical --

MR. MANDEL:  Object to form -- object to the form of the question.

A.   Technical legal term there.

Q.   I am sorry.  Did you and Mr. Percival

Page 303

ever refer to the Wachtell law firm as "the guru" on the issues that the company was facing legally?

A.   We saw them as the expert on all of the --

MR. MANDEL:  Object to the form.

A.   -- issues.  Again, guru, technical legal term there used by Albert.  In any event -- yeah.  No.  The intent there they are the experts, that's why we hired them.  Again, from our perspective we were not interested in selling, we wanted to hire the absolute best firm to represent us.

Q.   And starting in May of 2022 regarding this unsolicited offer from Emerson, what was the nature of the legal advice that Wachtell began to give the company and the board?

MR. MANDEL:  Object to the form.

A.   Well, they would -- maybe you can specify it a little bit more on the question.

Q.   I think it's a close question to what was the purpose of the company hiring Wachtell?

A.   Right.

Q.   So what I'm asking now, like, what was the advice just in general terms about?

A.   Yeah, I mean it was about --

Q.   The nature?

Page 304

(Simultaneous speaking.)

MR. MANDEL:  Object to the form of this question.

A.   We engaged Wachtell, again, upon receiving the unsolicited offer, because we had no interest in selling and we wanted to engage a firm that provided that sort of expertise in defense of an unsolicited offer.  Again, from our perspective they were the best.  I think that's pretty well-known within the legal community that they're among the best.  So their purpose was to advise us on really any and all activity associated with, you know, any of the Emerson unsolicited offer.

Q.   I heard you use the word "defense" there as you were talking about the advice that Wachtell was giving to the company.

A.   Uh-huh.

Q.   Can you expound on what you mean by that term "defense" as it relates to this context in May of 2022 and going forward?

MR. MANDEL:  Object to the form.

A.   So we were not interested in being acquired.  We received an unsolicited offer.  Our intent was to engage the firm to help us defend against an acquisition, we were not interested,

Page 305

again, in closing a transaction.  So that's really the purpose of the term, I guess.

Q.   And what was your role at National Instruments in terms of the communications between Wachtell and -- and the company?

A.   Yeah, so obviously as the general counsel I was a bit of a -- the middle person, to be politically correct, I guess.  And the liaison between, you know, the advice of our counsel and our management team, our board, engaged in the -- you know, raised issues where we thought they might, you know, arise.  But just to ensure that we were communicating all the legal advice and -- and working closely with them on analyzing particular facts and situation but ultimately looking for their advice to provide to our management team and to our -- to our board.

Q.   And did attorneys from the Wachtell law firm attend meetings of the board of directors of National Instruments?

A.   On numerous occasions, yes.

Q.   And did attorneys from the Wachtell law firm meet with the management of the company, the CEO and -- and yourself about the -- the situation with Emerson starting in May of 2022?

Page 306

A.   Yes, we were -- typically it would involve the board too, but yes, there were meetings with the management team and Wachtell absolutely.

Q.   Okay.  We saw evidence that National Instruments implemented a trading restriction on May 27th, 2022, because of material nonpublic information.  Do you recall that?

A.   We received the unsolicited offer, we needed to assess that, engaged our counsel, put the restriction in place, yes.

Q.   Okay.  And was the purpose of putting that restriction in place because an offer had been made and until that was responded to, you felt that the company was in possession of material nonpublic information?

MR. MANDEL:  Object to the form.

A.   Yes.  We put it in place because we felt that at the time.  I had not responded.

Q.   In light of the objection let me try to rephrase the question.  What was the purpose of putting the trading restriction in place on May 27th, 2022?

A.   To ensure that we were compliant with all insider trading laws and, listen, the reality is, I'm very proud of our company for taking a very

Page 307

stark and strong approach to abiding being compliant with the law and ensuring that all of our employees did the same.

Q.   Okay.  I want to direct you back to Exhibit 40 and if we look -- I've got a paper copy here as well if that's easier for you to look at, but if you --

A.   At this point there's nothing easy on my eyes, but...

Q.   The -- there's an email from you to Mr. Percival on June 8th, 2022, at 2:13 p.m.

Do you see that?

A.   2:13.  From me?

Q.   Yeah, on the -- on the first --

A.   Yeah, yeah.  I see that, yeah.

Q.   -- page.  And you write:  The direct message is what Sabastian was recommending.  To avoid any indication we are interested in engaging if that is the decision of the board.  I can explain why the second bracketed sentences were probably added later.  Tied up now.

Do you see that?

A.   Yes.

Q.   Were you trying to convey to Mr. Percival that the company's goal at this point was to avoid

Page 308

giving Emerson any indication that the company was interested in engaging in discussions?

A.   Yeah.  Absolutely we were not interested.

Q.   Okay.

A.   More on this one?

Q.   No.  You can give that back to me.

Now, National Instruments responded to Emerson's offer on June 16th, 2022.  Emerson then later reiterated its $48 per share offer and National Instruments responded again on August 2nd, 2022.  Do you recall that?

