# EXHIBIT 41

**10b5-1 REPURCHASE PLAN AGREEMENT**

August 11, 2022

National Instruments Corporation
11500 North MoPac Expressway
Austin, TX 78759

This letter agreement (this "Letter Agreement") confirms the terms and conditions under which National Instruments Corporation, a corporation organized under the laws of the state of Delaware (the "Purchaser"), hereby establishes a plan (the "Plan") to repurchase shares of its common stock, $0.01 par value (the "Securities"), and under which J.P. Morgan Securities LLC ("JPMS") will act as its exclusive agent to execute the Plan.

1.  <u>Appointment of JPMS</u>. The Purchaser hereby appoints JPMS as its exclusive agent to purchase Securities pursuant to the Plan. It is the Purchaser's intention that such purchases benefit from the safe harbor provided by Rule 10b-18 ("Rule 10b-18") and the affirmative defense provided by Rule 10b5-1 ("Rule 10b5-1") each promulgated by the Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and that the Plan and the transactions contemplated hereby comply with the requirements of paragraph (c)(1)(i)(B) of Rule 10b5-1. Accordingly, the Purchaser hereby agrees that the terms of this Letter Agreement and the Plan shall be interpreted to comply with the requirements of such paragraph (c)(1)(i)(B) and that it shall not take, nor permit any person or entity under its control to take, any action that could jeopardize the availability of Rule 10b-18 for purchases of Securities under the Plan or result in such purchases not so complying with the requirements of such paragraph (c)(1)(i)(B). JPMS agrees that it shall use good faith efforts to execute all purchases of Securities under this Letter Agreement in accordance with the timing, price and volume restrictions contained in subparagraphs (2), (3) and (4) of paragraph (b) of Rule 10b-18, taking into account the rules and practices of the principal exchange on which the Securities are traded (the "Principal Market"), it being understood that JPMS shall not be responsible for delays between the execution and reporting of a trade in the Securities, any reporting errors of the Principal Market or third party reporting systems or other circumstances beyond JPMS's control.

2.  <u>Term</u>.

    (a)  JPMS is authorized to commence purchasing Securities on September 12, 2022 (the "Start Date"), and this Letter Agreement and the Plan shall terminate upon the earliest of (the period from and including the Start Date to such termination, the "Plan Period"):

        (i)    the close of business on December 31, 2022;
        (ii)   the completion of all purchases contemplated by the Plan;
        (iii)  subject to Section 12 below, the receipt by either party from the other of written notice of termination;
        (iv)   the existence of any legal or regulatory restriction that would prohibit any purchase pursuant to the Plan;
        (v)    the public announcement (as defined in Rule 165(f) under the Securities Act of 1933, as amended) of any merger, acquisition, or similar transaction relating to the Purchaser (other than any such transaction in which the Purchaser is the acquiring party and the consideration consists solely of cash and there is no valuation period);
        (vi)   the commencement of any voluntary or involuntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Purchaser under any bankruptcy, insolvency or similar law or seeking the appointment of a trustee, receiver or other similar official with respect to the Purchaser, or the taking of any corporate action by the Purchaser to authorize or commence any of the foregoing; and
        (vii)  the failure of the Purchaser to comply with Section 7 hereof.

CONFIDENTIAL

(b)       If, as contemplated by paragraph (a)(iv) of this Section 2, at any time during the term of this Letter Agreement, any legal or regulatory restriction that is applicable to the Purchaser or the Purchaser's affiliates would prohibit any purchase pursuant to the Plan, the Purchaser shall give JPMS notice of such restriction as soon as practicable (such notice, a "Required Termination Notice"). Such notice shall not include any information about the nature of the restriction or its applicability to the Purchaser.

(c)       The Purchaser shall be solely responsible for any purchases made by JPMS as the Purchaser's agent prior to the termination of the Plan. In addition, if JPMS receives notice of termination (including any Required Termination Notice) or of any of the termination events listed above, JPMS shall nevertheless be entitled to make, and the Purchaser shall be solely responsible for, a purchase hereunder pursuant to a bid made before such notice was received by JPMS.

(d)       Sections 7, 10 and 11 of this Letter Agreement shall survive any termination hereof.

