# EXHIBIT 45

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x
In re NATIONAL INSTRUMENTS         :       Civ. A. No. 1:23-cv-10488-DLC
CORPORATION SECURITIES LITIGATION  :
——————————————————————x       CLASS ACTION

## DECLARATION OF ALBERT PERCIVAL

I, Albert Percival, hereby declare under penalty of perjury as follows:

1.      I am over the age of 21, under no disability, and competent to testify to the matters contained in this Declaration.

2.      I have personal knowledge of the matters stated herein.

3.      I am an attorney. I obtained my undergraduate degree from Texas A&M University. I obtained a juris doctor from University of Houston Law Center in 1996. I obtained an LL.M., Taxation from New York University School of Law in 1997.

4.      As of 2022, I had been practicing law continuously for 25 years.

5.      In 2022, I was a licensed attorney in the State of Texas.

6.      In March 2020, I joined National Instruments Corporation ("NI") in a role as in-house counsel.

7.      I worked at NI as Legal Senior Director of Corporate for the entirety of 2022. This was an in-house counsel position within NI.

8.      Part of my responsibilities in this role included ensuring NI's compliance with the United States securities laws, including when repurchasing shares of its own Common Stock. I had many years of experience in this field. One of my jobs was to provide advice to senior executives and board members about when it might be inappropriate to purchase or sell NI stock.

1

9.    In 2022, I understood that share repurchases were an important part of NI's capital allocation strategy and that NI's Board of Directors had approved a share repurchase program on January 19, 2022, authorizing NI to repurchase $250 million in shares of its Common Stock, with the quantity, timing, price, and other terms of the repurchases to be left to NI's management. *See* Ex. A, January 2022 Board Meeting Minutes and Exhibit G.

10.    In executing the responsibilities of my role and providing advice to employees, officers, and directors at NI, I frequently engaged with outside counsel and relied on their expertise and advice, including oral advice. I also provided my own, independent legal advice.

11.    After initial outreach from Emerson Electric Co. ("Emerson") to NI in May 2022, I worked with NI's Chief Legal Officer, Eddie Dixon, and attorneys at Wachtell, Lipton, Rosen & Katz ("Wachtell") in connection with NI's review of Emerson's proposals and responses to those proposals. *See* Ex. B, Percival Email (June 8, 2022).

12.    Wachtell and its attorneys had experience and expertise in advising companies in receipt of unsolicited acquisition offers and they were retained based on this experience and expertise.

13.    I reviewed draft responses by NI to Emerson's May 25, 2022 letter, in which Emerson proposed to acquire all of NI's outstanding shares at $48 per share in cash, including a draft response sent to me by Sabastian Niles, a partner at Wachtell, on June 8, 2022. *See, e.g.*, Ex. B.

14.    Based on discussions with Dixon, I understood that the intention behind NI's June 16, 2022 response to Emerson's May 25, 2022 letter was to send the message to Emerson that NI was not interested in engaging and to avoid language or content that Emerson would construe as an invitation to re-bid or as a suggestion that NI was for sale. *See, e.g.*, Ex. B.

2

15. I was present at the July 19-20, 2022 meeting of NI's Board of Directors, at which the Board discussed Emerson's June 22, 2022 letter repeating its proposal to acquire all of NI's outstanding shares at $48 per share in cash. *See* Ex. C, Board Meeting Minutes (July 19, 2022).

16. On July 20, 2022, NI's Board members reaffirmed their view that the proposal from Emerson was not in the best interests of NI and its shareholders, did not reflect the value that was expected to be generated by NI's business strategies, and did not merit engaging in discussions with Emerson or providing Emerson diligence materials. *See* Ex. C.

17. On August 2, 2022, NI responded to Emerson's June 22, 2022 letter, informing Emerson that NI's Board remained unanimously of the view that Emerson's proposal was not in the best interests of NI and its shareholders.

18. On August 4, 2022, NI's Chief Financial Officer, Karen Rapp, emailed Dixon and me asking what NI could do to put a plan in place to resume repurchases of NI Common Stock. *See* Ex. D, Dixon, Rapp, and Percival Email Chain (August 4, 2022).

19. I believed that, if NI possessed material non-public information, including any material non-public information related to Emerson and its May 25 and June 22 proposals to NI, NI could not implement a 10b5-1 Trading Plan or otherwise resume stock repurchases.

20. In response to Karen Rapp's August 4, 2022 email, I at first believed that NI was in a "gray area" regarding when it could resume stock repurchases after sending the August 2 letter to Emerson. *See* Ex. D. Thus, I was going to carefully consider the situation before coming to a final conclusion that would be communicated to the business leaders of NI.

21. In response to Karen Rapp's August 4, 2022 email, I decided to seek the advice of Wachtell attorneys about NI's ability to resume repurchases. *See* Ex. D.

3

22.    The structure and amount of Wachtell's compensation from NI was not impacted by NI's share repurchases or NI's decision to, or decision not to, repurchase its Common Stock. I viewed Wachtell as the appropriate firm for NI to consult due to their experience in situations such as that facing NI. Wachtell was the law firm retained to address any issues related to Emerson.

23.    Also on August 4, 2022, I emailed Niles and Kwon-Yong Jin, another attorney at Wachtell, stating that NI sent its rejection letter to Emerson two days earlier and asking for advice from Wachtell about NI implementing a repurchase plan. Ex. E, Percival Email (August 4, 2022).

24.    On August 5, 2022, I scheduled an August 5, 2022 call, with listed attendees including Dixon, Niles, Jin, and Wayne Carlin, another Wachtell attorney. Ex. F, Percival Email (August 5, 2022).

25.    In seeking advice from Wachtell attorneys about whether NI was in possession of material non-public information, requiring it to abstain from share repurchases or disclose such information before engaging in repurchases, I ensured Wachtell was aware of all relevant information of which I was aware regarding Emerson so that it could accurately assess whether NI possessed material non-public information based on a complete understanding of the facts. I believed I was also aware of the material facts.

26.    On a subsequent call, I was part of a conversation with Jin wherein it was discussed that NI would consider resuming repurchases by August 15, so long as NI did not receive further outreach from Emerson.

27.    On August 8, 2022, Emerson announced the sale of its InSinkErator business, and Niles emailed the announcement to multiple NI personnel, including me. Ex. G, Niles Email (August 8, 2022).

28. By August 10, 2022, I did not believe NI possessed material non-public information. NI had firmly rejected the offers, Emerson did not increase its offer, and Emerson did not reach out to NI following the rejection of its second offer.

29. I understood on August 10, 2022 that, on that same date, Wachtell attorneys Niles, Adam Emmerich, and Wayne Carlin advised members of NI's management, including Dixon, that NI was not in possession of material non-public information and therefore could resume stock repurchases.

30. On August 11, 2022, I sent an email to members of NI's Board informing them that the restriction on trading in NI's Common Stock, which had been put in place in relation to Emerson's letters proposing an acquisition of NI and NI's review of those letters, was lifted. Ex. H, Percival Email (August 11, 2022).

31. I would not have sent the August 11, 2022 email lifting the trading restriction unless I personally believed based on my own experience and consultation with Wachtell, as outside counsel, that NI was not in possession of material non-public information. I also would not have sent the email had attorneys from Wachtell not advised NI's management on August 10, 2022 that NI did not possess material non-public information that would affect the repurchases. The email, in essence, was my legal advice that it was appropriate for NI and its Board and officers to engage in open market transactions in NI Common Stock, and I expected the officers and directors to rely on that advice.

32. Also on August 11, 2022, NI executed a 10b5-1 Repurchase Plan Agreement with J.P. Morgan Securities LLC, appointing JPMorgan as NI's agent to purchase NI's Common Stock pursuant to the plan, beginning on September 12, 2022. Ex. I, 10b5-1 Repurchase Plan Agreement.

33. I advised Rapp in connection with the finalization and execution of the 10b5-1 Repurchase Plan Agreement. I provided advice that it was appropriate to do so under the securities laws.

34. I would not have advised Rapp or anyone at NI to execute a 10b5-1 Repurchase Plan Agreement if I did not personally believe that NI was not in possession of material non-public information or understand that attorneys from Wachtell advised NI's management on August 10, 2022 that NI did not possess material non-public information.

I, Albert Percival, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *See* 28 U.S.C. § 1746.

/s/ _____

Executed on: _December 19, 2025_

[Date]

# EXHIBIT A



## NI Committee & Special Board Meetings

February 16, 2022

The meetings will be held via Teams access in the calendar invitation.

| February 16 | Committee & Special Board Meeting Schedule | |
| --- | --- |
| 12:00 – 1:00 | Compensation Committee Meeting |
| 1:00 – 1:15 | Special Nomination & Governance Committee Meeting |
| 1:15 – 2:15 | Audit Committee Meeting |
| 2:15 – 2:30 | Break |
| 2:30 – 4:30 | Special Board Meeting |

| February 16| Special Board of Directors Meeting | | |
| --- | --- | --- |
| **Time** | **Agenda Item / Presenter** | | **Discussion/ Approval** |
| 2:30 | 1. CEO Review and Feedback Closeout | McGrath | Discussion |
| 2:40 | 2. Minutes | McGrath | Approval |
| 2:41 | 3. Q1 Business Update | Starkloff | Discussion |
| 2:50 | 4. Annual Stockholder Meeting Matters | Dixon | Approval |
| 2:55 | 5. 2022 CEO EIP Metrics & Targets | Prescott | Approval |
| 3:05 | 6. 2022 Budget Approval for AIP/EIP Matrix | Starkloff / Rapp | Approval |
| 3:15 | 7. ERM Topic – Shareholder Activism and Competitor Metrics – S. Miller / Centerview Partners | | Discussion |
| 3:45 | 8. Executive Session (with Eric) | | Discussion |

| Pre-read and Support Materials |
| --- |
| Supports Item 2.  Minutes – January 19, 2022 |
| Supports Item 4.  Annual Stockholder Meeting – Resolutions |
| Supports Item 5.  2022 CEO EIP Metrics & Targets – Resolutions |

CONFIDENTIAL



# Meeting Minutes Approval

Action Required of Board:

Approval of January 19, 2022 Board Meeting Minutes

(the full set of Minutes are in Support Documentation)

ni.com

NI CONFIDENTIAL

CONFIDENTIAL

NAT-SL-00000003



CONFIDENTIAL

PRE-READ

## National Instruments Corporation
## Minutes of Board of Directors' Meeting
## January 19, 2022

A meeting of the Board of Directors (the "Board") of National Instruments Corporation (the "Company") was held via video conference on January 19, 2022 at approximately at 8:00 a.m. Each person on the call could hear and be heard by each other person.

