UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

In re NATIONAL INSTRUMENTS            :          Civ. A. No. 1:23-cv-10488-DLC
CORPORATION SECURITIES LITIGATION     :

———————————————————————— x        CLASS ACTION


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. MATTHEW CAIN**

# **TABLE OF CONTENTS**

PAGE

Table of Authorities .................................................................................................................iii

Preliminary Statement.............................................................................................................. 1

Legal Standard .......................................................................................................................... 2

Argument ................................................................................................................................... 4

I.    Dr. Cain's Loss-Causation and Damages Opinions Do Not "Fit" Plaintiff's Theory of Liability Because They Ignore Half of the Equation of Insider Trading ...................... 4

II.   Dr. Cain's Testimony About Economic Materiality, an Economic Link, and Artificial Deflation Should be Excluded as Unreliable and Irrelevant to the Facts of This Case ...................................................................................................................... 6

    a.    Dr. Cain Fails to Specifically Identify the Information He Claims is Economically Material and Caused Artificial Deflation ........................................... 6

    b.    Even Dr. Cain's Vague, Admittedly Incomplete Descriptions of the "Alleged Omissions" or "Relevant Truth" Cherry-Pick from the Facts and Omit Pertinent Information ............................................................................................. 7

    c.    Dr. Cain's Event Study is Unreliable and Does Not "Fit" the Facts of this Case ........................................................................................................................ 8

        1.    Dr. Cain Fails to Adequately Identify "Corrective Disclosures," and Instead Relies on Public Disclosures of Information Not Available to NI During the Class Period ...................................................................... 10

        2.    Dr. Cain Fails to Disaggregate the Multiple, Confounding Facts Embedded in the January Disclosures ........................................................ 12

    d.    Dr. Cain Cherry-Picks from the Academic Literature and Relies on Sources that Do Not "Fit" the Facts in this Case................................................................... 16

    e.    Dr. Cain's Description of the Factual Narrative in this Case is Disconnected from Any "Expert" Analysis, "Cherry-Picks" from the Evidence, and is Unreliable........................................................................................................... 19

III.   Dr. Cain's Testimony Purporting to Quantify a Link Between the "Alleged Omissions" and NI's Stock Prices, and his Proposed "Methodology" for Calculating Damages, Should Be Excluded as Unreliable and Unhelpful to the Trier of Fact .......................................................................................................... 20

     a.   Dr. Cain Fails to Analyze the "Evidence" or Provide Any Explanation for How it Supports the $48.00 But-For Price .............................................. 21

     b.   Dr. Cain's Unreliable Event Study Does Not Calculate Artificial Deflation .................................................................................................. 24

     c.   Dr. Cain's Opinion 5 Simply Describes a Typical Out-of-Pocket Damages Methodology Using His $48 But-For Price ............................................. 25

Conclusion ............................................................................................................ 26

Certificate of Word Count ..................................................................................... 27

Certificate of Service ............................................................................................... 2

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)...............................................................................................Passim

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
  222 F. Supp. 2d 423 (S.D.N.Y. 2002) ....................................................................................... 8

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................................... 8

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
  752 F.3d 82 (1st Cir. 2014) ..................................................................................13, 14, 15-16

*Bustamante v. KIND, LLC*,
  100 F.4th 419 (2d Cir. 2024)...................................................................................................2-3

*Capri Sun GmbH v. Am. Beverage Corp.*,
  595 F. Supp. 3d 83 (S.D.N.Y. 2022) ......................................................................................... 3

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ..................................................................................................................... 4

*Daniels-Feasel v. Forest Pharmaceuticals, Inc.*,
  2021 WL 4037820 (S.D.N.Y. 2021) .......................................................................................... 8
  *aff'd* 2023 WL 4837521 (2d Cir. 2023)............................................................................... 8, 19

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ...........................................................................................................Passim

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ................................................................................................. 9

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ...................................................................................................... 3, 12, 24

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
  594 U.S. 113 (2021)............................................................................................................... 9, 12

*Gross v. GFI Grp., Inc.*,
  310 F. Supp. 3d 384 (S.D.N.Y. 2018)
  *aff'd* 784 F. App'x 27 (2d Cir. 2019).................................................................................14-15

iv

*Highland Cap. Mgmt., L.P. v. Schneider*,
 379 F. Supp. 2d 461 (S.D.N.Y. 2005) ...................................................................... 19

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
 707 F. Supp. 3d 309 (S.D.N.Y. 2023) ...................................................... 8, 16, 19, 20

*In re Exec. Telecard, Ltd. Sec. Litig.*,
 979 F. Supp. 1021 (S.D.N.Y. 1997) ........................................................ 14, 16, 21, 25

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
 252 F. Supp. 2d. 1005 (C.D. Cal. 2003) ................................................................... 25

*In re Mirena IUD Prods. Liab. Litig.*,
 169 F. Supp. 3d 396 (S.D.N.Y. 2016) ........................................................................ 4

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*
 341 F. Supp. 3d 213 (S.D.N.Y. 2018) ...................................................................... 16

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*
 982 F.3d 113 (2d Cir. 2020) ...................................................................................... 3

*In re Omnicom Grp., Inc. Sec. Litig.*,
 541 F. Supp. 2d 546 (S.D.N.Y. 2008)
 *aff'd*, 597 F.3d 501 (2d Cir. 2010) ......................................................................... 14

*In re Oracle Sec. Litig.*,
 829 F. Supp. 1176 (N.D. Cal. 1993) ........................................................................ 25

*In re Williams Sec. litigation-WCG Subclass*,
 558 F.3d 1130 (10th Cir. 2009) ............................................................................ 9, 12

*Lattanzio v. Deloitte & Touche LLP*,
 476 F.3d 147 (2d Cir. 2007) ...................................................................................... 9

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005) .................................................................................... 10

*Miller v. Asensio & Co.*,
 364 F.3d 223 (4th Cir. 2004) ................................................................................... 21

*R.F.M.A.S., Inc. v. So*,
 748 F. Supp. 2d 244 (S.D.N.Y. 2010) ........................................................................ 7

*Restivo v. Hessemann*,
 846 F.3d 547 (2d Cir. 2017) ................................................................................. 3, 24

v

Case 1:23-cv-10488-DLC   Document 115   Filed 12/22/25   Page 6 of 34

*SEC v. Lyon*,
  605 F. Supp. 2d 531 (S.D.N.Y. 2009) ......................................................................................... 10

*SEC v. Obus*,
  693 F.3d 276 (2d Cir. 2012) ...................................................................................................... 4, 5

## **Rules**

Federal Rule of Evidence 702 ............................................................................................... Passim

Defendants National Instruments Corporation ("NI"), Eric Starkloff, and Michael McGrath ("Defendants") respectfully submit this memorandum of law in support of their motion to exclude expert testimony of Dr. Matthew Cain pursuant to Federal Rule of Evidence 702.

