# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NATIONAL INSTRUMENTS CORPORATION SECURITIES LITIGATION | Case No. 1:23-cv-10488-DLC |

**EXPERT REPORT OF DAVID J. DENIS**
AUGUST 27, 2025

**<u>CONFIDENTIAL</u>**

**TABLE OF CONTENTS**

I.    **Qualifications and assignment**................................................................................1

    A.    Qualifications.........................................................................................................1

    B.    Assignment ...........................................................................................................2

II.   **Summary of opinions**..............................................................................................4

III.  **Dr. Cain's opinions about the economic materiality of the Alleged Omissions and corresponding loss causation are flawed** ...................................5

    A.    Dr. Cain's event study and review of financial analyst and media commentary are irrelevant ........................................................................8

    B.    Dr. Cain's discussion of the academic literature to support his opinion that the Alleged Omissions are economically material does not address the information allegedly withheld in this case ...........................................11

IV.   **Dr. Cain does not appear to dispute my opinion that a firm receives no ill-gotten gains from conducting repurchases, even assuming it was in possession of MNPI**..............................................................................................17

V.    **Dr. Cain ignores one plausible "but-for" world in which out-of-pocket damages are zero**.................................................................................................18

VI.   **Dr. Cain's measurement of economic losses and corresponding damages analysis are both flawed** .......................................................................20

    A.    Dr. Cain's $48 per share "but-for" price is speculative, lacks economic basis, and overstates deflation........................................................21

    B.    Dr. Cain's out-of-pocket damages analysis is flawed because it does not address the circumstance of this matter ................................................24

VII.  **Dr. Cain's opinions on differences between repurchases and dividends are irrelevant to my opinion that a firm receives no ill-gotten gains from conducting repurchases at allegedly deflated prices, even while in possession of MNPI**..............................................................................................26

    A.    Dr. Cain's opinion that repurchases and dividends can have materially different implications for firm value based on the signaling theory is irrelevant to my opinions ..........................................................27

    B.    Dr. Cain's opinion that repurchases and dividends can have materially different implications for firm value in light of a tax-efficient capital structure optimization is irrelevant to my opinions ...........................................29

    C.    Dr. Cain's opinion that repurchases serve a strategic function, which he claims is confirmed by managerial behavior outcomes, is also irrelevant to my opinions ..............................................................................31

**I.      Qualifications and assignment**

**A.      Qualifications**

1.      I am the Terrence P. Laughlin Chair in Finance at the University of Pittsburgh School of Business. I received a B.S. in finance and managerial statistics from Syracuse University (1982), an M.B.A. from the University of Michigan (1984), and a Ph.D. in finance from the University of Michigan (1988). I have also been employed as an assistant professor at the University of Toledo (1988–1989), an assistant and associate professor (with tenure) at Virginia Tech (1989–1995), and a tenured associate professor, full professor, and chaired professor at Purdue University (1995–2011). I have taught courses in corporate finance, investments, and capital markets in the graduate, undergraduate, and executive education programs of these universities. Many of these courses have contained components that analyze stock price valuation and corporate financial policies.

2.      I have served as a member of the Board of Directors of FuturaGene Corporation (2002–2003) and have served as a consultant to law firms, corporations, and government agencies on various aspects of financial markets and securities including corporate valuation, corporate financial policies, corporate governance, capital acquisition, credit quality, bankruptcy and solvency, stock prices, executive compensation, mortgage backed securities (MBSs), collateralized mortgage obligations (CMOs), and swap transactions.

3.      I have published over 50 articles in leading peer-reviewed finance, economics, and management journals, have edited the *Handbook of Corporate Finance*, and have co-edited a book on corporate restructuring. I have served as an Editor of the *Review of Financial Studies* and the *Journal of Corporate Finance*. In this capacity, I have reviewed and edited a large number of academic studies on the topics of market efficiency, corporate financial policies, and stock price valuation. I have also served as an Associate Editor of the *Journal of Finance*, *Journal of Financial Research*, *Financial Review*, and *Annals of Finance*. I served a term as President of the Financial Management Association and served for seven years as a member of the Board of Trustees of that organization.

4.       A detailed list of my experience, research publications, and prior expert work is included in my curriculum vitae, which is attached to this report as **Appendix A**. A list of my expert testimony in the past four years is attached to this report as **Appendix B**.

### B.       Assignment

5.       Lead Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.[1] Lead Plaintiff alleges an "insider trading theory of liability […] based on the Company's 'failing… to disclose Emerson's offers while buying back NI's securities.'"[2] Specifically, Lead Plaintiff alleges that National Instruments ("NI") "repurchased millions of shares with no disclosure concerning Emerson's high-premium offer" from August 12, 2022 through September 30, 2022 (the "Proposed Class Period").[3]

6.       In response to an affirmative report by Dr. Cain in connection with Plaintiff's motion for class certification ("Cain Class Certification Report"), I submitted a rebuttal report on June 16, 2025 ("Class Certification Rebuttal Report" or "my report"). Subsequently, I received the expert report submitted by Dr. Cain dated July 28, 2025 for merits issues ("Cain Merits Report").

7.       I have been asked to review and respond to the opinions presented in the Cain Merits Report, including but not limited to his opinions on economic materiality of the alleged omissions, loss causation, magnitude of any alleged artificial deflation, and methods to quantify damages in this case.

---

[1]     Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, May 2, 2025 ("Memorandum in Support of Motion for Class Certification"), p. 1.

[2]     Memorandum in Support of Motion for Class Certification, p. 1.

[3]     Memorandum in Support of Motion for Class Certification, pp. 1, 2. *See also* Amended Complaint for Violations of the Federal Securities Laws, *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, March 29, 2024 ("Amended Complaint"), ¶¶ 28, 82 ("Beginning in May 2022, Defendants were aware of material information concerning Emerson's offer to acquire National Instruments […] Defendants concealed […] these facts for approximately eight months. During that time, National Instruments repurchased over 2.3 million of its shares at prices well below Emerson's offer – including the largest quarterly expenditure on share repurchases in the Company's history – while failing to disclose any information concerning Emerson or its offer, […] while in possession of material non-public information about that offer.").

8.    For the purposes of this assignment, counsel has instructed that I make the following assumption regarding the "Alleged Omitted Information" or "Alleged Omissions" or "Material Non-Public Information" ("MNPI"):

> The information that NI is alleged to have withheld from investors during the Proposed Class Period is that it had received two unsolicited non-binding proposals to acquire all NI shares at $48 per share in May and June 2022, both of which NI's Board had unanimously rejected after careful consideration and advice from its legal and financial advisors as not in the best interests of NI's shareholders, and both of which the Board had determined did not provide a basis for further discussions with the unsolicited suitor.

9.    I understand that Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, "are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information," that "the corporate insider has 'a duty to disclose or refrain from trading,'" and that "a corporation is subject to the same duty as individual insiders to disclose material non-public information before trading in its own shares."[4] Counsel has informed me that damages for insider trading shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the insider trading violation—in other words, damages for insider trading claims are limited to the insider's allegedly ill-gotten gains from trading with MNPI.[5] I further understand from counsel that courts recognize the "profits gained or loss avoided" as the measure, and not just the limitation, of damages owed to private plaintiffs from a Section 10(b) insider trading violation. I also understand from counsel that measuring damages by the ill-gotten gains is consistent with an "insider trading" theory of liability.

10.    I am being compensated at my standard rate of $1,100 per hour for my time spent on this matter. Employees of Analysis Group, Inc. ("Analysis Group") working under my

---

[4]    Opinion and Order, *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, September 6, 2024 ("MTD Opinion and Order"), pp. 15 – 16.

[5]    I understand from counsel that the parties dispute whether this damages cap applies to Plaintiff's claim that NI violated Section 10(b) and Rule 10b-5 by repurchasing stock while in possession of allegedly material non-public information, whether by operation of Section 20A and/or common law damages caps that predated Section 20A. *See* Memorandum in Support of Motion for Class Certification, pp. 6 – 7 (describing Lead Plaintiff's legal theories of liability). I am not offering a legal opinion as to that question.

direction have assisted me in preparing this report. I also receive a portion of the professional fees received by Analysis Group for their work performed in conjunction with my assignment in this matter. Neither my compensation nor the compensation paid to Analysis Group is dependent on my findings or the outcome of this case.

## II.    Summary of opinions

11.    Based on my expertise and my review of the materials in this matter, I have reached the following opinions:

- Dr. Cain has not established that the Alleged Omissions were economically material. For example, Dr. Cain's event study of the January 2023 announcements and review of market commentary at that time is irrelevant because the announced information was very different than what the company could have disclosed during the Proposed Class Period (*i.e.*, very different from what Dr. Cain refers to as the "relevant truth"). Additionally, none of the papers cited by Dr. Cain is informative about the probability of deal success or the impact on the target's stock price after a disclosure of the specific circumstances in this matter. Therefore, Dr. Cain has not established the materiality of the Alleged Omissions nor, consequently, an "economic link" between the Alleged Omissions and the price at which NI's Common Stock traded. *See* **Section III.**

- Dr. Cain provides no evidence that NI benefited from conducting its repurchases while the share prices were allegedly deflated. Dr. Cain does not appear to dispute my opinion that a firm receives no ill-gotten gains from conducting repurchases, even assuming it was in possession of MNPI. *See* **Section IV**.

- As discussed above and in my Class Certification Rebuttal Report, I understand that damages for insider trading claims are limited to the insider's allegedly ill-gotten gains, which in this case are zero. Even if the out-of-pocket measure is applicable as Dr. Cain opines, Dr. Cain ignores one plausible "but-for" world (where, rather than disclose the Alleged Omissions, the company simply refrained from repurchasing) in which out-of-pocket damages are also zero. *See* **Section V**.

- Even if I assume that Dr. Cain has established materiality and loss causation, that damages are not limited to NI's ill-gotten gains (which are zero), and that the appropriate "but-for" world is one in which NI disclosed the alleged "relevant truth" rather than abstained from repurchasing, there is still no economic basis for Dr. Cain's speculative "but-for" price of $48 per share. Dr. Cain's damages analysis is also flawed because he fails to address the unique circumstance of this matter. *See* **Section VI.**

- Dr. Cain's critique of my Class Certification Rebuttal Report in Appendix C of the Cain Merits Report is a red herring. The central point of my report is that a firm receives no ill-gotten gains from conducting repurchases at allegedly deflated prices while in possession of MNPI. Dr. Cain's discussion of reasons why a firm might choose repurchases over dividends (or vice versa), which are unrelated to whether the firm possesses MNPI, diverts from this central issue. None of Dr. Cain's flawed arguments about the relative benefits of dividends and repurchases affects my conclusion that there were no ill-gotten gains to NI from the repurchases. *See* **Section VII.**

12. The materials I have considered in developing the opinions contained in this report are listed in **Appendix C**. My analysis and conclusions to date are based on the information available when this report was submitted. I reserve the right to amend my report and may modify, refine, or revise my opinions if new information is identified or otherwise becomes available.

## III. Dr. Cain's opinions about the economic materiality of the Alleged Omissions and corresponding loss causation are flawed

13. Dr. Cain concludes that "[t]he alleged omissions in this matter were economically material."[6] He defines "economically material" as "information that would affect a reasonable

---

[6] Expert Report of Matthew D. Cain, PH.D., *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, July 28, 2025 ("Cain Merits Report"), ¶ 18.

investor's investment decisions, including the prices at which they traded NI's Common Stock."[7] This conclusion is based on Dr. Cain's:

- Review of the timeline of Merger and Acquisition ("M&A")-related events;

- Purported application of principles of finance, economics, valuation, and M&A analysis;

- Event study analysis;

- Review of financial analyst and media commentary.[8]

14.    As an initial matter, Dr. Cain does not define what he assumes "the alleged omissions" to be despite using the term twenty-six times. Dr. Cain discusses "a premium acquisition offer from Emerson" when summarizing Plaintiff's allegations and the "alleged omissions"[9] and discusses "the importance of information about M&A developments."[10] Dr. Cain repeatedly states the allegation that NI failed to disclose Emerson's proposals and subsequently refers to omission of "this" (or "that," or "such") material information.[11] Nowhere in his report does Dr. Cain discuss precisely the information allegedly withheld that would have been disclosed in the "but-for" world.

15.    Dr. Cain has not discussed what level of detail about Emerson's rejected proposals would be provided with respect to price, identity of the potential acquirer, deal structure, timeline of communications, NI's action (or inaction) in response to each of the

---

[7]    Cain Merits Report, ¶ 18.

[8]    Cain Merits Report, ¶ 18.

[9]    Cain Merits Report, Section IV.B. (titled "Summary of the Alleged Omissions […]").

[10]   Cain Merits Report, ¶ 125.

[11]   See, *e.g.*, Cain Merits Report, ¶ 37 ("I assume that the omissions Plaintiff alleges in this matter misinformed investors relating to Emerson's offer to acquire NI Common Stock. I conclude that the omissions alleged in this matter were economically material to investors in National Instruments Common Stock. I base my opinion of the importance of this information on: […]"), ¶ 115 ("If Plaintiff ultimately proves their allegation that material information regarding Emerson's proposal and related developments was withheld from the market during a period in which National Instruments was repurchasing its own shares, […], investors would have viewed that information as value-relevant and thus, material from an economic perspective.") , ¶ 124 ("the release of information concerning potential M&A in general, and concerning a potential acquisition by Emerson specifically, […], reflecting the economic materiality of such information."), ¶ 129 ("Plaintiff alleges that National Instruments and its senior executives failed to disclose Emerson's offers to acquire National Instruments Common Stock while NI was repurchasing shares of the Company's stock. Plaintiff contends that the omission of this material information rendered the Company's stock price artificially low during the Class Period […]").

6

proposals, etc. It is puzzling for Dr. Cain to conclude that omission of certain information is material without clearly defining what that information is.[12]

16.    Dr. Cain's opinions about materiality are flawed. None of Dr. Cain's four categories of evidence establishes the economic materiality of the Alleged Omissions. Dr. Cain's lengthy litany of facts provides no economic basis for concluding that the Alleged Omitted Information was economically material. Dr. Cain's event study and review of financial analyst and media commentary are irrelevant because the January 2023 announcements, which are the basis for Dr. Cain's event study analysis, were very different than what the company could have disclosed during the Proposed Class Period and reveal nothing about the economic materiality of the Alleged Omissions in this case.

17.    Dr. Cain's purported application of the "fundamental principles of finance, valuation, and mergers & acquisitions analysis"[13] is flawed. Dr. Cain ignores that NI's Board unanimously rejected both of Emerson's proposals and determined that the proposals did not provide a basis for further discussions.[14] Therefore, his opinion that "[i]n the case of National Instruments, the existence of a credible acquisition *proposal* would directly impact how investors assessed the firm's future value and strategic trajectory"[15] is irrelevant to this matter because it says nothing about how investors would assess the firm's value based on a *double rejection* of a purportedly credible acquisition proposal.

18.    Additionally, none of the papers cited by Dr. Cain is informative about the probability of deal success or the impact on the target's stock price after a disclosure of the specific circumstances in this matter, because none of them address a situation in which all of the following conditions hold:

---

[12]    The assumptions regarding the Alleged Omissions I have been asked to assume are provided above in **Section I.B**.

[13]    Cain Merits Report, Section V.B.

[14]    "NI Letter to Emerson 6-16-2022," June 16, 2022, NAT-SL-00001254 – 255, at 255 ("The Board has unanimously determined that your letter does not provide a basis for further discussions."); "NI Letter to Emerson 8-2-2022," August 2, 2022, NAT-SL-00001239 – 240, at 240 ("The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders."); "National Instruments Corporation, Minutes of a Special Meeting of the Board of Directors," June 14, 2022, NAT-SL-00001447 – 448, at 448; "National Instruments Corporation Minutes of a Meeting of the Board of Directors," July 19 – 20, 2022, NAT-SL-00001457 – 509, at 457, 460, 461.

