# EXHIBIT E

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re NATIONAL INSTRUMENTS CORPORATION SECURITIES LITIGATION | Civil Action No. 1:23-cv-10488-DLC |

**EXPERT REPORT OF SHANE GOODWIN**

**August 27, 2025**

**<u>CONFIDENTIAL</u>**

**TABLE OF CONTENTS**

I.      Background ..................................................................................................................1

II.     Summary of Opinions ................................................................................................5

III.    Dr. Cain misquotes my report and mischaracterizes my opinions ..........................8

IV.     Emerson's public comments and academic research on the dynamics of merger
        negotiations are inconsistent with Dr. Cain's theory that "National Instruments
        remained actively engaged with the prospect of a transaction with Emerson
        throughout the Class Period" ...................................................................................10

        A.      Emerson's public comments are inconsistent with Dr. Cain's theory ..................10

        B.      Dr. Cain's opinions are inconsistent with the Bruner (2004) research on
                the dynamics of merger negotiations that he cites ................................................11

V.      Dr. Cain's event study analysis does not support his claim that the alleged
        omissions were economically material .....................................................................14

VI.     Dr. Cain's review of internal documents is flawed and incomplete and does not
        support his claim that "a potential deal with Emerson remained under active
        consideration" throughout the Proposed Class Period ............................................18

        A.      Category A (August 2, 2022 and earlier) documents do not support Dr.
                Cain's Active Engagement Claim ..........................................................................22

        B.      Category B (August 3 – 11, 2022) documents do not support Dr. Cain's
                Active Engagement Claim ......................................................................................48

        C.      Category C (August 12, 2022 – November 3, 2022) documents do not
                support Dr. Cain's Active Engagement Claim ......................................................58

VII.    The academic literature that Dr. Cain cites is irrelevant and does not support his
        opinions that the alleged omissions were economically material or that NI
        "remained actively engaged with the prospect of a transaction with Emerson
        throughout the Class Period" ...................................................................................75

        A.      The research on target firms' price reactions to offer announcements that
                Dr. Cain cites does not support his conclusion that the alleged omissions
                were economically material ...................................................................................77

        B.      The research on multi-round negotiations that Dr. Cain cites does not
                support his conclusions ..........................................................................................79

        C.      The academic research on offer characteristics that Dr. Cain cites does not
                support his theory that the characteristics of Emerson's May and June
                2022 proposals "increase[d] the probability of successful deal completion" ........82

                (1)     The offer premium literature Dr. Cain cites does not support his
                        claim that the offer premia in Emerson's May and June 2022
                        proposals support the "credibility and likelihood of Emerson's
                        acquisition proposal" ................................................................................ 84

(2)    The reference point literature Dr. Cain cites does not support his claim that the offer premia in Emerson's May and June 2022 proposals support the "credibility and likelihood of Emerson's acquisition proposal" ................................................................................ 86

(3)    The literature on "toeholds" Dr. Cain cites does not support his claim that the offer premia in Emerson's May and June 2022 proposals support the "credibility and likelihood of Emerson's acquisition proposal" ................................................................................ 87

(4)    The literature on "all-cash offers" Dr. Cain cites does not support his claim that the offer premia in Emerson's May and June 2022 proposals support the "credibility and likelihood of Emerson's acquisition proposal" ................................................................................ 89

(5)    The literature on analysts' "target price optimism" Dr. Cain cites does not support his claim that the alleged omissions would be material ................................................................................ 91

VIII.    Dr. Cain's claim that Emerson's June 22, 2022 Letter "explicitly signaled a willingness to increase its offer" obfuscates that the proposed price explicitly remained $48 per share .................................................................94

IX.    Dr. Cain's opinions regarding the BofA Engagement Letter are speculative and incorrect .................................................................96

A.    Dr. Cain's claim that the BofA Engagement Letter was not defensive is incorrect .................................................................96

B.    Dr. Cain's claim that, even if NI's engagement of BofA was defensive, it still suggests Emerson's proposal "remained a credible threat" throughout the Proposed Class Period is speculative and incorrect .................................100

X.    Dr. Cain's criticisms of my opinion that "it is highly unlikely that […] BofA would have issued a fairness opinion confirming that Emerson's proposed price of $48 per share was fair 'from a financial point of view'" are fundamentally flawed and incorrect.................................102

XI.    Dr. Cain's comments regarding my opinions on NI's decision not to adopt a poison pill after rejecting Emerson's second proposal are incorrect ...............................110

## I.     Background

1.     At the request of Dowd Bennett LLP ("Counsel"), counsel for Defendants, I submitted an expert report on June 16, 2025 (my "First Report").[1] In the First Report, I was asked by Counsel to:[2]

(i)     Describe generally, based on my experience, the process and potential outcomes when a potential target is approached by an acquirer expressing interest in acquiring the target; and

(ii)    Analyze the indicia of probability and assess the probability of Emerson acquiring NI after NI sent its letter on August 2, 2022 rejecting Emerson's second proposal and whether this probability was higher than it was before on May 16, 2022, when Emerson first contacted NI with an unsolicited proposal to acquire all of NI's shares at $48 per share.

2.     Based on my experience, and my review and analysis, I summarized my opinions in paragraph 18 of my First Report as reproduced below:[3]

(1)     Although Emerson had submitted two unsolicited, non-binding, and contingent proposals in May and June 2022 to acquire National Instruments at $48 per share, the probability of an acquisition occurring as of the start of the Proposed Class Period was negligible. By that time, NI's Board had already rejected both proposals—on June 16 and again on August 2, 2022—after comprehensive review and deliberation with its legal and financial advisors. In both instances, NI's Board voted unanimously to decline the proposals and NI clearly communicated to Emerson that it did not wish to engage in any further discussions. These unequivocal rejections constituted classic "Just Say No" responses, signaling the absence of any meaningful engagement or likelihood of a transaction under the terms offered.

(2)     Emerson's proposals were not definitive offers. Instead, they are examples of the typical unsolicited preliminary proposal that a potential acquirer's Chief Executive Officer ("CEO") makes confidentially to a potential target's CEO, inviting him/her

---

[1]     In my First Report, I defined capitalized terms which I use in this report and provided my qualifications and compensation details. In **Appendix A** of this report, I list the documents that I have considered in preparing this report.

[2]     First Report, ¶ 13.

[3]     First Report, ¶ 18.

and the target's board of directors to engage in further confidential discussions. Before a potential acquirer can make a definitive offer to acquire a public company in a friendly, negotiated merger, both parties typically follow a standard multi-phase process designed to ensure regulatory compliance, fiduciary diligence, and refined price discovery. But if the target's board "Just Says No," (*i.e.*, refuses to engage in further discussions) as NI's Board did twice, then the friendly merger process stops, absent further developments. The probability of an acquisition thereafter is negligible, and the target continues its normal course of business.

(3)   Other corroborating facts also confirm that NI's Board was not interested in pursuing further discussions about a merger at the start of the Proposed Class Period, and the probability of an acquisition thereafter was negligible. Such facts include:

   i.   NI retained Bank of America ("BofA") as a financial advisor defensively to assist its Board to evaluate acquisition attempts only, not seek out prospective buyers;

   ii.  NI's Board unanimously decided not to engage with Emerson because it considered Emerson's proposals "opportunistic" and significantly undervalued the Company (relative to its stand-alone basis) given inter alia its financial advisor's valuations of NI's stand-alone value, and the Company's transformational plans.

   iii. NI and Emerson did not take the customary next steps typical in a friendly merger process, *e.g.*, the parties did not sign a non-disclosure agreement ("NDA") and Emerson was not granted access to confidential information about NI to conduct its due diligence.

   iv.  The parties had no further discussions until November 3, 2022 when Emerson sent a third proposal to acquire all NI shares for $53 per share.

   v.   After rejecting Emerson's second proposal, NI did not adopt any anti-takeover defenses such as a shareholder rights plan ("poison pill") before the start of the Proposed Class Period which potential targets commonly do when they anticipate that the potential acquirer may attempt a hostile takeover. This suggests—and would suggest to a reasonable investor—that the Board and NI did not perceive a substantial threat that Emerson would return with a hostile bid.

(4)   As the probability of Emerson acquiring NI was negligible as of the start of the Proposed Class Period given the facts at the time, Plaintiff's claim that NI possessed "material non-public information" about Emerson's offers over the Proposed Class Period is speculative and flawed.

(5)   If hypothetically, NI had disclosed at the start of the Proposed Class Period that it had received two unsolicited non-binding proposals to acquire all NI shares at $48 per share in May and June, 2022, both of which the Board had unanimously rejected after careful consideration and advice from its legal and financial advisors as not in

2

the best interests of NI's shareholders, and both of which the Board had determined did not provide a basis for further discussions with the unsolicited suitor, such a disclosure would have been economically immaterial and would not have had a significant impact on NI's stock price.

(6) NI's actions from November 2022 through April 2023, which followed the typical merger process when a target is interested in closing a deal, were in stark contrast to NI's actions after receiving Emerson's May 2022 and June 2022 proposals.

(7) Based on my experience, when a company receives an unsolicited, non-binding acquisition proposal in the ordinary course of business—particularly when it is not actively pursuing a sale process—and summarily rejects the proposal while explicitly declining to engage in further discussions, it is not customary for the company to publicly disclose the existence or rejection of that proposal.

(8) Even when the target is interested in completing a deal, and engages in merger discussions, the multi-stage merger process can stall or fail at any point. Accordingly, a target company typically refrains from disclosing unsolicited proposals unless merger discussions have advanced significantly. Thus, it is speculative to assume that because information regarding advanced discussions is material, a reasonable investor would have viewed the information available as of the start of the Class Period (of preliminary, brief interactions between NI and Emerson that did not advance and were not advancing) as significantly altering the total mix of information available.

3. Also, based on my review and discussion of the June 2022 BofA Presentation to NI's Board,[4] I concluded that BofA's own valuation ranges for the Company on a stand-alone basis using three different well-accepted valuation methods:

(1) "exceeded [Emerson's] offer;"[5] and

(2) "given these valuation reference ranges, it is highly unlikely that NI's Board would have approved (or even recommended to NI's shareholders to vote in favor of) an acquisition of the Company by Emerson for $48 per share, or that BofA would have

---

[4] "Project Wolverine: Discussion Materials," June 2022 (NAT-SL-00001513 – 545, at -522) ("June 14 BofA Presentation").

[5] National Instruments June 14, 2022, Board of Directors Meeting Minutes (NAT-SL-00001447 – 448) ("June 14 Board Meeting"). *See* First Report, ¶ 27.

BofA also compared NI's stock performance against the Nasdaq, "Test and Measurement Peers," and Industrial Software Peers." BofA's analysis showed that NI's performance was worse than these benchmarks over the prior twelve months, but had improved over time, *e.g.*, over the last one month, NI's stock return (7.4%) was higher than two of the three benchmarks (the Nasdaq, "Test and Measurement Peers"). *See* June 14 BofA Presentation (NAT-SL-00001513 – 545, at -517).

issued a fairness opinion confirming that Emerson's proposed price of $48 per share was fair 'from a financial point of view.'"[6]

4.    On May 25, 2025, Dr. Matthew Cain submitted an expert report on behalf of the Plaintiffs ("Cain First Report"). Dr. Cain submitted a second report on July 28, 2025 ("Cain Second Report"), in which he opines that:

(1)    "The alleged omissions in this matter were economically material in that they relate to information that would affect a reasonable investor's investment decisions, including the prices at which they traded NI's Common Stock."[7]

(2)    "There is an economic link, which can be reliably measured, between the alleged omissions and NI's Common Stock prices."[8]

(3)    "The alleged omissions introduced artificial deflation into the prices of National Instruments Common Stock, causing investors to sell their stock at artificially depressed prices during the Class Period."[9]

(4)    "Based on [his] loss causation analysis, [he has] calculate[d] the amount of artificial deflation in National Instruments Common Stock."[10]

(5)    He has "provide[d] a method for calculating Section 10(b) and 20(a) damages on a per share basis for each Class member using the standard out-of-pocket methodology."[11]

(6)    "Nothing in the Denis Report or Goodwin Report disturbs [his] Efficiency Report opinions," and that there are purportedly "flaws" in both these reports.[12]

5.    To support his opinions that the alleged omissions are economically material, he attempts to critique my First Report. In particular, the criticisms Dr. Cain has specifically regarding my First Report relate to the opinions I expressed in my First Report in paragraphs 18.1 – 18.4, 18.7

---

[6]    First Report, ¶ 31.

[7]    Cain Second Report, ¶ 18.

[8]    Cain Second Report, ¶ 19.

[9]    Cain Second Report, ¶ 20.

[10]    Cain Second Report, ¶ 21.

[11]    Cain Second Report, ¶ 22.

[12]    Cain Second Report, ¶ 24. Dr. Cain refers to the Cain First Report as his "Efficiency Report."

– 18.8, 27, and 31, which I have reproduced above.[13] Dr. Cain alleges that these opinions of mine are not consistent with internal documents and academic literature he has cited. He claims my opinion that "NI's rejections of Emerson's offers marked a definitive end to engagement, rendering the likelihood of a transaction 'negligible' at the start of the Class Period"[14] is "flawed"[15] because my First Report purportedly:[16]

    i. "[O]verlooks multiple pieces of evidence, including internal documents, showing that National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period."

    ii. "[I]gnores internal assessments that the probability of Emerson taking its offer public had increased significantly—a development which carried market implications regardless of whether the Board was engaged in formal negotiations."

    iii. "Finally, it disregards well-established academic research on the structure and dynamics of merger negotiations."

6.    Counsel has asked me to review and comment on Dr. Cain's opinions that the alleged omissions are economically material and his critiques of my First Report.

## II.    SUMMARY OF OPINIONS

7.    I continue to hold the opinions expressed in my First Report summarized above. As I discuss in detail in this report, Dr. Cain's criticisms of my First Report are fundamentally flawed. Among other things, the Cain Second Report:

---

[13]   *See* Cain Second Report, Appendix C, ¶¶ 2 – 34.

[14]   Cain Second Report, Appendix C, ¶ 3.

[15]   Cain Second Report, Appendix C, ¶ 3.

[16]   Cain Second Report, Appendix C, ¶ 3.

1) Misquotes my report and mischaracterizes my opinions.

2) Posits a fundamentally flawed claim that, even after NI had rejected both of Emerson's preliminary confidential May and June 2022 proposals, "National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period" (henceforth Dr. Cain's "Active Engagement Claim").[17] This claim contradicts, among other things, facts in evidence cited in my First Report, Emerson's own public remarks, and academic research on merger dynamics which Dr. Cain claims I disregarded.

3) Presents event study results that are entirely irrelevant and do not prove that the alleged omissions were economically material.

4) Presents a critically incomplete and misleading review of certain internal documents which neither support Dr. Cain's Active Engagement Claim, nor prove that the alleged omissions were material, as Dr. Cain asserts.

5) Cites some academic studies that Dr. Cain claims I disregarded. The findings of these studies are irrelevant and do not affect my conclusions. They do not support and in fact contradict Dr. Cain's Active Engagement Claim and his opinion that the alleged omissions were material.

6) Claims that Emerson's June 22, 2022 Letter (the "June 22 Emerson Letter") "explicitly signaled a willingness to increase its offer,"[18] which obfuscates that

---

[17]    Cain Second Report, Appendix C, ¶¶ 3, 11.

[18]    Cain Second Report, Appendix C, ¶ 10.

6

Emerson's proposed acquisition price in this second proposal explicitly remained $48 per share. Dr. Cain's interpretation of the language in Emerson's second proposal is pure speculation. Instead, consistent with academic research on bargaining, the language Dr. Cain cites is akin to "cheap talk," which a buyer uses to attempt to engage in negotiations.

7) Makes numerous speculative and erroneous claims regarding the nature of the June 10, 2022 BofA engagement letter with NI (the "BofA Engagement Letter") which reflect a fundamental lack of understanding about industry practices.

8) Presents fundamentally flawed critiques of my conclusion that, given the valuation ranges that BofA presented to NI's Board in June 2022,[19] it is highly unlikely that BofA would have issued a fairness opinion confirming that Emerson's proposed price of $48 per share was fair "from a financial point of view," consistent with the Board's decision to reject the $48 per share proposal. Among other things, Dr. Cain's criticisms reflect a fundamental lack of understanding of valuation principles, the facts in this case, and fairness opinions. The findings of the study he cites to support his claims are entirely irrelevant.

9) Presents fundamentally flawed critiques of my conclusion that NI's decision not to adopt a poison pill after rejecting Emerson's second proposal would suggest to a reasonable investor that NI and its Board did not perceive a substantial threat that

---

[19] *See* June 14 BofA Presentation (NAT-SL-00001513 – 545).

Emerson would return with a hostile bid. My conclusion is consistent with the findings of the study Dr. Cain cites in this connection.

### III.    Dr. Cain misquotes my report and mischaracterizes my opinions

8.    As I opined in my First Report, (i) Emerson's two unsolicited, non-binding, and contingent proposals in May and June 2022 to acquire National Instruments at $48 per share were "not definitive offers"; and (ii) the NI Board's unanimous votes to reject Emerson's May and June 2022 proposals and NI's clear communication to Emerson that it did not wish to engage in any further discussions "constituted classic 'Just Say No' responses, signaling the absence of any meaningful engagement or likelihood of a transaction under the terms offered."[20]

9.    These opinions were based on my review of a host of facts in evidence which I discussed at length in Section III of my First Report. Yet, puzzlingly, Dr. Cain asserts that I have purported to:[21]

> […] opine on the state of mind of NI's management and board of directors (the "Board") by claiming they were **"not interested in pursuing further discussions about a merger** […]"

10.    Dr. Cain's assertion is blatantly misleading and incorrect. My opinions are not based on speculations about the "state of mind" of NI's management and Board, as Dr. Cain misleadingly claims by cherry-picking words from a single sentence in my First Report (bolded in the excerpt above). In its entirety, the sentence that Dr. Cain only partially quotes reads as follows:[22]

---

[20]    First Report, Section III and ¶ 18.

[21]    Cain Second Report, Appendix C, ¶ 2. (Emphasis added).

[22]    First Report, ¶ 18. (Emphasis added).

> **Other corroborating facts also confirm that** NI's Board was not interested in pursuing further discussions about a merger at the start of the Proposed Class Period.

11.     As the bolded portion of the above-quoted sentence clearly states, my opinions were based on my review of the facts in evidence, namely, NI's board meeting minutes, NI's proxy statement summarizing its Board's deliberations with NI's management and advisors, the NI Board's grounds for rejecting Emerson's proposals, and other corroborating facts.[23]

12.     Notably, while mischaracterizing my opinions as conclusions I have drawn about NI leadership's "state of mind", rather than facts in evidence, Dr. Cain also ignores the remainder of the same paragraph he selectively quotes from my First Report, which lists the "other corroborating facts" I reviewed as follows:[24]

> (i)     NI retained Bank of America ("BofA") as a financial advisor defensively to assist its Board to evaluate acquisition attempts only, not seek out prospective buyers;
>
> (ii)     NI's Board unanimously decided not to engage with Emerson because it considered Emerson's proposals "opportunistic" and significantly undervalued the Company (relative to its stand-alone basis) given inter alia its financial advisor's valuations of NI's stand-alone value, and the Company's transformational plans.
>
> (iii)     NI and Emerson did not take the customary next steps typical in a friendly merger process, *e.g.*, the parties did not sign a non-disclosure agreement ("NDA") and Emerson was not granted access to confidential information about NI to conduct its due diligence.
>
> (iv)     The parties had no further discussions until November 3, 2022 when Emerson sent a third proposal to acquire all NI shares for $53 per share.
>
> (v)     After rejecting Emerson's second proposal, NI did not adopt any anti-takeover defenses such as a shareholder rights plan ("poison pill") before the start of the Proposed Class Period which potential targets commonly do when they anticipate that the potential acquirer may attempt a hostile takeover. This

---

[23]     First Report, Section III.

[24]     First Report, ¶ 18.

suggests—and would suggest to a reasonable investor—that the Board and NI did not perceive a substantial threat that Emerson would return with a hostile bid.

**IV.    Emerson's public comments and academic research on the dynamics of merger negotiations are inconsistent with Dr. Cain's theory that "National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period"**

**A.    Emerson's public comments are inconsistent with Dr. Cain's theory**

13.    Dr. Cain claims that, even after NI had rejected both of Emerson's $48 per share proposals, "National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period."[25] While Dr. Cain cites "multiple pieces of evidence, including internal documents"[26] and "academic research on the structure and dynamics of merger negotiations"[27] to attempt to support his conclusions, this evidence does not support his opinions. Rather, Dr. Cain's claims rest on speculative and incorrect interpretations of cherry-picked passages of internal documents, where Dr. Cain repeatedly ignores portions of the same documents (and a host of others) that flatly contradict his views. He provides zero evidence that NI "engaged" in any way with Emerson, or that Emerson "engaged" with NI in any way after receiving NI's second rejection letter on August 2, 2022, until November 3, 2022, when Emerson sent NI its third acquisition proposal.[28]

---

[25]    Cain Second Report, Appendix C, ¶ 3.

[26]    Cain Second Report, Appendix C, ¶ 3.

[27]    Cain Second Report, Appendix C, ¶ 3.

[28]    Merriam-Webster defines "engage" as "to deal with especially at length." *See* "Engage," Merriam-Webster, available at https://www.merriam-webster.com/dictionary/engage.

10

14. Before I respond specifically to Dr. Cain's many speculative assertions, it is worth noting that Dr. Cain's claim is entirely at odds with Emerson's public statements. In its January 17, 2023 press release (the "Emerson January 17 Press Release"), Emerson stated that, since submitting its first proposal to NI in May 2022, NI had categorically "**refused to engage** meaningfully with Emerson" to date (*i.e.,* through January 17, 2023).[29] Emerson described NI's June 16, 2022 and August 2, 2022 letters rejecting its $48 per share proposals as "curt response letter[s] **refusing to engage**."[30] My review of NI's Proxy Statement, which describes the background of the eventual merger between NI and Emerson, as well as the materials Dr. Cain cites discussed below, which provide no evidence of "engagement", show that the parties did not engage in any discussion between August 2, 2022 and November 3, 2022, when Emerson submitted its third acquisition proposal at a higher proposed acquisition price of $53 per share.[31] Thus, Emerson's own characterization of its interactions with NI contradict Dr. Cain's assertions.

> **B.    Dr. Cain's opinions are inconsistent with the Bruner (2004) research on the dynamics of merger negotiations that he cites**

15. Dr. Cain's opinions reflect a fundamental misunderstanding about the dynamics of merger negotiations as described in Bruner (2004), a reference Dr. Cain cites. Consistent with my own description of the dynamics of merger negotiations, Bruner (2004) states:[32]

---

[29] "Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share," *Emerson*, January 17, 2023 ("Emerson January 17 Press Release"), p. 3. (Emphasis added).

[30] Emerson January 17 Press Release, p. 12. (Emphasis added).

[31] NI Proxy Statement, p. 26.

[32] Bruner, Robert F., *Applied Mergers & Acquisitions*, John Wiley & Sons, ("Bruner (2004)"), p. 690. (Emphasis added).

> Friendly negotiations typically begin with a conversation between the CEOs of the buyer and target firms […]. The aim of this first conversation is to open the door and gain an agreement to meet again. It presents the concept of the merger, expresses its strategic logic, and frames some possibilities about social issues.
>
> **The target's response to the buyer's initial pitch is a crucial inflection point.** […] If the target has a strong prior desire to remain independent, or at least not to merge with the buyer, the target CEO will express a strong and clear "no"—this is the **famous *"just say no"* defense** and must be grounded in some belief that the transaction is not in the interest of the target's shareholders and/or that the target has some other strategy that dominates the buyer's idea.
>
> […]
>
> Following a rejection, **most merger proposals die**. But some buyers may elect to appeal directly to the board of directors in the form of a "bear hug" proposal, or directly to the shareholders in the form of a hostile tender offer.

16.    As Bruner (2004) explains, if parties agree to engage in merger discussions, they typically sign "first-round" documents (*e.g.,* letters of intent and NDAs).[33] Bruner (2004)'s commentary is entirely consistent with my own opinion. As I had stated in my First Report, citing another well-known textbook on mergers and acquisitions by DePamphilis (2018):[34]

> Typically, *if* the potential target wished to engage in a friendly merger discussion with the potential acquirer, after receiving an unsolicited confidential proposal, the next steps in a merger discussion would be for the parties to enter into an NDA after which the potential buyer would be given access to confidential material about the target through a "data room" to conduct customary due diligence. In this case, NI's Board refused to enter

---

[33]    Bruner (2004), pp. 690 – 691 ("In order to set an economically attractive price, the buyer needs to gain inside information about the target and perhaps an expression of precommitment to the concept of the deal. The target may find it in its interest to grant these requests, but needs to address two fears: (1) the leakage of its inside information to others, particularly competitors, and (2) the possibility that the buyer will stop negotiating and simply mount a hostile tender offer or buy the target's shares in the open market. The purpose of […] first-round documents [*e.g.*, term sheet, letter of intent, NDA, and engagement of advisers] is to manage risks arising from these needs and fears.").

[34]    First Report, ¶ 33, citing DePamphilis, Donald M., *Mergers, Acquisitions, and Other Restructuring Activities*, 9th Edition, Elsevier, 2018, Chapter 5: Implementation: Search Through Closing, pp. 165 – 192, at pp. 175 – 176, 182. (Emphasis in original).

into an NDA with Emerson and grant it access to confidential information to conduct its due diligence.

17.    After unequivocally refusing to engage with Emerson or give it access to any confidential information for the second time on August 2, 2022, NI and Emerson did not communicate with each other until November 3, 2022. NI and Emerson did not execute an NDA until December 23, 2022.[35]

18.    As Bruner (2004) explains, until the parties have signed first-round documents, "the two sides have little to show for their efforts but a degree of oral agreement on the possibilities of merger."[36] In this case, throughout the Proposed Class Period, NI and Emerson had not reached even that limited "degree of oral agreement on the possibilities of merger,"[37] and had certainly not moved to the next step of signing "first-round documents."

19.    In short, following a target's refusal to engage further with a potential acquirer when it considers two identically priced proposals unworthy of further attention, "most merger proposals die" in Bruner's (2004) words.[38] As the literature has clearly explained, when a target decides to "Just Say No," it means exactly that—a conclusion Dr. Cain refuses to acknowledge.[39]

---

[35]    NI Proxy Statement, p. 29.

[36]    Bruner (2004), p. 690.

[37]    Bruner (2004), p. 690.

[38]    Bruner (2004), p. 690.

[39]    Dr. Cain argues that, notwithstanding Bruner (2004)'s unambiguous conclusions about "Just Say No" responses, a target's unequivocal rejection of an acquisition proposal *and refusal to engage in further discussions* with the suitor (as NI informed Emerson twice in June and August 2022), could somehow "support the view that rejecting an initial offer is not necessarily a refusal, but rather is commonly part of a deliberate and strategic negotiating process intended to invite competing offers or improved terms that enhance shareholder value. For these reasons, Bruner (2004) ultimately concludes that 'Merger negotiations are highly material for every target firm.'" *See* Cain Second Report, ¶ 114. Such a reference to Bruner (2004) is entirely misleading, as Bruner (2004) notes that merger negotiations are material, *provided parties agree to engage*, not if the target company decides to "Just Say No."

13

20.     In contrast, when parties are engaged in negotiations, then, as Bruner (2004) explains, the dynamics of the merger process are fundamentally different.[40] As I discussed in Section IV of my First Report, the negotiations between NI and Emerson (and other interested parties) after Emerson had submitted its third proposal on November 3, 2022 were "consistent with the steps that parties take in a merger process when both are seriously interested in closing a deal."[41] As I opined in my First Report:[42]

> Thus, it would be speculative to assume that the preliminary and limited nature of interactions between NI and Emerson—none of which progressed to active or ongoing negotiations—would have significantly altered the total mix of information available to a reasonable investor at the start of the Class Period, merely because advanced merger discussions might be considered material in other contexts.

## V.     Dr. Cain's event study analysis does not support his claim that the alleged omissions were economically material

21.     The Cain Second Report does not critique my opinion that "NI's actions from November 2022 through April 2023 [which followed] the typical merger process when a target is interested in closing a deal, were in stark contrast to NI's actions after receiving Emerson's May 2022 and June 2022 proposals."[43]

---

[40]    *See* Bruner (2004), Chapter 25: How a Negotiated Deal Takes Place, pp. 685 – 702.

[41]    First Report, Section IV. These steps are consistent with the steps parties typically take in completing a deal as described in Chapter 25 of Bruner (2004).

[42]    First Report, ¶ 57.

[43]    First Report, ¶¶ 18, 44.

14

22.    Yet, the event study analysis that Dr. Cain conducts to assess whether the alleged omissions were economically material[44] disregards this fundamental difference in merger dynamics.[45] Dr. Cain's analysis examines the magnitude and statistical significance of NI stock abnormal returns on January 13 and/or January 17, 2023. He finds the abnormal returns are large and statistically significant and then nonsensically opines that his event study results support his conclusion that the alleged omissions were economically material. They do not, for the obvious reason that the events on January 13 and 17, 2023 (months after the end of the Proposed Class Period) are fundamentally different from the disclosures that the Defendants could (and allegedly should) have made at the start of the Proposed Class Period.[46]

---

[44]    *See* Cain Second Report, Section V.C. The event study Dr. Cain conducts calculates NI's "abnormal" return (*i.e.*, the portion of NI's stock return that is "attributable to company-specific news" rather than contemporaneous changes in the market and industry indices) following two announcements after the end of the Proposed Class Period (on January 13 and 17, 2023) and determines whether these abnormal returns were "'statistically significant,' *i.e.*, sufficiently large compared to the typical volatility such that simple random movement can be rejected as the cause." *See* Cain Second Report, ¶ 119.

