# EXHIBIT H

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND on behalf of itself and all others similarly situated,<br> Plaintiffs,<br><br>vs.<br><br>DELOITTE & TOUCHE, LLP;<br>DELOITTE LLP,<br> Defendants. | Case No. 3:19-cv-3304<br><br>CLASS ACTION |

**DECLARATION OF MATTHEW D. CAIN, PH.D.**

**November 14, 2024**

1. On September 27, 2024, I submitted an expert report in this matter (the "Loss Causation and Damages Report").

2. On pages 19 and 167 of my Loss Causation and Damages Report, I included a table entitled "SCANA Common Stock Artificial Inflation per Share During the Class Period" (the "Daily Inflation Table"). At the time I completed my Loss Causation and Damages Report, I intended to, and believed that I had, displayed the appropriate date ranges in the Daily Inflation Table. However, on November 13, 2024, while in the process of preparing for my deposition scheduled for November 19, 2024, I discovered that the date ranges displayed in the "Date Range" column of the Daily Inflation Table were unintentionally offset by one day. The values displayed in the "Artificial Inflation Per Share" column are correct and require no changes. Upon learning of the mistake, I immediately brought this to Counsel's attention, and I worked with the staff assisting me in this matter to display the proper date ranges in the Daily Inflation Table, as well as to correct the related dates in paragraphs 341-342 of the Cain Loss Causation and Damages Report.[1]

---

[1] Specifically, paragraphs 341 and 342 of my Loss Causation and Damages Report state:

"In a hypothetical example, assume the jury concludes that before December 1, 2016, inflation was only half of the value I have calculated. As shown above in Table B, I have estimated $25.71 of per share artificial inflation was present in SCANA Common Stock from the start of the Class Period through September 2, 2016. If the jury determines that inflation was only half that amount from February 26, 2016 through September 2, 2016, then the inflation table I presented above can be adjusted to $12.86 for that initial period (50% of $25.71). In the hypothetical case I have presented above, purchasers during this initial part of the Class Period would have purchased shares with $25.71 of artificial inflation, while shares bought beginning September 3, 2016, would be purchased at the full amount of artificial inflation I calculated ($26.42)."

Based on the Corrected Daily Inflation Table, these sentences should be corrected to:

"In a hypothetical example, assume the jury concludes that before *September 2, 2016*, inflation was only half of the value I have calculated. As shown above in Table B, I have estimated $25.71 of per share artificial inflation was present in SCANA Common Stock from the start of the Class Period through *September 1, 2016*. If the jury determines that inflation was only half that amount from February 26, 2016 through *September 1, 2016*, then the inflation table I presented above can be adjusted to $12.86 for that initial period (50% of $25.71). In the hypothetical case I have presented above, purchasers during this initial part of the Class Period would have purchased shares with $25.71 of artificial inflation, while shares bought beginning *September 2, 2016*, would be purchased at the full amount of artificial inflation I calculated ($26.42)."

3.      As a result, I am attaching as **Exhibit A**, a corrected expert report which corrects the dates that appear in paragraphs 341-342 and replaces the original Daily Inflation Table that appears on pages 19 and 167 of my Loss Causation and Damages Report with a corrected Daily Inflation Table. No other changes are made in **Exhibit A**.[2]

4.      Correction of these date errors does not change any conclusions in my Loss Causation and Damages Report or any of the opinions offered therein.

5.      The Corrected Daily Inflation Table included in the attached **Exhibit A** accurately summarizes the per share artificial inflation that I estimate was present in SCANA Common Stock for each day of the Class Period.

6.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Matthew D. Cain


Executed on November 14, 2024

---

The change from "December 1, 2016" to "September 2, 2016" in paragraph 341 was a typographical error and is unrelated to the Daily Inflation Table error.

[2] The backup excel spreadsheet which includes the information included in this table was produced at Pltf-Cain-0003609-73.  A backup excel spreadsheet correcting that information is simultaneously being produced with this Declaration at Pltf-Cain-0003674-3718.

3

# Exhibit A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

|  |  |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND on behalf of itself and all others similarly situated,<br> Plaintiffs,<br><br>vs.<br><br>DELOITTE & TOUCHE, LLP; DELOITTE LLP,<br> Defendants. | Case No. 3:19-cv-3304<br><br><u>CLASS ACTION</u> |

**CORRECTED EXPERT REPORT OF MATTHEW D. CAIN, PH.D.**

November 14, 2024

# Table of Contents

|  |  | **Page** |
|---|---|---|
| I. | INTRODUCTION | 4 |
| II. | SUMMARY OF OPINIONS | 6 |
| III. | BACKGROUND | 20 |
|  | A. OVERVIEW OF DELOITTE AND SCANA | 20 |
|  | B. PLAINTIFF'S ALLEGATIONS | 22 |
| IV. | MARKET EFFICIENCY AND DAMAGES ON A CLASS-WIDE BASIS | 25 |
| V. | IMPORTANCE OF ALLEGED MISSTATEMENTS AND OMISSIONS | 27 |
|  | A. PUBLIC STATEMENTS REGARDING THE NUCLEAR PROJECT | 30 |
|  | B. ANALYST COMMENTARY | 37 |
|  | C. ECONOMIC AND VALUATION PRINCIPLES | 48 |
|  | D. EVENT STUDY | 50 |
| VI. | LOSS CAUSATION | 53 |
|  | A. INVESTOR LOSSES WERE FORESEEABLE | 53 |
|  | B. THE CORRECTIVE INFORMATION CAUSED ECONOMIC LOSSES | 55 |
| VII. | ANALYSIS OF THE CORRECTIVE DISCLOSURE EVENTS | 58 |
|  | A. DECEMBER 27, 2016 to DECEMBER 28, 2016 | 58 |
|  | B. JANUARY 19, 2017 | 66 |
|  | C. JANUARY 31, 2017 | 69 |
|  | D. FEBRUARY 14, 2017 | 71 |
|  | E. FEBRUARY 17, 2017 | 76 |
|  | F. MARCH 22, 2017 to MARCH 23, 2017 | 87 |
|  | G. JULY 28, 2017 | 91 |
|  | H. AUGUST 4, 2017 | 97 |
|  | I. AUGUST 10, 2017 | 100 |
|  | J. AUGUST 11, 2017 | 104 |
|  | K. SEPTEMBER 7, 2017 | 109 |
|  | L. SEPTEMBER 21, 2017 to SEPTEMBER 22, 2017 | 112 |
|  | M. SEPTEMBER 27, 2017 | 116 |

N.  SEPTEMBER 29, 2017 ...................................................................................... 122

O.  OCTOBER 19, 2017 .......................................................................................... 126

P.  OCTOBER 26, 2017 to OCTOBER 27, 2017 ..................................................... 129

Q.  OCTOBER 31, 2017 .......................................................................................... 133

R.  NOVEMBER 24, 2017 ....................................................................................... 138

S.  DECEMBER 21, 2017 ........................................................................................ 141

**VIII. ANALYSIS OF THE INFLATION CREATING EVENTS ....................................... 144**

A.  SEPTEMBER 2, 2016 ........................................................................................ 145

B.  FEBRUARY 15, 2017 ........................................................................................ 148

C.  JULY 31, 2017 to AUGUST 1, 2017 ................................................................. 151

D.  AUGUST 14, 2017 ............................................................................................ 158

E.  NOVEMBER 9, 2017 ......................................................................................... 160

**IX.  ARTIFICIAL INFLATION PER SHARE AND DAMAGES FOR SCANA COMMON STOCK ............................................................................................ 162**

A.  ARTIFICIAL INFLATION PER SHARE ............................................................ 162

B.  DAMAGES ....................................................................................................... 167

C.  ADAPTATION TO ALTERNATIVE FINDINGS ................................................. 170

## I.      INTRODUCTION

1.      On April 30, 2021, I submitted an expert report in this matter (my "Opening Report" or "Efficiency Report") (ECF No. 185-2 (Ex. A)), in which I concluded that: (a) the market for shares of SCANA Common Stock was efficient during the entire Class Period (February 26, 2016 through December 20, 2017, inclusive)[1] and (b) damages in this matter can be calculated on a class-wide basis subject to a common methodology.[2]  I continue to hold the opinions expressed in my Efficiency Report and I summarize my findings from my Efficiency Report in **Section IV** below.  The Efficiency Report is attached hereto as **Appendix C**.

2.      Following the submission of my Efficiency Report, I was deposed by Defendants' counsel in this matter on September 14, 2021.[3]

3.      On February 5, 2024, Defendants filed an Opposition to Plaintiff's Motion for Class Certification (ECF No. 189) and a Motion to Exclude (ECF No. 188).  In those filings, Defendants conceded my finding that the market for shares of SCANA Common Stock was efficient during the entire Class Period.  Yet, they attempted to incorrectly bifurcate Plaintiff's theory of liability into a "materialization of risk" and "corrective disclosures" theory, and argued that the out-of-pocket methodology is incapable of measuring damages attributable to Plaintiff's theory of liability.[4]  Defendants also argued that because the market commentary on the alleged Corrective Disclosure Events put forth by Plaintiff does not specifically reference Deloitte's audit reports, the alleged false

---

[1] All emphasis within this report is added unless otherwise noted.  All times cited in this report are in Eastern Time ("ET") unless otherwise noted.  All capitalized terms defined herein have the same meaning as defined in my Efficiency Report and Rebuttal Report.  For purposes of this report, the "Company" or "SCE&G", as SCANA's principal and wholly owned subsidiary, refers to SCANA.  Complaint ¶ 23 ("SCANA's principal and wholly owned subsidiary, South Carolina Electric & Gas ("SCE&G") is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.").

[2] Efficiency Report ¶¶ 7, 9-10, 75.

[3] Deposition of Matthew Cain, Ph.D. via Remote Videoconference, in International Brotherhood of Electrical Workers Local 98 Pension Fund on Behalf of Itself and All Others Similarly Situated vs. Deloitte & Touche, LLP and Deloitte LLP, taken on September 14, 2021.

[4] Defendants' Opposition to Class Certification, p. 4; Defendants' Motion to Exclude, p. 8.

4

and misleading audit reports could not have resulted in any movement in SCANA's stock price on the alleged Corrective Disclosure Events.[5]

4.     On March 7, 2024, I responded in an expert rebuttal report to Defendants' Opposition to Plaintiff's Motion for Class Certification and Motion to Exclude (my "Rebuttal Report" or "Cain Rebuttal Report") (ECF No. 203-1), which is attached hereto as **Appendix D**.[6]  In my Rebuttal Report, I explained why Defendants' arguments regarding Plaintiff's theory of liability do not change the appropriateness of the out-of-pocket damages methodology to calculate class-wide damages, which was first introduced in this matter in my Efficiency Report, and thus do not disturb my opinion that the out-of-pocket methodology is appropriate in this matter.[7]  I also provided evidence of, and an analysis supporting, price impact for a selection of Plaintiff's alleged Corrective Disclosure Events attached thereto as Appendix C, demonstrating that the full truth regarding the Defendants' alleged fraud was not disclosed until the end of the Class Period.  I continue to hold the opinions expressed in my Rebuttal Report.

5.     I have been asked by Counsel in this matter to offer additional opinions on: (1) whether the misstatements and omissions alleged in the Complaint (ECF No. 44)  contained value-relevant information that investors would consider economically material; (2) whether investor losses were proximately caused by Deloitte's alleged misrepresentations and/or omissions (*i.e.,* loss causation); (3) the quantification of investor losses resulting from the revelation of the alleged misrepresented and/or omitted facts; (4) the quantification of any artificial inflation per share for SCANA Common Stock for each day of the Class Period resulting from the alleged misrepresentations and/or omissions; and (5) the appropriate method to quantify Rule 10b-5 class-wide damages in this matter.

---

[5] Defendants' Opposition to Class Certification, pp. 24-26.

[6] My Efficiency Report and my Rebuttal Report are collectively referred to as my "Prior Reports."

[7] Cain Rebuttal Report Sections IV, V.

6.      My Efficiency Report contained my qualifications, and I do not repeat them here.  I have attached an updated version of my curriculum vitae as **Appendix A.**

7.      My time is billed at an hourly rate of $750 per hour for my work on this matter.  I am being assisted in this matter by staff from Peregrine Economics LLC who have worked under my direction and supervision, at an hourly rate ranging from $260 - $450.[8]  My compensation and that of the staff of Peregrine Economics LLC is in no way contingent on the outcome of this case or upon any opinions that I express.

8.      In connection with my work, I have relied upon the analyses already described in my Efficiency Report and Rebuttal Report, as well as my knowledge and experience gained during my professional career.  My opinions are based on my experience and expertise in finance, economics, and financial reporting, as well as my understanding of the allegations and facts set forth in this lawsuit and are not intended to represent legal conclusions or opinions.  All of the materials I have considered in forming my opinions are identified in **Appendix B** to this report, in addition to those previously identified in Appendix B to my Efficiency Report and Appendix B to my Rebuttal Report.

9.      The analyses and opinions contained in this report are based on information available as of the date of the report.  I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

## II.    SUMMARY OF OPINIONS

10.     As stated in my Prior Reports, the market for shares of SCANA Common Stock was efficient throughout the Class Period, meaning that widely available public information was quickly

---

[8] Prior to January 1, 2024, I was assisted in this matter by staff at Global Economics Group and Global Economics Group was being compensated for my work on this matter and for work performed by members of my staff acting under my supervision and direction.  Starting on January 1, 2024, I am assisted in this matter by staff at Peregrine Economics.  My agreement with Counsel transferred to Peregrine Economics on January 1, 2024, and the terms of that agreement otherwise remain unchanged.

incorporated into the price of SCANA Common Stock, and damages in this matter for SCANA Common Stock can be calculated on a class-wide basis subject to a common methodology.[9] I continue to hold the opinions expressed in my Prior Reports and reiterate them herein.

11. My opinions regarding economic materiality, loss causation, and damages in this matter arising under Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the SEC, are premised upon Defendants being found to have knowingly or recklessly made material misrepresentations and/or omissions during the Class Period; and that, more specifically, Defendants' misconduct surrounding their audit reports concealed from investors that: (1) the Nuclear Project[10] faced substantial delays, cost overruns, and an inability to meet the necessary requirements for obtaining $1.4 billion in nuclear tax credits under the Energy Policy Act ("Nuclear Tax Credits");[11] (2) SCANA would be subject to investigations and regulatory action (3) SCANA would be unable to recoup losses from the Nuclear Project through the Base Load Review Act ("BLRA"),[12] and (4) SCANA did not have a reliable, fully resource-loaded, integrated schedule that supported the Guaranteed Substantial Completion Dates ("GSCDs").[13]

12. I conclude that the alleged misrepresentations and/or omissions in this matter were economically material to investors.[14] I base my opinion of the economic materiality of this

---

[9] Efficiency Report ¶¶ 10, 11, 74-76.

[10] The Nuclear Project was a multibillion-dollar nuclear energy expansion project of the Virgil C. Summer Nuclear Station in Fairfield County, South Carolina co-owned by SCE&G and the South Carolina Public Service Authority known as Santee Cooper, a state-owned public utility providing electricity in South Carolina ("Santee Cooper"). *See* Complaint ¶¶ 1, 32, 37.

[11] The 2005 Energy Policy Act established a nuclear production tax credit for an approved nuclear reactor design placed in service before January 1, 2021. Complaint ¶¶ 42-44.

[12] Complaint ¶ 45: ("The BLRA was designed to allow utility companies to recoup 'prudently incurred' capital for a base load generating power plant during its construction, rather than waiting until it was built. Prior to the BLRA's passage, South Carolina required utilities to complete construction before charging ratepayers for the costs associated with that construction.").

[13] Complaint ¶ 38.

[14] When I refer to materiality or information that was material to investors, I am referring to economic materiality, not legal materiality, as defined and discussed in more detail in **Section V**.

7

information on: (1) SCANA's consistent highlighting of key aspects of the Nuclear Project in Class Period public statements, including statements on the GSCDs, costs, and the realization of Nuclear Tax Credits, recognizing their influence on investor sentiment; (2) consistent Class Period analyst commentary expressing how the Nuclear Project had implications for SCANA's business, including the timelines, costs, and likelihood that SCANA would receive the Nuclear Tax Credits and/or be able to recoup associated costs once it was abandoned; (3) the application of basic valuation principles to SCANA's business that indicates the value of SCANA's Common Stock price was directly related to future cash flows from the Nuclear Project and the Company's ability to both receive the Nuclear Tax Credits and to recover its costs under the BLRA; and (4) an event study analysis based on peer-reviewed methodology that establishes a statistically significant decline in the price of SCANA Common Stock on the Corrective Disclosure Events, discussed below. Further, Deloitte itself repeatedly recognized the materiality of the Nuclear Project related disclosures to investors.

13. I also conclude that there is a logical link and economic connection between the alleged misrepresentations and the alleged corrective disclosures. Given this and my event study's findings of statistically significant declines in SCANA's Common Stock prices following the alleged corrective disclosures, I conclude that the alleged misrepresentations impacted SCANA's Common Stock price.

14. I have identified, reviewed, evaluated, and empirically analyzed all of the events that were alleged in the Complaint as revealing corrective information (including by conducting an event study analysis). I have identified 19 event windows that contained both corrective information and, based on my event study analysis, were accompanied by a statistically significant decline in the market price of SCANA Common Stock ("Corrective Disclosure Events"). The Corrective Disclosure Events include the following disclosures and events, described in summary here:

8

**December 27-28, 2016**: On a non-U.S. trading day, Monday, December 26, 2016, Reuters reported that Toshiba was expected to report approximately $854 million in losses from its subsidiary, Westinghouse, which was the main contractor for SCANA's Nuclear Project.[15]  Throughout the day on December 27, 2016, and December 28, 2016, news outlets in the United States continued to report on the need for a write-down and its potential ramifications.  Moody's also issued a credit downgrade for Toshiba given the announced financial distress.[16]

**January 19, 2017**: On January 19, 2017, Japanese media reported that Toshiba's write-down could reach 700 billion yen.[17]

**January 31, 2017**: During market hours on January 31, 2017, Dow Jones published that Toshiba would be exiting nuclear construction and that Toshiba's chairman, Shigenori Shiga, and Danny Roderick, a Toshiba executive and the former head of Westinghouse, would be resigning from their respective positions, according to a Toshiba executive.[18]

**February 14, 2017**: Before U.S. trading began on February 14, 2017, Toshiba submitted and was granted a request to delay the release of its earnings, creating a sense of uncertainty as investors worried about Toshiba's stability and U.S. nuclear acquisitions.[19]  In its earnings presentation and release, Toshiba disclosed that its write-down in connection with its struggling U.S. nuclear program, specifically as it related to Westinghouse, was $6.3 billion and that the potential for sale of all Westinghouse assets was possible.[20]

**February 17, 2017**: After the markets closed on February 16, 2017, on which SCANA announced its 4Q and FY 2016 financial results and management

---

[15] "BRIEF: Toshiba expected to report roughly 100 bln yen extraordinary loss on U.S. nuclear operations – Nikkei," *Reuters News*, December 26, 2016, 12:22 PM.  The Reuters article sourced its information from a Nikkei article that was released at 2:00 AM JST on December 27, 2016, or 12:00 PM on December 26, 2016.  Toshiba's official press release and accompanying conference call discussion disclosing and discussing further the need for a write-down was dated December 27, 2016, in Japan.

[16] "Rating Action: Moody's downgrades Toshiba Corp to Caa1; ratings on review for further downgrade," *Moody's Investors Service*, December 28, 2016.

[17] "Toshiba Drops 16 Percent on Reported Writedown Losses," *Bloomberg*, January 18, 2017.

[18] "Toshibato Exit Nuclear Construction Business," *Dow Jones Institutional News*, January 31, 2017, 1:22 PM.

[19] "Notice on Submission of Application for Approval of Extension of the Deadline for Submission of the 178th Third Quarter Securities Report (October 1, 2016 to December 31, 2016)," *Toshiba Corporation Investor Relations*, February 14, 2017 (*See* https://www.global.toshiba/ww/ir/corporate/news.html?newsListID=newslist-id-736761986&pageNo=1&month=2017-02); "URGENT: Toshiba submits application to postpone Tuesday earnings release," *Kyodo News*, February 14, 2017, 12:54 AM.

[20] "Provisional Outlook for FY2016 3Q Business Results and FY2016 Forecast, and Outline of Loss in Nuclear Power Business and Countermeasures," *Toshiba Corporation Investor Relations*, February 14, 2017 (*See* https://www.global.toshiba/ww/ir/corporate/news.html?newsListID=newslist-id-736761986&pageNo=1&month=2017-02); "Toshiba to take $6.3 bln hit on U.S. nuclear unit," *Reuters News*, February 14, 2017, 3:40 AM.

9

provided commentary on a 3:00 PM conference call, analysts issued reports expressing mixed reactions – some were reassured that SCANA had a contingency plan while others were concerned that SCANA shareholders would bear the brunt of the Nuclear Project's cost if Toshiba and Westinghouse were to exit.[21]

**March 22-23, 2017**: At 12:01 AM on March 22, 2017, Morgan Stanley reported that additional cost overruns and delays for the Nuclear Project could cost SCANA as much as 108% of the original cost estimate and as much as $5.2 billion in higher costs if Westinghouse declared bankruptcy and abandoned the Nuclear Project.[22] After trading hours on March 22, 2017, and before trading began on March 23, 2017, Reuters reported that Westinghouse had hired advisers for its potential bankruptcy and that SCANA and Southern Company ("Southern") had hired restructuring advisers.[23]

**July 28, 2017**: Aftermarket hours on July 27, 2017, SCANA and Santee Cooper (the co-owner of the Nuclear Project) announced acceptance of Toshiba's $2.168 billion for their Westinghouse obligations to the Nuclear Project. In addition to this news, SCANA and Santee Cooper notified the market that anticipated costs for the Nuclear Project would materially exceed prior Westinghouse estimates, and that they did not believe that the units would be online before January 2021, the deadline to qualify for production tax credits.[24]

**August 4, 2017**: On August 4, 2017, The Post and Courier reported that the South Carolina Attorney General announced an investigation into the abandoned Nuclear Project.[25] Following this news, South Carolina Senate leaders called for a special legislative session to block a potential electric rate hike for residents, calling into question SCANA's projected revenues from a

---

[21] "SCANA Reports Financial Results for Fourth Quarter and Full Year 2016, Announces 2017 Earnings Guidance and Long-term Guidance," *PR Newswire*, February 16, 2017, 7:30 AM; "FQ4 2016 Earnings Call Transcripts," *S&P Capital IQ*, February 16, 2017, 3:00 PM; "Reassessing Nuclear Risk," *Morgan Stanley*, February 17, 2017.

[22] "Implications of Potential Westinghouse Bankruptcy Filing," *Morgan Stanley*, March 22, 2017.

[23] "SCANA CORP, SOUTHERN CO HIRE ADVISERS TO PREPARE FOR BANKRUPTCY OF TOSHIBA CORP'S WESTINGHOUSE ELECTRIC CO LLC-SOURCES," *Reuters News*, March 22, 2017, 10:40 PM; "EXCLUSIVE-Westinghouse's clients gear up for bankruptcy fight-sources," *Reuters News*, March 22, 2017, 10:41 PM; "Exclusive: Westinghouse's clients gear up for bankruptcy fight - sources," *Reuters News*, March 23, 2017, 3:18 AM.

[24] "South Carolina Electric & Gas Company And Santee Cooper Agree To Amount of Guaranty Payments from Toshiba," *PR Newswire*, July 27, 2017, 6:04 PM.

[25] "Attorney General says he's investigating abandonment of nuclear reactors; South Carolina state senators call for special session," *The Post and Courier*, August 4, 2017.

rate hike.[26]  SCANA filed a Form 10-Q with the SEC disclosing that the Company would not earn Nuclear Tax Credits.[27]

**August 10, 2017**: After market hours, at 5:16 PM on August 9, 2017, The State[28] released news that the South Carolina Office of Regulatory Staff ("ORS") filed a motion to dismiss SCE&G's abandonment petition.[29]  At 6:33 PM on August 9, 2017, South Carolina lawmakers announced the creation of the Utility Ratepayer Protection Committee to protect customers.[30]

**August 11, 2017**: After market hours on August 10, 2017, The Post and Courier published an article titled, "CEO: SCANA may not return to scuttled nuclear project—even if a new partner emerges," that reported on the status of the Nuclear Project and on the ORS motion to dismiss.[31]  On August 11, 2017, SCANA dropped its plans to raise rates following abandonment of the Nuclear Project.[32]

**September 7, 2017**: After market hours on September 6, 2017, The Post and Courier published an article titled, "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South Carolina nuclear plant failure," and released internal emails from Kevin Marsh, SCANA's CEO,[33] ("CEO Marsh") and Toshiba executives that showcased a crumbling relationship between SCANA and Westinghouse, a subsidiary of Toshiba.[34]

**September 21-22, 2017**: At 8:00 AM on September 21, 2017, SCANA announced it had received a subpoena issued by the U.S. Attorney's Office for

---

[26] "SC Senate leaders want special session to block rate hikes after nuclear plant boondoggle," *The State*, August 4, 2017.

[27] SCANA Corp., Quarterly Report (Form 10-Q) (Aug. 4, 2017).

[28] All references to "The State", as capitalized here, refer to the South Carolina newspaper.

[29] "State agency challenges nuke plan shutdown proposal, says ratepayers could be hurt," *The State*, August 9, 2017, 5:16 PM.

[30] "Legislators to separately study failed nuclear project," *Associated Press Newswires*, August 9, 2017, 6:33 PM.

[31] "CEO: SCANA may not return to scuttled nuclear project – even if a new partner emerges," *The Post and Courier*, August 10, 2017; @postandcourier, "SCE&G might return to fail nuclear reactors — even if the governor can find another power company willing to partner…" *X*, August 10, 2017, 8:45 PM, available at https://x.com/postandcourier/status/895808232786210816.  X was formerly known as Twitter during the Class Period.

[32] "The Latest: Utility drops rate hike plans after project ends," *Associated Press Newswires*, August 11, 2017, 11:17 AM.

[33] Kevin Marsh was also SCANA's Chairman, CEO, President and COO.  *See* SCANA Corp., Annual Report (Form 10-K) at 20 (Feb. 24, 2017).

[34] "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South Carolina nuclear plant failure," *The Post and Courier*, September 7, 2017; @ricknelson7, "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South … @postandcourier," *X*, September 6, 2017, 7:44 PM, https://twitter.com/ricknelson7/status/905577426897559552.

the District of South Carolina related to the Nuclear Project.[35]  News and analyst commentary continued after hours and on September 22, 2017 regarding the subpoena.[36]

**September 27, 2017**: After market hours on September 26, 2017, the ORS requested that the South Carolina Public Service Commission ("PSC")  suspend the rates that SCANA was charging their customers for the Nuclear Project.[37]  At 7:39 AM on September 27, 2017, SCANA filed a Form 8-K disclosing the ORS request.[38]  At 11:35 AM, The State reported that SCANA may have softened the results of the Bechtel Corporation's assessment[39] of the Nuclear Project's status and challenges.[40]

**September 29, 2017**: At 5:54 PM on September 28, 2017, SCANA issued a press release announcing the PSC had decided to defer action on the ORS's request for SCE&G to suspend revised rates collections, and that SCE&G had filed a motion to dismiss the proposed suspension.[41]  Also on September 29, 2017, SCANA received multiple analyst downgrades revealing the seriousness of the regulatory risk faced by the company.[42]

**October 19, 2017**: On October 19, 2017, South Carolina Governor Henry McMaster ("Governor McMaster") addressed a letter to CEO Marsh, requesting SCANA immediately stop recovering funds from ratepayers for the abandoned

---

[35] "SCANA Receives Subpoena For Documents Relating To Nuclear Project," *PR Newswire*, September 21, 2017, 8:00 AM.

[36] "Scana Plunges to Lowest in Almost Two Years on Criminal Probe," *Bloomberg*, September 21, 2017, 8:52 PM; "Feds subpoena documents from SCANA and Santee Cooper, receive nuclear plant audit from Gov. McMaster; Failed S.C. nuclear project under federal scrutiny," *The Post and Courier*, September 22, 2017; "GrubHub and Scana fall while CarMax and Finish Line soar," *Associated Press Newswires*, September 22, 2017, 4:30 PM; "Flash Comment: Utility & Infrastructure Daily," *Wells Fargo Securities*, September 22, 2017.

[37] "SCE&G customers may get break on power bills to offset nuclear plant debacle," *The State*, September 26, 2017.

[38] SCANA Corp., Current Report (Form 8-K) (Sept. 26, 2017).

[39] SCANA hired the Bechtel Corporation ("Bechtel"), an engineering, construction, and project management firm, to conduct an analysis of the Nuclear Project.  Bechtel presented its findings in a 130-page Project Assessment Report, dated November 9, 2015 (the "First Bechtel Report").  *See* Complaint ¶¶ 5, 7, 159, 176.  Although Bechtel issued a second report on or around February 5, 2016 (the "Second Bechtel Report"), no new assessment work had been performed and thus no additional information had been added since the First Bechtel Report (collectively, the "Bechtel Reports").  The key conclusions of the Second Bechtel Reports indicated that completion of the Nuclear Project by the end of 2020 would be impossible, particularly given the dismal construction progress.  *See* Complaint ¶¶ 184-187.

[40] "How much worse was the original Bechtel nuclear report," *The State*, September 27, 2017, 11:35 AM.

[41] "Public Service Commission of South Carolina Defers Action on Office of Regulatory Staff Request to Suspend Revised Rates Collections," *PR Newswire*, September 28, 2017, 5:54 PM.

[42] "08:42 EDT Scana downgraded to Sell from Hold at Williams CapitalWilliams [*sic*] Capital..." *Theflyonthewall*, September 29, 2017, 8:42 AM; "Fitch Downgrades SCANA to 'BB+' / SCE&G to 'BBB-'; Negative Watch Maintained," *Dow Jones Institutional News*, September 29, 2017, 12:40 PM; "*S&PGR Downgrades SCANA And Subs To 'BBB'; On Watch Negative," *Dow Jones Institutional News*, September 29, 2017, 1:26 PM.

Nuclear Project.[43] The State extensively covered this letter and continued their negative news about SCANA by publishing information about SCANA executives' compensation packages from the beginning of the Nuclear Project and the "golden parachutes" available to them.[44]

**October 26-27, 2017**: On October 27, 2017, Morgan Stanley published a negative analyst report discussing some worst-case scenarios for SCANA given their most recent earnings announcement.[45]

**October 31, 2017**: Before trading began on October 31, 2017, SCANA issued a press release announcing the retirements of CEO Marsh and Stephen Byrne as Senior Vice President of SCANA and COO of SCE&G ("SCE&G COO Byrne") and appointments of then CFO Jimmy Addison ("CFO Addison") as the new CEO and Keller Kissam as the new COO.[46]

**November 24, 2017**: After market close on November 22, 2017, The Post and Courier published details about the extent to which SCANA had scrubbed the First Bechtel Report.[47]

**December 21, 2017**: After market close on December 20, 2017, SCANA issued a press release announcing that the PSC had denied SCE&G's Motion to Dismiss and ordered a hearing to be set for the ORS's request for rate relief.[48]

15. For each Corrective Disclosure Event, I reviewed relevant news, analyst reports, press releases, conference call transcripts, and conference call presentations, among other documents. Based on this review, coupled with my event study analysis, I conclude that the corrective information caused the price of SCANA Common Stock to decline on the Corrective Disclosure Events. I also analyzed whether and to what degree there was information released on the Corrective

---

[43] "Dear Mr. Marsh," *Governor Henry McMaster*, October 19, 2017.

[44] "SCANA should stop charging its customers for failed nuclear project, governor says," *The State*, October 19, 2017.

[45] "Exploring Severe Downside Scenarios Given Recent Governor and Legislator Comments," *Morgan Stanley*, October 27, 2017.

[46] "SCANA Corporation and South Carolina Electric & Gas Company Announce Leadership Changes," *PR Newswire*, October 31, 2017, 9:00 AM.

[47] "Insight that would've alerted problems with nuclear project scrubbed from audit two years ago," *The Post and Courier*, November 22, 2017; @postandcourier, "Insight that would've alerted problems with nuclear project was scrubbed from an audit two years ago…" *X*, November 22, 2017, 8:00 PM, available at https://x.com/postandcourier/status/933500346160226305.

[48] "Public Service Commission of South Carolina Orders Hearing on the South Carolina Office of Regulatory Staff's Request to Reduce Rates," *PR Newswire*, December 20, 2017, 5:01 PM; Complaint ¶¶ 25-27.

Disclosure Events that was unrelated to the alleged fraud (*i.e.*, "confounding" information). Based on this loss causation analysis, I conclude that the total fraud-related price decline associated with the Corrective Disclosure Events is $35.59 per share, as shown below.[49]

SCANA Common Stock
Artificial Inflation per Share Dissipated

| Date | Artificial Inflation Per Share Dissipated |
|---|---|
| December 27, 2016 | $0.33 |
| December 28, 2016 | $0.87 |
| January 19, 2017 | $0.74 |
| January 31, 2017 | $0.60 |
| February 14, 2017 | $2.68 |
| February 17, 2017 | $1.73 |
| March 22, 2017 | $0.80 |
| March 23, 2017 | $0.86 |
| July 28, 2017 | $4.30 |
| August 4, 2017 | $1.35 |
| August 10, 2017 | $0.90 |
| August 11, 2017 | $0.87 |
| September 7, 2017 | $0.90 |
| September 21, 2017 | $0.50 |
| September 22, 2017 | $1.50 |
| September 27, 2017 | $3.60 |
| September 29, 2017 | $2.43 |
| October 19, 2017 | $0.88 |
| October 27, 2017 | $1.63 |
| October 31, 2017 | $2.75 |
| November 24, 2017 | $1.66 |
| December 21, 2017 | $3.71 |
| **Total** | **$35.59** |

16. To further assess the appropriate level of artificial inflation during the Class Period, I also considered whether there were events during the Class Period that clearly bolstered the market's

---

[49] I described above how I consider the two-day window of October 26, 2017 to October 27, 2017 as a Corrective Disclosure Event. October 26, 2017 is not shown in this table because the price of SCANA Common Stock increased, after controlling for market and industry effects, on this date. As I describe in greater detail below in Section **VII.P**, I estimate that $0.32 of artificial inflation per share was introduced into the price of SCANA Common Stock on October 26, 2017, and that $1.63 of artificial inflation per share was dissipated from the price of SCANA Common Stock on October 27, 2017, which nets to a total of $1.31 over this two-day window. Thus, the $0.32 attributable to October 26, 2017 is shown in the following table that summarizes artificial inflation per share that was introduced into the price of SCANA Common Stock during the Class Period.

14

confidence in the Nuclear Project timeline and costs, and therefore, logically introduced a portion of the artificial inflation into the stock. I note that this is a conservative approach because in a matter alleging inflation maintenance as of the start of the Class Period (as in this matter), one acceptable approach is to assume that all of the artificial inflation dissipated via corrective disclosures was present in the stock price at the start of the Class Period. By allowing some of the inflation to enter the stock during the Class Period, this conservatively limits the amount of artificial inflation present in the stock price during earlier portions of the Class Period.

17. I consider such events related to SCANA's ability to obtain the Nuclear Tax Credits, the likelihood of SCANA facing investigations and regulatory actions, or SCANA's ability to recoup losses from the Nuclear Project through the BLRA. I then relied upon my event study to determine if there was a statistically significant increase in the market price of SCANA Common Stock (after controlling for market and industry movements) in the wake of the release of such information. The events I identified that fit the criteria above introduced a portion of the artificial inflation during the Class Period into the market price of SCANA Common Stock on the following dates (the "Inflation Creating Events"):

> **September 2, 2016:** After trading hours on September 1, 2016, SCANA's principal and wholly owned subsidiary, SCE&G announced that it filed a petition with the ORS and various other parties in South Carolina for a settlement agreement under which Units 2 and 3 of the Nuclear Project would be completed by August 2019 and August 2020, respectively, and capital costs would include an additional $831 million.[50]
>
> **February 15, 2017:** After the market closed on February 14, 2017, SCANA issued a press release stating that Westinghouse had announced an extended completion schedule that would still qualify the Nuclear Project for federal production tax credits and that Toshiba had confirmed its commitment to finishing the Nuclear Project.[51]

---

[50] "SCE&G Announces Settlement Agreement Related to Election of Fixed Price Option and Petition to Update Construction and Capital Cost Schedules for New Nuclear Units," *PR Newswire*, September 1, 2016, 5:10 PM.

[51] "SCANA Receives Reaffirmation from Westinghouse Regarding Completion of VC Summer New Nuclear Project," *PR Newswire*, February 14, 2017, 4:30 PM.

**July 31, 2017 – August 1, 2017**: At 1:00 PM on July 31, 2017, SCANA announced it would be abandoning the Nuclear Project, with management providing additional background information on a special call after market hours.[52] The following day, SCANA executives held an *ex parte* briefing at the PSC.[53]

**August 14, 2017:** On August 14, 2017, Wells Fargo published an analyst report opining that SCANA would likely receive a "constructive settlement" following its decision to abandon the Nuclear Project.[54]

**November 9, 2017:** On November 9, 2017, the PSC held a hearing with SCE&G regarding its petition for a settlement agreement that was announced on September 1, 2016,[55] after which The State reported that SCANA would cease maintenance of the Nuclear Project by the end of 2017 and surrender its federal license.[56]

18. In other words, I consider the possibility that some of the artificial inflation that was dissipated from the share price of SCANA Common Stock on the Corrective Disclosure Events did not extend all the way back to the beginning of the Class Period. I therefore conservatively *reduce* the artificial inflation prior to the Inflation Creating Events.

19. On the Inflation Creating Events, I reviewed relevant analyst reports, press releases, and conference call transcripts, among other documents. Based on this review, and coupled with my event study analysis, I conclude that the inflation creating information caused the price of SCANA Common Stock to increase on the Inflation Creating Events. I also analyzed whether there was information released on the Inflation Creating Events that was unrelated to the alleged fraud (*i.e.*, "confounding" information).[57] I note that an event can introduce a portion of artificial inflation into

---

[52] "South Carolina Electric & Gas Company to Cease Construction And Will File Plan of Abandonment of The New Nuclear Project," *PR Newswire*, July 31, 2017, 1:00 PM.

[53] "Allowable Ex Parte Briefing – ND-2017-12-E," *Public Service Commission of South Carolina*, August 1, 2017, 10:05 AM.

[54] "SCG: Beyond The Negative Headlines -- Part 2," *Wells Fargo Securities*, August 13, 2017; "SCG: Scana still likely to obtain 'constructive' settlement," *The Fly via Bloomberg*, August 14, 2017, 8:09 AM.

[55] "SCANA seeks $2 billion in tax breaks for abandoning failed nukes," *The State*, November 9, 2017.

[56] *Id*.

[57] As discussed in more detail in **Section VIII**, I find no evidence that information disclosed on the Inflation Creating Events was unrelated to the alleged fraud.

16

the price of SCANA Common Stock even if there was not an alleged misstatement or omission made on that day.  This is because information does not necessarily need to be false or misleading to bolster investors' confidence in the Nuclear Project timeline and costs.  For example, consider the event described above on July 31, 2017, where SCANA abandoned the Nuclear Project.  Although this is not a false and misleading statement alleged by Plaintiff, this event still introduced artificial inflation into the price of SCANA Common Stock because the abandonment signaled to investors that SCANA could stop spending money on the Nuclear Project and could recoup costs under the BLRA.

20.    For each Inflation Creating Event, I did not identify any other Company-specific, value-relevant news that was released outside of the inflation creating information.  Based on this analysis, I conservatively conclude that the total fraud-related price increase associated with the Inflation Creating Events is $9.88 per share, as shown below:

**SCANA Common Stock**
**Artificial Inflation per Share Introduced**

| Date | Artificial Inflation Per Share Introduced |
|---|---|
| September 2, 2016 | $0.71 |
| February 15, 2017 | $0.82 |
| July 31, 2017 | $2.89 |
| August 1, 2017 | $2.91 |
| August 14, 2017 | $0.80 |
| October 26, 2017 | $0.32 |
| November 9, 2017 | $1.43 |
| **Total** | **$9.88** |

21.    As set forth above, I understand that Plaintiff expects to prove that during the Class Period, Defendants materially misled investors to believe that their clean audit reports were accurate and that SCANA's financial statements were in accordance with GAAP and reflected the true progress of the Nuclear Project.  Further, I understand that Plaintiff expects to prove that, as of the start of the Class Period, Defendants knew or recklessly disregarded that (1) SCANA did not have a reliable, fully resource-loaded integrated schedule that supported the GSCDs; (2) the GSCDs were

17

unrealistic and unattainable; and (3) SCANA would be unable to recoup losses from or obtain Nuclear Tax Credits for the Nuclear Project. Additionally, I understand Plaintiff expects to prove that Defendants' misstatements allegedly concealed that the Nuclear Project would experience cost overruns, would subject SCANA to investigations and regulatory actions, and that SCANA would be unable to recoup its billions in costs under the BLRA. As a result of the foregoing, I find no economic reason to believe that the financial impact of the misstatements and/or omissions would have been any different earlier in the Class Period. Therefore, I assume these misstatements and/or omissions maintained the level of artificial inflation present in SCANA Common Stock. Additionally, I am not aware of evidence demonstrating that the economic impact of the alleged misstatements and omissions would have been different had a disclosure of the relevant truth been made earlier in the Class Period. Therefore, I find no economic reason to deviate from the standard constant dollar methodology. I summarize how artificial inflation evolved during the Class Period in the table below:

**Corrected Daily Inflation Table**
**SCANA Common Stock**
**Artificial Inflation per Share During the Class Period**

| Date Range | Artificial Inflation Per Share |
|---|---|
| February 26, 2016 - September 1, 2016 | $25.71 |
| September 2, 2016 - December 26, 2016 | $26.42 |
| December 27, 2016 | $26.09 |
| December 28, 2016 - January 18, 2017 | $25.22 |
| January 19, 2017 - January 30, 2017 | $24.48 |
| January 31, 2017 - February 13, 2017 | $23.88 |
| February 14, 2017 | $21.20 |
| February 15, 2017 - February 16, 2017 | $22.02 |
| February 17, 2017 - March 21, 2017 | $20.29 |
| March 22, 2017 | $19.49 |
| March 23, 2017 - July 27, 2017 | $18.63 |
| July 28, 2017 - July 30, 2017 | $14.33 |
| July 31, 2017 | $17.22 |
| August 1, 2017 - August 3, 2017 | $20.13 |
| August 4, 2017 - August 9, 2017 | $18.78 |
| August 10, 2017 | $17.88 |
| August 11, 2017 - August 13, 2017 | $17.01 |
| August 14, 2017 - September 6, 2017 | $17.81 |
| September 7, 2017 - September 20, 2017 | $16.91 |
| September 21, 2017 | $16.41 |
| September 22, 2017 - September 26, 2017 | $14.91 |
| September 27, 2017 - September 28, 2017 | $11.31 |
| September 29, 2017 - October 18, 2017 | $8.88 |
| October 19, 2017 - October 25, 2017 | $8.00 |
| October 26, 2017 | $8.32 |
| October 27, 2017 - October 30, 2017 | $6.69 |
| October 31, 2017 - November 8, 2017 | $3.94 |
| November 9, 2017 - November 23, 2017 | $5.37 |
| November 24, 2017 - December 20, 2017 | $3.71 |

22.    The remainder of this report is organized as follows: **Section III** provides an overview of Deloitte, SCANA, and the allegations in this matter. **Section IV** reiterates my opinions in my Efficiency Report related to market efficiency and how damages can be calculated on a class-wide

19

basis subject to a common methodology. **Section V** summarizes my approach to analyzing the value-relevance of the allegedly misrepresented and omitted facts in this case. **Section VI** discusses loss causation principles. **Section VII** presents my analysis of the Corrective Disclosure Events. **Section VIII** discusses my analysis of the Inflation Creating Events. **Section IX** presents the resulting artificial inflation per share and damages methodology for SCANA Common Stock.

## III. BACKGROUND

### A. OVERVIEW OF DELOITTE AND SCANA

23. Deloitte, LLP manages U.S. subsidiaries that offer tax, consulting, and financial advisory services, and is the largest professional service organization in the United States.[58] Deloitte & Touche, LLP is the accounting arm of Deloitte, LLP, offering audit and enterprise risk services to clients (together with Deloitte, LLP, "Deloitte" or "Defendants").[59] According to the Complaint, Deloitte was SCANA's external auditor for over 70 years, and subsequently was responsible for understanding SCANA's business, identifying and responding to risks of material misstatements and omissions, and acquiring sufficient, appropriate audit evidence so it could assure that SCANA's financial statements were in accordance with GAAP.[60]

24. SCANA was an energy-based holding company engaged, through subsidiaries, in electric and natural gas utility operations and other energy-related businesses. SCANA's principal and wholly owned subsidiary, South Carolina Electric & Gas ("SCE&G"), was a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.[61] SCE&G comprised a substantial portion of SCANA's business. Namely, for the fiscal year ended December 31, 2015, SCANA reported operating revenue of $4.4 billion, of which $2.9

---

[58] Complaint ¶ 22.

[59] Complaint ¶¶ 21-22.

[60] Complaint ¶ 3.

[61] Complaint ¶ 23.

billion, or 66%, was generated by SCE&G.[62] Similarly, for the fiscal year ended December 31, 2016, SCANA reported operating revenue of $4.2 billion, of which $3.0 billion, or 71%, was generated by SCE&G.[63]

25.    Years before the start of the Class Period, on May 23, 2008, SCANA issued a press release announcing that SCE&G had contracted with Westinghouse Electric Company ("Westinghouse") and Stone & Webster to design, engineer, and construct two 1,117-megawatt nuclear electric generating units at the Virgil C. Summer Nuclear Station ("Summer Station") near Jenkinsville, South Carolina (the "Nuclear Project").[64] According to the Complaint, this was the largest capital project undertaken in SCANA's history, estimated to cost $9.8 billion.[65]

26.    The expected timeline for the completion of phases of the Nuclear Project changed in the several years following the initial announcement in 2008. At the start of the Class Period, SCANA conveyed to investors that Unit 2 was scheduled to be completed by August 2019 and Unit 3 was expected to be completed by August 2020.[66] At the same time, SCANA also made it clear that the Company would receive Nuclear Tax Credits, totaling as much as $1.4 billion, if the Nuclear Project met these GSCDs and other requirements.[67] In February 2017, SCANA disclosed revised

---

[62] SCANA Corp., Annual Report (Form 10-K) at 23, 47 (Feb. 26, 2016).

[63] SCANA Corp., Annual Report (Form 10-K) at 95-96 (Feb. 24, 2017).

[64] SCANA Corp., Current Report (Form 8-K) (May 23, 2008).

[65] Complaint ¶ 39.

[66] SCANA Corp., Annual Report (Form 10-K) at 134 (Feb. 26, 2016).

[67] *See Id*. at 80: "The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the Internal Revenue Code to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met. These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion. Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. Based on the guaranteed substantial completion dates provided above, both New Units are expected to be operational and to qualify for the nuclear production tax credits…"

deadlines of April 2020 and December 2020 for Unit 2 and 3 respectively, and reaffirmed that these timelines would allow the Company to still receive Nuclear Tax Credits.[68]

## B.   PLAINTIFF'S ALLEGATIONS

27.    Plaintiff's Complaint alleges that SCANA's Common Stock prices were artificially inflated on the first day of the Class Period by statements made that day that failed to disclose material facts set forth in the Complaint.  Defendants' subsequent statements during the Class Period also allegedly failed to disclose material facts, thereby maintaining the artificial inflation in the price of SCANA Common Stock.  The fact that the prices of SCANA Common Stock did not increase in a statistically significant manner on the dates of each of the alleged false and misleading statements and omissions does not mean there was no inflation on that day from the misstatements.  In fact, where a misleading statement or omission maintains market expectations or otherwise prevents a negative market reaction because the information was withheld from the market, it would not be expected to cause an immediate increase in the trading price of the stock.

28.    The Complaint also alleges that throughout the Class Period, Deloitte repeatedly violated its professional responsibilities and deceived investors about SCANA's accounting for, and expected completion of, the Nuclear Project.  Specifically, Plaintiff alleges that Deloitte knowingly or recklessly misled investors by giving "unqualified, 'clean' audit reports" covering SCANA's internal controls and financial statements.  Furthermore, Plaintiff alleges that Defendants were aware as of the start of the Class Period that SCANA did not have a reliable, fully resource-loaded integrated schedule that supported the GSCDs.  Allegedly, this deceived investors into believing that

---

[68] *See* SCANA Corp., Annual Report (Form 10-K) at 12 (Feb. 24, 2017): "…the contractual guaranteed substantial completion dates of August 2019 and2020 for Unit 2 and Unit 3, respectively, which were reflected in the October 2015 Amendment, are not likely to be met. Instead, revised substantial completion dates of April 2020and December 2020 are reflected within WEC's revised project schedule. While these later dates remain within the SCPSC-approved 18-month contingency periods provided for under the BLRA, and achievement of such dates would also allow the output of both units to qualify, under current law, for federal production tax credits…".

22

SCANA would complete its Nuclear Project in time to obtain $1.4 billion in Nuclear Tax Credits, despite Deloitte allegedly having "voluminous evidence that SCANA could not possibly achieve this goal,"[69] and that "numerous reports and documents were available to any reasonably diligent auditor demonstrating that SCANA's financial statements were not in accordance with GAAP, despite Deloitte's 'clean' audit reports to the contrary."[70] Additionally, Deloitte's misconduct surrounding their audit reports concealed from investors the risks that SCANA would be subject to investigations and regulatory action and that SCANA would be unable to recoup losses from the Nuclear Project through the BLRA.

29. For example, on the first day of the Class Period, February 26, 2016, SCANA filed its annual Form 10-K with the SEC.[71] In this Form 10-K, Deloitte "expressed an unqualified opinion on the Company's internal control over financial reporting," and included the following statements:

> In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2015 and 2014, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2015, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.
>
> …
>
> In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015…[72]

30. However, Plaintiff alleges that these statements were false and misleading because Deloitte did not adhere to auditing standards, failed to gather sufficient evidence about the Nuclear Project's completion timeline and tax credit eligibility, neglected necessary audit procedures related

---

[69] Complaint ¶ 1.

[70] Complaint ¶ 15.

[71] SCANA Corp., Annual Report (Form 10-K) (Feb. 26, 2016).

[72] *Id.*

to SCANA's construction work and financial disclosures, and did not properly assess SCANA's internal financial controls.[73]  Deloitte also allegedly ignored significant inconsistencies in SCANA's financial disclosures, indicating ineffective disclosure controls, and overlooked red flags indicating SCANA's financial statements were materially misstated and omitted key information about the Nuclear Project's status, thus not aligning with GAAP.[74]

31.     The above-mentioned statements are only examples of the false and misleading statements and omissions that Plaintiff alleges in the Complaint.  The Complaint and the Interrogatories[75] contains a full list of the alleged false and misleading statements and omissions that I was asked to assume occurred.

32.     Plaintiff alleges that the relevant truth concerning the Nuclear Project was revealed through a series of partial corrective disclosures from late December 2016 through December 20, 2017.[76]  These disclosures included news about cost overruns, missed deadlines, financial distress, and the bankruptcy of SCANA's lead contractor on the Nuclear Project, Westinghouse, and its parent company, Toshiba Corporation.[77]  The disclosures further included a press release from SCANA on July 31, 2017, announcing its intentions to: (a) abandon the Nuclear Project, and (b) file a petition with the PSC seeking approval of its abandonment plan.[78]  Further disclosures and materializations of the risks followed, including numerous updates, press releases, news coverage, investigations and lawsuits, public testimony, and regulatory updates, during the summer and fall of 2017.  The

---

[73] Complaint ¶ 445.

[74] Complaint ¶¶ 445-446.

[75] LEAD PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' THIRD SET OF INTERROGATORIES, in International Brotherhood of Electrical Workers Local 98 Pension Fund on Behalf of Itself and All Others Similarly Situated vs. Deloitte & Touche, LLP and Deloitte LLP, filed September 13, 2024 (the "Interrogatories").

[76] Complaint ¶ 312.

[77] Complaint ¶¶ 4, 14.

[78] Complaint ¶ 344.

24

emerging facts revealed that (1) the Nuclear Project would not be completed by the end of 2020, or at all; (2) the actual costs of the Nuclear Project were significantly higher than projected; (3) SCANA knew of and actively misrepresented these risks; (4) SCANA's refusal to correct the deficiencies ensured the Nuclear Project's failure; and (5) given Westinghouse and Toshiba's known financial distress and the election of the Fixed Price Option ("FPO") in the EPC Amendment, it was likely that Westinghouse would be unable to complete the Nuclear Project. These disclosures culminated in a press release by the PSC on December 20, 2017 (after-market hours). The related news coverage indicated the need for an inspection and hearing: (1) to determine the reasonableness of SCE&G's retail electric rates; (2) to address the potential effect that the removal of revenues from these electric rates could have on SCE&G; and (3) to decide whether SCANA should refund its customers for the roughly $1.8 billion it had collected from them to fund the Nuclear Project to date.[79]

33.    Finally, Plaintiff alleges Deloitte's misconduct ultimately caused damages to purchasers of SCANA Common Stock who unknowingly bought SCANA Common Stock at artificially inflated prices and were damaged when the stock price ultimately reflected the relevant truth regarding the concealed information.

## IV.    MARKET EFFICIENCY AND DAMAGES ON A CLASS-WIDE BASIS

34.    In my Efficiency Report, I empirically analyzed the eleven market efficiency-related factors that courts typically examine during the Class Period for SCANA Common Stock. In so doing, my Efficiency Report demonstrated that: (1) the average weekly trading volume of SCANA Common Stock during the Class Period was 5.81 million shares, which represents 4.07% turnover per week, easily exceeding the *Cammer* threshold and comparing favorably against other exchange-traded securities (*Cammer* Factor 1);[80] (2) securities analysts followed SCANA, and there was also

---

[79] Complaint ¶ 404.

[80] Efficiency Report Section IV.A, *see* ¶¶ 27-28.

substantial press coverage among other sources of publicly available information regarding the Company (*Cammer* Factor 2);[81] (3) SCANA had at least 116 market makers and brokers providing similar activity over the Class Period and SCANA Common Stock traded on the NYSE, thus satisfying the "market maker" factor (*Cammer* Factor 3);[82] (4) SCANA filed a Form S-3 during the Class Period and a Form S-3ASR before and after the Class Period and SCANA made all required filings with the SEC in a timely manner during the Class Period (*Cammer* Factor 4);[83] and (5) there was a clear cause-and-effect relationship between new Company-specific information and the market price of SCANA Common Stock during the Class Period (*Cammer* Factor 5).[84] The analysis in my Efficiency Report also demonstrates that (6) the market capitalization of SCANA Common Stock averaged $9.4 billion over the Class Period (*Krogman* Factor 1);[85] and (7) SCANA Common Stock also had an average bid-ask spread ranging from 0.010% to 0.035% during the Class Period (*Krogman* Factor 2).[86] My Efficiency Report further shows that (8) on average, insiders held approximately 8% of SCANA's Common Stock while approximately 68% of outstanding shares were held by non-insiders (*Krogman* Factor 3);[87] and (9) at least 991 institutions held SCANA Common Stock at some point during the Class Period (Additional Factor 1).[88] Finally, (10) there was no evidence of autocorrelation for SCANA Common Stock during the Class Period (Additional Factor 2);[89] and (11) there was options trading during the Class Period, which is associated with the

---

[81] Efficiency Report Section IV.B, *see* ¶¶ 30-32.

[82] Efficiency Report Section IV.C, *see* ¶¶ 35-37.

[83] Efficiency Report Section IV.D, *see* ¶ 40.

[84] Efficiency Report Section IV.E.

[85] Efficiency Report Section IV.F, *see* ¶ 58.

[86] Efficiency Report Section IV.G, *see* ¶ 60.

[87] Efficiency Report Section IV.H, *see* ¶ 63 and Exhibit 10.

[88] Efficiency Report Section IV.I, *see* ¶ 65.

[89] Efficiency Report Section IV.J, *see* ¶ 68.

underlying security trading in an efficient market (Additional Factor 3).[90] Taken together, these metrics provide strong economic evidence supporting my opinion that SCANA Common Stock traded in an efficient market throughout the entire Class Period.

35.   Lastly, I described in my Efficiency Report how the "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act.  I therefore concluded that SCANA Common Stock damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

36.   In my Rebuttal Report, I concluded that nothing in the Defendants' Opposition to Class Certification or in Defendants' Motion to Exclude disturbed the opinions expressed in my Prior Reports.[91]  I described why Defendants' arguments regarding Plaintiff's theory of liability do not change the appropriateness of the out-of-pocket damages methodology to calculate class-wide damages, which was first introduced in this matter in my Efficiency Report, and thus do not disturb my opinion that the out-of-pocket methodology is appropriate in this matter.[92]  I also provided evidence of and an analysis supporting price impact for Plaintiff's alleged misstatements and omissions throughout the entirety of the Class Period.[93]  I continue to hold the opinions expressed in my Prior Reports.

## V.   IMPORTANCE OF ALLEGED MISSTATEMENTS AND OMISSIONS

37.   Financial economists consider economic materiality to relate to information, news, announcements, or other events that would impact the valuation of a company and its securities, and thus, investors' demand for those securities.  As such, my opinions in this report regarding economic

---

[90] Efficiency Report Section IV.K, *see* ¶ 69.

[91] Rebuttal Report ¶ 6.

[92] Rebuttal Report Sections IV, V.

[93] *Supra* ¶ 4.

27

materiality are based upon my analysis of such information as it pertains to finance, economics, and valuation, and are not intended to represent legal analyses or conclusions. An element of the loss causation analysis involves an examination of fundamental valuation principles, public statements, and analysts' commentary in order to assess whether the subject matter of the alleged misrepresentations and omissions is economically material, and thus, value-relevant to investors. While I understand that materiality has a legal definition in matters such as this one, for the purposes of my report, the term "economic materiality" means the importance of information to the market (and thus, investors), such that it would affect the valuation of a security and investors' decisions to buy or sell the security.

38. Therefore, the relevant question is whether the allegedly misrepresented and omitted information—that Deloitte concealed from the market through its clean audit reports—would have been important to investors. For purposes of evaluating whether the alleged misstatements and omissions are material from an economic and financial perspective, I also consider what information was concealed and would have been disclosed in a hypothetical "but-for" disclosure. In this matter, based on the Complaint's allegations, I understand that the Corrective Disclosure Events revealed the relevant truth about how; (1) the Nuclear Project would not be in service by 2021; (2) SCANA would not meet the deadline to receive credits pursuant to the Nuclear Tax Credits; (3) SCANA would be subject to investigations and regulatory action; and (4) SCANA would be unable to recoup losses from the Nuclear Project through the BLRA.[94]

39. For the purposes of my report, I assume that the misrepresentations and omissions the Complaint alleges in this matter misinformed investors regarding the true status of the Nuclear Project. I conclude that the misrepresentations and omissions and the undisclosed information

---

[94] I am not suggesting the specific wording of any hypothetical but-for disclosure. Instead, I am describing the relevant economic factors that any such disclosure would convey based upon my understanding of the Complaint's allegations.

alleged in this matter were economically material to investors in SCANA Common Stock.  I base my opinion of the importance of this information on: (1) SCANA's consistent highlighting of key aspects of the Nuclear Project in public statements, including estimated GSCDs, costs, and the realization of Nuclear Tax Credits, recognizing their influence on investor sentiment; (2) analyst commentary expressing how the Nuclear Project had implications for SCANA's business, including the timelines, costs, and likelihood that SCANA would receive the Nuclear Tax Credits, face investigations or regulatory actions, or be able to recoup associated costs once it was abandoned; (3) the application of basic valuation principles to SCANA's business that indicates the value of SCANA's Common Stock price was directly related to future cash flows from the Nuclear Project and its ability to recover its costs under the BLRA; and (4) my event study analysis, that establishes a statistically significant decline in the price of SCANA Common Stock on the Corrective Disclosure Events.

40.    Further, during its 2015 and 2016 Audits, Deloitte itself repeatedly recognized the materiality of the Nuclear Project related disclosures as material to investors.  For example, Deloitte's 2015 Planning workpaper states the following:

> ***Due to the overall focus on the construction of the New Units by investors****,* the risk of material misstatement is that significant changes, delays, or other events impacting the projected construction schedule or costs of the New Units could adversely impact the Companies' liquidity or financial position and these matters are not appropriately accounted for or disclosed.[95]

---

[95] 2015 WP 1810, Fiscal Year 2015 SCANA Integrated Audit Planning Memo [D&T_SCANA_IBEW_00005802 – D&T_SCANA_IBEW_00005852 at '5821]. *See also, e.g.*, 2015 WP 5625, V.C. Summer 2&3 Contract Overview Memo [D&T_SCANA_IBEW_00012729 – D&T_SCANA_IBEW_00012746 at '2729] (similar); 2015 WP 2330, Audit Summary Memo [D&T_SCANA_IBEW_00007836 – D&T_SCANA_IBEW_00007881 at '7845]; 2015 WP 1312, SCANA Corporation, 2015 Integrated Audit Plan, Deloitte presentation to SCANA Audit Committee, July 2015 [D&T_SCANA_IBEW_00004091 – D&T_SCANA_IBEW_00004147 at '4112]; 2015 WP 2800B, SCANA Audit Committee Final Communications YE 2015 [D&T_SCANA_IBEW_00008434 – D&T_SCANA_IBEW_00008484 at '8440]; 2016 WP 5625A, New Nuclear Development (NND) Memo [D&T_SCANA_IBEW_00037339 –D&T_SCANA_IBEW_00037367 at '7339] (similar); 2016 WP 1210, Comprehensive Risk Assessment. [D&T_SCANA_IBEW_00028403 – D&T_SCANA_IBEW_00028424 at '8410-8411, '8413, and '8420-8422] (similar); 2016 WP 1810, Fiscal Year 2016 SCANA Integrated Audit Planning Memo [D&T_SCANA_IBEW_00030419 – D&T_SCANA_IBEW_00030434 at '0429-0430] (similar).

## A. PUBLIC STATEMENTS REGARDING THE NUCLEAR PROJECT

41. SCANA considered information about the Nuclear Project, including GSCDs, costs, ability to meet deadlines in order to receive the Nuclear Tax Credits, likelihood of regulatory actions or investigations, and ability to recoup costs under the BLRA as important drivers of SCANA's value and the valuation of its stock. This is demonstrated through statements made by the Company in SCANA's SEC filings and during Company conference calls.

42. In its filings with the SEC throughout the Class Period, SCANA made clear that it periodically posted pertinent information regarding the Nuclear Project to its website and urged investors to review this information. For example:

> SCANA and SCE&G post information from time to time regarding developments relating to SCE&G's new nuclear project and other matters of interest to investors on SCANA's website. On SCANA's homepage, there is a yellow box containing links to the Nuclear Development and Other Investor Information sections of the website. The Nuclear Development section contains a yellow box with a link to project news and updates. The Other Investor Information section of the website contains a link to recent investor related information that cannot be found at other areas of the website. Some of the information that will be posted from time to time, including the quarterly reports that SCE&G submits to the SCPSC and the ORS in connection with the new nuclear project, may be deemed to be material information that has not otherwise become public. Investors, media and other interested persons are encouraged to review this information and can sign up, under the Investor Relations Section of the website, for an email alert when there is a new posting in the Nuclear Development and Other Investor Information yellow box.[96]

43. The Company reiterated this on its conference calls during the Class Period. For example:

> Additionally, we post information related to our new nuclear project and other investor information directly to our website at scana.com. On SCANA's home page, there is a yellow box containing links to the nuclear development and other investor information sections of the website. It is possible that some of the

---

[96] SCANA Corp., Annual Report (Form 10-K) at 5 (Feb. 26, 2016); *see also* SCANA Corp., Annual Report (Form 10-K) at 5 (Feb. 24, 2017) and SCANA Corp., Annual Report (Form 10-K) at 5 (Feb. 23, 2018).

information that we will be posting from time to time may be deemed material information that has not otherwise become public.[97]

You can sign up for email alerts under the Investors section of scana.com to notify you when there is a new posting in the nuclear development and/or other investor information sections of the website.[98]

44.     The Company also made it clear that the realization of the Nuclear Tax Credits was dependent on the expected GSCDs of the Nuclear Project:

> These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion. Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. ***Based on the guaranteed substantial completion dates provided above, both New Units are expected to be operational and to qualify for the nuclear production tax credits; however, further delays in the schedule or changes in tax law could impact such conclusions. When and to the extent that production tax credits are realized, their benefits are expected to be provided directly to SCE&G's electric customers***.[99]

45.     During the Class Period, the Company routinely updated investors on the GSCDs of the Nuclear Project, demonstrating that SCANA understood the importance of keeping investors informed on the Nuclear Project timeline.  For instance:

> In September 2015, the SCPSC [South Carolina Public Service Commission or PSC] approved an updated BLRA milestone schedule based on ***revised substantial completion dates for Units 2 and 3 of June 2019 and June 2020, respectively,*** each subject to an 18-month contingency period. In addition, the SCPSC approved certain updated owner's costs ($245 million) and other capital costs ($453 million), of which $539 million were associated with the schedule delays and other contested costs. In this proceeding, SCE&G's total projected capital costs (in 2007 dollars) and ***gross construction cost estimates (including escalation and AFC) were estimated to be $5.2 billion and $6.8 billion, respectively***. These projections included cost amounts related to the Revised, Fully-Integrated Construction Schedule for which SCE&G had not accepted responsibility and which were the subject of dispute. As such, these updated

---

[97] "FQ1 2016 Earnings Call Transcripts," *S&P Capital IQ*, April 28, 2016, 3:00 PM.

[98] "FQ2 2016 Earnings Call Transcripts," *S&P Capital IQ*, July 28, 2016, 3:00 PM.  *See also* "FQ3 2016 Earnings Call Transcripts," *S&P Capital IQ*, October 27, 2016, 3:00 PM; "FQ4 2016 Earnings Call Transcripts," *S&P Capital IQ*, February 16, 2017, 3:00 PM; and "FQ1 2017 Earnings Call Transcripts," *S&P Capital IQ*, April 27, 2017, 3:00 PM.

[99] SCANA Corp., Annual Report (Form 10-K) at 80-81 (Feb. 26, 2016); *see also* SCANA Corp., Annual Report (Form 10-K) at 90 (Feb. 24, 2017).

milestone schedule and projections did not reflect the resolution of negotiations. In addition, the **SCPSC approved a revision to the allowed return on equity for new nuclear construction from 11.0% to 10.5%.** This revised return on equity will be applied prospectively for the purpose of calculating revised rates sought by SCE&G under the BLRA on and after January 1, 2016, until such time as the New Units are completed.[100]

Among other things, the October 2015 Amendment: … *(ii) revised the guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively*… Under the October 2015 Amendment, SCE&G's total estimated project costs increased by approximately $286 million over the $6.8 billion approved by the SCPSC in September 2015, *bringing its total estimated gross construction cost of the project (including escalation and AFC) to approximately $7.1 billion*.[101]

WEC has engaged Fluor to review and confirm the project schedule. The owners understand that this process has not been completed. The analysis by Fluor, to the extent that it is shared with the owners, could affect the owners' expectations regarding the project schedule. In a discussion of the project status on September 26, 2016, and in response to SCE&G's specific questioning regarding work crew efficiency and productivity and schedule mitigation efforts, *WEC executive management stated that it had no reason to believe that the August 2019 and 2020 guaranteed completion dates would not be met.* WEC submits monthly schedule updates, however, and it has reported that there are significant risks to achieving the current guaranteed substantial completion dates. WEC has also reported that it is continuing to develop detailed mitigation plans to address those risks.[102]

The approved construction schedule designates contractual guaranteed substantial completion dates of August 31, 2019 and August 31, 2020 for Units 2 and 3, respectively, although *recent communications from WEC indicate substantial completion dates of April 2020 and December 2020 for Units 2 and 3, respectively.* These later dates remain within SCPSC-approved 18-month contingency periods provided for under the BLRA, and achievement of such dates would also allow the output of both units to qualify, under current law, for federal production tax credits. However, there is substantial uncertainty as to WEC's ability to meet these dates given its historical inability to meet forecasted productivity and work force efficiency levels.[103]

---

[100] SCANA Corp., Annual Report (Form 10-K) at 79 (Feb. 26, 2016).

[101] *Id*.

[102] SCANA Corp., Quarterly Report (Form 10-Q) at 35-36 (Nov. 4, 2016).

[103] SCANA Corp., Annual Report (Form 10-K) at 25 (Feb. 24, 2017).

SCE&G also considered that even the newly revised substantial completion dates identified by WEC of April and December 2020 for Unit 2 and Unit 3, respectively, would not be met.[104]

On August 1, 2017, SCE&G filed the Abandonment Petition with the SCPSC which sought recovery of costs expended on the construction of the New Units, including certain costs incurred subsequent to SCE&G's last revised rates update, other costs under the abandonment provisions of the BLRA, and affirmation of SCE&G's decision to abandon construction of the New Units, among other things.[105]

46. Importantly, I understand that Plaintiff alleges that Defendants misrepresented the relevant truth to investors by disclosing only revised deadlines and the *risk* of failing to meet such deadlines for completion of the Nuclear Project (and therefore qualification for Nuclear Tax Credits), when, in reality, Defendants already *knew* or were reckless in not knowing at the time that these deadlines were not achievable and failed to disclose the true status of the Nuclear Project to investors.[106] Indeed, I understand that Plaintiff expects to prove that by the start of the Class Period, Defendants knew that SCANA did not have a reliable, fully resource-loaded integrated schedule that supported the GSCDs.

47. Throughout the Class Period, SCANA regularly provided updates to investors regarding the Nuclear Project on its conference calls. For example, on April 28, 2016, SCE&G COO Byrne explained:

> While Slide 13 presents *cost as of the settlement date*, in our next quarterly BLRA update filing to be filed in the next couple of weeks, *we plan to update the project costs for estimated change orders*, primarily related items listed in Exhibit C of the settlement agreement. As you may recall, Exhibit C described items not resolved in net settlement.
>
> *Listed on Slide 14 are several of those items for which we now have estimated the cost.* Also listed are the estimated change orders associated with escrowing the software and documentation necessary to complete the project and new

---

[104] SCANA Corp., Quarterly Report (Form 10-Q) at 35 (Aug. 4, 2017).

[105] SCANA Corp., Quarterly Report (Form 10-Q) at 20 (Nov. 3, 2017).

[106] Complaint ¶¶ 447-450.

change orders initiated since the settlement that are owner directed. Additional sales tax, which has been excluded from the fixed price option, is also listed.

Slide 15 presents the relative schedules of both the filing of an update petition and the annual request for revised rates. We continue our analysis of the fixed price option, and we'll consider any input received from Fluor.[107]

48.     SCANA devoted entire segments of subsequent earnings calls to providing updates on the Nuclear Project.  Some portions of those dialogues include:

*July 28, 2016*: Slide 14 presents the projected cost associated with our update petition. Please note that we have removed the additional transmission cost originally requested in the petition from our testimony filing, as we are evaluating other alternatives to installing additional capacitors in the Unit 1 switch chart. Moving on to some of the activities at the new nuclear construction site. Slide 15 presents an aerial photo of what we call the tabletop from June of this year. This photo gives you a view of the layout of the site and have labeled both Units 2 and 3 as well as many of the other areas of the construction site.[108]

*October 27, 2016*: I'd like to discuss the petition that SCE&G filed with the Public Service Commission of South Carolina on May 26 of this year, **seeking approval to update the construction milestone schedule as well as the capital cost schedule for the 2 new nuclear units.** We are hopeful that the PSC will approve the settlement agreement we entered into with the ORS and 4 other intervenors related to the aforementioned petition. This settlement agreement signifies that no contested issues exist among the settling parties and supports the approval of the revised construction and capital cost schedules.[109]

*February 16, 2017*: As previously mentioned in our press release, Westinghouse officials told us earlier this week that they, along with Toshiba, **remain committed to completing the construction of these units.** As Jimmy mentioned earlier, we also received **new in-service dates** from Westinghouse, and we will be reviewing the corresponding integrated project schedule supporting these dates once they provide it to us. After our review and once we've completed our evaluation, **we will make you aware of any changes or implications as information may have.** This would most likely take place during our first quarter 2017 earnings call.[110]

*April 27, 2017*: We remain focused and are working diligently to determine the most prudent path for our nuclear project. Our goal is to reach a decision that

---

[107] "FQ1 2016 Earnings Call Transcripts," *S&P Capital IQ*, April 28, 2016, 3:00 PM.

[108] "FQ2 2016 Earnings Call Transcripts," *S&P Capital IQ*, July 28, 2016, 3:00 PM.

[109] "FQ3 2016 Earnings Call Transcripts," *S&P Capital IQ*, October 27, 2016, 3:00 PM.

[110] "FQ4 2016 Earnings Call Transcripts," *S&P Capital IQ*, February 16, 2017, 3:00 PM.

addresses the needs of our customers and all of our stakeholders. ***During this complex transition and evaluation period, we remain committed to providing you with timely information and updates as we move towards a decision***.[111]

49.   In addition to quarterly earnings calls, SCANA hosted special calls for the sole purpose of discussing updates to the Nuclear Project.  For example, on March 29, 2017, CFO Addison, stated on a call:

> "We are hosting this call today to discuss the potential impact of Westinghouse's bankruptcy petition on our new nuclear project. Kevin Marsh, SCANA's CEO, will lead you through some brief prepared remarks.  And then he, along with Steve Byrne, SCE&G's Chief Operating Officer, and myself will be available for questions."[112]

50.   CEO Marsh's remarks on the call included the following:

> ***We have been closely following the Toshiba and Westinghouse financial situation since Toshiba's December 27 announcement*** [...] Prior to Westinghouse's Chapter 11 filing, we [...] have worked [...] to reach an agreement [...] that allows for work on the project to continue during a transition and evaluation period. [...] w***e expect that construction at the site will continue toward completion of the units,*** with approximately 5,000 workers on site daily. [...] Westinghouse has provided us with this estimate of the additional cost needed to complete our project beyond the cost provided for under existing agreements. [...] ***At this time, we expect that the resources available from Westinghouse and Toshiba,*** [...] ***are adequate to compensate us for the Westinghouse estimate of additional costs.*** [...] if continuing the construction is not determined to be the most prudent path forward [...] we will look to exercise the abandonment clause under the provisions of the Base Load Review Act. This clause would allow us to recover the costs that were prudently incurred to date. [...] ***We plan to analyze a variety of options in order to make the most prudent decision*** [...] As always, we continue to focus on operating all of our businesses in a safe, reliable and efficient manner.[113]

51.   A few months later, on July 31, 2017, SCANA hosted another special call to discuss the abandonment of the Nuclear Project.  Specifically, Iris Griffin, SCANA's Associate Treasurer, stated: "We're hosting this call to discuss the announcement we made earlier today regarding the

---

[111] "FQ1 2017 Earnings Call Transcripts," *S&P Capital IQ*, April 27, 2017, 3:00 PM.

[112] "Shareholder/Analyst Call," *S&P Capital IQ*, March 29, 2017, 4:00 PM.

[113] "Shareholder/Analyst Call," *S&P Capital IQ*, March 29, 2017, 4:00 PM.

35

decision to cease construction and pursue abandonment of the new nuclear project under the

provisions of the Base Load Review Act, what you're going to expect from the regulatory process to

follow and SCANA's strategy going forward."[114]  CEO Marsh provided the following details:

> This team conducted a thorough evaluation of the calls and completion
> schedules for the new units. […] As you can see, we projected robust and
> service dates to be December of 2022, and March of 2024 for Units 2 and 3,
> respectively. ***These projected revised and service dates exceed the regulatory
> 18-month contingency window***[…] In addition, the cost associated with
> completing both units net of the anticipated Toshiba guarantee payments
> ***materially exceeded the fixed price cost amounts***[…] Santee's decision to
> suspend construction of the project may further analysis of this alternative
> unnecessary, as ***SCE&G concluded it will not be in the best interest of its
> customers and other stakeholders to continue construction of the project on
> its own.*** […] Abandoning the project is always been our least desired option
> because of the long-term hedge, the new nuclear generation provided our
> customers against carbon legislation or regulation, and volatility, and natural
> gas prices. […] I will now turn the call over to Jimmy to further ***discuss our
> regulatory strategy and how this decision affects our company's financial
> plan***.[115]

52.    Once the Nuclear Project had been abandoned, SCANA publicly discussed the

corresponding regulatory proceedings and the Company's ability to recoup the associated costs under

the BLRA.  For example, on October 26, 2017, CFO Addison stated the following on a call:

> Slide 5 depicts the impairment loss recorded for the quarter as it relates to the
> new nuclear project. While we believe that the issues regarding recovery of
> these costs and the rates being collected under the BLRA for financing costs
> should be resolved in future proceedings before the South Carolina Public
> Service Commission, the public, political and regulatory response to the
> abandonment decision has been extremely contentious.
>
> In light of this and under applicable accounting guidance, SCE&G took a $210
> million pretax impairment charge or $132 million, net of taxes. The estimate
> was determined by taking the total cost expended on the new nuclear project
> that have not been included in revised rates and offsetting those with the
> approximate net value of the Toshiba settlement proceeds.
>
> As you are aware, there remains great uncertainty as to the eventual regulatory
> outcome regarding the abandonment of the project, but it's our current estimate

---

[114] "Special Call," *S&P Capital IQ*, July 31, 2017, 5:00 PM.

[115] *Id*.

of an impairment charge that is both probable and reasonably estimable under applicable accounting principles.[116]

53.     As demonstrated above, throughout the Class Period, SCANA consistently highlighted key aspects of the Nuclear Project, including GSCDs, costs, and the realization of Nuclear Tax Credits, recognizing their influence on investor sentiment.  Indeed, CEO Marsh, underscored the Nuclear Project's importance when he stated that abandoning the Nuclear Project has "always been our least desired option."[117]  SCANA also discussed its regulatory actions and investigations as well as its ability to recoup associated costs under the BLRA.  Such statements like the ones described above reflect the Company's acknowledgment of investors' keen interest in the status of the Nuclear Project and its potential implications for shareholder value.  Thus, Defendants' alleged misstatements and omissions regarding the true status and ultimate failure of the Nuclear Project would be economically material to investors.

## B.   ANALYST COMMENTARY

54.     As further evidence of the importance of Defendants' alleged misstatements and omissions regarding Deloitte's failure to properly assess SCANA's financial statements and internal controls – which Plaintiff alleges concealed the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of it being completed on time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project – securities analysts following the Company routinely monitored the status of the Nuclear Project.  Specifically, securities analysts evaluated the release and content of new information concerning the expected timeline of the Nuclear Project, expected costs, SCANA's likelihood of achieving the Nuclear Tax Credits, the likelihood of regulatory actions or

---

[116] "FQ3 2017 Earnings Call Transcripts," *S&P Capital IQ*, October 26, 2017, 3:00 PM.

[117] "Special Call," *S&P Capital IQ*, July 31, 2017, 5:00 PM.

investigations, and SCANA's ability to recoup associated costs, as well as the extent to which these factors impacted the Company's expected future earnings and revenue growth.  It is evident from the published analyst reports, as well as from analysts' questions during SCANA's conference calls, that analysts were focused on these factors when forming valuation opinions about the Company.

55.     For example, prior to the start of the Class Period, analysts discussed how changes in completion dates or costs would impact their view of the stock:

> *Morningstar*: We do not expect the regulatory structure that supports earnings for SCANA's utilities to change substantially in the near future, leading us to a stable moat trend. Its nuclear project enjoys legislative and regulatory support that should allow SCANA to maintain near its 10.5% project allowed returns. Four years into the project, the regulatory mechanisms are working as prescribed with about half of the total capital invested. Even with the latest round of cost and schedule adjustments, SCANA was able to reach an agreement that is effectively value-neutral for shareholders. ***However, any future problems that push construction completion out further or result in additional material cost overruns could lead us to consider downgrading SCANA's moat trend due to cost recovery uncertainty.***[118]

> *MarketLine*: In August 2014, the IRS notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the Internal Revenue Code to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met***. Based on the above substantial completion dates provided by the Consortium of June 2019 and June 2020 for Units 2 and 3, respectively, both New Units are expected to be operational and to qualify for the nuclear production tax credits; however, further delays in the schedule or changes in tax law could impact such conclusions. To the extent that production tax credits are realized, their benefits are expected to be provided directly to SCE&G's electric customers as so realized.***[119]

56.     Analysts also inquired about the status of the Nuclear Project from SCANA on conference calls prior to the start of the Class Period.  For instance:

> *Macquarie Research*: Next question is my understanding that, so far, your payment schedule hasn't really been based on the completion of milestones. So you'll need to have a true up of what's been paid so far. ***Are you expecting to***

---

[118] "EPA's Final Carbon Rules Positive for Clean Generation and Transmission, Negative for Coal," *Morningstar Equity Research*, October 15, 2015.

[119] "MarketLine Strategy, SWOT and Corporate Financial Report," *MarketLine*, December 2015.

*be ahead or behind? In other words, are you expecting to get some cash back from cost overruns to date?*[120]

*Goldman Sachs*: First of all, can you give us an update on how 2015 nuclear CapEx is progressing? I noticed the tables didn't have 2015 numbers on it. Just wanted to see relative to your last disclosure *whether there's been any change to the expected spend this year on the project*.[121]

*UBS*: But could you give us a sense of how much you would be exposed to and via what variable if you were to have, for instance, *the shift off of that August 2019 and 2020 date? Just to kind of give us a sense of the magnitude there*.[122]

*Mizuho*: And then, I guess, the last question really maybe is for Steve. How -- if you think about all the components, to build the 2 summer units? *How much of them are still, say, overseas and still need to be shipped to the place? Or I mean, are most of the components on-site at this point in time?*[123]

*Wells Fargo*: So if Fluor's assessment of schedule kind of comes back that the current schedule isn't kind of feasible, how does that work then? *Do you have to then negotiate another amended EPC contract before you would file that with the commission, so that kind of the benchmarks, the milestones are set appropriately in the next kind of approved BLRA?*[124]

57. Throughout the Class Period, analysts continued to comment on their model assumptions and how factors related to the Nuclear Project, such as Nuclear Tax Credits, recouping costs, construction timelines and costs, and regulatory actions or investigations impacted their views of the Company. For instance:

*Morningstar*: Additional construction delays and higher-than-expected costs at its nuclear project could significantly impair equity returns.[125]

*Morningstar*: We assume that the South Carolina Public Service Commission continues to approve quarterly rate increases based on the new nuclear project's schedule and budget. This includes the 10.5% allowed ROE for investments in

---

[120] "FQ3 2015 Earnings Call Transcripts," *S&P Capital IQ*, October 29, 2015, 3:00 PM.

[121] *Id*.

[122] *Id*.

[123] "FQ4 2015 Earnings Call Transcripts," *S&P Capital IQ*, February 18, 2016, 3:00 PM.

[124] *Id*.

[125] "Scana's Fixed-Price Decision Reduces Nuclear Project Risk for Shareholders," *Morningstar Equity Research*, June 9, 2016.

2016 and beyond. ***We assume Scana recovers all project costs per the current approved budget***.[126]

*UBS*: But the big offset is nuclear PTCs could get an extension from IRS. We believe the IRS could extend Production Tax Credits (PTCs) for the nuclear industry, currently slated to expire if not deemed in-service by the end of 2020. This would follow similar relief recently provided by the IRS for renewables, with 'start of construction' language clarification for eligibility. Several projects owners continue to advocate for this… SCANA has succeeded in achieving significant improvements in construction and regulatory risk profiles as a result of settlements with contractors, regulators, and key interveners. While peak construction years 2017 and 2018 remain ahead, the key remains executing on time, given weaker productivity trends driving doubts over timeline. It appears status quo progress would put Scana well behind on the PTC eligibility for its second unit. That said, low interest rates remain a clear benefit to the project, and with economic growth in South Carolina steadily improving, its territory presents opportunity for above-average load growth as well. We will revisit our view on the shares after a 2Q update on project timeline into a Fall deal.[127]

*Williams Capital Group*: Nuclear Risk - The new V.C. Summer units have been well delayed and over budget, largely a result of problems with EPC contractors. While the company has secured a settlement with major interveners to approve the latest cost and schedule changes for NNC, material risk remains for the completion of the new units in a timely and cost effective manner. ***Given the scale of the construction, numerous regulatory approvals required by the Public Service Commission of South Carolina (PSCSC), and the significant potential ramifications of any significant further problems, a discount valuation for nuclear risk is warranted, in our view. However, the selection of the fixed EPC cost option should help to mitigate the cost risk. Nevertheless, any delay in start-up dates that risk nuclear production tax credits (PTCs) could harm local support for the NNC***.[128]

58. Similarly, analysts continually asked questions during conference calls with SCANA management about the status of the Nuclear Project:

*Macquarie Research*: I just want to clarify timing of this nuclear fixed option, if you do exercise it or not. It seems to me like there a couple of different steps here, and I just want to understand when we can expect each and in what order. So you're going to make a decision. You're going to file with regulators. You're going to tell us about it, and you're going to officially exercise the

---

[126] *Id*.

[127] "Expecting Some Slippage," *UBS*, July 18, 2016.

[128] "Exceptional Growth Trumps Nuclear Risk," *The Williams Capital Group*, September 12, 2016.

option with the contractors. Is that the right order? And what might the time line of those 4 pieces look like?[129]

*UBS*: So I wanted to follow up a little bit on the time line and schedule on the project, and specifically on the milestones, if you could provide a little bit more of an update there. And ultimately, if and or when you expect to do or hear back from Fluor for more of an integrated schedule update for the overall project.[130]

*Goldman Sachs:* So you're expected -- so if I just give like-for-like or one-for-one CapEx in revenue, your expected nuclear revenue increase '16 to '17 is roughly $45 million, $50 million lower -- or 45%, 50% lower than it would have been 6 or 9 months ago because of the change in the construction schedule.[131]

*UBS:* And how much nuclear rate base do you anticipate will be assigned a 10.5% ROE in 2016? And how much has already been assigned 11%?[132]

59.    In February 2017, when SCANA updated the schedule for the Nuclear Project, analysts were quick to comment on the implications of this change.  For example:

*UBS*: After Toshiba's long-awaited update yesterday, SCANA released the latest BLRA report and a reaffirmation from Westinghouse that included an ***updated schedule pushing the in service dates to April 2020 and Dec 2020 for Units 2 and 3, respectively – previously Aug '19 and Aug '20. Bottom line in our mind is that this exacerbates SCG's risk profile though much of this is accounted for in the current ~3 turn discount to 16.2x peer multiple on 2019 earnings.*** Notably, the 'extreme' scenario here would require a full renegotiation of the contract if SCG were forced to find a different contractor, but Toshiba appears fully committed at the parent level to Westinghouse obligations. Relative to SO's Vogtle plant, we see relatively greater risk given elected profile of the commission relative to South Carolina. We continue to perceive support from the SC PSC; rather, we see GA's position with an elected PSC as creating more issues for SO. Higher costs should remain recoverable and adds to EPS (SCG 4Q Preview note here). Still within 18-months of contingency: ***Currently, there are 2-reasons that would require SCG to return to the SC PSC: 1) Approval of a change in project cost; and 2) A shift in the construction timeline outside an 18 month contingency window. Unit 2's 8 month delay and Unit 3's 4 month delay suggest additional latitude (up to Feb 2020 and Feb 2022 under the current 18 month window for units 2 and 3).*** Assuming previously guided ~$10M/month per unit cost increase, current

---

[129] "FQ1 2016 Earnings Call Transcripts," *S&P Capital IQ*, April 28, 2016, 3:00 PM.

[130] "FQ2 2016 Earnings Call Transcripts," *S&P Capital IQ*, July 28, 2016, 3:00 PM.

[131] *Id.*

[132] "FQ3 2016 Earnings Call Transcripts," *S&P Capital IQ*, October 27, 2016, 3:00 PM.

41

delays suggest a ~$120M capitalized cost increase (quite modest) but the $10M/Month metric may be stale at this stage. *We note the Year-End 2020 date remains critical to qualify for Production Tax Credits (PTC) and qualifying for Bonus Depreciation; we also highlight nascent efforts to extend the PTC eligibility (through the House Ways and Means Committee, but not on House Floor yet). This remains a very clear risk to the project that could substantially increase cost to consumers*.[133]

*Wells Fargo*: After-the-market-close yesterday (2/14), SCG issued a statement that Westinghouse (WEC) and its parent guarantor, Toshiba, are committed to completing the V.C. Summer new nuclear units. However, WEC did provide SCG with revised in-service dates of April 2020 and December 2020 which represents 4-8 month delays from the previous substantial completion dates of August 2019 and August 2020. *SCG noted the new completion dates are within the 18-month contingency window provided under the Base Load Review Act (BLRA) and would qualify for the federal production tax credits (in-service by 1/1/21 per current law).*[134]

*Morningstar*: The second risk for shareholders is ongoing project delays. If Scana pushes beyond its new 2020 in-service dates, it could lose regulatory support and federal tax credits, likely impairing shareholder value. Regulators already have cut Scana's allowed ROE to 10.25% from 11% because of delays and cost overruns, reducing the earnings accretion. Southern also agreed to a reduction in ROE to 10% from 10.95% for its nuclear construction rate tracker.[135]

*Morgan Stanley*: Along with SCG's BLRA filing on 2/14, the company revealed that Westinghouse notified the company of new in-service dates of April and December 2020 for VC Summer units 2 and 3 respectively. This represents a delay of 8 months and 4 months for the units, which had previously been targeted for August 2019 and 2020. *If the plants are delayed beyond 2020, they would not be eligible to receive production tax credits.*[136]

*Williams Capital Group*: The frequently changing prospective costs and uncertain timing of the prospective cash flows of NNC makes forecasting confidence more difficult to secure for SCANA. While we are reasonably confident that the larger changes in NNC estimates have now passed with the selection of the fixed price EPC option, some annual variability in financial projections are likely. Fortunately, lower debt costs and higher than expected

---

[133] "Just How Far Can It Go?" *UBS*, February 15, 2017.

[134] "Flash Comment: Energy and Utility Daily," *Wells Fargo Securities*, February 15, 2017.

[135] "Scana Corp. and Southern Co. Investors Should Not Fret Toshiba's Woes...Yet," *Morningstar Equity Research*, February 15, 2017.

[136] "Reassessing Nuclear Risk," *Morgan Stanley*, February 17, 2017.

nuclear PTCs are likely to obviate much of the higher than expected NNC costs.[137]

60.     Analysts also asked SCANA about the updated schedule on the conference call in

February 2017:

> *UBS*: Given the new time lines released obviously recently, what's your level of confidence against these time lines, particularly given some of the risks around further delay on the second unit? Do you have any sense on that?[138]

> *Morningstar*: And then walk me through what a worst-case scenario on the nuclear side might look like when -- if you were to get to some kind of stranded cost-type situation. [...] And then the abandonment clause in the BLRA, you feel confident that given this type of situation that's happened, that would still be valid. Is that right?[139]

> *Lord, Abbett & Co:* Just wanted to get a little clarification. On the Slide 30, the -- you mentioned in-service dates, and in prior presentations, you've mentioned guaranteed substantial completion dates. Are those the same? In other words, ***is the guaranteed substantial completion date now April 2020 and December 2020?***[140]

> *Morgan Stanley:* Wanted to discuss the abandonment provision of the BLRA. If the issues with the budget and the cost overruns are really driven by -- nothing changing to the, I guess, the licensed reactor design but rather just sort of more ordinary-course scheduling issues, overruns and also the fact that Toshiba may not be able to sort of meet its financial obligations. ***Is that -- under the abandonment provision, is that a sort of cause for being able to get recovery for the money spent to date?***[141]

> *Goldman:* And the other thing is, can you -- what is the time line? When do you need to get the projects put in service? And we saw the detail in the BLRA filing earlier this week about the potential change in schedule. ***When do you have to get them in service to ensure you qualify both for the production tax credits*** and for bonus depreciation? And does that date differ for either of those?[142]

---

[137] "Q416 Results OK, Stock Remains an Incredible Value," *The Williams Capital Group*, February 17, 2017.

[138] "FQ4 2016 Earnings Call Transcripts," *S&P Capital IQ*, February 16, 2017, 3:00 PM.

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] *Id.*

61.    In July 2017, SCANA announced it was abandoning the Nuclear Project.  Not surprisingly, analysts immediately began to comment on this major update and the implications it would have on the Company.  For example:

> *Morgan Stanley*: Yesterday SCANA announced that it would abandon the construction of its VC Summer nuclear plant. The company determined that its estimate of additional costs, uncertainty around production tax credits, and the decision by partner Santee Cooper to exit the project would make it uneconomical to complete. ***We are shifting our valuation to reflect our prior bear case assumptions: the financial impact of abandoning the project and protecting ratepayers through securitization of costs spent to date. We are lowering our PT to $58 from $67 and remaining UW on the stock. We continue to see the risk-reward skewed unfavorably given several scenarios that could lead to significant downside in the stock***.[143]

> *Wells Fargo*: SCG announced plans to stop new nuclear development (NND) construction and seek abandonment recovery of the stranded investment in accordance with SC's Base Load Review Act (BLRA). In addition, mgmt affirmed the 3-5-yr 4-6% EPS CAGR off the $3.97 weather-normalized '16 EPS base. ***The CAGR implies '18 & '19 EPS guidance ranges of roughly $4.30-4.45 & $4.45-4.75. We are encouraged by SCG's initial comments on the post-abandonment EPS outlook while fully acknowledging the uncertainty around recovery.*** That said, we continue to believe ***the BLRA affords SCG strong legal protections and that SC is a generally reasonable state from a political/regulatory standpoint***.[144]

> *Guggenheim*: At the end of the day, management described a relatively constructive path forward for recovery of (and return on) capital associated with V.C. Summer nuclear construction, premised upon SC's BLRA, which we acknowledge set the most constructive regulatory/policy back-drop in support of nuclear construction that we've seen, although as the abandonment plan has yet to be filed with regulators (SCG plans to update regulators tomorrow), ***we look forward to reactions from regulators and policy-makers whom management acknowledged were disappointed with the decision to abandon construction***. We would also note that while we recognize the solid regulatory/legislative framework for cost recovery provided by the BLRA, we have less experience ascertaining the quality of earnings power that would be derived from a ratebase comprised of such a large "regulatory asset" (i.e.,

---

[143] "Bear Case Playing Out, and Risks Remain High in Abandonment; Lower PT, Remain UW," *Morgan Stanley*, August 1, 2017.

[144] "SCG: Abandonment Officially The Path Forward," *Wells Fargo Securities*, July 31, 2017.

44

stranded costs associated with abandoned investments in new nuclear units at V.C. Summer).[145]

62.     SCANA hosted special calls in July 2017 and August 2017 to discuss the abandonment in more detail.  Analysts' questions were heavily focused on how this news would impact the Company, including the earnings impact, tax implications, ability to recoup costs, and regulatory actions.  For example:

> *Goldman Sachs*: **Can you walk us through the tax deduction component of this?** I'm not entirely sure I understand it, and you kind of went through that a little bit quickly. Can you walk us through the 38.5% times to $4 billion, so the $1.5 billion. How that can -- **when you'll be able to take that deduction?** And win [*sic*] that deduction actually converts into cash? How should we just be thinking about this? And then how you actually filed for that component of that when you make your filing?[146]

> *Wolfe Research*: I'm not trying to understand the mechanics here. So at a high level, if you are getting this much cash back through Toshiba guarantee, and through and tax deductions, in theory that should lower your rate base meaningfully, which would actually may be able to lower rates to customers? And it also creates kind of less earning rate base. And so I'm a little confused than in how you're still able to keep the same earnings growth rate?[147]

> *Lord, Abbett & Co.*: So there's $1.5 billion of CapEx still to be recovered or that hasn't yet been being deemed prudent. Is that correct?[148]

> *Wells Fargo*: Given the political process, I'm sure there's no specific timetable. So I'm wondering if this allows you to file your annual BLRA update to alleviate some potential regulatory lag.[149]

> *Guggenheim*: And then Jimmy, you provided the financials a few weeks ago. Is there -- depending on how long this process takes, and I have to imagine legislators tend to take their time going through a process, **is there any impact to the updated disclosures you provided**?[150]

---

[145] "SCG – We Both Made a Tough Call – Walking Away from Nuclear, But Still Loose Ends to Tie; Regulatory Execution Key," *Guggenheim*, July 31, 2017.

[146] "Special Call," *S&P Capital IQ*, July 31, 2017, 5:00 PM.

[147] *Id*.

[148] *Id*.

[149] "Special Call," *S&P Capital IQ*, August 16, 2017, 9:30 AM.

[150] *Id*.

*Mizuho*: And then really last question. I mean, without knowing sort of what the legislature is ultimately going to come up with, does that potentially create a situation where you would suspend guidance until you had a better sense of where the legislature and the regulatory process, what direction it was going to move in?[151]

63. Throughout the remainder of the Class Period, analysts continued to comment on the status of the Nuclear Project in their reports:

> *Gabelli & Company*: The attack on the constitutionality of the BLRA and BLRA rate increases adds a significant element of uncertainty to SCG's position as the 2007 law protects the nuclear development investment and provides for recovery under abandonment. SCEG has roughly $4.9 billion of nuclear investment recognized in rate base through eight consecutive ORS recommended and PSCSC approved annual rate increases totaling $380 million in annual revenues. ***We had assumed the law provided firm ground to negotiate a constructive settlement. However, the enormity of the stranded investment has resulted in a political "firestorm", including accusations of negligence from various political players, and significantly weakens SCG's negotiating positon*** [*sic*]."[152]
>
> *S&P Ratings*: We could further lower ratings if legal challenges to a rate decrease are unsuccessful, if the SCPSC orders cash refunds or rate credits for Summer-related costs, if the BLRA is repealed or changed by the legislature, or if the BLRA is deemed unconstitutional.[153]
>
> *Morgan Stanley*: SCE&G emphasized that in order to qualify for the abandonment tax deduction (worth $2b at current tax rates, or a lower number to the extent tax reform is passed by Congress), the company must 'intend to discard assets irrevocably, and must affirmatively and consistently demonstrate this intention.' ***The company reiterated that the IRS is likely to audit the company's 2017 tax filing, and anything inconsistent with a complete abandonment would put the tax deduction at risk. No strategies were laid out that would enable both a preservation of the site and the use of the abandonment tax deduction.*** SCE&G would like to claim this deduction in the 2017 tax year because it would allow the company to capture a $200m refund of taxes paid in 2015 (and the ability to carry back tax deductions is only allowed for 2 years). ***We think the total tax deduction would remain unchanged, but the upfront cash receipt would be lower with a 2018 or later abandonment. The rest of the tax benefit would accrue to customers over time as the company paid less in cash taxes.*** The company also noted that an IRS audit could take 2-4 years to complete. In our view, the Commissioners

---

[151] *Id.*

[152] "BLRA Rates Challenged; Political Firestorm – Hold," *Gabelli & Company*, September 28, 2017.

[153] "*S&PGR Downgrades SCANA And Subs To 'BBB'; On Watch Negative," *Dow Jones Institutional News*, September 29, 2017, 1:26 PM.

appeared to be concerned with the fact that tax benefits would accrue to customers over a long period of time, the IRS review could take multiple years, and ***there is risk of not receiving any tax benefits at all if the IRS denies this treatment***.[154]

*Morgan Stanley*: By our estimates, if the company were to receive no nuclear cost recovery (in addition to a lower 8% ROE at the core utilities) the stock would be worth $30/share, and if SCG were to also refund all revenue collected thus far the stock would be worth $18/share.[155]

*CFRA*: After rejection of SCG's request to dismiss the regulatory staff's rate review that seeks a $445 million annual rate reduction, we reduce our 12-month target by $9 to $42. While we think the $445 million rate reduction is too high, we cut our '18 EPS estimate by $0.75 to $3.05 on our expectation of reduced rates. SCG can successfully fight any potentially unjust rate reductions through legal means, but risks to acceptance of SCG's proposed approach for handling the nuclear costs are greater following the rejection, in our view. SCG may be forced into tougher negotiations.[156]

64.     As documented above, analysts specifically focused on the expected timeline of the Nuclear Project, anticipated costs, SCANA's likelihood of achieving the Nuclear Tax Credits, the likelihood of regulatory actions or investigations, SCANA's ability to recoup associated costs, and the extent to which these factors impacted the Company's expected future earnings and revenue growth.  They relied upon these elements when providing investment advice and questioned the Company about the status of the Nuclear Project during calls with SCANA executives.  The foregoing provides compelling evidence that the alleged misstatements and omissions pertaining to Deloitte's audit reports that masked the true status of the Nuclear Project were important, value-relevant, and economically material to investors in SCANA Common Stock.  As such, Deloitte's alleged misrepresentations and omissions regarding its audit reports, which concealed the true status and ultimate failure of the Nuclear Project, would likewise be economically material to investors.

---

[154] "Update on House Legislation, SC Regulator Meeting," *Morgan Stanley*, November 10, 2017.

[155] "Nuclear Dockets Will Proceed, But Commission Action Pushed to 2018," *Morgan Stanley*, December 21, 2017.

[156] "Stock Report: SCANA Corporation," *CFRA*, December 27, 2017.

## C. ECONOMIC AND VALUATION PRINCIPLES

65.     A fundamental principle of financial economics holds that the value of a security is equal to the present value of the expected future cash flows to holders of that security.[157]  In other words, a security's value is the sum of the estimated future cash flows discounted at a rate that reflects their riskiness.[158]  All else being equal, a decrease in a company's future revenue or future earnings reflects a decrease in the cash flows to the common stockholders, and thus, causes a decrease in the value of the security.

66.     As it pertains to this matter, there is a link between (1) SCANA's ability to earn the Nuclear Tax Credits and recoup capital associated with the Nuclear Project under the BLRA through increased rates charged to customers, and (2) SCANA's future cash flows and therefore its equity value.  As discussed in **Section V.B**, market commentary demonstrates that investors held and adjusted beliefs about SCANA's Nuclear Project and the likelihood that SCANA would be able to recoup associated costs.  The underlying reality was that there were undisclosed facts (regarding the lack of a reliable, fully resource-loaded integrated schedule, unachievable GSCDs, unreliable cost estimates of the Nuclear Project and the lack of prudency under which the Nuclear Project was proceeding), and the market accordingly overestimated SCANA's future cash flows and the risk to those cash flows.  Plaintiff alleges information regarding the viability of the Nuclear Project, SCANA's ability to earn Nuclear Tax Credits, and risk to recouping costs under the BLRA would have been public knowledge had Deloitte not engaged in improper and fraudulent conduct when serving as SCANA's "independent" auditor.  Because of the link between SCANA's cash flows from the Nuclear Project (including recouping costs under the BLRA) and the market value of SCANA's

---

[157] Tim Koller, Marc Goedhart, & David Wessels, *Measuring and Managing the Value of Companies*, John Wiley & Sons, Sixth Edition, 2015, p. 17.

[158] *Id*. at 42.

48

Common Stock, there is an economic link between misinformation regarding the true viability of the Nuclear Project and the value of SCANA's Common Stock.

67. Academic literature supports this economic link. While corrective information is often provided to investors through outside sources such as financial media or research analysts, it is frequently disclosed through internal company sources such as SEC filings, earnings releases, conference call discussions, press releases, and financial statements. Moreover, the same corrective information can be communicated to investors via auditors. Academic research demonstrates that while investors generally expect clean audit reports, non-clean audit reports disclose important value-relevant information to investors. For example, a study by Whisenant, et al. (2003) shows that investors react negatively to disclosures of reportable events like "weaknesses in internal control and problems related to the reliability of management representations and/or financial statement reliability."[159] In addition to disclosures of auditor changes, the authors conclude that these reportable events "are considered by investors to have information content."[160] Several other publications document similar findings regarding disclosures of internal control weaknesses – regardless of the source of such disclosures, meaning that both management and auditor disclosures are important to investors.[161] Academic studies also document negative stock price reactions around

---

[159] Whisenant, J. Scott, Srinivasan Sankaraguruswamy, and K. Raghunandan, 2003, "Market Reactions to Disclosure of Reportable Events," *Auditing: A Journal of Practice & Theory* 22, No. 1, at p. 181.

[160] *Id.*

[161] Hammersley, Jacqueline S., Linda A. Myers, and Catherine Shakespeare, 2008, "Market Reactions to the Disclosure of Internal Control Weaknesses and to the Characteristics of Those Weaknesses Under Section 302 of the Sarbanes Oxley Act of 2002," *Review of Accounting Studies* 13; Ashbaugh-Skaife, Hollis, Daniel W. Collins, William R. Kinney Jr., and Ryan LaFond, 2009, "The Effect of SOX Internal Control Deficiencies on Firm Risk and Cost of Equity," *Journal of Accounting Research* 47, No. 1.

auditor resignations[162,163] and around audit reports expressing substantial doubts about the client's ability to continue as a going concern.[164]

68.    Relatedly, academic research has also shown that public disclosures involving restatements – or material GAAP violations – generally lead to negative investor reactions. Studies looking at restatements consistently find negative abnormal returns around the day of the restatement announcement.[165]  While estimates of average effects vary depending on the sample selection and the nature of the restatement, research has documented that restatements are value-relevant to investors and generally cause negative stock price reactions regardless of the actual restated amounts.[166]

69.    If Plaintiff ultimately proves their allegations, then based on fundamental valuation principles, investors would have viewed the concealed information and the alleged misstatements and omissions to be value-relevant and thus, material, from an economic perspective.

### D.  EVENT STUDY

70.    In order to study and opine on the stock price movements for SCANA Common Stock over the Class Period and on relevant days, I performed an event study.  Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency, loss causation, and damages in securities litigation.[167]  As Nobel-prize winning Professor Eugene Fama has explained:

---

[162] *Id.*

[163] Shu, Susan Zhan, 2000, "Auditor Resignations: Clientele Effects and Legal Liability," *Journal of Accounting and Economics* 29, Issue 2.

[164] Menon, Krishnagopal and David D. Williams, 2010, "Investor Reaction to Going Concern Audit Reports," *The Accounting Review* 85, No. 6.

[165] *See, e.g.*, Palmrose, Zoe-Vonna, *et al.*, "Determinants of market reactions to restatement announcements," *Journal of Accounting and Economics*, Vo. 37, No. 1 (2004): 59-89; Drake, Michael S., *et al.*, "Short Selling around Restatement Announcements: When Do Bears Pounce?," *Journal of Accounting, Auditing & Finance*, Vol. 30, No. 2 (2015): 218-245.

[166] Palmrose, Zoe-Vonna, *et al.*, "Determinants of market reactions to restatement announcements," *Journal of Accounting and Economics*, Vol. 37, No. 1 (2004): 59-89.

[167] MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 13.

> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[168]

71. To determine whether price movements in SCANA Common Stock on any given date are statistically significant, I performed an event study using generally accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and a market or industry index.

72. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (the "abnormal return") is "statistically significant," (*i.e.*, sufficiently large compared to the typical volatility such that simple random movement can be rejected as the cause).

73. I applied these widely used and generally accepted econometric methodologies to perform my event study, which was first introduced in my Efficiency Report.[169] Specifically, in order to isolate the impact of company-specific news on the price of SCANA Common Stock during the Class Period, I performed regression analyses to measure the relationship between price returns of SCANA Common Stock and: (1) changes in market-wide factors that would be expected to impact

---

[168] Fama, Eugene F., 1991, "Efficient Capital Markets: II," *The Journal of Finance* 46, at 1607.

[169] Efficiency Report Section IV.E.

all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in SCANA's industry. By modeling how SCANA Common Stock price returns moved relative to an overall market index and an industry index, I was also able to measure the response of SCANA Common Stock to announcements of company-specific news.

74. I previously presented my event study in my Efficiency Report to evaluate whether SCANA Common Stock responded to relevant information and together with other supporting factors as listed in my Efficiency Report. I reached the conclusion that SCANA Common Stock traded in an efficient market. After carefully reviewing and considering the relevant information environment for purposes of assessing loss causation and damages in this report, I have utilized the same event study methodology as that performed in my Efficiency Report. For brevity, I repeat the key parameters of this event study below, but I refer to my Efficiency Report for a more fulsome discussion of my event study process. My event study incorporates a rolling 120-trading day estimation window[170] of the Class Period, the Market Index, and the members of the Industry Index, which SCANA compared its performance to in its DEF 14A SEC filings for the years ending during the Class Period.[171] **Exhibit 1**, attached hereto, graphs the coefficients on these controls for SCANA Common Stock. **Exhibit 2**, attached hereto, plots the standard deviation of the regression errors, also known as Root Mean Squared Error (or "RMSE"), over the estimation window for SCANA Common Stock.

75. **Exhibit 3**, attached hereto, reports the event study results for the Corrective Disclosure Events and Inflation Creating Events for the SCANA Common Stock. Overall, the Corrective Disclosure Events and Inflation Creating Events caused stock price movements that were statistically

---

[170] *See* Efficiency Report ¶ 48.

[171] The S&P 500 Utilities Index included 28 constituents during the Class Period. Since SCANA was a member of the S&P 500 Utilities Index during the Class Period, I created a market capitalization-weighted Industry Index of the S&P 500 Utilities Index constituents other than SCANA. The Industry Index returns are net of the S&P 500 Total Return Index returns.

significant beyond the 95% confidence level. The statistical significance of these stock price movements due to information related to the risks associated with the Nuclear Project provides direct scientific evidence of the importance of the alleged misstatements and omissions. For the reasons discussed above, a reasonable investor would have viewed the alleged misrepresentations and omissions as having significantly altered the total mix of information available. Thus, I conclude that the alleged misstatements and omissions in this case were important, value-relevant, and economically material to investors.

## VI. LOSS CAUSATION

76. I consider loss causation in this matter in the context of a two-prong test. First, would Plaintiff and the Class have avoided an economic loss "but for" the Defendants' alleged violations? And second, was the economic loss a "foreseeable consequence" of Defendants' alleged violations? In evaluating these two factors, I can assess the economic impact of the allegations and determine whether there is economic evidence to link any stock price declines to the revelation of the prior alleged misstatements or omissions such that the alleged misrepresentations or omissions were a substantial factor in the stock price declines.

77. First, I address why there is a foreseeable causal link between Defendants' alleged misrepresentations and omissions and the Corrective Disclosure Events. Second, I explain how the event study methodology I employ demonstrates that the Corrective Disclosure Events caused economic losses to the Class.

### A. INVESTOR LOSSES WERE FORESEEABLE

78. As explained above, the Complaint alleges that Defendants made material misrepresentations and omissions during the Class Period in its audit reports which concealed the financial and regulatory risks associated with the Nuclear Project. Plaintiff alleges information regarding the viability of the Nuclear Project and risk to recouping costs under the BLRA would

53

have been public knowledge had Deloitte not engaged in improper and fraudulent conduct when serving as SCANA's "independent" auditor. Because of the link between SCANA's cash flows from the Nuclear Project (including ability to obtain the Nuclear Tax Credits and recouping costs under the BLRA) and the market value of SCANA Common Stock, there is an economic link between misinformation regarding the true viability of the Nuclear Project and the value of SCANA Common Stock. As a result, it is foreseeable that the failure to disclose to investors the true viability of the Nuclear Project would harm investors when the corrective information came to light.

79. A generally accepted economic principle is that the value of a security is directly related to expectations about the future cash flows to holders of that security. As discussed above in **Section V.C**, there is an economic link between Deloitte's clean audit reports of SCANA and the Company's future earnings and anticipated future cash flows. Investors rely on independent auditor reports to inform their view of a company and its anticipated future cash flows. Therefore, there is a clear economic link between Deloitte's clean audit reports and the market value of SCANA Common Stock.

80. If, as the Complaint alleges, Defendants published misleading and inaccurate audit reports, then it was foreseeable at the time of the alleged misstatements and/or omissions that when the relevant truth would eventually become known, the market value of SCANA Common Stock would fall. As such, investors who purchased SCANA Common Stock while Defendants concealed this information suffered losses as the relevant truth was revealed. Therefore, the misrepresentations and omissions represent the but-for cause of the economic losses that Plaintiff and other Class members suffered.

81. Therefore, it is my opinion that there is a direct and foreseeable causal link between the alleged material misrepresentations and omissions and the subsequent economic losses that occurred following the Corrective Disclosure Events.

### B.   THE CORRECTIVE INFORMATION CAUSED ECONOMIC LOSSES

82.   Economists assessing loss causation commonly employ event studies to evaluate whether there is economic evidence to link corrective information regarding prior misstatements and/or omissions to price declines in the subject security.  Based on the alleged misrepresentations and omissions and my understanding of loss causation principles, news that directly or indirectly revealed the relevant truth regarding the facts allegedly misrepresented and/or concealed from investors represents corrective information.  Here, this includes news regarding the true status of the Nuclear Project's timeline and costs, the true extent of the risks that the Nuclear Project would not be completed in time or at all which would cause SCANA to be ineligible to obtain Nuclear Tax Credits, the true extent of investigations and regulatory proceedings against SCANA, or the true extent to which SCANA could expect to recoup losses from the Nuclear Project through the BLRA. Below, I describe the events that meet this standard.

83.   I have identified, reviewed, evaluated, and empirically analyzed all of the events that were alleged in the Complaint as potentially revealing corrective information (including by conducting an event study analysis).  I have identified 19 event windows that both: (1) contained both corrective information; and (2) based on my event study analysis, were accompanied by a statistically significant decline in the market price of SCANA Common Stock ("Corrective Disclosure Events").

84.   In identifying the Corrective Disclosure Events, I gathered and reviewed news about SCANA during the Class Period.  Among other items, my news search included a variety of articles obtained from Factiva, numerous analyst reports issued by equity research firms that covered SCANA, SEC filings, press releases, conference call transcripts, and interviews with Defendants. My evaluation of what information represents corrective information did not depend on the market response, but rather whether new information was revealed that was allegedly misrepresented or

concealed in this matter from investors. I then relied upon the event study, as described above, to determine whether the market's reaction to the corrective information was statistically significant.

85. To be clear, it is not necessary for market commentary on the alleged Corrective Disclosure Events to explicitly reference Deloitte. As explained in **Section V.C** above, academic literature demonstrates that investors generally expect clean audit reports. One way in which corrective information may reach investors is when auditors do not provide clean audit reports, such as through qualified audit reports, reportable events, or auditor changes/resignations. But another way in which *the same* corrective information may reach investors is through the financial media, analysts, company executives, earnings releases, press releases, or other non-auditor-related sources. In other words, the nature of the corrective information can remain the same regardless of the disclosure source of that information. Therefore, one would expect the market commentary to focus on the *implications of* such corrective information as opposed to the *source of* that information, as in this matter.

86. Indeed, Plaintiff alleges Deloitte's false and misleading audit reports further concealed the risk from the market that the Nuclear Project would not be in service by the GSCDs, that SCANA would not meet the deadline to receive credits pursuant to the Nuclear Tax Credits, that SCANA would face risk of investigations and regulatory action, and that SCANA would be unable to recoup losses from the Nuclear Project through the BLRA.[172] On the Corrective Disclosure Events, the information environment (including analyst commentary) included details and discussion about declines in SCANA Common Stock as a direct result of its disclosures regarding the Nuclear Project and its potential inability to recoup losses from the Nuclear Project – the same information Plaintiff alleges Defendants' audit reports concealed. There is thus a logical link and economic connection between the alleged misrepresentations/omissions and the Corrective Disclosure Events. Given this,

---

[172] *See e.g.*, Complaint ¶ 474.

and my event study's findings of statistically significant declines in SCANA's Common Stock prices following the Corrective Disclosure Events, I conclude that the alleged misrepresentations impacted SCANA's stock price. As a result, each of the Corrective Disclosure Events partially revealed the truth about false and misleading information contained in SCANA's financial statements, which Deloitte had verified as being "presented fairly" and in accordance with GAAP.[173] Below in **Section IX.C**, I describe why there is no need to disaggregate or separately assign artificial inflation to Deloitte versus SCANA or its officers – namely, because this is a legal question about the apportionment of liability; however, if the finder of fact determines that it is necessary to do so, the damages methodology is flexible enough to incorporate such a finding.

87. **Exhibit 3** summarizes the results of the event study I conducted on the Corrective Disclosure Events, demonstrating that there was a statistically significant negative price reaction beyond the 95% confidence level on each Corrective Disclosure Event window. In the following section, I describe each of the Corrective Disclosure Events, explaining how new Company-specific information released to the market was corrective of Defendants' material misrepresentations and omissions and the impact that the release of this information had on the price of SCANA Common Stock.

---

[173] Complaint ¶¶ 79, 297.

## VII. ANALYSIS OF THE CORRECTIVE DISCLOSURE EVENTS

### A. DECEMBER 27, 2016 to DECEMBER 28, 2016[174]

88.    On December 26, 2016, Nikkei Asian Review reported that Toshiba was expected to report approximately $854 million in losses from its subsidiary Westinghouse.[175]  Reuters cited the article shortly after its publication, reiterating Toshiba's expected losses.[176]  The article from Nikkei was available in Japan on Monday, December 26, 2016, a non-trading date for SCANA Common Stock, and was confirmed by Toshiba in a press release on Tuesday, December 27, 2016:

> Toshiba is expected to report a roughly 100 billion yen ($854 million) extraordinary loss on its U.S. nuclear power operations, it was learned on Monday, continuing a string of bad news in what the Japanese company considers a core business. The loss relates to subsidiary Westinghouse Electric's acquisition of an American nuclear power services business last year. Westinghouse and seller Chicago Bridge & Iron have turned to an independent accountant to resolve a dispute over a difference of around $2.6 billion in asset valuation. Toshiba's loss could exceed 100 billion yen depending on the result of the valuation process. The company currently projects group net profit of 145 billion yen for the fiscal year ending in March. Toshiba upgraded its earnings forecast three times on a strong showing by the company's mainstay memory chip business. On Tuesday, Toshiba admitted to the possibility of the loss and said the company would make public any information that needs to be disclosed. At the start of trading on the Tokyo Stock Exchange that day, Toshiba's shares declined 72 yen, to 371 yen, down 16% from the previous trading day. […] *Toshiba booked roughly 250 billion yen in impairment losses in its nuclear power systems business last fiscal year, stemming mainly from Westinghouse*. A spinoff of the operations has been suggested.[177]

---

[174] I refer to the Corrective Disclosure Event as December 27-28, 2016, to reflect that is the window of time over which the relevant price impact occurs even though the first mention of the corrective information came out on Monday, December 26, 2016.  The NYSE was closed on December 26, 2016, in observation of the Christmas holiday.  I consistently follow this convention of referring to Corrective Disclosure Events based on the window of the relevant price movements, not necessarily the calendar date when the corrective information was released, if it came out after market hours or on a non-trading day. *See* "NYSE Group Announces 2017 Holiday and Early Closings Calendar," *Business Wire*, February 2, 2016, 4:05 PM.

[175] "Toshiba seen taking $850m hit on US nuclear business," *Nikkei Asian Review*, December 26, 2016, 12:00 PM.

[176] "BRIEF- Toshiba expected to report roughly 100 bln yen extraordinary loss on U.S. nuclear operations – Nikkei," *Reuters News*, December 26, 2016, 12:22 PM.

[177] "Toshiba seen taking $850m hit on US nuclear business," *Nikkei Asian Review*, December 26, 2016, 12:00 PM.

89.     Westinghouse was the primary contractor of the Nuclear Project, a relationship of which the public was well-aware.[178]  News outlets continued to report on the announcement into after-market hours on December 26, 2016,[179] including follow-up from Reuters that indicated Toshiba "would make any necessary announcements following a board meeting on the matter on Tuesday [December 27, 2016]."[180]

90.     A report from Bloomberg released after market hours on December 26, 2016, mentioned that the Japanese broadcasting company, NHK, estimated that the charge could be as much as 500 billion yen.[181]  At 7:59 PM, Dow Jones released a report that elaborated on potential causes of the loss:

> Japanese media reported earlier today that the special loss stems from a differences in accounting between Toshiba and third-party accountants regarding a nuclear reactor company that Westinghouse purchased a while ago.[182]

---

[178] "UPDATE 6-Toshiba flags hit of 'billions of dollars' on U.S. nuclear acquisition," *Reuters News*, December 27, 2016, 1:02 PM.  Westinghouse's involvement with the Nuclear Project was well known since the beginning of the Class Period (*see* "PRESS RELEASE; SCE&G Announces an Amendment to the Engineering, Procurement, and Construction Agreement for AP1000 Plants at VC Summer," *Platts Commodity News*, October 27, 2015.)  Wells Fargo analysts published about SCANA's relationship with Westinghouse in their October 28, 2015, report, stating "On 10/27, SCG announced an amendment to the Engineering, Procurement & Construction (EPC) contract with Westinghouse Electric Company, a subsidiary of Toshiba, related to the development of VC Summer nuclear units 2 & 3.  Amongst other items, the agreement results in an increase in the gross construction cost to $7.1B, or $7.6B under a fixed-price option, vs. $6.8B approved by the South Carolina Public Service Commission (SCPSC) in September."  (*See* "SCG: EPC Revisions Require Going Back To The Regulatory Well," *Wells Fargo Securities*, October 28, 2015).  Gabelli & Company analysts published about the relationship as well, stating, "On October 27, SCG announced an amended EPC agreement with its construction consortium, including Westinghouse for the construction of Units 2 and 3 of the VC Summer Nuclear Plant."  (*See* "Amended Nuke Contract Lowers Risk-Buy," *Gabelli & Company*, October 30, 2015.)

[179] "Toshiba sees some 100 bil. FY 2017 loss on U.S. nuclear business," *Kyodo News*, December 26, 2016, 6:54 PM; "18:56 EDT Toshiba expected to report loss on U.S. nuclear division, Nikkei..." *Theflyonthewall*, December 26, 2016, 6:56 PM.

[180] "Toshiba considering booking loss on US nuclear power acquisition," *Reuters News*, December 26, 2016, 7:14 PM.

[181] "Toshiba Drops on Reports of Nuclear Unit's $4.3 Billion Loss (1)," *Bloomberg*, December 26, 2016, 7:28 PM.

[182] "Toshiba to Announce Y100B Impairment; Share Price Tumbles -- Market Talk," *Dow Jones Institutional News*, December 26, 2016, 7:59 PM.

91.     News outlets continued to report on the write-down into early trading hours on December 27, 2016.  Dow Jones reported on the news, including background of Toshiba's relationships with Westinghouse and the impact of the news on Toshiba's share price:

> Toshiba's share price closed down 11.6% in Tuesday trading on the Tokyo Stock Exchange as investors renewed their concerns about the company's earnings outlook. Toshiba executives have been signaling optimism on its nuclear reactor operating business, saying it would remain an important pillar despite the global trend away from nuclear power after the Fukushima Daiichi accident in Japan in 2011. Toshiba took a Yen260 billion impairment charge in its last fiscal year due to downgrading the book value of Westinghouse itself.[183]

92.     News outlets in the U.S. released updates from Toshiba's conference call, specifically reporting on the CEO's and CFO's statements.[184]  Coverage continued to develop throughout the U.S. trading day on December 27, 2016, with new figures for the write-down reported by Reuters at 1:02 PM.  Reuters attributed the decline in Toshiba's stock price to the announcement of the higher write-down and noted that Toshiba would report the final estimation of the charge in February 2017:

> Toshiba Corp…said cost overruns at U.S. power projects handled by the CB&I Stone & Webster Inc business it acquired last December from Chicago Bridge & Iron Company NV (CB&I) **would be much greater than initially expected**, potentially requiring a huge writedown. Toshiba's announcement came as its Westinghouse Electric Company subsidiary is engaged in a legal and accounting row with CB&I, which has argued in court that it expected a relatively small payment from Westinghouse of only $161 million when the deal closed on the understanding that the latter was taking on a challenged business.
>
> Chief Financial Officer Masayoshi Hirata said the company had not yet completed its estimation of the charge. ***It would finalise that by mid-February***,

---

[183] "Toshiba Expects Write-Down of as Much as Several Billion Dollars – Update," *Dow Jones Institutional News*, December 27, 2016, 4:13 AM.

[184] "Toshiba CFO: Can't Rule Out Risk of Negative Net Worth at Westinghouse Caused by Possible Write-Down," *Dow Jones Institutional News*, December 27, 2016, 4:38 AM; "Toshiba CFO Meets Press After Company Announced Possible Multibillion-Dollar Write-Down," *Dow Jones Institutional News*, December 27, 2016, 4:40 AM; "06:05 EDT Toshiba considering strategic initiatives after U.S. nuclear flop,..." *Theflyonthewall*, December 27, 2016, 6:05 AM ("Toshiba CEO Satoshi Tsunakawa said during a news conference that the company is 'considering measures including some kind of capital strategy' after the company announced that it may realize several billion dollars in losses from its U.S. nuclear business acquisition, reports Reuters.")

60

he said, adding that the conglomerate would explain the situation to its main banks and seek their support.[185]

93.    On the call, Toshiba's VP of Nuclear Energy Systems & Services provided background on Westinghouse's acquisition of Stone & Webster and an explanation for the write-down:

> Under the US GAAP, acquisition accounting must be completed within one year after the completion of the acquisition. As part of this accounting process, if the acquisition price is more than mark-to-market net asset value of the acquired company, which was negative in this case, the difference must be recognized as goodwill. This is as explained in the handout material distributed today, as well as in the disclosure document released in January this year at the time of the completion of the acquisition. And ***at that time, our estimated amount was around $87 million, based on the exchange rate of JPY105 to the dollar***, as we had explained before. However, during the acquisition accounting process, as I just explained, ***it became clear that the estimated cost for completing the projects may be higher than the original expectations***. Estimating the construction cost of a nuclear power station, including the valuation of the transferred materials and parameters, requires a huge amount of effort due to the very diverse range of facilities and parts and components and the large amount of services involved.
>
> […]
>
> This amount of goodwill is still under examination but it will be much larger than the initially estimated value of $87 million, and at this point it is possible to reach a level of several billion US dollars or several hundred billion yen. As already announced, impairment testing for the goodwill will be conducted by Westinghouse and Toshiba for the consolidated third quarter FY2016 business result. Depending on the result, there is a possibility of an impairment of all or part of the goodwill for both Westinghouse and Toshiba. After the acquisition accounting and impairment testing by Westinghouse and Toshiba, accounting auditors will audit the result.[186]

94.    Analysts' questions to Toshiba executives focused primarily on the amount of the write-down and on whose shoulders the liability would fall.  As an example, an analyst from Mitsubishi UFJ Morgan Stanley Securities asked about and further questioned the existence of the write-down:

---

[185] "UPDATE 6-Toshiba flags hit of 'billions of dollars' on U.S. nuclear acquisition," *Reuters News*, December 27, 2016, 1:02 PM.

[186] "Toshiba Corp Possibility of Recognition of Goodwill and Loss related to Westinghouse's Acquisition of CB&I Stone & Webster Corporate Presentation – Final," *CQ FD Disclosure*, December 27, 2016.

Will WEC, as a standalone entity, fall into excess liability or is the situation not that serious? Second question is on the acquisition of CB&I. Do you think that the due diligence process carried out by Mr. Roderick and his team was not adequate because you wanted to settle the case quickly? Do you think the management was not able to sufficiently exercise internal control?

[…]

Then why in just a year are we seeing such a big variance in asset valuation? Nuclear power project spans for more than a decade, right? Is it correct to understand that the deal with the client was on a fixed cost basis and any cost overrun had to be absorbed by WEC?[187]

95.     Similarly, an analyst from UBS asked Toshiba executives for clarification about the cause of the cost overrun:

My last question, my third question, when you acquired Stone & Webster from CB&I, I believe that CB&I was not planning to promote their nuclear power business so aggressively. But you made CB&I accept the potential cost overrun that was anticipated at that time and a fixed-cost assumption on that basis, if I remember correctly. And now you are faced with another cost overrun or impairment risk. So suppose that this is about around JPY100 billion now, if you combined the previous cost overrun already accepted by CB&I, the total would be JPY200 billion or so, which is rather substantial for a project with JPY2 trillion in sales. What was the major driver of deviation in cost? According to your explanation, it is mainly labor cost, but I don't think it can be explained only by that factor or by the volume of materials or construction efficiency, efficiency of workers or number of supervisors alone. There must be something else. It looks like actual cost is nearly double the initial expectation. Why was there so much change in just a matter of one or two years? Those are my questions.[188]

96.     In response to a question about timing of the announcement, Toshiba management stated: "We are planning to announce the third-quarter results in the middle of February next year. So we would like to fix the losses by that timing."[189]

97.     An article from Bloomberg released at 1:30 PM on December 27, 2016, explicitly linked Toshiba's write-down to SCANA's Nuclear Project:

---

[187] *Id.*

[188] *Id.*

[189] *Id.*

> The Japanese company said Tuesday it may have to write down billions related to an acquisition made by U.S. unit Westinghouse Electric that was geared toward completing the newest generation of reactors at two U.S. facilities. ***The projects, overseen by utilities Southern Co. and Scana Corp., are years behind schedule and billions of dollars over budget.***[190]

98.     News of Toshiba's financial woes continued to spread through the market on December 28, 2016, as additional detail linking Toshiba's write-down to SCANA and the Nuclear Project was revealed.  For example, Dow Jones reported at 2:10 AM that Westinghouse was providing reactor components for nuclear plants in Georgia and South Carolina being built by utilities Southern Co. and SCANA Corp, respectively:

> Westinghouse and its subcontractors recently took over construction management duties at its reactor projects in Georgia and South Carolina for CB&I Stone & Webster Inc., a U.S. company that it acquired in December 2015 for $229 million. ***Toshiba said this week it discovered unexpected inefficiencies in the labor force at the subsidiary that along with other factors were driving up costs.***
>
> Westinghouse acquired CB&IStone [*sic*] & Webster in part because it was having difficulty producing the big modules at a facility at Lake Charles, La., that form the building-block units for nuclear reactors going up in the U.S. But the company struggled to find skilled construction workers, maintain quality control and tap a global supply chain that is required to meet rigorous standards of nuclear regulators.
>
> Toshiba Chief Executive Satoshi Tsunakawa said the problems would force the company to take a write-down estimated at several hundred billion yen, or several billion dollars. Toshiba said it would release an exact number for accounting charges in February.
>
> It isn't clear if Toshiba's financial difficulties will have an impact on the eight reactors it is trying to complete in the U.S. and China, but ***its disclosure suggests the situation is worse than previously understood.***[191]

99.     On Wednesday, December 28, 2016, news outlets continued to report on Toshiba's announcement and the associated management commentary.  Reuters reported that Toshiba's stock price was falling, erasing "almost $5 billion off its value in two days and prompt[ing] a credit rating

---

[190] "Toshiba Finds U.S Nuclear Renaissance a Nightmare for Costs," *Bloomberg*, December 27, 2016, 1:30 PM.

[191] "Toshiba Stumbles as Nuclear Bet Proves Costly," *Dow Jones Institutional News*, December 28, 2016, 2:10 AM.

downgrade on Wednesday" upon the commentary provided in the conference call.[192]  Moody's reported on December 28, 2016, that its subsidiary in Japan had downgraded Toshiba on the basis of "'deepening concerns over the sustainability of Toshiba's near-term liquidity, as well as the substantive and rapid erosion of its equity base'" and "breach of Toshiba's bank debt financial covenants."[193]  News outlets acknowledged the larger impact of the write-down:

> *The Japan News*: Toshiba has already incurred a large loss from an accounting scandal and its financial situation has been deteriorating. The additional loss will likely fetter the company's efforts to rebuild its business.[194]
>
> *The Wall Street Journal (Asia Edition)*: Analysts said further write-downs were possible and expressed fears about the nuclear business weighing down the company, which makes everything from elevators to electronic devices. Already, Toshiba took a 260 billion yen ($2.2 billion) impairment charge in its last fiscal year when it downgraded the book value of Westinghouse.[195]
>
> *Washington Post*: Masahiko Ishino, an analyst at Tokai Tokyo Research Center, said the focus may soon shift to whether Toshiba will divest some of its businesses if the latest loss wipes out its shareholders' equity.[196]

100.  On December 27, 2016, my event study demonstrates that the market price of SCANA Common Stock fell by 0.44% ($0.33 per share) after controlling for market and industry effects. This abnormal price decline is not statistically significant with a t-statistic of -1.15.  On December 28, 2016, my event study demonstrates the market price of SCANA Common Stock fell by 1.17% ($0.87 per share) after controlling for market and industry effects.  This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -3.05.

---

[192] "UPDATE 2-Writedown fears wipe $5 bln off Toshiba's value as it weighs options," *Reuters News*, December 28, 2016, 4:27 AM.

[193] "Rating Action: Moody's downgrades Toshiba Corp to Caa1; ratings on review for further downgrade," *Moody's Investors Service*, December 28, 2016.

[194] "Toshiba poised to incur massive loss in N-power business," *The Japan News*, December 28, 2016.

[195] "Toshiba Anticipates Nuclear Write-down," *The Wall Street Journal (Asia Edition)*, December 28, 2016.

[196] "Toshiba may lose billions of dollars on troubled U.S. nuclear power deal; Massive loss may be coming after the company bought a nuclear construction business," *Washington Post.com*, December 28, 2016.

101.  Given that the news was released during a holiday when the U.S. market was closed (December 26, 2016) and that reporting by analysts and the press continued through December 28, 2016, it is appropriate to consider the two-day return from December 27, 2016, to December 28, 2016 as the relevant event window.  Moreover, academic research shows that trading volumes and investor attention are lower around major U.S. holidays.[197]  Given this dynamic, it can take longer for information to be fully reflected in stock prices even in markets that are generally efficient, such as the NYSE and NASDAQ.[198]  For this two-day window, my event study demonstrates that the market price of SCANA fell by 1.60% ($1.20 per share), after controlling for market and industry factors.  This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -2.96.

102.  I carefully evaluated whether there was any news outside of the above corrective information that could explain the observed SCANA Common Stock price declines over December 27, 2016, and December 28, 2016, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff will prove that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines on either December 27, 2016, or December 28, 2016.  Thus, I attribute the full amount of $1.20 per share of the two-day abnormal dollar decline to the above corrective information and estimate that $1.20 of artificial inflation per share was dissipated from SCANA Common Stock over the two-day window of December 27, 2016, to December 28, 2016.[199]

---

[197] Hood, Matthew and Vance Lesseig, 2017, "Investor Inattention Around Stock Market Holidays," *Finance Research Letters* 23, 217-222.

[198] *Id*.

[199] Specifically, I estimate that $0.33 and $0.87 of artificial inflation per share was dissipated from the price of SCANA Common Stock on December 27, 2016 and December 28, 2016, respectively.

103.   This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project.  The information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed the troubled financial situation of Westinghouse, and, in particular, the losses it incurred related to the Nuclear Project and what it implied about the status of the Nuclear Project.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

104.   For example, analysts continued to express the view that the Nuclear Project was "going well."[200]  Williams Capital Group also published a report on January 19, 2017 highlighting commentary from the Chairman of the PSC, Swain Whitfield indicating he "appeared pleased" with the progress of the Nuclear Project and had "limited concern" for potential financial difficulties:

> For SCANA (NYSE:SCG, $72.36, Buy), the Chairman appeared pleased with the progress of SCE&G's new Summer Units 2-3. He expressed **limited concern for the financial difficulties** with the company's lead contractor and significant confidence in Fluor's (NYSE: FLR, $52.98, Not Rated) capabilities to complete construction on time to preserve nuclear Production Tax Credits for customers.[201]

## B.   JANUARY 19, 2017

105.   After market hours on January 18, 2017, Japanese media reported that Toshiba had asked the Development Bank of Japan for financial support and reported that the write-down

---

[200] "SCANA Corporation: Power For Living," *Seeking Alpha*, January 17, 2017, 4:42 AM.

[201] "Utility Sector Commentary: Visit With Four State Commissioners: Regulators Support Gas Infrastructure, Worry About Nuclear," *The Williams Capital Group*, January 19, 2017.

associated with its U.S. nuclear business could reach 700 billion yen (approximately $6.1 billion).[202] Toshiba then issued a press release on January 19, 2017 reaffirming that the exact figures associated with the write-down were still being calculated.[203] However, Toshiba's press release did little to assuage investors, as the information that the write-down could balloon to much larger than initially expected caused Toshiba's largest stock drop in 40 years.[204]

106.   Bloomberg directly tied this information to SCANA's price decline on January 19, 2017, noting that "Scana fell as much as 2.1%, the most in three weeks, after a report that Toshiba Corp.'s writedown for a U.S. nuclear business may exceed $4.4 billion."[205]

107.   Analysts following SCANA negatively reacted to the revelation by Japanese media that the write-down could exceed $4 to $6 billion:

> *UBS*: Following recent headlines around an ever-larger writedown forthcoming from Toshiba ($6.1 Bn now) with 4Q and given more cautious commentary on capex timing for the Summer project, ***we believe the latest relative pullback looks likely to continue. We expect SCG will prove particularly sensitive to risks around Toshiba*** given the recent ~$500 Mn payment for a fixed-price EPC deal with the consortium (which we view as advantageous given cost increases appear beyond this level, but potentially of limited value depending on developments at Toshiba).[206]

> *Macquarie Research*: We downgrade SCG to N from OP following a strong outperformance of the stock in 2016 and in light of financial concerns surrounding Toshiba, a guarantor of SCG's newly amended engineering, procurement, and construction (EPC) contract for its nuclear new build project in SC.[207]

---

[202] "Toshiba Drops 16 Percent on Reported Writedown Losses," *Bloomberg*, January 18, 2017, 7:21 PM.

[203] "Notice on Media Coverage of Toshiba's Nuclear Business," *Toshiba Corporation Investor Relations*, January 19, 2017.

[204] "Toshiba shares plunge, two presidents in Gambia and Russia's Middle East push," *Financial Times*, January 19, 2017.

[205] "Scana Falls After Report of Bigger Toshiba Nuclear Writedown," *Bloomberg*, January 19, 2017, 3:19 PM.

[206] "Scanning the Nuclear Risks," *UBS*, January 23, 2017.

[207] "Don't want to push our luck," *Macquarie Research*, January 24, 2017.

108.   On January 19, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 1.02% ($0.74 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -2.44.

109.   I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on January 19, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price decline on January 19, 2017.  Thus, I attribute $0.74 per share of the abnormal dollar decline to the above corrective information and estimate that $0.74 of artificial inflation per share was dissipated from SCANA Common Stock on January 19, 2017.

110.   This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project.  The information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed the true size of the write-down associated with Toshiba's U.S. nuclear business and its impact on the Nuclear Project. However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

111.   For example, analysts at UBS and Macquarie Research issued reports on January 23, 2017 and January 24, 2017, respectively, in which they assessed the likely impact on SCANA of the update from Toshiba.  UBS remained cautiously optimistic on the financial guidance:

68

> Despite the delays in spend and the more cautious schedule, we still see EPS as playing out reasonably well vs. Street with a guidance midpoint for FY17 likely around $4.30 ($4.20-4.40) vs Street at $4.23.
>
> […]
>
> We are incrementally more cautious on the shares, where we believe the update from Toshiba and a further project delay are likely to be met cautiously despite 2017 guidance ahead of Street.[208]

112. Macquarie Research, while concerned about the financial woes affecting Toshiba, nevertheless expressed a hopeful outlook and pointed to other routes for offsetting the risk of the investment:

> We recognize that SCG could sign another EPC contract, if Toshiba's financial situation were to further deteriorate. While we recognize the strong support for the VC Summer nuclear project in SC, another meaningful increase in the capital cost of the project could boost the regulatory risk of the investment, especially as the company has just agreed to wait with any additional cost increases until early '19.[209]

## C. JANUARY 31, 2017

113. On January 31, 2017, Dow Jones reported on a Wall Street Journal article stating that, according to a Toshiba executive, Toshiba was planning to exit nuclear construction and expected the resignation of both Toshiba chairman, Shigenori Shiga, and former head of Westinghouse Electric Co., Danny Roderick.[210] These details reflected the consequences of Toshiba's actions during their management of Westinghouse.

114. Specifically, the article stated that Toshiba planned to stop building nuclear power plants "after incurring billions of dollars in losses trying to complete long-delayed projects in the

---

[208] "Scanning the Nuclear Risks," *UBS*, January 23, 2017.

[209] "Don't want to push our luck," *Macquarie Research*, January 24, 2017.

[210] "Toshiba to Exit Nuclear Construction Business," *Dow Jones Institutional News*, January 31, 2017, 1:22 PM.

69

U.S."[211]  The article cited a SCANA spokeswoman saying that the Company was "closely monitoring [Westinghouse's] financial status, as well as that of Toshiba." [212]

115.  The article also quoted a critic of the U.S. nuclear projects being undertaken by Southern and SCANA who questioned both companies' confidence that they would not be responsible for further cost overruns associated with their respective nuclear projects:

> "I don't see how Southern and Scana are confident they won't be responsible for any further cost increases," said Sara Barczak, a critic of the projects who works for the Southern Alliance for Clean Energy, a nonpartisan advocacy group.[213]

116.  On January 31, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 0.88% ($0.60 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -2.00.

117.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on January 31, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines on January 31, 2017.  Thus, I attribute $0.60 per share of the abnormal dollar decline to the above corrective information and estimate that $0.60 of artificial inflation per share was dissipated from SCANA Common Stock on January 31, 2017.

118.  This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project,

---

[211] *Id.*

[212] *Id.*

[213] *Id.*

including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project. The information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed Toshiba's decision to end nuclear construction in the United States and the expected resignation of key executives due to Toshiba's incurring of losses from cost overruns at U.S. nuclear construction projects. However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

119. For example, Morgan Stanley hosted a conference call with members of the ORS and noted in its follow up report published on February 7, 2017, that "the regulatory environment in SC remains supportive of the [Nuclear] project overall […] and the ORS believes that the current contract structure provides a good path forward to get the plant completed."[214]

### D. FEBRUARY 14, 2017

120. Prior to U.S. market hours on February 14, 2017, Toshiba submitted and was granted its request to delay the release of its earnings and hosted a corresponding update call, leaving investors with concerns about its stability and U.S. nuclear acquisitions.[215] Soon afterward, Toshiba disclosed $6.3 billion as the precise amount of its write-down in connection with its struggling U.S. nuclear program, specifically as it related to Westinghouse.[216]

---

[214] "Perspectives on New Nuclear – Call Takeaways," *Morgan Stanley*, February 7, 2017.

[215] "Notice on Submission of Application for Approval of Extension of the Deadline for Submission of the 178th Third Quarter Securities Report (October 1, 2016 to December 31, 2016)," *Toshiba Corporation Investor Relations*, February 14, 2017; "URGENT: Toshiba submits application to postpone Tuesday earnings release," *Kyodo News*, February 14, 2017, 12:54 AM; "Toshiba Corporation TSE:6502 Guidance/Update Call," *S&P Capital IQ*, February 13, 2017, 7:00 PM.

[216] "Provisional Outlook for FY2016 3Q Business Results and FY2016 Forecast, and Outline of Loss in Nuclear Power Business and Countermeasures," *Toshiba Corporation Investor Relations*, February 14, 2017; "Toshiba to take $6.3 bln hit on U.S nuclear unit," *Reuters News*, February 14, 2017, 3:40 AM.

121.   This write-down pushed Toshiba to a full-year net loss of $3.44 billion for the fiscal year ending March 31, 2017.[217]  Accompanying Toshiba's announcements, Shigenori Shiga, the chairman at Toshiba, announced his resignation given the company's poor performance and management related to Westinghouse's purchase of the nuclear construction business, CB&I Stone & Webster.[218]  The purpose of the acquisition was to assist the building of nuclear reactors in Georgia and South Carolina, but Toshiba admitted later that it may have overestimated the value of CB&I Stone & Webster during the acquisition process.[219]

122.   In the guidance and update call with analysts after U.S. trading hours on February 13, 2017,[220] Toshiba reported that it may sell its stake in Westinghouse, further signaling the troubled economic viability of the Nuclear Project.[221]  Following this news from Toshiba, media outlets reported that analyst James Von Riesemann of Mizuho downgraded SCANA.[222]  Benzinga reported on the downgrade from Buy to Neutral and the lowered price target to $68 from $80, and questioned Westinghouse's financial stability and the future of the Nuclear Project:

> SCANA Corporation (NYSE: SCG) was downgraded by Mizuho Tuesday as Toshiba Corp (USA) (OTC: TOSYY) — the backer for Scana's nuclear construction projects in the U.S. — went into financial meltdown. […] Scana's construction consortium with Toshiba subsidiary Westinghouse may not be economically viable any longer, leaving the construction of two new nuclear units to fall into Scana's lap.[223]

---

[217] "Toshiba to take $6.3 bln hit on U.S. nuclear unit," *Reuters News*, February 14, 2017, 3:40 AM.

[218] "SCANA Corp. Hit By Toshiba's $6 Billion Writedown Catastrophe," *Benzinga*, February 14, 2017, 12:10 PM.

[219] "Toshiba's shares tank as nuclear worries intensify," *CNN Wire*, February 14, 2017, 2:18 AM.

[220] "Toshiba Corporation TSE:6502 Guidance/Update Call," *S&P Capital IQ*, February 13, 2017, 7:00 PM.

[221] "Toshiba Corporation TSE:6502 Guidance/Update Call," *S&P Capital IQ*, February 13, 2017, 7:00 PM. (Satoshi Tsunakawa Representative Executive Officer, President, CEO, Head of Nuclear Plant Operations & Director: "As for overseas nuclear power business, we will analyze the strategic alternatives, which means that we will be reducing our stake or our shares if there is any partner who is acceptable to our customers and employees."); "Toshiba CEO: Want to Sell Westinghouse's Stake if Appropriate Partners Appear," *Dow Jones Institutional News*, February 14, 2017, 5:01 AM.

[222] "Scana Cut to Neutral at Mizuho," *Bloomberg*, February 14, 2017, 8:47 AM.

[223] "SCANA Corp. Hit By Toshiba's $6 Billion Writedown Catastrophe," *Benzinga*, February 14, 2017, 12:10 PM.

123. Bloomberg also reported on the day's news and noted that "Scana Corp. slid the most in three months after Toshiba said it would consider selling its atomic business following a $6.3 billion write down related to reactors under construction in the U.S."[224]

124. Wells Fargo acknowledged the resulting decline in SCANA Common Stock and reported a more optimistic view, pointing out that the BLRA provided SCANA with financial protections if Toshiba and Westinghouse are unable to fulfill their commitments to complete the Nuclear Project. Wells Fargo said:

> Shares of SCG are underperforming the S&P Utilities by roughly 200-300 bps in the wake of the news that Toshiba delayed filing quarterly financials due to concerns around the company's accounting controls, specifically as it relates to Westinghouse (and a competitor pre-market-open downgrade). […] While Toshiba's financial woes create a degree of uncertainty and are concerning, we continue to remain of the opinion that SC's Baseload Review Act (BLRA) provides SCG with substantial protections in the event Toshiba is ultimately unable to honor the $7.8B Fixed Price Option contract due to solvency issues.[225]

125. On February 14, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 3.83% ($2.68 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -8.10.

126. I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on February 14, 2017, and found no such confounding information. As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be

---

[224] "Scana Drops on Concern Over Fall-Out From Toshiba's Nuclear Woes," *Bloomberg*, February 14, 2017, 10:28 AM.

[225] "Flash Comment: SCG: Comments On Toshiba Situation," *Wells Fargo Securities*, February 14, 2017.

disaggregated from the price decline on February 14, 2017.[226]  Thus, I attribute $2.68 per share of the abnormal dollar decline to the above corrective information and estimate that $2.68 of artificial inflation per share was dissipated from SCANA Common Stock on February 14, 2017.  This decline was partially offset by SCANA's allegedly false and misleading reassurances on the next trading day, as I describe in **Section VIII.B** below.

127.   This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project.  The information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed the magnitude of the write-down in connection with Westinghouse.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

128.   For example, in a report on February 15, 2017, Morningstar reiterated its belief that "the new nuclear plants Scana and Southern are building with Westinghouse will be completed" and its confidence in SCANA as "better positioned given its fixed-price contract with Westinghouse and stranded cost recovery."[227]  The Morningstar report continued to praise SCANA executives for having "done a great job de-risking the project."[228]

---

[226] As mentioned above, Wells Fargo references a competitor downgrade (*see,* Flash Comment: SCG: Comments On Toshiba Situation," *Wells Fargo Securities*, February 14, 2017.)  However, I do not find coverage of this downgrade in other SCANA news on February 14, 2017.  Furthermore, my event study controls for price movements in the industry index (and thus price movements related to SCANA's competitors).  As a result, I do not see a need to disaggregate for the competitor downgrade discussed by Wells Fargo.

[227] "Scana Corp. and Southern Co. Investors Should Not Fret Toshiba's Woes...Yet," *Morningstar Equity Research*, February 15, 2017.

[228] *Id*.

129. Similarly, Wells Fargo issued a Flash Comment following the disclosure about Westinghouse's and Toshiba's commitments to complete the Nuclear Project. Wells Fargo's optimism persisted:

> We view SCG's statement positively as we believe there was some concern amongst investors that the $6.3B WEC/Toshiba impairment charge from cost overruns related to the two U.S. projects reflected a more substantial delay than 4-8 months. As such, we reiterate our comments published intraday on 2/14 and view the nearly 400 bps underperformance on 2/14 (SCG shares -4.5% vs. S&P Utilities -0.7%) to be overdone.[229]

130. UBS also felt reassured by Toshiba's commitment and the PSC's support:

> Notably, the 'extreme' scenario here would require a full renegotiation of the contract if SCG were forced to find a different contractor, but Toshiba appears fully committed at the parent level to Westinghouse obligations. Relative to SO's Vogtle plant, we see relatively greater risk given elected profile of the commission relative to South Carolina. We continue to perceive support from the SC PSC.[230]

131. In their later report published on February 16, 2017, analysts from Wells Fargo opined that the share price arguably already reflected a highly pessimistic outcome and expressed optimism about the BLRA:

> However, we think the current valuation arguably overstates the risk, particularly considering the protections afforded SCG under the Baseload Review Act (BLRA). Under the BLRA, SCG is permitted to recover higher costs unless regulators can prove the costs were a direct result of SCG's negligence (a high burden). In addition, over the past several years SCG and key parties in the state, including the Office of Regulatory Staff (ORS), have consistently demonstrated an ability to work together to come up with balanced outcomes as issues have arose. While the next several months could include news flow "ups and downs" as Toshiba works through its financial issues, we believe the current valuation case for SCG is highly compelling.[231]

132. Guggenheim also conveyed a sense of trust in SCANA management's contingency plans:

---

[229] "Flash Comment: Energy and Utility Daily," *Wells Fargo Securities*, February 15, 2017.

[230] "Just How Far Can It Go?" *UBS*, February 15, 2017.

[231] "SCG: We View Recent Weakness As A Buying Opportunity Reiterate Outperform Rating," *Wells Fargo Securities*, February 16, 2017.

SCG is taking necessary steps to be prepared for a scenario in which Westinghouse walks away from the project. Despite Westinghouse reaffirming its commitment, and Toshiba reiterating its parent guarantee, SCG is taking several steps to be prepared for a scenario with Westinghouse exiting the project.[232]

### E.   FEBRUARY 17, 2017

133.   Before the market opened on February 16, 2017, SCANA issued a press release announcing its earnings results for the fourth quarter and full year 2016.  The Company reported fourth quarter earnings of $124 million, or $0.87 earnings per share, missing S&P Capital IQ's consensus normalized EPS estimate for the quarter of $0.92 but exceeding the prior year's fourth quarter earnings.[233]  SCANA also reported fiscal year earnings of $595 million, or $4.16 per share, which surpassed the fiscal year Wall Street consensus of $4.13 per share.[234]  SCANA expressed a positive outlook:

> We are pleased with our annual results and the continued growth in our electric and gas companies… Our earnings outlook continues to support our long-term growth expectations, based upon expected customer growth and investment in our electric and gas infrastructure driven by the economies of the Carolinas.[235]

134.   Later that day, February 16, 2017, SCANA also announced an increase in the Company's dividend and hosted an earnings conference call at 3:00 PM.[236]  During the call with analysts, CEO Marsh made a number of statements about Toshiba's financial stability and the

---

[232] "SCG – Focus Remains on Nuclear Fallout; 2017 Expectations In-Line, LT Outlook Extended," *Guggenheim*, February 16, 2017.

[233] "SCANA Reports Financial Results for Fourth Quarter and Full Year 2016, Announces 2017 Earnings Guidance and Long-term Guidance," *PR Newswire*, February 16, 2017, 7:30 AM; "SCANA Q4'16 EPS increases YOY but misses analyst estimates," *SNL Energy Finance Daily*, February 17, 2017; "SCANA Corp. Bottom Line Rises 27% In Q4," *RTT News*, February 16, 2017.

[234] "SCANA Reports Financial Results for Fourth Quarter and Full Year 2016, Announces 2017 Earnings Guidance and Long-term Guidance," *PR Newswire*, February 16, 2017, 7:30 AM; "Stock Report: SCANA Corp," *CFRA*, February 16, 2017.

[235] "SCANA Reports Financial Results for Fourth Quarter and Full Year 2016, Announces 2017 Earnings Guidance and Long-term Guidance," *PR Newswire*, February 16, 2017, 7:30 AM.

[236] "SCANA Corporation Announces 6.5 Percent Increase in Common Dividend and an Increase in Payout Ratio Policy," *PR Newswire*, February 16, 2017, 10:15 AM; "FQ4 2016 Earnings Call Transcripts," *S&P Capital IQ*, February 16, 2017, 3:00 PM.

76

progress of the Nuclear Project, specifically stating that "we still anticipate completing our 2 new nuclear units" and that "we are making substantial progress on these new plants."[237]  In an attempt to further allay concerns about the Nuclear Project, CEO Marsh stated:

> We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally, Toshiba would be without these stresses, we still anticipate completing our 2 new nuclear units, which will enable us to provide our customers with safe, reliable energy for decades to come.
>
> […]
>
> [W]e have already initiated steps, as identified in our original EPC contract, to assist in the orderly transition to a new construction team and assist in the continuation of construction activities if necessary.[238]

135.   SCE&G COO Byrne additionally assured investors that SCANA would reach its "2020 deadline" for completion of Unit 2 because "efficiency factors have increased significantly," and that the Company was nearing the point at which "the unique nuclear aspects and the unique aspects of this new regulatory framework are getting behind us."[239]

136.   In the presentation associated with the earnings call, a slide entitled "Toshiba" stated that SCANA "continues to monitor" Toshiba's financials and plans, while also including a bullet point on "SCANA's contingency plan should Westinghouse exit the project."[240]

---

[237] "FQ4 2016 Earnings Call Transcripts," *S&P Capital IQ*, February 16, 2017, 3:00 PM.

[238] *Id*.

[239] *Id*.

[240] "Fourth Quarter and Full Year 2016," *Scana Corporation*, February 16, 2017.



### Toshiba

- SCANA continues to monitor Toshiba's financial situation and its proposed plans

- Westinghouse officials indicated that WEC and Toshiba are committed to completing the two new nuclear units

- Westinghouse's revised in-service dates are April 2020 and December 2020 for Unit 2 and Unit 3, respectively

- Toshiba reiterated its parental (payment) guarantee of Westinghouse

- SCANA's contingency plan should Westinghouse exit the project:
  - In process of escrowing the AP1000 intellectual property and software – goal is to provide access to design for new construction team
  - Surety Bond in the form of standby letters of credit – provides source of liquidity to assist in orderly transition to new construction team
  - Various options for new construction team:
    - SCANA/SCE&G could potentially serve as general contractor
    - Seek to enter into a new Engineering, Procurement, & Construction contract
    - Seek to enter into a Procurement & Construction contract
  - Abandonment provision under the BLRA

Fourth Quarter 2016 | Earnings Conference Call    30

137. Analyst questions at the end of the call focused not on the earnings announcement, but rather on the status of the Nuclear Project if Westinghouse were no longer on part of the project. For example, Travis Miller of Morningstar said, "walk me through what a worst-case scenario on the nuclear side might look like when –if you were to get to some kind of stranded cost-type situation."[241] In response, CEO Marsh explained:

> First of all, it's difficult to speculate on exactly what the status of construction would look like if they were to -- if Westinghouse were to exit the project. If that were to happen, I would expect that SCE&G, along with our partner, Santee Cooper, would go through a thorough assessment of the facts and circumstances at that time and make some decisions around what options we thought might be appropriate and then certainly engage the Office of

---

[241] "FQ4 2016 Earnings Call Transcripts," *S&P Capital IQ*, February 16, 2017, 3:00 PM.

78

Regulatory Staff and the commission to determine the most prudent path forward.

[…]

But with the construction team specifically, we could make a decision to serve as a general contractor, we could look at entering into a new EPC contract or we could look to find someone just to do the procurement and construction. **So we would certainly consider all of those, kind of look at the last case option, the abandonment provisions under BLRA. That's not something that's high on our list. We would certainly like to finish these projects. They're critical to us over the long term in meeting customers' needs and the growth we expect to see in the state of South Carolina over the long term**.[242]

138. Stephen Calder Byrd of Morgan Stanley asked a question specific to the BLRA abandonment provision:

> Wanted to discuss the abandonment provision of the BLRA. If the issues with the budget and the cost overruns are really driven by – nothing changing to the, I guess, the licensed reactor design but rather just sort of more ordinary-course scheduling issues, overruns and also the fact that Toshiba may not be able to sort of meet its financial obligations. Is that – under the abandonment provision, is that a sort of cause for being able to get recovery for the money spent to date?[243]

139. In response, CEO Marsh said:

> The provision is not specific as to exactly what it would cover. There was not an effort to make a listing of the types of items that will qualify. It's more specifically focused on what will be deemed prudent at the time that decision was made. And that clearly means in the regulatory space that there would have to be a meeting of the minds and serious evaluation of where the project is, what it might cost to complete and then jointly make that decision as the most prudent action. It would be extremely difficult, not knowing all of the facts and circumstances, to try to list what would or would not qualify under that provision. **And generally, prudency is the rule that the commission banks on at the end of the day**.[244]

---

[242] *Id*.

[243] *Id*.

[244] *Id*.

140.  The conference call ended after-hours on February 16, 2017, with analysts' reactions occurring after market hours and into the following day.[245]  Analysts continued to view the future optimistically, given the reassurances provided by SCANA management, but recognized such assurances were unlikely to ease investor concerns.  For instance, analysts from Wells Fargo said:

> As we expected, mgmt. stressed that development activities at the site continue and that the company has contemplated contingency plans in the event that Toshiba/Westinghouse exits the contract with SCG. **While we doubt the SCG's commentary will substantially allay investors concerns, we believe the share price arguably already reflects a highly pessimistic outcome.**
>
> […]
>
> **In our view, investor concerns related to Westinghouse's ability to execute on the FPO are legitimate.** However, we think the current valuation arguably overstates the risk, particularly considering the protections afforded SCG under the Baseload Review Act (BLRA)… While the next several months could include news flow "ups and downs" as Toshiba works through its financial issues, we believe the current valuation case for SCG is highly compelling.[246]

141.  Guggenheim analysts seemed comforted by SCANA management's actions and believed that SCANA was actively reducing the risk of Toshiba and Westinghouse's departure from the Nuclear Project:

> SCG is taking necessary steps to be prepared for a scenario in which Westinghouse walks away from the project. Despite Westinghouse reaffirming its commitment, and Toshiba reiterating its parent guarantee, SCG is taking several steps to be prepared for a scenario with Westinghouse exiting the project. SCG is escrowing intellectual property associated with the AP1000 in order to secure rights for another construction team to have access. Toward that end, management suggested various options available to them with regards to a new construction team, such as self-build, enter a new Engineering, Procurement, and Construction (EPC) contract, or potentially bring engineering in house and only seek to enter into a procurement and construction contract, for example.[247]

---

[245] "*SCANA 4Q EARNINGS CALL ENDS," *Bloomberg*, February 16, 2017, 4:30 PM.

[246] "SCG: We View Recent Weakness As A Buying Opportunity Reiterate Outperform Rating," *Wells Fargo Securities*, February 16, 2017.

[247] "SCG – Focus Remains on Nuclear Fallout; 2017 Expectations In-Line, LT Outlook Extended," *Guggenheim*, February 16, 2017.

142.   At the start of and throughout the rest of the following trading day, February 17, 2017, the stock price continued to decline as analysts expressed new levels of concern about Toshiba's financial instability and the impact it would have on SCANA's Nuclear Project.  Morgan Stanley, The Williams Capital Group, Barclays, and Gabelli & Company published analyst reports in which they expressed mixed opinions about SCANA moving forward with the Nuclear Project.

143.   Morgan Stanley analysts were pessimistic about SCANA's future and ability to withstand a collapse of the Nuclear Project partnership with Westinghouse and Toshiba.[248]  In their report, Morgan Stanley analysts provided an approximate calculation of the write-down and the high likelihood that shareholders, and not SCANA ratepayers, would carry the cost of Westinghouse's and Toshiba's abandonment of the Nuclear Project:[249]

> Financial conditions at nuclear construction contractor Toshiba have worsened, cost overruns have increased, and completion has been delayed again. **We are lowering our PT from $69 to $62 based on a greater probability in our view that SCG faces a liability for nuclear construction cost overruns**. […] Toshiba announced a $6.1b cost overrun for its US nuclear projects that appears to be mostly incremental to the previous plans. Assuming an even split between the two US nuclear plants (one being developed primarily by SO, the other primarily by SCG),and accounting for SCG's 55% share of the nuclear construction project, this would indicate that the investment needed to complete SCG's project has potentially increased by $1.7b, which would represent an additional 28% overrun compared to the original cost estimate (on top of the 21% to date). In addition, SCG's two units have been delayed by another 4 and 8 months respectively, which could add additional costs and puts the project at risk of not receiving tax credits if there are further delays.
>
> […]
>
> Given the likely cost overrun from the latest Toshiba announcement translates to ~$1.7b, and given we see continued overrun risk (due to poor labor productivity, the potential for disruptions from potential changes to the project execution plan, and risks of inability to receive compensation for cost overruns from the EPC contractor Westinghouse/Toshiba*), we believe this discount will likely increase as the market continues to absorb the news flow from both Toshiba and SCANA.* […]  Given the project execution track record to date, however, we believe execution risk remains very significant. […] Recent data

---

[248] "Reassessing Nuclear Risk," *Morgan Stanley*, February 17, 2017.

[249] *Id.*

81

that is concerning to us, over and above the news relating to Toshiba: the labor productivity at the SCANA new nuclear site deteriorated significantly in the latest BLRA status report, indicative of the challenges in mitigating the risk of further project cost overruns.

[…]

[B]oth companies had already settled disputes with Westinghouse at the end of 2015. SO settled outstanding litigation in late 2015 and updated the forecasted cost to $5.44b in early 2016, and the forecasted cost remained $5.44b as of the latest construction monitoring report. SCG negotiated the fixed price option at the end of 2015 and disclosed a total capital cost forecast at that time of $7.6b (including the fixed price option); the latest BLRA indicates a capital cost forecast only modestly higher at $7.678b. Presumably, the settlements reached at the end of 2015 would have incorporated the costs forecasted by Westinghouse at that time, so it appears that the $6.1b of increased costs would be mostly incremental to Westinghouse's prior expectation for total construction cost of the projects. […] In the event that Toshiba and Westinghouse cannot honor the contract, we see greater risk that this sum would fall upon SCG shareholders and/or ratepayers. Based on our recent conversation with the regulatory staff in South Carolina (summary note here), we believe there is little willingness to allow ratepayers to fund greater cost overruns given the pressure on customer bills. We thus see significant risk that this cost is borne by shareholders. […] ***Overall, we think SCG investors have relatively limited protection from potential overruns given the small letter of credit posted by Toshiba, no regulatory provision for cost overruns beyond the fixed price EPC agreement, and because the project represents a large percentage of the company's market cap.***

[…]

Along with SCG's BLRA filing on 2/14, the company revealed that Westinghouse notified the company of new in-service dates of April and December 2020 for VC Summer units 2 and 3 respectively. This represents a delay of 8 months and 4 months for the units, which had previously been targeted for August 2019 and 2020. If the plants are delayed beyond 2020, they would not be eligible to receive production tax credits.[250]

144.   Williams Capital analysts remarked that, on the earnings call, "attention was focused on Toshiba/Westinghouse's financial issues and the potential impact on SCANA's new nuclear construction," further stating that "the Toshiba situation warrants continued attention."[251]

---

[250] *Id.*

[251] "Q416 Results OK, Stock Remains an Incredible Value," *The Williams Capital Group*, February 17, 2017.

SCANA reported Q416 recurring and GAAP earnings of $124 million, $0.87 per share compared with $98 million, $0.69 per share reported in Q415. For the year, SCANA reported recurring earnings of $595 million, $4.16 per share compared with $544 million, $3.81 per share reported in 2015. On the long earnings call yesterday, attention was focused on Toshiba/Westinghouse's financial issues and the potential impact on SCANA's new nuclear construction. Management discussed that while Toshiba/Westinghouse reiterated their V.C. Summer primary contractor's intention to complete SCANA's new nuclear units, SCANA is working on contingency plans in the event of a default of Westinghouse's contractual obligations. Management provided its initial 2017 guidance range of $4.15-$4.35 per share and reiterated the company's 4%-6% 3-5 year EPS growth CAGR. Yesterday, SCANA also raised the dividend 6.5% to $0.6125, $2.450 per share from $0.575, $2.300 per share. With the dividend increase, the board also raised the target dividend payout to 55%-65% from 55%-60%. We reiterate our Buy investment rating and $80.00 target price on SCANA Corporation (NYSE: SCG) on February 17, 2017 at a price of $67.32. Nevertheless, the Toshiba situation warrants continued attention. […] ***While SCANA addressed the Westinghouse issues, no epiphany on a resolution of project risks was in the offing***.[252]

145.   Barclays analysts reiterated their Equal Weight rating, but lowered their Price Target from $71 to $70, and acknowledged that Toshiba's ability to finish the Nuclear Project was in greater question given recent events and that SCANA therefore faced increasing risks:

SCANA Corp has a fixed price contract with Toshiba subsidiary Westinghouse. Toshiba's ability to back that contract or finish the project is now in greater question as Toshiba has delayed the reporting of audited financials to mid-March, and took a $6.3 billion write-down related to cost overruns. Toshiba CEO Shigenori Shiga, who formerly headed the Westinghouse unit, also resigned… if Toshiba is unable to complete the project SCANA would presumably negotiate finishing the project with subcontractor Fluor who would not be willing to absorb cost increases. SCANA does have approximately $100 million in letters of credit and could go back to the South Carolina regulator to absorb higher costs. This potential path would be fraught with risks, including potential for lack of equity return or regulatory recovery on higher costs, credit rating pressure, project timeline delays, and increased external funding needs. […] We have an EW rating on SCG because while the company is meaningfully growing rate base and earnings through the construction of V.C. Summer, construction risk, Toshiba risks, and potential regulatory risk as rate fatigue mounts over time keep us on the sidelines.[253]

---

[252] *Id.*

[253] "Toshiba Now an Overhang; 4Q in Line," *Barclays*, February 17, 2017.

146. However, Gabelli & Company continued to rate SCANA as Buy:

> We consider SCG to be one of the more compelling rate base growth utility stocks given the annual 10.25/10.5%/11% ROE (53% equity) on the significant new nuclear development project and above average customer growth. Shares trade at 15.8x and 15.3x our 2017 and 2018 EPS estimates, compared to peer group multiples of 18.4x and 17.4x, respectively. SCG recently raised the annual dividend to $2.45 per share, from $2.30 per share, and which represents a 3.6% current return. Our 2017 and 2018 PMV estimates are $73 and $79 per share, respectively, using an 11.0x multiple. We expect the new nuclear units to be very valuable given low marginal cost baseload generation and the challenges with building base-load generation.[254]

147. Some analysts believed that SCANA's abandonment of the Nuclear Project was unlikely. Barclays analysts believed that Toshiba would be able to fulfill its commitments and the Nuclear Project would be completed:

> There are several potential routes that the Toshiba situation and as a result the Summer project could take from here. The status quo is that Toshiba survives its current situation by raising liquidity through asset sales from other businesses and it should be able to meet their commitments under the contracts. At the other end of the spectrum is a Toshiba default, and lack of abandonment recovery from the South Carolina regulators on the portion of the new nuclear units constructed to date. We would see a Commission finding against prudency for steel already in the ground and amounts already approved through the Base Load Review Act (BLRA) regulatory mechanism as unlikely in that worst case scenario.[255]

148. Gabelli & Company analysts believed that abandonment was highly unlikely and concluded, unlike Morgan Stanley analysts, that SCANA would be fine even if abandonment occurred:

> Toshiba outlined a plan to improve its financial position and plans to reduce risk at the 8 plants currently under construction by implementing cost reduction measures. In China, the Sanmen and Haiyang plants using the AP 1000 are nearly complete and undergoing operational testing. SCG's nuclear development investment is largely protected under SC's Baseload Review Act (BLRA). In order for SCE&G investment to be imprudent, opposing parties would need to prove negligence on SCE&G. The BLRA provides for recovery

---

[254] "Strong '16 Results; Higher Estimates – Buy," *Gabelli & Company*, February 17, 2017.

[255] "Toshiba Now an Overhang; 4Q in Line," *Barclays*, February 17, 2017.

84

even under the highly unlikely scenario of abandonment. We believe that SCG or Fluor would assume the contractor role in as worst case scenario.[256]

149. On February 17, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 2.56%, or a decline of $1.73 per share, after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -5.24.[257]

150. I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on February 17, 2017, and found no such confounding information. As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines on February 17, 2017. Thus, I attribute $1.73 per share of the abnormal dollar decline to the above corrective information and estimate that $1.73 of artificial inflation per share was dissipated from SCANA Common Stock on February 17, 2017.

151. This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project. Thus, the information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed the reasoning for concern about Toshiba's financial instability and the impact it would have on

---

[256] "Strong '16 Results; Higher Estimates – Buy," *Gabelli & Company*, February 17, 2017.

[257] I consider February 17, 2017, as the Corrective Disclosure Event as opposed to the two-day window from February 16, 2017 through February 17, 2017. This is a conservative assumption to account for the mix of news on February 16, 2017, and in consideration of the fact that SCANA's earnings call began at 3:00 PM, near market close on February 16, 2017.

85

SCANA's Nuclear Project.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

152.    For example, a report from Macquarie Research published on February 21, 2017, listed the safety nets that were in place in the event that the Nuclear Project to encounter more complications:

> SCG has a US$100m letter of credit from Toshiba and up to US$372m in liquidated damages from Westinghouse/Toshiba under last year's fixed price EPC contract. Those should offset the increase in owner's costs of the project, assuming the new in-service dates are in fact honored by Westinghouse. The EPC contractor should soon provide SCG with details behind the new timeline and SCG points to likely conservative assumptions behind labor costs for the project, based on Toshiba's public comments. SCG's contingency plan should allow for no disruption in the project construction.[258]

153.    Similarly, UBS expressed an optimistic outlook given "mgmt.'s commitment to execute the project within th[e] schedule", as well as Toshiba's commitment to Westinghouse:

> We think SCG shares could find support in the near term as some degree of confidence returns with many of the unknowns resolved. While the shares have underperformed in recent months due to concerns on the schedule, growing confidence that Toshiba will come through on its guarantees for Westinghouse could enable investors to find support for SCG shares. Further, with '17 guidance intact and wider estimates likely too, we don't expect a further material degradation in the near term (just a modest timing shift).
>
> […]
>
> We think mgmt.'s commitment to execute the project within this schedule at least reduces the more meaningful risky aspects of the project.
>
> […]
>
> the latest update on the project has no net increase on consumer rates. This last bit is critically important in positioning with regulators the risk of this latest delay in schedule after having only recently approved the settlement for a fixed price deal late last year. We continue to perceive strong support from the SC PSC for the project, its economic development benefits, and giving SCG the

---

[258] "Nuclear risks overshadow EPS growth," *Macquarie Research*, February 21, 2017.

benefit of the doubt on project developments. The risk is principally tied to just the overall impact on customer bills and need to find mitigating factors. [259]

### F. MARCH 22, 2017 to MARCH 23, 2017

154. On March 22, 2017, Morgan Stanley issued an analyst report which described its predictions of additional cost overruns and delays for the Nuclear Project that could cost SCANA as much as 108% of the original cost estimate and as much as $5.2 billion in higher costs for SCANA if Westinghouse declared bankruptcy and abandoned the Nuclear Project.[260] Morgan Stanley reported that SCANA would face three possible issues if Westinghouse filed for bankruptcy:

> (1) the potential for nuclear contracts to be modified by a bankruptcy filing, potentially limiting liability of Westinghouse and Toshiba for current and/or future overruns, (2) the risk of protracted litigation regarding liability for cost overruns, and (3) potential for lack of assets at Toshiba with which to satisfy SCANA's and Southern's claims.[261]

155. Morgan Stanley warned about the possibility that SCANA would not be able to recover its costs under the BLRA. However, Morgan Stanley believed it would be difficult for regulators given the commission's involvement with the Nuclear Project:

> We believe these earnings would potentially be at risk in the event that the company abandons the project and is not allowed to recover its return on the capital spent to date. We have highlighted the abandonment language from the BLRA below. The language appears to allow SCG to recover costs approved under the BLRA as long as the decision to abandon the construction of the plant is deemed prudent. However, one portion of the language (bold text below) seems to indicate that recovery could be disallowed if the utility should have anticipated or avoided costs considering information available at the time. We believe this would be a difficult path for the commission to pursue since the Office of Regulatory Staff (ORS) and commission have been closely involved in assessing the project's costs thus far, but it opens the door in our view for regulatory risk in this scenario.[262]

---

[259] "Finding Comfort with Nuclear Risk," *UBS*, February 21, 2017.

[260] "Implications of Potential Westinghouse Bankruptcy Filing," *Morgan Stanley*, March 22, 2017.

[261] *Id.*

[262] *Id.*

156. In response to this report, other news outlets repeated Morgan Stanley's estimates on March 22, 2017 and March 23, 2017, stating that going forward "[Southern] and [SCANA] shareholders would have a greater likelihood of bearing nuclear cost overruns."[263] As news coverage began to spread about the Morgan Stanley report, Reuters reported twice – once after trading closed on March 22, 2017, and again before market hours on March 23, 2017 – that Westinghouse had hired advisers for its potential bankruptcy and that SCANA and Southern Company had hired restructuring advisers.[264] As discussed further below, bankruptcy by Westinghouse would negatively impact the financial status of the Nuclear Project.

157. This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project. The information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed to the market information

---

[263] "Morgan Stanley Sees Potential $5.2B Cost Hike for SCANA," *Bloomberg*, March 22, 2017, 10:34 AM; "Southern, Scana seen facing $8.5 billion threat on Toshiba woes," *Bloomberg*, March 22, 2017, 12:21 PM; "Morgan Stanley weighs Westinghouse bankruptcy risks for Southern, SCANA," *SNL Energy Finance Daily*, March 23, 2017.

[264] "SCANA CORP, SOUTHERN CO HIRE ADVISERS TO PREPARE FOR BANKRUPTCY OF TOSHIBA CORP'S WESTINGHOUSE ELECTRIC CO LLC-SOURCES," *Reuters News*, March 22, 2017, 10:40 PM; "EXCLUSIVE-Westinghouse's clients gear up for bankruptcy fight-sources," *Reuters News*, March 22, 2017, 10:41 PM; "Exclusive: Westinghouse's clients gear up for bankruptcy fight - sources," *Reuters News*, March 23, 2017, 3:18 AM.

88

about the future of the Nuclear Project if Westinghouse declared bankruptcy,[265] which would significantly increase costs and delay the completion of the Nuclear Project, that investors would have understood but for Deloitte's alleged misrepresentations and omissions.

158.  On March 22, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 1.17% ($0.80 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -2.19.  On March 23, 2017, my event study demonstrates the market price of SCANA Common Stock decreased by 1.26% ($0.86 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -2.36.  When I consider the two-day window, the market price of SCANA fell by 2.42% or $1.66 per share, after controlling for market and industry effects.  This decrease is statistically significant beyond the 95% confidence level with a t-statistic of -3.20.

159.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price declines over March 22-23, 2017, and found no such confounding information.  Prior to trading hours on March 22, 2017,

---

[265] I understand that as early as after-market hours on March 23, 2017, U.S. news outlets were reporting that Toshiba was planning for Westinghouse to file for bankruptcy by the end of the month.  *See* "Toshiba's main banks ask for Westinghouse bankruptcy filing this month -Nikkei," *Reuters News*, March 23, 2017, 8:54 PM.  Coverage of this information continued over the next few days.  *See* "Toshiba decides on Westinghouse bankruptcy, sees $9 billion in charges: sources," *Reuters News*, March 24, 2017, 6:59 AM ("Toshiba expects a Chapter 11 filing for Westinghouse would expand charges related to the U.S. unit in the current financial year to around 1 trillion yen ($9 billion) from its publicly flagged estimate of 712.5 billion yen, the people also said. […] Toshiba said on Friday it was not appropriate to comment prematurely. 'Whether or not Westinghouse files for Chapter 11 is ultimately a decision for its board, and must take into account the various interests of all of its stakeholders, including Toshiba and its creditors,' it said in a statement"); "Toshiba shares rise after report Westinghouse may file bankruptcy Tuesday," *Reuters News*, March 26, 2017, 8:14 PM ("Shares in Toshiba Corp rose on Monday morning after a report that U.S. unit Westinghouse Electric Co could file for bankruptcy protection as early as Tuesday and is seeking support from South Korea's Korea Electric Power Corp. Toshiba's shares were last up 0.5 percent at 224 yen after earlier rising as high as 232 yen, against the backdrop of a broader market downturn"); "Factbox: Toshiba's options in U.S. nuclear bankruptcy," *Reuters News*, March 27, 2017, 7:30 PM.  Westinghouse officially announced on March 29, 2017 that it had filed for bankruptcy.  *See* "Toshiba's Westinghouse Electric Files for Bankruptcy Protection," *Dow Jones Institutional News*, March 29, 2017, 3:12 AM.  None of the abnormal returns on the dates from March 24, 2017 through March 29, 2017 are statistically significant.

89

news sources reported that more than 2,000 customers were without electricity in South Carolina due to storms that had passed through the area late Tuesday, March 21, 2017, and early Wednesday, March 22, 2017.[266] Even though this implicated SCANA, it was not a focus among analysts.

160.   As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines over March 22, 2017, and March 23, 2017.  Thus, I attribute $1.66 per share of the two-day abnormal dollar decline to the above corrective information on March 22, 2017, and estimate that $1.66 of artificial inflation per share was dissipated from SCANA Common Stock over the two-day window of March 22, 2017, to March 23, 2017.[267]

161.   This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project.  The information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed some of the extent to which Deloitte had not properly audited SCANA's financials with respect to the Nuclear Project.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

---

[266] "More than 2,000 without power after South Carolina storms," *Associated Press Newswires*, March 22, 2017, 6:54 AM.

[267] Specifically, I estimate that $0.80 and $0.86 of artificial inflation per share was dissipated from the price of SCANA Common Stock on March 22, 2017 and March 23, 2017, respectively.

162. For example, equity analysts specifically expressed continued belief that the Nuclear Project would be completed in a timely fashion and, if not, that the Nuclear Project would be protected under the BLRA:

> Westinghouse's (WEC) 3/29 Chapter 11 filing does not materially alter our thoughts on SCG's and SO's new nuclear projects. […] We consider it likely that Fluor takes on an increased role and both projects get finished. However, if after a thorough analysis abandonment is warranted, there are recovery safeguards in both GA & SC and we consider both regulatory environments to be constructive.[268]

> In an abandonment, SCG would very likely recover investments made to date […][269]

> We believe the project moves forward to completion as $4.634 billion has been invested and SCG needs the capacity. In a worst case scenario, we believe SCG's nuclear development investment is protected under SC's Baseload Review Act (BLRA), which provides for recovery even under the scenario of abandonment. In order for SCE&G investment to be imprudent, opposing parties would need to prove negligence on SCE&G.[270]

## G.  JULY 28, 2017

163. After hours on July 27, 2017, SCANA and Santee Cooper jointly announced that their respective boards voted to accept Toshiba's offer to satisfy its obligations to the Nuclear Project.[271] Toshiba agreed to pay $2.168 billion to SCANA and Santee Cooper to cap its liability for guaranteeing that Westinghouse would complete the Nuclear Project.[272,273]  The series of payment

---

[268] "WEC Chapter 11 Unlikely to Derail SCG & SO Nukes," *Wells Fargo Securities*, March 30, 2017.

[269] "Perspectives on New Nuclear #2 - Call Takeaways," *Morgan Stanley*, April 21, 2017.

[270] "Evaluation Continues; Affirmed Outlook -Buy," *Gabelli & Company*, April 28, 2017.

[271] "South Carolina Electric & Gas Company And Santee Cooper Agree To Amount of Guaranty Payments from Toshiba," *PR Newswire*, July 27, 2017, 6:04 PM; "Santee Cooper, SCE&G to accept nearly $2.2 billion from Toshiba for nuclear plant," *The State*, July 27, 2017.

[272] "Toshiba reaches $2.2 billion deal over SCANA's S. Carolina nuclear project," *Reuters News*, July 27, 2017, 6:42 PM.

[273] "South Carolina Electric & Gas Company And Santee Cooper Agree To Amount of Guaranty Payments from Toshiba," *PR Newswire*, July 27, 2017, 6:04 PM.  The $2.168 billion is comprised of $1.192 billion to SCANA and $0.976 billion to Santee Cooper.

installments would begin in October 2017 and end in September 2022 and would be payable regardless of the completion status of the nuclear units.[274]

164.   Following this positive news, however, SCANA and Santee Cooper continued to announce more negative information about the Nuclear Project.  Collectively, SCANA and Santee Cooper notified the market they anticipated that the costs to complete the Nuclear Project would "materially exceed" the prior estimates made by Westinghouse.[275]  Thus, the settlement payments from Toshiba would not cover the additional costs to complete both nuclear units.  Additionally, it was made clear that SCANA and Santee Cooper did not believe the units would be completed before January 2021, the deadline to qualify for Nuclear Tax Credits.[276]  SCANA and Santee Cooper, however, firmly stated that decisions had not been made yet on the Nuclear Project moving forward.

165.   Sentiment in news and analyst reports surrounding the viability of the Nuclear Project was pessimistic.  The State noted that the "news release issued jointly by the utilities after Santee Cooper's meeting raised questions about their commitment to building two reactors."[277]  There was serious concern, even with Toshiba's guarantee, that the company would be unable to make the payments as Toshiba itself was going through its own financial troubles.[278]  Santee Cooper's CEO, Lonnie Carter, stated concerns about the financial viability of Toshiba at their board meeting prior to the board vote:

> Toshiba's finances and ability to pay the full amount are worrisome… Santee Cooper would have preferred all of the money up front… "Quite frankly, Toshiba's financial condition is a concern, no matter whether we accept this settlement today or not,"…If Toshiba can't provide the money because of a

---

[274] *Id.*

[275] *Id.*

[276] *Id.*

[277] "Santee Cooper, SCE&G to accept nearly $2.2 billion from Toshiba for nuclear plant," *The State*, July 27, 2017.

[278] *Id.*

92

possible bankruptcy in Japan, Santee Cooper might be "forced to litigate … in a foreign jurisdiction."[279]

166.    Additionally, The State highlighted that since the initial plans for the plant expansion, demand for power had flattened, meaning that both Santee Cooper and SCANA would have more energy capacity than needed once the reactors would be finished.[280]

167.    Analysts expressed concern about the probability of completion.  News about materially exceeding previous cost estimates and SCANA's inability to finish construction in time to claim Nuclear Tax Credits greatly influenced analysts' views.  Analysts at Morningstar emphasized the effects of an extended deadline on shareholders and ratepayers:

> The $1.2 billion guarantee effectively protects shareholders from project costs up to $8.9 billion. However, management also said that they expect costs will exceed that amount and the company might have to give up some $2.2 billion of tax credits because the project won't be completed by the end of 2020. Shareholders or ratepayers would have to bear any costs above $8.9 billion and ratepayers would lose out on $2.2 billion of tax related savings. […] We expect Scana will appeal to regulators to recover from ratepayers any costs above $8.9 billion but likely would not receive full recovery. A bigger uncertainty right now is whether regulators would hold Scana liable for the foregone tax benefits. We think there is a good chance government proposals to extend the tax credit deadline will be successful. We estimate every $1 billion of costs above the $8.9 billion guarantee will result in a $2 per share cut in our fair value estimate. […] State law allows Scana to recover all costs incurred to-date. Thus, terminating the project could be the optimal outcome for shareholders but not ratepayers, who would have to pay sunk project costs and replacement power costs. [281]

168.    Wells Fargo analysts felt that this news indicated the potential for abandonment of the Nuclear Project:

> While SCG & Santee have not yet reached a decision on the best course of action for the NND, we viewed the language in the press release as strongly suggesting that the companies are leaning toward project abandonment. […] We think it is highly unlikely that SCG would be willing to have shareholders fully foot the bill for project costs in excess of $8.8B. And we also think that

---

[279] *Id.*

[280] "Walk away or build it? Decision on SC's troubled nuclear reactor project nears," *The State*, July 28, 2017.

[281] "Toshiba's $1.2 Billion Guarantee Might Not Be Enough to Finish Scana's Nuclear Project," *Morningstar Equity Research*, July 28, 2017.

regulators will balk at committing materially more customer money towards the endeavor beyond the roughly $7.7B agreed upon under the Fixed Price Option. If SCG elects the abandonment route, we estimate 2018 EPS would be in the neighborhood of $3.25-3.50 (vs. our current estimate of $4.60).[282]

169. Analysts at Gabelli & Company lowered their recommendation from Buy to Hold on increased concerns regarding abandonment of one or both of the units:

> We lowered our recommendation to Hold, from Buy, to reflect increased concern that SCG abandons the construction of VCS units 2 & 3. On July 27, 2017, SCG and Santee Cooper issued a release stating that completion of both units would materially exceed the $2.2 billion Toshiba guarantee and would not be completed before January 1, 2021, which is the date need to qualify for the expected $2.2 billion (taken over 8 years) of production tax credits under current tax rules. While SCG and Santee Cooper continue to evaluate the most prudent path forward with a decision expected soon, we consider it increasingly possible that one or both of the units are abandoned. As such, we expect SCG shares to trade with considerable uncertainty over the next several months as various scenarios are contemplated.[283]

170. Guggenheim analysts downgraded SCANA on concerns that the stock could "be under substantially more pressure for some time":

> Downgrading SCG from BUY to Sell. It's extremely rare for us to make such a rating change, especially on a regulated utility, and especially during market hours, and especially during such a heavy earnings day, but with news coming out this morning, we believe SCG should be under substantially more pressure for some time. At this point, it is becoming more evident to us that the situation around VC Summer is materially deteriorated and a situation that is constructive for shareholders is becoming less evident. It is our view that in time, post VC Summer abandonment, SCG will be acquired but this could be months away – for now, we see material earnings and growth downside.[284]

171. On July 28, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 6.56% ($4.30 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -10.14.

---

[282] "Flash Comment: Utility & Alternative Energy Daily," *Wells Fargo Securities*, July 28, 2017.

[283] "Potential Abandonment/Lowered From Buy to Hold," *Gabelli & Company*, July 28, 2017.

[284] "SCG – Downgrading to Sell – The Curtain Call Cometh," *Guggenheim*, July 28, 2017.

172.   I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on July 28, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines on July 28, 2017.  Thus, I attribute $4.30 per share of the abnormal dollar decline to the above corrective information and estimate that $4.30 of artificial inflation per share was dissipated from SCANA Common Stock on July 28, 2017.  This decline was partially offset by SCANA's allegedly false and misleading reassurances on the next two trading days, as I describe in **Section VIII.C** below.

173.   This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project.  The information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed that the Nuclear Project was going to be more expensive than anticipated and not on track to be constructed in time for the Nuclear Tax Credits.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

174.   Specifically, during market hours on July 31, 2017, SCANA assured investors that, under the BLRA, the Company would be able to recoup costs of the Nuclear Project:

> In accordance with the BLRA, we will seek an amortization of the project
> costs and a return at the weighted average cost of capital on the unamortized
> balance until fully recovered. We plan to use the anticipated proceeds from

95

the Toshiba settlement and benefits derived from tax deductions to mitigate rate increases and lessen the impact on our customers for several years.[285]

175. Analysts appeared confident in SCANA's ability to recoup costs from the Nuclear Project under the BLRA. For example, Wells Fargo analysts wrote:

SCG announced plans to stop new nuclear development (NND) construction and seek abandonment recovery of the stranded investment in accordance with SC's Base Load Review Act (BLRA). In addition, mgmt affirmed the 3-5-yr 4-6% EPS CAGR off the $3.97 weather-normalized '16 EPS base. The CAGR implies '18 & '19 EPS guidance ranges of roughly $4.30-4.45 & $4.45-4.75. We are encouraged by SCG's initial comments on the post-abandonment EPS outlook while fully acknowledging the uncertainty around recovery. That said, *we continue to believe the BLRA affords SCG strong legal protections and that SC is a generally reasonable state from a political/regulatory standpoint*.[286]

176. Analysts optimistically viewed the recovery from abandonment:

At the end of the day, management described a relatively constructive path forward for recovery of (and return on) capital associated with V.C. Summer nuclear construction, premised upon SC's BLRA, which we acknowledge set the most constructive regulatory/policy back-drop in support of nuclear construction that we've seen, although as the abandonment plan has yet to be filed with regulators (SCG plans to update regulators tomorrow), we look forward to reactions from regulators and policy-makers whom management acknowledged were disappointed with the decision to abandon construction. We would also note that while we recognize the solid regulatory/legislative framework for cost recovery provided by the BLRA, we have less experience ascertaining the quality of earnings power that would be derived from a ratebase comprised of such a large "regulatory asset" (i.e., stranded costs associated with abandoned investments in new nuclear units at V.C. Summer).[287]

---

[285] "South Carolina Electric & Gas Company to Cease Construction And Will File Plan of Abandonment of The New Nuclear Project," *PR Newswire*, July 31, 2017, 1:00 PM.

[286] "SCG: Abandonment Officially The Path Forward," *Wells Fargo Securities*, July 31, 2017.

[287] "SCG – We Both Made a Tough Call – Walking Away from Nuclear, But Still Loose Ends to Tie; Regulatory Execution Key," *Guggenheim*, July 31, 2017.

177.   Guggenheim analysts similarly stated that "[w]e already noted SCG was tilting toward the abandonment route; what was really introduced this afternoon was share buy-backs, which management expects will allow SCG to maintain a 4-6% growth trajectory."[288]

## H.   AUGUST 4, 2017

178.   On August 4, 2017, the South Carolina Attorney General's Office introduced additional pressure on SCANA's abandonment provision.[289]  According to The Post and Courier, the Attorney General announced an investigation into the abandoned Nuclear Project stating, "We would like the opportunity to investigate this issue in order to ensure that all laws were complied with and all applicable procedures were followed."[290]

179.   In addition, according to The State, South Carolina Senate leaders, with support from the Attorney General, called for a special legislative session to block a potential electric rate hike for residents.[291]  The State noted that the "State Senate Majority Leader Shane Massey… and State Senate Minority Leader Nikki Setzler… want[ed] the General Assembly to return to pass a resolution that would prevent the Public Service Commission from approving further rate hikes until the Legislature return[ed] to Columbia next January."[292]

---

[288] *Id*.

[289] I understand that Plaintiff alleges August 3, 2017 as a Corrective Disclosure Event (Complaint ¶ 358), but I do not consider it as a corrective disclosure because I find that the energy caucus was formed and held a news conference on August 2, 2017 ("'The public trust is gone' says newly-formed SC caucus to regulate energy," *wistv.com*, August 2, 2017, 11:09 AM).  I do not find a statistically significant decline in the price of SCANA Common Stock on August 2, 2017.  On August 3, 2017, SCANA held a conference call after reporting Q2 2017 earnings results, which were positive and exceeded analyst expectations ("SCANA Reports Financial Results for Second Quarter of 2017," *PR Newswire*, August 3, 2017, 7:30 AM and "FQ2 2017 Earnings Call Transcripts," *S&P Capital IQ*, August 3, 2017, 3:00 PM).

[290] "Attorney General says he's investigating abandonment of nuclear reactors; South Carolina state senators call for special session," *The Post and Courier*, August 4, 2017.

[291] "SC Senate leaders want special session to block rate hikes after nuclear plant boondoggle," *The State*, August 4, 2017.

[292] *Id*.

180.  Reactions to the day's news continued on social media.  For example, one post on X from a former reporter at The Post and Courier Reporter reacted to a letter issued by South Carolina Senate leaders calling for a special session: "[t]hat's quite the press release to find in your inbox on a Friday morning.  #specialsession #nuclearboondoggle."[293]  South Carolina Senator Nikki Setzler also posted a series of five tweets including a link to the letter expressing his concerns with the fallout of the Nuclear Project:

> Calling for SC legislature to meet ASAP to discuss decision by SCANA and Santee Cooper to abandon V.C. Summer nuclear plan. 1/
>
> I'm concerned utility companies may try to pass the buck for their abandonment on to ratepayers.  That's completely unfair. 2/
>
> Before SCANA attempts to increase power bills we need to know what happened & need to see some responsibility taken for what's occurred. 3/
>
> It's not the ratepayers' fault this happened & consumers shouldn't be held responsible. 4/
>
> Read my full letter to my fellow Senators, co-signed with my colleague @ShaneMassey, here…[294]

181.  Later that afternoon, SCANA filed a Form 10-Q with the SEC, disclosing that the Company would not earn the Nuclear Tax Credits.  The Form 10-Q stated:

> In August 2014, the IRS notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units would qualify for nuclear production tax credits under Section 45J of the IRC

---

[293] @Andy_Ed_Brown, "That's quite the press release to find in your inbox on a Friday morning. #specialsession #nuclearboondoggle," *X*, August 4, 2017, 10:17 AM, available at https://x.com/Andy_Ed_Brown/status/893475895033430016/photo/1.

[294] @NikkiSetzler, "Calling for SC legislature to meet ASAP to discuss decision by SCANA and Santee Cooper to abandon V.C. Summer nuclear plan. 1/," *X*, August 4, 2017, 1:09 PM, available at https://x.com/NikkiSetzler/status/893519316561395713; @NikkiSetzler, "I'm concerned utility companies may try to pass the buck for their abandonment on to ratepayers. That's completely unfair. 2/," *X*, August 4, 2017, 1:11 PM, available at https://x.com/NikkiSetzler/status/893519841528860672; @NikkiSetzler, "Before SCANA attempts to increase power bills we need to know what happened & need to see some responsibility taken for what's occurred. 3/," *X*, August 4, 2017, 1:13 PM, available at https://x.com/NikkiSetzler/status/893520222740774913; @NikkiSetzler, "It's not the ratepayers' fault this happened & consumers shouldn't be held responsible. 4/," *X*, August 4, 2017, 1:14 PM, available at https://x.com/NikkiSetzler/status/893520429205291008; @NikkiSetzler, "Read my full letter to my fellow Senators, co-signed with my colleague @ShaneMassey, here. →→ https://scribd.com/document/355541214/Letter-to-Senators-regarding-shuttering-of-VC-Summer-nuclear-plan 5/5," *X*, August 4, 2017, 1:14 PM, available at https://x.com/NikkiSetzler/status/893520646805782533.

to the extent that such New Unit was operational before January 1, 2021 and other eligibility requirements were met. These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could have totaled as much as approximately $1.4 billion. Due to the Company's determination to abandon the construction of the New Units, which determination was based in part on the expectation that the New Units would not be placed in service before January 2021, no such production tax credits will be earned.[295]

182.   News outlets also reported on the South Carolina lawmakers' and Attorney General's activities.  The Associated Press reported on the letter that proposed a special session and, later in the day, South Carolina House Speaker Jay Lucas's ("House Speaker Lucas") describing of the proposal for a special session as "impulsive."  Specifically, House Speaker Lucas said, "he isn't ready to call lawmakers back for a special session."[296]

183.   On August 4, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 2.07% ($1.35 per share) after controlling for market and industry effects.  This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -3.13.

184.   I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price declines on August 4, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines on August 4, 2017.  Thus, I attribute $1.35 per share of the abnormal dollar decline to the above corrective information and estimate that $1.35 of artificial inflation per share was dissipated from SCANA Common Stock on August 4, 2017.

---

[295] SCANA Corp., Quarterly Report (Form 10-Q) (Aug. 4, 2017).

[296] "The Latest: Speaker not ready for nuke plants session," *Associated Press Newswires*, August 4, 2017, 1:44 PM.

99

185. This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project. The information contained in the announcement that the South Carolina Attorney General was investigating SCANA and that legislators wanted a special session is corrective of the alleged misstatements and omissions because it revealed that SCANA would face additional regulatory risk and that SCANA's rate hikes were in jeopardy. However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

186. Indeed, some analysts and investors remained optimistic. In an August 7, 2017, report, for example, Wells Fargo gave SCANA a positive rating, citing SCANA's various "legal protections":

> Our positive rating reflects our assessment of the likely outcome and our view that the current valuation offers investors an attractive risk/reward profile – keeping in mind the strong legal protections afforded SCG via the Base Load Review Act (BLRA), which was passed by the South Carolina General Assembly in 2007. In the end, we believe SCG will be [] able to negotiate a constructive settlement through the regulatory process.[297]

## I. AUGUST 10, 2017

187. After market hours on August 9, 2017, The State released news that the ORS filed a motion to dismiss SCE&G's abandonment petition. According to The State, "[a] state consumer

---

[297] "Flash Comment: Utility & Alternative Energy Daily," *Wells Fargo Securities*, August 7, 2017.

agency took legal action Wednesday against SCE&Gs's [*sic*] plan to charge customers for a nuclear expansion project the utility said had become too expensive to finish."[298]

188. Additionally, after trading closed on August 9, 2017, South Carolina lawmakers took additional steps to further investigate SCANA's abandonment of the Nuclear Project by announcing the Utility Ratepayer Protection Committee, which followed the announcement of the Nuclear Project Review Committee on August 8, 2017. House Speaker Lucas said that the Committee would "study 'every possible option' for better protecting customers who have already 'spent their hard-earned paychecks on a service they will never receive.'"[299] Governor McMaster weighed options to save at least one of the abandoned Nuclear Project reactors, including finding another utility company to take over Santee Cooper's share of the Nuclear Project.[300]

189. In addition, on August 9, 2017, minutes before market close, The State reported that SCANA executives were paid almost $21.4 million in annual performance bonuses over the past decade.[301] Some of these bonuses were paid to executives for matters related to the failed construction of the nuclear reactors at the V.C. Summer site.[302] Lawmakers questioned the bonuses amidst the uncertainty of the Nuclear Project. South Carolina State Representative Russell Ott said, "[k]nowing everything we know now, and knowing that we have a project that has been abandoned, those are pretty staggering numbers… If everything was going so well that you were willing to give

---

[298] "State agency challenges nuke plan shutdown proposal, says ratepayers could be hurt," *The State*, August 9, 2017, 5:16 PM; Complaint ¶ 360.

[299] "Legislators to separately study failed nuclear project," *Associated Press Newswires*, August 9, 2017, 6:33 PM.

[300] "SC governor, lawmakers attempting to save abandoned nuke, protect ratepayers," *SNL Power Daily with Market Report*, August 9, 2017.

[301] "Top SCANA executives were paid millions in bonuses for roles in failed nuclear project," *The State*, August 9, 2017; @AveryGWilks, "NEW: Top SCANA execs took home millions in bonuses for their accomplishments on now-failed nuclear project,…" *X*, August 9, 2017, 3:53 PM, available at https://x.com/AveryGWilks/status/895372561386745856.

[302] "Top SCANA executives were paid millions in bonuses for roles in failed nuclear project," *The State*, August 9, 2017, 3:50 PM.

your executives bonuses because of it, then what all of a sudden went so badly?"[303]  Other news

outlets also commented on the article published by The State on August 10, 2017.[304]

190.   On August 10, 2017, there was continued coverage of the previous days' events

following the utility and SCANA's abandonment of the Nuclear Project and concerning a potential

sale of Santee Cooper:

> South Carolina's state-owned utility Santee Cooper announced recently that it
> would have to walk away from its 45 percent share of two nuclear reactors
> being built at the Summer nuclear plant in Fairfield County. The decision to
> abandon the Summer project was essentially a death knell for the unfinished
> reactors—SCANA Corp, the 55 percent owner, couldn't complete the project
> on its own and Santee Cooper had tried selling its share to Duke Energy years
> before to no avail. Without generous government assistance, Santee Cooper
> stood to lose billions.
>
> But with the reality of an abandoned nuclear project on the state's hands,
> South Carolina Governor Henry McMaster says he's in talks again with Duke
> Energy—as well as with Southern Power Co. of Atlanta and Dominion
> Energy of Richmond, VA—to sell "some or all" of the publicly-owned
> utility, according to South Carolina's *Post and Courier*.
>
> […]
>
> SCANA would not comment to the *Post and Courier* on whether it would
> resume the project if a buyer for Santee Cooper's share of Summer was
> found, but last week SCANA's CEO Kevin Marsh said his company would
> have continued building the plant were it not for Santee Cooper's exit.[305]

191.   Media coverage included commentary on Morgan Stanley raising its price target and

maintaining its underweight rating for SCANA.[306]  For example, the Canadian Press reported:

---

[303] *Id*.

[304] "Utility pays bonuses to execs before nuclear project fails," *The Canadian Press – Broadcast wire*, August 10, 2017, 7:36 AM.

[305] "South Carolina Gov., utility think sale could keep abandoned nuclear plant alive," *ARS Technica,* August 10, 2017, 10:16 AM.

[306] "Scana Corp Price Target Raised to $59.00/Share From $58.00 by Morgan Stanley," *Bloomberg*, August 10, 2017, 3:13 PM; "Scana Corp is Maintained at Underweight by Morgan Stanley," *Bloomberg*, August 10, 2017, 3:13 PM.

A South Carolina agency responsible for examining utilities says state regulators should reject South Carolina Electric & Gas' plans to recover billions more from customers for a nuclear project it bailed on last week.

The Office of Regulatory Staff recommends dismissal of the company's abandonment plans.

The private utility and state-owned Santee Cooper decided last week to halt their expansion of V.C. Summer Nuclear Station after jointly spending $10 billion. By law, SCE&G must get approval from the Public Service Commission.

SCE&G is asking commissioners to find it acted prudently, so it can proceed with plans to revise electricity rates and recoup $5 billion over 60 years.

The Office of Regulatory Staff, which represents the public in utility regulation, argues SCE&G is making its request under the wrong section of state law.[307]

192.  On August 10, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 1.43% ($0.90 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -2.18.

193.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on August 10, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines on August 10, 2017.  Thus, I attribute $0.90 per share of the abnormal dollar decline to the above corrective information and estimate that $0.90 of artificial inflation per share was dissipated from SCANA Common Stock on August 10, 2017.

---

[307] "The Latest: Agency recommends dismissal of utility's plans," *The Canadian Press – Broadcast wire*, August 10, 2017, 3:33 PM.

103

194. This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project. The information contained in the announcement that legislators would further investigate SCANA is corrective of the alleged misstatements and omissions because it revealed that SCANA would face additional regulatory risk and that SCANA's rate hikes were in jeopardy. However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated (as discussed further below).

## J. AUGUST 11, 2017

195. After market hours on August 10, 2017, The Post and Courier published an article titled, "CEO: SCANA may not return to scuttled nuclear project—even if a new partner emerges," that reported on the status of the Nuclear Project and on the ORS motion to dismiss. CEO Marsh was quoted in the article questioning SCANA's desire to return to the Nuclear Project with a new partner:

> "I've got to be convinced that building the one-plant option – even with a new partner – would be in the best interest for our customers," Marsh said Thursday. "If it's beyond that, I don't know that it makes economic sense."[308]

196. CEO Marsh further stated he was unsure if it was feasible to make advancements on the Nuclear Project after it "fell years behind schedule" and "costs soared billions of dollars over budget."[309] His comments raised suspicions on the viability of Governor McMaster's efforts to find

---

[308] "CEO: SCANA may not return to scuttled nuclear project – even if a new partner emerges," *The Post and Courier*, August 10, 2017; @postandcourier, "SCE&G might return to fail nuclear reactors — even if the governor can find another power company willing to partner…," *X*, August 10, 2017, 8:45 PM, available at https://x.com/postandcourier/status/895808232786210816.

[309] *Id.*

another utility company to purchase Santee Cooper's share of the Nuclear Project.  CEO Marsh also stated that revival of the Nuclear Project would take time:

> "The governor has stated that he's looking for another partner to possibly come into the plant, but if someone says they're interested, that's not something that will happen overnight… There are a lot of bridges that have to be crossed before we would get there."[310]

197.   The same article reported that SCANA requested permission to charge customers $2.2 billion for the costs of the abandoned Nuclear Project over the next 60 years under the BLRA provision.[311]  The article quoted South Carolina State Representative Leon Stavrinakis who urged SCANA to pull its request:

> "There's a lot of public trust and public money at stake here, and I think it would be the right thing for you guys to do… I fear that if you don't… you may force the General Assembly to be more rash than we may otherwise would want to be." [312]

198.   A reporter from The Post and Courier responded on X: "[n]o offense to lawmakers but SCANA ain't likely to pay bill… unless there's some type of fraud that can be proven…"[313]

199.   The following day, on August 11, 2017, the Associated Press reported that SCANA had dropped its rate hike plans:

> 11:10 a.m. The state-owned utility Santee Cooper has dropped plans for rate increases in the next two years, after it cancelled plans to finish two new nuclear reactors in South Carolina. Company leaders in Moncks Corner said Friday they will no longer seek increases of 3.5 percent and 3.9 percent that had been planned to help pay for the now-abandoned reactors.
>
> […]
>
> The Post and Courier of Charleston reported SCANA Corp. leader Kevin Marsh told some state lawmakers Thursday night in Charleston that South

---

[310] *Id.*

[311] *Id.*

[312] *Id.*

[313] @Andy_Ed_Brown, "No offense to lawmakers, but SCANA ain't likely to pay bill... unless there's some type of fraud that can be proven…" *X*, August 10, 2017, 4:47 PM, available at https://x.com/Andy_Ed_Brown/status/895748533902618624.

105

Carolina Electric & Gas Co. might not want to resume construction on two nuclear reactors even if a replacement was found.[314]

200. The Post and Courier also reported on the current status of investigations into SCANA, the status of rates for customers, and the ORS news from August 10, 2017:

If SCE&G has its way, state officials might only have six months to fight a request to push another $4.9 billion in costs for its failed nuclear reactor project onto the backs of customers, who would have to pay it off over the next 60 years.

But six months isn't enough time to fully investigate and debate the issues behind what is surely the most consequential decision the Public Service Commission (PSC), the regulatory body that represents state ratepayers, has ever had to make.

"It's too short a time to litigate something like this," explained Dukes Scott, director of the state Office of Regulatory Staff (ORS), which will argue on behalf of ratepayers before the PSC.

The ORS has asked PSC to dismiss the SCE&G request, which would buy more time.

[…]

Otherwise, the utility is entitled under the fatally flawed Base Load Review Act (BLRA) to recover nearly $5 billion in construction costs from ratepayers, who have already paid more than $2 billion for project financing costs.[315]

201. News outlets reported on SCANA's stock price decline after the events on the previous day.

Scana falls as much as 3.2% as Guggenheim says "negative headlines" will continue to get gloomier after co. decided to abandon 2 new reactors at V.C. Summer plant in S.C. S.C. utility regulatory staff filed motion posted Thur. asking to dismiss Scana's request to recover ~$4.9b for reactors, saying Scana filed cost recovery under wrong statute…Scana shares to be driven by regulatory treatment of stranded investments…[316]

---

[314] "The Latest: Utility drops rate hike plans after project ends," *Associated Press Newswires*, August 11, 2017, 11:17 AM.

[315] "More time to save ratepayers," *The Post and Courier*, August 11, 2017.

[316] "Scana Slides as Guggenheim Sees Fallout from Dropping Reactors," *Bloomberg*, August 11, 2017, 2:17 PM.

106

202. A Wells Fargo analyst also recognized pressure in the stock following the abandonment of the Nuclear Project and referenced the ORS news.

> Since the positive reaction to SCG's 7/31 abandonment decision and the updated financial outlook, the stock has been under considerable pressure. Shares of SCG are -11% since 8/1 versus +1% for the S&P Utilities. While there is no doubt that the political pressure and negative media headlines have intensified over the past week, much of this should have been anticipated given the plug was pulled on a $14B+ infrastructure project that has been touted as an economic boon to the state in terms of jobs, tax base, energy future, etc. While we are very much cognizant of the potential for the process to get politically hijacked (risk of punitive measures levied against SCG), we continue to believe the risk of a "populist" outcome in a conservative state like SC is low. And while we wouldn't rule out the possibility that some combination of Santee Cooper, SC Gov. McMaster and the Trump administration breathes life back into the new nuclear development (NND), we consider that outcome unlikely. At the end of the day, we think the most likely outcome is a deliberate abandonment (regulatory) process that ultimately ends with a constructive settlement negotiated between SCG and key parties, including the Office of Regulatory Staff (ORS).
>
> […]
>
> On 8/10, the ORS filed a motion with the SC Public Service Commission (PSC) to dismiss SCG's 8/1 abandonment and recovery filing with the PSC. Importantly, the ORS is only taking issue with the procedural method with which SCG is seeking to pursue abandonment and cost recovery approval as opposed to condemning the merits of the proposal… The ORS wants SCG to refile a petition under the appropriate section of the BLRA that only requests abandonment. Assuming abandonment is deemed prudent, SCG can then pursue recovery of the $4.9B stranded asset including the portion of construction work in progress (CWIP) that is not in rates. SCG has 10 days to respond to ORS's motion and a PSC decision is expected shortly thereafter. It is unclear whether the abandonment examination will be completed in 6 months (as SCG requests) but at the very least we believe the path that ORS advocates would (intentionally?) allow additional time for the other parties (Gov. McMaster, legislature, etc.) to conduct their various pursuits.[317]

203. On August 11, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 1.40% ($0.87 per share) after controlling for market and industry effects.

---

[317] "SCG: Beyond The Negative Headlines -- Part 2," *Wells Fargo Securities*, August 13, 2017.

This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -2.13.

204.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on August 11, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines on August 11, 2017.  Thus, I attribute $0.87 per share of the abnormal dollar decline to the above corrective information and estimate that $0.87 of artificial inflation per share was dissipated from SCANA Common Stock on August 11, 2017.

205.  This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project.  The information contained in the announcement that SCANA would not return to the Nuclear Project and the continued reaction to the ORS motion to dismiss is corrective of the alleged misstatements and omissions because it revealed that SCANA would face additional regulatory risk and that SCANA's rate hikes were in jeopardy.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

206.  For example, following this news, analyst coverage continued to focus on the possibility that SCANA shareholders would recover Nuclear Project costs:

Scana shareholders will be made whole if regulators approve its abandonment plan and uphold state law allowing recovery of $2.2 billion from customers.[318]

## K.   SEPTEMBER 7, 2017

207.   After market hours on September 6, 2017, The Post and Courier published an article titled, "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South Carolina nuclear plant failure," and released internal emails from CEO Marsh and Toshiba executives that showcased a crumbling relationship between SCANA and Westinghouse.[319]  These emails revealed false information that SCANA and Santee Cooper continued to spread about the progress of the Nuclear Project:

> They [the emails] also suggest that SCANA and Santee Cooper quietly prepared more than a year ago for the possibility that Westinghouse and Toshiba might fall into bankruptcy and bring the nuclear project down in the process. In an October letter to Marsh, Lonnie Carter, Santee Cooper's chief executive officer, noted that SCANA had agreed in June 2016 to hire bankruptcy lawyers "to help us think through Toshiba/Westinghouse insolvency scenarios." But SCANA's public portrayal of the project was much different. During a hearing before state utility regulators that October, Bob Guild, an attorney for the Sierra Club, specifically asked SCANA officials about the possibility of Westinghouse's insolvency. SCANA officials shrugged off the question.[320]

208.   The State published multiple articles commenting on the SCE&G's rate requests and the Betchel Report.[321]

> You want names? We've got names. Names of the SC Public Service Commissioners, who have been acting on SCE&G's rate requests and will

---

[318] "Political Rhetoric Around Nuclear Power Heating Up; Scana Approaches Buy Territory," *Morningstar Equity Research*, August 14, 2017.

[319] "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South Carolina nuclear plant failure," *The Post and Courier*, September 7, 2017; @ricknelson7, "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South … @postandcourier," *X*, September 6, 2017, 7:44 PM, https://twitter.com/ricknelson7/status/905577426897559552.

[320] *Id*.

[321] I understand that news outlets reported on the Betchel Report on September 5, 2017 after it was released by the South Carolina Governor's office.  *See* "Audit highlighted problems with South Carolina nuclear project a year before cancellation," *The Post and Courier*, September 4, 2017 and "The Latest: Challenger: SC gov playing politics with report," *Associated Press Newswire*s, September 4, 2017, 6:28 PM.  However, this date is not alleged as a Corrective Disclosure Event nor is it statistically significant.

decide how much more the utility can charge us for its unfinished nuclear reactors at the VC Summer nuclear facility.[322]

The Bechtel report repeats a lot of what we've come to recognize since the two utilities announced July 31 that they were halting construction: Essentially, they weren't exercising the basic level of oversight that any rational person would expect a business to provide for the multi-billion-dollar construction project. But it could be significant legally because it's a report the utilities commissioned, not our after-the-fact speculation.[323]

209.  On September 11, 2017, Wells Fargo analysts acknowledged the share weakness and heightened regulatory risk that SCANA faced:

We believe shares are baking in an overly pessimistic outcome in SCG's new nuclear project abandonment cost recovery pursuit. On a P/E basis, shares trade at 20-25% discounts to peers on our "abandonment" estimates. However, post-nuclear build, we believe SCG should trade at only a modest discount to peers given a similar risk profile partially offset by an EPS growth rate towards the bottom half of regulated electric peers (4-6%) as well as perhaps heightened regulatory risk (we assume a considerable amount of regulatory capital may need to be expended when all is said and done with regards to the new nuclear abandonment recovery).[324]

210.  On September 7, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 1.50% ($0.90 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -2.27.

211.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on September 7, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be

---

[322] "These are the people who brought us the SCE&G/Santee Cooper nuclear debacle," *The State*, September 7, 2017, 9:04 AM.

[323] "Does anyone at Santee Cooper remember who Santee Cooper works for?" *The State*, September 7, 2017, 9:05 AM.

[324] "Flash Comment: Utility & Alternative Energy Daily," *Wells Fargo Securities*, September 11, 2017.

disaggregated from the price declines on September 7, 2017.  Thus, I attribute $0.90 per share of the abnormal dollar decline to the above corrective information and estimate that $0.90 of artificial inflation per share was dissipated from SCANA Common Stock on September 7, 2017.

212.  This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and prohibited SCANA from recouping costs associated with the Nuclear Project.  The information contained in the insider emails revealing executives knew the Nuclear Project was failing are corrective of the alleged misstatements and omissions because it revealed that executives at SCANA knew that the Nuclear Project was failing before they publicly acknowledged it.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

213.  For example, in response to earlier revealed information and emails, the same Wells Fargo analysts on September 11, 2017, believed that in the long-term, SCANA would recover from its current position:

> The company is expected to wrap up hearings with the special South Carolina Senate committee shortly and then begin hearings with a separate House committee. Once completed, we expect SCG will revisit refiling the abandonment recommendation with the South Carolina Public Service Commission (PSC)…we do not expect resolution of V.C. Summer cost recovery until 1H'18 at the earliest. In the meantime, we expect there will continue to be plenty of negative of headlines, such as last week's release of the February 2016 audit conducted by Bechtel into Summer's project management. In our view, the contents of the report were not overly surprising but the method by which it was released caused some parties to think SCG was attempting to hide something. We do not think this was the case and fully believe that SCG's decision not to publicly release the audit reflected substantial concerns that such a move could jeopardize SCG's legal position vs. Toshiba/Westinghouse (potentially to the detriment of customers). Bottom line: in the near-term, we think the uncertainty around V.C. Summer will make it difficult for the shares to gain meaningful and sustained traction on a relative basis vs. electric utility peers. That being said, longer-term we continue to think

111

shares reflect an overly pessimistic outcome to V.C. Summer (substantial disallowances plus little to no return on the remaining investment).[325]

## L.  SEPTEMBER 21, 2017 to SEPTEMBER 22, 2017

214.  On September 21, 2017, SCANA announced it had received a subpoena issued by the U.S. Attorney's Office for the District of South Carolina related to the Nuclear Project.[326]  SCANA did not provide information regarding the substance of the subpoena but indicated it would cooperate.[327]  The State quickly reported on the subpoena stating that a federal grand jury in South Carolina was looking at SCANA's actions concerning the Nuclear Project.[328]  The State also acknowledged the scrutiny SCANA faced after the Nuclear Project abandonment and the prevailing pressure on the stock.  For example:

> SCANA, and its subsidiary, SCE&G, have been under intense scrutiny since they walked away from a nuclear expansion project after spending $9 billion on the effort over the past decade. The company charged ratepayers at least $1.7 billion for the work and has indicated it wants more from customers to shut down the project. SCANA's shares are now trading in the $57 range, sharply down from earlier this year when the stock hit a high in the $75 range.[329]

215.  News outlets quickly reported on SCANA's press release on September 21, 2017.[330]

> JUST IN: Feds issue subpoena to SCANA over failed South Carolina nuclear project[331]
>
> Utility holding company Scana Corp. said Thursday it has received a federal subpoena to turn over documents related to its cancelled South Carolina

---

[325] *Id.*

[326] "SCANA Receives Subpoena For Documents Relating To Nuclear Project," *PR Newswire*, September 21, 2017, 8:00 AM.

[327] *Id.*

[328] "SCANA being investigated by federal grand jury over failed nuke project," *The State*, September 21, 2017, 9:17 AM; @thestate, "SCANA being investigated by federal grand jury over failed nuke project," *X*, September 21, 2017, 10:09 AM, available at https://x.com/thestate/status/910868628492345344.

[329] *Id.*

[330] "08:04 EDT Scana receives subpoena for documents relating to nuclear project…" *Theflyonthewall*, September 21, 2017.

[331] @postandcourier, "JUST IN: Feds issue subpoena to SCANA over failed South Carolina nuclear project …" *X*, September 21, 2017, 9:09 AM, available at https://x.com/postandcourier/status/910853612296982529.

nuclear plant after an audit released by the South Carolina governor's office this month raised questions about how long the company knew the project was unlikely to succeed.[332]

Subpoenas to SCANA Corp. & @santeecooper reveal federal investigation of shuttered V.C. Summer project.[333]

216.   Reporting on the subpoena and grand jury investigation continued after hours on September 21, 2017, and throughout September 22, 2017:

> Scana Corp. slid to the lowest level in almost two years as the U.S. began a criminal investigation into the $21 billion nuclear power project in South Carolina that the utility owner abandoned two months ago. The U.S. Attorney's office in South Carolina is carrying out a grand jury probe that involves agents at the Federal Bureau of Investigation, a Sept. 7 subpoena disclosed on Friday by Scana's partner on the nuclear project, Santee Cooper, shows. The government asked for copies of correspondence, notes and reports related to the V.C. Summer nuclear plant, including a study engineering firm Betchel Corp. drafted last year suggesting Scana was aware of challenges plaguing the project since early last year. Scana declined on Friday to release the subpoena it had received or comment on the one Santee Cooper disclosed. Shares of the utility owner were down as much as 3.2 percent at $55.33 as of 2:46 p.m. New York time, the lowest since October 2015. The federal probe and intensifying backlash from South Carolina legislators doesn't bode well for Scana as the utility owner seeks to recoup billions of dollars it spent on the project from South Carolina's utility customers.[334]

> The U.S. Attorney's Office in South Carolina subpoenaed documents from SCANA Corp. and Santee Cooper, and the office received a copy of a highly critical construction audit from Gov. Henry McMaster. News of the federal probe does not surprise South Carolina legislators, who have formed two special committees to examine the project abandoned mid-construction on July 31. "Something else is at play. We're not getting the full story," state Sen. Tom Davis, a Beaufort Republican, said in echoing themes of questioning of utility executives by legislators.[335]

---

[332] "Scana Is Subpoenaed Over Abandoned Nuclear Project," *The Wall Street Journal*, September 21, 2017, 11:10 AM.

[333] @CBJenergy, "Subpoenas to SCANA Corp. & @santeecooper reveal federal investigation of shuttered V.C. Summer project…" *X*, September 21, 2017, 3:18 PM, available at https://x.com/CBJenergy/status/910946457565442048.

[334] "Scana Plunges to Lowest in Almost Two Years on Criminal Probe," *Bloomberg*, September 21, 2017, 8:52 PM.

[335] "Feds subpoena documents from SCANA and Santee Cooper, receive nuclear plant audit from Gov. McMaster; Failed S.C. nuclear project under federal scrutiny," *The Post and Courier*, September 22, 2017.

Scana Corp., down $1.96 to $55.22 Scana said the federal government subpoenaed documents from it and another company that had abandoned a nuclear power project in South Carolina.[336]

217.  On September 21, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 0.86% ($0.50 per share) after controlling for market and industry effects. This abnormal price decrease is not statistically significant with a t-statistic of -1.28.  On September 22, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 2.62% ($1.50 per share) after controlling for market and industry effects.  This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -3.90.

218.  Given that news and reporting by analysts continued through September 22, 2017, it is appropriate to consider the two-day return from September 21, 2017, and September 22, 2017.  Over this two-day window, my event study demonstrates that the market price of SCANA Common Stock fell by 3.46% or $2.00 per share, after controlling for market and industry factors.  This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -3.64.

219.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price declines over September 21, 2017 to September 22, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines over September 21, 2017, and September 22, 2017.  Thus, I attribute $2.00 per share of the abnormal dollar decline to the above corrective information and estimate that $2.00 of artificial inflation per share was dissipated

---

[336] "GrubHub and Scana fall while CarMax and Finish Line soar," *Associated Press Newswires*, September 22, 2017, 4:30 PM.

from SCANA Common Stock over the two-day window of September 21, 2017, to September 22, 2017.[337]

220. This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and prohibited SCANA from recouping costs associated with the Nuclear Project. The information contained in the news that SCANA was being investigated for its actions related to the Nuclear Project is corrective of the alleged misstatements and omissions because it revealed that SCANA continued to face regulatory risk for its actions related to the Nuclear Project. However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

221. For example, Wells Fargo released an analyst report on September 22, 2017, which assessed the news in the subpoena and The State article. The report acknowledged underperformance in the stock and a belief that SCANA would face short-term obstacles, but ultimately was optimistic that SCANA would recover long-term:

> Yesterday (9/21), SCG issued a press release indicating that the company had received a subpoena from the United States Attorney's Office from the District of South Carolina requesting documents related to the V.C. Summer nuclear build. While it was not clear from the release what the federal government investigation relates to, a subsequent article by The State a Columbia, SC newspaper cited sources indicating that a federal grand jury has been convened to investigate SCG's role in the failed project. Unfortunately, the news flow is not likely to get any better anytime soon as early next week, per The State, the South Carolina Attorney General's (AG's) office is expected to opine on the constitutionality of the Base Load Review Act (BLRA) as well as the ability of the SC General Assembly to change the law. The BLRA affords SCG substantial legal protections in the event of project abandonment including recovery of and a return on the remaining balance. We think it is likely that the

---

[337] Specifically, I estimate that $0.50 and $1.50 of artificial inflation per share was dissipated from the price of SCANA Common Stock on September 21, 2017 and September 22, 2017, respectively.

> AG will seek to attack the legality of the BLRA in one form or fashion. As for the stock, shares remain under pressure in the midst of continued and substantial uncertainty related to the cost recovery of the Summer project - shares have underperformed the S&P Utilities by 12% since SCG announced plans to abandon. While we think it's unlikely that shares gain relative traction in the near-term, we think the price already reflects an onerous, though not implausible, outcome (no recovery of the $1.5B of uncertified Summer costs and recovery of but no return on the remaining balance).[338]

## M. SEPTEMBER 27, 2017

222. During market hours on September 26, 2017, SCANA filed a Form 8-K with the SEC that disclosed that the South Carolina Attorney General's Office, the Speaker of the South Carolina House of Representatives, and the Chair and Vice-Chair of the South Carolina House Utility Ratepayer Protection Committee requested the South Carolina Law Enforcement Division ("SLED") to lead a criminal investigation into SCANA for its management of the Nuclear Project.[339] The announcement of the SLED investigation was followed by a letter written by House Speaker Lucas, which stated that SCANA had possibly committed "'criminal fraud through the concealment of material information.'"[340] After market hours, the Associated Press published a detailed report on the state's probe into SCANA. Specifically, top state lawmakers and South Carolina Attorney General Alan Wilson requested that state police investigate "potential criminality" by SCE&G and their parent company SCANA.[341] Kathryn Richardson, state police spokeswoman, told the Associated Press that state police were "going to investigate exactly what the Legislature asked us to."[342]

---

[338] "Flash Comment: Utility & Infrastructure Daily," *Wells Fargo Securities*, September 22, 2017.

[339] SCANA Corp., Current Report (Form 8-K) (Sept. 26, 2017).

[340] "SC Attorney General questions law allowing SCE&G to raise rates," *The State*, September 26, 2017.

[341] "Probe opened into 'potential criminality' in nuke project," *Associated Press Newswires*, September 26, 2017, 4:49 PM.

[342] "Probe opened into 'potential criminality' in nuke project," *Associated Press Newswires*, September 26, 2017, 4:49 PM.

223.   Additionally on September 26, 2017, The State published an article stating that the ORS requested that the PSC suspend the rates that SCANA was charging their customers for the Nuclear Project.[343]   In the article, the ORS also asked the PSC to refund or credit ratepayers for the charges made towards the abandoned Nuclear Project.[344]   This request was directly tied back to Attorney General Alan Wilson who called the charging of customers "'constitutionally suspect.'"[345]

> SCE&G customers could see an 18 percent drop in their power bills if the state Public Service Commission agrees with a request to stop charging people for the costs of a failed nuclear reactor project in Fairfield County. The S.C. Office of Regulatory Staff asked [on September 26, 2017] that the PSC suspend rates now being charged for the V.C. Summer expansion northwest of Columbia.[346]

224.   During the morning of September 27, 2017, SCANA filed a Form 8-K with the SEC disclosing the ORS request.

> On September 26, 2017, the South Carolina Office of Regulatory Staff (ORS) filed a Request for Rate Relief (Request) with the Public Service Commission of South Carolina (Commission), asking for an order from the Commission directing South Carolina Electric & Gas Company (SCE&G) to immediately suspend all revised rates collections from customers which were previously approved by the Commission pursuant to the authority of the Base Load Review Act (BLRA). In the Request, ORS relies upon an opinion published by the South Carolina Attorney General's Office on September 26, 2017 that "as applied, portions of the BLRA are constitutionally suspect." Based on ORS' review of the Attorney General's Office's opinion, ORS asserts it is not just and reasonable or in the public interest to allow SCE&G to continue collecting revised rates. In the Request, ORS further alleges that SCE&G failed to disclose information that should have been disclosed and that would have appeared to provide a basis for challenging prior requests, and alleges SCE&G should not be allowed to continue to benefit from nondisclosure. The Request also asks for an order that, if the BLRA is found to be unconstitutional or the General Assembly amends or revokes the BLRA, then

---

[343] "SCE&G customers may get break on power bills to offset nuclear plant debacle," *The State*, September 26, 2017.

[344] *Id*.

[345] *Id*.

[346] *Id*.

117

SCE&G should make credits to future bills or refunds to customers for prior revised rates collections.[347]

225.   During market hours on September 27, 2017, The State reported that SCANA may have softened the results from an original third-party assessment it had commissioned to assess the Nuclear Project's status and challenges by Bechtel.[348]   Regarding the diluted report, Cindi Ross Scoppe of The State stated:

> A timeline that Santee Cooper CEO Lonnie Carter sent to SCANA CEO Kevin Marsh complaining about delays includes this Nov. 12, 2015, entry: "Bechtel Assessment Report – Issued to George Wenick – Weeks go by with Wenick/Bechtel wrangling over Wenick's rejection of initial report, redactions, timeline removal, critique of project management."
>
> That's one of the most disturbing details so far in an ever-growing pile of the disturbing details about the colossal failure of SCANA and Santee Cooper to stop years of bleeding that eventually killed the two unfinished nuclear reactors.
>
> What that suggests is that the damning report that has upended the whole conversation about the project was originally much worse. What it suggests is that the version of that report that we've seen pulled some of its punches.[349]

226.   The article indicates that the Mr. Wenick referenced was a partner at Smith, Currie & Hancock, the law firm SCANA and Santee Cooper had hired for the Bechtel Report who was given the Bechtel report so the utilities companies could label it "confidential, attorney-client privileged" and could therefore hide the results from the public.[350]

227.   SCANA filed another Form 8-K with the SEC on September 27, 2017, which included a press release disclosing that SCE&G sold future guaranty payments from Toshiba, claiming that the "monetization mitigates the credit risk associated with receiving the payments from Toshiba over a

---

[347] SCANA Corp., Current Report (Form 8-K) (Sept. 27, 2017).

[348] "How much worse was the original Bechtel nuclear report," *The State*, September 27, 2017, 11:35 AM.

[349] *Id.*

[350] *Id.*

five-year period and ensures that these funds are available to mitigate costs of the abandoned

project."[351]

> On September 25, 2017, South Carolina Electric & Gas Company ("SCE&G") and the South Carolina Public Service Authority ("Santee Cooper" and together with SCE&G, the "Owners") executed a Trade Confirmation with Citibank,N.A. (the "Buyer"), subject to the approval of the Owners' respective boards, to sell certain future guaranty settlement payments due from Toshiba Corporation ("Toshiba"). Such guaranty settlement payments were originally established as part of a definitive agreement dated July 27, 2017 (the "Toshiba Settlement") and totaled $2.168 billion (approximately $1.192 billion for SCE&G's 55% share) payable over five years in full satisfaction of its guaranty of obligations of Westinghouse Electric Company, LLC ("WEC") under the Engineering, Procurement, and Construction contract dated May 23, 2008, as amended (the "EPC Contract") for the new nuclear project at V.C. Summer Nuclear Station.[352]

228. News articles published on September 27, 2017, focused primarily on the ORS request.

For example:

> ORS Request Asks for Order From Commission Directing SCE&G to Suspend All revised Rate Collections From Customers Which Were Approved by Commission Pursuant to Authority of Base Load Review Act.[353]
>
> South Carolina utility regulators are weighing an appeal to suspend previously approved rate increases… "This would be a severe, a huge financial blow to the utility," Kit Konolige, a New-York-based utility analyst for Bloomberg Intelligence said by phone Wednesday.[354]
>
> The stock price of a S.C. utility took a big hit in early trading Wednesday. Shares in Cayce-based SCANA opened at $55.57 on the New York Stock Exchange at 9:30 a.m., and lost more than $3 a share in early trading. With 142.9 million shares stock outstanding, Wednesday morning's loss knocks $400 million off SCANA's value. The plunge comes the day after state regulators said they want the company to cut the rates that it charges customers by 18 percent, citing its late July decision to abandon construction of two nuclear reactors in Fairfield County. On Wednesday, market analysts

---

[351] "South Carolina Electric & Gas Company Monetizes Guaranty Settlement Payments From Toshiba," *PR Newswire*, September 27, 2017, 2:25 PM.

[352] SCANA Corp., Current Report (Form 8-K) (Sept. 26, 2017); "South Carolina Electric & Gas Company Monetizes Guaranty Settlement Payments From Toshiba," *PR Newswire*, September 27, 2017, 2:25 PM.

[353] "*Scana Corp: S.C. Office of Regulatory Staff Files Request for Rate Relief with Public Service Commission of S.C.," *Dow Jones Institutional News*, September 27, 2017, 7:46 AM.

[354] "Regulators to Review Rate Hikes for Canceled Scana Reactors (1)," *Bloomberg*, September 27, 2017, 9:45 AM.

at the firm Williams Capital decreased SCANA's price target from $70 to $50, but continued to rate the utility as a "hold" for its clients.[355]

229.  On September 27, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 6.47% ($3.60 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -9.43.

230.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on September 27, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines on September 27, 2017.  Thus, I attribute $3.60 per share of the abnormal dollar decline to the above corrective information and estimate that $3.60 of artificial inflation per share was dissipated from SCANA Common Stock on September 27, 2017.

231.  This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and prohibited SCANA from recouping costs associated with the Nuclear Project.  The news that the ORS requested a review of the rates charged by SCANA is corrective of the alleged misstatements and omissions because it revealed SCANA would face additional regulatory risk and that SCANA's rate hikes were in jeopardy.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports

---

[355] "Price of stock in nuclear-besieged SCANA drops sharply," *The State*, September 27, 2017.

was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

232. Although Wells Fargo changed some of its opinions on SCANA in light of the above, it continued to maintain an Outperform rating:

> We are lowering our 18E & 19E EPS to/from $3.50/$4.10 & $3.60/$4.35 along with our forward price target to $65/sh from $77/sh. […] We expected the abandonment proposal to be contentious but thought that the rhetoric would abate over time and SCG, along with other parties, would be able to reach a negotiated settlement that balanced various interests while remaining consistent with the legal protections afforded under the Base Load Review Act (BLRA). Our calculation was predicated on our belief that the response from the Republican-dominated SC government would not be overly populist. Thus far, this has proven to be a miscalculation on our part. That all being said, we think the current share price reflects an overly pessimistic outcome and, therefore, we stick with our Outperform rating – while acknowledging the lack of near-term positive catalysts.[356]

233. Similarly, on September 28, 2017, Gabelli & Company analysts remained unsure about the outcome regarding the BLRA:

> On September 26, 2017, SCG shares declined -$4.44 per share, or 7.8%, following the South Carolina Office of Regulatory Staff (ORS) request with the Public Service of South Carolina (PSCSC) to immediately suspend all revised rates associated with the 2007 Base Load Review Act (BLRA). The request is premised on the SC Attorney General's recently published opinion that portions of the BLRA are constitutionally suspect. In addition, ORS alleges that SCG did not disclose information that would have provided grounds to challenge previous rate increases. Finally, the ORS requests that should the BLRA be revoked, that SCG should credit future bills or refund for previous collections.
>
> […]
>
> The attack on the constitutionality of the BLRA and BLRA rate increases adds a significant element of uncertainty to SCG's position as the 2007 law protects the nuclear development investment and provides for recovery under abandonment. SCEG has roughly $4.9 billion of nuclear investment recognized in rate base through eight consecutive ORS recommended and PSCSC approved annual rate increases totaling $380 million in annual revenues. We had assumed the law provided firm ground to negotiate a constructive settlement. However, the enormity of the stranded investment has resulted in a political "firestorm", including accusations of negligence from various political

---

[356] "SCG: ORS Rate Request Adds Yet Another Layer of Uncertainty," *Wells Fargo Securities*, September 27, 2017.

players, and significantly weakens SCG's negotiating position. As such, we lowered our 2018-20 earnings estimates to $3.80, $4.00 and $4.20 per share, from $4.30, $4.40 and $4.50 per share, to reflect a more likely scenario. We have a low degree of confidence in our estimates given dependence on approval of rate mitigation plans.[357]

### N.   SEPTEMBER 29, 2017

234.   On September 28, 2017, after market hours, SCANA issued a press release announcing the PSC's decision to defer action on the ORS's request for SCE&G to suspend revised rates collections.[358]  The press release also announced that SCE&G filed a motion to dismiss the ORS's proposed suspension of rate collections, citing that the request had many legal and constitutional deficiencies.[359]

> Today, the Public Service Commission of South Carolina (SCPSC), as part of a Special Commission Business Meeting (Business Meeting), deferred action on the Office of Regulatory Staff's (ORS) request for South Carolina Electric & Gas Company (SCE&G), principal subsidiary of SCANA Corporation (SCANA)(NYSE:SCG), to suspend revised rates collections. At its Business Meeting today, the SCPSC ordered a hearing officer to establish a briefing schedule and hearing date concerning the ORS's request. The SCPSC cited the need for due process and for additional review given the potential impact of the proposed actions. In its ruling today, the SCPSC stated, "Judgments of this magnitude require the highest measure of care, but also require expedient action. We are acting today with caution and purpose." SCE&G's existing retail electric rates will remain in effect pending further action of the SCPSC.[360]

235.   In the midst of this potential regulatory and legal trouble, SCANA began to receive additional downgrades from multiple analysts.  Before market hours on September 29, 2017, Williams Capital downgraded SCANA:

> Williams Capital analyst Christopher Ellinghaus downgraded Scana to Sell and cut its price target to $40 from $50, a day after cutting his price target from $70. On Thursday, the company was the target of a new shareholder lawsuit

---

[357] "BLRA Rates Challenged; Political Firestorm – Hold," *Gabelli & Company*, September 28, 2017.

[358] "Public Service Commission of South Carolina Defers Action on Office of Regulatory Staff Request to Suspend Revised Rates Collections," *PR Newswire*, September 28, 2017, 5:54 PM.

[359] *Id.*

[360] *Id.*

accusing the company of manipulating the stock regarding the development of the V.C. Summer nuclear project and reduced estimates dramatically to reflect the likelihood of a regulatory outcome.[361]

236.  During the market day, Fitch Ratings also downgraded its rating for SCANA from "BBB-" to "BB+" in reaction to the regulatory news:

> Fitch is concerned with the sharp deterioration in the legislative and regulatory environment in South Carolina. There is a significant risk that SCE&G may have to cease collection of revenues related to the new nuclear units, as petitioned by the Office of the Regulatory Staff (ORS) to the SC Public Service Commission (PSC) until the legal issues regarding the BLRA are resolved. Fitch could consider additional negative rating actions if the BLRA were to be found unconstitutional and material refunds required. The Rating Watch Negative primarily reflects the risk that adverse regulatory orders could lead to restricted liquidity, constrained capital access and incremental debt issuance.[362]

237.  S&P Global ratings also downgraded its rating and put the stock on its negative CreditWatch, noting that the current level of SCANA's customer rates "are in jeopardy":

> The current level of the customer rates of South Carolina Electric & Gas Co., SCANA Corp.'s largest operating subsidiary, are in jeopardy because of the company's abandonment of two nuclear units it was building. […] The CreditWatch with negative implications on SCANA and its subsidiaries reflects our view that the political atmosphere in South Carolina following the company's decision to abandon Summer construction has worsened and could result in regulatory and legislative decisions that harm both the business and financial risk of SCANA. We could lower the ratings on SCANA and its subsidiaries if Summer-related rates are rescinded. We could further lower ratings if legal challenges to a rate decrease are unsuccessful, if the SCPSC orders cash refunds or rate credits for Summer-related costs, if the BLRA is repealed or changed by the legislature, or if the BLRA is deemed unconstitutional.[363]

238.  Morningstar felt that this news reaffirmed its rating for SCANA as a buying opportunity:

---

[361] "08:42 EDT Scana downgraded to Sell from Hold at Williams CapitalWilliams [*sic*] Capital..." *Theflyonthewall*, September 29, 2017, 8:42 AM.

[362] "Fitch Downgrades SCANA to 'BB+' / SCE&G to 'BBB-'; Negative Watch Maintained," *Dow Jones Institutional News*, September 29, 2017, 12:40 PM.

[363] "*S&PGR Downgrades SCANA And Subs To 'BBB'; On Watch Negative," *Dow Jones Institutional News*, September 29, 2017, 1:26 PM.

By Thursday afternoon Scana had resolved two key uncertainties. It struck a deal to sell its Toshiba guaranty payments for $1.1 billion and it convinced South Carolina regulators to take a measured approach on rate recovery rulings. The after-tax cash from selling the Toshiba payments reduces Scana's unrecovered investment to $4.2 billion from $4.9 billion. We expect Scana to use some of that cash to buy back stock, limiting the EPS impact of lower customer rates. This will not impact our fair value estimate. We think management made a good decision to sell the 5-year payment plan and eliminate Toshiba's credit risk even though it came at a slight discount to the full payment value.

Shareholders also should feel relieved that state regulators dismissed a Draconian rate refund request from the Office of Regulatory Staff, or ORS, and instead plans litigate the case [*sic*]. Any regulatory decision likely will end up in the courts in 2018. However, the benefit of a litigated case is it could open a settlement opportunity for Scana, which we think will be eager to settle to avoid a long regulatory, legal, and political slog.[364]

239. News outlets noted that SCANA's stock price fell "as it continues to deal with the repercussions from a failed nuclear project."[365] The Fly noted "Scana at a new 52-week low" and referenced the Williams Capital downgrade.[366] Seeking Alpha similarly summarized the day's news:

SCANA (SCG -4.7%) sinks to 52-week lows as Williams Capital downgrades shares to Sell from Hold and cuts its price target to $40 from $50, a day after lowering its price target from $70. On Thursday, SCG reportedly was the target of a new shareholder lawsuit accusing the company of manipulating the stock in lying about the development of the V.C. Summer nuclear project, and Williams dramatically reducing its 2018-19 earnings estimates to reflect the likelihood of a regulatory outcome. Also yesterday, South Carolina's Public Service Commission deferred action on a petition by the state's customer advocate to suspend ~$37M per month in rates South Carolina Electric & Gas charges customers for costs at the failed V.C. Summer plant and tasked a hearing officer to set up a schedule for considering the petition. SCG praised the PSC's decision "not to rush to judgment" and prevent SCE&G from collecting what amounts to $447M/year; Williams says it was somewhat encouraged by the tenor of the PSC's order to hold substantive hearings in the rate request.[367]

---

[364] "In Whirlwind of Activity, Scana Remains a Buying Opportunity," *Morningstar Equity Research*, September 29, 2017.

[365] "The Biggest Loser: Scana Skids…Again -- Barron's Blog," *Dow Jones Institutional News*, September 29, 2017, 4:14 PM.

[366] "09:57 EDT Technical View: Scana at new 52-week low, analyst actionThe shares..." *Theflyonthewall*, September 29, 2017.

[367] "SCANA hits 52-week low as Williams downgrades to Sell," *Seeking Alpha*, September 29, 2017, 3:28 PM.

240.  On September 29, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 4.77% ($2.43 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -6.93.

241.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on September 29, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines on September 29, 2017.  Thus, I attribute $2.43 per share of the abnormal dollar decline to the above corrective information and estimate that $2.43 of artificial inflation per share was dissipated from SCANA Common Stock on September 29, 2017.

242.  This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and prohibited SCANA from recouping costs associated with the Nuclear Project.  The news that analysts downgraded SCANA is corrective of the alleged misstatements and omissions because it revealed SCANA was continuing to face substantial regulatory risk to the rates it charged customers causing analysts to downgrade the stock.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

243.  This is evident, for example, from commentary in a report issued by Morgan Stanley on October 4, 2017:

> We believe the most likely base case outcome for treatment of SCG's abandoned nuclear plant is now meaningfully worse than we previously expected. SCG faces significant risk that investments made in its nuclear plant will be partially disallowed given recent indications that management may have had serious concerns well before the plant was officially abandoned in late July […]. ***We believe a $1.5b disallowance is the most likely outcome***…[368]

## O.  OCTOBER 19, 2017

244.  On October 19, 2017, Governor McMaster addressed a letter to CEO Marsh, in which he requested that SCANA immediately stop collecting funds from ratepayers for the abandoned Nuclear Project and use Toshiba's payments to refund ratepayers.[369]  Ensuing news coverage of this letter provided more color about the situation and implications of the governor's request.  According to The State, approximately 18% of SCE&G customers' power bills went towards the abandoned Nuclear Project, a total of $1.7 billion, which Governor McMaster described as "unreasonable and oppressive."[370]  The letter was an additional sign of Governor McMaster's growing critical attitude towards SCANA since the July 31, 2017 abandonment announcement.[371]  According to The State, SCANA replied to this letter with an email statement:

> "[T]he request in the letter is essentially the same as that recently expressed by the Office of Regulatory Staff. […] As we have consistently communicated, SCE&G intends to utilize the net value of the Toshiba parental guaranty payments to mitigate the cost of the abandoned project to customers. We hope that we will be able to engage in a discussion for a comprehensive settlement of the issues related to the project and how to further mitigate the impact on our customers."[372]

245.  The State continued publishing negative news about SCANA following its coverage of Governor McMaster's letter, revealing specifics about SCANA leadership's "golden parachutes" if

---

[368] "High Risk of Disallowance; Lowering PT to $45 and Remaining UW," *Morgan Stanley*, October 4, 2017.

[369] "Dear Mr. Marsh," *Governor Henry McMaster*, October 19, 2017.

[370] "SCANA should stop charging its customers for failed nuclear project, governor says," *The State*, October 19, 2017.

[371] *Id.*

[372] *Id.*

SCANA were to be sold following the abandonment of the Nuclear Project and large increases in executive pay since the start of the Nuclear Project.[373]  Since the Nuclear Project was approved in 2007, SCANA's executive team's total compensation for rose from $8.5 million to $14 million, with the team collecting more than $432,000 in bonuses in 2016.[374]  According to the State, although SCANA mismanagement led to the Nuclear Project ultimately being abandoned, SCANA leadership could still be well compensated for their behavior because the aftermath of the Nuclear Project abandonment led to the stock price sinking causing SCANA to become a takeover target.[375]  The State's review of SCANA's SEC filings estimated that if SCANA were to be sold, then CEO Marsh could be entitled to $28 million, a substantial profit despite seriously mismanaging the Nuclear Project.[376]

246.  On October 19, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 1.80% ($0.88 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -2.53.

247.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on October 19, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines over October 19, 2017.  Thus, I attribute $0.88 per share of the

---

[373] "Who gets $60 million when nuke project fails? SCANA execs with golden parachutes could," *The State*, October 19, 2017.

[374] *Id*.

[375] *Id*.

[376] *Id*.

abnormal dollar decline to the above corrective information and estimate that $0.88 of artificial inflation per share was dissipated from SCANA Common Stock on October 19, 2017.

248. This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and prohibited SCANA from recouping costs associated with the Nuclear Project. The information contained in both Governor McMaster's letter and The State article is corrective of the alleged misstatements and omissions because it revealed further regulatory and legal risk for SCANA. However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

249. For example, Morningstar published a report in which it reaffirmed its $64 fair value estimate for SCANA and remained steadfast in its belief that the BLRA would protect SCANA:

> We think the market already assumes an outcome more similar to our worst-case scenario. But we think this ignores legal, financial, political, and regulatory nuances. Our worst-case scenario fair value estimate is $42 per share. This includes refunding $1.9 billion that Scana has collected from customers since 2007 ($8 per share aftertax) and writing off the entire $4.9 billion pretax investment in the project. Our best-case scenario fair value estimate is $81 per share. South Carolina's 2007 Base Load Review Act, which state legislators passed nearly unanimously, ***guarantees Scana full recovery of financing and capital costs even if the company abandons the project***.[377]

250. Later that day, Morningstar issued a second report titled, "Scana's nuclear project abandonment will slow earnings growth beyond 2017" that hailed SCANA management as highly considerate of investors:

> Management has done a remarkable job of protecting shareholder value during the project. It supported the 2007 South Carolina Baseload Review Act, which gives Scana legal rights to collect all financing costs and capital investment

---

[377] "Scana's Nuclear Option an Attractive Risk/Reward Trade-Off," *Morningstar Equity Research*, October 24, 2017.

from ratepayers even if it abandons the project. Scana favorably settled several regulatory proceedings, signed a fixed-price agreement with Westinghouse and, ultimately, secured $1.2 billion of guaranty payments from Toshiba.[378]

## P.   OCTOBER 26, 2017 to OCTOBER 27, 2017

251.   On October 27, 2017, Morgan Stanley published a report with a more pessimistic outlook about SCANA's potential settlement with regulators.  In a report titled "Exploring Severe Downside Scenarios Given Recent Governor and Legislator Comments," Morgan Stanley cited several concerns that could make the potential outcomes of discussions with the South Carolina committees less favorable to the Company and its investors.  One of its concerns was the possibility that the market was not made aware earlier about significant issues with the Nuclear Project:

> We are growing increasingly concerned that a more negative scenario than our base case may play out for SCG. […] Why have we grown increasingly concerned about more severe outcomes? (A) Recently, SC Governor McMaster stated in a letter to SCANA CEO Kevin Marsh that "it is unreasonable and oppressive for SCANA to require its customers to bear the burden of actions and decisions in which customers played no part and over which they had no control." The Governor also suggested it would be "unwise" for SCANA to contest the legality of the potential overturning of the Base Load Review Act (BLRA), the law that set the framework for SCANA subsidiary SCE&G to pursue construction of the VC Summer nuclear project. (B) The SC Office of Regulatory Staff recently made a recommendation that SCANA stop collecting customer revenue for its new nuclear plant until the General Assembly acts on the BLRA. (C) The SC Attorney General has argued in a brief that the BLRA law is "constitutionally suspect" under the SC Constitution. (D) Some legislators have suggested they may move to overturn the BLRA and move to eliminate any recovery for VC Summer costs incurred by SCANA. (E) *Media reports suggest emails between SCANA management and executives at Toshiba and Westinghouse highlight prior SCANA knowledge of significant issues with the VC Summer plant (as early as 2014) at the same time that management was allegedly not fully disclosing such issues to key constituents.*

> We acknowledge there is potential for a settlement, but still see significant risk. SCG announced on its 3Q17 earnings call that it has entered preliminary discussions with several parties, and that the tone of these discussions has been "professional." While we recognize this could be a less contentious path forward, we have some skepticism on the ability to reach a settlement given the

---

[378] "Scana's nuclear project abandonment will slow earnings growth beyond 2017," *Morningstar Equity Research*, October 24, 2017.

tone from legislators and other intervenors, and also think a settlement could still result in a sizeable disallowance for the company.

…

While overturning the BLRA is in our view unlikely to succeed, we believe there are potentially more valid arguments for disallowing a significant portion of capex spent by SCANA to date. We believe the Bechtel report provides support for such an outcome. In 2015 SCANA and Santee Cooper commissioned Bechtel, an engineering and construction firm, to assess the status and challenges of the VC Summer project in anticipation of litigation with Westinghouse. Bechtel delivered its report in February 2016, highlighting significant issues with the design, schedules, project management, oversight, and construction contract, and recommending a number of actions to improve the project. ***This report was kept confidential between the utilities and never released to the ORS or PSC. The report was publicly released by Governor McMaster in early September after demanding it from Santee Cooper. Both utilities requested to keep the report confidential to protect their legal defense in litigation with Westinghouse***.

In its 130-page report, Bechtel highlighted a number of issues with the project on the parts of both owners and contractors. Most significant included 1) EPC plans and schedules did not reflect actual project circumstances, 2) contractors lacked project management integration, 3) lack of shared vision, goals, and accountability across owners/ contractors, 4) the contract does not service any party particularly well, 5) the engineering design is not complete, 6) the design is often not constructible, 7) owners' oversight does not allow for real-time cost and schedule mitigation, and 8) there is a strained relationship between contractors…***We are concerned that points 5 and 6 could be construed as issues that were in existence at the early stages of the project, and given that SCANA did not fully disclose the lack of a complete engineering design and the challenges in constructing the design, capex that was approved as prudent by the regulator was made without all of the relevant information and therefore potentially invalid***. Given that the report was never disclosed to or evaluated by any regulatory body at the time, although many of SCG's decisions were presented, scrutinized, and approved by regulators, the company's operational response to this report did not have any stamp of approval. We assume in our base case that $1.5b in capex spent since the last nuclear rate review (which considered capital spent through 6/2016, a few months after the Bechtel report was issued) will be disallowed for recovery by regulators. Given some legislators are considering complete disallowance, the Bechtel report could in our view be used to support this request.[379]

---

[379] "Exploring Severe Downside Scenarios Given Recent Governor and Legislator Comments," *Morgan Stanley*, October 27, 2017.

252.   The publication of this analyst report was predicated on SCANA's publication of its financial results from the day prior.  On October 26, 2017, before the start of trading, SCANA issued a press release announcing its financial results for the third quarter of 2017, including specific results for SCE&G.[380]  In comparison to SCE&G's Q3 2016 earnings of $204 million (EPS $1.43), SCANA reported a dramatic decrease in SCE&G's earnings for Q3 2017 of just $42 million (EPS $0.29).[381] On the earnings call later that day, SCANA explained that its Q3 2017 earnings miss was driven in large part by a $210 million impairment related to the Nuclear Project.[382]  SCANA proceeded not to provide any long-term earnings guidance for SCE&G because of the failed Nuclear Project.[383] However, analysts appeared to focus their questioning on the potential for settlement, which SCANA leadership engaged with positively.[384]  Optimistic sentiment surrounding settlement led to market confidence that a potential catalyst was in the near future for SCANA.[385]

253.   On October 26, 2017, my event study demonstrates the market price of SCANA Common Stock increased by 0.67% ($0.32 per share) after controlling for market and industry effects.  This abnormal price increase is not statistically significant with a t-statistic of 0.93.  On October 27, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 3.41% ($1.63 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -4.73.

254.   The October 26, 2017 to October 27, 2017 window captures the information environment relevant to the Morgan Stanley report and incorporates changing market sentiment

---

[380] "SCANA Reports Financial Results for Third Quarter of 2017," *PR Newswire*, October 26, 2017, 7:30 AM.

[381] *Id.*

[382] "FQ3 2017 Earnings Call Transcripts," *S&P Capital IQ*, October 26, 2017, 3:00 PM.

[383] "SCANA Reports Financial Results for Third Quarter of 2017," *PR Newswire*, October 26, 2017, 7:30 AM.

[384] "FQ3 2017 Earnings Call Transcripts," *S&P Capital IQ*, October 26, 2017, 3:00 PM.

[385] "SCG – Did Somebody Say Settlement? Not Out of the Woods Yet but Potentially a First Sign of Light," *Guggenheim*, October 26, 2017.

131

about potential settlement.  Therefore, I consider the two-day window of October 26, 2017 to October 27, 2017. Over this two-day window my event study demonstrates the market price of SCANA Common Stock fell by 2.76% ($1.31 per share) after controlling for market and industry effects.  This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -2.71.

255.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline over October 26, 2017 to October 27, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines over October 26, 2017 and October 27, 2017.  Thus, I attribute $1.31 per share of the abnormal dollar decline to the above corrective information and estimate that $1.31 of artificial inflation per share was dissipated from SCANA Common Stock over the two-day window of October 26, 2017, and October 27, 2017.[386]

256.  This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and prohibited SCANA from recouping costs associated with the Nuclear Project.  Thus, the information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed increasing concerns from the market that SCANA had not fully disclosed issues with the Nuclear Project to all parties.  However, the relevant truth that was allegedly concealed by Deloitte's clean

---

[386] Specifically, I estimate that $0.32 of artificial inflation per share was introduced into the price of SCANA Common Stock on October 26, 2017, and that $1.63 of artificial inflation per share was dissipated from the price of SCANA Common Stock on October 27, 2017, which nets to a total of $1.31 over this two-day window.

132

audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA

Common Stock remained artificially inflated.

257.   For example, in Morningstar's October 27, 2017 report, it stated that "the market is overly discounting the financial consequences of Scana's decision to abandon its new nuclear project."[387]  The report demonstrated the same confidence in SCANA management that Morningstar, and other analysts, continued to hold:

> First, management confirmed they are in settlement negotiations and hope to finalize an agreement by year-end. This timing likely would prevent state legislators from altering the 2007 Base Load Review Act when the next legislative session starts in January. Removing this $42 per share worst-case scenario--that the BLRA is repealed-- should provide a big relief for shareholders. […] We continue to believe core earnings with partial nuclear capital recovery will bottom at $3.85 per share next year.[388]

## Q.   OCTOBER 31, 2017

258.   Before market open on October 31, 2017, SCANA issued a press release announcing the retirement of CEO Marsh and SCE&G COO Byrne.[389]  The press release also named CFO Addison as the new CEO and Keller Kissam as the new COO.[390]  The news came after several days of rumors published by local newspapers, specifically from The State.[391]  However, these prior

---

[387] "Scana's Settlement Discussions, Nuclear Write-Off, and Core Business Growth Support Upside," *Morningstar Equity Research*, October 26, 2017.

[388] *Id*.

[389] "SCANA Corporation and South Carolina Electric & Gas Company Announce Leadership Changes," *PR Newswire*, October 31, 2017, 9:00 AM.

[390] *Id*.

[391] "SCANA to oust CEO, chief operating officer in aftermath of VC Summer failure," *The State*, October 28, 2017. ("SCANA board members decided on the departures during a phone meeting Saturday morning, sources told The State newspaper. Marsh and Byrne will join former Santee Cooper chief executive Lonnie Carter, who announced his retirement in August, as the state's only top executives to depart their jobs over the bungled attempt to build two new nuclear reactors in Fairfield County.")

133

reports regarding the leadership change had been rebuffed by SCANA's spokesperson and CEO

Marsh himself.[392]  The State also recognized the criticism facing SCANA executives:

> SCANA's executives, and Marsh and Byrne in particular, have come under fire in S.C. House and Senate hearings into the project's demise. S.C. lawmakers have fumed that the executives refused to accept blame for the project's failures, instead deflecting to lead contractor Westinghouse, which declared for bankruptcy in March. Lawmakers also were rankled to learn that SCANA's top executives accepted roughly $3 million in bonuses tied to their performance on the doomed project - much of which SCANA now has left to ruin against the wishes of Santee Cooper and some lawmakers.[393]

259.  In the press release, SCANA provided no information as to whether the leadership

change was due to the challenges facing the retiring officers as a result of the failed Nuclear Project.

260.  In response to the leadership change, The State interviewed Tom Clements, an adviser

to the Friends of the Earth Environmental group, who expressed anxiety towards the new leadership

role for CFO Addison:

> "Addison is one of the ringleaders of the project," […] "[r]ewarding him is very unsettling."[394]

261.  South Carolina State Representative James Smith had a more positive outlook on the

transition:

> "It's a good thing and this is an important step to bringing everything back into alignment." […] "It's a step that allows the company to take necessary action to regain the public trust and confidence."[395]

---

[392] "SCANA to oust CEO, chief operating officer in aftermath of VC Summer failure," *The State*, October 28, 2017; "SCANA chief denies he's leaving embattled utility," *The State*, October 30, 2017.

[393] "SCANA to oust CEO, chief operating officer in aftermath of VC Summer failure," *The State*, October 28, 2017.

[394] "SCANA CEO Marsh, another top executive departing after nuclear fiasco," *The State*, October 31, 2017.

[395] *Id.*

262.   The Post and Courier reported that House Speaker Lucas called for CEO Marsh's resignation as a result of the Nuclear Project's cancellation.[396]  House Speaker Lucas voiced his disproval and exasperation against SCANA and CEO Marsh:

> S.C. House Speaker Jay Lucas called for SCANA Chief Executive Officer Kevin Marsh to resign Monday, two days after state lawmakers rejected an offer by the Cayce-based utility to oust its boss in exchange for concessions over the canceled $9 billion nuclear plant expansion.
>
> "SCANA's mismanagement of the V.C. Summer nuclear facility has proven that the company cannot be trusted to promote or protect its consumers' interests," said Lucas, a Hartsville Republican and one of the two most powerful lawmakers in the state.
>
> "On behalf of the South Carolina ratepayer, I believe SCANA CEO Kevin Marsh should resign immediately," he continued. "This measure should have occurred long before now and without pressure from elected officials."
>
> […]
>
> SCANA refuted reports that Marsh, the utility's boss since 2011, was ousted by the board over the weekend. Marsh sent a memo to employees Monday reiterating that the situation hasn't changed, company spokesman Eric Boomhower said.
>
> "SCANA's board did not take any action over the weekend to remove any members of management," Boomhower said. "No senior executives were terminated, nor did any resign or retire. (Marsh) urged employees to remain focused on their jobs and to not be distracted by speculation in the media. He is doing the same."
>
> Lucas' call for Marsh's resignation adds to what one SCANA executive last week called the "extremely contentious" response to the decision by SCE&G and its minority partner in the project, state-run Santee Cooper, in pulling the plug.[397]

263.   Similarly, other news outlets saw CEO Marsh's departure as a natural consequence of SCANA's abandonment of the Nuclear Project.  Reuters reported at 9:28 AM on October 31, 2017, that "[t]he move comes after a unit of Scana and state-owned utility Santee Cooper abandoned two

---

[396] "'Cannot be trusted:' South Carolina House Speaker calls for SCANA chief's resignation," *The Post and Courier*, October 31, 2017.

[397] *Id.*

135

unfinished nuclear reactors in July after being dogged by billions of dollars in cost overruns."[398]   In

an updated note about an hour later, Reuters acknowledged that the Santee Cooper's CEO had also

resigned.[399]  Dow Jones connected SCANA's leadership changes to "the legal and financial

reverberations of its ill-fated attempt to build a nuclear power plant in South Carolina."[400]

264.   The State quoted an excerpt of an email from CEO Marsh to SCANA employees in

which he stated:

> I informed the board late yesterday that I have decided it is in the best interest
> of our company at this time that SCANA move forward under new leadership.
> Steve (Byrne) and I are committed to staying on board through the end of the
> year to ensure a smooth transition in leadership and ***to continue working***
> ***toward resolution of issues related to our decision to abandon our nuclear***
> ***construction project.***[401]

265.   The article from The State also quoted Governor McMaster who acknowledged the

overdue nature of the leadership decision:

> "While this decision indicates that SCANA is beginning to fully understand the
> devastating consequences of abandoning the VC Summer project, any effort to
> regain the public's trust starts with no longer charging ratepayers for this failed
> project, and refunding them the money they've already paid for it."[402]

266.   Analysts who mentioned the leadership change had a relatively positive outlook on the

news.  For example, analysts at Wells Fargo felt that the news was almost expected:

> Prior to the market open, the company announced the retirements of Chairman
> & CEO Kevin Marsh and COO Stephen Byrne as of year-end 2017. CFO
> Jimmy Addison will step into the CEO role. We view the executive departures
> as an inevitability in the wake of the political firestorm around the proposed
> abandonment of the two new V.C. Summer nuclear units.[403]

---

[398] "Scana CEO to step down after failed nuclear project," *Reuters News*, October 31, 2017, 9:28 AM.

[399] "UPDATE 1-Scana CEO to step down after failed nuclear project," *Reuters News*, October 31, 2017, 10:26 AM.

[400] "Scana Shakes Up Management," *Dow Jones Institutional News*, October 31, 2017, 11:40 AM.

[401] "What SCANA, others said about executive shake-up," *The State*, October 31, 2017.

[402] *Id*.

[403] "Flash Comment: Utility & Infrastructure Daily," *Wells Fargo Securities*, November 1, 2017.

267.   The State also reported that "[f]inancial analysts said the departures of Marsh and Byrne created uncertainty that caused the company's stock to drop Tuesday [October 31, 2017]."[404]

268.   On October 31, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 5.99% ($2.75 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -8.23.

269.   I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on October 31, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines on October 31, 2017.  Thus, I attribute $2.75 per share of the abnormal dollar decline to the above corrective information and estimate that $2.75 of artificial inflation per share was dissipated from SCANA Common Stock on October 31, 2017.

270.   This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and prohibited SCANA from recouping costs associated with the Nuclear Project.  Thus, the information contained in the announcement is corrective of the alleged misstatements and omissions because the resignation of key executives revealed the consequences to SCANA following the abandonment of the Nuclear Project.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports

---

[404] "New leaders give SCANA a chance to repair damage from failed nuke project," *The State*, October 31, 2017.

was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

271. For example, Wells Fargo's comment on SCANA issued on November 1, 2017, concluded with hope of a resolution through a negotiated settlement:

> On the whole, we continue to think that the nuclear debacle will be resolved via a negotiated settlement (the CEO/COO retirements could be one part of that process) as we do not think it is in any of the parties' interests to fight the BLRA out in court.[405]

272. Likewise, Morningstar analysts held fast to their investment thesis and continued to dismiss the market's "discounting [of] the financial consequences of Scana's abandonment decision."[406] Morningstar analysts felt that the leadership changes announced on October 31, 2017 were strategically timed:

> On Tuesday, Scana announced Chairman and CEO Kevin Marsh and Chief Operating Officer Stephen Byrne will retire Jan. 1, 2018. We think this is a **_good political move after several top state lawmakers had called for a change in Scana's leadership_**. Although insiders will replace them, we hear that CFO Jimmy Addison--who will become CEO--and President of Retail Operations Keller Kissam--who will become COO--are well-respected across the state.[407]

### R. NOVEMBER 24, 2017

273. After market hours on November 22, 2017, The Post and Courier reported on the extent to which SCANA had scrubbed details from an internal audit which showed that the Nuclear Project would not be done in time to receive the Nuclear Tax Credits.[408] After an earlier version of the First Bechtel Report was finally released by the ORS on November 21, 2017, officials stated that the draft

---

[405] "Flash Comment: Utility & Infrastructure Daily," *Wells Fargo Securities*, November 1, 2017.

[406] "Headlines Keep Flying But Thesis Intact For Scana," *Morningstar Equity Research*, November 5, 2017.

[407] *Id.*

[408] "Insight that would've alerted problems with nuclear project scrubbed from audit two years ago," *The Post and Courier*, November 22, 2017; @postandcourier, "Insight that would've alerted problems with nuclear project was scrubbed from an audit two years ago…" *X*, November 22, 2017, 8:00 PM, available at https://x.com/postandcourier/status/933500346160226305.

clearly showed that SCANA withheld even more information than previously assumed.[409]  The Post and Courier highlighted that SCANA's failure to disclose Bechtel's actual schedule analysis could negatively affect the company as legislators and the ORS were pushing to stop SCANA from collecting payment from ratepayers.

274.  Bloomberg directly tied the decline on November 24, 2017, the trading date following the November 22, 2017 Post and Courier article,[410] in SCANA Common Stock to the article from The Post and Courier:

> [Scana] falls 3.8%, most since Oct. 31, and worst performer in S&P 500 Utilities Index on Friday. The Post and Courier reported co. scrubbed details from internal audit that showed V.C. Summer nuclear project wouldn't be finished in time to take advantage of federal tax credit. Scana didn't immediately respond to request for comment "Given the extreme politics surrounding V.C. Summer, it wouldn't be surprising if an article such as this might impact the stock," Paul Patterson, Glenrock Associates LLC Volume of shrs traded was down by more than half from week ago[411]

275.  On November 24, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 3.81% ($1.66 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -3.45.

276.  I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on November 24, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be

---

[409] *Id.*

[410] Scana Common Stock did not trade on November 23, 2017 due to the Thanksgiving holiday.  *See* "NYSE Group Announces 2017 Holiday and Early Closings Calendar," *Business Wire*, February 2, 2016, 4:05 PM.

[411] "Scana Biggest Decliner in Utility Index; Stock Falls 3.8%," *Bloomberg*, November 24, 2017, 2:25 PM.

disaggregated from the price declines over November 24, 2017.  Thus, I attribute $1.66 per share of the abnormal dollar decline to the above corrective information and estimate that $1.66 of artificial inflation per share was dissipated from SCANA Common Stock on November 24, 2017.

277.  This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and prohibited SCANA from recouping costs associated with the Nuclear Project.  Thus, the information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed that SCANA hid the internal audit findings, which estimated completion dates after the Nuclear Tax Credits expired.  However, the relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this Corrective Disclosure Event, and so the price of SCANA Common Stock remained artificially inflated.

278.  For example, on November 29, 2017, Wells Fargo published a Flash Comment about SCANA's share price movements vis-à-vis the S&P Utilities Index.[412]  The report highlighted thoughts on the article in The State that mentioned that SCANA had hired an investment bank "'to consider its possible sale'" [413]:

> [W]e think striking a "'grand bargain'" that includes the sales of both Santee Cooper and SCG while at the same time resolving SCG's $5B stranded new nuclear investment issue could be a very difficult needle to thread. We think it is arguably more plausible that SCG will need to resolve the stranded investment issue first before contemplating a sale of the company. On that front, we believe SCG remains in discussions with key constituents in the state with a goal of reaching a settlement by year-end.[414]

---

[412] "Flash Comment: Utility & Infrastructure Daily," *Wells Fargo Securities*, November 29, 2017.

[413] *Id.*

[414] *Id.*

## S.   DECEMBER 21, 2017

279.   On December 20, 2017, after market close, SCANA issued a press release announcing that the PSC denied SCE&G's Motion to Dismiss and ordered a hearing to be set for the ORS's request for rate relief.[415]   Additionally, according to the release, "the SCPSC ordered the ORS to perform a thorough inspection and audit … to determine the reasonableness of SCE&G's retail electric rates and to address SCE&G's statements regarding the potential effect that the removal of these revenues, as requested by the ORS, could have on SCE&G."[416]   The motion to dismiss was associated with two separate regulatory dockets, each dealing with SCANA and SCE&G's rates charged to its customers which were used to continue financing the failed Nuclear Project.[417]   The ORS case called for an immediate rate reduction for SCE&G by about $445 million annually,[418]   and the other request called for customer refunds for the approximately $2 billion previously collected.[419] On the ruling, CFO Addison, who would become SCANA's CEO on January 1, 2018, commented that:

> "We welcome the ORS's examination of our books and records to evaluate our revenue requirements.  We are also encouraged by the Commission's decision to move forward with a hearing that will allow for the full development and review of the relevant facts and issues before making such a critical decision on this matter, which will ultimately have great ramifications on not just SCANA and SCE&G, but also on SCE&G's customers."[420]

280.   The State noted the magnitude of the PSC's actions:

---

[415] "Public Service Commission of South Carolina Orders Hearing on the South Carolina Office of Regulatory Staff's Request to Reduce Rates," *PR Newswire,* December 20, 2017, 5:01 PM.

[416] *Id*.

[417] "Nuclear Dockets Will Proceed, But Commission Action Pushed to 2018," *Morgan Stanley*, December 21, 2017, 12:01 AM.

[418] "Public Service Commission of South Carolina Orders Hearing on the South Carolina Office of Regulatory Staff's Request to Reduce Rates," *PR Newswire*, December 20, 2017, 5:01 PM.

[419] "Ratepayers win victory in fight to recover money from failed SCE&G nuclear project," *The State*, December 20, 2017.

[420] "Public Service Commission of South Carolina Orders Hearing on the South Carolina Office of Regulatory Staff's Request to Reduce Rates," *PR Newswire*, December 20, 2017, 5:01 PM.

Wednesday's decision was a rare win for ratepayers and a blow to SCE&G, which faces withering criticism for failing to complete the V.C. Summer nuclear project with its state-owned partner Santee Cooper.[421]

281. An article released by The Post and Courier also stressed the implications of this decision:

The unanimous vote by the seven-member Public Service Commission leaves open the possibility that the panel could cut off the payments SCANA, the parent of South Carolina Electric & Gas, collects for the failed project. SCE&G customers pay almost a fifth of their bills, or $37 million a month, for the unfinished reactors north of Columbia. By combining that action with another proposal, the utility commission will also consider whether SCANA should refund customers for the roughly $1.8 billion it has collected to finance its share of the nuclear project since 2009.

[…]

Wednesday's ruling Wednesday was the first major decision the commission has issued since the $9 billion project was canceled. It also marked the first time that the panel has ruled against Cayce-based SCANA since the project began.[422]

282. The Post and Courier article further explained how the ORS will investigate other potentially fraudulent activity:

Commissioner Elliott Elam ordered the Office of Regulatory Staff – the state's utility watchdog agency – to determine whether SCANA's bankruptcy warnings were accurate or whether the utility could absorb the lost revenue.[423]

283. Morgan Stanley analysts highlighted the profound impact the two cases could inflict on the price on SCANA Common Stock if they resulted in an unfavorable decision for the Company:

By our estimates, if the company were to receive no nuclear cost recovery (in addition to a lower 8% ROE at the core utilities) the stock would be worth

---

[421] "Ratepayers win victory in fight to recover money from failed SCE&G nuclear project," *The State*, December 20, 2017.

[422] "South Carolina utility regulators refuse to throw out case against SCE&G," *The Post and Courier*, December 21, 2017.

[423] *Id.*

142

$30/share, and if SCG were to also refund all revenue collected thus far the stock would be worth $18/share.[424]

284.   Christopher Muir, an analyst at CFRA, noted that even though SCANA can fight unjust rate reductions legally, this news will certainly affect its financing of the failed Nuclear Project.  For this reason, he lowered CFRA's price target by $9:

> After rejection of SCG's request to dismiss the regulatory staff's rate review that seeks a $445 million annual rate reduction, we reduce our 12-month target by $9 to $42. While we think the $445 million rate reduction is too high, we cut our '18 EPS estimate by $0.75 to $3.05 on our expectation of reduced rates. SCG can successfully fight any potentially unjust rate reductions through legal means, but risks to acceptance of SCG's proposed approach for handling the nuclear costs are greater following the rejection, in our view. SCG may be forced into tougher negotiations.[425]

285.   On December 21, 2017, my event study demonstrates the market price of SCANA Common Stock fell by 8.99% ($3.71 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of -6.02.

286.   I carefully evaluated whether there was any other news outside of the above corrective information that could explain the observed SCANA Common Stock price decline on December 21, 2017, and found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price declines over December 21, 2017.  Thus, I attribute $3.71 per share of the abnormal dollar decline to the above corrective information and estimate that $3.71 of artificial inflation per share was dissipated from SCANA Common Stock on December 21, 2017.

---

[424] "Nuclear Dockets Will Proceed, But Commission Action Pushed to 2018," *Morgan Stanley*, December 21, 2017, 12:01 AM.

[425] "Stock Report: SCANA Corporation," *CFRA*, December 27, 2017.

287.    This Corrective Disclosure Event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and prohibited SCANA from recouping costs associated with the Nuclear Project.  Thus, the information contained in the announcement is corrective of the alleged misstatements and omissions because it revealed that cases against SCANA would move forward and there would be further scrutiny of the rates charged by SCANA.

## VIII. ANALYSIS OF THE INFLATION CREATING EVENTS

288.    An event can introduce a portion of artificial inflation into the price of a stock even if there was not an alleged misstatement or omission made on that day.  This is because information does not necessarily need to be false or misleading to bolster investors' confidence, such as the Inflation Creating Events did here by bolstering investors' confidence in the Nuclear Project timeline and costs.  For example, as I will describe in greater detail below, SCANA abandoned the Nuclear Project on July 31, 2017.  Although this is not a false and misleading statement alleged by Plaintiff, this event still introduced artificial inflation into the price of SCANA Common Stock because the abandonment signaled to investors that SCANA could stop spending money on the Nuclear Project and could recoup costs under the BLRA.

289.    To be clear, it is not necessary for market commentary on the alleged Inflation Creating Events to explicitly reference Deloitte.  As explained in **Section V.C** above, academic literature demonstrates that investors generally expect clean audit reports.  One way in which inflation-creating information may reach investors is when auditors provide clean audit reports.  But another way in which *the same* inflation-creating information may reach investors is through the financial media, analysts, company executives, earnings releases, press releases, or other non-auditor-related sources.

These are the same sources as those of potential corrective disclosures.  In other words, the nature of the inflation-creating information can remain the same regardless of the disclosure source of that information.  Therefore, one would expect the market commentary to focus on the *implications of* such inflation-creating information as opposed to the *source of* that information, as in this matter.

## A. SEPTEMBER 2, 2016

290.   After trading hours on September 1, 2016, SCE&G issued a press release announcing that it had entered into a settlement agreement with the ORS and other energy entities in South Carolina.[426]  The press release stated that the agreement was based on "SCE&G's petition to update construction and capital cost schedules, including SCE&G's election of the Fixed Price Option as included in the October 2015 Amendment to its Engineering, Procurement, and Construction agreement with Westinghouse Electric Company, for the two new nuclear units under construction at the V.C. Summer Station in Jenkinsville, South Carolina."[427]  SCE&G noted that its petition for this agreement would be given a public hearing with the PSC on October 4, 2016.[428]  Importantly, the agreement would entail the following:

> This settlement agreement signifies that no contested issues exist among the settling parties and supports approval of the updated construction schedule, which indicates guaranteed substantial completion dates of August 2019 and August 2020 for Units 2 and 3, respectively, and inclusion of an additional $831 million in the capital cost schedule. In addition to supporting approval of the Fixed Price Option and the revised construction and capital cost schedules, the settling parties agreed to revise the allowed Return on Equity (ROE) for the new nuclear project from 10.50 percent to 10.25 percent. Under the Base Load Review Act, the revised ROE will be applied prospectively for the purpose of calculating revised rates sought on and after January 1, 2017, until such time as the new nuclear units are completed. Additionally, SCE&G agreed that it will

---

[426] "SCE&G Announces Settlement Agreement Related to Election of Fixed Price Option and Petition to Update Construction and Capital Cost Schedules for New Nuclear Units," *PR Newswire*, September 1, 2016, 5:10 PM.

[427] *Id.*

[428] *Id.*

145

not file future requests to amend capital cost schedules prior to January 28, 2019.[429]

291.    Analysts at Wells Fargo and UBS Securities commented on this update in reports issued on September 1, 2016, and September 2, 2016, respectively.  Analysts at Wells Fargo reported that the announcement was "constructive and supportive of [their] positive rating on SCG,"[430] and pointed ahead to expectations following the hearing with the PSC:

> Bottom line – we view the agreement as constructive and supportive of our positive rating on SCG - particularly as it relates to our longstanding thesis that there exists strong stakeholder support for new nuclear in SC. No change to our 16E & 17E of $4.00 & $4.25. We are modestly increasing our 18E to $4.75 from $4.65 to reflect an accelerated NND capex recovery vs. our prior assumption (model revision). We reiterate our Outperform rating and 12-18 month valuation range of $78-80/share.
>
> […] The SC Public Service Commission (PSC) is scheduled to issue a final decision by 11/28. Based on historical precedent, we would be surprised if the final order included any material modifications to the settlement. Along with the approved incremental capital costs and 10.25% ROE, other elements of the settlement include an approval of the updated schedule, which contemplates substantial completion dates of August 2019 (Unit 2) and August 2020 (Unit 3) and, separately, an agreement on the part of SCG to not request approval of any additional costs prior to 1/28/19.[431]

292.    Analysts at UBS described the details of the agreement and their assessment of the subsidiary's risk profile:

> Hearings are still scheduled for Oct 4 with a decision from the PSC expected in ~Nov. We see the project as substantially de-risked with this deal;
>
> […]
>
> In turn, mgmt. commits to avoid further increases in capital costs pre Jan 28, 2019, just a few months before the scheduled Aug 2019 in-service date of Unit 2 (slight delay from last order of Jun 2019). We note the deal includes interveners with a contingency for project delay of 18-months+ (presumably to line up with the end of ~2020). Experts we've spoken to believe efforts appear

---

[429] *Id.*

[430] "SCG: Constructive Settlement Reached On Fixed-Price Option," *Wells Fargo Securities*, September 1, 2016.

[431] *Id.*

146

under way to provide for a potential PTC qualification extension beyond the 12/31/2020 deadline (potentially indefinitely).

[…] We are wary re progress on the site as hiring activities by Fluor ramp and overall productivity appears above 1.0. We believe the project could still be readily delayed, but the question is whether any such delay would be beyond the end of 2020. We note the order only limits the company's ability to file for further increases until 2019, rather than preventing it from doing so. From an investor perspective the limited ability to refile for the time being should substantially de-risk near-term EPS as the SCG will not seek deals beyond the scope defined.[432]

293. In response to this news, on September 2, 2016, my event study demonstrates that the market price of SCANA Common Stock increased by 1.02% ($0.71 per share) after controlling for market and industry effects. This abnormal price increase is statistically significant beyond the 95% confidence level with a t-statistic of 2.60. Therefore, I conclude that $0.71 per share of artificial inflation re-entered the price of SCANA Common Stock on September 2, 2016.

294. I carefully evaluated whether there was any other news outside of the above information that could explain the observed SCANA Common Stock price increase on September 2, 2016, and I found no such confounding information. As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price increase on September 2, 2016. Thus, I attribute $0.71 per share of the abnormal dollar increase to the above information and estimate that $0.71 of artificial inflation was introduced to SCANA Common Stock on September 2, 2016.

295. If Plaintiff's allegations regarding Deloitte's failure to properly assess SCANA's financial statements and internal controls are accurate, then the announcement of the settlement agreement is inflation-creating because the settlement implied that the market should be less concerned about the financial viability of the Nuclear Project than previously anticipated. Therefore,

---

[432] "Fixing a Deal on a Fixed Price Contract," *UBS*, September 2, 2016.

SCANA's stock price was artificially inflated further by this information that reassured the market of Deloitte's supposed ability to properly assess SCANA's financial reporting. The market remained unaware of the true impact of Deloitte's lack of effective internal controls, which should have flagged deadlines for the Nuclear Project as improbable and indicated that the Nuclear Project would not be completed in time to obtain Nuclear Tax Credits. Deloitte's inaction eventually led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project. As a result, the information released on September 2, 2016, represents a maintenance of the alleged fraud, keeping SCANA Common Stock artificially inflated.

## B.   FEBRUARY 15, 2017

296.   Shortly after the market closed on February 14, 2017, SCANA issued a press release revealing that Westinghouse, and thus Toshiba, had confirmed its commitment to finishing the Nuclear Project and provided an extended completion schedule "with revised in-service dates of April 2020 and December 2020 for Units 2 and 3, respectively."[433]  SCANA said, "the completion dates provided in the new schedule… would enable both units to qualify, under current law, for the federal production tax credits."[434]  Lastly, the Company indicated that further commentary would be provided during a conference call scheduled at 3:00 PM on February 16, 2017.[435]

297.   Reuters reported on the receipt of Westinghouse's commitment and SCE&G's continued overseeing of the extended completion schedule.[436]  Analysts reacted positively, especially with respect to SCANA's ability to meet the updated completion timelines. For example, Morningstar said:

---

[433] "SCANA Receives Reaffirmation from Westinghouse Regarding Completion of VC Summer New Nuclear Project," *PR Newswire*, February 14, 2017, 4:30 PM.

[434] *Id*.

[435] *Id*.

[436] "BRIEF – SCANA receives reaffirmation from Westinghouse regarding completion of new nuclear project," *Reuters News*, February 14, 2017, 5:20 PM.

We continue to believe the new nuclear plants Scana and Southern are building with Westinghouse will be completed. These in part support our 5% projected annual earnings-growth rate for Scana and 4% projected annual earnings-growth rate for Southern.[437]

298. Wells Fargo similarly expressed relief from the announcement:

We view SCG's statement positively as we believe there was some concern amongst investors that the $6.3B WEC/Toshiba impairment charge from cost overruns related to the two U.S. projects reflected a more substantial delay than 4-8 months. As such, we reiterate our comments published intraday on 2/14 and view the nearly 400 bps underperformance on 2/14 (SCG shares -4.5% vs. S&P Utilities -0.7%) to be overdone.[438]

299. UBS, however, issued a more cautious view given the increased risk for SCANA as a result of the revised schedule from Westinghouse:

After Toshiba's long-awaited update yesterday, SCANA released the latest BLRA report and a reaffirmation from Westinghouse that included an updated schedule pushing the in service dates to April 2020 and Dec 2020 for Units 2 and 3, respectively - previously Aug '19 and Aug '20. Bottom line in our mind is that this exacerbates SCG's risk profile though much of this is accounted for in the current ~3 turn discount to 16.2x peer multiple on 2019 earnings. Notably, the 'extreme' scenario here would require a full renegotiation of the contract if SCG were forced to find a different contractor, but Toshiba appears fully committed at the parent level to Westinghouse obligations.[439]

300. The State gave a positive perspective after expressing initial concern. In an interview with The State, Travis Miller of Morningstar stressed that any news about completing the Nuclear Project in a timely manner was good news:

Toshiba's announcement initially raised concerns about the future of SCE&G's plants in Jenkinsville. Those concerns were alleviated some by Westinghouse's commitment, which included plans to finish both reactors by the end of 2020.

[…]

"The key for SCANA in all of this is continuing to gain the support of regulators and ratepayers," said Travis Miller, […] "For shareholders, the key

---

[437] "Scana Corp. and Southern Co. Investors Should Not Fret Toshiba's Woes...Yet," *Morningstar Equity Research*, February 15, 2017.

[438] "Flash Comment: Energy and Utility Daily," *Wells Fargo Securities*, February 15, 2017.

[439] "Just How Far Can It Go?" *UBS*, February 15, 2017.

149

issue is that SCANA completes the project and produces the earnings growth that management is projecting based on the project."[440]

301. In response to this news, on February 15, 2017, my event study demonstrates the market price of SCANA Common Stock increased by 1.23% ($0.82 per share) after controlling for market and industry effects. This abnormal price increase is statistically significant beyond the 95% confidence level with a t-statistic of 2.58. Therefore, I conclude that $0.82 per share of artificial inflation re-entered the price of SCANA Common Stock on February 15, 2017.

302. I carefully evaluated whether there was any other news outside of the above information that could explain the observed SCANA Common Stock price increase on February 15, 2017, and I found no such confounding information. As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price increase on February 15, 2017. Thus, I attribute $0.82 per share of the abnormal dollar increase to the above information and estimate that $0.82 of artificial inflation was introduced to SCANA Common Stock on February 15, 2017.

303. If Plaintiff's allegations regarding Deloitte's failure to properly assess SCANA's financial statements and internal controls are accurate, then the announcement of Westinghouse's revised project timeline and Toshiba's commitment to completing the Nuclear Project is inflation-creating because the announcements eased the market's concerns about the financial viability of the Nuclear Project. Therefore, SCANA's stock price was artificially inflated further by this information that reassured the market of Deloitte's supposed ability to properly assess SCANA's financial reporting. The market remained unaware of the true impact of Deloitte's lack of effective internal controls, which should have flagged deadlines for the Nuclear Project as improbable and indicated

---

[440] "SCE&G to discuss reactors, announce earnings Thursday; detractors will protest at the State House," *The State*, February 15, 2017.

150

that the Nuclear Project would not be completed in time to obtain Nuclear Tax Credits. Deloitte's

inaction eventually led to regulatory investigations and SCANA being unable to recoup costs

associated with the Nuclear Project. As a result, the information released on February 15, 2017,

represents a maintenance of the alleged fraud, keeping SCANA Common Stock artificially inflated.

### C. JULY 31, 2017 to AUGUST 1, 2017

304. Then, during market hours on July 31, 2017, SCANA announced that it would abandon

the Nuclear Project because completion would materially exceed prior cost estimates and left the

Company open to additional risks:

> This decision was reached by SCE&G after considering the additional costs to complete the Units, the uncertainty regarding the availability of production tax credits for the project, the amount of anticipated guaranty settlement payments from Toshiba Corporation (Toshiba), and other matters associated with continuing construction, including the decision of the co-owner of the project, the South Carolina Public Service Authority (Santee Cooper), the state owned electric utility, to suspend construction of the project. Based on these factors, SCE&G concluded that it would not be in the best interest of its customers and other stakeholders to continue construction of the project.[441]

305. SCANA further explained that "completion of both Units would be prohibitively

expensive" and that the "units could not be brought online until after" January 1, 2021, which

implied the Company would not qualify for the Nuclear Tax Credits.[442] However, SCANA assured

investors that, under the BLRA, the Company would be able to recoup costs of the Nuclear Project:

> In accordance with the BLRA, we will seek an amortization of the project costs and a return at the weighted average cost of capital on the unamortized balance until fully recovered. We plan to use the anticipated proceeds from the Toshiba settlement and benefits derived from tax deductions to mitigate rate increases and lessen the impact on our customers for several years.[443]

---

[441] "South Carolina Electric & Gas Company to Cease Construction And Will File Plan of Abandonment of The New Nuclear Project," *PR Newswire*, July 31, 2017, 1:00 PM.

[442] *Id.*

[443] *Id.*

306.  Santee Cooper, the minority owner in the Nuclear Project, estimated the total cost of the finished facility in 2024 would rise to approximately $25.7 billion – more than twice the initial projection of $11.5 billion.[444]  Spurred on by these figures, Santee Cooper's board of directors voted to halt construction, prompting SCANA to follow shortly afterwards.[445]

307.  Management added additional color to this decision on a conference call after trading had closed on July 31, 2017.  CEO Marsh said:

> As you all aware, the Westinghouse bankruptcy will move the benefits and protection of the fixed price option. This call SCANA and our project co-owner, Santee Cooper, to reevaluate the entire new nuclear project from all perspectives. To accomplish this task, we formed review teams supported by external consulting firms and industry experts. This team conducted a thorough evaluation of the calls and completion schedules for the new units. Our evaluation process included recomputing the required units of labor and construction commodities needed to complete construction of the nuclear units and creating models, developing staffing plans and scrutinizing available information to fully multiple planning scenarios and arrive at the most prudent decision.
>
> […]
>
> While we were still evaluating the viability of this option [completing Unit and abandoning Unit 3], senior management of Santee Cooper informed us that they're evaluating results, and the likelihood that their board would approve a plan to suspend construction of Units 2 and 3. As noted in our press release, the Santee board approved that plan today. Santee's decision to suspend construction of the project may further analysis of this alternative unnecessary, as SCE&G concluded it will not be in the best interest of its customers and other stakeholders to continue construction of the project on its own. In an effort to consider all possible avenues, we reached out to other potential partners and pursued governmental support. These are those efforts that's been successful. As a result, SCE&G will cease construction of both new nuclear units. Additionally, we will conduct and allow ex parte communication briefing with the Public Service Commission of South Carolina tomorrow and file a petition to seek recovery of the project costs under the abandonment provisions of the Baseload Review Act.

---

[444] "Scana Abandons Nuclear-Site Plans," *The Wall Street Journal*, August 1, 2017.

[445] *Id.*

> Abandoning the project is always been our least desired option because of the long-term hedge, the new nuclear generation provided our customers against carbon legislation or regulation, and volatility, and natural gas prices.[446]

308.    In light of this, analysts appeared confident in SCANA's ability to recoup costs from the Nuclear Project under the BLRA. Wells Fargo analysts reiterated management's belief in the BLRA:

> SCG announced plans to stop new nuclear development (NND) construction and seek abandonment recovery of the stranded investment in accordance with SC's Base Load Review Act (BLRA). In addition, mgmt affirmed the 3-5-yr 4-6% EPS CAGR off the $3.97 weather-normalized '16 EPS base. The CAGR implies '18 & '19 EPS guidance ranges of roughly $4.30-4.45 & $4.45-4.75. We are encouraged by SCG's initial comments on the post-abandonment EPS outlook while fully acknowledging the uncertainty around recovery. That said, we continue to believe the BLRA affords SCG strong legal protections and that SC is a generally reasonable state from a political/regulatory standpoint.[447]

309.    Guggenheim analysts stated that "[w]e already noted SCG was tilting toward the abandonment route; what was really introduced this afternoon was share buy-backs, which management expects will allow SCG to maintain a 4-6% growth trajectory."[448]  Analysts optimistically viewed the recovery from abandonment:

> At the end of the day, management described a relatively constructive path forward for recovery of (and return on) capital associated with V.C. Summer nuclear construction, premised upon SC's BLRA, which we acknowledge set the most constructive regulatory/policy back-drop in support of nuclear construction that we've seen, although as the abandonment plan has yet to be filed with regulators (SCG plans to update regulators tomorrow), we look forward to reactions from regulators and policy-makers whom management acknowledged were disappointed with the decision to abandon construction. We would also note that while we recognize the solid regulatory/legislative framework for cost recovery provided by the BLRA, we have less experience ascertaining the quality of earnings power that would be derived from a ratebase comprised of such a large "regulatory asset" (i.e., stranded costs

---

[446] "Special Call," *S&P Capital IQ*, July 31, 2017, 5:00 PM.

[447] "SCG: Abandonment Officially The Path Forward," *Wells Fargo Securities*, July 31, 2017.

[448] "SCG – We Both Made a Tough Call – Walking Away from Nuclear, But Still Loose Ends to Tie; Regulatory Execution Key," *Guggenheim*, July 31, 2017.

associated with abandoned investments in new nuclear units at V.C. Summer).[449]

310. On August 1, 2017, prior to SCANA's scheduled meeting with the PSC, analysts reported on the news from the day prior. Analysts at Barclays updated their stock rating from Equal Weight to Overweight with the belief that SCANA's risk premium following the news of abandonment was reduced:

> We have an Overweight rating on SCG because the company is meaningfully growing rate base and earnings, and we believe the likely outcome of the new nuclear abandonment filing, inclusive of share buybacks, maintains the company's 4%-6% EPS growth rate over the next 3-5 yrs at materially lower risk than moving forward with the project.[450]

311. Morgan Stanley analysts maintained their "Underweight" valuation, believing that there was a significant downside to the stock:

> Yesterday SCANA announced that it would abandon the construction of its VC Summer nuclear plant. The company determined that its estimate of additional costs, uncertainty around production tax credits, and the decision by partner Santee Cooper to exit the project would make it uneconomical to complete. We are shifting our valuation to reflect our prior bear case assumptions: the financial impact of abandoning the project and protecting ratepayers through securitization of costs spent to date. We are lowering our PT to $58 from $67 and remaining UW on the stock. We continue to see the risk-reward skewed unfavorably given several scenarios that could lead to significant downside in the stock.[451]

312. At 10:05 AM on August 1, 2017, SCANA executives held a briefing on SCANA's plan going forward to recover their losses from the Nuclear Project. SCE&G COO Byrne told the PSC that SCANA officials were unaware of Toshiba's financial problems until the December 2016 announcement, stating:

> I think we probably should point out that we thought – like I think everybody in this room thought – in October, when we negotiated our fixed-price option, that we had largely resolved the issues with costs. We brought that before this

---

[449] *Id.*

[450] "Summer Isn't Coming; Upgrading to Overweight on Nuclear Abandonment," *Barclays*, August 1, 2017.

[451] "Bear Case Playing Out, and Risks Remain High in Abandonment; Lower PT, Remain UW," *Morgan Stanley*, August 1, 2017.

154

Commission, and this Commission approved it in November. Within about six weeks, we got a call from Westinghouse saying, "Toshiba is going to have a press conference tomorrow. You might want to listen in." We listened in on that press conference intently, and that's the first time that they indicated that Toshiba had a huge financial liability issue on finishing the cost of our project and the Vogtle project in Georgia. When they entered into bankruptcy, it nullified the benefit of our fixed-price contract. So that is really what drove us here.[452]

313.   CEO Marsh stated that following the Westinghouse bankruptcy, the Company's internal analysis of the state of affairs pushed them towards abandonment:

SCE&G's evaluation team arrived at substantial completion dates for Unit 2 of December 31, 2022, and for Unit 3 of March 31, 2025… Our evaluation team arrived at a forecasted cost at completion of the units of approximately \$8.8 billion. This amount is net of the estimated \$1.1 billion value of the Toshiba settlement payments. Here, too, in a project of this complexity, there's an important element of risk surrounding forecasts of estimated costs of completion. Our team evaluated the option of completing Unit 2 and abandoning Unit 3. The cost of that option would be approximately \$7.1 billion. This amount is also net of the estimated \$1.1 billion value of the Toshiba settlement payments. All of these cost forecasts include the additional owner's costs SCE&G would anticipate incurring by assuming a broader scope of responsibility for directing the project and as a result of the extensions in the substantial completion dates for the units. The resulting estimated costs to complete both units is approximately \$2.2 billion more than the comparable costs, as approved in Order 2016-794. This increase in costs was approximately three times the estimate of the additional costs to complete the units that Westinghouse had provided SCE&G at the time of bankruptcy filing. Net of the parental guaranty, the resulting increase is \$1.1 billion.[453]

314.   During the hearing, the PSC Commissioners, including Chairman Whitfield, harshly criticized SCANA and its executives:

Thank you, Mr. Addison. I'm going to break with tradition once again, and I'm going to use a little judicial privilege and go first. Some of my fellow Commissioners encouraged me to do that, and I'm going to do that. And I'll start by saying: I'm from Fairfield County, and it's a grim day. Mr. Marsh, Mr. Byrne, Mr. Addison, even your harshest critics have called it a sad day for the State of South Carolina and for Fairfield County. I'm going to go a little further and say that public trust is at stake here, folks. Act 175 demanded and required that. And you know the ethics rules and the Judicial Code, South Carolina

---

[452] "Allowable Ex Parte Briefing – ND-2017-12-E," *Public Service Commission of South Carolina*, August 1, 2017, 10:05 AM.

[453] *Id.*

Ethics Commission law prohibits communication, and we've all abided by that, as have you, the company, and other parties. However, are the three of you aware that this Commission was blindsided yesterday by this news?[454]

315.  Commissioner Elam questioned SCANA management's pacing of the Nuclear Project:

Over the course of this project, we've seen completion dates that seems to slip exponentially—for lack of a better word. And when we were talking about increase of costs, they seemed to slip from—well, it's, you know, a couple hundred million more than we thought it was going to be, and then it started slipping by billions. Not for one minute do I believe that an initial estimate of something this complicated would not have had some cost overruns, but what I'm trying to understand is why it seemed to get worse as we went along. What element of the construction is causing the slowdown to seemingly get slower as we go?[455]

316.  In response, SCANA executives deflected blame to Westinghouse during the hearing.

For example, SCE&G COO Byrne stated:

The cause of the major delays, I would say, are a couple-fold. We did have some regulatory delays upfront, disagreements between the regulator and Westinghouse on code compliance type issues. And without arguing about who is right or wrong, if the regulator says you're wrong, then you're wrong. So we had to change things to accommodate that regulatory review. The supply chain was probably the biggest issue we've had to date, particularly with supply of modules. So the modular construction techniques – the same way they build aircraft carriers and nuclear submarines – is a great idea, but if the modules aren't there when you need them, that becomes a problem. And the supply chain was letting us down, where Westinghouse, again, was responsible for that supply chain.

[…]

The underestimation by the contractors previously has been a problem. The supply chain let them down, and a couple of regulatory arguments with the Nuclear Regulatory Commission requests. Those are the drivers, the key drivers, for the delay.[456]

317.  The reactions from regulatory bodies were within analysts' expectations.  Wells Fargo analysts thought the dialogue was "pragmatic" and expected that "SCG and key parties in the state

---

[454] *Id.*

[455] *Id.*

[456] *Id.*

156

will be able to negotiate a constructive settlement that will be palatable to the PSC."[457]  Similarly, Barclays analysts saw "regulatory risk as being an overhang to performance, but overall an acceptable settlement or ruling from the commission moving the stock to fair value."[458]

318.  On July 31, 2017, my event study demonstrates the market price of SCANA Common Stock increased by 4.72% ($2.89 per share) after controlling for market and industry effects.  This abnormal price increase is statistically significant beyond the 95% confidence level with a t-statistic of 7.27.  On August 1, 2017, my event study demonstrates the market price of SCANA Common Stock increased by 4.51% ($2.91 per share) after controlling for market and industry effects.  This abnormal price increase is statistically significant beyond the 95% confidence level with a t-statistic of 6.93.  When I consider the two-day window, the market price of SCANA rose by 9.45% or $5.80 per share, after controlling for market and industry factors.  This increase is statistically significant at beyond the 95% confidence level with a t-statistic of 10.27.

319.  I carefully evaluated whether there was any other news outside of the above information that could explain the observed SCANA Common Stock price increase over the window of July 31, 2017 to August 1, 2017, and I found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price increase over the window of July 31, 2017 to August 1, 2017.  Thus, I attribute $5.80 per share of the abnormal dollar increase to the above information and estimate that $5.80 of artificial inflation was introduced to SCANA Common Stock over the two-day window of July 31, 2017, and August 1, 2017.[459]

---

[457] "SCG: Takeaways From SCG's Ex Parte Meeting with the SC PSC," *Wells Fargo Securities*, August 2, 2017.

[458] "Ex Parte Transcript; 2Q '17 Results," *Barclays*, August 3, 2017.

[459] Specifically, I estimate that $2.89 and $2.91 of artificial inflation per share was introduced into the price of SCANA Common Stock on July 31, 2017 and August 1, 2017, respectively.

320.   This announcement has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project.  Thus, the information contained in the announcement is inflation-creating because this signaled that SCANA could stop spending money on the Nuclear Project and could recoup costs under the BLRA and SCANA's stock price was artificially inflated further by this information.  As a result, the information released in the July 31, 2017 and August 1, 2017 window represents a maintenance of the alleged fraud, keeping SCANA Common Stock artificially inflated.

## D.   AUGUST 14, 2017

321.   Through the weekend of August 12, 2017 through August 13, 2017 and on August 14, 2017 (the market day following the alleged Corrective Disclosure Event on August 11, 2017 (*see* **Section VII.J**)), news about SCANA and the Nuclear Project continued.  Two analysts published reports with a positive outlook for the Company, with Wells Fargo maintaining its outperform rating and Morningstar viewing SCANA as a buying opportunity.  Particularly, Wells Fargo predicted SCANA would obtain a "constructive settlement":

> At the end of the day, we think the most likely outcome is a deliberate abandonment (regulatory) process that ultimately ends with a constructive settlement negotiated between SCG and key parties, including the Office of Regulatory Staff (ORS). As such, we maintain our Outperform rating and $77 price target (represents a 5-10% discount to the '18 Regulated Electric P/E on our 19E EPS of $4.35.[460]
>
> We think the swoon in Scana's stock offers a buying opportunity below $58 per share. The stock finished this week below our fair value estimate for the first time since mid-2015 after giving up the 10% rally that briefly followed its abandonment decision. Scana is down more than 17% year to date, while the Morningstar U.S. utilities index is up 11%, excluding dividends. Despite

---

[460] "SCG: Beyond The Negative Headlines – Part 2," *Wells Fargo Securities*, August 13, 2017.

the political rhetoric, we think shareholders are in a good position. Our fair value estimate assumes shareholders lose $400 million pretax, or $1 per share after tax, based on a variety of scenarios. Our worst-case scenarios contemplate about $2 billion, or $14 per share, of lost value. This implies a $54 per share worst-case stock value using a 16 times forward P/E for its core businesses.[461]

322.   News articles reported on both SCANA's discontinuation of its rate hike plans and the resulting Wells Fargo report, further indicating that the market believed that SCANA would be able to recoup costs and obtain a settlement following its abandonment of the Nuclear Project.

Santee Cooper in June proposed rate increases at an average of 3.7% across all customer classes. Those rate increases, which would take effect in April 2018 and April 2019, were required to meet additional expenses tied to the nuclear project, according to the state-owned utility. SCE&G plans to seek a rate hike to recover about $4.9 billion in capital costs tied to V.C. Summer, which it would amortize over 60 years. A $2.17 billion guaranteed payment from Toshiba to SCE&G and Santee Cooper is expected to help offset V.C. Summer costs.[462]

Scana still likely to obtain 'constructive' settlement, says Wells Fargo Wells Fargo notes that Scana's stock has dropped 11% in the past week amid an increased backlash against its decision to abandon a nuclear energy project in South Carolina. However, the firm still expects the company to obtain "a constructive settlement" of the project that ratifies its abandonment of the deal. Wells keeps an Outperform rating on the stock.[463]

323.   On August 14, 2017, my event study demonstrates the market price of SCANA Common Stock increased by 1.32% ($0.80 per share) after controlling for market and industry effects.  This abnormal price decrease is statistically significant beyond the 95% confidence level with a t-statistic of 2.02.

324.   I carefully evaluated whether there was any other news outside of the above information that could explain the observed SCANA Common Stock price increase on August 14,

---

[461] "Political Rhetoric Around Nuclear Power Heating Up; Scana Approaches Buy Territory," *Morningstar Equity Research*, August 14, 2017.

[462] "Santee Cooper drops planned rate hikes following nuke abandonment," *SNL Energy Finance Daily*, August 14, 2017.

[463] "SCG: Scana still likely to obtain 'constructive' settlement," *The Fly via Bloomberg*, August 14, 2017, 8:09 AM.

2017, and I found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price increase on August 14, 2017.  Thus, I attribute $0.80 per share of the abnormal dollar increase to the above information and estimate that $0.80 of artificial inflation was introduced to SCANA Common Stock August 14, 2017.

325.   This announcement has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the true status of the Nuclear Project, including its substantial delays, cost overruns, and the unlikelihood of its completion in time to receive Nuclear Tax Credits, which led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project.  Thus, the information contained in the Wells Fargo Report is inflation-creating because it signaled that SCANA could stop spending money on the Nuclear Project and could recoup costs.  SCANA's stock price was artificially inflated further by this information.  As a result, the information released on August 14, 2017, represents a maintenance of the alleged fraud, keeping SCANA Common Stock artificially inflated.

**E.   NOVEMBER 9, 2017**

326.   During market hours on November 9, 2017, the PSC commissioners questioned SCE&G about its petition for a settlement agreement with the ORS, among other parties in South Carolina, a request that had been announced after trading hours on September 1, 2016.[464]  News outlets, specifically The State, reported on the discussions that came from the hearing, including the request to cease maintenance of the Nuclear Project:

> SCANA will stop maintaining its V.C. Summer nuclear construction site by year's end as the utility tries to collect $2 billion in tax breaks. Company officials say their push to abandon the site and surrender its much-coveted

---

[464] This event on September 1, 2016, is described above.  *See* **Section VIII.A**.

160

federal license will help customers by defraying the costs of the failed nuclear project. But the company's moves also are significant because they could determine how easy - or hard - it might be for another utility to one day complete the project. Failing to maintain equipment would make cranking the project up more difficult in the future. Federal nuclear licenses also are hard to obtain, taking years to secure for any utility that might be interested in completing the two reactors. Many critics doubt the project ever will be completed, noting public statements of disinterest in the botched V.C. Summer expansion by other major utilities, including Charlotte-based Duke Energy. SCE&G's plans, revealed Thursday, provide the most concrete evidence to date of how serious the utility is about never completing two new V.C. Summer reactors. SCANA laid out its plans during its first meeting with the S.C Public Service Commission since Aug. 1, the day after the company abandoned the V.C. Summer project.

"Site preservation is not in the best interest of our customers," outgoing chief operating officer Steve Byrne said. "The abandonment does bring with it a tax deduction that represents a large benefit to our customers." Winding down the project would help make the case to the Internal Revenue Service that SCANA deserves the tax break, officials said. The utility will notify the Nuclear Regulatory Commission by Dec. 15 "that we're going to terminate that license," general manager Todd Johnson said. SCANA's plans sparked questions from PSC members, as well as interest groups. Many wanted to know whether the utility actually would get the $2 billion tax break it says is so important.[465]

SCE&G has begun breaking down huge construction cranes as it moves to abandon the failed V.C. Summer nuclear construction site by the end of this year. Taking down the cranes is part of final company activities on the property, SCE&G officials told the state Public Service Commission during a meeting Thursday in Columbia. […] The V.C. Summer nuclear site is being shut down by SCE&G and partner Santee Cooper after the companies spent $9 billion on the effort over a decade. The companies agreed July 31 to quit the project, leaving 5,000 people out of work. Customers were irate because they had been charged $1.7 billion for the work.[466]

327.  In response to this news, on November 9, 2017, my event study demonstrates that the market price of SCANA Common Stock increased by 3.32% ($1.43 per share) after controlling for market and industry effects.  This abnormal price increase is statistically significant beyond the 95% confidence level with a t-statistic of 3.35.

---

[465] "SCANA seeks $2 billion in tax breaks for abandoning failed nukes," *The State*, November 9, 2017.

[466] "Massive cranes coming down as nuke project goes silent," *The State*, November 9, 2017.

328.   I carefully evaluated whether there was any other news outside of the above information that could explain the observed SCANA Common Stock price increase on November 9, 2017, and I found no such confounding information.  As a result of the foregoing, and assuming that Plaintiff proves that Defendants recklessly or intentionally made material misstatements or omissions, I find no economic evidence of information unrelated to Plaintiff's claims that needs to be disaggregated from the price increase on November 9, 2017.  Thus, I attribute $1.43 per share of the abnormal dollar increase to the above information and estimate that $1.43 of artificial inflation was introduced to SCANA Common Stock on November 9, 2017.

329.   If Plaintiff's allegations regarding Deloitte's failure to properly assess SCANA's financial statements and internal controls are accurate, then the announcement of SCANA's intent to cease maintenance of the Nuclear Project by end of 2017 is inflation-creating because the market received clear indication from the Company about its lack of commitment to the Nuclear Project.  Therefore, SCANA's stock price was artificially inflated further by this information that reassured the market of Deloitte's supposed ability to properly assess SCANA's financial reporting.  The market remained unaware of the true impact of Deloitte's lack of effective internal controls, which should have flagged deadlines for the Nuclear Project as improbable and indicated that the Nuclear Project would not be completed in time to obtain Nuclear Tax Credits.  Deloitte's inaction eventually led to regulatory investigations and SCANA being unable to recoup costs associated with the Nuclear Project.  As a result, the information released on November 9, 2017, represents a maintenance of the alleged fraud, keeping SCANA Common Stock artificially inflated.

## IX.   ARTIFICIAL INFLATION PER SHARE AND DAMAGES FOR SCANA COMMON STOCK

### A.   ARTIFICIAL INFLATION PER SHARE

330.   The analysis in **Section VII** quantifies the artificial inflation dissipated from the price of SCANA Common Stock on the Corrective Disclosure Events and the analysis in **Section VIII**

quantifies the artificial inflation introduced into the price of SCANA Common Stock on the Inflation

Creating Events.  This is summarized below in **Table A**:

Table A
SCANA Common Stock
Artificial Inflation per Share Dissipated and Introduced

| Date | Artificial Inflation Per Share Dissipated |
|---|---|
| December 27, 2016 | $0.33 |
| December 28, 2016 | $0.87 |
| January 19, 2017 | $0.74 |
| January 31, 2017 | $0.60 |
| February 14, 2017 | $2.68 |
| February 17, 2017 | $1.73 |
| March 22, 2017 | $0.80 |
| March 23, 2017 | $0.86 |
| July 28, 2017 | $4.30 |
| August 4, 2017 | $1.35 |
| August 10, 2017 | $0.90 |
| August 11, 2017 | $0.87 |
| September 7, 2017 | $0.90 |
| September 21, 2017 | $0.50 |
| September 22, 2017 | $1.50 |
| September 27, 2017 | $3.60 |
| September 29, 2017 | $2.43 |
| October 19, 2017 | $0.88 |
| October 27, 2017 | $1.63 |
| October 31, 2017 | $2.75 |
| November 24, 2017 | $1.66 |
| December 21, 2017 | $3.71 |
| **Total** | **$35.59** |

| Date | Artificial Inflation Per Share Introduced |
|---|---|
| September 2, 2016 | $0.71 |
| February 15, 2017 | $0.82 |
| July 31, 2017 | $2.89 |
| August 1, 2017 | $2.91 |
| August 14, 2017 | $0.80 |
| October 26, 2017 | $0.32 |
| November 9, 2017 | $1.43 |
| **Total** | **$9.88** |

331.  However, these analyses do not establish how artificial inflation evolved over the Class

Period.  One standard method commonly relied upon to evaluate the level of artificial inflation in a

163

stock price is the "constant dollar" method.[467]  This method assumes that the amount of artificial inflation dissipated from the stock price on the Corrective Disclosure Events was present in the stock price going back to the beginning of the Class Period (adjusted for any days on which artificial inflation was introduced).  Put another way, this means that barring an intervening event that is related to the fraud (*i.e.*, a Corrective Disclosure Event or an Inflation Creating Event), the artificial inflation per share on day *t-1* is the same as the artificial inflation on day *t*.  I note that the constant dollar methodology is used by a wide variety of experts in matters such as this, and in my experience, is often advocated by defense experts.[468]

332.    Based on my understanding of Plaintiff's allegations, coupled with my review of the documents and information identified in **Appendix B**, I conclude that constant dollar inflation is appropriate in this matter.  My opinion is based on the fact that the nature of the misrepresented and/or omitted information did not change during the Class Period.  I understand that Plaintiff expects to prove that, as of the start of the Class Period, Defendants knew, or recklessly disregarded, that SCANA did not have a reliable, fully resource-loaded integrated schedule that supported the GSCDs and that SCANA would be unable to recoup losses from or to obtain Nuclear Tax Credits for the Nuclear Project and yet, Defendants continued to issue clean audit reports – and concealed these issues from investors.  Additionally, Defendants' misstatements allegedly concealed that (1) the Nuclear Project would experience cost overruns; (2) the Nuclear Project would subject SCANA to investigations and regulatory actions; and (3) SCANA would be unable to recoup its billions of dollars in costs under the BLRA.  Plaintiff alleges that by the start of the Class Period, Defendants had ignored highly credible allegations from a whistleblower that the Nuclear Project would not be completed in time to qualify for the Nuclear Tax Credits and that SCANA was lying to and not being

---

[467] *See e.g.*, Jeff G. Hammel & B. John Casey, 2009, "Sizing Securities Fraud Damages: 'Constant Percentage' on Way Out?" *New York Law Journal*, available at https://www.law.com/newyorklawjournal/almID/1202427590818/.
[468] *Id.*

transparent with its regulators regarding the status of the Nuclear Project.[469]  Furthermore, Plaintiff alleges that by the start of the Class Period, Defendants had ignored various internal SCANA documents and presentations which demonstrated the Nuclear Project would not be completed on time.[470]

333.  As a result of the foregoing, I find no economic reason to believe that the financial impact of the misstatements and/or omissions would have been any different earlier in the Class Period and, thus, I find no economic reason to deviate from the standard constant dollar methodology.  In my view, the most widely accepted and reliable proxy for evaluating how the market would have reacted to a disclosure of the relevant truth at the beginning of the Class Period is to rely upon the abnormal market price decline observed upon the later disclosure of such information.[471]  I also consider the Inflation Creating Events, where information was released that bolstered the market's confidence in SCANA's ability to complete the Nuclear Project prior to the Nuclear Tax Credit deadline and provided the market with optimism about the viability of recovering costs under the BLRA, the true status of which would have already been understood but for Deloitte's issuance of clean audit reports that misled investors and therefore logically introduced a portion of the artificial inflation in the share price of SCANA Common Stock.[472]  In other words, I

---

[469] Complaint ¶¶ 422-427.

[470] Complaint ¶ 271.

[471] See *e.g.*, David I. Tabak & Frederick C. Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, In Litigation Services Handbook, The Role of the Financial Expert, John Wiley & Sons, Third Edition, 2001, at p. 3 ("Event studies can also measure the size of a stock price movement as the basis for a damages calculation. For example, in cases of securities fraud, experts commonly measure changes in the alleged inflation in a stock price by the movement in that stock price in the wake of a corrective disclosure, after controlling for market, industry, and other company-specific influences. This results from the disclosure's removing the inflation, and an event study measures the change in inflation in the stock at the time of the disclosure. Often, courts find that this is the best estimate of the inflation per share if the defendant had a duty to disclose the same information that the corrective disclosure revealed. As a result, an event study is a common method that serves as the basis for quantifying damages in securities fraud cases.") (citations omitted); *Id*. at p. 19 ("[E]vent studies can be useful in quantifying damages in cases ranging from securities fraud to other commercial litigation requiring the calculation of lost profits. In some areas, such as securities fraud, stock price reactions are already a standard method for quantifying damages").

[472] *See* **Section VIII**.

also consider the possibility that some of the artificial inflation that was dissipated from the share price of SCANA Common Stock on the Corrective Disclosure Events did not extend all the way back to the beginning of the Class Period, and therefore *reduce* the artificial inflation prior to the Inflation Creating Events.  This is a conservative assumption.

334.   By applying the constant dollar methodology described above and taking the analyses of the Corrective Disclosure Events and the Inflation Creating Events into account, **Table B** below summarizes how the total artificial inflation per share for SCANA Common Stock evolved during the Class Period:

**Table B**
**Corrected Daily Inflation Table**
**SCANA Common Stock**
**Artificial Inflation per Share During the Class Period**

| Date Range | Artificial Inflation Per Share |
|---|---|
| February 26, 2016 - September 1, 2016 | $25.71 |
| September 2, 2016 - December 26, 2016 | $26.42 |
| December 27, 2016 | $26.09 |
| December 28, 2016 - January 18, 2017 | $25.22 |
| January 19, 2017 - January 30, 2017 | $24.48 |
| January 31, 2017 - February 13, 2017 | $23.88 |
| February 14, 2017 | $21.20 |
| February 15, 2017 - February 16, 2017 | $22.02 |
| February 17, 2017 - March 21, 2017 | $20.29 |
| March 22, 2017 | $19.49 |
| March 23, 2017 - July 27, 2017 | $18.63 |
| July 28, 2017 - July 30, 2017 | $14.33 |
| July 31, 2017 | $17.22 |
| August 1, 2017 - August 3, 2017 | $20.13 |
| August 4, 2017 - August 9, 2017 | $18.78 |
| August 10, 2017 | $17.88 |
| August 11, 2017 - August 13, 2017 | $17.01 |
| August 14, 2017 - September 6, 2017 | $17.81 |
| September 7, 2017 - September 20, 2017 | $16.91 |
| September 21, 2017 | $16.41 |
| September 22, 2017 - September 26, 2017 | $14.91 |
| September 27, 2017 - September 28, 2017 | $11.31 |
| September 29, 2017 - October 18, 2017 | $8.88 |
| October 19, 2017 - October 25, 2017 | $8.00 |
| October 26, 2017 | $8.32 |
| October 27, 2017 - October 30, 2017 | $6.69 |
| October 31, 2017 - November 8, 2017 | $3.94 |
| November 9, 2017 - November 23, 2017 | $5.37 |
| November 24, 2017 - December 20, 2017 | $3.71 |

## B.    DAMAGES

335.    The standard and well-settled formula for assessing damages for each Class member under Section 10(b) is the "out-of-pocket" methodology.  This methodology measures damages as the artificial inflation per share at the time of purchase less the artificial inflation per share at the time

167

of sale (or the artificial inflation at the time of purchase if the share was not ultimately sold). If the security was sold at a time before any of the artificial inflation had dissipated – that is, prior to the first Corrective Disclosure Event, which in this case is December 27, 2016—then there are no damages. However, if the share was purchased after alleged misstatements and/or omissions were made and then sold after the artificial inflation was dissipated, then damages would be equal to the artificial inflation at the time of purchase minus the artificial inflation at the time of sale.

336. For example, assume that Investor A purchased a share of SCANA Common Stock March 27, 2017, and sold it on July 30, 2017. As shown in **Table B**, there was $18.63 of artificial inflation in the price of SCANA Common Stock at the time of purchase and $14.33 of artificial inflation in the price of SCANA Common Stock at the time of sale. Thus, Investor A's damages on the share of SCANA Common Stock would be equal to $4.30 ($18.63 – $14.33).

337. In addition, the calculation of damages incorporates the application of a statutory cap on recovery in federal securities cases brought under Section 10b and Rule 10(b)-5 (*i.e.*, the 90-day lookback provision of the Private Securities Litigation Reform Act of 1995 codified at 15 U.S.C. §78u–4(e)(1)). The limitation provides that damages calculated on SCANA Common Stock purchased during the Class Period and sold during the 90-day lookback period cannot exceed the difference between the purchase price paid during the Class Period and the average closing price from date of the last corrective disclosure to the date of sale. **Table C** below shows the 90-day lookback price for SCANA Common Stock for each day starting on December 21, 2017, the last Corrective Disclosure Event.

338. For example, if Investor A purchased a share of SCANA Common Stock for $50.00 and then sold that share on January 12, 2018, during the 90-day lookback period, when the average closing price from December 21, 2017 through January 12, 2018 was $42.37 as shown in **Table C**, then Investor A's damages could not exceed $7.63 ($50.00 – $42.37) per share under the 90-day lookback provision. Furthermore, SCANA Common Stock purchased during the Class Period and

either never sold or sold after the 90-day lookback period cannot have per share damages that exceed the difference between the purchase price paid and the average price of SCANA Common Stock during the 90-day lookback period, which is $40.29 as shown in the last row in **Table C** below.

Table C
SCANA Common Stock Closing Price and Average Closing Price
December 21, 2017 - March 20, 2018

| Date | Closing Price | Average Closing Price Between December 21, 2017 and Date Shown | Date | Closing Price | Average Closing Price Between December 21, 2017 and Date Shown |
|---|---|---|---|---|---|
| 12/21/2017 | $37.39 | $37.39 | 2/6/2018 | $37.62 | $41.77 |
| 12/22/2017 | $39.01 | $38.20 | 2/7/2018 | $36.66 | $41.61 |
| 12/26/2017 | $39.09 | $38.50 | 2/8/2018 | $35.60 | $41.43 |
| 12/27/2017 | $39.48 | $38.74 | 2/9/2018 | $36.30 | $41.28 |
| 12/28/2017 | $39.72 | $38.94 | 2/12/2018 | $35.66 | $41.11 |
| 12/29/2017 | $39.78 | $39.08 | 2/13/2018 | $36.02 | $40.97 |
| 1/2/2018 | $38.87 | $39.05 | 2/14/2018 | $36.48 | $40.85 |
| 1/3/2018 | $47.65 | $40.12 | 2/15/2018 | $37.21 | $40.76 |
| 1/4/2018 | $46.33 | $40.81 | 2/16/2018 | $37.71 | $40.68 |
| 1/5/2018 | $45.02 | $41.23 | 2/20/2018 | $36.94 | $40.58 |
| 1/8/2018 | $45.52 | $41.62 | 2/21/2018 | $36.29 | $40.48 |
| 1/9/2018 | $44.80 | $41.89 | 2/22/2018 | $39.93 | $40.47 |
| 1/10/2018 | $44.26 | $42.07 | 2/23/2018 | $39.29 | $40.44 |
| 1/11/2018 | $44.51 | $42.25 | 2/26/2018 | $39.98 | $40.43 |
| 1/12/2018 | $44.05 | $42.37 | 2/27/2018 | $39.93 | $40.42 |
| 1/16/2018 | $42.31 | $42.36 | 2/28/2018 | $39.67 | $40.40 |
| 1/17/2018 | $42.53 | $42.37 | 3/1/2018 | $39.76 | $40.39 |
| 1/18/2018 | $42.47 | $42.38 | 3/2/2018 | $39.65 | $40.37 |
| 1/19/2018 | $43.35 | $42.43 | 3/5/2018 | $40.73 | $40.38 |
| 1/22/2018 | $43.36 | $42.48 | 3/6/2018 | $40.96 | $40.39 |
| 1/23/2018 | $41.16 | $42.41 | 3/7/2018 | $41.64 | $40.42 |
| 1/24/2018 | $40.72 | $42.34 | 3/8/2018 | $41.20 | $40.43 |
| 1/25/2018 | $42.00 | $42.32 | 3/9/2018 | $39.13 | $40.41 |
| 1/26/2018 | $43.43 | $42.37 | 3/12/2018 | $39.08 | $40.38 |
| 1/29/2018 | $43.31 | $42.40 | 3/13/2018 | $39.00 | $40.36 |
| 1/30/2018 | $40.74 | $42.34 | 3/14/2018 | $39.42 | $40.34 |
| 1/31/2018 | $40.64 | $42.28 | 3/15/2018 | $40.38 | $40.34 |
| 2/1/2018 | $39.07 | $42.16 | 3/16/2018 | $40.21 | $40.34 |
| 2/2/2018 | $39.17 | $42.06 | 3/19/2018 | $39.12 | $40.32 |
| 2/5/2018 | $37.44 | $41.91 | 3/20/2018 | $38.68 | $40.29 |

169

## C. ADAPTATION TO ALTERNATIVE FINDINGS

339. The damages methodology I have laid out above for Section 10(b) is flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period. The methodology I have described above to calculate Section 10(b) can be modified based on alternative findings the finder of fact may determine, including, but not limited to findings as to: (1) any confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; (3) the first alleged misstatement and/or omission no longer being actionable (that is, the class period begins later); (4) dismissal of alleged misstatements and/or omissions after the first one; and (5) artificial inflation attributable to Deloitte versus SCANA. Below I describe additional details concerning each of these potential variations.

340. *First*, irrespective of what the ultimate finder of fact, the jury, determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. For example, as described in **Section VII.I**, I estimate that 0% of the abnormal price movement in SCANA Common Stock on August 10, 2017, is attributable to confounding information. Assume, for purely illustrative purposes, that the jury determines instead that 50% of the abnormal price movement in SCANA Common Stock on August 10, 2017 is attributable to confounding information. This would translate into $0.68 of artificial inflation being dissipated from SCANA Common Stock on this day (50% of $1.35). The daily inflation table could easily be updated for this alternative finding. Similarly, if the jury determines that none of the abnormal return on a Corrective Disclosure Event is attributable to the corrective

170

information, then it would be assumed that $0 of artificial inflation was dissipated from SCANA

Common Stock on that date, which could also be updated in the daily inflation table.[473]

341. *Second*, should the jury determine that the true economic inflation evolved over the

Class Period, my out-of-pocket damages model can still account for such a scenario and can

mechanically calculate damages on a class-wide basis. In a hypothetical example, assume the jury

concludes that before September 2, 2016, inflation was only half of the value I have calculated. As

shown above in **Table B**, I have estimated $25.71 of per share artificial inflation was present in

SCANA Common Stock from the start of the Class Period through September 1, 2016. If the jury

determines that inflation was only half that amount from February 26, 2016 through September 1,

2016, then the inflation table I presented above can be adjusted to $12.86 for that initial period (50%

of $25.71).

342. In the hypothetical case I have presented above, purchasers during this initial part of the

Class Period would have purchased shares with $25.71 of artificial inflation, while shares bought

beginning September 2, 2016, would be purchased at the full amount of artificial inflation I

calculated ($26.42). Damages calculations using the out-of-pocket method (inflation at the time of

purchase minus inflation at the time of sale) will still result in an appropriate and accurate assessment

of damages. This hypothetical example illustrates how artificial inflation need not be constant during

the Class Period for the out-of-pocket damages methodology to be applied on a class-wide basis.

343. *Third*, should the jury decide that the first actionable misstatement and/or omission

happened at a date later than February 26, 2016, prior to that date, inflation could simply be set to

zero. The examples I have described above clearly demonstrate the flexibility of the out-of-pocket

---

[473] This also explains how the damages methodology I have outlined is flexible if the Class Period is determined to end before December 20, 2017. For example, if the jury determines that none of the abnormal return on the last Corrective Disclosure Event, December 21, 2017, is attributable to the corrective information, then it would be assumed that $0 of artificial inflation was dissipated from SCANA Common Stock on December 21, 2017, which could easily be updated in the daily inflation table. The same approach can be applied to any of the Corrective Disclosure Events.

damages model. If the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model and damages calculated on a class-wide basis.

344. *Fourth,* should the jury decide later misstatements and/or omissions after the first one are no longer actionable, the out-of-pocket damages methodology would remain unchanged. This is because, as I described in my Rebuttal Report, Plaintiff alleges one theory of liability, which includes materialization of risks that were disclosed to the market through the Corrective Disclosure Events.[474] If there is still at least one actionable misstatement and/or omission that encompasses Plaintiff's claims, damages would still be calculated in the method I have outlined above and would not need to be adjusted. Based on my understanding of Plaintiff's allegations, I conclude that it is not necessary to bifurcate Plaintiff's single theory of liability. To be clear, there is no need for disaggregation related to materializations of the risk because these are part of the same theory of liability. Doing so would create an artificial and unnecessary distinction for how the Corrective Disclosure Events should be treated in the damages methodology. However, if the finder of fact determines that it is necessary to disaggregate different theories of liability, the daily inflation table could easily be updated for this alternative finding by separating confounding versus corrective information in the same manner described above. For example, if the finder of fact determines that 50% of the abnormal decline is due to a theory of liability that is no longer actionable, then 50% of the inflation I estimate for that date can be removed from the daily inflation table.

345. *Fifth*, I conclude there is no need to disaggregate or separately assign artificial inflation to Deloitte versus other potential actors, because this is a legal question about the apportionment of liability. In other words, I conclude that if the relevant truth were disclosed on the first day of the Class Period, it would have had the same impact as the abnormal declines on the Corrective

---

[474] Rebuttal Report ¶ 29.

172

Disclosure Events regardless of how any but-for disclosure could have been made. However, if the finder of fact determines that it is necessary to disaggregate artificial inflation to Deloitte versus any other entity or individual, the daily inflation table could easily be updated for this alternative finding by separating confounding versus corrective information in the same manner described above. For example, if the finder of fact determines that 50% of the abnormal decline is due to a party that is not actionable, then 50% of the inflation I estimate for that date can be removed from the daily inflation table.

346. Regardless of how the jury weighs evidence – that is, whether they find that my disaggregation analysis is the most appropriate, or they determine that based upon the evidence, a different percentage is more appropriate, this finding can be incorporated into the damages calculation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 14, 2024.

_____

Matthew D. Cain

173

**Exhibit 1**
**Beta Coefficients from SCANA Common Stock Event Study**
**2/26/2016 - 12/20/2017**





**Exhibit 2**
**Root Mean Squared Error from SCANA Common Stock Event Study**
**2/26/2016 - 12/20/2017**

**Exhibit 3**
**Daily Event Study and Multi-Day Window Analyses of SCANA Corrective Disclosure Events**

| # | Market Date | Day | Closing Price | Raw Return | Volume (millions) | Daily Event Study Results [1] | | | | | Multi-Day Window Cumulative Results [2] | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Abnormal Return | Abnormal Dollar Change | t-Statistic | p-Value | Significance Level [3] | Event Window | Abnormal Return | Abnormal Dollar Change | t-Statistic | p-Value | Significance Level [3] |
| [1] | 9/2/2016 | Fri | $71.65 | 2.34% | 0.97 | 1.02% | $0.71 | 2.60 | 0.01 | ** | | | | | | |
| [2] | 12/27/2016 | Tue | $74.43 | -0.35% | 0.33 | -0.44% | -$0.33 | -1.15 | 0.25 | | | | | | | |
| | 12/28/2016 | Wed | $72.92 | -2.03% | 0.79 | -1.17% | -$0.87 | -3.05 | 0.00 | *** | 12/27/2016 to 12/28/2016 | -1.60% | -$1.20 | -2.96 | 0.00 | *** |
| [3] | 1/19/2017 | Thu | $70.99 | -1.89% | 0.65 | -1.02% | -$0.74 | -2.44 | 0.02 | ** | | | | | | |
| [4] | 1/31/2017 | Tue | $68.70 | 0.84% | 1.31 | -0.88% | -$0.60 | -2.00 | 0.05 | ** | | | | | | |
| [5] | 2/14/2017 | Tue | $66.86 | -4.53% | 1.94 | -3.83% | -$2.68 | -8.10 | 0.00 | *** | | | | | | |
| [6] | 2/15/2017 | Wed | $67.47 | 0.91% | 1.74 | 1.23% | $0.82 | 2.58 | 0.01 | ** | | | | | | |
| [7] | 2/17/2017 | Fri | $65.65 | -2.48% | 1.56 | -2.56% | -$1.73 | -5.24 | 0.00 | *** | | | | | | |
| [8] | 3/22/2017 | Wed | $67.74 | -0.78% | 1.26 | -1.17% | -$0.80 | -2.19 | 0.03 | ** | | | | | | |
| | 3/23/2017 | Thu | $66.71 | -1.52% | 1.70 | -1.26% | -$0.86 | -2.36 | 0.02 | ** | 3/22/2017 to 3/23/2017 | -2.42% | -$1.66 | -3.20 | 0.00 | *** |
| [9] | 7/28/2017 | Fri | $61.29 | -6.63% | 2.47 | -6.56% | -$4.30 | -10.14 | 0.00 | *** | | | | | | |
| [10] | 7/31/2017 | Mon | $64.37 | 5.03% | 4.79 | 4.72% | $2.89 | 7.27 | 0.00 | *** | | | | | | |
| | 8/1/2017 | Tue | $67.56 | 4.96% | 5.33 | 4.51% | $2.91 | 6.93 | 0.00 | *** | 7/31/2017 to 8/1/2017 | 9.45% | $5.80 | 10.27 | 0.00 | *** |
| [11] | 8/4/2017 | Fri | $63.79 | -2.37% | 1.76 | -2.07% | -$1.35 | -3.13 | 0.00 | *** | | | | | | |
| [12] | 8/10/2017 | Thu | $62.01 | -1.10% | 1.10 | -1.43% | -$0.90 | -2.18 | 0.03 | ** | | | | | | |
| [13] | 8/11/2017 | Fri | $60.69 | -2.13% | 1.72 | -1.40% | -$0.87 | -2.13 | 0.04 | ** | | | | | | |
| [14] | 8/14/2017 | Mon | $61.81 | 1.85% | 0.85 | 1.32% | $0.80 | 2.02 | 0.05 | ** | | | | | | |
| [15] | 9/7/2017 | Thu | $59.58 | -0.75% | 0.90 | -1.50% | -$0.90 | -2.27 | 0.03 | ** | | | | | | |
| [16] | 9/21/2017 | Thu | $57.18 | -1.07% | 1.01 | -0.86% | -$0.50 | -1.28 | 0.20 | | | | | | | |
| | 9/22/2017 | Fri | $55.22 | -3.43% | 1.83 | -2.62% | -$1.50 | -3.90 | 0.00 | *** | 9/21/2017 to 9/22/2017 | -3.46% | -$2.00 | -3.64 | 0.00 | *** |
| [17] | 9/27/2017 | Wed | $51.22 | -7.83% | 3.96 | -6.47% | -$3.60 | -9.43 | 0.00 | *** | | | | | | |

**Exhibit 3**
**Daily Event Study and Multi-Day Window Analyses of SCANA Corrective Disclosure Events**

| # | Market Date | Day | Closing Price | Raw Return | Volume (millions) | Daily Event Study Results [1] | | | | | Multi-Day Window Cumulative Results [2] | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Abnormal Return | Abnormal Dollar Change | t-Statistic | p-Value | Significance Level [3] | Event Window | Abnormal Return | Abnormal Dollar Change | t-Statistic | p-Value | Significance Level [3] |
| [18] | 9/29/2017 | Fri | $48.49 | -4.90% | 4.07 | -4.77% | -$2.43 | -6.93 | 0.00 | *** | | | | | | |
| [19] | 10/19/2017 | Thu | $48.65 | -0.98% | 2.32 | -1.80% | -$0.88 | -2.53 | 0.01 | ** | | | | | | |
| [20] | 10/26/2017 | Thu | $47.83 | 0.55% | 2.00 | 0.67% | $0.32 | 0.93 | 0.36 | | 10/26/2017 to 10/27/2017 | -2.76% | -$1.31 | -2.71 | 0.01 | *** |
| | 10/27/2017 | Fri | $46.50 | -2.78% | 2.79 | -3.41% | -$1.63 | -4.73 | 0.00 | *** | | | | | | |
| [21] | 10/31/2017 | Tue | $43.14 | -6.03% | 4.06 | -5.99% | -$2.75 | -8.23 | 0.00 | *** | | | | | | |
| [22] | 11/9/2017 | Thu | $44.60 | 3.17% | 2.37 | 3.32% | $1.43 | 3.35 | 0.00 | *** | | | | | | |
| [23] | 11/24/2017 | Fri | $41.86 | -3.75% | 1.34 | -3.81% | -$1.66 | -3.45 | 0.00 | *** | | | | | | |
| [24] | 12/21/2017 | Thu | $37.39 | -9.51% | 5.86 | -8.99% | -$3.71 | -6.02 | 0.00 | *** | | | | | | |

Sources: Complaint, Factiva, S&P Capital IQ, and Cain Efficiency Report filed April 30, 2021.

Notes:

(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for the S&P 500 Total Return Index and a Market Capitalization-Weighted Peer Index. The Peer Index consists of the members of the S&P 500 Utilities Index during the Class Period; SCANA compares its stock performance to the S&P 500 Utilities Index in the Company's DEF 14A SEC filings for the years ending during the Class Period. Returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcement dates, the alleged Corrective Disclosures, and two outlier dates (7/31/2017, SCANA ceases construction and will file plan of abandonment of the nuclear project; 8/1/2017, SCANA executives hold briefing with SC Public Service Commission on loss recovery) were excluded from estimation.

(2) Results are calculated based on the cumulative Daily Event Study results.

(3) *** Denotes statistical significance at the 99% confidence level or greater; ** denotes statistical significance at the 95% confidence level or greater; * denotes statistical significance at the 90% confidence level or greater.

# Appendix A

**Matthew D. Cain, Ph.D.**                           September 2024

---

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

---

**Education**

Ph.D., Finance, August 2007                      Purdue University, West Lafayette, IN
B.S., Finance, May 2001                          Grove City College, Grove City, PA

**Professional and Academic Experience**

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

**Publications**

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).


**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden

- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

LAW 246.31: Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2024

LAW 251.52: Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business

FIN 70400: Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

FIN 40410: Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management

MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

MGMT 610: Financial Management I (MBA Core), Fall: 2007

**Expert Witness Experience**

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al*., Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

# Appendix B
# Documents Considered

## Court Documents

- Consolidated Complaint filed May 19, 2020, Case No. 3:19-cv-3304-MBS.
- Defendants' Motion to Exclude. Defendants' Motion To Exclude Damages-Related Expert Opinions Of Dr. Matthew D. Cain, filed February 5, 2024, Case No. 3:19-cv-3304-DCC.
- Defendants' Opposition To Lead Plaintiff's Motion For Class Certification, Appointment Of Class Representative, And Appointment Of Class Counsel, filed October, 1, 2021, Case No. 3:19-cv-3304-MBS.
- Deposition of Matthew Cain, Ph.D. via Remote Videoconference, in International Brotherhood of Electrical Workers Local 98 Pension Fund on Behalf of Itself and All Others Similarly Situated vs. Deloitte & Touche, LLP and Deloitte LLP, taken on September 14, 2021.
- Expert Rebuttal Report Of Matthew D. Cain, Ph.D., filed March 7, 2024, Case No. 3:19-cv-3304.
- Expert Report Of Matthew D. Cain, Phd, filed April, 30, 2021, Case No. 3:19-cv-3304.
- Kevin B. Marsh and Stephen A. Byrne prefiled testimony and in-person hearing testimony – Provided by Counsel.
- LEAD PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' THIRD SET OF INTERROGATORIES, in International Brotherhood of Electrical Workers Local 98 Pension Fund on Behalf of Itself and All Others Similarly Situated vs. Deloitte & Touche, LLP and Deloitte LLP, filed September 13, 2024.

## Bates Stamped Documents

- 2015 WP 1810, Planning Memo [D&T_SCANA_IBEW_00005802 – D&T_SCANA_IBEW_00005852 at '5821].
- 2015 WP 5625, V.C. Summer 2&3 Contract Overview Memo [D&T_SCANA_IBEW_00012729 – D&T_SCANA_IBEW_00012746 at '2729].
- 2015 WP 2330, Audit Summary Memo [D&T_SCANA_IBEW_00007836 – D&T_SCANA_IBEW_00007881 at '7845].
- 2015 WP 1312, SCANA Corporation, 2015 Integrated Audit Plan, Deloitte presentation to SCANA Audit Committee, July 2015 [D&T_SCANA_IBEW_00004090 – D&T_SCANA_IBEW_00004147].
- 2015 WP 2800B, SCANA Audit Committee Final Communications YE 2015 [D&T_SCANA_IBEW_00008434 – D&T_SCANA_IBEW_00008484 at '8440].
- 2016 WP 5625A, New Nuclear Development (NND) Memo [D&T_SCANA_IBEW_00037338 –D&T_SCANA_IBEW_00037367 at '7339].
- 2016 WP 1210, Risk Assessment. [D&T_SCANA_IBEW_00028402 – D&T_SCANA_IBEW_00028424 at '8410-8411, '8413, and '8420-8422].

Appendix B

- 2016 WP 1810, Planning Memo [D&T_SCANA_IBEW_00030418 –
  D&T_SCANA_IBEW_00030434 at '0429-0430].

## SEC Filings

- SEC Form 10-K filings:
  - SCANA Corp., Annual Report (Form 10-K) (Feb. 26, 2016).
  - SCANA Corp., Annual Report (Form 10-K) (Feb. 24, 2017).
  - SCANA Corp., Annual Report (Form 10-K) (Feb. 23, 2018).
- SEC Form 10-Q filings:
  - SCANA Corp., Quarterly Report (Form 10-Q) (May 6, 2016).
  - SCANA Corp., Quarterly Report (Form 10-Q) (Aug. 5, 2016).
  - SCANA Corp., Quarterly Report (Form 10-Q) (Nov. 4, 2016).
  - SCANA Corp., Quarterly Report (Form 10-Q) (Aug. 4, 2017).
  - SCANA Corp., Quarterly Report (Form 10-Q) (Nov. 3, 2017).
- SEC Form 8-K filings:
  - SCANA Corp., Current Report (Form 8-K) (May 23, 2008).
  - SCANA Corp., Current Report (Form 8-K) (Sept. 26, 2017).
  - SCANA Corp., Current Report (Form 8-K) (Sept. 27, 2017).
- SEC Form DEF-14A filings:
  - SCANA Corp., Proxy Statement (Form DEF-14A) (Mar. 29, 2016).
  - SCANA Corp., Proxy Statement (Form DEF-14A) (Mar. 24, 2017).

## SCANA News

- SCANA news headlines and select articles downloaded from Factiva and Bloomberg for
  the Class Period:
  - "*SCANA 4Q EARNINGS CALL ENDS," *Bloomberg*, February 16, 2017, 4:30
    PM.
  - "*Scana Corp: S.C. Office of Regulatory Staff Files Request for Rate Relief with
    Public Service Commission of S.C.," *Dow Jones Institutional News*, September
    27, 2017, 7:46 AM.
  - "*S&PGR Downgrades SCANA And Subs To 'BBB'; On Watch Negative," *Dow
    Jones Institutional News*, September 29, 2017, 1:26 PM.
  - "06:05 EDT Toshiba considering strategic initiatives after U.S. nuclear flop..."
    *Theflyonthewall*, December 27, 2016, 6:05 AM.
  - "08:04 EDT Scana receives subpoena for documents relating to nuclear
    project…" *Theflyonthewall*, September 21, 2017.
  - "08:42 EDT Scana downgraded to Sell from Hold at Williams CapitalWilliams
    [*sic*] Capital..." *Theflyonthewall*, September 29, 2017, 8:42 AM.
  - "09:57 EDT Technical View: Scana at new 52-week low, analyst actionThe
    shares..." *Theflyonthewall*, September 29, 2017.
  - "18:56 EDT Toshiba expected to report loss on U.S. nuclear division, Nikkei..."
    *Theflyonthewall*, December 26, 2016, 6:56 PM.

Appendix B

- "Allowable Ex Parte Briefing – ND-2017-12-E," *Public Service Commission of South Carolina*, August 1, 2017, 10:05 AM.
- "Attorney General says he's investigating abandonment of nuclear reactors; South Carolina state senators call for special session," *The Post and Courier*, August 4, 2017.
- "Audit highlighted problems with South Carolina nuclear project a year before cancellation," *The Post and Courier*, September 4, 2017.
- "BRIEF – SCANA receives reaffirmation from Westinghouse regarding completion of new nuclear project," *Reuters News*, February 14, 2017, 5:20 PM.
- "BRIEF–Toshiba expected to report roughly 100 bln yen extraordinary loss on U.S. nuclear operations – Nikkei," *Reuters News*, December 26, 2016, 12:22 PM.
- "CEO: SCANA may not return to scuttled nuclear project – even if a new partner emerges," *The Post and Courier*, August 10, 2017.
- "Does anyone at Santee Cooper remember who Santee Cooper works for?" *The State*, September 7, 2017, 9:05 AM.
- "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South Carolina nuclear plant failure," *The Post and Courier*, September 7, 2017.
- "Exclusive: Westinghouse's clients gear up for bankruptcy fight - sources," *Reuters News*, March 23, 2017, 3:18 AM.
- "EXCLUSIVE-Westinghouse's clients gear up for bankruptcy fight-sources," *Reuters News*, March 22, 2017, 10:41 PM.
- "Factbox: Toshiba's options in U.S. nuclear bankruptcy," *Reuters News*, March 27, 2017, 7:30 PM.
- "Feds subpoena documents from SCANA and Santee Cooper, receive nuclear plant audit from Gov. McMaster; Failed S.C. nuclear project under federal scrutiny," *The Post and Courier*, September 22, 2017.
- "*Fitch Downgrades SCANA to 'BB+' / SCE&G to 'BBB-'; Negative Watch Maintained," *Dow Jones Institutional News*, September 29, 2017, 12:40 PM.
- "GrubHub and Scana fall while CarMax and Finish Line soar," *Associated Press Newswires*, September 22, 2017, 4:30 PM.
- "How much worse was the original Bechtel nuclear report," *The State*, September 27, 2017, 11:35 AM.
- "Insight that would've alerted problems with nuclear project scrubbed from audit two years ago," *The Post and Courier*, November 22, 2017.
- "Legislators to separately study failed nuclear project," *Associated Press Newswires*, August 9, 2017, 6:33 PM.
- "MarketLine Strategy, SWOT and Corporate Financial Report," *MarketLine*, December 2015.
- "Massive cranes coming down as nuke project goes silent," *The State*, November 9, 2017.
- "More than 2,000 without power after South Carolina storms," *Associated Press Newswires*, March 22, 2017, 6:54 AM.
- "More time to save ratepayers," *The Post and Courier*, August 11, 2017.
- "Morgan Stanley Sees Potential $5.2B Cost Hike for SCANA," *Bloomberg*, March 22, 2017, 10:34 AM.

- o "Morgan Stanley weighs Westinghouse bankruptcy risks for Southern, SCANA," *SNL Energy Finance Daily*, March 23, 2017.
- o "New leaders give SCANA a chance to repair damage from failed nuke project," *The State*, October 31, 2017.
- o "NYSE Group Announces 2017 Holiday and Early Closings Calendar," Business Wire, February 2, 2016, 4:05 PM.
- o "PRESS RELEASE; SCE&G Announces an Amendment to the Engineering, Procurement, and Construction Agreement for AP1000 Plants at VC Summer," *Platts Commodity News*, October 27, 2015.
- o "Price of stock in nuclear-besieged SCANA drops sharply," *The State*, September 27, 2017.
- o "Probe opened into 'potential criminality' in nuke project," *Associated Press Newswires*, September 26, 2017, 4:49 PM.
- o "Ratepayers win victory in fight to recover money from failed SCE&G nuclear project," *The State*, December 20, 2017.
- o "Rating Action: Moody's downgrades Toshiba Corp to Caa1; ratings on review for further downgrade," *Moody's Investors Service*, December 28, 2016.
- o "Regulators to Review Rate Hikes for Canceled Scana Reactors (1)," *Bloomberg*, September 27, 2017, 9:45 AM.
- o "Santee Cooper drops planned rate hikes following nuke abandonment," *SNL Energy Finance Daily*, August 14, 2017.
- o "SC Attorney General questions law allowing SCE&G to raise rates," *The State*, September 26, 2017.
- o "SC governor, lawmakers attempting to save abandoned nuke, protect ratepayers," *SNL Power Daily with Market Report*, August 9, 2017.
- o "SC Senate leaders want special session to block rate hikes after nuclear plant boondoggle," *The State*, August 4, 2017.
- o "Scana Abandons Nuclear-Site Plans," *The Wall Street Journal*, August 1, 2017.
- o "SCANA being investigated by federal grand jury over failed nuke project," *The State*, September 21, 2017, 9:17 AM.
- o "Scana Biggest Decliner in Utility Index; Stock Falls 3.8%," *Bloomberg*, November 24, 2017, 2:25 PM.
- o "SCANA CEO Marsh, another top executive departing after nuclear fiasco," *The State*, October 31, 2017.
- o "Scana CEO to step down after failed nuclear project," *Reuters News*, October 31, 2017, 9:28 AM.
- o "SCANA chief denies he's leaving embattled utility," *The State*, October 30, 2017.
- o "Scana Corp is Maintained at Underweight by Morgan Stanley," *Bloomberg*, August 10, 2017, 3:13 PM.
- o "SCANA Corp. Bottom Line Rises 27% In Q4," *RTT News*, February 16, 2017.
- o "SCANA Q4'16 EPS increases YOY but misses analyst estimates," *SNL Energy Finance Daily*, February 17, 2017.
- o "'Cannot be trusted:' South Carolina House Speaker calls for SCANA chief's resignation," *The Post and Courier*, October 31, 2017.

Appendix B

- o "'The public trust is gone' says newly-formed SC caucus to regulate energy," *wistv.com*, August 2, 2017, 11:09 AM.
- o "Scana Corp Price Target Raised to $59.00/Share From $58.00 by Morgan Stanley," *Bloomberg*, August 10, 2017, 3:13 PM.
- o "SCANA CORP, SOUTHERN CO HIRE ADVISERS TO PREPARE FOR BANKRUPTCY OF TOSHIBA CORP'S WESTINGHOUSE ELECTRIC CO LLC-SOURCES," *Reuters News*, March 22, 2017, 10:40 PM.
- o "Scana Cut to Neutral at Mizuho," *Bloomberg*, February 14, 2017, 8:47 AM.
- o "Scana Drops on Concern Over Fall-Out From Toshiba's Nuclear Woes," *Bloomberg*, February 14, 2017, 10:28 AM.
- o "SCANA Corp. Hit By Toshiba's $6 Billion Writedown Catastrophe," *Benzinga*, February 14, 2017, 12:10 PM.
- o "Scana Falls After Report of Bigger Toshiba Nuclear Writedown," *Bloomberg*, January 19, 2017, 3:19 PM.
- o "Scana Is Subpoenaed Over Abandoned Nuclear Project," *The Wall Street Journal*, September 21, 2017, 11:10 AM.
- o "Scana Plunges to Lowest in Almost Two Years on Criminal Probe," *Bloomberg*, September 21, 2017, 8:52 PM.
- o "SCANA seeks $2 billion in tax breaks for abandoning failed nukes," *The State*, November 9, 2017.
- o "Scana Shakes Up Management," *Dow Jones Institutional News*, October 31, 2017, 11:40 AM.
- o "SCANA should stop charging its customers for failed nuclear project, governor says," *The State*, October 19, 2017.
- o "Scana Slides as Guggenheim Sees Fallout from Dropping Reactors," *Bloomberg*, August 11, 2017, 2:17 PM.
- o "SCANA to oust CEO, chief operating officer in aftermath of VC Summer failure," *The State*, October 28, 2017.
- o "SCE&G customers may get break on power bills to offset nuclear plant debacle," *The State*, September 26, 2017.
- o "SCE&G to discuss reactors, announce earnings Thursday; detractors will protest at The State House," *The State*, February 15, 2017.
- o "SCG: Scana Still likely to obtain 'constructive' settlement," *The Fly via Bloomberg*, August 14, 2017, 8:09 AM.
- o "South Carolina Gov., utility think sale could keep abandoned nuclear plant alive," *ARS Technica*, August 10, 2017, 10:16 AM.
- o "South Carolina utility regulators refuse to throw out case against SCE&G," *The Post and Courier*, December 21, 2017.
- o "Southern, Scana seen facing $8.5 billion threat on Toshiba woes," *Bloomberg*, March 22, 2017, 12:21 PM.
- o "State agency challenges nuke plan shutdown proposal, says ratepayers could be hurt," *The State*, August 9, 2017, 5:16 PM.
- o "The Biggest Loser: Scana Skids…Again-- Barron's Blog," *Dow Jones Institutional News*, September 29, 2017, 4:14 PM.
- o "The Latest: Agency recommends dismissal of utility's plans," *The Canadian Press – Broadcast wire*, August 10, 2017, 3:33 PM.

Appendix B

- "The Latest: Challenger: SC gov playing politics with report," *Associated Press Newswires*, September 4, 2017, 6:28 PM.
- "The Latest: Speaker not ready for nuke plants session," *Associated Press Newswires*, August 4, 2017, 1:44 PM.
- "The Latest: Utility drops rate hike plans after project ends," *Associated Press Newswires*, August 11, 2017, 11:17 AM.
- "These are the people who brought us the SCE&G/Santee Cooper nuclear debacle," *The State*, September 7, 2017, 9:04 AM.
- "Top SCANA executives were paid millions in bonuses for roles in failed nuclear project," *The State*, August 9, 2017, 3:50 PM.
- "Toshiba Anticipates Nuclear Write-down," *The Wall Street Journal* (Asia Edition), December 28, 2016.
- "Toshiba CEO: Want to Sell Westinghouse's Stake if Appropriate Partners Appear," *Dow Jones Institutional News*, February 14, 2017, 5:01 AM.
- "Toshiba CFO Meets Press After Company Announced Possible Multibillion-Dollar Write-Down," *Dow Jones Institutional News*, December 27, 2016, 4:40 AM.
- "Toshiba CFO: Can't Rule Out Risk of Negative Net Worth at Westinghouse Caused by Possible Write-Down," *Dow Jones Institutional News*, December 27, 2016, 4:38 AM.
- "Toshiba considering booking loss on US nuclear power acquisition," *Reuters News*, December 26, 2016, 7:14 PM.
- "Toshiba decides on Westinghouse bankruptcy, sees $9 billion in charges: sources," *Reuters News*, March 24, 2017, 6:59 AM.
- "Toshiba Drops 16 Percent on Reported Writedown Losses," *Bloomberg*, January 18, 2017, 7:21 PM.
- "Toshiba Drops on Reports of Nuclear Unit's $4.3 Billion Loss (1)," *Bloomberg*, December 26, 2016, 7:28 PM.
- "Toshiba Expects Write-Down of as Much as Several Billion Dollars – Update," *Dow Jones Institutional News*, December 27, 2016, 4:13 AM.
- "Toshiba Finds U.S Nuclear Renaissance a Nightmare for Costs," *Bloomberg*, December 27, 2016, 1:30 PM.
- "Toshiba may lose billions of dollars on troubled U.S. nuclear power deal; Massive loss may be coming after the company bought a nuclear construction business," *Washington Post.com*, December 28, 2016.
- "Toshiba poised to incur massive loss in N-power business," *The Japan News*, December 28, 2016.
- "Toshiba reaches $2.2 billion deal over SCANA's S. Carolina nuclear project," *Reuters News*, July 27, 2017, 6:42 PM.
- "Toshiba seen taking $850m hit on US nuclear business," *Nikkei Asian Review*, December 26, 2016, 12:00 PM.
- "Toshiba sees some 100 bil. FY 2017 loss on U.S. nuclear business," *Kyodo News*, December 26, 2016, 6:54 PM.
- "Toshiba shares plunge, two presidents in Gambia and Russia's Middle East push," *Financial Times*, January 19, 2017.

Appendix B

- o "Toshiba shares rise after report Westinghouse may file bankruptcy Tuesday," *Reuters News*, March 26, 2017, 8:14 PM.
  - o "Toshiba Stumbles as Nuclear Bet Proves Costly," *Dow Jones Institutional News*, December 28, 2016, 2:10 AM.
  - o "Toshiba to Announce Y100B Impairment; Share Price Tumbles -- Market Talk," *Dow Jones Institutional News*, December 26, 2016, 7:59 PM.
  - o "Toshiba to take $6.3 bln hit on U.S nuclear unit," *Reuters News*, February 14, 2017, 3:40 AM.
  - o "Toshiba's main banks ask for Westinghouse bankruptcy filing this month - Nikkei," *Reuters News*, March 23, 2017, 8:54 PM.
  - o "Toshiba's shares tank as nuclear worries intensify," *CNN Wire*, February 14, 2017, 2:18 AM.
  - o "Toshiba's Westinghouse Electric Files for Bankruptcy Protection," *Dow Jones Institutional News*, March 29, 2017, 3:12 AM.
  - o "Toshibato Exit Nuclear Construction Business," *Dow Jones Institutional News*, January 31, 2017, 1:22 PM.
  - o "UPDATE 1-Scana CEO to step down after failed nuclear project," *Reuters News*, October 31, 2017, 10:26 AM.
  - o "UPDATE 2-Writedown fears wipe $5 bln off Toshiba's value as it weighs options," *Reuters News*, December 28, 2016, 4:27 AM.
  - o "UPDATE 6-Toshiba flags hit of 'billions of dollars' on U.S. nuclear acquisition," *Reuters News*, December 27, 2016, 1:02 PM.
  - o "URGENT: Toshiba submits application to postpone Tuesday earnings release," *Kyodo News*, February 14, 2017, 12:54 AM.
  - o "Utility pays bonuses to execs before nuclear project fails," *The Canadian Press – Broadcast wire*, August 10, 2017, 7:36 AM.
  - o "Walk away or build it? Decision on SC's troubled nuclear reactor project nears," *The State*, July 28, 2017.
  - o "What SCANA, others said about executive shake-up," *The State*, October 31, 2017.
  - o "Who gets $60 million when nuke project fails? SCANA execs with golden parachutes could," *The State*, October 19, 2017.
- Seeking Alpha articles or reports for SCANA published during the class period:
  - o "SCANA Corporation: Power For Living," *Seeking Alpha*, January 17, 2017, 4:42 AM.
  - o "SCANA hits 52-week low as Williams downgrades to Sell," *Seeking Alpha*, September 29, 2017, 3:28 PM.
- Posts on X, formerly known as Twitter:
  - o @Andy_Ed_Brown, "No offense to lawmakers, but SCANA ain't likely to pay bill... unless there's some type of fraud that can be proven," *X*, August 10, 2017, 4:47 PM, available at https://x.com/Andy_Ed_Brown/status/895748533902618624.
  - o @Andy_Ed_Brown, "That's quite the press release to find in your inbox on a Friday morning. #speacialsession #nuclearboondoggle," *X*, August 4, 2017, 10:17 AM, available at https://x.com/Andy_Ed_Brown/status/893475895033430016/photo/1.

Appendix B

- @AveryGWilks, "NEW: Top SCANA execs took home millions in bonuses for their accomplishments on now-failed nuclear project," *X*, August 9, 2017, 3:53 PM, available at https://x.com/AveryGWilks/status/895372561386745856.
- @CBJenergy, "Subpoenas to SCANA Corp. & @santeecooper reveal federal investigation of shuttered V.C. Summer project…"
- *X*, September 21, 2017, 3:18 PM, available at https://x.com/CBJenergy/status/910946457565442048.
- @NikkiSetzler, "Before SCANA attempts to increase power bills we need to know what happened & need to see some responsibility taken for what's occurred. 3/," *X*, August 4, 2017, 1:13 PM, available at https://x.com/NikkiSetzler/status/893520222740774913.
- @NikkiSetzler, "Calling for SC legislature to meet ASAP to discuss decision by SCANA and Santee Cooper to abandon V.C. Summer nuclear plan. 1/," *X*, August 4, 2017, 1:09 PM, available at https://x.com/NikkiSetzler/status/893519316561395713.
- @NikkiSetzler, "I'm concerned utility companies may try to pass the buck for their abandonment on to ratepayers. That's completely unfair. 2/," *X*, August 4, 2017, 1:11 PM, available at https://x.com/NikkiSetzler/status/893519841528860672.
- @NikkiSetzler, "It's not the ratepayers' fault this happened & consumers shouldn't be held responsible. 4/," *X*, August 4, 2017, 1:14 PM, available at https://x.com/NikkiSetzler/status/893520429205291008.
- @NikkiSetzler, "Read my full letter to my fellow Senators, co-signed with my colleague @ShaneMassey, here. → → https://scribd.com/document/355541214/Letter-to-Senators-regarding-shuttering-of-VC-Summer-nuclear-plan 5/5," X, August 4, 2017, 1:14 PM, available at https://x.com/NikkiSetzler/status/893520646805782533.
- @postandcourier, "Insight that would've alerted problems with nuclear project was scrubbed from an audit two years ago. http://bit.ly/2AnyQxL #scpol #chsnews," *X*, November 22, 2017, 7:00 PM available at https://x.com/postandcourier/status/933500346160226305.
- @postandcourier, "JUST IN: Feds issue subpoena to SCANA over failed South Carolina nuclear project http://bit.ly/2hkoypG #scnews #chsnews," *X*, September 21, 2017, 9:09 AM, available athttps://x.com/postandcourier/status/910853612296982529.
- @postandcourier, "SCE&G might return to fail nuclear reactors — even if the governor can find another power company willing to partner ..." *X*, August 10, 2017, 8:45 PM, available at https://x.com/postandcourier/status/895808232786210816.
- @ricknelson7, "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South … @postandcourier," *X*, September 6, 2017, 7:44 PM, https://twitter.com/ricknelson7/status/905577426897559552.
- @thestate, "SCANA being investigated by federal grand jury over failed nuke project," *X*, September 21, 2017, 10:09 AM, available at https://x.com/thestate/status/910868628492345344.

Appendix B

## Press Releases and Earnings Announcements

- SCANA Press Releases:
  - "Public Service Commission of South Carolina Defers Action on Office of Regulatory Staff Request to Suspend Revised Rates Collections," *PR Newswire*, September 28, 2017, 5:54 PM.
  - "Public Service Commission of South Carolina Orders Hearing on the South Carolina Office of Regulatory Staff's Request to Reduce Rates," *PR Newswire*, December 20, 2017, 5:01 PM.
  - "SCANA Corporation and South Carolina Electric & Gas Company Announce Leadership Changes," *PR Newswire*, October 31, 2017, 9:00 AM.
  - "SCANA Receives Reaffirmation from Westinghouse Regarding Completion of VC Summer New Nuclear Project," *PR Newswire*, February 14, 2017, 4:30 PM.
  - "SCANA Receives Subpoena For Documents Relating To Nuclear Project," *PR Newswire*, September 21, 2017, 8:00 AM.
  - "SCANA Reports Financial Results for Fourth Quarter and Full Year 2016, Announces 2017 Earnings Guidance and Long-term Guidance," *PR Newswire*, February 16, 2017, 7:30 AM.
  - "SCANA Reports Financial Results for Second Quarter of 2017," *PR Newswire*, August 3, 2017, 7:30 AM.
  - "SCANA Reports Financial Results for Third Quarter of 2017," *PR Newswire*, October 26, 2017, 7:30 AM.
  - "SCE&G Announces Settlement Agreement Related to Election of Fixed Price Option and Petition to Update Construction and Capital Cost Schedules for New Nuclear Units," *PR Newswire*, September 1, 2016, 5:10 PM.
  - "South Carolina Electric & Gas Company And Santee Cooper Agree To Amount of Guaranty Payments from Toshiba," *PR Newswire*, July 27, 2017, 6:04 PM.
  - "South Carolina Electric & Gas Company Monetizes Guaranty Settlement Payments From Toshiba," *PR Newswire*, September 27, 2017, 2:25 PM.
  - "South Carolina Electric & Gas Company to Cease Construction And Will File Plan of Abandonment of The New Nuclear Project," *PR Newswire*, July 31, 2017, 1:00 PM.
- Toshiba Press Releases:
  - "Notice on Media Coverage of Toshiba's Nuclear Business," *Toshiba Corporation Investor Relations*, January 19, 2017.
  - "Notice on Submission of Application for Approval of Extension of the Deadline for Submission of the 178th Third Quarter Securities Report (October 1, 2016 to December 31, 2016)," *Toshiba Corporation Investor Relations*, February 14, 2017 (See https://www.global.toshiba/ww/ir/corporate/news.html?newsListID=newslist-id-736761986&pageNo=1&month=2017-02).
  - "Provisional Outlook for FY2016 3Q Business Results and FY2016 Forecast, and Outline of Loss in Nuclear Power Business and Countermeasures," *Toshiba Corporation Investor Relations*, February 14, 2017 (See https://www.global.toshiba/ww/ir/corporate/news.html?newsListID=newslist-id-736761986&pageNo=1&month=2017-02).

Appendix B

- o "Toshiba Corp Possibility of Recognition of Goodwill and Loss related to Westinghouse's Acquisition of CB&IStone & Webster Corporate Presentation – Final," *CQ FD Disclosure*, December 27, 2016.
- Earnings conference calls during the Class Period:
  - o "FQ3 2015 Earnings Call Transcripts," *S&P Capital IQ*, October 29, 2015, 3:00 PM.
  - o "FQ4 2015 Earnings Call Transcripts," *S&P Capital IQ*, February 18, 2016, 3:00 PM.
  - o "FQ1 2016 Earnings Call Transcripts," *S&P Capital IQ*, April 28, 2016, 3:00 PM.
  - o "FQ2 2016 Earnings Call Transcripts," *S&P Capital IQ*, July 28, 2016, 3:00 PM.
  - o "FQ3 2016 Earnings Call Transcripts," *S&P Capital IQ*, October 27, 2016, 3:00 PM.
  - o "FQ4 2016 Earnings Call Transcripts," *S&P Capital IQ*, February 16, 2017, 3:00 PM.
  - o "Fourth Quarter and Full Year 2016," *Scana Corp*, February 16, 2017.
  - o "FQ1 2017 Earnings Call Transcripts," *S&P Capital IQ*, April 27, 2017, 3:00 PM.
  - o "FQ2 2017 Earnings Call Transcripts," *S&P Capital IQ*, August 3, 2017, 3:00 PM.
  - o "FQ3 2017 Earnings Call Transcripts," *S&P Capital IQ*, October 26, 2017, 3:00 PM.
- Other conference call Transcripts during the Class Period:
  "Shareholder/Analyst Call," *S&P Capital IQ*, March 29, 2017, 4:00 PM.
  "Special Call," *S&P Capital IQ*, July 31, 2017, 5:00 PM.
  "Special Call," *S&P Capital IQ*, August 16, 2017, 9:30 AM.
- Toshiba conference call Transcripts during the Class Period:
  - o "Toshiba Corporation TSE:6502 Guidance/Update Call," *S&P Capital IQ*, February 13, 2017, 7:00 PM.

## SCANA Analyst Reports

- SCANA analyst reports supplied by Investext via Thomson Reuters for the period of October 27, 2015 – December 20, 2017:
  - o "Amended Nuke Contract Lowers Risk- Buy" *Gabelli & Company*, October 30, 2015.
  - o "Bear Case Playing Out, and Risks Remain High in Abandonment; Lower PT, Remain UW," *Morgan Stanley*, August 1, 2017.
  - o "BLRA Rates Challenged; Political Firestorm – Hold," *Gabelli & Company*, September 28, 2017.
  - o "Don't want to push our luck," *Macquarie Research*, January 24, 2017.
  - o "EPA's Final Carbon Rules Positive for Clean Generation and Transmission, Negative for Coal," *Morningstar Equity Research*, October 15, 2015.
  - o "Evaluation Continues; Affirmed Outlook -Buy," *Gabelli & Company*, April 28, 2017.
  - o "Ex Parte Transcript; Q2 '17 Results," *Barclays*, August 3, 2017.

Appendix B

- o "Exceptional Growth Trumps Nuclear Risk," *The Williams Capital Group*, September 12, 2016.
- o "Expecting Some Slippage," *UBS*, July 18, 2016.
- o "Exploring Severe Downside Scenarios Given Recent Governor and Legislator Comments," *Morgan Stanley*, October 27, 2017.
- o "Finding Comfort with Nuclear Risk," *UBS*, February 21, 2017.
- o "Fixing a Deal on a Fixed Price Contract," *UBS*, September 2, 2016.
- o "Flash Comment: Energy and Utility Daily," *Wells Fargo Securities*, February 15, 2017.
- o "Flash Comment: SCG: Comments On Toshiba Situation," *Wells Fargo Securities*, February 14, 2017.
- o "Flash Comment: Utility & Alternative Energy Daily," *Wells Fargo Securities*, August 7, 2017.
- o "Flash Comment: Utility & Alternative Energy Daily," *Wells Fargo Securities*, July 28, 2017.
- o "Flash Comment: Utility & Alternative Energy Daily," *Wells Fargo Securities*, September 11, 2017.
- o "Flash Comment: Utility & Infrastructure Daily," *Wells Fargo Securities*, November 1, 2017.
- o "Flash Comment: Utility & Infrastructure Daily," *Wells Fargo Securities*, November 29, 2017.
- o "Flash Comment: Utility & Infrastructure Daily," *Wells Fargo Securities*, September 22, 2017.
- o "Headlines Keep Flying But Thesis Intact For Scana," *Morningstar Equity Research*, November 5, 2017.
- o "High Risk of Disallowance; Lowering PT to $45 and Remaining UW," *Morgan Stanley*, October 4, 2017.
- o "Implications of Potential Westinghouse Bankruptcy Filing," *Morgan Stanley*, March 22, 2017.
- o "In Whirlwind of Activity, Scana Remains a Buying Opportunity," *Morningstar Equity Research*, September 29, 2017.
- o "Just How Far Can It Go?" *UBS*, February 15, 2017.
- o "Nuclear Dockets Will Proceed, But Commission Action Pushed to 2018," *Morgan Stanley*, December 21, 2017.
- o "Nuclear risks overshadow EPS growth," *Macquarie Research*, February 21, 2017.
- o "Perspectives on New Nuclear – Call Takeaways," *Morgan Stanley*, February 7, 2017.
- o "Perspectives on New Nuclear #2 - Call Takeaways," *Morgan Stanley*, April 21, 2017.

Appendix B

- o "Political Rhetoric Around Nuclear Power Heating Up; Scana Approaches Buy Territory," *Morningstar Equity Research*, August 14, 2017.
- o "Potential Abandonment/Lowered From Buy to Hold," *Gabelli & Company*, July 28, 2017.
- o "Q416 Results OK, Stock Remains an Incredible Value," *The Williams Capital Group*, February 17, 2017.
- o "Reassessing Nuclear Risk," *Morgan Stanley*, February 17, 2017.
- o "Santee Cooper, SCE&G to accept nearly $2.2 billion from Toshiba for nuclear plant," *The State*, July 27, 2017.
- o "Scana Corp. and Southern Co. Investors Should Not Fret Toshiba's Woes...Yet," *Morningstar Equity Research*, February 15, 2017.
- o "Scana's Fixed-Price Decision Reduces Nuclear Project Risk for Shareholders," *Morningstar Equity Research*, June 9, 2016.
- o "Scana's Nuclear Option an Attractive Risk/Reward Trade-Off," *Morningstar Equity Research*, October 24, 2017.
- o "Scana's nuclear project abandonment will slow earnings growth beyond 2017," *Morningstar Equity Research*, October 24, 2017.
- o "Scana's Settlement Discussions, Nuclear Write-Off, and Core Business Growth Support Upside," *Morningstar Equity Research*, October 26, 2017.
- o "Scanning the Nuclear Risks," *UBS*, January 23, 2017.
- o "SCG – Did Somebody Say Settlement? Not Out of the Woods Yet but Potentially a First Sign of Light," *Guggenheim*, October 26, 2017.
- o "SCG – Downgrading to Sell – The Curtain Call Cometh," *Guggenheim*, July 28, 2017.
- o "SCG – Focus Remains on Nuclear Fallout; 2017 Expectations In-Line, LT Outlook Extended," *Guggenheim*, February 16, 2017.
- o "SCG – We Both Made a Tough Call – Walking Away from Nuclear, But Still Loose Ends to Tie; Regulatory Execution Key," *Guggenheim*, July 31, 2017.
- o "SCG: Abandonment Officially The Path Forward," *Wells Fargo Securities*, July 31, 2017.
- o "SCG: Beyond The Negative Headlines -- Part 2," *Wells Fargo Securities*, August 13, 2017.
- o "SCG: Constructive Settlement Reached On Fixed-Price Option," *Wells Fargo Securities*, September 1, 2016.
- o "SCG: EPC Revisions Require Going Back To The Regulatory Well," *Wells Fargo Securities*, October 28, 2015.
- o "SCG: ORS Rate Request Adds Yet Another Layer of Uncertainty," *Wells Fargo Securities*, September 27, 2017.
- o "SCG: Takeaways From SCG's Ex Parte Meeting with the SC PSC," *Wells Fargo Securities*, August 2, 2017.

Appendix B

- o "SCG: We View Recent Weakness As A Buying Opportunity Reiterate Outperform Rating," *Wells Fargo Securities*, February 16, 2017.
- o "Stock Report: SCANA Corporation," *CFRA*, December 27, 2017.
- o "Stock Report: Scana Corp," *CFRA*, February 16, 2017.
- o "Strong '16 Results; Higher Estimates – Buy," *Gabelli & Company*, February 17, 2017.
- o "Summer Isn't Coming; Upgrading to Overweight on Nuclear Abandonment," *Barclays*, August 1, 2017.
- o "Toshiba Now an Overhang; 4Q in Line," *Barclays*, February 17, 2017.
- o "Toshiba's $1.2 Billion Guarantee Might Not Be Enough to Finish Scana's Nuclear Project," *Morningstar Equity Research*, July 28, 2017.
- o "Update on House Legislation, SC Regulator Meeting," *Morgan Stanley*, November 10, 2017.
- o "Utility Sector Commentary: Visit With Four State Commissioners: Regulators Support Gas Infrastructure, Worry About Nuclear," *The Williams Capital Group*, January 19, 2017.
- o "WEC Chapter 11 Unlikely to Derail SCG & SO Nukes," *Wells Fargo Securities*, March 30, 2017.

## Academic Articles

- Ashbaugh-Skaife, Hollis, Daniel W. Collins, William R. Kinney Jr., and Ryan LaFond, 2009, "The Effect of SOX Internal Control Deficiencies on Firm Risk and Cost of Equity," *Journal of Accounting Research* 47, No. 1.
- David I. Tabak & Frederick C. Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom, In Litigation Services Handbook, The Role of the Financial Expert*, John Wiley & Sons, Third Edition, 2001, at pp. 3 & 19.
- Drake, Michael S., *et al.*, "Short Selling around Restatement Announcements: When Do Bears Pounce?" *Journal of Accounting, Auditing & Finance*, Vol. 30, No. 2 (2015): 218-245.
- Fama, Eugene F., 1991, "Efficient Capital Markets: II," *The Journal of Finance* 46, at 1607.
- Hammersley, Jacqueline S., Linda A. Myers, and Catherine Shakespeare, 2008, "Market Reactions to the Disclosure of Internal Control Weaknesses and to the Characteristics of Those Weaknesses Under Section 302 of the Sarbanes Oxley Act of 2002," Review of Accounting Studies 13.
- Hood, Matthew and Vance Lesseig, 2017, "Investor Inattention Around Stock Market Holidays," *Finance Research Letters* 23, 217-222.
- Jeff G. Hammel & B. John Casey, 2009, "Sizing Securities Fraud Damages: 'Constant Percentage' on Way Out?" *New York Law Journal*, available at https://www.law.com/newyorklawjournal/almID/1202427590818/.

Appendix B

- MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 13.
- Menon, Krishnagopal and David D. Williams, 2010, "Investor Reaction to Going Concern Audit Reports," *The Accounting Review* 85, No. 6.
- Palmrose, Zoe-Vonna, *et al*., "Determinants of market reactions to restatement announcements," *Journal of Accounting and Economics*, Vo. 37, No. 1 (2004): 59-89.
- Tim Koller, Marc Goedhart, & David Wessels, *Measuring and Managing the Value of Companies*, John Wiley & Sons, Sixth Edition, 2015.
- Shu, Susan Zhan, 2000, "Auditor Resignations: Clientele Effects and Legal Liability," *Journal of Accounting and Economics* 29, Issue 2.
- Whisenant, J. Scott, Srinivasan Sankaraguruswamy, and K. Raghunandan, 2003, "Market Reactions to Disclosure of Reportable Events," *Auditing: A Journal of Practice & Theory* 22, at p. 181.

**Data Sources**

- Bloomberg Terminal
- Factiva News
- Investext Analyst Reports via Thomson Reuters
- Tick Intraday Data
- SEC Edgar Online
- S&P Capital IQ Historical Stock Data

**Other**

- "First Bechtel Report," November 9, 2015.
- "Second Bechtel Report," February 5, 2016.
- "Dear Mr. Marsh," *Governor Henry McMaster*, October 19, 2017.

**Appendix C**

**Matthew D. Cain, Ph.D.**

**Efficiency Report**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND on behalf of itself and all others similarly situated, ) | Case No. 3:19-cv-3304 |
| | CLASS ACTION |
| Plaintiffs, ) | |
| vs. ) | |
| DELOITTE & TOUCHE, LLP; DELOITTE LLP, ) | |
| Defendants. ) | |

EXPERT REPORT OF MATTHEW D. CAIN, PHD

April 30, 2021

## Table of Contents

I.     Qualifications ........................................................................................ 2

II.    Introduction and Summary of Opinions ............................................. 3

III.   Case Background ................................................................................. 5

     A.    Overview of the Company and Allegations ......................................... 5

     B.    Bases for Opinions on Market Efficiency ........................................... 7

IV.   Evaluation of Market Efficiency Factors to SCANA Common Stock ......... 11

     A.    *Cammer* Factor 1: Average Weekly Trading Volume ........................ 11

     B.    *Cammer* Factor 2: Analyst Coverage .................................................. 13

     C.    *Cammer* Factor 3: Market Makers ...................................................... 15

     D.    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ......................... 17

     E.    *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices ............................................... 19

     F.    Additional Factor 1: Market Capitalization ....................................... 25

     G.    Additional Factor 2: Bid-Ask Spread .................................................. 26

     H.    Additional Factor 3: Public Float ........................................................ 28

     I.    Additional Factor 4: Institutional Ownership ..................................... 28

     J.    Additional Factor 5: Autocorrelation ................................................... 29

     K.    Additional Factor 6: Options Trading .................................................. 30

V.    Ability to Calculate Damages on a Class-Wide Basis ....................... 31

VI.   Conclusion ......................................................................................... 33

Appendix A ......................................................................................... 35

Appendix B ......................................................................................... 36

Exhibits ............................................................................................... 38

## I. Qualifications

1. I am a Ph.D. in Finance, and a Senior Fellow at the Berkeley Center for Law and Business and a Senior Visiting Scholar at Berkeley Law School, University of California. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business. My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

2. I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

3. Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate

2

and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

4. Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

5. In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

6. I have published research in leading peer-reviewed finance, accounting, law, and economics journals, including the *Journal of Financial Economics, Journal of Law and Economics, Journal of Accounting and Economics, Journal of Empirical Legal Studies, and Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications and previous testimony.

## II. Introduction and Summary of Opinions

7. I have been asked by the Court-appointed Lead Plaintiff in this matter to determine whether the market for SCANA Corporation ("SCANA" or the "Company") common stock ("Common Stock") was efficient during the period February 26, 2016 – December 20,

2017, inclusive (the "Class Period").[1] In addition, I have been asked to opine on whether the calculation of damages on a class-wide basis in this matter is subject to a common methodology.

8.    The materials I have considered in forming my opinions are summarized in **Appendix B**. I am being compensated at an hourly rate of $750 per hour for my work on this matter. I am being assisted by staff at Global Economics Group, who performed work under my direction at rates between $200 and $450 per hour. My compensation is in no way contingent on the outcome of this case. My work is ongoing and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

9.    Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for shares of SCANA's Common Stock was efficient during the Class Period.

10.    I have also formed the opinion that damages in this matter can be calculated on a class-wide basis subject to a common methodology.

11.    The remainder of my report is organized as follows: **Section III** describes the case background and the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section IV** presents my analyses of the market efficiency factors during the Class Period. **Section V** addresses how damages can be calculated on a class-wide basis subject to a common methodology. **Section VI** contains my conclusions.

---

[1] I understand the Lead Plaintiff to be International Brotherhood of Electrical Workers Local 98 Pension Fund, and Defendants to comprise SCANA's auditor during the Class Period, Deloitte & Touche, LLP and Deloitte LLP, collectively the "Defendants" or "Deloitte." Source: Consolidated Complaint, *International Brotherhood of Electrical Workers Local 98 Pension Fund on Behalf of Itself and All Others Similarly Situated vs. Deloitte & Touche, LLP and Deloitte LLP*, No. 3:19-cv-3304 (the "Complaint").

III.   **Case Background**

   A. **Overview of the Company and Allegations**

12.      Deloitte, LLP manages U.S. subsidiaries that offer tax, consulting, and financial advisory services, and is the largest professional service organization in the United States.[2] Deloitte & Touche, LLP is the accounting arm of Deloitte, LLP, offering audit and enterprise risk services to clients.[3] SCANA was an energy-based holding company engaged, through subsidiaries, in electric and natural gas utility operations and other energy-related businesses. SCANA's principal and wholly owned subsidiary, South Carolina Electric & Gas ("SCE&G"), was a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.[4] Deloitte was SCANA's external auditor for over 70 years, and subsequently was responsible for understanding SCANA's business, identifying and responding to risks of material misstatements, and acquiring sufficient, appropriate audit evidence so it could assure that SCANA's financial statements were in accordance with Generally Accepted Accounting Principles ("GAAP").[5] It is alleged that throughout the Class Period, Deloitte repeatedly violated its professional responsibilities and deceived investors about SCANA's accounting for, and expected completion of, a multi-billion dollar nuclear energy expansion project of the Virgil C. Summer Nuclear Station in Fairfield County, South Carolina (the "Nuclear Project"). Specifically, it is alleged that Deloitte misled investors by giving "unqualified, 'clean' audit reports" covering SCANA's internal controls and financial statements. Allegedly, this deceived investors into believing that SCANA would complete its Nuclear Project in time to obtain $1.4 billion in nuclear tax credits, despite Deloitte having

---

[2] Complaint ¶22
[3] Complaint ¶¶21-22
[4] Complaint ¶23
[5] Complaint ¶3

5

"voluminous evidence that SCANA could not possibly achieve this goal"[6], and that "numerous reports and documents were available to any reasonably diligent auditor demonstrating that SCANA's financial statements were not in accordance with GAAP, despite Deloitte's 'clean' audit reports to the contrary."[7]

13.     The Complaint alleges that the relevant truth concerning the Nuclear Project was revealed through a series of partial corrective disclosures from late December 2016 through December 20, 2017.[8]   These disclosures included news about cost overruns, missed deadlines, financial distress, and bankruptcy of SCANA's lead contractor on the nuclear project, Westinghouse Electric Company LLC, and its parent company, Toshiba Corporation.[9] The disclosures further included a press release from SCANA on July 31, 2017, announcing its intentions to: a) abandon the nuclear project, and b) file a petition with the South Carolina Public Service Commission ("PSC") seeking approval of its abandonment plan.[10] Further disclosures and materializations of the risks followed, including numerous updates, press releases, news coverage, investigations and lawsuits, public testimony, and regulatory updates, during the summer and fall of 2017. These disclosures culminated in a press release by the PSC on December 20, 2017 (after market hours) and related news coverage that indicated the need for an inspection and hearing to determine the reasonableness of SCE&G's retail electric rates and whether SCANA should refund its customers for the roughly $1.8 billion it had collected from them to fund the Nuclear Project.[11] An investigation and Complaint by the SEC later concluded that SCANA's Class Period statements regarding the status and ultimate failure of the nuclear

---

[6] Complaint ¶1
[7] Complaint ¶15
[8] Complaint ¶312
[9] Complaint ¶¶4, 14, 28
[10] Complaint ¶344
[11] Complaint ¶404

6

project violated the securities laws.[12] As a result of Deloitte's involvement in the fraud, investors allegedly purchased SCANA Common Stock at artificially inflated prices during the Class Period.

14. **Exhibit 1** graphs the closing stock price and trading volume for SCANA's Common Stock shares throughout the Class Period.

## B. Bases for Opinions on Market Efficiency

15. I understand that Plaintiff asserts the "fraud-on-the-market" theory, which posits that shareholders rely on the alleged misrepresentations or omissions made by defendants through their effect on stock prices in an open and well-developed market. If a market is efficient, meaning that widely available public information is quickly incorporated into stock prices, then all purchasers of the stock are induced into reliance on any misrepresentations or omissions because those statements or omissions have distorted the value of each class member's purchase price. The fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to Section 10(b) claims, and was adopted by the U.S. Supreme Court in its *Basic* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[13]

16. This theory was also reaffirmed by the Supreme Court in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort

---

[12] Complaint ¶433
[13] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[14]

17.     As these cases indicate, stock prices quickly incorporate the valuation effects of public statements in an open, developed, and efficient market. In finance, "semi-strong-form" market efficiency refers to a market in which publicly available information is quickly reflected in a security's market price. Thus, if a company omits important information or provides misleading information to shareholders, the stock price will become distorted and either inflated or deflated relative to the price at which the stock would trade but-for the misleading or omitted information. Thus, in an efficient market, purchasers implicitly rely on a company's misrepresentations or omissions because they are impounded into the stock price at which trades are made.

18.     Courts and practitioners have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, should be granted a presumption of efficiency for virtually all securities traded on them.[15] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other exchange rules practically guarantee a liquid market for securities traded on these exchanges.  The fact that SCANA's Common Stock traded in such a well-developed market (under the trading symbol "SCG" on the NYSE) leads to a strong presumption of market efficiency.

---

[14] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[15] See *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*"), citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

19.     Numerous academics have studied the pricing behavior of stock markets and some have purported to identify anomalies that call into question the efficiency of markets. However, academics have generally concluded that these anomalies represent random patterns in the data, are often not scientifically reproducible or robust to different statistical modeling choices, and/or are not persistent and have been quickly eliminated by arbitrage trading. For example, Nobel prize winner Eugene Fama summarizes market efficiency as follows:

> The recent finance literature seems to produce many long-term return anomalies. Subjected to scrutiny, however, the evidence does not suggest that market efficiency should be abandoned. Consistent with the market efficiency hypothesis that the anomalies are chance results, apparent overreaction of stock prices to information is about as common as underreaction. And post-event continuation of pre-event abnormal returns is about as frequent as post-event reversal. Most important, the long-term return anomalies are fragile. They tend to disappear with reasonable changes in the way they are measured.[16]

Similarly, Kewei Hou, Chen Xue, and Lu Zhang concluded that "[m]ost anomalies fail to replicate, falling short of the currently acceptable standards for empirical finance…In all, capital markets are more efficient than previously recognized."[17]

20.     Academic research thus provides a strong presumption for market efficiency. I understand that courts have also developed various tests that attempt to weigh in favor of or against the presumption of market efficiency. None of these tests are individually determinative of market efficiency, but when viewed as a whole they can be informative in supporting or rebutting a presumption of market efficiency in relation to the reliance element of the fraud-on-

---

[16] Eugene F. Fama, 1998, Market Efficiency, Long-Term Returns, and Behavioral Finance, *Journal of Financial Economics* 49, at 304.
[17] Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, *Review of Financial Studies* 33, at 2071.

the-market theory. These factors include what courts have referred to as the *Cammer* and *Krogman*[18] factors, as well as other additional metrics.

21. In the following section, I discuss these factors and evaluate them in relation to SCANA Common Stock. In doing so, I compare the various factors for SCANA's Common Stock against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

22. One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[19] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[20] The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock...Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading

---

[18] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). ("*Krogman*").
[19] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *Accounting Review* 88, at 667-705. ("*MRK Study*").
[20] MRK Study at 678, 681-682.

volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[21]

23.     The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[22] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets. I then compare several of SCANA's market efficiency factors to the samples of firms in the MRK Study to assess whether SCANA's characteristics are consistent with firms operating in efficient markets.

24.     The following section presents my analyses and findings from the evaluation of various market efficiency factors for SCANA Common Stock during the Class Period.

## IV.     Evaluation of Market Efficiency Factors for SCANA Common Stock

### A. *Cammer* Factor 1: Average Weekly Trading Volume

25.     Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security. Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock. Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[23]

---

[21] MRK Study at 667.
[22] MRK Study at 681 (footnotes omitted).
[23] Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63, at 108.

11

26.     Stock trading volume refers to the extent to which a firm's equity is traded among investors during a given time period. The first *Cammer* factor for stock trading volume has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[24]

27.     **Exhibit 2** graphs SCANA's Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[25] The average weekly trading volume was 4.07% of SCANA's common shares outstanding over the Class Period. This level of trading volume significantly exceeds both the 1% and 2% thresholds established by the *Cammer* court. As a result, SCANA's level of stock trading volume throughout the Class Period supports the conclusion that SCANA's Common Stock traded in an efficient market throughout the Class Period.

28.     I also note that the average weekly trading volume of SCANA's Common Stock over the Class Period was 5.81 million shares. According to the authors in the MRK Study, the median *annual* trading volume for the MRK Sample firms was 1.75 million shares while the median for the MRK Covered firms was 11.19 million shares *annually*.[26] Based on SCANA's average *weekly* trading volume of 5.81 million shares during the Class Period, SCANA's trading volume greatly exceeds the median MRK Sample firm's *annual* level. Moreover, the sum of two

---

[24] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).
[25] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.
[26] MRK Study at 678 (Table 3).

12

average weeks of SCANA trading volume would exceed the median MRK Covered firm's *annual* level.[27] This further supports the conclusion that SCANA's Common Stock traded in an efficient market throughout the Class Period.

### B. *Cammer* Factor 2: Analyst Coverage

29.    An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or an industry.  Analysts typically publish reports in which they may assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock. The content of analyst reports includes information that the analyst believes is important for investors. Analyst coverage can be indicative of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities
> analysts followed and reported on a company's stock during the
> class period. The existence of such analysts would imply, for
> example, the [auditor] reports were closely reviewed by investment
> professionals, who would in turn make buy/sell recommendations
> to client investors.[28]

30.    In **Exhibit 3** I report the analyst coverage of SCANA over the Class Period. I identified a total of 186 reports issued by analysts at 13 separate firms.[29] These reports included

---

[27] SCANA's average *weekly* trading volume over the Class Period of 5.81 million shares multiplied by two equals 11.62 million shares.

[28] *Cammer*, 711 F. Supp. at 1286.

[29] I obtained analyst reports covering SCANA from Investext. These statistics represent a lower bound of the analyst coverage of SCANA because many analyst reports are provided directly to investors but are not captured by third-party data vendors such as Investext.

research issued by large, established, and reputable firms such as Morningstar, Wells Fargo, Morgan Stanley, UBS, and Barclays. This is a significant degree of analyst coverage which served to disseminate important new publicly-available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

31.     This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[30] Charles M.C. Lee and Eric So documented that on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[31] In other words, many firms within the category of the least amount of analyst coverage in their sample were covered by only one or two analysts. SCANA's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest. The significant analyst coverage of SCANA, quantified by the number of analyst firms providing coverage as well as the volume of analyst reports generated during the Class Period, supports the conclusion that SCANA's Common Stock traded in an efficient market throughout the Class Period.

32.     In addition to the analyst coverage documented above, investors could access information about SCANA from a variety of other sources.[32] For example, I conducted a search of press and news articles about SCANA using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes Dow Jones Newswires, PR Newswires, The Wall Street Journal, Reuters, MarketWatch, Investor's Business

---

[30] MRK Study at 668.

[31] Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124, at 336 (see Table 1, Panel B – "COV").

[32] Investors can also receive information from online research forums, such as SeekingAlpha, which offers both free and subscription-based research reports. For example, there were nine analyst reports published during the Class Period on SeekingAlpha.

Daily, and numerous other outlets. This search produced over 3,700 articles throughout the Class Period.[33] Moreover, SCANA produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. Individual and institutional investors thus had access to publicly available information about SCANA from a variety of sources during the Class Period. As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about SCANA supports the conclusion that SCANA Common Stock traded in a well-developed and informationally efficient market during the Class Period.

## C. *Cammer* Factor 3: Market Makers

33.    The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate buying and selling – order flow – in a company's stock during trading hours.[34] Market makers can facilitate market efficiency in an over-the-counter market because they are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[35]

---

[33] The articles were identified through two Factiva searches: one using SCANA's company tag over all available sources, and a second using the word "SCANA," but excluding articles generated by SCANA's company tag, and limiting to Major News and Business Sources. I excluded articles covering Scana Industrier or its parent Incus Investors, which are unrelated to SCANA Corporation. I then performed an additional check for articles returned by both searches and removed these duplicates.

[34] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[35] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19, at 291.

34.     In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[36]

35.     The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting. SCANA had at least 116 market makers over the Class Period.[37] In addition, SCANA's Common Stock traded on the New York Stock Exchange ("NYSE") throughout the Class Period. This type of large, national exchange reports volume, prices, bid-ask spreads, and other trading details which ensure that it remains well-developed, liquid, and efficient. The *Cammer* court thus stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[38]

36.     I understand that courts view large, established stock exchanges with designated market makers (such as the NYSE[39]) as being informationally efficient.[40] Moreover, I

---

[36] *Cammer*, 711 F. Supp. at 1293.
[37] Bloomberg "RANK" function.
[38] *Cammer,* 711 F. Supp. at 1292.
[39] The NYSE Market Model, *NYSE*, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery."
[40] *See, e.g., Vinh Nguyen v. Radient Pharmaceuticals Corporation*, 287 F.R.D. 563, 572-73 (C.D.Ca. 2012),: "One defendant in *Cammer* contended that only stocks trading on the New York or American stock exchanges should be

understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally-efficient and informed trading.[41] Academic research has similarly found that institutional investors can facilitate trading liquidity. As I discuss further in Section IV.I below, SCANA's Common Stock was widely held by institutional investors throughout the Class Period.[42]

37.     In sum, SCANA easily satisfies the intent of this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for SCANA Common Stock during the Class Period.

## D. *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

38.     The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number

---

eligible for the presumption of reliance provided by the theory of fraud on the market. In rejecting that broad distinction, the court noted that "the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades." "But the trading location is still important, in one key sense: In an over the counter market, the number of market makers may be a particularly important measure of market efficiency…By contrast, Radient traded on the NYSE Amex during the Class Period which, as Plaintiffs' expert notes, means that it was assigned what that market now calls a Designated Market Maker" (citations omitted). See also: *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D.Ca. 2016), at 6: "The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency."

[41] *See, e.g.*, *In re Countrywide Financial Corp. Securities Litigation*, 273 F.R.D. 586, 614 (C.D.Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading.") (citations omitted); *In re HealthSouth Corp. Securities Litigation*, 257 F.R.D. 260, 281 (N.D. Al. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.")

[42] SCANA Common Stock was held by at least 991 institutional investors at some point during the Class Period (see Exhibit 10). Institutional ownership fluctuated on a quarterly basis throughout the Class Period, from a minimum of 66% of shares outstanding on March 31, 2016 to a maximum of 70% of shares outstanding on March 31, 2017, according to data from S&P Capital IQ and SCANA's SEC Filings. These figures represent a lower-bound estimate of institutional holdings as some institutions may not be reflected in S&P Capital IQ's coverage.

17

of shares traded and value of shares outstanding that involve the facts which imply efficiency.[43]

39.  Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Securities Exchange Act of 1934 ("Exchange Act"), the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[44] The logic and intuition behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

40.  Not only was SCANA eligible to file Forms S-3 throughout the Class Period, but it did so during the Class Period.  Specifically, on September 26, 2016, SCANA filed a Form S-3ASR with the SEC. In addition, SCANA filed a Form S-3ASR with the SEC shortly before and after the Class Period, on August 27, 2015, and March 16, 2018, respectively.[45] A Form S-3ASR is a version of Form S-3 for "a well-known seasoned issuer."[46] Finally, SCANA made all required filings with the SEC on a timely manner during the Class Period. As a result, this factor supports the efficiency of the market for SCANA Common Stock during the Class Period.

---

[43] *Cammer*, 711 F. Supp. at 1287.
[44] https://www.sec.gov/files/forms-3.pdf.
[45] https://www.sec.gov/Archives/edgar/data/754737/000075473716000125/0000754737-16-000125-index.htm;
https://www.sec.gov/Archives/edgar/data/754737/000075473715000062/0000754737-15-000062-index.htm;
https://www.sec.gov/Archives/edgar/data/754737/000075473718000124/0000754737-18-000124-index.htm.
[46] https://www.sec.gov/files/forms-3.pdf.

**E.** *Cammer* **Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices**

41.     The fifth *Cammer* factor relates to whether a company's stock prices quickly respond to and incorporate new value-relevant information. The *Cammer* court held:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[47]

42.     The underlying logic of this test is that in an informationally efficient market, a company's stock price should rapidly incorporate the value of new company-specific information. If, over the course of multiple events, new information becomes public and this information would clearly indicate a significant increase or decrease in firm value, but the company's stock price does not change, this would indicate potential market inefficiency. Alternatively, if the company's stock price does move more on days in which new information was released, this would support a finding of market efficiency. It is important to note that one would only expect to observe this pattern around the release of unexpected and unanticipated value-relevant company news. If investors had already anticipated the value impact of this information, then one would not expect to observe a price reaction to the publication of such information in an efficient market.

43.     To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed SCANA's quarterly and annual earnings announcements during the Class Period. Earnings announcements represent a potential opportunity for the public release of new value-relevant company information to investors. This information can include historical financial and operating performance, forecasts and projections

---

[47] *Cammer,* 711 F. Supp. at 1291.

19

of anticipated future performance of the company, executive statements made during earnings conference calls, analyst reports, other firm-specific news, and some combination and mix of this information. One would not expect every earnings announcement to cause a significant stock price movement for a company since investors and analysts may anticipate the reported performance, or because the information may contain a mix of both positive and negative information. The mix of unanticipated performance, earnings surprises (beyond the earnings forecasted by analysts and investors), forward guidance, executive statements, analyst interpretations of this information, and other company-specific news can cause company stock prices to move in an efficient market. I also considered the fact that other types of news or information could be more or less relevant for a given company during certain time periods.

44.     I compared the stock returns and trading volume of SCANA's Common Stock on trading days following Company earnings announcements versus those metrics on trading days that contained the least news during the Class Period (the "Least News Trading Days").[48] The Least News Trading Days provide a benchmark measurement of days in which relatively less company-specific information was provided to the market. If SCANA's stock prices tend to move more significantly following earnings announcements than on the Least News Trading Days, this would support a conclusion of market efficiency.

45.     In order to study the stock price movements for SCANA on different trading days, I performed an event study.[49] A generally accepted method for performing an event study is to create a regression model over a selected time period to observe the typical relationship between

---

[48] Least News Trading Days were identified as dates with one or no Factiva headlines, earnings announcements, SEC filings, or analyst reports during the Class Period.

[49] An event study is a standard method to analyze the impact of information on market prices that has been adopted in academic research and a wide variety of other applications. See A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 13.

20

the price of the relevant security and market and industry indices. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study method, an economist tests whether the deviation from expected price movements (i.e., the abnormal return) is sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

46.     Here, I performed an event study to evaluate whether SCANA's Common Stock responded to information disclosed in the Company's earnings announcements. To conduct the event study, I deployed the methodologies described above that are well-established in academic literature and routinely applied and accepted in the context of securities fraud litigation.

47.     In an effort to isolate the impact of Company-specific news on SCANA's stock price during the Class Period, I performed regression analyses to measure the relationship between SCANA's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in SCANA's industry. By modeling how SCANA's stock price returns moved relative to an overall market index and an industry index, I could also measure its response to Company-specific news.

48.     For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (approximately six months). It is common practice to employ a 120-

day Estimation Window.[50] To study the relationship between SCANA's stock price returns and overall market factors, I used the S&P 500 Total Return Index (the "Market Index"). The Market Index is commonly used by economists as a representation of the overall market. To study the relationship between SCANA's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in SCANA's particular industry, I constructed an industry index (the "Industry Index") made up of members of the S&P 500 Utilities Index, which SCANA compared its performance to in its DEF 14A SEC filings for the years ending during the Class Period.[51]

49.     I established the relationship between the daily return of the Company stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[52] As shown in **Exhibit 4**, the event study model revealed a generally positive relation between the Company's daily returns and those of the overall stock market and industry. In other words, movements of the Market Index and Industry Index help explain movements in SCANA's stock price. This allowed me to predict the expected daily return of the Company on a date, once

---

[50] *See, e.g.*, Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *The Business Lawyer* 49, at 568 ("The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study."); A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.")

[51] The S&P 500 Utilities Index included 28 constituents during this time period. Since SCANA was a member of the S&P 500 Utilities Index during the Class Period, I created a market capitalization-weighted Industry Index of the S&P 500 Utilities Index constituents other than SCANA. The Industry Index returns are net of the S&P 500 Total Return Index returns.

[52] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."); *see also* Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50, at 1597.

I controlled for that day's market and industry returns. I then subtracted the predicted return from the actual return to get the "abnormal" return, which represented the component of the return that is not attributable to market-wide or industry-wide movements.

50. Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in the Company stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much "randomness" remains in the price movement of SCANA's Common Stock, after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period. My rolling regression event study adjusts for changing volatility in SCANA's Common Stock over time.

51. To test for statistical significance, I calculated the t-statistic, which is the test that economists use to determine whether randomness can be rejected as the explanation for an abnormal price movement. The t-statistic measures the number of standard deviations between the actual observation and the predicted movement. It is calculated by dividing the abnormal return by the standard deviation of the errors. Probability theory suggests that under the standard assumption that abnormal returns will be normally distributed with a mean of zero in the absence of new value-relevant company-specific news, based purely on randomness, using a 95% confidence level and a sufficiently large sample size, an abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) approximately 5% of the time in the absence of new

23

company-specific information.[53] In other words, there is a 95% chance that, barring some non-random explanation, the actual observed return will fall within 1.96 standard deviations of the predicted return.

52.     **Exhibit 6** reports the event study results of SCANA's seven earnings announcement dates during the Class Period. The columns list the dates, description of the earnings release, closing stock price, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, and the p-value for interpretation of statistical significance of the stock movement. Overall, three SCANA earnings announcements caused stock price movements that were statistically significant at the 95% level. I compare this rate with that on the Least News Trading Days in the following exhibit.

53.     **Exhibit 7** summarizes the statistical comparison of SCANA's stock returns and trading volume following the seven earnings announcements versus these metrics as measured on the Least News Trading Days. The Least News Trading Days include 41 observations, meaning that the tests of statistical significance are based on 48 observations. As shown in the exhibit, 42.9% of the earnings announcements caused stock movements that were statistically significant at the 95% level. This compares to 0.0% of the Least News Trading Dates with statistically significant stock price movements. This difference is itself significant at the 99% level. This provides strong evidence of a cause-and-effect relationship between information and SCANA Common Stock price movements.

54.     This exhibit also shows that the average of the absolute value of stock price movements following SCANA's earnings announcements was 1.0%. This compares to an

---

[53] David I. Tabak and Frederick C. Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom, Litigation Services Handbook, The Role of the Financial Expert, Ch. 19*, (*3rd ed.* 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

average of only 0.3% on the Least News Trading Days. This difference is statistically significant at the 99% level. This further supports a finding of a strong cause-and-effect relationship between information and SCANA Common Stock price movements.

55. Finally, this exhibit reports an average daily trading volume of 1.4 million shares for SCANA Common Stock following earnings announcements. This compares to an average daily trading volume of 0.7 million shares on the Least News Trading Days. The difference between these two levels is statistically significant at the 99% level, providing further evidence of the cause-and-effect relationship between information and SCANA's Common Stock price movements.

56. In summary, relative to other trading days, SCANA's earnings announcements caused a significantly greater proportion of statistically significant stock price movements, absolute levels of price changes, and increases in trading volume. This finding establishes a clear cause-and-effect relationship between new company-specific information and SCANA Common Stock price movements. As a result, this price impact analysis supports the conclusion that SCANA's Common Stock traded in an efficient market during the Class Period.

## F. Additional Factor 1: Market Capitalization

57. I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[54] Moreover, the *Krogman* court stated "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there

---

[54] *Cammer*, 711 F. Supp. at 1287.

is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[55]

As stated previously, the MRK Study found that firms lacking analyst coverage had other

indicators of trading in less developed and efficient markets, including smaller market

capitalizations. The median market capitalization of the MRK Sample firms was $27.91

million.[56] By contrast, the MRK Covered firms had a median market capitalization of $243.97

million.[57] This study supports the view that firms with larger market capitalizations tend to trade

in more efficient markets.

58.     **Exhibit 8** reports SCANA's market capitalization throughout the Class Period.

This market capitalization exceeded $5.89 billion throughout this time frame, and averaged $9.4

billion over the Class Period.  This greatly exceeds the median market capitalization value for the

MRK Covered firms.[58] Moreover, SCANA's number of shares outstanding ranged from 142.62

million shares to 142.92 million shares during the Class Period.[59] As a result, SCANA's market

capitalization supports the conclusion that the Common Stock traded in an efficient market

during the Class Period.

## G.  Additional Factor 2: Bid-Ask Spread

59.     The *Krogman* court considered the bid-ask spread as another factor that can

indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market,

because it suggests that the stock is too expensive to trade."[60] The bid-ask spread is the

difference between the price at which an investor could purchase a stock (the ask) and the price

at which an investor could sell the stock (the bid). This spread can be expressed as the difference

---

[55] *Krogman,* 202 F.R.D. at 478.
[56] MRK Study at 678 (Table 3).
[57] MRK Study at 678 (Table 3).
[58] SCANA's market capitalization also significantly exceeds these levels on an inflation-adjusted basis.
[59] Shares outstanding obtained from SCANA SEC filings during the Class Period.
[60] *Krogman*, 202 F.R.D. at 478.

26

between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally-efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

60.     I analyzed the bid-ask spread of SCANA's Common Stock during the Class Period. **Exhibit 9** reports the monthly average bid-ask spread as a percentage of the bid-ask midpoint over this time period.[61] This spread fluctuated between 0.010% and 0.035% from March 2016 through November 2017.[62]

61.     By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55% while the MRK Covered firms had a median bid-ask spread of 1.69%.[63] SCANA's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade SCANA's Common Stock at very low relative cost. As a result, SCANA's bid-ask spread supports the conclusion that the Common Stock traded in an efficient market during the Class Period.

---

[61] The bid-ask spread was calculated by taking the average of the difference between the ask price and the bid price during trading hours on the primary exchange of the security, the NYSE, weighted by the amount of time each quote prevailed in the market. I calculated the weighted average quote, with the weight being the number of seconds between a given quote and the next quote that was reported. The bid-ask spread is calculated as the difference between the ask price and bid price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang and Hans R. Stoll, 1996, Dealer Versus Auction Markets: A Paired Comparison of Execution Costs on NASDAQ and the NYSE, *Journal of Financial Economics* 41.

[62] I also examined the dates from February 2016 and December 2017 that were part of the Class Period, and report them in Exhibit 9. The Class Period dates from February 2016 had an average bid-ask spread of 0.04%, and the Class Period dates from December 2017 had an average bid-ask spread of 0.01%. I noted, however, that neither of these figures was computed using a full month of data. Quote Data for SCANA's Common Stock was obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[63] MRK Study at 678 (Table 3).

## H. Additional Factor 3: Public Float

62.     The *Krogman* court also considered the public float of a company in weighing market efficiency.[64] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

63.     **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for SCANA Common Stock during the Class Period. As shown in the exhibit, SCANA insiders held less than 10% of the Common Stock throughout the Class Period (average = 8%). Thus, approximately 92% of SCANA's common shares were held by institutions and other outside investors. This large degree of public float for SCANA's Common Stock supports the conclusion that it traded in an efficient market during the Class Period.

## I. Additional Factor 4: Institutional Ownership

64.     Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

65.     I also report the total institutional ownership of SCANA Common Stock in **Exhibit 10,** which shows that at least 991 institutions held the stock at some point during the

---

[64] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

Class Period. By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors while the MRK Covered firms had a median of 40 institutional investors.[65] SCANA's institutional ownership base greatly exceeds both of these levels. Thus, the significant institutional ownership base for SCANA Common Stock supports the conclusion that the Common Stock traded in an efficient market during the Class Period.

## J. Additional Factor 5: Autocorrelation

66.    Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns. The interval over which autocorrelation is examined tends to be on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated. A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days. A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are positive (negative) in order to capture profits when the returns reverse. Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters, and is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly-available information about prior stock price movements would not be fully reflected in current stock prices.

---

[65] MRK Study at 678 (Table 3).

29

67.     I use an established methodology, *i.e.*, a regression analysis, to test for autocorrelation in SCANA's Common Stock returns.[66] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[67] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

68.     **Exhibit 11** presents the results from the autocorrelation test for SCANA's Common Stock during the Class Period. The autocorrelation coefficient over the full Class Period is not statistically significant.[68] Moreover, the quarterly autocorrelation coefficients alternate between negative and positive throughout the Class Period, indicating no consistent predictability in the Company's daily stock returns over time. Thus, I find no evidence of persistent autocorrelation in SCANA's Common Stock returns. This finding supports the conclusion that SCANA's Common Stock traded in an efficient market during the Class Period.

K. **Additional Factor 6: Options Trading**

69.     Academic studies have shown that options written on company stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as indicated

---

[66] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor five analysis section of this report (IV.E).

[67] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, *Journal of Financial Economics* 6, at 95-101.

[68] I excluded one outlier daily return on July 28, 2017 (an alleged corrective disclosure). This date generated an artificial autocorrelation result due to consecutive days of news releases, but would not be indicative of riskless arbitrage driven by market inefficiency.

by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[69] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading. According to iVolatility, SCANA Common Stock had 73,619 call option contracts and 76,964 put option contracts traded during the Class Period. This significant level of options trading supports the conclusion that SCANA's Common Stock traded in an efficient market during the Class Period.

## V. Ability to Calculate Damages on a Class-Wide Basis

70. I have been asked by Counsel to evaluate whether per-share damages can be assessed for all Class members under §10(b) of the Exchange Act based upon a methodology common to all class members and consistent with Lead Plaintiff's theory of liability. The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act. This approach calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Securities Litigation Reform Act of 1995 ("PSLRA").[70] This limit on damages can also be applied class-wide. I understand that this out-of-pocket methodology has been widely accepted for use across 10(b) matters.

---

[69] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53. See also: Stephen A. Ross, 1976, Options and Efficiency, *Quarterly Journal of Economics* 90.

[70] The PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." See, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

71.     The claims process produces information necessary for the calculation of damages for each Class member, including the purchase and sale information for the security. This information is available from brokerage statements and other documentation of securities transactions. Artificial inflation per share is quantified for each day of the Class period and then damages are calculated using the formula described above. As a result, the methodology for calculating damages in Section 10(b) matters such as this is well-established and formulaic across all Class members.

72.     The quantification of artificial inflation per share is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and I understand that such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

73.     Event studies are widely-employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations.[71] To the extent that reliable evidence is introduced to show that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of SCANA securities can be determined on a common, class-wide basis using various accepted methodologies.  The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during the discovery process, and will be based on the specific set of facts and circumstances in a given case.

---

[71] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

74.    A loss causation analysis must also document how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery. One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period. Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. In other instances, artificial inflation may have varied on a daily basis and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents. All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual class member identities or circumstances.

75.    To summarize, I have not been asked to calculate damages in this matter. Such loss causation analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of claims in this matter, I conclude that damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## VI.    Conclusion

76.    In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I conducted my analyses, it is my opinion that SCANA's Common Stock

traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

77.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 30, 2021

Matthew D. Cain

34

**Appendix A**

**Matthew D. Cain, Ph.D.**  April 2021

E-mail: mdcain@outlook.com  Homepage
Mobile: 574-485-8065  SSRN

## Education

Ph.D., Finance, August 2007  Purdue University, West Lafayette, IN
B.S., Finance, May 2001  Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business; *Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-Present

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).


**Presentations**

Arizona State University College of Law, 2020
U.C. Berkeley School of Law, 2019; 2018
Vanderbilt University Law School, 2019
Berkeley Center for Law and Business, 2018
Cornerstone Research, 2018
Cornell University, 2016; 2015
Oxera, London, 2016
Institute for Law and Economics, University of Pennsylvania, 2015
U.C. Berkeley M&A Roundtable, New York, 2015
American Bar Association, Business Law, Private Equity M&A Subcommittee meeting, 2015
Virginia Commonwealth University, 2015
American Finance Association, annual meeting, 2015
Argentum Centre for Private Equity Symposium, Bergen, Norway, 2014
U.S. Securities and Exchange Commission, 2014
American Law and Economics Association, University of Chicago, 2014
The Brattle Group, 2013
U.S. Securities and Exchange Commission, 2013
Institute for Law and Economics, University of Pennsylvania, 2013
All Indiana Conference, 2013; 2010; 2009

American Law and Economics Association, Stanford Law School, 2012
George Washington University Law School, 2012
American Finance Association, annual meeting, 2012
Ohio State, 2011
Ohio University, 2011
Conference on Empirical Legal Studies, Yale Law School, 2010
Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden, 2010
Purdue Alumni Conference, 2010
American Finance Association, annual meeting, 2008
Indiana University, 2008
Penn State, 2008
University of Arizona, 2008
University of Colorado, 2008
University of Florida, 2008
University of North Carolina at Chapel Hill, 2008
University of Notre Dame, 2008
University of Oregon, 2008
University of Pittsburgh, 2008
Virginia Tech, 2008
Financial Management Association, annual meeting, 2007
University of Georgia, 2007
University of Kentucky, 2007
Western Finance Association, annual meeting, 2006

**Journal Referee**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *European Financial Management*, *Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law
    LAW 251.52: Economics of Corporate and Securities Litigation, Fall: 2020

University of Notre Dame, Mendoza College of Business
    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
    MGMT 610: Financial Management I (MBA Core), Fall: 2007

**Expert Witness Experience**

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021.

- *Mark Stoyas and New England Teamsters & Trucking Industry Pension Fund, Plaintiffs, and Automotive Industries Pension Trust Fund, Lead Plaintiff, v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

Appendix B

# Documents Considered

**Court Documents:**

- Consolidated Complaint, *International Brotherhood of Electrical Workers Local 98 Pension Fund on Behalf of Itself and All Others Similarly Situated vs. Deloitte & Touche, LLP and Deloitte LLP*, No. 3:19-cv-3304.

**Court Decisions and Securities Law:**

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).
- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).
- *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D.Ca. 2016)
- *In re Countrywide Financial Corp. Securities Litigation*, 273 F.R.D. 586, 614 (C.D.Ca. 2009)
- *In re HealthSouth Corp. Securities Litigation*, 257 F.R.D. 260, 281 (N.D.Al. 2009)
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.
- *Vinh Nguyen v. Radient Pharmaceuticals Corporation*, 287 F.R.D. 563, 572-73 (C.D.Ca. 2012)

**Academic Literature:**

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, *Journal of Finance* 61.
- Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19.
- Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50.
- Eugene F. Fama, 1998, Market Efficiency, Long-term Returns, and Behavioral Finance, *Journal of Financial Economics* 49.
- Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, *Review of Financial Studies* 33.
- Roger D. Huang and Hans R. Stoll, 1996, Dealer Versus Auction Markets: A Paired Comparison of Execution Costs on NASDAQ and the NYSE, *Journal of Financial Economics* 41.
- Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, *Journal of Financial Economics* 6.
- Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53.

- Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124.
- A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 13.
- Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *The Business Lawyer* 49.
- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *Accounting Review* 88.
- Stephen A. Ross, 1976, Options and Efficiency, *Quarterly Journal of Economics* 90.
- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," LITIGATION SERVICES HANDBOOK, THE ROLE OF THE FINANCIAL EXPERT, (3rd ed. 2001).
- Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63.

**Data Sources:**

- Factiva News
- Investext Analyst Reports
- iVolatility Historical Options data
- SEC Edgar Online
- S&P Capital IQ Historical Stock Data
- SCANA Press Releases
- TICK Data for Stock Quotes
- Bloomberg Terminal

**Other:**

- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.
- https://www.sec.gov/files/forms-3.pdf.
- https://www.nyse.com/market-model
- https://www.sec.gov/Archives/edgar/data/754737/000075473716000125/0000754737-16-000125-index.htm
- https://www.sec.gov/Archives/edgar/data/754737/000075473715000062/0000754737-15-000062-index.htm
- https://www.sec.gov/Archives/edgar/data/754737/000075473718000124/0000754737-18-000124-index.htm

**Exhibit 1**



**Common Stock Price and Volume**
**2/26/2016 - 12/31/2017**

Class Period: 2/26/2016 - 12/20/2017

Data Source: S&P Capital IQ   ■ Volume  —— Price  ◆ First Alleged Corrective Disclosure

**Exhibit 2**



**Average Weekly Trading Volume**
**2/26/2016 - 12/20/2017**

Data sources: S&P Capital IQ and SEC Filings.

**Exhibit 3**

## Analyst Coverage
## Class Period: 2/26/2016 - 12/20/2017

| # | Analysts | Reports Published |
|---|----------|-------------------|
| 1 | Morningstar | 49 |
| 2 | Wells Fargo Securities, LLC | 29 |
| 3 | Minkabu | 16 |
| 4 | CFRA Research | 15 |
| 5 | Gabelli & Company | 14 |
| 6 | UBS Research | 13 |
| 7 | Guggenheim Securities LLC | 12 |
| 8 | BuySellSignals Research | 9 |
| 9 | Morgan Stanley | 9 |
| 10 | The Williams Capital Group | 9 |
| 11 | Barclays | 5 |
| 12 | Macquarie Research | 5 |
| 13 | theScreener | 1 |
| | **Total** | **186** |

Data Source: Investext.

**Exhibit 4**



**Coefficients from Rolling Event Study Regressions**
**2/26/2016-12/20/2017**

—— Market Cap-Weighted Peer Index Coefficient        ----- S&P 500 Total Return Index Coefficient

Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for the S&P 500 Total Return Index and a Market Capitalization-Weighted Peer Index. The Peer Index consists of the members of the S&P 500 Utilities Index during the Class Period; SCANA compares its stock performance to the S&P 500 Utilities Index in the Company's DEF 14A SEC filings for the years ending during the Class Period. Returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcement dates, the alleged Corrective Disclosures, and two outlier dates (7/31/2017, SCANA ceases construction and will file plan of abandonment of the nuclear project; 8/1/2017, SCANA executives hold briefing with SC Public Service Commission on loss recovery) were excluded from estimation. Data from S&P Capital IQ.

**Exhibit 5**



**Root Mean Squared Error (RMSE) for Rolling Event Study Regressions**
**2/26/2016-12/20/2017**

Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for the S&P 500 Total Return Index and a Market Capitalization-Weighted Peer Index. The Peer Index consists of the members of the S&P 500 Utilities Index during the Class Period; SCANA compares its stock performance to the S&P 500 Utilities Index in the Company's DEF 14A SEC filings for the years ending during the Class Period. Returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcement dates, the alleged Corrective Disclosures, and two outlier dates (7/31/2017, SCANA ceases construction and will file plan of abandonment of the nuclear project; 8/1/2017, SCANA executives hold briefing with SC Public Service Commission on loss recovery) were excluded from estimation. Data from S&P Capital IQ.

**Exhibit 6**

## Event Study Analysis of SCANA Earnings Announcements During the Class Period

| Date | Market Date | Event | Price | Raw Return | Abn. Return | Abn. Dollar | T-Stat | P-Value |
|---|---|---|---|---|---|---|---|---|
| 4/28/2016 | 4/28/2016 | FY 2016 Q1 Earnings *Source: PR Newswire* | $67.81 | 1.12% | 1.15% | $0.77 | 2.11 | 0.04 |
| 7/28/2016 | 7/28/2016 | FY 2016 Q2 Earnings *Source: PR Newswire* | $73.94 | 1.01% | 0.67% | $0.49 | 1.54 | 0.13 |
| 10/27/2016 | 10/27/2016 | FY 2016 Q3 Earnings *Source: PR Newswire* | $71.13 | -0.49% | 0.06% | $0.04 | 0.18 | 0.86 |
| 2/16/2017 | 2/16/2017 | FY 2016 and Q4 Earnings *Source: PR Newswire* | $67.32 | -0.22% | -1.34% | -$0.90 | -2.75 | 0.01 |
| 4/27/2017 | 4/27/2017 | FY 2017 Q1 Earnings *Source: PR Newswire* | $67.24 | 0.42% | 0.12% | $0.08 | 0.22 | 0.83 |
| 8/3/2017 | 8/3/2017 | FY 2017 Q2 Earnings *Source: PR Newswire* | $65.34 | -2.70% | -3.13% | -$2.10 | -4.74 | 0.00 |
| 10/26/2017 | 10/26/2017 | FY 2017 Q3 Earnings *Source: PR Newswire* | $47.83 | 0.55% | 0.67% | $0.32 | 0.93 | 0.36 |

Data sources: S&P Capital IQ and Factiva.

Notes: The results are based on a rolling regression of the previous 120 trading days as described in Exhibits 4 and 5.

**Exhibit 7**

### Statistical Comparison of SCANA Returns and Volume on
### Earnings Announcement vs. Least News Trading Days

|  | Earnings Announcements | Least News Trading Days | P-Value for Differences | Significance Level |
|---|---|---|---|---|
| N | 7 | 41 | | |
| # of Significant Days at 95% Level | 3 | 0 | | |
| % of Significant Days at 95% Level | 42.9% | 0.0% | 0.00 | >99% |
| Average Absolute Abnormal Return | 1.0% | 0.3% | 0.00 | >99% |
| Average Volume (Millions) | 1.4 | 0.7 | 0.00 | >99% |

Notes: The seven earnings announcement dates and market trading days are listed in the previous exhibit. Least News Trading Days were identified as dates with one or no Factiva headlines, earnings announcements, SEC filings, or analyst reports during the Class Period. Data from S&P Capital IQ, SEC EDGAR, Factiva, and Investext.

**Exhibit 8**



Market Capitalization
2/26/2016 - 12/31/2017

Class Period: 2/26/2016 - 12/20/2017
Average Market Capitalization Over the
Class Period: $9.4 billion

Data sources: S&P Capital IQ and SEC filings.

45

**Exhibit 9**

**Bid-Ask Spread**
**2/26/2016 - 12/20/2017**



Data Source: TICK Data
Notes: February 2016 and December 2017 dates analyzed are limited to the Class Period.

**Exhibit 10**

### SCANA Common Stock Public Float, Insider Holdings, and Institutional Ownership

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Ownership (in 000s) | Institutional Ownership % of Shares Outstanding | Institutional Ownership % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 3/31/2016 | 142,917 | 617 | 12,873 | 5,741 | 135,785 | 9% | 94,538 | 66% | 70% |
| 6/30/2016 | 142,917 | 640 | 12,901 | 5,281 | 135,297 | 9% | 95,150 | 67% | 70% |
| 9/30/2016 | 142,917 | 624 | 12,872 | 4,839 | 134,884 | 9% | 94,818 | 66% | 70% |
| 12/31/2016 | 142,917 | 647 | 11,606 | 5,069 | 136,380 | 8% | 95,160 | 67% | 70% |
| 3/31/2017 | 142,917 | 643 | 11,618 | 5,306 | 136,606 | 8% | 99,335 | 70% | 73% |
| 6/30/2017 | 142,917 | 638 | 11,572 | 5,462 | 136,807 | 8% | 98,186 | 69% | 72% |
| 9/30/2017 | 142,917 | 622 | 11,575 | 4,139 | 135,481 | 8% | 97,920 | 69% | 72% |
| 12/31/2017 | 142,616 | 605 | 7,285 | 5,150 | 140,481 | 5% | 96,959 | 68% | 69% |
| **Total Institutions over Class Period:** | | **991** | | | **Average:** | **8%** | | **68%** | **71%** |

Data Sources: S&P Capital IQ and SEC Filings.

47

**Exhibit 11**

## SCANA Common Stock

## Test for Autocorrelation During the Class Period

| Quarter | Coefficient on Previous Day's Abnormal Return | T-Statistic | P-Value |
|---|---|---|---|
| Q1 2016 | -0.37 | -1.90 | 0.07 |
| Q2 2016 | -0.03 | -0.24 | 0.81 |
| Q3 2016 | 0.14 | 1.13 | 0.26 |
| Q4 2016 | 0.08 | 0.61 | 0.54 |
| Q1 2017 | -0.09 | -0.72 | 0.47 |
| Q2 2017 | -0.04 | -0.29 | 0.77 |
| Q3 2017 | 0.25 | 2.04 | 0.05 |
| Q4 2017 | -0.21 | -1.68 | 0.10 |
| **Class Period** | **-0.03** | **-0.73** | **0.47** |

Data Source: S&P Capital IQ

Notes: The autocorrelation testing period is February 26, 2016 through December 20, 2017. I performed a regression each quarter and over the full Class Period with event study daily abnormal returns as the dependent variable and the event study daily abnormal returns lagged by one trading day as the independent variable. One outlier daily return on July 28, 2017 was removed from the analysis (an alleged Corrective Disclosure date).

**Appendix D**

**Matthew D. Cain, Ph.D.**

**Rebuttal Report**

3:19-cv-03304-JFA Document 116-8 Entry Number 222-3 Page 259 of 331

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

|  |  |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND on behalf of itself and all others similarly situated,<br> Plaintiffs,<br><br>vs.<br><br>DELOITTE & TOUCHE, LLP; DELOITTE LLP,<br> Defendants. | Case No. 3:19-cv-3304<br><br><u>CLASS ACTION</u> |

# EXPERT REBUTTAL REPORT OF MATTHEW D. CAIN, PH.D.

March 7, 2024

# Table of Contents

I.     Introduction ............................................................................................................... 2

II.    Summary of Opinions .............................................................................................. 3

III.   Background on the Fraud-on-the-Market Theory and Stock Prices.................................... 7

IV.   The Out-of-Pocket Methodology is Widely Accepted by Courts and Addresses Defendants' Misplaced Concerns Regarding Plaintiff's Theory of Liability ................................ 9

    A.  Materialization of Risk ...................................................................................... 11

    B.  Defendants' Arguments Relate to Apportionment of Liability and Not to Damages Methodology ............................................................................................... 13

    C.  Defendants Mischaracterize My Deposition Testimony.................................... 16

V.    The Out-of-Pocket Methodology Can Readily Accommodate a Shortened Class Period, Which Defendants Fail to Establish....................................................................................... 18

VI.   Conclusion............................................................................................................ 20

Appendix A.................................................................................................................... 21

Appendix B.................................................................................................................... 27

Appendix C.................................................................................................................... 32

## I.    Introduction

1.    On April 30, 2021, I submitted an expert report in this matter (my "Opening Report") (ECF No. 185-2 (Ex A)), in which I concluded that: (a) the market for shares of SCANA Common Stock was efficient during the entire Class Period, and (b) damages in this matter can be calculated on a class-wide basis subject to a common methodology.[1]

2.    Following the submission of my Opening Report, I was deposed by Defendants' counsel in this matter on September 14, 2021 ("Cain Deposition" or "my Deposition Testimony").[2]

3.    Most recently, Counsel provided me with Defendants' Opposition to Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel ("Defendants' Opposition to Class Certification") (ECF No. 189) and Defendants' Motion to Exclude Damages-Related Expert Opinions of Dr. Matthew D. Cain ("Defendants' Motion to Exclude") (ECF No. 188). I have been asked to review, evaluate, and respond to certain arguments presented in these filings.

4.    My qualifications and rate of compensation for work in this matter were identified in my Opening Report and I do not repeat them here. I have attached an updated version of my curriculum vitae as **Appendix A**. I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

---

[1] *See* ECF No. 185-2 (Ex. A) ("Opening Report") ¶¶ 7, 9, 10, 75. I continue to hold the opinions expressed in my Opening Report and reiterate them here. Capitalized terms in this declaration have the same meaning as in my Opening Report.

[2] Deposition of Matthew Cain, Ph.D. via Remote Videoconference, in *International Brotherhood of Electrical Workers Local 98 Pension Fund on Behalf of Itself and All Others Similarly Situated vs. Deloitte & Touche, LLP and Deloitte LLP*, taken on September 14, 2021 ("Cain Deposition").

5.      In formulating my opinions set forth in this Expert Rebuttal Report, I have relied upon the analyses already described in my Opening Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this matter. I also performed additional research to evaluate certain assertions made in Defendants' Motion to Exclude and Defendants' Opposition to Class Certification. All of the materials I have considered in forming my opinions are identified in **Appendix B** to this Rebuttal Report, in addition to those previously identified in Appendix B to my Opening Report.

## II.    Summary of Opinions

6.      Nothing in either Defendants' Opposition to Class Certification or Defendants' Motion to Exclude disturbs the opinions expressed in my Opening Report or my Deposition Testimony.

7.      There are a number of important opinions I express in my Opening Report that Defendants do not dispute. First, Defendants do not dispute my conclusion that SCANA Common Stock traded in an efficient market throughout the entirety of the Class Period. In my Opening Report, I test SCANA Common Stock market efficiency by evaluating 11 separate factors (including the *Cammer* and *Krogman* factors). Defendants do not dispute my analyses of *any* of these 11 factors.

8.      Second, Defendants do not offer any criticism of the event study regression specified in my Opening Report. Defendants do not perform their own event study, nor do they dispute that I performed a valid event study regression that controls for market and industry effects and accurately measures the abnormal returns exhibited by SCANA Common Stock during the Class Period and on the alleged corrective disclosure dates.  They also do not dispute

3

that an event study regression, like the one I conducted in my Opening Report, is one of the economically valid methods for conducting a loss causation and damages analysis.

9.     Third, Defendants do not offer an opinion related to price impact, and therefore do not establish a lack of price impact from their alleged misrepresentations.

10.     Fourth, Defendants do not dispute that the general damages framework and methodology (*i.e.*, the out-of-pocket method) that I detail in my Opening Report is standard, reasonable, and relied upon in virtually all securities class action matters alleging fraud claims under Section 10(b) of the Exchange Act. Nor do they put forward any alternative approach that would be more suitable in this matter.

11.     Defendants, however, claim that the out-of-pocket methodology is incapable of measuring damages attributable to Plaintiff's theory of liability. Defendants' opinion is incorrect, and Defendants' attempt to support their position mischaracterizes my Opening Report analyses and my Deposition Testimony. Further, Defendants fail to provide any expert report or evidence to support this argument.

12.     To start, Defendants falsely bifurcate Plaintiff's theory of liability into what they term a "'materialization of risk' theory" and a "'corrective disclosures' theory."[3] They then claim that I have not identified a methodology that can accommodate damages that arise separately through these theories.[4] To the contrary, the out-of-pocket methodology discussed in my Opening Report fits Plaintiff's actual singular theory of liability in this matter—that through a series of corrective disclosures and/or materialization of risk events, the market learned the truth about the Nuclear Project, the risks of non-completion in time to obtain the nuclear tax

---

[3] Defendants' Opposition to Class Certification, p. 4.

[4] *Id.*, pp. 4-5.

credits, of investigations and regulatory proceedings, and of SCANA's ability to recoup losses

from the project through the Base Load Review Act ("BLRA").[5] My out-of-pocket damages

methodology is flexible and robust enough to accommodate Defendants' concerns regarding

materialization of risk corrective disclosure events. It is regularly relied upon by experts at the

class certification stage (and beyond) as a method for calculating class-wide damages in matters

involving materialization of risk corrective disclosure events, including in cases that I have

opined on and which have been recently certified in this Circuit.[6]

13.    Defendants also argue that because the market commentary on the alleged

corrective disclosure dates put forth by Plaintiff do not reference Deloitte's audit reports, the

alleged false and misleading audit reports could not have resulted in any movement in SCANA's

stock price on the corrective disclosure dates.[7] However, and as I explain below, this assumption

ignores Plaintiff's allegations. Specifically, Plaintiff alleges that ***Defendants' misconduct***

***surrounding their audit reports concealed from investors*** the risk that, among other things, the

Nuclear Project would not be in service by 2021, SCANA would not meet the deadline to receive

credits pursuant to the nuclear production tax credits, that SCANA would be subject to

investigations and regulatory action, and that SCANA would be unable to recoup losses from the

project through the BLRA.[8] As set forth below, on the dates Plaintiff alleges as corrective

disclosures, the information environment (including analyst commentary) and my event study

---

[5] *See, e.g.,* Complaint ¶ 474.

[6] *See, e.g.,* Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation*, p. 37. Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, dated October 14, 2020, *In re Under Armour Securities Litigation*, Civil No. RDB-17-388, at ¶ 377: "The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the ***risk caused by Defendants' fraud materialized, through partial revelations of truthful informatio***n." (Emphasis Added.) At ¶ 404: "These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very ***risks they sought to warn of began to materialize***." (Emphasis Added.)

[7] Defendants' Opposition to Class Certification, pp. 24-26.

[8] Complaint ¶¶ 1, 13, 265-311.

analysis establishes that SCANA Common Stock declined as a direct result of its prudency regarding the Nuclear Project and its potential inability to recoup losses from the project—the very same information Plaintiff alleges Defendants' audit reports concealed.[9] In other words, this analysis provides clear evidence of the price impact of the allegations in this matter.

14.    Defendants' assertions regarding the need for a damages methodology in this matter that "separates out losses allegedly caused by Deloitte's audit reports from losses allegedly arising from misstatements by SCANA and its management,"[10] if relevant, concern whether case-specific adjustments may ultimately be needed at the ***merits*** stage and not at the class certification stage of litigation. This concern relates to how to isolate corrective information from confounding information, if any, on the alleged corrective disclosures and how to measure artificial inflation. Answering these questions requires an exhaustive loss causation analysis, which I understand is not required at the class certification stage of litigation. These more nuanced issues regarding loss causation (*i.e.*, disaggregating the impact of confounding information) are present in virtually every certified securities class action matter, are routinely the subject of expert discovery during the merits phase of the litigation, and in any event, such analyses are determined based upon proof that is common to all class members. I clearly explain this in my Opening Report.[11] As explained there, the out-of-pocket methodology – which can rely on an event study (such as the one presented in my Opening Report and which Defendants do not dispute is reliable) – can accommodate artificial inflation that accounts for any confounding information.[12]

---

[9] *See*, **Appendix C**.

[10] Defendants' Opposition to Class Certification, p. 20.

[11] Opening Report ¶¶ 71-75.

[12] *Id*. ¶ 73.

15.     Finally, Defendants claim the full relevant truth was disclosed no later than July 31, 2017 – when SCANA abandoned the Nuclear Project; and perhaps as early as February 24, 2017 – when SCANA disclosed that there were "significant risks and uncertainties" regarding Westinghouse's ability to fulfill its performance related to the Nuclear Project.[13] However, Plaintiff alleges that the false and misleading statements attributable to Deloitte were not fully corrected until the end of the Class Period. Under either scenario, the out-of-pocket methodology described in my Opening Report is flexible enough to accommodate the inclusion or exclusion of different corrective disclosure dates and/or an alternative end date to the Class Period. Additionally, my event study demonstrates there is price impact on the alleged corrective disclosure dates following both February 24, 2017 and July 31, 2017, and the information environment around these subsequent alleged corrective disclosure dates included new details related to SCANA's prudency regarding the Nuclear Project, the threat of investigations and regulatory action, and SCANA's ability to recoup losses from the project, all of which Plaintiff alleges were hidden from investors by Defendants' false statements.

### III.   Background on the Fraud-on-the-Market Theory and Stock Prices

16.     In my Opening Report, I explain how the fraud-on-the-market theory relates directly to the prices of a given security.[14] This theory posits that if a company's stock prices reflect all publicly-available information, then all purchasers of that company's stock are induced into reliance on any misrepresentations or omissions because those statements or omissions have distorted the value of each investor's purchase price. I further explain how the fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to

---

[13] Defendants' Opposition to Class Certification, pp. 6-7.

[14] Opening Report, Section III.B.

claims made under Section 10(b) of the Exchange Act and was adopted by the U.S. Supreme Court in *Basic* and reaffirmed in its *Halliburton II* decision.

17.    I analyze the *Cammer*, *Krogman*, and other relevant factors relating to SCANA Common Stock in my Opening Report, and I ultimately find that these factors support a conclusion of market efficiency.[15] Thus, it follows that purchasers of SCANA Common Stock implicitly relied on the Defendants' alleged misrepresentations and/or omissions because the value of that information was impounded into the stock price at which their trades were made. Defendants do not dispute my analyses of any of these 11 factors or my conclusion that SCANA Common Stock traded in an efficient market during the entirety of the Class Period.

18.    As part of the analysis in my Opening Report, I perform an event study to analyze the stock price movements for SCANA Common Stock throughout the Class Period. To perform the event study, I use a regression analysis to measure the relationship between SCANA's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in SCANA's industry. By modeling how SCANA's stock price returns moved relative to an overall market index and an industry index, I am able to measure its "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

19.    Defendants' Opposition to Class Certification and Defendants' Motion to Exclude offer no criticisms of my event study analysis. Nor do they dispute that it accurately measures the abnormal returns exhibited by SCANA Common Stock during the Class Period and on the alleged corrective disclosure dates. As a result, there is no dispute to the finding from my event study analysis that the market price of SCANA Common Stock declined in a statistically

---

[15] Opening Report, Section IV.

8

significant manner in the wake of multiple corrective disclosures alleged by Plaintiff. Specifically, my event study shows that there were statistically significant price declines in SCANA Common Stock – after controlling for market and industry effects, at the 95% confidence level or greater – after the following alleged corrective disclosures, which include alleged corrective disclosures after both February 24, 2017 and July 31, 2017:

| Date (Market Impact) | Abnormal Return | t-stat | p-value | Date (Market Impact) | Abnormal Return | t-stat | p-value |
|---|---|---|---|---|---|---|---|
| December 28, 2016 | -1.17% | -3.05 | 0.0029 | August 11, 2017 | -1.40% | -2.13 | 0.0354 |
| February 14, 2017 | -3.83% | -8.10 | <.0001 | September 7, 2017 | -1.50% | -2.27 | 0.0251 |
| February 17, 2017 | -2.56% | -5.24 | <.0001 | September 21-22, 2017 | -3.46% | -3.64 | 0.0004 |
| March 22, 2017 | -1.17% | -2.19 | 0.0305 | September 27, 2017 | -6.47% | -9.43 | <.0001 |
| March 23, 2017 | -1.26% | -2.36 | 0.0200 | September 29, 2017 | -4.77% | -6.93 | <.0001 |
| July 28, 2017 | -6.56% | -10.14 | <.0001 | October 19, 2017 | -1.80% | -2.53 | 0.0128 |
| August 3, 2017 | -3.13% | -4.74 | <.0001 | October 27, 2017 | -3.41% | -4.73 | <.0001 |
| August 4, 2017 | -2.07% | -3.13 | 0.0023 | October 31, 2017 | -5.99% | -8.23 | <.0001 |
| August 10, 2017 | -1.43% | -2.18 | 0.0314 | December 21, 2017 | -8.99% | -6.02 | <.0001 |

### IV. The Out-of-Pocket Methodology is Widely Accepted by Courts and Addresses Defendants' Misplaced Concerns Regarding Plaintiff's Theory of Liability

20.     In addition to not challenging my opinions of market efficiency or my event study methodology or analysis, Defendants do not challenge the opinion in my Opening Report that the "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act.[16] Rather, Defendants argue that the methodology explained in my Opening Report does not fit Plaintiff's theory of liability. Their argument is incorrect as they fail to understand the connection between the out-of-pocket methodology and Plaintiff's theory.

21.     As I explain in my Opening Report, the "out-of-pocket" method calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus

---

[16] *Id*. ¶ 70.

the artificial inflation in the share price at the time of sale.[17] Ultimately, the actual calculation and quantification of artificial inflation per share is based upon a detailed loss causation analysis. As I discuss in my Opening Report[18] and I explained further in my Deposition Testimony,[19] I have not been asked to perform a loss causation analysis at this time. Such analysis often requires the incorporation of information obtained during discovery and takes place during the merit experts phase of the case.

22.    In my Opening Report I describe how, in order to quantify the artificial inflation per share, I can utilize a variety of different and well-accepted valuation techniques including, but not limited to, event studies, published academic research studies, analyst research, or other case-specific documents.[20] Most commonly, event studies – like the one I use in my Opening Report and which Defendants do not dispute – are employed. Whether I employ an event study or some other valuation technique, the specific method used to quantify artificial inflation will be dependent on a thorough loss causation analysis that takes into account information obtained through discovery.

23.    As I noted in my Opening Report, the inputs I would use in conducting this analysis to quantify artificial inflation will be applied on a class-wide basis, and the resulting inflation per share for each day during the Class Period will apply to all class members.

---

[17] *Id.* ¶ 70: Additionally, "[i]f shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Securities Litigation Reform Act of 1995 ("PSLRA"). This limit on damages can also be applied class-wide."

[18] *Id.* ¶ 75: "To summarize, I have not been asked to calculate damages in this matter. Such loss causation analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of claims in this matter, I conclude that damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis."

[19] Cain Deposition Tr. 146:19-147:13.

[20] Opening Report ¶ 74.

24.     Rather than disputing the out-of-pocket methodology as a well-accepted measure of damages in Section 10(b) securities cases, Defendants instead incorrectly bifurcate Plaintiff's theory of liability into two separate theories: a "'materialization of risk' theory" and a "'corrective disclosures' theory."[21] They then challenge the ability of the out-of-pocket damages methodology to handle certain aspects of their revised theory of liability. Their attempt to bifurcate Plaintiff's liability theory is misguided. More importantly, the out-of-pocket methodology is well equipped to handle Plaintiff's theory of liability, as I explain further below.

### A.  Materialization of Risk

25.     Plaintiff's theory of liability alleges that Deloitte's issuance of clean audit reports concealed and understated the foreseeable risks that SCANA would not complete the Nuclear Project on time, that SCANA would not receive the billions in tax credits, that SCANA would face risk of investigations and regulatory action, and that SCANA would be unable to recoup related costs from ratepayers.[22] Allegedly, the concealed risks were later revealed to the market on the corrective disclosure dates identified in the Complaint, resulting in the declines of SCANA Common Stock.[23] This is a theory of liability that can be – and regularly is – addressed through the out-of-pocket methodology. In Defendants' Opposition to Class Certification and Defendants' Motion to Exclude they attempt to separate out Plaintiff's single theory of liability into two separate theories that Defendants claim require two separate damages methodologies. Defendants first take issue with the theory they claim was not addressed:

> Plaintiff here proceeds under two theories of liability: (1) a "materialization of risk" theory; and (2) a "corrective disclosures" theory, each of which is explained in more detail below. (See ECF 44 (Consolidated Complaint ("Complaint" or "Compl.")) ¶ 473.) Plaintiff

---

[21] Defendants' Opposition to Class Certification, p. 4.

[22] *See, e.g.,* Complaint ¶¶ 265-311.

[23] *Id*. ¶¶ 476-77.

succeeds on neither. Cain's opinion does not even address the "materialization of risk" theory.[24]

26.     Their position is incorrect. Generally speaking, corrective disclosure events can correct prior misstatements and/or omissions related to risks as well as those that are unrelated to risks. The out-of-pocket methodology described in my Opening Report capably handles both types of alleged misrepresentations. Defendants' attempt to bifurcate Plaintiff's single theory of liability thus creates an artificial and unnecessary distinction for how such corrective disclosures would be treated in a damages methodology.

27.     Defendants then attempt to draw a parallel between this case and *Ludlow v. BP*, incorrectly claiming it involved "an expert opinion very similar to" my opinion in this matter.[25] First, the expert's damages methodology in that case was quite different from the out-of-pocket methodology.[26] Defendants thus misrepresent my Opening Report methodology. Second, Defendants claim that the out-of-pocket methodology is incapable of handling a hypothetical scenario involving investors with different risk preferences.[27] This is incorrect because Defendants fail to grasp the fundamental concepts of finance and valuation analysis.

28.     Fundamental principles of valuation analysis demonstrate that a company's stock price reflects the value of all future cash flows discounted to the present time at a rate that reflects the riskiness of the business and those cash flows.[28] The discount rate does not depend

---

[24] Defendants' Opposition to Class Certification, p. 4.

[25] *Id.*, p. 16.

[26] *In Re: BP p.l.c Securities Litigation,* MDL No.: 10-md-2185, Memorandum and Order of Hon. Keith P. Ellison, filed on May 20, 2014, (ECF 857), explaining that Plaintiff's theory of liability involved multiple alleged sub-classes, the proposed damages methodology was based on a "'Bayesian Updating'" economic model of investor expectations, that this was a methodology of "'investor insurance'" instead of the standard "'out-of-pocket'" damages methodology, and that Defendants argued that the proper type of damages methodology for securities fraud cases is the "'out-of-pocket'" damages methodology.

[27] Defendants' Opposition to Class Certification, pp. 16-17.

[28] *See, e.g.,* Joshua Rosenbaum and Joshua Pearl, *Investment Banking*, 2009, Wiley Finance. At p. 109: "The projected [free cash flows] and terminal value are discounted to the present at the target's weighted average cost of capital (WACC), which is a discount rate commensurate with its business and financial risks."

12

on the identities or differing risk preferences of individual investors.[29] To the extent that any portion of a stock price decline following a corrective disclosure event is unrelated to Plaintiff's allegations, including the materialization of concealed risk, this portion can be disaggregated using the same techniques described in my Opening Report. To reiterate, individual damages are calculated based on differences in artificial inflation in stock prices at the time of purchase versus the time of sale; these differences do not depend in any way on the identities of individual investors, their risk preferences, or other inputs to their investment decisions. As a result, calculation of the inputs to the out-of-pocket methodology is formulaic and common across class members.

29.     In summary, the fact that Plaintiff's theory of liability potentially includes materialization of risks that were disclosed to the market through a series of corrective disclosure events does not prevent me from quantifying artificial inflation throughout the Class Period and measuring damages on a class-wide basis at the merits stage. This methodology has been regularly relied upon at the class certification stage (and beyond) as a method for calculating class-wide damages in matters involving corrective disclosure events, including materialization of risks.[30]

### B. Defendants' Arguments Relate to Apportionment of Liability and Not to Damages Methodology

---

[29] *Id.*

[30] *See, e.g.,* Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation*, p. 34. Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, at ¶ 377: "The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the *risk caused by Defendants' fraud materialized, through partial revelations of truthful informatio*n." At ¶ 404: "These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very *risks they sought to warn of began to materialize*." *See also,* Memorandum Opinion and Order filed March 29, 2018, in *Washtenaw County Employees' Retirement System v. Walgreen Co., et al.*, No. 15-cv-3187 (N.D. Ill.).

30.     Defendants also argue that market commentary on the alleged corrective disclosure dates put forth by Plaintiff does not even reference Deloitte's audit reports or a restatement and thus, in Defendants' view, could not have corrected any movement in SCANA's stock price on the alleged corrective disclosure dates.[31] Defendants also raise points about a prior settlement involving SCANA and its officers, and the fact that I have not disaggregated any damages related to these other parties.[32] These arguments raised by Defendants do not undermine the out-of-pocket damages methodology I put forward in my Opening Report. Ultimately, their arguments relate to the apportionment of liability across different parties. This does not undermine the damages methodology – but rather, relates to how liability may be assigned to different parties – a legal conclusion or, at best, confounding information that would be accounted for at the merits phase in a loss causation analysis.

31.     Moreover, Defendants' argument relating to Deloitte ignores the market commentary which demonstrates the lack of complete awareness of the alleged fraud by the market. Plaintiff alleges Defendants' misleading audit reports concealed the risk from the market that the Nuclear Project would not be in service by 2021, SCANA would not meet the deadline to receive credits pursuant to the nuclear production tax credits, that SCANA would face risk of investigations and regulatory action, and that SCANA would be unable to recoup losses from the project through the BLRA.[33] On the dates Plaintiff allege as corrective disclosures, the information environment (including analyst commentary) included details and discussion about SCANA Common Stock declines representing a direct result of its prudency regarding the Nuclear Project and its potential inability to recoup losses from the project – the same

---

[31] Defendants' Opposition to Class Certification, p. 25.

[32] *Id.*, pp. 14-15, 20.

[33] *See, e.g.,* Complaint ¶ 474.

14

information Plaintiff alleges Defendants' audit reports concealed.[34] As a result, each of the alleged disclosures potentially revealed the truth about false and misleading information contained in SCANA's financial statements, which Defendants had verified as being "presented fairly" and in accordance with GAAP.[35]

32.    Furthermore, even if it becomes necessary to disaggregate damages from Defendants' audit reports from damages attributable to SCANA, its officers, or other parties, Defendants' concerns still fail for two reasons. First, Defendants' criticisms of the need for specific methodology to parse damages hinge on premature loss causation arguments, which I understand are not requisite at the class certification stage. Second, the detailed issues regarding loss causation (*i.e.*, disaggregating the effect of confounding information) is present in virtually every certified securities class action matter, is regularly the subject of expert discovery during the merits phase of the litigation, and can be determined based upon proof that is common to all class members. Moreover, as explained above, I have not expressed any legal opinions regarding the apportionment of liability across different parties, and I continue to relegate such matters appropriately to the finder of fact.

33.    It is also important to draw a distinction between two concepts that are part of a damages methodology: the damages formula itself and the inputs to the damages formula. I make clear in my Opening Report that quantifying artificial inflation per share for each day in the Class Period – the input to the damages formula – is a question separate and apart from whether there is a common, class-wide method for computing damages.[36] In my Opening Report, I describe how the quantification of artificial inflation per share can rely on a variety of different

---

[34] *See*, **Appendix C**.

[35] Complaint ¶¶ 79, 297.

[36] Opening Report ¶¶ 70-73.

15

valuation techniques including, but not limited to, event studies, published academic research studies, analyst research, or other case-specific documents.[37] Defendants, without basis, suggest that I am required to provide a more detailed description of the specific calculation of the artificial inflation input to the formula in this matter.[38] However, I explain in my Opening Report how the determination of artificial inflation per share for each day in the Class Period represents a case- and fact-specific loss causation analysis.[39] Nevertheless, Defendants balk at the fact that I have not explicitly demonstrated "'how [my] methodology will quantify the 'artificial inflation caused by Deloitte's' – and Deloitte's alone – alleged 'false and misleading statements and omissions.'"[40]

34.      Ultimately, whatever approach is used to determine the quantification and evolution of artificial inflation per share throughout the Class Period, it can be done on a class-wide basis and does not depend on specific circumstances of individual investors. The artificial inflation per share for each day during the Class Period can easily be used as inputs in the out-of-pocket damages formula I describe in my Opening Report. Even if one were to determine that disaggregation is impossible in this case, the out-of-pocket formula can easily handle such an outcome on a class-wide basis by assigning 0% artificial inflation to the alleged newly disclosed corrective information.

### C. Defendants Mischaracterize My Deposition Testimony

35.      In attempting to discredit my work, Defendants mischaracterize my Deposition Testimony by asserting that I was "unable to articulate with any specificity how"[41] to develop a

---

[37] *Id.* ¶ 74.

[38] Defendants' Opposition to Class Certification, p. 20.

[39] Opening Report ¶ 74.

[40] Defendants' Opposition to Class Certification, p. 20.

[41] I*d.*, p. 20.

16

damages model that identifies artificial inflation due solely to alleged misstatements and/or

omissions made by Defendants, and not SCANA.[42]

36.     The model I articulate in my Opening Report, however, is both flexible and robust

enough to accommodate any of the concerns that Defendants describe, and which would become

relevant at the merits stage of this matter. Indeed, I testified that "[t]he goal with section 5 [of my

Opening Report] is not for me to tell you exactly what steps I would take if I were asked to

perform a merits analysis but, rather, to explain that those damages can be calculated on a class-

wide basis."[43] Defendants misrepresent my testimony that "I cannot lay out the actual analysis or

the steps that I would take"[44] with their flawed assumption that the damages model I detail in my

Opening Report is insufficient for certification of the class.[45] In full context, I testified as to the

following:

> So, again, I cannot lay out the actual analysis or the steps that I would
> take at the merit stage because I have not been asked to do any of those
> analyses at this point in time. I have not evaluated the information
> environment. I have not yet evaluated any potential alleged corrective
> disclosures, so I cannot tell you what the course or what path that
> analysis is going to take because that's an analysis that takes a lot of
> time and effort and research in the specific set of facts and
> circumstances. But, like I said, in my academic experience, as well as
> my professional experience working on other merits reports, the tools or
> the methodologies that I employ and that other experts employ at the
> merit stage, such as event studies and valuation analysis, are tools that
> are very easily applied on a class-wide basis.[46]

37.     Although I addressed Defendants' flawed arguments related to assigning the

proper amount of artificial inflation tied to Plaintiff's specific theory of liability above, whether

---

[42] Defendants' Motion to Exclude, pp. 5, 10-12, fn. 6.

[43] Cain Deposition Tr. 154:22-155:3.

[44] *Id*. 146:19-20.

[45] Defendants' Opposition to Class Certification, p. 20.

[46] Cain Deposition Tr. 146:19-147:13.

this factor or any other information needs to be accounted for in the calculation of artificial inflation will be dependent on a detailed loss causation analysis. And again, if such disaggregation is necessary, this will apply on a class-wide basis. That is, if it is determined that artificial inflation needs to be adjusted due to the impact of any factor unrelated to Deloitte's fraud, the resulting inflation per share for each day during the Class Period will apply to all class members.

## V.   The Out-of-Pocket Methodology Can Readily Accommodate a Shortened Class Period, Which Defendants Fail to Establish

38.     Defendants argue that the Class Period must end earlier than December 20, 2017.[47] They point to SCANA's 2016 10-K filed on February 24, 2017 and certain disclosures contained therein.[48] However, Plaintiff alleges that this filing does not mark the complete dissipation of artificial inflation attributable to Defendants' false and misleading statements, and that investors only learned the full extent of those risks over the ensuing months. Defendants' contention that the Class Period must end on February 24, 2017 is premised upon an alternative interpretation of Plaintiff's claims and that SCANA's 2016 10-K (which Plaintiff alleges was false and misleading) represents the point at which the complete relevant "truth" was fully revealed to the market.[49]

39.     Similarly, Defendants contend that if the Class Period extends beyond February 24, 2017, that it must end when the market learned of the Company's abandonment of the Nuclear Project on July 31, 2017.[50] Plaintiff contends SCANA Common Stock remained inflated after the July 31, 2017 partial corrective disclosure because the full relevant truth regarding the

---

[47] Defendants' Opposition to Class Certification, pp. 26-29.

[48] *Id*.

[49] *Id*., p. 6.

[50] *Id*., p. 7.

ramifications and fallout from the abandonment of the project that was concealed by Deloitte's

clean audit reports had not yet been fully revealed. These further revelations allegedly include a

series of updates, press releases, news coverage, investigations and lawsuits, public testimony,

and regulatory updates, during the summer and fall of 2017.[51] The alleged corrective disclosures

culminated in a press release by the PSC on December 20, 2017 (after market hours) that

indicated the need for an inspection and hearing to determine whether SCANA should refund its

customers for the roughly $1.8 billion it had collected from them to fund the Nuclear Project.[52]

40.     First, Defendants' argument regarding what date the Class Period should end on

does not call into question the out-of-pocket damages methodology I put forward in my Opening

Report. Second, I note that Defendants' argument does not concern my determination that the

market price of SCANA Common Stock declined in a statistically significant manner following

the alleged corrective disclosures after February 24, 2017. As noted above, my event study

shows that the price declines of SCANA Common Stock, after controlling for market effects, are

statistically significant at the 95% confidence level or greater on March 22, 2017; March 23,

2017; July 28, 2017; August 3, 2017; August 4, 2017; August 10, 2017; August 11, 2017;

September 7, 2017; September 21-22, 2017; September 27, 2017; September 29, 2017; October

19, 2017; October 27, 2017; October 31, 2017; and December 21, 2017.

41.     Moreover, Defendants ignore substantial evidence of the price impact from

additional alleged corrective disclosures after both February 24, 2017 and July 31, 2017,

continuing through December 2017. In **Appendix C** I summarize the results of my event study

analysis, as well as further evidence of price impact provided by research analysts and media

---

[51] Complaint ¶¶ 344-407.

[52] *Id.* ¶ 404.

19

commentary, around Plaintiff's alleged corrective disclosures following February 24, 2017 and through December 21, 2017.

42.     Finally, even if a subsequent analysis or the finder of fact determines the Class Period should end on a date prior to December 20, 2017, then the out-of-pocket damages methodology would still apply class-wide. For example, it could be assumed that $0 of artificial inflation remained in SCANA Common Stock after such date determined by the finder of fact and informed via further loss causation analysis.

## VI.  Conclusion

43.     In summary, Defendants' opinions are based upon a flawed view of Plaintiff's theory of liability, a mischaracterization of my Deposition Testimony, and improper interpretations of the conclusions reached in my Opening Report. Thus, their opinions are flawed and irrelevant. In direct contrast to the arguments raised by Defendants, not only have I provided a reasonable and concrete damages methodology, but I have explained how the out-of-pocket damages methodology is widely-employed in cases like this one precisely because it is capable of reliably calculating damages on a class-wide basis in a manner consistent with Plaintiff's theory of liability.

I declare under the penalty of perjury that the foregoing is true and correct.

_____
Matthew D. Cain

20

# Appendix A

## Matthew D. Cain, Ph.D.                                        March 2024

E-mail: mdcain@outlook.com                                      Homepage
Mobile: 574-485-8065                                                SSRN

### Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                        Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group

- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

    LAW 246.31: Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2024

    LAW 251.52: Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business

    FIN 70400: Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

    FIN 40410: Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007

## **Expert Witness Experience**

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

25

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al*., Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

26

# Appendix B

## Documents Considered

**Court Documents:**
- Expert Report of Matthew D. Cain, Ph.D, dated April 30, 2021 (ECF No. 185-2 (Ex A)), including all data and documents included in the Appendices of that report.
- Deposition of Matthew Cain, Ph.D. via Remote Videoconference, *in International Brotherhood of Electrical Workers Local 98 Pension Fund on Behalf of Itself and All Others Similarly Situated vs. Deloitte & Touche, LLP and Deloitte LLP*, taken on September 14, 2021.
- Defendants' Opposition to Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, dated February 5, 2024, in *International Brotherhood of Electrical Workers Local 98 Pension Fund on Behalf of Itself and All Others Similarly Situated vs. Deloitte & Touche, LLP and Deloitte LLP* (ECF 189).
- Defendants' Motion to Exclude Damages-Related Expert Opinions of Dr. Matthew D. Cain, dated February 5, 2024, in *International Brotherhood of Electrical Workers Local 98 Pension Fund on Behalf of Itself and All Others Similarly Situated vs. Deloitte & Touche, LLP and Deloitte LLP* (ECF 188).
- Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation.*
- Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, dated October 14, 2020, *In re Under Armour Securities Litigation, Civil No. RDB-17-388.*
- *In Re: BP p.l.c Securities Litigation, MDL No.: 10-md-2185*, Memorandum and Order of Hon. Keith P. Ellison, filed on May 20, 2014, (ECF 857).
- Memorandum Opinion and Order filed March 29, 2018, in *Washtenaw County Employees' Retirement System v. Walgreen Co., et al.*, No. 15-cv-3187 (N.D. Ill.).

**Academic Literature:**
- Joshua Rosenbaum and Joshua Pearl, *Investment Banking*, 2009, Wiley Finance.

**Analyst Reports:**
- "Implications of Potential Westinghouse Bankruptcy Filing," *Morgan Stanley,* March 22, 2017, 12:01 AM.
- "WEC Chapter 11 Unlikely to Derail SCG & SO Nukes," *Wells Fargo Securities*, March 30, 2017.
- "Perspectives on New Nuclear #2 - Call Takeaways," *Morgan Stanley*, April 21, 2017.
- "Evaluation Continues; Affirmed Outlook -Buy," *Gabelli & Company*, April 28, 2017.
- "Toshiba's $1.2 Billion Guarantee Might Not Be Enough to Finish Scana's Nuclear Project," *Morningstar Equity Research,* July 28, 2017.
- "Flash Comment: Utility & Alternative Energy Daily," *Wells Fargo,* July 28, 2017.
- "Potential Abandonment/Lowered From Buy to Hold," *Gabelli & Company,* July 28, 2017.

- "SCG – Downgrading to Sell – The Curtain Call Cometh," *Guggenheim*, July 28, 2017.
- "SCG: Abandonment Officially The Path Forward," *Wells Fargo*, July 31, 2017.
- "SCG – We Both Made a Tough Call – Walking Away from Nuclear, But Still Loose Ends to Tie; Regulatory Execution Key," *Guggenheim,* July 31, 2017.
- "Summer Isn't Coming; Upgrading to Overweight on Nuclear Abandonment," *Barclays,* August 1, 2017.
- "Bear Case Playing Out, and Risks Remain High in Abandonment; Lower PT, Remain UW," *Morgan Stanley*, August 1, 2017.
- "SCG – Big 2Q17 Beat, But Focus Is on the Regulatory/Legislative Back-drop Amidst V.C. Summer Fallout," *Guggenheim,* August 3, 2017.
- "Ex Parte Transcript; 2Q'17 Results," *Barclays*, August 3, 2017, 4:29 PM.
- "SCANA Corp," *CFRA*, August 3, 2017.
- "Utility & Alternative Energy Daily," *Wells Fargo,* August 7, 2017.
- "Utility & Alternative Energy Daily" *Wells Fargo,* August 9, 2017.
- "Political Rhetoric Around Nuclear Power Heating Up; Scana Approaches Buy Territory," *Morningstar Equity Research*, August 14, 2017.
- "Utility & Alternative Energy Daily," *Wells Fargo,* September 11, 2017, 5:19 AM.
- "Utility & Infrastructure Daily," *Wells Fargo,* September 22, 2017.
- "SCG: ORS Rate Request Adds Yet Another Layer of Uncertainty," *Wells Fargo,* September 27, 2017.
- "BLRA Rates Challenged; Political Firestorm – Hold," *Gabelli & Company,* September 28, 2017.
- "In Whirlwind of Activity, Scana Remains a Buying Opportunity," *Morningstar Equity Research,* September 29, 2017.
- "High Risk of Disallowance; Lowering PT to $45 and Remaining UW," *Morgan Stanley*, October 4, 2017.
- "Exploring Severe Downside Scenarios Given Recent Governor and Legislator Comments," *Morgan Stanley,* October 27, 2017 12:01 AM.
- "Flash Comment, Utility & Infrastructure Daily," *Wells Fargo,* November 1, 2017.
- "Headlines Keep Flying But Thesis Intact For Scana," *Morningstar Equity Research,* November 5, 2017.
- "Nuclear Dockets Will Proceed, But Commission Action Pushed to 2018," *Morgan Stanley*, December 21, 2017, 12:01 AM.
- "SCANA Corporation," *CFRA,* December 27, 2017.

**SEC Filings:**
- SCANA Corporation SEC Form 8-K dated July 27, 2017, exhibit 99.1.
- SCANA Corporation SEC Form 8-K, dated September 25, 2017.

**Call Transcripts:**
- "FQ2 2017 Earnings Call Transcripts," *S&P Capital IQ,* August 3, 2017, 3:00 PM.
- "FQ3 2017 Earnings Call Transcripts," *S&P Capital IQ,* October 26, 2017, 3:00 PM.

**News:**

- "Morgan Stanley Sees Potential $5.2B Cost Hike for SCANA," *Bloomberg*, March 22, 2017, 10:34 AM.
- "Southern, Scana seen facing $8.5 billion threat on Toshiba woes," *Bloomberg*, March 22, 2017, 12:21 PM.
- "Morgan Stanley weighs Westinghouse bankruptcy risks for Southern, SCANA," *SNL Energy Finance Daily*, March 23, 2017.
- SCANA CORP, SOUTHERN CO HIRE ADVISERS TO PREPARE FOR BANKRUPTCY OF TOSHIBA CORP'S WESTINGHOUSE ELECTRIC CO LLC-SOURCES," *Reuters News*, March 22, 2017, 10:40 PM.
- "EXCLUSIVE-Westinghouse's clients gear up for bankruptcy fight-sources," *Reuters News*, March 22, 2017, 10:41 PM.
- "Exclusive: Westinghouse's clients gear up for bankruptcy fight - sources," *Reuters News*, March 23, 2017, 3:18 AM.
- "Toshiba reaches $2.2 billion deal over SCANA's S. Carolina nuclear project," *Reuters News*, July 27, 2017, 6:42 PM.
- "South Carolina Electric & Gas Company And Santee Cooper Agree To Amount of Guaranty Payments from Toshiba," *PR Newswire*, July 27, 2017, 6:04 PM.
- "Santee Cooper, SCE&G to accept nearly $2.2 billion from Toshiba for nuclear plant," *The State,* July 27, 2017.
- "South Carolina Electric & Gas Company to Cease Construction And Will File Plan of Abandonment of The New Nuclear Project," *PR Newswire*, July 31, 2017, 1:00 PM.
- Allowable Ex Parte Briefing – ND-2017-12-E, *Public Service Commission of South Carolina*, August 1, 2017, 10:05 AM.
- "The Latest: Legislators call for refunds from nuke project," *Associated Press Newswires,* August 2, 2017, 1:36 PM
- "Workers, lawmakers angry over nuclear plant debacle," *Associated Press Newswires,* August 2, 2017, 5:40 PM.
- "S.C. lawmakers want SCANA stockholders to eat costs of two failed nuclear reactors," *The Post and Courier,* August 3, 2017.
- "SCANA Reports Financial Results for Second Quarter of 2017," *PR Newswire*, August 3, 2017, 7:30 AM.
- "Attorney General says he's investigating abandonment of nuclear reactors; South Carolina state senators call or special session," *The Post and Courier*, August 4, 2017.
- "SC Senate leaders want special session to block rate hikes after nuclear plant boondoggle," *The State,* August 4, 2017, 10:19 AM.
- "State agency challenges nuke plan shutdown proposal, says ratepayers could be hurt," *The State,* August 9, 2017
- "Legislators to separately study failed nuclear project," *Associated Press Newswires,* August 9, 2017, 6:33 PM.
- "SC governor, lawmakers attempting to save abandoned nuke, protect ratepayers," *SNL Power Daily with Market Report,* August 9, 2017.
- "Top SCANA executives were paid millions in bonuses for roles in failed nuclear project," *The State,* August 9, 2017.
- "CEO: SCANA may not return to scuttle nuclear project – even if a new partner emerges," *Post and Courier,* August 10, 2017.

- "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South Carolina nuclear plant failure," *The Post and Courier,* September 7, 2017, 7:30 PM.
- "SCANA Receives Subpoena For Documents Relating To Nuclear Project," *PR Newswire*, September 21, 2017, 8:00 AM.
- "SCANA being investigated by federal grand jury over failed nuke project," *The State*, September 21, 2017.
- "SCE&G customers may get break on power bills to offset nuclear plant debacle," *The State,* September 26, 2017.
- "How much worse was the original Bechtel nuclear report," *The State,* September 27, 2017, 11:35 AM.
- "SC Attorney General questions law allowing SCE&G to raise rates," *The State,* September 26, 2017.
- "Probe opened into 'potential criminality' in nuke project," *Associated Press Newswires*, September 26, 2017, 4:49 PM.
- "Public Service Commission of South Carolina Defers Action on Office of Regulatory Staff Request to Suspend Revised Rates Collections," *PR Newswire,* September 28, 2017, 5:54 PM.
- "Suit accuses utility of misleading investors on nuke project," *Associated Press Newswires,* September 28, 2017, 4:56 PM.
- "08:42 EDT Scana downgraded to Sell from Hold at Williams CapitalWilliams Capital...," *theflyonthewall,* September 29, 2017, 8:42 AM.
- "Fitch Downgrades SCANA to 'BB+' / SCE&G to 'BBB-'; Negative Watch Maintained," *Dow Jones Newswires,* September 29, 2017, 12:40 PM.
- "S&PGR Downgrades SCANA And Subs To 'BBB'; On Watch Negative," *Dow Jones Newswires,* September 29, 2017, 1:26 PM.
- "Confidential memo shows SCNA, Santee Cooper long worried over nuclear woes," *The State,* September 29, 2017, 8:20 PM.
- "Letter shows S.C. utilities knew Westinghouse's reactor designs would lead to increased costs and schedule delays," *The Post and Courier,* September 30, 2017.
- "Gov to utility: Stop charging customers for scuttled project," *Associated Press Newswires*, October 19, 2017, 1:53 PM.
- *"*Dear Mr. Marsh*," Governor Henry McMaster,* October 19, 2017.
- "SCANA should stop charging its customers for failed nuclear project, governor says," *The State*, October 19, 2017.
- "SCANA Reports Financial Results for Third Quarter of 2017," *PR Newswire,* October 26, 2017, 7:30 AM.
- "SCANA Corporation and South Carolina Electric & Gas Company Announce Leadership Changes," *PR Newswire,* October 31, 2017, 9:00 AM.
- "SCANA to oust CEO, chief operating officer in aftermath of VC Summer failure," *The State*, October 28, 2017.
- "SCANA chief denies he's leaving embattled utility," *The State,* October 30, 2017.
- "SCANA CEO Marsh, another top executive departing after nuclear fiasco," *The State*, October 31, 2017.

- "Public Service Commission of South Carolina Orders Hearing on the South Carolina Office of Regulatory Staff's Request to Reduce Rates," *PR Newswire,* December 20, 2017, 5:01 PM.
- "Ratepayers win victory in fight to recover money from failed SCE&G nuclear project," *The State,* December 20, 2017.
- "South Carolina utility regulators refuse to throw out case against SCE&G," *The Post and Courier,* December 21, 2017.

31

**Appendix C**

1.      In this appendix, I summarize the results of my event study analysis as well as commentary by research analysts and media coverage around Plaintiff's alleged corrective disclosures following both February 24, 2017 and July 31, 2017. For the purpose of this analysis, I have adopted the unchallenged event study regression specified in my Opening Report.[1]

2.      As part of Defendants' Opposition to Class Certification, Defendants contend the Class Period is improperly long and the alleged truth was disclosed to the market as of either February 24, 2017 or July 31, 2017. Defendants argue:

> In securities class actions, the class period must end when information that "corrects" the alleged misstatements "is publicly announced or otherwise effectively disseminated to the market." *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 82 (D. Md. 1991). Here, by contrast, Plaintiff's proposed Class Period—February 26, 2016, through December 20, 2017 (the "Class Period")—runs far beyond the point when the alleged "truth" was disclosed to the market, presumably in an effort to impermissibly make the putative class as large as possible. But since Plaintiff's (flawed) theory is that D&T's audit opinions somehow concealed and/or failed to disclose the "truth" about the risk that the Nuclear Project would not be completed in time to qualify for tax credits, then *according to Plaintiff's own allegations*, these risks were disclosed to the market far before the end of the proposed Class Period. Indeed, SCANA's 2016 10-K, filed on February 24, 2017, disclosed that there were *"significant risks and uncertainties"* regarding Westinghouse's ability to fulfill its performance and financial commitments and *"substantial uncertainty"* as to whether Westinghouse could complete the Nuclear Project on schedule. That same 10-K warned investors that SCANA was evaluating alternatives, including the abandonment of the Nuclear Project. These disclosures should mark the end of any putative class. But even if the 2016 10-K disclosures were somehow found to be insufficiently corrective, there can be no question that on the date that the Nuclear Project was *actually abandoned*, July 31, 2017, it was crystal clear to the market that the Nuclear Project would not be completed at all and, therefore, that no one who invested in SCANA after that event should be part of Plaintiff's putative class.[2]

---

[1] Opening Report ¶¶ 45-49.

[2] Defendants' Opposition to Class Certification, pp. 6-7.

3.      In contrast, Plaintiff alleges the truth was not fully disclosed in February 2017 or July 2017, because the market did not have a full understanding of, among other things, the likelihood that SCANA had acted prudently regarding the Nuclear Project and would qualify for the financial protections provided by the BLRA on those dates.[3] It was not until after the market learned about SCANA's mismanagement of the project and concealment of information (*i.e.* lack of internal controls and failure to disclose the relevant truth to regulators) that the market learned that full recoverability was impossible.[4]

4.      My event study analysis, which is laid out below, demonstrates there is price impact on the alleged corrective disclosure dates following both February 24, 2017 and July 31, 2017, and the information environment around the alleged corrective disclosure dates included new details related to SCANA's prudency regarding the Nuclear Project and its ability to recoup losses from the project – facts which Plaintiff alleges were hidden by Defendants' clean audit reports. To be clear, I have not performed a loss causation analysis at this point, as that would depend on a full record of discovery and information as to what Plaintiff ultimately intends to prove at the merits stage of this litigation. However, based on my review of publicly available information, there is a logical connection between Plaintiff's allegations and the information environment on the alleged corrective disclosure dates up to and including December 20, 2017.

---

[3] Plaintiff alleges Defendants' misrepresentations concealed, among other things, the material risk that SCANA would be unable to recover the costs associated with the failed Nuclear Project. As part of its allegations, Plaintiff contends Defendants failed to comply with Public Company Accounting Oversight Board ("PCAOB") standards by failing to identify audit evidence that supported SCANA's estimates and statements in its annual reports about the schedule, costs and estimated completion of the Nuclear Project (Complaint ¶¶ 3, 90-91, 436); Defendants failed to comply with PCAOB standards by ignoring evidence that SCANA's own internal experts contradicted their statements and disclosures to regulators (Complaint ¶¶ 422-27); and SCANA's internal controls were inadequate to ensure that the Company was properly disclosing information to regulators (Complaint ¶¶ 445), putting SCANA at risk for regulatory investigations and actions and that it would be unable to recover its costs for the Nuclear Project.

[4] Complaint ¶¶ 444-447.

Moreover, my event study indicates there is price impact on multiple alleged corrective disclosure dates up to and including December 20, 2017.

**March 22-23, 2017[5]**

5.    In an analyst report published at 12:01 AM on March 22, 2017, Morgan Stanley predicted additional cost overruns and delays for the Nuclear Project that could cost SCANA as much as 108% of the original cost estimate, and as much as $5.2 billion in higher costs for SCANA if Westinghouse declared bankruptcy and abandoned the project.[6] Morgan Stanley reported that SCANA would face three possible issues if Westinghouse filed for bankruptcy:

> (1) the potential for nuclear contracts to be modified by a bankruptcy filing, potentially limiting liability of Westinghouse and Toshiba for current and/or future overruns, (2) the risk of protracted litigation regarding liability for cost overruns, and (3) potential for lack of assets at Toshiba with which to satisfy SCANA's and Southern's claims.[7]

6.    Later in the report, Morgan Stanley warned about the possibility that SCANA would not be able to recover its costs under BLRA. However, the analysts believed it would be difficult for regulators given the commission's close involvement with the Nuclear Project:

> We believe these earnings would potentially be at risk in the event that the company abandons the project and is not allowed to recover its return on the capital spent to date. We have highlighted the abandonment language from the BLRA below. The language appears to allow SCG to recover costs approved under the BLRA as long as the decision to abandon the construction of the plant is deemed prudent. However, one portion of the language (bold text below) seems to indicate that recovery could be disallowed if the utility should have anticipated or avoided costs considering information available at the time. We believe this would be a difficult path for the commission to pursue since the Office of Regulatory Staff (ORS) and commission have been closely involved

---

[5] All headings refer to the market impact date of the corrective information. All emphasized and italicized language is added unless otherwise specified.

[6] "Implications of Potential Westinghouse Bankruptcy Filing," *Morgan Stanley,* March 22, 2017, 12:01 AM.

[7] "Implications of Potential Westinghouse Bankruptcy Filing," *Morgan Stanley,* March 22, 2017, 12:01 AM.

in assessing the project's costs thus far, but it opens the door in our view for regulatory risk in this scenario.[8]

7.  In response to this report, other news outlets repeated Morgan Stanley's estimates, stating that going forward "[Southern] and [SCANA] shareholders would have a greater likelihood of bearing nuclear cost overruns."[9] As news coverage began to spread about the Morgan Stanley report, *Reuters* reported after trading closed on March 22, 2017 and again before market hours on March 23, 2017 that Westinghouse had hired advisers for its potential bankruptcy and that SCANA and Southern Company had hired restructuring advisers.[10] As discussed further below, bankruptcy by Westinghouse would negatively impact the financial status of the Nuclear Project.

8.  Plaintiff alleges this event is partially corrective because it provided information to the market about the future of the Nuclear Project if Westinghouse declared bankruptcy, which would significantly increase costs and delay the completion of the Nuclear Project, that investors would have understood but for Deloitte's alleged misrepresentations and omissions.

9.  On March 22, 2017, my event study indicates the market price of SCANA Common Stock fell by 1.17% ($0.80 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 95% confidence level with a t-statistic of -2.19. On March 23, 2017, my event study indicates the market price of SCANA Common Stock decreased by 1.26% ($0.86 per share) after controlling for market and industry

---

[8] "Implications of Potential Westinghouse Bankruptcy Filing," *Morgan Stanley,* March 22, 2017, 12:01 AM.

[9] "Morgan Stanley Sees Potential $5.2B Cost Hike for SCANA," *Bloomberg*, March 22, 2017, 10:34 AM; "Southern, Scana seen facing $8.5 billion threat on Toshiba woes," *Bloomberg*, March 22, 2017, 12:21 PM; "Morgan Stanley weighs Westinghouse bankruptcy risks for Southern, SCANA," *SNL Energy Finance Daily,* March 23, 2017.

[10] "SCANA CORP, SOUTHERN CO HIRE ADVISERS TO PREPARE FOR BANKRUPTCY OF TOSHIBA CORP'S WESTINGHOUSE ELECTRIC CO LLC-SOURCES," *Reuters News*, March 22, 2017, 10:40 PM; "EXCLUSIVE-Westinghouse's clients gear up for bankruptcy fight-sources," *Reuters News*, March 22, 2017, 10:41 PM; "Exclusive: Westinghouse's clients gear up for bankruptcy fight - sources," *Reuters News,* March 23, 2017, 3:18 AM.

35

effects. This abnormal price decrease is statistically significant at the 95% confidence level with a t-statistic of -2.36. When I consider the two-day window, the market price of SCANA fell by 2.42% or $1.65 per share, after controlling for market and industry effects. This decrease is statistically significant at the 99% confidence level with a t-statistic of -3.20.

10.    This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event.

11.    However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event. For example, equity analysts specifically noted their continued belief that the project would be completed in a timely fashion and, if not, that the project would be protected under the BLRA:

> Westinghouse's (WEC) 3/29 Chapter 11 filing does not materially alter our thoughts on SCG's and SO's new nuclear projects. […] We consider it likely that Fluor takes on an increased role and both projects get finished. However, if after a thorough analysis abandonment is warranted, there are recovery safeguards in both GA & SC and we consider both regulatory environments to be constructive.[11]
>
> In an abandonment, SCG would very likely recover investments made to date […][12]
>
> We believe the project moves forward to completion as $4.634 billion has been invested and SCG needs the capacity. In a worst case scenario, we believe SCG's nuclear development investment is protected under SC's Baseload Review Act (BLRA), which provides for recovery even under the scenario of abandonment. In order for SCE&G investment to

---

[11] "WEC Chapter 11 Unlikely to Derail SCG & SO Nukes," *Wells Fargo Securities*, March 30, 2017.

[12] "Perspectives on New Nuclear #2 - Call Takeaways," *Morgan Stanley*, April 21, 2017.

36

be imprudent, opposing parties would need to prove negligence on SCE&G.[13]

**July 28, 2017**

12.      After hours on July 27, 2017, SCANA and Santee Cooper announced an agreement with Toshiba regarding its obligations to the Nuclear Project.[14] Toshiba agreed to pay $2.168 billion to SCANA and its partner, Santee Cooper, to cap its liability for guaranteeing that Westinghouse would complete the Nuclear Project.[15] SCANA would receive 55% of the total amount.[16] Payment would begin in October 2017 and end in September 2022.[17]

13.      Two additional pieces of news followed SCANA's statements to the public. First, SCANA announced that the cost to complete the Nuclear Project would "materially exceed" the prior estimates made by Westinghouse.[18] SCANA anticipated the settlement payments from Toshiba would not cover the additional costs to complete both units as the costs would "materially exceed prior WEC estimates," and "the anticipated guaranty settlement payments from Toshiba."[19] Second, SCANA anticipated that the units would not be online before January 2021, the deadline to qualify for production tax credits.[20]

14.      Sentiment in news reports and analyst reports surrounding the viability of the Nuclear Project was pessimistic. *The State,* a local South Carolina newspaper, noted that the

---

[13] "Evaluation Continues; Affirmed Outlook -Buy," *Gabelli & Company*, April 28, 2017.

[14] "South Carolina Electric & Gas Company And Santee Cooper Agree To Amount of Guaranty Payments from Toshiba," *PR Newswire,* July 27, 2017, 6:04 PM.

[15] "Toshiba reaches $2.2 billion deal over SCANA's S. Carolina nuclear project," *Reuters News,* July 27, 2017, 6:42 PM.

[16] "South Carolina Electric & Gas Company And Santee Cooper Agree To Amount of Guaranty Payments from Toshiba," *PR Newswire,* July 27, 2017, 6:04 PM.

[17] *Id.*

[18] SCANA Corporation SEC Form 8-K dated July 27, 2017, exhibit 99.1.

[19] "Santee Cooper, SCE&G to accept nearly $2.2 billion from Toshiba for nuclear plant," *The State,* July 27, 2017.

[20] *Id.*

"news release issued jointly by the utilities after Santee Cooper's meeting raised questions about their commitment to building two reactors."[21] Quoted in *The State's* article, Santee Cooper's CEO stated concerns about the financial viability of Toshiba:

> …Toshiba's finances and ability to pay the full amount are worrisome… Santee Cooper would have preferred all of the money up front…"Quite frankly, Toshiba's financial condition is a concern, no matter whether we accept this settlement today or not,"…If Toshiba can't provide the money because of a possible bankruptcy in Japan, Santee Cooper might be "forced to litigate … in a foreign jurisdiction.[22]

15. Analysts expressed concern about the realistic probability of completion. News about materially exceeding previous cost estimates and SCANA's inability to finish construction in time to claim production tax benefits significantly influenced analysts' views. Analysts at Morningstar emphasized the effects of an extended deadline on shareholders and ratepayers:

> The $1.2 billion guarantee effectively protects shareholders from project costs up to $8.9 billion. However, management also said that they expect costs will exceed that amount and the company might have to give up some $2.2 billion of tax credits because the project won't be completed by the end of 2020. Shareholders or ratepayers would have to bear any cost about $8.9 billion and ratepayers would lose out on $2.2 billion of tax related savings. […] We expect Scana will appeal to regulators to recover from ratepayers any costs above $8.9 billion but likely would not receive full recovery. A bigger uncertainty right now is whether regulators would hold Scana liable for the foregone tax benefits. We think there is a good chance government proposals to extend the tax credit deadline will be successful. We estimate every $1 billion of costs above the $8.9 billion guarantee will result in a $2 per share cut in our fair value estimate.[23]

16. Wells Fargo analysts felt that this news indicated the potential for abandonment of the Nuclear Project:

---

[21] *Id*.

[22] *Id.*

[23] "Toshiba's $1.2 Billion Guarantee Might Not Be Enough to Finish Scana's Nuclear Project," *Morningstar Equity Research,* July 28, 2017.

While SCG & Santee have not yet reached a decision on the best course of action for the NND, we viewed the language in the press release as strongly suggesting that the companies are leaning toward project abandonment. […] We think it is highly unlikely that SCG would be willing to have shareholders fully foot the bill for project costs in excess of $8.8B. And we also think that regulators will balk at committing materially more customer money towards the endeavor beyond the roughly $7.7B agreed upon under the Fixed Price Option. If SCG elects the abandonment route, we estimate 2018 EPS would be in the neighborhood of $3.25-3.50 (vs. our current estimate of $4.60).[24]

17.    Gabelli & Company lowered their recommendation from Buy to Hold on increased concerns regarding abandonment of one or both of the units:

We lowered our recommendation to Hold, from Buy, to reflect increased concern that SCG abandons the construction of VCS units 2 & 3. On July 27, 2017, SCG and Santee Cooper issued a release stating that completion of both units would materially exceed the $2.2 billion Toshiba guarantee and would not be completed before January 1, 2021, which is the date need to qualify for the expected $2.2 billion (taken over 8 years) of production tax credits under current tax rules. While SCG and Santee Cooper continue to evaluate the most prudent path forward with a decision expected soon, we consider it increasingly possible that one or both of the units are abandoned. As such, we expect SCG shares to trade with considerable uncertainty over the next several months as various scenarios are contemplated.[25]

18.    Guggenheim analysts downgraded SCANA on concerns that SCANA could "be under substantially more pressure for some time":

Downgrading SCG from BUY to Sell. It's extremely rare for us to make such a rating change, especially on a regulated utility, and especially during market hours, and especially during such a heavy earnings day, but with news coming out this morning, we believe SCG should be under substantially more pressure for some time. At this point, it is becoming more evident to us that the situation around VC Summer is materially deteriorated and a situation that is constructive for shareholders is becoming less evident. It is our view that in time, post VC Summer

[24] "Flash Comment: Utility & Alternative Energy Daily," *Wells Fargo,* July 28, 2017.

[25] "Potential Abandonment/Lowered From Buy to Hold," *Gabelli & Company,* July 28, 2017.

39

abandonment, SCG will be acquired but this could be months away – for now, we see material earnings and growth downside.[26]

19.     On July 28, 2017, my event study indicates the market price of SCANA Common Stock fell by 6.56% ($4.30 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence level with a t-statistic of -10.14.

20.     This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event.

21.     Specifically, during market hours on July 31, 2017, SCANA assured investors that, under BLRA, the Company would be able to recoup costs of the Nuclear Project:

> In accordance with the BLRA, we will seek an amortization of the project costs and a return at the weighted average cost of capital on the unamortized balance until fully recovered. We plan to use the anticipated proceeds from the Toshiba settlement and benefits derived from tax deductions to mitigate rate increases and lessen the impact on our customers for several years.[27]

22.     Analysts appeared confident in SCANA's ability to recoup costs from the Nuclear Project under BLRA. For example, Wells Fargo analysts wrote:

---

[26] "SCG – Downgrading to Sell – The Curtain Call Cometh," *Guggenheim,* July 28, 2017.

[27] "South Carolina Electric & Gas Company to Cease Construction And Will File Plan of Abandonment of The New Nuclear Project," *PR Newswire*, July 31, 2017, 1:00 PM.

40

SCG announced plans to stop new nuclear development (NND) construction and seek abandonment recovery of the stranded investment in accordance with SC's Base Load Review Act (BLRA). In addition, mgmt affirmed the 3-5-yr 4-6% EPS CAGR off the $3.97 weather-normalized '16 EPS base. The CAGR implies '18 & '19 EPS guidance ranges of roughly $4.30-4.45 & $4.45-4.75. We are encouraged by SCG's initial comments on the post-abandonment EPS outlook while fully acknowledging the uncertainty around recovery. That said, ***we continue to believe the BLRA affords SCG strong legal protections and that SC is a generally reasonable state from a political/regulatory standpoint***.[28]

23.     Analysts optimistically viewed the recovery from abandonment:

At the end of the day, management described a relatively constructive path forward for recovery of (and return on) capital associated with V.C. Summer nuclear construction, premised upon SC's BLRA, which we acknowledge set the most constructive regulatory/policy back-drop in support of nuclear construction that we've seen, although as the abandonment plan has yet to be filed with regulators (SCG plans to update regulators tomorrow), we look forward to reactions from regulators and policy-makers whom management acknowledged were disappointed with the decision to abandon construction. We would also note that while we recognize the solid regulatory/legislative framework for cost recovery provided by the BLRA, we have less experience ascertaining the quality of earnings power that would be derived from a ratebase comprised of such a large "regulatory asset" (i.e., stranded costs associated with abandoned investments in new nuclear units at V.C. Summer).[29]

24.     Guggenheim analysts similarly stated that '[w]e already noted SCG was tilting toward the abandonment route; what was really introduced this afternoon was share buy-backs, which management expects will allow SCG to maintain a 4-6% growth trajectory."[30]

25.     On August 1, 2017, prior to SCANA's scheduled PSC meeting, analysts reported on the news from the day prior. Barclays updated their stock rating from Equal Weight to

---

[28] "SCG: Abandonment Officially The Path Forward," *Wells Fargo,* July 31, 2017. (Emphasis Added.)

[29] "SCG – We Both Made a Tough Call – Walking Away from Nuclear, But Still Loose Ends to Tie; Regulatory Execution Key," *Guggenheim,* July 31, 2017.

[30] *Id.*

41

Overweight and believed SCANA's risk premium following the news of abandonment was reduced:

> SCANA Corp to Abandon V.C. Summer Nuclear Plant: We are upgrading the stock from Equal Weight to Overweight and are increasing our price target from $65 to $73. […] We have an Overweight rating on SCG because the company is meaningfully growing rate base and earnings, and we believe the likely outcome of the new nuclear abandonment filing, inclusive of share buybacks, maintains the company's 4%-6% EPS growth rate over the next 3-5 yrs at materially lower risk than moving forward with the project. […] Our upside case assumes recovery of new nuclear costs on abandonment […][31]

26.     Morgan Stanley analysts maintained their "Underweight" valuation, believing that there was a significant downside to the stock:

> Yesterday SCANA announced that it would abandon the construction of its VC Summer nuclear plant. The company determined that its estimate of additional costs, uncertainty around production tax credits, and the decision by partner Santee Cooper to exit the project would make it uneconomical to complete. We are shifting our valuation to reflect our prior bear case assumptions: the financial impact of abandoning the project and protecting ratepayers through securitization of costs spent to date. We are lowering our PT to $58 from $67 and remaining UW on the stock. We continue to see the risk-reward skewed unfavorably given several scenarios that could lead to significant downside in the stock.[32]

27.     Then, at 10:05 AM on August 1, SCANA executives held an ex parte briefing at the S.C. Public Service Commission on SCANA's plan going forward to recover their losses from the project. SCANA executive, Stephen Byrne ("Byrne"), told the Commission that SCANA officials were unaware of Toshiba's financial problems until the December 2016 announcement, stating:

> I think we probably should point out that we though – like I think everybody in this room thought – in October, when we negotiated our

---

[31] "Summer Isn't Coming; Upgrading to Overweight on Nuclear Abandonment," *Barclays,* August 1, 2017.

[32] "Bear Case Playing Out, and Risks Remain High in Abandonment; Lower PT, Remain UW," *Morgan Stanley,* August 1, 2017.

fixed-price option, that we had largely resolved issues with costs. We brought that before this Commission, and this Commission approved it in November. Within about six weeks, we got a call from Westinghouse saying, "Toshiba is going to have a press conference tomorrow. You might want to listen in." We listened in on that press conference intently, and that's the first time that they indicated that Toshiba had a huge financial liability issue on finishing the cost of our project and the Vogtle project in Georgia. When they entered into bankruptcy, it nullified the benefit of our fixed-price contract. So that is really what drove us here.[33]

28.     SCANA also deflected blame to Westinghouse for the delays during the hearing.

Byrne stated:

> The cause of the major delays, I would say, are a couple-fold. We did have some regulatory delays upfront, disagreements between the regulator and Westinghouse on code compliance type issues. And without arguing about who is right or wrong, if the regulator says you're wrong, then you're wrong. So we have to change things to accommodate that regulatory review. The supply chain was probably the biggest issue we've had to date, particularly with supply of modules. So the modular construction techniques –the same way they build aircraft carriers and nuclear submarines –is a great idea, but if the modules aren't there when you need them, that becomes a problem. And the supply chain was letting us down, where Westinghouse, again, was responsible for that supply chain.[34]

**August 3, 2017**

29.     On August 2, 2017 after the close of market trading, South Carolina legislators announced the creation of the Energy Caucus to overhaul the utility review process. Rep. James Smith noted, "[t]he 'catastrophic' end of the project at V.C. Summer Nuclear Station shows the regulatory process doesn't adequately protect residents or the state as a whole."[35] The legislation in South Carolina allowed utility companies to collect money from their customers to finance

---

[33] Allowable Ex Parte Briefing – ND-2017-12-E, *Public Service Commission of South Carolina*, August 1, 2017, 10:05 AM.

[34] Allowable Ex Parte Briefing – ND-2017-12-E, Public Service Commission of South Carolina, August 1, 2017, 10:05 AM.

[35] "The Latest: Legislators call for refunds from nuke project," *Associated Press Newswires,* August 2, 2017, 1:36 PM; "Workers, lawmakers angry over nuclear plant debacle," *Associated Press Newswires,* August 2, 2017, 5:40 PM.

projects and still recover costs if they never became operational. This project accounted for 18% of SCE&G's residential electric bills and SCANA executives did not plan to refund their customers, but requested permission to recover an additional $5 billion in costs over 60 years.[36] Lawmakers expressed their desire for "shareholders of SCANA Corp, to eat any remaining costs tied to the high-profile cancellation of two multi-billion nuclear reactors in Fairfield County," and claimed there would be further investigation into how SCANA managed the project.[37]

30.     Prior to market hours on August 3, 2017, SCANA reported its financial results for Q2 2017. It announced earnings of $121 million, or $0.85 per share,[38] which exceeded the analyst consensus of $0.74.[39] On the Company's earnings call at 3:00 PM that day, analysts primarily focused on the abandonment of the Nuclear Project and its implications.

31.     For example, a Morningstar analyst asked, "And you still remain confident that the BLRA will be upheld after at least these – those first discussion?" Marsh responded:

> It's clear that the law provides for it. We are following the procedures outlined in the law, which will require us to make sure we didn't do anything imprudent to put ourselves in this situation. And we validated everything we had done on the project but the fixed price option that was approved in 2016, that validated everything we had done on the project is prudent at that point. It was shortly thereafter that we learned of the news of the Toshiba financial distress, followed by the Westinghouse bankruptcy in March of 2017. So clearly from our perspective, we had an active project. It was moving forward, we were making progress and looking forward to hitting the targets but when Westinghouse withdrew from the project by declaring bankruptcy, that put us in a situation we had to do the analysis. So we believe we have -- we were prudent to the point we learned of the financial distress and bankruptcy of Westinghouse. We acted prudently after that, do a thorough evaluation of all options, which included building 2 plants, building one plant,

---

[36] "Workers, lawmakers angry over nuclear plant debacle," *Associated Press Newswires,* August 2, 2017, 5:40 PM.

[37] "S.C. lawmakers want SCANA stockholders to eat costs of two failed nuclear reactors," *The Post and Courier,* August 3, 2017.

[38] "SCANA Reports Financial Results for Second Quarter of 2017," *PR Newswire,* August 3, 2017, 7:30 AM.

[39] "SCG – Big 2Q17 Beat, But Focus Is on the Regulatory/Legislative Back-drop Amidst V.C. Summer Fallout," *Guggenheim,* August 3, 2017.

abandoning one plant or full abandonment. I am confident we made the right decision on behalf of customers and all the other stakeholders. And we will present that in a very clear and understandable form to the commission.[40]

32. Stephen Calder Byrd, a Morgan Stanley analyst, asked SCANA executives about the Energy Caucus:

Have you all had an opportunity to have a dialogue with some of the legislators who have formed this energy caucus group just to talk through the situation with those legislators?[41]

33. Marsh responded:

I've not had any personal discussions with any of them since they formed the group. We believe in open communication so I'm confident we'll be talking to members of that group as we go forward. We have a very active regulatory team who will certainly be reaching out to members of that group who can help them understand the challenge that we had in making this decision and why we decided to seek the abandonment. Our process at the commission is very open. And as we've said, the commission will take a lot of information and as they make their decision, I'm confident we'll be in settlement discussions.[42]

34. On August 3, 2017, my event study indicates the market price of SCANA Common Stock fell by 3.13% ($2.10 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence level with a t-statistic of -4.74. Based upon a review of the mix of information revealed, the only other news that may have influenced SCANA's stock on this date was the earnings announcement, which was positive. Given that the news was positive, the stock price decline on this day conservatively measures the price impact of the disclosure.

---

[40] "FQ2 2017 Earnings Call Transcripts," *S&P Capital IQ,* August 3, 2017, 3:00 PM.

[41] *Id.*

[42] *Id.*

35.     This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event, as discussed further below.

36.     With the breadth of the information on SCANA being released, analysts, mirroring the discussion on the earnings call, focused primarily on the reaction to the abandonment of the Nuclear Project and lightly referenced the Q2 results. Guggenheim analysts focused on the legislative situation:

> [W]e expect share performance to be driven by regulatory treatment of stranded investments at V.C. Summer, and the extent to which that treatment deviates from existing legislation supporting recovery of (and return on) capital deployed… Today's share price performance supports that thesis, as shares underperformed the group (SCG -2.7% vs. UTY +0.5%) despite a strong print as initial reactions from public figures (e.g. Governor, regulators, etc..,) began circulating.[43]

37.     Barclays recognized the risks related to SCANA's future, while also highlighting a potential silver lining related to rate mitigation:

> While we acknowledge the regulatory and political risk around SCANA's submitted cost recovery allowed under abandonment in the BLRA, we would also acknowledge the significant front year rate mitigation for customers funded by the tax deductions and the Toshiba financial guarantee. We see regulatory risk as being an overhang to

---

[43] "SCG – Big 2Q17 Beat, But Focus Is on the Regulatory/Legislative Back-drop Amidst V.C. Summer Fallout," *Guggenheim,* August 3, 2017.

46

performance, but overall an acceptable settlement or ruling from the commission moving the stock to fair value.[44]

38.     CFRA analysts rated SCANA's risk as "LOW," citing an optimistic future for SCANA:

> Above-average population growth in SCG's service areas will likely lead to further rate increases. We have a favorable view on SCG's three-year capital spending plan. With its decision to halt construction of the nuclear plants, we believe SCG will need to build more conventional baseload generation over the next four years. SCG's dividend payout ratio target is in the 55% to 65% range, and we think dividends will increase faster than EPS for the next several years.
>
> […]
>
> Risks to our recommendation and target price include changes in interest rates, prolonged deviations from average temperatures, regulatory actions, and changes in economic conditions within SCG's service area.[45]

**August 4, 2017**

39.     On August 4, 2017, the South Carolina Attorney General's Office introduced additional pressure on SCANA'S abandonment provision. According to *The Post and Courier*, the AG announced an investigation into the abandoned Nuclear Project stating, "We would like the opportunity to investigate this issue in order to ensure that all laws were complied with and all applicable procedures were followed."[46]

40.     In addition, according to *The State*, South Carolina Senate leaders, with support from the Attorney General, called for a special legislative session to block a potential electric rate hike for residents.[47] *The State* noted that Senate Majority Leader Shane Massey and Senate

---

[44] "Ex Parte Transcript; 2Q'17 Results," *Barclays,* August 3, 2017, 4:29 PM.

[45] "SCANA Corp," *CFRA*, August 3, 2017.

[46] "Attorney General says he's investigating abandonment of nuclear reactors; South Carolina state senators call or special session," *The Post and Courier,* August 4, 2017.

[47] "SC Senate leaders want special session to block rate hikes after nuclear plant boondoggle," *The State,* August 4, 2017, 10:19 AM.

Minority Leader Nikki Setzler "want[ed] the General Assembly to return to pass a resolution that would prevent the Public Service Commission from approving further rate hikes until the Legislature returns to Columbia next January."[48]

41.     On August 4, 2017, my event study indicates the market price of SCANA Common Stock fell by 2.07% ($1.35 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence level with a t-statistic of -3.13.

42.     This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event.

43.     Indeed, some analysts and investors remained optimistic. In an August 7, 2017 report, for example, Wells Fargo gave SCANA a positive rating, citing SCANA's various "legal protections":

> Our positive rating reflects our assessment of the likely outcome and our view that the current valuation offers investors an attractive risk/reward profile – keeping in mind the strong legal protections afforded SCG via the Base Load Review Act (BLRA), which was passed by the South Carolina General Assembly in 2007. In the end, we believe SCG will be

---

[48] *Id.*

48

[] able to negotiate a constructive settlement through the regulatory process.[49]

**August 10, 2017**

44.     Over the course of August and September, additional civil and criminal investigations and lawsuits were launched, negatively affecting SCANA's stock price. After market hours on August 9, 2017, *The State* released news that the Office of Regulatory Staff filed a motion to dismiss SCE&G's abandonment petition. According to *The State*, "[a] state consumer agency took legal action Wednesday against SCE&Gs's plan to charge customers for a nuclear expansion project the utility said had become too expensive to finish."[50]

45.     South Carolina lawmakers took additional steps to further investigate SCANA's abandonment of the Nuclear Project by announcing the Utility Ratepayer Protection Committee, which followed the announcement of the Nuclear Project Review Committee on August 8, 2017. House Speaker Jay Lucas said that the Committee would "study 'every possible option' for better protecting customers who have already 'spent their hard-earned paychecks on a service they will never receive.'"[51] South Carolina's governor, Henry McMaster, weighed options to save at least one of the abandoned Nuclear Project reactors, including finding another utility company to take over Santee Cooper's share of the Nuclear Project.[52]

46.     In addition, on August 9, 2017, at 3:50 pm (ten minutes before the market close), *The State* reported that SCANA's executives were paid almost $21.4 million in annual performance bonuses over the past decade. Some of these bonuses were paid to executives for

---

[49] "Utility & Alternative Energy Daily," *Wells Fargo,* August 7, 2017.

[50] "State agency challenges nuke plan shutdown proposal, says ratepayers could be hurt," *The State,* August 9, 2017; Complaint ¶ 360.

[51] "Legislators to separately study failed nuclear project," *Associated Press Newswires,* August 9, 2017, 6:33 PM.

[52] "SC governor, lawmakers attempting to save abandoned nuke, protect ratepayers," *SNL Power Daily with Market Report,* August 9, 2017.

49

matters related to the failed construction of the nuclear reactors at the V.C. Summer site.[53]

Lawmakers questioned the bonuses amidst the uncertainty of the project. Rep. Russell Ott said, "[k]nowing everything we know now, and knowing that we have a project that has been abandoned, those are pretty staggering numbers… If everything was going so well that you were willing to give your executives bonuses because of it, then what all of a sudden went so badly?"[54]

47.    On August 10, 2017, my event study indicates the market price of SCANA Common Stock fell by 1.43% ($0.90 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 95% confidence level with a t-statistic of -2.18.

48.    This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event.

49.    For example, numerous analysts were still positive about SCANA's future.  For example, Wells Fargo analysts still rated SCANA as Outperform, and stated:

> While we are skeptical that the NND will be resurrected, we would not rule it out and believe it could be positive to SCG's investment thesis

---

[53] "Top SCANA executives were paid millions in bonuses for roles in failed nuclear project," *The State,* August 9, 2017.

[54] *Id.*

50

depending upon what the go-forward construction looks like from a risk perspective (i.e., strong partner, state support and/or federal backstop protection). As for the Senate committee - we view the examination as to be expected in light of the understandable public outcry to SCG's and Santee Cooper's abandonment decision.[55]

**August 11, 2017**

50.     After market hours on August 10, 2017, *The Post and Courier* published an article titled, "CEO: SCANA may not return to scuttled nuclear project—even if a new partner emerges," that reported on the status of the project and on the Office of Regulatory Staff's ("ORS") motion to dismiss. Kevin Marsh was quoted in the article questioning SCANA's desire to return to the project with a new partner:

> "I've got to be convinced that building the one-plant option – even with a new partner – would be in the best interest for our customers," Marsh said Thursday. "If it's beyond that, I don't know that it makes economic sense."[56]

51.     He stated he was unsure if it was feasible to make advancements on the project after it "fell years behind schedule" and "costs soared billions of dollars over budget."[57] Marsh's comments raised suspicions on the viability of Governor Henry McMaster's efforts to find another utility company to purchase Santee Cooper's share of the Nuclear Project. Marsh also stated that revival of the project would also take time:

> "The governor has stated he's looking for another partner to possibly come into the plant, but if someone says they're interested, that's not something that will happen overnight… There are a lot of bridges that have to be crossed before we would get there."[58]

---

[55] "Utility & Alternative Energy Daily" *Wells Fargo,* August 9, 2017.

[56] "CEO: SCANA may not return to scuttle nuclear project – even if a new partner emerges," *Post and Courier,* August 10, 2017.

[57] *Id.*

[58] *Id.*

51

52. Tensions with SCANA and lawmakers continued as SCANA requested permission to charge customers $2.2 billion for the costs of the abandoned project over the next 60 years under the BLRA provision.[59] Rep. Leon Stavrinakis was quoted in the article urging SCANA to pull its request:

> "There's a lot of public trust and public money at stake here, and I think it would be the right thing for you guys to do… I fear that if you don't… you may force the General Assembly to be more rash than we may otherwise would want to be." [60]

53. This event provided information to the market about the status of the Nuclear Project and management's ability to complete the project with a different partner and the likelihood that SCANA may not recover costs under the BLRA provision. On August 11, 2017, my event study indicates the market price of SCANA Common Stock fell by 1.40% ($0.87 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 95% confidence level with a t-statistic of -2.13.

54. This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event. For example, following this news, analyst coverage continued to report on the possibility that SCANA shareholders would recover project costs:

---

[59] *Id.*

[60] *Id.*

52

> Scana shareholders will be made whole if regulators approve its abandonment plan and uphold state law allowing recovery of $2.2 billion from customers.[61]

**September 7, 2017**

55.     After market hours on September 6, 2017, *The Post and Courier* published an article titled, "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South Carolina nuclear plant failure," and released internal emails from Kevin Marsh, SCANA's CEO and Toshiba executives that showcased a crumbling relationship between SCANA and Westinghouse, a subsidiary of Toshiba.[62] These emails revealed false information that SCANA and Santee Cooper continued to spread about the progress of the Nuclear Project:

> They [the emails] also suggest that SCANA and Santee Cooper quietly prepared more than a year ago for the possibility that Westinghouse and Toshiba might fall into bankruptcy and bring the nuclear project down in the process. In an October letter to Marsh, Lonnie Carter, Santee Cooper's chief executive officer, noted that SCANA had agreed in June 2016 to hire bankruptcy lawyers "to help us think through Toshiba/Westinghouse insolvency scenarios." But SCANA's public portrayal of the project was much different. During a hearing before state utility regulators that October, Bob Guild, an attorney for the Sierra Club, specifically asked SCANA officials about the possibility of Westinghouse's insolvency. SCANA officials shrugged off the question.[63]

56.     On September 7, 2017, my event study indicates the market price of SCANA Common Stock fell by 1.50% ($0.90 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 95% confidence level with a t-statistic of -2.27.

---

[61] "Political Rhetoric Around Nuclear Power Heating Up; Scana Approaches Buy Territory," *Morningstar Equity Research*, August 14, 2017.

[62] "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South Carolina nuclear plant failure," *The Post and Courier,* September 7, 2017, 7:30 PM.

[63] *Id.*

53

57.     This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event.

58.     For example, in response to earlier revealed information and emails, Wells Fargo analysts on September 11, 2017 believed that long-term, SCANA would recover from its current position:

> The company is expected to wrap up hearings with the special South Carolina Senate committee shortly and then begin hearings with a separate House committee. Once completed, we expect SCG will revisit refiling the abandonment recommendation with the South Carolina Public Service Commission (PSC)…we do not expect resolution of V.C. Summer cost recovery until 1H'18 at the earliest. In the meantime, we expect there will continue to be plenty of negative of headlines, such as last week's release of the February 2016 audit conducted by Bechtel into Summer's project management. In our view, the contents of the report were not overly surprising but the method by which it was released caused some parties to think SCG was attempting to hide something. We do not think this was the case and fully believe that SCG's decision not to publicly release the audit reflected substantial concerns that such a move could jeopardize SCG's legal position vs. Toshiba/Westinghouse (potentially to the detriment of customers). Bottom line: in the near-term, we think the uncertainty around V.C. Summer will make it difficult for the shares to gain meaningful and sustained traction on a relative basis vs. electric utility peers. That being said, longer-term we continue to think shares reflect an overly pessimistic outcome to V.C. Summer (substantial disallowances plus little to no return on the remaining investment).[64]

---

[64] "Utility & Alternative Energy Daily," *Wells Fargo,* September 11, 2017, 5:19 AM.

**September 21-22, 2017**

59.	On September 21, 2017, SCANA announced it had received a subpoena issued by the U.S. Attorney's Office for the District of South Carolina related to the Nuclear Project.[65] SCANA did not provide information regarding the substance of the subpoena but indicated it would cooperate.[66] Additionally, *The State* newspaper reported that multiple sources had informed it that a federal grand jury in South Carolina is looking at SCANA's actions concerning the Nuclear Project.[67]

60.	Over the two-day window of September 21-22, 2017, my event study indicates that the market price of SCANA Common Stock fell by 3.46% or $2.00 per share, after controlling for market and industry factors. This decrease is statistically significant at the 99% confidence level with a t-statistic of -3.64.

61.	This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event.

---

[65] "SCANA Receives Subpoena For Documents Relating To Nuclear Project," *PR Newswire*, September 21, 2017, 8:00 AM.

[66] *Id.*

[67] "SCANA being investigated by federal grand jury over failed nuke project," *The State*, September 21, 2017.

62. For example, Wells Fargo released an analyst report on September 22, 2017, in which it stated that while it believed that SCANA would face short-term obstacles, it would recover long-term:

> Unfortunately, the news flow is not likely to get any better anytime soon as early next week, per The State, the South Carolina Attorney General's (AG's) office is expected to opine on the constitutionality of the Base Load Review Act (BLRA) as well as the ability of the SC General Assembly to change the law. The BLRA affords SCG substantial legal protections in the event of project abandonment including recovery of and a return on the remaining balance. We think it is likely that the AG will seek to attack the legality of the BLRA in one form or fashion.[68]

**September 27, 2017**

63. After market hours on September 26, 2017, the South Carolina Office of Regulatory Staff requested that the state PSC suspend the rates that SCANA was charging their customers for the Nuclear Project. Additionally, the Office of Regulatory Staff asked the PSC to refund or credit ratepayers for the charges made towards the abandoned nuclear project.[69] This request was directly tied back to Attorney General Alan Wilson who called the charging of customers as "'constitutionally suspect.'"[70]

64. During market hours on September 27, *The State* reported that SCANA may have softened the results from an original third-party assessment it commissioned of the Nuclear Project's status and challenges by Bechtel Corporation–an engineering, construction and project management firm. Cindi Ross Scoppe of *The State* stated in regard to the diluted report:

> A timeline that Santee Cooper CEO Lonnie Carter sent to SCANA CEO Kevin Marsh complaining about delays includes this Nov. 12, 2015, entry: "Bechtel Assessment Report – Issued to George Wenick – Weeks

---

[68] "Utility & Infrastructure Daily," *Wells Fargo,* September 22, 2017.

[69] "SCE&G customers may get break on power bills to offset nuclear plant debacle," *The State,* September 26, 2017.

[70] *Id.*

> go by with Wenick/Bechtel wrangling over Wenick's rejection of initial report, redactions, timeline removal, critique of project management."
>
> That's one of the most disturbing details so far in an ever-growing pile of the disturbing details about the colossal failure of SCANA and Santee Cooper to stop years of bleeding that eventually killed the two unfinished nuclear reactors.
>
> What that suggests is that the damning report that has upended the whole conversation about the project was originally much worse. What is suggests is that the version of the report that we've seen pulled some of its punches.[71]

65.     The article indicates that the Mr. Wenick referenced was a partner at Smith, Currie & Hancock, the law firm SCANA and Santee Cooper hired for the report, and who was given the report so the utilities companies could label it "confidential, attorney-client privileged" and could hide the results from the public.[72]

66.     Additionally, during market hours on September 26, 2017, SCANA filed an 8-K that disclosed that the South Carolina Attorney General's Office, the Speaker of the South Carolina House of Representatives, and the Chair and Vice-Chair of the South Carolina House Utility Ratepayer Protection Committee requested the South Carolina Law Enforcement Division (SLED) to lead a criminal investigation into SCANA for their management of the Nuclear Project.[73] The announcement of the SLED investigation was driven by House Speaker Jay Lucas' letter, which stated SCANA had possibly committed "'criminal fraud through the concealment of material information.'"[74] After market hours, the *Associated Press* published a detailed report on the state probe into SCANA. Top state lawmakers and Attorney General Alan Wilson requested that state police investigate "potential criminality" by South Carolina Electric

---

[71] "How much worse was the original Bechtel nuclear report," *The State,* September 27, 2017, 11:35 AM.

[72] *Id.*

[73] SCANA Corporation SEC Form 8-K, dated September 25, 2017.

[74] "SC Attorney General questions law allowing SCE&G to raise rates," *The State,* September 26, 2017.

57

& Gas Co. and their parent company SCANA; Kathryn Richardson, state police spokeswoman, told the *Associated Press* that the state police was "going to investigate exactly what the Legislature asked us to."[75]

67. On September 27, 2017, my event study indicates the market price of SCANA Common Stock fell by 6.47% ($3.60 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence level with a t-statistic of -9.43.

68. This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event.

69. Specifically, while Wells Fargo analysts changed some of its opinions on SCANA, it still maintained an Outperform rating:

> We are lowering our 18E & 19E EPS to/from $3.50/$4.10 & $3.60/$4.35 along with our forward price target to $65/sh from $77/sh. [...] We expected the abandonment proposal to be contentious but thought that the rhetoric would abate over time and SCG, along with other parties, would be able to reach a negotiated settlement that balanced various interests while remaining consistent with the legal protections afforded under the Base Load Review Act (BLRA). Our calculation was predicated on our belief that the response from the Republican-dominated SC government would not be overly populist. Thus far, this

---

[75] "Probe opened into 'potential criminality' in nuke project," *Associated Press Newswires*, September 26, 2017, 4:49 PM.

has proven to be a miscalculation on our part. That all being said, we think the current share price reflects an overly pessimistic outcome and, therefore, we stick with our Outperform rating – while acknowledging the lack of near-term positive catalysts.[76]

70.     Similarly, on September 28, 2017 Gabelli & Company analysts remained unsure about the outcome regarding the BLRA:

The attack on the constitutionality of the BLRA and BLRA rate increases adds a significant element of uncertainty to SCG's position as the 2007 law protects the nuclear development investment and provides for recovery under abandonment. SCEG has roughly $4.9 billion of nuclear investment recognized in rate base through eight consecutive ORS recommended PSCSC approved annual rate increases totaling $380 million in annual revenues. We had assumed the law provided firm ground to negotiate a constructive settlement. However, the enormity of the stranded investment has resulted in a political "firestorm", including accusations of negligence from various political players, and significantly weakens SCG's negotiating position. As such, we lowered our 2018-20 earnings estimates $3.80, $4.00 and $4.20 per share, from $4.30, $4.40 and $4.50 per share, to reflect a more likely scenario. We have a low degree of confidence in our estimates given dependence on approval of rate mitigation plans.[77]

**September 29, 2017**

71.     On September 28, 2017, after market hours, SCANA issued a press release announcing the PSC's decision to defer action on the ORS's request for SCE&G to suspend revised rates collections.[78] The press release also announced that SCE&G filed a motion to dismiss the ORS's proposed suspension of rate collections, citing that the request had many legal and constitutional deficiencies.[79] In addition to this press release, the *Associated Press* published

---

[76] "SCG: ORS Rate Request Adds Yet Another Layer of Uncertainty," *Wells Fargo,* September 27, 2017.

[77] "BLRA Rates Challenged; Political Firestorm – Hold," *Gabelli & Company,* September 28, 2017.

[78] "Public Service Commission of South Carolina Defers Action on Office of Regulatory Staff Request to Suspend Revised Rates Collections," *PR Newswire,* September 28, 2017, 5:54 PM.

[79] *Id.*

an article about a securities fraud lawsuit recently filed after market hours by a SCANA shareholder.[80]

72.     In the midst of all this potential regulatory and legal trouble, SCANA began to receive additional downgrades from multiple analysts. Before market hours on September 29, 2017, Williams Capital downgraded SCANA:

> Williams Capital analyst Christopher Ellinghaus downgraded Scana to Sell and cut its price target to $40 from $50, a day after cutting his price target from $70. On Thursday, the company was the target of a new shareholder lawsuit accusing the company of manipulating the stock regarding the development of the V.C. Summer nuclear project and reduced estimates dramatically to reflect the likelihood of a regulatory outcome.[81]

73.     During the market day, Fitch Ratings also downgraded its rating for SCANA from "BBB-" to "BB+" in reaction to the regulatory news:

> Fitch is concerned with the sharp deterioration in the legislative and regulatory environment in South Carolina. There is a significant risk that SCE&G may have to cease collection of revenues related to the new nuclear units, as petitioned by the Office of the Regulatory Staff (ORS) to the SC Public Service Commission (PSC) until the legal issues regarding the BLRA are resolved. Fitch could consider additional negative rating actions if the BLRA were to be found unconstitutional and material refunds required. The Rating Watch Negative primarily reflects the risk that adverse regulatory orders could lead to restricted liquidity, constrained capital access and incremental debt issuance.[82]

74.     S&P Global ratings also downgraded their rating and put the stock on its negative CreditWatch:

> The CreditWatch with negative implications on SCANA and its subsidiaries reflects our view that the political atmosphere in South

---

[80] "Suit accuses utility of misleading investors on nuke project," *Associated Press Newswires,* September 28, 2017, 4:56 PM.

[81] "08:42 EDT Scana downgraded to Sell from Hold at Williams CapitalWilliams Capital...," *theflyonthewall,* September 29, 2017, 8:42 AM.

[82] "Fitch Downgrades SCANA to 'BB+' / SCE&G to 'BBB-'; Negative Watch Maintained," *Dow Jones Newswires,* September 29, 2017, 12:40 PM.

Carolina following the company's decision to abandon Summer construction has worsened and could result in regulatory and legislative decisions that harm both the business and financial risk of SCANA. We could lower the ratings on SCANA and its subsidiaries if Summer-related rates are rescinded. We could further lower ratings if legal challenges to a rate decrease are unsuccessful, if the SCPSC orders cash refunds or rate credits for Summer-related costs, if the BLRA is repealed or changed by the legislature, or if the BLRA is deemed unconstitutional.[83]

75. Morningstar felt that this news reaffirmed its rating for SCANA as a buying opportunity:

Shareholders also should feel relieved that state regulators dismissed a Draconian rate refund request from the Office of Regulatory Staff, or ORS, and instead plans to litigate the case. Any regulatory decision likely will end up in the courts in 2018. However, the benefit of a litigated case is it could open a settlement opportunity for Scana, which we think will be eager to settle to avoid a long regulatory, legal, and political slog.[84]

76. Additionally, there was more information that was released on this day in relation to SCANA. After market hours, two local newspapers ran news stories regarding two confidential documents from SCANA. One article released by *The State* gave extra information regarding a memo released earlier in the Class Period with the Bechtel Report.[85] The other, released by *The Post And Courier,* was about a recently undisclosed letter sent by Marsh of SCANA and Lonnie Carter of Santee Cooper to Westinghouse and Chicago Bridge and Iron about costly setbacks and overruns at the Nuclear Project.[86] In the article, South Carolina Representative Russell Ott stated, "[i]t is just more proof, concrete proof, that these guys knew

---

[83] "S&PGR Downgrades SCANA And Subs To 'BBB'; On Watch Negative," *Dow Jones Newswires,* September 29, 2017, 1:26 PM.

[84] "In Whirlwind of Activity, Scana Remains a Buying Opportunity," *Morningstar Equity Research,* September 29, 2017.

[85] "Confidential memo shows SCNA, Santee Cooper long worried over nuclear woes," *The State,* September 29, 2017, 8:20 PM.

[86] "Letter shows S.C. utilities knew Westinghouse's reactor designs would lead to increased costs and schedule delays," *The Post and Courier,* September 30, 2017.

this project was in bad shape… It's a shame we had to go this far and spend this much money to get to this point."[87]

77.     On September 29, 2017 my event study indicates the market price of SCANA Common Stock fell by 4.77% ($2.43 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence level with a t-statistic of -6.93.

78.     This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event.

79.     This is evident, for example, from commentary in a report issued by Morgan Stanley analysts on October 4, 2017:

> We believe the most likely base case outcome for treatment of SCG's abandoned nuclear plant is now meaningfully worse than we previously expected. SCG faces significant risk that investments made in its nuclear plant will be partially disallowed given recent indications that management may have had serious concerns well before the plant was officially abandoned in late July […]. We believe a $1.5b disallowance is the most likely outcome…[88]

---

[87] *Id.*

[88] "High Risk of Disallowance; Lowering PT to $45 and Remaining UW," *Morgan Stanley*, October 4, 2017.

**October 19, 2017**

80.      On October 19, 2017, Governor Henry McMaster addressed a letter to SCANA executives in which he criticized the ways in which SCANA was financing the abandoned nuclear project. Later that day, the *Associated Press* released an article about the letter to Marsh, describing how Governor Henry McMaster had urged Marsh to stop charging customers $37 million a month for the nuclear project.[89] In his letter, he wrote:

> I also urge SCANA to use the Toshiba settlement funds to begin refunding to ratepayers money collected for the construction of the nuclear reactors in Fairfield County. I believe this is the right thing to do under these circumstances. It is unreasonable and oppressive for SCANA to require its customers to bear the burden of actions and decisions in which customers played no part and over which they had no control.[90]

81.      According to *The State*, SCANA replied to this letter with an email statement:

> "[T]he request in the letter is essentially the same as that recently expressed by the Office of Regulatory Staff. […] As we have consistently communicated, SCE&G intends to utilize the net value of the Toshiba parental guaranty payments to mitigate the cost of the abandoned project to customers. We hope that we will be able to engage in a discussion for a comprehensive settlement of the issues related to the project and how to further mitigate the impact on our customers."[91]

82.      On October 19, 2017, my event study indicates the market price of SCANA Common Stock fell by 1.80% ($0.88 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 95% confidence level with a t-statistic of -2.53.

---

[89] "Gov to utility: Stop charging customers for scuttled project," *Associated Press Newswires*, October 19, 2017, 1:53 PM.

[90] *"Dear Mr. Marsh,"* *Governor Henry McMaster,* October 19, 2017.

[91] "SCANA should stop charging its customers for failed nuclear project, governor says," *The State,* October 19, 2017.

83.     This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event, as it failed to fully disclose that SCANA would be unable to recoup its costs under the BLRA.

**October 27, 2017**

84.     Prior to market hours on October 27, 2017, analysts at Morgan Stanley published an article with a less optimistic outlook about SCANA's most recent earnings announcement and the potential settlement than analysts on the day prior. In an article titled "Exploring Severe Downside Scenarios Given Recent Governor and Legislator Comments," released prior to the market opening on October 27, Morgan Stanley cited several concerns that may make the potential outcomes of discussions with the SC committees less favorable to the Company and its investors. One of their concerns was the possibility that the market was not made aware earlier about significant issues with the Nuclear Project:

> We are growing increasingly concerned that a more negative scenario than our base case may play out for SCG. [...] Why have we grown increasingly concerned about more severe outcomes? (A) Recently, SC Governor McMaster stated in a letter to SCANA CEO Kevin Marsh that "it is unreasonable and oppressive for SCANA to require its customers to bear the burden of actions and decisions in which customers played no part and over which they had no control." The Governor also suggested it would be "unwise" for SCANA to contest the legality of the potential overturning of the Base Load Review Act (BLRA), the law that set the framework for SCANA subsidiary SCE&G to pursue construction of the

64

VC Summer nuclear project. (B) The SC Office of Regulatory Staff recently made a recommendation that SCANA stop collecting customer revenue for its new nuclear plant until the General Assembly acts on the BLRA. (C) The SC Attorney General has argued in a brief that the BLRA law is "constitutionally suspect" under the SC Constitution. (D) Some legislators have suggested they may move to overturn the BLRA and move to eliminate any recovery for VC Summer costs incurred by SCANA. (E) *Media reports suggest emails between SCANA management and executives at Toshiba and Westinghouse highlight prior SCANA knowledge of significant issues with the VC Summer plant (as early as 2014) at the same time that management was allegedly not fully disclosing such issues to key constituents.*

We acknowledge there is potential for a settlement, but still see significant risk. SCG announced on its 3Q17 earnings call that it has entered preliminary discussions with several parties, and that the tone of these discussions has been "professional." While we recognize this could be a less contentious path forward, we have some skepticism on the ability to reach a settlement given the tone from legislators and other intervenors, and also think a settlement could still result in a sizeable disallowance for the company.

[...]

While overturning the BLRA is in our view unlikely to succeed, we believe there are potentially more valid arguments for disallowing a significant portion of capex spent by SCANA to date. We believe the Bechtel report provides support for such an outcome. In 2015 SCANA and Santee Cooper commissioned Bechtel, an engineering and construction firm, to assess the status and challenges of the VC Summer project in anticipation of litigation with Westinghouse. Bechtel delivered its report in February 2016, highlighting significant issues with the design, schedules, project management, oversight, and construction contract, and recommending a number of actions to improve the project. This report was kept confidential between the utilities and never released to the ORS or PSC. The report was publicly released by Governor McMaster in early September after demanding it from Santee Cooper. Both utilities requested to keep the report confidential to protect their legal defense in litigation with Westinghouse.[92]

---

[92] "Exploring Severe Downside Scenarios Given Recent Governor and Legislator Comments," *Morgan Stanley,* October 27, 2017 12:01 AM. (Emphasis Added.)

85.     The publication of this analyst report was predicated on SCANA's publication of their financial results from the day prior.[93] On October 26, 2017, before the start of trading, SCANA issued a press release announcing its financial results for the third quarter of 2017.[94] For SCE&G, its principal subsidiary, the Company reported earnings of $42 million, or earnings per share of $0.29.[95] SCE&G's earnings fell drastically compared to its third quarter of 2016 results of $204 million, or an EPS of $1.43.[96] On the earnings call later that day, SCANA explained that its Q3 earnings miss was driven in large part by a $210 million impairment related to the Nuclear Project.[97] SCANA went on to provide no long-term earnings guidance for SCE&G because of the failed project.[98]

86.     On October 27, 2017, my event study indicates the market price of SCANA Common Stock fell by 3.41% ($1.63 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence level with a t-statistic of -4.73.

87.     This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant that

---

[93] October 26, 2017 is not statistically significant the 95% confidence level.

[94] "SCANA Reports Financial Results for Third Quarter of 2017," *PR Newswire,* October 26, 2017, 7:30 AM.

[95] *Id.*

[96] *Id.*

[97] "FQ3 2017 Earnings Call Transcripts," *S&P Capital IQ,* October 26, 2017, 3:00 PM.

[98] "SCANA Reports Financial Results for Third Quarter of 2017," *PR Newswire,* October 26, 2017, 7:30 AM.

66

was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event, as it failed to disclose that SCANA would be unable to recoup its costs under the BLRA.

**October 31, 2017**

88.     On October 31, 2017, before market open, SCANA issued a press release announcing the retirement of Marsh as CEO and Byrne as Senior Vice President of SCANA and COO of SCE&G.[99] The press release also named Addison as the new CEO and Keller Kissam as the new COO.[100] The news came after several days of rumors published by local newspapers regarding the leadership change, which were subsequently rebuffed by SCANA's spokesperson and Marsh himself.[101] In the press release, SCANA provided no information as to whether the leadership change was due to the challenges faced by the retiring officers as a result of the failed Nuclear Project.

89.     In response to the leadership change, *The State* interviewed Tom Clements, an adviser to the Friends of the Earth Environmental group. He expressed anxiety towards the new leadership role for Addison:

> "Addison is one of the ringleaders of the project," […] "[r]ewarding him is very unsettling."[102]

90.     South Carolina State Representative James Smith had a more positive outlook on the transition:

---

[99] "SCANA Corporation and South Carolina Electric & Gas Company Announce Leadership Changes," *PR Newswire,* October 31, 2017, 9:00 AM.

[100] *Id.*

[101] "SCANA to oust CEO, chief operating officer in aftermath of VC Summer failure," *The State*, October 28, 2017;"SCANA chief denies he's leaving embattled utility," *The State,* October 30, 2017.

[102] "SCANA CEO Marsh, another top executive departing after nuclear fiasco," *The State*, October 31, 2017.

67

"It's a good thing and this is an important step to bringing everything back into alignment." […] "It's a step that allows the company to take necessary action to regain the public trust and confidence."[103]

91. Analysts who mentioned the leadership change had a relatively positive outlook on the news. Analysts at Wells Fargo felt that the news was almost expected:

Prior to the market open, the company announced the retirements of Chairman & CEO Kevin Marsh and COO Stephen Byrne as of year-end 2017. CFO Jimmy Addison will step into the CEO role. We view the executive departures as an inevitability in the wake of the political firestorm around the proposed abandonment of the two new V.C. Summer nuclear units.[104]

92. In its report days later, Morningstar expressed the same sentiment:

On Tuesday, Scana announced Chairman and CEO Kevin Marsh and Chief Operating Officer Stephen Byrne will retire Jan. 1, 2018. We think this is a good political move after several top state lawmakers had called for a change in Scana's leadership. Although insiders will replace them, we hear that CFO Jimmy Addison—who will become CEO—and President of Retail Operations Keller Kissam—who will become COO— are well-respected across the state.[105]

93. On October 31, 2017, my event study indicates the market price of SCANA Common Stock fell by 5.99% ($2.75 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence level with a t-statistic of -8.23.

94. This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical

---

[103] *Id.*

[104] "Flash Comment, Utility & Infrastructure Daily," *Wells Fargo,* November 1, 2017.

[105] "Headlines Keep Flying But Thesis Intact For Scana," *Morningstar Equity Research,* November 5, 2017.

68

connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. However, the full relevant truth that was allegedly concealed by Deloitte's clean audit reports was not fully revealed by this corrective disclosure event, as it did not disclosure that SCANA would be unable to recoup its costs under the BLRA.

**December 21, 2017**

95. On December 20, 2017, after market close, SCANA issued a press release announcing that the PSC denied SCE&G's Motion to Dismiss and ordered a hearing to be set of the ORS's request for rate relief.[106] According to the release, "the SCPSC ordered the ORS to perform a thorough inspection and audit […] to determine the reasonableness of SCE&G's retail electric rates."[107] The motion to dismiss was associated with two separate regulatory dockets, both dealing with SCANA and SCE&G's rates and fees to its customers used to continue financing the failed Nuclear Project.[108] The ORS case called for an immediate rate reduction for SCE&G by about $445 million annually.[109] The other request called for customer refunds estimated by a local newspaper to reach billions of dollars.[110]

96. An article released by *The Post and Courier* stressed the implications of this decision:

> By combining that action with another proposal, the utility commission
> will also consider whether SCANA should refund customers for the

---

[106] "Public Service Commission of South Carolina Orders Hearing on the South Carolina Office of Regulatory Staff's Request to Reduce Rates," *PR Newswire,* December 20, 2017, 5:01 PM.

[107] *Id.*

[108] "Nuclear Dockets Will Proceed, But Commission Action Pushed to 2018," *Morgan Stanley*, December 21, 2017, 12:01 AM.

[109] "Public Service Commission of South Carolina Orders Hearing on the South Carolina Office of Regulatory Staff's Request to Reduce Rates," *PR Newswire,* December 20, 2017, 5:01 PM.

[110] "Ratepayers win victory in fight to recover money from failed SCE&G nuclear project," *The State,* December 20, 2017.

69

roughly $1.8 billion it has collected to finance its share of the nuclear project since 2009.[111]

97.     Additionally, the article further explained how the ORS will investigate other potentially fraudulent activity:

> Commissioner Elliott Elam ordered the Office of Regulatory Staff – the state's utility watchdog agency – to determine whether SCANA's bankruptcy warnings were accurate or whether the utility could absorb the lost revenue.[112]

98.     Morgan Stanley analysts highlighted the profound impact the two cases could inflict on the price on SCANA's shares if they resulted in an unfavorable decision for the Company:

> By our estimates, if the company were to receive no nuclear cost recovery (in addition to a lower 8% ROE at the core utilities) the stock would be worth $30/share, and if SCG were also to refund all revenue collected thus far the stock would be worth $18/share.[113]

99.     Christopher Muir, an analyst at CFRA, noted that even though SCANA can fight unjust rate reductions legally, this news will certainly affect its financing of the failed project. Therefore, he lowered CFRA's price target by $9:

> After rejection of SCG's request to dismiss the regulatory staff's rate review that seeks a $445 million annual rate reduction, we reduce our 12-month target by $9 to $42. While we think the $445 million rate reduction is too high, we cut our '18 EPS estimate by $0.75 to $3.05 on our expectation of reduced rates. SCG can successfully fight any potentially unjust rate reductions through legal means, but risks to acceptance of SCG's proposed approach for handling the nuclear costs are greater following the rejection, in our view. SCG may be forced into tougher negotiations.[114]

---

[111] "South Carolina utility regulators refuse to throw out case against SCE&G," *The Post and Courier,* December 21, 2017.

[112] *Id.*

[113] "Nuclear Dockets Will Proceed, But Commission Action Pushed to 2018," *Morgan Stanley*, December 21, 2017, 12:01 AM.

[114] "SCANA Corporation," *CFRA,* December 27, 2017.

100.    On December 21, 2017, my event study indicates the market price of SCANA Common Stock fell by 8.99% ($3.71 per share) after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence level with a t-statistic of -6.02.

101.    This corrective disclosure event has a logical connection to Plaintiff's allegation that Deloitte's clean audit reports concealed from investors the risk that the Nuclear Project would not be completed in time to obtain nuclear tax credits, of regulatory investigations and actions, and that SCANA would be unable to recoup losses from the project. This logical connection and my event study's finding of a statistically significant price decline supports a showing of price impact from this corrective disclosure event. Following this corrective disclosure, Plaintiff alleges that the market was finally made aware of the full extent of Defendants' false and misleading statements and omissions. This is evidenced by the analyst report published by Morgan Stanley on December 21, 2017, as described above and the article released by *The State* that commented on the matter:

> SCE&G customers who have paid nearly $2 billion for a failed nuclear construction project scored a victory Wednesday that could lead to a cut in power bills of up to 18 percent. The S.C. Public Service Commission denied SCE&G's request to throw out a legal case that seeks to eliminate charges customers now pay for the shuttered project. The commission also agreed not to dismiss a case that seeks potentially billions of dollars in customer refunds from SCE&G.[115]

---

[115] "Ratepayers win victory in fight to recover money from failed SCE&G nuclear project," *The State,* December 20, 2017.

71