# EXHIBIT 10

# Information Production by Investment Banks: Evidence from Fairness Opinions

Matthew D. Cain    *University of Notre Dame*

David J. Denis    *University of Pittsburgh*

## Abstract

We analyze a direct product of the investment banking process: target firm valuations disclosed in the fairness opinions of negotiated mergers. On average, acquirer advisers exhibit positive valuation errors that are significantly greater than those of target advisers. Top-tier advisers produce more accurate valuations than lower tier advisers, but we find no relation between valuation accuracy and the contingency structure of advisory fees. The stock price reactions to merger announcements and to the public disclosure of target-sought fairness opinions are positively related to the difference between target firm valuations contained in the fairness opinion and the merger offer price. We conclude that investment banks produce information not previously available to market participants through the rendering of target-side fairness opinions.

## 1. Introduction

Investment banks play important roles as intermediaries in financial markets. Through mergers and acquisitions (M&A) advisory services, they reduce transactions costs, contracting costs, and asymmetric information costs for bidders and targets (Servaes and Zenner 1996). Through securities underwriting services, investment banks benefit clients by reducing transaction costs (see, for example,

This paper is adapted from a portion of Matthew Cain's Ph.D. dissertation completed at Purdue University. We thank an anonymous referee, Dennis Carlton (editor), Mark Bagnoli, Diane Denis, Fernando Diaz, Ken Harden, Antonio Macias, Rodolfo Martell, John McConnell, Raghu Rau, Alessio Saretto, Paul Schultz, Gohar Stepanyan, session participants at the 2008 American Finance Association meetings in New Orleans, and the 2007 Financial Management Association meetings in Orlando, Florida, and seminar participants at Indiana University, Pennsylvania State University, the University of Arizona, the University of North Carolina at Chapel Hill, the University of Colorado at Boulder, the University of Florida, the University of Georgia, the University of Kentucky, the University of Notre Dame, the University of Oregon, the University of Pittsburgh, and Virginia Polytechnic Institute and State University.

[*Journal of Law and Economics*, vol. 56 (February 2013)]
© 2013 by The University of Chicago. All rights reserved. 0022-2186/2013/5601-0008$10.00

CAIN0001209

Benston and Smith 1976) and certifying the quality of issuers (see, for example, Denis 1991; Easterbrook 1984; Hansen and Torregrosa 1992; Smith 1986; Titman and Trueman 1986). Moreover, a number of studies demonstrate that investment banks produce superior underwriting results when they also have commercial lending relationships with clients (Gande et al. 1997; Puri 1996; Song 2004; Drucker and Puri 2005; Narayanan, Rangan, and Rangan 2007; Duarte-Silva 2010).

While many of these past studies hypothesize an information production role for investment banks, most provide only indirect evidence by documenting the performance of client issuers from underwriting services or of bidders from M&A advisory services. However, because these decisions are ultimately made by the clients, the performance of merged firms and securities issuers is, at best, a noisy proxy for the information produced by the investment bankers. To our knowledge, there is little direct evidence on the information production abilities of investment banks in an M&A advisory context.[1] We provide such evidence by analyzing fairness opinions rendered by investment banks in negotiated mergers.

Fairness opinions are a ubiquitous feature of negotiated mergers. In our sample of mergers between 1998 and 2005, over 96 percent of the transactions use a fairness opinion on either the target or the acquirer side. These opinions state whether the proposed offer price is fair to the client firm's shareholders from a financial point of view, though the terms "fair" and "from a financial point of view" are never formally defined. In addition to the bottom-line opinion, fairness opinions presented to corporate boards typically also include a board book that provides details of the valuation analyses conducted by the opinion provider in arriving at the overall opinion of financial fairness (see Davidoff 2006). Since the *Smith v. Van Gorkom* (488 A.2d 858 [Del. 1985]) decision, courts have generally allowed target directors to rely on fairness opinions as a primary component in the satisfaction of fiduciary duties in recommending mergers to shareholders. Implicit in this decision is the notion that fairness opinions contain incremental information, either because opinion providers enjoy access to higher quality information or because they have superior ability to process this information.

An alternative view, however, is that fairness opinions contain no incremental information. Fairness opinions have been widely criticized on the grounds that their valuation analyses are overly subjective, methodologically flawed, and tainted by conflicts of interest because opinion providers are also paid advisory fees that are contingent on the successful completion of the merger. Moreover, to the extent that targets and acquirers shop for favorable opinions among the set of fairness opinion providers, observed acquirer-sought fairness opinions are more likely to exhibit positive bias, while target-sought opinions are more likely

---

[1] Kisgen, Qian, and Song (2009) document the market reaction to the decision of targets and acquirers to seek a fairness opinion. However, they do not evaluate the content of the rendered fairness opinions and related valuation analyses. Their tests thus provide only indirect evidence on the benefits of mergers and acquisitions (M&A) advisory services.

CAIN0001210

to exhibit negative bias relative to the negotiated offer price.[2] For these reasons, Elson (1992, p. 1002) goes so far as to conclude that a fairness opinion is "as necessary to valuation analysis as is the appendix to the human digestive system" and that it "produces no benefits to stockholders." In addition, many politicians and practitioners view fairness opinions with suspicion because investment banks compete for additional fee-based business beyond the provision of fairness opinions (see, for example, Drummond 2005).[3] Prior studies by Kanatas and Qi (2003) and Bolton, Freixas, and Shapiro (2007) argue that the potential for conflicts of interest increases when investment banks offer overlapping sources of fee-generating business (see also Harper and Werdigier 2005).[4]

We provide direct evidence on these views by analyzing the valuation analyses included in 582 fairness opinions issued in conjunction with negotiated mergers between 1998 and 2005. From the proxy mailings that contain fairness opinions, we record the valuation prices per share for each valuation method disclosed in each fairness opinion provided to the acquirer and target in a given merger. We then address four questions. First, to what extent are valuations contained in fairness opinions systematically different from market-based measures of target firm value? Second, are such systematic valuation errors (if any) associated with possible conflicts of interest? Third, do fairness opinions increase the amount of information available to directors and to investors? Fourth, what factors, if any, affect the information content of fairness opinions?

Perhaps not surprising, we find strong evidence that acquirer-side investment banks tend to value targets significantly above offer prices (by 20 percent on average). Our evidence for target-side investment banks is more mixed. Although median valuations in target-side fairness opinions are significantly below offer prices, mean valuations do not differ significantly from the offer price. We further find that top-tier investment banks produce significantly lower absolute valuation errors, as do advisers with a preestablished relationship with the target. Thus, adviser rankings and relationship-based information appear to play a role in the accuracy of fairness opinion valuations. We find no statistically significant evidence, however, that opinion providers provide less accurate valuations for mergers in which they are paid contingent fees. Moreover, we find no evidence that unaffiliated third-party investment banks provide valuations that are more accurate than those of affiliated advisers. We conclude, therefore, that there is little statistical evidence that fairness opinion valuations are driven by conflicts of interest. This conclusion is consistent with the conclusions of Rau (2000) and

[2] This process is similar to the phenomenon of credit ratings shopping analyzed in Bolton, Freixas, and Shapiro (2012).

[3] More recently, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, sec. 919A (124 Stat. 1376 [2010]), commissioned a study "to identify and examine potential conflicts of interest that exist between the staffs of the investment banking and equity fixed income securities analyst functions within the same firm." This does not directly address fairness opinions but is motivated by a broad suspicion of investment banks and conflicts of interest.

[4] Povel and Singh (2010) provide a theoretical model of stapled finance and discuss the potential for conflicts of interest but do not directly address these conflicts in their model.

CAIN0001211

Calomiris and Hitscherich (2007), who also find no relation between merger advisers' fee structure and the quality of their advisory services.

In the second part of our analysis, we examine the information content of fairness opinions by conducting event studies at two different dates. The first date is the date on which the merger is first announced. Although fairness opinion valuations are not yet publicly available at this date, if fairness opinion valuations contain information about the intrinsic value of the target, we expect acquirer returns at the merger announcement date to be positively associated with the difference between fairness opinion valuations and the merger offer price. Consistent with this view, we find that, for target-sought opinions, acquirers' cumulative abnormal returns (CARs) around the announcement of the merger are positively related to the amount by which fairness opinion valuations of target firms exceed offer prices. This result is robust to controls for other determinants of the stock price reaction to merger announcements. While this result supports the notion that target-sought fairness opinions can inform directors as to how shareholders will react to a merger announcement, it does not allow us to infer whether fairness opinions contain information that is incrementally informative to directors or shareholders.

To further explore this issue, the second date that we analyze is the proxy mailing date, that is, the date at which the fairness opinion valuations are first publicly revealed. If fairness opinions contain information that is incrementally informative beyond publicly available information, we expect market participants to update their priors about the valuation consequences of the merger for acquiring firm shareholders at this time. Consistent with this view, we find that acquiring firm abnormal returns around proxy mailing dates are positively related to the amount by which fairness opinion valuations of target firms exceed offer prices, but again the result is statistically significant only in target-sought opinions. That is, acquiring firm value increases (or decreases less) if target-sought fairness opinions indicate that the acquirer is paying less for a target than its true value.

Overall, our findings indicate that target-side advisers produce fairness opinion valuations that are informative to market participants. The findings also cast doubt on the claim that investors suffer when investment banks face a potential conflict of interest arising from contingent-fee payments. This type of compensation scheme does not appear to significantly influence investors' perception of the informativeness of fairness opinion valuations. Investors respond to valuable information in target-side fairness opinions regardless of investment banks' fee structure. One caveat, however, is that our data do not permit us to evaluate whether the cost of obtaining fairness opinions (in advisory fees, diversion of managerial effort, or delayed bids) outweighs the benefits of doing so. Further work is necessary to shed light on the ultimate cost-benefit trade-off associated with fairness opinions. At a minimum, however, our findings indicate that target-sought fairness opinions contain information that is useful to corporate boards

CAIN0001212

and to investors, which supports the courts' reliance on these valuations since the *Smith v. Van Gorkom* decision.

The remainder of the paper proceeds as follows: Section 2 provides an overview of fairness opinions and valuation methods and places our study in the context of related literature. Section 3 describes the sample selection process and presents descriptive statistics on the sample of fairness opinions. Section 4 documents the extent of bias present in acquirer adviser and target adviser opinions. The information content of fairness opinion valuations is explored in Section 5. Section 6 draws conclusions.

## 2. Background on Fairness Opinions

Fairness opinions are typically obtained by boards of directors at the time that they are considering corporate control transactions.[5] Often, the fairness opinion is delivered orally in a meeting with the board and followed subsequently with a formal letter stating whether the opinion provider believes that the proposed offer price is fair to the client firm's shareholders from a financial point of view. No objective metric has been established by the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA; formerly the National Association of Securities Dealers, or NASD), or the courts to determine what "fair" or "from a financial point of view" actually means in the context of a fairness opinion.

In addition to the formal letter containing the bottom-line opinion, fairness opinions are typically accompanied by a board book that details the underlying analyses conducted by the investment bankers in arriving at their opinion. Opinion providers use a variety of analytical methods, including discounted cash flow techniques, recent transaction multiples, recent transaction premia, comparable firm multiples, net asset valuation techniques, and sum-of-parts analysis, to arrive at a range of potential values for the target firm. An offer price is deemed fair to target (acquirer) shareholders if it falls within or above (below) the valuation range(s) of the adviser's analysis. Note, however, that a fair verdict does not indicate whether the offer price is the best price a target could fetch or the lowest price an acquirer could accomplish in a competitive auction framework.

Figure 1 summarizes a typical timeline of fairness opinions and the merger negotiation process. Fairness opinions are normally presented to the board of directors ($t = 0$) shortly after completion of the merger negotiations and just before the merger is publicly announced ($t = 1$). As Figure 1 indicates, the median gap between these events is just 1 day in our sample. The written, dated opinions and summaries of the advisers' valuation analyses are also included in proxy statements mailed to shareholders for voting approval of the merger. The opinions are thus made publicly available once proxy statements are mailed and

---

[5] Much of this section is drawn from the thorough description of fairness opinions provided in Davidoff (2006) and Davidoff, Makhija, and Narayanan (2011).

