# EXHIBIT 11

# Does *Revlon* Matter? An Empirical and Theoretical Study

Matthew D. Cain[*], Sean J. Griffith[**], Robert J. Jackson, Jr.[***], and Steven Davidoff Solomon[****]

*We empirically examine whether and how the doctrine of enhanced judicial scrutiny that emerged from* Revlon *and its progeny actually affects M&A transactions. Combining hand-coding and machine-learning techniques, we assemble data from the proxy statements of publicly announced mergers between 2003 and 2017 into a dataset of 1,913 unique transactions. Of these, 1,167 transactions were subject to the* Revlon *standard, and 553 were not. After subjecting this sample to empirical analysis, our results show that* Revlon *does indeed matter for companies incorporated in Delaware. We find that in Delaware,* Revlon *deals are more intensely negotiated, involve more bidders, and result in higher transaction premiums than non-*Revlon *deals. However, these results do not hold for target companies incorporated in other jurisdictions that have adopted the* Revlon *doctrine.*

---

DOI: https://doi.org/10.15779/Z38GM81P7Q.

Copyright © 2020 Matthew D. Cain, Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon.

[*]    Senior Fellow, Berkeley Center for Law and Business. For helpful comments the authors wish to thank Stephen Bainbridge, Keith Bishop, Ryan Bubb, Emiliano Catan, Jens Dammann, Elizabeth de Fontenay, Zachary Gubler, Daniel Hemel, Travis Laster, George Mossary, and Holger Spamann, as well as attendees at the 2019 BYU Winter Conference, the 2019 Conference on Empirical Legal Studies, the 2018 National Business Law Scholars Conference, the Weinberg Center 2020 Corporate Governance Symposium, and workshop participants at Harvard, the London School of Economics, NYU, UCLA, and the Corporate Law Academic Webinar Series. We also thank James Hicks for research assistance.
[**]    Professor, T.J. Maloney Chair in Business Law, Fordham Law School.
[***]    Professor, New York University School of Law.
[****]    Professor, University of California, Berkeley, School of Law.

CAIN0001245

*Our results shed light on the implications of the current state of uncertainty surrounding* Revlon *and provide some direction for courts going forward. We theorize that* Revlon *is a monitoring standard whose effectiveness depends upon the judiciary's credible commitment to intervene in biased transactions. The precise contours of the doctrine are unimportant as long as the judiciary retains a substantive avenue for intervention. Recent Delaware decisions in* C&J *and* Corwin *have been criticized for overly restricting* Revlon, *but we suggest that such concerns are overstated so long as Delaware judges continue to monitor the substance of transactions. Thus, in applying these decisions, Delaware judges should focus not on procedural aspects but the substantive component of transactions, which* Revlon *initially sought to regulate.*

Introduction.............................................................................................. 1684
I. *Revlon*'s Place in Corporate Law ...................................................... 1688
    A.    The Rise of *Revlon* ........................................................... 1688
    B.    The Fall of *Revlon*?........................................................... 1692
    C.    *Revlon*'s Place in Corporate Law Theory.......................... 1696
II. Empirical Analysis........................................................................... 1702
    A.    Hypothesis Development.................................................... 1702
    B.    Sample Set ......................................................................... 1704
    C.    Descriptive Statistics ........................................................ 1705
    D.    Findings ............................................................................. 1707
        1.    Empirical Results....................................................... 1707
        2.    Robustness Checks .................................................... 1712
            a.    Delaware Versus Non-Delaware Targets ............. 1713
            b.    Non-*Revlon* Deals Versus Mergers-of-Equals...... 1716
III. How *Revlon* Matters ........................................................................ 1717
    A.    *Revlon* Matters as a Monitoring Standard ......................... 1718
    B.    Should Delaware Retreat From *Revlon*?............................ 1721
    C.    Should Delaware Expand *Revlon*?..................................... 1725
    D.    *Revlon*'s Next 35 Years ..................................................... 1728
Conclusion .......................................................................................... 1730

## INTRODUCTION

The *Revlon* doctrine has reached almost mythical status. Named after the seminal case *Revlon v. MacAndrews & Forbes Holdings*,[1] the doctrine holds that in a change-of-control transaction, a seller board is required to seek and achieve

---

1.    506 A.2d 173 (Del. 1986).

CAIN0001246

the highest price reasonably available.[2] *Revlon* is one of the few cases every corporate lawyer knows.[3] The case has been cited thousands of times in Westlaw.[4] It is covered in every corporations casebook and has been the subject of hundreds of law review articles. Most importantly, it has become the touchstone for the substantive judicial review of mergers and acquisitions (M&A) transactions.

But does *Revlon* really matter? That is, has it actually affected the sale process of transactions subject to it? And, if so, *how*?

In this Article, we conduct an in-depth empirical examination of the effect of the *Revlon* doctrine on the takeover process. We theorize that the *Revlon* doctrine—by promising substantive judicial review—results in target boards engaging in more search and negotiation in their sale process.[5] More specifically, we theorize that target boards acting under *Revlon* will have more bidders during the private negotiating process, will engage in more protracted negotiations with these bidders, will have more third-party bidder interventions post-announcement, and will ultimately achieve higher premiums.

We examine these questions through a novel M&A dataset of 1,913 transactions from 2003 to 2017. We build this dataset by hand-coding and applying machine-language learning techniques to proxy and tender offer statements describing the bidding process. We collect information on a number of variables, including bidding rounds, number of bidders, types of acquirers (e.g., private equity versus strategic), and prices negotiated.

We find, essentially, that *Revlon* matters, at least for Delaware firms. For Delaware-incorporated firms, deals within *Revlon* result in more protracted negotiations, more rounds of bidding, more bidders, and higher deal premiums. However, these results do not hold for states outside of Delaware that have also adopted *Revlon*. When we exclude Delaware-incorporated firms, we find no differences in any key variables for *Revlon* and non-*Revlon* deals. *Revlon* matters, but it appears to matter only in Delaware.

---

2.   *Id.* at 182; *see also* Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1288 (Del. 1989) ("[I]n a sale of corporate control the responsibility of the directors is to get the highest value reasonably attainable for the shareholders."); Barkan v. Amsted Indus., Inc., 567 A.2d 1279, 1286 (Del. 1989) ("[T]he board must act in a neutral manner to encourage the highest possible price for shareholders.").

3.   *See, e.g.*, James D. Cox & Randall S. Thomas, *Delaware's Retreat: Exploring Developing Fissures and Tectonic Shifts in Delaware Corporate Law*, 42 DEL. J. CORP. L. 323, 324 (2018) (describing *Revlon* as one of a "Golden Quartet" of momentous corporate law decisions).

4.   The case has been cited 5,106 times in Westlaw, including in 1,722 law review articles (as of Sept. 16, 2020).

5.   *See* STEPHEN M. BAINBRIDGE, MERGERS AND ACQUISITIONS 298–99 (3d ed. 2012) (distilling *Revlon* to require even-handed treatment of bidders and a sales process "reasonably designed to elicit the best possible offer"); *see also* Frank v. Elgamal, No. 6120-VCN, 2014 WL 957550, at *20–21 (Del. Ch. Mar. 10, 2014) (noting "best practices" that may satisfy *Revlon*, including "[s]oliciting potential acquirers in advance of agreeing to a transaction" and considering "alternative transactions offered by any responsible buyer") (quoting Wells Fargo & Co. v. First Interstate Bancorp, Nos. 14696, 14623, 1996 WL 32169, at *4 n.3 (Del. Ch. Jan. 18, 1996)).

CAIN0001247

These results do not appear to be driven by other transaction-specific characteristics. For example, although we find, consistent with other studies, that private equity buyers pay significantly lower premiums (up to 8% lower on average), our other results remain qualitatively similar, indicating that private equity transactions do not alter our results. Nor are our results driven by the unique characteristics of "mergers of equals" (MOEs), whereby the parties deliberately do not seek out other bidders or focus on premium because the transaction value is in the strategic combination of the companies. In a series of robustness tests, we find significant bidding in non-*Revlon* transactions, a fact inconsistent with the idea that MOEs drive our results.

On average, *Revlon* transactions in Delaware have multiple bidders 60% of the time, 5.83 bidding rounds, a negotiation period of about four and a half months, and a 37% offer premium. Non-*Revlon* transactions in Delaware have multiple bidders 32% of the time, 4.49 bidding rounds, a negotiation period of about three months, and a 27% offer premium. We further test this finding by examining the twenty-three MOE transactions in our sample. We find that these transactions have significantly lower measures of these variables than both *Revlon* and non-*Revlon* transactions, which indicates that our findings are not driven by MOEs.[6]

So, given our findings that *Revlon* matters, what can we say about how it matters? The differing results between Delaware and other states adopting *Revlon* offer a clue. Although several states have adopted the doctrine, we find that it has an effect in Delaware alone. We explain this finding by reference to the more active and focused Delaware judiciary, which has a core competency in M&A transactions. Delaware courts have thus been more willing to substantively review and intervene in transactions which violate *Revlon*.[7] This may be true even today, where Delaware courts intervene considerably less often than they did in the 1980s. The credible threat to intervene may be enough. The threat is credible in Delaware because its judiciary has demonstrated its

---

6. *Revlon* applies when there is a change of control, "regardless of whether or not there is to be a break-up of the corporation." Paramount Commc'ns v. QVC Network, 637 A.2d 34, 46 (Del. 1994). In *QVC Network*, the court held that a change of control did not occur when the shares of the combined companies were "owned by a fluid aggregation of unaffiliated stockholders both before and after the merger . . . ." *Id.* at 46–47. These non-*Revlon* transactions are still subject to scrutiny under the *Unocal* doctrine. *See* Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954–55 (Del. 1985); *infra* notes 18–22 and accompanying text.

7. This is a form of enhanced scrutiny. The Delaware Supreme Court has stated that in a *Revlon* deal:

> The key features of an enhanced scrutiny test are: (a) a judicial determination regarding the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision; and (b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing. The directors have the burden of proving that they were adequately informed and acted reasonably.

*QVC Network*, 637 A.2d at 45.

CAIN0001248

willingness to intervene. In other states, the threat of judicial intervention is less credible, and *Revlon* is therefore less meaningful.

Seeing *Revlon* as a flexible monitoring standard suggests a course for its future evolution. We follow corporate law theory in justifying judicial intervention in M&A as a constraint on managerial rent-seeking at a time when opportunism is relatively unconstrained by other norms. Judicial intervention may thus be less necessary when other constraints retain their force. But when alternative constraints weaken, as in final period sale-of-the-company transactions, the case for judicial intervention strengthens.

These considerations provide insight into the debate surrounding two recent Delaware decisions that seem to substantially restrict the scope of *Revlon* duties. *Corwin v. KKR Financial Holdings LLC* eliminated breach of fiduciary duty claims if full disclosure was made to the shareholder prior to the shareholder vote.[8] Read together with *C&J Energy Services v. City of Miami General Employees' and Sanitation Employees' Retirement Trust,*[9] which purported to limit the ability of Delaware courts to grant injunctions under *Revlon, Corwin* would seem to confine *Revlon* either to transactions involving materially inadequate disclosure or to transactions where a third-party bidder seeks an injunction. Yet our results hold even when we control for these cases. We suggest two interpretations for this non-result. First, it may be that in spite of the ways in which *Corwin* and *C&J* change the law, M&A practitioners continue to advise clients based on prior norms and practices. Alternatively, it may be that notwithstanding *Corwin* and *C&J*, Delaware courts have found ample space for judicial review albeit through different mechanisms.

Ultimately, our results indicate that while *Revlon* matters, it seems to matter only in an ecosystem where there is the potential for consistent judicial review and intervention by a competent judiciary. The lesson of *Revlon* may thus be that a standard alone is insufficient—it is the implementation and oversight which counts. As for the criticism of *C&J* and *Corwin*, such criticism may be overstated to the extent that *Revlon*'s core precept—access for judicial intervention into substantively biased transactions—is preserved.

From this Introduction, the Article proceeds as follows. Part I situates *Revlon* both in corporate law doctrine and corporate law theory, demonstrating its centrality to both. Part II contains our empirical analysis. It begins by developing our hypotheses and by describing our sample selection. It then offers descriptive statistics and elaborates the core findings of our empirical analysis. Finally, it summarizes a series of robustness checks designed to address endogeneity concerns. Next, Part III considers the implications of our empirical analysis by examining *how Revlon* matters, considering whether the doctrine

---

8.    *See* 125 A.3d 304, 312–14 (Del. 2015) (en banc).
9.    *See* 107 A.3d 1049, 1067 (Del. 2014) (en banc).

CAIN0001249

ought to be expanded or contracted, and framing the interpretive issues going forward. Finally, Part IV closes with a brief summary and conclusion.

## I.
## *REVLON*'S PLACE IN CORPORATE LAW

*Revlon,* a decision of the Delaware Supreme Court from nearly thirty-five years ago, remains the leading case outlining the duties of directors in third-party mergers. Because Delaware is the most important corporate law jurisdiction,[10] *Revlon* is among the most important cases in modern deal-making. Yet there is evidence that the *Revlon* doctrine is now in decline. Indeed, although corporate law scholars remain divided on the meaning of the doctrine, they broadly agree that whatever it meant or seemed to mean, *Revlon*'s bite as a substantive standard has dissipated.[11]

This Section situates *Revlon* in modern corporate law doctrine. It first examines the origins of the decision and its impact on subsequent corporate law jurisprudence. It then analyzes the place of *Revlon* in corporate law theory, summarizing the prior literature interpreting the opinion and the more recent debate over its current relevance.

### A.    The Rise of Revlon

The *Revlon* doctrine originated with a lawsuit brought by a frustrated third-party bidder to enjoin the consummation of a transaction between the target company and a favored bidder. The case began when the board of cosmetics company Revlon responded to Ron Perelman's unsolicited bid for the company by engaging in a series of defensive maneuvers designed to fend him off. Among these was the buyback of some of Revlon's public shares for a class of senior subordinated notes (the "Notes"). Perelman was determined, however, and responded to the board's defensive maneuvers by raising his bid for Revlon. As a result, the Revlon board determined that the best way to keep Perelman at bay was to pursue an acquisition with a "white knight" bidder, Forstmann Little (Forstmann).[12] Undeterred, Perelman continued to raise his bid, forcing

---

10.    *See generally* ROBERTA ROMANO, THE GENIUS OF AMERICAN CORPORATE LAW (1993) (analyzing Delaware's prominent status in corporate law).

11.    *See* Steven Davidoff Solomon & Randall S. Thomas, *The Rise and Fall of Delaware's Takeover Standards, in* THE CORPORATE CONTRACT IN CHANGING TIMES 29, 29 (Steven Davidoff Solomon & Randall Stuart Thomas eds., 2019) ("The takeover standards that we learn and teach in law school—*Blasius, Revlon, Unocal, Van Gorkom,* and *Weinberger*—appear to be in decline."); Charles R. Korsmo, *Delaware's Retreat from Judicial Scrutiny of Mergers,* 10 U.C. IRVINE L. REV. 55, 57 (2019) (noting that Delaware's response to increased merger litigation "was a substantive relaxation of the standard of review for merger-related claims, making it more difficult for plaintiffs to prevail"); Cox & Thomas, *supra* note 3, at 329 ("In recent decisions, we find that *Revlon*'s bark is today greatly muffled and its bite largely nonexistent."). We further discuss this *infra* notes 82–87 and accompanying text.

12.    Forstmann, a private equity firm, was content to leave incumbent management in charge of substantial parts of Revlon, provided they produced sufficient revenue to service the debt incurred in

CAIN0001250

Forstmann into a bidding war, which Perelman promised to win by engaging in fractional bidding to top any Forstmann offer.

Nevertheless, the board declared Forstmann the winner and locked up the deal by granting Forstmann a below-market option to purchase one of the company's most valuable businesses should Revlon be sold to another bidder. Because the lock-up destroyed his plans for the company, Perelman had no choice but to sue for an injunction of the Revlon-Forstmann agreement to permit further rounds of bidding.

The Delaware Supreme Court sided with Perelman, holding that something about the acquisition process transformed the Revlon board, famously, "from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company."[13] While it would remain unclear for some years exactly what about the acquisition process triggered this transformation and what precisely was required of boards once the transformation had occurred, *Revlon* itself clearly holds that once a company has opened itself to a bidding process, the board cannot end it without satisfying itself that the process had maximized shareholder value.

Applying this standard, the court found that Revlon's board had failed to maximize shareholder value. The Revlon board argued that it had picked Forstmann over Perelman because Forstmann offered a better price, better financing, and had committed to supporting the value of the Notes. Rejecting the first two rationales as inconsistent with the facts, the court focused on the third, noting that the board's principal consideration "appears to have been protection of the noteholders over the shareholders' interests."[14] This, the court held, was the problem. The Revlon board had favored another constituency—creditors—over shareholders in the sale of the company. The point of the "auctioneer" analogy is that when the company is sold, the board must maximize shareholder value in the sale, not creditor value, employee value, or any other constituent value. Instead, "[m]arket forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity."[15] In the aftermath of the case, the duty to maximize shareholder value in a sale-of-the-company transaction came to be known as "*Revlon* duties."

Subsequent cases clarified two lingering questions: (1) what triggered *Revlon* duties and (2) what actions were required of boards in satisfying them. With regard to the first question, *Revlon* duties are triggered by a "change of control," which principally includes an acquisition of target shares for cash, as

---

connection with the acquisition. CONNIE BRUCK, THE PREDATORS' BALL: THE JUNK-BOND RAIDERS AND THE MAN WHO STAKED THEM 219 (1988).

13.  Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182 (Del. 1986).

