# EXHIBIT  17

JOURNAL OF FINANCIAL AND QUANTITATIVE ANALYSIS    VOL. 20, NO. 4, DECEMBER 1985

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

# Predicting Tender Offer Success: A Logistic Analysis

Ralph A. Walkling*

## Abstract

This research develops and tests a model for the prediction of tender offer outcomes. Variables that increase the supply of "obtainable shares" (such as increased bid premiums or the payment of solicitation fees) are shown to increase the probability of success. Increased ownership of target firm shares by the bidder also increases the probability of success. Variables that impede the tendering of shares (such as target management opposition or a competing bid) decrease the probability of success. Tests of the model utilizing both linear and logistic analysis support the theoretical constructs and help resolve the paradoxical findings of previous research.

## I. Introduction

The compensation offered to shareholders in a tender offer varies considerably, ranging from a few percent to over 100 percent of market price.[1] Surprisingly, previous research has not confirmed the importance of the bid premium in influencing the outcomes of tender offers. Ebeid [7], Pelligrino [19], and Hoffmeister and Dyl [10] each develop linear models for the prediction of tender offer success. All of these authors appear to define the dependent and independent variables in a similar fashion. Although over 20 years of data are examined in the three studies, two findings are remarkably consistent: 1) the primary deterrent to offer success is managerial resistance, and 2) bid premiums do not significantly influence offer outcomes. The latter result contradicts standard economic theory and demands investigation. If this result is accepted as stated, it is difficult to explain why bid premiums have so wide a distribution or, for that matter, why they exist at all.

* Faculty of Finance, Ohio State University, Columbus, OH 43210. This paper was completed while the author was on the faculty of the Georgia Institute of Technology. An earlier version of this paper was presented at the 1982 Western Finance Association Meetings. The author would like to thank Leonard Parsons, Nikhail Varaiya, Nai-Fu Chen, and two anonymous *JFQA* referees for their comments.

[1] In a separate paper [26], the author develops a model for determining optimal bid premiums and examines the implications of estimated success probability for determining bidding strategy.

CAIN0001758

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

The principle objective of this paper is to resolve the bid premium anomaly. The paragraphs that follow develop a model for tender offer success around a simple supply and demand schedule. Variables that increase the supply of "obtainable shares" (such as increased bid premiums or the payment of solicitation fees) are shown to increase the probability of success. Increased ownership of target firm shares by the bidder is also shown to increase the probability of success. Variables that impede the tendering of shares (such as opposition by the target firm's management or by another bidder) decrease the probability of success. Tests of the model on a sample of 158 cash tender offers support the theoretical constructs and help resolve the anomalous findings of previous research.

A second objective of this research is to provide evidence on the content and predictive accuracy of probability models for subsamples of contested and uncontested offers. Previous research ignores the comparison of model performance on subgroups. Predicting the outcome of contested offers, however, is of much greater importance to bidding firms than determining the outcome of uncontested offers. Results of the model for the contested cases are particularly striking: 83 percent of the estimation sample and 63 percent of the validation sample are correctly classified whereas the average percentages of successful offers for these samples are only 46 percent and 44 percent, respectively.[2]

The remainder of this paper is organized as follows: Section II presents the supply-demand model for shares of the target firm. Variables relating to this model are described along with the findings of previous researchers. The sample utilized in this research is discussed in Section III. This study uses a larger, more recent, and more complete set of data than was previously available. The results of estimating the probability models are presented in Section IV. Separate subsections explore possible reasons for the anomalous findings of previous research, including both variable and model misspecification. The distribution of control versus noncontrol offers in the sample is also analyzed. In addition, Section IV examines the predictive power of the LOGIT models on a chronologically drawn validation sample and on subsamples of contested and uncontested offers. The final section summarizes the research and discusses its implications.

## II.  Model Development

### A.  Bid Premium Size

Economic theory suggests that the probability of tender offer success should be directly related to the size of the bid premium. If bidders face an upward-sloping supply curve in their quest for shares of the target, they would need to pay a premium over market price in order to insure a successful offer. Several conditions could produce an upward-sloping supply curve. Heterogeneous ex-

---

[2] A third objective of this research is to compare estimates of linear probability models (as used in previous research) with those of a more sophisticated, nonlinear procedure—logistic regression. LOGIT analysis overcomes some of the statistical and interpretive difficulties of linear models. The probability function it describes is also more appealing, being asymptotic for extreme values of the independent variables. The results of logistic regressions are compared with the linear estimates on the estimation sample and on a validation sample from a later period. Rank correlations between the predictions of each model are also computed.

CAIN0001759

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

pectations among the target firm's shareholders would result in different estimates of value and differing selling (tendering) prices. Alternatively, if the value of a block of shares from any shareholder (or cooperative group of shareholders) is a positive function of the size of the block, premiums for increased amounts of share purchases could also be observed. This would be particularly applicable in the purchase of "control blocks" of target firm shares.

Of course, in practice, the supply schedule is not known with certainty and, hence, the optimal premium is unknown as well. Bidders *estimate* a supply curve and price their offers accordingly, cognizant of the imprecision of their estimates. Underestimating the required premium will result in a failed offer. Nevertheless, higher bid premiums would result in an increased amount of shares being tendered, increasing the probability of success.

## B.    Managerial Resistance

Ebeid [7], Pellegrino [19], and Hoffmeister and Dyl [10] all report that managerial opposition by the target firm is the single most important deterrent to tender offer success. Opposition to the offer by the target management can take many forms, from withholding the list of shareholders to legal action against the bidder.[3] The adverse influence of the target management on shareholders serves to reduce the pool of obtainable shares and decrease the probability of a successful offer. Moreover, target managements also influence the outcome of an offer through their ownership positions in the target firms.

