# EXHIBIT 19

WILEY FINANCE

# APPLIED MERGERS & ACQUISITIONS

WITH CD-ROM

## ROBERT F. BRUNER

FOREWORD BY JOSEPH R. PERELLA

CAIN0001195

Copyright © 2004 by Robert F. Bruner. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, 978-750-8400, fax 978-646-8600, or on the web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, 201-748-6011, fax 201-748-6008.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services, or technical support, please contact our Customer Care Department within the United States at 800-762-2974, outside the United States at 317-572-3993 or fax 317-572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic books.

For more information about Wiley products, visit our web site at www.wiley.com.

*Library of Congress Cataloging-in-Publication Data:*
Bruner, Robert F, 1949–
    Applied mergers and acquisitions / Robert F. Bruner.
      p.  cm.
    Includes index.
    ISBN 0-471-39506-4 (cloth/CD-ROM) — ISBN 0-471-39505-6 (cloth) —
0-471-395064 (university)
    1. Consolidation and merger of corporations.  I. Title.
HD2746.5.B783  2004
658.1'62—dc22

                                                    2003020246

Printed in the United States of America.

10  9  8  7  6

CAIN0001196

The answer is emphatically "yes." Usually these returns occur over a few days. Abnormal returns of this magnitude in a short period of time are enough to cause concern or elation among institutions or other sophisticated investors whose performance in turn can be greatly affected by these kinds of events. One also needs to compare apples to apples: the M&A event returns must be *annualized* to compare them to other rates of return that investors experience. For instance, a 1 percent abnormal positive return to announcements by buyers that occurs over a week should be annualized by compounding one percent across 52 weeks to yield a 68 percent annualized gain.[6] This is merely theoretical: Reinvestment risk will frustrate attempts to invest in a way that reliably yields a 68 percent abnormal return each year. But in order to make fair comparisons of the materiality of M&A activity with other investing activity by corporations and institutions, it is necessary to adjust for differences in time frame.

# FINDINGS BASED ON THE ANALYSIS OF
# MARKET-BASED RETURNS TO SHAREHOLDERS

Event studies yield insights about market-based returns to target firm shareholders, buyers, and a combination of both.

## Returns to Target Firms

Target firm shareholders enjoy returns that are significantly and materially positive. Exhibit 3.3 summarizes the findings of 25 studies, which reveal returns that are material and significant, despite variations in time period, type of deal (merger vs. tender offer), and observation period. In short, the M&A transaction delivers a premium return to target firm shareholders.

## Returns to Buyer Firms

The pattern of findings about market-based returns to buyer firms' shareholders is more problematical.

- There are 22 studies that report negative returns with 14 of the 22 significantly negative (see Exhibit 3.4). The significantly negative returns vary between 1 and 4 percent.
- There are 32 studies (see Exhibit 3.5) that report positive returns—23 of these report significantly positive returns.
- The studies of returns to buyer firm shareholders around the time of announcement are distributed with a slight positive bias: 26 percent (14) show value destruction (significantly negative returns); 31 percent (17) show value conservation (insignificantly different from zero): and 43 percent (23) show value creation (positively significant returns).

