# EXHIBIT 20

Case 1:23-cv-10488-DLC    Document 130-20    Filed 01/26/26    Page 2 of 5

■ *Corporate review.* The corporate guidance committee and its advisers will conduct a review of the buyer itself to identify any issues that could bar a transaction. These could entail problems across a wide range of considerations including environmental, accounting, and tax issues.

## INITIATING DISCUSSIONS: GAINING AN EARLY SENSE OF THE POSSIBILITIES

Friendly negotiations typically begin with a conversation between the CEOs of the buyer and target firms, except where the target is much smaller than the buyer, in which case the buyer may delegate an operating or staff executive to make the approach. The aim of this first conversation is to open the door and gain an agreement to meet again. It presents the concept of the merger, expresses its strategic logic, and frames some possibilities about social issues.

The target's response to the buyer's initial pitch is a crucial inflection point. If the target CEO is neutral or favorably disposed to the pitch, he or she will typically ask for time to consult advisers, and propose a meeting in a few days or weeks. This hiatus will give the target time to engage advisers, do some initial research on the buyer, brief the board, and set strategy. If the target has a strong prior desire to remain independent, or at least not to merge with the buyer, the target CEO will express a strong and clear "no"—this is the famous "*just say no*" defense,[4] and must be grounded in some belief that the transaction is not in the interest of the target's shareholders and/or that the target has some other strategy that dominates the buyer's idea. For instance, the other better strategy may entail a new product launch, deployment of new technology, entry into new geographic markets, investment in R&D, and/or reliance on different forms of combination other than M&A—these alternatives may create more value for the target's shareholders than selling the company to another firm. The tools of strategic analysis (outlined in Chapter 6) and valuation (outlined in Chapters 9 through 15) can help inform the target's decision to say "yes" or "no."

Following a rejection, most merger proposals die. But some buyers may elect to appeal directly to the board of directors in the form of a "bear hug"[5] proposal, or directly to the shareholders in the form of a hostile tender offer.[6]

Following a positive response (i.e., agreement to meet again), the two CEOs may subsequently get together to sketch out social issues, price, and other major terms. After that may come a few more meetings among delegates (such as chief financial officers) to add more detail. The objective of these subsequent meetings is to lend more certainty to the belief that an attractive deal is to be had, and that it is worthwhile for both parties to enter the next phase with a letter of intent.

## FIRST-ROUND DOCUMENTS: TERM SHEET, LETTER OF INTENT, AGREEMENTS ABOUT CONFIDENTIALITY, STANDSTILL, AND ENGAGEMENT OF ADVISERS

Up to this point, the two sides have little to show for their efforts but a degree of oral agreement on the possibilities of merger. In order to set an economically attrac-

CAIN0001959

*How a Negotiated Deal Takes Shape*

3. **Be aware that project leadership skills are at a premium.** Shaping the deal is a complex task. Governance requires the satisfaction of procedural steps that come in a certain order. One must focus on good process and trust that, in doing so, a good outcome will emerge. M&A is too important to be left to technicians. The complexity of the process described in this chapter suggests that excellence in deal doing rests fundamentally on diverse skills of process management.

4. **Get expert professional help.** The best path forward is not well defined, and the risks to the deal are legion. Some missteps may expose directors and corporate executives to personal financial liability. The chapter outlines the areas of expertise that may be required: law, accounting, investment banking, and public relations, to name a few.

5. **Stay in charge of the process.** The Daimler-Chrysler case study illustrates that executives from Daimler and Chrysler were intimately involved with the development of the deal. While they plainly delegated some responsibilities to lower-level managers and financial advisers, they and their boards of directors remained in control of the deal shaping process.

## NOTES

1. Covenants such as indemnification provisions and earnout plans usually extend beyond closing.

2. After electricity markets are deregulated, prices may fall, rendering some plants and projects unprofitable. The cost of the investment in these assets is said to be "stranded." Utilities usually seek to recover the lost investment through rate increases, which are subject to approval by regulatory commissions. See Dean Starkman, "DQE Calls Off Its Planned Acquisition by Allegheny Energy, Citing Regulators," *Wall Street Journal*, July 29, 1998.

3. Quoted in Scott Kilman and Robin Sidel, "Judge Rules against Tyson in IBP Takeover Case," *Wall Street Journal*, June 18, 2001.

4. In 1983, First Lady Nancy Reagan advocated a drug abuse prevention program that had the popular slogan, "Just say no." This preceded a series of court decisions that seemed to legitimize the power of CEOs to reject merger proposals without bringing them to the board of directors or shareholders. Thus, the defense of a firm but simple rejection—"just say no"—was born. The effectiveness of this defense relies on the firm's past financial performance and the height of its share price. Poorly performing targets rarely fend off an insistent suitor by just saying no.

5. The "bear hug" is a technique just one step short of a hostile tender offer. The buyer sends a merger proposal directly to the target firm's board of directors—bypassing the CEO. Typically, the financial offer is high enough to warrant serious consideration by the directors, who may elect to appoint a special committee (i.e., excluding the CEO) to negotiate a sale of the target.

6. A "tender offer" invites the target company shareholders to submit ("tender") their shares to the buyer in return for offered payment. Tender offers for public companies are subject to rules of the U.S. Securities and Exchange Commission. A tender offer is judged "hostile" when the target company management and board are opposed to the offer.

