UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x
                                    :   Civil Action No. 1:23-cv-10488-DLC
In re NATIONAL INSTRUMENTS          :
CORPORATION SECURITIES LITIGATION : CLASS ACTION
                                    :
                                    :
————————————————————— :
                                    x

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ............................................................................................................... 1

II.    LEGAL STANDARD ....................................................................................................... 2

III.   ARGUMENT ..................................................................................................................... 2

    A.   Emerson's Offer to Acquire NI Was Material Information ................................................ 2

    B.   Defendants Acted With Scienter ..................................................................................... 12

    C.   Defendants' Purported Reliance on Counsel Does Not Support Summary Judgment ...... 15

    D.   Defendants Are Not Entitled to Summary Judgment on Loss Causation ......................... 21

    E.   Defendants Are Not Entitled to Summary Judgment on Damages .................................. 23

    F.   Defendants Are Not Entitled to Summary Judgment on 10b5-1 Trading Plan Defense ... 26

    G.   Defendants Are Not Entitled to Summary Judgment on Section 20(a) Claim ................. 27

IV.   CONCLUSION .................................................................................................................. 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012)................................................................................26

*Abdel-Karim v. EgyptAir Airlines*,
   116 F.Supp.3d 389 (S.D.N.Y. 2015)................................................................20

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
   19 F.4th 145 (2021)............................................................................................3

*Basic Inc. v Levinson*,
   485 U.S. 224 (1988)............................................................................................3

*Duttle v. Bandler & Kass*,
   1990 WL 52147 (S.D.N.Y. Apr. 17, 1990).......................................................26

*Elkind v. Liggett & Myers, Inc.*,
   635 F.2d 156 (2d Cir. 1980)..............................................................................26

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)...............................................................27

*George v. China Auto. Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012).....................................................27

*Gruber v. Gilbertson*,
   628 F.3d 472 (S.D.N.Y. 2022)..........................................................................19

*Jackvony v. RIHT Fin. Corp.*,
   873 F.2d 411 (1st Cir. 1989)...............................................................................5

*Leberman v. John Blair & Co.*,
   880 F.2d 1555 (2d Cir. 1989)............................................................................16

*Levie v. Sears Roebuck & Co.*,
   676 F. Supp.2d. 680 (N.D. Ill. 2009)..................................................................5

*Linde v. Arab Bank, PLC*,
   269 F.R.D. 186 (E.D.N.Y. 2010)................................................................. 20-21

*Matsushita Electronics Corp. v. Loral Corp.*,
   1995 WL 527640 (S.D.N.Y. Sept. 7, 1995).......................................................16

*Mills Bridge V, Inc. v. Benton*,
    2010 WL 5186078 (E.D. Pa. Dec. 21, 2010).................................................................5

*Mrs. U. S. Nat'l Pageant, Inc. v. Williams*,
    2022 WL 4115305 (W.D.N.Y. Sept. 9, 2022) .........................................................16

*Nokaj v. N. E. Dental Mgmt., LLC*,
    2019 WL 634656 (S.D.N.Y. Feb. 14, 2019).............................................................19

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) .............................................................................14

*In re Perrigo Co. PLC Sec. Litig.*,
    435 F. Supp. 3d 571 (S.D.N.Y. 2020).....................................................................12

*In re Perrigo Co. PLC Sec. Litig.*,
    2021 WL 3005657 (S.D. N.Y. July 15, 2021) .........................................................12

*Press v. Chemical Inv. Servs. Corp.*,
    166 F.3d 529 (2d Cir. 1999).......................................................................................3

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
    2025 WL 556283 (S.D.N.Y. Feb. 18, 2025).............................................................18

*In re Rsrv. Fund Sec. & Derivative Litig.*,
    732 F. Supp. 2d 310 (S.D.N.Y. 2010).......................................................................16

*S.E.C. v. Aly*,
    2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018) ...........................................................4

*S.E.C. v. Biovail Corp.*,
    2010 WL 2465482 (S.D.N.Y. June 16, 2010) ...........................................................2

*S.E.C.. v. Cole*,
    2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015)..........................................................12

*S.E.C v. Lek Sec. Corp.*
    612 F. Supp. 3d 287 (S.D.N.Y. 2020).......................................................................18

*S.E.C v. O'Meally*,
    2010 WL 3911444 (S.D.N.Y. Sept. 29, 2010)..........................................................19

*S.E.C. v. Sekhri*,
    2002 WL 31100823 (S.D.N.Y. July 22, 2002) ...........................................................4

*S.E.C. v. Warde*,
    151 F.3d 42 (2d Cir. 1998).........................................................................................4

iii

*S.E.C v. Wyly,*
    950 F.Supp.2d 547 (S.D.N.Y. 2013)....................................................................16, 19

*Stevelman v. Alias Rsch. Inc.*,
    174 F.3d 79 (2nd Cir. 1999)...............................................................................14

*U.S. Commodity Futures Trading Comm'n v. McCrudden*,
    2013 WL 142377 (E.D.N.Y. Jan. 11, 2013) ............................................................19

