# EXHIBIT 1

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:23-cv-10488-DLC

IN RE:   NATIONAL INSTRUMENTS CORPORATION
         SECURITIES LITIGATION



*******************************************

VIDEOTAPED ORAL DEPOSITION OF

KAREN RAPP

SEPTEMBER 3, 2025

*******************************************


Everest Job No.: 44776


        VIDEOTAPED ORAL DEPOSITION OF KAREN RAPP, was taken via hybrid Zoom Videoconference, with the witness in person, along with her counsel, at 901 South MoPac Expressway, Building 1, Suite 300, Austin, Texas, 78746, in the above-styled and numbered cause on September 3, 2025, commencing at 9:04 a.m. before Della M. Duett, Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter, Certified Realtime Reporter, and Registered Merit Reporter.

In Re National Instruments Corporation Securities Litigation

A P P E A R A N C E S


On behalf of Plaintiffs:

        (PLAINTIFFS' ATTORNEYS APPEARED VIA ZOOM
         VIDEOCONFERENCE)

        ROBBINS GELLER RUDMAN & DOWD, LLP
        420 Lexington Avenue, Suite 1832
        New York, New York 10170
By:   FRANCIS P. KARAM, ESQUIRE
        fkaram@rgrdlaw.com
        CHRISTOPHER T. GILROY, ESQUIRE
        cgilroy@rgrdlaw.com
        ALYSSA PLASCOFF, ESQUIRE
        aplascoff@rgrdlaw.com


On behalf of Defendants:

        DOWD BENNETT, LLP
        7676 Forsyth Boulevard, Suite 1900
        Saint Louis, Missouri  63105
By:   JOHN D. COMERFORD, ESQUIRE
        jcomerford@dowdbennett.com


ALSO PRESENT:

            Brent Kirby, Videographer

INDEX

                                                        PAGE

Appearances                                               2


WITNESS

KAREN RAPP

    Examination by Mr. Karam....................   6
    Examination by Mr. Comerford...............  157


                        EXHIBITS

    NO.      DESCRIPTION                            PAGE

    P-1      NATI Capital Allocation Strategy        11

    P-2      5/3/22 email                            16

    P-3      5/16/22 email                           19

    P-4      5/24/22 email                           20

    P-5      News release                            23

    P-6      Privileged and Confidential            31
             Wachtell Lipton Draft

    P-7      6/12/22 email with slides               50

    P-8      6/13/22 email                           56

    P-9      6/29/22 email                           57

    P-10     Project Wolverine: Meeting of the       59
             Directors
    P-11     6/15/22 email                           68

    P-12     6/16/22 letter                          69

    P-13     6/22/22 letter                          70

| P-14 | 6/27/22 email | 76 |
| P-15 | 7/7/22 email | 80 |
| P-16 | 7/7/22 email | 82 |
| P-17 | 7/15/22 | 89 |
| P-18 | Documents with handwriting | 90 |
| P-19 | 7/14/22 email | 99 |
| P-20 | 7/31/22 email | 103 |
| P-21 | 8/2/22 letter | 104 |
| P-22 | 8/4/22 email | 105 |
| P-23 | 8/8/22 email | 118 |
| P-24 | 8/9/22 email | 120 |
| P-25 | 8/9/22 with attachment | 121 |
| P-26 | 8/10/22 email | 122 |
| P-27 | 8/10/22 email | 126 |
| P-28 | 8/10/22 email | 133 |
| P-29 | 8/11/22 email | 134 |
| P-30 | 10b5-1 Repurchase Plan Agreement dated August 11, 2022 | 135 |
| P-31 | 8/14/22 email | 137 |
| P-32 | Spreadsheet | 138 |
| P-33 | 8/16/22 email | 143 |
| P-34 | 8/17/22 email | 144 |
| P-35 | Security Ownership of Certain Beneficial Owners and Management table | 145 |
| P-36 | 9/1/22 email | 147 |

P-37      9/21/22 email                                        147

P-38      9/21/22 email                                        149

P-39      10/14/22 email                                       150

P-40      10/28/22 email                                       155

Page 6

KAREN RAPP

THE VIDEOGRAPHER: This is the videotaped oral deposition of Karen Rapp. Today's date is September 3rd, 2025, the approximate time 9:04 a.m. Central Standard Time. We're recording and on the record.

(The witness was sworn)

THE REPORTER: Thank you, ma'am.

KAREN RAPP, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. KARAM:

Q. Good morning, Ms. Rapp.

A. Good morning.

Q. Have you ever sat through a deposition before?

A. I have.

Q. On how many occasions?

A. At least two. It may have been three.

Q. Can -- can you describe the types of cases in which those depositions took place?

A. My deposition was to provide information about company data. So it was reading reports and how to understand the reports. I'm not actually sure the cases -- or I don't remember the circumstances of the cases themselves.

Page 7

KAREN RAPP

Q. Okay. And that's for -- those are all of the previous depositions?

A. Correct.

Q. Were for that type of testimony?

A. Yes.

Q. So I'm going to be asking you questions. If my questions are unclear or you don't understand, you can just tell -- ask me to rephrase my question, and I'll do my best to make it understandable to you. Do you understand that?

A. Yes.

Q. And we'll take breaks occasionally, usually it's once every hour, but if you need a break, you know, other than that, just let us know. As long as it's not between a question and an answer, we're happy to accommodate you. Do you understand that?

A. Yes. Thank you.

Q. Have you prepared for this deposition in any way?

A. Yes.

Q. Can you tell me what you've done to prepare?

A. Yes. I met with my lawyer on Friday, last week.

Q. Mr. Comerford?

Page 8

KAREN RAPP

A. Yes.

Q. And then the other rule is I've got to wait until you finish your answer, and you have to wait until I finish my question, because the court reporter is taking all this down, and as fast as she is, she can't take down with two people talking at the same time. So I'll do my best to wait until you finish your answer.

Did you meet with Mr. Comerford in person or remotely?

A. Remotely.

Q. How long was that meeting?

A. Maybe 30 minutes or an hour. It might have been an hour.

Q. And were there any other meetings other than the one on Friday?

A. We talked on the phone briefly yesterday, just to confirm logistics and make sure everything was set.

Q. When you met with Mr. Comerford, did you review any documents to help refresh your memory about this testimony?

A. Yes.

Q. Generally, about how many documents did you review?

MR. COMERFORD: I'm going to object at this

Page 9

KAREN RAPP

point on the basis of attorney-client privilege.

I think that the content of our preparation is privileged, and I'm going to instruct you to not answer on the basis of privilege.

MR. KARAM: Counsel, I'm not asking about the content of any document. I'm asking her about the number of documents, which is allowable under the case law.

MR. COMERFORD: Okay. I'll withdraw it, but that's probably about all I'm going to allow. You can answer, if you know.

A. Somewhere around 15, maybe.

Q. (BY MR. KARAM) Okay. And then did they help you remember the events from 2022 when the facts of this case happened?

A. Yes.

Q. Are you familiar with the allegations in the case that we're -- that you're going to testify about today?

A. Yes.

Q. Can you summarize for me what your understanding of the allegations are?

MR. COMERFORD: I'm going to object. Calls for a narrative answer, and I'm objecting to the extent

Page 10

KAREN RAPP

it calls for legal conclusions.

Subject to that, you can answer.

Q. (BY MR. KARAM) And so the other rule, ma'am, is your counsel may object. Unless your counsel instructs you not to answer the question, you can answer the question, and then a judge will rule at a later time on these objections.

A. Okay. Thank you.

My understanding is that the case revolves around us providing -- not providing the information externally that Emerson had made a bid to acquire National Instruments.

Q. So unless I tell you about a different time period, the time period that we're talking about is the beginning of 2022 through, let's say, April of 2023.

A. Okay.

Q. Are you familiar with that time period?

A. Yes.

Q. Okay. And we're going to be showing you some documents, and our concierge, or our person in charge of documents, will be putting them up on your screen, and I'll probably be asking you some questions about them. Is that okay?

A. Yes.

Page 11

KAREN RAPP

MR. KARAM: So who's going to -- who's putting up the documents?

THE VIDEOGRAPHER: The court reporter, the Everest court reporter technician. He should be on here.

MR. KARAM: Okay. What's the technician's name?

TECHNICIAN: It's Andrew.

MR. KARAM: What is it? Andrew?

TECHNICIAN: Yes.

MR. KARAM: Okay. Hi, Andrew. So can we put up the exhibit that's marked A. And for the purpose of this case, we're going to mark it as Plaintiff's Number 1.

(P-1 was marked for identification)

TECHNICIAN: Stand by.

Q. (BY MR. KARAM) And, Ms. Rapp, before we go to the document, I'm going to ask you some general background questions.

During 2022, did National Instruments engage in a process of buying back its own stock?

A. Yes.

Q. And can you tell me what the purpose -- or this -- the strategy of the stock buybacks by National

Page 12

KAREN RAPP

Instruments was, in general terms?

A. We used stock buybacks to return cash to shareholders by increasing their value in the company through a stock buyback.

Q. So we're talking about 2022. How long before that had the stock buyback strategy -- at National Instruments had the stock buyback strategy in place?

MR. COMERFORD: Objection, vague.

You can answer.

A. Yeah, I don't know the exact details, but stock buybacks were one of the tools we used to return cash to shareholders through multiple years.

Q. (BY MR. KARAM) So it was years before 2022; is that right?

A. Yes. I'd have to go back and refresh my memory on the details, but there were stock buybacks before 2022.

Q. Okay.

MR. KARAM: Andrew, would it be possible for us to see both the witness and the document?

TECHNICIAN: Yes, it's the -- it would be your setup in the room, though. You would go to the view on Zoom, and you would select the speaker view, or the gallery might change that for you, the view at the

Page 13

KAREN RAPP

top right of Zoom.

MR. KARAM: So I should select gallery?

TECHNICIAN: You will be able to see everybody if you select gallery -- or side by side, you might say. You can select speaker side by side.

MR. KARAM: Okay. I think I'm good. That's good. Thank you very much.

Q. (BY MR. KARAM) Okay. So, Ms. Rapp, we have a document that's been marked as Plaintiff's Exhibit 1. Do you recognize this?

A. I'm familiar with this format. I don't know the content of this document yet.

Q. Okay. And just for the record, this is part of a larger document. So you're -- do you want to take a few minutes to scroll through the document and tell me if that helps you remember what it is?

And just for your information, this is dated January of 2022.

A. Sorry, you're going to need to slow down. I'm not sure.

Okay. You can go to the next page.

Q. Okay. Yeah, I'm also informed that this is an audit committee packet.

A. Okay. That's helpful. That's -- thank you.

Page 14

KAREN RAPP

Okay. You can go to the next page.

Okay.

Okay.

Okay.

Q. Okay. Can we stop for a moment on that slide scenario of cash projections?

A. Okay.

Q. So if you see, there's three numbered sentences there under the heading "Prioritized" -- "Prioritized Use of Cash." Do you see that?

A. Yes.

Q. So the first is to pay the dividend; right?

A. Correct.

Q. And second one is "Repurchase shares through offset dilution." Can you explain that to me?

A. Yeah. I can explain the way we use the term.

Q. That would be fine.

A. It was -- we issued shares to employees as part of a compensation structure. And so as employees' shares vested, that diluted the ownership for the other shareholders, the nonemployee shareholders. And so this "repurchase shares to offset dilution" is a scenario where we could reduce the dilution that our shareholders would feel because we would buy back the same number of

Page 15

KAREN RAPP

shares or close to the number of shares that we were issuing to our employees.

Q. All right. And that indicates it's about 2.2 million shares per year?

A. Correct.

Q. And then number 3 is "Excess cash will be used to repurchase shares," which seems to be self-explanatory.

So my question is how did you choose between cash to be used to pay the dividend and cash to be used to repurchase shares?

MR. COMERFORD: Object to the form of the question.

A. This proposal or this scenario proposes that we leave the dividend flat at the 27 cents, which is in line with our common practice, probably.

I don't think we ever reduced the dividend. So the baseline would be to pay the dividend at its current value or potentially increase it. And then the second step here, our scenario was that we would offset dilution, and then the third step would be to use the excess cash for repurchase.

Q. So the -- so the excess cash might be variable, but you wanted to keep the dividend at a steady amount?

Page 16

KAREN RAPP

A. Correct.

MR. KARAM: Andrew, can we pull up document B, which will be marked as Plaintiff's Number 2.

This is an email, and it's Bates number NAT-SL-00005982.

(P-2 was marked for identification)

Q. (BY MR. KARAM) Ms. Rapp, do you see these emails as they're printed out? You may be familiar. They run chronologically from the last page to the first. So if you could start on the Bates number ending 5984, and then read upward.

So I'm first going to ask you about this May 3rd email. Do you -- does -- is this document familiar to you, this email?

A. It's the format -- I mean, it's an email. I wrote it.

Q. Okay. Do you have a memory of communicating with Pedro Andrade on May 3rd, 2022?

A. Only what it says in the email. I don't remember the -- more details than that at this point.

Q. Okay. That's fine.

So you -- I'm going to refer you to the last sentence of that email signed by you. It says,

Page 17

KAREN RAPP

"The intent would be that this is a pull-ahead of what we would have spent later in the year. So still 100 billion total for the year." Do you see that?

A. I do.

Q. And does that indicate that in May of 2022, National Instruments' plan was to buy back approximately $100 million worth of its own shares a year?

MR. COMERFORD: I'm going to object to the form and object to the description of the time frame as being different than the date of the document.

Subject to that, you can answer.

A. Yeah, the way I read this is, on May 3rd, we were modeling a plan of about $100 million share buyback for the year.

Q. (BY MR. KARAM) All right. Now, I'm going to refer you to the top email, which would be the last email chronologically from Mr. Starkloff to yourself.

A. Okay.

Q. So he says, "If you deem it acceptable and manageable from a cash flow point of view, then I supported it at 10 million. Seems like this would be a bit of a constraint throughout the year."

Does this indicate that the level of buybacks were dictated by the amount of available cash

Deposition of Karen Rapp                    In Re National Instruments Corporation Securities Litigation

Page 18

KAREN RAPP

at a particular time?

MR. COMERFORD:  Object to the form.

You can answer.

A.  Yeah, I'm not sure exactly how to answer that, because we had cash available through multiple means, whether that was cash on hand or through our debt process.

Q.  (BY MR. KARAM)  All right.  All right.  Please forgive me.  I should have asked you to read through the -- read through the emails from the bottom to the top, and maybe that'll help --

A.  Okay.

Q.  -- me ask a more clear question.

A.  Okay.

Okay.  You can move up.

Okay.

Q.  So have you read these emails?  First, a general question.  Would it be correct that from -- on occasion, if they were not available through cash flow to do the buybacks, that you would borrow to do buybacks.  Is that accurate?

A.  Yes.

Q.  And that was one means available to continue the buyback program; right?

Page 19

KAREN RAPP

A.  Correct.

Q.  And then the other one would be to use available cash at whatever level it was available?

A.  Correct.

Q.  Okay.  Let's go to document number -- document C, which we'll call -- we'll mark as Plaintiff's Number 3.

A.  Okay.

(P-3 was marked for identification)

Q.  (BY MR. KARAM)  Are you familiar with this document?  Have you seen this before?

A.  I'm not sure if I've seen this exact email.

Q.  Are you -- did you become aware approximately May 16th, 2022, that Mr. Lal Karsanbhai from Emerson had contacted Mr. Starkloff with a proposal?

MR. COMERFORD:  I'm going to object to the form, and I'm objecting to the extent it mischaracterizes the document as conveying a proposal.

But subject to that, you can answer.

A.  Yeah, I don't -- I don't know the exact date.  At some point in May of 2022, I became aware that Lal had reached out to Eric.

Q.  What was your understanding of the purpose of that communication?

Page 20

KAREN RAPP

MR. COMERFORD:  Objection.  That calls for speculation, lacks foundation.

Q.  (BY MR. KARAM)  You can answer.

A.  We didn't know it at this point.

Q.  Did you have conversations with Mr. Starkloff about Mr. Karsanbhai's initial contact?

A.  I don't remember if Eric told me about it at this point.  I do know Eric called me at one point and said that he had been contacted by Emerson, but I don't know the date or the timing on it.

Q.  Okay.  And what was -- what did Mr. Starkloff say the nature of the contact was?

A.  Oh, I don't remember the -- I don't remember.  I don't know if it was -- if I was involved at this point or if it was after they had made the official offer.

Q.  Okay.

A.  I'm sorry.  I just don't remember the exact --

Q.  That's -- that's all right.  It was a couple years ago.

All right.  Let's --

MR. KARAM:  Andrew, D, document D, will be Number 4.

(P-4 was marked for identification)

Page 21

KAREN RAPP

Q.  (BY MR. KARAM)  So this document is dated May 24th, 2022.  It's Bates number ending 6133.

Ms. Rapp, take a couple minutes to look this over, please.

A.  Yeah.  Is there more at the bottom of this?  Or does it start with Marissa?

Q.  I think -- if you read it from the bottom up, I don't think there's anything below the --

A.  Okay.

Q.  -- the words "internal" and "confidential"?

A.  Okay.

MR. COMERFORD:  Can we scroll down just to see that second page?

Thank you.

MR. KARAM:  Mr. Comerford is a skeptic.  He asks for proof.

MR. COMERFORD:  Trust, but verify.

A.  Okay.  You can scroll up.  Thank you.

Q.  (BY MR. KARAM)  Who is Marissa Vidaurri or Vidaurri?  If I'm pronouncing that right.

A.  Yeah, Vidaurri.  She's the head of internal investor relations.

Q.  Okay.  Do you know who drafted the bottom email that begins with "Team"?

Page 22

KAREN RAPP

A. Looks like Marissa did.

Q. Okay.

(Brief interruption)

Q. (BY MR. KARAM) Okay. So this is dated May 24th. Did you have a conversation with Ms. Vidaurri about the Emerson overture or contact to Mr. Starkloff?

A. I don't know when Marissa was brought into that. I don't know the date.

Q. And would it be correct that the reason for writing this email had to do with the contact between Mr. Karsanbhai and Mr. Starkloff?

MR. COMERFORD: Objection, calls for speculation and lacks foundation.

If you know, you can answer.

A. I think this was in response to the Seeking Alpha -- the articles that had been made public. I don't think this refers to Emerson or the reach-out in any way.

Q. (BY MR. KARAM) Okay. So this has -- so it just was a coincidence that Mr. Karsanbhai sent this email May 16th, and then May 24th there was an article about rumors of takeover activity?

MR. COMERFORD: Objection, calls for speculation, lacks foundation about the cause of rumors

Page 23

KAREN RAPP

or whether things were a coincidence.

Subject to that, you can answer.

MR. KARAM: Counsel, the rules in the Southern District require objections to be made succinctly, no speaking objections. So please just state your objection and the grounds for the objection without further comment. I don't --

And I'll re-ask the question.

Q. (BY MR. KARAM) Ms. Rapp, is it your understanding that the -- this email drafted by Ms. Vidaurri was not directly related to Emerson's overture or contact to Mr. Starkloff?

MR. COMERFORD: Objection, lacks foundation, calls for speculation.

A. I believe this email was in response to the rumors that were in the media.

Q. (BY MR. KARAM) Okay. Thank you.

MR. KARAM: Okay. So this will be letter E, Andrew, and it will be Plaintiff's Number 5.

(P-5 was marked for identification)

Q. (BY MR. KARAM) And this is a document, the Bates number is BofA_003270, and the actual date of the document is January 13th, 2023, but it contains other documents, other letters at earlier dates.

Page 24

KAREN RAPP

Ms. Rapp, I'm going to refer you to the page ending 3274 at the bottom, which has a May 25th, 2022, letter dated -- entitled "Emerson's First Offer Letter to NI." So I'd just refer you to that page.

A. Could you scroll there, please?

Mr. Karam, did you say this is public -- this was a public document?

Q. Yes. This was -- just for your -- this was filed by Emerson in January of 2023.

A. Okay.

Q. Or it was published by Emerson.

MR. KARAM: So can we -- Andrew, can we scroll up a little bit?

Okay. And then continue -- okay. Keep going down.

Okay. So let's stop at this page that says "May 25th."

Q. (BY MR. KARAM) So, Ms. Rapp, I'm going to give you time to read this over, but are you familiar with the letter that was sent by Mr. Karsanbhai to Mr. Starkloff dated May 25th, 2022?

A. I know one was sent. I'm not sure if I saw the details of that.

Q. Okay. Are you familiar with the terms of the

Page 25

KAREN RAPP

letter? Were you familiar at the time with the terms of the letter?

A. Yes.

Q. What was your understanding of the terms of that letter?

MR. COMERFORD: I'm going to object. The May 25th, 2022, letter speaks for itself. I'm also going to object based on the best evidence rule because this is -- appears to be the May 25th letter embedded --

MR. KARAM: Counsel, number one, you're making speaking objections. Number two, the "speaks for itself objection" is not a real objection.

MR. COMERFORD: Okay. Well, I think I need to interpose an objection because you're showing the witness a letter that is embedded in a letter -- or a press release from Emerson from January of 2023. So I'm objecting that what you're showing her is not the actual May 25th, 2022, letter.

MR. KARAM: Counsel, you're making speaking objections.

MR. COMERFORD: It's -- I'm trying to --

MR. KARAM: You can make the arguments to the judge. This is a deposition. Please just say "objection" and the grounds, according to the rules of

Page 26

KAREN RAPP

the Southern District of New York.

MR. COMERFORD:  I --

MR. KARAM:  And you can make your arguments to the judge.

MR. COMERFORD:  I think that's exactly what I'm trying to do, Mr. Karam, and I would appreciate it if I could just interpose my objection, and then we can move on with the deposition.

MR. KARAM:  Please interpose your objection in a proper way.

MR. COMERFORD:  I have done that.

Q.  (BY MR. KARAM)  So, Ms. Rapp, as we've said before, your lawyer will object, but unless your lawyer directs you not to answer, you can answer the question.

A.  I'm sorry.  Can you ask the question again, please?

Q.  I certainly can.
Were you generally familiar with the terms of Mr. Starkloff -- or Mr. Karsanbhai's May 25th, 2022, letter to Mr. Starkloff?

MR. COMERFORD:  I'm going to object.  The May 25th, 2022, letter speaks for itself.
You can answer.

A.  I was aware that Emerson had offered $48 a

Page 27

KAREN RAPP

share to purchase the company.

Q.  (BY MR. KARAM)  And so let's take a look at -- under the paragraph entitled "Valuation."

A.  Okay.

MR. KARAM:  Andrew, can we scroll up a little bit?  So that will be -- stop right there, and we can --

Q.  (BY MR. KARAM)  Could you take a look at that paragraph?

A.  Okay.

Q.  Were you aware that the $48 was a 39 percent premium to NI's closing price as of May 24th of 2022?

MR. COMERFORD:  Object to the form of the question.

A.  The -- I'm sure they did the math correctly.  I didn't have that kind of premium number in my head at the time.

Q.  (BY MR. KARAM)  Okay.  Was that -- so I guess my question would be was that -- did you have a discussion or meeting with executives internal to NI at the time you received the letter?

MR. COMERFORD:  Object to the form, assumes facts not in evidence as to when she received this letter.  That's not been established.

Page 28

KAREN RAPP

A.  I don't remember the process Eric went through.  I'm -- he was very careful about bringing in many people.

Q.  (BY MR. KARAM)  Was there -- you had a conversation -- would it be correct that you had a conversation with Mr. Starkloff about his receipt of this letter?

A.  Yes.

Q.  Was that a phone conversation or an in-person meeting?

A.  I don't remember.  It depends on if I was in the office when he got it, probably.

Q.  Go ahead.  Do you remember if anybody else was either on the call or in the conversation?

A.  I don't remember.  I'm sorry.  I don't remember.

Q.  Was -- and did there come a point after Mr. Starkloff received this letter that he designated or listed a -- the number of persons who would be brought into knowledge or confidentiality of this information?

A.  Yes.

Q.  Tell me how that happened.

A.  Oh, I don't know how Eric went through that process.  I --

Page 29

KAREN RAPP

Q.  Tell me what -- go ahead.

A.  I just --

Q.  Tell me what you know about it.

A.  I just know --

MR. COMERFORD:  I'm going to object that it lacks foundation, and calls for speculation.
You can answer to what you know.

A.  There were a list of people who were aware of this.

Q.  (BY MR. KARAM)  Who was on that list?

A.  Oh, I don't remember.  It was -- I mean, it was Eddie Dixon, who's our legal counsel; and Kevin Ilcisin was head of strategy; and me as the CFO.  And I don't remember who else.  I think the list expanded over time, depending on the situation.

Q.  And so at some point you had a discussion with Mr. Starkloff about his receipt of this letter; is that right?

A.  Yes.

Q.  Tell me what the content of that discussion was.

A.  I don't remember any of the details.  I remember Emerson offered $48, was the takeaway.

Q.  And was there -- after the takeaway, was there

Deposition of Karen Rapp                                    In Re National Instruments Corporation Securities Litigation

Page 30

KAREN RAPP

a plan on what to do next, if anything?

MR. COMERFORD: Foundation, calls for speculation.

You can answer if you know.

A. Eric worked with the board on a plan.

Q. (BY MR. KARAM) Were you involved in his communication with the board?

A. No. Unless it was a regularly scheduled board meeting, I wasn't in any of the special meetings, or at least -- I don't know if "any" is completely accurate, but I wasn't in -- hardly any.

Q. In that initial conversation between you and Mr. Starkloff, was there any evaluation about the offer, whether it was serious or overvalued, undervalued, any characterization of the offer?

A. I don't remember.

Q. So after this conversation with Mr. Starkloff about him receiving the letter, is it correct that he communicated to you that he was going to be in touch with the board?

A. I know he did get in touch with the board. I'm not sure if he told me that at that time or not. I don't remember that meeting. Sorry.

Q. Did you -- okay. All right.

Page 31

KAREN RAPP

Did he suggest that you take any action or do anything?

A. I don't remember.

Q. After this meeting with Mr. Starkloff, did you do anything in connection with the Emerson offer?

A. I don't remember. I'd have done whatever Eric directed as his CFO.

Q. So -- all right. So we saw the date on the Karsanbhai letter as May 25th.

MR. KARAM: Andrew, may we look at -- may we put up document F, which will be Plaintiff's Number 6.

(P-6 was marked for identification)

Q. (BY MR. KARAM) After your conversation with Mr. Starkloff, Ms. Rapp, are you aware of someone contacting the law firm Wachtell, Lipton, Rosen & Katz?

MR. COMERFORD: Objection, lacks foundation, calls for speculation.

You can answer if you know.

A. I know Wachtell became our outside counsel for this.

Q. (BY MR. KARAM) And do you know how that happened?

A. I don't. I wasn't part of that.

Page 32

KAREN RAPP

Q. So are you -- just from the first page of this document, are you familiar with this document?

A. Not just looking at the first page.

Q. Take a -- why don't you peruse through the document. I have questions on certain pages. It's fairly lengthy, but just tell me if you've seen it before and in what context.

A. You can keep scrolling. It looks like something that was presented to the board of directors.

You can keep scrolling.

Okay.

Q. And would it be correct that you are -- you are not familiar with this document?

A. I don't remember it specifically, but that doesn't mean I haven't seen it. I may have --

Q. Okay.

A. -- been in a board meeting at the time. I don't remember.

Q. But did you have any interaction with Wachtell, Lipton, with the law firm of Wachtell, Lipton, at about this time frame in relation to the Emerson action?

A. I don't know when I started, but at some point I had interactions with Wachtell, but I don't remember if it was May of 2022.

Page 33

KAREN RAPP

Q. Were you present at either a board meeting or any other meeting where Wachtell, Lipton made a presentation or presented slides like these?

A. I was present in meetings where Wachtell presented. I don't remember what slides they may have presented, though. Sorry.

Q. Well -- well, when you say you were present when they presented, did they make presentations other than to the board of directors?

MR. COMERFORD: Yeah, foundation, calls for speculation.

A. I don't remember. I was in meetings with Wachtell, but I don't remember what -- who presented what. I'm sorry.

Q. (BY MR. KARAM) Okay. And the dates -- so these meetings, they were in relation to the Emerson letter?

A. Yes.

Q. And were they -- what do you remember about these presentations?

A. I'm actually not sure Wachtell presented. They mostly provided their input, and it was a lot of conversations, but I -- I don't remember exact presentations. I'm sorry.

Deposition of Karen Rapp                                    In Re National Instruments Corporation Securities Litigation

Page 34

KAREN RAPP

Q. Did they -- did they provide you documentation, and then there was like a conference call in a room? Is that how it happened?

A. It was a conference call in a room. I don't remember if they provided documentation. It wouldn't have been to me directly if they did. Eddie Dixon was our general counsel and was the contact with Wachtell.

Q. So any documents that Wachtell provided, they would have provided to Mr. Dixon; is that right?

MR. COMERFORD: Foundation, calls for speculation.

Q. (BY MR. KARAM) Yeah, let me rephrase that.

Any -- as far as you remember, any documents that Wachtell provided, they provided to Mr. Dixon; right?

MR. COMERFORD: Same objections.

A. Yeah, I don't -- I don't know. You -- this looks like it went to the board of directors. I don't know if it went through Eddie to the board of directors.

Q. (BY MR. KARAM) And you said you do not have a memory of being present at a board meeting where Wachtell advised the board of directors about directors' duties and takeovers?

A. I don't remember, but there should be meeting

Page 35

KAREN RAPP

minutes; right?

Q. So you just don't remember if you were at a meeting where these slides were presented; is that correct?

A. Correct.

MR. KARAM: Let's just go to Slide Number 7, Andrew, on this.

Q. (BY MR. KARAM) Take a minute to look at this, Ms. Rapp, and tell me if this refreshes your recollection about having seen it before.

A. Can we scroll through more pages? I don't -- I don't know.

Q. Sure. Absolutely. Anytime I ask you, you can always look at the pages before or after as much of the document as you need to to answer the question.

A. Okay.

THE WITNESS: Andrew, could you just scroll through some more, please?

Okay. You can keep going.

Okay.

Okay. You can keep going.

Okay. Keep going.

Okay. Keep going.

Keep going.

Page 36

KAREN RAPP

Keep going.

Next.

Next.

Keep going.

You can keep going.

You can keep going.

Next.

Next.

Next.

Next.

A. I think the problem is I've seen decks like this multiple times in other cases, right, just from investment bankers that come in and present and how to handle activism in situations. So it's -- doesn't stand out as something that's unique, but you can keep scrolling. Maybe something will trigger it.

Q. (BY MR. KARAM) I don't mean to interrupt, but maybe -- we have a metadata sheet, which I don't know if you're familiar with it. These are documents that indicate from whose files documents were produced or found.

A. Okay.

Q. So in -- we've uploaded that.

MR. KARAM: Can you put that on the screen

Page 37

KAREN RAPP

if you have it?

MS. PLASCOFF: It's the same -- it's the Bates number -- it's the Bates number with the metadata in parentheses. That's what it's saved as.

Not that one. So it's saved as NAT-SL-00025277 with metadata.

THE WITNESS: Oh, okay.

Q. (BY MR. KARAM) Does that help you remember whether you've seen these?

A. It looks like I had this document.

Q. So let's go to Slide Number 7 again, and I understand you've seen a lot of these, and that may actually help you answer the question.

A. Okay.

Q. Well, let me just take a moment. I've read your CV. I'm not going to mark it or anything, but tell us about your experience in mergers and acquisitions up to this point in 2022.

A. Okay. At Freescale, I was brought into the role to help merge with NXP. So I was part of the integration committee for that merger. Then I became the lead for the divestiture of the NXP standard products business, which became a standalone company called Nexperia.

Deposition of Karen Rapp                    In Re National Instruments Corporation Securities Litigation

Page 38

KAREN RAPP

And then I had some brief interaction as Qualcomm was working to acquire NXP. And then at NI, as the CFO, I was engaged from a financial aspect in the acquisitions that we made when I was there, and I don't remember the dates on -- on those. Sorry.

Q. So referring you to this slide, can you tell me generally what your understanding of the information is that's being presented in this slide?

MR. COMERFORD: Objection, the document speaks for itself.

A. I believe the slide is talking about the ways that companies can approach other companies to acquire them.

Q. (BY MR. KARAM) So -- and the -- the heading is "█████████████████████████████████ ███████████████." Do you see that?

A. Yes.

Q. And would it be correct that that is a not uncommon process in acquisitions?

MR. COMERFORD: Object to the form.

A. What's a not uncommon process?

Q. (BY MR. KARAM) That -- that an acquisition at first approach would be friendly; and if rebuff, it's possible that the acquirer might escalate pressure on

Page 39

KAREN RAPP

the target?

MR. COMERFORD: Object to the form, foundation, calls for speculation.

A. Yeah. I believe this has been an approach for acquisitions for companies, yes.

Q. (BY MR. KARAM) So -- and in this one, there's, it looks like, ████████████████████████. Do you see that?

A. Yes.

Q. So the ██████████████████████ ████████████████████████████████ ████████████████████████████. Do you see that?

A. Yes.

Q. All right. And that appears to have happened by Emerson; right?

A. Yes, you showed me the letter from Lal to Eric.

Q. Okay. And ████████ would it be correct that at this point in, let's say, May of 2022, there had not been conversation between the boards of the companies?

MR. COMERFORD: Foundation.

A. Not that I'm aware of.

Q. (BY MR. KARAM) All right. But then ████ ████████ That

Page 40

KAREN RAPP

had taken place in May of -- May 25th; right?

A. Yeah, that's what was in that public document you showed me, yes.

Q. And at that point, as far as you know, in May, ████████████████ had occurred; is that right?

MR. COMERFORD: I'm going to object to the extent this is mischaracterizing the document as --

MR. KARAM: Counsel, you have --

MR. COMERFORD: -- as listing steps.

MR. KARAM: You can say "objection." You can say "objection." That's what you can say in a deposition.

MR. COMERFORD: No, I don't -- I don't think that's correct, Mr. Karam. I think I need to state the basis for the objection. I think that -- you telling me that I'm only allowed to say the word "objection" and nothing else, I think is incorrect.

MR. KARAM: No, I'm telling you, you can say the word "objection," and then there are limited enumerated grounds for objection on which a judge can rule under the Rules of Evidence. You're rambling with words that are not in the Rules of Evidence for a judge to rule on.

MR. COMERFORD: Okay. I object that you --

Page 41

KAREN RAPP

MR. KARAM: As you have suggested -- you're not allowed to try to coach or suggest the answer to the witness by your objections.

MR. COMERFORD: I --

MR. KARAM: And that's what you are doing.

MR. COMERFORD: I'm aware of that, Mr. Karam. That's not what I'm doing.

I object on the basis that you are mischaracterizing this document, when you say that it describes steps. That's my objection.

Q. (BY MR. KARAM) Okay. So the question is, Ms. Rapp, are you aware, as of May of 2022, whether any of the other enumerated steps had occurred?

A. I don't know if the other steps had occurred.

MR. KARAM: Let's go, Andrew, to the next slide.

Q. (BY MR. KARAM) This one is titled "█████ ███."

Had you ever heard the expression "bear hug" as it's used in the context of mergers and acquisitions?

A. Yes.

Q. Tell me what your understanding of that term is.

Deposition of Karen Rapp                                    In Re National Instruments Corporation Securities Litigation

Page 42

KAREN RAPP

A. I actually don't understand it well. Sorry. It's a --

Q. Can -- all right. Well, let's take a look at -- under the -- in the top row, the fourth box over, it's entitled "███████████." Do you see that?

A. Yes.

Q. Read what's in that box, and then I'm going to ask you a question about it.

A. Okay.

Q. So that says, "████████████████████████ ████████████████████████."

Would it be correct that Emerson had sent a private letter to the CEO, and presumably the board, at a specific transaction price?

MR. COMERFORD: Object to the form to the extent it mischaracterizes the letter.

Subject to that, you can answer.

A. You showed me the letter that he sent to Eric, which is the CEO, with the transaction price.

Q. (BY MR. KARAM) And then it requested a timely response; did it not?

A. Probably. You'd have to show me again. But I don't think it said it was threatening public disclosure, did it?

Page 43

KAREN RAPP

Q. You -- you may be correct in that. I'm going to ask you other questions later.

A. Okay.

Q. So at least for the -- other than threatening a public disclosure, there were characteristics in that letter that were consistent with what ████████████ ████████████████; would that be correct?

MR. COMERFORD: Objection, mischaracterizes the document, the document speaks for itself.

Subject to that, you can answer.

A. I don't know. Doesn't it seem more like it was maybe this weak bear hug, potentially?

Q. Well, you propose more than a valuation range; right?

A. Oh, okay. All right.

Q. So there was some -- it could be half to half; right? Can we agree on that?

MR. COMERFORD: Form.

A. Okay.

Q. (BY MR. KARAM) So I'm going to refer you back, once again, to Slide Number 7, and I'm going to refer you to ██████████. Do you see that?

A. Yes.

Q. It says, "██████████████████

Page 44

KAREN RAPP

████████████████████████████████████ ██████████████████████████ Do you see that?

A. Yes.

Q. And just from your experience, is acquiring stock by an offeror in a transaction a well-known technique to pressure the target?

MR. COMERFORD: Objection, form, foundation, calls for speculation. It's an incomplete and improper hypothetical.

Q. (BY MR. KARAM) Well, let me ask -- let me re-ask the question.

Are you personally familiar, from your experience, with an acquiring company buying stock in the target to assist in its takeover efforts?

A. I actually don't know how it assists in its takeover efforts. But I do know that Emerson acquired stock in NI.

Q. Are you familiar with that strategy or tactic from -- from your experience, other than this Emerson transaction?

A. No. It's usually something you see with an activist, is where I'm familiar with it.

Q. Okay. And when I say "your experience," it could be your background, knowledge, your knowledge of

Page 45

KAREN RAPP

financial markets.

Are you aware that acquiring stock in a target is a way that certain acquirers act?

MR. COMERFORD: Objection, form, foundation, calls for speculation.

A. I'm aware it's how Emerson acted.

Q. (BY MR. KARAM) And would it be correct that -- so we -- we saw that this document was in your file as of May 25th. So here is Wachtell ████████ ████████████████████ right?

MR. COMERFORD: Let me object that I don't remember that being established. I think that your question is --

MR. KARAM: Well, Counsel, you're -- you're making speaking objections. That's suggesting the answer to the witness. You're not allowed to do that.

MR. COMERFORD: You just asserted that this document was in Ms. --

MR. KARAM: Counsel, you can object, and --

MR. COMERFORD: Okay.

MR. KARAM: -- if you're right, the judge will disallow the question.

MR. COMERFORD: So, Mr. Karam, you just said that this document was in Ms. --



Page 46

KAREN RAPP

MR. KARAM:  Counsel, you're not supposed to be speaking at this deposition.  You'll have a chance to ask questions later if you want to.

MR. COMERFORD:  Mr. Karam, I'm trying to ask you a question for clarification purposes.  You just asserted that this document -- that you have established that this document was in Ms. Rapp's file as of May 25th, 2022, and I'm objecting that I don't remember you establishing that.  That's all I'm trying to say.

MR. KARAM:  All right.  I'm going to ignore your comments.  You have an objection.  I'll take it, but I don't think you made it properly.

MR. COMERFORD:  Do you think you established that, Mr. Karam, the fact that you asserted?

MR. KARAM:  Counsel, you -- Counsel, you are not to be asking questions of me at this deposition.  Don't you -- don't you have experience in taking depositions?

MR. COMERFORD:  Okay.  Let -- why don't we go off the record and take a brief recess, please.

THE VIDEOGRAPHER:  We're off the record, 10:11.

MR. KARAM:  That's fine.

(Recess taken 10:11 a.m. - 10:19 a.m.)

Page 47

KAREN RAPP

THE VIDEOGRAPHER:  This is Segment Number 2.  We're back on the record, 10:19 p.m. -- a.m.

MR. KARAM:  Okay.  So I just want to make sure that we've substituted for the previous Number 6 the same document, same Bates number, but with the addition of the metadata sheet.  Is that right?

TECHNICIAN:  Confirmed.

THE REPORTER:  Who was that?

THE WITNESS:  Andrew, the tech.

THE REPORTER:  Thank you.

Q.  (BY MR. KARAM)  So I'm going to refer you, Ms. Rapp, to Slide Number 10?

A.  I don't see any slides right now.

MR. KARAM:  I'm going to -- how do I do it?  Multi-speaker or --

MS. PLASCOFF:  He's going to put it up.

MR. KARAM:  Yeah, he's going to put it up.

Can you go to Slide Number 10, please, Andrew.

A.  I see it.

Q.  (BY MR. KARAM)  Okay.  So Slide Number 10, I'm going to refer you to the second -- in the left-hand column, the second sentence from the bottom, and this is the Wachtell slide deck.  It says, "

Page 48

KAREN RAPP

."  Do you see that?  That's the heading.

A.  Yes.

Q.  And then it has a                    .  Do you see that?

A.  "

Q.  Correct.

And the second one from the bottom is "                    Do you see that?

A.  Yes.

Q.  So certainly                    is that correct?

A.  Yes.

Q.  And are you familiar with the term "toehold" as it relates to mergers and acquisitions?

A.  Does it mean to have some stock?

Q.  You don't have to guess.  I mean, unless you -- if you don't know, that's fine.

A.  Okay.  I don't use that term.  Sorry.

Q.  Okay.  Let's go to Number 14, and                    "  That's the title.

It says, "

Page 49

KAREN RAPP

."

So my question to you, even though this is meant for the directors, were you instructed by anybody to prefer not to communicate about this in writing?

A.  Probably, likely.

Q.  That would be a fairly standard practice?

A.  Yes.

Q.  Let's go to Slide Number 30.  The title of this one is "                    And I'm going to refer you to the fourth bullet point down.  Do you see that?

A.  Yes.

Q.  It says, "                    ."  Do you see that?

A.  Yes.

Q.  So would it be correct that this slide deck is dated late May, and this was before Emerson actually started accumulating shares of National Instruments?

MR. COMERFORD:  Object to the form.

Only answer if you know.

A.  I don't know the date they started accumulating shares.

Q.  (BY MR. KARAM)  Okay.

Page 50

KAREN RAPP

MR. KARAM:  Andrew, document G will be Plaintiff's Number 7.

(P-7 was marked for identification)

Q.  (BY MR. KARAM)  Ms. Rapp, could you take a look at -- this is an email cover with what appears to be some slides.  Could you review them and tell me if you are familiar with these?

A.  Okay.  Can you scroll down, please?

Keep going.

Go ahead.

Okay.  Next page.

You can go ahead.

Okay.

Next page.

Okay.

Okay.

Okay.

Okay.

Yep.

I've seen slides like this.  I don't know if it's this exact document, but I've definitely seen this type of presentation from Bank of America.

Q.  Okay.  Just for the record, this is an email from Philip Youn.  It's dated June 12th, 2022.  It's

Page 51

KAREN RAPP

Bates numbers ending -- NAT-SL ending 7159.

Were you present when Bank of America made a presentation to the board of directors about a possible Emerson overture?

A.  I don't remember if I was there when they did this or not.

Q.  Did you have -- so can you tell me if you are familiar with these particular slides?

A.  I'm familiar with some that you've shown already, definitely.  I don't -- I don't know if I'm familiar with every one in here.  If you want to keep scrolling, I could look through some of them -- some more of them.

Q.  Well, I'm going to ask you -- I'm going to ask about one in particular.

A.  Okay.

MR. KARAM:  Can we go to Slide Number 5, please?

Q.  (BY MR. KARAM)  If you would, Ms. Rapp, take a look at this and tell me if you are familiar with it.

A.  I have seen this slide or some version of it. I don't remember the exact numbers on this slide I'm familiar with.

Q.  And was it correct that Bank of America made a

Page 52

KAREN RAPP

presentation to NI's board regarding National Instrument's valuation?

A.  It looks like that was the purpose.  That's what they said in that email to Kevin.

Q.  And the -- at the top, this larger chart or whatever you want to call it, had a valuation range in the -- in the -- can you read the gray box at the top?

It says, '██████████████████ ██████████████████████████████ ████████.'  Do you see that?

A.  Yes.

Q.  And so would it be correct that this -- what's shown here at the top was ████████████ ████████████████████████████████████ ████████████?

A.  Yes.

Q.  Then the wall that -- there's a gray box.  It's the last box on the bottom.  Do you see that?

A.  "████████████████████████," that one?

Q.  That's correct.

A.  Okay.

Q.  So when you see that -- the top box, the ████████████████████████████████████ ████████████████  Do you see that?

Page 53

KAREN RAPP

A.  ████████████████████████████ ████

Q.  Right.  Right.

A.  Yep.

Q.  ████████████████████████████ ████

A.  ████████████████████████████, yes.

Q.  ████████████████████████████ ████████████████████████████  Do you see that?

A.  ████████████████

Q.  Correct.  Correct.

So would it be correct that the valuation based on management's internal numbers was higher than that of the consensus analyst's estimates?

MR. COMERFORD:  Object to the form.

A.  Yes.

Q.  (BY MR. KARAM)  Did you -- were you -- whether you were at this board meeting or not, did you have discussions with Bank of America and different bankers about the Emerson transaction?

A.  Yes.

Q.  Who -- with whom did you have those discussions?

Deposition of Karen Rapp                    In Re National Instruments Corporation Securities Litigation

Page 54

KAREN RAPP

A. My -- the main contact was Shawn Liu.

Q. And were those discussions about the possible valuations if Emerson should come back with another offer?

A. I don't -- I don't remember. They talked mostly with Kevin directly. My role was providing the financial plan of record.

Q. Were you involved in any discussions about what would be a good price for the company, a good valuation if -- for a successful deal?

A. I don't remember. We had a lot of conversations.

Q. And various stock prices were discussed at those conversations?

MR. COMERFORD: Objection, calls for speculation.

A. You know, most of the conversations were just that the offer didn't represent the value we saw in the company. I don't know how specific they were.

Q. (BY MR. KARAM) So the -- there was general agreement within management that the $48 offer was too low; is that right?

A. Yes.

Q. Was there any discussion of whether there would

Page 55

KAREN RAPP

be a high -- there was an expectation of a higher offer?

A. We didn't know what Emerson was going to do.

Q. Well, of course, nobody can know, but was there a plan or expectation that there would be a higher offer?

MR. COMERFORD: Form, foundation, calls for speculation.

A. We didn't know what Emerson was going to do.

Q. (BY MR. KARAM) From your experience in mergers and acquisitions, is it correct that the first offer is not the best offer?

MR. COMERFORD: Objection, form, foundation, calls for speculation, incomplete and improper hypothetical.

A. I'm not sure how to answer that. Sorry. I haven't been involved in any other direct offers made to acquire my company.

Q. (BY MR. KARAM) What -- just -- taking -- go ahead. Sorry.

A. Yeah. When Emerson came back, they didn't increase their price.

Q. Well, we'll look at that.

MR. KARAM: Andrew, let's go to document number H, which will be Plaintiff's Number 8.

Page 56

KAREN RAPP

(P-8 was marked for identification)

Q. (BY MR. KARAM) Just before we go to that document, were you ever in any discussions with Bank of America where they said they would not give a fairness opinion below any specified price?

A. Not that I remember.

Q. Did Bank of America or anybody -- anybody involved express to you that they would not give a fairness opinion if the transaction closed at 48?

A. I don't remember.

Q. Okay. Take a look at this document. This is an email dated June 29th, 2022. And it's dated -- it's Bates number NAT-SL, last digits 25857.

And, Ms. Rapp, I'm going to refer you to the earliest email, which is dated June 28th, from Eddie Dixon to Sabastian Niles. It's at the bottom.

MR. KARAM: Andrew, can we give the witness control of the document so she doesn't have to ask you to move it?

TECHNICIAN: Can what?

MR. KARAM: Can we give the witness control of the document so she doesn't have to ask you to go to the next page? She can do it herself.

TECHNICIAN: Yes, you can click on your

Page 57

KAREN RAPP

screen, and you should be able to get control of the document.

MR. COMERFORD: And, Mr. Karam, this is a different Bates number than the one you just mentioned.

MR. KARAM: I think I mentioned the first -- the beginning Bates number. This one is the last page, 25859. Oh, I'm sorry, it is --

Andrew, is this -- this is a different -- this is the last --

Hold on. Let's go off the record for a second.

You're correct. Thank you.

THE VIDEOGRAPHER: We're off the record, 10:39 a.m.

(Recess taken 10:39 a.m. - 10:40 a.m.)

THE VIDEOGRAPHER: This is Segment Number 3. We're back on the record, 10:40 a.m.

(P-9 was marked for identification)

Q. (BY MR. KARAM) So this is Plaintiff's Number 9. It is NAT-SL-00025857. And I'm going to refer you to Page 25859, which is an email from Mr. Dixon to Sabastian Niles. Could you read that?

A. Okay.

Q. And just look up once you've read it.

Page 58

KAREN RAPP

A. Okay.

Q. So is it correct that in this paragraph -- Paragraph No. 1 from Mr. Dixon talks to Mr. Niles, who is a Wachtell, Lipton partner; is that right?

A. I don't know Sabastian's role, but I know Sabastian, yes. He's at Wachtell, or he was.

Q. Okay. And this -- this paragraph talks about Wachtell's fee structure and a request that he and Mr. Dixon discuss it or finalize it. Would that be correct?

A. Yes.

Q. So in the middle of that paragraph, there is a -- starting with an A, parenthesis, it says, "████ ████████████████████████ ████████████████ ████████████████████ ██████████████ ███████████."

Do you see that?

A. Yes, I do.

Q. And then his next sentence is "Eric and Karen are obviously very interested in locking something down."

Did you have a discussion with Mr. Dixon

Page 59

KAREN RAPP

about Wachtell's fee in connection with Emerson at about this time, late June?

A. Probably, if it was quarter end. I was probably trying to make sure I closed the books accurately.

Q. Did -- do you know if Wachtell, in fact, finalized the retainer agreement with National Instruments in connection with the Emerson case or transaction?

A. They -- they finalized an agreement with NI, yes.

Q. Can you describe what that agreement was?

A. Oh, I don't remember.

Q. Did it involve a ██████████████████ ████████████?

MR. COMERFORD: Objection, foundation, calls for speculation.

A. I don't remember.

MR. KARAM: This would be letter I, Andrew, and it would be Plaintiff Number 10, and it's Bates number NAT-SL-00020537.

(P-10 was marked for identification)

Q. (BY MR. KARAM) Ms. Rapp, this is another slide presentation by Wachtell, Lipton, entitled "Meeting of

Page 60

KAREN RAPP

The Board of Directors, June 14, 2022."

Were you present at the June 14th, 2022, board of directors meeting?

A. I don't remember.

Q. And obviously the same questions as last time. Were you -- are you familiar with these slides from Wachtell, Lipton?

A. Can I -- am I going to scroll through this or is Andrew?

Q. You can -- you can scroll to the other one, but not exactly.

A. This is different than the last one. Is that what you said?

Q. It -- it has differences. There are some slides that are the same, and some slides that are different.

A. Okay.

Okay. It looks a lot like the last one, or a subset of it. Oh, with some examples. Okay.

Q. Can -- yeah, can we go to --

A. Which page?

Q. Slide Number 12.

Are you familiar with Wachtell ████████ ████████████████████████████████████

Page 61

KAREN RAPP

A. Looks like it was marked as a pre-read in this document for whoever this was sent to.

Q. Is that your answer, or were you going to continue?

A. Yeah, I don't know if they presented this or not. Is that what you asked me?

Q. So this is my question. Were you familiar with information -- so let -- before we start, "Nuthatch" is the code word for Emerson; is that right?

A. Correct, at this point, yes.

Q. At this point.

And "Wolverine" was the code name for National Instruments in this transaction; right?

MR. COMERFORD: Objection, form.

A. Yeah, or else it was the program overall, the whole process. I don't remember.

Q. (BY MR. KARAM) Okay. So did you have information at this time from either Wachtell or any other source about Emerson's previous takeover activity?

A. It looks like Wachtell presented this, or provided this information at least.

Q. All right. Did you -- were you aware of it? Were you aware of that?

A. Maybe at the time. I -- probably.



Page 62

KAREN RAPP

Q. Okay. And so we can look at this slide here. It says, "████████████████████" And the first bullet point says, "████████████" ████████████████ ████████████████ ████████████████████ ███."

Do you see that?

A. Yes.

Q. Did you have knowledge that Emerson had pursued an acquisition over a period of several years?

MR. COMERFORD: Objection, form, foundation, calls for speculation.

A. That's actually not how I read this.

Q. (BY MR. KARAM) Okay. How do you read it?

A. "████████████████" reads to me like they weren't able to connect at all.

Q. So you -- you don't read this as being -- as making offers and being rejected?

A. No. It says that Nuthatch privately made its first formal offer in August 2017.

Q. Okay. Okay. So let's change the subject a little bit. It says -- look at the bottom timeline.

A. Okay.

Page 63

KAREN RAPP

Q. And it says, "████████████████." Do you see that?

A. Where is that? Oh, at the very end. At the end, yes.

Q. It's at the end.

A. Yes, "████████████."

Q. Okay. So would it be correct that in this Rockwell Automation transaction, or attempted transaction, that Emerson made a formal withdrawal?

MR. COMERFORD: Form, foundation, calls for speculation.

A. Do you think they made that -- I guess it says they withdrew it, but I don't know if they withdrew it with Rockwell or internally. It doesn't say.

Q. (BY MR. KARAM) Okay. Well, let's read the whole thing. "████████████ ████████████████████ ████████████████ ████████████████ ███████"

Do you see that?

A. Yes.

Q. Okay. And ████████████████

Page 64

KAREN RAPP

████████████; right?

MR. COMERFORD: Objection, form, foundation, calls for speculation.

A. ████████████████. I don't know where they got the information.

Q. (BY MR. KARAM) Okay. Please go to Slide Number 15, and this is ████████████ ████████████ Do you see that?

A. Yes.

Q. And, again, the first bullet point says, "████████████████ ████████████████ ████████████████████"; right?

A. Yes.

Q. So that one does, in fact, indicate a multiyear effort; right?

A. Yes.

Q. Then it says, "████████████ ████████████████████ ████████████" Do you see that?

A. Yes.

Q. Okay. And so the timeline -- ████████ ████████████████████

Page 65

KAREN RAPP

████████████████ Do you see that?

A. Yes.

Q. So would it be correct that in this particular case, Emerson persisted over a two-year -- more than two-year period; right?

MR. COMERFORD: Objection, form, foundation, calls for speculation.

A. I actually don't understand this time- -- oh, I see. It's above it. ████████████ ████████████████████ ████████████████ ████████████That's how I read this. Yeah.

Q. (BY MR. KARAM) Yeah, just for the timeline, it -- ████████████████████?

A. And they -- ████████████████ ████████████████████ ████ Q. ████████████████████ ████████████████, according to this timeline?

MR. COMERFORD: Form, foundation, calls for speculation.



Page 66

KAREN RAPP

A. Yeah, I think you mischaracterized that a little bit. ▮▮▮▮

▮▮▮▮

▮▮▮▮

▮▮▮▮

Q. (BY MR. KARAM) Well, I mean, you can read the paragraphs one by one. ▮▮▮▮

▮▮▮▮

▮▮▮▮ --

A. Right.

Q. -- ▮▮▮▮

A. Right.

Q. And so ▮▮▮▮

▮▮▮▮

▮▮▮▮ ?

A. Right. That's what this says.

Q. And then ▮▮▮▮

▮▮▮▮

▮▮▮▮ right?

A. Yes.

Q. So ▮▮▮▮

▮▮▮▮

▮▮▮▮ right?

Page 67

KAREN RAPP

MR. COMERFORD: Objection, form, foundation, calls for speculation, the document speaks for itself.

A. That's not how I read it. I read that ▮▮▮▮

▮▮▮▮

▮▮▮▮ That's how --

Q. (BY MR. KARAM) Okay.

A. -- that's how I read it. So...

Q. Okay. That's not unfair.

But it's the same -- it's the same company, the same two companies; right?

MR. COMERFORD: Form, foundation, calls for speculation, document speaks for itself.

Q. (BY MR. KARAM) And ▮▮▮▮

▮▮▮▮

MR. COMERFORD: Same objections.

A. That's how I interpret this, yes.

Q. (BY MR. KARAM) Okay. Do you want to take a short break? Are you --

A. I'm good.

MR. COMERFORD: Yeah, we're okay to keep going.

MR. KARAM: Okay. So it's 12 o'clock

Page 68

KAREN RAPP

Eastern. What time do you guys want to break for lunch, if at all? I probably will go past lunch at least a little bit.

MR. COMERFORD: Whatever you want to do, Mr. Karam, is fine on our end.

THE WITNESS: I'm okay to keep going.

MR. KARAM: All right. Well, let's keep going for a while and see what happens.

THE WITNESS: Okay.

MR. KARAM: This is -- are we on 11 or 12?

MS. PLASCOFF: We're on Number 11.

MR. KARAM: All right. This will be K, Andrew, and this will be Number 11, and this is dated -- an email dated June 15th, 2022, Bates number NAT-SL-00007093.

(P-11 was marked for identification)

Q. (BY MR. KARAM) So you're not a recipient on this email, but you're mentioned in it, Ms. Rapp, where Kevin Ileisin -- is that the way to pronounce his name?

A. Ileisin, Kevin Ileisin.

Q. -- Ileisin, where he says, "Following up our discussion yesterday, can we set up some time with Karen so we can start to frame the management plan of record?"

Can you explain to me what he meant by that

Page 69

KAREN RAPP

phrase, "frame the management plan of record"?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I don't know what Kevin's thoughts were there, but we worked with Bank of America. That's -- that other document we looked at, I provided the data for that plan of record so that they could do a valuation analysis.

Q. (BY MR. KARAM) All right.

MR. KARAM: L, letter L, Andrew, and it'll be Plaintiff's 12.

(P-12 was marked for identification)

Q. (BY MR. KARAM) And it is a letter dated June 16th, NAT-SL-00001255?

A. Okay.

Q. So, Ms. Rapp, you are aware that on June 16th, Mr. Starkloff and Mr. McGrath, who was the chairman of the board, wrote a letter to Mr. Karsanbhai; right?

A. I see the letter, yes.

Q. And that they rejected Mr. Karsanbhai's offer of -- in the terms stated in this letter; correct?

A. Yes.

MR. KARAM: This will be Number 13, letter M, Andrew, and it is a letter dated June 22nd,

Page 70

KAREN RAPP

2022, NAT-SL-000029992 -- I'm sorry, 2992.

(P-13 was marked for identification)

Q. (BY MR. KARAM) Ms. Rapp, are you familiar with this June 22nd letter sent to Mr. Starkloff and Mr. McGrath by Mr. Karsanbhai?

A. I see the letter, yes.

Q. Were you aware of the -- of its contents at the time?

A. I was aware that Lal reiterated the $48.

Q. Were you aware that, probably because the National Instruments stock price was lower than the first offer, that this June offer represented a 51 percent premium to the previous closing date?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I see the math in -- or I see the calculation in this letter. I didn't have that figure in my head.

Q. (BY MR. KARAM) I'm going to refer you to the second page.

A. Okay.

Q. There are -- there are three bullet points there. Do you see those?

A. At the top?

Q. At the top.

Page 71

KAREN RAPP

So the first bullet point says, "The top ten active shareholders, as of the end of Q1 of 2021, own approximately 19 percent of the company with an estimated average" -- "weighted average cost basis of $35. Over the past year, eight of those ten shareholders have reduced their positions and sold stock materially below the price that we are offering."

Do you see that?

A. Yes.

Q. Were you aware of that information at the time?

A. Was I aware that eight of the --

Q. That the larger --

A. -- ten shareholders -- our top shareholders bought and sold stock regularly. So I don't know that it stuck in my head for any reason.

Q. Were you or somebody, maybe investor relations, or anybody within the company, monitoring the positions of larger shareholders when they increased or reduced positions?

A. Yes.

Q. Whose -- whose job was that?

A. Marissa Vidaurri, the head of investor relations.

Q. And this is a little bit of a change of

Page 72

KAREN RAPP

subject. Did that have any impact on decisions to buy back stock? So, for example, the idea that when National Instruments is buying stock, its larger shareholders may have been reducing and selling stock.

A. No, that was not part of the discussion about buying stock.

Q. So they're referring to the -- the paragraph below that bullet point, in the first sentence there says, "We prefer to engage in collaborative, bilateral discussions with minimal distraction to your management team to reach an agreement privately."

Do you see that?

A. Yes.

Q. So but would it be correct that what Mr. Karsanbhai was saying is that he preferred to engage privately; right?

A. That's how I would interpret that, yes.

Q. And could you interpret that as a possible inference that if he didn't get his preference to engage privately, he would go public?

MR. COMERFORD: Objection, form, foundation, calls for speculation.

A. I don't read it as a threat. Is that what you're implying?

Page 73

KAREN RAPP

Q. (BY MR. KARAM) Well, I think, you know, we're dealing with time level professionals here, and threats kind of get issued in back alleys, but this may be something more like a subtle intimation more than a threat.

MR. COMERFORD: Objection, form, foundation, calls for speculation.

A. I don't know what Lal was thinking. Sorry.

Q. (BY MR. KARAM) Okay. So you -- he's saying we prefer to keep it private; right? That's what he's saying?

A. That's what he says.

Q. And when someone prefers something, that's what they want more than something else; right?

MR. COMERFORD: Objection, form, foundation, calls for speculation, incomplete and improper hypothetical.

Q. (BY MR. KARAM) That suggests that somebody has a choice, right, when someone says, "I prefer A to B"?

MR. COMERFORD: Same objections.

A. This says Emerson prefers to reach an agreement privately. That's what I read here.

Q. (BY MR. KARAM) Okay. And then at the bottom of that paragraph, it says "We look forward to learning

Page 74

KAREN RAPP

more about your internal plan and are confident that with access to limited nonpublic information, after signing an NDA, we could work with you to find additional value that would allow us to increase our proposal."

Do you see that?

A. I do.

Q. So this contains something that the first letter did not; right?

MR. COMERFORD: Objection, form.

A. Yeah, re- -- yeah, this sentence wasn't in the first letter, that's correct.

Q. (BY MR. KARAM) And so even though -- that the actual offer was at the same price, although higher premium, what he's saying here is he's willing to raise the proposal; right?

MR. COMERFORD: Objection, form, mischaracterizes the document.

A. I don't think he's saying he will increase the $48. I think he just wanted access to information.

Q. (BY MR. KARAM) But he's saying, "We could work" -- "work with you to find additional value"; right?  That means we could work with you to increase the price?

Page 75

KAREN RAPP

MR. COMERFORD: Form, foundation, calls for speculation, the document speaks for itself.

A. Yeah, I don't know how to answer that. It says, "We could work with you to find additional value that would allow us to increase our proposal." It doesn't say that he will or that the information doesn't mean he would then walk away. So I think it just says, "I'd like access to more information."

Q. And "If I get it, I can increase my proposal"?

MR. COMERFORD: Form, foundation, calls for speculation, document speaks for itself.

A. I'm not sure the material itself would cause him to increase his proposal.  I mean, he'd need to find the additional value that he mentions here.  So --

Q. (BY MR. KARAM) So can we -- these are -- as I said, these are negotiations between sophisticated parties; right?

A. Yes.

Q. And sometimes the signals are not overt. They're somewhat subtle; right?

MR. COMERFORD: Objection, form, foundation, calls for speculation.  It's an incomplete hypothetical.

And I'll further object it's been asked and

Page 76

KAREN RAPP

answered, I feel.

A. I don't know what to -- to add to what I've already said.  Sorry.

MR. KARAM: All right.  Let's go to letter N, Andrew, which is dated June 27th, 2022, NAT-SL-00016278.

MR. COMERFORD: Is this Exhibit 14?

MR. KARAM: That is Exhibit 14, I think.

THE WITNESS: Okay.  Yes.  Might want to scroll down so I can see who else is on the disclosed list at this point.

Okay.

Okay.  Thank you.

(P-14 was marked for identification)

Q. (BY MR. KARAM) You recognize this?  This is an email.  It's dated June 27th, 2022, NAT-SL-000016278, if I haven't said that before.

A. Yes.

Q. Can you tell me what this is?

A. This is adding Marissa to the insider list so that she knows about Wolverine, about this offer from Emerson, and it tells her that she should not trade stock because she's on this list.

Q. Do you know who -- who drafted the substance of

Page 77

KAREN RAPP

this email?

MR. COMERFORD: Foundation, calls for speculation.

A. Well, it's from Albert, so someone in legal, but probably Albert.

Q. (BY MR. KARAM) And do you know -- were you part of the decision made to -- to issue this email restricting trading in the stock?

A. No.  The legal team decided the trading restrictions.  I was part of the decision to add Marissa to the disclosed list.

Q. What's your understanding of the reason that the legal team decided to restrict trading?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I think he explains it at the top, doesn't he?

Can you scroll back up, please?  Or I can. Sorry.

He's saying Marissa became aware of material nonpublic information.

Q. (BY MR. KARAM) Did you receive a copy of this email, to your knowledge?

A. Probably.  A copy of Marissa's, or a copy to me?  I don't know if I received Marissa's.

Deposition of Karen Rapp                          In Re National Instruments Corporation Securities Litigation

Page 78

KAREN RAPP

Q. A copy of Mr. Percival's email.

A. But sent to Marissa?

Q. No.

A. Oh. Sorry.

Q. In other words, did Mr. Percival send you an email with this substance informing you that trading was restricted?

A. Quite possibly. Probably, actually, but the whole disclosure list got one, except for -- I don't know if the board does or not.

Q. And as you said, the first line says, "Due to the existence of National Instruments Corporation, material nonpublic information of which you have become aware during your" -- "the course of your work on project Wolverine"; right? That's what that says?

A. Yes.

Q. What was your understanding of the material nonpublic information?

A. Project Wolverine.

Q. The whole project?

A. Probably. Most of the material related to it would be -- well, I don't know, like some of the information like we just saw from Wachtell was more generic, right, so that's not material nonpublic

Page 79

KAREN RAPP

information, but anything that's material and nonpublic related to Wolverine is what should be covered by this document.

Q. Certainly you would agree that the price offer by Mr. Karsanbhai in both his May 25th letter and June 22nd letter were material nonpublic information?

A. Yes.

Q. Right?

A. Yes.

MR. COMERFORD: I'm going to object to --

Q. The $48 offer --

MR. KARAM: I'm sorry.

MR. COMERFORD: Object that it calls for legal conclusions.

Q. (BY MR. KARAM) The $48 offer was material and nonpublic information; right?

MR. COMERFORD: Objection, calls for legal conclusions.

A. It's not something I would share publicly.

Q. (BY MR. KARAM) And National Instruments' rejection of that offer on -- on June 15th was also part of the material nonpublic information?

MR. COMERFORD: Objection, calls for legal conclusions.

Page 80

KAREN RAPP

A. Yeah, it's not something I shared publicly.

Q. (BY MR. KARAM) Do you -- do you know why this -- this is dated June 27th, and this is from Mr. Percival to Ms. Vidaurri.

Do you know if Mr. Percival sent you this notification before June 27th?

A. I don't know. I don't even remember getting one, but I'm on the disclosed list. So -- and I -- and I knew about it before Marissa. So I'm guessing he sent one to me, too.

MR. KARAM: Andrew, letter O, which is a July 7th, 2022, email from Mr. Dixon to Mr. Ilcisin -- Ilcisin, I'm sorry, NAT-SL-00023205.

(P-15 was marked for identification)

MR. COMERFORD: Is this Plaintiff's 15?

MR. KARAM: Yeah, that's Number 15.

A. Is there more lower down?

Q. (BY MR. KARAM) No, this is -- that's it.

MR. COMERFORD: You can take it and scroll down.

Can the witness control the document, please?

A. Okay.

Q. (BY MR. KARAM) So this is the

Page 81

KAREN RAPP

July 7th, 3:34 p.m. emails from Mr. Ilcisin to you. It says, "Sent this to Pedro, copying you, but without explaining why. This could be Nuthatch discoverable. Don't want these listed as problems."

And then the email below says, "Suggest the first section of the Page 1 be labeled context, not problem statement. Recurring M&A and opportunistic buybacks are better not framed as a problem."

Do you see that?

A. Yes.

Q. Can you explain this email, the context of these emails to me, please?

MR. COMERFORD: Form, foundation, calls for speculation.

A. Do you have the slide he's referring to?

Q. (BY MR. KARAM) Unfortunately, your counsel was not able to get us that slide.

A. From this, it looks like Kevin is just providing feedback on the slide to change the title.

Q. So were there buybacks taking place on July 7th, 2022?

A. I don't know. That would be public -- wouldn't it be public information you could look up?

Q. Well, we saw that -- the June 27th email to

Deposition of Karen Rapp                     In Re National Instruments Corporation Securities Litigation

Page 82

KAREN RAPP

Ms. Vidaurri restricting trading; is that right? Remember that email? It was the last one we looked at.

A. Yeah, that's individual trading.

Q. That did not apply to buybacks?

A. No. That letter was to Marissa so that she didn't sell any of her individual -- or sell or buy any stock personally.

Q. Do you know if at that time Mr. Percival or someone from the legal department restricted buybacks on the grounds of material nonpublic information?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I don't remember.

MR. KARAM: This is Number 16, and it is letter P. It's dated July 7th, NAT-SL-00001250.

(P-16 was marked for identification)

Q. (BY MR. KARAM) Are you familiar with this email string, Ms. Rapp?

A. Hold on. Sorry. I'm still reading it.

I don't know if Eric showed this to me or not.

Q. I'm going to refer you to the -- the second email, which is on the first page, which is from Mr. Karsanbhai. And the second paragraph of that says,

Page 83

KAREN RAPP

"As I highlighted in our prior communication dated June 22nd, we prefer to keep our conversations private. However, for that to remain feasible, we need relative expedience from NI to move forward."

Do you see that?

A. Yes.

Q. Okay. Were you aware of Mr. Karsanbhai's -- in this case, more -- or less subtle statement that he could possibly go public?

MR. COMERFORD: Objection, form, foundation, mischaracterizes the document, and I think it's asked and answered.

You can answer.

A. I'm not sure if Eric shared that with me or not, or how he shared it with me, how he interpreted it.

Q. (BY MR. KARAM) Was there an awareness within National Instruments, yourself, Mr. Ilcisin, Mr. Starkloff, of the possibility that Emerson could escalate and go public?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I think an acquiree can go public anytime they want.

Q. (BY MR. KARAM) Including Emerson?

Page 84

KAREN RAPP

A. An acquiror.

Emerson could have gone public anytime they wanted to.

MR. KARAM: Do you mind if we take a short break, ten-minute break and then -- so it's about -- it's 11:30 Central, 12:30 Eastern. Why don't we go -- let's take a short break now. We'll go for like another hour or so, and then take a lunch break. Is that agreeable?

MR. COMERFORD: Yes.

THE WITNESS: Sure.

THE VIDEOGRAPHER: We're off the record, 11:26 a.m.

(Recess taken 11:26 a.m. - 11:46 a.m.)

THE VIDEOGRAPHER: This is Segment Number 4. We're back on the record, 11:46 a.m.

MR. COMERFORD: This is John Comerford for the defendants. It has just come to my attention that Mr. Karam has not entered his appearance in this case, and Defendants object to this deposition on that basis, and we reserve all rights.

MR. KARAM: So -- well, first of all, I've been -- I'm admitted to practice in the Southern District, and I have been for many years.

Page 85

KAREN RAPP

I inadvertently neglected to enter my appearance. My paralegals are doing that now.

So, Mr. Comerford, we have a choice here. I can either begin the deposition again from the beginning. I had actually not planned to go a full day. So if I redo the last couple hours, I can do that within the seven hours allotted. Is that what you would prefer, or can we just agree that you withdraw your objection?

MR. COMERFORD: No, I don't have any -- anything to express. I just want to put that objection on the record so that it is preserved. And I'm not asking you to do anything.

MR. KARAM: So you don't -- you don't want me to start again, now that I'm -- now that I filed the appearance?

MR. COMERFORD: No, I think --

MR. KARAM: You want me to start at the -- we can remark all these exhibits. I can ask the witness the same questions again. It would take a couple extra hours of her time. I don't think that's a good use of anybody's time.

MR. COMERFORD: Yeah, I think the -- I think the questioning should just proceed in light of

Deposition of Karen Rapp                    In Re National Instruments Corporation Securities Litigation

Page 86

KAREN RAPP

the objection, and we can deal with it later.

MR. KARAM:  Well, what do you mean deal with it later?  You know, I don't want you to come back and say the deposition is not valid.  I'm offering to redo the questioning.

MR. COMERFORD:  I don't -- I don't really have a view on how you are supposed to proceed, Mr. Karam.

MR. KARAM:  Well, it's your objection.  What's your objection?

MR. COMERFORD:  I made the objection, and --

MR. KARAM:  Do you have -- do you have any -- I'm interested, is there any authority to void an objection because somebody inadvertently didn't enter an appearance?  Is that -- do you have any case law on it?  I would be interested to see it.

MR. COMERFORD:  As I said, I just became aware of it, of this fact.  So I'm -- I'm preserving our objection.  We reserve all our rights.  And I suggest that you get on with the questioning, and we can deal with this matter after the deposition today.

MR. KARAM:  So you're declining my offer to restart the deposition from scratch?

Page 87

KAREN RAPP

MR. COMERFORD:  Yeah, I'm not taking a position on that.

MR. KARAM:  All right.  Well, let's -- let's start from scratch, then.

MR. COMERFORD:  Well, Mr. Karam, I -- I don't -- I'm not telling you that I think that that's necessary.

MR. KARAM:  It's like two and a half or three hours of your clients' time.

MR. COMERFORD:  Well, we're not -- we're not going to do that today.  We've already been here for hours.  It's just simply a -- an objection that you didn't enter your appearance before you started taking this deposition.  And now trying to punish us for that is not something that's --

MR. KARAM:  I'm not punishing.

MR. COMERFORD:  -- appropriate.

MR. KARAM:  Not punishing, just trying to rectify what your objection is.

MR. COMERFORD:  I've made the objection, and I suggest that the most efficient thing to do would be to let us look at the case law after the deposition, and we will determine what to do.  The discovery period in this case is not closing, you know, this month, I

Page 88

KAREN RAPP

don't believe, so there should be time to deal with anything, if anything needs to be done.

MR. KARAM:  So I guess what you're saying is if you want to claim that any part of this deposition is not valid, you will give us a chance to retake the deposition?

MR. COMERFORD:  Yes.  We will -- we will let you know if we are going to take that position as soon as practical.  And I'll commit to you -- today is Wednesday -- I'll commit to you that we will -- we will take that position by next Wednesday, September 10th, at the latest.

MR. KARAM:  All right.  I just want to let you -- if you're -- if you're going to object to my appearance, I'm going to be willing to re-ask all these questions and re- -- you know, if you're going to object to the exhibits that were marked, I'm prepared to re-mark them and redo the question.

MR. COMERFORD:  I understand you're prepared to do that.  I think the best --

MR. KARAM:  I think that is -- I think that would be a waste of time for the witness.  That's my position.

MR. COMERFORD:  I understand.  So I --

Page 89

KAREN RAPP

MR. KARAM:  Whether it's today or some other day.

MR. COMERFORD:  I understand.

MR. KARAM:  Anyway, I'm flattered that you're so threatened by my questioning that you want to object based on the technicality that I haven't entered my appearance.  I consider it a compliment.

Let's go.

Are we ready to get back on the record?

THE VIDEOGRAPHER:  We've been on the whole time.

MR. KARAM:  All right.  So this will -- Andrew, this is document QQ, and it is an email dated July 15th, 2022, NAT-SL-00017939.

(P-17 was marked for identification)

Q.  (BY MR. KARAM)  Ms. Rapp, I'm going to ask you just to read the top email between yourself and Mr. Dixon, and then one from Mr. Dixon to Mr. Starkloff and yourself.

A.  Just stay at the top?  Is that what you said?  Sorry.

Q.  Just the ones above the line.

A.  Okay.

Q.  The two emails above the line.

Page 90

KAREN RAPP

A. Okay.

MR. KARAM: Counsel, can we just take another short break while the witness is reviewing this document?

MR. COMERFORD: Yeah, that's fine.

THE VIDEOGRAPHER: We're off the record, 11:54 a.m.

(Recess taken 11:54 a.m. - 12:31 p.m.)

THE VIDEOGRAPHER: This is Segment Number 5. We're back on the record, 12:31 p.m.

MR. KARAM: Can I ask how much time we have on the record?

THE VIDEOGRAPHER: Hang on one sec.

2 hours, 38 minutes.

MR. KARAM: Okay, plenty of time. Andrew, can we put up document J, which will be Number 17.

TECHNICIAN: So I think that QQ would have been 17.

MR. KARAM: This will be 18?

TECHNICIAN: Yes.

(P-18 was marked for identification)

MR. KARAM: Andrew, can you make sure that the witness always has control of the document without

Page 91

KAREN RAPP

us asking? Because I want to -- I think it'll just make things go more smoothly.

TECHNICIAN: Of course.

THE WITNESS: Thank you.

Q. (BY MR. KARAM) Could you please take a look at this, Ms. Rapp? And this is NAT-SL-00008520 --

THE REPORTER: What was the last number?

MR. KARAM: 8520 and 8521.

Q. (BY MR. KARAM) Do you recognize this?

A. I do.

Q. Can you identify the handwriting? There appear to be two different handwritings.

A. Yeah, the first page of handwriting is Kevin Ilcisin, and the second page is me.

Q. And can you tell me what this document pertains to?

A. Yes. This pertains to Kevin and I speculating on what may happen in the Wolverine project.

Q. And the Wolverine project was Emerson's offer to acquire National Instruments; right?

A. Yes.

Q. So the date of this is June 14th, 2022; right?

A. Correct.

Q. Do you remember at what time of day this --

Page 92

KAREN RAPP

these notes were written?

A. No. Sorry.

Q. I guess my question is I -- you know that we looked at a presentation by Wachtell at a board meeting on this same date. Do you know if this happened before or after that Wachtell presentation?

A. I don't -- I don't know. I don't remember.

Q. Well, tell me the background on this. Obviously you had a conversation. Tell me how that happened.

A. Oh, I don't remember the background. This is just Kevin and I being silly. You know, just friends -- friends --

Q. Speculating on the outcome of a possible acquisition; right?

A. Correct.

Q. So on this first page -- and I'm not sure if this is the first page of the notes, but it's the first page on our document here. This is Mr. Ilcisin's writing; correct?

A. Correct.

Q. So you said, "Today" and "rejection notice"; right?

A. That's what it says, yes.

Page 93

KAREN RAPP

Q. So his -- I -- you could call it speculation. You could call it expectation. Most bets are based on probability; right?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I think most bets are based on uncertainty.

Q. (BY MR. KARAM) Uncertainty and guessing the probability of an outcome; right? You could call it a guess, you could call it speculation, but you're trying to determine an outcome that you're not quite sure of?

A. Yeah, we had no idea what was --

Q. Right?

A. -- going to happen.

Q. Right. So this is just your -- based on the information that you had on June 16th, 2022 --

A. June 14th.

Q. -- June 14th, 2022, this is your confirmed speculation; right?

A. Yeah.

Q. And each of you had a background and experience in acquisitions; right?

A. Yep.

Q. And you had knowledge of the terms of Emerson's offer; right?

Page 94

KAREN RAPP

A. The $48.

Q. At least to make -- and some of the other information; right?

MR. COMERFORD: Form.

A. Yeah, we knew the $48 offer.

Q. (BY MR. KARAM) So Mr. Ilcisin says, "Today, rejection notice"; right? So he expected or speculated that the first response to the $48 would be a rejection; right?

A. Yes. That's what this says.

Q. And then he says, "Late June" -- I actually can't read his writing, even though it's printing. But he has the number 51 there; right? $51?

A. Yes.

Q. Then it says, "Announce before or with earnings"; right?

A. Yes.

Q. So did you interpret this that he was guessing, predicting that Emerson would announce a $51 offer before or with earnings?

MR. COMERFORD: Foundation, calls for speculation, form.

A. I actually don't know what it says before the $51. Sorry.

Page 95

KAREN RAPP

Q. (BY MR. KARAM) Yeah, neither do I.

But how do you interpret the "announce before or with earnings"?

MR. COMERFORD: Foundation, calls for speculation.

A. I don't know because next he says wait for the earnings cost. So I don't know -- I'm not sure.

Q. (BY MR. KARAM) Okay.

A. Somebody was going to announce, I guess. I don't know.

Q. Okay. Then it says, "Early August, message LT challenge recent performance," and then it says, "$51 is a great premium. If we miss, $55 and threat to go public." Do you see that?

A. Yes.

Q. So this is Mr. Ilcisin predicting that Emerson will raise its offer either to $51 or $55; isn't that right?

A. Yeah, you could probably interpret it that way.

Q. And then the next word down is "reject"?

A. Right.

Q. So he's -- he's predicting that National Instruments would reject that offer?

A. Yep.

Page 96

KAREN RAPP

Q. Right?

A. This is his scenario, yep.

Q. And then he's predicting a late August public letter to the board of Q3 earnings consensus and $55; right? So that's predicting Emerson raising its pricing going public at $55; right?

MR. COMERFORD: Form, foundation.

A. Oh, is that public -- what is the word after letter?

Q. (BY MR. KARAM) In my -- I see it as "board," but I could be wrong. It's up -- you're the witness, so --

A. Sorry. I don't know. Yeah. He got to $55 or earnings consensus. Maybe he's talking about what consensus would be --

Q. All right. And then --

A. -- at late August, and then final price 61.

Q. All right. So he's predicting that the final price would be $61; right?

A. Yep.

Q. And so just -- and --

A. That assumes -- sorry.

Q. In terms -- I know it's a friendly bet, it's just for a bottle of wine, but were the rules that --

Page 97

KAREN RAPP

like the Price is Right? You can't go over? Or was it just simply the one who was closer to the final?

A. I don't even remember. I'm sure we'd have debated it.

Q. Okay. All right. So then let's -- let's look at the next page, which is yours. And you say, "New private offer at 52 before June 30th"?

A. Yep.

Q. And then you say, "We reply no by July 15th"; right?

A. Yep.

Q. Then you predict "Public with 52 by July 31st"; right?

A. Yes.

Q. And then you say, "All top shareholders sign up."

So this was -- your estimate was shareholders -- the top shareholders would approve an offer above 52. Is that what that means?

MR. COMERFORD: Objection, mischaracterizes the document, form.

A. Well, my final price was 58.50.

Q. (BY MR. KARAM) And you believe that all -- is that what "All top shareholders sign up" refer to, the

Page 98

KAREN RAPP

$58.50 offer?

A. Yeah, I don't remember exactly what I was thinking at the time, but that was the conclusion.

Q. Okay. All right. So if I may say so, both and you Mr. Ilcisin were remarkably prescient for the outcome of this case; right?

MR. COMERFORD: Object to the form.

Q. (BY MR. KARAM) Would you agree with that?

A. It settled for close to these numbers, so yes.

Q. It settled at 60; right?

A. Uh-huh.

Q. It's kind of remarkable. Here you are on June 15th, and it wasn't until the next April that it finally got to that number; right?

A. Yep.

Q. And you were within 1.50 and he was within a dollar; right?

A. Yes.

Q. And this is based on the information that you had at the time and your own experience; right?

MR. COMERFORD: Objection, form, mischaracterizes prior testimony, mischaracterizes the document.

A. I think this was in fun and could have changed

Page 99

KAREN RAPP

a million times along the way through the process.

Q. (BY MR. KARAM) Based on the information that you had on June 15th, both you and Mr. Ilcisin came very close to the final price; right?

MR. COMERFORD: Objection, form, mischaracterizes the document, mischaracterizes prior testimony.

A. We were just speculating and having fun.

Q. (BY MR. KARAM) But you came close to the final price?

MR. COMERFORD: Same objections.

A. We came in at 58.50 and $61, yes.

Q. (BY MR. KARAM) And each of you was betting that the deal would close; right?

A. This assumes that the deal closed; correct.

Q. If I were into sports betting, I might try to ask you for some tips.

MR. KARAM: Andrew, document Q, which is dated July 14th, NAT-SL-0025703.

(P-19 was marked for identification)

Q. (BY MR. KARAM) So, Ms. Rapp, reading this from the bottom, there's an email from Kevin Ilcisin to yourself, Mr. Dixon, Mr. Percival. And then Mr. Percival's email is the one I'm going to ask you

Page 100

KAREN RAPP

about.

A. Okay.

Q. Where he says -- he said, "Perspectives on Timing: Input to the question, 'when should we time a potential deal with █?'" Do you see that?

A. Yes.

Q. And is it correct that at -- during this time period, National Instruments was considering a deal with █████?

A. Yes.

Q. Then it says, "There's relatively aligned consensus that an investment in NI would become unattractive to █ if Nuthatch goes public before the deal is inked." Do you see that?

A. Yes.

Q. And is -- was that your understanding?

MR. COMERFORD: Form.

A. Well, I didn't write any of this.

Q. (BY MR. KARAM) Well, I know, but you're on the email string, and Mr. Percival is saying "There's a relatively aligned consensus." So I'm inferring that he means among National Instruments' management.

A. Oh, I don't know who Albert is referring to there, or I don't --

Page 101

KAREN RAPP

Q. Okay.

A. I don't know.

Q. And then he says, "based on resulting stock price increase"; right? He says that?

A. Yeah, that's the part he added below.

Q. Okay. Because it's generally understood that if Emerson went public with a $46 offer or higher, that that would affect National Instruments' stock price; right?

MR. COMERFORD: Form, foundation, calls for speculation.

A. That's what it says in this email, that there's a consensus that if it was made public, it might result in a stock price increase.

Q. (BY MR. KARAM) Then he says, "There's added consideration that until Nuthatch or alternative offer was fully withdrawn or terminated, that our own transformational M&A could be difficult to transact." Do you see that?

A. Yes.

Q. And it's correct that as of this date, July 14th, Emerson had not withdrawn or terminated its offer or communicated that to National Instruments; right?

Page 102

KAREN RAPP

A. But he's referring to if -- or whoever wrote this -- is referring to if Nuthatch goes public, and they -- they didn't go public until January or something.

That's a sub bullet; right? So that's referring to if Nuthatch goes public. At least that's how I read it.

Q. Okay. So he was contemplating the possibility that they would go public, and if they did go public, until they withdrew the offer, that would interfere with National Instruments' other M&A; right?

A. That's their assumption here, yes.

Q. Okay.

A. That's how I read it, at least.

MR. KARAM: Okay. We're done with that. What number was that?

MS. PLASCOFF: That number was 17.

MR. KARAM: What? 18?

MS. PLASCOFF: 17.

MR. KARAM: No.

TECHNICIAN: 19.

MR. KARAM: 19.

Andrew, this is document R.

MR. COMERFORD: Will this be Exhibit 20?

Page 103

KAREN RAPP

MR. KARAM: 20, which is NAT-SL-00002967, and it's Exhibit 20.

(P-20 was marked for identification)

Q. (BY MR. KARAM) Can you take a few moments to review this?

A. Yes.

Okay.

Q. So the bottom email is from Mr. McGrath, right, the chairman?

A. Correct.

Q. And he says -- he referred to analysts. "While most of them improve their models, they didn't use the guidance we provided." Is that what he says?

A. Correct.

Q. And is that correct that the analyst did not incorporate National Instruments' guidance?

A. Well, he documented the different pieces below. So if he got that correct, then that's correct.

Q. Okay. And then at the top, he said -- before he documents it, he said, "It looks like from the analyst's reports that they either didn't listen to your 2023 guidance or didn't give it credibility"; right?

A. Yes.

Page 104

KAREN RAPP

Q. And so one of the reasons on which you -- National Instruments rejected Emerson's overture is because the company believed that it could get a higher price operationally without a transaction; isn't that right?

A. Yeah, not get a higher price. You mean --

Q. I --

A. Are you trying to say our value would be higher?

Q. Achieve a --

A. Yeah.

Q. Yeah, achieve a higher stock price. Forgive me. I misspoke.

A. Right. Yes.

Q. This is S, which is NAT-SL-00001240, and it's a letter dated August 2nd.

MR. KARAM: That would be Number 21, Andrew.

(P-21 was marked for identification)

A. Okay.

Q. (BY MR. KARAM) So this is -- you're familiar with this letter dated August 2nd?

A. I don't know if I saw this exact letter, but I am familiar that we rejected their proposal.

Page 105

KAREN RAPP

Q. Rejected the June 22nd proposal from Mr. Karsanbhai; right?

A. Correct.

Q. Okay, and the reason was that the board and management believed that it could achieve higher shareholder value without doing the transaction; right?

A. Yes.

MR. KARAM: This is document T, Andrew, and it is NAT-SL-00009611.

(P-22 was marked for identification)

Q. (BY MR. KARAM) And if you could, Ms. Rapp, read it from the bottom up, which is chronologically.

A. Okay.

Okay.

Q. So you write on August 4th, "Can you please let me know what we can do to put a plan in place for stock repurchases given the current situation?"

What are you referring to by the word "plan"?

A. A 10b5-1 stock repurchase plan.

Q. And what was your reasoning for wanting to do that at this time, even though you had been repurchasing stock earlier in the year without one?

MR. COMERFORD: Object to the form of the

Page 106

KAREN RAPP

question.

A. Yeah, I don't remember --

Q. (BY MR. KARAM) I'm -- I'm sorry, do you want me to --

A. Yeah, I understand what you're asking. I don't remember the conversations that led to a plan versus opportunistic repurchase, but both were tools that we used on a regular basis.

Q. You had not had a 10b5-1 plan in place since that -- the beginning of the year, that January audit committee presentation; isn't that right?

A. I'd have to go back and check, but that would be public. Do you know -- do you know?

Q. Well, I can -- I can't answer.

A. We could check. I don't -- I don't remember off the top of my head.

Q. Okay. All right. Did the Emerson/Wolverine transaction situation have an effect on your desire to implement a 10b5-1 plan as opposed to opportunistic purchases?

MR. COMERFORD: Form.

A. I don't remember the conversations that led up to deciding to use a plan, sorry, but we did use -- we used a plan and opportunistic repurchases regularly. So

Page 107

KAREN RAPP

I -- I don't know.

Q. (BY MR. KARAM) What's the advantage of the plan?

A. When you put a plan in place, you don't have to manage it daily. It's set up with terms that are executed according to the plan that you put in place.

Q. And there's -- there's some protection from allegations of insider trading, right, of opportune -- of trading on inside information?

A. Yes.

Q. All right. So then let's look at the next email where Mr. Percival says, "I'll need to discuss with WLRK." That's Wachtell. "We still have Nuthatch letter overhang or perhaps hangover, so I believe we are in a gray area."

What did you understand that to mean?

A. That he wanted to get input from outside counsel before we implemented any -- any repurchase plans.

Q. I believe you testified earlier that there was -- there was no restriction on buybacks during the -- the Wolverine material nonpublic information period; is that correct?

MR. COMERFORD: Form.

Page 108

KAREN RAPP

Q. (BY MR. KARAM) It was only individual trading that was restricted?

A. We were referring to that letter that was sent to Marissa. That letter to Marissa was for her individual trading.

Q. Did you have information that company buybacks were restricted on the grounds of material nonpublic information?

MR. COMERFORD: Form.

A. We used advice of counsel for buybacks throughout this period.

Q. (BY MR. KARAM) So any buyback from the first Emerson approach to -- up to this date, which is August 4th, is it correct that you cleared any buyback with counsel?

MR. COMERFORD: Form.

A. Did we do any in those periods? Do you know?

Q. (BY MR. KARAM) May not have, but -- so let me ask you this. Is it -- so here we are in August. Did you -- my question is did you individually clear each buyback with counsel, or did you get an overall or overarching opinion that lifted the restriction?

MR. COMERFORD: Form.

A. I'm not -- I'm not actually sure how to answer

Page 109

KAREN RAPP

that. Right. If we -- Eddie and Albert would have worked with Wachtell to understand where we were in the process and what Wachtell's recommendation would be given a buyback.

So I think what you're asking is if Wachtell said they believed we could repurchase, then that felt like the right -- like the direction we could go for purchase -- repurchasing. I'm not sure if I'm ask -- answering your question. Sorry.

Q. Okay. Let's look at -- let's re-up the emails. Maybe that can help clarify.

A. Okay.

Q. So this is Mr. Dixon, "FYI, the reconfirm rejection was sent on Tuesday. So hopefully we can do something near the end of the open window, if no further engagement by Nuthatch. I believe that is what we discussed before, but as you noted, let's get WLRK's take in the timing."

So Mr. Dixon is saying that he believes you can possibly resume near the end of the open window?

A. Uh-huh.

Q. Do you see that phrase? What does that mean?

MR. COMERFORD: Objection, mischaracterizes the document, lacks foundation, calls for speculation as

Page 110

KAREN RAPP

to the meaning, the document speaks for itself.

A. We -- the legal team defined the open window each quarter where we could repurchase stock, and that seems to be what Eddie's referring to there.

Q. (BY MR. KARAM) And that would be sometime after an earnings announcement?

A. Yeah. It's -- and I don't remember the exact dates, but it was pretty consistent. Some period after earnings until some period before the next earnings.

Q. All right. And then you say, "I was thinking maybe now is the time to put a plan in place since we sent the letter"?

A. Uh-huh.

Q. So that refers to the August 2nd rejection letter of Emerson; right?

A. Correct.

Q. And then you say, "I know we have to wait 30 or 60 days from when it's implemented to start the repurchases, so the sooner the better." Do you see that?

A. Yes.

Q. And that -- and so you were motivated or as part of your normal strategy to -- to begin repurchases as soon as possible?

Page 111

KAREN RAPP

MR. COMERFORD: Form, compound.

A. Yeah, as part of our capital allocation strategy, repurchases were one of the tools we used.

Q. (BY MR. KARAM) And then Mr. Dixon says, "I think the question is when does Nuthatch" -- "the Nuthatch engagement becomes stale so legitimate argument that we don't have MNPI when the plan is put in place, but will let Albert confirm with WLRK."

Do you see that?

A. Yes.

Q. So is it correct that this statement by Mr. Dixon indicated that, at least until the August 4th rejection, there was material nonpublic information?

MR. COMERFORD: Object to the form, foundation, calls for speculation, mischaracterizes the document.

You can answer.

A. I didn't read it that way, but -- I read it as just another check to make sure that we don't have MNPI.

Q. (BY MR. KARAM) Right. Well, it's saying, "the engagement becomes stale, so legitimate argument that we don't"; right?

MR. COMERFORD: Objection, literally misreading the document and asking a question.

Page 112

KAREN RAPP

I'm going to read it for the record. It says, "I think the question is" --

MR. KARAM: Counsel. Counsel, please. Counsel, you have an objection; you made your objection.

MR. COMERFORD: Right.

MR. KARAM: That's what you get to do.

MR. COMERFORD: My objection is that --

MR. KARAM: You can ask -- you can ask questions after I'm finished.

MR. COMERFORD: My objection is that you are intentionally misconstruing and mischaracterizing what some other person said in a document, and then you're asking the witness to agree with your characterization.

MR. KARAM: Counsel, you're coaching the witness. You're improperly making speaking objections, and it's giving hints for the witness how to answer questions. You're not allowed to do that.

MR. COMERFORD: I am not doing that, Mr. Karam. You're mischaracterizing documents, and I'm entitled to object to it.

Q. (BY MR. KARAM) Let me rephrase the question, Ms. Rapp.

A. Okay.

Page 113

KAREN RAPP

Q. Mr. Dixon writes, "I think the question is when does the Nuthatch engagement become stale, so legitimate argument that we don't have MNPI." Do you see that?

A. Yes.

Q. Isn't it correct that there was a trading restriction before the August 2nd rejection of Emerson's offer?

MR. COMERFORD: Form.

A. I don't remember.

Q. (BY MR. KARAM) Well, I showed you the June 27th letter to Ms. Vidaurri; right?

A. Well, that's -- but that's an individual.

Q. Right.

A. The company is different than an individual.

Q. Okay. But the reason for the individual restriction was material nonpublic information; right?

A. Yes.

Q. So those persons on the list -- which included yourself?

A. Yes.

Q. -- of the Nuthatch engagement, according to that June 27th email, were in possession of material nonpublic information; right? That's what that's saying?

Page 114

KAREN RAPP

MR. COMERFORD: Form, calls for legal conclusions.

A. Yeah, Albert's letter said don't trade stock.

Q. (BY MR. KARAM) But it said -- it used the words "material nonpublic information"; right?

A. Right, in that first paragraph.

Q. Right. The word -- because it was material; right?

A. Yes. But -- yeah.

Q. Go ahead. Say what you were going to say.

A. I couldn't remember what the date was on that document. Everything was changing.

Q. So --

A. Which is why they were checking, so anyway...

Q. Okay. All right. So all I'm trying to establish is that before a certain date, let's say August 4th, the date of these emails, there was material nonpublic information --

MR. COMERFORD: Objection.

Q. (BY MR. KARAM) -- isn't that right?

MR. COMERFORD: Are you saying -- are you asking her to assume that?

MR. KARAM: Counsel, you're not allowed to ask questions.

Page 115

KAREN RAPP

MR. COMERFORD: Can you --

MR. KARAM: Let the witness answer the question.

MR. COMERFORD: Can the court reporter please read back the question?

THE REPORTER: "All I'm trying to establish is that before a certain date, let's say August 4th, the date of these emails, there was material nonpublic information; isn't that right?

MR. COMERFORD: Okay, form, calls for legal conclusions.

A. I think -- I think, yes, there was material and nonpublic information, and we were, in this time period, trying to understand if that was done.

Q. (BY MR. KARAM) Right. If that was -- when you say "done," if that was still in effect; right? That's the purpose of the review details --

A. That's why they were asking --

Q. -- right?

A. -- outside counsel, yes.

Q. Right, that before there was material nonpublic information, but is it -- you know, is it stale, is it done, can we remove any restrictions; that's what the purpose of these emails was; right?

Page 116

KAREN RAPP

A. That's what --

MR. COMERFORD: Yeah, form, foundation, calls for speculation as to why other people wrote emails.

Subject to that, you can answer.

A. That's how I would interpret this, yeah.

Q. (BY MR. KARAM) Normally in a business context, people write emails to make themselves understood to other people; right?

MR. COMERFORD: Form, improper and incomplete hypothetical, calls for speculation, and lacks foundation.

Q. (BY MR. KARAM) People generally in business situations communicate in the English language by emails and they often understand one another; right?

MR. COMERFORD: Same objections: It's an incomplete and improper hypothetical, it lacks foundation, asks for the witness to speculate. And I further object to the form.

MR. KARAM: I'll admit it was rhetorical, Counsel.

Q. (BY MR. KARAM) So was there -- did Wachtell, as far as you know, communicate to Mr. Percival or Mr. Dixon what their opinion was on whether there was

Page 117

KAREN RAPP

material nonpublic information at or about August 4th, 2022?

MR. COMERFORD: Foundation.

A. Yeah, it's my understanding that Wachtell -- I don't know -- I don't know the way you asked that -- that Wachtell said that we could move ahead with share repurchases.

Q. (BY MR. KARAM) How did you learn that information?

A. Either through Eddie or Albert.

Q. Was it on a phone call? In person? By email?

A. I don't remember. Sorry.

Q. You don't remember what the -- what the -- if it was an in-person conversation? You don't remember the details of the conversation?

A. From -- no, I don't remember from August of 2022 if Eddie or Albert told me that in person or some other way.

Q. And do you have any recollection of Wachtell writing an email with the details of their legal opinion?

A. No, I don't have any knowledge of that.

Q. Do you have any recollection of either Mr. Dixon or Mr. Percival writing an email or a memo or

Deposition of Karen Rapp                                    In Re National Instruments Corporation Securities Litigation

Page 118

KAREN RAPP

any type of document that reflected their or Wachtell's legal opinion?

MR. COMERFORD: Foundation.

A. No, I don't -- I don't remember.

Q. (BY MR. KARAM) But you do remember that at some time, around the time of these emails, you heard from either Mr. Dixon or Mr. Percival; right?

A. I don't remember a conversation about it at all, but I would not have moved forward with a buyback without approval from Eddie or Albert.

Q. Okay. But you have no recollection whatsoever of how -- how that occurred?

A. I do not remember. I'm sorry.

Q. Okay.

MR. KARAM: Andrew, this is document U. It's dated August 8th, 2022, NAT-SL-000010395.

(P-23 was marked for identification)

Q. (BY MR. KARAM) Do you recognize this, Ms. Rapp, this email?

A. No, but this looks like a normal type of calendar invite I'd have received.

Q. Okay. So is it -- this was sent by Mr. Ilcisin; right?

A. Yes.

Page 119

KAREN RAPP

Q. And it included Mr. Starkloff, yourself, Mr. Dixon, Mr. Sabastian [sic] from Wachtell, and other lawyers and investment bankers; right?

A. Yes.

Q. And its subject is "Wolverine Check-in Call." Do you see that?

A. Yes.

Q. And so is it correct that there -- that as of August 9th, even after the second rejection sent by National Instruments' board, there were still discussions of Wolverine?

A. Yeah, it looked like Kevin wanted to talk about the Emerson earnings call.

Q. So is it correct that someone inside National Instruments was keeping an eye on Emerson?

MR. COMERFORD: Form.

A. Yes.

THE REPORTER: Mr. Karam, did you mark this as an exhibit number?

MR. KARAM: Forgive me, I did not. This would be Number 22.

THE REPORTER: Thank you.

MR. COMERFORD: I've got it as 23.

MS. PLASCOFF: 23.

Page 120

KAREN RAPP

MR. KARAM: 23.

THE REPORTER: 23. Okay. Thank you.

MR. KARAM: Andrew, document W, please, and this will be Number 24, Plaintiff's 24.

(P-24 was marked for identification)

Q. (BY MR. KARAM) Do you recognize this, Ms. Rapp?

A. It's an email I wrote. I don't --

Q. And you wrote it to JP Morgan; right?

A. Yes.

Q. And what was the function of JP Morgan in connection with the 10b5-1 plan?

A. They were our banking partner that assisted us with share repurchases.

Q. They -- were they responsible for drafting the plan or just implementing it?

A. Implementing it.

Q. Okay. Then you say in the last line, "We also want to be able to do open-market purchases." Do you see that?

A. Yes.

Q. Does that mean that, in addition to the 10b5-1 plan, you wanted to do opportunistic purchases as you referred to earlier?

Page 121

KAREN RAPP

A. Yes. Not that we wanted to -- we wanted to be able to. I don't know if we actually did or not, but we wanted the option to be able to.

Q. Okay. Just hold on for a second. I just want to talk to my team. I'm going to turn my mic off.

A. Okay.

MR. KARAM: Andrew, document V, as in Victor, and that will be Number 25.

(P-25 was marked for identification)

A. Okay.

Q. (BY MR. KARAM) Can you take a look at these? It's an email dated August 9th, 2022, NAT-SL-00006230.

A. Yep.

Q. So this appears to be some slides reflecting analyst coverage of National Instruments; right?

A. Correct.

Q. So I'm going to refer to you Slide Number 3 where the heading for the slide is "PE Ratio". Do you see that?

A. No. Hold on. It's not -- I need to make it smaller or something. There you go. Yes. Thank you.

Q. Got it?

A. Yes, uh-huh.

Q. Okay. Good.

Page 122

KAREN RAPP

All right.  So I'm just going to refer you to the analyst price targets.

A. Okay.

Q. So the bottom ones are April of 2022.  Do you see that?

A. Yes.

Q. Okay.  And the -- the average is 46?

A. Yes.

Q. Is that correct?

A. Correct.

Q. And then the next one -- are -- it doesn't have a date, but it appears to be concurrent of the date of the slides, and the average price target is 45.  Do you see that?

A. Yes.

MR. KARAM:  This is document X, Andrew, and it will be Number 26.

(P-26 was marked for identification)

Q. (BY MR. KARAM)  Do you recognize this email, Ms. Rapp?

A. Yes.

Q. Tell me what this email pertains to.

MR. COMERFORD:  Form.

A. Mackenzie was a company that did market watch

Page 123

KAREN RAPP

analysis for us, and Sam sent us this note to let us know that ███████████████████████.

Q. (BY MR. KARAM)  So yourself or somebody from National Instruments assigned Mackenzie to monitor possible share accumulation by Emerson or other possible acquirers?

A. Yes.  That's --

Q. When did that happen?

A. Oh, I don't remember when --

Q. Okay, it happens.  Sorry, go ahead.

A. No, sorry.  I don't remember when we started that.

Q. Okay.  But it was sometime before August 10th; right?  They were already in place on August 10th monitoring?

A. Yes, that's correct.

Q. All right.  Mr. Ilcisin says, "This just got interesting."  Do you have an idea what he meant by that?

MR. COMERFORD:  Form, foundation, calls for speculation.

A. You need to ask Kevin.

Q. (BY MR. KARAM)  You remember the Wachtell slides, right, that we looked at?

Page 124

KAREN RAPP

A. Yes.

Q. And all of them discussed monitoring or being aware of share accumulation by a possible acquirer; right?

A. Yes.

Q. So is it correct that this ████████████████ ██████████████████?

MR. COMERFORD:  Form, foundation, calls for speculation.

A. Well, we already knew Emerson was interested.  They sent us letters.  So, I mean, they already expressed their interest.

Q. (BY MR. KARAM)  Right.  They expressed them in a letter.  But you remember that other Wachtell slide with the -- ████████████████████  right?

A. Right.  But I --

Q. So the letter was --

A. I don't think those are --

Q. -- the letter was step 1 --

A. I --

Q. Go ahead.

A. Yeah, I'm sorry.  I wasn't -- I don't -- well, I don't remember what I was thinking on August 10th of 2022, but this is like just a tool; right?  This is just

Page 125

KAREN RAPP

one of the things that honestly makes no sense.  I don't know why they did this anyway, but...

Q. Could it be described as a tactic?

MR. COMERFORD:  Form, foundation, calls for speculation.

A. But they -- the tactic would be to tell us they're interested, and they already told us they were interested.  So I'm not sure what this did for them honestly, but...

Q. (BY MR. KARAM)  Well, it was -- sending a letter was one thing; right?  You don't even have to buy a stamp to send him a letter by email; right?

A. True.

Q. And ████████████████████████ ██████████████████████████; right?  That's different?

MR. COMERFORD:  Form.

A. I don't know why they did this.  That's something they'd have to answer.

Q. (BY MR. KARAM)  Yeah, I'm not asking you why.  All I'm saying is it indicated a move above and beyond simply writing a letter; right?

MR. COMERFORD:  Form, foundation, calls for speculation.

Page 126

KAREN RAPP

A. It was definitely in addition to doing a letter.

MR. KARAM: All right. This is document Y. It's dated August 10th, 2022, NAT-SL-00008756.

MR. COMERFORD: Is this Plaintiff's Exhibit 27?

MR. KARAM: I'm sorry, I didn't hear that.

MR. COMERFORD: Is this Plaintiff's Exhibit 27?

MR. KARAM: That would be Number 27.

(P-27 was marked for identification)

A. Okay.

Q. (BY MR. KARAM) This appears to be an email that Mr. Dixon sent to himself and nobody else. Do you see that?

A. Yes.

Q. Do you know if he was normally in the custom of doing that, sending emails to himself?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I have no idea.

Q. (BY MR. KARAM) Okay. Have you ever seen this email?

A. Not that I remember.

Page 127

KAREN RAPP

Q. Around this time, after you learned that Emerson was buying National Instruments' stock, did you have a conversation with Mr. Dixon?

A. About what?

Q. About Emerson, about Wolverine, about anything related to it.

MR. COMERFORD: I'm --

A. I would imagine I did -- I don't remember -- I mean, I talked to Eddie frequently.

Q. (BY MR. KARAM) Do you have any remembrance of a conversation about Mr. Dixon about ███████ ███████?

A. I don't remember a specific conversation with Eddie about ███████.

Q. A general conversation?

A. May have had a conversation. I don't remember.

Q. You don't remember any details of any conversation with Mr. Dixon on or about August 10th about Emerson or anything related to Emerson?

A. No.

Q. So he has a bunch of bullet points here, right, where he says -- the first one is "Unusual action." Do you see that?

A. Yes.

Page 128

KAREN RAPP

Q. Do you know -- understand what he's talking about there?

A. I don't.

Q. Then it says, "Putting money where mouth is messaging. Uplift in price is due to them..." Do you see that?

A. Yes.

Q. Do you understand what he's talking about there?

A. I assume that's related to the purchase of stock that Emerson did.

Q. What about the phrase "uplift in price is due to them"?

A. I would interpret that as there was a buyer in the stock. When some -- when there's buyers for the stock, it creates demand, and it increases the price.

Q. So ███████████████████ ███████████ could be lifting or propping up the National Instruments stock price; right?

MR. COMERFORD: Form, foundation, calls for speculation.

A. There's a lot of market dynamics there, so I don't even know how to answer that question. Sorry.

Q. (BY MR. KARAM) Okay. But these -- this is

Page 129

KAREN RAPP

Mr. Dixon's words. He's saying, "uplift in prices due to them"; right?

A. That's what Eddie wrote.

Q. And he's a sophisticated professional; right?

A. I think Eddie is a sophisticated professional, yes.

Q. And then the next one is "Why now after an extended period of engagement?"

And the next one is "Probability of going public is much higher now."

Do you see that?

A. I do.

Q. Did he ever discuss that with you or anybody else, as far as you know?

A. I don't remember.

Q. Did you ever -- did you have any discussion with Mr. Ilcisin about whether ███████████ increased the probability of going public?

A. I don't remember the conversations I had about this.

Q. All right. Let's go to the bottom one where he -- he writes, "Adam Wayne Sabastian re buy back - no material change to situation, implement if desired."

Did you have a conversation with Mr. Dixon

Page 130

KAREN RAPP

where -- about the buybacks after you learned ▇▇▇ ▇▇▇▇▇▇

A. Probably, because I don't implement a buyback without Eddie's approval.

Q. All right. So when you're saying "probably" in your last answer, you're just inferring; right? You don't actually have a memory, but you're assuming that you would not do buybacks without a clearance; right?

A. Correct.

Q. Do you know -- were you on any calls with Adam Emmerich?

A. Yes. He's at Wachtell.

Q. And around this time, about clearance for doing buybacks?

A. Oh. I don't remember. I don't know.

Q. Okay. Because he refers -- he's got Adam, who's Adam Emmerich; right?

A. Probably.

Q. And then Wayne, who is Wayne Carlin; right?

A. I don't know Wayne.

Q. Okay. So fair to say that you were not on any call with Mr. Carlin to lift trading restrictions to do buybacks; right?

A. I honestly don't remember. We were on multiple

Page 131

KAREN RAPP

calls with Wachtell multiple times for months. So I don't know all the people that were on the calls all the time, and I don't remember all of the conversations that were had.

Q. Okay. But I'm just trying to get -- you know, I'm -- to be quite honest, what lawyers call it, I'm probing your memory to see how much you remember about any call with Wachtell or Dixon or Percival lifting the restriction to -- in order for you to do buybacks on or about August 10th.

A. I don't remember personally.

Q. Okay.

A. But that doesn't mean I wasn't. But Eddie kind of summarized it here. "No material change to the situation; implement if desired," kind of --

Q. Okay. But --

A. -- supports that --

Q. -- when you have --

A. -- that we moved forward; right?

Q. Yeah. But you never saw that email; right?

A. I did not, at least not from what I remember.

Q. And you never -- I'm sorry. Go ahead.

A. But I don't have to get it in writing from Eddie to do a buyback. I can take over --

Page 132

KAREN RAPP

Q. I -- I understand.

A. Okay.

Q. I'm just trying to find out what's out there.

A. Okay.

Q. This is what's known as a discovery proceeding. I'm trying to learn the facts as best I can.

A. Okay.

Q. And so as far as you know, you infer that you had a conversation because you would not have done the buybacks without a conversation; right?

A. That's fair.

Q. Okay. And you don't remember any email specifically from Wachtell; right?

A. I don't.

Q. And nor from Mr. Dixon or Mr. Percival?

A. No, I don't.

Q. Okay.

A. That doesn't mean there wasn't one.

Q. That's understood.

A. Sorry.

Q. Don't be sorry. That's normal in these things.
Okay. This is document Z, and it is dated August 10th. It's an email, NAT-SL-00009535.

MR. COMERFORD: For the record, this is

Page 133

KAREN RAPP

Plaintiff's 28?

MR. KARAM: That's correct, Plaintiff's 28.

(P-28 was marked for identification)

Q. (BY MR. KARAM) So we've looked at the bottom email already.

A. Yeah.

Q. I'm not going to go over that again.

A. Yeah.

Q. So this is one from Mr. Dixon to Mr. Percival, the top -- I'm just going to ask you about the top one, where it says, "FYI, Eric and Karen are calling board members to let them know the plans re buyback and lifting the restriction."
Do you see that?

A. Yes.

Q. And did you, in fact, call board members and tell them that the restriction had been lifted and that you were proceeding with buybacks?

A. I'm sure I did.

Q. Okay. Do you have any memory of it?

A. No. Sorry.

Q. Okay. And that lifting of restriction was both for individuals and for the company to buy back? I'm sorry -- yeah, that's right.

Page 134

KAREN RAPP

A. Yes.

Q. Okay. This is AA. It's dated August 11th, NAT-SL-000009179.

A. Okay.

Q. So this is the email from Mr. Percival to the board informing them that the project Wolverine trading restriction is lifted; right?

A. Yes.

MR. COMERFORD: Counsel, can we please mark this as Plaintiff's Exhibit 29?

MR. KARAM: All right. Exhibit 29.

(P-29 was marked for identification)

Q. (BY MR. KARAM) And, once again, is it correct that you cannot remember -- you have no recollection of a conversation with Mr. Percival or Mr. Dixon informing you of the lifting of the deal, right -- of the restriction; right?

A. I don't remember the conversation, but I would have --

Q. Okay.

A. -- gotten a letter lifting it as well.

Q. Okay. And do you -- do you remember any discussion of the reason that it was lifted?

A. No, because I don't remember the conversation.

Page 135

KAREN RAPP

Sorry.

(P-30 was marked for identification)

Q. Okay. This is BB, August 11, 2022, NAT-SL-000000765. This is Number 30. I have very smart lawyers reminding me of these numbers.

A. Okay.

Q. Do you recognize this document?

A. Yeah. This is the repurchase plan.

Q. All right. And this was -- it's dated August 11th, 2022; is that right?

A. Yes.

Q. And it -- in the numbered Paragraph 2, where it says "term" --

A. Yes.

Q. -- it says, "JPMS is authorized to commence purchasing securities on September 12th, 2022." Do you see that?

A. Yes.

Q. Okay. And that was the plan; right?

A. Yes.

Q. And going to the final page, which is on Page Number 7771, it says, "Annex A." Do you see that?

A. Yes.

Q. The last sentence in the paragraph says, "JPMC

Page 136

KAREN RAPP

will not spend more than $60 million under the plan, inclusive of commission"?

A. Yes.

Q. So the plan was for $60 million; right?

A. Up to.

Q. Up to.

And this -- the box below this, where we have the share prices, can you explain to me what that means?

A. Yeah. So if the shares are trading for less than $37, they're authorized to spend up to $8 million per day to repurchase those shares.

And then the amount that they're authorized to spend per day declines based on the share price, and if it goes over $45, they were not to make any purchases.

Q. Okay. So -- and who arrived at these -- these target numbers?

A. It would have been me and Eric.

Q. Well, would it be correct that you did not consider the stock undervalued at 45?

A. No, but I don't think that's a correct statement. I think where we're trading isn't the same as how we value the stock. This was more of a trading

Page 137

KAREN RAPP

solution or a trading situation.

Q. All right. So -- but there was a decision made not to buy back stock at 45 or above; right?

A. Correct.

Q. And actually, even at 43, to curtail significantly the buybacks; right?

A. Yeah, the goal is to buy it as -- at the lowest price possible.

Q. Well, was there a discussion at this time that you're buying stock and ████████████████ and that that may be affecting the market in some way?

A. Not that I remember.

(P-31 was marked for identification)

Q. All right. This is CC, August 14, 2022. It will be Number 31, NAT-SL-000006245.

A. Okay.

Q. So the bottom email from you to Ms. Ursula Conterno says, "We may do open-market purchases again this week. I spent $9 million on Friday and committed $60 million on the 10b5-1." Do you see that?

A. Yes.

Q. So that indicates that, in addition to the 10b5-1 plan, you bought back $9 million of stock, probably on August 12th, because this is dated Saturday,

Page 138

KAREN RAPP

August 13th; right?

A. Correct. That's how I look at it.

Q. All right. And you were continuing opportunistic purchases in addition to the 10b5-1 plan?

A. Yes.

Q. This is --

MR. KARAM: What is the Bates number? Do we have it?

MS. PLASCOFF: It's --

(P-32 was marked for identification)

MR. KARAM: This will be Number 32. It's document DD, NAT-SL-000000772, and it's a large spreadsheet. Hopefully Ms. Rapp can navigate it.

Q. (BY MR. KARAM) Ms. Rapp, do you recognize this document?

A. Looks like something that comes from treasury to track the repurchases. It's not something I use frequently, but I understand it.

Q. Okay. So looking at the first page, it says, "Briefly" -- it says, "New 10b5-1." And that's right around the date of March 16th, 2022?

A. Up at the top? Is that where you're at?

Q. Yes, I'm at the top of it.

A. New 10b5-1, March 16th, yes.

Page 139

KAREN RAPP

Q. Okay. So would that indicate that you had a 10b5-1 plan in place around March of 2022?

A. Yes.

Q. Okay. And then moving downward where there's -- it's entitled "Open Market"?

A. Yes.

Q. And the next date after that, is May 3rd, and there were -- it looks like there were purchases on the -- in the -- in the left-hand column is the purchase date, and the column next to that is the clearing date. So we're just going to deal with the purchase date.

A. Okay.

Q. There are apparently open-market purchases from May 3rd through May 6th. Do you see that?

A. Yes.

Q. And then there are no purchases between May 6th and August 12th. Do you see that?

A. Correct.

Q. What was the reason for the ceasing or pausing of purchases between May and August?

A. I would imagine it was because we were -- we had received the letter from Emerson and paused, but my -- I would imagine it was the Emerson situation.

Q. Okay. So this is my question. You recall that

Page 140

KAREN RAPP

the letter -- at least the email to Ms. Vidaurri was dated May 27th?

A. Okay.

Q. Did you ever refrain from purchasing or doing buybacks between May 25th and June 27th even though you did not have a formal trading restriction in place?

MR. COMERFORD: Form.

A. I'm sorry. Say that again. We didn't buy back after May 6th, it looks like on here.

Q. (BY MR. KARAM) Right. Right. And part of that was, you know, in the May 25th time frame; right?

A. Correct.

Q. So did you ever say, "Let's not do buybacks, even though there's no formal restriction in place, because, you know, Emerson is making this offer"?

MR. COMERFORD: Form, vague, and ambiguous.

A. Possibly. The -- I don't remember all the details of the discussions regarding stock buybacks. It's -- it's usually driven after a board conversation. So we may have paused because we wanted to understand more about what might happen with Emerson.

Q. (BY MR. KARAM) Okay. And -- all right. So then there are -- looks like there are four buys between August 12th and August 26th. Do you see that?

Page 141

KAREN RAPP

A. Yes.

Q. And those are all open market?

A. Yes.

Q. And not --

A. Correct.

Q. Okay. And then there's a notation "10b5-1 program begins," and then there are purchases between September 12th and September 26th; right?

A. Yes.

Q. And then there are no -- appear to be no more purchases for the year 2022. Would that be correct?

A. Yeah, none on this spreadsheet.

Q. And do you know if there were any purchases after September 26th, 2022?

A. I don't remember, but that's -- we can look that up. That's public.

Q. Okay. So there's information at the bottom here, and in the -- in the bottom right corner, there's a notation "ADL - Recalc total $250,002" -- $2,877." Does that reflect a total amount of repurchases?

MR. COMERFORD: Form, foundation, calls for speculation.

A. Sorry. Where are you --

Q. (BY MR. KARAM) Let me withdraw that.

Deposition of Karen Rapp

Page 142

KAREN RAPP

A. Yeah.

Q. Let me withdraw that.

Do you see this number, the $250 million number in the lower right-hand corner?

A. Yes. "ADL recalc total."

Q. Right. What does that refer to?

MR. COMERFORD: Form, foundation, calls for speculation.

A. Oh, I don't know. You'd have to put the cursor there and see what the formula is. But -- I'm not sure.

Q. (BY MR. KARAM) Okay.

A. I don't -- I don't know those words. I'm not sure.

Q. All right. I mean, do any of these numbers in -- at the bottom here on the right-hand side, the 191 million number, the 169 million number, do any of those reflect a total for the amount of repurchases for a year or any other period?

MR. COMERFORD: Form, foundation, calls for speculation.

A. Yeah, this isn't my spreadsheet. So you'd have to go back and see what they're adding up. They're -- it looked like a total from somewhere. It could be -- I can't do math fast enough. I don't know -- and I'm not

Page 143

KAREN RAPP

sure what it ties to.

Q. (BY MR. KARAM) Okay. That's not a problem.

THE WITNESS: I'm sorry. I need to take a couple minutes to go to the restroom, please.

MR. KARAM: Not a problem. Let's take a ten-minute break.

THE WITNESS: Oh, I don't need ten minutes but...

THE VIDEOGRAPHER: We're off at 1:57.

(Recess taken 1:57 p.m. - 2:06 p.m.)

THE VIDEOGRAPHER: This is Segment Number 6. We're back on the record at 2:06 p.m.

MR. KARAM: Andrew, this is EE, and it's dated August 16th, 2022. It's Number 34, NAT-SL-00007475.

MS. PLASCOFF: I thought this was 33.

MR. KARAM: I'm sorry, this is Number 33. The spreadsheet is 32.

(P-33 was marked for identification)

Q. (BY MR. KARAM) So, Ms. Rapp, this is dated August 16th from Mr. Jeffrey Mackenzie to Marissa Vidaurri, indicating that ███████████████ ███████████████████████████████. Were you aware of that at the time?

Page 144

KAREN RAPP

MR. COMERFORD: Objection, mischaracterizes the document.

A. I think this one says that Goldman was who was active. It's who Emerson had used the last time. So they're -- ████████████████████ ██████████

(P-34 was marked for identification)

Q. (BY MR. KARAM) Okay. This will be Number 34. It's dated August 17th, 2022, NAT-SL-00001156.

Ms. Rapp, the bottom email is from Ursula Conterno saying, "Authorized spend remaining 182 million." What does that mean?

A. Ursula was the treasurer, and she's referring to the share repurchase summary dated August 12th, 2022. I'm guessing someone asked her a question about what was the authorized spend remaining, so she replied with 182 million.

Q. All right. And that would be out of the 252 million; is that correct?

MR. COMERFORD: Form, foundation, calls for speculation.

A. Yeah, it's probably out of whatever the board authorized.

Q. (BY MR. KARAM) Okay. And then the next email

Page 145

KAREN RAPP

is from Mr. Starkloff to you: "Let's chat repurchase strat tomorrow."

What was your conversation with Mr. Starkloff about repurchase strategy?

A. I don't remember.

Q. This is PP, document PP with no Bates number. It's a page out of a proxy statement by National Instruments --

A. Okay.

Q. -- dated May 25th of 2025 -- '23.

Ms. Rapp, does this document reflect your stock ownership in National Instruments as of May 2023?

MR. COMERFORD: Can we identify this with an exhibit number, please?

MR. KARAM: This will be 35.

(P-35 was marked for identification)

A. This is a list of owners who had more than 5 percent of our common stock, and then the NEOs, the named executive officers, and the directors.

Q. (BY MR. KARAM) And the number of your ownership was accurate at the time; is that correct?

A. I'm sorry. Say that again, please.

Q. Was the number reported here accurate at the time?

Deposition of Karen Rapp

In Re National Instruments Corporation Securities Litigation

Page 146

KAREN RAPP

A. I'm sure it was. This is an external document. We were pretty diligent in making sure they're accurate.

Q. And you retired from National Instruments; is that right?

A. I did.

Q. When was your retirement?

A. May of 2023.

Q. Did you sell shares either upon or after your retirement?

A. I did, but I don't remember when. I think Eddie advised me of something like holding them for six months or something like that.

Q. So it would have been toward the end of 2023?

A. Yeah, I'd have to go back and look.

Q. Okay. And did you sell all of your shares in National Instruments or just a portion?

A. I don't remember.

Q. In this share accumulation, did you ever, during your time at National Instruments, buy shares on the open market?

A. No, not that I remember.

Q. Would you have received notification if the other officers were buying shares on the open market?

A. No, not if they're buying. I don't think we're

Page 147

KAREN RAPP

notified, unless they -- there may have been some agreement with E*TRADE, if they did it through E*TRADE. I think they only had -- we only had to report it if they sold.

(P-36 was marked for identification)

Q. (BY MR. KARAM) All right. This will be Number 36, and it's letter II, document letter II, September 1st, 2022, NAT-SL-0010806.

MR. KARAM: This is the one.

MS. PLASCOFF: Okay.

A. Okay.

Q. (BY MR. KARAM) So, Ms. Rapp, did you, on or about September 1st, 2022, receive information that

A. Yes. That's what this email is from Kevin White.

(P-37 was marked for identification)

Q. (BY MR. KARAM) Okay. This will be JJ, and it'll be Number 37, September 21st, 2022, NAT-SL-000012292.

MS. PLASCOFF: It's --

A. Okay.

Page 148

KAREN RAPP

MR. COMERFORD: They've got the wrong document up.

THE WITNESS: Oh.

I think you're muted, if you're talking to us.

MR. KARAM: Hold on a second.

THE VIDEOGRAPHER: You're back. We hear you.

Q. (BY MR. KARAM) All right. So this is an email from Mr. Ilcisin to you, presumably about your retirement; is that right?

A. Yes.

MR. COMERFORD: Okay. Can we please make it clear for the record that this is Bates-numbered 23530?

MR. KARAM: Yes. Forgive me. This is Bates number 23530.

MR. COMERFORD: And is this Exhibit 37?

MR. KARAM: Number 37.

MR. COMERFORD: Thank you.

Q. (BY MR. KARAM) So had the -- had the wine bet been discarded by this time?

A. I don't know that Kevin and I ever talked about it after --

Page 149

KAREN RAPP

Q. Okay.

A. -- doing it initially.

Q. Okay. So you don't know if you or he ever collected the bottle of wine?

A. I know I didn't get any wine.

Q. Okay. Well, we might have to track him down.

MR. KARAM: All right. This is -- all right. So my numbers are off now. Let me see your numbers.

This is document KK, and it's dated September 21st, 2022. It's number NAT-SL-000012292.

MR. COMERFORD: Can we mark this as Exhibit 38?

MR. KARAM: Number 38.

(P-38 was marked for identification)

Q. (BY MR. KARAM) Do you recognize this, Ms. Rapp?

A. I know what it's saying. I don't know if I've seen it. Possibly.

Q. So would -- so this is addressed to Mr. Ilcisin.

Were you involved in any meetings that monitored Emerson's financial capacity in or around September 21st, 2022?

Page 150

KAREN RAPP

A. Maybe. I don't remember. I mean, at some point we talked about their cash. I don't remember when that was.

Q. Turning to -- so you see this first bullet point that I have my cursor on. It says, "As illustrated on the right, Nuthatch has ample capacity to pursue M&A."

A. Yes.

Q. Was -- was that National Instruments' assessment of Emerson at that time, that it had ample capacity to acquire National Instruments if it pursued it?

MR. COMERFORD: Form. I'm going to object to the extent it mischaracterizes the document.

A. This is -- I think this is a Bank of America form. I think Bank of America did this analysis.

Q. (BY MR. KARAM) Okay. Was that -- did Bank of America convey that information to Mr. Ilcisin and other National Instruments' people?

MR. COMERFORD: Form, foundation, calls for speculation.

A. Looks like they sent this to Kevin. So I'm assuming Kevin had it.

(P-39 was marked for identification)

Page 151

KAREN RAPP

Q. (BY MR. KARAM) This will be 39. It's dated October 14th. It's document LL -- I'm sorry, MM, NAT-SL-000006122.

So I'm going to refer to you your email dated October 14th at 10:08 a.m., which is at the top.

A. Okay.

Q. And you say, "Biggest drain on cash this year has been our intentional decision to grow inventory - some of that growth is because we are buying broker parts that are VERY expensive to help close supply gaps."

And then you say, "We've also done 160 million in share repurchases because we believe our stock has been undervalued. Our planned repurchase was 100 million, so we did more this year than our original plan"; is that right?

A. Yep.

Q. So did the Emerson offer affect your decisions to increase buybacks?

MR. COMERFORD: Objection, asked and answered.

A. I don't remember it being an impact in our repurchase decision.

Q. (BY MR. KARAM) Did it affect it in any way?

Page 152

KAREN RAPP

A. I don't remember the details of how it played out during the year, but this says we believed our stock had been undervalued.

Q. So you remember that the trading restriction was lifted even after you learned █████ █████ right?

A. Yes.

Q. And you were given the okay to go ahead with buybacks; right?

A. Correct.

Q. And we saw on that spreadsheet that you were buying back stock from like August 14th until the end of September; right?

A. Yes.

Q. And even though you had the okay from the lawyers, you knew that Emerson had the offer out there of 48; right?

MR. COMERFORD: Object to the form, object to mischaracterizes the evidence.

A. No, we had rejected the $48.

Q. (BY MR. KARAM) Right.

A. And they hadn't come back.

Q. But you knew that it was a third party with sufficient cash that made an offer for the company;

Page 153

KAREN RAPP

right?

A. Yes. Emerson had made an offer that we then rejected twice, at least, and then they didn't come back.

Q. All right. But the offer was rejected as being too low; right?

A. Correct. That's correct.

Q. So even though you rejected the offer, you still knew you were buying stock below 48; right?

A. Yes.

Q. And you knew that you could go back to Emerson and say, "We'll take the 48," if you wanted to?

MR. COMERFORD: Form, foundation, calls for speculation.

Q. (BY MR. KARAM) Isn't it correct that Emerson had not withdrawn the offer; right?

MR. COMERFORD: Form.

A. We had rejected it at $48.

Q. (BY MR. KARAM) Right. But Emerson had not said offer was withdrawn; right?

A. There may have been a -- didn't -- wasn't there usually a time attached to each offer?

Q. Did Emerson ever give a formal withdrawal? They did not; right?

Deposition of Karen Rapp

In Re National Instruments Corporation Securities Litigation

Page 154

KAREN RAPP

A. No, they did not.

Q. And you saw in the ██████████ ████████████████████████████████ ███████████████████████?

A. Oh, okay.

MR. COMERFORD: Foundation.

A. There's a lot of different scenarios that can happen. They also --

Q. (BY MR. KARAM) I'll say --

A. -- went public very quickly in those situations, and they didn't go public. So we had no idea what they were thinking.

Q. Okay. Nobody knows what the other party is absolutely thinking, but you do know that there was a written offer at 48; right?

A. Yes.

Q. And once you know something, you really can't unknow it; right?

A. Correct.

Q. And you were buying stock, buying back stock with the permission of the lawyers, according to you?

A. Yes.

Q. At prices below 48; right?

A. Yes.

Page 155

KAREN RAPP

MR. KARAM: Okay. Let's go to NN, and that will be --

MS. PLASCOFF: 40.

MR. KARAM: -- Number 40, October 28th, 2022, NAT-SL-00006940.

(P-40 was marked for identification)

Q. (BY MR. KARAM) So this is dated October 28th. If you look at the -- there were four enumerated sentences. I'm going to refer to you number 3. It says, "Wolverine follow-up with Karen, 8:30 to 9:00 a.m. on Friday. She will dial in." Do you see that?

A. Yes.

Q. So is it correct that, as of October 28th, 2022, you were still having meetings or discussions of Wolverine?

A. Yes.

MR. KARAM: All right. Let's take a five-minute break.

THE VIDEOGRAPHER: We're off the record at 2:31 p.m.

(Recess taken 2:31 p.m. - 2:33 p.m.)

THE VIDEOGRAPHER: This is Segment Number 7. We're back on the record, 2:33 p.m.

MR. KARAM: So I'm reaching the end of my

Page 156

KAREN RAPP

planned questioning, and the question is whether Mr. Comerford wishes to maintain his objection.

We've done some research into it. We have found no rule that says a lawyer cannot take a deposition without -- before he files a notice of appearance. The requirement to file notice of -- notice of appearance appears to be -- or appearance in open court or filing of documents. There's no mention of the requirement to file notice of appearance. Nonetheless, I have, of course, filed an appearance today.

And I'm prepared if Mr. Comerford -- well, what's Mr. Comerford's position?

MR. COMERFORD: Well, Mr. Karam, based on your representations about the local rules and the law, we will go ahead and withdraw the objection.

MR. KARAM: Thank you. Thank you.

That being said, I'm not noticeably a scholar, so I rely on others for that.

But I have no further questions.

Counsel, I'm informed that document production is not complete and that there may be other documents. So we're reserving our rights to continue this deposition if other documents should be produced.

MR. COMERFORD: Okay. Understood.

Page 157

KAREN RAPP

I would like to ask some questions of the witness.

THE VIDEOGRAPHER: Microphone.

MR. COMERFORD: Yes.

MR. KARAM: Be my guest.

MR. COMERFORD: Thank you.

EXAMINATION

BY MR. COMERFORD:

Q. Ms. Rapp, my name is John Comerford, and I represent National Instruments and the other defendants in this case. I'd like to ask you some questions here. We're toward the end of your deposition today.

Let me ask you some questions about your background just to get oriented so the jury understands who you are.

Where are you from originally?

A. I was born in California, moved around a lot as a kid. My father was a salesman. Spent most of my growing up years in Illinois, northern Illinois, went to high school and college in Illinois.

MR. KARAM: I'm sorry to interrupt.

Mr. Comerford, could you go on camera when you're asking questions, please?

MR. COMERFORD: Yes.

Page 158

KAREN RAPP

MR. KARAM:  Sorry about that.

A. Lived in Illinois, got my first job out of college in Illinois with Motorola, and then transferred to Austin, Texas, with Motorola in -- would have been 1992.

Q. (BY MR. COMERFORD)  So where do you live now?

A. '93.

Now, I live in Zephyr, Texas.  It's a couple hours outside of Austin.

Q. Okay.  And what do you do now for work?  Anything?

A. I am on three public company boards, but retired as a CFO.

Q. Okay.  And when did you retire?

A. May of 2023.

Q. All right.  Why don't we trace your education after high school.  Where -- where did you go to college?

A. Northern Illinois University.  Got a degree in finance in 1989.

Q. And you have education after your bachelor's in finance?

A. I went to the University of Texas to the executive MBA program, graduated in 1999.  So '89 on the

Page 159

KAREN RAPP

first one, and '99 on the second one.

Q. And that was an executive MBA, you said?

A. Yes.

Q. Did you get that while you were working?

A. Yes.

Q. And then I know you touched on it a little already, but starting in 1989 when you graduated from Northern Illinois University, can you start tracing your work history, please?

A. Sure.  I started with Motorola when I graduated in their finance team.  I've been in finance my whole career.  Stayed with Motorola until they spun off their semiconductor group and went with the semiconductor spin-off, which became named Freescale.  Stayed with Freescale.  They got purchased by NXP.

So I worked for Motorola, Freescale, NXP from 1989 until 2017.  And then 2017, I started with National Instruments and stayed with them until May of 2023.

Q. And what was your first role with National Instruments?

A. CFO.

Q. Okay.  And I think the jury understands CFO stands for chief financial officer; is that right?

Page 160

KAREN RAPP

A. It does, yes.

Bless you.

Q. Can you describe your -- just in general terms your job duties as the chief financial officer at National Instruments from 2017 through 2023?

A. Sure.  My role was to ensure that our financials were accurately stated and published in a timely basis so that our shareholders would know what our financial position was as a company.  It involved a lot more than that.

Along the way -- oh, I also had the IT team reporting to me, so I also did information services.  And then along the way, the manufacturing operations team reported to me, and facilities, procurement.  And my job was to provide strategic counsel to the management team and the CEO and partner with them to make the company successful.

Q. Thank you.

I want to show you a document, which it's just a single page, and it's Page 32 of the plaintiff's complaint, the lawsuit in this matter.  And after Paragraph 78 of the complaint, there is a timeline that the plaintiffs have included in their complaint.  It is a graphic timeline that talks about Emerson's initial

Page 161

KAREN RAPP

outreach to National Instruments on May 16th, 2022, and then it goes through certain events.  And this timeline ends at January 13th, 2023.  Do you see that?

A. Yes.

Q. Some -- some things are noted as "Emerson communications."  Some things are noted as "offer letters."  Some events are noted as "National Instruments communications."  A few things are noted as "limited engagements."  Do you see all that?

A. Yes.

Q. Now, you were asked a number of questions about the share repurchase program today and the timeline of those share repurchases being made by National Instruments in August of 2022 and September of 2022.  Do you recall those questions?

A. Yes.

Q. And then do you agree with me that the timeline that the plaintiffs have offered in this case shows that Emerson made an offer on May 25th, 2022; it was rejected by National Instruments on June 16th, 2022; Emerson made another offer at the same offer price of $48 per share on June 22nd, 2022; and National Instruments rejected that offer on July 6th, 2022?  Right?

A. Correct.

Page 162

KAREN RAPP

Q. And those --

MR. KARAM: Objection, leading, compound.

Counsel, you haven't marked the document, too.

MR. COMERFORD: Well, it's in the complaint. So I wasn't planning to separately mark it.

Q. (BY MR. COMERFORD) My question is, is it your understanding, and is it your recollection, as you've lived through these events, that Emerson had twice offered $48 per share to acquire National Instruments and National Instruments had twice rejected that offer before the share repurchases were made by National Instruments in August and September of 2022?

A. Yes.

MR. KARAM: Objection, leading.

Q. (BY MR. COMERFORD) And is it your recollection and your testimony that Emerson then, after the share repurchases that are at issue in this case occurred, that subsequent to that, it increased its offer to $53 per share on or about --

MR. KARAM: Objection, leading.

Q. (BY MR. COMERFORD) -- on or about November 3rd, 2022? Do you see that in the plaintiff's timeline?

Page 163

KAREN RAPP

A. Yes.

MR. KARAM: Objection, leading.

Q. (BY MR. COMERFORD) Okay. Do you think that the offer that Emerson made of $48 per share that was made on May 25th, 2022, and made again on June 22nd, 2022, should have been accepted by National Instruments?

A. No.

Q. What was the eventual price that Emerson agreed to pay per share to acquire National Instruments?

A. $60.

Q. And so is it your view, as the former CFO of National Instruments, that when Emerson offered $48 per share, that offer undervalued the true value of what the company was worth per share?

A. Yes.

MR. KARAM: Objection, leading.

Q. (BY MR. COMERFORD) All right. You were shown at least two PowerPoint presentations that were created by the law firm Wachtell, Lipton, Rosen, Katz. Do you recall that today?

A. Yes.

Q. And those presentations were given to National Instruments about ███████████████████████
███████████████████████████████████████

Page 164

KAREN RAPP

██████. Do you remember those questions?

A. Yeah, I remember those examples.

Q. Okay. Do you have any personal knowledge of those events being ████████████████████
████████████████████████████

A. No.

Q. And to your knowledge, did anyone working at National Instruments have any personal knowledge of ████████████████████████████████████
████████████████

A. No.

Q. All right. And so your limit -- your knowledge about those events would be limited to what you could read on those slides, just like anyone else could read; right?

A. Yes.

Q. Okay. I want to ask you about the shares of National Instruments' stock that were repurchased by National Instruments in August and September of 2022.

When the company repurchases its own shares -- first of all, did it do that on the open market, or did it do it from specific buyers, or how did that work?

A. It's all through the open market.

Page 165

KAREN RAPP

Q. Okay. And then what did the company do with those shares after it repurchased them?

A. Put them back -- we typically put them back into our treasury stock, which took them out of circulation.

Q. And if we -- if we think about the value to National Instruments' shareholders as a whole being one thing and value to National Instruments just as a company being the other thing -- I'm going to ask you a question about that. Okay?

When National Instruments repurchases its own stock, what is -- what is the effect of that for the shareholders as a whole?

A. The -- each shareholder's stake in National Instruments increases.

Q. Does it do anything for the company itself when National Instruments repurchases its own shares as opposed to the benefiting shareholders?

MR. KARAM: Objection --

A. No. National Instruments -- sorry.

MR. KARAM: Go ahead. Sorry.

A. National Instruments didn't own its own stock.

Q. (BY MR. COMERFORD) Okay. And it's because those became treasury shares?

Page 166

KAREN RAPP

A. Correct. Treasury shares are not --

MR. KARAM: Objection, leading.

A. -- not in circulation.

Q. (BY MR. COMERFORD) And just so we're clear, what -- let me ask it again. Was there any benefit to National Instruments as a company when it repurchased its own shares?

A. No.

MR. KARAM: Objection.

MR. COMERFORD: What's the objection?

MR. KARAM: Leading.

Q. (BY MR. COMERFORD) So my question is what was the benefit, if any, to National Instruments as a company when it repurchased its own shares?

A. None. The benefit goes to the shareholders.

Q. Okay. Thank you.

I want to ask you about the wine bet document that you testified about. You were asked questions that seemed to suggest that the -- that you and Mr. Ilcisin --

A. Kevin Ilcisin.

Q. -- both thought that an acquisition was going to occur, and you were simply betting on the price. And I thought I heard you say that this was a bet like --

Page 167

KAREN RAPP

that assumed -- essentially said, "Let's assume that an acquisition occurs. How do you think it would play out?"

A. Correct.

Q. Okay. I want --

MR. KARAM: Object to leading. Go ahead.

Q. (BY MR. COMERFORD) So let me ask you -- let me ask you --

MR. KARAM: Can I ask the witness to pause a second before answering so that I don't have to talk over her while objecting. Thank you.

Q. (BY MR. COMERFORD) When you made that wine bet with Mr. Ilcisin, was the premise of it that you were to assume that an acquisition was going to happen and then try to predict the price that it would happen?

MR. KARAM: Objection, leading.

Q. (BY MR. COMERFORD) That's a yes or a no question.

A. Yes.

Q. And is that different from your views about whether an acquisition was likely to successfully be consummated or not?

MR. KARAM: Objection, leading.

A. We had no idea if an acquisition was actually

Page 168

KAREN RAPP

going to happen or not.

Q. (BY MR. COMERFORD) Okay. Emerson made its offers of $48 per share in May and June of 2022, and then it eventually, in 2023, agreed to pay $60 per share to acquire National Instruments. Is that your testimony?

A. Yes, that's correct.

MR. KARAM: Objection, leading.

Q. (BY MR. COMERFORD) Did anything fundamental happen to National Instruments as a company between May of 2022 and the time when it was acquired in terms of a -- a material increase in its earnings or its revenue or anything like that? Or did things basically stay the same in terms of the company's performance?

A. We didn't have anything significantly material happen. We didn't do any large acquisitions or anything that would change the normal expected growth of the company.

Q. Okay.

MR. COMERFORD: Those are all the questions I have.

MR. KARAM: I have no further questions.

Are we going -- I tell you what, give me a moment, and let me see if...

Page 169

KAREN RAPP

All right. I have no further questions, and I reserve all the rights that I talked about before.

MR. COMERFORD: Okay. We would like the witness to read and sign, please. And my order will be an E-tran of the transcript and PDF exhibits, please.

THE REPORTER: And opposing counsel is getting it tomorrow. Would you -- do you want your copy as well, rush tomorrow?

MR. COMERFORD: No. Standard delivery is fine.

THE REPORTER: Okay. Thank you.

MR. KARAM: Ms. Rapp, thank you very much for your time. I appreciate it.

THE WITNESS: You're welcome.

THE VIDEOGRAPHER: We're off the record, 2:50 p.m.

(Deposition concluded)

CERTIFICATE

I, Della M. Duett, Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter, Certified Realtime Reporter, and Registered Merit Reporter, do certify that the above deposition was reported by me and that the foregoing transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not an employee of counsel or any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Subscribed and sworn to before me when taken this 3rd day of September, 2025.


_____

DELLA M. DUETT, CSR, RPR, CRR, RMR

ACKNOWLEDGMENT OF DEPONENT


I, KAREN RAPP, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.


_____
KAREN RAPP                                              Date


Subscribed and sworn to before me this

___ day of _____, 2025.

My commission expires:_____


_____

Notary Public

_ _ _ _ _ _ _

ERRATA

_ _ _ _ _ _ _


PAGE    LINE        CHANGE/REASON

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

**WORD INDEX**

**< $ >**
**$100**  17:*8, 14*
**$2,877**  141:*20*
**$200**  62:*7*
**$250**  142:*4*
**$250,002**  141:*20*
**$270**  66:*10*
**$35**  71:*6*
**$37**  136:*12*
**$45**  136:*16*
**$46**  101:*8*
**$48**  26:*25*  27:*12*
*29:24*  54:*22*  70:*10*
*74:21*  79:*12, 16*  94:*2,*
*6, 9*  152:*21*  153:*19*
*161:22*  162:*11*  163:*5,*
*13*  168:*4*
**$51**  94:*14, 20, 25*
*95:13, 18*
**$53**  162:*20*
**$55**  95:*14, 18*  96:*5, 7,*
*14*
**$58.50**  98:*2*
**$60**  136:*2, 5*  137:*21*
*163:11*  168:*5*
**$61**  96:*20*  99:*13*
**$8**  136:*12*
**$9**  137:*20, 24*

**< 1 >**
**1**  1:*20*  11:*15*  13:*10*
*58:4*  81:*7*  124:*16, 20*
**1.2**  125:*15*
**1.50**  98:*17*
**1:23-cv-10488-DLC**
*1:2*
**1:57**  143:*10, 11*
**10**  17:*22*  47:*13, 19,*
*22*  59:*21*
**10/14/22**  5:*4*
**10/28/22**  5:*5*
**10:08**  151:*6*
**10:11**  46:*23, 25*
**10:19**  46:*25*  47:*3*
**10:39**  57:*15, 16*
**10:40**  57:*16, 18*
**100**  17:*3*  151:*16*

**10170**  2:*9*
**103**  4:*1*
**104**  4:*1*
**105**  4:*1*
**10b5-1**  4:*1*  105:*21*
*106:10, 20*  120:*13, 23*
*137:21, 24*  138:*5, 21,*
*25*  139:*3*  141:*7*
**10th**  88:*12*  123:*14,*
*15*  124:*24*  126:*5*
*127:19*  131:*11*
*132:24*
**11**  3:*8*  4:*18*  39:*8*
*68:11, 12, 14*  124:*16*
*135:4*
**11:26**  84:*14, 15*
**11:30**  84:*7*
**11:46**  84:*15, 17*
**11:54**  90:*8, 9*
**118**  4:*1*
**11th**  134:*3*  135:*11*
**12**  60:*23*  67:*25*
*68:11*  69:*12*
**12:30**  84:*7*
**12:31**  90:*9, 11*
**120**  4:*1*
**121**  4:*1*
**122**  4:*1*
**126**  4:*1*
**12th**  50:*25*  135:*17*
*137:25*  139:*18*
*140:25*  141:*9*  144:*15*
**13**  69:*24*
**133**  4:*1*
**134**  4:*1*
**135**  4:*1*
**137**  4:*19*
**138**  4:*20*
**13th**  23:*24*  138:*2*
*161:4*
**14**  48:*22*  60:*2*  76:*8,*
*9*  137:*15*
**143**  4:*21*
**144**  4:*22*
**145**  4:*23*
**147**  4:*25*  5:*2*
**149**  5:*3*
**14th**  60:*3*  91:*23*
*93:17, 18*  99:*20*

**101**:*23*  151:*3, 6*
*152:13*
**15**  9:*13*  64:*8*  80:*16,*
*17*
**150**  5:*4*
**155**  5:*5*
**157**  3:*8*
**15th**  68:*15*  79:*22*
*89:15*  97:*10*  98:*14*
*99:4*
**16**  3:*8*  82:*15*
**160**  151:*13*
**169**  142:*17*
**16th**  19:*15*  22:*22*
*69:15, 17*  93:*16*
*138:22, 25*  143:*15, 22*
*161:2, 21*
**17**  90:*18, 20*  102:*18,*
*20*
**17th**  144:*10*
**18**  90:*21*  102:*19*
**182**  144:*12, 17*
**1832**  2:*8*
**18th**  64:*25*  65:*17*
*66:24*
**19**  3:*8*  71:*4*  102:*22,*
*23*
**1900**  2:*15*
**191**  142:*17*
**1989**  158:*21*  159:*8,*
*18*
**1992**  158:*6*
**1999**  158:*25*
**1st**  147:*9, 14*

**< 2 >**
**2**  3:*4*  16:*5*  47:*3*
*90:15*  135:*13*
**2.2**  15:*5*
**2:06**  143:*11, 13*
**2:31**  155:*21, 22*
**2:33**  155:*22, 24*
**2:50**  169:*17*
**20**  3:*8*  102:*25*  103:*2,*
*3*
**2008**  64:*14*  65:*2*
*66:4, 8, 9, 24*  67:*6*
**2010**  64:*14, 21*  65:*2,*
*21*  66:*5, 15, 18, 25*
*67:7*

**2017**  62:*7, 22*  159:*18*
*160:6*
**2021**  71:*3*
**2022**  4:*18*  9:*15*
*10:16*  11:*21*  12:*6, 14,*
*18*  13:*19*  16:*20*  17:*6*
*19:15, 22*  21:*3*  24:*4,*
*22*  25:*8, 19*  26:*20, 23*
*27:13*  32:*25*  37:*19*
*39:20*  41:*13*  46:*9*
*50:25*  56:*13*  60:*2, 3*
*68:15*  70:*2*  76:*6, 17*
*80:13*  81:*22*  89:*15*
*91:23*  93:*16, 18*
*117:3, 18*  118:*17*
*121:13*  122:*5*  124:*25*
*126:5*  135:*4, 11, 17*
*137:15*  138:*22*  139:*3*
*141:12, 15*  143:*15*
*144:10, 15*  147:*9, 14,*
*16, 22*  149:*12, 25*
*155:6, 15*  161:*2, 15,*
*20, 21, 23, 24*  162:*14,*
*24*  163:*6, 7*  164:*20*
*168:4, 12*
**2023**  10:*16*  23:*24*
*24:10*  25:*17*  103:*23*
*145:13*  146:*8, 14*
*158:16*  159:*20*  160:*6*
*161:4*  168:*5*
**2025**  1:*12, 22*  6:*4*
*145:11*  170:*16*
*171:16*
**21**  104:*18*
**21st**  147:*22*  149:*12,*
*25*
**22**  119:*22*
**22nd**  69:*25*  70:*5*
*79:7*  83:*3*  105:*2*
*161:23*  163:*6*
**23**  3:*8*  53:*10*  119:*24,*
*25*  120:*2, 3*  145:*11*
**23530**  148:*16, 18*
**23rd**  66:*15*
**24**  120:*5*
**24th**  21:*3*  22:*6, 22*
*27:13*
**25**  121:*9*
**252**  144:*19*

**25857**  56:*14*
**25859**  57:*8, 22*
**25th**  24:*3, 18, 22*
 25:*8, 10, 19*  26:*20, 23*
 31:*10*  40:*2*  45:*10*
 46:*9*  79:*6*  140:*6, 12*
 145:*11*  161:*20*  163:*6*
**26**  122:*18*
**26th**  140:*25*  141:*9,*
*15*
**27**  15:*16*  126:*7, 10,*
*11*
**270**  66:*10*
**275**  66:*16*
**27th**  76:*6, 17*  80:*4, 7*
 81:*25*  113:*12, 23*
 140:*3, 6*
**28**  133:*2, 3*
**28th**  56:*16*  155:*5, 8,*
*14*
**29**  134:*11, 12*
**2992**  70:*2*
**29th**  56:*13*
**2nd**  104:*17, 23*
 110:*15*  113:*7*

**< 3 >**
**3**  1:*12, 22*  15:*7*  19:*8*
 39:*25*  57:*18*  121:*18*
 155:*10*
**3:34**  81:*2*
**30**  8:*13*  49:*10*
 110:*18*  135:*5*
**300**  1:*20*
**30th**  97:*8*
**31**  3:*8*  137:*16*
**31st**  97:*13*
**32**  138:*12*  143:*19*
 160:*21*
**3274**  24:*3*
**33**  53:*11*  143:*17, 18*
**33.50**  53:*12*
**34**  143:*15*  144:*9*
**35**  145:*16*
**36**  147:*8*
**37**  147:*22*  148:*19, 20*
**38**  90:*15*  149:*14, 15*
**39**  27:*12*  151:*2*
**3rd**  6:*4*  16:*15, 20*
 17:*13*  65:*2, 21*  66:*25*

139:*8, 15*  162:*24*
 170:*16*

**< 4 >**
**4**  20:*24*  43:*23*  84:*17*
**40**  155:*4, 5*
**420**  2:*8*
**43**  137:*6*
**44776**  1:*15*
**45**  122:*14*  136:*22*
 137:*4*
**46**  53:*11*  122:*8*
**46.25**  53:*12*
**48**  56:*10*  152:*18*
 153:*10, 13*  154:*16, 24*
**4th**  65:*12, 19*  105:*16*
 108:*15*  111:*13*
 114:*18*  115:*8*  117:*2*

**< 5 >**
**5**  23:*20*  44:*3*  51:*18*
 90:*11*  145:*19*
**5/16/22**  3:*8*
**5/24/22**  3:*8*
**5/3/22**  3:*8*
**50**  3:*19*
**51**  70:*14*  94:*14*
**52**  97:*8, 13, 20*
**56**  3:*20*
**57**  3:*21*
**58.50**  97:*23*  99:*13*
**59**  3:*22*
**5984**  16:*13*
**5th**  147:*16*

**< 6 >**
**6**  3:*8*  31:*13*  47:*5*
 143:*13*
**6/12/22**  3:*19*
**6/13/22**  3:*20*
**6/15/22**  3:*23*
**6/16/22**  3:*24*
**6/22/22**  3:*25*
**6/27/22**  4:*1*
**6/29/22**  3:*21*
**60**  53:*2*  98:*11*
 110:*19*
**61**  96:*18*
**6133**  21:*3*

**62**  52:*25*
**62.75**  53:*2*
**63105**  2:*16*
**65**  53:*2*
**68**  3:*23*
**69**  3:*24*
**6th**  139:*15, 17*
 140:*10*  161:*24*

**< 7 >**
**7**  35:*8*  37:*12*  43:*22*
 50:*3*  155:*24*
**7/14/22**  4:*1*
**7/15/22**  4:*1*
**7/31/22**  4:*1*
**7/7/22**  4:*1*
**70**  3:*25*
**7159**  51:*2*
**76**  4:*1*
**7676**  2:*15*
**7771**  135:*23*
**78**  160:*23*
**78.50**  53:*3*
**78746**  1:*21*
**7th**  80:*13*  81:*2, 22*
 82:*16*

**< 8 >**
**8**  55:*25*
**8/10/22**  4:*1*
**8/11/22**  4:*1*
**8/14/22**  4:*19*
**8/16/22**  4:*21*
**8/17/22**  4:*22*
**8/2/22**  4:*1*
**8/4/22**  4:*1*
**8/8/22**  4:*1*
**8/9/22**  4:*1*
**8:30**  155:*11*
**80**  4:*1*
**82**  4:*1*
**8520**  91:*9*
**8521**  91:*9*
**89**  4:*1*  158:*25*
**8th**  118:*17*

**< 9 >**
**9**  57:*21*  147:*16*
**9/1/22**  4:*25*

**9/21/22**  5:*2, 3*
**9:00**  155:*11*
**9:04**  1:*22*  6:*4*
**90**  4:*1*
**901**  1:*19*
**93**  158:*8*
**99**  4:*1*  159:*2*
**9th**  119:*10*  121:*13*

**< A >**
**a.m**  1:*22*  6:*4*  46:*25*
 47:*3*  57:*15, 16, 18*
 84:*14, 15, 17*  90:*8, 9*
 151:*6*  155:*11*
**AA**  134:*3*
**ability**  170:*10*
**able**  13:*4*  57:*2*
 62:*18*  81:*18*  120:*20*
 121:*3, 4*
**above-styled**  1:*21*
**Absolutely**  35:*14*
 154:*15*
**acceptable**  17:*20*
**accepted**  163:*7*
**access**  74:*3, 21*  75:*9*
**accommodate**  7:*17*
**account**  147:*15*
**accumulating**  49:*20,*
*23*  143:*23*
**accumulation**  48:*10*
 123:*6*  124:*4*  146:*19*
**accumulations**  49:*16*
**accurate**  18:*22*
 30:*11*  145:*22, 24*
 146:*3*  170:*9*
**accurately**  59:*6*
 160:*8*
**Achieve**  104:*11, 13*
 105:*6*
**ACKNOWLEDGMEN
T**  171:*2*
**acquire**  10:*12*  38:*3,*
*13*  43:*25*  55:*18*
 64:*12*  91:*21*  150:*12*
 162:*11*  163:*10, 24*
 164:*10*  168:*6*
**acquired**  44:*17*
 168:*12*
**acquiree**  83:*23*

**acquirer** 38:*25* 58:*19* 124:*4*
**acquirers** 45:*4* 123:*7*
**acquiring** 44:*5, 14* 45:*3*
**acquiror** 84:*2*
**Acquirors** 38:*16*
**acquisition** 38:*23* 62:*12* 64:*9* 65:*22* 66:*20, 24* 92:*16* 166:*23* 167:*3, 15, 22, 25*
**acquisitions** 37:*18* 38:*5, 20* 39:*6* 41:*22* 48:*17* 55:*11* 93:*22* 168:*17*
**act** 45:*4*
**acted** 45:*7*
**Action** 1:*2* 31:*2* 32:*22* 127:*23* 170:*14*
**actions** 60:*25*
**active** 71:*3* 144:*5*
**activism** 36:*15*
**activist** 44:*23*
**activity** 22:*23* 49:*15* 61:*20*
**actual** 23:*23* 25:*18* 74:*15*
**Adam** 129:*23* 130:*11, 17, 18*
**add** 76:*3* 77:*11*
**added** 101:*6, 16*
**adding** 76:*21* 142:*23*
**addition** 47:*7* 120:*23* 126:*2* 137:*23* 138:*5*
**additional** 74:*5, 23* 75:*5, 15*
**addressed** 149:*21*
**adjusted** 52:*9*
**ADL** 141:*20* 142:*6*
**admit** 116:*21*
**admitted** 84:*24*
**advantage** 107:*3*
**advice** 108:*11*
**advised** 34:*23* 146:*12*
**affect** 101:*9* 151:*19, 25*
**aggressively** 64:*21*
**ago** 20:*21*

**agree** 43:*18* 79:*5* 85:*9* 98:*9* 112:*14* 161:*18*
**agreeable** 84:*10*
**agreed** 163:*9* 168:*5*
**Agreement** 4:*1* 54:*22* 59:*8, 11, 13* 66:*6* 72:*12* 73:*22* 147:*3*
**ahead** 28:*14* 29:*2* 50:*11, 13* 55:*20* 114:*11* 117:*7* 123:*11* 124:*22* 131:*23* 152:*9* 156:*16* 165:*22* 167:*7*
**Albert** 77:*5, 6* 100:*24* 109:*2* 111:*9* 117:*11, 18* 118:*11*
**Albert's** 114:*4*
**aligned** 100:*12, 22*
**allegations** 9:*18, 23* 107:*9*
**alleys** 73:*4*
**Allocation** 3:*8* 111:*3*
**allotted** 85:*8*
**allow** 9:*11* 74:*5* 75:*6*
**allowable** 9:*8*
**allowed** 40:*17* 41:*3* 45:*17* 112:*19* 114:*24*
**Alpha** 22:*17*
**alternative** 101:*17*
**ALYSSA** 2:*11*
**ambiguous** 140:*17*
**America** 50:*23* 51:*3, 25* 52:*14* 53:*21* 56:*5, 8* 69:*6* 150:*16, 17, 19*
**amount** 15:*25* 17:*25* 136:*14* 141:*21* 142:*18*
**ample** 150:*7, 11*
**analysis** 69:*9* 123:*2* 150:*17*
**analyst** 53:*9* 103:*16* 121:*16* 122:*3*
**analysts** 103:*12*
**analyst's** 53:*16* 103:*22*
**Andrade** 16:*20*
**Andrew** 11:*9, 10, 12* 12:*20* 16:*3* 20:*23* 23:*20* 24:*13* 27:*6*

31:*11* 35:*8, 18* 41:*16* 47:*10, 20* 50:*2* 55:*24* 56:*18* 57:*9* 59:*20* 60:*10* 68:*14* 69:*11, 25* 76:*6* 80:*12* 89:*14* 90:*17, 24* 99:*19* 102:*24* 104:*19* 105:*9* 118:*16* 120:*4* 121:*8* 122:*17* 143:*14*
**Annex** 135:*23*
**announce** 66:*6* 94:*16, 20* 95:*3, 10*
**announcement** 110:*7*
**answer** 7:*16* 8:*4, 8* 9:*5, 12, 25* 10:*3, 6* 12:*10* 17:*12* 18:*4, 5* 19:*20* 20:*4* 22:*15* 23:*3* 26:*15, 24* 29:*8* 30:*5* 31:*20* 35:*16* 37:*14* 41:*3* 42:*18* 43:*11* 45:*17* 49:*22* 55:*16* 61:*4* 75:*4* 83:*14* 106:*15* 108:*25* 111:*18* 112:*18* 115:*3* 116:*6* 125:*20* 128:*24* 130:*7*
**answered** 76:*2* 83:*13* 151:*22*
**answering** 109:*10* 167:*11*
**answers** 171:*6*
**anybody** 28:*14* 49:*5* 56:*8* 71:*18* 129:*14*
**anybody's** 85:*23*
**Anytime** 35:*14* 83:*23* 84:*3*
**Anyway** 89:*5* 114:*15* 125:*3*
**aplascoff@rgrdlaw.com** 2:*12*
**apparently** 139:*14*
**appear** 91:*12* 141:*11*
**appearance** 84:*20* 85:*3, 17* 86:*17* 87:*14* 88:*16* 89:*8* 156:*7, 8, 10, 11*
**Appearances** 3:*4*
**APPEARED** 2:*3*

**appears** 25:*10* 39:*16* 50:*6* 121:*15* 122:*13* 126:*14* 156:*8*
**apply** 82:*5*
**appreciate** 26:*7* 169:*14*
**approach** 38:*13, 24* 39:*5* 48:*2* 108:*14*
**appropriate** 87:*18*
**approval** 118:*11* 130:*5*
**approve** 97:*19*
**approximate** 6:*4*
**approximately** 17:*7* 19:*14* 71:*4*
**April** 10:*16* 66:*15* 67:*7* 98:*14* 122:*5*
**area** 107:*16*
**argument** 111:*7, 22* 113:*4*
**arguments** 25:*23* 26:*4*
**arrived** 136:*18*
**article** 22:*22*
**articles** 22:*17*
**asked** 18:*10* 61:*7* 75:*25* 83:*13* 117:*6* 144:*16* 151:*21* 161:*12* 166:*19*
**asking** 7:*7* 9:*6, 7* 10:*23* 46:*17* 85:*14* 91:*2* 106:*6* 109:*6* 111:*25* 112:*14* 114:*23* 115:*19* 125:*21* 157:*24*
**asks** 21:*17* 116:*19*
**aspect** 38:*4*
**asserted** 45:*18* 46:*7, 15*
**assessment** 150:*11*
**assigned** 123:*5*
**assist** 44:*15*
**assisted** 120:*14*
**assists** 44:*16*
**assume** 114:*23* 128:*11* 167:*2, 15*
**assumed** 167:*2*
**assumes** 27:*23* 96:*23* 99:*16*

**assuming** 130:*8* 150:*24*
**assumption** 102:*13*
**attached** 153:*23* 171:*9*
**attachment** 4:*1*
**attempted** 63:*9*
**attempting** 62:*5*, *17*
**attention** 84:*19*
**attorney** 170:*13*
**attorney-client** 9:*2*
**ATTORNEYS** 2:*3*
**audit** 13:*24* 106:*11*
**August** 4:*18* 62:7, *22* 95:*12* 96:*4*, *18* 104:*17*, *23* 105:*16* 108:*15*, *20* 110:*15* 111:*13* 113:*7* 114:*18* 115:*8* 117:*2*, *17* 118:*17* 119:*10* 121:*13* 123:*14*, *15* 124:*24* 126:*5* 127:*19* 131:*11* 132:*24* 134:*3* 135:*4*, *11* 137:*15*, *25* 138:*2* 139:*18*, *21* 140:*25* 143:*15*, *22* 144:*10*, *15* 147:*16* 152:*13* 161:*15* 162:*14* 164:*20*
**Austin** 1:*20* 158:*5*, *10*
**authority** 86:*15*
**authorized** 135:*16* 136:*12*, *14* 144:*12*, *17*, *24*
**Automation** 62:*3*, *5* 63:*9*
**available** 17:*25* 18:*6*, *20*, *24* 19:*4*
**Avenue** 2:*8*
**average** 71:*5* 122:*8*, *14*
**aware** 19:*14*, *22* 26:*25* 27:*12* 29:*9* 31:*16* 39:*23* 41:*7*, *13* 45:*3*, *7* 61:*23*, *24* 69:*17* 70:*8*, *10*, *11* 71:*11*, *12* 77:*20* 78:*15* 83:*8* 86:*20* 124:*4* 143:*25*

**awareness** 83:*17*

**< B >**
**bachelor's** 158:*22*
**back** 11:*22* 12:*16* 14:*25* 17:*7* 43:*21* 47:*3* 54:*4* 55:*21* 57:*18* 66:*16* 67:*17* 72:*3* 73:*4* 77:*18* 84:*17* 86:*4* 89:*10* 90:*11* 106:*13* 115:*6* 129:*23* 133:*24* 137:*4*, *24* 140:*9* 142:*23* 143:*13* 146:*15* 148:*8* 152:*13*, *23* 153:*5*, *12* 154:*21* 155:*24* 165:*4*
**background** 11:*20* 44:*25* 92:*9*, *12* 93:*21* 157:*15*
**Bank** 50:*23* 51:*3*, *25* 52:*14* 53:*21* 56:*4*, *8* 69:*6* 150:*16*, *17*, *18*
**bankers** 36:*14* 53:*21* 119:*4*
**banking** 120:*14*
**based** 25:*9* 52:*9*, *20* 53:*6*, *15* 89:*7* 93:*3*, *7*, *15* 98:*20* 99:*3* 101:*4* 136:*15* 156:*14*
**baseline** 15:*19*
**basically** 168:*14*
**basis** 9:*2*, *5* 40:*16* 41:*9* 71:*5* 84:*21* 106:*9* 160:*9*
**Bates** 16:*6*, *12* 21:*3* 23:*23* 37:*4* 47:*6* 51:*2* 56:*14* 57:*5*, *7* 59:*21* 68:*15* 138:*8* 145:*7* 148:*18*
**Bates-numbered** 148:*16*
**BB** 135:*4*
**bear** 41:*20* 42:*6* 43:*8*, *13*
**beginning** 10:*16* 57:*7* 85:*6* 106:*11*
**begins** 21:*25* 64:*25* 141:*8*
**behalf** 2:*3*, *14*

**believe** 23:*16* 38:*12* 39:*5* 88:*2* 97:*24* 107:*15*, *21* 109:*17* 151:*14*
**believed** 104:*4* 105:*6* 109:*7* 152:*3*
**believes** 109:*20*
**Beneficial** 4:*23*
**benefit** 166:*6*, *14*, *16*
**benefiting** 165:*19*
**BENNETT** 2:*15*
**best** 7:*10* 8:*8* 25:*9* 55:*12* 88:*21* 132:*7* 170:*9*
**bet** 96:*24* 148:*22* 166:*18*, *25* 167:*13*
**bets** 93:*3*, *7*
**Better** 49:*2* 81:*9* 110:*20*
**betting** 99:*14*, *17* 166:*24*
**beyond** 125:*22*
**bid** 10:*12* 62:*3* 64:*21*
**Biggest** 151:*8*
**bilateral** 72:*10*
**billion** 17:*4*
**bit** 17:*23* 24:*14* 27:*7* 62:*24* 66:*3* 68:*4* 71:*25*
**Bless** 160:*3*
**board** 30:*6*, *8*, *9*, *21*, *22* 32:*10*, *18* 33:*2*, *10* 34:*19*, *20*, *22*, *23* 42:*12*, *14* 51:*4* 52:*2* 53:*20* 60:*2*, *4* 63:*19*, *21* 69:*19* 78:*11* 92:*5* 96:*5*, *11* 105:*5* 119:*11* 133:*12*, *17* 134:*7* 140:*20* 144:*23*
**boards** 39:*21* 158:*13*
**BofA_003270** 23:*23*
**books** 59:*5*
**born** 157:*18*
**borrow** 18:*21*
**bottle** 96:*25* 149:*5*
**bottom** 18:*11* 21:*6*, *8*, *24* 24:*3* 47:*24* 48:*9* 52:*19* 53:*9* 56:*17* 62:*24* 73:*24* 99:*23*

103:*9* 105:*13* 122:*5* 129:*22* 133:*5* 137:*18* 141:*18*, *19* 142:*16* 144:*11*
**bought** 71:*15* 137:*24*
**Boulevard** 2:*15*
**box** 42:*5*, *8* 52:*8*, *18*, *19*, *23* 136:*8*
**break** 7:*14* 67:*21* 68:*2* 84:*6*, *8*, *9* 90:*4* 143:*7* 155:*19*
**breaks** 7:*13*
**Brent** 2:*20*
**Brief** 22:*4* 38:*2* 46:*21*
**briefly** 8:*17* 138:*21*
**bringing** 28:*3*
**broker** 143:*24* 151:*10*
**brought** 22:*8* 28:*20* 37:*20*
**Building** 1:*20*
**bullet** 48:*23* 49:*13* 62:*4* 64:*11* 70:*22* 71:*2* 72:*9* 102:*6* 127:*22* 150:*5*
**bunch** 127:*22*
**business** 37:*24* 116:*8*, *14*
**buy** 14:*25* 17:*7* 62:*7* 72:*2* 82:*7* 125:*12* 129:*23* 133:*24* 137:*4*, *8* 140:*9* 146:*20*
**buyback** 12:*5*, *7*, *8* 17:*14* 18:*25* 108:*13*, *15*, *22* 109:*5* 118:*10* 130:*4* 131:*25* 133:*13*
**buybacks** 11:*25* 12:*3*, *12*, *17* 17:*25* 18:*21*, *22* 81:*9*, *21* 82:*5*, *10* 107:*22* 108:*7*, *11* 130:*2*, *9*, *15*, *24* 131:*10* 132:*11* 133:*19* 137:*7* 140:*6*, *14*, *19* 151:*20* 152:*10*
**buyer** 128:*15*
**buyers** 128:*16* 164:*23*

Deposition of Karen Rapp                                      In Re National Instruments Corporation Securities Litigation

buying 11:22 44:14 72:4, 7 125:15 127:3, 12, 15 130:3 137:11 146:24, 25 151:10 152:6, 13 153:10 154:21
buys 129:18 140:24

< C >
calculation 70:17
calendar 118:22
California 157:18
call 19:7 28:15 34:3, 5 52:7 93:2, 3, 9, 10 117:12 119:6, 14 130:23 131:7, 9 133:17
called 20:9 37:25 163:25
calling 133:12
Calls 9:24 10:2 20:2 22:13, 24 23:15 29:7 30:3 31:19 33:11 34:11 39:4 44:9 45:6 54:16 55:7, 14 59:18 62:14 63:11 64:4 65:8, 24 67:3, 14 69:3 70:15 72:23 73:8, 17 75:2, 11, 23 77:3, 15 79:14, 18, 24 81:14 82:12 83:21 93:5 94:22 95:5 101:11 109:25 111:16 114:2 115:11 116:4, 12 123:21 124:9 125:5, 24 126:20 128:21 130:11 131:2, 3 141:22 142:8, 20 144:21 150:21 153:14
camera 157:23
capacity 149:24 150:7, 12
Capital 3:8 111:3
career 159:13
careful 28:3
Carlin 130:20, 23
case 9:8, 16, 19 10:10 11:14 59:9

60:25 65:5 83:9 84:20 86:17 87:23, 25 98:7 154:3 157:12 161:19 162:19
cases 6:19, 24, 25 36:13
cash 12:3, 12 14:7, 11 15:7, 11, 23, 24 17:21, 25 18:6, 7, 20 19:4 150:3 151:8 152:25
cause 1:21 22:25 75:13
CC 137:15
ceasing 139:20
Central 6:5 84:7
cents 15:16
CEO 42:11, 14, 20 160:17
CEO's 39:12
Certain 4:23 32:6 45:4 114:17 115:8 161:3
certainly 26:18 48:13 79:5
CERTIFICATE 170:2
Certified 1:23, 25 170:4, 6
certify 170:7, 11 171:4
CFO 29:14 31:8 38:4 158:14 159:23, 24 163:12
cgilroy@rgrdlaw.com 2:11
chairman 69:18 103:10
challenge 95:13
chance 46:3 88:6
change 12:25 62:23 71:25 81:20 129:24 131:15 168:18
CHANGE/REASON 172:5
changed 98:25
changes 171:8
changing 114:13
characteristics 43:6

characterization 30:16 112:15
charge 10:21
chart 52:6
chat 145:2
check 106:13, 16 111:20
Check-in 119:6
checking 114:15
checklist 48:5
chief 159:25 160:5
Chloride 64:9, 13 65:22 66:20 164:2, 6
choice 73:20 85:4
choose 15:10 38:16
CHRISTOPHER 2:10
chronologically 16:11 17:18 105:13
circulation 165:6 166:4
circumstances 6:24
Civil 1:2
claim 88:5
clarification 46:6
clarify 109:12
clear 18:14 108:21 148:15 166:5
clearance 130:9, 14
cleared 108:15
clearing 139:11
click 56:25
clients 87:10
close 15:2 98:10 99:5, 10, 15 151:11
closed 56:10 59:5 65:21 99:16
closer 97:3
closing 27:13 58:19 70:14 87:25
coach 41:3
coaching 112:16
code 61:10, 13
coincidence 22:21 23:2
collaborative 72:10
collected 149:5
college 157:21 158:4, 19

column 47:24 139:10, 11
combination 63:20
come 28:18 36:14 54:4 84:19 86:4 152:23 153:4
COMERFORD 2:16 3:8 7:25 8:9, 19, 25 9:10, 24 12:9 15:13 17:9 18:3 19:17 20:2 21:13, 16, 18 22:13, 24 23:14 25:7, 14, 22 26:3, 6, 12, 22 27:14, 23 29:6 30:3 31:18 33:11 34:11, 17 38:10, 21 39:3, 22 40:7, 10, 14, 25 41:5, 7 42:16 43:9, 19 44:8 45:5, 12, 18, 21, 24 46:5, 14, 20 49:21 53:17 54:16 55:7, 13 57:4 59:17 61:15 62:13 63:11 64:3 65:7, 24 67:2, 14, 18, 23 68:5 69:3 70:15 72:22 73:7, 16, 21 74:11, 18 75:2, 11, 22 76:8 77:3, 15 79:11, 14, 18, 24 80:16, 20 81:14 82:12 83:11, 21 84:11, 18 85:4, 11, 18, 24 86:7, 12, 19 87:2, 6, 11, 18, 21 88:8, 20, 25 89:4 90:6 93:5 94:5, 22 95:5 96:8 97:21 98:8, 22 99:6, 12 100:18 101:11 102:25 105:25 106:22 107:25 108:10, 17, 24 109:24 111:2, 15, 24 112:6, 8, 11, 20 113:9 114:2, 20, 22 115:2, 5, 11 116:3, 11, 17 117:4 118:4 119:17, 24 122:24 123:21 124:9 125:5, 18, 24 126:6, 9, 20 127:8 128:21 132:25 134:10 140:8,

17 141:*22* 142:*8*, *20* 144:*2*, *21* 145:*14* 148:*2*, *14*, *19*, *21* 149:*13* 150:*14*, *21* 151:*21* 152:*19* 153:*14*, *18* 154:*7* 156:*3*, *12*, *14*, *25* 157:*5*, *7*, *9*, *10*, *23*, *25* 158:*7* 162:*6*, *8*, *17*, *23* 163:*4*, *18* 165:*24* 166:*5*, *11*, *13* 167:*8*, *13*, *18* 168:*3*, *10*, *21* 169:*4*, *10*

**Comerford's** 156:*13*

**comes** 138:*17*

**commence** 135:*16*

**commencing** 1:*22*

**comment** 23:*8*

**comments** 46:*12*

**commission** 136:*3* 171:*17*

**commit** 88:*10*, *11*

**committed** 137:*20*

**committee** 13:*24* 37:*22* 106:*12*

**common** 15:*17* 145:*19*

**communicate** 49:*6* 116:*15*, *24*

**communicated** 30:*20* 101:*24*

**communicating** 16:*19*

**communication** 19:*25* 30:*8* 83:*2*

**communications** 161:*7*, *9*

**companies** 38:*13* 39:*6*, *21* 67:*13* 164:*10*

**company** 6:*22* 12:*4* 27:*2* 37:*24* 44:*2*, *14* 48:*10* 54:*10*, *20* 55:*18* 62:*7* 64:*13* 67:*12* 71:*4*, *18* 104:*4* 108:*7* 113:*15* 122:*25* 133:*24* 152:*25* 158:*13* 160:*10*, *18* 163:*15*, *25* 164:*21* 165:*2*, *10*, *17* 166:*7*,

15 168:*11*, *19*

**company's** 168:*15*

**compensation** 14:*20*

**complaint** 160:*22*, *23*, *24* 162:*7*

**complete** 156:*22*

**completed** 65:*22* 66:*20*

**completely** 30:*11*

**completion** 66:*24*

**compliment** 89:*8*

**compound** 111:*2* 162:*3*

**concierge** 10:*21*

**concluded** 169:*18*

**conclusion** 98:*4*

**conclusions** 10:*2* 79:*15*, *19*, *25* 114:*3* 115:*12*

**concurrent** 122:*13*

**conduct** 49:*2*

**conference** 34:*3*, *5*

**confident** 74:*2*

**Confidential** 3:*8* 21:*11*

**confidentiality** 28:*21*

**confirm** 8:*18* 111:*9*

**Confirmed** 47:*8* 93:*18*

**connect** 62:*18*

**connected** 170:*13*

**connection** 31:*6* 59:*2*, *9* 120:*13*

**consensus** 52:*20* 53:*10*, *16* 96:*5*, *15*, *16* 100:*13*, *22* 101:*14*

**consider** 89:*8* 136:*22*

**consideration** 101:*17*

**considering** 100:*9*

**consistent** 43:*7* 110:*9*

**constraint** 17:*23*

**constructive** 63:*21*

**consummated** 167:*23*

**contact** 20:*7*, *13* 22:*7*, *11* 23:*13* 34:*8* 54:*2*

**contacted** 19:*16* 20:*10*

**contacting** 31:*17*

**contains** 23:*24* 74:*9*

**contemplating** 102:*9*

**content** 9:*3*, *7* 13:*13* 29:*21*

**contents** 70:*8*

**Conterno** 137:*19* 144:*12*

**context** 32:*8* 41:*21* 81:*7*, *12* 116:*8*

**continue** 18:*24* 24:*15* 61:*5* 156:*23*

**continuing** 138:*4*

**control** 56:*19*, *22* 57:*2* 80:*22* 90:*25*

**conversation** 22:*6* 28:*6*, *7*, *10*, *15* 30:*13*, *18* 31:*15* 39:*11*, *21* 92:*10* 117:*15*, *16* 118:*9* 127:*4*, *12*, *14*, *16*, *17*, *19* 129:*25* 132:*10*, *11* 134:*16*, *19*, *25* 140:*20* 145:*4*

**conversations** 20:*6* 33:*24* 54:*13*, *15*, *18* 83:*3* 106:*7*, *23* 129:*20* 131:*4*

**convey** 150:*19*

**conveying** 19:*19*

**copy** 77:*22*, *24* 78:*2* 169:*8*

**copying** 81:*3*

**corner** 141:*19* 142:*5*

**CORPORATION** 1:*5* 78:*13*

**Correct** 7:*4* 14:*14* 15:*6* 16:*2* 18:*19* 19:*2*, *5* 22:*10* 28:*6* 30:*19* 32:*13* 35:*5*, *6* 38:*19* 39:*19* 40:*15* 42:*13* 43:*2*, *8* 45:*8* 48:*8*, *14* 49:*18* 51:*25* 52:*13*, *21* 53:*13*, *14* 55:*11* 57:*13* 58:*3*, *11* 61:*11* 63:*8* 65:*4* 69:*22* 72:*15* 74:*13* 91:*24* 92:*17*, *21*, *22* 99:*16* 100:*8* 101:*22* 103:*11*, *15*, *16*, *19* 105:*4* 107:*24* 108:*15* 110:*17* 111:*12* 113:*6* 119:*9*, *15* 121:*17* 122:*10*, *11* 123:*17*

124:*7* 130:*10* 133:*3* 134:*14* 136:*21*, *23* 137:*5* 138:*3* 139:*19* 140:*13* 141:*6*, *12* 144:*20* 145:*22* 152:*11* 153:*8*, *16* 154:*20* 155:*14* 161:*25* 166:*2* 167:*5* 168:*8* 171:*5*

**corrections** 171:*7*

**correctly** 27:*16*

**cost** 71:*5* 95:*8*

**counsel** 1:*19* 9:*6* 10:*5* 23:*4* 25:*11*, *20* 29:*13* 31:*21* 34:*8* 40:*9* 45:*15*, *20* 46:*2*, *16* 81:*17* 90:*3* 107:*19* 108:*11*, *16*, *22* 112:*4*, *5*, *16* 114:*24* 115:*21* 116:*22* 134:*10* 156:*21* 160:*16* 162:*4* 169:*7* 170:*12*, *13*

**couple** 20:*20* 21:*4* 85:*7*, *21* 143:*5* 158:*10*

**course** 55:*4* 78:*15* 91:*4* 156:*11*

**COURT** 1:*2* 8:*5* 11:*4*, *5* 115:*5* 156:*9*

**cover** 50:*6*

**coverage** 121:*16*

**covered** 79:*3*

**created** 163:*19*

**creates** 128:*17*

**credibility** 103:*23*

**CRR** 170:*19*

**CSR** 170:*19*

**current** 15:*20* 58:*15* 105:*18*

**cursor** 142:*10* 150:*6*

**curtail** 137:*6*

**custom** 126:*18*

**CV** 37:*17*

**< D >**

**daily** 107:*6*

**data** 6:*22* 69:*7*

**date** 6:*3* 17:*11* 19:*21* 20:*11* 22:*9*

23:*23*  31:*9*  49:*23*
70:*14*  91:*23*  92:*6*
101:*22*  108:*14*
114:*12, 17, 18*  115:*8,
9*  122:*13*  138:*22*
139:*8, 11, 12*  171:*13*
**dated**  4:*18*  13:*19*
21:*2*  22:*5*  24:*4, 22*
49:*19*  50:*25*  56:*13,
16*  68:*14, 15*  69:*14,
25*  76:*6, 17*  80:*4*
82:*16*  83:*2*  89:*14*
99:*20*  104:*17, 23*
118:*17*  121:*13*  126:*5*
132:*23*  134:*3*  135:*10*
137:*25*  140:*3*  143:*15,
21*  144:*10, 15*  145:*11*
149:*11*  151:*2, 6*
155:*8*
**dates**  23:*25*  33:*16*
38:*6*  110:*9*
**day**  85:*6*  89:*3*  91:*25*
136:*13, 15*  170:*16*
171:*16*
**days**  110:*19*
**DD**  138:*13*
**deal**  54:*11*  64:*22*
66:*3*  86:*2, 3, 22*  88:*2*
99:*15, 16*  100:*6, 9, 15*
134:*17*  139:*12*
**dealing**  73:*3*
**debated**  97:*5*
**debt**  18:*7*
**decided**  67:*6*  77:*10,
14*
**deciding**  106:*24*
**decision**  77:*8, 11*
137:*3*  151:*9, 24*
**decisions**  72:*2*  151:*19*
**deck**  47:*25*  49:*18*
**decks**  36:*12*
**declines**  136:*15*
**declining**  86:*24*
**deem**  17:*20*
**Deeper**  48:*23*
**Defendants**  2:*14*
84:*19, 21*  157:*11*
**defined**  110:*3*
**definitely**  50:*22*

51:*11*  126:*2*
**degree**  158:*20*
**delivery**  169:*10*
**Della**  1:*23*  170:*4, 19*
**demand**  128:*17*
**department**  82:*10*
**depending**  29:*16*
**depends**  28:*12*
**DEPONENT**  171:*2*
**DEPOSITION**  1:*10,
17*  6:*3, 15, 21*  7:*19*
25:*24*  26:*9*  40:*13*
46:*3, 17*  84:*21*  85:*5*
86:*5, 23, 25*  87:*15, 23*
88:*5, 7*  156:*6, 24*
157:*13*  169:*18*  170:*7*
**depositions**  6:*20*  7:*3*
46:*19*
**describe**  6:*19*  59:*13*
160:*4*
**described**  59:*15*
125:*4*
**describes**  41:*11*  43:*7*
**DESCRIPTION**  3:*8*
17:*10*
**designated**  28:*19*
**desire**  106:*19*
**desired**  129:*24*
131:*16*
**details**  12:*11, 17*
16:*22*  24:*24*  29:*23*
115:*18*  117:*16, 21*
127:*18*  140:*19*  152:*2*
**determine**  87:*24*
93:*11*
**dial**  155:*12*
**dialogue**  63:*22*
**dictated**  17:*25*
**differences**  60:*15*
**different**  10:*14*
17:*11*  53:*21*  57:*5, 9*
60:*13, 17*  91:*13*
103:*18*  113:*15*
125:*17*  154:*8*  163:*25*
167:*21*
**difficult**  101:*19*
**digits**  56:*14*
**diligent**  146:*3*
**diluted**  14:*21*

**dilution**  14:*16, 23, 24*
15:*22*
**direct**  55:*17*
**directed**  31:*8*
**direction**  109:*8*
**directly**  23:*12*  34:*7*
54:*7*
**Directors**  3:*22*  32:*10*
33:*10*  34:*19, 20, 23*
48:*24*  49:*5*  51:*4*
60:*2, 4*  145:*20*
**directs**  26:*15*
**disallow**  45:*23*
**disappointed**  63:*19*
**discarded**  148:*23*
**disclosed**  66:*10*
76:*11*  77:*12*  80:*9*
**disclosure**  42:*25*
43:*6*  78:*10*
**disclosure/notification**
44:*2*
**discoverable**  81:*4*
**discovery**  87:*24*
132:*6*
**discuss**  58:*10*  63:*20*
107:*13*  129:*14*
**discussed**  54:*14*
109:*18*  124:*3*
**discussion**  27:*21*
29:*17, 21*  54:*25*
58:*25*  68:*23*  72:*6*
129:*17*  134:*24*
137:*10*
**discussions**  49:*3*
53:*21, 25*  54:*3, 9*
56:*4*  72:*11*  119:*12*
140:*19*  155:*15*
**distraction**  72:*11*
**DISTRICT**  1:*2*  23:*5*
26:*2*  84:*25*
**Dive**  48:*23*
**divestiture**  37:*23*
**dividend**  14:*13*
15:*11, 16, 18, 19, 25*
**Dixon**  29:*13*  34:*7, 10,
16*  56:*17*  57:*23*  58:*4,
10, 25*  80:*13*  89:*19*
99:*24*  109:*14, 20*
111:*5, 13*  113:*2*
116:*25*  117:*25*  118:*8*

119:*3*  126:*15*  127:*4,
12, 19*  129:*25*  131:*9*
132:*16*  133:*10*
134:*16*
**Dixon's**  129:*2*
**document**  9:*7*  11:*19*
12:*21*  13:*10, 13, 15,
16*  16:*4, 15*  17:*11*
19:*6, 7, 12, 19*  20:*23*
21:*2*  23:*22, 24*  24:*8*
31:*12*  32:*3, 6, 14*
35:*16*  37:*11*  38:*10*
40:*3, 8*  41:*10*  43:*10*
45:*9, 19, 25*  46:*7, 8*
47:*6*  50:*2, 22*  55:*24*
56:*4, 12, 19, 23*  57:*3*
61:*3*  67:*3, 15*  69:*7*
74:*19*  75:*3, 12*  79:*4*
80:*22*  83:*12*  89:*14*
90:*5, 17, 25*  91:*16*
92:*20*  97:*22*  98:*24*
99:*7, 19*  102:*24*
105:*9*  109:*25*  110:*2*
111:*17, 25*  112:*13*
114:*13*  118:*2, 16*
120:*4*  121:*8*  122:*17*
126:*4*  132:*23*  135:*8*
138:*13, 16*  144:*3*
145:*7, 12*  146:*2*
147:*8*  148:*3*  149:*11*
150:*15*  151:*3*  156:*21*
160:*20*  162:*4*  166:*19*
**documentation**  34:*2,
6*
**documented**  103:*18*
**Documents**  4:*1*  8:*20,
23*  9:*8*  10:*21, 22*
11:*3*  23:*25*  34:*9, 15*
36:*20, 21*  103:*21*
112:*21*  156:*9, 23, 24*
**doing**  41:*6, 8*  85:*3*
105:*7*  112:*20*  126:*2,
19*  130:*14*  140:*5*
149:*3*
**dollar**  98:*18*
**dormant**  67:*16*
**DOWD**  2:*8, 15*
**downward**  139:*5*
**Draft**  3:*18*

**drafted**  21:*24*  23:*11*
 76:*25*
**drafting**  120:*16*
**drain**  151:*8*
**driven**  140:*20*
**Due**  78:*12*  128:*6*, *13*
 129:*2*
**Duett**  1:*23*  170:*4*, *19*
**duly**  6:*10*
**duties**  34:*24*  160:*5*
**dynamics**  128:*23*

**< E >**
**E*TRADE**  147:*3*
**earlier**  23:*25*  105:*24*
 107:*21*  120:*25*
**earliest**  56:*16*
**Early**  95:*12*
**earnings**  94:*17*, *21*
 95:*4*, *8*  96:*5*, *15*
 110:*7*, *10*  119:*14*
 168:*13*
**Eastern**  68:*2*  84:*7*
**Eddie**  29:*13*  34:*7*, *20*
 56:*16*  109:*2*  117:*11*,
 *18*  118:*11*  127:*10*, *15*
 129:*4*, *6*  131:*14*, *25*
 146:*12*
**Eddie's**  110:*5*  130:*5*
**education**  158:*17*, *22*
**EE**  143:*14*
**effect**  106:*19*  115:*17*
 165:*13*
**efficient**  87:*22*
**effort**  64:*12*, *14*, *18*
**efforts**  44:*15*, *17*
 163:*24*  164:*5*, *10*
**eight**  71:*6*, *12*
**either**  28:*15*  33:*2*
 58:*15*  61:*19*  85:*5*
 95:*18*  103:*22*  117:*11*,
 *24*  118:*8*  146:*9*
**email**  3:*8*, *19*, *20*, *21*,
 *23*  4:*1*, *19*, *21*, *22*, *25*
 5:*2*, *3*, *4*, *5*  16:*6*, *15*,
 *16*, *17*, *21*, *25*  17:*17*,
 *18*  19:*13*  21:*24*
 22:*11*, *22*  23:*11*, *16*
 50:*6*, *24*  52:*5*  56:*13*,
 *16*  57:*22*  68:*15*, *19*

76:*17*  77:*2*, *8*, *23*
 78:*2*, *7*  80:*13*  81:*6*,
 *12*, *25*  82:*3*, *19*, *24*
 89:*14*, *18*  99:*23*, *25*
 100:*21*  101:*13*  103:*9*
 107:*13*  113:*23*
 117:*12*, *21*, *25*  118:*20*
 120:*9*  121:*13*  122:*20*,
 *23*  125:*13*  126:*14*, *24*
 131:*21*  132:*13*, *24*
 133:*6*  134:*6*  137:*18*
 140:*2*  144:*11*, *25*
 147:*18*  148:*10*  151:*5*
**emails**  16:*10*  18:*11*,
 *18*  48:*25*  81:*2*, *13*
 89:*25*  109:*11*  114:*18*
 115:*9*, *25*  116:*5*, *9*, *15*
 118:*7*  126:*19*
**embedded**  25:*10*, *16*
**Emerson**  10:*12*
 19:*15*  20:*10*  22:*7*, *18*
 24:*10*, *12*  25:*17*
 26:*25*  29:*24*  31:*6*
 32:*22*  33:*17*  39:*17*
 42:*13*  44:*17*, *20*  45:*7*
 49:*19*  51:*5*  53:*22*
 54:*4*  55:*3*, *9*, *21*  59:*2*,
 *9*  61:*10*  62:*11*  63:*10*
 65:*5*  73:*22*  76:*23*
 83:*19*, *25*  84:*3*  94:*20*
 95:*17*  96:*6*  101:*8*, *23*
 108:*14*  110:*16*
 119:*14*, *16*  123:*3*, *6*
 124:*8*, *11*  127:*3*, *6*, *12*,
 *15*, *20*  128:*12*  129:*18*
 130:*2*  139:*23*, *24*
 140:*16*, *22*  143:*23*
 144:*5*, *7*  147:*16*
 150:*11*  151:*19*  152:*6*,
 *17*  153:*3*, *12*, *16*, *20*,
 *24*  161:*6*, *20*, *21*
 162:*10*, *18*  163:*5*, *9*,
 *13*  168:*3*
**Emerson/Wolverine**
 106:*18*
**Emerson's**  23:*12*
 24:*4*  60:*25*  61:*20*
 64:*8*  91:*20*  93:*24*
 104:*3*  113:*7*  128:*18*
 137:*11*  147:*15*

149:*24*  160:*25*
 163:*24*  164:*5*, *10*
**Emmerich**  130:*12*, *18*
**employee**  170:*11*, *13*
**employees**  14:*19*, *20*
 15:*3*
**ends**  65:*2*  161:*4*
**engage**  11:*22*  62:*5*,
 *17*  63:*21*  72:*10*, *16*,
 *20*
**engaged**  38:*4*  64:*12*
**engagement**  109:*17*
 111:*7*, *22*  113:*3*, *22*
 129:*9*
**engagements**  161:*10*
**English**  116:*15*
**ensure**  160:*7*
**enter**  85:*2*  86:*16*
 87:*14*
**entered**  84:*20*  89:*7*
**entitled**  24:*4*  27:*4*
 42:*6*  59:*25*  112:*22*
 139:*6*
**entry**  66:*19*
**enumerated**  40:*21*
 41:*14*  155:*9*
**enumerates**  39:*8*
**Eric**  19:*23*  20:*8*, *9*
 28:*2*, *24*  30:*6*  31:*7*
 39:*18*  42:*19*  58:*22*
 82:*21*  83:*15*  133:*12*
 136:*20*
**Errata**  171:*9*  172:*2*
**Escalate**  38:*17*, *25*
 83:*20*
**escalation**  45:*11*
 124:*8*
**ESQUIRE**  2:*9*, *10*, *11*,
 *16*
**essentially**  167:*2*
**establish**  114:*17*
 115:*7*
**established**  27:*25*
 45:*13*  46:*7*, *15*
**establishing**  46:*10*
**estimate**  53:*10*  97:*18*
**estimated**  71:*5*
**estimates**  53:*16*
**E-tran**  169:*6*
**evaluation**  30:*14*

**events**  9:*15*  161:*3*, *8*
 162:*10*  164:*5*, *14*
**eventual**  163:*9*
**eventually**  168:*5*
**Everest**  1:*15*  11:*5*
**everybody**  13:*5*
**evidence**  25:*9*  27:*24*
 40:*22*, *23*  152:*20*
**exact**  12:*11*  19:*13*,
 *21*  20:*19*  33:*24*
 50:*22*  51:*23*  104:*24*
 110:*8*
**exactly**  18:*5*  26:*6*
 60:*12*  98:*3*
**Examination**  3:*8*
 6:*11*  157:*8*
**example**  72:*3*
**examples**  60:*20*
 164:*3*
**Excess**  15:*7*, *23*, *24*
**executed**  107:*7*
**executive**  145:*20*
 158:*25*  159:*3*
**executives**  27:*21*
**exhibit**  11:*13*  13:*10*
 76:*8*, *9*  102:*25*  103:*3*
 119:*20*  126:*7*, *10*
 134:*11*, *12*  145:*15*
 148:*19*  149:*14*
**EXHIBITS**  3:*8*
 85:*20*  88:*18*  169:*6*
**existence**  78:*13*
**expanded**  29:*15*
**expectation**  55:*2*, *5*
 93:*3*
**expected**  94:*8*  168:*18*
**expedience**  83:*5*
**expensive**  151:*11*
**experience**  37:*18*
 44:*5*, *14*, *20*, *24*  46:*18*
 55:*10*  93:*21*  98:*21*
**expires**  171:*17*
**explain**  14:*16*, *17*
 68:*25*  81:*12*  136:*9*
**explaining**  81:*4*
**explains**  77:*17*
**express**  56:*9*  85:*12*
**expressed**  124:*13*, *14*
**expression**  41:*20*

**Expressway** 1:*20*
**extended** 129:*9*
**extent** 9:*25* 19:*18* 40:*8* 42:*17* 150:*15*
**external** 146:*2*
**externally** 10:*12*
**extra** 85:*21*
**extrapolation** 52:*11*
**eye** 119:*16*

**< F >**
**facilities** 160:*15*
**fact** 46:*15* 59:7 64:*17* 86:*20* 133:*17*
**facts** 9:*15* 27:*24* 132:7
**fair** 130:*22* 132:*12*
**fairly** 32:7 49:*8*
**fairness** 56:5, *10*
**familiar** 9:*18* 10:*18* 13:*12* 16:*10*, *16* 19:*11* 24:*20*, *25* 25:*2* 26:*19* 32:*3*, *14* 36:*20* 44:*13*, *19*, *23* 48:*16* 50:*8* 51:*9*, *10*, *12*, *21*, *24* 60:*7*, *24* 61:*8* 70:*4* 82:*18* 104:*22*, *25*
**far** 34:*14* 40:*5* 116:*24* 129:*15* 132:*9*
**fast** 8:*6* 142:*25*
**father** 157:*19*
**feasible** 83:*4*
**fee** 58:*9*, *17* 59:*2*, *15*
**feedback** 81:*20*
**feel** 14:*25* 76:*2*
**fees** 58:*15*
**felt** 109:*8*
**figure** 70:*18*
**file** 45:*9* 46:*8* 156:*7*, *10*
**filed** 24:*10* 85:*16* 156:*11*
**files** 36:*21* 156:*6*
**filing** 156:*9*
**final** 96:*18*, *19* 97:*3*, *23* 99:*5*, *10* 135:*22*
**finalize** 58:*10*
**finalized** 59:*8*, *11*
**finally** 98:*15*

**finance** 158:*21*, *23* 159:*12*
**financial** 38:*4* 45:*2* 54:*8* 149:*24* 159:*25* 160:*5*, *10*
**financially** 170:*14*
**financials** 160:*8*
**find** 74:*4*, *23* 75:*5*, *14* 132:*4*
**fine** 14:*18* 16:*23* 46:*24* 48:*20* 68:*6* 90:*6* 169:*11*
**finish** 8:*4*, *5*, *8*
**finished** 112:*10*
**firm** 31:*17* 32:*21* 163:*20*
**first** 6:*10* 14:*13* 16:*12*, *14* 18:*18* 24:*4* 32:*2*, *4* 38:*24* 39:*11* 55:*11* 57:*7* 62:*4*, *6*, *22* 64:*11* 65:*17* 66:*23* 70:*13* 71:*2* 72:*9* 74:*9*, *13* 78:*12* 81:*7* 82:*24* 84:*23* 91:*14* 92:*18*, *19* 94:*9* 108:*13* 114:*7* 127:*23* 138:*20* 150:*5* 158:*3* 159:*2*, *21* 164:*22*
**five-minute** 155:*19*
**fkaram@rgrdlaw.com** 2:*10*
**flat** 15:*16*
**flattered** 89:*5*
**Flexibility** 38:*16*
**flow** 17:*21* 18:*20*
**Following** 68:*22*
**follows** 6:*10*
**follow-up** 155:*11*
**foregoing** 170:*8* 171:*5*
**forgive** 18:*10* 104:*13* 119:*21* 148:*17*
**form** 15:*13* 17:*10* 18:*3* 19:*18* 27:*14*, *23* 38:*21* 39:*3* 42:*16* 43:*19* 44:*8* 45:*5* 49:*21* 53:*17* 55:*7*, *13* 61:*15* 62:*13* 63:*11* 64:*3* 65:*7*, *24* 67:*2*, *14* 69:*3* 70:*15* 72:*22*

73:*7*, *16* 74:*11*, *18* 75:*2*, *11*, *22* 77:*15* 81:*14* 82:*12* 83:*11*, *21* 93:*5* 94:*5*, *23* 96:*8* 97:*22* 98:*8*, *22* 99:*6* 100:*18* 101:*11* 105:*25* 106:*22* 107:*25* 108:*10*, *17*, *24* 111:*2*, *15* 113:*9* 114:*2* 115:*11* 116:*3*, *11*, *20* 119:*17* 122:*24* 123:*21* 124:*9* 125:*5*, *18*, *24* 126:*20* 128:*21* 140:*8*, *17* 141:*22* 142:*8*, *20* 144:*21* 150:*14*, *17*, *21* 152:*19* 153:*14*, *18* 171:*8*
**formal** 62:*6*, *22* 63:*10* 140:*7*, *15* 153:*24*
**format** 13:*12* 16:*17*
**former** 163:*12*
**formula** 142:*11*
**Forsyth** 2:*15*
**forward** 73:*25* 83:*5* 118:*10* 131:*20*
**found** 36:*22* 156:*5*
**foundation** 20:*3* 22:*14*, *25* 23:*15* 29:*7* 30:*3* 31:*19* 33:*11* 34:*11* 39:*4*, *22* 44:*9* 45:*6* 55:*7*, *14* 59:*17* 62:*14* 63:*11* 64:*4* 65:*8*, *24* 67:*3*, *14* 69:*3* 70:*15* 72:*23* 73:*8*, *17* 75:*2*, *11*, *23* 77:*3*, *15* 81:*14* 82:*12* 83:*12*, *21* 93:*5* 94:*22* 95:*5* 96:*8* 101:*11* 109:*25* 111:*16* 116:*3*, *13*, *19* 117:*4* 118:*4* 123:*21* 124:*9* 125:*5*, *24* 126:*20* 128:*21* 141:*22* 142:*8*, *20* 144:*21* 150:*21* 153:*14* 154:*7*
**four** 140:*24* 155:*9*
**fourth** 42:*5* 49:*12*
**frame** 17:*10* 32:*22*

68:*24* 69:*2* 140:*12*
**framed** 81:*9*
**FRANCIS** 2:*9*
**Freescale** 37:*20* 159:*15*, *16*, *17*
**frequently** 127:*10* 138:*19*
**Friday** 7:*23* 8:*16* 137:*20* 155:*12*
**friendly** 38:*24* 64:*22* 96:*24*
**friends** 92:*13*, *14*
**full** 85:*6*
**fully** 101:*18*
**fun** 98:*25* 99:*9*
**function** 120:*12*
**fundamental** 168:*10*
**further** 23:*8* 75:*25* 109:*16* 116:*20* 156:*20* 168:*23* 169:*2* 170:*11*
**FYI** 109:*14* 133:*12*

**< G >**
**gallery** 12:*25* 13:*3*, *5*
**gaps** 151:*12*
**GELLER** 2:*8*
**general** 11:*19* 12:*2* 18:*19* 34:*8* 54:*21* 127:*16* 160:*4*
**Generally** 8:*23* 26:*19* 38:*8* 101:*7* 116:*14*
**generic** 78:*25*
**getting** 80:*8* 169:*8*
**GILROY** 2:*10*
**give** 24:*19* 56:*5*, *9*, *18*, *22* 88:*6* 103:*23* 153:*24* 168:*24*
**given** 105:*18* 109:*5* 152:*9* 163:*23* 171:*6*
**giving** 112:*18*
**go** 11:*18* 12:*16*, *23* 13:*22* 14:*2* 19:*6* 28:*14* 29:*2* 35:*7* 37:*12* 41:*16* 46:*21* 47:*19* 48:*22* 49:*10* 50:*11*, *13* 51:*18* 55:*19*, *24* 56:*3*, *23* 57:*11* 60:*21* 64:*7*, *20*

68:*3*  72:*21*  76:*5*
83:*10*, *20*, *23*  84:*7*, *8*
85:*6*  89:*9*  91:*3*
95:*14*  97:*2*  102:*4*, *10*
106:*13*  109:*9*  114:*11*
121:*22*  123:*11*
124:*22*  129:*22*
131:*23*  133:*8*  142:*23*
143:*5*  146:*15*  152:*9*
153:*12*  154:*12*  155:*2*
156:*16*  157:*23*
158:*18*  165:*22*  167:*7*
**goal**  137:*8*
**goes**  100:*14*  102:*3*, *7*
136:*16*  161:*3*  166:*16*
**going**  7:*7*  8:*25*  9:*4*,
*11*, *19*, *24*  10:*20*  11:*2*,
*14*, *19*  13:*20*  16:*14*,
*24*  17:*9*, *16*  19:*17*
24:*2*, *16*, *19*  25:*7*, *9*
26:*22*  29:*6*  30:*20*
35:*20*, *22*, *23*, *24*, *25*
36:*2*, *5*, *6*, *7*  37:*17*
40:*7*  42:*8*  43:*2*, *21*,
*22*  46:*11*  47:*12*, *15*,
*17*, *18*, *23*  49:*12*
50:*10*  51:*15*  55:*3*, *9*
56:*15*  57:*21*  60:*9*
61:*4*  67:*24*  68:*7*, *9*
70:*19*  79:*11*  82:*23*
87:*12*  88:*9*, *15*, *16*, *17*
89:*17*  93:*14*  95:*10*
96:*7*  99:*25*  112:*2*
114:*11*  121:*6*, *18*
122:*2*  129:*10*, *19*
133:*8*, *11*  135:*22*
139:*12*  150:*14*  151:*5*
155:*10*  165:*10*
166:*23*  167:*15*  168:*2*,
*24*
**Goldman**  143:*24*
144:*4*
**Good**  6:*13*, *14*  13:*7*,
*8*  54:*10*  67:*22*  85:*22*
121:*25*
**gotten**  134:*22*
**graduated**  158:*25*
159:*8*, *11*
**graphic**  160:*25*

**gray**  52:*8*, *18*  107:*16*
**great**  95:*14*
**grounds**  23:*7*  25:*25*
40:*21*  82:*11*  108:*8*
**Group**  64:*13*  159:*14*
**grow**  151:*9*
**growing**  157:*20*
**growth**  151:*10*
168:*18*
**guess**  27:*19*  48:*19*
63:*13*  88:*4*  92:*4*
93:*10*  95:*10*  144:*6*
**guessing**  80:*10*  93:*8*
94:*19*  144:*16*
**guest**  157:*6*
**guidance**  103:*14*, *17*,
*23*
**Guidelines**  48:*24*
**guys**  68:*2*

**< H >**
**half**  43:*17*  87:*9*
**hand**  18:*7*
**handle**  36:*15*  47:*25*
**handwriting**  4:*1*
91:*12*, *14*
**handwritings**  91:*13*
**Hang**  90:*14*
**hangover**  107:*15*
**happen**  91:*19*  93:*14*
123:*9*  140:*22*  154:*9*
167:*15*, *16*  168:*2*, *11*,
*17*
**happened**  9:*16*
28:*23*  31:*24*  34:*4*
39:*16*  65:*14*  66:*4*
92:*6*, *11*
**happens**  68:*9*  123:*11*
**happy**  7:*16*
**head**  21:*22*  27:*17*
29:*14*  70:*18*  71:*16*,
*23*  106:*17*
**heading**  14:*10*  38:*15*
48:*3*  53:*8*  121:*19*
**hear**  126:*8*  148:*8*
**heard**  41:*20*  118:*7*
166:*25*
**he'd**  75:*14*

**help**  8:*20*  9:*14*
18:*12*  37:*9*, *14*, *21*
109:*12*  151:*11*
**helpful**  13:*25*
**helps**  13:*17*
**Hi**  11:*12*
**high**  55:*2*  157:*21*
158:*18*
**higher**  53:*15*  55:*2*, *5*
74:*15*  101:*8*  104:*4*, *7*,
*10*, *13*  105:*6*  129:*11*
**highlighted**  83:*2*
**hints**  112:*18*
**history**  159:*10*
**Hold**  57:*11*  82:*20*
121:*5*, *21*  148:*7*
**holding**  146:*12*
**honest**  131:*7*
**honestly**  125:*2*, *10*
130:*25*
**hopefully**  109:*15*
138:*14*
**Hostile**  38:*16*  64:*8*,
*21*
**hour**  7:*14*  8:*13*, *14*
84:*9*
**hourly**  58:*15*
**hours**  85:*7*, *8*, *22*
87:*10*, *13*  90:*15*
158:*10*
**hug**  41:*21*  42:*6*
43:*8*, *13*
**hybrid**  1:*18*
**hypothetical**  44:*10*
55:*15*  73:*18*  75:*24*
116:*12*, *18*

**< I >**
**idea**  72:*3*  93:*12*
123:*19*  126:*22*
154:*13*  167:*25*
**identification**  11:*16*
16:*8*  19:*10*  20:*25*
23:*21*  31:*14*  50:*4*
56:*2*  57:*19*  59:*23*
68:*17*  69:*13*  70:*3*
76:*15*  80:*15*  82:*17*
89:*16*  90:*23*  99:*21*
103:*4*  104:*20*  105:*11*
118:*18*  120:*6*  121:*10*

122:*19*  126:*12*  133:*4*
134:*13*  135:*3*  137:*14*
138:*11*  143:*20*  144:*8*
145:*17*  147:*6*, *20*
149:*16*  150:*25*  155:*7*
**identify**  91:*12*  145:*14*
**ignore**  46:*11*
**II**  147:*8*
**Ilcisin**  29:*13*  80:*13*,
*14*  81:*2*  83:*18*  91:*15*
94:*7*  95:*17*  98:*6*
99:*4*, *23*  118:*24*
123:*18*  129:*18*
148:*11*  149:*22*
150:*19*  166:*21*, *22*
167:*14*
**Ilcisin's**  92:*20*
**Ileisin**  68:*20*, *21*, *22*
**Illinois**  157:*20*, *21*
158:*3*, *4*, *20*  159:*9*
**illustrated**  150:*7*
**Illustrative**  49:*11*
**imagine**  127:*9*
139:*22*, *24*
**impact**  72:*2*  151:*23*
**implement**  106:*20*
129:*24*  130:*4*  131:*16*
**implemented**  107:*19*
110:*19*
**implementing**  120:*17*,
*18*
**implying**  72:*25*
**improper**  44:*10*
55:*15*  73:*18*  116:*11*,
*18*
**improperly**  112:*17*
**improve**  103:*13*
**inadvertently**  85:*2*
86:*16*
**included**  48:*13*
113:*19*  119:*2*  160:*24*
**Including**  83:*25*
**inclusive**  136:*3*
**incomplete**  44:*9*
55:*14*  73:*17*  75:*23*
116:*12*, *18*
**incorporate**  103:*17*
**incorrect**  40:*18*
**increase**  15:*20*  55:*22*
74:*5*, *20*, *24*  75:*6*, *10*,

*14* 101:*5, 15* 151:*20*
168:*13*
**increased** 71:*19*
129:*19* 162:*20*
**increases** 128:*17*
165:*16*
**increasing** 12:*4*
**INDEX** 3:*2*
**indicate** 17:*6, 24*
36:*21* 64:*17* 139:*2*
**indicated** 111:*13*
124:*7* 125:*22*
**indicates** 15:*4* 137:*23*
**indicating** 143:*23*
**individual** 82:*4, 7*
108:*2, 6* 113:*13, 15,*
*16*
**individually** 108:*21*
**individuals** 133:*24*
**infer** 132:*9*
**inference** 72:*20*
**inferring** 100:*22*
130:*7*
**information** 6:*21*
10:*11* 13:*18* 28:*21*
38:*8* 61:*9, 19, 22*
63:*25* 64:*6* 71:*11*
74:*3, 21* 75:*7, 9*
77:*21* 78:*14, 19, 24*
79:*2, 7, 17, 23* 81:*24*
82:*11* 93:*16* 94:*4*
98:*20* 99:*3* 107:*10,*
*23* 108:*7, 9* 111:*14*
113:*17, 24* 114:*6, 19*
115:*10, 14, 23* 117:*2,*
*10* 141:*18* 147:*14*
150:*19* 160:*13*
**informed** 13:*23*
154:*4* 156:*21*
**informing** 78:*7*
134:*7, 16*
**initial** 20:*7* 30:*13*
48:*2* 160:*25*
**initially** 149:*3*
**inked** 100:*15*
**in-person** 28:*10*
117:*15*
**input** 33:*23* 100:*5*
107:*18*

**inputting** 52:*14*
**inside** 107:*10* 119:*15*
**insider** 76:*21* 107:*9*
**instruct** 9:*4*
**instructed** 49:*5*
**instructs** 10:*6*
**Instrument** 52:*15*
**INSTRUMENTS** 1:*5*
10:*13* 11:*21* 12:*2, 8*
17:*7* 49:*20* 59:*9*
61:*14* 70:*12* 72:*4*
78:*13* 79:*21* 83:*18*
91:*21* 95:*24* 100:*9,*
*23* 101:*9, 24* 102:*12*
103:*17* 104:*3* 119:*11,*
*16* 121:*16* 123:*5*
127:*3, 13* 128:*19, 20*
145:*9, 13* 146:*4, 17,*
*20* 147:*17* 150:*10, 12,*
*20* 157:*11* 159:*19, 22*
160:*6* 161:*2, 9, 15, 21,*
*23* 162:*11, 12, 14*
163:*7, 10, 13, 24*
164:*9, 19, 20* 165:*8, 9,*
*12, 16, 18, 21, 23*
166:*7, 14* 168:*6, 11*
**Instrument's** 52:*3*
**integration** 37:*22*
**intent** 17:*2*
**intentional** 151:*9*
**intentionally** 112:*12*
**interaction** 32:*20*
38:*2*
**interactions** 32:*24*
**interest** 67:*7* 124:*13*
**interested** 58:*23*
86:*15, 18* 124:*11*
125:*8, 9* 170:*14*
**interesting** 123:*19*
**interfere** 102:*11*
**internal** 21:*11, 22*
27:*21* 49:*2* 53:*15*
74:*2*
**internally** 63:*15*
**interpose** 25:*15* 26:*8,*
*10*
**interpret** 67:*19*
72:*18, 19* 94:*19* 95:*3,*
*20* 116:*7* 128:*15*
**interpreted** 83:*16*

**interrupt** 36:*18*
157:*22*
**interruption** 22:*4*
**intimation** 73:*5*
**inventory** 151:*9*
**investment** 36:*14*
100:*13* 119:*4*
**investor** 21:*23* 71:*17,*
*23*
**invite** 118:*22*
**involve** 59:*15*
**involved** 20:*15* 30:*7*
54:*9* 55:*17* 56:*9*
149:*23* 160:*10*
**issue** 77:*8* 162:*19*
**issued** 14:*19* 73:*4*
**issuing** 15:*3*
**it'll** 69:*11* 91:*2*
147:*22*
**its** 11:*22* 15:*19* 17:*8*
44:*15, 16* 62:*6, 21*
63:*2, 7, 18* 64:*21*
70:*8* 72:*4* 95:*18*
96:*6* 101:*23* 119:*6*
162:*20* 164:*21*
165:*12, 18, 23* 166:*8,*
*15* 168:*3, 13*

**< J >**
**January** 13:*19* 23:*24*
24:*10* 25:*17* 102:*4*
106:*11* 161:*4*
**jcomerford@dowdben
nett.com** 2:*17*
**Jeffrey** 143:*22*
**JJ** 147:*21*
**Job** 1:*15* 71:*22*
158:*3* 160:*5, 16*
**JOHN** 2:*16* 84:*18*
157:*10*
**JP** 120:*10, 12*
**JPMC** 135:*25*
**JPMS** 135:*16*
**judge** 10:*7* 25:*24*
26:*5* 40:*21, 23* 45:*22*
**July** 66:*4* 80:*13*
81:*2, 22* 82:*16* 89:*15*
97:*10, 13* 99:*20*
101:*23* 161:*24*

**June** 50:*25* 56:*13, 16*
59:*3* 60:*2, 3* 65:*12,*
*19* 66:*4, 8* 67:*6*
68:*15* 69:*15, 17, 25*
70:*5, 13* 76:*6, 17*
79:*7, 22* 80:*4, 7*
81:*25* 83:*3* 91:*23*
93:*16, 17, 18* 94:*12*
97:*8* 98:*14* 99:*4*
105:*2* 113:*12, 23*
140:*6* 161:*21, 23*
163:*6* 168:*4*
**jury** 157:*15* 159:*24*

**< K >**
**KARAM** 2:*9* 3:*8*
6:*12* 9:*6, 14* 10:*4*
11:*2, 7, 10, 12, 18*
12:*14, 20* 13:*3, 7, 9*
16:*3, 9* 17:*16* 18:*9*
19:*11* 20:*4, 23* 21:*2,*
*16, 20* 22:*5, 20* 23:*4,*
*10, 18, 19, 22* 24:*7, 13,*
*19* 25:*11, 20, 23* 26:*4,*
*7, 10, 13* 27:*3, 6, 9, 19*
28:*5* 29:*11* 30:*7*
31:*11, 15, 23* 33:*16*
34:*13, 21* 35:*7, 9*
36:*18, 25* 37:*9* 38:*15,*
*23* 39:*7, 24* 40:*9, 11,*
*15, 19* 41:*2, 6, 8, 12,*
*16, 18* 42:*21* 43:*21*
44:*11* 45:*8, 15, 20, 22,*
*24* 46:*2, 5, 11, 15, 16,*
*24* 47:*4, 12, 15, 18, 22*
49:*25* 50:*2, 5* 51:*18,*
*20* 53:*19* 54:*21*
55:*10, 19, 24* 56:*3, 18,*
*22* 57:*4, 6, 20* 59:*20,*
*24* 61:*18* 62:*16*
63:*16* 64:*7* 65:*16*
66:*7* 67:*9, 16, 20, 25*
68:*6, 8, 11, 13, 18*
69:*10, 11, 14, 24* 70:*4,*
*19* 73:*2, 10, 19, 24*
74:*14, 22* 75:*16* 76:*5,*
*9, 16* 77:*7, 22* 79:*13,*
*16, 21* 80:*3, 12, 17, 19,*
*25* 81:*17* 82:*15, 18*
83:*17, 25* 84:*5, 20, 23*

85:*15, 19*  86:*3, 9, 10, 14, 24*  87:*4, 6, 9, 17, 19*  88:*4, 14, 22*  89:*2, 5, 13, 17*  90:*3, 12, 16, 21, 24*  91:*6, 9, 10*  93:*8*  94:*7*  95:*2, 9*  96:*11*  97:*24*  98:*9*  99:*3, 10, 14, 19, 22*  100:*20*  101:*16*  102:*16, 19, 21, 23*  103:*2, 5*  104:*18, 22*  105:*9, 12*  106:*4*  107:*3*  108:*2, 13, 19*  110:*6*  111:*5, 21*  112:*4, 7, 9, 16, 21, 23*  113:*11*  114:*5, 21, 24*  115:*3, 16*  116:*8, 14, 21, 23*  117:*9*  118:*6, 16, 19*  119:*19, 21*  120:*2, 4, 7*  121:*8, 12*  122:*17, 20*  123:*4, 24*  124:*14*  125:*11, 21*  126:*4, 8, 11, 14, 23*  127:*11*  128:*25*  133:*3, 5*  134:*12, 14*  138:*8, 12, 15*  140:*11, 23*  141:*25*  142:*12*  143:*3, 6, 14, 18, 21*  144:*9, 25*  145:*16, 21*  147:*7, 10, 13, 21*  148:*7, 10, 17, 20, 22*  149:*8, 15, 17*  150:*18*  151:*2, 25*  152:*22*  153:*16, 20*  154:*10*  155:*2, 5, 8, 18, 25*  156:*14, 17*  157:*6, 22*  158:*2*  162:*3, 16, 22*  163:*3, 17*  165:*20, 22*  166:*3, 10, 12*  167:*7, 10, 17, 24*  168:*9, 23*  169:*13*

**KAREN**  1:*11, 17*  3:*7*  6:*1, 3, 9*  7:*1*  8:*1*  9:*1*  10:*1*  11:*1*  12:*1*  13:*1*  14:*1*  15:*1*  16:*1*  17:*1*  18:*1*  19:*1*  20:*1*  21:*1*  22:*1*  23:*1*  24:*1*  25:*1*  26:*1*  27:*1*  28:*1*  29:*1*  30:*1*  31:*1*  32:*1*  33:*1*  34:*1*  35:*1*  36:*1*  37:*1*  38:*1*  39:*1*  40:*1*

41:*1*  42:*1*  43:*1*  44:*1*  45:*1*  46:*1*  47:*1*  48:*1*  49:*1*  50:*1*  51:*1*  52:*1*  53:*1*  54:*1*  55:*1*  56:*1*  57:*1*  58:*1, 22*  59:*1*  60:*1*  61:*1*  62:*1*  63:*1*  64:*1*  65:*1*  66:*1*  67:*1*  68:*1, 23*  69:*1*  70:*1*  71:*1*  72:*1*  73:*1*  74:*1*  75:*1*  76:*1*  77:*1*  78:*1*  79:*1*  80:*1*  81:*1*  82:*1*  83:*1*  84:*1*  85:*1*  86:*1*  87:*1*  88:*1*  89:*1*  90:*1*  91:*1*  92:*1*  93:*1*  94:*1*  95:*1*  96:*1*  97:*1*  98:*1*  99:*1*  100:*1*  101:*1*  102:*1*  103:*1*  104:*1*  105:*1*  106:*1*  107:*1*  108:*1*  109:*1*  110:*1*  111:*1*  112:*1*  113:*1*  114:*1*  115:*1*  116:*1*  117:*1*  118:*1*  119:*1*  120:*1*  121:*1*  122:*1*  123:*1*  124:*1*  125:*1*  126:*1*  127:*1*  128:*1*  129:*1*  130:*1*  131:*1*  132:*1*  133:*1, 12*  134:*1*  135:*1*  136:*1*  137:*1*  138:*1*  139:*1*  140:*1*  141:*1*  142:*1*  143:*1*  144:*1*  145:*1*  146:*1*  147:*1*  148:*1*  149:*1*  150:*1*  151:*1*  152:*1*  153:*1*  154:*1*  155:*1, 11*  156:*1*  157:*1*  158:*1*  159:*1*  160:*1*  161:*1*  162:*1*  163:*1*  164:*1*  165:*1*  166:*1*  167:*1*  168:*1*  169:*1*  171:*4, 13*

**Karsanbhai**  19:*15*  22:*12, 21*  24:*21*  31:*10*  69:*19*  70:*6*  72:*16*  79:*6*  82:*25*  105:*3*

**Karsanbhai's**  20:*7*  26:*20*  69:*21*  83:*8*

**Katz**  31:*17*  163:*20*

**keep**  15:*25*  24:*15*  32:*9, 11*  35:*20, 22, 23,*

24, 25  36:*2, 5, 6, 7, 16*  50:*10*  51:*12*  67:*23*  68:*7, 8*  73:*11*  83:*3*

**keeping**  119:*16*

**Kevin**  29:*13*  52:*5*  54:*7*  68:*20, 21*  81:*19*  91:*14, 18*  92:*13*  99:*23*  119:*13*  123:*23*  147:*18*  148:*24*  150:*23, 24*  166:*22*

**Kevin's**  69:*5*

**kid**  157:*19*

**kind**  27:*17*  73:*4*  98:*13*  131:*14, 16*

**Kirby**  2:*20*

**KK**  149:*11*

**knew**  80:*10*  94:*6*  124:*11*  152:*17, 24*  153:*10, 12*

**know**  7:*14, 15*  9:*12*  12:*11*  13:*12*  19:*21*  20:*5, 9, 11, 15*  21:*24*  22:*8, 9, 15*  24:*23*  28:*24*  29:*4, 5, 8*  30:*5, 11, 22*  31:*20, 21, 23*  32:*23*  34:*18, 20*  35:*13*  36:*19*  40:*5*  41:*15*  43:*12*  44:*16, 17*  48:*20*  49:*22, 23*  50:*21*  51:*11*  52:*24*  54:*18, 20*  55:*3, 4, 9*  58:*6*  59:*7*  61:*6*  63:*14*  64:*5*  69:*5*  71:*15*  73:*2, 9*  75:*4*  76:*3, 25*  77:*7, 25*  78:*11, 23*  80:*3, 6, 8*  81:*23*  82:*9, 21*  86:*4*  87:*25*  88:*9, 17*  92:*4, 6, 8, 13*  94:*24*  95:*7, 8, 11*  96:*14, 24*  100:*20, 24*  101:*3*  104:*24*  105:*17*  106:*14*  107:*2*  108:*18*  110:*18*  115:*23*  116:*24*  117:*6*  121:*3*  123:*3*  125:*3, 15, 19*  126:*18*  128:*2, 24*  129:*15*  130:*11, 16, 21*  131:*3, 6*  132:*9*  133:*13*  140:*12, 16*  141:*14*  142:*10, 13, 25*

148:*24*  149:*4, 6, 19*  154:*15, 18*  159:*7*  160:*9*

**knowledge**  28:*21*  44:*25*  62:*11*  77:*23*  93:*24*  117:*23*  164:*4, 8, 9, 13*  170:*9*

**known**  132:*6*

**knows**  76:*22*  154:*14*

**< L >**

**labeled**  81:*7*

**lacks**  20:*3*  22:*14, 25*  23:*14*  29:*7*  31:*18*  109:*25*  116:*13, 18*  ▉▉▉▉100:*10*

**Lal**  19:*15, 22*  39:*18*  70:*10*  73:*9*

**language**  116:*15*

**large**  138:*13*  168:*17*

**larger**  13:*15*  52:*6*  71:*13, 19*  72:*4*

**late**  49:*19*  59:*3*  94:*12*  96:*4, 18*

**latest**  88:*13*

**law**  9:*9*  31:*17*  32:*21*  86:*17*  87:*23*  156:*15*  163:*20*

**lawsuit**  160:*22*

**lawyer**  7:*23*  26:*14*  156:*5*

**lawyers**  119:*4*  131:*7*  135:*6*  152:*17*  154:*22*

**lead**  37:*23*

**leading**  162:*3, 16, 22*  163:*3, 17*  166:*3, 12*  167:*7, 17, 24*  168:*9*

**learn**  117:*9*  132:*7*

**learned**  127:*2*  130:*2*  152:*6*

**learning**  73:*25*

**leave**  15:*16*

**led**  106:*7, 23*

**left-hand**  47:*23*  139:*10*

**legal**  10:*2*  29:*13*  77:*5, 10, 14*  79:*15, 18, 24*  82:*10*  110:*3*  114:*2*  115:*11*  117:*21*  118:*3*

**legitimate** 111:7, *22* 113:*3*
**lengthy** 32:*7*
**letter** 3:*24*, *25* 4:*1* 23:*20* 24:*4*, *5*, *21* 25:*2*, *3*, *6*, *8*, *10*, *16*, *19* 26:*21*, *23* 27:*22*, *25* 28:*8*, *19* 29:*18* 30:*19* 31:*10* 33:*18* 39:*18*, *25* 42:*11*, *14*, *17*, *19* 43:*7* 59:*20* 65:*17* 66:*23* 69:*11*, *14*, *19*, *20*, *22*, *25* 70:*5*, *7*, *18* 74:*10*, *13* 76:*6* 79:*6*, *7* 80:*12* 82:*6*, *16* 96:*5*, *10* 104:*17*, *23*, *24* 107:*15* 108:*4*, *5* 110:*13*, *16* 113:*12* 114:*4* 124:*15*, *18*, *20* 125:*12*, *13*, *23* 126:*3* 134:*22* 139:*23* 140:*2* 147:*8*
**letters** 23:*25* 124:*12* 161:*8*
**level** 17:*24* 19:*4* 73:*3*
**Lexington** 2:*8*
**lift** 130:*23*
**lifted** 108:*23* 133:*18* 134:*8*, *24* 152:*6*
**lifting** 128:*19* 131:*9* 133:*14*, *23* 134:*17*, *22*
**light** 85:*25*
**limit** 164:*13*
**limited** 40:*20* 74:*3* 161:*10* 164:*14*
**line** 15:*17* 78:*12* 89:*23*, *25* 120:*19* 172:*5*
**Lipton** 3:*18* 31:*17* 32:*21* 33:*3* 58:*5* 59:*25* 60:*8* 163:*20*
**list** 29:*9*, *11*, *15* 76:*12*, *21*, *24* 77:*12* 78:*10* 80:*9* 113:*19* 145:*18*
**listed** 28:*20* 81:*5*
**listen** 103:*22*
**listing** 40:*10* 45:*10*

**literally** 111:*24*
**LITIGATION** 1:*5*
**little** 24:*14* 27:*7* 62:*24* 66:*3* 68:*4* 71:*25* 159:*7*
**Liu** 54:*2*
**live** 158:*7*, *9*
**Lived** 158:*3* 162:*10*
**LLP** 2:*8*, *15*
**local** 156:*15*
**locking** 58:*23*
**logistics** 8:*18*
**long** 7:*15* 8:*12* 12:*6*
**look** 21:*4* 27:*3*, *9* 31:*11* 35:*9*, *15* 42:*4* 50:*5* 51:*13*, *21* 55:*23* 56:*12* 57:*25* 62:*2*, *24* 73:*25* 81:*24* 87:*23* 91:*6* 97:*6* 107:*12* 109:*11* 121:*12* 138:*3* 141:*16* 146:*15* 155:*9*
**looked** 69:*7* 82:*3* 92:*5* 119:*13* 123:*25* 133:*5* 142:*24*
**looking** 32:*4* 138:*20*
**Looks** 22:*2* 32:*9* 34:*19* 37:*11* 39:*8* 52:*4* 60:*19* 61:*2*, *21* 81:*19* 103:*21* 118:*21* 138:*17* 139:*9* 140:*10*, *24* 150:*23*
**lot** 33:*23* 37:*13* 54:*12* 60:*19* 128:*23* 154:*8* 157:*18* 160:*11*
**Louis** 2:*16*
**low** 54:*23* 153:*7*
**lower** 70:*12* 80:*18* 142:*5*
**lowest** 137:*8*
**LT** 95:*12*
**lunch** 68:*2*, *3* 84:*9*

**< M >**
**M&A** 81:*8* 101:*19* 102:*12* 150:*8*
**ma'am** 6:*8* 10:*4*
**Mackenzie** 122:*25* 123:*5* 143:*22*
**main** 54:*2*
**maintain** 156:*3*

**making** 25:*12*, *20* 45:*16* 62:*20* 112:*17* 140:*16* 144:*6* 146:*3*
**manage** 107:*6*
**manageable** 17:*21*
**Management** 4:*23* 52:*10* 54:*22* 68:*24* 69:*2* 72:*11* 100:*23* 105:*6* 160:*17*
**management's** 52:*15* 53:*6*, *15*
**manufacturing** 160:*14*
**March** 64:*25* 65:*12*, *17* 66:*24* 138:*22*, *25* 139:*3*
**Marissa** 21:*7*, *20* 22:*2*, *8* 71:*23* 76:*21* 77:*11*, *20* 78:*3* 80:*10* 82:*6* 108:*5* 143:*22*
**Marissa's** 77:*24*, *25*
**mark** 11:*14* 19:*7* 37:*17* 119:*19* 134:*10* 149:*13* 162:*7*
**marked** 11:*13*, *16* 13:*10* 16:*4*, *8* 19:*10* 20:*25* 23:*21* 31:*14* 50:*4* 56:*2* 57:*19* 59:*23* 61:*2* 68:*17* 69:*13* 70:*3* 76:*15* 80:*15* 82:*17* 88:*18* 89:*16* 90:*23* 99:*21* 103:*4* 104:*20* 105:*11* 118:*18* 120:*6* 121:*10* 122:*19* 126:*12* 133:*4* 134:*13* 135:*3* 137:*14* 138:*11* 143:*20* 144:*8* 145:*17* 147:*6*, *20* 149:*16* 150:*25* 155:*7* 162:*4*
**market** 122:*25* 128:*23* 137:*12* 139:*6* 141:*3* 146:*21*, *24* 164:*23*, *25*
**markets** 45:*2*
**material** 75:*13* 77:*21* 78:*14*, *18*, *22*, *25* 79:*2*, *7*, *16*, *23* 82:*11* 107:*23* 108:*8* 111:*14* 113:*17*, *23* 114:*6*, *8*,

**18** 115:*9*, *13*, *22* 117:*2* 129:*24* 131:*15* 168:*13*, *16*
**materially** 71:*8*
**math** 27:*16* 70:*17* 142:*25*
**matter** 86:*23* 160:*22*
**MBA** 158:*25* 159:*3*
**McGrath** 69:*18* 70:*6* 103:*9*
**mean** 16:*17* 29:*12* 32:*16* 36:*18* 48:*18*, *19* 66:*7* 75:*8*, *14* 86:*3* 104:*7* 107:*17* 109:*23* 120:*23* 124:*12* 127:*10* 131:*14* 132:*19* 142:*15* 144:*13* 150:*2*
**meaning** 110:*2*
**means** 18:*6*, *24* 74:*24* 97:*20* 100:*23* 136:*10*
**meant** 49:*5* 68:*25* 123:*19*
**media** 23:*17*
**meet** 8:*9*
**Meeting** 3:*22* 8:*12* 27:*21* 28:*11* 30:*10*, *24* 31:*5* 32:*18* 33:*2*, *3* 34:*22*, *25* 35:*4* 39:*13* 53:*20* 59:*25* 60:*4* 92:*5*
**meetings** 8:*15* 30:*10* 33:*5*, *13*, *17* 149:*23* 155:*15*
**members** 133:*13*, *17*
**memo** 117:*25*
**memory** 8:*20* 12:*16* 16:*19* 34:*22* 130:*8* 131:*8* 133:*21*
**mention** 156:*9*
**mentioned** 57:*5*, *6* 68:*19*
**mentions** 75:*15*
**merge** 37:*21*
**merger** 37:*22*
**mergers** 37:*18* 41:*21* 48:*17* 55:*10*
**Merit** 1:*25* 170:*7*

**message** 95:*12*
**messages** 48:*25*
**messaging** 128:*6*
**met** 7:*23* 8:*19*
**metadata** 36:*19* 37:*4*, *7* 47:*7*
**mic** 121:*6*
**Microphone** 157:*4*
**middle** 58:*13*
**million** 15:*5* 17:*8*, *14*, *22* 99:*2* 125:*15* 136:2, *5*, *12* 137:*20*, *21*, *24* 142:*4*, *17* 144:*13*, *18*, *20* 147:*15* 151:*14*, *16*
**mind** 84:*5*
**minimal** 72:*11*
**minute** 35:*9*
**minutes** 8:*13* 13:*16* 21:*4* 35:*2* 90:*15* 143:*5*, *8*
**mischaracterized** 66:*2*
**mischaracterizes** 19:*19* 42:*17* 43:*9* 74:*19* 83:*12* 97:*21* 98:*23* 99:*7* 109:*24* 111:*16* 144:*2* 150:*15* 152:*20*
**mischaracterizing** 40:*8* 41:*10* 112:*12*, *21*
**misconstrued** 49:*2*
**misconstruing** 112:*12*
**misreading** 111:*25*
**Missouri** 2:*16*
**misspoke** 104:*14*
**MM** 151:*3*
**MNPI** 111:*8*, *20* 113:*4*
**modeling** 17:*14*
**models** 103:*13*
**moment** 14:*6* 37:*16* 168:*25*
**moments** 103:*5*
**money** 125:*16* 128:*5*
**Monitor** 48:*10* 123:*5*
**monitored** 149:*24*
**monitoring** 71:*18* 123:*16* 124:*3*
**month** 87:*25*

**months** 65:*13*, *19* 131:*2* 146:*13*
**MoPac** 1:*20*
**Morgan** 120:*10*, *12*
**morning** 6:*13*, *14*
**motivated** 110:*23*
**Motorola** 158:*4*, *5* 159:*11*, *13*, *17*
**mouth** 128:*5*
**move** 18:*16* 26:*9* 56:*20* 83:*5* 117:*7* 125:*22*
**moved** 118:*10* 131:*20* 157:*18*
**moving** 139:*5*
**multiple** 12:*13* 18:*6* 36:*13* 130:*25* 131:*2*
**Multi-speaker** 47:*16*
**multiyear** 64:*12*, *17*
**muted** 148:*5*

**< N >**
**name** 11:*8* 61:*13* 68:*20* 157:*10*
**named** 145:*20* 159:*15*
**narrative** 9:*25*
**NATI** 3:*8*
**NATIONAL** 1:*5* 10:*13* 11:*21*, *25* 12:*7* 17:*7* 49:*20* 52:*2*, *15* 59:*8* 61:*14* 70:*12* 72:*4* 78:*13* 79:*21* 83:*18* 91:*21* 95:*23* 100:*9*, *23* 101:*9*, *24* 102:*12* 103:*17* 104:*3* 119:*11*, *15* 121:*16* 123:*5* 127:*3*, *13* 128:*18*, *20* 145:*8*, *13* 146:*4*, *17*, *20* 147:*17* 150:*10*, *12*, *20* 157:*11* 159:*19*, *21* 160:*6* 161:*2*, *8*, *14*, *21*, *23* 162:*11*, *12*, *13* 163:*7*, *10*, *13*, *23* 164:*9*, *19*, *20* 165:*8*, *9*, *12*, *15*, *18*, *21*, *23* 166:*7*, *14* 168:*6*, *11*
**NAT-SL** 51:*2* 56:*14*

**NAT-SL-000000765** 135:*5*
**NAT-SL-000000772** 138:*13*
**NAT-SL-000006122** 151:*4*
**NAT-SL-000006245** 137:*16*
**NAT-SL-000009179** 134:*4*
**NAT-SL-000010395** 118:*17*
**NAT-SL-00001156** 144:*10*
**NAT-SL-000012292** 147:*23* 149:*12*
**NAT-SL-00001240** 104:*16*
**NAT-SL-00001250** 82:*16*
**NAT-SL-00001255** 69:*15*
**NAT-SL-000016278** 76:*17*
**NAT-SL-00002967** 103:*2*
**NAT-SL-000029992** 70:*2*
**NAT-SL-00005982** 16:*7*
**NAT-SL-00006230** 121:*13*
**NAT-SL-00006940** 155:*6*
**NAT-SL-00007093** 68:*16*
**NAT-SL-00007475** 143:*16*
**NAT-SL-00008520** 91:*7*
**NAT-SL-00008756** 126:*5*
**NAT-SL-00009535** 132:*24*
**NAT-SL-00009611** 105:*10*
**NAT-SL-00016278** 76:*7*
**NAT-SL-00017939** 89:*15*

**NAT-SL-00020537** 59:*22*
**NAT-SL-00023205** 80:*14*
**NAT-SL-00025277** 37:*7*
**NAT-SL-00025857** 57:*21*
**NAT-SL-0010806** 147:*9*
**NAT-SL-0025703** 99:*20*
**nature** 20:*13*
**navigate** 138:*14*
**NDA** 74:*4*
**near** 109:*16*, *21*
**necessary** 87:*8*
**need** 7:*14* 13:*20* 25:*14* 35:*16* 40:*15* 75:*14* 83:*4* 107:*13* 121:*21* 123:*23* 143:*4*, *8*
**needs** 88:*3*
**neglected** 85:*2*
**negotiations** 75:*17*
**neither** 95:*2*
**NEOs** 145:*19*
**never** 131:*21*, *23*
**NEW** 1:*2* 2:*9* 26:*2* 97:*7* 138:*21*, *25*
**News** 3:*8*
**Nexperia** 37:*25*
**NI** 24:*5* 27:*21* 38:*3* 44:*18* 52:*9*, *10*, *20* 59:*11* 83:*5* 100:*13*
**Niles** 56:*17* 57:*23* 58:*4*
**NI's** 27:*13* 52:*2*
**NN** 155:*2*
**nonemployee** 14:*22*
**nonpublic** 74:*3* 77:*21* 78:*14*, *19*, *25* 79:*2*, *7*, *17*, *23* 82:*11* 107:*23* 108:*8* 111:*14* 113:*17*, *24* 114:*6*, *19* 115:*9*, *14*, *22* 117:*2*
**normal** 110:*24* 118:*21* 132:*22* 168:*18*

**Normally** 116:*8* 126:*18*
**northern** 157:*20* 158:*20* 159:*9*
**Notary** 171:*20*
**notation** 141:*7, 20*
**note** 123:*2*
**noted** 109:*18* 161:*6, 7, 8, 9* 171:*8*
**notes** 48:*25* 92:2, *19*
**notice** 92:*23* 94:*8* 156:*6, 7, 10*
**noticeably** 156:*18*
**notification** 80:*7* 146:*23*
**notified** 147:*2*
**November** 162:*24*
**number** 9:*8* 11:*15* 14:*25* 15:2, *7* 16:*5, 6, 12* 19:*6, 8* 20:*24* 21:*3* 23:*20, 23* 25:*11, 12* 27:*17* 28:*20* 31:*13* 35:*8* 37:*4, 12* 39:*19, 25* 43:*22, 23* 47:*3, 5, 6, 13, 19, 22* 48:*22* 49:*10* 50:*3* 51:*18* 55:*25* 56:*14* 57:*5, 7, 18, 21* 59:*21, 22* 60:*23* 64:*8* 68:*12, 14, 15* 69:*24* 80:*17* 82:*15* 84:*17* 90:*11, 18* 91:*8* 94:*14* 98:*15* 102:*17, 18* 104:*18* 119:*20, 22* 120:*5* 121:*9, 18* 122:*18* 126:*11* 135:*5, 23* 137:*16* 138:*8, 12* 142:*4, 5, 17* 143:*13, 15, 18* 144:*9* 145:*7, 15, 21, 24* 147:*7, 16, 22* 148:*18, 20* 149:*12, 15* 155:*5, 10, 24* 161:*12*
**numbered** 1:*21* 14:*9* 135:*13*
**numbers** 51:*2, 23* 53:*15* 98:*10* 135:*6* 136:*19* 142:*15* 149:*9, 10*

**Nuthatch** 61:*9* 62:*6, 21* 63:*2, 7, 18* 64:*8, 12, 20* 66:*20* 67:*16* 81:*4* 100:*14* 101:*17* 102:*3, 7* 107:*14* 109:*17* 111:*6, 7* 113:*3, 22* 150:*7*
**Nuthatch's** 62:*3*
**NXP** 37:*21, 23* 38:*3* 159:*16, 17*

**< O >**
**object** 8:*25* 9:*24* 10:*5* 15:*13* 17:*9, 10* 18:*3* 19:*17* 25:*7, 9* 26:*14, 22* 27:*14, 23* 29:*6* 38:*21* 39:*3* 40:*7, 25* 41:*9* 42:*16* 45:*12, 20* 49:*21* 53:*17* 75:*25* 79:*11, 14* 84:*21* 88:*15, 17* 89:*7* 98:*8* 105:*25* 111:*15* 112:*22* 116:*20* 150:*14* 152:*19* 167:*7*
**objecting** 9:*25* 19:*18* 25:*18* 46:*9* 167:*12*
**Objection** 12:*9* 20:*2* 22:*13, 24* 23:*7, 14* 25:*13, 15, 25* 26:*8, 10* 31:*18* 38:*10* 40:*11, 12, 16, 18, 20, 21* 41:*11* 43:*9* 44:*8* 45:*5* 46:*12* 54:*16* 55:*13* 59:*17* 61:*15* 62:*13* 64:*3* 65:*7* 67:*2* 72:*22* 73:*7, 16* 74:*11, 18* 75:*22* 79:*18, 24* 83:*11* 85:*10, 12* 86:*2, 10, 11, 12, 16, 21* 87:*13, 20, 21* 97:*21* 98:*22* 99:*6* 109:*24* 111:*24* 112:*5, 8, 11* 114:*20* 144:*2* 151:*21* 156:*3, 16* 162:*3, 16, 22* 163:*3, 17* 165:*20* 166:*3, 10, 11* 167:*17, 24* 168:*9*
**objections** 10:*8* 23:*5, 6* 25:*12, 21* 34:*17*

**41:*4* 45:*16* 67:*18* 73:*21* 99:*12* 112:*17* 116:*17*
**obtained** 63:*25*
**obviously** 58:*23* 60:*6* 92:*10*
**occasion** 18:*20*
**occasionally** 7:*13*
**occasions** 6:*17*
**occur** 166:*24*
**occurred** 40:*6* 41:*14, 15* 118:*13* 162:*19* 164:*11*
**occurs** 167:*3*
**o'clock** 67:*25*
**October** 151:*3, 6* 155:*5, 8, 14*
**offer** 20:*17* 24:*4* 30:*14, 16* 31:*6* 54:*5, 19, 22* 55:*2, 6, 11, 12* 62:*7, 22* 63:*2, 7, 18* 65:*11* 66:*10, 12, 16* 69:*21* 70:*13* 74:*15* 76:*22* 79:*5, 12, 16, 22* 86:*24* 91:*20* 93:*25* 94:*6, 20* 95:*18, 24* 97:*8, 20* 98:*2* 101:*8, 17, 24* 102:*11* 113:*8* 140:*16* 151:*19* 152:*17, 25* 153:*3, 6, 9, 17, 21, 23* 154:*16* 161:*7, 20, 22, 24* 162:*12, 20* 163:*5, 14*
**offered** 26:*25* 29:*24* 161:*19* 162:*11* 163:*13*
**offeree** 39:*25*
**offeree's** 39:*12*
**offering** 71:*8* 86:*5*
**offeror** 39:*12, 25* 44:*6*
**offers** 55:*17* 62:*20* 168:*4*
**office** 28:*13*
**officer** 159:*25* 160:*5*
**officers** 145:*20* 146:*24*
**official** 20:*16*
**offset** 14:*16, 23* 15:*21*

**Oh** 20:*14* 28:*24* 29:*12* 37:*8* 43:*16* 57:*8* 59:*14* 60:*20* 63:*4* 65:*9* 78:*5* 92:*12* 96:*9* 100:*24* 123:*10* 130:*16* 142:*10* 143:*8* 148:*4* 154:*6* 160:*12*
**Okay** 7:*2* 9:*10, 14* 10:*9, 17, 20, 24* 11:*7, 12* 12:*19* 13:*7, 9, 14, 22, 23, 25* 14:*2, 3, 4, 5, 6, 8* 16:*19, 23* 17:*19* 18:*13, 15, 16, 17* 19:*6, 9* 20:*12, 18* 21:*10, 12, 19, 24* 22:*3, 5, 20* 23:*18, 19* 24:*11, 15, 17, 25* 25:*14* 27:*5, 11, 19* 30:*25* 32:*12, 17* 33:*16* 35:*17, 20, 21, 22, 23, 24* 36:*23* 37:*8, 15, 20* 39:*19* 40:*25* 41:*12* 42:*10* 43:*4, 16, 20* 44:*24* 45:*21* 46:*20* 47:*4, 22* 48:*21, 22* 49:*25* 50:*9, 12, 14, 16, 17, 18, 19, 24* 51:*17* 52:*22* 56:*12* 57:*24* 58:*2, 8* 60:*18, 19, 20* 61:*18* 62:*2, 16, 23, 25* 63:*8, 16, 25* 64:*7, 24* 67:*9, 11, 20, 23, 25* 68:*7, 10* 69:*16* 70:*21* 73:*10, 24* 76:*10, 13, 14* 80:*24* 83:*8* 89:*24* 90:*2, 16* 95:*9, 12* 97:*6* 98:*5* 100:*3* 101:*2, 7* 102:*9, 14, 16* 103:*8, 20* 104:*21* 105:*5, 14, 15* 106:*18* 109:*11, 13* 112:*25* 113:*16* 114:*16* 115:*11* 118:*12, 15, 23* 120:*3, 19* 121:*5, 7, 11, 25* 122:*4, 8* 123:*11, 14* 126:*13, 23* 128:*25* 130:*17, 22* 131:*6, 13, 17* 132:*3, 5, 8, 13, 18, 23* 133:*21, 23* 134:*3,*

*5, 21, 23*  135:*4, 7, 20*
136:*18*  137:*17*
138:*20*  139:*2, 5, 13,*
*25*  140:*4, 23*  141:*7,*
*18*  142:*12*  143:*3*
144:*9, 25*  145:*10*
146:*16*  147:*11, 12, 21,*
*25*  148:*14*  149:*2, 4, 7*
150:*18*  151:*7*  152:*9,*
*16*  154:6, *14*  155:*2*
156:*25*  158:*11, 15*
159:*24*  163:*4*  164:*4,*
*18*  165:*2, 11, 24*
166:*17*  167:*6*  168:*3,*
*20*  169:*4, 12*
**once**  7:*14*  43:*22*
57:*25*  134:*14*  154:*18*
**ones**  89:*23*  122:*5*
**open**  58:*17*  63:*19*
109:*16, 21*  110:*3*
139:*6*  141:*3*  146:*21,*
*24*  156:*8*  164:*22, 25*
**open-market**  120:*20*
137:*19*  139:*14*
**operationally**  104:*5*
**operations**  160:*14*
**opinion**  56:*6, 10*
108:*23*  116:*25*
117:*22*  118:*3*
**opportune**  107:*9*
**opportunistic**  81:*8*
106:*8, 20, 25*  120:*24*
138:*5*
**opposed**  106:*20*
165:*19*
**opposing**  169:*7*
**option**  121:*4*
**ORAL**  1:*10, 17*  6:*3*
**order**  131:*10*  169:*5*
**oriented**  157:*15*
**original**  151:*16*
**originally**  157:*17*
**outcome**  92:*15*  93:*9,*
*11*  98:*7*
**outreach**  161:*2*
**outside**  31:*21*  107:*18*
115:*21*  158:*10*
**overall**  61:*16*  108:*22*
**overarching**  108:*23*

**overhang**  107:*15*
**overt**  75:*20*
**overture**  22:*7*  23:*13*
51:*5*  104:*3*
**overvalued**  30:*15*
**Owners**  4:*23*  145:*18*
**Ownership**  4:*23*
14:*21*  145:*13, 22*


**< P >**
**p.m**  47:*3*  81:*2*  90:*9,*
*11*  143:*11, 13*  155:*21,*
*22, 24*  169:*17*
**P-1**  3:*8*  11:*16*
**P-10**  3:*22*  59:*23*
**P-11**  3:*23*  68:*17*
**P-12**  3:*24*  69:*13*
**P-13**  3:*25*  70:*3*
**P-14**  4:*1*  76:*15*
**P-15**  4:*1*  80:*15*
**P-16**  4:*1*  82:*17*
**P-17**  4:*1*  89:*16*
**P-18**  4:*1*  90:*23*
**P-19**  4:*1*  99:*21*
**P-2**  3:*8*  16:*8*
**P-20**  4:*1*  103:*4*
**P-21**  4:*1*  104:*20*
**P-22**  4:*1*  105:*11*
**P-23**  4:*1*  118:*18*
**P-24**  4:*1*  120:*6*
**P-25**  4:*1*  121:*10*
**P-26**  4:*1*  122:*19*
**P-27**  4:*1*  126:*12*
**P-28**  4:*1*  133:*4*
**P-29**  4:*1*  134:*13*
**P-3**  3:*8*  19:*10*
**P-30**  4:*1*  135:*3*
**P-31**  4:*19*  137:*14*
**P-32**  4:*20*  138:*11*
**P-33**  4:*21*  143:*20*
**P-34**  4:*22*  144:*8*
**P-35**  4:*23*  145:*17*
**P-36**  4:*25*  147:*6*
**P-37**  5:*2*  147:*20*
**P-38**  5:*3*  149:*16*
**P-39**  5:*4*  150:*25*
**P-4**  3:*8*  20:*25*
**P-40**  5:*5*  155:*7*
**P-5**  3:*8*  23:*21*

**P-6**  3:*8*  31:*14*
**P-7**  3:*19*  50:*4*
**P-8**  3:*20*  56:*2*
**P-9**  3:*21*  57:*19*
**packet**  13:*24*
**PAGE**  3:*3, 8*  13:*22*
14:*2*  16:*11*  21:*14*
24:*3, 5, 17*  32:*2, 4*
50:*12, 15*  56:*24*  57:*8,*
*22*  60:*22*  70:*20*  81:*7*
82:*24*  91:*14, 15*
92:*18, 19, 20*  97:*7*
135:*22*  138:*20*  145:*8*
160:*21*  172:*5*
**pages**  32:*6*  35:*12, 15*
171:*5*
**paragraph**  27:*4, 10*
58:*3, 4, 8, 13*  59:*16*
72:*8*  73:*25*  82:*25*
114:*7*  135:*13, 25*
160:*23*
**paragraphs**  66:*8*
**paralegals**  85:*3*
**parentheses**  37:*5*
**parenthesis**  44:*2, 3*
58:*14*
**part**  13:*14*  14:*19*
31:*25*  37:*21*  72:*6*
77:*8, 11*  79:*22*  88:*5*
101:*6*  110:*24*  111:*3*
140:*11*
**particular**  18:*2*  51:*9,*
*16*  65:*4*
**parties**  75:*18*  170:*12*
**partner**  58:*5*  120:*14*
160:*17*
**parts**  151:*11*
**party**  152:*24*  154:*14*
**pause**  66:*14*  167:*10*
**paused**  139:*23*
140:*21*
**pausing**  139:*20*
**pay**  14:*13*  15:*11, 19*
163:*10*  168:*5*
**PC**  64:*13*
**PDF**  169:*6*
**PE**  121:*19*
**Pedro**  16:*20*  81:*3*
**pence**  66:*10, 16*

**people**  8:*7*  28:*4*
29:*9*  116:*4, 9, 10, 14*
131:*3*  150:*20*
**percent**  27:*12*  44:*3*
70:*14*  71:*4*  145:*19*
**Percival**  78:*6*  80:*5, 6*
82:*9*  99:*24*  100:*21*
107:*13*  116:*24*
117:*25*  118:*8*  131:*9*
132:*16*  133:*10*  134:*6,*
*16*
**Percival's**  78:*2*  99:*25*
**performance**  95:*13*
168:*15*
**period**  10:*15, 18*
62:*12*  65:*6*  87:*24*
100:*9*  107:*24*  108:*12*
110:*9, 10*  115:*14*
129:*9*  142:*19*
**periods**  108:*18*
**permission**  154:*22*
**persisted**  65:*5*
**person**  1:*19*  8:*9*
10:*21*  49:*3*  112:*13*
117:*12, 18*
**personal**  164:*4, 9*
**personally**  44:*13*
82:*8*  131:*12*
**persons**  28:*20*  113:*19*
**Perspectives**  100:*4*
**pertains**  91:*16, 18*
122:*23*
**peruse**  32:*5*
**Philip**  50:*25*
**phone**  8:*17*  28:*10*
49:*3*  117:*12*
**phrase**  69:*2*  109:*23*
128:*13*
**pieces**  103:*18*
**place**  6:*20*  12:*8*
40:*2*  81:*21*  105:*17*
106:*10*  107:*5, 7*
110:*12*  111:*8*  123:*15*
139:*3*  140:*7, 15*
**Plaintiff**  59:*21*
**Plaintiffs**  2:*3*  160:*24*
161:*19*
**Plaintiff's**  11:*14*
13:*10*  16:*4*  19:*8*
23:*20*  31:*12*  50:*3*

55:25  57:20  69:12  80:16  120:5  126:6, 9  133:2, 3  134:11  160:21  162:24

**Plan**  4:1  17:7, 14  30:2, 6  52:9  54:8  55:5  68:24  69:2, 8  74:2  105:17, 20, 21  106:7, 10, 20, 24, 25  107:4, 5, 7  110:12  111:8  120:13, 17, 24  135:9, 20  136:2, 5  137:24  138:5  139:3  151:17

**planned**  85:6  151:15  156:2

**planning**  162:7

**plans**  107:20  133:13

**PLASCOFF**  2:11  37:3  47:17  68:12  102:18, 20  119:25  138:10  143:17  147:11, 24  155:4

**Play**  49:11  167:3

**played**  152:2

**Please**  18:9  21:5  23:6  24:6  25:24  26:10, 17  35:19  46:21  47:19  50:9  51:19  64:7  77:18  80:23  81:13  91:6  105:16  112:4  115:6  120:4  134:10  143:5  145:15, 23  148:14  157:24  159:10  169:5, 6

**plenty**  90:16

**point**  9:2  16:22  17:21  19:22  20:5, 9, 16  28:18  29:17  32:23  37:19  39:20  40:5  48:23  49:13  61:11, 12  62:4  64:11  71:2  72:9  76:12  150:3, 6

**points**  70:22  127:22

**portion**  146:17

**position**  87:3  88:9, 12, 24  123:3  156:13

160:10

**positions**  71:7, 18, 20

**possession**  113:23

**possibility**  83:19  102:9

**possible**  12:20  38:25  45:11  51:5  54:3  58:17  72:19  92:15  110:25  123:6  124:4, 7  137:9

**possibly**  78:9  83:10  109:21  140:18  149:20

**potential**  58:18  63:20  100:6

**potentially**  15:20  43:13

**PowerPoint**  163:19

**PP**  145:7

**practical**  88:10

**practice**  15:17  49:8  84:24

**predict**  97:13  167:16

**predicting**  94:20  95:17, 23  96:4, 6, 19

**prefer**  49:6  72:10  73:11, 20  83:3  85:9

**preference**  72:20

**preferred**  72:16

**prefers**  73:14, 22

**premise**  167:14

**premium**  27:13, 17  70:14  74:16  95:14

**preparation**  9:3

**prepare**  7:22

**prepared**  7:19  88:18, 21  156:12

**pre-read**  61:2

**prescient**  98:6

**PRESENT**  2:19  33:2, 5, 8  34:22  36:14  51:3  60:3

**presentation**  33:4  48:14  50:23  51:4  52:2  59:25  92:5, 7  106:12

**presentations**  33:9, 21, 25  163:19, 23

**presented**  32:10  33:4, 6, 7, 9, 14, 22  35:4  38:9  61:6, 21

**presenting**  60:24

**preserved**  85:13

**preserving**  86:20

**press**  25:17

**Pressure**  38:17, 25  44:7

**presumably**  42:14  148:11

**pretty**  110:9  146:3

**previous**  7:3  47:5  61:20  70:14

**price**  27:13  42:12, 15, 20  54:10  55:22  56:6  70:12  71:8  74:15, 25  79:5  96:18, 20  97:2, 23  99:5, 11  101:5, 9, 15  104:5, 7, 13  122:3, 14  128:6, 13, 17, 20  136:15  137:9  161:22  163:9  166:24  167:16

**prices**  54:14  129:2  136:9  154:24

**pricing**  96:6

**prime**  143:24

**printed**  16:10

**printing**  94:13

**prior**  60:25  83:2  98:23  99:7

**Prioritized**  14:10

**private**  39:11, 25  42:11, 14  65:12, 17  66:16, 23  73:11  83:3  97:8

**privately**  62:6, 21  72:12, 17, 21  73:23

**privilege**  9:2, 5

**Privileged**  3:8  9:4

**probability**  93:4, 9  129:10, 19

**probably**  9:11  10:23  15:17  28:13  42:23  49:7  59:4, 5  61:25  68:3  70:11  77:6, 24  78:9, 22  95:20  130:4, 6, 19  137:25  144:23

**probing**  131:8

**problem**  36:12  81:8, 9  143:3, 6

**problems**  81:5

**proceed**  85:25  86:8

**proceeding**  132:6  133:19

**proceeds**  66:18

**process**  11:22  18:8  28:2, 25  38:20, 22  61:17  99:2  109:4

**procurement**  160:15

**produced**  36:21  156:24

**production**  156:22

**products**  37:24

**Professional**  1:24  129:5, 6  170:5

**professionals**  73:3

**program**  18:25  61:16  141:8  158:25  161:13

**Project**  3:22  78:16, 20, 21  91:19, 20  134:7

**projections**  14:7  52:10, 15, 20  53:6, 10

**pronounce**  68:20

**pronouncing**  21:21

**proof**  21:17

**proper**  26:11

**properly**  46:13

**proposal**  15:15  19:16, 19  74:6, 17  75:6, 10, 14  104:25  105:2

**propose**  43:14

**proposes**  15:15

**proposing**  42:12

**propounded**  171:7

**propping**  128:19

**protection**  107:8

**provide**  6:21  34:2  160:16

**provided**  33:23  34:6, 9, 10, 15  61:22  69:7  103:14

**providing**  10:11  54:7  81:20

**proxy**  145:8

Deposition of Karen Rapp                                    In Re National Instruments Corporation Securities Litigation

**public** 22:*17* 24:7, *8*
40:*3* 42:*24* 43:6, *25*
64:*13, 21* 65:*11, 13,*
*18, 20* 66:*5* 72:*21*
81:*23, 24* 83:*10, 20,*
*23* 84:*3* 95:*15* 96:*4,*
*7, 9* 97:*13* 100:*14*
101:*8, 14* 102:*3, 4, 7,*
*10* 106:*14* 129:*11, 19*
141:*17* 154:*11, 12*
158:*13* 171:*20*
**publicly** 66:*9* 79:*20*
80:*2*
**published** 24:*12*
160:*8*
**pull** 16:*3*
**pull-ahead** 17:*2*
**punish** 87:*15*
**punishing** 87:*17, 19*
**purchase** 27:*2* 109:*9*
128:*11* 139:*10, 12*
164:*5, 6*
**purchased** 159:*16*
**purchases** 106:*21*
120:*20, 24* 128:*18*
136:*17* 137:*19* 138:*5*
139:*9, 14, 17, 21*
141:*8, 12, 14*
**purchasing** 135:*17*
140:*5*
**purpose** 11:*13, 24*
19:*24* 39:*13* 52:*4*
115:*18, 25*
**purposes** 46:*6*
**pursue** 150:*8*
**pursued** 62:*11*
150:*12*
**put** 11:*13* 31:*12*
36:*25* 47:*17, 18* 64:*5*
85:*12* 90:*17* 105:*17*
107:*5, 7* 110:*12*
111:*8* 142:*10* 165:*4*
**putting** 10:*22* 11:*3*
128:*5*

**< Q >**
**Q1** 71:*3*
**Q3** 96:*5*
**QQ** 89:*14* 90:*19*

**Qualcomm** 38:*3*
**quarter** 59:*4* 110:*4*
**quarterly** 58:*16*
**question** 7:*9, 16* 8:*5*
10:*6, 7* 15:*10, 14*
18:*14, 19* 23:*9* 26:*15,*
*16* 27:*15, 20* 35:*16*
37:*14* 41:*12* 42:*9*
44:*12* 45:*14, 23* 46:*6*
49:*4* 61:*8* 88:*19*
92:*4* 100:*5* 106:*2*
108:*21* 109:*10* 111:*6,*
*25* 112:*3, 23* 113:*2*
115:*4, 6* 128:*24*
139:*25* 144:*16* 156:*2*
162:*8* 165:*11* 166:*13*
167:*19*
**questioning** 85:*25*
86:*6, 22* 89:*6* 156:*2*
**questions** 7:*7, 8*
10:*23* 11:*20* 32:*6*
43:*3* 46:*4, 17* 60:*6*
85:*21* 88:*17* 112:*10,*
*19* 114:*25* 156:*20*
157:*2, 12, 14, 24*
161:*12, 16* 164:*2*
166:*20* 168:*21, 23*
169:*2* 171:*7*
**quickly** 154:*11*
**Quite** 78:*9* 93:*11*
131:*7*
**quote** 58:*17* 63:*19*
**quote-unquote** 49:*11*

**< R >**
**raise** 74:*16* 95:*18*
**raising** 96:*6*
**rambling** 40:*22*
**range** 43:*14* 52:*7, 24,*
*25* 53:*10*
**RAPP** 1:*11, 17* 3:*7*
6:*1, 3, 9, 13* 7:*1* 8:*1*
9:*1* 10:*1* 11:*1, 18*
12:*1* 13:*1, 9* 14:*1*
15:*1* 16:*1, 9* 17:*1*
18:*1* 19:*1* 20:*1* 21:*1,*
*4* 22:*1* 23:*1, 10* 24:*1,*
*2, 19* 25:*1* 26:*1, 13*
27:*1* 28:*1* 29:*1* 30:*1*
31:*1, 16* 32:*1* 33:*1*

34:*1* 35:*1, 10* 36:*1*
37:*1* 38:*1* 39:*1* 40:*1*
41:*1, 13* 42:*1* 43:*1*
44:*1* 45:*1* 46:*1* 47:*1,*
*13* 48:*1* 49:*1* 50:*1, 5*
51:*1, 20* 52:*1* 53:*1*
54:*1* 55:*1* 56:*1, 15*
57:*1* 58:*1* 59:*1, 24*
60:*1* 61:*1* 62:*1* 63:*1*
64:*1* 65:*1* 66:*1* 67:*1*
68:*1, 19* 69:*1, 17*
70:*1, 4* 71:*1* 72:*1*
73:*1* 74:*1* 75:*1* 76:*1*
77:*1* 78:*1* 79:*1* 80:*1*
81:*1* 82:*1, 19* 83:*1*
84:*1* 85:*1* 86:*1* 87:*1*
88:*1* 89:*1, 17* 90:*1*
91:*1, 7* 92:*1* 93:*1*
94:*1* 95:*1* 96:*1* 97:*1*
98:*1* 99:*1, 22* 100:*1*
101:*1* 102:*1* 103:*1*
104:*1* 105:*1, 12*
106:*1* 107:*1* 108:*1*
109:*1* 110:*1* 111:*1*
112:*1, 24* 113:*1*
114:*1* 115:*1* 116:*1*
117:*1* 118:*1, 20*
119:*1* 120:*1, 8* 121:*1*
122:*1, 21* 123:*1*
124:*1* 125:*1* 126:*1*
127:*1* 128:*1* 129:*1*
130:*1* 131:*1* 132:*1*
133:*1* 134:*1* 135:*1*
136:*1* 137:*1* 138:*1,*
*14, 15* 139:*1* 140:*1*
141:*1* 142:*1* 143:*1,*
*21* 144:*1, 11* 145:*1,*
*12* 146:*1* 147:*1, 13*
148:*1* 149:*1, 18*
150:*1* 151:*1* 152:*1*
153:*1* 154:*1* 155:*1*
156:*1* 157:*1, 10*
158:*1* 159:*1* 160:*1*
161:*1* 162:*1* 163:*1*
164:*1* 165:*1* 166:*1*
167:*1* 168:*1* 169:*1,*
*13* 171:*4, 13*
**Rapp's** 46:*8*
**rates** 58:*16*

**Ratio** 121:*19*
**reach** 72:*12* 73:*22*
**reached** 19:*23*
**reaching** 155:*25*
**reach-out** 22:*18*
**read** 16:*13* 17:*13*
18:*10, 11, 18* 21:*8*
24:*20* 37:*16* 42:*8*
52:*8* 57:*23, 25* 62:*15,*
*16, 19* 63:*16* 65:*14*
66:*7* 67:*5, 10* 72:*24*
73:*23* 89:*18* 94:*13*
102:*8, 15* 105:*13*
111:*19* 112:*2* 115:*6*
164:*15* 169:*5* 171:*5*
**reading** 6:*22* 82:*20*
99:*22*
**reads** 62:*17*
**ready** 89:*10*
**real** 25:*13*
**really** 86:*7* 154:*18*
**Realtime** 1:*25* 170:*6*
**re-ask** 23:*9* 44:*12*
88:*16*
**reason** 22:*10* 71:*16*
77:*13* 105:*5* 113:*16*
134:*24* 139:*20*
**reasoning** 105:*22*
**reasons** 104:*2*
**rebuff** 38:*24*
**Recalc** 141:*20* 142:*6*
**recall** 139:*25* 161:*16*
163:*21*
**receipt** 28:*7* 29:*18*
**receive** 77:*22* 147:*14*
**received** 27:*22, 24*
28:*19* 77:*25* 118:*22*
139:*23* 146:*23*
**receiving** 30:*19*
**recess** 46:*21, 25*
57:*16* 84:*15* 90:*9*
143:*11* 155:*22*
**recipient** 68:*18*
**recognize** 13:*11*
76:*16* 91:*10* 118:*19*
120:*7* 122:*20* 135:*8*
138:*15* 149:*17*
**recollection** 35:*11*
117:*20, 24* 118:*12*
134:*15* 162:*9, 17*

**recommendation**
109:*4*
**reconfirm**  109:*14*
**record**  6:*6*  13:*14*
46:*21, 22*  47:*3*  50:*24*
52:*10*  54:*8*  57:*11, 14,
18*  68:*24*  69:*2, 8*
84:*13, 17*  85:*13*
89:*10*  90:*7, 11, 13*
112:*2*  132:*25*  143:*13*
148:*15*  155:*20, 24*
169:*16*  170:*9*
**recording**  6:*5*
**rectify**  87:*20*
**Recurring**  81:*8*
**redo**  85:*7*  86:*6*
88:*19*
**reduce**  14:*24*
**reduced**  15:*18*  71:*7,
19*
**reducing**  72:*5*
**refer**  16:*24*  17:*17*
24:*2, 5*  43:*21, 22*
47:*12, 23*  49:*12*
56:*15*  57:*22*  70:*19*
82:*23*  97:*25*  121:*18*
122:*2*  142:*7*  151:*5*
155:*10*
**referred**  103:*12*
120:*25*
**referring**  38:*7*  66:*9*
72:*8*  81:*16*  100:*24*
102:*2, 3, 7*  105:*19*
108:*4*  110:*5*  144:*14*
**refers**  22:*18*  110:*15*
130:*17*
**reflect**  141:*21*
142:*18*  145:*12*
**reflected**  118:*2*
**reflecting**  121:*15*
**refrain**  140:*5*
**refresh**  8:*20*  12:*16*
**refreshes**  35:*10*
**refused**  63:*20, 21*
**regarding**  52:*2*
140:*19*
**Registered**  1:*24, 25*
170:*5, 6*
**regular**  106:*9*

**regularly**  30:*9*  71:*15*
106:*25*
**reiterated**  70:*10*
**reject**  95:*21, 24*
**rejected**  62:*20*  69:*21*
104:*3, 25*  105:*2*
152:*21*  153:*4, 6, 9, 19*
161:*20, 23*  162:*12*
**rejection**  79:*22*
92:*23*  94:*8, 9*  109:*15*
110:*15*  111:*14*  113:*7*
119:*10*
**related**  23:*12*  58:*18*
78:*22*  79:*3*  127:*7, 20*
128:*11*
**relates**  48:*17*
**relation**  32:*22*  33:*17*
**relations**  21:*23*
71:*17, 24*
**relative**  83:*4*  170:*12*
**relatively**  100:*12, 22*
**release**  3:*8*  25:*17*
**rely**  156:*19*
**remain**  83:*4*
**remaining**  144:*12, 17*
**remark**  85:*20*
**re-mark**  88:*19*
**remarkable**  98:*13*
**remarkably**  98:*6*
**remember**  6:*24*  9:*15*
13:*17*  16:*22*  20:*8, 14,
19*  28:*2, 12, 14, 16, 17*
29:*12, 15, 23, 24*
30:*17, 24*  31:*4, 7*
32:*15, 19, 24*  33:*6, 13,
14, 20, 24*  34:*6, 14, 25*
35:*3*  37:*9*  38:*6*
45:*13*  46:*9*  51:*6, 23*
54:*6, 12*  56:*7, 11*
59:*14, 19*  60:*5*  61:*17*
80:*8*  82:*3, 14*  91:*25*
92:*8, 12*  97:*4*  98:*3*
106:*3, 7, 16, 23*  110:*8*
113:*10*  114:*12*
117:*13, 14, 15, 17*
118:*5, 6, 9, 14*  123:*10,
12, 24*  124:*15, 24*
126:*25*  127:*9, 14, 17,
18*  129:*16, 20*  130:*16,
25*  131:*4, 8, 12, 22*

132:*13*  134:*15, 19, 23,
25*  137:*13*  140:*18*
141:*16*  145:*6*  146:*11,
18, 22*  150:*2, 3*
151:*23*  152:*2, 5*
164:*2, 3*
**remembrance**  127:*11*
**reminding**  135:*6*
**remotely**  8:*10, 11*
**remove**  115:*24*
**rephrase**  7:*9*  34:*13*
112:*23*
**replied**  144:*17*
**reply**  97:*10*
**report**  147:*4*
**reported**  145:*24*
160:*15*  170:*8*
**reportedly**  62:*4*
**Reporter**  1:*23, 24, 25*
6:*8*  8:*5*  11:*4, 5*  47:*9,
11*  91:*8*  115:*5, 7*
119:*19, 23*  120:*3*
169:*7, 12*  170:*4, 6, 7*
**reporting**  160:*13*
**reports**  6:*22, 23*
103:*22*
**represent**  54:*19*
157:*11*
**representations**
156:*15*
**represented**  70:*13*
**Repurchase**  4:*1*
14:*15, 23*  15:*8, 12, 23*
105:*21*  106:*8*  107:*19*
109:*7*  110:*4*  135:*9*
136:*13*  144:*15*  145:*2,
5*  151:*15, 24*  161:*13*
**repurchased**  164:*19*
165:*3*  166:*7, 15*
**repurchases**  105:*18*
106:*25*  110:*20, 24*
111:*4*  117:*8*  120:*15*
138:*18*  141:*21*
142:*18*  151:*14*
161:*14*  162:*13, 19*
164:*21*  165:*12, 18*
**repurchasing**  105:*23*
109:*9*
**request**  39:*13*  58:*9*

**requested**  42:*21*
**require**  23:*5*
**requirement**  156:*7, 10*
**research**  156:*4*
**reserve**  84:*22*  86:*21*
169:*3*
**reserving**  156:*23*
**response**  22:*16*
23:*16*  42:*22*  94:*9*
**responsible**  120:*16*
**restart**  86:*25*
**restrict**  77:*14*
**restricted**  78:*8*  82:*10*
108:*3, 8*
**restricting**  77:*9*  82:*2*
**restriction**  107:*22*
108:*23*  113:*7, 17*
131:*10*  133:*14, 18, 23*
134:*8, 18*  140:*7, 15*
152:*5*
**restrictions**  77:*11*
115:*24*  130:*23*
**restroom**  143:*5*
**result**  101:*14*
**resulting**  101:*4*
**resume**  109:*21*
**retainer**  58:*16*  59:*8*
**retake**  88:*6*
**retire**  158:*15*
**retired**  146:*4*  158:*14*
**retirement**  146:*7, 10*
148:*12*
**return**  12:*3, 12*
**re-up**  109:*11*
**revenue**  168:*13*
**review**  8:*19, 24*  50:*7*
103:*6*  115:*18*
**reviewing**  90:*4*
**revolves**  10:*10*
**rhetorical**  116:*21*
**right**  12:*15*  13:*2*
14:*13*  15:*4*  17:*16*
18:*9, 25*  20:*20, 22*
21:*21*  27:*7*  29:*19*
30:*25*  31:*9*  34:*10, 16*
35:*2*  36:*13*  39:*16, 17,
24*  40:*2, 6*  42:*4*
43:*15, 16, 18*  45:*11,
22*  46:*11*  47:*7, 14*
53:*4, 7*  54:*23*  58:*5*

61:*10*, *14*, *23*  64:2, *15*, *18*  65:6, *19*  66:*10*, *11*, *13*, *15*, *16*, *17*, *21*, *25*  67:*13*  68:8, *13*  69:*10*, *19*  72:*17*  73:*11*, *15*, *20*  74:*10*, *17*, *24*  75:*18*, *21*  76:5  78:*16*, *25*  79:9, *17*  82:2  87:4  88:*14*  89:*13*  91:*21*, *23*  92:*16*, *24*  93:4, *9*, *13*, *15*, *19*, *22*, *25*  94:*4*, *8*, *10*, *14*, *17*  95:*19*, *22*  96:2, *6*, *7*, *17*, *19*, *20*  97:*2*, *6*, *11*, *14*  98:*5*, *7*, *11*, *15*, *18*, *21*  99:*5*, *15*  101:*5*, *10*, *25*  102:*6*, *12*  103:*9*, *24*  104:*6*, *15*  105:*3*, *7*  106:*12*, *18*  107:*9*, *12*  109:*2*, *8*  110:*11*, *16*  111:*21*, *23*  112:*6*  113:*12*, *14*, *17*, *24*  114:*6*, *7*, *8*, *9*, *16*, *21*  115:*10*, *16*, *17*, *20*, *22*, *25*  116:*10*, *16*  118:*8*, *24*  119:*4*  120:*10*  121:*16*  122:*2*  123:*15*, *18*, *25*  124:*5*, *14*, *16*, *17*, *25*  125:*12*, *13*, *16*, *23*  126:*4*  127:*22*  128:*20*  129:*3*, *5*, *22*  130:*6*, *7*, *9*, *18*, *20*, *24*  131:*20*, *21*  132:*11*, *14*  133:*25*  134:*8*, *12*, *17*, *18*  135:*10*, *11*, *20*  136:*5*  137:*3*, *4*, *7*, *15*  138:*2*, *4*, *21*  140:*11*, *12*, *23*  141:*9*, *19*  142:*7*, *15*  144:*19*  146:*5*  147:*7*  148:*10*, *12*  149:*8*, *9*  150:*7*  151:*17*  152:*7*, *10*, *14*, *18*, *22*  153:*2*, *6*, *7*, *10*, *17*, *20*, *21*, *25*  154:*16*, *19*, *24*  155:*18*  158:*17*  159:*25*  161:*24*  163:*18*  164:*13*, *16*  169:*2*
**right-hand**  142:*5*, *16*

**rights**  84:*22*  86:*21*  156:*23*  169:*3*
**RMR**  170:*19*
**ROBBINS**  2:*8*
**Rockwell**  62:*3*, *5*  63:*9*, *15*, *19*  163:*25*  164:*6*
**role**  37:*21*  54:7  58:*6*  159:*21*  160:*7*
**room**  12:*23*  34:*3*, *5*
**Rosen**  31:*17*  163:*20*
**row**  42:*5*
**RPR**  170:*19*
**RUDMAN**  2:*8*
**rule**  8:*3*  10:*4*, *7*  25:*9*  40:*22*, *24*  156:*5*
**rules**  23:*4*  25:*25*  40:*22*, *23*  96:*25*  156:*15*
**rumors**  22:*23*, *25*  23:*17*
**run**  16:*11*
**rush**  169:*9*

**< S >**
**Sabastian**  56:*17*  57:*23*  58:*7*  119:*3*  129:*23*
**Sabastian's**  58:*6*
**Sachs**  143:*24*
**Saint**  2:*16*
**salesman**  157:*19*
**Sam**  123:*2*
**sat**  6:*15*
**satisfactory**  58:*19*
**Saturday**  137:*25*
**saved**  37:*5*, *6*
**saw**  24:*23*  31:*9*  45:*9*  54:*19*  78:*24*  81:*25*  104:*24*  131:*21*  152:*12*  154:*3*
**saying**  63:*18*  72:*16*  73:*10*, *12*  74:*16*, *20*, *22*  77:*20*  88:*4*  100:*21*  109:*20*  111:*21*  113:*25*  114:*22*  125:*22*  129:*2*  130:*6*  144:*12*  149:*19*
**says**  16:*21*, *25*  17:*20*  24:*17*  42:*11*  43:*25*

47:*25*  48:*23*, *25*  49:*15*  52:*9*  53:*8*  58:*14*  62:*3*, *4*, *21*, *24*  63:*2*, *13*  64:*11*, *20*  66:*17*, *20*  68:*22*  71:*2*  72:*10*  73:*13*, *20*, *22*, *25*  75:*5*, *8*  78:*12*, *16*  81:*3*, *6*  82:*25*  92:*25*  94:*7*, *11*, *12*, *16*, *24*  95:*7*, *12*, *13*  100:*4*, *12*  101:*4*, *5*, *13*, *16*  103:*12*, *14*  107:*13*  111:*5*  112:*3*  123:*18*  127:*23*  128:*5*  133:*12*  135:*14*, *16*, *23*, *25*  137:*19*  138:*20*, *21*  144:*4*  150:*6*  152:*3*  155:*11*  156:*5*
**scenario**  14:*7*, *23*  15:*15*, *21*  96:*3*
**Scenarios**  49:*12*  154:*8*
**scheduled**  30:*9*
**scholar**  156:*19*
**school**  157:*21*  158:*18*
**scratch**  86:*25*  87:*5*
**screen**  10:*22*  36:*25*  57:*2*
**scroll**  13:*16*  21:*13*, *19*  24:*6*, *14*  27:*6*  35:*12*, *18*  50:*9*  60:*9*, *11*  76:*11*  77:*18*  80:*20*
**scrolling**  32:*9*, *11*  36:*17*  51:*13*
**sec**  90:*14*
**second**  14:*15*  15:*21*  21:*14*  47:*23*, *24*  48:*9*  57:*12*  70:*20*  82:*23*, *25*  91:*15*  119:*10*  121:*5*  148:*7*  159:*2*  167:*11*
**section**  81:*7*
**SECURITIES**  1:*5*  135:*17*
**Security**  4:*23*
**see**  12:*21*  13:*4*  14:*9*, *11*  16:*9*  17:*4*  21:*14*  38:*17*  39:*9*, *14*  42:*6*  43:*23*  44:*3*, *22*  47:*14*,

*21*  48:*2*, *6*, *11*  49:*13*, *16*  52:*11*, *19*, *23*, *25*  53:*11*  58:*20*  62:*9*  63:*3*, *23*  64:*9*, *22*  65:*2*, *10*  68:*9*  69:*20*  70:*7*, *17*, *23*  71:*9*  72:*13*  74:*7*  76:*11*  81:*10*  83:*6*  86:*18*  95:*15*  96:*11*  100:*6*, *15*  101:*20*  109:*23*  110:*20*  111:*10*  113:*4*  119:*7*  120:*21*  121:*20*  122:*6*, *15*  126:*16*  127:*24*  128:*7*  129:*12*  131:*8*  133:*15*  135:*18*, *23*  137:*21*  139:*15*, *18*  140:*25*  142:*4*, *11*, *23*  149:*9*  150:*5*  155:*12*  161:*4*, *10*  162:*24*  168:*25*
**Seeking**  22:*16*
**seen**  19:*12*, *13*  32:*7*, *16*  35:*11*  36:*12*  37:*10*, *13*  50:*21*, *22*  51:*22*  126:*23*  149:*20*
**Segment**  47:*2*  57:*17*  84:*16*  90:*10*  143:*12*  155:*23*
**select**  12:*24*  13:*3*, *5*, *6*
**self-explanatory**  15:*9*
**sell**  82:*7*  146:*9*, *16*
**selling**  72:*5*
**semicolon**  58:*16*
**semiconductor**  159:*14*
**send**  78:*6*  125:*13*
**sending**  125:*11*  126:*19*
**sense**  125:*2*
**sent**  22:*21*  24:*21*, *23*  42:*13*, *19*  61:*3*  65:*17*  70:*5*  78:*3*  80:*6*, *10*  81:*3*  108:*4*  109:*15*  110:*13*  118:*23*  119:*10*  123:*2*  124:*12*  126:*15*  150:*23*
**sentence**  16:*25*  47:*24*  58:*22*  72:*9*  74:*12*  135:*25*
**sentences**  14:*9*

155:*10*
**separately** 162:*7*
**SEPTEMBER** 1:*12,* *22* 6:*4* 65:2, *21* 66:*19,* *25* 88:*12* 135:*17* 141:9, *15* 147:9, *14,* *22* 149:*12,* *25* 152:*14* 161:*15* 162:*14* 164:*20* 170:*16*
**serious** 30:*15*
**services** 160:*13*
**set** 8:*18* 68:*23* 107:*6*
**settled** 98:*10,* *11*
**setup** 12:*23*
**seven** 85:*8*
**share** 17:*14* 27:*2* 62:*8* 79:*20* 117:*7* 120:*15* 123:*6* 124:*4* 136:9, *15* 144:*15* 146:*19* 151:*14* 161:*13,* *14,* *22* 162:*11,* *13,* *18,* *21* 163:*5,* *10,* *14,* *15* 168:*4,* *5*
**shared** 80:*2* 83:*15,* *16*
**shareholder** 105:*7* 147:*17*
**shareholders** 12:*4,* *13* 14:*22,* *24* 71:*3,* *7,* *14,* *19* 72:*5* 97:*16,* *19,* *25* 160:*9* 165:*8,* *14,* *19* 166:*16*
**shareholder's** 165:*15*
**shares** 14:*15,* *19,* *21,* *23* 15:*2,* *5,* *8,* *12* 17:*8* 49:*20,* *24* 125:*15* 136:*11,* *13* 143:*24* 146:*9,* *16,* *20,* *24* 147:*15* 164:*18,* *22* 165:*3,* *18,* *25* 166:*2,* *8,* *15*
**Shawn** 54:*2*
**sheet** 36:*19* 47:*7* 171:*9*
**short** 67:*21* 84:*5,* *8* 90:*4*
**Shorthand** 1:*23* 170:*4*
**show** 42:*23* 160:*20*

**showed** 39:*18* 40:*4* 42:*19* 82:*21* 113:*11*
**showing** 10:*20* 25:*15,* *18*
**shown** 51:*10* 52:*14* 163:*18*
**shows** 161:*19*
**sic** 119:*3*
**side** 13:*5,* *6* 142:*16*
**sign** 97:*16,* *25* 169:*5*
**signals** 75:*20*
**signed** 16:*25*
**significantly** 137:*7* 168:*16*
**signing** 74:*4*
**silly** 92:*13*
███████ 100:*10*
**simply** 87:*13* 97:*3* 125:*23* 166:*24*
**single** 160:*21*
**situation** 29:*16* 105:*18* 106:*19* 129:*24* 131:*16* 137:*2* 139:*24*
**situations** 36:*15* 116:*15* 154:*12*
**six** 146:*12*
**skeptic** 21:*16*
**skills** 170:*10*
███ 100:*6,* *14*
**slide** 14:*6* 35:*7* 37:*12* 38:*7,* *9,* *12* 41:*17* 43:*22* 47:*13,* *19,* *22,* *25* 49:*10,* *18* 51:*18,* *22,* *23* 59:*24* 60:*23* 62:*2* 64:*5,* *7,* *25* 81:*16,* *18,* *20* 121:*18,* *19* 124:*15*
**slides** 3:*19* 33:*4,* *6* 35:*4* 47:*14* 50:*7,* *21* 51:*9* 60:*7,* *16* 121:*15* 122:*14* 123:*25* 164:*15*
**slow** 13:*20*
**smaller** 121:*22*
**smart** 135:*5*
**smoothly** 91:*3*
**sold** 71:*7,* *15* 147:*5*
**solution** 137:*2*

**somebody** 71:*17* 73:*19* 86:*16* 95:*10* 123:*4*
**somewhat** 75:*21*
**soon** 88:*10* 110:*25*
**sooner** 110:*20*
**sophisticated** 75:*17* 129:*5,* *6*
**Sorry** 13:*20* 20:*19* 26:*16* 28:*16* 30:*24* 33:*7,* *15,* *25* 38:*6* 42:*2* 48:*21* 55:*16,* *20* 57:*8* 70:*2* 73:*9* 76:*4* 77:*19* 78:*5* 79:*13* 80:*14* 82:*20* 89:*22* 92:*3* 94:*25* 96:*14,* *23* 106:*4,* *24* 109:*10* 117:*13* 118:*14* 123:*11,* *12* 124:*23* 126:*8* 128:*24* 131:*23* 132:*21,* *22* 133:*22,* *25* 135:*2* 140:*9* 141:*24* 143:*4,* *18* 145:*23* 151:*3* 157:*22* 158:*2* 165:*21,* *22*
**source** 61:*20*
**South** 1:*19*
**SOUTHERN** 1:*2* 23:*5* 26:*2* 84:*24*
**speaker** 12:*24* 13:*6*
**speaking** 23:*6* 25:*12,* *20* 45:*16* 46:*3* 112:*17*
**speaks** 25:*8,* *12* 26:*23* 38:*11* 43:*10* 67:*3,* *15* 75:*3,* *12* 110:*2*
**special** 30:*10*
**specific** 42:*12,* *15* 54:*20* 127:*14* 164:*23*
**specifically** 32:*15* 132:*14*
**specified** 56:*6*
**speculate** 116:*19*
**speculated** 94:*8*
**speculating** 91:*18* 92:*15* 99:*9*
**speculation** 20:*3* 22:*14,* *25* 23:*15* 29:*7* 30:*4* 31:*19* 33:*12*

34:*12* 39:*4* 44:*9* 45:*6* 54:*17* 55:*8,* *14* 59:*18* 62:*14* 63:*12* 64:*4* 65:*8,* *25* 67:*3,* *15* 69:*4* 70:*16* 72:*23* 73:*8,* *17* 75:*3,* *12,* *23* 77:*4,* *16* 81:*15* 82:*13* 83:*22* 93:*2,* *6,* *10,* *19* 94:*23* 95:*6* 101:*12* 109:*25* 111:*16* 116:*4,* *12* 123:*22* 124:*10* 125:*6,* *25* 126:*21* 128:*22* 141:*23* 142:*9,* *21* 144:*22* 150:*22* 153:*15*
**spend** 136:*2,* *12,* *15* 144:*12,* *17*
**spent** 17:*3* 137:*20* 157:*19*
**spin-off** 159:*15*
**sports** 99:*17*
**Spreadsheet** 4:*20* 138:*14* 141:*13* 142:*22* 143:*19* 152:*12*
**spun** 159:*13*
**stake** 165:*15*
**stale** 111:*7,* *22* 113:*3* 115:*23*
**stamp** 125:*13*
**Stand** 11:*17* 36:*15*
**standalone** 37:*24*
**Standard** 6:*5* 37:*23* 49:*8* 169:*10*
**stands** 159:*25*
**Starkloff** 17:*18* 19:*16* 20:*6,* *12* 22:*7,* *12* 23:*13* 24:*22* 26:*20,* *21* 28:*7,* *19* 29:*18* 30:*14,* *18* 31:*5,* *16* 69:*18* 70:*5* 83:*19* 89:*19* 119:*2* 145:*2,* *5*
**start** 16:*12* 21:*7* 61:*9* 68:*24* 85:*16,* *19* 87:*5* 110:*19* 159:*9*
**started** 32:*23* 49:*20,* *23* 87:*14* 123:*12* 159:*11,* *18*
**starting** 58:*14* 159:*8*

**State** 1:*24* 23:*7* 40:*16* 170:*5*
**stated** 39:*13* 69:*22* 160:*8*
**statement** 81:*8* 83:*9* 111:*12* 136:*24* 145:*8*
**STATES** 1:*2*
**stay** 89:*21* 168:*14*
**Stayed** 159:*13, 15, 19*
**steady** 15:*25*
**step** 15:*21, 22* 39:*24* 43:*23* 45:*11* 124:*20*
**steps** 39:*8* 40:*6, 10* 41:*11, 14, 15* 48:*5* 124:*16*
**stock** 11:*22, 25* 12:*3, 5, 7, 8, 11, 17* 43:*25* 44:*6, 14, 18* 45:*3* 48:*10, 18* 54:*14* 70:*12* 71:*7, 15* 72:*3, 4, 5, 7* 76:*24* 77:*9* 82:*8* 101:*4, 9, 15* 104:*13* 105:*17, 21, 24* 110:*4* 114:*4* 123:*3* 127:*3, 13, 15* 128:*12, 16, 17, 19, 20* 129:*18* 130:*3* 136:*22, 25* 137:*4, 11, 24* 140:*19* 145:*13, 19* 151:*15* 152:*3, 7, 13* 153:*10* 154:*21* 164:*19* 165:*5, 13, 23*
**stop** 14:*6* 24:*17* 27:*7*
**strat** 145:*3*
**strategic** 160:*16*
**Strategy** 3:*8* 11:*25* 12:*7, 8* 29:*14* 44:*19* 110:*24* 111:*4* 145:*5*
**string** 82:*19* 100:*21*
**Strong** 42:*6* 43:*8*
**structure** 14:*20* 58:*9, 17*
**stuck** 71:*16*
**studies** 154:*3*
**study** 60:*25*
**sub** 102:*6*
**Subject** 10:*3* 17:*12* 19:*20* 23:*3* 42:*18* 43:*11* 62:*23* 72:*2* 116:*6* 119:*6*

**Subscribed** 170:*15* 171:*15*
**subsequent** 162:*20*
**subset** 60:*20*
**substance** 76:*25* 78:*7* 171:*8*
**substantial** 49:*16*
**substituted** 47:*5*
**subtle** 73:*5* 75:*21* 83:*9*
**success** 58:*17* 59:*15*
**successful** 54:*11* 160:*18*
**successfully** 58:*18* 167:*22*
**succinctly** 23:*6*
**sufficient** 152:*25*
**suggest** 31:*2* 41:*3* 81:*6* 86:*21* 87:*22* 166:*20*
**suggested** 41:*2*
**suggesting** 45:*16*
**suggests** 73:*19*
**Suite** 1:*20* 2:*8, 15*
**summarize** 9:*22*
**summarized** 131:*15*
**summary** 144:*15*
**supply** 151:*11*
**supported** 17:*22*
**supports** 131:*18*
**supposed** 46:*2* 86:*8*
**sure** 6:*23* 8:*18* 13:*21* 18:*5* 19:*13* 24:*23* 27:*16* 30:*23* 33:*22* 35:*14* 47:*5* 55:*16* 59:*5* 66:*4* 75:*13* 83:*15* 84:*12* 90:*24* 92:*18* 93:*11* 95:*8* 97:*4* 108:*25* 109:*9* 111:*20* 125:*9* 133:*20* 142:*11, 14* 143:*2* 146:*2, 3* 159:*11* 160:*7*
**sworn** 6:*7, 10* 170:*15* 171:*15*

**< T >**
**table** 4:*24*
**tactic** 44:*19* 125:*4, 7*
**Tactics** 41:*19*

**take** 7:*13* 8:*7* 13:*15* 21:*4* 27:*3, 9* 31:*2* 32:*5* 35:*9* 37:*16* 42:*4* 46:*12, 21* 48:*6* 50:*5* 51:*20* 56:*12* 67:*20* 80:*20* 84:*5, 8, 9* 85:*21* 88:*9, 12* 90:*3* 91:*6* 103:*5* 109:*19* 121:*12* 131:*25* 143:*4, 6* 153:*13* 155:*18* 156:*5*
**takeaway** 29:*24, 25*
**taken** 1:*18* 40:*2* 46:*25* 57:*16* 84:*15* 90:*9* 143:*11* 155:*22* 170:*15*
**takeover** 22:*23* 41:*18* 44:*15, 17* 48:*2* 60:*25* 61:*20* 64:*14*
**takeovers** 34:*24*
**talk** 119:*13* 121:*6* 167:*11*
**talked** 8:*17* 54:*6* 127:*10* 148:*24* 150:*3* 169:*3*
**talking** 8:*7* 10:*15* 12:*6* 38:*12* 96:*15* 128:*2, 9* 148:*5*
**talks** 58:*4, 8* 160:*25*
**target** 39:*2* 42:*11* 44:*7, 15* 45:*4* 122:*14* 136:*19* 154:*5*
**targets** 122:*3*
**Team** 21:*25* 72:*12* 77:*10, 14* 110:*3* 121:*6* 159:*12* 160:*12, 15, 17*
**tech** 47:*10*
**technicality** 89:*7*
**technician** 11:*5, 9, 11, 17* 12:*22* 13:*4* 47:*8* 56:*21, 25* 90:*19, 22* 91:*4* 102:*22*
**technician's** 11:*7*
**technique** 44:*7*
**Techniques** 38:*16*
**tell** 7:*9, 22* 10:*14* 11:*24* 13:*16* 28:*23* 29:*2, 4, 21* 32:*7* 35:*10* 37:*17* 38:*7*

**41**:*24* 50:*7* 51:*8, 21* 76:*20* 91:*16* 92:*9, 10* 122:*23* 125:*7* 133:*18* 168:*24*
**telling** 40:*17, 19* 87:*7*
**tells** 76:*23*
**ten** 71:*3, 6, 14* 143:*8*
**ten-minute** 84:*6* 143:*7*
**term** 14:*17* 41:*24* 48:*16, 21* 135:*14*
**terminated** 101:*18, 23*
**terms** 12:*2* 24:*25* 25:*2, 5* 26:*19* 69:*22* 93:*24* 96:*24* 107:*6* 160:*4* 168:*12, 15*
**testified** 6:*10* 107:*21* 166:*19*
**testify** 9:*19*
**testimony** 7:*5* 8:*21* 98:*23* 99:*8* 162:*18* 168:*7*
**Texas** 1:*20, 24* 158:*5, 9, 24* 170:*5*
**text** 48:*25*
**Thank** 6:*8* 7:*18* 10:*9* 13:*8, 25* 21:*15, 19* 23:*18* 47:*11* 57:*13* 76:*14* 91:*5* 119:*23* 120:*3* 121:*22* 148:*21* 156:*17* 157:*7* 160:*19* 166:*17* 167:*12* 169:*12, 13*
**thing** 63:*17* 87:*22* 125:*12* 165:*9, 10*
**things** 23:*2* 91:*3* 125:*2* 132:*22* 161:*6, 7, 9* 168:*14*
**think** 9:*3* 13:*7* 15:*18* 21:*8, 9* 22:*16, 18* 25:*14* 26:*6* 29:*15* 36:*12* 40:*15, 16, 18* 42:*24* 45:*13* 46:*13, 14* 57:*6* 63:*13* 66:*2* 73:*2* 74:*20, 21* 75:*8* 76:*9* 77:*17* 83:*12, 23* 85:*18, 22, 24, 25* 87:*7* 88:*21, 22* 90:*19* 91:*2* 93:*7* 98:*25* 109:*6* 111:*6* 112:*3* 113:*2*

115:*13*  124:*19*  129:*6*
136:*23, 24*  144:*4, 6*
146:*11, 25*  147:*4*
148:*5*  150:*16, 17*
159:*24*  163:*4*  165:*7*
167:*3*
**thinking**  73:*9*  98:*4*
110:*11*  124:*24*
154:*13, 15*
**third**  15:*22*  48:*22*
152:*24*
**thought**  143:*17*
166:*23, 25*
**thoughts**  69:*5*
**threat**  72:*24*  73:*6*
95:*14*
**threatened**  89:*6*
**threatening**  42:*24*
43:*5*
**threats**  73:*3*
**three**  6:*18*  14:*9*
65:*13, 19*  70:*22*
87:*10*  158:*13*
**ties**  143:*2*
**time**  6:*4, 5*  8:*7*  10:*7,*
*14, 15, 18*  17:*10*  18:*2*
24:*20*  25:*2*  27:*18, 22*
29:*15*  30:*23*  32:*18,*
*22*  59:*3*  60:*6*  61:*19,*
*25*  65:*9*  68:*2, 23*
70:*9*  71:*11*  73:*3*
82:*9*  85:*22, 23*  87:*10*
88:*2, 23*  89:*12*  90:*12,*
*16*  91:*25*  98:*4, 21*
100:*5, 8*  105:*23*
110:*12*  115:*14*  118:*7*
127:*2*  130:*14*  131:*4*
137:*10*  140:*12*
143:*25*  144:*5*  145:*22,*
*25*  146:*20*  147:*17*
148:*23*  150:*11*
153:*23*  168:*12*
169:*14*
**timeline**  62:*24*  64:*24*
65:*16, 23*  66:*19*
160:*23, 25*  161:*3, 13,*
*18*  162:*25*
**timelines**  64:*25*
**timely**  42:*21*  160:*9*

**times**  36:*13*  99:*2*
131:*2*
**timing**  20:*11*  100:*5*
109:*19*
**tips**  99:*18*
**title**  48:*24*  49:*10*
81:*20*
**titled**  41:*18*
**today**  9:*20*  86:*23*
87:*12*  88:*10*  89:*2*
92:*23*  94:*7*  156:*11*
157:*13*  161:*13*
163:*21*
**Today's**  6:*3*
**toehold**  48:*16*
**told**  20:*8*  30:*23*
117:*18*  125:*8*
**tomorrow**  145:*3*
169:*8, 9*
**tool**  124:*25*
**tools**  12:*12*  106:*8*
111:*4*
**top**  13:2  17:*17*
18:*12*  42:*5*  52:*6, 8,*
*14, 23, 24*  64:*22*
70:*24, 25*  71:*2, 14*
77:*17*  89:*18, 21*
97:*16, 19, 25*  103:*20*
106:*17*  133:*11*
138:*23, 24*  151:*6*
**total**  17:*4*  141:*20, 21*
142:*6, 18, 24*
**touch**  30:*20, 22*
**touched**  159:*7*
**trace**  158:*17*
**tracing**  159:*9*
**track**  138:*18*  149:*7*
**trade**  76:*23*  114:*4*
**trading**  48:*10*  49:*15*
77:*9, 10, 14*  78:*7*
82:*2, 4*  107:*9, 10*
108:*2, 6*  113:*6*
130:*23*  134:*7*  136:*11,*
*24, 25*  137:*2*  140:*7*
152:*5*
**transact**  101:*19*
**transaction**  42:*12, 15,*
*20*  44:*6, 21*  53:*22*
56:*10*  58:*19*  59:*10*

61:*14*  63:*9, 10*  104:*5*
105:*7*  106:*19*
**transactions**  154:*4*
**transcript**  169:*6*
170:*8*
**transcription**  171:*6*
**transferred**  158:*4*
**transformational**
101:*19*
**treasurer**  144:*14*
**treasury**  138:*17*
165:*5, 25*  166:*2*
**trigger**  36:*17*
**True**  125:*14*  163:*14*
170:*9*
**Trust**  21:*18*
**try**  41:*3*  99:*17*
167:*16*
**trying**  25:*22*  26:*7*
46:*5, 10*  59:*5*  87:*15,*
*19*  93:*10*  104:*9*
114:*16*  115:*7, 15*
131:*6*  132:*4, 7*
**Tuesday**  109:*15*
**turn**  121:*6*
**Turning**  150:*5*
**twice**  153:*4*  162:*10,*
*12*
**two**  6:*18*  8:*7*  25:*12*
39:*19*  64:*25*  65:*14*
66:*5, 14*  67:*13, 17*
87:*9*  89:*25*  91:*13*
163:*19*  164:*10*
**two-year**  65:*5, 6*
**type**  7:*5*  50:*23*
118:*2, 21*
**types**  6:*19*
**typically**  165:*4*

< U >
**Uh-huh**  98:*12*
109:*22*  110:*14*
121:*24*
**UK**  64:*13*  66:*12*
**unattractive**  100:*14*
**uncertainty**  93:*7, 8*
**unclear**  7:*8*
**uncommon**  38:*20, 22*
**understand**  6:*23*  7:*8,*
*11, 17*  37:*13*  42:*2*

65:*9*  88:*20, 25*  89:*4*
106:*6*  107:*17*  109:*3*
115:*15*  116:*16*  128:*2,*
*9*  132:*2*  138:*19*
140:*21*
**understandable**  7:*10*
**understanding**  9:*23*
10:*10*  19:*24*  23:*11*
25:*5*  38:*8*  41:*24*
77:*13*  78:*18*  100:*17*
117:*5*  162:*9*
**understands**  157:*15*
159:*24*
**understood**  101:*7*
116:*9*  132:*20*  156:*25*
**undervalued**  30:*15*
136:*22*  151:*15*  152:*4*
163:*14*
**undisclosed**  128:*18*
**unfair**  67:*11*
**Unfortunately**  81:*17*
**unique**  36:*16*
**UNITED**  1:*2*
**University**  158:*20, 24*
159:*9*
**unknow**  154:*19*
**unsolicited**  64:*14*
**Unusual**  49:*15*
127:*23*
**Uplift**  128:*6, 13*
129:*2*
**uploaded**  36:*24*
**upward**  16:*13*
**Ursula**  137:*18*
144:*11, 14*
**Use**  14:*11, 17*  15:*22*
19:*3*  48:*21*  85:*22*
103:*13*  106:*24*
138:*18*
**usually**  7:*13*  44:*22*
140:*20*  153:*23*

< V >
**vague**  12:*9*  140:*17*
**valid**  86:*5*  88:*6*
**Valuation**  27:*4*
43:*14*  52:*3, 7, 16, 24,*
*25*  53:*14*  54:*10*  69:*8*
**valuations**  54:*4*

**value** 12:*4* 15:*20* 54:*19* 74:5, *23* 75:5, *15* 104:*9* 105:7 136:*25* 163:*14* 165:*7, 9*
**variable** 15:*24*
**various** 48:*5* 54:*14*
**verify** 21:*18*
**version** 51:*22*
**versus** 106:*7*
**vested** 14:*21*
**Victor** 121:*9*
**Vidaurri** 21:*20, 21, 22* 22:*6* 23:*12* 71:*23* 80:*5* 82:*2* 113:*12* 140:*2* 143:*23*
**Videoconference** 1:*18* 2:*7*
**Videographer** 2:*20* 6:*2* 11:*4* 46:*22* 47:*2* 57:*14, 17* 84:*13, 16* 89:*11* 90:7, *10, 14* 143:*10, 12* 148:*8* 155:*20, 23* 157:*4* 169:*16*
**VIDEOTAPED** 1:*10, 17* 6:*2*
**view** 12:*24, 25* 17:*21* 86:*8* 163:*12*
**views** 167:*21*
**void** 86:*15*

**< W >**
**Wachtell** 3:*18* 31:*17, 21* 32:*20, 21, 24* 33:*3, 5, 14, 22* 34:*8, 9, 15, 23* 39:*8* 43:*7* 45:*10* 47:*25* 48:*13, 23* 58:*5, 7* 59:*7, 25* 60:*8, 24* 61:*19, 21* 63:*25* 64:*5* 78:*24* 92:*5, 7* 107:*14* 109:*3, 7* 116:*23* 117:*5, 7, 20* 119:*3* 123:*24* 124:*15* 130:*13* 131:*2, 9* 132:*14* 154:*3* 163:*20*
**Wachtell's** 58:*9* 59:*2* 109:*4* 118:*2*
**wait** 8:*3, 4, 8* 95:*7*

110:*18*
**walk** 75:*8*
**wall** 52:*18*
**want** 13:*15* 46:*4* 47:*4* 51:*12* 52:*7* 67:*20* 68:*2, 5* 73:*15* 76:*10* 81:*5* 83:*24* 85:*12, 15, 19* 86:*4* 88:*5, 14* 89:*6* 91:*2* 106:*4* 120:*20* 121:*5* 160:*20* 164:*18* 166:*18* 167:*6* 169:*8*
**wanted** 15:*25* 74:*21* 84:*4* 107:*18* 119:*13* 120:*24* 121:*2, 4* 140:*21* 153:*13*
**wanting** 105:*22*
**warding** 58:*18*
**waste** 88:*23*
**watch** 122:*25*
**way** 7:*20* 14:*17* 17:*13* 22:*19* 26:*11* 45:*4* 68:*20* 95:*20* 99:*2* 111:*19* 117:*6, 19* 137:*12* 151:*25* 160:*12, 14*
**Wayne** 129:*23* 130:*20, 21*
**ways** 38:*12*
**weak** 43:*13*
**Wednesday** 88:*11, 12*
**week** 7:*24* 137:*20*
**weighted** 71:*5*
**welcome** 169:*15*
**Well** 25:*14* 33:*8* 37:*16* 42:*2, 4* 43:*14* 44:*11* 45:*15* 51:*15* 55:*4, 23* 63:*16* 66:*7* 68:*8* 73:*2* 77:*5* 78:*23* 81:*25* 84:*23* 86:*3, 10* 87:*4, 6, 11* 92:*9* 97:*23* 100:*19, 20* 103:*18* 106:*15* 111:*21* 113:*11, 13* 124:*11, 23* 125:*11* 134:*22* 136:*21* 137:*10* 149:*7* 156:*12, 14* 162:*6* 169:*9*
**well-known** 44:*6*

**went** 28:*2, 24* 34:*19, 20* 65:*11, 13, 18* 66:*5* 67:*6, 16* 101:*8* 154:*11* 157:*20* 158:*24* 159:*14*
**We're** 6:*5* 7:*16* 9:*19* 10:*15, 20* 11:*14* 12:*6* 46:*22* 47:*3* 57:*14, 18* 67:*23* 68:*12* 73:*2* 84:*13, 17* 87:*11* 90:*7, 11* 102:*16* 136:*24* 139:*12* 143:*10, 13* 146:*25* 155:*20, 24* 156:*23* 157:*13* 166:*5* 169:*16*
**we've** 26:*13* 36:*24* 47:*5* 87:*12* 89:*11* 133:*5* 151:*13* 156:*4*
**whatsoever** 118:*12*
**White** 147:*19*
**willing** 64:*20* 74:*16* 88:*16*
**window** 109:*16, 21* 110:*3*
**wine** 96:*25* 148:*22* 149:*5, 6* 166:*18* 167:*13*
**wishes** 156:*3*
**withdraw** 9:*10* 85:*9* 141:*25* 142:*3* 156:*16*
**withdrawal** 63:*10* 153:*24*
**withdrawing** 154:*5*
**withdrawn** 101:*18, 23* 153:*17, 21*
**withdraws** 63:*2, 7, 18*
**withdrew** 63:*14* 102:*11* 154:*4*
**witness** 1:*19* 3:*6* 6:*7* 12:*21* 25:*16* 35:*18* 37:*8* 41:*4* 45:*17* 47:*10* 56:*18, 22* 68:*7, 10* 76:*10* 80:*22* 84:*12* 85:*20* 88:*23* 90:*4, 25* 91:*5* 96:*12* 112:*14, 17, 18* 115:*3* 116:*19* 143:*4, 8* 148:*4* 157:*3*

167:*10* 169:*5, 15*
**WLRK** 107:*14* 111:*9*
**WLRK's** 109:*18*
**Wolverine** 3:*22* 61:*13* 76:*22* 78:*16, 20* 79:*3* 91:*19, 20* 107:*23* 119:*6, 12* 127:*6* 134:*7* 155:*11, 16*
**word** 40:*17, 20* 61:*10* 95:*21* 96:*9* 105:*19* 114:*8*
**words** 21:*11* 40:*23* 78:*6* 114:*6* 129:*2* 142:*13*
**work** 58:*15* 74:*4, 23, 24* 75:*5* 78:*15* 158:*11* 159:*10* 164:*24*
**worked** 30:*6* 69:*6* 109:*3* 159:*17*
**working** 38:*3* 159:*5* 164:*8*
**worth** 17:*8* 163:*15*
**write** 100:*19* 105:*16* 116:*9*
**writes** 113:*2* 129:*23*
**writing** 22:*11* 49:*6* 92:*21* 94:*13* 117:*21, 25* 125:*23* 131:*24*
**written** 92:*2* 154:*16*
**wrong** 96:*12* 148:*2*
**wrote** 16:*18* 69:*19* 102:*2* 116:*4* 120:*9, 10* 129:*4*

**< Y >**
**Yeah** 12:*11* 13:*23* 14:*17* 17:*13* 18:*5* 19:*21* 21:*6, 22* 33:*11* 34:*13, 18* 39:*5* 40:*3* 47:*18* 53:*2, 12* 55:*21* 60:*21* 61:*6, 16* 65:*15, 16* 66:*2* 67:*23* 74:*12* 75:*4* 80:*2, 17* 82:*4* 85:*24* 87:*2* 90:*6* 91:*14* 93:*12, 20* 94:*6* 95:*2, 20* 96:*14* 98:*3* 101:*6* 104:*7, 12, 13* 106:*3, 6* 110:*8* 111:*3*

114:*4*, *10*  116:*3*, *7*
117:*5*  119:*13*  124:*23*
125:*21*  131:*21*  133:*7,*
*9*, *25*  135:*9*  136:*11*
137:*8*  141:*13*  142:*2,*
*22*  144:*23*  146:*15*
164:*3*
**year**  15:*5*  17:*3*, *4*, *8*,
*15*, *23*  71:*6*  105:*24*
106:*11*  141:*12*
142:*19*  151:*8*, *16*
152:*3*
**years**  12:*13*, *14*
20:*21*  62:*6*, *12*, *17*
65:*14*  66:*6*, *15*  67:*17*
84:*25*  157:*20*
**Yep**  50:*20*  53:*5*
93:*23*  95:*25*  96:*3*, *21*
97:*9*, *12*  98:*16*
121:*14*  151:*18*
**yesterday**  8:*17*  68:*23*
**YORK**  1:*2*  2:*9*  26:*2*
**Youn**  50:*25*

**< Z >**
**Zephyr**  158:*9*
**Zoom**  1:*18*  2:*3*
12:*24*  13:*2*

## WORD LIST

**< $ >**
**$100**  *(2)*
**$2,877**  *(1)*
**$200**  *(1)*
**$250**  *(1)*
**$250,002**  *(1)*
**$270**  *(1)*
**$35**  *(1)*
**$37**  *(1)*
**$45**  *(1)*
**$46**  *(1)*
**$48**  *(18)*
**$51**  *(5)*
**$53**  *(1)*
**$55**  *(5)*
**$58.50**  *(1)*
**$60**  *(5)*
**$61**  *(2)*
**$8**  *(1)*
**$9**  *(2)*

**< 1 >**
**1**  *(7)*
**1.2**  *(1)*
**1.50**  *(1)*
**1:23-cv-10488-DLC**
 *(1)*
**1:57**  *(2)*
**10**  *(5)*
**10/14/22**  *(1)*
**10/28/22**  *(1)*
**10:08**  *(1)*
**10:11**  *(2)*
**10:19**  *(2)*
**10:39**  *(2)*
**10:40**  *(2)*
**100**  *(2)*
**10170**  *(1)*
**103**  *(1)*
**104**  *(1)*
**105**  *(1)*
**10b5-1**  *(13)*
**10th**  *(8)*
**11**  *(8)*
**11:26**  *(2)*
**11:30**  *(1)*
**11:46**  *(2)*

**11:54**  *(2)*
**118**  *(1)*
**11th**  *(2)*
**12**  *(4)*
**12:30**  *(1)*
**12:31**  *(2)*
**120**  *(1)*
**121**  *(1)*
**122**  *(1)*
**126**  *(1)*
**12th**  *(7)*
**13**  *(1)*
**133**  *(1)*
**134**  *(1)*
**135**  *(1)*
**137**  *(1)*
**138**  *(1)*
**13th**  *(3)*
**14**  *(5)*
**143**  *(1)*
**144**  *(1)*
**145**  *(1)*
**147**  *(2)*
**149**  *(1)*
**14th**  *(9)*
**15**  *(4)*
**150**  *(1)*
**155**  *(1)*
**157**  *(1)*
**15th**  *(6)*
**16**  *(2)*
**160**  *(1)*
**169**  *(1)*
**16th**  *(11)*
**17**  *(4)*
**17th**  *(1)*
**18**  *(2)*
**182**  *(2)*
**1832**  *(1)*
**18th**  *(3)*
**19**  *(4)*
**1900**  *(1)*
**191**  *(1)*
**1989**  *(3)*
**1992**  *(1)*
**1999**  *(1)*
**1st**  *(2)*

**< 2 >**

**2**  *(5)*
**2.2**  *(1)*
**2:06**  *(2)*
**2:31**  *(2)*
**2:33**  *(2)*
**2:50**  *(1)*
**20**  *(4)*
**2008**  *(7)*
**2010**  *(9)*
**2017**  *(5)*
**2021**  *(1)*
**2022**  *(79)*
**2023**  *(13)*
**2025**  *(6)*
**21**  *(1)*
**21st**  *(3)*
**22**  *(1)*
**22nd**  *(7)*
**23**  *(7)*
**23530**  *(2)*
**23rd**  *(1)*
**24**  *(2)*
**24th**  *(4)*
**25**  *(1)*
**252**  *(1)*
**25857**  *(1)*
**25859**  *(2)*
**25th**  *(18)*
**26**  *(1)*
**26th**  *(3)*
**27**  *(4)*
**270**  *(1)*
**275**  *(1)*
**27th**  *(9)*
**28**  *(2)*
**28th**  *(4)*
**29**  *(2)*
**2992**  *(1)*
**29th**  *(1)*
**2nd**  *(4)*

**< 3 >**
**3**  *(8)*
**3:34**  *(1)*
**30**  *(4)*
**300**  *(1)*
**30th**  *(1)*
**31**  *(2)*
**31st**  *(1)*

**32**  *(3)*
**3274**  *(1)*
**33**  *(3)*
**33.50**  *(1)*
**34**  *(2)*
**35**  *(1)*
**36**  *(1)*
**37**  *(3)*
**38**  *(3)*
**39**  *(2)*
**3rd**  *(11)*

**< 4 >**
**4**  *(3)*
**40**  *(2)*
**420**  *(1)*
**43**  *(1)*
**44776**  *(1)*
**45**  *(3)*
**46**  *(2)*
**46.25**  *(1)*
**48**  *(6)*
**4th**  *(8)*

**< 5 >**
**5**  *(5)*
**5/16/22**  *(1)*
**5/24/22**  *(1)*
**5/3/22**  *(1)*
**50**  *(1)*
**51**  *(2)*
**52**  *(3)*
**56**  *(1)*
**57**  *(1)*
**58.50**  *(2)*
**59**  *(1)*
**5984**  *(1)*
**5th**  *(1)*

**< 6 >**
**6**  *(4)*
**6/12/22**  *(1)*
**6/13/22**  *(1)*
**6/15/22**  *(1)*
**6/16/22**  *(1)*
**6/22/22**  *(1)*
**6/27/22**  *(1)*
**6/29/22**  *(1)*
**60**  *(3)*

**61** *(1)*
**6133** *(1)*
**62** *(1)*
**62.75** *(1)*
**63105** *(1)*
**65** *(1)*
**68** *(1)*
**69** *(1)*
**6th** *(4)*

**< 7 >**
**7** *(5)*
**7/14/22** *(1)*
**7/15/22** *(1)*
**7/31/22** *(1)*
**7/7/22** *(2)*
**70** *(1)*
**7159** *(1)*
**76** *(1)*
**7676** *(1)*
**7771** *(1)*
**78** *(1)*
**78.50** *(1)*
**78746** *(1)*
**7th** *(4)*

**< 8 >**
**8** *(1)*
**8/10/22** *(3)*
**8/11/22** *(1)*
**8/14/22** *(1)*
**8/16/22** *(1)*
**8/17/22** *(1)*
**8/2/22** *(1)*
**8/4/22** *(1)*
**8/8/22** *(1)*
**8/9/22** *(2)*
**8:30** *(1)*
**80** *(1)*
**82** *(1)*
**8520** *(1)*
**8521** *(1)*
**89** *(2)*
**8th** *(1)*

**< 9 >**
**9** *(2)*
**9/1/22** *(1)*
**9/21/22** *(2)*

**9:00** *(1)*
**9:04** *(2)*
**90** *(1)*
**901** *(1)*
**93** *(1)*
**99** *(2)*
**9th** *(2)*

**< A >**
**a.m** *(17)*
**AA** *(1)*
**ability** *(1)*
**able** *(7)*
**above-styled** *(1)*
**Absolutely** *(2)*
**acceptable** *(1)*
**accepted** *(1)*
**access** *(3)*
**accommodate** *(1)*
**account** *(1)*
**accumulating** *(3)*
**accumulation** *(4)*
**accumulations** *(1)*
**accurate** *(6)*
**accurately** *(2)*
**Achieve** *(3)*
**ACKNOWLEDGMEN
T** *(1)*
**acquire** *(13)*
**acquired** *(2)*
**acquiree** *(1)*
**acquirer** *(3)*
**acquirers** *(2)*
**acquiring** *(3)*
**acquiror** *(1)*
**Acquirors** *(1)*
**acquisition** *(12)*
**acquisitions** *(9)*
**act** *(1)*
**acted** *(1)*
**Action** *(6)*
**actions** *(1)*
**active** *(2)*
**activism** *(1)*
**activist** *(1)*
**activity** *(3)*
**actual** *(3)*
**Adam** *(4)*
**add** *(2)*

**added** *(2)*
**adding** *(2)*
**addition** *(5)*
**additional** *(4)*
**addressed** *(1)*
**adjusted** *(1)*
**ADL** *(2)*
**admit** *(1)*
**admitted** *(1)*
**advantage** *(1)*
**advice** *(1)*
**advised** *(2)*
**affect** *(3)*
**aggressively** *(1)*
**ago** *(1)*
**agree** *(6)*
**agreeable** *(1)*
**agreed** *(2)*
**Agreement** *(9)*
**ahead** *(14)*
**Albert** *(8)*
**Albert's** *(1)*
**aligned** *(2)*
**allegations** *(3)*
**alleys** *(1)*
**Allocation** *(2)*
**allotted** *(1)*
**allow** *(3)*
**allowable** *(1)*
**allowed** *(5)*
**Alpha** *(1)*
**alternative** *(1)*
**ALYSSA** *(1)*
**ambiguous** *(1)*
**America** *(11)*
**amount** *(5)*
**ample** *(2)*
**analysis** *(3)*
**analyst** *(4)*
**analysts** *(1)*
**analyst's** *(2)*
**Andrade** *(1)*
**Andrew** *(38)*
**Annex** *(1)*
**announce** *(5)*
**announcement** *(1)*
**answer** *(43)*
**answered** *(3)*
**answering** *(2)*

**answers** *(1)*
**anybody** *(6)*
**anybody's** *(1)*
**Anytime** *(3)*
**Anyway** *(3)*
**aplascoff@rgrdlaw.co
m** *(1)*
**apparently** *(1)*
**appear** *(2)*
**appearance** *(12)*
**Appearances** *(1)*
**APPEARED** *(1)*
**appears** *(7)*
**apply** *(1)*
**appreciate** *(2)*
**approach** *(5)*
**appropriate** *(1)*
**approval** *(2)*
**approve** *(1)*
**approximate** *(1)*
**approximately** *(3)*
**April** *(5)*
**area** *(1)*
**argument** *(3)*
**arguments** *(2)*
**arrived** *(1)*
**article** *(1)*
**articles** *(1)*
**asked** *(9)*
**asking** *(15)*
**asks** *(2)*
**aspect** *(1)*
**asserted** *(3)*
**assessment** *(1)*
**assigned** *(1)*
**assist** *(1)*
**assisted** *(1)*
**assists** *(1)*
**assume** *(4)*
**assumed** *(1)*
**assumes** *(3)*
**assuming** *(2)*
**assumption** *(1)*
**attached** *(2)*
**attachment** *(1)*
**attempted** *(1)*
**attempting** *(2)*
**attention** *(1)*
**attorney** *(1)*

Deposition of Karen Rapp    In Re National Instruments Corporation Securities Litigation

attorney-client  *(1)*
ATTORNEYS  *(1)*
audit  *(2)*
August  *(47)*
Austin  *(3)*
authority  *(1)*
authorized  *(6)*
Automation  *(3)*
available  *(6)*
Avenue  *(1)*
average  *(4)*
aware  *(25)*
awareness  *(1)*

< B >
bachelor's  *(1)*
back  *(37)*
background  *(6)*
Bank  *(11)*
bankers  *(3)*
banking  *(1)*
based  *(14)*
baseline  *(1)*
basically  *(1)*
basis  *(8)*
Bates  *(16)*
Bates-numbered  *(1)*
BB  *(1)*
bear  *(4)*
beginning  *(4)*
begins  *(3)*
behalf  *(2)*
believe  *(9)*
believed  *(4)*
believes  *(1)*
Beneficial  *(1)*
benefit  *(3)*
benefiting  *(1)*
BENNETT  *(1)*
best  *(7)*
bet  *(5)*
bets  *(2)*
Better  *(3)*
betting  *(3)*
beyond  *(1)*
bid  *(4)*
Biggest  *(1)*
bilateral  *(1)*
billion  *(1)*

bit  *(7)*
Bless  *(1)*
board  *(34)*
boards  *(2)*
BofA_003270  *(1)*
books  *(1)*
born  *(1)*
borrow  *(1)*
bottle  *(2)*
bottom  *(23)*
bought  *(2)*
Boulevard  *(1)*
box  *(7)*
break  *(10)*
breaks  *(1)*
Brent  *(1)*
Brief  *(3)*
briefly  *(2)*
bringing  *(1)*
broker  *(2)*
brought  *(3)*
Building  *(1)*
bullet  *(10)*
bunch  *(1)*
business  *(3)*
buy  *(12)*
buyback  *(13)*
buybacks  *(27)*
buyer  *(1)*
buyers  *(2)*
buying  *(19)*
buys  *(2)*

< C >
calculation  *(1)*
calendar  *(1)*
California  *(1)*
call  *(16)*
called  *(4)*
calling  *(1)*
Calls  *(66)*
camera  *(1)*
capacity  *(3)*
Capital  *(2)*
career  *(1)*
careful  *(1)*
Carlin  *(2)*
case  *(18)*
cases  *(4)*

cash  *(18)*
cause  *(3)*
CC  *(1)*
ceasing  *(1)*
Central  *(2)*
cents  *(1)*
CEO  *(4)*
CEO's  *(1)*
Certain  *(6)*
certainly  *(3)*
CERTIFICATE  *(1)*
Certified  *(4)*
certify  *(3)*
CFO  *(7)*
cgilroy@rgrdlaw.com
  *(1)*
chairman  *(2)*
challenge  *(1)*
chance  *(2)*
change  *(7)*
CHANGE/REASON
  *(1)*
changed  *(1)*
changes  *(1)*
changing  *(1)*
characteristics  *(1)*
characterization  *(2)*
charge  *(1)*
chart  *(1)*
chat  *(1)*
check  *(3)*
Check-in  *(1)*
checking  *(1)*
checklist  *(1)*
chief  *(2)*
Chloride  *(6)*
choice  *(2)*
choose  *(2)*
CHRISTOPHER  *(1)*
chronologically  *(3)*
circulation  *(2)*
circumstances  *(1)*
Civil  *(1)*
claim  *(1)*
clarification  *(1)*
clarify  *(1)*
clear  *(4)*
clearance  *(2)*
cleared  *(1)*

clearing  *(1)*
click  *(1)*
clients  *(1)*
close  *(6)*
closed  *(4)*
closer  *(1)*
closing  *(4)*
coach  *(1)*
coaching  *(1)*
code  *(2)*
coincidence  *(2)*
collaborative  *(1)*
collected  *(1)*
college  *(3)*
column  *(3)*
combination  *(1)*
come  *(7)*
COMERFORD  *(222)*
Comerford's  *(1)*
comes  *(1)*
commence  *(1)*
commencing  *(1)*
comment  *(1)*
comments  *(1)*
commission  *(2)*
commit  *(2)*
committed  *(1)*
committee  *(3)*
common  *(2)*
communicate  *(3)*
communicated  *(2)*
communicating  *(1)*
communication  *(3)*
communications  *(2)*
companies  *(6)*
company  *(35)*
company's  *(1)*
compensation  *(1)*
complaint  *(4)*
complete  *(1)*
completed  *(2)*
completely  *(1)*
completion  *(1)*
compliment  *(1)*
compound  *(2)*
concierge  *(1)*
concluded  *(1)*
conclusion  *(1)*
conclusions  *(6)*

concurrent  *(1)*
conduct  *(1)*
conference  *(2)*
confident  *(1)*
Confidential  *(2)*
confidentiality  *(1)*
confirm  *(2)*
Confirmed  *(2)*
connect  *(1)*
connected  *(1)*
connection  *(4)*
consensus  *(9)*
consider  *(2)*
consideration  *(1)*
considering  *(1)*
consistent  *(2)*
constraint  *(1)*
constructive  *(1)*
consummated  *(1)*
contact  *(7)*
contacted  *(2)*
contacting  *(1)*
contains  *(2)*
contemplating  *(1)*
content  *(4)*
contents  *(1)*
Conterno  *(2)*
context  *(5)*
continue  *(4)*
continuing  *(1)*
control  *(5)*
conversation  *(28)*
conversations  *(10)*
convey  *(1)*
conveying  *(1)*
copy  *(5)*
copying  *(1)*
corner  *(2)*
CORPORATION  *(2)*
Correct  *(88)*
corrections  *(1)*
correctly  *(1)*
cost  *(2)*
counsel  *(36)*
couple  *(6)*
course  *(4)*
COURT  *(6)*
cover  *(1)*
coverage  *(1)*

covered  *(1)*
created  *(1)*
creates  *(1)*
credibility  *(1)*
CRR  *(1)*
CSR  *(1)*
current  *(3)*
cursor  *(2)*
curtail  *(1)*
custom  *(1)*
CV  *(1)*

< D >
daily  *(1)*
data  *(2)*
date  *(26)*
dated  *(41)*
dates  *(4)*
day  *(7)*
days  *(1)*
DD  *(1)*
deal  *(14)*
dealing  *(1)*
debated  *(1)*
debt  *(1)*
decided  *(3)*
deciding  *(1)*
decision  *(5)*
decisions  *(2)*
deck  *(2)*
decks  *(1)*
declines  *(1)*
declining  *(1)*
deem  *(1)*
Deeper  *(1)*
Defendants  *(4)*
defined  *(1)*
definitely  *(3)*
degree  *(1)*
delivery  *(1)*
Della  *(3)*
demand  *(1)*
department  *(1)*
depending  *(1)*
depends  *(1)*
DEPONENT  *(1)*
DEPOSITION  *(25)*
depositions  *(3)*
describe  *(3)*

described  *(2)*
describes  *(2)*
DESCRIPTION  *(2)*
designated  *(1)*
desire  *(1)*
desired  *(2)*
details  *(11)*
determine  *(2)*
dial  *(1)*
dialogue  *(1)*
dictated  *(1)*
differences  *(1)*
different  *(14)*
difficult  *(1)*
digits  *(1)*
diligent  *(1)*
diluted  *(1)*
dilution  *(4)*
direct  *(1)*
directed  *(1)*
direction  *(1)*
directly  *(3)*
Directors  *(13)*
directs  *(1)*
disallow  *(1)*
disappointed  *(1)*
discarded  *(1)*
disclosed  *(4)*
disclosure  *(3)*
disclosure/notification
 *(1)*
discoverable  *(1)*
discovery  *(2)*
discuss  *(4)*
discussed  *(3)*
discussion  *(10)*
discussions  *(10)*
distraction  *(1)*
DISTRICT  *(5)*
Dive  *(1)*
divestiture  *(1)*
dividend  *(6)*
Dixon  *(31)*
Dixon's  *(1)*
document  *(97)*
documentation  *(2)*
documented  *(1)*
Documents  *(17)*
doing  *(10)*

dollar  *(1)*
dormant  *(1)*
DOWD  *(2)*
downward  *(1)*
Draft  *(1)*
drafted  *(3)*
drafting  *(1)*
drain  *(1)*
driven  *(1)*
Due  *(4)*
Duett  *(3)*
duly  *(1)*
duties  *(2)*
dynamics  *(1)*

< E >
E*TRADE  *(2)*
earlier  *(4)*
earliest  *(1)*
Early  *(1)*
earnings  *(11)*
Eastern  *(2)*
Eddie  *(15)*
Eddie's  *(2)*
education  *(2)*
EE  *(1)*
effect  *(3)*
efficient  *(1)*
effort  *(3)*
efforts  *(5)*
eight  *(2)*
either  *(11)*
email  *(94)*
emails  *(16)*
embedded  *(2)*
Emerson  *(84)*
Emerson/Wolverine
 *(1)*
Emerson's  *(17)*
Emmerich  *(2)*
employee  *(2)*
employees  *(3)*
ends  *(2)*
engage  *(7)*
engaged  *(2)*
engagement  *(6)*
engagements  *(1)*
English  *(1)*
ensure  *(1)*

| | | | |
|---|---|---|---|
| enter  (3) | expressed  (2) |  (1) | go  (63) |
| entered  (2) | expression  (1) | flat  (1) | goal  (1) |
| entitled  (6) | Expressway  (1) | flattered  (1) | goes  (6) |
| entry  (1) | extended  (1) | Flexibility  (1) | going  (90) |
| enumerated  (3) | extent  (5) | flow  (2) | Goldman  (2) |
| enumerates  (1) | external  (1) | Following  (1) | Good  (9) |
| Eric  (14) | externally  (1) | follows  (1) | gotten  (1) |
| Errata  (2) | extra  (1) | follow-up  (1) | graduated  (3) |
| Escalate  (3) | extrapolation  (1) | foregoing  (2) | graphic  (1) |
| escalation  (2) | eye  (1) | forgive  (4) | gray  (3) |
| ESQUIRE  (4) | | form  (85) | great  (1) |
| essentially  (1) | < F > | formal  (6) | grounds  (5) |
| establish  (2) | facilities  (1) | format  (2) | Group  (2) |
| established  (4) | fact  (5) | former  (1) | grow  (1) |
| establishing  (1) | facts  (3) | formula  (1) | growing  (1) |
| estimate  (2) | fair  (2) | Forsyth  (1) | growth  (2) |
| estimated  (1) | fairly  (2) | forward  (4) | guess  (8) |
| estimates  (1) | fairness  (2) | found  (2) | guessing  (4) |
| E-tran  (1) | familiar  (30) | foundation  (62) | guest  (1) |
| evaluation  (1) | far  (5) | four  (2) | guidance  (3) |
| events  (6) | fast  (2) | fourth  (2) | Guidelines  (1) |
| eventual  (1) | father  (1) | frame  (5) | guys  (1) |
| eventually  (1) | feasible  (1) | framed  (1) | |
| Everest  (2) | fee  (4) | FRANCIS  (1) | < H > |
| everybody  (1) | feedback  (1) | Freescale  (4) | half  (3) |
| evidence  (5) | feel  (2) | frequently  (2) | hand  (1) |
| exact  (9) | fees  (1) | Friday  (4) | handle  (2) |
| exactly  (4) | felt  (1) | friendly  (3) | handwriting  (3) |
| Examination  (4) | figure  (1) | friends  (2) | handwritings  (1) |
| example  (1) | file  (4) | full  (1) | Hang  (1) |
| examples  (2) | filed  (3) | fully  (1) | hangover  (1) |
| Excess  (3) | files  (2) | fun  (2) | happen  (10) |
| executed  (1) | filing  (1) | function  (1) | happened  (9) |
| executive  (3) | final  (7) | fundamental  (1) | happens  (2) |
| executives  (1) | finalize  (1) | further  (8) | happy  (1) |
| exhibit  (14) | finalized  (2) | FYI  (2) | head  (7) |
| EXHIBITS  (4) | finally  (1) | | heading  (5) |
| existence  (1) | finance  (4) | < G > | hear  (2) |
| expanded  (1) | financial  (7) | gallery  (3) | heard  (3) |
| expectation  (3) | financially  (1) | gaps  (1) | he'd  (1) |
| expected  (2) | financials  (1) | GELLER  (1) | help  (8) |
| expedience  (1) | find  (5) | general  (7) | helpful  (1) |
| expensive  (1) | fine  (7) | Generally  (5) | helps  (1) |
| experience  (9) | finish  (3) | generic  (1) | Hi  (1) |
| expires  (1) | finished  (1) | getting  (2) | high  (3) |
| explain  (5) | firm  (3) | GILROY  (1) | higher  (11) |
| explaining  (1) | first  (41) | give  (9) | highlighted  (1) |
| explains  (1) | five-minute  (1) | given  (5) | hints  (1) |
| express  (2) | fkaram@rgrdlaw.com | giving  (1) | history  (1) |

Hold  (5)
holding  (1)
honest  (1)
honestly  (3)
hopefully  (2)
Hostile  (3)
hour  (4)
hourly  (1)
hours  (7)
hug  (4)
hybrid  (1)
hypothetical  (6)

< I >
idea  (6)
identification  (40)
identify  (2)
ignore  (1)
II  (2)
Ilcisin  (20)
Ilcisin's  (1)
Ileisin  (4)
Illinois  (7)
illustrated  (1)
Illustrative  (1)
imagine  (3)
impact  (2)
implement  (4)
implemented  (2)
implementing  (2)
implying  (1)
improper  (5)
improperly  (1)
improve  (1)
inadvertently  (2)
included  (4)
Including  (1)
inclusive  (1)
incomplete  (6)
incorporate  (1)
incorrect  (1)
increase  (12)
increased  (3)
increases  (2)
increasing  (1)
INDEX  (1)
indicate  (5)
indicated  (3)
indicates  (2)

indicating  (1)
individual  (7)
individually  (1)
individuals  (1)
infer  (1)
inference  (1)
inferring  (2)
information  (47)
informed  (3)
informing  (3)
initial  (4)
initially  (1)
inked  (1)
in-person  (2)
input  (3)
inputting  (1)
inside  (2)
insider  (2)
instruct  (1)
instructed  (1)
instructs  (1)
Instrument  (1)
INSTRUMENTS  (70)
Instrument's  (1)
integration  (1)
intent  (1)
intentional  (1)
intentionally  (1)
interaction  (2)
interactions  (1)
interest  (2)
interested  (7)
interesting  (1)
interfere  (1)
internal  (6)
internally  (1)
interpose  (3)
interpret  (8)
interpreted  (1)
interrupt  (2)
interruption  (1)
intimation  (1)
inventory  (1)
investment  (3)
investor  (3)
invite  (1)
involve  (1)
involved  (7)
issue  (2)

issued  (2)
issuing  (1)
it'll  (3)
its  (27)

< J >
January  (7)
jcomerford@dowdben
nett.com  (1)
Jeffrey  (1)
JJ  (1)
Job  (5)
JOHN  (3)
JP  (2)
JPMC  (1)
JPMS  (1)
judge  (6)
July  (11)
June  (42)
jury  (2)

< K >
KARAM  (327)
KAREN  (175)
Karsanbhai  (11)
Karsanbhai's  (4)
Katz  (2)
keep  (21)
keeping  (1)
Kevin  (17)
Kevin's  (1)
kid  (1)
kind  (5)
Kirby  (1)
KK  (1)
knew  (7)
know  (128)
knowledge  (12)
known  (1)
knows  (2)

< L >
labeled  (1)
lacks  (9)
███  (1)
Lal  (5)
language  (1)
large  (2)
larger  (5)

late  (5)
latest  (1)
law  (7)
lawsuit  (1)
lawyer  (4)
lawyers  (5)
lead  (1)
leading  (11)
learn  (2)
learned  (3)
learning  (1)
leave  (1)
led  (2)
left-hand  (2)
legal  (14)
legitimate  (3)
lengthy  (1)
letter  (77)
letters  (3)
level  (3)
Lexington  (1)
lift  (1)
lifted  (5)
lifting  (6)
light  (1)
limit  (1)
limited  (4)
line  (6)
Lipton  (9)
list  (11)
listed  (2)
listen  (1)
listing  (2)
literally  (1)
LITIGATION  (1)
little  (7)
Liu  (1)
live  (2)
Lived  (2)
LLP  (2)
local  (1)
locking  (1)
logistics  (1)
long  (3)
look  (27)
looked  (7)
looking  (2)
Looks  (17)
lot  (8)

Louis  *(1)*
low  *(2)*
lower  *(3)*
lowest  *(1)*
LT  *(1)*
lunch  *(3)*

< M >
M&A  *(4)*
ma'am  *(2)*
Mackenzie  *(3)*
main  *(1)*
maintain  *(1)*
making  *(8)*
manage  *(1)*
manageable  *(1)*
Management  *(10)*
management's  *(3)*
manufacturing  *(1)*
March  *(7)*
Marissa  *(14)*
Marissa's  *(2)*
mark  *(7)*
marked  *(46)*
market  *(9)*
markets  *(1)*
material  *(27)*
materially  *(1)*
math  *(3)*
matter  *(2)*
MBA  *(2)*
McGrath  *(3)*
mean  *(21)*
meaning  *(1)*
means  *(6)*
meant  *(3)*
media  *(1)*
meet  *(1)*
Meeting  *(18)*
meetings  *(7)*
members  *(2)*
memo  *(1)*
memory  *(7)*
mention  *(1)*
mentioned  *(3)*
mentions  *(1)*
merge  *(1)*
merger  *(1)*
mergers  *(4)*

Merit  *(2)*
message  *(1)*
messages  *(1)*
messaging  *(1)*
met  *(2)*
metadata  *(4)*
mic  *(1)*
Microphone  *(1)*
middle  *(1)*
million  *(21)*
mind  *(1)*
minimal  *(1)*
minute  *(1)*
minutes  *(7)*
mischaracterized  *(1)*
mischaracterizes  *(15)*
mischaracterizing  *(4)*
misconstrued  *(1)*
misconstruing  *(1)*
misreading  *(1)*
Missouri  *(1)*
misspoke  *(1)*
MM  *(1)*
MNPI  *(3)*
modeling  *(1)*
models  *(1)*
moment  *(3)*
moments  *(1)*
money  *(2)*
Monitor  *(2)*
monitored  *(1)*
monitoring  *(3)*
month  *(1)*
months  *(4)*
MoPac  *(1)*
Morgan  *(2)*
morning  *(2)*
motivated  *(1)*
Motorola  *(5)*
mouth  *(1)*
move  *(6)*
moved  *(3)*
moving  *(1)*
multiple  *(5)*
Multi-speaker  *(1)*
multiyear  *(2)*
muted  *(1)*

< N >

name  *(4)*
named  *(2)*
narrative  *(1)*
NATI  *(1)*
NATIONAL  *(72)*
NAT-SL  *(2)*
NAT-SL-000000765  *(1)*
NAT-SL-000000772  *(1)*
NAT-SL-000006122  *(1)*
NAT-SL-000006245  *(1)*
NAT-SL-000009179  *(1)*
NAT-SL-000010395  *(1)*
NAT-SL-00001156  *(1)*
NAT-SL-000012292  *(2)*
NAT-SL-00001240  *(1)*
NAT-SL-00001250  *(1)*
NAT-SL-00001255  *(1)*
NAT-SL-000016278  *(1)*
NAT-SL-00002967  *(1)*
NAT-SL-000029992  *(1)*
NAT-SL-00005982  *(1)*
NAT-SL-00006230  *(1)*
NAT-SL-00006940  *(1)*
NAT-SL-00007093  *(1)*
NAT-SL-00007475  *(1)*
NAT-SL-00008520  *(1)*
NAT-SL-00008756  *(1)*
NAT-SL-00009535  *(1)*
NAT-SL-00009611  *(1)*
NAT-SL-00016278  *(1)*
NAT-SL-00017939  *(1)*
NAT-SL-00020537  *(1)*
NAT-SL-00023205  *(1)*
NAT-SL-00025277  *(1)*
NAT-SL-00025857  *(1)*
NAT-SL-0010806  *(1)*
NAT-SL-0025703  *(1)*
nature  *(1)*
navigate  *(1)*
NDA  *(1)*

near  *(2)*
necessary  *(1)*
need  *(12)*
needs  *(1)*
neglected  *(1)*
negotiations  *(1)*
neither  *(1)*
NEOs  *(1)*
never  *(2)*
NEW  *(7)*
News  *(1)*
Nexperia  *(1)*
NI  *(10)*
Niles  *(3)*
NI's  *(2)*
NN  *(1)*
nonemployee  *(1)*
nonpublic  *(21)*
normal  *(4)*
Normally  *(2)*
northern  *(3)*
Notary  *(1)*
notation  *(2)*
note  *(1)*
noted  *(6)*
notes  *(3)*
notice  *(6)*
noticeably  *(1)*
notification  *(2)*
notified  *(1)*
November  *(1)*
number  *(98)*
numbered  *(3)*
numbers  *(9)*
Nuthatch  *(23)*
Nuthatch's  *(1)*
NXP  *(5)*

< O >
object  *(41)*
objecting  *(5)*
Objection  *(80)*
objections  *(13)*
obtained  *(1)*
obviously  *(3)*
occasion  *(1)*
occasionally  *(1)*
occasions  *(1)*
occur  *(1)*

occurred  (6)
occurs  (1)
o'clock  (1)
October  (5)
offer  (65)
offered  (5)
offeree  (1)
offeree's  (1)
offering  (2)
offeror  (3)
offers  (3)
office  (1)
officer  (2)
officers  (2)
official  (1)
offset  (3)
Oh  (21)
Okay  (234)
once  (5)
ones  (2)
open  (12)
open-market  (3)
operationally  (1)
operations  (1)
opinion  (6)
opportune  (1)
opportunistic  (6)
opposed  (2)
opposing  (1)
option  (1)
ORAL  (3)
order  (2)
oriented  (1)
original  (1)
originally  (1)
outcome  (4)
outreach  (1)
outside  (4)
overall  (2)
overarching  (1)
overhang  (1)
overt  (1)
overture  (4)
overvalued  (1)
Owners  (2)
Ownership  (4)

< P >
p.m  (12)

P-1  (2)
P-10  (2)
P-11  (2)
P-12  (2)
P-13  (2)
P-14  (2)
P-15  (2)
P-16  (2)
P-17  (2)
P-18  (2)
P-19  (2)
P-2  (2)
P-20  (2)
P-21  (2)
P-22  (2)
P-23  (2)
P-24  (2)
P-25  (2)
P-26  (2)
P-27  (2)
P-28  (2)
P-29  (2)
P-3  (2)
P-30  (2)
P-31  (2)
P-32  (2)
P-33  (2)
P-34  (2)
P-35  (2)
P-36  (2)
P-37  (2)
P-38  (2)
P-39  (2)
P-4  (2)
P-40  (2)
P-5  (2)
P-6  (2)
P-7  (2)
P-8  (2)
P-9  (2)
packet  (1)
PAGE  (33)
pages  (4)
paragraph  (14)
paragraphs  (1)
paralegals  (1)
parentheses  (1)
parenthesis  (3)
part  (13)

particular  (4)
parties  (2)
partner  (3)
parts  (1)
party  (2)
pause  (2)
paused  (2)
pausing  (1)
pay  (5)
PC  (1)
PDF  (1)
PE  (1)
Pedro  (2)
pence  (2)
people  (9)
percent  (5)
Percival  (15)
Percival's  (2)
performance  (2)
period  (14)
periods  (1)
permission  (1)
persisted  (1)
person  (7)
personal  (2)
personally  (3)
persons  (2)
Perspectives  (1)
pertains  (3)
peruse  (1)
Philip  (1)
phone  (4)
phrase  (3)
pieces  (1)
place  (14)
Plaintiff  (1)
Plaintiffs  (4)
Plaintiff's  (19)
Plan  (36)
planned  (3)
planning  (1)
plans  (2)
PLASCOFF  (12)
Play  (2)
played  (1)
Please  (30)
plenty  (1)
point  (25)
points  (2)

portion  (1)
position  (7)
positions  (3)
possession  (1)
possibility  (2)
possible  (14)
possibly  (5)
potential  (3)
potentially  (2)
PowerPoint  (1)
PP  (2)
practical  (1)
practice  (3)
predict  (2)
predicting  (6)
prefer  (6)
preference  (1)
preferred  (1)
prefers  (2)
premise  (1)
premium  (5)
preparation  (1)
prepare  (1)
prepared  (4)
pre-read  (1)
prescient  (1)
PRESENT  (8)
presentation  (9)
presentations  (5)
presented  (11)
presenting  (1)
preserved  (1)
preserving  (1)
press  (1)
Pressure  (3)
presumably  (2)
pretty  (2)
previous  (4)
price  (36)
prices  (4)
pricing  (1)
prime  (1)
printed  (1)
printing  (1)
prior  (4)
Prioritized  (2)
private  (11)
privately  (6)
privilege  (2)

**Privileged**  *(2)*
**probability**  *(4)*
**probably**  *(21)*
**probing**  *(1)*
**problem**  *(5)*
**problems**  *(1)*
**proceed**  *(2)*
**proceeding**  *(2)*
**proceeds**  *(1)*
**process**  *(9)*
**procurement**  *(1)*
**produced**  *(2)*
**production**  *(1)*
**products**  *(1)*
**Professional**  *(4)*
**professionals**  *(1)*
**program**  *(5)*
**Project**  *(7)*
**projections**  *(6)*
**pronounce**  *(1)*
**pronouncing**  *(1)*
**proof**  *(1)*
**proper**  *(1)*
**properly**  *(1)*
**proposal**  *(10)*
**propose**  *(1)*
**proposes**  *(1)*
**proposing**  *(1)*
**propounded**  *(1)*
**propping**  *(1)*
**protection**  *(1)*
**provide**  *(3)*
**provided**  *(9)*
**providing**  *(4)*
**proxy**  *(1)*
**public**  *(42)*
**publicly**  *(3)*
**published**  *(2)*
**pull**  *(1)*
**pull-ahead**  *(1)*
**punish**  *(1)*
**punishing**  *(2)*
**purchase**  *(7)*
**purchased**  *(1)*
**purchases**  *(14)*
**purchasing**  *(2)*
**purpose**  *(7)*
**purposes**  *(1)*
**pursue**  *(1)*

**pursued**  *(2)*
**put**  *(16)*
**putting**  *(3)*

**< Q >**
**Q1**  *(1)*
**Q3**  *(1)*
**QQ**  *(2)*
**Qualcomm**  *(1)*
**quarter**  *(2)*
**quarterly**  *(1)*
**question**  *(45)*
**questioning**  *(5)*
**questions**  *(27)*
**quickly**  *(1)*
**Quite**  *(3)*
**quote**  *(2)*
**quote-unquote**  *(1)*

**< R >**
**raise**  *(2)*
**raising**  *(1)*
**rambling**  *(1)*
**range**  *(5)*
**RAPP**  *(209)*
**Rapp's**  *(1)*
**rates**  *(1)*
**Ratio**  *(1)*
**reach**  *(2)*
**reached**  *(1)*
**reaching**  *(1)*
**reach-out**  *(1)*
**read**  *(36)*
**reading**  *(3)*
**reads**  *(1)*
**ready**  *(1)*
**real**  *(1)*
**really**  *(2)*
**Realtime**  *(2)*
**re-ask**  *(3)*
**reason**  *(7)*
**reasoning**  *(1)*
**reasons**  *(1)*
**rebuff**  *(1)*
**Recalc**  *(2)*
**recall**  *(3)*
**receipt**  *(2)*
**receive**  *(2)*
**received**  *(7)*

**receiving**  *(1)*
**recess**  *(7)*
**recipient**  *(1)*
**recognize**  *(9)*
**recollection**  *(7)*
**recommendation**  *(1)*
**reconfirm**  *(1)*
**record**  *(29)*
**recording**  *(1)*
**rectify**  *(1)*
**Recurring**  *(1)*
**redo**  *(3)*
**reduce**  *(1)*
**reduced**  *(3)*
**reducing**  *(1)*
**refer**  *(19)*
**referred**  *(2)*
**referring**  *(12)*
**refers**  *(3)*
**reflect**  *(3)*
**reflected**  *(1)*
**reflecting**  *(1)*
**refrain**  *(1)*
**refresh**  *(2)*
**refreshes**  *(1)*
**refused**  *(2)*
**regarding**  *(2)*
**Registered**  *(4)*
**regular**  *(1)*
**regularly**  *(3)*
**reiterated**  *(1)*
**reject**  *(2)*
**rejected**  *(13)*
**rejection**  *(9)*
**related**  *(7)*
**relates**  *(1)*
**relation**  *(2)*
**relations**  *(3)*
**relative**  *(2)*
**relatively**  *(2)*
**release**  *(2)*
**rely**  *(1)*
**remain**  *(1)*
**remaining**  *(2)*
**remark**  *(1)*
**re-mark**  *(1)*
**remarkable**  *(1)*
**remarkably**  *(1)*
**remember**  *(107)*

**remembrance**  *(1)*
**reminding**  *(1)*
**remotely**  *(2)*
**remove**  *(1)*
**rephrase**  *(3)*
**replied**  *(1)*
**reply**  *(1)*
**report**  *(1)*
**reported**  *(3)*
**reportedly**  *(1)*
**Reporter**  *(22)*
**reporting**  *(1)*
**reports**  *(3)*
**represent**  *(2)*
**representations**  *(1)*
**represented**  *(1)*
**Repurchase**  *(19)*
**repurchased**  *(4)*
**repurchases**  *(17)*
**repurchasing**  *(2)*
**request**  *(2)*
**requested**  *(1)*
**require**  *(1)*
**requirement**  *(2)*
**research**  *(1)*
**reserve**  *(3)*
**reserving**  *(1)*
**response**  *(4)*
**responsible**  *(1)*
**restart**  *(1)*
**restrict**  *(1)*
**restricted**  *(4)*
**restricting**  *(2)*
**restriction**  *(13)*
**restrictions**  *(3)*
**restroom**  *(1)*
**result**  *(1)*
**resulting**  *(1)*
**resume**  *(1)*
**retainer**  *(2)*
**retake**  *(1)*
**retire**  *(1)*
**retired**  *(2)*
**retirement**  *(3)*
**return**  *(2)*
**re-up**  *(1)*
**revenue**  *(1)*
**review**  *(5)*
**reviewing**  *(1)*

**revolves**  *(1)*
**rhetorical**  *(1)*
**right**  *(244)*
**right-hand**  *(2)*
**rights**  *(4)*
**RMR**  *(1)*
**ROBBINS**  *(1)*
**Rockwell**  *(7)*
**role**  *(5)*
**room**  *(3)*
**Rosen**  *(2)*
**row**  *(1)*
**RPR**  *(1)*
**RUDMAN**  *(1)*
**rule**  *(7)*
**rules**  *(6)*
**rumors**  *(3)*
**run**  *(1)*
**rush**  *(1)*

**< S >**
**Sabastian**  *(5)*
**Sabastian's**  *(1)*
**Sachs**  *(1)*
**Saint**  *(1)*
**salesman**  *(1)*
**Sam**  *(1)*
**sat**  *(1)*
**satisfactory**  *(1)*
**Saturday**  *(1)*
**saved**  *(2)*
**saw**  *(10)*
**saying**  *(19)*
**says**  *(73)*
**scenario**  *(5)*
**Scenarios**  *(2)*
**scheduled**  *(1)*
**scholar**  *(1)*
**school**  *(2)*
**scratch**  *(2)*
**screen**  *(3)*
**scroll**  *(14)*
**scrolling**  *(4)*
**sec**  *(1)*
**second**  *(16)*
**section**  *(1)*
**SECURITIES**  *(2)*
**Security**  *(1)*
**see**  *(83)*

**Seeking**  *(1)*
**seen**  *(13)*
**Segment**  *(6)*
**select**  *(4)*
**self-explanatory**  *(1)*
**sell**  *(4)*
**selling**  *(1)*
**semicolon**  *(1)*
**semiconductor**  *(2)*
**send**  *(2)*
**sending**  *(2)*
**sense**  *(1)*
**sent**  *(21)*
**sentence**  *(6)*
**sentences**  *(2)*
**separately**  *(1)*
**SEPTEMBER**  *(22)*
**serious**  *(1)*
**services**  *(1)*
**set**  *(3)*
**settled**  *(2)*
**setup**  *(1)*
**seven**  *(1)*
**share**  *(26)*
**shared**  *(3)*
**shareholder**  *(2)*
**shareholders**  *(20)*
**shareholder's**  *(1)*
**shares**  *(29)*
**Shawn**  *(1)*
**sheet**  *(3)*
**short**  *(4)*
**Shorthand**  *(2)*
**show**  *(2)*
**showed**  *(5)*
**showing**  *(3)*
**shown**  *(3)*
**shows**  *(1)*
**sic**  *(1)*
**side**  *(5)*
**sign**  *(3)*
**signals**  *(1)*
**signed**  *(1)*
**significantly**  *(2)*
**signing**  *(1)*
**silly**  *(1)*
**█████**  *(1)*
**simply**  *(4)*
**single**  *(1)*

**situation**  *(7)*
**situations**  *(3)*
**six**  *(1)*
**skeptic**  *(1)*
**skills**  *(1)*
**███**  *(2)*
**slide**  *(29)*
**slides**  *(15)*
**slow**  *(1)*
**smaller**  *(1)*
**smart**  *(1)*
**smoothly**  *(1)*
**sold**  *(3)*
**solution**  *(1)*
**somebody**  *(5)*
**somewhat**  *(1)*
**soon**  *(2)*
**sooner**  *(1)*
**sophisticated**  *(3)*
**Sorry**  *(53)*
**source**  *(1)*
**South**  *(1)*
**SOUTHERN**  *(4)*
**speaker**  *(2)*
**speaking**  *(6)*
**speaks**  *(10)*
**special**  *(1)*
**specific**  *(5)*
**specifically**  *(2)*
**specified**  *(1)*
**speculate**  *(1)*
**speculated**  *(1)*
**speculating**  *(3)*
**speculation**  *(59)*
**spend**  *(5)*
**spent**  *(3)*
**spin-off**  *(1)*
**sports**  *(1)*
**Spreadsheet**  *(6)*
**spun**  *(1)*
**stake**  *(1)*
**stale**  *(4)*
**stamp**  *(1)*
**Stand**  *(2)*
**standalone**  *(1)*
**Standard**  *(4)*
**stands**  *(1)*
**Starkloff**  *(24)*
**start**  *(9)*

**started**  *(7)*
**starting**  *(2)*
**State**  *(4)*
**stated**  *(3)*
**statement**  *(5)*
**STATES**  *(1)*
**stay**  *(2)*
**Stayed**  *(3)*
**steady**  *(1)*
**step**  *(6)*
**steps**  *(8)*
**stock**  *(66)*
**stop**  *(3)*
**strat**  *(1)*
**strategic**  *(1)*
**Strategy**  *(9)*
**string**  *(2)*
**Strong**  *(2)*
**structure**  *(3)*
**stuck**  *(1)*
**studies**  *(1)*
**study**  *(1)*
**sub**  *(1)*
**Subject**  *(10)*
**Subscribed**  *(2)*
**subsequent**  *(1)*
**subset**  *(1)*
**substance**  *(3)*
**substantial**  *(1)*
**substituted**  *(1)*
**subtle**  *(3)*
**success**  *(2)*
**successful**  *(2)*
**successfully**  *(2)*
**succinctly**  *(1)*
**sufficient**  *(1)*
**suggest**  *(6)*
**suggested**  *(1)*
**suggesting**  *(1)*
**suggests**  *(1)*
**Suite**  *(3)*
**summarize**  *(1)*
**summarized**  *(1)*
**summary**  *(1)*
**supply**  *(1)*
**supported**  *(1)*
**supports**  *(1)*
**supposed**  *(2)*
**sure**  *(34)*

**sworn** (*4*)

**< T >**
**table** (*1*)
**tactic** (*3*)
**Tactics** (*1*)
**take** (*36*)
**takeaway** (*2*)
**taken** (*9*)
**takeover** (*8*)
**takeovers** (*1*)
**talk** (*3*)
**talked** (*6*)
**talking** (*8*)
**talks** (*3*)
**target** (*8*)
**targets** (*1*)
**Team** (*10*)
**tech** (*1*)
**technicality** (*1*)
**technician** (*13*)
**technician's** (*1*)
**technique** (*1*)
**Techniques** (*1*)
**tell** (*25*)
**telling** (*3*)
**tells** (*1*)
**ten** (*4*)
**ten-minute** (*2*)
**term** (*5*)
**terminated** (*2*)
**terms** (*12*)
**testified** (*3*)
**testify** (*1*)
**testimony** (*6*)
**Texas** (*6*)
**text** (*1*)
**Thank** (*24*)
**thing** (*5*)
**things** (*8*)
**think** (*64*)
**thinking** (*6*)
**third** (*3*)
**thought** (*3*)
**thoughts** (*1*)
**threat** (*3*)
**threatened** (*1*)
**threatening** (*2*)
**threats** (*1*)

**three** (*7*)
**ties** (*1*)
**time** (*62*)
**timeline** (*11*)
**timelines** (*1*)
**timely** (*2*)
**times** (*3*)
**timing** (*3*)
**tips** (*1*)
**title** (*3*)
**titled** (*1*)
**today** (*11*)
**Today's** (*1*)
**toehold** (*1*)
**told** (*4*)
**tomorrow** (*3*)
**tool** (*1*)
**tools** (*3*)
**top** (*27*)
**total** (*6*)
**touch** (*2*)
**touched** (*1*)
**trace** (*1*)
**tracing** (*1*)
**track** (*2*)
**trade** (*2*)
**trading** (*21*)
**transact** (*1*)
**transaction** (*15*)
**transactions** (*1*)
**transcript** (*2*)
**transcription** (*1*)
**transferred** (*1*)
**transformational** (*1*)
**treasurer** (*1*)
**treasury** (*4*)
**trigger** (*1*)
**True** (*3*)
**Trust** (*1*)
**try** (*3*)
**trying** (*15*)
**Tuesday** (*1*)
**turn** (*1*)
**Turning** (*1*)
**twice** (*3*)
**two** (*15*)
**two-year** (*2*)
**type** (*4*)
**types** (*1*)

**typically** (*1*)

**< U >**
**Uh-huh** (*4*)
**UK** (*2*)
**unattractive** (*1*)
**uncertainty** (*2*)
**unclear** (*1*)
**uncommon** (*2*)
**understand** (*20*)
**understandable** (*1*)
**understanding** (*12*)
**understands** (*2*)
**understood** (*4*)
**undervalued** (*5*)
**undisclosed** (*1*)
**unfair** (*1*)
**Unfortunately** (*1*)
**unique** (*1*)
**UNITED** (*1*)
**University** (*3*)
**unknow** (*1*)
**unsolicited** (*1*)
**Unusual** (*2*)
**Uplift** (*3*)
**uploaded** (*1*)
**upward** (*1*)
**Ursula** (*3*)
**Use** (*10*)
**usually** (*4*)

**< V >**
**vague** (*2*)
**valid** (*2*)
**Valuation** (*10*)
**valuations** (*1*)
**value** (*13*)
**variable** (*1*)
**various** (*2*)
**verify** (*1*)
**version** (*1*)
**versus** (*1*)
**vested** (*1*)
**Victor** (*1*)
**Vidaurri** (*11*)
**Videoconference** (*2*)
**Videographer** (*20*)
**VIDEOTAPED** (*3*)
**view** (*6*)

**views** (*1*)
**void** (*1*)

**< W >**
**Wachtell** (*49*)
**Wachtell's** (*4*)
**wait** (*5*)
**walk** (*1*)
**wall** (*1*)
**want** (*28*)
**wanted** (*11*)
**wanting** (*1*)
**warding** (*1*)
**waste** (*1*)
**watch** (*1*)
**way** (*16*)
**Wayne** (*4*)
**ways** (*1*)
**weak** (*1*)
**Wednesday** (*2*)
**week** (*2*)
**weighted** (*1*)
**welcome** (*1*)
**Well** (*45*)
**well-known** (*1*)
**went** (*15*)
**We're** (*32*)
**we've** (*8*)
**whatsoever** (*1*)
**White** (*1*)
**willing** (*3*)
**window** (*3*)
**wine** (*6*)
**wishes** (*1*)
**withdraw** (*5*)
**withdrawal** (*2*)
**withdrawing** (*1*)
**withdrawn** (*4*)
**withdraws** (*3*)
**withdrew** (*4*)
**witness** (*35*)
**WLRK** (*2*)
**WLRK's** (*1*)
**Wolverine** (*15*)
**word** (*7*)
**words** (*6*)
**work** (*10*)
**worked** (*4*)
**working** (*3*)

**worth**  *(2)*
**write**  *(3)*
**writes**  *(2)*
**writing**  *(8)*
**written**  *(2)*
**wrong**  *(2)*
**wrote**  *(7)*

**< Y >**
**Yeah**  *(70)*
**year**  *(14)*
**years**  *(12)*
**Yep**  *(11)*
**yesterday**  *(2)*
**YORK**  *(4)*
**Youn**  *(1)*

**< Z >**
**Zephyr**  *(1)*
**Zoom**  *(4)*

Deposition of Karen Rapp                                    In Re National Instruments Corporation Securities Litigation

ERRATA

— — — — — — —

| PAGE | LINE | CHANGE/REASON |
|------|------|---------------|
| 14 | 15 | should say "to" offset dilution not "through" |
| 17 | 4 | should be "million" not "billion" |
| 68 | 20,21,22 | Spelling should be "Ilcisin" |
| 73 | 3 | should be "high" level not "time" level |