# EXHIBIT 2

# FILED UNDER SEAL

UNITED STATES DISTRICT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:23-cv-10488-DLC

IN RE: NATIONAL INSTRUMENTS CORPORATION

SECURITIES LITIGATION

_____/

VIDEOTAPED DEPOSITION OF MICHAEL McGRATH

APPEARING REMOTELY

Tuesday, September 30, 2025

9:46 a.m. Eastern Time

REPORTED BY:

Cheri L. Poplin, CSR-5132, RPR, CRR

APPEARING REMOTELY FROM WAYNE COUNTY, MICHIGAN

REMOTE APPEARANCES:


     FOR PLAINTIFFS:

              NOAM MANDEL
              CHAD JOHNSON
              ANA S. AVALOS CUELLER
              ALYSSA H. PLASCOFF
              Robbins Geller Rudman & Dowd, LLP
              420 Lexington Avenue
              Suite 1832
              New York, New York 10170
              212.432.5100
              noam@rgrdlaw.com
              chadj@rgrdlaw.com
              aavalos@rgrdlaw.com
              aplascoff@rgrdlaw.com


     FOR DEFENDANTS:

              JOHN D. COMERFORD
              JEREMY M. HOFMAN
              Dowd Bennett, LLP
              7676 Forsyth Boulevard
              Suite 1900
              St. Louis, Missouri 63105
              314.889.7300
              jcomerford@dowdbennett.com
              jhofman@dowdbennett.com


ALSO PRESENT:

     Cali Giuggio, Summer Associate, Robbins Geller
          Rudman & Dowd
     Alex Jandrow, Video Technician
     Alex Held, Exhibit Technician

TABLE OF CONTENTS

WITNESS                                              PAGE

MICHAEL McGRATH


EXAMINATION BY MR. MANDEL                             9

EXAMINATION BY MR. COMERFORD                         330


EXHIBITS

(Exhibits attached to transcript.)

MARKED                      DESCRIPTION                      PAGE

EXHIBIT 1       "About the Author of Autonomous
                Vehicles"                                    12

EXHIBIT 2       Email 7/28/22 from Deborah Donahue
                re: NATI Trading Restriction -
                Window Opening - Persons Subject to
                the Trading Window via Exhibit A,
                with attachments
                Bates NAT-SL-00021241  - 21258               22

EXHIBIT 3       National Instruments Corporation
                Minutes of Board of Directors'
                Meeting, January 19, 2022
                Bates NAT-SL-00000048 - 64                   41

EXHIBIT 4       NI January Board & Committee
                Meetings, January 18 - 19, 2022
                Bates NAT-SL-00024256 - 24450                46

EXHIBIT 5       NI Q222 Committee & Board Meetings
                April 19-20, 2022
                Bates NAT-SL-00024451 - 24696                55

EXHIBIT 6       Email string 5/16/22 - 5/20/22 re:
                Introductions and Request for Call
                Bates NAT-SL-00001258 - 1259                 59

EXHIBIT 7        Email 5/20/22 from Eddie Dixon re:
                 Project Wolverine - follow-up/
                 Privileged and Confidential
                 Bates NAT-SL-00010818                    62

EXHIBIT 8        Email string 5/25/22 re: Emerson
                 Letter of Intent
                 Bates NAT-SL-00001113 - 1116             65

EXHIBIT 9        National Instruments Corporation
                 Minutes of a Special Meeting of the
                 Board of Directors, May 26, 2022
                 Bates NAT-SL-00001449                    78

EXHIBIT 10       Email string 5/25/22 re: Slides RE:
                 Privileged - hypothetical/
                 contingency stop look and listen
                 release
                 Bates NAT-SL-00016112                    80

EXHIBIT 11       Email 5/27/22 from Eddie Dixon re:
                 Project Wolverine Confidentiality
                 and Trading Restriction
                 Notification/ Please Read
                 Bates NAT-SL-00016270 - 16271            97

EXHIBIT 12       National Instruments Corporation
                 Minutes of a Special Meeting of the
                 Board of Directors, June 14, 2022
                 Bates NAT-SL-00001447 - 1448             98

EXHIBIT 13       Email string 6/11/22 - 6/12/22 re:
                 FINAL Docs Sent to Board By Eddie RE
                 6-14-2022 Meeting, with attachments
                 Bates WLRK-00000913 - 976                107

EXHIBIT 14       Email string 6/10/22 re: Draft Decks
                 Bates NAT-SL-00011671 - 11672            118

EXHIBIT 15       Email 6/16/22 re: Response to your
                 letter
                 Bates NAT-SL-00001254 - 1255             122

EXHIBIT 16       Email string 6/22/22 re:
                 Follow-up to NI letter dated June 16
                 Bates NAT-SL-00010410 - 10413            124

EXHIBIT 17       Email string 6/23/22 re:
                 Agenda for tomorrow's 1:1
                 Bates NAT-SL-00015282 - 15283            146

EXHIBIT 18       Email string 6/22/22 - 7/7/22 re:
                 Follow-up to NI letter dated June 16
                 Bates NAT-SL-00001250 - 1251            147

EXHIBIT 19       National Instruments Corporation
                 Minutes of a Meeting of the Board of
                 Directors, July 19-20, 2022
                 Bates NAT-SL-00001457 - 1509            153

EXHIBIT 20       Email 7/14/22 from McGrath re: Board
                 Presentation for Tuesday Night, with
                 PowerPoint
                 Bates NAT-SL-00020795 - 20819           159

EXHIBIT 21       Email 7/10/22 from McGrath re:
                 Discussion materials, with
                 PowerPoint
                 Bates NAT-SL-00021516 - 21531           178

EXHIBIT 22       Email 7/12/22 from Dixon re:
                 Privileged and confidential -
                 discussion with Michael
                 Bates NAT-SL-00027877 - 27878           185

EXHIBIT 23       NI Q322 Committee & Board Meetings
                 July 19-20, 2022
                 Bates NAT-SL-00024106 - 24255           188

EXHIBIT 24       National Instruments Corporation
                 Minutes of Special Board of
                 Directors' Meeting, July 25, 2022
                 Bates NAT-SL-00001455 - 1456            208

EXHIBIT 25       Email string 7/26/22 - 7/27/22 re:
                 Last night's minutes/privileged and
                 confidential
                 Bates NAT-SL-00020739 - 20741           216

EXHIBIT 26       Email string 7/26/22 re: NI Special
                 Board Meeting Last night's minutes/
                 privileged and confidential, with
                 PowerPoint                              232
                 Bates NAT-SL-00025798 - 25801

EXHIBIT 27       NI Form 8-K 7/28/22                     237

EXHIBIT 28       Email string 7/26/22 re: Priv,
                 Wolverine
                 Bates NAT-SL-00016998 - 16999           242

EXHIBIT 29          Email string 7/31/22 re: Analyst
                    Projections
                    Bates NAT-SL-00002982 - 2983          244

EXHIBIT 30          Email string 6/22/22 - 8/2/22 re:
                    Follow-up to NI letter dated June 16
                    Bates NAT-SL-00001239 - 1240          248

EXHIBIT 31          Email string 8/9/22 re: Transcript,
                    with FQ# 2022 earnings call
                    transcript
                    Bates NAT-SL-00023501 - 23529         257

EXHIBIT 32          Email string 8/8/22 re: Priv -
                    Wolverine
                    Bates NAT-SL-00016264 - 16266         261

EXHIBIT 33          Email string 8/7/22 - 8/8/22 re:
                    Follow up on buy back
                    Bates NAT-SL-00006694 - 6696          263

EXHIBIT 34          Email string 6/27/22 - 8/10/22 re:
                    Project Wolverine Confidentiality
                    and Trading Restriction
                    Notification/Please Read
                    Bates NAT-SL-00015017 - 15019         274

EXHIBIT 35          Email 8/11/22 from Percival re:
                    Project Wolverine Confidentiality
                    and Trading Restriction is Now
                    Lifted
                    Bates NAT-SL-00009179                 279

EXHIBIT 36          National Instruments Corporation
                    Minutes of a Special Meeting of the
                    Board of Directors, September 20-21,
                    2022
                    Bates NAT-SL-00001450 - 1454          288

EXHIBIT 37          Email 9/19/22 from Dixon re: Board
                    Exec Session Re Wolverine/10:30 am
                    CST (11:30 EST; 8:30 PST)/
                    privileged and confidential
                    Bates NAT-SL-00023189 - 23190         294

EXHIBIT 38          NI Q422 Committee & Board Meetings,
                    October 18-19, 2022
                    Bates NAT-SL-00000070 - 365           299

EXHIBIT 39      Email 10/20/22 from Rapp re: Final
                board decks, with PowerPoints
                Bates NAT-SL-00026220 - 26223          304

EXHIBIT 40      News Release
                Bates GOODWIN 000025 - 48              311
                                                       322
EXHIBIT 41      NI Schedule 14A

Page 8

REPORTED REMOTELY FROM WAYNE COUNTY, MICHIGAN

Tuesday, September 30, 2025, 9:46 a.m. Eastern Time

VIDEO TECHNICIAN:  We are now going on the record.  Today's date is September 30th, 2025, and the time on the monitor is 9:46 a.m.  This is the video recorded deposition of Michael McGrath, Case Number 1:23-cv-10488-DLC.  This deposition is being held at Regus, 170 Commerce Way, Suite 200, Portsmouth, New Hampshire.

My name is Alex Jandrow from Everest Court Reporting and I am the video specialist.  The court reporter today is Cheri Poplin also from Everest Court Reporting.

Counsel will introduce themselves for the record and the witness will be sworn.

MR. MANDEL:  This is Noam Mandel from Robbins Geller for the plaintiff and the class.

MR. COMERFORD:  John Comerford, Dowd Bennett LLP, representing the witness and the other defendants in the case, and I'm here in Portsmouth, New Hampshire, with the witness, and then attending by Zoom is my colleague, Jeremy Hofman.

MR. MANDEL:  And I've got, as we know, several other of my colleagues from my firm are

Page 9

observing via Zoom as well.

MICHAEL McGRATH,

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. MANDEL:

Q.  Good morning, Mr. McGrath.  How are you today?

A.  Good morning.  How are you?

Q.  I'm good.  Thank you very much.  It's nice to meet you after all this time.

Have you ever testified in a deposition before?

A.  Yes, I have.

Q.  About how many times?

A.  Not for a few years.  Not for a few years and not remotely like this, so . . .

Q.  I see.  Okay.  Well, we'll try to make it work.

How many times before would you say you've been in a deposition?

A.  Three to five.

Q.  What types of cases were those?

A.  They were mostly -- they were mostly cases while I was CEO of i2 Technologies, and they were claims against

Page 10

the company for various issues.

Q.  I see.  So when was the last time you testified in a deposition would you say?

A.  Probably 2007.

Q.  And was that a case involving i2?

A.  Yes.

Q.  I see.  Okay.  Doing a depo by Zoom is pretty similar to the rules of the way a depo works in person.  I'll ask questions.  You'll answer them.  Your counsel may object.  In most cases you'll still be required to answer the question even if your counsel objects unless your counsel instructs you not to answer a question.

Given the -- you know, we have to try to not talk over each other.  That's a normal rule in depositions.  It's especially important using this medium so that the reporter can -- can hear us and so that we're speaking clearly and slowly.  I will do my best not to interrupt or talk over you.  I'll ask you to do the same.

If you ever need to take a break, please say the word.  We can try to take a break every hour or so just to stretch our legs and so forth.  However, if we've got a pending question that's on deck, we are not going to take a break with a pending question.

Page 11

You've got to answer the question and then we can break if you need.

Do you understand all that?

A.  Yep.  Fine.

Q.  Are you okay -- are you okay with all that?

A.  Yes.

Q.  All right.  Very good.  Then let's get to the substance.

You're a very experienced businessman; is that correct?

A.  Yes.  I believe so.

Q.  And you've had a very successful career in business; is that correct?

A.  I would like to think so, yes.

Q.  And is it fair to say you're a very sophisticated businessman?

MR. COMERFORD:  Form.

MR. MANDEL:  I'm sorry?

MR. COMERFORD:  Object to the form.

MR. MANDEL:  Thank you.  I didn't hear.

MR. COMERFORD:  It's vague and ambiguous.

A.  I don't -- I don't know.  Sophisticated means different things to different people, so . . . I don't know what you mean by that, but, you know, I'm experienced.  I can say that.

Page 12

BY MR. MANDEL:

Q. Do you regard yourself as a sophisticated businessman?

MR. COMERFORD: Form.

A. What do you mean by sophisticated? Could you just define that a little bit more?

BY MR. MANDEL:

Q. Do you have a meaning for the word "sophisticated" in your mind?

A. I have experience on four publicly traded company boards, so, yeah, I have experience.

Q. Okay.

A. Sophistication is -- is a nuance I think that I -- that different people believe.

Q. Very good. We don't need to get stuck on the word "sophisticated."

MR. MANDEL: Let's put in as our first exhibit -- this is exhibit from our Tab Z-2, please.

(Marked EXHIBIT 1 for identification)

BY MR. MANDEL:

Q. In a moment the document will come up on the screen. You can take control of this document and just have a look at it. Tell me if you recognize the document.

A. I need to scroll down on it somehow.

MR. MANDEL: Can the witness have control?

EXHIBIT TECHNICIAN: The witness has

Page 13

control.

MR. MANDEL: Thank you, Alex.

A. I can't -- how do I scroll up on this? Or scroll down, I guess?

That looks like one of my profiles someplace.

BY MR. MANDEL:

Q. For the record, this is a document from the web. The web address from which it was drawn is listed near the top of the document. This is from the web page for your book Autonomous Vehicles. Do you recognize this?

A. I recognize it. It is somewhat dated I might add, but it --

Q. For the record, again, I looked last night, this is still on the web in this form today.

A. Right.

Q. Or at least it was last night. And this -- if you look at it, there's a section on "Board of Director Experience." Do you see that?

A. Okay. I lost it. Sorry.

Q. It's on the second page. You'll see a heading "Board of Director Experience."

A. Yep.

Q. Now, you see there where it begins it says, "He currently serves as Chairman of the Board of National

Page 14

Instruments . . ."

Do you see that?

A. Yep.

Q. So obviously this was written at the time you were still the Chairman of the Board of National Instruments; is that right?

A. Correct. And the website hasn't been updated. I haven't -- I haven't updated the website in many years, so . . . But it's correct. At that time it's correct, yes.

Q. Understood. So according to this document, you went to Harvard Business School; is that true?

A. That's correct. I have an MBA.

Q. You have an MBA from Harvard Business School; correct?

A. Correct. Yep.

Q. And you founded a company called PRTM; is that right?

A. Correct.

Q. What did PRTM stand for?

A. Pittiglio, Rabin, Todd & McGrath.

Q. And the McGrath in PRTM is you; is that right?

A. That's right.

Q. PRTM was a -- does PRTM still exist?

A. It was acquired by PwC years ago after I retired. I retired in 2004, and it was acquired several years after that.

Page 15

Q. You retired from PRTM in 2004; is that correct?

A. That's correct.

Q. Now, PRTM was a management consulting firm?

A. Correct.

Q. And you ran that firm for about 28 years; is that right?

A. 27. Yep.

Q. And in that time you advised numerous publicly traded companies; is that correct?

A. That's correct.

Q. Numerous Fortune 500 companies; is that correct?

A. That's correct.

Q. And, now, you mentioned this before, your board of directors experience. You've served on the boards of four publicly traded companies; is that right?

A. That's right.

Q. You served on the board of, what was it, The Thomas Group?

A. Yes.

Q. Is that right?

A. Yep.

Q. And about how long did you serve on that board?

A. Four or five years.

Q. And you were also the CEO of that company for a period; is that right?

Page 16

A.   Short period, yes.  I was executive chairman and acting CEO for a period.

Q.   And you served on the board of a company called Entrust; is that right?

A.   That's right.

Q.   You were the chairman of that board as well for a period; is that right?

A.   That's right.

Q.   And you were the chairman of the board when that company was sold; is that right?

A.   That's correct.

Q.   Thoma Bravo acquired it; is that correct?

A.   That's correct.

Q.   And Entrust in all this time was a publicly traded company; is that right?

A.   It was a publicly traded.  Is that what you said?

Q.   Yeah.  During the period of time in which you served on the board it was a publicly traded company; correct?

A.   Yes, it was.  Yes.

Q.   And you also served, you mentioned this before, on the board of i2 Technologies; is that right?

A.   That's correct.

Q.   And you were also the CEO and president of that company for a period; is that correct?

Page 17

A.   Right.  For two and a half years.

Q.   And during that period of time the company was relisted on the NASDAQ; is that right?

A.   Yes, it was.

Q.   And in addition you also spent about ten years on the board of National Instruments; is that right?

A.   Nine.  Right.

Q.   And you were the chairman of the board for about the last five years of that period; is that right?

A.   Yep.  2018.

Q.   So that's nearly 20 years of experience serving on the board of publicly traded companies.  Is that more or less right?

A.   Sounds right.  I haven't done the math, but it sounds right.

Q.   So you served as the director of corporations with public disclosure obligations for approximately 20 years; correct?

A.   Yes.  Yes.

Q.   Okay.  And if we look at your bio here, it states, this is on the top of Page 3, that your experience as a director covers a wide range of activities.  Do you see that?

A.   Yep.

Q.   And you list a number of areas in which you're

Page 18

experienced, including financial management.  Do you see that?

A.   Yep.

Q.   What does that mean, financial management?

A.   Financial management to me means a broad variety of things, including the budgeting and planning for the company, the management of -- of operating expenses, the management of the financials, the accounting, the public reporting of that company in case if it's a public company, cash management, asset management, allocation of resources.  It's pretty much a wide variety of -- of issues.

Q.   Okay.  You go on, it mentions experience in M&A, including the sale of the company.

A.   Yep.

Q.   M&A means mergers and acquisitions; correct?

A.   Correct.

Q.   And you've had experience with sales of a company, and this is before the sale of National Instruments; correct?

A.   Yes.

Q.   So is this a reference to the sale of Entrust?

A.   Yes.

Q.   It also mentions experience with SEC regulation.  What was your experience with SEC regulation?

Page 19

A.   Pretty much broadly as a publicly traded company on all issues of, you know, compliance with the SEC regulations.

Q.   It also goes on to note that you're qualified as a financial expert under SEC guidelines.  What does that mean?

A.   The SEC guidelines for financial expert requires you to either have been a CFO, have supervised a CFO, and some of the qualifications, I'm also a CPA and I've managed CFOs and obviously was a CEO of a public company.  Those are the qualifications that are required for somebody to serve on an audit committee of a publicly traded company.

Q.   So you're leading to my next question.  I know you served on the audit committee of National Instruments; is that correct?

A.   Correct.

Q.   And in the board materials it describes you as a "audit committee financial expert" under SEC rules.  Is that what we were just talking about --

A.   Yes.

Q.   -- where this referred to you as a qualified financial expert under SEC guidelines?

A.   Yes.

Q.   That's the same thing.  Okay.  And you said you were a

Page 20

CPA?

A. Yes. Not -- not -- not -- not an active CPA. I received a CPA, but I don't qualify as an active CPA under the CPA rules.

Q. Why is that?

A. I haven't kept my credentials active for decades, so . . .

Q. Understood. So in all of this experience, you've had a very significant amount of experience with public disclosure on behalf of public corporations; is that right?

A. Um-hmm. Yes.

Q. And public disclosure under SEC regulations; is that right?

A. That's right.

Q. Okay. And in all of that experience, have you had occasion to make determinations concerning the materiality of certain information?

MR. COMERFORD: I'm going to object to the extent that calls for legal conclusions.

BY MR. MANDEL:

Q. You can answer the question.

A. Could you repeat it a little more thoroughly?

Q. The question was, in all the experience we just talked about, did you have occasion to make determinations

Page 21

concerning the materiality of certain information?

MR. COMERFORD: Objection. Calls for legal conclusions. It's a vague hypothetical as well.

You can answer.

MR. MANDEL: John, just to be clear, the legal conclusion is as to what?

MR. COMERFORD: The materiality is a legal term, and so asking the question -- asking the witness if he made determinations about materiality is asking him if he drew legal conclusions, which is improper for this witness.

MR. MANDEL: Okay.

BY MR. MANDEL:

Q. You can answer the question, Mr. McGrath.

A. The -- I think continuously in my role as chairman or board member of -- of publicly traded companies, those issues have come up. We've had legal advice, and they -- I wouldn't -- if you ask me like specific issues, I can't recall specific issues, but it's been a continuing responsibility I guess is how I would word it.

Q. So when you say it's been a continuing responsibility, are you saying that it was a continuing responsibility to make determinations about materiality as a board member?

Page 22

A. It's an ongoing responsibility as a board member. Not -- it's not just one determination, but it's an ongoing responsibility, and it's always done in cooperation with legal counsel. If it's -- if there's any issue at all.

Q. So when you say it's been a continuing responsibility, I take you to be saying that over the course of your time on boards you actually had many occasions to make determinations concerning materiality; is that correct?

MR. COMERFORD: Same objections.

You can answer.

A. Most of them have been pretty obvious. I don't think there's any -- you know, the -- most of the time it's pretty obvious, so yes.

BY MR. MANDEL:

Q. Do you have a working definition of materiality?

MR. COMERFORD: Objection. Calls for legal conclusions.

A. I think it's situational.

MR. MANDEL: Okay. Let's put up Tab -- our next exhibit, this will be Exhibit 2, Tab A-36.

(Marked EXHIBIT 2 for identification)

BY MR. MANDEL:

Q. Now, while this is going, do you -- can you tell me

Page 23

the date when you became Chairman of the Board of National Instruments?

MR. COMERFORD: I apologize, Noam. What's the exhibit number that we're looking at now?

MR. MANDEL: This is -- the new document that's coming up is Exhibit 2.

MR. COMERFORD: Exhibit 2. And the prior -- the bio was Exhibit Z-2?

MR. MANDEL: Oh, no. That's Exhibit 1. I have my own system of tabs here, so when I say Z-2, I'm just calling that tab out to my team. The exhibits are just going to follow the order, McGrath 1, McGrath 2, et cetera.

MR. COMERFORD: Thank you.

MR. MANDEL: So this is Exhibit 2.

MR. COMERFORD: And -- and, Noam, just to make things easier, can we -- could you read the beginning Bates number of the document so that it's on the transcript when we're trying to find this stuff later?

MR. MANDEL: Absolutely. And I appreciate the suggestion.

MR. COMERFORD: Okay.

MR. MANDEL: This document is beginning Bates NAT-SL-21241. And of course just to go back,

Page 24

the first document is not a Bates labeled document, the first exhibit.

BY MR. MANDEL:

Q.   So here we are in Exhibit 2.  Mr. McGrath, have a moment to look at the document, and when you're through, let me know if you recognize any of it.

A.   Okay.  I believe this is the typical document from Albert Percival to the executives and board members regarding the window of trading for insider trading, when it opens and when it closes.  I believe this is the email on when it opened Friday, July 29th.

Q.   Now, I might have already asked.  When did you become the Chairman of The board of National Instruments?  Do you recall the date?

A.   I became the chairman in the fall.  I believe it was October of 2018.

Q.   October of 2018.  Okay.  Now, if we take a look at this document and we go to I guess it's -- after the email you'll see an Insider Trading Q&A followed by a document beginning at Bates 21247 entitled "National Instruments Corporation Insider Trading Policy."  Why don't we scroll to that page.

A.   I'm trying to.

     MR. MANDEL:  Does the witness have control?

A.   Okay.  I'm trying to.  Okay?  It's the Insider

Page 25

Trading Q&A?

BY MR. MANDEL:

Q.   No, no, no.  If you keep going two or three pages, you'll get to another attachment to the email, which is "National Instruments Corporation Insider Trading Policy."

A.   I'm trying to get it.  Who's -- somebody else is controlling it?

     MR. MANDEL:  Does the witness have control or, Alex, do you?

     EXHIBIT TECHNICIAN:  The witness has control.

BY MR. MANDEL:

Q.   So if you just scroll down, sir, to the page with the Bates number 21247.  There you go.  There's 21247 is the upper page there.  Yep.  Scroll up a little more.

A.   Is it -- I'm trying to get through it.  Exhibit A?  No?

Q.   No.  It's before Exhibit A.  If you go back a couple of more pages.

A.   Okay.  Somebody else is --

Q.   Do you see on the bottom right there are numbers?  Those are called Bates numbers.  We sort of use them as litigators.  We use them as page numbers.  So you see this is 21255.  You've got to go up to 21247.  And

Page 26

if I could make a recommendation, near the top of the page you'll see there's arrows.

A.   212 --

Q.   If you use those arrows, you can skip page by page without scrolling.  Yep.  Go up one, up one, and it'll get you there.

A.   Now I can't find the page number.

Q.   This is 21251.

A.   I can't find the page -- I'm trying to scroll.  I can't get it.  I'm sorry.

     MR. MANDEL:  Can we give -- can we give Alex control?  I'm sure he can get you to the right page.  Alex, do you mind?

     EXHIBIT TECHNICIAN:  Yep.  I have it here now.

A.   Okay.

BY MR. MANDEL:

Q.   Yes.  This is the page.

A.   Okay.

Q.   So this is the first page of National Instruments Corporation Insider Trading Policy.

A.   Right.

Q.   You see the -- there's a line there that says "Sponsor."  Do you see -- who sponsors this policy?

A.   Yep.  Board of Directors of National Instruments

Page 27

Corporation.

Q.   Right.  And the effective date of this policy is April 29th, 2020; is that right?

A.   Yep.

Q.   So this is the Board of Directors of National Instruments Corporation Insider Trading Policy from April 29th, 2020; is that right?

A.   Yep.

Q.   And you were the Chairman of the Board at this time; is that right?

A.   Correct.

Q.   So is it fair to say that this is your insider trading policy?

     MR. COMERFORD:  Form.

A.   It's the -- it's the board's policy.

BY MR. MANDEL:

Q.   And you were the Chairman of the Board?

A.   Correct.

Q.   Okay.  If we look down on B right there.  You see where it says "Policy Statement"?  It says, "No Trading on Material Nonpublic Information."

     Do you see that?

A.   I see the "Policy Statement."  Yeah.  I see the headline, but I don't see the text, but . . .  That's correct.

Page 28

Q.  Well, right under the "Policy Statement" there's an underlined phrase that says "No Trading" --

A.  I see -- I see -- I see the underlined phrase, yes.  I can't --

Q.  Yeah.  And it says -- so you understood that there was no trading on material nonpublic information; correct?

A.  Correct.

Q.  And you advised everyone in the company of this reality; is that right?

A.  Yes.

Q.  And your policy goes on to say or the board's policy goes on to say, "It is illegal for anyone to trade in securities on the basis of material nonpublic information."

      Do you see that?

A.  I don't see it, but I believe it.

Q.  Can we zoom in a drop?

A.  I'm trying to get down to it.

Q.  Oh, no, no.  You're already on the next page.  We're still on the same page.

A.  Okay.

Q.  There we go.  See that?  "It is illegal for anyone to trade in securities on the basis of material nonpublic information."

      You see that; is that right?

Page 29

A.  Yes.

Q.  So you understood at this time that it was illegal for anyone to trade in securities on the basis of material nonpublic information; is that right?

A.  That's correct.

Q.  And I note that this document is attached to an email dated July 28th, 2022.  So at that time did you understand that it was illegal for anyone to trade in securities on the basis of material nonpublic information?

A.  Yes.

Q.  Let's move to the next page.  Now, in the middle of the next page at Number -- Paragraph Number 3 is a section called "Definition of Material Nonpublic Information."

      Do you see that?

A.  Um-hmm.  Yes.

      MR. COMERFORD:  Let me just object that the document's only partially readable based on how it's displayed on the screen.  Thank you.

      MR. MANDEL:  What do you mean the document's only partially readable as displayed on the screen?  We're zooming in and out so the witness can see the letters better.  The entire document and the exhibit are right there.  What is your objection?

Page 30

      MR. COMERFORD:  Yeah.  It was -- it was -- I was just saying, Mr. Mandel, it was zoomed in too much and words were cut off.

      MR. MANDEL:  I see.  Well, let's zoom to the witness's comfort letter -- comfort.  Level.

BY MR. MANDEL:

Q.  And, Mr. McGrath, are you able to see Paragraph 3?

A.  Yes.  I can't read it clearly, though, because it's too small.

Q.  Okay.  Well, we can zoom in so you can see the words.

A.  Right.  Okay.  Could you zoom in to whatever you're talking about when you talk about it?

Q.  Yeah.  It's right there.  Do you see Number 3?

A.  I see it.

Q.  Is this large enough for you to see, sir?

A.  I see it, yes.

      MR. COMERFORD:  Okay.  But -- but it's zoomed in so far now that some of the words are not readable, so we're -- I'm just pointing that out.  We have to kind of strike a balance of making it readable but also not cutting off any words.

      MR. MANDEL:  Pause.  What is not --

BY MR. MANDEL:

Q.  Mr. McGrath, are you having trouble reading any of the words on the screen right now?

Page 31

A.  I can read the words on the screen, but I can't see the whole -- all of 3, so I can only see 3-A through C, so . . .

Q.  Oh, I understand that.

      MR. MANDEL:  So, Mr. Comerford, is your objection that when we zoom in on a certain part we can't see the other part of the page?

      MR. COMERFORD:  Yep.

      MR. MANDEL:  Okay.  That's a ridiculous objection.  We're just going to proceed.

      MR. COMERFORD:  I cannot see part -- some of the words on -- that are -- of this document.

      MR. MANDEL:  Okay.  You can't?  I remember at the beginning of this deposition Alex explained to you that you have an independent link where you can view all of these exhibits in their entirety independently.  So, Mr. Comerford, please, let's not distract from the substance here.

      MR. COMERFORD:  I'm looking at Alex Held Tech Screen, and it's zoomed in so much that I can't see some of the words.  Some of the words on the side of the document are cut off.  I'm just pointing this out.  I would appreciate it if Alex Held would zoom so that the document is readable.  On the right side of the document the words are cut off.  Is Alex Held --

Page 32

BY MR. MANDEL:

Q. Mr. McGrath, are the words cut off on the right side of the document on your screen?

A. No. But I can't see all of 3, so --

MR. MANDEL: Can we go off the record so we can fix Mr. Comerford's situation here? Evidently he's not seeing what me and the witness are seeing.

VIDEO TECHNICIAN: Do we want to go off the record?

MR. COMERFORD: I don't know. I -- I'm looking at Alex Held's Tech Screen, and for some reason he's zooming in too much. Okay. I -- I am trying to fix it through Zoom. You can -- you can go ahead, Mr. Mandel. I'm not -- I'm not objecting to the question. I'm just objecting to how the document was displayed on the screen.

MR. MANDEL: Understand. On your screen. Objecting in the way it was displayed on your screen. The witness seems to be able to see the document.

BY MR. MANDEL:

Q. So let's proceed here because, Mr. McGrath, you can see Paragraph 3 perfectly well, can't you?

A. I can see Paragraph 3 through A through C.

Q. A through C. Okay.

A. Now I can just see A, 3-A. But okay. Go ahead.

Page 33

Q. Okay. Well, let's just focus on Paragraph 3 itself where it says "Definition of Material Nonpublic Information." You see that full well? Yes?

A. Yes. Yep.

Q. Okay. And it goes on to say -- and, again, it goes on to say, "'Material Information' means information that a reasonable investor would be substantially likely to consider important in deciding whether to buy, hold or sell securities of the Company or view as significantly altering the total mix of information available in the marketplace about the Company as an issuer of securities."

Do you see that?

A. Yes.

Q. Is that a correct definition of materiality?

MR. COMERFORD: Object to the form. Calls for legal conclusions. Lacks foundation. Calls for speculation.

A. That's -- that's the legal definition we use at National Instruments obviously.

BY MR. MANDEL:

Q. And was it your understanding at that time that this is a correct definition of material information?

A. Yes.

MR. COMERFORD: Same objections.

Page 34

BY MR. MANDEL:

Q. And is it your view today that this is a correct definition of material information?

MR. COMERFORD: Same objections.

A. Yes.

BY MR. MANDEL:

Q. You agreed with me that this is the board's policy; is that right?

A. Yes.

Q. Isn't it strange that your lawyer is objecting to this as requiring a legal conclusion? Are you a lawyer?

MR. COMERFORD: Objection. Asking the witness to opine about his attorney's objections. I'm assuming that's a rhetorical question, Mr. Mandel, that you don't actually want him to answer.

BY MR. MANDEL:

Q. Mr. McGrath, are you a lawyer?

A. No.

Q. So when you -- when the Board of Directors issued this document, was it giving legal advice?

A. Oh, absolutely.

Q. The Board of Directors was giving legal advice?

MR. COMERFORD: Object to the form.

A. Was getting or giving? Can you clarify your wording?

BY MR. MANDEL:

Page 35

Q. Well, this is the board's policy; right?

A. Right.

Q. And this policy is distributed to National Instruments personnel; is that right?

A. Yes.

Q. So was the Board of Directors giving legal advice through this document?

MR. COMERFORD: Object to the form. Calls -- calls for speculation. Lacks foundation. And object to the extent it calls for legal conclusions as well.

A. It was a policy.

BY MR. MANDEL:

Q. Did the policy contain any errors, to your knowledge?

A. No.

Q. Did the policy inaccurately state the definition of material information?

MR. COMERFORD: Object to the form. Calls for legal conclusions.

A. No. No. Nothing I was aware of.

BY MR. MANDEL:

Q. So you understood material information to mean what it says here; is that right?

A. Yes.

Q. It goes on to say, "In general, any information that

Page 36

could reasonably be expected to affect the market price of a security is likely to be material."

Do you see that?

A.  Yes.

Q.  Did you understand that at the time?

A.  Yes.

Q.  Now, if we go a little bit lower on this document, it says, "It is not possible to define all categories of 'material' information."

Do you see that?

A.  Yes.

Q.  It goes on to say, "However, some examples of information that could be regarded as material include, but are not limited to," and then it gives a list of examples of material information; is that right?

A.  Yes.

Q.  Now, if we scroll to the next page.  Let's look at l.  So l gives us an example of material information, "significant corporate events, such as a pending or proposed merger . . ."; is that right?

A.  Yes.

Q.  So did you understand that a proposed merger was material information?

MR. COMERFORD:  Form.  Calls for legal

Page 37

conclusions.  Assumes facts not in evidence.

A.  Yeah.  Yeah.  I understand that.

BY MR. MANDEL:

Q.  You understand what, sir?

A.  Your question.

Q.  So you understand that your own -- that National Instruments' board's insider trading policy correctly stated that pending or proposed mergers were material information; is that right?

MR. COMERFORD:  Form.

A.  That's correct.

BY MR. MANDEL:

Q.  Now, if you scroll down a little more, it just says, "As a rule of thumb . . ."  Do you see that paragraph beginning with "As a rule of thumb"?

A.  Yep.

Q.  It says, "As a rule of thumb, if you think something might be material nonpublic information, you should treat it as such."

Do you see that?

A.  Yes.

Q.  Do you think that's good advice?

A.  Yes.

Q.  Now, let's go to the previous document attached here, which is the Insider Trading Q&A beginning at Bates

Page 38

21243.  And if you would go to the second page of the document.

Now, to be clear, this is a Q and A about the board's policy; is that right?

A.  Yes.

Q.  So is it fair to say that this is intended as a plain English explanation of what's in the board policy?

MR. COMERFORD:  Form.

A.  I -- it's an explanation, yes.  It's a Q and A document, yes.  I don't know about plain English.  Yes.

BY MR. MANDEL:

Q.  Well, it's intended to explain the board's policy; is that right?

A.  Yes.  That's correct.

Q.  And to answer questions that might come up regarding the policy; is that right?

A.  That's right.

Q.  Almost like a frequently asked questions; is that right?

A.  That's correct.

Q.  So let's go to Page 244, and you see right there there's a question "What is Material Nonpublic Information?"  Do you see that?

A.  Yes.

Page 39

Q.  And it states here, "'Material Nonpublic Information' means information that a reasonable investor would be substantially likely to consider important in deciding whether to buy, hold or sell company securities or view as significantly altering the total mix of information available in the marketplace about a company, as an issuer of the securities."

Do you see that?

A.  Yes.

Q.  Did you understand that to be so at the time?

A.  Yes.

Q.  It goes on to say, like we saw in the policy, "In general, any information that could reasonably be expected to affect the market price of NI shares or an investment decision by an investor is likely to be considered material . . ."

Do you see that?

A.  Yes.

Q.  Do you agree with that?

A.  Yes.

Q.  You believed it at the time?

A.  Yes.

Q.  And if you go on, you'll see there's two bullets beneath that paragraph, and the last sentence of the paragraph says, ". . . some examples of information

Page 40

that could be regarded as material include, but are not limited to" and it gives two bullets here; is that right?

A. Yes.

Q. We saw previously in the policy that there were numerous examples of material nonpublic information; is that right?

A. Yes.

Q. Here there are only two; is that right?

A. I believe so. I can't see the whole document, but I can see two. Yeah. Two bullet points I see.

Q. Yeah. So the Q and A focused on only two of the various examples of material nonpublic information; is that right?

A. Yes.

Q. And you see the second bullet refers to as an example of material nonpublic information "Knowledge of a significant acquisition or divestiture . . ."
     Do you see that?

A. Yes.

Q. Do you agree with that?

A. Yes.

Q. Did you understand this at the time?

A. Yes.

Q. And this goes on to reiterate, "As a rule of thumb, if

Page 41

you think something might be material nonpublic information, you should treat it as such."
     Do you see that?

A. Yes.

Q. And, again, you think that's good advice?

A. Yes.

Q. Okay. So is it fair to say that you had a pretty good understanding of what material nonpublic information is --

A. Yes.

Q. -- as of this time; is that right?

A. Yes.

     MR. MANDEL: Let's put up what will be our Exhibit 3, which is our Tab M-1.
     (Marked EXHIBIT 3 for identification)

BY MR. MANDEL:

Q. Take a look at the document. Tell me if you recognize it, please.

A. It's minutes of our board meeting of January 19, 2022.

Q. Correct. And the Bates number of this document is NAT-SL-0000004 -- sorry, 48.
     Now, you attended this meeting; is that right?

A. Yes.

Q. Now, if you go to Page 5 of 17, which is Bates ending

Page 42

52, please. A little below that -- yeah. Near the bottom of the page. There's a -- do you see there there's a discussion here of "Capital Allocation Strategy, Dividend Resolution and Stock Buy-Back Resolutions"? Do you see that?

A. Yes.

Q. The minutes describe a discussion from Mr. Starkloff; is that right?

A. It appears to, yes.

Q. And it says that he "discussed his desire to maintain the current M&A strategy, stock-repurchases and dividends as priorities but shift the mix over time."
     Do you see that?

A. Yes.

Q. So did this mean that it was -- up until this time the company had a relatively steady dividend; is that right?

A. Yes.

Q. And do you understand that the words here a "desire to maintain the current M&A strategy, stock-repurchases and dividends as priorities but shift the mix over time" as meaning that Mr. Starkloff discussed his desire to shift the mix from consistent dividends to also having consistent stock repurchases over time?

A. He didn't have the authority to shift dividends.

Page 43

Dividends are approved by the board of directors, not by the CEO.

Q. Oh, I understand. What I'm saying is is that he's -- he's approaching the Board of Directors here regarding certain resolutions, including a resolution for stock buybacks; right?

A. Including that. Yep.

Q. Right. So he's asking the board for some authority here, and what he's saying here is that he wants to shift the mix over time from dividends to stock repurchases; is that right?

A. No. No. There was -- there was never a discussion or motion to shift dividends to stock repurchases. It was really related to capital allocation in its entirety, some of which was used for acquisitions, some of which was used for dividends, and some of which was used for stock repurchases, but I don't recall any discussion about eliminating dividends and using it for stock repurchases. It was an overall capital allocation strategy discussion.

Q. So, to be clear, I'm not suggesting that Mr. Starkloff or anyone proposed eliminating dividends.

A. Or reducing dividends.

Q. Or reducing dividends in any way. I'm not really asking about that.

Page 44

A.   Right.  Okay.  It was -- it was --

Q.   I'm talking about the stock repurchases, there had not been up until this time consistent stock repurchases; is that right?

A.   I don't think that's correct.

Q.   Okay.

A.   There was a previous -- there was a previous approval by the board for stock repurchases that either expired or was used up, and then I believe at this meeting we were discussing a new restocking -- new stock repurchase program to follow that one.

Q.   And was it the intention to implement that stock repurchase over time?

A.   Of course.

Q.   It was not the intention to suddenly do a whole bunch of repurchases; right?

A.   No.  The repur -- no.  It's -- it's -- it was a -- there's a stock repurchase plan approved by the board that gives the CEO the authority to execute against that plan with the constraints of the plan.

Q.   And the intention was to shift the mix toward stock repurchases over time?

A.   No.  No.

Q.   Is that right?

A.   No.  No.  The intention was to responsibly use our

Page 45

capital, our cash and other capital to balance M&A, dividends, and stock repurchases.  In some cases we would probably favor M&A if we had -- an M&A in this case is us acquiring another company.  We would shift our capital to take advantage of an acquisition as opposed to stock repurchases.  There was never a discussion about eliminating dividends or reducing them for acquisitions or stock repurchases.  The discussion is how do we responsibly use our capital in three different ways.

Q.   And the -- and Mr. Starkloff expressed a desire to shift the mix over time; is that right?

A.   The shift in the mix primarily would occur if we had an attractive acquisition opportunity.  That would be more the driving factor than -- than repurchase.  We repurchase shares for very clear reasons.

Q.   And if you'll turn to the next page.  You'll just see here a discussion near the top of approval of a $250 million stock repurchase program?

A.   Correct.

Q.   Is that right?

A.   Yep.

Q.   And that was approved at this meeting; is that right?

A.   Yes.  That's correct.

        MR. MANDEL:  Let's look at what will be our

Page 46

Exhibit 4.  That's our Tab M-2.  This is beginning Bates NAT-SL-24256.

        (Marked EXHIBIT 4 for identification)

BY MR. MANDEL:

Q.   Now, this first page of the document, are you able to see the entire page?

A.   This is the agenda?

Q.   Yes.  Are you able to see that?

A.   Okay.

Q.   So just as a -- just to lay a foundation here, is this a standard form of agenda that you as a board member would receive for board meetings at National Instruments?

A.   Yes.

Q.   And typically these agendas include agenda items, that is, subject for discussion at the meeting; is that right?

A.   For discussion and approval, yes.

Q.   And typically these agendas come with documents behind them; is that right?

A.   Usually, yes.

Q.   And those are the documents that typically would be reviewed at the meeting; is that right?

A.   Yes.  That's correct.

Q.   Okay.  Now, you'll see on this agenda, Item 7, there's

Page 47

a "Capital Allocation Strategy."  Do you see that?

A.   Yep.

Q.   Okay.  So let's turn to that section of this document.  That's at Bates 24400.  And this is the first page of the discussion of the "Capital Allocation Strategy"; is that right?

A.   Correct.

Q.   Now, if we go to Page 24404.  Now, you see it says there -- it's describing the "Shareholder View of Return."  Do you see that?

A.   Yes.  I can't see the whole slide, so I can't see the axis on the bottom, but . . .  Okay.  Yep.

Q.   Now, do you see right across right beneath "Shareholder View of Return" it says "NATI leads peers with dividend but lags in consistent repurchase"?

A.   Yes.

Q.   What did that mean, lags in consistent repurchase?

A.   I think this is a peer comparison of dividend and stock repurchases.

Q.   And so what does it mean that National Instruments lags in consistent repurchases?

A.   It means that we're repurchasing -- I'm going to have to read the axis here, but . . .  The last -- the last 12 months share repurchases as a percentage, and we are repurchasing fewer shares than competitors -- than

Page 48

peers, not competitors, but peers.

Q. So did other -- did peers or competitors have consistent repurchases?

A. What this chart shows is what they did over the last 12 months, so . . . I don't know about peers consistently over a period of years, so . . . That's a different chart, I guess, or a different question.

Q. Is this indicating that National Instruments did not have a consistent repurchase?

A. It's indicating that we -- we repurchased fewer shares than peers in this chart.

Q. So was the goal to implement consistent repurchases?

A. In general, yes. Yes.

Q. Now, let's go back to --

A. Stock repurchases and dividends are the way we return capital to shareholders, and, you know, it's important to do both or a mix.

Q. And the goal was to do the repurchases consistently; is that right?

MR. COMERFORD: Form.

BY MR. MANDEL:

Q. You just answered that question.

A. What do you -- to do enough of -- to do enough of this we're balancing our capital allocation, yes.

Q. Okay. Let's move two pages ahead to Bates 24406.

Page 49

Now, you see on the left side of the page there it talks about "Prioritized use of cash"; is that right?

A. Yep.

Q. And it's talking about the dividend, as we were discussing, and then it goes on to say, "Repurchase shares to offset dilution" --

A. Yes.

Q. -- "(approximately 2.2 million shares a year)."

Do you see that?

A. Yes. Yes.

Q. And then it goes on to say, "Excess cash will be used to repurchase shares"; is that right?

A. Yes.

Q. So the idea is, if I'm understanding, to repurchase about 2.2 million shares a year to offset dilution and then beyond that any excess cash would be used to repurchase shares? Is that what this means?

A. The -- the repurchase of shares to offset dilution was important to us because we had an incentive stock program where we granted stock to employees, and we wanted to, as best possible, to offset that increased number of shares by repurchasing shares equivalent to the shares that we gave to employees so that there wouldn't be dilution for shareholders. It was an

Page 50

important part of our program.

Q. And so this anticipates about 2.2 million share repurchases a year for that purpose; is that right?

A. That would be the -- that would be the intent. That doesn't -- that wasn't a commitment, but that would -- was the intent.

Q. Okay.

A. It was a priority --

Q. Just to -- let's just jump forward a little bit here. You know this case arises from repurchases National Instruments did in August and September of 2022; is that right?

A. What was the question?

Q. You know that this case arises --

A. Oh, this -- this legal case, yes. Correct.

Q. Yeah. Stock repurchases in August and September of 2022; is that right?

A. Yes. That's correct.

Q. Do you know about how many shares National Instruments repurchased during that really narrow period?

A. I don't -- I don't recall the exact number, no.

Q. You know it was over two million? Do you know that?

A. Okay.

Q. So the intention was to do 2.2 million in repurchases over a year, and what ultimately happened was National

Page 51

Instruments did over two million in repurchases in about five weeks; is that right?

MR. COMERFORD: Form and foundation.

A. I don't have those exact numbers in front of me. I'll take your word for it. And the -- and it's done for two purposes. Obviously the excess cash used to repurchase shares and repurchase shares to offset dilution, so . . .

BY MR. MANDEL:

Q. Sure. But the intention was to do 2.2 million over a year, and National Instruments did them in the course of a few weeks; correct?

A. There was no intent that we would cap it at 2.2 million. The intent was that we wanted to at a minimum offset dilution with the $2.2 million. The actual -- the 2.2 million shares. The actual authorization by the board was $250 million.

Q. Sure. But the plan was about 2.2 million shares a year in repurchases to offset dilution?

A. No. The plan was that we would buy back $250 million over the course of the life of that plan.

Q. Okay.

A. Including -- including -- including a minimum of 2.2 million and also repurchases using excess cash which we had at the time. Okay. And the -- we had

Page 52

excess cash at the time, and it's probably important to note that we paid a three percent dividend or approximately a three percent dividend, close to three percent, and we were earning at this time about one percent on our cash, so that it was a diligent thing at that point in time to buy back shares to save three percent that we were paying out and forego one percent that we were earning on our cash, so at that particular time period there was also an important cash management factor that we had to consider which was that we were losing money by paying dividends instead of using -- earning one percent on our cash, so at that point in time there was another factor that we had to consider, which was repurchasing shares to re -- to improve our return on our cash essentially.

Q. Okay. So the top of this page is labeled "Scenario of Cash Projections"; right?

A. Yep.

Q. And the chart on the right reflects those cash projections; is that right?

A. Yes.

Q. Okay. So what's -- the share repurchase. See the line there for "Share Repurchase"?

A. Yes.

Q. So it's projected there for the year 2022 is a hundred

Page 53

million in share repurchase; is that right?

A. Yes.

Q. So the plan was to do a hundred million in share repurchases for the year 2022; is that correct?

A. That was the tentative plan, yes.

Q. Now, at the time -- you were sort of referencing this a little bit a moment ago. At the time that this slide was prepared, at the time this authorization of the buybacks occurred, the company began the year 2022 with 211 million in cash; is that right?

A. I have to see it on this chart, I guess.

Q. The top line is "Beginning Cash."

A. I can't see the top line on the chart. Sorry.

MR. MANDEL: Can we zoom on the chart so that the witness can see it?

A. Okay. Yes. I see it now.

BY MR. MANDEL:

Q. So at that time, again, this approval is in January, you began 2022 with 211 million in cash; is that right?

A. Correct.

Q. And were projecting cash from business operations for that year of 302 million; is that right?

A. Yes.

Q. And you see here that this hundred million in share

Page 54

repurchases is 36 percent of the company's projected free cash flow for 2022; is that right?

A. Yes. Approximately.

Q. Of course this document near the bottom there's a line for "EPS Improvement." Do you see that?

A. No. Okay. Now I do, yes. Okay.

Q. And so this reflects that share buybacks improve EPS; is that right?

A. That's correct.

Q. Share buybacks improve EPS because, what, there are fewer shares to divide the earnings amongst; is that right?

A. Exactly. Fewer shares outstanding, yes.

Q. So this shows, for example, that for 2022 the projected EPS improvement of these buybacks was $0.02 a share; is that right?

A. Yes.

Q. Okay.

MR. MANDEL: Okay. Very good. Let's press forward now to our next exhibit. This will be Exhibit 5. This will be our M-4.

EXHIBIT TECHNICIAN: Hang on, counsel. I'm not seeing an M-4 in the folder.

MR. MANDEL: It's coming up. It should be coming up.

Page 55

EXHIBIT TECHNICIAN: That was Alex, the tech. I was saying I don't see an M-4 in your folder. Hold on.

MR. MANDEL: Oh. It's coming. Hold on. We're going to post the document in a second.

EXHIBIT TECHNICIAN: Okay.

MR. MANDEL: I'm not sure the situation with the folder.

Evidently we're having a small issue with the exhibit. Maybe a technology issue. Perhaps you could help us with it, Mr. McGrath. I know you're probably much more capable with technology than I am. It's uploading there I'm told. Should be loading.

EXHIBIT TECHNICIAN: Okay. I have it now. Thank you.

MR. MANDEL: Thank you. Apologies for that.

(Marked EXHIBIT 5 for identification)

BY MR. MANDEL:

Q. So, again, for the record, this is Exhibit 5. This is -- appears to be the April board book.

A. Yep.

Q. The Bates number is NAT-SL-24451.

So, Mr. McGrath, do you recognize this document?

Page 56

A.   Yes.

Q.   It's the April board book and agenda?

A.   Yes.  Yes.

Q.   If we could turn, please, to Bates 24518.  It's the first page of the "Capital Strategy" section of the board book.  So this is the section of the board book where the capital strategy materials are discussed; is that right?

A.   Yes.

Q.   And if we go to the next page, you see a document entitled "Capital Summary."  Do you recognize this document?

A.   Yes.

Q.   Are you familiar with this layout of the document?

A.   Can I see the whole document?  Okay.

Q.   Okay.  So are you familiar with this document?  Have you seen slides like this before?

A.   Yes.

Q.   Is this a relatively standard slide reviewed by the board?

A.   Yes.

Q.   Now, you see the line there for "Share repurchase"?

A.   Yes.

Q.   So this is, again, projecting for the forecast full year 2022 a hundred million in share repurchases; is

Page 57

that right?

A.   Correct.

Q.   And projecting 20 million of those repurchases for the third quarter of 2022; is that right?

A.   Which quarter did you say?

Q.   For the third quarter of 2022 it's projecting.

A.   Yes.

Q.   So it's forecasting 20 million for that quarter; right?

A.   Yes.

Q.   Okay.  Now, at this time the previous quarter had negative cash flow; is that right?

A.   Q1, yes.

Q.   Q1 was a loss; is that right?  Negative cash flow?

A.   It's not a loss, but a negative cash flow.  Correct.

Q.   Negative cash flow?

A.   Not an operating loss, but a negative cash flow, yes.

Q.   Understood.  And the forecast for the second quarter at this time was 53 million; is that right?  In cash from business operations?

A.   Yes.

Q.   And if you look --

A.   Now, you know -- you know why the first quarter -- okay.  Go ahead.  Finish.  Go ahead.

Q.   So before we saw that at the time the 250 million in

Page 58

buybacks were authorized that the projection for cash from business operations for full year 2022 was over 300 million; is that right?

A.   I don't recall.  I'm sorry.  I'd have to go back and look.

Q.   Well, the document you just saw, "Scenario of Cash Projections," we just went over this, it's in the record, the cash from business operations projected was 302 million.  Do you remember seeing that a few minutes ago?

A.   I do, yes.

Q.   Okay.  So by April the forecast for cash from business operations for the year 2022 was down to 239 million for the year; is that right?

A.   It looks that way, yes.

Q.   Okay.  And at this time again the intention was to do only 20 million in buybacks in the third quarter; is that correct?

A.   Yes.  That was the forecast.  Yes.

        MR. MANDEL:  We've been going about an hour.  Should we take a five-minute break?

        THE WITNESS:  If we want to, yes.

        MR. MANDEL:  Why don't we do that.  Let's take five real quick.

        THE WITNESS:  Okay.

Page 59

        VIDEO TECHNICIAN:  All right.  Going off record at 10:50.

        (Recess taken at 10:50 a.m.)

        (Back on the record at 11:00 a.m.)

        VIDEO TECHNICIAN:  Going back on record at 11 a.m.

        MR. MANDEL:  Let's move forward to what will be Exhibit 6.  This is our document Tab A-6.

        (Marked EXHIBIT 6 for identification)

        MR. MANDEL:  For the record, this is Bates NAT-SL-00001258.

BY MR. MANDEL:

Q.   Mr. McGrath, this is an email chain between you and Mr. Starkloff in which Mr. Starkloff forwarded an email from Mr. Lal Karsanbhai to you.  Do you see that?

A.   Yes.

Q.   Now, the date of Mr. Karsanbhai's email to Mr. Starkloff is May 16th.  Do you see that?

A.   Yes.

Q.   Now, in this email Mr. Karsanbhai writes to Starkloff asking if he has ten minutes for a brief phone call.  Do you see that?

A.   Yes.

Q.   Do you know if that ten-minute phone call happened

Page 60

that week?

A.  I don't know specifically.  I assume so.  That was three years ago, so I don't recall exactly.  I assume it did.

Q.  He goes on to say, "I am looking forward to introducing myself and speaking to you for a few minutes ahead of meeting you in person."

Do you see that?

A.  Yes.

Q.  When Mr. Karsanbhai here is referring to meeting Mr. Starkloff in person, do you know what he's referring to?

A.  Meeting him in person.

Q.  Well, he says, "I am looking forward to introducing myself and speaking to you for a few minutes ahead of meeting you in person."

A.  I don't -- I don't recall if they ever met in person actually after this, but they may have.  I don't think they did, but they may have.

Q.  I see.  So Mr. -- as you know, Mr. Karsanbhai sends a letter with a proposal to acquire National Instruments on May 25th.  We'll look at that document in a minute.

A.  Right.

Q.  My question is, do you know if Mr. Karsanbhai -- Misters Karsanbhai and Starkloff met in person prior

Page 61

to that letter?

A.  I don't recall.  I'm sorry.

Q.  Are you aware that National Instruments held a conference called NI Connect at about this time in 2022?

A.  Yes.

Q.  Do you know if Mr. Karsanbhai attended NI Connect?

A.  I don't -- I don't know that he did.  He may have, but I don't know that he did.

Q.  Did you attend NI Connect?

A.  I attended most of them, but I don't recall if I attended in 2002 -- 22.

Q.  And just implicit in your previous answers, you don't recall meeting Mr. Karsanbhai there; right?

A.  I -- I've never met him.  Still haven't met him.

Q.  You've never met Mr. Karsanbhai?

A.  I've never met him.  Still haven't met him.

Q.  Okay.  That saves me a couple of questions.

Did you have an understanding of what Mr. Karsanbhai was contacting Mr. Starkloff for?

A.  Only speculation.

Q.  Did you have an understanding concerning whether this might be about a potential M&A deal?

A.  We speculated that was one of the possibilities.  We had no -- we had no awareness or suspicion or thinking

Page 62

ahead of this that Emerson was somebody that would be interested in NI for an acquisition at all, so it was out of the clear blue.  So we didn't really have anything other than speculation.

Q.  But once Mr. Karsanbhai reached out to Mr. Starkloff, you believed it was possible that the outreach was about a potential acquisition of National Instruments; is that correct?

A.  It was -- it was a possibility and speculation.  It could also have been a joint venture.  This could have been an attempt to hire Eric.  I don't know.  We speculated on several things, but that was one of them.

MR. MANDEL:  Okay.  Let's go to our next document.  This will be our Exhibit 7, and this is a document -- Alex, it's A-7 new.  There's a regular A-7 in there.  This is A-7 new, which is an unredacted lately produced version of the document.  For the record, the Bates number of this document is NAT-SL-10818.

(Marked EXHIBIT 7 for identification)

BY MR. MANDEL:

Q.  Now, this document is a meeting invite for a meeting involving you, Mr. Starkloff, Mr. Dixon, and a gentleman named Sabastian Niles.  Do you see that?

Page 63

A.  I believe so, yes.

Q.  Sabastian Niles is an attorney at the Wachtell law firm; is that right?

A.  That's correct.

Q.  Now, this meeting invite was sent on May 20th, 2022.  Do you see that?

A.  Okay.

Q.  And it was setting up a meeting for May 25th?

A.  Correct.

Q.  See that?  And the subject of this email is "Project Wolverine."  Do you see that?

A.  Yep.

Q.  What was Project Wolverine?

A.  That was the project related to the offer -- eventual offer by Emerson.

Q.  So on May 20th there was an invite regarding Project Wolverine to discuss Emerson's approach; is that right?

A.  Yes.

Q.  Now, at this time had Mr. Karsanbhai or Emerson submitted a proposal to acquire the company?

A.  I believe he talked to Eric by phone prior to submitting a written proposal.

Q.  Do you have an understanding when he talked to Mr. Starkloff by phone?

Page 64

A.   I believe it was prior to the 20th.

Q.   And did Mr. Karsanbhai, to your knowledge, on that call explain his intention to acquire -- for Emerson to acquire National Instruments?

A.   I wasn't on the call, so I didn't -- I didn't -- so . . .

Q.   Did Mr. Starkloff tell you about the call?

A.   Most likely he did and most likely that's why I recall this meeting.

Q.   I mean, you testified a moment ago that Mr. Karsanbhai had informed Mr. Starkloff about Emerson's proposed acquisition of National Instruments by phone before the formal offer letter was received; right?

A.   Yes.

Q.   And before May 20th it would have had to have been; right?

A.   Yes.

Q.   What else did Mr. Starkloff tell you about that phone call?

A.   I don't -- I don't recall the specifics, but obviously he told me that they were going to make an offer to acquire NI.

Q.   And so even prior to receiving a proposal, you were referring to Emerson's approach as Project Wolverine; is that right?

Page 65

A.   It looks like that, yes.

Q.   And so you understood there was a potential acquisition taking place here even before there was a formal proposal; is that right?

A.   Yes.

     MR. MANDEL:  Now, let's look at our next document.  This will be our Exhibit 8 and this is Tab A-8.  And for the record, this is Bates NAT-SL-00001113.

     (Marked EXHIBIT 8 for identification)

BY MR. MANDEL:

Q.   For the record, this is an email from Mr. Starkloff to McGrath forwarding an email from Mr. Karsanbhai with a letter attached to that email; is that correct?

A.   Yes.

Q.   Now, this was -- the letter attached to this email is Emerson's first acquisition proposal of National Instruments; is that right?

A.   The first written one, yes.

Q.   The first written one, yes.  Because they proposed it orally previously; correct?

A.   Yes.

Q.   And Mr. Starkloff received this email on May 25th, 2022, and forwarded it to you on the same day; is that right?

Page 66

A.   Yes.  Yes.

Q.   Let's have a look at that letter.  Let's go to the next page.

     Now, this letter begins with Mr. Karsanbhai expressing his excitement; is that right?

A.   Okay.  Yes.  That's what it says.

Q.   He says he's excited to present you with this proposal; is that right?

A.   Yes.

Q.   And he begins the next paragraph noting that he's very excited about the combination with National Instruments; is that right?

A.   Yes.

Q.   So it's fair to say he was eager to -- for Emerson to acquire National Instruments; is that right?

A.   It looks that way, yes.

Q.   Sure does.  Now, he proposed an acquisition price of $48 in cash at this time; is that right?

A.   Correct.

Q.   So he's proposing a specific transaction price here; is that right?

A.   Yes.

Q.   Not proposing a range or an indicative value or anything, but he's proposing a specific dollar value transaction price here; is that right?

Page 67

A.   Yes.

Q.   The proposal was for -- I'm sorry.  Is someone saying something?  No.

     The proposal was to purchase 100 percent of the outstanding common stock of National Instruments; is that right?

A.   Yes.

Q.   So this letter proposed a specific transaction structure; is that right?

A.   Yep.  Cash.  Yep.

Q.   And this was -- was this letter made public?

A.   No.

Q.   This was a private letter to the CEO; is that right?

A.   Private letter to the CEO with the expectation that the board would see it, yes.

Q.   Of course.  And of course Mr. Starkloff was also on the board at this time; is that right?

A.   Yes.

Q.   Now, the $48 in cash here is listed at a 39 percent premium to National Instruments closing share price as of May 24th, 2022.  Do you see that?

A.   Yes.

Q.   So nearly 40 percent premium; is that right?

A.   That's what it says.

Q.   Any reason to doubt it's true?

Page 68

A.  No.

Q.  Now, the letter goes on.  See the section there about "Timing."  Right?  He said they're prepared to proceed immediately.  Do you see that?

A.  Yes.

Q.  And states that it is their "expectation that the signing of the Definitive Agreement and announcement can be achieved in 4 to 6 weeks"; is that right?

A.  That's what it says, yes.

Q.  And it gives numerous other indicia of materiality, does it not?

MR. COMERFORD:  Form, foundation, calls for speculation, and calls for legal conclusions.

BY MR. MANDEL:

Q.  You can answer.

A.  I don't understand the question, I guess.  I'm sorry.

Q.  You don't understand the question.  Okay.  I'll withdraw that question.

You see where it says that this proposal would not be subject to any financing condition?  Do you see that?

A.  Yes.

Q.  And that it would be financed from cash on hand, committed lines of credit or other available sources of financing.  Do you see that?

Page 69

A.  Yes.

Q.  You see it says that Emerson's board of directors has reviewed the transaction and supports it?  Do you see that?

A.  Yes.

Q.  Now, the letter sort of near the conclusion on the next page says, "To reiterate, our Proposal - all cash consideration with no financing contingency and no substantive regulatory impediments - provides both significant value and certainty to NI's shareholders."

Do you see that?

A.  Yep.

Q.  It goes on to say, "We are prepared to move very quickly to complete our due diligence and sign definitive agreements."

Do you see that?

A.  Yes.

Q.  And it even goes on to say that "We are highly enthusiastic about the prospects of what" National Instruments and Emerson can achieve together; right?

A.  Yes.

Q.  Highly enthusiastic, very eager; right?

A.  I -- I'm sure he was.

MR. COMERFORD:  Objection.  The document speaks for itself.

Page 70

BY MR. MANDEL:

Q.  It goes on to say, "We look forward to hearing from you."

Do you see that?

A.  Yes.

Q.  So was Mr. Karsanbhai asking for a timely response to his letter when he writes he's looking forward to hearing from you?

A.  He writes that, yes.

Q.  Now, on the previous page, going back to Page 2, under "Timing," you see where he says "We have no current plan to disclose this letter and assume that you do not intend to either"?  Do you see that?

A.  Yes.

Q.  Now, was that a threat of public disclosure?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  I don't think I see it as a threat.  I see it as mutual confidentiality.

BY MR. MANDEL:

Q.  So when he says he has no current plan to disclose the letter, you don't see that as threatening to publicly disclose this approach?

MR. COMERFORD:  Same objections.

A.  Well, the -- yeah.  The second part says it's a

Page 71

request for us not to disclose it, and the first part, you know, you can interpret it as he wants to keep it confidential or that there is the intent of a hostile takeover.

BY MR. MANDEL:

Q.  So is it fair to say this was possibly a threat of going public?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  In subsequent meetings and conversations there was a more escalated threat, yes.

BY MR. MANDEL:

Q.  Oh, for sure.  And we'll get to that.  There did come a time when Mr. Karsanbhai said things that you clearly interpreted as a threat; is that right?

A.  Yes.

Q.  But here at this time, was this at least possibly a threat of going public in your view?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation as to what Mr. Karsanbhai was thinking and what he meant.

MR. MANDEL:  That's nonsense.  I'm asking the witness what he understood.

A.  I don't -- I don't -- I don't even recall my reaction to that first half of this sentence.  I'm sorry.

Page 72

BY MR. MANDEL:

Q.   Okay.  Do you agree with me today sitting here today that it would be fair to interpret that as possibly a threat?

MR. COMERFORD:  Objection.  Form.  Foundation.  Calls for speculation.

A.   Subsequently.  If you look at it in relation to subsequent events, you could interpret it that way.

BY MR. MANDEL:

Q.   So in retrospect this was possibly a threat; is that right?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation.  You're asking the witness what Mr. Karsanbhai meant.

MR. MANDEL:  No speaking objections, Mr. Comerford.  You're coaching the witness with your objections.  Quit it, please.

BY MR. MANDEL:

Q.   Go ahead, Mr. McGrath.

MR. COMERFORD:  Mr. Mandel, this has -- this has been asked and answered now I think four times, so it's an improper question to ask this witness what Mr. Karsanbhai meant.

MR. MANDEL:  I'm going to go back and reread my last question here because you're just

Page 73

distracting the proceedings.

BY MR. MANDEL:

Q.   So the question was, do you agree with me today sitting here that it would be fair to interpret this as possibly a threat?

A.   Given subsequent events?

MR. COMERFORD:  Same objections.

BY MR. MANDEL:

Q.   Given subsequent events, yes, it is fair to interpret this as a threat in retrospect; correct?

MR. COMERFORD:  Same objections.  And I just want to caution the witness do not speculate about what somebody else meant or wrote --

MR. MANDEL:  Whoa, whoa, whoa.  Dude, this is a completely improper direction to your witness.  I mean, we can all hear you, John.  You're going to caution the witness not to -- what are you talking about, John?  It's completely inappropriate.

A.   I can tell you I don't -- I don't recall reacting the first half of that sentence at the time in any way, so . . .

BY MR. MANDEL:

Q.   Okay.  But in retrospect you understand it's fairly understood as a threat; right?

MR. COMERFORD:  I object.  This has been

Page 74

asked and answered six times at least and -- and I'm --

MR. MANDEL:  Let the witness talk, John.

MR. COMERFORD:  I'm going to direct the witness to not answer again because you -- you are at this point badgering him.  I think that's fair to say.

MR. MANDEL:  So you are directing the witness not to answer a question for reasons that have nothing to do with privilege; is that correct, John?

MR. COMERFORD:  He -- he has asked -- you have asked it and he has answered it at least six times and you just don't like the answer, so I'm going to --

MR. MANDEL:  John, you're just trying to muddy up a record very obviously.  I'm trying to get a clear record answer from the witness, and you keep interrupting and have now directed a witness on the record not to answer a question for reasons having nothing to do with privilege, John.

MR. COMERFORD:  Well, I'm --

MR. MANDEL:  This is completely inappropriate and you know it.

MR. COMERFORD:  I am not directing -- I am not directing him to not answer.  I'm directing you, Mr. Mandel, to move on.  This is -- you can't just

Page 75

keep asking --

MR. MANDEL:  Are you withdrawing your direction to the witness --

MR. COMERFORD:  -- your question over and over again until you get a different response.

MR. MANDEL:  Are you withdrawing -- Mr. Comerford, are you withdrawing your totally inappropriate direction to the witness not to answer my questions?

MR. COMERFORD:  Yes, I will condition it on you withdrawing the question.

MR. MANDEL:  No, no, no, no.  I don't withdraw the question.  I withdraw nothing.  Are you withdrawing your direction to the witness to not answer non-privileged questions?

MR. COMERFORD:  There's -- there's no question pending right now.  Let's just move on to a new topic if you don't mind, please.

MR. MANDEL:  No.  I'm just trying to get a clear record on this point.  I want to understand --

MR. COMERFORD:  He has -- he has answered this six times.

MR. MANDEL:  What was the answer, John?

MR. COMERFORD:  The answer was no, he does not agree with you --

Page 76

MR. MANDEL: I don't think that was the answer at all.

MR. COMERFORD: That he's going --

MR. MANDEL: So let's go back to it, Mr. Comerford. You're obviously confused.

MR. COMERFORD: You're asking him what someone -- you're asking him about a letter --

MR. MANDEL: The question -- Mr. Comerford, you're taking up a lot of my record time here. This is not okay.

MR. COMERFORD: Hang on. Hang on.

MR. MANDEL: This is not okay. Please stop.

MR. COMERFORD: You're asking him about a letter that was sent by one person to another person, neither of whom are the witness. So --

MR. MANDEL: Are you trying to defend Mr. McGrath or Mr. Karsanbhai here? What are you doing?

MR. COMERFORD: I'm just saying --

MR. MANDEL: I'm asking the witness for his understanding of something, and you are clearly trying to coach the witness because you know the answer is dangerous for him.

MR. COMERFORD: More -- my objections are

Page 77

proper. Please stop asking the witness to speculate about what other people meant when they wrote what they wrote.

MR. MANDEL: Your objections are noted on the record. You're done now, John. Stop.

BY MR. MANDEL:

Q. So, again, I want to understand clearly. In retrospect, do you understand that this language we were just looking at about no current plan to disclose the letter, do you understand in retrospect that that's fairly understood as a threat to go public?

MR. COMERFORD: Objection. Form. Foundation. Calls for speculation. And it's been asked and answered several times.

A. I didn't -- I didn't -- I didn't understand it that way at the time.

BY MR. MANDEL:

Q. Do you understand it that way now?

MR. COMERFORD: Same objections.

A. I don't know. You know, I -- I don't -- I don't -- don't have an opinion one way or the other. I don't think it's relevant.

BY MR. MANDEL:

Q. All right.

A. I can't speculate on it. I can spec -- I can tell you

Page 78

subsequently there were some threats, but I don't know if that was a threat.

Q. Okay. But subsequently there were threats, and we'll get to that; right? Yeah.

MR. MANDEL: Okay. Let's look at Exhibit -- this will be our Exhibit 9. This is Tab M-5.

(Marked EXHIBIT 9 for identification)

BY MR. MANDEL:

Q. And for the record, these -- this is a document beginning Bates NAT-SL-00001449. These are the minutes of the National Instruments Corporation Special Meeting of the Board of Directors from May 26th, 2022.

A. Correct.

Q. Do you see that, Mr. McGrath?

A. Yes.

Q. Do you recognize this document?

A. Yes.

Q. Did you attend this meeting?

A. Yes.

Q. And in this meeting -- Wachtell attended this meeting as well; correct?

A. Yes.

Q. And -- or I should say attorneys from Wachtell

Page 79

attended this meeting; is that correct?

A. Correct.

Q. And at this meeting Wachtell representatives gave a presentation to the board; is that correct?

A. Correct.

Q. And as it says here in the minutes, ". . . WLRK, which stands for Wachtell, "outlined the Board's fiduciary duties in this context, various legal and practical considerations in the context of receiving Wolverine's proposal and potential go-forward scenarios."

A. Yes.

Q. Do you see that?

A. Yep.

Q. Is that an accurate representation of what occurred at this meeting?

A. It's -- it's -- yes.

Q. Generally speaking, are the board minutes of National Instruments' board meetings true and accurate representations of what occurred at these meetings?

A. I can't see all the minutes, but if you want to go through it part by part, we can comment on that. I can't comment on the whole meeting minutes because I haven't seen them in front of me right now.

Q. Well, to your knowledge, did National Instruments' Board of Directors approve minutes that were

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation



Page 80

inaccurate?

A.  Yes.  Yes.  Yes.  Were accurate.  Yes.  Did you say accurate or inaccurate?

Q.  Well, here, let me ask the question again because I think we had like some maybe triple negatives built into there.  But . . .

The question was, I mean, your testimony is that National Instruments' minutes approved by the board are generally accurate; is that right?

A.  Yes.

Q.  And at this meeting you received a presentation from Wachtell and ultimately agreed to reconvene in June to continue the discussion; is that right?

A.  Yes.

Q.  Okay.

MR. MANDEL:  Let's go to our next document.  This is our Exhibit 10.  This will be Tab M-6.

(Marked EXHIBIT 10 for identification)

BY MR. MANDEL:

Q.  Okay.  For the record, this is Bates NAT-SL-16112.  There's a cover email from Mr. Niles of Wachtell to Mr. Dixon and others; is that right?

A.  It looks that way, yes.

Q.  And attached to the email is a set of Wachtell slides; is that right?

Page 81

A.  I assume so.  I can't see them, but yes, I assume so.

Q.  If you -- sorry.  If you go to the next page, it begins -- or sorry, two pages later it begins a Wachtell presentation, "█████████████" --

A.  Yes.

Q.  -- "█████████████" --

A.  Yes.

Q.  -- "█████████████████"; is that right?

A.  That's correct.

Q.  And it says that on the first email "(Will refer to the attached slides . . ."

Do you see that?

A.  Yes.  Yep.

Q.  Okay.  So do you recognize this as the presentation from the May 26th meeting that Wachtell gave the board?

A.  Yes.  An important presentation.

Q.  Now, if we can go to Page 6 of this presentation, which is Bates 6120.  Now, it just says there, we'll just touch upon this, it says, █████████████ ████████████████████████████ ████████████████████"

Do you see that?

A.  Yep.

Q.  You see the third bullet there says, "██████████

Page 82

█████████ . . ."

Do you see that?

A.  Yes.  Again, I already said yes.

Q.  Oh, no.  But it repeats it.  That's why I'm asking.

A.  Okay.

Q.  It repeats it down to the third bullet.  "█████ ████████████████ . . ."

A.  Yeah.

Q.  So, and there are various other examples of this in the document.  I don't need to take you all through them.  I just want to establish the CEO, Mr. Starkloff, consulted with you, the chair, throughout this process; is that right?

A.  Yes.

Q.  Is it fair to say you consulted closely -- Mr. Starkloff consulted closely with you throughout this process?

A.  Yes.

Q.  Now, let's go to the next page.  Do you remember this document?  Do you remember this slide?

A.  Yes.

Q.  Okay.  This slide is entitled "████████████████ ████████████████████████████████ ████████"

Do you see that?

Page 83

A.  Yes.

Q.  And the document essentially shows a █████████ ████████████████████████████ ████████████████  is that right?

A.  That's correct.

Q.  And it says Number -- ████████████████ ██████████████████████████."

Do you see that?

A.  Yes.

Q.  And do you see that the next step up on this ████████████████████████████████████████ ████████████████████████████████."

Do you see that?

A.  Yes.

Q.  Okay.  So did you understand that ██████████████ ████████████████████████████ ████████████████████████████████████████████ ████████████████████?

A.  Correct.

Q.  Okay.  Now, if we go to the next page.  You see there's a -- the page is labeled "████████████."

Do you see that?

A.  Yep.

Q.  You see there's a column for "████████████

Do you see that?

Page 84

A. Yep.

Q. Did you understand at this time that you were in the zone of a strong bear hug here?

A. Can I see the whole slide?

Q. Please.

A. Most likely. I don't think I ever thought of it that way, but most likely ███████████████.

Q. Well, let's go through it. Right? It's a ████ ███████████████. He'd received that already; right?

A. Yes. Yep.

Q. And as you noted, it was ███████████; right?

A. Correct.

Q. And it ███████████████; right?

A. Correct.

Q. ███████████████████; right?

A. Correct.

Q. You agreed with me it ███████████████; right?

A. They ███████████████, yes.

Q. Right. And we had a discussion about whether this was possibly ███████████████, and, you know, I think your answer was quite unclear because Mr. Comerford was trying to prevent the record from being clear, but, you know, did you understand at this

Page 85

time that Mr. Karsanbhai's letter was possibly threatening public disclosure?

MR. COMERFORD: Objection. It's been asked and answered. Form. Foundation. Calls for speculation.

A. It was an unsolicited offer and, you know, we weren't satisfied with it, so obviously we were considering hostile takeover actions.

BY MR. MANDEL:

Q. Okay. Now, and of course, as you testified, before the buybacks ever occurred here, you did receive correspondence from Mr. Karsanbhai that you understood as threatening public disclosure; is that right?

MR. COMERFORD: Is that the same -- same objections.

A. I don't -- I don't recall that. I don't recall that, so . . .

BY MR. MANDEL:

Q. Okay. I'll show you the documents that establish that today.

Now, if we look at the second row here; right? That begins "███████████." Right? If you look in ███████████████████ ██████████████████████████ ██████████████████████

Page 86

███████████████████████

███████████████"? Do you see that?

A. Okay.

Q. So what ███████████ is this referring to?

A. I don't know. I'm sorry. I just don't know.

Q. You don't know. Let's look at it. Let's look at it more carefully. The full sentence says with regard to the ███████████ -- target in this case would refer to National Instruments; right?

A. Right.

Q. So it says that it ███████████████ ████████████████████████████ ████████████████████████ ███████████████."

Do you see that?

A. Yes.

Q. So do you understand that what's being discussed here is disclosure obligations?

A. Okay. Yes.

Q. And do you understand that this document indicates that ████████████████████████ ████████████████████████████ ███████ right?

A. There's two contexts for buybacks. One context would be for us to enter into a situation to buy back a lot

Page 87

of our stock in order to try to derail the acquisition. That was probably the briefing that we were also given. So there's two -- two interpretations of buybacks. One was a buyback to derail the acquisition. The other was our normal buyback period, our normal buyback process, and I'm not sure what this is referring to.

Q. So what advice were you given about buying back a lot of stock in order to try to derail the acquisition?

A. It wasn't relevant to us. We saw our case study on it, but it wasn't relevant to anything we wanted to do.

Q. I see. So then your testimony is that this is not referring to that but that this would be referring to your disclosure obligations; is that right?

A. No. It could be referring to that.

Q. Okay. So let's look at the row again for ████ ███████████ Let's look at "███████████." Right? We talked about how the letter -- this was not a weak bear hug; right? It did not propose a valuation range as -- it required for a weak bear hug here; is that right?

A. Okay. Yes.

Q. So in ████████████████████ ████████████████████████

Deposition of Michael McGrath

In Re National Instruments Corporation Securities Litigation

Page 88

Do you see that?

A.  Yes.

Q.  And then in the " ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  This is obviously talking about National Instruments' disclosure obligations in this scenario; is that right?

MR. COMERFORD:  Form.

A.  During -- during the period when we were considering an offer, but not forever.

BY MR. MANDEL:

Q.  I'm sorry.  Where is that in -- where did you -- where are the words you were just talking about here?

A.  I'm giving you my interpretation that those points applied to while we were considering an offer, and they didn't apply to NI forever and ever and ever after an offer was rejected.

Q.  Are you testifying to legal conclusions right now, Mr. McGrath?

MR. COMERFORD:  Objection.  Form.

BY MR. MANDEL:

Q.  I'm sorry.  I've heard a ton of objections where you

Page 89

couldn't talk about materiality.  And now you're testifying to the nature of your disclosure obligations?  I'm confused, Mr. McGrath.

A.  Whenever you ask me about the disclosure obligations that we had after we rejected the offer, we can discuss that.  Okay?

Q.  Okay.  So you understood as of this time that in -- since you'd received a strong bear hug letter that buybacks could be complicated; is that right?

A.  While the offer was open.

Q.  Where is that -- where is the language about while the offer is open?  Are you just adding that?  This is your own legal conclusion?

A.  No.  But it's common sense and it's my interpretation that it doesn't say forever and ever and ever for the next 20 years.  It's -- it implies in my interpretation, in my understanding, in my judgment and the judgment of the board, I believe, at the time that that related to while the offer was open and not rejected by the board.

Q.  Okay.  So at the very least you understood that given that you'd received a strong bear hug letter buybacks could be complicated because of potential disclosure obligations; is that right?

MR. COMERFORD:  Objection.  Form.

Page 90

A.  While the offer was open and not rejected.  If you want my -- if you're asking for my opinion, my judgment, my understanding, my interpretation --

BY MR. MANDEL:

Q.  I'm not asking you those things.

A.  Okay.  Then don't ask me, then.

Q.  I'm asking you -- I'm not asking you for your legal conclusions again.

A.  Okay.

Q.  I'm asking you whether it is so that Wachtell advised you that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

A.  Forever?  You think that they -- the advice they gave us was because we had this offer that forever and ever we'd never be able to do buybacks again?  Is that what you're asking me?  I think that's pretty dumb.  No.  There's a context here that you have to put into place.  You know, you can't -- you can't interpret anything without context.  I'm sorry.  So if you're saying that Wachtell was advising us that because we get an unsolicited offer that was not credible that forever and ever and ever NI would never be able to buy back stock again?  Is that what you think that says?  I don't think so.  I think that's -- and that's not a legal interpretation.  That's my common sense

Page 91

interpretation.  It would be pretty dumb if they said that.

Q.  What complications are they talking about here, Mr. McGrath?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  They're talking about complications while we were considering the offer.

BY MR. MANDEL:

Q.  What sort of complications might they have been talking about here?

A.  Any -- anything.

Q.  Really?  They're talking about disclosure obligations here, Mr. McGrath.  What are they talking about here?

A.  They're not talking about disclosure ob -- we were not -- we -- the company was never for sale.  The board never ruled the company was for sale.  We had no disclosure obligation to disclose this offer, okay, at all.

Q.  But if you did buybacks, did you understand that that could be a little more complicated?

A.  We didn't do any buybacks while we were considering the offer.  When the offer was rejected because it was not credible and we did a firm basis for rejecting the offer, we did a firm analysis, we followed our duty of

Page 92

care, our duty of loyalty, and we rejected the offer, and we can discuss that if you ever want to get into it, but we rejected the offer and so we had no obligation of disclosure.

Q.   I'm simply trying to understand.  When Wachtell advised you that ███████████████████ ████████████████ did you understand that the complication they were referring to was that you had to abstain or disclose from trading?

A.   Can I -- can I repeat my answer for the third time?

Q.   No.  Your answer is very longwinded and non-responsive and had many questions in it which you're not supposed to be asking.

     MR. COMERFORD:  I object to that.

A.   They did not tell us that we had to never buy stock back forever.  Okay?

BY MR. MANDEL:

Q.   Okay.

A.   Okay?

Q.   They did not tell you that forever you didn't have to not buy back stock?  That's your testimony?

A.   Yes.

Q.   Okay.  But they told you that ██████████ ████████████████████████; right?

A.   While we were considering the offer.  Correct.  But

Page 93

only while we were considering the offer.

Q.   Okay.

A.   And that's what the whole context of this presentation was, not -- not subsequent to rejecting the offer.  Okay?  So you have to put that point within a context.  If you don't, then you don't -- you get a whole different interpretation.

Q.   Well, we'll see about that.  Further in the "████ ███████████████████████ ███████████."

     Do you see that?

A.   Okay.  Yes.

Q.   So did you understand that the offer letter from Mr. Karsanbhai signaled seriousness to National Instruments' board?

A.   His seriousness, yes.

Q.   Emerson's seriousness; correct?

A.   Correct.

Q.   That Emerson was serious about acquiring National Instruments; correct?

A.   Correct.

Q.   Let's go to the next page.  Now, it identifies here there's ████████████████████████████████."  Do you see that?

A.   Yep.

Page 94

Q.   It's referring to ████████████████████ ████████████████████████.  Do you see that?

A.   Yep.

Q.   Did Emerson accumulate National Instruments' shares at any point?

A.   Yes.  They accumulated our shares, yes.

Q.   Do you know when they accumulated your shares?

A.   Not off the top of my head, no.  They disclosed that they had accumulated shares, but I don't know what they disclosed when.

Q.   Okay.  If you look on the next page where it says "███ ████████████████████████."  One of the recommendations there is "████████████████ ████████████████"

     Do you see that?

A.   Yep.

Q.   Did you monitor National Instruments' stock for accumulation?

A.   We monitored it.  We didn't have visibility of who was acquiring the shares.  We only had visibility of the volume of the shares.

Q.   Did there come a time when National Instruments learned that Emerson had been accumulating shares?

A.   Yes.  They disclosed it later on.

Page 95

Q.   ████████████████████████████ ████████████████████████ ████████████████ ████████████████████████ ████████████████████ ████████████

Q.   Okay.  Now, at this time, the time when you received this letter on May 25th and had this meeting with Wachtell on the following day, did you understand that you were in possession of material nonpublic information?

A.   At that time.

Q.   What was your understanding based on?

A.   What was the question?

Q.   What was your understanding that at that time you had material nonpublic information based on?

     MR. COMERFORD:  Can we -- can we put a year and month at least on this question so we're not confused about the time frame?

     MR. MANDEL:  Sure.  I did.  But I'll repeat it.

BY MR. MANDEL:

Q.   At this time, that is, when you received the offer letter from Emerson on May 25th and had this board meeting on the following day, May 26th, 2022, did you

Page 96

understand that you had nonpublic infor -- material nonpublic information in your possession at that time?

A. We did. We understood that we had it until we made a decision on the offer and rejected the offer.

Q. Okay. What was the basis of your understanding that at this time you had material nonpublic information?

A. I -- isn't that obvious? There was an offer outstanding that the board had to decide on, and -- and during that period of time it was material information that was not public.

Q. There was an offer outstanding; right?

A. Right.

Q. There was a proposal to acquire the company; right?

A. Yes.

Q. We saw in your insider trading policy that a proposed acquisition was material information; correct?

A. While it -- yes. While it was open, yes.

Q. But did your -- did the M&A -- did your insider trading policy add that little wrinkle that while it was open or anything? It just referred to a proposed acquisition, didn't it? We saw it today.

A. Yes. And there's no proposed acquisition after we rejected the offer, so I want to be very clear about that. All right? While we were considering the offer, it was material information. Once we rejected

Page 97

the offer, there was no offer outstanding, there was no material information. We did not expect Emerson to continue to make an offer. We wanted -- we went back to conducting business as usual. And we never heard from them for months. So if you're trying to get me to say that after we rejected the offer it was material information, I'm not going to say that.

Q. I'm trying to understand why you understood that there was material information in your possession at this time, and I understand you telling me because there was a proposed acquisition of National Instruments.

A. There was an open offer for an acquisition that had not been determined by the board yet, yes.

MR. MANDEL: Okay. Let's look very quickly at -- this will be Exhibit 11. This is our Tab Z-3.

(Marked EXHIBIT 11 for identification)

MR. MANDEL: For the record, this is email Bates number beginning NAT-SL-16270.

BY MR. MANDEL:

Q. And this is an email from Mr. Dixon to you and others informing you that you have material nonpublic information concerning Project Wolverine; is that correct?

A. Can I see the date of that?

Q. The date of the document is May 27th, 2022.

Page 98

A. Yes.

Q. And you received this at the time?

A. Yes.

Q. And so certainly by this time there's no question in your mind that you had material nonpublic information in your possession; is that right?

A. Correct. And as long as the offer was open. Correct.

Q. You keep adding that little self-serving --

A. Well, I don't want you to put words in my mouth to say that it went on forever for 20 years. I --

Q. I didn't ask you about that.

A. Okay. All right. All right. But I want to be clear that our understanding all the time was we had material nonpublic information while we were considering the offer, and that's what that memo refers to the event that we had to be aware of.

MR. MANDEL: Okay. Let's look at our next document, which is -- will be our Exhibit 12, and this is the -- our Exhibit 12 is Tab M-7. And this will be the meetings of the June 14th board of directors.

(Marked EXHIBIT 12 for identification)

BY MR. MANDEL:

Q. I want to actually take a step back because this question I'm going to ask also relates to May 25th. I just forgot to ask it before. This is a special

Page 99

meeting of the board of directors; is that right?

A. The May -- which one? The previous one.

Q. The June 14th but also the May 1 was labeled special meeting.

A. Yes. Correct. Yes. Right.

Q. So these are not regularly scheduled meetings; is that right?

A. That's correct.

Q. What makes a meeting special?

A. We had an offer outstanding to acquire the company, and we had to -- and it was our responsibility as board members to exercise our duty of care and loyalty, consider the offer, evaluate it, okay, listen to the advice of our legal counsel, we retained BofA for their, you know, financial advice, and we did our job as a board to consider the offer, and then we rejected it as not being credible. So these special meetings in May and June 14th were to react to their offer. We had a responsibility to shareholders to evaluate the offer and we did.

Q. So a special meeting is to deal with an extraordinary circumstance like a proposed acquisition; is that right?

A. Yes. Obviously.

Q. Now, you see these minutes of the June 14th special

Page 100

Q. meeting. You attended this meeting; correct?

A. Yes.

Q. Now, at this meeting Bank of America representatives attended as well as Wachtell representatives; is that right?

A. That's correct.

Q. And the Wachtell representatives gave another presentation concerning the board's fiduciary duties and various legal and practical situations and potential go-forward scenarios; is that correct?

A. Correct.

Q. And also Bank of America gave a presentation in which they presented values for the company that exceeded Wolverine's offer; correct?

A. Correct.

Q. And they also presented the board with a financing capacity analysis of Wolverine; is that correct?

A. Correct.

Q. You understand Wolverine in this context to refer to Emerson; right?

A. Yes.

Q. Okay.

A. Yeah. Okay. Go ahead. Right. The project, yes. The acquisition project. It's a project name, not a company name, but Project Wolverine.

Page 101

Q. Well, I mean, it seems to me and, I mean, there's evidence stating that the terms were used interchangeably. We can find it and show it to you.

A. Okay.

Q. But if you look here, it says "presented values for the Company that exceeded Wolverine's offer."

A. Yeah.

Q. Clearly it's not referring to the project name but to Emerson; right?

A. Okay. Yep. Okay. Yep. Both. I agree.

Q. Okay. Thank you, Mr. McGrath. Now, going to the next page, and we'll look at the BofA presentation and we'll look at the Wachtell presentation in a moment, but your conclusion, the board's conclusion was that the $48 proposal substantially undervalued the company; is that right?

A. Yes.

Q. And your belief was that the company had a strategic plan that had yet to be realized; is that right?

A. Can I -- can I explain it in detail?

Q. Please go ahead.

A. Okay. There were -- we believed strongly that the company's potential had not been realized for several very important reasons. Okay? First was that we had a major strategic change of the company in 2018, 2019

Page 102

and that we were just beginning to realize the benefits of it.

Another very important factor was that during this period of time, '21 to '22, coming out of Covid we faced very severe supply chain disruptions, and so we had a period of time where our bookings, our sales far exceeded our ability to book them as revenue because we couldn't ship the product. All right. So we had a -- we were coming out of a period of time where we felt the company was significantly undervalued because our financial reports couldn't reflect the -- couldn't reflect the actual sales of the company and we were building up a big backlog. That backlog would then become revenue in the future that would exceed our ability to sell. So we had a big opportunity ahead of us. Our stock we felt was undervalued because of the supply chain crisis. In addition, we had significantly higher cost of goods sold because we had to play brokers for components in order to ship products, so our profits were depressed during '21 and '22 and the first half of '22 because we had to pay two or three percent higher as a percentage of revenue, not percentage of components, to brokers to get the components to ship to our customers.

Page 103

And then, thirdly, we had a major program underway to look at reducing our operating expenses and increasing our operating income over the next several years which would significantly increase our profits. So there were some very major substantiated drivers that we had -- we wanted to realize for the benefit of our shareholders and that the offer in that regard was not credible, and that's why we rejected the offer.

Q. So for all the reasons you just summarized, $48 was way too low a price for this company in your view; is that right?

A. Yes. Did you say $38 or 28?

Q. I said 48.

A. Oh, 48. Okay. 48. Right. I couldn't hear you.

Q. 48 which was the offer price at this time.

A. Right. Right. Correct. Right.

Q. That was way too low; right?

A. Right.

Q. And the board decided -- determined to reject the proposal on that basis; is that right?

A. Yes. Correct.

Q. Says it right there. "Determined to reject Wolverine's proposal."

Now, if you had disclosed this rejection,

Page 104

would you have explained why you were rejecting it?

A. If we had --

Q. If you had disclosed this, --

A. Right.

Q. -- if you had disclosed that you'd received a $48 offer and were rejecting it, would you have disclosed the reasons for the rejection?

A. We did disclose -- we did disclose all those three things I just mentioned in our earnings call on July 28th.

Q. No, no, no, no, no. That's not my question.

A. Okay.

Q. My question is, if you had told investors at this time that you had received an offer from Emerson of $48 and you had disclosed to investors that the board had determined to reject that offer, would you have provided the market with a reason for that rejection?

A. We -- we felt -- you're asking me a question that we -- that -- we didn't believe -- we didn't believe we had to disclose it. We didn't -- we felt that it was inappropriate to disclose it. So I don't know what we would have disclosed if we did something inappropriate. Okay? We didn't disclose the offer. We didn't disclose that we rejected it, for several reasons. Okay? One is that it wasn't a credible

Page 105

offer, so we had no obligation under the law to -- to disclose it. Secondly, okay, Emerson, as you can see in the previous letter, had asked us to keep it confidential. We felt if we had disclosed that they made an offer, it would probably harm their stock and we would probably be sued. Third, once we rejected the offer, there was no expectation that Emerson would continue to make another offer. In fact, they didn't make an increased offer. Okay? And we had no expectation of negotiating with them. We had no obligation to negotiate with them. And we felt that if we were to simply say we had an offer and rejected it because we think the company's worth a lot more, okay, that would be simply hyping the company's stock, which is in violation of SEC regulations and we don't go there. So we weren't going to just do it to hype the value of the stock. There was no offer outstanding after we rejected it. And so we had no obligation and we thought that it would be inappropriate, potentially illegal for us to say we disclosed it, that the company was for sale when the board had specifically said the company was not for sale.

Q. So as a result of this, the board directed or I guess the word in the minutes is authorized you,

Page 106

Mr. Starkloff, and Mr. Dixon and representatives of Wachtell to inform Emerson that the board had determined to reject --

A. Yes.

Q. -- its proposal; is that correct?

A. Correct.

Q. Okay. And it goes on to state here in the minutes that "The directors then discussed potential courses of action in the event wolverine were to escalate the matter publicly or otherwise, respond with a higher offer or if other scenarios were to occur . . ."
        Do you see that?

A. Yes.

Q. So the board at this time discussed the possibility that Wolverine could escalate the matter publicly; is that right?

A. Obviously.

Q. And the board understood that Emerson could respond with a higher offer; is that right?

A. They could, but they didn't.

Q. Well, we'll get to that. But the point is at this point the board understood that they might respond with a higher offer; is that right?

A. I guess so, yes. That's what it says. But we didn't -- we didn't -- I mean, that's logical that we

Page 107

would --

Q. It was simply logical that they might respond with a higher offer; right?

A. Correct.

        MR. MANDEL: Now, let's move on to our Exhibit 13, which is going to be our Exhibit M-7A, Alex.
        (Marked EXHIBIT 13 for identification)

BY MR. MANDEL:

Q. Now, for the record, this is Bates WLRK-913. This is a cover email from Mr. Dixon to folks at Wachtell attaching a board book from the June 14th meeting. If you look to the next page, you'll see the agenda page.

A. Okay.

Q. Sorry. There you go. That's the cover agenda page. You recognize a page like this; right?

A. Yes. Yes.

Q. And as usual with these types of documents, like we established earlier, there are materials attached behind the agenda; is that right? You can scroll --

A. Yes. Yes.

Q. Okay. I just want to note that this board book was produced by Wachtell, not by defendants, who failed to produce this obviously relevant and responsive document, and, you know, just an example of many of



Page 108

the like at best haphazard production that took place here on defendant's part.

A.   I don't understand your question.

Q.   That's not for you. I'm just putting something on the record. I'll ask you a question in a moment.

MR. COMERFORD:  And I'll say for the record that none of what Mr. Mandel just said is true.

MR. MANDEL:  Well, that's not true, Mr. Comerford. Obviously this is a document you should have produced. Defendants never produced this document. It's clearly required to be produced, and we got it from Wachtell.

BY MR. MANDEL:

Q.   Now, if you go to page WLRK-923. That's the first page of the BofA presentation. You'll recall a few minutes ago we saw in the minutes that BofA gave a presentation at this meeting; right? So let's go to the page. See that? That's the first page of the BofA presentation; is that right?

A.   It looks that way. I don't see the date.

Q.   This is attached to the agenda of the June 14th, 2022, meeting that we just saw; right?

A.   Okay.

Q.   So, now, if we go to Bates ending 929. This document includes -- discusses management projections versus

Page 109

Wall Street consensus estimates; is that right?

A.   Yes.

Q.   And it shows under "EPS" under the National Instruments adjusted PoR -- PoR stands for Plan of Record; is that right?

A.   Yes.

Q.   So management is projecting $2.05 EPS for 2022 at this point; is that right?

A.   Yeah. I believe so. I can't see the column headings, but . . .

Q.   If you look under "EPS" National Instruments adjusted PoR, $2.05 for 2022 if you go to the top. You'll see that's 2022.

A.   Yep.

Q.   Do you see that?

A.   Okay. Yep. I see it.

Q.   And the street consensus at this time was $2.02; right?

A.   Yep.

Q.   If you go to the next page, you can see this all represented graphically as well.

A.   Yep.

Q.   You see the 2.05 EPS for 2022 versus street of $2.02. Okay.

Let's go to page Bates ending Page 932.

Page 110

Now, these are Bank of America's various valuation analyses summarized in a page; is that right?

A.   Yep.

Q.   And they use various different valuation techniques to come up with potential stock price ranges here; is that right?

A.   Yes.

Q.   So, for example, all the way on the right is a ███████████████████████████████████ ████████████████████████████ ██████████████?

A.   Yes.

Q.   And many of these valuation metrics show values that are above the $48 offer at this point; right?

A.   Yes.

Q.   And is this one of the bases of your conclusion that $48 was too low an offer price?

A.   Yes.

Q.   Okay. Now, there's one here in particular that's --
███████████████████████████████████
██████████████████████████
███████████████████████████████
███████████████████████████
█████████████

Page 111

A.   Yes.

Q.   And that one is the lowest value where it shows that at some point during the preceding 52 weeks the stock had traded as low as 31.65; is that right?

A.   Yes.

Q.   And as high as 45.39; is that right?

A.   Yes.

Q.   Okay. Now, if you look about the middle of the page there's another valuation method that yields a relatively lower valuation, so in ████████████
███████████████████████████████
███████████████████████████████████

A.   Yes.

Q.   And that's determining ██████████████████; is that right?

A.   Correct.

Q.   Now, it's doing that by ████████████████████
███████████████████████████████ is that correct?

A.   Correct.

Q.   So in this instance it's a ████████████████████
█████ right?

A.   Yes.

Q.   And they're ████████████████████████████████
████████████████████████ is that right?

A.   Yes.

Deposition of Michael McGrath

In Re National Instruments Corporation Securities Litigation



Page 112

Q. And essentially the ██████████████ ███████████████████████████ ████████ is that right?

A. Yes.

Q. You're ███████████████████ ████████████████████████████ is that right?

A. Yep.

Q. So ███████████████████ ████████████████████████ ████████ is that right?

A. Yes.

Q. Okay.

MR. COMERFORD: Mr. Mandel, could we take a very brief break?

MR. MANDEL: Yeah.

THE WITNESS: I need a toilet break. I'm sorry.

MR. MANDEL: No. Let's do it. It's a good moment. Yeah. I'll return back to this document when we return, but yeah, we can break for five.

MR. COMERFORD: Thanks.

VIDEO TECHNICIAN: Going off at 12:05.

(Recess taken at 12:05 p.m.)

(Back on the record at 12:16 p.m.)

Page 113

VIDEO TECHNICIAN: Going back on record at 12:16.

BY MR. MANDEL:

Q. Welcome back, Mr. McGrath.

MR. MANDEL: Alex, can we put Exhibit 13 back up? Thank you.

BY MR. MANDEL:

Q. And, now, I think we were done with this page. If we could go to page beginning with Bates 936. Now, you'll see here from this point forward this provides a ████████████████████████. Do you see that?

A. Yes.

Q. Nuthatch was another code name used for Emerson in this case; is that right?

A. Yes.

Q. But occasionally where it says Nuthatch I will just say Emerson. Is that all right with everyone?

A. That's fine.

Q. Thank you. So if we go to the Page 938, Bates ending 938. You see here it's discussing Emerson's capacity to pursue M&A; is that correct?

A. It looks that way, yes.

Q. And just to quote from the minutes which we read earlier, it says, "BofA also presented the board with financing capacity analysis of Wolverine."

Page 114

Is that what this is?

A. Yes.

Q. Okay. So this shows essentially ████████████ ███████████████████████████████████ █████████████████████████ is that right?

A. Correct.

Q. And the conclusion here is that they have, ████ ███████████████████████████████████████ right?

A. Yes. It was never in question.

Q. Now, if we look at the next page, it describes a ████ ████████████████████████████████████ ████████ Do you see that?

A. Yes.

Q. Now, Emerson at this time owned an InSinkErator business; is that right?

A. I believe so. It may have been in the process of being sold at the time, but . . .

Q. Yes. Emerson was in the process of selling its -- of divesting itself of the InSinkErator business; is that right?

A. Right. Right. Right.

Q. And what ████████████████████████████████ ████████████████████████████ is that right?

Page 115

A. Yes.

Q. And it was selling InSinkErator for approximately $3 billion; is that right?

A. I don't -- I don't recall, but . . .

Q. Well, if we look at the first bullet there, it says, █████████████████████████████████ . . ."

A. Whatever it says. That's correct. Yeah.

Q. So, and we can see a document later that was the approximate price of the deal. So what this is showing, the first slide we looked at, the last page ending -- ending Bates 938 shows its ████████████ ████████████████████████████████████; is that right?

A. Yes.

Q. And then the page ending 939, the subsequent page, shows its ███████████████████████████████ ████████████████████████████; is that right?

A. Yes.

Q. So if it sold the InSinkErator asset for about $3 billion, that would tend to even strengthen its capacity to pursue M&A; is that right?

A. Obviously, yes.

Q. And that's ███████████████; is that right?

A. Correct.

|

Page 116

Q.  Now, if we go in this document to the page Bates ending 956.  So this is -- as we saw before in the minutes, Wachtell also gave a presentation at this meeting; is that right?

A.  Correct.

Q.  This is the first page of the Wachtell slide deck attached to this agenda from this meeting and you see it's dated June 14th, 2022; right?

A.  I -- yes.  I can't see the date, but yes, I'll agree.

Q.  Thank you.  Now, let's look at Page 5 of this document, which is Bates 961.  Now, do you remember this slide?

A.  Yes.

Q.  Did you discuss this slide with Mr. Starkloff?

A.  The board discussed the whole slide, yes.  He was in the meeting.  He's a board member.

Q.  I see.  Now, you see in this slide it's ████████ ████████████████████████████████ right?

A.  Yes.

      MR. COMERFORD:  Object to form.

BY MR. MANDEL:

Q.  ██████████████████████████████████████ ███████ right?

A.  Correct.

Q.  And it states that █████████████████████

Page 117

████████████████████████████████ ████████████████████████ Do you see that?

A.  Yes.  Correct.

Q.  So this was advising you that ████████████████ ████████████████████████████████ ██████████████████████ is that right?

A.  Yes.

Q.  And like near the bottom of the document it says that ████████████████████████████████ █████████████████████████." Is that right?

A.  Could you reword the question? I'm sorry.  I don't understand.

Q.  Right there on the last line it states, ". . . █████ ████████████████████████████████ ██████████"; is that right?

A.  I can't see the last line of the slide.  Below the boxes you're talking about?

Q.  Right above the words "Wachtell, Lipton, Rosen & Katz."  Below the bar.

A.  Okay.  I see it now.  Yeah.  It wasn't on display for me, so I couldn't see it.  Yes.  Okay.  Yes.

Q.  So it says, "██████████████████████████ ████████████████████████████████████."

A.  Yes.

Page 118

Q.  So you understood that an outright rejection could increase the probability of aggressive action by Emerson; is that right?

A.  Yes.

      MR. COMERFORD:  Form.

BY MR. MANDEL:

Q.  So you understood that rejecting Emerson's offer didn't necessarily end the matter; is that right?

      MR. COMERFORD:  Object to form.  Calls for speculation.

A.  We -- we believed at the time and subsequently that they made one single offer, they weren't going to budge from that offer, and they may -- they may take hostile takeover actions at $48 a share, and we would defend the hostile takeover actions because we didn't think $48 a share was credible.  So correct.

BY MR. MANDEL:

Q.  Now, if we go to the next page -- wait.  Let's pause there for a second.

      MR. MANDEL:  Let's put up -- this will be our Exhibit 14.  This is our Tab A-12.

      (Marked EXHIBIT 14 for identification)

BY MR. MANDEL:

Q.  And this is an email from Mr. Starkloff -- sorry.  Let me read the Bates number.  This is Bates NAT-SL-11671.

Page 119

This is an email from Mr. Starkloff.  The lead email in the document is an email from Mr. Starkloff to you, Mr. McGrath, dated June 10th, 2022.  Do you see that?

A.  I don't see the date.  Okay.  Now I see it.  Yep.  Okay.

Q.  Now, you see Mr. Starkloff photographed a picture of his screen and emailed it to you here.  Is that what happened?  Do you recall this?

A.  I don't, but I believe it.  I don't recall it, but I believe it.  I'm not going to deny it.

Q.  Well, do you see here -- this is the same slide we were just looking at a moment ago; right?

A.  It's the same slide, yes.  I don't know what the text of the email is, though.  Nor do I recall it.

Q.  You can read the email, but the email --

A.  I can't read the email.  I can't see --

Q.  -- just so you know (inaudible) a photograph.

A.  I can't -- I can't see the email, so I can't read it.

Q.  There you go.  He says, "I can't export or even take a screenshot."  And he says, "(took a pick of my laptop with my phone)."  Do you see that?

A.  Okay.  I get it.  Yep.

Q.  And he refers to this as the most important slide.  Do you see that?

A.  Yes.

Page 120

Q.  So you paid a good amount of attention to this slide; is that right?

A.  Yes.

Q.  You reviewed it several days before the meeting; is that right?

A.  Most likely, yes.

Q.  Well, it shows here that you reviewed this slide on June 10th, --

A.  Yep.

Q.  -- 2022.  The meeting was on June 14th, 2022.

So you were reviewing the attorney presentations before the rest of the board; is that right?

A.  Yes.

Q.  And of course, just like this slide, this most important slide showed that ███████████████ ████████████████████████████████ ██████████████ right?

A.  Yes.  I've already admitted that.  Over and over again.

Q.  You'll note on this version it says "███████████ ████████ "

Was Eagle another code name that was used --

A.  Yes.

Page 121

Q.  -- for Emerson?

A.  Yes.  At one point we -- there was some objection to the term "Nuthatch" as being derogatory, so we changed the name to Eagle.

Q.  Whose objection was that?

A.  Mine.  Although I -- Nuthatch is an aggressive bird I learned subsequently, so . . .

Q.  Is that why it was derogatory because it's an aggressive bird?

A.  No.  Because the name "nut" in it.  Nuthatch is just a derogatory term I thought.

Q.  I see.

A.  It's just an aside, but . . .

Q.  I see.  Let's go back to the previous exhibit we were in the middle of.  This is Exhibit 13.

MR. COMERFORD:  Can I say something for the record?  Mr. Mandel, you -- you said that the defendants did not produce this, and we do believe it was produced.  There -- the cover email where these were forwarded is NATL-SL-17442.  The Wachtell slides are NAT-SL-17444, et cetera.  The BofA slide deck is NATL-17465.  So hopefully that clears up the confusion.

MR. MANDEL:  We'll take a look for that and see.  Thank you.

Page 122

BY MR. MANDEL:

Q.  So this is now we're back at -- this is Exhibit 13 on the page -- on the screen; right?  Okay.  Let's go to the next page of Exhibit 13.

Now, this is similar to the ██████████ ████████████ we looked at earlier today; right?

A.  Yes.

Q.  And of course here it indicates that you're -- it bolds Number 3; right?

A.  Yes.

Q.  Indicating that you're in the ██████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████ is that right?

A.  Correct.  We've already gone through this before.

Q.  All right.  It's the same slide with a new --

A.  It hasn't changed.  My -- my -- my agreement hasn't changed.  No.

MR. MANDEL:  Now, let's go to our next document.  This will be Exhibit 15.  And this will be Tab Z-4, Alex.

(Marked EXHIBIT 15 for identification)

BY MR. MANDEL:

Q.  Now, as you see, this is an email from Mr. Starkloff to Mr. Karsanbhai cc'ing Mr. Dixon dated June 16th,

Page 123

2022.  For the record, the beginning Bates number is NAT-SL-00001254.  And this is attaching a letter to Mr. Karsanbhai stating that National Instruments is not interested in the transaction; is that right?

A.  Yes.

Q.  And this letter is signed both by you and by Mr. Starkloff; is that right?

A.  Yes.

Q.  And -- and the letter states, "The Board has unanimously determined that your letter does not provide a basis for further discussions"; is that right?

A.  Correct.

Q.  Can we go back for a moment to Exhibit 13?  And look at the previous page.  You see there where ████████████ ████████████████████████████████████████ ████████████ ; right?

A.  Yes.

Q.  And it says, "███████████████████████████████ ████████████████████████████████████ ████████████ ."

Do you see that?

A.  Yes, I do.

Q.  So you are mirroring that language in the letter that you sent on June 16th; is that right?

Page 124

A. That's the substance of it, yes.

Q. Okay. Well, you wrote, " ███████████ ███████████████████████ ██████████████ "; right?

A. Correct.

Q. So -- so you understood when you were writing this letter that you were in ████████████████, you were even ███████████████████████, and that this may ████████████████████ ████████████; right?

A. Yes. I've already said that a number of times, so . . . If we could just get to the point or whatever. I'll agree that that's what we did, outright rejection, and we know all the bullet points in that column.

MR. MANDEL: Our next document is going to be Exhibit 16. This is Tab A-18. No. I'm sorry. Yes. Tab A-18.

(Marked EXHIBIT 16 for identification)

BY MR. MANDEL:

Q. This is NAT-SL-10410, and this is Mr. Karsanbhai's June 22nd letter offering to acquire National Instruments responding to National Instruments' letter dated June 16th; is that correct?

A. Yes.

Page 125

Q. And if you go to -- and of course Mr. Starkloff forwarded -- no. You received this email in the first instance; is that right?

A. Yes. Probably.

Q. You received it at your MSN email address; is that right?

A. That's what it says. Oh, no. It doesn't say -- it says it's at my ni --

Q. If you look at the bottom email, the email went from Lal Karsanbhai to Erik Starkloff and Michael_e_mcgrath@msn.com. Do you see that?

A. Okay. Yes, I do see that. Okay.

Q. And then subsequently Mr. Starkloff forwarded this --

A. Yeah.

Q. -- to Misters Dixon and Niles and cc'd you at your ni.com address; is that right?

A. That's correct.

Q. Now, let's turn the page and look at the letter itself. Do you remember this letter?

A. Yes.

Q. Now, this letter proposed to acquire all the outstanding shares of National Instruments for $48 per share in cash; is that right?

A. Correct. It's the same as the previous offer. It's just an extens -- it's a reiteration of the previous

Page 126

offer at $48 a share.

Q. So it describes -- this letter describes the $48 a share as a 51 percent premium to National Instruments' closing share price as of June 21st, 2022. Do you see that?

A. No.

Q. The first bullet --

A. Okay. Now I -- yeah. I see it now. Now I see it. Yeah. You have to scroll up for me to see it.

Q. Now, do you recall what the premium was in the first offer letter?

A. I believe it was less than that. 38 percent or something. 35 percent.

Q. The previous letter said 39 percent which we saw --

A. Okay. All right.

Q. So this is a higher premium offer than the previous one; is that right?

A. It's the same offer. The comparison is different.

Q. Well --

A. It's not -- it's not a high -- it's not a -- it's not a -- it's not a higher offer than the -- it's the same offer, $48 a share. The comparison shows a higher differential if that's what you're asking, yes.

Q. National Instruments' stock price had declined somewhat from the date of the previous offer; is that

Page 127

right?

A. Most likely.

Q. And so this was an even higher premium than had previously been offered; is that right?

MR. COMERFORD: Objection. Asked and answered.

A. No. No. It's not -- it was the same offer. Different comparison.

BY MR. MANDEL:

Q. The question is, was this offer at a higher premium than the previous offer?

MR. COMERFORD: Objection. Asked and answered.

A. No. You're implying that it was a better offer and it wasn't. It was the same offer. It was rejected for the same reason. And the fact that our share price changed and the comparison percentage changed is there, but it's not -- it's not a higher premium offer. I'm not going to -- I'm not going to acknowledge that. It's the same offer. 48 is 48.

BY MR. MANDEL:

Q. All right. You're asking me --

A. We rejected 48 and --

Q. -- not to waste time, Mr. McGrath.

A. What?

Page 128

Q.  This -- this was a 51 percent premium; correct?

A.  It was a comparison that it was 51 percent higher. I'm not going to say it was --

Q.  This offer was at a 51 percent premium according to this letter; is that correct?

A.  According to the wording of that letter, but I'm not going to acknowledge that it was a higher premium than the previous offer. Okay? It's the same offer.

Q.  Okay. The previous offer was a 39 percent premium; is that right?

A.  It was a -- yes. The word "premium" is -- is a comparison, that he chooses the word "premium." It was a comparison to our stock price. So it's his words, yes. He's saying premium premium, and it's a higher premium because the stock price went down, but it's the same $48 offer. It's not a more premium offer in our interpretation, so . . .

Q.  You're saying "I'm not going to acknowledge what you're trying to get me to say." I'm just trying to get you to acknowledge something that's obviously true. I don't know why you won't testify to it. 51 percent is higher than 39 percent; correct?

A.  Yes. But the offer is the same offer.

Q.  The premium listed here --

A.  Okay. All right. Okay.

Page 129

Q.  -- is 51 percent.

A.  He's saying it's a higher premium than his previous premium. I acknowledge that. I read the words. 51 percent premium. His previous letter said 39 percent premium. I acknowledge that. I'm not going to say that the $48 share offer is the same -- there's a premium over the $48 share offer, so as long as we have that clarification. His words say premium -- it's a higher premium because the stock price went down. Okay? That does not have any bearing on our analysis that $48 a share was not a credible offer for the company at the time for the reasons I previously explained, so . . .

Q.  Just to be clear, I was not asking you whether $48 is at a premium to $48. I'm saying --

A.  Okay. I acknowledge that.

Q.  -- the original offer was at a 39 percent premium to the stock price and this offer is at a 51 percent premium to the stock price; is that right?

MR. COMERFORD:  Objection. Asked and answered. The document speaks for itself.

A.  Okay. The same off -- it's the same offer. It's not one offer and this -- not that offer and this offer. It's the same offer. So --

MR. COMERFORD:  Mr. Mandel, you keep asking

Page 130

him about a letter somebody else wrote. He didn't write the letter. The letter --

MR. MANDEL:  Should I talk to the author of the letter, Mr. Comerford?

MR. COMERFORD:  The letter says what it says and --

MR. MANDEL:  Does the evidence need to come from the letter's author, Mr. Comerford?

MR. COMERFORD:  No. No. But what I'm --

MR. MANDEL:  Well, you keep saying I'm asking about someone else's letter.

MR. COMERFORD:  You have the letter. We have the letter. We can read the letter. The letter says what it says. It's not --

MR. MANDEL:  I'm asking the witness about it.

MR. COMERFORD:  The letter -- the letter is not going to change.

MR. MANDEL:  I am asking the witness about a letter. Your witness is a defendant in this securities fraud case. Are you telling me that I'm not allowed to ask him questions about this key piece of evidence, Mr. Comerford?

MR. COMERFORD:  You have asked him again and again about the same line. He's answered you

Page 131

again and again.

MR. MANDEL:  He's refusing to acknowledge basic realities.

MR. COMERFORD:  The witness is entertaining your questions and answering them as best he can, and I don't understand why you are so fixated on -- on this, Mr. Mandel. It's not -- he didn't write the letter. This is not the witness's letter.

MR. MANDEL:  I'm sorry -- I'm sorry for you, Mr. Comerford, that you don't understand why these facts matter, but the reality is that Mr. Karsanbhai's second offer letter offered a higher premium than his first letter.

MR. COMERFORD:  Mr. Mandel --

MR. MANDEL:  Do you acknowledge that, Mr. Comerford?

MR. COMERFORD:  Nothing you say or I say or the witness says is going to change what this letter says.

MR. MANDEL:  I'm asking for the witness's understanding of this letter.

MR. COMERFORD:  You have asked and he has provided it repeatedly.

MR. MANDEL:  Mr. Comerford, you're just wasting everyone's time, and it's totally

Page 132

inappropriate what you're doing, and you know it, and you learned it last time too.

A.   Okay.  Let me -- let me just clarify.  This is --

MR. MANDEL:  If I want to spend all seven hours here talking about this question, I'm going to do that.

MR. COMERFORD:  Let him ask -- let him ask a new question.

A.   Okay.  This is not a premium offer.  It's the same offer.  Okay?  He's characterizing it as a premium in his letters.  Okay.  But it's the same offer.  $48, $48.  It's not a different offer.  And we didn't reject it for the reasons of any percentage comparison to what our stock was.  We rejected the offer because, as we said, there was unrealized value in National Instruments that we had an obligation as board members to give to the shareholders and not to sell the company when we're coming out of a supply chain crunch from Covid that, you know -- and our stock price was understated and undervalued because we were struggling to get -- to fulfill all of our orders that we were selling and our stock price was undervalued at the time.  Okay?  So it doesn't make any difference what the comparison was to me.  The $48 was undervalued.  It was too low a value.  It was not credible for the

Page 133

company, and it still wasn't a week later.  This was a week after we rejected it.  So it still wasn't a week later no matter what comparisons are made in his letter.

BY MR. MANDEL:

Q.   Okay.  So, just to be clear, because I'm not sure what you are or are not acknowledging, do you acknowledge that this letter proposed a $48 per share offer and described it as being at a 51 percent premium to the stock price on June 21st, 2022?

MR. COMERFORD:  Objection.  The document speaks for itself.  This has been asked and answered.

MR. MANDEL:  This isn't a proper objection.

MR. COMERFORD:  It is a proper objection, Mr. Mandel.

MR. MANDEL:  It's totally improper.

MR. COMERFORD:  You are --

MR. MANDEL:  Object to form and stop.

MR. COMERFORD:  You're asking him -- you've asked him --

BY MR. MANDEL:

Q.   Mr. McGrath, it's your turn.

MR. COMERFORD:  -- probably eight times if a document -- why don't you just read it and say did I read that correctly.

Page 134

MR. MANDEL:  Well, maybe afterwards we can get together and you can give me depo taking tips.  But right now I'm asking your witness a question and you're obstructing.

MR. COMERFORD:  He has answered it again and again and I am asking you to move on, please.

MR. MANDEL:  All right.  I'm going to ask the same question again.  Let's get --

MR. COMERFORD:  Why don't you just read it -- why don't you just read it and say did I read that correctly.

MR. MANDEL:  Madam Reporter, can you please read back my previous question?

COURT REPORTER:  One moment.

Question:  So, just to be clear, because I'm not sure what you are or are not acknowledging, do you acknowledge that this letter proposed a $48 per share offer and described it as being at a 51 percent premium to the stock price on June 21st, 2022?

BY MR. MANDEL:

Q.   You can answer the question, Mr. McGrath.

MR. COMERFORD:  Same objections.

A.   I've already answered it, but I'll answer it again.  The same offer of $48 a share was repeated a week after we rejected it in this letter, and the

Page 135

comparison that he used was different than the comparison that he used in the previous offer, and, yes, in that comparison of the stock price it had a higher differential of 51 percent compared to 38, 39 percent.

BY MR. MANDEL:

Q.   Okay.  So this letter was offering a premium at this time 51 percent then to the stock price at that time; is that right?

MR. COMERFORD:  Same objections.

A.   It was offering the same $48 a share, and it was irrelevant to me that it -- what the comparison he used was.  Okay.  So I'm not going to -- I'm not going to say it's an increased offer or a more premium offer.  He worded it as an increased premium.  Good for him.  I don't even know --

BY MR. MANDEL:

Q.   Do you deny that the offer at this time was at a 51 percent premium to the stock price on June 21?

MR. COMERFORD:  Objection.  Lacks foundation.  Calls for speculation.

A.   Can we move on from this?

BY MR. MANDEL:

Q.   If you'd just give me a straight answer --

A.   The letter -- the letter says -- I'll read the letter

Page 136

to you in case you can't read it.  Okay?

BY MR. MANDEL:

Q.  No.  That's not necessary, Mr. McGrath.

A.  51 percent premium to NI's closing --

Q.  No.  This is all --

A.  -- share price as compared to June --

Q.  I object to all of this.  You're wasting my record time.

A.  You're wasting my time.

Q.  If you're going to keep going with this, I'm going to subtract this from my time.

MR. COMERFORD:  Mr. Mandel, he doesn't have the share price in front of him.  All he has in front of him is the letter, so it's unfair for you to ask him what the share price was.  So, please, we're going to stop the deposition and ask the Court to -- to advise us on this if you don't -- if you don't stop asking the same question over and over again.  This is really improper.

MR. MANDEL:  I'm not getting an answer to my question.  It's really simple.

BY MR. MANDEL:

Q.  So the 51 percent --

MR. COMERFORD:  I'm putting you on notice, Mr. Mandel, that this is improper and I'm going to

Page 137

reserve the right to file a motion on it.

MR. MANDEL:  You reserve that right, Mr. Comerford.

BY MR. MANDEL:

Q.  So I am assuming for purposes of this discussion that the $48 per share offer was at a 51 percent premium to the June 21, 2022, closing price.  Now, is a 51 percent premium a substantial premium, in your opinion?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  As I explained before, the comparison to our stock price at that time is not relevant because our stock price was suppressed because of the supply chain crisis that we faced and we weren't able to ship to our customers and we built up backlog for future revenue.  Our revenues were understated relative to our bookings, and we disclosed that our revenues were understated relative to our bookings.  Our stock price didn't reflect that.  And so that was not a -- it's not a comparison that we really used significantly because we were looking at the future value of the company that was unrealized and our obligation to shareholders to realize that value.  So the $48 a share was not credible.

Page 138

BY MR. MANDEL:

Q.  Do you think the 51 percent premium was irrelevant to shareholders?

A.  I have no idea.

MR. COMERFORD:  Speculation.

BY MR. MANDEL:

Q.  Well, the 51 percent premium showed that Emerson was proposing to buy the company at a substantially higher price than its stock was trading; is that right?

A.  And it turns out that we sold the company at $60 a share, so isn't this irrelevant?

Q.  Unresponsive.  At that time -- it's not irrelevant.  My client sold their shares in the 30s when you were not disclosing this information.  So I'm trying to ask you do you think that this 51 percent premium offer was irrelevant to shareholders?

MR. COMERFORD:  Form.

A.  I have no idea.  I don't speak for shareholders.  And, you know, I don't know every shareholder's opinion.

BY MR. MANDEL:

Q.  We saw before that the board advised that information that a reasonable investor would regard as important as being the essence of materiality.  So I'm going to -- so to tell me I don't know what investors think.  Do you think a 51 percent premium was irrelevant to a

Page 139

reasonable shareholder?

MR. COMERFORD:  Form, foundation, calls for speculation, and calls for legal conclusions.  Asked and answered.

A.  Can I -- can I say the same answer?  The board rejected the offer because we didn't feel that the stock price was sufficiently valued at the time and we had future value in the company and an obligation to shareholders to -- you know, our obligation is not just short-term.  Our obligation as a board is the long-term value to shareholders as well as short-term, and we considered both.  Okay.  We considered the -- the current share price, but we also considered the fact that the company had much higher potential for the shareholders over the longer term.

BY MR. MANDEL:

Q.  Okay.  So you're repeating a stock answer and refusing to answer the question; right?

MR. COMERFORD:  Objection.  Form.  Harassing.

A.  I don't even know the -- I don't even know the question anymore.  If you stop using the word do I agree that it was a premium, I don't agree it was a premium.  Okay?  I agree that there's a comparison to different stock prices and the percentage was

Page 140

different, but if you want me to say that this was a premium offer, I don't recognize it as a premium offer. Okay? It's in his letter as a premium, but that doesn't mean I have to acknowledge that I think it's a premium offer.

BY MR. MANDEL:

Q. Okay. Now, this letter goes on to say that the $48 -- the last time National Instruments' share price traded above $48 was in December 6th, 2018. Do you see that?

A. Yes.

Q. Do you have a reason to doubt that?

A. No.

Q. So the $48 offer price at this time was offering a price that National Instruments' stock had not touched for several years at this time; is that right?

A. Yes.

Q. Okay. Do you think that was unimportant to investors?

MR. COMERFORD: Form. Foundation. Calls for speculation. Calls for legal conclusions.

A. I -- I -- again, I don't know. We have an obligation as the board to think about the long-term value of the company and not the short-term or the historic term, okay, and we considered all factors, and we rejected this offer at $48 a share because it was insufficient because it wasn't taking into account the future value

Page 141

of the company, and subsequently, you know, the company was worth $60 a share. So --

BY MR. MANDEL:

Q. You didn't answer my question again. All right.

A. -- it would have been irresponsible for us to sell it at $48 a share -- it would have been irresponsible if we did that.

Q. Okay. So the record shows you've given a non-responsive answer.

A. I responded to -- I responded to your question. I just didn't put the words in my mouth that you wanted to put in my mouth. I responded to your question. Okay? But I'm not going to say it was a premium offer no matter how many times you ask me to say it's a premium offer.

Q. My question didn't reference a premium.

A. It's the same offer $48 a share. Okay?

Q. My question didn't even reference a premium, Mr. McGrath.

Moving on. This letter states that Emerson is prepared to engage immediately. Do you see that on Page 2?

A. Yes.

Q. And this letter says that Emerson has "organized the resources to move towards a transaction

Page 142

expeditiously." Right?

A. Yes. Which is irrelevant to us because we rejected the offer before that.

Q. It says they have performed extensive outside-in due diligence; is that right?

A. That's what they said.

Q. They had not previously said that they had done outside-in due diligence, had they?

MR. COMERFORD: Foundation.

A. I don't -- I don't recall. It's irrelevant, though, to me.

BY MR. MANDEL:

Q. And, again, regarding timing, they say they would be ready to sign and announce a definitive agreement within four weeks. Do you see that?

A. I do. All of it's irrelevant, but I see it.

Q. Okay. It says that they've now engaged Goldman Sachs and Centerview and Davis Polk & Wardwell. Do you see that?

A. Yes.

Q. None of that was in their previous letter, was it?

MR. COMERFORD: Foundation.

A. I don't know. I don't know if it was in any of the discussions or we were aware of it or not aware of it prior to this.

Page 143

BY MR. MANDEL:

Q. In the section on financing it states that they've obtained a highly confident letter from Goldman Sachs. Do you see that?

A. Yes.

Q. Do you know what a highly confident letter is?

A. We had no -- we had no question about their ability to finance the deals.

Q. Do you know what a highly confident letter is?

A. Yes. Well, that they could finance the deal. Yes. We had no questions about their ability to finance the deal, even though you keep asking that.

Q. Now, on the next page this goes on to state that "Emerson considers this Proposal to be of the highest strategic priority."

Do you see that?

A. Yes.

Q. So you understood at this time that Emerson regarded this transaction as its highest strategic priority; right?

A. They said it, yes.

Q. All right. And they go on to say they're very motivated to conclude a transaction. Do you see that?

A. They say it, yes. I see what they say, yes.

Q. And of course they conclude by asking for a response

Page 144

by July 11th; right?

A.  Yes.

Q.  Okay.  Going back to the second page.  You see here it says, again, "We before to engage in collaborative, bilateral discussions . . ."

Do you see that?  This is on the previous page.

A.  I don't see it.

Q.  Can we scroll to the previous page?

A.  I don't --

Q.  It says, "We prefer to engage in collaborative, bilateral discussions . . ."

A.  Yes.

Q.  Did you understand that to be a reference to potentially taking the matter public?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  It could be.  It's not my letter.

BY MR. MANDEL:

Q.  Did you understand it as a threat?

A.  That sentence or -- or -- in the overall context we understood that they may continue to pursue a hostile takeover at $14 a share -- I mean, $48 a share and we would reject it, okay, and we would have to defend a hostile takeover.  That doesn't -- the interpretation

Page 145

of that sentence is not necessarily relevant to that I don't think.  I don't know.  I never read that sentence and drew the conclusion you're asking me to draw.

Q.  Okay.  Later in that paragraph Mr. Karsanbhai writes in reference to your previous letter, to your rejection letter that we just looked at a few minutes ago, "Your letter referenced 'significant and steady increases in bookings and revenue' as well as 'strengthened operational performance and advances in technology.'"

Do you see that?

A.  Yep.

Q.  And he writes, "We look forward to learning more about your internal plan and are confident that with access to limited non-public information after signing an NDA, we could work with you to find additional value that would allow us to increase our Proposal."

Do you see that?

A.  Yes.

Q.  So Mr. Karsanbhai's letter states that he could work with you to find additional value that would allow Emerson to increase its proposal; is that right?

A.  Yes.

Q.  And you understood that at the time?  Yes?

Page 146

A.  Most likely, yes.

MR. MANDEL:  Now, let's move on to another document.  Let's look at -- this will be our Exhibit 17, and this is our Tab A, make sure I get this right, A-19.

(Marked EXHIBIT 17 for identification)

BY MR. MANDEL:

Q.  Now, this is an email chain -- I'm sorry.  Did someone say something?  No.  This is NAT-SL-15282.  This is an email chain between you and Mr. Starkloff from June 23rd, 2022; is that right?

A.  It looks that way, yes.

Q.  Now, in the bottom email you see at Number 2 he says -- it refers to "Discuss the response to Wolverine."

Do you see that?

A.  Okay.  Yes, I do.

Q.  And he in the third -- all way at the bottom there you see where it begins "In early July"?

A.  Right.

Q.  So he states, I'm just going to read the quote, "In early July, a short response to Nuthatch telling them we'll discuss at our regularly scheduled board meeting in late July" --

A.  Right.

Page 147

Q.  -- "(versus their 'deadline' for the week of the 11th)."

Do you see that?

A.  Yep.

Q.  So Mr. Starkloff is here articulating to you a plan to inform Emerson that National Instruments will discuss their most recent proposal at their next regularly scheduled July board meeting; is that right?

A.  Yes.

Q.  Okay.  So -- and you responded to that plan, "Sounds good"; is that right?

A.  Yes.

Q.  So you agreed with the plan to let Emerson know that you'll -- that National Instruments' board would be discussing their most recent proposal at your next regularly scheduled board meeting?

A.  Correct.

Q.  Right?

A.  Yes.

Q.  Okay.  Excellent.

MR. MANDEL:  Now let's look at, this will be our Exhibit 18.  And this is our Tab A-21.

(Marked EXHIBIT 18 for identification)

BY MR. MANDEL:

Q.  This is Bates NAT-SL-1250.  Now, this is an email

Page 148

chain. If you go to the last page, it will show the first email in the chain, the chronologically first email in the chain I should say.

Now, you see in the bottom is the email to you and Mr. Starkloff that we saw earlier in which Mr. Karsanbhai attaches his June 22nd letter; right?

A. Yes. The one we went through over and over.

Q. Correct.

A. Okay.

Q. Correct. And then right above that you see Mr. Starkloff's response; right?

A. Yes.

Q. And this response is consistent with the plan that you two discussed via email that we just saw a moment ago in the previous exhibit; is that right?

A. Yes.

Q. Great. He writes to Mr. Karsanbhai that they'll be discussing the follow-up letter at the regularly scheduled board meeting at the end of the month and that he'll be in touch with Mr. Karsanbhai afterwards to discuss; correct?

A. Correct.

Q. Okay. And Mr. Karsanbhai responded to this email; is that right? Well, let's scroll up and you can see the response. Now, in the first paragraph of it he asks

Page 149

Mr. Starkloff to let him know when the board meeting will be so that he can update his board; is that right?

A. Yes.

Q. He goes on to say, "As I highlighted in our prior communication dated June 22nd, we prefer to keep our conversations private, however for that to remain feasible we need relative expedience from NI's Board."

Do you see that?

A. Yes.

Q. Now, did you understand this to be a threat to go public?

MR. COMERFORD: Foundation. Calls for speculation. Form.

A. Can I just clarify? I didn't -- I agree that they -- that I felt they had a threat to go public, that we were preparing for them to go public and defending the $48 share offer that they -- and that there was no one sentence in any one letter or correspondence that solely triggered that. Okay? I mean, so, you know, that was our impression. It was our impression from our advisors. It was the impression from, you know, the situation. It was the impression that we had because they didn't increase the offer from $48 a share. There's a lot of impressions. It wasn't

Page 150

triggered by one part of one sentence in any communication. So I'm not -- I'm not saying that we -- I'm agreeing that -- with the point that you're making, but I'm not agreeing that any one sentence in any one letter triggered it. Is that fair?

BY MR. MANDEL:

Q. Well, so you're saying -- are you testifying that you did not understand this July 7th email from Mr. Karsanbhai as communicating a threat?

A. I didn't understand the sole purpose of that to communicate a threat under the basis that we already knew a threat existed, so --

Q. So a threat existed before this time?

A. It existed around that time, before that time, after that time. You can go back to the original briefing that we had in June from our attorneys advising us about the potential for, you know, a hostile takeover threat.

Q. So at all times you understood yourself to be under a threat of Mr. Karsanbhai going public; is that right?

A. At -- at most times. I don't know if I would say all times, but most times, you know. By this time.

Q. So certainly by the time you received this letter you understood that Mr. Karsanbhai was threatening to go public; is that right?

Page 151

A. We understood there was a potential.

Q. Well, did you understand that that's what he was threatening?

MR. COMERFORD: Form.

A. I understood he was -- that there was the potential of a threat. He didn't say we were going to go public and what we were going to do. It's not a -- it's not an outright threat. It's an implied, you know, threat potentially, but we already understood the implied threat, so . . . We're just wasting time going through this. I'm not -- I'm not saying we weren't threatened. I'm saying we felt the threat, but, you know, if you want me to say that I woke up that day and I read this first sentence or that sentence and all of a sudden it dawned on me that we -- he was making a threat, that's not the case. And we understood it. It's irrelevant because we understood there was a threat already. I don't get the point here. You're just wasting time. And I'm getting irritable. Sorry.

MR. MANDEL: Okay. Let's have a look -- let's pause here for a minute. It's a little bit after 1:00. Do we want to take a lunch break or anything for Mr. McGrath?

THE WITNESS: I don't want a lunch break.

Page 152

I don't want a lunch break. I want to continue.

MR. MANDEL: Okay.

THE WITNESS: I will need a bathroom break soon, though.

MR. MANDEL: Madam Court Reporter, do you need a break?

COURT REPORTER: I would like like ten minutes or so just to grab something real quick to eat. I don't need a full half hour or anything longer.

MR. MANDEL: Sure. Would you like to take that break now?

COURT REPORTER: Whenever is convenient for you is fine.

MR. MANDEL: It seems like a convenient stopping point just in terms of the documents. Do you want to take a 15-minute break now so you can --

THE WITNESS: Can we do ten? She said ten.

MR. MANDEL: Madam Reporter?

COURT REPORTER: That's fine.

MR. MANDEL: Ten minutes enough for you?

COURT REPORTER: Yes. Ten minutes is fine.

MR. MANDEL: Very good.

COURT REPORTER: Thank you.

VIDEO TECHNICIAN: All right. Going off

Page 153

record. The time is 1:04.

(Recess taken at 1:04 p.m.)

(Back on the record at 1:20 p.m.)

VIDEO TECHNICIAN: Going back on record at 1:20.

MR. MANDEL: Welcome back. We're going to look at another document now. This will be Exhibit 19. It's Tab M-11.

(Marked EXHIBIT 19 for identification)

BY MR. MANDEL:

Q. For the record, this is Bates beginning NAT-SL-1457. These are minutes of a meeting of the Board of Directors, National Instruments on July 19th and 20th, 2022.

Mr. McGrath, do you recognize this document?

A. Yes.

Q. Have you reviewed it before?

A. What was the question?

Q. Have you reviewed it before?

A. Yes. We always approve the minutes.

Q. I'm sorry?

A. We always approve the minutes of our previous meetings, so I have reviewed it.

Q. Understood. Thank you. And you attended this

Page 154

meeting; is that right?

A. Yes, I did.

Q. This meeting took place over a two-day period; is that right?

A. Correct.

Q. There was a meeting on July 19th that began at four p.m. and concluded at 8:45 p.m. on July 19th; is that right?

A. Yes.

Q. And then you reconvened at 8:30 the following morning and continued with your meetings; is that right?

A. Correct.

Q. The July 19th meeting, was that a dinner?

A. I think we had sandwiches during the meeting.

Q. Who attended the July 19th meeting?

A. The board members and I don't remember who from the executive team were there. Eric was obviously there.

Q. So the minutes note that all board members and Mr. Dixon were present for the working meeting. Do you see that?

A. Right. Yep.

Q. Does that -- it also indicates lower down that Mr. Niles participated in the meeting. Do you see that?

A. Where --

Page 155

Q. Beginning "During the foregoing presentation, members and Mr. Niles responded to questions from the members of the Board."

A. Okay.

Q. Do you see that? When it says "members and Mr. Niles responded to questions from the members of the Board," is the first reference to members a reference to management?

A. That is represent members of the Board.

Q. So members of the Board and Mr. Niles responded to questions from members of the Board?

A. Right.

Q. So there was a discussion at this meeting; is that right?

A. Yes. Yes.

Q. Do you recall what you discussed at this meeting?

A. We discussed I think two primary topics as I recall. One was the -- our response to a potential hostile takeover at $48 a share from Emerson, and the other was our ongoing evaluation of our operating expenses and trying to reach a -- a plan on how we -- how much we were going to reduce them going forward, which had been in the works for a while and continued beyond this meeting.

Q. And on the next day the meeting continued; is that

Page 156

right?

A.  Yep.  Correct.

Q.  And if you look at it's page ending 1460, also labeled Minutes 4 of 53, it's a few pages later, section labeled "Summary and Actions."

A.  Yep.

Q.  There was continued discussion of the response to Wolverine at this part of the meeting; is that right?

A.  Yes.

Q.  And, again, you concluded that the $48 a share substantially undervalued National Instruments; is that right?

A.  Correct.

Q.  And that Emerson's most recent offer was not in the best interests of the company and that it did not reflect the value expected to be generated by the company's business strategies; is that right?

A.  That's correct, as I previously said.

MR. COMERFORD:  I object that you're -- you're leaving out words as you're reading from the document.  You left out the best interests of the -- of the shareholders.  I'm not sure why you're selectively reading from the document.

MR. MANDEL:  Thanks, Mr. Comerford.  I wasn't quoting the document.  I was asking the witness

Page 157

whether parts of the document are correct.  When it's your turn, you can ask whatever you'd like.

MR. COMERFORD:  I thought you were quoting the document.  My objection is you're misquoting it.

MR. MANDEL:  Oh, I wasn't quoting it, but I was reading parts of it, and I think I read them accurately.

BY MR. MANDEL:

Q.  So . . .  And then ultimately on the following page it states that, "The Board also discussed with management the potential steps the Company could take at the upcoming earnings call to highlight the Company's strong momentum, prospects, margin priorities and other financial and operating performance matters."

Is that correct?

A.  That's correct.

Q.  So when the Board discussed with management steps that the company could take at the upcoming earnings call to highlight strong momentum, prospects, margin priorities, and other financial and operating performance matters, was that specifically in connection with the Wolverine offer?

A.  Not -- not directly.  It had to do with the fact that, you know, the company had -- we believed the company had much higher potential than was reflected in the

Page 158

stock price and that we wanted to communicate that to the street and to shareholders the optimism that we had for the future of the company between operating performance improvement, momentum that we had, and our margin priorities, that we felt the company had upcoming a good solid couple of years that would benefit shareholders, and we felt it was important to share that with -- with -- share that publicly with shareholders and analysts, which we did.

Q.  So -- so was the decision to share that information publicly with analysts unconnected to Emerson's proposal to acquire National Instruments?

A.  Yes.  It was connected to the fact that we didn't see it reflected in our stock price.

Q.  And as it states here in the minutes following that discussion, the Board unanimously voted to reaffirm their continued rejection of the Wolverine proposal; is that correct?

A.  That's correct.

Q.  And authorized you, Mr. Starkloff, and Mr. Dixon to communicate that to Wolverine; correct?

A.  Correct.

MR. MANDEL:  Now, let's look at our next document.  This will be our Exhibit 20.  And it's Tab A-27.

Page 159

(Marked EXHIBIT 20 for identification)

BY MR. MANDEL:

Q.  For the record, this is Bates NAT-SL-00020795.  It's an email from Mr. McGrath to Mr. Dixon, cc'ing Mr. Starkloff, dated July 14th, 2022; is that right?

A.  Yes.

Q.  And this is an email in which you are sending a presentation to Mr. Dixon; is that right?

A.  What was the date of this again?

Q.  July 14th, 2022.

A.  Right.  Correct.

Q.  And it says here that "Eric suggested that you," meaning Mr. Dixon, "distribute it through Diligent Messenger since it should go only to board members."

Do you see that?

A.  Yep.

Q.  So had Eric reviewed this document before?

A.  Emerson?

Q.  No.  Had Eric Starkloff reviewed the document attached to this email --

A.  I don't recall.

Q.  -- before you sent this email?  You don't recall?

A.  I don't recall.  Probably.  We -- we were discussing it previously, so probably.  At least portions of it.

Q.  Right.  You had discussed it with Eric previously;

Page 160

right?

A.  Yes.

Q.  And it says that Eric suggested that you, Mr. McGrath, send it to Mr. Dixon so that he could put it on Diligent Messenger; right?

A.  That's correct.

Q.  What was Diligent Messenger?

A.  That was a internal communications system to the board.

Q.  Is that where board materials were typically posted in advance of meetings?

A.  Yes.

Q.  And as a board member, if you were going to review materials in advance of a meeting, you would typically review them from Diligent Messenger; is that right?

A.  Yes.  Or there's also a related Diligent service, but they were -- they're both related.  One was Messenger and one was more for documents, but they're both Diligent.

Q.  Now, let's move forward in this document and look at your presentation.  Now, if we look at the first page of the presentation, I'm going to look at, sorry, Bates ending 20808.  This is the one version of the document attached here that's larger than the others. They're all the same, but I'm just asking to look at

Page 161

this one because it's easier for us to see it.

A.  Okay.

Q.  Now, on the cover this identifies this presentation as your work; is that right?

A.  Yes.

Q.  Was this presentation your work?

A.  Principally, yes.

Q.  Okay.  So this is your presentation to the National Instruments board directors from Tuesday night, July 19th, 2022, from four to eight p.m.; is that right?

A.  Yes.  Yes.

Q.  And it says it was created solely by the board chair for board discussion; is that right?

A.  That's correct.

Q.  Okay.  So did anyone else participate in preparing this document?

A.  Eric and I had discussed it previously, but he didn't prepare the document.

Q.  Did anyone else --

A.  No.

Q.  -- assist you in preparing this document?

A.  No.

Q.  Okay.  Do you remember this document?

A.  Yes, I do.

Page 162

Q.  Now, if we look at page Bates ending 20810.  Go ahead and take a look at that one for a moment for me.

Do you recognize the text of this --

A.  Yes, I do.

Q.  -- on this page?  This is the text of Mr. Karsanbhai's letter to Mr. Starkloff that we reviewed shortly ago; is that right?  Email to Mr. Starkloff that we reviewed shortly ago; is that right?

A.  Yep.

Q.  And you remember we had a spirited discussion about whether this was a threat or not; do you recall?

A.  And I agreed that that was one of the many things that indicated a threat.

Q.  Right.

A.  Okay.

Q.  And here clearly you're stating it as such?  Your document states --

A.  Yes.

Q.  -- "Most recent response indicates intention/threat to go public with its offer"; right?

A.  Yes.

Q.  Okay.  So I thought it was important to focus you on that for a moment.

Now, on the next page you discuss Emerson's objective here; right?

Page 163

A.  Yes.

Q.  And you identify their most likely objective as being to acquire National Instruments and drastically reduce operating expenses to increase its own valuation; is that right?

A.  Yes.  That's correct.

Q.  So was it your understanding that Emerson essentially meant to acquire National Instruments and then reduce its operating costs, which would then increase Emerson's valuation; is that right?

A.  Yes.

Q.  And at the bottom you note that at $48 a share its gain would be three billion to five and a half billion; is that right?

A.  That's correct.

Q.  So is that the increase in its own valuation that you referred to in the slide we just read previously?

A.  And that's my -- that's -- that's my estimate of that, yes.

Q.  So essentially this is saying if they were to acquire the company at $48 a share and then drastically reduce operating expenses, they could increase the valuation by three to five and a half billion?  Is that what this means?

A.  Yep.

Page 164

Q.  Now, on the next page you outline what Emerson's potential public argument would be; is that right?

A.  That's correct.

Q.  And the argument would be, in effect, that National Instruments, its leadership and board, has not been able to manage its operating expenses to competitive levels; is that right?

A.  That's a potential argument, yes.

Q.  That's what you expected Emerson's public argument would be; is that right?

A.  I anticipated that they would consider that.  I didn't -- I didn't -- it wasn't a conclusion.  It was an anticipation that they might do that.  Correct.

Q.  Okay.  And the bottom bullet here states, "Although we recognize the opportunity to reduce operating expenses, we are currently planning on doing this less significantly and gradually over time."
    Do you see that?

A.  Yes.

Q.  So the plan at this time was not to do a significant reduction in operating expenses; is that right?

A.  It was less significantly than what theirs were.  They were best in class.  We were not at peer average.  So we were planning on reducing it, and my point in this presentation was that we had an opportunity to reduce

Page 165

it even more, irrelevant of their offer.

Q.  But the plan going into this was to reduce operating expenses gradually over time; is that right?

A.  Yes.  Yes.  Yes.

Q.  Less significantly and gradually over time?

A.  Right.

Q.  Right?  Okay.  If we go two pages ahead to Bates ending 814.  You explain that "Defending this publicly will be a challenge"; is that right?

A.  Yes.  Could be.  Could be.

Q.  I'm sorry.  Go on.

A.  Yes.  It could be a challenge.  Yes.

Q.  And you write that "Defending the offer publicly based on that potential argument," referring to the argument we were just discussing about National Instruments' expenses, "is different than rejecting the offer privately."
    Do you see that?

A.  Yes.  Of course it's different.

Q.  Why is it different to defend that argument concerning National Instruments' expenses publicly rather than privately?

    MR. COMERFORD:  I'm going to object to the form.  I -- I'm not sure what -- what that word "this" is referring to in the document.  It might be helpful

Page 166

if we look at the prior page.

    MR. MANDEL:  "Defending this publicly will be a challenge"?

    MR. COMERFORD:  Yeah.  What is --

BY MR. MANDEL:

Q.  Well, the document is discussing --

    MR. COMERFORD:  What is "this"?

BY MR. MANDEL:

Q.  -- NI's potential public argument in the event it goes public with its $48 proposal, and, Mr. McGrath, it says, "Defending this publicly will be a challenge."
    Did you understand the "this" in your own document here to refer to defending against Emerson if they went public?

A.  Yes.  I mean, isn't that obvious that --

Q.  I thought so, too, but Mr. Comerford had an objection.

A.  -- doing it public -- public -- no.  No.  No.  Isn't it obvious that doing it publicly is harder than doing it privately?  I mean, that's --

Q.  Why?  Why is that?

A.  Because you have to do it in the press.  You have to do it to analysts.  You have to do it to employees.  You have to do it to customers.  You know, it's -- you know, it's much more -- any -- if they were to disclose their offer in a hostile takeover, it would

Page 167

significantly disrupt our company, so . . .

Q.  So you say in the sub bullet there that you "had sufficient justification with the B of A valuation analysis to reject the offer but now we need to defend it publicly with a more short-term focus."
    What does that mean to defend it with a more short-term focus?

A.  I actually don't recall, but we'd have to defend it publicly.

Q.  And you go on to say that you'd need to defend National Instruments' high operating costs unless you initiate more proactive actions; is that right?

A.  Yes.  You have to understand for -- for my -- my position as chairman of the board and my experience, I was trying to encourage management to be more proactive in reducing operating expenses to be down to peer average, and this is part of that discussion.

Q.  Okay.  But the plan going into this was to do so gradually over time; right?

A.  Yes.  And coming out of this, we -- we agreed to do it more aggressively, still over time, but there was a compromise that management would do it more aggressively, maybe not as aggressive as I wanted, and that's what happens in a board.  You have discussion, then you come up with agreement, then you go forward

Page 168

with, you know, the input from everybody.

Q. Your next bullet here, the third bullet on this page, says, "If it," meaning Emerson, "uses the argument that we have not managed operating expenses sufficiently, it will be a significant embarrassment."
Do you see that?

A. Yes.

Q. Why would that be a significant embarrassment?

A. Because they would accuse us of that. That's what happens in a hostile takeover. It's pretty simple.

Q. Who would have been embarrassed?

A. The company. Our company. And I. The board --

Q. It would have embarrassed management?

A. Potentially. The board and management.

Q. What about members of the board? Would it have embarrassed them?

A. Probably.

Q. You go on to say, "Nothing is more important than defending this for our shareholders' benefit."
Do you see that?

A. Yes.

Q. What did you mean by that?

A. That they -- we believed that the shareholder benefit over the long run was significant and we had to preserve that. We -- we -- it's the same thing I've

Page 169

been saying before.

Q. So defending against an acquisition at $48 is what you're referring to here; is that right?

A. Yes.

Q. And it was your view that nothing was more important than defending against that; is that right?

A. For our shareholders.

Q. And you then wrote that "We need to go 'all in.'" All in is in quotes in your writing. "We need to go 'all in.'"

A. Yes.

Q. What does that mean?

A. That we need to -- we need to give it a priority.

Q. So nothing was more important and you needed to go all in. This is an indication that -- that you were recommending any drastic action as potentially on the table; is that right?

MR. COMERFORD: Object to the form.

A. No. I was recommending that we seriously consider managing our operating expenses to peer average, to meeting it and not -- not to be -- despite the fact that historically our averages have been higher, so . . . You know, it's not the extreme that you mentioned.

BY MR. MANDEL:

Page 170

Q. Is "all in" a term that comes from somewhere?

A. No.

Q. All in, going all in?

A. It's just an expression I used. I don't -- I didn't get it from anyplace.

Q. You play poker?

A. No.

Q. You go on to write that "Delaying revenue or investing more in the future is not as important."
Not as important as what?

A. As being aggressive in managing to stockholder benefit by managing our expenses.

Q. So "delaying revenue or investing more in the future." What's that a reference to?

A. It's a reference to the fact that we had extremely high R&D expenses that we needed to bring down to more to industry averages.

Q. So the money was -- so the company under this view should not hold onto cash so that they could invest it more in the future; is that right?

A. It had nothing to do with cash. We shouldn't be -- be spending 19 percent of revenue in R&D when the average is more like 12 and that, you know, success five, six, seven years from now is -- is not as important as, you know, making sure that we reduce our expenses now and

Page 171

deliver shareholder value over the next few years.

Q. Going on to the next page. You list -- and this is -- this particular slide continues onto the next page. You identify seven potential responses to Emerson's public argument; is that right?

A. Can I just see the whole point there? Okay. Go ahead. Number 7 you're saying? Is that the slide, Number -- Point Number 7?

Q. Yeah. This is a sort of a two-pager from Bates 814 to 815. 1 -- I'm sorry. From 815 to 816. Potential responses 1 through 6 are on Page 815 and Response Number 7 is on the subsequent page. Do you see that? Do you see that, Mr. McGrath, Number 7?

A. Yeah. Yeah. Yeah. Yeah.

Q. Okay. And so let's focus on Response Number 7 here where response was to "Accelerate our operating expense reductions more aggressively."
This is what we were just talking about; right?

A. Right. That was my recommendation to the board.

Q. Your recommendation.

A. Right.

Q. And you write here that it's the "best possible defense and delivers immediate demonstrable shareholder value"; is that right?

Page 172

A.  That's correct.

Q.  And that it would most likely be reflected in a higher stock price if you communicated this to investors and analysts; is that right?

A.  That's correct.

Q.  That is to say, if you communicated your cost reduction plan, it would most likely be reflected in a higher stock price; is that right?

A.  That's correct.

Q.  And you write here that it "Would both increase the stock price required and reduce the cost reduction opportunity for Nuthatch.  At $65 per share, it most likely would not achieve its objective."

Do you see that?

A.  Yes.

Q.  So was the idea to make a disclosure to the market that could cause the stock price to go up such that it might reduce the incentive for Emerson to pursue the acquisition of National Instruments?

A.  Not -- not the sole intent.  The sole intent was to deliver shareholder value, and we would expect the stock price to reflect that.

Q.  So did you want the stock price to go up?

A.  I didn't want it to go down.

Q.  Was it your intention that the stock price go up?

Page 173

A.  The intention would be that if we managed operating expenses better and had higher profits, that the earnings per share would be higher and stock price would go up.  That's what the board's responsible for.

Q.  So you made a plan here to make a disclosure to the market that you hoped would cause the stock price to go up; is that right?

A.  We -- I was proposing that we reduce our operating expenses, increase our operating income, and that that would be disclosed, which we subsequently did disclose, in our earnings call along with some other things that relate to our valuation of the company.

Q.  And it was your hope that that would -- that that disclosure would cause the stock price could go -- to go up, which would make it more difficult for Emerson to pursue the acquisition of National Instruments; is that right?

A.  That wasn't the intention, but it would, yes.

Q.  And was it important that the stock price not go up because of Emerson's proposal?

A.  I -- I don't understand that question.  I don't -- I don't --

Q.  Well, you wanted the stock price to go up; right?

A.  We always have that obligation to improve our stock price.  Correct.  And this would be one way of doing

Page 174

it.

Q.  And you made a plan to go to the market with new projections based on cost reductions that you hoped would cause the stock price to go up; is that right?

A.  That's correct.

Q.  And did you want the stock price not to go up based on Emerson's offer?

A.  Are you saying that after we rejected the offer we should have prompted and -- and promoted the stock price to be higher with no basis?  I think that's in violation of SEC guidelines to say we reject the offer and, by the way, we had an offer and we think the stock's worth a lot more.  I think those are really strongly in violation of SEC guidelines on really, you know, touting your stock price.  We -- if we did that for the sole purpose of -- of -- of promoting increasing our stock price, that would be, you know -- that would be irresponsible and probably illegal.

Q.  I'm sorry.  I'm not -- would your plan have worked if Emerson's offer was disclosed and the stock price rose to that level?

MR. COMERFORD:  Object to the form.  Calls for speculation.

A.  I -- I -- I -- I don't understand the question.  I'm sorry.  We had no intention of disclosing the offer

Page 175

after we rejected it, so . . .  I don't -- I can't conjecture what would have happened.

BY MR. MANDEL:

Q.  So, just to be clear, is it correct that you had a plan to get your stock price up as soon as possible without the price being based on a potential sale of the company?

A.  Yeah.  It wasn't based on sale of the company.  Right.

Q.  So you wanted the stock price to go up as soon as possible without the price being based on a potential sale of the company; is that correct?

A.  Right.  I mean, we -- it was irrelevant.  We weren't going to -- we were not going to promote the stock price -- we didn't want to get the stock price up by promoting that we had an acquisition offer that we declined.  That -- so we -- that's -- we weren't gonna do that.

Q.  Right.  You wanted not to disclose Emerson's offer; right?

A.  Oh, we would not have disclosed Emerson's offer after we rejected it.

Q.  And your plan was to get the stock price up without disclosing Emerson's offer; is that correct?

A.  They weren't tied together.  That's -- yes.  There was no tying in to say we were going to reject the offer

Page 176

to get the stock price up, so they weren't related, but, no, we weren't relying on -- on Emerson's offer to get the stock price up if that's what you're asking.

Q. Well, let me go back to the question because I don't think you're asking the question. I'm trying to understand your plan here, and the question is, was it your intention to get National Instruments' stock price up without the price being based on a potential sale of the company?

MR. COMERFORD: Objection. Asked and answered twice.

MR. MANDEL: It wasn't answered is the point.

MR. COMERFORD: It's been answered.

A. If you ask me a question and you tie things together, it's sort of like saying, you know, if you killed your mother, would you have said it's self-defense? I mean, they weren't tied together. This was a plan to improve shareholder value and get the stock price up. It had -- it had nothing to do with disclosing the offer from Emerson. So if you tie the two together, I can't respond to your question.

BY MR. MANDEL:

Q. I mean, to tie the two together would be securities

Page 177

fraud? Is that what you're saying?

MR. COMERFORD: You don't need to answer that. That's --

A. No. That's not what I'm saying.

MR. COMERFORD: He's not going to answer that, Mr. Mandel.

BY MR. MANDEL:

Q. Well, a moment ago you were talking about all the SEC regulations that might be implicated if you disclosed an offer to try to get your stock price up. Now you're telling me you didn't tie these things together?

MR. COMERFORD: It says right on the document that they're -- they're -- they're operating expense reductions.

THE WITNESS: Yeah.

MR. COMERFORD: That's what this is about, Mr. Mandel. It says it right on the document.

MR. MANDEL: What does it say on the document, Mr. Comerford?

MR. COMERFORD: "Accelerate our operating expense reductions more aggressively."

MR. MANDEL: Um-hmm. Okay. Well, let's look at our next document. Our next document is going to be Exhibit 21. This is Tab A-23.

Page 178

(Marked EXHIBIT 21 for identification)

BY MR. MANDEL:

Q. This is Bates NAT-SL-21516. This is an email from Mr. Michael McGrath, from you, to Eric Starkloff from July 10th, 2022, labeled re line "Discussion materials."

Do you see that?

A. Yep.

Q. Now, if you look at the attachment, this is an earlier draft of the presentation we were just looking at.

A. Okay.

Q. Is that right?

A. Yep.

Q. Now, please go to page Bates ending 21525.

This is similar to the slide we were just looking at; is that right?

A. It looks it, yes.

Q. Similar, but there are some differences. Look at Number 7 there. Number 6 is identifying the accelerate cost reduction plan; is that right?

A. Yep.

Q. Number 7 goes on to discuss cost reduction plans and says, "If we implement cost reductions, we should disclose our new plans."

Do you see that?

Page 179

A. Yes.

Q. And you say that this would enable you to get the valu -- the advantage of forward valuations and higher target prices. Do you see that?

A. Yes.

Q. And then you explained the thinking. You wrote, "We need to get our stock price into the mid-40s, preferably 50s, as soon as possible without the price being based on a potential sale of the company."

Do you see that?

A. Yes.

Q. Okay. So is this an accurate statement of your intentions at this time?

A. It looks like it, yes.

Q. You wrote it; right?

A. Yep.

Q. So your intention was to get the stock price up as soon as possible without the price being based on a potential sale of the company to Emerson; is that right?

A. That's correct.

Q. And you'd never disclosed Emerson's approach; is that right?

MR. COMERFORD: Form.

A. What was the question again? We never disclosed?

Page 180

BY MR. MANDEL:

Q.  You did not disclose Emerson's approach; is that right?

A.  You mean the offer we rejected by approach?

Q.  Any of Emerson's proposals.  Did you disclose them?

A.  No.

        MR. COMERFORD:  Form.

BY MR. MANDEL:

Q.  So you wanted the stock price to go up not because of Emerson's proposal?

        MR. COMERFORD:  Oh, boy.

BY MR. MANDEL:

Q.  You did not disclose Emerson's proposal; is that right?

A.  Why would I have wanted it to go up based on Emerson's proposal?  I don't -- you know, it's -- again, you ask questions that have like double links in them.  No, we reject -- we rejected Emerson's proposal.  No, we did this, not disclose it.  No, we did not have any obligation to disclose it.  Yes, I wanted our stock price to go up.  I wanted us to reduce operating expenses.  And I felt it was important to communicate that to investors as part of our disclosure of where we intended to go.

Q.  And it was your intention that the stock price go up

Page 181

not because of disclosure of Emerson's proposal; is that correct?

        MR. COMERFORD:  This has been asked and answered.

A.  Yes.  It's like, you know, would it be my defense if I killed my mother, would it be defensive?  We weren't going to disclose the Emerson proposal.  We had no obligation to do it.  So it had -- it was irrelevant.  Yes, I wanted the stock price to go up as part of our obligation as board of directors and chairman, and this was a plan to do that.  But they weren't linked to not disclosing the Emerson offer.  No matter how you want me to link them.  They weren't linked.

BY MR. MANDEL:

Q.  Well, didn't you link them right here?

A.  No.

Q.  No?  You're discussing your cost reduction plan and hoping that the price will go up for reasons other than Emerson's undisclosed offer?

A.  Right.

Q.  Correct?

A.  Correct.

Q.  Now, you understood that if Emerson's offer were disclosed, it would impact the price of the stock; is that right?

Page 182

A.  If Emerson's offer was disclosed, it would -- it would probably drive our stock price down because it would disrupt the company, we would lose key executives, we would have customers defer their orders, and maybe there would be some blip for a day or two, but the disruption in the company would be significant, and it would injure the company, like it does with any company that has a hostile takeover offer or any offer.  Customers are going to question it, employees are going to question it, and it would probably drive our stock price down after that was digested.

Q.  So your testimony is that disclosure of Emerson's offer, which was above the market price, would have caused the stock price to go down?  That's your testimony, Mr. McGrath?

A.  My testimony is that it would disrupt the company and have consequences, and I don't know if the stock price would go down or not, but it would have negative consequences to the company.  That's my testimony.  Clearly.  We would lose key employees who would think they'd be fired in an acquisition, and we would have customers that we have long-term commitments to who would defer those commitments pending resolution of the sale of the company, and it would injure the company if we disclosed that.

Page 183

Q.  Mr. McGrath, I'm just going to read the sentence to you here again.  "We need to get our stock price [up] into the mid-40s, preferably 50s, as soon as possible without the price being based on a potential sale of the company."

        This is an acknowledgment that disclosure of Emerson's offer would cause the price to go up, is it not?

        MR. COMERFORD:  Form.

A.  No, it's not.  That has nothing to do with disclosure.  It has to do if we -- if we agreed to sell the company at that price.

BY MR. MANDEL:

Q.  So you wanted to get your stock price up to the 40s or 50s but not based on a potential sale of the company; correct?

A.  That's what it says.  That's what it says, yes.  That's what it says.  Okay.

Q.  Okay.

A.  So we move on?

Q.  So you understood that if the market learned of Emerson's offer, it would drive the price up?

A.  I don't -- I don't believe that.  Okay?

Q.  Okay.  Okay.  Let's go back to the previous exhibit, which was Exhibit 20.  Now, let's look at the

Page 184

page 20817. Okay. This is the base plan. Does this mean this is the plan based on management's existing projections at this time?

A. Yes.

Q. And the subsequent page describes the proposed cost reduction plan, and the page after that has a similar chart to the one we just saw about the base plan.

Do you see that?

A. Yes.

Q. Okay. So going back to the base plan. The base plan projected $2.05 earnings per share for the year 2022; is that right?

A. Yes.

Q. And $3.20 a share for 2023; is that right?

A. Yes.

Q. And you're using a 17X price earnings multiple in your work on this chart; is that right?

A. Yes.

Q. So that you're multiplying the EPS by 17 to obtain a share price; is that right?

A. That's correct.

Q. And so, again, every penny of increased EPS would increase the share price under that method; is that right?

A. That's obvious. Yes.

Page 185

Q. Okay. Now, a moment ago we saw in the previous exhibit an earlier draft of this presentation prepared -- sent on July 10th. Do you remember that?

A. Okay.

Q. So, just for the record, the previous exhibit that we looked at, Exhibit 21, was your earlier version of the July 19th board presentation attached to an email on July 10th. Okay? And you shared this presentation with Mr. Starkloff, is that right, on July 10th?

A. Yes. Yes.

MR. MANDEL: Let's look at document 20 -- this will be Exhibit 22. This is Tab Z-5.

(Marked EXHIBIT 22 for identification)

BY MR. MANDEL:

Q. This is Bates number NAT-SL-27877. It's an email from Mr. Dixon to Mr. Starkloff. The subject is "privileged and confidential - discussion with Michael."

Do you see that?

A. Um-hmm.

Q. Have you seen this email before?

A. I don't know if I'm copied on it.

Q. Well, you're not copied on it.

A. Okay.

Q. I'm asking if you've ever seen it.

Page 186

A. I don't think so.

Q. Okay. In this email, "Subject: privileged and confidential - discussion with Michael," Eddie Dixon writes to Mr. Starkloff after you send Mr. Starkloff the presentation we reviewed at Exhibit 22, he says to him -- he writes to him, "I was thinking how you might suggest to Michael that it is not a good idea to create materials like those he shared with you . . ."

Do you see that?

A. Yep.

Q. ". . . especially with something like Wolverine in play."

Do you see that?

A. Yep.

Q. And he goes on later in the document to write, "I don't think Michael would want his materials made public."

Do you see that?

A. I see that. Yes. I never write anything that I don't think would -- if it's made public would be a problem, so . . . I didn't think it would be a problem if it was made public.

Q. Well, did Mr. Starkloff have a conversation with you about this?

A. About the materials being made public? No. We had

Page 187

conversations about the --

Q. Well, no, no, no. Mr. Dixon proposes to Mr. Starkloff that he might suggest to you that it's not a good idea to create materials like those he shared with you. Did Mr. Starkloff ever convey that to you?

A. I don't believe so.

Q. Did Mr. Dixon ever convey it to you?

A. I don't believe so.

Q. Did anyone within National Instruments --

A. No.

Q. -- suggest to you --

A. No.

Q. -- that it was not a good idea to create materials like those you shared with Mr. Starkloff?

A. And I -- no. And I was -- I was aware that they could be made public and -- when I did them, when I just submitted them. And they were -- the materials were a normal discussion with the board and the CEO and the management team relative to planning and how we set our plan and how we communicate our plan, and I was advocating for a position that we more aggressively reduce operating expenses as part of our discussion, and the outcome of that was that we ended up with a compromise that was an improvement over management's plan and not as aggressive as I wanted, and that's how

Page 188

a board functions properly.

Q.   So we saw a moment ago in your earlier draft that you included this language "We need to get our stock price into the mid-40s, preferably 50s, as soon as possible without the price being based on a potential sale of the company." You remember that?

A.   Yep.

Q.   After that, Mr. Dixon sent Mr. Starkloff an email suggesting that Mr. Starkloff might tell you not to create those sorts of materials; is that right?

A.   It looks that way, yes.

Q.   And then in your final version of this presentation, which was Exhibit 20, which we looked at a moment ago, this language that you wrote about how "We need to get our stock price into the mid-40s, preferably 50s, as soon as possible without the price being based on a potential sale of the company," that language was no longer in your final presentation; is that correct?

A.   That's correct. I took it out.

MR. MANDEL:  Now, let's have a look at our next exhibit. This will be Exhibit 23. And this is M -- Tab M-13, Alex.

(Marked EXHIBIT 23 for identification)

BY MR. MANDEL:

Q.   For the record, this is NAT-SL-24106. This is the

Page 189

board book, the agenda and book from the July 19th and 20th meeting; is that correct?

A.   That's correct.

Q.   Okay. Now, at the -- and we see, as we discussed, it identifies on the first page four to eight p.m. "Working Meeting & Dinner Onsite"; right? That's what we were just talking about; right?

A.   Yes. Yes.

Q.   And then it sets the agenda for the meeting on the -- for the remainder of the meeting on the following day; is that right?

A.   That's correct.

Q.   Okay. Now, the document that we were just reviewing, you instructed Mr. Dixon to put it on Diligent to make it available to board members; is that right?

A.   That's correct.

Q.   And did you, in fact, present that presentation at the July 19th meeting?

A.   At that evening meeting from four to eight, yes.

Q.   Yes. At that meeting you presented that presentation we were just looking at; correct?

A.   Yes. Yes. Yes. Yes. Yes.

Q.   Can you explain why it's not included in this board book?

A.   Because the board book has a broader distribution and

Page 190

we wanted to leave that discussion on Tuesday night to board only. I made that decision. The board meeting has many minutes of executive team in it. It's simple as that.

Q.   Now, and at the July 20th meeting, you continued, as we saw earlier from the minutes, to discuss Project Wolverine and the company's response to Mr. Karsanbhai's most recent letter; is that correct?

A.   That's correct.

Q.   Did you discuss repurchases at that meeting?

A.   I don't recall. I don't think we did. I -- I don't recall.

Q.   Okay. Let's have a look at slide 24210 -- sorry, Bates number 24210, which is a document from within this presentation. Now, if we just go back one, two, three pages, you'll see that this is the first page of the capital strategy presentation discussion.

A.   Um-hmm.

Q.   And if you go two pages in, you'll go back to the "Cash Project by Quarter in 2022."

Now, we've seen a similar slide to this one before today; is that right?

A.   That's correct.

Q.   Okay. And you see that there is a line here for share repurchases; is that right?

Page 191

A.   Yes. And the -- yes. And it's -- the share repurchases actual for Q2 were higher than the previous chart that we looked at, which was the forecast.

Q.   Right. So on the share repurchase line, what's still forecast here for the full year 2022 is $100 million worth of buybacks; is that right?

A.   Correct.

Q.   And, in fact, previously we saw that the forecast for the third quarter was 20 million; is that right?

A.   That's correct.

Q.   But, as you noted, the number from Q2 '22 was somewhat higher, so you lowered the forecast for buybacks for the third quarter to ten million; is that right?

A.   I didn't lower it. This was -- this was a presentation by our CFO.

Q.   Right. This presentation is projecting at this time, July 20th, 2022, only $10 million worth of buybacks for the third quarter of 2022; is that right?

A.   That's what it looks like, yes.

Q.   And that's in keeping with the plan to do a hundred million that year; is that right?

A.   That's correct.

Q.   Now, we also saw previously that the first quarter had negative cash flow; is that right?

Deposition of Michael McGrath                 In Re National Instruments Corporation Securities Litigation

Page 192

A.  Yes.

Q.  And now we see that the second quarter also had negative cash flow; is that right?

A.  That's right.

Q.  Now, we saw before that the projection for the second quarter was $53 million in cash from business operations.  Do you remember that?

A.  Yes.

Q.  So this is $56 million in a -- in a -- a decline in cash from business operations; is that right?

A.  It looks that way, yes.

Q.  So this is -- this is two quarters in a row of negative cash flow; is that right?

A.  That's correct.  It looks that way.

Q.  And the most recent quarter had a sort of substantially larger decline in cash from business operations than the previous quarter; right?

A.  I think so.  I'm not going to argue with it.

Q.  That's $56 million in negative cash flow for the second quarter and only eight million in negative cash flow for the first quarter, so the negative cash flow had substantially accelerated during the second quarter; is that right?

A.  Yes.  We -- we accelerated share repurchase in the second quarter.

Page 193

Q.  Whoa, whoa, whoa, whoa.  The -- I asked you whether the -- there was negative cash flow in the second quarter.

A.  Yes.  That's what it says.

Q.  You said something about share repurchases.  My question is, on this line "Cash from business operation" is reflecting that during the second quarter there was negative cash flow of 56 million; right?

A.  Yes.  Yes.  Yes.  Yes.  Yes.  Yes.  I can read the chart.  Okay.  I didn't prepare the chart.

Q.  I'm just trying to get a clear record.

A.  I can read it as well as you can.  Yes.

Q.  I understand.  But we need clear records for litigation, Mr. McGrath.  I'm sorry.

Looking at the projection for the full year forecast 2022, at this time forecasting 170 million in cash from business operations for the full year; is that right?

A.  Yes.

Q.  So at the time the repurchases were first authorized in January, the projection as we saw was 302 million in cash from business operations for full year 2022.  Do you remember that?

A.  Yes.

Page 194

Q.  So the company was projecting to have substantially less cash from business operations in the year 2022 than when the repurchases were first authorized; is that right?

A.  Yes.  It looks that way.  I wouldn't say substantially, but somewhat, yes.

Q.  Well, it's almost half; right?  You had projected 302 million and now you're projecting 170 million after --

A.  Right.

Q.  -- two negative --

A.  Okay.

Q.  -- cash flow quarters; right?

A.  Yes.  Yes.  Yes.  Yes.

Q.  Okay.  And at the time at the beginning of the third quarter the cash balance was only 107 million; is that right?

A.  Yes.

Q.  So, again, at the beginning of the year when you projected -- when you authorized the repurchases, there was a cash balance of 211 million and at this time you're starting the third quarter with only 107 million in cash; is that right?

A.  Yes.

Q.  Okay.  Would you agree that was a precarious cash position for the company?

Page 195

A.  No.  We had expected significant cash inflows in Q3 and Q4, so not precarious, but I acknowledge the numbers on the sheet, but I'm not going to characterize it as precarious.

Q.  Fair enough.  If we look at the previous page, what -- across the top, we see a graph showing that cash position; right?

A.  Okay.

Q.  And it's showing the cash position getting smaller and smaller; right?

A.  Okay.

Q.  And it shows, consistent with the graph we just looked at, that at the time that the repurchases were initially authorized you had 211 million approximately in cash and now you've got, according to this, 106.9, 107 million.  This chart here is consistent with the cash projections chart we were just looking at; is that right?

A.  Yes.  Yes, it is.

Q.  Okay.  And let's just go to the next page.  The next page here -- I'm sorry.  The page after that.  Now, here is the capital strategy recommendation, and at this point if you look at share repurchase -- do you see there's a line for share repurchase here?

A.  Okay.  Now I see it.  Yes.

Page 196

Q.  So it's describing a hundred million in share repurchases for 2022, like we just saw; right?

A.  Yeah.  Are those columns years?  I can't see the headings for the columns.

Q.  We can adjust it so you should see the whole --

A.  I can't see the headings.  I see the share repurchase numbers, but can you just tell me if those are year -- okay.

Q.  Are you able to zoom out a little bit?

A.  Okay.  Now I -- now I can see the years.  Okay.  I just didn't know if they were years or -- or not.

Q.  So for 2022, again, it's projecting a hundred million share repurchase like we were just looking at; right?

A.  Yep.

Q.  And it's showing that -- it's got a line there for share repurchase as a percentage of free cash flow.  Do you see that?

A.  Yep.

Q.  This is 91 percent.  Do you see that?

A.  Yes.

Q.  But the share repurchase of just a hundred million at this time was 91 percent of free cash flow based on these projections.  Do you see that?

A.  Yes.  I see it.

Q.  Do you recall what percentage of free cash flow the

Page 197

hundred million in share repurchases were at the time?

A.  It was -- it was lower.

Q.  It was -- it was about how much lower would you say?

A.  I don't know lower.  You'd have to go back.  It was lower.  And --

Q.  It was 30 something percent; is that right?

A.  Right.  Yes.  Yes.  Yes.

Q.  Right.  So at this point the -- not only have you had two quarters of negative cash flow and your cash from business operations projections for the end of the year are only 170 million compared to the 300 at the beginning of the year, but in addition to that, the hundred million in share repurchases would take up over 90 percent of the company's free cash flow at this time; is that right?

A.  Yes.  Yes.  You keep asking the same question.

Q.  And that's without even more repurchases; right?

A.  Yes.

Q.  More repurchases would mean an even higher proportion of free cash flow; is that right?

A.  That's correct.

Q.  Okay.  Now, the key recommendation of this proposal is to add a 500 million term loan to current 500 million revolving credit facility; is that correct?

A.  That's what it looks like.  Yes.

Page 198

Q.  I'm sorry?

A.  That's what it looks like.  Yes.

Q.  Yeah.  Why was the recommendation to add a $500 million loan to the current $500 million credit revolving facility at this time?

A.  Why was the recommendation?  I don't recall.  It was a cash flow recommendation by the CFO.

Q.  So --

A.  Cash management recommendation.

Q.  So was this recommendation to address liquidity concerns?

A.  It was a cash management recommendation.  I don't think -- we didn't have liquidity concerns as in running out of cash.  It was a cash management recommendation.

Q.  All right.  Let's go to Page 24208, which is a couple pages earlier.
        So this states the recommendation to take out the new $500 million loan; correct?

A.  Yep.

Q.  And it explains at the first bullet that "As market condition changed, liquidity became tight . . ."
        Do you see that?

A.  I can't read it.  Which -- which bullet point?

Q.  The first bullet.  "As market condition changed,

Page 199

liquidity became tight" --

A.  Yep.

Q.  -- "and the Revolving Credit Facility balance grew to 475 million."
        Do you see that?

A.  Right.  Yep.

Q.  So this recommendation at this time was to borrow another $500 million to address tight liquidity; is that correct?

A.  It doesn't say tight liquidity.

Q.  It says liquidity became tight.

A.  Okay.  In the top one.  Yeah.

Q.  Yeah.  So liquidity was tight.  The recommendation was to borrow 500 million, and this document states that -- describes a new liquidity profile which would exist after borrowing this 500 million; is that correct?

A.  Without -- it's not a crisis situation, but yes, that's correct.  And that's based --

Q.  So it wasn't a liquidity crisis?  Is that your testimony?

A.  No.  I'm not saying it's a crisis.

Q.  The $500 million loan at this time was to address liquidity; is that correct?

A.  Yes.

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

Page 200

Q.   And to create a new liquidity profile; is that correct?

A.   Yes.

Q.   Now --

A.   And to keep our shareholder return strategy in place. That was the recommendation.

Q.   Right. The strategy in place. The strategy was five years a hundred million in repurchases for the year 2022; is that correct?

A.   The strategy was 250 million approved by the board over a period of years. The hundred million was not a strategy as much as a forecast.

Q.   Okay. So does this document refresh your recollection as to whether you discussed repurchases at the July 20th meeting?

A.   The recommendation was to keep our strategy in place. That's -- that was it. There wasn't any deeper discussion than that on repurchases specifically.

Q.   At the very least, you looked at slides concerning repurchases at this meeting; is that right?

A.   Can you repeat the question again? You're talking fast. I didn't hear it.

Q.   You looked at slides concerning repurchases during the July 20th meeting; is that correct?

         MR. COMERFORD:  Object --

Page 201

A.   As part of our shareholder return strategy. That's -- that was the sole discussion, to keep it in place.

BY MR. MANDEL:

Q.   And you discussed capital strategy broadly at this meeting; is that correct?

A.   Yes.

Q.   And part of capital strategy is share repurchases; is that correct?

A.   As part of our shareholder return strategy, yes. The board -- just a clarification. The board approves the shareholder repurchase plan, which we approved. We then delegate the actual repurchase decisions and timing to the executives within the parameters set by the board.

Q.   Let's go back if we can to Exhibit 19, which is the minutes from this meeting we've been discussing. Now, if we look at page Bates ending 1460. If we can just see that page. You see here at Part 4 of the agenda was "Supply Chain Update and Impact on 2022 and 2023 P&L."

         Do you see that?

A.   Yep.

Q.   Okay. Now, was the capital strategy discussion that we just looked at part of this discussion at this time in the meeting?

Page 202

A.   I don't believe so. This was a presentation on our supply chain issues that we were facing, which was the supply chain crisis of '21 and '22 going into '23, and when we could expect that to be alleviated.

Q.   So I'm going to refer you to the large paragraph in the middle of this page beginning with the words "Ms. Rapp reviewed the: 2022 double-digit bookings."

A.   Yeah.

Q.   Now, there's a sentence that begins on the third line, it's a very long sentence, has a lot of little clauses in it, and it says, "Ms. Rapp also discussed," and it gives a list of things she discussed, and if you look at the third -- fourth line from the bottom, it says that she discussed "a summary of the capital strategy, including discussion of investment impacts on liquidity, quarterly cash projections for 2022, and a capital strategy recommendation to add a 500 million Term Loan A to the current $500 million Revolving Credit Facility."

         Does that refresh your recollection about whether you discussed --

A.   That's what we just -- that's --

Q.   -- capital strategy issues at this part of the presentation?

A.   That was -- that was the presentation we just

Page 203

reviewed.

Q.   Right. So, and that's referred to within the minutes as part of the supply chain update; is that right?

A.   It looks like it is, yes. I don't know why. You know, it was in the same part, I guess, of the meeting.

Q.   I understand. But I'm just --

A.   Okay.

Q.   But the fact is, according to these minutes, that at this point in the meeting this is where the capital strategy discussion took place. Do you agree?

A.   That's what the minutes say, yes. I'm not --

Q.   Okay.

A.   -- gonna disagree with that.

Q.   And then right after that discussion, the board approved the resolution on the credit agreement, approved the quarterly dividend, and then turned right to a discussion of the Wolverine deal; is that right?

A.   It -- probably, yes.

Q.   So you went from a discussion of capital strategy that included repurchases directly to a discussion of Wolverine at this meeting; is that right?

A.   Yes. But it has no bearing on anything.

Q.   Sure. Agenda Item Number 6 was taken up out of order. Do you see that?

Page 204

A.  Okay.  I think that --

Q.  So the plan was not to discuss Project Wolverine at this point in the meeting, was it?

A.  If it were changed in order, it had to do with people's attendance at the meeting and their schedules.  It had nothing to do with anything beyond that.  I'm not reading anything into --

Q.  That's your view.  But the fact is that at this meeting right after a discussion on capital strategy you all changed the agenda and took the discussion of Wolverine out of the planned order; is that correct?

A.  Yes.  Probably because the discussion of Wolverine was limited to certain members of management, and we wanted to get the other people who were in the meeting, such as, you know, Mr. Porterfield to be -- complete their attendance at the meeting and then move into a more exclusive discussion of Wolverine.

Q.  Mr. McGrath, Item Agenda 5 for this meeting was a discussion of the board retreat.  Did that include Mr. Porterfield?

A.  I don't know.

Q.  Would that have included Mr. Porterfield?

A.  What was -- what was the item again?

Q.  Item Number 5 was "Key topics for Board Retreat."  It appears from the minutes that that was a board only

Page 205

discussion.

So your explanation that the reason you took it out of order was because of who was available to attend and everything really doesn't add up --

A.  We changed -- we changed the timing of every board meeting, okay, to coincide with what people were waiting outside of the room to present, okay, how long it took.  We made sure we had a thorough discussion of the things that we had to discuss, and we changed -- sometimes changed the timing of it.  And I don't recall why the timing of that event was changed, but I assume it had to do with that, which we normally did.  I don't know what point you're trying to get at.  But it was -- there was nothing more than just, you know, scheduling people in and out of the meeting.

Q.  So at this meeting was there a discussion concerning doing additional repurchases?

A.  You've asked that question again.  There was --

Q.  No, I haven't.  Was there a discussion concerning doing additional repurchases above the hundred million plan at this meeting?

MR. COMERFORD:  Asked and answered.

A.  That -- yeah.  That's not a board -- that's not a board decision.  It was not discussed by the board.  It's not a board decision.  That responsibility is

Page 206

delegated to management as part of our stock repurchase plan very clearly.

BY MR. MANDEL:

Q.  So to do buybacks above the hundred million did not require authorization from the board; is that correct?

A.  That's correct.  What required authorization of the board is anything that was in excess of I believe the 250 million that was approved in January.  The timing of those repurchases is delegated to management.  That's the whole purpose of the plan.

Q.  You went into an independent director session near the end of this meeting.  Do you see that?

A.  We always do.

Q.  Were you an independent director?

A.  Of course.

Q.  Okay.  So who attended the independent director sessions?  Was it all of the independent directors?

A.  All the independent directors, yes.

Q.  Did repurchases -- were repurchases discussed at that independent director meeting in your recollection?

A.  No.  No.  No.

Q.  No?

A.  No.

Q.  Did any board member comment on the company's negative cash flow at this time?

Page 207

A.  In the independent session?  No.

Q.  At any point in this meeting do you recall discussion of the negative cash flow at this time?

A.  We had the discussion on the slides that you presented, and I went through them, and, you know, there was discussion on them.  I don't recall any specific discussion in that brief session.  It wasn't a long session.

Q.  And was there any discussion concerning the company's cash position at this meeting?

A.  At the independent directors session?

Q.  In -- on July 20th at all.

A.  There was a discussion on the slides that we just went through, as you pointed out.  There was some discussion on it.  I don't recall any specific discussion points.  But we already went through those slides, and I acknowledged them, and you pointed it out, and I acknowledged it, but . . .  And so there was discussion around those.  I don't remember any specific discussion.  There were no motions.  There were no approvals or anything like that.

Q.  Okay.  Do you remember anybody referring to the company's precarious cash position?

A.  No.

Q.  No.  Okay.

Page 208

A.  Nobody used those words.

Q.  Nobody would use those words?  Is that your testimony?

A.  Nobody used those words.

Q.  Nobody used those words.  That's your testimony?

A.  Nobody -- I don't recall anybody using the word "precarious."

Q.  Okay.

MR. MANDEL:  Can we take a five-minute break, please?

THE WITNESS:  Sure.

MR. COMERFORD:  Sure.

MR. MANDEL:  Let's go off the record.

VIDEO TECHNICIAN:  Going off record at 2:32.

(Recess taken at 2:32 p.m.)

(Back on the record at 2:40 p.m.)

VIDEO TECHNICIAN:  Going back on record at 2:40.

MR. MANDEL:  Okay.  So let's look at another document.  This will be Exhibit think 24.  This is our Tab M-14.

(Marked EXHIBIT 24 for identification)

BY MR. MANDEL:

Q.  Now, this is Bates NAT-SL-1455.  This is the Minutes of the Special Board of Directors Meeting from

Page 209

July 25th, 2022, of National Instruments' board.

A.  Okay.

Q.  Do you recognize this document?

A.  Yes.

Q.  This document records the July 25th, 2022, meeting of National Instruments' board; is that correct?

A.  Yes.

Q.  Now, at this discussion did management present various new financial projections to the board?

A.  I believe so.  I can't read -- I can't -- all I can read is the first two paragraphs, so I don't know what the minutes reflect.

Q.  Oh, I see.  Well, if you can take a look under "Financial Scenarios."  It says there --

A.  Okay.  Now I can see that.  Yep.

Q.  Have a look and refresh your recollection and then I'll ask you some questions.

A.  Yep.  Yep.  Okay.  Yes.

Q.  So at this meeting management presented various projections of financial results to the board; is that right?

A.  Yes.

Q.  And presented -- and this -- the projections were for company revenue growth results in three potential growth scenarios; is that right?

Page 210

A.  I believe so.

Q.  A 25 percent revenue growth, 16 percent revenue growth, and 11 percent revenue growth; is that right?

A.  I -- I don't have it in front of me, so I --

Q.  Well, it's right there in the minutes under "Financial Scenarios" under --

A.  Okay.  Yes.  Now I can see it.  I read it now.  Okay.  Thank you.

Q.  So is that right they presented the three --

A.  Yes.

Q.  -- revenue scenarios?

A.  Yep.

Q.  Okay.  So in the previous meeting that we saw on July 19th you had articulated a plan to go to market with some new projections based on cost cutting; is that right?

A.  Yes.

Q.  And then some days later the board met again on July 25th, and at that meeting management presented various scenarios for potential disclosure; is that right?

A.  Various scenarios for the -- for the company's plan and disclosure, so what the company planned to do and then the disclosure of that, so . . .

Q.  Now, was this consistent with the plan you were

Page 211

outlining in your July 19th presentation?

A.  It was -- it was consistent with the discussion that resulted from that.  It was -- it was -- it was the discussion between the board members and the executive team and this was the result of it, which we all agreed with.

Q.  So management came to this meeting having prepared new financial projections after the July 19th meeting and after your presentation; is that correct?

A.  A new financial plan.  Right.  Not just projections, but also the plan of what we would do, so . . .

Q.  I see.  It's referred to in the minutes as a discussion of various projections.  So that's why we're calling it projections.

A.  Right.  Right.

Q.  Okay.  Now, the board of directors and management routinely discuss management's financial projections; is that right?

A.  Yes.

Q.  And routinely discuss management's plan; is that right?

A.  Yes.

Q.  Why was this a special meeting?

A.  Because at the previous board meeting we had a discussion that resulted in an action item to take all

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

Page 212

the items we discussed, put them together and come back to the board for essentially reviewing it with the board, so it was -- it was a follow-up from the previous meeting.

Q.   You agreed with me earlier today that special meetings were really for extraordinary circumstances.  Do you remember that?

A.   Yes.

Q.   Was preparing new financial projections an extraordinary circumstance?

A.   It was -- it was a follow-up action item, and we agreed that the board should review management's revised projections based on the meeting.

Q.   Was the purpose of these financial projections to assist in defending against Emerson's offer?

A.   No.  No.  The purpose of the financial projections was to put in place a revised plan of action for the -- for the company.

Q.   And it just happens that you had recommended going to market with new financial projections that would cause the stock price to go up and lo and behold management showed up some days later with a set of new financial projections?  Is that your testimony?

A.   My recommendation was a new financial plan that we would follow, and management -- after discussion with

Page 213

management and the board, we agreed that we would make some revisions to it, maybe not as much as I wanted in terms of my proposal, but something that we thought was -- was the right thing to do for the company in terms of the trade-offs between the status quo and cutting expenses.

Q.   So, to be clear, on July 19th you proposed disclosing new projections to the market based on a cost cutting plan; correct?

A.   Based on a real cost cutting plan, yes.

Q.   And the purpose of that plan articulated in your presentation was to cause the stock price to go up; is that correct?

A.   The purpose was to achieve shareholder value which would then be reflected in the stock price.  It's not -- it wasn't any artificial pumping the stock price up.  It was to have real value in the company that would eventually get reflected in the stock price.

Q.   But the plan to disclose new improved financial projections was in response to Emerson's offer; is that correct?

        MR. COMERFORD:  Form.

A.   No.  No.  It's something that we had been working on prior to Emerson and -- and, you know, it's -- it's --

Page 214

it wasn't in response to Emerson directly.

BY MR. MANDEL:

Q.   So you prepared a document in which you described a strategy to defend against Emerson's offer by going to market with new financial projections for improved performance that would cause the stock price to go up?  That's right, isn't it?

A.   Can I reword your question so I can answer it correctly?

Q.   Well, no.  My question is --

A.   Okay.

Q.   -- you prepared a document in which you described a strategy to defend against Emerson's offer by going to market with new financial projections --

A.   Not financial projections.

Q.   -- to improve the projections; is that right?

A.   Improve financial performance.  Performance.  Not projections.  We weren't making projections that didn't tie into the plan for the company.  We were planning to manage the company appropriately with cost reductions and then reflect that in projections, but you're wording it in a way that says we had projections that didn't relate to what we were doing in substance in the company.  The discussion issue was changing the strategy of the company around operating

Page 215

expenses, and we ended up with some improvement in that area.

Q.   So was your recommendation to change the company's strategy in response to Emerson's offer?

A.   No.  It was -- not the strategy.  Strategy is much broader.  It was to improve the company's operating performance.

Q.   So it was your plan to change the way the company operated to reduce operating expenses in response to Emerson's offer; is that correct?

A.   It wasn't -- it wasn't just in response to Emerson's -- I've been talking about that for three years before Emerson with the company --

Q.   The document we saw before stated -- you wrote in the document we saw before that the plan was not to do so as extensively or -- and to do so more gradually.  Do you remember that?

        MR. COMERFORD:  Mr. Mandel, you interrupted the witness again.  He was mid sentence and you cut him off.  This has happened several times now.

        MR. MANDEL:  I don't see that he was mid sentence.  I'm sorry.  But if I did, I apologize.

A.   Okay.  My point I was trying to make was that we had been discussing the appropriate level of operating expenses for several years, two or three years prior,

Page 216

okay, and, you know, when -- and when we were discussing it here, it was a continuation of earlier discussions that we had is what is the appropriate level of operating expenses because our operating expenses I felt and some of us felt were out of line with what they should be. That had been an ongoing discussion. Maybe, you know, Emerson's offer and -- and the fact that we were vulnerable to operating expenses triggered more attention to that, but it was not something that was invented as a reaction to Emerson. Matter of fact, some of those same slides I used and theories that I used had been, you know, used two or three years earlier.

BY MR. MANDEL:

Q. So did you recommend accelerating cutting operating expenses in response to Emerson's offer?

A. I recommended them cutting -- accelerating operating expenses cuts. I did recommend them. I recommended them in 2000, 2001, 2019 and, yes, in reaction to Emerson's offer it was also appropriate to consider them again.

MR. MANDEL: Let's look at another exhibit which is -- this will be Exhibit Number 25 and it's Tab A-34.

(Marked EXHIBIT 25 for identification)

Page 217

BY MR. MANDEL:

Q. Now, if you go all the way to the bottom of this, which is the first email in time, it's an email from you. This is beginning Bates NAT-SL-20739. And the bottom email is an email from you to Mr. Dixon, the general counsel of the company, written Tuesday, July 26th, the day after the meeting the minutes of which we were just reviewing. Do you see that?

A. Okay. Yeah.

Q. And the subject is "Last night's minutes."

Do you see that?

A. Yep.

Q. And you wrote, "Eddie: Please see the following introduction statement I made last night is included in the minutes of the meeting. I worded it deliberately."

Do you see that?

A. Yep.

Q. And you say that "The purpose of tonight's board meeting is to discuss our primary argument against the acquisition offer from Nuthatch, which is sharing our positive outlook for the next 18 months with our shareholders and analysts."

Do you see that?

A. Yep.

Page 218

Q. Is that a true and correct description of what you said at the meeting?

A. It's one of them, yes.

Q. Is this -- did you say -- did you read this introductory statement at the meeting, as you say in this email?

A. I believe I did.

Q. Was that in writing? Did you read it from a written document?

A. I don't recall. Most likely.

Q. But your description here in email is a truthful description of what occurred at this meeting; correct?

A. I gotta read the whole thing again. Yes. And it says if they went public with this offer, we would hold a special meeting and that we were not going through the whole process of a new three-year plan, that those are typically addressed in our strategy session in September, and that's what we continued to intend to do.

Q. So, again, at this time you understood that Emerson could go public with its offer; is that right?

A. Yes.

Q. Okay. And at this meeting you stated that the purpose of the meeting was to discuss the primary argument against the Wolverine offer which was your new

Page 219

financial disclosures to the market; is that right?

A. That's -- that was the result of the changes in the -- in the operating plan, yes.

Q. So the purpose of the meeting was to discuss your primary argument against Emerson's offer; correct?

A. Correct. We were in defensive mode at that point.

Q. And that argument was what you describe as "sharing our positive outlook for the next 18 months with our shareholders and analysts"; right?

A. Yep.

Q. That meant disclosing improved financial guidance to the market; is that right?

A. That's correct. Because, as I discussed previously, we felt that our shares were undervalued because of the supply chain crisis and because we were intending to reduce operating expenses, and we hadn't disclosed those sufficiently yet, and we needed to disclose them in general.

Q. Okay. So you wrote to Mr. McGrath instructing him to include this introductory statement you made in the minutes; is that right?

A. I wrote -- I wrote to Eddie. You said Mr. McGrath. But I wrote to Eddie. Yeah.

Q. I'm sorry. To Mr. Dixon.

A. Yes.

Page 220

Q. Apologies. And Mr. Dixon responded later that day.

A. Okay.

Q. You can see that on the subsequent page. And he writes that he'd like to confer with Sabastian as a sanity check. Do you see that?

A. Yep.

Q. Sabastian is an attorney at Wachtell; correct? Sabastian Niles; right?

A. Yes. Yes.

Q. Okay. So Mr. Dixon told you that he was -- he wanted a sanity check with respect to your description, your truthful description of the meeting; is that correct?

A. That it was worded properly. Yes. That's correct.

Q. Do you understand why the general counsel of your corporation might want a sanity check --

A. Yes.

Q. -- on your own writing?

        MR. COMERFORD: Foundation. Calls for speculation.

BY MR. MANDEL:

Q. Go ahead, Mr. McGrath.

A. What was the question?

Q. Well --

A. That was his job and I respect it, so we did --

Q. Do you have an understanding why Mr. Dixon would want

Page 221

a sanity check with respect to your truthful description --

        MR. COMERFORD: Same objections.

BY MR. MANDEL:

Q. -- of the July 20 -- of the July 25th meeting?

A. I think he wanted a sanity check for what we put in writing and documented, yes, and how it was worded.

Q. He discusses that the wording could "inadvertently put us in a difficult position should the minutes be discoverable."

        Do you see that?

A. Yep.

Q. So did you understand there was potential litigation afoot at this time?

A. No.

Q. Well, are things discoverable outside of litigation, to your knowledge?

A. You asked if I -- if there was potential litigation. I didn't see any potential litigation on the horizon.

Q. Well, your general counsel is telling you that the minutes could be discoverable.

A. Yes.

Q. All right.

A. That's his job, and I respect it.

Q. Are things discovered, to your knowledge, outside of

Page 222

the context of litigation?

A. You asked if I anticipated litigation. I said no, I don't anticipate it, but obviously anything that we have should be, you know -- his job is to anticipate if there was litigation. I wasn't anticipating any litigation in particular, so . . .

Q. Okay. But your general counsel was clearly concerned that minutes could be discoverable; is that right?

        MR. COMERFORD: Objection. Form. Foundation. Calls for speculation. The document speaks for itself.

A. Yeah. That's his job. He did it and I respect it. That's what I said, so . . .

BY MR. MANDEL:

Q. Okay. And you responded to him -- and he proposes in his email an alternative draft language; is that right?

A. I don't know.

Q. If you just take a look at his email he writes an alternative version, which is not the same as your July 25th --

A. Okay.

Q. -- as your description from July 25th.

A. Okay.

Q. Do you see that?

Page 223

        MR. COMERFORD: No.

A. No. I don't see it.

BY MR. MANDEL:

Q. He wrote an alternative version. He says --

A. I don't see it. So maybe he did. You don't have to yell at me about it. I just don't see it.

Q. Well, he says, "In any event, just wanted to provide a different perspective and to share a revised opening for the minutes . . ." And then he writes, "Begin Draft excerpt of minutes" that includes new language.

        Do you see that?

A. I see it there, yeah. Mr. McGrath called the meeting to order? Is that --

Q. Yeah.

A. Okay. Yes. I see it.

Q. Yeah. So Mr. Dixon was proposing alternative language to your truthful description of the July 25th meeting; is that correct?

A. I'm not -- I'm not -- you word -- his wasn't untruthful if you're implying that I think is a better wording of what I said, so . . .

Q. So he offered an alternative version --

A. Yes.

Q. -- that was not the same as your truthful description of that meeting; is that correct?

Page 224

A.  You word it as if I'm going to say that his is untruthful.  No.  It's a different wording of what I said.  But they're both consistent.

Q.  Okay.  You responded to him, "I think it's important to show that we discussed these financial plans in light of the offer and it's a primary reason we are rejecting the offer."

Do you see that?

A.  Yep.  We're rejecting the offer because we felt that the company has significant value that was unrecognized at the time and that Emerson was taking advantage of us with the $48 offer that was not credible at the time, and it was our responsibility to communicate that at some point.

Q.  And you were discussing -- you're describing here that at that meeting you discussed updated financial plans; right?

A.  Yes.

Q.  And those updated financial plans were the primary reason for rejecting that offer; right?

A.  The -- again, the financial strategy of the company and our plans and the expectation coming out of the supply chain prices and the expectation of reducing operating expenses would value the company significantly higher, and that's part of what we were

Page 225

doing in that meeting.

Q.  I'm not sure I understand the answer.  There were updated plans, financial plans discussed at the January 25th meeting, and what you're saying here is that at the meeting you discussed the updated financial plans in light of the offer and "it's a primary reason we're rejecting the offer."

Is that what you wrote?

A.  I have to read it again.  Where does it say that exactly?

Q.  Right there.  Right in the middle of the page right there on the screen.  "Eddie, I think it's important to show that we discussed these updated financial plans in light of the offer and it's a primary reason we are rejecting the offer."

Do you see that?

A.  Okay.  Yes.  Okay.  I agree with that.  I wrote it.  Yes.

Q.  Okay.  And that is kind of consistent with what you had written in your original email in this chain; right?  That the purpose of the meeting was to discuss our primary argument against the acquisition from Emerson; correct?

A.  Right.  Correct.

Q.  Which was sharing these updated financial plans with

Page 226

the market; is that right?

A.  Correct.  But they're updated plans.  They weren't just unwarranted projections.  They were updated plans.

Q.  I understand.  I understand.

A.  Okay.  Okay.

Q.  And then of course Mr. Dixon responds to you saying that he's "working with Sabastian to align all minutes."  See that?  See that at the top?

A.  Yeah.

Q.  Do you have an understanding of what that means to align all minutes?

A.  I think it's the responsibility of our chief legal officer to -- to do that.

Q.  What does it mean to align all the minutes?

A.  To make sure they're consistent.  To make sure they're real.  To make sure they're -- they're appropriate wording.

Q.  And you had outside counsel align the minutes for you; is that right?

A.  We had their input into it.  They didn't do it on their own without us.  They had input into it, which is what we pay them for.

Q.  And you ultimately approved the July 25th minutes; is that right?

Page 227

A.  That's correct.

Q.  Did the July 25th minutes include your description of the meeting from your July 26th email?

A.  I don't -- I don't recall.  I'd have to go back and look at it.

Q.  Well, let's do that.  Those minutes are -- they were Exhibit 24.  You told Mr. Dixon to include your truthful description of this meeting in the minutes.

Is your truthful description of this meeting in the minutes you approved?

A.  I -- I never used the word "truthful" or "untruthful."

Q.  But you agreed with me that your description was truthful earlier, so I'm calling your description truthful.  Was your description not truthful?

A.  I'm not saying that -- that one version was truthful and another version was not truthful.

Q.  Well, hold on.  You're not saying your version was truthful?

A.  No.  I'm not saying that -- neither one of them was inconsistent.  I'm not saying that mine was truthful and these were untruthful.  Okay?

Q.  That's wonderful.  But my question, sir --

A.  They were -- they were -- they were accurate, inaccurate, and they were -- they're all truthful.  They're all truthful.

Page 228

Q.  Wonderful.  However, --

A.  They may reflect different --

Q.  -- you wrote --

A.  Yeah.

Q.  -- you wrote a description of what you said at that meeting; correct?

A.  Correct.

Q.  You instructed the general counsel to include that description in the minutes; correct?

A.  Correct.  And he reviewed it.

Q.  General counsel asked you, told you he wanted a sanity check about what you had written; correct?

A.  Correct.

Q.  The thing you wrote is not in the final minutes; correct?

A.  It's not inconsistent with the final minutes.

Q.  Is the thing you wrote in the final minutes?

A.  The words I wrote and my recommendation are not repeated in the final minutes, but they're not inconsistent and one's not truthful and one untruthful.  Okay?

Q.  I see.  But the -- the minutes of the July 25th meeting omit your description of that meeting; is that right?

A.  That's correct.

Page 229

Q.  And you approved those final minutes; is that correct?

A.  That's correct.

Q.  And you understood that all of this could be discoverable; is that correct?

A.  Always.

Q.  You, in fact, even wrote in the email we were just looking at in Exhibit 25, "If discoverable, the plans support our argument that the offer is inappropriate."
    See that right in the middle of the page?

A.  No.

Q.  "If discoverable" -- Eddie -- in your email to Eddie at 10:39 a.m.

A.  Okay.

Q.  So you understood that the minutes could be discoverable; right?

A.  Yes.  I said that three times.  Yes, I do.  I always understand that.

Q.  And yet the final version of the minutes that you approved did not include your description of that meeting; correct?

    MR. COMERFORD:  Objection.  Asked and answered.  I really feel like you're badgering the witness over things that you're asking again and again.

    MR. MANDEL:  I'm sorry that you feel that

Page 230

way, Mr. Comerford.

A.  Wording is wording.  It's -- you know, It's not like there's one truth to every word in something.  Wording is -- and, you know, we have more accurate appropriate wording in the final draft.

BY MR. MANDEL:

Q.  Okay.  Mr. McGrath, you wrote in your initial email that the purpose of tonight's board meeting was a certain thing; correct?  To discuss the primary argument against Wolverine's offer.  The purpose of the meeting.  You wrote that; correct?

A.  Yes.

Q.  You followed up with an email stating that the primary reason for rejecting the offer was what -- was this meeting.  "In light of the offer and it's a primary reason we're rejecting the offer."  Do you see that?

A.  Yes.  Yes.  And the minutes don't -- are not inconsistent with that.

Q.  Do the minutes state anywhere that the purpose of this meeting was to discuss your primary argument against Emerson's offer?

A.  They don't state that I don't believe, but that doesn't mean it wasn't what we did.

Q.  Okay.

    MR. MANDEL:  Let's look at another version

Page 231

of this email chain, which will be our Slide M-15 and will be Exhibit 25.  Sorry.  26.

    EXHIBIT TECHNICIAN:  Counsel, do you want the PDF or the PowerPoint?

    MR. MANDEL:  This was a document that was produced in its native form.  The question was about a PDF?

    EXHIBIT TECHNICIAN:  Yeah.  There's a PDF M-15 and a PowerPoint M-15.  I'm just asking which would you like --

    MR. MANDEL:  Oh.  Yeah.  So the way this document was produced, it was produced as an email that had a PowerPoint attachment that was not produced as a PDF.  It was produced in native.  So the -- you're saying you can't put them both up as one because it doesn't continue as a PDF?  Is that what you're saying, Alex?

    EXHIBIT TECHNICIAN:  Correct.

    MR. MANDEL:  Okay.  Well, then let's go one at a time.  Let's put up the email that is at Bates 2578, which is our -- which is the PDF document at that exhibit number at M-15, and then subsequently we can put up the document that was attached to it, which has to be put up in a different format.  Thanks, Alex.  So this is Exhibit 26.

Page 232

(Marked EXHIBIT 26 for identification)

BY MR. MANDEL:

Q.   If you scroll down, you'll see that this is the same email thread we've been looking at but a different -- it spokes off in a different direction. You see on the bottom of the first page Mr. Dixon's response to you saying that he wants a sanity check. Do you see that?

A.   Yes. We already saw this, didn't we?

Q.   And then above that, if we go look at the email above it, says, "Fyi" -- this is to Sabastian Niles at Wachtell -- "take a look at the email string below and let me know what you think. Attached are the slides from the special meeting last night."
        Do you see that?

A.   Yes.

Q.   So, and this email had an attachment. It's a PowerPoint document, identified as such as .pptx. And what Mr. Dixon is forwarding to outside counsel is the slides from the July 25th meeting.
        MR. MANDEL:  And now I'd like to put those slides up.
        EXHIBIT TECHNICIAN:  And do you want to mark this as a new exhibit or the same?
        MR. MANDEL:  So, I mean, if we -- I think

Page 233

of it as the same exhibit. It's just an attachment and an email. I would prefer to just keep them as both Exhibit 26 unless that's impossible or too difficult or something.
        EXHIBIT TECHNICIAN:  That works for me.
        MR. MANDEL:  Thank you.

BY MR. MANDEL:

Q.   Now, if you would turn to -- there are no Bates numbers in this document unfortunately, so if we could go, including the cover page, one, two, three, four, five, six pages into the document, there's a document called "Financial Plan" -- there you go. All right. And following this financial plan are three different scenarios. If we go to the next page, this shows -- we discussed before at the meeting that at this meeting there were three scenarios discussed, 25 percent revenue growth, 16 percent revenue growth, and 11 percent revenue growth. Do you remember that?

A.   Yep.

Q.   Okay. So what we're going to look at is just look at each of these three scenarios. The scenario we're looking at here on this page is a 25 percent revenue growth rate scenario; is that right?

A.   I believe so.

Q.   And under that, under 25 percent revenue growth rate,

Page 234

you would have seen 2023 EPS of 61 percent; is that right?

A.   Yep.

Q.   Okay. And at this point in time, looking at the 2022 forecast, management was projecting $2.06 EPS. Do you see that?

A.   That's correct.

Q.   Earlier when we looked at it it was $2.05. Do you remember that?

A.   Yep.

Q.   Okay. So under the 25 percent revenue growth scenario you'd see 61 percent EPS growth.
        The next page shows the 16 percent revenue growth scenario, which would bring about 38 percent EPS growth; is that right?

A.   That's correct.

Q.   And so this is projecting under this scenario $2.84 in earnings per share for 2023; correct?

A.   Correct.

Q.   And still the same $2.06 for 2022; right?

A.   Yes.

Q.   Going to the next page. This is the 11 percent revenue growth scenario; is that right?

A.   That's correct.

Q.   That would show 26 percent EPS growth for $2.60 a

Page 235

share in 2023 EPS; is that correct?

A.   That's correct.

Q.   And still for the 2022 EPS projection remains unchanged here at $2.06; right?

A.   That's correct.

Q.   And if we just go to the last page. This -- one more page. There we go. I guess this isn't the last page, but this page. This summarizes the key investor points for the July 28th earnings call; is that right?

A.   It is. Can I see the title of that slide? I can't -- okay. Yep.

Q.   Yes, sir.

A.   Okay.

Q.   And, you know, are these the investor points that were decided to be communicated to investors at the July 28th earnings call?

A.   Yes.

Q.   Including operating income to increase by at least 300 basis points for 2023 followed by a hundred basis points each year?

A.   Yes.

Q.   Now, I think you mentioned this before. Of the three scenarios, the 25 percent, 16, and 11 percent scenario, which one was disclosed to the market?

A.   I don't believe we disclosed revenue that

Page 236

specifically. The basis point improvement in operating revenue was disclosed, but I don't think that we disclosed any specific percentage increase in revenue. We disclosed the 300 basis point, hundred basis point improvements, but -- and we disclosed the fact that we were going to be able to reduce our backlog and increase revenue, but I don't believe that we disclosed percentages of revenue increase. I'm almost certain.

Q. So --

A. So the investor points here are the investor points that were made that, you know, we -- despite a weaker macro in 2023, we will outperform due to very strong '22 bookings leading to record backlog, improved margin due to reduced broker and freight costs, software subscription going from headwind to tailwind, and expense management. Those were the major points we disclosed, and those were the fundamental reasons that we felt that the company had value that wasn't appreciated in the price of our stock and why $48 a share was not considered to be a credible offer to us.

Q. So just at a simple level, at the July 19th meeting you proposed a plan to update the company's financial projections; is that correct?

A. Correct.

Page 237

Q. And then on July 25th the board met with management to finalize that plan; is that right?

A. Correct.

Q. And as a result of the discussion at the July 25th meeting, management went out on July 28th and made the projections that they made; is that right?

A. They made these points that are in this slide. They didn't -- we did not make revenue projections based on three projections that you looked at when we went through them. Those are internal projections.

MR. MANDEL: Let's just look at -- we're going to call this Exhibit 27. This is our Exhibit Z-6.

(Marked EXHIBIT 27 for identification)

BY MR. MANDEL:

Q. And if we can scroll down. This is the -- for the record, there's no Bates number here. This is the Form 8-K filed by National Instruments on July 28th which attaches the earnings release. And if you look at that, there's a section on guidance on the fourth page of the document. And do you see there it refers to "Q3 GAAP revenue to be in the range of 410 million to 440 million, up 16 percent year over year at the midpoint"? Do you see that?

A. Yes.

Page 238

Q. So there was revenue guidance given to the market at this point; is that right?

A. Revenue guidance for the upcoming quarter. Correct. You were previously referring to revenue guidance for '23 and '24. That's what I was responding to your question on. This is revenue guidance. We -- we give revenue guidance for the upcoming quarter, which is what this is.

Q. I see. So there was revenue guidance given at this time; is that right?

A. For the upcoming quarter, which has been our practice.

Q. As well as EPS guidance right there; right?

A. Correct. Yep.

Q. Okay. And this disclosure, this 8K on July 28th was the result of the plan made at the board's July 19th and July 25th meetings; is that right?

A. It's -- it's consistent with that. The -- the broader discussion was more than the upcoming quarter in the -- in the previous meeting, so . . . These -- the guidance here is for upcoming quarter. That's -- I'm just clarifying it. That's all.

Q. I understand. I understand. Thank you. So was it your plan to disclose this information to the market on July 28th and then see how your stock responded?

A. This information here in the guidance, those three

Page 239

bullet points?

Q. Well, on July -- on July 19th and July 25th we agreed you prepared a plan to go to the market with new financial projections, and I'm asking was it your -- and I think we established before that it was your intention that it would -- that this disclosure would cause the stock price to go up; is that right?

MR. COMERFORD: Form.

A. It wasn't my intention that it went -- it was going to go down. So I was hoping it would go up, but that's typical.

BY MR. MANDEL:

Q. So you -- the plan was to issue these disclosures to the market and then see how the stock responded to that earnings call; is that right?

MR. COMERFORD: Objection. Asked and answered.

A. Always. I mean, a company always looks at what its stock price does after an earnings call when it gives guidance.

BY MR. MANDEL:

Q. And that's consistent with the plan you articulated at the July 19th meeting expressing your desire to see the stock price go up; is that right?

A. Yes.

Page 240

Q.   Intending to see the stock price go up to help defend against Emerson's proposal; is that right?

MR. COMERFORD:  Object to the form.

A.   I think I've responded to that over and over again.

MR. COMERFORD:  Asked and answered.

A.   Can we -- can we just change the tone and timing a little bit?  You know, first of all, your attack tone is starting to wear thin with me, and I can retaliate with an attack tone back to you.  Can we just have a cordial question and answer period for a little while?  And I don't know how long we're going to go, but I'm beginning to wear out, and could I just ask as a request without interfering in your legal responsibility that maybe we could move this along a little bit just as a -- as a personal request and not to impair your legal arguments?

BY MR. MANDEL:

Q.   I understand.  I will do my best to move this along.

A.   Thank you.

Q.   And -- and if you'd like to break for lunch or to rest for a little bit, that's okay.

A.   We're going to have to break for dinner in a couple hours.

MR. COMERFORD:  We've been going -- we've been going for about six hours, so obviously --

Page 241

MR. MANDEL:  Can I have a record time check, please?

VIDEO TECHNICIAN:  On record time is four hours 50 minutes.

MR. MANDEL:  Is that four hours 50 or 15?

VIDEO TECHNICIAN:  50.  Five zero.

MR. MANDEL:  Five zero.  Okay.  Why don't we take a short break.  Let's let Mr. McGrath get himself together and --

A.   I don't need to get myself together, but could you take a short break and try to tone down your attack tone a little bit and I will do the same?

BY MR. MANDEL:

Q.   I'm not sure exactly how to respond to that.  I don't believe I'm using an attack tone.  I don't believe you've been.

A.   Thank you.  Okay.  But let's take a short break.  I --

Q.   Let's do it.

A.   I can't go to six or seven or 8:00 tonight, so just so we know.

MR. COMERFORD:  Well, we're going to -- we're going to enforce the seven-hour rule.

VIDEO TECHNICIAN:  All right.  We're going off record.  The time is 3:22.

(Recess taken at 3:22 p.m.)

Page 242

(Back on the record at 3:29 p.m.)

VIDEO TECHNICIAN:  We're going back on record.  The time is 3:29.

MR. MANDEL:  Can you please put up what will be our Exhibit 28, which is our Tab A-33?  The Bates number of this document is NAT-SL-16998.

(Marked EXHIBIT 28 for identification)

BY MR. MANDEL:

Q.   This is an email exchange including you, Mr. McGrath, Mr. Dixon, Mr. Starkloff.  The bottom of the email includes some correspondence with Wachtell.  And as you see, if you go to the bottom email, what's being discussed here are proposed draft response letters to Emerson's most recent offer.  Do you see that?

A.   Yes.

Q.   And the -- those drafts are not attached to this, but it's obvious from the context that there had been some proposed draft responses attached to this; correct?

A.   Yes.

Q.   And you write -- Mr. Dixon clearly forwards this to you and you write that you prefer one of the attached versions.  Do you see that?

A.   Yep.

Q.   And you write, "Let's wait until we see if there if [sic] our stock responds to the earnings call."

Page 243

Do you see that?

A.   Yep.

Q.   Okay.  So this is consistent with what we were talking about before that you had issued the earnings release and were waiting to see how the stock responded; correct?

A.   Correct.

Q.   And Mr. Dixon responds to you explaining that "the plan is for this to go out after earnings - likely early next week."

Do you see that?

A.   Yep.

Q.   So the -- was the plan to issue the earnings on July 28th and then send out the letter to Mr. Karsanbhai?

A.   I don't -- I don't recall the timing of this.

Q.   Was that what Mr. Dixon's email indicates?

A.   I believe so.  I don't know.  What was the date of the -- I believe that the -- the letter to him went out after the earnings call.

Q.   Right.  It did.  The letter went out on August 2nd.  The earnings call was July 28th.

A.   Right.

Q.   But on July 26th Mr. Dixon is telling you that the plan is for the letter to Mr. Karsanbhai to go out

Page 244

after earnings, likely early next week. Do you see that?

A. Okay. Yep.

Q. Do you have a reason -- is that correct?

A. Yeah. I can read it. Yes. Yes.

Q. That's what he said. But do you recall this being the case?

A. Do I recall what?

Q. Do you recall it being the case that the plan was to do the earnings on July 28th and then send Mr. Karsanbhai his letter?

A. Yes. I believe that's what we did.

MR. MANDEL: Okay. Let's look now at what will be our Exhibit 29. This is our Tab A-38.

(Marked EXHIBIT 29 for identification)

BY MR. MANDEL:

Q. And in this email -- this is, sorry, Bates NAT-SL-2982.

This is an email discussion between you and Ms. Rapp and Mr. Starkloff; is that right?

A. Yes.

Q. And in this email you're assessing the analysts' response to the July 28th earnings release; is that correct?

A. That's correct.

Page 245

Q. And it's -- and you write that "It looks like from the analyst's reports that they either didn't listen to your 2023 guidance or didn't give it credibility."

Do you see that?

A. I don't see it on the screen, but I'm familiar with what you're -- yes. I see it now.

Q. And you go through 2023 revenue, 2023 net income, 2023 EPS, and you look at the price targets?

A. Yep. Absolutely.

Q. And the analysts did not accept the guidance issued at the July 28th earnings conference; is that correct?

MR. COMERFORD: Foundation. Form. Calls for speculation.

A. What was the question again? I don't . . .

BY MR. MANDEL:

Q. So is it correct that analysts did not accept the 2023 guidance?

A. No. No.

MR. COMERFORD: Form. Foundation. Calls for speculation.

A. It is what it is. I don't know if they accepted it or didn't accept it. I don't have any insight into it.

BY MR. MANDEL:

Q. Okay. But at the time you wrote that they either didn't listen or didn't give it credibility; is that

Page 246

correct?

A. That's correct.

Q. Okay.

A. In my -- that was my -- that was my opinion, yes. Correct.

Q. Right. And -- but you provide evidence for your opinion in this email; is that right?

A. How?

Q. Well, for example, you say that they did not -- that you look at their 2023 EPS projections for the company --

A. Right.

Q. -- and you say, "We are planning a much higher number than their estimates"; right?

A. Right. That's correct. You saw that on the previous presentation.

Q. And, for example, vis-à-vis revenue, you write, "We guided revenue growth for 2023 . . . even though we are planning much higher," and then talk about what their numbers are; right?

A. Right.

Q. Which is -- which are not as high as your guidance; is that right?

A. We -- we didn't give specific guidance in terms of 2023. We gave general guidance. So . . .

Page 247

Q. Right. You wrote, "We guided revenue for 2023 to be about the same as 2022" --

A. That's fair. That's correct.

Q. -- (15%) . . ."

A. That's correct. Yep.

Q. And the analysts from Baird, Morgan Stanley, Goldman, and Susquehanna all have this number lower than 15 percent; is that right?

A. That's right. That's right. They didn't under -- they didn't understand the impact that reducing our backlog would have on increasing revenue I would --

Q. They either didn't listen or didn't give it credibility; correct?

A. Correct.

Q. Near the end of this document, if you go all the way to the bottom, you write that the analysts "didn't use the guidance we provided, which is disappointing given our current ambitions"; right?

A. Yep.

Q. What ambitions are you referring to there?

A. The ambitions of the reduction in operating expenses and the increase in revenue coming from our ability to draw down backlog. So the higher revenue numbers and the higher profitability numbers that we had discussed in the previous meeting that you -- we went through.

Page 248

Q.  And you conclude here writing, "I hope that we get a chance to clarify these at the Investor Conference."

Is that right?

A.  Yes.

Q.  What investor conference are you referring to there?

A.  We had an investor conference in August in which we have, you know, half a day to go through their questions and answers and more in-depth discussion.

Q.  And so it was your -- was it your hope that at the investor conference you could convince the analysts to either listen to or give credibility to the company's guidance?

A.  I hoped that we had a chance to clarify it.  They had to draw their own opinions, but we had hoped we had a chance to clarify it for them.

MR. MANDEL:  Now, let's look at our next exhibit, which is Exhibit 30, and it is the document at A-41.

(Marked EXHIBIT 30 for identification)

BY MR. MANDEL:

Q.  This is NAT-SL-1239.  You'll see here on the next page this is the August 2nd letter signed by both you and Mr. Starkloff that was sent to Mr. Karsanbhai.

A.  Yep.

Q.  Do you see that letter?

Page 249

A.  Yep.

Q.  And it states that the board is unanimously of the view that Emerson's proposal was not in the best interests of National Instruments' shareholders; is that right?

A.  Correct.

Q.  So this is your what you describe as your second rejection letter; is that right?

A.  Second rejection to the same offer.  Correct.

Q.  Okay.  So this was rejecting the -- and it states the June 22nd, 2022, offer letter; is that right?

A.  Yes.

Q.  Okay.  So let's go back and have a look at the June 22nd offer letter again, which is at -- what exhibit was that?  Yeah.  Is -- that was Exhibit 16.  Thank you.

So as we just saw, you sent a letter on August 2nd saying that the proposal in the June 22nd letter was not in the best interests of National Instruments' shareholders; right?

A.  Correct.

Q.  Okay.  This letter -- to put it simply, you wrote a letter to Mr. Karsanbhai saying no; right?  No, we don't want the deal; right?  Rejecting the deal; right?

Page 250

A.  Right.

Q.  Okay.  So when you wrote a letter saying no, did that mean that acquiring National Instruments was no longer Emerson's highest strategic priority?

MR. COMERFORD:  Objection.  Form.  Foundation.  Calls for speculation.

A.  You're asking me if it was their priority?  I don't --

BY MR. MANDEL:

Q.  Well, do you have any reason to believe that your rejection letter meant that acquiring National Instruments was no longer Emerson's highest strategic priority?

MR. COMERFORD:  Same objections.

A.  I have no idea what their thought process was.  I can't -- I can't -- I can't answer that.  Sorry.

BY MR. MANDEL:

Q.  So you have no reason to believe that your letter would have changed the reality that this was Emerson's highest strategic priority; is that right?

MR. COMERFORD:  Okay.  That's three -- that's three times now asking the exact same question.  There's no foundation for it.  It calls for speculation.  I object to the form.  It's been asked and answered.

BY MR. MANDEL:

Page 251

Q.  Goes on to say motivate -- "We are very motivated to conclude a transaction . . ."

Did your letter saying no impact that?

MR. COMERFORD:  Objection.  Form.  Foundation.  Calls for speculation.

BY MR. MANDEL:

Q.  You can answer the question.

A.  What was the question?  Were they motivated?  I guess they were --

Q.  They wrote in their letter, "We are very motivated to conclude a transaction . . ."

A.  Right.

Q.  You sent them a letter saying no.  I'm asking whether you sending the letter saying no impacts their -- the fact that they were very motivated to conclude a transaction?

MR. COMERFORD:  I'm going to -- I'm going to interject here.  I object to this question.  You know as well as I do that he has no way to know what Emerson was thinking at this point in time.  I don't understand -- you -- I think it's not respectful of the witness's time to ask that kind of a question for the fourth time.

THE WITNESS:  Yeah.

MR. MANDEL:  This is the first time I'm

Page 252

asking this question. You are coaching the witness through your speaking objections. You're obstructing the progress of this deposition.

MR. COMERFORD: It's not a proper question, Mr. Mandel.

MR. MANDEL: If you think it's an improper question, you may object to its form and then allow your client to answer the question. You cannot do all of this that you keep doing.

MR. COMERFORD: I don't think you can do what -- with all due respect, I don't think you can ask him four times in a row to speculate about what Emerson was thinking or to tell you what Emerson was thinking. I just don't see any good faith basis for you to ask those questions, Mr. Mandel.

BY MR. MANDEL:

Q. Okay. Mr. McGrath, do you have any reason to believe that your letter saying no to Emerson of August 2nd would have changed Emerson's motivation to conclude a transaction?

MR. COMERFORD: Form. Foundation. Calls for speculation.

A. I never considered it, so I have no idea.

BY MR. MANDEL:

Q. The letter indicated that Emerson's -- the June 22nd

Page 253

letter indicated that Emerson's board of directors had reviewed and supported the acquisition of National Instruments; is that right?

MR. COMERFORD: Form.

A. Yes. I've said that four times when we went to the letter.

BY MR. MANDEL:

Q. Do you have any reason to believe that your letter of August 2nd changed Emerson's board's view of the deal?

MR. COMERFORD: Form and foundation.

A. Same thing. I have no -- I have no opinion. I have no idea. Okay? Never thought of it. Don't think of it now. In hindsight they paid $60 a share instead of, you know, $48 a share, so, you know.

BY MR. MANDEL:

Q. The June 22nd letter indicated that they -- Emerson had retained Goldman and Centerview as bankers. Did your August 2nd letter --

MR. COMERFORD: Mr. Mandel --

BY MR. MANDEL:

Q. Do you have any reason to believe your August 2nd letter changed that?

MR. COMERFORD: -- we've been over this. And I believe that this is approaching abusive to simply go back and ask the same questions again that

Page 254

he's already answered.

MR. MANDEL: Well, we just --

MR. COMERFORD: This is not --

MR. MANDEL: -- disagree, Mr. Comerford. I'm sorry.

MR. COMERFORD: It's not appropriate.

BY MR. MANDEL:

Q. Let's ask it this way. Mr. McGrath, did your letter of August 2nd change anything about the June 22nd offer?

A. Change anything?

Q. Can you identify anything in the June 22nd letter that was no longer true because you sent your August 2nd letter?

MR. COMERFORD: Calls for speculation. It lacks foundation.

A. I have no idea. I haven't the foggiest idea. So I haven't thought of it --

BY MR. MANDEL:

Q. Do you have any reason to believe -- do you have any reason to believe that anything in the June 22nd letter was no longer true because you sent your August 2nd letter?

MR. COMERFORD: Same objections.

A. Why -- why would I one way or the other? I have no

Page 255

opinion. I had no opinion at the time. Never thought of it at the time. I have no opinion now. I have no idea whether it did or not. And I think you're just wasting my time asking the same question about whether I thought it changed things. Let me be clear. They made a $48 offer. We rejected because it wasn't credible. I gave you the reasons why we rejected it. They repeated the same offer at $48, and we rejected the offer at $48. It's as simple as that. We ended up selling the company at $60 a share. So I don't understand why you're trying to get me to speculate on how they would react to a two-sentence letter that we intended to just tell them no. We're still --

BY MR. MANDEL:

Q. You agreed with me earlier today that Mr. Karsanbhai was eager to acquire National Instruments. Do you remember that?

A. Well, yeah. I mean, he -- yeah. He acquired it at $60 a share instead of $48 a share, so maybe --

Q. Do you have any reason -- do you have any reason to believe that your August 2nd letter made Mr. Karsanbhai any less eager to acquire National Instruments?

MR. COMERFORD: Foundation. Calls for speculation. Form. That's probably the fifth time

Page 256

now you've asked the same question, Mr. Mandel. Are you done asking --

MR. MANDEL: These objections are extremely improper.

MR. COMERFORD: Are you done asking questions?

MR. MANDEL: That's (inaudible), John.

A. You know, we hoped they would go away and they went away and they went away for three or four months and we never heard anything from them. So that's all. We rejected them for the second time, and we expected they didn't want to offer more than $48 a share, and it was done, it was over, we went on with business, and we didn't hear anything from them for three or four months. So, yeah. I mean, that was the gist of it. I don't know how -- I don't know why they reacted by not -- not coming back with anything for three or four months, but I was kind of hoping they just went away.

BY MR. MANDEL:

Q. So, in your view, Mr. Karsanbhai remained eager to acquire National Instruments even after your August 2nd letter; is that true?

MR. COMERFORD: Foundation. Calls for speculation. Form. Lacks a time frame. And it's

Page 257

been asked and answered.

A. Well, he was eager to acquire it at $60 a share eventually.

BY MR. MANDEL:

Q. So at this time -- so at this time after you sent your rejection letter, he remained eager to acquire National Instruments. Is that your testimony?

MR. COMERFORD: Asked and answered. Form. Foundation. Calls for speculation. That's seven times asking the same question, Mr. Mandel. I'm going to -- I'm going to interject here. I don't know what else to do.

MR. MANDEL: Please stop making threats on the record, Mr. Comerford. It's unbecoming. Stop it.

Let's go to the next document. We're going to look at -- this is going to be 31. This is A-45.

(Marked EXHIBIT 31 for identification)

BY MR. MANDEL:

Q. This is Bates NAT-SL-23501. This is an email exchange between you and Mr. Starkloff dated August 9th, 2022, and it attaches Emerson's earnings call transcript. Do you see that?

A. Okay.

Q. Why was Mr. Starkloff observing Emerson's earnings call of this date?

Page 258

MR. COMERFORD: Form. Foundation. Calls for speculation.

A. I think you need to ask him.

BY MR. MANDEL:

Q. He was communicating to you that he listened to it; is that right?

A. On what?

Q. He was communicating to you that he listened to the call live and was forwarding you the transcript; is that right?

A. Yes. That's what it says.

Q. Do you have any idea why he did that?

A. No. Ask him.

Q. So you don't know why the CEO of the company sent you Emerson's earning transcript on this date?

MR. COMERFORD: It's asked and answered. Calls for speculation. Lacks foundation.

A. I think he can better answer that question than I can.

BY MR. MANDEL:

Q. Earlier today we were discussing Bank of America advising you about Emerson's capacity to carry out M&A. Do you remember that?

A. Yes.

Q. And Mr. Starkloff is looking at their earnings to determine whether they're still intent on acquiring

Page 259

National Instruments; is that right?

MR. COMERFORD: Foundation. Calls for speculation.

A. I think you have to ask him. It doesn't say that in his note to me.

BY MR. MANDEL:

Q. Your response to him was to ask "Think that will make them more or less eager?" Do you see that?

A. That's correct. Yeah. I see that. Yeah.

Q. So this is -- the "them" in here is a reference to Emerson; is that right?

A. That's correct. I was hoping that would go away.

Q. So, again, at this point in time on August 9th you understood that Emerson remained eager to acquire National Instruments; is that right?

A. No. It's not correct. I was wondering if they were more or less eager.

Q. You asked whether they would be more or less eager.

A. Right.

Q. How could they be less eager if they weren't already eager, Mr. McGrath?

A. It's a figure of speech.

Q. So that's your testimony? Your email here is just a figure of speech?

A. More or less eager is a figure of speech.

Page 260

Q.  Okay.

A.  It wasn't an expression that they were eager or not eager.

Q.  So, but you agree they couldn't become less eager if they weren't already eager; right?

MR. COMERFORD:  Calls for speculation. Lacks foundation.

MR. MANDEL:  Calls for logic, sir.

MR. COMERFORD:  Okay.  That's a good comeback, Mr. Mandel.  Are you done asking -- are you done asking questions now?

MR. MANDEL:  So, no.  I'd like an answer to my last question that you're trying to distract the witness from answering.

MR. COMERFORD:  This -- you -- you are perseverating, Mr. Mandel.

BY MR. MANDEL:

Q.  Do you agree, Mr. McGrath, that Emerson couldn't become less eager if they weren't already eager at this time?

MR. COMERFORD:  Asked and answered.

MR. MANDEL:  No, it wasn't answered because you talked over it.

A.  They made -- they made -- they made the offer at $48 a share, and, you know, they -- we rejected it, and I

Page 261

just hoped they would go away, and they went away for three or four months.

MR. MANDEL:  Okay.  Let's look at our next document here.  This is going to be our Exhibit 32 and this is Tab A-43.

(Marked EXHIBIT 32 for identification)

BY MR. MANDEL:

Q.  This is Bates NAT-SL-16264.  The bottom email in this chain, the first one is an email from Sabastian Niles to various people at National Instruments, and he pastes into the email an article about Emerson's sale of the InSinkErator business.  Do you see that?

A.  Yes.

Q.  And this is -- this article is saying that Emerson has that day, August 8th, 2022, announced an agreement to sell the InSinkErator business for three billion.  Do you see that?

A.  Yes, I do.  Obviously.

Q.  So -- I'm sorry?

A.  Yes.

Q.  So on this date, August 8th, you learned that Emerson had sold InSinkErator for $3 billion and therefore, like we saw earlier from the Bank of America presentation, had an even more increased M&A capacity than without the InSinkErator sale; is that right?

Page 262

MR. COMERFORD:  Foundation.  Calls for speculation.

A.  Obviously they had $3 billion more.  We never questioned their ability to buy the -- you know, to get the capital.

BY MR. MANDEL:

Q.  Nevertheless, on this date you understood that their capacity for M&A had expanded even further; is that right?

A.  Yes.  For the fourth time.  Yes.  Yes.  Yes.  And you asked -- when you asked it earlier if they sold InSinkErator if they'd have more cash, I said yes previously.  It's obvious.

Q.  So on August 8th you learned about this; right?

A.  Obviously.

Q.  On August 8th your counsel forwarded you this article; is that right?

A.  That's correct.

Q.  Okay.  So at this time there was still a potential acquisition of Emerson, wasn't there?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  This was no more than doing our diligence and monitoring what we were concerned about, which is a hostile takeover attempt of the company.

Page 263

MR. MANDEL:  Okay.  Now, let's look at our next exhibit.  This is going to be Exhibit 33.  This is Tab A-44.

(Marked EXHIBIT 33 for identification)

BY MR. MANDEL:

Q.  Okay.  Now, if you scroll to the bottom of the email. It's the first email in the chain.  This is an email from Mr. Starkloff to you.  Do you see that?

A.  Okay.  All right.

Q.  The re line is "Follow up on buy back."  Do you see that?

A.  Okay.

Q.  And he begins writing, "Coming back to this topic as I'm planning on how to execute it this week."

Do you see that?

A.  Yes.

Q.  And later in the email he proposes a total possible outlay on buybacks of 60 million.  Do you see that?

A.  Not in what I'm looking at.  Oh, I see it at the bottom.  Okay.  I see it.  Yeah.

Q.  So he comes to you proposing 60 million in additional buybacks; is that right?

A.  Okay.  Yeah.  I'm not sure I understand it, but okay. I see it.

Q.  And he writes he's coming back to this topic as he's

Page 264

planning to execute it this week.

Did you and Mr. Starkloff talk about 60 million in buybacks before this?

A.  I -- I'm struggling to understand the context of the $60 million.

Q.  Well, he says, "My proposal is that we put in a plan through the end of the year, rather than for only 3 months.  I think the total possible outlay should be 60 million."

Do you see that?

A.  Okay.  Yeah.

Q.  So he was coming to you for approval for a total possible outlay of 60 million.  Do you see that?

A.  Yep.

Q.  Okay.  And he's coming back to the topic he says; right?

A.  Yep.

Q.  And the re line of the email is "Follow up on buy back."  So that indicates that you and Mr. Starkloff at least had spoken about this previously; is that right?

A.  It -- it implies that.  I don't remember any specific discussions, but . . .  I'm sorry.

Q.  No.  That's okay.  And -- and he explains in this email that "Buy backs are shareholder-friendly;" --

Page 265

A.  Yep.

Q.  -- "they help EPS and share price and are viewed very favorably by our investors."

Do you see that?

A.  Correct.  That's correct.  Yep.

Q.  Do you agree with all that?

A.  Yes.

Q.  Now, and he follows up with an email where he sends the cash projections from the July 19th meeting.  Do you see that?  Do you remember seeing this slide today?

A.  Yep.  Yep.  Yep.  Yep.

Q.  We looked at this slide today; right?

A.  Yep.  Yes, we did.

Q.  The slide's still showing --

A.  Yes.

Q.  -- a plan to do ten million in buybacks in the third quarter; right?

A.  Right.

Q.  And it shows the negative cash flow that we talked about; right?

A.  Yep.

Q.  It shows the company's cash position; right?

A.  Yep.

Q.  Okay.  And you responded, this is on the next page,

Page 266

you responded to Mr. Starkloff's request, "Go ahead with what you are planning."  Do you see that?

A.  Yep.

Q.  So Mr. Starkloff came to you with a request 60 million in additional buybacks and you approved the plan; is that correct?

A.  That's correct.

Q.  And you say that you'll reach out to a couple of board members about this in the meantime; is that right?

A.  Yep.  Yeah.

Q.  You say you'll discuss it at the retreat as a group.  The retreat was scheduled for September that year; correct?

A.  That's correct.

Q.  And -- but you say you'll reach out to some of the board members in the meantime, and you write, "The reaction was to the negative cash flow from operations and our precarious cash position at the end of the quarter."

Do you see that?

A.  Yep.

Q.  Did you write that?

A.  Okay.  Yes.

Q.  You did.  You're describing the reaction of certain board members here; is that right?

Page 267

A.  In general, yes.

Q.  So did you propose more buybacks to other board members?

A.  No.  We discussed the situation in general.  I don't remember any specific discussions, but . . .  It was really leading up to the discussion at the retreat.

Q.  Let's go back to the original email.  Mr. Starkloff -- if you scroll down.  Mr. Starkloff writes, "If there is a major concern among particular board members," right after he asked for the 60 million, he writes, "If there is a major concern among particular board members, I can call them this week and we can also discuss at the retreat," et cetera.

Do you see that?

A.  Um-hmm.  Yeah.  ". . . and in the worst case, withdraw the plan for the fourth quarter."

Q.  Right.  So --

A.  So what he was saying is that if we're concerned about cash flow, we should -- we should reduce the buybacks in the fourth quarter.

Q.  And he describes a major concern among particular board members; is that right?

MR. COMERFORD: Objection.  Form.  It mischaracterizes the document.

BY MR. MANDEL:

Page 268

Q.  You can answer.  He states, "If there is a major concern among particular board members, I can call them this week," et cetera; is that right?

A.  That's what it says, yes.

Q.  Okay.  And then you are in your email, if we go back to your email, the "Go ahead with what you are planning email," you just say that you'll reach out to a couple of the board members in the meantime, and you're describing the reaction of other board members; is that right?

A.  In what sentence?  Okay.  Yeah.  Right.  Right.  Right.

Q.  You say, "The reaction was to the negative cash flow from operations and our precarious cash position at the end of the quarter."

A.  That's correct.

Q.  See that?

A.  Yeah.

Q.  So some board member had that reaction; is that right?

A.  What was the question again?

Q.  Well, did board members have a reaction to the negative cash flow from operations and our precarious cash position when asked about buybacks?

A.  There was -- there was some concern, and that's what it expresses.

Page 269

Q.  Who expressed this concern?

A.  I don't remember.

Q.  When did they express this concern?

A.  It's three years ago.  I don't remember something like that.  Sorry.

Q.  I asked you earlier whether you discussed buybacks at the January 19th meeting, the January 19th meeting where you reviewed this slide that Starkloff included in this email.

A.  We didn't discuss --

Q.  I want to ask you whether all of this discussion refreshes your recollection as to whether at that meeting --

A.  We discussed -- we discussed -- we discussed the capital plan in general and cash flow in general, yes.

Q.  And at that meeting was there a proposal to do more buybacks?

A.  More than -- more than --

Q.  More than a hundred million.  The 60 million that he was proposing here.

A.  No.

Q.  And you write, going back to your email, after you described the negative -- the reaction to the negative cash flow from operations and precarious cash position, "The comment was "With almost no cash and

Page 270

negative cash flow, we sure the hell shouldn't be buying back stock . . ."  It goes on from there.
        Do you see that?

A.  No.  No.  That is not -- that's not correct.

Q.  I did not read that correctly?

A.  No.  There's the word "donation" there.  Okay?  There was a $10 million donation, cash donation that management wanted to make to a nonprofit, and that's what that refers to.

Q.  The $10 million donation part refers to that; right?

A.  Yes.  That whole thing, yes.  Yes.

Q.  Right.  Okay.  Did the donation of ten million have something to do with buybacks?

A.  We shouldn't be -- we shouldn't be making the $10 million donation and buying back stock at the same time probably.  The $10 million donation I was against, and I don't even know if we ended up making it or not, but given the cash position, donating $10 million -- and the $10 million came from a building we sold for significant gain and significant cash, and Eric wanted to take part of that gain and contribute it to a nonprofit, and -- and I wasn't in favor of that.  That's what that $10 million refers to specifically.

Q.  I understand that there's a reference here to a

Page 271

$10 million donation.  I understand it has to do with the sale of a property, which is otherwise discussed in this chain.  But what you wrote here is -- he -- he didn't write you in the first email asking about a $10 million donation, did he?

A.  No.  No.

Q.  He's asking you for approval about the $60 million buyback here; right?

A.  Yes.

Q.  Okay.  And you are describing the reaction of board members to that proposal; right?

A.  I was describing concerns about our cash position, not to that specific proposal of 60 million that he's referring to.

Q.  And so you wrote that "The comment was 'With almost no cash and negative cash flow, we sure the hell shouldn't be buying back stock . . ."  And it goes on from there.  Is that right?

A.  No.  It -- now, it -- it -- the sentence is -- is worded incorrectly.  We shouldn't be buying back stock to making a $10 million donation.  Okay?  I don't know what was the intention, but it was focused on the $10 million donation.

Q.  So when you wrote the words "we sure the hell shouldn't be buying back stock," you were really

Page 272

talking about a $10 million charitable donation? Is that your testimony?

A. That was -- yeah. That's the focus of what that intention was.

Q. Okay.

A. And I agree. It's -- the wording is convoluted. And I probably meant that we shouldn't be buying back stock and making a $10 million donation at the same time. That was probably the -- the intent of that sentence. It didn't come out right.

Q. Okay. So that's why you wrote the words "we sure the hell shouldn't be buying back stock"?

A. To making a $10 million donation.

Q. With almost no cash and negative cash flow?

A. It probably should have read shouldn't be buying back stock and making a $10 million donation.

Q. Well --

A. Yeah. That's -- that was my intention. It's not worded that way. And it doesn't make sense the way it was worded.

Q. But that's -- what you just said about how it should have been written is not what you wrote; right?

A. What I wrote doesn't make sense if you read that sentence.

Q. Well, what you wrote is --

Page 273

A. Well --

Q. -- "With almost no cash and negative cash flow, we sure the hell shouldn't be buying back stock . . ."

A. No. It doesn't say -- no. There's no period after that. Okay?

Q. I know, but that's from the closed quote.

A. There's no period after that, so stop putting a period. We shouldn't be buying back stock --

Q. Did you write the words or not?

A. We shouldn't be buying back stock to making a $10 million donation is what it says. There's not a period after we shouldn't be buying back stock. It's in relation --

Q. Where is the closed quote?

A. What?

Q. Where is the closed quote? There's obviously some kind of typo here.

A. It should be and.

Q. It's what you wrote. There's no typo in what you wrote. "With almost no cash and negative cash flow, we sure the hell shouldn't be buying back stock . . ." And you're telling me that doesn't mean what it says because of a period?

A. No. It should have said we shouldn't be buying back stock and making a $10 million donation. Okay?

Page 274

Q. Okay.

A. It's a grammatical error. I'm sorry. But it was a grammatical error. There's no relation between buying back -- we wouldn't be buying back stock in order to make a $10 million donation because they're both outflows, so the way it's worded doesn't make sense. It was obviously a typo, and there should have been an "and" in there instead of a "to." But there's no period -- there's no period at the end of the -- at the end of the word "stock," so . . .

Q. Okay. I think we understand your defense.

MR. MANDEL: Now, let's have a look at our next exhibit, which is going to be Exhibit 34 and it's Tab A-46.

(Marked EXHIBIT 34 for identification)

BY MR. MANDEL:

Q. Now, this email is an email -- I'm sorry. This is Bates NAT-SL-15017. This is an email that you're not on.

A. Right.

Q. So I won't ask you if you've seen it before. The email begins -- it states -- this is on August 10th. Right? So this is after August 8th. By the way, actually let's just go back for a second. We don't need to look at the previous document. The previous

Page 275

document we looked at was August 7th where you said "Go ahead with what you're planning"; right?

A. Yep.

Q. At that time was there a trading restriction in place?

A. There was -- at that time of what date?

Q. On August 7th, 2022, when you approved Mr. Starkloff's plan --

A. I believe -- I believe -- I believe -- I believe -- I believe --

Q. -- to buy back two million in stock, was there a trading restriction in place?

A. I believe there was. We always have a trading restriction following our earnings release, and I believe it was still in place.

Q. Was there a trading restriction in place due to MNPI concerning Wolverine?

A. I didn't hear you. Can you repeat it?

Q. With respect to MNPI concerning Wolverine.

A. What was the -- MNDI?

Q. We saw earlier -- we saw earlier that after Mr. Karsanbhai's first May 25th offer that there was a trading restriction put in place because -- with respect to people who had material nonpublic information concerning the potential Wolverine transaction. Do you remember that?

Page 276

A.  Yes.

Q.  Okay.  Was that restriction still in place on August 7th when you approved Mr. Starkloff's plan to buy back more shares?

A.  That restriction was no longer in place.  Once we formally rejected the offer, there was no offer outstanding.  There was no legal obligation to disclose it.  There was no trading restriction.  There may have been a trading restriction from our announcement of the earnings still in place, as I already said, but there was no trading restriction regarding Wolverine after we rejected the offer.

Q.  Based on what do you say this?  Was the trading restriction removed at that time?

A.  The trading restriction was -- there was two trading restrictions.  Okay?  And none of them -- and we were under the trading restriction of our quarterly announcement of earnings at that time.

Q.  I'm asking about the trading restriction concerning material nonpublic information regarding the Wolverine matter.

A.  Once we rejected --

Q.  That restriction, as we saw earlier, was put in place on May 27th.  Had that restriction been lifted at the time you approved Mr. Starkloff's plan to repurchase

Page 277

an additional 60 million in shares?

A.  It was -- that restriction we considered lifted after we rejected the offer.

Q.  When you say we considered it lifted, who is this we?

A.  Me.  The board.  Everybody.

Q.  So you considered it lifted?

A.  Our attorneys.  Our attorneys.  Our attorneys.  Everybody considered it lifted at that point in time.  We didn't formally lift it because we were under a restriction for our earnings announcement, so there was no need to formally release one restriction when we were under another restriction.  We then released both restrictions obviously at the same time because our earnings call restriction was in place later than the other one.  So that's -- I guess you're not understanding it, but . . .

Q.  So let's just look at this email real quick and then we can go on and I'll show you the trading restriction being lifted.  But right here you talk about -- see, not you.  Sorry.  Mr. Dixon wrote an email where he writes, "Eric and Karen are calling board members to let them know the plans re buy back and lifting the restriction."

        Do you see that?

A.  Yes.

Page 278

Q.  So there was a plan to lift the restrictions so you could do the buybacks; is that right?

A.  I -- that -- I don't -- I -- I -- I'm not interpreting that.  I --

Q.  Well --

A.  I'm -- you're reading -- you're reading this for the first time.  I'm reading it for a first time or I'm reading it for the first time, so I don't -- I wasn't involved in that email.

Q.  It says, "Eric and Karen are calling board members to let them know the plans re buy back and lifting the restriction."

        Did they call you?

A.  No.

Q.  Did they call other board members?

A.  I think you have to ask Eric and Karen.

Q.  Do you presume that they did call other board members?

A.  I think you have to ask Eric and Karen.  That's what they --

Q.  Why do you think it is they didn't call you to tell you this?

A.  Because I had ongoing discussions with Eric already, as he referred to.

Q.  It's because you knew it already; right?

A.  Knew what?

Page 279

Q.  Knew about the plans re buyback and lifting the restriction; is that right?

A.  I was -- it was never -- I was never involved in any discussions about lifting the restriction relative to the Emerson offer.  Okay?

Q.  But you understood that the restriction was being lifted specifically for buybacks; right?

A.  No.  No.  No.  The restriction was lifted in general.

Q.  Does this say that?

A.  The restriction was lifted -- the restriction was listed in general, not just for buybacks but for all insiders and everybody else, and it was -- primarily the restriction at the time was the restriction relating to the earnings call.  We always have a restriction after the earnings call for a set period of time, and that's what I believe the focus was in lifting the restriction.

Q.  Okay.

        MR. MANDEL:  Let's have a look at -- this will be our Exhibit 35.  Let's have a look at Tab A-47.

        (Marked EXHIBIT 35 for identification)

BY MR. MANDEL:

Q.  This is Bates NAT-SL-9179.

A.  Okay.

Page 280

Q.   This is an email from Albert Percival --

A.   Yep.

Q.   -- to Mr. McGrath, Mr. Starkloff, and it appears other board members; is that right?

A.   Yes.  Yep.

Q.   All right.  And the email is addressed to "Board Members"; correct?

A.   Correct.

Q.   And it states that "You are receiving this email to inform you that the Project Wolverine trading restriction is lifted, effective immediately."

See that?

A.   Yep.

Q.   This doesn't make reference to removing any other restriction, does it?

A.   It's simultaneous with that, though, yes.  But you're right.

Q.   This doesn't make any reference to removing any restriction post earnings conference, does it?

A.   I just answered that question.  I said you're right, it doesn't.

Q.   So on August 11th is when the trading restriction concerning Project Wolverine was lifted; is that correct?

A.   That's correct.

Page 281

Q.   And so on August 7th you authorized Mr. Starkloff's plan to repurchase 60 million in additional shares while a material nonpublic information trading restriction concerning Wolverine was still in place; is that correct?

A.   Not -- I didn't authorize him to do it during the trading restriction.

Q.   Your authorization came at the time of the trading restriction was in place; is that right?

A.   The authorization did, but not the authorization to do it within the restriction.  Any restriction.  The quarterly restriction or -- or any -- or the Wolverine restriction.  So there's -- there was -- I didn't authorize him to buy within the restricted period.  I want to make it clear.  All right?  And don't imply that I did.

Q.   You told him to go ahead with what he was planning at a time when there was a material nonpublic information trading restriction in place concerning Wolverine; true?

MR. COMERFORD:  Form.  Mischaracterizes the evidence.

A.   I never gave him the authorization to buy within a restricted window.  Okay?  So I gave him the go-ahead for the 60 million over a period of time.  We never --

Page 282

the policy that he was operating under prohibits us from doing any stock buyback during a restricted trading period, so I didn't override that.  Okay?

BY MR. MANDEL:

Q.   You told him to go ahead with what he was planning; right?

A.   Which wasn't to buy within a restricted window.

Q.   Well, did his email say anything about that?

MR. COMERFORD:  Oh, for God's sakes.

BY MR. MANDEL:

Q.   Why are we even talking about restricted windows?  This is a case about material nonpublic information concerning Wolverine.

MR. COMERFORD:  Look, it's been asked and answered.  He answered you, Mr. Mandel.

A.   I'll make it clear.  We have -- we -- we were -- never felt that we were restricted from buying back stock.  Our legal counsel made that very clear to us.  We asked several times.  We said -- they said we have an obligation to do business as usual once we rejected the offer, and they kept saying you have to do business as usual, and when somebody asked does that include buying back stock, they said business as usual.  So we were under complete guidelines from our legal counsel that we had no restrictions on buying

Page 283

back stock and it was business as usual, and obviously we have a trading window.  We lifted the trading window, and we didn't buy stock during the restriction of the trading window, and nobody ever authorized buying back during the trading window.

BY MR. MANDEL:

Q.   Are you through?

MR. MANDEL:  Okay.  Let's take a five-minute break.  I can try to organize some of what's left.  I think I can maybe do it quicker than I expected.

THE WITNESS:  How much time -- do you think you're going to do it in the next hour or two?

MR. MANDEL:  I can't make any promises, but I will do my best.

THE WITNESS:  Thank you.

VIDEO TECHNICIAN:  All right.  Going off record.  The time is 4:19.

(Recess taken at 4:19 p.m.)

(Back on the record at 4:25 p.m.)

VIDEO TECHNICIAN:  Going back on record at 4:25.

BY MR. MANDEL:

Q.   Mr. McGrath, you testified that the company had received some sort of legal advice to the effect that

Page 284

after August 2nd there was no more material nonpublic information; is that right?

A. I can tell you specifically what I said if that matters. I said that we were instructed by our legal counsel very clearly that after we rejected the offer we had to return to business as usual. Over and over again they told us business as usual. And during that discussion they were asked does that include stock buybacks, and they said business as usual, which was, yes, that's business as usual. If it was usual business, then we had to return to business as usual, and that included buying back stock. It was to me very clear that they made no exception for stock buybacks and business as usual or they would have responded and said, you know, wow, let's talk about that more or no or something. They said no, business as usual, so . . . And that was business as usual, so . . . We felt that that was not only something that we were cleared to do but we actually had some obligation to continue business as usual that way.

Q. Did you ever see this legal advice in writing?

A. No.

Q. This is legal advice about insider trading you understand; right?

        MR. COMERFORD: Foundation. Calls for

Page 285

legal conclusions.

A. Insider -- it was -- it was a broad base of the response to the question what about stock buybacks. They said business as usual, which means you can continue to do stock buybacks. That didn't broadly affect any insider trading among other restrictions or anything like that or -- or by individuals, and we had no -- we had no individuals that bought stock in the company during the period in question either, so . . . It doesn't -- it wasn't a broad-based insider trading opinion. It was based on the opinion that we could continue and we should continue to buy back stock as usual.

BY MR. MANDEL:

Q. Who advised the company of this?

A. Wachtell.

Q. And Wachtell gave that advice not in writing? Is that your testimony?

A. Yes.

Q. Who did Wachtell give that legal advice to?

A. The board. The board.

Q. To the board.

A. Yep.

Q. So you spoke directly to Wachtell?

A. Yes. I spoke -- I was there. I -- you know, somebody

Page 286

asked the question, I don't know who asked the question, what about share buybacks, and they said business as usual.

Q. Business as usual.

A. Yep. Which is a very firm response to say we should continue stock buybacks as business as usual. They didn't respond you can't. They didn't respond let's talk about it or anything like that. They said business as usual, and that was our business as usual, so we continued doing it under their legal -- legal guidance.

Q. When -- when was this legal advice received from Wachtell?

A. During one of our board meetings. I don't recall which one. But prior to what you're talking about now. Prior to any stock buybacks obviously.

Q. Was it at the July 25th meeting?

A. It was either -- it was -- it was probably the July 25th meeting. Or -- yeah. It was probably the July 25th meeting.

Q. So at the July 25th meeting you wrote -- you wrote earlier, we saw an email that the primary purpose of that meeting was to talk about the strategy for defending against Emerson; is that right?

A. Right. Right.

Page 287

Q. And it's at that meeting --

A. I don't recall -- I don't -- I'm sorry, but I'm not gonna -- I don't recall --

Q. -- share buybacks?

A. I don't recall if it was that meeting. Okay? It was -- it was their advice in a board meeting, and I don't recall which one, but it was obviously prior to any of the stock buybacks we did.

Q. And is there a reason that this discussion you're telling us about doesn't appear in any of the minutes?

A. No. The reason was it was just so obvious to them that it wasn't even a point to discuss or vote on or anything else. It was -- it was obvious --

Q. So this is -- so this is legal advice that was not in writing, that is not reflected in the board's minutes; is that right?

A. Yes.

Q. And your testimony is that they said business as usual?

A. Yep.

Q. Is that right?

A. Yep.

Q. And you understood this to mean that you were no longer in possession of MNPI?

A. I understood it to mean that we had no restrictions on

Page 288

stock buybacks, because that was the question they responded to.

Q. Did anyone ask them whether you were still in possession of material nonpublic information?

        MR. COMERFORD: Form. Foundation. Calls for speculation.

A. It was -- we believed once we rejected the offer, the offer was rejected, there was no nonpublic material information that we had.

BY MR. MANDEL:

Q. Did you ever ask Wachtell whether that was true, whether, in fact, you had no more MNPI after the August 2nd letter?

A. I don't recall that specific question. But if we did ask the question --

Q. And business as usual wouldn't have been a response to such a question, would it?

A. It wasn't the question, no.

Q. Right.

        MR. MANDEL: Let's move on to our next exhibit. This is going to be Exhibit 36 at Tab M-16.

        (Marked EXHIBIT 36 for identification)

BY MR. MANDEL:

Q. This is Bates NAT-SL-1450. This is board minutes from September 20 to 21, 2022. Do you recognize these

Page 289

minutes?

A. Yes.

Q. Are these the minutes from the retreat in September?

A. It's -- it's the minutes from the board meeting portion of the retreat in September.

Q. Thank you for clarifying. You'll see on the fourth page of this document, Bates 1453, a section labeled "Executive Session." Do you see that?

A. Yep.

Q. And Wachtell representatives joined you for this meeting; is that right?

A. Yep.

Q. And also Bank of America representatives joined you for this meeting; is that right?

A. Yep.

Q. And I guess my question is if you had sent the rejection letter on August 2nd and there was nothing material anymore, why were you still meeting with your lawyers and bankers about this potential deal?

A. We made it clear -- I made it clear that we were under the continued concern of a hostile takeover bid at $48 a share that we would have to defend. So that's part of our -- our -- our normal being responsible and continuing to watch it, even though they went away at that point.

Page 290

Q. So you understood at this time that Emerson could return with another offer; is that right?

        MR. COMERFORD: Calls for speculation. Lacks foundation.

A. We didn't know. We didn't know, but we were concerned that they could come back at $48 a share and make a hostile takeover bid, and, you know, we had to monitor that and we had to be professional and be prepared for it. That's all.

BY MR. MANDEL:

Q. Were you concerned that they could come back with a higher offer?

A. Not particularly. I mean, to me it was pretty clear that they were stuck at $48 a share at that time. They hadn't done anything for several months at this point in time. So I think that they were done at $48 a share.

Q. The June 22nd letter indicated a willingness to consider paying more; is that correct?

A. Indirectly. In return for other things. But we didn't believe that that was significant.

Q. When you say in return for other things, you mean in return for allowing due diligence?

A. Yeah. Yeah.

Q. So, again, Mr. Karsanbhai in his letter had stated a

Page 291

willingness to potentially pay more; is that correct?

A. It -- it -- it -- you can imply that from his letter.

Q. And you understood that that possibility remained live in September; is that right?

A. No. I thought it was --

Q. So --

A. I thought it was dead because we hadn't heard from them. You know, after their, you know, second reiteration of the $48 a share, we hadn't heard anything from them, and I figured that they went on to other priorities at that point in time in September when we were having this meeting. Nevertheless, you know, the board had to be responsible and consider a hostile takeover defense.

Q. And of course in this meeting there's a discussion of a -- ███████████████████████. Do you see that?

A. Yep.

Q. Do you understand what that is a reference to?

A. ████████████████

Q. So ███████████████████████████; is that right?

A. I don't know the time frame, but that's correct.

Q. Now, on August 7th when you approved Mr. Starkloff's plan to buy back more shares, you were aware that the

Deposition of Michael McGrath

Page 292

██████████████████████████████████; is that right?

A.   Generally.

Q.   Did you make any inquiry into whether Emerson had been accumulating National Instruments' shares at the time you approved Mr. Starkloff's plan?

A.   We didn't -- we didn't ask Emerson, if that's what you're asking me.  We didn't ask them, and we -- we had limited availability to realtime information on who was buying our shares, so we, in fact, didn't know.

Q.   I am asking you, not we, but you whether you at the time you authorized Mr. Starkloff's share repurchase plan on August 7th whether you had made any inquiry into whether Emerson had been accumulating National Instruments' shares.

A.   Who would I inquire of?  Emerson?  Would I call them and ask them if they've been buying shares?  I didn't inquire of anybody because I couldn't.  There's nobody I could inquire to.  You know, there's services that provide statistics, but they don't disclose who's buying the shares in that time frame.

Q.   So you made no inquiry; is that right?

A.   To who?

Q.   To anyone.  Did you make any inquiry to determine

Page 293

whether Emerson had been accumulating National Instruments' shares when you approved Mr. Starkloff's plan on August 7th?

A.   I had no ability to make any inquiry to anybody, so I didn't make any inquiry, but I couldn't inquire to anybody if I wanted to.  I wasn't going to call Emerson and ask them if they were buying our shares.  Okay?

Q.   Did you ask your bankers?

A.   They didn't know.

Q.   Did you ask your lawyers?

A.   They didn't know.

Q.   Did you ask management?

A.   They didn't know.

Q.   How do you know management didn't know?  Did you ask?

A.   They would have told me if they did.

Q.   So you never had --

A.   We suspected they could be, but we didn't know, and I guess I don't understand the point here.  I didn't -- we -- we -- we didn't know until later on ████████ ████████████████████ and some of that came --

Q.   When do you think you found out ████████████████ ████████████?

A.   When they disclosed it.

Q.   And so, again, just to be clear, it's your testimony

Page 294

that as of August 7th when you approved the share repurchase plan, you made no inquiry into whether they were accumulating shares and could not have made any such inquiry; is that right?

A.   I could -- I could not have made any.  Correct.

Q.   Okay.

     MR. MANDEL:  Now, let's have a look at document -- I'm sorry.  Was the last exhibit 36 or 37?

     EXHIBIT TECHNICIAN:  36.

     MR. MANDEL:  36.  So this next one will be 37.  This is Tab A-50.  Thank you for that.

     (Marked EXHIBIT 37 for identification)

BY MR. MANDEL:

Q.   This is Bates 23189.  This is an email that you are not on, so I'm not going to ask you if you've seen it before, but why don't you have a look at it.  It's an email from --

A.   Can we blow it up a little bit so I can read it?

Q.   Yeah.  Take a -- I mean, I'll refer you to the specific piece I'm going to ask you about.

A.   Okay.  Who is it from?

Q.   So this is an email from Eddie Dixon sent to --

A.   Okay.

Q.   -- the Wachtell attorneys and Bank of America bankers, and cc'ing Mr. Starkloff, Mr. Ilcisin, Mr. Dixon cc's

Page 295

himself, and Ms. Rapp.

A.   And what's the date of the email?  I can see the time but not the date.

Q.   Sorry.  The date of the email is September 19th --

A.   Okay.

Q.   -- which is the same date --

A.   Okay.

Q.   -- as the first day of the meeting of the minutes we were just looking at.

     MR. COMERFORD:  Can we just put the recipients and everything on the screen and then scroll down when the witness asks to scroll down?  Thank you.

     MR. MANDEL:  Absolutely.  Thank you, John.

BY MR. MANDEL:

Q.   Now, you see in this email Mr. Dixon is describing the "general message/Wolverine update to the board"; right?

A.   That's what it says, yes.  I haven't seen this email before, so . . .

Q.   I know.

A.   All I can -- all I can do is read -- read what is written.

Q.   Right.  And he summarizes the key points; right?  He writes, "The key points are as follows"; right?

Page 296

A.  Yep.

Q.  And one of those points is "NI is on Wolverine's acquisition pipeline list and there is no evidence that Wolverine's interest has petered out."

A.  Can you scroll up so I can read that?  Okay.

Q.  He says there's no evidence that their interest has petered out.  Do you see that?

A.  Yep.  And he gives an example of what interest -- what indication would be, what evidence.

Q.  Evidence might be, for example, Wolverine selling its shares?

A.  Right.

Q.  Again, we saw ███████████.  Or announcing another large acquisition making NI unaffordable.  Do you see that?

A.  Yep.

Q.  He doesn't include as an example here a letter from you rejecting a proposal, does he?

A.  It doesn't include what?

Q.  He doesn't include here as an example of evidence that Wolverine's interest has petered out your rejection letter, does he?

A.  No.  I don't know why he would.  I'm not going to --

Q.  I don't know why he would either.

A.  Okay.  I don't know, you know.  You have to ask him

Page 297

that question.

Q.  Right.  So at this point in time he states that there's no evidence that Wolverine's interest has petered out; right?

A.  That's what he says.

Q.  And this is after your letter of August 2nd; right?

A.  Correct.

Q.  So the general counsel of your company's view was that your letter was not evidence that Wolverine's interest had petered out; is that right?

A.  He's -- he's saying that there's no evidence that it's petered out.  He's not saying that it has or hasn't.  He said there's no evidence of it.  That's what I'm reading right here.  All I'm reading is what he's saying.

Q.  Well, he was aware of your August 2nd letter; right?

A.  Obviously.

Q.  Right.  And, nevertheless, believed that there was no evidence that Wolverine's interest had petered out; correct?

A.  Other than the fact that they went away.

Q.  Well, your general counsel is writing about the key points for the board meeting on this date that NI is on Wolverine's acquisition pipeline list.  Your general counsel is saying as of this date that

Page 298

National Instruments is on Wolverine's acquisition pipeline list.  What do you mean they never came back?  The general counsel is stating that NI is still on their acquisition list.

A.  That's his opinion, yes.  I can read it.  That's all -- all I can do is read it.

Q.  Did he advise the board of this?

A.  I can't -- did he advise the board of what specifically?

Q.  Did he advise the board that National Instruments was still on Wolverine's acquisition pipeline as of September 19th?

A.  I don't recall.  You know, we didn't have -- we -- we primarily had a discussion around his last point which we are a wait and see mode and we should continue to monitor the situation.  That's the only discussion I recall that we had.  You know, we didn't go through any of these points in detail, discuss them, debate them, question them, et cetera, and I had never seen this until you just showed it to me, so . . .  I can't help with that.

Q.  Okay.  So you don't remember whether Mr. Dixon said this at the meeting; is that right?

A.  Said what?

Q.  Well, we were just reading a bullet.  I'll read it

Page 299

again.  "NI is on Wolverine's acquisition pipeline list and there is no evidence that Wolverine's interest has petered out.  Evidence might be, for example, Wolverine selling its shares or announcing another large acquisition making NI unaffordable."

That bullet that I just read to you, did Mr. Dixon advise the board of these matters at this meeting, if you recall?

A.  Not -- not that I recall that specific point.  I don't recall a discussion around that point.

Q.  Okay.

MR. MANDEL:  Now, let's have another document.  This will be M-20.  This will be Exhibit 38.  This is our document M-20.

(Marked EXHIBIT 38 for identification)

BY MR. MANDEL:

Q.  This is the October 18th board book.  This is Bates beginning NAT-SL-70.

Do you recognize this document?

A.  Yes.  Yes.  It's the agenda for the board meeting, and I was there.

Q.  I'm sorry.  You were there?

A.  I was there, yes.  I know you were going to ask that question.  I'm trying to -- I'm just trying to save you some time.

Page 300

Q.  I thought you said wasn't.

A.  I was there.  Okay?

Q.  Got it.  Thank you.  I thought you were there.  That's why I was surprised when I thought you said you weren't.

Now, if we could go in this document to Bates NAT-SL-132.  This is the first page of the "Capital Strategy" presentation.  This is a regularly scheduled board meeting; correct?

A.  Um-hmm.

Q.  And you're doing this -- a routine capital strategy update here; is that right?

A.  Yep.

Q.  Okay.  Now, if you'll go to the next page.  You'll see that this document was withheld by defendants as an irrelevant document.  This is not withheld for privilege.  This is sensitive business information is what's supposedly the reason for withholding this document.  Do you see that?

A.  I see it says "Redacted - NSBI."

Q.  I know we've been looking at capital strategy presentations from board meetings all day; right? Yes?

A.  Yes.  Yes.  Yes.

MR. COMERFORD:  What's the Bates number of

Page 301

this document?

BY MR. MANDEL:

Q.  We require out loud answers for the reporter.

MR. COMERFORD:  What's the Bates number of this document?

MR. MANDEL:  The Bates number of this document again is NAT-SL-70 through -- I'm not sure of the last page.  It's a long document.  It's a big board book.  And this wasn't produced, so . . .  Let's have a look now at our next exhibit, which is document 39 -- Exhibit 39.

MR. COMERFORD:  Let me ask you a question.

MR. MANDEL:  This will be our Tab M-20A.

MR. COMERFORD:  Is -- are we looking at the -- are we looking at the -- hang on.  Hang on. We're looking at the 64th page of Exhibit 38?  Is that right?

MR. MANDEL:  That's correct.  64th page.

MR. COMERFORD:  And are there any other --

MR. MANDEL:  Yeah.  It's the one that would be right after Bates ending 132.  So 133.  Yes.  This is the correct page.

MR. COMERFORD:  Is that the only page that's redacted out of the 296 pages in the exhibit?

MR. MANDEL:  No.  There are plenty of

Page 302

redactions in this document, but this page is redacted.

MR. COMERFORD:  And so what's your -- how many -- how many pages are not redacted out of 296?

MR. MANDEL:  I don't know.  You produced the document.  Don't take up my record time asking me questions, please.

MR. COMERFORD:  You're -- you're making it appear, Mr. Mandel, that this -- this exhibit is redacted in its entirety.  I'd like to scroll through this and get oriented as to what we're looking at.

MR. MANDEL:  This exhibit is not redacted in its entirety.  There are many pages in it.  This page is redacted.

MR. COMERFORD:  I want to see it.  I want to see the exhibit.  I cannot see it.  Please --

MR. MANDEL:  Let's go off the record --

MR. COMERFORD:  Please go to --

MR. MANDEL:  -- and you can take time to review the exhibit.

MR. COMERFORD:  Please go to the first page.  I don't know who is controlling these exhibits, but I'd like to go to the first page.

MR. MANDEL:  Mr. Comerford, if you're going to spend a bunch of time doing document review during

Page 303

this deposition, please let's go off the record for you to do that.

MR. COMERFORD:  I feel like, Mr. Mandel --

MR. MANDEL:  I have an hour left of time. It is not fair for you to eat it up with this.  This is a document you produced.

MR. COMERFORD:  I think that you put a 296-page exhibit in front of the witness, went to one page that had a redaction mark on it, and then represented to the witness that the whole exhibit was redacted.  That's -- that's how I understood what you were saying.

MR. MANDEL:  Nonsense.  I represent that this document, that page was redacted.  That's all we're talking about.  I even showed the witness the beginning of the document.

MR. COMERFORD:  What's your --

MR. MANDEL:  It obviously wasn't redacted.

MR. COMERFORD:  I don't understand what your question is.

MR. MANDEL:  Listen, we're going to go off the record here.

MR. COMERFORD:  No.  Don't go off the record.

MR. MANDEL:  I'm not taking up my time with

Page 304

this.  Off the record, please.

MR. COMERFORD:  Go ahead.  Ask your questions.  We're not going off the record again. It's -- it's 4:50 in the afternoon.  We've been going since 9:30.

MR. MANDEL:  And you're wasting a bunch of time with this, Mr. Comerford.

MR. COMERFORD:  No, I'm not.  You just put a 296-page exhibit in front of the witness, and I wanted to get oriented.  So go ahead and ask your question.

MR. MANDEL:  You know, as Alex explained to you earlier, you have independent access to all of these exhibits all day long, and you produced this document, and the page we were just talking about was redacted.  Now, I'd like to move on, please.

We're going to go to our next exhibit, which is going to be our Exhibit 39, which is our M-20A.  This document is a PDF with a native file attached to it, like before.

(Marked EXHIBIT 39 for identification)

BY MR. MANDEL:

Q.  Okay.  So this is a document email from October 20th, "Subject: Final board decks."  Do you see that?

A.  That's what it says.  I'm not on the email again.

Page 305

Q.  And it includes various slides in there.  It describes what's included in the email; is that right?

A.  That's what the slide says.  I wasn't included in the email, so . . . I can only tell you what it says.  So I'm not going to disagree with what it says.

MR. MANDEL:  Okay.  Now if we could put up the -- now, the rest of this document was produced in a native format.  If we could put up the remainder of the document.

EXHIBIT TECHNICIAN:  Counsel, you want the PowerPoint or the Excel file?

MR. MANDEL:  It's the PowerPoint.

EXHIBIT TECHNICIAN:  And do you want --

MR. MANDEL:  They're both (inaudible).

EXHIBIT TECHNICIAN:  And you want both of them?

MR. MANDEL:  I think they're all in here as one -- there's a document -- I'm sorry.  I can tell you exactly.  Because these are produced not in PDF, they don't have Bates numbers, so it's difficult to answer the question.  I'm told it's on Page 221 of the attached native file.

EXHIBIT TECHNICIAN:  Okay.

MR. MANDEL:  Are you able to find that?

EXHIBIT TECHNICIAN:  Yes.

Page 306

MR. MANDEL:  That's the beginning of the document.  So now if we scroll in, there's -- you see -- it's difficult to see on the green, but there is a page number at the bottom of the green there. There's a Page 1 you can see.  If we scroll ahead to the page with a 43 there.

EXHIBIT TECHNICIAN:  This is the last page.

MR. MANDEL:  If we can scroll up a bit more, you'll see that's -- wait.  That's the last page of -- that's the last page of the document.  Then I'm sorry.  Can you put up the other document?

EXHIBIT TECHNICIAN:  Yes.

MR. MANDEL:  The other attachment.  I apologize.  With the native files it's difficult sometimes.

EXHIBIT TECHNICIAN:  One moment.

MR. MANDEL:  Thanks, Alex.  Okay.  Now, if we scroll to Page 43 of this document.  Thank you. Sorry for the confusion.

BY MR. MANDEL:

Q.  Right.  So this here is Page 43, the "Capital Strategy" slide that we were just looking at.  Now, let's go to the next page.  This appears to be the slide that should have been produced in the last document we were looking at.  And you'll see that the

Page 307

document on its face refers to share repurchase.  Do you see that?  So --

A.  Okay.  Go ahead.  Yeah.

Q.  So I don't understand how this document wasn't produced in the -- how it was withheld and redacted from the board minutes.  But let's have a look at this document.  This is the capital summary like we've been looking at all day from the October 19th and 20th meeting; is that right?

A.  It's the same -- same format, yes.

Q.  Right.  And this shows that there were 82 million in share repurchases in the third quarter; is that right?

A.  That's what it shows.

Q.  Now, you recall that when we looked at the July version of this document this was forecast to be ten million; right?

A.  Correct.

Q.  And of course the full year the projection was a hundred million and now it shows there were 152 million in share repurchases done during that year; right?

A.  That's what it shows.

Q.  Yeah.  And it shows that the Q3 share buyback retired two million shares at an average price of $40.25 a share?

Page 308

A.  I don't see that, but I'll take your word --

Q.  It's the third bullet beneath the chart.  Do you see that?

A.  Okay.  Yep.  Now I see it.  Yep.

Q.  Right.  Average price of $40.25 a share.  Do you see that?

A.  Yep.

Q.  Substantially below the $48 offer price at this time; is that right?

        MR. COMERFORD:  Form.

A.  I can do the math, yes.

BY MR. MANDEL:

Q.  Right.  Materially below the $48 number; right?

        MR. COMERFORD:  Form.  Calls for legal conclusions.

A.  Are you asking me if 40 is below 48 or for more of an opinion?

BY MR. MANDEL:

Q.  I'm asking you whether the difference of $7.75 a share is a material difference to shareholders.

        MR. COMERFORD:  Form.  Calls for legal conclusion.  Foundation.  Calls for speculation.

A.  I -- I -- I don't know the con -- I can't respond to the context of that, so . . .

BY MR. MANDEL:

Page 309

Q.  Okay.

A.  I know $60 a share was better.

Q.  Well, did anyone who sold their shares for under $40 when you weren't disclosing National Instruments' offer get that $60?

A.  I have no idea.

Q.  If they sold the share, they didn't get paid $60 for it; right?

A.  They could have sold very small portions of their -- of their shares --

Q.  I mean, $60 is a better price; right?

A.  They could have owned a million shares and sold ten and kept the rest.  I don't know.

Q.  Right.  But on the shares that they sold, they didn't get $60 for them; right?

A.  Right.  And the people that shorted the stock didn't make money either.

Q.  You got $60 for your shares; right?

A.  I guess so, yes.

Q.  You guess so?

A.  Yes.

Q.  This document also shows cash from business operations; right?  You see that?

A.  You have to go -- you have to scroll down.  I can't see the whole slide.

Page 310

Q.  It's right there on the screen, unless you're not --

A.  I can't --

Q.  Yeah.  If you look at the chart itself.

A.  You have to scroll.  I can't see the whole chart on my screen.  All right?  I can see the top half of the chart now.  Okay.  Just so you know.  So if you bounce around the chart, you have to move the slide.  Okay.

Q.  You've got "Cash from Business Operations."

A.  Yep.

Q.  And now it's the full year forecast.  Cash from business operations is projecting only $30 million; right?

A.  Yeah.

Q.  So this is substantially larger than the 300 million projected cash from business operations for fiscal year 2022 from January; is that right?

A.  Obviously.

Q.  Like ten percent of that number; is that right?

A.  Obviously.

Q.  Right.  Nevertheless, during this period of time in the third quarter the company did over 80 million in buybacks; right?

A.  That's what it says.

Q.  Despite what someone described as a precarious cash position; right?

Page 311

A.  And we -- we -- we aren't buying back any shares in the fourth quarter because of that.

Q.  And, in fact, you didn't buy -- no share buyback plan for Q4 it says on the bottom here; right?

A.  That's right.

Q.  Because the company had acquired -- done way more buybacks than planned; is that right?

A.  More.

        MR. COMERFORD:  Form.

BY MR. MANDEL:

Q.  Well, the plan was for --

A.  I'm not going to say -- I'm not going to say way more.  They bought more.  Okay?  I'm not going to say way more.  It's the emphasis that I can't agree with.

Q.  Well, the plan was for a hundred and you did 152 million.  That's more than 50 percent more; is that right?

A.  That's correct.

Q.  Okay.

A.  I mean, I think the slide speaks for itself, you know.

        MR. MANDEL:  Now, if we can go to our next exhibit here.  This is going to be our Exhibit 40.  And this is going to be Exhibit -- sorry, our Tab Z-7.  Exhibit 40.

        (Marked EXHIBIT 40 for identification)

Page 312

MR. MANDEL: Now, this document is not a Bates labeled document. Well, this is part of the document I want to show. I need to go off the record for two minutes here to address a document issue.

VIDEO TECHNICIAN: All right.

MR. MANDEL: I'll be very quick.

VIDEO TECHNICIAN: Going off record at 5:02.

(Recess taken at 5:02 p.m.)

(Back on the record at 5:05 p.m.)

VIDEO TECHNICIAN: Going back on record at 5:05.

BY MR. MANDEL:

Q. Okay. If we can go back to the exhibit, Exhibit 40, which is our Tab Z-7. Okay. This is Bates labeled GOODWIN 25. This was a press release produced by your expert, one of your experts, which is why it's labeled GOODWIN 25, and this is the Emerson Press Release announcing -- of January 13th, 2023, announcing its proposal to acquire National Instruments for $53 a share.

Do you recognize this document?

A. I saw it, yes. I don't remember it completely, but I recognize it. I know they did it. I don't know that I --

Page 313

Q. You saw it at the time; right?

A. I saw it at the time, yes.

Q. Now, if we go to the, first, second, third page of the document. GOODWIN 27 is the Bates number. And you see there under the heading "Emerson's Public Proposal Follows Eight Months of Delay and Lack of Engagement."

Do you see that?

A. That's what they said, yes.

Q. Right. Now, in there, in that section there's an area. It's in the first paragraph after the heading, four lines from the bottom. It says -- or the sentence begins five lines up from the bottom, "In addition." It says, "In addition, after receiving the initial May 25th, 2022 proposal from Emerson, NI not only refused to engage with Emerson - it repurchased more than 2 million shares at an average weighted price of $40.25, the largest quarterly repurchase in its history on a dollar basis, depriving its shareholders of the opportunity to realize immediate cash value through the transaction price, which is significantly above the repurchase price."

Do you see that?

A. Yes. I see that. That's what they said.

Q. Do you remember reading it at the time?

A. No.

Page 314

Q. Is there anything in that sentence that's not true?

A. Not that I can see, no. There's a -- there's an implied opinion in there, but the facts are true. I don't -- I'm not going to agree with depriving shareholders of the opportunity to real -- that's their opinion.

Q. A shareholder who sold their shares during this period was clearly deprived of the opportunity to realize immediate cash value through Emerson's proposed transaction price; is that right?

A. Of this revised offer for $53 a share is what they're referring to. Yes. If they -- if they had held onto the shares until Emerson offered $53 a share and then if they held onto it to an eventual price of 60. That's -- that's what they're saying.

Q. Now, attached to this you may recall, attached to this press release was all of -- or I don't know all, many of Emerson's and National Instruments' correspondence concerning Emerson's proposal to acquire National Instruments; is that right?

A. I don't recall. But I'm not going to argue with it.

Q. Yeah. So attached to this press release were a copy of the May 25th original offer letter --

A. Um-hmm.

Q. -- and the National Instruments June 16th response

Page 315

letter and -- and so forth. It includes all the way through the August 2nd rejection letter that we talked about earlier, and then thereafter at GOODWIN 35 you'll see it includes Mr. Karsanbhai's November 3rd letter. And if we could go to that page.

So the November 3rd letter, this is where Emerson first proposed to acquire the company for $53 a share; is that right?

A. Yes.

Q. Okay. Now, Mr. Karsanbhai writes here, he gives -- in this letter. This is the letter from Mr. Karsanbhai addressed to Mr. Starkloff and to you; is that right?

A. Correct.

Q. And he states under "Recap of Events of the Past Six Months," he says, "Over a period starting almost 6 months ago, we have consistently been prepared to provide your shareholders an all-cash offer at a meaningful premium . . ."

Do you see that?

A. That's his writing, yes.

Q. Right. So he is stating that during the six months preceding this letter Emerson was -- has consistently been prepared to provide your shareholders, National Instruments' shareholders, an all cash offer at a meaningful premium. Do you see that?

Page 316

A.  I see that.  There's been -- I would argue over the consistency point since we didn't hear from him after we rejected the first offer twice.  We hadn't -- didn't hear anything until -- till now, so several months have gone by without hearing anything from him, so by saying consistently, if you're implying that he was consistently making offers to us, that's not the case.  He made an off --

Q.  Well, let's just read what he wrote.

A.  -- he made an offer -- he made an offer in May, reiterated that offer, and then went silent when we rejected it the second time.

Q.  Okay.  But --

A.  So consistently is not -- that's his opinion of what the word is.  You can ask him why he used that word.  I don't know what he means by it.

Q.  I would love to.

A.  But -- but that's not my opinion.

Q.  But he wrote -- he wrote that during the preceding six months Emerson has been consistently prepared to provide National Instruments' shareholders an all cash offer at a meaningful premium; right?

A.  He's saying that.  Correct.

Q.  That's what he wrote.  You can't get in his head, but that's what he wrote; right?

Page 317

A.  Right.

Q.  Okay.  The six-month period preceding this letter, does that encompass the period of time after August 2nd when you sent your letter to Mr. Karsanbhai?

        MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  Are you saying that August 2nd -- we had no communication with him or any discussion after August 2nd if that's what you're asking.  We had none.

BY MR. MANDEL:

Q.  That's not what I'm asking.  What I'm asking is he says that over a period starting almost six months preceding this November 3rd letter that Emerson was consistently prepared to provide National Instruments' shareholders an all cash offer at a meaningful premium.

        Do you have any reason to say that that statement by Mr. Karsanbhai is false?

        MR. COMERFORD:  Foundation.  Calls for speculation.

A.  There's been no indication that they budged off of the offer that we rejected at $48 a share during that period of time, and this is evidence that now they're willing to come up with a more meaningful price, but

Page 318

before this letter there was no indication that they were still interested, that they were interested at a higher price than what we rejected, and this -- this is, you know, the transition point here at $53 a share.

BY MR. MANDEL:

Q.  The buybacks at issue in this case took place in August and September of 2022; is that correct?

A.  Yes.

Q.  August, September '22 were within the period of six months preceding this letter; is that correct?

A.  I can look at a calendar.  Can we take a break and I'll look at a calendar?  Of course it is.

Q.  Of course it is.

A.  But now I'm not going to say that his -- I'm in agreement that he consistently offered during that period of time a premium offer.  He didn't.  Okay?  So . . .  That's his wording.

Q.  Well, it doesn't say that he made such an offer.  It says that Emerson was consistently prepared to provide such an offer.

A.  Right.  And we were consistently --

Q.  Do you dispute that?

A.  I have no idea.

Q.  You don't know.

Page 319

A.  I don't know -- I don't know if they --

Q.  But you know that the buybacks were during the six months preceding this; right?

A.  I don't know why -- I don't know why they went away for four months if they were -- you know, they weren't consistently ready to offer more than $48 a share.  We were consistently prepared to defend not selling the company at $48 a share, and this proves that we were on the right track.  So . . .

Q.  So is it your testimony that what Mr. Karsanbhai wrote here wasn't true?

A.  I have no idea.  It's his opinion.  My testimony is he's giving his opinion.

Q.  His opinion about what?

A.  Consistency.

Q.  Isn't he giving you his opinion about what Emerson was prepared to do during the six months before November 3rd?

        MR. COMERFORD:  Objection.  Form.  Foundation.  Calls for speculation.  The document speaks for itself.

A.  I have no idea.  He's saying that.  If you're asking me to repeat the words he's saying, I can tell you this is what he said.  I can't tell you that he's lying or telling the truth or what that means or what

Page 320

consistently means or if they had meetings. We had no awareness of anything during that period of time that they were silent. So I can't refute, prove, question, agree to what he's saying. It's his opinion.

BY MR. MANDEL:

Q. You have no basis to question this statement by Mr. Karsanbhai; is that right?

A. Other than the fact that they went silent for four months.

Q. So are you testifying that Mr. Karsanbhai's statement here is untruthful?

A. I'm not going to say that.

Q. Well, are you testifying that he made it up?

A. No, I'm not. Don't put word -- don't -- you word things like I have to be calling somebody a liar. Okay? He said that. I don't know why he said it. I don't care why he said it. It's irrelevant to me. He said that. I agree he said it. It's right in the letter. I don't know what they did. I don't know if they had board meetings. I don't know if they had, you know, a meeting every week to talk about this. All I'm saying is if they did and they were ready, I didn't hear anything for three or four months and was kind of thinking they went away. All right? That's -- you know, he's saying what he's saying. But

Page 321

I don't -- I can't challenge that they were ready to or not because that's his words. I can't -- I can't prove it that they were ready either. I don't have any evidence of that, so . . .

Q. You testified you think this was irrelevant to you. If it's true that Emerson had for a period of six months preceding National Instruments -- been prepared to provide National Instruments' shareholders an all cash offer at a meaningful premium, do you think that would be -- that was irrelevant to National Instruments' shareholders?

A. If it was $48 a share, we had already done the work, done the diligence, gotten our legal opinions, gotten our estimates, and made a judgment on behalf of the board under our duty of care and loyalty that $48 a share was not in the best interest of shareholders, and -- and that hadn't changed at all.

Q. So you think this information is irrelevant to shareholders? That's your testimony?

A. The $53 is irrelevant to shareholders? I think it came relevant, the new offer.

Q. So -- anyway. We've been over this.
MR. MANDEL: Let's look at one more document. This will be 41. This is not a Bates stamped document. This is the -- oh, I'm sorry.

Page 322

Tab Z-9.
(Marked EXHIBIT 41 for identification)

BY MR. MANDEL:

Q. This is the definitive merger proxy from this transaction. Do you recognize this document?

A. Yes, I do.

Q. Are you the author of this document?

A. I signed it. It was authored by a bunch of people. I reviewed it in detail and signed it. I'm not the sole author of it if that's what you're asking.

Q. I understand. But you signed this document; is that right?

A. I just said that. I just said I signed it, yes.

Q. Yeah. The date, just for the record, of this document is May 25th, 2023. Now, can we go to Page 92 of this document, please? Now, this is a section of the proxy entitled "Security Ownership of Certain Beneficial Owners and Management."
Do you see that?

A. Yep.

Q. This identifies you as having approximately 40 -- beneficial interest in approximately 47,000 National Instruments' shares. Do you see that?

A. Yep. If we can scroll up so I can see it, but I believe it. Okay. Yep.

Page 323

Q. Now, is -- is this correct that you owned approximately 47,000 shares at this time?

A. Yes.

Q. Okay. Did you ultimately receive $60 a share for those shares?

A. Yes, I did.

Q. So in total -- let's just see. The repurchase price was $40.25 a share on average we saw; right? The two million shares repurchased by National Instruments; right?

A. Um-hmm.

Q. And if shareholders, class members sold their shares around that time, they would have sold their shares for about $40 a share; is that right?

A. I guess, yes.

Q. My client, for example, and this is in the record, sold their shares for approximately $39 a share.

A. How many shares did they sell? Did they sell all their shares?

Q. This is information in the record. You can talk to your attorney about that afterwards. So they sold shares during this class period for about $39 a share. So the difference between say the $40 repurchase price and $60 is approximately $20; is that right?

A. I can do the math, yes. You're telling me -- you're

Deposition of Michael McGrath

In Re National Instruments Corporation Securities Litigation

Page 324

asking me to subtract 40 from 60? I get 20 without my calculator.

Q. So at the time -- so you sold your shares for $60 apiece, 47,000 of them. About how much money is that that you pocketed as a result of that?

A. You want to take a break and do the math? I can get my calculator out. I don't recall. It's 40 time -- it's 60 times 47,000, so . . .

Q. Right. 60 times that. But the additional $20 between the $40 price of the repurchases and the $60 that you received is about $20 per share; right?

A. Correct. 60 from 40.

Q. So you sold 47,000 shares approximately for $20 more a share than my clients, more or less; is that right?

A. You're stating that. I don't know what your clients sold it for. You're telling me. I can't validate that.

Q. I am representing to you that my clients sold their shares for about $39 a share. It's in the record and been in the record since the first day of this case.

A. So you're asking me to subtract $39 from -- from $60 and I get 20, $21 a share. Correct.

Q. So call it $21 a share, and you sold 47,000 of those shares; right? 47,000 times 21 equals $987,000. Do you disagree with me?

Page 325

A. No.

Q. Do you take my word for the math? I just did it on a calculator here.

A. Yep.

Q. Okay. So that's nearly a million dollars; is that right?

A. Correct.

Q. So you pocketed an additional million dollars compared to say class members; is that right?

MR. COMERFORD: Form. Foundation. Calls for speculation. It's an improper hypothetical.

A. And -- and -- and then you're wording it like I alone. All the shareholders of the company at the time of the closing got $60 a share. My ownership at 47,000 shares was insignificant. That's why there's a little asterisk there. So the shareholders who owned the company on the date of the closing got $60 a share. I was one of those shareholders. I'm actually a small shareholder. The only reason it's listed on this chart is because it includes officers and directors, not because I was a major shareholder, and so I think to make your point you're going to have to like divide -- divide the number of shares and you probably are going to end up saying that I got -- you have to calculate how many shares your client sold versus how

Page 326

many shares there were at the closing, allocate them to me, and it's probably ten shares or five shares or two shares or something. I don't know. That's a different calculation.

BY MR. MANDEL:

Q. As a result of the --

A. You're making it sound like I got all the money from your clients selling their shares and that's not the case.

Q. As a result of the increase in this offer price to $60 from the $40 per share level of the stock at the time of the repurchases, you pocketed an additional million dollars? Is that wrong?

MR. COMERFORD: Object to the form.

A. I -- I -- I can't -- I can't get into that -- I don't understand the question.

BY MR. MANDEL:

Q. An extra $20 was worth a million dollars to you because of your 47,000 shares that you owned; is that right?

A. At that time. That's correct. And, you know, you're -- you're looking at, you know, a public disclosure at $53 a share and so, you know, did people sell at $53 a share instead of holding onto 60? You know, I don't know. You're making the assumption here

Page 327

at 60, but, you know, it was publicly disclosed at 53 in November in the prior announcement you just showed me.

Q. So, again, just to be clear, the extra $20 multiplied by your share ownership allowed you to pocket roughly an additional million? Yes or no?

A. Correct.

MR. COMERFORD: Objection. Asked and answered.

A. You know -- you know --

BY MR. MANDEL:

Q. Okay.

A. -- you want me to do the calculation? I can get a calculator and we can calculate it together. But, yes, 20 -- 60 times -- 60 minus 40 times the number of shares. Okay. You asked that question like four times. I agree. But I don't want -- but you're making it sound like I pocketed all the money that your clients sold and that's not the case.

Q. No, no, no. I'm just asking that extra $20 a share what it was worth to you.

A. Yeah. And --

Q. It was worth to you an extra million.

A. And it was worth to our shareholders $2 billion, just to be --

Page 328

Q.  Sure.  But not the shareholders you sold; right?

A.  No.  The shareholders --

Q.  Not the shareholders in the class I represent; right?

A.  I guess not.

Q.  Right.  After National Instruments was acquired by Emerson, have you served on any other boards of directors?

A.  No.  One nonprofit board called Grace Place in Naples.

Q.  So you were on the board of directors of Emerson for about ten years at the time of National Instruments' acquisition by Emerson; right?

A.  I was never on the board of Emerson.

Q.  I'm sorry if I misstated that.  You were on the board of directors of National Instruments for --

A.  Nine years.

Q.  -- about ten years at the time --

A.  Nine years.

Q.  -- of National Instruments' acquisition by Emerson; right?

A.  Nine years, yes.

Q.  And since that time you've not found a new board to serve on of a public corporation; is that right?

A.  I have -- have not found?  Like I was looking?  I'm 76 years old.  I have no interest in being on any other boards, you know, and I probably wouldn't

Page 329

qualify on many because of age restriction, so I have no -- no interest in other boards.  So I haven't -- you're making it sound like I looked for some and didn't find any.  I was done.  I'm 76.

Q.  If Emerson hadn't acquired National Instruments, would you have continued serving on National Instruments' board or would you have chosen to retire because of your age?

A.  I'm not sure.  It was -- I was considering that, but once we went into this hostile takeover, I had to put that aside.  So I don't know the answer to that -- it's hypothetical.  I may have.  Certainly after this stress and exercise of defending a hostile takeover bid, I was -- I was worn out, to be honest, and I may have stepped down after that, but I never really addressed the issue because I was off the board on the date of the closing and that was fine with me.

Q.  Understood.

    MR. MANDEL:  I'm going to go off the record here for a minute and consult with my team, but I'm very close to done if not done.

    THE WITNESS:  Okay.

    MR. MANDEL:  Give me a minute here.

    VIDEO TECHNICIAN:  All right.  Going off record.  The time is 5:28.

Page 330

    (Recess taken at 5:28 p.m.)

    (Back on the record at 5:32 p.m.)

    VIDEO TECHNICIAN:  Going back on record at 5:32.

    MR. MANDEL:  Mr. McGrath, thank you for your time.  I know it's been a long day.  I have no further questions at this time.  Thank you.

    THE WITNESS:  You're welcome.  And thank you.

                EXAMINATION

BY MR. COMERFORD:

Q.  Okay.  Mr. McGrath, I'd like to ask you some questions.  My name is John Comerford.  I represent National Instruments and you and Mr. Starkloff in this case.

    Can you tell the jury where are you from originally, sir?

A.  I'm from Massachusetts, southern Massachusetts.

Q.  And can you please trace your education after high school?

A.  After high school I went to Boston College and got a bachelor's degree in computer science.  Then I went to Harvard and got my MBA and it's 1973.  I also have an honorary degree but I didn't work for that.  I just got it.  I have an honorary Ph.D.

Page 331

Q.  And what was your first job after obtaining your MBA from Harvard Business School?

A.  I went to work for Pricewaterhouse for approximately two and a half years where I got my, sorry, where I got my CPA.

Q.  All right.  And I believe you already touched on this that you worked for the PRTM firm?

A.  I founded PRTM and ran it pretty much.

Q.  Okay.

A.  I was the M.

Q.  Right.  And how did you become involved with National Instruments?

A.  I became involved probably around 2000 -- a couple years before I joined the board or maybe 18 months before I joined the board.  Eric Starkloff contacted me.  He was Executive VP of Marketing and Sales at the time.  He contacted me and told me that National Instruments had shifted their entire strategy around a book that I wrote in 2000 called Product Strategy for High Technology Companies around platform strategy, and that drove their growth for about a decade or 12, 15 years, and he asked if I would come down and talk to his executive team, which I did.  Spent a little time with them.  And they asked if I would present to the board.  I presented to the board, and following

Page 332

that the board approached me and asked if I would join the board.

Q.   And I think you already said you were invited to join the board around May of 2014?

A.   Right.  I think that was the official -- 2014, yes.

Q.   And at a high level, can you describe the business of National Instruments?  What does the company -- what did the company do?

A.   The company made a very serious transition around 2018, 2019, so it primarily provided tools for engineers for test and measurement, and then around that time frame we changed CEOs.  Alex Davern became the CEO.  We went through a reset of our strategy to go from selling tools which had sales values of about $1500 each and selling them on a -- a basis where we tried to get as many leads as possible.  We shifted to selling total solutions, which were multimillion dollar sales to major accounts.  So it was a major change built around a redo of our core strategic vision, which is also another concept in my book that they followed to change their core strategic vision, and then that ended up changing our R&D strategy, our go-to-market strategy, our sales strategy, our organization structure, et cetera, which was unfolding when we hit Covid, and then we hit the Covid supply

Page 333

chain crisis, so it was still unfolding at this time in '22.

Q.   So I want to fast forward to May of 2022.  The company received an offer from the CEO of Emerson.

A.   Um-hmm.

Q.   Was that offer from Emerson solicited or unsolicited?

A.   Unsolicited and a complete surprise.

Q.   When Mr. Karsanbhai from Emerson reached out to Eric Starkloff, the CEO of National Instruments, did you know that Emerson might be making an offer to buy the company?

A.   When he reached out to Eric?

Q.   The first time.

A.   I speculated that that could be one of the reasons he wanted to reach out to him.

Q.   And before that initial reach-out in May of 2022, did you have any idea that Emerson might be interested in buying National Instruments?

A.   No.  We -- we probably thought other companies might, but not Emerson.

Q.   As you considered Emerson's offers from May 2022 all the way through when the transaction was consummated at $60 a share, how did you take into account the best interest of the shareholders of National Instruments?

A.   Very thoroughly.  You know, as chairman of the board,

Page 334

we had a board that was a highly experienced board that was experienced in these situations.  We had very good legal counsel.  We were very aware of our -- our duty of care, of our duty of loyalty.  We were briefed on that.  We took it very seriously.  We hired BofA as our advisor, financial advisor on it.  We spent a lot of time.  We were very thorough.  We thought it was important to exercise our responsibility for the shareholders, and I believe that we did, and I think the final progression shows that.

Q.   Emerson offered $48 per share to buy National Instruments twice.  When they -- when the company, Emerson, offered $48 per share the second time, how did that fact impact your thinking about a potential transaction with Emerson?

A.   It solidified our thinking that 48 was their max and that 48 was not a credible offer and that they may try to make a hostile takeover at $48 a share, and so it kind of solidified that.  There was no indication that they came back at 50 or 55 or something from that.  They -- they stayed at 48.

Q.   In May and June of 2022 and really all through 2022, why did you feel that National Instruments was worth more than what Emerson was offering?

A.   We had -- we had very -- several very important things

Page 335

that were happening at National Instruments.  The first was that our stock price we believed was depressed at the time because of the supply chain crisis we were facing, so we had an unusual situation coming out of Covid.  Obviously in Covid, companies' shares were down.  We had a longer period of time in '21 going into '22 where we could not get the components that we needed to ship our systems, so we had a period where we had a significant higher sales than we had revenue because we couldn't ship the product, so we had very -- traditionally had very low backlog and we built a big backlog, and so we had unrecognized revenue sitting there to be taken, so there's a two-step thing.  We had -- we were being penalized for not getting credit for what we were selling.  We did disclose bookings in our earnings calls.  And then we knew we had revenue that could come in so that we would have a period of -- a grace period where we could have higher revenue than sales, higher revenue than bookings.  Bookings equals sales.  So we had a favorable period we had coming up and we had an unfavorable period that we were dealing with.

We also were going through the process, and it's a continuation of something that I've been pushing for several years, which was to realign our

Page 336

operating expenses and increase our operating margins. We did that during 2022 going into '23 and '24 to cut back on our operating expenses and provide more profit to our shareholders at that time. There was also the impact of supply chain and that we had to pay a premium to brokers which was significant, and that cut our profit margin by two or three percentage points of revenue because of those higher prices. Those were working its way through. We still had in '22 and throughout most of '22 inventory that was purchased at a higher price than we could replace it at, so we had to work our way through that. And then also there was -- we made the shift from licensed revenue to subscription revenue, which is always a onetime adjustment for a company where the revenue goes down on -- on licensed revenue but it goes up on a continuing revenue basis going forward. And that -- and all of those things we -- we disclosed to our shareholders.

Q. Emerson made an offer in November of 2022 of $53 per share?

A. Right. Right.

Q. And at some point National Instruments formed a transaction committee?

A. Correct.

Page 337

Q. When was that in relation to the $53 per share?

A. Shortly after the $53. We felt at that time that $53 was something that deserved more attention, more attention being -- at that point in time we felt that we should probably work with Emerson, disclose some things with Emerson. We were under an NDA with them that expired at the date of their announcement. And so we had an NDA with them, we had a confidentiality agreement with them, and at the same time the transaction committee, which was three people, I headed it up and two other board members who were independent board members, we evaluated the whole spectrum of how do we work with Emerson, what should we do next, and then over that period of time we came to the conclusion that we wanted to get a validation of the value of the company by soliciting bids from other -- other companies, which we then went into that process, and the transaction committee guided that process right through to conclusion.

Q. So let me back up to May and June of 2022 when Emerson made the $48 per share offer and then -- and then repeated the $48 per share offer. What were your thoughts on -- on whether National Instruments should publicly disclose those offers?

A. I -- I thought that there was, first of all, no --

Page 338

MR. MANDEL: Object to form.

A. -- no responsibility to -- to disclose the offer because it was rejected. The company wasn't for sale. We had very clear legal advice that a company isn't for sale if somebody makes an offer. It's only for sale when the board decides it's for sale, and the board clearly decided it wasn't for sale, so we had no obligation to do that.

We also had an obligation to Emerson to not disclose what they -- the offers they made under a confidential statement in terms of their offers were always labeled confidential. And I also felt that the only purpose -- if the only purpose of disclosing was to pump up our stock price, that that was in violation of SEC regulations and there was no reason for us to do that just to solely pump up our stock price. And, finally, if we -- if it was disclosed, whether by us or by Emerson, we felt that that would have an impact on the company in terms of customers might hold off on sales and employees might defect if they thought the company was in the process of being sold, which is something that we ended up having to manage very closely by making that a short period of time, and we -- we went to great diligence to manage it once we had a public offer disclosed in, whatever it was,

Page 339

January.

BY MR. MANDEL:

Q. Regarding customers, why were you concerned that public disclosure of those offers from Emerson might impact the customers?

A. Our customers were buying -- our major customers were buying test systems that were integrated into their factory, so look at it like a major auto manufacturer was buying battery test equipment for their EVs, so they would -- they would -- it's a process of getting our product designed into their factory and then built out. As they build out their factory, they buy more and more of our test systems. So they are very heavily relying on us providing continuing support, heavily relying on us continuing to enhance and update their systems. If they thought the company was in jeopardy of being acquired, they would think that they -- their product line might be cut out or not supported and then they would be held with, you know, half of their factory being automated and the other half not being automated and not an ability to do it, so -- so their responsibility is to make sure the long-term commitment, we could honor that, so that -- that was one of the things that we were really concerned about, and that's a difference in the change

Page 340

of our strategy.  We had much longer term relationships in terms of tens of millions, $50 million of long-term relationships with our customers under our new strategy.

Q.   Okay.  So we've -- we've discussed the fact that Emerson approached National Instruments with a $48 per share offer in May of 2022, --

A.   Um-hmm.

Q.   -- repeated the $48 per share offer in June of 2022, --

A.   Um-hmm.

Q.   -- then raised the offer to $53 per share in November of 2022.

A.   Right.

Q.   And then what did Emerson ultimately pay per share for National Instruments?

A.   $60 a share after a competitive process.  We had three other companies -- four other companies initially bidding on National Instruments, and then to the end there was three and two, and they were all up into the close to $60 share range, and then Emerson and one other company were at 60 at the end, and we decided Emerson was the best selection for a variety of reasons.

Q.   Did the board of National Instruments ultimately vote

Page 341

to approve a transaction to be acquired by Emerson at $60 per share?

A.   Yes.

Q.   And tell me why you voted to approve that, that $60 per share.

A.   It's a good question.  We felt that there was still long-term potential beyond $60 a share, and we always kept open the option that we -- when we were getting bids on the company that we kept the option of not selling it.  We always made that clear that we're not committed to selling the company.  At $60 a share it got into the threshold of us really realizing -- at that point in time we had several other companies that looked at our plans because during that period from November 2nd to the final offers we shared our plans, the plans that you've seen, and other -- other ideas and thoughts on our long-term strategy with other companies, so we had other people that bid around $60 a share after being exposed to those plans, and we also had to understand that there was an execution risk that if we held out for another two or three years to get 75 or $80 a share, there was a risk that we had to execute against our plan, and that's not always a no-brainer, so we had to weigh that risk.  In the end $60 a share was -- was the right thing to do.

Page 342

Q.   The -- the focus of this case is that National Instruments repurchased its own shares in August and September of 2022.

A.   Um-hmm.

Q.   What is your understanding of the financial impact on National Instruments when it repurchased its own shares in that time period?

A.   The --

MR. MANDEL:  Object to the form.

A.   The -- we repurchased the shares for -- because that was part of our return of capital to shareholders, which we were committed to doing, that's a good governance practice, and we also wanted to offset the share repurchases over a -- share grants over a long period of time that we gave employees under the incentive program so we didn't dilute our shareholders with that, so at that point in time it was an important act that we did on behalf of our shareholders, the return of capital.

MR. COMERFORD:  I'm going to ask that Exhibit 35 be displayed again by the tech.  Thank you.

BY MR. COMERFORD:

Q.   This is Exhibit 35 to your deposition.  This is the August 11th, 2022, email from Albert Percival to you, and who are the other people who received this?

Page 343

A.   Yeah.  All the board members.

Q.   Okay.  And then carbon copied is Eddie Dixon --

A.   Yep.

Q.   -- and Albert Percival.  Who is Albert Percival?

A.   Albert Percival worked for Eddie in our legal department, and his responsibility was monitoring all the trading, the trading windows, when they're open, when they're closed, the point -- first point of contact if a director wanted to sell or buy stock during a non-trading window.

Q.   And Eddie Dixon was also an inhouse attorney for National Instruments?

A.   Yes.

Q.   Okay.  And so you received this email from an inhouse attorney for National Instruments, and he writes, "Board Members, You are receiving this email to inform you that the Project Wolverine trading restriction is lifted, effective immediately.  As always, before trading in NATI stock you should still consider whether you are in possession of any material-nonpublic information related to any other matter.  Thank you, Albert Percival."

Do you see all that?

A.   Um-hmm.  Yep.  No, I can't, but --

Q.   Okay.  And --

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

Page 344

A. I saw it before. I can't -- I can only -- okay. Now I can see it. Yep.

Q. Okay. And so is it fair to say that you and the other board members received advice from an attorney that as of August 11th, 2022, at the time this email was sent the trading restriction was lifted and in the view of the lawyers --

A. Right.

Q. -- the trading was permissible?

A. That's correct. That's correct.

Q. Okay. And then the law firm that was -- was engaged to advise the company and the board was who?

A. Yep.

Q. And what was the name of that firm?

A. Wachtell.

Q. Okay. And are you familiar that -- I mean, do you have a view that Wachtell is a -- is a reputable well-regarded law firm?

A. Absolutely. They're --

    MR. MANDEL: Object to form.

BY MR. COMERFORD:

Q. What's your understanding of the Wachtell law firm?

A. That they had a very good reputation. That's why we hired them. They're very experienced in this matter. And I believe that they were also the firm that

Page 345

created the poison pill originally.

Q. Did you as the Chairman of the Board of National Instruments rely on the advice of Wachtell as it presented at the board meetings?

A. Yes.

Q. And did you also rely on the advice of Eddie Dixon and Albert Percival, the inhouse National Instruments lawyers?

A. Yes.

Q. Did you understand from Mr. Dixon and Mr. Percival that they were having conversations outside of your presence with Wachtell?

A. Correct.

Q. Okay. And can you tell me again the phrase that you recall hearing from Wachtell in this time frame of August 2022 before the restriction was lifted and --

A. We had several discussions with them, and they kept making the point that we needed to return to business as usual. Once we rejected the offer, it was business as usual because the offer was rejected. At one point they were asked clearly does that include stock repurchases, and their response was business as usual, which was not -- if there was any restrictions on -- on us doing that, they would have raised them at that point in time rather than just repeated that it's

Page 346

business as usual, and as stock repurchases are business as usual, we had an obligation to continue stock repurchases on the -- on the -- for the benefit of our shareholders on distribution of capital. And also there was never any discussion that said that if a company got an unsolicited offer that it decided was not credible and rejected it, there was never any awareness, discussion, and I'm not still aware that there's a period of time that the company can't repurchase shares for two days afterwards, two weeks afterwards, two months afterwards, two years afterwards, two decades afterwards. There's -- there is -- there is no restriction on that legally, and so that point never came up about whether we had to restrict it for two months or two weeks or two days or two years. There was never any discussion on that.

Q. During the period of time that the trading restriction was in place, and -- and we know -- we can see from this email that the trading restriction related to Emerson was lifted on August 11th, are you aware of National Instruments repurchasing any of its own shares on the market while the trading restriction was in place?

A. No. No. None.

Q. Okay. That did not happen?

Page 347

A. No. No. Not the company or any individuals.

    MR. COMERFORD: Okay. Those are all the questions I have, sir.

    THE WITNESS: Okay. Thank you.

    MR. COMERFORD: Mr. Mandel, anything else?

    MR. MANDEL: No further questions at this time. Thank you.

    THE WITNESS: Thank you. Have a good evening, everybody.

    MR. COMERFORD: The -- the witness will read and sign.

    MR. MANDEL: Good evening, Mr. McGrath.

    THE WITNESS: Okay.

    VIDEO TECHNICIAN: All right. We're going off record. The time is 5:54.

    (Deposition concluded at 5:54 p.m.
    Signature of the witness was requested.

IN RE: NATIONAL INSTRUMENTS CORPORATION

SECURITIES LITIGATION.

_____/


                    VERIFICATION OF DEPONENT


          I, having read the foregoing deposition

     consisting of my testimony at the aforementioned time

     and place, do hereby attest to the correctness and

     truthfulness of the transcript.




                    _____

                    MICHAEL McGRATH

                    Dated:

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

ERRATA SHEET

PAGE    LINE    CORRECTION

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )

) SS

COUNTY OF WAYNE    )

I, CHERI L. POPLIN, certify that this deposition was taken remotely before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

Cheri L. Poplin, CSR 5132, RPR, CRR

Notary Public,

Wayne County, Michigan.

My Commission expires:  August 21, 2031

Deposition of Michael McGrath                                    In Re National Instruments Corporation Securities Litigation

## WORD INDEX

**< $ >**
**$0.02** 54:15
**$10** 191:18 270:7, 10, 15, 16, 19, 23 271:1, 5, 21, 23 272:1, 8, 13, 16 273:11, 25 274:5
**$100** 191:6
**$14** 144:23
**$1500** 332:15
**$2** 327:24
**$2.02** 109:17, 23
**$2.05** 109:7, 12 111:23 184:11 234:8
**$2.06** 234:5, 20 235:4
**$2.2** 51:15
**$2.60** 234:25
**$2.84** 234:17
**$20** 323:24 324:9, 11, 13 326:18 327:4, 20
**$21** 324:22, 23
**$250** 45:19 51:17, 20
**$3** 115:3, 21 261:22 262:3
**$3.20** 184:14
**$30** 310:11
**$38** 103:13
**$39** 323:17, 22 324:19, 21
**$40** 309:3 323:14, 23 324:10 326:11
**$40.25** 307:24 308:5 313:17 323:8
**$48** 66:18 67:19 101:15 103:10 104:5, 14 110:15, 18 118:14, 16 125:22 126:1, 2, 22 128:16 129:6, 7, 11, 14, 15 132:11, 12, 24 133:8 134:17, 24 135:11 137:6, 24 140:7, 9, 13, 24 141:6, 17 144:23 149:18, 24 155:19 156:10 163:12, 21 166:10 169:2 224:12 236:20 253:14 255:6, 8, 9, 19 256:12 260:24 289:21 290:6, 14, 16

291:9 308:8, 13 317:23 319:6, 8 321:12, 15 334:11, 13, 18 337:21, 22 340:6, 9
**$50** 340:3
**$50.75** 110:11
**$500** 198:4, 19 199:8, 23 202:18
**$53** 192:6 312:20 314:11, 13 315:7 318:4 321:20 326:23, 24 336:20 337:1, 2 340:12
**$56** 192:9, 19
**$60** 138:10 141:2 253:13 255:10, 19 257:2 264:5 271:7 309:2, 5, 7, 11, 15, 18 323:4, 24 324:3, 10, 21 325:14, 17 326:10 333:23 340:17, 21 341:2, 4, 7, 11, 18, 25
**$65** 172:12
**$7.75** 308:19
**$80** 341:22
**$987,000** 324:24

**< 0 >**
**000025** 7:3

**< 1 >**
**1** 3:12 12:18 23:9, 13 99:3 116:22 171:10, 11 306:5
**1:00** 151:23
**1:04** 153:1, 2
**1:1** 4:25
**1:20** 153:3, 5
**1:23-cv-10488-DLC** 1:4 8:8
**10** 4:8 80:17, 18
**10/20/22** 7:1
**10:39** 229:12
**10:50** 59:2, 3
**100** 67:4
**10170** 2:7
**10413** 4:23
**106.9** 195:15

**107** 4:18 194:15, 21 195:16
**10th** 119:3 120:8 178:5 185:3, 8, 9 274:22
**11** 4:11 59:6 97:15, 16 210:3 233:18 234:22 235:23
**11:00** 59:4
**11:30** 6:21
**1116** 4:4
**11672** 4:19
**118** 4:19
**11th** 144:1 147:2 280:22 342:24 344:5 346:20
**12** 3:12 4:14 47:24 48:5 98:18, 19, 21 170:23 331:21
**12:05** 112:23, 24
**12:16** 112:25 113:2
**122** 4:21
**124** 4:23
**1240** 6:4
**1251** 5:2
**1255** 4:21
**1259** 3:24
**13** 4:15 107:6, 8 113:5 121:15 122:2, 4 123:14
**132** 301:21
**133** 301:21
**13th** 312:19
**14** 4:15, 19 118:21, 22
**1448** 4:15
**1453** 289:7
**1454** 6:19
**1456** 5:16
**146** 4:25
**1460** 156:3 201:17
**147** 5:2
**14A** 7:4
**14th** 98:20 99:3, 18, 25 107:12 108:21 116:8 120:10 159:5, 10
**15** 4:19 122:20, 22 241:5 247:4, 8

331:22
**15019** 6:13
**1509** 5:4
**152** 307:19 311:15
**15283** 4:25
**153** 5:4
**159** 5:7
**15-minute** 152:17
**16** 4:21, 23 5:1 6:3 124:17, 19 210:2 233:17 234:13 235:23 237:23 249:15
**16266** 6:8
**16271** 4:13
**16999** 5:25
**16th** 59:19 122:25 123:25 124:24 314:25
**17** 4:23 41:25 111:20 146:4, 6 184:19
**170** 8:9 193:17 194:8 197:11
**178** 5:9
**17X** 184:16
**18** 3:20 5:1 147:22, 23 217:22 219:8 331:14
**18-19** 6:24
**1832** 2:6
**185** 5:12
**188** 5:14
**18th** 299:17
**19** 3:18, 20 5:3 41:19 153:8, 9 170:22 201:15
**1900** 2:14
**19-20** 3:22 5:4, 13
**1973** 330:23
**19th** 153:13 154:6, 7, 13, 15 161:10 185:7 189:1, 18 210:14 211:1, 8 213:7 236:22 238:15 239:2, 23 265:9 269:7 295:4 298:12 307:8

**< 2 >**

**2**  3:*12*  22:*22*, *23*
23:*6*, *7*, *13*, *15*  24:*4*
70:*10*  141:*22*  146:*13*
313:*16*
**2.05**  109:*23*
**2.2**  49:*9*, *16*  50:*2*, *24*
51:*10*, *14*, *16*, *18*, *24*
**2:32**  208:*14*, *15*
**2:40**  208:*16*, *18*
**20**  5:*4*  17:*11*, *18*
57:*3*, *8*  58:*17*  89:*16*
98:*10*  158:*24*  159:*1*
183:*25*  185:*11*
188:*13*  191:*10*  221:*5*
288:*25*  324:*1*, *22*
327:*15*
**200**  8:*9*
**2000**  216:*19*  331:*13*,
*19*
**2001**  216:*19*
**2002**  61:*12*
**2004**  14:*24*  15:*1*
**2007**  10:*4*
**2014**  332:*4*, *5*
**2018**  17:*10*  24:*16*, *17*
101:*25*  140:*9*  332:*10*
**2019**  101:*25*  216:*19*
332:*10*
**2020**  27:*3*, *7*
**20-21**  6:*18*
**2022**  3:*18*, *20*, *22*  4:*6*,
*15*  5:*4*, *13*, *16*  6:*5*, *19*,
*24*  29:*7*  41:*19*  50:*11*,
*17*  52:*25*  53:*4*, *9*, *19*
54:*2*, *14*  56:*25*  57:*4*,
*6*  58:*2*, *13*  61:*5*  63:*5*
65:*24*  67:*21*  78:*14*
95:*25*  97:*25*  108:*21*
109:*7*, *12*, *13*, *23*
111:*10*, *11*  116:*8*
119:*3*  120:*10*  123:*1*
126:*4*  133:*10*  134:*19*
137:*7*  146:*11*  153:*14*
159:*5*, *10*  161:*10*
178:*5*  184:*11*  190:*20*
191:*6*, *18*, *19*  193:*17*,
*23*  194:*2*  196:*2*, *12*
200:*9*  201:*19*  202:*7*,
*16*  209:*1*, *5*  234:*4*, *20*
235:*3*  247:*2*  249:*11*

257:*20*  261:*15*  275:*6*
288:*25*  310:*16*
313:*14*  318:*8*  333:*3*,
*16*, *21*  334:*22*  336:*2*,
*20*  337:*20*  340:*7*, *10*,
*13*  342:*3*, *24*  344:*5*
345:*16*
**2023**  112:*2*  184:*14*
201:*19*  234:*1*, *18*
235:*1*, *19*  236:*13*
245:*3*, *7*, *16*  246:*10*,
*18*, *25*  247:*1*  312:*19*
322:*15*
**2025**  1:*13*  8:*2*, *5*
**2031**  350:*25*
**20741**  5:*19*
**208**  5:*16*
**20808**  160:*23*
**20810**  162:*1*
**20817**  184:*1*
**20819**  5:*7*
**20th**  63:*5*, *16*  64:*1*,
*15*  153:*13*  189:*2*
190:*5*  191:*18*  200:*15*,
*24*  207:*12*  304:*23*
307:*8*
**21**  5:*8*  102:*4*, *21*
135:*19*  137:*7*  177:*25*
178:*1*  185:*6*  202:*3*
288:*25*  324:*24*  335:*7*
350:*25*
**211**  53:*10*, *19*  194:*20*
195:*14*
**212**  26:*3*
**212.432.5100**  2:*7*
**21243**  38:*1*
**21247**  24:*20*  25:*15*,
*25*
**21251**  26:*8*
**21255**  25:*25*
**21258**  3:*16*
**21525**  178:*14*
**21531**  5:*9*
**216**  5:*19*
**21st**  126:*4*  133:*10*
134:*19*
**22**  3:*16*  5:*9*  61:*12*
102:*4*, *21*  111:*21*
185:*12*, *13*  186:*5*
191:*12*  202:*3*  236:*14*

318:*10*  333:*2*  335:*7*
336:*9*, *10*
**221**  305:*21*
**22nd**  124:*22*  148:*6*
149:*6*  249:*11*, *14*, *18*
252:*25*  253:*16*  254:*9*,
*12*, *21*  290:*18*
**23**  5:*13*  188:*21*, *23*
202:*3*  238:*5*  336:*2*
**23189**  294:*14*
**23190**  6:*22*
**232**  5:*21*
**23529**  6:*6*
**237**  5:*23*
**239**  58:*13*
**23rd**  146:*11*
**24**  5:*15*  208:*20*, *22*
227:*7*  238:*5*  336:*2*
**242**  5:*25*
**24208**  198:*16*
**24210**  190:*13*, *14*
**24255**  5:*14*
**244**  6:*2*  38:*22*
**24400**  47:*4*
**24404**  47:*8*
**24406**  48:*25*
**24450**  3:*20*
**24518**  56:*4*
**24696**  3:*22*
**248**  6:*4*
**24th**  67:*21*
**25**  5:*16*  210:*2*
216:*23*, *25*  229:*7*
231:*2*  233:*17*, *22*, *25*
234:*11*  235:*23*
312:*16*, *18*
**250**  57:*25*  200:*10*
206:*8*
**257**  6:*6*
**2578**  231:*21*
**25801**  5:*22*
**25th**  60:*22*  63:*8*
65:*23*  95:*8*, *24*  98:*24*
209:*1*, *5*  210:*19*
221:*5*  222:*21*, *23*
223:*17*  225:*4*  226:*24*
227:*2*  228:*22*  232:*20*
237:*1*, *4*  238:*16*
239:*2*  275:*21*  286:*17*,

19, 20, 21  313:*14*
314:*23*  322:*15*
**26**  4:*6*  5:*20*  231:*2*,
*25*  232:*1*  233:*3*
234:*25*
**261**  6:*8*
**26223**  7:*2*
**263**  6:*10*
**26th**  78:*14*  81:*15*
95:*25*  217:*7*  227:*3*
243:*24*
**27**  5:*23*  15:*7*  237:*12*,
*14*  313:*4*
**274**  6:*13*
**27878**  5:*12*
**279**  6:*16*
**27th**  97:*25*  276:*24*
**28**  5:*24*  15:*5*  103:*13*
242:*5*, *7*
**288**  6:*19*
**28th**  29:*7*  104:*10*
235:*9*, *16*  237:*5*, *18*
238:*14*, *24*  243:*14*, *22*
244:*10*, *23*  245:*11*
**29**  6:*1*  244:*14*, *15*
**294**  6:*22*
**296**  301:*24*  302:*4*
**296-page**  303:*8*  304:*9*
**2983**  6:*2*
**299**  6:*24*
**29th**  24:*11*  27:*3*, *7*
**2nd**  243:*21*  248:*22*
249:*18*  252:*18*  253:*9*,
*18*, *21*  254:*9*, *13*, *23*
255:*21*  256:*23*  284:*1*
288:*13*  289:*17*  297:*6*,
*16*  315:*2*  317:*4*, *8*, *10*
341:*15*

**< 3 >**
**3**  3:*17*  17:*21*  29:*13*
30:*7*, *13*  31:*2*  32:*4*,
*22*, *23*  33:*1*  41:*14*, *15*
83:*6*  115:*6*  122:*9*
264:*7*
**3:22**  241:*24*, *25*
**3:29**  242:*1*, *3*
**30**  1:*13*  6:*3*  8:*2*
197:*6*  248:*17*, *19*

**300** 58:*3* 197:*11* 235:*19* 236:*4* 310:*14*
**302** 53:*23* 58:*9* 193:*22* 194:*7*
**304** 7:*2*
**30s** 138:*13*
**30th** 8:*5*
**31** 6:*5* 257:*16, 17*
**31.65** 111:*4*
**311** 7:*3*
**314.889.7300** 2:*15*
**32** 6:*6* 261:*4, 6*
**322** 7:*4*
**33** 6:*8* 263:*2, 4*
**330** 3:*7*
**34** 6:*10* 274:*13, 15*
**34.50** 111:*14, 24*
**35** 6:*13* 126:*13* 279:*20, 22* 315:*3* 342:*21, 23*
**36** 6:*16* 54:*1* 288:*21, 22* 294:*8, 9, 10*
**365** 6:*24*
**37** 6:*19* 294:*8, 11, 12*
**38** 6:*22* 126:*12* 135:*4* 234:*14* 299:*14, 15* 301:*16*
**39** 7:*1* 67:*19* 126:*14* 128:*9, 22* 129:*4, 17* 135:*5* 301:*11* 304:*18, 21*
**3-A** 31:*2* 32:*25*
**3rd** 315:*4, 6* 317:*14* 319:*18*

**< 4 >**
**4** 3:*18* 46:*1, 3* 68:*8* 156:*4* 201:*18*
**4:19** 283:*18, 19*
**4:25** 283:*20, 22*
**4:50** 304:*4*
**40** 7:*3* 67:*23* 308:*16* 311:*22, 24, 25* 312:*14* 322:*21* 324:*1, 7, 12* 327:*15*
**40s** 183:*14*
**41** 3:*18* 7:*4* 321:*24* 322:*2*
**410** 237:*22*

**420** 2:*6*
**43** 306:*6, 18, 21*
**44.50** 111:*14, 24*
**440** 237:*23*
**45.39** 111:*6*
**46** 3:*20*
**47,000** 322:*22* 323:*2* 324:*4, 8, 13, 23, 24* 325:*14* 326:*19*
**475** 199:*4*
**48** 7:*3* 41:*21* 103:*14, 15, 16* 127:*20, 23* 308:*16* 334:*16, 17, 21*

**< 5 >**
**5** 3:*20* 41:*25* 54:*21* 55:*18, 20* 116:*10* 204:*18, 24*
**5/16/22** 3:*22*
**5/20/22** 3:*22* 4:*1*
**5/25/22** 4:*2, 8*
**5/27/22** 4:*11*
**5:02** 312:*8, 9*
**5:05** 312:*10, 12*
**5:28** 329:*25* 330:*1*
**5:32** 330:*2, 4*
**5:54** 347:*15, 16*
**50** 241:*4, 5, 6* 311:*16* 334:*20*
**500** 15:*11* 197:*23* 199:*14, 16* 202:*17*
**50s** 179:*8* 183:*3, 15* 188:*4, 15*
**51** 126:*3* 128:*1, 2, 4, 22* 129:*1, 4, 18* 133:*9* 134:*18* 135:*4, 8, 19* 136:*4, 23* 137:*6, 8* 138:*2, 7, 15, 25*
**5132** 350:*22*
**52** 42:*1* 110:*24* 111:*3*
**52-week** 110:*21*
**53** 57:*19* 156:*4* 327:*1*
**55** 3:*22* 334:*20*
**56** 193:*8*
**59** 3:*24*

**< 6 >**

**6** 3:*22* 59:*8, 9* 68:*8* 81:*18* 171:*11* 178:*19* 203:*24* 315:*15*
**6/10/22** 4:*19*
**6/11/22** 4:*15*
**6/12/22** 4:*15*
**6/16/22** 4:*19*
**6/22/22** 4:*21* 5:*1* 6:*3*
**6/23/22** 4:*23*
**6/27/22** 6:*10*
**60** 263:*18, 21* 264:*2, 9, 13* 266:*4* 267:*10* 269:*19* 271:*13* 277:*1* 281:*2, 25* 314:*14* 324:*1, 8, 9, 12* 326:*24* 327:*1, 15* 340:*22*
**61** 234:*1, 12*
**6120** 81:*19*
**6-14-2022** 4:*17*
**62** 4:*2*
**63105** 2:*14*
**64** 3:*18*
**64th** 301:*16, 18*
**65** 4:*4*
**6696** 6:*10*
**6th** 140:*9*

**< 7 >**
**7** 4:*1* 46:*25* 62:*15, 21* 171:*7, 8, 12, 13, 15* 178:*19, 22*
**7/10/22** 5:*8*
**7/12/22** 5:*9*
**7/14/22** 5:*4*
**7/26/22** 5:*16, 20, 24*
**7/27/22** 5:*16*
**7/28/22** 3:*12* 5:*23*
**7/31/22** 6:*1*
**7/7/22** 5:*1*
**75** 341:*22*
**76** 328:*24* 329:*4*
**7676** 2:*13*
**78** 4:*7*
**78.50** 110:*12*
**7th** 150:*8* 275:*1, 6* 276:*3* 281:*1* 291:*24* 292:*14* 293:*3* 294:*1*

**< 8 >**

**8** 4:*2* 65:*7, 10*
**8/10/22** 6:*10*
**8/11/22** 6:*13*
**8/2/22** 6:*3*
**8/7/22** 6:*8*
**8/8/22** 6:*6, 8*
**8/9/22** 6:*5*
**8:00** 241:*19*
**8:30** 6:*21* 154:*10*
**8:45** 154:*7*
**80** 4:*10* 310:*21*
**814** 165:*8* 171:*9*
**815** 171:*10, 11*
**816** 171:*10*
**82** 307:*11*
**8K** 238:*14*
**8-K** 5:*23* 237:*18*
**8th** 261:*15, 21* 262:*14, 16* 274:*23*

**< 9 >**
**9** 3:*6* 4:*4* 78:*6, 8*
**9/19/22** 6:*19*
**9:30** 304:*5*
**9:46** 1:*14* 8:2, *6*
**90** 197:*14*
**91** 196:*19, 22*
**92** 322:*15*
**929** 108:*24*
**932** 109:*25*
**936** 113:*9*
**938** 113:*19, 20* 115:*11*
**939** 115:*15*
**956** 116:*2*
**961** 116:*11*
**97** 4:*13*
**976** 4:*18*
**98** 4:*15*
**9th** 257:*20* 259:*13*

**< A >**
**a.m** 1:*14* 8:2, *6* 59:*3, 4, 6* 229:*12*
**A-12** 118:*21*
**A-18** 124:*17, 18*
**A-19** 146:*5*
**A-21** 147:*22*
**A-23** 177:*25*

**A-27** 158:25
**A-33** 242:5
**A-34** 216:24
**A-36** 22:22
**A-38** 244:14
**A-41** 248:18
**A-43** 261:5
**A-44** 263:3
**A-45** 257:16
**A-46** 274:14
**A-47** 279:21
**A-50** 294:11
**A-6** 59:8
**A-7** 62:16, 17
**A-8** 65:8
**aavalos@rgrdlaw.com** 2:9
**ability** 102:7, 15 114:4 143:7, 11 247:22 262:4 293:4 339:21
**able** 30:7 32:19 46:5, 8 90:15, 22 137:15 164:6 196:9 236:6 305:24
**Absolutely** 23:21 34:21 245:9 295:14 344:19
**abstain** 92:9
**abusive** 253:24
**Accelerate** 171:16 177:21 178:20
**accelerated** 192:22, 24
**accelerating** 216:15, 17
**accept** 245:10, 16, 22
**accepted** 245:21
**access** 145:15 304:13
**account** 140:25 333:23
**accounting** 18:8
**accounts** 332:18
**accumulate** 94:5
**accumulated** 94:7, 8, 10 293:21
**accumulating** 94:24 291:21 292:5, 15 293:1, 23 294:3

**accumulation** 83:17 93:23 94:15, 19 292:2
**accurate** 79:14, 18 80:2, 3, 9 179:12 227:23 230:4
**accurately** 157:7
**accuse** 168:9
**achieve** 69:20 172:13 213:14
**achieved** 68:8
**acknowledge** 127:20 128:7, 18, 20 129:3, 5, 16 131:2, 15 133:7 134:17 140:4 195:2
**acknowledged** 207:17, 18
**acknowledging** 133:7 134:16
**acknowledgment** 183:6
**acquire** 60:21 63:21 64:3, 4, 22 66:15 83:11 96:13 99:10 114:5 124:22 125:21 158:12 163:3, 8, 20 255:16, 22 256:22 257:2, 6 259:14 312:20 314:19 315:7
**acquired** 14:23, 24 16:12 255:18 311:6 328:5 329:5 339:17 341:1
**acquiring** 45:4 93:19 94:1, 21 95:3 250:3, 10 258:25
**acquiror** 83:4, 18 122:14
**Acquirors** 82:22
**acquisition** 40:18 45:5, 14 62:2, 7 64:12 65:3, 17 66:17 87:2, 5, 9 96:16, 21, 22 97:11, 12 99:22 100:24 122:13 169:2 172:19 173:16 175:15 182:21 217:21 225:22 253:2 262:20 296:3, 14

297:24 298:1, 4, 11 299:1, 5 328:11, 18
**acquisitions** 18:16 43:15 45:8
**act** 342:18
**acting** 16:2
**Action** 1:4 106:9 117:2, 7 118:2 120:18, 21 124:10 169:16 211:25 212:11, 17
**actions** 85:8 118:14, 15 156:5 167:12
**active** 20:2, 3, 6
**Activism** 81:8
**activities** 17:22
**activity** 86:2, 14
**actual** 51:16 102:12 191:2 201:12
**add** 13:12 96:19 197:23 198:3 202:17 205:4
**adding** 89:12 98:8
**addition** 17:5 102:18 197:12 313:13
**additional** 145:17, 22 205:17, 20 263:21 266:5 277:1 281:2 324:9 325:8 326:12 327:6
**address** 13:9 125:5, 16 198:10 199:8, 23 312:4
**addressed** 218:17 280:6 315:12 329:16
**adjust** 196:5
**adjusted** 109:4, 11
**adjustment** 336:15
**admitted** 120:19
**advance** 160:11, 14
**advances** 145:10
**advantage** 45:5 179:3 224:12
**advice** 21:17 34:20, 22 35:6 37:22 41:5 83:17 87:8 90:13 99:14, 15 283:25 284:21, 23 285:17, 20 286:12 287:6, 14 338:4 344:4 345:3, 6

**advise** 136:17 298:7, 8, 10 299:7 344:12
**advised** 15:8 28:8 90:10 92:6 138:21 285:15
**advising** 90:20 117:5 150:16 258:21
**advisor** 334:6
**advisors** 149:22
**advocating** 187:21
**affect** 36:1 39:14 285:6
**afoot** 221:14
**aforementioned** 348:8
**afternoon** 304:4
**age** 329:1, 8
**Agenda** 4:25 46:7, 11, 15, 25 56:2 107:13, 15, 20 108:21 116:7 189:1, 9 201:18 203:24 204:10, 18 299:20
**agendas** 46:15, 19
**aggressive** 117:2, 7 118:2 120:18, 21 121:6, 9 124:9 167:23 170:11 187:25
**aggressively** 167:21, 23 171:17 177:22 187:21
**ago** 14:23 53:7 58:10 60:3 64:10 108:16 119:12 145:8 148:14 162:6, 8 177:8 185:1 188:2, 13 269:4 315:16
**agree** 39:19 40:21 72:2 73:3 75:25 101:10 116:9 124:13 139:23, 24 149:15 194:24 203:11 225:17 260:4, 18 265:6 272:6 311:14 314:4 320:4, 18 327:17
**agreed** 34:7 80:12 84:18 147:13 162:12 167:20 183:11 211:6

Deposition of Michael McGrath

In Re National Instruments Corporation Securities Litigation

212:*5*, *12*  213:*1*
227:*12*  239:*2*  255:*15*
**agreeing**  150:*3*, *4*
**Agreement**  68:*7*
122:*17*  142:*14*
167:*25*  203:*16*
261:*15*  318:*16*  337:*9*
**agreements**  69:*15*
**ahead**  32:*14*, *25*
48:*25*  57:*24*  60:*7*, *15*
62:*1*  72:*19*  100:*23*
101:*21*  102:*16*  162:*1*
165:*7*  171:*7*  220:*21*
266:*1*  268:*6*  275:*2*
281:*17*  282:*5*  304:*2*,
*10*  306:*5*  307:*3*
**Albert**  24:*8*  280:*1*
342:*24*  343:*4*, *5*, *22*
345:*7*
**Alex**  2:*19*, *20*  8:*11*
13:*2*  25:*10*  26:*12*, *13*
31:*14*, *19*, *23*, *25*
32:*11*  55:*1*  62:*16*
107:*7*  113:*5*  122:*21*
188:*22*  231:*17*, *25*
304:*12*  306:*17*
332:*12*
**align**  226:*8*, *12*, *15*, *19*
**all-cash**  315:*17*
**alleviated**  202:*4*
**allocate**  326:*1*
**allocation**  18:*11*
42:*3*  43:*14*, *20*  47:*1*,
*5*  48:*24*
**allow**  145:*18*, *22*
252:*7*
**allowed**  130:*22*  327:*5*
**allowing**  290:*23*
**altering**  33:*10*  39:*5*
**alternative**  222:*16*, *20*
223:*4*, *16*, *22*
**ALYSSA**  2:*5*
**ambiguous**  11:*21*
**ambitions**  247:*18*, *20*,
*21*
**America**  100:*3*, *12*
258:*20*  261:*23*
289:*13*  294:*24*
**America's**  110:*1*

**amount**  20:*9*  95:*5*
120:*1*
**ample**  114:*8*
**ANA**  2:*4*
**analyses**  110:*2*
**analysis**  91:*25*
100:*17*  110:*10*  112:*1*
113:*11*, *25*  114:*12*
115:*12*, *16*  129:*11*
167:*4*
**Analyst**  6:*1*
**analysts**  158:*9*, *11*
166:*22*  172:*4*  217:*23*
219:*9*  244:*22*  245:*10*,
*16*  247:*6*, *16*  248:*10*
**analyst's**  245:*2*
**announce**  142:*14*
**announced**  261:*15*
**announcement**  68:*7*
276:*10*, *18*  277:*10*
327:*2*  337:*7*
**announcing**  296:*13*
299:*4*  312:*19*
**answer**  10:*9*, *11*, *12*
11:*1*  20:*22*  21:*4*, *14*
22:*12*  34:*15*  38:*16*
68:*15*  74:*5*, *8*, *12*, *16*,
*18*, *24*  75:*8*, *15*, *23*, *24*
76:*2*, *23*  84:*23*  92:*10*,
*11*  134:*21*, *23*  135:*24*
136:*20*  139:*5*, *17*, *18*
141:*4*, *9*  177:*2*, *5*
214:*8*  225:*2*  240:*10*
250:*15*  251:*7*  252:*8*
258:*18*  260:*12*  268:*1*
305:*21*  329:*11*
**answered**  48:*22*
72:*21*  74:*1*, *11*  75:*21*
77:*14*  85:*4*  127:*6*, *13*
129:*21*  130:*25*
133:*12*  134:*5*, *23*
139:*4*  176:*12*, *13*, *15*
181:*4*  205:*22*  229:*22*
239:*17*  240:*5*  250:*24*
254:*1*  257:*1*, *8*
258:*16*  260:*21*, *22*
280:*20*  282:*15*  327:*9*
**answering**  131:*5*
260:*14*

**answers**  61:*13*  248:*8*
301:*3*  350:*9*
**anticipate**  222:*3*, *4*
**anticipated**  164:*11*
222:*2*
**anticipates**  50:*2*
**anticipating**  222:*5*
**anticipation**  164:*13*
**anybody**  207:*22*
208:*5*  292:*19*  293:*4*,
*6*
**anymore**  139:*22*
289:*18*
**anyplace**  170:*5*
**anyway**  321:*22*
**apiece**  324:*4*
**aplascoff@rgrdlaw.co
m**  2:*9*
**Apologies**  55:*16*
220:*1*
**apologize**  23:*3*
215:*22*  306:*14*
**appear**  287:*10*  302:*9*
**APPEARANCES**  2:*1*
**APPEARING**  1:*11*,
*25*
**appears**  42:*9*  55:*21*
204:*25*  280:*3*  306:*23*
**applied**  88:*18*  112:*1*
**apply**  88:*19*
**appreciate**  23:*21*
31:*23*
**appreciated**  236:*20*
**approach**  63:*17*
64:*24*  70:*23*  88:*1*
94:*13*  179:*22*  180:*2*,
*4*
**approached**  332:*1*
340:*6*
**approaching**  43:*4*
253:*24*
**appropriate**  215:*24*
216:*3*, *20*  226:*17*
230:*4*  254:*6*
**appropriately**  214:*20*
**approval**  44:*7*  45:*18*
46:*18*  53:*18*  264:*12*
271:*7*
**approvals**  207:*21*

**approve**  79:*25*
153:*21*, *23*  341:*1*, *4*
**approved**  43:*1*  44:*18*
45:*23*  80:*8*  200:*10*
201:*11*  203:*16*, *17*
206:*8*  226:*24*  227:*10*
229:*1*, *19*  266:*5*
275:*6*  276:*3*, *25*
291:*24*  292:*6*  293:*2*
294:*1*
**approves**  201:*10*
**approximate**  115:*9*
**approximately**  17:*17*
49:*9*  52:*3*  54:*3*
115:*2*  195:*14*  322:*21*,
*22*  323:*2*, *17*, *24*
324:*13*  331:*3*
**April**  3:*22*  27:*3*, *7*
55:*21*  56:*2*  58:*12*
**area**  215:*2*  313:*10*
**areas**  17:*25*
**argue**  192:*18*  314:*21*
316:*1*
**argument**  164:*2*, *4*, *8*,
*9*  165:*14*, *20*  166:*9*
168:*3*  171:*5*  217:*20*
218:*24*  219:*5*, *7*
225:*22*  229:*8*  230:*10*,
*20*
**arguments**  240:*16*
**arises**  50:*10*, *14*
**arrows**  26:*2*, *4*
**article**  261:*11*, *14*
262:*16*
**articulated**  210:*14*
213:*11*  239:*22*
**articulating**  147:*5*
**artificial**  213:*16*
**aside**  121:*13*  329:*11*
**asked**  24:*12*  38:*19*
72:*21*  74:*1*, *10*, *11*
77:*14*  84:*20*  85:*3*
105:*3*  127:*5*, *12*
129:*20*  130:*24*
131:*22*  133:*12*, *20*
139:*3*  176:*11*  181:*3*
193:*1*  205:*18*, *22*
221:*18*  222:*2*  228:*11*
229:*21*  239:*16*  240:*5*
250:*23*  256:*1*  257:*1*,

*8* 258:*16* 259:*18* 260:*21* 262:*11* 267:*10* 268:*23* 269:*6* 282:*14, 19, 22* 284:*8* 286:*1* 327:*8, 16* 331:*22, 24* 332:*1* 345:*21*

**asking** 21:*8, 9* 34:*12* 43:*8, 25* 59:*22* 70:*6* 71:22 72:*13* 75:*1* 76:*6, 7, 14, 21* 77:*1* 82:*4* 90:*2, 5, 7, 10, 16* 92:*13* 104:*18* 126:*23* 127:*22* 129:*14, 25* 130:*11, 15, 19* 131:*20* 133:*19* 134:*3, 6* 136:*18* 143:*12, 25* 145:*3* 156:*25* 160:*25* 176:*4, 6* 185:*25* 197:*16* 229:*23* 231:*9* 239:*4* 250:*7, 21* 251:*13* 252:*1* 255:*4* 256:*2, 5* 257:*10* 260:*10, 11* 271:*4, 7* 276:*19* 292:*8, 12* 302:*6* 308:*16, 19* 317:*10, 12* 319:*22* 322:*10* 324:*1, 21* 327:*20*

**asks** 148:*25* 295:*12*
**assessing** 244:*22*
**asset** 18:*10* 115:*17, 20*
**assist** 161:*22* 212:*15*
**Associate** 2:*16*
**assume** 60:*2, 3* 70:*12* 81:*1* 205:*12*
**Assumes** 37:*1*
**assuming** 34:*14* 137:*5*
**assumption** 326:*25*
**asterisk** 325:*16*
**attached** 3:*10* 29:*6* 37:*24* 65:*14, 16* 80:*24* 81:*11* 107:*19* 108:*21* 116:*7* 159:*19* 160:*24* 185:*7* 231:*23* 232:*13* 242:*16, 18, 21* 304:*20* 305:*22* 314:*16, 22*

**attaches** 148:*6* 237:*19* 257:*21*
**attaching** 107:*12* 123:*2*
**attachment** 25:*4* 178:*9* 231:*13* 232:*17* 233:*1* 306:*13*
**attachments** 3:*15* 4:*17*
**attack** 240:*7, 9* 241:*11, 15*
**attempt** 62:*11* 262:*25*
**attend** 61:*10* 78:*20* 205:*4*
**attendance** 204:*5, 16*
**attended** 41:*22* 61:*7, 11, 12* 78:*22* 79:*1* 100:*1, 4* 153:*25* 154:*15* 206:*16*
**attending** 8:*22*
**attention** 120:*1* 216:*9* 337:*3, 4*
**attest** 348:*9*
**attorney** 63:*2* 120:*11* 220:*7* 323:*21* 343:*11, 15* 344:*4*
**attorneys** 78:*25* 150:*16* 277:*7* 294:*24*
**attorney's** 34:*13*
**attractive** 45:*14*
**audit** 19:*12, 15, 19*
**August** 50:*11, 16* 243:*21* 248:*6, 22* 249:*18* 252:*18* 253:*9, 18, 21* 254:*9, 13, 23* 255:*21* 256:*23* 257:*20* 259:*13* 261:*15, 21* 262:*14, 16* 274:*22, 23* 275:*1, 6* 276:*3* 280:*22* 281:*1* 284:*1* 288:*13* 289:*17* 291:*24* 292:*14* 293:*3* 294:*1* 297:*6, 16* 315:*2* 317:*4, 8, 10* 318:*8, 10* 342:*2, 24* 344:*5* 345:*16* 346:*20* 350:*25*
**Author** 3:*12* 130:*3, 8* 322:*7, 10*
**authored** 322:*8*

**authority** 42:*25* 43:*8* 44:*19*
**authorization** 51:*17* 53:*8* 206:*5, 6* 281:*8, 10, 23*
**authorize** 281:*6, 14*
**authorized** 58:*1* 105:*25* 158:*20* 193:*21* 194:*3, 19* 195:*14* 281:*1* 283:*4* 292:*13*
**auto** 339:*8*
**automated** 339:*20, 21*
**Autonomous** 3:*12* 13:*11*
**availability** 292:*9*
**available** 33:*11* 39:*6* 68:*24* 189:*15* 205:*3*
**AVALOS** 2:*4*
**Avenue** 2:*6*
**average** 164:*23* 167:*17* 169:*20* 170:*22* 307:*24* 308:*5* 313:*16* 323:*8*
**averages** 169:*22* 170:*17*
**avoid** 86:*11* 88:*5*
**aware** 35:*20* 61:*3* 98:*16* 142:*24* 187:*15* 291:*25* 297:*16* 334:*3* 346:*8, 20*
**awareness** 61:*25* 320:*2* 346:*8*
**axis** 47:*12, 23*

**< B >**
**bachelor's** 330:*22*
**back** 6:*10* 23:*25* 25:*19* 48:*14* 51:*20* 52:*6* 58:*4* 59:*4, 5* 70:*10* 72:*24* 76:*4* 86:*25* 87:*8* 90:*23* 92:*16, 21* 97:*3* 98:*23* 112:*20, 25* 113:*1, 4, 6* 121:*14* 122:*2* 123:*14* 134:*13* 144:*3* 150:*15* 153:*3, 4, 6* 176:*5* 183:*24* 184:*10* 190:*15, 19* 197:*4* 201:*15* 208:*16, 17*

212:*2* 227:*4* 240:*9* 242:*1, 2* 249:*13* 253:*25* 256:*17* 263:*10, 13, 25* 264:*15, 19* 267:*7* 268:*5* 269:*22* 270:*2, 15* 271:*17, 20, 25* 272:*7, 12, 15* 273:*3, 8, 10, 12, 21, 24* 274:*4, 24* 275:*10* 276:*4* 277:*22* 278:*11* 282:*17, 23* 283:*1, 5, 20, 21* 284:*12* 285:*12* 290:*6, 11* 291:*25* 298:*2* 311:*1* 312:*10, 11, 14* 330:*2, 3* 334:*20* 336:*3* 337:*20*
**backlog** 102:*13, 14* 137:*16* 236:*7, 14* 247:*11, 23* 335:*12*
**backs** 264:*25*
**badgering** 74:*6* 229:*22*
**Baird** 247:*6*
**balance** 30:*20* 45:*1* 194:*15, 20* 199:*3*
**balancing** 48:*24*
**Bank** 100:*3, 12* 110:*1* 258:*20* 261:*23* 289:*13* 294:*24*
**bankers** 253:*17* 289:*19* 293:*9* 294:*24*
**bar** 117:*20*
**base** 184:*1, 7, 10* 285:*2*
**based** 29:*19* 95:*13, 16* 165:*13* 174:*3, 6* 175:*6, 8, 10* 176:*9* 179:*9, 18* 180:*15* 183:*4, 15* 184:*2* 188:*5, 16* 196:*22* 199:*19* 210:*15* 212:*13* 213:*8, 10* 237:*8* 276:*13* 285:*11*
**bases** 110:*17*
**basic** 131:*3*
**basis** 28:*13, 23* 29:*3, 9* 91:*24* 96:*5* 103:*21* 123:*11, 20* 124:*3* 150:*11* 174:*10*

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

235:*19*  236:*1, 4, 5*
252:*14*  313:*18*  320:*6*
332:*15*  336:*17*
**Bates**  3:*16, 18, 20, 22,*
*24*  4:*2, 4, 7, 10, 13, 15,*
*18, 19, 21, 23, 25*  5:*2,*
*4, 7, 9, 12, 14, 16, 19,*
*22, 25*  6:*2, 4, 6, 8, 10,*
*13, 16, 19, 22, 24*  7:*2,*
*3*  23:*18, 25*  24:*1, 20*
25:*15, 23*  37:*25*
41:*20, 25*  46:*2*  47:*4*
48:*25*  55:*23*  56:*4*
59:*10*  62:*19*  65:*8*
78:*11*  80:*20*  81:*19*
97:*18*  107:*10*  108:*24*
109:*25*  113:*9, 19*
115:*11*  116:*1, 11*
118:*25*  123:*1*  147:*25*
153:*11*  159:*3*  160:*23*
162:*1*  165:*7*  171:*9*
178:*3, 14*  185:*15*
190:*14*  201:*17*
208:*24*  217:*4*  231:*21*
233:8  237:*17*  242:*6*
244:*17*  257:*19*  261:8
274:*18*  279:*24*
288:*24*  289:*7*  294:*14*
299:*17*  300:*7, 25*
301:*4, 6, 21*  305:*20*
312:*2, 15*  313:*4*
321:*24*
**bathroom**  152:*3*
**battery**  339:*9*
**Bear**  83:*24*  84:*3*
85:*23, 25*  86:*21*
87:*18, 20, 21, 24*  88:*5*
89:*8, 22*  90:*11*  92:*7,*
*24*  93:*9*
**bearing**  129:*10*
203:*23*
**began**  53:*9, 19*  154:*6*
**beginning**  23:*18, 24*
24:*20*  31:*14*  37:*15,*
*25*  46:*1*  53:*12*  78:*11*
97:*18*  102:*1*  113:*9*
123:*1*  153:*11*  155:*1*
194:*14, 18*  197:*12*
202:*6*  217:*4*  240:*12*
299:*18*  303:*16*  306:*1*

**begins**  13:*24*  66:*4,*
*10*  81:*3*  85:*22*
146:*19*  202:*9*  263:*13*
274:*22*  313:*12*
**behalf**  20:*10*  321:*14*
342:*18*
**behold**  212:*21*
**belief**  101:*18*
**believe**  11:*11*  12:*13*
24:*7, 10, 15*  28:*16*
40:*10*  44:*9*  63:*1, 22*
64:*1*  89:*18*  104:*19*
109:*9*  114:*17*  119:*9,*
*10*  121:*18*  126:*12*
183:*23*  187:*6, 8*
202:*1*  206:*7*  209:*10*
210:*1*  218:*7*  230:*22*
233:*24*  235:*25*  236:*7*
241:*15*  243:*18, 19*
244:*12*  250:*9, 17*
252:*17*  253:*8, 21, 24*
254:*20, 21*  255:*21*
275:*8, 9, 12, 14*
279:*16*  290:*21*
322:*25*  331:*6*  334:*9*
344:*25*
**believed**  39:*21*  62:*6*
101:*22*  118:*11*
157:*24*  168:*23*  288:*7*
297:*18*  335:*2*
**beneath**  39:*24*  47:*13*
308:*2*
**Beneficial**  322:*17, 22*
**benefit**  103:*7*  158:*7*
168:*19, 23*  170:*11*
346:*3*
**benefits**  102:*2*
**Bennett**  2:*13*  8:*20*
**best**  10:*19*  49:*22*
108:*1*  131:*5*  156:*15,*
*21*  164:*23*  171:*23*
240:*18*  249:*3, 19*
283:*15*  321:*16*
333:*23*  340:*23*
**better**  29:*24*  127:*14*
173:*2*  223:*20*  258:*18*
309:*2, 11*
**beyond**  49:*17*
155:*23*  204:*6*  341:*7*

**bid**  289:*21*  290:*7*
329:*14*  341:*18*
**bidding**  340:*19*
**bids**  337:*16*  341:*9*
**big**  102:*13, 16*  301:*8*
335:*12*
**bilateral**  144:*5, 12*
**billion**  115:*3, 6, 21*
163:*13, 14, 23*  261:*16,*
*22*  262:*3*  327:*24*
**bio**  17:*20*  23:*8*
**bird**  121:*6, 9*
**bit**  12:*5*  36:*7*  50:*9*
53:*7*  151:*22*  196:*9*
240:*7, 15, 21*  241:*12*
294:*18*  306:*8*
**blip**  182:*5*
**blow**  294:*18*
**blue**  62:*3*
**Board**  3:*17, 18, 20*
4:*6, 15, 17*  5:*3, 4, 13,*
*15, 20*  6:*18, 19, 22*
7:*1*  13:*18, 21, 25*
14:*5*  15:*13, 17, 22*
16:*3, 6, 9, 18, 22*  17:*6,*
*8, 12*  19:*18*  21:*16, 24*
22:*1*  23:*1*  24:*8, 13*
26:*25*  27:*5, 9, 17*
34:*19, 22*  35:*6*  38:*7*
41:*19*  43:*1, 4, 8*  44:*8,*
*18*  46:*11, 12*  51:*17*
55:*21*  56:*2, 6, 20*
67:*15, 17*  69:*2*  78:*13*
79:*4, 17, 18, 25*  80:*9*
81:*16*  84:*12*  89:*18,*
*20*  91:*17*  93:*10, 15*
95:*24*  96:*8*  97:*13*
98:*20*  99:*1, 12, 16*
100:*16*  103:*20*
104:*15*  105:*22, 24*
106:*2, 14, 18, 22*
107:*12, 22*  113:*24*
116:*15, 16*  120:*12*
123:*9*  124:*2*  132:*16*
138:*21*  139:*5, 10*
140:*21*  146:*23*  147:*8,*
*14, 16*  148:*19*  149:*1,*
*2, 8*  153:*12*  154:*16,*
*18*  155:*3, 6, 9, 10, 11*
157:*10, 17*  158:*16*

159:*14*  160:*9, 10, 13*
161:*9, 13, 14*  164:*5*
167:*14, 24*  168:*12, 14,*
*15*  171:*20*  181:*10*
185:*7*  187:*18*  188:*1*
189:*1, 15, 23, 25*
190:*2*  200:*10*  201:*10,*
*14*  203:*15*  204:*19, 24,*
*25*  205:*5, 23, 24, 25*
206:*5, 7, 24*  208:*25*
209:*1, 6, 9, 20*  210:*18*
211:*4, 16, 24*  212:*2, 3,*
*12*  213:*1*  217:*19*
230:8  237:*1*  249:*2*
253:*1*  266:*8, 16, 25*
267:*2, 9, 11, 22*  268:*2,*
*8, 9, 19, 21*  271:*10*
277:*5, 21*  278:*10, 15,*
*17*  280:*4, 6*  285:*21,*
*22*  286:*14*  287:*6*
288:*24*  289:*4*  291:*13*
295:*17*  297:*23*  298:*7,*
*8, 10*  299:*7, 17, 20*
300:*9, 22*  301:*9*
304:*24*  307:*6*  320:*20*
321:*15*  328:*8, 9, 12,*
*13, 21*  329:*7, 16*
331:*14, 15, 25*  332:*1,*
*2, 4*  333:*25*  334:*1*
337:*11, 12*  338:*6, 7*
340:*25*  343:*1, 16*
344:*4, 12*  345:*2, 4*
**boards**  12:*10*  15:*14*
22:*8*  328:*6, 25*  329:*2*
**board's**  27:*15*  28:*11*
34:*7*  35:*1*  37:*7*  38:*4,*
*13*  79:*7*  100:*8*
101:*14*  173:*4*  238:*15*
253:*9*  287:*15*
**BofA**  99:*14*  101:*12*
108:*15, 16, 19*  113:*24*
121:*21*  334:*5*
**bolds**  122:*9*
**book**  13:*11*  55:*21*
56:*2, 6*  102:*7*  107:*12,*
*22*  189:*1, 24, 25*
299:*17*  301:*9*  331:*19*
332:*20*
**bookings**  102:*6*
137:*18, 19*  145:*9*

Deposition of Michael McGrath      In Re National Instruments Corporation Securities Litigation

202:7  236:14  335:16, 20
**borrow**  199:7, 14
**borrowing**  199:16
**Boston**  330:21
**bottom**  25:22  42:2  47:12  54:4  117:9  125:9  146:13, 18  148:4  163:12  164:14  202:13  217:2, 5  232:6  242:10, 12  247:16  261:8  263:6, 20  306:4  311:4  313:11, 12
**bought**  285:8  311:13
**Boulevard**  2:13
**bounce**  310:6
**boxes**  117:18
**boy**  180:11
**Bravo**  16:12
**break**  10:21, 22, 25  11:2  58:21  112:15, 17, 21  151:23, 25  152:1, 3, 6, 12, 17  208:9  240:20, 22  241:8, 11, 17  283:9  318:12  324:6
**brief**  59:22  112:15  207:7
**briefed**  334:4
**briefing**  87:2  150:15
**bring**  170:16  234:14
**broad**  18:5  285:2
**broad-based**  285:10
**broader**  189:25  215:6  238:17
**broadly**  19:1  201:4  285:5
**broker**  236:15
**brokers**  102:19, 24  336:6
**budge**  118:13
**budged**  317:22
**budgeting**  18:6
**build**  339:12
**building**  102:13  270:20
**built**  80:5  137:16  332:19  335:12  339:11

**bullet**  40:11, 16  81:25  82:6  115:5  123:16  124:14  126:7  164:14  167:2  168:2  198:21, 24, 25  239:1  298:25  299:6  308:2
**bullets**  39:23  40:2
**bunch**  44:15  302:25  304:6  322:8
**business**  11:12  14:12, 14  53:22  57:20  58:2, 8, 12  97:4  114:16, 20  156:17  192:6, 10, 16  193:6, 18, 23  194:2  197:10  256:13  261:12, 16  282:20, 22, 23  283:1  284:6, 7, 9, 10, 11, 14, 16, 17, 20  285:4  286:3, 4, 6, 9  287:18  288:16  300:17  309:22  310:8, 11, 15  331:2  332:6  345:18, 19, 22  346:1, 2
**businessman**  11:9, 16  12:2
**buy**  6:10  33:8  39:4  51:20  52:6  86:25  90:23  92:15, 21  138:8  262:4  263:10  264:18, 25  275:10  276:4  277:22  278:11  281:14, 23  282:7  283:3  285:12  291:25  311:3  333:10  334:11  339:12  343:9
**buyback**  87:4, 6  271:8  279:1  282:2  307:23  311:3
**Buy-Back**  42:4
**buybacks**  43:6  53:9  54:7, 10, 15  58:1, 17  85:11  86:1, 14, 23, 24  87:4  88:7  89:9, 22  90:12, 15  91:20, 22  92:6, 24  191:7, 13, 18  206:4  263:18, 22  264:3  265:17  266:5  267:2, 19  268:23  269:6, 17  270:13

278:2  279:7, 11  284:9, 14  285:3, 5  286:2, 6, 16  287:4, 8  288:1  310:22  311:7  318:7  319:2
**buying**  87:8  270:2, 15  271:17, 20, 25  272:7, 12, 15  273:3, 8, 10, 12, 21, 24  274:3, 4  282:17, 23, 25  283:5  284:12  291:20  292:10, 18, 22  293:7  311:1  333:18  339:6, 7, 9

**< C >**
**calculate**  325:25  327:14
**calculation**  326:4  327:13
**calculator**  324:2, 7  325:3  327:14
**calendar**  318:12, 13
**Cali**  2:16
**Call**  3:24  6:5  59:22, 25  64:3, 5, 7, 19  104:9  157:12, 18  173:11  235:9, 16  237:12  239:15, 19  242:25  243:20, 22  257:21, 25  258:9  267:12  268:2  277:14  278:13, 15, 17, 20  279:14, 15  292:17  293:6  324:23
**called**  9:3  14:16  16:3  25:23  29:14  61:4  223:12  233:12  328:8  331:19
**calling**  23:11  211:14  227:13  277:21  278:10  320:15
**calls**  20:20  21:2  22:18  33:16, 17  35:9, 10, 18  36:25  68:12, 13  70:16  71:8, 19  72:6, 12  77:13  85:4  91:5  118:9  135:21  137:10  139:2, 3  140:18, 19  144:16

149:13  174:22  220:18  222:10  245:12, 19  250:6, 22  251:5  252:21  254:15  255:24  256:24  257:9  258:1, 17  259:2  260:6, 8  262:1, 21  284:25  288:5  290:3  308:14, 21, 22  317:6, 20  319:20  325:10  335:17
**cap**  51:13
**capable**  55:12
**capacity**  100:17  113:20, 25  114:8, 12, 23  115:11, 16, 22  258:21  261:24  262:8
**Capital**  42:3  43:14, 20  45:1, 5, 9  47:1, 5  48:16, 24  56:5, 7, 11  190:17  195:22  201:4, 7, 23  202:14, 17, 23  203:10, 20  204:9  262:5  269:15  300:8, 11, 21  306:21  307:7  342:11, 19  346:4
**carbon**  343:2
**care**  92:1  99:12  320:17  321:15  334:4
**career**  11:12
**carefully**  86:7
**carry**  258:21
**Case**  8:7, 21  10:5  18:9  45:4  50:10, 14, 15  86:8  87:10  113:14  130:21  136:1  151:16  244:7, 9  267:15  282:12  316:8  318:7  324:20  326:9  327:19  330:15  342:1
**cases**  9:23, 24  10:10  45:2  117:10, 23
**cash**  18:10  45:1  49:2, 12, 17  51:6, 24  52:1, 5, 8, 10, 12, 15, 17, 19  53:10, 12, 19, 22  54:2  57:12, 14, 15, 16, 17, 19  58:1, 6, 8, 12  66:18  67:10, 19  68:23  69:7  110:10

125:*23*  170:*19, 21*  190:*20*  191:*25*  192:*3, 6, 10, 13, 16, 19, 20, 21*  193:*2, 6, 8, 18, 23*  194:*2, 12, 15, 20, 22, 24*  195:*1, 6, 9, 15, 17*  196:*16, 22, 25*  197:*9, 14, 20*  198:*7, 9, 12, 14*  202:*16*  206:*25*  207:*3, 10, 23*  262:*12*  265:*9, 20, 23*  266:*17, 18*  267:*19*  268:*13, 14, 22, 23*  269:*15, 24, 25*  270:*1, 7, 18, 21*  271:*12, 16*  272:*14*  273:*2, 20*  309:*22*  310:*8, 10, 15, 24*  313:*20*  314:*9*  315:*24*  316:*21*  317:*16*  321:*9*

**categories**  36:*8*

**cause**  172:*17*  173:*6, 14*  174:*4*  183:*7*  212:*20*  213:*12*  214:*6*  239:*7*  350:*14*

**caused**  182:*14*

**caution**  73:*12, 17*

**cc'd**  125:*15*

**cc'ing**  122:*25*  159:*4*  294:*25*

**cc's**  294:*25*

**Centerview**  142:*18*  253:*17*

**CEO**  9:*25*  15:*24*  16:*2, 24*  19:*10*  43:*2*  44:*19*  67:*13, 14*  81:*21, 25*  82:*6, 11*  84:*9*  187:*18*  258:*14*  332:*13*  333:*4, 9*

**CEOs**  332:*12*

**certain**  20:*18*  21:*1*  31:*6*  43:*5*  204:*13*  230:*9*  236:*9*  266:*24*  322:*17*

**certainly**  98:*4*  150:*23*  329:*12*

**certainty**  69:*10*

**CERTIFICATE**  350:*1*

**certify**  350:*6*

**cetera**  23:*13*  121:*21*  267:*13*  268:*3*  298:*19*  332:*24*

**CFO**  19:*8*  191:*16*  198:*7*

**CFOs**  19:*10*

**CHAD**  2:*4*

**chadj@rgrdlaw.com**  2:*8*

**chain**  59:*13*  102:*5, 17*  132:*18*  137:*14*  146:*8, 10*  148:*1, 2, 3*  201:*19*  202:*2, 3*  203:*3*  219:*15*  224:*23*  225:*20*  231:*1*  261:*9*  263:*7*  271:*3*  333:*1*  335:*3*  336:*5*

**Chair**  81:*22*  82:*1, 7, 12*  161:*13*

**Chairman**  13:*25*  14:*5*  16:*1, 6, 9*  17:*8*  21:*15*  23:*1*  24:*13, 15*  27:*9, 17*  167:*14*  181:*10*  333:*25*  345:*2*

**challenge**  165:*9, 12*  166:*3, 11*  321:*1*

**chance**  248:*2, 13, 15*

**change**  101:*25*  130:*18*  131:*18*  215:*3, 8*  240:*6*  254:*9, 11*  332:*19, 21*  339:*25*

**changed**  121:*3*  122:*17, 18*  127:*17*  198:*22, 25*  204:*4, 10*  205:*5, 9, 10, 11*  250:*18*  252:*19*  253:*9, 22*  255:*5*  321:*17*  332:*12*

**changes**  219:*2*

**changing**  214:*25*  332:*22*

**characterize**  195:*4*

**characterizing**  132:*10*

**charitable**  272:*1*

**chart**  48:*4, 7, 11*  52:*19*  53:*11, 13, 14*  84:*7*  184:*7, 17*  191:*3*  193:*11*  195:*16, 17*  308:*2*  310:*3, 4, 6, 7*  325:*20*

**check**  220:*5, 11, 15*  221:*1, 6*  228:*12*  232:*7*  241:*2*

**Cheri**  1:*24*  8:*13*  350:*6, 22*

**chief**  226:*13*

**Choose**  82:*23*

**chooses**  128:*12*

**chosen**  329:*7*

**chronologically**  148:*2*

**circumstance**  99:*22*  212:*10*

**circumstances**  212:*6*

**Civil**  1:*4*

**claims**  9:*25*

**clarification**  129:*8*  201:*10*

**clarify**  34:*24*  132:*3*  149:*15*  248:*2, 13, 15*

**clarifying**  238:*21*  289:*6*

**class**  8:*18*  164:*23*  323:*12, 22*  325:*9*  328:*3*

**clauses**  202:*10*

**clear**  21:*5*  38:*3*  43:*21*  45:*16*  62:*3*  74:*16*  75:*20*  84:*25*  96:*23*  98:*12*  129:*14*  133:*6*  134:*15*  175:*4*  193:*12, 14*  213:*7*  255:*5*  281:*15*  282:*16, 18*  284:*13*  289:*20*  290:*13*  293:*25*  327:*4*  338:*4*  341:*10*

**cleared**  284:*19*

**clearly**  10:*18*  30:*8*  71:*15*  76:*22*  77:*7*  101:*8*  108:*11*  162:*16*  182:*20*  206:*2*  222:*7*  242:*20*  284:*5*  314:*8*  338:*7*  345:*21*

**clears**  121:*22*

**client**  138:*13*  252:*8*  323:*16*  325:*25*

**clients**  324:*14, 15, 18*  326:*8*  327:*19*

**close**  52:*3*  329:*21*  340:*21*

**closed**  273:*6, 14, 16*  343:*8*

**closely**  82:*15, 16*  338:*23*

**closes**  24:*10*

**closing**  67:*20*  126:*4*  136:*4*  137:*7*  325:*14, 17*  326:*1*  329:*17*

**coach**  76:*23*

**coaching**  72:*16*  252:*1*

**code**  113:*13*  120:*23*

**coercive**  83:*3*

**coincide**  205:*6*

**collaborative**  144:*4, 11*

**colleague**  8:*23*

**colleagues**  8:*25*

**College**  330:*21*

**column**  83:*24*  85:*23*  93:*9*  109:*9*  124:*15*

**columns**  196:*3, 4*

**combination**  66:*11*

**come**  12:*20*  21:*17*  38:*16*  46:*19*  71:*13*  94:*23*  95:*1*  110:*6*  130:*7*  167:*25*  212:*1*  272:*10*  290:*6, 11*  317:*25*  331:*22*  335:*18*

**comeback**  260:*10*

**COMERFORD**  2:*12*  3:*7*  8:*19*  11:*17, 19, 21*  12:*3*  20:*19*  21:*2, 7*  22:*11, 18*  23:*3, 7, 14, 16, 23*  27:*14*  29:*18*  30:*1, 17*  31:*5, 8, 11, 17, 19*  32:*10*  33:*16, 25*  34:*4, 12, 23*  35:*8, 18*  36:*25*  37:*10*  38:*8*  48:*20*  51:*3*  68:*12*  69:*24*  70:*16, 24*  71:*8, 19*  72:*5, 12, 16, 20*  73:*7, 11, 25*  74:*4, 10, 20, 23*  75:*4, 7, 10, 16, 21, 24*  76:*3, 5, 6, 8, 11, 14, 20, 25*  77:*12, 19*  84:*24*  85:*3, 14*  88:*11, 23*  89:*25*  91:*5*  92:*14*  95:*17*  108:*6, 9*  112:*14, 22*

116:*20*  118:*5, 9*  121:*16*  127:*5, 12*  129:*20, 25*  130:*4, 5, 8, 9, 12, 17, 23, 24*  131:*4, 10, 14, 16, 17, 22, 24*  132:*7*  133:*11, 14, 17, 19, 23*  134:*5, 9, 22*  135:*10, 20*  136:*12, 24*  137:*3, 10*  138:*5, 17*  139:*2, 19*  140:*18*  142:*9, 22*  144:*16*  149:*13*  151:*4*  156:*19, 24*  157:*3*  165:*23*  166:*4, 7, 16*  169:*18*  174:*22*  176:*11, 15*  177:*2, 5, 13, 17, 20, 21*  179:*24*  180:*7, 11*  181:*3*  183:*9*  200:*25*  205:*22*  208:*11*  213:*23*  215:*18*  220:*18*  221:*3*  222:*9*  223:*1*  229:*21*  230:*1*  239:*8, 16*  240:*3, 5, 24*  241:*21*  245:*12, 19*  250:*5, 13, 20*  251:*4, 17*  252:*4, 10, 21*  253:*4, 10, 19, 23*  254:*3, 4, 6, 15, 24*  255:*24*  256:*5, 24*  257:*8, 14*  258:*1, 16*  259:*2*  260:*6, 9, 15, 21*  262:*1, 21*  267:*23*  281:*21*  282:*9, 14*  284:*25*  288:*5*  290:*3*  295:*10*  300:*25*  301:*4, 12, 14, 19, 23*  302:*3, 8, 15, 18, 21, 24*  303:*3, 7, 17, 19, 23*  304:*2, 7, 8*  308:*10, 14, 21*  311:*9*  317:*6, 20*  319:*19*  325:*10*  326:*14*  327:*8*  330:*11, 13*  342:*20, 22*  344:*21*  347:*2, 5, 10*

**Comerford's**  32:*6*
**comes**  170:*1*  263:*21*
**comfort**  30:*5*
**coming**  23:*6*  54:*24, 25*  55:*4*  102:*4, 9*  132:*18*  167:*20*  224:*22*  247:*22*

256:*17*  263:*13, 25*  264:*12, 15*  335:*5, 21*
**comment**  79:*21, 22*  206:*24*  269:*25*  271:*15*
**Commerce**  8:*9*
**Commission**  350:*25*
**commitment**  50:*5*  339:*23*
**commitments**  182:*22, 23*
**committed**  68:*24*  341:*11*  342:*12*
**Committee**  3:*18, 20*  5:*13*  6:*22*  19:*12, 15, 19*  336:*24*  337:*10, 18*
**common**  67:*5*  89:*14*  90:*25*
**communicate**  150:*11*  158:*1, 21*  180:*22*  187:*20*  224:*14*
**communicated**  172:*3, 6*  235:*15*
**communicating**  150:*9*  258:*5, 8*
**communication**  149:*6*  150:*2*  317:*9*
**communications**  160:*8*
**companies**  15:*9, 11, 15*  17:*12*  21:*16*  111:*12*  331:*20*  333:*19*  335:*5*  337:*17*  340:*18*  341:*13, 18*
**company**  10:*1*  12:*9*  14:*16*  15:*24*  16:*3, 10, 15, 18, 25*  17:*2*  18:*7, 9, 10, 14, 18*  19:*1, 11, 13*  28:*8*  33:*9, 11*  39:*4, 7*  42:*16*  45:*4*  53:*9*  63:*21*  83:*12*  91:*16, 17*  94:*14*  96:*13*  99:*10*  100:*13, 25*  101:*6, 16, 18, 25*  102:*10, 13*  103:*11*  105:*21, 22*  129:*12*  132:*18*  133:*1*  137:*23*  138:*8, 10*  139:*8, 14*  140:*22*  141:*1, 2*  156:*15*  157:*11, 18, 24*

158:*3, 5*  163:*21*  167:*1*  168:*12*  170:*18*  173:*12*  175:*7, 8, 11*  176:*10*  179:*9, 19*  182:*3, 6, 7, 8, 16, 19, 24, 25*  183:*5, 11, 15*  188:*6, 17*  194:*1, 25*  209:*24*  210:*23*  212:*18*  213:*4, 17*  214:*19, 20, 24, 25*  215:*8, 13*  217:*6*  224:*10, 21, 24*  236:*19*  239:*18*  246:*11*  255:*10*  258:*14*  262:*25*  283:*24*  285:*9, 15*  310:*21*  311:*6*  315:*7*  319:*8*  325:*13, 17*  332:*7, 8, 9*  333:*3, 11*  334:*12*  336:*15*  337:*16*  338:*3, 4, 19, 21*  339:*16*  340:*22*  341:*9, 11*  344:*12*  346:*6, 9*  347:*1*
**company's**  54:*1*  101:*23*  105:*13, 14*  156:*17*  157:*12*  190:*7*  197:*14*  206:*24*  207:*9, 23*  210:*22*  215:*3, 6*  236:*23*  248:*11*  265:*23*  297:*8*
**compared**  135:*4*  136:*6*  197:*11*  325:*8*
**comparison**  47:*18*  126:*18, 22*  127:*8, 17*  128:*2, 12, 13*  132:*13, 24*  135:*1, 2, 3, 12*  137:*12, 21*  139:*24*
**comparisons**  133:*3*
**competitive**  164:*6*  340:*17*
**competitors**  47:*25*  48:*1, 2*
**complete**  69:*14*  204:*16*  282:*24*  333:*7*
**completely**  73:*15, 18*  74:*21*  312:*23*
**compliance**  19:*2*
**complicate**  85:*25*  86:*12, 22*  92:*24*

**complicated**  89:*9, 23*  90:*12*  91:*21*  92:*6*
**complicates**  88:*6*
**complication**  92:*8*
**complications**  86:*4*  91:*3, 7, 10*
**components**  102:*19, 23, 24*  335:*8*
**compromise**  167:*22*  187:*24*
**computer**  330:*22*  350:*10*
**con**  308:*23*
**concept**  332:*20*
**concern**  267:*9, 11, 21*  268:*2, 24*  269:*1, 3*  289:*21*
**concerned**  222:*7*  262:*24*  267:*18*  290:*5, 11*  339:*3, 25*
**concerning**  20:*17*  21:*1*  22:*9*  61:*22*  97:*22*  100:*8*  165:*20*  200:*19, 23*  205:*16, 19*  207:*9*  275:*16, 18, 24*  276:*19*  280:*23*  281:*4, 19*  282:*13*  314:*19*
**concerns**  198:*11, 13*  271:*12*
**conclude**  143:*23, 25*  248:*1*  251:*2, 11, 15*  252:*19*
**concluded**  154:*7*  156:*10*  347:*16*
**conclusion**  21:*6*  34:*11*  69:*6*  89:*13*  101:*14*  110:*17*  114:*7*  145:*3*  164:*12*  308:*22*  337:*15, 19*
**conclusions**  20:*20*  21:*3, 10*  22:*19*  33:*17*  35:*11, 19*  37:*1*  68:*13*  88:*21*  90:*8*  139:*3*  140:*19*  285:*1*  308:*15*
**condition**  68:*20*  75:*10*  198:*22, 25*
**conducting**  97:*4*
**confer**  220:*4*

**conference** 61:*4* 245:*11* 248:2, *5, 6, 10* 280:*19*
**confident** 143:*3, 6, 9* 145:*15*
**Confidential** 4:*2* 5:*11, 18, 21* 6:*22* 71:*3* 105:*4* 185:*17* 186:*3* 338:*11, 12*
**Confidentiality** 4:*11* 6:*12, 15* 70:*19* 337:8
**confused** 76:*5* 89:*3* 95:*19*
**confusion** 121:*23* 306:*19*
**conjecture** 175:*2*
**Connect** 61:*4, 7, 10*
**connected** 158:*13*
**connection** 157:22
**consensus** 109:*1, 17*
**consequences** 182:*17, 19*
**consider** 33:*8* 39:*3* 52:*10, 14* 99:*13, 16* 164:*11* 169:*19* 216:*20* 290:*19* 291:*13* 343:*19*
**consideration** 69:8
**considerations** 79:*9*
**considered** 39:*16* 139:*12, 13* 140:*23* 236:*21* 252:*23* 277:*2, 4, 6, 8* 333:*21*
**considering** 85:*7* 88:*12, 18* 91:8, *22* 92:*25* 93:*1* 96:*24* 98:*15* 329:*9*
**considers** 143:*14*
**consistency** 316:*2* 319:*15*
**consistent** 42:*23, 24* 44:*3* 47:*15, 17, 21* 48:*3, 9, 12* 148:*13* 195:*12, 16* 210:*25* 211:2 224:*3* 225:*19* 226:*16* 238:*17* 239:*22* 243:*3*
**consistently** 48:*6, 18* 315:*16, 22* 316:6, 7,

*14*, *20* 317:*15* 318:*16, 20, 22* 319:6, *7* 320:*1*
**consisting** 348:8
**constraints** 44:*20*
**consult** 81:*25* 82:*7* 329:*20*
**consulted** 82:*12, 15, 16*
**consulting** 15:*3*
**consults** 81:22
**consummated** 333:22
**contact** 81:*21* 343:*9*
**contacted** 331:*15, 17*
**contacting** 61:*20*
**contain** 35:*14*
**CONTENTS** 3:*1*
**context** 79:8, *9* 86:*24* 90:*17, 19* 93:*3, 5* 100:*19* 144:*21* 222:*1* 242:*17* 264:*4* 308:*24*
**contexts** 86:*24*
**contingency** 4:*9* 69:8
**continuation** 216:2 335:*24*
**continue** 80:*13* 97:*3* 105:8 144:*22* 152:*1* 231:*16* 284:*20* 285:*5, 12* 286:*6* 298:*15* 346:*2*
**continued** 154:*11* 155:*23, 25* 156:7 158:*17* 190:5 218:*18* 286:*10* 289:*21* 329:*6*
**continues** 122:*12* 171:*3*
**continuing** 21:*20, 22, 23* 22:*6* 289:*24* 336:*17* 339:*14, 15*
**continuously** 21:*15*
**contribute** 270:22
**control** 12:*21, 24* 13:*1* 24:*24* 25:9, *12* 26:*12*
**controlling** 25:*8* 302:22
**convenient** 152:*13, 15*
**conversation** 186:*23*
**conversations** 71:*10* 149:*7* 187:*1* 345:*11*

**convey** 187:5, *7*
**convince** 248:*10*
**convoluted** 272:*6*
**cooperation** 22:*4*
**copied** 185:*22, 23* 343:*2*
**copy** 314:22
**cordial** 240:*10*
**core** 332:*19, 21*
**corporate** 36:*20*
**CORPORATION** 1:*6* 3:*17* 4:*4, 14* 5:*3, 15* 6:*16* 24:*21* 25:*5* 26:*21* 27:*1, 6* 78:*12* 220:*15* 328:*22* 348:*1*
**corporations** 17:*16* 20:*10*
**correct** 11:*10, 13* 14:*7, 9, 10, 13, 14, 15, 17* 15:*1, 2, 4, 9, 10, 11, 12* 16:*11, 12, 13, 19, 23, 25* 17:*18* 18:*16, 17, 20* 19:*16, 17* 22:*10* 27:*11, 18, 25* 28:*6, 7* 29:*5* 33:*15, 23* 34:*2* 37:*11* 38:*15, 21* 41:*20* 44:*5* 45:*20, 24* 46:*24* 47:*7* 50:*15, 18* 51:*12* 53:*4, 21* 54:*9* 57:*2, 15* 58:*18* 62:*8* 63:*4, 9* 65:*14, 21* 66:*19* 73:*10* 74:*9* 78:*15, 23* 79:*1, 2, 4, 5* 81:*9* 83:*5, 19* 84:*13, 15, 17* 92:*25* 93:*17, 18, 20, 21* 96:*16* 97:*23* 98:*7* 99:*5, 8* 100:*1, 6, 10, 11, 14, 15, 17, 18* 103:*17, 22* 106:5, *6* 107:*4* 111:*16, 18, 19* 113:*21* 114:*6* 115:*7, 25* 116:*5, 24* 117:*4* 118:*16* 122:*15* 123:*13* 124:*5, 24* 125:*17, 24* 128:*1, 5, 22* 147:*17* 148:*8, 10, 21, 22* 154:*5, 12* 156:*2, 13, 18* 157:*1, 15, 16* 158:*18, 19, 21,*

*22* 159:*11* 160:*6* 161:*15* 163:*6, 15* 164:*3, 13* 172:*1, 5, 9* 173:*25* 174:*5* 175:*4, 11, 23* 179:*21* 181:*2, 21, 22* 183:*16* 184:*21* 188:*18, 19* 189:*2, 3, 12, 16, 21* 190:8, *9, 23* 191:8, *11, 23* 192:*14* 197:*21, 24* 198:*19* 199:*9, 17, 19, 24* 200:*2, 9, 24* 201:*5, 8* 204:*11* 206:5, *6* 209:*6* 211:*9* 213:*9, 13, 22* 215:*10* 218:*1, 12* 219:*5, 6, 13* 220:*7, 12, 13* 223:*18, 25* 225:*23, 24* 226:*2* 227:*1* 228:*6, 7, 9, 10, 12, 13, 15, 25* 229:*1, 2, 4, 20* 230:*9, 11* 231:*18* 234:*7, 16, 18, 19, 24* 235:*1, 2, 5* 236:*24, 25* 237:*3* 238:*3, 13* 242:*18* 243:*6, 7* 244:*4, 24, 25* 245:*11, 16* 246:*1, 2, 5, 15* 247:*3, 5, 13, 14* 249:*6, 9, 21* 259:*9, 12, 16* 262:*18* 265:*5* 266:*6, 7, 13, 14* 268:*16* 270:*4* 280:*7, 8, 24, 25* 281:*5* 290:*19* 291:*1, 23* 294:*5* 297:*7, 20* 300:*9* 301:*18, 22* 307:*17* 311:*18* 315:*13* 316:*23* 318:*8, 11* 323:*1* 324:*12, 22* 325:*7* 326:*21* 327:*7* 336:*25* 344:*10* 345:*13* 350:*11*
**CORRECTION** 349:*2*
**correctly** 37:*7* 133:*25* 134:*11* 214:*9* 270:*5*
**correctness** 348:*9*

**correspondence** 85:*12* 149:*19* 242:*11* 314:*18*
**cost** 102:*18* 172:*6, 11* 174:*3* 178:*20, 22, 23* 181:*17* 184:*5* 210:*15* 213:*8, 10* 214:*20*
**costs** 163:*9* 167:*11* 236:*15*
**Counsel** 8:*15* 10:*9, 11, 12* 22:*4* 54:*22* 99:*14* 217:*6* 220:*14* 221:*20* 222:*7* 226:*19* 228:*8, 11* 231:*3* 232:*19* 262:*16* 282:*18, 25* 284:*5* 297:*8, 22, 25* 298:*3* 305:*10* 334:*3* 350:*13*
**COUNTY** 1:*25* 8:*1* 350:*4, 24*
**couple** 25:*19* 61:*18* 158:*6* 198:*16* 240:*22* 266:*8* 268:*8* 331:*13*
**course** 22:*7* 23:*25* 44:*14* 51:*11, 21* 54:*4* 67:*16* 85:*10* 120:*15* 122:*8* 125:*1* 143:*25* 165:*19* 206:*15* 226:*7* 291:*15* 307:*18* 318:*13, 14*
**courses** 106:*8*
**Court** 8:*11, 12, 13* 134:*14* 136:*16* 152:*5, 7, 13, 20, 22, 24*
**cover** 80:*21* 107:*11, 15* 121:*19* 161:*3* 233:*10*
**covers** 17:*22*
**Covid** 102:*5* 132:*19* 332:*25* 335:*5*
**CPA** 19:*9* 20:*1, 2, 3, 4* 331:*5*
**create** 186:*8* 187:*4, 13* 188:*10* 200:*1*
**created** 161:*13* 345:*1*
**credentials** 20:*6*
**credibility** 245:*3, 25* 247:*13* 248:*11*

**credible** 90:*21* 91:*24* 99:*17* 103:*8* 104:*25* 118:*16* 129:*11* 132:*25* 137:*25* 224:*13* 236:*21* 255:*7* 334:*17* 346:*7*
**credit** 68:*24* 197:*24* 198:*4* 199:*3* 202:*19* 203:*16* 335:*15*
**crisis** 102:*17* 137:*15* 199:*18, 20, 22* 202:*3* 219:*15* 333:*1* 335:*4*
**CRR** 1:*24* 350:*22*
**crunch** 132:*18*
**CSR** 350:*22*
**CSR-5132** 1:*24*
**CST** 6:*21*
**CUELLER** 2:*4*
**current** 42:*11, 20* 70:*11, 21* 77:*9* 139:*13* 197:*23* 198:*4* 202:*18* 247:*18*
**currently** 13:*25* 164:*16*
**customers** 102:*25* 137:*16* 166:*23* 182:*4, 9, 22* 338:*19* 339:*3, 5, 6* 340:*4*
**cut** 30:*3* 31:*22, 25* 32:*2* 215:*19* 336:*2, 6* 339:*18*
**cuts** 216:*18*
**cutting** 30:*21* 210:*15* 213:*6, 8, 10* 216:*15, 17*

**< D >**
**dangerous** 76:*24*
**date** 8:*5* 23:*1* 24:*14* 27:*2* 59:*18* 95:*5* 97:*24, 25* 108:*20* 116:*9* 119:*4* 126:*25* 159:*9* 243:*18* 257:*25* 258:*15* 261:*21* 262:*7* 275:*5* 295:*2, 3, 4, 6* 297:*23, 25* 322:*14* 325:*17* 329:*17* 337:*7* 350:*7*
**dated** 4:*23* 5:*1* 6:*3* 13:*12* 29:*7* 116:*8*

119:*3* 122:*25* 124:*24* 149:*6* 159:*5* 257:*20* 348:*15*
**Davern** 332:*12*
**Davis** 142:*18*
**dawned** 151:*15*
**day** 65:*24* 95:*9, 25* 151:*13* 155:*25* 182:*5* 189:*10* 217:*7* 220:*1* 248:*7* 261:*15* 295:*8* 300:*22* 304:*14* 307:*8* 324:*20* 330:*6*
**days** 120:*4* 210:*18* 212:*22* 346:*10, 15*
**DCF** 110:*10*
**dead** 291:*7*
**deadline** 147:*1*
**deal** 61:*23* 99:*21* 115:*9* 143:*10, 12* 203:*18* 249:*24* 253:*9* 289:*19*
**dealing** 335:*22*
**deals** 143:*8*
**debate** 298:*18*
**Deborah** 3:*12*
**debt** 114:*4, 11* 115:*11, 16*
**decade** 331:*21*
**decades** 20:*6* 346:*12*
**December** 140:*9*
**decide** 96:*8*
**decided** 103:*20* 235:*15* 338:*7* 340:*22* 346:*6*
**decides** 338:*6*
**deciding** 33:*8* 39:*3*
**decision** 39:*15* 96:*4* 158:*10* 190:*2* 205:*24, 25*
**decisions** 201:*12*
**deck** 10:*24* 116:*6* 121:*21*
**Decks** 4:*19* 7:*1* 304:*24*
**decline** 192:*9, 16*
**declined** 126:*24* 175:*16*
**deeper** 200:*17*
**defect** 338:*20*

**defend** 76:*17* 118:*15* 144:*24* 165:*20* 167:*4, 6, 8, 10* 214:*4, 13* 240:*1* 289:*22* 319:*7*
**defendant** 130:*20*
**DEFENDANTS** 2:*11* 8:*21* 107:*23* 108:*10* 121:*18* 300:*15*
**defendant's** 108:*2*
**defending** 149:*17* 165:*8, 13* 166:*2, 11, 13* 168:*19* 169:*2, 6* 212:*15* 286:*24* 329:*13*
**defense** 171:*24* 181:*5* 274:*11* 291:*14*
**defensive** 181:*6* 219:*6*
**defer** 182:*4, 23*
**define** 12:*5* 36:*8*
**definition** 22:*17* 29:*14* 33:*2, 15, 19, 23* 34:*3* 35:*16*
**Definitive** 68:*7* 69:*15* 142:*14* 322:*4*
**definitively** 95:*4, 6*
**degree** 330:*22, 24*
**Delay** 313:*6*
**Delaying** 170:*8, 13*
**delegate** 201:*12*
**delegated** 206:*1, 9*
**deliberately** 217:*16*
**deliver** 171:*1* 172:*21*
**delivers** 171:*24*
**demonstrable** 171:*24*
**deny** 119:*10* 135:*18*
**department** 343:*6*
**depo** 10:*7, 8* 134:*2*
**DEPONENT** 348:*5*
**DEPOSITION** 1:*10* 8:*7, 8* 9:*13, 21* 10:*3* 31:*14* 136:*16* 252:*3* 303:*1* 342:*23* 347:*16* 348:*7* 350:*7*
**depositions** 10:*16*
**depressed** 102:*20* 335:*3*
**deprived** 314:*8*
**depriving** 313:*18*

314:*4*

**derail** 87:*1*, *5*, *9*

**derogatory** 121:*3*, *8*, *11*

**describe** 42:*7* 219:*7* 249:*7* 332:*6*

**described** 133:*9* 134:*18* 214:*3*, *12* 269:*23* 310:*24*

**describes** 19:*18* 114:*11* 126:*2* 184:*5* 199:*15* 267:*21* 305:*1*

**describing** 47:*9* 196:*1* 224:*15* 266:*24* 268:*9* 271:*10*, *12* 295:*16*

**DESCRIPTION** 3:*11* 218:*1*, *11*, *12* 220:*11*, *12* 221:*2* 222:*23* 223:*17*, *24* 227:*2*, *8*, *9*, *12*, *13*, *14* 228:*5*, *9*, *23* 229:*19*

**deserved** 337:*3*

**designed** 339:*11*

**desire** 42:*10*, *19*, *23* 45:*11* 239:*23*

**despite** 169:*21* 236:*12* 310:*24*

**detail** 101:*20* 298:*18* 322:*9*

**determination** 22:*2*

**determinations** 20:*17*, *25* 21:*9*, *24* 22:*9*

**determine** 258:*25* 292:*25*

**determined** 97:*13* 103:*20*, *23* 104:*16* 106:*3* 123:*10* 124:*3*

**determining** 111:*14*

**difference** 132:*23* 308:*19*, *20* 323:*23* 339:*25*

**differences** 178:*18*

**different** 11:*23* 12:*13* 45:*10* 48:*7* 75:*5* 93:*7* 110:*5* 116:*18* 126:*18* 127:*8* 132:*12* 135:*1* 139:*25* 140:*1* 165:*16*, *19*, *20* 223:8 224:*2* 228:*2*

231:*24* 232:*4*, *5* 233:*13* 326:*4*

**differential** 126:*23* 135:*4*

**difficult** 173:*15* 221:*9* 233:*4* 305:*20* 306:*3*, *14*

**digested** 182:*11*

**diligence** 69:*14* 142:*5*, *8* 262:*23* 290:*23* 321:*13* 338:*24*

**diligent** 52:*5* 159:*13* 160:*5*, *7*, *15*, *16*, *19* 189:*14*

**dilute** 342:*16*

**dilution** 49:*7*, *16*, *19*, *25* 51:*8*, *15*, *19*

**dinner** 154:*13* 189:*6* 240:22

**direct** 74:*4*

**directed** 74:*17* 105:*24*

**directing** 74:*7*, *23*, *24*

**direction** 73:*15* 75:*3*, *8*, *14* 232:*5*

**directly** 112:*10* 157:*23* 203:*21* 214:*1* 285:*24*

**Director** 13:*18*, *22* 17:*16*, *22* 206:*11*, *14*, *16*, *20* 343:*9*

**Directors** 3:*17* 4:*6*, *15* 5:*4*, *16* 6:*18* 15:*14* 26:*25* 27:*5* 34:*19*, *22* 35:*6* 43:*1*, *4* 69:*2* 78:*13* 79:*25* 81:*4* 98:*20* 99:*1* 106:*8* 153:*13* 161:*9* 181:*10* 206:*17*, *18* 207:*11* 208:*25* 211:*16* 253:*1* 325:*20* 328:*7*, *9*, *14*

**disagree** 203:*14* 254:*4* 305:*5* 324:*25*

**disappointing** 247:*17*

**disclose** 70:*12*, *21*, *23* 71:*1* 77:*9* 86:*12* 88:*6* 91:*18* 92:*9* 104:*8*, *20*, *21*, *23*, *24*

105:*2* 166:*25* 173:*11* 175:*18* 178:*24* 180:*2*, *5*, *13*, *19*, *20* 181:*7* 213:*20* 219:*17* 238:*23* 276:*8* 292:*21* 335:*16* 337:*5*, *24* 338:*2*, *10*

**disclosed** 94:*9*, *11*, *25* 103:*25* 104:*3*, *5*, *6*, *15*, *22* 105:*4*, *21* 137:*18* 173:*10* 174:*20* 175:*20* 177:*9* 179:*22*, *25* 181:*24* 182:*1*, *25* 219:*16* 235:*24*, *25* 236:*2*, *3*, *4*, *5*, *8*, *18* 293:*24* 327:*1* 336:*18* 338:*17*, *25*

**disclosing** 138:*14* 174:*25* 175:*23* 176:*21* 181:*12* 213:7 219:*11* 309:*4* 338:*13*

**disclosure** 17:*17* 20:*10*, *13* 70:*15* 84:*22* 85:*2*, *13* 86:*18* 87:*15* 88:*1*, *9* 89:*2*, *4*, *23* 91:*13*, *15*, *18* 92:*4* 95:*1* 172:*16* 173:*5*, *14* 180:*23* 181:*1* 182:*12* 183:6, *10* 210:*20*, *23*, *24* 238:*14* 239:*6* 326:*23* 339:*4*

**disclosure/notification** 83:*12*

**disclosures** 219:*1* 239:*13*

**discounted** 110:*10*

**discoverable** 221:*10*, *16*, *21* 222:*8* 229:*4*, *7*, *11*, *15*

**discovered** 221:*25*

**discuss** 63:*17* 89:*6* 92:*2* 116:*14* 146:*14*, *23* 147:*6* 148:*21* 162:*24* 178:*22* 190:*6*, *10* 204:*2* 205:*9* 211:*17*, *20* 217:*20* 218:*24* 219:*4* 225:*21* 230:*9*, *20* 266:*11* 267:*13* 269:*10* 287:*12* 298:*18*

**discussed** 42:*10*, *22* 56:7 86:*17* 106:*8*, *14* 116:*15* 148:*14* 155:*16*, *17* 157:*10*, *17* 159:*25* 161:*18* 189:*4* 200:*14* 201:*4* 202:*11*, *12*, *14*, *21* 205:24 206:*19* 212:*1* 219:*13* 224:*5*, *16* 225:*3*, *5*, *13* 233:*15*, *16* 242:*13* 247:*24* 267:*4* 269:6, *14* 271:*2* 340:*5*

**discusses** 108:*25* 221:8

**discussing** 44:*10* 49:6 113:*20* 147:*15* 148:*18* 159:*23* 165:*15* 166:6 181:*17* 201:*16* 215:*24* 216:2 224:*15* 258:*20*

**Discussion** 5:*8*, *11* 42:*3*, *7* 43:*12*, *18*, *20* 45:*7*, *9*, *18* 46:*16*, *18* 47:*5* 80:*13* 84:*21* 137:*5* 155:*13* 156:7 158:*16* 161:*14* 162:*10* 167:*17*, *24* 178:*5* 185:*17* 186:*3* 187:*18*, *22* 190:*1*, *17* 200:*18* 201:*2*, *23*, *24* 202:*15* 203:*11*, *15*, *18*, *20*, *21* 204:*9*, *10*, *12*, *17*, *19* 205:*1*, *8*, *16*, *19* 207:*2*, *4*, *6*, *7*, *9*, *13*, *15*, *16*, *19*, *20* 209:8 211:2, *4*, *13*, *25* 212:*25* 214:*24* 216:7 237:*4* 238:*18* 244:*19* 248:8 267:6 269:*11* 284:8 287:*9* 291:*15* 298:*14*, *16* 299:*10* 317:*9* 346:*5*, *8*, *16*

**discussions** 123:*11*, *21* 124:*4* 142:*24* 144:*5*, *12* 216:*3* 264:*23* 267:*5* 278:22 279:*4* 345:*17*

**display** 117:*21*

**displayed** 29:*20*, *22*

32:*16*, *18*  342:*21*
dispute  318:*23*
disrupt  167:*1*  182:*3*, *16*
disruption  182:*6*
disruptions  102:*5*
distract  31:*18*  260:*13*
distracting  73:*1*
distribute  159:*13*
distributed  35:*3*
distribution  189:*25* 346:*4*
DISTRICT  1:*1*, *2*
divesting  114:*20*
divestiture  40:*18*
divestment  114:*13*
divests  115:*6*
divide  54:*11*  325:*23*
Dividend  42:*4*, *16* 47:*15*, *18*  49:*5*  52:*2*, *3*  203:*17*
dividends  42:*12*, *21*, *23*, *25*  43:*1*, *10*, *13*, *16*, *18*, *22*, *23*, *24*  45:*2*, *7* 48:*15*  52:*11*
Dixon  4:*1*, *11*  5:*9* 6:*19*  62:*24*  80:*22* 97:*20*  106:*1*  107:*11* 122:*25*  125:*15* 154:*19*  158:*20*  159:*4*, *8*, *13*  160:*4*  185:*16* 186:*3*  187:*2*, *7*  188:*8* 189:*14*  217:*5*  219:*24* 220:*1*, *10*, *25*  223:*16* 226:*7*  227:*7*  232:*19* 242:*10*, *20*  243:*8*, *24* 277:*20*  294:*22*, *25* 295:*16*  298:*22*  299:*7* 343:*2*, *11*  345:*6*, *10*
Dixon's  232:*6*  243:*17*
Docs  4:*17*
document  12:*20*, *21*, *22*  13:*8*, *10*  14:*11* 23:*5*, *18*, *24*  24:*1*, *5*, *7*, *18*, *20*  29:*6*, *24*  31:*12*, *22*, *24*, *25*  32:*3*, *15*, *19* 34:*20*  35:*7*  36:*7* 37:*24*  38:*2*, *10*  40:*10* 41:*17*, *20*  46:*5*  47:*3* 54:*4*  55:*5*, *25*  56:*10*,

*12*, *14*, *15*, *16*  58:*6* 59:*8*  60:*22*  62:*15*, *16*, *18*, *19*, *23*  65:*7*  69:*24* 78:*10*, *18*  80:*16* 82:*10*, *20*  83:*2*  86:*20* 97:*25*  98:*18*  107:*25* 108:*9*, *11*, *24*  112:*20* 115:*8*  116:*1*, *11* 117:*9*  119:*2*  122:*20* 124:*16*  129:*21* 133:*11*, *24*  146:*3* 153:*7*, *16*  156:*21*, *23*, *25*  157:*1*, *4*  158:*24* 159:*17*, *19*  160:*20*, *24* 161:*17*, *19*, *22*, *24* 162:*17*  165:*25*  166:*6*, *13*  177:*14*, *18*, *20*, *24* 185:*11*  186:*15* 189:*13*  190:*14* 199:*14*  200:*13* 208:*20*  209:*3*, *5* 214:*3*, *12*  215:*14*, *15* 218:*9*  222:*10*  231:*5*, *12*, *21*, *23*  232:*18* 233:*9*, *11*  237:*21* 242:*6*  247:*15*  248:*17* 257:*15*  261:*4*  267:*24* 274:*25*  275:*1*  289:*7* 294:*8*  299:*13*, *14*, *19* 300:*6*, *15*, *16*, *19* 301:*1*, *5*, *7*, *8*, *11* 302:*1*, *6*, *25*  303:*6*, *14*, *16*  304:*15*, *19*, *23* 305:*7*, *9*, *18*  306:*2*, *10*, *11*, *18*, *25*  307:*1*, *4*, *7*, *15*  309:*22*  312:*1*, *2*, *3*, *4*, *22*  313:*4*  319:*20* 321:*24*, *25*  322:*5*, *7*, *11*, *14*, *16*
documented  221:*7*
documents  46:*19*, *22* 85:*19*  107:*18*  152:*16* 160:*18*
document's  29:*19*, *22*
Doing  10:*7*  76:*19* 111:*17*  132:*1*  164:*16* 166:*17*, *18*  173:*25* 205:*17*, *20*  214:*23* 225:*1*  252:*9*  262:*23* 282:*2*  286:*10*  300:*11*

302:*25*  342:*12* 345:*24*
dollar  66:*24*  313:*18* 332:*18*
dollars  325:*5*, *8* 326:*13*, *18*
Donahue  3:*12*
donating  270:*18*
donation  270:*6*, *7*, *10*, *12*, *15*, *16*  271:*1*, *5*, *21*, *23*  272:*1*, *8*, *13*, *16* 273:*11*, *25*  274:*5*
double  180:*17*
double-digit  202:*7*
doubt  67:*25*  140:*11*
Dowd  2:*5*, *13*, *19* 8:*19*
Draft  4:*19*  178:*10* 185:*2*  188:*2*  222:*16* 223:*10*  230:*5*  242:*13*, *18*
drafts  242:*16*
drastic  169:*16*
drastically  163:*3*, *21*
draw  145:*4*  247:*23* 248:*14*
drawn  13:*9*
drew  21:*10*  145:*3*
drive  182:*2*, *10* 183:*22*
drivers  103:*6*
driving  45:*15*
drop  28:*17*
drove  331:*21*
Dude  73:*14*
due  69:*14*  142:*4*, *8* 236:*13*, *15*  252:*11* 275:*15*  290:*23*
duly  9:*4*
dumb  90:*16*  91:*1*
duties  79:*8*  81:*4* 100:*8*
duty  91:*25*  92:*1* 99:*12*  321:*15*  334:*4*

< E >
eager  66:*14*  69:*22* 255:*16*, *22*  256:*21* 257:*2*, *6*  259:*8*, *14*, *17*,

*18*, *20*, *21*, *25*  260:*2*, *3*, *4*, *5*, *19*
Eagle  120:*22*, *23* 121:*4*
earlier  107:*19* 113:*24*  122:*6*  148:*5* 178:*9*  185:*2*, *6*  188:*2* 190:*6*  198:*17*  212:*5* 216:*2*, *13*  227:*13* 234:*8*  255:*15*  258:*20* 261:*23*  262:*11*  269:*6* 275:*20*  276:*23* 286:*22*  304:*13*  315:*3*
early  146:*19*, *22* 243:*10*  244:*1*
earning  52:*4*, *8*, *12* 258:*15*
earnings  6:*5*  54:*11* 104:*9*  111:*11*, *18* 112:*2*, *6*, *9*  157:*12*, *18* 173:*3*, *11*  184:*11*, *16* 234:*18*  235:*9*, *16* 237:*19*  239:*15*, *19* 242:*25*  243:*4*, *9*, *13*, *20*, *22*  244:*1*, *10*, *23* 245:*11*  257:*21*, *24* 258:*24*  275:*13* 276:*10*, *18*  277:*10*, *14* 279:*14*, *15*  280:*19* 335:*16*
easier  23:*17*  161:*1*
Eastern  1:*14*  8:*2*
eat  152:*9*  303:*5*
Eddie  4:*1*, *11*, *17* 186:*3*  217:*13*  219:*22*, *23*  225:*12*  229:*11* 294:*22*  343:*2*, *5*, *11* 345:*6*
education  330:*19*
effect  164:*4*  283:*25*
effective  27:*2*  280:*11* 343:*18*
eight  133:*23*  161:*10* 189:*5*, *19*  192:*20* 313:*6*
either  19:*8*  44:*8* 70:*13*  245:*2*, *24* 247:*12*  248:*11*  285:*9* 286:*18*  296:*24* 309:*17*  321:*3*  350:*13*

**eliminating** 43:*18*, *22* 45:*7*

**else's** 130:*11*

**Email** 3:*12*, *22* 4:*1*, *2*, *8*, *11*, *15*, *19*, *21*, *23* 5:*1*, *4*, *8*, *9*, *16*, *20*, *24* 6:*1*, *3*, *5*, *6*, *8*, *10*, *13*, *19* 7:*1* 24:*11*, *19* 25:*4* 29:*6* 59:*13*, *15*, *18*, *21* 63:*10* 65:*12*, *13*, *14*, *16*, *23* 80:*21*, *24* 81:*10* 97:*17*, *20* 107:*11* 118:*24* 119:*1*, *2*, *14*, *15*, *16*, *18* 121:*19* 122:*24* 125:*2*, *5*, *9* 146:*8*, *10*, *13* 147:*25* 148:*2*, *3*, *4*, *14*, *23* 150:*8* 159:*4*, *7*, *20*, *22* 162:*7* 178:*3* 185:*7*, *15*, *21* 186:*2* 188:*8* 217:*3*, *5* 218:*6*, *11* 222:*16*, *19* 225:*20* 227:*3* 229:*6*, *11* 230:*7*, *13* 231:*1*, *12*, *20* 232:*4*, *10*, *12*, *17* 233:*2* 242:*9*, *10*, *12* 243:*17* 244:*17*, *19*, *22* 246:*7* 257:*19* 259:*23* 261:*8*, *9*, *11* 263:*6*, *7*, *17* 264:*18*, *25* 265:*8* 267:*7* 268:*5*, *6*, *7* 269:*9*, *22* 271:*4* 274:*17*, *18*, *22* 277:*17*, *20* 278:*9* 280:*1*, *6*, *9* 282:*8* 286:*22* 294:*14*, *17*, *22* 295:*2*, *4*, *16*, *19* 304:*23*, *25* 305:*2*, *4* 342:*24* 343:*14*, *16* 344:*5* 346:*19*

**emailed** 119:*7*

**embarrassed** 168:*11*, *13*, *16*

**embarrassment** 168:*5*, *8*

**Emerson** 4:*2* 62:*1* 63:*15*, *20* 64:*3* 66:*14* 69:*20* 93:*19* 94:*5*, *24* 95:*2*, *24* 97:*2* 100:*20* 101:*9* 104:*14* 105:*2*, *7* 106:*2*, *18* 113:*13*,

*17* 114:*15*, *19* 117:*6* 118:*3* 121:*1* 124:*10* 138:*7* 141:*20*, *24* 143:*14*, *18* 145:*23* 147:*6*, *13* 155:*19* 159:*18* 163:*7* 166:*13* 168:*3* 172:*18* 173:*15* 176:*22* 179:*19* 181:*7*, *12* 213:*25* 214:*1* 215:*13* 216:*11* 218:*20* 224:*11* 225:*23* 251:*20* 252:*13*, *18* 253:*16* 259:*11*, *14* 260:*18* 261:*14*, *21* 262:*20* 279:*5* 286:*24* 290:*1* 291:*21* 292:*4*, *7*, *15*, *17* 293:*1*, *7* 312:*18* 313:*14*, *15* 314:*13* 315:*7*, *22* 316:*20* 317:*14* 318:*20* 319:*16* 321:*6* 328:*6*, *9*, *11*, *12*, *18* 329:*5* 333:*4*, *6*, *8*, *10*, *17*, *20* 334:*11*, *13*, *15*, *24* 336:*20* 337:*5*, *6*, *13*, *20* 338:*9*, *18* 339:*4* 340:*6*, *15*, *21*, *23* 341:*1* 346:*20*

**Emerson's** 63:*17* 64:*11*, *24* 65:*17* 69:*2* 93:*17* 113:*20* 114:*23* 118:*7* 120:*16* 156:*14* 158:*11* 162:*24* 163:*10* 164:*1*, *9* 171:*4* 173:*20* 174:*7*, *20* 175:*18*, *20*, *23* 176:*2* 179:*22* 180:*2*, *5*, *10*, *13*, *15*, *18* 181:*1*, *19*, *23* 182:*1*, *12* 183:*7*, *22* 212:*15* 213:*21* 214:*4*, *13* 215:*4*, *10*, *12* 216:*7*, *16*, *20* 219:*5* 230:*21* 240:*2* 242:*14* 249:*3* 250:*4*, *11*, *18* 252:*19*, *25* 253:*1*, *9* 257:*21*, *24* 258:*15*, *21* 261:*11* 313:*5* 314:*9*, *18*, *19*

333:*21*

**emphasis** 311:*14*

**employees** 49:*21*, *24* 166:*22* 182:*9*, *20* 338:*20* 342:*15*

**enable** 179:*2*

**encompass** 317:*3*

**encourage** 167:*15*

**ended** 187:*23* 215:*1* 255:*9* 270:*17* 332:*22* 338:*22*

**enforce** 241:*22*

**engage** 141:*21* 144:*4*, *11* 313:*15*

**engaged** 142:*17* 344:*11*

**Engagement** 313:*6*

**engineers** 332:*11*

**English** 38:*7*, *10*

**enhance** 339:*15*

**enter** 86:*25*

**entertaining** 131:*4*

**enthusiastic** 69:*19*, *22*

**entire** 29:*24* 46:*6* 331:*18*

**entirety** 31:*16* 43:*15* 302:*10*, *13*

**entitled** 24:*20* 56:*11* 82:*22* 322:*17*

**Entrust** 16:*4*, *14* 18:*22*

**EPS** 54:*5*, *7*, *10*, *15* 109:*3*, *7*, *11*, *23* 184:*19*, *22* 234:*1*, *5*, *12*, *15*, *25* 235:*1*, *3* 238:*12* 245:*8* 246:*10* 265:*2*

**equals** 324:*24* 335:*20*

**equipment** 339:*9*

**equivalent** 49:*23*

**Eric** 62:*11* 63:*22* 154:*17* 159:*12*, *17*, *19*, *25* 160:*3* 161:*18* 178:*4* 270:*21* 277:*21* 278:*10*, *16*, *18*, *22* 331:*15* 333:*8*, *12*

**Erik** 125:*10*

**ERRATA** 349:*1*

**error** 274:*2*, *3*

**errors** 35:*14*

**Escalate** 82:*23* 106:*9*, *15*

**escalated** 71:*11*

**escalation** 117:*11*, *15*, *24* 122:*6*, *13*

**escalatory** 83:*11*, *16* 292:*1*

**especially** 10:*16* 186:*11*

**essence** 138:*23*

**essentially** 52:*15* 83:*2* 112:*1* 114:*3* 163:*7*, *20* 212:*2*

**EST** 6:*21*

**establish** 82:*11* 85:*19*

**established** 107:*19* 239:*5*

**estimate** 163:*18*

**estimates** 109:*1* 246:*14* 321:*14*

**et** 23:*13* 121:*21* 267:*13* 268:*3* 298:*19* 332:*24*

**evaluate** 99:*13*, *20*

**evaluated** 337:*12*

**evaluation** 155:*20*

**evening** 189:*19* 347:*9*, *12*

**event** 92:*7* 98:*16* 106:*9* 114:*12*, *24* 115:*16* 116:*25* 166:*9* 205:*11* 223:*7* 350:*13*

**events** 36:*20* 72:*8* 73:*6*, *9* 315:*14*

**eventual** 63:*14* 314:*14*

**eventually** 213:*18* 257:*3*

**Everest** 8:*11*, *13*

**everybody** 168:*1* 277:*5*, *8* 279:*12* 347:*9*

**everyone's** 131:*25*

**evidence** 37:*1* 101:*2* 130:*7*, *23* 246:*6* 281:*22* 296:*3*, *6*, *9*, *10*, *20* 297:*3*, *9*, *11*, *13*, *19* 299:*2*, *3* 317:*24* 321:*4*

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

**Evidently** 32:*6* 55:*9*
**EVs** 339:*9*
**exact** 50:*21* 51:*4*
250:*21*
**Exactly** 54:*13* 60:*3*
225:*10* 241:*14*
305:*19*
**EXAMINATION** 3:*6*,
*7* 9:*7* 330:*10*
**examined** 9:*6*
**example** 36:*19* 40:*16*
54:*14* 107:*25* 110:*9*
246:*9*, *17* 296:*8*, *10*,
*17*, *20* 299:*4* 323:*16*
**examples** 36:*12*, *15*
39:*25* 40:*6*, *13* 82:*9*
**exceed** 102:*15*
**exceeded** 100:*13*
101:*6* 102:*7*
**Excel** 305:*11*
**Excellent** 147:*20*
**exception** 284:*13*
**excerpt** 223:*10*
**Excess** 49:*12*, *17*
51:*6*, *24* 52:*1* 206:*7*
**exchange** 242:*9*
257:*19*
**excited** 66:*7*, *11*
**excitement** 66:*5*
**exclusive** 204:*17*
**Exec** 6:*21*
**execute** 44:*19*
263:*14* 264:*1* 341:*23*
**execution** 341:*20*
**executive** 16:*1*
154:*17* 190:*3* 211:*4*
289:*8* 331:*16*, *23*
**executives** 24:*8*
182:*3* 201:*13*
**exercise** 99:*12*
329:*13* 334:*8*
**Exhibit** 2:*20* 3:*12*,
*15*, *17*, *18*, *20*, *22* 4:*1*,
*2*, *4*, *8*, *11*, *14*, *15*, *19*,
*21*, *23* 5:*1*, *3*, *4*, *8*, *9*,
*13*, *15*, *16*, *20*, *23*, *24*
*6*:*1*, *3*, *5*, *6*, *8*, *10*, *13*,
*16*, *19*, *22* 7:*1*, *3*, *4*
12:*17*, *18*, *25* 22:*22*,
*23* 23:*4*, *6*, *7*, *8*, *9*, *15*

24:*2*, *4* 25:*11*, *17*, *19*
26:*14* 29:*25* 41:*14*,
*15* 46:*1*, *3* 54:*20*, *21*,
*22* 55:*1*, *6*, *10*, *14*, *18*,
*20* 59:*8*, *9* 62:*15*, *21*
65:*7*, *10* 78:*6*, *8*
80:*17*, *18* 97:*15*, *16*
98:*18*, *19*, *21* 107:*6*, *8*
113:*5* 118:*21*, *22*
121:*14*, *15* 122:*2*, *4*,
*20*, *22* 123:*14* 124:*17*,
*19* 146:*4*, *6* 147:*22*,
*23* 148:*15* 153:*8*, *9*
158:*24* 159:*1* 177:*25*
178:*1* 183:*24*, *25*
185:*2*, *5*, *6*, *12*, *13*
186:*5* 188:*13*, *21*, *23*
201:*15* 208:*20*, *22*
216:*22*, *23*, *25* 227:*7*
229:*7* 231:*2*, *3*, *8*, *18*,
*22*, *25* 232:*1*, *23*, *24*
233:*1*, *3*, *5* 237:*12*, *13*,
*14* 242:*5*, *7* 244:*14*,
*15* 248:*17*, *19* 249:*15*
257:*17* 261:*4*, *6*
263:*2*, *4* 274:*13*, *15*
279:*20*, *22* 288:*21*, *22*
294:*8*, *9*, *12* 299:*14*,
*15* 301:*10*, *11*, *16*, *24*
302:*9*, *12*, *16*, *20*
303:*8*, *10* 304:*9*, *17*,
*18*, *21* 305:*10*, *13*, *15*,
*23*, *25* 306:*7*, *12*, *16*
311:*22*, *23*, *24*, *25*
312:*14* 322:*2* 342:*21*,
*23*
**EXHIBITS** 3:*9*, *10*
23:*12* 31:*16* 302:*22*
304:*14*
**exist** 14:*22* 199:*16*
**existed** 150:*12*, *13*, *14*
**existing** 184:*2*
**expanded** 262:*8*
**expect** 97:*2* 172:*21*
202:*4*
**expectation** 67:*14*
68:*6* 105:*7*, *10*
224:*22*, *23*

**expected** 36:*1* 39:*14*
156:*16* 164:*9* 195:*1*
256:*11* 283:*11*
**expedience** 149:*8*
**expeditiously** 142:*1*
**expense** 171:*17*
177:*15*, *22* 236:*17*
**expenses** 18:*7* 103:*2*
155:*20* 163:*4*, *22*
164:*6*, *16*, *21* 165:*3*,
*16*, *21* 167:*16* 168:*4*
169:*20* 170:*12*, *16*, *25*
173:*2*, *9* 180:*22*
187:*22* 213:*6* 215:*1*,
*9*, *25* 216:*4*, *5*, *9*, *16*,
*18* 219:*16* 224:*24*
247:*21* 336:*1*, *3*
**experience** 12:*9*, *10*
13:*19*, *22* 15:*14*
17:*11*, *21* 18:*13*, *18*,
*24*, *25* 20:*8*, *9*, *16*, *24*
167:*14*
**experienced** 11:*9*, *25*
18:*1* 334:*1*, *2* 344:*24*
**expert** 19:*5*, *7*, *19*, *23*
312:*17*
**experts** 312:*17*
**expired** 44:*8* 337:*7*
**expires** 350:*25*
**explain** 38:*13* 64:*3*
101:*20* 165:*8* 189:*23*
**explained** 31:*14*
104:*1* 129:*13* 137:*12*
179:*6* 304:*12*
**explaining** 243:*8*
**explains** 198:*21*
264:*24*
**explanation** 38:*7*, *9*
205:*2*
**export** 119:*19*
**exposed** 341:*19*
**express** 269:*3*
**expressed** 45:*11*
269:*1*
**expresses** 268:*25*
**expressing** 66:*5*
239:*23*
**expression** 170:*4*
260:*2*

**extens** 125:*25*
**extensive** 142:*4*
**extensively** 215:*16*
**extent** 20:*20* 35:*10*
**extra** 326:*18* 327:*4*,
*20*, *23*
**extraordinary** 99:*21*
212:*6*, *10*
**extreme** 169:*23*
**extremely** 170:*15*
256:*3*

**< F >**
**face** 307:*1*
**faced** 102:*5* 137:*15*
**facility** 197:*24* 198:*5*
199:*3* 202:*19*
**facing** 202:*2* 335:*4*
**fact** 105:*8* 127:*16*
139:*14* 157:*23*
158:*13* 169:*21*
170:*15* 189:*17* 191:*9*
203:*9* 204:*8* 216:*8*,
*11* 229:*6* 236:*6*
251:*15* 288:*12*
292:*10* 297:*21* 311:*3*
320:*8* 334:*14* 340:*5*
**factor** 45:*15* 52:*10*,
*13* 102:*3*
**factors** 140:*23*
**factory** 339:*8*, *11*, *12*,
*20*
**facts** 37:*1* 131:*11*
314:*3*
**failed** 107:*23*
**fair** 11:*15* 27:*12*
38:*6* 41:*7* 66:*14*
71:*6* 72:*3* 73:*4*, *9*
74:*6* 82:*15* 150:*5*
195:*5* 247:*3* 303:*5*
344:*3*
**fairly** 73:*23* 77:*11*
**faith** 252:*14*
**fall** 24:*15*
**false** 317:*19*
**familiar** 56:*14*, *16*
245:*5* 344:*16*
**far** 30:*18* 102:*7*
**fast** 200:*22* 333:*3*

**favor** 45:*3* 270:*23*

**favorable** 335:*21*

**favorably** 265:*3*

**feasible** 149:*8*

**feel** 139:*6* 229:*22, 25* 303:*3* 334:*23*

**felt** 102:*10, 16* 104:*18, 20* 105:*4, 11* 149:*16* 151:*12* 158:*5, 7* 180:*22* 216:*5* 219:*14* 224:*9* 236:*19* 282:*17* 284:*18* 337:*2, 4* 338:*12, 18* 341:*6*

**fewer** 47:*25* 48:*10* 54:*11, 13*

**fiduciary** 79:*7* 100:*8*

**fifth** 255:*25*

**figure** 259:*22, 24, 25*

**figured** 291:*10*

**file** 137:*1* 304:*19* 305:*11, 22*

**filed** 237:*18*

**files** 306:*14*

**FINAL** 4:*17* 7:*1* 188:*12, 18* 228:*14, 16, 17, 19* 229:*1, 18* 230:*5* 304:*24* 334:*10* 341:*15*

**finalize** 237:*2*

**finally** 338:*17*

**finance** 143:*8, 10, 11*

**financed** 68:*23*

**financial** 18:*1, 4, 5* 19:*5, 7, 19, 22* 99:*15* 102:*11* 157:*14, 20* 209:*9, 14, 20* 210:*5* 211:*8, 10, 17* 212:*9, 14, 16, 20, 22, 24* 213:*20* 214:*5, 14, 15, 17* 219:*1, 11* 224:*5, 16, 19, 21* 225:*3, 6, 13, 25* 233:*12, 13* 236:*23* 239:*4* 334:*6* 342:*5*

**financials** 18:*8*

**financing** 68:*20, 25* 69:*8* 100:*16* 113:*25* 143:*2*

**find** 23:*19* 26:*7, 9* 101:*3* 145:*17, 22* 305:*24* 329:*4*

**Fine** 11:*4* 113:*18* 152:*14, 20, 22* 329:*17*

**Finish** 57:*24*

**fired** 182:*21*

**firm** 8:*25* 15:*3, 5* 63:*3* 91:*24, 25* 286:*5* 331:*7* 344:*11, 14, 18, 22, 25*

**first** 9:*4* 12:*16* 24:*1, 2* 26:*20* 46:*5* 47:*4* 56:*5* 57:*23* 65:*17, 19, 20* 71:*1, 25* 73:*20* 81:*10* 101:*24* 102:*21* 108:*14, 18* 115:*5, 10* 116:*6* 125:*2* 126:*7, 10* 131:*13* 148:*2, 25* 151:*14* 155:*7* 160:*21* 189:*5* 190:*16* 191:*24* 192:*21* 193:*21* 194:*3* 198:*21, 25* 209:*11* 217:*3* 232:*6* 240:*7* 251:*25* 261:*9* 263:*7* 271:*4* 275:*21* 278:*7, 8* 295:*8* 300:*7* 302:*21, 23* 313:*3, 10* 315:*7* 316:*3* 324:*20* 331:*1* 333:*13* 335:*2* 337:*25* 343:*8*

**fiscal** 310:*15*

**five** 9:*22* 15:*23* 17:*9* 51:*2* 58:*24* 112:*21* 163:*13, 23* 170:*23* 200:*7* 233:*11* 241:*6, 7* 313:*12* 326:*2*

**five-minute** 58:*21* 208:*8* 283:*9*

**fix** 32:*6, 13*

**fixated** 131:*6*

**Flexibility** 82:*23*

**flow** 54:*2* 57:*12, 14, 15, 16, 17* 110:*10* 191:*25* 192:*3, 13, 19, 21* 193:*2, 8* 194:*12* 196:*16, 22, 25* 197:*9, 14, 20* 198:*7* 206:*25* 207:*3* 265:*20* 266:*17* 267:*19* 268:*13, 22* 269:*15, 24* 270:*1* 271:*16* 272:*14* 273:*2, 20*

**focus** 33:*1* 162:*22* 167:*5, 7* 171:*15* 272:*3* 279:*16* 342:*1*

**focused** 40:*12* 271:*22*

**foggiest** 254:*17*

**folder** 54:*23* 55:*2, 8*

**folks** 107:*11*

**Follow** 6:*10* 23:*12* 44:*11* 212:*25* 263:*10* 264:*18*

**followed** 24:*19* 91:*25* 230:*13* 235:*19* 332:*21*

**following** 95:*9, 25* 154:*10* 157:*9* 158:*15* 189:*10* 217:*13* 233:*13* 275:*13* 331:*25*

**follows** 9:*6* 265:*8* 295:*25* 313:*6*

**follow-up** 4:*1, 23* 5:*1* 6:*3* 148:*18* 212:*3, 11*

**forecast** 56:*24* 57:*18* 58:*12, 19* 191:*4, 6, 9, 13* 193:*17* 200:*12* 234:*5* 307:*15* 310:*10*

**forecasting** 57:*8* 193:*17*

**forego** 52:*7*

**foregoing** 155:*1* 348:*7* 350:*8*

**forever** 88:*13, 19* 89:*15* 90:*13, 14, 22* 92:*16, 20* 98:*10*

**forgot** 98:*25*

**Form** 5:*23* 11:*17, 19* 12:*3* 13:*15* 27:*14* 33:*16* 34:*23* 35:*8, 18* 36:*25* 37:*10* 38:*8* 46:*11* 48:*20* 51:*3* 68:*12* 70:*16* 71:*8, 19* 72:*5, 12* 77:*12* 85:*4* 88:*11, 23* 89:*25* 91:*5* 116:*20* 118:*5, 9* 133:*18* 137:*10* 138:*17* 139:*2, 19* 140:*18* 144:*16* 149:*14* 151:*4* 165:*24* 169:*18* 174:*22* 179:*24* 180:*7* 183:*9*

213:*23* 222:*9* 231:*6* 237:*18* 239:*8* 240:*3* 245:*12, 19* 250:*5, 23* 251:*4* 252:*7, 21* 253:*4, 10* 255:*25* 256:*25* 257:*8* 258:*1* 262:*21* 267:*23* 281:*21* 288:*5* 308:*10, 14, 21* 311:*9* 317:*6* 319:*19* 325:*10* 326:*14* 338:*1* 342:*9* 344:*20*

**Forma** 113:*11*

**formal** 64:*13* 65:*4*

**formally** 276:*6* 277:*9, 11*

**format** 231:*24* 305:*8* 307:*10*

**formed** 336:*23*

**Forsyth** 2:*13*

**forth** 10:*23* 315:*1* 350:*8*

**Fortune** 15:*11*

**forward** 50:*9* 54:*20* 59:*7* 60:*5, 14* 70:*2, 7* 113:*10* 145:*14* 155:*22* 160:*20* 167:*25* 179:*3* 333:*3* 336:*17*

**forwarded** 59:*14* 65:*24* 121:*20* 125:*2, 13* 262:*16*

**forwarding** 65:*13* 232:*19* 258:*9*

**forwards** 242:*20*

**found** 293:*22* 328:*21, 23*

**foundation** 33:*17* 35:*9* 46:*10* 51:*3* 68:*12* 70:*16* 71:*8, 19* 72:*6, 12* 77:*13* 85:*4* 91:*5* 135:*21* 137:*10* 139:*2* 140:*18* 142:*9, 22* 144:*16* 149:*13* 220:*18* 222:*10* 245:*12, 19* 250:*6, 22* 251:*5* 252:*21* 253:*10* 254:*16* 255:*24* 256:*24* 257:*9* 258:*1, 17* 259:*2* 260:*7*

262:*1, 21*  284:*25*
288:*5*  290:*4*  308:*22*
317:*6, 20*  319:*20*
325:*10*
**founded**  14:*16*  331:*8*
**four**  12:*9*  15:*15, 23*
72:*21*  142:*15*  154:*6*
161:*10*  189:*5, 19*
233:*10*  241:*4, 5*
252:*12*  253:*5*  256:*9,
15, 18*  261:*2*  313:*11*
319:*5*  320:*8, 23*
327:*16*  340:*18*
**fourth**  202:*13*
237:*20*  251:*23*
262:*10*  267:*16, 20*
289:*6*  311:*2*
**FQ**  6:*5*
**frame**  95:*19*  256:*25*
291:*23*  292:*22*
332:*12*  345:*15*
**fraud**  130:*21*  177:*1*
**free**  54:*2*  196:*16, 22,
25*  197:*14, 20*
**freight**  236:*15*
**frequently**  38:*19*
**Friday**  24:*11*
**front**  51:*4*  79:*23*
136:*13*  210:*4*  303:*8*
304:*9*
**fulfill**  132:*21*
**full**  33:*3*  56:*24*  58:*2*
86:*7*  152:*9*  191:*6*
193:*16, 18, 23*  307:*18*
310:*10*  350:*11*
**functions**  188:*1*
**fundamental**  236:*18*
**Further**  93:*8*  123:*11*
124:*4*  262:*8*  330:*7*
347:*6*
**future**  102:*14*
137:*16, 22*  139:*8*
140:*25*  158:*3*  170:*9,
13, 20*
**Fyi**  232:*11*

**< G >**
**GAAP**  237:*22*
**gain**  163:*13*  270:*20,*

*21*
**Geller**  2:*5, 16*  8:*18*
**general**  35:*25*  39:*13*
48:*13*  217:*6*  219:*18*
220:*14*  221:*20*  222:*7*
228:*8, 11*  246:*25*
267:*1, 4*  269:*15*
279:*8, 11*  295:*17*
297:*8, 22, 25*  298:*3*
**Generally**  79:*17*
80:*9*  87:*25*  292:*3*
**generated**  156:*16*
**gentleman**  62:*25*
**getting**  34:*24*  136:*20*
151:*19*  195:*9*  335:*15*
339:*10*  341:*8*
**gist**  256:*15*
**Giuggio**  2:*16*
**give**  26:*11*  132:*17*
134:*2*  135:*24*  169:*13*
238:*6*  245:*3, 25*
246:*24*  247:*12*
248:*11*  285:*20*
329:*23*
**Given**  10:*14*  73:*6, 9*
87:*3, 8*  89:*21*  141:*8*
238:*1, 9*  247:*17*
270:*18*
**gives**  36:*14, 19*  40:*2*
44:*19*  68:*10*  202:*12*
239:*19*  296:*8*  315:*10*
**giving**  34:*20, 22, 24*
35:*6*  88:*17*  319:*13,
16*
**go**  18:*13*  23:*25*
24:*18*  25:*15, 19, 25*
26:*5*  28:*22*  32:*5, 8,
13, 25*  36:*7*  37:*24*
38:*1, 22*  39:*23*  41:*25*
47:*8*  48:*14*  56:*10*
57:*24*  58:*4*  62:*14*
66:*2*  72:*19, 24*  76:*4*
77:*11*  79:*20*  80:*16*
81:*2, 18*  82:*19*  83:*20*
84:*8*  93:*22*  100:*23*
101:*21*  105:*16*
107:*15*  108:*14, 17, 24*
109:*12, 20, 25*  113:*9,
19*  116:*1*  118:*18*
119:*19*  121:*14*  122:*3,*

*19*  123:*14*  125:*1*
143:*22*  148:*1*  149:*11,
16, 17*  150:*15, 24*
151:*6*  159:*14*  162:*1,
20*  165:*7, 11*  167:*10,
25*  168:*18*  169:*8, 9,
14*  170:*8*  171:*6*
172:*17, 23, 24, 25*
173:*4, 7, 14, 15, 19, 23*
174:*2, 4, 6*  175:*9*
176:*5*  178:*14*  180:*9,
15, 21, 24, 25*  181:*9,
18*  182:*14, 18*  183:*7,
24*  190:*15, 19*  195:*20*
197:*4*  198:*16*  201:*15*
208:*12*  210:*14*
212:*21*  213:*12*  214:*6*
217:*2*  218:*21*  220:*21*
227:*4*  231:*19*  232:*10*
233:*10, 12, 14*  235:*6,
7*  239:*3, 7, 10, 24*
240:*1, 11*  241:*19*
242:*12*  243:*9, 25*
245:*7*  247:*15*  248:*7*
249:*13*  253:*25*  256:*8*
257:*15*  259:*12*  261:*1*
266:*1*  267:*7*  268:*5, 6*
274:*24*  275:*2*  277:*18*
281:*17*  282:*5*  298:*17*
300:*6, 14*  302:*17, 18,
21, 23*  303:*1, 21, 23*
304:*2, 10, 17*  306:*23*
307:*3*  309:*24*  311:*21*
312:*3, 14*  313:*3*
315:*5*  322:*15*  329:*19*
332:*14*
**go-ahead**  281:*24*
**goal**  48:*12, 18*
**God's**  282:*9*
**goes**  19:*4*  28:*11, 12*
33:*5*  35:*25*  36:*12*
39:*12*  40:*25*  49:*6, 12*
60:*5*  68:*2*  69:*13, 18*
70:*2*  81:*20*  106:*7*
140:*7*  143:*13*  149:*5*
166:*9*  178:*22*  186:*15*
251:*1*  270:*2*  271:*17*
336:*15, 16*
**go-forward**  79:*10*
100:*10*

**going**  8:*4*  10:*25*
20:*19*  22:*25*  23:*12*
25:*3*  31:*10*  47:*22*
55:*5*  58:*20*  59:*1, 5*
64:*21*  70:*10*  71:*7, 18*
72:*24*  73:*16*  74:*4, 12*
76:*3*  97:*7*  98:*24*
101:*11*  105:*16*  107:*6*
110:*11*  112:*23*  113:*1*
114:*23*  118:*12*
119:*10*  124:*16*
127:*19*  128:*3, 7, 18*
129:*5*  130:*18*  131:*18*
132:*5*  134:*7*  135:*13*
136:*10, 15, 25*  138:*23*
141:*13*  144:*3*  146:*21*
150:*20*  151:*6, 7, 10*
152:*25*  153:*4, 6*
155:*22*  160:*13, 22*
165:*2, 23*  167:*18*
170:*3*  171:*2*  175:*13,
25*  177:*5, 24*  181:*7*
182:*9, 10*  183:*1*
184:*10*  192:*18*  195:*3*
202:*3, 5*  208:*13, 17*
212:*19*  214:*4, 13*
218:*15*  224:*1*  233:*20*
234:*22*  236:*6, 16*
237:*12*  239:*9*  240:*11,
22, 24, 25*  241:*21, 22,
23*  242:*2*  251:*17*
257:*10, 11, 15, 16*
261:*4*  263:*2*  269:*22*
274:*13*  283:*13, 17, 21*
288:*21*  293:*6*  294:*15,
20*  296:*23*  299:*23*
302:*24*  303:*21*  304:*3,
4, 17, 18*  305:*5*
311:*12, 13, 22, 23*
312:*7, 11*  314:*4, 21*
318:*15*  320:*12*
325:*22, 24*  329:*19, 24*
330:*3*  335:*7, 23*
336:*2, 17*  342:*20*
347:*14*
**Goldman**  142:*17*
143:*3*  247:*6*  253:*17*
**gonna**  175:*16*
203:*14*  287:*3*

**Good** 9:*9, 10, 11*
11:*7* 12:*14* 37:*22*
41:*5, 7* 54:*19* 112:*19*
120:*1* 135:*15* 147:*11*
152:*23* 158:*6* 186:*7*
187:*3, 13* 252:*14*
260:*9* 334:*3* 341:*6*
342:*12* 344:*23* 347:*8,*
*12*
**goods** 102:*18*
**GOODWIN** 7:*3*
312:*16, 18* 313:*4*
315:*3*
**go-to-market** 332:*23*
**gotta** 218:*13*
**gotten** 321:*13*
**governance** 342:*13*
**grab** 152:*8*
**Grace** 328:*8* 335:*18*
**gradually** 164:*17*
165:*3, 5* 167:*19*
215:*16*
**grammatical** 274:*2, 3*
**granted** 49:*21*
**grants** 342:*14*
**graph** 195:*6, 12*
**graphically** 109:*21*
**Great** 148:*17* 338:*24*
**green** 306:*3, 4*
**grew** 199:*3*
**Group** 15:*18* 266:*11*
**growth** 209:*24, 25*
210:*2, 3* 233:*17, 18,*
*23, 25* 234:*11, 12, 14,*
*15, 23, 25* 246:*18*
331:*21*
**guess** 13:*4* 21:*20*
24:*18* 48:*7* 53:*11*
68:*16* 105:*24* 106:*24*
203:*5* 235:*7* 251:*8*
277:*15* 289:*16*
293:*19* 309:*19, 20*
323:*15* 328:*4*
**guidance** 219:*11*
237:*20* 238:*1, 3, 4, 6,*
*7, 9, 12, 20, 25* 239:*20*
245:*3, 10, 17* 246:*22,*
*24, 25* 247:*17* 248:*12*
286:*11*

**guided** 246:*18* 247:*1*
337:*18*
**guidelines** 19:*5, 7, 23*
174:*11, 14* 282:*24*

**< H >**
**half** 17:*1* 71:*25*
73:*20* 102:*21* 152:*9*
163:*13, 23* 194:*7*
248:*7* 310:*5* 331:*4*
339:*20, 21*
**Hampshire** 8:*10, 22*
**hand** 68:*23*
**Handle** 94:*13*
**Hang** 54:*22* 76:*11*
301:*15*
**haphazard** 108:*1*
**happen** 346:*25*
**happened** 50:*25*
59:*25* 119:*8* 175:*2*
215:*20*
**happening** 335:*1*
**happens** 167:*24*
168:*10* 212:*19*
**Harassing** 139:*20*
**harder** 166:*18*
**harm** 105:*5*
**Harvard** 14:*12, 14*
330:*23* 331:*2*
**head** 94:*9* 316:*24*
**headed** 337:*11*
**heading** 13:*21* 313:*5,*
*10*
**headings** 109:*9*
196:*4, 6*
**headline** 27:*24*
**headwind** 236:*16*
**hear** 10:*17* 11:*20*
73:*16* 103:*15* 200:*22*
256:*14* 275:*17* 316:*2,*
*4* 320:*23*
**heard** 88:*25* 97:*4*
256:*10* 291:*7, 9*
**hearing** 70:*2, 8*
316:*5* 345:*15*
**heavily** 339:*14, 15*
**He'd** 84:*9* 220:*4*
**Held** 2:*20* 8:*8* 31:*19,*
*23, 25* 61:*3* 314:*12,*

*14* 339:*19* 341:*21*
**Held's** 32:*11*
**hell** 270:*1* 271:*16, 24*
272:*12* 273:*3, 21*
**he'll** 148:*20*
**help** 55:*11* 240:*1*
265:*2* 298:*21*
**helpful** 165:*25*
**hereinbefore** 350:*8*
**high** 110:*22* 111:*6*
126:*20* 167:*11*
170:*16* 246:*22*
330:*19, 21* 331:*20*
332:*6*
**higher** 102:*18, 22*
106:*10, 19, 23* 107:*3*
112:*9, 10* 126:*16, 21,*
*22* 127:*3, 10, 18*
128:*2, 7, 15, 22* 129:*2,*
*9* 131:*12* 135:*4*
138:*8* 139:*14* 157:*25*
169:*22* 172:*2, 8*
173:*2, 3* 174:*10*
179:*3* 191:*2, 13*
197:*19* 224:*25*
246:*13, 19* 247:*23, 24*
290:*12* 318:*3* 335:*9,*
*19, 20* 336:*8, 11*
**highest** 110:*23*
143:*14, 19* 250:*4, 11,*
*19*
**highlight** 157:*12, 19*
**highlighted** 149:*5*
**highly** 69:*18, 22*
143:*3, 6, 9* 334:*1*
**hindsight** 253:*13*
**hire** 62:*11*
**hired** 334:*5* 344:*24*
**historic** 140:*22*
**historically** 169:*22*
**history** 313:*18*
**hit** 332:*25*
**HOFMAN** 2:*12* 8:*23*
**hold** 33:*8* 39:*4* 55:*3,*
*4* 170:*19* 218:*14*
227:*17* 338:*19*
**holding** 326:*24*
**honest** 329:*14*
**honor** 339:*23*

**honorary** 330:*24, 25*
**hope** 173:*13* 248:*1, 9*
**hoped** 173:*6* 174:*3*
248:*13, 14* 256:*8*
261:*1*
**hopefully** 121:*22*
**hoping** 181:*18*
239:*10* 256:*18*
259:*12*
**horizon** 221:*19*
**hostile** 71:*3* 82:*22*
83:*3* 85:*8* 118:*14, 15*
144:*22, 25* 150:*17*
155:*18* 166:*25*
168:*10* 182:*8* 262:*25*
289:*21* 290:*7* 291:*14*
329:*10, 13* 334:*18*
**hour** 10:*22* 58:*21*
152:*9* 283:*13* 303:*4*
**hours** 132:*5* 240:*23,*
*25* 241:*4, 5*
**Hug** 83:*24* 84:*3*
85:*23, 25* 86:*21*
87:*18, 20, 21, 24* 88:*5*
89:*8, 22* 90:*11* 92:*7,*
*24* 93:*9*
**hundred** 52:*25* 53:*3,*
*25* 56:*25* 191:*21*
196:*1, 12, 21* 197:*1,*
*13* 200:*8, 11* 205:*20*
206:*4* 235:*19* 236:*4*
269:*19* 307:*19*
311:*15*
**hype** 105:*16*
**hyping** 105:*14*
**hypothetical** 4:*8*
21:*3* 325:*11* 329:*12*

**< I >**
**i2** 9:*25* 10:*5* 16:*22*
**idea** 49:*15* 138:*4, 18*
172:*16* 186:*7* 187:*3,*
*13* 250:*14* 252:*23*
253:*12* 254:*17* 255:*3*
258:*12* 309:*6* 318:*24*
319:*12, 22* 333:*17*
**ideas** 341:*16*
**identification** 12:*18*
22:*23* 41:*15* 46:*3*
55:*18* 59:*9* 62:*21*

65:*10*  78:*8*  80:*18*  97:*16*  98:*21*  107:*8*  118:*22*  122:*22*  124:*19*  146:*6*  147:*23*  153:*9*  159:*1*  178:*1*  185:*13*  188:*23*  208:22  216:*25*  232:*1*  237:*14*  242:*7*  244:*15*  248:*19*  257:*17*  261:*6*  263:*4*  274:*15*  279:*22*  288:22  294:*12*  299:*15*  304:*21*  311:*25*  322:*2*

**identified**  232:*18*
**identifies**  93:*22*  161:*3*  189:*5*  322:*21*
**identify**  163:*2*  171:*4*  254:*12*
**identifying**  178:*19*
**Ilcisin**  294:*25*
**illegal**  28:*12*, *22*  29:*2*, *8*  105:*20*  174:*18*
**immediate**  171:*24*  313:*19*  314:*9*
**immediately**  68:*4*  141:*21*  280:*11*  343:*18*
**impact**  181:*24*  201:*19*  247:*10*  251:*3*  334:*14*  336:*5*  338:*18*  339:*5*  342:*5*
**impacts**  202:*15*  251:*14*
**impair**  240:*16*
**impediments**  69:*9*
**implement**  44:*12*  48:*12*  178:*23*
**implicated**  177:*9*
**implicit**  61:*13*
**implied**  151:*8*, *9*  314:*3*
**implies**  89:*16*  264:*22*
**imply**  281:*15*  291:*2*
**implying**  127:*14*  223:*20*  316:*6*
**important**  10:*16*  33:*8*  39:*3*  48:*16*  49:*20*  50:*1*  52:*1*, *9*  81:*17*  101:*24*  102:*3*  119:*23*  120:*16*

138:*22*  158:*7*  162:*22*  168:*18*  169:*5*, *14*  170:*9*, *10*, *24*  173:*19*  180:*22*  224:*4*  225:*12*  334:*8*, *25*  342:*18*
**impossible**  233:*3*
**impression**  149:*21*, *22*, *23*
**impressions**  149:*25*
**improper**  21:*10*  72:*22*  73:*15*  133:*16*  136:*19*, *25*  252:*6*  256:*4*  325:*11*
**improve**  52:*15*  54:*7*, *10*  173:*24*  176:*20*  214:*16*, *17*  215:*6*
**improved**  213:*20*  214:*5*  219:*11*  236:*14*
**Improvement**  54:*5*, *15*  158:*4*  187:*24*  215:*1*  236:*1*
**improvements**  236:*5*
**inaccurate**  80:*1*, *3*  227:*24*
**inaccurately**  35:*16*
**inadvertently**  221:*8*
**inappropriate**  73:*18*  74:*22*  75:*8*  104:*21*, *23*  105:*20*  132:*1*  229:*8*
**inaudible**  119:*17*  256:*7*  305:*14*
**incentive**  49:*20*  172:*18*  342:*16*
**include**  36:*14*  40:*1*  46:*15*  204:*19*  219:*20*  227:*2*, *7*  228:*8*  229:*19*  282:*23*  284:*8*  296:*17*, *19*, *20*  345:*21*
**included**  188:*3*  189:*23*  203:*21*  204:*22*  217:*14*  269:*8*  284:*12*  305:*2*, *3*
**includes**  108:*25*  223:*10*  242:*11*  305:*1*  315:*1*, *4*  325:*20*
**including**  18:*1*, *6*, *14*  43:*5*, *7*  51:*23*  202:*15*  233:*10*  235:*18*  242:*9*

**income**  103:*3*  173:*9*  235:*18*  245:*7*
**inconsistent**  227:*20*  228:*16*, *20*  230:*18*
**incorrectly**  271:*20*
**increase**  103:*4*  117:*1*, *6*  118:*2*  120:*17*  124:*9*  145:*18*, *23*  149:*24*  163:*4*, *9*, *16*, *22*  172:*10*  173:*9*  184:*23*  235:*18*  236:*3*, *7*, *8*  247:*22*  326:*10*  336:*1*
**increased**  49:*22*  105:*9*  135:*14*, *15*  184:*22*  261:*24*
**increases**  145:*9*
**increasing**  103:*3*  174:*17*  247:*11*
**independent**  31:*15*  206:*11*, *14*, *16*, *17*, *18*, *20*  207:*1*, *11*  304:*13*  337:*12*
**independently**  31:*17*
**in-depth**  248:*8*
**indicated**  162:*13*  252:*25*  253:*1*, *16*  290:*18*
**indicates**  86:*20*  122:*8*  154:*22*  162:*19*  243:*17*  264:*19*
**indicating**  48:*8*, *10*  122:*11*
**indication**  169:*15*  296:*9*  317:*22*  318:*1*  334:*19*
**indicative**  66:*23*
**indicia**  68:*10*
**Indirectly**  290:*20*
**individuals**  285:*7*, *8*  347:*1*
**industry**  170:*17*
**inflows**  195:*1*
**infor**  96:*1*
**inform**  106:*2*  147:*6*  280:*10*  343:*16*
**information**  20:*18*  21:*1*  27:*21*  28:*6*, *14*, *24*  29:*4*, *10*, *15*  33:*3*, *6*, *10*, *23*  34:*3*  35:*17*,

*22*, *25*  36:*9*, *13*, *15*, *19*, *24*  37:*9*, *18*  38:*24*  39:*1*, *2*, *6*, *13*, *25*  40:*6*, *13*, *17*  41:*2*, *8*  95:*11*, *16*  96:*2*, *6*, *10*, *16*, *25*  97:*2*, *7*, *9*, *22*  98:*5*, *14*  138:*14*, *21*  145:*16*  158:*10*  238:*23*, *25*  275:*24*  276:*20*  281:*3*, *18*  282:*12*  284:*2*  288:*4*, *9*  292:*9*  300:*17*  321:*18*  323:*20*  343:*21*
**informed**  64:*11*
**informing**  97:*21*
**inhouse**  343:*11*, *14*  345:*7*
**Initial**  94:*13*  230:*7*  313:*14*  333:*16*
**initially**  195:*14*  340:*18*
**initiate**  167:*12*
**injure**  182:*7*, *24*
**input**  168:*1*  226:*21*, *22*
**inquire**  292:*17*, *19*, *20*  293:*5*
**inquiry**  292:*4*, *14*, *23*, *25*  293:*4*, *5*  294:*2*, *4*
**insider**  24:*9*, *19*, *21*, *25*  25:*5*  26:*21*  27:*6*, *12*  37:*7*, *25*  96:*15*, *18*  284:*23*  285:*2*, *6*, *10*
**insiders**  279:*12*
**insight**  245:*22*
**insignificant**  325:*15*
**InSinkErator**  114:*12*, *15*, *20*, *24*  115:*2*, *6*, *12*, *17*, *20*  261:*12*, *16*, *22*, *25*  262:*12*
**instance**  111:*20*  125:*3*
**instructed**  189:*14*  228:*8*  284:*4*
**instructing**  219:*19*
**instructs**  10:*12*
**INSTRUMENTS**  1:*6*  3:*17*  4:*4*, *14*  5:*3*, *15*  6:*16*  14:*1*, *6*  17:*6*  18:*19*  19:*15*  23:*2*

Deposition of Michael McGrath

In Re National Instruments Corporation Securities Litigation

24:*13, 21*  25:*5*  26:*20, 25*  27:*6*  33:*20*  35:*3*  37:*7*  46:*13*  47:*20*  48:*8*  50:*11, 19*  51:*1, 11*  60:*21*  61:*3*  62:*7*  64:*4, 12*  65:*18*  66:*12, 15*  67:*5, 20*  69:*20*  78:*12*  79:*18, 24*  80:*8*  86:*9*  88:*9*  93:*15, 20*  94:*5, 18, 23*  95:*2*  97:*11*  109:*4, 11*  114:*5*  123:*3*  124:*23*  125:*22*  126:*3, 24*  132:*16*  140:*8, 14*  147:*6, 14*  153:*13*  156:*11*  158:*12*  161:*9*  163:*3, 8*  164:*5*  165:*15, 21*  167:*11*  172:*19*  173:*16*  176:*8*  187:*9*  209:*1, 6*  237:*18*  249:*4, 20*  250:*3, 11*  253:*3*  255:*16, 23*  256:*22*  257:*7*  259:*1, 15*  261:*10*  291:*22*  292:*5, 16*  293:*2*  298:*1, 10*  309:*4*  312:*20*  314:*18, 20, 25*  315:*24*  316:*21*  317:*15*  321:*7, 8, 11*  322:*23*  323:*9*  328:*5, 10, 14, 18*  329:*5, 6*  330:*14*  331:*12, 18*  332:*7*  333:*9, 18, 24*  334:*12, 23*  335:*1*  336:*23*  337:*23*  340:*6, 16, 19, 25*  342:*2, 6*  343:*12, 15*  345:*3, 7*  346:*21*  348:*1*

**insufficient** 140:*24*
**integrated** 339:*7*
**intend** 70:*13*  218:*18*
**intended** 38:*6, 13*  180:*24*  255:*13*
**intending** 219:*15*  240:*1*
**Intent** 4:*4*  50:*4, 6*  51:*13, 14*  71:*3*  172:*20*  258:*25*  272:*9*
**intention** 44:*12, 15, 21, 25*  50:*24*  51:*10*

58:*16*  64:*3*  172:*25*  173:*1, 18*  174:*25*  176:*8*  179:*17*  180:*25*  239:*6, 9*  271:*22*  272:*4, 18*
**intention/threat** 162:*19*
**intentions** 179:*13*
**interchangeably** 101:*3*
**interest** 296:*4, 6, 8, 21*  297:*3, 9, 19*  299:*3*  321:*16*  322:*22*  328:*24*  329:*2*  333:*24*
**interested** 62:*2*  123:*4*  318:*2*  333:*17*  350:*13*
**interests** 156:*15, 21*  249:*4, 19*
**interfering** 240:*13*
**interject** 251:*18*  257:*11*
**internal** 145:*15*  160:*8*  237:*10*
**interpret** 71:*2*  72:*3, 8*  73:*4, 9*  90:*18*
**interpretation** 88:*17*  89:*14, 17*  90:*3, 25*  91:*1*  93:*7*  128:*17*  144:*25*
**interpretations** 87:*4*
**interpreted** 71:*15*
**interpreting** 278:*3*
**interrupt** 10:*19*
**interrupted** 215:*18*
**interrupting** 74:*17*
**introduce** 8:*15*
**introducing** 60:*6, 14*
**introduction** 217:*14*
**Introductions** 3:*24*
**introductory** 218:*5*  219:*20*
**invented** 216:*10*
**inventory** 336:*10*
**invest** 170:*19*
**investing** 170:*8, 13*
**investment** 39:*15*  202:*15*

**investor** 33:*7*  39:*2, 15*  138:*22*  235:*8, 14*  236:*11*  248:*2, 5, 6, 10*
**investors** 104:*13, 15*  138:*24*  140:*17*  172:*3*  180:*23*  235:*15*  265:*3*
**invite** 62:*23*  63:*5, 16*
**invited** 332:*3*
**involved** 278:*9*  279:*3*  331:*11, 13*
**involving** 10:*5*  62:*24*
**irrelevant** 135:*12*  138:*2, 11, 12, 16, 25*  142:*2, 10, 16*  151:*17*  165:*1*  175:*12*  181:*8*  300:*16*  320:*17*  321:*5, 10, 18, 20*
**irrespective** 115:*12*
**irresponsible** 141:*5, 6*  174:*18*
**irritable** 151:*20*
**issue** 22:*5*  55:*9, 10*  214:*24*  239:*13*  243:*13*  312:*4*  318:*7*  329:*16*
**issued** 34:*19*  243:*4*  245:*10*
**issuer** 33:*12*  39:*7*
**issues** 10:*1*  18:*12*  19:*2*  21:*17, 19*  202:*2, 23*
**Item** 46:*25*  203:*24*  204:*18, 23, 24*  211:*25*  212:*11*
**items** 46:*15*  212:*1*
**it'll** 26:*5*
**its** 43:*14*  106:*5*  114:*19*  115:*11, 16, 21*  138:*9*  143:*19*  145:*23*  162:*20*  163:*4, 9, 12, 16*  164:*5, 6*  166:*10*  172:*13*  218:*21*  231:*6*  239:*18*  252:*7*  296:*10*  299:*4*  302:*10, 13*  307:*1*  312:*19*  313:*18*  336:*9*  342:*2, 6*  346:*21*

**< J >**
**Jandrow** 2:*19*  8:*11*

**January** 3:*18, 20*  41:*19*  53:*18*  193:*22*  206:*8*  225:*4*  269:*7*  310:*16*  312:*19*  339:*1*
**jcomerford@dowdben nett.com** 2:*15*
**jeopardy** 339:*17*
**JEREMY** 2:*12*  8:*23*
**jhofman@dowdbennet t.com** 2:*16*
**job** 99:*16*  220:*24*  221:*24*  222:*4, 12*  331:*1*
**JOHN** 2:*12*  8:*19*  21:*5*  73:*16, 18*  74:*3, 9, 14, 19*  75:*23*  77:*5*  256:*7*  295:*14*  330:*13*
**JOHNSON** 2:*4*
**join** 332:*1, 3*
**joined** 289:*10, 13*  331:*14, 15*
**joint** 62:*10*
**judgment** 89:*17, 18*  90:*3*  321:*14*
**July** 5:*4, 13, 16*  24:*11*  29:*7*  104:*10*  144:*1*  146:*19, 22, 24*  147:*8*  150:*8*  153:*13*  154:*6, 7, 13, 15*  159:*5, 10*  161:*10*  178:*5*  185:*3, 7, 8, 9*  189:*1, 18*  190:*5*  191:*18*  200:*15, 24*  207:*12*  209:*1, 5*  210:*14, 19*  211:*1, 8*  213:*7*  217:*7*  221:*5*  222:*21, 23*  223:*17*  226:*24*  227:*2, 3*  228:*22*  232:*20*  235:*9, 16*  236:*22*  237:*1, 4, 5, 18*  238:*14, 15, 16, 24*  239:*2, 23*  243:*14, 22, 24*  244:*10, 23*  245:*11*  265:*9*  286:*17, 19, 20, 21*  307:*14*
**jump** 50:*9*
**June** 4:*15, 23*  5:*1*  6:*3*  80:*12*  98:*20*  99:*3, 18, 25*  107:*12*  108:*21*  116:*8*  119:*3*

120:8, 10  122:25
123:25  124:22, 24
126:4  133:10  134:19
135:19  136:6  137:7
146:11  148:6  149:6
150:16  249:11, 14, 18
252:25  253:16  254:9,
12, 21  290:18  314:25
334:22  337:20  340:9
**jury**  330:16
**justification**  167:3

**< K >**
**Karen**  277:21
278:10, 16, 18
**Karsanbhai**  59:15, 21
60:10, 20, 24, 25  61:7,
14, 16, 20  62:5  63:20
64:2, 10  65:13  66:4
70:6  71:14, 20  72:14,
23  76:18  85:12
93:14  122:25  123:3
125:10  145:5  148:6,
17, 20, 23  150:9, 20,
24  243:15, 25  244:11
248:23  249:23
255:15, 22  256:21
290:25  315:10, 11
317:5, 19  319:10
320:7  333:8
**Karsanbhai's**  59:18
85:1  124:21  131:12
145:21  162:5  190:8
275:21  315:4  320:10
**Katz**  117:20
**keep**  25:3  71:2
74:16  75:1  98:8
105:3  129:25  130:10
136:10  143:12  149:6
197:16  200:5, 16
201:2  233:2  252:9
**keeping**  191:21
**kept**  20:6  282:21
309:13  341:8, 9
345:17
**key**  130:22  182:3, 20
197:22  204:24  235:8
295:24, 25  297:22
**killed**  176:17  181:6

**kind**  30:20  110:22
225:19  251:22
256:18  273:17
320:24  334:19
**knew**  150:12  278:24,
25  279:1  335:17
**know**  8:24  10:14
11:22, 24  19:2, 14
22:14  24:6  32:10
38:10  48:5, 16  50:10,
14, 19, 22  55:11
57:23  59:25  60:2, 11,
20, 24  61:7, 8, 9
62:11  71:2  74:22
76:23  77:20  78:1
84:22, 25  85:6  86:5,
6  90:18  94:8, 10
99:15  104:21  107:25
110:21  119:13, 17
124:14  128:21  132:1,
19  135:16  138:19, 24
139:9, 21  140:20
141:1  142:23  143:6,
9  145:2  147:13
149:1, 20, 22  150:17,
21, 22  151:8, 13
157:24  166:23, 24
168:1  169:23  170:23,
25  174:15, 17  176:17
180:16  181:5  182:17
185:22  196:11  197:4
203:4, 5  204:15, 21
205:13, 14  207:5
209:11  213:25  216:1,
7, 12  222:4, 18  230:2,
4  232:13  235:14
236:12  240:7, 11
241:20  243:18
245:21  248:7  251:19
253:14  256:8, 16
257:11  258:14
260:25  262:4  270:17
271:21  273:6  277:22
278:11  284:15
285:25  286:1  290:5,
7  291:8, 13, 23
292:11, 20  293:10, 12,
14, 15, 18, 20  295:21
296:23, 24, 25  298:13,
17  299:23  300:21

302:5, 22  304:12
308:23  309:2, 13
310:6  311:20  312:24
314:17  316:16  318:4,
25  319:1, 2, 4, 5
320:16, 19, 20, 21, 25
324:15  326:3, 21, 22,
23, 25  327:1, 10
328:25  329:11  330:6
333:10, 25  339:19
346:18
**knowledge**  35:14
40:17  64:2  79:24
221:17, 25

**< L >**
**labeled**  24:1  52:16
83:21  99:3  156:3, 5
178:5  289:7  312:2,
15, 17  338:12
**Lack**  313:6
**Lacks**  33:17  35:9
135:20  254:16
256:25  258:17  260:7
290:4
**ladder**  83:11
**lags**  47:15, 17, 21
**Lal**  59:15  125:10
**language**  77:8  89:11
123:24  124:8  188:3,
14, 17  222:16  223:10,
16
**laptop**  119:20
**large**  30:15  202:5
296:14  299:5
**larger**  160:24  192:16
310:14
**largest**  313:17
**late**  146:24
**lately**  62:18
**law**  63:2  105:1
344:11, 18, 22
**lawyer**  34:10, 11, 17
**lawyers**  289:19
293:11  344:7  345:8
**lay**  46:10
**layout**  56:14
**lead**  119:1
**leadership**  164:5

**leading**  19:14
236:14  267:6
**leads**  47:14  332:16
**learned**  94:24  95:2
121:7  132:2  183:21
261:21  262:14
**learning**  145:14
**leave**  190:1
**leaving**  156:20
**left**  49:1  110:21
156:21  283:10  303:4
**legal**  20:20  21:2, 6, 7,
10, 17  22:4, 18  33:17,
19  34:11, 20, 22  35:6,
10, 19  36:25  50:15
68:13  79:8  88:21
89:13  90:7, 25  99:14
100:9  139:3  140:19
226:13  240:13, 16
276:7  282:18, 25
283:25  284:4, 21, 23
285:1, 20  286:10, 12
287:14  308:14, 21
321:13  334:3  338:4
343:5
**legally**  346:13
**legs**  10:23
**Letter**  4:4, 21, 23
5:1  6:3  30:5  60:21
61:1  64:13  65:14, 16
66:2, 4  67:8, 11, 13,
14  68:2  69:6  70:7,
12, 22  76:7, 15  77:10
83:7, 16  84:9  85:1,
25  86:21  87:19  89:8,
22  90:11  93:13  95:8,
24  105:3  122:11
123:2, 6, 9, 10, 24
124:3, 7, 22, 23
125:18, 19, 21  126:2,
11, 14  128:5, 6  129:4
130:1, 2, 4, 5, 11, 12,
13, 17, 20  131:8, 12,
13, 18, 21  133:4, 8
134:17, 25  135:7, 25
136:14  140:3, 7
141:20, 24  142:21
143:3, 6, 9  144:18
145:6, 7, 8, 21  148:6,
18  149:19  150:5, 23

162:*6* 190:*8* 243:*14, 19, 21, 25* 244:*11* 248:22, 25 249:8, *11, 14, 17, 19, 22, 23* 250:2, *10, 17* 251:*3, 10, 13, 14* 252:18, *25* 253:*1, 6, 8, 16, 18, 22* 254:8, *12, 14, 22, 23* 255:*12, 21* 256:23 257:6 288:*13* 289:*17* 290:*18, 25* 291:*2* 296:*17, 22* 297:*6, 9, 16* 314:*23* 315:*1, 2, 5, 6, 11, 22* 317:*2, 4, 14* 318:*1, 11* 320:*19*

**letters** 29:*24* 132:*11* 242:*13*

**letter's** 130:*8*

**Level** 30:*5* 174:*21* 215:*24* 216:*4* 236:22 326:*11* 332:*6*

**levels** 164:*7*

**Lexington** 2:*6*

**liar** 320:*15*

**licensed** 336:*13, 16*

**life** 51:*21*

**lift** 277:*9* 278:*1*

**Lifted** 6:*16* 276:*24* 277:*2, 4, 6, 8, 19* 279:*7, 8, 10* 280:*11, 23* 283:*2* 343:*18* 344:*6* 345:*16* 346:*20*

**lifting** 277:*22* 278:*11* 279:*1, 4, 17*

**light** 224:*6* 225:*6, 14* 230:*15*

**limited** 36:*14* 40:*2* 145:*16* 204:*13* 292:*9*

**line** 26:*23* 52:*23* 53:*12, 13* 54:*4* 56:22 117:*14, 17* 130:*25* 178:*5* 190:*24* 191:*5* 193:*6* 195:*24* 196:*15* 202:*9, 13* 216:*5* 263:*10* 264:*18* 339:*18* 349:*2*

**lines** 68:*24* 313:*11, 12*

**link** 31:*15* 181:*13, 15*

**linked** 181:*11, 13*

**links** 180:*17*

**Lipton** 117:*19*

**liquidity** 198:*10, 13, 22* 199:*1, 8, 10, 11, 13, 15, 20, 24* 200:*1* 202:*16*

**list** 17:*25* 36:*15* 171:*2* 202:*12* 296:*3* 297:*24* 298:*2, 4* 299:*2*

**listed** 13:*9* 67:*19* 128:*24* 279:*11* 325:*19*

**listen** 4:*9* 99:*13* 245:*2, 25* 247:*12* 248:*11* 303:*21*

**listened** 258:*5, 8*

**LITIGATION** 1:*7* 193:*15* 221:*13, 16, 18, 19* 222:*1, 2, 5, 6* 348:*2*

**litigators** 25:*24*

**little** 12:*5* 20:*23* 25:*16* 36:*7* 37:*13* 42:*1* 50:*9* 53:*7* 91:*21* 96:*19* 98:*8* 123:*16* 151:*22* 196:*9* 202:*10* 240:*7, 10, 15, 21* 241:*12* 294:*18* 325:*15* 331:*23*

**live** 258:*9* 291:*3*

**LLP** 2:*5, 13* 8:*20*

**lo** 212:*21*

**loading** 55:*13*

**loan** 197:*23* 198:*4, 19* 199:*23* 202:*18*

**logic** 260:*8*

**logical** 106:*25* 107:*2*

**long** 15:*22* 98:*7* 129:*7* 168:*24* 202:*10* 205:*7* 207:*8* 240:*11* 301:*8* 304:*14* 330:*6* 342:*14*

**longer** 139:*15* 152:*10* 188:*18* 250:*3, 11* 254:*13, 22* 276:*5* 287:*24* 335:*6* 340:*1*

**long-term** 139:*11* 140:*21* 182:*22*

339:*23* 340:*3* 341:*7, 17*

**longwinded** 92:*11*

**look** 4:*9* 12:*22* 13:*18* 17:*20* 24:*5, 17* 27:*19* 36:*18* 41:*17* 45:*25* 57:22 58:*5* 60:22 65:*6* 66:*2* 70:*2* 72:*7* 78:*5* 85:*21, 23* 86:*6* 87:*17, 18* 94:*12* 97:*14* 98:*17* 101:*5, 12, 13* 103:*2* 107:*13* 109:*11* 111:*8* 114:*11* 115:*5* 116:*10* 121:*24* 123:*14* 125:*9, 18* 145:*14* 146:*3* 147:*21* 151:*21* 153:*7* 156:*3* 158:*23* 160:*20, 21, 22, 25* 162:*1, 2* 166:*1* 177:*24* 178:*9, 18* 183:*25* 185:*11* 188:*20* 190:*13* 195:*5, 23* 201:*17* 202:*12* 208:*19* 209:*13, 16* 216:22 222:*19* 227:*5* 230:*25* 232:*10, 12* 233:*20* 237:*11, 19* 244:*13* 245:*8* 246:*10* 248:*16* 249:*13* 257:*16* 261:*3* 263:*1* 274:*12, 25* 277:*17* 279:*19, 20* 282:*14* 294:*7, 16* 301:*10* 307:*6* 310:*3* 318:*12, 13* 321:*23* 339:*8*

**looked** 13:*14* 115:*10* 122:*6* 145:*7* 185:*6* 188:*13* 191:*3* 195:*12* 200:*19, 23* 201:*24* 234:*8* 237:*9* 265:*13* 275:*1* 307:*14* 329:*3* 341:*14*

**looking** 23:*4* 31:*19* 32:*11* 60:*5, 14* 70:*7* 77:*9* 119:*12* 137:22 178:*10, 16* 189:*21* 193:*16* 195:*17* 196:*13* 229:*7* 232:*4* 233:22 234:*4* 258:*24*

263:*19* 295:*9* 300:*21* 301:*14, 15, 16* 302:*11* 306:*22, 25* 307:*8* 326:22 328:*23*

**looks** 13:*5* 58:*15* 65:*1* 66:*16* 80:*23* 108:*20* 113:22 146:*12* 178:*17* 179:*14* 188:*11* 191:*20* 192:*11, 14* 194:*5* 197:*25* 198:*2* 203:*4* 239:*18* 245:*1*

**lose** 182:*3, 20*

**losing** 52:*11*

**loss** 57:*14, 15, 17*

**lost** 13:*20*

**lot** 76:*9* 86:*25* 87:*8* 105:*13* 149:*25* 174:*13* 202:*10* 334:*6*

**loud** 301:*3*

**Louis** 2:*14*

**love** 316:*17*

**low** 103:*11, 18* 110:*18, 22* 111:*4* 132:*25* 335:*11*

**lower** 36:*7* 111:*10* 154:*22* 191:*15* 197:*2, 3, 4, 5* 247:*7*

**lowered** 191:*13*

**lowest** 110:*24* 111:*2*

**loyalty** 92:*1* 99:*13* 321:*15* 334:*4*

**lunch** 151:*23, 25* 152:*1* 240:*20*

**lying** 319:*25*

**< M >**

**M&A** 18:*13, 16* 42:*11, 20* 45:*1, 3* 61:*23* 81:*6* 96:*18* 113:*21* 114:8, *24* 115:22 258:22 261:*24* 262:*8*

**M-1** 41:*14*

**M-11** 153:*8*

**M-13** 188:22

**M-14** 208:*21*

**M-15** 231:*1, 9, 22*

**M-16** 288:*21*

**M-2**  46:*1*

**M-20**  299:*13, 14*

**M-20A**  301:*13*
304:*19*

**M-4**  54:*21, 23*  55:*2*

**M-5**  78:*7*

**M-6**  80:*17*

**M-7**  98:*19*

**M-7A**  107:*6*

**macro**  236:*13*

**Madam**  134:*12*
152:*5, 19*

**maintain**  42:*10, 20*

**major**  101:*25*  103:*1,
5*  236:*17*  267:*9, 11,
21*  268:*1*  325:*21*
332:*18*  339:*6, 8*

**making**  30:*20*  150:*4*
151:*16*  170:*25*
214:*18*  257:*13*
270:*14, 17*  271:*21*
272:*8, 13, 16*  273:*10,
25*  296:*14*  299:*5*
302:*8*  316:*7*  326:*7,
25*  327:*18*  329:*3*
333:*10*  338:*23*
345:*18*

**manage**  164:*6*
214:*20*  338:*22, 24*

**managed**  19:*10*
168:*4*  173:*1*

**management**  15:*3*
18:*1, 4, 5, 7, 8, 10*
52:*10*  108:*25*  109:*7*
155:*8*  157:*10, 17*
167:*15, 22*  168:*13, 14*
187:*19*  198:*9, 12, 14*
204:*13*  206:*1, 9*
209:*8, 19*  210:*19*
211:*7, 16*  212:*21, 25*
213:*1*  234:*5*  236:*17*
237:*1, 5*  270:*8*
293:*13, 15*  322:*18*

**management's**  184:*2*
187:*24*  211:*17, 20*
212:*12*

**managing**  169:*20*
170:*11, 12*

**MANDEL**  2:*1*  3:*6*
8:*17, 24*  9:*8*  11:*18,*

**20**  12:*1, 6, 16, 19, 24*
13:*2, 7*  20:*21*  21:*5,
12, 13*  22:*16, 21, 24*
23:*5, 9, 15, 21, 24*
24:*3, 24*  25:*2, 9, 13*
26:*11, 17*  27:*16*
29:*21*  30:*2, 4, 6, 22,
23*  31:*5, 9, 13*  32:*1, 5,
14, 17, 20*  33:*21*  34:*1,
6, 14, 16, 25*  35:*13, 21*
37:*3, 12*  38:*12*  41:*13,
16*  45:*25*  46:*4*  48:*21*
51:*9*  53:*14, 17*  54:*19,
24*  55:*4, 7, 16, 19*
58:*20, 23*  59:*7, 10, 12*
62:*14, 22*  65:*6, 11*
68:*14*  70:*1, 20*  71:*5,
12, 22*  72:*1, 9, 15, 18,
20, 24*  73:*2, 8, 14, 22*
74:*3, 7, 14, 21, 25*
75:*2, 6, 12, 19, 23*
76:*1, 4, 8, 12, 17, 21*
77:*4, 6, 17, 23*  78:*5, 9*
80:*16, 19*  85:*9, 18*
88:*14, 24*  90:*4*  91:*9*
92:*17*  95:*20, 22*
97:*14, 17, 19*  98:*17,
22*  107:*5, 9*  108:*7, 8,
13*  112:*14, 16, 19*
113:*3, 5, 7*  116:*21*
118:*6, 17, 20, 23*
121:*17, 24*  122:*1, 19,
23*  124:*16, 20*  127:*9,
21*  129:*25*  130:*3, 7,
10, 15, 19*  131:*2, 7, 9,
14, 15, 20, 24*  132:*4*
133:*5, 13, 15, 16, 18,
21*  134:*1, 7, 12, 20*
135:*6, 17, 23*  136:*2,
12, 20, 22, 25*  137:*2, 4*
138:*1, 6, 20*  139:*16*
140:*6*  141:*3*  142:*12*
143:*1*  144:*19*  146:*2,
7*  147:*21, 24*  150:*6*
151:*21*  152:*2, 5, 11,
15, 19, 21, 23*  153:*6,
10*  156:*24*  157:*5, 8*
158:*23*  159:*2*  166:*2,
5, 8*  169:*25*  175:*3*
176:*13, 24*  177:*6, 7,*

**18, 19, 23**  178:*2*
180:*1, 8, 12*  181:*14*
183:*13*  185:*11, 14*
188:*20, 24*  201:*3*
206:*3*  208:*8, 12, 19,
23*  214:*2*  215:*18, 21*
216:*14, 22*  217:*1*
220:*20*  221:*4*  222:*14*
223:*3*  229:*25*  230:*6,
25*  231:*5, 11, 19*
232:*2, 21, 25*  233:*6, 7*
237:*11, 15*  239:*12, 21*
240:*17*  241:*1, 5, 7, 13*
242:*4, 8*  244:*13, 16*
245:*15, 23*  248:*16, 20*
250:*8, 16, 25*  251:*6,
25*  252:*5, 6, 15, 16, 24*
253:*7, 15, 19, 20*
254:*2, 4, 7, 19*  255:*14*
256:*1, 3, 7, 20*  257:*4,
10, 13, 18*  258:*4, 19*
259:*6*  260:*8, 10, 12,
16, 17, 22*  261:*3, 7*
262:*6*  263:*1, 5*
267:*25*  274:*12, 16*
279:*19, 23*  282:*4, 10,
15*  283:*6, 8, 14, 23*
285:*14*  288:*10, 20, 23*
290:*10*  294:*7, 10, 13*
295:*14, 15*  299:*12, 16*
301:*2, 6, 13, 18, 20, 25*
302:*5, 9, 12, 17, 19, 24*
303:*3, 4, 13, 18, 21, 25*
304:*6, 12, 22*  305:*6,
12, 14, 17, 24*  306:*1, 8,
13, 17, 20*  308:*12, 18,
25*  311:*10, 21*  312:*1,
6, 13*  317:*11*  318:*6*
320:*5*  321:*23*  322:*3*
326:*5, 17*  327:*11*
329:*19, 23*  330:*5*
338:*1*  339:*2*  342:*9*
344:*20*  347:*5, 6, 12*

**manufacturer**  339:*8*

**margin**  157:*13, 19*
158:*5*  236:*15*  336:*7*

**margins**  336:*1*

**mark**  232:*24*  303:*9*

**MARKED**  3:*11*
12:*18*  22:*23*  41:*15*

**46:3**  55:*18*  59:*9*
62:*21*  65:*10*  78:*8*
80:*18*  97:*16*  98:*21*
107:*8*  118:*22*  122:*22*
124:*19*  146:*6*  147:*23*
153:*9*  159:*1*  178:*1*
185:*13*  188:*23*
208:*22*  216:*25*  232:*1*
237:*14*  242:*7*  244:*15*
248:*19*  257:*17*  261:*6*
263:*4*  274:*15*  279:*22*
288:*22*  294:*12*
299:*15*  304:*21*
311:*25*  322:*2*

**market**  36:*1*  39:*14*
86:*2, 14*  94:*2*  104:*17*
172:*16*  173:*6*  174:*2*
182:*13*  183:*21*
198:*21, 25*  210:*14*
212:*20*  213:*8*  214:*5,
14*  219:*1, 12*  226:*1*
235:*24*  238:*1, 23*
239:*3, 14*  346:*22*

**Marketing**  331:*16*

**marketplace**  33:*11*
39:*6*

**Massachusetts**  330:*18*

**Material**  27:*21*  28:*6,
13, 23*  29:*3, 9, 14*
33:*2, 6, 23*  34:*3*
35:*17, 22*  36:*2, 9, 13,
15, 19, 24*  37:*8, 18*
38:*23*  39:*1, 16*  40:*1,
6, 13, 17*  41:*1, 8*
95:*10, 16*  96:*1, 6, 9,
16, 25*  97:*2, 7, 9, 21*
98:*5, 14*  275:*23*
276:*20*  281:*3, 18*
282:*12*  284:*1*  288:*4,
8*  289:*18*  308:*20*

**materiality**  20:*18*
21:*1, 7, 9, 24*  22:*9, 17*
33:*15*  68:*10*  89:*1*
138:*23*

**Materially**  308:*13*

**material-nonpublic**
343:*21*

**materials**  5:*8*  19:*18*
56:*7*  107:*19*  160:*10,
14*  178:*6*  186:*8, 16,*

**25** 187:*4, 13, 17* 188:*10*

**math** 17:*14* 308:*11* 323:*25* 324:*6* 325:2

**matter** 106:*10, 15* 118:*8* 131:*11* 133:*3* 141:*14* 144:*15* 181:*12* 216:*11* 276:*21* 343:*22* 344:*24*

**matters** 157:*14, 21* 284:*4* 299:*7*

**max** 334:*16*

**MBA** 14:*13, 14* 330:*23* 331:*1*

**McGRATH** 1:*10* 3:*4* 5:*4, 8* 8:*7* 9:*2, 9* 14:*19, 20* 21:*14* 23:*13* 24:*4* 30:*7, 24* 32:*2, 21* 34:*17* 55:*11, 24* 59:*13* 65:*13* 72:*19* 76:*18* 78:*16* 88:*22* 89:*3* 91:*4, 14* 101:*11* 113:*4* 119:*3* 127:*24* 133:*22* 134:*21* 136:*3* 141:*19* 151:*24* 153:*15* 159:*4* 160:*3* 166:*10* 171:*13* 178:*4* 182:*15* 183:*1* 193:*15* 204:*18* 219:*19, 22* 220:*21* 223:*12* 230:*7* 241:*8* 242:*9* 252:*17* 254:*8* 259:*21* 260:*18* 280:*3* 283:*24* 330:*5, 12* 347:*12* 348:*14*

**mean** 11:*24* 12:*4* 18:*4* 19:*6* 29:*21* 35:*22* 42:*15* 47:*17, 20* 64:*10* 73:*16* 80:*7* 101:*1* 106:*25* 140:*4* 144:*23* 149:*20* 166:*15, 19* 167:*6* 168:*22* 169:*12* 175:*12* 176:*19, 25* 180:*4* 184:*2* 197:*19* 226:*15* 230:*23* 232:*25* 239:*18* 250:*3* 255:*18* 256:*15* 273:*22* 287:*23, 25*

290:*13, 22* 294:*19* 298:*2* 309:*11* 311:*20* 344:*16*

**meaning** 12:*7* 42:*22* 159:*13* 168:*3*

**meaningful** 315:*18, 25* 316:*22* 317:*16, 25* 321:*9*

**means** 11:*22* 18:*5, 16* 33:*6* 39:*2* 47:*22* 49:*18* 163:*24* 226:*11* 285:*4* 316:*16* 319:*25* 320:*1*

**meant** 71:*21* 72:*14, 23* 73:*13* 77:*2* 84:*12* 163:*8* 219:*11* 250:*10* 272:*7*

**measurement** 332:*11*

**medium** 10:*17*

**meet** 9:*11*

**Meeting** 3:*18* 4:*6, 14, 17* 5:*3, 16, 20* 6:*18* 41:*19, 22* 44:*9* 45:*23* 46:*16, 23* 60:*7, 10, 13, 16* 61:*14* 62:*23* 63:*5, 8* 64:*9* 78:*13, 20, 22* 79:*1, 3, 15, 22* 80:*11* 81:*15* 95:*8, 25* 99:*1, 4, 9, 21* 100:*1, 3* 107:*12* 108:*17, 22* 116:*4, 7, 16* 120:*4, 10* 146:*23* 147:*8, 16* 148:*19* 149:*1* 153:*12* 154:*1, 3, 6, 13, 14, 15, 19, 23* 155:*13, 16, 24, 25* 156:*8* 160:*14* 169:*21* 189:*2, 6, 9, 10, 18, 19, 20* 190:*2, 5, 10* 200:*15, 20, 24* 201:*5, 16, 25* 203:*6, 10, 22* 204:*3, 5, 9, 15, 16, 18* 205:*6, 15, 16, 21* 206:*12, 20* 207:*2, 10* 208:*25* 209:*5, 19* 210:*13, 19* 211:*7, 8, 23, 24* 212:*4, 13* 217:*7, 15, 20* 218:*2, 5, 12, 15, 23, 24* 219:*4* 220:*12* 221:*5* 223:*12, 17, 25* 224:*16* 225:*1,*

*4, 5, 21* 227:*3, 8, 10* 228:*6, 23* 229:*20* 230:*8, 11, 15, 20* 232:*14, 20* 233:*15, 16* 236:*22* 237:*5* 238:*19* 239:*23* 247:*25* 265:*9* 269:*7, 13, 16* 286:*17, 19, 20, 21, 23* 287:*1, 5, 6* 289:*4, 11, 14, 18* 291:*12, 15* 295:*8* 297:*23* 298:*23* 299:*8, 20* 300:*9* 307:*9* 320:*21*

**Meetings** 3:*20* 5:*13* 6:*22* 46:*12* 71:*10* 79:*18, 19* 98:*20* 99:*6, 18* 153:*24* 154:*11* 160:*11* 212:*5* 238:*16* 286:*14* 300:*22* 320:*1, 20* 345:*4*

**member** 21:*16, 25* 22:*1* 46:*11* 116:*16* 160:*13* 206:*24* 268:*19*

**members** 24:*8* 99:*12* 132:*16* 154:*16, 18* 155:*1, 2, 5, 6, 7, 9, 10, 11* 159:*14* 168:*15* 189:*15* 204:*13* 211:*4* 266:*9, 16, 25* 267:*3, 9, 12, 22* 268:*2, 8, 9, 21* 271:*11* 277:*21* 278:*10, 15, 17* 280:*4, 7* 323:*12* 325:*9* 337:*11, 12* 343:*1, 16* 344:*4*

**memo** 98:*15*

**mentioned** 15:*13* 16:*21* 104:*9* 169:*24* 235:*22*

**mentions** 18:*13, 24*

**merger** 36:*21, 23* 322:*4*

**mergers** 18:*16* 37:*8*

**message/Wolverine** 295:*17*

**messages** 123:*17*

**Messaging** 123:*19*

**Messenger** 159:*14* 160:*5, 7, 15, 17*

**met** 60:*17, 25* 61:*15, 16, 17* 210:*18* 237:*1*

**method** 111:*9* 112:*11* 184:*23*

**metrics** 110:*14*

**MICHAEL** 1:*10* 3:*4* 5:*11* 8:*7* 9:*2* 178:*4* 185:*18* 186:*3, 7, 16* 348:*14*

**Michael_e_mcgrath@ msn.com** 125:*11*

**MICHIGAN** 1:*25* 8:*1* 350:*2, 24*

**mid** 215:*19, 21*

**mid-40s** 179:*7* 183:*3* 188:*4, 15*

**middle** 29:*12* 111:*8* 121:*15* 202:*6* 225:*11* 229:*9*

**midpoint** 237:*24*

**million** 45:*19* 49:*9, 16* 50:*2, 22, 24* 51:*1, 10, 14, 15, 16, 17, 18, 20, 24* 53:*1, 3, 10, 19, 23, 25* 56:*25* 57:*3, 8, 19, 25* 58:*3, 9, 13, 17* 191:*6, 10, 14, 18, 22* 192:*6, 9, 19, 20* 193:*8, 17, 22* 194:*8, 15, 20, 22* 195:*14, 16* 196:*1, 12, 21* 197:*1, 11, 13, 23* 198:*4, 19* 199:*4, 8, 14, 16, 23* 200:*8, 10, 11* 202:*17, 18* 205:*20* 206:*4, 8* 237:*22, 23* 263:*18, 21* 264:*3, 5, 9, 13* 265:*17* 266:*4* 267:*10* 269:*19* 270:*7, 10, 12, 15, 16, 19, 23* 271:*1, 5, 7, 13, 21, 23* 272:*1, 8, 13, 16* 273:*11, 25* 274:*5* 275:*10* 277:*1* 281:*2, 25* 307:*11, 16, 19, 20, 24* 309:*12* 310:*11, 14, 21* 311:*16* 313:*16* 323:*9* 325:*5, 8* 326:*12, 18* 327:*6, 23* 340:*3*

**millions** 340:*2*

**mind** 12:*8* 26:*13* 75:*18* 98:*5*

**Mine** 121:*6* 227:*20*

**minimum** 51:*15, 23* 110:*11*

**minus** 327:*15*

**minute** 60:*22* 151:22 329:*20, 23*

**Minutes** 3:*17* 4:*6, 14* 5:*3, 15, 20* 6:*18* 41:*19* 42:*7* 58:*10* 59:*22* 60:*7, 15* 78:*12* 79:*6, 17, 20, 22, 25* 80:*8* 99:*25* 105:*25* 106:*7* 108:*16* 113:*23* 116:*3* 145:*7* 152:*8, 21, 22* 153:*12, 21, 23* 154:*18* 156:*4* 158:*15* 190:*3, 6* 201:*16* 203:2, *9, 12* 204:*25* 208:*24* 209:*12* 210:*5* 211:*12* 217:*7, 10, 15* 219:*21* 221:*9, 21* 222:*8* 223:*9, 10* 226:*9, 12, 15, 19, 24* 227:*2, 6, 8, 10* 228:*9, 14, 16, 17, 19, 22* 229:*1, 14, 18* 230:*17, 19* 241:*4* 287:*10, 15* 288:*24* 289:*1, 3, 4* 295:*8* 307:*6* 312:*4*

**minutes/privileged** 5:*18*

**mirroring** 123:*24*

**mischaracterizes** 267:*24* 281:*21*

**misquoting** 157:*4*

**Missouri** 2:*14*

**misstated** 328:*13*

**Misters** 60:*25* 125:*15*

**mix** 33:*10* 39:*5* 42:*12, 21, 23* 43:*10* 44:*21* 45:*12, 13* 48:*17*

**MNDI** 275:*19*

**MNPI** 275:*15, 18* 287:*24* 288:*12*

**mode** 219:*6* 298:*15*

**moment** 12:*20* 24:*5* 53:*7* 64:*10* 101:*13*

108:*5* 112:*20* 119:*12* 123:*14* 134:*14* 148:*14* 162:*2, 23* 177:*8* 185:*1* 188:*2, 13* 306:*16*

**momentum** 157:*13, 19* 158:*4*

**money** 52:*11* 114:*3* 170:*18* 309:*17* 324:*4* 326:*7* 327:*18*

**monitor** 8:*6* 94:*14, 18* 290:*7* 298:*16*

**monitored** 94:*20*

**monitoring** 262:*24* 343:*6*

**month** 95:*18* 148:*19*

**months** 47:*24* 48:*5* 97:*5* 217:*22* 219:*8* 256:*9, 15, 18* 261:*2* 264:*8* 290:*15* 313:*6* 315:*15, 16, 21* 316:*5, 20* 317:*13* 318:*11* 319:*3, 5, 17* 320:*9, 23* 321:*7* 331:*14* 346:*11, 15*

**Morgan** 247:*6*

**morning** 9:*9, 10* 154:*10*

**mother** 176:*18* 181:*6*

**motion** 43:*13* 137:*1*

**motions** 207:*20*

**motivate** 251:*1*

**motivated** 143:*23* 251:*1, 8, 10, 15*

**motivation** 252:*19*

**mouth** 98:*9* 141:*11, 12*

**move** 29:*12* 48:*25* 59:*7* 69:*13* 74:*25* 75:*17* 107:*5* 134:*6* 135:*22* 141:*25* 146:*2* 160:*20* 183:*20* 204:*16* 240:*14, 18* 288:*20* 304:*16* 310:*7*

**Moving** 141:*20*

**MSN** 125:*5*

**muddy** 74:*15*

**multimillion** 332:*17*

**multiple** 111:*11, 18*

112:*3, 5* 184:*16*

**multiples** 111:*20*

**multiplied** 111:*23* 327:*4*

**multiplying** 111:*17* 112:*5* 184:*19*

**mutual** 70:*19*

**< N >**

**name** 8:*11* 100:*24, 25* 101:*8* 113:*13* 120:*23* 121:*4, 10* 330:*13* 344:*14*

**named** 62:*25*

**Naples** 328:*8*

**narrow** 50:*20*

**NASDAQ** 17:*3*

**NATI** 3:*14* 47:*14* 343:*19*

**NATIONAL** 1:*6* 3:*17* 4:*4, 14* 5:*3, 15* 6:*16* 13:*25* 14:*5* 17:*6* 18:*19* 19:*15* 23:*2* 24:*13, 20* 25:*5* 26:*20, 25* 27:*5* 33:*20* 35:*3* 37:*6* 46:*12* 47:*20* 48:*8* 50:*10, 19, 25* 51:*11* 60:*21* 61:*3* 62:*7* 64:*4, 12* 65:*17* 66:*11, 15* 67:*5, 20* 69:*19* 78:*12* 79:*17, 24* 80:*8* 86:*9* 88:*8* 93:*14, 19* 94:*5, 18, 23* 95:*2* 97:*11* 109:*3, 11* 114:*5* 123:*3* 124:*22, 23* 125:*22* 126:*3, 24* 132:*15* 140:*8, 14* 147:*6, 14* 153:*13* 156:*11* 158:*12* 161:*8* 163:*3, 8* 164:*4* 165:*15, 21* 167:*11* 172:*19* 173:*16* 176:*8* 187:*9* 209:*1, 6* 237:*18* 249:*4, 19* 250:*3, 10* 253:*2* 255:*16, 22* 256:*22* 257:*7* 259:*1, 15* 261:*10* 291:*21* 292:*5, 15* 293:*1* 298:*1, 10* 309:*4* 312:*20* 314:*18,*

*19, 25* 315:*23* 316:*21* 317:*15* 321:*7, 8, 10* 322:*22* 323:*9* 328:*5, 10, 14, 18* 329:*5, 6* 330:*14* 331:*11, 17* 332:*7* 333:*9, 18, 24* 334:*11, 23* 335:*1* 336:*23* 337:*23* 340:*6, 16, 19, 25* 342:*1, 6* 343:*12, 15* 345:*2, 7* 346:*21* 348:*1*

**native** 231:*6, 14* 304:*19* 305:*8, 22* 306:*14*

**NATL-17465** 121:*22*

**NATL-SL-17442** 121:*20*

**NAT-SL-0000004** 41:*21*

**NAT-SL-00000048** 3:*18*

**NAT-SL-00000070** 6:*24*

**NAT-SL-00001113** 4:*4* 65:*9*

**NAT-SL-00001239** 6:*4*

**NAT-SL-00001250** 5:*2*

**NAT-SL-00001254** 4:*21* 123:*2*

**NAT-SL-00001258** 3:*24* 59:*11*

**NAT-SL-00001447** 4:*15*

**NAT-SL-00001449** 4:*7* 78:*11*

**NAT-SL-00001450** 6:*19*

**NAT-SL-00001455** 5:*16*

**NAT-SL-00001457** 5:*4*

**NAT-SL-00002982** 6:*2*

**NAT-SL-00006694** 6:*10*

**NAT-SL-00009179** 6:*16*

Deposition of Michael McGrath

In Re National Instruments Corporation Securities Litigation

**NAT-SL-00010410** 4:*23*

**NAT-SL-00010818** 4:*2*

**NAT-SL-00011671** 4:*19*

**NAT-SL-00015017** 6:*13*

**NAT-SL-00015282** 4:*25*

**NAT-SL-00016112** 4:*10*

**NAT-SL-00016264** 6:*8*

**NAT-SL-00016270** 4:*13*

**NAT-SL-00016998** 5:*25*

**NAT-SL-00020739** 5:*19*

**NAT-SL-00020795** 5:*7*  159:*3*

**NAT-SL-00021241** 3:*16*

**NAT-SL-00021516** 5:*9*

**NAT-SL-00023189** 6:*22*

**NAT-SL-00023501** 6:*6*

**NAT-SL-00024106** 5:*14*

**NAT-SL-00024256** 3:*20*

**NAT-SL-00024451** 3:*22*

**NAT-SL-00025798** 5:*22*

**NAT-SL-00026220** 7:*2*

**NAT-SL-00027877** 5:*12*

**NAT-SL-10410** 124:*21*

**NAT-SL-10818**  62:*20*

**NAT-SL-11671** 118:*25*

**NAT-SL-1239**  248:*21*

**NAT-SL-1250**  147:*25*

**NAT-SL-132**  300:*7*

**NAT-SL-1450**  288:*24*

**NAT-SL-1455**  208:*24*

**NAT-SL-1457**  153:*11*

**NAT-SL-15017** 274:*18*

**NAT-SL-15282**  146:*9*

**NAT-SL-16112**  80:*20*

**NAT-SL-16264**  261:*8*

**NAT-SL-16270**  97:*18*

**NAT-SL-16998**  242:*6*

**NAT-SL-17444** 121:*21*

**NAT-SL-20739**  217:*4*

**NAT-SL-21241**  23:*25*

**NAT-SL-21516**  178:*3*

**NAT-SL-23501** 257:*19*

**NAT-SL-24106** 188:*25*

**NAT-SL-24256**  46:*2*

**NAT-SL-24451**  55:*23*

**NAT-SL-27877** 185:*15*

**NAT-SL-2982**  244:*18*

**NAT-SL-70**  299:*18* 301:*7*

**NAT-SL-9179**  279:*24*

**nature**  89:*2*

**NDA**  145:*17*  337:*6, 8*

**near**  13:*9*  26:*1*  42:*1* 45:*18*  54:*4*  69:*6* 117:*9*  206:*11*  247:*15*

**nearly**  17:*11*  67:*23* 325:*5*

**necessarily**  118:*8* 145:*1*

**necessary**  136:*3*

**need**  10:*21*  11:*2* 12:*14, 23*  82:*10* 112:*17*  130:7  149:*8* 152:*3, 6, 9*  167:*4, 10* 169:*8, 9, 13*  177:*2* 179:*7*  183:*2*  188:*3, 14*  193:*14*  241:*10* 258:*3*  274:*25*  277:*11* 312:*3*

**needed**  169:*14* 170:*16*  219:*17*  335:*8* 345:*18*

**negative**  57:*12, 14, 15, 16, 17*  182:*18*  191:*25* 192:*3, 13, 19, 20, 21* 193:*2, 8*  194:*10* 197:*9*  206:*24*  207:*3* 265:*20*  266:*17* 268:*13, 22*  269:*23* 270:*1*  271:*16*  272:*14* 273:*2, 20*

**negatives**  80:*5*

**negotiate**  105:*11*

**negotiated**  94:*2*

**negotiating**  105:*10*

**neither**  76:*16*  227:*19*

**net**  245:*7*

**never**  43:*12*  45:*6* 61:*15, 16, 17*  90:*15, 22*  91:*16, 17*  92:*15* 97:*4*  108:*10*  114:*10* 145:*2*  179:*22, 25* 186:*19*  227:*11* 252:*23*  253:*12*  255:*1* 256:*10*  262:*3*  279:*3* 281:*23, 25*  282:*16* 293:*17*  298:*2, 19* 328:*12*  329:*15*  346:*5, 7, 14, 16*

**Nevertheless**  262:*7* 291:*12*  297:*18* 310:*20*

**NEW**  1:*2*  2:*7*  8:*9, 22*  23:*5*  44:*10*  62:*16, 17*  75:*18*  122:*16* 132:*8*  174:*2*  178:*24* 198:*19*  199:*15*  200:*1* 209:*9*  210:*15*  211:*7, 10*  212:*9, 20, 22, 24* 213:*8, 20*  214:*5, 14* 218:*16, 25*  223:*10* 232:*24*  239:*3*  321:*21* 328:*21*  340:*4*

**News**  7:*3*

**NI**  3:*18, 20*  4:*23* 5:*1, 13, 20, 23*  6:*3, 22* 7:*4*  39:*14*  61:*4, 7, 10* 62:*2*  64:*22*  88:*19* 90:*22*  125:*8*  291:*20* 296:*2, 14*  297:*23* 298:*3*  299:*1, 5*

313:*14*

**ni.com**  125:*16*

**nice**  9:*11*

**Night**  5:*6*  13:*14, 17* 161:*9*  190:*1*  217:*14* 232:*14*

**night's**  5:*18, 20* 217:*10*

**Niles**  62:*25*  63:*2* 80:*21*  125:*15*  154:*23* 155:*2, 5, 10*  220:*8* 232:*11*  261:*9*

**Nine**  17:*7*  328:*15, 17, 20*

**NI's**  69:*10*  136:*4* 149:*8*  166:*9*

**NOAM**  2:*1*  8:*17* 23:*3, 16*

**noam@rgrdlaw.com** 2:*8*

**no-brainer**  341:*24*

**non-privileged**  75:*15*

**nonprofit**  270:*8, 22* 328:*8*

**Nonpublic**  27:*21* 28:*6, 13, 23*  29:*4, 9, 14*  33:*2*  37:*18*  38:*23* 39:*1*  40:*6, 13, 17* 41:*1, 8*  95:*10, 16* 96:*1, 2, 6*  97:*21*  98:*5, 14*  275:*23*  276:*20* 281:*3, 18*  282:*12* 284:*1*  288:*4, 8*

**non-public**  145:*16* 291:*16*

**non-responsive**  92:*11* 141:*9*

**nonsense**  71:*22* 303:*13*

**non-trading**  343:*10*

**normal**  10:*15*  87:*5, 6*  187:*18*  289:*23*

**normally**  205:*12*

**NOTARY**  350:*1, 23*

**note**  19:*4*  29:*6*  52:*2* 107:*22*  120:*21* 122:*12*  154:*18* 163:*12*  259:*5*

**noted**  77:*4*  84:*12*

Deposition of Michael McGrath

In Re National Instruments Corporation Securities Litigation

191:*12*

**notes** 350:*12*

**notice** 136:*24*

**Notification** 4:*12*

**Notification/Please** 6:*13*

**noting** 66:*10*

**November** 315:*4, 6* 317:*14* 319:*18* 327:*2* 336:*20* 340:*13* 341:*15*

**NSBI** 300:*20*

**nuance** 12:*12*

**Number** 8:*7* 17:*25* 23:*4, 18* 25:*15* 26:*7* 29:*13* 30:*13* 41:*20* 49:*23* 50:*21* 55:*23* 62:*19* 83:*6* 97:*18* 110:*23* 116:*22* 118:*25* 122:*9* 123:*1* 124:*11* 146:*13* 171:*7, 8, 12, 13, 15* 178:*19, 22* 185:*15* 190:*14* 191:*12* 203:*24* 204:*24* 216:*23* 231:*22* 237:*17* 242:*6* 246:*13* 247:*7* 300:*25* 301:*4, 6* 306:*4* 308:*13* 310:*18* 313:*4* 325:*23* 327:*15*

**numbers** 25:*22, 23, 24* 51:*4* 195:*3* 196:*7* 233:*9* 246:*20* 247:*23, 24* 305:*20*

**numerous** 15:*8, 11* 40:*6* 68:*10*

**nut** 121:*10*

**Nuthatch** 113:*11, 13, 16* 115:*6* 117:*2, 11, 16, 24* 121:*3, 6, 10* 146:*22* 172:*12* 217:*21*

**< O >**

**ob** 91:*15*

**object** 10:*10* 11:*19* 20:*19* 29:*18* 33:*16* 34:*23* 35:*8, 10, 18* 73:*25* 92:*14* 116:*20* 118:*9* 133:*18* 136:*7*

156:*19* 165:*23* 169:*18* 174:*22* 200:*25* 240:*3* 250:*23* 251:*18* 252:*7* 326:*14* 338:*1* 342:*9* 344:*20*

**objecting** 32:*14, 15, 18* 34:*10*

**Objection** 21:*2* 22:*18* 29:*25* 31:*6, 10* 34:*12* 69:*24* 72:*5* 77:*12* 85:*3* 88:*23* 89:*25* 121:*2, 5* 127:*5, 12* 129:*20* 133:*11, 13, 14* 135:*20* 139:*19* 157:*4* 166:*16* 176:*11* 222:*9* 229:*21* 239:*16* 250:*5* 251:*4* 267:*23* 319:*19* 327:*8*

**objections** 22:*11* 33:*25* 34:*4, 13* 70:*24* 72:*15, 17* 73:*7, 11* 76:*25* 77:*4, 19* 85:*15* 88:*25* 134:*22* 135:*10* 221:*3* 250:*13* 252:*2* 254:*24* 256:*3*

**objective** 110:*23* 162:*25* 163:*2* 172:*13*

**objects** 10:*11*

**obligation** 86:*11* 87:*25* 88:*5* 91:*18* 92:*4* 105:*1, 11, 19* 132:*16* 137:*23* 139:*8, 9, 10* 140:*20* 173:*24* 180:*20* 181:*8, 10* 276:*7* 282:*20* 284:*20* 338:*8, 9* 346:*2*

**obligations** 17:*17* 85:*22, 24* 86:*8, 18* 87:*15, 18, 24* 88:*4, 9* 89:*3, 4, 24* 91:*13*

**observing** 9:*1* 257:*24*

**obstructing** 134:*4* 252:*2*

**obtain** 184:*19*

**obtained** 143:*3*

**obtaining** 331:*1*

**obvious** 22:*13, 15* 96:*7* 166:*15, 18* 184:*25* 242:*17* 262:*13* 287:*11, 13*

**obviously** 14:*4* 19:*10* 33:*20* 51:*6* 64:*20* 74:*15* 76:*5* 85:*7* 88:*8* 99:*24* 106:*17* 107:*24* 108:*9* 115:*23* 128:*20* 154:*17* 222:*3* 240:*25* 261:*18* 262:*3, 15* 273:*16* 274:*7* 277:*13* 283:*1* 286:*16* 287:*7* 297:*17* 303:*18* 310:*17, 19* 335:*5*

**occasion** 20:*17, 25*

**occasionally** 113:*16*

**occasions** 22:*8*

**occur** 45:*13* 106:*11* 114:*25*

**occurred** 53:*9* 79:*14, 19* 85:*11* 218:*12*

**October** 6:*24* 24:*16, 17* 299:*17* 304:*23* 307:*8*

**offer** 63:*14, 15* 64:*13, 21* 83:*16* 85:*6* 88:*13, 18, 20* 89:*5, 10, 12, 19* 90:*1, 14, 21* 91:*8, 18, 23, 25* 92:*1, 3, 25* 93:*1, 4, 13* 95:*23* 96:*4, 7, 11, 23, 25* 97:*1, 3, 6, 12* 98:*7, 15* 99:*10, 13, 16, 19, 20* 100:*14* 101:*6* 103:*7, 9, 16* 104:*6, 14, 16, 23* 105:*1, 5, 7, 8, 9, 12, 17* 106:*11, 19, 23* 107:*3* 110:*15, 18* 118:*7, 12, 13* 120:*17* 125:*24* 126:*1, 11, 16, 18, 21, 22, 25* 127:*7, 10, 11, 14, 15, 19, 20* 128:*4, 8, 9, 16, 17, 23* 129:*6, 7, 11, 17, 18, 22, 23, 24* 131:*12* 132:*9, 10, 11, 12, 14* 133:*8* 134:*18, 24* 135:*2, 14, 15, 18* 137:*6* 138:*15* 139:*6* 140:*2, 3, 5, 13, 24* 141:*13, 15, 17* 142:*3* 149:*18, 24* 156:*14* 157:*22* 162:*20* 165:*1, 13, 16* 166:*25* 167:*4*

174:*7, 8, 11, 12, 20, 25* 175:*15, 18, 20, 23, 25* 176:*2, 22* 177:*10* 180:*4* 181:*12, 19, 23* 182:*1, 8, 9, 13* 183:*7, 22* 212:*15* 213:*21* 214:*4, 13* 215:*4, 10* 216:*7, 16, 20* 217:*21* 218:*14, 21, 25* 219:*5* 224:*6, 7, 9, 12, 20* 225:*6, 7, 14, 15* 229:*8* 230:*10, 14, 15, 16, 21* 236:*21* 242:*14* 249:*9, 11, 14* 254:*10* 255:*6, 8, 9* 256:*12* 260:*24* 275:*21* 276:*6, 12* 277:*3* 279:*5* 282:*21* 284:*5* 288:*7, 8* 290:*2, 12* 308:*8* 309:*5* 314:*11, 23* 315:*17, 24* 316:*3, 10, 11, 22* 317:*16, 23* 318:*17, 19, 21* 319:*6* 321:*9, 21* 326:*10* 333:*4, 6, 10* 334:*17* 336:*20* 337:*21, 22* 338:*2, 5, 25* 340:*7, 9, 12* 345:*19, 20* 346:*6*

**offered** 127:*4* 131:*12* 223:*22* 314:*13* 318:*16* 334:*11, 13*

**Offeree** 83:*7* 122:*12*

**offerer** 122:*12*

**offering** 124:*22* 135:*7, 11* 140:*13* 334:*24*

**offerings** 86:*1, 13*

**Offeror** 83:*7*

**offers** 316:*7* 333:*21* 337:*24* 338:*10, 11* 339:*4* 341:*15*

**officer** 226:*14*

**officers** 325:*20*

**official** 332:*5*

**offset** 49:*7, 16, 19, 22* 51:*7, 15, 19* 342:*13*

**Oh** 23:*9* 28:*19* 31:*4* 34:*21* 43:*3* 50:*15* 55:*4* 71:*13* 82:*4* 103:*15* 125:*7* 157:*5*

175:*20*  180:*11*
209:*13*  231:*11*
263:*19*  282:9  321:*25*
**Okay**  9:*19*  10:7
11:*5*  12:*11*  13:*20*
17:*20*  18:*13*  19:*25*
20:*16*  21:*12*  22:*21*
23:*23*  24:7, *17, 25*
25:*21*  26:*16, 19*
27:*19*  28:*21*  30:*10,
11, 17*  31:9, *13*  32:*12,
24, 25*  33:*1, 5*  41:7
44:*1, 6*  46:9, *25*  47:*3,
12*  48:*25*  50:7, *23*
51:*22, 25*  52:*16, 22*
53:*16*  54:6, *18, 19*
55:6, *14*  56:*15, 16*
57:*11, 24*  58:*12, 16,
25*  61:*18*  62:*14*  63:7
66:6  68:*17*  72:2
73:*23*  76:*10, 12*  78:*3,
5*  80:*15, 20*  81:*14*
82:5, *22*  83:*15, 20*
85:*10, 19*  86:*3, 19*
87:*17, 23*  89:6, *7, 21*
90:6, *9*  91:*18*  92:*16,
18, 19, 23*  93:2, *5, 12*
94:*12*  95:7  96:5
97:*14*  98:*12, 17*
99:*13*  100:*22, 23*
101:*4, 10, 11, 22, 24*
103:*15*  104:*12, 23, 25*
105:2, *9, 14*  106:7
107:*14, 22*  108:*23*
109:*16, 24*  110:*20*
111:8  112:*13*  114:*3*
117:*21, 22*  119:*4, 5,
22*  122:*3*  124:2
125:*12*  126:*8, 15*
128:*8, 9, 25*  129:*10,
16, 22*  132:*3, 9, 10, 11,
23*  133:6  135:*7, 13*
136:*1*  139:*12, 17, 24*
140:*3, 7, 17, 23*  141:*8,
13, 17*  142:*17*  144:*3,
24*  145:*5*  146:*17*
147:*10, 20*  148:*9, 23*
149:*20*  151:*21*  152:*2*
155:4  161:2, *8, 16, 24*
162:*15, 22*  164:*14*

165:7  167:*18*  171:*6,
15*  177:*23*  178:*11*
179:*12*  183:*18, 19, 23,
24*  184:*1, 10*  185:*1, 4,
8, 24*  186:*2*  189:*4, 13*
190:*13, 24*  193:*11*
194:*11, 14, 24*  195:*8,
11, 20, 25*  196:*8, 10*
197:*22*  199:*12*
200:*13*  201:*23*  203:*8,
13*  204:*1*  205:*6, 7*
206:*16*  207:*22, 25*
208:7, *19*  209:*2, 15,
18*  210:*7, 13*  211:*16*
214:*11*  215:*23*  216:*1*
217:9  218:*23*  219:*19*
220:*2, 10*  222:*7, 15,
22, 24*  223:*15*  224:*4*
225:*17, 19*  226:*6*
227:*21*  228:*21*
229:*13*  230:*7, 24*
231:*19*  233:*20*  234:*4,
11*  235:*11, 13*  238:*14*
240:*21*  241:*7, 17*
243:*3*  244:*3, 13*
245:*24*  246:*3*  249:*10,
13, 22*  250:*2, 20*
252:*17*  253:*12*
257:*23*  260:*1, 9*
261:*3*  262:*19*  263:*1,
6, 9, 12, 20, 23*  264:*11,
15, 24*  265:*25*  266:*23*
268:*5, 11*  270:*6, 12*
271:*10, 21*  272:*5, 11*
273:*5, 25*  274:*1, 11*
276:*2, 16*  279:*5, 18,
25*  281:*24*  282:*3*
283:*8*  287:*5*  293:*8*
294:*6, 21, 23*  295:*5, 7*
296:*5, 25*  298:*22*
299:*11*  300:*2, 14*
304:*23*  305:*6, 23*
306:*17*  307:*3*  308:*4*
309:*1*  310:*6, 7*
311:*13, 19*  312:*14, 15*
315:*10*  316:*13*  317:*2*
318:*17*  320:*16*
322:*25*  323:*4*  325:*5*
327:*12, 16*  329:*22*
330:*12*  331:9  340:*5*

343:*2, 14, 25*  344:*1, 3,
11, 16*  345:*14*  346:*25*
347:*2, 4, 13*
**old**  328:*24*
**omit**  228:*23*
**once**  62:5  96:*25*
105:6  276:*5, 22*
282:*20*  288:*7*  329:*10*
338:*24*  345:*19*
**one's**  228:*20*
**onetime**  336:*14*
**ongoing**  22:*1, 3*
155:*20*  216:*6*  278:*22*
**Onsite**  189:*6*
**open**  89:*10, 12, 19*
90:*1*  94:*2*  96:*17, 20*
97:*12*  98:7  341:*8*
343:*7*
**opened**  24:*11*
**Opening**  3:*14*  223:*8*
**opens**  24:*10*
**operated**  215:*9*
**operating**  18:7
57:*17*  103:*2, 3*
155:*20*  157:*14, 20*
158:*3*  163:*4, 9, 22*
164:*6, 15, 21*  165:*2*
167:*11, 16*  168:*4*
169:*20*  171:*16*  173:*1,
8, 9*  177:*14, 21*
180:*21*  187:*22*
214:*25*  215:*6, 9, 24*
216:*4, 8, 15, 17*  219:*3,
16*  224:*24*  235:*18*
236:*2*  247:*21*  282:*1*
336:*1, 3*
**operation**  193:*7*
**operational**  145:*10*
**operations**  53:*22*
57:*20*  58:*2, 8, 13*
192:*7, 10, 17*  193:*18,
23*  194:*2*  197:*10*
266:*17*  268:*14, 22*
269:*24*  309:*23*  310:*8,
11, 15*
**opine**  34:*13*
**opinion**  77:*21*  90:*2*
137:*9*  138:*19*  246:*4,
7*  253:*11*  255:*1, 2*
285:*11*  298:*5*  308:*17*

314:*3, 6*  316:*14, 18*
319:*12, 13, 14, 16*
320:*4*
**opinions**  248:*14*
321:*13*
**opportunity**  45:*14*
102:*16*  164:*15, 25*
172:*12*  313:*19*  314:*5,
8*
**opposed**  45:*6*
**optimism**  158:*2*
**option**  341:*8, 9*
**orally**  65:*21*
**order**  23:*12*  87:*1, 9*
102:*20*  203:*24*  204:*4,
11*  205:*3*  223:*13*
274:*4*
**orders**  132:*21*  182:*4*
**organization**  332:*24*
**organize**  283:*9*
**organized**  141:*24*
**oriented**  302:*11*
304:*10*
**original**  129:*17*
150:*15*  225:*20*  267:*7*
314:*23*
**originally**  330:*17*
345:*1*
**outcome**  187:*23*
**outflows**  274:*6*
**outlay**  263:*18*  264:*8,
13*
**outline**  164:*1*
**outlined**  79:*7*
**outlining**  116:*17*
211:*1*
**outlook**  217:*22*  219:*8*
**outperform**  236:*13*
**outreach**  62:*6*
**outright**  116:*22, 25*
118:*1*  123:*15*  124:*7,
14*  151:*8*
**outside**  205:*7*  221:*16,
25*  226:*19*  232:*19*
345:*11*
**outside-in**  142:*4, 8*
**outstanding**  54:*13*
67:*5*  96:*8, 11*  97:*1*
99:*10*  105:*18*  125:*22*

276:7
**overall**  43:19  144:21
**override**  282:3
**owned**  114:15
309:12  323:1  325:16
326:19
**Owners**  322:18
**Ownership**  322:17
325:14  327:5

**< P >**
**P&L**  201:20
**p.m**  112:24, 25
153:2, 3  154:7
161:10  189:5  208:15,
16  241:25  242:1
283:19, 20  312:9, 10
330:1, 2  347:16
**PAGE**  3:3, 11  13:10,
21  17:21  24:22
25:14, 16, 24  26:2, 4,
7, 9, 13, 18, 20  28:19,
20  29:12, 13  31:7
36:18  38:1, 22  41:25
42:2  45:17  46:5, 6
47:4, 8  49:1  52:16
56:5, 10  66:3  69:7
70:10  81:2, 18  82:19
83:20, 21  93:22
94:12  101:12  107:13,
15, 16  108:14, 15, 18
109:20, 25  110:2
111:8  113:8, 9, 19
114:8, 11  115:10, 15
116:1, 6, 10  118:18
122:3, 4  123:15
125:18  141:22
143:13  144:3, 7, 9
148:1  156:3  157:9
160:21  162:1, 5, 24
164:1  166:1  168:2
171:2, 3, 11, 12
178:14  184:1, 5, 6
189:5  190:16  195:5,
20, 21  198:16  201:17,
18  202:6  220:3
225:11  229:9  232:6
233:10, 14, 22  234:13,
22  235:6, 7, 8  237:21
248:21  265:25  289:7

300:7, 14  301:8, 16,
18, 22, 23  302:1, 14,
22, 23  303:9, 14
304:15  305:21  306:4,
5, 6, 7, 9, 10, 18, 21, 23
313:3  315:5  322:15
349:2
**pages**  25:3, 20  48:25
81:3  156:4  165:7
190:16, 19  198:17
233:11  301:24  302:4,
13
**paid**  52:2  120:1
253:13  309:7
**Paragraph**  29:13
30:7  32:22, 23  33:1
37:14  39:24, 25
66:10  145:5  148:25
202:5  313:10
**paragraphs**  209:11
**parameters**  201:13
**part**  31:6, 7, 11  50:1
70:25  71:1  79:21
108:2  150:1  156:8
167:17  180:23  181:9
187:22  201:1, 7, 9, 18,
24  202:23  203:3, 5
206:1  224:25  270:10,
21  289:22  312:2
342:11
**partially**  29:19, 22
**participate**  161:16
**participated**  154:23
**particular**  52:9
110:20  171:3  222:6
267:9, 11, 21  268:2
**particularly**  290:13
**parts**  157:1, 6
**party**  350:13
**pastes**  261:11
**Pause**  30:22  118:18
151:22
**pay**  102:22  226:23
291:1  336:5  340:15
**paying**  52:7, 11
290:19
**PDF**  231:4, 7, 8, 14,
16, 21  304:19  305:19
**peer**  47:18  164:23
167:17  169:20

**peers**  47:14  48:1, 2,
5, 11
**penalized**  335:15
**pending**  10:24, 25
36:20  37:8  75:17
182:23
**penny**  112:9  184:22
**people**  11:23  12:13
77:2  204:14  205:6,
15  261:10  275:23
309:16  322:8  326:23
337:10  341:18
342:25
**people's**  204:5
**percent**  52:2, 3, 4, 5,
7, 12  54:1  67:4, 19,
23  102:22  126:3, 12,
13, 14  128:1, 2, 4, 9,
22  129:1, 4, 5, 17, 18
133:9  134:18  135:4,
5, 8, 19  136:4, 23
137:6, 8  138:2, 7, 15,
25  170:22  196:19, 22
197:6, 14  210:2, 3
233:17, 18, 22, 25
234:1, 11, 12, 13, 14,
22, 25  235:23  237:23
247:8  310:18  311:16
**percentage**  47:24
102:23  127:17
132:13  139:25
196:16, 25  236:3
336:7
**percentages**  236:8
**Percival**  6:13  24:8
280:1  342:24  343:4,
5, 22  345:7, 10
**perfectly**  32:22
**performance**  145:10
157:14, 21  158:4
214:6, 17  215:7
**performed**  142:4
**period**  15:25  16:1, 2,
7, 17, 25  17:2, 9  48:6
50:20  52:9  87:6
88:12  96:9  102:4, 6,
9  154:3  200:11
240:10  273:4, 7, 8, 12,
23  274:9  279:15
281:14, 25  282:3

285:9  310:20  314:7
315:15  317:2, 3, 13,
24  318:10, 17  320:2
321:6  323:22  335:6,
9, 18, 19, 21, 22
337:14  338:23
341:14  342:7, 15
346:9, 17
**permissible**  344:9
**perseverating**  260:16
**person**  10:8  60:7, 11,
13, 16, 17, 25  76:15
**personal**  240:15
**personnel**  35:4
**Persons**  3:14
**perspective**  223:8
**petered**  296:4, 7, 21
297:4, 10, 12, 19
299:3
**Ph.D**  330:25
**phone**  59:22, 25
63:22, 25  64:12, 18
119:21
**photograph**  119:17
**photographed**  119:6
**phrase**  28:2, 3
345:14
**pick**  119:20
**picture**  119:6
**piece**  130:22  294:20
**pill**  345:1
**pipeline**  296:3
297:24  298:2, 11
299:1
**Pittiglio**  14:19
**place**  65:3  90:18
92:24  108:1  154:3
200:5, 7, 16  201:2
203:11  212:17  275:4,
11, 14, 15, 22  276:2, 5,
10, 23  277:14  281:4,
9, 19  318:7  328:8
346:18, 23  348:9
**plain**  38:6, 10
**plaintiff**  8:18
**PLAINTIFFS**  2:1
**plan**  44:18, 20  51:18,
20, 21  53:3, 5  70:12,
21  77:9  101:19
109:4  145:15  147:5,

*10, 13* 148:*13* 155:*21* 164:*20* 165:2 167:*18* 172:7 173:5 174:2, *19* 175:*5, 22* 176:7, *19* 178:*20* 181:*11, 17* 184:*1, 2, 6, 7, 10* 187:*20, 25* 191:*21* 201:*11* 204:2 205:*21* 206:*2, 10* 210:*14, 22, 25* 211:*10, 11, 20* 212:*17, 24* 213:*9, 10, 11, 20* 214:*19* 215:*8, 15* 218:*16* 219:*3* 233:*12, 13* 236:*23* 237:2 238:*15, 23* 239:*3, 13, 22* 243:*9, 13, 25* 244:9 264:*6* 265:*17* 266:5 267:*16* 269:*15* 275:7 276:*3, 25* 278:*1* 281:2 291:*25* 292:*6, 14* 293:*3* 294:2 311:*3, 11, 15* 341:*23*

**planned** 204:*11* 210:*23* 311:7

**planning** 18:6 164:*16, 24* 187:*19* 214:*20* 246:*13, 19* 263:*14* 264:*1* 266:2 268:7 275:2 281:*17* 282:5

**plans** 178:*22, 24* 224:*5, 16, 19, 22* 225:*3, 6, 14, 25* 226:2, *4* 229:7 277:22 278:*11* 279:*1* 341:*14, 15, 16, 19*

**PLASCOFF** 2:*5*

**platform** 331:*20*

**play** 102:*19* 170:*6* 186:*12*

**Please** 4:*12* 10:*21* 12:*17* 31:*17* 41:*18* 42:*1* 56:4 72:*17* 75:*18* 76:*12* 77:*1* 84:5 101:*21* 134:*6, 12* 136:*15* 178:*14* 208:9 217:*13* 241:2 242:4 257:*13* 302:*7, 16, 18, 21* 303:*1*

304:*1, 16* 322:*16* 330:*19*

**plenty** 301:*25*

**pocket** 327:*5*

**pocketed** 324:*5* 325:8 326:*12* 327:*18*

**point** 52:*6, 13* 74:*6* 75:*20* 81:*21* 93:5 94:*6* 106:*21, 22* 109:8 110:*15* 111:*3* 113:*10* 121:2 124:*12* 150:*3* 151:*18* 152:*16* 164:*24* 171:6, *8* 176:*14* 195:*23* 197:8 198:*24* 203:*10* 204:*3* 205:*13* 207:2 215:*23* 219:*6* 224:*14* 234:*4* 236:*1, 4, 5* 238:*2* 251:*20* 259:*13* 277:8 287:*12* 289:*25* 290:*16* 291:*11* 293:*19* 297:2 298:*14* 299:*9, 10* 316:2 318:*4* 325:*22* 336:*23* 337:*4* 341:*13* 342:*17* 343:*8* 345:*18, 20, 25* 346:*14*

**pointed** 207:*14, 17*

**pointing** 30:*19* 31:*22*

**points** 40:*11* 88:*17* 124:*14* 207:*16* 235:*9, 14, 19, 20* 236:*11, 17* 237:*7* 239:*1* 295:*24, 25* 296:2 297:*23* 298:*18* 336:*7*

**poison** 345:*1*

**poker** 170:*6*

**Policy** 24:*21* 25:*6* 26:*21, 24* 27:*2, 6, 13, 15, 20, 23* 28:*1, 11* 34:*7* 35:*1, 3, 12, 14, 16* 37:*7* 38:*4, 7, 13, 17* 39:*12* 40:*5* 96:*15, 19* 282:*1*

**Polk** 142:*18*

**Poplin** 1:*24* 8:*13* 350:*6, 22*

**PoR** 109:*4, 12*

**Porterfield** 204:*15,*

*20, 22*

**portion** 289:*5*

**portions** 159:*24* 309:*9*

**Portsmouth** 8:*9, 21*

**position** 167:*14* 187:*21* 194:*25* 195:*7, 9* 207:*10, 23* 221:*9* 265:*23* 266:*18* 268:*14, 23* 269:*25* 270:*18* 271:*12* 291:*17* 310:*25*

**positive** 217:*22* 219:8

**possession** 95:*10* 96:*2* 97:*9* 98:*6* 287:*24* 288:*4* 343:*20*

**possibilities** 61:*24*

**possibility** 62:*9* 106:*14* 291:*3*

**possible** 36:*8* 49:*22* 62:*6* 171:*23* 175:*5, 10* 179:*8, 18* 183:*3* 188:*4, 16* 263:*17* 264:*8, 13* 332:*16*

**possibly** 71:*6, 17* 72:*3, 10* 73:5 84:*22* 85:*1*

**post** 55:*5* 280:*19*

**posted** 160:*10*

**potential** 61:*23* 62:*7* 65:*2* 79:*10* 83:*18* 89:*23* 100:*10* 101:*23* 106:*8* 110:*6* 112:*6* 116:*18* 117:*10, 15, 24* 139:*14* 150:*17* 151:*1, 5* 155:*18* 157:*11, 25* 164:*2, 8* 165:*14* 166:*9* 171:*4, 10* 175:*6, 10* 176:*9* 179:*9, 19* 183:*4, 15* 188:*5, 17* 209:*24* 210:*20* 221:*13, 18, 19* 262:*19* 275:*24* 289:*19* 334:*14* 341:*7*

**potentially** 105:*20* 144:*15* 151:*9* 168:*14* 169:*16* 291:*1*

**PowerPoint** 5:*6, 9, 21* 231:*4, 9, 13* 232:*18*

305:*11, 12*

**PowerPoints** 7:*1*

**pptx** 232:*18*

**practical** 79:*8* 100:*9*

**practice** 238:*11* 342:*13*

**precarious** 194:*24* 195:*2, 4* 207:*23* 208:*6* 266:*18* 268:*14, 22* 269:*24* 310:*24*

**preceding** 111:*3* 315:*22* 316:*19* 317:*2, 14* 318:*11* 319:*3* 321:*7*

**prefer** 144:*11* 149:*6* 233:*2* 242:*21*

**preferably** 179:*8* 183:*3* 188:*4, 15*

**premium** 67:*20, 23* 126:*3, 10, 16* 127:*3, 10, 18* 128:*1, 4, 7, 9, 11, 12, 14, 15, 16, 24* 129:*2, 3, 4, 5, 7, 8, 9, 15, 17, 19* 131:*13* 132:*9, 10* 133:*9* 134:*19* 135:*7, 14, 15, 19* 136:*4* 137:*6, 8* 138:*2, 7, 15, 25* 139:*23, 24* 140:*2, 3, 5* 141:*13, 15, 16, 18* 315:*18, 25* 316:*22* 317:*17* 318:*17* 321:*9* 336:*6*

**prepare** 161:*19* 193:*11*

**prepared** 53:*8* 68:*3* 69:*13* 117:*10, 15, 23* 141:*21* 185:*3* 211:*7* 214:*3, 12* 239:*3* 290:*8* 315:*16, 23* 316:*20* 317:*15* 318:*20* 319:*7, 17* 321:*7*

**Preparedness** 81:*8*

**preparing** 149:*17* 161:*16, 22* 212:*9*

**presence** 345:*12*

**PRESENT** 2:*16* 66:*7* 154:*19* 189:*17* 205:*7* 209:*8* 331:*24*

**Presentation** 5:*6*
79:*4*  80:*11*  81:*4*, *14*,
*17*, *18*  93:*3*  100:8, *12*
101:*12*, *13*  108:*15*, *17*,
*19*  116:*3*  155:*1*
159:*8*  160:*21*, *22*
161:*3*, *6*, *8*  164:*25*
178:*10*  185:2, *7*, *8*
186:*5*  188:*12*, *18*
189:*17*, *20*  190:*15*, *17*
191:*16*, *17*  202:*1*, *24*,
*25*  211:*1*, *9*  213:*12*
246:*16*  261:*24*  300:*8*
**presentations** 120:*12*
300:*22*
**presented** 100:*13*, *16*
101:*5*  113:*24*  189:*20*
207:*5*  209:*19*, *23*
210:*9*, *19*  331:*25*
345:*4*
**preserve** 168:*25*
**president** 16:*24*
**press** 54:*19*  166:*21*
312:*16*, *18*  314:*17*, *22*
**Pressure** 82:*24*
**presume** 278:*17*
**pretty** 10:*7*  18:*11*
19:*1*  22:*13*, *15*  41:*7*
90:*16*  91:*1*  168:*10*
290:*13*  331:*8*
**prevent** 84:*24*
**previous** 37:*24*  44:*7*
57:*11*  61:*13*  70:*10*
99:*2*  105:*3*  121:*14*
123:*15*  125:*24*, *25*
126:*14*, *16*, *25*  127:*11*
128:8, *9*  129:2, *4*
134:*13*  135:*2*  142:*21*
144:6, *9*  145:*6*
148:*15*  153:*23*
183:*24*  185:*1*, *5*
191:*3*  192:*17*  195:*5*
210:*13*  211:*24*  212:*4*
238:*19*  246:*15*
247:*25*  274:*25*
**previously** 40:*5*
65:*21*  127:*4*  129:*12*
142:*7*  156:*18*  159:*24*,
*25*  161:*18*  163:*17*

191:*9*, *24*  219:*13*
238:*4*  262:*13*  264:*20*
**price** 36:*2*  39:*14*
66:*17*, *20*, *25*  67:*20*
84:*14*  103:*11*, *16*
110:*6*, *11*, *18*  111:*11*
112:*2*, *6*, *10*  115:*9*
126:*4*, *24*  127:*16*
128:*13*, *15*  129:*9*, *18*,
*19*  132:*19*, *22*  133:*10*
134:*19*  135:*3*, *8*, *19*
136:*6*, *13*, *15*  137:*7*,
*13*, *14*, *19*  138:*9*
139:*7*, *13*  140:*8*, *13*,
*14*  158:*1*, *14*  172:*3*, *8*,
*11*, *17*, *22*, *23*, *25*
173:*3*, *6*, *14*, *19*, *23*, *25*
174:*4*, *6*, *10*, *15*, *17*, *20*
175:*5*, *6*, *9*, *10*, *14*, *22*
176:*1*, *3*, *9*, *20*  177:*10*
179:*7*, *8*, *17*, *18*  180:*9*,
*21*, *25*  181:*9*, *18*, *24*
182:*2*, *11*, *13*, *14*, *17*
183:*2*, *4*, *7*, *12*, *14*, *22*
184:*16*, *20*, *23*  188:*3*,
*5*, *15*, *16*  212:*21*
213:*12*, *15*, *17*, *19*
214:*6*  236:*20*  239:*7*,
*19*, *24*  240:*1*  245:*8*
265:*2*  307:*24*  308:*5*,
*8*  309:*11*  313:*17*, *20*,
*21*  314:*10*, *14*  317:*25*
318:*3*  323:*7*, *23*
324:*10*  326:*10*  335:*2*
336:*11*  338:*14*, *16*
**prices** 111:*24*  139:*25*
179:*4*  224:*23*  336:*8*
**Pricewaterhouse**
331:*3*
**primarily** 45:*13*
279:*12*  298:*14*
332:*10*
**primary** 155:*17*
217:*20*  218:*24*  219:*5*
224:*6*, *19*  225:*7*, *14*,
*22*  230:*9*, *13*, *15*, *20*
286:*22*
**Principally** 161:*7*
**prior** 23:*8*  60:*25*
63:*22*  64:*1*, *23*

142:*25*  149:*5*  166:*1*
213:*25*  215:*25*
286:*15*, *16*  287:*7*
327:*2*
**priorities** 42:*12*, *21*
157:*13*, *20*  158:*5*
291:*11*
**Prioritized** 49:*2*
**priority** 50:*8*  143:*15*,
*19*  169:*13*  250:*4*, *7*,
*12*, *19*
**Priv** 5:*24*  6:*6*
**private** 67:*13*, *14*
83:*6*, *16*  84:*8*  122:*11*
149:*7*
**privately** 94:*2*
165:*17*, *22*  166:*19*
**privilege** 74:*9*, *19*
300:*17*
**Privileged** 4:*2*, *8*
5:*11*, *21*  6:*22*  185:*17*
186:*2*
**Pro** 113:*11*
**proactive** 167:*12*, *16*
**probability** 117:*1*, *6*
118:*2*  120:*17*  124:*9*
**Probably** 10:*4*  45:*3*
52:*1*  55:*12*  87:*2*
105:*5*, *6*  125:*4*
133:*23*  159:*23*, *24*
168:*17*  174:*18*  182:*2*,
*10*  203:*19*  204:*12*
255:*25*  270:*16*  272:*7*,
*9*, *15*  286:*18*, *19*
325:*23*  326:*2*  328:*25*
331:*13*  333:*19*  337:*5*
**problem** 186:*20*, *21*
**proceed** 31:*10*  32:*21*
68:*3*
**proceedings** 73:*1*
**process** 82:*13*, *17*
87:*6*  114:*17*, *19*
218:*16*  250:*14*
335:*23*  337:*18*, *19*
338:*21*  339:*10*
340:*17*
**produce** 107:*24*
121:*18*
**produced** 62:*18*
107:*23*  108:*10*, *11*

121:*19*  231:*6*, *12*, *13*,
*14*  301:*9*  302:*5*
303:*6*  304:*14*  305:*7*,
*19*  306:*24*  307:*5*
312:*16*
**product** 102:*8*
331:*19*  335:*11*
339:*11*, *18*
**production** 108:*1*
**products** 102:*20*
**professional** 290:*8*
**profile** 199:*15*  200:*1*
**profiles** 13:*5*
**profit** 336:*3*, *7*
**profitability** 247:*24*
**profits** 102:*20*  103:*5*
173:*2*
**program** 44:*11*
45:*19*  49:*21*  50:*1*
103:*1*  342:*16*
**progress** 252:*3*
**progression** 334:*10*
**prohibits** 282:*1*
**Project** 4:*1*, *11*  6:*12*,
*15*  63:*10*, *13*, *14*, *16*
64:*24*  97:*22*  100:*23*,
*24*, *25*  101:*8*  190:*6*,
*20*  204:*2*  280:*10*, *23*
343:*17*
**projected** 52:*25*  54:*1*,
*15*  58:*8*  111:*17*
184:*11*  194:*7*, *19*
310:*15*
**projecting** 53:*22*
56:*24*  57:*3*, *6*  109:*7*
191:*17*  194:*1*, *8*
196:*12*  234:*5*, *17*
310:*11*
**projection** 58:*1*
192:*5*  193:*16*, *22*
235:*3*  307:*18*
**Projections** 6:*1*
52:*17*, *20*  58:*7*
108:*25*  174:*3*  184:*3*
195:*17*  196:*23*
197:*10*  202:*16*  209:*9*,
*20*, *23*  210:*15*  211:*8*,
*10*, *13*, *14*, *17*  212:*9*,
*13*, *14*, *16*, *20*, *23*
213:*8*, *21*  214:*5*, *14*,

*15, 16, 18, 21, 23*
226:*3* 236:*24* 237:*6,
8, 9, 10* 239:*4* 246:*10*
265:*9*
**promises** 283:*14*
**promote** 175:*13*
**promoted** 174:*9*
**promoting** 174:*16*
175:*15*
**prompted** 174:*9*
**proper** 77:*1* 133:*13,
14* 252:*4*
**properly** 188:*1*
220:*13*
**property** 271:*2*
**proportion** 197:*19*
**proposal** 60:*21*
63:*21, 23* 64:*23* 65:*4,
17* 66:*8* 67:*2, 4*
68:*19* 69:*7* 79:*10*
96:*13* 101:*15* 103:*21,
24* 106:*5* 117:*6*
123:*20* 143:*14*
145:*18, 23* 147:*7, 15*
158:*12, 17* 166:*10*
173:*20* 180:*10, 13, 16,
18* 181:*1, 7* 197:*22*
213:*3* 240:*2* 249:*3,
18* 264:*6* 269:*16*
271:*11, 13* 296:*18*
312:*20* 313:*5, 14*
314:*19*
**proposals** 180:*5*
**propose** 87:*20* 267:*2*
**proposed** 36:*21, 23*
37:*8* 43:*22* 64:*11*
65:*20* 66:*17* 67:*8*
84:*14, 16* 96:*15, 20,
22* 97:*11* 99:*22*
124:*8* 125:*21* 133:*8*
134:*17* 184:*5* 213:*7*
236:*23* 242:*13, 18*
314:*9* 315:*7*
**proposes** 187:*2*
222:*15* 263:*17*
**proposing** 66:*20, 23,
24* 138:*8* 173:*8*
223:*16* 263:*21*
269:*20*
**Pros** 93:*9*

**prospects** 69:*19*
157:*13, 19*
**prove** 320:*3* 321:*3*
**proves** 319:*8*
**provide** 123:*11, 20*
124:*3* 223:*7* 246:*6*
292:*21* 315:*17, 23*
316:*21* 317:*15*
318:*20* 321:*8* 336:*3*
**provided** 104:*17*
131:*23* 247:*17*
332:*10*
**provides** 69:*9*
113:*10* 123:*16*
**providing** 339:*14*
**proxy** 322:*4, 16*
**PRTM** 14:*16, 18, 20,
22* 15:*1, 3* 331:*7, 8*
**PST** 6:*21*
**public** 17:*17* 18:*9,
10* 19:*10* 20:*9, 10, 13*
67:*11* 70:*15* 71:*7, 18*
77:*11* 83:*11* 84:*22*
85:*2, 13* 87:*25* 96:*10*
144:*15* 149:*12, 16, 17*
150:*20, 25* 151:*6*
162:*20* 164:*2, 9*
166:*9, 10, 14, 17*
171:*5* 186:*17, 20, 22,
25* 187:*16* 218:*14, 21*
313:*5* 326:*22* 328:*22*
338:*25* 339:*4* 350:*23*
**publicly** 12:*9* 15:*8,
15* 16:*14, 16, 18*
17:*12* 19:*1, 13* 21:*16*
70:*22* 86:*12* 88:*6*
106:*10, 15* 111:*12*
158:*8, 11* 165:*8, 13,
21* 166:*2, 11, 18*
167:*5, 9* 327:*1*
337:*24*
**pump** 338:*14, 16*
**pumping** 213:*16*
**purchase** 67:*4*
**purchased** 336:*10*
**purchases** 94:*2*
**purpose** 50:*3* 150:*10*
174:*16* 206:*10*
212:*14, 16* 213:*11, 14*
217:*19* 218:*23* 219:*4*

225:*21* 230:*8, 10, 19*
286:*22* 338:*13*
**purposes** 51:*6* 137:*5*
**pursue** 113:*21* 114:*8*
115:*22* 144:*22*
172:*18* 173:*16*
**pushing** 335:*25*
**put** 12:*16* 22:*21*
41:*13* 90:*17* 93:*5*
95:*17* 98:*9* 113:*5*
118:*20* 141:*11, 12*
160:*4* 189:*14* 212:*1,
17* 221:*6, 8* 231:*15,
20, 23, 24* 232:*21*
242:*4* 249:*22* 264:*6*
275:*22* 276:*23*
295:*10* 303:*7* 304:*8*
305:*6, 8* 306:*11*
320:*14* 329:*10*
**putting** 108:*4*
136:*24* 273:*7*
**PwC** 14:*23*

**< Q >**
**Q&A** 24:*19* 25:*1*
37:*25*
**Q1** 57:*13, 14*
**Q2** 191:*2, 12*
**Q222** 3:*20*
**Q3** 195:*1* 237:*22*
307:*23*
**Q322** 5:*13*
**Q4** 195:*2* 311:*4*
**Q422** 6:*22*
**qualifications** 19:*9, 11*
**qualified** 19:*4, 22*
**qualify** 20:*3* 329:*1*
**quarter** 57:*4, 5, 6, 8,
11, 18, 23* 58:*17*
190:*20* 191:*10, 14, 19,
24* 192:*2, 6, 15, 17, 20,
21, 23, 25* 193:*3, 8*
194:*15, 21* 238:*3, 7,
11, 18, 20* 265:*18*
266:*19* 267:*16, 20*
268:*15* 307:*12*
310:*21* 311:*2*
**quarterly** 202:*16*
203:*17* 276:*17*
281:*12* 313:*17*

**quarters** 192:*12*
194:*12* 197:*9*
**question** 10:*11, 13, 24,
25* 11:*1* 19:*14* 20:*22,
24* 21:*8, 14* 32:*15*
34:*14* 37:*5* 38:*23*
48:*7, 22* 50:*13* 60:*24*
68:*16, 17, 18* 72:*22,
25* 73:*3* 74:*8, 18*
75:*4, 11, 13, 17* 76:*8*
80:*4, 7* 95:*14, 18*
98:*4, 24* 104:*11, 13,
18* 108:*3, 5* 114:*10*
117:*12* 127:*10* 132:*5,
8* 134:*3, 8, 13, 15, 21*
136:*18, 21* 139:*18, 22*
141:*4, 10, 12, 16, 18*
143:*7* 153:*19* 173:*21*
174:*24* 176:*5, 6, 7, 16,
23* 179:*25* 182:*9, 10*
193:*6* 197:*16* 200:*21*
205:*18* 214:*8, 10*
220:*22* 227:*22* 231:*6*
238:*6* 240:*10* 245:*14*
250:*21* 251:*7, 8, 18,
22* 252:*1, 4, 7, 8*
255:*4* 256:*1* 257:*10*
258:*18* 260:*13*
268:*20* 280:*20* 285:*3,
9* 286:*1, 2* 288:*1, 14,
15, 17, 18* 289:*16*
297:*1* 298:*19* 299:*24*
301:*12* 303:*20*
304:*11* 305:*21* 320:*3,
6* 326:*16* 327:*16*
341:*6*
**questioned** 262:*4*
**questions** 10:*9* 38:*16,
19* 61:*18* 75:*9, 15*
92:*12* 130:*22* 131:*5*
143:*11* 155:*2, 6, 11*
180:*17* 209:*17* 248:*8*
252:*15* 253:*25* 256:*6*
260:*11* 302:*7* 304:*3*
330:*7, 13* 347:*3, 6*
350:*8*
**quick** 58:*24* 152:*8*
277:*17* 312:*6*
**quicker** 283:*10*

Deposition of Michael McGrath                     In Re National Instruments Corporation Securities Litigation

quickly 69:*14* 97:*14*
Quit 72:*17*
quite 84:*23*
quo 213:*5*
quote 113:*23* 146:*21* 273:*6, 14, 16*
quotes 169:*9*
quoting 156:*25* 157:*3, 5*

< R >
R&D 170:*16, 22* 332:*22*
Rabin 14:*19*
raised 340:*12* 345:*24*
ran 15:*5* 331:*8*
range 17:*22* 66:*23* 87:*20* 110:*25* 111:*20, 23* 237:*22* 340:*21*
ranges 110:*6*
Rapp 7:*1* 202:*7, 11* 244:*20* 295:*1*
rate 233:*23, 25*
reach 155:*21* 266:*8, 15* 268:*7* 333:*15*
reached 62:*5* 333:*8, 12*
reach-out 333:*16*
react 99:*18* 255:*12*
reacted 256:*16*
reacting 73:*19*
reaction 71:*24* 216:*10, 19* 266:*17, 24* 268:*9, 13, 19, 21* 269:*23* 271:*10*
Read 4:*12* 6:*13* 23:*17* 30:*8* 31:*1* 47:*23* 113:*23* 118:*25* 119:*15, 16, 18* 129:*3* 130:*13* 133:*24, 25* 134:*10, 11, 13* 135:*25* 136:*1* 145:*2* 146:*21* 151:*14* 157:*6* 163:*17* 183:*1* 193:*10, 13* 198:*24* 209:*10, 11* 210:*7* 218:*4, 8, 13* 225:*9* 244:*5* 270:*5* 272:*15, 23* 294:*18* 295:*22* 296:*5* 298:*5,*

*6, 25* 299:*6* 316:*9* 347:*11* 348:*7*
readable 29:*19, 22* 30:*19, 20* 31:*24*
reading 30:*24* 156:*20, 23* 157:*6* 204:*7* 278:*6, 7, 8* 297:*14* 298:*25* 313:*24*
ready 142:*14* 319:*6* 320:*22* 321:*1, 3*
reaffirm 158:*16*
real 58:*24* 152:*8* 213:*10, 17* 226:*17* 277:*17* 314:*5*
realign 335:*25*
realities 131:*3*
reality 28:*9* 131:*11* 250:*18*
realize 102:*1* 103:*6* 137:*24* 313:*19* 314:*8*
realized 101:*19, 23*
realizing 341:*12*
really 43:*14, 24* 50:*20* 62:*3* 91:*13* 136:*19, 21* 137:*21* 174:*13, 14* 205:*4* 212:*6* 229:*22* 267:*6* 271:*25* 329:*15* 334:*22* 339:*24* 341:*12*
realm 124:*7*
realtime 292:*9*
reason 32:*12* 67:*25* 104:*17* 127:*16* 140:*11* 205:*2* 224:*6, 20* 225:*7, 14* 230:*14, 16* 244:*4* 250:*9, 17* 252:*17* 253:*8, 21* 254:*20, 21* 255:*20* 287:*9, 11* 300:*18* 317:*18* 325:*19* 338:*15*
reasonable 33:*7* 39:*2* 138:*22* 139:*1*
reasonably 36:*1* 39:*13*
reasons 45:*16* 74:*8, 18* 101:*24* 103:*10* 104:*7, 25* 129:*12*

132:*13* 181:*18* 236:*18* 255:*7* 333:*14* 340:*24*
recall 21:*19* 24:*14* 43:*18* 50:*21* 58:*4* 60:*3, 17* 61:*2, 11, 14* 64:*8, 20* 71:*24* 73:*19* 85:*16* 95:*4, 5* 108:*15* 115:*4* 119:*8, 9, 14* 126:*10* 142:*10* 155:*16, 17* 159:*21, 22, 23* 162:*11* 167:*8* 190:*11, 12* 196:*25* 198:*6* 205:*11* 207:*2, 6, 15* 208:*5* 218:*10* 227:*4* 243:*16* 244:*6, 8, 9* 286:*14* 287:*2, 3, 5, 7* 288:*14* 298:*13, 17* 299:*8, 9, 10* 307:*14* 314:*16, 21* 324:*7* 345:*15*
Recap 315:*14*
receive 46:*12* 85:*11* 323:*4*
received 20:*3* 64:*13* 65:*23* 80:*11* 84:*9* 86:*21* 89:*8, 22* 90:*11* 95:*7, 23* 98:*2* 104:*5, 14* 125:*2, 5* 150:*23* 283:*25* 286:*12* 324:*11* 333:*4* 342:*25* 343:*14* 344:*4*
receiving 64:*23* 79:*9* 280:*9* 313:*13* 343:*16*
Recess 59:*3* 112:*24* 153:*2* 208:*15* 241:*25* 283:*19* 312:*9* 330:*1*
recipients 295:*11*
recognize 12:*22* 13:*11, 12* 24:*6* 41:*17* 55:*24* 56:*11* 78:*18* 81:*14* 107:*16* 140:*2* 153:*15* 162:*3* 164:*15* 209:*3* 288:*25* 299:*19* 312:*22, 24* 322:*5*
recollection 200:*13* 202:*20* 206:*20* 209:*16* 269:*12*
recommend 216:*15, 18*

recommendation 26:*1* 171:*20, 21* 195:*22* 197:*22* 198:*3, 6, 7, 9, 10, 12, 15, 18* 199:*7, 13* 200:*6, 16* 202:*17* 212:*24* 215:*3* 228:*18*
recommendations 94:*14*
recommended 212:*19* 216:*17, 18*
recommending 169:*16, 19*
reconvene 80:*12*
reconvened 154:*10*
record 8:*5, 16* 13:*8, 14* 32:*5, 9* 55:*20* 58:*8* 59:*2, 4, 5, 10* 62:*19* 65:*8, 12* 74:*15, 16, 18* 75:*20* 76:*9* 77:*5* 78:*10* 80:*20* 84:*24* 97:*17* 107:*10* 108:*5, 6* 109:*5* 112:*25* 113:*1* 121:*17* 123:*1* 136:*7* 141:*8* 153:*1, 3, 4, 11* 159:*3* 185:*5* 188:*25* 193:*12* 208:*12, 13, 16, 17* 236:*14* 237:*17* 241:*1, 3, 24* 242:*1, 3* 257:*14* 283:*18, 20, 21* 302:*6, 17* 303:*1, 22, 24* 304:*1, 3* 312:*3, 7, 10, 11* 322:*14* 323:*16, 20* 324:*19, 20* 329:*19, 25* 330:*2, 3* 347:*15*
recorded 8:*7* 350:*9*
records 193:*14* 209:*5*
Redacted 300:*20* 301:*24* 302:*2, 4, 10, 12, 14* 303:*11, 14, 18* 304:*16* 307:*5*
redaction 303:*9*
redactions 302:*1*
redo 332:*19*
reduce 155:*22* 163:*3, 8, 21* 164:*15, 25* 165:*2* 170:*25* 172:*11, 18* 173:*8* 180:*21*

187:22  215:9  219:16  236:6  267:19
reduced  236:15  350:10
reducing  43:23, 24  45:7  103:2  164:24  167:16  224:23  247:10
reduction  164:21  172:7, 11  178:20, 22  181:17  184:6  247:21
reductions  171:17  174:3  177:15, 22  178:23  214:21
refer  81:10  86:9  100:19  166:13  202:5  294:19
reference  18:22  141:16, 18  144:14  145:6  155:7  170:14, 15  259:10  270:25  280:14, 18  291:19
referenced  145:8
referencing  53:6
referred  19:22  96:20  163:17  203:2  211:12  278:23
referring  60:10, 12  64:24  86:4  87:7, 14, 16  92:8  94:1  101:8  165:14, 25  169:3  207:22  238:4  247:20  248:5  271:14  314:12
refers  40:16  98:16  119:23  146:14  237:21  270:9, 10, 23  307:1
reflect  102:12  137:20  156:16  172:22  209:12  214:21  228:2
reflected  157:25  158:14  172:2, 7  213:15, 18  287:15
reflecting  193:7
reflects  52:19  54:7
refresh  200:13  202:20  209:16
refreshes  269:12
refused  313:15

refusing  131:2  139:17
refute  320:3
regard  12:2  86:7  103:8  138:22
regarded  36:13  40:1  143:18
regarding  24:9  38:16  43:4  63:16  123:16  142:13  276:12, 20  339:3
regular  62:16
regularly  99:6  146:23  147:7, 16  148:18  300:8
regulation  18:24, 25
regulations  19:3  20:13  105:15  177:9  338:15
regulatory  69:9
Regus  8:9
reiterate  40:25  69:7
reiterated  316:11
reiteration  125:25  291:9
reject  103:20, 23  104:16  106:3  132:13  144:24  167:4  174:11  175:25  180:18
rejected  88:20  89:5, 20  90:1  91:23  92:1, 3  96:4, 23, 25  97:6  99:17  103:8  104:24  105:6, 12, 18  117:5  120:16  127:15, 23  132:14  133:2  134:25  139:6  140:23  142:2  174:8  175:1, 21  180:4, 18  255:6, 7, 8  256:11  260:25  276:6, 12, 22  277:3  282:20  284:5  288:7, 8  316:3, 12  317:23  318:3  338:3  345:19, 20  346:7
rejecting  91:24  93:4  104:1, 6  118:7  165:16  224:7, 9, 20  225:7, 15  230:14, 16  249:10, 24  296:18

rejection  103:25  104:7, 17  116:22  117:1  118:1  123:16  124:7, 14  145:7  158:17  249:8, 9  250:10  257:6  289:17  296:21  315:2
relate  173:12  214:23
related  43:14  63:14  89:19  160:16, 17  176:1  343:21  346:19  350:12
relates  98:24
relating  279:14
relation  72:7  273:13  274:3  337:1
relationships  340:2, 3
relative  137:17, 19  149:8  187:19  279:4
relatively  42:16  56:19  111:10
release  4:9  7:3  237:19  243:4  244:23  275:13  277:11  312:16, 18  314:17, 22
released  277:12
relevant  77:22  87:10, 11  107:24  137:13  145:1  321:21
relisted  17:3
rely  345:3, 6
relying  176:2  339:14, 15
remain  149:7
remainder  189:10  305:8
remained  256:21  257:6  259:14  291:3
remains  235:3
remember  31:13  58:9  82:19, 20  116:11  125:19  154:16  161:24  162:10  185:3  188:6  192:7  193:24  207:19, 22  212:7  215:17  233:18  234:9  255:17  258:22  264:22  265:10  267:5  269:2,

4  275:25  298:22  312:23  313:24
REMOTE  2:1
REMOTELY  1:11, 25  8:1  9:18  350:7
removed  276:14
removing  280:14, 18
repeat  20:23  92:10  95:20  200:21  275:17  319:23
repeated  134:24  228:19  255:8  337:22  340:9  345:25
repeatedly  131:23
repeating  139:17
repeats  82:4, 6
replace  336:11
REPORTED  1:23  8:1
reporter  8:13  10:17  134:12, 14  152:5, 7, 13, 19, 20, 22, 24  301:3
Reporting  8:12, 14  18:9
reports  102:11  245:2
represent  155:9  303:13  328:3  330:13
representation  79:14
representations  79:19
representatives  79:3  100:3, 4, 7  106:1  289:10, 13
represented  109:21  303:10
representing  8:20  324:18
repur  44:17
repurchase  44:11, 13, 18  45:15, 16, 19  47:15, 17  48:9  49:6, 13, 15, 18, 19  51:7  52:22, 23  53:1  56:22  191:5  192:24  195:23, 24  196:6, 13, 16, 21  201:11, 12  206:2  276:25  281:2  292:13  294:2  307:1  313:17, 21  323:7, 23  346:10

**repurchased** 48:*10* 50:2*0* 313:*15* 323:*9* 342:2, *6*, *10*

**repurchases** 42:*24* 43:*11*, *13*, *17*, *19* 44:*2*, *3*, *8*, *16*, *22* 45:2, *6*, *8* 47:*19*, *21*, *24* 48:*3*, *12*, *15*, *18* 50:*3*, *10*, *16*, *24* 51:*1*, *19*, *24* 53:*4* 54:*1* 56:*25* 57:*3* 190:*10*, *25* 191:*2* 193:5, *21* 194:*3*, *19* 195:*13* 196:*2* 197:*1*, *13*, *17*, *19* 200:8, *14*, *18*, *20*, *23* 201:*7* 203:*21* 205:*17*, *20* 206:9, *19* 307:*12*, *20* 324:*10* 326:*12* 342:*14* 345:*22* 346:*1*, *3*

**repurchasing** 47:*22*, *25* 49:*23* 52:*14* 346:*21*

**reputable** 344:*17*

**reputation** 344:*23*

**Request** 3:*24* 71:*1* 240:*13*, *15* 266:*1*, *4*

**requested** 84:*18* 347:*17*

**require** 206:*5* 301:*3*

**required** 10:*10* 19:*12* 87:*21* 108:*11* 172:*11* 206:*6*

**requires** 19:*7*

**requiring** 34:*11*

**reread** 72:*25*

**reserve** 137:*1*, *2*

**reset** 332:*13*

**Resolution** 42:*4* 43:*5* 182:*23* 203:*16*

**Resolutions** 42:*5* 43:*5*

**resources** 18:*11* 141:*25*

**respect** 86:*1*, *13*, *22* 88:*7* 112:*2* 220:*11*, *24* 221:*1*, *24* 222:*12* 252:*11* 275:*18*, *23*

**respectful** 251:*21*

**respond** 106:*10*, *18*, *22* 107:*2* 176:*23* 241:*14* 286:*7* 308:*23*

**responded** 141:*10*, *12* 147:*10* 148:*23* 155:*2*, *6*, *10* 220:*1* 222:*15* 224:*4* 238:*24* 239:*14* 240:*4* 243:*5* 265:*25* 266:*1* 284:*15* 288:*2*

**responding** 124:*23* 238:*5*

**responds** 226:*7* 242:*25* 243:*8*

**Response** 4:*19* 70:*6* 75:*5* 84:*18*, *20* 117:*11*, *15*, *24* 143:*25* 146:*14*, *22* 148:*11*, *13*, *25* 155:*18* 156:*7* 162:*19* 171:*11*, *15*, *16* 190:*7* 213:*21* 214:*1* 215:*4*, *9*, *11* 216:*16* 232:*6* 242:*13* 244:*23* 259:*7* 285:*3* 286:*5* 288:*16* 314:*25* 345:*22*

**responses** 116:*18* 171:*4*, *11* 242:*18*

**responsibility** 21:2*0*, *22*, *23* 22:*1*, *3*, *6* 99:*11*, *19* 205:*25* 224:*13* 226:*13* 240:*14* 334:*8* 338:*2* 339:*22* 343:*6*

**responsible** 173:*4* 289:*23* 291:*13*

**responsibly** 44:*25* 45:*9*

**responsive** 107:*24*

**rest** 120:*12* 240:2*0* 305:*7* 309:*13*

**restocking** 44:*10*

**restrict** 346:*15*

**restricted** 281:*14*, *24* 282:2, *7*, *11*, *17*

**Restriction** 3:*14* 4:*12* 6:*12*, *15* 275:*4*, *11*, *13*, *15*, *22* 276:2, *5*, *8*, *9*, *11*, *14*, *15*, *17*, *19*, *23*, *24* 277:2, *10*, *11*, *12*, *14*, *18*, *23* 278:*12*

**respond** 279:*2*, *4*, *6*, *8*, *10*, *13*, *15*, *17* 280:*11*, *15*, *19*, *22* 281:*4*, *7*, *9*, *11*, *12*, *13*, *19* 283:*3* 329:*1* 343:*17* 344:*6* 345:*16* 346:*13*, *17*, *19*, *22*

**restrictions** 276:*16* 277:*13* 278:*1* 282:*25* 285:*6* 287:*25* 345:*23*

**result** 105:*24* 211:*5* 219:*2* 237:*4* 238:*15* 324:*5* 326:*6*, *10*

**resulted** 211:*3*, *25*

**results** 209:2*0*, *24*

**retained** 99:*14* 253:*17*

**retaliate** 240:*8*

**retire** 329:*7*

**retired** 14:*23*, *24* 15:*1* 307:*23*

**retreat** 204:*19*, *24* 266:*11*, *12* 267:*6*, *13* 289:*3*, *5*

**retrospect** 72:*10* 73:*10*, *23* 77:*8*, *10*

**Return** 47:*10*, *14* 48:*15* 52:*15* 112:2*0*, *21* 200:*5* 201:*1*, *9* 284:*6*, *11* 290:*2*, *20*, *22*, *23* 342:*11*, *19* 345:*18*

**revenue** 102:*7*, *14*, *23* 137:*17* 145:*9* 170:*8*, *13*, *22* 209:*24* 210:*2*, *3*, *11* 233:*17*, *18*, *22*, *25* 234:*11*, *13*, *23* 235:*25* 236:*2*, *4*, *7*, *8* 237:*8*, *22* 238:*1*, *3*, *4*, *6*, *7*, *9* 245:*7* 246:*17*, *18* 247:*1*, *11*, *22*, *23* 335:*10*, *13*, *17*, *19*, *20* 336:*8*, *13*, *14*, *15*, *16*, *17*

**revenues** 137:*17*, *18*

**review** 160:*13*, *15* 212:*12* 302:2*0*, *25*

**reviewed** 46:*23* 56:*19* 69:*3* 120:*4*, *7* 153:*18*, *20*, *24* 159:*17*, *19* 162:*6*, *8* 186:*5*

**reviewing** 120:*11* 189:*13* 212:*2* 217:*8*

**revised** 212:*13*, *17* 223:*8* 314:*11*

**revisions** 213:*2*

**revolving** 197:*24* 198:*5* 199:*3* 202:*18*

**reword** 117:*12* 214:*8*

**rhetorical** 34:*14*

**ridiculous** 31:*9*

**right** 11:*7* 13:*16* 14:*6*, *16*, *20*, *21* 15:*6*, *15*, *16*, *20*, *25* 16:*4*, *5*, *7*, *8*, *10*, *15*, *22* 17:*1*, *3*, *6*, *7*, *9*, *13*, *14*, *15* 20:*11*, *14*, *15* 25:*22* 26:*12*, *22* 27:*2*, *3*, *7*, *10*, *19* 28:*1*, *9*, *25* 29:*4*, *25* 30:*11*, *13*, *25* 31:*24* 32:*2* 34:*8* 35:*1*, *2*, *4*, *23* 36:*16*, *21* 37:*9* 38:*4*, *14*, *17*, *18*, *20*, *22* 40:*3*, *7*, *9*, *14* 41:*11*, *23* 42:*8*, *17* 43:*6*, *8*, *11* 44:*1*, *4*, *16*, *24* 45:*12*, *21*, *23* 46:*17*, *20*, *23* 47:*6*, *13* 48:*19* 49:*3*, *13* 50:*3*, *12*, *17* 51:*2* 52:*17*, *19*, *20* 53:*1*, *10*, *20*, *23* 54:*2*, *8*, *12*, *16* 56:*8* 57:*1*, *4*, *9*, *12*, *14*, *19* 58:*3*, *14* 59:*1* 60:*23* 61:*14* 63:*3*, *18* 64:*13*, *16*, *25* 65:*4*, *18*, *25* 66:*5*, *8*, *12*, *15*, *18*, *21*, *25* 67:*6*, *9*, *13*, *17*, *23* 68:*3*, *8* 69:*20*, *22* 71:*15* 72:*11* 73:*24* 75:*17* 77:*24* 78:*4* 79:*23* 80:*9*, *13*, *22*, *25* 81:*8* 82:*13* 83:*4* 84:*8*, *10*, *12*, *14*, *16*, *19*, *21* 85:*13*, *22* 86:*9*, *10*, *23* 87:*15*, *18*, *20*, *22* 88:*10*, *21* 89:*9*, *24* 92:*24* 96:*11*, *12*, *13*, *24* 98:*6*, *12* 99:*1*, *5*, *7*,

**reviewing** 120:*11* 202:*7* 203:*1* 228:*10* 253:*2* 269:*8* 322:*9*

23  100:5, 20, 23
101:9, 16, 19  102:8
103:12, 15, 17, 18, 19,
21, 23  104:4  106:16,
19, 23  107:3, 16, 20
108:17, 19, 22  109:1,
5, 8, 18  110:3, 7, 9, 12,
15, 22, 23, 25  111:4, 6,
15, 21, 24  112:3, 7, 11
113:14, 17  114:5, 9,
16, 21, 22, 25  115:3,
13, 18, 22, 24  116:4, 8,
18, 23  117:7, 11, 14,
16, 19  118:3, 8
119:12  120:2, 5, 13,
18  122:3, 6, 9, 14, 16
123:4, 7, 12, 17, 25
124:4, 10  125:3, 6, 16,
23  126:15, 17  127:1,
4, 22  128:10, 25
129:19  134:3, 7
135:9  137:1, 2  138:9
139:18  140:15  141:4
142:1, 5  143:20, 22
144:1  145:23  146:5,
11, 20, 25  147:8, 11,
18  148:6, 10, 11, 15,
24  149:3  150:20, 25
152:25  154:1, 4, 8, 11,
21  155:12, 14  156:1,
8, 12, 17  159:5, 8, 11,
25  160:1, 5, 15  161:4,
11, 14  162:7, 8, 14, 20,
25  163:5, 10, 14
164:2, 7, 10, 21  165:3,
6, 7, 9  167:12, 19
169:3, 6, 17  170:20
171:5, 19, 20, 22, 25
172:4, 8  173:7, 17, 23
174:4  175:8, 12, 18,
19  177:13, 18  178:12,
16, 20  179:15, 20, 23
180:3, 14  181:15, 20,
25  184:12, 14, 17, 20,
24  185:9  188:10
189:6, 7, 11, 15
190:22, 25  191:5, 7,
10, 14, 17, 19, 22, 25
192:3, 4, 10, 13, 17, 23
193:9, 19  194:4, 7, 9,

12, 16, 22  195:7, 10,
18  196:2, 13  197:6, 7,
8, 15, 17, 20  198:16
199:6  200:7, 20
203:2, 3, 15, 17, 18, 22
204:9  209:21, 25
210:3, 5, 9, 16, 21
211:10, 15, 18, 21
213:4  214:7, 16
218:21  219:1, 9, 12,
21  220:8  221:23
222:8, 17  224:17, 20
225:11, 21, 24  226:1,
20, 25  228:24  229:9,
15  233:12, 23  234:2,
15, 20, 23  235:4, 9
237:2, 6  238:2, 10, 12,
16  239:7, 15, 24
240:2  241:23  243:21,
23  244:20  246:6, 7,
12, 14, 15, 20, 21, 23
247:1, 8, 9, 18  248:3
249:5, 8, 11, 20, 23, 24,
25  250:1, 19  251:12
253:3  258:6, 10
259:1, 11, 15, 19
260:5  261:25  262:9,
14, 17  263:9, 22
264:16, 21  265:13, 18,
19, 21, 23  266:9, 25
267:10, 17, 22  268:3,
10, 11, 12, 19  270:10,
12  271:8, 11, 18
272:10, 22  274:20, 23
275:2  277:19  278:2,
24  279:2, 7  280:4, 6,
17, 20  281:9, 15
282:6  283:17  284:2,
24  286:24, 25  287:16,
21  288:19  289:11, 14
290:2  291:4, 22
292:2, 23  294:4
295:18, 24, 25  296:12
297:2, 4, 6, 10, 14, 16,
18  298:23  300:12, 22
301:17, 21  305:2
306:21  307:9, 11, 12,
16, 21  308:5, 9, 13
309:8, 11, 14, 15, 16,
18, 23  310:1, 5, 12, 16,

18, 20, 22, 25  311:4, 5,
7, 17  312:5  313:1, 9
314:10, 20  315:8, 12,
21  316:22, 25  317:1
318:22  319:3, 9
320:7, 18, 24  322:12
323:8, 10, 14, 24
324:9, 11, 14, 24
325:6, 9  326:20
328:1, 3, 5, 11, 19, 22
329:24  331:6, 11
332:5  336:22  337:19
340:14  341:25  344:8
347:14
**risk**  341:21, 22, 24
**Robbins**  2:5, 16  8:18
**role**  21:15
**room**  205:7
**rose**  174:20
**Rosen**  117:19
**roughly**  327:5
**routine**  300:11
**routinely**  211:17, 20
**row**  85:21, 24  87:17
192:12  252:12
**RPR**  1:24  350:22
**Rudman**  2:5, 19
**rule**  10:15  37:14, 15,
17  40:25  241:22
**ruled**  91:17
**rules**  10:8  19:19
20:4
**run**  168:24
**running**  198:14

**< S >**
**Sabastian**  62:25
63:2  220:4, 7, 8
226:8  232:11  261:9
**Sachs**  142:17  143:3
**sakes**  282:9
**sale**  18:14, 19, 22
91:16, 17  105:21, 23
175:6, 8, 11  176:10
179:9, 19  182:24
183:4, 15  188:5, 17
261:11, 25  271:2
338:3, 5, 6, 7

**sales**  18:18  102:7, 12
331:16  332:14, 18, 23
335:9, 19, 20  338:20
**sandwiches**  154:14
**sanity**  220:5, 11, 15
221:1, 6  228:11
232:7
**satisfied**  85:7
**save**  52:6  299:24
**saves**  61:18
**saw**  39:12  40:5
57:25  58:6  87:10
96:15, 21  108:16, 22
116:2  126:14  138:21
148:5, 14  184:7
185:1  188:2  190:6
191:9, 24  192:5
193:22  196:2  210:13
215:14, 15  232:9
246:15  249:17
261:23  275:20
276:23  286:22
296:13  312:23  313:1,
2  323:8  344:1
**saying**  21:23  22:7
30:2  43:3, 9  55:2
67:2  76:20  88:5
90:20  128:14, 18
129:2, 15  130:10
150:2, 7  151:11, 12
163:20  169:1  171:7
174:8  176:17  177:1,
4  199:22  225:4
226:7  227:15, 17, 19,
20  231:15, 17  232:7
249:18, 23  250:2
251:3, 13, 14  252:18
261:14  267:18
282:21  297:11, 12, 15,
25  303:12  314:15
316:6, 23  317:8
319:22, 23  320:4, 22,
25  325:24
**says**  13:24  26:23
27:20  28:2, 5  33:2
35:23  36:8  37:13, 17
39:25  42:10  47:8, 14
60:14  66:6, 7  67:24
68:9, 19  69:2, 7
70:11, 21, 25  79:6

Deposition of Michael McGrath — In Re National Instruments Corporation Securities Litigation

81:*10*, *19*, *20*, *25*  83:*6*  85:*25*  86:*7*, *11*  87:*25*  90:*24*  93:*9*  94:*12*  101:*5*  103:*23*  106:*24*  113:*16*, *24*  115:*5*, *7*  117:*9*, *23*  119:*19*, *20*  120:*21*  123:*19*  125:*7*, *8*  130:*5*, *6*, *14*  131:*18*, *19*  135:*25*  141:*24*  142:*4*, *17*  144:*4*, *11*  146:*14*  155:*5*  159:*12*  160:*3*  161:*13*  166:*11*  168:*3*  177:*13*, *18*  178:*23*  183:*17*, *18*  186:*5*  193:*4*  199:*11*  202:*11*, *13*  209:*14*  214:*22*  218:*13*  223:*4*, *7*  232:*11*  258:*11*  264:*6*, *15*  268:*4*  273:*11*, *23*  278:*10*  295:*19*  296:*6*  297:*5*  300:*20*  304:*25*  305:*3*, *4*, *5*  310:*23*  311:*4*  313:*11*, *13*  315:*15*  317:*13*  318:*20*

**scale**  83:*16*

**Scenario**  52:*16*  58:*6*  87:*24*  88:*9*  233:*21*, *23*  234:*11*, *14*, *17*, *23*  235:*24*

**scenarios**  79:*10*  100:*10*  106:*11*  209:*14*, *25*  210:*6*, *11*, *20*, *22*  233:*14*, *16*, *21*  235:*23*

**Schedule**  7:*4*

**scheduled**  99:*6*  146:*23*  147:*8*, *16*  148:*19*  266:*12*  300:*9*

**schedules**  204:*6*

**scheduling**  205:*15*

**School**  14:*12*, *14*  330:*20*, *21*  331:*2*

**science**  330:*22*

**screen**  12:*20*  29:*20*, *23*  30:*25*  31:*1*, *20*  32:*3*, *11*, *16*, *17*, *18*  119:*7*  122:*3*  225:*12*  245:*5*  295:*11*  310:*1*,

*5*

**screenshot**  119:*20*

**scroll**  12:*23*  13:*3*  24:*22*  25:*14*, *16*  26:*9*  36:*18*  37:*13*  107:*20*  126:*9*  144:*9*  148:*24*  232:*3*  237:*16*  263:*6*  267:*8*  295:*12*  296:*5*  302:*10*  306:*2*, *5*, *8*, *18*  309:*24*  310:*4*  322:*24*

**scrolling**  26:*5*

**SEC**  18:*24*, *25*  19:*2*, *5*, *7*, *19*, *23*  20:*13*  105:*15*  174:*11*, *14*  177:*8*  338:*15*

**second**  13:*21*  38:*1*  40:*16*  55:*5*  57:*18*  70:*25*  85:*21*  118:*19*  131:*12*  144:*3*  192:*2*, *5*, *20*, *22*, *25*  193:*2*, *7*  249:*7*, *9*  256:*11*  274:*24*  291:*8*  313:*3*  316:*12*  334:*13*

**Secondly**  105:*2*

**section**  13:*18*  29:*14*  47:*3*  56:*5*, *6*  68:*2*  143:*2*  156:*4*  237:*20*  289:*7*  313:*9*  322:*16*

**SECURITIES**  1:*7*  28:*13*, *23*  29:*3*, *9*  33:*9*, *12*  39:*4*, *7*  130:*21*  176:*25*  348:*2*

**security**  36:*2*  322:*17*

**see**  9:*19*  10:*2*, *7*  13:*19*, *21*, *24*  14:*2*  17:*23*  18:*2*  24:*19*  25:*22*, *25*  26:*2*, *23*, *24*  27:*19*, *22*, *23*, *24*  28:*3*, *15*, *16*, *22*, *25*  29:*16*, *24*  30:*4*, *7*, *10*, *13*, *14*, *15*, *16*  31:*1*, *2*, *7*, *11*, *21*  32:*4*, *19*, *22*, *23*, *25*  33:*3*, *13*  36:*3*, *10*  37:*14*, *20*  38:*22*, *24*  39:*8*, *17*, *23*  40:*10*, *11*, *16*, *19*  41:*3*  42:*2*, *5*, *13*  45:*17*  46:*6*, *8*, *25*  47:*1*, *8*, *10*, *11*, *13*  49:*1*, *10*  52:*22*  53:*11*, *13*, *15*, *16*, *25*  54:*5*

55:*2*  56:*10*, *15*, *22*  59:*15*, *19*, *23*  60:*8*, *20*  62:*25*  63:*6*, *10*, *11*  67:*15*, *21*  68:*2*, *4*, *19*, *21*, *25*  69:*2*, *3*, *11*, *16*  70:*4*, *11*, *13*, *18*, *22*  78:*16*  79:*12*, *20*  81:*1*, *12*, *23*, *25*  82:*2*, *25*  83:*8*, *10*, *13*, *20*, *22*, *24*, *25*  84:*4*  85:*24*  86:*2*, *15*  87:*13*  88:*2*  93:*8*, *11*, *24*  94:*3*, *16*  97:*24*  99:*25*  105:*2*  106:*12*  107:*13*  108:*18*, *20*  109:*9*, *12*, *15*, *16*, *20*, *23*  111:*10*, *12*  113:*10*, *11*, *20*  114:*13*  115:*8*  116:*7*, *9*, *17*  117:*3*, *17*, *21*, *22*  119:*3*, *4*, *6*, *11*, *16*, *18*, *21*, *24*  121:*12*, *14*, *25*  122:*24*  123:*15*, *22*  125:*11*, *12*  126:*4*, *8*, *9*  140:*9*  141:*21*  142:*15*, *16*, *18*  143:*4*, *16*, *23*, *24*  144:*3*, *6*, *8*  145:*12*, *19*  146:*13*, *16*, *19*  147:*3*  148:*4*, *10*, *24*  149:*9*  154:*20*, *23*  155:*5*  158:*13*  159:*15*  161:*1*  164:*18*  165:*18*  168:*6*, *20*  171:*6*, *12*, *13*  172:*14*  178:*7*, *25*  179:*4*, *10*  184:*8*  185:*19*  186:*9*, *13*, *18*, *19*  189:*4*  190:*16*, *24*  192:*2*  195:*6*, *24*, *25*  196:*3*, *5*, *6*, *10*, *17*, *19*, *23*, *24*  198:*23*  199:*5*  201:*18*, *21*  203:*25*  206:*12*  209:*13*, *15*  210:*7*  211:*12*  215:*21*  217:*8*, *11*, *13*, *17*, *24*  220:*3*, *5*  221:*11*, *19*  222:*25*  223:*2*, *5*, *6*, *11*, *12*, *15*  224:*8*  225:*16*  226:*9*  228:*22*  229:*9*  230:*16*  232:*3*, *5*, *7*, *15*  234:*6*, *12*  235:*10*  237:*21*, *24*  238:*9*, *24*  239:*14*, *23*  240:*1*

242:*12*, *14*, *22*, *24*  243:*1*, *5*, *11*  244:*1*  245:*4*, *5*, *6*  248:*21*, *25*  252:*14*  257:*22*  259:*8*, *9*  261:*12*, *17*  263:*8*, *10*, *15*, *18*, *19*, *20*, *24*  264:*10*, *13*  265:*4*, *10*  266:*2*, *20*  267:*14*  268:*17*  270:*3*  277:*19*, *24*  280:*12*  284:*21*  289:*6*, *8*  291:*17*  295:*2*, *16*  296:*7*, *15*  298:*15*  300:*14*, *19*, *20*  302:*15*, *16*  304:*24*  306:*3*, *5*, *9*, *25*  307:*2*  308:*1*, *2*, *4*, *5*  309:*23*, *25*  310:*4*, *5*  313:*5*, *7*, *22*, *23*  314:*2*  315:*4*, *19*, *25*  316:*1*  322:*19*, *23*, *24*  323:*7*  343:*23*  344:*2*  346:*18*

**seeing**  32:*7*  54:*23*  58:*9*  265:*10*

**seen**  56:*17*  79:*23*  185:*21*, *25*  190:*21*  234:*1*  274:*21*  294:*15*  295:*19*  298:*19*  341:*16*

**Selected**  111:*12*

**selection**  340:*23*

**selectively**  156:*23*

**self-defense**  176:*18*

**self-serving**  98:*8*

**sell**  33:*9*  39:*4*  102:*15*  132:*17*  141:*5*  183:*11*  261:*16*  323:*18*  326:*24*  343:*9*

**selling**  114:*19*  115:*2*  132:*22*  255:*10*  296:*10*  299:*4*  319:*7*  326:*8*  332:*14*, *15*, *17*  335:*16*  341:*10*, *11*

**send**  160:*4*  186:*4*  243:*14*  244:*10*

**sending**  159:*7*  251:*14*

**sends**  60:*20*  265:*8*

**sense**  89:*14*  90:*25*  272:*19*, *23*  274:*6*

**sensitive**  300:*17*

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

**Sent**  4:*17*  63:*5*  76:*15*  123:*25*  159:*22*  185:*3*  188:*8*  248:*23*  249:*17*  251:*13*  254:*13, 22*  257:*5*  258:*14*  289:*16*  294:*22*  317:*4*  344:*5*

**sentence**  39:*24*  71:*25*  73:*20*  86:*7*  144:*21*  145:*1, 3*  149:*19*  150:*1, 4*  151:*14*  183:*1*  202:*9, 10*  215:*19, 22*  268:*11*  271:*19*  272:*10, 24*  313:*12*  314:*1*

**September**  1:*13*  6:*18*  8:*2, 5*  50:*11, 16*  218:*18*  266:*12*  288:*25*  289:*3, 5*  291:*4, 11*  295:*4*  298:*12*  318:*8, 10*  342:*3*

**serious**  93:*19*  332:*9*

**seriously**  169:*19*  334:*5*

**seriousness**  93:*10, 14, 16, 17*

**serve**  15:*22*  19:*12*  328:*22*

**served**  15:*14, 17*  16:*3, 17, 21*  17:*16*  19:*15*  328:*6*

**serves**  13:*25*

**service**  160:*16*

**services**  292:*20*

**serving**  17:*11*  329:*6*

**Session**  6:*21*  206:*11*  207:*1, 7, 8, 11*  218:*17*  289:*8*

**sessions**  206:*17*

**set**  80:*24*  110:*24*  187:*19*  201:*13*  212:*22*  279:*15*  350:*8*

**sets**  189:*9*

**setting**  63:*8*

**seven**  132:*4*  170:*24*  171:*4*  241:*19*  257:*9*

**seven-hour**  241:*22*

**severe**  102:*5*

**share**  47:*24*  50:*2*  52:*22, 23*  53:*1, 3, 25*  54:*7, 10, 16*  56:*22, 25*  67:*20*  93:*23*  111:*18, 24*  112:*6, 9*  118:*14, 16*  125:*23*  126:*1, 3, 4, 22*  127:*16*  129:*6, 7, 11*  133:*8*  134:*18, 24*  135:*11*  136:*6, 13, 15*  137:*6, 25*  138:*11*  139:*13*  140:*8, 24*  141:*2, 6, 17*  144:*23*  149:*18, 25*  155:*19*  156:*10*  158:*8, 10*  163:*12, 21*  172:*12*  173:*3*  184:*11, 14, 20, 23*  190:*24*  191:*1, 5*  192:*24*  193:*5*  195:*23, 24*  196:*1, 6, 13, 16, 21*  197:*1, 13*  201:*7*  223:*8*  234:*18*  235:*1*  236:*21*  253:*13, 14*  255:*10, 19*  256:*12*  257:*2*  260:*25*  265:*2*  286:*2*  287:*4*  289:*22*  290:*6, 14, 17*  291:*9*  292:*13*  294:*1*  307:*1, 12, 20, 23, 25*  308:*5, 19*  309:*2, 7*  311:*3*  312:*21*  314:*11, 13*  315:*8*  317:*23*  318:*5*  319:*6, 8*  321:*12, 16*  323:*4, 8, 14, 17, 22*  324:*11, 14, 19, 22, 23*  325:*14, 17*  326:*11, 23, 24*  327:*5, 20*  333:*23*  334:*11, 13, 18*  336:*21*  337:*1, 21, 22*  340:*7, 9, 12, 15, 17, 21*  341:*2, 5, 7, 11, 19, 22, 25*  342:*14*

**shared**  185:*8*  186:*8*  187:*4, 14*  341:*15*

**Shareholder**  47:*9, 14*  139:*1*  168:*23*  171:*1, 25*  172:*21*  176:*20*  200:*5*  201:*1, 9, 11*  213:*14*  314:*7*  325:*19, 21*

**shareholder-friendly**  264:*25*

**shareholders**  48:*16*  49:*25*  69:*10*  99:*19*  103:*7*  132:*17*  137:*24*  138:*3, 16, 18*  139:*9, 11, 15*  156:*22*  158:*2, 7, 9*  168:*19*  169:*7*  217:*23*  219:*9*  249:*4, 20*  308:*20*  313:*19*  314:*5*  315:*17, 23, 24*  316:*21*  317:*16*  321:*8, 11, 16, 19, 20*  323:*12*  325:*13, 16, 18*  327:*24*  328:*1, 2, 3*  333:*24*  334:*9*  336:*4, 19*  342:*11, 16, 19*  346:*4*

**shareholder's**  138:*19*

**shares**  39:*14*  45:*16*  47:*25*  48:*10*  49:*7, 9, 13, 16, 18, 19, 23, 24*  50:*19*  51:*7, 16, 18*  52:*6, 14*  54:*11, 13*  94:*1, 5, 7, 8, 10, 21, 22, 24*  95:*3, 5*  125:*22*  138:*13*  219:*14*  276:*4*  277:*1*  281:*2*  291:*20, 21, 25*  292:*2, 5, 10, 16, 18, 22*  293:*2, 7, 21, 22*  294:*3*  296:*11*  299:*4*  307:*24*  309:*3, 10, 12, 14, 18*  311:*1*  313:*16*  314:*7, 13*  322:*23*  323:*2, 5, 9, 12, 13, 17, 18, 19, 22*  324:*3, 13, 19, 24*  325:*15, 23, 25*  326:*1, 2, 3, 8, 19*  327:*16*  335:*6*  342:*2, 7, 10*  346:*10, 22*

**sharing**  217:*21*  219:*7*  225:*25*

**sheet**  195:*3*  349:*1*

**shift**  42:*12, 21, 23, 25*  43:*10, 13*  44:*21*  45:*4, 12, 13*  336:*13*

**shifted**  331:*18*  332:*16*

**ship**  102:*8, 20, 24*  137:*15*  335:*8, 10*

**Short**  16:*1*  146:*22*  241:*8, 11, 17*  338:*23*

**shorted**  309:*16*

**shortly**  162:*6, 8*  337:*2*

**short-term**  139:*10, 11*  140:*22*  167:*5, 7*

**show**  85:*19*  101:*3*  110:*14*  148:*1*  224:*5*  225:*13*  234:*25*  277:*18*  312:*3*

**showed**  120:*16*  138:*7*  212:*22*  298:*20*  303:*15*  327:*2*

**showing**  115:*10*  195:*6, 9*  196:*15*  265:*15*

**shows**  48:*4*  54:*14*  83:*2*  109:*3*  110:*10*  111:*2*  114:*3*  115:*11, 16, 24*  120:*7*  126:*22*  141:*8*  195:*12*  233:*14*  234:*13*  265:*20, 23*  307:*11, 13, 19, 22, 23*  309:*22*  334:*10*

**sic**  242:*25*

**side**  31:*21, 24*  32:*2*  49:*1*

**sign**  69:*14*  142:*14*  347:*11*

**signaled**  93:*14*

**Signals**  93:*9*

**Signature**  347:*17*

**signed**  123:*6*  248:*22*  322:*8, 9, 11, 13*

**significant**  20:*9*  36:*20*  40:*18*  69:*10*  145:*8*  164:*20*  168:*5, 8, 24*  182:*6*  195:*1*  224:*10*  270:*20*  290:*21*  335:*9*  336:*6*

**significantly**  33:*10*  39:*5*  102:*10, 18*  103:*4*  137:*21*  164:*17, 22*  165:*5*  167:*1*  224:*25*  313:*21*

**signing**  68:*7*  145:*16*

**silent**  316:*11*  320:*3, 8*

**similar** 10:7 122:5 178:15, 18 184:6 190:21

**simple** 136:21 168:10 190:3 236:22 255:9

**simply** 92:5 105:12, 14 107:2 249:22 253:25

**simultaneous** 280:16

**single** 81:21 118:12

**sir** 25:14 30:15 37:4 227:22 235:12 260:8 330:17 347:3

**sitting** 72:2 73:4 335:13

**situation** 32:6 55:7 86:1, 13, 22, 25 88:6 149:23 199:18 267:4 298:16 335:4

**situational** 22:20

**situations** 100:9 334:2

**six** 74:1, 11 75:22 170:23 233:11 240:25 241:19 315:14, 21 316:19 317:13 318:10 319:2, 17 321:6

**six-month** 317:2

**skip** 26:4

**slide** 47:11 53:8 56:19 82:20, 22 84:4 115:10, 24 116:6, 12, 14, 15, 17 117:17 119:11, 13, 23 120:1, 7, 15, 16 121:21 122:6, 16 163:17 171:3, 7 178:15 190:13, 21 231:1 235:10 237:7 265:10, 13 269:8 305:3 306:22, 24 309:25 310:7 311:20

**Slides** 4:8 56:17 80:24 81:11 121:20 200:19, 23 207:4, 13, 17 216:11 232:13, 20, 22 305:1

**slide's** 265:15

**slowly** 10:18

**small** 30:9 55:9 291:16 309:9 325:18

**smaller** 195:9, 10

**software** 236:16

**sold** 16:10 102:19 114:18 115:17, 20 138:10, 13 261:22 262:11 270:20 309:3, 7, 9, 12, 14 314:7 323:12, 13, 17, 21 324:3, 13, 16, 18, 23 325:25 327:19 328:1 338:21

**sole** 150:10 172:20 174:16 201:2 322:9

**solely** 149:20 161:13 338:16

**solicited** 333:6

**soliciting** 337:16

**solid** 158:6

**solidified** 334:16, 19

**solutions** 332:17

**somebody** 19:12 25:7, 21 62:1 73:13 130:1 282:22 285:25 320:15 338:5

**someplace** 13:6

**somewhat** 13:12 126:25 191:12 194:6

**soon** 152:4 175:5, 9 179:8, 18 183:3 188:4, 16

**sophisticated** 11:15, 22 12:2, 4, 7, 15

**Sophistication** 12:12

**sorry** 11:18 13:20 26:10 41:21 53:13 58:4 61:2 67:2 68:16 71:25 81:2, 3 86:5 88:15, 25 90:19 107:15 112:18 117:12 118:24 124:17 131:9 146:8 151:20 153:22 160:22 165:11 171:10 174:19, 25 190:13 193:15 195:21 198:1 215:22

219:24 229:25 231:2 244:17 250:15 254:5 261:19 264:23 269:5 274:2, 17 277:20 287:2 294:8 295:4 299:22 305:18 306:11, 19 311:23 321:25 328:13 331:4

**sort** 25:23 53:6 69:6 91:10 171:9 176:17 192:15 283:25

**sorts** 188:10

**sound** 326:7 327:18 329:3

**Sounds** 17:14 147:10

**sources** 68:24

**SOUTHERN** 1:2 330:18

**speak** 138:18

**speaking** 10:18 60:6, 15 72:15 79:17 252:2

**speaks** 69:25 129:21 133:12 222:11 311:20 319:21

**spec** 77:25

**Special** 4:6, 14 5:15, 20 6:18 78:13 98:25 99:3, 9, 17, 21, 25 208:25 211:23 212:5 218:15 232:14

**specialist** 8:12

**specific** 21:18, 19 66:20, 24 67:8 84:14, 16 207:7, 15, 20 236:3 246:24 264:22 267:5 271:13 288:14 294:20 299:9

**specifically** 60:2 105:22 157:21 200:18 236:1 270:24 279:7 284:3 298:9

**specifics** 64:20

**spectrum** 83:2 122:5 292:1 337:13

**speculate** 73:12 77:1, 25 252:12 255:11

**speculated** 61:24 62:12 333:14

**speculation** 33:18 35:9 61:21 62:4, 9 68:13 70:17 71:9, 20 72:6, 13 77:13 85:5 91:6 118:10 135:21 137:11 138:5 139:3 140:19 144:17 149:14 174:23 220:19 222:10 245:13, 20 250:6, 23 251:5 252:22 254:15 255:25 256:25 257:9 258:2, 17 259:3 260:6 262:2, 22 288:6 290:3 308:22 317:7, 21 319:20 325:11

**speech** 259:22, 24, 25

**spend** 132:4 302:25

**spending** 170:22

**spent** 17:5 331:23 334:6

**spirited** 162:10

**spoke** 285:24, 25

**spoken** 264:20

**spokes** 232:5

**Sponsor** 26:24

**sponsors** 26:24

**SS** 350:3

**St** 2:14

**stage** 122:13

**stamped** 321:25

**stand** 14:18

**standard** 46:11 56:19

**stands** 79:7 109:4

**Stanley** 247:6

**Starkloff** 42:7, 22 43:21 45:11 59:14, 19, 21 60:11, 25 61:20 62:5, 24 63:25 64:7, 11, 18 65:12, 23 67:16 82:12, 16 106:1 116:14 118:24 119:1, 2, 6 122:24 123:7 125:1, 10, 13 146:10 147:5 148:5 149:1 158:20 159:5, 19 162:6, 7 178:4 185:9, 16 186:4, 23 187:2, 5, 14 188:8, 9

242:*10*  244:*20*  248:*23*  257:*20*, *24*  258:*24*  263:*8*  264:*2*, *19*  266:*4*  267:*7*, *8*  269:*8*  280:*3*  294:*25*  315:*12*  330:*14*  331:*15*  333:*9*
**Starkloff's**  148:*11*  266:*1*  275:*6*  276:*3*, *25*  281:*1*  291:*24*  292:*6*, *13*  293:*2*
**starting**  194:*21*  240:*8*  315:*15*  317:*13*
**state**  35:*16*  106:*7*  123:*19*  143:*13*  230:*19*, *22*  350:*2*
**stated**  37:*8*  215:*14*  218:*23*  290:*25*
**Statement**  27:*20*, *23*  28:*1*  179:*12*  217:*14*  218:*5*  219:*20*  317:*19*  320:*6*, *10*  338:*11*
**STATES**  1:*1*  17:*20*  39:*1*  68:*6*  116:*25*  117:*14*  123:*9*  141:*20*  143:*2*  145:*21*  146:*21*  157:*10*  158:*15*  162:*17*  164:*14*  198:*18*  199:*14*  249:*2*, *10*  268:*1*  274:*22*  280:*9*  297:*2*  315:*14*
**stating**  101:*2*  123:*3*  162:*16*  230:*13*  298:*3*  315:*21*  324:*15*
**statistics**  292:*21*
**status**  213:*5*
**stayed**  334:*21*
**steady**  42:*16*  145:*8*
**stenographic**  350:*11*
**stenographically**  350:*9*
**step**  83:*10*, *15*  98:*23*  292:*1*
**stepped**  329:*15*
**steps**  83:*3*  157:*11*, *17*
**Stock**  42:*4*, *24*  43:*5*, *10*, *13*, *17*, *19*  44:*2*, *3*, *8*, *10*, *12*, *18*, *21*  45:*2*, *6*, *8*, *19*  47:*19*  48:*15*  49:*20*, *21*  50:*16*  67:*5*

83:*11*, *18*  87:*1*, *9*  90:*23*  92:*15*, *21*  94:*15*, *18*  102:*16*  105:*5*, *14*, *17*  110:*6*  111:*3*  112:*6*, *10*  122:*14*  126:*24*  128:*13*, *15*  129:*9*, *18*, *19*  132:*14*, *19*, *22*  133:*10*  134:*19*  135:*3*, *8*, *19*  137:*12*, *13*, *19*  138:*9*  139:*7*, *17*, *25*  140:*14*  158:*1*, *14*  172:*3*, *8*, *11*, *17*, *22*, *23*, *25*  173:*3*, *6*, *14*, *19*, *23*, *24*  174:*4*, *6*, *9*, *15*, *17*, *20*  175:*5*, *9*, *13*, *14*, *22*  176:*1*, *3*, *8*, *20*  177:*10*  179:*7*, *17*  180:*9*, *20*, *25*  181:*9*, *24*  182:*2*, *11*, *14*, *17*  183:*2*, *14*  188:*3*, *15*  206:*1*  212:*21*  213:*12*, *15*, *16*, *18*  214:*6*  236:*20*  238:*24*  239:*7*, *14*, *19*, *24*  240:*1*  242:*25*  243:*5*  270:2, *15*  271:*17*, *20*, *25*  272:*8*, *12*, *16*  273:*3*, *8*, *10*, *12*, *21*, *25*  274:*4*, *10*  275:*10*  282:*2*, *17*, *23*  283:*1*, *3*  284:*8*, *12*, *13*  285:*3*, *5*, *8*, *12*  286:*6*, *16*  287:*8*  288:*1*  309:*16*  326:*11*  335:*2*  338:*14*, *16*  343:*9*, *19*  345:*21*  346:*1*, *3*
**stockholder**  170:*11*
**stock-repurchases**  42:*11*, *20*
**stock's**  174:*13*
**stop**  4:*9*  76:*13*  77:*1*, *5*  133:*18*  136:*16*, *17*  139:*22*  257:*13*, *14*  273:*7*
**stopping**  152:*16*
**straight**  135:*24*
**strange**  34:*10*
**strategic**  101:*18*, *25*  143:*15*, *19*  250:*4*, *11*,

*19*  332:*19*, *21*
**strategies**  156:*17*
**Strategy**  42:*4*, *11*, *20*  43:*20*  47:*1*, *5*  56:*5*, *7*  190:*17*  195:*22*  200:*5*, *7*, *10*, *12*, *16*  201:*1*, *4*, *7*, *9*, *23*  202:*14*, *17*, *23*  203:*11*, *20*  204:*9*  214:*4*, *13*, *25*  215:*4*, *5*  218:*17*  224:*21*  286:*23*  300:*8*, *11*, *21*  306:*22*  331:*18*, *19*, *20*  332:*13*, *22*, *23*  340:*1*, *4*  341:*17*
**Street**  109:*1*, *17*, *23*  158:*2*
**strengthen**  115:*21*
**strengthened**  145:*10*
**stress**  329:*13*
**stretch**  10:*23*
**strike**  30:*20*
**string**  3:*22*  4:*2*, *8*, *15*, *19*, *21*, *23*  5:*1*, *16*, *20*, *24*  6:*1*, *3*, *5*, *6*, *8*, *10*  232:*12*
**Strong**  83:*24*  84:*3*  85:*23*, *25*  86:*21*  88:*4*  89:*8*, *22*  90:*11*  92:*7*, *23*  93:*8*  157:*13*, *19*  236:*13*
**strongly**  101:*22*  174:*14*
**structure**  67:*9*  84:*16*  332:*24*
**struggling**  132:*20*  264:*4*
**stuck**  12:*14*  290:*14*
**study**  87:*10*
**stuff**  23:*19*
**sub**  167:*2*
**Subject**  3:*14*  46:*16*  63:*10*  68:*20*  185:*16*  186:*2*  217:*10*  304:*24*
**submitted**  63:*21*  187:*17*
**submitting**  63:*23*
**subscription**  236:*16*  336:*14*
**subsequent**  71:*10*  72:*8*  73:*6*, *9*  93:*4*

115:*15*  171:*12*  184:*5*  220:*3*
**Subsequently**  72:*7*  78:*1*, *3*  118:*11*  121:*7*  125:*13*  141:*1*  173:*10*  231:*22*
**substance**  11:*8*  31:*18*  124:*1*  214:*24*
**substantial**  137:*8*
**substantially**  33:*7*  39:*3*  101:*15*  138:*8*  156:*11*  192:*16*, *22*  194:*1*, *6*  308:*8*  310:*14*
**substantiated**  103:*5*
**substantive**  69:*9*
**subtract**  136:*11*  324:*1*, *21*
**success**  170:*23*
**successful**  11:*12*
**successfully**  115:*17*
**sudden**  151:*15*
**suddenly**  44:*15*
**sued**  105:*6*
**sufficient**  167:*3*
**sufficiently**  139:*7*  168:*5*  219:*17*
**suggest**  186:*7*  187:*3*, *11*
**suggested**  159:*12*  160:*3*
**suggesting**  43:*21*  188:*9*
**suggestion**  23:*22*
**Suite**  2:*6*, *14*  8:*9*
**summarized**  103:*10*  110:*2*
**summarizes**  235:*8*  295:*24*
**Summary**  56:*11*  156:*5*  202:*14*  307:*7*
**Summer**  2:*16*
**supervised**  19:*8*
**supply**  102:*5*, *17*  132:*18*  137:*14*  201:*19*  202:*2*, *3*  203:*3*  219:*15*  224:*23*  332:*25*  335:*3*  336:*5*
**support**  229:*8*  339:*14*

**supported**  253:*2*
339:*19*
**supports**  69:*3*
**supposed**  92:*12*
**supposedly**  300:*18*
**suppressed**  137:*14*
**sure**  26:*12*  51:*10*, *18*
55:*7*  66:*17*  69:*23*
71:*13*  87:*7*  95:*20*
133:*6*  134:*16*  146:*4*
152:*11*  156:*22*
165:*24*  170:*25*
203:*24*  205:*8*  208:*10*,
*11*  225:*2*  226:*16*, *17*
241:*14*  263:*23*  270:*1*
271:*16*, *24*  272:*11*
273:*3*, *21*  301:*7*
328:*1*  329:*9*  339:*22*
**surprise**  333:*7*
**surprised**  300:*4*
**suspected**  95:*4*
293:*18*
**suspicion**  61:*25*
**Susquehanna**  247:*7*
**sworn**  8:*16*  9:*4*
**system**  23:*10*  160:*8*
**systems**  335:*8*  339:*7*,
*13*, *16*

**< T >**
**Tab**  12:*17*  22:*21*, *22*
23:*11*  41:*14*  46:*1*
59:*8*  65:*8*  78:*7*
80:*17*  97:*15*  98:*19*
118:*21*  122:*21*
124:*17*, *18*  146:*4*
147:*22*  153:*8*  158:*25*
177:*25*  185:*12*
188:*22*  208:*21*
216:*24*  242:*5*  244:*14*
261:*5*  263:*3*  274:*14*
279:*21*  288:*21*
294:*11*  301:*13*
311:*23*  312:*15*  322:*1*
**TABLE**  3:*1*  169:*17*
**tabs**  23:*10*
**tactic**  93:*23*
**Tactics**  83:*21*
**tailwind**  236:*16*

**take**  10:*21*, *22*, *25*
12:*21*  22:*7*  24:*17*
41:*17*  45:*5*  51:*5*
58:*21*, *24*  82:*10*  83:*4*
98:*23*  112:*14*  114:*4*
118:*13*  119:*19*
121:*24*  151:*23*
152:*11*, *17*  157:*11*, *18*
162:*2*  197:*13*  198:*18*
208:*8*  209:*13*  211:*25*
222:*19*  232:*12*  241:*8*,
*11*, *17*  270:*21*  283:*8*
294:*19*  302:6, *19*
308:*1*  318:*12*  324:*6*
325:*2*  333:*23*
**taken**  59:*3*  112:*24*
153:*2*  203:*24*  208:*15*
241:*25*  283:*19*  312:*9*
330:*1*  335:*13*  350:*7*,
*12*
**takeover**  71:*4*  81:*6*
83:*21*  85:*8*  93:*23*
94:*13*  118:*14*, *15*
144:*23*, *25*  150:*17*
155:*19*  166:*25*
168:*10*  182:*8*  262:*25*
289:*21*  290:*7*  291:*14*
329:*10*, *13*  334:*18*
**talk**  10:*15*, *19*  30:*12*
74:*3*  89:*1*  130:*3*
246:*19*  264:*2*  277:*19*
284:*15*  286:8, *23*
320:*21*  323:*20*
331:*22*
**talked**  20:*24*  63:*22*,
*24*  87:*19*  260:*23*
265:*20*  315:*2*
**talking**  19:*20*  30:*12*
44:*2*  49:*5*  73:*17*
88:*8*, *16*  91:*3*, *7*, *11*,
*13*, *14*, *15*  117:*18*
132:*5*  171:*18*  177:*8*
189:*7*  200:*21*  215:*12*
243:*3*  272:*1*  282:*11*
286:*15*  303:*15*
304:*15*
**talks**  49:*2*
**target**  84:*9*  85:*22*, *24*
86:8, *12*  87:*17*, *24*

88:*4*  179:*4*
**targets**  245:*8*
**target's**  86:*1*, *13*, *22*
88:*6*  94:*1*
**team**  23:*11*  154:*17*
187:*19*  190:*3*  211:*5*
329:*20*  331:*23*
**Tech**  31:*20*  32:*11*
55:*2*  342:*21*
**Technician**  2:*19*, *20*
8:*4*  12:*25*  25:*11*
26:*14*  32:*8*  54:*22*
55:*1*, *6*, *14*  59:*1*, *5*
112:*23*  113:*1*  152:*25*
153:*4*  208:*13*, *17*
231:*3*, *8*, *18*  232:*23*
233:*5*  241:*3*, *6*, *23*
242:*2*  283:*17*, *21*
294:*9*  305:*10*, *13*, *15*,
*23*, *25*  306:*7*, *12*, *16*
312:*5*, *7*, *11*  329:*24*
330:*3*  347:*14*
**Techniques**  82:*23*
110:*5*
**Technologies**  9:*25*
16:*22*
**technology**  55:*10*, *12*
145:*11*  331:*20*
**Tell**  12:*22*  22:*25*
41:*17*  64:*7*, *18*  73:*19*
77:*25*  92:*15*, *20*
138:*24*  188:*9*  196:*7*
252:*13*  255:*13*
278:*20*  284:*3*  305:*4*,
*18*  319:*23*, *24*  330:*16*
341:*4*  345:*14*
**telling**  97:*10*  130:*21*
146:*22*  177:*11*
221:*20*  243:*24*
273:*22*  287:*10*
319:*25*  323:*25*
324:*16*
**ten**  17:*5*  59:*22*
152:*7*, *18*, *21*, *22*
191:*14*  265:*17*
270:*12*  307:*15*
309:*12*  310:*18*  326:*2*
328:*10*, *16*
**tend**  115:*21*

**ten-minute**  59:*25*
**tens**  340:*2*
**tentative**  53:*5*
**term**  21:*8*  121:*3*, *11*
139:*15*  140:*22*  170:*1*
197:*23*  202:*18*  340:*1*
**terms**  101:*2*  152:*16*
213:*3*, *5*  246:*24*
338:*11*, *19*  340:*2*
**test**  332:*11*  339:*7*, *9*,
*13*
**testified**  9:*6*, *13*  10:*2*
64:*10*  85:*10*  283:*24*
321:*5*
**testify**  9:*4*  128:*21*
**testifying**  88:*21*  89:*2*
150:*7*  320:*10*, *13*
**testimony**  80:*7*
87:*13*  92:*21*  182:*12*,
*15*, *16*, *19*  199:*21*
208:*2*, *4*  212:*23*
257:*7*  259:*23*  272:*2*
285:*18*  287:*18*
293:*25*  319:*10*, *12*
321:*19*  348:*8*
**text**  27:*24*  119:*13*
162:*3*, *5*
**Thank**  9:*11*  11:*20*
13:*2*  23:*14*  29:*20*
55:*15*, *16*  101:*11*
113:*6*, *19*  116:*10*
121:*25*  152:*24*
153:*25*  210:*8*  233:*6*
238:*22*  240:*19*
241:*17*  249:*16*
283:*16*  289:*6*  294:*11*
295:*13*, *14*  300:*3*
306:*18*  330:5, *7*, *8*
342:*21*  343:*22*  347:*4*,
*7*, *8*
**Thanks**  112:*22*
156:*24*  231:*24*
306:*17*
**theirs**  164:*22*
**theories**  216:*12*
**thin**  240:*8*
**thing**  19:*25*  52:*5*
168:*25*  213:*4*  218:*13*
228:*14*, *17*  230:*9*

253:*11*  270:*11*
335:*14*  341:*25*
**things**  11:*23*  18:*6*
23:*17*  62:*12*  71:*14*
90:*5*  104:*9*  162:*12*
173:*12*  176:*16*
177:*11*  202:*12*  205:*9*
221:*16, 25*  229:*23*
255:*5*  290:*20, 22*
320:*15*  334:*25*
336:*18*  337:*6*  339:*24*
**think**  11:*14*  12:*12*
21:*15*  22:*13, 20*
37:*17, 22*  41:*1, 5*
44:*5*  47:*18*  60:*18*
70:*18*  72:*21*  74:*6*
76:*1*  77:*22*  80:*5*
84:*6, 23*  90:*13, 16, 23,*
*24*  105:*13*  113:*8*
118:*16*  138:*2, 15, 24,*
*25*  140:*4, 17, 21*
145:*2*  154:*14*  155:*17*
157:*6*  174:*10, 12, 13*
176:*6*  182:*20*  186:*1,*
*16, 20, 21*  190:*11*
192:*18*  198:*13*  204:*1*
208:*20*  221:*6*  223:*20*
224:*4*  225:*12*  226:*13*
232:*13, 25*  235:*22*
236:*2*  239:*5*  240:*4*
251:*21*  252:*6, 10, 11*
253:*12*  255:*3*  258:*3,*
*18*  259:*4, 7*  264:*8*
274:*11*  278:*16, 18, 20*
283:*10, 12*  290:*16*
293:*22*  303:*7*  305:*17*
311:*20*  321:*5, 9, 18,*
*20*  325:*21*  332:*3, 5*
334:*9*  339:*17*
**thinking**  61:*25*
71:*20*  179:*6*  186:*6*
251:*20*  252:*13, 14*
320:*24*  334:*14, 16*
**third**  57:*4, 6*  58:*17*
81:*25*  82:*6*  92:*10*
105:*6*  146:*18*  168:*2*
191:*10, 14, 19*  194:*14,*
*21*  202:*9, 13*  265:*17*
307:*12*  308:*2*  310:*21*

313:*3*
**thirdly**  103:*1*
**Thoma**  16:*12*
**Thomas**  15:*17*
**thorough**  205:*8*
334:*7*
**thoroughly**  20:*23*
333:*25*
**thought**  84:*6*  105:*19*
121:*11*  157:*3*  162:*22*
166:*16*  213:*3*  250:*14*
253:*12*  254:*18*  255:*1,*
*5*  291:*5, 7*  300:*1, 3, 4*
333:*19*  334:*7*  337:*25*
338:*20*  339:*16*
**thoughts**  337:*23*
341:*17*
**thread**  232:*4*
**threat**  70:*15, 18*  71:*6,*
*11, 15, 18*  72:*4, 10*
73:*5, 10, 24*  77:*11*
78:*2*  144:*20*  149:*11,*
*16*  150:*9, 11, 12, 13,*
*18, 20*  151:*6, 8, 10, 12,*
*16, 18*  162:*11, 13*
**threatened**  151:*12*
**threatening**  70:*22*
84:*22*  85:*2, 13*
150:*24*  151:*3*
**threats**  78:*1, 3*
257:*13*
**Three**  9:*22*  25:*3*
45:*10*  52:*2, 3, 6*  60:*3*
102:*22*  104:*8*  116:*18*
163:*13, 23*  190:*16*
209:*24*  210:*9*  215:*12,*
*25*  216:*13*  229:*16*
233:*10, 13, 16, 21*
235:*22*  237:*9*  238:*25*
250:*20, 21*  256:*9, 14,*
*17*  261:*2, 16*  269:*4*
320:*23*  336:*7*  337:*10*
340:*17, 20*  341:*21*
**three-year**  218:*16*
**threshold**  341:*12*
**thumb**  37:*14, 15, 17*
40:*25*
**tie**  176:*16, 22, 25*
177:*11*  214:*19*
**tied**  175:*24*  176:*19*

**tight**  198:*22*  199:*1, 8,*
*10, 11, 13*
**till**  316:*4*
**Time**  1:*14*  8:*2, 6*
9:*12*  10:*2*  14:*4, 9*
15:*8*  16:*14, 17*  17:*2*
22:*8, 14*  27:*9*  29:*2, 7*
33:*22*  36:*5*  39:*10, 21*
40:*23*  41:*11*  42:*12,*
*15, 22, 24*  43:*10*  44:*3,*
*13, 22*  45:*12*  51:*25*
52:*1, 4, 6, 9, 13*  53:*6,*
*7, 8, 18*  57:*11, 19, 25*
58:*16*  61:*4*  63:*20*
66:*18*  67:*17*  71:*14,*
*17*  73:*20*  76:*9*  77:*16*
84:*2*  85:*1*  89:*7, 18*
92:*10*  94:*23*  95:*1, 7,*
*12, 15, 19, 23*  96:*2, 6,*
*9*  97:*10*  98:*2, 4, 13*
102:*4, 6, 9*  103:*16*
104:*13*  106:*14*
109:*17*  114:*15, 18*
118:*11*  127:*24*
129:*12*  131:*25*  132:*2,*
*23*  135:*8, 18*  136:*8, 9,*
*11*  137:*13*  138:*12*
139:*7*  140:*8, 13, 15*
143:*18*  145:*25*
150:*13, 14, 15, 22, 23*
151:*10, 19*  153:*1*
164:*17, 20*  165:*3, 5*
167:*19, 21*  179:*13*
184:*3*  191:*17*  193:*17,*
*21*  194:*14, 21*  195:*13*
196:*22*  197:*1, 15*
198:*5*  199:*7, 23*
201:*24*  206:*25*  207:*3*
217:*3*  218:*20*  221:*14*
224:*11, 13*  231:*20*
234:*4*  238:*10*  241:*1,*
*3, 24*  242:*3*  245:*24*
251:*20, 22, 23, 25*
255:*1, 2, 4, 25*  256:*11,*
*25*  257:*5*  259:*13*
260:*20*  262:*10, 19*
270:*16*  272:*9*  275:*4,*
*5*  276:*14, 18, 25*
277:*8, 13*  278:*7, 8*
279:*13, 16*  281:*8, 18,*

*25*  283:*12, 18*  290:*1,*
*14, 16*  291:*11, 23*
292:*5, 13, 22*  295:*2*
297:*2*  299:*25*  302:*6,*
*19, 25*  303:*4, 25*
304:*7*  308:*8*  310:*20*
313:*1, 2, 24*  316:*12*
317:*3, 24*  318:*17*
320:*2*  323:*2, 13*
324:*3, 7*  325:*13*
326:*11, 21*  328:*10, 16,*
*21*  329:*25*  330:*6, 7*
331:*17, 24*  332:*12*
333:*1, 13*  334:*7, 13*
335:*3, 6*  336:*4*  337:*2,*
*4, 9, 14*  338:*23*
341:*13*  342:*7, 15, 17*
344:*5*  345:*15, 25*
346:*9, 17*  347:*7, 15*
348:*8*
**timely**  70:*6*  84:*18, 20*
**times**  9:*16, 20*  72:*22*
74:*1, 12*  75:*22*  77:*14*
124:*11*  133:*23*
141:*14*  150:*19, 21, 22*
215:*20*  229:*16*
250:*21*  252:*12*  253:*5*
257:*10*  282:*19*  324:*8,*
*9, 24*  327:*15, 17*
**Timing**  68:*3*  70:*11*
142:*13*  201:*13*  205:*5,*
*10, 11*  206:*8*  240:*6*
243:*16*
**tips**  134:*2*
**title**  235:*10*
**today**  8:*13*  9:*9*
13:*15*  34:*2*  72:*2*
73:*3*  85:*20*  96:*21*
122:*6*  190:*22*  212:*5*
255:*15*  258:*20*
265:*11, 13*
**Today's**  8:*5*
**Todd**  14:*19*
**toehold**  291:*16*
296:*13*
**toilet**  112:*17*
**told**  55:*13*  64:*21*
92:*23*  104:*13*  220:*10*
227:*7*  228:*11*  281:*17*

282:5  284:7  293:16
305:21  331:17
**tomorrow's**  4:25
**ton**  88:25
**tone**  240:6, 7, 9
241:11, 12, 15
**tonight**  241:19
**tonight's**  217:19
230:8
**tools**  332:10, 14
**top**  13:10  17:21
26:1  45:18  52:16
53:12, 13  94:9
109:12  195:6  199:12
226:9  310:5
**topic**  75:18  263:13,
25  264:15
**topics**  155:17  204:24
**total**  33:10  39:5
263:17  264:8, 12
323:7  332:17
**totally**  75:7  131:25
133:16
**touch**  81:20  148:20
**touched**  140:14
331:6
**touting**  174:15
**trace**  330:19
**track**  319:9
**trade**  28:12, 23  29:3,
8
**traded**  12:9  15:8, 15
16:14, 16, 18  17:12
19:1, 13  21:16  111:4,
12  140:8
**trade-offs**  213:5
**Trading**  3:14, 15
4:12  6:12, 15  24:9,
19, 21  25:1, 5  26:21
27:6, 12, 21  28:2, 6
37:7, 25  92:9  94:14
96:15, 19  138:9
275:4, 11, 12, 15, 22
276:8, 9, 11, 13, 15, 17,
19  277:18  280:10, 22
281:3, 7, 8, 19  282:3
283:2, 4, 5  284:23
285:6, 10  343:7, 17,
19  344:6, 9  346:17,

19, 22
**traditionally**  335:11
**transaction**  66:20, 25
67:8  69:3  84:14, 16
114:25  115:12  123:4
141:25  143:19, 23
251:2, 11, 16  252:20
275:25  313:20
314:10  322:5  333:22
334:15  336:24
337:10, 18  341:1
**transcript**  3:10  6:5,
6  23:19  257:21
258:9, 15  348:10
350:11
**transcription**  350:10
**transition**  318:4
332:9
**translate**  112:10
**treat**  37:19  41:2
**tried**  332:16
**triggered**  149:20
150:1, 5  216:9
**triple**  80:5
**trouble**  30:24
**true**  14:12  67:25
79:18  108:7, 8
128:21  218:1  254:13,
22  256:23  281:20
288:11  314:1, 3
319:11  321:6  350:11
**truth**  9:4, 5  230:3
319:25
**truthful**  218:11
220:12  221:1  223:17,
24  227:8, 9, 11, 13, 14,
15, 16, 18, 20, 24, 25
228:20
**truthfulness**  348:10
**try**  9:19  10:14, 22
87:1, 9  177:10
241:11  283:9  334:17
**trying**  23:19  24:23,
25  25:7, 17  26:9
28:18  32:13  74:14,
15  75:19  76:17, 22
84:24  92:5  97:5, 8
128:19  138:14
155:21  167:15  176:6
193:12  205:13

215:23  255:11
260:13  299:24
**Tuesday**  1:13  5:6
8:2  161:9  190:1
217:6
**turn**  45:17  47:3
56:4  125:18  133:22
157:2  233:8
**turned**  203:17
**turns**  138:10
**twice**  176:12  316:3
334:12
**two**  17:1  25:3  39:23
40:2, 9, 11, 12  48:25
50:22  51:1, 6  81:3
86:24  87:3  102:22
116:22  148:14
155:17  165:7  176:22,
25  182:5  190:15, 19
192:12  194:10  197:9
209:11  215:25
216:13  233:10
275:10  276:15
283:13  307:24  312:4
323:8  326:3  331:4
336:7  337:11  340:20
341:21  346:10, 11, 12,
15, 16
**two-day**  154:3
**two-pager**  171:9
**two-sentence**  255:12
**two-step**  335:14
**tying**  175:25
**types**  9:23  107:18
**typical**  24:7  239:11
**typically**  46:15, 19,
22  160:10, 14  218:17
**typo**  273:17, 19
274:7

**< U >**
**ultimately**  50:25
80:12  157:9  226:24
323:4  340:15, 25
**Um-hmm**  20:12
29:17  177:23  185:20
190:18  267:15
300:10  314:24
323:11  333:5  340:8,
11  342:4  343:24

**unaffordable**  296:14
299:5
**unanimously**  123:10
124:2  158:16  249:2
**unbecoming**  257:14
**unchanged**  235:4
**unclear**  84:23
**unconnected**  158:11
**underlined**  28:2, 3
**understand**  11:3
29:8  31:4  32:17
36:5, 23  37:2, 4, 6
39:10  40:23  42:19
43:3  68:16, 17  73:23
75:20  77:7, 8, 10, 15,
18  83:15  84:2, 25
86:17, 20  91:20  92:5,
7  93:13  95:9  96:1
97:8, 10  100:19
108:3  117:13  131:6,
10  144:14, 20  149:11
150:8, 10  151:2
166:12  167:13
173:21  174:24  176:7
193:14  203:7  220:14
221:13  225:2  226:5
229:17  238:22
240:18  247:10
251:21  255:11
263:23  264:4  270:25
271:1  274:11  284:24
291:19  293:19
303:19  307:4  322:11
326:16  341:20
345:10
**understanding**  33:22
41:8  49:15  61:19, 22
63:24  76:22  89:17
90:3  95:13, 15  96:5
98:13  131:21  163:7
220:25  226:11
277:16  342:5  344:22
**understated**  132:20
137:17, 19
**Understood**  14:11
20:8  28:5  29:2
35:22  57:18  65:2
71:23  73:24  77:11
85:12  89:7, 21  96:3
97:8  106:18, 22

118:*1*, *7*  124:*6*
143:*18*  144:*22*
145:*25*  150:*19*, *24*
151:*1*, *5*, *9*, *17*  153:*25*
181:*23*  183:*21*
218:*20*  229:*3*, *14*
259:*14*  262:*7*  279:*6*
287:*23*, *25*  290:*1*
291:*3*  303:*11*  329:*18*
**undervalued**  101:*15*
102:*11*, *17*  132:*20*, *22*,
*24*  156:*11*  219:*14*
**underway**  103:*2*
**undisclosed**  181:*19*
**unfair**  136:*14*
**unfavorable**  335:*22*
**unfolding**  332:*24*
333:*1*
**unfortunately**  233:*9*
**unimportant**  140:*17*
**UNITED**  1:*1*
**unrealized**  132:*15*
137:*23*
**unrecognized**  224:*11*
335:*13*
**unredacted**  62:*17*
**Unresponsive**  138:*12*
**unsolicited**  85:*6*
90:*21*  333:*6*, *7*  346:*6*
**untruthful**  223:*20*
224:*2*  227:*11*, *21*
228:*21*  320:*11*
**unusual**  335:*4*
**unwarranted**  226:*3*
**upcoming**  157:*12*, *18*
158:*6*  238:*3*, *7*, *11*, *18*,
*20*
**update**  149:*2*  201:*19*
203:*3*  236:*23*  295:*17*
300:*12*  339:*15*
**updated**  14:*7*, *8*
224:*16*, *19*  225:*3*, *5*,
*13*, *25*  226:*2*, *3*
**uploading**  55:*13*
**upper**  25:*16*
**use**  25:*23*, *24*  26:*4*
33:*19*  44:*25*  45:*9*
49:*2*  110:*5*  208:*2*
247:*16*
**uses**  168:*3*

**usual**  97:*4*  107:*18*
282:*20*, *22*, *24*  283:*1*
284:*6*, *7*, *9*, *10*, *11*, *14*,
*17*, *20*  285:*4*, *13*
286:*3*, *4*, *6*, *9*  287:*19*
288:*16*  345:*19*, *20*, *22*
346:*1*, *2*
**Usually**  46:*21*

**< V >**
**vague**  11:*21*  21:*3*
**validate**  324:*16*
**validation**  337:*15*
**valu**  179:*3*
**valuation**  87:*20*
110:*2*, *5*, *14*  111:*9*, *10*
163:*4*, *10*, *16*, *22*
167:*3*  173:*12*
**valuations**  179:*3*
**value**  66:*23*, *24*
69:*10*  105:*17*  111:*2*,
*14*  132:*15*, *25*  137:*22*,
*24*  139:*8*, *11*  140:*21*,
*25*  145:*17*, *22*  156:*16*
171:*1*, *25*  172:*21*
176:*20*  213:*14*, *17*
224:*10*, *24*  236:*19*
313:*20*  314:*9*  337:*16*
**valued**  139:*7*
**values**  100:*13*  101:*5*
110:*14*  332:*14*
**variety**  18:*5*, *12*
340:*23*
**various**  10:*1*  40:*13*
79:*8*  82:*9*  100:*9*
110:*1*, *5*  209:*8*, *19*
210:*20*, *22*  211:*13*
261:*10*  305:*1*
**Vehicles**  3:*12*  13:*11*
**venture**  62:*10*
**VERIFICATION**
348:*5*
**version**  62:*18*
120:*21*  160:*23*  185:*6*
188:*12*  222:*20*  223:*4*,
*22*  227:*15*, *16*, *17*
229:*18*  230:*25*
307:*15*
**versions**  242:*22*

**versus**  108:*25*
109:*23*  112:*2*  147:*1*
325:*25*
**Video**  2:*19*  8:*4*, *6*, *12*
32:*8*  59:*1*, *5*  112:*23*
113:*1*  152:*25*  153:*4*
208:*13*, *17*  241:*3*, *6*,
*23*  242:*2*  283:*17*, *21*
312:*5*, *7*, *11*  329:*24*
330:*3*  347:*14*
**VIDEOTAPED**  1:*10*
**view**  31:*16*  33:*9*
34:*2*  39:*5*  47:*9*, *14*
71:*18*  103:*11*  169:*5*
170:*18*  204:*8*  249:*3*
253:*9*  256:*21*  297:*8*
344:*6*, *17*
**viewed**  265:*2*
**violation**  105:*15*
174:*11*, *14*  338:*14*
**vis-à-vis**  246:*17*
**visibility**  94:*20*, *21*
**vision**  332:*20*, *21*
**volume**  94:*22*
**vote**  287:*12*  340:*25*
**voted**  158:*16*  341:*4*
**VP**  331:*16*
**vulnerable**  216:*8*

**< W >**
**Wachtell**  63:*2*  78:*22*,
*25*  79:*3*, *7*  80:*12*, *21*,
*24*  81:*4*, *15*  90:*10*, *20*
92:*5*  95:*9*  100:*4*, *7*
101:*13*  106:*2*  107:*11*,
*23*  108:*12*  116:*3*, *6*
117:*19*  121:*20*  220:*7*
232:*12*  242:*11*
285:*16*, *17*, *20*, *24*
286:*13*  288:*11*
289:*10*  294:*24*
344:*15*, *17*, *22*  345:*3*,
*12*, *15*
**Wachtell's**  83:*17*
124:*8*  292:*1*
**wait**  118:*18*  242:*24*
298:*15*  306:*9*
**waiting**  205:*7*  243:*5*
**Wall**  109:*1*

**want**  32:*8*  34:*15*
58:*22*  73:*12*  75:*20*
77:*7*  79:*20*  82:*11*
90:*2*  92:*2*  96:*23*
98:*9*, *12*, *23*  107:*22*
132:*4*  140:*1*  151:*13*,
*23*, *25*  152:*1*, *17*
172:*23*, *24*  174:*6*
175:*14*  181:*13*
186:*16*  220:*15*, *25*
231:*3*  232:*23*  249:*24*
256:*12*  269:*11*
281:*15*  302:*15*
305:*10*, *13*, *15*  312:*3*
324:*6*  327:*13*, *17*
333:*3*
**wanted**  49:*22*  51:*14*
87:*11*  97:*3*  103:*6*
141:*11*  158:*1*  167:*23*
173:*23*  175:*9*, *18*
180:*9*, *15*, *20*, *21*
181:*9*  183:*14*  187:*25*
190:*1*  204:*14*  213:*2*
220:*10*  221:*6*  223:*7*
228:*11*  270:*8*, *21*
293:*6*  304:*10*  333:*15*
337:*15*  342:*13*  343:*9*
**wants**  43:*9*  71:*2*
232:*7*
**Wardwell**  142:*18*
**waste**  127:*24*
**wasting**  131:*25*
136:*7*, *9*  151:*10*, *19*
255:*4*  304:*6*
**watch**  289:*24*
**Way**  8:*9*  10:*8*  32:*18*
43:*24*  48:*15*  58:*15*
66:*16*  72:*8*  73:*20*
77:*16*, *18*, *21*  80:*23*
84:*7*  103:*11*, *18*
108:*20*  110:*9*, *11*, *21*
113:*22*  146:*12*, *18*
173:*25*  174:*12*
188:*11*  192:*11*, *14*
194:*5*  214:*22*  215:*8*
217:*2*  230:*1*  231:*11*
247:*15*  251:*19*  254:*8*,
*25*  272:*19*  274:*6*, *23*
284:*20*  311:*6*, *12*, *13*

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

315:*1*  333:*22*  336:*9,*
*12*
**WAYNE**  1:*25*  8:*1*
350:*4*, *24*
**ways**  45:*10*
**Weak**  87:*18*, *19*, *21*,
*24*
**weaker**  236:*12*
**wear**  240:*8*, *12*
**web**  13:*8*, *9*, *10*, *15*
**website**  14:*7*, *8*
**week**  60:*1*  133:*1*, *2*
134:*24*  147:*1*  243:*10*
244:*1*  263:*14*  264:*1*
267:*12*  268:*3*  320:*21*
**weeks**  51:*2*, *12*  68:*8*
110:*24*  111:*3*  142:*15*
346:*10*, *15*
**weigh**  341:*24*
**weighted**  313:*16*
**Welcome**  113:*4*
153:*6*  330:*8*
**well**  9:*1*, *19*  16:*6*
21:*3*  28:*1*  30:*4*, *10*
32:*22*  33:*1*, *3*  35:*1*,
*11*  38:*13*  58:*6*  60:*14*
70:*25*  74:*20*  78:*23*
79:*24*  80:*4*  84:*8*
93:*8*  98:*9*  100:*4*
101:*1*  106:*21*  108:8
109:*21*  115:*5*  119:*11*
120:*7*  124:*2*  126:*19*
130:*10*  134:*1*  138:7
139:*11*  143:*10*  145:9
148:*24*  150:*7*  151:2
166:*6*  173:*23*  176:*5*
177:*8*, *23*  181:*15*
185:*23*  186:*23*  187:*2*
193:*13*  194:*7*  209:*13*
210:*5*  214:*10*  220:*23*
221:*16*, *20*  223:*7*
227:*6*, *17*  231:*19*
238:*12*  239:*2*  241:*21*
246:*9*  250:*9*  251:*19*
254:*2*  255:*18*  257:*2*
264:*6*  268:*21*  272:*17*,
*25*  273:*1*  278:*5*
282:*8*  297:*16*, *22*
298:*25*  309:*3*  311:*11*,

*15*  312:*2*  316:*9*
318:*19*  320:*13*
**well-regarded**  344:*18*
**went**  14:*11*  58:*7*
97:*3*  98:*10*  125:*9*
128:*15*  129:*9*  148:*7*
166:*14*  203:*20*
206:*11*  207:*5*, *13*, *16*
218:*14*  237:*5*, *9*
239:*9*  243:*19*, *21*
247:*25*  253:*5*  256:*8*,
*9*, *13*, *18*  261:*1*
289:*24*  291:*10*
297:*21*  303:*8*  316:*11*
319:*4*  320:*8*, *24*
329:*10*  330:*21*, *22*
331:*3*  332:*13*  337:*17*
338:*24*
**we're**  10:*18*  23:*4*, *19*
28:*19*  29:*23*  30:*19*
31:*10*  47:*22*  48:*24*
55:*5*, *9*  95:*18*  122:*2*
132:*18*  136:*15*
151:*10*  153:*6*  211:*14*
224:*9*  225:*7*  230:*16*
233:*20*, *21*  237:*11*
240:*11*, *22*  241:*21*, *22*,
*23*  242:*2*  255:*13*
257:*15*  267:*18*
301:*16*  302:*11*
303:*15*, *21*  304:*3*, *17*
341:*10*  347:*14*
**we've**  10:*24*  21:*17*
58:*20*  122:*15*  190:*21*
201:*16*  232:*4*  240:*24*
253:*23*  300:*21*  304:*4*
307:*7*  321:*22*  340:*5*
**Whoa**  73:*14*  193:*1*
**wide**  17:*22*  18:*11*
**willing**  317:*25*
**willingness**  290:*18*
291:*1*
**Window**  3:*14*, *15*
24:*9*  281:*24*  282:*7*
283:*2*, *3*, *4*, *5*  343:*10*
**windows**  282:*11*
343:*7*
**withdraw**  68:*18*
75:*13*  267:*15*

**withdrawing**  75:*2*, *6*,
*7*, *11*, *14*
**withheld**  300:*15*, *16*
307:*5*
**withholding**  300:*18*
**WITNESS**  3:*3*  8:*16*,
*20*, *22*  9:*3*  12:*24*, *25*
21:*8*, *11*  24:*24*  25:*9*,
*11*  29:*23*  32:*7*, *19*
34:*13*  53:*15*  58:*22*,
*25*  71:*23*  72:*13*, *16*,
*23*  73:*12*, *15*, *17*  74:*3*,
*5*, *8*, *16*, *17*  75:*3*, *8*, *14*
76:*16*, *21*, *23*  77:*1*
112:*17*  130:*15*, *19*, *20*
131:*4*, *18*  134:*3*
151:*25*  152:*3*, *18*
156:*25*  177:*16*
208:*10*  215:*19*
229:*23*  251:*24*  252:*1*
260:*14*  283:*12*, *16*
295:*12*  303:*8*, *10*, *15*
304:*9*  329:*22*  330:*8*
347:*4*, *8*, *10*, *13*, *17*
**witness's**  30:*5*  131:*8*,
*20*  251:*22*
**WLRK**  79:*6*
**WLRK-00000913**
4:*18*
**WLRK-913**  107:*10*
**WLRK-923**  108:*14*
**woke**  151:*13*
**Wolverine**  4:*1*, *11*
5:*24*  6:*8*, *12*, *15*
63:*11*, *13*, *17*  64:*24*
97:*22*  100:*17*, *19*, *25*
106:*9*, *15*  113:*25*
146:*15*  156:*8*  157:*22*
158:*17*, *21*  186:*11*
190:*7*  203:*18*, *22*
204:*2*, *11*, *12*, *17*
218:*25*  275:*16*, *18*, *24*
276:*12*, *20*  280:*10*, *23*
281:*4*, *12*, *19*  282:*13*
291:*16*  296:*10*  299:*4*
343:*17*
**Wolverine/10:30**  6:*21*
**Wolverine's**  79:*9*
100:*14*  101:*6*  103:*24*
230:*10*  296:2, *4*, *21*

297:*3*, *9*, *19*, *24*  298:*1*,
*11*  299:*1*, *2*
**wonderful**  227:*22*
228:*1*
**wondering**  259:*16*
**word**  10:*22*  12:*7*, *14*
21:*21*  51:*5*  105:*25*
128:*11*, *12*  139:*22*
165:*24*  208:*5*  223:*19*
224:*1*  227:*11*  230:*3*
270:*6*  274:*10*  308:*1*
316:*15*  320:*14*  325:*2*
**worded**  86:*11*
135:*15*  217:*15*
220:*13*  221:*7*  271:*20*
272:*19*, *20*  274:*6*
**wording**  34:*24*  128:*6*
214:22  221:*8*  223:*21*
224:*2*  226:*18*  230:*2*,
*3*, *5*  272:*6*  318:*18*
325:*12*
**words**  30:*3*, *10*, *18*, *21*,
*25*  31:*1*, *12*, *21*, *25*
32:*2*  42:*19*  88:*16*
98:*9*  117:*19*  128:*14*
129:*3*, *8*  141:*11*
156:*20*  202:*6*  208:*1*,
*2*, *3*, *4*  228:*18*  271:*24*
272:*11*  273:*9*  319:*23*
321:*2*
**work**  9:*19*  145:*17*,
*21*  161:*4*, *6*  184:*17*
321:*12*  330:*24*  331:*3*
336:*12*  337:*5*, *13*
**worked**  174:*19*
331:*7*  343:*5*
**working**  22:*17*
154:*19*  189:*6*  213:*24*
226:*8*  336:*9*
**works**  10:*8*  155:*23*
233:*5*
**worn**  329:*14*
**worst**  267:*15*
**worth**  105:*13*  141:*2*
174:*13*  191:*7*, *18*
326:*18*  327:*21*, *23*, *24*
334:*23*
**wow**  284:*15*
**wrinkle**  96:*19*

Deposition of Michael McGrath                                In Re National Instruments Corporation Securities Litigation

**write** 130:2 131:7 165:13 170:8 171:23 172:10 186:15, 19 242:20, 21, 24 245:1 246:17 247:16 266:16, 22 269:22 271:4 273:9
**writes** 59:21 70:7, 9 145:5, 14 148:17 186:4, 6 220:4 222:19 223:9 263:25 267:8, 10 277:21 295:25 315:10 343:15
**writing** 124:6 169:9 218:8 220:17 221:7 248:1 263:13 284:21 285:17 287:15 297:22 315:20
**written** 14:4 63:23 65:19, 20 217:6 218:8 225:20 228:12 272:22 295:23
**wrong** 326:13
**wrote** 73:13 77:2, 3 124:2 130:1 169:8 179:6, 15 188:14 215:14 217:13 219:19, 22, 23 223:4 225:8, 17 228:3, 5, 14, 17, 18 229:6 230:7, 11 245:24 247:1 249:22 250:2 251:10 271:3, 15, 24 272:11, 22, 23, 25 273:19, 20 277:20 286:21 316:9, 19, 24, 25 319:10 331:19

**< Y >**
**yeah** 12:10 16:17 27:23 28:5 30:1, 13 37:2 40:11, 12 42:1 50:16 70:25 78:4 82:8 100:23 101:7 109:9 112:16, 20, 21 115:7 117:21 125:14 126:8, 9 166:4 171:9, 14 175:8 177:16 196:3 198:3 199:12,

13 202:8 205:23 217:9 219:23 222:12 223:12, 14, 16 226:10 228:4 231:8, 11 244:5 249:15 251:24 255:18 256:15 259:9 263:20, 23 264:11 266:10 267:15 268:11, 18 272:3, 18 286:19 290:24 294:19 301:20 307:3, 23 310:3, 13 314:22 322:14 327:22 343:1
**year** 49:9, 16 50:3, 25 51:11, 19 52:25 53:4, 9, 23 56:25 58:2, 13, 14 95:17 184:11 191:6, 22 193:16, 18, 23 194:2, 18 196:7 197:11, 12 200:8 235:20 237:23 264:7 266:12 307:18, 20 310:10, 16
**years** 9:17 14:9, 23, 24 15:5, 23 17:1, 5, 9, 11, 18 48:6 60:3 89:16 98:10 103:4 140:15 158:6 170:24 171:1 196:3, 10, 11 200:8, 11 215:13, 25 216:13 269:4 328:10, 15, 16, 17, 20, 24 331:4, 14, 22 335:25 341:22 346:11, 16
**yell** 223:6
**Yep** 11:4 13:23 14:3, 15 15:7, 21 17:10, 24 18:3, 15 25:16 26:5, 14, 25 27:4, 8 31:8 33:4 37:16 43:7 45:22 47:2, 12 49:4 52:18 55:22 63:12 67:10 69:12 79:13 81:13, 24 83:23 84:1, 11 93:25 94:4, 17 101:10 109:14, 16, 19, 22 110:4 112:8 119:4, 22 120:9 145:13 147:4 154:21

156:2, 6 159:16 162:9 163:25 178:8, 13, 21 179:16 186:10, 14 188:7 196:14, 18 198:20 199:2, 6 201:22 209:15, 18 210:12 217:12, 18, 25 219:10 220:6 221:12 224:9 233:19 234:3, 10 235:11 238:13 242:23 243:2, 12 244:3 245:9 247:5, 19 248:24 249:1 264:14, 17 265:1, 5, 12, 14, 22, 24 266:3, 10, 21 275:3 280:2, 5, 13 285:23 286:5 287:20, 22 289:9, 12, 15 291:18 296:1, 8, 16 300:13 308:4, 7 310:9 322:20, 24, 25 325:4 343:3, 24 344:2, 13
**yields** 111:9
**YORK** 1:2 2:7

**< Z >**
**Z-2** 12:17 23:8, 10
**Z-3** 97:15
**Z-4** 122:21
**Z-5** 185:12
**Z-6** 237:13
**Z-7** 311:23 312:15
**Z-9** 322:1
**zero** 241:6, 7
**zone** 84:3 122:11
**Zoom** 8:23 9:1 10:7 28:17 30:4, 10, 11 31:6, 23 32:13 53:14 196:9
**zoomed** 30:2, 18 31:20
**zooming** 29:23 32:12

## WORD LIST

**< $ >**
**$0.02**  *(1)*
**$10**  *(19)*
**$100**  *(1)*
**$14**  *(1)*
**$1500**  *(1)*
**$2**  *(1)*
**$2.02**  *(2)*
**$2.05**  *(5)*
**$2.06**  *(3)*
**$2.2**  *(1)*
**$2.60**  *(1)*
**$2.84**  *(1)*
**$20**  *(7)*
**$21**  *(2)*
**$250**  *(3)*
**$3**  *(4)*
**$3.20**  *(1)*
**$30**  *(1)*
**$38**  *(1)*
**$39**  *(4)*
**$40**  *(5)*
**$40.25**  *(4)*
**$48**  *(72)*
**$50**  *(1)*
**$50.75**  *(1)*
**$500**  *(6)*
**$53**  *(14)*
**$56**  *(2)*
**$60**  *(31)*
**$65**  *(1)*
**$7.75**  *(1)*
**$80**  *(1)*
**$987,000**  *(1)*

**< 0 >**
**000025**  *(1)*

**< 1 >**
**1**  *(9)*
**1:00**  *(1)*
**1:04**  *(2)*
**1:1**  *(1)*
**1:20**  *(2)*
**1:23-cv-10488-DLC**
 *(2)*
**10**  *(3)*

**10/20/22**  *(1)*
**10:39**  *(1)*
**10:50**  *(2)*
**100**  *(1)*
**10170**  *(1)*
**10413**  *(1)*
**106.9**  *(1)*
**107**  *(4)*
**10th**  *(7)*
**11**  *(8)*
**11:00**  *(1)*
**11:30**  *(1)*
**1116**  *(1)*
**11672**  *(1)*
**118**  *(1)*
**11th**  *(6)*
**12**  *(9)*
**12:05**  *(2)*
**12:16**  *(2)*
**122**  *(1)*
**124**  *(1)*
**1240**  *(1)*
**1251**  *(1)*
**1255**  *(1)*
**1259**  *(1)*
**13**  *(8)*
**132**  *(1)*
**133**  *(1)*
**13th**  *(1)*
**14**  *(4)*
**1448**  *(1)*
**1453**  *(1)*
**1454**  *(1)*
**1456**  *(1)*
**146**  *(1)*
**1460**  *(2)*
**147**  *(1)*
**14A**  *(1)*
**14th**  *(10)*
**15**  *(7)*
**15019**  *(1)*
**1509**  *(1)*
**152**  *(2)*
**15283**  *(1)*
**153**  *(1)*
**159**  *(1)*
**15-minute**  *(1)*
**16**  *(12)*
**16266**  *(1)*

**16271**  *(1)*
**16999**  *(1)*
**16th**  *(5)*
**17**  *(6)*
**170**  *(4)*
**178**  *(1)*
**17X**  *(1)*
**18**  *(7)*
**18-19**  *(1)*
**1832**  *(1)*
**185**  *(1)*
**188**  *(1)*
**18th**  *(1)*
**19**  *(8)*
**1900**  *(1)*
**19-20**  *(3)*
**1973**  *(1)*
**19th**  *(23)*

**< 2 >**
**2**  *(12)*
**2.05**  *(1)*
**2.2**  *(9)*
**2:32**  *(2)*
**2:40**  *(2)*
**20**  *(19)*
**200**  *(1)*
**2000**  *(3)*
**2001**  *(1)*
**2002**  *(1)*
**2004**  *(2)*
**2007**  *(1)*
**2014**  *(2)*
**2018**  *(6)*
**2019**  *(3)*
**2020**  *(2)*
**20-21**  *(1)*
**2022**  *(98)*
**2023**  *(19)*
**2025**  *(3)*
**2031**  *(1)*
**20741**  *(1)*
**208**  *(1)*
**20808**  *(1)*
**20810**  *(1)*
**20817**  *(1)*
**20819**  *(1)*
**20th**  *(13)*
**21**  *(13)*

**211**  *(4)*
**212**  *(1)*
**212.432.5100**  *(1)*
**21243**  *(1)*
**21247**  *(4)*
**21251**  *(1)*
**21255**  *(1)*
**21258**  *(1)*
**21525**  *(1)*
**21531**  *(1)*
**216**  *(1)*
**21st**  *(3)*
**22**  *(18)*
**221**  *(1)*
**22nd**  *(12)*
**23**  *(6)*
**23189**  *(1)*
**23190**  *(1)*
**232**  *(1)*
**23529**  *(1)*
**237**  *(1)*
**239**  *(1)*
**23rd**  *(1)*
**24**  *(6)*
**242**  *(1)*
**24208**  *(1)*
**24210**  *(2)*
**24255**  *(1)*
**244**  *(2)*
**24400**  *(1)*
**24404**  *(1)*
**24406**  *(1)*
**24450**  *(1)*
**24518**  *(1)*
**24696**  *(1)*
**248**  *(1)*
**24th**  *(1)*
**25**  *(14)*
**250**  *(3)*
**257**  *(1)*
**2578**  *(1)*
**25801**  *(1)*
**25th**  *(30)*
**26**  *(7)*
**261**  *(1)*
**26223**  *(1)*
**263**  *(1)*
**26th**  *(6)*
**27**  *(5)*

Deposition of Michael McGrath

In Re National Instruments Corporation Securities Litigation

**274**  (*1*)
**27878**  (*1*)
**279**  (*1*)
**27th**  (*2*)
**28**  (*5*)
**288**  (*1*)
**28th**  (*13*)
**29**  (*3*)
**294**  (*1*)
**296**  (*2*)
**296-page**  (*2*)
**2983**  (*1*)
**299**  (*1*)
**29th**  (*3*)
**2nd**  (*22*)

**< 3 >**
**3**  (*16*)
**3:22**  (*2*)
**3:29**  (*2*)
**30**  (*6*)
**300**  (*5*)
**302**  (*4*)
**304**  (*1*)
**30s**  (*1*)
**30th**  (*1*)
**31**  (*3*)
**31.65**  (*1*)
**311**  (*1*)
**314.889.7300**  (*1*)
**32**  (*3*)
**322**  (*1*)
**33**  (*3*)
**330**  (*1*)
**34**  (*3*)
**34.50**  (*2*)
**35**  (*7*)
**36**  (*7*)
**365**  (*1*)
**37**  (*4*)
**38**  (*7*)
**39**  (*12*)
**3-A**  (*2*)
**3rd**  (*4*)

**< 4 >**
**4**  (*6*)
**4:19**  (*2*)
**4:25**  (*2*)

**4:50**  (*1*)
**40**  (*12*)
**40s**  (*1*)
**41**  (*4*)
**410**  (*1*)
**420**  (*1*)
**43**  (*3*)
**44.50**  (*2*)
**440**  (*1*)
**45.39**  (*1*)
**46**  (*1*)
**47,000**  (*9*)
**475**  (*1*)
**48**  (*13*)

**< 5 >**
**5**  (*8*)
**5/16/22**  (*1*)
**5/20/22**  (*2*)
**5/25/22**  (*2*)
**5/27/22**  (*1*)
**5:02**  (*2*)
**5:05**  (*2*)
**5:28**  (*2*)
**5:32**  (*2*)
**5:54**  (*2*)
**50**  (*5*)
**500**  (*6*)
**50s**  (*5*)
**51**  (*21*)
**5132**  (*1*)
**52**  (*4*)
**52-week**  (*1*)
**53**  (*3*)
**55**  (*2*)
**56**  (*1*)
**59**  (*1*)

**< 6 >**
**6**  (*9*)
**6/10/22**  (*1*)
**6/11/22**  (*1*)
**6/12/22**  (*1*)
**6/16/22**  (*1*)
**6/22/22**  (*3*)
**6/23/22**  (*1*)
**6/27/22**  (*1*)
**60**  (*22*)
**61**  (*2*)

**6120**  (*1*)
**6-14-2022**  (*1*)
**62**  (*1*)
**63105**  (*1*)
**64**  (*1*)
**64th**  (*2*)
**65**  (*1*)
**6696**  (*1*)
**6th**  (*1*)

**< 7 >**
**7**  (*11*)
**7/10/22**  (*1*)
**7/12/22**  (*1*)
**7/14/22**  (*1*)
**7/26/22**  (*3*)
**7/27/22**  (*1*)
**7/28/22**  (*2*)
**7/31/22**  (*1*)
**7/7/22**  (*1*)
**75**  (*1*)
**76**  (*2*)
**7676**  (*1*)
**78**  (*1*)
**78.50**  (*1*)
**7th**  (*9*)

**< 8 >**
**8**  (*3*)
**8/10/22**  (*1*)
**8/11/22**  (*1*)
**8/2/22**  (*1*)
**8/7/22**  (*1*)
**8/8/22**  (*2*)
**8/9/22**  (*1*)
**8:00**  (*1*)
**8:30**  (*2*)
**8:45**  (*1*)
**80**  (*2*)
**814**  (*2*)
**815**  (*3*)
**816**  (*1*)
**82**  (*1*)
**8K**  (*1*)
**8-K**  (*2*)
**8th**  (*5*)

**< 9 >**
**9**  (*4*)

**9/19/22**  (*1*)
**9:30**  (*1*)
**9:46**  (*3*)
**90**  (*1*)
**91**  (*2*)
**92**  (*1*)
**929**  (*1*)
**932**  (*1*)
**936**  (*1*)
**938**  (*3*)
**939**  (*1*)
**956**  (*1*)
**961**  (*1*)
**97**  (*1*)
**976**  (*1*)
**98**  (*1*)
**9th**  (*2*)

**< A >**
**a.m**  (*7*)
**A-12**  (*1*)
**A-18**  (*2*)
**A-19**  (*1*)
**A-21**  (*1*)
**A-23**  (*1*)
**A-27**  (*1*)
**A-33**  (*1*)
**A-34**  (*1*)
**A-36**  (*1*)
**A-38**  (*1*)
**A-41**  (*1*)
**A-43**  (*1*)
**A-44**  (*1*)
**A-45**  (*1*)
**A-46**  (*1*)
**A-47**  (*1*)
**A-50**  (*1*)
**A-6**  (*1*)
**A-7**  (*3*)
**A-8**  (*1*)
**aavalos@rgrdlaw.com**  (*1*)
**ability**  (*9*)
**able**  (*11*)
**Absolutely**  (*5*)
**abstain**  (*1*)
**abusive**  (*1*)
**Accelerate**  (*3*)
**accelerated**  (*2*)

**accelerating**  *(2)*
**accept**  *(3)*
**accepted**  *(1)*
**access**  *(2)*
**account**  *(2)*
**accounting**  *(1)*
**accounts**  *(1)*
**accumulate**  *(1)*
**accumulated**  *(4)*
**accumulating**  *(7)*
**accumulation**  *(5)*
**accurate**  *(8)*
**accurately**  *(1)*
**accuse**  *(1)*
**achieve**  *(3)*
**achieved**  *(1)*
**acknowledge**  *(13)*
**acknowledged**  *(2)*
**acknowledging**  *(2)*
**acknowledgment**  *(1)*
**acquire**  *(25)*
**acquired**  *(9)*
**acquiring**  *(8)*
**acquiror**  *(3)*
**Acquirors**  *(1)*
**acquisition**  *(39)*
**acquisitions**  *(3)*
**act**  *(1)*
**acting**  *(1)*
**Action**  *(12)*
**actions**  *(5)*
**active**  *(3)*
**Activism**  *(1)*
**activities**  *(1)*
**activity**  *(2)*
**actual**  *(5)*
**add**  *(6)*
**adding**  *(2)*
**addition**  *(5)*
**additional**  *(12)*
**address**  *(7)*
**addressed**  *(4)*
**adjust**  *(1)*
**adjusted**  *(2)*
**adjustment**  *(1)*
**admitted**  *(1)*
**advance**  *(2)*
**advances**  *(1)*
**advantage**  *(3)*

**advice**  *(23)*
**advise**  *(6)*
**advised**  *(6)*
**advising**  *(4)*
**advisor**  *(2)*
**advisors**  *(1)*
**advocating**  *(1)*
**affect**  *(3)*
**afoot**  *(1)*
**aforementioned**  *(1)*
**afternoon**  *(1)*
**age**  *(2)*
**Agenda**  *(18)*
**agendas**  *(2)*
**aggressive**  *(11)*
**aggressively**  *(5)*
**ago**  *(17)*
**agree**  *(24)*
**agreed**  *(14)*
**agreeing**  *(2)*
**Agreement**  *(8)*
**agreements**  *(1)*
**ahead**  *(25)*
**Albert**  *(8)*
**Alex**  *(23)*
**align**  *(4)*
**all-cash**  *(1)*
**alleviated**  *(1)*
**allocate**  *(1)*
**allocation**  *(7)*
**allow**  *(3)*
**allowed**  *(2)*
**allowing**  *(1)*
**altering**  *(2)*
**alternative**  *(5)*
**ALYSSA**  *(1)*
**ambiguous**  *(1)*
**ambitions**  *(3)*
**America**  *(6)*
**America's**  *(1)*
**amount**  *(3)*
**ample**  *(1)*
**ANA**  *(1)*
**analyses**  *(1)*
**analysis**  *(11)*
**Analyst**  *(1)*
**analysts**  *(12)*
**analyst's**  *(1)*
**announce**  *(1)*

**announced**  *(1)*
**announcement**  *(6)*
**announcing**  *(4)*
**answer**  *(48)*
**answered**  *(34)*
**answering**  *(2)*
**answers**  *(4)*
**anticipate**  *(2)*
**anticipated**  *(2)*
**anticipates**  *(1)*
**anticipating**  *(1)*
**anticipation**  *(1)*
**anybody**  *(5)*
**anymore**  *(2)*
**anyplace**  *(1)*
**anyway**  *(1)*
**apiece**  *(1)*
**aplascoff@rgrdlaw.com**  *(1)*
**Apologies**  *(2)*
**apologize**  *(3)*
**appear**  *(2)*
**APPEARANCES**  *(1)*
**APPEARING**  *(2)*
**appears**  *(5)*
**applied**  *(2)*
**apply**  *(1)*
**appreciate**  *(2)*
**appreciated**  *(1)*
**approach**  *(8)*
**approached**  *(2)*
**approaching**  *(2)*
**appropriate**  *(6)*
**appropriately**  *(1)*
**approval**  *(6)*
**approvals**  *(1)*
**approve**  *(5)*
**approved**  *(21)*
**approves**  *(1)*
**approximate**  *(1)*
**approximately**  *(13)*
**April**  *(6)*
**area**  *(2)*
**areas**  *(1)*
**argue**  *(3)*
**argument**  *(18)*
**arguments**  *(1)*
**arises**  *(2)*
**arrows**  *(2)*

**article**  *(3)*
**articulated**  *(3)*
**articulating**  *(1)*
**artificial**  *(1)*
**aside**  *(2)*
**asked**  *(53)*
**asking**  *(75)*
**asks**  *(2)*
**assessing**  *(1)*
**asset**  *(3)*
**assist**  *(2)*
**Associate**  *(1)*
**assume**  *(6)*
**Assumes**  *(1)*
**assuming**  *(2)*
**assumption**  *(1)*
**asterisk**  *(1)*
**attached**  *(23)*
**attaches**  *(3)*
**attaching**  *(2)*
**attachment**  *(6)*
**attachments**  *(2)*
**attack**  *(4)*
**attempt**  *(2)*
**attend**  *(3)*
**attendance**  *(2)*
**attended**  *(11)*
**attending**  *(1)*
**attention**  *(4)*
**attest**  *(1)*
**attorney**  *(7)*
**attorneys**  *(6)*
**attorney's**  *(1)*
**attractive**  *(1)*
**audit**  *(3)*
**August**  *(49)*
**Author**  *(5)*
**authored**  *(1)*
**authority**  *(3)*
**authorization**  *(8)*
**authorize**  *(2)*
**authorized**  *(10)*
**auto**  *(1)*
**automated**  *(2)*
**Autonomous**  *(2)*
**availability**  *(1)*
**available**  *(5)*
**AVALOS**  *(1)*
**Avenue**  *(1)*

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

average  (8)
averages  (2)
avoid  (2)
aware  (11)
awareness  (3)
axis  (2)

**< B >**
bachelor's  (1)
back  (100)
backlog  (9)
backs  (1)
badgering  (2)
Baird  (1)
balance  (5)
balancing  (1)
Bank  (7)
bankers  (4)
bar  (1)
base  (5)
based  (27)
bases  (1)
basic  (1)
basis  (22)
Bates  (107)
bathroom  (1)
battery  (1)
Bear  (16)
bearing  (2)
began  (3)
beginning  (24)
begins  (11)
behalf  (3)
behold  (1)
belief  (1)
believe  (59)
believed  (9)
beneath  (3)
Beneficial  (2)
benefit  (6)
benefits  (1)
Bennett  (2)
best  (15)
better  (7)
beyond  (4)
bid  (4)
bidding  (1)
bids  (2)
big  (4)

bilateral  (2)
billion  (10)
bio  (2)
bird  (2)
bit  (12)
blip  (1)
blow  (1)
blue  (1)
Board  (252)
boards  (6)
board's  (14)
BofA  (8)
bolds  (1)
book  (16)
bookings  (9)
borrow  (2)
borrowing  (1)
Boston  (1)
bottom  (25)
bought  (2)
Boulevard  (1)
bounce  (1)
boxes  (1)
boy  (1)
Bravo  (1)
break  (24)
brief  (3)
briefed  (1)
briefing  (2)
bring  (2)
broad  (2)
broad-based  (1)
broader  (3)
broadly  (3)
broker  (1)
brokers  (3)
budge  (1)
budged  (1)
budgeting  (1)
build  (1)
building  (2)
built  (5)
bullet  (19)
bullets  (2)
bunch  (4)
business  (57)
businessman  (3)
buy  (29)
buyback  (8)

Buy-Back  (1)
buybacks  (54)
buying  (32)

**< C >**
calculate  (2)
calculation  (2)
calculator  (4)
calendar  (2)
Cali  (1)
Call  (35)
called  (10)
calling  (6)
calls  (60)
cap  (1)
capable  (1)
capacity  (12)
Capital  (35)
carbon  (1)
care  (5)
career  (1)
carefully  (1)
carry  (1)
Case  (25)
cases  (6)
cash  (121)
categories  (1)
cause  (10)
caused  (1)
caution  (2)
cc'd  (1)
cc'ing  (3)
cc's  (1)
Centerview  (2)
CEO  (19)
CEOs  (1)
certain  (9)
certainly  (3)
certainty  (1)
CERTIFICATE  (1)
certify  (1)
cetera  (6)
CFO  (4)
CFOs  (1)
CHAD  (1)
chadj@rgrdlaw.com  (1)
chain  (24)
Chair  (5)

Chairman  (16)
challenge  (5)
chance  (3)
change  (11)
changed  (21)
changes  (1)
changing  (2)
characterize  (1)
characterizing  (1)
charitable  (1)
chart  (21)
check  (8)
Cheri  (4)
chief  (1)
Choose  (1)
chooses  (1)
chosen  (1)
chronologically  (1)
circumstance  (2)
circumstances  (1)
Civil  (1)
claims  (1)
clarification  (2)
clarify  (6)
clarifying  (2)
class  (6)
clauses  (1)
clear  (29)
cleared  (1)
clearly  (16)
clears  (1)
client  (4)
clients  (5)
close  (3)
closed  (4)
closely  (3)
closes  (1)
closing  (8)
coach  (1)
coaching  (2)
code  (2)
coercive  (2)
coincide  (1)
collaborative  (2)
colleague  (1)
colleagues  (1)
College  (1)
column  (5)
columns  (2)

combination  *(1)*
come  *(17)*
comeback  *(1)*
**COMERFORD**  *(252)*
Comerford's  *(1)*
comes  *(2)*
comfort  *(2)*
coming  *(17)*
comment  *(5)*
Commerce  *(1)*
Commission  *(1)*
commitment  *(2)*
commitments  *(2)*
committed  *(3)*
Committee  *(10)*
common  *(3)*
communicate  *(6)*
communicated  *(3)*
communicating  *(3)*
communication  *(3)*
communications  *(1)*
companies  *(14)*
company  *(139)*
company's  *(18)*
compared  *(4)*
comparison  *(17)*
comparisons  *(1)*
competitive  *(2)*
competitors  *(3)*
complete  *(4)*
completely  *(4)*
compliance  *(1)*
complicate  *(4)*
complicated  *(5)*
complicates  *(1)*
complication  *(1)*
complications  *(4)*
components  *(4)*
compromise  *(2)*
computer  *(2)*
con  *(1)*
concept  *(1)*
concern  *(8)*
concerned  *(7)*
concerning  *(21)*
concerns  *(3)*
conclude  *(7)*
concluded  *(3)*
conclusion  *(13)*

conclusions  *(15)*
condition  *(4)*
conducting  *(1)*
confer  *(1)*
conference  *(7)*
confident  *(4)*
**Confidential**  *(11)*
**Confidentiality**  *(5)*
confused  *(3)*
confusion  *(2)*
conjecture  *(1)*
**Connect**  *(3)*
connected  *(1)*
connection  *(1)*
consensus  *(2)*
consequences  *(2)*
consider  *(12)*
consideration  *(1)*
considerations  *(1)*
considered  *(12)*
considering  *(10)*
considers  *(1)*
consistency  *(2)*
consistent  *(20)*
consistently  *(15)*
consisting  *(1)*
constraints  *(1)*
consult  *(3)*
consulted  *(3)*
consulting  *(1)*
consults  *(1)*
consummated  *(1)*
contact  *(2)*
contacted  *(2)*
contacting  *(1)*
contain  *(1)*
**CONTENTS**  *(1)*
context  *(13)*
contexts  *(1)*
contingency  *(2)*
continuation  *(2)*
continue  *(13)*
continued  *(10)*
continues  *(2)*
continuing  *(8)*
continuously  *(1)*
contribute  *(1)*
control  *(7)*
controlling  *(2)*

convenient  *(2)*
conversation  *(1)*
conversations  *(4)*
convey  *(2)*
convince  *(1)*
convoluted  *(1)*
cooperation  *(1)*
copied  *(3)*
copy  *(1)*
cordial  *(1)*
core  *(2)*
corporate  *(1)*
**CORPORATION**
 *(16)*
corporations  *(2)*
correct  *(297)*
**CORRECTION**  *(1)*
correctly  *(5)*
correctness  *(1)*
correspondence  *(4)*
cost  *(13)*
costs  *(3)*
**Counsel**  *(27)*
**COUNTY**  *(4)*
couple  *(8)*
course  *(20)*
courses  *(1)*
**Court**  *(11)*
cover  *(6)*
covers  *(1)*
**Covid**  *(6)*
**CPA**  *(7)*
create  *(5)*
created  *(2)*
credentials  *(1)*
credibility  *(4)*
credible  *(14)*
credit  *(7)*
crisis  *(9)*
**CRR**  *(2)*
crunch  *(1)*
**CSR**  *(1)*
**CSR-5132**  *(1)*
**CST**  *(1)*
**CUELLER**  *(1)*
current  *(10)*
currently  *(2)*
customers  *(12)*
cut  *(8)*

cuts  *(1)*
cutting  *(7)*

**< D >**
dangerous  *(1)*
date  *(30)*
dated  *(13)*
**Davern**  *(1)*
**Davis**  *(1)*
dawned  *(1)*
day  *(17)*
days  *(5)*
**DCF**  *(1)*
dead  *(1)*
deadline  *(1)*
deal  *(10)*
dealing  *(1)*
deals  *(1)*
debate  *(1)*
**Deborah**  *(1)*
debt  *(4)*
decade  *(1)*
decades  *(2)*
**December**  *(1)*
decide  *(1)*
decided  *(5)*
decides  *(1)*
deciding  *(2)*
decision  *(6)*
decisions  *(1)*
deck  *(3)*
**Decks**  *(3)*
decline  *(2)*
declined  *(2)*
deeper  *(1)*
defect  *(1)*
defend  *(13)*
defendant  *(1)*
**DEFENDANTS**  *(6)*
defendant's  *(1)*
defending  *(12)*
defense  *(4)*
defensive  *(2)*
defer  *(2)*
define  *(2)*
definition  *(8)*
**Definitive**  *(4)*
definitively  *(2)*
degree  *(2)*

| | | | |
|---|---|---|---|
| **Delay**  *(1)* | **directly**  *(5)* | **dollars**  *(4)* | **Emerson**  *(116)* |
| **Delaying**  *(2)* | **Director**  *(9)* | **Donahue**  *(1)* | **Emerson's**  *(70)* |
| **delegate**  *(1)* | **Directors**  *(34)* | **donating**  *(1)* | **emphasis**  *(1)* |
| **delegated**  *(2)* | **disagree**  *(4)* | **donation**  *(18)* | **employees**  *(7)* |
| **deliberately**  *(1)* | **disappointing**  *(1)* | **double**  *(1)* | **enable**  *(1)* |
| **deliver**  *(2)* | **disclose**  *(36)* | **double-digit**  *(1)* | **encompass**  *(1)* |
| **delivers**  *(1)* | **disclosed**  *(35)* | **doubt**  *(2)* | **encourage**  *(1)* |
| **demonstrable**  *(1)* | **disclosing**  *(9)* | **Dowd**  *(4)* | **ended**  *(6)* |
| **deny**  *(2)* | **disclosure**  *(34)* | **Draft**  *(9)* | **enforce**  *(1)* |
| **department**  *(1)* | **disclosure/notification** | **drafts**  *(1)* | **engage**  *(4)* |
| **depo**  *(3)* | *(1)* | **drastic**  *(1)* | **engaged**  *(2)* |
| **DEPONENT**  *(1)* | **disclosures**  *(2)* | **drastically**  *(2)* | **Engagement**  *(1)* |
| **DEPOSITION**  *(14)* | **discounted**  *(1)* | **draw**  *(3)* | **engineers**  *(1)* |
| **depositions**  *(1)* | **discoverable**  *(8)* | **drawn**  *(1)* | **English**  *(2)* |
| **depressed**  *(2)* | **discovered**  *(1)* | **drew**  *(2)* | **enhance**  *(1)* |
| **deprived**  *(1)* | **discuss**  *(27)* | **drive**  *(3)* | **enter**  *(1)* |
| **depriving**  *(2)* | **discussed**  *(41)* | **drivers**  *(1)* | **entertaining**  *(1)* |
| **derail**  *(3)* | **discusses**  *(2)* | **driving**  *(1)* | **enthusiastic**  *(2)* |
| **derogatory**  *(3)* | **discussing**  *(14)* | **drop**  *(1)* | **entire**  *(3)* |
| **describe**  *(4)* | **Discussion**  *(83)* | **drove**  *(1)* | **entirety**  *(4)* |
| **described**  *(6)* | **discussions**  *(12)* | **Dude**  *(1)* | **entitled**  *(4)* |
| **describes**  *(8)* | **display**  *(1)* | **due**  *(8)* | **Entrust**  *(3)* |
| **describing**  *(8)* | **displayed**  *(5)* | **duly**  *(1)* | **EPS**  *(21)* |
| **DESCRIPTION**  *(20)* | **dispute**  *(1)* | **dumb**  *(2)* | **equals**  *(2)* |
| **deserved**  *(1)* | **disrupt**  *(3)* | **duties**  *(3)* | **equipment**  *(1)* |
| **designed**  *(1)* | **disruption**  *(1)* | **duty**  *(6)* | **equivalent**  *(1)* |
| **desire**  *(5)* | **disruptions**  *(1)* | | **Eric**  *(19)* |
| **despite**  *(3)* | **distract**  *(2)* | **< E >** | **Erik**  *(1)* |
| **detail**  *(3)* | **distracting**  *(1)* | **eager**  *(20)* | **ERRATA**  *(1)* |
| **determination**  *(1)* | **distribute**  *(1)* | **Eagle**  *(3)* | **error**  *(2)* |
| **determinations**  *(5)* | **distributed**  *(1)* | **earlier**  *(26)* | **errors**  *(1)* |
| **determine**  *(2)* | **distribution**  *(2)* | **early**  *(4)* | **Escalate**  *(3)* |
| **determined**  *(7)* | **DISTRICT**  *(2)* | **earning**  *(4)* | **escalated**  *(1)* |
| **determining**  *(1)* | **divesting**  *(1)* | **earnings**  *(42)* | **escalation**  *(5)* |
| **difference**  *(5)* | **divestiture**  *(1)* | **easier**  *(2)* | **escalatory**  *(3)* |
| **differences**  *(1)* | **divestment**  *(1)* | **Eastern**  *(2)* | **especially**  *(2)* |
| **different**  *(27)* | **divests**  *(1)* | **eat**  *(2)* | **essence**  *(1)* |
| **differential**  *(2)* | **divide**  *(3)* | **Eddie**  *(15)* | **essentially**  *(7)* |
| **difficult**  *(6)* | **Dividend**  *(8)* | **education**  *(1)* | **EST**  *(1)* |
| **digested**  *(1)* | **dividends**  *(16)* | **effect**  *(2)* | **establish**  *(2)* |
| **diligence**  *(7)* | **Dixon**  *(46)* | **effective**  *(3)* | **established**  *(2)* |
| **diligent**  *(8)* | **Dixon's**  *(2)* | **eight**  *(6)* | **estimate**  *(1)* |
| **dilute**  *(1)* | **Docs**  *(1)* | **either**  *(13)* | **estimates**  *(3)* |
| **dilution**  *(7)* | **document**  *(185)* | **eliminating**  *(3)* | **et**  *(6)* |
| **dinner**  *(3)* | **documented**  *(1)* | **else's**  *(1)* | **evaluate**  *(2)* |
| **direct**  *(1)* | **documents**  *(6)* | **Email**  *(160)* | **evaluated**  *(1)* |
| **directed**  *(2)* | **document's**  *(2)* | **emailed**  *(1)* | **evaluation**  *(1)* |
| **directing**  *(4)* | **Doing**  *(21)* | **embarrassed**  *(3)* | **evening**  *(3)* |
| **direction**  *(5)* | **dollar**  *(3)* | **embarrassment**  *(2)* | **event**  *(11)* |

events  (5)
eventual  (2)
eventually  (2)
Everest  (2)
everybody  (5)
everyone's  (1)
evidence  (20)
Evidently  (2)
EVs  (1)
exact  (3)
Exactly  (5)
EXAMINATION  (4)
examined  (1)
example  (13)
examples  (6)
exceed  (1)
exceeded  (3)
Excel  (1)
Excellent  (1)
exception  (1)
excerpt  (1)
Excess  (6)
exchange  (2)
excited  (2)
excitement  (1)
exclusive  (1)
Exec  (1)
execute  (4)
execution  (1)
executive  (7)
executives  (3)
exercise  (3)
Exhibit  (213)
EXHIBITS  (6)
exist  (2)
existed  (3)
existing  (1)
expanded  (1)
expect  (3)
expectation  (6)
expected  (7)
expedience  (1)
expeditiously  (1)
expense  (4)
expenses  (35)
experience  (16)
experienced  (6)
expert  (5)
experts  (1)

expired  (2)
expires  (1)
explain  (5)
explained  (6)
explaining  (1)
explains  (2)
explanation  (3)
export  (1)
exposed  (1)
express  (1)
expressed  (2)
expresses  (1)
expressing  (2)
expression  (2)
extens  (1)
extensive  (1)
extensively  (1)
extent  (2)
extra  (4)
extraordinary  (3)
extreme  (1)
extremely  (2)

< F >
face  (1)
faced  (2)
facility  (4)
facing  (2)
fact  (23)
factor  (4)
factors  (1)
factory  (4)
facts  (3)
failed  (1)
fair  (16)
fairly  (2)
faith  (1)
fall  (1)
false  (1)
familiar  (4)
far  (2)
fast  (2)
favor  (2)
favorable  (1)
favorably  (1)
feasible  (1)
feel  (5)
felt  (23)
fewer  (4)

fiduciary  (2)
fifth  (1)
figure  (3)
figured  (1)
file  (4)
filed  (1)
files  (1)
FINAL  (14)
finalize  (1)
finally  (1)
finance  (3)
financed  (1)
financial  (45)
financials  (1)
financing  (6)
find  (8)
Fine  (6)
Finish  (1)
fired  (1)
firm  (13)
first  (67)
fiscal  (1)
five  (15)
five-minute  (3)
fix  (2)
fixated  (1)
Flexibility  (1)
flow  (37)
focus  (8)
focused  (2)
foggiest  (1)
folder  (3)
folks  (1)
Follow  (6)
followed  (5)
following  (10)
follows  (4)
follow-up  (7)
forecast  (13)
forecasting  (2)
forego  (1)
foregoing  (3)
forever  (9)
forgot  (1)
Form  (80)
Forma  (1)
formal  (2)
formally  (3)
format  (3)

formed  (1)
Forsyth  (1)
forth  (3)
Fortune  (1)
forward  (15)
forwarded  (6)
forwarding  (3)
forwards  (1)
found  (3)
foundation  (48)
founded  (2)
four  (24)
fourth  (8)
FQ  (1)
frame  (6)
fraud  (2)
free  (6)
freight  (1)
frequently  (1)
Friday  (1)
front  (7)
fulfill  (1)
full  (12)
functions  (1)
fundamental  (1)
Further  (6)
future  (9)
Fyi  (1)

< G >
GAAP  (1)
gain  (3)
Geller  (3)
general  (22)
Generally  (4)
generated  (1)
gentleman  (1)
getting  (7)
gist  (1)
Giuggio  (1)
give  (14)
Given  (11)
gives  (9)
giving  (7)
go  (182)
go-ahead  (1)
goal  (2)
God's  (1)
goes  (29)

Deposition of Michael McGrath                          In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| go-forward  (2) | headwind  (1) | ideas  (1) | in-depth  (1) |
| going  (153) | hear  (10) | identification  (41) | indicated  (5) |
| Goldman  (4) | heard  (5) | identified  (1) | indicates  (6) |
| gonna  (3) | hearing  (4) | identifies  (4) | indicating  (3) |
| Good  (26) | heavily  (2) | identify  (3) | indication  (5) |
| goods  (1) | He'd  (2) | identifying  (1) | indicative  (1) |
| GOODWIN  (5) | Held  (10) | Ilcisin  (1) | indicia  (1) |
| go-to-market  (1) | Held's  (1) | illegal  (6) | Indirectly  (1) |
| gotta  (1) | hell  (6) | immediate  (3) | individuals  (3) |
| gotten  (2) | he'll  (1) | immediately  (4) | industry  (1) |
| governance  (1) | help  (4) | impact  (9) | inflows  (1) |
| grab  (1) | helpful  (1) | impacts  (2) | infor  (1) |
| Grace  (2) | hereinbefore  (1) | impair  (1) | inform  (4) |
| gradually  (5) | high  (10) | impediments  (1) | information  (68) |
| grammatical  (2) | higher  (47) | implement  (3) | informed  (1) |
| granted  (1) | highest  (6) | implicated  (1) | informing  (1) |
| grants  (1) | highlight  (2) | implicit  (1) | inhouse  (3) |
| graph  (2) | highlighted  (1) | implied  (3) | Initial  (4) |
| graphically  (1) | highly  (6) | implies  (2) | initially  (2) |
| Great  (2) | hindsight  (1) | imply  (2) | initiate  (1) |
| green  (2) | hire  (1) | implying  (3) | injure  (2) |
| grew  (1) | hired  (2) | important  (29) | input  (3) |
| Group  (2) | historic  (1) | impossible  (1) | inquire  (4) |
| growth  (18) | historically  (1) | impression  (4) | inquiry  (8) |
| guess  (18) | history  (1) | impressions  (1) | insider  (16) |
| guidance  (21) | hit  (2) | improper  (9) | insiders  (1) |
| guided  (3) | HOFMAN  (2) | improve  (8) | insight  (1) |
| guidelines  (6) | hold  (8) | improved  (4) | insignificant  (1) |
| | holding  (1) | Improvement  (6) | InSinkErator  (14) |
| < H > | honest  (1) | improvements  (1) | instance  (2) |
| half  (13) | honor  (1) | inaccurate  (3) | instructed  (3) |
| Hampshire  (2) | honorary  (2) | inaccurately  (1) | instructing  (1) |
| hand  (1) | hope  (3) | inadvertently  (1) | instructs  (1) |
| Handle  (1) | hoped  (6) | inappropriate  (8) | INSTRUMENTS |
| Hang  (5) | hopefully  (1) | inaudible  (3) |   (145) |
| haphazard  (1) | hoping  (4) | incentive  (3) | insufficient  (1) |
| happen  (1) | horizon  (1) | include  (15) | integrated  (1) |
| happened  (5) | hostile  (20) | included  (9) | intend  (2) |
| happening  (1) | hour  (5) | includes  (7) | intended  (4) |
| happens  (3) | hours  (5) | including  (12) | intending  (2) |
| Harassing  (1) | Hug  (16) | income  (4) | Intent  (10) |
| harder  (1) | hundred  (19) | inconsistent  (4) | intention  (20) |
| harm  (1) | hype  (1) | incorrectly  (1) | intention/threat  (1) |
| Harvard  (4) | hyping  (1) | increase  (23) | intentions  (1) |
| head  (2) | hypothetical  (4) | increased  (6) | interchangeably  (1) |
| headed  (1) | | increases  (1) | interest  (13) |
| heading  (3) | < I > | increasing  (3) | interested  (6) |
| headings  (3) | i2  (3) | independent  (11) | interests  (4) |
| headline  (1) | idea  (19) | independently  (1) | interfering  (1) |

| | | | |
|---|---|---|---|
| **interject** *(2)* | **JOHN** *(14)* | **leads** *(2)* | **looked** *(18)* |
| **internal** *(3)* | **JOHNSON** *(1)* | **learned** *(7)* | **looking** *(32)* |
| **interpret** *(6)* | **join** *(2)* | **learning** *(1)* | **looks** *(20)* |
| **interpretation** *(9)* | **joined** *(4)* | **leave** *(1)* | **lose** *(2)* |
| **interpretations** *(1)* | **joint** *(1)* | **leaving** *(1)* | **losing** *(1)* |
| **interpreted** *(1)* | **judgment** *(4)* | **left** *(5)* | **loss** *(3)* |
| **interpreting** *(1)* | **July** *(77)* | **legal** *(50)* | **lost** *(1)* |
| **interrupt** *(1)* | **jump** *(1)* | **legally** *(1)* | **lot** *(8)* |
| **interrupted** *(1)* | **June** *(42)* | **legs** *(1)* | **loud** *(1)* |
| **interrupting** *(1)* | **jury** *(1)* | **Letter** *(168)* | **Louis** *(1)* |
| **introduce** *(1)* | **justification** *(1)* | **letters** *(3)* | **love** *(1)* |
| **introducing** *(2)* | | **letter's** *(1)* | **low** *(7)* |
| **introduction** *(1)* | **< K >** | **Level** *(7)* | **lower** *(9)* |
| **Introductions** *(1)* | **Karen** *(4)* | **levels** *(1)* | **lowered** *(1)* |
| **introductory** *(2)* | **Karsanbhai** *(51)* | **Lexington** *(1)* | **lowest** *(2)* |
| **invented** *(1)* | **Karsanbhai's** *(10)* | **liar** *(1)* | **loyalty** *(4)* |
| **inventory** *(1)* | **Katz** *(1)* | **licensed** *(2)* | **lunch** *(4)* |
| **invest** *(1)* | **keep** *(17)* | **life** *(1)* | **lying** *(1)* |
| **investing** *(2)* | **keeping** *(1)* | **lift** *(2)* | |
| **investment** *(2)* | **kept** *(6)* | **Lifted** *(17)* | **< M >** |
| **investor** *(12)* | **key** *(9)* | **lifting** *(5)* | **M&A** *(17)* |
| **investors** *(8)* | **killed** *(2)* | **light** *(4)* | **M-1** *(1)* |
| **invite** *(3)* | **kind** *(8)* | **limited** *(5)* | **M-11** *(1)* |
| **invited** *(1)* | **knew** *(5)* | **line** *(22)* | **M-13** *(1)* |
| **involved** *(4)* | **know** *(206)* | **lines** *(3)* | **M-14** *(1)* |
| **involving** *(2)* | **knowledge** *(6)* | **link** *(3)* | **M-15** *(4)* |
| **irrelevant** *(19)* | | **linked** *(2)* | **M-16** *(1)* |
| **irrespective** *(1)* | **< L >** | **links** *(1)* | **M-2** *(1)* |
| **irresponsible** *(3)* | **labeled** *(12)* | **Lipton** *(1)* | **M-20** *(2)* |
| **irritable** *(1)* | **Lack** *(1)* | **liquidity** *(13)* | **M-20A** *(2)* |
| **issue** *(9)* | **Lacks** *(8)* | **list** *(9)* | **M-4** *(3)* |
| **issued** *(3)* | **ladder** *(1)* | **listed** *(5)* | **M-5** *(1)* |
| **issuer** *(2)* | **lags** *(3)* | **listen** *(7)* | **M-6** *(1)* |
| **issues** *(8)* | **Lal** *(2)* | **listened** *(2)* | **M-7** *(1)* |
| **Item** *(7)* | **language** *(10)* | **LITIGATION** *(11)* | **M-7A** *(1)* |
| **items** *(2)* | **laptop** *(1)* | **litigators** *(1)* | **macro** *(1)* |
| **it'll** *(1)* | **large** *(4)* | **little** *(23)* | **Madam** *(3)* |
| **its** *(34)* | **larger** *(3)* | **live** *(2)* | **maintain** *(2)* |
| | **largest** *(1)* | **LLP** *(3)* | **major** *(13)* |
| **< J >** | **late** *(1)* | **lo** *(1)* | **making** *(25)* |
| **Jandrow** *(2)* | **lately** *(1)* | **loading** *(1)* | **manage** *(4)* |
| **January** *(13)* | **law** *(5)* | **loan** *(5)* | **managed** *(3)* |
| **jcomerford@dowdben** | **lawyer** *(3)* | **logic** *(1)* | **management** *(41)* |
| **nett.com** *(1)* | **lawyers** *(4)* | **logical** *(2)* | **management's** *(5)* |
| **jeopardy** *(1)* | **lay** *(1)* | **long** *(12)* | **managing** *(3)* |
| **JEREMY** *(2)* | **layout** *(1)* | **longer** *(11)* | **MANDEL** *(413)* |
| **jhofman@dowdbennet** | **lead** *(1)* | **long-term** *(7)* | **manufacturer** *(1)* |
| **t.com** *(1)* | **leadership** *(1)* | **longwinded** *(1)* | **margin** *(5)* |
| **job** *(6)* | **leading** *(3)* | **look** *(102)* | **margins** *(1)* |

Deposition of Michael McGrath                                           In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| mark  (2) | middle  (6) | < N > | NAT-SL-10818  (1) |
| MARKED  (42) | midpoint  (1) | name  (10) | NAT-SL-11671  (1) |
| market  (27) | million  (130) | named  (1) | NAT-SL-1239  (1) |
| Marketing  (1) | millions  (1) | Naples  (1) | NAT-SL-1250  (1) |
| marketplace  (2) | mind  (4) | narrow  (1) | NAT-SL-132  (1) |
| Massachusetts  (2) | Mine  (2) | NASDAQ  (1) | NAT-SL-1450  (1) |
| Material  (53) | minimum  (3) | NATI  (3) | NAT-SL-1455  (1) |
| materiality  (11) | minus  (1) | NATIONAL  (145) | NAT-SL-1457  (1) |
| Materially  (1) | minute  (4) | native  (6) | NAT-SL-15017  (1) |
| material-nonpublic | Minutes  (87) | NATL-17465  (1) | NAT-SL-15282  (1) |
| (1) | minutes/privileged  (1) | NATL-SL-17442  (1) | NAT-SL-16112  (1) |
| materials  (14) | mirroring  (1) | NAT-SL-0000004  (1) | NAT-SL-16264  (1) |
| math  (5) | mischaracterizes  (2) | NAT-SL-00000048  (1) | NAT-SL-16270  (1) |
| matter  (12) | misquoting  (1) | NAT-SL-00000070  (1) | NAT-SL-16998  (1) |
| matters  (4) | Missouri  (1) | NAT-SL-00001113  (2) | NAT-SL-17444  (1) |
| max  (1) | misstated  (1) | NAT-SL-00001239  (1) | NAT-SL-20739  (1) |
| MBA  (4) | Misters  (2) | NAT-SL-00001250  (1) | NAT-SL-21241  (1) |
| McGRATH  (65) | mix  (10) | NAT-SL-00001254  (2) | NAT-SL-21516  (1) |
| mean  (46) | MNDI  (1) | NAT-SL-00001258  (2) | NAT-SL-23501  (1) |
| meaning  (4) | MNPI  (4) | NAT-SL-00001447  (1) | NAT-SL-24106  (1) |
| meaningful  (6) | mode  (2) | NAT-SL-00001449  (2) | NAT-SL-24256  (1) |
| means  (13) | moment  (18) | NAT-SL-00001450  (1) | NAT-SL-24451  (1) |
| meant  (10) | momentum  (3) | NAT-SL-00001455  (1) | NAT-SL-27877  (1) |
| measurement  (1) | money  (7) | NAT-SL-00001457  (1) | NAT-SL-2982  (1) |
| medium  (1) | monitor  (5) | NAT-SL-00002982  (1) | NAT-SL-70  (2) |
| meet  (1) | monitored  (1) | NAT-SL-00006694  (1) | NAT-SL-9179  (1) |
| Meeting  (183) | monitoring  (2) | NAT-SL-00009179  (1) | nature  (1) |
| Meetings  (21) | month  (2) | NAT-SL-00010410  (1) | NDA  (3) |
| member  (8) | months  (28) | NAT-SL-00010818  (1) | near  (9) |
| members  (43) | Morgan  (1) | NAT-SL-00011671  (1) | nearly  (3) |
| memo  (1) | morning  (3) | NAT-SL-00015017  (1) | necessarily  (2) |
| mentioned  (5) | mother  (2) | NAT-SL-00015282  (1) | necessary  (1) |
| mentions  (2) | motion  (2) | NAT-SL-00016112  (1) | need  (28) |
| merger  (3) | motions  (1) | NAT-SL-00016264  (1) | needed  (5) |
| mergers  (2) | motivate  (1) | NAT-SL-00016270  (1) | negative  (29) |
| message/Wolverine | motivated  (5) | NAT-SL-00016998  (1) | negatives  (1) |
| (1) | motivation  (1) | NAT-SL-00020739  (1) | negotiate  (1) |
| messages  (1) | mouth  (3) | NAT-SL-00020795  (2) | negotiated  (1) |
| Messaging  (1) | move  (19) | NAT-SL-00021241  (1) | negotiating  (1) |
| Messenger  (5) | Moving  (1) | NAT-SL-00021516  (1) | neither  (2) |
| met  (9) | MSN  (1) | NAT-SL-00023189  (1) | net  (1) |
| method  (3) | muddy  (1) | NAT-SL-00023501  (1) | never  (37) |
| metrics  (1) | multimillion  (1) | NAT-SL-00024106  (1) | Nevertheless  (4) |
| MICHAEL  (11) | multiple  (5) | NAT-SL-00024256  (1) | NEW  (38) |
| Michael_e_mcgrath@ | multiples  (1) | NAT-SL-00024451  (1) | News  (1) |
| msn.com  (1) | multiplied  (2) | NAT-SL-00025798  (1) | NI  (27) |
| MICHIGAN  (4) | multiplying  (3) | NAT-SL-00026220  (1) | ni.com  (1) |
| mid  (2) | mutual  (1) | NAT-SL-00027877  (1) | nice  (1) |
| mid-40s  (4) | | NAT-SL-10410  (1) | Night  (7) |

| | | | |
|---|---|---|---|
| **night's**  *(3)* | **obvious**  *(10)* | **organize**  *(1)* | **pending**  *(6)* |
| **Niles**  *(11)* | **obviously**  *(32)* | **organized**  *(1)* | **penny**  *(2)* |
| **Nine**  *(4)* | **occasion**  *(2)* | **oriented**  *(2)* | **people**  *(14)* |
| **NI's**  *(4)* | **occasionally**  *(1)* | **original**  *(5)* | **people's**  *(1)* |
| **NOAM**  *(4)* | **occasions**  *(1)* | **originally**  *(2)* | **percent**  *(67)* |
| **noam@rgrdlaw.com**  *(1)* | **occur**  *(3)* | **outcome**  *(1)* | **percentage**  *(10)* |
| **no-brainer**  *(1)* | **occurred**  *(5)* | **outflows**  *(1)* | **percentages**  *(1)* |
| **non-privileged**  *(1)* | **October**  *(6)* | **outlay**  *(3)* | **Percival**  *(10)* |
| **nonprofit**  *(3)* | **offer**  *(252)* | **outline**  *(1)* | **perfectly**  *(1)* |
| **Nonpublic**  *(32)* | **offered**  *(7)* | **outlined**  *(1)* | **performance**  *(8)* |
| **non-public**  *(2)* | **Offeree**  *(2)* | **outlining**  *(2)* | **performed**  *(1)* |
| **non-responsive**  *(2)* | **offerer**  *(1)* | **outlook**  *(2)* | **period**  *(57)* |
| **nonsense**  *(2)* | **offering**  *(5)* | **outperform**  *(1)* | **permissible**  *(1)* |
| **non-trading**  *(1)* | **offerings**  *(2)* | **outreach**  *(1)* | **perseverating**  *(1)* |
| **normal**  *(5)* | **Offeror**  *(1)* | **outright**  *(7)* | **person**  *(9)* |
| **normally**  *(1)* | **offers**  *(7)* | **outside**  *(6)* | **personal**  *(1)* |
| **NOTARY**  *(2)* | **officer**  *(1)* | **outside-in**  *(2)* | **personnel**  *(1)* |
| **note**  *(9)* | **officers**  *(1)* | **outstanding**  *(9)* | **Persons**  *(1)* |
| **noted**  *(3)* | **official**  *(1)* | **overall**  *(2)* | **perspective**  *(1)* |
| **notes**  *(1)* | **offset**  *(8)* | **override**  *(1)* | **petered**  *(8)* |
| **notice**  *(1)* | **Oh**  *(19)* | **owned**  *(5)* | **Ph.D**  *(1)* |
| **Notification**  *(1)* | **Okay**  *(376)* | **Owners**  *(1)* | **phone**  *(7)* |
| **Notification/Please**  *(1)* | **old**  *(1)* | **Ownership**  *(3)* | **photograph**  *(1)* |
| **noting**  *(1)* | **omit**  *(1)* | | **photographed**  *(1)* |
| **November**  *(8)* | **once**  *(10)* | **< P >** | **phrase**  *(3)* |
| **NSBI**  *(1)* | **one's**  *(1)* | **P&L**  *(1)* | **pick**  *(1)* |
| **nuance**  *(1)* | **onetime**  *(1)* | **p.m**  *(19)* | **picture**  *(1)* |
| **Number**  *(53)* | **ongoing**  *(5)* | **PAGE**  *(155)* | **piece**  *(2)* |
| **numbers**  *(11)* | **Onsite**  *(1)* | **pages**  *(13)* | **pill**  *(1)* |
| **numerous**  *(4)* | **open**  *(11)* | **paid**  *(4)* | **pipeline**  *(5)* |
| **nut**  *(1)* | **opened**  *(1)* | **Paragraph**  *(13)* | **Pittiglio**  *(1)* |
| **Nuthatch**  *(14)* | **Opening**  *(2)* | **paragraphs**  *(1)* | **place**  *(29)* |
| | **opens**  *(1)* | **parameters**  *(1)* | **plain**  *(2)* |
| **< O >** | **operated**  *(1)* | **part**  *(30)* | **plaintiff**  *(1)* |
| **ob**  *(1)* | **operating**  *(46)* | **partially**  *(2)* | **PLAINTIFFS**  *(1)* |
| **object**  *(28)* | **operation**  *(1)* | **participate**  *(1)* | **plan**  *(97)* |
| **objecting**  *(4)* | **operational**  *(1)* | **participated**  *(1)* | **planned**  *(3)* |
| **Objection**  *(33)* | **operations**  *(20)* | **particular**  *(8)* | **planning**  *(14)* |
| **objections**  *(21)* | **opine**  *(1)* | **particularly**  *(1)* | **plans**  *(21)* |
| **objective**  *(4)* | **opinion**  *(23)* | **parts**  *(2)* | **PLASCOFF**  *(1)* |
| **objects**  *(1)* | **opinions**  *(2)* | **party**  *(1)* | **platform**  *(1)* |
| **obligation**  *(24)* | **opportunity**  *(8)* | **pastes**  *(1)* | **play**  *(3)* |
| **obligations**  *(14)* | **opposed**  *(1)* | **Pause**  *(3)* | **Please**  *(31)* |
| **observing**  *(2)* | **optimism**  *(1)* | **pay**  *(5)* | **plenty**  *(1)* |
| **obstructing**  *(2)* | **option**  *(2)* | **paying**  *(3)* | **pocket**  *(1)* |
| **obtain**  *(1)* | **orally**  *(1)* | **PDF**  *(8)* | **pocketed**  *(4)* |
| **obtained**  *(1)* | **order**  *(10)* | **peer**  *(4)* | **point**  *(62)* |
| **obtaining**  *(1)* | **orders**  *(2)* | **peers**  *(6)* | **pointed**  *(2)* |
| | **organization**  *(1)* | **penalized**  *(1)* | **pointing**  *(2)* |

Deposition of Michael McGrath                                                    In Re National Instruments Corporation Securities Litigation

points  *(19)*
poison  *(1)*
poker  *(1)*
Policy  *(29)*
Polk  *(1)*
Poplin  *(4)*
PoR  *(3)*
Porterfield  *(3)*
portion  *(1)*
portions  *(2)*
Portsmouth  *(2)*
position  *(17)*
positive  *(2)*
possession  *(7)*
possibilities  *(1)*
possibility  *(3)*
possible  *(15)*
possibly  *(7)*
post  *(2)*
posted  *(1)*
potential  *(47)*
potentially  *(6)*
PowerPoint  *(9)*
PowerPoints  *(1)*
pptx  *(1)*
practical  *(2)*
practice  *(2)*
precarious  *(10)*
preceding  *(8)*
prefer  *(4)*
preferably  *(4)*
premium  *(63)*
prepare  *(2)*
prepared  *(21)*
Preparedness  *(1)*
preparing  *(4)*
presence  *(1)*
PRESENT  *(7)*
Presentation  *(46)*
presentations  *(2)*
presented  *(12)*
preserve  *(1)*
president  *(1)*
press  *(6)*
Pressure  *(1)*
presume  *(1)*
pretty  *(11)*
prevent  *(1)*
previous  *(42)*

previously  *(16)*
price  *(139)*
prices  *(5)*
Pricewaterhouse  *(1)*
primarily  *(4)*
primary  *(14)*
Principally  *(1)*
prior  *(14)*
priorities  *(6)*
Prioritized  *(1)*
priority  *(8)*
Priv  *(2)*
private  *(7)*
privately  *(4)*
privilege  *(3)*
Privileged  *(7)*
Pro  *(1)*
proactive  *(2)*
probability  *(5)*
Probably  *(30)*
problem  *(2)*
proceed  *(3)*
proceedings  *(1)*
process  *(13)*
produce  *(2)*
produced  *(20)*
product  *(5)*
production  *(1)*
products  *(1)*
professional  *(1)*
profile  *(2)*
profiles  *(1)*
profit  *(2)*
profitability  *(1)*
profits  *(3)*
program  *(6)*
progress  *(1)*
progression  *(1)*
prohibits  *(1)*
Project  *(21)*
projected  *(9)*
projecting  *(12)*
projection  *(6)*
Projections  *(45)*
promises  *(1)*
promote  *(1)*
promoted  *(1)*
promoting  *(2)*
prompted  *(1)*

proper  *(4)*
properly  *(2)*
property  *(1)*
proportion  *(1)*
proposal  *(48)*
proposals  *(1)*
propose  *(2)*
proposed  *(26)*
proposes  *(3)*
proposing  *(8)*
Pros  *(1)*
prospects  *(3)*
prove  *(2)*
proves  *(1)*
provide  *(13)*
provided  *(4)*
provides  *(3)*
providing  *(1)*
proxy  *(2)*
PRTM  *(9)*
PST  *(1)*
public  *(47)*
publicly  *(28)*
pump  *(2)*
pumping  *(1)*
purchase  *(1)*
purchased  *(1)*
purchases  *(1)*
purpose  *(18)*
purposes  *(2)*
pursue  *(6)*
pushing  *(1)*
put  *(35)*
putting  *(3)*
PwC  *(1)*

< Q >
Q&A  *(3)*
Q1  *(2)*
Q2  *(2)*
Q222  *(1)*
Q3  *(3)*
Q322  *(1)*
Q4  *(2)*
Q422  *(1)*
qualifications  *(2)*
qualified  *(2)*
qualify  *(2)*
quarter  *(38)*

quarterly  *(5)*
quarters  *(3)*
question  *(123)*
questioned  *(1)*
questions  *(27)*
quick  *(4)*
quicker  *(1)*
quickly  *(2)*
Quit  *(1)*
quite  *(1)*
quo  *(1)*
quote  *(5)*
quotes  *(1)*
quoting  *(3)*

< R >
R&D  *(3)*
Rabin  *(1)*
raised  *(2)*
ran  *(2)*
range  *(8)*
ranges  *(1)*
Rapp  *(5)*
rate  *(2)*
reach  *(5)*
reached  *(3)*
reach-out  *(1)*
react  *(2)*
reacted  *(1)*
reacting  *(1)*
reaction  *(11)*
Read  *(52)*
readable  *(5)*
reading  *(13)*
ready  *(5)*
reaffirm  *(1)*
real  *(7)*
realign  *(1)*
realities  *(1)*
reality  *(3)*
realize  *(5)*
realized  *(2)*
realizing  *(1)*
really  *(19)*
realm  *(1)*
realtime  *(1)*
reason  *(28)*
reasonable  *(4)*
reasonably  *(2)*

Deposition of Michael McGrath                                    In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| reasons (14) | regularly (6) | represented (2) | revenue (52) |
| recall (63) | regulation (2) | representing (2) | revenues (2) |
| Recap (1) | regulations (5) | repur (1) | review (5) |
| receive (3) | regulatory (1) | repurchase (41) | reviewed (19) |
| received (24) | Regus (1) | repurchased (7) | reviewing (4) |
| receiving (5) | reiterate (2) | repurchases (64) | revised (4) |
| Recess (8) | reiterated (1) | repurchasing (5) | revisions (1) |
| recipients (1) | reiteration (2) | reputable (1) | revolving (4) |
| recognize (20) | reject (10) | reputation (1) | reword (2) |
| recollection (5) | rejected (53) | Request (6) | rhetorical (1) |
| recommend (2) | rejecting (16) | requested (2) | ridiculous (1) |
| recommendation (21) | rejection (18) | require (2) | right (694) |
| recommendations (1) | relate (2) | required (6) | risk (3) |
| recommended (3) | related (9) | requires (1) | Robbins (3) |
| recommending (2) | relates (1) | requiring (1) | role (1) |
| reconvene (1) | relating (1) | reread (1) | room (1) |
| reconvened (1) | relation (4) | reserve (2) | rose (1) |
| record (79) | relationships (2) | reset (1) | Rosen (1) |
| recorded (2) | relative (5) | Resolution (4) | roughly (1) |
| records (2) | relatively (3) | Resolutions (2) | routine (1) |
| Redacted (12) | release (11) | resources (2) | routinely (2) |
| redaction (1) | released (1) | respect (13) | row (5) |
| redactions (1) | relevant (7) | respectful (1) | RPR (2) |
| redo (1) | relisted (1) | respond (9) | Rudman (2) |
| reduce (17) | rely (2) | responded (19) | rule (6) |
| reduced (2) | relying (3) | responding (2) | ruled (1) |
| reducing (8) | remain (1) | responds (3) | rules (3) |
| reduction (8) | remainder (2) | Response (36) | run (1) |
| reductions (6) | remained (4) | responses (4) | running (1) |
| refer (6) | remains (1) | responsibility (16) | |
| reference (14) | remember (30) | responsible (3) | < S > |
| referenced (1) | REMOTE (1) | responsibly (2) | Sabastian (8) |
| referencing (1) | REMOTELY (5) | responsive (1) | Sachs (2) |
| referred (6) | removed (1) | rest (4) | sakes (1) |
| referring (20) | removing (2) | restocking (1) | sale (26) |
| refers (9) | repeat (6) | restrict (1) | sales (11) |
| reflect (8) | repeated (6) | restricted (6) | sandwiches (1) |
| reflected (7) | repeatedly (1) | Restriction (59) | sanity (7) |
| reflecting (1) | repeating (1) | restrictions (7) | satisfied (1) |
| reflects (2) | repeats (2) | result (8) | save (2) |
| refresh (3) | replace (1) | resulted (2) | saves (1) |
| refreshes (1) | REPORTED (2) | results (2) | saw (40) |
| refused (1) | reporter (12) | retained (2) | saying (62) |
| refusing (2) | Reporting (3) | retaliate (1) | says (112) |
| refute (1) | reports (2) | retire (1) | scale (1) |
| regard (4) | represent (4) | retired (4) | Scenario (11) |
| regarded (3) | representation (1) | retreat (8) | scenarios (13) |
| regarding (9) | representations (1) | retrospect (5) | Schedule (1) |
| regular (1) | representatives (7) | Return (18) | scheduled (7) |

schedules  (1)
scheduling  (1)
School  (5)
science  (1)
screen  (18)
screenshot  (1)
scroll  (28)
scrolling  (1)
SEC  (13)
second  (25)
Secondly  (1)
section  (12)
SECURITIES  (12)
security  (2)
see  (386)
seeing  (5)
seen  (11)
Selected  (1)
selection  (1)
selectively  (1)
self-defense  (1)
self-serving  (1)
sell  (11)
selling  (14)
send  (4)
sending  (2)
sends  (2)
sense  (5)
sensitive  (1)
Sent  (18)
sentence  (23)
September  (18)
serious  (2)
seriously  (2)
seriousness  (4)
serve  (3)
served  (8)
serves  (1)
service  (1)
services  (1)
serving  (2)
Session  (8)
sessions  (1)
set  (7)
sets  (1)
setting  (1)
seven  (5)
seven-hour  (1)
severe  (1)

share  (159)
shared  (5)
Shareholder  (16)
shareholder-friendly
 (1)
shareholders  (52)
shareholder's  (1)
shares  (94)
sharing  (3)
sheet  (2)
shift  (11)
shifted  (2)
ship  (6)
Short  (6)
shorted  (1)
shortly  (3)
short-term  (5)
show  (9)
showed  (6)
showing  (5)
shows  (25)
sic  (1)
side  (4)
sign  (3)
signaled  (1)
Signals  (1)
Signature  (1)
signed  (6)
significant  (17)
significantly  (12)
signing  (2)
silent  (3)
similar  (6)
simple  (5)
simply  (6)
simultaneous  (1)
single  (2)
sir  (8)
sitting  (3)
situation  (12)
situational  (1)
situations  (2)
six  (15)
six-month  (1)
skip  (1)
slide  (42)
Slides  (15)
slide's  (1)
slowly  (1)

small  (5)
smaller  (2)
software  (1)
sold  (29)
sole  (6)
solely  (3)
solicited  (1)
soliciting  (1)
solid  (1)
solidified  (2)
solutions  (1)
somebody  (10)
someplace  (1)
somewhat  (4)
soon  (8)
sophisticated  (6)
Sophistication  (1)
sorry  (59)
sort  (8)
sorts  (1)
sound  (3)
Sounds  (3)
sources  (1)
SOUTHERN  (2)
speak  (1)
speaking  (6)
speaks  (6)
spec  (1)
Special  (17)
specialist  (1)
specific  (18)
specifically  (9)
specifics  (1)
spectrum  (4)
speculate  (5)
speculated  (3)
speculation  (48)
speech  (3)
spend  (2)
spending  (1)
spent  (3)
spirited  (1)
spoke  (2)
spoken  (1)
spokes  (1)
Sponsor  (1)
sponsors  (1)
SS  (1)
St  (1)

stage  (1)
stamped  (1)
stand  (1)
standard  (2)
stands  (2)
Stanley  (1)
Starkloff  (72)
Starkloff's  (10)
starting  (4)
state  (7)
stated  (4)
Statement  (11)
STATES  (24)
stating  (7)
statistics  (1)
status  (1)
stayed  (1)
steady  (2)
stenographic  (1)
stenographically  (1)
step  (4)
stepped  (1)
steps  (3)
Stock  (169)
stockholder  (1)
stock-repurchases  (2)
stock's  (1)
stop  (11)
stopping  (1)
straight  (1)
strange  (1)
strategic  (9)
strategies  (1)
Strategy  (50)
Street  (4)
strengthen  (1)
strengthened  (1)
stress  (1)
stretch  (1)
strike  (1)
string  (18)
Strong  (15)
strongly  (2)
structure  (3)
struggling  (2)
stuck  (2)
study  (1)
stuff  (1)
sub  (1)

In Re National Instruments Corporation Securities Litigation

Subject  (8)
submitted  (2)
submitting  (1)
subscription  (2)
subsequent  (9)
Subsequently  (9)
substance  (4)
substantial  (1)
substantially  (11)
substantiated  (1)
substantive  (1)
subtract  (3)
success  (1)
successful  (1)
successfully  (1)
sudden  (1)
suddenly  (1)
sued  (1)
sufficient  (1)
sufficiently  (3)
suggest  (3)
suggested  (2)
suggesting  (2)
suggestion  (1)
Suite  (3)
summarized  (2)
summarizes  (2)
Summary  (4)
Summer  (1)
supervised  (1)
supply  (13)
support  (2)
supported  (2)
supports  (1)
supposed  (1)
supposedly  (1)
suppressed  (1)
sure  (36)
surprise  (1)
surprised  (1)
suspected  (2)
suspicion  (1)
Susquehanna  (1)
sworn  (2)
system  (2)
systems  (4)

< T >
Tab  (37)

TABLE  (2)
tabs  (1)
tactic  (1)
Tactics  (1)
tailwind  (1)
take  (45)
taken  (12)
takeover  (22)
talk  (15)
talked  (7)
talking  (26)
talks  (1)
target  (10)
targets  (1)
target's  (5)
team  (7)
Tech  (4)
Technician  (45)
Techniques  (2)
Technologies  (2)
technology  (4)
Tell  (23)
telling  (11)
ten  (16)
tend  (1)
ten-minute  (1)
tens  (1)
tentative  (1)
term  (9)
terms  (8)
test  (4)
testified  (7)
testify  (2)
testifying  (5)
testimony  (21)
text  (4)
Thank  (35)
Thanks  (4)
theirs  (1)
theories  (1)
thin  (1)
thing  (12)
things  (24)
think  (95)
thinking  (10)
third  (21)
thirdly  (1)
Thoma  (1)
Thomas  (1)

thorough  (2)
thoroughly  (2)
thought  (22)
thoughts  (2)
thread  (1)
threat  (31)
threatened  (1)
threatening  (6)
threats  (3)
Three  (41)
three-year  (1)
threshold  (1)
thumb  (4)
tie  (5)
tied  (2)
tight  (6)
till  (1)
Time  (250)
timely  (3)
times  (27)
Timing  (10)
tips  (1)
title  (1)
today  (16)
Today's  (1)
Todd  (1)
toehold  (2)
toilet  (1)
told  (13)
tomorrow's  (1)
ton  (1)
tone  (6)
tonight  (1)
tonight's  (2)
tools  (2)
top  (13)
topic  (4)
topics  (2)
total  (7)
totally  (3)
touch  (2)
touched  (2)
touting  (1)
trace  (1)
track  (1)
trade  (4)
traded  (13)
trade-offs  (1)
Trading  (61)

traditionally  (1)
transaction  (26)
transcript  (9)
transcription  (1)
transition  (2)
translate  (1)
treat  (2)
tried  (1)
triggered  (4)
triple  (1)
trouble  (1)
true  (17)
truth  (5)
truthful  (18)
truthfulness  (1)
try  (9)
trying  (30)
Tuesday  (6)
turn  (7)
turned  (1)
turns  (1)
twice  (3)
two  (54)
two-day  (1)
two-pager  (1)
two-sentence  (1)
two-step  (1)
tying  (1)
types  (2)
typical  (2)
typically  (6)
typo  (3)

< U >
ultimately  (7)
Um-hmm  (14)
unaffordable  (2)
unanimously  (4)
unbecoming  (1)
unchanged  (1)
unclear  (1)
unconnected  (1)
underlined  (2)
understand  (79)
understanding  (20)
understated  (3)
Understood  (45)
undervalued  (8)
underway  (1)

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

undisclosed  *(1)*
unfair  *(1)*
unfavorable  *(1)*
unfolding  *(2)*
unfortunately  *(1)*
unimportant  *(1)*
UNITED  *(1)*
unrealized  *(2)*
unrecognized  *(2)*
unredacted  *(1)*
Unresponsive  *(1)*
unsolicited  *(5)*
untruthful  *(6)*
unusual  *(1)*
unwarranted  *(1)*
upcoming  *(8)*
update  *(7)*
updated  *(10)*
uploading  *(1)*
upper  *(1)*
use  *(10)*
uses  *(1)*
usual  *(30)*
Usually  *(1)*

< V >
vague  *(2)*
validate  *(1)*
validation  *(1)*
valu  *(1)*
valuation  *(12)*
valuations  *(1)*
value  *(29)*
valued  *(1)*
values  *(4)*
variety  *(3)*
various  *(14)*
Vehicles  *(2)*
venture  *(1)*
VERIFICATION  *(1)*
version  *(14)*
versions  *(1)*
versus  *(5)*
Video  *(25)*
VIDEOTAPED  *(1)*
view  *(17)*
viewed  *(1)*
violation  *(4)*
vis-à-vis  *(1)*

visibility  *(2)*
vision  *(2)*
volume  *(1)*
vote  *(2)*
voted  *(2)*
VP  *(1)*
vulnerable  *(1)*

< W >
Wachtell  *(42)*
Wachtell's  *(3)*
wait  *(4)*
waiting  *(2)*
Wall  *(1)*
want  *(47)*
wanted  *(33)*
wants  *(3)*
Wardwell  *(1)*
waste  *(1)*
wasting  *(7)*
watch  *(1)*
Way  *(50)*
WAYNE  *(4)*
ways  *(1)*
Weak  *(4)*
weaker  *(1)*
wear  *(2)*
web  *(4)*
website  *(2)*
week  *(13)*
weeks  *(9)*
weigh  *(1)*
weighted  *(1)*
Welcome  *(3)*
well  *(89)*
well-regarded  *(1)*
went  *(42)*
we're  *(41)*
we've  *(16)*
Whoa  *(7)*
wide  *(2)*
willing  *(1)*
willingness  *(2)*
Window  *(10)*
windows  *(2)*
withdraw  *(4)*
withdrawing  *(5)*
withheld  *(3)*
withholding  *(1)*

WITNESS  *(70)*
witness's  *(4)*
WLRK  *(1)*
WLRK-00000913  *(1)*
WLRK-913  *(1)*
WLRK-923  *(1)*
woke  *(1)*
Wolverine  *(46)*
Wolverine/10:30  *(1)*
Wolverine's  *(16)*
wonderful  *(2)*
wondering  *(1)*
word  *(23)*
worded  *(9)*
wording  *(14)*
words  *(31)*
work  *(12)*
worked  *(3)*
working  *(6)*
works  *(3)*
worn  *(1)*
worst  *(1)*
worth  *(10)*
wow  *(1)*
wrinkle  *(1)*
write  *(19)*
writes  *(18)*
writing  *(12)*
written  *(10)*
wrong  *(1)*
wrote  *(50)*

< Y >
yeah  *(80)*
year  *(36)*
years  *(44)*
yell  *(1)*
Yep  *(138)*
yields  *(1)*
YORK  *(3)*

< Z >
Z-2  *(3)*
Z-3  *(1)*
Z-4  *(1)*
Z-5  *(1)*
Z-6  *(1)*
Z-7  *(2)*
Z-9  *(1)*

zero  *(2)*
zone  *(2)*
Zoom  *(12)*
zoomed  *(3)*
zooming  *(2)*

IN RE: NATIONAL INSTRUMENTS CORPORATION

SECURITIES LITIGATION.

_Nov 13 / 2025_

VERIFICATION OF DEPONENT


I, having read the foregoing deposition

consisting of my testimony at the aforementioned time

and place, do hereby attest to the correctness and

truthfulness of the transcript.

_____

MICHAEL McGRATH

Dated: _11/13/2025_

Deposition of Michael McGrath                    In Re National Instruments Corporation Securities Litigation

ERRATA SHEET

PAGE    LINE    CORRECTION

NONE