# EXHIBIT 3

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


IN RE NATIONAL              §   CIVIL ACTION
INSTRUMENTS CORPORATION     §   NO. 1:23-CV-10488-DLC
SECURITIES LITIGATION       §




ORAL AND VIDEOTAPED DEPOSITION OF
EDDIE DIXON
OCTOBER 9, 2025




   ORAL AND VIDEOTAPED DEPOSITION OF EDDIE DIXON, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above styled and numbered cause on Thursday, October 9, 2025, from 9:22 a.m. to 5:46 p.m., before TAMARA CHAPMAN, CSR, RPR-CRR in and for the State of Texas, reported by computerized stenotype machine, at Regus, 901 Mopac Expressway South, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Job No. 45924

A P P E A R A N C E S


FOR THE PLAINTIFFS:
    Noam Mandel
    Ana Vaalos Cuellar
    Alyssa Plascoff
    ROBBINS GELLER RUDMAN & DOWD, LLP
    420 Lexington Avenue, Suite 1832
    New York, New York 10170
    212-432-5100
    noam@rgrdlaw.com
    aavalos@rgrdlaw.com
    aplascoff@rgrdlaw.com



FOR THE DEFENDANTS:
    John D. Comerford
    Jeremy M. Hofman (via Zoom)
    DOWD BENNETT, LLP
    7676 Forsyth Boulevard, Suite 1900
    St. Louis, Missouri 63105
    314-889-7300
    jcomerford@dowdbennett.com
    jhofman@dowdbennett.com



ALSO PRESENT:
    Peter Zierlein, Videographer
    Alex Held, Technician Manager
    Carolyn Giuggio, Summer Associate, Robbins Geller

I N D E X

                                                  PAGE


APPEARANCES................................    2

  EDDIE DIXON

EXAMINATION
  BY MR. MANDEL............................   10
  BY MR. COMERFORD.........................  292


CORRECTION PAGE...........................  319
SIGNATURE PAGE............................  320
REPORTER'S CERTIFICATION..................  321


E X H I B I T S

NO.              DESCRIPTION                  PAGE
Exhibit 1    Vingelli v. United States
             Drug Enforcement Agency
             (No Bates - 5 pages)            28
Exhibit 2    United States v. Pierre
             (No Bates - 1 page)             30
Exhibit 3    Email from Albert Percival
             dated 8/12/2022, Subject:
             NI 10b5-1 Plan
             (NAT-SL-00022555 -
             NAT-SL-00022558)                41
Exhibit 4    Email from Eddie Dixon to
             Sabastian Niles, dated
             7/8/2022, Subject:  Re:
             Wolverine fee structure
             proposal / minutes for
             board meeting approval -
             privileged and confidential
             (NAT-SL-00020498 -
             NAT-SL-00020499)                49
Exhibit 5    Email from Eddie Dixon to
             Karen Rapp, dated
             9/17/2022, Subject "Re:
             Priv - see below Re NATI"
             (NAT-SL-00023183 -
             NAT-SL-00023184)                55

E X H I B I T S (continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | Memorandum from Sean Edgett dated 10/20/2022 (No Bates - 3 pages) | 62 |
| Exhibit 7 | Email from Deborah Donohue to various recipients, dated 7/28/2022, Subject: NATI Trading Restriction - Window Opening - Persons Subject to the Trading Window via Exhibit A (NAT-SL-00021241 - NAT-SL-00021258) | 69 |
| Exhibit 8 | Letter from Lal Karsanbhai to Eric Starkloff, dated 5/25/2022, Re: Emerson Letter of Intent (NAT-SL-00001113 - NAT-SL-00001116) | 84 |
| Exhibit 9 | Email from Sabastian Niles to various recipients, dated 5/25/2022, Subject: Wachtel Lipton - Directors Duties in Takeover and Activism Context (NAT-SL-00016112 - NAT-SL-00016145) | 90 |
| Exhibit 10 | Email from Eddie Dixon to various recipients, dated 5/27/2022, Subject: Project Wolverine Confidentiality and Trading Restriction Notification (NAT-SL-00016270 - NAT-SL-00016271) | 107 |
| Exhibit 11 | Email from Eddie Dixon to various recipients, dated 6/12/2022, Subject: FINAL Docs Sent to Board By Eddie RE 6-14-2022 Meeting (WLRK-00000913 - WLRK-00000976) | 108 |
| Exhibit 12 | 6/2/2022 email from Eddie Dixon to various recipients, Subject: Re: Priv - Q re financing (NAT-SL-00016466 - NAT-SL-00016467) | 126 |

Exhibit 13    6/22/2022 email from Eric Starkloff to various recipients, Subject: Follow-up to NI letter dated June 16 (NAT-SL-00010410 - NAT-SL-00010413)    128

Exhibit 14    6/23/2022 email from Eddie Dixon to various recipients (NAT-SL-00016089)    139

Exhibit 15    Email chain from Eddie Dixon to Kevin Ilcisin, Eric Starkloff, Karen Rapp, dated 6/23/2022, Subject "RE: Wolverine: Privileged and Confidential Information", with attachments "Dinner Options.pdf," "Guest List.xlsx," "Gift Registry.doc" (NAT-SL-00017152 - NAT-SL-00017155)    140

Exhibit 16    Email from Michael McGrath to Eric Starkloff, dated 7/10/2022, Subject: Discussion Materials (NAT-SL-00021516 - NAT-SL-00021531)    147

Exhibit 17    Email from Eddie Dixon to Eric Starkoff dated 7/12/2022, Subject: Privileged and confidential - discussion with Michael (NAT-SL-00027877 - NAT-SL-00027878)    153

Exhibit 18    Email from Michael McGrath to Eddie Dixon and Eric Starkloff, dated 7/13/2022, Subject: Board Discussion of Project Wolverine dated 7/19/2022 (NAT-SL-00020508 - NAT-SL-00020534)    154

E X H I B I T S (continued)

NO.              DESCRIPTION                        PAGE

Exhibit 19    Email from Michael McGrath
              to Eddie Dixon and Eric
              Starkloff, dated 7/14/2022,
              Subject: Board Discussion
              of Project Wolverine
              (NAT-SL-00020795 -
              NAT-SL-00020819)                      157

Exhibit 20    Email from Kevin Ilcisin to
              various recipients, dated
              7/14/2022, Subject Re: Two
              slide summary of the
              discussion this morning
              (NAT-SL-00025703 -
              NAT-SL-00025704)                      159

Exhibit 21    Email from Eddie Dixon to
              Sabastian Niles, dated
              7/18/2022, Subject: Re: Can
              I ring you back
              (NAT-SL-00017861)                     162

Exhibit 22    Minutes of a Meeting of the
              Board of Directors,
              National Instruments
              Corporation - July 19-20,
              2022
              (NAT-SL-00001457 -
              NAT-SL-00001509)                      166

Exhibit 23    NI Q322 Committee & Board
              Meetings
              (NAT-SL-00024106 -
              NAT-SL-00024255)                      171

Exhibit 24    Email from Eddie Dixon to
              Karen Rapp, dated 8/4/2022,
              Subject: Re: Buybacks
              (NAT-SL-00009611 -
              NAT-SL-00009612)                      176

Exhibit 25    Email from Eddie Dixon to
              various recipients, dated
              8/5/2022, Subject: RE:
              Emerson dividend
              (NAT-SL-00017249 -
              NAT-SL-00017251)                      188

E X H I B I T S (continued)

NO.                 DESCRIPTION                         PAGE

Exhibit 26    Email from Kevin Ilcisin to
              Eddie Dixon, dated
              8/8/2022, Subject:
              Re: Priv - Wolverine
              (NAT-SL-00018178 -
              NAT-SL-00018181)                          193

Exhibit 27    Email from Sam Geoffroy to
              various recipients, dated
              8/10/2022, Subject:
              National Instruments - NOBO
              List (8-5-22)
              (NAT-SL-00015079 -
              NAT-SL-00015080)                          201

Exhibit 28    Email from Eddie Dixon,
              dated 8/10/2022, Subject:
              Wolverine notes/ privileged
              and confidential
              (NAT-SL-00008756)                         205

Exhibit 29    Email from Eddie Dixon to
              Albert Percival, dated
              8/10/2022, Subject: FW:
              Project Wolverine
              Confidentiality and Trading
              Restriction Notification/
              Please Read
              (NAT-SL-00009535 -
              NAT-SL-00009537)                          222

Exhibit 30    Email from Eddie Dixon to
              various recipients, dated
              8/23/2022, Subject: RE:
              Priv Re: GS Broker Update -
              CONFIDENTIAL
              (NAT-SL-00020763 -
              NAT-SL-00020764)                          229

Exhibit 31    Email from Eddie Dixon to
              various recipients, dated
              8/26/2022, Subject: RE:
              MacKenzie Update --
              CONFIDENTIAL
              (NAT-SL-00017309 -
              NAT-SL-00017310)                          232

E X H I B I T S (continued)

NO.            DESCRIPTION                            PAGE

Exhibit 32     Email from Marissa Vidaurri
               to various recipients,
               dated 9/1/2022, Subject:
               NOBO, Estimated Investment
               -- CONFIDENTIAL
               (NAT-SL-00023790 -
               NAT-SL-00023791)                       237

Exhibit 33     Email from Eddie Dixon to
               various recipients, dated
               9/19/2022, Subject: Board
               Exec Session re Wolverine/
               10:30 am CST (11:30 EST;
               8:30 PST)/ privileged and
               confidential
               (NAT-SL-00023189 -
               NAT-SL-00023190)                       239

Exhibit 34     Minutes of a Special
               Meeting of the Board of
               Directors, September 20-21,
               2022
               (NAT-SL-00001450 -
               NAT-SL-00001454)                       245

Exhibit 35     Email from Eddie Dixon to
               Kevin Ilcisin and Karen
               Rapp, dated 7/7/2022,
               Subject:  RE: Quick note on
               your BoD financing slide
               (NAT-SL-00023205 -
               NAT-SL-00023206)                       252

Exhibit 36     Email from Eddie Dixon to
               Albert Percival and
               Sabastian Niles, dated
               6/7/2022, Subject: RE:
               Draft NI: May Board Meeting
               Minutes and June Meeting
               Agenda
               (NAT-SL-00026501 -
               NAT-SL-00026502)                       263

Exhibit 37     Email from Eddie Dixon to
               Albert Percival and
               Sabastian Niles, dated
               6/8/2022, Subject: RE: Priv
               minutes
               (NAT-SL-00025537)                      265

E X H I B I T S (continued)

NO.            DESCRIPTION                    PAGE
Exhibit 38     Email from Eddie Dixon to
               Albert Percival and
               Sabastian Niles, dated
               6/7/2022, Subject: Dated
               7/28/2022, Subject: Re:
               Last night's minutes/
               privileged and confidential
               (NAT-SL-00020751 -
               NAT-SL-00020754)                268
Exhibit 39     Email from Eddie Dixon to
               various recipients, dated
               5/26/2022, Subject: Re:
               Simple calc
               (Various Bates Numbers - 30
               pages)                          278
Exhibit 40     Email from Albert Percival
               to Eddie Dixon, dated
               6/8/2022, Subject: RE:
               Priv, Wolverine -
               Hypothetical Scenario
               Response Letter
               (NAT-SL-00016470 -
               NAT-SL-00016472)                302
Exhibit 41     Email from Kevin Ilcisin to
               various recipients, dated
               8/10/2022, Subject
               "Wolverine Call-Mackenzie
               Update"
               (NAT-SL-00008683)               312

Page 10

THE VIDEOGRAPHER:  Here begins the deposition of Eddie Dixon.  Today's date is October 9th, 2025, and the time is 9:22 a.m.

Will counsel please identify themselves for the record after which the court reporter will swear in the witness.

MR. MANDEL:  This is Noam Mandel from Robbins Geller Rudman & Dowd, for the plaintiff in the class.  There are other members of my team on the Zoom.  I don't think we need to go through all of the names.

MR. COMERFORD:  John Comerford, Dowd Bennett LLP, representing the defendants.  I'm here in the room with the witness.  With me on Zoom is my colleague, Jeremy Hofman.

EDDIE DIXON, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. MANDEL:

Q.   Good morning, Mr. Dixon.  How are you today?

A.   Good.

Q.   Okay.  Welcome.  As I said, my name is Noam Mandel.  I represent the plaintiffs in this case.  I'm going to take your deposition today.

Page 11

Have you ever testified in a deposition before?

A.   I don't recall that I have, no.

Q.   Okay.  Well, you know, the general ground rules are, I ask questions, you answer them to the best of your ability.  Your counsel might object.  In most instances, even though your counsel objects you're still expected to answer the question unless your counsel directs you not to, typically due to, like, privilege issues or things like that.

Let's do our best not to talk over each other.  Sometimes that, you know, fails in the heat of things, but let's both try to do our best.  I promise I'll try.

Okay.  Is that okay with you?

A.   Yes, absolutely.

Q.   Okay.  Very good.  Do you have any familiarity with this case?

A.   Yes, some.

Q.   Have you read the complaint in this case?

A.   I have not.

Q.   Have you read any of the Court's orders in this case?

A.   I have not.

Q.   What is the basis of your familiarity

Page 12

with this case?

A.   Conversations with counsel.

Q.   Which counsel?

A.   John Comerford.

Q.   Your counsel in the room with you now?

A.   Yes, absolutely.

Q.   Okay.  And other -- and conversations with other members of Mr. Comerford's firm.

Is that right?

A.   That's correct.

Q.   Okay.  And they're your counsel here today.  Is that right?

A.   That is correct.

Q.   Can you summarize for me, in your own words, your understanding of what this case is about?

A.   My understanding is it's about whether NI had traded with inside information.

Q.   You understand the case relates to the disclosure or nondisclosure of certain information alleged to be material?

A.   Yes.

Q.   And you understand that that is the nature of the insider trading that you were just mentioning, which is that there's an obligation to

Page 13

either abstain from trading or disclose material nonpublic information.  Do you understand that?

A.   Yes.

Q.   Okay.  Have you read any of the deposition transcripts in this case?

A.   I have not.

Q.   Have you spoken to any of the other witnesses in this case?

A.   I briefly spoke with -- well, actually, I haven't spoken with him.  I texted a couple of messages, just ^ to ask Hal to ask how things went.

Q.   And who did you text with?

A.   I just asked Michael McGrath how he was doing.

Q.   After the deposition?

A.   Yeah, just --

(Simultaneous speaking.)

Q.   How it went?

A.   Yeah, just how it went.

Q.   What did he say?

A.   He said it was long.

Q.   Well, let's see if we can avoid it being quite as long today.

A.   And then --

Q.   Did --

Deposition of Eddie Dixon

In Re National Instruments Corporation Securities Litigation

Page 14

A.    -- and Karen and I -- Karen Rapp, I texted the same thing.  She said it wasn't quite as long, but, yeah, it was long.

Q.    After her deposition?

A.    Yeah.

Q.    Have you been in touch with Mr. Starkloff?

A.    Yeah, we've had conversations, but I haven't talked to him.  I don't know if he's been deposed or not, but I haven't talked to him about that.

Q.    How recently have you spoken to Mr. Starkloff or corresponded with Mr. Starkloff?

A.    Probably a couple of weeks.  I just said, hey, I've been asked to be deposed, and that was it.  Then we had -- we had lunch probably a month ago, just to catch up.

Q.    Did you discuss the case?

A.    No.

Q.    Has any of the testimony --

A.    I mean, no -- no details about the case.  I mean, we knew that there was a case, and that was it, so...

Q.    Well, what -- what did you discuss about the case?

Page 15

A.    As I said, no details other than suspect, you know, he was going to be deposed, but he hadn't or it had been canceled.  I don't know if he ever did or not.  He said he hadn't heard anything about being deposed.

Q.    Are you in touch with Mr. Percival?

A.    Yes.

Q.    When is the last time you communicated with Mr. Percival?

A.    Actually, yesterday, because I was asked to reach out to him because our counsel was trying to get in touch with him.

Q.    I see.  So you spoke to him yesterday?

A.    Yes, after he reached out --
(Simultaneous speaking.)

Q.    What did you guys talk about?

A.    -- to counsel, yes.

Q.    But you spoke on the phone to him yesterday?

A.    Yes.

Q.    What did you guys talk about?

A.    That he had been -- well, our counsel had tried to get in touch with him, he hadn't responded.  He lives in Spain now.  So I reached out to him at their request so that he could get in touch with our

Page 16

counsel.  He did, so he called me and said, hey, I've talked to them.  Apparently they want to depose me.

Q.    Now, you mentioned that you had corresponded with Mr. McGrath and Ms. Rapp about their depositions.  How did you come to learn about their depositions?

A.    Well, Michael had told me he was going to be.  We were exchanging texts on something else just personal.  He said, yeah, I've got this deposition coming up.  And Karen, I think -- if I recall I was -- actually, I was told by our counsel here that -- that Karen had been deposed.  But I was not aware that she had.

Q.    I think I may have asked you this, but have you read any transcripts from either Mr. McGrath or Ms. Rapp's deposition?

A.    I have not.

Q.    Have you had their testimony summarized for you in any way?

A.    No.  I mean -- no, I mean, I don't know what the summary --

MR. COMERFORD:  That's just a "yes" or "no" question.

A.    Yeah, no.  Yeah.

Page 17

Q.    So the answer is "no" --

A.    No.

Q.    -- you have not had their testimony summarized --

A.    No.

Q.    -- for to you in any way?

A.    No.  I don't know how you summarize eight hours, but go ahead.

Q.    Have you been told any information about their depositions?

MR. COMERFORD:  I'm going to object that it is asking for communications between you and your counsel in the case.  If you've been told information about their depositions by people other than counsel, you can testify to that.

A.    No.  Other than what I told you earlier, which they just told me how -- that it was long and draining.

Q.    So you discussed Ms. Rapp and Mr. McGrath's depositions with your counsel here today.  Is that right?

MR. COMERFORD:  Objection; calls for attorney-client privileged information.  I'm going to instruct you to not answer.

MR. MANDEL:  Whether those

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 18

discussions took place is not privileged.

Q. I'm curious whether you had discussions with your counsel in which deposition testimony from Mr. McGrath or Ms. Rapp were summarized.

MR. COMERFORD: So that's a "yes" or "no" question. And you can answer it "yes" or "no" only.

A. Yes.

Q. So your counsel summarized those depositions for you. Is that correct?

A. No.

Q. Your counsel relayed information to you about those depositions. Is that correct?

MR. COMERFORD: I'm going to object. I think that calls for attorney-client privileged information. I think that's over the line. I'm going to instruct you to not answer.

Q. Mr. Dixon, you were an attorney. Is that right?

A. That is correct.

Q. When did you graduate from law school?

A. 1990. I believe I was licensed in '91 after the bar, Texas bar.

Q. And at that point you were in private practice for a few years. Is that correct?

Page 19

A. That's right.

Q. At a law firm?

A. That's right.

Q. What was your area of practice during those years?

A. I started doing bankruptcy work, but ultimately it was technology, corporate technology law, primarily technology commercial law.

Q. And then after that time at a firm you went in-house. Is that right?

A. That's right.

Q. And you were in-house at Dell. Is that correct?

A. Yes.

Q. And you were at Dell in the -- you know, holding various positions in the legal department until approximately 2010. Is that right?

A. Yeah, late 2010. Correct.

Q. So approximately 15 years at Dell in the corporate legal department. Is that right?

A. Right.

Q. And after that, you went to National Instruments. Correct?

A. Yes.

Q. And you were the deputy general counsel

Page 20

of National Instruments in the first instance. Is that right?

A. Yes.

Q. And then ultimately you were elevated to the general counsel position of National Instruments?

A. Yes.

Q. And that was in January of 2019. Is that correct?

A. I thought it was 2018, but I -- I don't know the exact date. But thereabouts, yes.

Q. I'll just tell you I'm looking here at your LinkedIn. It says January 2019. So either in -- in 2018 or 2019, you became the general counsel of National Instruments. Correct?

A. Yes.

Q. And served in that capacity until October of 2023. Is that correct?

A. Yes.

Q. And October '23 -- 2023 is when National Instruments was acquired by Emerson. Is that right?

A. Yes.

Q. So at that point, you left National Instruments. Is that right?

A. Yes.

Page 21

Q. And are you retired?

A. Yes.

Q. Then after you left National Instruments, you retired. Correct?

A. Yes.

Q. Okay. I see sometimes the term "chief legal officer" used rather than "general counsel." Were -- did you sort of use those terms interchangeably?

A. Yeah -- essentially. I mean, I took on some additional responsibilities of government affairs and so, yeah, it was expanded and I think maybe more aligned with the titles for chief legal counsel in publicly traded entities.

Q. But it's fair to say general counsel or chief legal officer. Is that right?

A. That's fine. Yes, that's fine.

Q. I'll -- I'll -- I'll use the terms.

Now, in your capacity as National Instruments general counsel, did you work with outside counsel?

A. Yes. Absolutely.

Q. Outside law firms providing legal services to National Instruments. Correct?

A. Yes.

Page 22

Q.  Did National Instruments work with many outside law firms?

MR. COMERFORD:  Form.

You -- you can answer.

Q.  You can answer the question, yeah.

MR. COMERFORD:  If you know -- if you know what "many" means, you can answer.

A.  Yeah.  I don't know what "many" means, but yeah, we -- we have -- we have multiple firms.

Q.  About how many -- multiple firms.

(Simultaneous speaking.)

Q.  About how many firms, outside firms would you say provided legal services to National Instruments during your time as general counsel?

A.  I -- I honestly don't recall how many firms.  I mean, we would have firms that may be doing work and then they may go away and we may engage another firm.  So I don't know the answer to that question.

Q.  All right.  Did you use any outside law firms for National Instruments' securities filings?

A.  Yes, we did.

Q.  Which law firms, if you can recall?

A.  Our -- Wilson Sonsini was our primary securities firm.

Page 23

Q.  So when you say "primary securities firm," you mean the firm that was principally responsible for drafting your SEC disclosures?

A.  Correct.

Q.  So, like, orderlies and 10-Ks and things like that, Wilson Sonsini was your main outside firm doing that work?

A.  Yeah, I mean, we would do it in-house and work with Wilson Sonsini for the full review and then they would complete the filing, yes.

Q.  Were there any firms you worked with focused on regulatory compliance with the securities laws other than the SEC disclosures?

A.  I don't recall.  I think in general it would be Wilson Sonsini.  Obviously, we engaged Wachtell eventually as it relates to this matter.

Q.  Sure.  And I'll ask about that in a moment.

Did National Instruments work with the law firm Morrison Foerster?

A.  Yeah.  Yeah, we did.  So I wasn't the lead on our securities filings.  It was a colleague of mine or one of my reports Albert Percival.  And I do believe he reached out to MoFo, Morrison Foerster, periodically, yes.

Page 24

Q.  Right.  And Morrison & Foerster are sometimes known as MoFo.  And if we say MoFo, that's what we mean.  Right?

A.  Yeah.

Q.  Okay.  So was -- what was the nature of the legal services that Morrison & Foerster provided to National Instruments?

A.  I -- I didn't engage with the firm directly.  Albert did.  So you would honestly need to ask him on what he was reaching out for.  So I -- I can't answer the question.

Q.  But you were the general counsel of this corporation.  Right?

A.  Uh-huh.

Q.  The corporation -- part of your responsibility was overseeing outside counsel.  Right?

A.  Uh-huh.

Q.  National Instruments had outside counsel from Morrison & Foerster.  Right?

A.  Yes.

Q.  You don't know what legal services Morrison & Foerster provided to National Instruments?

A.  I don't know specifically what we were

Page 25

asking at any one particular time, no, I do not.  That was -- I mean, obviously at the time, I would have probably been advised by my report, what the question was, but not necessarily always.  I intended to give my teammates, you know, the ability to go do their job well.  That was their expertise.

Q.  Did Morrison Foerster provide legal services to National Instruments with respect to 10b5-1 plans?

MR. COMERFORD:  Foundation.

A.  I -- I -- I can't say I reached out to them about a 10b5-1 that I can recall.  I can't tell you whether Albert did or not.  I suspect he may have, but I don't know for sure.

Q.  Well, I'm not asking whether you reached out to them about 10b5-1 plans, but in general, was that the firm providing legal advice to National Instruments regarding 10b5-1 plans?

MR. COMERFORD:  Form.

A.  Yeah.  Time frame, I -- I -- I don't know.  I mean, what we -- what we -- we engaged Wachtell for purposes of the 10b5-1 plan that was put in place.  Prior to that, Albert may have reached out to MoFo about previous considerations for 10b5-1 plans.

Page 26

Q.   So sitting here today, you don't know whether Morrison & Foerster was the firm that provided legal services to National Instruments concerning 10b5-1 plans?

A.   That's correct.

Q.   Did Morrison & Foerster provide legal advice to National Instruments with respect to compliance with insider trading law?

A.   I -- I answered the question.  I -- I don't know specifically what we may have asked them because Albert would have been the point of contact for them.

Q.   Wilson Sonsini, Morrison & Foerster, other than Wachtell, are there any other firms that you can think of as providing any material legal services to National Instruments?

A.   That's a very broad question.  Any material legal -- we use firms for commercial work. We would use firms for, you know, employment law. So yes, there were other firms that provided legal services to us.

Q.   Okay.  Now, Wilson Sonsini, presumably National Instruments paid that firm for their work. Is that right?

A.   Yes.

Page 27

Q.



Again, we're -- I've been out of this for two and a half years.  I don't remember.

Q.   So Wilson Sonsini was either paid their hourly rates or a flat fee for their services.  Is that right?

MR. COMERFORD:  I'm going to object. I think that the fee arrangement with Wilson Sonsini is privileged and it's outside the scope of the waiver in this case.

MR. MANDEL:  So to be clear, your position is that attorney's fees are privileged information?

MR. COMERFORD:  I -- I think a fee arrangement entered into between a client and a lawyer in matters that are not relevant to this dispute are privileged.

MR. MANDEL:  So it's your position, just, John, to be clear, that, you know, information

Page 28

about attorney's fees in general is privileged?  Is that what you're saying?

MR. COMERFORD:  No. I -- I'm saying if -- if you -- if you ask in any general case whether the lawyer has -- has the engagement on a contingent fee or an hourly fee, I -- just in my experience, that's generally not discoverable.  It's privileged.

MR. MANDEL:  All right.  Well, you know, while we're on that, let's just clear that up.

So let's put in our Exhibit X3, please.

THE STENOGRAPHER:  Is this a new exhibit?

MR. MANDEL:  This is going to be a new -- oh, is this our first exhibit?  This will be -- we haven't put in an exhibit in yet.  This will be our Exhibit 1.  Yes.  Thank you.

(Exhibit 1 was marked.)

Q.   This is a case, Vingelli versus United States, Drug Enforcement Agency, 992F.2d 449.

MR. MANDEL:  If we could go to the second page of the PDF, please.  If we could scroll to the bottom.  I'm just going to read this for the record here.  This is the Second Circuit Court of

Page 29

appeals.

"We have determined that in the absence of special circumstances, client identity and fee arrangements do not fall within the attorney-client privilege."

John, I just want to make sure that this is in the record and you see this before you continue with these objections.

Q.   You -- you see this language I'm reading there, Mr. Dixon?

A.   Yes, I see it.

MR. COMERFORD:  I -- and I -- I'm --

Q.   Did I read that correctly?

MR. COMERFORD:  Well, hang on, Noam. I'm happy to -- I'm responding to what you said. I -- I am happy to read this case and we will consider authority on it.  I have not researched this issue.  You're just bringing this up, so we're not going to change our position on the fly in the middle of the deposition.

MR. MANDEL:  Okay.  John, just to be clear, you're directing your witness not to answer this question even though you've not researched the issue?

MR. COMERFORD:  I have not researched

Deposition of Eddie Dixon                     In Re National Instruments Corporation Securities Litigation

Page 30

the issue today during the deposition since it has come up based on your questioning. No, I've been sitting here defending the deposition.

MR. MANDEL: Well, I understand, but going into this you're making an objection having done no research about that. Right?

MR. COMERFORD: I have done research about this in the past in other cases. But I have not researched it in this case under these circumstances because it hasn't come up until today.

MR. MANDEL: Have you researched it in this jurisdiction?

MR. COMERFORD: I don't know as I sit here.

(Exhibit 2 was marked.)

MR. MANDEL: Okay. I'm going to put another case in the record here just to help you out with your research. This is going to be our Exhibit X2 -- no, I'm sorry. It's going to be our Exhibit X4. This will be Exhibit 2, Tab X4, I should say.

Now, if we could scroll to see the whole page on the screen, please.

Q. It says right there this is Judge Gardephe very recently here in the Southern District

Page 31

of New York. "Information" -- you see that right there? I think it's the second sentence of the opinion: Information regarding the payment of attorney's fees is generally not privileged?

Do you see that? I read that correctly, Mr. Dixon?

A. Yes.

Q. Thank you. Okay. This is in the record, John, you can decide what you do with objecting to these sorts of cases.

MR. MANDEL: So, again, I just -- so to be clear, to allow you to kind of withdraw that objection.

Q. Wilson Sonsini was paid either an hourly or a flat fee for its legal services. Is that correct Mr. Dixon?

MR. COMERFORD: I'm going to lodge the same objection, Mr. Mandel. I -- I think it's invading the attorney-client privilege to ask him about fee arrangements between National Instruments and -- and law firms on legal work that is not related to the share repurchases that form the basis of your claim.

MR. MANDEL: Okay. Well, we very much disagree with that but we understand that

Page 32

despite this case law you're continuing to take opposition.

Q. I'm going to ask the same questions with regard to MoFo. Was MoFo paid an hourly rate or a flat fee for its work for National Instruments?

MR. COMERFORD: Form, foundation, calls for speculation and invades attorney-client privilege. I mean, he's already said he doesn't know, but -- about -- about the Morrison Foerster work. But subject to those objections --

Well, based on the objections, I'm going to instruct you to not answer.

Q. Okay. Well, Mr. Dixon, you're not going to answer the question based on your attorney's instructions. Right?

A. That is correct.

Q. Okay. Thank you, Mr. Dixon.

Let's turn to Wachtell. At some point, National Instruments retained the law firm Wachtell, Lipton, Rosen & Katz, call them Wachtell, to provide legal services. Is that right?

A. That is correct.

Q. Wachtell was retained to -- well, when was Wachtell first retained? Are you able to tell me?

Page 33

A. I believe we retained them initially when we had received some activist purchases of our shares that was prior to any engagement with Emerson. And ultimately the activist sold the shares and nothing happened. So that was the first time we engaged Wachtell.

Q. Understood. Around when was that engagement concerning the activist, if you could say?

A. I mean, I can't tell you. It was probably a year or two before Emerson engagement. But I can't tell you exactly when that was.

Q. I see. And when would you say the activist went away as you put it?

A. I don't -- I don't know. I -- I don't know the timeline on that. That was three, four, five years ago, so.

Q. But the activist went away before Emerson's approach to National Instruments?

A. Oh, yes.

Q. Is that --

A. Yes. Yes.

Q. Understood. I'm just trying to understand the timeline.

And so in approximately -- in mid-May

Page 34

Emerson first reached out concerning a potential transaction. Is that right? In mid-May of 2022 Emerson first reached out with respect to a potential transaction with National Instruments. Is that right?

A. That is correct.

Q. And it was at that point that National Instruments reached out to Wachtell again for legal services?

A. Yeah, it would be shortly --

Q. Is that right?

A. It would be shortly after that, yes.

Q. Understood.

So it was in connection with the approach from Emerson that National Instruments reached out to Wachtell for legal services in approximately May of 2022. Correct?

A. Correct.

Q. And Wachtell was retained to advise --

Well, did National Instruments retain Wachtell or did the board of directors of National Instruments retain Wachtell or another --

A. No, it was for the benefit of the board.

Q. Was there agreement -- was it -- did the board of directors retain them directly or was it

Page 35

National Instruments that was the client?

A. It would be for the benefit of the board and for the company. There was no -- there was a decision -- there was no need to engage something client separate -- I mean, counsel separate for the company versus the board.

Q. Understood.

Now, Wachtell was paid for its services, I assume. Is that right?

A. Ultimately it was paid for its services, yes.

Q. What was it paid for its services in total?

MR. COMERFORD: I'm going to -- I'm going to object for the time being, Noem. Now, I want to get it clear in my head whether we've agreed to disclose that information or not. If you don't -- I'm not saying that we're -- that I'm instructing him to not answer during the entire deposition, but at this point I -- I want to -- I want to run that down on a break just to make a sure that we're handling that correctly. So if you don't mind, can you just put a pin in that and come back to it?

MR. MANDEL: I guess I just don't

Page 36

understand what the waiver really has to do with this information that's not privileged in any respect. And I don't understand why we would delay things when we're looking here at case law. I think it's still sitting on the screen that says: Information regarding the payment of attorney's fees is generally not privileged.

So can you explain a little, like, why -- why is it that you want to take up time and delay this so you can look at the waiver language when the stuff is not privileged to begin with?

MR. COMERFORD: Yeah, I just -- I -- I'd like to -- frankly, I'd like to take a break and -- and take a look at it. I'm not sure we've agreed to produce information about the Wachtell fee arrangement. And I would just like to make sure I'm handling it correctly.

MR. MANDEL: Whether you've agreed to produce it or not is totally separate from whether this witness under oath must answer these questions. Why don't we go off the record, you guys can research the question for a few minutes to not waste time on my record and knock my depo time and then we can come back on the record in a couple of minutes and see where we are. How's that?

Page 37

MR. COMERFORD: That's fine with me.

MR. MANDEL: Let's do it. What do you need, about 10 minutes, 15 minutes, tell me what you need, John.

MR. COMERFORD: Yeah, I -- I think ten minutes.

MR. MANDEL: Sounds good. We'll see you then.

Off the record.

THE VIDEOGRAPHER: Going off the record. The time is 9:53.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 10:07.

MR. MANDEL: John, what did you decide?

MR. COMERFORD: So, Mr. Mandel, my understanding is that there are no interrogatories served by the plaintiffs that asked for the fee arrangement between National Instruments and the Wachtell law firm. It's also my understanding that the document requests that were served on us do not seek the fee arrangement. It's my understanding that plaintiffs' counsel has been asking us to produce the Wachtell engagement letter through email

Page 38

correspondence. And that we have responded in email correspondence and said that we are not going to produce it.

It's now October 9th, 2025. Before this morning during the deposition, you never sent us the cases that you're relying on when you could have done that easily yesterday or anytime before so that we could assess your position. I think that it is improper to -- to simply introduce case law that you have never sent to us before during the deposition and demand that we rely on it without giving us a chance to research it. I think that the correct way to handle this issue is for you to file a letter of motion and frankly to look and see if your discovery requests actually formally request this document.

So that's my position. We're not -- we're not going to change our position today during the deposition. I think we should handle this outside the deposition context.

MR. MANDEL: I understand your position, I think. I want to clarify a point. I was not asking this witness to produce any documents. We asked you to produce documents. You told us that you would not produce this particular

Page 39

document and never said you weren't doing so based on any kind of privilege.

I asked this witness a question under oath this morning. You're objecting on privilege grounds, having done no research on the question. And now you're saying that it's improper that I referred you to case law you should have researched before raising such an objection in the first instance. I understand you are inviting a letter of motion. We'll take that under advisement. But I understand that what you're doing now is directing your client not to answer questions concerning attorney's fees.

MR. COMERFORD: That's correct. And, Mr. Mandel, you knew you were going to ask this question today, and you prepared the case law, even preparing it as deposition exhibits. I had no idea you were going to ask that question of the witness until you literally asked the question during the deposition, and then demanded that I assess the case law that you had just put in front of me on the record during the deposition.

And I don't think that's the proper way to handle this. I feel ambushed, frankly. So I would like to handle this in a -- in an orderly way

Page 40

that gives us an opportunity to assess your question and assess your request of the witness, and then respond to it.

And during the deposition is not the time to do that.

MR. MANDEL: Well, you raised the objection with no basis.

Just to understand, is the objection -- is the direction to the client to not answer this question on the basis of privilege or on another basis?

MR. COMERFORD: It's on the basis of privilege and relevance.

MR. MANDEL: Well, relevance would not be a proper objection. Right?

MR. COMERFORD: I don't agree with that. Under the circumstances I don't agree with that. And I would refer back to the email correspondence that's -- that's gone on for a long time now between your firm and my firm about the issue of the Wachtell fee -- or the Wachtell engagement letter, where we -- you know, we have taken positions with you over email about this.

MR. MANDEL: Regarding documents. You've taken positions regarding documents.

Page 41

MR. COMERFORD: And --

MR. MANDEL: Not that these were privileged. Your position was that they were outside of the scope of a certain discovery period.

MR. COMERFORD: Right. Which is another way of saying relevance. So you know what our position is. You're asking, now, the witness to testify to the substance of the document that we have declined to produce, and that's why we're having this issue.

MR. MANDEL: Okay. Well, we'll try to move on. I'm sorry you feel ambushed as a result of your own objection.

Let's get -- try to get back on track here substantively.

Let's put up a document. This will be document -- our Tab D92. D92, please. This will be our Exhibit 3.

(Exhibit 3 was marked.)

Q.   Now, this is Exhibit 3. This is Bates NAT-SL-22555. It's an email chain including Mr. Albert Percival and attorneys from the Morrison & Foerster law firm, as well as another -- two other National Instruments people, Estefania Souza and Deborah Donahue.

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 42

Do you see this email, Mr. Dixon?

A.   Yeah.  It would be helpful to increase the size a little bit for -- I don't know how to do that from here, but if you can do that...

Q.   It would be helpful to see it.

A.   Okay.

Q.   Now, you -- do you see the re line in this email, the subject line is NI 10b5-1 plan?

A.   Yes.

Q.   This is an email to Morrison Foerster from -- an email chain involving Mr. Percival and Morrison & Foerster concerning National Instruments' 10b5-1 plan.  Is that right?

MR. COMERFORD:  Object.  We -- we have not seen the whole email chain.  We can read the subject line, but we can't see any of the content of the email chain.

Q.   Mr. Dixon, why don't you take a minute and scroll through the document and just see what it is.

(Discussion off the written record.)

Q.   Yeah, if we could stop right there, that's where -- I'll begin my questions on this bit of writing there on the screen.

So you see there Mr. Percival is writing

Page 43

to Morrison & Foerster regarding a 10b5-1 plan and says:  We are trying to execute tomorrow.

And asks -- and states that a fast review is preferable.  Do you see that?

A.   Yes.

Q.   So Mr. Dixon is writing an email to Morrison & Foerster asking for a fast review of a 10b5-1 plan that he wants to execute tomorrow.

Is that right?

A.   No, that was Mr. Percival.

Q.   I'm sorry.  Did I say Mr. Dixon?

A.   Yes, you did.

Q.   Sorry.  So this is Mr. Percival writing an email to Morrison & Foerster, asking for a fast review of a 10b5-1 plan that he wants to execute the following day.  Is that right?

MR. COMERFORD:  I object.  I can't see the attachment that he is asking them to review.

MR. MANDEL:  This is an email chain that does not have an attachment, Mr. Comerford.  This is an email chain you produced with no attachment.

Q.   Mr. Dixon, the question was, is this Mr. Percival writing an email to Morrison & Foerster asking for a fast review of a 10b5-1 plan that he

Page 44

wants executed the following day?

MR. COMERFORD:  I object.  The document speaks for itself?  There's -- the witness is not on the document.

MR. MANDEL:  Enough with the coaching, John.  Stop.

MR. COMERFORD:  My objection is that --

MR. MANDEL:  Let the witness answer.

MR. COMERFORD:  This is --

MR. MANDEL:  Your objections are coaching.  Come on, John.

MR. COMERFORD:  This is an email that someone else wrote to other people.  The witness that you're asking questions about is not on the email chain.

MR. MANDEL:  Uh-huh.

MR. COMERFORD:  And you're asking him what it means.  And there's -- and it's referring to an attachment that's not being put before the witness that I can't see and the witness can't see.

That's -- so --

MR. MANDEL:  You've made your objection.

MR. COMERFORD:  That's my objection.

Page 45

MR. MANDEL:  Now, let's let the witness answer the question, please, and stop muddying up the record.

Q.   So, again, with all the objections just noted for the record, the question is you're looking at this document right now.

Does Mr. Percival write to MoFo on August 10th, asking for a fast review of a 10b5-1 plan, and stating that he wants it executed on the following day?

MR. COMERFORD:  Form, foundation, calls for speculation.  The document speaks for itself.

Q.   Mr. Dixon?

A.   I agree the document speaks for itself. I -- I'm not on this.  I was not involved in this.

Q.   None of that is responsive to my question, Mr. Dixon.

I'm asking you what it says.  Could you read what -- did you read the language that I just read to you from it?

A.   I can reread the language for you, yes. And I'm not going to assess what the intent or anything was.  The language says:  Please review and see embedded questions, which we don't see.

Page 46

"We're trying to execute tomorrow after close of market, so a fast review is preferable, and we will need to send to bank by noonish our time to make that happen."

That's what I know.

Q.   Okay.  So Mr. -- so you know that Mr. Percival wrote this to MoFo on August 10, 2022. Correct?

MR. COMERFORD:  Objection; form, foundation.  The document speaks for itself.

Q.   Mr. Dixon?

A.   Based upon the date, that's all I know. I don't know if it was actually sent on that date, but that's what it says on the email.

Q.   Now, it's obvious from this email that Morrison & Foerster was counsel regarding 10b5-1 plans to National Instruments before August 10th. Right?

MR. COMERFORD:  Objection; form, foundation, calls for speculation.

Q.   Mr. Dixon?

A.   There's no evidence that it was before August 10th.  There was a date on here of August 10th.

Q.   Okay.  So you believe that Mr. Percival,

Page 47

out of the blue, on August 10th wrote an email to Morrison & Foerster asking for a fast review and for a document to be executed by the following day.

Is that what you're telling us?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   Yeah, I mean, I -- I don't have any other information to know what was -- what was discussed or not discussed between Mr. Percival and MoFo.

MR. MANDEL:  That's nonresponsive to the question.  Let the record show that you're evading the question and your counsel is giving you all kinds of hints about how to do that.

MR. COMERFORD:  Well, that -- that's improper, and I disagree with it for the record.

Q.   Now, I'm not sure exactly where you landed, where the line is with your privilege objections about fees.

So I just want to ask you:  Ultimately, in connection with his work for National Instruments related to the Emerson deal, what amount of money was the Wachtell law firm paid?

MR. COMERFORD:  Same objections as before.  I'm going to instruct you not to answer based on what we've already talked about.

Page 48

MR. MANDEL:  Understood.  I just wanted to clarify.

Q.   Was Wachtell paid a success fee?

MR. COMERFORD:  Same objections as before.  I'm going to instruct the witness to not answer based on what we have talked about today.

Q.   If the price of the transaction was higher, did Wachtell get paid more?

MR. COMERFORD:  Same objections.

Q.   And, Mr. Dixon, I take it you're not going to answer the question based on your attorney's objection?

A.   On advice of counsel --

Q.   Understood.

A.   -- I've been instructed not to answer the question.

Q.   Understood.  Was Wachtell paid handsomely for its work?

MR. COMERFORD:  Did you say "handsomely"?

MR. MANDEL:  I did.

MR. COMERFORD:  Same objections.  And I also object to the form that "handsomely" is vague and ambiguous.

Q.   Mr. Dixon, was Wachtell paid handsomely

Page 49

for its work here?

MR. COMERFORD:  Same objections.

A.   Based upon advice of counsel, I'm instructed not to answer the question.

MR. MANDEL:  So it's your position that whether they were paid handsomely is privileged information, Mr. Comerford?

MR. COMERFORD:  Yeah.  Same objections that we've already discussed.

MR. MANDEL:  Okay.  Let's put up Document No. 35, D35, please.  I think this will be Exhibit 4, if I'm counting correctly.

(Exhibit 4 was marked.)

Q.   This is Bates NAT-SL-20498.

MR. MANDEL:  If we could scroll to the lower part of that first page.

This is an email written by you, Mr. Dixon, on June 28th, 2022, beginning:  Hi, Sabastian.

Do you see that?

A.   Yes.

Q.   Sabastian is Sabastian Niles of the Wachtell Law Firm.  Correct?

A.   Yes, at the time.  He's no longer with Wachtell, but yes.

Page 50

Q.   Understood.  Here you say -- you write that: ███████████

Do you see that?

A.   Yes.

Q.   And you go on in the subsequent sentence to refer to a ███████████

Do you see that?

A.   Yes.

Q.   Now, had you asked Wachtell for a fee structure proposal before this email?

A.   I'm sorry.  Repeat the question.

Q.   Had you asked Wachtell for a fee structure proposal before this email?

A.   I believe I had sent a couple of emails requesting that, but I don't know the timing relative to this email.

Q.   Right.  I mean, it says -- you're writing that ███████████

A.   I -- I can't assess that.  The point was it was important to us.  I don't know whether it was a top priority to them.  I obviously hadn't received

Page 51

a response yet, so...

Q.   Well, right.  Is that it -- is that the point, you had asked for a fee structure proposal previously and not received it and you're writing here ███████████ but National Instruments needs to know?  Is that right?

A.   That would seem appropriate, yes.

Q.   Okay.  Now, was there discussion concerning possible success fee structure with Wachtell at around this time?

A.   We had not discussed any fee structure that was -- appears the reason I was sending this.  We need to understand what it might be.

Q.   You understood as of this time that there would be a possible success fee structure.  Is that right?

A.   At this time, there could be any type of structure.  We didn't know what was going to happen.

Q.   Well, you specifically referenced a ███████████ Correct?

A.   It appears I did, yes.  That could be --

Q.   Did you --

A.   -- a structure.

Q.   Did you ███████████

Page 52

███████████

A.   It's possible that anything could have been structured at that point.

Q.   So at this time, ███████████ ███████████?

A.   It is possible.

Q.   Okay.  And ███████████

MR. COMERFORD:  I think you can -- I think you can answer that yes or no.

Q.   The question was, ███████████

MR. COMERFORD:  Ever?  So I'm going to object to the lack of time frame.

Q.   Did Wachtell ███████████

A.   ███████████

Q.   Can you explain what you mean by "███████████

Page 53

A.   I don't -- in this context, success fee could mean a variety of different things.  In particular, we were not at all interested in selling the company.  Success could be not selling.  Success would be, well, do we end up selling.  But at the -- ultimately, you've got to understand ███████████

Q.   Can you explain to me when you say ███████████

A.   Parties agree on what the value of the work was.

Q.   How is the value of the work determined?

A.   ███████████

Q.   When did you come to this agreement?

A.   ███████████

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 54



Q.   When you say [redacted] hat's your basis for your understanding of how Wachtell typically bills?

A.   Communications from Wachtell, experience from my direct report who had worked with Wachtell on a prior transaction.

Q.   What communication -- what did Wachtell tell you about [redacted]

A.   I'm not quite sure how to answer that. I mean, [redacted], but obviously there -- they're considered the best or at least among the best defense firms. That's why we engaged Wachtell. [redacted]

So that was how they would explain it, too. That was their interest in ensuring their client was successful, whether it was defending, you know, an acquisition or ultimately concluding an

Page 55

acquisition, but [redacted] Again, [redacted] You would have to ask Wachtell that.

MR. MANDEL:  Let's put up document D102, please.

(Exhibit 5 was marked.)

MR. MANDEL:  It will be our Exhibit 5. This is Bates NAT-SL-23183.

Q.   This is an email chain between you, Mr. Dixon, and Ms. Rapp and Ms. Rapp asks you if you know where Sabastian -- that's Sabastian Niles of Wachtell -- gets certain information provided in the chain below.

Do you see that?

A.   I see "Do you know where Sabastian gets blurbs like that," if that's what you're referring to.

Q.   That is what I'm referring. Karen is asking if you know where Wachtell gets a blurb that was provided lower in the email. Right?

A.   That appears to be what she's asking. I don't know what the blurb is that she's referring to.

Q.   Sure. It won't matter for my question.

Page 56

But let's scroll up, if we could, to the top of this page and you responded that "Eric had the same question. I'm sure they," Wachtell, "pay for every available resource since they can leverage across multiple clients and they are paid handsomely."

Do you see that?

A.   Yes.

Q.   So -- And you use some kind of emoji there. Is that right?

A.   I -- I see something there. I don't know what it is.

Q.   It looks like a -- a dollar with wings -- a dollar -- a bill with wings. Could that be right, Mr. Dixon?

A.   No.

Q.   No?

A.   No, that couldn't be right.

MR. MANDEL:  Could you zoom in on that emoji, please.

Q.   There we go. You see that? It looks like a dollar sign with wings. No, you don't see that?

A.   Yeah, I see that. I don't recall ever having used that in my life, but maybe I did.

Page 57

Q.   Do you use emojis often?

A.   As any normal person would, about the same probably.

Q.   So, again, before we had some discussion about this word "handsomely," you weren't sure what it meant, but here, you're using that word. Right?

A.   With respect to WLRK's other clients.

Q.   Right. You're saying in general they're paid handsomely. Right?

A.   For some reason, this is blown up.

MR. COMERFORD:  I'm going to object to the form. The -- the witness is trying to take control of the document so he can read the document and he's not able to. We've also not been given the opportunity to actually read the document. I think -- I think --

THE WITNESS:  Right.

MR. COMERFORD:  Let's -- let's scroll to the bottom and just read it from the bottom up.

MR. MANDEL:  John, you're just, like, using the tactic to eat up my time here. This is a document you produced.

THE WITNESS:  I -- I'm not going to comment on any document that I haven't actually read so I fully agree. So I assume --

Page 58

MR. MANDEL: The record should show that the witness is reading a blurb attached to the email that I've expressly stated is not relevant to the questions I'm asking. I have a specific question about language near the top of this email. Counsel is encouraging the client to just spend a lot of time on the record reading the document.

MR. COMERFORD: That -- that's not true, Mr. Mandel. You've put a document in front of the witness and you've not given us the opportunity to read it. I'm asking the witness to read the document and I'd like the read the document, too. I think that's fair. It's just a two-page email. We're just trying to get to the bottom of it and get oriented.

A. (Pause.)
Yeah. Okay.

Q. Again, you -- you don't have a problem using the term "handsomely" with regard to Wachtell's pay in general. Right?

A. I don't have a problem using the word "handsomely" with any law firm that I ever used. Every law firm is extraordinarily overpaid from my perspective, so absolutely I don't have any problem with Wachtell. Quite frankly, I wouldn't have a

Page 59

problem with Dowd Bennett if I were paying them. And as you well know, you guys are paid very well, also.

Q. Well, I didn't ask if you had a problem with any of it. I'm just noting you understand that Wachtell is usually paid handsomely for their work. Correct?

MR. COMERFORD: Foundation, calls for speculation.

Q. Please answer.

A. That -- that was a -- an assumption there, I'm sure. I don't know. I don't know what they're paid.

Q. Were they paid handsomely for their work for National Instruments on the Emerson deal?

MR. COMERFORD: Form.

A. I believe I was previously instructed by my counsel not to answer the question.

MR. MANDEL: Mr. Comerford, are -- is that correct?

MR. COMERFORD: Yeah, that's -- that falls into what we talked about earlier. I'd like to -- I'd like to just research that, and if you're asking him how much Wachtell was ultimately paid after the Emerson transaction, yeah, we'd -- we'd

Page 60

like to research that because we've objected to that so far.

MR. MANDEL: Yeah, I understand that your objection is that whether Wachtell -- Wachtell was paid handsomely is privileged. Let the record shows that that's your objection.

MR. COMERFORD: You can -- you can rephrase my objection, but that doesn't mean that that's my objection, Mr. Mandel.

MR. MANDEL: Well, you --

MR. COMERFORD: Nothing you say about --

MR. MANDEL: You can make your objection any way you like. It means what it means.

MR. COMERFORD: Yeah, nothing you say about my objection actually makes it my objection.

MR. MANDEL: No, your objection is what it is and I'm just pointing that out.

Q. ████████████████████
██████████████████████████
███████
██  ████  mean...

Q. Was there discussion with Wachtell about targeting its fees in relation to the fees the investment bankers on the deal would earn?

Page 61

A. I don't -- I don't recall.

Q. Do you have any understanding of whether Wachtell typically gets paid in that way?

MR. COMERFORD: Form, foundation, calls for speculation.

Q. Mr. Dixon, we're waiting for you.

A. I -- I don't know how they're paid typically, so. All I know --

Q. You have no understanding how they're paid typically?

MR. COMERFORD: Form, foundation, calls for speculation. Just so the record's clear, Mr. Mandel, you're asking this witness how Wachtell gets paid by other clients in other cases and you're complaining about wasting time.

Q. Mr. Dixon, you testified before that ████████████████████████████
████████

Do you remember saying that?

A. Sure. I may have said that.

Q. What was your basis for that?

A. ████████████████████
██████████████████████████
that we would be using other firms at other lower, you know, what we would think would be typically

Page 62

lower fees and so forth -- and smaller fees.  So --

(Simultaneous speaking.)

Q.   (Unintelligible).

A.   We -- we used Wachtell for a reason. What they do.  And what they do is they're a defense firm.

Q.   Okay.  Let's put in our Exhibit X1 -- or Tab X1 which will be our Exhibit 6?

(Exhibit 6 was marked.)

Q.   Now, this is a -- a document pulled from a case in the Superior Court of California, county of San Francisco in the matter of X Corp versus Wachtell, Lipton, Rosen & Katz.  It is Case No. CGC-23607461.  This is Exhibit 7 to the complaint in that case between X Corp formerly known as Twitter and Wachtell.  This is a memorandum provided by Wachtell to Twitter also known as X Corp, Twitter at the time, concerning Wachtell's fees, Wachtell's typical fee arrangements.  If you look up at the top, you see the date of the document is -- the date of the memo is October 20th, 2022. Generally contemporaneous with the events of this case.  And in this memo Wachtell describes engagement fees as a percentage of banker fees.  Do you see that?

Page 63

A.   I see that.

Q.   And they explain that in -- that there -- that:  The firm Wachtell often receives fees in the range of 60 to 80 percent of the fees paid to investment advisors.

Do you see that?

MR. COMERFORD:  Form, foundation, calls for speculation.

MR. MANDEL:  I asked him if he sees words on a page.

MR. COMERFORD:  Who -- and who's the -- who is Shawn Edgett, the recipient of this?

MR. MANDEL:  I'm not here to answer questions about this, Mr. Comerford.  I told you what this document is.  I told you it's provenance. I told you where it comes from.  It's sitting on a docket.  It was filed by Twitter also known as X Corp in a lawsuit against Wachtell.

MR. COMERFORD:  Okay.

MR. MANDEL:  That's the origin of the document.  I know your witness hasn't seen it.  I know you haven't produced it.  But you can go to the docket and pull this document down yourself.  This email, by the way, was attached to -- this memo was attached to an Exhibit 6 on that document as well

Page 64

which is a cover letter from William Savitt of Wachtell.  It's the cover email of William Savitt from Wachtell to which the memo was attached.

MR. COMERFORD:  Okay.

MR. MANDEL:  I think that's plenty of information for you about the provenance of this document.  I'd like to ask the witness questions.

MR. COMERFORD:  Right.  And the plaintiff has not produced this document in this litigation.  Correct?

MR. MANDEL:  Correct. (Unintelligible).

MR. COMERFORD:  Okay.  And the defendants have also not produced this document.

MR. MANDEL:  Correct.  This is not a document that is produced in this litigation.  This is a publicly available document on a docket from a California case that's been highly publicized, by the way.

Q.   Now, to my question.  You see on this memo where Wachtell explains that they often receive fees in the range of 60 to 80 percent of the fees paid to investment advisors.

Do you see that?

A.   Yes.  I see that.

Page 65

Q.   And if we look at the rest of this page, they're describing numerous engagements of Wachtell from the year 2022 and 2021, where they are paid fees that are a percentage of the investment bank's fees.

Do you see that?

A.   Yes.

Q.   So, for example, it states that:  Earlier in '22, Wachtell represented a company that was acquired in a strategic transaction and the firm received a fee that was approximately 80 percent of the fees charged by investment banks.

Do you see that?

A.   Yes.

Q.   Below that they describe a:  REIT that was acquired by a private equity investor.  And they explained that Wachtell received a fee that was approximately 70 percent of the fee charged by investment banks.

Do you see that?

A.   Yes.

Q.   And it goes on from there.  There's some instances near the bottom of the page where they actually received 100 percent of the fee charged by the investment banks.  Do you see that?

Page 66

A.   Yes.

Q.   And if we scroll all the way to the bottom of the next page, we see that -- that they explained that:  The total fee amounts in these illustrative matters range from approximately 33 million to 134 million.

Do you see that?

A.   Yes.

Q.   Now, do you have any reason to believe that any of this is untrue?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   I don't know anything about this, yeah.

Q.   Is this consistent with your understanding of how Wachtell is compensated for its work on M&A transactions?

MR. COMERFORD:  Form, foundation, calls for speculation.  I would also observe, Mr. Mandel, that -- that this document is talking about premium billing matters that involve substantial litigation.

MR. MANDEL:  You can observe anything you'd like.  I don't know --

MR. COMERFORD:  Okay.

MR. MANDEL:  -- are you testifying,

Page 67

Mr. Comerford?

MR. COMERFORD:  Well, I'm -- I'm pointing that out for the record.  Because I think your use of this is misleading because I don't think this transaction that's at issue in this case involved substantial litigation.

MR. MANDEL:  Well, Mr. Comerford, you can make those arguments at the appropriate time.  But right now --

MR. COMERFORD:  Well --

MR. MANDEL:  -- you're just kind of sharing your thoughts about the document and the witness is hearing, certainly seems like you're trying to give some hints to the witness.  I don't know.

MR. COMERFORD:  No.

MR. MANDEL:  You should stop.

MR. COMERFORD:  My -- I'm objecting and I'm trying to explain that I think that you're mischaracterizing this document and you're trying to misapply this document.  It's objectionable in many ways.

Q.   Now, do you know what the -- Bank of America was the investment banker on this deal.  Is that right?

Page 68

A.   That is correct.

Q.   What was Bank of America ultimately paid for its work on this deal?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   I don't recall the exact amount anymore.

Q.   I will tell you that it is in the proxy.  It states that Bank of America was paid approximately $51 million for its work on this transaction.

Does that sound right to you?

A.   Again, I -- I can't recall but it seems rational.

Q.   So if Wachtell were paid 60 to 80 percent of what the I-Bankers earned in this case, that would be 30 to $40 million.  Is that right?

MR. COMERFORD:  Objection; form, foundation, calls for speculation, incomplete and improper hypothetical subject to that.

Q.   It's a math question, Mr. Dixon.  If --

MR. COMERFORD:  It's a hypothetical math question.  You said "if."

MR. MANDEL:  Yeah.  So what this -- is there some reason -- is there some proper objection to hypothetical questions?

Page 69

MR. COMERFORD:  Yeah, it's an improper --

MR. MANDEL:  If Wachtell -- if the bankers were paid $50 million approximately and Wachtell were paid 60 to 80 percent of that for its work here, is it correct that Wachtell would have been paid something like 30 to $40 million for its work here?

MR. COMERFORD:  Form, foundation, calls for speculation, incomplete and improper hypothetical.

Q.   Mr. Dixon, you must answer the question.

MR. COMERFORD:  You can answer subject to the objections.

A.   Subject to the objections, the math would indicate that is true.

Q.   Now, let's move on.  Let's put up a new document for a completely new subject here.  Let's look at -- it's Tab D60.  This will be our Exhibit 7, I believe.

(Exhibit 7 was marked.)

Q.   This is a document beginning Bates NAT-SL-21241.  This is an email attaching an insider trading policy and an insider trading Q&A.  I'm not going to ask you really about the email.  I'm going

Deposition of Eddie Dixon                                    In Re National Instruments Corporation Securities Litigation

Page 70

to ask you about the attachments which are the insider trading policy and the Q&A. Do you want to have a look --

A.   Sure.

Q.   -- real quick? I'll begin my questions in a moment.

A.   (Pause.)

Q.   And my first question will be are you familiar with this attached insider trading policy that begins on Bates 21247?

A.   Yes. Generally familiar, yes.

Q.   Right. So I see on the screen now you're looking at the Q&A. If you scroll down a little more, you'll get to -- to the page beginning 2437 is the next attachment to the email, which is the insider trading policy. The first document is a Q&A about that policy.

All right. There's the first page of the policy.

A.   Yeah.

Q.   You're familiar with this document?

A.   Yes.

Q.   Did you help develop this policy?

A.   I would review the policy for sure, yes.

Q.   If you scroll up, it states its effective

Page 71

date is April 9th, 2020. Do you see that?

A.   April 29th, 2020.

Q.   Yes, April 29th, 2020. Oh, I'm sorry. I must have misstated that. April 29th, 2020.

You were the general counsel of National Instruments at that time. Correct?

A.   Correct.

Q.   Now, in the first paragraph there that begins: It's your responsibility to understand and follow this policy.

You identify very serious consequences that can come from insider trading. Is that right?

A.   Correct.

Q.   You identify criminal and civil liability as a possibility. Correct?

A.   Yes.

Q.   Damages and fines and imprisonment are identified on this policy. Is that right?

A.   Yes.

Q.   You mention here that insider trading could cause irreparable damage to the company's reputation. Do you see that?

A.   Yes.

Q.   All right. Now, the next paragraph beginning "for purposes of this policy" states that:

Page 72

The company's general counsel serves as the compliance officer.

Do you see that?

A.   Yes.

Q.   That was you. Correct?

A.   Correct.

Q.   So you were the compliance officer for the insider trading policy of National Instruments?

A.   Correct.

Q.   Does that mean it was your responsibility to ensure compliance with this insider trading policy?

A.   That is correct.

Q.   And otherwise to ensure compliance with insider trading law?

A.   That is correct.

Q.   And if we move on from there on the policy statement, you state very clearly that it is illegal for anyone to trade securities on the basis of material nonpublic information. Correct?

A.   That is correct.

Q.   Do you agree with that statement of the law?

A.   Absolutely.

Q.   Let's move on to the next page, please.

Page 73

If we look at the definition of "material nonpublic information," do you see that right there in the middle of the page?

A.   Yes.

Q.   And you define "material information" here. Is that right?

A.   Yes.

Q.   And you define it, you write: Material information means information that a reasonable investor would be substantially likely to consider important in deciding whether to buy, hold, or sell securities of the company.

Is that right? I'll read -- I'll ask you about the second part of the sentence later.

But did I read that correctly?

A.   Yeah, I don't recall. What -- what -- what subsection are you looking at?

Q.   Oh, if we look right there, if you look at No. 3, definition of "material nonpublic information." Do you see that?

A.   Yeah.

Q.   So if we go on from there, you write --

A.   Oh, okay.

Q.   -- "material information means" --

A.   Yeah, I see it.

Page 74

Q.    -- "information that a reasonable investor would be substantially likely to consider important in deciding whether to buy, hold, or sell securities of the company, or view as significantly altering the total mix of information available in the marketplace about the company as an issuer of the securities."

Do you see that?

A.    Yes.

Q.    Is that a correct statement of the definition of "material information"?

A.    Yes.  From my perspective it is.

Q.    You take no issue with that definition?

A.    No.

Q.    You use the phrase "total mix" here.

Do you have an understanding of what "total mix" means in this context?

A.    No.  I mean, you would have to involve circumstances, of which were not -- there are no circumstances involved right now, so I don't know.

Q.    Is the total -- are you familiar with Basic versus Levinson?

A.    Am I familiar with what?

Q.    With the Supreme Court case Basic versus Levinson?

Page 75

A.    No, I can't say I am immediately.  No.

Q.    Okay.  Are you familiar with the concept of materiality as being a function of both magnitude and the probability of a potential transaction?

MR. COMERFORD:  Objection; calls for legal conclusions.

MR. MANDEL:  The man's a lawyer, John.

MR. COMERFORD:  It still calls for legal conclusions.

MR. MANDEL:  And he's a lawyer.

Q.    Mr. Dixon?

A.    Yeah.

MR. COMERFORD:  I object.  You're calling -- your question is asking the witness to draw legal conclusions.  I think it's improper. He's here as a fact witness.  He's not here in any other capacity other than a fact witness.

MR. MANDEL:  Are you instructing him not to answer?

MR. COMERFORD:  No.  I'm saying that -- I'm just putting an objection on the record.

MR. MANDEL:  Okay.  Good.  So your objection is on the record.

Q.    Mr. Dixon, are you familiar with the

Page 76

concept of materiality as being a function of both magnitude and probability of a potential transaction?

MR. COMERFORD:  Same objection.

A.    Yes, that would make sense based upon the facts at hand at the particular time.

Q.    Now, moving forward in this document, you note that -- you note some examples of information that could be regarded as material.

Do you see that in the next paragraph? There's a sentence beginning with the word "however"?

A.    Yeah.

Q.    It begins --

A.    Yeah.

Q.    -- "if not possible to define."

A.    Yeah, I see it.  Yeah.

Q.    Okay.  And then you go on to say:  Some examples of information that could be regarded as material include.

Do you see that?

A.    Yes.

Q.    Now, if you would scroll to the next page to L.  So what's stated there is as an example of information that could be regarded as material,

Page 77

significant corporate events such as pending or a proposed merger.

Do you see that?

A.    Yes.

Q.    So this policy advises that a proposed merger is material information.  Is that right?

A.    Yeah.

(Discussion off the written record.)

Q.    The question was -- the question was: This policy advises that a proposed merger is material information.

Is that correct?

A.    Yes, until the information is no longer -- I mean, it's stale or no longer valid.  So yes.

Q.    Sorry.  I don't see that language here. It says here -- I'll just read the whole Section L.

"Significant corporate events, such as pending or proposed merger, joint venture or tender offer, a significant investment, the acquisition or disposition of a significant business or asset or a change in control of the company."

Did I read that correctly?

A.    Yes.

Q.    And this states that a proposed merger is

Page 78

material information. Right?

A. It could be, yes.

Q. Now, if we go to the -- it's actually right there on the bottom of the screen. "As a rule of thumb." Do you see the paragraph beginning "as a rule of thumb"?

A. Yes.

Q. So it states: As a rule of thumb, if you think -- if you think something might be material nonpublic information, you should treat it as such.

Do you see that?

A. Yes.

Q. Do you agree with that advice?

A. Absolutely.

Q. So if something might be material information, it should be treated as such. Correct?

A. Yes. And then you would seek my input and I would seek input of outside counsel regarding the specific question.

Q. Well, I understand you're adding all of that.

A. That's what I would do.

Q. Well, I understand that, but that's not stated here in the policy, is it?

A. The policy said: Treat it as such then

Page 79

reach out to me.

And then they would reach out to me and I would reach out to counsel to determine if, in fact, there was a concern.

Q. Well, where does it say anything about you reaching out to counsel to determine if --

A. I'm telling you what I would do.

Q. Oh, so you're not telling me what's in the policy. You're just testifying now what you would do?

A. No, I'm telling you what I would do with the -- based upon what the policy says, which I fully agree with what the policy says.

Q. Okay. So if -- ultimately if information was in a gray area as to whether it was material information or not, this advises to treat the information as material nonpublic information.

Correct?

MR. COMERFORD: Form, foundation, calls for speculation. It's an incomplete and improper hypothetical.

Q. Mr. Dixon?

A. I'm -- at this point I'm not sure what your question is.

Q. So if information -- so if it was in a

Page 80

gray area whether information was material nonpublic information, your policy advises to treat that information as if it is material nonpublic information. Correct?

MR. COMERFORD: Form, foundation, calls for speculation, incomplete and improper hypothetical.

Q. Mr. Dixon?

A. I've answered the question. Yes, it would be. And then I would take that information and then I would run it by outside counsel. That's the appropriate process.

Q. Just to be clear, was outside counsel the compliance officer for this policy?

A. As you well know, any lawyer is not the expert in everything. My job as general counsel was to manage legal issues to ensure that we had the appropriate expertise for any particular matter.

In this particular case related to insider information, material nonpublic information, if I was not clear myself, I would always run it by outside counsel, yes.

Q. So surely you might seek advice from outside counsel about any matter. Right?

A. Absolutely.

Page 81

Q. But outside counsel is not the compliance officer with ultimate responsibility for compliance with this policy. Is that correct?

MR. COMERFORD: Form.

You can answer.

A. I -- yes. But I would make my decisions based upon advice of counsel.

Q. But the ultimate responsibility for determining whether any conduct complied with this policy was yours. Correct?

A. Correct.

Q. Now, if we can just look at the Q&A policy -- I'm sorry -- the Q&A about the policy which begins at Bates 243. I guess I'd ask generally, if you're providing National Instruments' personnel with the policy, what's the purpose of providing this Q&A in addition?

A. Well, any Q&A would be drafted for the purpose of helping someone understand the policy.

Q. So the purpose is to help National Instruments' personnel understand the policy. Is that right?

A. Yes.

Q. Is it intended to be a plain-English explanation of the policy?

Page 82

MR. COMERFORD:  Form.

A.    Yeah, it's intended to help the reader better understand the policy.

Q.    It's not in what you might call legalese, is it?

MR. COMERFORD:  Form.

A.    I -- I -- I don't know how you define "legalese."

Q.    Well, is it using technical legal language to explain the policy or is it intended to use language that might be accessible to nonlawyers to explain the policy?

MR. COMERFORD:  Form.

Go ahead.

A.    Yeah.  Listen, the Q&A is intended for the reader to better understand the policy.

Q.    Okay.  Now, if we look at the next page, there's a section "What is material nonpublic information?"

A.    Uh-huh.

Q.    You can have a look at that if you want, but from my reading, this language is virtually identical to the language from the policy that we just read in terms of the definition of material nonpublic information, in terms of the rule of thumb

Page 83

concerning treating material -- potentially material nonpublic information as material nonpublic information and so forth.

Do you see all that language there?

A.    (Pause.)

Yes.  I mean, yeah, that was a general summary but somewhat consistent, yeah.

Q.    Fair enough.

It uses much of the same language. Right?

A.    I haven't matched up the language, but...

Q.    Okay.  And you see it notes here as well in the second bullet that "Knowledge of a significant acquisition or a divestiture would be an example of material information."

Correct?

A.    I see that bullet point, yes.

Q.    You disagree with that?

MR. COMERFORD:  I -- I'm going to object to your mischaracterizing the document.

Subject to that, you can answer.

A.    (No answer given.)

MR. MANDEL:  All right.  We're going to switch gears here for a minute.  Let's take five, please.

Page 84

THE WITNESS:  Okay.

MR. MANDEL:  Just to get water and stuff.

THE VIDEOGRAPHER:  Going off the record.  The time is 11:06.

(Break.)

THE VIDEOGRAPHER:  Back on the record.  The time is 11:17.

Q.    Welcome back, Mr. Dixon.

So in mid-May -- we discussed this briefly.  Before mid-May 2022, Emerson approached National Instruments about a potential transaction. Correct?

A.    Correct.

Q.    And on May 25th, 2022, Emerson submitted a letter describing a proposed acquisition to National Instruments.  Is that right?

A.    I believe that was the date, yeah.

Q.    We can put that -- we can put it up.

MR. MANDEL:  Why don't we put up Tab D3, which will be our Exhibit 8.

(Exhibit 8 was marked.)

MR. MANDEL:  This is Bates 0 -- NAT-SL-01113 is the beginning Bates.  This is -- if you're looking at the bottom of the page, it's an

Page 85

email from Mr. Lal Karsanbhai to Mr. Eric Starkloff and to that email is attached a letter dated May 25th, 2022, from Emerson to National Instruments and this email and letter from Mr. Karsanbhai were forwarded to you by Mr. Starkloff on May 25th as well.  If you scroll to the top, you can see that. Let me know when you're oriented and then I'll ask you about this.

A.    Yeah.  No.  That's fine.

Q.    Okay.  Thank you.

So between Mr. Karsanbhai's first contact with Mr. Starkloff around May 15-May 16, do you know if Mr. Starkloff and Mr. Karsanbhai spoke prior to this letter?

MR. COMERFORD:  Foundation.

A.    And the answer is I don't know.  I don't recall.

Q.    Do you know if they met in person during that period of time?

MR. COMERFORD:  Foundation.

A.    I'm not aware.

Q.    Do you know if Mr. Karsanbhai or Mr. Starkloff had ever met before this time?

A.    I don't know that, either.

Q.    Thank you.

Page 86

Let's turn to the document itself. Now, did you -- to the -- let's turn to the letter, the attachment, the next page, 1114. Yeah. Here we go.

So did you read this letter at the time?

A. Yes. I'm sure I did.

Q. And the letter contains the substantial indicia of interest in acquiring National Instruments by Emerson. Is that right?

A. I -- I don't know how to characterize their view of it. We received the letter and we read it for the content that was included.

Q. Okay. So in the -- in the -- right near the beginning of the letter, Mr. Karsanbhai says he's excited to present this proposal.

Do you see that?

A. Uh-huh.

Q. And he goes on in the next paragraph, begins "Very excited about the combination of the two firms."

Right?

A. Yes.

Q. So you knew that Mr. Karsanbhai, the chief executive of Emerson, was excited about acquiring National Instruments. Correct?

A. I -- I -- didn't know that. For all I

Page 87

know, he could be just sending a letter as you would in trying to bait it in whatever manner he wanted, but that's what his letter says. I can't --

Q. His letter --

A. I can't --

Q. -- indicates excitement about --

A. His letter indicates his excitement. Sure.

Q. Okay. The letter indicates -- this is a -- this is a private letter to the chief executive officer of National Instruments. Right? This wasn't made public?

A. Yeah, that's correct.

Q. At the time. Of course, subsequently it was made public, but at the time, it was a private letter. Correct?

A. Correct.

Q. And -- and the chief executive officer was also a board member at the time. Is that right?

A. Yes.

Q. And you see it offers $48 in cash per common share. You see that? I'm sorry. If we scroll to the next page.

A. Yeah. Okay.

Q. Right. And it proposes to acquire

Page 88

100 percent of the outstanding stock for $48 in cash per share. Right?

A. That's what the letter says, yes. Right.

Q. It's offering a specific transaction price and a specific transaction structure. Correct?

A. It appears to be, yes.

Q. It identifies the -- the $48 offer as a 39 percent premium to the National Instruments closing share price on the previous day of May 24, 2022. Is that right?

A. That's what the letter states, yes.

Q. And you were aware of all of this at the time. Right?

A. Yes.

Q. And, you know, regarding timing, it states that they're -- that Emerson is prepared to proceed immediately to work with NI and its advisors to complete due diligence, et cetera.

Do you see that?

A. Yeah, sure.

Q. Yeah. Regarding timing right there.

A. Uh-huh.

Q. And it states that it was Emerson's expectation that the signing of the definitive

Page 89

agreement and announcement can be achieved in four to six weeks.

Do you see that?

A. Yeah, I see that.

Q. If we -- up in the financing point, it notes that the proposal is not subject to any financing condition.

You see that?

A. Yes.

Q. Meaning that Emerson is saying it has the money to do the deal. Correct?

A. I'm not going to speculate. It says they don't need any financing.

Q. And that it was not subject to any financing contingents. Is that right? Not subject to any financing conditions, it says.

A. That's what it says.

Q. It also notes regarding board review that it's been reviewed with Emerson's board of directors who support the proposed transaction.

Do you see that?

A. Yes.

Q. And if we go to the last page, we see that it states: To reiterate, our proposal all cash consideration with no financing contingency and no

Page 90

substantive regulatory impediments provides both significant value and certainty to NI shareholders. We're prepared to move very quickly to complete our due diligence and sign definitive agreements.

Do you see that?

A.   Yes.

Q.   And you read that at the time.  Right?

A.   Yes.

Q.   And it -- and the letter concludes in the concluding paragraph:  That Emerson is highly enthusiastic about the prospects of what we can achieve together.

Do you see that?

A.   That's what they stated, yes.

Q.   Okay.  But you understood that Emerson was highly enthusiastic about a potential combination with National Instruments.  Correct?

MR. COMERFORD:  Objection; asked and answered.

A.   I understand what the letter says, yes.

Q.   Okay.  Now, did --

MR. MANDEL:  Let's put up our next document.  Our next document is going to be Tab D2, that's going to be our Exhibit 9.

(Exhibit 9 was marked.)

Page 91

Q.   Now, there was a -- there was a May 26th board meeting of the National Instruments board.  Do you recall that?

A.   Yeah.

Q.   And this is an email to you attaching the slides for the May 26th board meeting.  Is that right?

A.   Slides prepared by Wachtell.  Yes.

Q.   Correct.  Slides prepared by Wachtell. And let's look at those slides.  If you want to just have a little look at the document, I'll refer you to some language in there.

MR. MANDEL:  So if we could turn to the seventh page of the document, that will be Bates ending in 16121.

THE WITNESS:  Alex, I don't know if you're doing that or if I'm supposed to be doing that.

Q.   I think Alex will do that.

MR. MANDEL:  Go two more.  Here we go.

Q.   Do you remember this slide?

A.   Yeah, I'm sure I've -- I've seen this slide.  So yes.

Q.   Now this slide is ▇▇▇▇▇▇▇

Page 92

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Is that right?

A.   Yes, that appears to be the case.

Q.   And ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Correct?

A.   Yes.

Q.   And, of course, National Instruments had already received such a letter.  Is that right?

A.   We received the letter, yes.

Q.   That was a private letter from the offerer to the offeree.  Right?

A.   Yes.

Q.   Okay.  So you understood at least you're at least ▇▇▇▇▇▇▇▇▇▇ there.  Right?

A.   Yes.

Q.   And ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Do you see that?

A.   Yes.

Q.   So this is expressing ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇.  Is that what that means?

MR. COMERFORD:  Form.

Page 93

Q.   Mr. Dixon?

A.   What was your question?

Q.   The question was, looking at this document, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇?

MR. COMERFORD:  Object; form, foundation, mischaracterizes the documents.

MR. MANDEL:  Let's let the witness --

A.   The purpose of this document was educating our board once we got an unsolicited offer.  That was the sole purpose of this.  Not to determine where we were, it was to educate our board.

Q.   Okay.  And in the process of educating your board, this document ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇



Deposition of Eddie Dixon

In Re National Instruments Corporation Securities Litigation

Page 94

██████████████████████████
████████████████████████?

MR. COMERFORD: I object. It mischaracterizes the document. The word "steps" does not appear on the document. The word "escalatory ladder" does not appear anywhere on the document. I object to counsel's characterization of the document. Its -- mischaracterization. It says techniques --

MR. MANDEL: Your objections are noted, John. Let the witness answer the question.

MR. COMERFORD: Well, Mr. Mandel, I mean, we talked about this in a prior deposition.

MR. MANDEL: What's going on is these long objections that are not proper, John, you know that.

MR. COMERFORD: I --

MR. MANDEL: You know that.

MR. COMERFORD: I don't think it's proper that you're mischaracterizing documents, Mr. Mandel. And I've asked you to not about this specific document.

MR. MANDEL: The documents -- the documents are -- I'm asking questions about the documents. The witness is supposed to be the one

Page 95

testifying about them. Not you testifying that you don't agree with what I'm saying about the document. That's what the witness is actually here for under oath, John.

MR. COMERFORD: Am -- am I allowed to object if you -- I feel you're --

MR. MANDEL: You're not allowed to object the way you've been objecting actually, no. You're not allowed to.

MR. COMERFORD: So you --

MR. MANDEL: You know that.

MR. COMERFORD: You're -- all right. Go ahead.

A. The document has a ████████ ██████████████████████████ ██████████████████████████ ████████████ That is without the context of any facts and it was for education purposes to our board.

Q. All right. What it's -- what it's educating your board about is to ██████████ ██████████████████████████ ██████ Is that right?

MR. COMERFORD: Form.

A. It was educating our board, period. I

Page 96

mean, again, the board had not been through anything like this. It's the majority of the board, if not any of them, had not been through this. So the purpose of this was purely educational. We didn't know what would happen, what we knew is we weren't interested.

Q. Mr. Dixon, I'm not asking you about the purpose. You've told me now several times that the purpose was to educate the board. I'm asking you about the substance of the document. The document indicates that ████████████████ ██████████████████████████. Is that right?

A. 4 follows 3, yes.

Q. And you understood that ██████████ ██████████████████████████ ██████████████████████████ ████████ Is that true?

MR. COMERFORD: Form.

A. I mean, these -- these could be any subset of these that really identified what state you were in. I can agree that 4 follows 3 in this slide. So, yes, we would be looking for any of these.

Q. And so you knew to be on the lookout for

Page 97

Emerson accumulating National Instruments' shares. Correct?

MR. COMERFORD: Form.

A. Yes, we would look for that.

Q. And you knew ██████████████████ ██████████████████████████ ██████████████ Correct?

MR. COMERFORD: Form, mischaracterizes this document.

Q. But you didn't know that, is that what you're saying?

A. Well, I don't know that it would be a step up. I don't -- I can't anticipate what Emerson was planning to do. I can't speculate as to what their mindset was. We would look for this, yes, we would look for this.

Q. But Wachtell in educating you and your board was explaining ██████████████████ ██████████████Correct?

MR. COMERFORD: Asked and answered.

MR. MANDEL: John, your groan's on the record. I mean, I don't know how the reporter is going to capture those but please.

MR. COMERFORD: Same objections as before and it's been asked and answered.



Page 98

MR. MANDEL: Let's go to the next page, please.

Q. It's describing certain ███████ Right. Now, do you agree with me that we're in the ███████████████

MR. COMERFORD: Form.

A. Yeah, I -- I mean, again, this was all hypothetical. I would not necessarily agree with that. I think there was always debate where we are.

Q. Okay. According to Wachtell's slide, were you in ████████████████ ?

MR. COMERFORD: Form, mischaracterizes document.

Q. You've got to answer the question, Mr. Dixon.

A. Again, I -- I don't define where we are. I think these headings are for purposes of a slide. I -- I don't define it by ████████ whatever. I defined by the facts we knew at the time and what decisions we were making at the time. We had received a private letter, that's all we had received.

Q. Right. And there was a private letter to the target CEO. Correct?

A. It went to Eric, yes.

Page 99

Q. It was proposing a specific transaction and the price. Correct?

A. It did have that in there.

Q. Okay. Did it request a timely response?

A. No, I don't recall whether it did that. But what -- what Emerson was requesting from us was irrelevant to our position.

Q. Was it threatening possible public disclosure?

A. I don't recall if that was in that letter or not.

Q. Did Emerson ultimately threaten public disclosure?

A. Yes, they did.

Q. Now, if we go in the ████████ ███████████████████ Do you see that?

A. Yeah.

Q. And it indicates that: ████████ ██████████████████ ████████████████████ ██████████████████ ██████████████ Do you see that?

A. I see that.

Page 100

Q. Do you understand that this was advising ████████████████████████ ██████████ ████████

A. I understood this was a training mechanism to identify all possible situations that would be facts based, not purpose -- you know, the purpose of this was not to try to make any determination.

MR. MANDEL: Sure. That's just nonresponsive.

A. No, that's the way we were operating.

Q. I mean, do you uner- -- but that's not my question.

Do you understand that this document is advising ████████████ ████████████████████ ████████

MR. COMERFORD: Yeah. Form, foundation, incomplete and improper hypothetical. The document speaks for itself. And it's been asked and answered.

Q. You're not going to answer the question, Mr. Dixon?

A. It could, it could not. It's all

Page 101

fact-based.

Q. Let's move to two pages later, 6124.

Do you see 6124 when it says: How to handle an initial takeover approach.

Do you see that?

A. Yeah.

Q. And it's divided into what to do and what not to do. Do you see that?

A. Yep.

Q. ████████████████████ ████████████████████ Do you see that?

A. Sure.

Q. So, again, this is Wachtell advising that ████████████████████ ████████████ .

Is that right?

A. Absolutely. We would do that.

Q. And did you do that?

A. Yes.

MR. MANDEL: Now, let's just go to Page 14 of this document. This is Bates ending 16128.

Q. Now, I want to look at No. 3 there at the top of the page. It states: ████████████████



Page 102

Do you see that?

A.   Yes.

Q.   Do you remember this advice at the time?

A.   I would give that advice to every board member continuously, regardless of what the issue was.

Q.   Say more about that.  What advice would you give continuously to board members about this?

A.   As with anything, you always want to be wary of whatever you say.  Could it end up on the front page of the New York Times, et cetera.  So you always want to be vigilant about that.

Q.   They go on to say:

Do you see that?

A.   Yes.

Q.   Do you agree with that advice?

A.   Absolutely.

Q.   Did you follow that advice?

A.   Generally.  I can't say it was always followed.  Sometimes you don't have entire control over what others are doing.  But in general that

Page 103

would be our approach.

Email is one-dimensional, et cetera.  So it can always be interpreted, as you're often doing here, in a different manner.

Q.   So you write -- they write -- they wrote here:

Do you see that?

A.   Yes.

Q.   And in bold "emails or texts."  Right?

A.   Correct.

Q.   They write:

Do you see that?

A.   Right.

Q.   And they go on to say:

Do you see that?

A.   Yes.

Q.   Do you agree with the advice in that paragraph?

A.   Yeah.  I mean, I -- I don't believe

Page 104

Wachtell would have included unless it wasn't appropriate; and if I would not have taken their advice, I would absolutely take their advice and I agree with it wholeheartedly.

Q.   So you followed this advice in connection with the Emerson transaction.  Is that right?

A.   To the best of my knowledge we did the -- yeah, we did as much as possible.  Sure.

Q.   And did you direct other National Instruments personnel to follow this advice?

A.   I'm sure it went to other members of the executive team, but I can't recall exactly.  This would be general advice that I would always give, outside the context of anything associated with Emerson.

Q.   I mean, just to be clear, you would advise, in general, do not, in any event, discuss with each other sensitive matters of substance or convey your thinking of -- or the thinking of others in emails or texts?

A.   Depending on the content and the subject matter, yes.  I mean, not everything, but absolutely.

I'm saying I would use this advice, provide this advice, just as Wachtell did to us, in

Page 105

many instances where any email or text or whatever could be misconstrued because it's one-dimensional, you don't have the context, you don't have the body language, et cetera.

Q.   You mentioned before that some activists had approached the company.

What kind of activists had approached the company?

A.   I honestly don't recall who it was, but it was, you know, one of your typical activists.  I don't recall at the time, right now, who it was.

Q.   Were they trying to convince the company to do more buybacks?

A.   We have no idea they bought shares.  I don't -- we don't know what they were trying to do.  We just paid attention to whether an activist was acquiring shares.

MR. MANDEL:  If we could go to Page 23 of this document briefly.  It's 16137.

Q.   This is a slide about economic activism.  Do you see that?

A.   Yeah.

Q.   Just to clarify regarding our previous conversation, you don't know whether that activist you were mentioning before was an economic activist,

Page 106

do you?

A.   I can't assume what their mindset was at the time.  I don't recall -- if we did, I don't recall what it was.

Q.   Fair enough.  Do you see here the second bullet on this page says: ███████████

███████████████████████████
███████████████████████
███████████████████████████
█████████████████████████████
██████████████

Do you see that?

A.   Uh-huh.  Yes.

Q.   So did Wachtell advise you that share repurchases were an example of often short-term-oriented value-maximizing activity?

A.   I don't know the context you're talking about.  They provided this slide, but we didn't have any discussion about share repurchases and value maximization that I recall specifically.

Q.   Well, this slide ███████████
█████████Correct?

A.   Yes, it absolutely does.

Q.   And it gives them, as an example, of an ████████████████████████████.

Page 107

Correct?

A.   That's what it says.

MR. MANDEL:  Let's look at the document -- it's Tab D6.  It will be Exhibit 10.

(Exhibit 10 was marked.)

MR. MANDEL:  This is, for the record, Bates NAT-SL-16270.

Q.   Do you recognize this document?

A.   Yes.

Q.   What is this document?

A.   It would be our typical restriction on trading notification.

Q.   Is this a restriction on trading due specifically to Project Wolverine?

A.   Yes, the inquiry -- the unsolicited offer we had received from Emerson, yes.

Q.   Project Wolverine referred to Emerson's potential acquisition of National Instruments.  Right?

A.   Yes.  I believe we had a couple of different names, but I think that was ultimately the name that -- the project name that we used, yeah.

Q.   And you advised here that the recipients of this email have material nonpublic information concerning Project Wolverine.  Correct?

Page 108

A.   At that time, yes.

Q.   Was it your conclusion that at this time there was material nonpublic information concerning Project Wolverine?

A.   Having received that letter and -- yeah, no other engagement, yes.

Q.   Now, at the May 26th meeting of the board there was a determination made to have another meeting in June to further consider Emerson's proposal.  Do you recall that?

A.   Yeah, I don't -- obviously we had a number of meetings around this time.  I don't recall the exact date, but, yes, I'm sure we had another meeting on the topic.

Q.   Right.  There was a May 26th meeting and the minutes of that meeting reflect -- I mean, I can show them to you, but to not waste time, reflect a decision to meet again mid-June to further consider Emerson's proposal.

So I'm going to ask you, stop, jump forward a little bit to that June meeting.

MR. MANDEL:  Now our next document, if we could look at this, will be Tab M7A.

(Exhibit 11 was marked.)

MR. MANDEL:  This will be our

Page 109

Exhibit 11.

Q.   Now, this is beginning Bates WLRK-913.  And it's an email between you and Sabastian Niles of Wachtell and others, but principally I'll direct you to the attachment, if you go to the next page.

I think you'll recognize this is a cover sheet, typical board agenda like was used within National Instruments.  Do you see that?

A.   Yep.

Q.   And behind it are several attachments.

A.   Okay.

Q.   And if we go to the page beginning Bates 923, this is a cover page of Bank of America's presentation at the June 14th meeting of National Instruments' board of directors.  Do you see that?

A.   Yes.

Q.   Now, if we go to the page beginning 936, Bates ending 936, you see first Nuthatch pro forma analysis.

Nuthatch was another code name used for Emerson.  Is that right?

A.   Yes.

Q.   Okay.  So if we go two pages ahead to the Bates beginning 938, right, we see this document called "Nuthatch Debt Capacity Analysis."

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 110

Do you see that?

A.   Yeah, I'm going to ask -- let me see if I can expand it a little bit here.

(Pause.)

Yep.  Go ahead.

Q.   Right.  So this is assessing Emerson's capacity to pursue M&A.  Do you see that?

A.   Okay.  Yeah.

Q.   It states there that a Nuthatch has ample capacity to pursue M&A.

You see that?

A.   Okay.  Yeah.

Q.   Have you ever heard this referred to as a firepower analysis?

A.   I suspect I've heard that term before, but yeah, I don't know.

Q.   Right.  I mean, they're essentially assessing Emerson's firepower to acquire National Instruments.  Is that right?

MR. COMERFORD:  Form, foundation, calls for speculation.

Q.   You can answer.

A.   I mean, you have to confirm with -- with B of A, but it seems to be along those lines, yes.

Q.   And if you look at the next page, it's an

Page 111

analysis -- it's a similar analysis done in the event of an InSinkErator divestment.

Do you see that?

A.   Yeah.

Q.   Was InSinkErator owned by Emerson at this time?

A.   Yeah, I believe they owned them or they were about to sell them.  I don't know timingwise whether this had already happened or not because I haven't looked at this in three years.

Q.   I can represent to you it hasn't happened yet at this time.

A.   Yeah.

Q.   But this is an analysis if they sell the InSinkErator asset.  Correct?

A.   Right.  It looks like that, yes.

Q.   And, of course, if they sold the InSinkErator asset, they would have even more firepower to acquire National Instruments.  Is that right?

MR. COMERFORD:  Form.

A.   I don't know their financials.  It wasn't my responsibility to know their financial situation.

Q.   Well, if he we look at the first bullet right there, it says, Nuthatch, meaning Emerson,

Page 112

divest InSinkErator for $3 billion.

Do you see that?

A.   Yeah.

Q.   So if they sold an asset for $3 billion, it's fair to infer they would have had more capacity to pursue National Instruments for a --

(Simultaneous speaking.)

A.   Not necessarily.

Q.   Right?

A.   I don't know what's on the other side but -- I don't know what to say.  This is not my document.  I wasn't preparing this.  I'm not in the heads of Emerson.  I know what's on the document.

Q.   Did you attend this meeting?  Did you attend this meeting?

A.   Yes, and I know what's on the document.

Q.   Did you observe this presentation?

A.   Yes.

Q.   So you understood the things Bank of America was presenting in this presentation.  Is that right?

A.   That's right.

Q.   All right.  And you understood that they had concluded that Emerson had ample capacity to pursue M&A.  Is that right?

Page 113

A.   That B of A had concluded.  You asked me earlier if I concluded that.  That's not my job.  So B of A had concluded that.

Q.   And from Bank of America's presentation, that Bank of America was saying that Emerson had ample capacity to pursue M&A?

A.   I assume that's, yeah, the purpose here, but, again, it's an assumption.  You'd have to talk to B of A.

Q.   And, of course, they conclude that if Emerson had sold the InSinkErator asset for $3 billion, also that they would have ample capacity to pursue M&A.

You see that?

MR. COMERFORD:  I'm going to object to form, mischaracterizing the document, calling for speculation, lacks foundation.

A.   I -- I don't know what they were going to use the funds for so, it could be, could not be.

Q.   Well --

A.   I mean, they could be using funds for something else, so I don't know that that gave them more --

Q.   Sure.

A.   -- but obviously we had to consider that

Page 114

that was a possibility.

Q. So Bank of America on this slide concerning the InSinkErator divestment rights Nuthatch has ample capacity to pursue M&A. Correct?

A. That's their conclusion or statement on the document, yes.

Q. And generally, it stands to reason that if a company had 3 billion more dollars, they would have a greater capacity for M&A. Is that fair, Mr. Dixon?

MR. COMERFORD: Object to the form, mischaracterizes the document.

A. In a vacuum --

Q. (Unintelligible) document. That's the question.

A. In a vacuum, that would make sense. I don't know the other facts surrounding it. I don't know their position. I don't know what they were looking to do as a business as in a vacuum selling something for 3 billion would suggest they have more funds, yes.

MR. COMERFORD: Can we -- can we go off the record and speak with one another, Mr. Mandel?

MR. MANDEL: Sure. Of course. Let's

Page 115

go off the record.

THE VIDEOGRAPHER: Going off the record. The time is 11:57.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 12:01.

Q. So just to be clear, this document at Page 938 concludes that Emerson has ample capacity to pursue M&A absent an InSinkErator divestment. Is that correct?

MR. COMERFORD: Objection; form, foundation, calls for speculation, mischaracterizes the document.

Q. Mr. Dixon.

A. I mean, all I can say is what B of A has put on the document and what B of A put on the document, it says, "ample capacity subject to certain assumptions."

Q. And then the next page conducts an analysis of their capacity to pursue M&A in the event of an InSinkErator divestment. Is that correct?

A. Subject to a number of other assumptions.

Q. Right. It concludes that Emerson has ample capacity to pursue M&A and it goes on to state

Page 116

certain assumptions. Correct?

A. Correct.

MR. MANDEL: Did I mischaracterize any of that, John?

MR. COMERFORD: Yes.

MR. MANDEL: Okay. We disagree about that, but you'll have your turn.

Q. Now, if we proceed further, the next document attached here to the board agenda was a Wachtell presentation from June 14th which begins at Page 956.

Do you remember this document?

A. No, I -- I don't remember the document. I'm sure I will when I see it.

Q. Fair enough.

Now, if we could go, please, to slide -- Bates 960 -- I'm sorry -- 961. Now, do you remember this slide? Do you remember this page?

A. I mean, again, I -- I don't remember it explicitly, but obviously, if it was, you know, provided, then yeah. I mean, I could look at it and I'm sure I would remember it, but yeah --

Q. Did anybody --

A. This -- remember, this is two and a half years ago or whatever so none of this is going to

Page 117

be, like, right off the top of my head I remember this. Right?

Q. I understand. That's one of the reasons I asked the question.

MR. COMERFORD: Three and a half.

A. Three and a half, yeah. Right. You're -- it's 20- -- almost 2026. Right. Yeah.

Q. So have you ever heard this slide referred to as an important slide?

MR. COMERFORD: Form.

A. I -- I don't recall.

Q. Did you discuss this slide with Mr. Starkloff?

A. I don't recall. It would seem that I would, but I don't recall.

Q. Did you discuss it with Mr. McGrath?

A. Same answer.

Q. Just so you're aware, there's an email that's already in the record in which Mr. Starkloff referred to this as the most important slide in this deck so that's why I was asking.

Did Mr. Starkloff ever say anything like that to you?

A. Obviously, if you have an email, then, yes, but I don't recall it.

Page 118

Q.   Oh, I understand.  I'm asking with me telling you these things and looking at this slide whether it refreshes your recollection as to whether Mr. Starkloff ever said anything like that to you.

A.   Yeah, I'm not looking at that so I'm assuming you actually have that, but I -- yeah, assuming that -- if you want to show it, that's fine and then I can tell you yes or no.  But I --

Q.   No, no, no.  He didn't say it to you. I'm just asking whether, in any conversation with Mr. Starkloff that you can recall, he referred to the importance of this slide.

A.   I don't recall.

Q.   Okay.  And the same for Mr. McGrath, I assume?

A.   Correct.

Q.   Now, looking at this slide, it identifies . Is that right?

A.   It looks like that, yes.

Q.   And ██████████████." Is that right?

A.   Yes.

Q.   And the outright rejection is the path that National Instruments chose with respect to

Page 119

Mr. (unintelligible) --

A.   Absolutely.
     (Simultaneous speaking.)

Q.   -- first offer letter.  Is that right?

A.   Absolutely.  We had no interest in selling.

Q.   All right.  And you sent a letter saying not interested, in effect.  Correct?

A.   Correct.

Q.   Now, this slide notes ████████ ████████████████████████

You see that?

A.   Sure.

Q.   So this slide is advising ████████ ████████████████████ that right?

A.   They might, yes.

Q.   It says that ████████████████ ██████████ Correct?

     MR. COMERFORD:  Form, objection; mischaracterizes the document.

Q.   Mr. Dixon?

A.   I -- I can read what you can read on the slide.  That doesn't mean that it will happen or it

Page 120

won't happen.  It just -- it's a slide providing information.

Q.   And so you were advised ████████ ████████████████████████████ ████████████ Is that true?

A.   If that's what's stated on the slide, yes.

Q.   And -- and near the bottom, it says: ██████████████████████████████ ██████████████████

Do you see that?

A.   Where -- where are we looking?

Q.   Oh, it's -- I'm sorry.  It's on the previous page all the way at the bottom.  Last line on the page.

A.   Yeah, absolutely it would be.  If we were not prepared for anything, we wouldn't be doing our job and certainly Wachtell wouldn't be doing their job.

Q.   So you understood that in all events Emerson might escalate.  Is that right?

     MR. COMERFORD:  Form, foundation, calls for speculation, incomplete and improper hypothetical.

Q.   The language reads: ████████████

Page 121

██████████████████████████████ ██████████

My question is, were you advised that in ██████████████████████████████ ██████████████████████████████ ██████████████████████████████ ██████████████

A.   I mean, that's -- that's the point that I was going to make.  This is Wachtell's slides. Obviously we've engaged them for advice.  I would expect them to be prepared for any situation.

Q.   So you understood that potential -- potential escalation by Emerson was a possibility. Correct?

A.   Certainly a possibility.

Q.   And you understood that an outright rejection may increase the probability of that.  Is that right?

A.   And I also understood that it could go -- it could go away which was the intent.

Q.   But you did understand that regardless of your intent, an outright rejection may increase the probability of escalation by Emerson?

     MR. COMERFORD:  Objection.

Q.   Is that right?

Page 122

MR. COMERFORD: Objection; asked and answered, form.

Q. Please answer the question, Mr. Dixon.

A. I understood that anything could happen.

MR. MANDEL: Let's go to the next page.

A. And I can't speculate as to what was going to happen at that time. We had no idea.

Q. Now, this is a similar slide to the one we saw before with  Do you recognize this slide?

A. Yeah.

Q. Similar to what we saw before?

A. Yeah.

Q. And it bolds ▇▇▇ Right?

A. Uh-huh.

Q. Whereas previously it wasn't bold. Right?

A. Okay. Yeah.

Q. So certainly --

A. I don't recall but -- that's fine. It's bolded here. I'll state --

Q. Right. You see that it's bold there --

A. Yeah.

Page 123

Q. -- I'm not asking whether you remember it being bold. And so certainly as of this time you understood ▇▇▇▇▇▇ Is that right?

MR. COMERFORD: Form.

A. I understood we had received a letter, again, whether it was less or more coercive wasn't really what we were assessing. We were assessing what action -- what action do we take relative to a letter we received.

Q. And this one like the last one ▇▇▇▇▇▇ Is that correct?

A. That's what No. 4 states. It doesn't say National Instruments. This was an educational document that states ▇▇▇▇▇▇

Q. Okay. But we're talking here about Emerson and National Instruments. Right? You don't know?

A. Well, that's --

Q. Maybe if we were talking about Pepsi and Coke?

Page 124

MR. COMERFORD: Form.

A. Yeah.

Q. You don't know what this is about?

A. I know this is stated how Nuthatch -- Nuthatch may respond. ▇▇▇▇▇▇ Certainly it relates to Nuthatch.

Q. And it relates to National Instruments' stock. Right? ▇▇▇▇▇▇ Right?

A. Yes. Of course.

Q. Of course.

If we go to the next page, we see here at No. 3 Wachtell ▇▇▇▇▇▇ Do you see that?

A. Yeah.

Q. And they say: ▇▇▇▇▇▇ Do you see that?

A. Yes.

Q. This is similar and further to the advice

Page 125

we saw in the same points from the previous Wachtell slide. Right?

A. Yes.

Q. And you took that advice very seriously. Is that right?

A. Absolutely.

Q. And you agree with it?

A. Totally.

Q. You followed it?

A. To the best of our ability we would try to do that, yes.

Q. And did you direct other National Instruments employees to follow that advice?

A. As stated previously, yes.

MR. MANDEL: If we could put up Document D8, this will be our Exhibit 12.

MR. COMERFORD: Before we move on to another document -- do you -- I'm asking the witness --

Do you want to take a short break and try to eat something?

THE WITNESS: We can do that.

MR. MANDEL: Why don't you let me ask this question about the next document, it'll be quick and then it's -- it will be kind of a

Page 126

reasonable breaking point --

THE WITNESS: Okay.

MR. MANDEL: -- for lunch.

Q. So this is an email Bates NAT-SL-16466. This is -- it appears to be a discussion of the agenda for an upcoming board meeting. Do you see that?

(Exhibit 12 was marked.)

A. Yeah.

Q. And you write that: Firepower is one of the agenda items for the board meeting. Do you see that?

A. Yeah.

Q. So, you know, just so that there's no confusion, when we're talking about their capacity, Emerson's capacity to do M&A, that's what you mean when you say firepower. Is that right?

MR. COMERFORD: Form.

A. B of A would be discussing capacity, I assume, based upon the slides you've already showed. Yes.

Q. Right and firepower is a shorthand for that M&A capacity. Is that right?

MR. COMERFORD: Form.

A. In general, I would think that's what

Page 127

it's used for, yeah.

Q. Is that what you meant it as when you wrote the word?

A. I don't recall explicitly but that would make sense, yes.

Q. Fair enough. Thank you.

MR. MANDEL: John, do you want to go off the record and talk about lunch?

MR. COMERFORD: Sure.

THE VIDEOGRAPHER: Going off the record. The time is 12:15.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 12:57.

Q. Welcome back, Mr. Dixon.

A. Thank you.

Q. I hope you enjoyed your lunch.

A. It was quick.

Q. Okay. So we were just talking about the June 14th board meeting. After -- at the June 14th board meeting, there was a determination made to send a letter to Emerson saying no to their proposal at that time. Is that right?

A. Yes. Correct.

Q. Okay. And that was just, you know, for

Page 128

the record, that letter is dated June 14th. It's -- it's in the record otherwise. And then on June 22nd National Instruments received another letter from Emerson proposing to acquire National Instruments. Do you recall that?

A. Yeah, I -- I don't recall exactly the day that we --

Q. Sure.

A. -- received, I believe, the same offer. Right.

Q. I'll put the document up on the screen. So it's Tab G21. This will be our Exhibit 13.

MR. HELD: Sorry, Counsel, D21?

MR. MANDEL: Oh, I'm sorry. D21, yes, sir.

MR. HELD: Thanks.

(Exhibit 13 was marked.)

Q. This is Bates NAT-SL-10410. It's -- the first page shows an email from Mr. Lal Karsanbhai to Mr. Starkloff and Mr. McGrath. There's an offer proposal letter attached to that. And the email we're looking at now if you look at the top of the page, was forwarded by Mr. Starkloff to you, Mr. Dixon, on the same date, June 22nd. Do you see that?

Page 129

A. Yes.

Q. Okay. So if we could just turn the page and look at the letter itself. If we can -- are you able to see the -- the entirety of the first page?

A. Not the -- not the entirety of the first page.

MR. MANDEL: Here, let's -- can we get this so that Mr. Dixon can see?

Q. Is that -- are you able to read that or is that too small for you?

A. That's pretty small.

Q. Right. So we'll --

(Simultaneous speaking.).

A. That's probably good.

Q. -- for a minute. Okay?

So this is the June 22nd letter from Mr. Karsanbhai from Emerson, proposing to acquire National Instruments that we were just talking about.

And you see it says there -- right there: Our proposal to acquire all of NI's outstanding shares at $48 per share in cash offers significant value.

Do you see that?

A. Yes.

Deposition of Eddie Dixon

Page 130

Q.   Now, the $48, that was the same price as the previous proposal letter.  Is that right?

A.   Yes.

Q.   The previous letter indicated that the stock price was at a 39 percent premium, the previous days' share price.  Do you see that?  Do you recall that?

A.   Yeah, I recall that.

Q.   And do you see this one identifies the premium as being 51 percent to NI's closing price from the day previous to this letter?

A.   Yes.

Q.   So the -- although the absolute dollar value of the offer had stayed the same, the premium to the previous day's close had increased in relative terms in this letter.  Is that right?

A.   From our perspective it still didn't provide the value that we -- even for the company, based upon our transformation plans.

Q.   Oh, I understand that.  I'm just simply trying to establish the fact that according to this letter, the $48 offer on June 22nd was at a higher premium to the previous day's closing price than the previous $48 offer had been.

Do you agree with that?

Page 131

A.   Yeah.  Markets were depressed all along, which was part of the issue.  We felt like Emerson was taking advantage of a weak market generally, but, yeah, it shows 51 percent at that time.

Q.   So the premium had increased over the previous premium.  Right?

A.   Yes.

Q.   And, you know, the -- if we go to the next page, you know, it identifies -- you know, it includes some -- other information about the 48 dollars.  Like it notes, for example, that the last time National Instruments' share price had closed above 48 was back in 2018.  Do you see that?

A.   Yes.

Q.   Okay.  Now, if we look down at this page, you see there's a paragraph beginning:  We are prepared to engage immediately.

A.   Yes.

Q.   Do you see that?  So Emerson informed National Instruments that Emerson was prepared to engage immediately.  Is that right?

A.   Yes.

Q.   And represented that they had organized the resources to move towards the transaction expeditiously.  Do you see that?

Page 132

A.   Yes.

Q.   You saw that at the time.  Yes?

A.   Yes.

Q.   It describes under the bullet "diligence."  That they have performed "extensive outside-in due diligence."  Do you see that?

A.   Yes.

Q.   And they say they have "limited and specific confirmatory due diligence requirements."  Right?

A.   Yes, that's what it says.

Q.   I mean, this is -- did this indicate that they've done substantial due diligence?

A.   I'm sorry.  Say that again.

Q.   Did this indicate that Emerson had done substantial due diligence?

A.   That's what the letter says.  I have no idea what they had done.

Q.   And it goes on, the next bullet, that they're ready to begin that confirmatory due diligence and would work towards signing and announcing a definitive agreement within four weeks.

Do you see that?

A.   Yeah, I see that.

Q.   And that's consistent with their

Page 133

statements earlier that we saw that they were prepared to engage immediately and organize the resources to move towards the transaction expeditiously.  Is that right?

MR. COMERFORD:  Form.

A.   That's their position.  It wasn't NI's position.

Q.   Well, I understand it's their position.  This is Emerson's position articulated in a letter.  Correct?

A.   Yeah.

Q.   And you received and read this letter at the time.  Correct?

A.   Yes, we did.

Q.   Okay.  I'm just trying to confirm that you understand certain parts of it and that you, in fact, understood them at that time.

Regarding the regulatory work, this notes that they don't anticipate any significant regulatory risks or delays.  Right?

A.   Yeah, that was their -- their view, yes.

Q.   Did you disagree with that?  Did you think there would be significant regulatory delays or risks?

A.   We didn't -- we weren't considering that.

Deposition of Eddie Dixon                      In Re National Instruments Corporation Securities Litigation

Page 134

The price was the same. We were not interested in selling.

Q.   Regarding financing, they state again that their proposal is not subject to any financing condition. Correct?

A.   Yes.

Q.   And they go on to note that they've obtained a highly confident letter from Goldman Sachs. Do you see that?

A.   Yeah, I see what it states in the letter. Yes.

Q.   Do you have an understanding of what a highly confident letter is?

A.   Generally. I have no idea what their letter said or what the outcome or results of that was.

Q.   Generally, what is a highly confident letter?

MR. COMERFORD:  Form, foundation, calls for speculation.

Q.   You can answer the question, Mr. Dixon.

A.   Yeah, I'm not -- honestly, I'm not going to speculate on what their letter said. I have no idea what their letter said. I have no idea.

Q.   Well, I asked -- I asked you before if

Page 135

you have an understanding of what a highly confident letter is, and you said generally.

So I'm asking you what is your general understanding of what a highly confident letter is?

A.   It depends on the circumstances, but confident in what? I have no idea. Confident in what? So -- I don't know.

Q.   So you have no idea what they're talking about here?

A.   I don't know what their letter said. I cannot comment on what their letter said.

Q.   I didn't ask you what their letter said. I'm asking you if you understand -- if you have an understanding of what a highly confident letter is?

MR. COMERFORD:  Objection; asked and answered.

MR. MANDEL:  Not answered, sir.

MR. COMERFORD:  But you keep asking anyway. He has answered.

MR. MANDEL:  Asked and unanswered might be a better objection.

Q.   So you're not willing to say your general understanding of what a highly confident letter is.

Is that right, Mr. Dixon?

MR. COMERFORD:  Form, foundation,

Page 136

calls for speculation.

A.   Yeah, I -- I -- I don't know in this context anything. Right. So I don't know what their -- you know, confident was -- confidence was.

So, no, I don't know. I don't know what it was in this context at all.

Q.   All right, Mr. Dixon.

The next bullet notes "Advisor," and it notes that they've engaged Goldman Sachs and Centerview Partners as financial advisors.

Do you see that?

A.   Yes.

Q.   And it notes that they've retained Davis, Polk & Wardwell as legal counsel. Correct?

A.   Right.

Q.   And that was new in this letter. It wasn't in the previous letter. Is that right?

MR. COMERFORD:  Foundation.

MR. MANDEL:  Foundation? We just read the other letter.

MR. COMERFORD:  Is this a memory test, Mr. Mandel?

A.   Yeah. I mean...

Q.   We just looked at the other letter. Did it mention Goldman Sachs and Centerview?

Page 137

You don't remember?

MR. COMERFORD:  Foundation. The document speaks for itself.

MR. MANDEL:  Improper objection, John.

MR. COMERFORD:  Why don't you put it in front of him and ask him, Mr. Mandel?

A.   Yeah, I -- I don't recall on that. If you want to put the other letter and let me look at it --

Q.   If you don't recall, okay.

A.   -- I can do that.

(Simultaneous speaking.)

Q.   Okay. That's fine.

A.   I don't recall.

Q.   You don't recall -- you don't recall. You don't know what a highly confident letter is. Who knows what they might be confident in. Okay. I get it.

MR. MANDEL:  Moving forward to the next page, please.

Q.   It notes that: Emerson considers this proposal to be of the highest strategic priority.

Do you see that?

A.   Yes.

Page 138

Q.   Did you see that at the time?

A.   Yes.

Q.   Did you understand what it meant?

A.   I can't speculate as what it meant to them.  It didn't matter to us.

Q.   So maybe you didn't understand what it meant when Emerson said that this proposal was their highest strategic priority.

Is that your testimony, Mr. Dixon?

MR. COMERFORD:  Objection; asked and answered.

A.   It says it's their highest strategic priority.  That's all I can comment on, is what the letter says.

Q.   It goes on to say they're very motivated to conclude a transaction.  Do you see that?

A.   Yes.

Q.   All right.  And you saw that at the time.  Correct?

A.   Yes.

Q.   Okay.  The letter concludes saying:  We recognize you may not be able to get back to us until the week of July 11th.

And he writes:  I look forward to hearing from you by then at the latest.

Page 139

Do you see that?

A.   Sure.

Q.   Okay.  So did you understand at this time that Emerson was requesting a timely response to this?

A.   Yeah.  Emerson didn't direct our calendar, but, yeah, I understand what they were asking for.

Q.   They were requesting a timely response.  Right?

A.   It appears that was the case, yes.

MR. MANDEL:  Let's look at Document D22, please.

(Exhibit 14 was marked.)

MR. MANDEL:  This is an email Bates NAT-SL-16089.  It's an email from Mr. Dixon dated June 23rd, 2022, to Mr. Starkloff, Mr. Rapp (sic), and others.

Q.   Do you see that?

A.   Yeah.

Q.   Okay.  Did you write this email?

A.   It appears I did, yes.

Q.   This email is referring to Mr. Karsanbhai's letter of the previous day.

Correct?

Page 140

A.   It reiterates what the letter said, yes.

Q.   Right.  You took note in your email that Lal's letter indicated a significant level of due diligence.

Do you see that?

A.   Yeah.  It repeated what the letter said, yes.

Q.   Is it -- was it -- was it true that you viewed Mr. Karsanbhai's letter as indicating a significant level of due diligence?

A.   We had to react to what the letter said, so I repeated that's what they're saying that they did.  I don't know what they did.

Q.   So you -- in your view, the letter indicated a significant level of due diligence.

A.   That's what --

Q.   Correct?

A.   -- the letter said, yes.

Q.   And that's what your email here says.  Is that right?

A.   That's right.

MR. MANDEL:  Let's look at Document A -- I'm sorry -- D25, please.

(Exhibit 15 was marked.)

Q.   This is an email Bates NAT-SL-17152.  It

Page 141

is an email chain involving you, Mr. Ilcisin, Mr. Starkloff, Ms. Rapp.

And in the email on the cover page here you write that you:  Copied Kevin's suggestions from below (which captured things pretty well) and made a few changes.

Do you see that?

A.   Yeah.

Q.   You referred to the content in yellow is really the most relevant.

Do you see that?

A.   Yeah.

Q.   Now, if we look at the document, you can see some of the writing is shaded as if it were highlighted.

Do you see that?

A.   Yeah.

Q.   Now, do you remember this email?

A.   No, but I believe I wrote it if I'm looking at it, yes.

Q.   Can you -- is it clear to you that the language that's shaded is the language that you're referring to in your email as being in yellow?

MR. COMERFORD:  Calls for speculation, lacks foundation.

Page 142

A.   I -- I mean, it's not yellow there so I -- I don't know.  But I assume it was, but I don't know.

MR. MANDEL:  Okay.  I'm going to make a request on the record, Defense Counsel, John, please produce this email in its original form showing the yellow if this is going to be an issue, an evidentiary issue in this case, that we're not going to agree that the shaded language here is what was in yellow.  So I -- I'd ask you to please produce that document.  And we've received other documents in the course of this production with yellow highlighting so maybe this one fell through a crack.

Q.   Now, in the document, you write this is -- you know, received response from Nuthatch Wednesday, June 22nd.

You see that?

A.   Yeah.

Q.   And underneath it, you list key points.

You see that.  Right?

A.   Yeah.

Q.   So you wrote:  No change in offer.

That's what you said earlier, was the same $48.  Correct?

Page 143

A.   Right.

Q.   You see that?  The third bullet.  Do you see that?

A.   Yeah.

Q.   And you wrote that suggesting that -- you wrote that this suggests the, quote, original offer is attractive to shareholders, end quote.

A.   Yes.

Q.   Do you see that?

A.   Yeah, that's -- that's not what we suggested.  That's what they were suggesting, what Emerson was suggesting.

Q.   All right.  So you're saying here that this is Emerson --

A.   Emerson suggested in their letter that it would -- was attractive to shareholders.

Q.   Understood.  Okay.

Next bullet, you note:  Goldman and Centerview have been retained as financial advisors.

You see that?

A.   Yeah.

Q.   All right.  So you took note, like we were talking about a minute ago, of the fact that in the June 22nd letter, there was new information about the retention of Goldman and Centerview.  Is

Page 144

that right?

A.   Yes.

Q.   All right.  And Goldman and Centerview are investment banks.  Right?

A.   Yes.

Q.   The two -- would you say they're prominent investment banks?

MR. COMERFORD:  Form.

A.   They're well-known investment banks.

Q.   So the June 22nd letter indicated that National -- that Emerson had retained two well-known investment banks to act as financial advisors in connection with a potential acquisition of National Instruments.  Is that right?

A.   Yeah.  That's pretty clear, yeah.

Q.   And also that they had retained Davis, Polk & Wardwell.

A.   Yes.

Q.   Right?

A.   Yes.

Q.   Davis, Polk is a very well-known American law firm.  Correct?

A.   Yes.

Q.   Davis, Polk does a lot of work in the mergers and acquisitions space.  Is that correct?

Page 145

A.   I have no idea.  I've never -- never utilized them as an outside counsel.

Q.   Well, why did you take note of it here?

A.   Because they've engaged the firm.

Q.   And why was that significant?

A.   They had engaged the firm.  It was new information.

Q.   And, you know, if we look at the bottom of the key points, you write that they requested acknowledgement of receipt of letter and request for a response by July 11th, kind of like we were just looking at in the letter itself.  Right?

A.   This was Kevin basically repeated what was in the letter and I confirmed that.

Q.   Okay.  And from there, it goes -- it discusses the current plan next steps.

Do you see that?

A.   Uh-huh.

Q.   And the plan is in the first instance for Eric -- that's Eric Starkloff -- to acknowledge receipt of the letter soon with a simple acknowledgment.  Nothing else.  Is that right?

A.   Yeah, that's what it states, yes.

Q.   Was that the plan?

A.   It appears that was the plan based upon

Page 146

this at the time.  Things were very dynamic.  Right?  So...

Q.  Do you not recall this plan sitting here today?

A.  No, I mean, it's in my email.  I just said that appeared to be the plan --

Q.  I understand.

A.  -- based upon my email.

Q.  I'm asking -- I'm asking you simply whether you recall this or whether you are reading the document and testifying about it.

A.  I -- I don't specifically recall, but yeah, we would acknowledge typically a response at some point.  Yeah, we -- we were not going to respond immediately because we had upcoming board meetings, et cetera, so...

Q.  Right.  And in the next, in B under the current plan, it states that Emerson is not respecting (sic) a response until July 11 and that by July 11, quote, our response will likely state that we will discuss the letter at our standard board meeting that takes place later in the month.

You see that?

A.  Yes.

Q.  Is that -- was that the plan at this

Page 147

time?

A.  Yes.  That was the plan.

Q.  And, in fact, is that what occurred?

A.  Yes.  We had a board meeting -- meeting later that month, yes, and we discussed the response.

Q.  Okay.  So there was a regularly scheduled board meeting for July 19th and 20th.  Do you recall that?

A.  That would seem up -- I don't know the exact dates, but that would seem appropriate.  That would be about the time we would have a board meeting prior to earnings call.

Q.  And the plan here was to discuss Mr. Karsanbhai's most recent letter at that upcoming regularly scheduled board meeting and to get back to Mr. Karsanbhai thereafter.  Is that right?

A.  Correct.

Q.  And is that what happened?

A.  Yes.

Q.  Okay.

MR. MANDEL:  Let's look at our Tab A23, please.

(Exhibit 16 was marked.)

MR. HELD:  Exhibit 16 for the record.

Page 148

MR. MANDEL:  Thank you.  Exhibit 16.

Q.  Now, this is a document Bates beginning NAT-SL-21516.  It's a July 10th, 2022, email from McGrath to Mr. Starkloff subject "Discussion materials" and it includes an attachment.

Now, you see in the email itself, Mr. McGrath writes to Mr. Starkloff:  Attached are the discussion materials for the board meeting discussion on Tuesday night.

Do you see that?

A.  Yes.

Q.  Okay.  Now, July 19th was a Tuesday and there was a board meeting on that date.  We can look at the minutes of it, but do you understand that that's what this is referring to?

A.  Yes, that would make sense.

Q.  Okay.  Now, do you remember seeing this document?

A.  I don't know if I saw it or not, but it wouldn't -- I don't think I was copied on it, but -- so I didn't get this email specifically, no.  But I don't know that I talked to Eric about it or not so...

Q.  Let's look at the third page of the document, NAT-SL-21519.  Now, this -- there's a

Page 149

heading on this page and beneath it is language that is from -- that is a note from Mr. Karsanbhai to Mr. Eric Starkloff.

Do you see that?

A.  Yeah.

Q.  Do you remember this correspondence between Mr. Karsanbhai and Mr. Starkloff?

A.  I don't remember it.  I mean, this was three years ago so I -- I don't remember it explicitly, no.

Q.  Okay.  You see the -- the language there, it's quoting an email from Mr. Starkloff -- I'm sorry -- from Mr. Karsanbhai to Mr. Starkloff and across the top it says:  Most recent response indicates intention/threat to go public with its offer.

Do you see that?

A.  Uh-huh.

Q.  This is Mr. McGrath writing that Emerson is threatening to go public with its offer.  Is that right?

A.  Yeah, that's what it says.

Q.  Now, we go to Page Bates 21525.  Now, this carries over from the previous page.  It's like 6 and 7 and you can see 1 through 5 on the previous

Page 150

page. If you'd like to look at them for a minute, that's okay. Let me know. But I'm going to ask you about the language under there under No. 7. So I'll just proceed and you let me know.

Do you see there where it says that: We need to get our stock price into the mid-40s, preferably 50s, as soon as possible without the price being based on a potential sale of the company?

Do you see that?

A. Yeah, I see that.

Q. Do you remember this language at the time?

A. No, I don't. I wasn't on that email, but I don't remember it.

Q. Okay. So does this language indicate a desire to get National Instruments' stock price up as soon as possible without the price being based on a potential sale of the company?

MR. COMERFORD: Form, foundation, calls for speculation.

A. We were in the middle of a transformation of our business. The goal would be to drive our stock price up based upon what we saw as an undervalued company so...

Page 151

Q. So if Emerson's approach, proposal to acquire National Instruments for $48 a share at this time had been disclosed, would it have caused the stock price to go up?

MR. COMERFORD: Form, foundation, calls for speculation, incomplete and improper hypothetical.

Q. You can answer the question.

A. I -- I don't know what the stock would do. The market moves for a variety of different reasons.

Q. Does this language assume that the stock price would go up based on disclosure of Emerson's proposed offer?

A. I don't -- I don't read that. I read that as Michael saying we need to drive our business so that we get our stock price up based upon our business plans.

Q. Right. And not based on Emerson's offer. Right?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I -- yeah, I don't know what Michael was thinking when he said that. I know what we were trying to do as a business.

Page 152

Q. Did this language concern you as general counsel?

A. I stated earlier, I asked that no documents be circulated without, you know, my opportunity to review. So anything would -- would be unfortunate and which is why I would communicate back to our board and our executive officers not to do that. So the mere fact that Michael was doing it was bothersome. I don't know that any particular language in here was bothersome.

Q. If this language had become public, would it have given you concern?

MR. COMERFORD: Form, foundation, calls for speculation, improper and incomplete hypothetical.

A. I -- I -- I would not want to see the last part, but the reality is, again, we were trying to drive our business through a strategic transformation. We were telling our investment community what we were doing to drive the stock price up as any company would do.

Q. And the goal was that the stock price go up as soon as possible without the price being based on a potential sale of the company to Emerson. Is that right?

Page 153

A. You'd have to ask Michael what he -- what he meant by that.

Q. Is that -- is that the goal articulated here in this presentation?

MR. COMERFORD: Form, document speaks for itself, foundation, calls for speculation.

A. Yeah, I've -- I've answered the question.

Q. Well, Mr. Dixon, I don't think you've answered the question. But we can move on.

MR. MANDEL: Let's have a look at Document D37.

(Exhibit 17 was marked.)

Q. Now, the document we just looked at was a July 10th presentation. This is an email you wrote on July 12th, 2022. The Bates is 27 -- is NAT-SL-27877. And this is an email you wrote to Mr. Starkloff in which you wrote: I was thinking about how you might suggest to Michael that it is not a good idea to create materials like those he shared with you, especially with something like Wolverine in play.

Do you see that?

A. Yes.

Q. And later in the document you write: I don't think Michael would want his materials made

Page 154

public.

Do you see that?

A.  Correct.  Yes.

Q.  So why did you write that it was not a good idea for Michael to create materials like those he had shared with Mr. Starkloff?

A.  Same reason I told you earlier.  We don't want documents getting out that might be misinterpreted as to their meaning.  And I've communicated that on multiple times to the board, to the executive team, recommunicating it here.  Just as --

Q.  So --

A.  That's enough.  Go ahead.

Q.  Yeah, so in your view Mr. McGrath should not have written this down.  Is that right?

A.  Absolutely not.  We should be having conversations.

MR. MANDEL:  Let's now look, please, at Document D38 which is Exhibit 18, I think. Someone correct me if I'm wrong, please.

MR. HELD:  That's right.

MR. MANDEL:  Thank you, Alex.

(Exhibit 18 was marked.)

Q.  This is an email, Bates NAT-SL-200508.

Page 155

This is an email from Mr. McGrath to you, Mr. Dixon, cc'g Mr. Starkloff and attaching another version of the presentation we were just looking at.  Do you remember this?

A.  Yeah, it makes sense.  Yeah.

Q.  Do you remember receiving this?

A.  Again, I don't remember explicitly receiving it, but I'm not disagreeing that I received it.  It's pretty clear that I did.

Q.  And it instructs the -- it's for the Tuesday night board discussion, again.  Correct?

A.  Yeah, that appears to be the topic. Right.

Q.  And there's a direction here to post it prior to the remaining board materials so they have time to review it.  "Post it" means to post it to the Diligent Platform.  Is that right?

A.  Yes.  That would be Diligent Platform which was the board communication platform.

Q.  Understood.  Now --

MR. MANDEL:  If we can go, please, to Page 20517.

Q.  Do you see that language there about:  We need to get our stock price in the mid-40s preferably 50s as soon as possible without the price

Page 156

being based on a potential sale of the company.

Do you see that?

A.  Yes.

Q.  So you did receive via email a version of this presentation that included that language. Correct?

A.  Yes.

Q.  Okay.  And so you understood that Mr. McGrath was expressing this point in this presentation.  Correct?

A.  What I understood was Mr. McGrath wanted us to execute our business.  And Mr. McGrath was driving us to execute on our transformation plan to increase the value to our shareholders.  That's what I understood.

Q.  And the purpose of that plan was to get National Instruments' stock price up into the mid-40s, preferably 50s as soon as possible without the price being based on a potential sale of the company to --

(Simultaneous speaking.)

A.  No.  The purpose --

Q.  -- is that correct?

A.  No, purpose -- no, that is incorrect. The purpose of our plan was to drive our business

Page 157

and execute our business for a transformation that was in multiyear stage, that was the purpose.  And we were driving that business, that was our goal.

Q.  The chairman of the board wrote the language I'm reading to you here.  Is that right?

A.  You would have to ask him what he meant by it.  I know what our purpose was.  Our purpose was to --

Q.  I asked you if he wrote it?

A.  He wrote it.

Q.  He wrote it.  Correct?

A.  Yeah.

Q.  And you read it.  Correct?

A.  I did.

MR. MANDEL:  Would you please go to Tab D41 which will be our Exhibit 19.

(Exhibit 19 was marked.)

Q.  This is Bates NAT-SL-20795.  It's a July 14th email from Mr. McGrath to you, Mr. Dixon, cc'g Mr. Starkloff and attaches yet another version of the presentation.  Do you see that?

A.  Yes.

Q.  Do you remember this?

A.  I'll repeat what I've said before, I don't remember any of these things from --

Page 158

explicitly from three years ago but I just trust that if I received it, I've seen it.

MR. MANDEL: Now, can we please go to page ending -- ending 20816?

Q. Do you see that page?

A. Yes.

Q. Do you see that the language that we were just looking at from the two previous versions of this present- -- presentation is no longer here? Do you see that?

A. It doesn't appear to be in there, no.

Q. All right. So do you understand why it was removed?

A. I don't know explicitly why it was removed. But as we've stated, my concern would always be whether language is misinterpreted on what the intent was.

Q. Did you advise that that language be removed?

A. I don't recall.

Q. Did you discuss that language with Mr. McGrath or Mr. Starkloff?

A. I'm sure I did.

Q. But you don't recall whether you advised its removal?

Page 159

A. As I've stated, I would have advised them not to. I don't recall explicitly telling them that, but I would recommend that language that could be misconstrued not be included. Absolutely.

Q. And then that language was removed from the final version of the presentation which is what we're looking at. Correct?

A. Correct. Doing my job. As you would, by the way.

MR. MANDEL: Let's have a look, please, at Document D44.

(Exhibit 20 was marked.)

Q. This one you'll see has yellow highlighting as produced. Excuse me. Now this is Bates NAT-SL-25703. This is a July 14th email from the same date of the document we were just looking at. And it's a chain involving you and Mr. Percival, Mr. Ilcisin, and Ms. Rapp. Is that right?

A. Yes, that appears to be who is on the email string, yes.

Q. Now, was there some kind of investment in National Instruments by ███████ in discussion at this time?

A. There was a discussion going on, yes.

Page 160

Q. Is that what's referred to in this email where it's talking about when should we time a potential deal with █?

A. I believe that's what that would reference, yes.

Q. Okay. And the sentence there with the highlighting is: There's a relatively aligned consensus that an investment in NI will become unattractive to ████████ if Emerson goes public before the deal is inked based on resulting stock price increase.

Do you see that?

A. I see that.

Q. Now, if you look above, Mr. Percival writes: I added the highlight below and have no other suggestive changes.

Do you see that?

A. Yes.

Q. So do you agree with me that that says that Mr. Percival added the yellow highlighted language here?

A. Yes.

Q. And this document acknowledges that if Nuthatch goes public, if Emerson goes public, there will be a resulting stock price increase.

Page 161

Is that correct?

A. I think you'll have to talk to Albert about this, but my interpretation of this is we were looking at potentially doing a deal with ████. If Nuthatch went public, an assumption might be that there could be a resulting stock increase and assumption. We don't know. We don't know where the market is going.

But that could happen and that would make it less attractive to do the deal with ████████.

Q. Understood. So just to restate it, there was an understanding that if Emerson went public, there could be a resulting stock price increase, which would then make the investment by ████████ unattractive. Is that right?

A. I answered the -- yeah, it's the same answer that I just gave you.

Q. Okay. I just want to make sure I have it clear on the record. Thank you.

MR. MANDEL: Okay. Can we take five, please?

MR. COMERFORD: Sure.

THE VIDEOGRAPHER: Going off the record. The time is 1:39.

(Break.)

Page 162

THE VIDEOGRAPHER: Back on the record. The time is 1:50.

Q. So before the break we were looking at some documents prepared for the July 19th board meeting. There was ultimately a board meeting. It was a two-day meeting, July 19th and 20th. We can look at the minutes from that.

Before then I'd like to look at Document D48, please. That will be our Exhibit 20, I think.

(Exhibit 21 was marked.)

MR. HELD: It will be 21.

MR. MANDEL: 21. Thank you.

Q. This is an email chain, Bates 1 -- it's NAT-SL-17861. It's an email between you and Mr. Sabastian Niles of Wachtell.

Do you remember this?

A. I mean, obviously, I sent it. I don't recall exactly what -- what we -- what I wanted to talk to him about, but I obviously sent this email.

Q. So you sent -- so it shows that you called Mr. Niles on July 18th and then he wrote an email to you saying: Can I ring you back?

A. Uh-huh.

Q. Do you see that?

A. Yep.

Page 163

Q. So you picked up the phone and made a phone call to Mr. Niles, and he didn't answer, and wrote you an email saying: Can I ring you back?

Is that right?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I -- yeah, I mean, I don't -- he obviously didn't pick up, so...

Q. Do you remember calling him?

A. I'm sure I did. And as evidenced by his note, I did. So, I don't -- and, again, we're talking three years ago, guys. So I don't remember every phone call I made three years ago. But it wouldn't surprise me that I made a phone call to Sabastian.

Q. Okay. But your testimony is that you do not remember this call. Is that right?

A. I don't remember exactly that call, no, I do not. I don't know --

Q. Okay. So he -- excuse me.

A. -- I don't know what the issue is, though, the reality is. It says he tried to call me back, so...

Q. Right. He tried to call you back.

A. Yeah.

Page 164

Q. He wrote: Can I ring you back?

And you wrote to him: Yep - quick question re stock buyback.

Do you see that?

A. Right. Yeah.

Q. Do you remember writing that?

A. I remember, now that I'm looking at it again, yes. But, no, if you'd asked me without showing it, no, I wouldn't have remembered it.

Q. Okay.

A. I've been retired. I'm not thinking about NI or Emerson or anything else.

Q. Did Mr. Niles call you back?

A. I assume he did, but I don't recall.

Q. What were you wanting to ask him about stock buybacks on July 18th?

A. I don't know. I don't know, without any other information.

Q. You can't remember?

A. I can't remember.

Q. Is this an example of you not writing sensitive things down?

MR. COMERFORD: Form.

A. I don't know that it can be an example of anything. It's an email.

Page 165

Q. Well, but you didn't write in the email what you wanted about stock buybacks. Right?

A. I would call Sabastian for a variety of things. So I don't know why I called him. So I don't know that you can make any assumptions about anything other than the fact I called him.

Q. Okay. But you didn't write down what about stock buybacks you were calling about. Right?

A. Not that I'm aware of.

Q. And you had been advised not to write sensitive things down. Right?

MR. COMERFORD: Form.

A. I've answered that.

Q. Is it true that --

A. I've answered that.

Q. -- is it true that you've been advised not to write sensitive things down?

A. I've answered that before. Yes.

Q. Okay. Yes. And is this an example of you not writing sensitive things down?

A. I don't know that that's the case.

Q. Okay. Were buybacks on the agenda for the meeting for September 19th -- sorry -- for July 19th, 2022?

A. I don't remember. I'd have to see the --

Deposition of Eddie Dixon                     In Re National Instruments Corporation Securities Litigation

Page 166

(Exhibit 22 was marked.)

Q.   Fair enough.  Fair enough.  Okay.  Let's have a look at Document D49, Exhibit 22.  This is Bates NAT-SL-1457, the minutes from National Instruments Corporation board of directors meeting from July 19th through 20, 2022.

Do you recognize this document?

A.   It appears to be minutes of the board meeting.

Q.   Now, this meeting took place over the course of two days.  Is that right?

A.   Yeah.  Typically a day and a half or so, but, yeah.  Over two days, yeah.

Q.   Now, the first day's meeting took place starting at 4:00 p.m. and went through 8:54 p.m.

This is on the first page, if we could just look at the whole thing.  Do you see that?

A.   Yeah, now I do.

Q.   So there was an evening meeting on the 19th, and then there was another meeting that resumed the following morning at 8:30 a.m.

Is that right?

A.   Yeah.  That was the plan, based upon the minutes here, yes.

Q.   And so the evening of July 19th is what's

Page 167

referred to in here as "working meeting."

Is that right?

A.   I don't know when that started, whether it was in the afternoon or the evening, but it is -- it appears that that started prior to the 8:45 adjournment.

Q.   If we just scroll up a drop, it says, beginning on July 19th at approximately 4:00 p.m.  That's where I got that from.

A.   Yeah.

Q.   So this is a working meeting that took place on July 19th between 4:00 and about 8:45 p.m.

Is that right?

A.   Yeah, that's what it looks like.  Yes.

Q.   Do you remember this meeting?

A.   Clearly we had the meeting.  I don't recall what all happened in the meeting, other than what we've captured in the minutes here.

Q.   All right.  So at this working meeting that evening in attendance were all the board members, yourself, and Mr. Niles from Wachtell.

Is that right?

If we could scroll down a drop, we can see Mr. Niles participated in that meeting.

A.   Yeah.

Page 168

Q.   Did anybody else participate in this meeting?

A.   Not that I'm aware of.  But, again, what's stated in the minutes is all that I could remember.  That's why we draft the minutes.  Right.

Q.   The minutes are generally a true and accurate representation of what occurred at these meetings?

A.   Correct.  Yes.

Q.   Now, did Mr. McGrath make his presentation at this meeting on the July 19th evening meeting?

A.   I'll have to read the minutes because honestly I don't recall what happened at that meeting.  So I can read the minutes and recite to you what is stated in the minutes if you want me to do that.

Q.   No.  The minutes make no mention of the presentation we were just looking at.  I'm asking you from your recollection whether you recall them being presented at this meeting.

A.   And I -- I don't recall.  Three years ago I don't recall.

Q.   Okay.  And were buybacks discussed at the July 19th meeting?

Page 169

A.   I don't recall.  If it's not in here, I don't recall.

Q.   Okay.

A.   We would have captured in here what the primary topics were.  I don't know.  I don't -- I can't recall if there was anything else, so...

I'm assuming not, if it's not referenced here.

Q.   And yet the night before you were calling Mr. Niles to ask him a question about buybacks.

Right?

A.   I made a call to him.  I don't know what the question was that I was going to ask him, yes.

Q.   You can't recall what you asked?

A.   Right.

Q.   Do you recall whether anyone directed you to make that phone call?

A.   No, I don't recall anyone directing me.

Q.   Did anyone suggest to you to make the phone call?

A.   No, not that I recall.

Q.   Now, if we press forward into the minutes, they relate what occurred on the following day, July 20th, as well.  Is that right?

We can scroll further so you can see

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 170

that.

A.    Yeah.  Restarted at 8:30 the next day.  Yep.

Q.    Were buybacks discussed during this meeting?

A.    I don't recall.  So if it's not referenced in here, I would say no.  But I don't recall explicitly what happened in this meeting other than what's on this document.

Q.    Okay.  Can we look at Bates 1460?  Here there's a heading:  Supply chain update.

Do you see that?

Now, within -- there's a large paragraph in that section beginning with:  Ms. Rapp reviewed.

Do you see that?

A.    Yeah.

Q.    And it -- it includes -- it states that Ms. Rapp's discussion included, quote, a summary of the capital strategy, including discussion of investment impacts on liquidity, quarterly cash projections for 2022 and a capital strategy recommendation, et cetera.

Do you see all of that?

A.    Yes.

Q.    Does that refresh your recollection with

Page 171

respect to whether buybacks were discussed at this meeting?

A.    No.

Q.    So would buybacks typically be discussed as part of the capital strategy of the corporation?

MR. COMERFORD:  Form.

A.    I -- I don't recall anything that's not in here being discussed.  You would have to ask Ms. Rapp.

Q.    Okay.

MR. MANDEL:  Why don't we have a look, please, at Tab M13, which will be our 23, Exhibit 23.

(Exhibit 23 was marked.)

Q.    This is the agenda and materials for the July 19 and 20 board meeting beginning Bates NAT-SL-24106.

Do you recognize this document?

A.    Yes, that would be our typical agenda.

Q.    Now, if we could please go to the page Bates ending in 24207, please, and you see this is the first page of a capital strategy discussion?

A.    Yeah, I see that.

Q.    We were just looking at the minutes describing Ms. Rapp discussing capital strategy

Page 172

during this meeting.  You remember?

A.    Yes.

Q.    Okay.  If we flip ahead one, two, three pages, please.  Now, do you see there -- do you recognize this slide?

A.    Well, I -- I do now, but, yeah, I wouldn't have recalled it absent you showing it to me now.

Q.    Okay.  But this is a -- this is a common form of slide that the board reviewed at board meetings concerning capital strategy?

A.    I don't recall that.  I mean, you would have to ask Karen.  That was Karen's responsibility.  I don't know what format she would use whenever she discussed capital strategy.  Don't recall that.

Q.    Okay.  And you see along the left-hand side there's a line for share repurchase.  You see that?

A.    Uh-huh.

Q.    Do you see it's projecting the forecast for the third quarter of '22 is projecting $10 million worth of repurchases for that quarter.  Do you see that?

A.    Yeah, I see that.

Q.    So as of July 19th, as of this point in

Page 173

time, the projection was the National Instruments would do 10 million worth of buybacks in the third quarter.  Is that right?

A.    That's what's stated on Karen's slide.  This is her content.

Q.    Well, were you present when this was reviewed?

A.    Yeah.

Q.    Was Wachtell present when this was reviewed?

A.    I don't recall who was all on there, but if the minutes state they were there, yes.

Q.    Do you know how many millions of dollars worth of repurchases National Instruments ultimately did during the third quarter of 2022?

A.    I do not.  That was Karen's responsibility.

Q.    So you do not know the amount of repurchases at issue in this case?

MR. COMERFORD:  Asked and answered, form.

Q.    Okay.  Well, if I told you that the company did over 80 million in repurchases during the third quarter, does that sound right to you, through the third quarter of 2022?

Page 174

MR. COMERFORD: Form, foundation, calls for speculation.

A. Yeah. As I said, I don't know. I don't know. That was not my responsibility. Karen would work with her on that so I don't know what the number was.

Q. So the amount of repurchases done was something not within your authority. Is that correct?

A. That's correct.

Q. And -- and you would have no idea what amount of repurchases were planned. Is that right?

MR. COMERFORD: Form.

A. I mean, in -- in general, that -- that would be correct. We would confirm what -- what the board had given authority to and we would ensure that we're doing everything compliant with the law and then finance would execute on that with their and obviously the board's approval.

Q. Did Ms. Rapp ever tell you of a plan to do $80 million worth of stock repurchases during the third quarter of 2022?

A. I don't recall that, no.

Q. Did you know that National Instruments was planning to do $80 million worth of share

Page 175

repurchases during the third quarter of 2022 --

A. Did not know --

Q. -- at any --

A. -- the number that we were going to execute on. I knew that we were interested in doing share buybacks after we had rejected the offer twice and had -- which had not changed over a period of months thinking this deal was done and so we engaged with Wachtell and got advice from Wachtell that we could continue forward.

Q. Okay. Now, after --

MR. MANDEL: We could -- oh, we can put this document down.

Q. After July 19, there was another board meeting on July 25th. Do you recall that?

A. No.

Q. That's fine.

A. You keep asking me that. I'm going to tell you the same. I don't remember everything --

Q. I understand.

A. -- that happened three years ago.

Q. I understand. I still got to ask the question.

A. Yeah.

Q. I'm sure you understand --

Page 176

A. Yeah.

Q. -- that.

The -- so I'll -- so I'll represent to you there was a July 25th meeting, and ultimately, is it correct that there was a decision made to respond to Emerson's most recent offer which had been on June 22nd with a no? Is that right?

A. Yeah, I mean, realistically, the answer was no long before that. We were not interested in selling at $48 a share or anywhere close to that.

Q. Understood.

And on August 2nd, 2022, National Instruments sent a letter back to Emerson saying no to their most recent proposal. Correct?

A. Correct.

Q. Now, if we could look, please, at Document D67.

(Exhibit 24 was marked.)

MR. MANDEL: It's an email Bates NAT-SL-9611.

Q. It is an email chain amongst you, Mr. Dixon, Ms. Rapp, and Mr. Percival. Do you remember this email?

A. Yeah, I mean, again, looking at it now, certainly I do.

Page 177

Q. Have you reviewed this email recently?

A. Yeah, I did -- I did take a look at this with --

Q. When?

A. -- counsel.

Q. When did you look at it last?

A. A couple of days ago. I don't recall exactly when you walked me through the deposition process.

Q. That's fine.

So if we go to the bottom of this email, which is the chronologically first-in-time email, on August 4th, two days after the letter to Emerson saying no to their most recent proposal, Ms. Rapp wrote to you and Mr. Percival asking: Can you please let me know what we can do to put in place for stock repurchases given the current situation?

You see that?

A. Yeah.

Q. Do you have an understanding of what Ms. Rapp meant by "given the current situation" --

A. Yeah.

Q. -- in this email?

A. Yeah, given the fact that we've rejected the, frankly, offending same offer of $48 over a

Page 178

period of months, we've gone through our earnings call. Quite frankly, the initial unofficial discussion that Lal had with Eric was in the 30s, so having seen the same number twice now, our view was this thing is -- they're not serious; we need to move forward and run our business. So Karen, obviously, who's responsible for capital management was reaching out to ask Albert who was honestly the one who would work with her. He was my SEC finance-related legal guy and he would work with her so that's why she was reaching out and I'm sure, to ask him what the -- you know, what the status is, given that we had now rejected a second time, no new information, et cetera, so...

Q. So Ms. Rapp was asking whether she could go ahead and execute buybacks for National Instruments. Is that right?

A. It appears she was wanting to put in place a plan, yes.

Q. And asking in light of the Emerson situation whether she could proceed to do that. Is that right?

A. In light of the fact that we've rejected Emerson twice on the same price over a period of months and no -- no change in anything from Emerson

Page 179

so --

Q. Right. In light of the facts at that moment regarding Emerson, she's asking whether she can go ahead and do buybacks on behalf of National Instruments. Right?

A. Correct.

Q. So you understood that Ms. Rapp wanted to do buybacks. Correct?

A. Yeah, I mean, that's what I would read out of this, that she would, yes.

Q. Right. And was seeking authority to do so. Correct?

A. Yes.

Q. Okay. And --

A. To confirm that we -- we are okay to do that which we would run by outside counsel. Right.

Q. So if we scroll up, Mr. Percival wrote that he would need to discuss with WLRK. Right?

And he goes on to cite that: We still have the Nuthatch letter overhang or perhaps hangover so I believe we're in a gray area.

Is that right?

A. That's what it states, yes.

Q. So Mr. Percival's view was that National Instruments was in a gray area as to whether it

Page 180

could do these buybacks. Is that correct?

A. Well, I -- I don't want to speculate as to what Albert was thinking, but the reality is, yeah, we -- we rejected a letter twice. At some point which we believe had happened at that point since it was over a period of months and no change, we rejected. We had no interest in selling, that it becomes stale as -- as I think I say up here, maybe not. And so --

Q. It's a later email. We'll get to it in a second. Yeah.

A. Yeah. So, yeah, I think our view was then we need to confirm that we are good and so that's what we would do. We would go work with WLRK and confirm with all the facts where we are and whether or not we were okay to implement buybacks.

Q. So Mr. Percival wrote that this question is a gray area and you read that he had written that. Correct?

A. Yeah.

Q. And you understood in Mr. Percival's view was this was a gray area right now. Correct?

MR. COMERFORD: Asked and answered, form.

A. Yeah, I mean, you -- you can read the

Page 181

email. So that's what I read as well. So...

Q. And Ms. Rapp writes about the reconfirmed rejection sent on Tuesday that's obviously a reference to the August 2nd letter to Emerson saying no. Right?

MR. COMERFORD: Form.

A. So -- so, yeah, I -- I missed the question. Can you scroll -- this is from me?

Q. Oh, I'm sorry, no.

A. You said Ms. Rapp --

(Simultaneous speaking.)

Q. You wrote -- I'm sorry. I think I misspoke.

You wrote: The reconfirmed, in quotes, rejection was sent on Tuesday.

And by that you're referring to the August 2nd letter saying no to Emerson. Correct?

A. Yes.

Q. Right. And so you're saying hopefully we can do something near the end of an upcoming period. You're saying: Hopefully given that we have said no to Emerson that we could maybe do these stock buybacks that Ms. Rapp was asking to do.

Is that right, is that the meaning of your email?

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 182

A.   Yeah, we needed to run our business as usual.  We rejected it twice.  No -- no reason to believe anything was going to happen.  So we needed to move forward but not without getting advice of Wachtell at what we could do or not do.

Q.   Did you receive any advice regarding some obligation to do business as usual?

A.   I mean, the conversations we would have with Wachtell would be yeah, we need to run our business.  This is not moving forward.  We have no interest, we said no.  Can we move our business.  But I -- I can't recall explicitly whether we used those phrases or not.

Q.   Now, you in the ultimate email here all the way at the top, you write -- I'm just going to read:  I think the question is when does the Nuthatch engagement become stale so legitimate argument that we don't have MNPI when the plan is put in place, but will let Albert confirm with WLRK.

Is that what you wrote?

A.   Yeah, good for me.  That's exactly what I would write.

Q.   So, again, you understood that management wanted to do buybacks.  Is that right?

A.   Yes.

Page 183

Q.   And you understood that in order to authorize such buybacks you needed a, quote, legitimate argument that we don't have MNPI.

Is that correct?

A.   Correct.  That we didn't have MNPI.  Right.

Q.   So you were looking for a legitimate argument that we don't have MNPI to give management the authorization to do buybacks they were seeking.  Is that correct?

MR. COMERFORD:  Form, foundation, mischaracterizes the document.

A.   Yeah, what I was looking for would be advice from Wachtell whether we could implement or not that's the bottom line.  It's no less or more clear than that.  I would not make a decision absent Wachtell approving the moving forward with absent Wachtell's advice that we were okay.

Q.   So you identified the question as whether the engagement with Emerson had become stale.  Is that right?

MR. COMERFORD:  Object to the form, asked and answered, the document speaks for itself.

A.   Yeah, I mean, I -- that's what I've stated in the email which is the question.  Right.

Page 184

What are the facts.

Q.   So if -- so if Emerson's engagement was not stale, there would be no legitimate argument --

A.   No.

Q.   -- that National Instruments did not have MNPI.  Is that correct?

MR. COMERFORD:  Form.

A.   Yeah, I -- I'm not going to answer that because everything is based upon the facts of the situation.  So clearly what we wanted to confirm was we didn't have MNPI, we did that with Wachtell, and that's why we made the decision.

Q.   Again, I just want to go back to your words here.  You wrote I think the question is that you were identifying a question here and the question was does Emerson's engagement become stale so there is a legitimate argument that we don't have MNPI?

MR. COMERFORD:  Object to the form, it's been asked and answered.  The document speaks for itself.  You're trying to change the meaning of the document.  I object to it.

Q.   Well, my question is, is it true that you understood that if Emerson's engagement was not stale that National Instruments would have

Page 185

legitimate argument that it did not have MNPI?

MR. COMERFORD:  Objection; form.

A.   Yeah, and that's not true because I didn't know all of the -- all of the facts.  That's why we engaged Wachtell.  Ultimately any decision was going to be made with the advice of counsel regardless of what, you know, I stated or not.  In this case, this was one of the questions that we would want to ask.

Q.   So you identified it as "the" question.  Right?

A.   Say that again.

Q.   You identified it as "the" question.  Correct?  The question was whether Emerson's engagement with National Instruments had become stale.  Correct?

MR. COMERFORD:  Objection; form, foundation.

A.   No. 1, I said I think that's not my area of expertise.  That's why I engaged Wachtell.  So it could very well could not be that question.  It could be many other questions which was the point.  At this point, that's what I was thinking was the question that we needed to get clarity on.

Q.   This was your view that this was the

Page 186

question.  Is that right?

A.   It is.  It was a question, yes.

Q.   Your view as the --

A.   That we would --

Q.   -- compliance officer of the insider trading policy --

A.   That we would review -- that we would review with Wachtell.  Yes.

Q.   Why was it important to ask Wachtell this question?

A.   As a GC, I can't be the expert on every legal issue that could possibly come up.  Wachtell does this every day.  I don't do this every day with an unsolicited offer.  So absolutely my goal as a GC is always to follow the absolute letter of the law and to ensure the company is only taking action consistent with the letter of the law.  The way I confirm that since it's not my area of expertise, is through our counsel, Wachtell Lipton.

Q.   But why the Wachtell law firm in particular, rather than any of the other law firms that worked for National Instruments?

A.   Because that's who we had engaged for this particular matter.  And I'm not going to go around talking to 50 different law firms to -- I

Page 187

mean, this was our primary firm for this particular matter.

Q.   Which particular matter are you referring to, Mr. Dixon?  Wachtell was retained to represent you in connection with the Emerson transaction.

Correct?

A.   Correct.

Q.   Wachtell was not your buyback counsel.  Correct?

MR. COMERFORD:  Objection; form.

A.   In this context we would always -- we would run everything that even potentially touched on the Emerson transaction through Wachtell.  That was the prudent thing to do.  And that's what we did.

Q.   You had other law firms that advised you about 10b5-1 plans.  Is that right?

MR. COMERFORD:  Asked and answered.

A.   Yeah.

Q.   You didn't ask them, did you?

A.   I don't recall.  Albert may have asked them. I don't know.

MR. MANDEL:  All right.  Let's move forward.  Let's look at Document D69.  This is an email Bates NAT-SL-17249.  It's an email chain

Page 188

including you, Mr. Dixon, Mr. Ilcisin, Mr. Starkloff, Ms. Rapp.  There's some others further down in here.

(Exhibit 25 was marked.)

Q.   Now, this is a -- this is dated August 5th.  So this is the day after the email we were just looking at.  Right?  And three days after the August 2nd letter saying no to Emerson.  Is that right?

A.   It appears to be dated August 5th, yeah.

MR. COMERFORD:  What's the Bates number?

MR. MANDEL:  NAT-SL-17249.

MR. COMERFORD:  Thank you.

Q.   Now, Emerson's earnings were going to be announced a few days from this.  You can see that in the bottom email where Mr. Starkloff refers to the given earnings next week.  We're talking about earnings.

A.   Yeah, you'd have to scroll down.  I don't -- I don't see any of the --

Q.   Oh, I'm sorry.  If you go all the way to the bottom, Mr. Starkloff is talking about -- he's writing an email about Emerson having announced its dividend.  And he's saying:  It may give us insight

Page 189

that their board meeting was this week, which would be logical given earnings next week.

My point is only that the earnings are upcoming at this point from Emerson.

Do you see that?

A.   Uh-huh.

Q.   And if we scroll up a little bit more, right there (indicating), Mr. Ilcisin is proposing an earnings call party if the time works.

Do you see that?

A.   Yeah, I see that.

Q.   So is Mr. Ilcisin proposing that you-all get together to watch Emerson's earnings?

A.   I -- I have no idea what that was all about at the time.  You'd have to ask Kevin.

Q.   Well, you responded with an emoji -- with three emojis.  Right?

A.   Yeah, but I don't know what the purpose of the call was.  It could be an earnings call. I -- I don't know.  It said "if the timing works." I don't know.  I don't know what the relevance is, but anyway...

Q.   Mr. Ilcisin is proposing that you all get together to watch Emerson's upcoming earnings.

Isn't that right?

Page 190

A.   I don't know.

MR. COMERFORD:  Yeah, I'm going to object to the form and foundation.

A.   I mean --

Q.   Is it --

A.   -- you can ask Kevin what he intended. Right?

Q.   Well, did you have an understanding of what he intended?

A.   I mean, three years later, no, I can't tell you I know exactly what he was intending, but if -- you can read just as well as I can that it says we should do an earnings call party if the timing works.  It makes some sense, but you'd have to ask Kevin.

Q.   Well, would it make sense at this time to be watching Emerson's earnings?

MR. COMERFORD:  Foundation, form.

A.   Sure.

Q.   Why?

A.   Well, we had received an unsolicited offer that we rejected twice.  You always want to pay attention.  You got to be prepared for anything.

Q.   You'd sent the letter two days earlier -- three days earlier, I'm sorry, saying no to Emerson.

Page 191

Right?

A.   Absolutely.

Q.   And the defendant's position in this case is that after that there was no more material information to do with Emerson.

Do you understand that?

A.   We didn't have any material information at that point.  Right.

Q.   Why then were you watching Emerson's earnings call?  If you said no, and so Emerson's proposal was no longer material, why would you-all be planning a party to watch Emerson's earnings?

MR. COMERFORD:  Form.

A.   I mean, we virtually followed all competitors.  Obviously, anytime we had received something like this, it would behoove us.  It would only be prudent of us, in fact, to pay attention, regardless of where we were, because we owe a duty to our shareholders to do the right thing and be prepared.

Q.   Were you paying attention to this because you understood Emerson might return with another offer?

A.   Our view was we reject -- they came back with the same offer twice over a period of months,

Page 192

which, frankly, was, again, offensive in many ways, taking advantage of a seriously depressed market while we were in the position of doing a transformation -- a strategic transformation of our business.  We were not interested.  They had the opportunity to change.  They did not do that.

So, no, our view was this is done, we're not interested, we were never interested at that price.  And they could have changed the number if they were really interested in showing that they were interested in doing the deal, so...

Q.   Would Emerson -- would Emerson's earnings tell you anything about their firepower?

MR. COMERFORD:  Form, foundation, calls for speculation, incomplete hypothetical.

Q.   Please answer.

A.   I don't know.  I don't know what their earnings call might suggest.

Q.   Well, you guys were watching their earnings call aware that their capacity to carry out M&A was important to National Instruments.

Is that true?

A.   I --

MR. COMERFORD:  Form.

A.   -- I don't recall what -- and, again,

Page 193

you'd have to talk to Karen and Kevin.  I don't recall why we would be watching this.  We'd just obviously be interested in seeing what they're saying.  I don't know there was any particular purpose.  I mean, we just rejected, so...

Q.   Okay.  Did you actually watch the earnings call?

A.   I honestly don't recall whether we did or not.

Q.   Okay.  So after -- your testimony is that after August 2nd you were paying attention to Emerson's earnings, but you don't know why.

Is that right?

A.   We would pay attention to Emerson because we had been -- we had received an unsolicited offer which we rejected twice.  Absolutely.  And -- yeah, I mean, clearly what would they say about that.  So anyway...

MR. MANDEL:  Let's look at Document D75.

(Exhibit 26 was marked.)

Q.   This is Bates NAT-SL-18178.  I think this is Exhibit 26.

A.   Yeah.

Q.   If you can go to the page beginning

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 194

18179. You see there this is an email from Sabastian Niles at Wachtell on August 8th, informing you about Emerson's sale of InSinkErator.

Do you see that?

A.   Yeah.  Which one there?  It looks like there's two from Sabastian.

Q.   If you look at the bottom:  FYI re: -- re: Wolverine moving forward.

And it attaches an article, if you keep scrolling.

A.   Right.

Q.   So Sabastian Niles was letting you know on August 8th that they had completed the InSinkErator transaction.  Is that right?

A.   It appears that was the case, yes.

Q.   For $3 billion.  Is that right?

A.   That's what it says.

Q.   And we talked before about the relationship between that and Emerson's ample capacity to do M&A.  Do you recall that?

A.   I recall saying I don't know what they would use the proceeds for, so I don't know if it increased their capacity or not.  In a vacuum it could.  Outside of knowledge of any other facts or what their plans were, I don't know.

Page 195

Q.   But Wachtell was informing you of this information.  Correct?

A.   That's what the email says, yes.

Q.   Wachtell obviously thought it was important.  Right?

A.   They sent me the email.

Q.   Now, going to the first page of the document, 18178.  If you look near the bottom, do you see that Mr. Ilcisin is saying that the B of A team has some related thoughts related to the impact of the cash generation event.

Do you see that?

A.   Yeah.

Q.   But that's referring to -- the cash generation event is a reference to the sale of InSinkErator for 3 billion.  Correct?

A.   I assume that's what it relates to.

Q.   Okay.  And so the B of A team had some thoughts about that.  Right?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   That's what it says, but, yeah.

Q.   And we saw an earlier presentation from Bank of America, where they were doing some analysis of Emerson's capacity to acquire National

Page 196

Instruments in the event that they carried out this InSinkErator sale for $3 billion.

Do you remember that?

A.   I remember the other slide.

Q.   So now we learn on August 8th, 2022, that Emerson was selling InSinkErator for 3 billion and Mr. Ilcisin is saying that B of A has thoughts about that cash generation event.  Right?

A.   That's what his email says, yes.

Q.   Okay.  And if we look at the top email, it says:  I was talking to B of A on the weekend and they suggested a call in general related to earnings.  This news is key in their thinking.

Do you see that?

A.   Yes, I see that.

Q.   So the news about the InSinkErator sale was key in Bank of America's thinking about this transaction.  Is that right?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   Yeah, I don't know what Kevin explicitly was referring to.

Q.   Okay.  But did you -- did you read this email?

A.   I'm sure I did.  It was to me, yeah.

Page 197

Q.   Who was Kevin Ilcisin?  What was his role?

A.   He was the senior VP of business development, M&A, and strategy.

Q.   Was he very much involved in the development of the Emerson transaction?

A.   Well, I don't know what you mean by "the development."  He was actively involved once we received an unsolicited offer.

Q.   And he wrote to you that the news regarding the InSinkErator sale was key in Bank of America's thinking.  Is that right?

A.   He said in there -- if you don't know if he's --

MR. COMERFORD:  Hang on.

Objection; form, foundation, calls for speculation, asked and answered.

Go ahead.

A.   Yeah, I don't know who in their thinking he's referring to, you know.

Q.   Really?  Let's read the whole sentence.

"I was talking to BoA on the weekend and they suggested a call in general related to earnings.  This news is key in their thinking."

Does this help you see who the "they" is

Page 198

in that sentence?

MR. COMERFORD: Objection. It lacks foundation. It calls for speculation, form.

MR. MANDEL: Noted.

Q. Mr. Dixon --

MR. COMERFORD: It's been asked and answered five times now, I think.

MR. MANDEL: It hasn't been answered.

Q. You understand that Mr. Ilcisin is referring to BoA when he says that the news about the InSinkErator sale is key in their thinking?

A. I honestly -- I'm telling you --

MR. MANDEL: Please, stop, John.

A. -- no, I don't know. They could -- he could be referring to B of A. He could be referring to Wachtell. He could be referring to Emerson in their thinking.

All he said was "I'm talking to B of A on the weekend," suggesting a call. The news is key in somebody's thinking. You would have to ask Kevin who he was talking about.

Q. So you, as the general counsel of the company, had sort of a limited ability to interpret the English language and --

MR. COMERFORD: Okay.

Page 199

Q. -- and email. Is that what you're saying?

MR. COMERFORD: Okay. We're going to take a break because that's harassing and abusive, Mr. Mandel, and I'm not going to allow it.

MR. MANDEL: Mr. Comerford --

MR. COMERFORD: Do you understand?

MR. MANDEL: Your persistent coaching objections are something else.

MR. COMERFORD: Do you understand what I said?

MR. MANDEL: Do you guys want to take a five-minute break?

MR. COMERFORD: Do you understand?

MR. MANDEL: I'm sorry?

MR. COMERFORD: Do you understand what I said?

MR. MANDEL: Oh, I understood the words you said, yes.

MR. COMERFORD: All right. Why don't we take a short break?

MR. MANDEL: You know, English is -- you know, words have meanings, yeah.

MR. COMERFORD: Great. Short break.

MR. MANDEL: Do you want to take a

Page 200

break?

MR. COMERFORD: Yes.

MR. MANDEL: Okay. Five minutes?

MR. COMERFORD: Yes.

THE VIDEOGRAPHER: Going off the record. The time is 2:38.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 2:48.

Q. So we've been looking previously at an email in which you described the need for a legitimate argument that National Instruments had no MNPI. Do you recall that?

MR. COMERFORD: Objection; form, mischaracterizes the document.

Q. Do you recall that?

MR. COMERFORD: Mischaracterizes prior testimony.

A. I recall an email.

Q. Okay. And since then we looked at several emails in which you and National Instruments were paying attention to Emerson's earnings and the sale of the InSinkErator deal.

Do you remember that?

A. I remember a number of emails you put in

Page 201

front of me, yes.

Q. Okay. Now we're going to keep going further than that. Let's look at Document D79, please.

(Exhibit 27 was marked.)

(Discussion off the written record.)

MR. HELD: This will be Exhibit 27.

Q. This is document Bates 15079, NAT-SL-15079. This is an email from Sam Jeffrey at Mackenzie Partners to you and others at National Instruments and others at Mackenzie.

You see that?

A. Yeah.

Q. Now, this email states: ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or -- et cetera from there.

You see that?

A. Yes.

Q. And that ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Do you see that?

A. Yeah.

Q. So we saw before that Wachtell had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Page 202

▮▮▮▮▮▮.  Is that right?

A.    Yes --

MR. COMERFORD:  Form.

A.    -- that was in their materials.

Q.    And in the lead-up to this email, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮  Do you recall that?

A.    I -- I don't recall anything more than what you're showing me here, yeah.

Q.    Okay.  So this is referring to the recent Goldman Sachs buyer.  You see that?

A.    Yeah.

Q.    So what's going on in this email is that Mackenzie -- let's start there.  Who is Mackenzie Partners?

A.    Well, they were advisors for us.  I believe they were proxy advisors, too.  I forget what all they did, but they were certainly gathering market intelligence on shares, ownership, et cetera.

Q.    Is one of the things they were doing monitoring or accumulation of National Instruments' shares?

A.    Right.  They were engaged --

Q.    And --

A.    Yeah, they were engaged by our -- Marissa

Page 203

Vidaurri who was a part of the finance team at Corp.com, et cetera.

Q.    And what they're telling you in this email on August 10th, 2022, is that they have learned that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Is that right?

MR. COMERFORD:  Form, foundation.

A.    I'm reading what you're reading on the email, yes.

Q.    So on this date, you learned that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Is that right?

A.    That appears to be what it's communicating, yes.

Q.    And they ▮▮▮▮▮▮▮▮▮ that right?

MR. COMERFORD:  Form.

A.    I mean, I don't necessarily consider that ▮▮▮▮▮▮▮▮▮▮▮▮▮ but depends on your perspective.

Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Right?

A.    We didn't have a large number of shareholders.

Page 204

Q.    Do you know how many shareholders you had?

A.    No, I'm talking about large institutional ones.  I mean, there were, you know, a few that were 10-plus percent or whatever, but I don't recall exactly.

Q.    Now, this information ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it indicate to you that Emerson remained engaged in a potential National Instruments transaction?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.    Yeah, I -- I have no idea ▮▮▮▮▮▮▮▮▮▮▮▮▮ thus, why I would want to engage with our counsel about any change of information.

Q.    So just to be clear, your testimony is that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮  Is that right?

MR. COMERFORD:  Form.

A.    I don't read their mind.  I don't know ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ I had no idea.

Q.    Okay.  Let's have a look at Document D84

Page 205

now, which will be our Exhibit 28.

(Exhibit 28 was marked.)

Q.    This is a document Bates No. NAT-SL -- I'm sorry -- 8756.  This is an email from you to yourself --

A.    Yeah.

Q.    -- dated August 10th, 2022?

A.    Yeah.

Q.    Now, do you remember this email?

A.    Yeah, I remember it as I'm looking at it, yeah.

Q.    So on the evening of August 10th, you wrote this email to yourself.  Correct?

A.    Yes.

Q.    And this is after you learned about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮.  Is that right?

A.    After that and after a conversation with our counsel, yes.

Q.    Right.  So you learned that information.  You had a call involving several advisors, and then later that day, you went to -- and -- and wrote this email to yourself.  Is that right?

A.    Yeah, obviously a lot of things -- I dealt with a lot of things so I likely did this

Deposition of Eddie Dixon                                    In Re National Instruments Corporation Securities Litigation

Page 206

either real-time and saved it in draft or whatever. Went back and take a look at it and sent it to myself so we could document it, yes, the conversation, right.

Q.   So -- and this notes that -- it says: Putting money where mouth is messaging.

Is -- is that saying that ███████ ███████████████████ Emerson was putting its money where its mouth is?

A.   This was a -- basically a recapturing of the conversation and input that we had received from our counsel.  And clearly, that is a possibility, but, again, speculating exactly what was intended by that, we don't know.

Q.   Well, you wrote these words.  Right?

A.   I was capturing what Wachtell was periodically saying to us, yes.  I mean saying to us as part of that --

Q.   So you were advised --

A.   -- conversation, yeah.

Q.   So were you advised that ████████ ███████████████████ was an example of its putting its money where its mouth is?

A.   I would think they would use that phrase potentially, yes, but I don't recall exactly how

Page 207

they said it.  All I can recall was just what I captured from their discussion.

Q.   And you note:  Probability of going public is much higher now.

You see that?

A.   Yeah.

Q.   Do you believe that to be true?

A.   We had no idea.  They -- again, we're just capturing what the communication advice from Wachtell was, that that is a possibility.  We don't know what they're doing, especially considering we rejected the same offer over multiple months and had no interest in moving forward.

Q.   So according to your notes, Wachtell advised that the probability of Emerson going public is much higher now.  Is that correct?

A.   That would be a communication point that they likely made because I would just capture what they were telling us, yes.

Q.   Okay.  Now, the last bullet in this list -- I'm just going to read it and we'll talk about it.

"Adam, Wayne, Sabastian re-buyback, no material change situation implement if desired."

Did I read that correctly?

Page 208

A.   Yes.

Q.   Okay.  And you wrote that?

A.   I wrote that, yes.

Q.   Adam, Wayne, and Sabastian are Wachtell lawyers.  Is that right?

A.   All Wachtell lawyers, correct.

Q.   And does this note indicate that they said to implement buyback if desired?

A.   Correct.  That was the intent.

Q.   Okay.  Now, did Wachtell provide any written legal analysis on this point?

A.   I -- I don't recall any.  No.  That's why.

Q.   For example, did you read any memos from Wachtell?

A.   I don't recall reading any memos on it.

Q.   Did you do any independent research with respect to this question?

A.   I worked with Wachtell on it.  Albert may have done some additional, but the reality is we're relying on the experts on this, which was Wachtell, after providing them all the information and facts relevant with the case.  So again --

Q.   Did you --

A.   -- they do this every day.

Page 209

Q.   But --

A.   I don't do this every day.  This was their position.  I captured their position following the call.

Q.   Did you read any case law on this question?

A.   I can't recall whether I read any specific case law on it.

Q.   Do you recall doing any independent diligence with respect to this question?

A.   Don't recall.

Q.   Now, we saw the insider trading policy earlier today.  Do you remember that?

A.   Uh-huh.

Q.   The insider trading policy really emphasized the gravity of insider trading.  Is that right?

A.   Correct.

Q.   It noted criminal liability as a possibility.  Correct?

A.   That's what the policy said, yes.

Q.   Noted irreparable reputational harm. Noted potential civil liability.  All that is correct?

A.   Yes.

Page 210

Q.   Was it your custom to make decisions about potential criminal matters without receiving any written legal advice?

A.   It didn't see this is a criminal matter, but absolutely it is very common to get legal advice from your counsel not necessarily requesting any written documentation on it, particularly in a sensitive time like this where we don't want discovery of -- of documents.

So yeah, I'm very comfortable with making the decision based upon the analysis and advice of our counsel which are the experts in this area.

Q.   So you made this determination that the company could proceed with buybacks without reviewing any legal analysis in writing whatsoever.

Is that true?

MR. COMERFORD:  Form.

A.   I -- I don't recall whether I did any additional research myself, but ultimately I would absolutely rely on our outside counsel that we engaged for the specific person -- purpose of this, you know, unsolicited offer.  That's what they do.  That's not what I do every day.  So it would behoove me to rely on the experts, not on someone who would be doing it on a whim.  And I felt like that was in

Page 211

the best interest of our company, of our shareholders, and of myself to follow the advice of counsel.

Q.   Now, we discussed before in August and September of 2022 National Instruments did over $80 million worth of buybacks.

Do you remember that conversation?

A.   I didn't testify to that.  That's what you said.  And, again, I didn't disagree.  I don't know.  I didn't see the number.  I wasn't aware of the number at the time.

Q.   Understood.  Did you tell Wachtell that National Instruments planned on doing $80 million worth of buybacks in the third quarter?

A.   I don't recall what we communicated to Wachtell on the specific number.

Q.   But you didn't even know the $80 million figure.  Correct?

A.   Karen would be engaging on the -- and executing on any buyback.  Albert may have been aware because he would be the one responsible for working with Karen on that.

Q.   You didn't even know it.  Right?  You didn't know the plan to spend $80 million --

A.   No.

Page 212

Q.   -- on buybacks during that quarter.  Correct?

A.   That's right.  I didn't know everything because that was impossible to know everything.

Q.   So you could not have told Wachtell that fact.  Is that right?

A.   Yeah, I would not have told them that.

Q.   Now, at the time you say you sought this advice from Wachtell, ████████████████ ████████ Is that right?

A.   Likely the case, yeah, because I believe it was near closed.  Right.

Q.   So at this time ████████████████ ████████████████ Is that correct?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   We weren't -- yeah, we were not discussing that.  We were doing what was in the best interest of our shareholders based upon what we valued the company at and that's what we were getting advice from Wachtell on.

Q.   So their ████████████████████████ ████████████ just to be clear?

A.   ████████

Q.   And ████████████████████████████ ████████

████████████████████████████████ ████████ Correct?

A.   Yeah.  To be honest, we were not talking about fees.  We were focused on what we needed to do for our company.  That was the priority on what we would do for our company.

How to ensure that we're following the law, how to ensure that we're protecting our shareholders the best possible and getting the maximum value out of our company, including executing on our strategic plan.

Q.   I've shown you numerous emails today, in which you raised their fee structure.

When you say "to be honest, we were not talking about the fees," you mean in this conversation on August 10th fees didn't come up?

A.   Yeah.

Q.   Is that what you mean?

A.   I mean, I'd asked on a couple of occasions to give me a general fee structure because that was the way I worked generally.

Again, after having sent that, I had a conversation with, I suspect, Sabastian, and I suspect Adam was on there as well, around the general process and that we would -- we would

Page 214

discuss that at a later time.  But we did not continue to talk about, you know, fees.  We were focused on doing what was in the best interest of our company and our shareholders.

Q.   Okay.  I can't remember if you agreed to answer this question before based on some of Mr. Comerford's objections.  So I apologize if I'm retreading ground.

Page 215

MR. COMERFORD:  Form.

MR. MANDEL:  Correct or incorrect?

MR. COMERFORD:  Object.

Q.   Was this --

Page 216

A.

Q.   -- was this --

A.

MR. COMERFORD:  Asked and answered.

MR. MANDEL:  It hasn't been answered, Mr. Comerford.

MR. COMERFORD:  It has.

MR. MANDEL:  That's a "yes" or "no" question.

Q.

MR. COMERFORD:  Asked and answered.

Q.   Mr. Dixon?

MR. COMERFORD:  You can answer again. Answer again.

A.

Page 217

Q.   Earlier when I was asking you about the phrase "putting money where mouth is" at the second bullet of this document, you noted that you were -- these were the words Wachtell would have said that you wrote down.  Is that right?

A.   Yeah.  I believe that would be the case, yeah.

Q.   And so the same with like -- we read about probability of going public is much higher now.  What you're saying is you were jotting down, in effect, words Wachtell lawyers were saying.

Is that right?

A.   That would be the purpose of this memo to myself, was to capture what was discussed in that meeting, yes.

Q.   And the same is true with regard to implement if desired.  Is that correct?

A.   Correct.

Q.   So Wachtell said to you implement if desired.  Is that right?

A.   Again, I can't say those were the absolute exact words, but that was the -- the message was if we wanted to move forward, then we could do that.  There was no reason we shouldn't because we were not in possession of MNPI and there

Page 218

was no reason to not continue to just manage our business then.

Q. So this note doesn't indicate that Wachtell advised you that if you were to buy back shares, there would be no disclosure obligation concerning Emerson. Is that right?

MR. COMERFORD: Form.

A. Yeah, repeat the question. What was the question?

Q. Your note here from the August 10th call does not indicate that Wachtell advised you that if National Instruments bought back shares, there would be no disclosure obligation concerning Emerson.

Is that correct?

MR. COMERFORD: Form.

A. You see what's in the memo, but obviously I would have captured anything that Wachtell had said that was of substance and what we would have to do or not do.

Q. Right. So Wachtell did not advise you that you had no disclosure obligation if you bought back shares?

A. That would be --

Q. Is that right?

A. -- that would be implicit in this. I

Page 219

would -- if we had an obligation, I would have noted that we would have to do that.

Q. Well, this doesn't note any discussion of disclosure obligations, does it?

MR. COMERFORD: It's been asked and answered.

A. Yeah. I -- I -- you can read the memo as well as I can. I captured our actions, what we had discussed, and obviously if there were any other obligations or concerns, it would have been captured in here.

Q. And to be clear, you did no other diligence than this phone call for determining whether if you bought back shares, you had a disclosure obligation concerning Emerson.

Is that correct?

A. What's correct is I cannot recall. I can't tell you that I didn't have Albert do something. I can't recall at all what we may have done other than that.

At the end of the day I relied on my experts. That's why I paid them, to give us this advice, to make sure we were aligned.

If I didn't do that, I would be remiss to our company, to our shareholders, to be making

Page 220

decisions without involving the experts, such as Wachtell.

Q. Before, we saw that Ms. Rapp had sent an email to you on August 4th asking for authority to do buybacks. Do you remember that?

A. I don't recall exactly. I thought she had sent a message to Albert and copied me on something to that effect.

Q. Sure. You -- that's the email chain I'm talking about. There was an August 4th email where Ms. Rapp included you on the communication was seeking authority to do buybacks, and you identified the question of whether we had MNPI.

MR. COMERFORD: I'm going to object.

Q. Do you remember the email I'm talking about?

MR. COMERFORD: I'm going to object to the extent that mischaracterizes the document. The document speaks for itself.

Q. Do you recall the email I'm talking about?

A. I recall the email string, yeah.

Q. Okay. Before receiving that email, had you taken any steps to determine whether National Instruments was still in possession of MNPI?

Page 221

A. Well, clearly, we were -- we would talk to our board. We advised our board if anybody was aware of anything, but -- but, I mean, I -- I don't know how to answer that question. We clearly would have reviewed whether we had anything and that's why we would have a discussion with counsel on the facts, that information that we knew in order to get proper advice.

Q. So before you were asked for authority regarding buybacks, did you do any analysis concerning whether you were in possession of MNPI?

A. Well, we -- we would gather the information that we have and that we would go to counsel to share that information with them to help make a decision, provide us advice based upon their expertise.

Q. So on August 2nd when you sent -- when National Instruments sent a letter saying no to Emerson, you began an analysis concerning whether National Instruments no longer had MNPI?

MR. COMERFORD: Form.

A. I would say we didn't necessarily do anything until Karen asked us the question. So I wouldn't say immediately after August 2nd, no, we wouldn't do that. It was only when Karen in her

Page 222

role as CFO making a determination of how she would utilize our capital, ask the question, then we would do an analysis of, hey, here's the information we have. We would share everything. Literally everything -- every piece of information we had would go to Wachtell. They were hand-in-hand with us throughout this process.

Q. Let's have a look at Document D85, which will be our Exhibit 29.

MR. MANDEL: This is NAT-SL-9535. And I think I said this is probably -- yeah, our Exhibit 29.

(Exhibit 29 was marked.)

Q. This is an email -- it's an email chain. The email at the top is written by you to Albert Percival cc'g yourself. There are other emails below.

So just for the record, the last email that we looked at was dated August 10th, 2022, and you sent it to yourself at 7:39 p.m. and 34 seconds according to the cover of the previous document we just looked at. This email you sent a little over ten minutes later on August 10th, 2022, at 7:51 p.m.

Do you see that?

A. Uh-huh. Yes.

Page 223

Q. So about ten minutes after you wrote an email to yourself --

A. Well, again, I don't know when I -- I likely created a draft of that on the call and then sent it to myself later in that evening. Right.

Q. Fair enough. I'll -- I'll rephrase it.

So about ten minutes after you hit send on that email to yourself on August 10th, you wrote the email that we see here on the screen beginning with the words "FYI." Correct?

A. Yes.

Q. And you wrote: Eric and Karen are calling board members to let them know the plans re: Buyback and lifting the restriction.

You see that?

A. Yeah.

Q. What plan is being referred to here?

A. What do you mean? The plans regarding a buyback? That would be Karen and Eric made a decision they were going to implement share buyback after we got advice from counsel confirming that day that it would be okay.

Q. So there was a plan re: Buyback and lifting the restriction.

You see that?

Page 224

A. We would -- yeah, we would clearly lift the restriction before the -- before the buybacks were made, but...

Q. Why would it be necessary to lift the restrictions before the buybacks were made?

MR. COMERFORD: Form.

A. Yeah, I -- that seems kind of self-evident. We would want to lift the restriction if we had a trading restriction in place before we actually implemented a buyback or anyone else was allowed to buy because there was no longer any MNPI in possession. So we would lift the restriction like we did any other time.

Q. Did the restriction you had issued apply to National Instruments?

A. Did the -- say that again. Did the restriction apply to National Instruments?

Q. Yes.

A. We would operate as if it did, but I don't know that the restriction that we sent explicitly stated something about the company.

Q. Right. This was a restriction you were lifting regarding the board members trading because they were aware of Wolverine. Is that right?

A. Clearly, we would be lifting it for the

Page 225

board members as well as -- as we would everyone else associated with Wolverine.

Q. So the -- you didn't need to lift the restriction on board members in order for National Instruments to do buybacks. Is that right?

A. We would always look -- the -- if we had a restriction in place, we would not expect our board to be trading.

Q. I understand.

In the buybacks, was your board trading?

A. No, not that I'm aware of, but I -- I --

Q. Right. The buybacks were carried out by National Instruments. Correct?

A. Correct. Correct.

Q. But you're lifting a restriction that doesn't apply to National Instruments here. Do you see that?

A. I'm lifting a restriction because we no longer possess MNPI and there was no reason to have a restriction in place for anyone.

Q. Well, you're lifting the restriction to enable buybacks. Correct?

MR. COMERFORD: Asked and answered.

A. We're lifting the restriction to no longer have a trading restriction in place, period.

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 226

Q.   But you wrote here that there was a plan re:  Buybacks and lifting the restriction.  Correct?

A.   No, I said to let them know that there are plans regarding a buyback and that we will be lifting the restriction.

Q.   Well, that's not what you wrote, Mr. Dixon.

A.   Well, I --

(Simultaneous speaking.)

Q.   (Unintelligible.)

A.   Yeah.  Shame on me for not being perfect for you.

Q.   So before, you told me you didn't consider lifting the MNPI restriction until you were asked for authority to do buybacks.  Right?

A.   Well, we went through the process obviously.  We would be eventually lifting the restriction, but, I mean, we've got a lot going on obviously at that time.  Very quickly after, you know, we notified them, Karen reached out about it.

I -- I mean, frankly, we were likely expecting to do that regardless because we've received a $48 offer months later that, again, was offensive and we were no longer -- we were no -- never interested in doing that.  So at some point,

Page 227

again, we have to move on and operate our business when it was clear that wasn't going to happen.

Q.   Why were Eric and Karen calling board members about this?

A.   You'd have to ask them.

Q.   Well, you wrote an email saying that that's what they were doing.

A.   Yeah.  I mean, they're going to call them.  Somebody has to notify them.

Q.   Are these notifications typically done in writing or by phone?

MR. COMERFORD:  Form.

A.   I mean, it would vary.  Who -- notifications of what?  Tell me what you're talking about.

Q.   When you set up the Wolverine restricted list, did you do that by phone?

A.   We would send a restriction message of which I believe you've seen.

Q.   Right.  We showed it to you earlier.

So here, you're lifting -- you're calling board members -- Eric and Karen are calling board members to let them know about the plan re:  Buyback and lifting the restriction.  Why was it necessary to call them rather than just doing it in writing?

Page 228

A.   I'm sure we actually did it in writing as well.

Q.   But why was it necessary to call them beforehand?

A.   You'd have to ask Karen and Eric, but I suspect they just wanted to give them update on the plans based upon the fact that we had rejected the offer; we had talked to counsel; we had gotten clearance to move forward.  No reason other than general board communication that was appropriate to do on many occasions.

Q.   You write in the next sentence:  Once they complete those calls tomorrow, we will need to send a release message associated with Wolverine, et cetera.

Do you see that?

A.   Uh-huh.

Q.   So why was the plan to call board members about a plan re:  Buyback and lifting the restrictions and only once those phone calls were completed to send a written notification of this?

MR. COMERFORD:  Foundation.

A.   Yeah.  I mean, that would be out of respect of the board, quite frankly.  So -- and it was -- as you're looking at it, it's 7:50 at night.

Page 229

We weren't going to -- you know, Karen and Eric were unlikely to get the board then, anyway.  So, basically, we give them -- give them the proper respect that the board deserves, communicate to them what the plan is and then move forward with the release message.

MR. MANDEL:  Now, let's just press forward a little bit.  Let's look at Document D93.  This is Bates NAT-SL-20763.  I think it's Exhibit 30.  Correct.

(Exhibit 30 was marked.)

Q.   This is an email written by you to some others dated August 23rd, 2022.  Do you know what NOBO refers to?

A.   I believe it's name only beneficial owner or something like that, but I don't recall the exact acronym.

Q.   Is this referring to the market surveillance that Mackenzie was doing?

A.   Right.

Q.   And here, you are saying to execute another NOBO "limited costs to get an idea if anything else is going on with Emerson.

Do you see that?

A.   Sure.

Page 230

Q.   So did you propose to continue the market surveillance that Mackenzie had been doing?

A.   Sure.  We would be absolutely remiss if we wouldn't pay attention to what was going on with our -- with our stock.  But natural, I was doing my job and I was triggered by, I think, Marissa.  It looks like Marissa had sent a -- basically an update on some of the prior information that we had received.  So, hey, let's just do it again, make sure.  If we get new information, we may have to make just different decisions, but let's do that.  We don't have any more information at this point.

Q.   I understand.

So you just -- to -- to put it simply, you're proposing continuing the surveillance to monitor for accumulation of National Instruments' shares.  Is that fair?

A.   Yeah.  Yeah, I wouldn't say it was like a continual thing, but at this time, it just made sense to do a check.

Q.   Understood.

You had had some market surveillance going on and you're proposing to keep it going.

A.   Yeah, at that time.

Q.   Is that correct?

Page 231

A.   Not necessarily indefinite or anything like that, but let's just --

Q.   Of course.

A.   You know, let's be smart like we would with any other, you know, purchaser of our stock.

Q.   And so you regarded information regarding the accumulation of National Instruments' shares by Emerson as valuable information.  Is that fair?

MR. COMERFORD:  Form.

A.   Not the -- the level of interest that they had in the company, but we would obviously want to know if things changed.

Q.   Well, you explain in your email here that the purpose is to, quote, get an idea if anything else is going on with Emerson.

A.   Right.

Q.   Do you see that?

A.   Yeah, there was a significant change, a new material change, but...

Q.   So the purpose of this continued surveillance was to see ███████████ ████████████████████████  Correct?

A.   We would actually pay attention to any other major buyers of our stock so absolutely.  In this particular case clearly I noted Emerson, but

Page 232

that's just proper, you know, a -- approached by any company to pay attention to what's going on in the stock all the time.

Q.   Why was it important to know if Emerson was ████████████████████████████████ ████████

A.   Just to see if there was any new information that we should be aware of.

(Exhibit 31 was marked.)

Q.   Let's look at Document D94, that'll be NAT-SL-17309.  Now, you mentioned Marissa Vidaurri.  Am I pronouncing that correctly?

A.   Right.  She was investor relations, Corp.com, yeah.

Q.   And -- right.  She sends the email on the bottom half of the paper we're looking at here which is "having executed that" -- she says:  We have executed the NOBO.

That's what you were referring to in the email we were just looking at about continuing the NOBO.  Is that right?

A.   Yeah, I believe that relates to that, yeah.

Q.   So she mentions that National Instruments has executed the NOBO and it notes that Mackenzie is

Page 233

not in the loop on Nuthatch.  Do you see that?

A.   Uh-huh.

Q.   So did Mackenzie not know that Emerson had approached National Instruments about a potential acquisition?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   Yeah, I cannot recall the timing of Mackenzie.

Q.   Well, this email indicates that Mackenzie is not in the loop on Nuthatch.  Correct?

A.   Marissa -- that's what Marissa says and she would coordinate that relationship, yeah.

Q.   And so -- but nevertheless she asks their perspective on the accumulation.  Do you see that?

A.   Uh-huh.

Q.   And do you see Mackenzie's interpretation of these facts?

A.   I see Mackenzie's summary of general comments about the accumulation, yes.  I don't believe --

Q.   So --

A.   -- it related to any particular transaction or purpose, it was general statements made in a case study.

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 234

Q.   Well, there's a link to a case study but the summary is not of the case study, is it?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   I was involved.  I didn't see the case study.  I don't know what it was about.

Q.   It says:  Below is a summary and a link to a case study.

The summary is one thing, the link to the case study is the other?

A.   Yeah.

MR. COMERFORD:  Form, foundation calls for speculation.

Q.   So Mackenzie's summary was, quote, ██████████████████████████████

Do you see that?

A.   I don't know if that was their summary or if that was Marissa's summary, but I see the bullet point, yes.

Q.   Okay.  So Marissa is writing in this email that this is a summary of Mackenzie's perspective on the accumulation.  Is that right?

A.   No, this was a summary of a case study that Mackenzie apparently did ten years ago and that

Page 235

Marissa was summarizing.

Q.   Well, I'm sorry.  This is the plain meaning of the document.  This summary is not a summary of a case study.  This specifically says:  Mackenzie's not in the loop on Nuthatch but I did ask their perspective on the accumulation.  Below is a summary and link to a case study from over ten years ago.

Do you not see that?

MR. COMERFORD:  Yeah, this has been asked and answered.  I'm objecting to the form, foundation, and it calls for speculation.

A.   I did not speak with Mackenzie on this.

MR. MANDEL:  I don't think it's calling for speculation.

A.   I didn't speak to Mackenzie on this.  This was what Marissa said so it speaks for itself.

Q.   So Marissa indicates that Mackenzie's view was, quote, ████████████████████ ████████████████

Correct or incorrect?

MR. COMERFORD:  Objection; mischaracterizes the document, foundation, calls for speculation.

Q.   Mr. Dixon?

Page 236

A.   I mean, I'm reading the same thing you are.  That's all I can say.

Q.   So ████████

A.   It's her summary.

Q.   -- █████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████. Is that right?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   Yeah, I can't assume this had anything to do with Emerson at all.  This was a general discussion.

Q.   You can't assume this has anything to do with Emerson, it references Nuthatch.  Nuthatch was a code name for Emerson.  No?

A.   But again, it states they were not even aware of Nuthatch.  That was a general statement about accumulation of shares.  There are facts that play into every different scenario as you well know.  This would be no different than any other training material, education material, that you might give a board, so...

MR. MANDEL:  Now let's have a look at

Page 237

Document D97.

(Exhibit 32 was marked.)

Q.   This is, I want to say, exhibit --

MR. MANDEL:  Alex, you tell me the current exhibit number?  I've lost my exhibits.

Mr. HELD:  32.

MR. MANDEL:  32.  Thanks.

Q.   This is Bates NAT-SL-23790.  This is an email from Marissa Vidaurri dated September 1st, to you and others at National Instruments and Wachtell.

Do you see that?

A.   Yeah.

Q.   So if we look at the last page of the document, yeah, there it says "see attached" and it writes: ██████████████████████

██████████████████████████████.

It goes on from there.  Do you see that?

A.   Yeah.

Q.   And it states that t██████████████

██████████  Do you see that?

A.   Yeah.

Q.   So, before, we saw that Mackenzie had informed you that they were -- ████████████

██████████████████████████████

██████████████  you remember that?

Deposition of Eddie Dixon                                   In Re National Instruments Corporation Securities Litigation

Page 238

A.   Yes.

Q.   And now, ███████████████████ ███████████████████████████████. Is that right?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   I can see what the note says from Kevin.

Q.   Do you have any reason to believe it's untrue?

A.   I have no reason to believe that.  I don't know as a fact.

Q.   So ████████████████████████████████████████████████████. Is that right?

A.   It appears that they did.

Q.   If we go to the first email in the chain, at the top, ████████████████████████████████████████████████████████████████████████████████████

Do you see that?

A.   Yep.

Q.   So this is indicating that ██████

Page 239

██████████████████████████████████████████████████████████████████████████

A.   That's what it says, yes.

Q.   And you knew this at this time?  Is that right?

A.   Yeah, we knew it was below $48.  And, frankly, again, our view was it was undervalued.  Likely a good purchase for them.

MR. MANDEL:  Another document, let's look at D104.

(Exhibit 33 was marked.)

Q.   This is Exhibit 33 NAT-SL-23189, an email from you, Mr. Dixon, to several Wachtell lawyers as well as Mr. Starkloff, Mr. Ilcisin, and Ms. Rapp.  Is that right?

A.   Yep.

Q.   Now, there was an upcoming board meeting at this time.  Is that right?

A.   I don't recall.

Q.   I can represent to you there was a board meeting on September 20th to 21st, 2022?

A.   Okay.

Q.   Now, in this email you write:  Eric, Kevin, and I spoke this afternoon regarding the

Page 240

general message/Wolverine update to the board on Wednesday.

Do you see that?

A.   Yep.

Q.   Is this an email where you're planning the general message to tell the board regarding Wolverine at the upcoming board meeting?

A.   That seems to be correct, yes.

Q.   Now, you write here that:  NI is on Wolverine's acquisition pipeline list and there is no evidence that Wolverine's interest has petered out.

Do you see that?

A.   Uh-huh.

Q.   So as of this time you understood -- well, did you believe as of this time that Emerson's interest had not petered out?

A.   We honestly didn't think they would go above 48, so there was no reason to believe they wouldn't come back at 48 again, but we had no reason to believe they would go above that in light of their behavior to this point.

Q.   Why did you believe they wouldn't go above 48?

A.   Because they've given us 48 twice over a

Page 241

period of months, they had significant time to better the offer, they never did that.  They, in fact, didn't communicate with us for quite some time.

Q.   Did the June 22nd letter indicate a willingness to possibly pay more?

A.   I don't recall exactly what it said, but the reality is they never did.  All we could operate on is what we received.

Q.   And nevertheless as of September 19th it was your belief that, quote, there is no evidence that Wolverine's interest has petered out.

Is that right?

A.   At $48 a share.

Q.   Well, where is that in this document?

A.   No.  I'm saying there is no evidence that's what they've given us twice.  I mean, clearly they would buy the company at $48 a share.  We wouldn't sell the company at $48 a share.

Q.   As of this time you understood that National Instruments remained on Emerson's acquisition pipeline.  Is that true?

A.   We assumed they wouldn't have sent an unsolicited offer if we hadn't been.

Q.   And when you say there's no evidence that

Page 242

Wolverine's interest has petered out, you mean to say that since you learned National Instruments was on Wolverine's acquisition pipeline, you had learned no information to indicate that Wolverine, Emerson, was no longer interested in acquiring National Instruments. Correct?

MR. COMERFORD: Objection; asked and answered, form, calls for speculation.

Q. You can answer, Mr. Dixon.

A. No interest above what we had received from them over the last several months.

Q. And you give examples of what evidence that Emerson's interest had petered out might be.

Is that right?

A. Yeah. Okay.

Q. You wrote: Evidence might be, for example, Wolverine selling its shares or announcing another large acquisition, making NI unaffordable.

Do you see that?

A. Yeah. Absolutely.

Q. And what you're writing here is that no such evidence exists. Correct?

A. No such evidence existed. No such evidence existed that they were any more interested than they were at $48.

Page 243

Q. In the third bullet on this page you wrote: Speculation is that the purchase of shares was intended to signal that they are serious about the potential for an acquisition.

Is that right?

A. Yeah, that's what I said. I --

Q. Whose speculation are you --

A. That was a discussion among --

(Simultaneous speaking.)

Q. -- referring to?

A. Yeah, that was discussion among Eric and Kevin and I.

Q. And so you and Eric and Kevin had a discussion in which you speculated that Emerson's purchase of National Instruments' shares was intended to signal that Emerson was serious about the potential acquisition of National Instruments?

A. Yeah. Purely speculation. Again, not at any different price than what we had assumed and received twice already, of which we had zero interest.

Q. And, of course, you wrote further: Speculation -- this is the second bullet from the bottom here -- speculation is that Wolverine will likely approach NI privately again before going

Page 244

public, but that is unknown, of course.

Do you see that?

A. Yes.

Q. Whose speculation are you referring to there?

A. That would be the conversation Eric, Kevin, and I had.

Q. So you, Eric, and Kevin had a conversation in which you speculated that Wolverine will likely approach NI privately again.

Is that correct?

A. Yeah. And if they did, it would be at $48 a share, just like we had received before. No new information.

Listen, they wanted us cheap. We weren't going to sell cheap. That's the bottom line. And they made no indication that they were willing to move above that.

MR. MANDEL: Let's look at D105.

This is going to be Bates NAT-SL-1450. It's the minutes from the September 20, 2021 -- 20 and 21, 2022 meeting of National Instruments' board of directors.

MR. COMERFORD: Exhibit 34, for the record.

Page 245

MR. MANDEL: Thank you, John.

MR. COMERFORD: Yep.

(Exhibit 34 was marked.)

Q. Now, I'm going to ask you to please turn to Page 4 of 5 of these minutes. It's Bates 1453.

Now, you see -- oh, if we scroll down to executive session, do you see there Mr. Emmerich, Mr. Niles, Mr. Liu, and Mr. Daniels joined the meeting.

Do you see that?

A. Yes.

Q. Mr. Emmerich and Mr. Niles are Wachtell attorneys. Correct?

A. Correct.

Q. And Mr. Liu and Mr. Daniels are Bank of America bankers, advising National Instruments about the potential Emerson deal. Is that right?

A. Correct.

Q. Now, the date of this meeting is September 20th and 21. And at this point in time this is now -- the letter was sent on August 2nd, saying no. Right? So this is over six weeks after that. Right?

A. Yeah. I don't know the exact amount of time, but that's approximate, yeah.

Page 246

Q.  Well, if it's true that there was no more material information concerning Emerson's potential acquisition of National Instruments at this time, why was the board meeting with lawyers and bankers about that potential transaction?

A.  It would be appropriate to always keep our board informed. When you get something like an unsolicited offer, you don't, like, treat it willy-nilly and just toss it aside. You stay informed, stay up to speed, keep the board informed.

The last thing you ever want to do is have a board surprise plan anything. So we would keep giving them periodic updates on this, along with many other opportunities that we might have.

Q.  You were giving them periodic updates about Emerson's potential acquisition of National Instruments. Is that what you're saying?

A.  We would give them periodic updates around the situation that we had been involved in and what the status was as of that day.

Q.  But I thought when you sent the letter --

A.  We didn't see it as an acquisition. We were not interested in being acquired. We didn't look to sell the company. So we just needed to keep the board informed, and that's what we would do.

Page 247

Q.  You're keeping the board informed about this because it's important information.

Is that right?

A.  No. If there were important -- new important information that the board needed to be informed of, we absolutely would want to. It would be very much the case if we were going to communicate to them that there was no new information, that we would communicate that as well.

Q.  So you invited bankers and lawyers to a board meeting to inform your board that there was nothing to inform them about? Is that what you're saying?

A.  Our board would want to hear from our bankers and from our lawyers periodically on this transaction. This was --

Q.  What transaction? I thought you said no and there was nothing material left? Why are you --

A.  On the unsolicited offer --

Q.  -- meeting about this if there's nothing of a transaction?

(Simultaneous speaking.)

A.  -- on the unsolicited offer that we had received. They would want to stay up to speed if anything had changed.

Page 248

Q.  But you invite -- just to be clear, you invite your lawyers, your bankers to a board meeting to tell your board nothing has changed.

Is that your testimony?

A.  I'm telling you we invited them to this meeting. We had this executive session. And what was discussed was what was discussed, as noted in the minutes.

Q.  It says there that Wachtell and B of A provided their perspectives on the potential go-forward scenarios with Wolverine.

Do you see that?

A.  Yeah.

Q.  What potential go-forward scenarios were discussed here?

A.  I think it's clear regarding ███████ ███████████████████████, any public commentary that they might have regarding their priorities. Exactly what's stated. That was what Wachtell communicated and discussed with the board.

Q.  So it was clear at this time that Emerson remained potentially interested in acquiring National Instruments. Is that right?

MR. COMERFORD:  Form, foundation, calls for speculation.

Page 249

A.  We had no idea what Emerson would do. It's not my job to figure out and anticipate what Emerson would do. It's my job to make sure our board is fully informed and that we're prepared for anything. But we didn't know what they were going to do. What we knew was we were not interested in selling the company at $48 a share. And that's all the information we had at that time.

Q.  You knew at this time that there were potential go-forward scenarios with Wolverine.

Correct?

A.  I don't know exactly what -- what was discussed in that particular meeting, but clearly you had to anticipate anything that potentially could happen. Not that, again, we expected anything to happen.

Q.  So there were potential go-forward scenarios involving Emerson. Is that right?

A.  I don't know exactly what was communicated by Wachtell at this -- in this meeting. I don't recall.

Q.  Do you have an understanding of why -- why you were using code names at this point?

A.  When we received the unsolicited offer, we would provide -- in any particular case, whether

Page 250

we were acquired -- looking to acquire a company, whether we received some unsolicited offer like this, we would create a code name so that it would be kept, you know, confidential within the company, and we would continue to use that because that's how people would know it.

Q.   Are code names necessary because you're talking about potential material nonpublic information?

A.   At this point it was simply a convenience to use the same name.

Q.   So the code names originate with a need to protect MNPI, but by this time you're saying that was no longer necessary and you just kept using the code names.  Is that correct?

A.   Yeah, pretty much.  Yeah.

Q.   Okay.  So you're using code names, meeting with lawyers and bankers about potential go-forward scenarios with Emerson, including discussion of their toehold, but there was nothing material concerning Emerson at this time.

Is that your position?

A.   That was our position, as supported by advice from our counsel, yes.

Q.   And your counsel is telling you about

Page 251

potential go-forward scenarios with Emerson?

A.   Oh, boy.  Yeah, you've -- you've asked me that.  It's the same answer.

Q.   Yeah.  Well, but that's contrary to what you're describing as the position supported by advice from your counsel, isn't it?

MR. COMERFORD:  Objection; mischaracterizes testimony.

Q.   Mr. Dixon?

A.   I -- I don't have a response.  I don't even know what your question was.

Q.   When your counsel is advising you about potential go-forward scenarios with Emerson. Including the implications of their toehold, the fact of this advice is contrary to the idea that there's no material information anymore here.  Do you agree?

MR. COMERFORD:  Objection; mischaracterizes the document, form, foundation, calls for speculation.

A.   Yeah.  No, I -- I don't agree.  I -- I don't know at the time what was discussed and it absolutely could be just general business discussions, making people aware, informing the board, keeping them up to speed.  Like, other than

Page 252

that, I can't tell you anything else about what took place in this meeting.

Q.   Okay.

MR. COMERFORD:  Can we take a short break?

MR. MANDEL:  Absolutely.  I was going to propose the same just now.

MR. COMERFORD:  Okay.  Thanks.

THE VIDEOGRAPHER:  Going off the record.  The time is 3:58.

(Break.)

THE VIDEOGRAPHER:  Back on the record.  The time is 4:15.

Q.   Welcome back, Mr. Dixon.

Let's put up another document.  This will be Document D33.  Exhibit 35.

(Exhibit 35 was marked.)

Q.   This is an email Bates NAT-SL-23205. It's an email chain involving Mr. Dixon, Mr. Ilcisin, and Ms. Rapp.  At the bottom, also, there's a Pedro Andrade on the communication who is not on the communication at the top of the page.

Do you remember this exchange, Mr. Dixon?

A.   No, I don't -- I don't remember it.

Q.   Have you reviewed this document recently?

Page 253

A.   No, I don't believe I've seen this.

Q.   All right.  So if you look at this document, in the bottom, Mr. Ilcisin writes an email to Mr. Andrade and Ms. Rapp.  And the re: line message is "Quick note on your BOD financing slot."

You see that?

A.   Yeah.

Q.   And who is Pedro Andrade?  Do you know?

A.   Yeah, Pedro was a VP of finance, treasurer at NI.

Q.   Now, Mr. Ilcisin wrote an email to Pedro saying -- and the email is regarding the -- it's a quick note regarding your BOD financing slide.

And he writes:  Suggest the first section on Page 1 be labeled context, not problem statements.  Recurring M&A and opportunistic buybacks are better not framed as a problem.

Do you see that?

A.   Yeah, I see that.

Q.   Do you understand from this that Mr. Andrade had created a document that referred to opportunistic buybacks as a problem?

A.   I don't recall seeing what Pedro had created, but I -- anyway, yeah.  Go ahead.

Q.   Well, but do you understand from this

Page 254

email that that's what occurred?

A.    It appears.  I would like to see the document you're referring to that he created if -- if you want me to comment on it.

Q.    I, too, would like to see this document, Mr. Dixon.  We'll get to that.

So Mr. Ilcisin writes an email to Mr. Andrade suggesting to change a -- a -- a description of opportunistic buybacks as a problem to one referring to only context rather than problem.

Do you see that?

A.    Yeah, I mean, that would make sense.  I would agree with that.  Opportunistic buybacks are exactly that.  The stock's valued low.  You look at those opportunities.  It shouldn't be a problem.

Q.    Okay.  So it seems that there was a document created by Mr. Andrade in July of 2022 that referred to buybacks as a problem and Mr. Ilcisin suggested changing "problem" to "context."

A.    No I don't read it that way.  So he uses the phrase "problem statement," which is a common thing in any technology company, by the way, when it's outlining a discussion to state at the top of the document "problem statement," identify the issue

Page 255

that you're, you know, talking about and then continue with -- with, you know, more details about it and then maybe ultimately a conclusion or proposal.

So I don't necessarily see it -- problem statement as opportunity buybacks are a problem.  I think Kevin is saying that that could be misconstrued when, in fact, problem statement is really intended to provide the context.

Q.    Okay.  He's saying: Opportunistic buybacks are better not framed as a problem.  Better to frame them as context.

Correct?

A.    That appears to be what his recommendation is, yeah.  You can talk to Kevin about that, but that seems appropriate.

Q.    Okay.  Kevin then forwarded that email to you.

A.    Uh-huh.

Q.    And to Ms. Rapp.

And he writes to you:  Sent this to Pedro copying you but without explaining why.  This could be Nuthatch discoverable.  Don't want these listed as problems.

Do you see that?

Page 256

A.    Yeah.

Q.    So Mr. Ilcisin informs you about this and explains that because the document could be discoverable, he's recommending to changing it from referring to buybacks as problems.  Is that what this means?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.    As -- as we've stated, any document that's discoverable can be misinterpreted and I think Kevin, to his, you know, credit is actually saying, hey, let's -- let's draft things what they really mean, not something that could be misconstrued as a problem.

Q.    So he doesn't want buybacks referred to as problems because the document could be discoverable.

A.    No.

Q.    Is that correct?

A.    No, because they're not a problem.  Opportunity buybacks are not a problem and he's saying we don't want anyone to interpret that they are a problem, which is what you're trying to do.

Q.    I'm sorry.  I'm going to read his quote again: This could be Nuthatch discoverable.  Don't

Page 257

want these listed as problems.

MR. COMERFORD:  Asked and answered, form, foundation, calls for speculation.

Q.    When he says that it could be discoverable, what's he talking about?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.    Yeah, I mean, I can't read it any more than you can.  You can probably interpret it as well as I can.

Q.    Well, but you're the one under oath here, Mr. Dixon.

A.    Yeah.  I mean, the document that he's referring to could be discoverable.  It states exactly what it means.

Q.    Discoverable in a litigation?

MR. COMERFORD:  Form, speculation, calls for speculation.

A.    Speculation.  Yeah.  I -- I mean, sure, possibly but you'd have to --

Q.    Would it be discoverable at some other context?

A.    Yeah, you'd -- you'd have to talk to Kevin and ask him, but that seems rational.

Q.    Well, you're the general counsel of the

Deposition of Eddie Dixon

In Re National Instruments Corporation Securities Litigation

Page 258

company and he's writing to you an email about whether something might be discoverable.

A.   Right.

Q.   And he's discussing changing the document because it could be discoverable.  Is that right?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   I agree that I don't want something discoverable that can be misconstrued that's inconsistent with what the intent was.

Q.   So you as the general counsel of this corporation were aware that management were changing documents in case they were discoverable.  Is that right?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   Every company reviews its documents to ensure that they're as clean as possible, should they be discoverable, that they won't be misinterpreted.  Not an uncommon thing for any company.

Q.   And there was some concern that buybacks might be referred to as a problem in something discoverable.  Is that correct?

A.   That they could be misinterpreted if --

Page 259

if discoverable, yes.

Q.   And so when Mr. Ilcisin told you about this, your response was a thumbs-up emoji.  Is that right?

A.   Yeah, very consistent with what I just told you.

Q.   Right.  But you approved of changing the reference to buybacks from problem to context because it could be discoverable.  Correct?

A.   No, because I thought it -- no, because I better -- I thought it better represented the intent and we didn't want something that was discoverable to be misconstrued, as I would give any advice on any other document that might go to the board or any of our executives.

Q.   Did you ever direct anyone to destroy documents?

A.   No.

Q.   You never told anyone to destroy a document that might be discoverable --

A.   I'm not -- I'm not aware of that.

Q.   Okay.  Do you think it's possible that some of the management team might have understood anything you said as a direction to destroy documents --

Page 260

A.   I -- I -- I can't speculate --

Q.   -- that could be --

(Simultaneous speaking.)

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   Yeah, I can't speculate as to what they may or may not have thought.

Q.   Okay.  Do you know what happened to the document that referred to opportunistic buybacks as a problem?

A.   I do not.

Q.   Would it surprise you to hear --

MR. COMERFORD:  That mischaracterizes the document.  It's a problem statement which is not the same thing as a problem -- a problem.

MR. MANDEL:  Mr. Comerford, please stop testifying.  Quote, Recurring M&A and opportunistic buybacks are better not framed as a, quote, problem.  By Mr. Ilcisin to Mr. Dixon in this exhibit.

Please stop, Mr. Comerford.  Come on.

MR. COMERFORD:  Labeling something as a problem statement is different than labeling something as a problem.  I hope you know that.

MR. MANDEL:  You can testify about

Page 261

that.  You can testify about that later, Mr. Comerford.

A.   I will testify to that.  Again, as I told you, it's not uncommon to have problem statement on a slide and it could be misinterpreted, you know, in this particular case Kevin was concerned about that being misinterpreted as suggesting opportunistic buybacks were a problem.  That's not what the intent was.

Q.   Okay.  Well we have asked repeatedly for this underlying document, the one that referred to opportunistic buybacks using the word "problem" and defense counsel was unable to locate this document.  Does that surprise you, Mr. Dixon?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   I have no opinion on that.  I've not been involved in this in three years, so I have no idea.

Q.   So it comes as no surprise to you that this document no longer exists?

A.   I have no opinion on this, is my point.  You're putting words in my mouth.  I have no idea if it does, if it shouldn't have or not, I have no opinion on it.  I don't know.

Q.   Do you have an opinion about why --

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 262

A.   I don't know what happened.

     (Simultaneous speaking.)

A.   I don't know where it is, so I don't know.

Q.   Do you have an opinion about why such a document might no longer exist?

A.   No, I have no opinion.

Q.   Is it possible someone destroyed it?

     MR. COMERFORD:  Form, foundation, calls for speculation.

A.   You're asking me to speculate on what somebody else does.  I don't know.  I have no idea.

Q.   Well, in all events Mr. Ilcisin told you about his proposed change to the plan.  You approved it with a thumbs-up, and sitting here today your counsel is unable to find that document anywhere.  Do you disagree with any of that?

     MR. COMERFORD:  Foundation.

A.   Yeah, I don't disagree with that.  I mean, you're telling me.  I have no idea of whether the document exists or not, so all I can do is say what you've told me.

Q.   Sure.  I'm telling you what your counsel told me.  Do you understand that?

A.   I mean, he may have told you that.

Page 263

You'll have to ask him.  I didn't tell you that, so...

Q.   You have no reason to believe that your counsel's representation that they can't located this document anywhere is untrue.  Is that right?

A.   No, I have no reason to believe that that's untrue.

     (Exhibit 36 was marked.)

Q.   Let's have a look at Document D10.  This will be 36.  Exhibit 36.  Bates NAT-SL-26501.  Now, I'd like to look at the email at the bottom of the page written by Mr. Percival to Mr. Niles at Wachtell, cc'g you.  In the re line of this email is:  Draft NI:  May Board Meeting Minutes and June Meeting Agenda.

     Do you see that?

A.   Yeah, I see the re line, yeah.

Q.   It says:  Eddie would like to discuss the strategy re not approving minutes (consistent with NI past practice of approving prior meeting minutes at each meeting).

     Do you see that?

A.   Yes.

Q.   So Mr. Percival is describing NI's past practice of approving prior meeting minutes at each

Page 264

meeting.  Is that right?

A.   Yeah, that was our general approach, yeah.

Q.   Right.  And he is saying in this email that you wanted to discuss a strategy re:  Not doing that.  Is that right?

A.   With counsel.  Right.  To understand I believe that was -- we were not able to complete everything.  Wachtell was helping draft the minutes of everything, and so I just wanted to understand if they were not completed and approved at each meeting, you know, what the implications of that might be.

Q.   So was the strategy ultimately to reserve approving the minutes until later?

A.   I don't know that it was a strategy.  I think it was the fact that we had to do that later, but I don't recall exactly the timing of when we approved all the meeting minutes.

Q.   Well, it says there Eddie would like to discuss the strategy re:  Not approving minutes.  Do you see that?

A.   Yeah.

Q.   The strategy of not approving minutes.  Do you see that?

Page 265

A.   Well, that would be a reference to maybe how the term that Wachtell, you know, saying, hey, we're not -- we're not getting these done, we've got to complete these as we get a better understanding of everything.  And so I just wanted to understand what does that mean.

Q.   So the minutes of the minutes -- I'm sorry -- the minutes of the meetings concerning Emerson were all ultimately approved later inconsistent with NI's past practice of approving meetings (sic) at each meeting.  Is that correct?

A.   I believe there were instances where they were approved later than they would the immediate next meeting.

Q.   In simple terms they're sort of approved in a batch later rather than one at a time along the way.  Is that right?

A.   I believe that was the case, yes.

Q.   Let's look at Document D11.  It will be 36.  And this is NAT-SL-25537.

     MR. HELD:  This will be 37.

     MR. MANDEL:  Exhibit 37.

     (Exhibit 37 was marked.)

Q.   An email from you, Mr. Dixon to Sabastian Niles and Albert Percival.  Two emails in the chain.

Page 266

So in the bottom email Mr. Niles --

MR. MANDEL:  If we can scroll to that.

Q.   -- is describing the plan to approve minutes later rather than at the next meeting consistent with NI's common practice.  Right?

A.   It appears that's, yeah, the topic.

Q.   And then if we can just go up to your email.  You write:  It is not so much a need as much as ensuring we are timely (and we have a history of doing at the next meeting) and not appearing as if we are "manipulating" (only word I could think of) the minutes that are not consistent with what actually happened, period.

Do you see that?

A.   Yeah, that's exactly what I thought. Want to make sure we're just capturing what happened at the meeting.  Don't want it to appear as if we're doing anything different.

Q.   So Wachtell was suggesting doing them in batches later and you were concerned that that might appear as if you were manipulating the content of the minutes.  Is that right?

A.   I wanted to ensure that wasn't viewed as -- that way.  I understood that, you know,

Page 267

Wachtell in helping draft those meeting minutes had a lot going on and wouldn't always be as timely as we might if we were doing only ourself.  But yeah, we got comfortable with that obviously.

Q.    So you got comfortable with the practice that could have the appearance of manipulating the minutes.  Is that your testimony?

A.   I got.

MR. COMERFORD:  Form.

A.   I got comfortable that -- yeah, as long as we're not doing anything that is inappropriate I'm okay with it.  And we were not doing anything that was inappropriate.  We were capturing in the meeting minutes what was happening at the meeting.

Q.   You said before that you were sort of concerned about the appearance of manipulating the minutes, is that right?  You say that here.  You're concerned about not appearing as if we are manipulating the minutes.  Do you see that?

A.   Yeah, that goes straight to my integrity. Right?  Which is I don't want anything to appear as if it was, if we can get confident that that won't be the case, after talking with Wachtell then we move forward.  That's how they do things, so we got comfortable with that.

Page 268

Q.   So when you say you were concerned that it would appear as if you were manipulating the minutes, who would it appear to that way?

A.   Anyone.  It could be anyone that might be reading them, you know, reviewing the minutes at a later date.  My job was to ensure --

Q.   Who might be reviewing the minutes?

A.   I don't know.  My job was to ensure that we do everything on the straight and narrow and that's what we were doing.

Q.   So were you concerned that these minutes might be produced in litigation?

A.   Always concerned any board minutes might be produced.

Q.   Let's have a look at Document D58, please.  Exhibit 38.

(Exhibit 38 was marked.)

MR. MANDEL:  I said D58?  Yeah, D58, Exhibit 30 (sic) .

MR. COMERFORD:  What's the Bates number?

MR. MANDEL:  This is Bates NAT-SL-20751.

MR. COMERFORD:  Thank you.

Q.   Now, this is an email chain in which --

Page 269

involving you and others.  If we could go all the way to the beginning of the document, go to the first email.  This is an email from Mr. McGrath to you dated July 26 regarding last night's minutes. Do you see that?

A.   Yeah.

Q.   There was a meeting of the board on July 25th, 2022, and that's the minutes he's referring to.  Is that right?

A.   I believe that was the case, yeah.

Q.   He writes:  Please see the following introduction statement I made last night is included in the minutes.  I worded it deliberately -- deliberately.

Do you see that?

A.   Yeah.

Q.   Now, you -- if we scroll up -- responded to Mr. McGrath later that day?

MR. MANDEL:  Have you scroll up a drop more.

Q.   And you write:  Hi Michael, thanks for sending.  I'd like to confer with Sabastian as a sanity check to make sure any reference to Nuthatch does not inadvertently put us in a difficult position should the minutes be discoverable.

Page 270

Do you see that?

A.   Yeah.

Q.   So Mr. McGrath was presenting you with a truthful statement concerning what he said at the July 25th meeting.  Is that correct?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.   Yeah, I mean, I don't know that this followed exactly what was stated at the meeting.  It was what he intended to communicate generally and this was what he sent me.

Q.   He says:  I worded it deliberately.

Do you see that?

A.   Yeah.

Q.   And he says:  This is the statement I made last night.

Right?

A.   That's what he says, yes.

Q.   Why would you need a sanity check from Wachtell with respect to whether to include the chairman's words in the minutes?

A.   We would have Wachtell review all of our board minutes, or in the case of other board meetings unrelated to this before we engaged them, you know, another firm.

Page 271

So, again, as we've stated on multiple occasions, we would always want to review because things can be misinterpreted if they aren't drafted appropriately, if they're discoverable after the fact.

Q.   And you were concerned that if the minutes included Mr. McGrath's proposed language, that it could put you in a, quote, difficult position should the minutes be discoverable.

A.   No, I didn't say that.

Q.   Is that correct?

A.   I didn't say I was concerned.  I said I wanted to do a sanity check to ensure that that's not the case, which is what I would always do.  That's why I hire outside counsel.  That's my job as general counsel.

Q.   You wanted to do a sanity check but you weren't concerned about it?

A.   I didn't know.  I mean, I wanted to do a review of this in light of the topic because that's why we hired the firm.  As I said, they walked hand in hand with us throughout this entire thing.  We absolutely relied on them throughout the entire engagement and post engagement.

Q.   And you relied on them as well to ensure

Page 272

that minutes didn't put you in a difficult position, should they be discoverable.  Right?

A.   Should they be misinterpreted and not reflect the intent.  Correct.

Q.   Okay.  Now, ultimately the July 25th meeting minutes did not include Mr. McGrath's words.  Is that right?

A.   I don't recall.  So I don't know.

Q.   Okay.  I can represent to you that they're not there.  You know, on the next page, if we just look at the bottom of the next page -- well, actually, let's just scroll to the top email on the previous page there.  You see there:  Per email from Eddie Dixon, Eric Starkloff.

Do you see that?

A.   Yeah.

Q.   So you wrote there:  Per email, just let him know I'm working with Sabastian to align all minutes and will share the set when done.

Do you see that?

A.   Right.

Q.   What does it mean to "align all the minutes"?

A.   Consistent with what happened at the meeting -- meetings, I guess.

Page 273

Q.   To align them.  That's what that means?

A.   Consistent with what happened at the meeting.

Q.   So they're doing them all in a batch at the end.  Right?  And you were concerned that could look manipulative.  Right?

A.   I wanted to make sure it wasn't.

Q.   Well, you were concerned that doing them all later distinct from past practice could be -- could appear manipulative?

A.   As a lawyer you should know --

Q.   Now you're writing about how you understand that Wachtell is going to be aligning all the minutes.  Right?

A.   I understand they're drafting all the minutes that we will review.  Right.

Q.   And you were concerned that the minutes might put you in a difficult position, should they be discoverable.  Right?

A.   No, I was not concerned because I had Wachtell working on the draft of them to ensure that they were aligned with all the content of the meetings that were held.

Q.   That is to say you have Wachtell working for you, so you were confident that the minutes

Page 274

would not put you in a difficult position if they were discoverable. Right?

A. I was confident that they would reflect what happened at the meetings, in which I would review to confirm that that was what's happened at the meetings.

Q. And if you included Mr. Dixon's words, that would have put you in a difficult position if discoverable. Right?

A. No. I don't know what you -- what you're asking.

Q. Okay. Let's turn to the top of the next page.

MR. MANDEL: Let's scroll up a drop there.

Q. And you write --

MR. MANDEL: Scroll down right to the bottom.

Q. You wrote to Sabastian Niles here. Sabastian Niles replies to you right there.

"FYI never seen so much interest in the minutes."

And some kind of smiley face emoji. Do you see that?

A. Uh-huh.

Page 275

Q. So, now, if we look at this email below, we see you're communicating with Mr. Starkloff and you're communicating with Mr. McGrath. Right?

A. It looks like it's with Eric only, but...

Q. Oh, no, no. The bottom chain we saw was Mr. McGrath writing to you.

A. Oh, okay. Yeah, sure.

Q. Back and forth with Mr. McGrath.

A. Sure.

Q. Then you forward that to Mr. Starkloff. Right?

A. Right.

Q. And then you forward that to Sabastian Niles, noting: FYI never seen so much interest in the minutes. Smiley face emoji.

Correct?

A. Right. They were asking for drafts of the minutes. We always -- Eric and I always had a meeting with the board chair prior to the board meetings -- I mean prior to, you know, the minutes being approved. And he was asking about this. And obviously we had a lot of other things going on. So, yeah, I made that comment.

Q. Well, your testimony just now was Eric and I always had a meeting with the chair prior to

Page 276

board meetings. This isn't that. Right?

A. No. I'm just saying we generally communicated with the chair regarding the minutes and the content of the board meeting.

So, yeah, I mean, he was asking for the board minutes. So, yeah, I got a lot of interest about the board minutes.

Q. Was that an unusual amount of interest in the board minutes from Mr. McGrath?

A. Clearly at this time, considering we were -- this looks like July, late July, we were, you know, had determined we were going to reject the offer again. Clearly Mr. McGrath was interested in the minutes, yes.

Q. Okay. And how about Mr. Starkloff? Are you including him in the never seen so much interest in the minutes smiley face emoji line?

A. I think this was to Eric, wasn't it? Or was this to Sabastian? I was probably primarily --

Q. It appears it was to Sabastian.

A. -- talking about Mr. McGrath, but I can't tell you whether I included at the time Eric or not. It doesn't really matter. There was interest obviously in light of the decision that was made to reject the offer again that was the same offer that

Page 277

we received multiple months before, so...

Q. Now, if we scroll down slightly to Mr. McGrath's email that starts right there, there you go, yeah.

When you told him you needed a sanity check from Wachtell, he responded -- he wrote two sentences. I'll read you the second one.

He wrote: If discoverable, the plans support our argument that the offer is inappropriate.

Do you see that?

A. I don't see that exactly. Where are you?

Q. Where it says: Eddie, I think it's important.

The next line. "If discoverable, the plans support our argument the offer is inappropriate."

Do you see that?

A. Yeah, okay.

Q. Okay. So you were writing to Mr. McGrath about concerns related to the discoverability of minutes and he was responding to you in kind, referring to the discoverability of the minutes.

Is that right?

A. It appears that's what he's -- yeah.

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

Page 278

Q.   And so you-all were very concerned with how these minutes would look if discovered in litigation.  Is that true?

A.   As I stated on multiple occasions, I would review every document that would go into the board, have counsel review them for the purpose of ensuring that things would not be misinterpreted if they were discoverable.

Q.   Okay.  Mr. Dixon, did you use text messages in connection with the Emerson proposal to acquire National Instruments?

A.   Oh, I have -- I'm sure I did, but what's your question?  Did I use -- did I --

Q.   Well, that was my question.

A.   -- do I text?  Yes, I text.

Q.   Okay.  You text.  Do you text a lot for work?

A.   I wouldn't say I'm a heavy texter, but I -- sure, just like you did.  Yeah.

Q.   Okay.  Let's put just a document in here.  This is our Exhibit X5 -- or our document X5, Tab X5, Exhibit 39.

     (Exhibit 39 was marked.)

Q.   Now, this is a -- this document is a compilation of one, two, three, four, five, six,

Page 279

seven, eight emails produced by defendants here, reflecting your use of text messages in connection with this process we've been discussing today.

     You can look at it.  You know, you've already told me you used a lot of text messages.  I'm just putting into the record in evidence that you did, in fact, send numerous text messages concerning --

A.   I have no idea how many text messages.  I don't know that you can state numerous or not.  I have no idea.  Three years ago.

Q.   I'm not asking you how many.  I'm showing you evidence of at least eight different emails in which your texts are referred to that were produced in this case.  We can look at them together.  They reflect texting.

A.   I mean, I -- actually, what I'm looking at, I don't see any reference to texts.  So if you could scroll it where I can see it.

Q.   They're all in there, but you --

A.   Where?  I don't see...

Q.   Well, I can happily show you, but, you mean, you admit it to me that you sent text messages?

A.   I send text messages.  But what is the

Page 280

point of this then?

Q.   Right.  Oh, well, we'll get to the point.  But if you want to go through it, sure.

A.   Where does it show that I text and --

Q.   The first document.  Let's scroll.  It refers to:  See the text I just sent as well.

     And if we can scroll down, it refers to you -- you refer to it sending a text message.

     Can you scroll down?  There it is.  "Eddie Dixon to Kevin, Karen, Eric.  See the text I just sent as well.  Don't want any management model necessarily discussed with the board."

     Do you see that?

A.   Yes.

Q.   Do you remember sending such a text about not wanting certain information --

A.   No, I don't remember.

Q.   -- to be discussed with the board?

A.   No, I don't remember.

Q.   Okay.  Will you take my word for it that the rest of these emails reflect your text messages?

A.   They reflect that I text, yeah.

Q.   They reflect that you texted, yes.  They show that you texted with Wachtell, they show that you texted with Mr. Starkloff, they show that you

Page 281

texted with Mr. Ilcisin, and so forth.  They show that you texted with Ms. Rapp.

     You deny that you texted with all of those people regarding the potential Emerson transaction.

A.   I -- I can't say that I didn't text them about a -- an unsolicited offer from Emerson.

Q.   Okay.  What device were you sending text messages from?

A.   My phone.  I'm not sure.

Q.   What kind of phone -- what kind of phone did you have?

A.   It was an iPhone.

Q.   An iPhone.  Did it belong to you or did it belong to National Instruments?

A.   It was paid for by National Instruments and ultimately I took it when I retired.  We closed.

Q.   But you took that phone with you?

A.   After having it been cleaned and all the data taken off the phone, yeah.

Q.   Okay.  So when you say cleaned and all the data taken off the phone, explain to me what you mean by that?

A.   It would be like it's a new iPhone to me.

Q.   So did this occur that -- this cleaning

Page 282

of the phone, did this take place in October 2023 when the --

A.  It -- it would be -- yeah, it would be about that time.

Q.  Okay.  So --

A.  That was a policy we didn't generally allow folks so if someone did take it, typically it would be more director level or above, then we would obviously -- we would expect that to be cleaned before they took the device.

Q.  So the company's policy was to wipe employees' phones before employees left the firm. Is that right?

A.  Sure.  Yeah.  I mean, we wouldn't want confidential information of the company on someone's personal device.

Q.  Who created this policy?

A.  I -- our IT department.  I don't know exactly, but it would be an IT-related policy.

Q.  Okay.  It wouldn't be a policy that emanates in any way from the general counsel's office?

A.  Say that again.

Q.  This policy didn't emanate in any way from the general counsel's office?

Page 283

A.  When the original policy may have been put in place, I have no idea if the prior GC reviewed it or not.

Q.  So you turned your phone in physically to National Instruments and National Instruments cleaned it, as you say, and returned that phone to you.  Is that right?

A.  That's what I said.

Q.  Okay.  Were you aware at the time of these events that litigation concerning these events was reasonably foreseeable?

MR. COMERFORD:  Form.

A.  I had no idea.

Q.  You had no idea.  We've seen numerous emails involving you today discussing potential discovery.  Do you remember those emails, Mr. Dixon?

A.  Yeah.  Yeah.

Q.  Discovery is a litigation process. Correct?

MR. COMERFORD:  Form, foundation, calls for speculation.  It's vague.

Q.  All those emails in which you're talking about potential discovery, they reflect your understanding of potential litigation here.  Is that true?

Page 284

MR. COMERFORD:  Form.

A.  I don't want -- know what to say.  Again, we did it in every case because there could be potentially discoverable information, yes.

Q.  You're an attorney.  Correct?

A.  Yes.

Q.  And you understood that litigation concerning the stuff we've been talking about here today was reasonably foreseeable.  Is that right?

A.  No.  Did not see it --

Q.  No?

A.  Did not see litigation as a likelihood, but, again, we were just practicing what we normally do --

Q.  You were concerned --

A.  -- as a procedure and policy.

Q.  Mr. Dixon, you were expressing concern in your own emails about materials you were creating being discovered.  Are you testifying here that despite that, you had no idea litigation could occur here?

A.  Litigation could occur any time.  It could occur here.  It could have occurred on any other matter.  As I said, we always reviewed materials for that purpose to ensure anything that

Page 285

would be discoverable wouldn't be misconstrued.

Q.  But in this particular instance, you understood that litigation was reasonably foreseeable.  Is that true?

A.  I can't say reasonably foreseeable.  It could happen.  It could not happen.  I don't know. You're asking me to speculate on what was going to happen in the future and I don't know.

Q.  Okay.  Well, the documents show that you were concerned with discovery which is a litigation process.  So do you agree with me that that suggests you understood that there was potential litigation going to happen here?

MR. COMERFORD:  Asked and answered, form.

A.  I've answered the question.

Q.  Okay.  Despite your understanding that litigation could occur here, you allowed your phone to be cleaned by National Instruments.  Is that right?

MR. COMERFORD:  Objection; mischaracterizes testimony, form.

A.  Yeah.  I mean, the -- the purpose was because that was our policy.  I don't honestly know when there was litigation filed.  We were not

Page 286

managing that. Again, I was leaving the company so, to my knowledge, I wasn't in any -- under any sort of litigation hold or anything. So, yeah, I let the company do what its procedures and policy implemented should be -- that should be implemented.

Q. So you just followed the policy. Is that right?

A. Seems rational, yes.

Q. The policy of wiping phones whether or not there's potential litigation?

MR. COMERFORD: Objection; mischaracterizes --

Q. Is that right?

MR. COMERFORD: Objection; it mischaracterizes the testimony.

Q. Answer the question, please, Mr. Dixon.

A. I had no reason to know whether there would be litigation or not. I have no reason to know there's going to be litigation tomorrow on some other topic. I can't speculate what's going to happen in the future. What I did was I left the company. I went through our process and our procedures to wipe the device as appropriate. I had no reason to believe I shouldn't do that.

Q. Mr. Dixon, did other members of National

Page 287

Instruments' management team also use phones provided by the company?

A. I'm sure they did, yes.

Q. So, for example, Mr. Ilcisin who you were texting with, you're texting him on a device that was provided by National Instruments?

A. I don't recall if that was provided by the company or his own personal device. I have no idea who paid for it. I assume it was the company, but I don't know that --

Q. How about Mr. Starkloff, were you texting him on a National Instruments device?

A. It would be -- if he's -- he paid for it out of his budget, yes, I assume it was the case. I don't know the ownership interest of everybody's phone so...

Q. And the same policy that you followed that led to your phone being cleaned would have applied to all of their phones if they were supplied by National Instruments as well. Is that correct?

A. If they left the company, yes.

Q. Well, everyone left the company in October 2023. Right?

A. Well, not everyone. There's still --

Q. Not everyone. All of the management --

Page 288

A. -- multiple thousands of people that still --

Q. Managers.

A. -- remain with NI. Yeah. Anyway --

Q. Yeah. The management team, you, Mr. Starkloff, Ms. Rapp, Mr. Ilcisin, you all left the company in October 2023. Correct?

A. I don't know the exact dates, that everybody was exactly the same, but ultimately, they all left the company.

Q. But the policy that you're describing would have applied to their phones as well. Is that right?

A. Should have applied to their phones as well if they were issued by the company and paid for by the company.

Q. So you as the general counsel of this company oversaw a process wherein potentially numerous phones were cleaned of text messages even though you knew there could be litigation. Is that true?

A. No, I did not know that there would be litigation. There was no indication of litigation. Did not know there would be litigation. We had no litigation hold on this that I'm aware of so no.

Page 289

Only I can't state that.

Q. I'll ask again.

So you as general counsel of this company oversaw a process wherein potentially numerous phones were cleaned of text messages in October 2023. Is that correct?

MR. COMERFORD: Form.

A. I -- I don't know when they were cleaned. I assume that they would have been cleaned. I was not responsible for ensuring that. It was an IT policy -- IT policy. The IT organization would have been responsible for cleaning that if someone left and it was an NI-issued phone.

I don't know the timing. I would not have been individually or the department would not have been responsible for cleaning that. It would have been the IT department.

Q. But the very least, your phone was cleaned in October of '23 and possibly others. Is that right?

MR. COMERFORD: Objection; asked and answered, form.

A. My phone was cleaned. I -- I can't speculate as to what happened to others. I assume they followed the policy, but I don't know.

Page 290

Q.   Okay.

MR. MANDEL:  I think I might be done with my direct questioning here.  Can we take a two-minute off-the-record break just so I can consult with my team.  Make sure there's nothing I need to ask.

And then, John, I assume you're going to ask some questions.

MR. COMERFORD:  Yes.

MR. MANDEL:  Yeah.  Okay.  Let's take, like, a two or three-minute break.

THE VIDEOGRAPHER:  Going off the record.  The time is 5:00.

(Break.)

THE VIDEOGRAPHER:  Back on the record.  The time is 5:05.

Q.   Mr. Dixon, we were talking about your National Instruments-provided cell phone before the break.  You remember that?

A.   Yes.

Q.   Who was your carrier?  Who provided your cell phone service on that phone?

A.   At that time I believe it was AT&T, but I can't tell you for sure who it was.  I mean, honestly, my admin would get my phone, deal with the

Page 291

carrier, get it set up, all that, but I believe it was AT&T, but I'm not positive.  It could have been Verizon, one of the two of those.

Q.   Was the cell phone service provider selected by National Instruments or was that -- did you sign up independently for that service?

A.   No.  I mean, we had standards on who we utilized for carriers, again, through the IT department.  So whatever our carrier standard was, that would be what I would have.

Q.   So is it possible that different employees of National Instruments who had cell phones provided by National Instruments could be using different carriers or were you all on the same plan, in effect?

A.   I have no idea.  I mean, again, it wasn't my job to be up-to-date on who our carriers were.  I would just get a phone and whoever it was, I was -- you know, we would pay for it out of our budget.  So I have no idea.

Q.   Do you have a cell phone now?

A.   Yeah.

Q.   Who is your carrier now?

A.   Verizon.  Let me make sure.  Yes. Verizon.

Page 292

Q.   Normally people aren't supposed to check their phones during depos, but we'll make an exception for that one.

A.   I haven't looked at it other than that.

Q.   Have you changed carriers since you left National Instruments?

A.   I can't recall whether I had to change carriers or whether I was already on Verizon or not. I just -- I don't recall.

Yeah.  I mean, all I know is I've had AT&T and I've had Verizon.  I don't recall when the transition was, yeah.

Q.   Okay.  Very good.  Thank you, Mr. Dixon. I have no further questions at this time, reserving all rights to continue my questioning, et cetera. Thank you, Mr. Dixon.

A.   Thank you.

EXAMINATION
BY MR. COMERFORD:

Q.   Mr. Dixon, my name is John Comerford.  I represent the defendants in this case.  I'd like to ask you some questions today.  Okay?

A.   Okay.

Q.   Let me talk to you about your background. Where are you from originally?

Page 293

A.   I grew up in -- well, I was born in Little Rock, Arkansas.  I grew up in a suburb of Little Rock.

Q.   Okay.  And can you trace for us your education after high school?

A.   Sure.  I went to the University of Arkansas, got a BS in industrial engineering. Immediately following the receipt of that degree I went to the University of Texas for a master's in business administration.

You only talked about education.  I had a work period in between that and then ultimately came back for the law degree also at the University of Texas at Austin.

Q.   Okay.  What year did you obtain your law degree?

A.   I believe 1990 was when it was issued.

Q.   Okay.

A.   And I think it was licensed in '91.

Q.   And so would it be fair to say from the time you got your law degree until the time you retired in 2023, you -- you practiced law for 32 years?

A.   Yeah, 30, 35, whatever the number is, yes.  Yeah.

Page 294

Q.   Okay.

A.   From '91 to '23, yeah.  So I guess that would be 32, yeah.

Q.   Let's talk about your work history.  What did you do for work between college and law school?

A.   Between my MBA and law school I worked for an investment banking firm, Merrill Lynch Capital Markets in institutional bond sales, fixed income side of the market, selling to banks, bond funds, et cetera.

Q.   Okay.  And then you attend law school.  You were licensed as an attorney in 1991?

A.   I believe it was May of '91, but don't quote me.

Q.   Okay.  And then take us through your work history as an attorney.

A.   Okay.  So after graduating, my wife and I wanted to stay in Austin and so I clerked at multiple firms, but ended up going with Winstead Sechrest & Minick at the time.  The firm is now known, I believe, as Winstead.

And did -- started initially in bankruptcy, but ultimately transitioned to more of a corporate technology -- really technology commercial law at Winstead.

Page 295

Q.   And then what did you do next?

A.   So after that, one of the clients for Winstead was Dell Technologies.  The firm had taken Dell public.  I did a lot of work for Dell that last year or so that I was still at the firm.  I actually had an office at Dell and spent most of the time there.  I was ultimately recruited to join Dell and joined Dell in '95, I believe.

And over the course of 15-plus years had multiple roles -- roles there.  Ultimately vice president of legal across everything from our product group, the development arm to the sales organizations, global responsibilities for our various business units, et cetera.

Q.   Okay.  And then what did you do next after Dell?

A.   So I left Dell to join NI.  A friend of mine from law school actually was the general counsel at NI, had been pursuing me to join for some time.  He had actually been with NI from, frankly, out of law school.  So it wanted someone that had larger in-house experience to help build the organization, kind of a global legal team within NI, so...

Q.   What year was it that you joined National

Page 296

Instruments?

A.   I believe it was 2011 February, but I'm not -- again, I'd have to go back and confirm that, but around 2011, yeah.

Q.   Okay.  And then -- and what was your -- what were the roles you held at National Instruments from 2011 all the way until 2023 when you left them?

A.   So basically I had responsibility for everything other than the board and securities.  So our GC remained sort of the lead on that.  So I built the global legal team.  So we ultimately -- we had no one in Asia.  A small group in Europe.  We had locations in 50-odd different countries and we didn't have representative there.  So helped build that organization and we were responsible for everything from our sales procurement-related activities, HR, you know, employment-related support.

So pretty much anything outside of corporate securities and the board activity.

Q.   And then were you elevated to general counsel at National Instruments?

A.   Yes, I was.

Q.   And what year did that take place?

A.   Well, I believe -- I was told that it

Page 297

was -- I had my LinkedIn January of '19.  To me the transition happened sometime around 2018.  I was interim for a while after the -- our GC left and ultimately was put in the position permanently.

Q.   Okay.  At a high level explain what National Instruments does as a company.  What -- what's the nature of the business?

A.   Okay.  I'll refrain from taking the five or six hours to really explain that.

So in a nutshell, National Instruments is in the test and measurement industry.  And what that means is its customers all produce their own products and technologies.  And within that obviously there -- we primarily worked with engineers within our customer set.  And they would need to test products to ensure they're reliable, that they're safe, they actually function the way they should.

And I say it was -- it's complicated because our products can be used, our hardware and software combination that can be used in virtually any industry.  So our products were used for test and measurement purposes in transportation, in energy, aerospace defense, really across the gamut.

And one of our key selling points was the

Page 298

fact that our products were -- we called them modular flexible, if you will, so you could get a chassis with multiple different devices within that chassis and used for different purposes, and then change the purpose of that later versus a single-function product that maybe our competitors might be selling.

Q. I think we've mentioned that you're retired now as of late 2023?

A. Correct.

Q. And where do you reside at this time?

A. Austin, Texas.

Q. Okay. I want to ask you about the -- the idea of material information. And so we'll kind of lead up to that. But that's just to orient you.

My first question is, in May of 2022, when the CEO of Emerson first approached National Instruments, was the management of National Instruments interested in selling the company?

A. Absolutely not.

Q. Okay. And so would you say that the interest from Emerson was solicited or unsolicited?

A. Oh, it was clearly unsolicited.

Q. Okay. Did National Instruments ever ask Emerson to make an offer?

Page 299

A. No.

Q. Okay. What was your reaction to Emerson's $48 per share offer that it conveyed in that letter of May 25th, 2022?

A. We were uninterested. It was -- from our perspective, did not at all value the company based upon our plans for -- our strategic plan, transformation plans.

And, quite frankly, the initial call, from my understanding with Eric, was Lal had had a conversation with Eric and he first threw -- our stock was depressed like everybody else's was in May of 2022.

I don't recall. But it was probably in the low 30s. So we honestly felt like they were trying to take advantage of an overall depressed market to acquire the stock at a -- a company at a cheap price.

They -- he had actually thrown out a number in the 30s verbally. It was never an official offer. We assumed that was strategically done so that when he came back at 48, that it might come across as like, oh, no, they really upped it, when the reality is -- again, we still saw that as significantly undervaluing the company. So we were

Page 300

not interested.

Q. What was the purpose of National Instruments engaging Bank of America shortly after May 25th, 2022?

A. So, again, our ultimate responsibility is to our shareholders and ensuring we, you know, maximize value for our shareholders. So once we received that unsolicited offer, we -- we thought prudent was work with bankers to kind of look and assess at what our future growth plans are, what our value, you know, cohesion might be relative to, you know, certainly the unsolicited offer, but just generally where are we going as a company.

Q. Okay. What was National Instruments' purpose in engaging the Wachtell Lipton Rosen & Katz law firm in May of 2022?

A. We received an unsolicited offer. Wachtell Lipton is known as the best, if not the best, at least one of the top three or four activist defense firms. We obviously owed a duty to our shareholders to engage the best. Our board was obviously very interested in that. I had a team member in Albert Percival, who had worked with Wachtell in a prior acquisition. He had worked at Whole Foods, which ultimately was acquired by

Page 301

Amazon, and worked with Wachtell during that process. We interviewed them. They were outstanding, very responsive, a top-notch firm.

Q. Okay.

MR. COMERFORD: I would like to introduce an exhibit. This will be Exhibit 40. And the Bates number is NAT-SL-16470.

And, Mr. Hofman, can you share your screen and pull that document up, 16470?

MR. HOFMAN: Yeah, let me pull that up in one moment.

MR. MANDEL: Can I just raise a question here. Doesn't Everest need the exhibit so that they can download it and mark it rather than Jeremy doing it via screen share?

MR. COMERFORD: We can send it to Everest after the deposition, certainly. We won't have many of these, but just a few we'd like to share.

MR. MANDEL: Yeah, no, no. I'm not trying to stop you. I'm just trying to make sure we're just doing this so that we don't have problems later.

Q. Yeah.

Okay. I only want to ask you about

Page 302

the -- that top exchange between you and Albert Percival June 8th, 2022?

(Exhibit 40 was marked.)

Q.    Really just the top.  Albert Percival, who is that person?

A.    Who is Albert?

Q.    Yes.

A.    He was the VP of legal reporting to me, primarily responsible for securities matters, M&A, et cetera.

Q.    Okay.  And you and Mr. Percival, as lawyers at National Instruments, were discussing something and then Mr. Percival writes:  Well, WLRK is the guru here.  I stand corrected.

Do you see that?

A.    I see that.

Q.    And so I'm showing this to you to ask you about that phrase that was used by Mr. Percival calling the Wachtell law firm "the guru."  What do you think that term means?

A.    That's a technical --

MR. MANDEL:  Object to form -- object to the form of the question.

A.    Technical legal term there.

Q.    I am sorry.  Did you and Mr. Percival

Page 303

ever refer to the Wachtell law firm as "the guru" on the issues that the company was facing legally?

A.    We saw them as the expert on all of the --

MR. MANDEL:  Object to the form.

A.    -- issues.  Again, guru, technical legal term there used by Albert.  In any event -- yeah.  No.  The intent there they are the experts, that's why we hired them.  Again, from our perspective we were not interested in selling, we wanted to hire the absolute best firm to represent us.

Q.    And starting in May of 2022 regarding this unsolicited offer from Emerson, what was the nature of the legal advice that Wachtell began to give the company and the board?

MR. MANDEL:  Object to the form.

A.    Well, they would -- maybe you can specify it a little bit more on the question.

Q.    I think it's a close question to what was the purpose of the company hiring Wachtell?

A.    Right.

Q.    So what I'm asking now, like, what was the advice just in general terms about?

A.    Yeah, I mean it was about --

Q.    The nature?

Page 304

(Simultaneous speaking.)

MR. MANDEL:  Object to the form of this question.

A.    We engaged Wachtell, again, upon receiving the unsolicited offer, because we had no interest in selling and we wanted to engage a firm that provided that sort of expertise in defense of an unsolicited offer.  Again, from our perspective they were the best.  I think that's pretty well-known within the legal community that they're among the best.  So their purpose was to advise us on really any and all activity associated with, you know, any of the Emerson unsolicited offer.

Q.    I heard you use the word "defense" there as you were talking about the advice that Wachtell was giving to the company.

A.    Uh-huh.

Q.    Can you expound on what you mean by that term "defense" as it relates to this context in May of 2022 and going forward?

MR. MANDEL:  Object to the form.

A.    So we were not interested in being acquired.  We received an unsolicited offer.  Our intent was to engage the firm to help us defend against an acquisition, we were not interested,

Page 305

again, in closing a transaction.  So that's really the purpose of the term, I guess.

Q.    And what was your role at National Instruments in terms of the communications between Wachtell and -- and the company?

A.    Yeah, so obviously as the general counsel I was a bit of a -- the middle person, to be politically correct, I guess.  And the liaison between, you know, the advice of our counsel and our management team, our board, engaged in the -- you know, raised issues where we thought they might, you know, arise.  But just to ensure that we were communicating all the legal advice and -- and working closely with them on analyzing particular facts and situation but ultimately looking for their advice to provide to our management team and to our -- to our board.

Q.    And did attorneys from the Wachtell law firm attend meetings of the board of directors of National Instruments?

A.    On numerous occasions, yes.

Q.    And did attorneys from the Wachtell law firm meet with the management of the company, the CEO and -- and yourself about the -- the situation with Emerson starting in May of 2022?

Page 306

A.   Yes, we were -- typically it would involve the board too, but yes, there were meetings with the management team and Wachtell absolutely.

Q.   Okay.  We saw evidence that National Instruments implemented a trading restriction on May 27th, 2022, because of material nonpublic information.  Do you recall that?

A.   We received the unsolicited offer, we needed to assess that, engaged our counsel, put the restriction in place, yes.

Q.   Okay.  And was the purpose of putting that restriction in place because an offer had been made and until that was responded to, you felt that the company was in possession of material nonpublic information?

MR. MANDEL:  Object to the form.

A.   Yes.  We put it in place because we felt that at the time.  I had not responded.

Q.   In light of the objection let me try to rephrase the question.  What was the purpose of putting the trading restriction in place on May 27th, 2022?

A.   To ensure that we were compliant with all insider trading laws and, listen, the reality is, I'm very proud of our company for taking a very

Page 307

stark and strong approach to abiding being compliant with the law and ensuring that all of our employees did the same.

Q.   Okay.  I want to direct you back to Exhibit 40 and if we look -- I've got a paper copy here as well if that's easier for you to look at, but if you --

A.   At this point there's nothing easy on my eyes, but...

Q.   The -- there's an email from you to Mr. Percival on June 8th, 2022, at 2:13 p.m.

Do you see that?

A.   2:13.  From me?

Q.   Yeah, on the -- on the first --

A.   Yeah, yeah.  I see that, yeah.

Q.   -- page.  And you write:  The direct message is what Sabastian was recommending.  To avoid any indication we are interested in engaging if that is the decision of the board.  I can explain why the second bracketed sentences were probably added later.  Tied up now.

Do you see that?

A.   Yes.

Q.   Were you trying to convey to Mr. Percival that the company's goal at this point was to avoid

Page 308

giving Emerson any indication that the company was interested in engaging in discussions?

A.   Yeah.  Absolutely we were not interested.

Q.   Okay.

A.   More on this one?

Q.   No.  You can give that back to me.

Now, National Instruments responded to Emerson's offer on June 16th, 2022.  Emerson then later reiterated its $48 per share offer and National Instruments responded again on August 2nd, 2022.  Do you recall that?

A.   Yes.

MR. MANDEL:  Object to the form of the question.

Q.   Okay.  When National Instruments responded to Emerson on June 16th and August 2nd, 2022, to reject the two $48 per share offers, what was the intention of National Instruments, from your perspective?

A.   To make it clear that we were no longer -- we were not interested and were never interested in transacting at $48 a share.  We were not looking to be sold.  It was unsolicited.  We had a strategic plan in place.  We were confident in our plan.

Page 309

Q.   When Emerson offered $48 per share and then came back to National Instruments and, again, offered $48 per share, what did that fact convey to you about the price?

A.   That it was clear that --

MR. MANDEL:  Objection; form.

A.   -- that was their maximum offer, that they were not interested in doing anything more.

Again, our argue was they were trying to get us on a -- you know, very cheap price based upon what the overall market dynamics were.

Q.   And then after National Instruments sent its second rejection on August 2nd, 2022, what was your view of the prospect of doing a transaction with Emerson?

A.   Not -- not.  No -- no prospect.

Q.   Okay.  I want to introduce another exhibit.  This has been previously marked as Exhibit 24 to your deposition.  This is executives from National Instruments discussing, on August 4th, 2022, whether the company can start share repurchasing and wanting to get guidance from the Wachtell law firm.  Do you see that?

A.   Yeah, I don't know specifically what section you're looking at, but that was the overall

Page 310

intent of this.

Q.   Okay.  And on --

MR. MANDEL:  For clarity, John, just let me interrupt you.  The Bates number of the document you're looking at is NAT-SL-8756.

Is that right?

MR. COMERFORD:  No.  It should be 9611.  I had it marked as Exhibit 24 earlier.

MR. MANDEL:  No, no, no.  You're -- that's -- yeah, it's my fault for not keeping track of the exhibits.  I'm there with you.  Thank you.  I apologize.

MR. COMERFORD:  Okay.  No problem.

Q.   On August 4th, 2022, you wrote to Mr. Percival and Karen Rapp, who was the CFO of National Instruments.  Correct?

A.   At 10:50 a.m.?  Is that the --

Q.   Yes.

A.   Yes.

Q.   And you wrote:  FYI the reconfirmed rejection was sent on Tuesday.

Is that a reference to the August 2nd, 2022, rejection letter?

A.   Yes.

Q.   And then you write:  So hopefully we can

Page 311

do something near the end of the open window if no further engagement by Nuthatch.

What did that mean?

A.   That our -- that we would be able to implement a buyback plan, assuming no further engagement, which we had not received, and frankly didn't receive for a very long time after that.

Q.   Right.  And do you remember when it was that Emerson engaged with National Instruments again?

A.   I believe -- I -- I believe we didn't get another communication until November.

Q.   Okay.  And then you say:  I believe that is what we discussed before, but as you noted, let's get WLRK's take in the timing.

What did you mean by that?

A.   Again, this was something that Wachtell does every day, not something that we do every day.  My intent was to make sure that we're absolutely compliant following the letter of the law so I wanted to run anything of this nature by our counsel for their expertise and get their guidance and advice.

Q.   And then this email string has another email from you at the top, August 4th at 10:57 a.m.

Page 312

just a -- several minutes later and you write:  I think the question is when does the Nuthatch engagement become stale so legitimate argument that we don't have MNPI when the plan is put in place, but we'll let Albert confirm with WLRK.

What -- what did that mean when you said "but we'll let Albert confirm with WLRK"?

A.   I mean, there could be a variety of factors involved in making a decision, but -- so I made an assumption, this might be one of them, but let's run everything by Wachtell to confirm our position and any, you know, advice that we -- that we would receive from them.

Q.   Okay.  And then you received advice from Wachtell that you recorded in your notes on August 10th, 2022.  You were asked about this earlier.

First of all, let me introduce another exhibit.  This will be Exhibit 41.  And the Bates number is 8683.

MR. COMERFORD:  And Mr. Hofman, I would ask that you please pull this up.

(Discussion off the written record.)

(Exhibit 41 was marked.)

Q.   And this is a -- essentially creating a

Page 313

calendar entry, I would say, for a Microsoft Teams meeting.  Do you see that?

A.   Yes.

Q.   The -- this indicates that the meeting is scheduled to start on August 10th, 2022, at 1:30 p.m. and conclude on August 10th, 2022, at 2:00 p.m.  Right?

A.   That's what it states, yes.

Q.   And the subject is "Wolverine call Mackenzie update."

Do you see that?

A.   Yes.

Q.   And then it indicates that the required attendees are Eric Starkloff, Eddie Dixon, Marissa Vidaurri, Karen Rapp.

Do you see that?

A.   Yes.

Q.   And those were all National Instruments executives.  Right?

A.   Eric, Marissa, Karen, Kevin are -- or were -- well, I -- I think it says Kevin Daniels.  Kevin Ilcisin is with NI.  Kevin Daniels, I believe, was with -- was with B of A.

Q.   Okay.  And then Shawn Liu --

A.   Also B of A.

Page 314

Q.    All right.  And then Adam Emmerich and Sabastian Niles, who are they?

A.    They were our lead counsel at Wachtell.

Q.    Okay.  And it looks like this -- this meeting was set up by Kevin Ilcisin.  I'm -- Im looking at the very top --

A.    Right.

Q.    -- where it says it's from him.

A.    Yes.

Q.    And it looks like he -- he sent this calendar invitation on August 10th at 10:41 in the morning for -- for a call to be a few hours later. Is that how you see it?

A.    Yes.

Q.    Okay.  And then I want to direct your attention to what was previously marked as Exhibit 28 to your deposition which is an email from you.

MR. COMERFORD:  And -- and Mr. -- could I ask Mr. Held to pull up Exhibit 28.

Okay.  Thank you.

Q.    This is an email that you sent from -- from your account to yourself August 10th, 2022, at 7:39 p.m. with certain notes.  The subject is "Wolverine notes privileged and confidential."

Page 315

A.    Uh-huh.

Q.    Correct?

And this is, at the bottom, the -- the last bullet point you write is:  Adam, Wayne, Sabastian re:  Buyback, no material change to situation.  Implement if desired.

Do you see all that?

A.    Yes, I do.

Q.    Okay.  So Adam, Wayne, and Sabastian, who were those people?

A.    They were all attorneys with Wachtell Lipton.

Q.    Okay.  Aside from the advice that you received from the attorneys at Wachtell Lipton about whether it was permissible to implement the share buyback program at this time --

MR. MANDEL:  Object to the form.

Q.    Well, let -- let me ask it this way.  On August 10th, 2022, do you believe that you received advice from three attorneys at Wachtell law firm that the company could resume share buybacks or -- or implement the share buyback program if desired?

A.    Yes.

Q.    Okay.  Now, aside from the advice that you received from those attorneys, did you have your

Page 316

own opinion that at this point in time, August 10th, 2022, the company was -- was or was not in possession of material nonpublic information about an Emerson proposal?

A.    Yeah, my -- my perspective is --

MR. MANDEL:  Object to the form.

A.    -- we were not in possession of MNPI at this time.

Q.    Okay.

A.    But as noted, certainly this is something that I would want advice of counsel on, thus, the purpose of the call.

Q.    All right.  Now, you ███████████ ████████████████████████████████████ ███████████     Right?

A.    Yes.  At some point, yes.

MR. MANDEL:  Object to the form.

Q.    Okay. ███████████████████████ ██████████████████████████████████ ████████████

A.    Correct.

Q.    Okay.  And did you discuss that fact with the Wachtell attorneys?

A.    Yes, we did.

Q.    Okay.  And did they change their advice

Page 317

to you based on that fact?

A.    No, not changed their advice.

MR. MANDEL:  Object to the form.

Q.    Okay.  Was it always your goal to provide all potentially relevant information to the -- the Wachtell attorneys so they could accurately assess whether National Instruments was in possession of material nonpublic information?

A.    Absolutely.

MR. MANDEL:  Object to the form.

Q.    Would you ever have allowed National Instruments to make repurchases or buybacks of its own stock after August 10th, 2022, if you had any concern that National Instruments was in possession of material nonpublic information?

A.    Absolutely not.

MR. MANDEL:  Object to the form.

Q.    Your -- your answer was "absolutely not"?

A.    Absolutely not.

Q.    Okay.  Those are all the questions I have for you, sir.

THE VIDEOGRAPHER:  Counsel, did you have follow-up or are we --

MR. MANDEL:  I might.  Why don't we go off the record for two or three minutes and let

Page 318

me consult with my team and come right back.

THE VIDEOGRAPHER: All right. Going off the record. The time is 5:41.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 5:45.

MR. MANDEL: Okay. Thank you very much for your time today, Mr. Dixon. We're going to have no more questions now for the plaintiff. We reserve all rights. Otherwise, again, thank you for your time. Thank everyone for their time and thanks. See you soon. No further questions.

MR. COMERFORD: And we'll read and sign. Okay.

THE VIDEOGRAPHER: All right. This concludes the deposition of Eddie Dixon. Going off the record. The time is 5:46.

(Deposition concluded at 5:46 p.m.)

CORRECTION PAGE


WITNESS NAME:  EDDIE DIXON      DATE:  10/09/2025


PAGE   LINE   CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE PAGE


   I, EDDIE DIXON, have read the foregoing deposition
and hereby affix my signature that same is true and
correct, except as noted on the correction page.


                    _____
                    EDDIE DIXON

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE NATIONAL            §    CIVIL ACTION NO.
INSTRUMENTS CORPORATION   §    1:23-CV-10488-DLC
SECURITIES LITIGATION     §

REPORTER'S CERTIFICATION
DEPOSITION OF EDDIE DIXON
TAKEN OCTOBER 9, 2025

I, TAMARA CHAPMAN, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, EDDIE DIXON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to NOAM MANDEL;

That a copy of this certificate was served on all parties and/or the witness shown herein on _____.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

   X   was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 10th day of October, 2025.


_____
Tamara Chapman, CSR, RPR-CRR
CSR NO. 7248; Expiration Date: 12-31-25
Everest Court Reporting LLC
100 N. 18th Street, Suite 2001
Philadelphia, Pennsylvania 19103
215-341-3616

## WORD INDEX

**< $ >**
**$10**  172:*22*
**$3**  112:*1, 4*  113:*12*  194:*16*  196:*2*
**$40**  68:*16*  69:*7*
**$48**  87:*21*  88:*1, 8*  129:*22*  130:*1, 22, 24*  142:*25*  151:*2*  176:*10*  177:*25*  226:*23*  239:*7*  241:*14, 18, 19*  242:*25*  244:*13*  249:*7*  299:*3*  308:*9, 17, 22*  309:*1, 3*
**$50**  69:*4*
**$51**  68:*9*
**$80**  174:*21, 25*  211:*6, 13, 17, 24*  239:*1*
**$86**  238:*22*

**< § >**
**§**  1:*3, 4*  321:*1, 3*

**< 0 >**
**0**  84:*23*

**< 1 >**
**1**  3:*13, 15*  28:*18, 19*  118:*21*  149:*25*  162:*13*  185:*19*  253:*15*
**1.26**  201:*16*
**1:23-CV-10488-DLC**  1:*3*  321:*3*
**1:30**  313:*6*
**1:39**  161:*24*
**1:50**  162:*2*
**10**  3:*6*  4:*15*  37:*3*  46:*7*  107:*4, 5*  173:*2*
**10/09/2025**  319:*3*
**10/20/2022**  4:*3*
**10:07**  37:*14*
**10:30**  8:*8*
**10:41**  314:*11*
**10:50**  310:*17*
**10:57**  311:*25*
**100**  65:*24*  88:*1*  322:*13*
**10170**  2:*6*

**107**  4:*19*
**108**  4:*22*
**10b5-1**  3:*16*  25:*9, 12, 16, 18, 22, 25*  26:*4*  42:*8, 13*  43:*1, 8, 15, 25*  45:*8*  46:*16*  187:*17*
**10-Ks**  23:*5*
**10-plus**  204:*5*
**10th**  45:*8*  46:*17, 23, 24*  47:*1*  148:*3*  153:*14*  203:*4*  205:*7, 12*  213:*16*  218:*10*  222:*19, 23*  223:*8*  312:*16*  313:*5, 6*  314:*11, 23*  315:*19*  316:*1*  317:*13*  322:*8*
**11**  4:*19*  108:*24*  109:*1*  146:*19, 20*
**11:06**  84:*5*
**11:17**  84:*8*
**11:30**  8:*8*
**11:57**  115:*3*
**1114**  86:*3*
**11th**  138:*23*  145:*11*
**12**  4:*23*  125:*16*  126:*8*
**12:01**  115:*6*
**12:15**  127:*11*
**12:57**  127:*14*
**12-31-25**  322:*12*
**126**  4:*25*
**128**  5:*4*
**12th**  153:*15*
**13**  5:*1*  128:*12, 17*
**134**  66:*6*
**139**  5:*5*
**14**  5:*4*  101:*22*  139:*14*
**140**  5:*12*
**1453**  245:*5*
**1460**  170:*10*
**147**  5:*15*
**14th**  109:*14*  116:*10*  127:*20*  128:*1*  157:*19*  159:*15*
**15**  5:*6*  19:*19*  37:*3*  140:*24*
**15079**  201:*8*

**153**  5:*18*
**154**  5:*22*
**157**  6:*5*
**159**  6:*9*
**15-May**  85:*12*
**15-plus**  295:*9*
**16**  5:*3, 12*  85:*12*  147:*24, 25*  148:*1*
**16121**  91:*15*
**16128**  101:*23*
**16137**  105:*19*
**162**  6:*11*
**16470**  301:*9*
**166**  6:*15*
**16th**  308:*8, 16*
**17**  5:*15*  153:*12*
**171**  6:*17*
**176**  6:*19*
**18**  5:*19*  154:*20, 24*
**18178**  195:*8*
**18179**  194:*1*
**1832**  2:*5*
**188**  6:*22*
**18th**  162:*21*  164:*16*  322:*13*
**19**  6:*2*  157:*16, 17*  171:*16*  175:*14*  297:*1*
**1900**  2:*12*
**19103**  322:*14*
**19-20**  6:*13*
**193**  7:*5*
**1990**  18:*22*  293:*17*
**1991**  294:*12*
**19th**  147:*8*  148:*12*  162:*4, 6*  165:*23, 24*  166:*6, 20, 25*  167:*8, 12*  168:*11, 25*  172:*25*  241:*10*
**1st**  237:*9*

**< 2 >**
**2**  3:*4, 14*  30:*15, 20*
**2:00**  313:*7*
**2:13**  307:*11, 13*
**2:38**  200:*6*
**2:48**  200:*9*
**20**  6:*6*  117:*7*  159:*12*  162:*9*  166:*6*  171:*16*  244:*22*

**2001**  322:*13*
**201**  7:*8*
**2010**  19:*17, 18*
**2011**  296:*2, 4, 7*
**2018**  20:*10, 14*  131:*13*  297:*2*
**2019**  20:*8, 13, 14*
**2020**  71:*1, 2, 3, 4*
**2021**  65:*3*  244:*22*
**20-21**  8:*11*
**2022**  6:*14*  8:*12*  34:*2, 17*  46:*7*  49:*18*  62:*21*  65:*3*  84:*11, 15*  85:*3*  88:*11*  139:*17*  148:*3*  153:*15*  165:*24*  166:*6*  170:*21*  173:*15, 25*  174:*22*  175:*1*  176:*12*  196:*5*  203:*4*  205:*7*  211:*5*  222:*19, 23*  229:*13*  237:*16*  239:*22*  244:*22*  254:*18*  269:*8*  298:*16*  299:*4, 13*  300:*4, 16*  302:*2*  303:*12*  304:*20*  305:*25*  306:*6, 22*  307:*11*  308:*8, 11, 17*  309:*13, 21*  310:*14, 23*  312:*16*  313:*5, 6*  314:*23*  315:*19*  316:*2*  317:*13*
**2023**  20:*18, 20*  282:*1*  287:*23*  288:*7*  289:*6*  293:*22*  296:*7*  298:*9*
**2025**  1:*8, 13*  10:*3*  38:*4*  321:*5*  322:*8*
**2026**  117:*7*
**205**  7:*11*
**20517**  155:*22*
**20816**  158:*4*
**20th**  62:*21*  147:*8*  162:*6*  169:*24*  239:*22*  245:*20*
**21**  6:*9*  162:*10, 11, 12*  244:*22*  245:*20*
**212-432-5100**  2:*6*
**21247**  70:*10*
**21525**  149:*23*
**215-341-3616**  322:*14*
**21st**  239:*22*

**22**  6:*12*  65:*9*  166:*1, 3*  172:*21*
**222**  7:*15*
**229**  7:*19*
**22nd**  128:2, *24*  129:*16*  130:*22*  142:*17*  143:*24*  144:*10*  176:7  241:5
**23**  6:*15*  20:*20*  105:*19*  171:*12, 13, 14*  289:*19*  294:*2*
**232**  7:*22*
**237**  8:5
**239**  8:*10*
**23rd**  139:*17*  229:*13*
**24**  6:*17*  88:*10*  176:*18*  309:*19*  310:*8*
**24207**  171:*21*
**243**  81:*14*
**2437**  70:*14*
**245**  8:*13*
**25**  6:*20*  188:*4*  201:*21*  203:*22*  237:*24*  238:*18*
**252**  8:*16*
**25th**  84:*15*  85:*3, 5*  175:*15*  176:*4*  239:*2*  269:*8*  270:*5*  272:*5*  299:*4*  300:*4*
**26**  7:*2*  193:*21, 23*  269:*4*
**263**  8:*21*
**265**  8:*24*
**268**  9:*6*
**26th**  91:*1, 6*  108:7, *15*
**27**  7:*5*  153:*15*  201:*5, 7*
**278**  9:*9*
**27th**  306:*6, 22*
**28**  3:*14*  7:*9*  205:*1, 2*  314:*17, 20*
**28th**  49:*18*
**29**  7:*11*  222:*9, 12, 13*
**292**  3:*7*
**29th**  71:*2, 3, 4*
**2nd**  176:*12*  181:*4, 17*  188:*8*  193:*11*  221:*17, 24*  245:*21*

308:*10, 16*  309:*13*  310:*22*

**< 3 >**
**3**  3:*15*  4:*3*  41:*18, 19, 20*  73:*19*  92:*4, 14*  93:*5, 24*  96:*11, 14, 22*  101:*24*  114:*8, 20*  122:*16*  123:*12*  124:*15*  195:*16*  196:*6*
**3:58**  252:*10*
**30**  3:*15*  7:*16*  9:*9*  68:*16*  69:*7*  229:*10, 11*  268:*19*  293:*24*  321:*22*
**30(f)(i**  321:*19*
**302**  9:*13*
**30s**  178:*3*  299:*15, 20*
**31**  7:*19*  232:*9*
**312**  9:*16*
**314-889-7300**  2:*13*
**319**  3:*7*
**32**  8:*2*  237:2, *6, 7*  293:*22*  294:*3*
**320**  3:*9*
**321**  3:*9*
**33**  8:*6*  66:*5*  239:*12, 13*
**34**  8:*10*  222:*20*  244:*24*  245:*3*
**35**  8:*13*  49:*11*  252:*16, 17*  293:*24*
**36**  8:*17*  263:8, *10*  265:*20*
**37**  8:*21*  265:*21, 22, 23*
**38**  9:*2*  268:*16, 17*
**39**  9:*7*  88:*9*  130:*5*  278:*22, 23*

**< 4 >**
**4**  3:*18*  49:*12, 13*  92:*16*  93:*5*  95:*15*  96:*11, 14, 22*  123:*12, 15*  124:*5*  245:*5*
**4:00**  166:*15*  167:*8, 12*
**4:15**  252:*13*
**40**  9:*10*  301:*6*  302:*3*  307:*5*

**41**  3:*17*  9:*14*  312:*19, 24*
**420**  2:*5*
**449**  28:*21*
**45924**  1:*25*
**48**  131:*10, 13*  240:*19, 20, 24, 25*  299:*22*
**49**  3:*22*
**4th**  177:*13*  220:*4, 10*  309:*20*  310:*14*  311:*25*

**< 5 >**
**5**  3:*14, 22*  55:7, *9*  95:*17*  149:*25*  245:*5*
**5/25/2022**  4:9, *12*
**5/26/2022**  9:*8*
**5/27/2022**  4:*16*
**5:00**  290:*13*
**5:05**  290:*16*
**5:41**  318:*3*
**5:45**  318:*6*
**5:46**  1:*13*  318:*17, 18*
**50**  186:*25*
**50-odd**  296:*13*
**50s**  150:*7*  155:*25*  156:*18*
**51**  130:*10*  131:*4*
**55**  3:*25*
**5th**  188:*6, 10*  237:*16*

**< 6 >**
**6**  4:*2*  62:8, *9*  63:*25*  149:*25*
**6/12/2022**  4:*20*
**6/2/2022**  4:*23*
**6/22/2022**  5:*1*
**6/23/2022**  5:4, *7*
**6/7/2022**  8:*18*  9:*4*
**6/8/2022**  8:*23*  9:*11*
**60**  63:*4*  64:*22*  68:*14*  69:*5*
**6124**  101:*2, 3*
**6-14-2022**  4:*21*
**62**  4:*3*
**63105**  2:*13*
**69**  4:*8*

**< 7 >**

**7**  4:*4*  62:*14*  69:*20, 21*  149:*25*  150:*3*  238:*17*
**7/10/2022**  5:*13*
**7/12/2022**  5:*16*
**7/13/2022**  5:*20*
**7/14/2022**  6:*3, 7*
**7/18/2022**  6:*10*
**7/19/2022**  5:*21*
**7/28/2022**  4:*5*  9:*4*
**7/7/2022**  8:*14*
**7/8/2022**  3:*19*
**7:39**  222:*20*  314:*24*
**7:50**  228:*25*
**7:51**  222:*23*
**70**  65:*18*
**7248**  322:*12*
**7676**  2:*12*
**7th**  239:*2*

**< 8 >**
**8**  4:*8*  84:*21, 22*
**8/10/2022**  7:6, *9, 12*  9:*15*
**8/12/2022**  3:*16*
**8/23/2022**  7:*17*
**8/26/2022**  7:*20*
**8/4/2022**  6:*18*
**8/5/2022**  6:*21*
**8/8/2022**  7:*3*
**8:30**  8:*8*  166:*21*  170:*2*
**8:45**  167:*5, 12*
**8:54**  166:*15*
**80**  63:*4*  64:*22*  65:*11*  68:*14*  69:*5*  173:*23*
**84**  4:*11*
**8-5-22**  7:*7*
**8683**  312:*20*
**8756**  205:*4*
**8th**  194:*2, 13*  196:*5*  302:*2*  307:*11*

**< 9 >**
**9**  1:*8, 12*  4:*11*  90:*24, 25*  237:*20*  321:*5*
**9/1/2022**  8:*3*
**9/17/2022**  3:*23*
**9/19/2022**  8:*7*

**9:22**  1:*13*  10:*3*
**9:53**  37:*11*
**90**  4:*15*
**901**  1:*14*
**91**  18:*22*  293:*19*
294:*2, 13*
**923**  109:*13*
**936**  109:*17, 18*
**938**  109:*24*  115:*8*
**95**  295:*8*
**956**  116:*11*
**960**  116:*17*
**961**  116:*17*
**9611**  310:*8*
**992F.2d**  28:*21*
**9th**  10:*3*  38:*4*  71:*1*

**< A >**
**a.m**  1:*13*  10:*3*
166:*21*  310:*17*
311:*25*
**A23**  147:*23*
**aavalos@rgrdlaw.com**
2:*7*
**abiding**  307:*1*
**ability**  11:*6*  25:*5*
125:*10*  198:*23*
**able**  32:*24*  57:*14*
129:*4, 9*  138:*22*
264:*8*  311:*4*
**absence**  29:*3*
**absent**  115:*9*  172:*7*
183:*16, 17*
**absolute**  130:*13*
186:*15*  217:*22*
303:*11*
**absolutely**  11:*16*
12:*6*  21:*22*  58:*24*
72:*24*  78:*14*  80:*25*
101:*18*  102:*21*  104:*3,
23*  106:*23*  119:*2, 5*
120:*16*  125:*6*  154:*17*
159:*4*  186:*14*  191:*2*
193:*16*  210:*5, 20*
230:*3*  231:*24*  242:*20*
247:*6*  251:*23*  252:*6*
271:*23*  298:*20*  306:*3*
308:*3*  311:*19*  317:*9,
16, 18, 19*

**abstain**  13:*1*
**abusive**  199:*4*
**accessible**  82:*11*
**account**  237:*15*
314:*23*
**accumulate**  232:*5*
**accumulating**  95:*22*
96:*17*  97:*1*  203:*12*
204:*8*  238:*13*  316:*14*
**accumulation**  97:*19*
101:*12, 16*  201:*25*
202:*21*  205:*16*
230:*16*  231:*7*  233:*15,
20*  234:*15, 23*  235:*6,
19*  236:*20*  238:*18*
**accurate**  168:*7*
**accurately**  317:*6*
**achieve**  90:*12*
**achieved**  89:*1*
**acknowledge**  145:*20*
146:*13*
**acknowledgement**
145:*10*
**acknowledges**  160:*23*
**acknowledgment**
145:*22*
**acquire**  87:*25*  92:*17*
93:*5*  95:*15*  96:*12*
110:*18*  111:*19*  124:*5*
128:*4*  129:*17, 21*
151:*2*  195:*25*  250:*1*
278:*11*  299:*17*
**acquired**  20:*21*
65:*10, 16*  246:*23*
250:*1*  300:*25*  304:*23*
**acquirer**  92:*2*  100:*4*
**acquiring**  86:*7, 24*
92:*22*  93:*11*  94:*2*
96:*17*  97:*5*  105:*17*
123:*13*  202:*6*  231:*21*
238:*12, 19*  242:*5*
248:*22*  316:*19*
**acquisition**  54:*25*
55:*1*  77:*20*  83:*14*
84:*16*  107:*18*  123:*18*
144:*13*  203:*5*  206:*22*
233:*5*  240:*10*  241:*22*
242:*3, 18*  243:*4, 17*
246:*3, 16, 22*  300:*24*

304:*25*
**acquisitions**  144:*25*
**acronym**  229:*17*
**act**  101:*25*  144:*12*
**ACTION**  1:*3*  119:*12,
17, 20*  120:*5*  123:*9*
186:*16*  321:*1*  322:*5,
7*
**actions**  219:*8*
**actively**  197:*8*
**Activism**  4:*14*  105:*20*
**activist**  33:*2, 4, 8, 14,
18*  105:*16, 24, 25*
300:*19*
**activists**  105:*5, 7, 10*
106:*7*
**activities**  95:*14*
296:*17*
**activity**  99:*23*  106:*8,
16, 25*  201:*20*  296:*20*
304:*12*
**actual**  203:*6*
**Adam**  207:*23*  208:*4*
213:*24*  314:*1*  315:*4,
9*
**added**  160:*15, 20*
307:*21*
**adding**  78:*20*
**addition**  81:*17*
208:*20*  210:*19*
**additional**  21:*11*
208:*20*  210:*19*
**adjournment**  167:*6*
**adjustments**  106:*11*
**admin**  290:*25*
**administration**  293:*10*
**admit**  279:*23*
**advantage**  131:*3*
192:*2*  299:*16*
**advice**  25:*17*  26:*7*
48:*13*  49:*3*  78:*13*
80:*23*  81:*7*  102:*5, 6,
9, 20, 22*  103:*23*
104:*3, 5, 10, 13, 24, 25*
121:*10*  124:*25*  125:*4,
13*  175:*9*  182:*4, 6*
183:*14, 18*  185:*6*
207:*9*  210:*3, 5, 11*
211:*2*  212:*9, 21*
219:*23*  221:*8, 15*
223:*21*  250:*24*  251:*6,*

*15*  259:*13*  303:*14, 23*
304:*15*  305:*9, 13, 16*
311:*23*  312:*12, 14*
315:*13, 20, 24*  316:*11,
25*  317:*2*
**advise**  34:*19*  104:*17*
106:*14*  158:*18*
218:*20*  304:*11*
**advised**  25:*3*  107:*23*
120:*3*  121:*3*  158:*24*
159:*1*  165:*10, 16*
187:*16*  201:*25*
206:*19, 21*  207:*15*
218:*4, 11*  221:*2*
**advisement**  39:*10*
**advises**  77:*5, 10*
79:*16*  80:*2*
**advising**  100:*1, 16*
101:*14*  119:*15*
245:*16*  251:*12*
**Advisor**  136:*8*
**advisors**  63:*5*  64:*23*
88:*18*  136:*10*  143:*19*
144:*12*  202:*16, 17*
205:*21*
**advocate**  106:*8*
**aerospace**  297:*24*
**affairs**  21:*12*
**affix**  320:*5*
**afternoon**  167:*4*
239:*25*
**Agency**  3:*13*  28:*21*
**Agenda**  8:*20*  109:*7*
116:*9*  126:*6, 11*
165:*22*  171:*15, 19*
263:*15*
**aggressive**  119:*12, 17,
20*  120:*4*
**ago**  14:*16*  33:*17*
116:*25*  143:*23*  149:*9*
158:*1*  163:*12, 13*
168:*22*  175:*21*  177:*7*
234:*25*  235:*8*  279:*11*
**agree**  40:*16, 17*
45:*15*  53:*13*  57:*25*
72:*22*  78:*13*  79:*13*
95:*2*  96:*22*  98:*4, 8*
102:*20*  103:*23*  104:*4*
125:*7*  130:*25*  142:*9*

160:*19*  251:*17, 21*
254:*14*  258:8  285:*11*
**agreed**  35:*17*  36:*15,
18*  53:*20*  93:8, *23*
214:*5*
**agreement**  34:*24*
53:*21*  89:*1*  132:*22*
212:*22*  213:*1*
**agreements**  90:*4*
**ahead**  17:8  82:*14*
95:*13*  109:*23*  110:*5*
154:*14*  172:*3*  178:*16*
179:*4*  197:*18*  253:*24*
**Albert**  3:*15*  7:*12*
8:*17, 22*  9:*3, 10*
23:*23*  24:*9*  25:*13, 23*
26:*11*  41:*22*  161:*2*
178:8  180:*3*  182:*19*
187:*21*  208:*19*
211:*20*  219:*18*  220:7
222:*15*  265:*25*
300:*23*  302:*1, 4, 6*
303:7  312:*5, 7*
**Alex**  2:*18*  91:*16, 19*
154:*23*  237:*4*
**align**  272:*18, 22*
273:*1*
**aligned**  21:*13*  160:7
219:*23*  273:*22*
**aligning**  273:*13*
**alleged**  12:*21*
**allow**  31:*12*  199:*5*
282:7
**allowed**  95:*5, 7, 9*
224:*11*  285:*18*
317:*11*
**altering**  74:*5*
**Alyssa**  2:*4*
**Amazon**  301:*1*
**ambiguous**  48:*24*
**ambushed**  39:*24*
41:*12*
**America**  67:*24*  68:*2,
8*  112:*20*  113:*5*
114:*2*  195:*24*  245:*16*
300:*3*
**American**  144:*21*
**America's**  60:*20*
109:*13*  113:*4*  196:*17*
197:*12*

**amount**  47:*21*  68:*6*
173:*18*  174:7, *12*
245:*24*  276:8
**amounts**  66:*4*
**ample**  110:*9*  112:*24*
113:*6, 12*  114:*4*
115:8, *17, 25*  194:*19*
**Ana**  2:*4*
**analysis**  109:*19, 25*
110:*14*  111:*1, 14*
115:*20*  195:*24*
208:*11*  210:*11, 15*
221:*10, 19*  222:*3*
**analyzing**  305:*14*
**and/or**  321:*16*
**Andrade**  252:*21*
253:*4, 8, 21*  254:*8, 18*
**announced**  188:*16, 24*
**announcement**  89:*1*
**announcing**  132:*22*
242:*17*
**answer**  11:*5, 8*  17:*1,
24*  18:*6, 17*  22:*4, 5, 7,
18*  24:*11*  27:7  29:*22*
32:*12, 14*  35:*19*
36:*20*  39:*12*  40:*10*
44:*9*  45:*2*  47:*24*
48:*6, 11, 15*  49:*4*
52:*13*  54:*13*  59:*10,
18*  63:*13*  69:*12, 13*
75:*20*  81:*5*  83:*21, 22*
85:*16*  94:*11*  98:*14*
100:*23*  110:*22*
117:*17*  122:*3*  134:*21*
151:8  161:*17*  163:*2*
176:8  184:8  192:*16*
214:*6, 12, 13*  216:*19,
20*  221:*4*  242:*9*
251:*3*  286:*16*  317:*18*
**answered**  26:*9*  80:*9*
90:*19*  97:*20, 25*
100:*22*  122:*2*  135:*16,
17, 19*  138:*11*  153:*7,
9*  161:*16*  165:*13, 15,
18*  173:*20*  180:*23*
183:*23*  184:*20*
187:*18*  197:*17*  198:*7,
8*  215:*5, 22*  216:*9, 10,
17*  219:*6*  225:*23*

235:*11*  242:8  257:*2*
285:*14, 16*  289:*22*
**anticipate**  97:*13*
133:*19*  249:*2, 14*
**anybody**  116:*23*
168:*1*  221:*2*
**anymore**  68:*6*  251:*16*
**anytime**  38:7  191:*15*
**anyway**  135:*19*
189:*22*  193:*18*  229:*2*
253:*24*  288:*4*
**aplascoff@rgrdlaw.co
m**  2:8
**apologize**  214:7
310:*12*
**Apparently**  16:*2*
234:*25*
**appeals**  29:*1*
**appear**  94:*5, 6*
158:*11*  266:*18, 22*
267:*21*  268:*2, 3*
273:*10*
**appearance**  267:*6, 16*
**APPEARANCES**  3:*4*
**appeared**  146:*6*
**appearing**  266:*11*
267:*18*
**appears**  51:*13, 22*
55:*22*  88:7  92:*3*
126:*5*  139:*11, 22*
145:*25*  155:*12*
159:*20*  166:8  167:*5*
178:*18*  188:*10*
194:*15*  203:*14*
238:*15*  254:*2*  255:*14*
266:7  276:*20*  277:*25*
**applied**  287:*19*
288:*12, 14*
**apply**  224:*14, 17*
225:*16*
**approach**  33:*19*
34:*14*  101:*4, 15*
103:*1*  151:*1*  243:*25*
244:*10*  264:*2*  307:*1*
**approached**  84:*11*
105:*6, 7*  232:*1*  233:*4*
298:*17*
**appropriate**  51:8
53:*20*  67:8  80:*12, 18*

104:*2*  147:*11*  228:*10*
246:*6*  255:*16*  286:*23*
**appropriately**  271:*4*
**approval**  3:*20*  174:*19*
**approve**  266:*4*
**approved**  259:7
262:*14*  264:*11, 19*
265:*9, 13, 15*  275:*21*
**approving**  183:*17*
263:*19, 20, 25*  264:*15,
21, 24*  265:*10*
**approximate**  245:*25*
**approximately**  19:*17,
19*  33:*25*  34:*16*
65:*11, 18*  66:*5*  68:*9*
69:*4*  167:8
**April**  71:*1, 2, 3, 4*
**area**  19:*4*  79:*15*
80:*1*  179:*21, 25*
180:*18, 22*  185:*19*
186:*18*  210:*12*
**argue**  309:*9*
**argument**  182:*18*
183:*3, 8*  184:*3, 17*
185:*1*  200:*12*  277:*9,
16*  312:*3*
**arguments**  67:8
**Arkansas**  293:*2, 7*
**arm**  295:*12*
**arrangement**  27:*14,
21*  36:*16*  37:*20, 23*
**arrangements**  29:*4*
31:*20*  62:*19*
**article**  194:*9*
**articulated**  133:*9*
153:*3*
**Asia**  296:*12*
**aside**  246:*9*  315:*13,
24*
**asked**  13:*13*  14:*15*
15:*10*  16:*15*  26:*10*
37:*19*  38:*24*  39:*3, 19*
50:*11, 14*  51:*3*  63:*9*
90:*18*  94:*21*  97:*20,
25*  100:*21*  113:*1*
117:*4*  122:*1*  134:*25*
135:*15, 20*  138:*10*
152:*3*  157:*9*  164:8
169:*14*  173:*20*
180:*23*  183:*23*

184:*20*  187:*18, 21*
197:*17*  198:*6*  213:*19*
216:*9, 17*  219:*5*
221:*9, 23*  225:*23*
226:*15*  235:*11*  242:*7*
251:*2*  257:*2*  261:*10*
285:*14*  289:*21*
312:*16*
**asking**  17:*12*  25:*1,*
*15*  37:*24*  38:*23*  41:*7*
43:*7, 14, 18, 25*  44:*15,*
*18*  45:*8, 19*  47:*2*
55:*20, 22*  58:*4, 11*
59:*24*  61:*13*  75:*15*
93:*24*  94:*24*  96:*7, 9*
117:*21*  118:*1, 10*
123:*1*  125:*18*  135:*3,*
*13, 18*  139:*8*  146:*9*
168:*19*  175:*18*
177:*15*  178:*15, 20*
179:*3*  181:*23*  217:*1*
220:*4*  262:*11*  274:*11*
275:*17, 21*  276:*5*
279:*12*  285:*7*  303:*22*
**asks**  43:*3*  55:*11*
233:*14*
**assess**  38:*8*  39:*20*
40:*1, 2*  45:*23*  50:*23*
300:*10*  306:*9*  317:*6*
**assessing**  110:*6, 18*
123:*8*
**asset**  77:*21*  111:*15,*
*18*  112:*4*  113:*11*
**Associate**  2:*18*
**associated**  104:*14*
225:*2*  228:*14*  304:*12*
**assume**  35:*9*  57:*25*
106:*2*  113:*7*  118:*15*
126:*20*  142:*2*  151:*12*
164:*14*  195:*17*
236:*12, 15*  287:*9, 14*
289:*9, 24*  290:*7*
**assumed**  53:*17*
241:*23*  243:*19*
299:*21*
**assuming**  118:*6, 7*
169:*7*  311:*5*
**assumption**  59:*11*
113:*8*  161:*5, 7*
312:*10*

**assumptions**  115:*18,*
*23*  116:*1*  165:*5*
**AT&T**  290:*23*  291:*2*
292:*11*
**attached**  58:*2*  63:*24,*
*25*  64:*3*  70:*9*  85:*2*
116:*9*  128:*21*  148:*7*
237:*14*  321:*24*
**attaches**  157:*20*
194:*9*
**attaching**  69:*23*  91:*5*
155:*2*
**attachment**  43:*18, 20,*
*22*  44:*20*  70:*15*  86:*3*
109:*5*  148:*5*
**attachments**  5:*9*
70:*1*  109:*10*
**attend**  112:*14, 15*
294:*11*  305:*19*
**attendance**  167:*20*
**attendees**  313:*14*
**attention**  105:*16*
190:*23*  191:*17, 21*
193:*11, 14*  200:*22*
230:*4*  231:*23*  232:*2*
314:*16*
**attorney**  18:*18*
215:*10*  284:*5*  294:*12,*
*16*
**attorney-client**  17:*23*
18:*15*  29:*5*  31:*19*
32:*7*
**attorneys**  41:*22*
245:*13*  305:*18, 22*
315:*11, 14, 20, 25*
316:*23*  317:*6*
**attorney's**  27:*18*
28:*1*  31:*4*  32:*14*
36:*6*  39:*13*  48:*12*
**attractive**  143:*7, 16*
161:*10*
**August**  45:*8*  46:*7, 17,*
*23, 24*  47:*1*  176:*12*
177:*13*  181:*4, 17*
188:*6, 8, 10*  193:*11*
194:*2, 13*  196:*5*
203:*4*  205:*7, 12*
211:*4*  213:*16*  218:*10*
220:*4, 10*  221:*17, 24*
222:*19, 23*  223:*8*

229:*13*  237:*16*
238:*18*  239:*2*  245:*21*
308:*10, 16*  309:*13, 20*
310:*14, 22*  311:*25*
312:*16*  313:*5, 6*
314:*11, 23*  315:*19*
316:*1*  317:*13*
**Austin**  1:*14*  293:*14*
294:*18*  298:*12*
**authority**  29:*17*
174:*8, 16*  179:*11*
220:*4, 12*  221:*9*
226:*15*
**authorization**  183:*9*
**authorize**  183:*2*
**available**  56:*4*  64:*17*
74:*5*
**Avenue**  2:*5*
**average**  53:*17*
**avoid**  13:*22*  99:*20*
307:*18, 25*
**aware**  16:*13*  85:*21*
88:*13*  117:*18*  165:*9*
168:*3*  192:*20*  211:*10,*
*21*  221:*3*  224:*24*
225:*11*  232:*8*  236:*19*
251:*24*  258:*12*
259:*21*  283:*9*  288:*25*
316:*13, 18*

**< B >**
**back**  6:*11*  35:*24*
36:*24*  37:*13*  40:*18*
41:*14*  53:*19*  84:*7, 9*
115:*5*  127:*13, 15*
131:*13*  138:*22*
147:*16*  152:*7*  162:*1,*
*22*  163:*3, 23, 24*
164:*1, 13*  176:*13*
184:*13*  191:*24*  200:*8*
206:*2*  218:*4, 12, 22*
219:*14*  240:*20*
252:*12, 14*  275:*8*
290:*15*  293:*13*  296:*3*
299:*22*  307:*4*  308:*6*
309:*2*  318:*1, 5*
**background**  292:*24*
**bait**  87:*2*
**balance**  106:*10*

**bank**  46:*3*  60:*20*
67:*23*  68:*2, 8*  109:*13*
112:*19*  113:*4, 5*
114:*2*  195:*24*  196:*17*
197:*11*  245:*15*  300:*3*
**banker**  62:*24*  67:*24*
**bankers**  60:*25*  69:*4*
245:*16*  246:*4*  247:*10,*
*15*  248:*2*  250:*18*
300:*9*
**banking**  294:*7*
**bankruptcy**  19:*6*
294:*23*
**banks**  65:*12, 19, 25*
144:*4, 7, 9, 12*  294:*9*
**bank's**  65:*4*
**bar**  18:*23*
**base**  215:*17*
**based**  30:*2*  32:*11, 14*
39:*1*  46:*12*  47:*25*
48:*6, 11*  49:*3*  76:*5*
79:*12*  81:*7*  100:*7*
126:*20*  130:*19*
145:*25*  146:*8*  150:*8,*
*18, 24*  151:*13, 17, 19*
152:*23*  156:*1, 19*
160:*10*  166:*23*  184:*9*
210:*11*  212:*19*  214:*6,*
*14*  216:*21, 22, 23*
221:*15*  228:*7*  299:*6*
309:*10*  317:*1*
**Basic**  74:*22, 24*
**basically**  145:*13*
206:*10*  229:*3*  230:*7*
296:*8*
**basis**  11:*25*  31:*22*
40:*7, 10, 11, 12*  54:*6*
61:*21*  72:*19*
**batch**  265:*16*  273:*4*
**batches**  266:*21*
**Bates**  3:*14, 15*  4:*3*
9:*9*  41:*20*  49:*14*
55:*9*  69:*22*  70:*10*
81:*14*  84:*23, 24*
91:*14*  101:*22*  107:*7*
109:*2, 13, 18, 24*
116:*17*  126:*4*  128:*18*
139:*15*  140:*25*  148:*2*
149:*23*  153:*15*
154:*25*  157:*18*

159:*15*  162:*13*  166:*4*  170:*10*  171:*16, 21*  176:*19*  187:*25*  188:*11*  193:*22*  201:*8*  205:*3*  229:*9*  237:*8*  244:*20*  245:*5*  252:*18*  263:*10*  268:*20, 22*  301:*7*  310:*4*  312:*19*

**bear**  98:*5, 11*  99:*16, 19*  100:*17*

**began**  221:*19*  303:*14*

**beginning**  49:*18*  69:*22*  70:*14*  71:*25*  76:*11*  78:*5*  84:*24*  86:*13*  109:*2, 12, 17, 24*  131:*16*  148:*2*  167:*8*  170:*14*  171:*16*  193:*25*  223:*9*  269:*2*

**begins**  10:*1*  70:*10*  71:*9*  76:*14*  81:*14*  86:*18*  116:*10*

**behalf**  179:*4*

**behavior**  240:*22*

**behoove**  191:*16*  210:*23*

**belief**  241:*11*

**believe**  18:*22*  23:*24*  33:*1*  46:*25*  50:*16, 21*  59:*17*  66:*9*  69:*20*  84:*18*  103:*25*  107:*20*  111:*7*  128:*9*  141:*19*  160:*4*  179:*21*  180:*5*  182:*3*  202:*17*  207:*7*  212:*11*  217:*6*  227:*19*  229:*15*  232:*22*  233:*21*  238:*8, 10*  240:*16, 19, 21, 23*  253:*1*  263:*3, 6*  264:*8*  265:*12, 18*  269:*10*  286:*24*  290:*23*  291:*1*  293:*17*  294:*13, 21*  295:*8*  296:*2, 25*  311:*11, 13*  313:*22*  315:*19*

**belong**  281:*14, 15*

**beneath**  149:*1*

**beneficial**  229:*15*

**benefit**  34:*23*  35:*2*

**BENNETT**  2:*12*  10:*13*  59:*1*

**best**  11:*6, 11, 13*  54:*16, 17*  104:*7*  125:*10*  211:*1*  212:*18*  213:*9*  214:*3*  300:*18, 19, 21*  303:*11*  304:*9, 11*

**better**  82:*3, 16*  102:*16*  135:*21*  241:*2*  253:*17*  255:*11*  259:*11*  260:*18*  265:*4*

**bigger**  215:*9, 10*

**bill**  55:*1, 3*  56:*14*

**billed**  53:*10*

**billing**  53:*7, 11, 12*  54:*12*  66:*20*

**billion**  112:*1, 4*  113:*12*  114:*8, 20*  194:*16*  195:*16*  196:*2, 6*

**bills**  53:*7*  54:*5, 7*

**bit**  42:*3, 23*  108:*21*  110:*3*  189:*7*  229:*8*  303:*18*  305:*7*

**blown**  57:*10*

**blue**  47:*1*

**blurb**  55:*20, 23*  58:*2*

**blurbs**  55:*17*

**BoA**  197:*22*  198:*10*

**board**  3:*20*  4:*21*  5:*20*  6:*4, 12, 15*  8:*7, 11, 19*  34:*21, 23, 25*  35:*2, 6*  87:*19*  89:*18, 19*  91:*2, 6*  93:*17, 20, 22*  95:*19, 21, 25*  96:*1, 2, 9*  97:*18*  102:*6, 10*  108:*7*  109:*7, 15*  116:*9*  126:*6, 11*  127:*20, 21*  146:*15, 22*  147:*4, 8, 12, 16*  148:*8, 13*  152:*7*  154:*10*  155:*11, 15, 19*  157:*4*  162:*4, 5*  166:*5, 8*  167:*20*  171:*16*  172:*10*  174:*16*  175:*14*  189:*1*  221:*2*  223:*13*  224:*23*  225:*1, 4, 8, 10*  227:*3, 22*  228:*10, 18, 24*  229:*2, 4*  236:*24*  239:*18, 21*  240:*1, 6, 7*  244:*23*

246:*4, 7, 10, 12, 25*  247:*1, 5, 11, 14*  248:*2, 3, 20*  249:*4*  251:*25*  259:*14*  263:*14*  268:*13*  269:*7*  270:*23*  275:*19*  276:*1, 4, 6, 7, 9*  278:*6*  280:*12, 18*  296:*9, 20*  300:*21*  303:*15*  305:*10, 17, 19*  306:*2*  307:*19*

**board's**  174:*19*

**BoD**  8:*15*  253:*5, 13*

**body**  105:*3*

**bold**  103:*12*  122:*18, 24*  123:*2*

**bolded**  122:*23*

**bolds**  122:*16*

**bond**  294:*8, 9*

**born**  293:*1*

**bothersome**  152:*9, 10*

**bottom**  28:*24*  57:*19*  58:*14*  65:*23*  66:*3*  78:*4*  84:*25*  120:*8, 14*  145:*8*  177:*11*  183:*15*  188:*17, 23*  194:*7*  195:*8*  232:*16*  243:*24*  244:*16*  252:*20*  253:*3*  263:*11*  266:*1*  272:*11*  274:*18*  275:*5*  315:*3*

**bought**  105:*14*  203:*16*  218:*12, 21*  219:*14*

**Boulevard**  2:*12*

**boy**  251:*2*

**bracketed**  307:*20*

**break**  35:*21*  36:*13*  37:*12*  84:*6*  115:*4*  125:*20*  127:*12*  161:*25*  162:*3*  199:*4, 13, 21, 24*  200:*1, 7*  252:*5, 11*  290:*4, 11, 14, 19*  318:*4*

**breaking**  126:*1*

**briefly**  13:*9*  84:*11*  105:*19*

**bringing**  29:*18*

**broad**  26:*17*

**Broker**  7:*17*

**BS**  293:*7*

**budget**  50:*4*  287:*14*  291:*19*

**build**  295:*22*  296:*14*

**built**  296:*11*

**bullet**  83:*13, 17*  106:*6*  111:*24*  132:*4, 19*  136:*8*  143:*2, 18*  207:*20*  217:*3*  234:*19*  238:*20*  243:*1, 23*  315:*4*

**business**  77:*21*  106:*10*  114:*19*  150:*23*  151:*16, 18, 25*  152:*18*  156:*12, 25*  157:*1, 3*  178:*6*  182:*1, 7, 10, 11*  192:*5*  197:*3*  218:*2*  227:*1*  251:*23*  293:*10*  295:*14*  297:*7*

**buy**  73:*11*  74:*3*  204:*22*  218:*4*  224:*11*  241:*18*

**buyback**  164:*3*  187:*8*  208:*8*  211:*20*  223:*14, 19, 20, 23*  224:*10*  226:*4*  227:*23*  228:*19*  311:*5*  315:*5, 16, 22*

**Buybacks**  6:*18*  99:*23*  100:*2, 17*  105:*13*  164:*16*  165:*2, 8, 22*  168:*24*  169:*10*  170:*4*  171:*1, 4*  173:*2*  175:*6*  178:*16*  179:*4, 8*  180:*1, 16*  181:*23*  182:*24*  183:*2, 9*  210:*14*  211:*6, 14*  212:*1*  220:*5, 12*  221:*10*  224:*2, 5*  225:*5, 10, 12, 22*  226:*2, 15*  253:*17, 22*  254:*9, 14, 19*  255:*6, 11*  256:*5, 15, 21*  258:*22*  259:*8*  260:*9, 18*  261:*8, 12*  315:*21*  317:*12*

**buyer**  201:*15*  202:*11*  203:*7*

**buyers**  231:*24*

buying  124:*11*
204:*14, 18, 23*  206:*7*
239:*1*

< C >
calc  9:*8*
calendar  139:*7*
313:*1*  314:*11*
California  62:*11*
64:*18*
call  32:*20*  82:*4*
147:*13*  163:*2, 13, 14,
17, 18, 22, 24*  164:*13*
165:*3*  169:*12, 17, 20*
178:*2*  189:*9, 19*
190:*13*  191:*10*
192:*18, 20*  193:*7*
196:*12*  197:*23*
198:*19*  205:*21*  209:*4*
218:*10*  219:*13*  223:*4*
227:*8, 25*  228:*3, 18*
299:*9*  313:*9*  314:*12*
316:*12*
called  16:*1*  109:*25*
162:*21*  165:*4, 6*
298:*1*
calling  75:*15*  113:*16*
163:*9*  165:*8*  169:*9*
223:*13*  227:*3, 21, 22*
235:*15*  302:*19*
Call-Mackenzie  9:*15*
calls  17:*22*  18:*15*
32:*7*  45:*12*  46:*20*
47:*6*  59:*8*  61:*5, 12*
63:*8*  66:*12, 18*  68:*5,
18*  69:*10*  75:*5, 9*
79:*20*  80:*6*  110:*21*
115:*12*  120:*23*
134:*20*  136:*1*  141:*24*
150:*21*  151:*6, 22*
152:*14*  153:*6*  163:*6*
174:*2*  192:*15*  195:*21*
196:*20*  197:*16*  198:*3*
204:*12*  212:*16*
228:*13, 20*  233:*7*
234:*4, 13*  235:*12, 23*
236:*11*  238:*6*  242:*8*
248:*25*  251:*20*  256:*8*
257:*3, 7, 18*  258:*7, 16*

260:*5*  261:*16*  262:*10*
270:*7*  283:*21*
canceled  15:*3*
capacity  20:*17*  21:*19*
75:*18*  109:*25*  110:*7,
10*  112:*5, 24*  113:*6,
12*  114:*4, 9*  115:*8, 17,
20, 25*  126:*15, 16, 19,
23*  192:*20*  194:*20, 23*
195:*25*
capital  170:*19, 21*
171:*5, 22, 25*  172:*11,
15*  178:*7*  222:*2*
294:*8*
capture  97:*23*
207:*18*  217:*14*
captured  141:*5*
167:*18*  169:*4*  207:*2*
209:*3*  218:*17*  219:*8,
10*
capturing  206:*16*
207:*9*  266:*17*  267:*13*
Carolyn  2:*18*
carried  196:*1*  225:*12*
carrier  290:*21*  291:*1,
9, 23*
carriers  291:*8, 14, 17*
292:*5, 8*
carries  149:*24*
carry  192:*20*
case  10:*25*  11:*18, 20,
23*  12:*1, 15, 19*  13:*5,
8*  14:*18, 21, 22, 25*
17:*13*  27:*16*  28:*4, 20*
29:*16*  30:*9, 17*  32:*1*
36:*4*  38:*9*  39:*7, 16,
20*  60:*21*  62:*11, 13,
15, 23*  64:*18*  67:*5*
68:*15*  74:*24*  80:*19*
92:*3*  139:*11*  142:*8*
165:*21*  173:*19*  185:*8*
191:*3*  194:*15*  208:*23*
209:*5, 8*  212:*11*
217:*6*  231:*25*  233:*25*
234:*1, 2, 5, 8, 10, 24*
235:*4, 7*  247:*7*
249:*25*  258:*13*  261:*6*
265:*18*  267:*23*
269:*10*  270:*23*

271:*14*  279:*15*  284:*3*
287:*14*  292:*21*
cases  27:*7*  30:*8*
31:*10*  38:*6*  61:*14*
120:*9, 25*  121:*4*
cash  87:*21*  88:*1*
89:*24*  129:*22*  170:*20*
195:*11, 14*  196:*8*
catch  14:*17*
cause  1:*12*  71:*21*
caused  151:*3*
cc'g  155:*2*  157:*20*
222:*16*  263:*13*
cell  290:*18, 22*  291:*4,
12, 21*
Centerview  136:*10,
25*  143:*19, 25*  144:*3*
CEO  98:*24*  298:*17*
305:*24*
certain  12:*20*  41:*4*
55:*13*  98:*3*  115:*18*
116:*1*  133:*16*  280:*16*
314:*24*
certainly  67:*13*
120:*18*  121:*15*
122:*21*  123:*2*  124:*8*
176:*25*  202:*18*
300:*12*  301:*17*
316:*10*
certainty  90:*2*
certificate  321:*15*
CERTIFICATION
3:*9*  321:*3*
Certified  321:*5*  322:*8*
certify  321:*7, 18*
322:*3*
cetera  54:*21*  88:*19*
102:*13*  103:*2*  105:*4*
146:*16*  170:*22*
178:*14*  201:*16*
202:*19*  203:*2*  228:*15*
292:*15*  294:*10*
295:*14*  302:*10*
CFO  222:*1*  310:*15*
CGC-23607461  62:*14*
chain  5:*6*  41:*21*
42:*11, 15, 17*  43:*19,
21*  44:*16*  55:*10, 14*
141:*1*  159:*17*  162:*13*
170:*11*  176:*21*

187:*25*  220:*9*  222:*14*
238:*16*  252:*19*
265:*25*  268:*25*  275:*5*
chair  275:*19, 25*
276:*3*
chairman  157:*4*
chairman's  270:*21*
chance  38:*12*
change  29:*19*  38:*18*
77:*22*  142:*23*  178:*25*
180:*6*  184:*21*  192:*6*
204:*15*  207:*24*
231:*18, 19*  254:*8*
262:*14*  292:*7*  298:*5*
315:*5*  316:*25*  319:*5*
changed  175:*7*  192:*9*
231:*12*  247:*25*  248:*3*
292:*5*  317:*2*
changes  141:*6*
160:*16*  321:*24, 25*
changing  254:*20*
256:*4*  258:*4, 12*
259:*7*
CHAPMAN  1:*13*
321:*5*  322:*12*
characterization  94:*7*
characterize  86:*9*
charge  27:*1*
charged  65:*12, 18, 24*
chart  123:*3*
chassis  298:*3, 4*
cheap  244:*15, 16*
299:*18*  309:*10*
check  230:*20*  269:*23*
270:*19*  271:*13, 17*
277:*6*  292:*1*
chief  21:*6, 13, 16*
86:*23*  87:*10, 18*
chose  118:*25*  121:*5*
chronologically
177:*12*
Circuit  28:*25*
circulated  152:*4*
circumstances  29:*3*
30:*10*  40:*17*  74:*19,
20*  135:*5*
cite  179:*19*
CIVIL  1:*3, 15*  71:*14*
209:*23*  321:*1*
claim  31:*23*

**clarify** 38:22  48:2 105:23
**clarity** 185:24  310:3
**class** 10:9
**clean** 258:18
**cleaned** 281:19, 21 282:9  283:6  285:19 287:18  288:19  289:5, 8, 9, 19, 23
**cleaning** 281:25 289:12, 16
**clear** 27:17, 25  28:10 29:22  31:12  35:16 61:12  80:13, 21 104:16  115:7  141:21 144:15  155:9  161:19 183:16  204:17 212:23  219:12  227:2 248:1, 16, 21  308:20 309:5
**clearance** 228:9
**clearly** 72:18  167:16 184:10  193:17 206:12  221:1, 4 224:1, 25  231:25 241:17  249:13 276:10, 13  298:23
**clerked** 294:18
**client** 27:21  29:3 35:1, 5  39:12  40:9 54:24  58:6
**clients** 56:5  57:7 61:14  295:2
**close** 46:2  53:23 54:1  130:15  176:10 214:23  303:19
**closed** 131:12 212:12  281:17
**closely** 305:14
**closing** 88:10  130:10, 23  305:1
**coaching** 44:6, 12 199:8
**code** 109:20  236:17 249:23  250:3, 7, 12, 15, 17
**coercive** 92:1  123:7
**cohesion** 300:11
**Coke** 123:25

**colleague** 10:15 23:22
**college** 294:5
**column** 98:5  99:15, 16
**combination** 86:18 90:17  297:21
**come** 16:6  30:2, 10 35:23  36:24  44:12 53:21  71:12  186:12 213:16  240:20 260:21  299:23  318:1
**Comerford** 2:11  3:7 10:12  12:4  16:23 17:11, 22  18:5, 14 22:3, 6  25:10, 19 27:13, 20  28:3  29:12, 14, 25  30:7, 13  31:17 32:6  35:14  36:12 37:1, 5, 17  39:14 40:12, 16  41:1, 5 42:14  43:17, 20  44:2, 7, 10, 13, 18, 25  45:11 46:9, 19  47:5, 14, 23 48:4, 9, 19, 22  49:2, 7, 8  52:12, 16  57:11, 18 58:8  59:8, 16, 19, 21 60:7, 11, 15  61:4, 11 63:7, 11, 14, 19  64:4, 8, 13  66:11, 17, 24 67:1, 2, 7, 10, 16, 18 68:4, 17, 21  69:1, 9, 13  75:5, 9, 14, 21 76:4  79:19  80:5 81:4  82:1, 6, 13 83:19  85:15, 20 90:18  92:25  93:13 94:3, 12, 17, 19  95:5, 10, 12, 24  96:19  97:3, 8, 20, 24  98:6, 12 100:19  110:20 111:21  113:15 114:11, 22  115:11 116:5  117:5, 10 119:21  120:22 121:24  122:1  123:5 124:1  125:17  126:18, 24  127:9  133:5 134:19  135:15, 18, 25 136:18, 21  137:2, 6

138:10  141:24  144:8 150:20  151:5, 21 152:13  153:5  161:22 163:5  164:23  165:12 171:6  173:20  174:1, 13  180:23  181:6 183:11, 22  184:7, 19 185:2, 17  187:10, 18 188:11, 14  190:2, 18 191:13  192:14, 24 195:20  196:19 197:15  198:2, 6, 25 199:3, 6, 7, 10, 14, 16, 20, 24  200:2, 4, 14, 17 202:3  203:8, 18 204:11, 20  210:17 212:15  215:12, 21 216:9, 11, 12, 17, 19 218:7, 15  219:5 220:14, 17  221:21 224:6  225:23  227:12 228:22  231:9  233:6 234:3, 12  235:10, 22 236:10  238:5  242:7 244:24  245:2  248:24 251:7, 18  252:4, 8 256:7  257:2, 6, 17 258:6, 15  260:4, 13, 16, 21, 22  261:2, 15 262:9, 18  267:9 268:20, 24  270:6 283:12, 20  284:1 285:14, 21  286:11, 14 289:7, 21  290:9 292:19, 20  301:5, 16 310:7, 13  312:21 314:19  318:13
**Comerford's** 12:8 214:7
**comes** 63:16  261:19
**comfortable** 210:10 267:4, 5, 10, 25
**coming** 16:11
**comment** 57:24 135:11  138:13  254:4 275:23
**commentary** 248:18
**comments** 233:20
**commercial** 19:8

26:18  294:24
**Committee** 6:15
**common** 87:22 172:9  210:5  254:22 266:6
**communicate** 152:6 229:4  241:3  247:8, 9 270:10
**communicated** 15:8 154:10  211:15 248:20  249:20  276:3
**communicating** 203:15  275:2, 3 305:13
**communication** 54:11 155:19  207:9, 17 220:11  228:10 252:21, 22  311:12
**communications** 17:12  54:8  124:19 305:4
**community** 152:20 304:10
**company** 35:3, 6 53:4  65:9  73:12 74:4, 6  77:22  92:18 93:7, 23  95:16 101:11  105:6, 8, 12 106:7  114:8  124:7 130:18  150:9, 19, 25 152:21, 24  156:1, 20 173:23  186:16 198:23  203:23 210:14  211:1  212:20 213:5, 6, 10  214:4 219:25  224:21 231:11  232:2  237:19 241:18, 19  246:24 249:7  250:1, 4 254:23  258:1, 17, 21 282:15  286:1, 4, 22 287:2, 8, 9, 21, 22 288:7, 10, 15, 16, 18 289:3  297:6  298:19 299:6, 17, 25  300:13 303:2, 15, 20  304:16 305:5, 23  306:14, 25 308:1  309:21  315:21 316:2

company's 71:*21* 72:*1* 238:*3* 282:*11* 307:*25*

compensated 52:*2* 60:*19* 66:*15*

compensation 60:*20* 215:*20*

competitors 191:*15* 298:*6*

compilation 278:*25*

complaining 61:*15*

complaint 11:*20* 62:*15*

complete 23:*10* 88:*19* 90:*3* 228:*13* 264:*8* 265:*4*

completed 194:*13* 228:*21* 264:*11*

completely 69:*18*

completion 321:*21* 322:*2*

compliance 23:*12* 26:*8* 72:2, *7*, *11*, *14* 80:*14* 81:*1*, *2* 186:*5*

compliant 174:*17* 306:*23* 307:*1* 311:*20*

complicate 99:*21*

complicated 297:*19*

complications 100:2, *16*

complied 81:*9*

computerized 1:*14*

concept 75:*2* 76:*1*

concern 79:*4* 152:*1*, *12* 158:*15* 258:*22* 284:*17* 317:*14*

concerned 261:*6* 266:*21* 267:*16*, *18* 268:*1*, *11*, *13* 271:*6*, *12*, *18* 273:5, *8*, *17*, *20* 278:*1* 284:*15* 285:*10*

concerning 26:*4* 33:*8* 34:*1* 39:*12* 42:*12* 51:*10* 62:*18* 83:*1* 107:*25* 108:*3* 114:*3* 172:*11* 218:*6*, *13* 219:*15* 221:*11*, *19* 246:*2* 250:*21* 265:*8* 270:*4* 279:*8* 283:*10* 284:*8*

concerns 219:*10* 277:*21*

conclude 113:*10* 124:*21* 138:*16* 313:*6*

concluded 112:*24* 113:*1*, *2*, *3* 236:*5* 318:*18*

concludes 90:*9* 115:8, *24* 138:*21* 318:*16*

concluding 54:*25* 90:*10*

conclusion 108:*2* 114:*5* 236:*6* 255:*3*

conclusions 75:6, *10*, *16*

condition 89:*7* 134:*5*

conditions 89:*16*

conduct 81:*9* 102:*17*

conducts 115:*19*

confer 269:*22*

confidence 136:*4*

confident 134:8, *13*, *17* 135:*1*, *4*, *6*, *14*, *23* 136:*4* 137:*17*, *18* 267:*22* 273:*25* 274:*3* 308:*24*

confidential 3:*21* 5:*8*, *17* 7:*10*, *18*, *21* 8:*4*, *9* 9:*5* 250:*4* 282:*15* 314:*25*

Confidentiality 4:*17* 7:*13*

confirm 110:*23* 133:*15* 174:*15* 179:*15* 180:*13*, *15* 182:*19* 184:*10* 186:*18* 274:*5* 296:*3* 312:5, *7*, *11*

confirmatory 132:*9*, *20*

confirmed 145:*14*

confirming 223:*21*

confusion 126:*15*

connection 34:*14* 47:*20* 52:*3*, *20* 104:*5* 144:*13* 187:*5* 278:*10* 279:*2*

consensus 160:*8*

consequences 71:*11*

consider 29:*17* 73:*10* 74:*2* 108:*9*, *18* 113:*25* 203:*19* 226:*14*

consideration 89:*25* 216:*16*

considerations 25:*24*

considered 54:*16*

considering 133:*25* 207:*11* 276:*10*

considers 137:*22*

consistent 66:*14* 83:*7* 132:*25* 186:*17* 259:*5* 263:*19* 266:6, *13* 272:*24* 273:*2*

consult 290:*5* 318:*1*

contact 26:*11* 85:*11*

contains 86:*6* 321:*24*

contemporaneous 62:*22*

content 42:*17* 86:*11* 104:*21* 141:*9* 173:*5* 266:*22* 273:*22* 276:*4*

Context 4:*14* 38:*20* 53:*1* 74:*17* 95:*18* 104:*14* 105:*3* 106:*17* 136:*3*, *6* 187:*11* 253:*15* 254:*10*, *20* 255:*9*, *12* 257:*22* 259:*8* 304:*19*

contingency 89:*25*

contingent 28:*6*

contingents 89:*15*

continual 230:*19*

continue 29:*8* 175:*10* 214:*2* 218:*1* 230:*1* 250:*5* 255:*2* 292:*15*

continued 4:*1* 6:*1* 7:*1* 8:*1* 9:*1* 231:*20* 238:*12*

continuing 32:*1* 230:*15* 232:*5*, *20*

continuously 102:*7*, *10*

contract 54:*21*

contrary 251:*4*, *15*

control 57:*13* 77:*22* 102:*24*

convenience 250:*10*

conversation 105:*24* 118:*10* 205:*18* 206:*4*, *11*, *20* 211:*7* 213:*16*, *23* 244:*6*, *9* 299:*11*

Conversations 12:*2*, *7* 14:*8* 154:*18* 182:*8*

convey 103:*7* 104:*19* 307:*24* 309:*3*

conveyed 299:*3*

convince 105:*12*

coordinate 233:*13*

Copied 141:*4* 148:*20* 220:*7*

copy 307:*5* 321:*15*

copying 255:*22*

Corp 62:*12*, *15*, *18* 63:*18*

Corp.com 203:*2* 232:*14*

corporate 19:*7*, *20* 77:*1*, *18* 294:*24* 296:*20*

CORPORATION 1:*3* 6:*13* 24:*13*, *15* 166:*5* 171:*5* 258:*12* 321:*3*

correct 12:*10*, *13* 18:*10*, *13*, *20*, *25* 19:*13*, *18*, *23* 20:*9*, *15*, *18* 21:*4*, *24* 23:*4* 26:*5* 31:*16* 32:*16*, *22* 34:*6*, *17*, *18* 38:*13* 39:*14* 46:*8* 49:*23* 51:*21* 52:*8* 54:*2* 59:*7*, *20* 64:*10*, *11*, *15* 68:*1* 69:*6* 71:*6*, *7*, *13*, *15* 72:*5*, *6*, *9*, *13*, *16*, *20*, *21* 74:*10* 77:*12* 78:*16* 79:*18* 80:*4* 81:*3*, *10*, *11* 83:*16* 84:*13*, *14* 86:*24* 87:*13*, *16*, *17* 88:*6* 89:*11* 90:*17* 91:*9* 92:*5* 97:*2*, *7*, *19* 98:*24* 99:*2* 103:*13* 106:*22* 107:*1*, *25* 111:*15* 114:*4* 115:*10*, *22* 116:*1*, *2* 118:*16* 119:*8*, *9*, *20* 121:*14* 123:*14* 127:*24* 133:*10*, *13* 134:*5*

136:*14*  138:*19*  139:*25*  140:*17*  142:*25*  144:*22, 25*  147:*18*  154:*3, 21*  155:*11*  156:*6, 10, 23*  157:*11, 13*  159:*7, 8*  161:*1*  168:*9*  174:*9, 10, 15*  176:*5, 14, 15*  179:*6, 8, 12*  180:*1, 19, 22*  181:*17*  183:*4, 5, 10*  184:*6*  185:*14, 16*  187:*6, 7, 9*  195:*2, 16*  205:*13*  207:*16*  208:*6, 9*  209:*18, 20, 24*  211:*18*  212:*2, 14, 24*  213:*2*  215:*14*  217:*17, 18*  218:*14*  219:*16, 17*  223:*10*  225:*13, 14, 22*  226:*2*  229:*10*  230:*25*  231:*22*  233:*11*  235:*21*  239:*3*  240:*8*  242:*6, 22*  244:*11*  245:*13, 14, 18*  249:*11*  250:*15*  255:*13*  256:*19*  258:*24*  259:*9*  265:*11*  270:*5*  271:*11*  272:*4*  275:*16*  283:*19*  284:*5*  287:*20*  288:*7*  289:*6*  298:*10*  305:*8*  310:*16*  315:*2*  316:*21*  320:*5*
**corrected**  302:*14*
**CORRECTION**  3:*7*  319:*1*  320:*5*
**correctly**  29:*13*  31:*5*  35:*22*  36:*17*  49:*12*  73:*15*  77:*23*  207:*25*  232:*12*
**corresponded**  14:*13*  16:*5*
**correspondence**  38:*1, 2*  40:*19*  149:*6*
**costs**  229:*22*
**counsel**  10:*4*  11:*6, 7, 9*  12:*2, 3, 5, 11*  15:*11, 17, 22*  16:*1, 12*  17:*13, 15, 20*  18:*3, 9, 12*  19:*25*  20:*5, 15*  21:*7, 14, 15, 20, 21*  22:*14*  24:*12, 16, 19*  35:*5*

37:*24*  46:*16*  47:*12*  48:*13*  49:*3*  58:*6*  59:*18*  71:*5*  72:*1*  78:*18*  79:*3, 6*  80:*11, 13, 16, 22, 24*  81:*1, 7*  128:*13*  136:*14*  142:*5*  145:*2*  152:*2*  177:*5*  179:*16*  185:*6*  186:*19*  187:*8*  198:*22*  204:*15*  205:*19*  206:*12*  210:*6, 12, 20*  211:*3*  215:*7*  221:*6, 14*  223:*21*  228:*8*  250:*24, 25*  251:*6, 12*  257:*25*  258:*11*  261:*13*  262:*16, 23*  264:*7*  271:*15, 16*  278:*6*  288:*17*  289:*3*  295:*19*  296:*22*  305:*6, 9*  306:*9*  311:*21*  314:*3*  316:*11*  317:*22*  322:*3*
**counsel's**  94:*7*  263:*4*  282:*21, 25*
**counting**  49:*12*
**countries**  296:*13*
**county**  62:*11*
**couple**  13:*10*  14:*14*  36:*24*  50:*16*  107:*20*  177:*7*  213:*19*
**course**  87:*14*  92:*7*  111:*17*  113:*10*  114:*25*  124:*12, 13*  142:*12*  166:*11*  231:*3*  243:*22*  244:*1*  295:*9*
**COURT**  1:*1*  10:*5*  28:*25*  62:*11*  74:*24*  321:*1*  322:*13*
**Court's**  11:*22*
**cover**  64:*1, 2*  109:*6, 13*  141:*3*  222:*21*
**crack**  142:*14*
**create**  153:*19*  154:*5*  250:*3*
**created**  223:*4*  253:*21, 24*  254:*3, 18*  282:*17*
**creating**  284:*18*  312:*25*
**credit**  256:*11*

**criminal**  71:*14*  209:*19*  210:*2, 4*
**CSR**  1:*13*  322:*12*
**CST**  8:*8*
**Cuellar**  2:*4*
**curious**  18:*2*
**current**  145:*16*  146:*18*  177:*17, 21*  237:*5*
**custom**  210:*1*
**customer**  297:*15*
**customers**  297:*12*

**< D >**
**D10**  263:*9*
**D102**  55:*6*
**D104**  239:*11*
**D105**  244:*19*
**D11**  265:*19*
**D2**  90:*23*
**D21**  128:*13, 14*
**D22**  139:*13*
**D25**  140:*23*
**D3**  84:*21*
**D33**  252:*16*
**D35**  49:*11*
**D37**  153:*11*
**D38**  154:*20*
**D41**  157:*16*
**D44**  159:*11*
**D48**  162:*9*
**D49**  166:*3*
**D58**  268:*15, 18*
**D6**  107:*4*
**D60**  69:*19*
**D67**  176:*17*
**D69**  187:*24*
**D75**  193:*20*
**D79**  201:*3*
**D8**  125:*16*
**D84**  204:*25*
**D85**  222:*8*
**D92**  41:*17*
**D93**  229:*8*
**D94**  232:*10*
**D97**  237:*1*
**damage**  71:*21*
**Damages**  71:*17*
**Daniels**  245:*8, 15*

313:*21, 22*
**data**  281:*20, 22*
**date**  10:*2*  20:*11*  46:*12, 13, 23*  53:*22, 24*  54:*3*  62:*20, 21*  71:*1*  84:*18*  108:*13*  128:*24*  148:*13*  159:*16*  203:*11*  245:*19*  268:*6*  319:*3*  321:*22*  322:*12*
**dated**  3:*16, 18, 23*  4:*3, 5, 9, 12, 16, 20*  5:*3, 7, 13, 16, 20, 21*  6:*3, 6, 10, 18, 20*  7:*3, 6, 9, 12, 16, 20*  8:*3, 6, 14, 18, 22*  9:*3, 4, 7, 10, 14*  85:*2*  128:*1*  139:*16*  188:*5, 10*  205:*7*  222:*19*  229:*13*  237:*9*  269:*4*
**dates**  147:*11*  288:*8*
**Davis**  136:*13*  144:*16, 21, 24*
**day**  43:*16*  44:*1*  45:*10*  47:*3*  88:*10*  128:*6*  130:*11*  139:*24*  166:*12*  169:*24*  170:*2*  186:*13*  188:*6*  205:*17, 22*  208:*25*  209:*2*  210:*23*  215:*18*  219:*21*  223:*21*  246:*20*  269:*18*  311:*18*  322:*8*
**days**  130:*6*  166:*11, 13*  177:*7, 13*  188:*7, 16*  190:*24, 25*  321:*22*
**day's**  130:*15, 23*  166:*14*
**deal**  47:*21*  59:*15*  60:*25*  67:*24*  68:*3*  89:*11*  160:*3, 10*  161:*4, 10*  175:*8*  192:*11*  200:*23*  215:*19*  216:*1, 3, 7, 15*  245:*17*  290:*25*
**dealt**  205:*25*
**debate**  98:*9*
**Deborah**  4:*4*  41:*25*
**Debt**  109:*25*

decide  31:9  37:16
deciding  73:11  74:3
decision  35:4  108:18
176:5  183:16  184:12
185:5  210:11  221:15
223:20  276:24
307:19  312:9
decisions  81:6  98:20
210:1  220:1  230:11
deck  117:21
declined  41:9
defend  304:24
DEFENDANTS  2:8
10:13  64:14  279:1
292:21
defendant's  191:3
defending  30:3  54:24
defense  54:17  62:5
142:5  261:13  297:24
300:20  304:7, 14, 19
define  73:5, 8  76:16
82:7  98:16, 18
defined  98:19
definition  73:1, 19
74:11, 13  82:24
definitive  88:25  90:4
132:22
degree  293:8, 13, 16,
21
delay  36:3, 10
delays  133:20, 23
deliberately  269:13,
14  270:12
delivered  215:3
321:13
Dell  19:12, 15, 19
295:3, 4, 6, 7, 8, 16, 17
demand  38:11
demanded  39:20
deny  281:3
department  19:16, 20
282:18  289:15, 17
291:9
Depending  104:21
depends  135:5
203:21
depo  36:23
deponent  321:19, 20
322:1

depos  292:2
depose  16:2
deposed  14:10, 15
15:2, 5  16:13
DEPOSITION  1:7,
11  10:2, 25  11:1
13:5, 15  14:4  16:10,
17  18:3  29:20  30:1,
3  35:20  38:5, 11, 19,
20  39:17, 20, 22  40:4
94:13  177:8  301:17
309:19  314:17
318:16, 18  320:3
321:5, 11, 13, 21
322:2
depositions  16:6, 7
17:10, 14, 20  18:10,
13
depressed  131:1
192:2  299:12, 16
deputy  19:25
describe  65:15
described  200:11
describes  62:23
132:4
describing  65:2
84:16  98:3  171:25
251:5  263:24  266:4
288:11
DESCRIPTION  3:9
4:2  6:2  7:2  8:2  9:2
254:9
deserves  229:4
desire  150:17
desired  207:24
208:8  217:17, 20
315:6, 22
despite  32:1  284:20
285:17
destroy  259:16, 19, 24
destroyed  262:8
details  14:21  15:1
255:2
determination  100:9
108:8  127:21  210:13
222:1
determine  79:3, 6
93:19  214:24  220:24

determined  29:2
53:15, 16, 25  215:4
276:12
determining  81:9
216:8  219:13
develop  70:23
development  197:4, 6,
8  295:12
device  281:8  282:10,
16  286:23  287:5, 8,
12
devices  298:3
different  53:2  54:20
103:4  107:21  118:18
121:5  151:10  186:25
230:11  236:21, 22
243:19  260:23
266:19  279:13
291:11, 14  296:13
298:3, 4
difficult  269:24
271:8  272:1  273:18
274:1, 8
diligence  88:19  90:4
132:5, 6, 9, 13, 16, 21
140:4, 10, 15  209:10
219:13
Diligent  155:17, 18
dime  61:17
Dinner  5:9
direct  54:9  104:9
109:4  125:12  139:6
259:16  290:3  307:4,
16  314:15
directed  169:16
directing  29:22
39:11  169:18
direction  40:9
155:14  259:24
directly  24:9  34:25
215:7
director  282:8
Directors  4:13  6:12
8:11  34:21, 25  89:19
109:15  166:5  244:23
305:19
directs  11:9
disagree  31:25  47:15
83:18  116:6  133:22

211:9  262:17, 19
disagreeing  155:8
disclose  13:1  35:17
99:21
disclosed  151:3
disclosure  12:20
92:17, 24  93:6, 12
95:16  96:12  99:9, 13
123:19  124:6  151:13
218:5, 13, 21  219:4,
15
disclosures  23:3, 13
discoverability
277:21, 23
discoverable  28:7
255:23  256:4, 10, 17,
25  257:5, 14, 16, 21
258:2, 5, 9, 13, 19, 24
259:1, 9, 12, 20
269:25  271:4, 9
272:2  273:19  274:2,
9  277:8, 15  278:8
284:4  285:1
discovered  278:2
284:19
discovery  38:15  41:4
210:9  283:16, 18, 23
285:10
discuss  14:18, 24
103:6  104:17  117:12,
16  146:21  147:14
158:21  179:18  214:1
263:18  264:5, 21
316:22
discussed  17:19  47:8,
9  49:9  51:12  84:10
147:5  168:24  170:4
171:1, 4, 8  172:15
211:4  217:14  219:9
248:7, 15, 20  249:13
251:22  280:12, 18
311:14
discusses  106:21
145:16
discussing  126:19
171:25  212:18
238:17  258:4  279:3
283:15  302:12
309:20

**Discussion** 5:*14, 17, 20* 6:*4, 8* 42:*21* 51:*9* 57:*4* 60:*23* 77:*8* 106:*19* 126:*5* 148:*4, 8, 9* 155:*11* 159:*23, 25* 170:*18, 19* 171:*22* 178:*3* 201:*6* 207:*2* 215:*6* 216:*4* 219:*3* 221:*6* 236:*14* 243:*8, 11, 14* 250:*20* 254:*24* 312:*23*

**discussions** 18:*1, 2* 102:*17* 251:*24* 308:*2*

**disposition** 77:*21*

**dispute** 27:*23*

**distinct** 273:*9*

**DISTRICT** 1:*1* 30:*25* 321:*1*

**divest** 112:*1*

**divestiture** 83:*14*

**divestment** 111:*2* 114:*3* 115:*9, 21*

**divided** 101:*7*

**dividend** 6:*21* 188:*25*

**DIXON** 1:*7, 11* 3:*5, 18, 22* 4:*15, 19, 23* 5:*5, 6, 15, 19* 6:*3, 9, 17, 20* 7:*3, 9, 11, 16, 19* 8:*6, 13, 17, 21* 9:*2, 7, 10* 10:*2, 16, 20* 18:*18* 29:*10* 31:*6, 16* 32:*13, 17* 42:*1, 18* 43:*6, 11, 23* 45:*14, 18* 46:*11, 21* 48:*10, 25* 49:*18* 55:*11* 56:*15* 61:*6, 16* 68:*20* 69:*12* 75:*12, 25* 79:*22* 80:*8* 84:*9* 93:*1* 96:*7* 98:*15* 100:*24* 114:*10* 115:*14* 119:*23* 122:*3* 127:*15* 128:*24* 129:*8* 134:*21* 135:*24* 136:*7* 138:*9* 139:*16* 153:*8* 155:*1* 157:*19* 176:*22* 187:*4* 188:*1* 198:*5* 216:*18* 226:*7* 235:*25* 239:*14* 242:*9* 251:*9* 252:*14, 19, 23* 254:*6* 257:*12* 260:*19* 261:*14* 265:*24*

272:*14* 278:*9* 280:*10* 283:*16* 284:*17* 286:*16, 25* 290:*17* 292:*13, 16, 20* 313:*14* 318:*8, 16* 319:*3* 320:*3, 8* 321:*5, 9*

**Dixon's** 274:*7*

**do/say** 102:*1*

**docket** 63:*17, 23* 64:*17*

**Docs** 4:*21*

**document** 37:*22* 38:*16* 39:*1* 41:*8, 16, 17* 42:*19* 44:*3, 4* 45:*6, 12, 15* 46:*10* 47:*3* 49:*11* 55:*5* 57:*13, 15, 22, 24* 58:*7, 9, 12* 62:*10, 20* 63:*15, 21, 23, 25* 64:*7, 9, 14, 16, 17* 66:*19* 67:*12, 20, 21* 69:*18, 22* 70:*16, 21* 76:*7* 83:*20* 86:*1* 90:*23* 91:*11, 14* 93:*4, 16, 22* 94:*4, 5, 7, 8, 22* 95:*2, 14* 96:*10* 97:*9* 98:*13* 100:*15, 21* 101:*22* 105:*19* 107:*4, 8, 10* 108:*22* 109:*24* 112:*12, 13, 16* 113:*16* 114:*6, 12, 14* 115:*7, 13, 16, 17* 116:*9, 12, 13* 119:*22* 123:*17* 125:*16, 18, 24* 128:*11* 137:*3* 139:*13* 140:*22* 141:*13* 142:*11, 15* 146:*11* 148:*2, 18, 25* 153:*5, 11, 13, 24* 154:*20* 159:*11, 16* 160:*23* 162:*8* 166:*3, 7* 170:*9* 171:*18* 175:*13* 176:*17* 183:*12, 23* 184:*20, 22* 187:*24* 193:*20* 195:*8* 200:*15* 201:*3, 8* 204:*25* 205:*3* 206:*3* 217:*3* 220:*18, 19* 222:*8, 21* 229:*8* 232:*10* 235:*3, 23* 237:*1, 14* 239:*10* 241:*15* 251:*19*

252:*15, 16, 25* 253:*3, 21* 254:*3, 5, 18, 25* 256:*3, 9, 16* 257:*13* 258:*4* 259:*14, 20* 260:*9, 14* 261:*11, 13, 20* 262:*6, 16, 21* 263:*5, 9* 265:*19* 268:*15* 269:*2* 278:*5, 20, 21, 24* 280:*5* 301:*9* 310:*5*

**documentation** 210:*7*

**documents** 38:*24* 40:*24, 25* 93:*14* 94:*20, 23, 24, 25* 142:*12* 152:*4* 154:*8* 162:*4* 210:*9* 258:*13, 17* 259:*17, 25* 285:*9*

**doing** 13:*14* 19:*6* 22:*17* 23:*7* 39:*1, 11* 54:*21* 91:*17* 102:*25* 103:*3* 120:*17, 18* 152:*8, 20* 159:*8* 161:*4* 174:*17* 175:*5* 192:*3, 11* 195:*24* 202:*20* 207:*11* 209:*9* 210:*25* 211:*13* 212:*18* 214:*3* 226:*25* 227:*7, 25* 229:*19* 230:*2, 5* 264:*5* 266:*11, 19, 20* 267:*3, 11, 12* 268:*10* 273:*4, 8* 301:*15, 22* 309:*8, 14*

**dollar** 56:*13, 14, 22* 130:*13*

**dollars** 114:*8* 131:*11* 173:*13*

**Donahue** 41:*25*

**Donohue** 4:*4*

**DOWD** 2:*5, 12* 10:*8, 12* 59:*1*

**download** 301:*14*

**Draft** 8:*19* 168:*5* 206:*1* 223:*4* 256:*12* 263:*14* 264:*9* 267:*1* 273:*21*

**drafted** 81:*18* 271:*3*

**drafting** 23:*3* 273:*15*

**drafts** 275:*17*

**draining** 17:*18*

**draw** 75:*16*

**drive** 150:*23* 151:*16* 152:*18, 20* 156:*25*

**driving** 156:*13* 157:*3*

**drop** 167:*7, 23* 269:*20* 274:*14*

**Drug** 3:*13* 28:*21*

**due** 11:*9* 88:*19* 90:*4* 107:*13* 132:*6, 9, 13, 16, 20* 140:*3, 10, 15*

**duly** 1:*12* 10:*17* 321:*9*

**Duties** 4:*13*

**duty** 191:*18* 300:*20*

**dynamic** 146:*1*

**dynamics** 309:*11*

**< E >**

**e.g** 106:*9*

**earlier** 17:*16* 59:*22* 65:*8* 113:*2* 133:*1* 142:*24* 152:*3* 154:*7* 190:*24, 25* 195:*23* 205:*17* 209:*13* 217:*1* 227:*20* 310:*8* 312:*17*

**earn** 60:*25*

**earned** 68:*15*

**earnings** 147:*13* 178:*1* 188:*15, 18, 19* 189:*2, 3, 9, 13, 19, 24* 190:*13, 17* 191:*10, 12* 192:*12, 18, 20* 193:*7, 12* 196:*13* 197:*24* 200:*22*

**easier** 307:*6*

**easily** 38:*7*

**easy** 307:*8*

**eat** 57:*21* 125:*21*

**economic** 105:*20, 25* 106:*6*

**EDDIE** 1:*7, 11* 3:*5, 18, 22* 4:*15, 19, 21, 23* 5:*4, 6, 15, 19* 6:*3, 9, 17, 20* 7:*3, 9, 11, 16, 19* 8:*6, 13, 17, 21* 9:*2, 7, 10* 10:*2, 16* 263:*18* 264:*20* 272:*14* 277:*13* 280:*10*

313:*14*  318:*16*  319:*3*
320:*3, 8*  321:*5, 9*
**Edgett**  4:*2*  63:*12*
**educate**  93:*19*  96:*9*
**educating**  93:*17, 21*
95:*21, 25*  97:*17*
**education**  95:*19*
236:*23*  293:*5, 11*
**educational**  96:*4*
123:*16*
**effect**  119:*8*  217:*11*
220:*8*  291:*15*
**effective**  70:*25*
**eight**  17:*7*  279:*1, 13*
**either**  13:*1*  16:*16*
20:*13*  27:*10*  31:*14*
85:*24*  206:*1*
**Electric**  201:*16*
203:*7, 12*
**Electric's**  237:*15*
**elevated**  20:*4*  296:*21*
**else's**  299:*12*
**Email**  3:*15, 18, 22*
4:*4, 11, 15, 19, 23*  5:*1,
4, 6, 12, 15, 19*  6:*2, 6,
9, 17, 20*  7:*2, 5, 9, 11,
16, 19*  8:*2, 6, 13, 17,
21*  9:*2, 7, 10, 14*
37:*25*  38:*1*  40:*18, 23*
41:*21*  42:*1, 8, 10, 11,
15, 17*  43:*6, 14, 19, 21,
24*  44:*13, 16*  46:*14,
15*  47:*1*  49:*17*  50:*12,
15, 18*  55:*10, 21*  58:*3,
5, 13*  63:*24*  64:*2*
69:*23, 25*  70:*15*  85:*1,
2, 4*  91:*5*  103:*2*
105:*1*  107:*24*  109:*3*
117:*18, 24*  126:*4*
128:*19, 21*  139:*15, 16,
21, 23*  140:*2, 19, 25*
141:*1, 3, 18, 23*  142:*6*
146:*5, 8*  148:*3, 6, 21*
149:*12*  150:*14*
153:*14, 16*  154:*25*
155:*1*  156:*4*  157:*19*
159:*15, 21*  160:*1*
162:*13, 14, 19, 22*
163:*3*  164:*25*  165:*1*
176:*19, 21, 23*  177:*1,*

*11, 12, 23*  180:*10*
181:*1, 25*  182:*14*
183:*25*  187:*25*  188:*6,
17, 24*  194:*1*  195:*3, 6*
196:*9, 10, 24*  199:*1*
200:*11, 19*  201:*9, 14*
202:*5, 13*  203:*4, 10*
205:*4, 9, 13, 23*  220:*4,
9, 10, 15, 20, 22, 23*
222:*14, 15, 18, 22*
223:*2, 8, 9*  227:*6*
229:*12*  231:*13*
232:*15, 20*  233:*10*
234:*22*  237:*9*  238:*16*
239:*13, 24*  240:*5*
252:*18, 19*  253:*3, 11,
12*  254:*1, 7*  255:*17*
258:*1*  263:*11, 13*
264:*4*  265:*24*  266:*1,
9*  268:*25*  269:*3*
272:*12, 13, 17*  275:*1*
277:*3*  307:*10*  311:*24,
25*  314:*17, 22*
**emails**  50:*16*  102:*15*
103:*8, 12, 18*  104:*20*
124:*19*  200:*21, 25*
213:*12*  222:*16*
265:*25*  279:*1, 13*
280:*21*  283:*15, 16, 22*
284:*18*
**emanate**  282:*24*
**emanates**  282:*21*
**embarrassing**  103:*19*
**embedded**  45:*25*
**Emerson**  4:*9*  6:*21*
20:*21*  33:*4, 11*  34:*1,
3, 15*  47:*21*  52:*3, 20*
59:*15, 25*  84:*11, 15*
85:*3*  86:*8, 23*  88:*17*
89:*10*  90:*10, 15*
92:*22*  93:*11*  94:*2*
95:*22*  96:*16*  97:*1, 5,
13*  99:*6, 12*  104:*6, 15*
107:*16*  109:*21*  111:*5,
25*  112:*13, 24*  113:*5,
11*  115:*8, 24*  119:*16,
20*  120:*5, 21*  121:*13,
23*  123:*12, 21*  127:*22*
128:*4*  129:*17*  131:*2,
19, 20*  132:*15*  137:*22*

138:*7*  139:*4, 6*
143:*12, 14, 15*  144:*11*
146:*18*  149:*19*
152:*24*  160:*9, 24*
161:*12*  164:*12*
176:*13*  177:*13*
178:*20, 24, 25*  179:*3*
181:*4, 17, 22*  183:*20*
187:*5, 13*  188:*8, 24*
189:*4*  190:*25*  191:*5,
22*  192:*12*  193:*14*
196:*6*  197:*6*  198:*16*
201:*15, 21*  202:*1, 6*
203:*7, 11*  204:*7, 9, 13,
18*  206:*8*  207:*15*
218:*6, 13*  219:*15*
221:*19*  229:*23*  231:*8,
15, 21, 25*  232:*4*
233:*3*  236:*8, 13, 16,
17*  237:*15, 23*  238:*2,
12, 19, 25*  242:*4*
243:*16*  245:*17*
248:*21*  249:*1, 3, 18*
250:*19, 21*  251:*1, 13*
265:*9*  278:*10*  281:*4,
7*  298:*17, 22, 25*
303:*13*  304:*13*
305:*25*  308:*1, 8, 16*
309:*1, 15*  311:*9*
316:*4, 14, 19*
**Emerson's**  33:*19*
88:*24*  89:*19*  107:*17*
108:*9, 19*  110:*6, 18*
126:*16*  133:*9*  151:*1,
13, 19*  176:*6*  184:*2,
16, 24*  185:*14*  188:*15*
189:*13, 24*  190:*17*
191:*9, 10, 12*  192:*12*
193:*12*  194:*3, 19*
195:*25*  200:*22*
205:*16*  206:*21*  236:*5*
238:*22*  240:*16*
241:*21*  242:*13*
243:*14*  246:*2, 16*
299:*3*  308:*8*
**Emmerich**  245:*7, 12*
314:*1*
**emoji**  56:*9, 20*
189:*16*  259:*3*  274:*23*

275:*15*  276:*17*
**emojis**  57:*1*  189:*17*
**emphasized**  209:*16*
**employed**  322:*4*
**employees**  125:*13*
282:*12*  291:*12*  307:*2*
**employment**  26:*19*
**employment-related**
296:*17*
**enable**  225:*22*
**encouraging**  58:*6*
**ended**  294:*19*
**energy**  297:*24*
**Enforcement**  3:*13*
28:*21*
**engage**  22:*18*  24:*8*
35:*4*  131:*17, 21*
133:*2*  204:*15*  300:*21*
304:*6, 24*
**engaged**  23:*15*  25:*21*
33:*6*  54:*18*  121:*10*
136:*9*  145:*4, 6*  175:*8*
185:*5, 20*  186:*23*
202:*23, 25*  204:*9*
210:*21*  270:*24*  304:*4*
305:*10*  306:*9*  311:*9*
**engagement**  28:*5*
33:*3, 8, 11*  37:*25*
40:*22*  62:*24*  108:*6*
182:*17*  183:*20*  184:*2,
16, 24*  185:*15*  271:*24*
311:*2, 6*  312:*3*
**engagements**  65:*2*
**engaging**  54:*18*
211:*19*  300:*3, 15*
307:*18*  308:*2*
**engineering**  293:*7*
**engineers**  297:*15*
**English**  198:*24*
199:*22*
**enjoyed**  127:*17*
**ensure**  72:*11, 14*
80:*17*  174:*16*  186:*16*
213:*7, 8*  258:*18*
266:*24*  268:*6, 8*
271:*13, 25*  273:*21*
284:*25*  297:*16*
305:*12*  306:*23*

ensuring 54:*23* 266:*10* 278:*7* 289:*10* 300:*6* 307:*2*

entered 27:*21*

enthusiastic 90:*11*, *16*

entire 35:*19* 102:*24* 271:*22*, *23*

entirety 129:*4*, *5*

entities 21:*14*

entry 313:*1*

equity 65:*16*

Eric 4:*9* 5:*1*, *7*, *13*, *16*, *19* 6:*3* 56:*2* 85:*1* 98:*25* 145:*20* 148:*22* 149:*3* 178:*3* 223:*12*, *19* 227:*3*, *22* 228:*5* 229:*1* 239:*24* 243:*11*, *13* 244:*6*, *8* 272:*14* 275:*4*, *18*, *24* 276:*18*, *22* 280:*10* 299:*10*, *11* 313:*14*, *20*

escalate 120:*21*

escalation 97:*7* 120:*10* 121:*1*, *6*, *13*, *23*

escalator 93:*22*

escalatory 92:*16*, *22* 93:*4*, *10* 94:*6* 96:*16* 122:*10*, *11*

especially 153:*20* 207:*11*

essentially 21:*10* 110:*17* 312:*25*

EST 8:*8*

establish 130:*21*

Estefania 41:*24*

estimate 238:*21*

Estimated 8:*4*

et 54:*21* 88:*19* 102:*13* 103:*2* 105:*4* 146:*16* 170:*22* 178:*14* 201:*16* 202:*19* 203:*2* 228:*15* 292:*15* 294:*10* 295:*14* 302:*10*

Europe 296:*12*

evading 47:*12*

evening 166:*19*, *25* 167:*4*, *20* 168:*12* 205:*12* 223:*5*

event 100:*3* 103:*6* 104:*17* 111:*2* 115:*21* 195:*11*, *15* 196:*1*, *8* 303:*7*

events 62:*22* 77:*1*, *18* 120:*20* 262:*13* 283:*10*

eventually 23:*16* 102:*1* 226:*17*

Everest 301:*13*, *17* 322:*13*

everybody 288:*9* 299:*12*

everybody's 287:*15*

evidence 46:*22* 240:*11* 241:*11*, *16*, *25* 242:*12*, *16*, *22*, *23*, *24* 279:*6*, *13* 306:*4*

evidenced 163:*10*

evidentiary 142:*8*

exact 20:*11* 53:*22*, *24* 54:*3* 68:*6* 108:*13* 147:*11* 217:*22* 229:*16* 245:*24* 288:*8*

exactly 33:*12* 47:*16* 104:*12* 128:*6* 162:*18* 163:*18* 177:*8* 182:*21* 190:*11* 204:*6* 206:*13*, *25* 215:*23* 216:*6* 220:*6* 241:*7* 248:*19* 249:*12*, *19* 254:*15* 257:*15* 264:*18* 266:*16* 270:*9* 277:*12* 282:*19* 288:*9*

EXAMINATION 3:*6* 10:*18* 292:*18*

example 65:*8* 76:*24* 83:*15* 106:*15*, *24* 131:*11* 164:*21*, *24* 165:*19* 206:*23* 208:*14* 242:*17* 287:*4*

examples 76:*8*, *19* 242:*12*

exception 292:*3*

exchange 252:*23* 302:*1*

exchanging 16:*9*

excited 86:*14*, *18*, *23*

excitement 87:*6*, *7*

Excuse 159:*14* 163:*20*

Exec 8:*7*

execute 43:*2*, *8*, *15* 46:*1* 156:*12*, *13* 157:*1* 174:*18* 175:*5* 178:*16* 229:*21*

executed 44:*1* 45:*9* 47:*3* 232:*17*, *18*, *25*

executing 211:*20* 213:*11*

executive 86:*23* 87:*10*, *18* 104:*12* 152:*7* 154:*11* 245:*7* 248:*6*

executives 259:*15* 309:*19* 313:*19*

Exhibit 3:*13*, *14*, *15*, *18*, *22* 4:*2*, *4*, *7*, *8*, *11*, *15*, *19*, *23* 5:*1*, *4*, *6*, *12*, *15*, *19* 6:*2*, *6*, *9*, *12*, *15*, *17*, *20* 7:*2*, *5*, *9*, *11*, *16*, *19* 8:*2*, *6*, *10*, *13*, *17*, *21* 9:*2*, *7*, *10*, *14* 28:*11*, *14*, *16*, *17*, *18*, *19* 30:*15*, *19*, *20* 41:*18*, *19*, *20* 49:*12*, *13* 55:*7*, *9* 62:*7*, *8*, *9*, *14* 63:*25* 69:*20*, *21* 84:*21*, *22* 90:*24*, *25* 107:*4*, *5* 108:*24* 109:*1* 125:*16* 126:*8* 128:*12*, *17* 139:*14* 140:*24* 147:*24*, *25* 148:*1* 153:*12* 154:*20*, *24* 157:*16*, *17* 159:*12* 162:*9*, *10* 166:*1*, *3* 171:*13*, *14* 176:*18* 188:*4* 193:*21*, *23* 201:*5*, *7* 205:*1*, *2* 222:*9*, *12*, *13* 229:*10*, *11* 232:*9* 237:*2*, *3*, *5* 239:*12*, *13* 244:*24* 245:*3* 252:*16*, *17* 260:*20* 263:*8*, *10* 265:*22*, *23* 268:*16*, *17*, *19* 278:*21*, *22*, *23* 301:*6*, *13* 302:*3* 307:*5* 309:*18*, *19*

310:*8* 312:*19*, *24* 314:*17*, *20*

exhibits 39:*17* 237:*5* 310:*11*

exist 262:*6*

existed 242:*23*, *24*

exists 242:*22* 261:*20* 262:*21*

expand 110:*3*

expanded 21:*12*

expect 121:*11* 225:*7* 282:*9*

expectation 88:*25*

expected 11:*8* 249:*15*

expecting 226:*22*

expeditiously 131:*25* 133:*4*

experience 28:*7* 54:*8* 295:*22*

expert 80:*16* 186:*11* 303:*3*

expertise 25:*6* 80:*18* 185:*20* 186:*18* 221:*16* 304:*7* 311:*22*

experts 208:*21* 210:*12*, *24* 219:*22* 220:*1* 303:*8*

Expiration 322:*12*

explain 36:*8* 52:*24* 53:*9* 54:*22* 63:*2* 67:*19* 82:*10*, *12* 231:*13* 281:*22* 297:*5*, *9* 307:*19*

explained 65:*17* 66:*4*

explaining 97:*18* 255:*22*

explains 64:*21* 256:*3*

explanation 81:*25*

explicitly 116:*20* 127:*4* 149:*10* 155:*7* 158:*1*, *14* 159:*2* 170:*8* 182:*12* 196:*21* 224:*21*

expound 304:*18*

expressing 92:*21* 156:*9* 284:*17*

expressly 58:*3*

Expressway 1:*14*

extensive 132:*5*

**extent** 220:*18*
**extraordinarily** 58:*23*
**eyes** 307:*9*

**< F >**
**face** 274:*23* 275:*15* 276:*17*
**facing** 303:*2*
**fact** 75:*17, 18* 79:*3* 130:*21* 133:*17* 143:*23* 147:*3* 152:*8* 165:*6* 177:*24* 178:*23* 191:*17* 212:*6* 228:*7* 238:*11* 241:*3* 251:*15* 255:8 264:*17* 271:*5* 279:*7* 298:*1* 309:*3* 316:*22* 317:*1*
**fact-based** 101:*1*
**factors** 312:*9*
**facts** 76:*6* 95:*18* 98:*19* 100:*7* 114:*17* 179:*2* 180:*15* 184:*1, 9* 185:*4* 194:*24* 208:*22* 221:*7* 233:*18* 236:*20* 305:*15*
**fails** 11:*12*
**fair** 21:*15* 58:*13* 83:*8* 106:*5* 112:*5* 114:*9* 116:*15* 127:*6* 166:*2* 223:*6* 230:*17* 231:*8* 293:*20*
**fall** 29:*4*
**falls** 59:*22*
**familiar** 70:*9, 11, 21* 74:*21, 23* 75:*2, 25*
**familiarity** 11:*18, 25*
**far** 60:*2*
**fast** 43:*3, 7, 14, 25* 45:*8* 46:*2* 47:*2*
**fault** 310:*10*
**February** 296:*2*
**Federal** 1:*15*
**fee** 3:*19* 27:*6, 11, 14, 20* 28:*6* 29:*4* 31:*15, 20* 32:*5* 36:*15* 37:*19, 23* 40:*21* 48:*3* 50:*2, 8, 11, 14, 20* 51:*3, 10, 12, 16, 21, 25* 52:*2, 8, 11, 15, 19, 21, 25* 53:*1* 54:*19* 62:*19* 65:*11,*

*17, 18, 24* 66:*4* 212:*9, 14, 22* 213:*13, 20* 214:*8, 9, 14* 215:*10* 216:*16*
**feel** 39:*24* 41:*12* 95:*6*
**fees** 27:*18* 28:*1* 31:*4* 36:*6* 39:*13* 47:*18* 53:*25* 60:*24* 62:*1, 19, 24* 63:*3, 4* 64:*22* 65:*4, 5, 12* 213:*1, 4, 15, 16* 214:*2*
**fell** 142:*13*
**felt** 131:*2* 210:*25* 214:*14* 216:*4* 299:*15* 306:*13, 17*
**figure** 211:*18* 249:*2*
**figured** 53:*18*
**file** 38:*13*
**filed** 63:*17* 285:*25*
**filing** 23:*10*
**filings** 22:*21* 23:*22*
**FINAL** 4:*21* 159:*6*
**finance** 174:*18* 203:*1* 253:*9*
**finance-related** 178:*10*
**financial** 111:*23* 136:*10* 143:*19* 144:*12*
**financially** 322:*6*
**financials** 111:*22*
**financing** 4:*24* 8:*15* 89:*5, 7, 13, 15, 16, 25* 134:*3, 4* 253:*5, 13*
**find** 262:*16*
**fine** 21:*17* 37:*1* 85:*9* 118:*7* 122:*22* 137:*14* 175:*17* 177:*10*
**fines** 71:*17*
**firepower** 110:*14, 18* 111:*19* 126:*10, 17, 22* 192:*13*
**firm** 12:*8* 19:*2, 9* 22:*18, 25* 23:*2, 6, 20* 24:*8* 25:*17* 26:*2, 23* 32:*19* 37:*21* 40:*20* 41:*23* 47:*22* 49:*23* 54:*20* 58:*22, 23* 62:*6*

63:*3* 65:*10* 144:*22* 145:*4, 6* 186:*20* 187:*1* 201:*20* 270:*25* 271:*21* 282:*12* 294:*7, 20* 295:*3, 5* 300:*16* 301:*3* 302:*19* 303:*1, 11* 304:*6, 24* 305:*19, 23* 309:*23* 315:*20*
**firms** 21:*23* 22:*2, 9, 10, 12, 16, 21, 23* 23:*11* 26:*14, 18, 19, 20* 31:*21* 54:*17* 61:*24* 86:*19* 186:*21, 25* 187:*16* 294:*19* 300:*20*
**first** 10:*17* 20:*1* 28:*16* 32:*24* 33:*5* 34:*1, 3* 39:*8* 49:*16* 70:*8, 16, 18* 71:*8* 85:*11* 109:*18* 111:*24* 119:*4* 128:*19* 129:*4, 5* 145:*19* 166:*14, 16* 171:*22* 195:*7* 238:*16* 253:*14* 269:*3* 280:*5* 298:*16, 17* 299:*11* 307:*14* 312:*18*
**first-in-time** 177:*12*
**five** 33:*17* 83:*24* 161:*20* 198:*7* 200:*3* 278:*25* 297:*8*
**five-minute** 199:*13*
**fixed** 294:*8*
**flat** 27:*6, 11* 31:*15* 32:*5*
**flexible** 298:*2*
**flip** 172:*3*
**fly** 29:*19*
**focused** 23:*12* 213:*4* 214:*3*
**Foerster** 23:*20, 25* 24:*1, 6, 20, 23* 25:*7* 26:*2, 6, 13* 32:*9* 41:*23* 42:*10, 12* 43:*1, 7, 14, 24* 46:*16* 47:*2*
**folks** 282:*7*
**follow** 71:*10* 102:*22* 104:*10* 125:*13* 186:*15* 211:*2*
**followed** 102:*24* 104:*5* 125:*9* 191:*14*

270:*9* 286:*6* 287:*17* 289:*25*
**following** 43:*16* 44:*1* 45:*10* 47:*3* 166:*21* 169:*23* 209:*3* 213:*7* 269:*11* 293:*8* 311:*20* 321:*8*
**follows** 10:*17* 96:*14, 22*
**Follow-up** 5:*2* 317:*23*
**Foods** 300:*25*
**forecast** 172:*20*
**foregoing** 320:*3*
**foreseeable** 283:*11* 284:*9* 285:*4, 5*
**forget** 202:*17*
**Form** 22:*3* 25:*19* 31:*22* 32:*6* 45:*11* 46:*9, 19* 47:*5* 48:*23* 57:*12* 59:*16* 61:*4, 11* 63:*7* 66:*11, 17* 68:*4, 17* 69:*9* 79:*19* 80:*5* 81:*4* 82:*1, 6, 13* 92:*25* 93:*13* 95:*24* 96:*19* 97:*3, 8* 98:*6, 12* 100:*19* 110:*20* 111:*21* 113:*16* 114:*11* 115:*11* 117:*10* 119:*21* 120:*22* 122:*2* 123:*5* 124:*1* 126:*18, 24* 133:*5* 134:*19* 135:*25* 142:*6* 144:*8* 150:*20* 151:*5, 21* 152:*13* 153:*5* 163:*5* 164:*23* 165:*12* 171:*6* 172:*10* 173:*21* 174:*1, 13* 180:*24* 181:*6* 183:*11, 22* 184:*7, 19* 185:*2, 17* 187:*10* 190:*3, 18* 191:*13* 192:*14, 24* 195:*20* 196:*19* 197:*16* 198:*3* 200:*14* 202:*3* 203:*8, 18* 204:*11, 20* 210:*17* 212:*15* 215:*12* 218:*7, 15* 221:*21* 224:*6* 227:*12* 231:*9* 233:*6* 234:*3, 12* 235:*11* 236:*10* 238:*5* 242:*8*

248:*24*  251:*19*  256:*7*  257:*3, 6, 17*  258:*6, 15*  260:*4*  261:*15*  262:*9*  267:*9*  270:*6*  283:*12, 20*  284:*1*  285:*15, 22*  289:*7, 22*  302:*22, 23*  303:*5, 16*  304:*2, 21*  306:*16*  308:*13*  309:*6*  315:*17*  316:*6, 17*  317:*3, 10, 17*

**forma**  109:*18*

**formally**  38:*15*

**format**  172:*14*

**formerly**  62:*15*

**Forsyth**  2:*12*

**forth**  62:*1*  83:*3*  275:*8*  281:*1*

**forward**  76:*7*  108:*21*  118:*18*  137:*20*  138:*24*  169:*22*  175:*10*  178:*6*  182:*4, 10*  183:*17*  187:*24*  194:*8*  207:*13*  217:*23*  228:*9*  229:*5, 8*  267:*24*  275:*10, 13*  304:*20*

**forwarded**  85:*5*  128:*23*  255:*17*

**Foundation**  25:*10*  32:*6*  45:*11*  46:*10, 20*  47:*5*  59:*8*  61:*4, 11*  63:*7*  66:*11, 17*  68:*4, 18*  69:*9*  79:*19*  80:*5*  85:*15, 20*  93:*14*  100:*20*  110:*20*  113:*17*  115:*12*  120:*22*  134:*19*  135:*25*  136:*18, 19*  137:*2*  141:*25*  150:*20*  151:*5, 21*  152:*13*  153:*6*  163:*5*  174:*1*  183:*11*  185:*18*  190:*3, 18*  192:*14*  195:*20*  196:*19*  197:*16*  198:*3*  203:*8*  204:*11*  212:*15*  228:*22*  233:*6*  234:*3, 12*  235:*12, 23*  236:*10*  238:*5*  248:*24*  251:*19*  256:*7*  257:*3, 6*  258:*6, 15*  260:*4*  261:*15*

262:*9, 18*  270:*6*  283:*20*

**four**  33:*16*  89:*1*  132:*22*  278:*25*  300:*19*

**frame**  25:*20*  52:*17*  255:*12*

**framed**  253:*17*  255:*11*  260:*18*

**Francisco**  62:*12*

**frankly**  36:*13*  38:*14*  39:*24*  58:*25*  177:*25*  178:*2*  192:*1*  226:*21*  228:*24*  239:*8*  295:*20*  299:*9*  311:*6*

**FRCP**  321:*18*

**friend**  295:*17*

**front**  39:*21*  58:*9*  102:*13*  137:*7*  201:*1*

**full**  23:*9*

**fully**  57:*25*  79:*13*  249:*4*

**function**  60:*20*  75:*3*  76:*1*  297:*17*

**funds**  113:*19, 21*  114:*21*  294:*10*

**further**  108:*9, 18*  116:*8*  124:*25*  169:*25*  188:*3*  201:*3*  243:*22*  292:*14*  311:*2, 5*  318:*12*  321:*18*  322:*3, 6*

**future**  285:*8*  286:*21*  300:*10*

**FW**  7:*12*

**FYI**  194:*7*  223:*10*  274:*21*  275:*14*  310:*20*


< G >

**G21**  128:*12*

**gamut**  297:*24*

**Gardephe**  30:*25*

**gather**  221:*12*

**gathering**  202:*18*

**GC**  186:*11, 14*  283:*2*  296:*10*  297:*3*

**gears**  83:*24*

**GELLER**  2:*5, 18*  10:*8*

**general**  11:*4*  19:*25*  20:*5, 14*  21:*7, 15, 20*  22:*14*  23:*14*  24:*12*  25:*16*  28:*1, 4*  57:*8*  58:*20*  71:*5*  72:*1*  80:*16*  83:*6*  102:*25*  104:*13, 17*  126:*25*  135:*3, 22*  152:*1*  174:*14*  196:*12*  197:*23*  198:*22*  213:*20, 25*  228:*10*  233:*19, 24*  236:*13, 19*  240:*1, 6*  251:*23*  257:*25*  258:*11*  264:*2*  271:*16*  282:*21, 25*  288:*17*  289:*3*  295:*18*  296:*21*  303:*23*  305:*6*

**Generally**  27:*2, 3*  28:*7*  31:*4*  36:*7*  62:*22*  70:*11*  81:*15*  102:*23*  106:*6*  114:*7*  131:*3*  134:*14, 17*  135:*2*  168:*6*  213:*21*  270:*10*  276:*2*  282:*6*  300:*13*

**generation**  195:*11, 15*  196:*8*

**Geoffroy**  7:*5*

**getting**  154:*8*  182:*4*  212:*21*  213:*9*  214:*15*  216:*22*  265:*3*

**Gift**  5:*10*

**Giuggio**  2:*18*

**give**  25:*5*  67:*14*  102:*6, 10*  104:*13*  183:*8*  188:*25*  213:*20*  219:*22*  228:*6*  229:*3*  236:*23*  242:*12*  246:*18*  259:*13*  303:*15*  308:*6*

**given**  57:*14*  58:*10*  83:*22*  152:*12*  174:*16*  177:*17, 21, 24*  178:*13*  181:*21*  188:*18*  189:*2*  240:*25*  241:*17*  321:*11*

**gives**  40:*1*  106:*24*

**giving**  38:*12*  47:*12*  246:*13, 15*  304:*16*  308:*1*

**global**  295:*13, 23*  296:*11*

**go**  10:*10*  17:*8*  22:*17*  25:*6*  28:*22*  36:*21*  50:*7*  56:*21*  63:*22*  73:*22*  76:*18*  78:*3*  82:*14*  86:*3*  89:*23*  91:*20, 21*  95:*13*  98:*1*  99:*15*  101:*21*  102:*15*  103:*18*  105:*18*  109:*5, 12, 17, 23*  110:*5*  114:*22*  115:*1*  116:*16*  121:*19, 20*  122:*5*  124:*14*  127:*7*  131:*8*  134:*7*  149:*15, 20, 23*  151:*4, 13*  152:*22*  154:*14*  155:*21*  157:*15*  158:*3*  171:*20*  177:*11*  178:*16*  179:*4*  180:*14*  184:*13*  186:*24*  188:*22*  193:*25*  197:*18*  221:*13*  222:*6*  238:*16*  240:*18, 21, 23*  253:*24*  259:*14*  266:*8*  269:*1, 2*  277:*4*  278:*5*  280:*3*  296:*3*  317:*25*

**goal**  150:*23*  152:*22*  153:*3*  157:*3*  186:*14*  307:*25*  317:*4*

**goes**  65:*22*  86:*17*  115:*25*  132:*19*  138:*15*  145:*15*  160:*9, 24*  179:*19*  237:*17*  267:*20*

**go-forward**  248:*11, 14*  249:*10, 17*  250:*19*  251:*1, 13*

**going**  10:*25*  15:*2*  16:*8*  17:*11, 23*  18:*14, 17*  27:*13*  28:*15, 24*  29:*19*  30:*5, 16, 18, 19*  31:*17*  32:*3, 12, 13*  35:*14, 15*  37:*10*  38:*2, 18*  39:*15, 18*  45:*23*  47:*24*  48:*5, 11*  51:*19*  52:*2, 16*  57:*11, 23*  69:*25*  83:*19, 23*  84:*4*  89:*12*  90:*23, 24*  94:*14*  97:*23*  100:*23*

108:*20*  110:*2*  113:*15, 18*  115:*2*  116:*25*  121:*9*  122:*8*  127:*10*  134:*22*  142:*4, 7, 9*  146:*14*  150:*2*  159:*25*  161:*8, 23*  169:*13*  175:*4, 18*  182:*3, 15*  184:*8*  185:*6*  186:*24*  188:*15*  190:*2*  195:*7*  199:*3, 5*  200:*5*  201:*2*  202:*13*  204:*22*  207:*3, 15, 21*  217:*9*  220:*14, 17*  223:*20*  226:*18*  227:*2, 8*  229:*1, 23*  230:*4, 23*  231:*15*  232:*2*  243:*25*  244:*16, 20*  245:*4*  247:*7*  249:*5*  252:*6, 9*  256:*24*  267:*2*  273:*13*  275:*22*  276:*12*  285:*7, 13*  286:*19, 20*  290:*7, 12*  294:*19*  300:*13*  304:*20*  318:*2, 8, 16*

**Goldman**  134:*8*  136:*9, 25*  143:*18, 25*  144:*3*  201:*15*  202:*5, 11*  203:*6*

**Good**  10:*20, 22*  11:*17*  37:*7*  75:*23*  129:*14*  153:*19*  154:*5*  180:*13*  182:*21*  239:*9*  292:*13*

**gotten**  228:*8*
**government**  21:*11*
**graduate**  18:*21*
**graduating**  294:*17*
**gravity**  209:*16*
**gray**  79:*15*  80:*1*  179:*21, 25*  180:*18, 22*
**Great**  199:*24*
**greater**  114:*9*
**grew**  293:*1, 2*
**groan's**  97:*21*
**ground**  11:*4*  214:*8*
**grounds**  39:*5*
**group**  295:*12*  296:*12*
**growth**  300:*10*
**GS**  7:*17*

**guess**  35:*25*  81:*14*  272:*25*  294:*2*  305:*2, 8*
**Guest**  5:*10*
**guidance**  309:*22*  311:*22*
**guru**  302:*14, 19*  303:*1, 6*
**guy**  178:*10*
**guys**  15:*16, 21*  36:*21*  59:*2*  163:*12*  192:*19*  199:*12*

**< H >**
**Hal**  13:*11*
**half**  27:*9*  116:*24*  117:*5, 6*  166:*12*  232:*16*
**hand**  76:*6*  271:*21, 22*
**hand-in-hand**  222:*6*
**handle**  38:*13, 19*  39:*24, 25*  101:*4*
**handling**  35:*22*  36:*17*
**handsomely**  48:*17, 20, 23, 25*  49:*6*  56:*6*  57:*5, 9*  58:*19, 22*  59:*6, 14*  60:*5*
**hang**  29:*14*  197:*15*
**hangover**  179:*21*
**happen**  46:*4*  51:*19*  96:*5*  119:*25*  120:*1*  122:*4, 8*  161:*9*  182:*3*  227:*2*  249:*15, 16*  285:*6, 8, 13*  286:*21*
**happened**  33:*5*  111:*9, 11*  147:*19*  167:*17*  168:*14*  170:*8*  175:*21*  180:*5*  260:*8*  262:*1*  266:*14, 17*  272:*24*  273:*2*  274:*4, 5*  289:*24*  297:*2*
**happening**  267:*14*
**happily**  279:*22*
**happy**  29:*15, 16*
**harassing**  199:*4*
**hardware**  297:*20*
**harm**  209:*22*
**head**  35:*16*  117:*1*
**heading**  149:*1*

170:*11*
**headings**  98:*17*
**heads**  112:*13*
**hear**  247:*14*  260:*12*
**heard**  15:*4*  110:*13, 15*  117:*8*  304:*14*
**hearing**  67:*13*  138:*24*
**heat**  11:*12*
**heavy**  278:*18*
**Held**  2:*18*  128:*13, 16*  147:*25*  154:*22*  162:*11*  201:*7*  237:*6*  265:*21*  273:*23*  296:*6*  314:*20*
**help**  30:*17*  70:*23*  81:*20*  82:*2*  197:*25*  221:*14*  295:*22*  304:*24*
**helped**  296:*14*
**helpful**  42:*2, 5*
**helping**  81:*19*  264:*9*  267:*1*
**hey**  14:*15*  16:*1*  222:*3*  230:*9*  256:*12*  265:*2*
**Hi**  49:*18*  269:*21*
**high**  293:*5*  297:*5*
**higher**  48:*8*  130:*22*  207:*4, 16*  217:*9*
**highest**  137:*23*  138:*8, 12*
**highlight**  160:*15*
**highlighted**  141:*15*  160:*20*
**highlighting**  142:*13*  159:*14*  160:*7*
**highly**  64:*18*  90:*10, 16*  134:*8, 13, 17*  135:*1, 4, 14, 23*  137:*17*
**hints**  47:*13*  67:*14*
**hire**  271:*15*  303:*10*
**hired**  271:*21*  303:*9*
**hiring**  303:*20*
**history**  266:*10*  294:*4, 16*
**hit**  223:*7*
**Hofman**  2:*11*  10:*15*  301:*8, 10*  312:*21*

**hold**  73:*11*  74:*3*  286:*3*  288:*25*
**holder**  237:*20*  238:*3*
**holding**  19:*16*
**honest**  213:*3, 14*
**honestly**  22:*15*  24:*9*  105:*9*  134:*22*  168:*14*  178:*8*  193:*8*  198:*12*  240:*18*  285:*24*  290:*25*  299:*15*
**hope**  127:*17*  260:*24*
**hopefully**  181:*19, 21*  310:*25*
**hourly**  27:*1, 5, 11*  28:*6*  31:*14*  32:*4*  53:*17*  54:*15, 20*  61:*22*
**hours**  17:*8*  53:*17*  297:*9*  314:*12*
**How's**  36:*25*
**HR**  296:*17*
**hug**  98:*5, 11*  99:*16, 20*  100:*18*
**Hypothetical**  9:*12*  68:*19, 21, 25*  69:*11*  79:*21*  80:*7*  98:*8*  100:*20*  120:*24*  151:*7*  152:*15*  192:*15*

**< I >**
**I-Bankers**  68:*15*
**idea**  39:*17*  105:*14*  122:*8*  132:*18*  134:*14, 24*  135:*6, 8*  145:*1*  153:*19*  154:*5*  174:*11*  189:*14*  204:*13, 18, 24*  207:*8*  229:*22*  231:*14*  249:*1*  251:*15*  261:*18, 22*  262:*12, 20*  279:*9, 11*  283:*2, 13, 14*  284:*20*  287:*9*  291:*16, 20*  298:*14*
**identical**  82:*23*
**identified**  71:*18*  96:*21*  183:*19*  185:*10, 13*  201:*15*  220:*12*
**identifies**  88:*8*  93:*22*  118:*17*  130:*9*  131:*9*
**identify**  10:*4*  71:*11,*

*14* 100:*6* 254:*25*
**identifying** 184:*15*
**identity** 29:*3*
**Ilcisin** 5:*6* 6:*6* 7:*2*
8:*14* 9:*14* 141:*1*
159:*18* 188:*1* 189:*8,
12, 23* 195:*9* 196:*7*
197:*1* 198:*9* 239:*15*
252:*20* 253:*3, 11*
254:*7, 19* 256:*2*
259:*2* 260:*19* 262:*13*
281:*1* 287:*4* 288:*6*
313:*22* 314:*5*
**illegal** 72:*19*
**illustrative** 66:*5*
**Im** 314:*5*
**immediate** 265:*13*
**immediately** 75:*1*
88:*18* 131:*17, 21*
133:*2* 146:*15* 221:*24*
293:*8*
**impact** 50:*4* 195:*10*
**impacts** 170:*20*
**impediments** 90:*1*
**implement** 180:*16*
183:*14* 207:*24* 208:*8*
217:*17, 19* 223:*20*
311:*5* 315:*6, 15, 22*
**implemented** 224:*10*
286:*5* 306:*5*
**implications** 251:*14*
264:*12*
**implicit** 218:*25*
**importance** 118:*12*
**important** 50:*3, 24*
73:*11* 74:*3* 101:*15*
117:*9, 20* 186:*9*
192:*21* 195:*5* 232:*4*
247:*2, 4, 5* 277:*14*
**impossible** 212:*4*
**imprisonment** 71:*17*
**improper** 38:*9* 39:*6*
47:*15* 68:*19* 69:*2, 10*
75:*16* 79:*21* 80:*6*
100:*20* 120:*23* 137:*4*
151:*6* 152:*14*
**inadvertently** 269:*24*
**inappropriate** 267:*11,
13* 277:*10, 17*

**include** 76:*20*
270:*20* 272:*6*
**included** 86:*11*
104:*1* 156:*5* 159:*4*
170:*18* 220:*11*
269:*12* 271:*7* 274:*7*
276:*22*
**includes** 131:*10*
148:*5* 170:*17*
**including** 41:*21*
170:*19* 188:*1* 213:*10*
250:*19* 251:*14*
276:*16*
**income** 294:*9*
**incomplete** 68:*18*
69:*10* 79:*20* 80:*6*
100:*20* 120:*23* 151:*6*
152:*14* 192:*15*
**inconsistent** 258:*10*
265:*10*
**incorrect** 156:*24*
215:*14* 235:*21*
**increase** 42:*2* 119:*11*
120:*4* 121:*17, 22*
156:*14* 160:*11, 25*
161:*6, 13* 214:*10*
**increased** 130:*15*
131:*5* 194:*23* 214:*11*
**increases** 119:*19*
**indefinite** 231:*1*
**independent** 208:*17*
209:*9*
**independently** 291:*6*
**indicate** 69:*16*
132:*12, 15* 150:*16*
204:*8* 208:*7* 218:*3,
11* 241:*5* 242:*4*
**indicated** 130:*4*
140:*3, 15* 144:*10*
**indicates** 87:*6, 7, 9*
96:*11* 99:*19* 149:*15*
233:*10* 235:*18* 313:*4,
13*
**indicating** 93:*9* 94:*1*
140:*9* 189:*8* 238:*25*
**indication** 244:*17*
288:*23* 307:*18* 308:*1*
**indicia** 86:*7*
**individually** 289:*15*

**industrial** 293:*7*
**industry** 297:*11, 22*
**infer** 112:*5*
**inform** 247:*11, 12*
**Information** 5:*9*
12:*18, 20* 13:*2* 17:*9,
14, 23* 18:*12, 16*
27:*19, 25* 31:*1, 3*
35:*17* 36:*2, 6, 15*
47:*8* 49:*7* 55:*13*
64:*6* 72:*20* 73:*2, 5, 9,
20, 24* 74:*1, 5, 11*
76:*8, 19, 25* 77:*6, 11,
13* 78:*1, 10, 16* 79:*14,
16, 17, 25* 80:*1, 2, 3, 4,
10, 20* 82:*19, 25* 83:*2,
3, 15* 107:*24* 108:*3*
120:*2* 131:*10* 143:*24*
145:*7* 164:*18* 178:*14*
191:*5, 7* 195:*2* 204:*7,
16* 205:*20* 208:*22*
221:*7, 13, 14* 222:*3, 5*
230:*8, 10, 12* 231:*6, 8*
232:*8* 242:*4* 244:*14*
246:*2* 247:*2, 5, 9*
249:*8* 250:*9* 251:*16*
280:*16* 282:*15* 284:*4*
298:*14* 306:*7, 15*
316:*3* 317:*5, 8, 15*
**informed** 131:*19*
237:*23* 246:*7, 10, 25*
247:*1, 6* 249:*4*
**informing** 194:*2*
195:*1* 251:*24*
**informs** 256:*2*
**in-house** 19:*10, 12*
23:*8* 295:*22*
**initial** 101:*4, 15*
178:*2* 299:*9*
**initially** 33:*1* 294:*22*
**inked** 160:*10*
**input** 78:*17, 18*
206:*11*
**inquiry** 107:*15*
**inside** 12:*18*
**insider** 12:*24* 26:*8*
69:*23, 24* 70:*2, 9, 16*
71:*12, 20* 72:*8, 11, 15*
80:*20* 186:*5* 209:*12,*

*15, 16* 306:*24*
**insight** 188:*25*
**insignificant** 61:*23*
**InSinkErator** 111:*2,
5, 15, 18* 112:*1*
113:*11* 114:*3* 115:*9,
21* 194:*3, 14* 195:*16*
196:*2, 6, 16* 197:*11*
198:*11* 200:*23*
**instance** 1:*11* 20:*1*
27:*4* 39:*9* 145:*19*
285:*2*
**instances** 11:*7* 65:*23*
105:*1* 265:*12*
**institutional** 204:*3*
294:*8*
**instruct** 17:*24* 18:*17*
32:*12* 47:*24* 48:*5*
**instructed** 48:*15*
49:*4* 59:*17*
**instructing** 35:*19*
75:*19*
**instructions** 32:*15*
**instructs** 155:*10*
**INSTRUMENTS** 1:*3*
6:*13* 7:*7* 19:*23* 20:*1,
6, 15, 21, 24* 21:*3, 20,
24* 22:*1, 14, 21* 23:*19*
24:*7, 19, 24* 25:*8, 18*
26:*3, 7, 16, 23* 31:*20*
32:*5, 19* 33:*19* 34:*4,
8, 15, 20, 22* 35:*1*
37:*20* 41:*24* 42:*12*
46:*17* 47:*20* 51:*6*
52:*19* 59:*15* 71:*6*
72:*8* 81:*15, 21* 84:*12,
17* 85:*3* 86:*8, 24*
87:*11* 88:*9* 90:*17*
91:*2* 92:*7, 23* 93:*11*
94:*2* 95:*22* 96:*18*
97:*1, 6* 104:*10*
107:*18* 109:*8, 15*
110:*19* 111:*19* 112:*6*
118:*25* 123:*13, 16, 21*
124:*9* 125:*13* 128:*3,
4* 129:*18* 131:*12, 20*
144:*14* 150:*17* 151:*2*
156:*17* 159:*23* 166:*5*
173:*1, 14* 174:*24*
176:*13* 178:*17* 179:*5,*

184:*5*, *25* 185:*15* 186:*22* 192:*21* 196:*1* 200:*12*, *21* 201:*11* 202:*21* 203:*6*, *12* 204:*10* 205:*16* 206:*8*, *22* 211:*5*, *13* 213:*2* 218:*12* 220:*25* 221:*18*, *20* 224:*15*, *17* 225:*5*, *13*, *16* 230:*16* 231:*7*, *22* 232:*5*, *24* 233:*4* 236:*6* 237:*10*, *25* 238:*13*, *20* 239:*1* 241:*21* 242:*2*, *6* 243:*15*, *17* 244:*23* 245:*16* 246:*3*, *17* 248:*23* 278:*11* 281:*15*, *16* 283:*5* 285:*19* 287:*1*, *6*, *12*, *20* 291:*5*, *12*, *13* 292:*6* 296:*1*, *6*, *22* 297:*6*, *10* 298:*18*, *19*, *24* 300:*3*, *14* 302:*12* 305:*4*, *20* 306:*5* 308:*7*, *10*, *15*, *18* 309:*2*, *12*, *20* 310:*16* 311:*9* 313:*18* 316:*15* 317:*7*, *12*, *14* 321:*3*

**Instruments-provided** 290:*18*

**integrity** 267:*20*

**intelligence** 202:*19*

**intended** 25:*5* 81:*24* 82:*2*, *10*, *15* 190:*6*, *9* 206:*13* 243:*3*, *16* 255:*9* 270:*10*

**intending** 190:*11*

**Intent** 4:*10* 45:*23* 121:*20*, *22* 158:*17* 208:*9* 258:*10* 259:*11* 261:*8* 272:*4* 303:*8* 304:*24* 310:*1* 311:*19*

**intention** 308:*18*

**intention/threat** 149:*15*

**interchangeably** 21:*9*

**interest** 54:*23* 86:*7* 119:*5* 180:*7* 182:*11* 207:*13* 211:*1* 212:*19* 214:*3* 231:*10* 240:*11*, *17* 241:*12* 242:*1*, *10*,

243:*21* 274:*21* 275:*14* 276:*6*, *8*, *16*, *23* 287:*15* 298:*22* 304:*6*

**interested** 53:*3* 54:*14* 96:*6* 119:*8* 134:*1* 175:*5* 176:*9* 192:*5*, *8*, *10*, *11* 193:*3* 226:*25* 242:*5*, *24* 246:*23* 248:*22* 249:*6* 276:*13* 298:*19* 300:*1*, *22* 303:*10* 304:*22*, *25* 307:*18* 308:*2*, *3*, *21*, *22* 309:*8* 322:*7*

**interim** 297:*3*

**internal** 102:*17*

**interpret** 198:*23* 256:*22* 257:*9*

**interpretation** 161:*3* 233:*17*

**interpreted** 103:*3*

**interrogatories** 37:*18*

**interrupt** 310:*4*

**interviewed** 301:*2*

**introduce** 38:*9* 301:*6* 309:*17* 312:*18*

**introduction** 269:*12*

**invades** 32:*7*

**invading** 31:*19*

**Investment** 8:*4* 60:*25* 63:*5* 64:*23* 65:*4*, *12*, *19*, *25* 67:*24* 77:*20* 144:*4*, *7*, *9*, *12* 152:*19* 159:*22* 160:*8* 161:*14* 170:*20* 238:*22* 294:*7*

**investor** 65:*16* 73:*10* 74:*2* 232:*13*

**invitation** 314:*11*

**invite** 248:*1*, *2*

**invited** 247:*10* 248:*5*

**inviting** 39:*9*

**involve** 66:*20* 74:*18* 306:*2*

**involved** 45:*16* 67:*6* 74:*20* 197:*5*, *8* 234:*5* 246:*19* 261:*18* 312:*9*

**involving** 42:*11* 141:*1* 159:*17* 205:*21*

220:*1* 249:*18* 252:*19* 269:*1* 283:*15*

**iPhone** 281:*13*, *14*, *24*

**irrelevant** 99:*7* 215:*19*

**irreparable** 71:*21* 209:*22*

**issue** 29:*18*, *24* 30:*1* 38:*13* 40:*21* 41:*10* 67:*5* 74:*13* 102:*7* 131:*2* 142:*7*, *8* 163:*21* 173:*19* 186:*12* 254:*25*

**issued** 224:*14* 288:*15* 293:*17*

**issuer** 74:*6*

**issues** 11:*10* 80:*17* 303:*2*, *6* 305:*11*

**Item** 95:*15* 124:*5*

**items** 126:*11*

**it'll** 125:*24*

**IT-related** 282:*19*

**its** 31:*15* 32:*5* 35:*8*, *10*, *12* 48:*18* 49:*1* 52:*3*, *19* 60:*24* 66:*15* 68:*3*, *9* 69:*5*, *7* 70:*25* 88:*18* 94:*8* 124:*15* 142:*6* 149:*15*, *20* 158:*25* 188:*24* 203:*6* 206:*9*, *23* 242:*17* 258:*17* 286:*4* 297:*12* 308:*9* 309:*13* 317:*12*

**< J >**

**January** 20:*8*, *13* 297:*1*

**jcomerford@dowdbennett.com** 2:*14*

**Jeffrey** 201:*9*

**Jeremy** 2:*11* 10:*15* 301:*15*

**jhofman@dowdbennett.com** 2:*14*

**Job** 1:*25* 25:*6* 80:*16* 113:*2* 120:*18*, *19* 159:*8* 230:*6* 249:*2*, *3* 268:*6*, *8* 271:*15* 291:*17*

**John** 2:*11* 10:*12* 12:*4* 27:*25* 29:*6*, *21*

31:*9* 37:*4*, *15* 44:*6*, *12* 57:*20* 75:*8* 94:*11*, *15* 95:*4* 97:*21* 116:*4* 127:*7* 137:*5* 142:*5* 198:*13* 245:*1* 290:*7* 292:*20* 310:*3*

**join** 295:*7*, *17*, *19*

**joined** 245:*8* 295:*8*, *25*

**joint** 77:*19*

**jotting** 217:*10*

**Judge** 30:*24*

**July** 6:*13* 138:*23* 145:*11* 146:*19*, *20* 147:*8* 148:*3*, *12* 153:*14*, *15* 157:*19* 159:*15* 162:*4*, *6*, *21* 164:*16* 165:*24* 166:*6*, *25* 167:*8*, *12* 168:*11*, *25* 169:*24* 171:*16* 172:*25* 175:*14*, *15* 176:*4* 238:*17* 239:*2* 254:*18* 269:*4*, *8* 270:*5* 272:*5* 276:*11*

**jump** 108:*20*

**June** 5:*3* 8:*19* 49:*18* 108:*9*, *21* 109:*14* 116:*10* 127:*20* 128:*1*, *2*, *24* 129:*16* 130:*22* 139:*17* 142:*17* 143:*24* 144:*10* 176:*7* 241:*5* 263:*14* 302:*2* 307:*11* 308:*8*, *16*

**jurisdiction** 30:*12*

**< K >**

**Karen** 3:*23* 5:*7* 6:*18* 8:*14* 14:*1* 16:*11*, *13* 55:*19* 172:*13* 174:*4* 178:*6* 193:*1* 211:*19*, *22* 221:*23*, *25* 223:*12*, *19* 226:*20* 227:*3*, *22* 228:*5* 229:*1* 280:*10* 310:*15* 313:*15*, *20*

**Karen's** 172:*13* 173:*4*, *16*

**Karsanbhai** 4:*8* 85:*1*, *4*, *13*, *22* 86:*13*, *22*

128:*19*  129:*17*
147:*17*  149:2, *7, 13*
**Karsanbhai's** 85:*11*
139:*24*  140:9  147:*15*
**Katz** 32:*20*  62:*13*
300:*15*
**keep** 135:*18*  175:*18*
194:*9*  201:2  215:*15*
230:*23*  246:*6, 10, 13,*
*24*
**keeping** 247:*1*
251:*25*  310:*10*
**kept** 250:*4, 14*
**Kevin** 5:*6*  6:*6*  7:*2*
8:*14*  9:*14*  145:*13*
189:*15*  190:*6, 15*
193:*1*  196:*21*  197:*1*
198:*20*  238:7  239:*25*
243:*12, 13*  244:*7, 8*
255:*7, 15, 17*  256:*11*
257:*24*  261:*6*  280:*10*
313:*20, 21, 22*  314:*5*
**Kevin's** 141:*4*
**key** 142:*20*  145:*9*
196:*13, 17*  197:*11, 24*
198:*11, 19*  297:*25*
**kind** 31:*12*  39:*2*
56:*9*  67:*11*  105:*7*
125:*25*  145:*11*
159:*22*  224:7  274:*23*
277:*22*  281:*11*
295:*23*  298:*14*  300:*9*
**kinds** 47:*13*
**knew** 14:*22*  39:*15*
54:*18*  86:*22*  96:*5, 25*
97:*5*  98:*19*  175:*5*
221:7  239:*5, 7*  249:*6,*
*9*  288:*20*
**knock** 36:*23*
**know** 11:*4, 12*  14:*9*
15:*2, 3*  16:*22*  17:*7*
19:*15*  20:*11*  22:*6, 7,*
*8, 18*  24:*22, 25*  25:*5,*
*14, 21*  26:*1, 10, 19*
27:*25*  28:*10*  30:*13*
32:*9*  33:*15, 16*  40:*22*
41:*6*  42:*3*  46:*5, 6, 12,*
*13*  47:*8*  50:*17, 24*
51:*6, 19*  53:*22, 24*
54:*3, 15, 20, 25*  55:*12,*

*16, 20, 23*  56:*11*  59:*2,*
*12*  61:*7, 8, 23, 25*
63:*21, 22*  66:*13, 23*
67:*15, 23*  74:*20*
80:*15*  82:7  85:*7, 12,*
*16, 18, 22, 24*  86:*9, 25*
87:*1*  88:*16*  91:*16*
94:*15, 18*  95:*11*  96:*5*
97:*10, 12, 22*  100:*7*
105:*10, 15, 24*  106:*17*
110:*16*  111:*8, 22, 23*
112:*10, 11, 13, 16*
113:*18, 22*  114:*17, 18*
116:*20*  123:*22*  124:*3,*
*4*  126:*14*  127:*25*
131:*8, 9*  135:*7, 10*
136:*2, 3, 4, 5*  137:*17*
140:*13*  142:*2, 3, 16*
145:*8*  147:*10*  148:*19,*
*22*  150:*2, 4*  151:*9, 23,*
*24*  152:*4, 9*  157:*7*
158:*14*  161:*7*  163:*19,*
*21*  164:*17, 24*  165:*4,*
*5, 21*  167:*3*  169:*5, 12*
172:*14*  173:*13, 18*
174:*3, 4, 5, 24*  175:*2*
177:*16*  178:*12*  185:*4,*
*7*  187:*22*  189:*18, 20,*
*21*  190:*1, 11*  192:*17*
193:*4, 12*  194:*12, 21,*
*22, 25*  196:*21*  197:*7,*
*13, 19, 20*  198:*14*
199:*22, 23*  204:*1, 4,*
*21*  206:*14*  207:*11*
210:*22*  211:*10, 17, 23,*
*24*  212:*3, 4*  214:*2*
221:*4*  223:*3, 13*
224:*20*  226:*3, 20*
227:*23*  229:*1, 13*
231:*4, 5, 12*  232:*1, 4*
233:*3*  234:*6, 18*
236:*8, 21*  238:*11*
245:*24*  249:*5, 12, 19*
250:*4, 6*  251:*11, 22*
253:*8*  255:*1, 2*
256:*11*  260:*8, 24*
261:*5, 24*  262:*1, 3, 4,*
*12*  264:*12, 16*  265:*2*
266:*25*  268:*5, 8*
270:*8, 25*  271:*19*

272:*8, 10, 18*  273:*11*
274:*10*  275:*20*
276:*12*  279:*4, 10*
282:*18*  284:*2*  285:*6,*
*8, 24*  286:*17, 19*
287:*10, 15*  288:*8, 22,*
*24*  289:*8, 14, 25*
291:*19*  292:*10*
296:*17*  300:*6, 11, 12*
304:*13*  305:*9, 11, 12*
309:*10, 24*  312:*12*
**Knowledge** 83:*13*
104:7  194:*24*  286:*2*
**known** 24:*2*  62:*15,*
*17*  63:*17*  294:*21*
300:*18*
**knows** 137:*18*

**< L >**
**labeled** 253:*15*
**Labeling** 260:*22, 23*
**lack** 52:*17*
**lacks** 113:*17*  141:*25*
198:*2*
**ladder** 92:*17, 22*
93:*4, 10, 23, 24*  94:*1,*
*6*  122:*10*
████████████████████
██████████
**Lal** 4:*8*  85:*1*  128:*19*
178:*3*  299:*10*
**Lal's** 140:*3*
**landed** 47:*17*
**language** 29:*9*  36:*10*
45:*20, 22, 24*  58:*5*
77:*16*  82:*10, 11, 22,*
*23*  83:*4, 9, 11*  91:*12*
105:*4*  120:*25*  141:*22*
142:*9*  149:*1, 11*
150:*3, 12, 16*  151:*12*
152:*1, 10, 11*  155:*23*
156:*5*  157:*5*  158:*7,*
*16, 18, 21*  159:*3, 5*
160:*21*  198:*24*  271:*7*
**large** 170:*13*  203:*24*
204:*3*  242:*18*
**larger** 203:*20*  295:*22*
**largest** 238:*3*
**late** 19:*18*  276:*11*

298:*9*
**latest** 138:*25*
**law** 18:*21*  19:*2, 8*
21:*23*  22:*2, 20, 23*
23:*20*  26:*8, 19*  31:*21*
32:*1, 19*  36:*4*  37:*21*
38:*9*  39:*7, 16, 21*
41:*23*  47:*22*  49:*23*
58:*22, 23*  72:*15, 23*
144:*22*  174:*17*
186:*15, 17, 20, 21, 25*
187:*16*  209:*5, 8*
213:*8*  293:*13, 15, 21,*
*22*  294:*5, 6, 11, 25*
295:*18, 21*  300:*16*
302:*19*  303:*1*  305:*18,*
*22*  307:*2*  309:*23*
311:*20*  315:*20*
**laws** 23:*13*  306:*24*
**lawsuit** 63:*18*
**lawyer** 27:*22*  28:*5*
75:*7, 11*  80:*15*
273:*11*
**lawyers** 208:*5, 6*
217:*11*  239:*14*  246:*4*
247:*10, 15*  248:*2*
250:*18*  302:*12*
**lead** 23:*22*  296:*10*
298:*15*  314:*3*
**lead-up** 202:*5*
**learn** 16:*6*  196:*5*
**learned** 203:*5, 11*
205:*15, 20*  242:*2, 3*
**leaving** 286:*1*
**led** 287:*18*
**left** 20:*23*  21:*3*
247:*18*  282:*12*
286:*21*  287:*21, 22*
288:*6, 10*  289:*12*
292:*5*  295:*17*  296:*7*
297:*3*
**left-hand** 172:*16*
**legal** 19:*16, 20*  21:*7,*
*13, 16, 23*  22:*13*  24:*6,*
*22*  25:*7, 17*  26:*3, 6,*
*15, 18, 20*  31:*15, 21*
32:*21*  34:*8, 16*  54:*21*
75:*6, 10, 16*  80:*17*
82:*9*  136:*14*  178:*10*
186:*12*  208:*11*  210:*3,*

*5, 15* 214:*25* 215:*17* 216:*24* 295:*11, 23* 296:*11* 302:*8, 24* 303:*6, 14* 304:*10* 305:*13*
**legalese** 82:*4, 8*
**legally** 303:*2*
**legitimate** 182:*17* 183:*3, 7* 184:*3, 17* 185:*1* 200:*12* 312:*3*
**Letter** 4:*8, 10* 5:*2* 9:*12* 37:*25* 38:*14* 39:*9* 40:*22* 64:*1* 84:*16* 85:*2, 4, 14* 86:*2, 4, 6, 10, 13* 87:*1, 3, 4, 7, 9, 10, 16* 88:*3, 12* 90:*9, 20* 92:*4, 8, 9, 10* 93:*10* 98:*21, 23* 99:*10, 20* 100:*3, 18* 108:*5* 119:*4, 7* 123:*6, 10* 127:*22* 128:*1, 3, 21* 129:*3, 16* 130:*2, 4, 11, 16, 22* 132:*17* 133:*9, 12* 134:*8, 10, 13, 15, 18, 23, 24* 135:*2, 4, 10, 11, 12, 14, 23* 136:*16, 17, 20, 24* 137:*9, 17* 138:*14, 21* 139:*24* 140:*1, 3, 6, 9, 11, 14, 18* 143:*15, 24* 144:*10* 145:*10, 12, 14, 21* 146:*21* 147:*15* 176:*13* 177:*13* 179:*20* 180:*4* 181:*4, 17* 186:*15, 17* 188:*8* 190:*24* 221:*18* 238:*14* 241:*5* 245:*21* 246:*21* 299:*4* 310:*23* 311:*20*
**letting** 194:*12*
**level** 140:*3, 10, 15* 231:*10* 282:*8* 297:*5*
**levels** 53:*18*
**leverage** 56:*4*
**Levinson** 74:*22, 25*
**Lexington** 2:*5*
**liability** 71:*14* 209:*19, 23*
**liaison** 305:*8*

**licensed** 18:*22* 293:*19* 294:*12*
**life** 56:*25*
**lift** 224:*1, 4, 8, 12* 225:*3*
**lifting** 223:*14, 24* 224:*23, 25* 225:*15, 18, 21, 24* 226:*2, 5, 14, 17* 227:*21, 24* 228:*19*
**light** 178:*20, 23* 179:*2* 240:*21* 271:*20* 276:*24* 306:*19*
**likelihood** 284:*12*
**limited** 132:*8* 198:*23* 229:*22*
**line** 18:*16* 42:*7, 8, 16* 47:*17* 120:*14* 172:*17* 183:*15* 244:*16* 253:*4* 263:*13, 17* 276:*17* 277:*15* 319:*5*
**lines** 110:*24*
**link** 234:*1, 7, 9* 235:*7*
**LinkedIn** 20:*13* 297:*1*
**Lipton** 4:*13* 32:*20* 62:*13* 186:*19* 300:*15, 18* 315:*12, 14*
**liquidity** 170:*20*
**List** 7:*7* 142:*20* 207:*21* 227:*17* 240:*10*
**List.xlsx** 5:*10*
**listed** 255:*23* 257:*1*
**Listen** 82:*15* 244:*15* 306:*24*
**literally** 39:*19* 222:*4*
**LITIGATION** 1:*4* 64:*10, 16* 66:*21* 67:*6* 257:*16* 268:*12* 278:*3* 283:*10, 18, 24* 284:*7, 12, 20, 22* 285:*3, 10, 12, 18, 25* 286:*3, 10, 18, 19* 288:*20, 23, 24, 25* 321:*3*
**little** 36:*8* 42:*3* 70:*13* 91:*11* 108:*21* 110:*3* 189:*7* 222:*22* 229:*8* 293:*2, 3* 303:*18*

**Liu** 245:*8, 15* 313:*24*
**lives** 15:*24*
**LLC** 322:*13*
**LLP** 2:*5, 12* 10:*13*
**locate** 261:*13*
**located** 263:*4*
**locations** 296:*13*
**lodge** 31:*17*
**logical** 189:*2*
**long** 13:*21, 23* 14:*3* 17:*17* 40:*19* 94:*15* 176:*9* 267:*10* 311:*7*
**longer** 49:*24* 77:*14* 158:*9* 191:*11* 221:*20* 224:*11* 225:*19, 25* 226:*24* 242:*5* 250:*14* 261:*20* 262:*6* 308:*21*
**look** 36:*10, 14* 38:*14* 62:*20* 65:*1* 69:*19* 70:*3* 73:*1, 18* 81:*12* 82:*17, 21* 91:*10, 11* 97:*4, 15, 16* 101:*24* 107:*3* 108:*23* 110:*25* 111:*24* 116:*21* 128:*22* 129:*3* 131:*15* 137:*9* 138:*24* 139:*12* 140:*22* 141:*13* 145:*8* 147:*22* 148:*13, 24* 150:*1* 153:*10* 154:*19* 159:*10* 160:*14* 162:*7, 8* 166:*3, 17* 170:*10* 171:*12* 176:*16* 177:*2, 6* 187:*24* 193:*19* 194:*7* 195:*8* 196:*10* 201:*3* 204:*25* 206:*2* 222:*8* 225:*6* 229:*8* 232:*10* 236:*25* 237:*13* 239:*11* 244:*19* 246:*24* 253:*2* 254:*15* 263:*9, 11* 265:*19* 268:*15* 272:*11* 273:*6* 275:*1* 278:*2* 279:*4, 15* 300:*9* 307:*5, 6*
**looked** 111:*10* 136:*24* 153:*13* 200:*20* 222:*19, 22* 292:*4*
**looking** 20:*12* 36:*4* 45:*5* 70:*13* 73:*17*

84:*25* 93:*3* 96:*23* 114:*19* 118:*2, 5, 17* 120:*12* 128:*22* 141:*20* 145:*12* 155:*3* 158:*8* 159:*7, 16* 161:*4* 162:*3* 164:*7* 168:*19* 171:*24* 176:*24* 183:*7, 13* 188:*7* 200:*10* 205:*10* 228:*25* 232:*16, 20* 250:*1* 279:*17* 305:*15* 308:*23* 309:*25* 310:*5* 314:*6*
**lookout** 95:*21* 96:*25* 201:*25*
**looks** 56:*13, 21* 111:*16* 118:*20* 167:*14* 194:*5* 230:*7* 275:*4* 276:*11* 314:*4, 10*
**loop** 233:*1, 11* 235:*5*
**lost** 237:*5*
**lot** 58:*7* 144:*24* 203:*16, 20* 205:*24, 25* 226:*18* 267:*2* 275:*22* 276:*6* 278:*16* 279:*5* 295:*4*
**Louis** 2:*13*
**low** 254:*15* 299:*15*
**lower** 49:*16* 55:*21* 61:*24* 62:*1*
**lunch** 14:*16* 126:*3* 127:*8, 17*
**Lynch** 294:*7*

**< M >**
**M&A** 66:*16* 110:*7, 10* 112:*25* 113:*6, 13* 114:*4, 9* 115:*9, 20, 25* 126:*16, 23* 192:*21* 194:*20* 197:*4* 253:*16* 260:*17* 302:*9*
**M13** 171:*12*
**M7A** 108:*23*
**machine** 1:*14*
**MacKenzie** 7:*21* 201:*10, 11* 202:*14* 229:*19* 230:*2* 232:*25* 233:*3, 9, 10* 234:*25*

235:*13, 16*  236:*3*
237:*22*  313:*10*
**Mackenzie's**  233:*17,*
*19*  234:*14, 22*  235:5,
*18*
**magnitude**  75:*3*  76:*2*
**main**  23:*6*
**major**  231:*24*
**majority**  96:*2*
**making**  30:*5*  98:*20*
210:*10*  219:*25*  222:*1*
242:*18*  251:*24*  312:*9*
**manage**  80:*17*  218:*1*
**management**  178:*7*
182:*23*  183:*8*  258:*12*
259:*23*  280:*11*  287:*1,*
*25*  288:*5*  298:*18*
305:*10, 16, 23*  306:*3*
**Manager**  2:*18*
**Managers**  288:*3*
**managing**  286:*1*
**Mandel**  2:*3*  3:*6*
10:*7, 19, 24*  17:*25*
27:*17, 24*  28:*9, 15, 22*
29:*21*  30:*4, 11, 16*
31:*11, 18, 24*  35:*25*
36:*18*  37:*2, 7, 15, 17*
38:*21*  39:*15*  40:*6, 14,*
*24*  41:*2, 11*  43:*19*
44:*5, 9, 11, 17, 23*
45:*1*  47:*10*  48:*1, 21*
49:*5, 10, 15*  55:*5, 8*
56:*19*  57:*20*  58:*1, 9*
59:*19*  60:*3, 9, 10, 13,*
*17*  61:*13*  63:*9, 13, 20*
64:*5, 11, 15*  66:*19, 22,*
*25*  67:*7, 11, 17*  68:*23*
69:*3*  75:*7, 11, 19, 23*
83:*23*  84:*2, 20, 23*
90:*22*  91:*13, 20*
93:*15*  94:*10, 12, 14,*
*18, 21, 23*  95:*7, 11*
97:*21*  98:*1*  100:*10*
101:*21*  105:*18*  107:*3,*
*6*  108:*22, 25*  114:*24,*
*25*  116:*3, 6*  122:*5*
125:*15, 23*  126:*3*
127:*7*  128:*14*  129:*7*
135:*17, 20*  136:*19, 22*
137:*4, 7, 20*  139:*12,*

*15*  140:*22*  142:*4*
147:*22*  148:*1*  153:*10*
154:*19, 23*  155:*21*
157:*15*  158:*3*  159:*10*
161:*20*  162:*12*
171:*11*  175:*12*
176:*19*  187:*23*
188:*13*  193:*19*  198:*4,*
*8, 13*  199:*5, 6, 8, 12,*
*15, 18, 22, 25*  200:*3*
215:*14*  216:*10, 13*
222:*10*  229:*7*  235:*14*
236:*25*  237:*4, 7*
239:*10*  244:*19*  245:*1*
252:*6*  260:*16, 25*
265:*22*  266:*2*  268:*18,*
*22*  269:*19*  274:*14, 17*
290:*2, 10*  301:*12, 20*
302:*22*  303:*5, 16*
304:*2, 21*  306:*16*
308:*13*  309:*6*  310:*3,*
*9*  315:*17*  316:*6, 17*
317:*3, 10, 17, 24*
318:*7*  321:*14*
**manipulating**  266:*12,*
*22*  267:*6, 16, 19*
268:*2*
**manipulative**  273:*6,*
*10*
**manner**  87:*2*  103:*4*
**man's**  75:*7*
**Marissa**  8:*2*  202:*25*
230:*6, 7*  232:*11*
233:*12*  234:*21*  235:*1,*
*17, 18*  237:*9*  313:*14,*
*20*
**Marissa's**  234:*19*
**mark**  301:*14*
**marked**  28:*19*  30:*15*
41:*19*  49:*13*  55:*7*
62:*9*  69:*21*  84:*22*
90:*25*  107:*5*  108:*24*
126:*8*  128:*17*  139:*14*
140:*24*  147:*24*
153:*12*  154:*24*
157:*17*  159:*12*
162:*10*  166:*1*  171:*14*
176:*18*  188:*4*  193:*21*
201:*5*  205:*2*  222:*13*
229:*11*  232:*9*  237:*2*

239:*12*  245:*3*  252:*17*
263:*8*  265:*23*  268:*17*
278:*23*  302:*3*  309:*18*
310:*8*  312:*24*  314:*16*
**market**  46:*2*  99:*23*
131:*3*  151:*10*  161:*8*
192:*2*  202:*19*  229:*18*
230:*1, 22*  294:*9*
299:*17*  309:*11*
316:*20*
**marketplace**  74:*6*
**Markets**  131:*1*  294:*8*
**master's**  293:*9*
**matched**  83:*11*
**material**  12:*21*  13:*1*
26:*15, 18*  72:*20*  73:*1,*
*5, 8, 19, 24*  74:*11*
76:*9, 20, 25*  77:*6, 11*
78:*1, 9, 15*  79:*15, 17*
80:*1, 3, 20*  82:*18, 24*
83:*1, 2, 15*  107:*24*
108:*3*  191:*4, 7, 11*
207:*24*  231:*19*
236:*23*  246:*2*  247:*18*
250:*8, 21*  251:*16*
298:*14*  306:*6, 14*
315:*5*  316:*3*  317:*8,*
*15*
**materiality**  75:*3*  76:*1*
**Materials**  5:*14*  148:*5,*
*8*  153:*19, 25*  154:*5*
155:*15*  171:*15*  202:*4*
284:*18, 25*
**math**  68:*20, 22*  69:*15*
**matter**  23:*16*  55:*25*
62:*12*  80:*18, 24*
104:*22*  138:*5*  186:*24*
187:*2, 3*  210:*4*
276:*23*  284:*24*
**matters**  27:*22*  61:*23*
66:*5, 20*  103:*7*
104:*18*  210:*2*  302:*9*
**maximization**  106:*20*
**maximize**  300:*7*
**maximum**  213:*10*
309:*7*
**MBA**  294:*6*
**McGrath**  5:*12, 19*
6:*2*  13:*13*  16:*5, 17*
18:*4*  117:*16*  118:*14*

128:*20*  148:*4, 7*
149:*19*  154:*15*  155:*1*
156:*9, 11, 12*  157:*19*
158:*22*  168:*10*  269:*3,*
*18*  270:*3*  275:*3, 6, 8*
276:*9, 13, 21*  277:*20*
**McGrath's**  17:*20*
271:*7*  272:*6*  277:*3*
**mean**  14:*21, 22*
16:*21*  21:*10*  22:*16*
23:*2, 8*  24:*3*  25:*2, 21*
32:*8*  33:*10*  35:*5*
47:*7*  50:*19*  52:*24*
53:*2*  54:*14*  60:*8, 22*
72:*10*  74:*18*  77:*14*
83:*6*  94:*13*  96:*1, 20*
97:*22*  98:*7*  100:*13*
103:*25*  104:*16, 22*
108:*16*  110:*17, 23*
113:*21*  115:*15*
116:*19, 21*  119:*25*
121:*8*  126:*16*  132:*12*
136:*23*  142:*1*  146:*5*
149:*8*  162:*17*  163:*7*
172:*12*  174:*14*  176:*8,*
*24*  179:*9*  180:*25*
182:*8*  183:*24*  187:*1*
190:*4, 10*  191:*14*
193:*5, 17*  197:*7*
203:*19*  204:*4*  206:*17*
213:*15, 18, 19*  221:*3*
223:*18*  226:*18, 21*
227:*8, 13*  228:*23*
236:*1*  241:*17*  242:*1*
254:*13*  256:*13*  257:*8,*
*13, 19*  262:*20, 25*
265:*6*  270:*8*  271:*19*
272:*22*  275:*20*  276:*5*
279:*17, 23*  281:*23*
282:*14*  285:*23*
290:*24*  291:*7, 16*
292:*10*  303:*24*
304:*18*  311:*3, 16*
312:*6, 8*
**Meaning**  89:*10*
111:*25*  154:*9*  181:*24*
184:*21*  201:*21*  235:*3*
**meanings**  199:*23*
**means**  22:*7, 8*  44:*19*
60:*14*  73:*9, 24*  74:*17*

Deposition of Eddie Dixon

In Re National Instruments Corporation Securities Litigation

92:*24*  155:*16*  234:*15*
235:*19*  256:*6*  257:*15*
273:*1*  297:*12*  302:*20*
**meant**  57:*6*  127:*2*
138:*3, 4, 7*  153:*2*
157:*6*  177:*21*  236:*6*
**measurement**  297:*11,
23*
**mechanism**  100:*6*
**meet**  108:*18*  305:*23*
**meeting**  3:*20*  4:*21*
6:*12*  8:*11, 19*  91:*2, 6*
108:*7, 9, 14, 15, 16, 21*
109:*14*  112:*14, 15*
126:*6, 11*  127:*20, 21*
146:*22*  147:*4, 8, 13,
16*  148:*8, 13*  162:*5, 6*
165:*23*  166:*5, 9, 10,
14, 19, 20*  167:*1, 11,
15, 16, 17, 19, 24*
168:*2, 11, 12, 15, 21,
25*  170:*5, 8*  171:*2, 16*
172:*1*  175:*15*  176:*4*
189:*1*  217:*15*  239:*18,
22*  240:*7*  244:*22*
245:*9, 19*  246:*4*
247:*11, 20*  248:*2, 6*
249:*13, 20*  250:*18*
252:*2*  263:*14, 15, 20,
21, 25*  264:*1, 12, 19*
265:*11, 14*  266:*5, 11,
18*  267:*1, 14*  269:*7*
270:*5, 9*  272:*6, 25*
273:*3*  275:*19, 25*
276:*4*  313:*2, 4*  314:*5*
**Meetings**  6:*16*
108:*12*  146:*16*  168:*8*
172:*11*  265:*8, 11*
270:*24*  272:*25*
273:*23*  274:*4, 6*
275:*20*  276:*1*  305:*19*
306:*2*
**member**  87:*19*  102:*7*
300:*23*
**members**  10:*9*  12:*8*
102:*10*  104:*11*
167:*21*  223:*13*
224:*23*  225:*1, 4*
227:*4, 22, 23*  228:*18*
286:*25*

**memo**  62:*21, 23*
63:*24*  64:*3, 21*
217:*13*  218:*16*  219:*7*
**Memorandum**  4:*2*
62:*16*
**memory**  136:*21*
**memos**  208:*14, 16*
**mention**  71:*20*
136:*25*  168:*18*
**mentioned**  16:*4*
105:*5*  232:*11*  298:*8*
**mentioning**  12:*25*
105:*25*
**mentions**  232:*24*
**mere**  152:*8*
**merger**  77:*2, 6, 10, 19,
25*
**mergers**  144:*25*
**Merrill**  294:*7*
**message**  217:*23*
220:*7*  227:*18*  228:*14*
229:*6*  240:*6*  253:*5*
280:*8*  307:*17*
**message/Wolverine**
240:*1*
**messages**  13:*11*
102:*16*  278:*10*  279:*2,
5, 7, 9, 24, 25*  280:*21*
281:*9*  288:*19*  289:*5*
**messaging**  206:*6*
**met**  85:*18, 23*
**Michael**  5:*12, 17, 19*
6:*2*  13:*13*  16:*8*
151:*16, 23*  152:*8*
153:*1, 18, 25*  154:*5*
269:*21*
**Microsoft**  313:*1*
**mid-40s**  150:*6*
155:*24*  156:*18*
**middle**  29:*20*  73:*3*
150:*22*  305:*7*
**mid-June**  108:*18*
**mid-May**  33:*25*  34:*2*
84:*10, 11*
**million**  66:*6*  68:*9, 16*
69:*4, 7*  172:*22*  173:*2,
23*  174:*21, 25*  201:*16*
211:*6, 13, 17, 24*
238:*22*  239:*1*

**million-plus**  237:*16*
**millions**  173:*13*
**mind**  35:*23*  204:*21*
**mindful**  124:*18*
**mindset**  97:*15*  106:*2*
**mine**  23:*23*  295:*18*
**Minick**  294:*20*
**minute**  42:*18*  83:*24*
129:*15*  143:*23*  150:*1*
**minutes**  3:*20*  6:*12*
8:*10, 19, 23*  9:*5*
36:*22, 24*  37:*3, 6*
108:*16*  148:*14*  162:*7*
166:*4, 8, 24*  167:*18*
168:*4, 5, 6, 13, 15, 16,
18*  169:*23*  171:*24*
173:*12*  200:*3*  222:*23*
223:*1, 7*  244:*21*
245:*5*  248:*8*  263:*14,
19, 20, 25*  264:*9, 15,
19, 21, 24*  265:*7, 8*
266:*5, 13, 23*  267:*1, 7,
14, 17, 19*  268:*3, 5, 7,
11, 13*  269:*4, 8, 13, 25*
270:*21, 23*  271:*7, 9*
272:*1, 6, 19, 23*
273:*14, 16, 17, 25*
274:*22*  275:*15, 18, 20*
276:*3, 6, 7, 9, 14, 17*
277:*22, 23*  278:*2*
312:*1*  317:*25*
**misapply**  67:*21*
**mischaracterization**
94:*8*
**mischaracterize**  116:*3*
**mischaracterizes**
93:*14*  94:*4*  97:*9*
98:*13*  114:*12*  115:*12*
119:*22*  183:*12*
200:*15, 17*  220:*18*
235:*23*  251:*8, 19*
260:*13*  285:*22*
286:*12, 15*
**mischaracterizing**
67:*20*  83:*20*  94:*20*
113:*16*
**misconstrued**  102:*16*
105:*2*  124:*20*  159:*4*
255:*8*  256:*14*  258:*9*
259:*13*  285:*1*

**misinterpreted**  154:*9*
158:*16*  256:*10*
258:*20, 25*  261:*5, 7*
271:*3*  272:*3*  278:*7*
**misleading**  67:*4*
**missed**  181:*7*
**Missouri**  2:*13*
**misspoke**  181:*13*
**misstated**  71:*4*
**mix**  74:*5, 15, 17*
**MNPI**  182:*18*  183:*3,
5, 8*  184:*6, 11, 18*
185:*1*  200:*13*  217:*25*
220:*13, 25*  221:*11, 20*
224:*11*  225:*19*
226:*14*  250:*13*  312:*4*
316:*7*
**model**  280:*11*
**modular**  298:*2*
**MoFo**  23:*24*  24:*2*
25:*24*  32:*4*  45:*7*
46:*7*  47:*9*
**moment**  23:*18*  70:*6*
179:*3*  301:*11*
**money**  47:*21*  89:*11*
206:*6, 9, 23*  217:*2*
**monitor**  101:*11, 16*
230:*16*
**monitoring**  202:*21*
**month**  14:*16*  146:*22*
147:*5*
**months**  175:*8*  178:*1,
25*  180:*6*  191:*25*
207:*12*  226:*23*  241:*1*
242:*11*  277:*1*
**Mopac**  1:*14*
**morning**  6:*8*  10:*20*
38:*5*  39:*4*  166:*21*
314:*12*
**Morrison**  23:*20, 24*
24:*1, 6, 20, 23*  25:*7*
26:*2, 6, 13*  32:*9*
41:*23*  42:*10, 12*  43:*1,
7, 14, 24*  46:*16*  47:*2*
**motion**  38:*14*  39:*10*
**motivated**  138:*15*
**mouth**  206:*6, 9, 23*
215:*16*  217:*2*  261:*22*
**move**  41:*12*  69:*17*
72:*17, 25*  90:*3*  101:*2*

125:*17*  131:*24*  133:*3*  153:*9*  178:*6*  182:*4, 11*  187:*23*  217:*23*  227:*1*  228:*9*  229:*5*  244:*18*  267:*24*

**moves**  151:*10*

**moving**  76:*7*  137:*20*  182:*10*  183:*17*  194:*8*  207:*13*

**muddying**  45:*3*

**multiple**  22:*9, 10*  56:*5*  154:*10*  207:*12*  271:*1*  277:*1*  278:*4*  288:*1*  294:*19*  295:*10*  298:*3*

**multiyear**  157:*2*

**< N >**

**name**  10:*23*  107:*22*  109:*20*  229:*15*  236:*17*  250:*3, 11*  292:*20*  319:*3*

**names**  10:*11*  107:*21*  249:*23*  250:*7, 12, 15, 17*

**narrow**  268:*9*

**NATI**  3:*24*  4:*5*

**NATIONAL**  1:*3*  6:*13*  7:*7*  19:*22*  20:*1, 5, 15, 20, 23*  21:*3, 19, 24*  22:*1, 13, 21*  23:*19*  24:*7, 19, 23*  25:*8, 17*  26:*3, 7, 16, 23*  31:*20*  32:*5, 19*  33:*19*  34:*4, 7, 15, 20, 21*  35:*1*  37:*20*  41:*24*  42:*12*  46:*17*  47:*20*  51:*6*  52:*19*  59:*15*  71:*5*  72:*8*  81:*15, 20*  84:*12, 17*  85:*3*  86:*7, 24*  87:*11*  88:*9*  90:*17*  91:*2*  92:*7, 23*  93:*11*  94:*2*  95:*22*  96:*17*  97:*1, 6*  104:*9*  107:*18*  109:*8, 14*  110:*18*  111:*19*  112:*6*  118:*25*  123:*13, 16, 21*  124:*9*  125:*12*  128:*3, 4*  129:*18*  131:*12, 20*  144:*11, 13*  150:*17*

151:*2*  156:*17*  159:*23*  166:*4*  173:*1, 14*  174:*24*  176:*12*  178:*16*  179:*4, 24*  184:*5, 25*  185:*15*  186:*22*  192:*21*  195:*25*  200:*12, 21*  201:*10*  202:*21*  203:*5, 12*  204:*10*  205:*16*  206:*8, 22*  211:*5, 13*  213:*1*  218:*12*  220:*24*  221:*18, 20*  224:*15, 17*  225:*4, 13, 16*  230:*16*  231:*7, 22*  232:*5, 24*  233:*4*  236:*6*  237:*10, 25*  238:*13, 20*  239:*1*  241:*21*  242:*2, 5*  243:*15, 17*  244:*23*  245:*16*  246:*3, 16*  248:*23*  278:*11*  281:*15, 16*  283:*5*  285:*19*  286:*25*  287:*6, 12, 20*  290:*18*  291:*5, 12, 13*  292:*6*  295:*25*  296:*6, 22*  297:*6, 10*  298:*17, 18, 24*  300:*2, 14*  302:*12*  305:*3, 20*  306:*4*  308:*7, 10, 15, 18*  309:*2, 12, 20*  310:*16*  311:*9*  313:*18*  316:*14*  317:*7, 11, 14*  321:*1*

**NAT-SL**  205:*3*

**NAT-SL-00001113**  4:*10*

**NAT-SL-00001116**  4:*11*

**NAT-SL-00001450**  8:*12*

**NAT-SL-00001454**  8:*13*

**NAT-SL-00001457**  6:*14*

**NAT-SL-00001509**  6:*15*

**NAT-SL-00008683**  9:*16*

**NAT-SL-00008756**  7:*11*

**NAT-SL-00009535**  7:*15*

**NAT-SL-00009537**  7:*15*

**NAT-SL-00009611**  6:*19*

**NAT-SL-00009612**  6:*19*

**NAT-SL-00010410**  5:*3*

**NAT-SL-00010413**  5:*4*

**NAT-SL-00015079**  7:*8*

**NAT-SL-00015080**  7:*8*

**NAT-SL-00016089**  5:*5*

**NAT-SL-00016112**  4:*14*

**NAT-SL-00016145**  4:*15*

**NAT-SL-00016270**  4:*18*

**NAT-SL-00016271**  4:*19*

**NAT-SL-00016466**  4:*25*

**NAT-SL-00016467**  4:*25*

**NAT-SL-00016470**  9:*13*

**NAT-SL-00016472**  9:*13*

**NAT-SL-00017152**  5:*11*

**NAT-SL-00017155**  5:*12*

**NAT-SL-00017249**  6:*22*

**NAT-SL-00017251**  6:*22*

**NAT-SL-00017309**  7:*22*

**NAT-SL-00017310**  7:*22*

**NAT-SL-00017861**  6:*11*

**NAT-SL-00018178**  7:*4*

**NAT-SL-00018181**  7:*5*

**NAT-SL-00020498**  3:*21*

**NAT-SL-00020499**  3:*22*

**NAT-SL-00020508**  5:*22*

**NAT-SL-00020534**  5:*22*

**NAT-SL-00020751**  9:*6*

**NAT-SL-00020754**  9:*6*

**NAT-SL-00020763**  7:*18*

**NAT-SL-00020764**  7:*19*

**NAT-SL-00020795**  6:*5*

**NAT-SL-00020819**  6:*5*

**NAT-SL-00021241**  4:*7*

**NAT-SL-00021258**  4:*8*

**NAT-SL-00021516**  5:*14*

**NAT-SL-00021531**  5:*15*

**NAT-SL-00022555**  3:*17*

**NAT-SL-00022558**  3:*17*

**NAT-SL-00023183**  3:*24*

**NAT-SL-00023184**  3:*25*

**NAT-SL-00023189**  8:*9*

**NAT-SL-00023190**  8:*10*

**NAT-SL-00023205**  8:*16*

**NAT-SL-00023206**  8:*16*

**NAT-SL-00023790**  8:*5*

**NAT-SL-00023791**  8:*5*

NAT-SL-00024106 6:16
NAT-SL-00024255 6:17
NAT-SL-00025537 8:24
NAT-SL-00025703 6:8
NAT-SL-00025704 6:9
NAT-SL-00026501 8:20
NAT-SL-00026502 8:21
NAT-SL-00027877 5:18
NAT-SL-00027878 5:18
NAT-SL-01113 84:24
NAT-SL-10410 128:18
NAT-SL-1450 244:21
NAT-SL-1457 166:4
NAT-SL-15079 201:9
NAT-SL-16089 139:16
NAT-SL-16270 107:7
NAT-SL-16466 126:4
NAT-SL-16470 301:7
NAT-SL-17152 140:25
NAT-SL-17249 187:25 188:13
NAT-SL-17309 232:11
NAT-SL-17861 162:14
NAT-SL-18178 193:22
NAT-SL-200508 154:25
NAT-SL-20498 49:14
NAT-SL-20751 268:23
NAT-SL-20763 229:9
NAT-SL-20795 157:18
NAT-SL-21241 69:23
NAT-SL-21516 148:3

NAT-SL-21519 148:25
NAT-SL-22555 41:21
NAT-SL-23183 55:9
NAT-SL-23189 239:13
NAT-SL-23205 252:18
NAT-SL-23790 237:8
NAT-SL-24106 171:17
NAT-SL-25537 265:20
NAT-SL-25703 159:15
NAT-SL-26501 263:10
NAT-SL-27877 153:16
NAT-SL-8756 310:5
NAT-SL-9535 222:10
NAT-SL-9611 176:20
**natural** 230:5
**nature** 12:24 24:5 103:19 297:7 303:14, 25 311:21
**near** 54:4 58:5 65:23 86:12 120:8 181:20 195:8 212:12 311:1
**necessarily** 25:4 98:8 112:8 203:19 210:6 215:13 221:22 231:1 255:5 280:12
**necessary** 224:4 227:24 228:3 250:7, 14
**need** 10:10 24:9 35:4 37:3, 4 46:3 50:4 51:14 89:13 150:6 151:16 155:24 178:5 179:18 180:13 182:9 200:11 225:3 228:13 250:12 266:9 270:19 290:6 297:16 301:13
**needed** 182:1, 3 183:2 185:24 213:4 246:24 247:5 277:5

306:9
**needs** 51:6
**negotiate** 214:17
**negotiated** 27:6 52:22 53:8
**neither** 322:3
**never** 38:5, 10 39:1 145:1 192:8 226:25 241:2, 8 259:19 274:21 275:14 276:16 299:20 308:21
**nevertheless** 233:14 241:10
**NEW** 1:1 2:6 28:13, 16 31:1 69:17, 18 102:13 136:16 143:24 145:6 178:13 230:10 231:19 232:7 244:14 247:4, 8 281:24 321:1
**news** 196:13, 16 197:10, 24 198:10, 19
**NI** 3:16 5:2 6:15 8:19 12:17 42:8 50:3 52:23 88:18 90:2 160:8 164:12 240:9 242:18 243:25 244:10 253:10 263:14, 20 288:4 295:17, 19, 20, 23 313:22
**nickel** 61:17
**nickel-and-dime** 54:15
**night** 148:9 155:11 169:9 228:25 269:12 270:16
**night's** 9:5 269:4
**NI-issued** 289:13
**Niles** 3:18 4:11 6:10 8:18, 22 9:3 49:22 55:12 109:3 162:15, 21 163:2 164:13 167:21, 24 169:10 194:2, 12 245:8, 12 263:12 265:25 266:1 274:19, 20 275:14 314:2
**ninth** 238:3

**NI's** 129:21 130:10 133:6 263:24 265:10 266:6
**Noam** 2:3 10:7, 24 29:14 321:13
**noam@rgrdlaw.com** 2:7
**NOBO** 7:7 8:4 229:14, 22 232:18, 21, 25
**Noem** 35:15
**nondisclosure** 12:20
**nonlawyers** 82:11
**nonpublic** 13:2 72:20 73:1, 19 78:10 79:17 80:1, 3, 20 82:18, 25 83:2 107:24 108:3 250:8 306:6, 14 316:3 317:8, 15
**nonresponsive** 47:10 100:11
**noonish** 46:3
**normal** 57:2
**normally** 284:13 292:1
**note** 8:15 76:8 134:7 140:2 143:18, 22 145:3 149:2 163:11 207:3 208:7 218:3, 10 219:3 238:7 253:5, 13
**noted** 45:5 94:11 198:4 209:19, 22, 23 217:3 219:1 231:25 248:7 311:14 316:10 320:5
**notes** 7:10 83:12 89:6, 18 102:16 119:10 131:11 133:18 136:8, 9, 13 137:22 206:5 207:14 232:25 312:15 314:24, 25
**Notification** 4:18 7:14 92:18 93:6 95:16 107:12 124:6 228:21
**notifications** 227:10,

*14*
**notified** 226:*20*
**notify** 227:*9*
**noting** 59:*5* 275:*14*
**November** 311:*12*
**number** 53:*19*
 108:*12* 115:*23* 174:*6*
 175:*4* 178:*4* 188:*12*
 192:*9* 200:*25* 203:*24*
 211:*10, 11, 16* 237:*5*
 268:*21* 293:*24*
 299:*20* 301:*7* 310:*4*
 312:*20*
**numbered** 1:*12*
**Numbers** 9:*9*
**numerous** 65:*2*
 213:*12* 279:*7, 10*
 283:*14* 288:*19* 289:*4*
 305:*21*
**Nuthatch** 109:*18, 20,*
*25* 110:*9* 111:*25*
 114:*4* 119:*12* 120:*10*
 121:*2, 7* 124:*4, 5, 8*
 142:*16* 160:*24* 161:*5*
 179:*20* 182:*17* 233:*1,*
*11* 235:*5* 236:*16, 19*
 255:*23* 256:*25*
 269:*23* 311:*2* 312:*2*
**nutshell** 297:*10*

**< O >**
**oath** 36:*20* 39:*4*
 95:*4* 257:*11*
**object** 11:*6* 17:*11*
 18:*14* 27:*13* 35:*15*
 42:*14* 43:*17* 44:*2*
 48:*23* 52:*17* 57:*11*
 75:*14* 83:*20* 93:*13*
 94:*3, 7* 95:*6, 8*
 113:*15* 114:*11*
 183:*22* 184:*19, 22*
 190:*3* 215:*21* 220:*14,*
*17* 302:*22* 303:*5, 16*
 304:*2, 21* 306:*16*
 308:*13* 315:*17* 316:*6,*
*17* 317:*3, 10, 17*
**objected** 60:*1*
**objecting** 31:*9* 39:*4*
 67:*18* 95:*8* 235:*11*

**Objection** 17:*22*
 30:*5* 31:*13, 18* 39:*8*
 40:*7, 9, 15* 41:*13*
 44:*7, 24, 25* 46:*9, 19*
 48:*12* 60:*4, 6, 8, 9, 14,*
*16, 17* 68:*17, 25* 75:*5,*
*22, 24* 76:*4* 90:*18*
 115:*11* 119:*21*
 121:*24* 122:*1* 135:*15,*
*21* 137:*4* 138:*10*
 185:*2, 17* 187:*10*
 197:*16* 198:*2* 200:*14*
 235:*22* 242:*7* 251:*7,*
*18* 285:*21* 286:*11, 14*
 289:*21* 306:*19* 309:*6*
**objectionable** 67:*21*
**objections** 29:*8*
 32:*10, 11* 44:*11* 45:*4*
 47:*18, 23* 48:*4, 9, 22*
 49:*2, 9* 69:*14, 15*
 94:*10, 15* 97:*24*
 199:*9* 214:*7*
**objects** 11:*7*
**obligation** 12:*25*
 99:*20* 182:*7* 218:*5,*
*13, 21* 219:*1, 15*
**obligations** 99:*17*
 219:*4, 10*
**observe** 66:*18, 22*
 112:*17*
**obtain** 293:*15*
**obtained** 134:*8*
**obvious** 46:*15*
**Obviously** 23:*15*
 25:*2* 50:*25* 54:*16*
 108:*11* 113:*25*
 116:*20* 117:*24*
 121:*10* 162:*17, 19*
 163:*8* 174:*19* 178:*7*
 181:*3* 191:*15* 193:*3*
 195:*4* 205:*24* 218:*16*
 219:*9* 226:*17, 19*
 231:*11* 267:*4* 275:*22*
 276:*24* 282:*9* 297:*14*
 300:*20, 22* 305:*6*
**occasions** 213:*20*
 228:*11* 271:*2* 278:*4*
 305:*21*
**occur** 281:*25* 284:*20,*
*22, 23* 285:*18*

**occurred** 147:*3*
 168:*7* 169:*23* 254:*1*
 284:*23*
**OCTOBER** 1:*8, 12*
 10:*3* 20:*17, 20* 38:*4*
 62:*21* 282:*1* 287:*23*
 288:*7* 289:*6, 19*
 321:*5* 322:*8*
**offending** 177:*25*
**offensive** 192:*1*
 226:*24*
**offer** 77:*20* 88:*8*
 93:*18* 107:*15* 119:*4*
 128:*9, 20* 130:*14, 22,*
*24* 142:*23* 143:*6*
 149:*16, 20* 151:*14, 19*
 175:*6* 176:*6* 177:*25*
 186:*14* 190:*22*
 191:*23, 25* 193:*15*
 197:*9* 207:*12* 210:*22*
 226:*23* 228:*8* 234:*15*
 235:*20* 236:*7, 8*
 241:*2, 24* 246:*8*
 247:*19, 23* 249:*24*
 250:*2* 276:*13, 25*
 277:*9, 16* 281:*7*
 298:*25* 299:*3, 21*
 300:*8, 12, 17* 303:*13*
 304:*5, 8, 13, 23* 306:*8,*
*12* 308:*8, 9* 309:*7*
**offered** 309:*1, 3*
**offeree** 92:*5, 11*
**offerer** 92:*5, 11*
**offering** 88:*4*
**offerings** 99:*22*
**offers** 87:*21* 129:*22*
 308:*17*
**office** 282:*22, 25*
 295:*6*
**officer** 21:*7, 16* 72:*2,*
*7* 80:*14* 81:*2* 87:*11,*
*18* 186:*5* 321:*10*
**officers** 152:*7*
**official** 299:*21*
**off-the-record** 290:*4*
**oh** 28:*16* 33:*20* 71:*3*
 73:*18, 23* 79:*8* 118:*1*
 120:*13* 128:*14*
 130:*20* 175:*12* 181:*9*
 188:*22* 199:*18* 245:*6*

 251:*2* 275:*5, 7*
 278:*12* 280:*2* 298:*23*
 299:*23*
**Okay** 10:*23* 11:*4, 15,*
*17* 12:*7, 11* 13:*4*
 21:*6* 24:*5* 26:*22*
 29:*21* 30:*16* 31:*8, 24*
 32:*13, 17* 41:*11* 42:*6*
 46:*6, 25* 49:*10* 51:*9*
 52:*10* 58:*17* 62:*7*
 63:*19* 64:*4, 13* 66:*24*
 73:*23* 75:*2, 23* 76:*18*
 79:*14* 82:*17* 83:*12*
 84:*1* 85:*10* 86:*12*
 87:*9, 24* 90:*15, 21*
 92:*13* 93:*21* 98:*10*
 99:*4* 109:*11, 23*
 110:*8, 12* 116:*6*
 118:*14* 122:*20*
 123:*20* 126:*2* 127:*19,*
*25* 129:*2, 15* 131:*15*
 133:*15* 137:*11, 14, 18*
 138:*21* 139:*3, 21*
 142:*4* 143:*17* 145:*15*
 147:*7, 21* 148:*12, 17*
 149:*11* 150:*2, 16*
 156:*8* 160:*6* 161:*18,*
*20* 163:*16, 20* 164:*10*
 165:*7, 19, 22* 166:*2*
 168:*24* 169:*3* 170:*10*
 171:*10* 172:*3, 9, 16*
 173:*22* 175:*11*
 179:*14, 15* 180:*16*
 183:*18* 193:*6, 10*
 195:*18* 196:*10, 23*
 198:*25* 199:*3* 200:*3,*
*20* 201:*2* 202:*10*
 204:*25* 207:*20* 208:*2,*
*10* 214:*5* 220:*23*
 223:*22* 234:*21*
 239:*23* 242:*15*
 250:*17* 252:*3, 8*
 254:*17* 255:*10, 17*
 259:*22* 260:*8* 261:*10*
 267:*12* 272:*5, 9*
 274:*12* 275:*7* 276:*15*
 277:*19, 20* 278:*9, 16,*
*20* 280:*20* 281:*8, 21*
 282:*5, 20* 283:*9*
 285:*9, 17* 290:*1, 10*

Deposition of Eddie Dixon                          In Re National Instruments Corporation Securities Litigation

292:*13, 22, 23*  293:*4, 15, 18*  294:*1, 11, 15, 17*  295:*15*  296:*5*  297:*5, 8*  298:*13, 21, 24*  299:*2*  300:*14*  301:*4, 25*  302:*11*  306:*4, 11*  307:*4*  308:*4, 15*  309:*17*  310:*2, 13*  311:*13*  312:*14*  313:*24*  314:*4, 15, 21*  315:*9, 13, 24*  316:*9, 18, 22, 25*  317:*4, 20*  318:*7, 14*
**once**  93:*17*  197:*8*  228:*12, 20*  300:*7*
**one-dimensional**  103:*2*  105:*2*
**ones**  204:*4*
**open**  311:*1*  316:*20*
**Opening**  4:*6*
**operate**  224:*19*  227:*1*  241:*8*
**operating**  100:*12*
**opinion**  31:*3*  261:*17, 21, 24, 25*  262:*5, 7*  316:*1*
**opportunistic**  253:*16, 22*  254:*9, 14*  255:*10*  260:*9, 18*  261:*7, 12*
**opportunities**  246:*14*  254:*16*
**opportunity**  40:*1*  57:*15*  58:*10*  152:*5*  192:*6*  255:*6*  256:*21*
**opposition**  32:*2*
**Options.pdf**  5:*10*
**ORAL**  1:*7, 11*  321:*10*
**order**  183:*1*  221:*7*  225:*4*
**orderlies**  23:*5*
**orderly**  39:*25*
**orders**  11:*22*
**organization**  289:*11*  295:*23*  296:*15*
**organizations**  295:*13*
**organize**  133:*2*
**organized**  131:*23*
**orient**  298:*15*

**oriented**  58:*15*  85:*7*
**origin**  63:*20*
**original**  142:*6*  143:*6*  283:*1*  321:*13*
**originally**  292:*25*
**originate**  250:*12*
**ourself**  267:*3*
**outcome**  134:*15*  322:*7*
**outlining**  254:*24*
**outright**  118:*21, 24*  119:*10, 16*  120:*3*  121:*4, 16, 22*
**outside**  21:*21, 23*  22:*2, 12, 20*  23:*6*  24:*16, 19*  27:*15*  38:*20*  41:*4*  78:*18*  80:*11, 13, 22, 24*  81:*1*  104:*14*  145:*2*  179:*16*  194:*24*  210:*20*  271:*15*  296:*19*
**outside-in**  132:*6*
**outstanding**  88:*1*  129:*21*  301:*3*
**overall**  299:*16*  309:*11, 25*
**overhang**  179:*20*
**overpaid**  58:*23*
**oversaw**  288:*18*  289:*4*
**overseeing**  24:*16*
**owe**  191:*18*
**owed**  300:*20*
**owned**  111:*5, 7*
**owner**  229:*15*
**ownership**  202:*19*  287:*15*

**< P >**
**p.m**  1:*13*  166:*15*  167:*8, 12*  222:*20, 23*  307:*11*  313:*6, 7*  314:*24*  318:*18*
**PAGE**  3:*1, 7, 9, 15*  4:*2*  6:*2*  7:*2*  8:*2*  9:*2*  28:*23*  30:*23*  49:*16*  56:*2*  63:*10*  65:*1, 23*  66:*3*  70:*14, 18*  72:*25*  73:*3*  76:*23*  82:*17*  84:*25*  86:*3*  87:*23*

89:*23*  91:*14*  98:*2*  101:*22, 25*  102:*13*  105:*19*  106:*6*  109:*5, 12, 13, 17*  110:*25*  115:*8, 19*  116:*11, 18*  120:*14, 15*  122:*6*  124:*14*  128:*19, 23*  129:*2, 4, 6*  131:*9, 15*  137:*21*  141:*3*  148:*24*  149:*1, 23, 24*  150:*1*  155:*22*  158:*4, 5*  166:*16*  171:*20, 22*  193:*25*  195:*7*  237:*13*  243:*1*  245:*5*  252:*22*  253:*15*  263:*12*  272:*10, 11, 13*  274:*13*  307:*16*  319:*1, 5*  320:*3, 5*  321:*24*
**pages**  3:*14*  4:*3*  9:*9*  101:*2*  109:*23*  172:*4*
**paid**  26:*23*  27:*10*  31:*14*  32:*4*  35:*8, 10, 12*  47:*22*  48:*3, 8, 17, 25*  49:*6*  56:*5*  57:*9*  59:*2, 6, 13, 14, 24*  60:*5*  61:*3, 7, 10, 14*  63:*4*  64:*23*  65:*3*  68:*2, 8, 14*  69:*4, 5, 7*  105:*16*  214:*9*  219:*22*  281:*16*  287:*9, 13*  288:*15*
**paper**  232:*16*  307:*5*
**paragraph**  71:*8, 24*  76:*10*  78:*5*  86:*17*  90:*10*  103:*24*  131:*16*  170:*13*
**part**  24:*15*  49:*16*  73:*14*  131:*2*  152:*17*  171:*5*  203:*1*  206:*18*  216:*15*
**participate**  168:*1*
**participated**  167:*24*
**particular**  25:*1*  38:*25*  53:*3*  76:*6*  80:*18, 19*  152:*9*  186:*21, 24*  187:*1, 3*  193:*4*  231:*25*  233:*23*  249:*13, 25*  261:*6*  285:*2*  305:*14*
**particularly**  210:*7*

**Parties**  53:*13*  103:*20*  321:*16*  322:*4*
**Partners**  136:*10*  201:*10*  202:*15*
**parts**  133:*16*
**party**  189:*9*  190:*13*  191:*12*  321:*20*  322:*1*
**path**  118:*24*
**paths**  118:*18*
**Pause**  58:*16*  70:*7*  83:*5*  110:*4*
**pay**  56:*3*  58:*20*  190:*23*  191:*17*  193:*14*  230:*4*  231:*23*  232:*2*  241:*6*  291:*19*
**paying**  59:*1*  191:*21*  193:*11*  200:*22*
**payment**  31:*3*  36:*6*
**PDF**  28:*23*
**Pedro**  252:*21*  253:*8, 9, 11, 23*  255:*21*
**pending**  77:*1, 19*
**Pennsylvania**  322:*14*
**people**  17:*14*  41:*24*  44:*14*  250:*6*  251:*24*  281:*4*  288:*1*  292:*1*  315:*10*
**Pepsi**  123:*24*
**percent**  63:*4*  64:*22*  65:*11, 18, 24*  68:*14*  69:*5*  88:*1, 9*  95:*17*  130:*5, 10*  131:*4*  204:*5*
**percentage**  62:*24*  65:*4*
**Percival**  3:*15*  7:*12*  8:*17, 22*  9:*3, 10*  15:*6, 9*  23:*23*  41:*22*  42:*11, 25*  43:*10, 13, 24*  45:*7*  46:*7, 25*  47:*9*  159:*18*  160:*14, 20*  176:*22*  177:*15*  179:*17*  180:*17*  222:*16*  263:*12, 24*  265:*25*  300:*23*  302:*2, 4, 11, 13, 18, 25*  307:*11, 24*  310:*15*
**Percival's**  179:*24*  180:*21*

perfect  226:*11*
performed  132:*5*
period  41:*4*  85:*19*
95:*25*  175:*7*  178:*1*,
*24*  180:*6*  181:*20*
191:*25*  214:*16*
225:*25*  238:*19*  241:*1*
266:*14*  293:*12*
periodic  246:*13*, *15*,
*18*
periodically  23:*25*
206:*17*  247:*15*
permanently  297:*4*
permissible  315:*15*
persistent  199:*8*
person  57:*2*  85:*18*
102:*17*  210:*21*  302:*5*
305:*7*
personal  16:*10*
282:*16*  287:*8*
personnel  81:*16*, *21*
104:*10*
Persons  4:*6*
perspective  58:*24*
74:*12*  130:*17*  203:*21*
233:*15*  234:*23*  235:*6*
299:*6*  303:*9*  304:*8*
308:*19*  316:*5*
perspectives  248:*10*
Peter  2:*17*
petered  240:*11*, *17*
241:*12*  242:*1*, *13*
Philadelphia  322:*14*
phone  15:*18*  102:*17*
124:*22*  163:*1*, *2*, *13*,
*14*  169:*17*, *20*  219:*13*
227:*11*, *17*  228:*20*
281:*10*, *11*, *18*, *20*, *22*
282:*1*  283:*4*, *6*
285:*18*  287:*16*, *18*
289:*13*, *18*, *23*  290:*18*,
*22*, *25*  291:*4*, *18*, *21*
phones  282:*12*  286:*9*
287:*1*, *19*  288:*12*, *14*,
*19*  289:*5*  291:*13*
292:*2*
phrase  74:*15*  206:*24*
217:*2*  254:*22*  302:*18*
phrases  182:*13*

physically  283:*4*
Pick  124:*22*  163:*8*
picked  163:*1*
piece  222:*5*
Pierre  3:*14*
pin  35:*23*
pipeline  240:*10*
241:*22*  242:*3*
place  18:*1*  25:*23*
146:*22*  166:*10*, *14*
167:*12*  177:*16*
178:*19*  182:*19*  224:*9*
225:*7*, *20*, *25*  252:*2*
282:*1*  283:*2*  296:*24*
306:*10*, *12*, *17*, *21*
308:*24*  312:*4*
places  201:*20*
plain  235:*2*
plain-English  81:*24*
plaintiff  10:*8*  64:*9*
318:*9*
Plaintiffs  1:*12*  2:*3*
10:*24*  37:*19*, *24*
Plan  3:*16*  25:*22*
42:*8*, *13*  43:*1*, *8*, *15*,
*25*  45:*9*  145:*16*, *19*,
*24*, *25*  146:*3*, *6*, *18*, *25*
147:*2*, *14*  156:*13*, *16*,
*25*  166:*23*  174:*20*
178:*19*  182:*18*
211:*24*  213:*11*
223:*17*, *23*  226:*1*
227:*23*  228:*18*, *19*
229:*5*  246:*12*  262:*14*
266:*4*  291:*15*  299:*7*
308:*24*, *25*  311:*5*
312:*4*
planned  174:*12*
211:*13*
planning  97:*14*
174:*25*  191:*12*  240:*5*
plans  25:*9*, *16*, *18*, *25*
26:*4*  46:*17*  130:*19*
151:*18*  187:*17*
194:*25*  223:*13*, *18*
226:*4*  228:*7*  277:*8*,
*16*  299:*7*, *8*  300:*10*
Plascoff  2:*4*
Platform  155:*17*, *18*,
*19*

play  153:*21*  216:*7*
236:*21*
Please  7:*14*  10:*4*
28:*12*, *23*  30:*23*
41:*17*  45:*2*, *24*  49:*11*
55:*6*  56:*20*  59:*10*
72:*25*  83:*25*  97:*23*
98:*2*  116:*16*  122:*3*
137:*21*  139:*13*
140:*23*  142:*6*, *10*
147:*23*  154:*19*, *21*
155:*21*  157:*15*  158:*3*
159:*11*  161:*21*  162:*9*
171:*12*, *20*, *21*  172:*4*
176:*16*  177:*16*
192:*16*  198:*13*  201:*4*
245:*4*  260:*16*, *21*
268:*16*  269:*11*
286:*16*  312:*22*
plenty  64:*5*
point  18:*24*  20:*23*
26:*11*  32:*18*  34:*7*
35:*20*  38:*22*  50:*23*
51:*3*  52:*6*  79:*23*
83:*17*  89:*5*  93:*24*
121:*8*  124:*15*  126:*1*
146:*14*  156:*9*  172:*25*
180:*5*  185:*22*, *23*
189:*3*, *4*  191:*8*
207:*17*  208:*11*
226:*25*  230:*12*
234:*20*  240:*22*
245:*20*  249:*23*
250:*10*  261:*21*  280:*1*,
*2*  307:*8*, *25*  315:*4*
316:*1*, *16*, *18*
pointing  60:*18*  67:*3*
points  125:*1*  142:*20*
145:*9*  297:*25*
policy  69:*24*  70:*2*, *9*,
*16*, *17*, *19*, *23*, *24*
71:*10*, *18*, *25*  72:*8*, *12*,
*18*  77:*5*, *10*  78:*24*, *25*
79:*9*, *12*, *13*  80:*2*, *14*
81:*3*, *10*, *13*, *16*, *19*, *21*,
*25*  82:*3*, *10*, *12*, *16*, *23*
186:*6*  209:*12*, *15*, *21*
282:*6*, *11*, *17*, *19*, *20*,
*24*  283:*1*  284:*16*
285:*24*  286:*4*, *6*, *9*

287:*17*  288:*11*
289:*11*, *25*
politically  305:*8*
Polk  136:*14*  144:*17*,
*21*, *24*
position  20:*5*  27:*18*,
*24*  29:*19*  38:*8*, *17*, *18*,
*22*  41:*3*, *7*  49:*5*  99:*7*
114:*18*  133:*6*, *7*, *8*, *9*
191:*3*  192:*3*  209:*3*
248:*17*  250:*22*, *23*
251:*5*  269:*25*  271:*9*
272:*1*  273:*18*  274:*1*,
*8*  297:*4*  312:*12*
positions  19:*16*
40:*23*, *25*
positive  291:*2*
possess  225:*19*
possession  217:*25*
220:*25*  221:*11*
224:*12*  306:*14*  316:*3*,
*7*  317:*7*, *14*
possibility  71:*15*
114:*1*  121:*13*, *15*
206:*12*  207:*10*
209:*20*
possible  50:*4*, *8*
51:*10*, *16*, *21*, *25*  52:*1*,
*5*, *7*, *9*  76:*16*  99:*8*
100:*6*  104:*8*  150:*7*,
*18*  152:*23*  155:*25*
156:*18*  213:*9*  258:*18*
259:*22*  262:*8*  291:*11*
possibly  186:*12*
241:*6*  257:*20*  289:*19*
post  155:*14*, *16*
271:*24*
potential  34:*1*, *4*
75:*4*  76:*2*  84:*12*
90:*16*  92:*1*  100:*3*
107:*18*  118:*18*  120:*9*
121:*1*, *6*, *12*, *13*
144:*13*  150:*8*, *19*
152:*24*  156:*1*, *19*
160:*3*  204:*9*  209:*23*
210:*2*  233:*5*  243:*4*,
*17*  245:*17*  246:*2*, *5*,
*16*  248:*10*, *14*  249:*10*,
*17*  250:*8*, *18*  251:*1*,

Deposition of Eddie Dixon                                In Re National Instruments Corporation Securities Litigation

*13* 281:*4* 283:*15, 23, 24* 285:*12* 286:*10*
**potentially** 83:*1* 161:*4* 187:*12* 206:*25* 248:*22* 249:*14* 284:*4* 288:*18* 289:*4* 317:*5*
**practice** 18:*25* 19:*4* 263:*20, 25* 265:*10* 266:*6* 267:*5* 273:*9*
**practiced** 293:*22*
**practicing** 284:*13*
**prefer** 122:*11*
**preferable** 43:*4* 46:*2*
**preferably** 150:*7* 155:*25* 156:*18*
**premium** 66:*20* 88:*9* 130:*5, 10, 14, 23* 131:*5, 6*
**prepared** 39:*16* 88:*17* 90:*3* 91:*8, 9* 120:*9, 17* 121:*1, 6, 11* 131:*17, 20* 133:*2* 162:*4* 190:*23* 191:*20* 249:*4*
**preparing** 39:*17* 112:*12*
**PRESENT** 2:*17* 86:*14* 158:*9* 173:*6, 9*
**presentation** 109:*14* 112:*17, 20* 113:*4* 116:*10* 153:*4, 14* 155:*3* 156:*5, 10* 157:*21* 158:*9* 159:*6* 168:*11, 19* 195:*23*
**presented** 168:*21*
**presenting** 112:*20* 270:*3*
**president** 295:*11*
**press** 169:*22* 229:*7*
**pressure** 96:*16*
**presumably** 26:*22*
**pretty** 129:*11* 141:*5* 144:*15* 155:*9* 250:*16* 296:*19* 304:*9*
**previous** 25:*24* 88:*10* 105:*23* 120:*14* 125:*1* 130:*2, 4, 6, 11, 15, 23, 24* 131:*6* 136:*17* 139:*24*

149:*24, 25* 158:*8* 222:*21* 272:*13*
**previously** 51:*4* 59:*17* 122:*18* 125:*14* 200:*10* 309:*18* 314:*16*
**price** 48:*7* 88:*5, 10* 99:*2* 130:*1, 5, 6, 10, 23* 131:*12* 134:*1* 150:6, 8, *17, 18, 24* 151:*4, 13, 17* 152:*21, 22, 23* 155:*24, 25* 156:*17, 19* 160:*11, 25* 161:*13* 178:*24* 192:*9* 215:*4* 216:*7* 243:*19* 299:*18* 309:*4, 10*
**primarily** 19:*8* 53:*7, 11* 276:*19* 297:*14* 302:*9*
**primary** 22:*24* 23:*1* 169:*5* 187:*1*
**principally** 23:*2* 109:*4*
**Prior** 25:*23* 33:*3* 54:*10* 85:*13* 94:*13* 147:*13* 155:*15* 167:*5* 200:*18* 230:*8* 263:*20, 25* 275:*19, 20, 25* 283:*2* 300:*24*
**priorities** 248:*19*
**priority** 50:*3, 21, 22, 25* 51:*6* 137:*23* 138:*8, 13* 213:*5*
**Priv** 3:*24* 4:*24* 7:*4, 17* 8:*23* 9:*11*
**private** 18:*24* 65:*16* 87:*10, 15* 92:*4, 10* 93:*10* 98:*21, 23*
**privately** 243:*25* 244:*10*
**privilege** 11:*10* 29:*5* 31:*19* 32:*8* 39:*2, 4* 40:*10, 13* 47:*17*
**privileged** 3:*21* 5:*8, 17* 7:*10* 8:*8* 9:*5* 17:*23* 18:*1, 15* 27:*15, 18, 23* 28:*1, 8* 31:*4* 36:*2, 7, 11* 41:*3* 49:*6* 60:*5* 103:*14* 314:*25*
**pro** 109:*18*

**probability** 75:*4* 76:*2* 119:*11, 19* 120:*4* 121:*17, 23* 207:*3, 15* 217:*9*
**Probably** 14:*14, 16* 25:*3* 33:*11* 57:*3* 129:*14* 222:*11* 257:*9* 276:*19* 299:*14* 307:*20*
**problem** 58:*18, 21, 24* 59:*1, 4* 253:*15, 17, 22* 254:*9, 11, 16, 19, 20, 22, 25* 255:*5, 6, 8, 11* 256:*14, 20, 21, 23* 258:*23* 259:*8* 260:*10, 14, 15, 19, 23, 24* 261:*4, 8, 12* 310:*13*
**problems** 255:*24* 256:*5, 16* 257:*1* 301:*22*
**Procedure** 1:*15* 284:*16*
**procedures** 286:*4, 23*
**proceed** 88:*18* 116:*8* 150:*4* 178:*21* 210:*14*
**proceeding** 322:*5*
**proceeds** 194:*22*
**process** 80:*12* 93:*21* 123:*17* 177:*9* 213:*25* 222:*7* 226:*16* 279:*3* 283:*18* 285:*11* 286:*22* 288:*18* 289:*4* 301:*2*
**procurement-related** 296:*16*
**produce** 36:*15, 19* 37:*25* 38:*3, 23, 24, 25* 41:*9* 142:*6, 11* 297:*12*
**produced** 1:*11* 43:*21* 57:*22* 63:*22* 64:*9, 14, 16* 159:*14* 268:*12, 14* 279:*1, 14*
**product** 295:*12* 298:*6*
**production** 142:*12*
**products** 297:*13, 16, 20, 22* 298:*1*
**program** 315:*16, 22*

**Project** 4:*16* 5:*21* 6:*4* 7:*13* 107:*14, 17, 22, 25* 108:*4*
**projecting** 172:*20, 21*
**projection** 173:*1*
**projections** 170:*21*
**prominent** 144:*7*
**promise** 11:*14*
**pronouncing** 232:*12*
**proper** 39:*23* 40:*15* 68:*24* 94:*15, 20* 221:*8* 229:*3* 232:*1*
**proposal** 3:*20* 50:*2, 12, 15, 20* 51:*3* 52:*4* 86:*14* 89:*6, 24* 108:*10, 19* 127:*22* 128:*21* 129:*21* 130:*2* 134:*4* 137:*23* 138:*7* 151:*1* 176:*14* 177:*14* 191:*11* 255:*4* 278:*10* 316:*4*
**propose** 230:*1* 252:*7*
**proposed** 77:*2, 5, 10, 19, 25* 84:*16* 89:*20* 151:*14* 262:*14* 271:*7*
**proposes** 87:*25*
**proposing** 99:*1* 128:*4* 129:*17* 189:*8, 12, 23* 230:*15, 23*
**prospect** 309:*14, 16*
**prospects** 90:*11*
**protect** 250:*13*
**protecting** 213:*8*
**proud** 306:*25*
**proved** 103:*19*
**provenance** 63:*15* 64:*6*
**provide** 25:*7* 26:*6* 32:*20* 104:*25* 130:*18* 208:*10* 221:*15* 249:*25* 255:*9* 305:*16* 317:*4*
**provided** 22:*13* 24:*6, 23* 26:*3, 20* 55:*13, 21* 62:*17* 106:*18* 116:*21* 214:*23* 215:*1* 216:*5* 248:*10* 287:*2, 6, 7* 290:*21* 291:*13* 304:*7*
**provider** 291:*4*
**provides** 90:*1*

**providing** 21:*23*
25:*17* 26:*15* 81:*15,*
*17* 120:*1* 208:*22*
**provisions** 1:*15*
**proxy** 68:7 202:*17*
**prudent** 187:*14*
191:*17* 300:*9*
**PST** 8:*8*
**public** 87:*12, 15*
92:*17, 23* 93:6, 7, *12*
95:*16* 96:*12* 98:*18*
99:*8, 12* 102:*2*
103:*15* 123:*18* 124:*6*
149:*15, 20* 152:*11*
154:*1* 160:*9, 24*
161:*5, 12* 207:*4, 15*
217:*9* 244:*1* 248:*17*
295:*4*
**publicized** 64:*18*
**publicly** 21:*14* 64:*17*
99:*21*
**pull** 63:*23* 301:*9, 10*
312:*22* 314:*20*
**pulled** 62:*10*
**purchase** 239:*9*
243:*2, 15*
**purchaser** 231:*5*
**purchases** 33:*2*
**purely** 96:*4* 243:*18*
**purpose** 81:*16, 19, 20*
93:*16, 18* 96:*4, 8, 9*
100:*7, 8* 113:*7*
156:*16, 22, 24, 25*
157:*2, 7, 8* 189:*18*
193:*5* 210:*21* 217:*13*
231:*14, 20* 233:*24*
278:*6* 284:*25* 285:*23*
298:*5* 300:*2, 15*
303:*20* 304:*11* 305:*2*
306:*11, 20* 316:*12*
**purposes** 25:*22*
71:*25* 95:*19* 98:*17*
297:*23* 298:*4*
**pursuant** 1:*15*
321:*18*
**pursue** 110:*7, 10*
112:*6, 25* 113:*6, 13*
114:*4* 115:*9, 20, 25*
**pursuing** 295:*19*

**put** 25:*23* 28:*11, 17*
30:*16* 33:*14* 35:*23*
39:*21* 41:*16* 44:*20*
49:*10* 55:*5* 58:*9*
62:*7* 69:*17* 84:*19, 20*
90:*22* 115:*16* 125:*15*
128:*11* 137:*6, 9*
175:*13* 177:*16*
178:*18* 182:*19*
200:*25* 215:*15*
230:*14* 252:*15*
269:*24* 271:*8* 272:*1*
273:*18* 274:*1, 8*
278:*20* 283:*2* 297:*4*
306:*9, 17* 312:*4*
**putting** 75:*22* 206:*6,*
*8, 23* 217:*2* 261:*22*
279:*6* 306:*11, 21*

**< Q >**
**Q&A** 69:*24* 70:*2, 13,*
*16* 81:*12, 13, 17, 18*
82:*15*
**Q322** 6:*15*
**quarter** 172:*21, 22*
173:*3, 15, 24, 25*
174:*22* 175:*1* 211:*14*
212:*1*
**quarterly** 170:*20*
**question** 11:8 16:*24*
18:*6* 22:*5, 19* 24:*11*
25:*4* 26:*9, 17* 29:*23*
32:*14* 36:*22* 39:*3, 5,*
*16, 18, 19* 40:*1, 10*
43:*23* 45:*2, 5, 18*
47:*11, 12* 48:*11, 16*
49:*4* 50:*13* 52:*14*
55:*25* 56:*3* 58:*5*
59:*18* 64:*20* 68:*20,*
*22* 69:*12* 70:*8* 75:*15*
77:*9* 78:*19* 79:*24*
80:*9* 93:*2, 3, 8* 94:*11*
98:*14* 100:*14, 23*
114:*15* 117:*4* 121:*3*
122:*3* 125:*24* 134:*21*
151:*8* 153:*7, 9* 164:*3*
169:*10, 13* 175:*23*
180:*17* 181:*8* 182:*16*
183:*19, 25* 184:*14, 15,*
*16, 23* 185:*10, 13, 14,*

*21, 24* 186:*1, 2, 10*
208:*18* 209:*6, 10*
214:*6* 215:*5, 22*
216:*14* 218:*8, 9*
220:*13* 221:*4, 23*
222:*2* 251:*11* 278:*13,*
*14* 285:*16* 286:*16*
298:*16* 301:*13*
302:*23* 303:*18, 19*
304:*3* 306:*20* 308:*14*
312:*2*
**questioning** 30:*2*
290:*3* 292:*15*
**questions** 11:5 32:*3*
36:*20* 39:*12* 42:*23*
44:*15* 45:*25* 58:*4*
63:*14* 64:*7* 68:*25*
70:*5* 94:*24* 185:*8, 22*
290:*8* 292:*14, 22*
317:*20* 318:*9, 12*
**Quick** 8:*15* 70:*5*
125:*25* 127:*18* 164:*2*
253:*5, 13*
**quickly** 90:*3* 226:*19*
**quite** 13:*23* 14:*2*
54:*13* 58:*25* 178:*2*
228:*24* 241:*3* 299:*9*
**quote** 101:*11* 119:*11*
143:*6, 7* 146:*20*
170:*18* 183:*2* 231:*14*
234:*14* 235:*19*
241:*11* 256:*24*
260:*17, 19* 271:*8*
294:*14*
**quotes** 181:*14*
**quoting** 149:*12*

**< R >**
**raise** 301:*12*
**raised** 40:*6* 213:*13*
305:*11*
**raising** 39:*8*
**range** 63:*4* 64:*22*
66:*5* 95:*14*
**Rapp** 3:*23* 5:*7* 6:*18*
8:*14* 14:*1* 16:*5*
17:*19* 18:*4* 55:*11*
139:*17* 141:*2* 159:*18*
170:*14* 171:*9, 25*
174:*20* 176:*22*

177:*14, 21* 178:*15*
179:*7* 181:*2, 10, 23*
188:*2* 220:*3, 11*
239:*15* 252:*20* 253:*4*
255:*20* 281:*2* 288:*6*
310:*15* 313:*15*
**Rapp's** 16:*17* 170:*18*
**rate** 32:*4* 53:*17*
54:*15*
**rates** 27:*1, 5, 11*
**rational** 68:*13*
257:*24* 286:*8*
**reach** 15:*11* 79:*1, 2,*
*3*
**reached** 15:*14, 24*
23:*24* 25:*11, 15, 24*
34:*1, 3, 8, 15* 226:*20*
**reaching** 24:*10* 79:*6*
178:*8, 11*
**react** 140:*11*
**reaction** 299:*2*
**Read** 7:*14* 11:*20, 22*
13:*4* 16:*16* 28:*24*
29:*13, 16* 31:*5* 42:*15*
45:*20, 21* 57:*13, 15,*
*19, 24* 58:*11, 12*
73:*13, 15* 77:*17, 23*
82:*24* 86:*4, 11* 90:*7*
119:*24* 129:*9* 133:*12*
136:*20* 151:*15*
157:*13* 168:*13, 15*
179:*9* 180:*18, 25*
181:*1* 182:*16* 190:*12*
196:*23* 197:*21*
204:*21* 207:*21, 25*
208:*14* 209:*5, 7*
217:*8* 219:*7* 254:*21*
256:*24* 257:*8* 277:*7*
318:*13* 320:*3*
**reader** 82:*2, 16*
**reading** 29:*9* 58:*2, 7*
82:*22* 146:*10* 157:*5*
203:*9* 208:*16* 236:*1*
268:*5*
**reads** 120:*25*
**ready** 132:*20*
**real** 70:*5*
**realistically** 176:*8*

**reality** 152:*17* 163:22 180:*3* 208:*20* 241:*8* 299:*24* 306:*24*

**really** 36:*1* 69:*25* 96:2*1* 123:*8* 141:*10* 192:*10* 197:*21* 209:*15* 255:*9* 256:*13* 276:23 294:*24* 297:*9, 24* 299:*23* 302:*4* 304:*12* 305:*1*

**real-time** 206:*1*

**reason** 51:*13* 57:*10* 62:*4* 66:*9* 68:*24* 114:*7* 154:*7* 182:*2* 217:*24* 218:*1* 225:*19* 228:*9* 238:8, *10* 240:*19, 20* 263:*3, 6* 286:*17, 18, 24* 319:*5*

**reasonable** 73:*9* 74:*1* 126:*1*

**reasonably** 283:*11* 284:*9* 285:*3, 5*

**reasons** 117:*3* 151:*11* 321:*25*

**re-buyback** 207:*23*

**recall** 11:*3* 16:*11* 22:*15, 23* 23:*14* 25:*12* 56:*24* 61:*1* 68:6, *12* 73:*16* 85:*17* 91:*3* 99:5, *10* 104:*12* 105:9, *11* 106:*3, 4, 20* 108:*10, 12* 117:*11, 14, 15, 25* 118:*11, 13* 122:22 127:*4* 128:*5, 6* 130:7, *8* 137:8, *11, 15, 16* 146:*3, 10, 12* 147:*8* 158:*20, 24* 159:*2* 162:*18* 164:*14* 167:*17* 168:*14, 20, 22, 23* 169:*1, 2, 6, 14, 16, 18, 21* 170:*6, 8* 171:*7* 172:*12, 15* 173:*11* 174:23 175:*15* 177:*7* 182:*12* 187:*21* 192:25 193:2, *8* 194:*20, 21* 200:*13, 16, 19* 202:*7, 8* 204:*5* 206:25 207:*1* 208:*12, 16* 209:*7, 9, 11* 210:*18* 211:*15*

219:*17, 19* 220:6, *20, 22* 229:*16* 233:*8* 239:*20* 241:*7* 249:2*1* 253:23 264:*18* 272:*8* 287:*7* 292:7, *9, 11* 299:*14* 306:*7* 308:*11*

**recalled** 172:*7*

**recapturing** 206:*10*

**receipt** 145:*10, 21* 293:*8* 321:*23*

**receive** 52:8, *10, 15, 18* 64:*21* 156:*4* 182:*6* 311:*7* 312:*13*

**received** 33:*2* 50:25 51:*4* 52:*21* 65:*11, 17, 24* 86:*10* 92:8, *9* 98:*21, 22* 100:*17* 107:*16* 108:*5* 123:*6, 10* 128:*3, 9* 133:*12* 142:*11, 16* 155:*9* 158:*2* 190:2*1* 191:*15* 193:*15* 197:*9* 206:*11* 214:*10* 226:23 230:*9* 241:*9* 242:*10* 243:*20* 244:*13* 247:*24* 249:*24* 250:*2* 277:*1* 300:*8, 17* 304:*23* 306:*8* 311:*6* 312:*14* 315:*14, 19, 25*

**receives** 63:*3*

**receiving** 155:*6, 8* 210:*2* 220:23 304:*5*

**recipient** 63:*12*

**recipients** 4:*4, 12, 16, 20, 24* 5:*2, 5* 6:*6, 20* 7:*6, 16, 20* 8:*3, 6* 9:*7, 14* 107:*23*

**recite** 168:*15*

**recognize** 107:*8* 109:*6* 122:*12* 138:22 166:*7* 171:*18* 172:*5*

**recollection** 118:*3* 168:20 170:*25*

**recommend** 159:*3*

**recommendation** 170:*22* 255:*15*

**recommending** 256:*4* 307:*17*

**recommunicating** 154:*11*

**reconfirmed** 181:*2, 14* 310:*20*

**record** 1:*15* 10:*5* 28:25 29:*7* 30:*17* 31:*8* 36:*21, 23, 24* 37:*9, 11, 14* 39:*22* 42:2*1* 45:*3, 5* 47:*11, 15* 58:*1, 7* 60:*5* 67:*3* 75:*22, 24* 77:*8* 84:*5, 8* 97:22 107:*6* 114:23 115:*1, 3, 6* 117:*19* 127:*8, 11, 14* 128:*1, 2* 142:*5* 147:*25* 161:*19, 24* 162:*2* 200:*6, 9* 201:*6* 222:*18* 244:*25* 252:*10, 13* 279:*6* 290:*13, 16* 312:*23* 317:*25* 318:*3, 6, 17* 321:*11*

**recorded** 312:*15*

**record's** 61:*12*

**recruited** 295:*7*

**Recurring** 253:*16* 260:*17*

**refer** 40:*18* 50:*8* 91:*11* 122:*11* 280:*8* 303:*1*

**reference** 51:*25* 160:*5* 181:*4* 195:*15* 215:*4* 259:*8* 265:*1* 269:*23* 279:*18* 310:*22*

**referenced** 51:*20* 169:*7* 170:*7*

**references** 236:*16*

**referred** 39:*7* 107:*17* 110:*13* 117:*9, 20* 118:*11* 141:*9* 160:*1* 167:*1* 223:*17* 253:2*1* 254:*19* 256:*15* 258:23 260:*9* 261:*11* 279:*14*

**referring** 44:*19* 55:*17, 19, 23* 139:23 141:23 148:*15* 181:*16* 187:*3* 195:*14* 196:22 197:*20* 198:*10, 15, 16* 202:*10* 229:*18* 232:*19*

243:*10* 244:*4* 254:*3, 10* 256:*5* 257:*14* 269:*9* 277:*23*

**refers** 188:*17* 229:*14* 280:*6, 7*

**reflect** 108:*16, 17* 272:*4* 274:*3* 279:*16* 280:*21, 22, 23* 283:*23*

**reflecting** 279:*2*

**refrain** 297:*8*

**refresh** 170:*25*

**refreshes** 118:*3*

**regard** 32:*4* 58:*19* 217:*16*

**regarded** 76:*9, 19, 25* 231:*6*

**regarding** 25:*18* 31:*3* 36:*6* 40:*24, 25* 43:*1* 46:*16* 78:*18* 88:*16, 22* 89:*18* 100:*2* 105:23 133:*18* 134:*3* 179:*3* 182:*6* 197:*11* 221:*10* 223:*18* 224:23 226:*4* 231:*6* 239:25 240:*6* 248:*16, 18* 253:*12, 13* 269:*4* 276:*3* 281:*4* 303:*12*

**regardless** 102:*7* 121:2*1* 185:*7* 191:*18* 215:*24* 226:22

**Registry.doc** 5:*11*

**regularly** 147:*7, 16*

**regulatory** 23:*12* 90:*1* 133:*18, 20, 23*

**Regus** 1:*14*

**REIT** 65:*15*

**reiterate** 89:*24*

**reiterated** 308:*9*

**reiterates** 140:*1*

**reiterating** 124:*15*

**reject** 191:*24* 276:*12, 25* 308:*17*

**rejected** 175:*6* 177:*24* 178:*13, 23* 180:*4, 7* 182:*2* 190:22 193:*5, 16* 207:*12* 228:*7*

**rejection** 118:*21, 24* 119:*11, 16* 120:*4*

Deposition of Eddie Dixon

121:*4, 17, 22*  181:*3, 15*  309:*13*  310:*21, 23*
relate  169:*23*
related  31:*22*  47:*21*  80:*19*  195:*10*  196:*12*  197:*23*  233:*23*  277:*21*  322:*4*
relates  12:*19*  23:*16*  124:8, *9*  195:*17*  232:22  304:*19*
relation  60:*24*
relations  232:*13*
relationship  194:*19*  233:*13*
relative  50:*18*  123:*9*  130:*16*  203:*20*  300:*11*
relatively  160:7
relayed  18:*12*
release  228:*14*  229:6
relevance  40:*13, 14*  41:6  189:*21*
relevant  27:*22*  58:*3*  141:*10*  208:*23*  317:5
reliable  297:*16*
relied  219:*21*  271:*23, 25*
rely  38:*11*  210:*20, 24*
relying  38:6  208:*21*
remain  288:*4*
remained  204:9  241:*21*  248:22  296:*10*
remaining  155:*15*
remember  27:9  61:*19*  91:22  102:5  116:*12, 13, 17, 18, 19, 22, 24*  117:*1*  123:*1*  137:*1*  141:*18*  148:*17*  149:6, *8, 9*  150:*12, 15*  155:*4, 6, 7*  157:*23, 25*  162:*16*  163:9, *12, 17, 18*  164:6, *7, 19, 20*  165:25  167:*15*  168:5  172:*1*  175:*19*  176:*23*  196:*3, 4*  200:*24, 25*  205:9, *10*  209:*13*  211:7  214:5  220:5, *15*  237:*25*  252:*23, 24*

280:*15, 17, 19*  283:*16*  290:*19*  311:8
remembered  164:*9*
remiss  219:*24*  230:*3*
removal  158:*25*
removed  158:*13, 15, 19*  159:5
Repeat  50:*13*  157:*24*  218:8
repeated  140:6, *12*  145:*13*
repeatedly  261:*10*
rephrase  60:*8*  223:6  306:*20*
replies  274:*20*
report  25:*3*  54:9
reported  1:*14*
reporter  10:6  97:22  321:5
REPORTER'S  3:9  321:*3*
reporting  302:8  322:*13*
reports  23:*23*
represent  10:*24*  111:*11*  176:*3*  187:*4*  239:*21*  272:9  292:*21*  303:*11*
representation  168:7  263:*4*
representative  296:*14*
represented  65:9  131:*23*  259:*11*
representing  10:*13*
repurchase  172:*17*
repurchases  31:*22*  106:9, *15, 19, 22*  172:22  173:*14, 19, 23*  174:7, *12, 21*  175:*1*  177:*17*  317:*12*
repurchasing  309:*22*
reputation  71:22
reputational  209:*22*
request  15:*25*  38:*15*  40:2  99:*4*  142:5  145:*10*
requested  145:9  321:*20*  322:*1*
requesting  50:*17*

99:6  139:*4, 9*  210:6
requests  37:22  38:*15*
required  313:*13*
requirements  132:9
reread  45:22
research  30:6, *7, 18*  36:22  38:*12*  39:5  59:*23*  60:*1*  208:*17*  210:*19*
researched  29:*17, 23, 25*  30:9, *11*  39:7
reserve  264:*14*  318:*10*
reserving  292:*14*
reside  298:*11*
resource  56:*4*
resources  131:*24*  133:*3*
respect  25:8  26:7  34:*3*  36:*3*  57:7  99:22  100:*17*  118:*25*  171:*1*  208:*18*  209:*10*  228:24  229:4  270:*20*
respecting  146:*19*
respond  40:*3*  124:5  146:*15*  176:6
responded  15:*23*  38:*1*  56:2  189:*16*  269:*17*  277:6  306:*13, 18*  308:7, *10, 16*
responding  29:*15*  277:22
Response  9:*12*  51:*1*  99:*4*  120:*10*  121:*1*  139:*4, 9*  142:*16*  145:*11*  146:*13, 19, 20*  147:*6*  149:*14*  251:*10*  259:*3*
responsibilities  21:*11*  295:*13*
responsibility  24:*16*  71:*9*  72:*10*  81:2, *8*  111:*23*  172:*13*  173:*17*  174:*4*  296:*8*  300:5
responsible  23:*3*  178:7  211:*21*  289:*10, 12, 16*  296:*15*  302:9
responsive  45:*17*

301:*3*
rest  65:*1*  280:*21*
Restarted  170:2
restate  161:*11*
restricted  227:*16*
Restriction  4:5, *17*  7:*14*  107:*11, 13*  223:*14, 24*  224:2, *8, 9, 12, 14, 17, 20, 22*  225:4, *7, 15, 18, 20, 21, 24, 25*  226:2, *5, 14, 18*  227:*18, 24*  306:5, *10, 12, 21*
restrictions  224:5  228:*20*
result  41:*12*
resulting  160:*10, 25*  161:6, *13*
results  134:*15*
resume  315:*21*
resumed  166:*21*
retain  34:*20, 22, 25*
retained  32:*19, 23, 24*  33:*1*  34:*19*  136:*13*  143:*19*  144:*11, 16*  187:*4*
retention  143:*25*
retired  21:*1, 4*  164:*11*  281:*17*  293:*22*  298:*9*
retreading  214:*8*
return  191:22
returned  283:6  321:22, *23*
review  23:9  43:*3, 7, 15, 18, 25*  45:8, *24*  46:2  47:2  70:*24*  89:*18*  152:5  155:*16*  186:7, *8*  270:22  271:2, *20*  273:*16*  274:5  278:5, *6*
reviewed  89:*19*  170:*14*  172:*10*  173:7, *10*  177:*1*  221:5  252:25  283:*3*  284:*24*
reviewing  210:*15*  268:5, *7*
reviews  258:*17*
right  12:9, *12*  17:*21*  18:*19*  19:*1, 3, 10, 11,*

17, 20, 21  20:2, 21, 24 21:16  22:20  24:1, 3, 13, 17, 20  26:24 27:12  28:9  30:6, 24 31:1  32:15, 21  34:2, 5, 11  35:9  40:15 41:5  42:13, 22  43:9, 16  45:6  46:18  50:19 51:2, 7, 17  55:21 56:10, 14, 18  57:6, 8, 9, 17  58:20  64:8 67:9, 25  68:11, 16 70:12, 18  71:12, 18, 24  73:2, 6, 13, 18 74:20  77:6  78:1, 4 80:24  81:22  83:10, 23  84:17  86:8, 12, 20 87:11, 19, 25  88:2, 3, 11, 14, 22  89:15  90:7 91:7  92:2, 8, 11, 14 95:12, 20, 23  96:13 98:4, 23  101:17 103:12, 17  104:6 105:11  107:19 108:15  109:21, 24 110:6, 17, 19  111:16, 20, 25  112:9, 21, 22, 23, 25  115:24  117:1, 2, 6, 7  118:19, 22 119:4, 7, 17  120:21 121:18, 25  122:16, 19, 24  123:4, 21  124:10, 11  125:2, 5  126:17, 22, 23  127:23  128:10 129:12, 20  130:2, 16 131:6, 21  132:10 133:4, 20  135:24 136:3, 7, 15, 17 138:18  139:10  140:2, 20, 21  142:21  143:1, 13, 22  144:1, 3, 4, 14, 19  145:12, 22  146:1, 17  147:17  149:21 151:19, 20  152:25 154:16, 22  155:13, 17 157:5  158:12  159:19 161:15  163:4, 17, 24 164:5  165:2, 8, 11 166:11, 22  167:2, 13, 19, 22  168:5  169:11,

15, 24  173:3, 24 174:12  176:7  178:17, 22  179:2, 5, 11, 16, 18, 22  180:22  181:5, 19, 24  182:24  183:6, 21, 25  185:11  186:1 187:17, 23  188:7, 9 189:8, 17, 25  190:7 191:1, 8, 19  193:13 194:11, 14, 16  195:5, 19  196:8, 18  197:12 199:20  202:1, 23 203:7, 13, 17, 23 204:19  205:17, 20, 23 206:4, 15  208:5 209:17  211:23  212:3, 6, 10, 12  217:5, 12, 20 218:6, 20, 24  223:5 224:22, 24  225:5, 12 226:15  227:20 229:20  231:16 232:13, 15, 21  234:23 236:9  238:4, 14 239:6, 16, 19  241:13 242:14  243:5  245:17, 22, 23  247:3  248:23 249:18  253:2  258:3, 5, 14  259:4, 7  263:5 264:1, 4, 6, 7  265:17 266:6, 23  267:17, 21 269:9  270:17  272:2, 7, 21  273:5, 6, 14, 16, 19  274:2, 9, 17, 20 275:3, 11, 12, 17 276:1  277:3, 24 280:2  282:13  283:7 284:9  285:20  286:7, 13  287:23  288:13 289:20  303:21  310:6 311:8  313:7, 19 314:1, 7  316:13, 15 318:1, 2, 15
**rights**  114:3  292:15 318:10
**ring**  6:11  162:22 163:3  164:1
**risks**  133:20, 24
**ROBBINS**  2:5, 18 10:8
**Rock**  293:2, 3

**role**  197:2  216:8 222:1  305:3
**roles**  295:10  296:6
**room**  10:14  12:5
**Rosen**  32:20  62:13 300:15
**row**  99:16
**RPR-CRR**  1:13 322:12
**RUDMAN**  2:5  10:8
**rule**  78:4, 6, 8  82:25
**Rules**  1:15  11:5
**run**  35:21  80:11, 21 178:6  179:16  182:1, 9  187:12  311:21 312:11

**< S >**
**Sabastian**  3:18  4:11 6:10  8:18, 22  9:3 49:19, 22  55:12, 16 109:3  162:15  163:15 165:3  194:2, 6, 12 207:23  208:4  213:23 265:24  269:22 272:18  274:19, 20 275:13  276:19, 20 307:17  314:2  315:5, 9
**Sachs**  134:9  136:9, 25  201:15  202:6, 11
**safe**  297:17
**sale**  150:8, 19 152:24  156:1, 19 194:3  195:15  196:2, 16  197:11  198:11 200:23  215:4, 9, 10
**sales**  294:8  295:12 296:16
**Sam**  7:5  201:9
**San**  62:12
**sanity**  269:23  270:19 271:13, 17  277:5
**saved**  206:1
**Savitt**  64:1, 2
**saw**  93:8  122:10, 14 125:1  132:2  133:1 138:18  148:19 150:24  195:23 201:24  209:12  220:3

237:22  275:5  299:24 303:3  306:4
**saying**  28:2, 3  35:18 39:6  41:6  57:8 61:19  75:21  89:10 95:2  97:11  104:24 113:5  119:7  127:22 138:21  140:12 143:13  151:16 162:22  163:3  176:13 177:14  181:4, 17, 19, 21  188:8, 25  190:25 193:4  194:21  195:9 196:7  199:2  206:7, 17  217:10, 11  221:18 227:6  229:21  238:14 241:16  245:22 246:17  247:13 250:13  253:12  255:7, 10  256:12, 22  264:4 265:2  276:2
**says**  20:13  30:24 36:5  43:2  45:19, 24 46:14  50:19  77:17 79:12, 13  86:13  87:3 88:3  89:12, 16, 17 90:20  94:8  101:3, 10 106:6  107:2  111:25 115:17  119:19  120:8 129:20  132:11, 17 138:12, 14  140:19 149:14, 22  150:5 160:19  163:22  167:7 190:13  194:17  195:3, 22  196:9, 11  198:10 206:5  232:17  233:12 234:7  235:4  237:14 238:7  239:4  248:9 257:4  263:18  264:20 270:12, 15, 18  277:13 313:21  314:8
**Scenario**  9:12  236:21
**scenarios**  248:11, 14 249:10, 18  250:19 251:1, 13
**scheduled**  147:7, 16 313:5
**school**  18:21  293:5 294:5, 6, 11  295:18,

Deposition of Eddie Dixon

In Re National Instruments Corporation Securities Litigation

*21*

**scope**  27:*15*  41:*4*

**screen**  30:*23*  36:*5*  42:*24*  70:*12*  78:*4*  128:*11*  223:*9*  301:*9, 15*

**scroll**  28:*23*  30:*22*  42:*19*  49:*15*  56:*1*  57:*18*  66:*2*  70:*13, 25*  76:*23*  85:*6*  87:*23*  167:*7, 23*  169:*25*  179:*17*  181:*8*  188:*20*  189:*7*  245:*6*  266:*2*  269:*17, 19*  272:*12*  274:*14, 17*  277:*2*  279:*19*  280:*5, 7, 9*

**scrolling**  194:*10*

**Sean**  4:*2*

**SEC**  23:*3, 13*  178:*9*

**Sechrest**  294:*20*

**second**  28:*23, 25*  31:*2*  73:*14*  83:*13*  106:*5*  178:*13*  180:*11*  217:*2*  243:*23*  277:*7*  307:*20*  309:*13*

**seconds**  222:*20*

**Section**  77:*17*  82:*18*  170:*14*  253:*14*  309:*25*

**SECURITIES**  1:*4*  22:*21, 25*  23:*1, 12, 22*  72:*19*  73:*12*  74:*4, 7*  296:*9, 20*  302:*9*  321:*3*

**see**  3:*24*  13:*22*  15:*13*  21:*6*  29:*7, 9, 11*  30:*22*  31:*1, 5*  33:*13*  36:*25*  37:*7*  38:*14*  42:*1, 5, 7, 16, 19, 25*  43:*4, 18*  44:*21*  45:*25*  49:*20*  50:*5, 9*  55:*15, 16*  56:*7, 11, 21, 22, 24*  62:*20, 25*  63:*1, 6*  64:*20, 24, 25*  65:*6, 13, 20, 25*  66:*3, 7*  70:*12*  71:*1, 22*  72:*3*  73:*2, 20, 25*  74:*8*  76:*10, 17, 21*  77:*3, 16*  78:*5, 11*  83:*4, 12, 17*  85:*6*  86:*15*  87:*21, 22*

88:*20*  89:*3, 4, 8, 21, 23*  90:*5, 13*  92:*19*  99:*17, 24, 25*  101:*3, 5, 8, 12*  102:*3, 18*  103:*10, 16, 21*  105:*21*  106:*5, 12*  109:*8, 15, 18, 24*  110:*1, 2, 7, 11*  111:*3*  112:*2*  113:*14*  116:*14*  119:*13*  120:*11*  122:*24*  124:*14, 16, 23*  126:*6, 11*  128:*24*  129:*4, 8, 20, 24*  130:*6, 9*  131:*13, 16, 19, 25*  132:*6, 23, 24*  134:*9, 10*  136:*11*  137:*24*  138:*1, 16*  139:*1, 19*  140:*5*  141:*7, 11, 14, 16*  142:*18, 21*  143:*2, 3, 9, 20*  145:*17*  146:*23*  148:*6, 10*  149:*4, 11, 17, 25*  150:*5, 10, 11*  152:*16*  153:*22*  154:*2*  155:*23*  156:*2*  157:*21*  158:*5, 7, 10*  159:*13*  160:*12, 13, 17*  162:*24*  164:*4*  165:*25*  166:*17*  167:*24*  169:*25*  170:*12, 15, 23*  171:*21, 23*  172:*4, 16, 17, 20, 23, 24*  177:*18*  188:*16, 21*  189:*5, 10, 11*  194:*1, 4*  195:*9, 12*  196:*14, 15*  197:*25*  201:*12, 18, 22*  202:*11*  207:*5*  210:*4*  211:*10*  218:*16*  222:*24*  223:*9, 15, 25*  225:*17*  228:*16*  229:*24*  231:*17, 21*  232:*7*  233:*1, 15, 17, 19*  234:*5, 17, 19*  235:*9*  237:*11, 14, 17, 20*  238:*7, 23*  240:*3, 13*  242:*19*  244:*2*  245:*6, 7, 10*  246:*22*  248:*12*  253:*6, 18, 19*  254:*2, 5, 12*  255:*5, 25*  263:*16, 17, 22*  264:*22, 25*  266:*15*  267:*19*

269:*5, 11, 15*  270:*1, 13*  272:*13, 15, 20*  274:*24*  275:*2*  277:*11, 12, 18*  279:*18, 19, 21*  280:*6, 10, 13*  284:*10, 12*  302:*15, 16*  307:*12, 15, 22*  309:*23*  313:*2, 11, 16*  314:*13*  315:*7*  318:*12*

**seeing**  148:*17*  193:*3*  253:*23*

**seek**  37:*23*  78:*17, 18*  80:*23*  106:*7*

**seeking**  179:*11*  183:*9*  220:*12*

**seen**  42:*15*  63:*21*  91:*23*  158:*2*  178:*4*  227:*19*  253:*1*  274:*21*  275:*14*  276:*16*  283:*14*

**sees**  63:*9*

**selected**  291:*5*

**self-evident**  224:*8*

**sell**  73:*11*  74:*3*  111:*8, 14*  241:*19*  244:*16*  246:*24*

**selling**  53:*3, 4, 5*  114:*19*  119:*6*  134:*2*  176:*10*  180:*7*  196:*6*  242:*17*  249:*7*  294:*9*  297:*25*  298:*7, 19*  303:*10*  304:*6*

**send**  46:*3*  127:*22*  223:*7*  227:*18*  228:*14, 21*  279:*7, 25*  301:*16*

**sending**  51:*13*  87:*1*  269:*22*  280:*8, 15*  281:*8*

**sends**  232:*15*

**senior**  197:*3*

**sense**  76:*5*  114:*16*  127:*5*  148:*16*  155:*5*  190:*14, 16*  230:*20*  254:*13*

**sensitive**  103:*7*  104:*18*  164:*22*  165:*11, 17, 20*  210:*8*

**Sent**  4:*21*  38:*5, 10*  46:*13*  50:*16*  119:*7*  121:*4*  162:*17, 19, 20*

176:*13*  181:*3, 15*  190:*24*  195:*6*  206:*2*  213:*22*  220:*3, 7*  221:*17, 18*  222:*20, 22*  223:*5*  224:*20*  230:*7*  241:*23*  245:*21*  246:*21*  255:*21*  270:*11*  279:*23*  280:*6, 11*  309:*12*  310:*21*  314:*10, 22*

**sentence**  31:*2*  50:*7*  73:*14*  76:*11*  160:*6*  197:*21*  198:*1*  228:*12*

**sentences**  277:*7*  307:*20*

**separate**  35:*5*  36:*19*

**September**  8:*11*  165:*23*  211:*5*  237:*9*  239:*22*  241:*10*  244:*22*  245:*20*

**serious**  71:*11*  178:*5*  243:*3, 16*

**seriously**  125:*4*  192:*2*

**served**  20:*17*  37:*19, 22*  321:*15*

**serves**  72:*1*

**service**  214:*15*  290:*22*  291:*4, 6*

**services**  21:*24*  22:*13*  24:*6, 22*  25:*8*  26:*3, 16, 21*  27:*11*  31:*15*  32:*21*  34:*9, 16*  35:*8, 10, 12*  214:*22*  215:*1, 17, 23*  216:*5, 25*

**Session**  8:*7*  245:*7*  248:*6*

**set**  212:*10, 14, 22*  227:*16*  272:*19*  291:*1*  297:*15*  314:*5*

**seven**  279:*1*

**seventh**  91:*14*

**shaded**  141:*14, 22*  142:*9*

**Shame**  226:*11*

**share**  31:*22*  87:*22*  88:*2, 10*  106:*9, 14, 19, 21*  129:*22*  130:*6*  131:*12*  151:*2*  172:*17*  174:*25*  175:*6*  176:*10*  221:*14*  222:*4*  223:*20*

Deposition of Eddie Dixon

In Re National Instruments Corporation Securities Litigation

236:6  241:14, 18, 19  244:13  249:7  272:19  299:3  301:8, 15, 19  308:9, 17, 22  309:1, 3, 21  315:15, 21, 22

**shared**  153:20  154:6

**shareholders**  90:2  143:7, 16  156:14  191:19  201:21  203:20, 23, 25  204:1  211:2  212:19  213:9  214:4  219:25  237:24  300:6, 7, 21

**shares**  33:3, 5  93:11  94:2  95:23  96:17  97:1, 6  105:14, 17  129:22  201:16  202:1, 6, 19, 22  203:13, 16  204:8, 14, 19, 22, 23  205:17  206:8, 22  218:5, 12, 22  219:14  230:17  231:7, 22  232:6  236:20  237:16  238:3, 13, 20  239:2  242:17  243:2, 15  316:14, 19

**sharing**  67:12

**Shawn**  63:12  313:24

**sheet**  106:10  109:7

**short**  125:20  199:21, 24  252:4

**shorthand**  126:22  321:5

**shortly**  34:10, 12  300:3

**short-term-oriented**  106:9, 16, 25

**show**  47:11  58:1  108:17  118:7  279:22  280:4, 24, 25  281:1  285:9

**showed**  126:20  227:20

**showing**  91:25  142:7  164:9  172:7  192:10  202:9  279:12  302:17

**shown**  213:12  321:16

**shows**  60:6  123:11  128:19  131:4  162:20

**sic**  139:17  146:19  265:11  268:19

**side**  112:10  172:17  294:9

**sign**  56:22  90:4  291:6  318:14

**signal**  243:3, 16

**SIGNATURE**  3:9  320:3, 5  321:19, 22, 24

**significant**  77:1, 18, 20, 21  83:14  90:2  129:22  133:19, 23  140:3, 10, 15  145:5  231:18  241:1

**significantly**  74:4  299:25

**signing**  88:25  132:21

**similar**  111:1  122:9, 14  124:25

**Simple**  9:8  145:21  265:15

**simply**  38:9  130:20  146:9  230:14  250:10

**Simultaneous**  13:17  15:15  22:11  62:2  112:7  119:3  129:13  137:13  156:21  181:11  226:9  243:9  247:22  260:3  262:2  304:1

**single-function**  298:6

**sir**  128:15  135:17  317:21

**sit**  30:13

**sitting**  26:1  30:3  36:5  63:16  146:3  262:15

**situation**  111:23  121:11  177:17, 21  178:21  184:10  207:24  215:8  246:19  305:15, 24  315:6

**situations**  99:22  100:6

**six**  89:2  245:22  278:25  297:9

**size**  42:3  215:18

**slide**  6:7  8:15  91:22, 24, 25  96:16, 23  98:10, 17  105:20  106:18, 21  114:2  116:16, 18  117:8, 9, 12, 20  118:2, 12, 17  119:10, 15, 25  120:1, 6  122:9, 12  125:2  172:5, 10  173:4  196:4  253:13  261:5

**slides**  91:6, 8, 9, 10  121:9  126:20

**slightly**  277:2

**slot**  253:5

**small**  61:23  129:10, 11  248:16  296:12

**smaller**  62:1

**smart**  231:4

**smiley**  274:23  275:15  276:17

**software**  297:21

**sold**  33:4  111:17  112:4  113:11  308:23

**sole**  93:18

**solicited**  298:22

**Somebody**  227:9  262:12

**somebody's**  198:20

**someone's**  282:15

**somewhat**  83:7

**Sonsini**  22:24  23:6, 9, 15  26:13, 22  27:1, 4, 10, 14  31:14

**soon**  145:21  150:7, 18  152:23  155:25  156:18  318:12

**sorry**  30:19  41:12  43:11, 13  50:13  71:3  77:16  81:13  87:22  116:17  120:13  128:13, 14  132:14  140:23  149:13  165:23  181:9, 12  188:22  190:25  199:15  205:4  235:2  256:24  265:8  302:25

**sort**  21:8  198:23  265:15  267:15  286:2  296:10  304:7

**sorts**  31:10

**sought**  212:8

**sound**  68:11  173:24

**Sounds**  37:7

**South**  1:14

**SOUTHERN**  1:1  30:25  321:1

**Souza**  41:25

**space**  144:25

**Spain**  15:24

**span**  238:18

**speak**  101:25  114:23  235:13, 16

**speaking**  13:17  15:15  22:11  62:2  112:7  119:3  129:13  137:13  156:21  181:11  226:9  243:9  247:22  260:3  262:2  304:1

**speaks**  44:3  45:12, 15  46:10  100:21  137:3  153:5  183:23  184:20  220:19  235:17

**Special**  8:10  29:3

**specific**  58:4  78:19  88:4, 5  94:22  99:1  132:9  209:8  210:21  211:16

**specifically**  24:25  26:10  51:20  106:20  107:14  146:12  148:21  235:4  309:24

**specify**  303:17

**spectrum**  91:25  97:7  122:11

**speculate**  89:12  97:14  122:7  134:23  138:4  180:2  204:23  260:1, 6  262:11  285:7  286:20  289:24

**speculated**  243:14  244:9

**speculating**  206:13

**speculation**  32:7  45:12  46:20  47:6

59:9  61:5, 12  63:8
66:12, 18  68:5, 18
69:10  79:20  80:6
110:21  113:17
115:12  120:23
134:20  136:1  141:25
150:21  151:6, 22
152:14  153:6  163:6
174:2  192:15  195:21
196:20  197:17  198:3
204:12  212:16  233:7
234:4, 13  235:12, 15,
24  236:11  238:6
242:8  243:2, 7, 18, 23,
24  244:4  248:25
251:20  256:8  257:3,
7, 17, 18, 19  258:7, 16
260:5  261:16  262:10
270:7  283:21
**speed**  246:10  247:24
251:25
**spend**  58:6  211:24
**spent**  239:1  295:6
**spin-offs**  106:10
**spoke**  13:9  15:13, 18
85:13  239:25
**spoken**  13:7, 10
14:12
**St**  2:13
**stage**  157:2
**stale**  77:14  180:8
182:17  183:20  184:3,
16, 25  185:16  312:3
**stand**  302:14
**standard**  146:21
291:9
**standards**  291:7
**stands**  114:7
**stark**  307:1
**Starkloff**  4:9  5:1, 7,
13, 20  6:3  14:7, 13
85:1, 5, 12, 13, 23
117:13, 19, 22  118:4,
11  128:20, 23  139:17
141:2  145:20  148:4,
7  149:3, 7, 12, 13
153:17  154:6  155:2
157:20  158:22  188:2,
17, 23  239:15  272:14
275:2, 10  276:15

280:25  287:11  288:6
313:14
**Starkoff**  5:16
**start**  202:14  309:21
313:5
**started**  19:6  167:3, 5
294:22  316:14
**starting**  166:15
303:12  305:25
**starts**  277:3
**State**  1:13  72:18
96:21  115:25  122:23
134:3  146:20  173:12
254:24  279:10  289:1
321:7
**stated**  1:15  58:3
76:24  78:24  90:14
120:6  124:4  125:14
152:3  158:15  159:1
168:4, 16  173:4
183:25  185:7  224:21
248:19  256:9  270:9
271:1  278:4
**statement**  72:18, 22
74:10  114:5  236:19
254:22, 25  255:6, 8
260:14, 23  261:4
269:12  270:4, 15
**statements**  133:1
233:24  253:16
**STATES**  1:1  3:13,
14  28:21  43:3  65:8
68:8  70:25  71:25
77:25  78:8  88:12, 17,
24  89:24  93:5  95:15
101:25  110:9  123:15,
17  124:5  134:10
145:23  146:18
170:17  179:23
201:14  236:18
237:19  238:21
257:14  313:8  321:1
**stating**  45:9
**status**  178:12  246:20
**stay**  246:9, 10
247:24  294:18
**stayed**  130:14
**STENOGRAPHER**
28:13
**stenotype**  1:14

**step**  92:16, 21  93:4,
9, 25  94:1  96:11, 15
97:6, 13, 18  122:16
123:12, 17
**steps**  92:1  94:4
145:16  220:24
**stock**  88:1  92:17, 23
93:5  95:15  96:12
101:11, 16  123:13, 18
124:6, 10  130:5
150:6, 17, 24  151:4, 9,
12, 17  152:20, 22
155:24  156:17
160:10, 25  161:6, 13
164:3, 16  165:2, 8
174:21  177:17
181:22  203:6  230:5
231:5, 24  232:3
299:12, 17  316:15
317:13
**stock's**  254:15
**stop**  42:22  44:6
45:2  67:17  108:20
198:13  260:17, 21
301:21
**straight**  267:20  268:9
**strategic**  65:10
137:23  138:8, 12
152:18  192:4  213:11
299:7  308:24
**strategically**  299:21
**strategy**  106:10
121:5  170:19, 21
171:5, 22, 25  172:11,
15  197:4  263:19
264:5, 14, 16, 21, 24
**Street**  322:13
**string**  159:21  220:22
311:24
**strong**  98:5, 11, 18
99:16, 19  100:17
307:1
**structure**  3:19  50:2,
8, 12, 15  51:3, 10, 12,
16, 19, 21, 24  52:1, 2
54:19  88:5  213:13,
20
**structured**  52:6
**study**  233:25  234:1,
2, 6, 8, 10, 24  235:4, 7

**stuff**  36:11  61:18
84:3  284:8
**styled**  1:12
**Subject**  3:16, 19, 23
4:5, 6, 12, 16, 20, 24
5:2, 7, 13, 16, 20  6:4,
7, 10, 18, 21  7:3, 6, 9,
12, 17, 20  8:3, 7, 15,
18, 23  9:4, 8, 11, 15
32:10  42:8, 16  68:19
69:14, 15, 18  83:21
89:6, 14, 15  104:21
115:17, 23  134:4
148:4  313:9  314:24
**submitted**  84:15
**subsection**  73:17
**subsequent**  50:7
**subsequently**  87:14
**subset**  96:21
**substance**  41:8
96:10  103:7  104:18
218:18
**substantial**  66:21
67:6  86:6  132:13, 16
**substantially**  73:10
74:2
**substantive**  90:1
**substantively**  41:15
**suburb**  293:2
**success**  48:3  50:8
51:10, 16, 21, 25  52:2,
8, 11, 15, 18  53:1, 4
212:13  214:8, 14
**successful**  54:24
**suggest**  114:20
153:18  169:19
192:18  253:14
**suggested**  143:11, 15
196:12  197:23
254:20
**suggesting**  143:5, 11,
12  198:19  254:8
261:7  266:20
**suggestions**  141:4
**suggestive**  160:16
**suggests**  143:6
285:11
**Suite**  2:5, 12  322:13
**summarize**  12:14
17:7

**summarized** 16:*19* 17:*4* 18:*4, 9*
**summarizing** 235:*1*
**summary** 6:*7* 16:*22* 83:*7* 170:*18* 233:*19* 234:*2, 7, 9, 14, 18, 19, 22, 24* 235:*3, 4, 7* 236:*4*
**Summer** 2:*18*
**Superior** 62:*11*
**supplied** 287:*19*
**Supply** 170:*11*
**support** 89:*20* 277:*9, 16* 296:*18*
**supported** 250:*23* 251:*5*
**supposed** 91:*17* 94:*25* 292:*1*
**Supreme** 74:*24*
**Sure** 23:*17* 25:*14* 29:*6* 35:*22* 36:*14, 16* 47:*16* 54:*13* 55:*25* 56:*3* 57:*5* 59:*12* 61:*20* 70:*4, 24* 79:*23* 86:*5* 87:*8* 88:*21* 91:*23* 100:*10* 101:*13* 104:*8, 11* 108:*13* 113:*24* 114:*25* 116:*14, 22* 119:*14* 127:*9* 128:*8* 139:*2* 158:*23* 161:*18, 22* 163:*10* 175:*25* 178:*11* 190:*19* 196:*25* 219:*23* 220:*9* 228:*1* 229:*25* 230:*3, 10* 249:*3* 257:*19* 262:*23* 266:*17* 269:*23* 273:*7* 275:*7, 9* 278:*12, 19* 280:*3* 281:*10* 282:*14* 287:*3* 290:*5, 24* 291:*24* 293:*6* 301:*21* 311:*19*
**surely** 80:*23*
**surprise** 163:*14* 246:*12* 260:*12* 261:*14, 19*
**surrounding** 114:*17*
**surveillance** 229:*19* 230:*2, 15, 22* 231:*21*

**suspect** 15:*1* 25:*13* 110:*15* 213:*23, 24* 228:*6*
**swear** 10:*6*
**switch** 83:*24*
**sworn** 1:*12* 10:*17* 321:*9*

**< T >**
**Tab** 30:*20* 41:*17* 62:*8* 69:*19* 84:*21* 90:*23* 107:*4* 108:*23* 128:*12* 147:*23* 157:*16* 171:*12* 278:*22*
**tactic** 57:*21*
**tactics** 98:*3*
**take** 10:*25* 32:*1* 36:*9, 13, 14* 39:*10* 42:*18* 48:*10* 57:*12* 74:*13* 80:*10* 83:*24* 92:*2* 104:*3* 106:*7* 119:*16* 123:*9* 125:*20* 145:*3* 161:*20* 177:*2* 199:*4, 12, 21, 25* 206:*2* 252:*4* 280:*20* 282:*1, 7* 290:*3, 11* 294:*15* 296:*24* 299:*16* 311:*15*
**taken** 1:*12* 40:*23, 25* 104:*2* 220:*24* 248:*17* 281:*20, 22* 295:*3* 321:*5* 322:*5*
**Takeover** 4:*13* 98:*3* 101:*4, 15*
**takes** 146:*22*
**talk** 11:*11* 15:*16, 21* 113:*8* 127:*8* 161:*2* 162:*19* 193:*1* 207:*21* 214:*2* 221:*1* 255:*15* 257:*23* 292:*24* 294:*4*
**talked** 14:*9, 10* 16:*2* 47:*25* 48:*6* 59:*22* 94:*13* 148:*22* 194:*18* 228:*8* 293:*11*
**talking** 66:*19* 106:*17* 123:*20, 24* 124:*10* 126:*15* 127:*19* 129:*18* 135:*8* 143:*23* 160:*2* 163:*12* 186:*25*

188:*18, 23* 196:*11* 197:*22* 198:*18, 21* 204:*3* 213:*3, 15* 220:*10, 15, 20* 227:*14* 250:*8* 255:*1* 257:*5* 267:*23* 276:*21* 283:*22* 284:*8* 290:*17* 304:*15*
**TAMARA** 1:*13* 321:*5* 322:*12*
**target** 98:*24* 99:*17, 21, 22*
**targeting** 60:*24*
**team** 10:*9* 104:*12* 154:*11* 195:*10, 18* 203:*1* 259:*23* 287:*1* 288:*5* 290:*5* 295:*23* 296:*11* 300:*22* 305:*10, 16* 306:*3* 318:*1*
**teammates** 25:*5*
**Teams** 313:*1*
**technical** 82:*9* 302:*21, 24* 303:*6*
**Technician** 2:*18*
**techniques** 94:*9*
**Technologies** 295:*3* 297:*13*
**technology** 19:*7, 8* 254:*23* 294:*24*
**tell** 20:*12* 25:*12* 27:*7* 32:*24* 33:*10, 12* 37:*3* 54:*12* 55:*2* 68:*7* 118:*8* 174:*20* 175:*19* 190:*11* 192:*13* 211:*12* 214:*12* 219:*18* 227:*14* 237:*4* 240:*6* 248:*3* 252:*1* 263:*1* 276:*22* 290:*24*
**telling** 47:*4* 79:*7, 8, 11* 118:*2* 152:*19* 159:*2* 198:*12* 203:*3* 207:*19* 248:*5* 250:*25* 262:*20, 23*
**ten** 37:*6* 222:*23* 223:*1, 7* 234:*25* 235:*7*
**tender** 77:*19*

**term** 21:*6* 58:*19* 110:*15* 265:*2* 302:*20, 24* 303:*7* 304:*19* 305:*2*
**terms** 21:*8, 18* 82:*24, 25* 130:*16* 214:*15* 216:*24* 265:*15* 303:*23* 305:*4*
**test** 136:*22* 297:*11, 16, 22*
**testified** 10:*17* 11:*1* 61:*16*
**testify** 17:*15* 41:*8* 211:*8* 260:*25* 261:*1, 3*
**testifying** 66:*25* 79:*9* 95:*1* 146:*11* 260:*17* 284:*19*
**testimony** 14:*20* 16:*19* 17:*3* 18:*3* 138:*9* 163:*16* 193:*10* 200:*18* 204:*17* 248:*4* 251:*8* 267:*7* 275:*24* 285:*22* 286:*15* 321:*11*
**Texas** 1:*13, 14* 18:*23* 293:*9, 14* 298:*12* 321:*7*
**text** 13:*12* 102:*15* 105:*1* 278:*9, 15, 16* 279:*2, 5, 7, 9, 23, 25* 280:*4, 6, 8, 10, 15, 21, 22* 281:*6, 8* 288:*19* 289:*5*
**texted** 13:*10* 14:*2* 280:*23, 24, 25* 281:*1, 2, 3*
**texter** 278:*18*
**texting** 279:*16* 287:*5, 11*
**texts** 16:*9* 103:*9, 12, 18* 104:*20* 124:*18* 279:*14, 18*
**Thank** 28:*18* 31:*8* 32:*17* 85:*10, 25* 127:*6, 16* 148:*1* 154:*23* 161:*19* 162:*12* 188:*14* 245:*1* 268:*24* 292:*13, 16, 17*

310:*11*  314:*21*  318:*7, 10, 11*
**Thanks**  128:*16*  237:7  252:8  269:*21*  318:*12*
**thereabouts**  20:*11*
**therefor**  321:*25*
**thing**  14:*2*  166:*17*  178:*5*  187:*14*  191:*19*  230:*19*  234:*9*  236:*1*  246:*11*  254:*23*  258:*20*  260:*15*  271:22
**things**  11:*10, 13*  13:*11*  23:5  36:*4*  53:2  54:*15*  101:*10*  112:*19*  118:2  124:*16*  141:5  146:*1*  157:*25*  164:*22*  165:*4, 11, 17, 20*  202:*20*  205:*24, 25*  231:*12*  256:*12*  267:*24*  271:*3*  275:22  278:7
**think**  10:*10*  16:*11, 15*  18:*15, 16*  21:*12*  23:*14*  26:*15*  27:*14, 20*  31:*2, 18*  36:*4*  37:5  38:*8, 12, 19, 22*  39:*23*  49:*11*  52:*12, 13*  57:*16*  58:*13*  61:*25*  64:5  67:*3, 4, 19*  75:*16*  78:*9*  91:*19*  94:*19*  98:*9, 17*  107:*21*  109:6  126:*25*  133:*23*  148:*20*  153:*8, 25*  154:*20*  161:*2*  162:*9*  180:*8, 12*  181:*12*  182:*16*  184:*14*  185:*19*  193:*22*  198:7  206:*24*  222:*11*  229:*9*  230:*6*  235:*14*  240:*18*  248:*16*  255:7  256:*11*  259:*22*  264:*17*  266:*12*  276:*18*  277:*13*  290:2  293:*19*  298:8  302:*20*  303:*19*  304:*9*  312:2  313:*21*
**thinking**  103:*8*  104:*19*  151:*24*

153:*17*  164:*11*  175:*8*  180:*3*  185:*23*  196:*13, 17*  197:*12, 19, 24*  198:*11, 17, 20*
**third**  103:*20*  143:2  148:*24*  172:*21*  173:*2, 15, 24, 25*  174:*22*  175:*1*  211:*14*  238:*20*  243:*1*
**thought**  20:*10*  195:*4*  216:*22*  220:*6*  246:*21*  247:*17*  259:*10, 11*  260:7  266:*16*  300:*8*  305:*11*
**thoughts**  67:*12*  195:*10, 19*  196:7
**thousands**  288:*1*
**threaten**  99:*12*
**threatening**  99:*8*  149:*20*
**three**  33:*16*  111:*10*  117:*5, 6*  118:*18*  149:*9*  158:*1*  163:*12, 13*  168:*22*  172:*3*  175:*21*  188:7  189:*17*  190:*10, 25*  261:*18*  278:*25*  279:*11*  300:*19*  315:*20*  317:*25*
**three-minute**  290:*11*
**threw**  299:*11*
**thrown**  299:*19*
**thumb**  78:*5, 6, 8*  82:*25*
**thumbs-up**  259:*3*  262:*15*
**Thursday**  1:*12*
**Tied**  307:*21*
**time**  10:*3*  15:8  19:*9*  22:*14*  25:*1, 2, 20*  33:6  35:*15*  36:*9, 23*  37:*11, 14*  40:*5, 20*  46:*3*  49:*24*  51:*11, 15, 18*  52:*7, 17*  53:*16*  57:*21*  58:7  61:*15*  62:*18*  67:*8*  71:*6*  76:6  84:*5, 8*  85:*19, 23*  86:*4*  87:*14, 15, 19*  88:*14*  90:7  98:*20*  102:5  105:*11*  106:*3*

108:*1, 2, 12, 17*  111:*6, 12*  115:*3, 6*  122:*8*  123:2  127:*11, 14, 23*  131:*4, 12*  132:2  133:*13, 17*  138:*1, 18*  139:*3*  146:*1*  147:*1, 12*  150:*13*  151:*3*  155:*16*  159:*24*  160:*2*  161:*24*  162:*2*  173:*1*  178:*13*  189:*9, 15*  190:*16*  200:*6, 9*  204:*24*  210:*8*  211:*11*  212:*8, 13, 23*  214:*1*  224:*13*  226:*19*  230:*19, 24*  232:*3*  238:*19*  239:*5, 19*  240:*15, 16*  241:*1, 4, 20*  245:*20, 25*  246:*3*  248:*21*  249:*8, 9*  250:*13, 21*  251:*22*  252:*10, 13*  265:*16*  276:*10, 22*  282:*4*  283:*9*  284:*22*  290:*13, 16, 23*  292:*14*  293:*21*  294:*20*  295:*6, 20*  298:*11*  306:*18*  311:*7*  315:*16*  316:*1, 8*  318:*3, 6, 8, 11, 17*
**timeline**  33:*16, 24*
**timely**  99:*4*  139:*4, 9*  266:*10*  267:*2*
**times**  96:*8*  102:*13*  154:*10*  198:7
**timing**  50:*17*  88:*16, 22*  189:*20*  190:*14*  233:*8*  264:*18*  289:*14*  311:*15*
**timingwise**  111:*8*
**titles**  21:*13*
**today**  10:*21, 25*  12:*12*  13:*23*  17:*21*  26:*1*  30:*1, 10*  38:*18*  39:*16*  48:6  146:*4*  209:*13*  213:*12*  262:*15*  279:*3*  283:*15*  284:*9*  292:*22*  318:*8*
**Today's**  10:*2*
**toehold**  248:*17*  250:*20*  251:*14*

**told**  16:*8, 12*  17:*9, 13, 16, 17*  38:*25*  63:*14, 15, 16*  96:8  154:7  173:*22*  212:*5, 7*  215:*5, 16, 22*  226:*13*  259:*2, 6, 19*  261:*3*  262:*13, 22, 24, 25*  277:5  279:*5*  296:*25*
**tomorrow**  43:*2, 8*  46:*1*  228:*13*  286:*19*
**top**  50:*3, 20, 22, 25*  51:5  56:2  58:5  62:*20*  85:*6*  101:*25*  117:*1*  128:*22*  149:*14*  182:*15*  196:*10*  201:*21*  203:*22*  222:*15*  237:*24*  238:*17*  252:*22*  254:*24*  272:*12*  274:*12*  300:*19*  302:*1, 4*  311:*25*  314:6
**topic**  108:*14*  155:*12*  266:7  271:*20*  286:*20*
**topics**  169:*5*
**top-notch**  301:*3*
**toss**  246:*9*
**total**  35:*13*  66:*4*  74:*5, 15, 17, 21*  238:*21*
**totally**  36:*19*  125:*8*
**touch**  14:*6*  15:*6, 12, 23, 25*
**touched**  187:*12*
**trace**  293:*4*
**track**  41:*14*  310:*10*
**trade**  72:*19*
**traded**  12:*18*  21:*14*
**Trading**  4:*5, 6, 17*  7:*13*  12:*24*  13:*1*  26:8  69:*24*  70:*2, 9, 16*  71:*12, 20*  72:*8, 11, 15*  101:*11*  107:*12, 13*  186:6  209:*12, 15, 16*  224:*9, 23*  225:*8, 10, 25*  306:*5, 21, 24*
**training**  100:*5*  236:*22*
**transacting**  308:*22*

Deposition of Eddie Dixon                                    In Re National Instruments Corporation Securities Litigation

transaction  34:2, *4*
48:7  52:20  53:23
54:*1, 10*  59:25  65:10
67:5  68:10  75:4
76:3  84:12  88:4, *5*
89:*20*  99:*1*  104:6
131:24  133:3  138:16
187:5, *13*  194:14
196:18  197:6  204:10
214:*11, 18, 23*  215:2
216:23  233:24  246:5
247:*16, 17, 21*  281:5
305:1  309:14
transactions  66:16
transcript  321:*10, 23*
transcripts  13:5
16:*16*
transformation
130:*19*  150:22
152:*19*  156:13  157:1
192:4  299:8
transition  292:12
297:2
transitioned  294:23
transportation  297:23
treasurer  253:10
treat  78:*10, 25*  79:16
80:2  246:8
treated  78:16
treating  83:1
tried  15:*23*  163:22,
*24*
triggered  230:6
true  58:9  69:16
96:*18*  120:5  140:8
165:*14, 16*  168:6
184:23  185:3  192:22
207:7  210:16  217:16
241:22  246:1  278:3
283:25  285:4  288:21
320:5  321:11
trust  158:1
truthful  270:4
try  11:*13, 14*  41:*11,
14*  100:8  125:*10, 21*
306:19
trying  15:11  33:23
43:2  46:1  57:12
58:14  67:*14, 19, 20*
87:2  105:*12, 15*

130:*21*  133:15
151:25  152:17
184:21  215:15
256:23  299:16
301:21  307:24  309:9
Tuesday  148:9, *12*
155:11  181:3, *15*
310:21
turn  32:18  86:1, *2*
91:*13*  116:7  129:2
245:4  274:12
turned  283:4
twice  175:6  178:4,
*24*  180:4  182:2
190:22  191:25
193:16  240:25
241:17  243:20
Twitter  62:*16, 17, 18*
63:*17*
Two  6:7  27:9  33:11
41:24  86:19  91:20
101:2  109:23  116:24
144:6, *11*  158:8
166:*11, 13*  172:3
177:13  190:24  194:6
265:25  277:6  278:25
290:11  291:3  308:17
317:25
two-day  162:6
two-minute  290:4
two-page  58:13
type  51:18
typical  54:*12, 20*
61:22  62:19  105:10
107:11  109:7  171:19
typically  11:9  54:5,
*7*  55:1  61:*3, 8, 10, 25*
146:13  166:12  171:4
227:10  282:7  306:1


< U >
Uh-huh  24:*14, 18*
44:17  82:20  86:16
88:23  106:13  122:17
145:18  149:18
162:23  172:19  189:6
209:14  222:25
228:17  233:2, *16*
240:14  255:19
274:25  304:*17*  315:1

ultimate  81:2, *8*
182:14  216:16  300:5
ultimately  19:7  20:4
33:4  35:10  47:19
52:*10, 14, 18, 22*  53:6,
*19*  54:*19, 25*  59:24
68:2  79:14  99:12
107:21  162:5  173:14
176:4  185:5  210:19
214:9  215:2, *8*  216:7
255:3  264:14  265:9
272:5  281:17  288:9
293:12  294:23  295:7,
*10*  296:11  297:4
300:25  305:15
unable  261:13
262:16
unaffordable  242:18
unanswered  135:20
unattractive  160:9
161:15
uncommon  258:20
261:4
underlining  124:21
underlying  261:11
underneath  99:15
142:20
understand  12:*19, 23*
13:2  30:4  31:25
33:24  36:*1, 3*  38:21
39:*9, 11*  40:8  50:*4,
20*  51:*5, 14*  53:*6, 10*
59:5  60:3  71:9
78:*20, 23*  81:*19, 21*
82:*3, 16*  90:20  100:*1,
15*  117:3  118:1
121:21  130:20  133:*8,
16*  135:13  138:*3, 6*
139:*3, 7*  146:7
148:14  158:12
175:*20, 22, 25*  191:6
198:9  199:*7, 10, 14,
16*  225:9  230:13
253:*20, 25*  262:24
264:*7, 10*  265:5
273:*13, 15*
understanding  12:*15,
17*  37:*18, 21, 23*  54:7
61:*2, 9*  66:15  74:16
134:12  135:*1, 4, 14,*

*23*  161:12  177:20
190:8  249:22  265:4
283:24  285:17
299:10
Understood  33:7, *23*
34:13  35:7  48:*1, 14,
17*  50:1  51:15  90:15
92:13  96:15  100:5
112:*19, 23*  120:20
121:*12, 16, 19*  122:4
123:*3, 6*  133:17
143:17  155:20  156:8,
*11, 15*  161:11  176:11
179:7  180:21  182:23
183:1  184:24  191:22
199:18  211:12
230:21  240:15
241:20  259:23
266:25  284:7  285:3,
*12*
undervalued  150:25
239:8
undervaluing  299:25
uner  100:13
unfortunate  152:6
unfriendly  103:20
Unintelligible  62:3
64:12  114:14  119:1
226:10
uninterested  299:5
UNITED  1:1  3:*13,
14*  28:20  321:1
units  295:14
University  293:6, *9,
13*
unknown  244:1
unofficial  178:2
unrelated  270:24
unsolicited  93:17
107:15  186:14
190:*21*  193:15  197:9
210:22  241:24  246:8
247:*19, 23*  249:24
250:2  281:7  298:*22,
23*  300:8, *12, 17*
303:13  304:*5, 8, 13,
23*  306:8  308:23
untrue  66:10  238:9
263:5, *7*
unusual  276:8

**upcoming**  126:*6*  146:*15*  147:*15*  181:*20*  189:*4*, *24*  239:*18*  240:*7*
**Update**  7:*17*, *21*  9:*16*  170:*11*  228:*6*  230:*7*  240:*1*  313:*10*
**updates**  246:*13*, *15*, *18*
**upped**  299:*23*
**up-to-date**  291:*17*
**use**  21:*8*, *18*  22:20  26:*18*, *19*  56:*9*  57:*1*  67:*4*  74:*15*  82:*11*  104:*24*  113:*19*  172:*14*  194:*22*  206:*24*  250:*5*, *11*  278:*9*, *13*  279:*2*  287:*1*  304:*14*
**uses**  83:*9*  254:*21*
**usual**  182:*2*, *7*
**usually**  59:*6*
**utilize**  222:*2*
**utilized**  145:*2*  291:*8*

**< V >**
**Vaalos**  2:*4*
**vacuum**  114:*13*, *16*, *19*  194:*23*
**vague**  48:*23*  283:*21*
**valid**  77:*14*
**valuable**  231:*8*
**value**  53:*13*, *15*, *20*  90:*2*  106:*19*  129:*23*  130:*14*, *18*  156:*14*  213:*10*  214:*10*, *14*, *18*, *19*, *21*, *22*, *24*, *25*  215:*3*, *10*, *17*, *19*, *23*  216:*5*, *8*, *15*, *21*  299:*6*  300:*7*, *11*
**value-based**  52:*21*, *25*  53:*7*, *11*  54:*6*, *12*  215:*6*
**valued**  212:*20*  254:*15*
**value-maximizing**  106:*8*, *16*, *25*
**variety**  53:*2*  151:*10*  165:*3*  312:*8*
**various**  4:*4*, *12*, *16*, *20*, *23*  5:*1*, *5*  6:*6*, *20*  7:*6*, *16*, *20*  8:*3*, *6*  9:*7*,

*9*, *14*  19:*16*  53:*18*  295:*14*
**vary**  227:*13*
**venture**  77:*19*
**verbally**  299:*20*
**Verizon**  291:*3*, *24*, *25*  292:*8*, *11*
**version**  155:*2*  156:*4*  157:*20*  159:*6*
**versions**  158:*8*
**versus**  28:*20*  35:*6*  62:*12*  74:*22*, *24*  298:*5*
**vice**  295:*10*
**Vidaurri**  8:*2*  203:*1*  232:*11*  237:*9*  313:*15*
**Videographer**  2:*17*  10:*1*  37:*10*, *13*  84:*4*, *7*  115:*2*, *5*  127:*10*, *13*  161:*23*  162:*1*  200:*5*, *8*  252:*9*, *12*  290:*12*, *15*  317:*22*  318:*2*, *5*, *15*
**VIDEOTAPED**  1:*7*, *11*
**view**  74:*4*  86:*10*  133:*21*  140:*14*  154:*15*  178:*4*  179:*24*  180:*12*, *21*  185:*25*  186:*3*  191:*24*  192:*7*  235:*19*  239:*8*  309:*14*
**viewed**  103:*20*  140:*9*  266:*24*
**vigilant**  102:*14*
**Vingelli**  3:*13*  28:*20*
**virtually**  82:*22*  191:*14*  297:*21*
**VP**  197:*3*  253:*9*  302:*8*

**< W >**
**Wachtel**  4:*13*
**Wachtell**  23:*16*  25:*22*  26:*14*  32:*18*, *19*, *20*, *23*, *24*  33:*6*  34:*8*, *16*, *19*, *21*, *22*  35:*8*  36:*15*  37:*21*, *25*  40:*21*  47:*22*  48:*3*, *8*, *17*, *25*  49:*23*, *25*  50:*11*, *14*  51:*11*  52:*1*,

*14*, *18*, *21*  53:*6*, *10*  54:*5*, *7*, *8*, *9*, *11*, *18*  55:*3*, *13*, *20*  56:*3*  58:*25*  59:*6*, *24*  60:*4*, *19*, *23*  61:*3*, *13*, *17*  62:*4*, *13*, *16*, *17*, *23*  63:*3*, *18*  64:*2*, *3*, *21*  65:*2*, *9*, *17*  66:*15*  68:*14*  69:*3*, *5*, *6*  91:*8*, *9*  97:*17*  101:*14*  104:*1*, *25*  106:*14*  109:*4*  116:*10*  120:*18*  121:*5*  123:*4*  124:*15*  125:*1*  162:*15*  167:*21*  173:*9*  175:*9*  182:*5*, *9*  183:*14*, *17*  184:*11*  185:*5*, *20*  186:*8*, *9*, *12*, *19*, *20*  187:*4*, *8*, *13*  194:*2*  195:*1*, *4*  198:*16*  201:*24*  206:*16*  207:*10*, *14*  208:*4*, *6*, *10*, *15*, *19*, *21*  211:*12*, *16*  212:*5*, *9*, *13*, *21*  214:*9*, *16*  215:*1*, *3*, *11*  216:*5*, *25*  217:*4*, *11*, *19*  218:*4*, *11*, *17*, *20*  220:*2*  222:*6*  237:*10*  239:*14*  245:*12*  248:*9*, *20*  249:*20*  263:*13*  264:*9*  265:*2*  266:*20*  267:*1*, *23*  270:*20*, *22*  273:*13*, *21*, *24*  277:*6*  280:*24*  300:*15*, *18*, *24*  301:*1*  302:*19*  303:*1*, *14*, *20*  304:*4*, *15*  305:*5*, *18*, *22*  306:*3*  309:*23*  311:*17*  312:*11*, *15*  314:*3*  315:*11*, *14*, *20*  316:*23*  317:*6*
**Wachtell's**  51:*5*  53:*25*  58:*20*  62:*18*, *19*  96:*16*  98:*10*  121:*9*  183:*18*  212:*9*  215:*19*  216:*16*
**waiting**  61:*6*  212:*25*
**waiver**  27:*16*  36:*1*, *10*
**walked**  177:*8*  271:*21*

**want**  16:*2*  29:*6*  35:*16*, *20*, *21*  36:*9*  38:*22*  47:*19*  70:*2*  82:*21*  91:*10*  101:*24*  102:*11*, *14*  118:*7*  125:*20*  127:*7*  137:*9*  152:*16*  153:*25*  154:*8*  161:*18*  168:*16*  180:*2*  184:*13*  185:*9*  190:*22*  199:*12*, *25*  204:*14*  210:*8*  224:*8*  231:*11*  237:*3*  246:*11*  247:*6*, *14*, *24*  254:*4*  255:*23*  256:*15*, *22*  257:*1*  258:*8*  259:*12*  266:*17*, *18*  267:*21*  271:*2*  280:*3*, *11*  282:*14*  284:*2*  298:*13*  301:*25*  307:*4*  309:*17*  314:*15*  316:*11*
**wanted**  48:*2*  87:*2*  156:*11*  162:*18*  165:*2*  179:*7*  182:*24*  184:*10*  212:*13*  217:*23*  228:*6*  244:*15*  264:*5*, *10*  265:*5*  266:*24*  271:*13*, *17*, *19*  273:*7*  294:*18*  295:*21*  303:*10*  304:*6*  311:*21*
**wanting**  164:*15*  178:*18*  280:*16*  309:*22*
**wants**  43:*8*, *15*  44:*1*  45:*9*
**Wardwell**  136:*14*  144:*17*
**wary**  102:*12*
**waste**  36:*22*  108:*17*
**wasting**  61:*15*
**watch**  189:*13*, *24*  191:*12*  193:*6*
**watching**  190:*17*  191:*9*  192:*19*  193:*2*
**water**  84:*2*
**way**  16:*20*  17:*6*  38:*13*  39:*24*, *25*  41:*6*  53:*16*  54:*6*  55:*1*  60:*14*  61:*3*  63:*24*  64:*19*  66:*2*  95:*8*  100:*12*  120:*14*  159:*9*

182:*15*  186:*17*  188:*22*  213:*21*  254:*21, 23*  265:*17*  266:*25*  268:*3*  269:*2*  282:*21, 24*  296:*7*  297:*17*  315:*18*

**Wayne**  207:*23*  208:*4*  315:*4, 9*

**ways**  67:*22*  192:*1*

**weak**  98:*18*  131:*3*

**Wednesday**  142:*17*  240:*2*

**week**  138:*23*  188:*18*  189:*1, 2*

**weekend**  196:*11*  197:*22*  198:*19*

**weeks**  14:*14*  89:*2*  132:*22*  238:*2*  245:*22*

**Welcome**  10:*23*  84:*9*  127:*15*  252:*14*

**Well**  11:*4*  13:*9, 22*  14:*24*  15:*22*  16:*8*  25:*6, 15*  27:*3*  28:*9*  29:*14*  30:*4*  31:*24*  32:*11, 13, 23*  34:*20*  40:*6, 14*  41:*11, 23*  47:*14*  51:*2, 20*  53:*5*  59:*2, 4*  60:*10*  63:*25*  67:*2, 7, 10*  78:*20, 23*  79:*5*  80:*15*  81:*18*  82:*9*  83:*12*  85:*6*  94:*12*  97:*12*  106:*21*  111:*24*  113:*20*  123:*23*  133:*8*  134:*25*  141:*5*  145:*3*  153:*8*  165:*1*  169:*24*  172:*6*  173:*6, 22*  180:*2*  181:*1*  184:*23*  185:*21*  189:*16*  190:*8, 12, 16, 21*  192:*19*  197:*7*  202:*16*  206:*15*  213:*24*  219:*3, 8*  221:*1, 12*  223:*3*  225:*1, 21*  226:*6, 8, 16*  227:*6*  228:*2*  231:*13*  233:*10*  234:*1*  235:*2*  236:*21*  239:*15*  240:*16*  241:*15*  246:*1*  247:*9*  251:*4*  253:*25*  257:*9, 11, 25*  261:*10*

262:*13*  264:*20*  265:*1*  271:*25*  272:*11*  273:*8*  275:*24*  278:*14*  279:*22*  280:*2, 6, 11*  285:*9*  287:*20, 22, 24*  288:*12, 15*  293:*1*  296:*25*  302:*13*  303:*17*  307:*6*  313:*21*  315:*18*

**well-known**  144:*9, 11, 21*  304:*10*

**went**  13:*11, 18, 19*  19:*10, 22*  33:*14, 18*  98:*25*  104:*11*  161:*5, 12*  166:*15*  205:*22*  206:*2*  226:*16*  286:*22*  293:*6, 9*

**we're**  27:*8*  28:*10*  29:*18*  35:*18, 22*  36:*4*  38:*17, 18*  41:*9*  46:*1*  58:*14*  61:*6*  83:*23*  90:*3*  98:*4*  123:*20*  126:*15*  128:*22*  142:*8*  159:*7*  163:*11*  174:*17*  179:*21*  188:*18*  192:*7*  199:*3*  201:*2*  207:*8*  208:*20*  213:*7, 8*  225:*24*  232:*16*  249:*4*  265:*3*  266:*17, 18*  267:*11*  301:*22*  311:*19*  318:*8*

**we've**  14:*8*  35:*16*  36:*14*  47:*25*  49:*9*  57:*14*  60:*1*  121:*10*  142:*11*  158:*15*  167:*18*  177:*24*  178:*1, 23*  200:*10*  226:*18, 22*  256:*9*  265:*3*  271:*1*  279:*3*  283:*14*  284:*8*  298:*8*

**whatsoever**  210:*15*

**whim**  210:*25*

**wholeheartedly**  104:*4*

**wife**  294:*17*

**William**  64:*1, 2*

**willing**  135:*22*  244:*17*

**willingness**  241:*6*

**willy-nilly**  246:*9*

**Wilson**  22:*24*  23:*6, 9, 15*  26:*13, 22*  27:*1, 4, 10, 14*  31:*14*

**Window**  4:*6, 7*  311:*1*

**wings**  56:*13, 14, 22*

**Winstead**  294:*19, 21, 25*  295:*3*

**wipe**  282:*11*  286:*23*

**wiping**  286:*9*

**withdraw**  31:*12*

**witness**  1:*11*  10:*6, 14*  29:*22*  36:*20*  38:*23*  39:*3, 18*  40:*2*  41:*7*  44:*3, 9, 14, 21*  45:*2*  48:*5*  57:*12, 17, 23*  58:*2, 10, 11*  61:*13*  63:*21*  64:*7*  67:*13, 14*  75:*15, 17, 18*  84:*1*  91:*16*  93:*15*  94:*11, 25*  95:*3*  125:*19, 22*  126:*2*  319:*3*  321:*9, 12, 16*

**witnesses**  13:*8*

**WLRK**  50:*3, 21, 22*  179:*18*  180:*14*  182:*19*  302:*13*  312:*5, 7*

**WLRK-00000913**  4:*22*

**WLRK-00000976**  4:*22*

**WLRK-913**  109:*2*

**WLRK's**  57:*7*  311:*15*

**Wolverine**  3:*19*  4:*17*  5:*8, 21*  6:*4*  7:*4, 10, 13*  8:*7*  9:*11, 15*  107:*14, 17, 25*  108:*4*  153:*21*  194:*8*  224:*24*  225:*2*  227:*16*  228:*14*  240:*7*  242:*4, 17*  243:*24*  244:*9*  248:*11*  249:*10*  313:*9*  314:*25*

**Wolverine's**  240:*10, 11*  241:*12*  242:*1, 3*

**word**  57:*5, 6*  58:*21*  76:*11*  94:*4, 5*  127:*3*  261:*12*  266:*12*  280:*20*  304:*14*

**worded**  99:*20*  269:*13*  270:*12*

**words**  12:*15*  63:*10*  124:*21*  184:*14*  199:*19, 23*  206:*15*  215:*15*  217:*4, 11, 22*  223:*10*  261:*22*  270:*21*  272:*6*  274:*7*

**work**  19:*6*  21:*20*  22:*1, 17*  23:*7, 9, 19*  26:*18, 23*  31:*21*  32:*5, 10*  47:*20*  48:*18*  49:*1*  52:*3, 19, 22*  53:*14, 15, 20*  54:*21*  59:*6, 14*  61:*17, 23*  66:*16*  68:*3, 9*  69:*6, 8*  88:*18*  132:*21*  133:*18*  144:*24*  174:*5*  178:*9, 10*  180:*14*  278:*17*  293:*12*  294:*4, 5, 15*  295:*4*  300:*9*

**worked**  23:*11*  54:*9*  186:*22*  208:*19*  213:*21*  294:*6*  297:*14*  300:*23, 24*  301:*1*

**working**  27:*5*  53:*18*  167:*1, 11, 19*  211:*22*  272:*18*  273:*21, 24*  305:*14*

**works**  189:*9, 20*  190:*14*

**worth**  172:*22*  173:*2, 14*  174:*21, 25*  211:*6, 14*

**write**  45:*7*  50:*1*  73:*8, 22*  103:*5, 14*  126:*10*  139:*21*  141:*4*  142:*15*  145:*9*  153:*24*  154:*4*  165:*1, 7, 10, 17*  182:*15, 22*  228:*12*  239:*24*  240:*9*  266:*9*  269:*21*  274:*16*  307:*16*  310:*25*  312:*1*  315:*4*

**writes**  138:*24*  148:*7*  160:*15*  181:*2*  237:*15*  253:*3, 14*  254:*7*  255:*21*  269:*11*  302:*13*

**writing**  42:*24, 25*  43:*6, 13, 24*  50:*19*  51:*4*  124:*16*  141:*14*

149:*19*  164:6, *21*
165:*20*  188:*24*
210:*15*  227:*11, 25*
228:*1*  234:*21*  242:*21*
258:*1*  273:*12*  275:*6*
277:*20*
**written**  42:*21*  49:*17*
77:*8*  154:*16*  180:*18*
201:*6*  208:*11*  210:*3,*
*7*  222:*15*  228:*21*
229:*12*  263:*12*
312:*23*
**wrong**  154:*21*
**wrote**  44:*14*  46:*7*
47:*1*  103:*5*  127:*3*
141:*19*  142:*23*  143:*5,*
*6*  153:*14, 16, 17*
157:*4, 9, 10, 11*
162:*21*  163:*3*  164:*1,*
*2*  177:*15*  179:*17*
180:*17*  181:*12, 14*
182:*20*  184:*14*
197:*10*  205:*13, 22*
206:*15*  208:*2, 3*
217:*5*  223:*1, 8, 12*
226:*1, 6*  227:*6*
242:*16*  243:*2, 22*
253:*11*  272:*17*
274:*19*  277:*6, 8*
310:*14, 20*

**< X >**
**X1**  62:*7, 8*
**X2**  30:*19*
**X3**  28:*11*
**X4**  30:*20*
**X5**  278:*21, 22*

**< Y >**
**Yeah**  13:*16, 19*  14:*3,*
*5, 8*  16:*10, 25*  19:*18*
21:*10, 12*  22:*5, 8, 9*
23:*8, 21*  24:*4*  25:*20*
34:*10*  36:*12*  37:*5*
42:*2, 22*  47:*7*  49:*8*
56:*24*  58:*17*  59:*21,*
*25*  60:*3, 15*  66:*13*
68:*23*  69:*1*  70:*20*
73:*16, 21, 25*  75:*13*
76:*13, 15, 17*  77:*7*

82:*2, 15*  83:*6, 7*
84:*18*  85:*9*  86:*3*
87:*13, 24*  88:*21, 22*
89:*4*  91:*4, 23*  98:*7*
99:*18*  100:*19*  101:*6*
103:*25*  104:*8*  105:*22*
107:*22*  108:*5, 11*
110:*2, 8, 12, 16*  111:*4,*
*7, 13*  112:*3*  113:*7*
116:*21, 22*  117:*6, 7*
118:*5, 6*  120:*16*
122:*13, 15, 20, 25*
124:*2, 17*  126:*9, 13*
127:*1*  128:*6*  130:*8*
131:*1, 4*  132:*24*
133:*11, 21*  134:*10, 22*
136:*2, 23*  137:*8*
139:*6, 7, 20*  140:*6*
141:*8, 12, 17*  142:*19,*
*22*  143:*4, 10, 21*
144:*15*  145:*23*
146:*13, 14*  149:*5, 22*
150:*11*  151:*23*  153:*7*
154:*15*  155:*5, 12*
157:*12*  161:*16*  163:*7,*
*25*  164:*5*  166:*12, 13,*
*18, 23*  167:*10, 14, 25*
170:*2, 16*  171:*23*
172:*6, 24*  173:*8*
174:*3*  175:*24*  176:*1,*
*8, 24*  177:*2, 19, 22, 24*
179:*9*  180:*4, 11, 12,*
*20, 25*  181:*7*  182:*1, 9,*
*21*  183:*13, 24*  184:*8*
185:*3*  187:*19*  188:*10,*
*20*  189:*11, 18*  190:*2*
193:*16, 24*  194:*5*
195:*13, 22*  196:*21, 25*
197:*19*  199:*23*
201:*13, 23*  202:*9, 12,*
*25*  204:*13*  205:*6, 8,*
*10, 11, 24*  206:*20*
207:*6*  210:*10*  212:*7,*
*11, 17*  213:*3, 17*
214:*16*  217:*6, 7*
218:*8*  219:*7*  220:*22*
222:*11*  223:*16*  224:*1,*
*7*  226:*11*  227:*8*
228:*23*  230:*18, 24*
231:*18*  232:*14, 22, 23*

233:*8, 13*  234:*11*
235:*10*  236:*12*
237:*12, 14, 18, 21*
239:*7*  242:*15, 20*
243:*6, 11, 18*  244:*12*
245:*24, 25*  248:*13*
250:*16*  251:*2, 4, 21*
253:*7, 9, 19, 24*
254:*13*  255:*15*  256:*1*
257:*8, 13, 19, 23*
259:*5*  260:*6*  262:*19*
263:*17*  264:*2, 3, 23*
266:*7, 16*  267:*3, 10,*
*20*  268:*18*  269:*6, 10,*
*16*  270:*2, 8, 14*
272:*16*  275:*7, 23*
276:*5, 6*  277:*4, 19, 25*
278:*19*  280:*22*
281:*20*  282:*3, 14*
283:*17*  285:*23*  286:*3*
288:*4, 5*  290:*10*
291:*22*  292:*10, 12*
293:*24, 25*  294:*2, 3*
296:*4*  301:*10, 20, 24*
303:*7, 24*  305:*6*
307:*14, 15*  308:*3*
309:*24*  310:*10*  316:*5*
**year**  33:*11*  65:*3*
293:*15*  295:*5, 25*
296:*24*
**years**  18:*25*  19:*5, 19*
27:*9*  33:*17*  111:*10*
116:*25*  149:*9*  158:*1*
163:*12, 13*  168:*22*
175:*21*  190:*10*
234:*25*  235:*8*  261:*18*
279:*11*  293:*23*  295:*9*
**yellow**  141:*9, 23*
142:*1, 7, 10, 13*
159:*13*  160:*20*
**Yep**  101:*9*  109:*9*
110:*5*  162:*25*  164:*2*
170:*3*  238:*24*  239:*17*
240:*4*  245:*2*
**yesterday**  15:*10, 13,*
*19*  38:*7*
**yield**  215:*10*
**YORK**  1:*1*  2:*6*  31:*1*
102:*13*  321:*1*

**you-all**  189:*12*
191:*11*  278:*1*

**< Z >**
**zero**  243:*20*
**Zierlein**  2:*17*
**zone**  92:*14*  98:*11*
**Zoom**  2:*11*  10:*10, 14*
56:*19*

## WORD LIST

**< $ >**
**$10**  (*1*)
**$3**  (*5*)
**$40**  (*2*)
**$48**  (*25*)
**$50**  (*1*)
**$51**  (*1*)
**$80**  (*7*)
**$86**  (*1*)

**< § >**
**§**  (*6*)

**< 0 >**
**0**  (*1*)

**< 1 >**
**1**  (*9*)
**1.26**  (*1*)
**1:23-CV-10488-DLC**
 (*2*)
**1:30**  (*1*)
**1:39**  (*1*)
**1:50**  (*1*)
**10**  (*7*)
**10/09/2025**  (*1*)
**10/20/2022**  (*1*)
**10:07**  (*1*)
**10:30**  (*1*)
**10:41**  (*1*)
**10:50**  (*1*)
**10:57**  (*1*)
**100**  (*3*)
**10170**  (*1*)
**107**  (*1*)
**108**  (*1*)
**10b5-1**  (*17*)
**10-Ks**  (*1*)
**10-plus**  (*1*)
**10th**  (*24*)
**11**  (*5*)
**11:06**  (*1*)
**11:17**  (*1*)
**11:30**  (*1*)
**11:57**  (*1*)
**1114**  (*1*)
**11th**  (*2*)

**12**  (*3*)
**12:01**  (*1*)
**12:15**  (*1*)
**12:57**  (*1*)
**12-31-25**  (*1*)
**126**  (*1*)
**128**  (*1*)
**12th**  (*1*)
**13**  (*3*)
**134**  (*1*)
**139**  (*1*)
**14**  (*3*)
**140**  (*1*)
**1453**  (*1*)
**1460**  (*1*)
**147**  (*1*)
**14th**  (*7*)
**15**  (*4*)
**15079**  (*1*)
**153**  (*1*)
**154**  (*1*)
**157**  (*1*)
**159**  (*1*)
**15-May**  (*1*)
**15-plus**  (*1*)
**16**  (*6*)
**16121**  (*1*)
**16128**  (*1*)
**16137**  (*1*)
**162**  (*1*)
**16470**  (*1*)
**166**  (*1*)
**16th**  (*2*)
**17**  (*2*)
**171**  (*1*)
**176**  (*1*)
**18**  (*3*)
**18178**  (*1*)
**18179**  (*1*)
**1832**  (*1*)
**188**  (*1*)
**18th**  (*3*)
**19**  (*6*)
**1900**  (*1*)
**19103**  (*1*)
**19-20**  (*1*)
**193**  (*1*)
**1990**  (*2*)
**1991**  (*1*)

**19th**  (*15*)
**1st**  (*1*)

**< 2 >**
**2**  (*4*)
**2:00**  (*1*)
**2:13**  (*2*)
**2:38**  (*1*)
**2:48**  (*1*)
**20**  (*8*)
**2001**  (*1*)
**201**  (*1*)
**2010**  (*2*)
**2011**  (*3*)
**2018**  (*4*)
**2019**  (*3*)
**2020**  (*4*)
**2021**  (*2*)
**20-21**  (*1*)
**2022**  (*61*)
**2023**  (*9*)
**2025**  (*6*)
**2026**  (*1*)
**205**  (*1*)
**20517**  (*1*)
**20816**  (*1*)
**20th**  (*6*)
**21**  (*6*)
**212-432-5100**  (*1*)
**21247**  (*1*)
**21525**  (*1*)
**215-341-3616**  (*1*)
**21st**  (*1*)
**22**  (*5*)
**222**  (*1*)
**229**  (*1*)
**22nd**  (*9*)
**23**  (*8*)
**232**  (*1*)
**237**  (*1*)
**239**  (*1*)
**23rd**  (*2*)
**24**  (*5*)
**24207**  (*1*)
**243**  (*1*)
**2437**  (*1*)
**245**  (*1*)
**25**  (*6*)
**252**  (*1*)

**25th**  (*11*)
**26**  (*4*)
**263**  (*1*)
**265**  (*1*)
**268**  (*1*)
**26th**  (*4*)
**27**  (*4*)
**278**  (*1*)
**27th**  (*2*)
**28**  (*6*)
**28th**  (*1*)
**29**  (*4*)
**292**  (*1*)
**29th**  (*3*)
**2nd**  (*12*)

**< 3 >**
**3**  (*21*)
**3:58**  (*1*)
**30**  (*10*)
**30(f)(i**  (*1*)
**302**  (*1*)
**30s**  (*3*)
**31**  (*2*)
**312**  (*1*)
**314-889-7300**  (*1*)
**319**  (*1*)
**32**  (*6*)
**320**  (*1*)
**321**  (*1*)
**33**  (*4*)
**34**  (*4*)
**35**  (*5*)
**36**  (*5*)
**37**  (*4*)
**38**  (*3*)
**39**  (*5*)

**< 4 >**
**4**  (*13*)
**4:00**  (*3*)
**4:15**  (*1*)
**40**  (*4*)
**41**  (*4*)
**420**  (*1*)
**449**  (*1*)
**45924**  (*1*)
**48**  (*7*)
**49**  (*1*)

| | | | |
|---|---|---|---|
| **4th**  *(6)* | **7248**  *(1)* | **abiding**  *(1)* | **advantage**  *(3)* |
| | **7676**  *(1)* | **ability**  *(4)* | **advice**  *(60)* |
| **< 5 >** | **7th**  *(1)* | **able**  *(7)* | **advise**  *(6)* |
| **5**  *(7)* | | **absence**  *(1)* | **advised**  *(16)* |
| **5/25/2022**  *(2)* | **< 8 >** | **absent**  *(4)* | **advisement**  *(1)* |
| **5/26/2022**  *(1)* | **8**  *(3)* | **absolute**  *(4)* | **advises**  *(4)* |
| **5/27/2022**  *(1)* | **8/10/2022**  *(4)* | **absolutely**  *(38)* | **advising**  *(6)* |
| **5:00**  *(1)* | **8/12/2022**  *(1)* | **abstain**  *(1)* | **Advisor**  *(1)* |
| **5:05**  *(1)* | **8/23/2022**  *(1)* | **abusive**  *(1)* | **advisors**  *(9)* |
| **5:41**  *(1)* | **8/26/2022**  *(1)* | **accessible**  *(1)* | **advocate**  *(1)* |
| **5:45**  *(1)* | **8/4/2022**  *(1)* | **account**  *(2)* | **aerospace**  *(1)* |
| **5:46**  *(3)* | **8/5/2022**  *(1)* | **accumulate**  *(1)* | **affairs**  *(1)* |
| **50**  *(1)* | **8/8/2022**  *(1)* | **accumulating**  *(7)* | **affix**  *(1)* |
| **50-odd**  *(1)* | **8:30**  *(3)* | **accumulation**  *(16)* | **afternoon**  *(2)* |
| **50s**  *(3)* | **8:45**  *(2)* | **accurate**  *(1)* | **Agency**  *(2)* |
| **51**  *(2)* | **8:54**  *(1)* | **accurately**  *(1)* | **Agenda**  *(9)* |
| **55**  *(1)* | **80**  *(6)* | **achieve**  *(1)* | **aggressive**  *(4)* |
| **5th**  *(3)* | **84**  *(1)* | **achieved**  *(1)* | **ago**  *(14)* |
| | **8-5-22**  *(1)* | **acknowledge**  *(2)* | **agree**  *(24)* |
| **< 6 >** | **8683**  *(1)* | **acknowledgement**  *(1)* | **agreed**  *(7)* |
| **6**  *(5)* | **8756**  *(1)* | **acknowledges**  *(1)* | **agreement**  *(6)* |
| **6/12/2022**  *(1)* | **8th**  *(5)* | **acknowledgment**  *(1)* | **agreements**  *(1)* |
| **6/2/2022**  *(1)* | | **acquire**  *(16)* | **ahead**  *(11)* |
| **6/22/2022**  *(1)* | **< 9 >** | **acquired**  *(7)* | **Albert**  *(30)* |
| **6/23/2022**  *(2)* | **9**  *(7)* | **acquirer**  *(2)* | **Alex**  *(5)* |
| **6/7/2022**  *(2)* | **9/1/2022**  *(1)* | **acquiring**  *(16)* | **align**  *(3)* |
| **6/8/2022**  *(2)* | **9/17/2022**  *(1)* | **acquisition**  *(22)* | **aligned**  *(4)* |
| **60**  *(4)* | **9/19/2022**  *(1)* | **acquisitions**  *(1)* | **aligning**  *(1)* |
| **6124**  *(2)* | **9:22**  *(2)* | **acronym**  *(1)* | **alleged**  *(1)* |
| **6-14-2022**  *(1)* | **9:53**  *(1)* | **act**  *(2)* | **allow**  *(3)* |
| **62**  *(1)* | **90**  *(1)* | **ACTION**  *(11)* | **allowed**  *(6)* |
| **63105**  *(1)* | **901**  *(1)* | **actions**  *(1)* | **altering**  *(1)* |
| **69**  *(1)* | **91**  *(4)* | **actively**  *(1)* | **Alyssa**  *(1)* |
| | **923**  *(1)* | **Activism**  *(2)* | **Amazon**  *(1)* |
| **< 7 >** | **936**  *(2)* | **activist**  *(9)* | **ambiguous**  *(1)* |
| **7**  *(7)* | **938**  *(2)* | **activists**  *(4)* | **ambushed**  *(2)* |
| **7/10/2022**  *(1)* | **95**  *(1)* | **activities**  *(2)* | **America**  *(9)* |
| **7/12/2022**  *(1)* | **956**  *(1)* | **activity**  *(7)* | **American**  *(1)* |
| **7/13/2022**  *(1)* | **960**  *(1)* | **actual**  *(1)* | **America's**  *(5)* |
| **7/14/2022**  *(2)* | **961**  *(1)* | **Adam**  *(6)* | **amount**  *(7)* |
| **7/18/2022**  *(1)* | **9611**  *(1)* | **added**  *(3)* | **amounts**  *(1)* |
| **7/19/2022**  *(1)* | **992F.2d**  *(1)* | **adding**  *(1)* | **ample**  *(9)* |
| **7/28/2022**  *(2)* | **9th**  *(3)* | **addition**  *(1)* | **Ana**  *(1)* |
| **7/7/2022**  *(1)* | | **additional**  *(3)* | **analysis**  *(14)* |
| **7/8/2022**  *(1)* | **< A >** | **adjournment**  *(1)* | **analyzing**  *(1)* |
| **7:39**  *(2)* | **a.m**  *(5)* | **adjustments**  *(1)* | **and/or**  *(1)* |
| **7:50**  *(1)* | **A23**  *(1)* | **admin**  *(1)* | **Andrade**  *(6)* |
| **7:51**  *(1)* | **aavalos@rgrdlaw.com** | **administration**  *(1)* | **announced**  *(2)* |
| **70**  *(1)* | *(1)* | **admit**  *(1)* | **announcement**  *(1)* |

Deposition of Eddie Dixon                              In Re National Instruments Corporation Securities Litigation

announcing  (2)
answer  (61)
answered  (38)
anticipate  (4)
anybody  (3)
anymore  (2)
anytime  (2)
anyway  (6)
aplascoff@rgrdlaw.com  (1)
apologize  (2)
Apparently  (2)
appeals  (1)
appear  (9)
appearance  (2)
APPEARANCES  (1)
appeared  (1)
appearing  (2)
appears  (23)
applied  (3)
apply  (3)
approach  (10)
approached  (6)
appropriate  (11)
appropriately  (1)
approval  (2)
approve  (1)
approved  (8)
approving  (8)
approximate  (1)
approximately  (10)
April  (4)
area  (10)
argue  (1)
argument  (10)
arguments  (1)
Arkansas  (2)
arm  (1)
arrangement  (5)
arrangements  (3)
article  (1)
articulated  (2)
Asia  (1)
aside  (3)
asked  (54)
asking  (54)
asks  (3)
assess  (9)
assessing  (4)

asset  (5)
Associate  (1)
associated  (4)
assume  (17)
assumed  (4)
assuming  (4)
assumption  (5)
assumptions  (4)
AT&T  (3)
attached  (11)
attaches  (2)
attaching  (3)
attachment  (8)
attachments  (3)
attend  (4)
attendance  (1)
attendees  (1)
attention  (11)
attorney  (5)
attorney-client  (5)
attorneys  (10)
attorney's  (7)
attractive  (3)
August  (50)
Austin  (4)
authority  (8)
authorization  (1)
authorize  (1)
available  (3)
Avenue  (1)
average  (1)
avoid  (4)
aware  (21)

< B >
back  (45)
background  (1)
bait  (1)
balance  (1)
bank  (15)
banker  (2)
bankers  (9)
banking  (1)
bankruptcy  (2)
banks  (8)
bank's  (1)
bar  (2)
base  (1)
based  (41)

Basic  (2)
basically  (5)
basis  (9)
batch  (2)
batches  (1)
Bates  (52)
bear  (5)
began  (2)
beginning  (20)
begins  (7)
behalf  (1)
behavior  (1)
behoove  (2)
belief  (1)
believe  (54)
belong  (2)
beneath  (1)
beneficial  (1)
benefit  (2)
BENNETT  (3)
best  (17)
better  (12)
bigger  (2)
bill  (3)
billed  (1)
billing  (5)
billion  (9)
bills  (3)
bit  (8)
blown  (1)
blue  (1)
blurb  (3)
blurbs  (1)
BoA  (2)
board  (128)
board's  (1)
BoD  (3)
body  (1)
bold  (4)
bolded  (1)
bolds  (1)
bond  (2)
born  (1)
bothersome  (2)
bottom  (28)
bought  (5)
Boulevard  (1)
boy  (1)
bracketed  (1)

break  (22)
breaking  (1)
briefly  (3)
bringing  (1)
broad  (1)
Broker  (1)
BS  (1)
budget  (3)
build  (2)
built  (1)
bullet  (16)
business  (25)
buy  (6)
buyback  (16)
Buybacks  (58)
buyer  (3)
buyers  (1)
buying  (6)

< C >
calc  (1)
calendar  (3)
California  (2)
call  (40)
called  (6)
calling  (11)
Call-Mackenzie  (1)
calls  (62)
canceled  (1)
capacity  (24)
capital  (10)
capture  (3)
captured  (8)
capturing  (4)
Carolyn  (1)
carried  (2)
carrier  (4)
carriers  (5)
carries  (1)
carry  (1)
case  (72)
cases  (8)
cash  (8)
catch  (1)
cause  (2)
caused  (1)
cc'g  (4)
cell  (5)
Centerview  (5)

**CEO**  (3)
**certain**  (9)
**certainly**  (11)
**certainty**  (1)
**certificate**  (1)
**CERTIFICATION** (2)
**Certified**  (2)
**certify**  (3)
**cetera**  (16)
**CFO**  (2)
**CGC-23607461**  (1)
**chain**  (23)
**chair**  (3)
**chairman**  (1)
**chairman's**  (1)
**chance**  (1)
**change**  (19)
**changed**  (7)
**changes**  (4)
**changing**  (5)
**CHAPMAN**  (3)
**characterization**  (1)
**characterize**  (1)
**charge**  (1)
**charged**  (3)
**chart**  (1)
**chassis**  (2)
**cheap**  (4)
**check**  (7)
**chief**  (6)
**chose**  (2)
**chronologically**  (1)
**Circuit**  (1)
**circulated**  (1)
**circumstances**  (6)
**cite**  (1)
**CIVIL**  (5)
**claim**  (1)
**clarify**  (3)
**clarity**  (2)
**class**  (1)
**clean**  (1)
**cleaned**  (12)
**cleaning**  (3)
**clear**  (25)
**clearance**  (1)
**clearly**  (15)
**clerked**  (1)

**client**  (8)
**clients**  (4)
**close**  (7)
**closed**  (3)
**closely**  (1)
**closing**  (4)
**coaching**  (3)
**code**  (8)
**coercive**  (2)
**cohesion**  (1)
**Coke**  (1)
**colleague**  (2)
**college**  (1)
**column**  (3)
**combination**  (3)
**come**  (14)
**Comerford**  (282)
**Comerford's**  (2)
**comes**  (2)
**comfortable**  (5)
**coming**  (1)
**comment**  (5)
**commentary**  (1)
**comments**  (1)
**commercial**  (3)
**Committee**  (1)
**common**  (5)
**communicate**  (6)
**communicated**  (6)
**communicating**  (4)
**communication**  (9)
**communications**  (4)
**community**  (2)
**company**  (86)
**company's**  (5)
**compensated**  (3)
**compensation**  (2)
**competitors**  (2)
**compilation**  (1)
**complaining**  (1)
**complaint**  (2)
**complete**  (6)
**completed**  (3)
**completely**  (1)
**completion**  (2)
**compliance**  (10)
**compliant**  (4)
**complicate**  (1)
**complicated**  (1)

**complications**  (2)
**complied**  (1)
**computerized**  (1)
**concept**  (2)
**concern**  (7)
**concerned**  (17)
**concerning**  (24)
**concerns**  (2)
**conclude**  (4)
**concluded**  (6)
**concludes**  (5)
**concluding**  (2)
**conclusion**  (4)
**conclusions**  (3)
**condition**  (2)
**conditions**  (1)
**conduct**  (2)
**conducts**  (1)
**confer**  (1)
**confidence**  (1)
**confident**  (16)
**confidential**  (12)
**Confidentiality**  (2)
**confirm**  (14)
**confirmatory**  (2)
**confirmed**  (1)
**confirming**  (1)
**confusion**  (1)
**connection**  (9)
**consensus**  (1)
**consequences**  (1)
**consider**  (8)
**consideration**  (2)
**considerations**  (1)
**considered**  (1)
**considering**  (3)
**considers**  (1)
**consistent**  (10)
**consult**  (2)
**contact**  (2)
**contains**  (2)
**contemporaneous**  (1)
**content**  (8)
**Context**  (19)
**contingency**  (1)
**contingent**  (1)
**contingents**  (1)
**continual**  (1)
**continue**  (8)

**continued**  (7)
**continuing**  (4)
**continuously**  (2)
**contract**  (1)
**contrary**  (2)
**control**  (3)
**convenience**  (1)
**conversation**  (12)
**Conversations**  (5)
**convey**  (4)
**conveyed**  (1)
**convince**  (1)
**coordinate**  (1)
**Copied**  (3)
**copy**  (2)
**copying**  (1)
**Corp**  (4)
**Corp.com**  (2)
**corporate**  (6)
**CORPORATION**  (8)
**correct**  (195)
**corrected**  (1)
**CORRECTION**  (3)
**correctly**  (9)
**corresponded**  (2)
**correspondence**  (4)
**costs**  (1)
**counsel**  (99)
**counsel's**  (4)
**counting**  (1)
**countries**  (1)
**county**  (1)
**couple**  (7)
**course**  (13)
**COURT**  (7)
**Court's**  (1)
**cover**  (6)
**crack**  (1)
**create**  (3)
**created**  (6)
**creating**  (2)
**credit**  (1)
**criminal**  (4)
**CSR**  (3)
**CST**  (1)
**Cuellar**  (1)
**curious**  (1)
**current**  (5)
**custom**  (1)

customer  *(1)*
customers  *(1)*

< D >
D10  *(1)*
D102  *(1)*
D104  *(1)*
D105  *(1)*
D11  *(1)*
D2  *(1)*
D21  *(2)*
D22  *(1)*
D25  *(1)*
D3  *(1)*
D33  *(1)*
D35  *(1)*
D37  *(1)*
D38  *(1)*
D41  *(1)*
D44  *(1)*
D48  *(1)*
D49  *(1)*
D58  *(3)*
D6  *(1)*
D60  *(1)*
D67  *(1)*
D69  *(1)*
D75  *(1)*
D79  *(1)*
D8  *(1)*
D84  *(1)*
D85  *(1)*
D92  *(2)*
D93  *(1)*
D94  *(1)*
D97  *(1)*
damage  *(1)*
Damages  *(1)*
Daniels  *(4)*
data  *(2)*
date  *(22)*
dated  *(46)*
dates  *(2)*
Davis  *(4)*
day  *(27)*
days  *(10)*
day's  *(3)*
deal  *(20)*
dealt  *(1)*

debate  *(1)*
Deborah  *(2)*
Debt  *(1)*
decide  *(2)*
deciding  *(2)*
decision  *(12)*
decisions  *(5)*
deck  *(1)*
declined  *(1)*
defend  *(1)*
DEFENDANTS  *(5)*
defendant's  *(1)*
defending  *(2)*
defense  *(9)*
define  *(6)*
defined  *(1)*
definition  *(5)*
definitive  *(3)*
degree  *(4)*
delay  *(2)*
delays  *(2)*
deliberately  *(3)*
delivered  *(2)*
Dell  *(11)*
demand  *(1)*
demanded  *(1)*
deny  *(1)*
department  *(6)*
Depending  *(1)*
depends  *(2)*
depo  *(1)*
deponent  *(3)*
depos  *(1)*
depose  *(1)*
deposed  *(5)*
DEPOSITION  *(36)*
depositions  *(7)*
depressed  *(4)*
deputy  *(1)*
describe  *(1)*
described  *(1)*
describes  *(2)*
describing  *(8)*
DESCRIPTION  *(7)*
deserves  *(1)*
desire  *(1)*
desired  *(6)*
despite  *(3)*
destroy  *(3)*

destroyed  *(1)*
details  *(3)*
determination  *(5)*
determine  *(5)*
determined  *(6)*
determining  *(3)*
develop  *(1)*
development  *(4)*
device  *(7)*
devices  *(1)*
different  *(20)*
difficult  *(6)*
diligence  *(13)*
Diligent  *(2)*
dime  *(1)*
Dinner  *(1)*
direct  *(10)*
directed  *(1)*
directing  *(3)*
direction  *(3)*
directly  *(3)*
director  *(1)*
Directors  *(10)*
directs  *(1)*
disagree  *(8)*
disagreeing  *(1)*
disclose  *(3)*
disclosed  *(1)*
disclosure  *(17)*
disclosures  *(2)*
discoverability  *(2)*
discoverable  *(32)*
discovered  *(2)*
discovery  *(7)*
discuss  *(15)*
discussed  *(25)*
discusses  *(2)*
discussing  *(9)*
Discussion  *(35)*
discussions  *(5)*
disposition  *(1)*
dispute  *(1)*
distinct  *(1)*
DISTRICT  *(5)*
divest  *(1)*
divestiture  *(1)*
divestment  *(4)*
divided  *(1)*
dividend  *(2)*

DIXON  *(116)*
Dixon's  *(1)*
do/say  *(1)*
docket  *(3)*
Docs  *(1)*
document  *(182)*
documentation  *(1)*
documents  *(19)*
doing  *(49)*
dollar  *(4)*
dollars  *(3)*
Donahue  *(1)*
Donohue  *(1)*
DOWD  *(5)*
download  *(1)*
Draft  *(9)*
drafted  *(2)*
drafting  *(2)*
drafts  *(1)*
draining  *(1)*
draw  *(1)*
drive  *(5)*
driving  *(2)*
drop  *(4)*
Drug  *(2)*
due  *(12)*
duly  *(3)*
Duties  *(1)*
duty  *(2)*
dynamic  *(1)*
dynamics  *(1)*

< E >
e.g  *(1)*
earlier  *(17)*
earn  *(1)*
earned  *(1)*
earnings  *(23)*
easier  *(1)*
easily  *(1)*
easy  *(1)*
eat  *(2)*
economic  *(3)*
EDDIE  *(43)*
Edgett  *(2)*
educate  *(2)*
educating  *(5)*
education  *(4)*
educational  *(2)*

effect  (*4*)
effective  (*1*)
eight  (*3*)
either  (*7*)
Electric  (*3*)
Electric's  (*1*)
elevated  (*2*)
else's  (*1*)
Email  (*208*)
emails  (*19*)
emanate  (*1*)
emanates  (*1*)
embarrassing  (*1*)
embedded  (*1*)
Emerson  (*160*)
Emerson's  (*43*)
Emmerich  (*3*)
emoji  (*7*)
emojis  (*2*)
emphasized  (*1*)
employed  (*1*)
employees  (*5*)
employment  (*1*)
employment-related
 (*1*)
enable  (*1*)
encouraging  (*1*)
ended  (*1*)
energy  (*1*)
Enforcement  (*2*)
engage  (*10*)
engaged  (*21*)
engagement  (*19*)
engagements  (*1*)
engaging  (*6*)
engineering  (*1*)
engineers  (*1*)
English  (*2*)
enjoyed  (*1*)
ensure  (*18*)
ensuring  (*6*)
entered  (*1*)
enthusiastic  (*2*)
entire  (*4*)
entirety  (*2*)
entities  (*1*)
entry  (*1*)
equity  (*1*)
Eric  (*37*)

escalate  (*1*)
escalation  (*6*)
escalator  (*1*)
escalatory  (*8*)
especially  (*2*)
essentially  (*3*)
EST  (*1*)
establish  (*1*)
Estefania  (*1*)
estimate  (*1*)
Estimated  (*1*)
et  (*16*)
Europe  (*1*)
evading  (*1*)
evening  (*7*)
event  (*10*)
events  (*7*)
eventually  (*3*)
Everest  (*3*)
everybody  (*2*)
everybody's  (*1*)
evidence  (*13*)
evidenced  (*1*)
evidentiary  (*1*)
exact  (*11*)
exactly  (*27*)
EXAMINATION  (*3*)
example  (*13*)
examples  (*3*)
exception  (*1*)
exchange  (*2*)
exchanging  (*1*)
excited  (*3*)
excitement  (*2*)
Excuse  (*2*)
Exec  (*1*)
execute  (*11*)
executed  (*6*)
executing  (*2*)
executive  (*8*)
executives  (*3*)
Exhibit  (*142*)
exhibits  (*3*)
exist  (*1*)
existed  (*2*)
exists  (*3*)
expand  (*1*)
expanded  (*1*)
expect  (*3*)

expectation  (*1*)
expected  (*2*)
expecting  (*1*)
expeditiously  (*2*)
experience  (*3*)
expert  (*3*)
expertise  (*7*)
experts  (*6*)
Expiration  (*1*)
explain  (*13*)
explained  (*2*)
explaining  (*2*)
explains  (*2*)
explanation  (*1*)
explicitly  (*11*)
expound  (*1*)
expressing  (*3*)
expressly  (*1*)
Expressway  (*1*)
extensive  (*1*)
extent  (*1*)
extraordinarily  (*1*)
eyes  (*1*)

< F >
face  (*3*)
facing  (*1*)
fact  (*25*)
fact-based  (*1*)
factors  (*1*)
facts  (*16*)
fails  (*1*)
fair  (*14*)
fall  (*1*)
falls  (*1*)
familiar  (*7*)
familiarity  (*2*)
far  (*1*)
fast  (*7*)
fault  (*1*)
February  (*1*)
Federal  (*1*)
fee  (*53*)
feel  (*3*)
fees  (*26*)
fell  (*1*)
felt  (*7*)
figure  (*2*)
figured  (*1*)

file  (*1*)
filed  (*2*)
filing  (*1*)
filings  (*2*)
FINAL  (*2*)
finance  (*3*)
finance-related  (*1*)
financial  (*4*)
financially  (*1*)
financials  (*1*)
financing  (*12*)
find  (*1*)
fine  (*9*)
fines  (*1*)
firepower  (*7*)
firm  (*50*)
firms  (*24*)
first  (*34*)
first-in-time  (*1*)
five  (*7*)
five-minute  (*1*)
fixed  (*1*)
flat  (*4*)
flexible  (*1*)
flip  (*1*)
fly  (*1*)
focused  (*3*)
Foerster  (*20*)
folks  (*1*)
follow  (*6*)
followed  (*8*)
following  (*12*)
follows  (*3*)
Follow-up  (*2*)
Foods  (*1*)
forecast  (*1*)
foregoing  (*1*)
foreseeable  (*4*)
forget  (*1*)
Form  (*140*)
forma  (*1*)
formally  (*1*)
format  (*1*)
formerly  (*1*)
Forsyth  (*1*)
forth  (*4*)
forward  (*22*)
forwarded  (*3*)
Foundation  (*71*)

Deposition of Eddie Dixon                    In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| **four**  (*5*) | **gravity**  (*1*) | **helping**  (*3*) | **implement**  (*11*) |
| **frame**  (*3*) | **gray**  (*6*) | **hey**  (*6*) | **implemented**  (*4*) |
| **framed**  (*3*) | **Great**  (*1*) | **Hi**  (*2*) | **implications**  (*2*) |
| **Francisco**  (*1*) | **greater**  (*1*) | **high**  (*2*) | **implicit**  (*1*) |
| **frankly**  (*13*) | **grew**  (*2*) | **higher**  (*5*) | **importance**  (*1*) |
| **FRCP**  (*1*) | **groan's**  (*1*) | **highest**  (*3*) | **important**  (*15*) |
| **friend**  (*1*) | **ground**  (*2*) | **highlight**  (*1*) | **impossible**  (*1*) |
| **front**  (*5*) | **grounds**  (*1*) | **highlighted**  (*2*) | **imprisonment**  (*1*) |
| **full**  (*1*) | **group**  (*2*) | **highlighting**  (*3*) | **improper**  (*14*) |
| **fully**  (*3*) | **growth**  (*1*) | **highly**  (*11*) | **inadvertently**  (*1*) |
| **function**  (*4*) | **GS**  (*1*) | **hints**  (*2*) | **inappropriate**  (*4*) |
| **funds**  (*4*) | **guess**  (*6*) | **hire**  (*2*) | **include**  (*3*) |
| **further**  (*15*) | **Guest**  (*1*) | **hired**  (*2*) | **included**  (*10*) |
| **future**  (*3*) | **guidance**  (*2*) | **hiring**  (*1*) | **includes**  (*3*) |
| **FW**  (*1*) | **guru**  (*4*) | **history**  (*3*) | **including**  (*7*) |
| **FYI**  (*5*) | **guy**  (*1*) | **hit**  (*1*) | **income**  (*1*) |
| | **guys**  (*7*) | **Hofman**  (*5*) | **incomplete**  (*9*) |
| **< G >** | | **hold**  (*4*) | **inconsistent**  (*2*) |
| **G21**  (*1*) | **< H >** | **holder**  (*2*) | **incorrect**  (*3*) |
| **gamut**  (*1*) | **Hal**  (*1*) | **holding**  (*1*) | **increase**  (*11*) |
| **Gardephe**  (*1*) | **half**  (*6*) | **honest**  (*2*) | **increased**  (*4*) |
| **gather**  (*1*) | **hand**  (*3*) | **honestly**  (*12*) | **increases**  (*1*) |
| **gathering**  (*1*) | **hand-in-hand**  (*1*) | **hope**  (*2*) | **indefinite**  (*1*) |
| **GC**  (*5*) | **handle**  (*5*) | **hopefully**  (*3*) | **independent**  (*2*) |
| **gears**  (*1*) | **handling**  (*2*) | **hourly**  (*10*) | **independently**  (*1*) |
| **GELLER**  (*3*) | **handsomely**  (*13*) | **hours**  (*4*) | **indicate**  (*10*) |
| **general**  (*52*) | **hang**  (*2*) | **How's**  (*1*) | **indicated**  (*4*) |
| **Generally**  (*21*) | **hangover**  (*1*) | **HR**  (*1*) | **indicates**  (*10*) |
| **generation**  (*3*) | **happen**  (*17*) | **hug**  (*5*) | **indicating**  (*5*) |
| **Geoffroy**  (*1*) | **happened**  (*19*) | **Hypothetical**  (*13*) | **indication**  (*4*) |
| **getting**  (*7*) | **happening**  (*1*) | | **indicia**  (*1*) |
| **Gift**  (*1*) | **happily**  (*1*) | **< I >** | **individually**  (*1*) |
| **Giuggio**  (*1*) | **happy**  (*2*) | **I-Bankers**  (*1*) | **industrial**  (*1*) |
| **give**  (*18*) | **harassing**  (*1*) | **idea**  (*36*) | **industry**  (*2*) |
| **given**  (*15*) | **hardware**  (*1*) | **identical**  (*1*) | **infer**  (*1*) |
| **gives**  (*2*) | **harm**  (*1*) | **identified**  (*7*) | **inform**  (*2*) |
| **giving**  (*6*) | **head**  (*2*) | **identifies**  (*5*) | **Information**  (*102*) |
| **global**  (*3*) | **heading**  (*2*) | **identify**  (*5*) | **informed**  (*9*) |
| **go**  (*75*) | **headings**  (*1*) | **identifying**  (*1*) | **informing**  (*3*) |
| **goal**  (*7*) | **heads**  (*1*) | **identity**  (*1*) | **informs**  (*1*) |
| **goes**  (*12*) | **hear**  (*2*) | **Ilcisin**  (*30*) | **in-house**  (*4*) |
| **go-forward**  (*7*) | **heard**  (*5*) | **illegal**  (*1*) | **initial**  (*4*) |
| **going**  (*125*) | **hearing**  (*2*) | **illustrative**  (*1*) | **initially**  (*2*) |
| **Goldman**  (*10*) | **heat**  (*1*) | **Im**  (*1*) | **inked**  (*1*) |
| **Good**  (*12*) | **heavy**  (*1*) | **immediate**  (*1*) | **input**  (*3*) |
| **gotten**  (*1*) | **Held**  (*12*) | **immediately**  (*8*) | **inquiry**  (*1*) |
| **government**  (*1*) | **help**  (*8*) | **impact**  (*2*) | **inside**  (*1*) |
| **graduate**  (*1*) | **helped**  (*1*) | **impacts**  (*1*) | **insider**  (*18*) |
| **graduating**  (*1*) | **helpful**  (*2*) | **impediments**  (*1*) | **insight**  (*1*) |

insignificant  *(1)*
InSinkErator  *(18)*
instance  *(6)*
instances  *(4)*
institutional  *(2)*
instruct  *(5)*
instructed  *(3)*
instructing  *(2)*
instructions  *(1)*
instructs  *(1)*
INSTRUMENTS  *(188)*
Instruments-provided  *(1)*
integrity  *(1)*
intelligence  *(1)*
intended  *(12)*
intending  *(1)*
Intent  *(14)*
intention  *(1)*
intention/threat  *(1)*
interchangeably  *(1)*
interest  *(26)*
interested  *(33)*
interim  *(1)*
internal  *(1)*
interpret  *(3)*
interpretation  *(2)*
interpreted  *(1)*
interrogatories  *(1)*
interrupt  *(1)*
interviewed  *(1)*
introduce  *(4)*
introduction  *(1)*
invades  *(1)*
invading  *(1)*
Investment  *(22)*
investor  *(4)*
invitation  *(1)*
invite  *(2)*
invited  *(2)*
inviting  *(1)*
involve  *(3)*
involved  *(9)*
involving  *(9)*
iPhone  *(3)*
irrelevant  *(2)*
irreparable  *(2)*
issue  *(16)*

issued  *(3)*
issuer  *(1)*
issues  *(5)*
Item  *(2)*
items  *(1)*
it'll  *(1)*
IT-related  *(1)*
its  *(37)*

**< J >**
January  *(3)*
jcomerford@dowdben nett.com  *(1)*
Jeffrey  *(1)*
Jeremy  *(3)*
jhofman@dowdbennet t.com  *(1)*
Job  *(14)*
John  *(26)*
join  *(3)*
joined  *(3)*
joint  *(1)*
jotting  *(1)*
Judge  *(1)*
July  *(38)*
jump  *(1)*
June  *(25)*
jurisdiction  *(1)*

**< K >**
Karen  *(28)*
Karen's  *(3)*
Karsanbhai  *(13)*
Karsanbhai's  *(4)*
Katz  *(3)*
keep  *(10)*
keeping  *(3)*
kept  *(2)*
Kevin  *(31)*
Kevin's  *(1)*
key  *(9)*
kind  *(16)*
kinds  *(1)*
knew  *(15)*
knock  *(1)*
know  *(284)*
Knowledge  *(4)*
known  *(6)*
knows  *(1)*

**< L >**
labeled  *(1)*
Labeling  *(2)*
lack  *(1)*
lacks  *(3)*
ladder  *(9)*
██████
Lal  *(5)*
Lal's  *(1)*
landed  *(1)*
language  *(41)*
large  *(4)*
larger  *(2)*
largest  *(1)*
late  *(3)*
latest  *(1)*
law  *(57)*
laws  *(2)*
lawsuit  *(1)*
lawyer  *(6)*
lawyers  *(10)*
lead  *(4)*
lead-up  *(1)*
learn  *(2)*
learned  *(6)*
leaving  *(1)*
led  *(1)*
left  *(14)*
left-hand  *(1)*
legal  *(46)*
legalese  *(2)*
legally  *(1)*
legitimate  *(8)*
Letter  *(116)*
letting  *(1)*
level  *(6)*
levels  *(1)*
leverage  *(1)*
Levinson  *(2)*
Lexington  *(1)*
liability  *(3)*
liaison  *(1)*
licensed  *(3)*
life  *(1)*
lift  *(5)*
lifting  *(15)*
light  *(7)*
likelihood  *(1)*

limited  *(3)*
line  *(15)*
lines  *(1)*
link  *(4)*
LinkedIn  *(2)*
Lipton  *(8)*
liquidity  *(1)*
List  *(5)*
List.xlsx  *(1)*
listed  *(2)*
Listen  *(3)*
literally  *(2)*
LITIGATION  *(30)*
little  *(12)*
Liu  *(3)*
lives  *(1)*
LLC  *(1)*
LLP  *(3)*
locate  *(1)*
located  *(1)*
locations  *(1)*
lodge  *(1)*
logical  *(1)*
long  *(10)*
longer  *(15)*
look  *(82)*
looked  *(7)*
looking  *(41)*
lookout  *(3)*
looks  *(11)*
loop  *(3)*
lost  *(1)*
lot  *(13)*
Louis  *(1)*
low  *(2)*
lower  *(4)*
lunch  *(4)*
Lynch  *(1)*

**< M >**
M&A  *(19)*
M13  *(1)*
M7A  *(1)*
machine  *(1)*
MacKenzie  *(17)*
Mackenzie's  *(6)*
magnitude  *(2)*
main  *(1)*
major  *(1)*

Deposition of Eddie Dixon                                In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| **majority** *(1)* | **mention** *(3)* | **money** *(6)* | **NAT-SL-00016472** *(1)* |
| **making** *(8)* | **mentioned** *(4)* | **monitor** *(3)* | **NAT-SL-00017152** *(1)* |
| **manage** *(2)* | **mentioning** *(2)* | **monitoring** *(1)* | **NAT-SL-00017155** *(1)* |
| **management** *(14)* | **mentions** *(1)* | **month** *(3)* | **NAT-SL-00017249** *(1)* |
| **Manager** *(1)* | **mere** *(1)* | **months** *(10)* | **NAT-SL-00017251** *(1)* |
| **Managers** *(1)* | **merger** *(5)* | **Mopac** *(1)* | **NAT-SL-00017309** *(1)* |
| **managing** *(1)* | **mergers** *(1)* | **morning** *(6)* | **NAT-SL-00017310** *(1)* |
| **Mandel** *(197)* | **Merrill** *(1)* | **Morrison** *(20)* | **NAT-SL-00017861** *(1)* |
| **manipulating** *(6)* | **message** *(9)* | **motion** *(2)* | **NAT-SL-00018178** *(1)* |
| **manipulative** *(2)* | **message/Wolverine** | **motivated** *(1)* | **NAT-SL-00018181** *(1)* |
| **manner** *(2)* | *(1)* | **mouth** *(6)* | **NAT-SL-00020498** *(1)* |
| **man's** *(1)* | **messages** *(13)* | **move** *(20)* | **NAT-SL-00020499** *(1)* |
| **Marissa** *(14)* | **messaging** *(1)* | **moves** *(1)* | **NAT-SL-00020508** *(1)* |
| **Marissa's** *(1)* | **met** *(2)* | **moving** *(6)* | **NAT-SL-00020534** *(1)* |
| **mark** *(1)* | **Michael** *(14)* | **muddying** *(1)* | **NAT-SL-00020751** *(1)* |
| **marked** *(44)* | **Microsoft** *(1)* | **multiple** *(12)* | **NAT-SL-00020754** *(1)* |
| **market** *(14)* | **mid-40s** *(3)* | **multiyear** *(1)* | **NAT-SL-00020763** *(1)* |
| **marketplace** *(1)* | **middle** *(4)* | | **NAT-SL-00020764** *(1)* |
| **Markets** *(2)* | **mid-June** *(1)* | **< N >** | **NAT-SL-00020795** *(1)* |
| **master's** *(1)* | **mid-May** *(4)* | **name** *(10)* | **NAT-SL-00020819** *(1)* |
| **matched** *(1)* | **million** *(18)* | **names** *(7)* | **NAT-SL-00021241** *(1)* |
| **material** *(51)* | **million-plus** *(1)* | **narrow** *(1)* | **NAT-SL-00021258** *(1)* |
| **materiality** *(2)* | **millions** *(1)* | **NATI** *(2)* | **NAT-SL-00021516** *(1)* |
| **Materials** *(11)* | **mind** *(2)* | **NATIONAL** *(190)* | **NAT-SL-00021531** *(1)* |
| **math** *(3)* | **mindful** *(1)* | **NAT-SL** *(1)* | **NAT-SL-00022555** *(1)* |
| **matter** *(13)* | **mindset** *(2)* | **NAT-SL-00001113** *(1)* | **NAT-SL-00022558** *(1)* |
| **matters** *(8)* | **mine** *(2)* | **NAT-SL-00001116** *(1)* | **NAT-SL-00023183** *(1)* |
| **maximization** *(1)* | **Minick** *(1)* | **NAT-SL-00001450** *(1)* | **NAT-SL-00023184** *(1)* |
| **maximize** *(1)* | **minute** *(5)* | **NAT-SL-00001454** *(1)* | **NAT-SL-00023189** *(1)* |
| **maximum** *(2)* | **minutes** *(91)* | **NAT-SL-00001457** *(1)* | **NAT-SL-00023190** *(1)* |
| **MBA** *(1)* | **misapply** *(1)* | **NAT-SL-00001509** *(1)* | **NAT-SL-00023205** *(1)* |
| **McGrath** *(31)* | **mischaracterization** | **NAT-SL-00008683** *(1)* | **NAT-SL-00023206** *(1)* |
| **McGrath's** *(4)* | *(1)* | **NAT-SL-00008756** *(1)* | **NAT-SL-00023790** *(1)* |
| **mean** *(110)* | **mischaracterize** *(1)* | **NAT-SL-00009535** *(1)* | **NAT-SL-00023791** *(1)* |
| **Meaning** *(7)* | **mischaracterizes** *(18)* | **NAT-SL-00009537** *(1)* | **NAT-SL-00024106** *(1)* |
| **meanings** *(1)* | **mischaracterizing** *(4)* | **NAT-SL-00009611** *(1)* | **NAT-SL-00024255** *(1)* |
| **means** *(17)* | **misconstrued** *(9)* | **NAT-SL-00009612** *(1)* | **NAT-SL-00025537** *(1)* |
| **meant** *(9)* | **misinterpreted** *(10)* | **NAT-SL-00010410** *(1)* | **NAT-SL-00025703** *(1)* |
| **measurement** *(2)* | **misleading** *(1)* | **NAT-SL-00010413** *(1)* | **NAT-SL-00025704** *(1)* |
| **mechanism** *(1)* | **missed** *(1)* | **NAT-SL-00015079** *(1)* | **NAT-SL-00026501** *(1)* |
| **meet** *(2)* | **Missouri** *(1)* | **NAT-SL-00015080** *(1)* | **NAT-SL-00026502** *(1)* |
| **meeting** *(104)* | **misspoke** *(1)* | **NAT-SL-00016089** *(1)* | **NAT-SL-00027877** *(1)* |
| **Meetings** *(16)* | **misstated** *(1)* | **NAT-SL-00016112** *(1)* | **NAT-SL-00027878** *(1)* |
| **member** *(3)* | **mix** *(3)* | **NAT-SL-00016145** *(1)* | **NAT-SL-01113** *(1)* |
| **members** *(14)* | **MNPI** *(20)* | **NAT-SL-00016270** *(1)* | **NAT-SL-10410** *(1)* |
| **memo** *(8)* | **model** *(1)* | **NAT-SL-00016271** *(1)* | **NAT-SL-1450** *(1)* |
| **Memorandum** *(2)* | **modular** *(1)* | **NAT-SL-00016466** *(1)* | **NAT-SL-1457** *(1)* |
| **memory** *(1)* | **MoFo** *(9)* | **NAT-SL-00016467** *(1)* | **NAT-SL-15079** *(1)* |
| **memos** *(2)* | **moment** *(4)* | **NAT-SL-00016470** *(1)* | **NAT-SL-16089** *(1)* |

NAT-SL-16270  *(1)*
NAT-SL-16466  *(1)*
NAT-SL-16470  *(1)*
NAT-SL-17152  *(1)*
NAT-SL-17249  *(2)*
NAT-SL-17309  *(1)*
NAT-SL-17861  *(1)*
NAT-SL-18178  *(1)*
NAT-SL-200508  *(1)*
NAT-SL-20498  *(1)*
NAT-SL-20751  *(1)*
NAT-SL-20763  *(1)*
NAT-SL-20795  *(1)*
NAT-SL-21241  *(1)*
NAT-SL-21516  *(1)*
NAT-SL-21519  *(1)*
NAT-SL-22555  *(1)*
NAT-SL-23183  *(1)*
NAT-SL-23189  *(1)*
NAT-SL-23205  *(1)*
NAT-SL-23790  *(1)*
NAT-SL-24106  *(1)*
NAT-SL-25537  *(1)*
NAT-SL-25703  *(1)*
NAT-SL-26501  *(1)*
NAT-SL-27877  *(1)*
NAT-SL-8756  *(1)*
NAT-SL-9535  *(1)*
NAT-SL-9611  *(1)*
natural  *(1)*
nature  *(7)*
near  *(9)*
necessarily  *(10)*
necessary  *(5)*
need  *(25)*
needed  *(9)*
needs  *(1)*
negotiate  *(1)*
negotiated  *(3)*
neither  *(1)*
never  *(15)*
nevertheless  *(2)*
NEW  *(21)*
news  *(6)*
NI  *(25)*
nickel  *(1)*
nickel-and-dime  *(1)*
night  *(6)*
night's  *(2)*

NI-issued  *(1)*
Niles  *(27)*
ninth  *(1)*
NI's  *(6)*
Noam  *(5)*
noam@rgrdlaw.com  *(1)*
NOBO  *(7)*
Noem  *(1)*
nondisclosure  *(1)*
nonlawyers  *(1)*
nonpublic  *(21)*
nonresponsive  *(2)*
noonish  *(1)*
normal  *(1)*
normally  *(2)*
note  *(18)*
noted  *(13)*
notes  *(18)*
Notification  *(8)*
notifications  *(2)*
notified  *(1)*
notify  *(1)*
noting  *(2)*
November  *(1)*
number  *(21)*
numbered  *(1)*
Numbers  *(1)*
numerous  *(8)*
Nuthatch  *(29)*
nutshell  *(1)*

< O >
oath  *(4)*
object  *(41)*
objected  *(1)*
objecting  *(5)*
Objection  *(54)*
objectionable  *(1)*
objections  *(19)*
objects  *(1)*
obligation  *(8)*
obligations  *(3)*
observe  *(3)*
obtain  *(1)*
obtained  *(1)*
obvious  *(1)*
Obviously  *(32)*
occasions  *(5)*

occur  *(5)*
occurred  *(5)*
OCTOBER  *(14)*
offending  *(1)*
offensive  *(2)*
offer  *(62)*
offered  *(2)*
offeree  *(2)*
offerer  *(2)*
offering  *(1)*
offerings  *(1)*
offers  *(3)*
office  *(3)*
officer  *(10)*
officers  *(1)*
official  *(1)*
off-the-record  *(1)*
oh  *(22)*
Okay  *(201)*
once  *(5)*
one-dimensional  *(2)*
ones  *(1)*
open  *(2)*
Opening  *(1)*
operate  *(3)*
operating  *(1)*
opinion  *(8)*
opportunistic  *(9)*
opportunities  *(2)*
opportunity  *(7)*
opposition  *(1)*
Options.pdf  *(1)*
ORAL  *(3)*
order  *(3)*
orderlies  *(1)*
orderly  *(1)*
orders  *(1)*
organization  *(3)*
organizations  *(1)*
organize  *(1)*
organized  *(1)*
orient  *(1)*
oriented  *(2)*
origin  *(1)*
original  *(4)*
originally  *(1)*
originate  *(1)*
ourself  *(1)*
outcome  *(2)*

outlining  *(1)*
outright  *(8)*
outside  *(24)*
outside-in  *(1)*
outstanding  *(3)*
overall  *(3)*
overhang  *(1)*
overpaid  *(1)*
oversaw  *(2)*
overseeing  *(1)*
owe  *(1)*
owed  *(1)*
owned  *(2)*
owner  *(1)*
ownership  *(2)*

< P >
p.m  *(12)*
PAGE  *(86)*
pages  *(6)*
paid  *(41)*
paper  *(2)*
paragraph  *(9)*
part  *(9)*
participate  *(1)*
participated  *(1)*
particular  *(19)*
particularly  *(1)*
Parties  *(4)*
Partners  *(3)*
parts  *(1)*
party  *(5)*
path  *(1)*
paths  *(1)*
Pause  *(4)*
pay  *(10)*
paying  *(4)*
payment  *(2)*
PDF  *(1)*
Pedro  *(6)*
pending  *(2)*
Pennsylvania  *(1)*
people  *(9)*
Pepsi  *(1)*
percent  *(14)*
percentage  *(2)*
Percival  *(40)*
Percival's  *(2)*
perfect  *(1)*

**performed**  *(1)*
**period**  *(15)*
**periodic**  *(3)*
**periodically**  *(3)*
**permanently**  *(1)*
**permissible**  *(1)*
**persistent**  *(1)*
**person**  *(6)*
**personal**  *(3)*
**personnel**  *(3)*
**Persons**  *(1)*
**perspective**  *(12)*
**perspectives**  *(1)*
**Peter**  *(1)*
**petered**  *(5)*
**Philadelphia**  *(1)*
**phone**  *(35)*
**phones**  *(10)*
**phrase**  *(5)*
**phrases**  *(1)*
**physically**  *(1)*
**Pick**  *(2)*
**picked**  *(1)*
**piece**  *(1)*
**Pierre**  *(1)*
**pin**  *(1)*
**pipeline**  *(3)*
**place**  *(23)*
**places**  *(1)*
**plain**  *(1)*
**plain-English**  *(1)*
**plaintiff**  *(3)*
**Plaintiffs**  *(5)*
**Plan**  *(44)*
**planned**  *(2)*
**planning**  *(4)*
**plans**  *(19)*
**Plascoff**  *(1)*
**Platform**  *(3)*
**play**  *(3)*
**Please**  *(48)*
**plenty**  *(1)*
**point**  *(45)*
**pointing**  *(2)*
**points**  *(4)*
**policy**  *(57)*
**politically**  *(1)*
**Polk**  *(4)*
**position**  *(33)*

**positions**  *(3)*
**positive**  *(1)*
**possess**  *(1)*
**possession**  *(9)*
**possibility**  *(7)*
**possible**  *(24)*
**possibly**  *(4)*
**post**  *(4)*
**potential**  *(46)*
**potentially**  *(10)*
**practice**  *(8)*
**practiced**  *(1)*
**practicing**  *(1)*
**prefer**  *(1)*
**preferable**  *(2)*
**preferably**  *(3)*
**premium**  *(8)*
**prepared**  *(17)*
**preparing**  *(2)*
**PRESENT**  *(5)*
**presentation**  *(16)*
**presented**  *(1)*
**presenting**  *(2)*
**president**  *(1)*
**press**  *(2)*
**pressure**  *(1)*
**presumably**  *(1)*
**pretty**  *(7)*
**previous**  *(20)*
**previously**  *(7)*
**price**  *(37)*
**primarily**  *(6)*
**primary**  *(4)*
**principally**  *(2)*
**Prior**  *(17)*
**priorities**  *(1)*
**priority**  *(9)*
**Priv**  *(6)*
**private**  *(9)*
**privately**  *(2)*
**privilege**  *(9)*
**privileged**  *(23)*
**pro**  *(1)*
**probability**  *(10)*
**Probably**  *(11)*
**problem**  *(36)*
**problems**  *(5)*
**Procedure**  *(2)*
**procedures**  *(2)*

**proceed**  *(5)*
**proceeding**  *(1)*
**proceeds**  *(1)*
**process**  *(14)*
**procurement-related**  *(1)*
**produce**  *(11)*
**produced**  *(12)*
**product**  *(2)*
**production**  *(1)*
**products**  *(5)*
**program**  *(2)*
**Project**  *(9)*
**projecting**  *(2)*
**projection**  *(1)*
**projections**  *(1)*
**prominent**  *(1)*
**promise**  *(1)*
**pronouncing**  *(1)*
**proper**  *(8)*
**proposal**  *(26)*
**propose**  *(2)*
**proposed**  *(10)*
**proposes**  *(1)*
**proposing**  *(8)*
**prospect**  *(2)*
**prospects**  *(1)*
**protect**  *(1)*
**protecting**  *(1)*
**proud**  *(1)*
**proved**  *(1)*
**provenance**  *(2)*
**provide**  *(11)*
**provided**  *(20)*
**provider**  *(1)*
**provides**  *(1)*
**providing**  *(7)*
**provisions**  *(1)*
**proxy**  *(2)*
**prudent**  *(3)*
**PST**  *(1)*
**public**  *(31)*
**publicized**  *(1)*
**publicly**  *(3)*
**pull**  *(5)*
**pulled**  *(1)*
**purchase**  *(3)*
**purchaser**  *(1)*
**purchases**  *(1)*

**purely**  *(2)*
**purpose**  *(37)*
**purposes**  *(6)*
**pursuant**  *(2)*
**pursue**  *(10)*
**pursuing**  *(1)*
**put**  *(44)*
**putting**  *(9)*

**< Q >**
**Q&A**  *(9)*
**Q322**  *(1)*
**quarter**  *(10)*
**quarterly**  *(1)*
**question**  *(109)*
**questioning**  *(3)*
**questions**  *(21)*
**Quick**  *(7)*
**quickly**  *(2)*
**quite**  *(8)*
**quote**  *(16)*
**quotes**  *(1)*
**quoting**  *(1)*

**< R >**
**raise**  *(1)*
**raised**  *(3)*
**raising**  *(1)*
**range**  *(4)*
**Rapp**  *(36)*
**Rapp's**  *(2)*
**rate**  *(3)*
**rates**  *(3)*
**rational**  *(3)*
**reach**  *(4)*
**reached**  *(11)*
**reaching**  *(4)*
**react**  *(1)*
**reaction**  *(1)*
**Read**  *(60)*
**reader**  *(2)*
**reading**  *(11)*
**reads**  *(1)*
**ready**  *(1)*
**real**  *(1)*
**realistically**  *(1)*
**reality**  *(7)*
**really**  *(18)*
**real-time**  *(1)*

Deposition of Eddie Dixon                                    In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| **reason**  *(22)* | **reiterate**  *(1)* | **repurchasing**  *(1)* | **right**  *(365)* |
| **reasonable**  *(3)* | **reiterated**  *(1)* | **reputation**  *(1)* | **rights**  *(3)* |
| **reasonably**  *(4)* | **reiterates**  *(1)* | **reputational**  *(1)* | **ring**  *(4)* |
| **reasons**  *(3)* | **reiterating**  *(1)* | **request**  *(6)* | **risks**  *(2)* |
| **re-buyback**  *(1)* | **reject**  *(4)* | **requested**  *(3)* | **ROBBINS**  *(3)* |
| **recall**  *(112)* | **rejected**  *(12)* | **requesting**  *(5)* | **Rock**  *(2)* |
| **recalled**  *(1)* | **rejection**  *(13)* | **requests**  *(2)* | **role**  *(4)* |
| **recapturing**  *(1)* | **relate**  *(1)* | **required**  *(1)* | **roles**  *(3)* |
| **receipt**  *(4)* | **related**  *(10)* | **requirements**  *(1)* | **room**  *(2)* |
| **receive**  *(9)* | **relates**  *(7)* | **reread**  *(1)* | **Rosen**  *(3)* |
| **received**  *(49)* | **relation**  *(1)* | **research**  *(10)* | **row**  *(1)* |
| **receives**  *(1)* | **relations**  *(1)* | **researched**  *(6)* | **RPR-CRR**  *(2)* |
| **receiving**  *(5)* | **relationship**  *(2)* | **reserve**  *(2)* | **RUDMAN**  *(2)* |
| **recipient**  *(1)* | **relative**  *(5)* | **reserving**  *(1)* | **rule**  *(4)* |
| **recipients**  *(17)* | **relatively**  *(1)* | **reside**  *(1)* | **Rules**  *(2)* |
| **recite**  *(1)* | **relayed**  *(1)* | **resource**  *(1)* | **run**  *(10)* |
| **recognize**  *(7)* | **release**  *(2)* | **resources**  *(2)* | |
| **recollection**  *(3)* | **relevance**  *(4)* | **respect**  *(14)* | **< S >** |
| **recommend**  *(1)* | **relevant**  *(5)* | **respecting**  *(1)* | **Sabastian**  *(34)* |
| **recommendation**  *(2)* | **reliable**  *(1)* | **respond**  *(4)* | **Sachs**  *(6)* |
| **recommending**  *(2)* | **relied**  *(3)* | **responded**  *(11)* | **safe**  *(1)* |
| **recommunicating**  *(1)* | **rely**  *(3)* | **responding**  *(2)* | **sale**  *(15)* |
| **reconfirmed**  *(3)* | **relying**  *(2)* | **Response**  *(16)* | **sales**  *(3)* |
| **record**  *(60)* | **remain**  *(1)* | **responsibilities**  *(2)* | **Sam**  *(2)* |
| **recorded**  *(1)* | **remained**  *(4)* | **responsibility**  *(11)* | **San**  *(1)* |
| **record's**  *(1)* | **remaining**  *(1)* | **responsible**  *(8)* | **sanity**  *(5)* |
| **recruited**  *(1)* | **remember**  *(61)* | **responsive**  *(2)* | **saved**  *(1)* |
| **Recurring**  *(2)* | **remembered**  *(1)* | **rest**  *(2)* | **Savitt**  *(2)* |
| **refer**  *(6)* | **remiss**  *(2)* | **Restarted**  *(1)* | **saw**  *(18)* |
| **reference**  *(10)* | **removal**  *(1)* | **restate**  *(1)* | **saying**  *(57)* |
| **referenced**  *(3)* | **removed**  *(4)* | **restricted**  *(1)* | **says**  *(64)* |
| **references**  *(1)* | **Repeat**  *(3)* | **Restriction**  *(33)* | **Scenario**  *(2)* |
| **referred**  *(17)* | **repeated**  *(3)* | **restrictions**  *(2)* | **scenarios**  *(7)* |
| **referring**  *(27)* | **repeatedly**  *(1)* | **result**  *(1)* | **scheduled**  *(3)* |
| **refers**  *(4)* | **rephrase**  *(3)* | **resulting**  *(4)* | **school**  *(7)* |
| **reflect**  *(9)* | **replies**  *(1)* | **results**  *(1)* | **scope**  *(2)* |
| **reflecting**  *(1)* | **report**  *(2)* | **resume**  *(1)* | **screen**  *(9)* |
| **refrain**  *(1)* | **reported**  *(1)* | **resumed**  *(1)* | **scroll**  *(31)* |
| **refresh**  *(1)* | **reporter**  *(3)* | **retain**  *(3)* | **scrolling**  *(1)* |
| **refreshes**  *(1)* | **REPORTER'S**  *(2)* | **retained**  *(10)* | **Sean**  *(1)* |
| **regard**  *(3)* | **reporting**  *(2)* | **retention**  *(1)* | **SEC**  *(3)* |
| **regarded**  *(4)* | **reports**  *(1)* | **retired**  *(6)* | **Sechrest**  *(1)* |
| **regarding**  *(33)* | **represent**  *(8)* | **retreading**  *(1)* | **second**  *(13)* |
| **regardless**  *(6)* | **representation**  *(2)* | **return**  *(1)* | **seconds**  *(1)* |
| **Registry.doc**  *(1)* | **representative**  *(1)* | **returned**  *(3)* | **Section**  *(5)* |
| **regularly**  *(2)* | **represented**  *(3)* | **review**  *(23)* | **SECURITIES**  *(14)* |
| **regulatory**  *(5)* | **representing**  *(1)* | **reviewed**  *(10)* | **see**  *(291)* |
| **Regus**  *(1)* | **repurchase**  *(1)* | **reviewing**  *(3)* | **seeing**  *(3)* |
| **REIT**  *(1)* | **repurchases**  *(15)* | **reviews**  *(1)* | **seek**  *(5)* |

| | | | |
|---|---|---|---|
| **seeking**  *(3)* | **sign**  *(4)* | **span**  *(1)* | **stop**  *(9)* |
| **seen**  *(11)* | **signal**  *(2)* | **speak**  *(4)* | **straight**  *(2)* |
| **sees**  *(1)* | **SIGNATURE**  *(6)* | **speaking**  *(16)* | **strategic**  *(9)* |
| **selected**  *(1)* | **significant**  *(15)* | **speaks**  *(11)* | **strategically**  *(1)* |
| **self-evident**  *(1)* | **significantly**  *(2)* | **Special**  *(2)* | **strategy**  *(16)* |
| **sell**  *(7)* | **signing**  *(2)* | **specific**  *(10)* | **Street**  *(1)* |
| **selling**  *(17)* | ▮▮▮▮ | **specifically**  *(9)* | **string**  *(3)* |
| **send**  *(9)* | **similar**  *(4)* | **specify**  *(1)* | **strong**  *(7)* |
| **sending**  *(6)* | **Simple**  *(3)* | **spectrum**  *(3)* | **structure**  *(18)* |
| **sends**  *(1)* | **simply**  *(5)* | **speculate**  *(13)* | **structured**  *(1)* |
| **senior**  *(1)* | **Simultaneous**  *(16)* | **speculated**  *(2)* | **study**  *(9)* |
| **sense**  *(9)* | **single-function**  *(1)* | **speculating**  *(1)* | **stuff**  *(4)* |
| **sensitive**  *(7)* | **sir**  *(3)* | **speculation**  *(66)* | **styled**  *(1)* |
| **Sent**  *(38)* | **sit**  *(1)* | **speed**  *(3)* | **Subject**  *(53)* |
| **sentence**  *(8)* | **sitting**  *(6)* | **spend**  *(2)* | **submitted**  *(1)* |
| **sentences**  *(2)* | **situation**  *(12)* | **spent**  *(2)* | **subsection**  *(1)* |
| **separate**  *(3)* | **situations**  *(2)* | **spin-offs**  *(1)* | **subsequent**  *(1)* |
| **September**  *(8)* | **six**  *(4)* | **spoke**  *(5)* | **subsequently**  *(1)* |
| **serious**  *(4)* | **size**  *(2)* | **spoken**  *(3)* | **subset**  *(1)* |
| **seriously**  *(2)* | ▮▮▮ | **St**  *(1)* | **substance**  *(5)* |
| **served**  *(4)* | **slide**  *(36)* | **stage**  *(1)* | **substantial**  *(5)* |
| **serves**  *(1)* | **slides**  *(6)* | **stale**  *(9)* | **substantially**  *(2)* |
| **service**  *(4)* | **slightly**  *(1)* | **stand**  *(1)* | **substantive**  *(1)* |
| **services**  *(22)* | **slot**  *(1)* | **standard**  *(2)* | **substantively**  *(1)* |
| **Session**  *(3)* | **small**  *(6)* | **standards**  *(1)* | **suburb**  *(1)* |
| **set**  *(8)* | **smaller**  *(1)* | **stands**  *(1)* | **success**  *(17)* |
| **seven**  *(1)* | **smart**  *(1)* | **stark**  *(1)* | **successful**  *(1)* |
| **seventh**  *(1)* | **smiley**  *(3)* | **Starkloff**  *(47)* | **suggest**  *(5)* |
| **shaded**  *(3)* | **software**  *(1)* | **Starkoff**  *(1)* | **suggested**  *(5)* |
| **Shame**  *(1)* | **sold**  *(5)* | **start**  *(3)* | **suggesting**  *(7)* |
| **share**  *(39)* | **sole**  *(1)* | **started**  *(5)* | **suggestions**  *(1)* |
| **shared**  *(2)* | **solicited**  *(1)* | **starting**  *(3)* | **suggestive**  *(1)* |
| **shareholders**  *(19)* | **Somebody**  *(2)* | **starts**  *(1)* | **suggests**  *(2)* |
| **shares**  *(45)* | **somebody's**  *(1)* | **State**  *(12)* | **Suite**  *(3)* |
| **sharing**  *(1)* | **someone's**  *(1)* | **stated**  *(22)* | **summarize**  *(2)* |
| **Shawn**  *(2)* | **somewhat**  *(1)* | **statement**  *(15)* | **summarized**  *(4)* |
| **sheet**  *(2)* | **Sonsini**  *(11)* | **statements**  *(3)* | **summarizing**  *(1)* |
| **short**  *(4)* | **soon**  *(7)* | **STATES**  *(34)* | **summary**  *(17)* |
| **shorthand**  *(2)* | **sorry**  *(27)* | **stating**  *(1)* | **Summer**  *(1)* |
| **shortly**  *(3)* | **sort**  *(7)* | **status**  *(2)* | **Superior**  *(1)* |
| **short-term-oriented**  *(3)* | **sorts**  *(1)* | **stay**  *(4)* | **supplied**  *(1)* |
| **show**  *(11)* | **sought**  *(1)* | **stayed**  *(1)* | **Supply**  *(1)* |
| **showed**  *(2)* | **sound**  *(2)* | **STENOGRAPHER**  *(1)* | **support**  *(4)* |
| **showing**  *(8)* | **Sounds**  *(1)* | | **supported**  *(2)* |
| **shown**  *(2)* | **South**  *(1)* | **stenotype**  *(1)* | **supposed**  *(3)* |
| **shows**  *(5)* | **SOUTHERN**  *(3)* | **step**  *(15)* | **Supreme**  *(1)* |
| **sic**  *(4)* | **Souza**  *(1)* | **steps**  *(4)* | **Sure**  *(67)* |
| **side**  *(3)* | **space**  *(1)* | **stock**  *(45)* | **surely**  *(1)* |
| | **Spain**  *(1)* | **stock's**  *(1)* | **surprise**  *(5)* |

Deposition of Eddie Dixon                                    In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| surrounding *(1)* | therefor *(1)* | transcript *(2)* | unfriendly *(1)* |
| surveillance *(5)* | thing *(13)* | transcripts *(2)* | Unintelligible *(5)* |
| suspect *(6)* | things *(28)* | transformation *(8)* | uninterested *(1)* |
| swear *(1)* | think *(77)* | transition *(2)* | UNITED *(5)* |
| switch *(1)* | thinking *(18)* | transitioned *(1)* | units *(1)* |
| sworn *(3)* | third *(13)* | transportation *(1)* | University *(3)* |
| | thought *(12)* | treasurer *(1)* | unknown *(1)* |
| < T > | thoughts *(4)* | treat *(5)* | unofficial *(1)* |
| Tab *(13)* | thousands *(1)* | treated *(1)* | unrelated *(1)* |
| tactic *(1)* | threaten *(1)* | treating *(1)* | unsolicited *(26)* |
| tactics *(1)* | threatening *(2)* | tried *(3)* | untrue *(4)* |
| take *(36)* | three *(22)* | triggered *(1)* | unusual *(1)* |
| taken *(11)* | three-minute *(1)* | true *(22)* | upcoming *(8)* |
| Takeover *(4)* | threw *(1)* | trust *(1)* | Update *(8)* |
| takes *(1)* | thrown *(1)* | truthful *(1)* | updates *(3)* |
| talk *(15)* | thumb *(4)* | try *(8)* | upped *(1)* |
| talked *(11)* | thumbs-up *(2)* | trying *(24)* | up-to-date *(1)* |
| talking *(35)* | Thursday *(1)* | Tuesday *(6)* | use *(22)* |
| TAMARA *(3)* | Tied *(1)* | turn *(8)* | uses *(2)* |
| target *(4)* | time *(142)* | turned *(1)* | usual *(2)* |
| targeting *(1)* | timeline *(2)* | twice *(11)* | usually *(1)* |
| team *(17)* | timely *(5)* | Twitter *(4)* | utilize *(1)* |
| teammates *(1)* | times *(4)* | Two *(25)* | utilized *(2)* |
| Teams *(1)* | timing *(9)* | two-day *(1)* | |
| technical *(4)* | timingwise *(1)* | two-minute *(1)* | < V > |
| Technician *(1)* | titles *(1)* | two-page *(1)* | Vaalos *(1)* |
| techniques *(1)* | today *(20)* | type *(1)* | vacuum *(4)* |
| Technologies *(2)* | Today's *(1)* | typical *(8)* | vague *(2)* |
| technology *(6)* | toehold *(3)* | typically *(14)* | valid *(1)* |
| tell *(26)* | told *(30)* | | valuable *(1)* |
| telling *(14)* | tomorrow *(5)* | < U > | value *(30)* |
| ten *(6)* | top *(29)* | Uh-huh *(23)* | value-based *(8)* |
| tender *(1)* | topic *(5)* | ultimate *(5)* | valued *(2)* |
| term *(9)* | topics *(1)* | ultimately *(41)* | value-maximizing *(3)* |
| terms *(10)* | top-notch *(1)* | unable *(2)* | variety *(4)* |
| test *(4)* | toss *(1)* | unaffordable *(1)* | various *(20)* |
| testified *(3)* | total *(7)* | unanswered *(1)* | vary *(1)* |
| testify *(6)* | totally *(2)* | unattractive *(2)* | venture *(1)* |
| testifying *(7)* | touch *(5)* | uncommon *(2)* | verbally *(1)* |
| testimony *(16)* | touched *(1)* | underlining *(1)* | Verizon *(5)* |
| Texas *(7)* | trace *(1)* | underlying *(1)* | version *(4)* |
| text *(25)* | track *(2)* | underneath *(2)* | versions *(1)* |
| texted *(8)* | trade *(1)* | understand *(63)* | versus *(6)* |
| texter *(1)* | traded *(2)* | understanding *(23)* | vice *(1)* |
| texting *(4)* | Trading *(32)* | Understood *(46)* | Vidaurri *(5)* |
| texts *(8)* | training *(2)* | undervalued *(2)* | Videographer *(22)* |
| Thank *(22)* | transacting *(1)* | undervaluing *(1)* | VIDEOTAPED *(2)* |
| Thanks *(5)* | transaction *(42)* | uner *(1)* | view *(16)* |
| thereabouts *(1)* | transactions *(1)* | unfortunate *(1)* | viewed *(3)* |

| | | |
|---|---|---|
| **vigilant**  *(1)* | **wipe**  *(2)* | **Zoom**  *(4)* |
| **Vingelli**  *(2)* | **wiping**  *(1)* | |
| **virtually**  *(3)* | **withdraw**  *(1)* | |
| **VP**  *(3)* | **witness**  *(44)* | |
| | **witnesses**  *(1)* | |
| **< W >** | **WLRK**  *(9)* | |
| **Wachtel**  *(1)* | **WLRK-00000913**  *(1)* | |
| **Wachtell**  *(188)* | **WLRK-00000976**  *(1)* | |
| **Wachtell's**  *(12)* | **WLRK-913**  *(1)* | |
| **waiting**  *(2)* | **WLRK's**  *(2)* | |
| **waiver**  *(3)* | **Wolverine**  *(30)* | |
| **walked**  *(2)* | **Wolverine's**  *(5)* | |
| **want**  *(59)* | **word**  *(11)* | |
| **wanted**  *(25)* | **worded**  *(3)* | |
| **wanting**  *(4)* | **words**  *(16)* | |
| **wants**  *(4)* | **work**  *(46)* | |
| **Wardwell**  *(2)* | **worked**  *(10)* | |
| **wary**  *(1)* | **working**  *(10)* | |
| **waste**  *(2)* | **works**  *(3)* | |
| **wasting**  *(1)* | **worth**  *(7)* | |
| **watch**  *(4)* | **write**  *(30)* | |
| **watching**  *(4)* | **writes**  *(11)* | |
| **water**  *(1)* | **writing**  *(24)* | |
| **way**  *(33)* | **written**  *(14)* | |
| **Wayne**  *(4)* | **wrong**  *(1)* | |
| **ways**  *(2)* | **wrote**  *(50)* | |
| **weak**  *(2)* | | |
| **Wednesday**  *(2)* | **< X >** | |
| **week**  *(4)* | **X1**  *(2)* | |
| **weekend**  *(3)* | **X2**  *(1)* | |
| **weeks**  *(5)* | **X3**  *(1)* | |
| **Welcome**  *(4)* | **X4**  *(2)* | |
| **Well**  *(124)* | **X5**  *(3)* | |
| **well-known**  *(4)* | | |
| **went**  *(18)* | **< Y >** | |
| **we're**  *(42)* | **Yeah**  *(326)* | |
| **we've**  *(24)* | **year**  *(6)* | |
| **whatsoever**  *(1)* | **years**  *(20)* | |
| **whim**  *(1)* | **yellow**  *(8)* | |
| **wholeheartedly**  *(1)* | **Yep**  *(10)* | |
| **wife**  *(1)* | **yesterday**  *(4)* | |
| **William**  *(2)* | **yield**  *(1)* | |
| **willing**  *(2)* | **YORK**  *(6)* | |
| **willingness**  *(1)* | **you-all**  *(3)* | |
| **willy-nilly**  *(1)* | | |
| **Wilson**  *(11)* | **< Z >** | |
| **Window**  *(3)* | **zero**  *(1)* | |
| **wings**  *(3)* | **Zierlein**  *(1)* | |
| **Winstead**  *(4)* | **zone**  *(2)* | |

CORRECTION PAGE

WITNESS NAME:   EDDIE DIXON        DATE:   10/09/2025

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 1 | 7 | R. Eddie Dixon, Jr. | |
| | | Royal Eddie Dixon, Jr. | Full name |
| 13 | 11 | Change "Hal" to "how" | correction |
| 23 | 5 | "orderlies" to "quarterlies" | correction |
| 114 | 19 | "as in a vacuum" to | |
| | | "but in a vacuum" | correction |
| 130 | 18 | "we--even" to "we envisioned" | correction |
| 183 | 16 | "forward with absent" | |
| | | to "forward or absent" | correction |
| 212 | 12 | "closed" to "close" | correction |
| 230 | 6 | change "I" to "it" | correction |
| 234 | 5 | change "was" to "wasn't" | correction |
| 246 | 12 | change "surprise plan" | |
| | | to "surprised by" | correction |
| 281 | 17 | change "retired. We..." to | |
| | | "retired after we closed." | correction |
| 300 | 11 | delete "cohesion" | correction |
| 303 | 8 | insert "is" between there and they | correction |
| 306 | 18 | "I" should be "we" | correction |
| 309 | 9 | change "argue" to "view" | correction |

SIGNATURE PAGE

I, EDDIE DIXON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the correction page.

_____
EDDIE DIXON