A.   Yes.

MR. MANDEL:  Object to the form of the question.

Q.   Okay.  When National Instruments responded to Emerson on June 16th and August 2nd, 2022, to reject the two $48 per share offers, what was the intention of National Instruments, from your perspective?

A.   To make it clear that we were no longer -- we were not interested and were never interested in transacting at $48 a share.  We were not looking to be sold.  It was unsolicited.  We had a strategic plan in place.  We were confident in our plan.

Page 309

Q.   When Emerson offered $48 per share and then came back to National Instruments and, again, offered $48 per share, what did that fact convey to you about the price?

A.   That it was clear that --

MR. MANDEL:  Objection; form.

A.   -- that was their maximum offer, that they were not interested in doing anything more.

Again, our argue was they were trying to get us on a -- you know, very cheap price based upon what the overall market dynamics were.

Q.   And then after National Instruments sent its second rejection on August 2nd, 2022, what was your view of the prospect of doing a transaction with Emerson?

A.   Not -- not.  No -- no prospect.

Q.   Okay.  I want to introduce another exhibit.  This has been previously marked as Exhibit 24 to your deposition.  This is executives from National Instruments discussing, on August 4th, 2022, whether the company can start share repurchasing and wanting to get guidance from the Wachtell law firm.  Do you see that?

A.   Yeah, I don't know specifically what section you're looking at, but that was the overall

Page 310

intent of this.

Q. Okay. And on --

MR. MANDEL: For clarity, John, just let me interrupt you. The Bates number of the document you're looking at is NAT-SL-8756.

Is that right?

MR. COMERFORD: No. It should be 9611. I had it marked as Exhibit 24 earlier.

MR. MANDEL: No, no, no. You're -- that's -- yeah, it's my fault for not keeping track of the exhibits. I'm there with you. Thank you. I apologize.

MR. COMERFORD: Okay. No problem.

Q. On August 4th, 2022, you wrote to Mr. Percival and Karen Rapp, who was the CFO of National Instruments. Correct?

A. At 10:50 a.m.? Is that the --

Q. Yes.

A. Yes.

Q. And you wrote: FYI the reconfirmed rejection was sent on Tuesday.

Is that a reference to the August 2nd, 2022, rejection letter?

A. Yes.

Q. And then you write: So hopefully we can

Page 311

do something near the end of the open window if no further engagement by Nuthatch.

What did that mean?

A. That our -- that we would be able to implement a buyback plan, assuming no further engagement, which we had not received, and frankly didn't receive for a very long time after that.

Q. Right. And do you remember when it was that Emerson engaged with National Instruments again?

A. I believe -- I -- I believe we didn't get another communication until November.

Q. Okay. And then you say: I believe that is what we discussed before, but as you noted, let's get WLRK's take in the timing.

What did you mean by that?

A. Again, this was something that Wachtell does every day, not something that we do every day. My intent was to make sure that we're absolutely compliant following the letter of the law so I wanted to run anything of this nature by our counsel for their expertise and get their guidance and advice.

Q. And then this email string has another email from you at the top, August 4th at 10:57 a.m.

Page 312

just a -- several minutes later and you write: I think the question is when does the Nuthatch engagement become stale so legitimate argument that we don't have MNPI when the plan is put in place, but we'll let Albert confirm with WLRK.

What -- what did that mean when you said "but we'll let Albert confirm with WLRK"?

A. I mean, there could be a variety of factors involved in making a decision, but -- so I made an assumption, this might be one of them, but let's run everything by Wachtell to confirm our position and any, you know, advice that we -- that we would receive from them.

Q. Okay. And then you received advice from Wachtell that you recorded in your notes on August 10th, 2022. You were asked about this earlier.

First of all, let me introduce another exhibit. This will be Exhibit 41. And the Bates number is 8683.

MR. COMERFORD: And Mr. Hofman, I would ask that you please pull this up.

(Discussion off the written record.)

(Exhibit 41 was marked.)

Q. And this is a -- essentially creating a

Page 313

calendar entry, I would say, for a Microsoft Teams meeting. Do you see that?

A. Yes.

Q. The -- this indicates that the meeting is scheduled to start on August 10th, 2022, at 1:30 p.m. and conclude on August 10th, 2022, at 2:00 p.m. Right?

A. That's what it states, yes.

Q. And the subject is "Wolverine call Mackenzie update."

Do you see that?

A. Yes.

Q. And then it indicates that the required attendees are Eric Starkloff, Eddie Dixon, Marissa Vidaurri, Karen Rapp.

Do you see that?

A. Yes.

Q. And those were all National Instruments executives. Right?

A. Eric, Marissa, Karen, Kevin are -- or were -- well, I -- I think it says Kevin Daniels. Kevin Ilcisin is with NI. Kevin Daniels, I believe, was with -- was with B of A.