3.      <u>Purchases Outside Plan</u>. The Purchaser agrees that it shall not, and shall cause any "affiliated purchaser" (as defined in Rule 10b-18) of the Purchaser not to directly or indirectly (including in any similar purchase plan or any derivative transaction) purchase, offer to purchase or place any bid or limit order for the purchase of any Securities or any securities convertible or exchangeable into or exercisable for, or the value of which is derived from, the Securities during the Plan Period except under the Plan pursuant to this Letter Agreement or pursuant to the Rule 10b-18 Repurchase Agreement dated August 2, 2021 between the Purchaser and JPMS. If the Purchaser becomes aware that any affiliated purchaser of the Purchaser has taken any such action during the Plan Period, the Purchaser shall so notify JPMS as soon as practicable.

4.      <u>Purchasing Procedures</u>.

(a)       On each Trading Day during the Plan Period on which no Market Disruption Event (as defined below) occurs, JPMS shall use commercially reasonable efforts to purchase as agent for the Purchaser and for the account of the Purchaser the lesser of (i) the maximum number of Securities that the Purchaser could purchase on such Trading Day in accordance with the volume condition set forth in Rule 10b-18 and (ii) the number of Securities that JPMS is able, subject to market conditions and principles of best execution, to purchase as agent for the Purchaser and for the account of the Purchaser on such Trading Day using commercially reasonable means in accordance with the Plan guidelines set forth in Annex A hereto. JPMS may purchase Securities on the Principal Market, any national securities exchange, in the over-the-counter market, on an automated trading system or otherwise. Any numbers of Securities to be purchased (and any corresponding purchase price limits or ranges) set forth in Annex A shall be adjusted automatically on a proportionate basis to take into account any stock split, reverse stock split or stock dividend with respect to the Securities or any change in capitalization with respect to the Purchaser or any similar event that occurs during the term of this Letter Agreement, as determined by JPMS in good faith and a commercially reasonable manner.

A "Trading Day" is any day during the Plan Period that the Principal Market is open for business and the Securities trade regular way on the Principal Market.

"Market Disruption Event" means that (i) there occurs any material (as reasonably determined by JPMS) suspension of or limitation on trading by the Principal Market, (ii) there occurs any event that materially (as reasonably determined by JPMS) disrupts or impairs the ability of market participants in general to effect transactions in or obtain market values for the Securities or futures or options contracts on the Securities or (iii) the Principal Market closes prior to its scheduled closing time for such Trading Day.

(b)       In the event that JPMS, in its discretion, determines that it is appropriate with regard to any legal, regulatory or self-regulatory requirements or related internal policies and procedures (whether or not such requirements, policies or procedures are imposed by law or have been voluntarily adopted by JPMS) for JPMS to refrain from purchasing Securities or to purchase fewer than the number of Securities otherwise specified in the instructions provided by the Purchaser on any day, then JPMS may, in its sole discretion, elect that the number of Securities purchased shall be reduced for such day to an amount determined by JPMS in its discretion.

2

CONFIDENTIAL                                                         NAT-SL-00000766

(c)      Any Securities purchased pursuant to the Plan shall be purchased under ordinary principles of best execution at the then-prevailing market price. Subject to the terms of the Plan as set forth herein (including Annex A hereto), JPMS shall have full discretion with respect to the execution of all purchases, and the Purchaser acknowledges and agrees that the Purchaser does not have, and shall not attempt to exercise, any influence over how, when or whether purchases of Securities are affected pursuant to the Plan. The Purchaser acknowledges and agrees that, in purchasing Securities pursuant to the Plan, JPMS will be an independent contractor and will not be acting as the Purchaser's trustee or fiduciary or in any similar capacity.

5.      <u>Payment for and Delivery of Purchased Securities</u>. Payment for Securities purchased, together with any applicable fees, shall be made by the Purchaser within one standard settlement cycle after the purchase. Purchased Securities will be held or delivered in accordance with instructions to be furnished by the Purchaser.

6.      <u>Compensation</u>. For the services provided in this Letter Agreement, the Purchaser agrees to pay to JPMS a fee of $0.02 per share for the Securities purchased pursuant to the terms of this Letter Agreement.

7.      <u>Representations, Warranties and Agreements</u>. The Purchaser represents and warrants to, and agrees with, JPMS as follows:

(a)      This Letter Agreement and the transactions contemplated herein have been duly authorized by the Purchaser; this Letter Agreement is the valid and binding agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms; performance of the transactions contemplated herein will not violate any law, rule, regulation, order, judgment or decree applicable to the Purchaser or conflict with or result in a breach of or constitute a default under any agreement or instrument to which the Purchaser is a party or by which it or any of its property is bound or its certificate of incorporation or by-laws; and no governmental, administrative or official consent, approval, authorization, notice or filing is required for performance of the transactions contemplated herein.