Directors present at the meeting were: Michael E. McGrath (Chair), Eric H. Starkloff (also, President and Chief Executive Officer), James E. Cashman, III, Alex M. Davern, Gayla J. Delly, Gerhard P. Fettweis, Liam K. Griffin, and Duy-Loan T. Le. No directors were absent.

Also, in attendance for all or a part of the meeting were: Karen Rapp (Executive Vice President and Chief Financial Officer), R. Eddie Dixon, Jr. (Chief Legal Officer, Senior Vice President and Secretary), Albert Percival (Legal Senior Director and Assistant Secretary), Deborah Donahue (Principal Paralegal), Jason Green (Chief Revenue Officer and Executive Vice President, Portfolio BU), Ritu Favre (Executive Vice President & GM, Business Units), Luke Schreier (Senior Vice President and GM, BU), Josh Mueller (Senior Vice President, Marketing & GM, BU), Drita Roggenbuck (Senior Vice President & GM, BU), Kevin Ilcisin (Senior Vice President, Corporate Strategy), and Thomas Benjamin (Executive Vice President, Chief Technology Officer & Head of Product Analytics).

The Chairman called the meeting to order and announced that a quorum was present.

### Executive Session

The meeting began with the Board meeting in executive session with Mr. Dixon in attendance.

Following the executive session, Ms. Rapp, Mr. Percival and Ms. Donahue joined the meeting. Mr. McGrath reviewed the meeting agenda and protocols for the meeting, and Mr. Percival recorded the minutes.

### Approval of Minutes (Agenda Item 2.1)

The minutes of the Board Meeting and Retreat held October 19 – 20, 2021 were reviewed and unanimously approved.

### Committee Chair Reports (Agenda Item 2.2)

#### Audit Committee

Ms. Delly, Audit Committee Chair, reported on the matters discussed and/or actions taken at the Audit Committee meeting held on January 18, 2022, including the following: the 10-K Filing Schedule; approval of the Ernst & Young ("EY") services since the October Audit Committee meeting; 2021 Audit Committee self-assessment & EY assessment results; a Nash compliance update; Hotline Report and Potential Conflicts of Interest Report; Internal Audit 2021 update and 2022 Plan; the EY update and pre-approval of certain proposed services and fees; 2021 Section 16

NI Confidential                          Page **1** of **17**

PRE-READ

insider trading compliance; EEOC Activity Report; Enterprise Risk Management update on product security; Enterprise Risk Management update on IT security, and; capital allocation strategy. Ms. Delly then reported that separate executive sessions were held with representatives of EY and Ms. Rapp.

### Compensation Committee

Ms. Le, Compensation Committee Chair, reported on the matters discussed and/or actions taken at the Compensation Committee meeting held on January 18, 2022, including the following: review and approval of the 2021 Executive Incentive Program ("EIP") bonus payout amounts for the Executive Officers (excluding the CEO); recommendation that the independent members of the Board approve the 2021 EIP bonus payout amount for Mr. Starkloff; review of the proposed payouts for the 2021 Annual Incentive Plan ("AIP") bonus amount for employees; review of the Total Rewards Philosophy and 2022 EIP Design Principles; review and approval of the 2019 PRSU vesting; review of the 2020 and 2021 PRSU update on TSR position; review of Compensia's 2022 Executive Officer Compensation Assessment and ISS Say-On-Pay Simulation; approval of the $65 million - 2022 RSU Pool for discretionary equity grants; approval of the 2022 compensation for executive officers (excluding the CEO); approval of the ESPP share increase; approval of the new trustee appointment for Israel Equity Incentive Plan and ESPP subplan; approval of adding NH Research LLC (US) to the ESPP, and; recommendation that the independent members of the Board approve CEO compensation for 2022.

### Budget Increase For Additional Bonus Payout (Agenda Item 2.10 – matter intentionally taken up out of order)

Following discussion, on a motion duly made and seconded, the members of the Board approved a motion to increase the 2021 budget from $797 million to $824 million (an increase of $27 million) to fund additional employee bonus payouts of $27 million.

### 2021 CEO Executive Incentive Program ("EIP") Payout (Agenda Item 2.5 – matter intentionally taken up out of order)

The independent members of the Board discussed the recommendations of the Compensation Committee regarding the proposed final 2021 EIP payout amounts for Mr. Starkloff as Chief Executive Officer based on the specific 2021 EIP goal achievements. Following discussion, upon a motion duly made and seconded, the independent members of the Board unanimously adopted the resolutions set forth in **Exhibit A**.

### 2022 CEO Compensation (Base Pay, EIP Target Bonus Percentage and RSU/PRSU Grants) (Agenda Item 2.6 – matter intentionally taken up out of order)

The independent members of the Board discussed the recommendations of the Compensation Committee concerning the 2022 compensation arrangements for Mr. Starkloff, including the annual base salary, EIP incentive bonus percentage, and RSU and PRSU grants.

Following discussion, on a motion duly made and seconded, the independent members of the Board approved the resolutions set forth in **Exhibit B**.

CONFIDENTIAL                                                    NAT-SL-00000049

### ESPP Share Increase (Agenda Item 2.8 – matter intentionally taken up out of order)

The Board considered the Compensation Committee's recommendation to approve an increase in the number of shares reserved for issuance under the Company's 1994 Employee Stock Purchase Plan (the "ESPP") by 3,000,000 shares. Following discussion, upon a motion duly made and seconded, the Board adopted the resolutions set forth in **Exhibit C**.

### Nomination and Governance Committee

Mr. Cashman, Nomination and Governance Committee Chair, reported on the matters discussed and/or actions taken at the Nomination and Governance Committee meeting held on January 18, 2022, including the following: approval of the independence and committee qualifications of each non-employee director for recommendation to the Board, and; discussion of the Board Skills Matrix Survey Results as well as the Board Self-Evaluation Survey, Board Chair Survey and Nomination & Governance Committee Self-Evaluation Survey results.

### Director and Committee Independence/Audit Independence/Audit Committee Financial Expert Designation (Agenda Item 2.7 – matter intentionally taken up out of order)

The Board discussed the information included in the Board materials regarding the independence of its members, the independence of the Audit Committee, Compensation Committee and Nomination and Governance Committee members, and member qualifications to be an "audit committee financial expert" under applicable SEC and Nasdaq rules. Following this discussion, upon a motion duly made and seconded, the Board adopted the resolutions set forth in **Exhibit D** with each Board member abstaining from the vote related to themselves.

### 2022, 2023 and 2024 Board Calendars (Agenda Item 2.3)

The Board reviewed the 2022, 2023 and 2024 Board Calendars. Following discussion, upon a motion duly made and seconded, the Board approved the changes to the 2022 and 2023 Board Calendars and approved the new 2024 Board Calendar as presented.

### Slate of Executive (Section 16) and Non-Executive Officers (Agenda Item 2.4)

The Board considered the resolutions related to the election and ratification of officers of the Company (including the designation of executive officers for purposes of Section 16 of the Securities Exchange Act of 1934). Following discussion, upon a motion duly made and seconded, the Board unanimously adopted the resolutions set forth in **Exhibit E**.

### Board Self-Evaluation and Board Survey Chair Results (Agenda Item 2.9)

Mr. McGrath led a discussion among the directors regarding the Board Self-Evaluation and Board Chair Survey results.

CONFIDENTIAL                                                          NAT-SL-00000050

PRE-READ

### Q4 and 2021 Business Update (Agenda Item 3)

Ms. Favre, Mr. Green, Mr. Mueller, Ms. Roggenbuck and Mr. Schreier joined the meeting at this time.

Mr. Green provided a report on company-wide Q4 and 2021 financial results, including revenue and bookings. Mr. Green then discussed the Q4 performance and bookings growth by region, business unit and customer tier.

Ms. Rapp provided additional input regarding the Q4 and 2021 financial results including an update on the Q4 backlog growth and a discussion of revenue verses bookings. Ms. Rapp then provided an industry, global economic and competitor update.

### Q4 2021 Business Unit Report

Ms. Favre, Ms. Roggenbuck, Mr. Schreier and Mr. Mueller presented Q4 BU reports for the business units. The reports included information regarding Q4 performance, a 2021 summary, 2022 outlook, and updates on the markets, industries, strategy, implementation, top accounts, key areas of investment and key wins.

### Q1 2022 Outlook

Mr. Green provided sales insight as it related to Q1 2022, including preliminary bookings forecast by region, and data points for guidance considerations.

During the foregoing presentations, the members of the Board discussed such matters and the members of management responded to questions.