**<u>PRELIMINARY STATEMENT</u>**

Plaintiff intends to introduce the testimony of Dr. Matthew Cain in support of its sole remaining theory of liability in this atypical securities-fraud action—an "insider trading" theory premised on stock repurchases by NI in August and September 2022 after NI received, considered, and rejected two proposals by Emerson Electric Co. ("Emerson") to acquire NI at the same price of $48 per share. Dr. Cain opines that information allegedly omitted by NI was "economically material," that NI's failure to disclose such information caused "artificial deflation" in NI's stock price, and that, had NI disclosed the allegedly omitted information, NI's stock would have traded at or above $48 during the Class Period.

Dr. Cain's testimony should be excluded because it is unreliable and does not "fit" the facts and legal issues in this case. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993). Dr. Cain's "analysis" is disconnected from Plaintiff's insider trading theory of liability, as he focuses on a pure-omission premise and ignores NI's ***trading***. Further, Dr. Cain's methodology is conclusory, circular, and outcome-driven: he commits to deeming "economically material" anything alleged by Plaintiff, rather than beginning his "analysis" from the logical starting point—defining the information about which he is opining. Dr. Cain also cherry-picks from the facts and academic literature—a hallmark of inadmissible, unreliable expert testimony. He ignores unfavorable conclusions from studies he relies on, and even ignores the entirety of a 2024 study with a closer "fit" to the facts of this case that was ███████████████████████ ██████████████████████████████████.

Dr. Cain's "analysis" relies heavily on his event study, which is not a reliable measure of loss causation or "artificial deflation" in this case because it hinges on January 2023 announcements that contained extensive "confounding information" that did not exist, and could not have been disclosed, during the Class Period. Dr. Cain makes no attempt to disaggregate this confounding information, which, as the case law makes clear, is a crucial requirement of a reliable event study. This failure is especially egregious given that Dr. Cain himself admitted in his class certification deposition that an event study that cannot disaggregate confounding information from the information being measured would lead him to assume there was no artificial deflation in the stock and that damages would be zero. Of course, these conclusions would be fatal to Plaintiff's claim, so Dr. Cain skirts them in his subsequent reports and testimony.

Finally, Dr. Cain's opinion that damages should be measured based on a "but-for" price of "at or above $48" is inadmissible. Dr. Cain supplies no testable method connecting any "evidence" to his $48 "but-for" price, (let alone any unidentified price "above" that figure), but instead simply claims that this price is "clearly supported"—pure "*ipse dixit*" that fails Rule 702. That Dr. Cain chose not to rely on his event study when "calculating" damages not only implicitly concedes the unreliability of the study, but also further reinforces the inadmissibility of his damages opinions. Under Rule 702 and *Daubert*, Dr. Cain's gaps in "fit," unreliable "methods," and unreliable application warrant exclusion.

## **LEGAL STANDARD**

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal courts. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). As the "gatekeeper," the Court "is charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d

2

Cir. 2024) (cleaned up). The district court's role as "gatekeeper" is "critical." Fed. R. Evid. 702, Advisory Committee cmt. 2023 ("[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)."). Rule 702 provides a qualified witness may testify to their opinions if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

A "'trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.'" *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (citation omitted). Further, exclusion is warranted where there exists "'too great an analytical gap between the data and the opinion proffered,'" meaning the "expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). *See also Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). To be admissible, the expert's analysis must be reliable "at every step." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020). The requirement that expert testimony be relevant means the testimony must "'fit' the facts of the case." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 120 (S.D.N.Y. 2022) (citations omitted).

The party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence. *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016). *See also id.* ("The standard for admissibility is the same at the summary judgment stage as it is at trial.").

## ARGUMENT

### I.   Dr. Cain's Loss-Causation and Damages Opinions Do Not "Fit" Plaintiff's Theory of Liability Because They Ignore Half of the Equation of Insider Trading.

Dr. Cain opines "[t]here is an economic link . . . between the alleged omissions and NI's Common Stock prices," "[t]he alleged omissions introduced artificial deflation into the prices of National Instruments Common Stock," and "had the relevant truth been disclosed as of the start of the Class Period, NI's Common Stock would have traded at or above $48 per share throughout the Class Period." Ex.[1] A, ECF 86-1 (Expert Report of Matthew D. Cain, PhD, July 28, 2025) ("Merits Report") ¶¶ 19, 20, 134. These loss-causation and damages opinions do not "fit" Plaintiff's remaining theory of liability, which requires consideration of NI's trading and not just alleged omissions. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (setting forth "unremarkable premise" that damages model "must measure only those damages attributable to [Plaintiff's] theory").

An insider trading theory is premised on the assertion that the defendant had a duty to disclose alleged material non-public information *or* to abstain from trading. *SEC v. Obus*, 693 F.3d 276, 284-85 (2d Cir. 2012). But Dr. Cain's opinions focus exclusively on the alleged *omission* of information about Emerson's early, rejected proposals, and make no effort whatsoever to assess the impact (or lack thereof) of NI's *trading*. *See, e.g.*, Merits Report ¶ 134 ("had the relevant truth

---

[1] Exhibit citations refer to exhibits to the Declaration of James F. Bennett in support of Defendants' motion to exclude.

been disclosed as of the start of the Class Period, NI's Common Stock would have traded at or above $48 per share throughout the Class Period"). When Defendants' expert, Dr. David Denis, critiqued Dr. Cain on his decision to consider only the but-for world where NI disclosed the allegedly omitted information before trading, without also considering the but-for world where NI abstained from trading, Dr. Cain did not provide, or even attempt to provide, an explanation. Instead, Dr. Cain responded only that he does not need to "address a situation where there is no alleged violation of the law." Merits Report, Appendix C ¶ 53. But Dr. Cain's own damages methodology purports to address such a situation in the context of alleged omissions—he opines that NI's stock price would have been higher "had the relevant truth been disclosed as of the start of the Class Period." Merits Report ¶ 134. Of course, there would be no alleged violation had NI made such disclosure. *Obus*, 693 F.3d at 285.