[15]    Cain Merits Report, ¶ 105. (Emphasis added).

- The target made an announcement (not a joint announcement or an acquirer announcement such as a tender offer);

- The target simultaneously announced the receipt of an offer and its rejection (not an announcement about the receipt of an offer that is follow by a separate announcement about the rejection of such offer—potentially days, weeks, or even months later);

- The rejection that the target announced pertained to two offers, both at the same price (not one offer, and not two offers at different, *i.e.*, increasing, prices).

19.    Because Dr. Cain's opinion about economic materiality is flawed, by extension, so is his opinion concerning loss causation.[16] Dr. Cain has not established an "economic, financial, and valuation link between the alleged omission of Emerson's offers to acquire National Instruments Common Stock and the price at which NI's Common Stock traded."[17]

### A.    Dr. Cain's event study and review of financial analyst and media commentary are irrelevant

20.    To support his opinion regarding the economic materiality of the Alleged Omissions, Dr. Cain presents an event study analysis of announcements made on January 13 and 17, 2023.[18] Dr. Cain also opines that the commentary of analysts and the financial press on public announcements of M&A developments that took place in January 2023 "strongly suggest" materiality of the Alleged Omissions.[19] I disagree—both Dr. Cain's event study analysis and his review of financial analyst and media commentary are irrelevant in assessing the economic materiality of the Alleged Omissions.

21.    Both analyses are an attempt to address the economic materiality of the announcements in January 2023. However, the January 2023 announcements were very different than the Alleged Omitted Information that NI could have disclosed at the start of and during the Proposed Class Period (*i.e.,* the information that could have been disclosed to the market included the *rejection* of two $48 per share proposals, not just the proposals themselves, and that

---

[16]    Cain Merits Report, Section VI.

[17]    Cain Merits Report, ¶ 130.

[18]    Cain Merits Report, ¶ 124.

[19]    Cain Merits Report, ¶¶ 126 – 127.

NI's Board had concluded the proposals were not in the best interests of NI's shareholders, and both of which the Board had determined did not provide a basis for further discussions with the unsolicited suitor).[20] By contrast, the January 2023 announcements revealed substantially different information, including that NI was seriously considering the sale of the Company, that Emerson had made a $53 per share proposal to acquire NI in 2022 (after the end of the Proposed Class Period), and that NI had executed a shareholder rights' plan.[21] Dr. Cain has acknowledged in his deposition ████████████████████████████████████████[22] He has not done so here. The January 2023 price reaction and commentary do not pertain solely to the "relevant truth," and Dr. Cain has not isolated any price impact attributable to that "truth" from the contemporaneous confounding announcements.[23]

22.    Therefore, the stock price reaction to and commentary about the January 2023 announcements reveal nothing about the economic materiality of the Alleged Omissions in this case. Plaintiff's suggestion in its class certification reply memorandum that I endorsed event

---

[20]    "First Emerson Letter to NI," May 25, 2022, NAT-SL-00001114 – 116; "NI Letter to Emerson 6-16-2022," June 16, 2022, NAT-SL-00001254 – 255, at 255 ("The Board has unanimously determined that your letter does not provide a basis for further discussions."); "Emerson Letter to NI June 22 2022," June 22, 2022, NAT-SL-00002991 – 994; "NI Letter to Emerson 8-2-2022," August 2, 2022, NAT-SL-00001239 – 240, at 240 ("The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders.").

[21]    Expert Report of David J. Denis, *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, June 16, 2025 ("Class Certification Rebuttal Report"), ¶¶ 18 – 20, 44, 46. *See also* "NI Announces Commencement of Strategic Review Process," *Businesswire*, January 13, 2023 ("Strategic Review Announcement"), available at https://www.businesswire.com/news/home/20230113005094/en/NIAnnounces-Commencement-of-Strategic-Review-Process; "Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share," *Emerson*, January 17, 2023, available at https://web.archive.org/web/20230127212705/https://www.maximizingvalueatni.com; National Instruments Corporation, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed May 25, 2023 ("Merger Proxy Statement"), pp. 25 – 31; "Immediate, Compelling And Certain Value For NI Shareholders," *Emerson*, January 17, 2023, available at https://www.emerson.com/documents/corporate/immediate-compelling-certainvalue-for-ni-shareholders-en-us-8730600.pdf; National Instruments Corporation, Form 8-K, filed January 13, 2023.

[22]    Deposition of Matthew Cain, June 3, 2025, at 119:3 – 120:15 ████████████████████
████████████████████████████████████████████████████████████████████████████

[23]    For example, as Dr. Cain acknowledges, in January 2023 NI "announced the strategic review via press release, stating that it would evaluate a full range of business and financial alternatives to maximize shareholder value" and Emerson "publicly disclosed its $53 per share proposal via press release." (Cain Merits Report, ¶¶ 102, 103). This information is not part of the Alleged Omitted Information that could have been disclosed during the Proposed Class Period.

studies to measure the impact of an acquisition offer on a stock price[24] misstates my testimony, which is clear that "this particular matter has unique circumstances."[25] Dr. Cain's event study does not address the price impact of the Alleged Omissions including a public announcement about the Board's *rejection* of two private and unsolicited proposals, both at a price of $48 per share, which is also lower than the January 2023 proposal of $53 per share. Neither is Dr. Cain's review of financial analyst and media commentary following the January 2023 announcements informative about the market's response to the Alleged Omissions as of the start of the Proposed Class Period.

23.     Dr. Cain's "but-for" price of $48 per share is an implicit acknowledgment of the irrelevance of his event study. When considering the price that NI stock would have traded if the Alleged Omissions were disclosed, Dr. Cain relied on the price of the latest proposal that NI's Board received and rejected, at $48 per share. Dr. Cain's lack of reliance on the stock price response to the January 2023 announcements, when news about a non-rejected, and higher-priced proposal came out, is inconsistent with Dr. Cain's opinion that the event study and analyst and financial press commentary "strongly suggest[s]" the materiality of the Alleged Omissions.[26]

---

[24]    Reply Memorandum of Law in Further Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, July 28, 2025, pp. 5 – 6 ("By contrast, Defendants' expert admitted that event studies and other standard economic tools can be used to measure the impact on a stock price of a potential merger or acquisition offer. *See* Ex. B, Denis Tr. at 45:16-21; 46:14-20; 47:5-12; 48:6-12; 48:18-22.").

[25]    Deposition of David J. Denis, July 21, 2025, at 47:5 – 48:15 ("Q. So Dr. Cain writes, for example, 'Mergers and acquisitions, arbitrage spreads and/or offer premiums analyses can be used to assess the impact on a stock price of merger negotiations and an acquisition offer premium.' Do you disagree with that? A. I think as a general statement that can be correct. Part of my criticism is that this particular matter has unique circumstances that I think would require Dr. Cain to put a little bit more specificity into how […] this could be done. […] Q. Well, acquisition, arbitrage spreads, Dr. Cain says that those can be used to assess the impact on a stock price. Merger negotiations and an acquisition offer premium. Do you disagree with that? A. I would agree there are circumstances in which those could be used. I think the circumstances of this matter make it a lot more challenging to do so, and it's not obvious it would apply at this time.").

[26]    Cain Merits Report, ¶¶ 18, 124, 127.

**B.      Dr. Cain's discussion of the academic literature to support his opinion that the Alleged Omissions are economically material does not address the information allegedly withheld in this case**

24.      Dr. Cain repeatedly cites academic literature to suggest that certain characteristics of Emerson's $48 per share acquisition proposal (*e.g.*, an all-cash structure,[27] a purportedly "generous" offer price premium[28]) and Emerson's "toehold"[29] indicate the proposal had a high likelihood of success and therefore represented an economically material event.[30] To further support his opinion that NI's Alleged Omissions were economically material, Dr. Cain relies on findings from academic literature purportedly supporting his view that markets react strongly to credible acquisition offers.[31] However, the literature on the takeover characteristics associated with the likelihood of deal success, and the literature on the price impact of takeover-related announcements that Dr. Cain discusses does not address the information allegedly withheld in this case and therefore provides no support for Dr. Cain's conclusion that NI's Alleged Omissions were material.

---

[27]    Cain Merits Report, ¶ 111.

[28]    Cain Merits Report, ¶ 112.

[29]    Cain Merits Report, ¶ 74.

[30]    Cain Merits Report, ¶¶ 112, 115, 135. *See also* Cain Merits Report, Appendix C, ¶ 30.

[31]    Cain Merits Report, ¶¶ 105 – 108.

25.    Dr. Cain cites nine papers[32] in support of the purported materiality of the Alleged Omissions.[33] Four of Dr. Cain's cited papers focus on rejected bids, but in the context of tender offers: Branch and Yang (2003),[34] Betton and Eckbo (2000),[35] Walkling (1985),[36] and Jindra and Walkling (2004).[37] Dr. Cain cites to these papers in his discussion of cash offers,[38] "toeholds"[39] and/or price impact following an acquisition-related announcement.[40] Tender offers are *public* announcements of an acquisition offer by the bidder, which can proceed directly to the

---

[32]    Cain Merits Report, Section IV and Section V. These papers are: 1) Bruner, Robert F., *Applied Mergers and Acquisitions*, University Edition (John Wiley & Sons, 2004) ("Bruner (2004)"); 2) Betton, Sandra and Eckbo, B. Espen, "Toeholds, Bid Jumps, and Expected Payoffs in Takeovers," *The Review of Financial Studies*, vol. 13, no. 4, Winter 2000 ("Betton and Eckbo (2000)"); 3) Walkling, Ralph A., "Predicting Tender Offer Success: A Logistic Analysis," *The Journal of Financial and Quantitative Analysis*, vol. 20, no. 4, December 1985 ("Walkling (1985)"); 4) Cain, Matthew D. and Denis, David J., "Information Production by Investment Banks: Evidence from Fairness Opinions," *Journal of Law and Economics*, vol. 56, no. 1, February 2013 ("Cain and Denis (2013)"); 5) Jindra, Jan and Walkling, Ralph A., "Speculation Spreads and the Market Pricing of Proposed Acquisitions," *Journal of Corporate Finance*, vol. 10, no. 4, September 2004 ("Jindra and Walkling (2004)"); 6) Fishman, Michael J., "Preemptive Bidding and the Role of the Medium of Exchange in Acquisitions," *The Journal of Finance*, vol. 44, no. 1, March 1989 ("Fishman (1989)"); 7) Branch, Ben and Yang, Taewon, "Predicting Successful Takeovers and Risk Arbitrage," *Quarterly Journal of Business and Economics*, vol. 42, no. 1/2, Winter/Spring 2003 ("Branch and Yang (2003)"); 8) Baker, Malcolm, Pan, Xin, and Wurgler, Jeffrey, "The Effect of Reference Point Prices on Mergers and Acquisitions," *Journal of Financial Economics*, vol. 106, no. 1, October 2012 ("Baker, Pan, and Wurgler (2012)"); 9) Cain, Matthew D., *et al.*, "Does *Revlon* Matter? A Empirical and Theoretical Study," *California Law Review*, vol. 108, no. 6, 2020 ("Cain *et al.* (2020)").

[33]    I exclude from this count MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, vol. 35, no. 1, March 1997 and Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance*, vol. 46, no. 5, December 1991, which Dr. Cain cites to support the wide use of event studies. I also exclude from this count Tabak, David and Dunbar, Frederick C., "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition (John Wiley & Sons, 2001) and Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, University Edition (John Wiley & Sons, 1996), which Dr. Cain cites to support that the value of a security is directly related to expectations about the future cash flows to holders of that security.

[34]    Branch and Yang (2003), p. 7 ("We collect information on 1,097 completed (successful or unsuccessful) stock, cash tender, and collar merger offers for the 1991 to 2000 period.").

[35]    Betton and Eckbo (2000), pp. 842, 846.

[36]    Walkling (1985), p. 465 ("The population addressed in this study consists of all cash tender offers filed at the SEC during the period 1972 through 1977.").

[37]    Jindra and Walkling (2004), p. 501 ("Our screening procedure results in a sample of 362 cash tender offers over the 1981 to 1995 period."). *See also* Cain Merits Report, ¶ 108.

[38]    Cain Merits Report, ¶ 111 (citing Branch and Yang (2003), p. 12).

[39]    Cain Merits Report, ¶¶ 74, 109 (citing Betton and Eckbo (2000) and Walking (1985)).

[40]    Cain Merits Report, ¶ 108 (citing Jindra and Walkling (1985)).

shareholders and bypass the target company's management and board of directors.[41] Tender offers thus convey economically different information to investors than the disclosure of *private* proposals that have already been considered and *rejected* by the target's board, such as the Alleged Omissions in this matter.[42]

26.    Dr. Cain also relies on Cain *et al.* (2020) when discussing the average premium and the average number of rounds of bidding for successful deals.[43] Cain *et al.* (2020)'s sample includes only deals for which a merger agreement was signed and publicly disclosed through SEC filings.[44] Successful deals that resulted in a merger agreement, and thus the papers that analyze them, are irrelevant to this case. While Emerson returned with a new proposal in November 2022 and ultimately acquired NI after public announcements were made in January 2023, that information was not known, and could not be disclosed, at the start of or during the Proposed Class Period. At that time what could have been disclosed was the Alleged Omitted Information, including that NI had twice rejected Emerson's unsolicited $48 proposals.[45] Dr. Cain's analysis that cites this paper is therefore not apposite.

27.    Dr. Cain cites Bruner (2004)'s summary of 25 academic studies,[46] but has not provided any evidence that those studies fit the facts in this matter. For example, studies which consider mergers, tender offers, white knight bids, long-run returns, deals involving banks,

---

[41]    *See*, *e.g.*, Branch and Yang (2003), p. 5 ("In tender offers, the offers can proceed directly to the shareholders, bypassing the target company's management and board of directors."); Betton and Eckbo, p. 846 ("To make a tender offer, the bidder must file a 14d statement with the SEC, which forms our initial sample source.").

[42]    "NI Letter to Emerson 6-16-2022," June 16, 2022, NAT-SL-00001254 – 255; "NI Letter to Emerson 8-2-2022," August 2, 2022, NAT-SL-00001239 – 240. *See also* Cain Merits Report, Section IV (Relevant Background) through Section V.B. (Fundamental Principles of Finance, Valuation, and Mergers & Acquisition Analysis).

[43]    Cain Merits Report, ¶¶ 112 – 114.

[44]    Cain *et al*. (2020), p. 1704 ("These transactions were announced during the time period 2003 through 2017 and meet all of the following criteria: […] (4) a merger agreement is signed and publicly disclosed through a filing with the Securities and Exchange Commission (SEC). Roughly 5% of the transactions were ultimately withdrawn.").

[45]    "First Emerson Letter to NI," May 25, 2022, NAT-SL-00001114 – 116; "NI Letter to Emerson 6-16-2022," June 16, 2022, NAT-SL-00001254 – 255, at 255 ("The Board has unanimously determined that your letter does not provide a basis for further discussions."); "Emerson Letter to NI June 22 2022," June 22, 2022, NAT-SL-00002991 – 994; "NI Letter to Emerson 8-2-2022," August 2, 2022, NAT-SL-00001239 – 240, at 240 ("The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders.").