[45]    "Event study" is a well-understood methodological tool in the finance literature to "measure the reaction of a security's price to news. *See* Cain Second Report ¶ 117 citing MacKinlay, A. Craig (1997), "Event Studies in Economies and Finance", *Journal of Economic Literature*, Vol. 35, No. 1, pp. 13 – 39. *See* Fama, E. (1991), "Efficient Capital Markets: II", *The Journal of Finance*, Vol 46, No 5, pp. 1575 – 1617.

[46]    Dr. Cain also discusses several analyst reports and public articles related to these January 2023 events in Section V.D ("Financial Analyst and Media Commentary") which according to him is "further evidence of the importance of information about M&A developments, multiple securities analysts and the financial press issued commentary and analysis in response to post-Class Period disclosures of M&A developments at National Instruments." *See* Cain Second Report, ¶ 125. In Section V.D, Dr. Cain cites the following articles and reports. Dr. Cain does not explain how these documents support his Active Engagement Claim. In my opinion, these documents, which discuss events that occurred well after the end of the Proposed Class Period, do not in any way support Dr. Cain's Active Engagement Claim. *See* January 13, 2023, "NATI Initiates a Strategic Review," Morgan Stanley; January 17, 2023, "Emerson Electric Co. NATI Suited to EMR's Strengths," Oppenheimer, CAIN0001827-838; January 17, 2023, "Takeaways from NATI's Announced Strategic Review," Jefferies; January 17, 2023, "Strategic Review to Fast Charge Shareholder Value Creation," J.P. Morgan; January 17, 2023, "NATI exploring strategic options. How much might potential buyers pay?," UBS; January 13, 2023, "National Instruments announces strategic review, eyeing shareholder value," Investing.com; January 13, 2023, "National Instruments to Undergo Strategic Review," Dow Jones Newswires; January 13, 2023, "National Instruments, Virgin Galactic And Other Big Stocks Moving Higher On Friday," Benzinga; January 17, 2023, "Emerson Electric Offers to Buy National Instruments in $7.6 Billion Deal," Dow Jones Newswires; January 17, 2023, "Emerson reveals $7.6 billion bid for National Instruments," AP; January 18, 2023, "In Pursuit of National Instruments, Emerson Electric Bids Nearly $7 Billion," *The Wall Street Journal*).

15

23.    Dr. Cain's event study analysis examines NI's abnormal return following: (i) NI's January 13, 2023 announcement that its Board has "initiated a review and evaluation of strategic options, in consultation with its financial and legal advisors, with the intent to unlock and maximize shareholder value," signaling the Company's willing to entertain acquisition proposals;[47] and (ii) Emerson's January 17, 2023 announcement that it had confidentially submitted a proposal to acquire NI for $53 per share on November 3, 2022.[48] In contrast, as I explained in my First Report, the hypothetical disclosure NI could have made at the start of the Proposed Class Period would have been fundamentally different.[49]

24.    According to the Compliant, the alleged omission in this case is NI's alleged failure to "disclose material non-public information," *i.e.,* that it had "offers" from Emerson, "while buying back NI's securities."[50] As I discussed in my First Report, by the start of the Proposed Class Period NI had rejected the "offers" it had received by Emerson.

25.    Assuming this allegedly omitted information is found to be material, the hypothetical disclosure that Defendants could have made at the start of the Proposed Class Period would be to disclose the "offers" (*i.e.,* NI had received two confidential, unsolicited, and non-binding proposals in May and June 2022 from the same interested party, at the same proposed acquisition price of $48 per share) and also simultaneously disclose that "NI's Board had rejected both proposals after

---

[47]    "NI Announces Commencement of Strategic Review Process," *Business Wire,* January 13, 2023.

[48]    Emerson January 17 Press Release. *See also* Cain Second Report, ¶ 124.

[49]    *See, e.g.*, First Report, ¶ 43.

[50]    *In Re. National Instruments Corporation Securities Litigation*, United States District Court, Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Opinion and Order filed September 6, 2024, pp. 15 – 16.

16

careful review with its financial and legal advisors, and also informed the suitor twice that it did not wish to engage in further discussions."[51] It would have been impossible for NI to have disclosed the events on January 13 and 17, 2023 that Dr. Cain analyzes in his event study at the start of the Proposed Class Period because that information was not known at that time.

26.     Dr. Cain asserts that his event study results support his conclusion that the alleged omissions were economically material.[52] That is, he assumes that since NI's stock price experienced statistically significant (positive) abnormal returns following the January 13, 2023 and January 17, 2023 announcements of an active merger discussion, including a $53 per share proposal, these price reactions are indicative of how NI's stock price would have reacted to a hypothetical disclosure several months earlier confirming NI's two rejections of $48 per share proposals, its refusal to engage, and its termination of any further discussion with the suitor.

27.     In summary, Dr. Cain's event study analysis is irrelevant and a misleading attempt to introduce the imprimatur of established empirical techniques that are entirely inappropriate to support his opinions regarding the economic materiality of the alleged omissions. The fatal error in Dr. Cain's analysis is that the information the market was reacting to on the dates analyzed in his event study is fundamentally different from the alleged omissions. As such, the market reactions on January 13 and 17, 2023 are irrelevant to assessing how the market would have reacted to the alleged omissions.

---

[51]    First Report, ¶ 43.

[52]    Cain Second Report, ¶ 124.

**VI.    Dr. Cain's review of internal documents is flawed and incomplete and does not support his claim that "a potential deal with Emerson remained under active consideration" throughout the Proposed Class Period**

28.    Dr. Cain claims that my opinion that "NI's rejections of Emerson's offers marked a definitive end to engagement, rendering the likelihood of a transaction 'negligible' at the start of the Class Period […] is flawed because it overlooks multiple pieces of evidence, including internal documents, showing that National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period."[53]

29.    Dr. Cain's Active Engagement Claim is fundamentally flawed. This claim rests on Dr. Cain's misleading and speculative interpretations of cherry-picked documents, which are tantamount to assuming that Defendants had a crystal ball. That is, Dr. Cain's claim rests on the flawed premise that, simply because Emerson eventually submitted a new $53 per share acquisition proposal on November 3, 2022, even after NI's two "Just Say No" responses to Emerson's May and June 2022 proposals, Defendants "knew" another proposal from Emerson was forthcoming and remained engaged about "a potential deal with Emerson" throughout (and after) the Proposed Class Period.[54] Such a claim is completely unsupported by the internal documents Dr. Cain cites.

30.    Instead, the internal documents Dr. Cain cites contradict his claim. My review of these documents confirms they indicate that, after rejecting two confidential acquisition proposals at the same price from Emerson (on June 16 and August 2, 2022, respectively) and refusing to

---

[53]    Cain Second Report, Appendix C, ¶ 3. Dr. Cain also claims that I mischaracterize "the nature of the M&A-related events associated with Emerson's offer to acquire NI." *See* Cain Second Report, Appendix C, ¶ 23.

[54]    *See, e.g.*, Cain Second Report, Appendix C, ¶ 4.

engage in further discussions, NI monitored Emerson to be prepared to issue public statements or adopt defensive measures (such as a poison pill) in the event Emerson "went public", *i.e.,* disclosed publicly that it had previously submitted an acquisition proposal to NI which NI had rejected[55] or pursued a "hostile" public acquisition strategy (a "hostile bid").[56] Dr. Cain has apparently confused or confounded this monitoring with NI's purported "engagement" with Emerson regarding a "potential deal."[57] In my experience, it is typical for a target company's management to monitor the activities of a potential acquirer after it has rejected that acquirer's confidential acquisition proposal (as was the case with NI at least since its June 16, 2022 rejection of Emerson's first proposal) in order to be prepared to reject, confidentially or publicly, any future acquisition attempts by the same acquirer.

31.    The internal documents Dr. Cain cites cover the following time periods: (i) August 2, 2022 and earlier ("Category A"), (ii) August 3 – 11, 2022 ("Category B"), and (iii) August 12 to November 3, 2022, when Emerson submitted its third proposal ("Category C"). I discuss below the specific reasons why none of these documents support Dr. Cain's Active Engagement Claim. In summary:

---

[55]    BofA_000806 – 808, at -807 – 808.

[56]    In a May 2022 presentation to NI's Board, WLRK noted that ████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ " *WLRK*, May 2022 ("May 2022 WLRK

[57]    Cain Second Report, Appendix C, ¶ 4.

1) *Category A: August 2, 2022 and earlier*: These documents confirm that NI evaluated Emerson's May and June 2022 acquisition proposals carefully and considered Emerson's possible responses *before* NI's Board ultimately rejected Emerson's second proposal on August 2, 2022. Following its review of Emerson's proposals, NI's Board unanimously and unequivocally rejected them. NI's review of these proposals, before determining that they did not merit further discussions, does not in any way imply NI remained engaged with Emerson for a possible future transaction, as Dr. Cain incorrectly asserts.[58]

2) *Category B: August 3 – 11, 2022*: These documents confirm that, after learning of Emerson's accumulation of a 0.97% equity stake in NI on August 10, 2022, NI's management continued to view its August 2 rejection of Emerson's proposal as conclusive. The documents confirm that, after rejecting Emerson's second proposal, NI's management consulted its legal counsel (WLRK) to verify that it did not possess any MNPI regarding Emerson's proposals before commencing with its share repurchases. The documents also confirm that NI received updates regarding Emerson's trading activities in NI's stock from MacKenzie Partners, a consulting firm that NI retained to monitor such trading activities but did not involve in its evaluation of Emerson's proposals. None of the documents Dr. Cain cites from this

---

[58]    Cain Second Report, Appendix C, ¶ 4.

period show any engagement about a "potential deal" between NI and Emerson throughout the Proposed Class Period.[59]

3) *Category C: August 12 to November 3, 2022*: These documents comprise NI management's communications with NI's Board and advisors in advance of its September 15, 2022 Investor Day and September 20 – 21, 2022 Board Meeting. Among other things, these discussions referenced Emerson's small equity stake in NI at the time. Notably, despite learning that ████████████████████████ ████████████████[60] NI considered but did not make any revisions to its strategy (*i.e.*, monitoring Emerson, being prepared to respond if Emerson went public, and being prepared to reject any unacceptable acquisition proposal if Emerson made another). The documents cited from September 22 to November 3, 2022 refer to NI's ongoing communications with its advisors, namely with BofA regarding its financial model and with MacKenzie Partners regarding its weekly updates on Emerson's trading activities in NI's stock. None of the documents Dr. Cain cites from this period show any engagement between NI and Emerson about a "potential deal"[61] or any other matter.

---

[59]    Cain Second Report, Appendix C, ¶ 4.

[60]    NAT-SL-00010806 – 807.

[61]    Cain Second Report, Appendix C, ¶ 4.

### A.    Category A (August 2, 2022 and earlier) documents do not support Dr. Cain's Active Engagement Claim

32.    Dr. Cain claims that "internal documents confirm that a potential deal with Emerson remained under active consideration throughout the Class Period."[62] In Section V.A of his Second Report, Dr. Cain dedicates 67 paragraphs to describing these "internal documents" in what he calls a "Timeline of M&A-Related Events Associated with Emerson's Offers to Acquire National Instruments Common Stock."[63] Nearly half of Dr. Cain's commentary regarding this purported "timeline" refers to internal documents dated *before* August 2, 2022, during which time NI received, considered, and ultimately rejected Emerson's unsolicited and confidential May and June 2022 acquisition proposals.[64]

33.    In my opinion, these documents are consistent with a target company's board of directors undertaking the typical steps to evaluate an unsolicited acquisition proposal with the assistance of its financial and legal advisors. They do not in any way support Dr. Cain's claim that, after August 2, 2022, "a potential deal with Emerson remained under active consideration throughout the Class Period."[65]

---

[62]    Cain Second Report, Appendix C, ¶¶ 4 – 5.

[63]    Cain Second Report, Section V.A. ("Timeline of M&A-Related Events Associated with Emerson's Offers to Acquire National Instruments Common Stock"), ¶¶ 38 – 104.

[64]    Cain Second Report, ¶¶ 38 – 66.

[65]    Cain Second Report, Appendix C, ¶ 4.

1.  Internal documents dated June 16, 2022 (when NI informed Emerson that NI's Board had voted unanimously to reject Emerson's first proposal) and earlier

34.     The earliest internal documents that Dr. Cain discusses are: three January 2022 documents related to NI's planned 2022 share repurchases;[66] Emerson's initial outreach to NI on May 16, 2022;[67] Emerson's first proposal submission to NI on May 25, 2022;[68] a presentation by WLRK entitled "███████████████████████████" made to NI's Board in May 2022;[69] the June 10, 2022 BofA Engagement Letter;[70] an email chain dated June 7 – 10, 2022 between NI and BofA assigning the code name "Nuthatch" to Emerson for "internal discussion materials" regarding Emerson's proposal;[71] and an email chain dated June 12 – 16, 2022 between NI personnel and management discussing NI's share repurchase strategy (namely, NI's capacity to buy back shares and the possible timing of such share repurchases).[72]

---

[66]   Dr. Cain cites a January 8 – 10, 2022 email exchange between NI's Pedro Andrade, Ms. Vidaurri, and Ms. Rapp. *See* Cain Second Report, Appendix C, ¶ 24, citing NAT-SL-00001609 – 611 and two drafts of a presentation (dated January 8 and 9, 2022) regarding NI's planned 2022 share repurchase strategy entitled "NATI Capital Allocation Strategy." *See* Cain Second Report, Appendix C, ¶ 24, citing NAT-SL-00001612; NAT-SL-00026027.

[67]   Cain Second Report, ¶ 38, citing NAT-SL-00001267.

[68]   Cain Second Report, ¶ 39, citing NAT-SL-00001114 – 116.

[69]   Cain Second Report, ¶ 40, citing May 2022 WLRK Presentation (NAT-SL-00025277 – 308, at -289, -292 – 294).

[70]   Cain Second Report, ¶ 41, citing NAT-SL-00001554 – 566 ("BofA Engagement Letter").

[71]   Cain Second Report, ¶ 42, citing NAT-SL-00006807 – 810. As Dr. Cain acknowledges, the "involvement of outside advisors and use of code names are consistent with the formal protocols typically used during confidential M&A discussions." *See* Cain Second Report, ¶ 42, citing Bruner (2004), p. 736.

[72]   Cain Second Report, ¶ 43, citing NAT-SL-00002988 – 990.

35.    For most of these cited documents, Dr. Cain provides no discussion of how they purportedly support his Active Engagement Claim.[73] In some cases, he refers to portions of documents but does not proffer any conclusions about why the documents support his Claim, and in other cases he cites portions of the documents to reach fundamentally flawed conclusions, as I discuss at length later in this report.[74] Taken as a whole, these documents provide no support for Dr. Cain's Active Engagement Claim. Instead, they confirm that NI was preparing to carefully review Emerson's first proposal. On June 14, 2022, NI's Board completed its review Emerson's proposal with the assistance of its advisors and unanimously voted to reject it.

---

[73]    Dr. Cain cites the following documents without providing any discussion of these documents or explanation of how they purportedly support his Active Engagement Claim: January 8 – 10, 2022 email exchange between NI's Pedro Andrade, Ms. Vidaurri, and Ms. Rapp; two drafts of the same presentation regarding NI's planned 2022 share repurchase strategy entitled "NATI Capital Allocation Strategy"; Emerson's initial May 16, 2022 outreach to NI; Emerson's first proposal to acquire NI on May 25, 2022; the June 7 – 10 email exchange between NI and BofA; and the June 12 – 16, 2022 email exchange between an NI employee and NI executives regarding NI's planned share repurchases. Citations to these documents are provided above in footnotes 66 – 68, 71 – 72.

[74]    In Section V of the Cain Second Report, Dr. Cain discusses:

1)    *WLRK's May 2022 presentation to NI's Board (the "May 2022 WLRK Presentation")*: Dr. Cain notes that "[a]mong the recommended actions were to ██████████████████████ The presentation also included a ████████████ listing 12 governance-related features relevant to takeover defense ████████████ ████████████ " *Se*ance-related features (discussed in the May 2022 WLRK Presentation) as its "perceived risk of a public campaign [by Emerson] grew." Cain Second Report, Appendix C, ¶ 22. Such a claim is misleading and incorrect. As I discuss in **Section XI,** because NI had adopted the 10 of 12 governance features before considering Emerson's May 25, 2022 proposal, not after perceiving the threat of Emerson going public after its proposal was rejected, as Dr. Cain suggests. Thus, NI's adoption of 10 of 12 governance features does not support Dr. Cain's Active Engagement Claim.

2)    *The BofA Engagement Letter*: Dr. Cain notes that its "structure and terms […] provided for BofA to be compensated for their continued assistance with merger negotiations over the coming quarters, as well as upon a successful acquisition of National Instruments." *See* Cain Second Report, ¶ 41. As I discuss in detail in **Section IX**, this opinion is fundamentally flawed. The engagement letter explicitly noted that, *if BofA were to serve as a financial advisor for a merger*, its fee structure would be different. Thus, this engagement letter did not represent compensation to BofA for "a successful acquisition of National Instruments," as Dr. Cain asserts, or support Dr. Cain's Active Engagement Claim.

24

36.    Dr. Cain also cites four documents dated June 14, 2022:

1)  A presentation to NI's Board on June 14, 2022 by WLRK;[75]

2)  A presentation to NI's Board on June 14, 2022 by BofA;[76]

3)  Minutes of the June 14 Special Meeting of NI's Board;[77] and

4)  Handwritten notes exchanged by Karen Rapp, NI's Chief Financial Officer ("CFO"), and Kevin Ilcisin, NI's Senior Vice President ("SVP") for Strategy and Corporate Development,[78] which Dr. Cain identifies as the "Wolverine Karen-Kevin Wine Bet."[79]

37.    None of these documents suggests that "a potential deal with Emerson remained under active consideration throughout the Class Period,"[80] as Dr. Cain claims.

### 1.    *June 14, 2022 WLRK Presentation to NI's Board*

38.    In its June 14, 2022 presentation to NI's Board (the "June 14 WLRK Presentation"), WLRK discussed the "legal obligations and strategic considerations in evaluating and responding to takeover proposals, including illustrative response options to Emerson's May 25 letter," as Dr. Cain notes.[81] Dr. Cain's discussion of this presentation is misleadingly selective and incomplete. He notes that the presentation "███████████████████████████████████████████████████████████████████████████████████████████████████████████—both of which involved transitions from friendly to

---

[75]   Cain Second Report, ¶ 44, citing NAT-SL-00022986 – 006 ("June 14 WLRK Presentation").

[76]   Cain Second Report, ¶ 45, citing NAT-SL-00001513 – 545 ("June 14 BofA Presentation").

[77]   Cain Second Report, ¶ 46, citing NAT-SL-00001447 – 448.

[78]   Other members of NI's management and board included CEO and President Eric Starkloff, Chief Legal Officer ("CLO") Eddie Dixon, Legal Senior Director of Corporate Albert Percival, Head of Investor Relations Marissa Vidaurri, and Chairman of the Board ("Chair") Michael McGrath.

[79]   Cain Second Report, ¶ 47, citing NAT-SL-00008520 – 521.

[80]   Cain Second Report, Appendix C, ¶¶ 4 – 5.

[81]   Cain Second Report, ¶ 44, citing June 14 WLRK Presentation (NAT-SL-00022986 – 006).

hostile engagement."[82] He fails to note, however, that the presentation ███████████████

███████████████████████████████████████████████████

███████████████████████████ [83] Notably, in each of these four case studies

the potential acquirer raised its proposed acquisition price in subsequent proposals after its first

proposal was rejected and, in three of the cases, the prospective acquirer withdrew after the

target repeatedly rejected its proposals.[84]

> 2.    *June 14, 2022 BofA Presentation to NI's Board*

39.    According to Dr. Cain, BofA's June 14, 2022 presentation (the "June 14 BofA

Presentation") reflected BofA's "strategic analysis of Project Wolverine to the Board," including

its evaluation of "NI's financial perspective, a preliminary valuation overview, and a pro forma

analysis of Emerson."[85] In its presentation, BofA presented several stand-alone valuation

estimates of NI conducted under alternative methodologies.[86] Dr. Cain notes that "[u]sing

internal management forecasts, the implied valuation ranged from ███████████ per share,

depending on the methodology. A separate analysis based on analyst forecasts yielded a

narrower range of ███████████ per share."[87] Dr. Cain also notes that BofA conducted a

---

82    Cain Second Report, ¶ 44.

83    June 14 WLRK Presentation (NAT-SL-00022986 – 006, at -999 – 000).

84    *See* June 14 WLRK Presentation (NAT-SL-00022986 – 006) for discussion regarding ███████████████████████████████████████████████████████████

85    Cain Second Report, ¶ 45, citing June 14 BofA Presentation (NAT-SL-00001513 – 545).

86    *See* **Section X** for further discussion of these valuation estimates and my responses to Dr. Cain's flawed analysis of them.

87    Cain Second Report, ¶ 45.

"Debt Capacity Analysis," which indicated that ███████████████████████

████ "[88]

40.    Dr. Cain's discussion of the BofA presentation before NI had decided to reject Emerson's proposal does not in any way support his Active Engagement Claim. It is customary for a financial advisor to perform such valuation and debt capacity analyses to assist a target firm's board evaluate a live proposal. Such analyses do not imply that even after the proposal was repeatedly rejected that NI and Emerson remained engaged regarding a future transaction throughout the Proposed Class Period.

3.    *Minutes of the June 14 Special Meeting of NI's Board*

41.    These meeting minutes confirm that the NI Board reviewed and considered both the WLRK and BofA presentations as part of its broader evaluation of Emerson's first proposal, and NI's directors "**unanimously determined to reject [Emerson's] proposal**,"[89] notwithstanding BofA's assessment that ██████████████████████████ "[90] or WLRK's comment that "██████████████████████████████

██████████████████████████████████ "[91]

---

[88]   Cain Second Report, ¶ 45, citing June 14 BofA Presentation (NAT-SL-00001513 – 545, at -528 – 529).

[89]   NAT-SL-00001447 – 448, at -448. (Emphasis added).

[90]   Cain Second Report, ¶ 45, citing June 14 BofA Presentation (NAT-SL-00001513 – 545, at -528).

[91]   Cain Second Report, ¶ 44, citing June 14 WLRK Presentation (NAT-SL-00022986 – 006, at -991).

42.    Dr. Cain concludes that "[t]he record indicates that, despite NI's formal rejection of the proposal, the Board was actively preparing for further developments with Emerson," purportedly because:[92]

> At the same board meeting, directors discussed "potential courses of action in the event Wolverine were to escalate the matter publicly or otherwise, respond with a higher offer or if other scenarios were to occur," according to the meeting minutes.

43.    NI directors' discussions about "potential courses of action in the event Wolverine were to escalate the matter publicly,"[93] do not support Dr. Cain's Active Engagement Claim. Instead, such discussions confirm that after rejecting Emerson's proposal, NI's Board was preparing to respond again to Emerson if it went public with its proposal, not actively engage to complete a "potential deal"[94] as Dr. Cain asserts.[95]

### 4.    *June 14, 2022 Wolverine Karen-Kevin Wine Bet*

44.    Dr. Cain claims that handwritten notes of the discussion between Ms. Rapp and Mr. Ilcisin:[96]

> […] appear to outline alternative scenarios for how the transaction might progress. **Their forecasts** included the initial rejection of Emerson's $48

---

[92]    Cain Second Report, ¶ 46, citing NAT-SL-00001447 – 448. The cited text does not appear in the document Dr. Cain cites. However, the cited text does appear in: NAT-SL-00000070 – 365, at -179.

[93]    Cain Second Report, ¶ 46, citing NAT-SL-00001447 – 448.

[94]    Cain Second Report, Appendix C ¶ 4.

[95]    As a matter of record, Emerson did not respond with a higher offer or make a hostile public attempt to acquire the Company throughout the Proposed Class Period. Thus, NI's directors purported conjectures as of June 14, 2022 do not prove that "a potential deal with Emerson remained under active consideration throughout the Class Period." *See* Cain Second Report, Appendix C, ¶ 4.

[96]    Cain Second Report, ¶ 47, citing NAT-SL-00008520 – 521. (Emphasis added). Dr. Cain also cites to a September 13, 2022 email exchange between Ms. Rapp and Mr. Ilcisin in which, after congratulating Ms. Rapp on her retirement, Mr. Ilcisin states "[n]ext wine night is on me, regardless of what nuthatch does to both our paths." Notably, in that exchange, neither Mr. Ilcisin nor Ms. Rapp discuss any details of a new bet. *See* Cain Second Report, ¶ 47, at fn. 39, citing NAT-SL-00023530 – 532, at -530.

28

offer, the anticipated timing and pricing of a revised offer, potential public disclosure of the proposal by Emerson, and targeted outreach to institutional shareholders. Notably, **the forecasts explicitly contemplated a second rejection of an improved private offer, followed by the possibility of a public bid**. While the predicted timelines and tactical steps varied, **the notes assumed that Emerson would increase its offer, culminating in a transaction**. The exchange concluded with a wager — "loser buys wine, winner chooses" — further underscoring that the proposed deal remained **active and unresolved.**

45.    Dr. Cain's comments are entirely misleading. By the end of the day, the possibility of a deal with Emerson was no longer "active and unresolved" as Ms. Rapp and Mr. Ilcisin (neither of whom were NI Board members) speculated, because the Board "resolved" the issue by unanimously voting on June 14, 2022 to reject Emerson's proposal.

46.    Dr. Cain ignores that, contrary to the "wine bet's" purported "forecast", Emerson did not submit a second "improved private offer."[97] Moreover, the "wine bet" was made over a month before August 2, 2022, when NI rejected Emerson's second proposal to acquire NI at the same proposed acquisition price of $48 per share. Thus, this document does not in any way support Dr. Cain's Active Engagement Claim.

47.    Dr. Cain discusses two documents after June 14, 2022 through June 16, 2022 (when NI informed Emerson that it was rejecting its proposal and that it did not want to engage in further discussions.

5.    *June 15, 2022 emails from BofA to NI*

---

[97]   As I discussed in my First Report, Emerson's second proposal was at that the same proposed acquisition price of $48 per share, which NI also rejected on August 2, 2022. *See* Cain Second Report, ¶ 47.

29

48.    According to Dr. Cain, in emails dated June 15, 2022 from BofA personnel to NI SVP Kevin Ilcisin:[98]



49.    Dr. Cain claims that this email chain "show that National Instruments and its financial advisor, Bank of America, were actively preparing for continued engagement with Emerson."[99] This claim is misleading and incorrect. The documents do not provide any support for Dr. Cain's Active Engagement Claim. Instead, in my opinion and consistent with my experience, these emails discuss routine and customary actions typical of a target company preparing a formal rejection of an unsolicited acquisition proposal which it does not consider to be in the best interest of its shareholders.

　　　　6.    *June 16, 2022 letter from NI rejecting Emerson's proposal*

50.    Dr. Cain notes that:[100]

> On June 16, 2022, National Instruments sent a letter to Emerson **stating the offer did not provide a basis for further discussions,** offering little explanation of the Board's underlying rationale.

51.    NI's response to Emerson echoed the standard language its legal advisor, WLRK, had recommended the Company use when issuing an "████████████"[101] Such a response, as I

---

[98]    Cain Second Report, ¶ 48, citing NAT-SL-00007093.

[99]    Cain Second Report, ¶ 48, citing NAT-SL-00007093.

[100]    Cain Second Report, ¶ 49, citing NAT-SL-00001254 – 255. (Emphasis added).

[101]    The June 14 WLRK Presentation advised that if NI's Board chose to issue an ████████████ ████████████████████████████████████" *See* June 14

discussed in my First Report, constitutes a "classic example […] of the 'Just Say No' response that target companies have often successfully used to thwart takeover attempts."[102]

52.     As the letter makes clear, NI's Board "unanimously determined that [Emerson's first proposal] does not provide a basis for further discussions."[103] Thus, this letter that Dr. Cain cites directly contradicts his Active Engagement Claim.[104]

### 2. Documents dated June 17 through August 2, 2022 (when NI rejected Emerson's second proposal)

53.     Dr. Cain cites one public document (NI's 2022 Q2 earnings announcement on July 28, 2022[105]) and several internal documents over this period to support his Active Engagement Claim. None support his claim, as I discuss below.

### 1. NI's 2022 Q2 earnings release on July 28, 2022

54.     Dr. Cain notes that in its public 2022 Q2 earnings release, NI noted that "[d]espite underwhelming financial performance, National Instruments raised full-year guidance

---

[102]  First Report, ¶ 38.

[103]  NAT-SL-00001254 – 255, at -255.

[104]  Further, even if this and earlier-dated documents suggested "a potential deal with Emerson remained under active consideration" beyond NI's June 16 rejection of Emerson's first offer—which they do not—they still would not constitute support for Dr. Cain's Active Engagement Claim, which asserts such "active consideration" continued beyond both of NI's rejections of Emerson's $48 per share proposals. If anything, documents dated June 16, 2022 and earlier only relate to conjectures about Emerson's response to NI's first rejection (i.e., Emerson would propose an improved price premium). Such conjectures soon proved false because Emerson's second proposal, made on June 22, 2022, did not reflect an improved acquisition proposal price and was also unanimously rejected by NI's Board.

[105]  Cain Second Report, ¶ 66, citing National Instruments, SEC Schedule 14A, filed by Emerson Electric Co. and dated January 17, 2023, available at: https://www.sec.gov/Archives/edgar/data/32604/000095010323000538/dp187067_dfan14a.htm.

significantly. This included mid-teens revenue growth and 300 basis points of operating margin expansion—triple the guidance issued in Q1, prior to Emerson's approach."[106]

55.    Dr. Cain fails to explain how this earnings announcement or the fact that NI raised its guidance supports his Active Engagement Claim. There is no logical basis to reach such a conclusion. If anything, NI's updated guidance signaled the Company's prospects were strong, which all other things constant, would *reduce*, rather than increase the prospects of a NI agreeing to a merger with Emerson at a proposed acquisition price of $48 per share that "substantially undervalued" the Company and "was not in the best interests of NI and its stockholders," as NI's Board had concluded about Emerson's first and second proposals.[107]

56.    I next discuss each of the internal documents over the June 17 – August 2, 2022 period that Dr. Cain cites and explain why none of them support his Active Engagement Claim.