CAIN0001213

250                              The Journal of LAW & ECONOMICS



**Figure 1.** Timeline of fairness opinions and the merger negotiation process

submitted electronically to the SEC ($t = 2$). Opinions are occasionally presented or updated after the merger announcement; this can occur if the offer price is subsequently revised. However, the majority of fairness opinions (84 percent in our sample) are dated prior to public merger announcements.

A possible concern is that if private merger negotiations are canceled when fairness opinions are unfavorable, our sample of acquisitions may be truncated. However, as depicted in Figure 1, fairness opinions are produced only at the end of the merger negotiation process. Furthermore, our conversations with practitioners confirm that mergers are virtually never canceled because of unfavorable fairness opinions. Thus, we are confident that our acquisition sample is not truncated and that it represents the full population of rendered fairness opinions.

We are interested in determining whether fairness opinions provide incremental information to boards of directors and to investors about the value of proposed acquisitions. As noted earlier, one view is that fairness opinions fail to provide incremental information because of conflicts of interest between the opinion providers and the firms soliciting the opinions. Because over 75 percent of acquirer advisers and 80 percent of target advisers receive fees that are contingent on merger completion, unfair verdicts might jeopardize a substantial portion of these investment banking fees. Thus, critics claim that fairness opinions are merely rubber stamps on deals and adds no apparent value to the merger negotiation process (Elson 1992; Carney 1992). Moreover, even when opinion providers are not advisers to the acquisition itself, they may have the incentive to issue pro-management opinions in a desire to secure future M&A business with the client firm (see Fink 2006). Under this view, therefore, fairness opinions do not provide incremental information to either the board of directors or investors.

An alternative view is that, because fairness opinion providers have access to financial forecasts and synergy estimates on both sides of a negotiated merger transaction (Bruner 2004), they are able to generate new private information

CAIN0001214

when conducting the due diligence and fairness opinion process. This information is communicated to the board and investors through the detailed valuation analyses contained in the fairness opinion's board book. This view has some support in the Delaware Chancery Court: "Courts must be candid in acknowledging that the disclosure of the banker's 'fairness opinion' alone and without more, provides stockholders with nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker from liability. The real informative value of the banker's work is not in its bottom-line conclusion. But in the valuation analysis that buttresses that result" (see Vice Chancellor Strine's opinion in *Pure Resources, Inc., Stockholders Litigation*, 808 A.2d 449 [Del. Ch. 2002], as quoted in Davidoff [2006, p. 1601]). Similarly, Davidoff (2006, p. 10), in discussing the valuation analyses contained in the board book, argues that "[i]t is in these actual analyses that the meaning and worth, if any, of a fairness opinion lies."

Whether fairness opinions provide useful information to the board and to investors is, therefore, an empirical question. To our knowledge, ours is the first study to directly address this issue. Related studies by DeAngelo (1990), Bowers and Latham (2006), and Kisgen, Qian, and Song (2009) provide indirect evidence. DeAngelo (1990) analyzes a large sample of fairness opinions and a small sample of detailed investment bankers' working papers in management buyouts and finds that advisers' valuations predominantly rely on accounting-based information to determine fair value of the target. She argues that an adviser's independent determination has the potential to be more impartial and informative than any valuation conclusions reached by management or directors. However, she does not test this argument. Bowers and Latham (2006) analyze the determinants of the use of fairness opinions in mergers and tender offers and conclude that fairness opinions are more likely to be sought when legal risk, information asymmetry, and valuation uncertainty are greater.

Kisgen, Qian, and Song (2009) explore whether the presence of fairness opinions on the target or acquirer side influences characteristics of the transaction. They find no significant relation between the use of fairness opinions on the target side and transaction premia, the probability of transaction completion, or acquirers' announcement-period abnormal returns. On the acquirer side, they find that fairness opinions are associated with lower transaction premia, a higher probability of deal completion, and lower announcement-period abnormal returns. Because their study does not evaluate the content of fairness opinions or the related valuation analyses produced by investment banks, it provides only indirect evidence on the benefits of M&A advisory services.

In providing direct evidence on the information content of fairness opinions, our study is related to prior studies of the behavior of securities analysts and the information content of their recommendations and reports. While a thorough review of this literature is beyond the scope of this study, we note that although analysts tend to issue optimistically biased research on firms with which they are affiliated or seek to be affiliated (Michaely and Womack 1999; Easterwood

CAIN0001215

and Nutt 1999; Cliff 2007), recommendation changes, earnings forecasts, and target price revisions by analysts are positively associated with abnormal market returns (Jegadeesh et al. 2004; Francis and Soffer 1997; Brav and Lehavy 2003). Thus, an identifiable conflict of interest among analyst subgroups does not appear to preclude the production of new and useful information. Our study seeks to determine whether fairness opinions can be characterized in the same manner.

## 3. Sample Selection and Descriptive Statistics

The SEC requires firms to disclose all material information to shareholders when issuing a proxy solicitation for purposes of obtaining a shareholder vote.[7] Because the SEC considers fairness opinion valuations to be material information if they are presented to boards of directors during the process of approving a merger, fairness opinion details must be disclosed in merger proxy statements. Negotiated mergers always require a shareholder vote from target shareholders; therefore target-side fairness opinions are always observable in these cases. However, negotiated mergers do not always require a vote of approval from acquirer shareholders. The New York Stock Exchange (NYSE), American Stock Exchange (AMEX), and the National Association of Securities Dealers Automated Quotation system (NASDAQ) require listed firms to obtain shareholder approval only when issuing new shares that amount to at least 20 percent of the existing number of outstanding shares.[8] Thus, if an acquirer issues more than 20 percent new equity to finance a merger, the firm must issue proxy solicitations and disclose the presence of fairness opinions. Otherwise, in mergers in which an acquirer shareholder vote is not mandated, acquirers are not required to disclose the presence of fairness opinions.

With this regulatory framework in mind, our sample begins with all negotiated mergers identified in the Securities Data Corporation (SDC) database involving publicly traded U.S. firms (acquirers and targets) between 1998 and 2005. We exclude banking and financial firms because opinion providers are also financial advisory firms. We also require that acquirers seek 100 percent of the targets' shares. Tender offers are excluded because tender offer targets must disclose the usage of fairness opinions, but not the valuation analyses in the opinions and because acquirers are not required to disclose the usage of fairness opinions unless they issue a proxy solicitation to approve the issuance of at least 20 percent new equity to finance the tender offer—and this rarely occurs.[9] Thus, in tender

---

[7] This requirement stems from item 14(7)(b)(6) of Schedule 14A (17 C.F.R. sec. 240.14a-101 [2013]). We thank Steven Davidoff for this clarification.

[8] See NYSE Listed Company Manual, sec. 312.03(c) (http://nysemanual.nyse.com/LCM/Sections/); AMEX Company Guide, sec. 712(b) (http://wallstreet.cch.com/MKT/CompanyGuide/); NASDAQ Marketplace Rule 4350(i)(1)(C) (http://nasdaq.cchwallstreet.com/).

[9] See Mergers and Acquisitions (Regulation M-A), 17 C.F.R. sec. 229.1014(b) (2013), for disclosure requirements in tender offers.

offers, acquirer-side fairness opinions are usually unobservable and target-side opinion valuation data are not disclosed.[10,11]

This process results in a sample of 582 mergers, including both completed (95 percent) and withdrawn transactions (5 percent). The frequency of completed transactions in our sample is greater than the 85 percent completion rate for the SDC population. This is not surprising since, in order to be included in the sample, each transaction must have progressed to the stage at which proxy statements are mailed to shareholders. We also observe that the time profile of the sample transactions is quite similar to that of the SDC population (not reported).

Firm-level accounting data and market value information are obtained from Compustat and the Center for Research in Security Prices (CRSP), respectively. We collect fairness opinion data from merger proxy statements mailed to shareholders and filed electronically with the SEC.[12] These data include the number of fairness opinions obtained by acquirers and targets, fairness verdicts, fairness opinion valuation methods and corresponding valuation ranges, the fees paid to opinion providers, the contingency structure of these fee payments, and other preexisting relationships of financial advisers with client firms. For purposes of illustration, a supplementary file available online contains the text of a fairness opinion provided by Thomas Weisel Partners to ScanSoft in May 2005. Scansoft acquired Nuance Communications in this transaction.

Table 1 provides descriptive statistics for the sample of negotiated mergers and compares these statistics with those for a subsample of mergers with joint proxy statements issued by acquirers and targets (that is, those for which both the target and acquirer may disclose a fairness opinion) and for all public mergers in the SDC database meeting the sample selection criteria. The data indicate that mergers that include a joint proxy solicitation are larger on average than the full sample, as measured by transaction value or target market value of equity. The acquirers are smaller, however, so the resulting relative size of the target to the acquirer is much greater for mergers containing a joint proxy solicitation. The median relative size is 58 percent for the joint proxy subsample, compared to only 10 percent for the full sample. This pattern supports the idea that acquirers require shareholder approval of transactions that are larger in relative

---

[10] Disclosure requirements are much more burdensome in going-private transactions. For an example of the detailed fairness opinion disclosure of valuations in a recent going-private proposal, refer to Lear Corporation, SEC Schedule 13e-3 filing (March 20, 2007).

[11] The fact that acquirers are not always required to disclose the presence of fairness opinions (even if they are obtained) imparts a potentially serious sample selection bias to studies in which a key variable is an indicator denoting whether or not acquirers or targets obtain a fairness opinion supporting the transaction. For example, since a proxy solicitation is required only when at least 20 percent new equity is issued, it is likely that the set of mergers in which acquirer-side fairness opinions is observed represents transactions of larger size relative to the acquirer. If the short-run or long-run market performance of acquirers of relatively large targets differs from that of acquirers of small targets, studies might falsely attribute the performance difference to the observed fairness opinion.

[12] Proxy statements are most commonly filed under DEFM14A filings (68 percent of the sample), but also under DEF 14A (18 percent), DEFS14A (4 percent), DEFR14A (2 percent), and other filings.

CAIN0001217

The Journal of LAW & ECONOMICS

### Table 1
#### Descriptive Statistics for Sample Mergers

|  | Mean | SD | Min | Median | Max |
|---|---|---|---|---|---|
| **Fairness opinion merger sample:** | | | | | |
| Transaction value ($ millions) | 2,496.7 | 8,578.4 | .6 | 280.8 | 113,643.8 |
| Acquirer market value ($ millions) | 24,542.7 | 58,853.1 | 7.8 | 2,916.2 | 517,357.4 |
| Target market value ($ millions) | 1,898.5 | 6,578.8 | 1.5 | 237.8 | 67,226.8 |
| Transaction/acquirer market value (%) | 31.15 | 46.33 | .01 | 10.49 | 287.35 |
| Initial offer premium (%) | 36.18 | 42.49 | −77.65 | 27.27 | 295.56 |
| Premium at proxy mailing date (%) | 35.16 | 39.31 | −78.26 | 27.97 | 295.56 |
| Final offer premium (%) | 35.80 | 41.55 | −77.65 | 27.78 | 295.56 |
| **Fairness opinion joint proxy subsample:** | | | | | |
| Transaction value ($ millions) | 5,023.9 | 13,135.1 | .6 | 829.9 | 113,643.8 |
| Acquirer market value ($ millions) | 8,011.0 | 19,645.1 | 18.9 | 1,388.1 | 141,369.3 |
| Target market value ($ millions) | 3,693.3 | 9,812.4 | 7.3 | 579.6 | 67,226.8 |
| Transaction/acquirer market value (%) | 69.79 | 54.54 | .38 | 58.33 | 287.35 |
| Initial offer premium (%) | 33.80 | 46.43 | −55.00 | 23.58 | 271.70 |
| Premium at proxy mailing date (%) | 27.69 | 33.90 | −55.00 | 22.90 | 216.57 |
| Final offer premium (%) | 32.23 | 44.16 | −55.00 | 23.39 | 271.70 |
| **All SDC public mergers:** | | | | | |
| Transaction value ($ millions) | 2,025.9 | 8,280.3 | .001 | 193.1 | 164,746.9 |
| Acquirer market value ($ millions) | 15,650.7 | 45,177.0 | 1.4 | 1,681.8 | 517,357.4 |
| Target market value ($ millions) | 1,623.3 | 6,023.3 | 1.5 | 212.0 | 76,361.6 |
| Transaction/acquirer market value (%) | 42.87 | 74.79 | .00 | 16.99 | 1,090.59 |
| Initial offer premium (%) | 35.90 | 52.92 | −91.37 | 25.40 | 726.10 |
| Final offer premium (%) | 36.11 | 55.10 | −91.37 | 25.74 | 726.10 |

**Note.** Each sample comprises negotiated mergers between public U.S. acquirers and targets from 1998 to 2005 in which the acquirer seeks to own 100% of target shares after merger completion. Both completed and withdrawn mergers are included. Financial firms are excluded. Acquirer and target market values are calculated as (common shares outstanding) × (price per share 3 days prior to merger announcement). Initial offer premium, premium at proxy mailing date, and final offer premium are premia of prevailing offer price on announcement, at the date of proxy statement mailing, and on the merger effective or withdrawn date, respectively, over target's trading price 1 day prior to merger announcement. SDC = Securities Data Corporation.

size, often accompanied by the issuance of a substantial amount of new equity. We also observe lower offer premia in the joint proxy subsample than in the full sample.