14.  *Id.* at 184.

15.  *Id.*

in *Revlon* itself,[16] or—in the case of a stock-for-stock acquisition—an acquisition in which diffusely held public equity is exchanged for shares of a company in which there is a controlling shareholder.[17] The principal transaction type that does *not* trigger *Revlon* is the stock-for-stock deal in which the post-closing entity remains controlled by disaggregated stockholders.[18]

With regard to the second question, *Revlon* duties require boards to conduct a sale process reasonably designed to maximize shareholder value. However, *Revlon* duties do not necessarily require an auction or preclude a transaction negotiated with a single bidder, as long as the company is exposed to other bidders either before or after the merger agreement is signed. Many cases finding a breach of *Revlon* duties focus on a conflict of interest resulting in the board favoring one bidder over others for reasons unrelated to shareholders' wealth.[19] This was the case in *Revlon* itself, in which the court focused both on the personal antipathy between Ron Perelman and Revlon's CEO as well as the Revlon board's fear of being sued by the holders of the Notes should their value fall below par.[20]

---

16. Immediately after *Revlon*, cases focused on the initiation of a process to sell or break-up the company or situations in which a target acquiesces to a takeover offer. *See, e.g.*, Arnold v. Soc'y for Sav. Bancorp, Inc., 650 A.2d 1270, 1290 (Del. 1994) (en banc) (holding that *Revlon* duties apply in three scenarios: (1) a sale involving a break-up, (2) a sale to an unsolicited bidder, and (3) approval of a change-of-control transaction). However, the concept of a change of control—essentially, a transaction in which the shareholder base changes, as in a cash-for-stock buyout—logically includes the first two categories. We therefore focus on the form of consideration in the construction of our dataset.

17. *See* Paramount Commc'ns Inc. v. QVC Network Inc., 637 A.2d 34, 43 (Del. 1994). Other potential triggers for the doctrine have been rejected. *See generally* Ronald J. Gilson & Reinier Kraakman, *What Triggers* Revlon?, 25 WAKE FOREST L. REV. 37 (1990) (surveying takeover litigation to define *Revlon*'s trigger and legal consequences).

18. Within these non-*Revlon* transactions, there is a type of transaction known as a merger of equals. The core principle of a merger of equals is that both parties are equals driven by strategic considerations where a merger premium is unnecessary. In actuality, mergers of equals often fail due to the fact that one set of managers typically winds up with the upper hand. *See* Steven Davidoff Solomon, *To Guide the Merger Giants, Strong Hands Are Needed*, N.Y. TIMES: DEALBOOK (May 13, 2014), https://dealbook.nytimes.com/2014/05/13/lessons-from-the-breakup-of-an-advertising-merger [https://perma.cc/9JAR-SMHH] (describing how integration issues turned the Publicis-Omnicom merger of equals into a failed takeover).

The change-of-control test, however, looks merely to whether the transaction results in the emergence of a single shareholder capable of controlling management, not whether the two corporations or their management teams are truly equal. *See QVC Network*, 637 A.2d at 43 (holding that sale to a controlling stockholder with power to alter the long-term strategic alliance of the company amounted to a change of control).

19. *See, e.g.*, Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1264 (Del. 1989) (finding that the management team's financial interest in winning the auction and its domination of the nominally independent board contaminated the sale process); *In re* El Paso Corp. S'holder Litig., 41 A.3d 432, 440–42 (Del. Ch. 2012) (finding that an investment bank had a conflict of interest); *In re* Del Monte Foods Co. S'holders Litig., No. 6027-VCL, 2011 WL 6008590, ¶¶ 2–3 (Del. Ch. Dec. 1, 2011) (finding that an investment bank had a conflict of interest); *In re* The Topps Co. S'holders Litig., 926 A.2d 58, 91 (Del. Ch. 2007) (finding that the interest of the founding family in remaining in management may have caused the target to prefer a private equity bidder).

20. *Revlon*, 506 A.2d at 176 (noting that the repeated bids may have been rebuffed "in part based on Mr. Bergerac's strong personal antipathy to Mr. Perelman"); *id.* at 178 ("One director later reported

CAIN0001252

*Revlon* is not the only Delaware case relevant to M&A practice. It speaks principally to deals involving unaffiliated third-party buyers. Board duties in transactions with a controlling shareholder are derived from another line of cases.[21] Nor is *Revlon* the only case setting forth expectations of boards in connection with third-party bids. *Unocal v. Mesa Petroleum* establishes limitations on a board's ability to defend its projects from unsolicited bids.[22] A line of cases from *Smith v. Van Gorkom* outlines further standards of conduct in deals with third-party buyers.[23]

Nevertheless, *Revlon* remains the central case addressing third-party deals. *Revlon* drives judicial analyses of defensive devices, with the applicability of *Revlon* duties typically determining the outcome.[24] Likewise, in contrast to other cases that clarify details—requiring, for example, a fairness opinion or a fiduciary out[25]—*Revlon* frames the big picture, outlining the basic rules for

---

(at the October 12 meeting) a 'deluge' of telephone calls from irate noteholders, and on October 10 the Wall Street Journal reported threats of litigation by these creditors.").

21.     *See* Weinberger v. UOP, Inc., 457 A.2d 701, 711–15 (Del. 1983) (en banc) (holding that the standard of "entire fairness" applies to controlling shareholder deals); *see also* Kahn v. M & F Worldwide Corp., 88 A.3d 635, 644 (Del. 2014) (en banc) (holding that involvement of a special committee and a majority of the minority vote may shift the standard of review from entire fairness back to the business judgment rule), *overruled by* Flood v. Synutra Int'l, Inc., 195 A.3d 754 (Del. 2018) (en banc).

22.     493 A.2d 946, 954 (Del. 1985) (finding that where a board may be acting in its own interests, there is an "enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred"). *But see* Versata Enters., Inc. v. Selectica, Inc., 5 A.3d 586 (Del. 2010) (en banc) (holding that a board need not abandon a long-term business strategy in the face of an unsolicited bid and may therefore keep defenses in place); Air Prods. & Chems., Inc. v. Airgas, Inc., 16 A.3d 48, 129 (Del. Ch. 2011) ("[A] board cannot be forced into *Revlon* mode any time a hostile bidder makes a tender offer that is at a premium to market value.").

23.     488 A.2d 858 (Del. 1985) (en banc), *overruled in part by* Gantler v. Stephens, 965 A.2d 695 (Del. 2009) (en banc). *Van Gorkom* stands for the proposition that a board must be "fully informed" when it engages in a sale process. 488 A.2d at 890; *see also id.* at 873 ("[A] director has a duty . . . to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders."). This principle also animates later cases holding that a board cannot preclude itself from considering intervening bids, because doing so would render it uninformed at the time that it submits the transaction to shareholders for their approval. *See* Omnicare, Inc. v. NCS Healthcare, Inc., 818 A.2d 914, 938–39 (Del. 2003) (en banc) (holding that "[t]he stockholders of a Delaware corporation are entitled to rely upon the board to discharge its fiduciary duties at all times" and therefore that "[t]he NCS board was required to contract for an effective fiduciary out clause to exercise its continuing fiduciary responsibilities to the minority stockholders"); *see also* Sean J. Griffith, *The Omnipresent Specter of* Omnicare, 38 J. CORP. L. 753, 780–85 (2013) (critiquing this line of cases).

24.     *See* Robert B. Thompson & D. Gordon Smith, *Toward a New Theory of the Shareholder Role: "Sacred Space" in Corporate Takeovers*, 80 TEX. L. REV. 261, 284 (2001) (finding after empirical study that courts enjoined defensive devices under *Unocal* almost exclusively when *Revlon* also applied).

25.     The fairness opinion "requirement" is commonly associated with *Van Gorkom*, while the fiduciary out requirement is a legacy of *Omnicare*. *See* Steven M. Davidoff, *Fairness Opinions*, 55 AM. U. L. REV. 1557, 1570–71 (2006) (detailing how *Van Gorkom* imposed a de facto rule requiring target boards of Delaware companies to obtain fairness opinions); Griffith, *supra* note 23, at 754 ("[*Omnicare*] had immediate and wide-ranging implications . . . for transactional practice, effectively requiring a fiduciary out in every merger agreement.").

CAIN0001253

selling a company. *Revlon* answers whether the parties can negotiate on an exclusive basis, when other bidders must be invited to join the process, and how bidding may be brought to a close. Furthermore, although *Revlon* is perhaps most applicable to sales processes, like the one in the case itself, in which an intervening bidder seeks an injunction to stop an unfair sale process, it is not limited to that context. Instead, the animating principle of *Revlon* duties guides boards and transaction planners without regard to whether an intervening bidder arises to challenge their deal.[26]

*Revlon* eventually spread to corporate law jurisdictions beyond Delaware.[27] Seventeen states have decided cases involving *Revlon* duties. Of these, five states (North Carolina, Ohio, Pennsylvania, Virginia, and Wisconsin) rejected *Revlon* from the outset,[28] and three other states (Indiana, Nevada, and New York) ultimately rejected *Revlon* by reversing earlier decisions holding that *Revlon* duties applied.[29] By contrast, Maryland recognized the *Revlon* doctrine after reversing an earlier case that had rejected it.[30] Hence, by 2003, of the seventeen states to have expressly considered it, the *Revlon* doctrine had been adopted into the law of nine states (California, Delaware, Illinois, Kansas, Maryland, Michigan, Minnesota, Missouri, and New Hampshire).[31]

## B. The Fall of Revlon?

*Revlon's* breadth, however, eventually fueled a crisis in shareholder litigation. Because individual shareholders can sue to enforce *Revlon* duties against allegedly deficient boards in the absence of an intervening bidder, plaintiffs' lawyers learned to recruit a shareholder plaintiff to sue in virtually

---

26. *See generally* Steven M. Davidoff & Christina M. Sautter, *Lock-Up Creep*, 38 J. CORP. L. 681 (2013) (detailing the various merger agreement provisions companies negotiate under the shadow of *Revlon*).

27. *See generally* Matthew D. Cain et al., *Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers*, 124 J. FIN. ECON. 464 (2017) (evaluating the relationship between hostile takeovers and takeover laws from 1965 to 2014).

28. *See id.* at 469–70.

29. *See id.* Indiana rejected *Revlon* as inconsistent with its non-shareholder constituency statute. *See* Stephen M. Bainbridge, *Interpreting Nonshareholder Constituency Statutes*, 19 PEPP. L. REV. 971, 993–94 (1992) (discussing such statutes in relation to *Revlon* and describing the Indiana statute as an express repudiation of *Revlon*). Interestingly, roughly half of the states that have adopted *Revlon* into their law also have non-shareholder constituency statutes (Illinois, Maryland, Mississippi, Minnesota, and Missouri). In spite of the apparent incongruity, such statutes may not be inconsistent with *Revlon* because all make the consideration of other constituency interests optional. *See* George A. Mocsary, *Freedom of Corporate Purpose*, 2016 BYU L. REV. 1319, 1359–62 (describing how most of these statutes permit boards to consider non-shareholder interests so long as "long-term shareholder wealth is the ultimate goal").

30. *See* Cain et al., *supra* note 27, at 469–70.

31. *See id.* This data was compiled from Michal Barzuza, *The State of State Antitakeover Law*, 95 VA. L. REV. 1973, 2042–46 (2009), and updated by hand. These articles document the position of states on *Revlon*, taking into account federal courts that have weighed in on the question.

every M&A transaction.[32] Eventually, 85%–95% of all merger transactions valued over $100 million attracted at least one shareholder suit, typically filed as a class action.[33] Complaints began by invoking *Revlon* to challenge the merger process, only to be amended once the provision proxy statement was released to allege disclosure deficiencies as well.[34] Appending disclosure claims to the core *Revlon* claims both opened a door to expedited discovery and cleared a path to settlement.[35] Taking into account the cost of discovery and the risk involved in winning a motion to dismiss under tight time constraints, defendants chose to settle for supplemental disclosures and, of course, attorneys' fees.[36] Disclosure settlements thus became the principal route out of *Revlon* claims.[37] But the ease of settlement only encouraged further filings until *Revlon* claims and disclosure

---

32. On the recruitment of plaintiffs, see Sean J. Griffith, *Innovation in Disclosure-Based Shareholder Suits*, 69 CASE W. RES. L. REV. 927, 929–30 (2019) (describing attorney advertising, masked as press releases of "investigations" into board conduct, designed to yield clients in merger litigation).

33. *See* Matthew D. Cain & Steven Davidoff Solomon, Takeover Litigation in 2015 2 (Jan. 16, 2016) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2715890 [https://perma.cc/W3ZP-WVDP] (finding that the litigation rate was between 84.9% and 94.9% from 2009 to 2015).

34. *See* ROBERT M. DAINES & OLGA KOUMRIAN, CORNERSTONE RESEARCH, RECENT DEVELOPMENTS IN SHAREHOLDER LITIGATION INVOLVING MERGERS AND ACQUISITIONS (2012), https://www.cornerstone.com/Publications/Reports/Recent-Developments-in-Shareholder-Litigation-Invo [https://perma.cc/V7Z9-4QRP].

> Common allegations include the deal terms not resulting from a sufficiently competitive auction, the existence of restrictive deal protections that discouraged additional bids, or the impact of various conflicts of interests, such as executive retention or change-of-control payments to executives. Complaints also typically allege that a target's board failed to disclose sufficient information to shareholders to enable their informed vote. Insufficient disclosure allegations have focused on information related to the sale process, the reasons for the board's actions, financial projections, and the financial advisors' fairness opinions.

*Id.* at 1 (footnote omitted).

35. Shareholders alleging disclosure claims were virtually assured of expedited discovery because the Delaware standard focusing on irreparable injury was met in every case by the argument that shareholders would be irreparably harmed by voting on deals in which adequate information had not been disclosed. *See* Sinchareonkul v. Fahnemann, No. 10543-VCL, 2015 WL 292314, at *1 n.1 (Del. Ch. Jan. 22, 2015) ("[T]he standard for expedition, colorability, which simply implies a non-frivolous set of issues, is even lower that [*sic*] the 'conceivability' standard applied on a motion to dismiss.") (quoting *In re* BioClinica, Inc. S'holder Litig., No. 8272-VCG, 2013 WL 5631233, at *1 n.1 (Del. Ch. Oct. 16, 2013)); Giammargo v. Snapple Beverage Corp., No. 13845, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994) (setting forth standard for expedited discovery as a "colorable claim and . . . a sufficient possibility of . . . irreparable injury").

36. *See generally* Jill E. Fisch et al., *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 TEX. L. REV. 557 (2015) (documenting this pattern and testing the effect of supplemental disclosures on shareholder voting).

37. Approximately 70% of merger litigation cases settle—and almost all the rest are dismissed. *See* Matthew D. Cain & Steven Davidoff Solomon, *A Great Game: The Dynamics of State Competition and Litigation*, 100 IOWA L. REV. 465, 477 (2015) ("[L]itigation with respect to transactions is dismissed by a court 28.4% of the time. The other 71.6% of transaction litigations result in some type of settlement."). There are still a handful of cases that go to trial, but it is rare. *See, e.g., In re* Rural Metro Corp. Stockholders Litig., 88 A.3d 54 (Del. Ch. 2014); *In re* Dole Food Co. Stockholder Litig., No. 8703-VCL, 2015 WL 5052214 (Del. Ch. Aug. 27, 2015).

CAIN0001255

settlements accompanied virtually every deal. The dynamic clogged Delaware courts with non-meritorious claims[38] and eroded the shareholder interests the law sought to protect.[39]

After experimenting with a variety of possible responses to the crisis in merger litigation,[40] the Delaware judiciary responded by resetting *Revlon* in two major cases: *Corwin* and *C&J.* In *Corwin v. KKR Financial Holdings,*[41] the Delaware Supreme Court affirmed the dismissal of a post-closing damages claim involving a third-party merger.[42] Because the shareholders had voted in favor of the merger, the court held *Revlon* duties no longer applied.[43] The fully-informed, uncoerced vote of shareholders cancelled the need for judicial intervention, and the applicable standard of review returned to the business judgment rule.[44]

---

38.    *See* Stephen M. Bainbridge, *Fee-Shifting: Delaware's Self-Inflicted Wound*, 40 DEL. J. CORP. L. 851, 852 (2016) (stating that the problem of merger litigation "has reached crisis proportions," with over 90% of merger transactions resulting in lawsuits).

39.    *See, e.g.*, Joel Edan Friedlander, *How* Rural/Metro *Exposed the Systemic Problem of Disclosure Settlements*, 40 DEL. J. CORP. L. 877 (2016):

> The widespread availability of disclosure settlements created perverse pressures on transactional counsel and defense counsel. Lawyers for target corporations and their fiduciaries, financial advisors and purchasers rationally expected that much M&A litigation can be resolved by means of a disclosure settlement. This knowledge lessened the influence of transactional counsel to uncover or police conflicts of interest while a sale process or transaction is pending and to ensure the prompt, full disclosure of material facts. When litigation began, defense counsel were incentivized to devote their talents to drafting supplemental disclosures amenable to a negotiated resolution, and guiding litigation along a path of least judicial oversight. Successful merits-based litigation by plaintiffs' counsel empowers transactional counsel to avoid, police, and disclose conflicts of interest. Disclosure settlements do not.

*Id.* at 882–83.