## C.    Percentage of Shares Owned by the Bidder

Ownership of the target firm is, of course, not restricted to its management. Bidding firms frequently own or control sizeable portions of companies they seek to acquire. The bargaining position of bidding firms should be directly related to the fraction of shares they control. The most obvious reflection of this bargaining strength is voting power and its influence on the target management itself. At the extreme, this influence would be manifested in control of the target's board of directors.

A second reason for the influence of share ownership on offer success is that shareholders and arbitragers are likely to view partial ownership by the bidding firm as a positive indication of the bidder's motivation towards the offer. Increased ownership reduces the fraction of shares necessary to obtain control of the firm (51 percent or possibly less) and the fraction of shares necessary to insure a successful merger (generally 67 percent or 80 percent). Shareholders, fearful of becoming inactive minorities, are more likely to tender their shares or sell them on the open market in the face of partial bidder control. Correspondingly, arbitragers are more likely to be active in the open market if they expect a successful offer or subsequent merger.

---

[3] A recent defensive strategy employed in the Cities Service-Mesa Petroleum tender offer is the "Pac-Man" defense, in which the target firm files a counter-offer seeking to acquire the bidder.

463

CAIN0001760

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

## D.  Solicitation Fees

Bidders often pay fees to brokers to encourage them to solicit shares on the bidder's behalf. These "sweeteners" are paid on a per share basis and generally range from a few cents to a dollar per share. Paying these incentives to brokers results in increased dissemination of offer information and enlarges the pool of obtainable shares. The payment of these fees by a large percentage of bidders suggests the expectation of a positive correlation with tender offer success.

## E.  Competing Bids

Multiple offers for a given target by several bidders decrease the probability that any one offer will be successful. In most multiple bid situations, the demand for shares among all bidders exceeds the total shares outstanding. Obviously, one or more bidders will be unsuccessful in acquiring the shares they desire. Of course, bidders can only be certain of *existing* bids at the time of their own last offer revision. Beyond that point in time, subsequent bids may develop or previous bids by other suitors may be revised. These occurrences are unknown at the time of a particular bidder's offer and hence cannot be considered. Noting the presence of existing bids, however, recognizes the increased possibility that revision will occur. This possibility should reduce the probability of success.

## F.  Model Specification

The behavioral specification of the model described in the previous paragraphs is shown in equation 1

$$(1) \quad P\left(S_A \geq S_S\right) = f(BP, RESIST, BIDSHARE, SOLFEE, OPPBID)$$

where

| | | |
|---|---|---|
| $P(S_A \geq S_S)$ | = | probability that shares acquired exceeds or is equal to shares sought, |
| $S_A$ | = | shares acquired, |
| $S_S$ | = | shares sought (the average of the maximum and minimum shares sought by a bidder), |
| $BP$ | = | bid premium as a percent of the target firm's stock price prior to the market's reaction to the bid,[4] |
| $RESIST$ | = | an indicator variable set equal to one if statements 13D or 14D or *The Wall Street Journal* indicate that the target management is resisting the offer. Indications of resistance consist of public statements of opposition, the filing of court actions against the bidder, and the search for "white knights." |
| $BIDSHARE$ | = | percentage of shares controlled by the bidder at the time of the offer, |

---

[4] A subsequent section (III) addresses the issue of premium specification in considerable detail.

464

CAIN0001761

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

| | | |
|---|---|---|
| *SOLFEE* | = | the dollar amount of any solicitation fees (on a per share basis), and |
| *OPPBID* | = | an indicator variable equal to one if an opposing offer exists at the time of a bidder's last revision. |

Positive coefficients (signifying an increased probability of success) are expected for variables denoting the percentage bid premium, the percentage of shares controlled by the bidder, and the solicitation fee. A negative coefficient is expected on the indicator variables for managerial resistance and opposing bids.

### G. Logistic Regression

The previously cited research by Ebeid, Pelligrino, and Hoffmeister and Dyl utilizes either ordinary least squares or multiple discriminant analysis. However, the predicted probabilities from traditional linear regression models can violate the meaningful zero-one boundaries. Moreover, use of linear regression with a binary dependent variable can be shown to cause heteroskedasticity. Press and Wilson [20], p. 699, note:

> In most discriminant analysis applications, however, at least one variable is qualitative (ruling out multivariate normality). Under nonnormality, we prefer the logistic regression model with maximum likelihood estimators for solving [the] problems.

This objection to linear discriminate models is certainly valid for research on the probability of tender offer success; the most important variable in previous models is the qualitative indicator for managerial resistance.

A preferable method of analysis, logistic regression, is used here. Logit analysis maps the predicted probabilities to the meaningful zero-one range. The form of the logistic function is also more appealing, being asymptotic at the extremes where a small change in the independent variables is unlikely to materially affect the outcome.

The equation used in estimating the LOGIT model is

$$ (2) \qquad P\left(S_A \geqslant S_S\right) = \frac{e^{BX}}{1 + e^{BX}} $$

where the $X$ matrix denotes the independent variables and the $B$ vector denotes their coefficients.

### III. Research Design

#### A. Sample Selection

The population addressed in this study consists of all cash tender offers filed at the SEC during the period 1972 through 1977.[5] This period is chosen for several reasons: first, the Williams Act of 1968 (and the 1970 amendment to it)

---

[5] The initial list of names of tender offer bidders and targets was supplied by Professor Douglas Austin of the University of Toledo.