CAIN0001197

**EXHIBIT 8.3** Summary of Shareholder Return Studies for M&A: Returns to the Target Firm Shareholders

| Study | Cumulative Abnormal Returns (% or avg$/acq) | Sample Size | Sample Period | Event Window (Days) | % Positive Returns | Notes |
|---|---|---|---|---|---|---|
| Langetieg (1978) | +10.63%* | 149 | 1929–1969 | (–120,0) | 71.6% | Mergers; uses effective date as event date. |
| Bradley, Desai, Kim (1988) | +31.77%* | 236 | 1963–1984 | (–5,5) | 95% | Tender offers only; subperiod data available for 7/63–6/68, 7/68–12/80, 1/81–12/84; acquirer returns have increased from +19% to +35% over time. |
| Dennis, McConnell (1986) | +8.56%* | 76 | 1962–1980 | (–1,0) | 70% | |
| Jarrell, Poulsen (1989) | +28.99%* | 526 | 1963–1986 | (–20,10) | N/A | Tender offers only. |
| Lang, Stulz, Walkling (1989) | +40.3%* | 87 | 1968–1986 | (–5,5) | N/A | Tender offers only. |
| Franks, Harris, Titman (1991) | +28.04%* | 399 | 1975–1984 | (–5,5) | N/A | Mergers and tenders offers; segment data available on means of payment and competition. |
| Servaes (1991) | +23.64%* | 704 | 1972–1987 | (–1,close) | N/A | Mergers and tender offers; segment data by payment method. |
| Bannerjee, Owers (1992) | +$137.1 MM* | 33 | 1978–1987 | (–1,0) | 85% | White knight bids. |
| Healy, Palepu, Ruback (1992) | +45.6%* | 50 | 1979–1984 | (–5,5) | N/A | Largest U.S. mergers during period. |
| Kaplan, Weisbach (1992) | +26.9%* | 209 | 1971–1982 | (–5,5) | 94.7% | Mergers and tender offers. |
| Berkovitch, Narayanan (1993) | +$130.1 MM* | 330 | 1963–1988 | (–5,5) | 95.8% | Tender offers. |
| Smith, Kim (1994) | +30.19%* +15.84%* | 177 | 1980–1986 | (–5,5) (–1,0) | 96.0% 91.3% | Successful and unsuccessful tender offers. |

*(Continued)*

CAIN0001198

EXHIBIT 3.8    (Continued)

| Study | Cumulative Abnormal Returns (% or avg$/acq) | Sample Size | Sample Period | Event Window (Days) | % Positive Returns | Notes |
|---|---|---|---|---|---|---|
| Schwert (1996) | +26.3%* | 666 | 1975–1991 | (–42,126) | N/A | Mergers, tenders offers; segment data available for various transaction attributes. |
| Loughran, Vijh (1997) | +29.6%* merger<br>+126.9%* tender<br>+47.9* combined | 419<br>135 | 1970–1989 | (–2,1,250) | N/A | Five-year postacquisition returns; segment data also available on form of payment. |
| Maquieira, Megginson and Nail (1998) | +41.65%* conglomerate<br>+38.08% * nonconglomerate | 47<br>55 | 1963–1996 | (–60,60) | 61.8%<br>83.0% | Study of returns for conglomerate and nonconglomerate stock-for-stock mergers. |
| Eckbo, Thorburn (2000) | +7.45%* | 332 | 1964–1983 | (–40,0) | N/A | Canadian targets only. |
| Leeth, Borg (2000) | +13.27%* | 72 | 1919–1930 | (–40,0) | N/A | |
| Mulherin, Boone (2000) | +21.2%* | 376 | 1990–1999 | (–1,+1) | N/A | |
| Mulherin (2000) | +10.14%* | 202 | 1962–1997 | (–1,0) | 76% | A sample of incomplete acquisitions. |
| DeLong (2001) | +16.61%* | 280 | 1988–1995 | (–10,1) | 88.6% | Studied deals where at least one party is a bank. |
| Houston et al. (2001) | +15.58% * (1985–90)<br>+24.60%* (1991–96)<br>+20.80%* (all) | 27<br>37<br>64 | 1985–1996 | (–4,1) | N/A | Deals in which both parties are banks. |
| Beitel et al. (2002) | +10.48%* | 98 | 1985–2000 | (–1,0) | 53% | Sample of European bank mergers. |
| Kuipers, Miller, Patel (2003) | +23.07%* | 181 | 1982–1991 | (–1,0) | N/A | U.S. targets of foreign acquirers. |
| Renneboog, Goergen (2003) | +9.01%* | 136 | 1993–2000 | (–1,0) | N/A | European transactions. |
| Billett, King, Mauer (2003) | +22.15%* | 265 | 1979–1997 | (–1,0 month) | N/A | |

Unless otherwise noted, event date is announcement date of merger/bid.
*Significant at the 0.95 confidence level or better.