CAIN0001960

## A PROFILE OF HOSTILE TAKEOVERS

Hostile takeovers offer an unusual blend of risk and return. Judged against the strategic alternatives that were outlined in Chapter 6, the hostile bid is an unusual tactic.

### Uncertain Outcomes

Exhibit 32.1 summarizes the outcomes of 371 U.S. and 190 foreign hostile takeover attempts from 1975 to 2000. In a hostile bid, the target's directors officially oppose the offer in the face of the bidder's advances.[8] *Unsolicited bids* account for 1.2 percent of all completed deals in the United States (0.3 percent outside the United States)—plainly, these are rare events. Of the unsolicited bids, about 32 percent were hostile according to Thomson Securities Data Corporation. Of the U.S. bids that were hostile, the hostile bidder consummates a deal about 25 percent of the time. In about 30 percent of the cases, the target is acquired by another, usually friendly, firm. And in about 45 percent of the cases, the target remains independent. In other countries, the results are less benign for the target. There, the hostile bidder wins in 37 percent of the cases; a "white knight" wins in 25 percent; and the target remains independent in 38 percent. Whether in the United States or elsewhere, the odds tilt against the hostile bidder. At the same time, the odds run against the target remaining independent. Plainly, the hostile bid triggers an episode of high uncertainty for all participants. These contests are hardly

**EXHIBIT 32.1**    Summary of Outcomes of Hostile Takeover Attempts: Breakdown of Deal Attitude and Takeover Results from 1975 to 2000

| | Bids for U.S. Targets by U.S. or Foreign Bidders | | Bids for Foreign Targets by U.S. or Foreign Bidders | |
|---|---|---|---|---|
| Total M&A done deals | 93,312 | 100% | 147,971 | 100% |
| Total confirmed, unsolicited | 1,151 | 1.2% | 451 | 0.3% |
| Of those that were unsolicited: | | | | |
|    Friendly | 111 | 9.7% | 147 | 25.3% |
|    Neutral* | 669 | 58.1% | 114 | 42.1% |
|    Hostile | 371 | 32.2% | 190 | 32.6% |
| Total | 1,151 | 100.0% | 451 | 100.0% |
| Of those that were hostile: | | | | |
| Target sold to hostile bidder | 91 | 24.5% | 71 | 37.4% |
|    (over competing bids) | (28) | (7.5%) | (11) | (5.8%) |
| Target sold to another bidder | 114 | 30.7% | 47 | 24.7% |
| Successful defense, target not sold | 166 | 44.8% | 72 | 37.9% |
| Total | 371 | 100% | 190 | 100% |

*Neutral is defined as either (1) the bid is independent of the board of directors or (2) the board of directors neither accepts the initial bid as friendly nor rejects the bid as hostile.
*Source of data:* Thomson Securities Data Corporation. The observations run from January 1, 1975, to November 1, 2000.

CAIN0001961

*Hostile Takeovers: Preparing a Bid in Light of Competition and Arbitrage*

sure things, a fact that should heighten the importance of professional counsel and mastery of the process for decision makers in these scenarios.

## Attractive Returns

Given the low rate of success for hostile bidders, what would induce them to take action? The summary of event returns to bidders in hostile takeovers given in Chapter 3 reveals that bidders win significantly positive abnormal returns of about 2 to 4 percent.[9] Target shareholders win as well, receiving higher acquisition premiums in hostile deals than in friendly deals. When a target successfully rejects a bidder, the target's share price falls but to a price level higher than prevailed *ex ante*—the takeover attempt typically stimulates a restructuring that unlocks value for shareholders. Further evidence presented in Chapter 20 shows that when the bidder offers cash, the returns are more positive still.

## Bargaining Tactic

Looking at the similarity of targets in hostile and friendly deals, Schwert (2000) concluded that hostility was merely in the eyes of the beholder and that "hostility reflect[s] strategic choices made by the bidder or the target firm to maximize their respective gains from a potential transaction. . . . Strategic bargaining is the motivation for hostility." (Page 2639) This is consistent with the two previous chapters that characterized negotiation, auction, and hostile bids as segments of a *spectrum* of bargaining approaches to a deal.

## BE AWARE OF THE PLAYERS, BOTH ON THE FIELD AND OFF

It is useful to enter a game by surveying all the players. Here is a brief rundown of the usual suspects. It is naive to see the hostile tender offer as a contest simply between bidder and target. The field is considerably more complicated. Viewed through the lens of economics, the contest embraces six kinds of players:

1. *Attacker (or in street parlance, a bidder)*. The popular press and halls of government view bidders rather harshly, for it is the bidders who propose to wrest control, close plants, lay off workers, and take other actions to enrich themselves. A more benign view is that bidders are *entrepreneurs* who through research and initiative discover profitable opportunities. The hostile tender offer is the action taken to begin to harvest the profit.
2. *Defender or target is* the profitable opportunity. The bidder may see synergies, hidden or underutilized assets that could be sold, or businesses that are draining cash and could be restructured or closed.
3. *Various free riders*. Free riders are shareholders who may not be well informed but who suspect that the bidder knows something they don't, and who are tempted to participate in some of the profits flowing to the bidder. These shareholders seek to ride free in harvesting the profitable opportunity. The bidder would like to quell the free riders, because they reduce the bidder's profit.

CAIN0001962