*U.S. v. Denkberg,*
    139 F.4th 147 (2d Cir. 2025) ..............................................................................15

*U.S. v. Scully,*
    877 F.3d 464 (2d Cir. 2017)...............................................................................15

*Veleron Holding, B.V. v. Morgan Stanley*,
    117 F. Supp. 3d 404 (S.D.N.Y. 2015)....................................................................3, 8

*Vivenzio v. City of Syracuse*,
    611 F.3d 98 (2d Cir. 2010)..................................................................................2

*In re WorldCom, Inc. Sec. Litig.*,
    352 F. Supp. 2d 472 (S.D.N.Y. 2005)..................................................................12, 16

*In re WorldCom, Inc. Sec. Litig.*,
    2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) .............................................................2

## Other Authorities

17 CFR § 240.10b5-1............................................................................................27

Fed. R. Civ. P. 56................................................................................................2

Fed. R. Civ. P 56(c)(2)..........................................................................................20

## I.    INTRODUCTION

Plaintiff and the Class respectfully ask the Court to deny Defendants' summary judgment motion. There is a strong evidentiary record more than sufficient for jurors to find for Plaintiff on every issue Defendants raise.

*Materiality*: The facts demonstrate that Emerson's undisclosed premium offer to acquire National Instruments ("NI") was material information (and that this was apparent to Defendants). The Court has previously rejected Defendants' effort to rebut Plaintiff's substantial showing of materiality (Dkt. 105 at 12-13).  Reasonable jurors can come to the same conclusion.

*Scienter*: It is undisputed that Defendants were aware of the material facts regarding Emerson's offer, and there is substantial evidence demonstrating Defendants' understanding that this was material information at the time NI repurchased stock. The evidence of Defendants' intent to defraud also includes ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████" Ex. 45, NAT-SL-00001276-1278 at -1276.[1]

*Advice of Counsel*: Defendants' purported reliance on counsel is not a valid basis for summary judgment under well-established precedent. In any event, reasonable jurors can readily find that the record does not establish the required elements of this defense.

*Loss Causation and Damages*: Defendants seek summary judgment on causation and damages based largely on their motion to exclude portions of the testimony of Plaintiff's expert Dr. Matthew Cain. The Court should reject this effort for the reasons detailed in Plaintiff's opposition to Defendants' motion to exclude. Defendants also disagree with Dr. Cain (and the

---

[1] Exhibits referenced as "Ex. __" are to the Declaration of Noam Mandel filed contemporaneously. Exhibits referenced as "Def Ex. __" are to the Declaration of James F. Bennett, December 22, 2025, Dkt. 113.

Court) regarding the appropriate measure of damages and advance several flawed arguments for limiting damages supported by zero evidence. None of these arguments come close to the threshold for summary judgment.

_10b5-1 Plan_: Defendants' 10b5-1 plan defense is meritless because reasonable jurors can conclude that Defendants knew material information regarding Emerson's offer at the time they created that plan. Indeed, the suspicious timing of the plan – which was created just one day before NI began its repurchases in August 2022 – is itself strong evidence of scienter.

For these reasons and those detailed in the accompanying briefs concerning the admissibility of expert evidence, Defendants' summary judgment motion should be denied in full.

## II.    LEGAL STANDARD

Summary judgment is only appropriate where a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "'[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper[.]'" _Vivenzio v. City of Syracuse_, 611 F.3d 98, 106 (2d Cir. 2010); _see also In re WorldCom, Inc. Sec. Litig._, 2005 WL 638268, at *3 (S.D.N.Y. Mar. 21, 2005) (same). Where the evidence cited "in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." _Id._ "Issues of scienter and materiality are difficult ones on which to grant summary judgment as they are particularly fact and context" dependent. _S.E.C. v. Biovail Corp._, 2010 WL 2465482, at *2 (S.D.N.Y. June 16, 2010).

## III.    ARGUMENT

### A.    Emerson's Offer to Acquire NI Was Material Information

The record evidence supports an unequivocal jury finding that Emerson's undisclosed high-premium offer was material information during the Class Period.

2

"The determination of materiality is a mixed question of law and fact that generally should be presented to a jury." *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 430 (S.D.N.Y. 2015) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)). A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021). "When a contingent or speculative event is at issue, such as the potential acquisition of a company, 'materiality will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" Dkt. 105, at 10 (quoting *Basic Inc. v Levinson*, 485 U.S. 224, 238 (1988)).

Defendants do not dispute (or even address) the "magnitude" prong, and Emerson's undisclosed offer to acquire NI shares at a substantial premium clearly involved a high-magnitude event. As to the "probability" prong, the Court has recognized that "[t]here was a meaningful possibility that Emerson would continue its efforts to acquire NI after it indicated serious interest in doing so in its letters of May 25 and June 22" and "[i]t remained entirely plausible that Emerson would return with an improved offer or take its offer public." *Id.* at 11, 13. Thus, as the Court has observed, "[t]he swift rejection of those early offers by NI's Board does not prevent them from being found material." *Id.* at 13. The facts strongly support these conclusions, and refute Defendants' core contention that the prospect of a transaction was "dead" during the Class Period.