Q. Okay. And then Shawn Liu --

A. Also B of A.

Deposition of Eddie Dixon                                In Re National Instruments Corporation Securities Litigation

Page 314

Q.   All right.  And then Adam Emmerich and Sabastian Niles, who are they?

A.   They were our lead counsel at Wachtell.

Q.   Okay.  And it looks like this -- this meeting was set up by Kevin Ilcisin.  I'm -- Im looking at the very top --

A.   Right.

Q.   -- where it says it's from him.

A.   Yes.

Q.   And it looks like he -- he sent this calendar invitation on August 10th at 10:41 in the morning for -- for a call to be a few hours later. Is that how you see it?

A.   Yes.

Q.   Okay.  And then I want to direct your attention to what was previously marked as Exhibit 28 to your deposition which is an email from you.

MR. COMERFORD:  And -- and Mr. -- could I ask Mr. Held to pull up Exhibit 28.

Okay.  Thank you.

Q.   This is an email that you sent from -- from your account to yourself August 10th, 2022, at 7:39 p.m. with certain notes.  The subject is "Wolverine notes privileged and confidential."

Page 315

A.   Uh-huh.

Q.   Correct?

And this is, at the bottom, the -- the last bullet point you write is:  Adam, Wayne, Sabastian re:  Buyback, no material change to situation.  Implement if desired.

Do you see all that?

A.   Yes, I do.

Q.   Okay.  So Adam, Wayne, and Sabastian, who were those people?

A.   They were all attorneys with Wachtell Lipton.

Q.   Okay.  Aside from the advice that you received from the attorneys at Wachtell Lipton about whether it was permissible to implement the share buyback program at this time --

MR. MANDEL:  Object to the form.

Q.   Well, let -- let me ask it this way.  On August 10th, 2022, do you believe that you received advice from three attorneys at Wachtell law firm that the company could resume share buybacks or -- or implement the share buyback program if desired?

A.   Yes.

Q.   Okay.  Now, aside from the advice that you received from those attorneys, did you have your

Page 316

own opinion that at this point in time, August 10th, 2022, the company was -- was or was not in possession of material nonpublic information about an Emerson proposal?

A.   Yeah, my -- my perspective is --

MR. MANDEL:  Object to the form.

A.   -- we were not in possession of MNPI at this time.

Q.   Okay.

A.   But as noted, certainly this is something that I would want advice of counsel on, thus, the purpose of the call.

Q.   All right.  Now, you became aware that Emerson had started accumulating shares in National Instruments' stock.  Right?

A.   Yes.  At some point, yes.

MR. MANDEL:  Object to the form.

Q.   Okay.  At some point, you became aware that -- that Emerson had been acquiring shares on the open market?

A.   Correct.

Q.   Okay.  And did you discuss that fact with the Wachtell attorneys?

A.   Yes, we did.

Q.   Okay.  And did they change their advice

Page 317

to you based on that fact?

A.   No, not changed their advice.

MR. MANDEL:  Object to the form.

Q.   Okay.  Was it always your goal to provide all potentially relevant information to the -- the Wachtell attorneys so they could accurately assess whether National Instruments was in possession of material nonpublic information?

A.   Absolutely.

MR. MANDEL:  Object to the form.

Q.   Would you ever have allowed National Instruments to make repurchases or buybacks of its own stock after August 10th, 2022, if you had any concern that National Instruments was in possession of material nonpublic information?

A.   Absolutely not.

MR. MANDEL:  Object to the form.

Q.   Your -- your answer was "absolutely not"?

A.   Absolutely not.

Q.   Okay.  Those are all the questions I have for you, sir.

THE VIDEOGRAPHER:  Counsel, did you have follow-up or are we --

MR. MANDEL:  I might.  Why don't we go off the record for two or three minutes and let

CORRECTION PAGE

WITNESS NAME:   EDDIE DIXON         DATE:   10/09/2025

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 1 | 7 | R. Eddie Dixon, Jr. | |
| | | Royal Eddie Dixon, Jr. | Full name |
| 13 | 11 | Change "Hal" to "how" | correction |
| 23 | 5 | "orderlies" to "quarterlies" | correction |
| 114 | 19 | "as in a vacuum" to | |
| | | "but in a vacuum" | correction |
| 130 | 18 | "we--even" to "we envisioned" | correction |
| 183 | 16 | "forward with absent" | |
| | | to "forward or absent" | correction |
| 212 | 12 | "closed" to "close" | correction |
| 230 | 6 | change "I" to "it" | correction |
| 234 | 5 | change "was" to "wasn't" | correction |
| 246 | 12 | change "surprise plan" | |
| | | to "surprised by" | correction |
| 281 | 17 | change "retired. We..." to | |
| | | "retired after we closed." | correction |
| 300 | 11 | delete "cohesion" | correction |
| 303 | 8 | insert "is" between there and they | correction |
| 306 | 18 | "I" should be "we" | correction |
| 309 | 9 | change "argue" to "view" | correction |

_____

_____

SIGNATURE PAGE


    I, EDDIE DIXON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the correction page.

_____
EDDIE DIXON