(b)      As of the date of this Letter Agreement, the Purchaser is not aware of any material nonpublic information concerning the Securities or the business, operations or prospects of the Purchaser.

(c)      The Purchaser is engaging JPMS and entering into this Letter Agreement and the Plan in good faith and not as part of a plan or scheme to evade compliance with the federal securities laws, including, without limitation, Rule 10b-5 under the Exchange Act. Until this Letter Agreement is terminated, the Purchaser agrees not to enter into or alter any corresponding or hedging transaction or position with respect to the Securities.

(d)      The Purchaser is not entering into this Letter Agreement to create actual or apparent trading activity in the Securities (or any security convertible into or exchangeable for the Securities) or to raise or depress the price of the Securities (or any security convertible into or exchangeable for the Securities) for the purpose of inducing others to buy or sell Securities, and will not engage in any other securities or derivative transaction to such ends.

(e)      During the term of this Letter Agreement, neither the Purchaser nor its officers or employees shall, directly or indirectly, disclose to any person at JPMS effecting purchases under the Plan any material nonpublic information regarding the Purchaser or the Securities or any information regarding the Purchaser or the Securities that could reasonably be expected to influence the execution of the Plan.

(f)      The Purchaser acknowledges that JPMS is a "financial institution" and "financial participant" within the meaning of Sections 101(22) and 101(22A), respectively, of Title 11 of the United States Code (the "Bankruptcy Code"). The parties hereto further agree and acknowledge that each transaction under this Letter Agreement is intended to be a "securities contract" as defined in Section 741(7) of the Bankruptcy Code and each payment or delivery of cash, Securities or other property or assets hereunder is a "settlement payment" within the meaning of Section 741(8) of the Bankruptcy Code, and the parties

3

NAT-SL-00000767

hereto are to be entitled to the protections afforded by, among other Sections, Sections 362(b)(6), 362(b)(27), 362(o), 546(e), 546(j), 555 and 561 of the Bankruptcy Code.

(g)     Prior to 8:00 a.m., New York City time on the Start Date, the Purchaser shall provide to JPMS all information, other than publicly reported trading volumes, necessary for JPMS to calculate the maximum number of Securities that may be purchased as of the Start Date in accordance with the volume condition set forth in Rule 10b-18, and JPMS shall be entitled to rely on such information so provided.

(h)     Neither the Purchaser nor any of its affiliates or agents shall take any action that would cause Regulation M under the Exchange Act ("Regulation M") to be applicable to any purchases of Securities, or any security for which the Securities are a reference security (as defined in Regulation M), by the Purchaser or any of its affiliated purchasers (as defined in Regulation M) during the Plan Period.

(i)     The Purchaser shall be solely responsible for compliance with all statutes, rules and regulations applicable to the Purchaser and the transactions contemplated hereby, including, without limitation, reporting and filing requirements. The Purchaser acknowledges and agrees that it is not relying, and has not relied, upon JPMS or any affiliate of JPMS with respect to the legal, accounting, tax or other implications of the Plan and the transactions contemplated thereby and that it has conducted its own analyses of the legal, accounting, tax and other implications hereof.  JPMS has made no representation and has no obligation with respect to whether the Plan or the transactions contemplated thereunder qualify for the safe harbor provided by Rule 10b-18 or the affirmative defense provided by Rule 10b5-1.

8.     <u>Disclosure of Acquisition Program</u>.  The Purchaser represents and warrants that it has publicly disclosed its intention to institute a program for the acquisition of the Securities.

9.     <u>Other Purchases by JPMS</u>. Nothing herein shall preclude the purchase by JPMS of Securities for JPMS's own account, or the solicitation or execution of purchase or sale orders of Securities for the account of JPMS's clients.

10.     <u>Indemnification</u>.  The Purchaser shall indemnify JPMS, its affiliates and the respective directors, officers, agents and employees of JPMS and its affiliates (each, a "JPMS Person") against any third-party liabilities or expenses (including reasonable attorney's fees and disbursements), or third-party actions in respect of any liabilities or expenses, arising from the services furnished pursuant to this Letter Agreement including, but not limited to, third-party liabilities and expenses arising by reason of any violation or alleged violation of any state or federal securities laws, except to the extent such liabilities or expenses result from the gross negligence, willful misconduct or bad faith of JPMS in performing its services under this Letter Agreement. The Purchaser shall also promptly reimburse the JPMS Persons for all expenditures (including reasonable attorney's fees and disbursements) made to investigate, prepare or defend any action or claim in respect of any such liability or expense, regardless of whether any litigation is pending or threatened against such JPMS Persons.