Ms. Favre, Mr. Green, Mr. Mueller, Ms. Roggenbuck and Mr. Schreier left the meeting.

### 2022 Budget Approval (Agenda Item 4)

Mr. Starkloff and Ms. Rapp presented on the proposed FY2022 operating expense budget. Ms. Rapp discussed the 2022 financial budget expectations, including the approach for the 2022 budget, bookings and revenue assumptions (with budget and target), 2022 Plan (with budget and target), operating expenses by function, AIP scenarios, operating-expense bridge from non-GAAP to GAAP, investment in people included in the budget, preliminary revenue growth by industry and preliminary quarterly profile.

Following discussion, upon a motion duly made and seconded, the Board unanimously approved a FY2022 operating expense budget of $921 million on a revenue budget of $1,766 million.

### Portfolio Deep Dive (Agenda Item 5)

Mr. Mueller rejoined the meeting.

NI Confidential                              Page **4** of **17**

PRE-READ

Mr. Mueller provided a deep dive on the Portfolio BU initiatives, including discussion of the Portfolio business unit's financials, mission, growth opportunities, customer mix, new organizational structure, key application segments, strategy, mass market offerings, simplified systems selling (across digital, distribution and direct), focus on software and test-flow subscription bundles, shift to subscriptions verses licenses and streamlining the customer experience at ni.com, high growth vertical strategy and examples.

During the foregoing presentation, the members of the Board discussed such matters and Mr. Mueller responded to questions.

## M&A and Integration Update (Agenda Item 6)

Mr. Ilcisin and Mr. Benjamin joined the meeting at this time.

Mr. Ilcisin outlined the Company's review of several capital deployment options in the M&A space, including: █████████████████████ Mr. Ilcisin, next presented possible courses of action, given the current market, after which the Board discussed its desire to continue to focus on in-organic growth even with the current purchase-price multiples being historically high.

Mr. Benjamin gave a review of key project updates, beginning with █████ Mr. Benjamin noted thoughts on the reason for bookings misses, with a focus on an understanding of root causes and corrective actions.

Mr. Ilcisin provided an update on ██████████ touching on supply chain issues, and the pending Heinzinger acquisition that is scheduled to close late in Q1 2022. Mr. Ilcisin then reviewed the Corporate Development 2021 activities and pipeline of targets, noting that deal-flow was becoming a gating-item so the team is exploring strategies to increase deal flow and obtain earlier insight into potential targets.

During the foregoing presentation, the members of the Board discussed such matters and the members of management responded to questions.

Mr. Ilcisin and Mr. Benjamin left the meeting at this time.

## Capital Allocation Strategy, Dividend Resolution and Stock Buy-Back Resolutions (Agenda Item 7)

Mr. Starkloff discussed his desire to maintain the current M&A strategy, stock-repurchases and dividends as priorities but shift the mix over time. Mr. Starkloff and Ms. Rapp reviewed the strategy and future key external messaging. Ms. Rapp noted that the Company's balance sheet was strong and that with the cash on hand and the Company's line of credit, the Company was clearly able to continue to meet its capital allocation priorities.

Ms. Rapp presented financial information pertaining to a cash dividend. Mr. Starkloff and Ms. Rapp recommended a cash dividend of $0.28 per share. Following discussion, upon a motion duly made and seconded, the Board unanimously adopted the resolutions set forth in **Exhibit F**.

CONFIDENTIAL                                            NAT-SL-00000052

Ms. Rapp then discussed management's request for approval of a $250 million stock repurchase program, including the reasons why stock-repurchases are in the company's and shareholder's best interest. Mr. Starkloff and Ms. Rapp recommended that the Board approve a $250 million stock repurchase program. Following discussion, upon a motion duly made and seconded, the Board unanimously adopted the resolutions set forth in **Exhibit G**.

During the foregoing presentations, the members of the Board discussed such matters and the members of management responded to questions.

**Independent Director Executive Session**

The independent members of the Board met in executive session.

**Adjournment**

There being no further business, the meeting was adjourned at approximately 3:00 p.m.

Signed:

_____

Albert Percival
Assistant Secretary

CONFIDENTIAL                    NAT-SL-00000053

PRE-READ

## EXHIBIT G

**National Instruments Corporation ("Company")**
**Board of Directors ("Board")**
**Resolutions to Approve New Stock Repurchase Program**
**January 19, 2022**

**WHEREAS**, the Company has an existing stock repurchase plan that authorizes the Company to repurchase shares of the Company's common stock (the "Common Stock") from time to time up to a maximum number of shares of 3,794,324 shares (the "Existing Repurchase Program");

**WHEREAS**, 270,445 shares remain available for repurchase under the Existing Repurchase Program;

**WHEREAS**, it has been proposed that the Company put in place a new repurchase program, in addition to the Existing Repurchase Program, that will permit the Company to repurchase, from time to time in the open market or through privately negotiated transactions, shares of the Common Stock in an amount not to exceed $250,000,000 (the "New Repurchase Program");

**WHEREAS**, the Board believes that it would be in the best interests of the Company and the stockholders for the Company to repurchase additional shares of the Common Stock in the open market for the following reasons among others:

1. Partially offsetting dilution to stockholders resulting from issuance of Common Stock under the Company's equity incentive plans;

2. Increasing earnings per share; and

3. Utilizing the Company's cash flow from operations.

**WHEREAS,** the Company has sufficient cash available to effect repurchases without significantly weakening the Company's financial position; and

**WHEREAS**, the Board believes that repurchase by the Company of shares of the Common Stock (whether pursuant to the Existing Repurchase Program or the New Repurchase Program) will continue to provide a realistic opportunity to increase shareholder value;

**NOW, THEREFORE, BE IT RESOLVED**, that the Company is authorized and empowered to repurchase, from time to time in the open market or through privately negotiated transactions, shares of the Common Stock in an amount not to exceed $250,000,000 pursuant to the New Repurchase Program;

CONFIDENTIAL                                                    NAT-SL-00000062

PRE-READ

**RESOLVED FURTHER**, the New Repurchase Program shall serve as a new plan, in addition to the Existing Repurchase Plan, which shall continue to be available for future stock repurchases;

**RESOLVED FURTHER**, that each of the President and Chief Executive Officer and the Chief Financial Officer of the Company, together with such other officers of the Company as may be designated by the President and Chief Executive Officer or the Chief Financial Officer of the Company (each, an "Authorized Officer") be, and hereby are, severally authorized, empowered and directed to expend up to an additional $250,000,000 in cash to effect the New Repurchase Program at such per share valuations and in such manner as approved by any Authorized Officer, including, without limitation, through open market purchases (including purchases pursuant to a plan adopted pursuant to Rule 10b5-1 of the Securities Exchange Act of 1934 (the "Exchange Act") or in reliance on Rule 10b-18 promulgated under the Exchange Act), and other privately negotiated transactions or other market participants, which approval shall be conclusively evidenced by the purchase by the Company of the Common Stock at the direction of any Authorized Officer;

**RESOLVED**, that, subject to the limitations set forth herein, the Authorized Officers of the Company be, and hereby are, severally authorized, empowered and directed to otherwise determine and approve the quantity, timing, price and other terms of the New Repurchase Program;

**RESOLVED**, that the Authorized Officers of the Company be, and hereby are, severally authorized, empowered and directed to determine and approve the engagement of one or more investment bankers to act as agent for the Company in connection with the New Repurchase Program;

**RESOLVED**, that the Authorized Officers of the Company be, and hereby are, severally authorized, empowered and directed, for and on behalf of the Company, to execute and deliver any certificates or other documents that may be required by any of them and to do any other lawful acts and things and to enter into and execute any documents or instruments that in the opinion of those officers are necessary or desirable in connection with the carrying out by the Company of the New Repurchase Program and the transactions contemplated thereby, including, without limitation, paying all such fees, costs and expenses, in the name and on behalf of the Company, and where necessary or appropriate, filing with the appropriate governmental authorities all such further certificates, instruments or other documents as in the judgment of any Authorized Officer shall be necessary or advisable in order to effect the intent and purposes of the Repurchase Program and these resolution;

**RESOLVED**, that should the consummation of the transactions authorized in the foregoing resolutions require additional or more specific authorization of actions to consummate the transactions contemplated herein, including, without limitation, the execution and delivery of any and all agreements, instruments, documents or filings, such additional or specific authorizations are hereby deemed to be included herein as of the date hereof;

CONFIDENTIAL                                                                            NAT-SL-00000063

**RESOLVED**, that the execution by any Authorized Officer of any of the agreements, documents and instruments authorized in the foregoing resolutions, and the taking by any such Authorized Officer of any lawful acts in any way relating to the transactions contemplated by the foregoing resolutions, shall be conclusive (but not exclusive) evidence of the approval thereof by the Board, and the authority of such officer to execute and deliver and take the same in the name and on behalf of the Company; and

**RESOLVED**, that the authorization of transactions set forth in the foregoing transactions shall continue in effect until terminated by resolution of the Board.

CONFIDENTIAL

NAT-SL-00000064

# EXHIBIT B

Message

| | |
|---|---|
| **From:** | Albert Percival [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5E6DDFD6BD284F6B8061385D353ECB94-APERCIVA] |
| **Sent:** | 6/8/2022 7:15:48 PM |
| **To:** | Eddie Dixon [eddie.dixon@ni.com] |
| **Subject:** | RE: Priv, Wolverine - Hypothetical Scenario Response Letter |

Well, WLRK is the guru here.  I stand corrected.