Dr. Cain seems to implicitly concede that the expert analysis in this case must be tied to NI's trading, and not merely omissions. He testified in conclusory fashion that ████████████ ████████████████████████████████████████████████ Ex. B (Cain Dep., November 14, 2025) at 308:18-309:6. But he also gave contradictory testimony highlighting his treatment of the "trading" aspect of Plaintiff's claim as irrelevant to his opinions: ████ ████████████████████████████████████████████████ ████ and, ████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* at 103:18-104:6. *See also* Merits Report ¶ 20 ("***Opinion 3:*** The alleged omissions introduced artificial deflation into the prices of National Instruments Stock[.]").

Ultimately, Dr. Cain presents conclusions about the effect of alleged ***omissions***, not trading. This testimony does not "fit" Plaintiff's insider trading claim. It is telling that Dr. Cain's "Summary

of Opinions" in the Merits Report, including his loss-causation and damages opinions, *does not once mention NI's repurchases*. Merits Report ¶¶ 16-24. Dr. Cain's testimony is unhelpful in this insider trading case and should be excluded.

## II. Dr. Cain's Testimony About Economic Materiality, an Economic Link, and Artificial Deflation Should Be Excluded as Unreliable and Irrelevant to the Facts of This Case.

### a. *Dr. Cain Fails to Specifically Identify the Information He Claims is Economically Material and Caused Artificial Deflation.*

Dr. Cain opines that the "alleged omissions in this matter were economically material" and "introduced artificial deflation into the prices of National Instruments Common Stock," and that there "is an economic link . . . between the alleged omissions and NI's Common Stock prices." Merits Report ¶¶ 18-20. *See also id.* ¶¶ 5, 19, 20, 36, 124, 127, 128, 131, 132, 139 (addressing "alleged omissions"); *id.* ¶¶ 31, 134, 141 (addressing "the relevant truth"). Crucially, Dr. Cain does not define the "alleged omissions" or "relevant truth," but instead points to ███████████ ████████████████████████████████████████████ while refusing to specifically identify the information he is "analyzing." Ex. C (Reply Expert Report of Matthew D. Cain, PhD, November 10, 2025) ("Reply Report") ¶ 27; *see also* Ex. B, at 65:9-66:16.[2] This is despite Dr. Cain's acknowledgment that ████████████████████████████████ *Id.* at 67:18-68:4 ████████████████████

████████████████████████████████████████████

████████████

By failing to define the "alleged omissions" or "relevant truth," and by instead leaving those terms pinned to whatever Plaintiff has alleged and proves at trial, Dr. Cain's testimony

---

[2] Dr. Cain effectively admits that he has not defined the information about which he is opining. *See* Reply Report ¶ 29 ████████████████████████ ████████████████████ ).

effectively functions as a rubber stamp: the facts alleged, whatever they may be, are "economically material" and caused "artificial deflation." This is not a reliable, testable methodology. Allowing Dr. Cain to offer such an opinion at trial would certainly **not** assist the trier of fact. *See Daubert*, 509 U.S. at 593 ("[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.").

One cannot opine on the significance of information without identifying what the information is. Dr. Cain's failure to do so shows that his economic materiality, economic link, and artificial deflation testimony is unreliable and flawed at the most foundational level and should be excluded. *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269-70 (S.D.N.Y. 2010) (explaining, "plaintiff's experts must lay bare the information and assumptions on which they relied," and excluding expert testimony on causation where "neither expert . . . identified with any amount of precision what the hypothetical acts on the part of defendants [we]re that" caused the outcome noted by plaintiff's experts).

> b. *Even Dr. Cain's Vague, Admittedly Incomplete Descriptions of the "Alleged Omissions" or "Relevant Truth" Cherry-Pick from the Facts and Omit Pertinent Information.*

In addition to Dr. Cain's failure to specifically identify the information that makes up the "alleged omissions" or "relevant truth," his opinions exclude facts that are highly relevant and would have to be considered in any reliable assessment of materiality. In particular, he excludes the NI Board's rejection of Emerson's May 25 and June 22, 2022 proposals after careful review with its financial and legal advisors, and NI's message to Emerson that the proposals did not

provide a basis to engage in further discussions.[3] *See, e.g.*, Merits Report ¶¶ 29-31 (vaguely summarizing the "Alleged Omissions" without mentioning NI's rejections); Reply Report ¶ 29

[black redaction box]

Courts in this circuit have condemned expert "cherry-picking," explaining that "exclusion of . . . proffered [expert] testimony is warranted where the expert fails to address evidence that is highly relevant to his or her conclusion." *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 336 (S.D.N.Y. 2023) (cleaned up); *Daniels-Feasel v. Forest Pharmaceuticals, Inc.*, 2021 WL 4037820, at *5 (S.D.N.Y. 2021), *aff'd*, 2023 WL 4837521 (2d Cir. 2023). *See also Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002) (describing the "'fit' or relevance requirement enunciated in *Daubert*," explaining, "[i]f the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded for lack of probative value"). Dr. Cain's economic materiality, economic link, and artificial deflation testimony fails Rule 702's reliability and relevance requirements because he has developed his opinions about selectively chosen pieces of information that are intertwined with other, highly relevant information that he has ignored—NI's rejection of Emerson's proposals and associated messaging to Emerson.

    c. *Dr. Cain's Event Study is Unreliable and Does Not "Fit" the Facts of this Case.*

---

[3] In the context of potential M&A, materiality depends on "a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988).

Defendants' experts Dr. Denis and Dr. Shane Goodwin both cite literature supporting the proposition that "[f]ollowing a rejection, most proposals die." Ex. D (Expert Report of David J. Denis, August 27, 2025) ("Denis Report") ¶ 27 & n.49 (citing Bruner (2004), a source cited for other propositions by Dr. Cain); and Ex. E (Expert Report of Shane Goodwin, August 27, 2025) ("Goodwin Report") ¶ 161 (same). While Dr. Cain has a different opinion about Bruner's application here, *see* Reply Report ¶¶ 33, 79, Dr. Cain does not suggest that rejections are irrelevant when considering the economic materiality of potential M&A.