[46]    Cain Merits Report, ¶¶ 107, 114.

stock-for-stock deals, and foreign bidders and/or targets,[47] do not closely mirror the Alleged Omitted Information here. Therefore, Dr. Cain's reliance on Bruner (2004)'s conclusion about returns that target firm shareholders enjoy is not appropriate in this matter.[48] Moreover, Dr. Cain also fails to recognize that, according to Bruner (2004), a "target's response to a buyer's initial pitch is a crucial inflection point" and that "[f]ollowing a rejection, most proposals die."[49]

28.    Dr. Cain's reliance on the estimate of a "takeover premium" reported in Cain and Denis (2013) is also flawed.[50] This estimate does not represent the price impact following the announcement of rejections, such as the rejected proposals in this matter,[51] as this paper is based on a sample of successful, negotiated mergers that disclosed fairness opinions, with a small percentage of withdrawn offers.[52] Additionally, the Alleged Omitted Information does not include any mention of a fairness opinion as there was not fairness opinion as of the start of the Proposed Class Period.[53]

29.    Dr. Cain also relies on Baker, Pan, and Wurgler (2012),[54] where the sample includes multiple types of deals or offers (e.g., completed and uncompleted, cash and non-cash,

---

[47]    Bruner (2004), Exhibit 3.3, pp. 37 – 38.

[48]    Bruner (2004), p. 36. *See also* Cain Merits Report, ¶¶ 107, 114.

[49]    Bruner (2004), p. 690 ("The target's response to the buyer's initial pitch is a crucial inflection point. If the target CEO is neutral or favorably disposed to the pitch, he or she will typically ask for time to consult advisers, and propose a meeting in a few days or weeks. This hiatus will give the target time to engage advisers, do some initial research on the buyer, brief the board, and set strategy. If the target has a strong prior desire to remain independent, or at least not to merge with the buyer, the target CEO will express strong and clear 'no'—this is the famous '*just say no*' defense, and must be grounded in some belief that the transaction is not in the interest of the target's shareholders and/or that the target has some other strategy that dominates the buyer's idea. […] Following a rejection, most merger proposals die."). (Italics in original).

[50]    Cain Merits Report, ¶ 107.

[51]    "First Emerson Letter to NI," May 25, 2022, NAT-SL-00001114 – 116; "NI Letter to Emerson 6-16-2022," June 16, 2022, NAT-SL-00001254 – 255; "Emerson Letter to NI June 22 2022," June 22, 2022, NAT-SL-00002991 – 994; "NI Letter to Emerson 8-2-2022," August 2, 2022, NAT-SL-00001239 – 240.

[52]    Cain and Denis (2013), pp. 252 – 253 ("Our sample begins with all negotiated mergers identified in the Securities Data Corporation (SDC) database involving publicly traded U.S. firms (acquirers and targets) between 1998 and 2005 […] Tender offers are excluded […] This process results in a sample of 582 mergers, including both completed (95 percent) and withdrawn transactions (5 percent)."), p. 246 ("Fairness opinions are a ubiquitous feature of negotiated mergers. In our sample of mergers between 1998 and 2005, over 96 percent of the transactions use a fairness opinion on either the target or the acquirer side.").

[53]    BofA Securities provided a fairness opinion on April 12, 2023 for the ultimate agreed upon price of $60 per share. Merger Proxy Statement, pp. 40 – 43.

[54]    Cain Merits Report, ¶ 112

14

tender offers and other offers).[55] Empirical estimates of the average premium and the likelihood of deal success that average across multiple types of deals or offers do not provide a reliable basis to assess the economic materiality of the specific Alleged Omissions in this matter. Dr. Cain's discussion of the average premium and likelihood of deal success reported in Baker, Pan, and Wurgler (2012) is misleading because that study does not address the information allegedly withheld in this case. Moreover, the explanation that Baker, Pan, and Wurgler (2012) provide for why the offer premium affects the likelihood of success is inconsistent with the documents in this matter.[56]

30.    Lastly, theoretical analyses, such as Fishman (1989),[57] which Dr. Cain relies on when discussing cash offers,[58] also are not informative about the facts in this matter.

31.    Dr. Cain also opines that the pricing of Emerson's proposal relative to NI's trading history supports "the credibility and likelihood of Emerson's acquisition proposal."[59] Yet Dr. Cain fails to acknowledge that, contrary to his assertion, one of the papers he cites (Branch and Yang (2003)) finds the bid premium to *not* be a statistically significant factor predicting the probability of success of a bid, and discusses that this is confirmed by some of the literature.[60]

---

[55]   Baker, Pan, and Wurgler (2012), p. 54 (Table 1), p. 55 ("Of the 6,462 deals that Thomson records as either completed or withdrawn, 25% are withdrawn."). *See also* Cain Merits Report, ¶ 112.

[56]   Baker, Pan, and Wurgler (2012) argue that "lacking time, information, and ability to accurately compute present values of future cash flows under alternative scenarios, some of them will consult recent peak prices as references." (Baker, Pan, and Wurgler (2012), p. 52). In NI's case, two private consecutive same-price offers were twice rejected, and documents indicate that the Board thoroughly evaluated Emerson's proposals. (*See*, *e.g.*, "National Instruments Corporation, Minutes of a Special Meeting of the Board of Directors," June 14, 2022, NAT-SL-00001447 – 448, at 448; "Project Wolverine Discussion Materials, BofA Securities," June 2022, NAT-SL-00001513 – 545; "National Instruments Corporation Minutes of a Meeting of the Board of Directors," July 19 – 20, 2022, NAT-SL-00001457 – 509, at 457, 460, 461). Baker, Pan, and Wurgler (2012) do not provide estimates for the probability of success after such rejected offers are announced.

[57]   This paper provides a theoretical analysis of a bidder's public offer (observable to the other bidder), showing that the bidder chooses a cash offer over a securities offer as a signal of having private information and to deter competing bids. *See* Fishman (1989), p. 41 ("The medium of exchange in acquisitions is studied in a model where (i) bidders' offers bring forth potential competition and (ii) targets and bidders are asymmetrically informed. In equilibrium, both securities and cash offers are observed […] Cash has the advantage of serving in equilibrium to "preempt" competition by signaling a high valuation for the target.").

[58]   Cain Merits Report, ¶ 111.

[59]   Cain Merits Report, ¶ 112.

[60]   Branch and Yang (2003), p. 6 ("Mitchell and Pulvino (2002) and Baker and Savasoglu (2002), however, can not find a significant role for bid premium in estimating a probability of merger completion/success."), p. 12 ("We do not find the bid premium and post price variables to be statistically significant at the level of α = 0.1 in the prediction model."). Dr. Cain relies on this paper's other finding—that "a cash payment is likely to improve the

Even if Branch and Yang (2003) was a relevant paper—which it is not because it studies stock, cash tender, and collar merger offers, which was not the proposal here—Dr. Cain appears to have cherry-picked findings in the literature to selectively support conclusions regarding materiality.

32.    To support his conclusion that the deal characteristics in this matter would have indicated a high probability of deal success, Dr. Cain also relies on academic literature concerning "toeholds." Dr. Cain argues that Emerson's acquisition of NI shares would have represented a "toehold" that increases the likelihood of a successful acquisition, based on findings in Betton and Eckbo (2000) and Walkling (1985).[61] Even if these papers were relevant—which they are not[62]—Dr. Cain fails to recognize that the "toeholds" that these papers report are far above Emerson's stake in NI. Specifically, while as Dr. Cain describes ██████████████████████████████████████████████████████████████████ "[64] Betton and Eckbo (2000) report an average toehold of 7 percent in cases where the target management is "opposed,"[65] and Walkling (1985) reports a 9 percent average toehold for contested offers.[66]

33.    Dr. Cain also cites academic literature to argue that "targets initially reject[ing] offers and negotiat[ing] for better terms, is common"[67] and that "rejecting an initial offer is not necessarily a refusal, but rather commonly part of a deliberate and strategic negotiating process,

---

probability of merger completion/success, as compared with a stock payment offer" to support his opinion that the all-cash characteristic of Emerson's proposal would have also positively influenced both "deal outcomes and market perceptions." (Cain Merits Report, ¶ 111 citing Branch and Yang (2003), p. 12).

[61]    Cain Merits Report, ¶¶ 74, 109 – 110, 115.

[62]    Both Betton and Eckbo (2000) and Walkling (1985) analyze tender offers. (Betton and Eckbo (2000), pp. 842, 846; Walkling (1985), p. 465). Their findings are based on all toeholds in the sample and are not informative for the situation in this matter in which NI had already rejected two offers from Emerson.

[63]    Cain Merits Report, ¶ 74.

[64]    Cain Merits Report, ¶ 80.

[65]    Betton and Eckbo (2000), pp. 857 – 858 (Table 4) (showing panel III "Target management opposed" defined as "Opposed: Target management states that the offer is unfair; fraudulent; inadequate; unfriendly; that it is suing or otherwise intending to fights the takeover; or that it has received or been denied an injunction against the bidder.").

[66]    Walkling (1985), p. 472 ("The percentage of shares controlled by the bidder is much higher in the uncontested offers (33 percent compared to 9 percent)"), p. 470 ("managerial resistance is the key factor in separating successful from unsuccessful offers.")

[67]    Cain Merits Report, ¶ 113.

16

intended to invite competing offers or improved terms that enhance shareholder value."[68] Dr. Cain therefore argues that rejecting an initial offer is not a factor that would affect the likelihood of success.[69] However, by stating that a rejection is "not necessarily a refusal," Dr. Cain appears to also acknowledge that some rejections are refusals. He fails to account for the documents here that show that NI's rejection was a firm and unequivocal refusal, rather than an invitation for improved terms. NI's first rejection to Emerson stated that "[t]he Board has unanimously determined that your letter does not provide a basis for further discussions"[70] and the second rejection stated that "[t]he Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders."[71] NI Board meeting documents prepared when the Board was considering Emerson's proposal show that this exact messaging falls in the category of an ███████████████████████████████████████ based on the response options that NI considered.[72] Dr. Cain cites to these response options without acknowledging that the language used in NI's rejection letters was inconsistent with a "soft rejection," according to NI's own analysis.[73]

### IV. Dr. Cain does not appear to dispute my opinion that a firm receives no ill-gotten gains from conducting repurchases, even assuming it was in possession of MNPI

34.    I understand from counsel that damages for insider trading claims are limited to the insider's allegedly ill-gotten gains. In my Class Certification Rebuttal Report, I explained that ill-gotten gains are zero in this case:

> [B]ecause share repurchases distribute excess cash to shareholders and are functionally equivalent to dividends in that respect, NI (as a company) did not profit from its share repurchases, even assuming the repurchases occurred while NI was in possession of MNPI that indicated the firm's

---

[68]   Cain Merits Report, ¶ 114.

[69]   Cain Merits Report, ¶¶ 113, 114.

[70]   "NI Letter to Emerson 6-16-2022," June 16, 2022, NAT-SL-00001254 – 255, at 255.

[71]   "NI Letter to Emerson 8-2-2022," August 2, 2022, NAT-SL-00001239 – 240, at 240.

[72]   "Project Wolverine: Meeting of the Board of Directors, Wachtell, Lipton, Rosen & Katz," June 14, 2022, NAT-SL-00022986 – 3006, at 991 (███████████████████████████████████████████████████████████████████████████████

[73]   Cain Merits Report, ¶ 44.

share price was undervalued. This implies that damages are zero to the Class, given my understanding that damages are measured by and limited to NI's ill-gotten gains.[74]

35.    Dr. Cain acknowledges my "focus on firm-level profits"[75] and does not appear to dispute my opinion that a firm receives no ill-gotten gains from conducting share repurchases at allegedly deflated prices while in possession of MNPI. In other words, he provides no evidence that NI benefited from conducting its repurchases while the share prices were allegedly deflated.

36.    In Appendix C of the Cain Merits Report, Dr. Cain provides several irrelevant discussions as to why a firm might choose to distribute cash to shareholders via share repurchases rather than dividends.[76] However, the question in this case is whether the firm had any *ill-gotten* gains from conducting repurchases *while allegedly in possession of MNPI that indicated the share prices were allegedly undervalued*. The answer to that is no. Reasons why a firm might choose repurchases over dividends (or vice versa) that are unrelated to whether the firm possesses MNPI are irrelevant to this case. I address each of Dr. Cain's opinions concerning repurchases and dividends in **Section VII**.

## V.    Dr. Cain ignores one plausible "but-for" world in which out-of-pocket damages are zero

37.    As discussed above and in my Class Certification Rebuttal Report, I understand that damages for insider trading claims are limited to the insider's allegedly ill-gotten gains. My opinion is that in this case those are zero. Dr. Cain's understanding is that Plaintiff does not allege a claim that results in this damages approach and calculation.[77] With this understanding, he then opines that the out-of-pocket measure of damages is appropriate.[78] However, even if the

---

[74]    Class Certification Rebuttal Report, ¶ 25.

[75]    Cain Merits Report, Appendix C, ¶ 37.

[76]    Cain Merits Report, Appendix C, ¶¶ 38 – 49.

[77]    Cain Merits Report, Appendix C, ¶ 35 ("My understanding is that this case does not allege a Section 20A claim.").

[78]    Cain Merits Report, footnote 3 ("the out-of-pocket damages methodology, which is used in virtually all Section 10(b) securities class actions, is appropriate and applicable here."), Appendix C, ¶ 35 ("It [this case] alleges a violation of Rule 10b-5 based on NI's repurchases while in possession of MNPI concerning Emerson's offers to acquire the Company's Common Stock.").

18

out-of-pocket measure applies, Dr. Cain has still not addressed how to calculate damages under a "but-for" world where, rather than disclose the Alleged Omissions, the company simply refrained from repurchasing.[79] In that situation, damages are also zero. The reason, as I explain further below, is that if there was no disclosure of the Alleged Omitted Information, the "but-for" price would be the same as the actual price.[80]

38.      Dr. Cain says this issue is "irrelevant" because "had NI abstained from repurchase activity during the Class Period, Plaintiff's Complaint would not contain allegations of a securities law violation in this matter."[81] This is a puzzling argument because there presumably would be no allegations of a securities law violation had NI disclosed the alleged MNPI, which Dr. Cain assumes for his "but-for" world. Dr. Cain says he is "unaware of any requirement or historical precedent for a damages expert proposing a damages methodology to address a situation in which there is no alleged violation of the law."[82] Yet, that is exactly what damages experts do in *every matter*; they quantify damages by comparing the actual world to the world in which there was no alleged violation of the law. If a company in possession of MNPI can either abstain from trading in its own shares or disclose the MNPI, two alternatives that Plaintiffs allege in the Amended Complaint,[83] then Dr. Cain should consider a "but-for" world in which NI chooses to abstain from repurchases, as well as a "but-for" world in which NI discloses the MNPI.

39.      Dr. Cain has not addressed this circumstance, but I do. Damages are still zero. In the world in which the company did not disclose and did not repurchase, the set of public

---

[79]    As noted above, I understand insiders with MNPI have a duty to either disclose the MNPI or refrain from trading.

[80]    Dr. Cain states that "had the relevant truth been disclosed as of the start of the Class Period, NI's Common Stock would have traded at or above $48 per share throughout the Class Period. In other words, the 'but-for' price equals at least $48 per share." (Cain Merits Report, ¶ 134). However, had there been no disclosure, there would have been no economic reason for the price to change so the "but-for" price would equal the actual price.

[81]    Cain Merits Report, Appendix C, ¶ 53.

[82]    Cain Merits Report, Appendix C, ¶ 53.