### 2.    *June 22, 2022 letter from Emerson containing its second proposal*[108]

57.    In discussing Emerson's June 22, 2022 letter to NI containing its second acquisition proposal (the "June 22 Emerson Letter"), Dr. Cain highlights some language which later in his report he incorrectly argues "indicates that the $48 per share figure was not Emerson's final offer, but rather an opening bid."[109] That assertion is incorrect as I explain in **Section VIII**. To the contrary, the fact that Emerson had not raised its proposed acquisition price from $48 per share

---

[106]    Cain Second Report, ¶ 66.

[107]    *See* NI Proxy Statement, pp. 25 – 26; NAT-SL-00001447 – 448, at -448; NAT-SL-00001455 – 456.

[108]    NAT-SL-00002991 – 994 ("June 22 Emerson Letter"), cited at Cain Second Report, ¶ 50. *See also* NAT-SL-00010411 – 413.

[109]    Cain Second Report, Appendix C, ¶ 10.

signaled its possible lack of interest. In Emerson's attempts to acquire other companies discussed in the June 14 WLRK Presentation, ██████████████████████████ ████████████,[110] which, in my experience, is customary in such negotiations when a potential acquirer wants to signal its serious intent.

58.    Dr. Cain also claims that: "The letter emphasized that Emerson did not foresee any regulatory issues and that the proposed transaction had "'[c]ertainty.'"[111] The June 22 Emerson Letter actually states:[112]

> *Regulatory*: We do not anticipate any **significant** regulatory risks or delays given the complementary nature of our businesses.
>
> […]
>
> *Certainty*: Our Board of Directors has reviewed and supports the proposed transaction. Emerson shareholder approval will not be required.

59.    Thus, contrary to Dr. Cain's claims, the June 22 Emerson Letter did not dismiss all regulatory issues (only ones that Emerson considered "significant"), nor did it imply the transaction was certain. Emerson's comment about "certainty" pertained only to the fact that approval from Emerson's Board and shareholders would not be required to complete the transaction if the parties agreed to such transaction. Nevertheless, considerable uncertainty related to the proposed transaction remained (*e.g.,* obtaining the approval of NI's Board and shareholders was not guaranteed).[113] Regardless of whether Emerson's second proposal signaled its serious

---

[110]    June 14 WLRK Presentation (NAT-SL-00022986 – 006, at -998 and -001).

[111]    Cain Second Report, ¶ 50, incompletely citing the June 22 Emerson Letter (NAT-SL-00002991 – 994).

[112]    June 22 Emerson Letter (NAT-SL-00002991 – 994, at -993). (Emphasis added).

[113]    As Bruner (2004) states, until the parties signed first-round documents (which NI and Emerson had not done at this stage or throughout the Proposed Class Period), "the two sides have little to show for their efforts but a degree of oral agreement on the possibilities of merger." *See* Bruner (2004), p. 690.

intent or conveyed "certainty," it does not support Dr. Cain's claim that the parties remained engaged regarding a "potential deal" throughout the Proposed Class Period,[114] even after NI rejected Emerson's second proposal on August 2, 2022.

### 3. June 23, 2022 email from NI CLO Eddie Dixon[115]

60.    This email from Mr. Dixon to Mr. Starkloff and others at NI noted that, in Mr. Dixon's opinion, Emerson's second proposal "indicated a significant level of DD [due diligence]."[116] Mr. Dixon, however, does not elaborate on his reasons for forming this opinion.[117] Importantly, whatever due diligence Emerson had done was done without the benefit of receiving confidential information from NI as NI and Emerson had not executed an NDA at this point in time. Moreover, Dr. Cain does not explain why Mr. Dixon's email supports his Active Engagement Claim. A single line in an email from one member of NI's management team does not in any way prove that the parties remained engaged regarding a "potential deal" throughout the Proposed Class Period after NI rejected Emerson's second proposal on August 2, 2022.

### 4. MacKenzie Partners' June 28, 2022 proposal to NI

61.    Dr. Cain cites MacKenzie Partners' June 28, 2022 proposal to NI "to serve as '███████

███████████████████████████████████████████████████████████████

---

[114]   Cain Second Report, Appendix C, ¶ 4.

[115]   NAT-SL-00016089, cited at Cain Second Report, ¶ 51.

[116]   NAT-SL-00016089, cited at Cain Second Report, ¶ 51.

[117]   The June 22 Emerson Letter included some details about the "premium" that its $48 per share proposed acquisition price represented compared to NI's past stock price and "recent market data" that Emerson believed "reinforce [its] view" that NI's shareholders would consider its offer "favorably." In my experience, such statistics are commonly presented by a potential acquirer seeking to convince a target of the value of its proposal. *See* June 22 Emerson Letter (NAT-SL-00002991 – 994, at -992 – 993).

█████ '"[118] He notes that MacKenzie Partners' proposal "outlined a range of services, including

███████████████████████████████████████████████████████████

███████    The scope of services also included access to MacKenzie Partners' ███████

████████████████████████████ "[119] Dr. Cain does not explain why this proposal

supports his Active Engagement Claim. It does not. To the contrary, the proposal indicates that

NI was not considering a future transaction with Emerson because it was considering a proposal

from a firm that could assist it defending against potential takeover attempts.

> 5.    *September 9, 2022 Project Wolverine - Communications Prep Materials (incorrectly dated "early July 2022" documents by Dr. Cain)*

62.    Dr. Cain cites documents he claims are dated "early July 2022" that "included talking

points, press release language, and framing options for investor outreach."[120] Notably, however,

the documents Dr. Cain cites are a September 9, 2022 email from FGS to NI and advisors BofA

and WLRK[121] and attachments to that email,[122] *i.e.*, documents from after NI had rejected

Emerson's second proposal. FGS's email states that the attachments were ("clean and tracked"

copies of) the "updated version of the Wolverine scenario plan."[123] FGS summarizes these

materials as:[124]

---

[118]    Cain Second Report, ¶ 52, citing NAT-SL-00001428 – 429.

[119]    Cain Second Report, ¶ 52, citing NAT-SL-00001428 – 429.

[120]    Cain Second Report, ¶ 53.

[121]    Cain Second Report, ¶ 53, citing FGS email dated September 9, 2022 (NAT-SL-00022026).

[122]    Cain Second Report, ¶ 53, citing two documents titled "Project Wolverine Scenario Planning Materials" dated September 9, 2022 (NAT-SL-00022027 – 046 and NAT-SL-00022047 – 066) which were attachments to the FGS email dated September 9, 2022 (NAT-SL-00022026), and another undated draft of the same attached "Project Wolverine Planning Materials" document (NAT-SL-00016315 – 325).

[123]    NAT-SL-00022026.

[124]    NAT-SL-00022026. (Bracketed text in original).

63.     It is evident from the documents Dr. Cain cites that NI had already rejected Emerson's second proposal by the time the documents were written, and they discuss NI's strategies to defensively reject any future hostile attempts by Emerson to acquire the Company. Dr. Cain offers no explanations for why, in his opinion, these documents support his Active Engagement Claim. They do not. Instead, these documents contradict Dr. Cain's Active Engagement Claim because they indicate that NI was assessing strategies to defend against future takeover attempts by Emerson.

   6.     *July 1, 2022 dated Project Wolverine Discussion Materials presentation*

64.     Dr. Cain also cites a July 1, 2022 dated presentation authored by NI's advisors BofA, WLRK, and FGS, which he claims also "emphasized scenario planning around a **public bid**."[125] Again, Dr. Cain does not explain why this presentation supports his Active Engagement Claim. It does not. Instead, it contradicts Dr. Cain's Active Engagement Claim because it indicates that before rejecting Emerson's second (confidential) proposal, NI assessed strategies to defend against future public takeover attempts by Emerson. Such evaluations of an interested buyer's possible response to an proposal rejection are customary in my experience.

   7.     *July 6 – 7, 2022, email chain between NI CEO and Emerson CEO*

---

[125]   Cain Second Report, ¶ 53, citing NAT-SL-00020476 – 494. (Emphasis added).

65.     Dr. Cain notes that on July 6, 2022, NI updated Emerson that it would respond to Emerson's second proposal after "its Q2 earnings call at the end of the month," and that Emerson's CEO Lal Karsanbhai responded the next day that he was "disappointed in the timing, […] [a]s I highlighted in our prior communication dated June 22, we prefer to keep our conversations private, however for that to remain feasible we need relative expedience from NI's Board."[126]

66.     Dr. Cain does not explain why this email exchange supports his Active Engagement Claim. It does not. Instead, it contradicts Dr. Cain's Active Engagement Claim because it shows that NI was slow in responding to Emerson's second proposal, supporting the conclusion that NI was not interested in completing a transaction with Emerson (and thus explaining the source of Mr. Karsanbhai's "disappoint[ment]").[127]

    *8.    July 7, 2022 email chain between NI management discussing board meeting materials[128]*

67.     Dr. Cain cites a July 7, 2022, email exchange between NI SVP Kevin Ilcisin and other NI management and personnel in which Mr. Ilcisin "commented on internal Board materials related to the Company's financing strategy."[129] Dr. Cain further states that "[i]n response to a draft slide labeling M&A and opportunistic buybacks as a 'Problem Statement,' Ilcisin suggested rephrasing the section as 'Context,'" as "'[r]ecurring M&A and opportunistic buy-backs are

---

[126]   Cain Second Report, ¶¶ 54 – 55, citing NAT-SL-00001260 – 261, at -260.

[127]   NAT-SL-00001260 – 261, at -260.

[128]   NAT-SL-00023205 – 206, cited at Cain Second Report, ¶ 56.

[129]   Cain Second Report, ¶ 56.

better not framed as a "problem.""""[130] According to Dr. Cain, "this exchange indicates that National Instruments was discussing repurchases and potential M&A activity in parallel, and that these were being discussed at the Board level."[131] Dr. Cain's conclusion is irrelevant and misleading; in my experience, it is typical and expected for a company's board of directors to discuss all relevant matters before the company at its regularly scheduled board meetings, including any planned share repurchase activity and outstanding acquisition offers still under active consideration (as was Emerson's second proposal as of July 7). For avoidance of doubt, Dr. Cain's citation to this document also does not support his Active Engagement Claim, nor does Dr. Cain provide any explanation of how this document could constitute support for said claim.

   9.    *July 14, 2022 email chain between NI management regarding NI's M&A plans[132]*

68.    Dr. Cain cites a July 14, 2022 email chain between NI's Mr. Ilcisin, Ms. Rapp, Mr. Dixon, and Mr. Percival summarizing their discussions earlier that day. Dr. Cain states that in this email chain:[133]

> NI's executives discussed how Emerson's acquisition interest could interfere with the Company's ability to pursue its own transformational M&A. A slide summarizing the discussion explicitly referenced a "resulting stock price increase" if Emerson's offer were to be made public. The internal recognition that public disclosure of Emerson's interest would increase NI's stock price is direct evidence of economic materiality (*i.e.*, information a reasonable investor would consider important in making investment decisions). The slide also emphasized that, until Emerson's proposal was fully withdrawn or terminated, engaging in separate

---

[130]    Cain Second Report, ¶ 56.

[131]    Cain Second Report, ¶ 56.

[132]    NAT-SL-00025703 – 704, cited at Cain Second Report, ¶ 57. *See also* NAT-SL-00023167 – 168.

[133]    Cain Second Report, ¶ 57, citing NAT-SL-00025703 – 704.

> transactions could be difficult, underscoring that the threat posed by Emerson's interest remained live unless and until it was formally resolved. Finally, it warned that even pursuing another deal could be used by Emerson to strengthen its public narrative […]

69.    Dr. Cain does not explain how this email chain supports his Dr. Cain's Active Engagement Claim. To the contrary, the email chain indicates that NI considered Emerson's interest in acquiring it an impediment in its operations as a stand-alone company because it could "interfere with the Company's ability to pursue its own transformational M&A," or "engag[e] in separate transactions."[134] Such comments do not support Dr. Cain's opinion that NI and Emerson remained engaged regarding a future transaction even after NI rejected Emerson's second proposal.

70.    Dr. Cain misleading claims that the "internal recognition that public disclosure of Emerson's interest would increase NI's stock price is direct evidence of economic materiality (*i.e.*, information a reasonable investor would consider important in making investment decisions)."[135] While a positive price reaction may have followed a public announcement by Emerson that it had submitted an acquisition proposal to NI which NI was considering, the hypothetical disclosure regarding the alleged omissions at the start of Proposed Class Period would have been fundamentally different. Instead, NI would have disclosed that it had received *and rejected* two unsolicited proposals at the same proposed acquisition price of $48 per share. There is no evidence to suggest *that* disclosure would have had an economically material impact on NI's price. In short, Mr. Ilcisin's conjecture that news of a live and public acquisition

---

[134]    Cain Second Report, ¶ 57.

[135]    Cain Second Report, ¶ 57.

proposal from Emerson for NI could increase NI's stock price does not constitute "evidence" that the alleged omissions were material, as Dr. Cain claims.[136]

> 10.    *July 15, 2022 email chain between NI management regarding upcoming board meeting*[137]

71.    Dr. Cain cites a July 15, 2022, email chain between NI's CEO, CLO, and CFO discussing preparations "for an upcoming Board discussion on how to manage Emerson's ongoing acquisition interest."[138] According to Dr. Cain:[139]

> The conversation focused on maintaining private engagement with Emerson as a strategy to delay any public announcement and preserve the Company's ability to pursue alternative transactions. Executives discussed the advantages of appearing receptive while intentionally slowing the process. As reflected in the exchange below, they discussed continuing private dialogue as a means to "string [Emerson] along" while evaluating other opportunities[.]

72.    Dr. Cain does not explain why this email chain supports his Active Engagement Claim. After continuing discussions regarding Emerson's second proposal past NI's 2022 Q2 earnings release, NI eventually rejected that proposal unequivocally and refused to engage in further discussions with Emerson. NI executives' view that NI should "string [Emerson] along" suggests a lack of interest in completing a merger transaction with Emerson, not the opposite, as Dr. Cain suggests.

> 11.    *NI's July 2022 "Nuthatch Defense Strategy" presentation*[140]

---

[136]    NAT-SL-00025703 – 704, at -703.

[137]    NAT-SL-00016977 – 978, cited at Cain Second Report, ¶ 59.

[138]    Cain Second Report, ¶ 59.

[139]    Cain Second Report, ¶ 59.

[140]    NAT-SL-00019759, cited at Cain Second Report, ¶ 58.

40

73.    Dr. Cain cites to excerpts from a July 2022 NI presentation titled "Nuthatch Defense Strategy", specifically the objectives listed in a slide titled "OST thoughts", which he claims:[141]

> [were] to delay Emerson ("Nuthatch") from going public with its acquisition proposal prior to NI's Q2 earnings call. The slide laid out specific strategies and tactics designed to achieve this goal. This internal planning illustrates NI's proactive attempts to shape the deal timeline and keep M&A-related communications private as of July 2022.

74.    Dr. Cain does not explain how this document supports his Active Engagement Claim. NI's objective to "delay" Emerson from publicly announcing its acquisition proposal before NI's 2022 Q2 earnings release does not imply that NI was interested in pursuing a merger transaction with Emerson. Instead, the document clearly indicates that NI was not interested in a merger transaction with Emerson, noting that in NI's view, among other things, "Nuthatch [Emerson] doesn't have [NI's] financial model with [NI's] upside potential."[142] That is, NI considered its stand-alone prospects superior to being a part of a combined entity with Emerson. NI's statements clearly indicate NI's lack of interest in pursuing a merger transaction with Emerson, not the opposite, as Dr. Cain's Active Engagement Claim asserts.

### 12.    *July 19, 2022 NI Board presentation from Chair Michael McGrath*[143]

75.    Dr. Cain cites to a presentation prepared by NI Chair Michael McGrath and made to NI's Board at its July 19, 2022 Board Meeting (the "July 19 McGrath Presentation"). According to Dr. Cain, this presentation, titled "Board Discussion of Project Wolverine,"[144]

---

[141]    Cain Second Report, ¶ 58.

[142]    NAT-SL-00019759, slide 2.

[143]    NAT-SL-00020796 – 807 ("July 19 McGrath Presentation"), cited at Cain Second Report, ¶ 60.

[144]    Cain Second Report, ¶ 60, citing to July 19 McGrath Presentation (NAT-SL-00020796 – 807).

[…] characterized Emerson's response on July 7 as an "intention/threat to go public with its offer," […] examined Emerson's likely strategy to acquire National Instruments and generate substantial financial gains, estimated at $3 to $5.5 billion, by "drastically reduc[ing] operating expenses" to align NI's cost structure with its own [...] suggested that Emerson, if it went public, "could argue that NI (its leadership and board) has not been able to manage its operating expenses to competitive levels." […] cautioned that "[d]efending the offer publicly… is different than rejecting the offer privately," and that "If [Emerson] uses the argument that we have not managed operating expenses sufficiently, it will be a significant embarrassment." […] emphasized that "[n]othing is more important than defending this for our shareholders' benefit," […] discussed several defensive measures, including accelerating cost reductions, disclosing its valuation analysis, and adopting a poison pill […] [and] concluded with three detailed slides outlining the proposed financial plan, which featured an "Aggressive Backlog Drain" and a "Proposed Cost Reduction Plan."

76. Despite Dr. Cain's extensive quotation of the Board presentation, he provides no explanation of how Mr. McGrath's presentation or any of the portions he quotes from support his Active Engagement Claim. It does not. Rather, the contents of July 19 McGrath Presentation make clear that, contrary to Dr. Cain's claims, NI's Board was not actively contemplating a merger transaction with Emerson and did not consider such a transaction to be in the best interests of its shareholders. Although only briefly noted by Dr. Cain, the slides clearly state that NI's "best possible defense" would be to accelerate the implementation of their ongoing "strategic transition" such that their stock price incorporates the "upside value" identified by the "B of A valuation analysis" presented to the Board in June.[145] This view, as expressed by NI Chair McGrath, directly contradicts Dr. Cain's Active Engagement Claim and demonstrates that NI viewed its stand-alone valuation as superior to its value as part of a combined entity with Emerson.

---

[145]  July 19 McGrath Presentation (NAT-SL-00020796 – 807, at -803 – 804). *See also* June 14 BofA Presentation (NAT-SL-00001513 – 545, at -522).

13.    *July 19, 2022 NI Board Meeting*[146]

77.    Dr. Cain notes that, according to NI's May 25, 2023 Proxy Statement, at its July 19 – 20, 2022 Board Meeting:[147]

> NI's Board reaffirmed that the $48 offer was inadequate and refused to provide due diligence access. During the same meeting, the Board met with management and Wachtell, NI's legal counsel, to discuss "the potential for Emerson to change its offer and the degree to which Emerson would pursue the potential transaction." The Board also discussed how best to "highlight NI's momentum, prospects, margin priorities and other financial and operating performance matters" during the upcoming earnings call[.]

78.    Dr. Cain does not explain how the above description of the July 19 – 20 Board Meeting supports his Active Engagement Claim. It does not. As NI's May 25, 2023 Proxy Statement also notes:[148]

> During these meetings, the Board and management discussed the June 22 Letter and various aspects of Emerson's outreach, including that the June 22 Letter reaffirmed Emerson's prior inadequate proposal, the potential for Emerson to change its offer and the degree to which Emerson would pursue the potential transaction, the potential for entry into a confidentiality agreement and engaging in due diligence and negotiations with Emerson, and various strategic and financial alternatives. **The Board reaffirmed its view that Emerson's proposal was not in the best interests of NI and its stockholders and did not reflect the value expected to be generated by NI's business strategies. Following discussion, the Board concluded that the proposal from Emerson did not merit engaging in further discussions with or providing diligence materials to Emerson.**

79.    It is clear from the above language that NI's Board's discussion at its July 19 – 20, 2022 meeting contradicts, rather than supports, Dr. Cain's Claim because it: (a) confirms that NI's

---

[146]    Cain Second Report, ¶ 61, citing to NI Proxy Statement, p. 26.

[147]    Cain Second Report, ¶ 61, citing to a summary of the board meeting given in NI Proxy Statement, p. 26.

[148]    NI Proxy Statement, p. 26. (Emphasis added).

Board found Emerson's "$48 offer […] inadequate,"[149] "not in the best interests of NI and its stockholders," and "did not merit engaging in further discussions with […] Emerson";[150] (b) indicates that, having decided to reject Emerson's second proposal, NI considered Emerson's possible responses and NI's potential counter-responses, as is typical in such circumstances; and (c) demonstrates that NI viewed its stand-alone valuation as superior to its value as a part of Emerson.

14.    *July 19, 2022 email chain between NI management regarding upcoming special board meeting*[151]

80.    Dr. Cain cites a July 19, 2022 email exchange between members of NI management which he claims "show that National Instruments worked with its advisors to shape investor-facing communications in response to Emerson's continued interest."[152] As Dr. Cain states:[153]

> In discussing plans for a potential investor conference, one executive noted that both Bank of America and FGS Global ("FGS"), a strategy firm retained to assist National Instruments with scenario planning related to Project Wolverine, had advised that an ███████████████████████████████████████████████ Starkloff, NI's CEO, responded that the Company should move forward with planning the conference for late August or early September and announce it during the upcoming earnings call, noting that this would position National Instruments well regardless of whether Emerson acted publicly

---

[149]    Cain Second Report, ¶ 61.

[150]    NI Proxy Statement, p. 26.

[151]    NAT-SL-00006205 – 206, cited at Cain Second Report, ¶ 62. In the same paragraph, Dr. Cain also cites FGS Global's July 18, 2022, Scope of Work proposal to NI, although he does not appear to cite this document as support for his Active Engagement Claim. *See* NAT-SL-00012657 – 658.

[152]    Cain Second Report, ¶ 62.

[153]    Cain Second Report, ¶ 62.

44

81.    Dr. Cain's discussion of this document is selective and misleading. In the email chain, NI management discussed their interest in scheduling an investor conference "as we've done in past years" with the goal of "reaffirming our confidence in our performance despite" what NI's management considered "a tougher macro[economic]" environment.[154] In my experience, such public investor conferences are a typical and commonly employed tool by corporations for routine investor outreach operations. As Mr. Starkloff noted in the email chain, NI had held such investor conferences in "past years."[155]  As Dr. Cain notes, the email chain indicates that Mr. Starkloff intended to hold an investor conference "regardless of whether Emerson acted publicly."[156] In short, NI's plans to schedule and announce an upcoming investor conference is unrelated to whether NI and Emerson remained engaged for a future transaction. Thus, this document provides no support for Dr. Cain's Active Engagement Claim.

    *15.*    *July 25, 2022 NI Special Board Meeting presentation by NI's CEO and CFO[157]*

82.    Dr. Cain cites a presentation prepared by Mr. Starkloff and Ms. Rapp and made to NI's Board at its July 25, 2022 Special Meeting, which he states:[158]

> presented updated financial planning materials and investor communication strategies. All financial scenarios included an aggressive backlog reduction in 2023 and expense reductions. One slide, titled "2022 to 2023 Expense Bridge," detailed the Company's plan to reduce operating expenses from 51% of revenue in 2022 to 47% in 2023. The presentation continued with "Key Investor Points" for the messaging for the upcoming earnings call,

---

[154]   NAT-SL-00006205 – 206, at -206.

[155]   NAT-SL-00006205 – 206, at -206.

[156]   Cain Second Report, ¶ 62.

[157]   NAT-SL-00025801, cited at Cain Second Report, ¶ 63.

[158]   Cain Second Report, ¶ 63.

projecting 2023 outperformance driven by record backlog in 2022, margin expansion, and expense management.

83.    Dr. Cain provides no explanation of how this presentation supports his Active Engagement Claim. It does not. On the contrary, it details the Company's efforts to reduce operating expenditures and maintain existing revenue growth in order to achieve the "upside value" identified by BofA[159] that it felt was not reflected in contemporaneous investor sentiment.[160] This is fully consistent with the Company's repeatedly expressed view that, as a stand-alone company, NI's value exceeded its potential value as part of a combined entity with Emerson.[161]

> 16.    *July 26 – 28, 2022 email chain between NI directors, management, and advisors[162] regarding the minutes of NI's July 25 Special Board Meeting[163]*

84.    Dr. Cain states:[164]

> Following [NI's July 25 Special] Board meeting, between July 26 and July 28, 2022, leading up to the July 28 earnings call, NI's leadership, in-house counsel, and outside legal counsel from Wachtell coordinated ████████
> ██████████ McGrath, NI's Chairman of the Board, emphasized that the primary ████ e of the July 25 Special Board of Directors meeting was to prepare a strong public-facing narrative around NI's updated financial plan as a basis for rejecting Emerson's bid. Dixon, NI's CLO, expressed concern over how

---

[159]   June 14 BofA Presentation (NAT-SL-00001513 – 545).

[160]   *See, e.g.*, NAT-SL-00025801, slides 7 – 9, which each forecast NI's 2023 EPS as beating the analyst consensus outlook ($2.60 or more per share in NI's forecasts vs. the $2.38 per share analyst consensus). *See also* July 19 McGrath Presentation, slide 9 (NAT-SL-00020796 – 807, at -804), which shows NI's Board expected NI's share price to rise, possibly to $65 per share, following the full implementation of its "strategic transition."

[161]   *See, e.g.*, July 19 McGrath Presentation (NAT-SL-00020796 – 807).

[162]   NAT-SL-00020751 – 754, cited at Cain Second Report, ¶ 64.

[163]   NAT-SL-00001455 – 456, cited at Cain Second Report, ¶ 65.

[164]   Cain Second Report, ¶ 64.

46

references to "Nuthatch" might be viewed in a discovery context and stressed the need for caution[.]

85.     Dr. Cain does not explain how such communications support his Active Engagement Claim. They do not. Such communications indicate that NI had no interest in pursuing any merger negotiations with Emerson as its proposal (in NI's view) was "inappropriate" based on management's "updated financial plans."[165] Such communications between NI's Board, management, and advisors indicate that NI was considering its responses to a possible public attempt by Emerson to acquire the Company. In my experience, target companies typically consider potential responses of interested buyers (and the target company's potential counter-responses) after rejecting an acquisition proposal.

   *17.    NI's August 2, 2022 letter rejecting Emerson's second proposal*

86.     Dr. Cain states: [166]

> On August 2, 2022, National Instruments sent a second letter rejecting Emerson's offer, stating: "The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders."

87.     Dr. Cain does not discuss this letter further or proffer any explanation about why this *rejection* letter from NI supports his Active Engagement Claim. In fact, this letter is yet another illustration of how the internal documents Dr. Cain claims support his theory clearly contradict it. His Active Engagement Claim that even after NI unequivocally rejected Emerson's second proposal and refused to engage with Emerson, the parties remained engaged regarding a "potential deal"[167] is baseless speculation.

---

[165]  NAT-SL-00020751 – 754, cited at Cain Second Report, ¶ 64.

[166]  NAT-SL-00001239 – 240, cited at Cain Second Report, ¶ 67.

[167]  Cain Second Report, Appendix C ¶ 4.

47

**B.      Category B (August 3 – 11, 2022) documents do not support Dr. Cain's Active Engagement Claim**

*1.      August 4 and 7, 2022: Internal emails discussing NI's authorized share repurchases*

88.      Dr. Cain discusses internal Company emails between members of NI leadership dated August 4, 2022[168] and August 7, 2022.[169] The excerpts of the August 4, 2022 emails that Dr. Cain discusses show that NI's management recognized they would need to consult the Company's legal advisor, WLRK, to determine "whether the ongoing interest from Emerson constituted [MNPI] in the context of adopting a stock repurchase plan."[170] There is nothing unusual about such correspondence as it is customary for a company's management to confirm that they are not in possession of any MNPI before trading. Dr. Cain's discussion is also critically incomplete and misleading, as he fails to note that WLRK approved of the Company's share repurchase plan.[171]

89.      Further, internal assessments of whether NI possessed MNPI regarding Emerson's previously rejected proposals do not and cannot prove Dr. Cain's Active Engagement Claim. The facts in evidence I discussed in my First Report[172] unambiguously confirm that no "potential deal

---

[168]   Cain Second Report, ¶ 68, citing NAT-SL-00009611 – 612.

[169]   Cain Second Report, ¶ 69, citing NAT-SL-00001276 – 278. Dr. Cain also cites but does not discuss two other emails dated August 5, 2022 between NI management and WLRK containing Microsoft Teams meeting invites with the subjects "buy backs" and "NI Stock Trading Plan". Dr. Cain discusses the invites collectively with five other Teams meeting invites, but he provides no individualized discussion of the two August 5 invites and he appears to misidentify them as being related to Project Wolverine. As I have stated, discussions of NI's share repurchases do not support Dr. Cain's Active Engagement Claim, and Dr. Cain has provided no explanation of why that may be the case. *See* Cain Second Report, ¶ 73, citing NAT-SL-00008684; NAT-SL-00008685.

[170]   Cain Second Report, ¶ 68, citing NAT-SL-00009611 – 612.

[171]   Email from Eddie Dixon to self, Re: "Wolverine Notes/privileged and confidential," August 10, 2022 (NAT-SL-00008756), cited at Cain Second Report, ¶ 75. This email indicates that WLRK had confirmed that NI could continue its share repurchases.

[172]   *See* First Report, Section III.

with Emerson remained under active consideration"[173] after August 2, 2022 and through August 12, 2022, the start of the Proposed Class Period.