Table 2 provides summary data on the observed fairness opinions. Virtually all targets (96 percent) utilize at least one fairness opinion in negotiated mergers. Approximately 8 percent utilize two opinions, and almost 1 percent obtain three opinions in a given merger. On the surface, it appears that acquirers appear to seek opinions much less frequently—in only about 28 percent of transactions. However, as noted earlier, firms are required to disclose the presence of fairness opinions only if they issue proxy solicitations to shareholders in negotiated mergers. This is always the case for targets in mergers, but acquirers frequently do not require shareholder approval of acquisitions. The most common trigger for this rule occurs when acquirers issue at least 20 percent new equity to finance

CAIN0001218

Table 2
Descriptive Statistics for Fairness Opinions

| Opinions | Full Sample | | Joint Proxies | | Target-Only Proxies | |
|---|---|---|---|---|---|---|
| | Count | % | Count | % | Count | % |
| Acquirer: | | | | | | |
| 0 | 416 | 71.5 | 34 | 17.5 | 382 | 98.5 |
| 1 | 146 | 25.1 | 140 | 72.2 | 6 | 1.5 |
| 2 | 18 | 3.1 | 18 | 9.3 | 0 | .0 |
| 3 | 2 | .3 | 2 | 1.0 | 0 | .0 |
| Total | 582 | 100.0 | 194 | 100.0 | 388 | 100.0 |
| Target: | | | | | | |
| 0 | 21 | 3.6 | 5 | 2.6 | 16 | 4.1 |
| 1 | 511 | 87.8 | 162 | 83.5 | 349 | 90.0 |
| 2 | 46 | 7.9 | 25 | 12.9 | 21 | 5.4 |
| 3 | 4 | .7 | 2 | 1.0 | 2 | .5 |
| Total | 582 | 100.0 | 194 | 100.0 | 388 | 100.0 |

mergers.[13] To explore the impact of this selection issue, Table 2 partitions the sample by the type of proxy solicitation. In joint proxy solicitations, where selection bias is not a problem, acquirers obtain at least one fairness opinion in 83 percent of mergers. In target-only proxy solicitations, acquirer-sought fairness opinions are observed in fewer than 2 percent of mergers, which confirms the existence of a severe selection bias. The use of fairness opinions is similar across the partitions for target-sought opinions; thus, selection bias is not an issue on the target side. In our subsequent empirical tests, we control for selection bias on the acquirer side by analyzing matched transactions in which there is a fairness opinion on both the target and the acquirer side.

We also find (in untabulated results) that every fairness opinion in the sample deems the respective transaction fair. This observation is consistent with the view that targets and acquirers continue to shop for favorable opinions until one is obtained. The majority of opinions (84–88 percent) are dated on or before the merger announcement date. The remaining cases typically represent opinions that have been updated to reflect revisions in offer prices. In other words, boards of directors typically have access to the information contained in the fairness opinion prior to the announcement of the merger. Thus, it is not the case that the fairness opinion valuations are influenced by the market's reaction to the merger announcement.

[13] This selection bias is present in the Kisgen, Qian, and Song (2009) study. They report that 37 percent of acquirers in their sample obtain a fairness opinion. This is roughly in line with the observed rate of 28 percent in our sample (without controlling for joint proxies). They document lower deal premia and lower acquirer announcement returns for transactions with acquirer-side fairness opinions. However, if acquirer-side fairness opinions are observable only for the most significant acquisitions, these are likely to be the transactions that have lower offer premia (for example, mergers of equals) and lower announcement returns (Moeller, Schlingemann, and Stulz 2005).

CAIN0001219

Table 3

Adviser Fee Structure

| Fee Structure | Mean | SD | Min | 25th Percentile | Median | 75th Percentile | Max |
|---|---|---|---|---|---|---|---|
| All advisers: | | | | | | | |
| Total advisory fees ($ millions) | 5.58 | 7.61 | .02 | .80 | 3.00 | 7.40 | 62.00 |
| Fairness opinion fees ($ millions) | .79 | 1.33 | .00 | .20 | .40 | .75 | 10.00 |
| Opinion fees/total fees (%) | 46 | 37 | 0 | 15 | 30 | 100 | 100 |
| Acquirer advisers: | | | | | | | |
| Total advisory fees ($ millions) | 6.14 | 6.91 | .05 | 1.30 | 3.86 | 9.80 | 36.44 |
| Fairness opinion fees ($ millions) | 1.00 | 1.35 | .00 | .25 | .50 | 1.00 | 7.50 |
| Opinion fees/total fees (%) | 52 | 38 | 0 | 18 | 38 | 100 | 100 |
| Target advisers: | | | | | | | |
| Total advisory fees ($ millions) | 5.43 | 7.80 | .02 | .75 | 2.88 | 6.98 | 62.00 |
| Fairness opinion fees ($ millions) | .74 | 1.32 | .00 | .18 | .35 | .75 | 10.00 |
| Opinion fees/total fees (%) | 44 | 36 | 0 | 15 | 27 | 100 | 100 |
| Target advisers (joint proxies only): | | | | | | | |
| Total advisory fees ($ millions) | 8.18 | 10.34 | .08 | 1.59 | 4.36 | 10.00 | 62.00 |
| Fairness opinion fees ($ millions) | 1.16 | 1.79 | .00 | .25 | .50 | 1.25 | 10.00 |
| Opinion fees/total fees (%) | 41 | 33 | 0 | 17 | 26 | 59 | 100 |

**Note.** Values are univariate statistics on fee structure between fairness-opinion-providing financial advisers and their clients in negotiated mergers. All calculations of opinion fees/total fees exclude firms for which opinion fees are not separately disclosed.

Table 3 reports the distribution of advisory fee income for sample investment banks. On average, opinion providers earn 46 percent of total fee revenue from advisory services related to the fairness opinion process. In Table 4 we report data on the fee structure for the investment banks and their prior affiliation (if any) with the client firm. About 15 percent of investment banks earn no transaction fees other than those from rendering a fairness opinion. Approximately 79 percent of acquirer advisers and 82 percent of target advisers receive additional fees contingent on the final outcome of a transaction. Contingent fees include percentage fees (fees based on a percentage of the transaction value) and success fees (flat fees paid upon successful consummation of the merger).

Table 4 also documents that 20 percent of acquirer advisers and 13 percent of target advisers have provided past financing to the client firm or arrange a portion of the financing necessary to close the current transaction (stapled financing). About 22 percent of acquirer advisers and 36 percent of target advisers have no preexisting business relationship with the merging firms, which would include prior M&A advisory services, initial public offering or seasoned equity offering business, or other investment banking services. Of the firms seeking two fairness opinions, it is more often the case that both advisers have a preexisting relationship with the firms, which indicates that firms rarely add an unaffiliated adviser to provide a second opinion. Table A1 lists the top 30 advisory firms based on the total number of fairness opinions provided to targets during the sample period.

Table 5 provides univariate statistics on the range between the high and low

CAIN0001220

Table 4
Adviser-Client Relationships

|  | Acquirer Advisers | | Target Advisers | |
|---|---|---|---|---|
|  | Count | % | Count | % |
| Adviser fee structure: |  |  |  |  |
|   Percentage fee | 25 | 15.7 | 189 | 33.1 |
|   Success fee | 100 | 62.9 | 282 | 49.2 |
|     All contingent fees | 125 | 78.6 | 471 | 82.2 |
|   Flat fee | 9 | 5.7 | 19 | 3.3 |
|   No other fees | 25 | 15.7 | 83 | 14.5 |
|   Total | 159 | 100.0 | 573 | 100.0 |
| Advisory relationship: |  |  |  |  |
|   Provides financing | 14 | 8.0 | 11 | 1.8 |
|   Previous lending relationship | 21 | 12.0 | 67 | 11.1 |
|   No related financing | 140 | 80.0 | 525 | 87.1 |
|   Total | 175 | 100.0 | 603 | 100.0 |
| Previous business (PB) relationship: |  |  |  |  |
|   With target | 7 | 4.0 | 178 | 29.5 |
|   With acquirer | 79 | 45.1 | 37 | 6.1 |
|   With both | 50 | 28.6 | 174 | 28.9 |
|   None | 39 | 22.3 | 214 | 35.5 |
|   Total | 175 | 100.0 | 603 | 100.0 |
| First versus second advisers: any PB: |  |  |  |  |
|   One adviser, has no PB | 35 | 21.6 | 188 | 34.0 |
|   One adviser, has any PB | 117 | 72.2 | 323 | 58.4 |
|   Two advisers, neither have any PB | 0 | .0 | 3 | .5 |
|   Two advisers, one has PB | 2 | 1.2 | 14 | 2.5 |
|   Two advisers, both have PB | 8 | 4.9 | 25 | 4.5 |
|   Total | 162 | 100.0 | 553 | 100.0 |

Note. Values are summary statistics on adviser fee structures and the frequency with which advisers have disclosed business relationships with client firms. Previous business includes securities underwriting, prior M&A advisory services, or other investment banking services.

prices per share determined through various valuation techniques. To calculate the average we take the average range for all methods reported by a given adviser and then report the distribution across firms. The distribution of ranges reveals significant valuation estimate variability in both acquirer-sought and target-sought fairness opinions. The average (median) range is $16 ($10) per share for acquirer-sought average valuations and $11 ($7) per share for target-sought average valuations. The maximum range for acquirer-sought opinions is $225, while the maximum range for target-sought opinions is $325, both found using the public-firm-multiples technique. This implies a striking degree of uncertainty regarding target value. The target-sought fairness opinion containing this $325 range indicated low and high target values of $26.98 and $351.62 per share, respectively.