40.    *See, e.g.*, ATP Tour, Inc. v. Deutscher Tennis Bund, 91 A.3d 554, 558–60 (Del. 2014) (en banc) (offering fee-shifting provisions as a potential response to the problem of non-meritorious litigation); Boilermakers Local 154 Ret. Fund v. Chevron Corp., 73 A.3d 934, 953 (Del. Ch. 2013) (offering forum-selection as a way of dealing with non-meritorious suits filed in other jurisdictions). However, the legislature quickly reversed the judiciary on fee-shifting, and defendants proved reluctant to use forum-selection to avoid disclosure settlements. *See* Dan Awrey et al., *Resolving the Crisis in U.S. Merger Regulation: A Transatlantic Alternative to the Perpetual Litigation Machine*, 35 YALE J. REG. 1, 16–20 (2018) (discussing failed attempts to respond to the crisis in merger litigation).

41.    125 A.3d 304 (Del. 2015) (en banc).

42.    Although much of the dispute in the Court of Chancery was over whether the buyer should be treated as a controlling shareholder, the case was decided as if it were a third-party merger. *Id.* at 306–08. The logic of the opinion has since been extended to tender offers. *See, e.g., In re* Volcano Corp. Stockholder Litig., 143 A.3d 727, 738 (Del. Ch. 2016) (applying business judgment review where "disinterested, uncoerced, fully informed stockholders tendered a majority of the [target company's] outstanding shares into the Tender Offer").

43.    *Corwin*, 125 A.3d at 306 ("[W]e find that the Chancellor was correct in finding that the voluntary judgment of the disinterested stockholders to approve the merger invoked the business judgment rule standard of review and that the plaintiffs' complaint should be dismissed.").

44.    *Id.* at 308 (holding that an "uncoerced, informed stockholder vote is outcome-determinative, even if *Revlon* applied to the merger").

CAIN0001256

*Revlon*, in other words, did not apply: the shareholder vote substituted for judicial scrutiny.[45]

At first glance, *Corwin* may not seem like much of a departure. It followed recent Delaware cases in substituting transaction procedures, notably voting for heightened judicial scrutiny.[46] Moreover, it was a damages case, a context in which Delaware judges had applied *Revlon* grudgingly, if at all.[47]

However, the meaning of *Corwin* becomes clear when it is paired with the Delaware Supreme Court's earlier ruling in *C&J Energy Services, Inc. v. City of Miami General Employees' and Sanitation Employees' Retirement Trust*.[48] This case held that transactions should generally not be enjoined in the absence of an alternative bidder.[49] Like *Corwin*, *C&J* follows longstanding Delaware practice.[50] Considered in tandem, however, the decisions seem to prune *Revlon* duties back substantially. *Corwin* clarifies that *Revlon* is generally available only for injunctions, not damages. *C&J* clarifies that for an injunction to issue, an intervening bidder must have arisen. Together, the cases seem to pare *Revlon* back to its original factual context: an intervening bidder seeking an injunction against board conduct in a competitive bidding situation. But *Corwin* and *C&J* would seem to eliminate what one influential jurist has referred to as "non-*Revlon*, *Revlon* suits"—that is, cases that involve a third-party deal for cash and thereby invoke *Revlon* duties, but, unlike *Revlon* itself, do not involve an

---

45. The goal of substituting the vote for judicial scrutiny was expressly announced in the decision itself:

> [W]hen a transaction is not subject to the entire fairness standard, the long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves.

*Id.* at 312–13.

46. *See, e.g.*, Kahn v. M & F Worldwide Corp., 88 A.3d 635, 644 (Del. 2014) (en banc) (holding that the business judgment review standard applied to a merger conditioned upon "the uncoerced, informed vote of a majority of the minority stockholders"), *overruled by* Flood v. Synutra Int'l, Inc., 195 A.3d 754 (Del. 2018) (en banc); *see also* J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1443 (2014) (arguing that only in the absence of "an independent, disinterested, and sufficiently informed decision maker" will the court apply stringent review).

47. *See, e.g.*, Lyondell Chem. Co. v. Ryan, 970 A.2d 235, 243 (Del. 2009) (en banc) (denying a damages claim by finding that a board of directors had acted in good faith in spite of not having conducted a market check); *see also Corwin*, 125 A.3d at 312 (arguing that enhanced scrutiny was designed for injunctions, not damages).

48. 107 A.3d 1049 (Del. 2014) (en banc).

49. *Id.* at 1053 ("It is too often forgotten that *Revlon*, and later cases like *QVC*, primarily involved board resistance to a competing bid after the board had agreed to a change of control . . . .") (footnote omitted).

50. Delaware courts have long been reluctant to issue injunctions in single-bidder deals for fear of leaving shareholders with no transaction at all. *See, e.g.*, *In re* El Paso Corp. S'holder Litig., 41 A.3d 432, 439 (Del. Ch. 2012) ("Although a reasonable mind might debate the tactical choices made by the El Paso Board, these choices would provide little basis for enjoining a third-party merger approved by a board overwhelmingly comprised of independent directors, many of whom have substantial industry experience.").

CAIN0001257

intervening bidder pursuing an injunction.[51] After *Corwin* and *C&J*, *Revlon* duties may no longer apply to these cases.

Finally, it is worth noting that *Corwin* and *C&J* may not ultimately deserve the credit for stemming the tide of merger litigation in Delaware. The credit for that may go to the Court of Chancery's 2016 holding in *In re Trulia Stockholder Litigation* which raised the bar for attorneys seeking to collect fees from disclosure settlements.[52] Nevertheless, *Corwin* and *C&J* do seem to reflect a shift in the meaning of *Revlon* and, therefore, board duties in third-party deals. Whether the shift is a return to the original meaning of the case or a retreat from it is a subject for scholarly debate, which we discuss in the next Section.

## C. Revlon*'s Place in Corporate Law Theory*

There are literally hundreds of law review articles on *Revlon*.[53] An early wave of scholarly commentary discussed whether boards ought to be able to defend themselves against bidders at all and, if so, under what circumstances and to what extent.[54] *Revlon* settled some of these questions by suggesting that there were limits to boards' authority to employ takeover defenses in at least some situations. Scholarly commentators then turned to the task of articulating whether and when these limits to board authority should apply and to justifying them according to a larger theory of corporate law. Our review of *Revlon*'s place in

---

51. *See* KT4 Partners LLC v. Palantir Techs. Inc., 203 A.3d 738, 759 (Del. 2019) (describing "third-party, non-conflicted mergers and acquisitions governed by *Revlon*" as "non-*Revlon*, *Revlon* suits"). In a footnote, the court clarified further:

> Unlike in *Revlon*, where the board had resisted selling (and especially selling to a specific bidder), the fact scenario in these multiforum cases typically involved boards actively selling the corporation and seeking out buyers. The plaintiffs in these cases did not in reality seek relief for the class or to stop the deal. Instead, they used the costs and uncertainty of having suits in several forums at once to extract "disclosure-only" settlements resulting in the class getting the same economic deal supposedly being challenged, but with extra disclosures. Although these disclosures typically provided the class with nothing of substance, the plaintiffs' lawyers got a fee and the defendants a release from further exposure.

*Id.* at 759 n.97 (citation omitted). An alternative view, however, is that judicial protection is most needed by shareholders in single-bidder transactions, in which there is no intervening bidder to threaten the board's favored transaction.

52. *See* 129 A.3d 884, 898 (Del. Ch. 2016) (holding that supplemental disclosures provide no compensable benefit unless they correct "a plainly material misrepresentation or omission").

53. *See supra* note 4.

54. For some of the major first-generation articles on *Revlon*, see generally John C. Coffee, Jr., *Shareholders Versus Managers: The Strain in the Corporate Web*, 85 MICH. L. REV. 1 (1986) (arguing that managerial passivity in the face of a hostile takeover is unlikely because takeovers intensify a fundamental tension between managers' and shareholders' risk preferences); Frank H. Easterbrook & Daniel R. Fischel, *The Proper Role of a Target's Management in Responding to a Tender Offer*, 94 HARV. L. REV. 1161 (1981) (proposing a rule of managerial passivity to control resistance by corporate managers to premium tender offers); Ronald J. Gilson, *The Case Against Shark Repellent Amendments: Structural Limitations on the Enabling Concept*, 34 STAN. L. REV. 775 (1982) (discussing how shark repellent amendments prevent shareholders from receiving maximum value and insulate incumbent management); Lucian A. Bebchuk, Comment, *The Case for Facilitating Competing Tender Offers*, 95 HARV. L. REV. 1028 (1982) (making the case that facilitating competing bids benefits target shareholders and society).

CAIN0001258

corporate law theory therefore focuses on the latter wave of scholarly commentary more relevant to the questions we address in this Article. This Section takes up the question of how *Revlon* fits within broader theories of corporate law and what those theories reveal about whether recent movements in the doctrine amount to a return or a retreat.

Mainstream corporate law theory focuses fundamentally on the principal–agent problem.[55] One such agency cost is that managers will divert wealth from shareholders unless something stops them.[56] The law is part of what stops them. Theft is illegal, and outright self-dealing is a breach of fiduciary duty. But markets are also part of what stops managers from taking advantage of shareholders. Firms whose managers divert all free cash flow to themselves may find themselves unable to compete in product, labor, and capital markets. The most important market for constraining managerial agency costs, however, may be the market for corporate control.[57]

Corporate law theory also posits that if equity markets are efficient, the value of a corporate share reflects the degree to which management diverts shareholder wealth. This creates an opportunity to create value through acquisition. If an inefficiently run company can be taken over, the amount of shareholder wealth presently being diverted to management can be reallocated between the shareholders and the bidder. Everyone benefits, except for incumbent managers.[58]

This market for corporate control affects managerial behavior in at least two significant ways. Recognizing that they have much to lose from takeovers, managers can be expected to manage efficiently and to divert less wealth from shareholders in order to avoid attracting the attention of a bidder. They may also adopt takeover defenses. The pattern of the law is to allow managers to adopt takeover defenses, perhaps because other market forces (labor markets, product markets, capital markets) still constrain them. But courts are less deferential to defensive measures when the board has put the company up for sale—that is, in the incumbent management's last period of play.

---

55.    *See, e.g.*, Eugene F. Fama, *Agency Problems and the Theory of the Firm*, 88 J. POL. ECON. 288, 288 (1980) ("Economists have long been concerned with the incentive problems that arise when decision making in a firm is the province of managers who are not the firm's security holders.").

56.    *See* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. FIN. ECON. 305, 308 (1976) (explaining that if agents are utility maximizers, "there is good reason to believe that the agent will not always act in the best interests of the principal").

57.    The insight goes back to Professor Henry Manne. *See generally* Henry G. Manne, *Mergers and the Market for Corporate Control*, 73 J. POL. ECON. 110, 112 (1965). *See also* Coffee, *supra* note 54; Easterbrook & Fischel, *supra* note 54; Gilson, *supra* note 54; Bebchuk, *supra* note 54.

58.    *See* Ronald J. Gilson, *A Structural Approach to Corporations: The Case Against Defensive Tactics in Tender Offers*, 33 STAN. L. REV. 819, 842 (1981) ("Selling shareholders receive more for their stock than its value under previous management; new management receives an entrepreneurial reward through the increased value of acquired shares; and society benefits from more efficiently used resources.").

CAIN0001259

In game theory, the last period is the moment when the cooperative dynamics that had guided player conduct in prior rounds of a repeated game predictably break down.[59] Anticipating that the game will end, players are no longer constrained by the fear that their opponent will retaliate in a future round and are motivated to extract as much as possible before the game ends. The sale of a company presents a last-period scenario, in which the ordinary constraints of product, labor, and capital markets no longer limit managerial agency costs.[60] If managers can insulate their favored transaction from being challenged by intervening bidders, the market for corporate control will likewise not prevent them from diverting wealth from shareholders to themselves.

*Revlon* responds to precisely this last-period problem. The increase in judicial scrutiny and the reluctance to allow defensive devices when *Revlon* duties apply reflects a legal realization of the dangers inherent in the last-period scenario.[61] *Revlon* ensures that management cannot extract rents in the last period by imposing judicial supervision. Following the logic elaborated above, if a manager agrees to a sub-optimal bid in pursuit of his or her own interests, it increases the possibility of an intervening bid, which will have the effect of reallocating the rents extracted, in part, to shareholders.[62] *Revlon* calls on courts to be on guard against this diversion of shareholder wealth, thereby guaranteeing the operation of some constraint on managers when the company is sold. Thus, from the perspective of corporate law theory, *Revlon* responds to the last-period problem.

Whether *Revlon* solves the agency problem it addresses, however, is disputed. Corporate law commentators have frequently challenged *Revlon* for doing too much or too little. One line of commentary asserts that the enhanced judicial scrutiny triggered by *Revlon* has been confined too narrowly. Insofar as *Revlon* responds to a board conflict, the same conflict often exists regardless of the form of consideration or whether the transaction involves a controlling shareholder.[63] The CEO and top managers are often replaced (and thus face last-period incentives) regardless of whether the transaction form qualifies for

---

59. *See* Drew Fudenberg & Jean Tirole, Game Theory 110 (1991) (showing that in repeated games, players "condition their actions on the way their opponents played in previous periods").

60. *See* Sean J. Griffith, *Deal Protection Provisions in the Last Period of Play*, 71 Fordham L. Rev. 1899, 1937 (2003).

61. Opinions of the Delaware Court of Chancery have explicitly recognized the last-period problem inherent in M&A. *See, e.g.*, Reis v. Hazelett Strip-Casting Corp., 28 A.3d 442, 458 (Del. Ch. 2011) ("Final stage transactions for stockholders provide another situation where enhanced scrutiny applies" because they "give rise to what economists refer to as the last period problem.").

62. *See supra* notes 59–61 and accompanying text.

63. J. Travis Laster, Revlon *is a Standard of Review: Why it's True and What it Means*, 19 Fordham J. Corp. & Fin. Law 5, 7 (2013) ("[C]onflicts exist regardless of the form of consideration or whether the post-merger entity would have a controlling stockholder.").

enhanced scrutiny under *Revlon*.[64] In recognition of this eventuality, managers may negotiate for either increased severance payments or for continued control in the combined entity, trading off merger consideration to receive them.[65] In either case, wealth is diverted from shareholders to managers. If *Revlon* does not apply to such transactions, managers may be unconstrained in diverting shareholder wealth to themselves.

Another perspective is that deals outside of the traditional change-of-control paradigm do not raise the same problems because the post-acquisition entity remains diffusely held and therefore subject to acquisition itself. In this way, the final period has not come because the company still can be sold, and if it is sold, the premium will go to the public stockholders.[66]

Critics of this view have pointed out that there is no rule limiting shareholders to a *single* control premium.[67] In the words of then-Vice Chancellor Leo Strine, any time a control premium is paid, target shareholders:

> [W]ould rightly be worried about whether the *current* merger represented an unfair transfer of wealth from the [target] stockholders to the [acquiring] stockholders. . . . [T]he fairness of the exchange ratio would be critical to the [target] stockholders because it fixes . . . *their share of any future control premium*.[68]

Perhaps, then, enhanced scrutiny should apply any time the board negotiates for a deal premium — regardless of whether the combined company can later be sold. In calling for change along these lines, Vice Chancellor J. Travis Laster has urged the Delaware Supreme Court to recognize *Revlon* as a form of enhanced scrutiny that "applies to negotiated acquisitions, regardless of the form of consideration."[69] Following similar logic, the Vice Chancellor and an academic co-author have also advocated expanding enhanced scrutiny to the buy-side of acquisitions as well.[70]

---

64.    *See* Jay C. Hartzell et al., *What's in it for Me? CEOs Whose Firms are Acquired*, REV. FIN. STUD., Spring 2004, at 37 (studying CEO turnover in the wake of acquisitions).

65.    Julie Wulf, *Do CEOs in Mergers Trade Power for Premium? Evidence from "Mergers of Equals,"* 20 J.L. ECON. & ORG. 60, 96–98 (2004) (finding evidence that target CEOs trade premium for continued control).

66.    *See generally* Lawrence A. Hamermesh, *Premiums in Stock-for-Stock Mergers and Some Consequences in the Law of Director Fiduciary Duties*, 152 U. PA. L. REV. 881 (2003) (examining different explanations for premiums in stock-for-stock acquisitions of publicly held corporations and arguing that the similar positions of acquirer shareholders and target shareholders in such transactions justifies more similar judicial and legislative treatment).

67.    *See, e.g.*, Laster, *supra* note 63, at 41 ("[T]here is no corporate law limit of one premium per stockholder.").

68.    Leo E. Strine, Jr., *Categorical Confusion: Deal Protection Measures in Stock–for–Stock Merger Agreements*, 56 BUS. LAW. 919, 930 (2001).

69.    Laster, *supra* note 63, at 53.

70.    *See* Afra Afsharipour & J. Travis Laster, *Enhanced Scrutiny on the Buy-Side*, 53 GA. L. REV. 443, 488–93 (2019) (arguing that enhanced scrutiny of buy-side decisions would induce more frequent buy-side stockholder votes).

CAIN0001261

Another line of commentary on *Revlon* argues that it ought not to be interpreted too broadly, and that it should instead be confined to the existing doctrinal paradigm.[71] As interpreted by Professor Stephen Bainbridge, *Revlon* ought not to be understood as a response to a pervasive last-period problem but rather as a judicial compromise between board authority and accountability.[72] To Bainbridge, enhanced scrutiny does not serve principally to align managers with shareholders but rather to ensure that the board can be trusted as a locus of authority independent of management in the takeover context.[73] When it can, Bainbridge argues, courts defer.[74]

From this perspective, limiting *Revlon* to change-of-control transactions makes sense and its scope ought not be expanded. Provided there is no conflict of interest, the share of gains between targets and acquirers when both companies are public ought to be a matter of indifference to diversified shareholders.[75] When companies are taken private, however, diversified shareholders are not on both sides and therefore not indifferent to the division of gains.[76] Likewise, controlling shareholder deals present situations in which the controller may extract private benefits at the expense of public shareholders.[77] In either situation, target shareholders are especially concerned with the allocation of gains, and these are precisely the situations to which *Revlon* traditionally applies.[78] According to this view, any further expansion of *Revlon* is

---

71. *See, e.g.*, Stephen M. Bainbridge, *The Geography of* Revlon-Land, 81 FORDHAM L. REV. 3277 (2013) (arguing for a conflict of interest-based approach to invoking *Revlon*).