465

CAIN0001762

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

significantly influenced the legal environment of tender offers. All tender offers examined in this study are subsequent to this legislation. Second, the six-year span of the study provides a much more homogeneous time grouping than previous studies. Many of these studies pooled data from a period ten to twenty years long. The increased magnitude of tender offers in the past several years permits a fairly large sampling in a relatively short time span.

Cash tender offers are chosen for analysis because they have been the predominant form in recent years, comprising approximately 90 percent of all tender offers during the 1972 through 1977 period. Furthermore, the problem of placing a value on the securities offered in noncash exchanges (usually the common stock of the bidding firm) is avoided.

Data on bid characteristics and offer outcomes were obtained directly from statements 13D and 14D filed by bidding and target firms at the Securities and Exchange Commission. These documents, while replete with amendments and time consuming to decipher, contain information vital to the analysis of a tender offer.[6] This information includes data on share ownership, premium size, compensation to brokers, and managerial resistance.

Share price information was obtained from the *Stock Price Guide* published by Standard and Poors. The existence and date of offer announcements were ascertained from *The Wall Street Journal, The Wall Street Journal Index, Value Line's Investments Survey,* and Funk and Scott's *Index of Corporations.* Financial data were obtained from Compustat's Annual, Over the Counter, and Research Tapes. Complete data were obtained on 158 offers.[7]

The offers are divided chronologically into an estimation sample of 108 offers (covering the period January 1972 through September 1976) and a validation sample of 50 offers (October 1976 through December 1977). Dividing the data chronologically permits a robust test of the time and sample stability of the model coefficients.

## B. Variable Specification

Prior research on tender offer success confirms the importance of managerial opposition, but reports insignificant results for the bid premium variable and leaves effects of bidder share ownership, solicitation fees, and opposing bids largely unexplored. Previous work has also been restricted to linear models, even though the assumptions of these models are not met by the data. Moreover, little discussion has been given to the sensitivity of prior results to alternative variable or model specifications.[8]

---

[6] Statements 13D and 14D were only available in photocopy form at the time of this research. It took the author and two assistants nearly three months of full-time effort to collect the data. The difficulty of obtaining this information undoubtedly accounts for the scarcity of tender offer research using other than CRSP or Compustat data.

[7] Five offers were deleted because of their abnormal bid premiums. Four of these involved small negative or zero bid premiums. One involved a premium of over 400 percent.

[8] Hoffmeister and Dyl [10] do not report the results of alternate variable specifications or estimation procedures. They do, however, report results for a variety of subsamples and for models in which the managerial resistance variable is excluded.

466

CAIN0001763

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

A proper specification of the dependent variable (success or failure) should include consideration of all available information concerning the bidder's own definition of success prior to the offer. The most obvious indications of the bidder's idea of success are the conditions it sets concerning the maximum and minimum number of shares sought. Success is defined here as the situation in which the bidder acquires greater than the average number of shares sought.[9]

Proper specification of the bid premium is also crucial. Although a percentage (as opposed to a dollar) specification is unquestionably appropriate, an important issue remains: upon which base should this percentage be calculated? Alternatively stated, what event date is appropriate for tender offer research? Previous studies use the official filing date of the offer at the Securities and Exchange Commission (SEC).[10] This research, however, finds that over 40 percent of the tender offers in the sample are announced in the financial press prior to this date! These news items make specific mention of both target and bidding firms and, in many cases, reveal information about prospective terms of the offer. Using the SEC date as a base would, consequently, bias the estimates of bid premiums. By the time of the SEC filing, an efficient market would have discounted news of the impending offer, thus increasing the market price and causing severe distortion in the estimates of the premium.[11] Moreover, the market price would rise most dramatically in situations in which a successful tender is anticipated. As a consequence, the size of the bid premiums on these "likely to be successful" offers would actually appear to be small!

An additional source of misspecification may arise from failure to consider the pro rata effects of the tender offer. Bradley [2] notes that offers for less than the total number of shares of a firm may cause tendering shareholders to be left with unaccepted shares. This fraction of their original holdings will then be subject to whatever post-offer market price prevails. In view of this, the effective bid premium a shareholder anticipates must be weighted by the percentage of shares sought.[12]

---

[9] Previous authors define a successful tender offer as one in which ". . . the bidding firm received and accepted tenders equal to, or in excess of, the number requested." Apparently, either the minimum or maximum shares sought is used as the requested number of shares. Although this definition recognizes the dichotomous nature of tender bid results, the use of one number (either the maximum or minimum) to determine the dividing line between success and failure seems unreasonable. Acquiring 90 percent of the maximum number of shares sought should not be considered an unsuccessful offer. Nor should these offers be excluded from the sample. Conversely, acquiring only 10 percent of the maximum number of shares (where no minimum number is stated) should not necessarily be considered a success. Nevertheless, sensitivity tests on the present research do not find the choice of definition to materially affect the results.

[10] One previous probability study [10] refers to announcement dates in the description of the data. Discussion with the authors, however, reveals this to be the SEC announcement (filing) date.

[11] Keown and Pinkerton [12], for example, find abnormal price movements 12 days prior to the date on which the firm in their sample reported that they announced a merger. (The authors do not disclose whether the actual press dates preceded these reported dates.) The importance of correctly identifying the event date is also stressed by Brown and Warner [4].

[12] According to Aranow and Einhorn [1], p. 227:

Shareholders that tender their shares during the first ten days of a tender offer are entitled under the Williams Act to have their shares purchased pro-rata based on the total number of shares tendered during those ten days. Many state pro-rata statutes dilute this right by requiring that the pro-rata purchases be based on all shares tendered to the offerer.