CAIN0001199

**EXHIBIT 8.4**   Studies Reporting Negative Returns to Acquirers

| Study | Cumulative Abnormal Returns | Sample Size | Sample Period | Event Window (Days) | % Positive Returns | Notes |
|---|---|---|---|---|---|---|
| Langetieg (1978) | −1.61% | 149 | 1929–1969 | (−120,0) | 47.6% | Mergers; uses effective date as event date. |
| Dodd (1980) | −1.09%* successful | 60 | 1970–1977 | (−1,0) | N/A | Mergers only. Daily data. |
| | −1.24%* unsuccessful | 66 | | | | |
| Asquith, Bruner, Mullins (1987) | −0.85%* | 343 | 1973–1983 | (−1,0) | 41% | |
| Varaiya, Ferris (1987) | −2.15%* | 96 | 1974–1983 | (−1,0) | N/A | |
| | −3.9%* | 96 | 1974–1983 | (−20,80) | 42% | |
| Morck, Shleifer, Vishny (1990) | −0.70% | 326 | 1975–1987 | (−1,1) | 41.4% | Measured return by comparing change in bidder market value to market value of target's equity. |
| Franks, Harris, Titman (1991) | −1.45% | 399 | 1975–1984 | (−5,5) | N/A | Mergers and tenders offers; segment data available on means of payment and competition. |
| Servaes (1991) | −1.07%* | 384 | 1972–1987 | (−1,close) | N/A | Mergers and tender offers; segment data by payment method. |
| Jennings, Mazzeo (1991) | −0.8%* | 352 | 1979–1985 | (−1,0) | 37% | |
| Bannerjee, Owers (1992) | −3.3%* | 57 | 1978–1987 | (−1,0) | 21% | White knight bids. |
| Byrd, Hickman (1992) | −1.2%** | 128 | 1980–1987 | (−1,0) | 33% | |
| Healy, Palepu, Ruback (1992) | −2.2% | 50 | 1979–1984 | (−5,5) | N/A | 50 largest U.S. mergers during period. |
| Kaplan, Weisbach (1992) | −1.49%* | 271 | 1971–1982 | (−5,5) | 38% | Mergers and tender offers. |

(Continued)

63

CAIN0001200

**EXHIBIT 3.4**  *(Continued)*

| Study | Cumulative Abnormal Returns | Sample Size | Sample Period | Event Window (Days) | % Positive Returns | Notes |
|---|---|---|---|---|---|---|
| Berkovitch, Narayanan (1993) | –$10 MM | 330 | 1963–1988 | (–5,5) | 49.4% | Tender offers. |
| Sirower (1994) | –2.3%* | 168 | 1979–1990 | (–1,1) | 35% | |
| Eckbo, Thorburn (2000) | –0.30% | 390 | 1964–1983 | (–40,0) | N/A | U.S. acquirers of Canadian targets. |
| Mulherin, Boone (2000) | –0.37% | 281 | 1990–1999 | (–1,+1) | N/A | |
| Mitchell, Stafford (2000) | –0.14%*† –0.07% | 366 366 | 1961–1993 | (–1,0) | N/A | Fama and French three-factor model, applied to monthly returns. |
| Walker (2000) | –0.84%*‡ –0.77% | 278 278 | 1980–1996 | (–2,+2) | 41.4% 46.4% | |
| DeLong (2001) | –1.68%* | 280 | (1988–1995) | (–10,1) | 33.6% | Deals in which at least one party is a bank. |
| Houston et al. (2001) | –4.64%* (1985–1990) –2.61% (1991–1996) –3.47%* (all) | 27 37 64 | (1985–1996) | (–4,1) | N/A | Deals in which both parties are banks. |
| Ghosh (2002) | –0.96% | 1,190 | (1985–1999) | (–5,0) | N/A | |
| Kuipers, Miller, Patel (2003) | –0.92%* | 138 | (1982–1991) | (–1,0) | N/A | Foreign acquirers of U.S. targets. |

Unless otherwise noted, event date is announcement date of merger/bid.

*Significant at the 0.95 confidence level or better.

†Top return is based on an equal-weighted benchmark portfolio. Bottom return is based on a value-weighted benchmark portfolio.