*Emerson's Undisclosed Offer*: The facts concerning Emerson's offer support materiality. Emerson offered cash to acquire NI for $48 per share, a price the stock had not reached for several years and a significant premium to its market price. *See* Def. Ex. 24; Declaration of James Bennett,

Dkt. 116, Exhibit A, Expert Report of Dr. Matthew Cain, July 28, 2025 ("Cain Rpt.") ¶¶111-12.

Emerson's June 22, 2022 proposal – its second approach to NI in under a month – evidenced its

willingness to increase its offer price and determination to pursue the acquisition of NI.  Emerson

made clear that:

- Emerson was "very motivated to conclude a transaction" and that acquiring NI was Emerson's "highest strategic priority;"

- Emerson was "prepared to engage immediately" and had "organized the resources to move toward a transaction expeditiously;"

- Emerson had "performed extensive outside-in due-diligence" and "would work towards signing and announcing a definitive agreement within four weeks;"

- Emersons' offer was not subject to any financing contingency;

- Emerson's $48 per share offer price represented a 51% premium to the market price;

- Emerson had engaged prominent advisors, namely Goldman Sachs and Centerview (as financial advisors) and Davis Polk & Wardwell (as legal advisor);

- Emerson's Board had "reviewed and support[ed] the proposed transaction;" and

- Emerson was willing to "work with [NI] to find additional value that would allow it to increase [its] Proposal." *Id*.

Jurors could readily find that this information was material because "[f]ew matters are more

material than a corporation's involvement in a possible merger or acquisition" and "specific

information pertaining to a proposed corporate acquisition, tender offer, or merger is

quintessentially material." *S.E.C. v. Sekhri*, 2002 WL 31100823, at *14 (S.D.N.Y. July 22, 2002);

*S.E.C. v. Aly*, 2018 WL 1581986, at *20 (S.D.N.Y. Mar. 27, 2018); *see also S.E.C. v. Warde*, 151

F.3d 42, 47 (2d Cir. 1998) (information concerning acquisition offer was material because it "had

a very high likelihood of affecting the price of [the company's] stock, as confirmed by the fact that the stock price jumped when this information was made public").[2]

Indeed, NI's Insider Trading Policy recognized this reality in plain English, defining material information as "any information that could reasonably be expected to affect the market price of a security" including "significant corporate events, such as a pending or proposed merger."

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ Ex. 5, BofA Tr. at 35:20-22; 36:25-37:12.

Jurors could also take note of the evolution of Emerson's offer from its first offer letter on May 25, 2022 to the June 22, 2022 offer letter to support the conclusion that Emerson was serious about acquiring NI. For example, although the market price of NI stock had declined in the interim, Emerson did not reduce its offer price and, instead, continued to offer $48 per share, representing a significantly greater premium of 51% compared to the 39% premium offered on May 25. Further,

██████████████████████████████████████████

██████████████████████████████████████████ence

---

[2] Defendants rely on distinguishable cases. In *Jackvony v. RIHT Fin. Corp.,* 873 F.2d 411, 415 (1st Cir. 1989), there were "no concrete offers, specific discussions, or anything more than vague expressions of interest." In *Mills Bridge V, Inc. v. Benton*, 2010 WL 5186078, at *12 (E.D. Pa. Dec. 21, 2010), information about a potential merger (that was never consummated) was not material at the time of stock sales, where "discussions as to the actual terms of any potential deal . . . did not commence until" more than a month later. In *Levie v. Sears Roebuck & Co.*, 676 F. Supp.2d. 680, 687-88 (N.D. Ill. 2009), the court held there was no duty to disclose, including because challenged misstatements occurred before the target was even approached. None of these cases involve facts remotely like Emerson's specific high-premium cash offer, willingness to pay more, toehold investment, and potential hostility, among other indicia of materiality.

████████████████████. Ex. 30, NAT-SL-00016089. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ Ex. 31, NAT-SL-00017152-154.

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Def. Ex. 37, 39.

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████



Counterstatement, ¶¶ 34, 58-60, 75; Def. Ex. 36; Ex. 61, NAT-SL-00012292-295; Ex. 47, NAT-SL-00018186-187; Ex. 46, NAT-SL-00017263-267).

Ex. 25, NAT-SL-00001513 at 528-9.

Then, just days before NI's repurchases began, NI learned that Emerson was in fact selling InSinkErator for $3 billion. On August 8, 2022, Wachtell's principal partner advising NI concerning Emerson's offer told NI senior executives that Emerson was "moving forward with portfolio realignment" by "selling InSinkErator $3B to Whirlpool . . . (Another reason why Lal [Karsanbhai, Emerson's CEO] may have been a bit busy past few days)." Def. Ex. 36.