11.     <u>Limitation of Liability</u>. No JPMS Person shall be liable in respect of any liabilities or expenses incurred by the Purchaser arising from or in connection with JPMS's role or services under this Letter Agreement, except to the extent any such liabilities or expenses result from the gross negligence, willful misconduct or bad faith of JPMS in performing its services under this Letter Agreement.

12.     <u>Amendment, Modification, Waiver or Termination</u>.  Any amendment, modification or waiver of this Letter Agreement or the Plan must be effected in accordance with the requirements for the amendment of a "plan" as defined in paragraph (c) of Rule 10b5-1.  Without limiting the generality of the foregoing, any amendment, modification, waiver or termination shall be made in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b-5 under the Exchange Act, and no such amendment or modification shall be made at any time at which the Purchaser is aware of any material nonpublic information concerning the Purchaser or the Securities.  The Purchaser acknowledges and agrees that any action taken by it that results in the termination of the Plan pursuant to Section 2 is subject to the principles set forth in this section.

4

CONFIDENTIAL

NAT-SL-00000768

13.    <u>Notices</u>.  Any written communication shall be sent to the address specified below: and shall become effective upon receipt:

     (a)    if to JPMS, to it at

     J.P. Morgan Securities LLC
     383 Madison Avenue, 7th Floor
     New York, NY 10179
     Attention: Brett Chalmers
     Telephone: (212) 622 2252

or at such other address as may from time to time be designated by notice to the Purchaser in writing; and

     (b)    if to the Purchaser, to it at

     National Instruments Corporation
     11500 North MoPac Expressway
     Austin, TX 78759
     Attn: Ursula Conterno
     Telephone: 512-750-2566

or at such other address as may from time to time be designated by notice to JPMS in writing.

14.    <u>Assignment</u>.  Neither party may assign its rights and obligations under this Letter Agreement to any other party; *provided* that JPMS may assign its rights and obligations under this Letter Agreement to any subsidiary of J.P. Morgan Chase & Co.

15.    <u>Governing Law</u>.  This Letter Agreement and any claim, controversy or dispute arising under or related to this Letter Agreement shall be governed by and construed in accordance with the law of the State of New York. The parties hereto irrevocably submit to the exclusive jurisdiction of the federal and state courts located in the Borough of Manhattan, in the City of New York in any suit or proceeding arising out of or relating to this Letter Agreement or the transactions contemplated hereby. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS LETTER AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

CONFIDENTIAL     NAT-SL-00000769

If the foregoing correctly sets forth our agreement, please sign the form of acceptance below.

J.P. MORGAN SECURITIES LLC

By: _____
    Name:  Brett Chalmers
    Title:    Executive Director


Agreed to and accepted as of:

NATIONAL INSTRUMENTS CORPORATION

By: _____
Name:  **Karen Rapp**
Title:  **Executive Vice President and Chief Financial Officer**

CONFIDENTIAL

**Plan Details**

On each Trading Day during the Plan Period on which no Market Disruption Event (as defined above) occurs, JPMS shall use commercially reasonable efforts to purchase as agent for the Purchaser and for the account of the Purchaser the lesser of (i) the maximum number of Securities that the Purchaser could purchase on such Trading Day in accordance with the volume condition set forth in Rule 10b-18 and (ii) the number of Securities that JPMS is able, subject to market conditions and principles of best execution, to purchase as agent for the Purchaser and for the account of the Purchaser on such Trading Day using commercially reasonable means in accordance with the Plan guidelines set forth below; Notwithstanding any of the parameters set forth below, JPMC will not spend more than $60,000,000 under this Plan, inclusive of commission.

| Price ($/shr) - Low | Price ($/shr) - High | Daily Purchase Amount ($ In Millions) |
|---|---|---|
| $45.00 | $-- | No Purchase |
| $43.00 | $44.99 | $1.0 |
| $40.00 | $42.99 | $4.0 |
| $37.00 | $39.99 | $6.0 |
| < $37/share | $37.00 | $8.00 |

A-1

CONFIDENTIAL

NAT-SL-00000771