Without the first paragraph it certainly gets the message across that we are not interested in engaging :)



**Albert Percival**

Legal Senior Director of Corporate

albert.percival@ni.com

O+1 512.297.5855| ni.com

National Instruments
is now NI.

CONFIDENTIALITY NOTICE:
The information contained in this email and any attached documents may be confidential or legally privileged. If you are not the intended recipient of this message, you may not review, use, disclose, distribute, print, copy or disseminate this communication or any attached documents. If you have received this in error, please reply and notify the sender (only) and destroy all copies of the original message and any attached documents. Unauthorized interception of this e-mail is a violation of federal criminal law.

**From:** Eddie Dixon <eddie.dixon@ni.com>
**Sent:** Wednesday, June 8, 2022 2:13 PM
**To:** Albert Percival <albert.percival@ni.com>
**Subject:** Re: Priv, Wolverine - Hypothetical Scenario Response Letter

The direct message is what Sabastian was recommending. To avoid any indication we are interested in engaging if that is the decision of the board. I can explain why the second bracketed sentences were probably added later. Tied up now.

Get Outlook for iOS

**From:** Albert Percival <albert.percival@ni.com>
**Sent:** Wednesday, June 8, 2022 2:09:22 PM
**To:** Eddie Dixon <eddie.dixon@ni.com>
**Subject:** RE: Priv, Wolverine - Hypothetical Scenario Response Letter

I think he will say you need some version of the second paragraph to point to the "why" we reached that conclusion.

IMO with out PP2 the letter would come off as a little curt and we would not want that in a litigation setting.



**Albert Percival**
Legal Senior Director of Corporate
albert.percival@ni.com

O+1 512.297.5855 | ni.com

National Instruments
is now NI.

CONFIDENTIALITY NOTICE:
The information contained in this email and any attached documents may be confidential or legally privileged. If you are not the intended recipient of this message, you may not review, use, disclose, distribute, print, copy or disseminate this communication or any attached documents. If you have received this in error, please reply and notify the sender (only) and destroy all copies of the original message and any attached documents. Unauthorized interception of this e-mail is a violation of federal criminal law.

---

**From:** Eddie Dixon <eddie.dixon@ni.com>
**Sent:** Wednesday, June 8, 2022 10:35 AM
**To:** Niles, Sabastian V. <SVNiles@wlrk.com>; Eric Starkloff <eric.starkloff@ni.com>; Karen Rapp <karen.rapp@ni.com>; Kevin Ilcisin <kevin.ilcisin@ni.com>; Albert Percival <albert.percival@ni.com>
**Cc:** Emmerich, Adam O. <aoemmerich@WLRK.com>; Jin, Kwon-Yong <KJin@wlrk.com>; Dimitrijevic, Anna <ADimitrijevic@wlrk.com>
**Subject:** RE: Priv, Wolverine - Hypothetical Scenario Response Letter

Thanks, Sabastian. I like the short and direct response. I'm not sure I would include any of the second paragraph. But, if we want to expand a bit, perhaps we add a portion of the second paragraph (slightly tweaked) to the end of the first paragraph:

"Our focus is on our value creation strategies and the industry inflections that are expected to drive growth for NI [ahead of the test and measurement market]."

Just my two cents and we can discuss more as noted.

Eddie



**R. Eddie Dixon, Jr.**
Chief Legal Officer &
Senior Vice President
+15126836814 | ni.com

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

NAT-SL-00019516

**From:** Niles, Sabastian V. <SVNiles@wlrk.com>
**Sent:** Wednesday, June 8, 2022 9:24 AM
**To:** Eric Starkloff <eric.starkloff@ni.com>; Karen Rapp <karen.rapp@ni.com>; Eddie Dixon <eddie.dixon@ni.com>; Kevin Ilcisin <kevin.ilcisin@ni.com>; Albert Percival <albert.percival@ni.com>
**Cc:** Emmerich, Adam O. <aoemmerich@WLRK.com>; Jin, Kwon-Yong <KJin@wlrk.com>; Dimitrijevic, Anna <ADimitrijevic@wlrk.com>; Niles, Sabastian V. <SVNiles@wlrk.com>
**Subject:** [EXTERNAL] Priv, Wolverine - Hypothetical Scenario Response Letter

For scenario planning and preparedness purposes, attached is a hypothetical draft response letter to Eagle in the event the Board makes a determination that is consistent with the attached.

**Sabastian V. Niles**
**Wachtell, Lipton, Rosen & Katz**
51 West 52nd Street | New York, NY 10019
+1 (212) 403-1366 (Direct) | +1 (212) 403-2366 (Fax)
SVNiles@wlrk.com | www.wlrk.com


==================================================
Please be advised that this transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, please do not read, copy or re-transmit this communication. If you have received this communication in error, please notify us by e-mail (helpdesk@wlrk.com) or by telephone (call us collect at 212-403-4357) and delete this message and any attachments.

Thank you in advance for your cooperation and assistance.
==================================================

INTERNAL - NI CONFIDENTIAL

INTERNAL - NI CONFIDENTIAL

INTERNAL - NI CONFIDENTIAL

CONFIDENTIAL                                    NAT-SL-00019517

# EXHIBIT C

Privileged & Confidential

**National Instruments Corporation**
**Minutes of a Meeting of the Board of Directors**
**July 19-20, 2022**

A meeting of the Board of Directors (the **"Board"**) of National Instruments Corporation (the "**Company**" or "**NI**") was held on July 19th and 20th, 2022, beginning on July 19th at approximately at 4:00 p.m.

Directors present at the meeting were: Michael E. McGrath (Chair), Eric H. Starkloff (also, President and Chief Executive Officer), James E. Cashman, III, Alex M. Davern, Gayla J. Delly, Gerhard P. Fettweis, Liam K. Griffin, and Duy-Loan T. Le. No directors were absent.

Also, in attendance for all or a part of the meeting were: Karen Rapp (Executive Vice President and Chief Financial Officer), R. Eddie Dixon, Jr. (Chief Legal Officer, Senior Vice President and Secretary), Albert Percival (Legal Senior Director and Assistant Secretary), Deborah Donahue (Principal Paralegal), Jason Green (Chief Revenue Officer and Executive Vice President, Portfolio BU), Ritu Favre (Executive Vice President & GM, Business Units), Josh Mueller (Senior Vice President, Marketing & GM, PBU), Drita Roggenbuck (Senior Vice President & GM, TBU), Rob Porterfield, (Senior Vice President, Manufacturing), Scott Rust, (Executive Vice President, Platform & Technology), Kevin Schultz (Senior Vice President, Product Research & Development) and Sabastian Niles (Partner, Wachtell, Lipton, Rosen & Katz).

Mr. McGrath reviewed the meeting agenda and Mr. Percival recorded the minutes.

**Working Meeting**

All Board members and Mr. Dixon were present for the working meeting. Mr. McGrath opened the session with a discussion regarding the purpose of the working session. Mr. Starkloff then led a brief discussion regarding succession planning for his leadership team which will be addressed in more detail at the September Board Retreat.

Mr. McGrath and Mr. Starkloff then facilitated a discussion regarding various financial operating models including revenue and operating expense projections for the Company. There was extensive discussion concerning expected results under a number of such models and projections.

Mr. Starkloff led a discussion regarding Wolverine's response to the Company's rejection of Wolverine's proposal, which such response had been previously circulated to the Board. It was noted that the letter from Wolverine did not present an increased offer and the letter proposed the same pricing and terms as had been previously reviewed and rejected, unanimously, by the Board. Mr. Starkloff noted that the matter was scheduled for further discussion with outside counsel present tomorrow.

During the foregoing presentation, members and Mr. Niles responded to questions from the members of the Board.

At 8:45 p.m. on July 19, 2022, the meeting was adjourned until 8:30 a.m. on July 20, 2022.

Minutes 1 of 53

Privileged & Confidential

## General Session

The meeting was reconvened on July 20, 2022 at 8:30 a.m. All Board members were present. Also, in attendance: Ms. Rapp, Mr. Dixon, Mr. Percival, and Ms. Donahue.

## Approval of Minutes (Agenda Item 1.1)

The minutes of the Board Meeting held on April 19, 2022 and the minutes of the Annual Stockholder Meeting held on May 10, 2022 were reviewed and unanimously approved.

## Committee Chair Reports (Agenda Item 1.2)

### Audit Committee

Ms. Delly, Audit Committee Chair, reported on the matters discussed and/or actions taken at the Audit Committee meeting held on July 19, 2022, including the following: the 10-Q Filing Schedule; Hotline Reports and Conflict of Interest Reports; approval and recommendation that the Board members adopt revisions to the Code of Ethics and underlying policies; enterprise risk management update; Q2 financial results update; Internal Audit update; EY update, including approval of services requiring pre-approval. Ms. Delly then reported that separate executive sessions were held with representatives of EY and Ms. Rapp.

### *Code of Ethics and Underlying Policies (Agenda Item 1.3 - taken up out of order)*

Following discussion, upon a motion duly made and seconded, the Board unanimously adopted the related resolutions set forth in **Exhibit A**.

### Compensation Committee

Ms. Le, Compensation Committee Chair, reported on the matters discussed and/or actions taken at the Compensation Committee meeting held on July 19, 2022, including the following: review and approval of the NI peer companies listed below with the removal of ▮▮▮▮▮▮▮▮▮▮

**Redacted - NSBI**

Ms. Le also reported on the Compensations Committee's review of compensation trends; review of Future LTI program design principles; and review and approval of ESPP implementation for Heinzinger Automotive GmbH.