Dr. Cain cites his event study as one of the primary pieces of evidence supporting his economic materiality, economic link, and artificial deflation testimony. Merits Report ¶¶ 18-20. Dr. Cain's event study measured the stock price impact of public announcements on January 13 and 17, 2023, treating them as "corrective disclosures" that publicized the information allegedly concealed by Defendants during the Class Period. From there, Dr. Cain concludes that the increase in NI's stock price after the January announcements means that "a reasonable investor would have viewed the alleged omissions [during the Class Period] concerning Emerson's offers as economically material." *Id.* ¶ 124.

An event study can be reliable only if it measures the price impact of disclosures that actually corrected the alleged prior omission, and only if it addresses confounding information disclosed contemporaneously. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) ("[That] inference—that the back-end price [increase] equals front-end [de]flation— starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."); *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation *and not some other [positive] information about the company*." (emphasis added)). *See also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (affirming dismissal of 10(b) and Rule 10b-5 claim for failure to allege loss causation, concluding, "Plaintiffs have not alleged facts to show that [Defendant']s misstatements, among others (made by [another entity]) that were much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [Defendant]'s misstatements."); *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311-12

(11th Cir. 2011) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)) (loss causation analysis requires "eliminating other possible explanations for th[e] price [change], so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of the price [change]").

Dr. Cain's event study is both unreliable and unhelpful to the trier of fact because it measures stock price reactions to January 13 and 17, 2023 announcements that disclosed substantially different information than what could have been disclosed during the Class Period. Further, Dr. Cain fails to disaggregate the multiple, confounding news items embedded in those January disclosures. These foundational flaws in Dr. Cain's event study, which he places at the heart of his economic materiality, economic link, and artificial deflation opinions, *see* Merits Report ¶¶ 18-20, warrant exclusion of those opinions. *See Amorgianos*, 303 F.3d at 267 ("'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible'" (citation omitted)).

1. *Dr. Cain Fails to Adequately Identify "Corrective Disclosures," and Instead Relies on Public Disclosures of Information Not Available to NI During the Class Period.*

Plaintiff's insider trading claim requires proof "that the defendant[s] w[ere] knowingly in possession of the [material non-public] information *at the time the trading occurred*." *SEC v. Lyon*, 605 F. Supp. 2d 531, 547 (S.D.N.Y. 2009) (emphasis added). Dr. Cain acknowledges that the ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. F (Cain Dep., June 3, 2025) at 120:7-10 (emphasis added). The informational environment at the start of the class period included: the information contained in Emerson's May 25 and June 22, 2022 letters proposing to

purchase NI at $48 per share; NI's consideration of those proposals, including by its Board in consultation with legal and financial advisors; and NI's rejection of the May and June 2022 proposals, including the message that Emerson's $48 proposal "does not provide a basis for further discussions." ECF 29, Compl. ¶¶ 36, 38-39, 42, 44. The so-called "corrective disclosures" underlying Dr. Cain's event study are not well-matched to this state of facts.

First, Dr. Cain points to a January 13, 2023 press release in which NI announced that its Board "had initiated a review and evaluation of strategic options," which would "include consideration of a full range of available strategic, business and financial alternatives, including solicitation of interest from potential acquirors and other transaction partners, some of whom have already approached the Company." Compl. ¶ 72. The press release also announced NI's implementation of a "shareholder rights plan." *Id.* ¶ 74. While it should go without saying that the January 13 announcement of developments months after the Class Period did not disclose any information allegedly concealed by NI during the Class Period, ***Plaintiff's Amended Complaint expressly confirms it*** and treats that announcement as an entirely different disclosure. *See* Compl. ¶ 83 n.13 (discussing the alleged "material information concerning Emerson's offer," stating, "[i]n fact, National Instruments' duty to disclose this information was not discharged until Emerson disclosed the material facts on January 17, 2023[.]"). Dr. Cain's assertion that the January 13 disclosure "allegedly revealed the relevant truth to investors" and can support his event study is inconsistent with Plaintiff's own allegations. Merits Report ¶¶ 31, 124.

The only other data point in Dr. Cain's event study is Emerson's public disclosure on January 17, 2023, of the following information: the history of engagement between the two companies beginning in May 2022, including Emerson's two $48 proposals in May and June and NI's rejections; Emerson's November 3, 2022 proposal to acquire NI at $53 per share; NI's

11

subsequent creation of a working group of its Board to consider the November proposal; a January 4, 2023 meeting between NI and Emerson representatives; and Emerson's reiteration of its $53 proposal on January 11, 2023. Ex. G (Emerson News Release, January 17, 2023). Again, most of this information involved developments that occurred **after** September 2022 and therefore could not have been disclosed during the Class Period. Further, the information available to the market after the January 17 disclosure is completely different than the information available in August and September 2022 about two rejected $48 proposals that NI stated did not provide a basis for further discussions—notably, by January 17, NI had announced that it was engaging in a strategic review process and would **solicit** acquisition offers, and Emerson announced a January 11 offer at $53 per share that **had not been rejected** at the time. Like the January 13 announcement, the January 17 press release is not a valid point of comparison for Dr. Cain's event study.

Dr. Cain's failure to adequately identify any "corrective disclosure"—meaning the release of information that "relate[s] back to the misrepresentation *and not some other [positive] information about the company*"—renders his event study unreliable and irrelevant. *Williams*, 558 F.3d at 1140 (emphasis added); *Goldman Sachs*, 594 U.S. at 123.[4]

        2.  *Dr. Cain Fails to Disaggregate the Multiple, Confounding Facts Embedded in the January Disclosures.*

Dr. Cain himself ███████████████ ███████ Ex. B, at 273:13-274:11. Despite this acknowledgment, Dr. Cain's event study does not account for these differences **at all**. Instead, Dr. Cain attempts to obscure these differences by

---

[4] For these same reasons, Dr. Cain's reliance on analyst's reactions to the January 13 and 17, 2023 disclosures is unreliable and irrelevant. *See* Merits Report ¶¶ 125-27. The "M&A developments" disclosed in January 2023 were fundamentally different than the information that existed, and could have been disclosed, during the Class Period, and Dr. Cain fails to provide any explanation or analysis connecting the analyst commentary on such developments in January to the impact of allegedly omitted information during the Class Period. *Joiner*, 522 U.S. at 146.

describing the January disclosures using vague generalizations—"the release of information concerning potential M&A in general, and concerning a potential acquisition by Emerson specifically"—and measures the price impact of each date's disclosure as a whole, without making the slightest attempt to determine how much, if any, of the price impact is attributable to the disclosure of information available, and allegedly concealed, during the Class Period. Merits Report ¶ 124.[5]

Dr. Cain's failure to even attempt to disaggregate the confounding information in the January disclosures is especially egregious because when Dr. Cain was deposed on his Class Certification Report—before he formed his opinions on artificial deflation—he

- Ex. F, at 18:14-20.