[83]    Amended Complaint, ¶ 83 ("Under Section 10(b) and Rule 10b-5, National Instruments was required to abstain from trading in National Instruments' securities or to disclose this material information concerning Emerson's offer."). The court also recognized these alternatives in its Opinion and Order on NI's motion to dismiss, which says: "[t]he plaintiff also alleges that NI violated § 10(b) and Rule 10b-5 by failing to either abstain from trading in NI's securities or to disclose Emerson's offers while buying back NI's securities." (MTD Opinion and Order, p. 15).

information would be unchanged from the actual world, and thus NI's "but-for" stock price would be the same as the actual stock price. Hence, there would be no deflation. Shareholders that sold shares during the Proposed Class Period would sell shares in the "but-for" world at the same price as in the actual world. The only difference would be that some of the investors would be selling to different counterparties (because the company would not, in this "but-for" world, be buying its shares back). Because the price is unchanged, there is no deflation and there would be no damages.

40.     Alternatively, even if repurchases were to have a positive signaling effect, as Dr. Cain contends,[84] in such a situation, NI's "but-for" price assuming no repurchases would have been *lower* by whatever amount (if any) that the signaling effect increased the price. In this case, sellers would have been worse off had NI refrained from repurchases, and so damages to sellers would be negative. Therefore, under Dr. Cain's out-of-pocket approach, damages would be at most zero had NI abstained from repurchases.

## VI.    Dr. Cain's measurement of economic losses and corresponding damages analysis are both flawed

41.     Dr. Cain concludes that "had the relevant truth been disclosed as of the start of the Class Period, NI's Common Stock would have traded at or above $48 per share throughout the Class Period" and that "[t]his measure of an investor's damages is conservative."[85]

42.     Even if I assume, contrary to my opinions above, that Dr. Cain *has* established economic materiality and loss causation, that damages are *not* limited to NI's ill-gotten gains (which are zero), and that the appropriate "but-for" world is one in which NI disclosed the alleged "relevant truth" rather than abstained from repurchasing, even then his $48 "but-for" price is still speculative and falls short of having sufficient economic basis to be reliable. The available academic evidence, though not quite specific to NI's circumstances, nonetheless undermines Dr. Cain's assumed "but-for" price of $48 per share.

43.     Additionally, Dr. Cain does not address the unique circumstance of this matter, that news about the acquisition came out several months after the end of the Proposed Class

---

[84]    Cain Merits Report, Appendix C, ¶ 39.

[85]    Cain Merits Report, ¶ 134.

Period ("October – January Period"), and as Dr. Cain states, his estimated deflation continued during this period.[86] Because of each of these unique circumstances, there may be gains that would offset any potential damages to the proposed class members, and Dr. Cain has neither discussed nor provided a methodology to account for these unique economic issues. Therefore, his out-of-pocket damages analysis is flawed.

**A.    Dr. Cain's $48 per share "but-for" price is speculative, lacks economic basis, and overstates deflation**

44.    The purported analysis Dr. Cain conducts to arrive at a "but-for" price of $48 has no economic basis, and neither does his conclusion that such a "but-for" price is conservative. NI's price following the two rejections would be a weighted average of its stand-alone value and the expected price if acquired, where the weights are determined by the probability of the acquisition closing. The day before the Proposed Class Period (on August 11, 2022), the closing price of NI's stock was $40.14.[87] Dr. Cain's opines that NI's "but-for" price would be $48 per share.[88] He justifies this in part because "[a]s of the start of the Class Period, Emerson executives had offered $48 per share and indicated their willingness to work with National Instruments 'to find additional value that would allow [Emerson executives] to increase [their] Proposal.'"[89] Therefore, his "but-for" price assumes either a very high probability of an acquisition, a very high expected acquisition price if acquired, or both. Dr. Cain has not provided any justification for these implied assumptions. For example, one implication of Dr. Cain's "but-for" price is that the market would view the probability of the deal closing at $48 per share (or higher) as 100 percent, or close to that probability. Such as assumption would be nonsensical. As I discuss above, the announcement would be the Alleged Omitted Information, including that NI's Board had unanimously *rejected* two $48 per share proposals, after careful consideration and advice from its legal and financial advisors as not in the best interests of NI's shareholders, and both of which the Board had determined did not provide a basis for further discussions with the

---

[86]    Cain Merits Report, ¶ 134, footnote 178.

[87]    S&P Capital IQ.

[88]    Cain Merits Report, ¶ 134.

[89]    Cain Merits Report, ¶ 135.

unsolicited suitor.[90] The "but-for" announcement would not be that a $48 transaction was likely or even that a $48 per share offer was pending.

45.    It is puzzling that Dr. Cain has failed to cite specific academic literature supporting his "but-for" price of $48 per share. Dr. Cain states the following without any support:

> "Academic research documents that target stock prices frequently trade above offer prices, and this effect is more pronounced in hostile transactions and when bidders accumulate target share ownership (*i.e.*, toeholds)."[91]

46.    If Dr. Cain is relying on Jindra and Walkling (2004) to argue that target stock prices frequently rise above the initial offer price,[92] and therefore NI's stock price also would have done so "but for" the Alleged Omissions, that argument is flawed. Jindra and Walkling's (2004) findings are not relevant because they study cash tender offers (a public disclosure of the offer by the acquirer to bypass the target's Board), most of which were completed.[93] Such announcements are fundamentally different from the disclosure by the target that its' Board rejected two same-priced proposals, at a time when the success or failure of the deal is

---

[90]    "First Emerson Letter to NI," May 25, 2022, NAT-SL-00001114 – 116; "NI Letter to Emerson 6-16-2022," June 16, 2022, NAT-SL-00001254 – 255, at 255 ("The Board has unanimously determined that your letter does not provide a basis for further discussions."); "Emerson Letter to NI June 22 2022," June 22, 2022, NAT-SL-00002991 – 994; "NI Letter to Emerson 8-2-2022," August 2, 2022, NAT-SL-00001239 – 240, at 240 ("The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders.").

[91]    Cain Merits Report, ¶ 135.

[92]    Cain Merits Report, ¶ 108 (discussing Jindra and Walkling (2004) finding as "a phenomenon known as a negative arbitrage spread—indicating that investors anticipate increased offers or competing bids. Specifically, they show that on average, 23% of targets have a negative spread, with the rate exceeding 40% in certain years (citing to Jindra and Walkling (2004), p. 502, Table 1). These market dynamics reflect investors' expectations that the initial offer may undervalue the firm and that additional bids or improvements are likely. The authors also find that this effect is more pronounced in hostile deals and when bidders employ toehold strategies.").

[93]    Jindra and Walkling (2004), pp. 510 – 511 (Table 3) (Of the 362 sampled tender offers, 96.7% were completed (vs. withdrawn); 78.7% were friendly (vs. hostile); 28.5% included multiple bidders; and 41.7% included bid revisions.).

unknown.[94] Even if Dr. Cain's interpretation of the study's findings is correct,[95] this paper is not informative about the stock price reaction in response to disclosure of the Alleged Omissions in this matter. The toehold literature cited by Dr. Cain that he may be referring to as support is also irrelevant: Walkling (1985) also studies cash tender offers,[96] as do Betton and Eckbo (2000).[97] Furthermore, as I discuss above, the toeholds analyzed in those papers are much larger than Emerson's toehold in this matter.[98]

47.    In fact, academic literature on price reactions to rejected or failed deals generally finds that prices increase upon the announcement of the offer but then revert for rejected offers, and Dr. Cain has not considered the price decline and reversion after rejections/failures. For example, in a recent paper with "a large hand-collected sample" that provides reasons for rejections and failures, Even-Tov *et al.* (2024) estimate average cumulative abnormal returns, across both the initial price increase upon announcement and the subsequent reversion upon rejection, of 7.34 percent (and median cumulative abnormal return of 5.56 percent) for offers that are rejected by the target, measured from 25 trading days before the acquisition announcement to

---

[94]   "NI Letter to Emerson 6-16-2022," June 16, 2022, NAT-SL-00001254 – 255, at 255 ("The Board has unanimously determined that your letter does not provide a basis for further discussions."); "NI Letter to Emerson 8-2-2022," August 2, 2022, NAT-SL-00001239 – 240, at 240 ("The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders.").

[95]   Dr. Cain does not discuss Jindra and Walkling's (2004) finding that "the *typical* stock price of a target firm on the day after the acquisition announcement increases to an amount *just below* the initial bid price." (Jindra and Walkling (2004), p. 501). (Emphasis added). Jindra and Walkling (2004) present nine regression models "explaining the speculation spread with ex ante characteristics," of which only four report a statistically significant negative coefficient on the toehold dummy (*i.e.*, indicating a greater market price reaction). For the "friendly" dummy, Jindra and Walkling (2004) find that when looking at mostly completed (*i.e.*, successful) deals, offers that were hostile were associated with a lower spread (*i.e.*, indicating a great market price reaction), which could include situations where market price jumps to a level higher than the announced bid price, but these findings do not establish that all hostile offers were associated with this negative spread. (*See* Jindra and Walkling (2004), p. 516, Table 6).

[96]   Walking (1985), p. 465 ("The population addressed in this study consists of all cash tender offers filed at the SEC during the period 1972 through 1977.").

[97]   Betton and Eckbo (2000), pp. 846 – 847.

[98]   As Dr. Cain describes NI was informed on August 10, 2022 that "Emerson had acquired […] nearly one percent of shares outstanding" and that "[b]y August 29, Emerson's stake had grown to […] 1.73 percent of shares outstanding," (Cain Merits Report, ¶ 74, 80). Betton and Eckbo (2000) report an average toehold of 7 percent in cases where the target management is opposed, and Walkling (1985) reports a 9 percent average toehold for contested offers (*See* Betton and Eckbo (2000), pp. 857 – 858, Table 4; Walkling (1985), p. 472).

25 trading days after the target's rejection and the offer's failure.[99] While the sample in Even-Tov *et al.* (2024) does not fully reflect the facts and circumstances in this case (*e.g.*, an announcement of two rejected proposals),[100] its sub-sample involving target's rejection of offers[101] is a closer match to the issues of this case than the literature that Dr. Cain appears to rely on to arrive at his "but-for" price of $48. Using the average and median cumulative abnormal return from 25 trading days before the acquisition announcement to 25 trading days after the target's rejection and offer's failure of 7.34 percent and 5.56 percent implies a "but-for" price of $43.09 and $42.37, respectively.[102] It should be noted that these estimates are based on average and median values for the offers that failed due to the target's rejection and therefore may not adequately control for relevant firm-specific, offer-specific, or rejection-specific characteristics, but they are at least based on the documented reversion in price after offers are rejected.

## B.    Dr. Cain's out-of-pocket damages analysis is flawed because it does not address the circumstance of this matter

48.    Dr. Cain describes the out-of-pocket damages as "the artificial deflation per share at the time of sale less the artificial deflation per share at the time of purchase" and provides an

---

[99]    Even-Tov, Omri, *et al.*, "Failed Acquisition Offers: The Impact of Failure Reasons on Target Valuation," *Finance Research Letters*, vol. 63, May 2024 ("Even-Tov *et al.* (2024)"), p. 1 ("We categorize failure reasons into two groups: offers rejected by the target (rejection group) and all other reasons without explicit target objection (non-rejection group). To assess the impact of failure reasons on target valuation, we calculate cumulative abnormal returns (CAR) across various subwindows of the entire proposal period, which spans from 25 trading days before the acquisition announcement to 25 days after the offer failure date."), p. 4 (Table 2 showing "CAR [A-25, F+25]" for "Rejection group" with a "Mean" of 7.34% and a "Median" of 5.56%.).

[100]    Like the studies cited in the Cain Merits Report, this estimate is based on a sample that does not isolate the price impact solely attributable to the target simultaneously disclosing an offer and its rejection by the Board, for two private offers that were identically priced.

[101]    *See* Even-Tov *et al.* (2024), p. 2 ("Beginning with 63,082 acquisition offers in the Securities Data Company (SDC) Mergers and Acquisitions database between 1979 and 2016 […] we exclude […] successful acquisitions […] offers to purchase less than 50% […] targets with market values below $10 million […] and offers classified as 'Seeking Buyer Withdrawn' or 'Dis Rumor.' […] offers with unclear or multiple failure reasons that prevent clean categorization […] observations misclassified by SDC […] cases without any press release discussing the acquisition process. Additionally, we consolidate failed bids for the same target into one observation […] and exclude […] observations where another bid for the same target succeeded. Our final sample consists of 1246 observations. […] The rejection group [offers rejected by the target] comprises 673 observations.").

[102]    Calculated as 100 + 7.34 percent and 100 + 5.56 percent, respectively, times the closing price the day before the start of the Proposed Class Period on August 11, 2022 ($40.14).

24

example for a security that was purchased prior to the start of the Proposed Class Period, and sold during the Proposed Class Period.[103] Dr. Cain either assumes (or is instructed by counsel) that "*only* Class members who purchased or otherwise acquired National Instruments Common Stock *prior* to the start of the Class Period and who sold those shares *during* the Class Period are eligible to recover damages,"[104] recognizing that "the Court may impose additional limitations on the calculation of individual investor damages, such as offsetting gain generated on other trades (*e.g.*, purchasing shares *during* the Class Period at deflated prices and selling those shares *after* the alleged revelation of the truth)."[105]

49.	Therefore, Dr. Cain implicitly recognizes that a member of the proposed class could be better off as a result of purchasing NI stock during the Proposed Class Period at allegedly deflated prices and selling after that deflation has dissipated. However, that is not the only situation where a member of the proposed class could have an "offsetting gain generated on other trades."[106]

50.	In this matter, news about the proposed acquisition came out several months *after* the end of the Proposed Class Period (October – January Period). This is not a situation that "commonly arise[s] in securities litigation matters and [is] commonly addressed at trial," contrary to Dr. Cain's general claim,[107] and is not represented by the situation that Dr. Cain defers to the Court.[108] Dr. Cain opines that "NI's Common Stock prices remained artificially deflated until the January 17, 2023 disclosure."[109] If this is accurate, members of the class could have also bought NI shares at allegedly deflated prices *after* the Proposed Class period (not only *during*, as Dr. Cain acknowledges[110]). If a class member purchased shares during the October – January Period and held them through the January 17, 2023 announcement, the benefits from buying shares at a deflated price during the October – January Period could have offset economic

---

[103]	Cain Merits Report, ¶¶ 139 – 140.

[104]	Cain Merits Report, ¶ 139. (Emphasis added).

[105]	Cain Merits Report, footnote 179. (Emphasis added).

[106]	Cain Merits Report, footnote 179.

[107]	Cain Merits Report, Appendix C, ¶ 54.

[108]	Cain Merits Report, footnote 179. (Emphasis added).

[109]	Cain Merits Report, ¶ 134, footnote 178.

[110]	Cain Merits Report, ¶ 139 and footnote 179.

losses from that class members' sales of other shares at a deflated price during the Proposed Class Period. Dr. Cain also fails to acknowledge another situation where a member of the Proposed Class may receive an "offsetting gain." This situation arises when a member of the Proposed Class benefits from shares purchased *prior* to the Proposed Class Period that were *not sold* while the price was allegedly deflated.[111] Dr. Cain fails to provide a reliable and accurate methodology to account for benefits (if any) that members of the Proposed Class may have received in this situation, even though I have raised these issues in my Class Certification Rebuttal Report.[112]

### VII. Dr. Cain's opinions on differences between repurchases and dividends are irrelevant to my opinion that a firm receives no ill-gotten gains from conducting repurchases at allegedly deflated prices, even while in possession of MNPI

51.    Dr. Cain's critique of my Class Certification Rebuttal Report in Appendix C of the Cain Merits Report is a red herring. The central point of my report is that a firm receives no ill-gotten gains from conducting repurchases at allegedly deflated prices while in possession of MNPI. By focusing on marginal potential differences between dividends and repurchases in imperfect capital markets, managerial incentives, and corresponding reasons why a firm might choose repurchases over dividends (or vice versa), which are unrelated to whether the firm possesses MNPI and gains from repurchasing at allegedly deflated prices, Dr. Cain's critique is misleading and fails to rebut this central issue in my opinion.