90.    Dr. Cain also cites an August 7, 2022 email from Mr. Starkloff to NI Chair Michael McGrath responding to Mr. McGrath's message that "'some board members'"[174] had expressed concern about NI commencing with share repurchases given the Company's cash flows. Mr. Starkloff noted that the Board "had unanimous support for the authorization"[175] when the Company's existing share repurchase authorization was first approved and also noted the "[b]uy backs are shareholder-friendly."[176] Dr. Cain does not explain the relevance of this document to his Active Engagement Claim. In my opinion, the document does not support that claim. Discussions between a company's CEO and its Chairman about the pros and cons of planned share repurchases are common. In this case, as Mr. Starkloff noted, notwithstanding "some" unnamed board members' questions about NI's share repurchases, the NI Board had unanimously voted to authorize them.[177]

> 2.    *August 8, 2022: Emails between NI, advisors regarding news of Emerson's sale of InSinkErator[178]*

---

[173]  Cain Second Report, Appendix C, ¶ 4.

[174]  NAT-SL-00001276 – 278, at -277, cited at Cain Second Report, ¶ 69.

[175]  NAT-SL-00001276 – 278, at -277.

[176]  NAT-SL-00001276 – 278, at -278.

[177]  NAT-SL-00001276 – 278, at -277.

[178]  Cain Second Report, ¶ 70, citing NAT-SL-00017263 – 267; NAT-SL-00021472 – 474; NAT-SL-00018186 – 187. In the same paragraph, Dr. Cain also cites but does not discuss an October 31, 2022 dated email exchange between members of NI management discussing a separate Emerson transaction with Blackstone. This document is unrelated to NI's purported "engagement" with Emerson regarding a potential merger and does not in any way support Dr. Cain's Active Engagement Claim (nor does Dr. Cain provide any explanation for how this document could support his Claim). *See* NAT-SL-00020681 – 682.

91.     Dr. Cain notes that on August 8, 2022, BofA "informed NI executives that Emerson had agreed to sell its InSinkErator business to Whirlpool for $3 billion, with the deal expected to close in Q4."[179] NI's executives discussed the timing of the sale and noted that the sale could potentially reduce Emerson's "dependency on the credit markets."[180] NI executives scheduled a meeting "with [NI's] advisors to evaluate the transaction's implications."[181] Dr. Cain does not explain why this email chain supports his Active Engagement Claim. NI's discussion of Emerson's asset sale and potentially reduced dependency on credit markets is consistent with the review of a potential bidder's debt capacity. In my experience, it is not uncommon after rejecting an acquisition proposal for the target company's management to continue to monitor the bidder's debt capacity to be prepared to respond to another *possible* public takeover bid that it does not consider to be in the best interest of its shareholders. The documents Dr. Cain cites are irrelevant and do not support his Active Engagement Claim.

> 3.     *August 9, 2022: Email chain between NI management discussing Emerson's 2022 Q3 earnings release*[182]

92.     Dr. Cain cites an August 9, 2022 email chain in which members of NI senior management "exchanged views via email on Emerson's Q3 earnings performance."[183] Dr. Cain states that in that email chain, Mr. Starkloff "described the results as 'a modest disappointment

---

[179]   Cain Second Report, ¶ 70.

[180]   NAT-SL-00018186 – 187, at -186.

[181]   Cain Second Report, ¶ 70, citing NAT-SL-00017263 – 267.

[182]   NAT-SL-00023501 – 502, cited at Cain Second Report, ¶ 71.

[183]   Cain Second Report, ¶ 71, citing to NAT-SL-00023501 – 502.

overall'"[184] to which Mr. McGrath responded: "Think that will make them more or less eager?"[185] Dr. Cain concludes that this exchange "indicates that internally, National Instruments executives continued to discuss the next steps regarding Emerson's acquisition strategy for the Company."[186]

93.    However, Dr. Cain does not explain why this email chain supports his opinion that even after NI had rejected Emerson's second proposal on August 2, 2022, NI remained actively engaged for a "potential deal" with NI.[187] It does not. Instead, this email chain indicates that while NI executives were uncertain about Emerson's continued interest in acquiring NI following NI's rejection of Emerson's second proposal on August 2, 2022, they continued to consider Emerson's possible future actions to be prepared to respond to another *possible* takeover bid which it does not consider to be in the best interest of its shareholders. Thus, this email chain does not support Dr. Cain's Active Engagement Claim.

        4.    *August 9, 2022: Discussion of Project Wolverine meeting materials*[188]

94.    To support his claim that "[i]internal records show ongoing coordination around Project Wolverine during this period," Dr. Cain cites five meeting invites related to Project Wolverine

---

[184]   Cain Second Report, ¶ 71, citing to NAT-SL-00023501 – 502, at -501.

[185]   NAT-SL-00023501 – 502, at -501.

[186]   Cain Second Report, ¶ 71.

[187]   Cain Second Report, Appendix C, ¶ 4.

[188]   Cain Second Report, ¶ 73, citing NAT-SL-00010395 – 396; NAT-SL-00008607 – 609.

dating from June 16, 2022 through August 8, 2022.[189] All but one of these meetings occurred

before NI had rejected Emerson's second proposal on August 2, 2022.[190] As I discussed above,

evidence that NI was actively reviewing Emerson's live proposal at the time does not support Dr.

Cain's Active Engagement Claim that NI remained actively engaged regarding a "potential deal"

with Emerson even after rejecting Emerson's second proposal.[191] Dr. Cain also cites two meeting

invites for August 5, 2022, although these meetings don't appear to have been related to Project

Wolverine, as Dr. Cain suggests.[192] Instead, both August 5 meetings related to NI's plans for its

upcoming share repurchases. As I discussed above, the Company's review of its share

repurchase strategy does not support Dr. Cain's Active Engagement Claim.

95.    Dr. Cain describes the August 9, 2022 meeting agenda discussed in the email invite[193] as

including discussion of: " ███████████████████████████████ ," " ███████

███████████████████████████████ "[194] and " ███████████████

███████████████████████████████ "[195] Contrary to Dr.

---

[189]  Cain Second Report, ¶ 73, citing to NAT-SL-00010395 – 396; NAT-SL-00008607 – 609; NAT-SL-00010389; NAT-SL-00001569; NAT-SL-00022476 – 477; NAT-SL-00001579. As explained above in footnote 169, Dr. Cain also cites two other emails dated August 5, 2022 containing same-day Microsoft Teams meeting invites that he identifies as related to Project Wolverine. Nothing in either of those two emails, however, appear to have any connection to Project Wolverine and their subjects indicate both were related solely to NI's planned share repurchases. *See* NAT-SL-00008684; NAT-SL-00008685.

[190]  *See* NAT-SL-00010389 (meeting on June 20, 2022); NAT-SL-00001569 (meeting on July 6, 2022); NAT-SL-00022476 – 477 (meeting on July 8, 2022); NAT-SL-00001579 (meeting on August 1, 2022).

[191]  Cain Second Report, Appendix C, ¶ 4.

[192]  Cain Second Report, ¶ 73, citing NAT-SL-00008684; NAT-SL-00008685. *See also* footnotes 169 and 189 above for further discussion of these two documents.

[193]  Cain Second Report, ¶ 73, citing NAT-SL-00010395 – 396, at -395.

[194]  Cain Second Report, ¶ 73, citing NAT-SL-00008607 – 608.

[195]  Cain Second Report, ¶ 73.

Cain's assertion, these documents do not "indicate that National Instruments remained actively engaged in connection with a potential transaction with Emerson during the same period in which the Company was preparing to repurchase shares."[196] Instead, as the name of one of the listed meeting documents (BofA's "███████████████[1]97") suggests, these documents indicate that NI, with the advice of its advisors, was preparing to "fight" back against Emerson, if Emerson launched another attempt to acquire NI.

> 5.    *August 10, 2022: MacKenzie Partners' notification of Emerson's 0.97% stake in NI and related internal communications*

96.    Dr. Cain notes that MacKenzie Partners informed NI that Emerson (as a NOBO[198]) held

███████████████████████████████████████████████████

███████[200] On August 10, 2022, NI SVP Kevin Ilcisin shared that information with NI's financial advisor, BofA, with a one-line comment: "This just got interesting!"[201] Mr. Ilcisin also requested NI's legal advisor, WLRK, join a call with BofA to discuss Emerson's stake.[202]

---

[196]    Cain Second Report, ¶¶ 73 – 74.

[197]    NAT-SL-00010395 – 396, at -395.

[198]    As I stated in footnote 53 of my First Report: "A public company's shareholder can hold shares directly or indirectly through an intermediary such as a bank or broker-dealer. Beneficial owners can be either "objecting" or "non-objecting." Under SEC rules, the intermediary cannot reveal the identity of objecting beneficial owners ("OBOs") to the company, but can reveal the identity of non-objecting beneficial owners ("NOBOs") to the company." *See* Price, Thomas F., "Non-Objecting Beneficial Owners & Objecting Beneficial Owners, Explained," *SIFMA*, May 20, 2021, available at https://www.sifma.org/resources/news/blog/non-objecting-beneficial-owners-objecting-beneficial-owners-explained/.

[199]    Cain Second Report, ¶ 74 and Appendix C, ¶ 4, citing NAT-SL-00011768.

[200]    Cain Second Report, ¶ 74, citing NAT-SL-00009678.

[201]    Email from Kevin Ilcisin to Shawn Liu, Re: "National Instruments - NOBO List (8-5-22)," August 10, 2022 (NAT-SL-00011768).

[202]    NAT-SL-00009678, cited at Cain Second Report, ¶ 74. *See also* NAT-SL-00008683, cited at Cain Second Report, ¶ 75.

97.    Later on August 10, 2022, Mr. Dixon emailed himself a summary of the meeting with WLRK and BofA about Emerson's stake, which read as follows:[203]

- Unusual action

- Putting money where mouth is messaging, ie. Uplift in price is due to them...

- Why now after extended period of engagement.

- Probability of going public is much higher now

- Two things we should do - 1) Mackenzie cadences re Emerson and 2) increase operational preparedness to respond instantaneously, board engagement,

- Want to avoid moving into arb hands - so we will want to know from MacKenzie

- Do not say "the company is not for sale" - get all shareholders opposite us

- Act deliberately since more likely than not, should we accept opportunity to meet

- Review comms plan again in light of facts

- **Adam Wayne Sabastian re buy back - no material change to situation, implement if desired**

98.    According to Dr. Cain, "on the same day, internal correspondence noted that NI senior management "have not exposed Mackenzie to Nuthatch [*i.e.*, Emerson]."[204] Dr. Cain also notes that on August 10, 2022, Mr. Starkloff "drafted an internal message to NI employees preparing to respond in the event Emerson made its offer public."[205]

---

[203]    Email from Eddie Dixon to self, Re; "Wolverine Notes/privileged and confidential," August 10, 2022 (NAT-SL-00008756), cited at Cain Second Report, ¶ 75. (Emphasis added).

[204]    Cain Second Report, ¶ 75, citing NAT-SL-8750 – 752, at -750.

[205]    Cain Second Report, ¶ 76, citing NAT-SL-00021470.

99.     None of the August 10, 2022, communications that Dr. Cain cites supports his Active Engagement Claim or "frame the heightened probability of **a public bid** that NI and its advisors continued to monitor throughout the Class Period,"[206] as Dr. Cain asserts.

100.    Instead, as Mr. Dixon's notes indicate, upon learning that Emerson had acquired a stake in NI, NI's management began considering possible responses to further actions from Emerson, *if any,* and NI's communication strategy with shareholders if Emerson were to go public about its past proposals. Notably, NI's legal advisors, WLRK had confirmed that despite Emerson acquiring a stake in NI, there had been "no material change to [the] situation" (which Dr. Cain fails to note), and NI was free to implement its share repurchase plan.[207]

101.    Mr. Starkloff's draft email to NI's employees (sent only to himself) also did not indicate that NI was actively engaged in a potential deal with Emerson. To the contrary, it was a message prepared as a response to Emerson if it went public—*an event that did not occur until January 17, 2023*,[208] well after the end of the Proposed Class Period.

102.    If Emerson did go public, Mr. Starkloff's message would clarify that NI had not solicited Emerson's proposal, nor had NI's Board been "trying to sell the company." Mr. Starkloff's proposed message would also "emphasize [his] own focus and commitment to [NI's] strategy and the opportunity [he saw for NI as a stand-alone company] to deliver meaningful shareholder

---

[206]  Cain Second Report, Appendix C, ¶ 4. (Emphasis added).

[207]  Email from Eddie Dixon to self, Re: "Wolverine Notes/privileged and confidential," August 10, 2022 (NAT-SL-00008756), cited at Cain Second Report, ¶ 75.

[208]  Emerson January 17 Press Release.

returns by executing to it."[209] This is entirely consistent with my opinion that NI's responses to Emerson were classic "Just Say No" responses and that NI was not seeking further engagement with Emerson.

103.    None of these documents alters my conclusion that the facts in evidence I have discussed at length in Section III of my First Report unambiguously confirm that no "potential deal with Emerson remained under active consideration" after August 2, 2022 and throughout the Proposed Class Period.

104.    Dr. Cain identifies three documents dated August 11, 2022, that purportedly support his Active Engagement Claim. They do not as I explain below

> 6.    *August 11, 2022: Percival email to Board lifting trading restrictions, announcement of investor day and adoption of 10(b)5-1 share repurchase plan*

105.    Dr. Cain cites an email to NI's Board from Mr. Percival lifting the Project Wolverine-related trading restriction, *i.e.,* confirming that information related to Emerson's prior communications with NI were no longer deemed MNPI.[210] This email is consistent with Mr. Dixon's notes regarding his meeting with WLRK on the subject held the previous day, as discussed above.

106.    Dr. Cain notes that Mr. Percival's email also reminded NI directors that, before trading, they should still consider whether they were in possession of "any other material nonpublic information."[211] Again Dr. Cain's discussion is misleadingly incomplete. He has critically left

---

209    Cain Second Report, ¶ 76, citing NAT-SL-00021470.

210    Cain Second Report, ¶ 77, citing NAT-SL-00009179.

211    Cain Second Report, ¶ 77, citing NAT-SL-00009179.

out the last part of Mr. Percival's sentence. Read in whole, Mr. Percival's email makes clear that his reference to "any other material nonpublic information" was related to any MNPI a board member may have "related to any *other* [*i.e.,* non-Wolverine] matter."[212] Such a cautionary email to board members from management is customary and does not support Dr. Cain's Active Engagement Claim.

107.    Dr. Cain discusses two other August 11, 2022 documents: (1) an announcement that NI would hold its annual Investor Day on September 15, 2022;[213] and (2) NI's 10(b)5-1 Repurchase Plan Agreement with JP Morgan Securities ("JPMS") authorizing JPMS to conduct repurchases starting September 12, 2022,[214] which Dr. Cain states "was explicitly structured to increase buyback volume as the stock price declined."[215]

108.    Dr. Cain does not explain how either of these documents support his Active Engagement Claim. They do not. Based on my experience, in my opinion these documents are boilerplate corporate communications and policies. Companies routinely: (a) issue notice of forthcoming investor day conferences; and (b) adopt share repurchase plans that are "explicitly structured to increase buyback volume as the stock price declined."[216]

---

[212]  Cain Second Report, ¶ 77, citing NAT-SL-00009179. (Emphasis added).

[213]  Cain Second Report, ¶ 79, citing "NI to Host Annual Investor Conference in San Francisco on September 15th," *Business Wire,* August 11, 2022 (CAIN0001882 – 887), available at https://www.businesswire.com/news/home/20220811005124/en/NI-to-Host-Annual-Investor-Conference-in-San-Francisco-on-September-15th.

[214]  This share repurchase agreement between NI and JPMS was first discussed with JPMS by NI's CFO in an email dated August 9, 2022, expressing the Company's interest in setting up "another 10b51 plan in the next week or so" and requesting assistance "with the process to put that in place." *See* NAT-SL-00001160, cited at Cain Second Report, ¶ 72.

[215]  Cain Second Report, ¶ 78, citing NAT-SL-00005642 – 648.

[216]  Cain Second Report, ¶ 78, citing NAT-SL-00005642 – 648.

C.    **Category C (August 12, 2022 – November 3, 2022) documents do not support Dr. Cain's Active Engagement Claim**

1.    Internal documents dated August 12, 2022 to September 15, 2022 (NI's Investor Day Presentation)

109.    Dr. Cain discusses various NI communications from this period between members of its senior management and with NI's external advisors that, in general, concern (i) NI's ongoing monitoring of Emerson's NI holdings and (ii) the Company's preparations for the possibility that Emerson takes its proposal public.[217] According to Dr. Cain, these documents show "the Company's focus on both the size and financial significance of Emerson's position"[218] and prove that "National Instruments and its advisors were preparing for a public bid by Emerson" throughout the Proposed Class Period.[219]

110.    While the documents cited by Dr. Cain indicate NI continued monitoring Emerson's stake in NI and preparing for the possibility of Emerson taking an acquisition attempt public, such actions are unsurprising and reflect reasoned and typical corporate contingency planning for a low probability but potentially disruptive event that it does not view to be in its shareholders' best interest. These actions are also entirely *inconsistent* with, and distinct from, the actions a company would take were it actively "engaging" in merger negotiations in pursuit of a deal. Again, Dr. Cain presents no evidence of NI engaging with Emerson in any way regarding a "potential deal."[220]

---

[217]    Cain Second Report, ¶¶ 80 – 88.

[218]    Cain Second Report, ¶ 84.

[219]    Cain Second Report, ¶ 87.

[220]    Cain Second Report, Appendix C, ¶ 4.

> 1.    *August 12 – 26, 2022: Emails regarding NI's share repurchase plan*

111.    Dr. Cain cites emails dated "[b]etween August 12 and August 26, 2022" (specifically, August 13, 14, 17 – 19, and 26, 2022) between members of NI management and JPMS regarding the Company's share repurchases.[221] I do not disagree that these emails relate to NI's monitoring its share repurchases. However, Dr. Cain's assertion that "[t]hese coordinated purchases occurred while **Emerson's nonpublic interest in acquiring National Instruments remained undisclosed to the market**"[222] is incorrect.

112.    NI's management's discussions of NI's share repurchases during the Proposed Class Period do not in any way support Dr. Cain's Active Engagement Claim. As I have explained, there was no confidential acquisition proposal from Emerson to "acquir[e] National Instruments"[223] outstanding during this time. Moreover, the evidence (internal documents and academic research) that Dr. Cain provides as support for his Active Engagement Claim (*i.e.,* "Emerson's nonpublic interest in acquiring National Instruments remained"[224] throughout the Proposed Class Period) is speculative and incorrect.

---

[221]    Cain Second Report, ¶ 81, citing NAT-SL-0006245; NAT-SL-00001156; NAT-SL-00001152 – 153; NAT-SL-00009596 – 597. ("Between August 12 and August 26, 2022, shortly after lifting the Project Wolverine trading restriction, National Instruments proceeded with discretionary share repurchases outside of a 10b5-1 plan. For example, on August 13, 2022, Rapp, NI's CFO, noted that she had spent $9 million on the previous day on open market purchases, and 'committed $60 m[illion] on the 10b51' plan that was not yet in effect.  On August 14, Rapp directed JPM to buy back in the open market 'up to $5m[illion] per day this week' (only if the stock was trading under $40). On August 17, internal emails show that $182 million in buyback capacity remained and that senior executives, including the CEO, were actively discussing their repurchase strategy. The next day, National Instruments confirmed a $5 million repurchase order for August 19. On August 26, JPM confirmed NI's order to repurchase $4 million worth of the Company's Common Stock.").

[222]    Cain Second Report, ¶ 81. (Emphasis added).

[223]    Cain Second Report, ¶ 81.

[224]    Cain Second Report, ¶ 81.

113.    As discussed above, before the start of the Proposed Class Period, and before adopting its share repurchase plan, NI consulted its legal advisor, WLRK, to confirm that it did not possess any MNPI related to "the nuthatch engagement," and that it was appropriate to continue with its planned share repurchases.[225]

    2.    *August 19, 2022: Email chain between NI external advisors FGS and BofA[226]*

114.    Dr. Cain cites an August 19, 2022 email chain in which NI's advisors "continued to strategize around ███████████████████████████████████████ ██████"[227] Dr. Cain's characterization of this email chain is critically incomplete. He ignores the fact that in the same email chain, notwithstanding ███████████████████████████ ██████ NI's advisors noted that "our current [public communications] plan works with these new circumstances."[228] This statement (a) confirms that NI's advisors did not view ███████████ ██████████ as meriting changes to NI's planned external communications strategies and (b) does not relate to any purported engagement between NI and Emerson regarding a potential future transaction. Thus, this email chain does not provide any support for Dr. Cain's Active Engagement Claim.

    3.    *August 23 – 25, 2022: Communications regarding Emerson's share accumulation[229]*

---

[225]    NAT-SL-00009611 – 612, at -611.

[226]    BofA_000803 – 804.

[227]    Cain Second Report, ¶ 82.

[228]    BofA_000803 – 804, at -803.

[229]    NAT-SL-00012665 – 667; NAT-SL-00017309 – 310.

115.    On August 23, 2022, in its weekly update, MacKenzie Partners informed NI that

[REDACTED]

[REDACTED] [30] While MacKenzie "[REDACTED]

[REDACTED]" it was not sure and

noted it would be "monitoring the ongoing activity from the broker level pending further

confirmation."[231]

116.    Dr. Cain notes that on August 25, 2022, Marissa Vidaurri, NI Head of Investor Relations,

"circulated a summary of MacKenzie Partners' perspective on accumulation activity in National

Instruments Common Stock. Although MacKenzie Partners had not been briefed on the Emerson

engagement, it indicated that the accumulation [REDACTED] and

described it as a [REDACTED]

[REDACTED]"[232] However, Dr. Cain critically misrepresents the email and its summary of

MacKenzie Partners' perspective.

117.    Even after NI had rejected Emerson's second proposal, NI had not informed MacKenzie

Partners of Emerson's May and June 2022 proposals, as Dr. Cain notes.[233] Unlike BofA and

---

[230]    NAT-SL-00012665 – 667, at -665, cited at Cain Second Report, ¶ 80, at fn. 100.

[231]    NAT-SL-00012665 – 667, at -666, cited at Cain Second Report, ¶ 80, at fn. 100. As Dr. Cain notes, MacKenzie Partners' first confirmed that [REDACTED] n its second NOBO list dated August 29, 2022, and sent to NI on September 1, 2022. See NAT-SL-00010806 – 807, at -806, cited at Cain Second Report, ¶ 84 ([REDACTED]

[REDACTED]").

[232]    Cain Second Report, ¶ 83, citing NAT-SL-00017309 – 310, at -309.

[233]    See NAT-SL-00017309 – 310, at -309, cited at Cain Second Report, ¶ 83. See also NAT-SL-00008750 – 752, at -750 ("And we [i.e., NI and WLRK] have not exposed Mackenzie to Nuthatch"), cited at Cain Second Report, ¶ 75.

WLRK, MacKenzie Partners was a market surveillance consultant, not an advisor to NI regarding its evaluation of Emerson's proposals. Furthermore, MacKenzie Partners' "perspective" does not in any way support that NI remained actively engaged with Emerson regarding a "potential deal," as Dr. Cain asserts.[234]

118.    Moreover, Dr. Cain's discussion of Ms. Vidaurri's email summarizing MacKenzie Partners' "perspective" is misleading. Dr. Cain selectively cites the first two bullets from a list of five in Ms. Vidaurri's email, ignoring the remaining three, which I reproduce below.[235]



119.    As this complete list of bullets above indicates, MacKenzie Partners had ████████████ ████████████████████████████████████████████████████████████ ██████████████████ "[236] However, even according to MacKenzie Partners' █████████████ ████████████████████████ "[237] Thus this email chain does not provide any support for Dr. Cain's Active Engagement Claim.

> 4.    *September 1, 2022: Email chains regarding MacKenzie Partners update stating that Emerson's stake in NI had grown to 1.73%*[238]

---

[234]    Cain Second Report, Appendix C, ¶ 4.

[235]    NAT-SL-00017309 – 310.

[236]    NAT-SL-00017309 – 310.

[237]    NAT-SL-00017309 – 310. (Emphasis added).

[238]    NAT-SL-00010806 – 807.

120.    MacKenzie Partners' September 1, 2022 email to NI contained their August 29, 2022-dated "NOBO" list [239] Dr. Cain cites to three documents that contain emails between members of NI's management, WLRK, and MacKenzie Partners in which NI management attempts to [240]

121.    First, it should be noted that this information came to NI after its last open market repurchase on August 26, 2022 and after it had put in place its 10b-5 plan.[241]  Moreover, such value estimations are a routine aspect of market surveillance services (such as those provided by MacKenzie Partners to NI) and it is not surprising that NI would as part of its regular and ongoing monitoring efforts. Such discussions are irrelevant and do not support Dr. Cain's Active Engagement Claim.

122.    Dr. Cain also cites a related internal email chain in which Mr. Dixon informs Mr. Starkloff of MacKenzie Partners' update regarding [242] In response to Mr. Dixon's email ("We should probably set up a call to

---

[239]  NAT-SL-00010806 – 807, at -806, cited at Cain Second Report, ¶ 80.

[240]  NAT-SL-00017322 – 323, NAT-SL-00022130 – 131, and NAT-SL-00023790 – 791, cited at Cain Second Report, ¶ 84.

[241]  *See* NATI Summary_Native_NAT-SL-00009178.xlsx, at "Summary" tab. *See also* NAT-SL-00005642 – 648, at -642.

[242]  Cain Second Report, ¶ 85, citing to NAT-SL-00023453 – 454

discuss if there is any action needed in our part. I'm not sure what it would be, but probably worth a call with our advisors"), Mr. Starkloff replies:[243]

> I agree. In particular, when I brought up shareholder rights plans previously the idea that [Emerson would] get to 5-10% was perceived as also incredibly unlikely as to not be relevant, but we should ask that question again in light of new data.

123.    According to Dr. Cain, this reconsideration of a poison pill measure constitutes "active and ongoing engagement with the threat" of Emerson's proposal turning hostile.[244] What Dr. Cain fails to note, however, is that, even after reconsidering a poison pill measure in light of Emerson's larger stake, NI did not adopt such a measure. NI's reconsideration and reaffirmation of its decision to not adopt a poison pill would suggest to a reasonable investor that the NI Board did not perceive a substantial threat that Emerson would return with a hostile bid, as I opined in my First Report.[245] Moreover, in my opinion, the email chain Dr. Cain cites is consistent with the typical discussions a company's management has when preparing for a *possible* public takeover bid in which it is not interested. It is not consistent with a company seeking continued engagement for a future transaction with a potential acquirer it has twice rejected. Thus, Dr. Cain's citations to these discussions are irrelevant and do not support his Active Engagement Claim.

> 5.    *September 8 – 9, 2022: Email chains between NI and advisors discussing updates to potential Company messaging in the event Emerson takes proposal public*[246]

---

[243]    NAT-SL-00023453 – 454, at -253.

[244]    Cain Second Report, Appendix C, ¶ 22.

[245]    *See* First Report, ¶ 18.

[246]    BofA_000806 – 808; NAT-SL-00022116 – 117.

124.    Dr. Cain cites September 8, 2022, emails between NI advisors FGS, BofA, and WLRK discussing updates to NI's external communications strategy, which FGS summarized and shared with NI on September 9, 2022 in preparation for NI's upcoming September 15 Investor Day.[247] These discussions show NI, together with its advisors, reviewing its external communications strategy for its September 15, 2022 Investor Day presentation to ensure the Company could readily respond if Emerson went public with a proposal shortly before NI's Investor Day.

125.    Based on my experience, the email chains Dr. Cain cites are consistent with the typical discussions a company's management has when preparing for a *possible* public takeover bid which it does not consider to be in the best interests of its shareholders. They are not consistent with a company seeking continued engagement for a future transaction with a potential acquirer it has twice rejected. Thus, Dr. Cain's citations to these discussions are irrelevant and do not support his Active Engagement Claim.

>    6.    *September 15, 2022: NI's reaffirmation of its Q2 2022 guidance at its Annual Investor Day Conference*

126.    Dr. Cain notes that "[o]n September 15, 2022, during NI's Investor Day, the Company reaffirmed its Q2 2023 [*sic*] guidance and added a long-term goal of an additional 200 bps of operating margin expansion by 2025."[248] Dr. Cain fails to explain how NI's reaffirmation of its prior guidance or the announcement that it expected to increase its operating margin supports his Active Engagement Claim. There is no logical basis to reach such a conclusion. If anything, NI's

---

[247]    Cain Second Report, ¶¶ 86 – 87, citing BofA_000806 – 808 dated September 8, 2022 and NAT-SL-00022116 dated September 9, 2022.

[248]    Cain Second Report, ¶ 88, citing NATI Annual Investor Conference, Final Transcript, September 15, 2022 ("NI Investor Day Transcript"), pp. 2, 20.

guidance signaled the Company's prospects were strong,[249] which all other things constant, would *reduce*, rather than increase the prospects of a NI agreeing to a merger with Emerson at a proposed acquisition price of $48 per share that "substantially undervalued" the Company and "was not in the best interests of NI and its stockholders," as NI's Board had concluded about Emerson's first and second proposals.

2.    Internal documents from September 16, 2022 to September 19, 2022 (the day before NI's Board Meeting)

127.    Dr. Cain cites internal emails between members of NI's management and NI's advisors related to preparations for NI's upcoming September 20 – 21, 2022 Board Meeting.

1.    *September 16, 2022: Emails between NI, WLRK discussing upcoming Board meeting*

128.    Dr. Cain cites a September 16, 2022 email chain between Sabastian Niles of WLRK and Mr. Dixon (and others at NI and WLRK). In his email, Mr. Niles noted analyst commentary following NI's September 15 Investor Day presentation, which one analyst speculatively interpreted as "a playbook that **could** double as a pitchbook."[250] In response to this email, Mr. Dixon replied: "probably worth touching base prior to the board Wolverine update."[251] Quoting Mr. Dixon's email, Dr. Cain observes that "the Company was preparing for an upcoming board update on Project Wolverine."[252] I do not disagree. However, preparation for an upcoming board

---

[249]    In the same presentation that Dr. Cain cites, Mr. Starkloff stated that he would discuss "the pillars of the transformation" that the Company had gone through "over the last five years" which had created "a trajectory change in [its] business." *See* NI Investor Day Transcript, p. 2 (CAIN0001894 – 927, at -895).