The lower portion of Table 5 reports average ranges scaled by offer price. The mean (median) range is 76 (48) percent of the offer price for acquirer adviser

CAIN0001221

The Journal of LAW & ECONOMICS

## Table 5
### Fairness Opinion Valuation Ranges

| High − Low Price per Share ($): | N | Mean | SD | Min | 25th Percentile | Median | 75th Percentile | Max |
|---|---|---|---|---|---|---|---|---|
| Acquirer sought: | | | | | | | | |
| Average | 152 | 16.38 | 20.36 | .00 | 5.44 | 9.92 | 20.15 | 175.50 |
| Discounted cash flows | 121 | 16.61 | 16.35 | .00 | 6.49 | 11.94 | 21.86 | 105.00 |
| Transaction multiples | 66 | 13.47 | 21.51 | .00 | 4.72 | 8.70 | 13.65 | 125.09 |
| Transaction premia | 48 | 12.06 | 20.42 | .22 | 1.76 | 4.42 | 13.31 | 126.00 |
| Public firm multiples | 91 | 17.37 | 30.16 | .00 | 4.60 | 8.07 | 16.00 | 225.00 |
| Net asset valuation | 10 | 7.00 | 5.58 | 1.17 | 2.44 | 6.71 | 9.12 | 19.26 |
| Sum of parts | 9 | 12.95 | 7.85 | 5.00 | 7.00 | 11.00 | 21.24 | 25.25 |
| Target sought: | | | | | | | | |
| Average | 541 | 10.83 | 15.09 | .00 | 3.12 | 6.53 | 13.00 | 207.71 |
| Discounted cash flows | 436 | 9.22 | 8.75 | .00 | 3.04 | 6.45 | 12.93 | 50.17 |
| Transaction multiples | 289 | 11.12 | 19.78 | .00 | 2.60 | 6.50 | 12.00 | 241.56 |
| Transaction premia | 215 | 11.94 | 17.08 | .03 | 2.02 | 5.24 | 12.74 | 93.32 |
| Public firm multiples | 318 | 11.49 | 23.51 | .00 | 2.51 | 6.00 | 13.12 | 324.64 |
| Net asset valuation | 19 | 4.06 | 5.21 | .00 | .64 | 2.64 | 4.64 | 22.69 |
| Sum of parts | 21 | 11.16 | 7.95 | 1.70 | 4.00 | 10.38 | 17.00 | 29.00 |
| Range/offer price (%): | | | | | | | | |
| Acquirer-sought average | 152 | 76.0 | 98.4 | .0 | 26.7 | 48.3 | 85.4 | 820.9 |
| Target-sought average | 541 | 59.9 | 137.1 | .0 | 22.9 | 36.0 | 58.7 | 2,461.7 |
| Target-sought average (joint proxies only) | 197 | 57.0 | 125.8 | .0 | 21.6 | 35.4 | 53.5 | 1,699.1 |

**Note.** Values are univariate statistics on the range between the high and low target valuation prices per share for various valuation techniques, as concluded by target and acquirer advisers, with this difference as a percentage of the offer price also reported. The sample includes 177 opinions provided to acquirers, 607 opinions provided to targets, and multiple opinions provided to the same acquirer or target in a total of 582 negotiated merger transactions. The average for a given firm is calculated by averaging the valuation ranges across all methods reported by the adviser. The distribution across all firm observations is also reported.

opinion valuations and 60 (36) percent for all target adviser opinion valuations. The range is 57 (35) percent for target opinions contained in joint proxy solicitations, very similar to the ranges for the full target-side sample. For a hypothetical offer price of $20 per share, the median acquirer adviser opinion would reach a range of target values of $9.60, while the median target adviser opinion would reach a range of $7.20. Although this range could lie fully above or below the offer price, we find that offer prices fall within acquirer-side average valuation ranges 75 percent of the time, with only 8 percent of offers coming in above the average high end of valuations. Similarly, offers fall within target-side average valuation ranges 67 percent of the time, with only 3 percent of offers coming in below the average low end of valuations. (These results are not reported.)

The average level of uncertainty revealed in the valuation prices seems significant given the supposedly expert status of fairness opinion providers. Nonetheless, the statistics in Table 5 show that while some advisers disclose extremely wide valuations of targets, others reach very precise price ranges. We later explore whether this price dispersion influences the information content of the fairness opinion conclusions.

CAIN0001222

## 4. Do Fairness Opinion Valuations Differ Systematically from Market-Based Measures of Target Value?

Here we analyze whether there are systematic differences between target valuations contained in fairness opinions and other market-based estimates of the target's intrinsic value. We then explore whether these differences (if any) are related to whether the opinion provider is hired by the target or acquiring firm and to various characteristics of the investment bank and the contract between the bank and the firm seeking the fairness opinion.

### 4.1. Valuations Relative to Offer Prices

We begin our analysis of fairness opinion valuations by comparing the valuations of advisers hired by acquiring firms with those of advisers hired by targets. We note at the outset that if firms engage in fairness opinion shopping, we are unable to observe the opinions of investment banks that were not selected by acquirers and targets. It is plausible that other investment banks would have produced different valuations. However, this effect, similar to shopping among credit ratings issuers, does not preclude us from evaluating the accuracy of rendered fairness opinions.[14] These initial tests are thus able to provide evidence on the prevailing view that observed fairness opinions are uninformative because they are systematically biased.

As indicated in Table 6, the valuations of acquirer advisers exceed those of matched target advisers by 29 percent, on average. This tendency persists across all valuation methods for the sample of transactions in which both target and acquirer advisers employ the same valuation methodology. While the excess valuation is not positive in all transactions, it is positive almost 80 percent of the time, with the mean percentage statistically significantly greater than zero at the 1 percent level for the average valuation and at the 5 percent level for all individual valuation methods.

Table 6 and Figure 2 summarize valuation midpoints as a percentage premium over initial offer prices. As Figure 2 indicates, on average, and in most valuation techniques, acquirer advisers tend to value targets above offer prices, while target advisers tend to value targets at or below offer prices (only transactions with the matched valuation techniques employed by both acquirer and target advisers are included; if more than one adviser provides an opinion to the acquirer or target, the average valuation is used). The univariate statistics in Table 6 show that in the full sample, acquirer advisers produce a positive mean and median valuation premium; both are statistically significantly different from zero and

---

[14] It is worth noting that even if such truncation exists, it does not affect our later tests in which we analyze the impact of adviser characteristics on valuation accuracy. Perhaps more important, it does not affect our later tests of the information content of fairness opinions since these tests ask whether observed fairness opinions contain incremental information despite any possible biases.

CAIN0001223

Table 6
Acquirer-Sought versus Target-Sought Valuations

|  | N | Mean | SD | $p$-Value | Median | $p$-Value | % Positive |
|---|---|---|---|---|---|---|---|
| % Difference of acquirer-sought over matched target-sought valuation midpoints: | | | | | | | |
|   Average | 132 | 29.19 | 49.39 | .000 | 13.40 | .000 | 78.8 |
|   Discounted cash flows | 93 | 30.16 | 53.66 | .000 | 16.45 | .000 | 79.6 |
|   Transaction multiples | 40 | 26.83 | 72.15 | .024 | 10.47 | .003 | 70.0 |
|   Transaction premia | 19 | 27.14 | 46.52 | .020 | 11.16 | .010 | 79.0 |
|   Public firm multiples | 51 | 37.30 | 86.85 | .004 | 13.48 | .000 | 80.4 |
| Adviser valuation premia over initial offer prices: | | | | | | | |
|   All transactions: | | | | | | | |
|     Acquirer advisers | 152 | 19.56 | 50.68 | .000 | 7.66 | .000 | 69.1 |
|     Target advisers | 541 | −1.60 | 68.26 | .587 | −7.57 | .000 | 32.0 |
|     Target advisers (joint proxies only) | 197 | −1.80 | 59.84 | .673 | −6.93 | .000 | 35.5 |
|   Matched transactions: | | | | | | | |
|     Acquirer advisers | 132 | 19.87 | 53.53 | .000 | 6.98 | .000 | 69.7 |
|     Target advisers | 132 | .98 | 70.96 | .874 | −8.60 | .000 | 34.9 |

**Note.** The percentage difference between acquirer-sought valuations and target-sought valuations is calcualted when both advisers perform the same type of valuation method on target firms. The percentage difference for each type of valuation method indicated is calculated as (acquirer-sought valuation midpoint − target-sought valuation midpoint)/target-sought valuation midpoint. When more than one adviser is hired by the acquirer or target, average valuations are used to determine midpoints for these calculations. The univariate statistics on acquirer and target adviser valuation midpoints are reported as a percentage of initial offer prices, for all transactions and for matched transactions in which both acquirer and target advisers provide fairness opinion valuations. P-values are from t-tests of difference of means from zero and Wilcoxon signed-rank tests of difference of medians from zero.

economically large (mean = 20 percent; median = 8 percent).[15] The average valuation premium for target advisers is not significantly different from zero (mean = −2 percent), but the median (−8 percent) is different from zero at the 1 percent level. The acquirer advisers' valuation premium is positive about 69 percent of the time, while the target advisers' valuation premium is negative about 68 percent of the time.

### 4.2. Valuation Accuracy

If offer prices represent an unbiased measure of target value, the data in Table 6 indicate that acquiring firm advisers systematically overvalue targets while target advisers slightly undervalue targets, on average. One criticism of this interpretation, however, is that prior studies have shown that acquiring firms overpay, on average, for targets (see, for example, Moeller, Schlingemann, and Stulz 2004). Thus, a simple comparison of valuation estimates with offer prices is potentially

---

[15] One interpretation of positive valuation errors is that investment bankers are overly optimistic in their forecasts. Another is that they produce valuations that are favorable to their clients (that is, they help to seal the deal) despite their beliefs regarding the true valuations. While we suspect that the latter interpretation is more likely, we do not attempt to differentiate between the two possibilities. Our main purpose is to first document the systematic tendencies in valuation errors (if any), then test whether the opinions contain incremental information content.

CAIN0001224



**Figure 2.** Median valuation midpoint premium over initial offer price, for valuations disclosed in fairness opinions issued by acquirer and target advisers.

a misleading measure of the valuation accuracy of fairness opinion providers. That is, it will be biased toward concluding that fairness opinions understate the value of the target.

To address this issue, Table 7 reports a more refined calculation of adviser valuation accuracy in which we compare acquirer shareholder wealth changes that are predicted by the fairness opinion valuations with actual acquirer shareholder wealth changes. The intuition for this measure is as follows. When the true value of the target differs from the offer price, acquiring firm shareholders gain or lose by the aggregate value of this difference. Thus, the wealth change that is predicted by a given fairness opinion valuation is equal to the difference between the valuation in the fairness opinion and the offer price, multiplied by the number of target shares being acquired (excluding any acquirer toeholds in the target), plus the product of toehold shares in the target owned by the acquirer and the updated valuation of these shares based on the potential merger:

$$\text{Predicted Change} = [(\text{Target Valuation} - \text{Offer Price})$$
$$\times \ (\text{Target Shares} - \text{Toehold})] \tag{1}$$
$$+ \ [(\text{Target Valuation} - \text{Target Price}_{t=-3})$$
$$\times \ \text{Toehold}].$$

CAIN0001225

The Journal of LAW & ECONOMICS

Table 7

Valuation Errors

| | Predicted Change ($ millions) | Actual Change ($ millions) | Raw Error ($ millions) | Scaled Error (%) | \|Scaled Error\| (%) |
|---|---|---|---|---|---|
| All transactions: | | | | | |
| Acquirer advisers ($N = 74$): | | | | | |
| Mean | 193.7 | 726.9 | −533.2 | 9.1 | 41.3 |
| Median | 17.7 | −20.4 | 34.9 | 7.4 | 23.1 |
| p-Value | | | | .172 | .074 |
| Target advisers ($N = 359$): | | | | | |
| Mean | −158.2 | 179.0 | −337.2 | −19.5 | 374.4 |
| Median | −12.0 | 22.2 | −34.9 | −14.9 | 101.3 |
| p-Value | | | | .020 | .072 |
| Target advisers (joint proxies only) ($N = 99$): | | | | | |
| Mean | −191.5 | 257.2 | −448.7 | 2.8 | 105.8 |
| Median | −33.0 | −18.7 | −11.0 | −1.1 | 32.6 |
| p-Value | | | | .279 | .577 |
| Matched transactions ($N = 67$): | | | | | |
| Acquirer advisers: | | | | | |
| Mean | 187.0 | 970.4 | −783.4 | 7.0 | 42.4 |
| Median | 19.4 | −18.7 | 17.1 | 5.3 | 28.7 |
| p-Value | | | | .536 | .209 |
| Target advisers: | | | | | |
| Mean | −248.2 | 970.4 | −1,218.7 | −6.9 | 37.5 |
| Median | −33.0 | −18.7 | 1.6 | 1.4 | 28.1 |
| p-Value | | | | .156 | .480 |
| Difference: | | | | | |
| Mean | | | 435.2 | 13.9 | 4.9 |
| Median | | | 82.9 | 8.5 | .0 |
| p-Value | | | .000 | .000 | .410 |

Note. Values are sample medians of predicted wealth changes, actual wealth changes, and prediction errors for acquirer's equity. Predicted Change is given in equation (1): (Target Valuation − Offer Price) × (Target Shares − Toehold) + (Target Valuation − Target Price$_{t = -3}$) × Toehold. Actual Change is acquirer shares outstanding times acquirer price 3 days prior to merger announcement times cumulative abnormal returns, which are measured from 2 days before the merger announcement through the merger effective date and calculated using the Fama-French (1993) three-factor model. P-values are from Wilcoxon signed-rank tests.