72. *Id.* at 3313 ("[T]he search for conflicted interests reflects the Delaware courts' solution to the irreconcilable tension between authority and accountability.").

73. *Id.* (describing judicial enquiry into whether the board has functioned "as a separate institution independent from and superior to the firm's managers" as involving review of "the role actually played by the board, especially the outside directors, the extent to which they were supplied with all relevant information and independent advisors, and the extent to which they were insulated from management influence").

74. *Id.* (noting that if the board passes this heightened analysis "respect-for-authority values will require the court to defer to the board's substantive decisions. The board has legitimate authority in the takeover context, just as it has in proxy contests and a host of other decisions that nominally appear to belong to the shareholders.").

75. *Id.* at 3335 ("[S]o long as acquisitions of publicly held corporations are conducted by other publicly held corporations, diversified shareholders will be indifferent as to the allocations of gains between the parties. In turn, those shareholders also will be indifferent as to the form of consideration.") (footnote omitted).

76. *See id.* ("[I]f the transaction results in a privately held entity, a diversified shareholder cannot be on both sides of the transaction.").

77. *Id.* ("If the post-transaction entity remains publicly held, but will be dominated by a controlling shareholder, there is a substantial risk that the control shareholder will be able to extract non-pro rata benefits in the future and get a sweetheart deal from target directors in the initial acquisition.").

78. *Id.*

CAIN0001262

unwarranted, on either the sell side or the buy side.[79] Others go still further, arguing that *Revlon* ought to be limited to its facts or abandoned altogether.[80]

Finally, another line of scholarly commentary argues that *Revlon* has in fact withered away to near meaninglessness. Professors Lyman Johnson and Robert Ricca, for example, focus on remedies to argue that *Revlon* is not meaningful in the damages context because, at least since *Lyondell,* plaintiffs have an impossible case to prove.[81] Even in the context of equitable relief, Johnson and Ricca argue, *Revlon* is essentially meaningless because transactions are so rarely enjoined.[82] As a result, they conclude, the importance of *Revlon* in corporate law doctrine is vastly overstated.[83]

After *Corwin*, many corporate law commentators have come to agree that *Revlon* has lost its bite. For example, Professor Iman Anabtawi argues that allowing shareholder ratification to substitute for enhanced scrutiny constitutes a fundamental shift in Delaware jurisprudence which may reduce deal litigation but also deprive shareholders of important protections.[84] Likewise, although Professor Charles Korsmo sees the outcome in *Corwin* as largely foreordained by *MFW*, he laments its potential effect on M&A transactions.[85] Numerous other corporate law commentators have expressed similar unease with *Corwin*.[86]

---

79.     *Id.* at 3337 ("[T]he Delaware courts should not go further down the road toward applying a substantive reasonableness analysis to all corporate acquisitions.").

80.     *See, e.g.*, Franklin A. Gevurtz, *Removing* Revlon, 70 WASH. & LEE L. REV. 1485, 1488 (2013) (arguing that "because there is no sensible policy that one can articulate for *Revlon* beyond the narrow confines of the original decision" the doctrine ought to be limited to "its original foundation of choosing between two all-cash bids"); *see also* Franklin A. Gevurtz, *Saying Yes: Reviewing Board Decisions to Sell or Merge the Corporation*, 44 FLA. ST. U. L. REV. 437 (2017) (arguing that the explosion in merger litigation signals a need to return *Revlon* to a narrower factual context).

81.     Lyman Johnson & Robert Ricca, *The Dwindling of* Revlon, 71 WASH. & LEE L. REV. 167, 208–09 (2014) (noting that after *Lyondell*, plaintiffs must prove a breach of good faith—that is, that directors intentionally acted contrary to fiduciary duty—in order to recover damages, and that proving this is virtually impossible).

82.     *Id.* at 173.

83.     *Id.* at 173–74 ("[T]he stakes are far smaller than many scholars, judges, and lawyers may fully appreciate . . . .").

84.     Iman Anabtawi, *The Twilight of Enhanced Scrutiny in Delaware M&A Jurisprudence*, 43 DEL. J. CORP. L. 161 (2019).

85.     Korsmo, *supra* note 11, at 59–60 ("*Corwin* follows directly from *MFW*. Once you hold that the procedural trappings of an arm's-length deal entitle a majority stockholder squeeze-out to business judgment rule deference, it would be strange indeed to deny such deference to an actual arm's-length deal.").

86.     *See* Joel Edan Friedlander, *Vindicating the Duty of Loyalty: Using Data Points of Successful Stockholder Litigation as a Tool for Reform*, 72 BUS. LAW. 623, 643–45 (2017) (identifying how the doctrinal limitation of a fully informed stockholder vote falls short of providing adequate protections in practice); Matthew Schoenfeld, From *Corwin* to *Dell*: The Cost of Turning a Blind Eye (Feb. 12, 2018) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3122511 [https://perma.cc/LK6N-CWJ9 ] (predicting that *Corwin* and its progeny will result in faster CEO pay growth and more industry-specific, concentrated M&A, which will contribute to lower competition, wage stagnation, and inequality); Franklin A. Gevurtz, Cracking the *Corwin* Conundrum and Other Mysteries Regarding Shareholder Approval of Mergers and Acquisitions 7–8 (Sept. 19, 2018) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3252264

CAIN0001263

*CALIFORNIA LAW REVIEW* [Vol. 108:1683

Amid all of this debate, however, one question lingers: what effect can *Revlon* be shown to have had on M&A transactions? Each of the positions in this debate assumes that *Revlon* has (or had) an important effect on M&A. But did it? What does the empirical evidence show? In the Section that follows, we subject *Revlon* to empirical analysis.

## II.
### EMPIRICAL ANALYSIS

Evidence bearing on whether *Revlon* matters should appear in transactions subject to the doctrine, also known as "*Revlon* deals." As described above, when *Revlon* applies, transaction planners must follow a sale process reasonably designed to maximize shareholder value.[87] Because this is a higher standard of judicial review than the typical standard of review (i.e., the business judgment rule), if *Revlon* matters we predict that transactions subject to *Revlon* will differ from transactions to which the doctrine does not apply. Such a difference, if it exists, could result either from transaction planners following different sale processes for their *Revlon* deals or, alternatively, from the greater potential for the involvement of intervening bidders in *Revlon* deals.

In this Section, we first develop a set of hypotheses to test empirically whether *Revlon* matters. Next, we describe the data set against which we will test our hypotheses. Third, we offer descriptive statistics of the transactions in our data set. Fourth and finally, we report the results of our empirical analysis.

### A. Hypothesis Development

How will *Revlon* deals differ from non-*Revlon* deals? We develop three core hypotheses relating to the length and intensity of negotiations, the number of bidders involved, and the size of the premium paid in the deal. Moreover, insofar as it is *Revlon* that matters and not something else, any difference in these core predictions must be driven by the doctrine and not by something else, such as the type of deal (for example, MOE or non-MOE) or the type of buyer (for example, private equity or other financial buyers versus strategic bidders).

First, we observe that a sale process reasonably designed to maximize shareholder value may imply intensive negotiations. A seller seeking to maximize the value of an asset ordinarily does not accept the first offer without seeking to negotiate further.[88] Instead, a series of offers and counter-offers may

---

[https://perma.cc/JT25-PLBT] (arguing that courts must understand shareholder approval in light of shareholders' limited choices when voting on proposed mergers). *But see* Brandon Mordue, *The* Revlon *Divergence: Evolution of Judicial Review of Merger Litigation*, 12 VA. L. & BUS. REV. 531, 535, 575–76 (2018) (referring to *Corwin* as one of three separate lines of cases that have altered the judicial review of merger litigation by Delaware courts and concluding that *Corwin* encourages disclosure to stockholders while discouraging meritless litigation).

87.    *See supra* notes 18–20 and accompanying text.

88.    This concept is embedded in basic negotiation theory. *See generally* STUART DIAMOND, GETTING MORE: HOW YOU CAN NEGOTIATE TO SUCCEED IN WORK AND LIFE (2010).

CAIN0001264

develop. Even when the parties agree on certain features of the transaction, they may continue to negotiate other terms, such as price, over a protracted period of time. The intensity of negotiations may thus be measured in two ways: by the number of rounds of bidding or by the number of days over which negotiations occur. These lead to our first set of hypotheses:

- Hypothesis 1A: *Revlon* deals will involve more rounds of bidding than non-*Revlon* deals.
- Hypothesis 1B: *Revlon* deals will involve more days of negotiations than non-*Revlon* deals.

Because each of these relate fundamentally to the intensity of negotiations, we will occasionally refer to Hypothesis 1A and Hypothesis 1B collectively as our "negotiation process" hypotheses.

Second, a sale process reasonably designed to maximize shareholder value may also engage a larger number of bidders. Rather than negotiating privately, a seller may decide to sell the company through a public auction process. Auction processes may be designed differently—with one or several rounds of bidding. Because multiple rounds of bidding are captured by Hypothesis 1A, above, we focus here on the number of bidders.

- Hypothesis 2: *Revlon* deals will involve more bidders than non-*Revlon* deals.

If Hypothesis 2 is true, it may be that transaction planners designed a multi-bidder auction from the outset or, alternatively, that the announcement of a negotiated transaction prompted the intervention of outside bidders. Either of these situations can be related to *Revlon*, since a multi-bidder auction may be selected *ex ante* as the best way to maximize shareholder value and the consideration of intervening bids *ex post* may be required in order to maximize shareholder value.

Third, we hypothesize that transactions designed to maximize shareholder wealth will ultimately result in higher deal premiums. Our negotiation process hypotheses along with our hypothesis focusing on additional bidders all focus on *means*—that is, *how* the transaction process is designed to maximize shareholder wealth. But we can also focus on the *ends*. Did the transaction process result in greater wealth for shareholders? The clearest way to see this is in the premium offered in the deal—the extent to which the deal price exceeded the pre-announcement share price.

- Hypothesis 3: *Revlon* deals will have higher premiums than non-*Revlon* deals.

In other words, greater scrutiny of the transaction process should result in transactions at higher premiums.

If *Revlon* matters, we would predict that all of the above hypotheses are true. Additionally, in order to demonstrate that it is *Revlon* that matters and not unrelated features of the transactional environment, our predictions must hold across time periods and through a series of controls relating to deal

CAIN0001265

characteristics. We undertake this analysis in Part II.D, below. But first, we explain how we developed our sample set and provide descriptive characteristics of the transactions in the sample.

### B.  Sample Set

To assemble data for analysis, we started with the transactions in the FactSet MergerMetrics database. These transactions were announced during the time period 2003 through 2017 and meet all of the following criteria: (1) the target is a publicly traded U.S. firm, (2) the deal size is at least $100 million, (3) the offer price is at least $5 per share, and (4) a merger agreement is signed and publicly disclosed through a filing with the Securities and Exchange Commission (SEC).[89] Roughly 5% of the transactions were ultimately withdrawn. We manually reviewed approximately 70% of the deal proxy statements to record information disclosed in the Background of the Merger sections, including the number of bidders, bidding rounds, time period of negotiations, and bid prices during the rounds.[90] The remaining 30% of transactions were coded by a machine learning algorithm that was trained on the manually coded observations.

The result is a data set containing 1,913 unique transactions over a fifteen-year period. Within this sample, we used two parameters to distinguish which transactions were within *Revlon*. First, the target company must have been incorporated in a state that had adopted *Revlon*.[91] Second, the consideration paid in the transaction must have consisted of at least 50% cash.[92] Applying these parameters to our sample set, we found 1,167 transactions that were subject to the *Revlon* standard, and 553 that were not. We also found 193 transactions to which *Revlon* might have applied due to the form of consideration but which involved targets incorporated in a state without any *Revlon* decision. Given this ambiguity, we coded our primary *Revlon* variable as being equal to one for deals subject to *Revlon*, negative one for deals not subject to *Revlon*, and zero for the 193 transactions in states without a resolution of the *Revlon* status.

---

89.     This criteria is similar to that utilized in prior studies. *See* Cain & Solomon, *A Great Game*, *supra* note 37.

90.     The time period of negotiations was measured as the difference in days between the first offer date and the merger agreement date.

91.     For a discussion of the variation between states in adopting the *Revlon* standard, see *supra* notes 28–32 and accompanying text.

92.     This parameter is based on prior case law, which generally sets *Revlon* applicable at these thresholds. *See In re* Smurfit-Stone Container Corp. S'holder Litig., No. 6164-VCP, 2011 WL 2028076 (Del. Ch. May 20, 2011, revised May 24, 2011) (stating that *Revlon* would likely apply if the consideration mix was at least 50% cash); *In re* Lukens Inc. S'holders Litig., 757 A.2d 720, 732 n.25 (Del. Ch. 1999) (holding *Revlon* applies where 62% of consideration was cash), *aff'd sub nom.* Walker v. Lukens, Inc., 757 A.2d 1278 (Del. 2000) (mem.).

## C.  Descriptive Statistics

In Table 1 we report the distributions of key variables in our sample.[93] Variables relating to merger characteristics are reported in Panel A, and variables relating to target company characteristics are reported in Panel B.[94]

### Table 1: Transaction and Party Characteristics

**Panel A: Merger Characteristics**

|  | N | Mean | Std. Dev. | Min | 25th % | Median | 75th % | Max |
|---|---|---|---|---|---|---|---|---|
| # of Bidding Rounds | 1,897 | 5.4 | 3.6 | 1 | 3 | 5 | 7 | 30 |
| Negotiation Days | 1,825 | 131.5 | 141.3 | 0 | 39 | 78 | 169 | 719 |
| Log Negotiation Days | 1,873 | 4.4 | 1.3 | 0 | 3.7 | 4.4 | 5.2 | 10.6 |
| Multiple Bidders Indicator | 1,913 | 0.55 | 0.5 | 0 | 0 | 1 | 1 | 1 |
| Private Equity / LBO | 1,913 | 0.18 | 0.39 | 0 | 0 | 0 | 0 | 1 |
| Offer Premium | 1,819 | 0.34 | 0.26 | -0.59 | 0.18 | 0.29 | 0.44 | 1.75 |

93.    In the table, we trim outliers of the following variables (resulting in the number of observations set to missing values): negotiation periods greater than two years (N=75), offer premiums over 200% (N=17), debt-to-equity ratios below zero or greater than fifty (N=53), and market-to-book ratios below zero or greater than fifty (N=57).

94.    *# of Bidding Rounds* is the number of offers and counteroffers made by any parties involved in the negotiation process, *Negotiation Days* is the number of days between the first bid date and the merger agreement signing date (typically prior to any public announcement of the deal), *Multiple Bidders Indicator* equals one if more than one party bids for a target and zero for single bidder negotiations, *Private Equity / LBO* equals one if the acquirer is a private equity firm or the transaction is a leveraged buyout involving at least one private equity firm and zero for strategic transactions (as coded by MergerMetrics), and *Offer Premium* is the premium of the final offer price relative to the target's stock price 30 days before the public merger announcement. *Log Total Assets* is the log of the book value of total assets, *Net Loss Indicator* equals one if the company had negative net income in the fiscal year and zero otherwise, *Market-to-Book* is the market value of common stock at the end of the calendar year divided by the book value of common equity, *Debt-to-Equity* is the book value of debt divided by the book value of common equity, *Log Sales Growth* is the log of sales in the given fiscal year divided by the prior year's sales, and *Log Age* is the log of the number of years since a firm's IPO date.

CAIN0001267

**Panel B: Target Characteristics**

| | N | Mean | Std. Dev. | Min | 25th % | Median | 75th % | Max |
|---|---|---|---|---|---|---|---|---|
| Log Total Assets | 1,833 | 6.7 | 1.59 | -0.27 | 5.53 | 6.7 | 7.68 | 13.84 |
| Net Loss Indicator | 1,833 | 0.25 | 0.43 | 0 | 0 | 0 | 1 | 1 |
| Market-to-Book | 1,752 | 2.9 | 3.18 | 0 | 1.37 | 2.08 | 3.25 | 46.97 |
| Debt-to-Equity | 1,770 | 0.9 | 2.28 | 0 | 0 | 0.3 | 0.98 | 36.65 |
| Log Sales Growth | 1,809 | 0.09 | 0.3 | -2.97 | -0.01 | 0.07 | 0.17 | 3.02 |
| Log Age | 1,839 | 2.64 | 0.62 | 0 | 2.2 | 2.64 | 3.09 | 3.74 |

Table 1 reveals a wide range of values for the private merger negotiation variables. The number of bidding rounds ranges from a minimum of one to a maximum of thirty, with a median of five. The length of the negotiation period ranges from zero (an offer accepted within one day) to a maximum of just under two years, with a median of seventy-eight days (roughly two and a half months). About 55% of transactions involve multiple bidders. These unique data points from the private merger negotiating process reveal considerable heterogeneity, which we exploit in subsequent tests for negotiating intensity.