467

CAIN0001764

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

Three bid premium specifications are utilized in the empirical research that follows:[13]

1) Percentage premium based on the market price fourteen days before the SEC filing (this is the definition used in the previously cited research).

2) Percentage premium based on the market price fourteen days prior to the earliest of SEC dates or offer announcement.

3) As in definition two, but weighted for the pro rata effects of the offer.[14]

The first specification is the one used in the previously cited research. The second specification recognizes announcement effects. The third measure approximates the effective premium if shares are purchased pro rata.

## IV. Results

The results of estimating the probability of success model using the three

---

Fifteen states require that shares be purchased pro-rata based on the total number of shares tendered. The remaining states either specify the ten-day period of the Williams Act or have no specific statute on the subject (an exception is Delaware, which requires a twenty-day pro-rata period). The prorata calculation is given by

$$ P_S^* = P_S\left(\frac{S_S}{S_T}\right) + M_{S2}\left(1 - \frac{S_S}{S_T}\right) $$

or, in percentage terms,

$$ BP_S^* = \left(\frac{P_S - M_{S1}}{M_{S1}}\right)\left(\frac{S_S}{S_T}\right) + \left(\frac{M_{S2} - M_{S1}}{M_{S1}}\right)\left(1 - \frac{S_S}{S_T}\right) $$

where:

$P_S^*$    is the anticipated weighted average premium (in dollars),
$BP_S^*$   is the anticipated weighted average premium (in percent),
$P_S$      is the actual price offered by the bidder,
$M_{S1}$   is the market price prior to the earlier of filing or offer announcement,
$M_{S2}$   is the market price assumed to prevail after the offer expires,
$S_S$      is the number of shares of the target firm sought, and
$S_T$      is the total number of target shares outstanding.

This weighted premium will not be the effective premium if short-tendering of shares is permitted. Shareholders simultaneously tendering all shares and selling short the portion they expect the bidder to return may be able to "lock in" a higher weighted premium. Whether this value is greater or smaller than the weighted average value depends, of course, on post-offer market prices of the target firm. The possibility of this phenomenon also illustrates the error of assuming offer success can be measured by tenders received (rather than shares acquired). It is conceivable that more than 100 percent of shares outstanding could be tendered. See "SEC May Tighten or Drop Rule Saying Holders Must Own Shares They Tender," *The Wall Street Journal* (August 24, 1981), p. 8.

[13] In situations where multiple bids existed within a 90-day period, the filing or announcement date of the earliest bid is used. The purpose of this is to prevent distortions in calculations in which previous bids have occurred. Failure to observe this rule would result in calculating premiums for revised and subsequent bids on a base price artifically inflated by the first offer. (Subsequent bids are those where *OPPBID* = 1, i.e., an opposing bid exists.)

[14] The expected post-offer price is subjectively determined by each investor. Two estimates are tested here, one using the actual post-offer price, and the other assuming that shareholders expect post-offer prices to return to their pre-offer levels. Of course, the actual post-offer price cannot be ascertained at the time of the takeover attempt. Nevertheless, sensitivity tests using various estimates did not materially alter the results.

CAIN0001765

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

alternative bid premium specifications are revealed in Panel A of Table 1.[15] The importance of target management's reaction to the bid in predicting offer success is apparent from the highly significant, negative coefficient. This result confirms similar findings by previous researchers. Prior work, however, does not examine the importance of solicitation fees or bidder control. This research finds that the payment of solicitation fees to brokers in exchange for their assistance in soliciting tenders significantly increases the chance of success. Bidder control of target shares prior to the offer also substantially increases the probability of acquiring the desired number of additional shares.

The most striking result, however, concerns one of the central issues of this paper—the importance of bid premium size in tender offer success. Coefficients for bid premiums measured prior to the SEC filing of an offer are insignificant. This was the case for previous research using this definition. However, coefficients based on prices prior to *the earliest of either offer announcement or SEC filing* are significant. (Weighting to reflect pro rata tendering changes this only slightly.) The results suggest that the anomalous findings regarding the bid premium in previous probability models are due to specification errors. More precisely, failing to recognize the bias caused by early announcement of an offer distorts premium measurement and results in an insignificant coefficient.

To test the magnitude of this bias, the percentage change in stock price between the period 14 days prior to the offer announcement and 14 days prior to the offer filing is estimated for those offers characterized by an early announcement. The mean and median time between these dates is 34 and 17 days, respectively. The average percentage change for this period is a positive 16.1 percent (unannualized). This upward movement is substantial and confirms the bias introduced by failure to recognize announcement effects. The magnitude of this change also suggests an explanation for positive abnormal returns noted in merger studies that calculate event time around filing dates or consummation dates (rather than announcement dates). See [16], [22], [8], [13], and [15].

A further test for the extent of this bias is conducted by splitting the estimation sample into two groups: one characterized by early announcement of the offer, and one without early announcement. The results (available upon request) reveal that the bid premium using the SEC filing date as a base is significant in the group without announcement bias. The conclusion suggested by these findings is that research that does not recognize market reactions to announced information introduces a systematic bias into the specification of the bid premium. A finding of insignificance in these situations is caused by failure to recognize previous market response, not by the market's failure to react to tender offers in the manner predicted by economic theory.[16]

---

[15] Sensitivity analyses are also performed using linear models in order to compare the results to those of previous researchers. Although the logistic estimates reported in the paper are preferred for statistical reasons, the results and conclusions remain unchanged when the linear techniques are used.