‡Top return is a return adjusted for market average returns. Bottom return is adjusted for return on a matched firm.

CAIN0001201

**EXHIBIT 3.5**    Studies Reporting Positive Returns to Acquirers

| Study | Cumulative Abnormal Returns | Sample Size | Sample Period | Event Window (Days) | % Positive Returns | Notes |
|---|---|---|---|---|---|---|
| Dodd, Ruback (1977) | +2.83%* successful | 124 | 1958–1978 | (0,0) | N/A | Tender offers only. Monthly data. |
| | +0.58% unsuccessful | 48 | | | | |
| Kummer, Hoffmeister (1978) | +5.20%* successful | 17 | 1956–1970 | (0,0) | N/A | Tender offers only. Monthly data. |
| Bradley (1980) | +4.36%* successful | 88 | 1962–1977 | (–20,+20) | N/A | Tender offers only. Daily data. |
| | –2.96% unsuccessful | 46 | 1962–1977 | (–40,+20) | N/A | Tender offers only. Daily data. |
| Jarrell, Bradley (1980) | +6.66%* | 88 | 1962–1980 | (–10,+10) | N/A | Tender offers only. Daily data. |
| Bradley, Desai, Kim (1982) | +2.35* successful | 161 | 1962–1976 | (–1,0) | N/A | Mergers only. Daily data. |
| Asquith (1983) | +0.20% successful | 196 | | | | |
| | +0.50% unsuccessful | 89 | 1963–1979 | (–20,+1) | N/A | Mergers only. Daily data. |
| Asquith, Bruner, Mullins (1983) | +3.48%* successful | 170 | | | | |
| | +0.70% unsuccessful | 41 | 1963–1978 | (–1,0) | N/A | Mergers only. Daily data. |
| Eckbo (1983) | +0.07% successful | 102 | | | | Mergers only. Monthly data. |
| | +1.20%* unsuccessful | 57 | 1969–1974 | (0,0) | N/A | Unsuccessful mergers only. Daily data. |
| Malatesta (1983) | +0.90% successful | 256 | 1962–1979 | (–10, cancellation date) | N/A | |
| Wier (1983) | +3.99% unsuccessful | 16 | | | | |
| | | 90 | 1962–1980 | (–1,0) | 52% | |
| Dennis, McConnell (1986) | –0.12% (–1,0) | | | | | Tender offers only; subperiod data available for 1962–69, 70–79, 80–85; acquirer returns have decreased from +4% to –1% |
| | +3.24% (–6,+6)* | 440 | 1962–1985 | (–10,5) | N/A | |
| Jarrell, Brickley, Netter (1987) | +1.14%* | | | | | |

(Continued)

CAIN0001202

**42**

**EXHIBIT 3.5** *(Continued)*

| Study | Cumulative Abnormal Returns | Sample Size | Sample Period | Event Window (Days) | % Positive Returns | Notes |
|---|---|---|---|---|---|---|
| Sicherman, Pettway (1987) | +4.026%* related<br>+0.047% unrelated | 49<br>98 | 1983–1985 | (–10,+10) | N/A | Compared returns to buyers of divested assets in related and unrelated industries. |
| Bradley, Desai, Kim (1988) | +1%* | 236 | 1963–1984 | (–5,5) | 47% | Tender offers only; subperiod data available for 7/63–6/68, 7/68–12/80, 1/81–12/84; acquirer returns have decreased from +4% to –3% over time. |
| Jarrell, Poulsen (1989) | +0.92%* | 461 | 1963–1986 | (–5,5) | N/A | Tender offers only. |
| Lang, Stulz, Walkling (1989) | 0% | 87 | 1968–1986 | (–5,5) | N/A | Tender offers only. |
| Loderer, Martin (1990) | +1.72%* 1966–1968<br>+0.57%* 1968–1980<br>–0.07% 1981–1984 | 970<br>3,401<br>801 | 1966–1984 | (–5,0) | N/A | Mergers and tenders offers; segment data available on size of acquisition. |
| Smith, Kim (1994) | +0.50%<br>–0.23% | 177 | 1980–1986 | (–5,5)<br>(–1,0) | 49.2%<br>76.2% | Successful and unsuccessful tender offers. |
| Schwert (1996) | +1.4% | 666 | 1975–1991 | (–42,126) | N/A | Mergers, tenders offers; segment data available for various transaction attributes. |
| Maquieira et al. (1998) | +6.14%* nonconglomerate deals<br>–4.79% conglomerate | 55<br>47 | 1963–1996 | (–60,60) | 61.8%<br>36.2% | Study of returns in conglomerate and nonconglomerate stock-for-stock deals. |