7



*Conduct Demonstrating Materiality*: The conduct of NI's senior executives reflects their understanding that Emerson's offer was material information and that Emerson was likely to return with an improved offer or go public with its offer. "[W]here there is a question of whether certain information is material, courts often look to the actions of those who were privy to the information in determining materiality." *Veleron*, 117 F. Supp. 3d at 431. The actions and contemporaneous records of NI senior executives who were privy to Emerson's undisclosed offer reflect their understanding of and provide further support for materiality.

*Id.*, *see also* Ex. 38, NAT-SL-00020795-0819, at -0798, -0803, -0812; Ex. 36, NAT-SL-00021516-1531 at -1519, -1521; Ex. 2, McGrath Tr. at 218:20-22, 289:16-290:9.

8

9

Defendant Starkloff's conduct likewise reflects his understanding that Emerson's offer was material information. For example, ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ █

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████[3]

In response, Defendants point to NI's decision not to adopt a "poison pill" during the Class Period as a supposed sign that they did not believe Emerson was serious about a deal. Br. at 10. However, adopting a pill is a disclosable event, and indeed, NI later disclosed its adoption of a pill on January 13, 2023. Adopting a pill and making such a disclosure during the Class Period would have alerted the market that NI was in play and significantly increased NI's stock price, which would have been contrary to ████████████████████████████████ ████████████████████████████████████████ Thus, deciding not to adopt a pill during the Class Period is perfectly consistent with wrongfully withholding material information about Emerson's offers while engaging in repurchases.

---

[3] In these and numerous other documents, ████████████████████████
████████████████████████████████████████████
████████████████████████████

*Dr. Cain's Expert Opinion*: Dr. Cain's opinions provide further compelling evidence that the omitted information concerning Emerson's offer was economically material.

Dr. Cain explains that numerous features of Emerson's offer to acquire NI correspond to factors identified in the academic literature as increasing the likelihood of deal completion, including ████████████████, cash offers (as compared to stock or mixed offers), offers with substantial premiums, and offers priced above the target's 52-week high. Cain Rpt. ¶¶109-12.

Dr. Cain also draws upon academic literature finding that M&A negotiations commonly involve initial rejections followed by further rounds of bidding, refuting Defendants' contention that NI's rejection of Emerson's initial offers meant that the likelihood of a transaction was "negligible" or "dead" at the start of the Class Period. Dr. Cain cites his own published research, which found that transactions that implicate potential *Revlon* duties – like the one here – typically go through multiple (on average over five) rounds of bidding. Cain Rpt. ¶¶113-114 (explaining that "hostile transactions typically involve more rounds of bidding, longer timelines, and higher final offers."). Dr. Cain's analysis confirms the Court's observations that "[t]here was a meaningful possibility that Emerson would continue its efforts to acquire NI" and "[i]t remained entirely plausible that Emerson would return with an improved offer or take its offer public." Dkt. 105, at 11, 13. Dr. Cain's analysis likewise confirms that a "reasonable investor may well have concluded that $48 was only Emerson's opening bid" and that the "rejection of those early offers by NI's Board does not prevent them from being found material." Dkt. 105, at 13.

Dr. Cain also conducted an event study that examined the reaction of NI's stock price to the disclosure of similar M&A-related information. Specifically, he examined NI's January 13, 2023 announcement of a strategic review process to explore a potential sale, and Emerson's January 17, 2023 announcement of its offer to acquire NI for $53/share (along with disclosures

11

concerning Emerson's preceding bids). The event study showed that each announcement was associated with a statistically significant increase in NI's stock price, demonstrating the economic materiality of information concerning M&A in general and a potential acquisition by Emerson in particular. Cain Rpt. ¶124.

In short, there is substantial and compelling evidence from which jurors could conclude that materiality is apparent in this case.

## B.      Defendants Acted With Scienter

Jurors should decide whether Defendants acted with scienter. "The mental state required for liability is either an intent to deceive, manipulate, or defraud, or recklessness." *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 580 (S.D.N.Y. 2020) (internal quotation marks omitted). Defendants acknowledge that this culpable mental state includes mere "knowing possession" of material information. Def. Br. at 6-7. "Whether the defendants had the requisite scienter is a question of fact to be determined by a jury." *In re Perrigo Co. PLC Sec. Litig.,* 2021 WL 3005657, at * (S.D. N.Y. July 15, 2021); *see also In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 500 (S.D.N.Y. 2005) ("Whether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact."); *S.E.C. v. Cole*, 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19, 2015) ("[T]he Second Circuit has left no doubt that scienter issues are seldom appropriate for resolution at the summary judgment stage.").

The factual record strongly supports scienter here.

As a threshold matter, NI's senior executives, including Defendants Starkloff and McGrath, clearly knew the facts necessary to understand that Emerson's offers constituted material information. For example, it is undeniable that at the time of the repurchases, Defendants knew that Emerson's offer was for an all-cash transaction at a substantial premium to NI's market price; that Emerson had ample financial capacity to acquire NI and the offer was not subject to any

12

financing contingency; that ███████████████████████████████; that Emerson had hired top-tier financial and legal advisors to pursue the NI acquisition; that Emerson had stated that the transaction was its "highest strategic priority" and had otherwise expressed a serious commitment to acquiring NI; and that Emerson had specifically indicated a willingness to increase its offer. Def. Ex. 10; Def. Ex. 24; Def. Ex. 37; Ex. 4, Starkloff. Tr. at 140:2-13. Just as jurors could weigh the facts and conclude that Emerson's undisclosed premium cash offer was material information, so too could they conclude that this reality was evident to Defendants.