Minutes 2 of 53

NAT-SL-00001458

Privileged & Confidential

**Nomination and Governance Committee**

Mr. Cashman, Nomination and Governance Committee Chair, reported on the matters discussed and/or actions taken at the Nomination and Governance Committee meeting held on July 19, 2022, including the following: review of the Corporate Impact Report; review and approval of peer group companies for director compensation; and discussion of broad issues concerning the board of directors.

**Banking Accounts Authorized Persons (Agenda Item 1.4)**

Following discussion, upon a motion duly made and seconded, the Board unanimously adopted the related resolutions set forth in **Exhibit B**.

**Director and Officer Exclusion (Agenda Item 1.5)**

Following discussion, upon a motion duly made and seconded, the Board unanimously adopted the related resolutions set forth in **Exhibit C**.

**Q2 Results and Business Updates (Agenda Item 2)**

Mr. Green, Ms. Favre, Mr. Mueller and Ms. Roggenbuck joined the meeting.

Mr. Green provided an executive summary of the Q2 financial results. Mr. Green discussed overall bookings growth, as well as bookings growth by region, industry and customer tier. Mr. Green stated that macroeconomic and geo-political events continue to drive global supply chain constraints.

Ms. Rapp reviewed: the Q2 bookings to revenue bridge; Q2 revenue & EPS; Q3 P&L, revenue and EPS; Q2 GAAP revenue bridge; Q2 non-GAAP gross-margin bridge; preliminary Q2 non-GAAP to GAAP comparison; and preliminary Q2 and first half 2022 results, which included several positive new company records.

During the foregoing presentation, management responded to questions from the members of the Board.

**BU Results and H2/2023 Bookings Outlook (Agenda Item 3)**

Ms. Favre, Ms. Roggenbuck and Mr. Mueller presented BU reports for the ADG, SEBU TBU and Portfolio business units. The reports included information regarding Q2 bookings and revenue, focus areas, Q3 outlook, market update, industry outlook, and 18-month forecast.

During the foregoing presentation, management responded to questions from the members of the Board.

Ms. Favre, Mr. Mueller and Ms. Roggenbuck left the meeting.

Minutes 3 of 53

CONFIDENTIAL                                                                      NAT-SL-00001459

Privileged & Confidential

**Supply Chain Update and Impact on 2022 and 2023 P&L** (Agenda Item 4)

Mr. Porterfield, Mr. Rust and Mr. Schultz joined the meeting.

Mr. Porterfield led a presentation on the Company's supply chain, including: elements of historical Company strategy which have had implications for current supply chain challenges; current conditions at NI; mitigation actions; the impact of broker purchases; H2 revenue considerations; and a supply chain transformation.

During the foregoing presentation, management responded to questions from the members of the Board.

Mr. Rust, Mr. Porterfield and Mr. Schulz left the meeting.

Ms. Rapp reviewed the: 2022 double-digit bookings forecast; non-GAAP P&L forecast with bookings and backlog; 2022 revenue forecast; 2022 gross margin forecast; and expense control actions taken in 2022, including headcount and operating efficiencies. Ms. Rapp also discussed the long term Plan of Record; the 2022 current forecast verses the plan of record with various scenarios; non-GAAP operating expense and head count plan of record; Q3 preliminary budget forecast; Q3 data points for guidance; a summary of the capital strategy, including discussion of investment impacts on liquidity, quarterly cash projections for 2022, and a capital strategy recommendation to add a $500 million Term Loan A to the current $500 million Revolving Credit Facility.

Following discussion, upon a motion duly made and seconded, the Board unanimously adopted the resolutions set forth in **Exhibit D** related to the Credit Agreement.

Following discussion, upon a motion duly made and seconded, the Board unanimously adopted the resolutions set forth in **Exhibit E** related to the quarterly dividend.

During the foregoing presentation, management responded to questions from the members of the Board.

Mr. Green left the meeting.

Mr. Niles joined the meeting.

**Summary and Actions** (Agenda Item 6 - *taken up out of order*)

Mr. Starkloff led a continuation of the discussion related to Wolverine's response letter to the Company. Board members discussed various aspects of Wolverine's outreach, including Wolverine having simply reaffirmed their prior inadequate offer, the potential for Wolverine to change their offer and the degree of seriousness with which Wolverine would pursue the potential transaction, the potential for entry into an NDA and engaging in due diligence and negotiations with Wolverine, and various strategic and financial alternatives. The Board members reaffirmed their view that the Wolverine proposal is not in the best interests of the Company and its shareholders, does not reflect the value that is expected to be generated by the Company's businesses strategies, which continues to show positive momentum and that the timing was inopportune for such a proposal from the Company's perspective, including taking into account

Minutes 4 of 53

Privileged & Confidential

how supply chain constraints were impacting backlog and revenue conversion and the Company's plans for addressing such matters. The Board also concluded following discussion that the proposal from Wolverine did not merit engaging in discussions with or providing diligence materials to Wolverine. These conclusions also referenced and took into account the discussions and materials previously reviewed with the Board. The Board also discussed with management the potential steps the Company could take at the upcoming earnings call to highlight the Company's strong momentum, prospects, margin priorities and other financial and operating performance matters. Various elements of the Company's strategic plan, including potential acquisitions by the Company and their benefits, were also discussed. Representatives of WLRK provided perspectives, including as to legal matters.

Following discussion, upon a motion duly made and seconded, the Board unanimously voted to reaffirm their continued rejection of the Wolverine proposal and authorized Mr. McGrath, Mr. Starkloff and Mr. Dixon to determine the precise manner and content for communicating the reaffirmed rejection to Wolverine.

During the foregoing presentation, management and Mr. Niles responded to questions from the members of the Board.

Mr. Niles and Mr. Percival left the meeting.

**Key topics for Board Retreat (Agenda Item 5)**

Mr. Starkloff noted that the proposed agenda for the September 2022 Board Retreat was included in the Board materials and that the agenda would be finalized prior to the Board Retreat.

**Independent Director Session**

The independent members of the Board met in executive session.

**Adjournment**

There being no further business, the meeting was adjourned at approximately 3:00 p.m.

Signed:

*Albert Percival*
_____
Albert Percival
Assistant Secretary

Minutes 5 of 53

# EXHIBIT D

Message
_____

From:       Eddie Dixon [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
            (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=7B514D7306264DD7B03E998DBD732A06-EDIXON]
Sent:       8/4/2022 3:57:30 PM
To:         Karen Rapp [karen.rapp@ni.com]; Albert Percival [albert.percival@ni.com]
Subject:    Re: Buybacks


I think the question is when does the nuthatch engagement become stale so legitimate argument that we don't have MNPI  when the plan is put in place, but will let Albert confirm with WLRK.

Eddie

Get Outlook for iOS
_____

**From:** Karen Rapp <karen.rapp@ni.com>
**Sent:** Thursday, August 4, 2022 10:53:34 AM
**To:** Eddie Dixon <eddie.dixon@ni.com>; Albert Percival <albert.percival@ni.com>
**Subject:** RE: Buybacks

I was thinking maybe now is the time to put a plan in place since we sent the letter.  I know we have to wait 30 or 60 days from when it's implemented to start the repurchases so the sooner the better if possible.
_____

**From:** Eddie Dixon <eddie.dixon@ni.com>
**Sent:** Thursday, August 4, 2022 10:50 AM
**To:** Albert Percival <albert.percival@ni.com>; Karen Rapp <karen.rapp@ni.com>
**Cc:** Eddie Dixon <eddie.dixon@ni.com>
**Subject:** Re: Buybacks

FYI - the "reconfirmed" rejection was sent on Tuesday, so hopefully we can do something near the end of the open window if no further engagement by nuthatch. I believe that is what we discussed before, but as you noted, let's get WLRK's take in the timing.

Thanks, Albert.

Eddie

Get Outlook for iOS
_____

**From:** Albert Percival <albert.percival@ni.com>
**Sent:** Thursday, August 4, 2022 10:28:56 AM
**To:** Karen Rapp <karen.rapp@ni.com>; Eddie Dixon <eddie.dixon@ni.com>
**Subject:** RE: Buybacks

I'll need to discuss with WLRK.  We still have the Nuthatch letter "overhang" or perhaps  "hangover", so I believe we are in a gray area.



**Albert Percival**
Legal Senior Director of Corporate
albert.percival@ni.com
O+1 512.297.5855| ni.com

CONFIDENTIAL                                                                     NAT-SL-00015029

National Instruments
is now NI.

CONFIDENTIALITY NOTICE:
The information contained in this email and any attached documents may be confidential or legally privileged. If you are not the intended recipient of this message, you may not review, use, disclose, distribute, print, copy or disseminate this communication or any attached documents. If you have received this in error, please reply and notify the sender (only) and destroy all copies of the original message and any attached documents. Unauthorized interception of this e-mail is a violation of federal criminal law.

**From:** Karen Rapp <karen.rapp@ni.com>
**Sent:** Thursday, August 4, 2022 9:21 AM
**To:** Albert Percival <albert.percival@ni.com>; Eddie Dixon <eddie.dixon@ni.com>
**Subject:** Buybacks

Hi Albert,
Can you please let me know what we can do to put a plan in place for stock repurchases given the current situation.