- *Id.* at 110:12-15.

---

[5] Dr. Cain's *only* reference to "confounding information" in his Merits and Reply Reports relates to his damages "calculation," where Dr. Cain addressed only the possibility of confounding information during the Class Period, such as market forces that may have impacted stock price during the Class Period. Merits Report ¶ 136 (discussing his "calculation of artificial deflation," describing "confounding information" such as, "if the Common Stock prices for National Instruments increased during the Class Period due to the Company's repurchase activity, macroeconomic trends such as inflation or interest rates, or other non-fraud-related Company-specific information"). But factors impacting stock price during the Class Period have nothing to do with the confounding information from the January 13 and 17 announcements—the sole "event dates" forming the basis of his event study. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014) ("[W]hen conducting an event study, an expert must address confounding information that entered the market *on the event date*." (emphasis added)).

Dr. Cain further testified that,

*Id.* at 109:10-110:2.

- When asked whether Dr. Cain testified,

*Id.* at 111:7-20.

Dr. Cain's original testimony about the importance of disaggregating confounding information is well supported by the case law. *See Bricklayers*, 752 F.3d at 90, 95 (affirming exclusion of expert testimony where expert made an "attempt to disaggregate confounding information on the event dates" but only "made a judgment call as to confounding information without any methodological underpinning"); *In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1026 (S.D.N.Y. 1997) (expert's testimony inadmissible where expert failed "adequately to distinguish between fraud related and non-fraud related company specific influences on EXTL's stock price"); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ("Because the law requires the disaggregation of confounding factors, disaggregating only *some* of them cannot suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss." (emphasis in original)); *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384 (S.D.N.Y. 2018), *aff'd*, 784 F. App'x 27 (2d Cir. 2019).

14

*Gross* is instructive here. In *Gross*, third-party BGC Partners had "long expressed interest in purchasing" defendant GFI Group, and GFI's Chairman "rebuffed BGC's overtures." *Id.* at 389. GFI instead pursued an acquisition by a different entity, CME, at $4.55 per share and issued a press release announcing the proposed merger in which GFI's Chairman described the deal with CME as a "singular and unique opportunity to return value." *Id.* at 389-90. Months later, BGC announced a public tender offer at $5.25 per share and that it had acquired about 13.5% of GFI's stock. *Id.* at 390. After BGC's announcement, GFI's stock price increased about 20%. *Id.* In support of the loss-causation element of plaintiffs' 10(b) claim, they argued BGC's announcement "corrected" prior misstatements by GFI's Chairman that the potential CME transaction was "unique" and "singular." The court held plaintiffs could not show loss causation because "they c[ould ]not disaggregate corrective information in BGC's tender offer from the other 'new industry-specific or firm-specific facts' that it revealed," including that a bidder was offering more than was offered by CME "and that a bidding war might ensue." *Id.* at 398. The court further explained that analysis by plaintiffs' expert did not help establish loss causation because the expert did "not attempt to attribute any portion of the increase in GFI's share price to a corrective disclosure as opposed to other simultaneously released information." *Id.* Instead, the expert opined that there was no confounding information issued on the day of the tender offer announcement that could explain the price movement, thus "ignor[ing] the other information embedded in BGC's offer," including "information [that] could not have been disclosed by GFI at the time of the" alleged misstatements. *Id.*

Just as in *Gross*, Dr. Cain ignores the impact of confounding information disclosed on January 13 and 17, most of which could not have been disclosed during the Class Period. If inadequate attempts to disaggregate confounding information on the event dates warrant exclusion,

15

Dr. Cain's failure to try at all certainly does. *Bricklayers*, 752 F.3d at 90, 95; *Exec. Telecard*, 979 F. Supp. at 1026. Based on Dr. Cain's own testimony, ████████████████████

████████████████████████████████████████████████

███████████████████ Ex. F, at 109:10-110:2; 111:7-20. Under both the case law and Dr. Cain's own standards, he did not reliably apply the event study methodology in this case, and his opinions founded upon the event study are inadmissible. *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018) ("Where an expert ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted.").

   d.   *Dr. Cain Cherry-Picks from the Academic Literature and Relies on Sources that Do Not "Fit" the Facts in this Case.*

Dr. Cain also purports to rely on "fundamental principles of finance, economics, valuation, and M&A analysis" to supports his economic materiality and economic link opinions. Merits Report ¶¶ 18-19. As an initial matter, his "analysis" in this regard is flawed for many of the reasons already described herein—he fails to define the "material information" about which he is opining, and he reiterates his fail-safe, rubber stamp approach to "economic materiality." *Id.* ¶ 115.

Further, Dr. Cain's discussion of "fundamental principles" relies on findings from studies that do not "fit" the circumstances of this case, and he fails to acknowledge the distinguishable features from the studies or identify an analytical connection between these sources and his conclusions in this case. *See In re Acetaminophen*, 707 F. Supp. 3d at 336; *Amorgianos*, 303 F.3d at 268, 270 (affirming exclusion of expert where "the analytical gap between the studies on which she relied and her conclusions was simply too great and . . . her opinion was thus unreliable," rejecting argument "that the defects, if any, with respect to the[] proffered expert testimony went to its weight, not its admissibility"). Such inapposite studies include:

16

- Bruner (2004), which summarized findings from 25 academic studies, and from which Dr. Cain pulls the proposition, "the M&A transaction delivers a premium return to target firm shareholders." Merits Report ¶ 107. The studies summarized in Bruner considered "mergers, tender offers, white knight bids, long-run returns, deals involving banks, and foreign bidders and/or targets." Denis Report ¶ 27.