52.    Dr. Cain does not appear to dispute the similarity between dividends and repurchases in the sense that dividends and repurchases both distribute cash to shareholders.[113] Dr. Cain also does not disagree that a firm's repurchases do not affect the firm's intrinsic value

---

[111]    Class Certification Rebuttal Report, ¶¶ 31, 50.

[112]    Class Certification Rebuttal Report, ¶¶ 50 – 51.

[113]    Class Certification Rebuttal Report, ¶ 29 ("If a firm (such as NI) repurchases its shares in the market—for example, by purchasing $100 million worth of shares—it distributes $100 million in cash to the selling shareholders. As a result of the repurchase, the number of shares outstanding is reduced. If the firm instead paid a dividend of $100 million, it would similarly distribute $100 million to all shareholders, but in this scenario, the number of shares outstanding would remain unchanged. In both cases, however, the firm would end up in the same economic position. The firm would have $100 million less cash, reflecting the amount distributed to shareholders, although potentially different subsets of shareholders.").

(*i.e.*, the present value of the firm's cash flows).[114] These fundamental features of a repurchase imply that a company does not profit from its share repurchases, unlike an individual who buys shares while in possession of MNPI.[115]

> **A.    Dr. Cain's opinion that repurchases and dividends can have materially different implications for firm value based on the signaling theory is irrelevant to my opinions**

53.    Dr. Cain's discussion of the signaling theory of repurchases, where "the repurchase serves as a signal of private information,"[116] purportedly addresses my "claim that repurchases and dividends have the same effect on the present value of the firm's cash flows."[117] It does not, however, address the central point of my report that a firm receives no ill-gotten gains from conducting repurchases at allegedly deflated prices *while in possession of MNPI*.

54.    Dr. Cain cites one study of potential signaling benefits of repurchases, Bond and Zhong (2016), to conclude that, as a result of such signaling, "a firm is able to issue equity on more favorable terms," thereby producing an improvement in firm value "that would not be achievable under a dividend strategy."[118] In fact, Dr. Cain has misread and misinterpreted the Bond and Zhong study. The study does not support a claim that repurchases produced an improvement in firm value that would not be achievable under dividends. In the theoretical model presented by Bond and Zhong (2016), the authors do not make any direct comparisons

---

[114]    Class Certification Report, footnote 46, quoting Berk, Jonathan and DeMarzo, Peter, *Corporate Finance: The Core*, Second Edition (Prentice Hall, 2011) that "buying or selling shares is a zero-NPV transaction."

[115]    Class Certification Report, ¶ 26 ("A firm repurchasing its own shares (such as NI did during the proposed Class Period) is an economically different transaction from an individual purchasing a firm's shares for the individual's gain. An individual purchasing a share is buying an asset with a value that may increase or decrease over time. An individual that purchases a firm's shares while possessing MNPI may receive economic benefit. For example, an individual with positive MNPI (i.e., indicating the shares are undervalued in the market) gains when the share price increases once the MNPI is revealed. If the MNPI had instead been disclosed before the individual traded or if the individual had refrained from trading, the individual would not have received the gains from the share price increase."), ¶ 27 ("Unlike an individual who uses cash (an asset) to buy shares (another asset), corporate share repurchases (such as those authorized by NI) are a means of distributing cash to a firm's shareholders, analogous to dividends, that reduces the company's assets. After a company repurchases its shares, the repurchased shares become treasury shares and subsequently may be canceled (retired) […] As a result, such repurchase transactions render these shares valueless, effectively the same as unissued shares.").

[116]    Cain Merits Report, Appendix C, ¶ 39.

[117]    Cain Merits Report, Appendix C, ¶ 41.

[118]    Cain Merits Report, Appendix C, ¶ 39.

between the choice to issue dividends versus repurchase shares.[119] In fact, as Bond and Zhong (2016) explain:

> "[] large literature studies signaling in static payout models. Although many of these models are written in terms of dividend payouts rather than repurchases, *the economic effects would apply similarly to repurchases, and so we discuss both together*."[120]

55.    Furthermore, as Dr. Cain recognizes, Bond and Zhong (2016) develop a "theoretical model in which firms with private information about undervaluation repurchase shares *in advance of a seasoned equity offering (SEO). […] [and] as a result, the firm is able to issue new equity on more favorable terms.*"[121] NI had no seasoned equity offerings after its repurchases during the Proposed Class Period. Thus, the scenario discussed by Dr. Cain is irrelevant to this matter.

56.    Even if there are signaling benefits to repurchases due to the specific market imperfection of asymmetric information, such signaling benefits do not affect the intrinsic value of the company. They only impact investors' perception of that value. In other words, even if investors interpret announcements of repurchases (or dividends) as signals of value, the present value of the company's future cash flows is not changed as a result of the company announcing a share repurchase. Investors simply update their estimates of that present value.

57.    Finally, the purported signaling benefits that Dr. Cain cites would only serve to increase the price of NI's shares relative to what it would have been in the absence of the repurchase, contrary to Plaintiff's claims that NI's stock price was deflated. In other words, if Dr. Cain is correct that repurchases increase share price via a signaling mechanism, shareholders would have been worse off had they sold shares in the absence of the repurchase.[122] Even if Dr.

---

[119]    The theoretical model developed by Bond and Zhong (2016) models a firm's choice, in each of the two different periods, to either: 1) issue a stock repurchasing strategy to buy shares, 2) issue a secondary offering to sell additional shares, or 3) commit no actions. *See* Bond, Philip, and Zhong, Hongda, "Buying High and Selling Low: Stock Repurchases and Persistent Asymmetric Information," *The Review of Financial Studies*, vol. 29, no. 6, June 2016 ("Bond and Zhong (2016)").

[120]    Bond and Zhong (2016), p. 1411. (Emphasis added).

[121]    Cain Merits Report, Appendix C, ¶ 39. (Emphasis added).

[122]    Class Certification Report, footnote 52 ("Even if NI's repurchases would have had any kind of impact on stock price from a signaling theory perspective—those repurchases would have increased the stock price, if anything, rather than depressed it.").

28

Cain were correct that repurchases have a different impact on firm value than dividends, such an opinion, if anything, undermines his damages opinion that NI's share price was deflated during the Proposed Class Period.

> **B.    Dr. Cain's opinion that repurchases and dividends can have materially different implications for firm value in light of a tax-efficient capital structure optimization is irrelevant to my opinions**

58.    Dr. Cain also argues that repurchases can be used to alter the firm's capital structure to be more tax-advantaged.[123] Specifically, he cites Vermaelen (2005) to argue that firms with excess debt capacity can borrow to fund repurchases, thereby lowering the company's tax burden due to the tax deductibility of interest payments.[124] The gain to the firm, according to Dr. Cain, is the result of a lower tax burden from additional debt financing, "since interest payments on debt are tax-deductible whereas equity financing costs are not,"[125] commonly referred to as a "debt tax shield." This point Dr. Cain raises does not address the central point of my report that a firm receives no *ill-gotten* gains from conducting repurchases at allegedly deflated prices *while in possession of MNPI*. Even if the "debt tax shield" was the reason to conduct repurchases, that reason is unaffected by the alleged MNPI.

59.    However, it is also incorrect for Dr. Cain to claim that financing repurchases through borrowing to increase after-tax cash flows represents a benefit that is "not available under a dividend strategy."[126] The firm could just as easily borrow the same amount (thereby producing the same tax benefits, *i.e.*, the same debt tax shield) and use the proceeds to pay a dividend. In other words, the tax benefit to the firm is irrespective of how debt proceeds are used.

60.    Perhaps Dr. Cain is referring to tax advantages to specific *investors* (not the company).[127] Any potential tax advantages to investors depend on the relative tax rates on capital gains versus dividends and the investor's tax bracket (*e.g.*, taxable investors vs. tax-free

---

[123]  Cain Merits Report, Appendix C, ¶ 40.

[124]  Cain Merits Report, Appendix C, ¶ 40. *See also* Vermaelen, Theo, "Share Repurchases," *Foundations and Trends in Finance*, vol. 1, no. 3, December 2005 ("Vermaelen (2005)"), pp. 235 – 236.

[125]  Cain Merits Report, Appendix C, ¶ 40.

[126]  Cain Merits Report, Appendix C, ¶ 41.

[127]  Cain Merits Report, Appendix C, ¶ 40.

institutions), as Vermaelen (2005) makes clear.[128] In other words, these tax advantages do not accrue to the firm. They do not affect the present value of the firm's cash flows. Indeed, the Vermaelen (2005) paper that Dr. Cain cites acknowledges that "it is not obvious that types of [tax] benefits would be reflected in the share price, rather than simply in the pocketbooks of investors."[129] Consistent with this, Brav *et al.* (2005), another paper that Dr. Cain cites, notes that for many survey respondents, differing personal tax treatment of dividends and repurchases were of "second-order importance" to many investors.[130]

61.　　　Dr. Cain also cites internal communications in which NI management discussed converting its variable rate revolver into a fixed-rate Term Loan A.[131] Dr. Cain's discussion is irrelevant to whether dividends and repurchases have the same effect on the present value of the firm's cash flows, or to the central point in my report about the lack of ill-gotten gains to NI from conducting repurchases at allegedly deflated prices while in possession of MNPI. Seeking

---

[128]　Vermaelen (2005), p. 213 ("One of the main stated reasons for share repurchase is that a company can reduce the investor's tax bill if capital gains are taxed less than dividends."), p. 236 ("In many countries, dividends are taxed higher than capital gains, at least for individuals. Hence, buying back shares rather than paying dividends may reduce the present value of the investor's tax liability."), pp. 213 – 214 ("In a study of buybacks in the UK, Rau and Vermaelen [98] show that, although UK individual investors prefer share repurchases to dividends, pension funds (until the tax authorities changed the law in July 1997) had a clear preference for dividends: although tax-exempt, pension funds were entitled to a 25% dividend tax credit. Only when this advantage was abolished did repurchases become significantly more popular in the UK.").

[129]　Vermaelen (2005), pp. 236 – 237.

[130]　Brav, Alon, *et al.*, "Payout Policy in the 21ˢᵗ Century," *Journal of Financial Economics*, vol. 77, no. 3, September 2005 ("Brav *et al.* (2005)"), pp. 485, 507 – 509 ("Even when dividends were greatly tax disadvantaged, the survey evidence indicates that taxes were of second-order importance. When we mentioned personal taxes paid by investors (without highlighting that dividends were tax disadvantaged relative to capital gains), only 21.1% of dividend-payers cited this as an important or very important factor affecting dividend purchases (Table 5, Row 13). Likewise, only 29.1% of repurchasing firms cited personal taxes as an important factor affecting the number of shares repurchased (Table 6, Row 12). When we were more explicit and asked repurchasers whether the tax advantage that repurchases had over dividends affected their decision to repurchase, 41.8% agreed that it did (Table 8, Row 5)").

[131]　Cain Merits Report, Appendix C, ¶ 41.

alternative or additional financing,[132] such as in the NI communications that Dr. Cain cites,[133] is simply a choice to minimize the cost of borrowing that is distinct from the choice to conduct a share repurchase program. To the extent there was a benefit to the firm from converting the loan from variable to fixed, that benefit was unaffected by the alleged MNPI and thus would not be an *ill-gotten* gain.

### C.    Dr. Cain's opinion that repurchases serve a strategic function, which he claims is confirmed by managerial behavior outcomes, is also irrelevant to my opinions

62.     Dr. Cain also argues that, in asserting that "repurchases are simply a means of distributing cash to shareholders, similar to dividends,"[134] I overlook other strategic purposes—defensive mechanisms, managing earnings per share ("EPS") in the presence of dilution due to employee stock options ("ESOP"), etc.—that repurchases serve beyond mere cash distribution.[135] Dr. Cain's assertion regarding the "strategic functions" of share repurchases is irrelevant and does not contradict the central point of my Class Certification Rebuttal Report that, economically, a company does not benefit from the purchase of shares at deflated prices in the way an individual would, even if the company was in possession of MNPI. As I discuss

---

[132]   On June 18, 2021, before the Proposed Class Period, NI entered into a credit agreement for a secured revolving loan up to $500 million. *See* National Instruments Corporation, Form 10-Q for the quarterly period ended September 30, 2021, filed November 1, 2021, p. 31 ("The Credit Agreement provides for a secured revolving loan facility in an aggregate principal amount of up to $500 million at anytime outstanding, with a sublimit of $25 million for the issuance of letters of credit"). Two months after Dr. Cain's cited internal communication, on August 24, 2022, NI repaid all outstanding loans of the Prior Credit Agreement and entered into a Third Amended and Restated Credit Agreement consisting of a secured revolving loan up to $500 million and a secured term loan of $500 million. *See* National Instruments Corporation, Form 10-Q for the quarterly period ended September 30, 2022, filed October 28, 2022, p. 26 ("All outstanding loans under the Prior Credit Agreement were repaid in full in connection with the entry into the Credit Agreement. The replacement of the previous debt facility with the Credit Agreement was treated as a debt modification and the remaining balance of unamortized debt issuance costs were allocated to the new loan facilities[…]" "The Credit Agreement provides for an initial $1 billion credit facility consisting of (a) a secured revolving loan facility in aggregate principal amount of up to $500 million at any time outstanding, with a sublimit of $25 million for the issuance of letters of credit, and (b) a secured term loan facility in an aggregate principal amount of $500 million."). *See also* Email from Eric Starkloff to Karen Rapp, "Re. Follow up from last week," June 16, 2022, NAT-SL-00002988 – 990.

[133]   Cain Merits Report, Appendix C, ¶ 41.

[134]   Class Certification Rebuttal Report, ¶ 30.

[135]   Cain Merits Report, Appendix C, ¶¶ 42 – 44.

below, Dr. Cain does not explain how these purported strategic purposes benefited the firm, as opposed to management, and he does not quantify any alleged ill-gotten gains in any way.

63.    One of the purported strategic functions Dr. Cain argues that share repurchases have over dividends is "a central role in defending corporate control."[136] Dr. Cain offers no evidence that NI's repurchases were intended to be a takeover-defense mechanism. NI's 2022 repurchase program was authorized in January 2022, prior to any proposals from Emerson, for a total maximum dollar amount, and without a specific timeline.[137] Dr. Cain cites three papers to support his conclusion—Bagwell (1991),[138] Bradley and Rosenzweig (1986),[139] and my paper titled "Defensive Changes in Corporate Payout Policy" ("Denis (1990)").[140] However, the purported strategic benefit of defending a company against a hostile bid, the topic of analysis of these three papers, is irrelevant to whether a firm receives any ill-gotten gains from conducting repurchases, even while in possession of MNPI. The fact that share repurchasing may be used for a strategic purpose in light of a potential hostile takeover (either through increasing *managerial* concentration,[141] and/or through increasing the acquisition costs of the *acquiring* firm[142]) does

---

[136]    Cain Merits Report, Appendix C, ¶ 42.

[137]    Class Certification Rebuttal Report, ¶ 28.

[138]    While Dr. Cain cites to "Bagwell (1991)" in his Appendix C, there is no corresponding citation provided in his Appendix B. *See* Cain Merits Report, Appendix B, Appendix C, ¶ 42. I have identified the relevant article based on Dr. Cain's description of the conclusion of the paper as the following: Bagwell, Lauri Simon, "Share Repurchase and Takeover Deterrence," *RAND Journal of Economics*, vol. 22, no. 1, Spring 1991 ("Bagwell (1991)").

[139]    Cain Merits Report, Appendix C, ¶ 42. *See also* Bradley, Michael, and Rosenzweig, Michael, "Defensive Stock Repurchase," *Harvard Law Review*, vol. 99, no. 7, May 1986 ("Bradley and Rosenzweig (1986)").