[250]    Cain Second Report, ¶ 89, citing NAT-SL-00023183 – 184, at -184. (Emphasis added).

[251]    NAT-SL-00023183 – 184, at -183.

[252]    Cain Second Report, ¶ 89.

of directors meeting by a company's management and its legal advisors is common and to be expected. Nothing in the email exchange Dr. Cain cites supports his Active Engagement Claim.

      2.     *September 19, 2022: Email from NI's CLO to NI senior management and advisors summarizing updates regarding upcoming Board meeting*

129.    Dr. Cain cites a September 19, 2022 email from NI's Mr. Dixon to Mr. Starkloff, Ms. Rapp, Mr. Ilcisin, and advisors WLRK and BofA summarizing the "general message/Wolverine update to the board."[253] Dr. Cain claims this:[254]

> [S]ummary [...] emphasized that ▮▮▮▮▮▮▮▮▮▮
>
> ▮▮▮▮▮▮▮▮▮▮ Notably, the communication also noted that ▮▮▮▮▮▮▮
>
> ▮▮▮▮▮▮' consistent with Emerson's acquisition interest remaining strong

130.    However, Dr. Cain's commentary on Mr. Dixon's summary is misleading. As NI's own summary makes clear, NI's management was merely speculating about Emerson's potential future actions (*e.g.*, submitting another private proposal) and recognized that NI did not actually know what Emerson would do:[255]

> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

131.    Mr. Dixon also noted that while there was ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮' (which Dr. Cain incompletely cites to claim that this comment, among others, contradicts my opinion that "the likelihood of a deal was negligible" after August

---

253   NAT-SL-00023189 – 190, at -189, cited at Cain Second Report, ¶ 90.

254   Cain Second Report, ¶ 90.

255   NAT-SL-00023189 – 190, at -189.

2, 2022[256]), ███████████████████████████████████

██████████████████████████████████████"[257] In other words, Mr.

Dixon's comments regarding Emerson's interest in no way suggested there was any proposal

from Emerson on the table, nor that NI was interested in pursuing a merger with Emerson. That

is, the email that Dr. Cain cites does not support his Active Engagement Claim.

> 3. Internal documents dated September 20 – 21, 2022 relating to NI's Board Meeting that day

> 1.     *September 21, 2022: BofA presentations to NI's Board on (i) Emerson's stake and (ii) Emerson's financial capacity to complete acquisition*

132.    Dr. Cain cites two BofA presentations made "to NI's Board as part of its ongoing

evaluation of Emerson's acquisition interest" on September 21, 2022.[258] The first, titled ████

███████████████████████████████████████████████

█████████" and the second, titled ███████████████████████████████

████████████████████████████████████████"[259] Dr. Cain

claims that "[t]hese materials reflect that National Instruments and its advisors continued to

actively evaluate Emerson's acquisition interest and preparedness throughout this period."[260]

133.    In my opinion, the presentations Dr. Cain cites are typical of those shared with a

company's management by its advisors when preparing for a *possible* public takeover bid which

---

[256]   Cain Second Report, Appendix C, ¶ 5.

[257]   Cain Second Report, ¶ 90.

[258]   Cain Second Report, ¶ 91, citing BofA_000824 – 826 and BofA_000821 – 823. *See also* NAT-SL-00012292.

[259]   Cain Second Report, ¶ 91.

[260]   Cain Second Report, ¶ 91.

it does not consider to be in the best interest of its shareholders. They are not consistent with a company seeking continued engagement for a future transaction with a potential acquirer it has twice rejected. Thus, Dr. Cain's citations to these discussions are irrelevant and do not support his Active Engagement Claim.

2.    *September 20 – 21, 2022: Minutes from NI's Board Meeting*

134.    The minutes of NI's September 20 – 21, 2022 Board Meeting state, in part:[261]

> Mr. Starkloff then led a discussion concerning Project Wolverine. It was noted that the Company had not received any response from Wolverine to the Company's letter dated August 2, 2022 and Wolverine had not contacted NI for any follow-up or otherwise. The representatives of Wachtell Lipton and BofA provided their perspectives on the potential go-forward scenarios with Wolverine, including the implications of Wolverine having taken a small non-public "toehold" position and public commentary by Wolverine regarding their own priorities. Discussion ensued, and it was confirmed that the Board would be updated if there were any material developments regarding Project Wolverine.

135.    Dr. Cain misleading and incompletely cites the Board Meeting minutes, noting its reference to Emerson's "toehold", but failing to note that NI viewed Emerson's stake as "small" and that "the Company had not received any response from [Emerson] to the Company's letter dated August 2, 2022 and [Emerson] had not contacted NI for any follow-up or otherwise."[262]

136.    Notwithstanding Dr. Cain's misleadingly incomplete citations, nothing in the September 20 – 21 Board Meeting minutes support his claim that they "contradict" my opinion that "the likelihood of a deal was 'negligible,' and show that NI prepared for a public bid by Emerson as a

---

[261]    NAT-SL-00001450 – 454, at -453.

[262]    NAT-SL-00001450 – 454, at -453, cited at Cain Second Report, ¶ 92.

69

serious possibility throughout the Class Period."[263] To the contrary, the documents Dr. Cain cites confirm that NI had no communication with Emerson after August 2, 2022, and did not consider Emerson's "toehold" as significant, thus contradicting his Active Engagement Claim.

> 3.    *September 21, 2022: NI management's "Shareholder Update" presentation to NI's Board*

137.    Dr. Cain also notes that at the same board meeting, NI's Mr. Starkloff and Ms. Vidaurri "delivered a 'Shareholder Update' presentation [which] highlighted positive reactions to the Company's prior repurchasing activity [and] also summarized analyst concerns regarding the use of cash for repurchases rather than for potentially more value-accretive opportunities."[264] This document, which relates to NI's share repurchase activity, does not support Dr. Cain's Active Engagement Claim. It, like the other documents Dr. Cain cites, fails to show any engagement between NI and Emerson.

> 4.    Internal documents from September 22, 2022 to November 3, 2022

138.    In paragraphs 93 to 99 of the Cain Second Report, Dr. Cain cites 19 internal documents (14 of which are over the September 22, 2022 to November 3, 2022 period) which he claims "demonstrate that National Instruments continued to treat the matter [*i.e.*, a potential deal with Emerson] as active throughout" and following the Proposed Class Period.[265] They do not, as I explain below.

139.    The 19 documents Dr. Cain cites may be classified as follows:

---

[263]    Cain Second Report, Appendix C, ¶ 5.

[264]    Cain Second Report, ¶ 92, citing NAT-SL-00015951.

[265]    Cain Second Report, ¶ 99.

1) Eight meeting invites;[266]

2) Four documents related to the Company's 2022 share repurchases;[267]

3) One document related to an email exchange between BofA and NI regarding NI's updated financial model;[268] and

4) Six documents related to MacKenzie Partners' weekly updates.[269]

None of these documents support Dr. Cain's Active Engagement Claim.

*1.    The eight meeting invites that Dr Cain cites do not support his Active Engagement Claim*

140.    Dr. Cain cites eight Meeting invites, of which only three are within the September 22 to November 3, 2022 period.[270] The remaining five meeting invites that Dr. Cain cites are for meetings scheduled on August 5 through September 13, 2022.[271] He claims that simply because the subject headers of these meeting invites related to "Project Wolverine," these meeting invites

---

[266]    Cain Second Report, ¶ 99, citing NAT-SL-00008684 (invite for meeting on August 5, 2022); NAT-SL-00010395 (invite for meeting on August 9, 2022); NAT-SL-00008683 (invite for meeting on August 10, 2022); NAT-SL-00016269 (invite for meeting on September 2, 2022); NAT-SL00023536 (invite for meeting on September 13, 2022); NAT-SL-00006980 (invite for meeting on October 10, 2022); NAT-SL-00006977 (invite for meeting on October 27, 2022); NAT-SL-00003018 (invite for meeting on October 31, 2022).

[267]    Dr. Cain cites three documents that summarize the Company's completed share repurchases through September 28, 2022. *See* Cain Second Report, ¶ 95, citing NAT-SL-00000772 (NI's "Trade Confirmation Activity Sheet"); NAT-SL-00008757 (September 27, 2022 dated email with subject "H2-22 share repurchase summary 2022.09.26 ***Program completed***"); NAT-SL-00008758 (excerpt from September 2022 presentation titled "FY 22 Share Repurchase Summary"). Dr. Cain also cites an internal NI email chain dated October 14, 2022, in which he notes that "NI's CFO, noted that the Company had repurchased $160 million in stock, exceeding the original $100 million plan, based on the belief that the stock was undervalued[.]" *See* NAT-SL-00006122 – 123, cited at Cain Second Report, ¶ 96.

[268]    Cain Second Report, ¶ 93, citing NAT-SL-00006116 – 117.

[269]    Cain Second Report, ¶ 94, citing NAT-SL-00010427 – 428; NAT-SL-00010429 – 430; NAT-SL-00010431; NAT-SL-00010399 – 400; NAT-SL-00008468 – 469, at -468. *See also* Cain Second Report, ¶ 80, citing to NAT-SL-00008467.

[270]    Cain Second Report, ¶ 99, citing NAT-SL-00006980 (invite for meeting on October 10, 2022); NAT-SL-00006977 (invite for meeting on October 27, 2022); NAT-SL-00003018 (invite for meeting on October 31, 2022).

[271]    Cain Second Report, ¶ 99, citing NAT-SL-00008684 (invite for meeting on August 5, 2022); NAT-SL-00010395 (invite for meeting on August 9, 2022); NAT-SL-00008683 (invite for meeting on August 10, 2022); NAT-SL-00016269 (invite for meeting on September 2, 2022); NAT-SL00023536 (invite for meeting on September 13, 2022).

"demonstrate that National Instruments continued to treat the matter as active throughout this period."[272] Such a claim is misleading and incorrect. Other than the subject headers, the meeting invites contain *no* information. Inferring from a meeting's subject what the substance of the meeting may have been is pure speculation. These meeting invites do not in any way support Dr. Cain's Active Engagement Claim.

> 2.     *The four documents related to the Company's 2022 share repurchases that Dr. Cain cites do not support his Active Engagement Claim*

141.    Dr. Cain cites three documents related to NI's trade confirmation activity according to which NI repurchased 2,033,135 shares.[273] Dr. Cain also cites an internal NI email chain dated October 14, 2022, in which he notes that "NI's CFO, noted that the Company had repurchased $160 million in stock, exceeding the original $100 million plan, based on the belief that the stock was undervalued[.]"[274] Dr. Cain provides no explanation for why this share repurchase summary supports his Active Engagement Claim. It does not. Such periodic summaries of a company's share repurchases are routine corporate communications when a company has undertaken a share repurchase strategy.

142.    Dr. Cain's claim that NI undertook these repurchases "without disclosing Emerson's ongoing interest"[275] is misleading and incorrect. By August 2, 2022, NI had rejected Emerson's

---

[272]  Cain Second Report, ¶ 99.

[273]  *See* Cain Second Report, ¶ 95, citing NAT-SL-00000772 (NI's "Trade Confirmation Activity Sheet"); NAT-SL-00008757 (September 27, 2022 dated email with subject "H2-22 share repurchase summary 2022.09.26 ***Program completed***"); NAT-SL-00008758 (excerpt from September 2022 presentation titled "FY 22 Share Repurchase Summary").

[274]  Cain Second Report, ¶ 96, citing NAT-SL-00006122 – 123, at -122.

[275]  Cain Second Report, ¶ 95.

proposals twice. Thus, during this August 12 – September 26, 2022 repurchase period, there was no pending acquisition proposal from Emerson that NI was actively evaluating or any communication between NI and Emerson. Dr. Cain's review of internal documents (including his discussion of the Company's share repurchase activity) does not in any way support his Active Engagement Claim.

> 3.    The email exchange between NI and BofA regarding BofA's financial model of NI that Dr. Cain cites do not support his Active Engagement Claim

143.    Dr. Cain cites the following email exchange between BofA and NI: On September 22, 2022, NI sent BofA an updated financial model at BofA's request; on September 28, 2022 BofA replied with a set of model-related follow-up questions to "better understand the changes" in NI's model.[276] Dr. Cain notes that "[i]nternal emails show that the [BofA] questions were forwarded to Rapp, NI's CFO, for review, and that a meeting with Bank of America about Wolverine was requested."[277]

144.    Dr. Cain provides no explanation why BofA's model-related questions, or the fact these questions were sent to Ms. Rapp, in any way support his Active Engagement Claim. They do not. I can see no relevance, however tenuous, of these emails to Dr. Cain's Active Engagement Claim.

> 4.    The six documents related to MacKenzie Partners' weekly updates to NI that Dr. Cain cites do not support his Active Engagement Claim

---

[276]    NAT-SL-00006116 – 117, at -116.

[277]    Cain Second Report, ¶ 93.

145.    Dr. Cain four documents related to MacKenzie Partners' weekly updates on September 20 and 27, 2022);[278] an October 5, 2022 email from NI to BofA, noting that according to MacKenzie Partners, ███████████████████████████████████████████████"[279] and an email from MacKenzie Partners to Ms. Vidaurri regarding a Bloomberg article that noted Blackstone was "in talks to acquire Emerson Electric assets for $5-10B."[280]

146.    Dr. Cain acknowledges that the MacKenzie Partners September 20 and 27, 2022 updates indicated that "█████████████████████████"[281] Yet, he claims that "these updates reflect that National Instruments continued to monitor Emerson's holdings closely."[282]  Dr. Cain also claims that MacKenzie Partners' email to NI regarding rumors that Blackstone may acquire Emerson assets reflected NI's "monitoring of Emerson's broader M&A activity and its implications for cash availability."[283]

147.    NI's "monitoring" of Emerson's holdings after refusing two acquisition proposals from Emerson does not in any way support Dr. Cain's claim that NI was actively engaged with Emerson to complete a "potential deal" throughout the Proposed Class Period.

---

[278]  Cain Second Report, ¶ 94. Dr. Cain cites two MacKenzie Partners weekly updates dated September 20, 2022 (NAT-SL-00010427 – 428) and September 27, 2022 (NAT-SL-00010399 – 400). Each MacKenzie Partners weekly update included two attachments, and Dr. Cain also cites the two attachments to MacKenzie Partners' September 20 weekly update, namely:

(1) The "NATI Weekly Price Performance Report (9-20-2022)" (NAT-SL-00010431).

(2) The "NATI Weekly Ownership Analysis (9-20-2022)"  (NAT-SL-00010429 – 430).

[279]  *See* NAT-SL-00008467, cited at Cain Second Report, ¶ 80, at fn. 100.

[280]  Ms. Vidaurri indicated that such headlines are "appreciated in our sector." *See* NAT-SL-00008468 – 469, at -468.

[281]  Cain Second Report, ¶ 94.

[282]  Cain Second Report, ¶ 94.

[283]  Cain Second Report, ¶ 94.

74

148.    In summary, Dr. Cain's review of internal documents is misleading and irrelevant. None of these documents support his Active Engagement Claim.

**VII.    The academic literature that Dr. Cain cites is irrelevant and does not support his opinions that the alleged omissions were economically material or that NI "remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period"[284]**

149.    Dr. Cain claims that:[285]

> In the case of National Instruments, the existence of a credible acquisition proposal would directly impact how investors assessed the firm's future value and strategic trajectory. Accordingly, the academic literature discussed below provides a basis for concluding that such information is economically material under standard valuation principles.

150.    However, at the start of and throughout the Proposed Class Period, no "credible acquisition proposal" to acquire NI existed.[286] Therefore, even if the academic literature Dr. Cain cites "consistently supports the conclusion that credible acquisition proposals are economically material events,"[287] those findings are irrelevant. The results of those studies do not prove or provide support for Dr. Cain's opinion that the alleged omissions in this case were economically material.

151.    Generally, the studies Dr. Cain cites are irrelevant because the issues they examine are fundamentally different from the facts and circumstances in this case. For instance:

---

[284]   Cain Second Report, Appendix C, ¶ 11.

[285]   Cain Second Report, ¶ 105.

[286]   Cain Second Report, ¶ 105.

[287]   Cain Second Report, ¶ 115.

a. In this case, NI rejected Emerson's May and June 2022 proposals in which Emerson did not change its proposed acquisition price of $48 per share. None of the studies Dr. Cain cites examines the effects of a target company's repeated rejections of identically priced confidential acquisition proposals submitted by an interested party.

b. In this case, NI's hypothetical disclosure at the start of the Proposed Class Period would announce that it had received Emerson's May and June 2022 $48 per share proposals *and* rejected them. None of the studies Dr. Cain cites examine the effects of a target company's simultaneous disclosure of its receipt and rejection of an unsolicited private acquisition proposal.

c. In this case, Emerson's May and June 2022 proposals, and NI's rejections of these proposals, were confidential. The studies Dr. Cain cites rely on public information;[288] they do not, and cannot, examine the effects of private offer rejections when the target company is not subsequently acquired because, in such cases, the information that the target company had rejected a private proposal remains private.

152. Below I discuss each of the academic papers Dr. Cain cites.

---

[288] For example, an event study (an analysis conducted in some of the papers Dr. Cain cites) can only examine the price impact of a public disclosure. By definition, no event study can be conducted to examine the price impact of an undisclosed offer that was rejected, where the target remained independent thereafter. For other studies Dr. Cain cites, he discusses the offer premiums reported for mergers that were ultimately completed and reported publicly. Again, such results do not discuss the offer premiums in proposals that were privately rejected.

**A.    The research on target firms' price reactions to offer announcements that Dr. Cain cites does not support his conclusion that the alleged omissions were economically material**

153.    Dr. Cain cites Bruner (2004)'s summary of target firms' stock price reactions to tender offer announcements or on mergers' effective dates (*i.e.,* the date the merger becomes binding),[289] based on which Bruner (2004) concludes that: "Target firm shareholders enjoy returns that are significantly and materially positive."[290] Such a finding is irrelevant and does not support Dr. Cain's opinion that the alleged omissions were economically material.

154.    From an economic perspective, the value-relevance of a tender offer announcement (in which a bidder makes a firm and public offer to all of the target firm's shareholders to directly buy their shares[291]), or of news that a merger has been completed after the parties engaged in negotiations, is that such news sends a positive signal, *i.e.*, the target firm's value could improve with "a change of management and policies."[292] In contrast, NI's hypothetical disclosure regarding the information that NI allegedly failed to disclose (namely, that NI had *rejected* two confidential, identically priced acquisition proposals from the same party and informed that suitor that it would not engage in further discussions) would not convey such a positive signal to the investing public. Thus, it is speculative and incorrect to conclude, as Dr. Cain does, that

---

[289]    Cain Second Report, ¶ 107, citing Bruner (2004), p. 36. *See also* Bruner (2004), Exhibit 3.3.

[290]    Cain Second Report, ¶ 107, citing Bruner (2004), p. 36.

[291]    As the SEC notes, a tender offer cannot be "illusory." *See* "Tender Offer Rules and Schedules," *United States Securities and Exchange Commission*, March 6, 2025, available at https://www.sec.gov/rules-regulations/staff-guidance/compliance-disclosure-interpretations/tender-offer-rules-schedules.

[292]    *See, e.g.*, Senchack, A. J., Bruner, R. F., and Martin, J. D. (1991), "The Poison Pill Anti-takeover Defense: The Price of Strategic Deterrence," *Research Foundation of the Institute of Chartered Financial Analysts*, ("Senchack *et al.* (1991)"), p. 17. Dr. Cain cites Senchack *et al.* (1991), as I discuss further in **Section XI**.

77

Bruner (2004)'s findings of a positive price reaction to news of a tender offer or merger completion prove or even support Dr. Cain's claim that the alleged omissions were economically material.

155.    Dr. Cain also cites Jindra and Walkling (2004)'s study[293] which analyzes "speculation spreads" (defined by the study as "the percentage difference between the bid price and market price one-day after the initial announcement") following "initial acquisition announcements in 362 cash tender offers spanning the 1981-1995 period."[294] The study finds that the speculation spread was negative in 23.1% of the cases in their sample,[295] which Dr. Cain claims reflects "investors' expectations that the initial offer may undervalue the firm and that additional bids or improvements are likely."[296]

156.    Dr. Cain's conclusions are speculative and flawed for several reasons. First, as in Bruner (2004), Jindra and Walkling (2004) investigate the impact of tender offer announcements on target firm share prices. As I explained above, the results of such an analysis do not prove or support Dr. Cain's claim that the alleged omissions in this case were economically material because tender offers convey fundamentally different economic information to investors compared to the information that NI's hypothetical disclosure at the start of the Proposed Class Period would convey.

---

[293]  Cain Second Report, ¶ 108, citing Jindra, J., and Walkling, R. A., "Speculation spreads and the market pricing of proposed acquisitions," *Journal of Corporate Finance*, Vol. 10, No. 4, pp. 495 – 526. ("Jindra and Walkling (2004)").

[294]  Jindra and Walkling (2004), Abstract.

[295]  Jindra and Walkling (2004), Abstract.

[296]  Cain Second Report, ¶ 108. In the same paragraph, Dr. Cain also states that, according to Jindra and Walkling (2004), "this effect is more pronounced in hostile deals and when bidders employ toehold strategies."

157.    Second, according to Jindra and Walkling (2004), in the majority of cases (*i.e.*, all but the 23.1% that Dr. Cain cites), the speculation spread was *not* negative and the mean speculation spread was positive. Thus, in most cases, the target company's market price remained below the bid price following the announcement of a public tender offer, indicating that investors typically did *not* expect that "additional bids or improvements are likely,"[297] contradicting Dr. Cain's claims.[298]

### B.    The research on multi-round negotiations that Dr. Cain cites does not support his conclusions

158.    Dr. Cain notes that Cain *et al.* (2020) "found that announced transactions typically involve extensive back-and-forth, with an average of 5.4 rounds of bidding. This iterative process, where targets initially reject offers and negotiate for better terms, is common and consistent with the goal of maximizing shareholder value."[299] He claims that "NI's engagement timeline and planning are fully consistent with this pattern and further undermine Prof. Goodwin's claim that the probability of a transaction was negligible at the start of the Proposed Class Period."[300]

---

[297]    Cain Second Report, ¶ 108.

[298]    Moreover, Jindra and Walkling (2004)'s sample includes tender offers over the 1981 to 1995 period. The study notes that its results vary considerably across years. *See* Jindra and Walkling (2004), Table 1. Therefore, it is speculative and incorrect to assume, as Dr. Cain does, that Jindra and Walkling (2004)'s findings, based on a sample of offer announcements that are more than thirty years old, would apply to NI's hypothetical disclosure in 2022.

[299]    Cain Second Report, ¶ 113, citing Cain, M. D., Griffith, S. J., Jackson, Jr., R. J., & Solomon, S. D. (2020), "Does Revlon Matter? An Empirical and Theoretical Study," *California Law Review,* 108, pp. 1683 – 1731 ("Cain *et al.* (2020)").

[300]    Cain Second Report, Appendix C, ¶ 6.

159.    Dr. Cain's conclusions are incorrect and reflect a fundamental lack of understanding about merger dynamics. Cain *et al.* (2020)'s findings are unsurprising but irrelevant. That study's results are based on a sample of "announced transactions," *i.e.*, transactions in which (i) the parties had agreed to engage in merger negotiations and (ii) such negotiations had resulted in a transaction. I agree that *if the parties agree to engage in merger negotiations* and ultimately close a deal, such negotiations *do* typically take multiple rounds, as Cain *et al.* (2020) found. But, in this case, NI did *not* agree to engage in merger discussions with Emerson after receiving Emerson's May and June 2022 proposals. Critically, Dr. Cain is unable to provide any evidence that NI agreed to engage in merger negotiations with Emerson after rejecting its second proposal on August 2, 2022 and prior to receiving Emerson's third acquisition proposal on November 3, 2022.

160.    As I discussed in my First Report, after November 3, 2022, NI and Emerson engaged in discussions. Thereafter, "NI's actions from November 2022 through April 2023 followed the typical merger process when a target is interested in closing a deal."[301] During these merger discussions in November 2022 through April 2023, NI and Emerson had several rounds of negotiation as discussed in the NI Proxy Statement. That negotiation process is consistent with Cain *et al.* (2020)'s finding.

161.    However, as I noted in my First Report, NI's actions from November 2022 through April 2023 "were in stark contrast to its refusal to engage with Emerson in any merger-related

---

[301]    First Report, ¶ 56.

discussions following Emerson's May 2022 and June 2022 proposals."[302] After repeatedly rejecting Emerson proposals, the "famous just say no" response, according to Bruner (2004), most proposals die."[303] Bruner (2004)'s research, which Dr. Cain cites, is consistent with my opinion that, after NI's two "Just Say No" responses to Emerson on June 16, 2022, and August 2, 2022, the probability of "Emerson ultimately acquiring NI was […] negligible given the facts at the time" (as of the start of the Proposed Class Period).[304]

162.    The Cain *et al.* (2020) study does not, and cannot, determine how many rounds of private negotiations occur before parties permanently stop discussions without reaching an agreement, which is the issue at hand in this case. Thus, the study's findings do not in any way "undermine [my] claim that the probability of a transaction was negligible at the start of the Proposed Class Period," as Dr. Cain misleadingly asserts.[305]

163.    In summary, my conclusions are consistent with both Bruner (2004)'s and Cain *et al.* (2020)'s findings, whereas Dr. Cain's conclusion is not. His conclusion ("National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period"[306] despite NI's two "Just Say No" responses) contradicts Bruner (2004)'s findings as it fails to recognize that when a target refuses to engage with a bidder with a "Just Say No" response, the typical merger dynamics that Cain *et al.* (2020) examine simply do not commence.

---

[302]   First Report, ¶ 56.

[303]   Bruner (2004), p. 690. (Italics in original not shown). *See also* First Report, ¶ 18.

[304]   First Report, ¶ 42.

[305]   Cain Second Report, Appendix C, ¶ 6.

[306]   Cain Second Report, Appendix C, ¶ 11.

C.    **The academic research on offer characteristics that Dr. Cain cites does not support his theory that the characteristics of Emerson's May and June 2022 proposals "increase[d] the probability of successful deal completion"**

164.    Dr. Cain also cites studies that, according to him, support his conclusion that the "types of characteristics documented in the Emerson offers [*e.g.*, offer premium, "toehold accumulation", "all-cash consideration"]"[307] have been "shown to influence investor expectations and firm valuation."[308] According to Dr. Cain, these features, which Emerson's May and June 2022 proposals purportedly had, "signal offeror seriousness," "increase the probability of successful deal completion and raise investor expectations of potential offer values."[309]

165.    Dr. Cain's claims are fundamentally flawed. None of the studies he cites refute my opinion that "the probability of an acquisition occurring as of the start of the Proposed Class Period was negligible,"[310] as they are irrelevant for at least two reasons. First, even if one assumes for the sake of argument that the characteristics of Emerson's May and June 2022 proposals signaled Emerson's "seriousness," as Dr. Cain claims, the proposals were emphatically rejected because NI's Board unanimously concluded that Emerson's proposed acquisition price of $48 per share "substantially undervalue[d] the Company including relative to the value able to be realized and unlocked from execution of the Company's strategic plan and relative to the valuation

---

[307]    Cain Second Report, ¶ 115.

[308]    Cain Second Report, ¶ 115.

[309]    Cain Second Report, ¶ 115.

[310]    First Report, ¶ 18.

82

methodologies presented by BofA and discussed with the Board," and "did not provide a basis for further discussions."[311]

166.    According to the minutes of NI's July 19 – 20, 2022 Board of Directors meeting, following its review of Emerson's second $48 per share proposal, the NI Board "reaffirmed their view that [Emerson's] proposal is not in the best interests of the Company and its shareholders" and "does not reflect the value that is expected to be generated by the Company's business strategies."[312]

167.    On August 2, 2022, NI rejected Emerson's June 22 proposal. NI's rejection letter (the "August 2 Letter") informed Emerson that the Company's Board:[313]

> […] has carefully reviewed your letter dated June 22, 2022, with the assistance of our financial and legal advisors. **The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders**.

168.    Second, while some, but not all, of the studies Dr. Cain cites examine offer characteristics that *ex post* are found to be correlated with an offer's probability of success, none of them calculate the *ex ante* probability that a potential acquirer would submit an offer in the first place, or the probability that a potential acquirer would submit a third proposal even after its first two proposals had been rejected (as was the case for Emerson after August 2, 2022).

---

[311]  June 14 Board Meeting (NAT-SL-00001447 – 448, at -448). *See also* NAT-SL-00001254 – 255; NAT-SL-00001457 – 509, at -460 – 461; NAT-SL-00001239 – 240, at -240.

[312]  NAT-SL-00001457 – 509, at -460.

[313]  NAT-SL-00001239 – 240 ("August 2 Letter"), at -240. (Emphasis added).

> *(1) The offer premium literature Dr. Cain cites does not support his claim that the offer premia in Emerson's May and June 2022 proposals support the "credibility and likelihood of Emerson's acquisition proposal"*

169.    Dr. Cain notes that the offer premiums implied by Emerson's proposed acquisition price of $48 per share relative to "NI's unaffected share price" in its May and June 2022 proposals (36% and 41%, respectively) were "similar" to the "average initial announced offer premium of 36.2%" reported in Cain and Denis (2013)[314] and "greater than both the 29.19% median premium reported across more than 7,000 deals in the Baker, et al. [2012] sample, and the 34% average premium noted by Cain, et al. (2020)."[315]

170.    Dr. Cain claims that the similarity between the offer premiums in Emerson's May and June 2022 proposals "support[…] the credibility and likelihood of Emerson's acquisition proposal."[316] Such a claim is incorrect. The findings of the studies he cites are irrelevant for several reasons.