We then compare this predicted wealth change with the actual change in shareholder wealth from 2 days prior to the merger announcement through merger completion.[16] We cumulate the difference between the acquirer's raw return in the event window and that of the return predicted by the Fama-French (1993) three-factor model. We multiply this abnormal return by the acquirer's market value of equity 3 days prior to the merger announcement ($t = -3$) to obtain

---

[16] Alternatively, we could measure the actual change in shareholder wealth around the merger announcement. However, this stock price reaction understates the expected wealth effect of the merger because it incorporates the probability that the offer will be withdrawn. By contrast, Predicted Change implicitly assumes that the offer will be completed.

CAIN0001226

an estimate of the abnormal dollar change in acquirer shareholder wealth.[17] We call this variable Actual Change (seeTable 7).

We subtract Actual Change from Predicted Change in acquirer wealth to form a raw prediction error in millions of dollars, Raw Error. We then scale this error by dividing it by the transaction value and winsorizing the result at the 5 and 95 percent levels.[18] We report the median valuation error, Scaled Error, and the median absolute value of the scaled error, |Scaled Error|. Scaled Error measures the directional error of valuations, while |Scaled Error| measures the overall accuracy of valuations regardless of directional errors.

Although these measures of valuation accuracy have the advantage of incorporating any systematic overpayment by acquirers, we note several potential caveats that suggest caution in interpreting the data as true valuation errors. First, they implicitly attribute any negative acquirer abnormal returns to overpayment. To the extent that negative acquirer returns are attributable to other causes (such as signaling), these measures will bias us toward concluding that fairness opinions overstate the value of the target. Second, measured valuation errors might also be affected by unexpected costs of integrating the merging firms and market anticipation of the merger. Finally, our measure implicitly assumes that market prices at the time of the merger approval represent unbiased estimates of long-term value.[19]

We report in Table 7 the results for all transactions and for the subset of matched transactions.[20] The results for all transactions indicate that at the median, the fairness opinions of acquirer advisers overestimate the value of the target by a statistically significant 7 percent, while those of target advisers underestimate the value by a statistically significant 15 percent.

In the matched sample for which fairness opinions are disclosed by both acquirer and target advisers, we continue to find that acquirer advisers have positive median valuation errors, but these errors are no longer statistically significant. We find no evidence that the valuation errors of target advisers are significantly different from zero. It is possible that the reduced sample size of 67 matched transactions renders the tests of significance less powerful than those on the larger sample. Nonetheless, the results for the matched sample show a significant difference between the valuation errors of target and acquirer advisers.

[17] This variable is similar to the acquirer wealth effects measured by Malatesta (1983), who focuses on the abnormal dollar return cumulated over time.

[18] We winsorize errors to reduce the impact of extreme outliers in the distribution. In Section 5.3 we report that our findings are robust to various measures, including scaled errors that are not winsorized.

[19] Several studies find long-run underperformance for certain categories of acquirers, including those using stock financing (Loughran and Vijh 1997) and glamour acquirers (Rau and Vermaelen 1998). However, Mitchell and Stafford (2000) show that after correcting for cross correlation of event-firm returns, this abnormal performance virtually disappears.

[20] We choose to report p-values from the nonparametric Wilcoxon tests because the distribution of scaled errors may be skewed by outliers. However, we find that (unreported) statistical significance results from t-tests are qualitatively similar.

CAIN0001227

The median difference between acquirer and target advisers' valuations is 8.5 percent and is significant at the 1 percent level.[21]

Why do acquirer-side and target-side investment banks exhibit different valuation errors? Even apart from a contingent-fee structure, investment banks might have an incentive to issue pro-management fairness opinions in the hope of gaining lucrative M&A advisory or other business from the acquiring firm in the future (see, for example, Bebchuk and Kahan 1989; Fink 2006). Since it is not possible to gain future investment banking business from a target that is acquired, target-side opinion providers do not exhibit this conflict of interest.[22]

### 4.3. Adviser Characteristics and Valuation Accuracy

Table 8 analyzes whether valuation accuracy is systematically related to adviser characteristics. We partition the data according to whether opinion providers are paid additional fees contingent on merger success, whether they have any prior business relationship with either the target or acquirer, and whether the opinion provider is from a top-tier investment bank (that is, one of the top 10 investment banks in Table A1).

We find little evidence that valuation errors are associated with fee structure or advisory relationships. Although valuation errors are higher when advisers are paid noncontingent fees or when an adviser does not have any prior business relationship with either the target or the acquirer, none of these differences are significantly different from zero at the 10 percent level.[23] The lack of statistical significance between valuation errors and the adviser's fee structure is consistent with other studies that offer a benign view of advisers' fee structure in negotiated mergers (Rau 2000; Calomiris and Hitscherich 2007). In fact, target adviser errors are actually lower if the advisers are paid contingent fees than if they are paid flat fees. We do note that acquirer advisers' valuation errors are significantly (at the 5 percent level) lower for top-tier investment banks than for lower tier banks. Also, target advisers produce significantly more negative valuation errors for clients with whom they have prior business experience.

A related question is whether certain investment banks tend to produce higher (or lower) valuation errors, and if so, whether they tend to be selected by

[21] Our findings are robust to alternative measures of scaled error that account for differences in the volatility of the acquirer's returns. In particular, in untabulated results, we divided scaled errors by the standard deviation of returns over the interval from 2 days prior to announcement through the merger effective date. We computed this measure using both winsorized and unwinsorized data. We also computed scaled errors using unwinsorized data. In all cases, our findings remain qualitatively unchanged; scaled errors are significantly smaller for target-sought fairness opinions.

[22] This argument is similar to that of Jegadeesh et al. (2004), who document that analysts have an economic incentive to bias their recommendations toward stocks with characteristics that make for attractive investment banking clients.

[23] This conclusion holds if we estimate multivariate regressions of valuation accuracy as a function of fee structure, prior business relationships, and adviser rank. The lone exception is that in such regressions, the coefficient on a dummy variable denoting no prior business relationship is significantly negative at the 10 percent level.

CAIN0001228

Table 8

Investment Bank Characteristics and Valuation Accuracy

| | Valuation Errors | | Absolute Valuation Errors | |
|---|---|---|---|---|
| | Acquirer Advisers (%) | Target Advisers (%) | Acquirer Advisers (%) | Target Advisers (%) |
| Fee structure: | | | | |
| (1) Contingent fees | 6.0 (.172) | −11.9 (.445) | 21.1 | 91.1 |
| (2) No contingent fees | 18.5 (.272) | −28.9 (.295) | 34.7 | 169.9 |
| (3) Flat M&A advisory fees | −16.0 (.893) | −89.8 (.383) | 67.7 | 379.0 |
| (4) No other fees | 28.7 (.173) | −18.2 (.547) | 32.5 | 145.1 |
| Difference (1) − (2) | −12.5 [.554] | 17.0 [.263] | −13.6 [.295] | −78.8 [.073] |
| Difference (1) − (3) | 22.0 [.764] | 77.9 [.096] | −46.6 [.182] | −287.9 [.051] |
| Difference (1) − (4) | −22.7 [.326] | 6.3 [.676] | −11.4 [.694] | −54.0 [.277] |
| Difference (3) − (4) | −44.7 [.549] | −71.6 [.202] | 35.2 [.739] | 233.9 [.153] |
| Advisory relationships: | | | | |
| (1) PB acquirer | 20.8 (.161) | −14.2 (.567) | 41.9 | 159.0 |
| (2) PB target | 18.3 (.225) | −19.1 (.030) | 18.3 | 77.2 |
| (3) PB both | −4.5 (.741) | −15.6 (.099) | 15.0 | 89.2 |
| (4) No PB | 9.1 (.212) | 4.5 (.343) | 36.9 | 124.8 |
| Difference (3)−(4) | −13.6 [.282] | −20.1 [.158] | −21.9 [.070] | −35.6 [.020] |
| Difference (1)−(4) | 11.7 [.964] | −18.7 [.923] | 5.0 [.698] | 34.2 [.368] |
| Difference (2) − (4) | 9.2 [.760] | −23.6 [.058] | −18.6 [.040] | −47.6 [.062] |
| Difference (1) − (2) | 2.5 [.594] | 4.9 [.383] | 23.6 [.021] | 81.8 [.034] |
| Adviser rank: | | | | |
| (1) Lower tiers | 25.2 (.033) | −11.9 (.770) | 37.1 | 158.8 |
| (2) Top tier | 5.6 (.726) | −17.5 (.046) | 17.0 | 73.6 |
| Difference (1) − (2) | 19.6 [.044] | 5.6 [.750] | 20.1 [.018] | 85.2 [.000] |

Note. Values are univariate sortings of investment banks' median valuation errors and median absolute valuation errors. In the fee structure sorting, advisers earning contingent fees are paid additional fees contingent on merger success, and advisers receiving flat mergers and acquisitions (M&A) fees or no fees do not receive contingent fees. The advisory relationships sorting is based on whether advisers have previous business experience (PB) with the acquirer, target, both, or neither. Adviser rank is based on the number of target-side fairness opinions provided by investment banks from 1998 to 2005. Top tier is the top 10 advisory firms by rank. The $p$-values from Wilcoxon signed-rank tests are given in parentheses; $p$-values from Wilcoxon rank-sum tests on unmatched data are in brackets.

acquirers (or targets).[24] To explore this issue, we calculate median valuation errors at the individual bank level for all banks in our sample that issue at least 10 opinions. In untabulated results, we found that only two advisers in the sample produce median errors that differ statistically significantly from zero. Moreover, we found no evidence that the rate of acquirer-side (target-side) engagement is positively (negatively) correlated with these bank-specific errors. Taken together, these results imply that investment banks do not tend to systematically produce one type of valuation error, but rather they produce valuation errors that are correlated with the side of each transaction with which they are engaged.

The results in Table 8 provide some evidence that both acquirer and target advisers produce significantly lower absolute valuation errors for transactions in which they have had previous business experience with either the target only or

[24] We thank an anonymous referee and the editor for raising this point.

CAIN0001229

both the acquirer and the target. This evidence supports the view that prior business relationships produce information that is useful in creating more precise fairness opinion valuations. This calls into question the potential benefits from proposals that advocate the procurement of fairness opinions from unaffiliated third-party advisers (Bebchuk and Kahan 1989).

Regarding fee structure, target adviser errors are again smaller when the advisers receive contingent fees than when they earn noncontingent fees. Similarly, we find that the valuations of top-tier advisers have lower absolute valuation errors than those of lower tier banks. The difference is significant at the 2 percent level for both acquirer-side and target-side advisers.

## 5. The Information Content of Fairness Opinion Valuations

Here we analyze whether (despite systematic valuation errors) the valuation data contained in fairness opinions provide incremental information to acquiring firm directors and to investors about the target's unobservable acquisition value. We do so by conducting stock price event studies at two dates: the first announcement of the merger and the date on which the proxy containing the fairness opinion is mailed to shareholders.[25] If fairness opinions contain incremental information, then, all else equal, we expect a positive association between the stock price reaction at announcement (and proxy mailing) and the premium of the fairness opinion valuation over the offer price. However, if the accuracy of fairness opinions is such that the opinions contain no meaningful information, or if advisers simply do not serve an information dissemination function through the provision of fairness opinions, then acquirer shareholder reactions should be uncorrelated with opinion data.