Table 2 reports summary statistics for key merger-related variables, broken down by transactions subject to *Revlon* duties versus those not subject to the *Revlon* standard. The final column reports t-statistics for differences in means between the two groups. Panel A reports details for the full sample in all jurisdictions while Panel B reports details only for Delaware-incorporated targets.[95] As mentioned above, within-Delaware variation in *Revlon* occurs through differences in the method of payment for these mergers.

Table 2: Key Merger-Related Variables

*Panel A: All Jurisdictions*

| | Non-Revlon | | Revlon | | |
|---|---|---|---|---|---|
| | *Mean* | *N* | *Mean* | *N* | *t-statistic (diff.)* |
| # of Bidding Rounds | 4.69 | 733 | 5.79 | 1,164 | 6.55*** |
| Negotiation Days | 118.00 | 711 | 140.03 | 1,114 | 3.32*** |
| Log Negotiation Days | 4.19 | 716 | 4.49 | 1,157 | 4.75*** |
| Multiple Bidders Indicator | 0.49 | 746 | 0.59 | 1,167 | 4.59*** |
| Hostile | 0.04 | 746 | 0.05 | 1,167 | 0.89 |
| Private Equity / LBO | 0.10 | 746 | 0.23 | 1,167 | 8.10*** |
| Offer Premium | 0.29 | 696 | 0.36 | 1,123 | 5.53*** |
| Bid Increase % | 12.51 | 678 | 14.38 | 1,104 | 1.16 |

95.     *Hostile* is an indicator variable that equals one if the acquirer's approach listed in MergerMetrics is "Hostile" or "Unsolicited" and zero otherwise. *Bid Increase %* is the percentage change from the initial bid to the final offer price * 100. All other variables are defined *supra* note 94.

| Panel B: Delaware-Incorporated Targets | | | | | |
|---|---|---|---|---|---|
| | **Non-Revlon** | | **Revlon** | | |
| | *Mean* | *N* | *Mean* | *N* | *t-statistic (diff.)* |
| # of Bidding Rounds | 4.49 | 196 | 5.83 | 1,059 | 5.04*** |
| Negotiation Days | 95.58 | 190 | 139.98 | 1,016 | 4.73*** |
| Log Negotiation Days | 3.97 | 194 | 4.47 | 1,052 | 4.62*** |
| Multiple Bidders Indicator | 0.32 | 200 | 0.60 | 1,061 | 7.66*** |
| Hostile | 0.06 | 200 | 0.05 | 1,061 | -0.02 |
| Private Equity / LBO | 0.01 | 200 | 0.23 | 1,061 | 16.47*** |
| Offer Premium | 0.27 | 186 | 0.37 | 1,019 | 4.54*** |
| Bid Increase % | 16.22 | 172 | 14.32 | 1,004 | -0.47 |

$p$-values in parentheses; $^{*}p < 0.10$, $^{**}p < 0.05$, $^{***}p < 0.01$

We break out Delaware and non-Delaware deals because we utilize this distinction for our robustness tests in later models.[96] For both the full sample in Panel A and Delaware targets in Panel B, deals within *Revlon* have more bidding rounds, longer negotiation periods, and a greater incidence of multiple bidders. *Revlon* deals are also associated with higher final offer premiums.

The univariate differences reported in Table 2 do not appear to be driven by differences in transaction type—that is, two-party exclusive mergers of equals (MOEs) versus open bidding for control. If non-*Revlon* deals were all MOEs, for example, we would not expect almost half of them to involve multiple bidders. Nor would we expect them to experience significant bidding activity in terms of the number of bidding rounds, negotiation days, bidders, and the size of the offer premium. The fact that these non-*Revlon* transactions experience this type of activity highlights that they are not predominantly MOEs as traditionally defined.

## D. *Findings*

In this Section, we examine whether our univariate results continue to hold after controlling for additional variables and fixed effects. We first report our basic empirical findings. We then subject our basic findings to a series of robustness checks.

### 1. *Empirical Results*

We first analyze our negotiation process hypotheses. Table 3 reports results from OLS regressions relating to Hypothesis 1A: that *Revlon* deals would have more rounds of bidding. In each model, the dependent variable is the number of bidding rounds. Column (1) reports a baseline model, Column (2) adds control variables, Column (3) adds year fixed effects, Column (4) replaces year with industry fixed effects, and Column (5) includes both year and industry fixed effects.

---

96.    *See infra* Part II.D.2.a.

CAIN0001269

Table 3: Rounds of Bidding

| *Dep. Var: # of Bidding Rounds* | (1) Base | (2) Controls | (3) Year F.E. | (4) Industry F.E. | (5) Ind. & Yr. F.E. |
|---|---|---|---|---|---|
| Revlon | 0.591*** | 0.415*** | 0.307*** | 0.310*** | 0.218* |
|  | (0.000) | (0.000) | (0.003) | (0.008) | (0.055) |
| Log Total Assets |  | -0.139** | -0.216*** | -0.080 | -0.156** |
|  |  | (0.022) | (0.000) | (0.248) | (0.020) |
| Net Loss Indicator |  | 0.554** | 0.201 | 0.471** | 0.148 |
|  |  | (0.014) | (0.352) | (0.036) | (0.498) |
| Market-to-Book |  | -0.005 | -0.022 | -0.010 | -0.024 |
|  |  | (0.899) | (0.561) | (0.825) | (0.561) |
| Debt-to-Equity |  | 0.000 | 0.023 | -0.010 | 0.010 |
|  |  | (0.995) | (0.549) | (0.826) | (0.814) |
| Log Sales Growth |  | -0.867*** | -0.668** | -0.954*** | -0.752*** |
|  |  | (0.003) | (0.016) | (0.002) | (0.008) |
| Log Age |  | 0.423*** | 0.258* | 0.369** | 0.232 |
|  |  | (0.004) | (0.074) | (0.021) | (0.138) |
| Hostile |  | 1.607*** | 1.533*** | 1.408*** | 1.369*** |
|  |  | (0.003) | (0.004) | (0.004) | (0.005) |
| Private Equity / LBO |  | 1.620*** | 1.700*** | 1.487*** | 1.563*** |
|  |  | (0.000) | (0.000) | (0.000) | (0.000) |
| Constant | 5.170*** | 4.655*** | 5.736*** | 4.523*** | 5.500*** |
|  | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| $R^2$ | 0.0212 | 0.0771 | 0.1319 | 0.1598 | 0.2060 |
| N | 1,897 | 1,708 | 1,708 | 1,700 | 1,700 |

*p*-values in parentheses; * $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$

In all models shown in Table 3, *Revlon* deals are associated with a greater number of bidding rounds, as predicted by Hypothesis 1A. This is consistent with more aggressive negotiating behavior on the part of targets and their directors, who are subject to *Revlon* duties and the expectation of obtaining the best offer price for shareholders. Alternatively, it may be that *Revlon* deals are more likely to attract intervening bids leading to further rounds of bidding.

As the results in Table 3 show, transactions involving private equity bidders are highly correlated with additional rounds of bidding. This finding is consistent with prior studies finding that private equity firms are more likely to participate in auctions which, in turn, lend themselves to more bidding.[97] But it also highlights that sellers generally negotiate more heavily with private equity

---

97.    *See* Audra L. Boone & J. Harold Mulherin, *Do Auctions Induce a Winner's Curse? New Evidence from the Corporate Takeover Market*, 89 J. FIN. ECON. 1 (2008); Audra L. Boone & J. Harold Mulherin, *Is There One Best Way to Sell a Company? Auctions Versus Negotiations and Controlled Sales*, J. APPLIED CORP. FIN., Summer 2009, at 28.

CAIN0001270

bidders. Some commentators asked whether our results were driven by the presence or absence of private equity bidders. The continuing statistical significance of *Revlon* deals even after the introduction of the private equity variable in this and other tables demonstrates that our results are not driven by private equity transactions.[98]

We test our second negotiating process hypothesis, Hypothesis 1B, in Table 4. Recall that Hypothesis 1B predicts that the negotiation periods would be longer in *Revlon* cases. This may be because of the effort exerted by target directors in obtaining higher offer prices for shareholders. Alternatively, it may be due to delays occasioned by the need to consider intervening bids. The dependent variable in these OLS regressions is the log of the number of days during which the transaction was negotiated.[99]

Table 4: Days of Negotiations

| Dep. Var: Log Negotiation Days | (1) Base | (2) Controls | (3) Year F.E. | (4) Industry F.E. | (5) Ind. & Yr. F.E. |
|---|---|---|---|---|---|
| Revlon | 0.193*** | 0.136*** | 0.094** | 0.121*** | 0.078* |
|  | (0.000) | (0.000) | (0.012) | (0.005) | (0.064) |
| Log Total Assets |  | -0.175*** | -0.194*** | -0.164*** | -0.182*** |
|  |  | (0.000) | (0.000) | (0.000) | (0.000) |
| Net Loss Indicator |  | 0.038 | -0.082 | 0.047 | -0.069 |
|  |  | (0.623) | (0.287) | (0.550) | (0.385) |
| Market-to-Book |  | -0.028*** | -0.032*** | -0.034*** | -0.039*** |
|  |  | (0.006) | (0.002) | (0.002) | (0.000) |
| Debt-to-Equity |  | 0.011 | 0.014 | 0.023 | 0.027* |
|  |  | (0.428) | (0.256) | (0.115) | (0.050) |
| Log Sales Growth |  | -0.443*** | -0.341*** | -0.468*** | -0.365*** |
|  |  | (0.000) | (0.001) | (0.000) | (0.001) |
| Log Age |  | 0.164*** | 0.118** | 0.132** | 0.087 |
|  |  | (0.002) | (0.029) | (0.025) | (0.137) |
| Hostile |  | 0.749*** | 0.720*** | 0.751*** | 0.737*** |
|  |  | (0.000) | (0.000) | (0.000) | (0.000) |
| Private Equity / LBO |  | 0.236*** | 0.287*** | 0.188** | 0.242*** |
|  |  | (0.006) | (0.001) | (0.038) | (0.006) |
| Constant | 4.309*** | 5.098*** | 5.382*** | 5.127*** | 5.399*** |
|  | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| $R^2$ | 0.0164 | 0.0882 | 0.1381 | 0.1360 | 0.1829 |
| N | 1,873 | 1,693 | 1,693 | 1,685 | 1,685 |

*p*-values in parentheses; * $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$

---

98. We thank Professor Elizabeth de Fontenay for pointing out this issue.

99. As in the prior table, Column (1) reports a baseline model, Column (2) adds control variables, Column (3) adds year fixed effects, Column (4) replaces year with industry fixed effects, and Column (5) includes both year and industry fixed effects.

CAIN0001271

The results from Table 4 support Hypothesis 1B: *Revlon* transactions tend to involve negotiations over a longer time period. The *Revlon* coefficients are positive and statistically significant in all models. This finding provides evidence that targets subject to *Revlon* negotiate for longer periods, implying greater negotiation intensity.

Again, as in Table 3, sellers negotiate for a longer period with private equity bidders, but the results are separately significant along with the *Revlon* variable. The significance of both variables means that private equity transactions do not entirely explain the significance of the *Revlon* variable.

Next, we turn to Hypothesis 2, which predicts more bidders in *Revlon* deals. Table 5 presents results from logit models with dependent variable equal to one for transactions involving multiple bidders and zero for transactions negotiated exclusively with a single bidder. Note that this information was collected from the background sections of merger proxy statements and thus includes all bidders during private negotiations, not merely bidders who made publicly observable competing bids after deal announcements.[100]

---

100.    As in prior tables, Column (1) reports a baseline model, Column (2) adds control variables, Column (3) adds year fixed effects, Column (4) replaces year with industry fixed effects, and Column (5) includes both industry and year fixed effects.

CAIN0001272

Table 5: Multiple Bidders

| Dep. Var: Multiple Bidders (0/1) | (1) Base | (2) Controls | (3) Year F.E. | (4) Industry F.E. | (5) Ind. & Yr. F.E. |
|---|---|---|---|---|---|
| Revlon | 0.260*** | 0.144** | 0.140** | 0.099 | 0.094 |
|  | (0.000) | (0.014) | (0.020) | (0.144) | (0.175) |
| Log Total Assets |  | -0.179*** | -0.186*** | -0.179*** | -0.184*** |
|  |  | (0.000) | (0.000) | (0.000) | (0.000) |
| Net Loss Indicator |  | 0.112 | 0.124 | 0.098 | 0.119 |
|  |  | (0.370) | (0.338) | (0.449) | (0.373) |
| Market-to-Book |  | -0.057*** | -0.064*** | -0.057*** | -0.064*** |
|  |  | (0.005) | (0.003) | (0.008) | (0.004) |
| Debt-to-Equity |  | 0.014 | 0.022 | 0.011 | 0.019 |
|  |  | (0.633) | (0.469) | (0.710) | (0.548) |
| Log Sales Growth |  | -0.073 | -0.125 | -0.080 | -0.120 |
|  |  | (0.679) | (0.502) | (0.661) | (0.532) |
| Log Age |  | 0.215** | 0.174* | 0.252** | 0.218** |
|  |  | (0.016) | (0.060) | (0.012) | (0.034) |
| Hostile |  | -0.171 | -0.173 | -0.247 | -0.237 |
|  |  | (0.441) | (0.438) | (0.315) | (0.338) |
| Private Equity / LBO |  | 0.943*** | 0.901*** | 0.991*** | 0.933*** |
|  |  | (0.000) | (0.000) | (0.000) | (0.000) |
| Constant | 0.121** | 0.794** | 0.174 | -0.068 | -0.733 |
|  | (0.013) | (0.017) | (0.711) | (0.958) | (0.568) |
| Pseudo $R^2$ | 0.0097 | 0.0456 | 0.0561 | 0.0730 | 0.0819 |
| N | 1,913 | 1,723 | 1,723 | 1,698 | 1,698 |

*p*-values in parentheses; $^*p < 0.10$, $^{**}p < 0.05$, $^{***}p < 0.01$

The results reported in Table 5 support Hypothesis 2: the coefficient on *Revlon* is positive and significant in Columns (1) through (3), indicating that transactions in *Revlon* tend to involve multiple bidders. The coefficients remain positive in Columns (4) and (5), but are not statistically significant when industry fixed effects are included in the models. This finding again provides evidence that targets subject to *Revlon* may search for or attract more bidders.

Finally, we test the effect of *Revlon* on deal outcomes. Hypothesis 3 predicts higher premiums for deals in *Revlon*. Table 6 reports results from OLS regressions testing this hypothesis, with offer premium being the dependent variable.[101]

---

101.    As in prior tables, Column (1) reports a baseline model, Column (2) adds control variables, Column (3) adds year fixed effects, Column (4) replaces year with industry fixed effects, and Column (5) includes both industry and year fixed effects.

CAIN0001273

Table 6: Offer Premiums

| Dep. Var: Offer Premium | (1) Base | (2) Controls | (3) Year F.E. | (4) Industry F.E. | (5) Ind. & Yr. F.E. |
|---|---|---|---|---|---|
| Revlon | 0.040*** | 0.029*** | 0.025*** | 0.019** | 0.017** |
| | (0.000) | (0.000) | (0.000) | (0.014) | (0.024) |
| Log Total Assets | | -0.026*** | -0.026*** | -0.026*** | -0.027*** |
| | | (0.000) | (0.000) | (0.000) | (0.000) |
| Net Loss Indicator | | 0.094*** | 0.082*** | 0.087*** | 0.078*** |
| | | (0.000) | (0.000) | (0.000) | (0.000) |
| Market-to-Book | | -0.002 | -0.001 | -0.006*** | -0.005** |
| | | (0.297) | (0.513) | (0.008) | (0.027) |
| Debt-to-Equity | | -0.002 | -0.002 | 0.002 | 0.001 |
| | | (0.565) | (0.458) | (0.635) | (0.817) |
| Log Sales Growth | | -0.014 | 0.001 | -0.006 | 0.007 |
| | | (0.727) | (0.972) | (0.883) | (0.860) |
| Log Age | | 0.003 | -0.003 | -0.002 | -0.008 |
| | | (0.765) | (0.769) | (0.860) | (0.489) |
| Hostile | | 0.082** | 0.080** | 0.088** | 0.087** |
| | | (0.024) | (0.028) | (0.018) | (0.019) |
| Private Equity / LBO | | -0.080*** | -0.078*** | -0.069*** | -0.066*** |
| | | (0.000) | (0.000) | (0.000) | (0.000) |
| Constant | 0.322*** | 0.490*** | 0.505*** | 0.515*** | 0.536*** |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| $R^2$ | 0.0193 | 0.0969 | 0.1246 | 0.1622 | 0.1834 |
| N | 1,819 | 1,685 | 1,685 | 1,676 | 1,676 |

$p$-values in parentheses; $^*p < 0.10$, $^{**}p < 0.05$, $^{***}p < 0.01$

The results reported in Table 6 support Hypothesis 3: in all models, deals subject to *Revlon* are associated with significantly higher offer premiums. The results show that *Revlon* deals have offer premiums that are 1.7% to 4% higher than non-*Revlon* deals. The magnitude of this difference is economically meaningful: a $2.6 billion transaction, the average-sized deal in our sample, would have a $41.6 million to $104 million larger deal premium if it were subject to *Revlon*.

To summarize our basic empirical results, Tables 3–6 show that *Revlon* transactions experience longer negotiation periods, more bidding rounds, more incidence of multiple bidders, and higher premiums. In the next Section, we conduct robustness tests to confirm these findings, and to determine whether our results are driven by Delaware or the peculiarity of transactions subject to *Revlon*.

### 2.  Robustness Checks

In this Section, we subject our basic results to further robustness checks. In particular, we are concerned that our *Revlon* results may be driven predominantly by Delaware versus non-Delaware deals. We are also concerned that certain

CAIN0001274

transaction characteristics—in particular, whether a deal is styled as a merger of equals—might also be driving our results. We therefore devise further tests to determine whether these variables, and not *Revlon* itself, drive our results.