[16] Sensitivity tests were performed, adding variables found important in previous empirical research. These include profitability ratios, price earnings ratios, earnings growth, and measures of firm size and liquidity. Any information contained in profitability, PE, or growth measures should already by discounted in the target firm's stock price. Measures of firm size or liquidity have somewhat stronger foundations. Firms facing capital rationing may be inhibited from acquiring relatively larger firms. Target firms with high degrees of liquidity could also invite acquisition financed by their

CAIN0001766

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

## A.  Contested and Uncontested Subsamples

Analysis of the news items about tender offers suggests that bidding firms can generally classify an impending offer as "likely to be contested" or "likely to be uncontested."[17] Consequently, it is meaningful to ascertain how contested and uncontested offers are differentiated from each other with respect to the previously defined variables.

Answers to the latter question are revealed by the results presented in Panel B of Table 1. The probability of success model is estimated on separate subsamples of uncontested and contested offers. Log likelihood tests reveal significant differences (at the 0.05 level) between the coefficients of the two models.[18]

The solicitation fee is the only significant variable for the subset of uncontested offers. The outcome of uncontested offers appears to be unresponsive to changes in the size of bid premiums or in the degree of bidder ownership. The major impact of bidder ownership is that it permits the bidder to influence target management through voting power. Increments in bidder ownership beyond the amount necessary to adequately influence the target management (i.e., persuade them to not contest the offer) would have little influence on its outcome. This may well be the case for the uncontested offers.

The impact of premium size could be given a similar interpretation. It may be premature to conclude that premium size has no impact on the outcome of uncontested offers since premiums may influence the decision of target management to oppose or not oppose the offer. The data, however, do not confirm this conjecture; there is no discernible relationship between managerial resistance and premium size. (Percentage bid premiums are slightly, but insignificantly, higher for the contested offers.)

Additional insight can be gained through the analysis of the contested offers. For the contested offers, all variables are significant. The implications of these results become obvious upon reflection: since managerial resistance is the key factor in separating successful from unsuccessful offers, the vast majority of uncontested offers is likely to be successful regardless of the level of the other

---

own excess funds. Nevertheless, the sensitivity analysis (available upon request) did not confirm the importance of any of these variables.

[17] All of the previously cited work on tender offer success reports that resistance by the target management is the single most important factor in determining whether the offer will succeed or fail. An apparent criticism of using a variable such as "managerial resistance" to predict tender offer success is that it may not be known at the time that an offer is made. This criticism assumes bidding firms are unaware of the probable reactions of the target management. This seems highly unlikely, particularly in view of the documented importance of this variable. Moreover, the evidence cited in this study reveals that more than 40 percent of tender offers are announced in advance. These announcements make specific mention of the bidding and target firms and often prospective information about the possible term of the offer. In addition, the news items make frequent mention of previous bidder inquiries about the target management's attitude. Consequently, in attributing a high level of naivety to bidding managements, academicians limit the potential usefulness of their work to practitioners. The variable "managerial resistance" should certainly be included in probability of success research. Moreover, it is useful to seek answers to the questions: "How accurately can success be predicted on subgroups of contested and uncontested offers?" and "Are variables equally important in both subsamples?"

[18] $x^2 = 11.04$, which surpasses the (0.05) critical value of 9.5. See [5] for further discusson of the appropriate test statistic.

470

CAIN0001767

TABLE 1

Estimation Sample Results for LOGIT Probability Models to Predict Tender Offer Success (A) Using Alternate Specifications for the Percentage Bid Premium and (B) on Subsamples of Contested and Uncontested Offers*

| Target Management Opposition | Solicitation Fee | Percentage of Shares Bidder Controls | Opposing Bid Indicator | Constant | Percentage Bid Premium | | |
|---|---|---|---|---|---|---|---|
| | | | | | 14 Days Prior to SEC Filing | 14 Days Prior to Earliest of Filing or Announcement | 14 Days Prior to Earliest Weighted by Percentage of Shares Sought |
| A. All Offers (N = 108) | | | | | | | |
| −0.927 | 3.629 | 3.268 | −0.443 | −1.882 | 0.530 | | |
| (−3.143) | (2.905) | (2.148) | (−0.907) | | (0.483) | | |
| −1.006 | 4.232 | 3.905 | −0.762 | −3.285 | | 2.151 | |
| (−3.307) | (3.269) | (2.514) | (−1.534) | | | (1.998) | |
| −0.954 | 4.299 | 4.390 | −0.597 | −2.811 | | | 1.906 |
| (−3.202) | (3.261) | (2.676) | (−1.265) | | | | (1.995) |
| B. Uncontested Offers Only (N = 62) | | | | | | | |
| 4.080 | 1.403 | −0.564 | −0.821 | | 0.787 | | |
| (2.365) | (0.824) | (−0.866) | | | (0.655) | | |
| Contested Offers Only (N = 46) | | | | | | | |
| 7.255 | 12.218 | −5.746 | −12.749 | | 5.817 | | |
| (2.716) | (3.030) | (−2.283) | | | (2.486) | | |

* Ratios of coefficients to standard errors are in parentheses.

CAIN0001768

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

independent variables. Where management does contest the offer, however, the importance of the other independent variables is magnified. The power inherent in bid premiums, solicitation fees, and share ownership becomes crucial in overcoming the negative influence the target management exerts.