CAIN0001203

| | | | | | | |
|---|---|---|---|---|---|---|
| Lyroudi, Lazardis, Subeniotis (1999) | 0% | 50 | 1989–1991 | (–5,5) | N/A | International acquisitions by European and Japanese firms. |
| Eckbo, Thorburn (2000) | +1.71%* | 1,261 | 1964–1983 | (–40,0) | N/A | Canadian acquirers of Canadian targets. |
| Leeth, Borg (2000) | +3.12%* | 466 | 1919–1930 | (–40,0) | N/A | |
| Kohers, Kohers (2000) | 1.37%* cash deals | 961 | 1987–1996 | (0,1) | N/A | Sample of mergers among high-tech firms. |
| | 1.09%* stock | 673 | | | | |
| | 1.26% whole sample | 1,634 | | | | |
| Mulherin (2000) | +0.85%* | 161 | 1962–1997 | (–1,0) | 49% | Sample of incomplete acquisitions. |
| Floreani, Rigamonti (2001) | +2.63%* | 56 | 1996–2000 | (–5,+5) | N/A | Sample of European insurance company mergers. |
| Kohers, Kohers (2001) | +0.92%* | 304 | 1984–1995 | (–1,0) | N/A | Sample of technology mergers. |
| Beitel et al. (2002) | +0.06% | 98 | 1985–2000 | (–1,0) | 53% | Sample of European bank mergers. |
| Fuller, Netter, Stegemoller (2002) | +1.77%* all +2.74%* 1st time bidders | 3,135 | 1990–2000 | (–2, +2) | N/A | |
| Billett, King, Mauer (2003) | +0.15% | 831 | 1979–1997 | (–1,0 month) | N/A | |
| Moeller, Schlingemann, Stulz (2003) | +1.13%* all +1.496%* private –1.020%* public +2.003%* subsidiary | 12,023 | 1980–2001 | (0, 36 months) | N/A | Tested the difference in bidder's returns at acquiring private company, public company, or subsidiary of public company. |
| Renneboog, Goergen (2003) | +0.70%* | 142 | 1993–2000 | (–1,0) | N/A | European transactions. |

Unless otherwise noted, event date is announcement date of merger/bid.

*Significant at the 0.95 confidence level or better.

CAIN0001204

- There are 16 studies that consider returns well *after* the consummation of the transaction (see Exhibit 3.6). Eleven of these studies report negative and significant returns. Caves (1989) infers that these findings are due to "second thoughts" by bidders' shareholders, and/or the release of new information about the deal. But interpretation of longer-run returns following the transaction is complicated by possibly confounding events that have nothing to do with the transaction. Consistent with this, two streams of recent research suggest plausible explanations for the postmerger declines. The first is overvaluation of the buyer's shares; Shleifer and Vishny (2001) suggest that buying firms tend to acquire with stock when they believe their shares are overvalued. Thus, the postmerger decline is not a reflection of the success of the merger, but rather a correction in the market's valuation of the buyer. The second is the effect of industry shocks. Mitchell and Mulherin (1996) argue that the poor performance following acquisition is often the signal of economic turbulence in the industry rather than the acquisition itself. More is said about both theories in Chapters 4 and 20.
- When the welfare of creditors *and* stockholders in the buyer firm are considered, three studies suggest that the value of the buyer firm increases by a statistically significant amount.[7] This suggests that the gains from acquisition are not isolated to stockholders.