Admissions concerning scienter likewise support this conclusion. For example, ███████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

The record includes substantial additional evidence of Defendants' intent to deceive, manipulate, and defraud. ████████████████████████
████████████████████████████████████
████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████    Such trading at unusual times and in unusual amounts is classic

evidence of scienter. *See, e.g., Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2nd Cir. 1999)

(finding large sales of stock by insiders during the period of the alleged misrepresentations

supported a strong inference of scienter); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139

(S.D.N.Y. 1999) ("Insider sales of stock may be evidence of scienter if the trades are unusual or

suspicious in timing or amount.").

The showing of scienter is strengthened by the fact that ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

14

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

Defendants have no credible response to this powerful evidence of scienter. For example, Defendants incorrectly contend that Defendant Starkloff's sale of 900 NI shares (approximately 0.3% of his ownership) on August 16, 2022 somehow negates scienter. *See* Def. Br. at 14. In fact, Starkloff's sale was executed pursuant to a pre-existing trading plan adopted on May 2, 2022 – before Emerson approached NI with its high premium offer. Def. Ex. 43; Ex. 4, Starkloff Tr. at 149:12-14. This argument is thus irrelevant to Defendants' scienter during the Class Period.

## C.    Defendants' Purported Reliance on Counsel Does Not Support Summary Judgment

Defendants' supposed reliance on the advice of counsel to defeat scienter fares no better.

Reliance on advice of counsel is not a complete affirmative defense that defeats liability in fraud cases, but rather "simply raises factual questions about a defendant's intent for a jury to decide." *U.S. v. Denkberg*, 139 F.4th 147, 157 (2d Cir. 2025); *see also U.S. v. Scully,* 877 F.3d 464, 476 (2d Cir. 2017) ("In a fraud case . . . the advice-of-counsel defense is not an affirmative defense that defeats liability . . . Rather, the claimed advice of counsel is evidence that, if believed, can raise a reasonable doubt in the minds of the jurors about whether . . . the defendant had an 'unlawful intent.'"); *S.E.C. v. Wyly*, 950 F.Supp.2d 547, 565-66 (S.D.N.Y. 2013) (reliance on advice of counsel is "not a complete defense, but only one factor for consideration"); *In re Rsrv. Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 321, n.8 (S.D.N.Y. 2010) ("The Second Circuit has held that where a defendant alleges that it acted in good faith and on advice of counsel, that defense generally presents a 'triable issue' of fact.") (*citing Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989)).

15

Summary judgment regarding Defendants' asserted reliance on counsel is particularly inappropriate here because ████████████████████████████████████████ ██████████████████████████████████████. The defense therefore rests entirely on fact finding and credibility determinations that are the province of jurors. When "the advice rendered was in part oral, as in this case, there will inevitably be some question as to what the attorney actually told the client." *Matsushita Electronics Corp. v. Loral Corp.*, 1995 WL 527640, at *2 (S.D.N.Y. Sept. 7, 1995). "Considering the questions of fact that underlie the advice-of-counsel defense, and the paucity of record evidence on the issues (let alone undisputed record evidence)," summary judgment should not be granted on this defense. *Mrs. U. S. Nat'l Pageant, Inc. v. Williams*, 2022 WL 4115305, at *5 (W.D.N.Y. Sept. 9, 2022); *see also In re WorldCom*, 352 F. Supp. 2d at 500 ("Fact finding and credibility determinations are the function of the jury and are not appropriately resolved on a motion for summary judgment.").

For example, Defendants appear to contend – ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

16



, demonstrating Defendants' scienter and raising serious questions about the credibility of the defense. *See, e.g., Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2025 WL 556283, at \*14 (S.D.N.Y. Feb. 18, 2025) (deliberately avoiding a "paper trail" creates an inference of scienter); *see also S.E.C. v. Lek Sec. Corp.* 612 F. Supp. 3d 287, 297 (S.D.N.Y. 2020) ("Defendants' scienter is also illustrated by their efforts to conceal their activity[.]").

Jurors could note, for example, that ███████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

should consider these facts when they evaluate Defendants' purported reliance on counsel.

In any event, the meager record on this issue refutes core elements of the advice of counsel defense. To establish that defense, a defendant must show "(1) that he made a complete disclosure to counsel; (2) sought advice from counsel as to the legality of his actions; (3) received advice that his conduct was legal; and (4) relied on such advice in good faith." *S.E.C. v. O'Meally*, 2010 WL 39111444, at *4 (S.D.N.Y. 2010); *Wyly*, 950 F.Supp.2d at 565-66. In addition, the party asserting the defense "must demonstrate that the counsel from whom he sought advice is 'disinterested and independent.'" *See Gruber v. Gilbertson,* 628 F.3d 472, 492 (S.D.N.Y. 2022) (citing *In re Rsrv.*

18

*Fund*, 2012 WL 4774834, at *2); *see also U.S. Commodity Futures Trading Comm'n v. McCrudden,* 2013 WL 142377, at *5 (E.D.N.Y. Jan. 11, 2013).