Thanks,
Karen

**Karen Rapp**
Chief Financial Officer
Pronouns: She/Her/Hers
+15126839296  |  ni.com

INTERNAL - NI CONFIDENTIAL

INTERNAL - NI CONFIDENTIAL

INTERNAL - NI CONFIDENTIAL

INTERNAL - NI CONFIDENTIAL

                                                      NAT-SL-00015030

# EXHIBIT E

Message

| | |
|---|---|
| **From:** | Albert Percival [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5E6DDFD6BD284F6B8061385D353ECB94-APERCIVA] |
| **Sent:** | 8/4/2022 6:37:45 PM |
| **To:** | Sabastian Niles (svniles@wlrk.com) [svniles@wlrk.com]; Jin, Kwon-Yong [KJin@wlrk.com] |
| **CC:** | Eddie Dixon [eddie.dixon@ni.com] |
| **Subject:** | Stock Buy Back Program |

We need to discuss the possibility of NI implementing a 10b5-1 stock-buy-back program during this open trading window.

FYI, the window is still closed on those in the know about Nuthatch. Also, we sent the firm rejections letter to Nuthatch on Tuesday.

We need your advice concerning the possibility of our implementing a company 10b5-1 stock-buy-back program sometime this month before we close the window on other insiders September 1st.   Also we should consider if we should open the trading window for the Nuthatch restricted list before we implement a company program or if that matters.

Thanks,
Albert



**Albert Percival**
Legal Senior Director of Corporate
albert.percival@ni.com

O+1 512.297.5855| ni.com

National Instruments
is now NI.

CONFIDENTIALITY NOTICE:
The information contained in this email and any attached documents may be confidential or legally privileged. If you are not the intended recipient of this message, you may not review, use, disclose, distribute, print, copy or disseminate this communication or any attached documents. If you have received this in error, please reply and notify the sender (only) and destroy all copies of the original message and any attached documents. Unauthorized interception of this e-mail is a violation of federal criminal law.

CONFIDENTIAL                                                                                              NAT-SL-00016006

# EXHIBIT F

Appointment

| | |
|---|---|
| **From**: | Albert Percival [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=5e6ddfd6bd284f6b8061385d353ecb94-aperciva] |
| **Sent**: | 8/5/2022 12:51:43 AM |
| **To**: | Albert Percival [albert.percival@ni.com]; Sabastian V. Niles [svniles@wlrk.com]; Jin, Kwon-Yong [KJin@wlrk.com] |
| **CC**: | Eddie Dixon [eddie.dixon@ni.com]; Carlin, Wayne M. [WMCarlin@wlrk.com] |

| | |
|---|---|
| **Subject**: | NI Stock Trading Plan |
| **Location**: | Microsoft Teams Meeting |

| | |
|---|---|
| **Start**: | 8/5/2022 7:30:00 PM |
| **End**: | 8/5/2022 8:00:00 PM |
| **Show Time As**: | Busy |

| | |
|---|---|
| **Required Attendees**: | Albert Percival; Sabastian V. Niles; Jin, Kwon-Yong |
| **Optional Attendees**: | Eddie Dixon; Carlin, Wayne M. |

---

# Microsoft Teams meeting

## Join on your computer or mobile app
Click here to join the meeting

Meeting ID: 274 298 060 821
Passcode: tj894s
Download Teams | Join on the web

## Or call in (audio only)
+1 512-851-8323,,297434621#   United States, Austin
Phone Conference ID: 297 434 621#
Find a local number | Reset PIN

Learn More | Meeting options

---

CONFIDENTIAL

NAT-SL-00008685

# EXHIBIT G

Message

| | |
|---|---|
| **From:** | Niles, Sabastian V. [SVNiles@wlrk.com] |
| **Sent:** | 8/8/2022 6:33:49 AM |
| **To:** | Eric Starkloff [eric.starkloff@ni.com]; Eddie Dixon [eddie.dixon@ni.com]; Karen Rapp [karen.rapp@ni.com]; Kevin Ilcisin [kevin.ilcisin@ni.com]; Albert Percival [albert.percival@ni.com] |
| **CC:** | Emmerich, Adam O. [aoemmerich@WLRK.com]; Ma, Christina C. [CCMa@wlrk.com]; Jin, Kwon-Yong [KJin@wlrk.com]; Dimitrijevic, Anna [ADimitrijevic@wlrk.com]; Niles, Sabastian V. [SVNiles@wlrk.com] |
| **Subject:** | [EXTERNAL] Priv - Wolverine |

FYI re Wolverine moving forward with portfolio realignment (selling InSinkErator $3B to Whirlpool / 18.1x EBITDA). (Another reason why Lal may have been a bit busy past few days). Wolverine will release their earnings tomorrow (Tues) morning. Wolverine and Whirlpool press releases are below.

Sabastian V. Niles
Partner
Wachtell Lipton

### *Emerson to Sell InSinkErator Business to Whirlpool Corporation*

Mon, August 8, 2022 at 6:55 AM

ST. LOUIS, August 08, 2022--(BUSINESS WIRE)--Emerson (NYSE: EMR) today announced an agreement to sell its InSinkErator® business to Whirlpool Corporation (NYSE: WHR) for $3.0 billion. InSinkErator's trailing twelve-month revenue, as of March 31, 2022, was $595 million, pretax earnings were $148 million and EBITDA* was $166 million, representing a transaction value of 18.1x EBITDA. The sale of InSinkErator represents a meaningful step in Emerson's continued commitment to creating a higher growth, more diversified and cohesive portfolio.
InSinkErator, the world's largest manufacturer of food waste disposers and instant hot water dispensers for home and commercial use, was founded in 1938 and acquired by Emerson in 1968. Whirlpool Corporation, a leader in the home appliance industry, is well positioned to build on InSinkErator's strong legacy and performance for long-term growth and success. The transaction is expected to close in Emerson's 2023 fiscal year, subject to regulatory approvals and other customary closing conditions. Emerson will work closely with Whirlpool Corporation to help ensure a smooth transition for customers and InSinkErator's nearly 1,400 employees. Emerson engaged Goldman Sachs as its financial adviser and Davis Polk & Wardwell LLP as legal counsel for the transaction.

### *Whirlpool Corporation Announces Acquisition Of InSinkErator >WHR*

BENTON HARBOR, Mich., Aug. 8, 2022 /PRNewswire/ -- Whirlpool Corporation (NYSE: WHR) today announced that it has entered into a definitive agreement with Emerson Electric Co. (NYSE: EMR) to acquire InSinkErator, the world's largest manufacturer of food waste disposers and instant hot water dispensers for home and commercial use, in an all-cash transaction for $3.0 billion.

"We are excited for the unique opportunity to add InSinkErator to our portfolio of leading brands. The acquisition is a clear accelerator of our ongoing portfolio transformation and aligned with our stated goals of investing in high- growth and high-margin businesses and Win Americas, " said Marc Bitzer, Chairman and CEO of Whirlpool Corporation. " InSinkErator is not only an iconic brand with a reputation for the highest quality and performance, but also a business that is purpose-driven and shares our vision of improving life at home. We look forward to capitalizing on the significant growth opportunities we see for this business."

CONFIDENTIAL                                                                NAT-SL-00016260

Established in 1938, InSinkErator is the leader in the food waste disposal industry with a greater than 70% share and the industry's most recognized and trusted brand. On a full-year basis, ending September 30, 2022, InSinkErator is expected to generate sales of $650 million and EBITDA(1) in excess of $170 million. This represents a transaction value of 14x EBITDA multiple, including future tax benefits and synergies. Following the close of the transaction, InSinkErator is expected to operate as a separate business as part of Whirlpool's North America Region. InSinkErator will maintain its headquarters in Mount Pleasant, Wisconsin.

The acquisition is expected to be immediately accretive to Whirlpool Corporation's margins, adding approximately $1.25 EPS accretion in fiscal 2023. Whirlpool Corporation also expects to generate revenue upside by capitalizing on InSinkErator's leading consumer brand preference, an installed base that is fives times larger than the rest of the industry driving a recurring sales profile, the strong underlying secular tailwinds of the U.S. housing market, and the expansion of the InSinkErator brand into new markets and product offerings.

Whirlpool Corporation plans to initially fund the acquisition through available liquidity, with new debt put in place at a later date. The acquisition, which has been approved by the Board of Directors of both companies, is subject to customary closing conditions, including regulatory approvals, and is expected to close in the fourth quarter of 2022. Whirlpool's 2022 guidance remains unchanged.

Greenhill & Co. LLC served as financial advisor and Wachtell, Lipton, Rosen & Katz served as legal counsel to Whirlpool Corporation.

A conference call to discuss the announced transaction will be held today at 8:30 am EST, hosted by Whirlpool Corporation Chairman and CEO, Marc Bitzer and CFO, Jim Peters. The conference call will be webcast live on the Company's website at www.whirlpoolcorp.com and may be accessed by clicking on the "Investors" tab located at the top of the page. To listen to the live webcast, participants should visit the site at least 15 minutes prior to the conference call to download any required streaming media software. Key financial statistics, the transaction presentation, and an archived recording of the conference call will be available on the Company's website for at least 30 days.

(1) EBITDA is a non-GAAP financial measure. We do not attempt to provide a reconciliation of EBITDA for the InSinkErator business to the equivalent GAAP measure of net earnings for the InSinkErator business as certain elements of the estimated full-year EBITDA measure cannot be precisely calculated without unreasonable effort or expense and the significance of these elements are indeterminable at this time. Forecasting the timing or amount of items that have not yet occurred and are out of our control is inherently uncertain and unavailable without unreasonable effort or expense.

============================================================
Please be advised that this transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, please do not read, copy or re-transmit this communication. If you have received this communication in error, please notify us by e-mail (helpdesk@wlrk.com) or by telephone (call us collect at 212-403-4357) and delete this message and any attachments.