- Jindra and Walkling (2004), which, according to Dr. Cain, "shows target stock prices frequently rise above the initial offer price"—called a "negative arbitrage spread"—and "show[s] that on average, 23% of targets have a negative spread." Merits Report ¶ 108. Jindra and Walkling "study cash tender offers (a public disclosure of the offer by the acquirer to bypass the target's Board), most of which were completed." Denis Report ¶ 46.

- Walkling (1985) and Betton and Eckbo (2000), which Dr. Cain cites for the proposition that a toehold—meaning ownership of target firm shares by the bidder—increases the probability of a successful acquisition attempt. Merits Report ¶ 109. Both of these sources studied cash tender offers. Denis Report ¶ 46.

- Branch and Yang (2003), which Dr. Cain quotes for the proposition, "a cash payment is likely to improve the probability of merger completion/success, as compared with a stock payment offer." Merits Report ¶ 111. Branch and Yang studied "stock, cash tender, and collar merger offers, which was not the proposal here." Denis Report ¶ 31.

- Cain, Griffith, Jackson, and Solomon (2020), which Dr. Cain cites for the proposition that "announced transactions typically involve extensive back-and-forth, with an average of 5.4 rounds of bidding." Merits Report ¶ 113. This study is based on "a sample of 'announced transactions,' *i.e.*, transactions in which (i) the parties had agreed to engage in merger negotiations and (ii) such negotiations had resulted in a transaction." Goodwin Report ¶ 159.[6]

In response to critiques from Dr. Denis and Dr. Goodwin highlighting these studies' lack of "fit" to this case—which, during the Class Period, did not involve a completed merger,

---

[6] Dr. Cain relies on Cain, et al. (2020) to opine that "the timeline from Emerson's initial approach in May to the end of the Class Period in September 2022 reflects [a] broader pattern unfolding over time"—referring to an "iterative process, where targets initially reject offers and negotiate for better terms." Merits Report ¶¶ 113-14. This opinion is confusing—by the end of the Class Period, Emerson had sent NI two letters with proposals at the same price, NI had responded to both letters with rejections, and Emerson had not communicated with NI after the second rejection on August 2, 2022. Compl. ¶¶ 34, 39, 40, 51-55. Dr. Cain does not provide any explanation to bridge this "analytical gap" between the facts of this case and the "iterative process" he describes based on Cain, et al. (2020).

announced transaction, tender offer, or other situations addressed in the above sources, but instead involved two private, rejected proposals at the same price—Dr. Cain deploys a range of tactics, none of which involves an explanation for how he can bridge the "analytical gap." For example, Dr. Cain simply ignores some critiques. His Reply Report ███████████████████████ ████████████████████████ For other critiques, Dr. Cain deflects, ████████████████████████████████████ ██████████████ Reply Report ¶¶ 76-78 & n.165.

Dr. Cain also "cherry-picks" from the academic literature. He cites Branch and Yang (2003) for his opinion on the significance of cash offers, but Branch and Yang reach a separate conclusion on another topic Dr. Cain considers—whether the premium of a bid has an impact on the bidder's likelihood of success. Merits Report ¶¶ 111-12. Specifically, Branch and Yang find "the bid premium to *not* be a statistically significant factor predicting the probability of success of a bid," in contrast to Dr. Cain's opinion that the premium of Emerson's proposal price "affirm[s] that Emerson's proposal aligned with historical patterns of successful, value-maximizing acquisitions." Denis Report ¶ 31; Merits Report ¶ 112. Rather than contend with the contradictory finding from Branch and Yang, Dr. Cain ignores it for more favorable studies and fails to address Branch and Yang at all in his Reply Report, even after this critique was raised by Dr. Denis.

Dr. Cain's "cherry-picking" is further illustrated by his failure to consider in his Merits Report Even-Tov, et al. (2024), which "estimate[s] average cumulative abnormal returns . . . for offers that are rejected by the target." Denis Report ¶ 47. Notably, two of that paper's authors— Even-Tov and Lourie— ██████████████████████████ Ex. B, at 16:7-14; 283:23-284:7. While the circumstances studied in that paper are not an exact match for this case, its focus on rejected offers makes it a far closer "fit" than the inapposite studies cited by Dr. Cain.

*See, e.g.*, Denis Report ¶ 47. When asked about his decision not to consider this recent paper in forming his opinions, Dr. Cain testified, ████████████████████████ ████████ Ex. B, at 302:20-303:5. Dr. Cain's decision to ignore a 2024 study addressing rejected offers—authored by the people who assisted in drafting his reports—and to instead rely on studies involving mergers, announced transactions, tender offers, and other distinguishable situations, ***in a case involving rejected proposals***, is textbook "cherry-picking." *See In re Acetaminophen*, 707 F. Supp. 3d at 357 (excluding expert testimony where expert "cherry pick[ed] isolated findings in studies measuring multiple outcomes" and "ignore[d] inconsistent results"); *Daniels-Feasel*, 2023 WL 4837521, at *3 (2d Cir. 2023) (affirming exclusion of expert testimony where expert "cherry-picked only favorable studies to support his causal conclusion").

Dr. Cain's failure to bridge the "analytical gap" between the sources relied upon and his analysis and conclusions, and his "cherry-picking" of studies—and "cherry-picking" of individual conclusions out of studies containing additional conclusions contradicting Dr. Cain's testimony— render his reliance on "fundamental principles" unreliable and irrelevant to this case.

  e. *Dr. Cain's Description of the Factual Narrative in this Case is Disconnected from Any "Expert" Analysis, "Cherry-Picks" from the Evidence, and Is Unreliable.*

Dr. Cain devotes 66 paragraphs of his Merits Report to describing a factual narrative of this case. Merits Report ¶¶ 38-104. While an expert must reliably apply their principles and methods to the facts of the case to be admitted under Rule 702, a mere recitation of facts, standing alone, is not expert testimony. *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005).

Further, Dr. Cain again resorted to "cherry-picking" when selecting evidence to include in his narrative, and he ████████████████ in his deposition. In Dr. Cain's Reply Report, he ████



Reply Report ¶ 21. But despite testifying that he ███████ ███████████████████ Dr. Cain did not acknowledge other, on-point testimony from Mr. McGrath that cuts against Dr. Cain's opinions. Ex. B, at 40:9-14. *See id.* at 36:8-24 ███████ . . ."). To explain his failure to cite other testimony, Dr. Cain admitted that ████████

- ████████████████████████ *Id.* at 31:21-32:17.
- ████████████████████ *Id.* at 39:5-12.