[140]    Cain Merits Report, Appendix C, ¶ 43. *See also* Denis, David J., "Defensive Changes in Corporate Payout Policy: Share Repurchases and Special Dividends," *The Journal of Finance*, vol. 45, no. 5, December 1990 ("Denis (1990)").

[141]    *See*, *e.g.,* Denis (1990), p. 1433 (discussing that for "special dividends […] managers typically receive additional shares instead of cash," which, similarly to share repurchasing, "c[ould] result in the concentration of voting powers in the hands of managers."), pp. 1452 − 1453 ("The repurchases are often part of an overall defensive strategy undertaken by the target firm and are associated with a high rate of success in maintaining target firm independence. However, in the process of retaining this independence, target firm shareholders suffer large abnormal wealth losses. Furthermore, the result of many payout plans is the concentration of managerial control of voting rights without a simultaneous increase in managerial cash flow ownership. This evidence can be interpreted as consistent with managers using the defensive strategy for their own benefit at the expense of shareholders").

[142]    In its theoretical analysis, Bagwell (1991) concludes that stock repurchases "increase […] the cost that a potential acquirer pay to attain control by altering the distribution of shareholder reservation values. The crucial insight is that repurchase eliminates shareholders with the lowest reservation values, leaving the acquirer facing those with relatively higher valuations." *See* Bagwell (1991), p. 84.

not establish that *the firm* receives *ill-gotten gains* from conducting repurchases at allegedly deflated prices while in possession of MNPI. To the extent that Dr. Cain suggests that Bradley and Rosenzweig (1986) and Bagwell (1991) establish that "repurchases can confer *firm-level* benefits"[143] that are ill-gotten as a result of MNPI, he is incorrect. In fact, Dr. Cain's discussion of Bradley and Rosenzweig's (1986) findings based on illustrative theoretical examples is about benefits to the company's insiders that retain their shares.[144] Moreover, Bagwell (1991) makes clear that the impact of dividends and share repurchases on the economic value of the firm is the same,[145] consistent with my opinion.[146]

64.    Dr. Cain also argues that repurchases serve a unique strategic purpose that dividends cannot: the management of EPS.[147] The studies that he cites[148] represent examples of firms managing earnings to meet certain EPS targets, perhaps to the benefit of individual executives.[149] These studies do not represent evidence that this earnings management behavior

---

[143]    Cain Merits Report, Appendix C, ¶ 42. (Emphasis added).

[144]    Cain Merits Report, Appendix C, ¶ 42 ("Bradley and Rosenzweig (1986), […] find that repurchases are frequently used as a defensive tactic to increase insider ownership and raise the effective acquisition price, making a bid less attractive.") citing Bradley and Rosenzweig, pp. 1378 – 1379 ("In recent years, targets have resorted with increasing frequency to repurchases of their own stock to defeat hostile tender offers. This tactic may serve several strategic purposes. First, such repurchases may increase the percentage of the target's stock that is owned by management or management loyalists who are unlikely to tender, thereby enhancing the probability that the bid will fail. Second, a repurchase may raise the price of the target's stock above the tender offer price, forcing the bidder to confront the unwelcome dilemma of having to increase its offer or abandon the fight.").

[145]    Bagwell (1991), p. 77 ("Next, to isolate effect of repurchase on the shareholder population, dividends are compared to a repurchase that distributes the same amount of cash. While the liquidation value of the firm is therefore unaffected by the form of the distribution, the distribution of shareholder types may be affected").

[146]    *See, e.g.*, Class Certification Rebuttal Report, ¶ 29 ("If a firm (such as NI) repurchases its shares in the market—for example, by purchasing $100 million worth of shares—it distributes $100 million in cash to the selling shareholders. As a result of the repurchase, the number of shares outstanding is reduced. If the firm instead paid a dividend of $100 million, it would similarly distribute $100 million to all shareholders, but in this scenario, the number of shares outstanding would remain unchanged. In both cases, however, the firm would end up in the same economic position. The firm would have $100 million less cash, reflecting the amount distributed to shareholders, although potentially different subsets of shareholders.").

[147]    Cain Merits Report, Appendix C, ¶ 44.

[148]    Bens, Daniel A., *et al.*, "Employee Stock Options, EPS Dilution, and Stock Repurchases," *Journal of Accounting and Economics*, vol. 36, nos. 1 – 3, December 2003 ("Bens *et al.* (2003)"); Hribar, Paul, Jenkins, Nicole Thorne, and Johnson, W. Bruce, "Stock Repurchases as an Earnings Management Device," *Journal of Accounting and Economics*, vol. 41, nos. 1 – 2, April 2006 ("Hribar *et al.* (2006)"), cited in Cain Merits Report, Appendix C, ¶ 44.

[149]    Bens *et al.* (2003), p. 51 ("We find that executives increase the level of their firms' stock repurchases when […] earnings are below the level required to achieve the desired rate of EPS growth."), p. 53 ("[W]e find that

has any impact on the intrinsic value of the company. In this regard, repurchasing shares to increase EPS is similar to how a reverse split would increase EPS by reducing the number of shares outstanding. It does not change the firm's underlying cash flows and intrinsic value. Thus, these papers do not show that a firm's value increases from this share repurchasing strategy or that the firm receives ill-gotten gains as a result of this strategic behavior.

65.    Dr. Cain cites internal communications that purport to show that NI's repurchase decisions were tied to strategic objectives distinct from dividend policy.[150] As discussed above, NI may very well have chosen to make payouts using repurchases rather than dividends in order to manage EPS numbers. However, even if this is the case, conditional on the payout being made, the economic impact on NI as a firm is identical for dividends and repurchases. The earnings management effect of changing EPS does not affect the intrinsic value of the company.

66.    Dr. Cain also argues that the fact that companies buy back shares when they think they are undervalued further underscores their lack of equivalence to dividends.[151] This fact does not imply that the company reaps ill-gotten gains from buying back undervalued shares. Regardless of the price at which the shares are repurchased, the company itself neither benefits nor loses as a result of the repurchase. As noted in my Class Certification Rebuttal Report, shareholders that do not sell undervalued shares as part of the repurchase transaction(s) are economically better off once the true value is revealed.[152] But this is a wealth transfer from

---

executives increase their firms' repurchases when earnings fall short of the level required to maintain the past growth rate of diluted EPS."); Hribar *et al.* (2006), p. 15 ("The clustering of accretive repurchases just to the left of zero is consistent with the use of stock repurchase to manage reported EPS toward analysts' consensus forecast when ex ante EPS would otherwise fall short of this benchmark."), p. 25 ("Collectively, these findings indicate that meeting or beating analyst forecasts influence the stock repurchase decisions of some firms.").

[150]    Cain Merits Report, Appendix C, ¶¶ 47 – 49.

[151]    Cain Merits Report, Appendix C, ¶ 45 quoting Brav *et al.* (2005). In his discussion of this paper, Dr. Cain omits other important factors to an executive's decision to repurchase shares discussed in Brav *et al.* (2005), such as "the availability of good investment opportunities for our firm to pursue," "merge and acquisition strategy," a firm's "stability of future earnings," and "a sustainable change in earnings." According to Brav *et al.* (2005) these were all reported as important by over 65 percent of survey respondents. Similarly, Brav *et al.* (2005) found that one of the primary reasons managers may choose repurchasing over dividends is that they "value the flexibility of repurchases and dislike the rigidity of dividends."[151] *See* Brav *et al.* (2005), pp. 496 – 497.

[152]    *See* Class Certification Rebuttal Report, ¶ 31 ("While a firm (such as NI) itself does not receive any economic benefit from repurchasing shares while possessing MNPI, it should be noted that in such a scenario, shareholders that sold undervalued shares as part of the repurchase transaction(s) are economically worse off on the shares that they sold. Conversely, shares that are retained by shareholders following the repurchase transaction(s) experience economic gains. As a result, the firm's repurchase of undervalued shares does not

selling shareholders to non-selling shareholders, not a benefit to the *company*. Dr. Cain relies on Ikenberry and Vermaelen (1996) to imply that firms "repurchase stock when market prices fall below intrinsic value, thereby capturing rents from mispricing opportunities."[153] The authors of this paper are explicit that "[repurchase] programs expand the company's investment opportunity set by authorizing management to use the firm's resources along with their 'insider' valuation of the firm *to the benefit of long-term shareholders*"[154] as opposed to the benefit of the firm.

67.    Dr. Cain's argument that NI's plan to repurchase more shares when NI's price is low "suggests a strategy of taking advantage of underpricing …"[155] is flawed to the extent that it implies that NI itself is the beneficiary. Such an implication contradicts standard economic logic and accepted economic wisdom broadly taught in standard corporate finance classes.

68.    In sum, none of Dr. Cain's flawed arguments about the relative benefits of dividends and repurchases affects my conclusion that there were no ill-gotten gains to NI from the repurchases.

David J. Denis
August 27, 2025

---

result in the firm itself receiving an economic benefit but rather results in a wealth transfer from the selling shareholders to the retaining shareholders (some of whom may be the same individuals).").

153    Cain Merits Report, Appendix C, ¶ 45.

154    Ikenberry, David L. and Vermaelen, Theo, "The Option to Repurchase Stock," *Financial Management*, vol. 25, no. 4, Winter 1996, p. 10. (Emphasis added).

155    Cain Merits Report, Appendix C, ¶ 46.

**Appendix A**
**Curriculum Vitae**


# DAVID J. DENIS

Office Address
University of Pittsburgh
School of Business
278B Mervis Hall
Pittsburgh, PA 15260
(412) 648-1708
e-mail: djdenis@katz.pitt.edu

Home Address

5536 Northumberland
Pittsburgh, PA  15217
(765) 491-2824

SSRN Author page: http://ssrn.com/author=17040

---

## EDUCATION

Ph.D, Finance, The University of Michigan, 1988.

M.B.A., Finance, The University of Michigan, 1984.

B.S., Finance and Managerial Statistics, Syracuse University, 1982.


## PROFESSIONAL EXPERIENCE

Terrence P. Laughlin Chair in Finance, University of Pittsburgh, 2024-

Roger S. Ahlbrandt, Sr. Chair and Professor of Finance, University of Pittsburgh, 2011 – 2024.

Burton Morgan Chair of Private Enterprise, Purdue University, 2003-2011.

Professor of Finance, Purdue University, 1999-2003.

Associate Professor of Finance, Purdue University, 1995-1999.

Associate Professor of Finance, Virginia Polytechnic Institute and State University, 1994-1995.

Assistant Professor of Finance, Virginia Polytechnic Institute and State University, 1989-1994.

Visiting Assistant Professor of Finance, University of Toledo, 1988-89.

Lecturer, The University of Michigan, 1986.


## BOOKS

"Corporate Restructuring," Edward Elgar Publishing (2005), two-volume compilation, edited with John J. McConnell.

"Handbook of Corporate Finance," Edward Elgar Publishing (2024), editor. Handbook of Corporate Finance | Elgar Online: The online content platform for Edward Elgar Publishing.

A-1

## PUBLISHED ARTICLES

"Corporate Social Responsibility and the Shareholder Primacy Paradigm," *Journal of Applied Corporate Finance* (2024), 1-6.

"Is Corporate Finance Research in Decline?" *Financial Review* 59 (2024), 257-264.

"Corporate Cash Holdings," *Handbook of Corporate Finance*, Edward Elgar Publishing (2024), with Luxi Wang.

"Rising Intangibles, Negative Cash Flows, and Corporate Funding Practices," *Journal of Applied Corporate Finance* 34 (4), Fall, 2022, 17-26.

"The SEC's Misguided Climate Disclosure Rule Proposal," *Banking and Financial Services Policy Report* 41 (10) (2022), 1-9.

"Persistent Negative Cash Flows, Staged Financing and the Stockpiling of Cash Balances," *Journal of Financial Economics*, 142 (2021), 293-313, with Stephen McKeon.

"Is Managerial Myopia a Persistent Governance Problem?" *Journal of Applied Corporate Finance* 31 (3), Summer, 2019, 74-80.

"Financing Investment Spikes in the Years Surrounding World War I," *Journal of Financial Economics*, 130 (2) (2019) 215-236, with Leonce Bargeron and Kenneth Lehn.

"Proactive Leverage Increases and the Value of Financial Flexibility," *Journal of Applied Corporate Finance* 28 (4) (2016), 17-28, with Stephen McKeon.

"CEO Assessment and the Structure of Newly Formed Boards," *Review of Financial Studies* 28 (2015), 3338-3366, with Diane Denis and Mark Walker.

"Corporate Payout, Cash Retention, and The Supply of Credit: Evidence from the 2008-09 Credit Crisis," *Journal of Financial Economics* 115 (2015), 521-540, with Barbara Bliss and Yingmei Cheng.

"Debt Covenant Renegotiations and Creditor Control Rights," *Journal of Financial Economics* 113 (2014), 348-367, with Jing Wang.

"Insider Trading Restrictions and Top Executive Compensation," *Journal of Accounting and Economics* 56:1 (2013), with Jin Xu.

"The Persistent Puzzle of Corporate Capital Structure: Current Challenges and New Directions," *Financial Review* 47 (2012), 231-243. Keynote Speech from Eastern Finance Association Annual Meeting, Boston, MA.

"Information Production by Investment Banks: Evidence from Fairness Opinions," *Journal of Law and Economics* 56 (2013), 245-280, with Matt Cain.

"Material Adverse Change Clauses and Acquisition Dynamics," *Journal of Financial and Quantitative Analysis* 48:3 (2013), 819-847, with Antonio Macias.

"Debt Financing and Financial Flexibility: Evidence from Pro-Active Leverage Increases," *Review of Financial Studies* 26 (6) (2012), 1897-1929, with Steve McKeon.

A-2

"Financial Flexibility and Corporate Liquidity," *Journal of Corporate Finance* 17:3 (2011), 667-684.

"Earnouts: A Study of Financial Contracting in Acquisition Agreements," *Journal of Accounting and Economics* 51 (2011), 151-170, with Matt Cain and Diane Denis.

"Financial Constraints, Investment, and the Value of Cash Holdings" *Review of Financial Studies* 23 (January, 2010), 247-269, with Valeriy Sibilkov.

"Factors Influencing Dividends," chapter in *Blackwell Companion on Dividends and Dividend Policy*, H. Kent Baker, ed. (May, 2009), John Wiley and Sons, with Gohar Stepanyan.

"Why Do Firms Pay Dividends? International Evidence on the Determinants of Dividend Policy," *Journal of Financial Economics* 89 (July, 2008), 62-82, with Igor Osobov.

"Do Firms Manage Earnings to Meet Dividend Thresholds?" *Journal of Accounting and Economics* 45 (March, 2008), 2-26, with Naveen Daniel and Lalitha Naveen.

"Dividend Policy," in The New Palgrave Dictionary of Economics, 2nd Edition, (2008) Steven Durlauf and Lawrence Blume, eds., Palgrave Macmillan Ltd., with John McConnell.

"Is There a Dark Side to Incentive Compensation?", *Journal of Corporate Finance* 12 (June, 2006), 467-488, with Paul Hanouna and Atulya Sarin.

"How Do IPO Issuers Pay for Analyst Coverage?" *Journal of Investment Management* 4 (2006), 48-61, with Mike Cliff.

"Leverage and Investment in Diversified Firms," *Journal of Financial Economics* 79 (February, 2006), 317-337, with Seoungpil Ahn and Diane Denis.

"Introduction to Corporate Restructuring," in *Corporate Restructuring*, edited by David J. Denis and John J. McConnell, Edward Elgar Publishing, 2006, with John J. McConnell.