171.    First, none of the studies find that if a proposal's offer price premium is in line with (or even exceeds) the average premium reported in the studies that Dr. Cain cites (*i.e.*, Cain *et al.* (2020), Cain and Denis (2013), and Baker *et al.* (2012)), then the success of that offer is guaranteed. Indeed, none of these papers have even found that an offer's price premium is

---

[314]    Cain Second Report, ¶ 107, citing Cain, M. D., and Denis, D. J. (2013), "Information Production by Investment Banks: Evidence from Fairness Opinions," *The Journal of Law and Economics*, Vol. 56, No. 1, pp. 245 – 280 ("Cain and Denis (2013)").

[315]    Cain Second Report, ¶ 112, citing Cain *et al.* (2020) and Baker, M., Pan, X., and Wurgler, J., "The effect of reference point prices on mergers and acquisitions," *Journal of Financial Economics*, Vol. 106, No. 1, pp. 49 – 71 ("Baker *et al.* (2012)").

[316]    Cain Second Report, ¶ 112.

statistically related to any degree to the probability of an offer's success, as Dr. Cain misleadingly suggests.[317]

172.    Second, even if one were to assume for the sake of argument that in the sample of completed transactions analyzed in the studies Dr. Cain cites, the offer premium was correlated with those transactions' probabilities of success, that finding is moot in this case. Regardless of the offer premiums in Emerson's May and June 2022 proposals, NI's Board concluded that the proposals undervalued the Company and rejected them. Thereafter, NI and Emerson did not engage in any merger discussions until after Emerson submitted its third acquisition proposal to NI on November 3, 2022.

173.    Third, the studies Dr. Cain cites document the offer premia observed in completed transactions, not failed bids.[318] These studies' results thus do not, and cannot, examine whether the offer premia in Emerson's May and June 2022 proposals were in line with other bids that were privately made and rejected.

174.    Fourth, these studies examine *ex post* outcomes (mergers in which the parties had reached an agreement) and the offer characteristics of such outcomes. They do not examine the *ex ante*

---

[317]    Dr. Cain claims that the "offer premium" (offer price relative to the unaffected market price of the target's stock) is an "indicator supporting the credibility and likelihood of Emerson's acquisition proposal is its pricing relative to NI's trading history." *See* Cain Second Report, ¶ 112. None of the papers cited examine the probability of offer success as a function of the offer premium. The Baker *et al.* (2012) study examines the probability of offer success a function of the offer *price* (not offer premium) relative to "reference point" (*e.g.,* the target's 52-week high price).

[318]    For example, the Cain and Denis (2013) study considers a sample of negotiated merger transactions in which fairness opinions were issued. *See also* Cain *et al.* (2020); Baker *et al.* (2012).

probability that a bidder will place a bid in the first place or the probability that a bidder will place a third bid after being rejected twice.

> *(2) The reference point literature Dr. Cain cites does not support his claim that the offer premia in Emerson's May and June 2022 proposals support the "credibility and likelihood of Emerson's acquisition proposal"*

175.    According to the Baker *et al.* (2012) study that Dr. Cain cites, "the probability of deal success increases discontinuously by 4.4–6.4% when the bidder makes an offer price even slightly above the target's 52-week high."[319] Dr. Cain claims that, because Emerson's May and June 2022 proposals exceeded NI's 52-week high at the time, this supports the "credibility and likelihood of Emerson's acquisition proposal."[320] It does not. Dr. Cain's reference to Baker *et al.* (2012)'s findings are irrelevant and misleading for at least two reasons.

176.    First, even if the sample of completed transactions studied in Baker *et al.* (2012) was appropriate, the finding that the probability of offer success increased if the offer price exceeded a reference point (the target's 52-week high price) is irrelevant in this case. Even if the proposed acquisition price of $48 per share in Emerson's May and June 2022 proposals exceeded the stock's "52-week high",[321] NI's Board concluded that the proposals undervalued the Company and rejected them. Thereafter, NI and Emerson did not engage in any merger discussions.

---

[319]    Cain Second Report, ¶ 112, citing Baker *et al*. (2012), p. 12.

[320]    Cain Second Report, ¶ 112.

[321]    I also note that Baker *et al.* (2012) calculate the offer price premiums and 52-week highs on a market-adjusted basis, whereas Dr. Cain in his report does not.

177.    Second, the reasons given by Baker *et al.* (2012) for why the probability of an offer's

success may increase if the offer price exceeds the target's 52-week high (*e.g.*, the 52-week high

acts as a reference point for shareholders considering tender offers) do not apply in this case.[322]

Thus, Dr. Cain's reference to the study's results is irrelevant and misleading.

> (3) *The literature on "toeholds" Dr. Cain cites does not support his claim that the offer premia in Emerson's May and June 2022 proposals support the "credibility and likelihood of Emerson's acquisition proposal"*

178.    Dr. Cain claims:[323]

> [W]hen a bidder holds an ownership stake in the target prior to or during negotiations [a "toehold"], the likelihood of a successful acquisition increases. Betton and Eckbo (2000) report that "the probability of a successful single-bid contest increases with… the toehold." Similarly, Walkling (1985) concludes that "[i]ncreased ownership of target firm shares by the bidder… increases the probability of success.
>
> […]
>
> Emerson's accumulation of a toehold in National Instruments is therefore not only consistent with these findings but also would enhance the credibility of its offer by signaling serious intent and increasing the likelihood of successful engagement.

---

[322]    For example, according to Baker *et al.* (2012), in a tender offer to target firm shareholders, "shareholders must form an estimate of target value when deciding whether to accept the offer. Lacking time, information, and ability to accurately compute present values of future cash flows under alternative ownership and management scenarios, some of them will consult recent peak prices as references." In this case, Emerson's proposals were not to NI's shareholders, but the Company's Board. NI's Board was not "[l]acking time, information, and ability to accurately compute present values of future cash flows under alternative ownership and management scenarios," and did not need to rely on the Company's recent peak prices as "references." To the contrary, NI's Board relied on the advice of BofA, a major financial institution, to evaluate Emerson's proposals thoroughly.

According to Baker *et al.* (2012), a board may use the "recent peak price […] as a negotiating anchor." NI's Board, however, did not because it refused to engage with Emerson in any merger negotiations regarding its May and June 2022 acquisition proposals. *See* Baker *et al.* (2012), p. 12.

[323]    Cain Second Report, ¶¶ 109 – 110.

179.     Dr. Cain's opinion is speculative and incorrect, and the findings of the Betton and Eckbo (2000) and Walkling (1985)[324] studies he cites by do not support his conclusion for several reasons, including:

180.     First, the studies Dr. Cain cites do not examine the likelihood that a bidder whose confidential acquisition proposals have been rejected twice will submit a third proposal. Instead, they study the outcomes of tender offer contests, *i.e.,* the *ex post* results of bids that were in fact made. Thus, the results of these studies are irrelevant for assessing "the probability (assessed as of August 12, 2022) of Emerson ultimately acquiring NI," which I opined was "negligible given the facts at the time."[325]

181.     Second, the studies examine public tender offer contests[326] where large toeholds could "reduce the probability of competition."[327] In this case, Emerson never made a tender offer for NI's shares. Its proposals were confidential. Thus, whether toeholds reduce competition and thereby increase the bidder's probability of success in public tender offer contests is irrelevant for assessing the probability as of August 12, 2022 that Emerson would submit a third proposal after being rejected twice by NI.

---

[324]  Cain Second Report, ¶ 109, citing Betton, S., and Eckbo, B. E., "Toeholds, Bid Jumps, and Expected Payoffs in Takeovers," *The Review of Financial Studies*, Vol. 13, No. 4, pp. 841 – 882 ("Betton and Eckbo (2000)"); Walkling, R. A., "Predicting Tender Offer Success: A Logistic Analysis," *Journal of Financial and Quantitative Analysis,* Vol. 20, No. 4, ("Walkling (1985)"), p. 461.

[325]  First Report, ¶ 42.

[326]  In a tender offer, the bidder does not attempt to negotiate with the target's board. Instead, it makes an offer made publicly and directly to a firm's shareholders to buy their stock. *See* Campbell Harvey, Glossary. Walkling (1985) studies the results of cash tender offers from 1972 to 1977. *See* Walkling (1985), p. 465. Betton and Eckbo (2000) study tender offer contests from January 1971 to December 1990. *See* Betto and Eckbo (2000), p. 846.

[327]  Betton and Eckbo (2000), Abstract.

182.    Third, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████ [328] According to the Betton and Eckbo (2000) study, when a bidder's toehold is less than

5%, that bidder does not ultimately succeed in acquiring the target in the majority of cases where

the target management is opposed to the initial bidder, as NI was opposed to Emerson as of the

start of the Proposed Class Period. [329] Thus, Dr. Cain's claim that ████████████████████

████████ in NI would signal Emerson's "serious intent" and "increas[e] the likelihood of

successful engagement" between NI and Emerson is speculative and incorrect. [330]

> (4) The literature on "all-cash offers" Dr. Cain cites does not support his claim that
> the offer premia in Emerson's May and June 2022 proposals support the
> "credibility and likelihood of Emerson's acquisition proposal"

183.    Dr. Cain cites the conclusions of a theoretical analysis by Fishman (1989) [331] and an

empirical analysis by Branch and Yang (2003) [332] which he argues support his claim that: [333]

> The type of payment offered in a takeover proposal also influences both
> deal outcomes and market perceptions. Academic research finds that cash
> offers are associated with a higher probability of completion relative to
> stock or mixed consideration.
>
> […]

---

[328]    NAT-SL-00011768; NAT-SL-00010806 – 807.

[329]    The initial bidder wins 30 of 68 contents when the target management is "opposed" and the initial bidder's toehold is less than 5%. *See* Betton and Eckbo (2000), Table 4.

[330]    Cain Second Report, ¶ 110.

[331]    Fishman, M. J., "Preemptive Bidding and the Role of the Medium of Exchange in Acquisitions," *The Journal of Finance*, Vol. 44, No. 1, pp. 41 – 57 ("Fishman (1989)"), cited at Cain Second Report, ¶ 111.

[332]    Branch, B., and Yang, T., "Predicting Successful Takeovers and Risk Arbitrage*," Quarterly Journal of Business and Economics*, pp. 3 – 18 ("Branch and Yang (2003)"), cited at Cain Second Report, ¶ 111.

[333]    Cain Second Report, ¶ 111.

> These findings are directly relevant to the circumstances of Emerson's proposals to acquire National Instruments, which were structured as an all-cash transaction.

184.    Dr. Cain's opinion is speculative and incorrect. The findings of both studies he cites are irrelevant for several reasons, including:

185.    First, the studies Dr. Cain cites find the probability of a tender offer's success are higher if the offer is "all-cash" versus paid for with the bidder's stock.[334] These findings are irrelevant in this case because NI rejected Emerson's May and June 2022 offers even though they were "all-cash" offers.

186.    Second, both studies consider scenarios in which the bids are publicly observable.[335] In that scenario, Fishman (1989) concludes that the probability of success of an all-cash offer is higher than offers involving stock because it helps "preempt" competition.[336] That finding is irrelevant here because Emerson's May and June 2022 proposals were confidential, and communications between the parties remained confidential until January 2023. There is no factual basis to assume that, after NI rejected Emerson's second proposal on August 2, 2022, Emerson would make another acquisition proposal and a public one. (As a matter of fact, when Emerson made its third proposal it was still confidential).

---

[334]    Branch and Yang (2003) note: "In tender offers, the offers can proceed directly to the shareholders, bypassing the target company's management and board of directors." *See* Branch and Yang (2003), p. 5.

Similarly, Fishman (1989) concludes: "The probability that target management will reject an offer is higher if the medium of exchange is securities as compared to cash." *See* Fishman (1989), p. 42.

[335]    Branch and Yang (2003) study the outcome of cash tender offers, made publicly to shareholders. *See* Branch and Yang (2003), Abstract and pp. 7 – 9. Fishman (1989)'s theoretical analysis similarly assumes that the first bidder's bid is observable to other bidders. *See* Fishman (1989), Abstract.

[336]    Fishman (1989), Abstract.

187.    Third, the findings of the studies Dr. Cain cites (*i.e.*, the greater probability of success of public all-cash offers compared to stock offers) have no bearing in this case. The studies do not examine the *ex ante* odds of a bidder placing a bid. Thus, the results of these studies are irrelevant for assessing "the probability (assessed as of August 12, 2022) of Emerson ultimately acquiring NI," which I opined was "negligible given the facts at the time."[337]

188.    Neither the Fishman (1989) nor the Branch and Yang (2003) studies' findings support Dr. Cain's claim that Emerson's all-cash proposals signaled its "serious intent" and "increas[ed] the likelihood of successful engagement" between NI and Emerson.[338]

189.    Despite Dr. Cain's lengthy discussion about offer characteristics that could improve the probability of success of public tender offers, and his view that Emerson's proposals displayed these characteristics, the fact remains that NI unequivocally rejected Emerson's May and June 2022 proposals. The findings of the academic research Dr. Cain cites are thus irrelevant in assessing whether NI remained engaged in a potential transaction with Emerson after August 2, 2022.

> ### *(5) The literature on analysts' "target price optimism" Dr. Cain cites does not support his claim that the alleged omissions would be material*

190.    Dr. Cain states:[339]

> Prof. Goodwin argues that even if National Instruments had disclosed Emerson's proposals, the information would not have been economically material because "the proposed acquisition price was within the NI's future

---

[337]   First Report, ¶ 42.

[338]   Cain Second Report, ¶ 110.

[339]   Cain Second Report, Appendix C, ¶ 34.

stock price range (or the range of undiscounted price targets) that equity analysts had provided in contemporaneous publicly available analyst reports."

191.    Dr. Cain claims my "reasoning is flawed. Academic research has consistently documented that analysts' price targets are systematically optimistic," citing a paper by Joos and Piotroski (2017) and also a study by Chopra (1998).[340]

192.    Dr. Cain mischaracterizes my conclusions. He cites paragraph 43 of my First Report, but fails to note that in that paragraph I had discussed several reasons for my opinion that NI's hypothetical disclosure would "not have been economically material," not simply the one he discusses.[341] As I stated, simply given NI's two "Just Say No" responses, a reasonable investor would have considered the probability of the merger's completion negligible and the hypothetical disclosure economically immaterial. The other *additional* reasons that would render the hypothetical disclosure economically immaterial include the fact that "the proposed acquisition price was within the NI's future stock price range (or the range of undiscounted price targets) that equity analysts had provided in contemporaneous publicly available analyst reports."[342] By focusing only on the second reason for my opinion that the hypothetical disclosure would be economically immaterial, while ignoring the first, Dr. Cain has cited my testimony out of context and mischaracterized my opinion.

---

[340]  Cain Second Report, Appendix C, ¶ 34 citing Joos, P. R., and Piotroski, J. D. (2017), "The best of all possible worlds: unraveling target price optimism using analysts' scenario-based valuations," *Review of Accounting Studies,* Vol. 22, No. 4, pp. 1492 – 1540 ("Joos and Piotroski (2017)"). *See also* Chopra, V. K., (1998), "Why So Much Error in Analysts' Earnings Forecasts?", *Financial Analysts Journal*, Vol. 54, No. 6, pp. 35 – 42 ("Chopra (1998)").

[341]  First Report, ¶ 43.

[342]  First Report, ¶ 43.

193.    Further, Dr. Cain's comment that some analyst forecasts are "optimistic"[343] in hindsight does not alter my conclusion that if investors had been informed at the start of the Proposed Class Period that NI had received (and rejected) two acquisition proposals at $48 per share, that information would not have altered a reasonable investor's assessment of NI's stock's value. That is, even if one were to assume incorrectly for the sake of argument that the parties in this case were willing to engage in completing a deal, a reasonable investor would not have considered the possible sale of the Company at $48 per share, several months in the future, as a "significant" increase in NI's expected future stock value, given analysts' contemporaneous target prices and the significant uncertainty associated with the completion of a merger even when parties engage to close a deal.

194.    Instead, as I stated in my First Report:[344]

> [A] reasonable investor would be aware that mergers customarily take several months to close. Thus, even assuming *arguendo* that reasonable investor (incorrectly) considered the probability of the merger's completion not negligible, that investor would also recognize that by the time the proposed acquisition closed, the difference between the proposed acquisition price of $48 per share and NI's market price would likely be negligible because the proposed acquisition price was within the NI's future stock price range (or the range of undiscounted price targets) that equity analysts had provided in contemporaneous publicly available analyst reports.

---

[343]    *See* Cain Second Report, Appendix C, ¶ 34, citing Joos and Piotroski (2017) ("As Joos and Piotroski (2017) summarize prior work, 'the average firm's stock price is forecasted to appreciate by approximately 25%–35% over the next year yet will ultimately underperform the analyst's target price by 10%–15% over that horizon.'"). Similarly, Chopra (1998) also documents analyst optimism with hindsight noting: "Wall Street analysts tend to be too optimistic about the earnings prospects of companies they follow. The average consensus 12-month EPS growth forecast is 17.7 percent, which is more than twice **the actual growth rate** [observed *ex post*]." *See* Chopra (1998), Abstract. (Emphasis added).

[344]    First Report, ¶ 43.

195.    Consequently, the hypothetical disclosure would be economically immaterial, not

"represent a significant economic event," as Dr. Cain claims, disregarding all facts that

contradict his claim.

**VIII.    Dr. Cain's claim that Emerson's June 22, 2022 Letter "explicitly signaled a willingness to increase its offer" obfuscates that the proposed price explicitly remained $48 per share**

196.    According to Dr. Cain:[345]

> Prof. Goodwin overlooks the fact that Emerson explicitly signaled a willingness to increase its offer. In its June 22, 2022 offer letter, Emerson reaffirmed that acquiring National Instruments was its "highest strategic priority" and stated: "We look forward to learning more about your internal plan and are confident that with access to limited non-public information after signing an NDA, we could work with you to find additional value that would allow us to increase our Proposal." This language indicates that the $48 per share figure was not Emerson's final offer, but rather an opening bid, undermining Prof. Goodwin's claim that the proposals lacked seriousness or were categorically undervalued.

197.    Dr. Cain's claim that Emerson's June 22, 2022 letter "indicates that the $48 per share

figure was not Emerson's final offer, but rather an opening bid,"[346] is speculative and incorrect

for several reasons. First, he appears to be opining on Emerson's state of mind when it issued its

June 22, 2022 letter. Second, Dr. Cain also ignores the fact that, in its June 22, 2022 letter,

Emerson simply repeated its previous "inadequate" proposal (as NI's Board noted[347]). Emerson's

near-repetition of its earlier proposal, at the *same* proposed acquisition price, mere days after

---

[345]    Cain Second Report, Appendix C, ¶ 10.

[346]    Cain Second Report, Appendix C, ¶ 10.

[347]    NAT-SL-00001457 – 509, at -460.

receiving NI's first rejection on June 16, 2022,[348] does not convey its "seriousness," as Dr. Cain speculates. Rather, in my experience, such language is classic "cheap talk," a well-recognized strategy in bargaining theory, according to which "these claims-or confessions-of urgent desire to trade are meant to encourage the other side to participate in more detailed negotiation," and are not a pre-commitment to submitting a higher bid.[349] The June 22 Emerson Letter does not provide an enhanced proposal than Emerson's first proposal; its proposed acquisition price remained at $48 per share.

---

[348]    NAT-SL-00001254 – 255.

[349]    Farrell, Joseph, and Robert Gibbons, "Cheap Talk Can Matter in Bargaining," *Journal of Economic Theory*, Vol. 48, pp. 221 – 237, at p. 222 ("One possibility is that these claims-or confessions-of urgent desire to trade are meant to encourage the other side to participate in more detailed negotiation. As we show below, if saying that one is 'keen' makes one's partner more likely to negotiate, then it is the keenest types (high-value buyers, low-value sellers) who are most willing to say so, damaging as it is to their terms of trade if trade occurs.

The following story illustrates the element of common interest that drives our analysis: cheap talk can affect whether negotiation ensues. Imagine that one Saturday evening, two corporate moguls have a chance encounter at their country club. One mogul's company owns a division that the other mogul's firm may wish to buy. Serious negotiation, involving binding offers and hordes of lawyers, can take place on Monday morning; all that can happen Saturday night is talk. If, based on this talk, the moguls conclude that there is sufficient prospect of gains from trade, then they will send their lawyers into the fray on Monday morning. Otherwise, Saturday evening will be the end of it. Therefore, each mogul has an incentive not to sneer too much, lest the other choose not to try to do business with one who seems uninterested. The strategy (common in bazaars) of sneering and then returning for serious bargaining is less attractive to the moguls because a sneer may end negotiations.").

**IX.    Dr. Cain's opinions regarding the BofA Engagement Letter are speculative and incorrect**

    **A.    Dr. Cain's claim that the BofA Engagement Letter was not defensive is incorrect**

198.    In my First Report, I concluded based on my review of the BofA engagement letter dated June 10, 2022 that "NI retained BofA as a financial advisor defensively to assist its Board to evaluate acquisition attempts only, not seek out prospective buyers."[350]

199.    In my experience, the BofA Engagement Letter was a standard anti-raid/defense retainer, which boards prudently maintain to ensure immediate access to an advisor if approached with unsolicited proposals. I have recommended precisely this sort of "standby" retainer letter to clients in similar circumstances, and it is indeed one I would want in place when advising a board facing a potential hostile approach. The terms of the BofA Engagement Letter confirm this purpose. The letter contained a modest quarterly retainer fee, not the incentive-based fee structure typical of a sell-side engagement (which ordinarily compensates the banker with a success fee tied to transaction value).

200.    Based on my experience, had NI had considered Emerson's approach a genuine hostile threat, its Board would have executed a more defensive-specific engagement, often including an "independence fee" designed to secure banker neutrality in advising against a hostile bidder. The absence of these features underscores that NI was not pursuing an active sale process, nor

---

[350]    First Report, ¶ 41. *See also* First Report, ¶¶ 18, 26.

bracing for imminent hostilities. Rather, it secured BofA in a defensive capacity—consistent with its two unanimous "Just Say No" rejections of Emerson's May and June 2022 proposals.

201.    Yet, Dr. Cain claims that the letter was not defensive but "suggest[s] a broader and more strategic mandate,"[351] making three arguments to support his claim, all of which are incorrect.

202.    First, Dr. Cain notes the engagement letter stated that NI would pay BofA a ████ ████████████████████████████"[352] He argues there "would have been little rationale for entering into an ongoing advisory arrangement" if "National Instruments viewed the matter [*i.e.*, NI's negotiations with Emerson] as concluded."[353] This claim is speculative and incorrect.

203.    The August 31, 2022 payment pertains to a quarterly payment "████████████ ████████████"[354] That is, this payment was for BofA's services in June through August, *i.e.*, the period during which NI was considering Emerson's proposals. And, of course, NI and BofA could not have known on the date of the engagement letter (June 10, 2022) whether the matter would be concluded by August or not.

204.    NI recognized that if Emerson went public, NI would have to clearly explain to its shareholders its grounds for rejecting Emerson's identically-priced May and June 2022 proposals. Such reasons included, among other things, the NI Board's view that Emerson's

---

[351]   Cain Second Report, Appendix C, ¶ 12.

[352]   Cain Second Report, Appendix C, ¶ 13.

[353]   Cain Second Report, Appendix C, ¶ 13.

[354]   BofA Engagement Letter (NAT-SL-00001554 – 566).

proposals to acquire NI at $48 per share undervalued NI based in part on BofA's analysis. Per the terms of its engagement letter, NI retained BofA to evaluate its "strategic alternatives." In my experience, the term "strategic alternatives" in a private engagement letter such as the BofA Engagement Letter includes the company remaining independent. In this case, the term "strategic alternatives" encompasses the possibility that NI would remain a stand-alone company if its valuation exceeded that implied by Emerson's proposal.[355]

205.    Second, Dr. Cain suggests that, because the BofA Engagement Letter uses the phrase "strategic alternatives," NI was considering a potential merger or sale of the Company. According to Dr. Cain, and one of the studies he cites, the phrase "strategic alternative" in a company's *public* communications signals its desire to be acquired.[356] Such an observation is irrelevant because the BofA Engagement Letter was a *private* communication between NI and its financial advisor. NI would have no reason to resort to code to communicate its express objectives for hiring BofA in an engagement letter. In my experience, investment bankers and their clients agree to language in the engagement letter that is carefully crafted and understood.

206.    Third, Dr. Cain contradicts my opinion that:[357]

> In a typical "sell-side engagement" a motivated seller retains a financial advisor to identify prospective buyers and specifies that the advisor would receive a "success" fee (typically the largest component of the financial

---

[355]    BofA Engagement Letter (NAT-SL-00001554 – 566).

[356]    Cain Second Report, Appendix C, ¶ 13, citing Zha Giedt, J., "Economic consequences of announcing strategic alternatives: A voluntary disclosure's benefits and costs," *Contemporary Accounting Research*, Vol. 40, No. 4, pp. 2446 – 2476 ("Zha Geidt (2023)"), p. 2477 and Levine, Matt (2014), "Allergan Is Open to Alternatives but Not to Valeant," *Bloomberg*, October 7, 2014.

[357]    First Report, ¶ 26.

advisor's fee) if a transaction is successfully completed with a prospective buyer that the financial advisor had identified.

207.    In this case, the BofA Engagement Letter explicitly noted that

███████████████████████████████████████████ " then BofA had " ██████████

██████████████████████ " and, if it chose to do so, ██████████████████████

████████████████████████████████████████████████████████████████

██████ "[358] That is, contrary to Dr. Cain's assertions,[359] the BofA Engagement Letter clarified

that the " ███████████████████████████ [360] did not represent BofA's compensation if it

served as a financial advisor in a future "Change of Control Transaction related to an Acquisition

Attempt" (*i.e.*, a merger or sale of the Company), a fundamentally different role from the one for

which BofA was paid a retainer fee. In fact, as NI's Proxy Statement noted, NI ultimately paid

BofA "approximately $51 million" in fees, "a significant portion of which [was] contingent upon

the completion of the Merger."[361]

208.    The only support Dr. Cain appears to provide to support his argument is a study he

coauthored with Prof. David Denis, who I understand has also been retained by Counsel for

Defendants as an expert in this case.[362] According to Cain and Denis (2013), "approximately

---

[358]    BofA Engagement Letter (NAT-SL-00001554 – 566, at -555).

[359]    Cain Second Report, Appendix C, ¶¶ 13 – 14.

[360]    BofA Engagement Letter (NAT-SL-00001554 – 566, at -554).

[361]    NI Proxy Statement, p. 46 ("NI has agreed to pay BofA Securities for its services in connection with the Merger an aggregate fee currently estimated to be approximately $51 million, a portion of which was payable in connection with its opinion and **a significant portion of which is contingent upon the completion of the Merger.** NI also has agreed to reimburse BofA Securities for its expenses incurred in connection with BofA Securities' engagement and to indemnify BofA Securities, any of its affiliates, its and their respective directors, officers, employees and agents and each other person controlling BofA Securities or any of its affiliates against specified liabilities."). (Emphasis added).

[362]    Cain Second Report, Appendix C, ¶ 14, citing Cain and Denis (2013).

18% of target-side financial advisors assist on M&A transactions without any contingent compensation."[363] While that may be the case for small transactions, in my experience it is rarely the case for transactions involving targets the size of NI; ultimately, Emerson acquired NI for $8.2 billion, and BofA was paid a performance fee as discussed above.[364] In contrast, the average transaction value in the Cain and Denis (2013) study was less than $2.5 billion (including the 82% of transactions that *did* involve contingent compensation).[365] Further, neither Cain and Denis (2013) nor Dr. Cain in his second report state the size of the transaction values of the targets in the Cain and Denis (2013) study that did not pay their financial advisor(s) any contingent fees. Thus, Dr. Cain's criticism of my opinion is speculative and incorrect.

**B.      Dr. Cain's claim that, even if NI's engagement of BofA was defensive, it still suggests Emerson's proposal "remained a credible threat" throughout the Proposed Class Period is speculative and incorrect[366]**

209.    Dr. Cain claims that: (i) "[e]ven if Prof. Goodwin's characterization of the BofA engagement as merely 'defensive' were accurate, this fact alone would suggest that Emerson's proposal remained a credible threat," and (ii) "the Company's engagement of BofA reflects a proactive effort to manage the risks and implications of an unsolicited proposal with a high

---

[363]  Cain Second Report, Appendix C, ¶ 14, citing Cain and Denis (2013), Table 4.

[364]  "Emerson to Advance Global Automation Leadership Through Acquisition of NI," *Emerson*, April 12, 2023, available at https://www.emerson.com/en-us/news/2023/emerson-completes-ni-acquisition.

[365]  *See* Cain and Denis (2013), Table 3.

[366]  Cain Second Report, Appendix C, ¶ 15, rebutting my opinion as summarized in First Report, ¶ 18.

probability of public escalation. This is inconsistent with Prof. Goodwin's opinion that the likelihood of a transaction was 'negligible.'"[367]

210.    These claims are speculative and unsupported by the available evidence. First, the BofA Engagement Letter is dated June 10, 2022, six days before NI rejected Emerson's first proposal, when the Company could not have known that Emerson would return with a second proposal at the same $48 per share price on June 22, 2022, and well before NI rejected that second proposal on August 2, 2022. Thus, this engagement letter tells us nothing about the state of NI's purported engagement with Emerson during the Proposed Class Period of August 12, 2022 to September 30, 2022, two to three months after the date of the engagement letter.