### 5.1. Fairness Opinion Valuations and the Stock Price Reaction to Merger Announcements

Our first test analyzes the association between fairness opinion values (relative to offer prices) and the stock price reaction to the initial merger announcement. Recall that as of the merger announcement date ($t = 1$ in Figure 1), fairness opinions have been presented to the board of directors but have not yet been publicly disclosed. Thus, the stock price reaction to the merger announcement reflects the market's assessment of the shareholder wealth impact of the merger conditional on the offer price approved by the acquiring firm directors. If fairness opinions contain information that is useful to directors in assessing the market's view of the intrinsic value of the target, we expect a positive association between the stock price reaction to the merger announcement and the premium of the

[25] One might also be interested in whether fairness opinion valuations are correlated with offer premia. However, these variables are determined jointly at the end of merger negotiations. We thus focus our attention on abnormal returns that occur after the fairness opinion valuations have been set.

CAIN0001230

Table 9

Acquirer Cumulative Abnormal Returns around Merger Announcements (%)

| Transactions | $N$ | Mean | SD | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|---|
| Acquirer-sought opinion | 86 | −4.19** | 11.39 | −9.49 | −3.26 | 1.65 |
| Target-sought opinion | 398 | −.58 | 9.55 | −4.56 | −.79 | 3.30 |
| Acquirer-sought and target-sought opinion | 82 | −4.33** | 11.40 | −9.49 | −3.27 | 1.41 |

Note. Values are acquirer cumulative abnormal returns (CARs) around merger announcements with an event window of (−2, +2). The Center for Research in Security Prices equal-weighted index is used to form market-adjusted CARs.

** Significant at the .01 level.

fairness opinion valuation over the offer price. Under the alternative hypothesis of no information content, we expect fairness opinion valuations and stock price reactions to merger announcements to be unrelated.

Table 9 reports CARs for acquiring firms in the 5-day window centered on the merger announcement. The CARs are computed as the difference between the stock return of the acquiring firm and that of the CRSP equal-weighted index.[26] Consistent with the prior literature, the data indicate that merger announcements are met with a significant negative abnormal stock price reaction. Acquiring firm mean CARs are negative in all fairness opinion provider sub-samples, but only significantly so in subsamples containing at least one acquirer-sought fairness opinion. This is likely due to the fact that mergers in which the transaction size is small relative to the acquirer often do not disclose an acquirer-sought fairness opinion.

Table 10 presents ordinary least squares (OLS) regressions of acquirer CARs around merger announcement dates on fairness opinion valuation data and interactions of these valuations with potential advisory conflicts of interest. We present the results separately for acquirer and target advisers. Our primary variable of interest is FO Valuation, defined as the percentage difference between the advisers' valuation and the initial offer price at the merger announcement date: (valuation implied value − initial offer price)/initial offer price.[27] We also control for the following potential determinants of the stock price reaction: Target Size, the log transaction value; Acquirer Size, the log market value of acquirer equity 3 days before the merger announcement, to control for any size effects in announcement returns (Moeller, Schlingemann, and Stulz 2004); Relative Size, the transaction value divided by acquirer market value of equity; Target Tobin's

[26] Following previous M&A studies (Masulis, Wang, and Xie 2007; Baker, Coval, and Stein 2007; Fuller, Netter, and Stegemoller 2002), we use a 5-day event window. Results are robust to the use of alternative window lengths, including a 3-day window (−1, +1). Results obtained using a 5-day window are reported here in order to remain consistent with the 5-day window used around proxy mailing dates in Table 11. A 5-day window around proxy mailing dates is necessary because of uncertainty regarding the exact time at which proxy statements become publicly available.

[27] Our construction of this variable is analogous to the measurement of the offer premium used in several prior studies of bidder returns. See, for example, Officer (2003) and Harford, Humphrey-Jenner, and Powell (2012).

CAIN0001231

$q$, the ratio of the market value of a target, measured as book value of total assets less book value of equity plus market value of equity, to the book value of its total assets; and All-Equity Payment, a dummy variable that equals one if the merger consideration is all stock, and zero otherwise. Standard errors are adjusted for heteroskedasticity and clustering of observations at the acquirer level.

The results in columns 1 and 5 indicate that acquirer announcement-period CARs are positively related to acquirer-side fairness opinion valuation premia, but we find no statistically significant relation among target-side fairness opinions. In columns 2 and 6, we additionally control for the variability of advisers' price estimates and the relative size of the acquisition. Recall that advisers typically provide a range of target prices and that there is considerable dispersion in the variability of the prices. It is possible that fairness opinions are informative when they are presented within a narrow range but uninformative when there is greater variability in the valuation estimates. Indeed, a wide range of valuation estimates could be an indication that the primary motive for the fairness opinion is what Kisgen, Qian, and Song (2009, p. 180) refer to as "legal protection only." Thus, to explore whether this variability has an impact on the information content of the opinion valuation, we define the variable Price Variance as the variance of advisers' valuation prices, where each price is scaled by the advisers' average valuation. We then interact Price Variance with FO Valuation to test whether the information content of fairness opinions is attenuated when valuation estimates are less precise. We find that the interaction of Price Variance and FO Valuation is significantly negative in the target adviser sample, which indicates that there is significant attenuation in the FO Valuation coefficient when the dispersion in advisers' valuations is high. The interaction of FO Valuation and Relative Size is positive but statistically insignificant for both the acquirer and adviser samples. To provide a sense of the economic magnitude of these results, we measure how much the bidder's CAR changes when FO Valuation changes from the twenty-fifth to the seventy-fifth percentile (a change of 21.5 percent). Using the significant coefficients in column 6 of Table 10 and the fact that the median value of Price Variance is 8.9 percent, this translates to a net impact of $(2.3 \times 21.5) - (1.3 \times 21.5 \times 8.9) = .5$ percent. This impact is approximately equal to the average CAR in the target advisers sample ($-.58$ percent in Table 9). Moreover, the effect remains positive even at the ninety-fifth percentile of Price Variance.

In columns 3 and 7, we test whether the information content of fairness opinions is affected by whether the opinion provider has a preexisting business relationship with the target or acquiring firm. The data show that the association between announcement CARs and FO Valuation is significantly stronger when acquirer-side investment banks have a prior working relationship with both the acquirer and the target. One interpretation of this finding is that the prior business relationship allows the opinion provider to have access to superior information.

CAIN0001232

Finally, columns 4 and 8 test whether the information content of fairness opinions is related to the stature and the independence of the opinion provider. We define two additional independent variables as follows. Top-Tier Adviser is the sum of dummy variables that equal one if one of the advisers is among the top 10 most frequent providers of fairness opinions in the sample, as detailed in Table A1. (Recall that a given deal may have multiple fairness opinions on the acquirer or target side.) Independent Adviser is the sum of indicator variables that equal one if a given adviser is paid fees only for providing a fairness opinion in the transaction, and zero otherwise. The results show that neither top-tier status nor the independence of the adviser has a statistically significantly positive association between acquirer CARs at the announcement of the merger and FO Valuation. Columns 4 and 8 do provide some evidence that fairness opinion valuations provided by both sets of advisers are more positively related to announcement returns when the transactions are more material to the acquirer, as measured by FO Valuation × Relative Size.

Overall, therefore, the data in Table 10 provide evidence that the stock price reaction to merger announcements is positively associated with the valuation premium implied in the fairness opinions provided by target advisers. This association is attenuated when the valuation estimates are less precise but is stronger for transactions that are larger relative to the size of the acquirer. These findings are consistent with the view that fairness opinions provided by target advisers have the potential to inform directors during merger negotiations. By contrast, there is, at best, only weak evidence that fairness opinion valuations provided by acquirer advisers are informative, though we note that the small sample size in the acquirer adviser sample limits the power of these tests.

### 5.2. Fairness Opinion Valuations and the Stock Price Reaction to Proxy Mailings

Although the findings in Table 10 imply that the fairness opinions of target advisers contain information that is potentially useful to directors, they are insufficient for determining whether fairness opinions contain incremental information for investors. Because fairness opinion valuation data are not publicly disclosed until merger proxy voting statements are mailed to shareholders, any private information contained in the valuations will not be assimilated by the market until that time.

To explore this issue, we analyze acquiring firm CARs in the 5-day window centered on the earlier of the proxy mailing date and the date on which the proxy is posted on the SEC's Edgar Web site.[28] The CARs are calculated using the same methodology as in Tables 9 and 10. We find that acquiring firm CARs are not significantly different from zero, on average, over the $(-2, +2)$ event window around proxy mailings (not reported in a table).

To analyze the information content of fairness opinions, we estimate OLS

---

[28] U.S. Securities and Exchange Commission, Edgar (http://www.sec.gov/edgar/searchedgar/companysearch.html).

CAIN0001233

Table 10

Fairness Opinion Valuations and the Stock Price Reaction to Merger Announcements

| | Acquirer Advisers | | | | Target Advisers | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Intercept | −.120* | −.121[+] | −.097 | −.101 | .031 | .044[+] | .048[+] | .046[+] |
| | (.047) | (.058) | (.121) | (.137) | (.136) | (.072) | (.062) | (.090) |
| Target Size | −.042 | −.054 | −.054 | −.054 | −.013** | −.012** | −.013** | −.013** |
| | (.252) | (.106) | (.124) | (.170) | (.001) | (.002) | (.002) | (.005) |
| Acquirer Size | .049 | .061[+] | .059[+] | .059 | .006* | .004[+] | .004 | .004 |
| | (.199) | (.083) | (.099) | (.127) | (.025) | (.088) | (.181) | (.121) |
| Relative Size | .021 | .009 | −.003 | −.008 | −.022 | −.027 | −.032 | −.029 |
| | (.633) | (.827) | (.946) | (.875) | (.458) | (.337) | (.248) | (.284) |
| Target Tobin's $q$ | −.001 | −.000 | .001 | .000 | −.000 | −.000 | −.000 | −.000 |
| | (.854) | (.970) | (.888) | (.931) | (.234) | (.186) | (.229) | (.160) |
| All-Equity Payment | −.022 | −.034 | −.047 | −.052 | −.004 | −.003 | −.003 | −.006 |
| | (.528) | (.394) | (.279) | (.229) | (.759) | (.837) | (.862) | (.716) |
| FO Valuation | .059** | −.023 | −.126 | −.074 | −.010 | .023* | .030* | .034** |
| | (.009) | (.737) | (.299) | (.532) | (.343) | (.042) | (.034) | (.001) |
| Price Variance | | −.000 | .025 | .015 | | −.017 | −.015 | −.014 |
| | | (.998) | (.701) | (.806) | | (.381) | (.442) | (.468) |
| FO Valuation × Price Variance | | −.011 | −.021 | −.025 | | −.013* | −.016* | −.018** |
| | | (.831) | (.719) | (.713) | | (.011) | (.022) | (.001) |
| FO Valuation × Relative Size | | .309 | .406 | .520[+] | | .108 | .127 | .166[+] |
| | | (.181) | (.160) | (.054) | | (.274) | (.262) | (.080) |
| PB Acquirer | | | −.014 | | | | .008 | |
| | | | (.699) | | | | (.483) | |
| PB Target | | | −.015 | | | | .009 | |
| | | | (.700) | | | | (.534) | |

CAIN0001234

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PB Both | | | .032 | | | | −.010 | |
| | | | (.447) | | | | (.624) | |
| FO Valuation × PB Acquirer | | | .089 | | | | −.064 | |
| | | | (.301) | | | | (.304) | |
| FO Valuation × PB Target | | | −.276[+] | | | | .019 | |
| | | | (.082) | | | | (.821) | |
| FO Valuation × PB Both | | | .381[*] | | | | .012 | |
| | | | (.019) | | | | (.909) | |
| Independent Adviser | | | | .006 | | | | −.010 |
| | | | | (.873) | | | | (.585) |
| FO Valuation × Independent Adviser | | | | −.141 | | | | −.129[+] |
| | | | | (.219) | | | | (.052) |
| Top-Tier Adviser | | | | −.002 | | | | .017 |
| | | | | (.970) | | | | (.312) |
| FO Valuation × Top-Tier Adviser | | | | .084 | | | | −.020 |
| | | | | (.403) | | | | (.793) |
| N | 79 | 79 | 79 | 74 | 355 | 355 | 354 | 336 |
| $R^2$ | 14.42 | 18.81 | 23.23 | 26.61 | 6.73 | 9.53 | 10.22 | 11.86 |

*Note.* Values are ordinary least squares (OLS) regressions in which the dependent variable is acquirer announcement cumulative abnormal returns. Target Size is log transaction value, Acquirer Size is log market value of acquirer equity 3 days before merger announcement, and Relative Size is the ratio of target to acquirer market value of equity. Target Tobin's $q$ is the ratio of the market value of a target, measured as book value of total assets less book value of equity plus market value of equity, to the book value of its total assets. All-Equity Payment is a dummy variable that equals one if the merger consideration is all stock, and zero otherwise. FO Valuation is the implied premium of advisers' valuations over initial offer price at merger announcement date. Price Variance is the variance of advisers' valuation prices, where each price is scaled by the advisers' average valuation. PB is the sum of indicator variables that equal one if a given adviser has a preexisting business relationship with the target, acquirer, or both, and zero otherwise. Independent Adviser is the sum of indicator variables that equal one if a given adviser is paid fees only for providing a fairness opinion in the transaction, and zero otherwise. Top-Tier Adviser is a variable that equals one if one of the advisers is among the top 10 most frequent providers of fairness opinions in the sample. Standard errors are adjusted for heteroskedasticity and clustering of observations at the acquiring firm level, and $p$-values are reported in parentheses.