### a.    *Delaware Versus Non-Delaware Targets*

We first tested whether Delaware deals drive our empirical findings by re-running the model specifications of Tables 3-6 exclusively on the non-Delaware companies in our sample. In unreported results, we found that that *Revlon* has no statistically significant effect in any of these models when only applied to non-Delaware firms. Our main empirical findings shown in Part II.D.1 therefore appear to be driven by Delaware firms. Outside of Delaware, *Revlon* appears to predict nothing with regard to bidding process, number of bidders, or deal premium. We explore the interesting implications of this non-result in Part III below.

In order to place this non-result in further context, we ran the same tests exclusively on Delaware companies. Table 7 reports results from the models reported in the final column of Tables 3-6 run only on Delaware incorporated targets. The *Revlon* coefficients are positive and statistically significant in each of these four models, consistent with the results from Tables 3-6. In fact, the statistical significance is stronger in Columns (3) and (4) of Table 7 than in the final columns of Tables 5 and 6. This indicates that these findings are particularly concentrated among Delaware firms.

CAIN0001275

Table 7: Delaware Firms Only

| Dependent Variable: | (1)<br>*Number of Bidding Rounds* | (2)<br>*Log Negotiation Days* | (3)<br>*(Logit) Multiple Bidders 0/1* | (4)<br>*Offer Premium* |
|---|---|---|---|---|
| Revlon | 0.296* | 0.095* | 0.289*** | 0.032*** |
| | (0.054) | (0.099) | (0.005) | (0.005) |
| Log Total Assets | -0.205** | -0.178*** | -0.162*** | -0.032*** |
| | (0.024) | (0.000) | (0.003) | (0.000) |
| Net Loss Indicator | -0.100 | -0.089 | 0.261 | 0.069*** |
| | (0.695) | (0.333) | (0.106) | (0.001) |
| Market-to-Book | -0.005 | -0.029** | -0.055** | -0.005* |
| | (0.911) | (0.012) | (0.036) | (0.085) |
| Debt-to-Equity | 0.020 | 0.015 | -0.034 | 0.001 |
| | (0.724) | (0.406) | (0.498) | (0.883) |
| Log Sales Growth | -0.816** | -0.385*** | -0.190 | 0.034 |
| | (0.022) | (0.003) | (0.453) | (0.487) |
| Log Age | 0.486** | 0.118 | 0.287** | -0.029* |
| | (0.017) | (0.125) | (0.032) | (0.058) |
| Hostile | 0.900* | 0.609*** | -0.429 | 0.086* |
| | (0.082) | (0.001) | (0.146) | (0.057) |
| Private Equity / LBO | 1.707*** | 0.234** | 0.955*** | -0.080*** |
| | (0.000) | (0.032) | (0.000) | (0.000) |
| Constant | 5.308*** | 5.289*** | -0.893 | 0.616*** |
| | (0.000) | (0.000) | (0.564) | (0.000) |
| Industry & Year F.E. | Yes | Yes | Yes | Yes |
| $R^2$ | 0.2025 | 0.1934 | 0.1012 | 0.2003 |
| N | 1,110 | 1,106 | 1,090 | 1,089 |

*p*-values in parentheses; $^*\ p < 0.10,\ ^{**}\ p < 0.05,\ ^{***}\ p < 0.01$

We conducted an additional robustness test reflected below in Table 8. This table reports the same regressions as those in Table 7, but across the entire sample. We included an indicator for Delaware and the interaction of Delaware and *Revlon*. This allows us to evaluate whether Delaware has any further impact on deal characteristics outside the scope of *Revlon*. The findings in Table 8 confirm those in Table 7: *Revlon* has a positive and statistically significant impact only through interaction with Delaware companies.[102]

---

102.    We note that when omitting year fixed effects, *Revlon* is positively and significantly related to the length of the negotiation period across all firms.

CAIN0001276

Table 8: All Firms with Delaware Interaction

| Dependent Variable: | (1) Number of Bidding Rounds | (2) Log Negotiation Days | (3) (Logit) Multiple Bidders 0/1 | (4) Offer Premium |
|---|---|---|---|---|
| Revlon | -0.211 | 0.093 | -0.215* | 0.009 |
| | (0.248) | (0.244) | (0.083) | (0.481) |
| Delaware | 0.296 | -0.079 | -0.130 | -0.032** |
| | (0.198) | (0.377) | (0.386) | (0.048) |
| Revlon*Delaware | 0.540** | 0.009 | 0.526*** | 0.026* |
| | (0.016) | (0.920) | (0.001) | (0.098) |
| Log Total Assets | -0.169** | -0.178*** | -0.174*** | -0.025*** |
| | (0.015) | (0.000) | (0.000) | (0.000) |
| Net Loss Indicator | 0.124 | -0.064 | 0.128 | 0.081*** |
| | (0.572) | (0.424) | (0.342) | (0.000) |
| Market-to-Book | -0.027 | -0.039*** | -0.065*** | -0.005** |
| | (0.517) | (0.000) | (0.004) | (0.029) |
| Debt-to-Equity | 0.013 | 0.028** | 0.023 | 0.001 |
| | (0.761) | (0.043) | (0.457) | (0.727) |
| Log Sales Growth | -0.775*** | -0.362*** | -0.126 | 0.008 |
| | (0.007) | (0.001) | (0.511) | (0.839) |
| Log Age | 0.282* | 0.075 | 0.205* | -0.013 |
| | (0.090) | (0.217) | (0.053) | (0.291) |
| Hostile | 1.363*** | 0.740*** | -0.227 | 0.088** |
| | (0.005) | (0.000) | (0.362) | (0.018) |
| Private Equity / LBO | 1.554*** | 0.238*** | 0.903*** | -0.069*** |
| | (0.000) | (0.007) | (0.000) | (0.000) |
| Constant | 5.166*** | 5.444*** | -0.837 | 0.548*** |
| | (0.000) | (0.000) | (0.512) | (0.000) |
| Industry & Year F.E. | Yes | Yes | Yes | Yes |
| $R^2$ | 0.2096 | 0.1833 | 0.0870 | 0.1862 |
| N | 1,700 | 1,685 | 1,698 | 1,676 |

*p*-values in parentheses; $^*$ $p < 0.10$, $^{**}$ $p < 0.05$, $^{***}$ $p < 0.01$

Taken together, these results confirm Delaware firms drive our main empirical results. Our findings in Table 7 are statistically significant for Delaware companies and highly statistically significant (at the 1% level) with respect to Hypothesis 2 (number of bidders) and Hypothesis 3 (deal premium). Again, the persistence of this statistically significant result even after controlling for the private equity variable shows that private equity transactions do not drive our results.

Additionally, the non-result in other states provides a meaningful robustness check on our results in the form of a quasi-placebo test.[103] For

---

103.    Our model set-up partially explains our differing conclusions from a contemporaneous paper by Professor Gubler. Professor Gubler used a random sample of 290 deals from 2009–2016 to examine the effect of *Revlon* on deal process. He also used an interaction term, *Revlon* * number of bids, as an independent variable regressed against offer premium and found no statistical significance. He concluded "the effect that the number of bids has on market returns and deal premia is no different in *Revlon* mode than outside of *Revlon* mode" and therefore *Revlon* has no "substantive bite." Zachary J. Gubler, What's the Deal with *Revlon*? 34 (June 30, 2019) (unpublished manuscript) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3402166 [https://perma.cc/8NQC-BBJ8]. The

CAIN0001277

example, it has often been supposed that premiums paid in cash transactions are generally higher than those paid in stock transactions.[104] If this were the case, however, we would expect to find higher premiums associated with our *Revlon* variable without regard to state. Instead, the lack of a statistically significant result outside of Delaware implies that the simple fact of cash consideration does not drive our results.[105]

### b. *Non-*Revlon *Deals Versus Mergers-of-Equals*

It is also possible that other deal characteristics drive our results. In particular, if non-*Revlon* deals predominantly constitute mergers-of-equals (MOEs)—which tend to have only one bidder, shorter negotiation windows, and lower offer premiums—then it may be that characteristics of those deals are more responsible for our results than *Revlon*. We therefore created an *MOE* variable, defining it as a transaction where the two parties are within 10% of market value at the time of the transaction announcement.[106] Only twenty-three deals in our sample qualify as MOEs by this definition. This suggests MOEs are unlikely to drive our main empirical results. Nevertheless, we tested our key variables on these subsamples.

Table 9 reports sample means of our variables by MOEs vs. non-MOEs.

---

number of bids and the deal terms themselves, however, are a joint-selection which are a product of, and influenced by, the premium. Professor Gubler did not control for this endogeneity and joint selection effects in his regression models.

104. This supposition appears in several papers. *See, e.g.*, Ulrike Malmendier et al., *Target Revaluation After Failed Takeover Attempts: Cash Versus Stock*, 119 J. FIN. ECON. 92 (2016); Andrei Shleifer & Robert W. Vishny, *Stock Market Driven Acquisitions*, 70 J. FIN. ECON. 295, 308 (2003); Eliezer M. Fich et al., *Contractual Revisions in Compensation: Evidence from Merger Bonuses to Target CEOs*, 61 J. ACCT. & ECON. 338, 348 (2016).

105. To further test this proposition, in unreported results we run a robustness check on our sample by dropping all deals with less than 50% cash payment and all-stock deals. This allows us to compare deals subject to *Revlon* by court decision with identical deals which would be subject to *Revlon* but for the fact the state of incorporation of the firm has not adopted or rejected *Revlon*. Our model results remain similar and support the conclusion that a cash payment premium for *Revlon*-mode deals does not drive our results. Our results thus address the point raised by Professor Gubler, who noted this issue and that none of these studies looked at the effect of *Revlon* itself. Gubler, *supra* note 103, at 21.

106. In unreported results, our results are similar when we relax our definition to within 20% of size, which includes sixty MOEs.

CAIN0001278

Table 9: Descriptive Statistics for Mergers of Equals

| | Non-MOEs | | MOEs | | |
| --- | --- | --- | --- | --- | --- |
| | *Mean* | *N* | *Mean* | *N* | *t-statistic (diff.)* |
| # of Bidding Rounds | 5.39 | 1,878 | 2.68 | 19 | 4.32*** |
| Negotiation Days | 132.16 | 1,805 | 67.40 | 20 | 3.25*** |
| Log Negotiation Days | 4.39 | 1,853 | 3.11 | 20 | 3.17*** |
| Multiple Bidders Indicator | 0.55 | 1,890 | 0.26 | 23 | 3.11*** |
| Offer Premium | 0.34 | 1,797 | 0.14 | 22 | 4.11*** |

*p*-values in parentheses; $^{*} p < 0.10$, $^{**} p < 0.05$, $^{***} p < 0.01$

As shown in Table 9, we find that MOEs differ from non-MOEs in the number of bidding rounds, length of negotiation time, incidence of multiple bidders, and offer premiums. Moreover, these differences are all statistically significant. However, MOEs do still involve multiple bidders 26% of the time. In other words, multiple bidders do not appear only in non-MOEs.

To determine whether MOEs drive our main empirical results, we re-ran all models excluding MOEs. Our results remain statistically significant with similar magnitudes. This implies MOEs are not driving our results. Thus, in similar transactions subject to *Revlon* and not subject to *Revlon*, our results still hold. These results show the fundamental differences between *Revlon* and non-*Revlon* transactions do not drive our main empirical findings.

In unreported results, we further examined the difference between *Revlon* and non-*Revlon* deals by measuring bid-jumping. We find that 4.83% of non-*Revlon* deals receive a third-party competing bid after transaction announcement, compared to 6.08% of *Revlon* deals. The t-statistic for this difference is 1.17, which is not statistically significant. Running these tests for Delaware deals only, we find that non-*Revlon* bids are jumped at a rate of 6.00% of deals while *Revlon* deals are jumped at a rate of 6.31%. The t-statistic for this difference is 0.17, which is again statistically insignificant. These results offer further support that hidden differences between *Revlon* and non-*Revlon* deals do not drive our main empirical findings.

In sum, our empirical analysis finds that *Revlon* transactions experience longer negotiation periods, more bidding rounds, more incidence of multiple bidders, and higher premiums. These empirical results are robust against tests designed to confirm that neither Delaware nor the peculiarity of transactions subject to *Revlon* drive our findings.

## III.
### HOW *REVLON* MATTERS

We now have the evidence to answer the question with which we began. Yes, *Revlon* matters. For Delaware companies, *Revlon* affects the negotiation process, the number of bidders, and the transaction premium. But our basic empirical results also provide insights into two questions. First, how exactly does

CAIN0001279

*Revlon* matter? And second, in light of the shifts in the doctrine over time, should courts contract or expand *Revlon* now or in the future? We consider each question in turn.

## A.    Revlon *Matters as a Monitoring Standard*

We begin with the empirical insight noted above: *Revlon* matters for target firms incorporated in Delaware but not for non-Delaware targets.[107] Although the *Revlon* standard has been adopted into the law of eight other states and the substance of the doctrine is the same across jurisdictions, *Revlon* matters only for companies incorporated under Delaware law.[108] This points squarely to the role of courts. Although companies incorporated in one state may be sued in another,[109] Delaware-incorporated companies are subject to suit in Delaware and their home state while companies incorporated in other states are most often sued elsewhere.[110] Our findings thus suggest that the Delaware courts use the *Revlon* standard to monitor transactions more strictly than other courts and that transacting parties respond in the planning and execution of transactions involving Delaware companies.

The distinction between what the law says and how it is applied has been described as the distinction between conduct rules and decision rules.[111] Alternatively, the same distinction can also be characterized as the divergence between standards of conduct and standards of review.[112] The two standards converge largely through the mediation of legal advisers.[113] When lawyers advise clients *ex ante*, what they say about the requirements of the law (the standard of conduct) is frequently affected by their professional assessment of how judges will (or have) interpreted those requirements (the standard of

---

107.    *See supra* Part II.D.2.a.

108.    *See supra* note 32 and accompanying text.

109.    When companies are sued in another forum, the law of the state of incorporation applies. *See generally* Sean J. Griffith, *Private Ordering Post-*Trulia*: Why No-Pay Provisions Can Fix the Deal Tax and Forum Selection Provisions Can't, in* THE CORPORATE CONTRACT IN CHANGING TIMES 292 (Steven Davidoff Solomon & Randall Stuart Thomas eds., 2019).

110.    Delaware companies now often adopt forum selection bylaws in favor of Delaware, increasing the odds that Delaware will be the exclusive forum for corporate law litigation. Without such provisions, however, merger litigation often unfolded concurrently in the home state and in Delaware. *See* Cain & Solomon, *A Great Game*, *supra* note 37, at 476 (highlighting the multi-state aspects of merger litigation); *see also* Sean J. Griffith & Alexandra D. Lahav, *The Market for Preclusion in Merger Litigation*, 66 VAND. L. REV. 1053 (2013) (discussing the policy implications of merger litigation in multiple jurisdictions).

111.    *See* Meir Dan-Cohen, *Decision Rules and Conduct Rules: On Acoustic Separation in Criminal Law*, 97 HARV. L. REV. 625 (1984) (explaining the distinction as a reflection of the desire to create and communicate strict conduct rules interpreted by more forgiving decision rules).

112.    *See* Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 FORDHAM L. REV. 437, 463 (1993) (noting that "corporate law presents a textbook case of the distinction between conduct rules and decisional rules.").

113.    *See* Dan-Cohen, *supra* note 111, at 640–41 (noting that "legal advice [concerning] relevant decision rules . . . reduces acoustic separation.").

CAIN0001280

review).[114] The standard of review thus gives specific meaning to the standard of conduct. In this way, well-advised clients adapt their conduct to the law as applied, rather than as it is written.

Our finding—that clients adapt their conduct to *Revlon* in Delaware but not in other jurisdictions—suggests that the doctrine has meaning primarily as a standard of review.[115] As a standard of conduct, *Revlon* has one meaning in all jurisdictions: maximize shareholder wealth in transactions to which it applies.[116] But as a standard of review applied by different state court judges, *Revlon* can (and does) take on different meanings. Delaware's interpretation of *Revlon* as a standard of review involves enhanced judicial scrutiny from rationality to reasonableness review.[117] Other state courts may differ in their interpretation of the standard of review or in their analysis of reasonableness. Moreover, it may not be that boards intentionally act differently but that lax enforcement leads to less aggressive shopping conduct in the sale process. In other words, given lower enforcement levels, managers and their advisors may simply not be incentivized to try as hard.

Delaware's prominence as a state of incorporation may also impact why *Revlon* matters only in Delaware. A byproduct of Delaware's leading status as a jurisdiction of incorporation is that the members of the Court of Chancery hear more corporate law disputes than judges in other states.[118] This allows Delaware

---

114. This follows from Holmes' famous observation that the science of the law is prediction. *See, e.g.*, O. W. Holmes, *The Path of the Law*, 10 HARV. L. REV. 457, 458 (1897) ("[A] legal duty so called is nothing but a prediction that if a man does or omits certain things he will be made to suffer in this or that way by judgment of the court; — and so of a legal right.").

115. *See* Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc., No. 1091-VCL, 2013 WL 458373, at *2 n.3 (Del. Ch. Feb. 6, 2013) ("What changes under *Revlon* is not the universal and loyalty-based standard of conduct that obligates a fiduciary to strive to maximize value for the beneficiary, but rather the standard of review that a court uses when reviewing the fiduciary's decisions, which narrows from rationality to range-of-reasonableness."); *accord* Laster, Revlon *is a Standard of Review*, *supra* note 63, at 6.