This analysis is also supported by a comparison of the means of the variables for the contested and uncontested groups. Whereas over 82 percent of the uncontested offers are successful, this is true for less than 46 percent of the contested offers. The percentage of shares controlled by the bidder is much higher in the uncontested offers (33 percent compared to 9 percent); this undoubtedly influences target management's reaction to the bid. Percentage bid premiums are slightly higher in the contested offers (51 percent compared to 45 percent). Solicitation fees are substantially higher. The average solicitation fee is $0.34 for the uncontested offers and $0.46 for the contested offers. It would appear that where bidders do not enjoy the cooperation of target management in alerting shareholders to news of the offer, they (the bidders) attempt to compensate by increasing the solicitation fee.

The analysis of these subjects is of interest to both the academician and the practitioner. They provide increased information about the tender offer process and strategic information about the value of variables of choice. Bidding managements are likely to find this (subsample) information more useful in ascertaining whether, and how, to undertake a contested bid.

## B.   Control vs. Clean-Up vs. Investment

Another interesting subgrouping is that of control vs. noncontrol offers. Bradley, Desai, and Kim [3] distinguish between three types of tender offers. Clean-up offers are operationally defined as those in which the bidder owns 70 percent or more of the target firm at the time of the offer. Investment offers are those in which the bidder owns less than 70 percent and seeks to increase its holdings by 15 percent or less. Remaining offers are presumed to be for control of the target firm.[19] Previous studies on the probability of success did not analyze contested and uncontested offers separately, nor did they disclose the distribution of control vs. noncontrol offers. Nevertheless, interpretation of the results could be affected by the purpose of the offers, particularly across subgroupings of contested versus uncontested and successful versus unsuccessful offers.

Tables 2 and 3 reveal the distribution of type of offer and success rate over the subgroupings of the estimation sample. It is apparent from the table that the offers in each subgrouping are predominantly those for control. More importantly, the uncontested cases are not dominated by investment and clean-up offers. The high success rate for the uncontested offers is only slightly influenced by the noncontrol offers in this subgrouping. The success rate for contested and uncontested control offers is approximately 48 percent and 80 percent, respectively. This closely parallels the corresponding figures for the overall sample,

---

[19] An alternate definition for investment offer was also tested. Those offers in which the bidder would own less than 15 percent after the offer (including initial holdings) were classified as investment offers. The results were not materially altered.

CAIN0001769

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

which are 46 percent and 82 percent. (Success rates for the investment and clean-up offers must be interpreted with caution since there are so few cases.)

Separate examination of the investment and clean-up offers was impractical due to the small number of cases. Nevertheless, as a further check on the effect these offers have on the analysis of this paper, all results were reestimated using only the 91 control offers. The results were nearly identical.

## C.  Predictive Accuracy of the Model

The full LOGIT model correctly classifies 79.6 percent of the 108 offers of the estimation sample.[20] Accuracy levels for 72 successful offers and 36 unsuccessful offers are 85.5 percent and 63.9 percent, respectively. (Figures for the predictive accuracy of the full model are not shown in table form due to space limitations.)

A robust test of a model's predictive power can be obtained by estimating the model on a sample of new data. A validation sample of 50 offers was withheld for this purpose. Whereas the estimation sample utilized offers occurring between January 1972 and September 1976, the validation sample comprises the period from October 1976 through December 1977. Using a chronologically drawn validation sample (as opposed to a randomly drawn sample over the entire period) more closely approximates the situation of developing a model with existing data for use in the future. In this more realistic setting, the predictive power depends on the sample *and* time stability of the model coefficients. The predictive accuracy of the LOGIT model on the entire validation sample of 50 offers is somewhat lower (60 percent), a probable reflection of intertemporal sample differences. Accuracy levels for the 38 successful offers and 12 unsuccessful offers are 55.3 percent and 75.0 percent, respectively. (Note that the actual percentage of successful offers rises from 66.7 percent in the estimation sample to 76.0 percent in the validation sample. It should also be noted that all but one of the offers in the validation sample were control offers.)

The predicted results of the full model are interesting since they enable comparisons with previous research (which only examined "full" models). These results will also be of interest to potential bidders who are not certain whether they will face oppposition from the target management. Most bidders are likely to anticipate such resistance. Consequently, for the analysis of predictions, other vital questions are: "How accurate are the models in predicting the outcome of *uncontested* offers?" or, more importantly for bidders "How accurate are the models in predicting the outcome of *contested* offers?" Predicting and understanding the outcome of contested offers will be particularly crucial in view of the large amount of resources bidding firms spend on these cases and the high amount of risk that is involved.

To answer these questions, the reduced models from Panel B of Table 1 are used to predict the outcome of offers in the two subgroupings. The results are presented in Table 4. The predictive accuracy of the LOGIT model for the un-

---

[20] The correct (pre-announcement) bid premium is utilized here. Sensitivity tests using the prorata specification reveal little difference.

CAIN0001770

474

## TABLE 2
### Distribution of Control, Clean-Up, and Investment Offers in the Estimation Sample

| Type of Offer | Successful Offers | | | | Unsuccessful Offers | | | | Total Offers | |
| | Contested | | Uncontested | | Contested | | Uncontested | | Overall | |
| | % | No. | % | No. | % | No. | % | No. | % | No. |
|---|---|---|---|---|---|---|---|---|---|---|
| Control Offers | 95% | 20 | 77% | 39 | 88% | 22 | 91% | 10 | 84% | 91 |
| Investment Offers | 5 | 1 | 13 | 7 | 12 | 3 | 9 | 1 | 11 | 12 |
| Clean-Up Offers | 0 | 0 | 10 | 5 | 0 | 0 | 0 | 0 | 5 | 5 |
| | 100% | 21 | 100% | 51 | 100% | 25 | 100% | 11 | 100% | 108 |

CAIN0001771

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

TABLE 3

### Success Rate of Control, Clean-Up, and Investment Offers in the Estimation Sample

| Type of Offer | Contested % Successful | Contested Total No. | Uncontested % Successful | Uncontested Total No. | Overall % Successful | Overall Total No. |
|---|---|---|---|---|---|---|
| Control Offers | 48% | 42 | 80% | 49 | 65% | 91 |
| Investment Offers | 25 | 4 | 88 | 8 | 67 | 12 |
| Clean-Up Offers | N.C.* | 0 | 100 | 5 | 100 | 5 |
| All Offers | 46% | 46 | 82% | 62 | 67% | 108 |

* N.C. = No cases.