A reasonable conclusion from these studies is that in the aggregate, abnormal (or market-adjusted) returns to buyer shareholders from M&A activity are essentially zero. Buyers basically break even (i.e., acquisitions tend to offer zero net present values, or, equivalently, investors earn their required return).

Any inferences about the typical returns to buyers based on returns must grapple with the difficult issue of the size difference between buyers and targets. Buyers are typically much larger than targets. Thus, even if the dollar gains from merger were divided equally between the two sides, the percentage gain to the buyer's shareholders would be smaller than to the target's. Asquith, Bruner, and Mullins (1983) reported results consistent with the size effect. For instance, in mergers where the target's market value was equal to 10 percent or more of the buyer's market value, the return to the buyer was 4.1 percent (t = 4.42). But where the target's value was less than 10 percent, the return to the buyer was only 1.7 percent. Numerous other studies have confirmed the significance of the relative size of the target in explaining variations in returns. The practical implication of this is that the impact of smaller deals (which constitute the bulk of M&A activity) *gets lost in the noise.* In other words, what we know about M&A profitability is a blend of noise and large deals.

## Returns to Buyer and Target Firms Combined

Findings of positive abnormal returns to the seller and breakeven returns to the buyer raise the question of *net economic gain* from this event. The challenge here stems from the size difference between buyer and target: typically, the buyer is substantially larger. Hence, a large percentage gain to the target shareholders could be more than offset by a small percentage loss to the buyer shareholders. A number of studies have examined this by forming a portfolio of the buyer and

CAIN0001205

Case 1:23-cv-10488-DLC   Document 130-19   Filed 01/26/26   Page 13 of 15

how much is enough? As the Supreme Court acknowledged in the landmark case *TSC Industries, Inc. v. Northway, Inc.*,[13] some information is of dubious significance. Setting the standard too low might "simply bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decision making." Therefore, the Court adopted a general standard of *materiality* as follows: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." In *Basic Inc. v. Levinson*,[14] the Supreme Court extended this standard of materiality to questions of insider trading under Section 10(b) and Rule 10b-5 of the '34 Act.

2. *Probability.* Merger negotiations are *highly* material for every target firm. But they may not be very important to investors if a merger is not likely. In *Basic Inc. v. Levinson*, the U.S. Supreme Court did not require disclosure simply because the information was material.

3. *Commit and disclose.* Evidence of high probability is the execution of written documents such as a definitive agreement or even a letter of intent. Many practitioners prefer to defer signing documents until the buyer and seller are ready to make a public announcement.

4. *Expectations in the market.* If a target has staunchly told investors in the past that "the firm is not for sale," but has recently initiated serious merger negotiations with a buyer, then the firm is obliged to correct the prevailing expectations in the market. A firm has a "duty to update" where recent actions depart from past pronouncements.

5. *"No comment."* To avoid spilling the beans under a "duty to update," many firms follow a strict policy of not commenting on market rumors, negotiations in progress, and so on. Carnation failed to do so in the face of rumors about its secret negotiations to be acquired by Nestlé in 1984. The company denied that it was for sale, even though negotiations were serious and ultimately produced a proposed deal. The SEC wrote, "Whenever an issuer makes a public statement or responds to an inquiry from a stock exchange official concerning rumors, unusual market activity, possible corporate developments, or any other matter, the statement must be materially accurate and complete. If the issuer is aware of nonpublic information concerning acquisition discussions that are occurring at the time the statement is made, the issuer has an obligation to disclose sufficient information concerning the discussions to prevent the statements made from being materially misleading."[15]

6. *Abstain from trading or disclose.* If a target firm is trading in its own shares, such as executing a standard share repurchase program over time, insider trading laws will require it to disclose to the market material information (such as news of merger negotiations) or else abstain from trading. It is possible that suspending a share repurchase program will become known to the market (through brokers or others), and thereby trigger speculation about material developments at the firm.[16]

In addition to these broad guidelines, two special issues warrant further discussion: forward looking statements and cautionary statements.