Defendants cannot satisfy these requirements.

*Defendants did not in good faith follow counsel's purported advice*:  Defendants assert that



*Defendants did not make complete disclosure to counsel*: Jurors could also readily conclude that

. *See, e.g., Nokaj v. N. E. Dental Mgmt., LLC,* 2019 WL 634656, at *13 (S.D.N.Y. Feb. 14, 2019) (denying summary judgment on advice of counsel defense where there were "[d]isputed issues of fact with respect to whether a complete disclosure to counsel was made[.]").

*Defendants fail to show their counsel was disinterested*: Jurors could also find that Defendants have failed to demonstrate that Wachtell was disinterested.  Defendants have made no showing or other effort to satisfy this requirement and have, in fact, obstructed Plaintiff from

19

learning the true underlying facts.[4] For example, ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████. Defendants likewise strenuously (and successfully) resisted Plaintiff's request to depose Wachtell. Dkts. 97, 99. It is Defendants' burden to demonstrate their counsel's disinterestedness, and Defendants cannot fairly argue they have done so while withholding the evidence that would refute their assertion. *See, e.g., Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 204 (E.D.N.Y. 2010) ("The Bank must be precluded from making any argument about its state of mind that would find proof or refutation in the withheld documents. []To permit the Bank to make such an argument would allow it to profit from evidentiary gaps that it chose to create.").

Regardless, the limited evidence in the record indicates that ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[4] Defendants attempt to cure this failure by submitting the Declaration of Albert Percival, which is inadmissible hearsay that Defendants have not shown can be introduced in an admissible form at trial, including because Percival resides in Spain (*see* Ex. 66) and has not committed to appear at trial in this District. *See* Fed. R. Civ. P 56(c)(2); *Abdel-Karim v. EgyptAir Airlines*, 116 F.Supp.3d 389, 409 (S.D.N.Y. 2015) (party cannot rely on inadmissible hearsay from out-of-country witness at summary judgment absent showing that admissible evidence will be available for trial). Moreover, ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

testified, then it is impossible for Defendants to prove, at least on a summary judgment standard, that any portion of its advice that provided value to NI was disinterested. Moreover, ▌

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

**D.    Defendants Are Not Entitled to Summary Judgment on Loss Causation**

Defendants advance three meritless arguments for summary judgment on loss causation. *First*, Defendants argue that the Court should exclude the testimony of Plaintiff's expert, Dr. Matthew Cain. Def. Br. at 20. As detailed in Plaintiff's opposition to Defendants' exclusion motion, Dr. Cain provides reliable and relevant expert testimony and should not be excluded.

*Second*, Defendants argue that if the Court excludes Dr. Cain's testimony – which it should not do – then no evidence supports loss causation. That is wrong. Plaintiff's causation theory is that, if Defendants had fulfilled their legal duties and disclosed Emerson's $48 per share offer, that would have caused the market price of NI's stock to rise to at least the level of that offer through the pricing mechanism of the efficient market for NI stock. Cain Rpt. ¶¶130, 134.  On May 2, 2025, Dr. Cain submitted an expert report in support of class certification opining that NI stock traded in an efficient market throughout the Class Period.  Dkt. 66-2. In his merits report, Dr. Cain expressly reaffirmed and reiterated that opinion. Cain Rpt. ¶¶16, 24. Defendants have never contested market efficiency and do not challenge the relevance or reliability of this opinion. Dr. Cain's market efficiency opinion coupled with readily admissible non-expert evidence (such

as the fact that Emerson had offered to acquire NI for $48 per share and stated a willingness to pay more) are sufficient to establish causation.

*Third*, the Court should reject summary judgment based on Defendants' groundless disagreements with Dr. Cain's opinions. Defendants argue that Dr. Cain's event study does not "connect any alleged loss to . . . information that actually existed" because (according to Defendants) his analysis "does not appear to include NI's Board's rejection of the proposals." Def. Br. at 19-20. This argument is meritless, as detailed in Plaintiff's opposition to Defendants' motion to exclude Dr. Cain's testimony. Dr. Cain considered NI's rejection of Emerson's offers in detail, and his reports explain why those rejections are consistent with Emerson's offers being economically material. In addition to applying economic principles drawn from academic literature, Dr. Cain conducted an event study showing that NI's stock price increased by statistically significant amounts after the January 13 and 17, 2023 disclosure of transaction-related information. Explaining the relevance of his event study, Dr. Cain observed that "there's a lot of overlap" between the information that was undisclosed during the Class Period and the information that was revealed in January 2023, because both sets of information revealed, or would have revealed, that a premium acquisition of NI had become materially more likely. Ex. 8, Cain Tr. at 174:16-175:4. Indeed, NI's January 13, 2023 announcement of a strategic review included only limited information (and disclosed no information about Emerson or its offers), yet still had a significant impact on NI's stock price. And Emerson's January 17, 2023 announcement of a revised offer was paired with a detailed discussion of NI's hostility to date, even after Emerson had increased its offer, Bennett Ex. G, at CAIN0001930-31, yet it still caused NI's stock price to increase significantly, demonstrating that NI's stated hostility was entirely consistent with the economic materiality of Emerson's offers.