Thank you in advance for your cooperation and assistance.
============================================================

NAT-SL-00016261

# EXHIBIT H

Message
___

**From:**   Albert Percival [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5E6DDFD6BD284F6B8061385D353ECB94-APERCIVA]
**Sent:**   8/11/2022 10:21:19 PM
**To:**     Michael McGrath [michael.mcgrath@ni.com]; Eric Starkloff [eric.starkloff@ni.com]; Alex Davern
[alex.davern@ni.com]; Duy-Loan T. Le (duyloanle@gmail.com) [duyloanle@gmail.com]; gayla delly
[gjdelly@gmail.com]; Gerhard P. Fettweis (gerhard.fettweis@tu-dresden.de) [gerhard.fettweis@tu-dresden.de];
James (Jim) E. Cashman (jecashman3@gmail.com) [jecashman3@gmail.com]; Liam K Griffin
[liam.griffin@skyworksinc.com]
**CC:**     Eddie Dixon [eddie.dixon@ni.com]; Albert Percival [albert.percival@ni.com]
**Subject:** Project Wolverine Confidentiality and Trading Restriction is Now Lifted


Board Members,

You are receiving this email to inform you that the Project Wolverine trading restriction is lifted, effective
immediately.   As always, before trading in NATI stock you should still consider whether you are in possession of any
material-nonpublic information related to any other matter.

Thank you,
Albert Percival




**Albert Percival**
Legal Senior Director of Corporate
albert.percival@ni.com

O+1 512.297.5855| ni.com


National Instruments
is now NI.


CONFIDENTIALITY NOTICE:
The information contained in this email and any attached documents may be confidential or legally
privileged. If you are not the intended recipient of this message, you may not review, use, disclose,
distribute, print, copy or disseminate this communication or any attached documents. If you have
received this in error, please reply and notify the sender (only) and destroy all copies of the original
message and any attached documents. Unauthorized interception of this e-mail is a violation of
federal criminal law.

INTERNAL - NI CONFIDENTIAL

# EXHIBIT I

## 10b5-1 REPURCHASE PLAN AGREEMENT

August 11, 2022

National Instruments Corporation
11500 North MoPac Expressway
Austin, TX 78759

This letter agreement (this "Letter Agreement") confirms the terms and conditions under which National Instruments Corporation, a corporation organized under the laws of the state of Delaware (the "Purchaser"), hereby establishes a plan (the "Plan") to repurchase shares of its common stock, $0.01 par value (the "Securities"), and under which J.P. Morgan Securities LLC ("JPMS") will act as its exclusive agent to execute the Plan.

1.    Appointment of JPMS.  The Purchaser hereby appoints JPMS as its exclusive agent to purchase Securities pursuant to the Plan. It is the Purchaser's intention that such purchases benefit from the safe harbor provided by Rule 10b-18 ("Rule 10b-18") and the affirmative defense provided by Rule 10b5-1 ("Rule 10b5-1") each promulgated by the Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and that the Plan and the transactions contemplated hereby comply with the requirements of paragraph (c)(1)(i)(B) of Rule 10b5-1. Accordingly, the Purchaser hereby agrees that the terms of this Letter Agreement and the Plan shall be interpreted to comply with the requirements of such paragraph (c)(1)(i)(B) and that it shall not take, nor permit any person or entity under its control to take, any action that could jeopardize the availability of Rule 10b-18 for purchases of Securities under the Plan or result in such purchases not so complying with the requirements of such paragraph (c)(1)(i)(B). JPMS agrees that it shall use good faith efforts to execute all purchases of Securities under this Letter Agreement in accordance with the timing, price and volume restrictions contained in subparagraphs (2), (3) and (4) of paragraph (b) of Rule 10b-18, taking into account the rules and practices of the principal exchange on which the Securities are traded (the "Principal Market"), it being understood that JPMS shall not be responsible for delays between the execution and reporting of a trade in the Securities, any reporting errors of the Principal Market or third party reporting systems or other circumstances beyond JPMS's control.

2.    Term.

(a)    JPMS is authorized to commence purchasing Securities on September 12, 2022 (the "Start Date"), and this Letter Agreement and the Plan shall terminate upon the earliest of (the period from and including the Start Date to such termination, the "Plan Period"):

(i)      the close of business on December 31, 2022;
(ii)     the completion of all purchases contemplated by the Plan;
(iii)    subject to Section 12 below, the receipt by either party from the other of written notice of termination;
(iv)    the existence of any legal or regulatory restriction that would prohibit any purchase pursuant to the Plan;
(v)     the public announcement (as defined in Rule 165(f) under the Securities Act of 1933, as amended) of any merger, acquisition, or similar transaction relating to the Purchaser (other than any such transaction in which the Purchaser is the acquiring party and the consideration consists solely of cash and there is no valuation period);
(vi)    the commencement of any voluntary or involuntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Purchaser under any bankruptcy, insolvency or similar law or seeking the appointment of a trustee, receiver or other similar official with respect to the Purchaser, or the taking of any corporate action by the Purchaser to authorize or commence any of the foregoing; and
(vii)   the failure of the Purchaser to comply with Section 7 hereof.

CONFIDENTIAL                                                                      NAT-SL-00000765

(b)      If, as contemplated by paragraph (a)(iv) of this Section 2, at any time during the term of this Letter Agreement, any legal or regulatory restriction that is applicable to the Purchaser or the Purchaser's affiliates would prohibit any purchase pursuant to the Plan, the Purchaser shall give JPMS notice of such restriction as soon as practicable (such notice, a "Required Termination Notice"). Such notice shall not include any information about the nature of the restriction or its applicability to the Purchaser.

(c)      The Purchaser shall be solely responsible for any purchases made by JPMS as the Purchaser's agent prior to the termination of the Plan. In addition, if JPMS receives notice of termination (including any Required Termination Notice) or of any of the termination events listed above, JPMS shall nevertheless be entitled to make, and the Purchaser shall be solely responsible for, a purchase hereunder pursuant to a bid made before such notice was received by JPMS.

(d)      Sections 7, 10 and 11 of this Letter Agreement shall survive any termination hereof.

3.      <u>Purchases Outside Plan</u>. The Purchaser agrees that it shall not, and shall cause any "affiliated purchaser" (as defined in Rule 10b-18) of the Purchaser not to directly or indirectly (including in any similar purchase plan or any derivative transaction) purchase, offer to purchase or place any bid or limit order for the purchase of any Securities or any securities convertible or exchangeable into or exercisable for, or the value of which is derived from, the Securities during the Plan Period except under the Plan pursuant to this Letter Agreement or pursuant to the Rule 10b-18 Repurchase Agreement dated August 2, 2021 between the Purchaser and JPMS. If the Purchaser becomes aware that any affiliated purchaser of the Purchaser has taken any such action during the Plan Period, the Purchaser shall so notify JPMS as soon as practicable.

4.      <u>Purchasing Procedures</u>.
(a)      On each Trading Day during the Plan Period on which no Market Disruption Event (as defined below) occurs, JPMS shall use commercially reasonable efforts to purchase as agent for the Purchaser and for the account of the Purchaser the lesser of (i) the maximum number of Securities that the Purchaser could purchase on such Trading Day in accordance with the volume condition set forth in Rule 10b-18 and (ii) the number of Securities that JPMS is able, subject to market conditions and principles of best execution, to purchase as agent for the Purchaser and for the account of the Purchaser on such Trading Day using commercially reasonable means in accordance with the Plan guidelines set forth in Annex A hereto. JPMS may purchase Securities on the Principal Market, any national securities exchange, in the over-the-counter market, on an automated trading system or otherwise. Any numbers of Securities to be purchased (and any corresponding purchase price limits or ranges) set forth in Annex A shall be adjusted automatically on a proportionate basis to take into account any stock split, reverse stock split or stock dividend with respect to the Securities or any change in capitalization with respect to the Purchaser or any similar event that occurs during the term of this Letter Agreement, as determined by JPMS in good faith and a commercially reasonable manner.

A "Trading Day" is any day during the Plan Period that the Principal Market is open for business and the Securities trade regular way on the Principal Market.

"Market Disruption Event" means that (i) there occurs any material (as reasonably determined by JPMS) suspension of or limitation on trading by the Principal Market, (ii) there occurs any event that materially (as reasonably determined by JPMS) disrupts or impairs the ability of market participants in general to effect transactions in or obtain market values for the Securities or futures or options contracts on the Securities or (iii) the Principal Market closes prior to its scheduled closing time for such Trading Day.

(b)      In the event that JPMS, in its discretion, determines that it is appropriate with regard to any legal, regulatory or self-regulatory requirements or related internal policies and procedures (whether or not such requirements, policies or procedures are imposed by law or have been voluntarily adopted by JPMS) for JPMS to refrain from purchasing Securities or to purchase fewer than the number of Securities otherwise specified in the instructions provided by the Purchaser on any day, then JPMS may, in its sole discretion, elect that the number of Securities purchased shall be reduced for such day to an amount determined by JPMS in its discretion.

2

                                                                                NAT-SL-00000766

(c)     Any Securities purchased pursuant to the Plan shall be purchased under ordinary principles of best execution at the then-prevailing market price.  Subject to the terms of the Plan as set forth herein (including Annex A hereto), JPMS shall have full discretion with respect to the execution of all purchases, and the Purchaser acknowledges and agrees that the Purchaser does not have, and shall not attempt to exercise, any influence over how, when or whether purchases of Securities are affected pursuant to the Plan.  The Purchaser acknowledges and agrees that, in purchasing Securities pursuant to the Plan, JPMS will be an independent contractor and will not be acting as the Purchaser's trustee or fiduciary or in any similar capacity.