In sum, Dr. Cain's extensive description of a factual narrative does not support the reliability of his testimony because he fails to connect this description to his "principles and methods," and he admits to "cherry-picking" only favorable evidence. *Amorgianos*, 303 F.3d at 266; *In re Acetaminophen*, 707 F. Supp. 3d at 357.

### III. Dr. Cain's Testimony Purporting to Quantify a Link Between the "Alleged Omissions" and NI's Stock Prices, and his Proposed "Methodology" for Calculating Damages, Should Be Excluded as Unreliable and Unhelpful to the Trier of Fact.

Dr. Cain opines that, "had the relevant truth been disclosed as of the start of the Class Period, NI's common stock would have traded at or above $48 per share throughout the Class Period." Merits Report ¶¶ 134, 21. As an initial matter, Dr. Cain's suggestion that he can quantify the price impact of disclosure of the "relevant truth," without defining what information makes up

20

the "relevant truth" that should have been disclosed, is unreliable on its face—especially given damages calculations require more precise analysis and disaggregation of confounding causes than is even required to establish loss causation. *Miller v. Asensio & Co.*, 364 F.3d 223, 232-33 (4th Cir. 2004) (citing *Exec. Telecard*, 979 F. Supp. at 1025).

Nonetheless, Dr. Cain supports his "but-for price" opinion with various "evidence," including: descriptions of various facts in this case; "peer-reviewed published academic research" about "the typical M&A process"; "[a]cademic research" that "documents that target stock prices frequently trade above offer prices"; his finding from the event study that "NI's Common Stock prices increased by statistically significant amounts following" the January "M&A disclosures." Merits Report ¶¶ 135(a)-(i). Dr. Cain's attempt to hedge his bets by citing multiple pieces of "evidence"—none of which he connects to any analysis that would support his $48 per share but-for price, let alone any higher figure—should fail. His damages opinions should be excluded as unreliable and speculative.

>   a. *Dr. Cain Fails to Analyze the "Evidence" or Provide Any Explanation for How it Supports the $48.00 But-For Price.*

While Dr. Cain cites "evidence" to support his $48 but-for price opinion, he does not provide *any* analysis or explanation to connect them. *See* Merits Report ¶¶ 134-35. Instead, Dr. Cain states, without explanation, that his "analysis in Section V" of the Merits Report—which is unreliable, as addressed above—"clearly supports an implied value of at least $48 per share." *Id.* ¶ 134. It appears Dr. Cain's "methodology" is to input a list of "evidence" into his head; output a number; and then, rather than attempt to explain how that number was reached, simply assert that the number is "clearly support[ed]." And Dr. Cain ██████████████████████████ in his deposition. When asked to identify the calculations he used to reach the $48 but-for price, Dr. Cain ████████████████ Instead of a calculation or an explanation bridging the analytical gap

between the "evidence" and $48, he ████████████████████████

████████████████████████████████████████

████████████████████████ Ex. B, at 42:3-20, 44:3-46:13. Without

*any* analysis or explanation connecting the "evidence" to Dr. Cain's "at least $48" figure, his

approach is nothing more than "a subjective, conclusory approach that cannot reasonably be

assessed for reliability." Fed. R. Evid. 702, Advisory Committee's Note to 2000 Amendments;

*Daubert*, 509 U.S. at 593.

For example, Dr. Cain cites a combination of facts, including that Emerson proposed $48

per share, Emerson indicated a willingness to work with NI "to find additional value," the $48

proposal price "represented a significant premium," the proposal was all cash, and NI had retained

MacKenzie Partners to monitor the accumulation of its stock and Bank of America as financial

advisor. Merits Report ¶ 135. But why do these facts "clearly support[]" Dr. Cain's $48 figure?

For example, how would Dr. Cain's $48 figure be impacted by other facts that existed at the time

but are omitted from Dr. Cain's "evidence" in paragraphs 134 and 135, including the fact that

Emerson did not raise its price between May and June but instead reiterated its $48 proposal, and

the fact that NI rejected both proposals before the Class Period? Additionally, how does academic

research indicating that "target stock prices frequently trade above offer prices" support the

conclusion *in this case* that disclosure of the "relevant truth," including the fact that the proposals

had been rejected by NI before the class period, would have caused NI's stock to trade above $48

a share?[7] Rather than answer these questions, describe the analytical "steps" connecting the

---

[7] While Dr. Cain did not cite a specific study for this proposition, he appears to rely on Jindra and
Walkling (2004). As discussed in Section II(d), *supra*, the Jindra and Walkling study involved cash
tender offers, most of which were completed. Denis Report ¶ 46. Further, the study only shows a
"negative arbitrage spread"—meaning stock prices rose above the offer price—in 23% of targets
on average. Merits Report ¶ 108. Given the salient differences between that study and this case,

evidence to his conclusion, or provide any semblance of a methodology, Dr. Cain simply assures that his conclusion is "clearly support[ed]." That *ipse dixit* is not a viable basis for admitting expert opinions.

Finally, Dr. Cain's failure to utilize any reliable "expert" methodology for his but-for price opinion is further illustrated by his outcome-driven assurance that the jury could arrive at a different figure after hearing the evidence—of course, only if that figure is **above** $48 per share, thus increasing damages. *See* Ex. B, at 113:7-12 ████████████████████████ ███████████████████████████████████████████████████████ ████████████████████ Merits Report ¶ 143. It is unclear what analysis Dr. Cain believes the jury could conduct to reach a figure above $48—other than Dr. Cain's "methodology" of simply picking a number (again, as long that number increases damages).[8] This testimony also undermines Dr. Cain's purported belief in his own but-for price opinion. *Id.* ¶ 138 ("I find no economic reason to believe that the calculation of artificial deflation would have been any different at any point in the Class Period, and thus I conclude that the but-for price of $48 per share . . . remained constant throughout the Class Period.").[9] Should the Court decline Defendants' request to exclude Dr.

---

and the fact that, on average, the study did not find a "negative arbitrage spread" in a majority of cases, it was especially vital that Dr. Cain provide an explanation for how this study could apply in this case and support his $48 figure. Nonetheless, Dr. Cain failed to do so.