"Do IPO Firms Purchase Analyst Coverage With Underpricing?" *Journal of Finance* 59 (December, 2004), 2871-2902, with Mike Cliff.

"Entrepreneurial Finance: An Overview of the Issues and Evidence," *Journal of Corporate Finance* 10 (March, 2004), 301-326.

"Internal Capital Markets and Investment Policy: Evidence From Corporate Spinoffs," *Journal of Financial Economics* 71 (March, 2004), 489-516, with Seoungpil Ahn.

"Mean Reversion in Earnings and the Use of E/P Multiples in Corporate Valuation," *Journal of Applied Finance* (Spring/Summer 2004), 4-10, with Mukesh Bajaj and Atulya Sarin.

"The Choice Among Bank Debt, Non-Bank Private Debt and Public Debt: Evidence From New Corporate Borrowings," *Journal of Financial Economics* 70 (2003), 3-28, with Vassil Mihov.

"Taxes and the Relative Valuation of S Corporations and C Corporations," *Journal of Applied Finance*, Vol. 12, No. 2 (Fall/Winter 2002), with Atulya Sarin.

A-3

"Global Diversification, Industrial Diversification, and Firm Value" *Journal of Finance* 57 (2002), 1951-1980, with Diane Denis and Keven Yost.

"Firm Value and Marketability Discounts," *Journal of Corporation Law* 27 (2001), 89-116, with Mukesh Bajaj, Steve Ferris, and Atulya Sarin,

"Is the Market Surprised by Poor Earnings Realizations Following Seasoned Equity Offerings?" *Journal of Financial and Quantitative Analysis*, 36 (2001), 169-193, with Atulya Sarin.

"Managerial Discipline and Corporate Restructuring Following Performance Declines," *Journal Financial Economics* 55, (2000), 391-424, with Timothy Kruse. Reprinted in "Corporate Takeovers: Modern Empirical Developments," Vol. 1, B.Espen Eckbo, ed., Academic Press, 2010.

"CEO Compensation and Managerial Decisions: Evidence From Acquisitions," *Research in International Business and Finance*, Special Volume on Issues in International Corporate Control and Governance, Vol. 15, 23-47, (2000),with Eric Blazer.

"Agency Theory and the Influence of Equity Ownership Structure on Corporate Diversification Strategies," *Strategic Management Journal* 20 (1999), 1071-1076, with Diane Denis and Atulya Sarin.

"Ownership and Board Structures in Publicly Traded Corporations," *Journal of Financial Economics* 52 (1999), pp. 187-224, with Atulya Sarin.

"Managerial Incentives and Corporate Diversification Strategies," *Journal of Applied Corporate Finance*, (Summer 1997), pp. 72-80, with Diane Denis and Atulya Sarin.

"Ownership Structure and Top Executive Turnover," *Journal of Financial Economics* 45 (1997), pp. 193-221, with Diane Denis and Atulya Sarin.

"Agency Problems, Equity Ownership, and Corporate Diversification," *Journal of Finance* 52 (1997), 135-160, with Diane Denis and Atulya Sarin. Abstracted in Contemporary Finance Digest, Autumn 1997, pp. 29-30.

"Leveraged Recaps and the Causes of Financial Distress," *Journal of Applied Corporate Finance*, Winter 1996, pp. 84-98, with Diane Denis.

"Active Investors and Management Turnover Following Unsuccessful Control Contests," *Journal of Financial Economics* 40 (1996), 239-266, with Jan Serrano.

"The Benefits of High Leverage: Lessons From Kroger's Recapitalization and Safeway's LBO," *Journal of Applied Corporate Finance*, Winter 1995, pp. 38-52.

"Performance Changes Following Top Management Dismissals," *Journal of Finance* 50, (1995), pp. 1029-1057, with Diane Denis.

"Causes of Financial Distress Following Leveraged Recapitalizations," *Journal of Financial Economics* 37 (1995), 129-158, with Diane Denis.

"Corporate Events, Trading Activity, and the Estimation of Systematic Risk: Evidence From Equity Offerings and Share Repurchases," *Journal of Finance*, December, 1994, with Greg Kadlec.

A-4

"The Information Content of Dividend Changes: Cash Flow Signaling, Overinvestment, and Dividend Clienteles," *Journal of Financial and Quantitative Analysis* 29, December 1994, 567-587, with Diane Denis and Atulya Sarin.

"Organizational Form and the Consequences of Highly Leveraged Transactions: Kroger's Recapitalization and Safeway's LBO," *Journal of Financial Economics* 36 (1994), 193-224.

"Investment Opportunities and the Market Reaction to Equity Offerings", *Journal of Financial and Quantitative Analysis* 29 (1994), 159-177.

"Majority Owner-Managers and Organizational Efficiency", *Journal of Corporate Finance* 1 (1994), 91-118, with Diane Denis.

"Leveraged Recaps and the Curbing of Corporate Overinvestment", *Journal of Applied Corporate Finance*, Spring, 1993, pp. 60-71, with Diane Denis.  Reprinted in <u>The New Finance: Where Theory Meets Practice</u>, Donald Chew ed., Irwin/McGraw-Hill.

"The Costs of Equity Issues Since Rule 415: A Closer Look", *Journal of Financial Research*, Spring, 1993.  Abstracted in Bowne and Company's *Review for CFOs and Investment Bankers*, June 1993.

"Managerial Discretion, Organizational Structure, and Corporate Performance: A Study of Leveraged Recapitalizations", *Journal of Accounting and Economics*, January, 1993, pp. 209-236, with Diane Denis.

"Corporate Investment Decisions and Corporate Control: Evidence From Going Private Transactions", *Financial Management*, Autumn, 1992.  Abstract reprinted in *Financial Management Collection*, Winter 1991.

"Shelf Registration and the Market for Seasoned Equity Offerings", *Journal of Business*, April, 1991.  Abstracted in Bowne and Company's *Review for CFOs and Investment Bankers*, October, 1991.

"Defensive Changes in Corporate Payout Policy: Share Repurchases and Special Dividends", *Journal of Finance*, December, 1990.


**WORKING PAPERS**

 "Unraveling the Mystery of Zero Leverage Firms," with Jared Smith.

"CEO Compensation ChangesFollowing Acquisitions," with Leonce Bargeron.


**PRESENTATIONS OF RESEARCH**

<u>Invited Seminars</u>

| | |
|---|---|
| Southern Methodist University | Syracuse University |
| University of Virginia (Darden) | University of Miami |
| University of Michigan | University of Kentucky |
| George Mason University | University of Notre Dame |
| University of Delaware | Vanderbilt University (Law and Business) |

| | |
|---|---|
| University of Colorado | University of Iowa |
| Ohio University | University of Western Ontario |
| INSEAD | London Business School |
| SUNY Binghamton | Concordia University |
| Michigan State University | University of Pittsburgh |
| University of Arkansas | DePaul University |
| Penn State University | Rutgers University |
| Ohio State University | University of Texas-Dallas |
| Tulane University | University of Missouri |
| Indiana University | University of Illinois |
| Stockholm School of Economics | University of Oregon |
| University of Washington | Virginia Tech |
| Loyola University | Michigan State University |
| Harvard Business School | Northeastern University |
| North Carolina State University | Purdue University |
| University of Houston | Texas A&M University |
| University of California-Davis | University of Utah |
| University of Florida | University of Pittsburgh |
| University of North Carolina | Texas Tech |
| University of Alabama | Louisiana State University |
| Florida State University | University of Illinois |
| University of Missouri | The College of William and Mary |
| Georgetown University | Drexel University |
| Chinese University of Hong Kong | University of Waterloo |
| University of Notre Dame | University of Pittsburgh |
| Virginia Tech | North Carolina State |
| Tulane University | Northeastern University |
| Duquesne University | Singapore Management University |
| Nanyang Technological University | National University of Singapore |
| Hong Kong Universtiy of Science and Tech. | Carnegie Mellon University |
| Penn State University | Temple University |
| University of Arizona | Georgia Tech |
| Case Western Reserve | University of Exeter |
| University of Amsterdam | Rice University |
| Wayne State University | University of South Florida |
| Ohio State University | Texas A&M University |
| Wilfrid Laurier University | University of Michigan |
| York University | University of Alberta |
| University of Illinois | Indiana University |
| University of Bristol | Warwick Business School |
| Manchester Business School | Bentley University |
| Michigan State University | Boston College |
| HEC-Paris | Lehigh University |
| University of Adelaide | University of Oklahoma |
| North Carolina State | Baruch College |
| Texas Christian University | Babson College |
| University of Utah | HKUST |
| Arizona State | University of Colorado |
| BI Norweigan Business School | Erasmus University |
| Nova-Lisbon | University of Porto |
| Tsinghua University | University of Delaware |
| Mississippi State University | University of Buffalo |
| University of British Columbia | Vanderbilt University |
| London Business School | UT-Dallas |

George Washington University  Rutgers University
University of Miami  Georgetown University
Australian National University  SMU
Tulane University  Lancaster University
University of Nebraska  University of Virginia – Darden
Iowa State  St. John's
Aalto  Western Ontario
Virginia Tech  University of Mississippi
Louisiana State University  Kent State University
American College of Beirut  UMass-Amherst

**BOOK REVIEW**

Review of "Corporate Restructuring: Managing the Change Process From Within" by Gordon
        Donaldson, Harvard Business School Press. *Journal of Finance*, June, 1995.

**HONORS**

Keynote Speaker, Conference on Ownership and Corporate Sustainable Policies, Hanken School
of Economics, 2023.

Distinguished Scholar, Drexel University Center for Corporate Governance, 2019.

Katz Excellence in Research Award, 2012, 2013, 2014.

Katz Excellence in Service Award, 2014, 2015, 2022.

Keynote Speaker, Australasian Banking and Finance Conference, Sydney, December, 2019.

Keynote Speaker, Financial Management Association Asia/Pacific Meeting, Hong Kong, May,
2018.

Keynote Speaker and Distinguished Scholar, Eastern Finance Association Annual Meeting,
April, 2012.

Excellence in Teaching Award, Executive MBA Program, 2010.

Fellow, Center for Corporate Governance, Drexel Univesity.

Co-Chair, Financial Management Association European Meeting, Hamburg, Germany, June
2010.

Keynote Speaker and Distinguished Scholar, Southern Finance Association Annual Meeting,
November, 2008.

Keynote Speaker, MidEast Research Conference in Finance, 2006

Distinguished Guest Speaker, California Corporate Finance Conference

University Faculty Scholar, 2000-2005.

Dean's Office Special Faculty Service Award, 2000

Krannert Faculty Fellow, 2007

Best Paper Award, Corporate Governance Symposium, Weinberg Cener for Corporate Governance, University of Delaware.

Best Paper Award, Financial Management, Financial Management Association Annual Meetings, San Francisco, 1992.

Best Paper Award, Financial Management, Financial Management Association Annual Meetings, Orlando, Florida, 1990.


**PROFESSIONAL SERVICE**

Editor, *Review of Financial Studies*, 2013 – 2019.
Co-Editor, *Journal of Corporate Finance*, 2001–2011.
Editor, *Journal of Corporate Finance*, special issue on Venture Capital and Entrepreneurial Finance, 2002.
Editor, *Journal of Corporate Finance*, special issue on Financial Flexibility and Corporate Liquidity, 2011.
Associate Editor, *Journal of Finance*, 2000-2003.
Associate Editor, *Review of Financial Studies*, 2010-2013.
Associate Editor, *Journal of Financial Research,* 1996-2015; 2024 - .
Associate Editor, *Financial Review,* 1998-2015; 2024 -.
Associate Editor, *Journal of Applied Finance*, 2002-2006.
Associate Editor, *Annals of Finance*, 2004-2016.
Academic Director, Financial Management Association, 2006-2008.
VP-Program, Financial Management Association, 2013 meeting.
President, Financial Management Association, 2015-16.
President-elect, Financial Management Association, 2014-15.
Board of Trustees, Financial Management Association, 2017-2023
Fellow, Center for Corporate Governance, Drexel University, 2010-
Nominating Committee, American Finance Association, 2003.
Nominating Committee, Financial Management Association, 2007-08.
Co-Coordinator, Doctoral Consortium, Financial Management Association European Meeting, Istanbul, 2012.
Fellows Committee, Financial Management Association, 2007-08.  Chair in 2008.
Faculty Participant, FMA Doctoral Consortium, 2000, 2003.
Program Committee, Yale Conference on Entrepreneurship, Venture Capital, and Initial Public Offerings, 2002.
Program Committee, American Finance Association Annual Meeting, 1999.
Program Committee, Western Finance Association Annual Meeting, 1998-2011.
Program Committee, Financial Management Association Annual Meeting, 1992, 1993, 1995, 1996, 1998, 1999, 2000, 2009, 2010.
Program Committee, Drexel Conference on Corporate Governance, 2009-12.
Referee, *Journal of Financial Economics*, *Journal of Finance*, *Review of Financial Studies*, *Journal of Business*, *Journal of Accounting and Economics*, *Journal of Financial and Quantitative Analysis*, *Journal of Economics and Management Strategy*, *The Accounting Review*, *Review of Economics and Statistics*, *Journal of Empirical Finance, Journal of Corporate Finance*, *Journal of Banking and Finance*, *Financial Management*, *Journal of Financial Services Research*, *Journal of Financial Research*, *Financial Review*, *Quarterly Journal of Business and Economics*, *Journal of Applied Business Research, Harvard Business School Press, Strategic Management Journal, Review of Financial Economics, Journal of Applied Finance, Journal of Comparative Economics.*

**ADMINISTRATIVE**

University Service

Provost Advisory Committee on Tenure and Promotion, 2021-22.
Chancellor's Distinguished Research Award Committee, 2020-22.
Chair, Socially Responsible Investment Committee, 2018-19.
Search committee for Director, Burton D. Morgan Center for Entrepreneurship, 2006-07.
Planning Committee, Pioneering Biotechnology Forum, 2006.
Graduate Council, 1999-2002.  (Area Chair:  2000-2001).
Counselor, University Honors System, 1990-1995.
United Way Team Captain, 1996, 1997,1999.
Horizons Mentoring Program, 2000, 2002.
Judge, Life Sciences Business Plan Competition, 2003-2006, 2008, 2009.
Advisory Committee, Burton D. Morgan Center for Entrepreneurship.
Retirement Plan Review Task Force, 2008-10.

College Service

Search Committee for Dean of Katz School of Business, 2021-22.
Diversity and Inclusion Committee, 2020-24
Chair, Search Committee for Director of Executive Education, 2019-20.
Chair, Strategic Plan Planning and Development Team, 2019.
Search Committee for Dean of Katz School of Business, 2014-15.
Katz Executive Committee, 2015 – 2018.  Chair, 2017-18, 2022- 2025.
Chair, Masters Program Committee, 2014-17.
Finance Area Director, 2012-2014.
Promotion and Tenure Committee, 2012-2014, 2016-2019, 2021-2023.
Masters Programs Committee, 2013-14.
Accounting Core Course Review Committee, Chair, 2011-12.
MACC Governance Committee, 2011-12.
Search Committee for Dean of Krannert School, 2010-11.
Masters Program Advisory Committee, 2010-11.
Management Executive Committee, 2009-10.
Strategic Plan Task Force, 2008-09
Management Head Selection Advisory Committee, 2008.
Executive Education Program Review Committee, 2007-08.
Executive Education Program Advisory Committee, 2008-09.
Krannert Strategy and Structure Task Force, 2006-07.
International Programs Council
Search Committee for Duke Realty Chair in Finance, 2006.
Search Committee for Hanna Chair in Entrepreneurship (Chair), 2005-2007.
Search Committee for Blake Chair in Strategic Management, 2006-2007.
Career Services Task Force
Data Purchases Review Committee
Committee on PhD Funding and Bonuses, 2002-2003.
Faculty Relations Committee, 2002-2005. (Chair, 2004-2005)
Advisory Committee for Executive Education Programs, 2001-2006.
Judge, Krannert Venture Capital Competition, 2002
Strategy and Structure Task Force (Chair) 1999-2000
Promotion and Tenure Area Committee 1999-2002, 2005-2008.
Area Coordinator, Finance, 1998-2006, 2008, 2009.
Management Policy Committee, 1997-1999, 2008-2010.
Faculty Advisory Committee, 1999-2006.
Grade Appeals Committee, 1999-2001.