211.    Furthermore, NI recognized that if Emerson went public, NI would have to clearly explain to its shareholders its grounds for rejecting Emerson's earlier proposals. Such reasons included, among other things, the Board's view that Emerson's proposals to acquire NI at $48 per share undervalued NI based in part on BofA's analysis. Therefore, per the terms of its engagement letter, NI could periodically require BofA's assistance to review its financial condition and stand-alone valuation.

212.    NI's retention of BofA and NI's monitoring of the possibility that Emerson could go public related to the steps NI expected to take to explain the basis of its rejection of Emerson's proposal, *not* to commence negotiations and ultimately consummate a merger with Emerson, as Dr. Cain claims.

---

[367]  Cain Second Report, Appendix C, ¶ 15.

**X.    Dr. Cain's criticisms of my opinion that "it is highly unlikely that […] BofA would have issued a fairness opinion confirming that Emerson's proposed price of $48 per share was fair 'from a financial point of view'" are fundamentally flawed and incorrect**

213.    In my First Report, I stated "[t]he BofA June 14 Board Presentation included a range of (undiscounted) analysts' price targets for the Company's stock which ranged from $42 to $50 per share, and BofA's own valuations of the Company on a stand-alone basis using three different well-accepted valuation methods according to which the Company's valuation 'exceeded [Emerson's] offer.'"[368] Dr. Cain claims this opinion "is inaccurate and mischaracterizes the nature of the analysis presented to the Board."[369] However, Dr. Cain's claim is wrong.

214.    First, Dr. Cain claims that my reference to BofA's analysis as its "own valuation" is somehow misleading because BofA's analysis was "derived from inputs provided by NI's management."[370] In my experience, when advising clients, investment banks typically rely upon projections provided by management as part of their analysis. However, BofA's analysis was only *partially* based on inputs from management regarding NI's future earnings and cash flows.[371, 372] The bank's final valuation conclusions critically depend on its own choice of several other key model inputs, such as the terminal growth rate and the discount rate used in the

---

[368]  First Report, ¶ 27.

[369]  Cain Second Report, Appendix C, ¶ 31.

[370]  Cain Second Report, Appendix C, ¶ 31.

[371]  June 14 BofA Presentation (NAT-SL-00001513 – 545, at -522).

[372]  As an initial matter, Dr. Cain appears to question the reliability of BofA's analyses and suggests they are biased because some of the inputs relied upon by BofA were provided by NI's management. While it is worth noting that the accuracy of BofA's deck (and NI's decision to reject Emerson's proposal based in part on this presentation) are not at issue in this case, nevertheless, Dr. Cain's characterizations of my opinions and BofA's analyses are misleading and incorrect.

discounted cash flow ("DCF") valuation method. Thus, BofA's valuations were in fact independent. Dr. Cain's claim to the contrary reveals a fundamental lack of understanding of valuation principles and industry practice.

215.    Second, Dr. Cain also claims that "valuation ranges based on consensus analyst forecasts of adjusted EBITDA" are "a benchmark that better reflected prevailing market expectations."[373] Dr. Cain notes that these consensus-based forecasts yield implied share prices below the $48 per share proposals made by Emerson and states that my "selective reliance on higher valuations derived from management's projections presents a misleading picture of how Emerson's $48 offer compared to NI's contemporaneous standalone value."[374]

216.    Such a comment is puzzling because *all* of BofA's analyses were presented to NI's Board, which ultimately concluded that Emerson's $48 per share proposals undervalued the Company. Dr. Cain's preference for one valuation method over the other three is entirely moot. The accuracy of the June 14 BofA Presentation, or the NI Board's decision to reject Emerson's proposal based in part on that presentation, are not at issue in this case.

217.    Valuation, however, is not a mechanical exercise driven by a single datapoint or method. It is an exercise in professional judgment, requiring the consideration of all relevant factors collectively and holistically. Different methodologies—DCF, trading multiples, precedent transactions, and others—are tools that inform judgment, not dispositive answers in isolation. To

---

[373]   Cain Second Report, Appendix C, ¶ 31.

[374]   Cain Second Report, Appendix C, ¶ 32.

suggest otherwise reflects a fundamental misunderstanding of how valuation is performed in practice.

218.    However, in the top panel of **Table 1** below, I present the valuation results based on the "consensus estimates" method[375] that Dr. Cain highlights along with the other three methods BofA had considered and which I had previously summarized in my First Report (*see* panels 2 – 4 of **Table 1** below).

**Table 1**

| Valuation Method | | Low | High | Mid-Point |
|---|---|---|---|---|
| Selected Publicly Traded Companies (*Consensus Estimates*) | EV / '22E Adj. EBITDA Multiple | $32.50 | $39.75 | $36.13 |
| | EV / '23E Adj. EBITDA Multiple | $33.75 | $42.25 | $38.00 |
| | Price / '22 Earnings Multiple | $34.25 | $44.50 | $39.38 |
| | Price / '23 Earnings Multiple | $33.50 | $46.25 | $39.88 |
| | **Average** | **$33.50** | **$43.19** | **$38.34** |
| | | | | |
| Selected Publicly Traded Companies (*NI's Estimates*) | EV / '22E Adj. EBITDA Multiple | $38.50 | $47.00 | $42.75 |
| | EV / '23E Adj. EBITDA Multiple | $52.00 | $65.00 | $58.50 |
| | Price / '22 Earnings Multiple | $34.75 | $45.00 | $39.88 |
| | Price / '23 Earnings Multiple | $46.00 | $63.50 | $54.75 |
| | **Average** | **$42.81** | **$55.13** | **$48.97** |
| | | | | |
| Precedent Transaction Premiums | EV / LTM Adj. EBITDA Multiple | $49.75 | $58.75 | $54.25 |
| | EV / NTM Adj. EBITDA Multiple | $50.00 | $62.75 | $56.38 |
| | **Average** | **$49.88** | **$60.75** | **$55.31** |
| | | | | |
| Discounted Cash Flow Analysis, Excl. Synergies | Implied Terminal LTM Adj. EBITDA Multiple | **$50.75** | **$78.50** | **$64.63** |

---

[375]    In this multiples-based valuation method, NI's stock price is calculated based on the selected traded public companies' enterprise value ("EV") to 2022 and 2023 Adjusted EBITDA multiples, and 2022 and 2022 earnings per share multiples, where such earnings and adjusted EBITDA estimates are based on analysis consensus estimates.

219.    Notably, based on the above information, three of the four valuation methods used by BofA yield valuations higher than Emerson's $48 per share proposals (with both the precedent transaction and DCF analyses' valuations being substantially higher), and the equally weighted average of the four methods' valuation mid-points is higher than $51.81, above Emerson's proposed acquisition price of $48 per share. Further, a reasonable review of these valuation methods would not necessarily weight their results equally.

220.    As I discussed in my First Report:[376]

> [T]he only method that explicitly reflects the control premium that acquirers pay to acquire a target is the Precedent Transaction Premiums method.[377] NI's valuation under this method according to BofA ranged from a low of $49.75 to a high of $62.75. Thus, Emerson's proposal of $48 per share was lower than even the low end of NI's estimated valuation range in a transaction that involves a change of control.

221.    Thus, even if the results of the "consensus estimates" method Dr. Cain focuses on are included, my opinion remains unchanged. That is:[378]

> Based on my experience, given these valuation reference ranges, it is highly unlikely that NI's Board would have approved (or even recommended to NI's shareholders to vote in favor of) an acquisition of the Company by Emerson for $48 per share, or that BofA would have issued a fairness opinion confirming that Emerson's proposed price of $48 per share was fair "from a financial point of view."

222.    Dr. Cain claims this opinion is "speculative and inconsistent with actual market practice."[379] He is wrong. It is based on my practical experience as an investment banker for several

---

[376]    First Report, ¶ 30.

[377]    The Selected Publicly Traded Companies method is based on selected public peer companies' observed stock prices on a minority basis and the DCF reflects BofA's assessment of NI's intrinsic value on a stand-alone basis, which does not reflect any premium that an acquirer may pay to get controlling interest in NI.

[378]    First Report, ¶ 31.

[379]    Cain Second Report, Appendix C, ¶ 27.

decades. While arguing that I have cited "no empirical support or **citation to standard fairness opinion practices**,"[380] he provides none himself.

223.    The only academic findings Dr. Cain cites are the mean and median offer premiums that Cain and Denis (2013) observed in a sample of negotiated merger transactions in which fairness opinions were issued, *i.e.,* "shortly after completion of the merger negotiations and just before the merger is publicly announced."[381] He notes that the mean and median offer premiums (36.18% and 27.27%, respectively) in that study's sample were:[382]

> […] both consistent with the 36% premium embedded in Emerson's May 25, 2022 $48 proposal to National Instruments. Notably, we report that "every fairness opinion in the sample deems the respective transaction fair," providing clear evidence that fairness opinions routinely support transactions with comparable or even lower premiums than the one Emerson made to National Instruments.

224.    Dr. Cain's observations regarding the findings of the Cain and Denis (2013) study are entirely irrelevant. Simply because (a) all the merger transactions in that study's sample were issued fairness opinions, and (b) the sample's mean and median offer premiums were "consistent" with the premium embedded in Emerson's May 25, 2022 proposal, does not mean there is necessarily a link between the two observations.

225.    Dr. Cain's reliance on the results of Cain and Denis (2013) in this instance is illogical because that study does not report the mean and median offer premia in instances in which an investment bank failed to issue a fairness opinion. Instead, it summarizes offer characteristics in

---

[380]    Cain Second Report, Appendix C, ¶ 27. (Emphasis added).

[381]    Cain and Denis (2013), p. 249.

[382]    Cain Second Report, Appendix C, ¶ 27.

106

mergers where fairness opinions *had* been issued. The fact that the mean and median offer premia in the Cain and Denis (2013) sample were "consistent with the 36% premium embedded in Emerson's May 25, 2022 $48 proposal to National Instruments" does not mean that a fairness opinion would have been forthcoming in this case.[383]

226.    Dr. Cain appears to suggest that an offer premium is a method of determining the fair value of a company, *i.e.*, a valuation methodology. It is not. Instead, it is the *result* of a valuation analysis. The offer premium reflects the difference (in percentage terms) between the offer price and the target's past stock price, unaffected by any news of the proposed merger. The offer price reflects the value of potential merger-related synergies and, possibly, the target company's improved performance under new management. In contrast, the target's past (and unaffected) stock price does not reflect the additional potential value due to possible synergies and improved post-merger performance under new management. Therefore, the offer price is typically higher than the target's unaffected stock price, as the studies Dr. Cain cites have documented, *i.e.*, transaction values reflect an offer premium. However, simply because an offer premium exceeds some *ad hoc* level does not mean the offer price is fair because it may still significantly undervalue the target and any potential synergy value associated with a merger. Thus, the offer premium is not indicative of the target's appropriate transaction value. Instead, to determine a company's value, common valuation methods (such as those shown in **Table 1** above) are used. Such methods reflect expectations about the company's future earnings and growth potential. A company with strong future earnings potential would reasonably merit a high offer price, and if its past unaffected stock price was low,

---

[383]    Cain Second Report, ¶ 27.

the implied offer premium could be relatively high, and possibly higher than the mean premium documented in studies Dr. Cain has cited.[384]

227.    In this instance, it is clear from NI's 2022 Q2 earnings announcement that the Company's future earnings potential was improving. On July 28, 2022, NI reported "record revenue […] 'up 14 percent [year-over-year],'" "record orders" for 2022 Q2, and "reaffirm[ed] guidance for full year 2022 and increase[d] expectations for full year 2023."[385] In its July 28, 2022 press release, NI also stated:[386]

> In Q2, GAAP gross margin was 68 percent and non-GAAP gross margin was 71 percent. Total GAAP operating expenses were $247 million and non-GAAP operating expenses were $218 million. GAAP operating income for Q2 was $21 million with non-GAAP operating income of $61 million. In Q2, GAAP operating margin was 5 percent with non-GAAP operating margin of 15 percent.
>
> GAAP net income for Q2 was $12 million and non-GAAP net income was $48 million, with GAAP diluted EPS of $0.09 and non-GAAP diluted EPS of $0.36.
>
> "NI has delivered strong performance over the last several quarters, driven by our highly differentiated technologies and offerings targeted at segments with powerful growth drivers, including electric and autonomous vehicles, wireless communication, and new space technology. We believe our focused strategy is leading to ongoing share gains," said Eric Starkloff, NI President and CEO. "**Momentum continued in the second quarter with orders up 20 percent year over year and revenue up 14 percent year over year. These results bring us increased confidence in achieving revenue growth and earnings per share in line with current consensus estimates**."

---

[384]    At best, the offer premium serves as a reference point *when such a reference point is necessary*, as noted by the Baker *et al.* (2012) study that Dr. Cain cites. As I discussed above, that was not the case here.

[385]    "NI Reports Record Revenue for a Second Quarter, up 14 Percent YOY," *National Instruments*, July 28, 2022 ("NI Q2 2022 Earnings Announcement"), available at https://www.nasdaq.com/press-release/ni-reports-record-revenue-for-a-second-quarter-up-14-percent-yoy-2022-07-28#:~:text=Percent%20YOY%20%7C%20Nasdaq-,NI%20Reports%20Record%20Revenue%20for%20a%20Second%20Quarter%2C%20up%2014,operating%20margin%20of%2015%20percent.

[386]    NI Q2 2022 Earnings Announcement. (Emphasis added).

"We continue to see the benefits of the actions we have taken to increase scale into our business model. Despite the temporary headwinds to gross margin, we have improved diluted non-GAAP EPS by 15 percent year over year in the first half of 2022. Looking ahead, we will continue to sharpen our focus on making intentional investments for growth and on streamlining processes for greater efficiency," said Karen Rapp, NI CFO. "With many key initiatives underway, we are confident in our ability to deliver on our commitment to non-GAAP operating margin improvement. Even in a potential recessionary environment, we now expect to increase our non-GAAP operating margin by 300 basis points in 2023, followed by 100 basis points of additional improvement each year through 2025."

228.    The markets reacted positively to the above announcement which was made after the close of trading on July 26, 2022. NI's stock price increased 6.9% from $34.52 at the close on July 28, 2022 before NI's 2022 Q2 earnings announcement, to $36.89 at the close the following day (July 29, 2022). By July 29, 2022, NI's stock price had appreciated by 18.5% compared to the price on June 14, 2022 (the day of the BofA presentation) and by 9.9% compared to the price on May 24, 2022, 2022 (the day before Emerson submitted its first proposal to NI).[387]

229.    An investment bank's evaluation of the fairness of a deal hinges on numerous factors, including the valuation ranges it determines appropriate for the subject company. It is not a mechanical exercise in which the investment bank automatically issues a fairness opinion every time an offer premium exceeds an *ad hoc* threshold (*e.g.,* the Cain and Denis (2013) mean and median offer premia) as Dr. Cain suggests. As Table 1 in Cain and Denis (2013) shows, there is a wide variation in offer premiums across transactions. The highest offer premium in the study's sample is 295.56%.[388] The range of offer premiums for the "Selected Precedent Transactions"

---

[387]    According to National Instruments' daily stock prices reported by Dr. Cain, NI stock's closing prices were as follows: May 24, 2022 ($33.57), June 14, 2022 ($31.12), July 28, 2022 ($34.52), and July 29, 2022 ($36.89). *See* CAIN0000918_bb_nati_mkt_ind.xlsx.

[388]    Cain and Denis (2013), Table 1, "Initial Offer Premium" row.

reported in the June 14 BofA Presentation also show a wide range of offer premia, from 15% to 89%.[389] Also, the same presentation shows no obvious relationship between offer premia and transaction values which form one of the primary factors investment banks consider in issuing fairness opinions.

**XI.    Dr. Cain's comments regarding my opinions on NI's decision not to adopt a poison pill after rejecting Emerson's second proposal are incorrect**

230.    In my First Report, I considered several "corroborating facts that also confirm that NI's Board was not interested in pursuing further discussions about a merger at the start of the Proposed Class Period, and the probability of an acquisition thereafter was negligible."[390] Such facts include:[391]

> After rejecting Emerson's second proposal, NI did not adopt any anti-takeover defenses such as a shareholder rights plan ("poison pill") before the start of the Proposed Class Period which potential targets commonly do when they anticipate that the potential acquirer may attempt a hostile takeover. This suggests—and would suggest to a reasonable investor—that the Board and NI did not perceive a substantial threat that Emerson would return with a hostile bid.

231.    Citing a study by Senchack *et al.* (1991), Dr. Cain claims this opinion "is flawed because it overlooks both academic literature on anti-takeover defenses and the practical steps the Company took in response to Emerson's approach."[392]

---

[389]    June 14 BofA Presentation. (NAT-SL-00001513 – 545, at -538).

[390]    First Report, ¶ 18.

[391]    First Report, ¶ 18.

[392]    Cain Second Report, Appendix C, ¶¶ 16 – 17, citing Senchack *et al.* (1991), p. 3.

232.     Dr. Cain notes that according to Senchack *et al.* (1991), "poison pills are powerful deterrents, but 'the informed and prudent manager and director… should carefully weigh the purported benefits of the poison pill defense against its costs.'"[393] I do not disagree. My conclusion is consistent with Senchack *et al.* (1991)'s research.

233.     In deciding whether to adopt a poison pill, managers and directors should verify that in their view, the deterrent benefits of a poison pill outweigh its cost. Notably, the deterrent benefit (*i.e.*, the need to have a deterrent to hostile takeovers) depends on the likelihood of a hostile bid. If that likelihood is low, then the deterrent value of a poison pill is low and may not outweigh its cost. The June 14 WLRK Presentation made to NI's Board discussed the "

████████████████████████████████████████████████████████████

"[394] Thus, my conclusion that the fact that NI did not adopt a poison pill after rejecting Emerson's May and June 2022 proposals "suggests—and would suggest to a reasonable investor—that the Board and NI did not perceive a substantial threat that Emerson would return with a hostile bid,"[395] is consistent with Senchack *et al.* (1991)'s research.

234.     Dr. Cain also claims that "National Instruments took a series of substantive defensive actions in response to Emerson's approach" and includes among such defensive actions:[396]

---

[393]   Cain Second Report, Appendix C, ¶ 17, citing Senchack *et al.* (1991), p. 3.

[394]   June 14 WLRK Presentation (NAT-SL-00022986 – 006, at -006).

[395]   First Report, ¶ 18.

[396]   Cain Second Report, Appendix C, ¶ 22, at fn. 214, citing NAT-SL-00025277 – 308, at -293 – 294.

111



Dr. Cain asserts that NI had adopted such "governance features" as its "perceived risk of a public campaign [by Emerson] grew."[397] This claim is clearly misleading and incorrect because NI had already adopted these governance features at least by May 26, 2022,[398] *i.e.,* before NI had even evaluated Emerson's first proposal.

Respectfully,

Shane Goodwin, Ph.D.

---

[397]    Cain Second Report, Appendix C, ¶ 22.

[398]    While the WLRK presentation cited by Dr. Cain is only dated May 2022, Dr. Cain dates the presentation May 26, 2022. *See* Cain Second Report, ¶ 40.

## Appendix A: Materials Considered

### Legal Filings

[1] *In Re National Instruments Corporation Securities Litigation*, United States District Court Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Amended Complaint for Violations of the Federal Securities Laws, filed March 29, 2024

[2] *In Re National Instruments Corporation Securities Litigation*, United States District Court, Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Opinion and Order filed September 6, 2024

[3] *In Re National Instruments Corporation Securities Litigation*, United States District Court, Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, filed May 2, 2025

[4] *In Re National Instruments Corporation Securities Litigation*, United States District Court, Southern District of New York, Civil Action No. 1:23-cv-10488-DLC, Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, filed May 2, 2025

### Expert Reports

[1] Expert Report of Matthew D. Cain, Ph.D., In Re National Instruments Corporation Securities Litigation, No. 1:23-cv-10488-DLC, May 2, 2025.

[2] Expert Report of Shane Goodwin, Ph.D., *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, June 16, 2025.

[3] Expert Report of Matthew D. Cain, Ph.D., *In Re National Instruments Corporation Securities Litigation*, No. 1:23-cv-10488-DLC, July 28, 2025.

### Legal Opinions Regarding Definition of Materiality

[1] *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 185 (2d. Cir. 2001)

[2] *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015)

[3] *United States v. Chow*, 993 F.3d 125, 136 (2d Cir. 2021)

### National Instruments SEC filings

[1] United States Securities and Exchange Commission, National Instruments Corporation, Form 10-Q, Quarter Ending September 30, 2022

[2] National Instruments, SEC Schedule 14A, filed by Emerson Electric Co. and dated January 17, 2023

[3] National Instruments Corporation, Schedule 14-A, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, March 27, 2023

[4] National Instruments Corporation, Schedule 14A, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, May 11, 2023

### Emerson Public Disclosures

[1] "Advancing the World's Most Essential Industries," *Emerson*, available at https://www.emerson.com/en-us.

[2] January 17, 2023, Emerson Press Release, "Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share", BofA_003270-293

[3] January 17, 2023, EMR Investor Call Transcript, BofA_001009-025 (note document is undated but call relates to EMR's January 17, 2023 press release.)

[4] January 17, 2023, Emerson Investor Presentation, "Immediate, Compelling And Certain Value For NI Shareholders", BofA_003251-269

[5] January 20, 2023, Email from Liam Villano to Shawn Liu "RE: Wolverine Acquisition Presentation.pdf; Wolverine Press Release.pdf", BofA_003250

### Internal Documents

[1] January 10, 2022, Email from Pedro Andrade to Karen Rapp "RE: Cap alloc feedback from Eric," NAT-SL-00001609-611

[2] January 18, 2022, NI Audit Committee Meeting, NAT-SL-00000541-0689

[3]   January 25, 2022, Email from Karen Rapp to Pedro Andrade "RE: Q1 FY22 Share Repurchase Recommendation 2022.01.23.pptx", NAT-SL-00011283-287

[4]   January 29, 2022, Email from Pedro Andrade to Karen Rapp "RE: Q1 FY22 Share Repurchase Recommendation 2022.01.23.pptx", NAT-SL-00015046-052

[5]   January 29, 2022, Powerpoint Presentation of NI's 1H 2022 10b5-1 Proposal, NAT-SL-00015053

[6]   January 30, 2022, Email from Pedro Andrade to Karen Rapp "RE: Q1 FY22 Share Repurchase Recommendation 2022.01.23.pptx", NAT-SL-00015038-045

[7]   February 11, 2022, 10b5-1 Repurchase Plan Agreement, NAT-SL-00001161-167

[8]   May 2022, "Directors' Duties for M&A, Takeover and Activism Preparedness," WLRK Presentation, NAT-SL-00025277-308

[9]   May 2022, Presentation: "Directors' Duties for M&A, Takeover and Activism Preparedness", NAT-SL-00016114-145

[10]  May 3, 2022, Email from Eric Starkloff to Karen Rapp "Re: repurchases," NAT-SL-00005982-984

[11]  May 6, 2022, Email from Karen Rapp to Eric Starkloff "RE: Talking points for Capital allocation slide for Shareholder meeting," NAT-SL-00006441-442

[12]  May 16, 2022, Email from Lal Karsanbhai to Eric Starkloff "[EXTERNAL] Introductions and Request for Call," NAT-SL-00001267

[13]  May 18, 2022, Email from Ragen Debbie to NI management "[No Subject]," NAT-SL-00001185-188

[14]  May 24, 2022, Email from Richard Ballerini to Marissa Vidaurri "[EXTERNAL] NATI Takeover Rumors – I hope NATI does not sell itself on the cheap. NATI was a $50 stock a few years ago.," NAT-SL-00001309

[15]  May 25, 2022, Email from Eric Starkloff to Michael Mcgrath and Eddie Dixon "Privileged: FW: [EXTERNAL] Emerson Letter of Intent," NAT-SL-00001113

[16]  May 25, 2022, Email from Lal Karsanbhai to Eric Starkloff "[EXTERNAL] Emerson Letter of Intent," NAT-SL-00001263-266

[17]  May 25, 2022, Email from Niles, Sabastian V. to NI team "RE: Privileged – hypothetical/contingency stop look and listen release", NAT-SL-00016112-113

[18]  May 25, 2022, Emerson Letter to NI, NAT-SL-00001114-116

[19]  May 26, 2022, National Instruments Corporation Minutes of a Special Meeting of the Board of Directors, NAT-SL-00001449

[20]  May 31, 2022, Karen Bartley BoA Compliance, NAT-SL-00027240-242

[21]  June 2022, "Financial Plan of Record" slides, NAT-SL-00001547-553

[22]  June 2022, "Project Wolverine Discussion Materials" slides, NAT-SL-00001513-545

[23]  June 2022, Powerpoint Presentation about NI Financial Plan of Record, NAT-SL-00008644

[24]  June 2022, Presentation: "Project Wolverine, Discussion Materials", NAT-SL-00007160-192

[25]  June 2, 2022, Wolverine Summary, NAT-SL-00026862-863

[26]  June 2, 2022, Email from Kevin Ilcisin to Liu, Shawn W "Re: Copy of letter from Emerson", NAT-SL-00006833

[27]  June 2, 2022, Email from Niles, Sabastian V. to NI Team "Re: Priv – Q re financing", NAT-SL-00016465

[28]  June 2, 2022, Wolverine Plan, NAT-SL-00019760-761

[29]  June 6, 2022, BoA and FSG Wolverine Group Meeting Minutes, NAT-SL-00019636-641

[30]  June 6, 2022, Wolverine Meeting Minutes, NAT-SL-00019642-644

[31]  June 8, 2022, Wolverine Meeting Minutes, NAT-SL-00019631-633

[32]  June 10, 2022, BofA Engagement Letter, NAT-SL-00001554-566

[33]  June 10, 2022, Email from Kevin Ilcisin o BoA team "Re: NI Internal Discussion Materials", NAT-SL-00006807-810

[34]  June 12, 2022, Email from Youn, Philip (BoA) to WLRK team "Re: Project Wolverine - BofA Board Materials", NAT-SL-00007159

[35]  June 13, 2022, Email from Karen Rapp to Eric Starkloff "RE: Follow up from last week," NAT-SL-00006677-678

[36]  June 14, 2022, Handwritten Notes about Wolverine, NAT-SL-00008520-521

[37]  June 14, 2022, National Instruments Corporation Minutes of a Special Meeting of the Board of Directors, NAT-SL-00001447-448

[38]  June 14, 2022, Project Wolverine: Meeting of the Board of Directors, NAT-SL-00022986-23006

[39]  June 15, 2022, Email from Karen Rapp to Pedro Andrade "RE: Outlook 3," NAT-SL-00001699-1702

[40]  June 15, 2022, Email from Liu, Shawn W to Kevin Ilcisin "Re: Flag for follow up", NAT-SL-00007093

[41]  June 16, 2022, Email from Eric Starkloff to Karen Rapp "Re: Follow up from last week," NAT-SL-00002988-990

| [42] | June 16, 2022, Email from Eric Starkloff to Lal Karsanbhai "Response to your letter," NAT-SL-00001254-255 |
| [43] | June 16, 2022, Email from Kevin Ilcisin to NI, BoA, and WLRK teams "Re: Project Wolverine: Potential Next Steps Discussion", NAT-SL-00010389 |
| [44] | June 22, 2022, Emai from Lal Karsanbhai to Eric Starkloff and Michael McGrath "Re: Proposal to acquire NI's outstanding shares", NAT-SL-00010411 |
| [45] | June 22, 2022, Email from Eric Starkloff to Eddie Dixon "Fwd: Follow-up to NI letter dated June 16", NAT-SL-00010410 |
| [46] | June 22, 2022, Email from John Christiansen to NI, BofA, and FGS Global Management "[EXTERNAL] Re: Connecting on Project Wolverine," NAT-SL-00003088-089 |
| [47] | June 22, 2022, Email from Kevin Ilcisin to NI and FGS Global team "Re: Connecting Advisors", NAT-SL-00014971-972 |
| [48] | June 22, 2022, Email from Lal Karsanbhai to Eric Starkloff "[EXTERNAL] Follow-up to NI letter dated June 16," NAT-SL-00002991-994 |
| [49] | June 23, 2022, Email from Eddie Dixon to NI team, NAT-SL-00016089 |
| [50] | June 23, 2022, Email from Kevin Ilcisin to Eddie Dixon "Re: Wolverine: Privileged and Confidential Information", NAT-SL-00018628-631 |
| [51] | June 28, 2022, MacKenzie Partners, Inc. Letter to Karen Rapp, NAT-SL-00001428-429 |
| [52] | July 2022, Powerpoint Presentation about Nuthatch Defense Strategy, NAT-SL-00019759 |
| [53] | July 1, 2022, Email from Eddie Dixon to Niles, Sabastian V. "Fw: Wolverine/Confidential", NAT-SL-00020474-475 |
| [54] | July 1, 2022, Email from Kevin Ilcisin to NI, BoA, WLRK management, NAT-SL-00018401 |
| [55] | July 1, 2022, Email from Kevin Ilcisin to NI, BofA, and WLRK management "Wolverine Call," NAT-SL-00001569 |
| [56] | July 5, 2022, Email from Danya Al-Qattan to NI, WLRK, BoA, FGS Global management "Re: Project Wolverine – Communications Prep Materials 7.5.22.DOCX", NAT-SL-00016314 |
| [57] | July 6, 2022, Email from Kevin Ilcisin to BoA, NI, WLRK management "Re: Wolverine Call", NAT-SL-00022476-477 |
| [58] | July 6, 2022, Wolverine Call Notes, NAT-SL-00019645-647 |
| [59] | July 7, 2022, Emai from Kevin Ilcisin to WLRK, NI, FGS Global management "Re: Wolverine Call", NAT-SL-00018398-8400 |
| [60] | July 7, 2022, Email from Lal Karsanbhai to Eric Starkloff "Re: [EXTERNAL] Re: Follow-up to NI letter dated June 16," NAT-SL-00001260-261 |
| [61] | July 8, 2022 Meeting, NAT-SL-00020476-494 |
| [62] | July 8, 2022, Wolverine Call Notes, NAT-SL-00019634 |
| [63] | July 12 to July 15, 2022, SL Discussion, NAT-SL-00027226-239 |
| [64] | July 13, 2022, Email from Karen Rapp to Kevin Ilcisin "Re: FW: Wolverine Questions – privileged and confidential", NAT-SL-00021442-444 |
| [65] | July 14, 2022, Email from Albert Percival to Kevin Ilcisin "RE: Two slide summary of the discussion this morning", NAT-SL-00023167-168 |
| [66] | July 14, 2022, Email from Jane Magnuson to Deborah Donahue "RE: does the company have a 10b5-1 in place right now", NAT-SL-00022536-539 |
| [67] | July 14, 2022, Email from Kevin Ilcisin to Albert Percival "Re: Two slide summary of the discussion this morning", NAT-SL-00025703-704 |
| [68] | July 14, 2022, Email from Michael McGrath to Eddie Dixon "Re: Board Presentation", NAT-SL-00020795 |
| [69] | July 15, 2022, Email from Karen Rapp to Eddie Dixon "RE: Privileged and confidential – Slide on options", NAT-SL-00016977-978 |
| [70] | July 16, 2022, Email from Karen Rapp to Eric Starkloff "RE: Cost modeling," NAT-SL-00006579-580 |
| [71] | July 18, 2022, Email from FGS Global to Karen Rapp and Marissa Vidaurri "RE: Strategic Communications & Positioning Support – Project Wolverine Scope of Work", NAT-SL-00012657-658 |
| [72] | July 19, 2022, Email from Marissa Vidaurri to Karen Rapp "RE: Investor Messaging/Investor Conference," NAT-SL-00006205-206 |
| [73] | July 19, 2022, National Instruments Corporation Minutes of a Meeting of the Board of Directors, NAT-SL-00001457-1509 |
| [74] | July 19, 2022, Presentation: "Board Discussion of Project Wolverine", NAT-SL-00020808-819 |
| [75] | July 19-20, 2022, Presentation: "NI Q322 Committee & Board Meetings Schedule", NAT-SL-00024106-4255 |
| [76] | July 21, 2022, Email from Eddie Dixon to Sabastian B. Niles, Adam O. Emmerich, and Albert Percival, "Re: Wolverine", NAT-SL-00019909 |
| [77] | July 25, 2022, National Instruments Corporation Minutes of Board of Directors' Meeting, NAT-SL-00001455-456 |