[+] Significant at the .10 level.
[*] Significant at the .05 level.
[**] Significant at the .01 level.

CAIN0001235

regressions of acquiring firm CARs around the proxy mailing date on FO Valuation, the implied premium of advisers' average valuation over the prevailing offer price at the time proxy statements are mailed: (valuation implied value − current offer price)/current offer price. Note that this definition of FO Valuation is slightly different from the one used in Table 10 in that it incorporates any changes in the offer price between the initial merger announcement and the proxy mailing. If fairness opinions contain valuable information for investors, we expect a positive association between CARs and FO Valuation.

The results are presented in Table 11. We again estimate models separately for opinions provided by acquiring firm advisers and those provided by target advisers. We find that CARs around the proxy mailing date are positively related to FO Valuation for target advisers, but we find no significant association for acquirer advisers. The coefficient on the interaction of FO Valuation with Price Variance is negative for target advisers but statistically significant only in column 7. Using the coefficients from column 7, we see that the economic impact of a target-side FO Valuation moving from the twenty-fifth to the seventy-fifth percentile (a change of 21.5 percent) results in a change in CAR of $(2.5 \times 21.5) − (0.7 \times 21.5 \times 8.9) = .5$ percent for an acquirer with no prior business relationship. This impact is larger than the average CAR in the target advisers sample (a statistically insignificant −.32 percent).

In columns 3 and 7, we again test whether the impact of FO Valuation is affected by prior business relationships between the opinion provider and either the target or the acquirer (or both). We find that target advisers produce more informative valuations when they have prior experience with both parties to the transaction. We note also that once we control for such prior business relationships, the coefficient on FO Valuation continues to be significantly positive for target advisers and statistically insignificant for acquirer advisers. Finally, in columns 4 and 8, we again test whether the information content of fairness opinions around the proxy mailing date is related to the stature and the independence of the opinion provider. We find that, if anything, fairness opinions of acquirer advisers are less informative if the advisers are independent.

On balance, therefore, these findings support the view that target adviser valuations contained in fairness opinions provide incremental information to investors. The greater the difference between the fairness opinion valuation and the offer price, the larger the stock price reaction to the merger announcement and to the proxy statements containing this new information. By contrast, we find little evidence that acquirer-sought fairness opinions provide incremental information to investors, though again we note that the small size of the acquirer adviser sample reduces the power of our tests.

## 5.3. Robustness Tests

It is possible that market reactions to target-sought fairness opinion valuations represent behavioral responses to useless valuations rather than rational reactions

CAIN0001236

to new information. To examine this possibility, we document long-run returns to investing in different acquiring firm portfolios based on target-sought fairness opinion valuations. We sort acquirers on the basis of the target adviser FO Valuation: average fairness opinion target valuation premium over prevailing offer price at proxy mailing dates. We create portfolios based on FO Valuation terciles, with the bottom portfolio representing the most negative valuations and the top portfolio representing the most positive valuations. Following the calendar-time portfolio method advocated by Mitchell and Stafford (2000), firms are added to the portfolios 1 month after a new proxy statement is mailed to shareholders containing fairness opinion valuations and remain in the portfolios for a holding period of 6 months to 3 years. Portfolios are rebalanced monthly on either an equal-weighted or a value-weighted basis. Monthly portfolio excess returns are then regressed on the three factors from Fama and French (1993). Results from these regressions (unreported) produce an insignificant intercept for both the high-valuation and low-valuation portfolios. Thus, the initial market reactions to the fairness opinions appear to be unbiased.

Approximately 5 percent of our sample mergers are ultimately withdrawn. If the probability of withdrawal is systematically associated with FO Valuation, this can produce biased coefficients in our regressions. Therefore, as an additional robustness check, we cumulate acquirer abnormal returns over the period extending from 2 days prior to the initial announcement of the merger through merger completion. By construction, therefore, this variable excludes withdrawn transactions and allows us to focus only on those observations for which the probability of completion equals one during the stock returns window. We then reestimate the Table 11 regressions. Our results (not reported in a table) support those in Tables 10 and 11. In particular, valuations provided by acquirer advisers are not significantly associated with acquirer returns; however, valuations provided by top-tier acquirer advisers and valuations provided by acquirer advisers with previous business experience with both the acquirer and target firms are positively related to acquirer returns. Target adviser valuations continue to be positively related to acquirer returns, and this relation is attenuated by the variance of these valuations. Valuations from top-tier target advisers are more strongly related to acquirer returns as well.

## 6. Conclusions

Fairness opinions are pervasive but are frequently criticized as being biased and, therefore, of little value to directors or investors. We provide evidence on these claims by analyzing the valuations contained in fairness opinions and the stock price reactions to the revelation of these opinions. Although we find that acquirer advisers exhibit significantly more positive valuation errors than do target advisers, we find no evidence that valuation accuracy is related to the contingency structure of advisory fees. In addition, we find that valuations of

CAIN0001237

CAIN0001238

Table 11

Fairness Opinion Valuations and cumulative Abnormal Returns around Proxy Mailing Dates

| | Acquirer Advisers | | | | Target Advisers | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Intercept | −.048 | −.046 | −.065 | −.073 | −.014 | −.003 | .001 | .002 |
| | (.324) | (.345) | (.228) | (.152) | (.394) | (.860) | (.936) | (.935) |
| Target Size | .015 | .020 | .022 | .012 | .000 | −.001 | −.001 | −.002 |
| | (.476) | (.426) | (.390) | (.698) | (.948) | (.872) | (.829) | (.500) |
| Acquirer Size | −.007 | −.011 | −.012 | −.001 | .000 | .000 | .000 | .000 |
| | (.769) | (.664) | (.655) | (.976) | (.911) | (.995) | (.966) | (.931) |
| Relative Size | −.013 | −.011 | −.008 | .001 | .023 | .023 | .026 | .023 |
| | (.714) | (.763) | (.848) | (.986) | (.262) | (.264) | (.199) | (.288) |
| Target Tobin's $q$ | −.004** | −.004** | −.005* | −.005* | .000 | .000 | .000 | .000 |
| | (.005) | (.008) | (.012) | (.024) | (.773) | (.743) | (.714) | (.542) |
| FO Valuation | .010 | .062 | .086 | .084 | −.001 | .014[+] | .025** | .016* |
| | (.701) | (.314) | (.322) | (.296) | (.900) | (.056) | (.001) | (.048) |
| Price Variance | | −.013 | −.006 | −.015 | | −.015 | −.016 | −.015 |
| | | (.844) | (.933) | (.826) | | (.323) | (.312) | (.347) |
| FO Valuation × Price Variance | | −.018 | −.028 | −.038 | | −.002 | −.007[+] | −.003 |
| | | (.752) | (.691) | (.602) | | (.424) | (.063) | (.363) |
| FO Valuation × Relative Size | | −.094 | −.100 | −.061 | | −.069 | −.004 | −.053 |
| | | (.393) | (.520) | (.587) | | (.207) | (.951) | (.426) |
| PB Acquirer | | | .025 | | | | −.004 | |
| | | | (.212) | | | | (.678) | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PB Target | | | $-.006$ | | | | $-.014^{+}$ | |
| | | | $(.833)$ | | | | $(.087)$ | |
| PB Both | | | $-.014$ | | | | $.018$ | |
| | | | $(.652)$ | | | | $(.183)$ | |
| FO Valuation × PB Acquirer | | | $-.032$ | | | | $-.109^{\star}$ | |
| | | | $(.598)$ | | | | $(.032)$ | |
| FO Valuation × PB Target | | | $-.112$ | | | | $-.049$ | |
| | | | $(.562)$ | | | | $(.273)$ | |
| FO Valuation × PB Both | | | $.113$ | | | | $.129^{+}$ | |
| | | | $(.622)$ | | | | $(.069)$ | |
| Independent Adviser | | | | $.014$ | | | | $.006$ |
| | | | | $(.576)$ | | | | $(.657)$ |
| FO Valuation × Independent Adviser | | | | $-.150^{\star\star}$ | | | | $.003$ |
| | | | | $(.002)$ | | | | $(.931)$ |
| Top-Tier Adviser | | | | $-.010$ | | | | $.017^{+}$ |
| | | | | $(.740)$ | | | | $(.059)$ |
| FO Valuation × Top-Tier Adviser | | | | $.010$ | | | | $-.026$ |
| | | | | $(.864)$ | | | | $(.469)$ |
| $N$ | 76 | 76 | 76 | 71 | 346 | 346 | 345 | 327 |
| $R^2$ | 9.03 | 10.75 | 13.38 | 18.58 | 1.08 | 3.45 | 5.39 | 5.73 |

Note. Values are ordinary least squares (OLS) regressions in which the dependent variable is acquirer proxy mailing date cumulative abnormal returns. Standard errors are adjusted for heteroskedasticity and clustering of observations at the acquiring firm level, and $p$-values are reported in parentheses.

$^{+}$ Significant at the .10 level.
$^{\star}$ Significant at the .05 level.
$^{\star\star}$ Significant at the .01 level.

CAIN0001239

top-tier investment banks exhibit significantly lower absolute valuation errors, as do those of advisers with a preestablished relationship with the target.

We further show that fairness opinion valuations provided by target advisers are significantly related to the stock price reaction to the merger announcement. In particular, acquiring firm CARs around the merger announcement date are positively related to fairness opinion valuations of target firms in excess of the merger offer price. In addition, acquiring firm CARs around the mailing of the proxy statement containing the fairness opinion are also positively related to fairness opinion valuations in excess of the offer price. These associations are stronger for transactions that are larger relative to the size of the acquirer, but weaker when the range of fairness opinion values is wider.

Taken together, these findings imply that, although fairness opinion valuations cannot necessarily be taken at face value, they nonetheless appear to contain information that is useful to both directors and investors. All else equal, when opinion valuation data indicate that offer prices exceed (fall below) target acquisition value, acquiring firm value decreases (increases). As such, our findings provide support for the long-run survival of fairness opinions and for the historical reliance of the judiciary on fairness opinions in legal proceedings.