116. RBC Capital Mkts., LLC v. Jervis, 129 A.3d 816, 849 (Del. 2016) (en banc) ("*Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply. Rather, *Revlon* emphasizes that the board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise.") (quoting Malpiede v. Townson, 780 A.2d 1075, 1083 (Del. 2001) (en banc)); *see also supra* notes 16–18 and accompanying text.

117. *See In re* Netsmart Techs., Inc. S'holders Litig., 924 A.2d 171, 192 (Del. Ch. 2007) ("Although linguistically not obvious, this reasonableness review is more searching than rationality review, and there is less tolerance for slack by the directors."); *accord* Laster, Revlon *is a Standard of Review*, *supra* note 63, at 6 (characterizing *Revlon* as a "standard of review under which the extent of judicial deference given to board decisions narrows from rationality to range-of-reasonableness").

118. More than half of all public companies and an even larger share (67.2%) of Fortune 500 companies incorporate in Delaware. *See Annual Report Statistics*, DEL. DIV. OF CORPS., https://corpfiles.delaware.gov/Annual-Reports/Division-of-Corporations-2018-Annual-Report.pdf [https://perma.cc/V2VA-X8A6]. For commentary on this fact, see, for example, Lucian Arye Bebchuk & Alma Cohen, *Firms' Decisions Where to Incorporate*, 46 J.L. & ECON. 383, 389 (2003) (finding that Delaware leads in a large sample of public firms); Robert Daines, *Does Delaware Law Improve Firm Value?*, 62 J. FIN. ECON. 525, 538 (2001) (finding that Delaware leads in a study of IPOs); Roberta Romano, *Law as a Product: Some Pieces of the Incorporation Puzzle*, 1 J.L. ECON. & ORG. 225, 244

judges to develop precedent on specific aspects of merger transactions that judges in other states may never have seen. At the same time, because cases are decided under general principles of fiduciary duty, Delaware's corporate law jurisprudence remains highly flexible and fact-specific.[119] Although fiduciary duty is the basis of corporate law in all states, other states have less factual precedent to guide its application. The result is standards like *Revlon* have less specific meaning in states where they are less often applied.[120] Indeed, our findings suggest *Revlon* may have no meaning at all outside of Delaware.

Why *Revlon* remains toothless in other states is unclear. Other states' judges may interpret reasonableness as essentially indistinct from deference. Alternatively, transaction planners may predict that judges will do so.[121] We can say, however, that the opposite is true of the Delaware judiciary. *Revlon* matters in Delaware because Court of Chancery judges take seriously the opportunity to review transactions for reasonableness. And because the judges of the Court of Chancery take reasonableness review seriously, well-advised parties do so as well. As a result, we find *Revlon* is reflected in the planning and execution of transactions involving Delaware companies.

Our findings thus reveal the role of *Revlon* in Delaware today: as a tool of the judiciary to monitor bias in M&A transactions. *Revlon* orders the transaction process and prevents managers, bankers, and lawyers from slacking in the service of shareholders. This account is consistent with *Revlon's* place in corporate law theory as well as the doctrine's historical development. As described above, the standard grew out of a case in which a manager imposed his own views to steer a sale process. This standard was subsequently applied in *Macmillan* and other cases to prevent management biases from infecting sale processes.[122] The Court of Chancery has continued to police transactions for management biases, often in altered forms, as the *Revlon* doctrine developed

---

(1985) (providing a significant study of reincorporations and jurisdictional choice of Fortune 100 companies).

119.	*See* Sean J. Griffith & Myron T. Steele, *On Corporate Law Federalism: Threatening the Thaumatrope*, 61 BUS. LAW. 1, 11 (2005) ("Because of the high degree of fact-specificity inherent in fiduciary-duty adjudication, corporate law judges are less bound by principles of *res judicata* and *stare decisis* than judges in other areas of law."); *accord* Jill E. Fisch, *The Peculiar Role of the Delaware Courts in the Competition for Corporate Charters*, 68 U. CIN. L. REV. 1061, 1078 (2000) (noting that the binding effect of *stare decisis* is limited in Delaware, because the Delaware Supreme Court can "deny that it is overruling a precedent by using case specific facts to distinguish its prior holding. Similarly the court can narrow the precedential effect of its decisions by framing its holdings narrowly and tying those holdings to specific facts") (footnote omitted).

120.	Delaware may also influence conduct though statements in dicta designed to guide transaction planning going forward. *See* Edward B. Rock, *Saints and Sinners: How Does Delaware Corporate Law Work?*, 44 UCLA L. REV. 1009, 1016 (1997) ("Delaware courts generate in the first instance the legal standards of conduct (which influence the development of the social norms of directors, officers, and lawyers) largely through what can best be thought of as 'corporate law sermons.'").

121.	These would be interesting questions for further research.

122.	*See supra* notes 20–21 and accompanying text.

over the course of decades.[123] As a result, Delaware transaction planners adjusted deal structures accordingly. That planners did not do so in other jurisdictions suggests the core meaning of *Revlon* is not the one-sentence recitation of the rule. Rather, the core meaning of *Revlon* is the demonstrated willingness of the judiciary to intervene when circumstances suggest management bias. Jurisdictions without that history cannot make *Revlon* matter.

### B.  Should Delaware Retreat From Revlon?

Yet the recent history of Delaware jurisprudence suggests a retreat from substantive judicial review.[124] Transaction structures that might once have been challenged under *Revlon* have been expressly endorsed, including management-led single-bidder sale processes and strong deal protection provisions.[125] The recent decision that most commentators cite for this retreat is *Corwin*.[126]

As described above, *Corwin* ostensibly substitutes procedural protections for substantive judicial review in transactions where *Revlon* would otherwise apply. Specifically, *Corwin* holds that if the transaction wins the majority vote of fully informed, uncoerced shareholders, the standard of review shifts from enhanced scrutiny to business judgment rule deference.[127] *Corwin* does not change the standard of conduct.[128] Boards must still maximize shareholder value. But, as we argued in the prior Section, conduct in fact converges upon the standard of review. By eliminating *Revlon* as a standard of review, *Corwin* at first blush suggests that many more M&A transactions will escape substantive judicial scrutiny.[129]

---

123.    *See In re* Toys "R" Us, Inc., S'holder Litig., 877 A.2d 975, 1002 (Del. Ch. 2005) (noting that the "paradigmatic context for a good *Revlon* claim" is one where "a supine board[,] under the sway of an overweening CEO bent on a certain direction, tilts the sales process for reasons inimical to the stockholders' desire for the best price"); *In re* Del Monte Foods Co. S'holders Litig., 25 A.3d 813 (Del. Ch. 2011); *In re* Netsmart Techs., Inc. S'holders Litig., 924 A.2d 171 (Del. Ch. 2007). Although *Revlon* has been used to enjoin relatively few transactions, Delaware judges have shown a willingness to use *Revlon* as a teaching platform, channeling conduct through criticism of bad actors. *See* Rock, *supra* note 120, at 1016. Similarly, *Revlon* raises the likelihood of success on the merits, which increases settlement value and thereby the deterrence effect in applicable cases, notwithstanding whether an injunction ultimately issues. *See* Friedlander, *supra* note 39, at 883.

124.    *See* Solomon & Thomas, *supra* note 11.

125.    *See* J. Travis Laster, *Changing Attitudes: The Stark Results of Thirty Years of Evolution in Delaware M&A Litigation*, *in* RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION 202, 222 (Sean Griffith et al. eds., 2018) (cataloging these changes and attributing them to "the rise of sophisticated stockholders" as a substitute for shareholder litigation).

126.    125 A.3d 304 (Del. 2015) (en banc). For extended discussion of the *Corwin* decision in the context of *Revlon*, see *supra* notes 42–53 and accompanying text.

127.    *Corwin*, 125 A.3d at 308.

128.    *See* Eisenberg, *supra* note 112, at 463 (noting that the standard of review can shift without moving the standard of conduct "in those cases where the standard of review is dramatically shifted when a given type of conduct has been approved by a designated corporate organ, while the standard of conduct remains unchanged").

129.    *See* Anabtawi, *supra* note 84.

Nevertheless, our empirical analysis does not suggest that *Corwin* or *C&J* immediately affected transactions. In unreported tests we find no statistically significant differences in our models, including bidding rates, before or after *C&J* and *Corwin*.[130] This may be attributable to a number of factors. First, transaction planning may respond to norms more directly than changes in the law, and norms may change more slowly than law. *Corwin* takes place at the tail end of our sample—in the last two years—and insofar as transaction planners act on the basis of norms built up over decades, it may take them more than two years to fully internalize *Corwin*.

A second possibility is that *Corwin* and *C&J* have changed the state of play with regard to *Revlon* less than many suppose. That is, whatever the cases may say, Delaware courts will still find a way to intervene in transactions where there is evidence of biased processes. The plaintiffs' bar will tirelessly test transactions for signs of bias and find some way to raise what they find in court. And the Court of Chancery will find some doctrinal basis to intervene.

The absence of a "*Corwin* effect" in our data may thus reflect the transaction planners' prediction that little of substance has in fact changed. This possibility has additional support in our results, which find that *Revlon* and non-*Revlon* transactions are continuously accorded different treatment in spite of shifts in the *Revlon* doctrine over time. Transaction planners apparently know to disregard these surface-level shifts. If *Corwin* is just another surface level shift, transaction planners have not been fooled. The evidence suggests they have continued to design transaction structures capable of surviving enhanced scrutiny.

More broadly, it is important to observe that *Revlon* exists within a larger context of management constraints, such as independent boards and active shareholders, each of which has shifted over time. We argue here (and one of us has argued elsewhere) that *Revlon* arose as a tool to keep management accountable when other constraints have made them less so.[131] In this way, it can be viewed as a substitute for other constraints, whether legal, structural, or market-based. At the time *Revlon* was decided, boards were often weak—the "torpid, if not supine" board in *Macmillan* is the classic example[132]—and shareholders were often passive.[133]

Times have changed. Inside corporations, boards became more independent and more likely to exert a structural constraint on management.[134] At the same

---

130. We similarly find no difference in our results before and after *Lyondell Chemical Corp. v. Ryan*, another case which arguably relaxed the *Revlon* standard by effectively limiting damages claims under the standard to actions not in good faith. *See* Lyondell Chem. Co. v. Ryan, 970 A.2d 235, 240 (Del. 2009) (en banc).

131. Griffith, *Deal Protection Provisions*, *supra* note 60, at 1945–47.

132. Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1280 (Del. 1989).

133. *See* Solomon & Thomas, *supra* note 11.

134. *See* Jeffrey N. Gordon, *The Rise of Independent Directors in the United States, 1950-2005: Of Shareholder Value and Stock Market Prices*, 59 STAN. L. REV. 1465 (2007).

CAIN0001284

time, outside the boardroom, institutional shareholders and especially activist hedge funds came to exert a greater structural constraint on management.[135] Insofar as *Revlon* has weakened at the same time that these other constraints have strengthened, the result may be a constant level of constraint.[136] *Revlon* may be less necessary in a world where other constraints apply, and *Corwin* may be just another chapter in this story.[137]

Moreover, judicial intervention in transactions did not end with *Corwin*. Delaware courts have now decided a series of cases challenging parties' attempts to avoid judicial scrutiny by invoking *Corwin*. These cases have denied motions to dismiss on the basis of coercion in the vote,[138] inadequate disclosures to shareholders,[139] and the existence of a controlling shareholder:[140] Delaware courts have thereby preserved an avenue for judicial intervention. As long as there are openings for plaintiffs to contest the applicability of *Corwin*, the route to judicial scrutiny remains open.

However, the cases contesting *Corwin's* applicability principally involve second-order concerns rather than the central question: namely, whether

---

135. *See* Laster, *Changing Attitudes*, *supra* note 125; Solomon & Thomas, *supra* note 11; *see also* Zohar Goshen & Sharon Hannes, *The Death of Corporate Law*, 94 N.Y.U. L. REV. 263 (2019). Claims of the triviality of corporate law are nothing new. *See* Bernard S. Black, *Is Corporate Law Trivial?: A Political and Economic Analysis*, 84 NW. U. L. REV. 542 (1990); Ronald J. Gilson & Jeffrey N. Gordon, *The Agency Costs of Agency Capitalism: Activist Investors and the Revaluation of Governance Rights*, 113 COLUM. L. REV. 863 (2013).

136. *See* Solomon & Thomas, *supra* note 11; Cox & Thomas, *supra* note 3, at 389.

137. This argument was first made previously in Solomon & Thomas, *supra* note 11.

138. *See, e.g., In re* Saba Software, Inc. Stockholder Litig., No. 10697-VCS, 2017 WL 1201108, at *16 (Del. Ch. Mar. 31, 2017, revised Apr. 11, 2017) (finding coercion where stockholders would hold delisted stock if they voted down the deal); Sciabacucchi v. Liberty Broadband Corp., No. 11418-VCG, 2017 WL 2352152, at *22 (Del. Ch. May 31, 2017) (finding coercion where stockholders were told underlying transaction would not occur unless they also approved other matters).

139. *See, e.g.,* Appel v. Berkman, 180 A.3d 1055, 1064 (Del. 2018) (holding stockholder vote was not fully informed because proxy disclosed that the founder and chairman abstained from the board's recommendation in favor of sale without explaining the reason for abstention); Morrison v. Berry, 191 A.3d 268, 280–84 (Del. 2018) (holding *Corwin* inapplicable due to disclosure deficiencies relating to a founder's unwillingness to consider other bidders and "troubling facts regarding director behavior"); *In re* Comverge, Inc. S'holders Litig., No. 7368-VCMR, at 8 (Del. Ch. Oct. 31, 2016) (order denying defendants' motion for summary judgment) (denying summary judgment because of factual questions as to whether shareholders were fully informed of all material information); van der Fluit v. Yates, No. 12553-VCMR, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) (declining *Corwin* dismissal due to failure to disclose identity of individuals who led sales outreach and possible involvement of persons receiving post-transaction employment and conversion of options).

140. *See, e.g., In re* Tesla Motors, Inc. Stockholder Litig., No. 12711-VCS, 2018 WL 1560293, at *19 (Del. Ch. Mar. 28, 2018) (holding that in spite of owning only 22.1% of Tesla stock, Elon Musk's influence on the transaction made him a controlling shareholder, rendering *Corwin* inapplicable), *appeal denied sub nom.* Musk v. Ark. Teacher Ret. Sys., 184 A.3d 1292 (Del. 2018) (mem.); *see also* Ann M. Lipton, *After* Corwin*: Down the Controlling Shareholder Rabbit Hole*, 72 VAND. L. REV. 1977, 1977–78 (2019) (analyzing the controlling shareholder test in the wake of *Corwin* and arguing that courts should look not only to influence over the board but also to alternatives realistically available to unaffiliated shareholders). *But see In re* Rouse Props., Inc., No. 12194-VCS, 2018 WL 1226015, at *19 (Del. Ch. Mar. 9, 2018) (applying *Corwin* and holding that plaintiff had failed to plead sufficient facts concerning "clout and retributive power" for court to treat a 33.5% stockholder as controlling).

CAIN0001285

management bias is present in the planning and execution of the transaction. Whether the alternatives presented in a shareholder vote are coercive, whether the disclosures are adequate, or whether a large minority shareholder ought to count as controlling are, in a sense, procedural questions. They do not directly address the substance of whether the transaction was designed to maximize shareholder wealth. Insofar as the questions under *Corwin*—the propriety of the vote and the adequacy of the disclosures—are procedural, the analysis is different in kind from prior cases under *Revlon*. These cases shifted the degree of substantive judicial scrutiny to be applied depending on the facts of the transaction. Transaction planners may thus respond to *Corwin* with procedural changes—for example, by making their proxy statements longer and more detailed, particularly when describing the background of the merger. Indeed, transaction planners suggest that this has already begun to occur.[141] But insofar as such procedural adaptations have less powerful wealth effects than, for example, more active bidding or higher premiums, *Corwin's* contraction of the *Revlon* doctrine may indeed affect shareholder wealth.[142]

On the other hand, it may not matter whether the central question of management bias is addressed directly, as in *Revlon*, or indirectly, as in *Corwin*—so long as the question is raised. And indeed, there is at least some evidence that pleadings under *Corwin* addressing issues of procedure are frequently argued in ways that raise core substantive concerns. For example, omitted disclosures are especially concerning precisely when they suggest ulterior motivations of management.[143] Likewise, an influential shareholder may be more likely to be treated as a controller when he or she is strongly self-interested in the underlying transaction.[144] As long as such substantive issues can

---

141. Statement at the "Delaware Developments" panel of the 31st Tulane Corporate Law Institute (Mar. 15, 2019).

142. To be certain, in other areas of Delaware law procedural restrictions have been found to create value. *See* Matthew D. Cain & Steven M. Davidoff, *Form over Substance? The Value of Corporate Process and Management Buy-Outs*, 36 DEL. J. CORP. L. 849 (2011) (finding that MBO transactions with procedural protections provide greater value to target shareholders); Guhan Subramanian, *Post-*Siliconix *Freeze-Outs: Theory and Evidence*, 36 J. LEGAL STUD. 1 (2007) (finding that minority shareholders achieve significantly lower abnormal returns, on average, in tender-offer freeze-outs relative to merger freeze-outs with different procedural protections).