TABLE 4

### Predictive Ability of LOGIT Probability Models on Estimation and Validation Samples for Subgroupings of Uncontested and Contested Offers[†]

| Actual Outcome | Uncontested No. of Cases | Uncontested Successful | Uncontested Unsuccessful | Contested Offers No. of Cases | Contested Offers Successful | Contested Offers Unsuccessful |
|---|---|---|---|---|---|---|
| **Estimation Sample** | | | | | | |
| Successful | 51 | 51 (100.0%) | 0 (0.0%) | 21 | 18 (85.7%) | 3 (14.3%) |
| Unsuccessful | 11 | 10 (90.9%) | 1 (9.1%) | 25 | 5 (20.0%) | 20 (80.0%) |
| **Validation Sample** | | | | | | |
| Successful | 31 | 27 (87.1%) | 4 (12.9%) | 7 | 1 (14.3%) | 6 (85.7%) |
| Unsuccessful | 3 | 2 (66.7%) | 1 (33.3%) | 9 | 0 (0.0%) | 9 (100.0%) |

Percentage of Estimation Sample Correctly Classified = 83.9% (Uncontested Offers) and 82.6% (Contested Offers)

Percentage of Validation Sample Correctly Classified = 82.4% (Uncontested Offers) and 62.5% (Contested Offers)

† Results are based upon the reduced models from Panel B of Table 1.

* Success is predicted if the estimated probability exceeds 0.5.

CAIN0001772

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

contested offers is 84 percent for the estimation sample and 82 percent for the validation sample.[21]

The most dramatic results of the predictive analysis, however, involved the contested offers. The predictive power of the model for the contested offers is high for both the estimation and validation samples. The LOGIT model correctly classifies nearly 83 percent of the estimation sample and 63 percent of the validation sample. This level of accuracy seems high considering the importance of correctly classifying this group and the fact that the percentage occurrence of successful offers in these two samples is only 46 percent and 44 percent, respectively.[22]

## V.   Summary and Conclusions

The primary objectives of this study were 1) to investigate the anomalous findings of previous research regarding the importance of bid premiums in tender offer outcomes and 2) to test the predictive accuracy of the models on subsamples of contested and uncontested offers. Empirical analysis of tender offer outcomes was conducted utilizing an estimation sample of 108 offers and a validation sample of 50 offers. The vast majority of these cases involved offers for corporate control. The results confirm the importance of bid premiums and indicate that previous findings of insignificance are attributable to a failure to correctly specify the bid premium. Over 40 percent of the offers examined were announced in the financial press prior to their SEC filing. Measurements that ignore this leakage of prior information introduce a systematic bias into the analysis. Premiums measured prior to market receipt of relevant offer information do appear as significant determinants of tender offer success. These premiums also remain significant after adjustment for the likely pro-rata effects of an offer.

Positive correlations were noted between offer success and variables measuring solicitation fees and bidder ownership of target shares. Target management opposition was a decisive deterrent to offer success. Moreover, the importance of this variable was shown to be great enough to cause dramatic differences in models estimated on subsamples of contested and uncontested offers. Future research measuring the source of this managerial power would be desirable.

---

[21] The small number of unsuccessful, uncontested offers in the validation sample precludes a definitive holdout test on this subgrouping. Any bias would appear to be in favor of understating the predictive power of the model, however, since two of the three cases are misclassified.

[22] Logistic analysis has been used throughout this study because of its superior theoretical attributes in situations involving binary dependent variables. Previous researchers all used linear models. In order to test the sensitivity of the results to the choice of estimating technique, the entire analysis was performed again using OLS regression. The findings (not shown due to space limitations) are nearly identical to those reported here and are available from the author upon request. The Spearman coefficient of rank correlation between the two sets of predictions (linear vs. logistic) is 0.99 for the estimation sample and 0.94 for the validation sample, suggesting no practical difference between the overall rankings of the OLS and LOGIT predictions. The overall accuracy of the models in correctly predicting the success or failure of the offers in both the estimation and validation samples is also quite similar. Thus, the results do not depend on the distributional assumptions made; both linear and logistic models are quite compatible.

CAIN0001773

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

Issues relating to model misspecification were also examined for their potential impact on coefficient estimates. Logistic regression was utilized in the analysis to overcome limitations inherent in linear models. Although the LOGIT model has greater theoretical appeal, sensitivity tests (including Spearman rank correlations) reveal that the coefficient estimates and predictive results were actually quite similar to the OLS model.

The value of this research is that it helps in resolving the issue of bid premium specification and in revealing the similarities and differences between linear and nonlinear probability models. The results are also valuable in interpreting the positive pre-merger residuals of event-time studies that do not recognize announcement dates.

Researchers and practitioners should be interested in the relative importance of managerial resistance, share ownership, solicitation fees, and premium size. Changes in the importance of the latter three variables on subsamples of contested and uncontested offers were also revealed for the first time. The predictive power of the model for the subsamples was also high. This finding is particularly important for the contested offers considering the high degree of risk, the relatively low success rate, and the large amounts of resources bidders spend on these cases.