CAIN0001206

## Forward-Looking Statements

Under U.S. securities law and case law, the ability to make forward-looking statements about the issuer has historically been limited. The rationale for this is that absent these restrictions, unscrupulous promoters might hype the prospects of an issuer to unsophisticated investors, and thereby exploit them. But as a practical matter, *all* securities are priced and purchased on the basis of expectations. It would appear, then, that the restriction on making forward-looking statements about an issuer would frustrate the effort to promote the efficiency of capital markets.

In 1995, Congress crafted a "safe harbor" with regard to forward-looking statements for issuers in the Private Securities Litigation Reform Act. The Act added new Sections 27A to the '33 Act and 21E to the '34 Act that protected from private litigation forward-looking statements that conformed to the following:

■ They are identified as "forward looking."
■ They are accompanied by meaningful cautionary statements reminding the reader that actual results could differ materially from projections. The cautions cannot be boilerplate; they must be meaningful.
■ The person making the forward-looking statement must not intend to make a false or misleading statement.

Covered here are financial projections, discussion of business plans, and discussion of assumptions underlying projections. However, not covered by this exemption are financial statements prepared in accordance with generally accepted accounting principles (GAAP), tender offers, and initial public offerings.

### Caution

Generally, courts have tended to dismiss fraud claims where a company has disclosed risks that might affect future performance—this is the *"bespeaks caution"* doctrine. For instance, Brad Grossman sued Novell, Inc. for falsely assuring investors about its acquisition of WordPerfect Corporation in 1994. The judge dismissed the claim and said, "Securities fraud claims cannot be maintained where defendants have issued detailed cautionary warnings. The 'bespeaks caution' doctrine provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." It does not matter "if the optimistic statements are later found to have been inaccurate or based on erroneous assumptions when made, provided that the risk disclosure was conspicuous, specific, and adequately disclosed the assumptions upon which the optimistic language was based."[17]

### Manage Leaks of Information

M&A practitioners manage the flow of information very carefully with a view toward forestalling leaks of facts or rumors in the stock market. Some of the typical practices include these four:

CAIN0001207

1. *Limited access, no access.* Information about a deal is limited strictly to those having a need to know. Documents are sequestered under lock and key; digital firewalls limit hackers and inadvertent e-mails. The organization practices a culture of secrecy.
2. *Small teams.* The circle of professionals brought in to work on a deal is no larger than necessary.
3. *Limited time.* Consistent with the need to know, disclosures to others are withheld until the last minute.
4. *Encryption and disguises.* Deals are given code names, the only point of reference in conversations outside the walls of the group.

These practices extend to suppliers to M&A professionals. For instance, a graphic designer who specializes in M&A work said, "We can't afford to trust anyone. . . . We're a self-contained environment. . . . It's a little bit like a loyal cult."[18]

## KEY IMPLICATION: INSIDER TRADING

In Section 10(b), the '34 Act prohibits insider trading and has been used to prosecute cases under two theories, both of which the U.S. Supreme Court has upheld. Rule 10b-5 of the SEC implements the section. The Insider Trading and Sanctions Act of 1984 pursues those who trade on information not available to the general public. Penalties under this act include disgorging the illegal profits from insider trading and up to three times the value of those profits. The Insider Trading and Securities Fraud Enforcement Act of 1988 added a section to the '34 Act that requires corporations and brokers to implement systems to prevent insider trading. Finally, the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO) has been applied to securities trading operations, most famously the junk bond desk of Drexel Burnham Lambert and its chief, Michael Milken. Originally aimed at corrupt unions, RICO has been applied more broadly and has two key criteria for prosecution: (1) conspiracy to defraud and (2) repeated transactions. The penalties include triple damages for successful plaintiffs. In criminal proceedings, RICO authorizes the court to seize the assets of the accused while the case is being tried—even though the defendant might be acquitted, the prospective disruption of business might be so severe as to impose a strong incentive to settle the case in advance of trial.

### Classical Theory of Insider Trading Liability

The first basis for prosecution is *deception*, which the classical approach to insider trading prohibits. Insiders, or agents of the owners, are viewed as holding a position of trust. In the landmark case *Dirks v. SEC*, the Supreme Court held that the

CAIN0001208