22

In any event, Dr. Cain is not using his event study to measure artificial deflation, so Defendants' argument that his event study does not sufficiently disaggregate non-fraud-related information has no bearing on loss causation. The only purportedly non-fraud-related information Defendants identify is that different information was disclosed in January 2023 than could have been disclosed during the Class Period.[5] For loss causation purposes, Dr. Cain conservatively takes that into account by tying NI's but-for value to the $48 per share that Emerson offered before the Class Period. The facts as they existed during the Class Period (or would have existed had Defendants made the required disclosure as NI engaged in repurchases) support a but-for value of at least $48 per share, as Dr. Cain opines, and the fact that the disclosure of similar information later caused significant stock price increases, as demonstrated by Dr. Cain's event study, is confirmatory evidence of the economic materiality of the information NI failed to disclose.

### E.    Defendants Are Not Entitled to Summary Judgment on Damages

The Court has already recognized that Dr. Cain has put forth a "foundational model for determining damages that result from the asserted theory of liability." Dkt. 105 at 15. The Court should reject Defendants' attempt to overturn that conclusion at summary judgment.

As with their loss causation argument, Defendants' request for summary judgment on damages hinges on their motion to exclude portions of Dr. Cain's opinions. Def. Br. at 21. For the reasons stated above and in the accompanying brief in opposition to Defendants' exclusion motion, the Court should reject this argument.

The Court should also reject Defendants' groundless demand for a summary judgment order limiting damages using a $48 per share but-for price. Def. Br. at 21-22. Defendants offer no evidence in support of this argument, and instead misconstrue Dr. Cain's opinions, which clearly

---

[5] Defendants have not challenged Dr. Cain's methodology for disaggregating the impact of unrelated events such as macroeconomic trends. *See* Cain Rpt. ¶136.

state that "had the relevant truth been disclosed . . . NI's Common Stock would have traded at or above $48 per share throughout the Class Period. In other words, the 'but-for' price equals at least $48 per share." Cain Expert Report ¶134 ("This measure of an investor's damages is conservative, including because NI's Board stated that Emerson's initial $48 offer undervalued NI stock, Emerson stated its willingness to increase its offer, and public disclosure of Emerson's offer was likely to prompt other, higher offers."). Along similar lines, Dr. Cain testified that "once investors start trading a stock based on the expectation of a takeover premium or a takeover price, that becomes the driving force for the value of the stock," and that NI's stock price could have increased above $48 "if investors expected further increases in the offer value[.]" Ex. 8, Cain Tr. at 112:2-21; 113:8-19. Indeed, Defendants' argument runs contrary to the Court's explanation that "Dr. Cain opines in his July 28 report that Emerson's offer to purchase NI stock at $48 per share implied a stock valuation of at least that amount per share during the class period." Dkt. 105 at 14.

Moreover, there is substantial additional evidence from which reasonable jurors could readily conclude that a but-for price above $48 per share is appropriate. For example, Emerson stated its willingness to pay more than $48 per share, and NI twice rejected Emerson's offer because it "substantially undervalued" NI – *i.e.*, Defendants believed that $48 was too low a price because NI was worth more. Def. Ex. 1, at 25; Ex. 2, McGrath Tr. at 103:10-19; Def. Ex. 29 at -1460-61; *see also* Dkt. 105 at 13 (NI's board "concluded that the $48 offer 'substantially undervalue[d]' NI and discussed 'the potential for [Emerson] to change its offer.'"). ███████. In sum, there is ample evidence to support a "but-for" price above $48, Defendants offer no evidence to the contrary, and the Court should reject Defendants' request to limit damages at this stage.

24

Defendants also ignore that there is "no obligation to offer a mathematically precise formula as to the amount of damages," and that "[i]f the plaintiff's inability to prove an exact amount of damages arises from actions of the defendant," then "a factfinder has some latitude to 'make a just and reasonable estimate of damages based on relevant data.'" *Raishevich v. Foster*, 247 F.3d 337, 343 (2d Cir. 2001) (quoting *Electro–Miniatures Corp. v. Wendon Co.*, 771 F.2d 23, 27 (2d Cir. 1985)). Defendants' wrongful failure to disclose Emerson's offers while NI was repurchasing stock is all that impedes a more direct measurement of the stock price impact of that information, so jurors should be permitted the latitude to make a reasonable estimate of damages.