5.     <u>Payment for and Delivery of Purchased Securities</u>.  Payment for Securities purchased, together with any applicable fees, shall be made by the Purchaser within one standard settlement cycle after the purchase.  Purchased Securities will be held or delivered in accordance with instructions to be furnished by the Purchaser.

6.     <u>Compensation</u>.  For the services provided in this Letter Agreement, the Purchaser agrees to pay to JPMS a fee of $0.02 per share for the Securities purchased pursuant to the terms of this Letter Agreement.

7.     <u>Representations, Warranties and Agreements</u>.  The Purchaser represents and warrants to, and agrees with, JPMS as follows:

(a)     This Letter Agreement and the transactions contemplated herein have been duly authorized by the Purchaser; this Letter Agreement is the valid and binding agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms; performance of the transactions contemplated herein will not violate any law, rule, regulation, order, judgment or decree applicable to the Purchaser or conflict with or result in a breach of or constitute a default under any agreement or instrument to which the Purchaser is a party or by which it or any of its property is bound or its certificate of incorporation or by-laws; and no governmental, administrative or official consent, approval, authorization, notice or filing is required for performance of the transactions contemplated herein.

(b)     As of the date of this Letter Agreement, the Purchaser is not aware of any material nonpublic information concerning the Securities or the business, operations or prospects of the Purchaser.

(c)     The Purchaser is engaging JPMS and entering into this Letter Agreement and the Plan in good faith and not as part of a plan or scheme to evade compliance with the federal securities laws, including, without limitation, Rule 10b-5 under the Exchange Act.  Until this Letter Agreement is terminated, the Purchaser agrees not to enter into or alter any corresponding or hedging transaction or position with respect to the Securities.

(d)     The Purchaser is not entering into this Letter Agreement to create actual or apparent trading activity in the Securities (or any security convertible into or exchangeable for the Securities) or to raise or depress the price of the Securities (or any security convertible into or exchangeable for the Securities) for the purpose of inducing others to buy or sell Securities, and will not engage in any other securities or derivative transaction to such ends.

(e)     During the term of this Letter Agreement, neither the Purchaser nor its officers or employees shall, directly or indirectly, disclose to any person at JPMS effecting purchases under the Plan any material nonpublic information regarding the Purchaser or the Securities or any information regarding the Purchaser or the Securities that could reasonably be expected to influence the execution of the Plan.

(f)     The Purchaser acknowledges that JPMS is a "financial institution" and "financial participant" within the meaning of Sections 101(22) and 101(22A), respectively, of Title 11 of the United States Code (the "Bankruptcy Code").  The parties hereto further agree and acknowledge that each transaction under this Letter Agreement is intended to be a "securities contract" as defined in Section 741(7) of the Bankruptcy Code and each payment or delivery of cash, Securities or other property or assets hereunder is a "settlement payment" within the meaning of Section 741(8) of the Bankruptcy Code, and the parties

3

NAT-SL-00000767

hereto are to be entitled to the protections afforded by, among other Sections, Sections 362(b)(6), 362(b)(27), 362(o), 546(e), 546(j), 555 and 561 of the Bankruptcy Code.

(g)      Prior to 8:00 a.m., New York City time on the Start Date, the Purchaser shall provide to JPMS all information, other than publicly reported trading volumes, necessary for JPMS to calculate the maximum number of Securities that may be purchased as of the Start Date in accordance with the volume condition set forth in Rule 10b-18, and JPMS shall be entitled to rely on such information so provided.

(h)      Neither the Purchaser nor any of its affiliates or agents shall take any action that would cause Regulation M under the Exchange Act ("Regulation M") to be applicable to any purchases of Securities, or any security for which the Securities are a reference security (as defined in Regulation M), by the Purchaser or any of its affiliated purchasers (as defined in Regulation M) during the Plan Period.

(i)      The Purchaser shall be solely responsible for compliance with all statutes, rules and regulations applicable to the Purchaser and the transactions contemplated hereby, including, without limitation, reporting and filing requirements. The Purchaser acknowledges and agrees that it is not relying, and has not relied, upon JPMS or any affiliate of JPMS with respect to the legal, accounting, tax or other implications of the Plan and the transactions contemplated thereby and that it has conducted its own analyses of the legal, accounting, tax and other implications hereof.  JPMS has made no representation and has no obligation with respect to whether the Plan or the transactions contemplated thereunder qualify for the safe harbor provided by Rule 10b-18 or the affirmative defense provided by Rule 10b5-1.

8.      <u>Disclosure of Acquisition Program</u>.  The Purchaser represents and warrants that it has publicly disclosed its intention to institute a program for the acquisition of the Securities.

9.      <u>Other Purchases by JPMS</u>. Nothing herein shall preclude the purchase by JPMS of Securities for JPMS's own account, or the solicitation or execution of purchase or sale orders of Securities for the account of JPMS's clients.

10.     <u>Indemnification</u>.  The Purchaser shall indemnify JPMS, its affiliates and the respective directors, officers, agents and employees of JPMS and its affiliates (each, a "JPMS Person") against any third-party liabilities or expenses (including reasonable attorney's fees and disbursements), or third-party actions in respect of any liabilities or expenses, arising from the services furnished pursuant to this Letter Agreement including, but not limited to, third-party liabilities and expenses arising by reason of any violation or alleged violation of any state or federal securities laws, except to the extent such liabilities or expenses result from the gross negligence, willful misconduct or bad faith of JPMS in performing its services under this Letter Agreement. The Purchaser shall also promptly reimburse the JPMS Persons for all expenditures (including reasonable attorney's fees and disbursements) made to investigate, prepare or defend any action or claim in respect of any such liability or expense, regardless of whether any litigation is pending or threatened against such JPMS Persons.

11.     <u>Limitation of Liability</u>. No JPMS Person shall be liable in respect of any liabilities or expenses incurred by the Purchaser arising from or in connection with JPMS's role or services under this Letter Agreement, except to the extent any such liabilities or expenses result from the gross negligence, willful misconduct or bad faith of JPMS in performing its services under this Letter Agreement.

12.     <u>Amendment, Modification, Waiver or Termination</u>.  Any amendment, modification or waiver of this Letter Agreement or the Plan must be effected in accordance with the requirements for the amendment of a "plan" as defined in paragraph (c) of Rule 10b5-1.  Without limiting the generality of the foregoing, any amendment, modification, waiver or termination shall be made in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b-5 under the Exchange Act, and no such amendment or modification shall be made at any time at which the Purchaser is aware of any material nonpublic information concerning the Purchaser or the Securities.  The Purchaser acknowledges and agrees that any action taken by it that results in the termination of the Plan pursuant to Section 2 is subject to the principles set forth in this section.

4

                                                                                  NAT-SL-00000768

13. <u>Notices</u>. Any written communication shall be sent to the address specified below: and shall become effective upon receipt:

    (a)    if to JPMS, to it at

    J.P. Morgan Securities LLC
    383 Madison Avenue, 7th Floor
    New York, NY 10179
    Attention: Brett Chalmers
    Telephone: (212) 622 2252

or at such other address as may from time to time be designated by notice to the Purchaser in writing; and

    (b)    if to the Purchaser, to it at

    National Instruments Corporation
    11500 North MoPac Expressway
    Austin, TX 78759
    Attn: Ursula Conterno
    Telephone: 512-750-2566

or at such other address as may from time to time be designated by notice to JPMS in writing.

14. <u>Assignment</u>. Neither party may assign its rights and obligations under this Letter Agreement to any other party; *provided* that JPMS may assign its rights and obligations under this Letter Agreement to any subsidiary of J.P. Morgan Chase & Co.

15. <u>Governing Law</u>. This Letter Agreement and any claim, controversy or dispute arising under or related to this Letter Agreement shall be governed by and construed in accordance with the law of the State of New York. The parties hereto irrevocably submit to the exclusive jurisdiction of the federal and state courts located in the Borough of Manhattan, in the City of New York in any suit or proceeding arising out of or relating to this Letter Agreement or the transactions contemplated hereby. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS LETTER AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

CONFIDENTIAL                                     NAT-SL-00000769

If the foregoing correctly sets forth our agreement, please sign the form of acceptance below.

J.P. MORGAN SECURITIES LLC

By: _____
    Name:  Brett Chalmers
    Title:   Executive Director


Agreed to and accepted as of:

NATIONAL INSTRUMENTS CORPORATION

By: _____
Name: **Karen Rapp**
Title: **Executive Vice President and Chief Financial Officer**

CONFIDENTIAL

A-1

**ANNEX A**

**Plan Details**

On each Trading Day during the Plan Period on which no Market Disruption Event (as defined above) occurs, JPMS shall use commercially reasonable efforts to purchase as agent for the Purchaser and for the account of the Purchaser the lesser of (i) the maximum number of Securities that the Purchaser could purchase on such Trading Day in accordance with the volume condition set forth in Rule 10b-18 and (ii) the number of Securities that JPMS is able, subject to market conditions and principles of best execution, to purchase as agent for the Purchaser and for the account of the Purchaser on such Trading Day using commercially reasonable means in accordance with the Plan guidelines set forth below; Notwithstanding any of the parameters set forth below, JPMC will not spend more than $60,000,000 under this Plan, inclusive of commission.

| Price ($/shr) - Low | Price ($/shr) - High | Daily Purchase Amount ($ In Millions) |
|---|---|---|
| $45.00 | $-- | No Purchase |
| $43.00 | $44.99 | $1.0 |
| $40.00 | $42.99 | $4.0 |
| $37.00 | $39.99 | $6.0 |
| < $37/share | $37.00 | $8.00 |

A-1

CONFIDENTIAL

NAT-SL-00000771