[8] Dr. Cain notably fails to provide any limiting principle to his conclusion that the but-for price could have been higher, although this failure is unsurprising—where there is no methodology or calculation supporting the $48 but-for price, there is also no methodology or calculation that could be utilized to calculate an upper limit.

[9] Dr. Cain's opinion about a constant but-for price during the Class Period raises further doubts about his methodology (or lack thereof). How does Dr. Cain account for changing facts during the Class Period? For example, Dr. Cain does not seem to account for potential differences in price impact between a disclosure of the relevant facts on August 22, which would include the fact that 20 days had passed since the last direct communication between the parties, and September 22, which would instead explain that 51 days had passed since such communication.

23

Cain's testimony in its entirety, Dr. Cain should at least be barred from presenting testimony about his outcome-driven guess that the but-for price could have exceeded $48.

Nonetheless, Dr. Cain's $48 but-for price is equally arbitrary, speculative, and conjectural, and is wholly unsupported by "reliable principles and methods" as required under Rule 702. Dr. Cain provides no reliable methodology to support a $48 but-for price piggybacking on the proposals NI rejected, and his assertion that the price could be even higher is purely gratuitous. This testimony should be excluded in its entirety. *See Amorgianos*, 303 F.3d at 267; *Joiner*, 522 U.S. at 146; *Restivo*, 846 F.3d at 577.

b.    *Dr. Cain's Unreliable Event Study Does Not Calculate Artificial Deflation.*

To the extent Dr. Cain attempts to suggest his event study is mathematical evidence that supports his $48 but-for price, it is a sleight of hand that does not cure the defects in his opinion. Dr. Cain's event study is unreliable for the reasons previously addressed and is directed to a different issue—the purported stock price impact of announcements on January 13 and 17, 2023 (the "event dates"). Merits Report ¶¶ 135(i), 124. As Dr. Cain expressly noted, "[his] artificial deflation estimate is not calculated as the amount of the stock price increase following the January 13, 2023 and January 17, 2023 disclosures." *Id.* ¶ 20, n.4. In other words, Dr. Cain's event study is not directed to calculating the but-for price. This contrasts with Dr. Cain's approach in other cases. *See, e.g.*, Ex. H, ECF 258-3, Cain Corrected Expert Report, No. 19-cv-03304 (D. S.C.), at Section VII (for each "corrective disclosure," using abnormal return calculated with event study to measure artificial inflation). This also contrasts with the approach Plaintiff originally suggested to this Court Dr. Cain would use to measure artificial deflation in their request to certify the class. *See* ECF 65, at 18 ("Dr. Cain . . . opines that an event study can quantify the amount of artificial inflation that existed in the prices of the stock on each day of the Class Period, which can be used

24

to calculate out-of-pocket damages for each Class member"). Dr. Cain's failure to use an event study—or any methodology besides arbitrary selection of a but-for price without an analysis supporting that price—warrants exclusion. *See In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d. 1005, 1014-15 (C.D. Cal. 2003) ("[A] number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar." (collecting cases)); *Exec. Telecard*, 979 F. Supp. at 1026 ("'As a result of his failure to employ [an event] study . . . the reliability of the magnitude and direction of [the expert's] value estimates are incapable of verification.'" (quoting *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993)).

By not relying on the event study to calculate damages, Dr. Cain implicitly concedes that the January announcements contained substantially different information than what could have been disclosed during the Class Period, and therefore price reactions to the January announcements do not provide a reliable insight into the impact of a hypothetical disclosure of the allegedly omitted information during the Class Period. *See* Section II(c), *supra*. *See* Denis Report ¶ 23. Nevertheless, Dr. Cain's $48 but-for price opinion relies on the event study only for the proposition that "NI's Common Stock prices increased by statistically significant amounts following the" January announcements. Merits Report ¶ 135(i). Like the other "evidence," Dr. Cain does not provide ***any*** analysis or explanation for how this "evidence" leads to the $48 figure.

   c.  *Dr. Cain's Opinion 5 Simply Describes a Typical Out-of-Pocket Damages Methodology Using His $48 But-For Price.*

In addition to Dr. Cain's but-for price opinion, his only other damages opinion simply describes the "standard out-of-pocket methodology" using his $48 but-for price. Merits Report ¶¶ 22, 139-41. As explained by Dr. Cain, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. F, at 32:15-22. *See* Merits Report ¶ 139. Given

25

the unreliability of Dr. Cain's artificial deflation "calculation," his damages opinions should be excluded as unreliable and unhelpful.

## **CONCLUSION**

For the reasons stated herein, Dr. Cain's testimony, reports, and opinions should be barred by this Court pursuant to Rule 702 and applicable case law.

Dated: December 22, 2025

By: /s/ *James F. Bennett*

James F. Bennett (*pro hac vice*)
John D. Comerford (*pro hac vice*)
Jeremy M. Hofman (*pro hac vice*)
Dowd Bennett LLP
7676 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone:  (314) 889-7300
Facsimile:   (314) 863-2111
jbennett@dowdbennett.com
jcomerford@dowdbennett.com
jhofman@dowdbennett.com

Andrew Ditchfield
Davis Polk & Wardwell LLP
450 Lexington Ave
New York, New York 10017
Telephone: (212) 450-4000
andrew.ditchfield@davispolk.com

*Counsel for Defendants National Instruments Corporation, Michael McGrath, and Eric Starkloff*

## CERTIFICATE OF WORD COUNT

1.      Pursuant to Rule 7.1 of the United States District Court for the Southern District of New York, the undersigned counsel certifies that the foregoing brief was prepared on a computer using Microsoft Word. A proportionally spaced typeface was used as follows:

> Name of Typeface: Times New Roman Point
> Size in Body: 12
> Line Spacing in Body: Double (footnotes, single)

2.       The total number of words in the brief as determined by Microsoft Word's word count function, inclusive of point headings and footnotes and exclusive of the caption, table of contents, table of authorities, signature block, and this Certification, is 8,729 words.

27

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 22, 2025, a true and correct copy of

the foregoing was filed electronically using the Court's electronic filing system. By operation of

that system a notice of electronic filing will be served upon all counsel of record in the case.

/s/ *James F. Bennett*

28