STAR Committee, 1999 - present (Chair from 2001-2009).
M.S. Steering Committee, 1996-1997.
Undergraduate Program Advisory Committee, 1995-1996.
Reviewer, Purdue Research Foundation research grant proposals, 1995-1998.
Reviewer, CIBER Faculty summer research grant proposals, 1999.
Faculty Adviser to Finance PhD students, 1995-1999.
Admissions Committee - PhD Program in Finance, 1996-present.
College of Business Faculty and Student Awards Committee, 1990-1992.
MBA Advisory Committee, 1992-1993.

Department Service (Virginia Tech)
Faculty and Student Awards Committee, 1989-1992.  Chair (1990-92)
Ph.D Policy Committee, 1991-1995. Interim Director, Winter, 1994.
Visiting Speaker Committee, 1990-1995. Chair (1994-95)
Faculty Recruiting Committee, 1991-1992, 1993-1994.
Graduate Curriculum Committee, 1993-1994.


**CONSULTING**
Ropes and Gray LLP
Cleary, Gottlieb, Steen, and Hamilton LLP
Milbank LLP
Hughes, Hubbard, and Reed LLP
Simpson, Thacher, and Bartlett LLP
Kirkland and Ellis LLP
Berger Montague PC
Schneider Wallace Cottrell Konecky Wotkyns LLP
Chimicles, Schwartz, Kriner, & Donaldson-Smith LLP
Ballard Spahr
USBank
Cohen and Grigsby
Cahill Gordon & Reindel LLP
McGraw Hill Financial Inc.
Fabian and Clendenin
Jones Day, LLP
American Greetings Corp.
Credit-Suisse Securities LLC
Xerox Corporation
Cravath, Swaine, and Moore, LLP
Merrill Lynch
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
Shook, Hardy & Bacon, LLP
Lite Machines Inc.
Pepe and Hazard LLP
Davis, Polk, and Wardwell
Quinn, Emanuel, Urquhart, Oliver, & Hedges, LLP
Law and Economics Consulting Group (LECG)
Analysis Group
Cornerstone
Internal Revenue Service
West Marine Inc.
FuturaGene Corp

**DISSERTATIONS CHAIRED**

| Student Name | Completion Date |
| --- | --- |
| Lucy Wang | July, 2023 |
| Lei Qin | In progress |
| Xin Fan | July, 2021 |
| Pengcheng Zhu | July, 2019 |
| Lin Ge | July, 2018 |
| Thuy Bui | July, 2017 |
| Jared Smith | July, 2014 |
| Jing Wang | July, 2013 |
| Stephen McKeon | June, 2011 |
| Craig Everett | May, 2011 |
| Amanda Thompson | November, 2010 |
| Rachel Diana | July, 2009 |
| Antonio Macias | June, 2008 |
| James Garrett | March, 2008 |
| Matt Cain | July, 2007 |
| Mira Straska | July, 2007 |
| Valeriy Sibilkov | July, 2005 |
| Paul Hanouna | July, 2005 |
| Matt Barcaskey | July, 2004 |
| Igor Osobov | July, 2004 |
| Nilanjan Basu | July, 2003 |
| Keven Yost | November, 2002 |
| Mark Walker | July, 2001 |
| Seoungpil Ahn | July, 2001 |
| Vassil Mihov (co-chair) | August, 2000 |
| Kimberly Rodgers (co-chair) | December, 1999 |
| Bharathram Thothadri (co-chair) | December, 1998 |
| Tim Kruse | June, 1997 |
| Eric Blazer | May, 1996 |
| Doug Eckel (co-chair) | March, 1996 |

**SERVICE ON DISSERTATION COMMITTEES**

| Student Name | Completion Date |
| --- | --- |
| Madeline Scanlon | July, 2024 |
| Chang Suk Bae | May, 2021 |
| Tianyue Zhao | July, 2020 |
| Majid Darvishan | July, 2020 |
| Yanran Liu | July, 2020 |
| Arup Ganguly | July, 2018 |
| Tom Shohfi | July, 2015 |
| Torsten Jochem | May, 2013 |
| Rahsan Inget | November, 2009 |

| | |
|---|---|
| Gohar Stepanyan | July, 2009 |
| Hugo Tang | November, 2008 |
| Dinesh Iyer | 2007 |
| Greg Waller | August, 2006 |
| Sandipan Mullick | June, 2006 |
| David Offenberg | October, 2005 |
| Alexei Ovtchinnikov | June, 2004 |
| Arun Khanna | August, 2003 |
| Muge Tiryakioglu | August, 2002 |
| Orlin Dimitrov | July, 2002 |
| Huseyin Gulen | June, 2000 |
| Yun Yu | May, 2000 |
| Matthew Flynn | June, 1998 |
| Heidi Dybevig | September, 1997 |
| Erik Lie | July, 1996 |
| David Haushalter | July, 1996 |
| Dee Ann Ellingson | March, 1996 |
| Don Rich | Summer, 1994 |
| Sudhir Singh | Summer, 1992 |
| Atulya Sarin | Summer, 1992 |
| John Shao | Summer, 1991 |
| Nilanjan Sen | Summer, 1990 |

# Appendix B
## List of Expert Testimony in Last Four Years

1.  Wayne County Employees' Retirement System, Individually and on Behalf of All Others Similarly Situated v. National Instruments Corporation, United States District Court, Southern District of New York, Expert Report (June, 2025), Deposition (July, 2025).

2.  Securities and Exchange Commission v. Vidul Prakash, United States District Court, Northern District of California, San Jose Division, Expert Report (June, 2025), Deposition (July, 2025).

3.  Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated v. Forescout Technologies, Inc., Michael DeCesare, and Christopher Harms, United States District Court, Northern District of California, Expert Reports (April and May, 2025), Deposition (May, 2025).

4.  Local 295 IBT Employer Group Welfare Fund v. Compass Minerals International, United States District Court for the District of Kansas, Expert Report (December, 2024), Deposition (January, 2025).

5.  International Brotherhood of Electrical Workers Local 98 Pension Fund v. Deloitte & Touche LLP, United States District Court for the District of South Carolina, Expert Report (November, 2024), Deposition (January, 2025).

6.  United States of America v. Nader Pourhassan, United States District Court for the District of Maryland, Declaration (July, 2024), Hearing Testimony (September, 2024), Expert Report (July, 2025).

7.  SoClean Inc. Marketing, Sales Practices and Products Liability Litigation, United States District Court for the Western District of Pennsylvania, Expert Report (October, 2024), Deposition (October, 2024), Hearing Testimony (November, 2024).

8.  Nikola Corporation v. Trevor Milton, American Arbitration Association. Expert Report (July, 2023), Deposition (July, 2023).

9.  Endless River Technologies LLC v. TransUnion LLC, United States District Court for the Northern District of Ohio Eastern Division. Expert Report, (June, 2021), Trial Testimony (September, 2022).

10. Latasha Davis et al. v. Washington University in St. Louis et al. United States District Court for the Eastern District of Missouri. Expert Report (August, 2021); Deposition (September, 2021).

11. Joseph C Bamford and Young Min Ban v. Penfold L.P.; Delaware Valley Regional Center LLP; West 36th Inc.; Joseph Manheim' and Reath & Co. LLC, Court of Chancery of the State of Delaware. Expert Report (January, 2021), Deposition (February, 2021) and Trial testimony (June, 2021).

# Appendix C
# Documents Considered

*Legal Documents*

Amended Complaint for Violations of the Federal Securities Laws, *In Re National Instruments Corporation Securities Litigation* , No. 1:23-cv-10488-DLC, March 29, 2024.

Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, *In Re National Instruments Corporation Securities Litigation* , No. 1:23-cv-10488-DLC, May 2, 2025.

Opinion and Order, *In Re National Instruments Corporation Securities Litigation* , No. 1:23-cv-10488-DLC, September 6, 2024.

Appointment of Class Representative and Class Counsel, *In Re National Instruments Corporation Securities Litigation* , No. 1:23-cv-10488-DLC, July 28, 2025.

*Expert Reports*

Expert Report of David J. Denis, *In Re National Instruments Corporation Securities Litigation* , No. 1:23-cv-10488-DLC, June 16, 2025 and materials cited therein.

Expert Report of Matthew D. Cain, PH.D., *In Re National Instruments Corporation Securities Litigation* , No. 1:23-cv-10488-DLC, July 28, 2025 and materials cited therein.

*Deposition Testimonies*

Deposition of David J. Denis, July 21, 2025.

Deposition of Matthew Cain, June 3, 2025.

*Produced Case Documents*

"Emerson Letter to NI June 22 2022," June 22, 2022, NAT-SL-00002991 –  994.

"First Emerson Letter to NI," May 25, 2022, NAT-SL-00001114 – 116.

"National Instruments Corporation Minutes of a Meeting of the Board of Directors," July 19 – 20, 2022, NAT-SL-00001457 – 509.

"National Instruments Corporation, Minutes of a Special Meeting of the Board of Directors," June 14, 2022, NAT-SL-00001447 – 448.

"NI Letter to Emerson 6-16-2022," June 16, 2022, NAT-SL-00001254 – 255.

"NI Letter to Emerson 8-2-2022," August 2, 2022, NAT-SL-00001239 – 240.

"Project Wolverine Discussion Materials, BofA Securities," June 2022, NAT-SL-00001513 – 545.

"Project Wolverine: Meeting of the Board of Directors, Wachtell, Lipton, Rosen & Katz," June 14, 2022, NAT-SL-00022986 – 3006.

Email from Eric Starkloff to Karen Rapp, "Re. Follow up from last week," June 16, 2022, NAT-SL-00002988 – 990.

*Academic Literature*

Bagwell, Lauri Simon, "Share Repurchase and Takeover Deterrence," *RAND Journal of Economics* , vol. 22, no. 1, Spring 1991.

Baker, Malcolm, Pan, Xin, and Wurgler, Jeffrey, "The Effect of Reference Point Prices on Mergers and Acquisitions," *Journal of Financial Economics* , vol. 106, no. 1, October 2012, CAIN0000928 – 950.

Bens, Daniel A., *et al.* , "Employee Stock Options, EPS Dilution, and Stock Repurchases," *Journal of Accounting and Economics* , vol. 36, nos. 1 – 3, December 2003, CAIN0000951 – 990.

Berk, Jonathan and DeMarzo, Peter, *Corporate Finance: The Core* , Second Edition (Prentice Hall, 2011).

Betton, Sandra and Eckbo, B. Espen, "Toeholds, Bid Jumps, and Expected Payoffs in Takeovers," *The Review of Financial Studies* , vol. 13, no. 4, Winter 2000, CAIN0000991 – 1032.

Bond, Philip, and Zhong, Hongda, "Buying High and Selling Low: Stock Repurchases and Persistent Asymmetric Information," *The Review of Financial Studies* , vol. 29, no. 6, June 2016, CAIN0001033 – 077.

Bradley, Michael and Rosenzweig, Michael, "Defensive Stock Repurchase," *Harvard Law Review* , vol. 99, no. 7, May 1986, CAIN0001078 – 132.

Branch, Ben and Yang, Taewon, "Predicting Successful Takeovers and Risk Arbitrage," *Quarterly Journal of Business and Economics* , vol. 42, no. 1/2, Winter/Spring 2003, CAIN0001133 – 149.

Brav, Alon, *et al.* , "Payout Policy in the 21st Century," *Journal of Financial Economics* , vol. 77, no. 3, September 2005, CAIN0001150 – 194.

Bruner, Robert F., *Applied Mergers and Acquisitions* , University Edition (John Wiley & Sons, 2004), CAIN0001195 – 208.

Cain, Matthew D. and Denis, David J., "Information Production by Investment Banks: Evidence from Fairness Opinions," *Journal of Law and Economics* , vol. 56, no. 1, February 2013, CAIN0001209 – 244.

Cain, Matthew D., et al., "Does *Revlon* Matter? A Empirical and Theoretical Study," *California Law Review* , vol. 108, no. 6, 2020, CAIN0001245 – 293.

Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* , University Edition (John Wiley & Sons, 1996), CAIN0001303 – 306.

Denis, David J., "Defensive Changes in Corporate Payout Policy: Share Repurchases and Special Dividends," *The Journal of Finance* , vol. 45, no. 5, December 1990, CAIN0001307 – 331.

Even-Tov, Omri, *et al.* , "Failed Acquisition Offers: The Impact of Failure Reasons on Target Valuation," *Finance Research Letters* , vol. 63, May 2024.

Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* , vol. 46, no. 5, December 1991, CAIN0001332 – 374.

Fishman, Michael J., "Preemptive Bidding and the Role of the Medium of Exchange in Acquisitions," *The Journal of Finance* , vol. 44, no. 1, March 1989, CAIN0001375 – 392.

Hribar, Paul, Jenkins, Nicole Thorne, and Johnson, W. Bruce, "Stock Repurchases as an Earnings Management Device," *Journal of Accounting and Economics* , vol. 41, nos. 1 – 2, April 2006, CAIN0001393 – 417.

Ikenberry, David L. and Vermaelen, Theo, "The Option to Repurchase Stock," *Financial Management* , vol. 25, no. 4, Winter 1996, CAIN0001418 – 435.

Jindra, Jan and Walkling, Ralph A., "Speculation Spreads and the Market Pricing of Proposed Acquisitions," *Journal of Corporate Finance* , vol. 10, no. 4, September 2004, CAIN0001436 – 467.

MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* , vol. 35, no. 1, March 1997, CAIN0001517 – 544.

Tabak, David and Dunbar, Frederick C., "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in *Litigation Services Handbook, The Role of the Financial Expert* , Third Edition (John Wiley & Sons, 2001), CAIN0001635 – 658.

Vermaelen, Theo, "Share Repurchases," *Foundations and Trends in Finance* , vol. 1, no. 3, December 2005, CAIN0001659 – 757.

Walkling, Ralph A., "Predicting Tender Offer Success: A Logistic Analysis," *The Journal of Financial and Quantitative Analysis* , vol. 20, no. 4, December 1985, CAIN0001758 – 775.

### Publicly Available Materials

"Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share," *Emerson* , January 17, 2023, available at https://web.archive.org/web/20230127212705/https://www.maximizingvalueatni.com.

"Immediate, Compelling And Certain Value For NI Shareholders," *Emerson* , January 17, 2023, available at https://www.emerson.com/documents/corporate/immediate-compelling-certainvalue-for-ni-shareholders-en-us-8730600.pdf.

"NI Announces Commencement of Strategic Review Process," *Businesswire* , January 13, 2023, available at https://www.businesswire.com/news/home/20230113005094/en/NIAnnounces-Commencement-of-Strategic-Review-Process.

National Instruments Corporation, Form 10-Q for the quarterly period ended September 30, 2021, filed November 1, 2021.

National Instruments Corporation, Form 10-Q for the quarterly period ended September 30, 2022, filed October 28, 2022.

National Instruments Corporation, Form 8-K, filed January 13, 2023.

National Instruments Corporation, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed May 25, 2023.

*Database*

S&P Capital IQ.