A-3

[78]  July 25, 2022, Powerpoint Presentation about July 2022 Special Board Meeting, NAT-SL-00025801

[79]  July 27-August 3, 2022, NI Weekly Price Performance Analysis, NAT-SL-00008755

[80]  July 28, 2022, Email from Eddie Dixon to Niles, Sabastian V. "Re: Last night's minutes / privileges and confidential", NAT-SL-00020751-754

[81]  July 31, 2022, Email from Eddie Dixon to NI and WLRK management "Wolverine / privileged and confidential," NAT-SL-00001579

[82]  July 31, 2022, Email from Eddie Dixon to NI and WLRK teams "Re: Wolverine / privileged and confidential", NAT-SL-00010393

[83]  July 31, 2022, Email from Eric Starkloff to Michael McGrath "Re: Analyst Projections," NAT-SL-00002967-968

[84]  August 2022, Excel Workbook: NI Ownership and Peer Report, NAT-SL-00009731

[85]  August 2022, NI Presentation: "Ownership and Peer Report", NAT-SL-00009732-765

[86]  August 2022, Powerpoint Presentation about FY 22 Share Repurchase Summary, NAT-SL-00001157

[87]  August 2, 2022, Email from Eric Starkloff to Lal Karsanbhai "Re: [EXTERNAL] Follow-up to NI letter dated June 16," NAT-SL-00001239-240

[88]  August 4, 2022, Email from Albert Percival to Karen Rapp and Eddie Dixon "RE: Buybacks", NAT-SL-00009242-243

[89]  August 4, 2022, Email from Eddie Dixon to Albert Percival and Karen Rapp "RE: Buybacks", NAT-SL-00009244-245

[90]  August 4, 2022, Email from Eddie Dixon to Karen Rapp and Albert Percival "Re: Buybacks", NAT-SL-00009611-612

[91]  August 4, 2022, Email from Jin, Kwon-Yong to NI and WLRK teams "RE: tock Buy Back Program", NAT-SL-00009246-247

[92]  August 5, 2022, Email from Albert Percival to WLRK and NI teams "Re: NI Stock Trading Plan", NAT-SL-00008685

[93]  August 5, 2022, Email from Eddie Dixon to NI team "Re: buy backs", NAT-SL-00008684

[94]  August 5, 2022, Email from Eric Starkloff "Nuthatch earnings call," NAT-SL-00006681

[95]  August 5, 2022, Excel Workbook containing MacKenzie Partners' NOBO List, NAT-SL-00011769

[96]  August 7, 2022, Email from Michael McGrath to Eric Starkloff "Re: Follow up on buy back," NAT-SL-00001276-278

[97]  August 8, 2022, Email from Eddie Dixon to Kevin Ilcisin "RE: Priv – Wolverine", NAT-SL-00017263-267

[98]  August 8, 2022, Email from Eddie Dixon to Michael McGrath "FW: Priv – Wolverine", NAT-SL-00021472-474

[99]  August 8, 2022, Email from Kevin Ilcisin to Liu, Shawn W "Re: Emerson Electric agrees to sell InSinkErator to Whirlpool for $3BN", NAT-SL-00018186-187

[100]  August 8, 2022, Email from Kevin Ilcisin to NI, WLRK, BoA management "Re; Wolverine check in call", NAT-SL-00010395-396

[101]  August 9, 2022, "Emerson Electric Co. NYSE:EMR FQ3 2022 Earnings Call Transcript", S&P Global, NAT-SL-00023503-523

[102]  August 9, 2022, Email from Karen Rapp to Riley Greer "Repurchase," NAT-SL-00001160

[103]  August 9, 2022, Email from Kevin Ilcisin to Eric Starkloff "Kevin Ilcisin shared "Pj Wolverine – Support Deck vDRAFT 48" with you.," NAT-SL-00006732

[104]  August 9, 2022, Email from Michael McGrath to Eric Starkloff "RE: Transcript", NAT-SL-00023501-502

[105]  August 9, 2022, NI Top 25 Shareholders & Ownership Analysis, NAT-SL-00008753-754

[106]  August 9, 2022, Presentation: "NI Nuthatch Earnings Update", NAT-SL-00008607-609

[107]  August 10, 2022, Email from Eddie Dixon "Re: Wolverine notes / privileged and confidential", NAT-SL-00008756

[108]  August 10, 2022, Email from Eddie Dixon to Albert Percival "FW: Project Wolverine Confidentiality and Trading Restriction Notification / Please Read", NAT-SL-00009535-537

[109]  August 10, 2022, Email from Eric Starkloff to NI team, NAT-SL-00021470

[110]  August 10, 2022, Email from Kevin Ilcisin to Liu, Shawn W "FW: National Instruments – NOBO List (8-5-22)", NAT-SL-00011768

[111]  August 10, 2022, Email from Kevin Ilcisin to NI, BoA, and WLRK teams "Re: Wolverine Call-MacKenzie Update", NAT-SL-00008683

[112]  August 10, 2022, Email from Kevin Ilcisin to Niles, Sabastian V., Emmerich, Adam O., and Eddie Dixon "Re: Brief Wolverine call today", NAT-SL-00009678

[113]  August 10, 2022, Email from Kevin Ilcisin to WLRK and NI team "FW: NATI Weekly Ownership Analysis (8-9-2022)", NAT-SL-00008750-752

[114]  August 11, 2022, 10b5-1 Repurchase Plan Agreement, NAT-SL-00000765-771

[115]  August 11, 2022, 10b5-1 Repurchase Plan Agreement, NAT-SL-00005642-648

A-4

[116] August 11, 2022, Email from Albert Percival to NI Board Members "Re: Project Wolverine Confidentiality and Trading Restriction is Now Lifted", NAT-SL-00009179

[117] August 11, 2022, Email from Lynn, David M to Albert Percival "RE: NI 10b5-1 Plan", NAT-SL-00022559-561

[118] August 11, 2022, Nuthatch Notes, NAT-SL-00019635

[119] August 14, 2022, Email from Karen Rapp to Ursula Conterno "Re: $$$," NAT-SL-00006245

[120] August 16, 2022, Email from Sam Geoffroy to Marissa Vidaurri "Re: Next NOBO?", NAT-SL-00007475-476

[121] August 17, 2022, Email from Eric Starkloff to Karen Rapp "FW: H2-22 share repurchase summary 2022.08.12," NAT-SL-00001156

[122] August 18, 2022, Email from Ursula Conterno to Karen Rapp "RE: Repurch on Fri Aug 19", NAT-SL-00001154

[123] August 19, 2022, Email from John Christiansen to Kevin Daniels "RE: Wolverine", BofA_000803-804

[124] August 19, 2022, Email from Movsesian, Ara H to Ursula Conterno (NI) and Ng, Andrew (JPMorgan) "RE: Open Market purchase 8/19", NAT-SL-00001152-153

[125] August 23, 2022, Email from Sam Geoffroy to Marissa Vidaurri "RE: NATI Weekly Ownership Analysis (8-23-2022)", NAT-SL-00012665-667

[126] August 26, 2022, Email from Eddie Dixon to NI, BoA, WLRK team "RE: MacKenzie Update – Confidential", NAT-SL-00017309-310

[127] August 26, 2022, Email from Movesian, Ara H (JPMorgan) to Ursula Conterno (NI) and Ng, Andrew (JPMorgan) "RE: Open Market purchase 8/26", NAT-SL-00009596-597

[128] August 29, 2022, Email from Kevin White to Marissa Vidaurri "RE: NATI - Continuing Goldman Sachs Inflows", NAT-SL-00007310-311

[129] August 29, 2022, Excel workbook containing MacKenzie Partners' NOBO List, NAT-SL-00010409

[130] August 29, 2022, Excel workbook containing MacKenzie Partners' NOBO List, NAT-SL-00010808

[131] September 1, 2022, Emai from Eddie Dixon to Niles, Sabastian V. "RE: NATI – Broadridge NOBO (8/29/22 record date), NAT-SL-00017322-323

[132] September 1, 2022, Email from Eddie Dixon to Eric Starkloff "RE: NATI – Broadridge NOBO/privileged and confidential (8/9/22 record date), NAT-SL-00023453-454

[133] September 1, 2022, Email from Eddie Dixon to Eric Starkloff, Karen Rapp, Kevin Ilcisin "Fwd: NATI – Broadridge NOBO/privileged and confidential(8/29/22 record date)", NAT-SL-00010806-807

[134] September 1, 2022, Email from Kevin White to NI team "Re: NATI – Broadridge NOBO (8/29/22 record date)", NAT-SL-00010408

[135] September 1, 2022, Email from Marissa Vidaurri to Eddie Dixon "RE: NATI – Broadridge NOBO (8/29/22 record date)", NAT-SL-00022130-131

[136] September 1, 2022, Email from Marissa Vidaurri to Eddie Dixon "Re: NOBO, Estimated Investment – CONFIDENTIAL", NAT-SL-00023790

[137] September 2022, "Project Wolverine, Firepower Analysis", BofA_000821-823

[138] September 2022, "Project Wolverine, Recent Performance and Trading Activity", BofA_000824-826

[139] September 2022, BoA Presentation: "Project Wolverine, Firepower Analysis", NAT-SL-00012293-295

[140] September 2022, Powerpoint Presentation about FY 22 Share Repurchase Summary, NAT-SL-00008758

[141] September 2022, Powerpoint Presentation about NI Shareholder Update, NAT-SL-00015951

[142] September 2, 2022, Email from Emmerich, Adam O. to Eddie Dixon "Re: Accepted: Wolverine update / confidential", NAT-SL-00016269

[143] September 7-14, 2022, NI Weekly Price Performance Analysis, NAT-SL-00010431

[144] September 8, 2022, Email from Shawn Liu to Kevin Daniels "RE: Project Wolverine – Updated Scenario Plan", BofA_000806-808

[145] September 9, 2022, Email from John Peter Kaytrosh to NI, BoA, WLRK management "Re: Updated Wolverine scenario planning materials", NAT-SL-00022026

[146] September 9, 2022, Email from Marissa Vidaurri to FGS Global, BoA, WLRK management "Updated Wolverine scenario planning materials", NAT-SL-00022116-117

[147] September 12, 2022, Email from Kevin Ilcisin to Philip Youn "Re: Pj, Wolverine – Updated Plan", NAT-SL-00023536

[148] September 13, 2022, Email from Kevin Ilcisin to Karen Rapp "Re: Executive Leadership Team Update", NAT-SL-00023530-532

[149] September 14-21, 2022, NI Weekly Price Performance Analysis, NAT-SL-00010403

A-5

[150] September 16, 2022, Email from Mellina Viesca to Marissa Vidaurri "Re: NATI Monthly Report - August 2022", NAT-SL-00009729-730

[151] September 17, 2022, Email from Eddie Dixon to Karen Rapp "RE: Priv – see below Re NATI", NAT-SL-00023183-184

[152] September 19, 2022, Email from Eddie Dixon to Niles, Sabastian V. "Board Exec Session re Wolverine", NAT-SL-00023189-190

[153] September 20, 2022, Email from Sam Geoffroy to NI team "Re: NATI Weekly Ownership Analysis (9-20-2022)", NAT-SL-00010427-428

[154] September 20, 2022, National Instruments Corporation Minutes of a Special Meeting of the Board of Directors, NAT-SL-00001450-454

[155] September 20, 2022, NI Top 25 Shareholders & Ownership Analysis, NAT-SL-00010429-430

[156] September 21, 2022, Email from Liu, Shawn W to Kevin Ilcisin, NAT-SL-00012292

[157] September 26, 2022, NI Trade Confirmation Activity Sheet, NAT-SL-00009178

[158] September 27, 2022, Email from Balazs Melko to NI team "Re: H2-22 share repurchase summary 2022.09.26", NAT-SL-00008757

[159] September 27, 2022, Email from Kevin Ilcisin to NI management "Fwd: Financial Scenario, per your request," NAT-SL-00006116-117

[160] September 27, 2022, Email from Sam Geoffroy to NI team "Re: NATI Weekly Ownership Analysis (9-27-2022)", NAT-SL-00010399-0400

[161] September 27, 2022, NI Top 25 Shareholders & Ownership Analysis, NAT-SL-00010401-402

[162] September 28, 2022, Email from Kevin Ilcisin to Miriam Segura "Re: Miscellaneous Items" (Administrative), NAT-SL-00006846-847

[163] October 5, 2022, Email from Marissa Vidaurri to Kevin White "RE: SA: Blackstone in talks to acquire Emerson Electric assets for $5-10B - Bloomberg ($78.25, 0.00)", NAT-SL-00008468-469

[164] October 5, 2022, Email from Marissa Vidaurri to Liu, Shawn W (BoA) "Re: Nobu Data", NAT-SL-00007779

[165] October 5, 2022, Email from Marissa Vidaurri to Liu, Shawn W (BoA) "Re: Nobu Data", NAT-SL-00008467

[166] October 10, 2022, Email from Miriam Segura "Re: Wolverine Meeting Discussion.msg", NAT-SL-00006980

[167] October 10, 2022, Email from Miriam Segura to Karen Rapp "Re: Wolverine Meeting Discussion", NAT-SL-00006981

[168] October 14, 2022, Email from Cate Prescott to Karen Rapp "RE: Free Cash Flow," NAT-SL-00006122-123

[169] October 18, 2022, NI Q4 2022 Committee & Board Meetings, NAT-SL-00000070-0365

[170] October 24, 2022, Email from Marissa Vidaurri to Jennifer Allison (NI) "Re: Executive Meeting Slide Recommendation and Discussion Flow", NAT-SL-00008139

[171] October 26, 2022, Powerpoint Presentation about NI Executive Meeting, NAT-SL-00008140

[172] October 27, 2022, Email from Miriam Segura "Re: Project Wolverine - RMT Discussion.msg", NAT-SL-00006978

[173] October 27, 2022, Email from Miriam Segura to Teti, Daniel "Re: Project Wolverine - RMT Discussion", NAT-SL-00006977

[174] October 27, 2022, Email from Miriam Segura to Teti, Daniel "Re: Project Wolverine - RMT Discussion", NAT-SL-00006979

[175] October 28, 2022, Email from Eddie Dixon to Kevin Ilcisin "Re: Wolverine Follow-Up", NAT-SL-00010835

[176] October 28, 2022, Email from Kevin Ilcisin to Miriam Segura "Re: Meetings next week …", NAT-SL-00006940

[177] October 28, 2022, Email from Kevin Ilcisin to NI Management "Wolverine Follow-up," NAT-SL-00003018

[178] October 28, 2022, Email from Miriam Segura "Re: Wolverine Follow-Up.msg", NAT-SL-00006968

[179] October 28, 2022, Email from Miriam Segura "Re: Wolverine Follow-Up.msg", NAT-SL-00006972

[180] October 28, 2022, Email from Miriam Segura to Eddie Dixon "Re: Wolverine follow-Up", NAT-SL-00006971

[181] October 31, 2022, Email from Eddie Dixon to Eric Starkloff "RE: Blackstone, Emerson Electric Strike $14 Billion Buyout Deal", NAT-SL-00020681-682

[182] October 31, 2022, Email from Miriam Segura to Eddie Dixon "Re: Wolverine Follow-Up", NAT-SL-00006973

[183] October 31, 2022, Email to Kevin Ilcisin "Re: Meeting Forward Notification: Wolverine Follow-Up", NAT-SL-00007152

[184] November 4, 2022, Email from Miriam Segura "Re: Wolverine Follow-Up Meeting", NAT-SL-00006969

[185] January 5, 2023, Email from Marissa Vidaurri to Eric Starkloff "RE: Needham Prep, Messaging and Presentation, meeting schedule to follow", NAT-SL-00011412-413

[186] January 17, 2023, Email from Marissa Vidaurri to FSG Global, NI, BofA, and WLRK management, BofA_001008

[187] 2022, Powerpoint Presentation about Financial Plan Discussion, supporting materials, NAT-SL-00006581

[188] 2022, Powerpoint Presentation about NATI Capital Allocation Strategy, NAT-SL-00001612
[189] 2022, Powerpoint Presentation about NATI Capital Allocation Strategy, NAT-SL-00026027
[190] Code Cache File, NAT-SL-00008759-8840
[191] Email from Eddie Dixon to Kevin Ilcisin "RE: Quick note on your BoD financing slide", NAT-SL-00023205-206
[192] Excel Workbook, Trading Confirmations, NAT-SL-00000772
[193] FGS Global, Project Wolverine Scenario Planning Materials, NAT-SL-00016315-325
[194] FGS Global, Project Wolverine Scenario Planning Materials, NAT-SL-00022027-046
[195] FGS Global, Project Wolverine Scenario Planning Materials, NAT-SL-00022047-066
[196] July 19 McGrath Presentation, NAT-SL-00020796-0807
[197] NI Logo, NAT-SL-00023524
[198] NI Logo, NAT-SL-00023526
[199] NI Logo, NAT-SL-00023527
[200] NI Logo, NAT-SL-00023529
[201] NI Page, NAT-SL-00023525
[202] NI Page, NAT-SL-00023528
[203] "Document Withheld for Privilege", BofA_000805
[204] January 1, 2022 to October 31 2023, Wayne-Reinhart Investment Account, Northern Trust, WCERS_0000001-0162

**Academic Articles Cited by Dr. Cain in Response to the Goodwin First Report**

[1] Baker, M., Xin, P., and Wurgler, Jeffrey, "The effect of reference point prices on mergers and acquisitions, Journal of Financial Economics", CAIN0000928-950
[2] Betton, S., and Eckbo, B., "Toeholds, Bid Jumps, and Expected Payoffs in Takeovers",  CAIN0000991-01032
[3] Branch, B. and Yang, Taewon, "Predicting Successful Takeovers and Risk Arbitrage", Quarterly Journal of Business and Economics, Winter – Spring, 2003, Vol. 42, No. ½ (Winter – Spring, 2003), CAIN0001133-1149
[4] Bruner, R., "Applied Mergers & Acquisitions", 2004, CAIN0001195-1208
[5] Cain, M. and Denis, D., "Information Production by Investment Banks: Evidence from Fairness Opinions", Journal of Law and Economics, Vol. 56, February 2013, CAIN0001209-1244
[6] Cain, M., Griffith, S., Jackson, R., and Solomon, S., "Does Revlon Matter? An Empirical and Theoretical Study", 2020, CAIN0001245-1293
[7] Chopra, V., "Why So Much Error in Analysts' Earnings Forecasts?", Financial Analysts Journal, 54:6, 1998, CAIN0001294-1302
[8] Damodaran, A., "Investment Valuation, Tools and techniques for determining the value of any asset", CAIN0001303-306
[9] Fama, E., "Efficient Capital Markets: II", The Journal of Finance, Vol 46, December 1991, CAIN0001332-374
[10] Fishman, M., "Preemptive Bidding and the Role of the Medium of Exchange in Acquisition", The Journal of Finance, Mar. 1989, Vol. 44, No. 1, CAIN0001375-392
[11] Jindra, J., Walkling, R., "Speculation spreads and the market pricing of proposed acquisitions", Journal of Corporate Finance, 2004, Vol. 10, CAIN0001436-467
[12] Joos, P. and Piotroski, J., "The best of all possible worlds: unraveling target price optimism using analysts' scenario-based valuations", 2017, CAIN0001468-1516
[13] MacKinlay, C., "Event Studies in Economies and Finance", Journal of Economic Literature, Mar. 1997, Vol. 35, No. 1, CAIN0001517-544
[14] Senchack, A. J., Bruner, R. F., and Martin, J. D. (1991), "The Poison Pill Anti-takeover Defense: The Price of Strategic Deterrence," Research Foundation of the Institute of Chartered Financial Analysts, CAIN0001545-1634
[15] Walkling, R. "Predicting Tender Offer Success: A Logistic Analysis", Journal of Financial And Quantitative Analysis, December 1985, Vol. 20, No. 4, CAIN0001758-775
[16] Zha Giedt, J., "Economic consequences of announcing strategic alternatives: A voluntary disclosure's benefits and costs", 2023, CAIN0001776-1806

**Academic Articles Cited by Dr. Cain in Response to the Denis First Report**

[1] Bond, P. and Zhong, H., "Buying High and Selling Low: Stock Repurchases and Persistent Asymmetric Information", The Review of Financial Studies, June 2016, Vol. 29, No. 6, CAIN0001033-1077

[2] Bradley, M. and Rosenzweig, M., "Defensive Stock Repurchases", Harvard Law Review, May 1986, Vol. 99, No. 7, CAIN0001078-1132

[3] Brav, A., Graham, J., Harvey, C., and Michaely, R., "Payout policy in the 21st century", Journal of Financial Economics, 2005, CAIN0001150-1194

[4] Daniel, B., Venky, N., Douglas, S., and Franco, W., "Employee stock options, EPS dilution, and stock repurchases", Journal of Accounting & Economics, CAIN0000951-990

[5] Denis, D. "Defensive Changes in Corporate Payout Policy: Share Repurchases and Special Dividends", The Journal of Finance, Dec. 1990, Vol. 45, No. 5, CAIN0001307-331

[6] Hribar, P., Jenkins, N., and Johnson, B., "Stock repurchases as an earnings management device", Journal of Accounting and Economics, 2006, Vol. 41, CAIN0001393-1417

[7] Vermaelen, T., "The Option to Repurchase Stock, Financial Management", February 1996, CAIN0001418-435

[8] Vermaelen, T., "Share Repurchases", Foundations and Trends in Finance, 2005, Vol. 1, No. 3, CAIN0001659-1757

[9] Weil, R., Wagner, M., and Peter, F. "The Role of the Financial Expert, Litigation Services Handbook", Third Edition, CAIN0001635-685

**Analyst Reports, News Articles, Press Releases, and Stock Price History Documents Produced by Dr. Cain**

[1] January 13, 2023, "NATI Initiates a Strategic Review," Morgan Stanley, CAIN0001815-826

[2] January 17, 2023, "Emerson Electric Co. NATI Suited to EMR's Strengths," Oppenheimer, CAIN0001827-838

[3] January 17, 2023, "Takeaways from NATI's Announced Strategic Review," Jefferies, CAIN0001839-848

[4] January 17, 2023, "Strategic Review to Fast Charge Shareholder Value Creation," J.P.Morgan, CAIN0001849-862

[5] January 17, 2023, "NATI exploring strategic options. How much might potential buyers pay?," UBS, CAIN0001863-878

[6] October 7, 2014, "Allergan Is Open to Alternatives but Not to Valeant: Matt Levine," Bloomberg, CAIN0001879-881

[7] January 13, 2023, "National Instruments announces strategic review, eyeing shareholder value," Investing.com, CAIN0001888

[8] January 13, 2023, "National Instruments to Undergo Strategic Review," Dow Jones Newswires, CAIN0001889

[9] January 13, 2023, "National Instruments, Virgin Galactic And Other Big Stocks Moving Higher On Friday," Benzinga, CAIN0001890

[10] January 17, 2023, "Emerson Electric Offers to Buy National Instruments in $7.6 Billion Deal," Dow Jones Newswires, CAIN0001891

[11] January 17, 2023, "Emerson reveals $7.6 billion bid for National Instruments," AP, CAIN0001892

[12] January 18, 2023, "In Pursuit of National Instruments, Emerson Electric Bids Nearly $7 Billion," The Wall Street Journal, CAIN0001893

[13] August 11, 2022, "NI to Host Annual Investor Conference in San Francisco on September 15th," CAIN0001882-887

[14] September 15, 2022, "NATI Annual Investor Conference," CAIN0001894-1927

[15] January 17, 2023, "Emerson Announces Premium, All-Cash Proposal to Acquire National Instruments for $53 Per Share," Emerson, CAIN0001928-951

[16] October 11, 2023, "Emerson Completes Acquisition of NI, Advancing Global Automation Leadership," CAIN0001952-958

[17] Excel Workbook containing NATI Stock Price, CAIN000918_bb_nati_mkt_ind.xlsx

[18] Excel Workbook containing dates to be dropped for regression, CAIN0001812

[19] Excel Workbook containing statistical results of event study analysis, CAIN0001813

[20] Excel Workbook containing graph of NATI stock price and volume traded from May 2, 2022-October 6, 2023, CAIN0001814

[21] May 25, 2021-May 24, 2022, Excel Workbook containing NATI stock price for 52-week period, CAIN0001807

[22] July 1, 2020-January 31, 2023, Excel Workbook containing NATI stock and XCMP index price, CAIN0001809

[23] January 17-April 30, 2023, Excel Workbook containing NATI Stock Price, CAIN0001808

[24] Code Script, CAIN0001810-811

**Publicly Available Materials**

| [1] | "Emerson to Advance Global Automation Leadership Through Acquisition of NI," Emerson, April 12, 2023, available at https://www.emerson.com/en-us/news/2023/04-emerson-ni-acquisition |
| [2] | "Engage," Merriam-Webster, available at https://www.merriam-webster.com/dictionary/engage |
| [3] | "NI Announces Commencement of Strategic Review Process," Business Wire, January 13, 2023 |
| [4] | "NI Reports Record Revenue for a Second Quarter, up 14 Percent YOY," National Instruments, July 28, 2022 ("NI Q2 2022 Earnings Announcement"), available at https://www.nasdaq.com/press-release/ni-reports-record-revenue-for-a-second-quarter-up-14-percent-yoy-2022-07-28#:~:text=Percent%20YOY%20%7C%20Nasdaq-,NI%20Reports%20Record%20Revenue%20for%20a%20Second%20Quarter%2C%20up%2014,operating%20margin%20of%2015%20percent |
| [5] | "Tender Offer Rules and Schedules," United States Securities and Exchange Commission, March 6, 2025, available at https://www.sec.gov/rules-regulations/staff-guidance/compliance-disclosure-interpretations/tender-offer-rules-schedules |
| [6] | DePamphilis, Donald M., Mergers, Acquisitions, and Other Restructuring Activities, 9th Edition, Elsevier, 2018 |
| [7] | Farrell, Joseph, and Robert Gibbons, "Cheap Talk Can Matter in Bargaining," Journal of Economic Theory, Vol. 48 |
| [8] | Price, Thomas F., "Non-Objecting Beneficial Owners & Objecting Beneficial Owners, Explained," SIFMA, May 20, 2021, available at https://www.sifma.org/resources/news/blog/non-objecting-beneficial-owners-objecting-beneficial-owners-explained/ |
| [9] | Black, Fischer, (1986), "Noise," The Journal of Finance, Vol. 41, No. 3 |
| [10] | Damodaran, Aswath, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset, Third Edition, John Wiley & Sons, Inc., 2012 |
| [11] | Gaughan, Patrick A., Mergers, Acquisitions, and Corporate Restructurings, 4th Edition, John Wiley & Sons, 2007 |
| [12] | Harvey, Campbell "Hypertextual Finance Glossary: Standstill Agreement," available at https://people.duke.edu/~charvey/classes/wpg/bfgloss.htm. |
| [13] | Houlihan Lokey Response To Request For Comments By The Securities And Exchange Commission (The "Commission") On File No: S7-03-22; Release, available at https://www.sec.gov/comments/s7-03-22/s70322-20126403-287074.pdf |
| [14] | Lipton, M. et al., "Just Say No," Harvard Law School Forum on Corporate Governance, December 9, 2014, available at https://corpgov.law.harvard.edu/2014/12/09/just-say-no/ |
| [15] | Schmelter, Joseph C., Lauren Fields, and Daria Ivanova, "Engagement Letters with Investment Bankers," Venable LLP, September 13, 2021, available at https://www.venable.com/insights/publications/2021/09/engagement-letters-with-investment-bankers |