CAIN0001240

# Appendix

## Adviser Frequencies

### Table A1

**Frequency Distribution of Fairness Opinions Provided by Top-30 Advisory Firms in Negotiated Mergers**

| Rank | Adviser | Advising Targets N | % | Advising Acquirers N | % | Total Opinions N | % |
|---|---|---|---|---|---|---|---|
| 1 | Morgan Stanley | 46.50 | 7.7 | 18.50 | 10.5 | 65.00 | 8.3 |
| 2 | Goldman Sachs | 35.00 | 5.8 | 14.33 | 8.1 | 49.33 | 6.3 |
| 3 | Credit Suisse First Boston | 31.50 | 5.2 | 11.50 | 6.5 | 43.00 | 5.5 |
| 4 | Salomon Smith Barney | 28.50 | 4.7 | 14.50 | 8.2 | 43.00 | 5.5 |
| 5 | Merrill Lynch | 24.00 | 4.0 | 20.33 | 11.5 | 44.33 | 5.7 |
| 6 | JP Morgan | 22.33 | 3.7 | 9.83 | 5.6 | 32.16 | 4.1 |
| 7 | Lehman Brothers | 19.00 | 3.1 | 9.50 | 5.4 | 28.50 | 3.6 |
| 8 | Bear Stearns | 18.50 | 3.0 | 3.00 | 1.7 | 21.50 | 2.7 |
| 9 | U.S. Bancorp Piper Jaffray | 17.00 | 2.8 | .00 | .0 | 17.00 | 2.2 |
| 10 | Lazard Freres & Co. | 16.33 | 2.7 | 2.50 | 1.4 | 18.83 | 2.4 |
| 11 | Houlihan Lokey Howard & Zufkin | 15.00 | 2.5 | 1.00 | .6 | 16.00 | 2.0 |
| 12 | DLJ | 14.50 | 2.4 | 10.00 | 5.6 | 24.50 | 3.1 |
| 12 | UBS | 14.50 | 2.4 | 3.50 | 2.0 | 18.00 | 2.3 |
| 14 | Broadview International | 14.00 | 2.3 | 2.00 | 1.1 | 16.00 | 2.0 |
| 15 | Cowen & Company | 13.00 | 2.1 | .00 | .0 | 13.00 | 1.7 |
| 16 | CIBC Oppenheimer | 11.00 | 1.8 | 1.00 | .6 | 12.00 | 1.5 |
| 17 | Deutsche Banc Alex Brown | 9.00 | 1.5 | 4.00 | 2.3 | 13.00 | 1.7 |
| 17 | Raymond James & Associates | 9.00 | 1.5 | .00 | .0 | 9.00 | 1.1 |
| 19 | Robertson Stephens | 8.50 | 1.4 | 3.00 | 1.7 | 11.50 | 1.5 |
| 20 | Banc of America | 8.00 | 1.3 | .00 | .0 | 8.00 | 1.0 |
| 20 | Chase H&Q | 8.00 | 1.3 | 2.00 | 1.1 | 10.00 | 1.3 |
| 22 | Citigroup | 7.00 | 1.2 | 1.00 | .6 | 8.00 | 1.0 |
| 22 | Jefferies & Co. | 7.00 | 1.2 | .00 | .0 | 7.00 | .9 |
| 24 | Dain Rauscher | 6.00 | 1.0 | 1.00 | .6 | 7.00 | .9 |
| 24 | Needham & Company | 6.00 | 1.0 | 4.00 | 2.3 | 10.00 | 1.3 |
| 24 | PaineWebber | 6.00 | 1.0 | 4.00 | 2.3 | 10.00 | 1.3 |
| 24 | Wasserstein Perella | 6.00 | 1.0 | 1.50 | .8 | 7.50 | 1.0 |
| 28 | Robert W. Baird | 5.00 | .8 | 1.00 | .6 | 6.00 | .8 |
| 28 | Legg Mason | 5.00 | .8 | 1.00 | .6 | 6.00 | .8 |
| 28 | Piper Jaffray | 5.00 | .8 | .00 | .0 | 5.00 | .6 |
| 28 | Thomas Weisel Partners | 5.00 | .8 | 1.00 | .6 | 6.00 | .8 |
| 28 | Warburg Dillon Read | 5.00 | .8 | 1.00 | .6 | 6.00 | .8 |

**Note.** Advisers are sorted in descending order by total number of opinions provided for targets from 1998 to 2005, as summarized in the Advising Targets column. When two or more advisers provide a single joint fairness opinion, each adviser is given credit $1/n$, where $n$ is the number of advisers providing the joint opinion.

CAIN0001241

## References

Baker, Malcolm, Joshua Coval, and Jeremy C. Stein. 2007. Corporate Financing Decisions When Investors Take the Path of Least Resistance. *Journal of Financial Economics* 84:266–98.

Bebchuk, Lucian, and Marcel Kahan. 1989. Fairness Opinions: How Fair Are They and What Can Be Done about It? *Duke Law Journal* 27:27–53.

Benston, George J., and Clifford W. Smith, Jr. 1976. A Transactions Costs Approach to the Theory of Financial Intermediation. *Journal of Finance* 31:215–31.

Bolton, Patrick, Xavier Freixas, and Joel Shapiro. 2007. Conflicts of Interest, Information Provision, and Competition in the Financial Services Industry. *Journal of Financial Economics* 85:297–330.

————. 2012. The Credit Ratings Game. *Journal of Finance* 67:85–112.

Bowers, Helen M., and William R. Latham III. 2006. Information Asymmetry, Litigation Risk, Uncertainty and the Demand for Fairness Opinions: Evidence from U.S. Mergers and Acquisitions, 1980–2002. Unpublished manuscript, University of Delaware, Alfred Lerner College of Business and Economics, Newark.

Brav, Alon, and Reuven Lehavy. 2003. An Empirical Analysis of Analysts' Target Prices: Short-Term Informativeness and Long-Term Dynamics. *Journal of Finance* 58:1933–67.

Bruner, Robert. 2004. *Applied Mergers and Acquisitions.* Hoboken, N.J.: John Wiley & Sons.

Calomiris, Charles W., and Donna M. Hitscherich. 2007. Banker Fees and Acquisition Premia for Targets in Cash Tender Offers: Challenges to the Popular Wisdom on Banker Conflicts. *Journal of Empirical Legal Studies* 4:909–38.

Carney, William J. 1992. Fairness Opinions: How Fair Are They and Why We Should Do Nothing about It. *Washington University Law Quarterly* 70:523–40.

Cliff, Michael T. 2007. Do Affiliated Analysts Mean What They Say? *Financial Management* 36:5–29.

Davidoff, Steven M. 2006. Fairness Opinions. *American University Law Review* 55:1557–1625.

Davidoff, Steven M., Anil K. Makhija, and Rajesh P. Narayanan. 2011. Fairness Opinions in Mergers and Acquisitions. Pp. 483–94 in *The Art of Capital Restructuring: Creating Shareholder Value through Mergers and Acquisitions,* edited by H. Kent Baker and Halil Kiymaz. Hoboken, N.J.: John Wiley & Sons.

DeAngelo, Linda E. 1990. Equity Valuation and Corporate Control. *Accounting Review* 65:93–112.

Denis, David J. 1991. Shelf Registration and the Market for Seasoned Equity Offerings. *Journal of Business* 64:189–212.

Drucker, Steven, and Manju Puri. 2005. On the Benefits of Concurrent Lending and Underwriting. *Journal of Finance* 60:2763–99.

Drummond, Bob. 2005. Opinions for Sale. *Bloomberg Markets,* August.

Duarte-Silva, Tiago. 2010. The Market for Certification by External Parties: Evidence from Underwriting and Banking Relationships. *Journal of Financial Economics* 98:568–82.

Easterbrook, Frank H. 1984. Two Agency Cost Explanations of Dividends. *American Economic Review* 74:650–59.

Easterwood, John C., and Stacey R. Nutt. 1999. Inefficiency in Analysts' Earnings Forecasts: Systematic Misreaction or Systematic Optimism? *Journal of Finance* 54:1777–97.

CAIN0001242

Elson, Charles M. 1992. Fairness Opinions: Are They Fair or Should We Care? *Ohio State Law Journal* 53:951–1003.

Fama, Eugene F., and Kenneth R. French. 1993. Common Risk Factors in the Returns on Stocks and Bonds. *Journal of Financial Economics* 33:3–56.

Fink, Ronald. 2006. All's Fair in M&A? Judges and Regulators Are Taking Aim at Conflicted "Fairness Opinions." *CFO Magazine*, April 1.

Francis, Jennifer, and Leonard Soffer. 1997. The Relative Informativeness of Analysts' Stock Recommendations and Earnings Forecast Revisions. *Journal of Accounting Research* 35:193–211.

Fuller, Kathleen, Jeffry Netter, and Mike Stegemoller. 2002. What Do Returns to Acquiring Firms Tell Us? Evidence from Firms That Make Many Acquisitions. *Journal of Finance* 57:1763–93.

Gande, Amar, Manju Puri, Anthony Saunders, and Ingo Walter. 1997. Bank Underwriting of Debt Securities: Modern Evidence. *Review of Financial Studies* 10:1175–1202.

Hansen, Robert S., and Paul Torregrosa. 1992. Underwriter Compensation and Corporate Monitoring. *Journal of Finance* 42:1537–55.

Harford, Jarrad, Mark Humphrey-Jenner, and Ronan Powell. 2012. The Sources of Value Destruction in Acquisitions by Entrenched Managers. *Journal of Financial Economics* 106:247–61.

Harper, Christine, and Julia Werdigier. 2005. "Stapled" Loans Create Potential Conflicts for Merger Advisers. *Bloomberg*, October 23.

Jegadeesh, Narasimhan, Joonghyuk Kim, Susan D. Krische, and Charles M. C. Lee. 2004. Analyzing the Analysts: When Do Recommendations Add Value? *Journal of Finance* 59:1083–1124.

Kanatas, George, and Jianping Qi. 2003. Integration of Lending and Underwriting: Implications of Scope Economies. *Journal of Finance* 58:1167–91.

Kisgen, Darren J., Jun "QJ" Qian, and Weihong Song. 2009. Are Fairness Opinions Fair? The Case of Mergers and Acquisitions. *Journal of Financial Economics* 91:179–207.

Loughran, Tim, and Anand M. Vijh. 1997. Do Long-Term Shareholders Benefit from Corporate Acquisitions? *Journal of Finance* 52:1765–90.

Malatesta, Paul H. 1983. The Wealth Effect of Merger Activity and the Objective Functions of Merging Firms. *Journal of Financial Economics* 11:155–81.

Masulis, Ronald W., Cong Wang, and Fei Xie. 2007. Corporate Governance and Acquirer Returns. *Journal of Finance* 62:1851–89.

Michaely, Roni, and Kent L. Womack. 1999. Conflict of Interest and the Credibility of Underwriter Analyst Recommendations. *Review of Financial Studies* 12:653–86.

Mitchell, Mark L., and Erik Stafford. 2000. Managerial Decisions and Long-Term Stock Price Performance. *Journal of Business* 73:287–329.

Moeller, Sara B., Frederik P. Schlingemann, and René M. Stulz. 2004. Firm Size and the Gains from Acquisitions. *Journal of Financial Economics* 73:201–28.

———. 2005. Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave. *Journal of Finance* 60:757–82.

Narayanan, Rajesh P., Kasturi P. Rangan, and Nanda K. Rangan. 2007. The Effect of Private-Debt-Underwriting Reputation on Bank Public-Debt Underwriting. *Review of Financial Studies* 20:597–618.

Officer, Micah S. 2003. Termination Fees in Mergers and Acquisitions. *Journal of Financial Economics* 69:431–67.

Povel, Paul, and Rajdeep Singh. 2010. Stapled Finance. *Journal of Finance* 65:927–53.

CAIN0001243

Puri, Manju. 1996. Commercial Banks in Investment Banking: Conflict of Interest or Certification Role? *Journal of Financial Economics* 40:373–401.

Rau, P. Raghavendra. 2000. Investment Bank Market Share, Contingent Fee Payments, and the Performance of Acquiring Firms. *Journal of Financial Economics* 56:293–324.

Rau, P. Raghavendra, and Theo Vermaelen. 1998. Glamour, Value and the Post-acquisition Performance of Acquiring Firms. *Journal of Financial Economics* 49:223–53.

Servaes, Henri, and Marc Zenner. 1996. The Role of Investment Banks in Acquisitions. *Review of Financial Studies* 9:787–815.

Smith, Clifford W. 1986. Investment Banking and the Capital Acquisition Process. *Journal of Financial Economics* 15:3–29.

Song, Wei-Ling. 2004. Competition and Coalition among Underwriters: The Decision to Join a Syndicate. *Journal of Finance* 59:2421–44.

Titman, Sheridan, and Brett Trueman. 1986. Information Quality and the Valuation of New Issues. *Journal of Accounting and Economics* 8:159–72.

CAIN0001244