143. *See, e.g.*, *In re* Xura, Inc., Stockholder Litig., No. 12698-VCS, 2018 WL 6498677, at *13 (Del. Ch. Dec. 10, 2018) (discussing a failure to disclose facts relating to $25 million payout and future employment package to CEO in connection with a deal that undervalued the target); *In re* Tangoe, Inc. Stockholders Litig., No. 2017-0650-JRS, 2018 WL 6074435, at *13 (Del. Ch. Nov. 20, 2018) (discussing a failure to disclose directors' motivation to sell the company arising from compensation-based incentives).

144. For example, indicia of Elon Musk's self-interest were all over the Tesla-SolarCity merger. *See, e.g.*, *supra* note 142. Musk chaired both companies and was SolarCity's largest shareholder. Additionally, SolarCity was founded by Musk's two cousins, with substantial support and encouragement from Musk himself. Musk had taken out millions of dollars in personal credit lines to buy shares in the company, and his aerospace company, SpaceX, had purchased $165 million in bonds issued by SolarCity. *See* Austin Carr, *The Real Story Behind Elon Musk's $2.6 Billion Acquisition Of SolarCity And What It Means For Tesla's Future—Not To Mention The Planet's*, FAST CO. (June 7,

be raised in challenging the procedural aspects of *Corwin*, judges can deny motions to dismiss and get to the substance of the transaction.

Ultimately, it may be too early to tell whether *Corwin* has contracted the *Revlon* doctrine in a way that harms shareholders. If it has, it has not yet turned up in our empirical results. Our theory of how *Revlon* affects transactions, however, suggests that courts should not read *Corwin* in such a way that its procedural aspects overwhelm their ability to intervene in biased transactions. Insofar as what matters is the availability of a pathway into the substance of transactions, *Corwin* should not be interpreted in such a way as to block that path.

### C.   *Should Delaware Expand* Revlon?

If our core finding suggests that the scope of *Revlon* ought not to be shrunk too far, perhaps it also implies that the doctrine ought to be expanded. Given that most of the non-*Revlon* transactions in our sample are defined primarily by the choice of consideration, *Revlon* could be expanded to deals involving a smaller fraction of cash consideration.[145] It could also cover MOEs.[146] Or it could expand still farther, as some have suggested, to encompass the buy-side as well.[147] Should it?

The logic for expanding *Revlon* is intuitive. First, as we have found, negotiations are more intense, bidders more numerous, and premiums richer when *Revlon* applies. Second, the doctrine's trigger—the fraction of cash consideration in the deal—seems largely arbitrary. Deals with 52% cash consideration do not seem fundamentally different from deals with 47% cash consideration. Furthermore, there is an argument that any standard that results in more bidding, higher premiums, and ultimately greater shareholder wealth should be expanded to all negotiated acquisitions.[148] If shareholder wealth maximization is the goal and *Revlon* serves to increase shareholder wealth, shouldn't we want more *Revlon*?

We are not so sure. Increasing shareholder wealth in the context of acquisitions is essentially a zero-sum game: higher premiums merely transfer wealth from buyers to sellers. Diversified shareholders, as Professor Bainbridge and others have pointed out, are largely indifferent because they will be on both

---

2017),        https://www.fastcompany.com/40422076/the-real-story-behind-elon-musks-2-6-billion-acquisition-of-solarcity-and-what-it-means-for-teslas-future-not-to-mention-the-planets [perma.cc/NL7U-MPJ3].

    145.    We define non-*Revlon* deals as those either (i) taking place in a state that had not adopted *Revlon* or (ii) consisting of less than 50% cash consideration. *See supra* notes 93–94 and accompanying text.

    146.    *See supra* note 106 and accompanying text.

    147.    *See* Afsharipour & Laster, *supra* note 70.

    148.    *See supra* notes 68–70 and accompanying text (reviewing this argument, as made by Vice Chancellor Laster).

CAIN0001287

sides of such transactions, at least when each company is public.[149] By exempting public stock-based deals and deals not resulting in a controlling shareholder, the *Revlon* doctrine avoids invoking scrutiny in deals where diversified shareholders are likely indifferent to the distribution of wealth between buyers and sellers. At the same time, *Revlon* applies to those transactions that matter most to diversified shareholders—that is, deals where they are not on both sides due to a private buyer and deals in which the appearance of a controlling shareholder raises the specter of private benefits of control. Whether the doctrine is responsive to last-period concerns or other doubts concerning board independence remains an open question.[150] But we consider it an achievement of the Delaware courts to have arrived at this balance without going down the rabbit-hole of asking whose wealth—diversified or non-diversified shareholders—corporate law should maximize.[151] Perhaps, in other words, *Revlon* should stay right where it is.

In making this claim, we are mindful of avoiding the Goldilocks fallacy. We are not claiming that *Revlon* in its current form is optimally designed or optimally applied. Indeed, we agree that basing application of the doctrine on whether a buyer used 51% cash versus 49% cash is essentially arbitrary. We readily admit that *Revlon* has been invoked successfully in cases where it ought not to have applied[152] and that it has not been applied in transactions where vast sums of shareholder wealth have been destroyed.[153] However, as discussed at length above, *Revlon* is not a fixed rule but rather a flexible monitoring standard. The precise contours of the rule thus matter less than the possibility that the judiciary will take a closer look at apparently biased transactions. As long as *Revlon* is applied flexibly, we need not be overly concerned about whether it is applied too much or too little on the margin. What is important is that scrutiny applies in scenarios giving specific cause for concern—for example, in last-period transactions where boards lack independence and shareholders are passive and generally disengaged. As long as the judiciary remains attentive to that basic problem, specific doctrinal shifts are of secondary concern. *Revlon*, at its core, does just that.

---

149.	Bainbridge, *Geography of* Revlon-*Land, supra* note 71, at 3310. The core insight goes back at least to Easterbrook & Fischel. *See* Easterbrook & Fischel, *supra* note 54.

150.	*See supra* Part II.B.

151.	We consider this an interesting academic question. *See, e.g.,* Gregory Scott Crespi, *Maximizing the Wealth of Fictional Shareholders: Which Fiction Should Directors Embrace?*, 32 J. Corp. L. 381 (2007). But it is likely one that judges would prefer to avoid, since answering it would have far-reaching and unforeseeable consequences beyond the case at hand.

152.	The recent flood of merger litigation would be a prime example. *See supra* notes 33–40 and accompanying text.

153.	*See, e.g.,* Paramount Commc'ns, Inc. v. Time Inc., 571 A.2d 1140 (Del. 1989). The Time/Warner transaction destroyed vast sums of shareholder wealth to pursue a transaction favored by management in spite of a plainly superior alternative, in the form of Paramount's cash tender offer for Time, yet it did not trigger *Revlon* scrutiny. *See generally* Ronald J. Gilson & Bernard S. Black, (Some of) The Essentials of Finance and Investment (1993) (describing the economic effects of the transaction and its immediate aftermath).

This brings us back, once again, to *Corwin* and *C&J*. One reading of those cases is that, together, they prune back the overgrowth of *Revlon*. As a result of those cases, enhanced scrutiny no longer applies in cases lacking an obvious conflict of interest in which no intervening bidder appears.[154] Under this reading, in the post-*Corwin*, post-*C&J* world, the *Revlon* doctrine is restored to its foundational context: an intervening bidder seeking an injunction against board conduct in a competitive bidding situation.[155] Indeed, the Supreme Court explained *Corwin* in precisely this way:

> [A]s the years go by, people seem to forget that *Revlon* was largely about a board's resistance to a particular bidder and its subsequent attempts to prevent market forces from surfacing the highest bid. *QVC* was of a similar ilk. But in this case, there was no barrier to the emergence of another bidder and more than adequate time for such a bidder to emerge.[156]

Understood in this way, what *Corwin* and *C&J* did was restore the *Revlon* doctrine to its proper role: operating as a judicial check in cases where normal constraints on management would otherwise be absent.[157] When substitute constraints are present—as in the case of an open process where other bidders have had an opportunity but have failed to emerge—the doctrine might not be needed.

Because we are sympathetic to these readings of *Corwin* and *Revlon*, we do not necessarily believe that *Revlon* should be expanded or contracted. *Revlon* should remain flexible enough to apply as needed. But therein lies the danger of *Corwin*. Insofar as *Corwin* focuses judicial analysis on procedural aspects of the vote and not on the substance of the transaction itself, it may not provide sufficient flexibility for the judiciary to intervene in biased transactions as needed. The danger, in other words, lies in the risk that *Corwin* will ossify into a rule-based analysis of procedural requirements, leaving no space for the judiciary to intervene in biased transactions.

---

154.    In other words, "non-*Revlon*, *Revlon*" cases. *See supra* note 51 and accompanying text.

155.    *See supra* Part I.B.

156.    C&J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr., 107 A.3d 1049, 1070 (Del. 2014) (en banc) (footnote omitted). Moreover, the court substantially frowned on the type of injunction here, holding that not only had the wrong standard been applied, but a mandatory injunction of this type could only be imposed after a trial and a finding that the third-party bidder had aided and abetted the breach. *See id.* at 1071–73.

157.    We recognize that some have argued that the Delaware courts are engaging in revisionist history in *C&J Energy*. *See, e.g.*, Gubler, *supra* note 103, at 20 (arguing that the Delaware Supreme Court in *C&J Energy* rejected a more capacious view of *Revlon* put forth in *Barkan*). We would argue, however, that *Revlon* was designed to meet the problems of the 1980s, which were boards and management unduly attempting to affect the outcome of a takeover. In other words, the actual factual paradigm of *Revlon*. *C&J Energy* merely recognizes the evolved market landscape of the current capital markets.

CAIN0001289

### D. *Revlon's Next 35 Years*

The future of *Revlon* depends on the interpretation and implementation of *Corwin* and *C&J* and courts' demonstrated willingness to intervene in substantively biased transactions. Having found that *Revlon* has value, in Delaware at least, we think it is important that the doctrine remain available as a means of entry for corporate law courts to evaluate potentially biased transactions. Therefore, as we have already argued, *Corwin* and *C&J* should not be interpreted in such a way as to prevent courts from focusing on the core question of managerial bias. But how are they supposed to do this? How should courts interpret *Corwin* and *C&J* to preserve the underlying value of *Revlon*?

In our view, courts should approach the second-order procedural questions under *Corwin* from the perspective of the first-order substantive issue in *Revlon*. *Corwin*, as we have noted, focuses courts on the procedural prerequisites of a fair and fully informed vote of the shareholders.[158] Cases decided in *Corwin*'s wake have focused on such questions as when shareholder voting is coerced and when disclosures are adequate.[159] Is the evidence presented probative of managerial bias in the underlying transaction? If so, the court should be hesitant to shift the standard of review back to the business judgment rule. If not, the court should grant the vote its full cleansing effect.

To make these considerations more concrete, consider the question of the adequacy of disclosure necessary to render a shareholder vote "fully informed" under *Corwin*. There are several lines of cases from Delaware addressing adequacies of disclosure. For example, in the context of so-called "disclosure settlements," omissions and corrective disclosures must be "plainly material."[160] By contrast, in the context of "mootness dismissals," i.e. cases resulting in corrective disclosures but no class-wide release of claims, the Court of Chancery has held that supplemental disclosures need only be "helpful."[161] The disclosures that have become typical in shareholder litigation—additional proxy statement descriptions of the calculations underlying a financial advisor's fairness opinion, for example—are now judged according to one or the other of these standards, depending upon whether the claim was resolved in settlement or mooted.[162]

Neither of these standards is apt for deciding the adequacy of disclosures under *Corwin*. Instead, the inquiry should be focused on the substance underlying *Revlon* scrutiny. Further detail on the financial advisors' math is almost never relevant to a *Revlon* analysis, but evidence of management bias is.

---

158. *See supra* notes 45–46 and accompanying text.

159. *See supra* notes 140–141 (compiling cases).

160. *See In re* Trulia, Inc. Stockholder Litig., 129 A.3d 884, 898 (Del. Ch. 2016); *see also supra* text accompanying note 53.

161. *See, e.g., In re* Xoom Corp. Stockholder Litig., No. 11263-VCG, 2016 WL 4146425, at *3 (Del. Ch. Aug. 4, 2016) (holding that the standard for disclosures on a mootness fee application is not materiality but rather whether the disclosure was helpful and benefited the class).

162. *See* Matthew D. Cain et al., *Mootness Fees*, 72 VAND. L. REV. 1777, 1779–80 (2019).

CAIN0001290

Courts evaluating the quality of disclosures under *Corwin* should therefore look to information that is probative of management bias, not matters that would be irrelevant to an application of enhanced scrutiny. If the plaintiffs succeed in uncovering previously undisclosed evidence of management bias, the shareholder vote should not count as "fully informed" and the cleansing effect of *Corwin* should not apply.

Fortunately, there is evidence that Delaware courts are moving in precisely this direction in analyzing the adequacy of disclosures under *Corwin*. For example, in *Morrison v. Berry*, the Delaware Supreme Court held that a vote was not fully informed due to the company's failure to disclose a benefit made available to the company's founder: the opportunity to roll over his equity interest.[163] This benefit would not likely have been available from other bidders, thereby biasing the founder in favor of the transaction. By taking issue with this lack of disclosure, the Supreme Court reversed the Court of Chancery's determination that the omitted information would not have made stockholders less likely to tender, emphasizing that information may be material if a stockholder would "generally want to know [it] in making the decision, regardless of whether it actually sways a stockholder one way or the other . . . ."[164] Management's potential bias in favor of a transaction is plainly something a shareholder would want to know. Similarly, in *van der Fluit v. Yates*, the Court of Chancery held that a vote was not fully informed because the target had failed to disclose that the company's co-founders were the ones soliciting bids for the company and that, in the process, they had obtained commitments for post-transaction employment.[165] In each of these cases, the inadequacies of disclosure point to management bias in the transaction. Having found them, the courts refused to apply *Corwin* and therefore retained their ability to inquire further under *Revlon*.[166]

A similar focus can (and should) be applied to judicial analyses of coercion under *Corwin*. If the facts suggest that management has exerted pressure to push through a transaction in which it has a particular interest to the exclusion of other corporate alternatives, courts should be more open to finding coercion. If by contrast, there is no evidence of management bias, but simply a lack of good options available to the company, the courts should be less open to finding

---

163.    191 A.3d 268, 285 (Del. 2018).

164.    *Id.* at 287.

165.    No. 12553-VCMR, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) (dismissing the complaint on other grounds).

166.    We recognize the lacunae in this argument. If *Revlon* is preserved through the ability for judges to intervene when there are substantive issues, it still leaves open the issue of when the corrective for inadequate disclosure is just better disclosure prior to the vote, and not enhanced judicial scrutiny of the substance. In other words, this still leaves open the possibility of evading enhanced scrutiny through full disclosure. However, we think this outcome is unlikely. Delaware courts are courts of equity and, in the face of an openly disclosed conflict, will likely find a plausible basis for substantive intervention. We acknowledge this is speculation, however, and leave this issue open, depending upon future developments.

coercion. Again, there is some evidence that Delaware courts are moving in this direction.[167]

In sum, insofar as judicial analyses of questions arising under *Corwin* continue to be guided by considerations that would be relevant under *Revlon*, there is no need to fear the death of enhanced scrutiny. In their analyses of disclosure inadequacies under *Corwin*, courts should focus on whether the alleged omission is probative of management bias. Likewise, in their analyses of coercion, courts should focus on whether the claim of coercion is grounded on a plausible theory of management bias. In doing so, courts will avoid deferring to transactions that raise concerns under *Revlon*. And, by continuing to apply enhanced scrutiny to these transactions, courts ensure that transaction planners do not disregard the doctrine, thereby destroying the value we have found in it.

What of the other states in our sample that have adopted *Revlon*?[168] To our knowledge none of these states have adopted *Corwin* or a case like it and therefore need not frame its analysis of disclosures or voting procedures in a way that preserves *Revlon*. But, as we argued above, these states have a more basic obstacle in achieving the benefits of enhanced scrutiny. They have not demonstrated a credible commitment to intervention in biased transactions. As a result, in spite of having *Revlon* on the books, the doctrine has had no apparent effect on transaction planning in those states. In order to make *Revlon* matter, the courts in these states must use it.

## CONCLUSION

We conduct an empirical and theoretical examination of whether and how *Revlon* matters based upon a novel M&A dataset of 1,897 transactions from 2003-2017. We find that *Revlon* matters in Delaware: acquisitions of Delaware firms have more bidding rounds, more bidders, and higher premiums when they are subject to *Revlon*. Robustness checks confirm these results.

With respect to the question of *how*, we posit *Revlon* as a monitoring standard whose value depends upon courts putting it into effect. Delaware drives our results due to the unique form of judicial oversight practiced by Court of Chancery. This account sheds light on recent decisions, such as *Corwin* and *C&J*, that seem to restrict the scope of *Revlon* duties. We argue that as long as these doctrinal shifts preserve a flexible entryway for judicial intervention into biased transactions, then reports of the death of *Revlon* will prove to have been largely exaggerated. However, should these doctrinal developments result in substituting hard procedural rules for flexible substantive standards, then the effectiveness of judicial scrutiny of M&A may indeed diminish. The Delaware

---

167. *See, e.g.*, Sciabacucchi v. Liberty Broadband Corp., No. 11418-VCG, 2017 WL 2352152, at *3 (Del. Ch. May 31, 2017) ("Fiduciaries cannot interlard [a stockholder] vote with extraneous acts of self-dealing, and thereby use a vote driven by the net benefit of the transactions to cleanse their breach of duty.").

168. *See supra* notes 28–32 and accompanying text.

judiciary should remain attentive to these issues. Meanwhile, judges in other states should take note of the lifeless form of *Revlon* now occupying their jurisdictions and consider the benefits of a *Revlon* revival.

CAIN0001293