# References

[1] Aranow, Edward Ross, and Herbert A. Einhorn. *Developments in Tender Offers for Corporate Control.* New York: Columbia University Press (1977).

[2] Bradley, Michael. "Interfirm Tender Offers and the Market for Corporate Control." *Journal of Business,* Vol. 53 (October 1980), pp. 345-376.

[3] Bradley, Michael; A. Desai; and E. Han Kim. "The Rationale behind Interfirm Tender Offers: Information or Synergy?" *Journal of Financial Economics,* Vol. 11 (1983), pp. 183-206.

[4] Brown, Stephen, and Jerold Warner. "Measuring Security Price Performance." *Journal of Financial Economics,* Vol. 8 (September 1980), pp. 205-258.

[5] Chapman, Randall G., and Richard Staelin. "Exploiting Rank Ordered Choice Set Data within the Stochastic Utility Model." *Journal of Marketing Research,* Vol. 19 (August 1982), pp. 288-301.

[6] Dodd, Peter, and Richard Ruback. "Tender Offers and Stockholder Returns: An Empirical Analysis." *Journal of Financial Economics,* Vol. 5 (December 1977), pp. 351-374.

[7] Ebeid, Fred Joseph. "The Inter-Firm Corporate Cash Tender Offer: Operating, Market, and Bid Characteristics of Target Firms." Ph.D. Dissertation, University of Illinois at Urbana-Champaign (1974).

[8] Elgers, Peter, and John Clark. "Merger Types and Shareholder Returns: Additional Evidence." *Financial Management,* Vol. 9 (Summer 1980), pp. 66-72.

[9] *Funk and Scott's Index of Corporations and Industries: Annual Editions.* Cleveland: Predicasts, Inc. (1971-1976).

[10] Hoffmeister, J. Ronald, and Edward A. Dyl. "Predicting Outcomes of Cash Tender Offers." *Financial Management,* Vol. 10 (Winter 1981), pp. 50-58.

[11] *ISL Daily Stock Price Index.* New York: Standard and Poor's Corporation (1971-1978).

[12] Keown, Arthur J., and John M. Pinkerton. "Merger Announcements and Insider Trading Activity: An Empirical Investigation." *Journal of Finance,* Vol. 36 (September 1981), pp. 855-869.

CAIN0001774

https://doi.org/10.2307/2330762 Published online by Cambridge University Press

[13]  Kim, E. Han, and John J. McConnell. "Corporate Merger and the Co-Insurance of Corporate Debt." *Journal of Finance*, Vol. 32 (May 1977), pp. 349-365.

[14]  Kuehn, Douglas. *Takeovers and the Theory of the Firm*. London: The MacMillan Press (1975).

[15]  Langetieg, Terence Craig. "An Application of a Three-Factor Model to Measure Stockholder Gains from Merger." *Journal of Financial Economics*, Vol. 6 (December 1978), pp. 365-384.

[16]  Mandelker, Gershon. "Risk and Return: The Case of Merging Firms." *Journal of Financial Economics*, Vol. 1 (March 1974), pp. 303-335.

[17]  Morrison, Donald G. "On the Interpretation of Discriminant Analysis." *Journal of Marketing Research*, Vol. 6 (May 1969), pp. 156-163.

[18]  Nerlove, Marc, and S. James Press. *Univariate and Multivariate Log-Linear and Logistic Models*. Santa Monica, California: Rand (1973).

[19]  Pelligrino, Joseph Charles. "Causes of Inter-Firm Tender Offers: An Empirical Study, 1962-1968." Ph.D. Dissertation, Northwestern University (1972).

[20]  Press, S. James, and Sandra Wilson. "Choosing between Logistic Regression and Discriminant Analysis." *Journal of the American Statistical Association*, Vol. 73 (December 1978), pp. 699-705.

[21]  Securities and Exchange Commission, Schedule 13D and 14D.

[22]  Smiley, Robert. "Tender Offers, Transaction Costs and the Theory of the Firm." *Review of Economics and Statistics*, Vol. 58 (February 1976), pp. 22-32.

[23]  Smith, Keith V. "Comment: A Financial Analysis of Acquisition and Merger Premiums." *Journal of Financial and Quantitative Analysis*, Vol. 8 (March 1973), pp. 159-162.

[24]  Stevens, Donald L. "Financial Characteristics of Merged Firms: A Multivariate Analysis." *Journal of Financial and Quantitative Analysis*, Vol. 8 (March 1973), pp. 149-158.

[25]  Stiglitz, Joseph E. "Some Aspects of the Pure Theory of Corporate Finance: Bankruptcies and Takeovers." *Bell Journal of Economics*, Vol. 3 (Autumn 1972), pp. 458-482.

[26]  Walkling, Ralph A. "Determinants of Bid Premiums in Inter-Firm Cash Tender Offers: A Simultaneous Equations Approach." Manuscript, Georgia Institute of Technology (October 1981).

[27]  Walkling, Ralph A., and Michael S. Long. "Agency Theory, Managerial Welfare and Takeover Bid Resistance." *The Rand Journal of Economics*, Vol. 1 (1984), pp. 54-68.

[28]  "SEC May Tighten or Drop Rule Saying Holders Must Own Shares They Tender." *The Wall Street Journal* (August 24, 1981), p. 8.

[29]  *The Wall Street Journal Index*. New York: Dow Jones and Company (1971-1978).

CAIN0001775