The Court should likewise reject Defendants' assertion that Dr. Cain's model does not account for NI's repurchases. *See* Def. Br. at 23. Dr. Cain's loss causation and damages opinions capture the artificial inflation in NI's stock caused by Defendants' failure to disclose economically material information while NI engaged in repurchases. *See* Cain Rpt. ¶131, Appendix C at ¶53. To the extent Defendants are suggesting (without evidence) that the repurchases themselves caused NI's stock price to increase, Dr. Cain's formula fully accounts for that by modeling artificial deflation as at least \$48 per share minus investors' sale prices. Under this formula, if the repurchases caused NI's stock price and thus investors' sale prices to increase, artificial deflation (and thus damages) would decrease by a corresponding amount.

The Court should also reject Defendants' hypothetical argument that Class Members may have benefited from the alleged misconduct and that Dr. Cain's damages model does not offset such supposed gains. *See* Def. Br. at 23. Defendants have not identified any specific facts regarding any such gains. Their argument appears to be based on a supposed "benefit" from transactions in NI stock that occurred well after the Class Period, but any gains from such transactions should not offset losses based on Class Period sales at artificially deflated prices. *See Acticon AG v. China N.*

25

*E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012) (refusing to "credit an unrelated gain" after the class period "against the plaintiff's recovery"). And even if Defendants' argument had merit (which it does not), summary judgment is not the appropriate stage to consider any damages offsets. *See Duttle v. Bandler & Kass*, 1990 WL 52147, at \*4 (S.D.N.Y. Apr. 17, 1990) (denying summary judgment based on offset; holding that offset would be determined "either at trial or in a post-trial hearing").

Finally, the Court has already held that Dr. Cain's out-of-pocket damages methodology provides a "foundational model for determining damages that result from the asserted theory of liability," that "[t]he traditional measure of damages in §10(b) cases is out-of-pocket loss, which is the difference between the price at which a stock is bought or sold and the stock's true value," and that "damages are not limited to profits gained and losses avoided by the defendants[.]" Dkt. 105 at 15-16 & n.4 (citing *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 168 (2d Cir. 1980) and *Acticon*, 692 F.3d at 38-39); *see also* Dkt. 84 at 4-5 (Plaintiffs' class certification reply brief citing authorities that damages are not limited to disgorgement). Defendants' disagreement with the Court and continued championing of the inapplicable disgorgement measure of damages is not a valid basis for summary judgment.

### F.    Defendants Are Not Entitled to Summary Judgment on 10b5-1 Trading Plan Defense

NI's 10b5-1 trading plan is not a qualifying plan that establishes Defendants' affirmative defense to insider trading liability. To qualify for protection, a valid Rule 10b5-1 plan cannot be created while in possession of material non-public information. *See* 17 CFR § 240.10b5-1 (qualifying plan must be adopted "[b]efore becoming aware of the information"). Here, NI adopted a 10b5-1 trading plan on August 11, 2022, Def. Ex. 41, while Defendants were aware of material non-public information concerning Emerson's May and June 2022 offers. Moreover, NI adopted

26

its 10b5-1 trading plan just one day before it began repurchasing shares on the open market. *See* Counterstatement, ¶84-5. A jury could find that NI's adoption of a Rule 10b5-1 plan the day before it started repurchasing shares does not support any defense, but rather provides additional evidence of Defendants' scienter. *See, e.g., Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) ("A Rule 10b5–l trading plan may give rise to an inference of scienter because 'a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5–1 plan."); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at \*9 (S.D.N.Y. Aug. 8, 2012) (trading under 10b5-1 plan can raise strong inference of scienter "where a 10b5–1 plan is entered into—or strategically amended—to take advantage of an inflated stock price or insider information.").

### G.    Defendants Are Not Entitled to Summary Judgment on Section 20(a) Claim

Defendants' only argument for summary judgment on Plaintiffs' control person claim is that Plaintiff cannot prove a primary violation. Def. Br. at 26. This argument fails for the reasons set forth above.

## IV.    CONCLUSION

Defendants' motion for summary judgment should be denied in its entirety.

DATED: January 26, 2026

**JOHNSON VAN KWAWEGEN LLP**

*s/ Noam Mandel*
Chad Johnson
Noam Mandel
Desiree Cummings
Jonathan Zweig
1120 Avenue of the Americas
New York, NY 10036
Telephone: (646) 836-9630
chad@jvk-law.com
noam@jvk-law.com
desiree@jvk-law.com
jonathan@jvk-law.com

*Lead and Class Counsel*

28

## CERTIFICATE OF WORD COUNT

1.      Pursuant to Rule 7.1 of the United States District Court for the Southern District of New York, the undersigned counsel certifies that the foregoing brief was prepared on a computer using Microsoft Word.  A proportionally spaced typeface was used as follows:

> Name of Typeface: Times New Roman
> Point Size in Body: 12 (footnotes, 12)
> Line Spacing in Body: Double (footnotes, single)

2.      The total number of words in the brief, inclusive of point headings and footnotes and exclusive of the caption, table of contents, table of authorities, signature block, and this Certification, is **8,731** words.  By operation of Microsoft Word's word count function, this number includes legal citations and certain forms of punctuation.

*/s/ Noam Mandel*

NOAM MANDEL