# EXHIBIT 4

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:23-cv-10488-DLC

IN RE: NATIONAL INSTRUMENTS CORPORATION
       SECURITIES LITIGATION


**********************************

VIDEOTAPED ORAL DEPOSITION OF

ERIC STARKLOFF

OCTOBER 23, 2025

**********************************

ORAL DEPOSITION OF ERIC STARKLOFF, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on October 23, 2025, from 9:08 a.m. to 3:07 p.m., before Kimberly Wheelis, CSR, RPR, CRR, in and for the State of Texas, reported by computerized stenotype machine, 3800 North Lamar Boulevard, Suite 200, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Chad Johnson (via Zoom)

Christopher Gilroy (via Zoom)

Ana Cueller (via Zoom)

ROBBINS GELLER RUDMAN & DOWD, LLP

420 Lexington Avenue, Suite 1832

New York, New York 10170

cjohnson@rgrdlaw.com


FOR THE DEFENDANTS:

John D. Comerford

Jeremy M. Hofman

DOWD BENNETT, LLP

7676 Forsyth Boulevard, Suite 1900

Saint Louis, Missouri 63105

jcomerford@dowdbennett.com



ALSO PRESENT:

Peter Zierlein - Videographer

I N D E X

                                                    PAGE

ERIC STARKLOFF

Examination by Mr. Johnson ....................... 5

Examination by Mr. Comerford .................... 156

Further Examination by Mr. Johnson ............... 178

Further Examination by Mr. Comerford ............. 180


NO.                      EXHIBITS

Exhibit 1  Email/PowerPoint .................... 18

Exhibit 2  NAT-SL-00005984 ..................... 21

Exhibit 3  NAT-SL-00001263 ..................... 28

Exhibit 4  NAT-SL-00016112 ..................... 41

Exhibit 5  NAT-SL000016270 ..................... 48

Exhibit 6  NAT-SL-00011671 ..................... 58

Exhibit 7  NAT-SL-00001696 ..................... 61

Exhibit 8  WLRK00001596 ........................ 65

Exhibit 9  NAT-SL-00021956 ..................... 67

Exhibit 10 Offer letter ........................ 69

Exhibit 11 Minutes ............................. 88

Exhibit 12 NAT-SL-00001457 ..................... 88

Exhibit 13 NAT-SL-7815 .........................91

Exhibit 14 NAT-SL-24106 ........................93

Exhibit 15 NAT-SL-16996 ........................99

Exhibit 16 NAT-SL-25798 ....................... 102

Case 1:23-cv-10488-DLC    Document 138-4    Filed 02/02/26    Page 5 of 97

Deposition of Eric Starkloff                    In Re National Instruments Corporation Securities Litigation

Exhibit 17 NAT-SL-18070 ........................... 108

Exhibit 18 PowerPoint .................... ......... 122

Exhibit 19 NAT-SL-20796 ......................... 132


Changes and corrections ....................... 183

Signature ..................................... 184

Reporter's Certificate ......................... 185

Further certification under Rule 203 TRCP ....... 187

215-341-3616   transcripts@everestdepo.com
Everest Court Reporting LLC                                    Page: 4 (4)

Page 5

THE VIDEOGRAPHER:  Here begins the deposition of Eric Starkloff.  Today's date is October 23rd, 2025.  And the time is 9:08 a.m.  Will counsel please identify themselves for the record, after which the court reporter will swear in the witness.

MR. JOHNSON:  Chad Johnson of Robbins Geller on behalf of the Plaintiffs.  And also present are colleagues of mine; we can identify them later for the record.

MR. COMERFORD:  John Comerford, Dowd Bennett, LLP representing the Defendants.  I'm here in Austin, Texas with the witness.  And attending by Zoom is my colleague Jeremy Hoffman.

ERIC STARKLOFF,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. JOHNSON:

Q.  Good morning, Mr. Starkloff.

A.  Good morning.

Q.  We've met briefly by this Zoom means, but I'm a lawyer -- one of the lawyers representing investors in this case.

Where did you go to college?

A.  At University of Virginia.

Q.  And did you obtain a degree there?

Page 6

A.  I did.

Q.  And what was that in?

A.  B.S. of electrical engineering.

Q.  And did you study business at all as part of your studies at the University of Virginia?

A.  I didn't have a degree in business.  I took some courses, but no degree.

Q.  And did those courses cover fiduciary duty concepts?

A.  Not that I recall.  I think I learned those on the job.

Q.  And when did you graduate from University of Virginia?

A.  1997.

Q.  And what did you do after that?

A.  Actually came directly to work for National Instruments in Austin.

Q.  And what position did you start out in?

A.  Application engineer.

Q.  And how long were you in that position approximately?

A.  Approximately, probably a year.

Q.  And maybe, maybe it's easier if I just ask you to briefly identify the positions you held at National Instruments up until the time you became CEO.  If you

Page 7

want I can run you through every one, but it might just get easier if I ask that way.

A.  We'll see how good my recall is.  Let me try.  So, application engineer, then I was a product marketing manager.  Then I was --

Q.  And that was approximately '98 when you --

A.  Yeah, '98, '98.

Q.  Around that.

A.  Yeah.  Then I was a product marketing group manager, managed a team.  Then at some point I became a director of marketing where I had several teams.

Q.  And that was approximately when?

A.  I believe that was 2004, because I think it coincided with the birth of my first daughter.

Q.  Congratulations on that --

A.  That's how I remember these things.

Then sometime after that I became vice president of marketing.  I might miss a couple.  Cause there's probably 20 different titles in there.  Platform manager, maybe that was, sort of before, I probably got that one out of order, then vice president of marketing.  Then probably senior vice president of marketing.  Led the entire marketing --

Q.  Do you know when that was, approximately?

A.  Oh, gosh, that might have been sometime

Page 8

between '07 and 2010, perhaps.  Long time ago.

And then I became senior vice president of sales and marketing, global sales and marketing, I think was that title.  Then, I don't recall the title -- let's see...

At some point I took on additional responsibility for research and development, I don't know if my title changed or what title I used, is not -- I don't recall.

Q.  Approximately when?

A.  That was probably, maybe '14 or '15, 2014 or 2015, perhaps.  Then it was 2017 I became president and chief operating officer.  And then in 2020 chief executive officer, sometimes president and CEO is often the title.

Q.  All right.  And you continued on as the company's CEO until it was acquired in 2023; is that right?

A.  Correct.  So I think I transitioned from that role on closing of that transaction, which if I recall was in October of 2023.  And then I was an adviser and left the company in beginning of 2024.

Q.  And since then, have you had a different job or jobs?

A.  I've been an adviser for multiple different

Page 9

companies.

Q. Can you just identify those companies for me?

A. Sure. I'm a board member and adviser for Audax, a private equity company, in one of their portfolio businesses, which called Ezurio. I'm on the board of Ezurio. And then I do advising on an ad-hoc basis for multiple other companies, outside of this industry, on an as-needed basis.

Q. Going back to roles building up to when you became the president and chief operating officer of the company.

A. Uh-huh.

Q. I'm often going to refer to the company, what I mean, of course, is National Instruments, unless I say otherwise.

A. Understood.

Q. Before you became president and COO of National Instruments, did you have any exposure to concepts about fiduciary duties?

A. Yes.

Q. And in what context did that happen -- or contexts?

A. Probably multiple contexts. I participated in most of our board of directors meetings, starting in the early, mid 2000s. So I was aware of the responsibility

Page 10

of a director.

I should mention that when we were talking about my career timeline, in 2020 when I became president, CEO, I was also appointed a director on the board. I was a board member as well, so I technically held two roles. So anyway --

Q. Just to pause on that real quick --

A. Sure.

Q. -- because I want to make sure I've got the timeline correct. Was it 2017, or 2020, or some other time, when you became president and COO?

A. President and COO was 2017.

Q. Okay.

A. There was a CEO at that time, Alex Davern. And 2020, I became CEO and director, board member.

Q. Thank you.

A. Okay, so back to your -- I kind of went back. So your question was, state it again, please.

Q. The context in which you became exposed to concepts about fiduciary duties.

A. Sure.

Q. You mentioned attending board meetings?

A. Attending board meetings, I -- as part of attending board meetings, I read materials from NACD. I was eventually a member of NACD, National Association of

Page 11

Corporate Directors.

I was involved in investor relations as well. So starting probably, again well before I took on that role in, say, the mid 2000s. I was first an occasional spokesperson with respect to investors. And ultimately a primary spokesperson with respect to investors. And over that time period, I don't know for sure, but I met with hundreds and hundreds of investors. So certainly, you know, you learn that concept when you're meeting with the people that are actually investing in the company, for example.

Q. And as part of attending board meetings in any of these capacities, were there presentations or discussions about concepts of fiduciary duties?

A. There were. We would occasionally have outside counsel present to our board summary reminder of fiduciary responsibilities, for example. So that would be the type of thing that would be a sort of concrete example. I would have likely -- I think I witnessed times when the board would have to make challenging decisions as well, as a sort of experiential example.

Q. Before we talk about Emerson -- or before Emerson approached National Instruments, in any of the positions you held at National Instruments, were there merger and acquisition activities that you were aware

Page 12

of?

A. Yes.

Q. Okay. So the dealings with Emerson, is it fair to say were not the first merger and acquisition situation you had been exposed to; is that fair?

A. That is fair. Most of them I was on the buy side.

Q. Okay, so --

A. Or all of, all of the transactions, all of them, I was on the buy side, yeah.

Q. Okay. So before Emerson reached out to National Instruments, you had been involved on behalf of National Instruments in acquiring other businesses; is that fair?

A. Acquiring, attempting to acquire, yes.

Q. And -- so, in connection with any of these situations before Emerson approached National Instruments, had you been introduced to concepts about materiality?

A. Yes.

Q. And had you been introduced to concepts about insider trading?

A. Yes.

Q. And what was your basic understanding of what the concept of insider trading amounted to?

Page 13

MR. COMERFORD:  Objection, form, foundation, calls for legal conclusions.

You can answer.

A.  You would like me to answer?

Q.  (BY MR. JOHNSON) Yes.

A.  Okay.  My understanding of insider trading, sure.  We did regular training on insider training with all insiders, basically making a trade and possession of material non-public information.

Q.  Is it fair to say that -- or am I understanding you correctly to be saying in effect that the concept of insider trading is to not engage in trading when one is in material non-public information?

MR. COMERFORD:  Objection, form, foundation, calls for legal conclusions.  You can answer.

A.  Yes, that would be my understanding.  If I was ever in doubt, I would talk to counsel, and often did, because I took that seriously.

Q.  (BY MR. JOHNSON) Sure.  And what was your understanding of what materiality meant in the context of securities trading?

MR. COMERFORD:  Same objections.

A.  Yeah, again, I want to preface my answer by saying that whenever I had a question about materiality,

Page 14

that would be something I would be consulting with my legal counsel.  I wasn't solely judging materiality. That was my style.

But generally, I understood materiality to be something that -- trying to define it without using the word materiality here.  Something that could significantly affect the business that was not known publicly.

Q.  (BY MR. JOHNSON) And I understand that there would be reason at points to consult with counsel, but I would also expect that there would be situations where materiality is so obvious one way or the other that it wouldn't even be necessary to ask a lawyer, is this material.  Is that fair?

MR. COMERFORD:  Same objections.

A.  Yeah, I don't recall ever having that opinion.

Q.  (BY MR. JOHNSON) And so if it's something -- if there was uncertainty about whether something was material or not, before you had a chance to confer with counsel about that, did you have any default approach to that?  Like you defaulted to assuming something wasn't material, or you defaulted to concluding that something was material?

MR. COMERFORD:  Object, form, foundation, calls for a legal conclusions, compound.

Page 15

A.  No.

Q.  (BY MR. JOHNSON) So I want to turn to 2022?

A.  Okay.

Q.  When you were by then the CEO of National Instruments and you were on the board at that point, right?

A.  That's correct.

Q.  Is it -- in early 2022 the board, including yourself, approved a plan related to share buybacks; is that right?

A.  That is correct.

Q.  And that plan contemplated approximately $250 million of shared buybacks over the course of the years 2022 and 2023, correct?

MR. COMERFORD:  Form.

A.  Yeah, I would have to check the notes, but that, that sounds -- that's my recollection, yes.

Q.  (BY MR. JOHNSON) And as part of this buyback plan, the board, including yourself, contemplated that $100 million of that $250 million total would be used in the year 2022 for shared buybacks, right?

MR. COMERFORD:  Form.

A.  Yeah, I, I don't recall.  I believe it's the case that we had various modeling scenarios, but we had a broad authorization was the -- the authorization was,

Page 16

as you stated, I believe, and anything else was just various models of how we may do it, but not a definitive decision, in terms of timing.  The idea was to be opportunistic with buyback.

Q.  (BY MR. JOHNSON) You're not sure if there was a plan to use $100 million for that during the year 2022?

A.  I don't, I don't recall if there was a plan. I do recall doing various modeling.  I'm not sure if, if plan -- well, yeah, exactly what that means.  The authorization was for 250 million.

Q.  And help me understand the difference you're drawing between a model?

A.  Sure.

Q.  That would say we're going to use a hundred million dollars in 2022 and a plan --

A.  Sure.

Q.  -- on the other --

A.  Two points.  One is I don't recall the specifics of what any model or plan is, like I don't recall if it's a hundred or 80, I don't -- I would have to look at notes for that.  You would have to show me notes.  Because I destroyed all of mine, of course, when I left the position.

My -- I guess the other distinction I was

Page 17

drawing is that because buyback -- and I'm speaking broadly of our buybacks, because of course this was one of many, many buyback authorizations. In fact, buybacks were a core tenet of our way to return cash to shareholders. And the notion of a buyback would typically be that in times when the market, for example, was at a low point, it would often be the case that you would buy more stock. So you would have an authorization and you might execute differently on that authorization, depending on the circumstances in a particular quarter or year. That's the point I was making.

I understood that the authorization gave discretion over that two year period to the management team on the actual execution of the buyback.

Q.  All right.  Let's --

Kim, if you can pull the folder, I believe is numbered 1.

(Exhibit 1 marked for identification.)

(Discussion off record.)

Q.  (BY MR. JOHNSON) And because we're not in the same location, Mr. Starkloff, I can't see if the document is in front of you, is it?

A.  It is, yes.

Q.  Okay.  And hopefully, hopefully, it is a document that begins -- well, it's mostly a PowerPoint

Page 18

that begins with the title page NATI Capital Allocation Strategy.  It may begin with a cover email.

A.  Yes.

Q.  That's up on the screen.  But then after that, hopefully, there's a PowerPoint presentation that begins with the --

A.  I'd like to ask you a question or make a note on this.

Q.  Yeah.

A.  I'm just trying to understand why the exhibit is a board deck over email as opposed to the actual board materials.  I don't know if this was the actual board materials.

Q.  We can compare it.  But the reality is it is. And it's more a matter of, you know, number of pages than --

A.  Well, it's just hard for me to know if this was what was -- it was very often the case that we would have many iterations over email before uploading it to Diligent, which would be the official board deck.  Even though I see that it's labeled final board deck, it would be common that we may have 10 or 20 versions that said final board deck before the one got loaded, so. I just want to note that it's quite possible that anything we look at in here could be different than what's in the

Page 19

board deck.

Q.  Understood.  I will, I will let you know to that we checked to make sure that what we're talking about here is the same, but your point is well taken.

A.  Okay.

Q.  Understood.  I'm not going to ask you about all of this, but first I just want to see if this generally comports with your understanding of what would have been discussed in January of 2022.  I'm not asking you for a line by line, by any means.

A.  Yeah, this looks like a fairly typical presentation of capital allocation.

Q.  And on the slide that is numbered 7 at the bottom --

A.  Yes.

Q.  -- right.  Do you see about a fifth of the way from the top, there's a line, share repurchase, and then four columns?

A.  I do.

Q.  And on that line, there's the number 100, under 2022, and 150 under 2023.  Do you see that?

A.  I do.

Q.  Does this generally indicate an intention to use $100 million of the total $250 million for share repurchases during the 2022 period?

Page 20

A.  It does not.

Q.  What does it indicate?

A.  It indicates a scenario of cash projections, as the title says.  Similarly if you look at the line under it in acquisitions, that was merely a model.  I don't know what we spent in acquisitions in 2022, but I'm certain it was not a hundred million dollars.  It was either more or less.  I think it was quite a bit more if I recall, but I don't, I don't recall.

So this was a model that was used to justify -- you know, to get the authorization for 250, a broad stroke number.

Q.  And to your knowledge, did the -- did management present to the board alternative models?

A.  I don't, I don't recall if we presented alternative models.  I'll note that this slide does say base case, which would indicate that maybe there were other cases, but I don't recall if those cases were presented.

Q.  Now, during the first half of 2022, the company did use tens of millions of dollars to purchase shares back from public stockholders; is that right?

MR. COMERFORD:  Form.

A.  I would have to check.  I do recall we did, we did share repurchases in the first part of 2022, but I

Page 21

don't recall the amount.

Q. (BY MR. JOHNSON) What was Karen Rapp's role in the company in 2022?

A. Chief financial officer.

Q. And did she report directly to you?

A. She did.

Q. And did she interact regularly with you about business matters?

A. Yes.

Q. Now, let's pull document, the file -- the document in the file numbered 3. And that can be marked as Exhibit 2.

(Exhibit 2 marked for identification.)

(Discussion off record.)

Q. (BY MR. JOHNSON) This is an email chain from May 3rd, 2022. Take whatever time you need to take a look at this. The first question I'm going to ask is whether you recognize it.

A. Do I recognize it... I, I assume it's correct, it's from my email. Do I remember this specific conversation? I mean, vaguely. Vaguely, three years ago -- three and a half.

Q. Okay. You don't remember it in particular, but you don't have reason to suggest this is anything other than what it appears to be, is that?

Page 22

A. No, no, correct. I guess my comment was more, I had many of these conversations. This was in the regular course of business.

Q. Fair enough. On the page with the letters and numbers at the bottom NAT-SL-00005984, which I think is the third page of this document.

A. Oh, okay. Email from Karen to Pedro and Chris?

Q. Exactly.

A. Okay.

Q. Do you see in that email that right near the end of her communication she refers to still $100 million total for the year?

A. Uh-huh.

Q. You see that?

A. I do.

Q. Okay. And is it fair to say that the amount that the company spent on share buybacks would depend, at least in part, on the cash position of the company at any given point?

A. Only modestly correlated to that.

Q. What else was it correlated to?

A. It would be correlated to a long-term -- longer term view of cash generation, for example. We didn't tend to make decisions like this, just based --

Page 23

there were oftentimes, and it was very much the case in 2022 more than any other time in our company's history, that the cash generation was displaced in time, because if you'll recall, 2022 was a year of a very unusual once in a century supply chain disruption where cars were sitting on lots without chips, so they couldn't ship. And we had the same challenge.

So our cash generation in any given quarter was affected by that. So we would be thinking more about cash over, maybe a year, or two years. We had dead instruments that could easily give us the flexibility in a given quarter to do something that was in the best interest of shareholders in that quarter.

The other factor would be acquisitions, for example. If we decided to acquire a company, or not, that would be an impact to how much we would maybe allocate to this, perhaps. So a number of different factors. Cash in a quarter would be a very minor factor, actually.

Q. And so then, at least in this email chain, are you indicating that you supported using $10 million in the coming weeks for buybacks?

A. It seems that the -- on the first page that I do say that I support the $10 million, yes. I also note to the point I was just making that cash flow will be

Page 24

changing quite a bit during the year.

Q. At some point in May of 2022 you were contacted by Mr. Karsanbhai, the CEO of Emerson, right?

A. Yes, I was.

Q. And prior to his outreach to you in May of 2022 had you ever had any contact with Mr. Karsanbhai previously?

A. No.

Q. Had you on behalf of National Instruments had any prior business dealings with Emerson?

MR. COMERFORD: Form.

A. Had we had any -- I'm -- we sold to about 35,000 companies. I -- well, I'm certain that Emerson was a company that we sold to. We also had a former board member and a personal mentor that was a leader at Emerson, named John Barra. So I had some familiarity with the company.

Q. (BY MR. JOHNSON) John Barra had been what at Emerson, to your understanding?

A. John Barra was like a divisional president of the division that was headquartered in Austin. Divisions have changed since then, so I think it's not a division that's currently still called the same thing. And while he was --

Q. And -- sorry, go ahead?

Page 25

A.   And this is -- I think he still had that position when he joined our board.  For much of his board service he was retired from that position and retired from Emerson.  And then he left our board in, I believe 2017, if I'm not mistaken, or thereabouts.  And then I still had a relationship with him after that as a mentor.

Q.   Now, at any point -- well, let me ask something else first.

From Mr. Barra did you have any impressions at all about Emerson?

MR. COMERFORD:  Form.

A.   Sure, I had a number of impressions.  We talked about his history with the company, and working for Chuck Knight, he had a lot of colorful stories about their previous, and legendary, CEO, so yeah.

Q.   (BY MR. JOHNSON) That was pre-dating Mr. Karsanbhai in his time as CEO?

A.   Yes, by quite some time.

Q.   And when -- at any point after Emerson, through Mr. Karsanbhai, approached you in May of 2022, did you reach out to Mr. Barra to discuss anything related to Emerson?

MR. COMERFORD:  Form.

A.   No, no, I don't believe -- no, I don't believe

Page 26

so.  Not that I recall certainly.

Q.   (BY MR. JOHNSON) Okay, so the first contact that you had with Mr. Karsanbhai was an email from him asking to talk by phone; is that right?

A.   That is correct.

Q.   And did you ultimately talk with him by phone at all --

A.   I did.

Q.   -- in that period?

A.   I did.

Q.   Okay.  And what was the gist of the conversation you had with Mr. Karsanbhai -- by the way, just to be clear, is that still in May of 2022?

A.   It was.  I recall that was in May, because it was during our NI week user conference, which is late May.

MR. COMERFORD:  So, I'll object to the form.  I don't think there's a question -- let him ask a question.

A.   Okay, yeah, so what is the question?

Q.   (BY MR. JOHNSON) Yeah, it was just, was that conversation in May, and I heard you to say --

A.   Yes.

Q.   -- it was late May.

A.   Yes.

Page 27

Q.   Okay.  And what was the substance of that conversation?

MR. COMERFORD:  Form.

A.   What do you mean by substance?

Q.   (BY MR. JOHNSON) I'm not asking for small talk, you know, what was, what was communicated in that conversation?

MR. COMERFORD:  Form.  Go ahead.

A.   Yeah, I was clarifying because it was mostly small talk.  So I'll just tell you my recollection.  He talked about how much he admired NI and what a great company we were and how good our software was.  And then talked about, like, working together, and only at the very end of the call made sort of a comment that made it sound like there might be an offer coming for the company.

Q.   What was that comment?

A.   I don't remember the comment, but it was sort of vague, so, by counsel, Eddie was on the call as well.  So afterwards we were, hey, I think, I think what's going to happen is we're going to get a letter with interest in the company.  Yeah, that's my recollection.  And then of course we did.  But the call was fairly general.

Q.   And so it was that same day that you received

Page 28

by email a letter of interest from Mr. Karsanbhai; is that right?

MR. COMERFORD:  Form.

A.   I don't remember if it was that day or the next day, but yes, it was certainly short -- sometime after the call.

Q.   (BY MR. JOHNSON) Okay.  Let's, let's look at what's in the file number 5, this can be numbered Exhibit 3.

(Exhibit 3 marked for identification.)

Q.   (BY MR. JOHNSON) And after you get the document, Mr. Starkloff, take a look at it as much as you want.  The first question I'm going to ask is whether you recognize it.

(Discussion off record.)

Q.   (BY MR. JOHNSON) NAT-SL-00001263 through 1266.

A.   I've got it.

Q.   Okay.  So the cover email references a call that afternoon, is that the call you were talking about previously?

A.   Yeah, yeah, there's only one call.  So this -- yeah, this must have been the same day then.

Q.   Okay.  Was that the only call you had with Mr. Karsanbhai in the year 2022?

A.   No.

Page 29

Q.   When was the next call?

A.   I believe the next call was in either November or December.  It was late that year.

Q.   Was that after -- or around the time when Emerson came back with the higher offer?

MR. COMERFORD:  Form.

A.   Yeah, it's possible that that next call was even in January, to be honest.  I don't recall if it was -- I believe we had a call in November, December.  And then in January.  It was later in the year, and it was certainly after the higher offer, yes.

Q.   (BY MR. JOHNSON) Okay.  From -- so from May through at least October, this is the only call you had with Mr. Karsanbhai; is that fair?

A.   Yes, I believe that's correct.

Q.   All right.  Then after the cover email is the letter --

A.   Uh-huh.

Q.   -- from Mr. Karsanbhai on behalf of Emerson expressing Emerson's interest in purchasing National Instruments for $48 in cash per common share; is that right?

A.   Yes, that's correct.

Q.   And in the letter Mr. Karsanbhai indicates that their proposal would not be subject to any

Page 30

financing condition, and would be financed from cash on-hand.  Do you see that?

A.   I see that.

Q.   And that as far as timing was concerned, Emerson was prepared to proceed immediately, to complete due diligence and the like.  Do you see that?

A.   I do.

Q.   The letter also indicates that Emerson had no plan, no current plan to disclose this letter and assume that you do not intend to either.  And the letter indicates that Emerson's strong preference was to work with you and your board to announce a definitive agreement.  And I've taken a few words out, really for efficiency, but do you see what I'm talking about?

A.   I do.

Q.   Okay.  And, Mr. Karsanbhai also indicates in the letter that, the Emerson board supported this proposed transaction.  Do you see that?

A.   I do.

Q.   Did you view this as a, an expression of sincere interest in Emerson purchasing National Instruments?

MR. COMERFORD:  Form.

A.   I viewed it as -- let's see, I viewed it as sincere interest, but not a serious offer.

Page 31

Q.   (BY MR. JOHNSON) So you viewed Emerson's interest as sincere, but the price offered as not sufficient; is that fair?

MR. COMERFORD:  Form.

A.   Yeah, I thought nowhere near sufficient, correct.  Happened to be at a time when the stock market was at a historic low, so.  We perceived this to be bargain hunting.

Q.   (BY MR. JOHNSON) Did you view Emerson as a company that was capable of purchasing National Instruments at the price it was offering?

MR. COMERFORD:  Form.

A.   I mean, that depends on your definition of capable.  It was clear that they -- I didn't doubt that they had the financial capability.  But as also a public company CEO, I understood that you also needed to have shareholder support.  So I -- it wasn't clear to me the strategic fit and if Emerson would be able to pay a reasonable price that would be attractive to NI.  It seemed unlikely at the time.

Q.   (BY MR. JOHNSON) And the shareholder support you're referring to is shareholders of National Instruments?

A.   Well, both.  I was actually referring to Emerson, meaning, you may have the cash to do something

Page 32

as a public company CEO, but you're accountable to the owners of the company, so you can't just do anything.  You have to --

Q.   You're not saying that Emerson had to get a shareholder vote through in order to acquire --

A.   No, no.

Q.   -- national Instruments --

A.   No, it's not about a shareholder vote.  It's about the accountability that the CEO has to their shareholders and -- to give you a simple example, if the price was twice this much, still wouldn't need shareholder approval, but probably would not be able to pull off the transaction.  That's what I'm referring to.  So when you asked, are they capable, the base level of cash and financing, I assumed they were -- had the firepower to, but I believe there's other ingredients to being able to do a transaction.

Q.   Did you have any reason to doubt that Emerson would have adequate shareholder support to purchase National Instruments at the price it was offering?

MR. COMERFORD:  Form, foundation.

A.   I don't think I had opinion on that one way or the other.  The price offered was not a serious price, so.

Q.   (BY MR. JOHNSON) And in the, in the -- in

Page 33

Emerson's offer letter here of May 25, on the second page, Mr. Karsanbhai under the valuation subheading, refers to their $48 per share offer as being a 30% premium to NI's closing share price as of May 24, 2022, and he gives other figures there.  Do you see that?

A.  I do.

Q.  Okay.  Were these figures factually correct?

A.  They were factually correct, and also misleading.

Q.  First, they were factually correct?

A.  They were factually correct and also misleading.

Q.  So an executive can make factually correct but misleading statements?

A.  Yes.

Q.  Okay.  Including to the public?

MR. COMERFORD:  Object to the form.

A.  I don't, I don't know what you're getting at, but, of course.

Q.  (BY MR. JOHNSON) So at the time NI stock was trading approximately 39% below what Emerson was offering, fair?  That's factually correct?

MR. COMERFORD:  Form, form, foundation.

A.  That's, that's the number shown.  The context is that the market was down, I believe about 50% at that

Page 34

point from its peak.  The NASDAQ later doubled in value, the NASDAQ, I'm referring to.  That's the context.

Q.  (BY MR. JOHNSON) So, is $48 a share materially higher than $40 per share?

MR. COMERFORD:  Form, calls for legal conclusion.

A.  You're asking a math problem with a judgment. I think you're associating with this, and so therefore my point about it being misleading is that you have to look at a broader period of time to make a conclusion about how much higher that value is.

Q.  (BY MR. JOHNSON) I understand what you're saying.  But you understand what I'm asking, right?  Is $48 per share materially higher than $40 per share; is that a question you are capable of answering?

MR. COMERFORD:  Same objections.

A.  Forty-eight dollars per share is 20% higher than $40 per share.

Q.  (BY MR. JOHNSON) Mathematically you're right. Is it materially higher than $40 per share?

A.  I think I've --

MR. COMERFORD:  Yeah, same objection, and asked and answered.

Q.  (BY MR. JOHNSON) So what is your answer?

A.  Twenty percent.

Page 35

Q.  And is that materially higher than 40?

MR. COMERFORD:  Form, foundation, calls for legal conclusions, vague, ambiguous, asked and answered.

Q.  (BY MR. JOHNSON) Go ahead.  What's your answer?

A.  I answered the question.

Q.  Yes or no, is $48 per share materially higher than $40 per share?

MR. COMERFORD:  Same objections.

A.  It's 20% higher.

Q.  (BY MR. JOHNSON) So with all of your experience, you are not capable of simply answering yes or no whether $48 per share is materially higher than $40 per share?

MR. COMERFORD:  Same objections.

A.  I'm giving you a more precise answer.  It's 20% higher.

Q.  (BY MR. JOHNSON) It's not responsive.  So you, you have all this experience, and you cannot say one way or the other whether that is materially higher than $40?

MR. COMERFORD:  Same objections, asked and answered.

A.  Yeah, it's 20% higher.

Q.  (BY MR. JOHNSON) So when we're in front of a

Page 36

jury, is that the same answer you're going to give?

MR. COMERFORD:  Same objections.

A.  Do I actually have to answer the question of what I'm going to say in front of a jury?

Q.  (BY MR. JOHNSON) Yes.  I want to know whether the answer you're giving me today is the answer you intend to stick to?

MR. COMERFORD:  Same objections.  And now he's answered it, I think four times at least, so.  You can just keep giving him the same answer if that's your answer.

A.  Yeah, I've already answered.

MR. JOHNSON:  John, John -- just hold on a second, Mr. Starkloff.

John, I know you're -- I frankly respect the fact that you're not a New York lawyer.  God bless.  But that is not how objections are handled in the southern district of New York.  And if you have any doubt about it, you can, you can find out, but that is wholly improper, okay.  I'm entitled to ask these questions, without these speaking objections.  And you know that objection, form is where it should stop.

Q.  (BY MR. JOHNSON) So, Mr. Starkloff --

A.  Yes.

Q.  Can you just answer the question?

Page 37

MR. COMERFORD:  He --

Q.  (BY MR. JOHNSON) Is that how you're going to answer this question in front of the jury?

MR. COMERFORD:  I'm going to object.  He has answered this question several times now, and I don't think it's appropriate to just continue asking the same question in the hopes you're going to get a different answer that you like more than the answer he's given.  I think, I think that's improper.

MR. JOHNSON:  You're heard, you're heard, got it.  You're heard.

MR. COMERFORD:  So when -- at what point do you stop asking the same question hoping for a different answer?  At what point does that become improper?

MR. JOHNSON:  Up to me.  Up to me.  Up to me.

Q.  (BY MR. JOHNSON) So, Mr. Starkloff?

A.  Sure.

Q.  You got anything else to say?

A.  I've answered the question.

Q.  Okay, so we'll show this part of the tape and we'll see how that goes.

Would one penny above $40 be a material difference between $40 and $40 and one cent?

Page 38

MR. COMERFORD:  Objection, form, foundation, improper hypothetical, calls for legal conclusions.  Probably calls for expert opinions.

A.  Yeah, I, I think this line of questioning is going to just come up with a bunch of different numbers and try to find some line of materiality, that seems -- I don't see -- I don't see the point.

Q.  (BY MR. JOHNSON) I'm asking based on your experience, based on everything you know, you cannot answer the question whether one penny would be a material difference, a material amount above $40 per share?

A.  Sure.

MR. COMERFORD:  Same objections.

A.  I think it would depend a lot more on the context.  I don't think you're giving me enough information to answer the question.

Q.  (BY MR. JOHNSON) So one penny might be material?

MR. COMERFORD:  Same objections.

Q.  (BY MR. JOHNSON) Above $40?

MR. COMERFORD:  Same objections, asked and answered.

Q.  (BY MR. JOHNSON) You don't see, Mr. Starkloff, how that sounds evasive?

Page 39

MR. COMERFORD:  Objection, argumentative.

A.  I disagree.  Without giving a broader context, I think, I think it's a -- sort of too little information to make a conclusion that you're asking me to do.

Q.  (BY MR. JOHNSON) If Emerson had offered National Instruments one penny more than the price the stock was trading at that point in time, that would not be a material amount above the stock price, right?

MR. COMERFORD:  Objection, form, vague, ambiguous, improper hypothetical, calls for legal conclusions, and possibly calls for expert opinions.

A.  I could say that given that we rejected 48, I'm quite certain we would have rejected that offer as well.

Q.  (BY MR. JOHNSON) Part of the reason you would have rejected it is because it wasn't a material -- it wouldn't have been a material amount above the stock price, right, one penny?

MR. COMERFORD:  Same objections.

A.  See, I think you're making my point.  The decision is much more complex than just the math.  It has to do with future performance, and past performance, and many, many other factors are part of that decision, and you're trying to boil it down to something too

Page 40

simple for me to answer.

Q.  (BY MR. JOHNSON) All right.  Well, if your experience doesn't allow you to have the capability to respond yes or no whether $48 is materially above $40, including in this context, good luck.

A.  That's --

MR. COMERFORD:  That's, that's not a question.  And I, I object --

MR. JOHNSON:  John, you've said more than enough.

MR. COMERFORD:  I object to the statement that you just made as abusive and harassing.

MR. JOHNSON:  Noted.

Q.  (BY MR. JOHNSON) All right.  So after Emerson made this approach in May of 2022, the board discussed that approach, right?

A.  Yes, we did.

Q.  And as part of discussing Emerson's approach, the board was advised by counsel about various things, including fiduciary duties under these circumstances, right?

A.  Correct.

Q.  And Wachtell Lipton was the firm that advised the board about those issues and others, right?

A.  They did.

Page 41

Q. And Wachtell used -- as part of their discussion about this with the board, Wachtell used various slides to help explain the points they were making, fair?

A. On multiple occasions, yes.

Q. And you had an opportunity to see those slides before they were presented to the board, right?

A. That would have been likely. I don't recall which slides you're talking about and if I saw them prior, but I often reviewed materials before they went to the board, typically did.

Q. Let's look at what's in folder 6, which I believe will be marked as Exhibit 4.

(Exhibit 4 marked for identification.)

Q. (BY MR. JOHNSON) This is short cover email followed by a PowerPoint presentation with numbers at the bottom, NAT-SL-00016112 through 16144. I'm not going to ask you about all of this, but take a look at whatever you'd like. And first question I'm going to ask is just if you recognize it.

A. I do. Again, is there a reason why we're showing draft materials instead of the actual materials? I don't know if this was what was presented to the board. It says draft.

Q. So you recognize this document?

Page 42

A. In broad strokes I remember this type of material, but I am --

Q. You received this document?

A. It appears that I received this document in its draft form.

Q. And can you look, please, at the slide that's number 7.

A. Yep.

Q. And this slide talks about ███████████ ██████████████████████████ Do you see that?

A. I do.

Q. And then there's a ███████████ ██████████████████████████ . Do you see that?

A. I do.

Q. And the substance of what's conveyed here, is this consistent with what Wachtell conveyed to the board when they did discuss it with the board?

MR. COMERFORD: Form.

A. I believe so. This is -- this was a boilerplate Wachtell slide was my impression that they probably showed to multiple clients, so. I would assume that the same form of this slide is what was actually in

Page 43

the board deck, is a reasonable assumption.

Q. (BY MR. JOHNSON) And you see on the slide ███ ██████████████████████████ ?

A. I do.

Q. Is it fair to describe the letter you got from Emerson in late May of 2022 as a private letter from an offerer to an offeree?

A. I think that's appropriate.

Q. And you see line four, ██████████████ ██████████████████████████ ██████████████████████████ Do you see that?

A. I do.

Q. And is it fair based on this slide to ██████ ██████████████████████████ ████████████████ 

MR. COMERFORD: Form.

A. I think that's the -- ██████████████ ████████

Q. (BY MR. JOHNSON) Would that be consistent with your experience as well, that acquiring stock without public disclosure would be more aggressive, more coercive than merely sending a private letter from the offerer to the offeree?

MR. COMERFORD: Form.

Page 44

A. In a very generic sense, I think so. I also understood that to be very uncommon.

Q. (BY MR. JOHNSON) So if it was very uncommon, what did you understand it to mean when it did happen?

MR. COMERFORD: Form.

A. Yeah, I think, you know, you have to look at this in broad context. Number 2 did not happen, for example. So, in broad context it was, you know, an additional tactic. But I don't think this is sort of completely linear list, as I noted, number two was not done. And I didn't necessarily mean that that concluded that, you know, it was even less coercive, because number two wasn't done, so.

Q. (BY MR. JOHNSON) Right, Wachtell wasn't suggesting this is, this is the order in which things always happen, right?

MR. COMERFORD: Form, foundation.

A. I don't think they present it that way. I think -- ██████████████████████ ██████████████████████████ ██████████████████████████ ██████████████████████████ ██████████████████████████ ████████████████████ .

Q. (BY MR. JOHNSON) ██████████████████



Page 45

[REDACTED]

A.  Correct.

Q.  And it's identifying them as, you know, [REDACTED]?

A.  Roughly ordered in that, in that way, correct.

Q.  And on the next slide, [REDACTED] Do you see those?

A.  Yes.

Q.  And [REDACTED]. Do you see that?

A.  Yeah, I do.

Q.  Now, Emerson had not done that in their May 2022 letter to you, right?

A.  No, incorrect.

Q.  I'm sorry, what do you mean?

A.  I think they did allude to that in the May letter.

Q.  Well, let's go back to Exhibit 3.

A.  Sure.

Q.  And understand what you're referring to.

A.  Do you have a question?

Page 46

Q.  I want to understand what in this letter you interpreted to be Emerson requesting timely response and possibly threatening public disclosure?

A.  Yeah.  Under timing, second paragraph, we have no current plan to disclose this letter and assume that you do not intend to either.  Our strong preference is to work constructively and expeditiously.

We took that to be a coded statement of a public disclosure threat.

Q.  Okay.

A.  And that was counsel's interpretation as well, and my understanding was that Wachtell had been presented to me as sort of the world's greatest attorneys in this category, so I trusted their judgment.

Q.  Okay.  So even in their first letter, Emerson was, as you understood it, threatening to go public with their offer; is that right?

MR. COMERFORD:  Objection, form, mischaracterizes testimony.

A.  Yeah.  They had some allusion to that, or -- well, I read this statement and mentioned our interpretation.

Q.  (BY MR. JOHNSON) Which was that it was a threat, right?

A.  Perhaps.  I should say -- let me say, that

Page 47

could have been their intent.  We were trying to interpret what could possibly be their intent.  We didn't have the -- we didn't discuss it with them.  So I didn't know their exact intent, but we were trying to ascertain what their intent might be.

Q.  You understood that their intent might include a threat to go public with their offer; is that fair?

MR. COMERFORD:  Objection, form, mischaracterizes prior testimony.

A.  Yeah.  It might be.  I didn't think they would actually do it, though.

Q.  (BY MR. JOHNSON) Okay.  On slide -- sorry, going back to Exhibit 4, on slide 10 towards the bottom, on the left-hand column. [REDACTED]. Do you see that?

A.  I do.

Q.  And that's under a column labeled what to do, right?

A.  Yes.

Q.  Did National Instruments begin monitoring trading of its stock for the possibility of accumulation by Emerson?

A.  At some point we did.  I don't recall the exact day that we did that.  But at some point in this

Page 48

period, we did.

Q.  Did, did that begin before you got Emerson's next letter?

A.  I think so.  I don't recall exactly.  Again, this is the difference between May and June three and a half years ago, I don't recall exactly when we engaged the firm that did that surveillance.

Q.  Let's look at what's in folder 7, and this I think can be labeled Exhibit 5.  It's a one page document --

COURT REPORTER:  One second, please.

(Exhibit 5 marked for identification.)

(Discussion off record.)

Q.  (BY MR. JOHNSON) NAT-SL-000016270 through 271.  When you've had a chance to look this over, I'm first going to ask if you recognize it.

A.  Yep, I do.

Q.  You received this email?

A.  Yes, it was sent to all board members.

Q.  And the subject line, Project Wolverine, that was, what, a code name for Emerson's approach to National Instruments?

A.  Correct.

Q.  And another code name that was used was Nut Hatch; is that right?

Page 49

A.   Yeah.  I think at some point Nut Hatch referred to Emerson, and then maybe that became a code name, but that was -- at this point I believe that referred to Emerson themselves.  Wolverine was the overall project.

Q.   So when you received this email, do you generally understand what the point of it was?

A.   Yes.  This was the -- we would have a similar action for other events that necessitated a trading restriction, or that we deemed necessary to trading restriction.  So this was not particularly uncommon.

Q.   So you had experience with --

A.   Yes.

Q.   -- situations like this?

A.   Yes.

Q.   And communications like this?

A.   Yeah.  Situation was kind of unique.  But communications like this for different types of situations, yes.

Q.   And what was it that you understood to be the material non-public information?

MR. COMERFORD:  I'm going to object to the form, calls for legal conclusions.

A.   The -- my recollection is the reason we decided to send this, with the advice of outside counsel

Page 50

included, was that even, even though, as I mentioned earlier, the initial impression of the offer was that it was not a very serious offer, given the price; that the appropriate action by our board would still be to thoughtfully consider it with external adviser's input, which I'm sure we'll talk about.

And so, as we were doing that we thought it was appropriate to, to restrict trading.

Q.   (BY MR. JOHNSON) And was the fact of Emerson's offer to acquire National Instruments the material non-public information issue?

MR. COMERFORD:  Form, asked and answered.

A.   I think at this time it was that we were considering the offer, even though we knew the likely -- that it was, you know, likely insufficient, but we were technically considering it.

Q.   (BY MR. JOHNSON) So the material non-public information was the fact of the offer and the fact that the board was considering the offer at all; is that right?

MR. COMERFORD:  Form, asked and answered.

A.   Yeah, I don't recall all the specifics of making this determination, but I think, I think that was part of it.  But I don't recall all the specific factors that went into the determination, but we did make the

Page 51

determination, obviously, and sent this out.

Q.   (BY MR. JOHNSON) Well, did you understand that you, you could not disclose the fact of Emerson's offer to the public at that point?

MR. COMERFORD:  Form, calls for legal conclusions.

Q.   (BY MR. JOHNSON) Let me put it a different way.  Did you understand that you could not go trade National Instruments' securities, because you were aware of Emerson's offer at that point?

MR. COMERFORD:  Form, calls for legal conclusions.

A.   I understood that I could not trade because we had made the determination based on the set of factors to put in the trading restriction.

Q.   (BY MR. JOHNSON) And you couldn't trade then in part because Emerson had made an offer to acquire National Instruments, right?

MR. COMERFORD:  Form, asked and answered.

A.   Yeah.  As I said, there were a set of factors that went into this decision.

Q.   (BY MR. JOHNSON) Did those factors include the reality that Emerson had made an offer to acquire National Instruments?

MR. COMERFORD:  Form, asked and answered.

Page 52

A.   They included that and other things.  That was not the sole factor.

Q.   (BY MR. JOHNSON) And they included the fact that the board was going to consider in good faith the offer, right?

A.   Correct.

Q.   And anything else?

A.   Let me think.  Yeah, I think those, those two things, and the issues around them.  But yeah, the board considering it, I think was also a factor.

Q.   Okay.  So, so the fact that Emerson had made an offer to acquire National Instruments, and the fact that the board was going to consider that offer, these were -- these amounted to material non-public information; is that right?

MR. COMERFORD:  Objection, form.

Q.   (BY MR. JOHNSON) That was your understanding?

MR. COMERFORD:  Objection, calls for legal conclusions, asked and answered.

A.   I think broadly speaking those were the things referred to in this document, which, which highlights the fact that there's material non-public information.

Q.   (BY MR. JOHNSON) Okay.  And given that, was it your understanding that it would, it would not have been appropriate for the company to go out and buy National

Page 53

Instruments shares under those circumstances?

MR. COMERFORD:  Object, calls for legal conclusions, form.  I think it's asked and answered.

A.  Yeah.

MR. JOHNSON:  Not at all.

A.  Previous to this we had had discussions -- or I had had discussions about whether the, the company's purchases were subject to trading restrictions, which we normally had for open windows.  And I had, I had decided to make the company's purchases subject to the same windows.  So I believe we paused company purchases while this restriction was in place as well.

Q.  (BY MR. JOHNSON) So while the restriction that's discussed in this May 27 email was in effect, you made the decision that the company would pause share buybacks; is that right?

MR. COMERFORD:  Form.

A.  It's my recollection, yes.

Q.  (BY MR. JOHNSON) And, and did you make that decision based on what we've already talked about, namely the fact that Emerson had made an offer to acquire National Instruments, and the fact that the board was considering that offer?

MR. COMERFORD:  Form, asked and answered, calls for legal conclusions.

Page 54

A.  Yes, as I answered before, we made -- we already discussed why the factors that led to putting the trading restriction in place.  And as a trading restriction was in place, we adhered to that trading restriction with buybacks as well.

Q.  (BY MR. JOHNSON) For the reasons you identified earlier, right?

A.  That I answered earlier.

Q.  Why would the fact that Emerson made an offer to acquire National Instruments be material as you understood it?

MR. COMERFORD:  Object to the form, calls for legal conclusions, calls for expert opinion, asked and answered.  It's vague, ambiguous.

MR. JOHNSON:  Got any more, John, to coach the witness with?

MR. COMERFORD:  No.  I'm not coaching the witness.  Those are proper objections, Mr. Johnson.  And I don't appreciate --

MR. JOHNSON:  Objection, form is proper.

MR. COMERFORD:  I don't appreciate that comment at all.  I don't appreciate that comment.

MR. JOHNSON:  Okay.  Don't appreciate it.

MR. COMERFORD:  That is unprofessional.

MR. JOHNSON:  Good luck.

Page 55

MR. COMERFORD:  You know what, we've been going for about an hour and a half, Mr. Johnson, and I think that your comments are unprofessional, and I think maybe we should take a quick break.  Maybe five minutes, we can use the restroom.

MR. JOHNSON:  There's an open question, John.

A.  You'll have to restate the question, I don't recall it.

Q.  (BY MR. JOHNSON) Why would the fact -- it's not meant to be difficult even.

Why would the fact that Emerson made an offer to acquire National Instruments be material as you understood it?

MR. COMERFORD:  Same objections.

A.  Our, our -- the way that we looked at these issues was, I believe, quite conservative, and we would try to use, kind of caution when there was a judgment.  We would often put a trading restriction in place out of the abundance of caution when the judgment on an issue could sort of go in either direction.

In this case I recall, you know, there was uncertainty about what, what could happen.  The board was doing some consideration on this.  We thought in that sort of realm of circumstances the conservative approach

Page 56

was to put a trading restriction in place.

And also I'll note, and you'll see in this document, the window was going to close in four days anyway.  So again, we thought just in an abundance of caution it was appropriate to put this restriction in place and we did.

Q.  (BY MR. JOHNSON) And one of the reasons that the fact that Emerson made an offer to acquire National Instruments was material is because disclosure of that fact ran the real risk of impacting the share price in the public market, right?

MR. COMERFORD:  Objection, misstates prior testimony.  Misstates evidence.  Form, foundation, calls for legal conclusions, and calls for expert opinion.  And it's asked and answered.

A.  I don't know that to be the case.

MR. COMERFORD:  Okay, so now, do you mind if we take a break, Mr. Johnson?

MR. JOHNSON:  Let me just ask the follow-up question.

Q.  (BY MR. JOHNSON) I'm not asking for you to know what would happen, Mr. Starkloff, of course that's not necessarily possible.  The question is:  One of the reasons that the fact that Emerson made an offer to acquire National Instruments was material was because of

Deposition of Eric Starkloff                    In Re National Instruments Corporation Securities Litigation

Page 57

the risk that disclosure of that fact would impact the share price in the public markets, right?

MR. COMERFORD: Objection, form, misstates prior testimony, misstates evidence, calls for legal conclusions, calls for expert opinion. Asked and answered.

A. I don't agree.

MR. JOHNSON: Okay, take a break.

THE VIDEOGRAPHER: Going off the record. The time is 10:35.

(Recess.)

THE VIDEOGRAPHER: Back on the record. The time is 10:48.

Q. (BY MR. JOHNSON) So, before the full board meeting to discuss Emerson's initial offer, Mr. Karsanbhai came back to you to ask when he could expect to hear from you; is that right?

A. I, I don't remember, but if -- that sounds right. If there's an email showing that, I'm sure it's correct.

Q. And you said you were reviewing the letter in a big meeting with the full board next week; that was something you said in --

A. Sounds right.

MR. COMERFORD: Form.

Page 58

Q. (BY MR. JOHNSON) Does that sound right to you?

A. It sounds right, yes, sir.

Q. Let's look at the documents in the file number 57. I think we're up to Exhibit 6.

(Exhibit 6 marked for identification.)

(Discussion off record.)

Q. (BY MR. JOHNSON) It's got designation NAT-SL-00011671 to 72. When you've had a chance to look at this, Mr. Starkloff, my first question will be, whether you recognize it?

A. This is from me. I'm reading, I don't recall this, but let me see. Sorry about the lawyer's comments, folks.

Yeah, I've reviewed it. I don't recall sending this, but I believe I did.

Q. This is in preparation for the upcoming board meeting to discuss Emerson's offer, right?

A. Yes, and is Eagle what we referred to as NI at that time; is that your understanding?

Q. No. I'll tell you my honest guess is that this is, this is probably, like a typo in effect or whatever, but -- it doesn't matter what --

A. Oh.

Q. -- whether Eagle was generally used or not.

A. Oh, that's Emerson, okay.

Page 59

Q. I think it's -- I think it's meant to refer to Emerson.

A. Oh, we hadn't given them a code name yet, okay. Or this was -- code name that didn't stick. Yeah, again, this -- I'll just note again, this is the challenge was using not the actual materials, but some -- obviously this isn't the version that we used, because it doesn't have the right name, but okay, we can talk about it.

Q. One thing I want to understand in your -- in the text of your email to Mr. McGrath, you say, the most important slide is below.

And I'd like your best understanding as to what in particular is important about this slide?

A. I believe it's that this slide represents kind of the -- the decision ultimately of, of the board and different variations or different versions of that decision and how it can be communicated. So it's kind of the punchline of the decision that the board was going to make.

Q. Different approaches to a response; is that fair?

A. Yes.

Q. And in the column, or box, ███████████
█████████████████████████████████

Page 60

█████████████████████████████████
██████████ right?

MR. COMERFORD: Form.

A. Yes, it may, yeah. It also says -- ██████
█████████████████████████████████.

Q. (BY MR. JOHNSON) Exactly. So, then ultimately you did meet with the board, the full board, you're a member of it, on or about -- rather, on June 14, 2022 --

A. Uh-huh.

Q. -- and determine to reject Emerson's offer; is that right?

A. Yeah, that's my -- yeah, that's correct, yeah.

Q. What was Mr. Ilcisin's role at the company at that time?

A. He was vice president, maybe senior vice president, of corporate development, which included strategic planning, but it's primarily mergers and acquisitions. Most of his time was spent on the buy side of mergers and acquisitions. And then he took on a role kind of leading some of the activities around this, this project as well.

Q. So he had something of a role in dealing with Emerson's approach to National Instruments?

A. He did. I don't recall when he took on that responsibility, if that was during this time, or not.

Page 61

At some point he certainly did. But I don't recall when, when he took on that responsibility.

Q. By June 13 the company had spent 70 million of the 100 million it planned to spend on share buybacks that year, correct?

A. I don't recall how much we had spent at that point. I guess that's a matter of public record, so -- yeah, I don't know what the number was.

I do -- as we discussed before, I do object to the use of the word planned with respect to the hundred million.

Q. Let's look at the document that's in file folder 9, which I think will become Exhibit 7.

(Exhibit 7 marked for identification.)

MR. JOHNSON: This document has designation numbers NAT-SL-00001696 through 1698.

Q. (BY MR. JOHNSON) After you've had whatever time you want to look at this, Mr. Starkloff, I'm going to ask you if you recognize it.

A. Yeah, I don't recall this exact email exchange, but I believe it represents an email exchange I was on.

Q. On the first page, you see at the bottom there Ms. Rapp's email to you of June 13, 2022, at 8:55 a.m., it says, we've already done 70 million this year of the

Page 62

100 million we planned. See that?

A. I see that.

Q. Do you have any reason to dispute that by that time the company had spent 70 million on buybacks for that year?

A. No. Karen was typically accurate and honest, yeah.

Q. But did Ms. Rapp understand your objection to the idea of referring to this as a plan?

A. I don't know what she had in mind when she wrote that.

Q. You tell her she shouldn't use that word when discussing what was going to be done with money used for buybacks?

MR. COMERFORD: Object to the form.

A. I don't know if I did or didn't.

Q. (BY MR. JOHNSON) So, on June 16 you sent a letter back to Mr. Karsanbhai from yourself and Mr. McGrath rejecting Emerson's offer to acquire National Instruments for $48 a share, right?

MR. COMERFORD: Form.

A. I believe so, yes. I know we did that. I trust that was the date.

Q. (BY MR. JOHNSON) And despite the company's rejection of Emerson's offer, was there a realistic

Page 63

likelihood that Emerson would come back to continue discussions with National Instruments about this?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I had no way of knowing what Emerson might do.

Q. (BY MR. JOHNSON) I understand you couldn't know for certain, but there was a realistic likelihood that Emerson would come back and continue these discussions, right?

MR. COMERFORD: Form, foundation, calls for speculation.

A. Yeah, I had no reason to -- I didn't know one way or the other. I tried to prepare for a lot of different options, but I had no idea at that point what the likelihood was.

Q. (BY MR. JOHNSON) So you were preparing for the possibility that Emerson would come back, right?

MR. COMERFORD: Form.

A. To some extent, sure.

Q. (BY MR. JOHNSON) Yeah, yeah, because there was a realistic possibility that Emerson would come back, right, you weren't just wasting your time?

MR. COMERFORD: Form, foundation, calls for speculation, asked and answered.

A. We prepared for lots of things that were low

Page 64

probability. I prepared for fires and explosions on campus, and those are pretty unlikely events, but I prepared for them.

Q. (BY MR. JOHNSON) Are you saying it was necessarily a low probability that Emerson would come back?

MR. COMERFORD: Form, foundation, calls for speculation, asked and answered.

A. I'm saying I don't know what the probability was.

Q. (BY MR. JOHNSON) But the probability was high enough that it was worth taking action to prepare for that, right?

MR. COMERFORD: Form, foundation, calls for speculation. Asked and answered.

A. We prepared for lots of low probability events, and high probability events.

Q. (BY MR. JOHNSON) One of the things you did after rejecting Emerson's initial offer was you met with Bank of America about steps that could be taken to help defend the company against a further approach by Emerson, right?

MR. COMERFORD: Form.

A. We met with Bank of America before the objection as well. I met with them multiple times

Page 65

during this period.

Q. (BY MR. JOHNSON) Okay. Well, after the point in time when you rejected Emerson's initial offer you met with Bank of America, among others, to discuss steps to prepare for potential escalation by Emerson, right?

MR. COMERFORD: Form.

A. I don't recall what specific meetings I had with Bank of America in that timeframe.

Q. (BY MR. JOHNSON) You don't know if you did that after rejecting Emerson's offer?

A. No.

MR. COMERFORD: Form, asked and answered.

A. I had, I had lots of different meetings. I don't recall if I met with Bank of America with that context at that time.

Q. (BY MR. JOHNSON) Let's look at what's in folder 13, which I think will become Exhibit 8.

(Exhibit 8 marked for identification.)

A. Okay. I have Exhibit 8.

Q. (BY MR. JOHNSON) It's WLRK-00001596 through 1611.

So this is after you'd rejected Emerson's initial offer, right?

A. June 20th, so yes.

Q. The rejection was on June 16th, okay?

Page 66

A. Yeah, so this was after, correct.

Q. All right. And so does this help remind you that you did have discussions at least with Bank of America and/or Wachtell Lipton about next steps related to Emerson's interest in acquiring National Instruments?

MR. COMERFORD: Form.

A. I don't, I don't see any NI people on this email. I don't see myself on this email, or any of my staff.

Q. (BY MR. JOHNSON) I can show you other things, but does this not refresh your recollection about discussions regarding next steps after, after rejecting Emerson's initial offer?

MR. COMERFORD: Form, foundation, asked and answered.

A. In a broad sense, we had lots of discussions in this time period about, about things of this nature. So I do recall sort of broadly speaking of things of this nature, I just don't -- I just don't know if I was reviewing this particular presentation, or exactly if I did, when I did. I don't know.

Q. (BY MR. JOHNSON) But you don't deny that even after rejecting Emerson's initial offer, you and others at National Instruments were involved in preparing for next steps related to Emerson's interest in buying

Page 67

National Instruments, right?

MR. COMERFORD: Form.

A. We were doing some activities, I believe, still on sort of preparedness for different scenarios. And we were also, as a normal kind of course of business, evaluating value creation possibilities for the business in different dimensions.

Q. (BY MR. JOHNSON) Let's look at -- what's in file 68.

Kim, it might be in the second box. I'm just not sure what's in the second box versus the first.

(Discussion off the record.)

THE VIDEOGRAPHER: Going off the record. The time is 11:08.

(Recess.)

THE VIDEOGRAPHER: Back on the record. The time is 11:10.

(Exhibit 9 marked for identification.)

Q. (BY MR. JOHNSON) Exhibit 9 has designation NAT-SL-00021956.

After you've had a chance to look at this, Mr. Starkloff, first ask if you recognize it?

A. Yeah, I've looked at it. In broad strokes I remember some of these. I don't remember the specific email. For context, I received about 300 emails a day,

Page 68

but --

Q. So this --

A. -- I believe I received this, yes.

Q. Okay. So is this reflective of a discussion you had with others within National Instruments about next steps to be taken by National Instruments with regard to Emerson's interest in purchasing National Instruments?

MR. COMERFORD: Form.

Q. (BY MR. JOHNSON) In part I base that on the subject line?

A. Oh, yeah, the subject line implies that, yeah. That's what I was trying to figure out. The subject line, I guess implies that. Although it seems like the actions are a bit broader, but that's reasonable context.

Q. And that's not the only meeting you had after rejecting Emerson's offer -- it's not the only meeting you had about other steps to take with regard to Emerson's interest in acquiring National Instruments, right?

MR. COMERFORD: Form.

A. Probably not.

Q. (BY MR. JOHNSON) And not too long after that, you got from Mr. Karsanbhai a second offer letter from

Page 69

Emerson; isn't that right?

A.  Correct, which day was that, I don't recall the day.

Q.  June 22, we could show it to you.

A.  Okay.  June --

Q.  It's in -- but does that sound consistent with your recollection?

A.  Yeah, yeah, I remember it being a week or so. I guess that was six days after we sent ours, yeah.

Q.  Okay.  It's in file 14.  I think we're up to Exhibit 10.

(Exhibit 10 marked for identification.)

A.  Okay.

Q.  (BY MR. JOHNSON) Is this the second offer letter you received from Emerson?

A.  Yeah, appears to be.

Q.  And Mr. Karsanbhai was reiterating their $48 per share offer with additional context, right?

MR. COMERFORD:  Form.

A.  He reiterated the $48 offer, correct.

Q.  (BY MR. JOHNSON) Well, and time had moved on, right, so the context was somewhat different, and he made reference to that, right?

MR. COMERFORD:  Form.

A.  I don't know exactly what you mean, but yeah,

Page 70

six, six days had passed.  Not a particularly significant amount of time.

Q.  (BY MR. JOHNSON) Well, more than six days had passed since their first offer?

A.  Six days had passed since we rejected the first offer.

Q.  Yeah.  But in the first offer, he was able to say our $48 share offer is a 39% premium to the recent closing price and in this offer letter he's able to say our $48 per share offer is a 51% premium.  Do you see that?

A.  He did say that.

Q.  Any reason to quibble with the facts that are here?

MR. COMERFORD:  Form, foundation.

A.  No.

Q.  (BY MR. JOHNSON) Okay.

A.  The facts remain misleading, but they are the facts, yes, correct.

Q.  And they are the facts because since the time when Emerson made its first offer, National Instruments' stock price had declined somewhat, right?

A.  Yes, that appears to be the case, as did the market.

Q.  And you recall that National Instruments'

Page 71

stock price had declined from approximately $33 a share to about $31 a share?

A.  I didn't check the ticker, but I, I buy that; that sounds about like the right math.  Do you know how much the NASDAQ declined at that point?  Do you have that date in front of you?

Q.  A particular date?

A.  Of the same period you just mentioned.

Q.  No.

A.  Okay.  My recollection is there was a decline in the overall market at that time.

Q.  And National Instruments was part of that decline, right?

A.  Correct.

Q.  Are you able to answer the question whether $48 per share is materially higher than $31 per share?

MR. COMERFORD:  Form, calls for legal conclusions, calls for expert opinion.  Foundation.

A.  It is the same question you asked me before.

Q.  (BY MR. JOHNSON) Not quite.

A.  Substantially similar.  And my answer is the same.

Q.  So what is the answer?

MR. COMERFORD:  Objection, it's asked and answered.

Page 72

A.  It was the same offer that we had received before.

Q.  (BY MR. JOHNSON) So just answer my question. It's not the same, okay.  The numbers are different.  Is $48 per share materially higher than $31 per share?

MR. COMERFORD:  Form, foundation, calls for a legal conclusion, calls for expert opinion, asked and answered.

A.  It objectively was the same offer.  It was $48 a share, the same offer that we received before.

Q.  (BY MR. JOHNSON) I'm not comparing the offers, I'm comparing the public trading price of National Instruments with the offer?

A.  And which day are you choosing to make that arbitrary comparison; do you know?

Q.  Day before.  So here's the simple numerical question requiring a simple yes or no.  Is $48 a share materially higher than $31 per share?

MR. COMERFORD:  Objection, form, calls for legal conclusions, calls for expert opinion, it's asked and answered.

A.  You're asking me to answer if 48 is higher than 38; is that your question?

Q.  (BY MR. JOHNSON) Is it materially higher?

A.  Oh, you're asking materially --

Page 73

MR. COMERFORD: Yeah, same objections.

A. Yeah, same answer.

Q. (BY MR. JOHNSON) What is the answer?

MR. COMERFORD: Same objections, it's been asked and answered.

A. We viewed this offer as the same as the offer that had been made and rejected a few days prior.

Q. (BY MR. JOHNSON) So you are incapable of answering yes or no, whether $48 a share is materially higher than $31 per share?

MR. COMERFORD: Objection, it's argumentative, form, asked and answered.

A. I find the comparison to an arbitrary price you're choosing to be not relevant.

Q. (BY MR. JOHNSON) You, of course, agree 48 is itself higher than 31, right?

A. It is both higher than 31 and the same as 48.

Q. And is it materially higher than 31?

MR. COMERFORD: Objection, form. Calls for a legal conclusion, calls for expert opinion, asked and answered.

A. Yeah. I've answered this question.

Q. (BY MR. JOHNSON) So remind me what your answer is?

MR. COMERFORD: Same objections.

Page 74

A. My answer is that the $48 share offer is the same as the previous $48 share offer that we rejected on January -- or sorry, June 16.

Q. (BY MR. JOHNSON) Okay. You're going to try that in front of the Court, too? You're going to stick with that answer in front of the Court?

MR. COMERFORD: Objection --

Q. Because I'm going to ask you this same question in front of the jury and the Judge.

MR. COMERFORD: Objection, argumentative.

MR. JOHNSON: Yeah, it is.

MR. COMERFORD: Form.

A. Did you ask me a question?

Q. (BY MR. JOHNSON) Yeah, are you going to stick with this in front of the jury?

MR. COMERFORD: Objection, form, argumentative, asked and --

Q. (BY MR. JOHNSON) Because if you don't, I'm going to play that point, okay. So tell me, are you -- is this your answer today, and in front of a jury?

MR. COMERFORD: Same objections.

A. I've given you my answer.

Q. (BY MR. JOHNSON) Now, in this second letter from Emerson, dated June 22, second offer letter from Emerson, Emerson says, and I'm reading on the second

Page 75

page in about the middle, we could work with you to find additional value that would allow us to increase our proposal. Do you see that? I can help you find it if you need.

A. Yeah, I'm looking for it, I vaguely remember that but where is that?

Q. It's the end of the paragraph that begins we prefer to engage.

A. Yes, I see it now.

Q. Okay. So you understood that to mean that Emerson was communicating a willingness to quite possibly raise their offer price, correct?

MR. COMERFORD: Form, calls for speculation.

A. Yeah, I didn't know what -- I didn't know what their real intent was there. I understood from counsel that's kind of a statement often, often put in, but not something I could really count on.

Q. (BY MR. JOHNSON) You, you see in the letter that they -- that Emerson notes that they've engaged Goldman Sachs, Centerview Partners, Davis Polk. Do you see that towards the bottom of this page?

A. I do.

Q. Those are reputable organizations, right?

MR. COMERFORD: Form.

Page 76

A. Yeah, two out of three.

Q. (BY MR. JOHNSON) As best you know, as best you know?

A. As best I know, sure.

Q. And in the world of mergers and acquisitions, those are credible organizations, fair?

MR. COMERFORD: Form.

A. Sure.

Q. (BY MR. JOHNSON) So on the whole, did you continue to believe that Emerson was sincere in its interest to acquire National Instruments?

MR. COMERFORD: Form, foundation, calls for speculation.

A. We didn't view this letter as having really any changes from the first one. I, for example, assume they already had all of those partners previously. So I didn't find any new information to be presented in this letter.

Q. (BY MR. JOHNSON) Certainly didn't see anything that indicated less seriousness on Emerson's part in its interests to acquire National Instruments, right?

A. Actually -- in some ways the fact that they just restated the same number after a rejection did make me question the seriousness of the offer, so yes -- so I disagree with your point.

Page 77

Q. The end of the letter, Emerson -- or Mr. Karsanbhai, on behalf of Emerson says, I look forward to hearing from you by then at the latest, and he was referring to July 11th. Do you see that?

A. Yep, I see that.

Q. Do you recall that Wachtell ███ ███████████████████████ ██████████?

MR. COMERFORD: Form.

A. I don't, I don't recall that. I know you showed that slide. I don't doubt that that may have been a point. I don't think that's the immediate conclusion I had at the time from reading this, but...

Q. (BY MR. JOHNSON) Did you --

A. In fact, if I may, at the time we thought that was a fairly long period. They didn't seem to have a lot of urgency actually, the way I interpreted it.

Q. What is that three weeks, three-ish weeks away?

A. Yeah. I had been -- previously had had experience being on the other side, where I was giving an unsolicited offer. I typically gave 24 to 48 hours response time, something like that. So this seemed not particularly urgent on their part. That's how we interpreted it at the time.

Page 78

Q. So you thought they were less serious about their interest in acquiring National Instruments?

A. I think that's accurate. Because they restated the same number, so that didn't seem like it had much likelihood of going anywhere since we had already rejected this offer a few days prior.

Q. So then did you advise the board of your view about that?

A. We collectively discussed this with the board and advisers.

Q. And given your view that this second letter from Emerson suggested less seriousness on Emerson's part, did you express that view to the full board?

A. I think as a full board we considered a range of interpretations that would range from less serious, about the same, to potentially more serious, as sort of a range of interpretations of this. But at the headline we viewed it as substantially the same offer that had been presented before, and rejected.

Q. So did you in effect stop thinking about the possibility that Emerson would come back with a third approach?

MR. COMERFORD: Form.

A. I mean, we continued to -- I viewed my job, not just in this context, but in general, as being

Page 79

prepared for all kinds of opportunities and challenges that would face the business. So in that context I believe we continued to think about in various different ways preparedness for this scenario, as well as many other scenarios, many others, as we had done before, while at the same time viewing this as sort of low probability of happening, because it was an offer that we had rejected once, and as you know, we would come to reject this one as well.

Q. (BY MR. JOHNSON) And so did you take any affirmative steps to help position the company for the possibility that Emerson continued to be interested in acquiring National Instruments?

MR. COMERFORD: Form.

A. I don't, I don't know what you mean by that. What do you mean?

Q. (BY MR. JOHNSON) What's complicated about the question?

MR. COMERFORD: Form.

A. You're asking if we took any affirmative steps -- I honestly do understand what you're getting at.

Q. (BY MR. JOHNSON) Did you do anything to prepare for the possibility that Emerson would come back with a third communication about buying National

Page 80

Instruments?

A. Yeah, I think I already said that we did a range of activities, for that possibility, for many other possibilities, so, yeah, of course.

Q. And that included -- and that included changing your approach to your cost cutting plans, right?

MR. COMERFORD: Form.

A. No. We had a debate happening, as is normal, I think, in a corporation like this, that predated all of this timeline that we've been discussing by a long time, about cost structure of the organization. Myself and the chairman had debated that quite a bit, and had sort of differing opinions.

And that debate was primarily exacerbated by the market conditions at the time that included the inability to obtain semi-conductors, and ship product, which resulted in large amounts of backlog and a reduction in short-term profit. So there was a very active debate about that that had predated all of the approach by Emerson. And it continued throughout this time vigorously.

Q. (BY MR. JOHNSON) And because of Emerson's interest in buying National Instruments, you accelerated the plans to engage in cost cutting, right?

Page 81

MR. COMERFORD: Objection, form, asked and answered.

A. I don't think that's correct. I know that the chairman in some ways sort of used the risk, or the threat, if you will, of the acquisition as a means to bolster his existing point of view of being more aggressive in cost cutting. But I don't think it really changed our position. But I know he made that argument at times, because he felt strongly that we should be cutting costs more aggressively. And I differed in my opinion on that.

Q. (BY MR. JOHNSON) Let's look at what's in folder 48.

(Discussion off record.)

Q. (BY MR. JOHNSON) NAT-SL-00021516 through 21531. Have you had a chance to look at this, going to start with whether you recognize it?

A. I do.

Q. And this is a draft of a PowerPoint to be used with the board sent from Mr. McGrath to you on July 10; is that right?

A. Yes, once again, it's a draft of materials for the board, and I don't know what was actually presented, but I do think we debated this quite a bit, so it might differ substantially.

Page 82

Q. And then one thing that -- one of the things that Mr. McGrath says in this document, on the slide numbered five, or 21521, is that Emerson seems likely to go public with this offer, and could initiate a formal bid. Do you see that?

A. Yeah, the first bullet.

Q. Did you agree with that thought?

A. I did not.

Q. You thought what would happen instead?

A. First, I thought the context of this presentation was the chairman using information to his advantage to get an objective that he wanted prior to all this. So I did not take it at face value. I took it as having a keen objective -- an objective underlying it that -- it had a motive. His presentation had a very specific motive. And I was quite frustrated with his tone.

Q. So did you -- just focusing on this bullet point, did you disagree that it seemed likely that Emerson was going to go public with its offer and could initiate a formal --

A. Yes, I did disagree with that. And our -- collectively our advisers I don't think agreed with that statement as well.

Q. And what did you think Emerson was going to do

Page 83

instead?

A. Again, I didn't know what exactly Emerson was going to do. But they, they had, I believe at this point made it public that they were looking at a wide range of acquisition targets. And if you're asking my specific opinion, I thought it was pretty likely they might find a different target and use their cash on something else. We didn't seem like a particularly good strategic fit for Emerson.

Q. So Mr. McGrath thought that Emerson was going to go public. You, on the other hand, thought that Emerson was going to turn its attention elsewhere?

A. No --

MR. COMERFORD: Objection, misstates prior testimony, form.

A. Yeah.

MR. COMERFORD: Calls for speculation.

A. No, I did not think that Mr. McGrath thought that they would go public either. I thought he was using that to justify a different opinion. I don't think he actually believed that. That was my point. And that's why I was frustrated with this document.

Q. (BY MR. JOHNSON) So in short, Mr. McGrath wanted to engage in deeper, faster cost cutting than you did at the company?

Page 84

MR. COMERFORD: Form, foundation, calls for speculation.

A. Yeah, that's correct.

Q. (BY MR. JOHNSON) On the slide numbered 9, or 21525, the item numbered 6, it says, accelerate our operating expenses -- sorry. Accelerate our operating expense reductions more aggressively. Do you see that?

A. Yes.

Q. And did you differ with Mr. McGrath on whether that was a sensible approach to take?

A. I -- yes, I did differ. I had a different opinion, correct.

For context, he made this argument again when they actually did go public many, many months later and our advisers also advised against this strategy.

Q. Mr. McGrath makes clear that a motivation in his mind to get the stock price higher of National Instruments is to help defend against Emerson's interest in acquiring National Instruments. Do you see that?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I guess that -- well, I'm trying to see. I don't know what his opinion was, but I guess you could infer that from this. Let me see. Yeah, that seems to be what he's trying to insinuate. Again, I'll state

Page 85

again, my belief was his objective was really just to reduce expenses. He always had that objective prior to this. This just gave fuel to his argument that he had going back a year or so.

Q. (BY MR. JOHNSON) So you question the sincerity of Mr. McGrath's --

A. Yes.

Q. -- beliefs in these points?

A. Yes.

Q. And you told him that?

A. Yes. We debated this vigorously.

Q. Did you at National Instruments implement a more aggressive cost cutting effort than had been planned at this point?

MR. COMERFORD: Form.

A. I don't remember all the decisions we did around cost. I don't recall us making any changes to our cost cutting objectives, due to the Emerson offer. The bigger context that was happening at this time, frankly, in the business was the supply chain disruption that I mentioned which was a, a huge impact to our business and other businesses. So we were making lots of decisions and adjustments related to that issue on a regular basis, in this time period, including probably cost.

Page 86

Q. (BY MR. JOHNSON) And as, as part of the changes you were implementing at this point in time, you implemented a deeper cost cutting effort than had been underway to that point, right?

A. I don't recall. We may have in response to changing dynamics of the market and the supply chain. That was a rapidly developing situation.

Q. You're trying to distinguish that from the fact of Emerson's interest in buying National Instruments, right?

A. Yes, I'm telling you that at the time the, the big business issue that was happening in this time period that I was spending a lot of my time on was the inability to procure the semi-conductors required to ship our products, which caused the largest amount of inventory we'd ever had as a company, the largest amount of backlog we'd ever had as a company, and dramatic impacts to the company overall. And that our actions as a business, that that was the primary driver for those actions as a business.

Q. And was any of that discussed in this presentation?

MR. COMERFORD: Form.

A. You're asking if any of that is discussed in this presentation, yes, the next slide. When we talk

Page 87

about backlog, when we show the difference between bookings and revenue and backlog, those were all things that were not actually typical in our business.

Normally we had very, very small backlog and our revenue and bookings would be sort of roughly the same, within a percent or two. But you can see on this slide that in Q1 of '22 we had 27% bookings growth and only 15% revenue growth. That was unprecedented in our business in its history. So yeah, there was scarcely a place in our business --

COURT REPORTER: Wait, wait --

Q. (BY MR. JOHNSON) But you agree --

COURT REPORTER: Can you repeat your question, please?

Q. (BY MR. JOHNSON) This is labeled -- the whole thing is labeled a discussion of Project Wolverine, which is Emerson's interest in buying National Instruments?

A. I'm saying that to ignore the giant disruption to the business that the supply chain as the overall context would be inappropriate or misleading. Specifically you asked me if this mentions anywhere that point, and I -- when I look at this, it's throughout. In my experienced expert opinion, it's impossible --

Q. Well, we've seen that your experienced opinion

Page 88

--

A. Can you let me finish?

Q. -- to even know what $48 is materially higher than $31 --

MR. COMERFORD: Objection, argumentative.

A. In my case, it's impossible for me to look at this, and to look at this P and L for example and not see glaring out of it the incredible disruption that was happening in '22; that's my point.

Q. (BY MR. JOHNSON) Let's look at what's in folder 18. I think that gets us to Exhibit 12 (sic).

(Exhibit 12 marked for identification.)

(Discussion off record.)

Q. (BY MR. JOHNSON) NAT-SL-00001457 to 1509. I am not going to ask you about the exhibits to this, Mr. Starkloff. The first thing I'm going to ask is if you recognize this?

A. Yeah, these are the minutes that I would have reviewed and approved, yeah, from the July meeting.

Q. Was that the practice that you would review and approve all minutes while you were at least CEO?

A. Yeah, I mean, I would typically -- I acted as just really in the capacity of a director on this. So I, along with the other directors would -- these would be circulated, we would have an opportunity to, sort of

Deposition of Eric Starkloff                     In Re National Instruments Corporation Securities Litigation

Page 89

say if anything was not represented correctly, and then at the next meeting we would, we would approve them. So I, like all other directors, participated in that review and approval process.

Q. Got it. You see on page 4 or 1460. There's a section that begins at the bottom of that page, summary and actions, agenda item six taken out of order?

A. Yeah, it's right under the supply chain update that's above it, correct.

Q. And this section is related to Emerson's response to the company, in other words, their second offer letter, right?

A. Uh-huh, correct.

Q. And as part of that the minutes note that -- and I'm reading on the top of the next page -- the board concluded that the proposal from Emerson did not merit engaging in discussions with or providing diligence materials to Emerson. Do you see that?

A. Yeah, I do.

Q. And then the minutes note the board also discussed with management the potential steps the company could take of the upcoming earnings call to highlight the company's strong momentum, prospects, margin, priorities and other financial and operating performance matters. Do you see that?

Page 90

A. Yes.

Q. So, do you agree that a part of National Instruments' efforts to defend against the Emerson interest in buying the company included emphasizing to the public the company's supposed improving prospects?

MR. COMERFORD: Form.

A. No.

Q. (BY MR. JOHNSON) And you, you wanted to have an investor conference in or around this time in part because of Emerson's interest in buying National Instruments, right?

MR. COMERFORD: Form.

A. It was pretty typical for us to have investor conferences like that. And I just want to note, you went over it quickly, I disagreed with your last statement, but -- with your last question.

Q. (BY MR. JOHNSON) You, you -- one of the reasons you wanted to have that investor conference in 2022 was to help defend the company against a possible further approach by Emerson, right?

MR. COMERFORD: Form, asked and answered.

A. Yeah, I don't recall all the, all the reasoning that went into the investor conference. I just made the point that was pretty typical.

And again, the biggest challenge we were

Page 91

having during this period, and the context that underlies a lot of the discussion I think that was happening in this period was the fact that because of the supply chain disruption, our revenue was suppressed compared to the very, very strong demand we had for our products, given our inability to ship them. And we were working very hard to make sure that the market understood.

It was difficult to get that message across in the market, these unusual circumstances. We weren't alone in that; GM and Apple and every other company was having the same struggle, but we were talking a lot about how to convey that --

Q. What question are you answering?

MR. COMERFORD: Counsel, I think you interrupted him mid answer.

MR. JOHNSON: I did interrupt him because there's no question that would remotely involve this speech.

A. You were asking why we had an investor conference.

Q. (BY MR. JOHNSON) No, it was much more pointed than that.

A. I said there was a -- I don't recall all the specific reasons for having investor conference, but I do recall the number one reason and that's what I was

Page 92

describing.

Q. Let's look at what's in folder 17. This I think is Exhibit 13. NAT-SL-7815 to 7816.

(Exhibit 13 marked for identification.)

Q. (BY MR. JOHNSON) After you've had a chance to look at this, Mr. Starkloff, first want to know if you recognize it.

A. Yeah, I recall these discussions.

Q. So this is in late July of 2022, right?

A. July 19th, yes.

Q. Yep. And this is at about the same time that the board was determining to reject Emerson's second offer, right?

A. Yeah, that's correct.

Q. And one of the things you say in your email, at the bottom of the first page is I'd like to plan for investor conference in late August, slash early September, and I think we need to announce that on the call. First, you're referring to the earnings call?

A. That would have been the earnings call, correct.

Q. Yeah. And you go on and say, this is also advantageous should not attach, meaning Emerson, go public as we already have the conference planned as we've done in past years. Do you see that?

Page 93

A. Correct.

Q. So one of the reasons that you wanted to have that investor conference was to help prepare for the possibility that Emerson would come back and engage in further discussions with National Instruments about buying the company, right?

MR. COMERFORD: Objection, form. Misstates prior testimony, misstates document, asked and answered.

A. No, I think you're misinterpreting that statement. I'm saying that it would be advantageous -- I'm saying we've done this in past years. This is pretty typical for us. And I'm saying we should go ahead and announce it now.

Q. (BY MR. JOHNSON) Why are you mentioning Emerson --

A. That's what my statement is. This would be advantageous should Emerson go public, because this meaning announcing it now, announcing it on the call, that's what we're talking about is whether or not -- when to announce the investor conference. We did one every year.

Q. Okay, so your focus here is when to announce it?

A. Yeah.

Page 94

Q. And that is relevant to the possibility that Emerson would come back and engage in further efforts to acquire National Instruments, right?

MR. COMERFORD: Form.

A. Yeah, we were trying to continue business as usual, even though we'd had this activity with an unsolicited bid.

Q. (BY MR. JOHNSON) Let's look at what's in file 69, which probably is in the second bunch of documents there.

Is that Exhibit 13, Kim?

COURT REPORTER: 14.

(Exhibit 14 marked for identification.)

(Discussion off record.)

Q. (BY MR. JOHNSON) That's got number NAT-SL-24106 through 24212. This is not the enormous, full board book, rather it's a portion of it. I'm not going to ask you about the entirety of this portion but I'd point out that on the first page at the top, this refers to third quarter 2022 committee and board meetings, July 19 to 20, 2022. Do you see that?

A. I do.

Q. And then flipping to the slide that's numbered 42, or 24210?

A. Uh-huh.

Page 95

Q. Cash project by quarter in 2022.

A. Yep.

Q. Am I reading this correctly to indicate that as far as share repurchases are concerned, 31 million had actually been spent by the company in the first quarter of 2022, and 39 million had been actually spent by the company in the second quarter of 2022?

A. That's how I interpret it, yes.

Q. By my math that's 70 million in the first half of 2022?

A. Correct.

Q. Do you agree with that?

A. That's correct.

Q. Okay. And the forecast at this point for the third quarter was to spend $10 million on share repurchases?

A. I guess at this point in time that's what's being shown.

Q. And July is in the third quarter, right?

A. Correct.

Q. So the third quarter is July, August, September, right?

A. Correct.

Q. So as of July 19 of 20, the forecast was $10 million to be spent on share repurchases by the company,

Page 96

right?

A. That's what's shown in this chart.

Q. Well, it's shown in this chart, but that was also your understanding as of that time, wasn't it? I mean, this chart had gone through your hands and approval, right?

MR. COMERFORD: Form.

A. Yeah, this was a -- yeah, a projection. It would be typical for us to execute on share repurchases based on the sort of pricing situation in the market. So it wasn't uncommon in the past if the market was low, to accelerate share purchasing in the time when the market was low. Shareholders really liked us to do that as well.

Q. (BY MR. JOHNSON) But it's not like somebody else prepared this chart and you disagreed with it, thought it was wrong, anything like that, right?

MR. COMERFORD: Form.

A. No, I don't recall disagreeing with this, no.

Q. (BY MR. JOHNSON) I mean, to the contrary, you approved it, correct?

A. Did we approve this... I don't think we -- no, I don't think that was -- I don't think we voted on that. We voted on the credit agreement and the dividend, but we --

Page 97

Q.  No, I don't mean the board, I mean management. You approved submitting this chart to the board?

A.  There's no formal approval process, but to the extent that this was a current projection that Karen showed, I didn't disagree.  I already answered that, yeah.

Q.  Okay, okay.  Now, at the July 19 and 20 board meeting or meetings, whether it's singular or plural, the board decided to reject Emerson's second offer, right?

A.  Yes, per the last exhibit.  It was highlighted that it was essentially the same as the first offer.

Q.  So was it on the 19th or the 20th that the board made the determination to reject Emerson's second offer?

MR. COMERFORD:  Form.

A.  I don't recall.

Q.  (BY MR. JOHNSON) Okay.  But at the latest, the 20th of July, would that --

A.  That would be correct, yes.

Q.  Okay.  So did you promptly thereafter take steps to communicate to Emerson that their second offer was rejected?

A.  We spent some time, sort of crafting exactly what that response would be, and then if I recall

Page 98

correctly, we sent the response on the 2nd, you probably, you probably have that in front of you.  But it was a week or so later, I guess.

Q.  So the reason there was time between when the board decided to reject Emerson's offer and when you sent a written communication telling Emerson that was due to the need to craft the letter itself, no other reason?

A.  I don't recall any other reason.  I believe the way the authorization -- or the decision was made, if I recall correctly, was that the board decided to reject and left the wording of the rejection to Michael, myself, with advice from Wachtell; I think that's how we'd done it.

And I don't know, I mean, I traveled all the time.  I don't know if there was some other travel, I don't recall all the things that were happening in that time period.

Q.  Well, weren't you and Mr. McGrath also waiting to respond to Emerson until after you held the earnings call?

A.  That could have been.  I don't recall.  Could have been.

Q.  And so if that's what --

A.  Sorry, it's also -- it's also the case that

Page 99

between the board meeting and the earnings call was a short period of time where I was typically very focused on the earnings call, but yeah.

Q.  So why would you wait to communicate the company's rejection to Emerson until after the earnings call; what does one have to do with the other?

A.  I don't, I don't recall why we, why we waited.

Q.  Wasn't it because your hope was that the information conveyed by the company on the earnings call would jack up the price of National Instruments stock?

MR. COMERFORD:  Form.

A.  I don't recall.

Q.  (BY MR. JOHNSON) And that that was relevant to the company's efforts to deal with Emerson's interest in acquiring National Instruments?

MR. COMERFORD:  Form.

A.  Don't recall.  Typically, you know, it was typically good if the street positively received the earnings call in any earnings call.  But I don't recall that about this one.

Q.  (BY MR. JOHNSON) Sure, but there was a connection here, wasn't there, to the reality that Emerson was trying to buy the company.  And that's what mattered at that time?

MR. COMERFORD:  Form.

Page 100

A.  Yeah, I don't, I don't recall that being the case or not.

Q.  (BY MR. JOHNSON) You don't remember being told that by Mr. McGrath, that it would make sense to wait to communicate to Emerson the rejection of their second offer until after seeing if the National Instruments stock responds to the earnings call?

MR. COMERFORD:  Form.

A.  That, that may be the case, it seems like you're reading it, so it might be the case, but I don't recall that being the case, but it may have been.

Q.  (BY MR. JOHNSON) Let's look at what's in file 21.

And Kim, are we up to 15?

COURT REPORTER:  Yes.

MR. JOHNSON:  Just let me know when I can read --

Q.  (BY MR. JOHNSON) It's number NAT-SL-16996 to 997.  After you've had a chance to look at this, I'm going to start with whether you recognize this.

A.  This is from Michael to Eddie, and I'm cc'd, sure, yeah.

Q.  Do you see where Mr. McGrath says, let's wait until we see if -- I think I'm going to correct for grammar.  Let's wait until we see if our stock responds

Page 101

to the earnings' call. Do you see that?

A. Yeah.

Q. So one of the reasons that the company waited to respond to Emerson's second offer letter was to see if you could get the stock price to increase because that would be relevant to dealing with Emerson, right?

MR. COMERFORD: Form.

A. I don't know if that's what he's saying. I can -- I don't know what his intent was, honestly, with this.

Q. (BY MR. JOHNSON) Well, I mean, do you read it some other way?

MR. COMERFORD: Form.

A. Our intent was to firmly reject this offer. And on the basis of the strong prospects of performance of the company. So I could also interpret it as getting the message out there about our prospects and performance would reiterate the strong rejection. But I don't know if that's exactly what he meant either. But that's what I meant -- that's what was in my head.

Q. (BY MR. JOHNSON) Well, what he's talking about is when to send the letter to Emerson. The waiting is waiting to send a letter, right?

A. Uh-huh.

MR. COMERFORD: Form.

Page 102

Q. (BY MR. JOHNSON) I need a word.

A. Oh, sorry. Restate then.

Q. When Mr. McGrath said let's wait, he's saying wait to send the letter to Emerson, right?

A. That appears to be what he's saying, yes.

Q. Okay. So he's connecting when the letter to Emerson goes out with when the earnings call takes place and the market has an opportunity to respond to what it hears on the earnings call, right?

MR. COMERFORD: Form, foundation, calls for speculation.

A. Yeah, you're asking me to speculate like why he sent that and I don't know exactly why he sent that.

Q. (BY MR. JOHNSON) Well, you're a recipient of it, I'm asking only for how you understood it. Not what he -- yeah, how you understood it?

MR. COMERFORD: Asked and answered, form.

A. Yeah, I think I shared what my interpretation was, but I don't recall my interpretation at the time. But sitting here today, I, you know, I shared with you what my interpretation was in terms of how we were thinking of making sure that the rejection was clear, and understood by the other party that that -- that our intent was to fully reject the offer. We didn't want any ambiguity in the rejection.

Page 103

Q. (BY MR. JOHNSON) Let's look at what's in file 59, which I believe will be Exhibit 16.

(Exhibit 16 marked for identification.)

Q. (BY MR. JOHNSON) It's number NAT-SL-25798 to 25801, and then attached is a PowerPoint presentation. I don't think I'm going to ask you about anything other than the email from Mr. McGrath on the bottom of the second page. It's his email of July 26th, 2022 at 2:07 p.m. So I'd ask you to read that to yourself.

A. Oh, this is the one that -- addressed to Eddie, that I was on?

Q. Correct, correct.

A. Okay.

Q. You attended the meeting that Mr. McGrath was referring to, the night before on July 25th, right?

A. Yes.

Q. And here in this email he is recounting a statement that he made at that meeting and directing to have that statement included in the minutes. Do you see that?

A. I see that.

Q. And it includes the following: The purpose of tonight's board meeting is to discuss our primary argument against the acquisition offer from Emerson, which is sharing our positive outlook for the next 18

Page 104

months with our shareholders and analysts, period. Eric will be reviewing his plans to do this on Thursday's earnings call, and our subsequent investor presentation, dot, dot, dot. Do you see that?

A. I see that.

Q. Is this in substance consistent with what Mr. McGrath stated at that meeting?

MR. COMERFORD: Form.

A. I don't recall exactly what he stated. I do recall as is shown in this, that there was some back and forth about capturing exactly what he said. There was some -- appeared to be some disagreement about exactly what he said. This is what he wanted captured.

Q. (BY MR. JOHNSON) Well, what in substance did Mr. McGrath say at that meeting about the relationship between Emerson's offer, and the company's sharing of positive -- a positive outlook for the next 18 months with shareholders and analysts, what did he say about that?

A. I don't recall exactly what he said.

Q. Was it consistent with what he's written here?

A. I think the tone of our discussions were that the company had a very positive view of the business going forward. That was the basis of our rejection. And is reflected in the Bank of America analysis that

Deposition of Eric Starkloff                                    In Re National Instruments Corporation Securities Litigation

Page 105

was done at the time of the valuation of the company.

And I believe he's saying here, and we discussed, the importance of the market understanding that opportunity as well, because that was the basis for us making the decision we did, and we wanted the market to also understand our prospects.

Q.  Do you take issue with his recounting of what he said at the board meeting?

MR. COMERFORD:  Form.

A.  I don't remember the exact words he said, but I would have worded the statement slightly differently. He's saying our argument against it is the sharing of the positive outlook.  Our argument against it was the outlook.  And we wanted to share the outlook.  I think that's reflected in a preponderance of documents and everything that were done around that time with the analysis of the valuation of the company.  We, we did have outlook that we believed justified a high value of the company.

Q.  (BY MR. JOHNSON) But you also knew that you were holding can back the letter rejecting Emerson's second offer until after you had the earnings call, right?

A.  I mean, I guess it is a fact that the rejection letter did go out after the earnings call.  I

Page 106

don't dispute that.  I don't recall all the logic that went into the timing of that, but it did go out after the earnings call, yes.

Q.  So the earnings call and the public release that was connected with that took place on July 28 of 2022; do you recall that?

A.  That sounds like our normal cadence, so I -- sounds correct.

Q.  And how did the market react to what information was put out by the company in connection with the earnings call?

MR. COMERFORD:  Form, foundation.

A.  I don't recall.  I don't recall quantitatively -- or frankly, I don't even recall qualitatively, because we got both.  We talked to all the analysts and then we would also see the actual stock price, which would also happen in the context of whatever else was happening in the market.  And I don't recall, frankly, the details of any of those factors here a few years later.

Q.  (BY MR. JOHNSON) Well, do you recall whether the stock price thereafter moved up significantly?

MR. COMERFORD:  Form, foundation.

A.  I don't, I don't recall.

Q.  (BY MR. JOHNSON) Did analysts for the most

Page 107

part use the guidance that you provided in the earnings call?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.  Do you mean in broad sense, or in this particular case?

Q.  (BY MR. JOHNSON) This particular case.

MR. COMERFORD:  Same objection.

A.  Oh, I don't, I don't recall.  I know in this timeframe we were, as I said before, having -- it was a challenge to convey the complexity happening in the business between orders and revenue due to the supply chain shortage, but I don't recall.

Q.  (BY MR. JOHNSON) So in connection with ultimately rejecting Emerson's second offer, you suggested the possibility of you making a follow-up call to Mr. Karsanbhai, right?

A.  I think there was, like some consideration of that, and I believe we decided against it.

Q.  And it was your suggestion to consider a follow-up call to Mr. Karsanbhai, right?

A.  Yeah, I think so.

Q.  And one of the reasons that you wanted to at least create -- consider that, or have the group consider that, was because it would create some further

Page 108

time before Emerson's next step, right?

MR. COMERFORD:  Form.

A.  I may have said that.  I think my primary thinking was that I could sort of verbally convey the strength of our rejection, but as we considered that, we thought that a call would send the opposite message, which we didn't want to do.  And that's why we didn't do it.  That's my recollection.

Q.  (BY MR. JOHNSON) Let's look at what's in file 24.

MR. COMERFORD:  Can we briefly go off the record while the court reporter is grabbing that?

MR. JOHNSON:  Sure.

THE VIDEOGRAPHER:  Going off the record. The time is 12:22.

(Recess.)

THE VIDEOGRAPHER:  Back on the record. The time is 12:23.

MR. JOHNSON:  I think this will be Exhibit 17.  Is that right, Kim?

COURT REPORTER:  Yes.

(Exhibit 17 marked for identification.)

MR. JOHNSON:  Are you ready for me to read the numbers in or not yet?

COURT REPORTER:  Yes.

Page 109

Q.  (BY MR. JOHNSON) Okay.  It's NAT-SL-18070 to 18072.  I think my questions are limited to that first page, the middle of the first page, your email.  And first question will be whether you recognize this?

A.  I do.

Q.  Okay.  So you laid out the pros and cons of a follow-up call, right?

A.  Yep.

Q.  And the pros included, it creates some further time passing before Emerson's next step.  Do you see that?

A.  Yeah, I do see that.

Q.  And another pro to this approach would be, it does show some willingness to hear them out.  Do you see that?

A.  Yes.

Q.  So when referring to Emerson's next step, you understood that it was reasonable to expect Emerson to come back and take a next step with regard to working to buy the company, right?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.  I mean, this was a quick sort of email laying out some points.  If I were to have worded it more accurately, I would have said something like any

Page 110

potential possible next step.

I started off by saying the intent would be to reinforce the position we've already taken.

Q.  (BY MR. JOHNSON) Sure.  If you wrote this email and crafted it for litigation against you, you'd write it differently, right?

A.  No, not --

MR. COMERFORD:  Form.

A.  I didn't mean that.  That's a mischaracterization.

Q.  (BY MR. JOHNSON) So under what circumstances would you want to rewrite this email?

MR. COMERFORD:  Form.

A.  For example, if you're asking me that, if I was trying to lay out some clarity to my team on a set of objectives and points, I would treat an email like that differently than if I was rapidly writing something in a continuing conversation where I didn't mind if there were grammatical errors or imprecise wording.  That's, that's what I meant.  This was the latter.

Q.  (BY MR. JOHNSON) So how would you rewrite this point in particular?

A.  I did not at the time think that a next step was inevitable or even likely.  Which is what you're implying with that point.  So that's -- I did not think

Page 111

it was -- a next step was inevitable by any means.

Q.  So you thought it was unlikely that Emerson would come back to National Instruments about acquiring the company?

A.  I didn't know what they thought.  We were preparing for all kinds of different things and we didn't, we didn't know what they would do.

Q.  So it wasn't clear to you whether it was likely or unlikely that Emerson would take another -- a next step as part of trying to buy National Instruments, right?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.  The only data point I had was that over the time period between then May and now the end of July, they had just reiterated the same offer, which was an uncompelling offer, so that's the data point I had.

Q.  (BY MR. JOHNSON) Well, of course you had more data points than that.  You had all the reality around you about how the business was doing, how Emerson was doing, what they said in their letters, et cetera.  There were far more data points than that; wouldn't you agree, Mr. Starkloff?

MR. COMERFORD:  Form, compound.

A.  Not with respect to their intent.  The other

Page 112

data points I had with respect to their intent is that I mentioned, I believe they had been public about having a large pipeline of potential acquisitions.  I think they used the number of 70 potential companies.  So I did have that data point, that perhaps we were one of 70 companies they were looking at.

So it didn't seem to me to indicate necessarily high likelihood that we would be the one that they would try to acquire, or -- obviously they were trying to acquire us, but -- that it would go to fruition.

Q.  (BY MR. JOHNSON) Of those 70, did you have any information to suggest that Emerson was engaged in efforts -- ongoing efforts to acquire them the way Emerson was with National Instruments?

MR. COMERFORD:  Form.

A.  No, I had no evidence of that.  I assumed they were.  They'd made it clear to investors that they were looking at a wide range of companies and a wide range of industries.  It would be unnatural to assume that we were the only ones.

Q.  (BY MR. JOHNSON) In the summer of 2022 when this back and forth with Emerson was taking place, would it have been reasonable to believe that Emerson would come back with a higher offer at some point?

Deposition of Eric Starkloff          In Re National Instruments Corporation Securities Litigation

Page 113

MR. COMERFORD:  Form, foundation, calls for speculation.

A.  Yeah, would it have been reasonable, I mean, I don't think it would have been unreasonable to assume that, but I also -- they had already made the same offer twice.  So I also think it would be quite reasonable to assume that they had already made their best offer.  But, I didn't know what their intent was.

Q.  (BY MR. JOHNSON) Did you know that in the summer of 2022 Ms. Rapp and Mrs. Illcisin were betting among themselves when they wrote this down?

A.  I did not.

Q.  Say again?

A.  No, I did not.

Q.  All right.  Well, let me just finish the question and you can give your answer.

A.  Thought you were done.

Q.  Did you know that in the summer of 2022, Ms. Rapp and Mr. Illcisin were betting among themselves and they wrote down this bet?

A.  No, I did not --

Q.  Not -- I'm still, I'm still --

A.  Sorry.

Q.  Not whether Emerson would come back, but when Emerson would come back and how high its next offer

Page 114

would be?

MR. COMERFORD:  Object to the form.  Mischaracterizes the evidence, mischaracterizes testimony and documents.  Calls for speculation.  Lacks foundation.

Q.  (BY MR. JOHNSON) Did you know that?  Did you know that?

A.  I didn't know of any such bet, or whatever you characterize it as, no, I was unaware of anything like that.

Q.  Shortly after rejecting Emerson's second offer, we started to get indications that ███████ ████████████████████████████████████, right?

A.  Yes, I recall that.

Q.  And for an offerer to acquire stock of an offeree, we saw that ██████████████████████ ████████████████████████ █████████████, right?

MR. COMERFORD:  Form.

A.  That was in the slide.  We actually discussed that with Wachtell, and I recall they brought in additional experts within their firm on that exact topic, and they conveyed that it was quite unusual and difficult to interpret exactly why they were doing that.

Page 115

Q.  (BY MR. JOHNSON) So, was there any suggestion that ██████████████████████████ indicated anything other than the reality that Emerson was sincerely interested in acquiring National Instruments?

MR. COMERFORD:  Object to the form, mischaracterizes testimony and evidence, calls for speculation.

A.  Yeah, we discussed it could be like a hedge, that, you know, even if, if they thought that we were either going to perform a lot better, or get acquired by someone, maybe not even them, that they could hedge their bet.  We, we had previously had an interaction with an activist investor that had taken similar tactics and benefited from the increase of the share price.  So it was kind of a quizzical move.  We speculated a lot.  But we knew we were just sort of speculating.

If I recall, we also weren't -- we didn't get very precise -- I don't believe we got very precise information about exactly when █████████████.  So I do recall us kind of talking about, well, hey, ██████ ████████████, you know, before the offer, or when in the time period.  We had like a block of time that it happened in, but we didn't know -- I don't believe we knew more precisely.  So there was a lot of, just speculation around what that -- what it meant.

Page 116

Q.  (BY MR. JOHNSON) And with ████████████ ████████████████████████████, the conclusion was, we don't know, we don't know what that means.  That was the best you smart people could come up with?

MR. COMERFORD:  Form, argumentative.

A.  We speculated a whole bunch of possible things, but it was inconclusive on what it actually -- what their actual intent was.

Q.  (BY MR. JOHNSON) Wasn't it far more likely than anything that it indicated continuing sincere interest in Emerson acquiring National Instruments?

MR. COMERFORD:  Form, foundation, calls for speculation, asked and answered.

A.  Yeah, not -- yeah, not necessarily.  It's very -- it's almost impossible to -- we had a poison pill, we had defenses.  It's almost impossible to acquire a public company ████████████████, so it's a strange strategy.

Q.  (BY MR. JOHNSON) Well, I forget, did Emerson ultimately acquire National Instruments?

A.  They did, as you know.  They outbid another company at about 6:00 a.m. before the day announced the acquisition by 50 cents, I think.  This is all public obviously in the proxy, but as you know, it was quite a competitive process and they did come out on top.

Deposition of Eric Starkloff | In Re National Instruments Corporation Securities Litigation

Page 117

Q.  So in the end, █████████████ was consistent with their ongoing, sincere desire to acquire National Instruments, right?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.  That's, that's looking at it with a benefit of hindsight.  That's not -- we didn't have that benefit at the time.

Q.  (BY MR. JOHNSON) Okay.  Well, before any of that, ████████████████ ██████████████████████ ██████ , right?

A.  That was on the list.  Also ███████████ ████████████████████ which they had not done.  So, it was kind of a mixed bag.

If we're going to use the benefit of hindsight, it's also true that they didn't -- they went between this period of time in November, before contacting us again.  So, for a long period of time, it did seem like this was completely -- this process had completely stopped.

MR. JOHNSON:  Let's take lunch.  Kim, do you need a particular amount of time?  I'll do whatever.

THE VIDEOGRAPHER:  Going off the record.

Page 118

The time is 12:37.

(Recess.)

THE VIDEOGRAPHER:  Back on the record.  The time is 1:23.

Q.  (BY MR. JOHNSON) Let's take a look at what's in folder 42.  And, Kim, you have to remind me where we are on exhibit numbers?

COURT REPORTER:  18.

MR. JOHNSON:  Can I read the numbers?

COURT REPORTER:  No, not yet.  Not yet.  Ready.

(Exhibit 18 marked for identification.)

Q.  (BY MR. JOHNSON) It's NAT-SL-23189 to 23190.  After you've had a chance to look at this, Mr. Starkloff, first going to ask you if you recognize it?

A.  Yes, yeah.

Q.  So you received this email on or around September 19, 2022?

A.  Yeah, looks like I was carbon copied on it, yeah.

Q.  And it says that you Kevin -- sorry, who's Kevin?

A.  Kevin Illcisin, is who that refers to, yes, it's Kevin Illcisin.

Q.  So you, Mr. Illcisin and Eddie Dixon spoke

Page 119

that afternoon regarding the general message slash Emerson update to the board on Wednesday.  Is that something that happened, and you were part of?

A.  Yeah, I think so.

Q.  And Mr. Dixon identifies key points below, are these points reflective of what you-all used to update the board about the situation with Emerson?

A.  Certainly this is Eddie's, Eddie's take, or Eddie's summary.  I don't remember what subsequent -- it said, Eric, Kevin, chime in if I missed anything.

I don't recall if we did chime in or if there was any discussion.  But certainly this is Eddie's take of what happened.

Q.  There's nothing we've seen of you or Mr. Illcisin responding to this, or chiming in?

A.  Yeah, Eddie's office was across from mine, so I might have talked to him, but I don't recall.

Q.  So you see in the third bullet point, speculation is that █████████████ was intended to signal that they are serious about the potential for an acquisition.  Right?

MR. COMERFORD:  Speculation.

A.  Yeah, I see that.

Q.  (BY MR. JOHNSON) You agreed with that?

MR. COMERFORD:  Form.

Page 120

A.  I don't recall.

Q.  (BY MR. JOHNSON) You don't disagree with it?

A.  Yeah, certainly don't disagree that this is Eddie's summary, so.  No, I don't disagree with it, I don't think.

Q.  Well, at the time did you --

A.  It was speculation -- I guess my -- sorry.  My point was -- I mean, we were, we were sort of recognizing that we were sort of speculating.  As I mentioned before, we were sort of trying to figure out what message they were trying to send, or whatever, so we did have -- I do recall us having like a wide range of speculation about what that really meant.  So it wasn't -- it wasn't conclusive to us.

Q.  Certainly there's no indication here that there's speculation, and we just don't have any idea what to make of it, right?

MR. COMERFORD:  Form.

A.  No, I mean, speculation means speculation.  It's possible, but I think that indicates that we didn't really know.  And that we were speculating on a range of different things.

Q.  (BY MR. JOHNSON) You and the others -- you were doing your best to make reasonable determinations about what was likely to happen, right?

Deposition of Eric Starkloff                    In Re National Instruments Corporation Securities Litigation

Page 121

MR. COMERFORD: Object to the form, mischaracterizes testimony, mischaracterizes documents.

A. We were, we were thinking a lot about what was possible, and preparing for different possibilities.

Q. (BY MR. JOHNSON) And it was entirely plausible, wasn't it, that Emerson was going to come back with a higher offer, or go public with their $48 a share offer?

MR. COMERFORD: Form, foundation, calls for speculation.

A. It's possible they would come back. It was possible they wouldn't. I felt like it was unlikely they would go public with the $48 offer. I thought that would make them look a little foolish.

Q. (BY MR. JOHNSON) Okay. So you thought going public was less likely than coming back with another offer?

MR. COMERFORD: Form, foundation, calls for speculation, mischaracterizes testimony.

A. I think that's fair. I thought it most likely that they probably wouldn't come back.

Q. (BY MR. JOHNSON) But you still recognized it was entirely plausible that Emerson would come back with another offer?

MR. COMERFORD: Same objections. Asked

Page 122

and answered.

A. I'd say it was possible.

Q. (BY MR. JOHNSON) Possible, okay, possible. Have you read any of the Court's decisions in this case?

A. Oh, on the other -- the other matters? Is that what you're referring to?

Q. No, I'm referring to the lawsuit that is brought against you and the reason you're testifying here today?

A. Oh, sorry. I meant -- I'm not really that informed. I know that there were a set of things that were I thought dismissed by the Court; that's what I was referring to. I was aware that other things were dismissed, but I don't know. I couldn't recall the specific things that were and weren't.

Q. So, have you read any of the Court's decisions?

A. No, I have not read their decisions I don't think.

Q. Are you at least aware that the Court has determined that despite National Instruments' rejections of Emerson's first two offers, it remained entirely plausible that Emerson would return with an improved offer or take its offer public?

Page 123

MR. COMERFORD: Form, foundation.

A. I -- again, I didn't read any of this, I don't know. I don't know what the Court said.

Q. (BY MR. JOHNSON) You see back on Exhibit 18, the next bullet point says, National Instruments is on Emerson's acquisition pipeline list and there is no evidence that Emerson's interest has petered out?

A. I see that.

Q. You see that?

A. I see that, yes.

Q. Okay. And you agreed with that.

MR. COMERFORD: Form, foundation, calls for speculation.

MR. JOHNSON: Sorry, Kim, I said you agreed with that.

MR. COMERFORD: Same objections.

A. I agree that NI was on Emerson's acquisition pipeline list. I believe at this point he was referring to 70 or whatever number LALL had said publicly list of potential companies. There's no evidence that Emerson's interest has petered out.

I would also submit that there was no evidence that their interests remained. We just -- in fact, it says that in the next sort of sentence. We were sort of speculating on what, what might be their intent.

Page 124

Q. (BY MR. JOHNSON) What in the next sentence suggests that Emerson may have lost its interest in acquiring National Instruments?

A. It says, evidence might be, for example, that Emerson is selling its shares or announcing another large acquisition, making NI unaffordable.

We held the position that if there really were dozens of different companies they were looking at, there was a high probability that we would hear about another acquisition being announced, which would mean that NI was, you know, no longer a target for Emerson. And the fact that there had been two offers of the same amount might indicate that we weren't as high a priority.

Q. So, did you agree or disagree with Mr. Dixon's statement that there was then no evidence that Emerson's interest had petered out?

A. I wouldn't have worded it that way, because I don't think there was any evidence in either direction.

Q. And did you ask Mr. Dixon to change the wording, or substance of this?

A. I don't recall the conversations we had. I would have to look at what we actually presented to the board. I don't think we presented that language to the board, so I think there was probably some conversation about what was the correct representation. But I don't

Page 125

recall the specific conversations.

Q. Well, here you're on an email chain with, not just Mr. Dixon, but Mr. Illcisin, Ms. Rapp, Wachtell Lipton, Bank of America --

A. Uh-huh.

Q. -- why not express your different perspective on this email?

A. Yeah, we were talking to that group on a pretty regular basis. So I think -- I don't know in this specific case, but it was quite common that I might get an email like this -- in this case I'm only cc'd on. But an email like this and then have a call a couple of hours later and express my opinion on that call. I think that happened on many, many occasions.

Q. Do you know for a fact -- can you recall for a fact that you indicated that the board should not be informed that there is no evidence that Emerson's interest had petered out?

A. I don't recall for a fact that I disagreed with that, nor do I recall if I agreed with it.

Q. You see, the following bullet point says, speculation is the Wolverine will likely approach National Instruments privately again before going public, but that is unknown, of course. Do you see that?

Page 126

A. I see that.

Q. Now, that comports with your view at the time, right?

A. I believe the intent of that as we discussed it was that if they were to go public, they would first reach out to us privately, not that they were going to go public and were going to reach out to us privately, but that that would be the order, if that event happened.

Q. So the question I asked before about what you remember doing or not doing with regard to the substance of this email, let me ask it more broadly.

Do you remember for a fact that you asked or directed that anything in this email be modified for purposes of communicating an update to the board?

A. I don't recall exactly what edits we made. Again, you're presenting a lot of things that were in draft material in discussion, as opposed to what was the final conclusion and I don't remember what conversations happened about this subsequent to that.

Q. You see in the bottom paragraph, the one that starts Sean slash Sebastian slash Adam, Mr. Dixon points out that a purpose of this is to, quote, make sure you-all aligned with the above. Do you see that?

A. Yep.

Page 127

MR. COMERFORD: I object to mischaracterizes the document, form.

Q. (BY MR. JOHNSON) Now, in the first half of -- well, August of 2022, you yourself listened in on Emerson's earnings call that month, correct?

A. Sounds plausible.

Q. Well, do you remember that you did it, in fact?

A. I, I don't remember -- I don't remember whether I listened to that specific earnings call. But if there's evidence in that regard, would not surprise me. I probably listened to several earnings calls from Emerson in this time period.

Q. Even earlier than the first half of August.

A. I don't, I don't know. I don't know when they had one before that, but... Given the letter they had sent in May, it's likely I would have been interested in the things they were saying publicly, as a public company.

Q. Well, you were listening in on their earnings call in the first half of August after the National Instruments board had twice rejected Emerson's acquisition offers, right?

A. Yeah, again, I don't recall specifically, but if there's evidence of that, it wouldn't surprise me

Page 128

that I would have listened to that earnings call.

Q. So, why, why do that? Why bother to do that, given the fact that National Instruments had told Emerson no twice?

A. Yeah, first of all, we -- I listen to a lot of different earnings calls from people inside and outside of our direct space. Of course, this company had approach us, I thought it was pretty natural that I had an interest in kind of what they were saying publicly, especially in regards to this pipeline of potential acquisitions. Maybe they were going to announce acquiring another company, for example, which I would have had -- I would have had an interest in.

Q. And wasn't it the case that you were interested in what Emerson was saying about itself in part because it was entirely plausible that Emerson would come back to National Instruments with either a better, higher offer, or go public with its offer to date?

MR. COMERFORD: Form, foundation, calls for speculation. Misstates prior testimony.

A. At that point in time I thought that could be possible. Of course that didn't happen from, you know, month after month after month that proved to not be the case.

Page 129

Q. (BY MR. JOHNSON) When I asked you about whether it was entirely plausible that Emerson would come back, you said you'd agree it was possible, right?

A. Sure.

Q. What's the distinction you're using between plausible and possible?

MR. COMERFORD: Form.

A. Yeah, my impression is that you're insinuating that it was likely, which I did not agree -- which I do not agree with, or certainly didn't at that time. I do agree that it's -- it was possible. It was possible for a whole range of things to happen, that among them. I thought the most likely thing was not that. Which turned out to be the case for many months.

Q. (BY MR. JOHNSON) And it wasn't so implausible that you just turned your attention entirely away from Emerson, right?

MR. COMERFORD: Form.

A. What's your -- sorry, can you restate that question?

Q. (BY MR. JOHNSON) The likelihood that Emerson would come back wasn't so low that you turned your attention entirely away from Emerson?

MR. COMERFORD: Form.

A. The vast majority of my attention was not on

Page 130

that. I was spending my time on the business, on other merger possibilities, a lot of other possibilities were more, more front of mind at that time.

Q. (BY MR. JOHNSON) But on your list of things to do, included take steps to help prepare for the very real possibility that Emerson would come back, right?

MR. COMERFORD: Form, assumes facts not in evidence.

A. I had some team members that were spending some time on that.

Q. (BY MR. JOHNSON) Okay. How about you --

A. Most of, most of it we had already done -- sorry -- in terms of putting in a communication plan for that possibility had already been done at this point.

Q. Well, we've been talking about the fact that you yourself listened in on Emerson's earnings call, right?

A. Correct. I -- for context, I probably listened to a dozen earnings calls or more in that cycle.

Q. And Emerson was one of them?

A. Sounds like it was.

Q. All right. Didn't delegate that to somebody else, right?

A. I didn't delegate the other dozen either.

Page 131

Although many of my team members would also be listening to various earnings calls.

Q. So did other team members of yours listen in on that Emerson earnings call with you?

A. I don't know.

Q. And in the first half of August you also went to the trouble of drafting an email to the company responding to that hypothetical possibility that Emerson went public with an offer for National Instruments, right?

A. Yeah, I think I did.

Q. So it was plausible enough that Emerson would come back that you went to the trouble to do that, right?

A. Yeah, I was in the habit at that time when I had something that I was thinking of, or maybe that I was -- yeah, I had a thought, or a concern or whatever that I -- it helped me to sort of write it down, sometimes in a draft email, and then move on. And I think that's the context with which I did that.

Q. You weren't so occupied with your other responsibilities that you couldn't make time to draft this email that wasn't even yet needed, because the facts hadn't developed yet, you weren't so busy with other things that you couldn't find time to do that,

Page 132

right?

MR. COMERFORD: Object to the form, it's argumentative.

A. No, obviously I found time to do that. I -- yeah, among many, many other things I was doing.

Q. (BY MR. JOHNSON) You also learned in the early half of -- sorry, the first half of August of 2022 that Emerson had sold the company and thereby raised additional capital. Do you remember that?

MR. COMERFORD: Form, foundation.

A. Yeah, I think you're probably referring to Insinkerator, garbage disposal company. I think it had been the case that we always expected, I think they had been public but that was always expected, so I didn't think the actual transaction was big news. We never questioned their ability to have the capital to do a deal.

Q. (BY MR. JOHNSON) Okay, you never questioned Emerson's ability to have the capital to buy National Instruments?

A. Correct, we discussed that before.

Q. Uh-huh. And the fact that Emerson raised additional capital was interesting enough for you to discuss that with your team, right?

A. Perhaps.

Deposition of Eric Starkloff                    In Re National Instruments Corporation Securities Litigation

Page 133

Q.  Going back -- let's take a look at what's in folder 52.

And Kim, can you remind me what Exhibit No. we're up to?

COURT REPORTER:  19.

MR. JOHNSON:  19.  Let me know, Kim, when I can read the numbers in.

COURT REPORTER:  Hold on.

Go ahead.

(Exhibit 19 marked for identification.)

Q.  (BY MR. JOHNSON) NAT-SL-20795 to 20818.  When you've had a chance to look this over, Mr. Starkloff, I'm going to first ask if you recognize it?

A.  Yes.

Q.  And what is it?

A.  Well, I'm a little confused because it says in the email there are two versions.

Q.  I can tell you what that is.

A.  Okay.  Is this one of the versions?

Q.  It was a PDF and a -- whatever you call it, Word document.

A.  Or a PowerPoint or something -- oh, they're the same, okay.  That's the only part I was confused.

Q.  Yeah, with that in mind, what is this?

A.  Yeah, this was, again, I think we had

Page 134

previous -- this might be the same thing that was previously brought up in one of these exhibits.  This was -- my recollection of this was Michael wanted to make a presentation to the board in the evening before the, sort of rest of the board meeting.

There was significant kind of consternation and debate because this was really going back to the issue of the disagreement over cost cutting.  And this was where Michael was using, in my opinion, the Wolverine issue as a means to justify his existing opinion about cost cutting.  So I was frustrated about that and the result of that disagreement was that he was going to make kind of his own presentation to the board.

Q.  So you had had back and forth with Mr. McGrath about this, prior to this being made available to the board, right?

A.  Yeah, we'd probably been debating this topic for 10 or 12 months.

Q.  And, so you saw this presentation at or before it was shared with the rest of the board, right?

A.  Yeah, it appears that I'm on this email which was prior, yes.

Q.  And are you saying you disagreed with the presentation, all or some of it?

A.  I disagreed with some of the contents of the

Page 135

presentation, and I disagreed with the pretense of him making the presentation.  It seemed -- I think Eddie held this opinion as well; I don't want to speak for him.  But we thought it was inappropriate for the chair to be making this kind of a presentation as opposed to management.

Because we believed it was really about the operating metrics and performance of the business is what it was really about, the profitability -- or the cost cutting measures of the business.  So that was the primary disagreement was the fact that he was making this presentation at all.

Q.  And as a result of the back and forth you had with Mr. McGrath up to this point, he did make certain changes to his PowerPoint presentation, right?

MR. COMERFORD:  Form, foundation.

A.  I don't know that he made changes because of my back and forth.  The substantive parts that I really disagreed with, I think -- I believe were still presented in this presentation.

Q.  (BY MR. JOHNSON) Am I right that Mr. McGrath wanted the company to engage in deeper, faster cuts of expenses than you and your team wanted?

MR. COMERFORD:  Form.

A.  Yeah, I think that's a, that's a -- yes, I

Page 136

think that's a correct generalization of the issue, but yeah, generally correct.

Q.  (BY MR. JOHNSON) And is it also correct that the outcome of discussing this with the board was that -- was not that the company followed Mr. McGrath's preferred speed and depth of cutting expenses, but it was agreed that expenses would be cut more and more quickly than had previously been anticipated?

MR. COMERFORD:  Form, compound.

A.  I don't recall the exact outcome.  I know that he wanted to cut approximately a thousand people.  And we thought that would be highly detrimental to the long-term performance and prospects of the company.  That was the disagreement.

As I said before, we were making adjustments to spending based on the challenges we faced with the supply chain.  So, I -- we made multiple changes along the way.  Perhaps some of them subsequent to this meeting.

Q.  (BY MR. JOHNSON) But in connection with this discussion with the board, isn't it the case that the company did begin making faster, deeper expense cuts than had previously been anticipated and planned?

MR. COMERFORD:  Form.

A.  I don't know that there's a result of this

Page 137

discussion. I don't, I don't recall that a firm cost reduction plan was specifically tied to this. Again, I know we made multiple iterations to our cost plan as we went through 2022. And I don't know that they were in response to this specific discussion that McGrath led.

Q. (BY MR. JOHNSON) Now, in addition to the other things we've already talked about that you were doing in the first half of August, you also pushed to have the company engage in further share repurchases, right?

MR. COMERFORD: Form.

A. I believe you're referring to when we -- at some point in August we lifted the trading restriction and we resumed buybacks.

Q. (BY MR. JOHNSON) In August you were in favor of engaging -- having the company engage in more buybacks than it had already completed to that point in the year, right?

A. We continued to want to execute on a buyback plan as a way to return capital to shareholders. We had paused it while we had a trading restriction. So we definitely had conversations and counsel about the trading restriction. And then once there wasn't a trading restriction, we did resume buybacks because the intent was still to do buybacks, yes.

Q. All this we talk, what was your position about

Page 138

resuming buybacks?

MR. COMERFORD: Form.

A. In general, I was in favor of buybacks for a couple of reasons. One is in hundreds of meetings with shareholders, they were broadly in favor of more buybacks and --

Q. (BY MR. JOHNSON) And you were in favor of them then, right, in the first half of August in particular?

A. Say in favor of them... I don't think my position on buybacks in a broad sense changed during this period. I continued to be in favor of buybacks. And we publicly stated that they were a key tenet of our capital allocation strategy.

Q. And you, you faced some pushback from some within the board on whether to resume buybacks at that time, right?

MR. COMERFORD: Form.

A. Yeah. Mainly Michael, he preferred that we use cash for acquisitions. And many other board members and shareholders preferred buybacks, almost all shareholders that I talked to preferred buybacks.

So we were trying to strike an appropriate balance between dividend buybacks and M and A. But certainly Michael was more in favor of the M and A, and therefore less in favor of buybacks as a consequence of

Page 139

that.

Q. (BY MR. JOHNSON) Well, you heard from Mr. McGrath that he wasn't the only board member who was not in favor of reengaging in buybacks in August of 2022, right?

A. Yes, and I recall questioning him on that statement, and asking him to have those board members contact me directly because I was skeptical that it wasn't just him. And I don't believe I ever heard from the other board members, leaving me with the conclusion that it was him.

Q. And although in the second half of July, the forecast was for the company to spend $10 million on buybacks during the third quarter of 2022, how much was, in fact, spent on buybacks in the third quarter of 2022?

A. I know it was significantly more than that. I don't recall the number. And that was driven by the fact that the stock market remained at a low point. So we felt like it was quite an advantageous time to buy back stock.

And also that we had a trading plan that contemplated different volume of stock purchases at different prices, which again is a very shareholder friendly way to buy back stock. And because the stock price and the stock market remained low, it maximized the

Page 140

purchases through that plan.

Q. In the third quarter of 2022 the company bought or spent over $80 million on buybacks, right?

A. That sounds right.

Q. And you were in favor of the company doing that, right?

A. I was.

Q. And obviously you were well aware of all the dealings with Emerson about them possibly buying the company, right?

MR. COMERFORD: Form, vague, ambiguous.

A. Yeah, I think we've established my awareness of that, yes.

Q. (BY MR. JOHNSON) And the public wasn't aware of Emerson's approaches to National Instruments and its offers to buy National Instruments, right?

MR. COMERFORD: Form, timeframe.
You can answer.

A. Not that I know of at that time.

Q. (BY MR. JOHNSON) If the fact of Emerson's offers to buy the company for $48 a share had become public in August of 2022, what's the logical expectation as to what the share price would have done in response, given that then it was trading below $40 a share?

MR. COMERFORD: Form, foundation, calls

Page 141

for speculation, calls for expert opinion.

A.  I don't know.

Q.  (BY MR. JOHNSON) No idea?

MR. COMERFORD:  Same objections.

A.  No.  I think the way a public will react to an offer like that is complex, because it's predicated on the broad market's view of the likelihood of the transaction.  If the public knew that the $48 price had been rejected twice, it might not make a difference.  They might -- again, it's all a market trying to bet on how likely a particular outcome is, so it's very hard to guess how the market would have reacted to that.

Q.  (BY MR. JOHNSON) You yourself were speculating that the likely outcome was that Emerson would come back with a higher offer, right?

MR. COMERFORD:  Form, misstates prior testimony.

A.  I don't know, yeah, I don't recall.

Q.  (BY MR. JOHNSON) So, if the public had the opportunity to evaluate for itself what was likely to happen after Emerson made these two offers of $48 a share, and the board rejected them, you can't simply agree that the stock price likely would have gone up?

MR. COMERFORD:  Form, foundation, calls for speculation, calls for expert opinion, asked and

Page 142

answered.

A.  No.

Q.  (BY MR. JOHNSON) Why not?

MR. COMERFORD:  Same objections.

A.  As I stated, there's a whole -- there's a whole range of factors that affect the way a market prices inequity.  And --

Q.  What's the scenario -- give me a scenario where the public is told that Emerson has made these offers and the board has rejected them and the stock price goes down?

MR. COMERFORD:  Mr. Starkloff, were you finished giving your answer to the prior question before you were interrupted?

A.  Yeah, my answer was no.

Q.  (BY MR. JOHNSON) The answer was completed, right?

A.  You're asking me to speculate about something that I think if someone went through the whole universe of these situations, I suspect they would find all kinds of different scenarios where stock prices reacted very differently to different public news, based on the perception of the public on what that -- how they interpret that news.

Q.  But it's something --

Page 143

A.  So I think you're asking me to speculate something that's impossible to speculate.

Q.  Really, impossible?

MR. COMERFORD:  Same objections.

Q.  (BY MR. JOHNSON) Okay, so --

A.  I think, I think the conclusion you're offering is naive.

Q.  Then give me a scenario in which the stock price goes down?

MR. COMERFORD:  Form, foundation, calls for speculation, calls for expert opinion.

Q.  (BY MR. JOHNSON) With these facts.

MR. COMERFORD:  Same objections.

A.  Yeah, I don't think I need to invent hypothetical scenarios.  I think the simple line that this would absolutely cause the stock to go up is simplistic and naive, and I stated that.

Q.  (BY MR. JOHNSON) One thing's for sure, you knew the facts about Emerson's engagement with National Instruments, and the public didn't, right?

MR. COMERFORD:  Form.

A.  That's true that the public, as far as I know, did not know about the letter, nor our rejection of it.

Q.  (BY MR. JOHNSON) So when public investors were selling their shares in the August and September period

Page 144

of 2022, they were doing so without knowledge that you yourself had about Emerson's dealings with National Instruments, right?

MR. COMERFORD:  Form, foundation, calls for speculation, calls for opinion testimony, argumentative.

A.  We had twice rejected the offer at that point.

Q.  (BY MR. JOHNSON) And members of the public -- let's step back.

Did you view yourself as having fiduciary duties to stockholders of National Instruments?

A.  Yes.

Q.  Of course.  And did, did those fiduciary duties run to public stockholders who were considering whether to sell their shares in the August and September timeframe?

MR. COMERFORD:  Objection, calls for legal conclusion, calls for speculation, improper hypothetical.

A.  I said before, broadly speaking, many of the shareholders or most of shareholders I talked to were broadly supportive of our capital allocation policy and our buyback in particular.

Q.  (BY MR. JOHNSON) Did your fiduciary duties as a board member and CEO of the company run to public

Page 145

stockholders who were considering whether to sell their shares in the August and September timeframe?

MR. COMERFORD: Same objections.

A. I think my --

MR. COMERFORD: Asked and answered as well.

A. I think --

Q. (BY MR. JOHNSON) Yes, no, or you don't know?

A. My fiduciary responsibilities were to broadly represent, to make decisions in the interest of all shareholders.

Q. Okay. So that would seem to include those public shareholders, right?

MR. COMERFORD: Object to the form, calls for legal conclusions, asked and answered.

A. Included all shareholders, others as well, yeah.

Q. (BY MR. JOHNSON) So, the public shareholders who were considering whether to sell their shares in the August, September 2022 period were among those who were owed fiduciary duties by you, right?

MR. COMERFORD: Objection, calls for legal conclusion. It's an improper hypothetical. It's incomplete. Asked and answered.

Q. (BY MR. JOHNSON) That's right, isn't it?

Page 146

MR. COMERFORD: Same objections.

A. Yeah, you're asking me to distinguish a, a particular buyer and seller as opposed to the broad class of shareholders, which I think is, is not the way I thought of my fiduciary responsibilities.

Q. (BY MR. JOHNSON) Well, I thought you said before those fiduciary duties ran to all National Instruments stockholders?

A. But in your way of thinking it, each time I made the decision I'd be helping one class and hurting another class and I think that's -- that's not -- that's an impossible way to think of it. I just disagree with the premise.

Q. I haven't presented that premise. I'm simply asking --

A. Well --

Q. -- the simple question of whether your fiduciary duties also ran to the public stockholders who were considering selling their stock in August, September of 2022?

MR. COMERFORD: Same objection. Asked and answered.

Q. (BY MR. JOHNSON) You can answer.

A. Yeah, I think the --

Q. Answer --

Page 147

A. The -- this was an important issue, and that's why we sought legal counsel, to make sure that, that it was an appropriate time to lift the trading restriction.

Q. Are you suggesting you needed to seek legal counsel to determine whether you had fiduciary duties that included --

A. No.

Q. -- the public stockholders in August and September of 2022 who would possibly sell their shares?

MR. COMERFORD: Yeah, objection.

A. No.

MR. COMERFORD: It calls for legal conclusions. It's asked and answered. It's an incomplete and improper hypothetical, assumes facts not in evidence. And it's been asked and answered if I didn't say that already.

A. Yeah, I think your question, trying to narrow my fiduciary responsibility to just one particular group of shareholders just doesn't comport with my understanding of the broader fiduciary responsibility I had.

Q. (BY MR. JOHNSON) So the contrary -- and I'm not trying to narrow your responsibilities, I'm trying to make sure it includes these people.

A. That sounds to me like you're trying to narrow

Page 148

it. That's how I'm perceiving your question.

Q. Well, whether you want to acknowledge that you had fiduciary duties to those public stockholders, you agree, don't you, that they didn't have the information that you had about Emerson's dealings with National Instruments about possibly buying the company, right?

MR. COMERFORD: Form.

A. Yeah, I don't think they had that information.

Q. (BY MR. JOHNSON) So, given that fact, would it have been -- whether it's legal or not, would it have been appropriate in your mind for you to go buy shares from those National Instruments stockholders in the August, September timeframe?

MR. COMERFORD: Form, calls for legal conclusion, it's an incomplete and improper hypothetical.

A. We'd come to the conclusion that that -- we had rejected that offer. By your way of thinking, for all future -- for all future time, we would never be able to trade again, I guess; is that your position?

Q. (BY MR. JOHNSON) I'm asking a question here, Mr. Starkloff. It's really not very complicated. It's, could you, in your view, have appropriately gone out and yourself purchased shares from public stockholders in the August, September 2022 time period, given the facts

Deposition of Eric Starkloff

Page 149

you knew about Emerson?

A. Oh, me?

Q. And the public didn't know about.

A. Oh --

MR. COMERFORD: So, same objections as before. It's argumentative.

A. Are you asking me personally? Yes, I could. In fact, I did sell stock in that timeframe that you're referring to, personally.

Q. (BY MR. JOHNSON) How much stock did you sell then?

A. I don't recall, I had a trading plan, and it went back into play because the restriction was lifted, and I sold at something in the 40s, personally.

Q. And is it your view that you could have gone out and purchased shares in the August, September 2022 period under the circumstances then?

MR. COMERFORD: Form.

A. Yeah, I think so. And I, I didn't. I sold though.

Q. (BY MR. JOHNSON) McKenzie -- sorry. But McKenzie was the firm that the company hired to monitor possible share acquisitions of National Instruments stock by Emerson, right?

A. Yeah, that's correct.

Page 150

Q. And, and McKenzie advised the company that given ███████████████████████████████████████████████████████ right?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I don't recall them -- I don't recall them making that statement. I generally would not have been looking to McKenzie to make that kind of judgment. They were just providing data.

Q. (BY MR. JOHNSON) You don't remember one way or another whether they indicated that?

MR. COMERFORD: Same objections.

A. I don't remember -- I don't remember them rendering that opinion, no.

Q. (BY MR. JOHNSON) Did you also have, you or others in the company, have Bank of America analyze Emerson's, what's referred to as firepower?

A. Yeah, that would be typical. That was probably done, I would think all the way back to the first presentation in June.

Q. And in this context firepower refers to Emerson's ability to fund a, an acquisition of National Instruments?

A. Correct.

Page 151

Q. And the results of that analysis were that it was determined that Emerson had ample capital to acquire National Instruments, right?

A. Correct.

Q. When Emerson did acquire the company, it was at $60 a share, right?

A. Correct.

Q. And your shares that you held at that time were, of course, exchanged for $60 per share, right?

A. Correct, the shares I owned, yes.

Q. And if you had sold all of your shares back in the August, September 2022 period, they would have sold for approximately $40 a share, right?

A. Yeah, the ones I sold sold for 40 some dollars a share I believe, yeah.

Q. So, by my math, you made on the sale of those shares when Emerson bought the company just under $15 million; is that right?

A. Sounds right.

Q. And if you had sold those shares back in August, September of 2022 for approximately $40 a share, you would have made about $5 million less; does that sound right?

MR. COMERFORD: Object to the form, incomplete and improper hypothetical.

Page 152

A. Math sounds approximately correct.

Q. (BY MR. JOHNSON) Were you at a board meeting where Wachtell gave advice about whether the company could engage in further share repurchases, taking into account the situation with Emerson?

A. I know there were discussions that I was part of, multiple discussions of that topic. I would, I would say specifically the lifting of the trade restriction, and when the appropriate time was to lift the trade restriction. I don't recall which of those were at a board meeting versus with Wachtell, and some of my team. But we had numerous discussions on that topic, I believe.

Q. Do you remember one way or the other whether this was discussed at any board meeting?

A. I -- at some level it was discussed because the board members were subject to the trading restriction. But I don't recall at what depth it was discussed or if it was sort of -- yeah, I don't recall at what depth it was discussed at a board meeting. I assume we have minutes that may reflect that, but I don't recall it.

Q. Do you recall there being a board meeting where Wachtell addressed this topic by indicating that the company should proceed with business as usual?

Deposition of Eric Starkloff                     In Re National Instruments Corporation Securities Litigation

Page 153

A.  Could have, could have been, but I don't recall a specific conversation at a specific board meeting, no.

Q.  Do you know for a fact whether Wachtell was informed about how many shares the company intend to repurchase in the August, September 2022 period?

A.  That's -- I don't, I don't know that we would have discussed that quantitatively with Wachtell, but we likely would have shared the trading grid with them as part of those discussions, but I don't recall that, that --

Q.  You don't know for a fact?

A.  -- that detail.  We discussed the issue at length about the trading restriction, and the trading plan; I know that.

Q.  And to your knowledge, did Wachtell ever provide any written guidance on this?

A.  I don't, I don't recall.

Let's take a break.

THE VIDEOGRAPHER:  Going off the record.  The time is 2:20.

(Recess.)

THE VIDEOGRAPHER:  Back on the record.  The time is 2:32.

Q.  (BY MR. JOHNSON) Did you have a company phone

Page 154

at National Instruments while you were CEO?

A.  Company phone, I had a desk phone, and I had a personal cell phone that I also used for company, and personal use.

Q.  And on your cell phone did you use that -- did you use texting and emails for business, or just one or the other, or something else that I'm not thinking of?

A.  I would -- yeah, I would use texting, sure, I would text some.  I'm not a huge texter, but I would text some.  Emails, and then we did have a messaging platform for our board that I used on my phone as well, Diligent.

Q.  And when you left the company, did the company -- I don't know -- take a copy of some role of your phone for record keeping purposes, or did anything else happen with your phone?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.  I don't think -- I don't think the company took a -- of my phone, my phone, I don't think so.

Q.  (BY MR. JOHNSON) All right.  You still have that same phone?

A.  I still have the same number, it's not the same phone, but, I, I think I still have the same number -- I do have the same number.

Page 155

Q.  And at least when I updated my phone recently, everything was downloaded to the cloud and then just moved over to my new phone; is that how it happened for you when you changed phones?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.  Yeah, I think that generally happens.

Q.  (BY MR. JOHNSON) You mentioned very early today, I don't know if it was notes or files or something like that, that got destroyed when you left the company.  Do you remember that?

A.  Yeah, that I turned over, or destroyed, correct.

Q.  Okay, so what got turned over or what got destroyed?

MR. COMERFORD:  Form.

A.  I turned over my laptop and all of its contents, although, of course, most of the email, as you know, was on the server.  Just about all the documents that I ever used were on a server.  We did everything kind of on a server.

I had physical documents that I either turned over or shredded, like stuff that was just on my desk, like -- most of it -- I don't even know if any -- honestly I don't know if any of it was turned over or

Page 156

shredded.  I think I just turned it all over to the company, yeah.  Most of it was already on the network, though, but I just wanted to make sure that I didn't remain in possession of any confidential information or anything, for example.  I had a file cabinet that I left with the company, too, that -- yeah.

Q.  (BY MR. JOHNSON) And have you spoken with anyone else who has been deposed in this case about this case?

A.  No.

Q.  Ever been sued before?

A.  Yes.

Q.  Once or more?

A.  Once.

Q.  What was that?

A.  I had -- a long time ago in the early 2000s, or maybe '99 or 2000, 2001, I had a business dispute with a company that we were trying to acquire in Belgium, and then we did not result in an acquisition, and they were -- yeah, so it was related to that.

Q.  Was it a shareholder lawsuit?

A.  No.  I forget the exact nature of it, but they sort of went out of business and they were trying to get us to still buy them, I think was the nature of the lawsuit, as they sort of went out of business.

Page 157

Q.  Did that lawsuit require you to testify at deposition or trial or otherwise?

A.  I did a deposition for that, I recall; that's I think the only other deposition I've ever done.

Q.  And you never previously testified in court; is that right?

A.  Correct, correct.

Q.  Okay.  Nothing further.  Thank you very much, Mr. Starkloff.

A.  Okay.

EXAMINATION
BY MR. COMERFORD:

Q.  Mr. Starkloff, my name is John Comerford.  I represent the Defendants in this case, which are National Instruments and you and Mr. McGrath, okay?

A.  Uh-huh.

Q.  And I'd like to ask you a series of questions for the jury so they understand your background --

A.  Sure.

Q.  -- and where you're from.

Let me begin by asking you, where are you from originally, sir?

A.  I grew up in, kind of suburban Washington, D.C. area, and then in Virginia.

Q.  And can you trace your education after high

Page 158

school, please?

A.  Yeah, went to University of Virginia, in engineering, electrical engineering.

Q.  And then what year did you graduate?

A.  1997.

Q.  And do you have any other formal education after the electrical engineering degree from the University of Virginia?

A.  No.  Some classes here and there, and I guess little certificates, but not, not formal study like that, no.

Q.  Okay.  What was your first job after graduating from college?

A.  National Instruments.

Q.  All right.  And what was your first role?

A.  Application engineer, entry level position at NI.

Q.  Okay.  And then in what role were you when you left National Instruments?

A.  CEO.  I left as an adviser for the last three months, but I think you're getting at I was CEO at the end, yes.

Q.  Okay.  And did you also serve on the board of directors of National Instruments?

A.  I did.  I was the director from 2000 through

Page 159

2003, yeah -- sorry, 2020 through 2023.  Little off.

Q.  You saw my confusion there.

A.  Director from 2020 through 2023.

Q.  Okay.  What is the business of National Instruments in terms of the industry, and the products of the company?

A.  Yeah, the easiest way to think of NI is we test electronic systems.  And so engineers and scientists use NI hardware and software to make sure the thing they're building works correctly and has quality.  And it's primarily any kind of electronics that you use in your everyday life use NI's products.

Q.  Okay.  And it's testing for those -- for electronic products?

A.  Yeah, testing the performance of those products, correct.

Q.  All right.  I want to ask you to focus on 2022, if we just orient ourselves there.  How was the business of National Instruments doing in terms of the revenue and the financial performance of the company, just in general terms?

A.  Sure.  2022 was a bit of a strange year.  It was the year of the supply chain disruption that affected the whole world, I'm sure everyone read about it in the papers or experienced it.  You couldn't buy a

Page 160

car because they didn't have enough chips for it.  And so that affected our business as well.

So on one hand we had some of the highest demand that we've ever had for the company.  We had recently transformed our strategy.  It was working.  And our bookings, the amount of orders we were getting were growing very strongly like 20 plus percent, I believe.

But, we couldn't get enough semi-conductors to ship our products, so it was difficult to keep up the revenue of the company with the bookings.  So it was a challenging year.  Demand was very high.  But it was difficult to ship, and customers were calling me wanting products and I was calling semi-conductors asking for chips throughout that year.

Q.  Okay.  In 2022 were you, as the CEO of National Instruments, interested in seeing National Instruments be acquired by another company?

A.  No, that wasn't my -- that wasn't my objective.  We had a long-term plan for the company, a hundred year plan, and a ten year plan, and focused on long-term value creation.

Q.  Okay.  In 2022, had National Instruments recently before that gone through a process where it had expressed interest in buying another company?

A.  Yes.  We were, we were doing more acquisitions

Page 161

in that time period and looking at a number of companies and we bought some in that time period as well.

Q.   Now, the jury understands that Emerson Electric Company approached National Instruments in May of 2022, correct?

A.   Correct, correct.

Q.   How did the National Instruments' acquisition activity in the recent past, prior to 2022 affect your thinking about Emerson's approach to National Instruments?

A.   Yeah, so, one acquisition in particular affected my sort of thinking, I think on that.  We had been trying to acquire another public company.  And we had been using -- it was an unsolicited offer.  So we had approached that company, we had ended up writing letters to that company, and their board, making an offer for the stock of that company.  And this went through several iterations.  And in the end resulted in us not buying the company.  And -- but I'd been on that side of the experience, trying to buy a company through an unsolicited public to public transaction.

Q.   Prior to Mr. Karsanbhai, the CEO of Emerson reaching out to you in May of 2022, did you have any idea that Emerson might be interested in acquiring National Instruments?

Page 162

A.   No, not at all.

Q.   Was Emerson's offer, or proposal I should say, to National Instruments in 2022, was that solicited or unsolicited?

A.   Totally unsolicited.

Q.   Okay.  And so what was your reaction as the CEO when Emerson made a proposal of $48 per share on May 25th, 2022?

A.   Yeah, I perceived this to be -- I described it at the time to others as like bargain hunting.  We -- like the stock market was down significantly in 2022, because of that supply chain disruption, post COVID supply chain disruption.  And so I thought that reaching out to NI with a $48 price, which was a premium to that day's price, but was not -- it was still sort of discounted to the long-term value of the company, was just an attempt to look for a bargain in the market.

Q.   And you, you mentioned the stock market, I believe?

A.   Uh-huh.

Q.   What's your recollection of the market and National Instruments' place in the stock market at that point in time?

A.   Yeah, I think --

        MR. JOHNSON:  Objection, form.

Page 163

A.   -- I think the stats were that, from the peak to the valley, which happened at approximately that timeframe.  Again, remember, COVID it went way a down, but then it recovered.  And then the supply chain disruption happened and the market had another big disruption, down 40 or 50% is my recollection, so significantly down.  And then also subsequently recovered in sort of 2023, and 2024, of course.  But -- so it was a challenging time for the market, because of this semi-conductor crises that happened.

Q.   (BY MR. COMERFORD) Okay.  Was National Instruments also going through a strategic transformation at this time?

A.   We, we had been.  And we were in -- we were still in it, in the latter stages.  We were kind of in the stage of that strategic transformation where it was starting to pay -- kind of come to fruition, as I mentioned.  The bookings or the demand for the company was starting to really inflect and we viewed that as a very positive sign that we were on a significant growth trajectory.

Q.   Did you think that National Instruments, based on the nature of its business, would be a natural fit with Emerson?

A.   No.  I was pretty surprised at the approach

Page 164

from Emerson because I always understood Emerson to be in the industrial automation business.  And NI was a test of measurement company, which is quite different, and then when I, when I learned a little bit more, after the approach, Emerson was talking about being a pure play automation business, which seemed even more far afield to our, our business than, than even what I initially understood.

        So at that time I thought it was, you know, a pretty big diversification for Emerson, which was a surprise.

Q.   Okay.  I want to ask you to pull up Exhibit No. 3 --

A.   Sure.

Q.   -- to your deposition.  Which is a May 25th, 2022 cover email and letter from Mr. Karsanbhai, the CEO of Emerson to you?

A.   Got it here, yep, I've got it.

Q.   Okay.  My first question is, I'd like you to look at page three of Mr. Karsanbhai's May 25th, 2022 letter after his signature.

A.   Uh-huh.

Q.   And at the bottom of the page, do you see where his letter says:  This proposal constitutes neither an offer, nor evidence of the existence of an

Page 165

offer, and then it goes on from there. Do you see that?

A. Yep, I do.

Q. Okay. And so did you understand that to mean that this was not an offer to acquire National Instruments -- that National Instruments could respond to and simply say, we agree, and now we have a deal?

A. Oh, yeah, absolutely. There's -- consummating a public to public transaction is very, very complex, well beyond the simple, quote/unquote, offer that this was, so yes.

Q. Now, I want to ask you to look at page 2 of Mr. Karsanbhai's letter of May 25th, 2022, and there's a section that's under the heading of timing?

A. Yes.

Q. And the second paragraph of the timing section says, we have no current plan to disclose this letter, and assume that you do not intend to either. Do you see where I read that?

A. Yes.

Q. All right. Now I want to ask you to pull up Exhibit 4 to your deposition.

A. Yes, got it.

Q. And I think earlier today we discussed the fact that these are slides that were created by the Wachtell, Lipton, Rosen and Katz law firm, right?

Page 166

A. Uh-huh.

Q. And can I ask you to go to page 7 --

A. Yes.

Q. -- of the slides. And I apologize, actually go to page 8 of the slides.

A. Yep, got it.

Q. The one that says ▮▮▮▮▮▮▮?

A. Uh-huh.

Q. So you were asked some questions about the language in this slide in ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮?

A. Yeah.

Q. The language in ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮?

A. Uh-huh.

Q. And in the ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮. Do you see that?

A. Yes.

Q. Okay. And so if we, if we look at Exhibit 3, which is Mr. Karsanbhai's letter, where he writes, we have no current plan to disclose this letter, and assume that you do not intend to either. Do you see that?

A. Yeah.

Q. So my question is, which category, ▮▮▮▮ --

Page 167

▮▮▮▮▮▮▮ does that indicate to you, just on the face of the language, without inferring anything?

A. Oh, on the face of the language, it would suggest a weak bear hug.

Q. Okay. Would it, would it suggest to you that he's requesting private discussions?

A. I forget if he, if he says anything about discussing it privately in this, to be honest.

Q. And what I'm referring to is Mr. Karsanbhai's --

A. Oh, meaning not public.

Q. Right. Where he says, we have no current plan to disclose this letter; does that suggest --

A. Correct.

Q. -- to you private discussions?

A. Private as opposed to public, yes, it implies private as opposed to public, correct.

Q. Okay. Now, after receiving this May 25th, 2022 proposal from Emerson, did National Instruments engage advisers?

A. We did, yes.

Q. Or, or -- I guess I should say even before --

A. Yeah, we -- that's what I was hesitating. We had one of our -- we had relationships with our advisers

Page 168

to some extent beforehand. We had already worked with Wachtell. And so we actually talked to Wachtell I think before I even talk the call with Mr. Karsanbhai, and then we had a long-standing relationship with Bank of America. But certainly after this, we sort of formalized that relationship more with those two advisers in particular.

Q. Okay. Let me focus on Wachtell initially with my questions. Did Wachtell give presentations to you and the rest of the board of directors about their responsibilities to shareholders?

A. They did, on multiple occasions.

Q. Okay. Did you follow the advice that was being given to you by the Wachtell law firm?

A. Yes. We had a lot of, kind of respect for Wachtell, and we used them heavily, yes, I did.

Q. Okay. And then Bank of America, did it also give presentations to National Instruments, to the board, and to management?

A. They did.

Q. Okay. And what were -- what was the nature of those presentations from Bank of America?

A. Yeah, a couple of things. The primary thing was a valuation analysis to -- for the board to understand the inherent value of the company as

Page 169

perceived by sort of external adviser. That was an important part of the decision. And it indicated a much higher value for the company.

And then they did some other analysis on other strategic alternatives. We were also working with them on looking at buy side acquisitions and stuff as well.

Q. Okay. You were asked questions today about the fact that National Instruments sent communications to Emerson on June 16th, 2022, and August 2nd, 2022?

A. Correct.

Q. Which indicated that it was rejecting proposals from Emerson on both those occasions; do you recall that?

A. Yes, I do.

Q. Okay. What was the intention of you and the company when those communications were sent to Emerson?

A. Yeah, we wanted --

MR. JOHNSON: Objection, form.

A. We wanted a firm and unambiguous rejection of the offer.

Q. (BY MR. COMERFORD) Okay, were you trying to hint in any way that National Instruments was open to further discussions or to a higher price?

A. We were specifically trying to make sure we

Page 170

did not inadvertently hint that we were open to additional discussions or a higher price. That's why the letters were quite short.

Q. And is it your understanding that Emerson offered $48 per share -- or proposed $48 per share twice?

A. The same offer twice, correct, $48 per share.

Q. How did the fact that Emerson proposed $48 per share twice impact your thinking about whether an acquisition by Emerson was going to happen eventually?

A. Yeah, when we got the second offer that was sub -- the same as the first offer, it was -- in some ways a little surprising that it was just reiterating the same offer. I didn't know what to make of that. Maybe that was the most they could possibly pay, was one theory.

And so the fact that they offered it again seemed less likely that any transaction was going to happen with Emerson. Because we knew that that was not a compelling offer.

Q. When Emerson offered $48 per share for the second time --

A. Uh-huh.

Q. -- in June of 2022, did you view that as an improved offer over the first $48 per share offer?

Page 171

A. No. And, in fact, the -- we viewed it as substantially the same offer, and our minutes from our board discussions, and even, I believe some of the tone of the letter that we sent back to Emerson indicated our position that we were rejecting what was substantially the same offer that we had previously rejected.

Q. After National Instruments sent a second rejection letter to Emerson on August 2nd, 2022, what was your view of the prospect of a transaction happening with Emerson?

A. Yeah, I thought it was very unlikely on that day. And then it also, as time went on, we had -- when we sent the previous letter we got a pretty quick response to that. This time as time went on, you know, after a week or so, it seemed unlikely that they were going to come back. And, of course, who knows the time, but, in fact, they didn't, for many months. So we assumed that this was dead, frankly. That this wasn't going anywhere.

Q. Okay. I want to ask you some questions about the advice that National Instruments received and that you received from the Wachtell, Lipton, Rosen, Katz law firm. Why did National Instruments want to resume share purchases after rejecting Emerson's offer for the second time?

Page 172

A. Yeah, there's two things. One is, we had a trading restriction in place that applied to directors, personally, as well as we viewed it as applying to the company as well. So, we were thinking about well, how long is it appropriate to keep that in place. Like, what are the triggers?

And so we had a point of view that this was no longer -- this offer was sort of -- had been rejected twice and it was no longer sort of a live offer. But we wanted to get counsel to re -- to sort of understand their point of view on that. And so we did. And they affirmed for us that it was no longer a live offer. We had clearly rejected it multiple times. And so that allowed us to release the trading restriction.

To the other part of the company, we did have a authorization for share repurchase, which we had paused because of the trading restriction. And ultimately, you know, we used that to help return value to shareholders. And so, in the absence of a trading restriction, business as usual for us was to execute on the buyback program.

Q. So you, you referred to an authorization to do share repurchases?

A. Yes.

Q. What was the authorization in substance?

Page 173

A.   Yeah, so we had had multiple authorizations over the years.  This was common practice for us.  In January of 2022 we had -- the newest authorization at that time was a $250 million authorization, which enabled the management team under that authorization to buy back up to $250 million of, of stock, and could be at any time during that two year period.  So it was understood that we could do that in any timing that was advantageous to shareholders.

Q.   Okay.  At certain points today I think the phrase capital allocation strategy was used?

A.   Yes.

Q.   Can you tell, tell the jury what is a capital allocation strategy?

A.   Yeah, it's just a fancy term for something really simple.  It's about what you do with money that is ultimately the shareholder's money and how you allocate it.  And so we had a very consistent strategy.  We had three priorities and we're always balancing among these three priorities.  One was the dividend, where you pay cash back to shareholders on a quarterly basis in our case.

The second was buyback, when you buy back stock and that returns -- it's a very efficient way to return cash back to shareholders of that stock.  And the

Page 174

third was mergers and acquisitions, where you're buying other companies to increase the value of your company.

So we were constantly thinking about how to balance across those priorities, and taking input, frankly, from shareholders about those priorities.

Q.   When, when the board of National Instruments was meeting in July 2022 --

A.   Uh-huh.

Q.   -- I think we looked at documents that said it was July 19th and 20th --

A.   Correct.

Q.   -- 2022.  Did the -- did lawyers from the Wachtell, Lipton, Rosen, Katz law firm speak to the board at that meeting?

A.   They did.

Q.   Okay.  And what was -- how did that relate to the share repurchase or the buyback issue that the company was looking at?

A.   Yeah, we'd had multiple conversations I think at that board meeting as well.  And their position was that after, you know, after the second rejection, that we would be clear to lift the trading restriction at some point.

So they were -- at that time we still had a few more discussions, because that was July 20th, we

Page 175

didn't make that decision for a little bit.  But we were starting to talk about, you know, we knew that we weren't going to keep that share restriction in place indefinitely.  We had to think about what are the criteria with which we would remove it.  And so we were talking about that and getting their advice on that.

Q.   Do you feel that you and the rest of the management team at National Instruments provided the lawyers at Wachtell with all of the pertinent information about what was going on with discussions with Emerson and communications with Emerson --

A.   Yeah.

Q.   -- in 2022?

MR. JOHNSON:  Objection, form.

A.   Absolutely.

Q.   (BY MR. COMERFORD) Do you think there's any reason why the lawyers at Wachtell didn't know something that was relevant to the question of whether National Instruments could resume share repurchasing?

A.   No, I think --

MR. JOHNSON:  Objection, form.

A.   No, I think they had the whole picture.  They were almost like a member of our team in that period.

Q.   (BY MR. COMERFORD) Okay.  Was it fair to say that National Instruments was in very close contact with

Page 176

the Wachtell lawyers in 2022?

A.   Yeah, that's what I meant.  When I say a member of their team, not that -- they were still independent counsel, but we were in very frequent commune with them, yes.

Q.   And the advice that you received from them about the issue of whether National Instruments could resume share repurchases, or buybacks, in this July, August, September '22 timeframe was what; what was the advice from them?

A.   That we were in the clear, meaning we were no longer in possession of material non-public information, we could lift the trading restriction and resume buybacks; I think we made that determination in early August.  And they confirmed that they -- they made that recommendation, I should say, in early August.

Q.   Aside from the advice that you received from the outside lawyers at Wachtell, did you also receive advice from in-house lawyers at National Instruments about this issue?

A.   Yes, I was talking frequently.

Q.   Aside from advice you received from lawyers and opinions you received from lawyers, did you have your own personal view of whether National Instruments was in possession of material non-public information

Page 177

that should prevent it from trading?

A. Yes, I have an opinion as well.

Q. Okay, and so if you're clear about the timeframe, and let's just focus on the timeframe of August -- early August.

A. Sure.

Q. August 3rd, 2022, what was your opinion about whether National Instruments was in possession of material non-public information that should preclude it from trading?

A. My, my opinion at that time was that we were not in possession of material non-public information as we had twice rejected the same offer.

Q. And then after August 2nd or 3rd, we move forward a few days, and did you and National Instruments learn that ████████████████████?

A. We did, we did.

Q. And then did the advice from -- did you go back to Wachtell and receive new or refreshed advice at that point?

A. We absolutely did.

Q. Okay. And what was the -- was the advice any different than you had already received?

A. The advice, the advice did not change.

Q. Okay. And then did, did the fact that you

Page 178

learned that ████████████████████ ██████████████████, did that change your opinion about whether National Instruments was in possession of material non-public information?

A. No, I still hold the same opinion.

Q. Okay. Did you personally buy or sell shares of National Instruments stock in between the dates of August 12th, 2022 and September 26th, 2022?

A. I did.

Q. Okay. And can you describe that as best you can recall?

A. Yeah, I had a trading plan that would execute sales at certain price points. And one of those price points was achieved in that period and I sold some shares per that trading plan.

I had that trading plan, by the way, just to sort of remove -- as a CEO of a public company, you're kind of -- you just want to remove yourself and make it as clean as possible when you're buying or selling shares, so I did that. I didn't have to do that, but I did that for that reason.

Now, at the time I could have canceled that plan and I was advised that it was within my rights to cancel the plan. I did not cancel the plan. I went forward and it sold, I believe at $42, if I'm not

Page 179

mistaken was the share price that it sold at.

Q. And so if it was indeed a sale at -- of your personal stock at $42 per share, how much less than Emerson's offer of $48 per share was that?

A. Yeah, so that was, that was at $6 less than Emerson's previous rejected offer.

Q. Okay. Those are all the questions I have for you, sir. I appreciate it.

A. Okay, thanks, John.

MR. JOHNSON: Just one or two real quick.

FURTHER EXAMINATION

BY MR. JOHNSON:

Q. Which Wachtell lawyers were at the July 19, 20, 2022 meeting and giving advice there to the board?

A. I believe that would have been Sebastian Niles was at sort of all of those meetings. And Adam Emmerick was likely at that meeting as well, would be my recollection is that Sebastian and Adam were the principal people. There could have been others, but those were the two people that were frequently in communication, and we would have consulted on that topic.

Q. And who did the talking for them?

A. I would expect both of them would have talked, and, in fact, both rendered their opinions, sort of

Page 180

independently was their style, frankly. But I don't recall specifically this conversation, but it was typically the case that, you know, both of them would, would render their, their kind of advice, you know, together and independently. So we were talking to both of them, yeah.

Q. And did any of their advice include words to the effect, or actual words, of conduct business as usual?

A. I don't remember if they used that phrase.

Q. When was your 10B5 plan put in place?

A. I think it was put in place -- mine personally, or you mean the company's?

Q. Yeah -- no, yours, your personal one.

A. I believe it was early -- it was early in 2022, I believe.

Q. Before --

A. Yeah.

Q. -- the approach by Emerson?

A. I believe so, yeah, I think it would have been before that.

MR. JOHNSON: Okay, that's all.

MR. COMERFORD: I'm just going to ask two or three questions about the questions you just received from Mr. Johnson and then that's all I will ask.

Page 181

FURTHER EXAMINATION

BY MR. COMERFORD:

Q. Can you please pull up Exhibit 12 to your deposition, which is in front of you.

A. Yeah.

Q. And can you identify this document again?

A. Yeah, this is board meeting minutes from July 19th and 20th.

Q. Okay. And at the bottom of the third paragraph -- well, the third paragraph describes those who are in attendance for all or part of the meeting; is that right?

A. Yes.

Q. Okay. And so, do you see anyone listed as attending this meeting from the Wachtell law firm?

A. Yeah, that would be Sebastian. Sebastian Niles was like the primary person, and then Adam Emmerick would come on at times. But it looks like this meeting Sebastian was the person.

Q. Okay. And let me ask you to look at page 4 of the minutes, which is Bates labeled NATSL1460.

A. Yes.

Q. We looked at this earlier today. This is summary and actions agenda item six taken out of order. Do you see that?

Page 182

A. Yes.

Q. And this is talking about the response to Emerson; is that right?

A. Correct.

Q. Okay. So at the end of the first paragraph, which runs onto page 5, do you see where it's written representatives of Wachtell, Lipton, Rosen, Katz provided perspectives including as to legal matters?

A. Yes.

Q. Okay. And then do you see another paragraph down, it says, during the foregoing presentation management and Mr. Niles responded to questions from members of the board?

A. Correct.

Q. Do you see that?

A. Yes.

Q. And then after that, it says, Mr. Niles left the meeting?

A. Yes.

Q. Okay. And so does this refresh your memory that Mr. Niles from the Wachtell law firm attended the July 19 and 20 --

A. Yes.

Q. -- 2022 meeting of the board of National Instruments?

Page 183

A. Yes, absolutely.

MR. COMERFORD: Okay, no further questions.

MR. JOHNSON: Thank you.

THE VIDEOGRAPHER: Mr. Johnson, you said no more questions?

MR. JOHNSON: Yes, yes.

THE VIDEOGRAPHER: All right. This concludes the deposition of Eric Starkloff. Going off the record. The time is 3:07.

(Deposition concluded.)

ERIC STARKLOFF

OCTOBER 23, 2025

CHANGES AND SIGNATURE

PAGE LINE   CHANGE                           REASON

I, ERIC STARKLOFF, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.


                          ERIC STARKLOFF


THE STATE OF                    )

COUNTY OF                       )

    Before me,                            , on this day personally appeared ERIC STARKLOFF, known to me or proved to me on the oath of                  or through _____ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

    Given under my hand and seal of office on this     day of                          ,      .


                          NOTARY PUBLIC IN AND FOR

                          THE STATE OF

My Commission Expires:

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:23-cv-10488-DLC

IN RE: NATIONAL INSTRUMENTS CORPORATION
        SECURITIES LITIGATION


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REPORTER'S CERTIFICATE

ORAL VIDEOTAPED DEPOSITION OF

ERIC STARKLOFF

OCTOBER 23, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, Kimberly Wheelis, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ERIC STARKLOFF, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That the deposition transcript was duly submitted on                     to the witness or to the attorney for the witness for examination, signature, and return to me by         .

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount

of time used by each party at the time of the deposition:

Mr. Johnson - 5 hours, 18 minutes

Mr. Comerford - 28 minutes

That a copy of this certificate was served on all parties shown herein on                          and filed with the Clerk.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to Rule 203 of the Texas Code of Civil Procedure will be complied with after they have occurred.

Certified to by me on this      day of

                   ,      .


                              /S/ Kimberly Wheelis

                              Kimberly Wheelis, CSR, RPR, CRR
                              Texas CSR 8510
                              Expiration:  4/30/27

Deposition of Eric Starkloff                    In Re National Instruments Corporation Securities Litigation

FURTHER CERTIFICATION UNDER TRCP RULE 203

The original deposition was/was not returned to the deposition officer on        .

If returned, the attached Changes and Signature page(s) contain(s) any changes and the reasons therefor.

If returned, the original deposition was delivered to _____ Custodial Attorney.

$          is the deposition officer's charges to the _____ for preparing the original deposition and any copies of exhibits;

The deposition was delivered in accordance with Rule 203.3, and a copy of this certificate, served on all parties shown herein, was filed with the Clerk.

Certified to by me on this 29th day of October, 2025.


                              /S/ Kimberly Wheelis

                              Kimberly Wheelis, CSR, RPR, CRR
                              Texas CSR 8510
                              Expiration:  4/30/27

## WORD INDEX

**< $ >**
**$10**  23:*21, 24*  95:*15, 24*  139:*13*
**$100**  15:*20*  16:*6*  19:*24*  22:*12*
**$15**  151:*17*
**$250**  15:*12, 20*  19:*24*  173:*4, 6*
**$31**  71:*2, 16*  72:*5, 18*  73:*10*  88:*4*
**$33**  71:*1*
**$40**  34:*4, 14, 18, 20*  35:*9, 15, 21*  37:*24, 25*  38:*11, 21*  40:*4*  140:*24*  151:*13, 21*
**$42**  178:*25*  179:*3*
**$48**  29:*21*  33:*3*  34:*3, 14*  35:*8, 14*  40:*4*  62:*20*  69:*17, 20*  70:*8, 10*  71:*16*  72:*5, 9, 17*  73:*9*  74:*1, 2*  88:*3*  121:*7, 13*  140:*21*  141:*8, 21*  162:*7, 14*  170:*5, 7, 8, 21, 25*  179:*4*
**$5**  151:*22*
**$6**  179:*5*
**$60**  151:*6, 9*
**$80**  140:*3*

**< 0 >**
**07**  8:*1*

**< 1 >**
**1**  3:*10*  17:*17, 18*
**1:23**  118:*4*
**1:23-cv-10488-DLC**  1:*3*  186:*3*
**10**  3:*19*  18:*22*  47:*13*  69:*11, 12*  81:*20*  134:*18*
**10:35**  57:*10*
**10:48**  57:*13*
**100**  19:*20*  61:*4*  62:*1*
**10170**  2:*8*
**102**  3:*25*
**108**  4:*1*

**10B5**  180:*11*
**11**  3:*20*  42:*13*
**11:08**  67:*14*
**11:10**  67:*17*
**11th**  77:*4*
**12**  3:*21*  88:*11, 12*  134:*18*  181:*3*
**12:22**  108:*15*
**12:23**  108:*18*
**12:37**  118:*1*
**122**  4:*2*
**1266**  28:*16*
**12th**  178:*8*
**13**  3:*22*  61:*3, 24*  65:*17*  92:*3, 4*  94:*11*
**132**  4:*3*
**14**  3:*23*  8:*11*  60:*8*  69:*10*  94:*12, 13*
**1460**  89:*5*
**15**  3:*24*  8:*11*  87:*8*  100:*14*
**150**  19:*21*
**1509**  88:*14*
**156**  3:*5*
**16**  3:*25*  62:*17*  74:*3*  103:*2, 3*
**1611**  65:*21*
**16144**  41:*17*
**1698**  61:*16*
**16th**  65:*25*  169:*10*
**17**  4:*1*  92:*2*  108:*20, 22*
**178**  3:*6*
**18**  3:*10*  4:*2*  88:*11*  103:*25*  104:*17*  118:*8, 12*  123:*4*  187:*2*
**180**  3:*7*
**18072**  109:*2*
**183**  4:*5*
**1832**  2:*7*
**184**  4:*6*
**185**  4:*7*
**187**  4:*8*
**19**  4:*3*  94:*21*  95:*24*  97:*7*  118:*18*  133:*5, 6, 10*  179:*13*  182:*22*
**1900**  2:*15*
**1997**  6:*14*  158:*5*
**19th**  92:*10*  97:*13*

**174:*10*  181:*8**

**< 2 >**
**2**  3:*11*  21:*12, 13*  44:*7*  165:*11*
**2:07**  103:*8*
**2:20**  153:*21*
**2:32**  153:*24*
**20**  7:*19*  18:*22*  34:*17*  35:*11, 18, 24*  94:*21*  95:*24*  97:*7*  160:*7*  179:*14*  182:*22*
**200**  1:*18*
**2000**  156:*17*  158:*25*
**2000s**  9:*25*  11:*4*  156:*16*
**2001**  156:*17*
**2003**  159:*1*
**2004**  7:*13*
**2010**  8:*1*
**2014**  8:*11*
**2015**  8:*12*
**2017**  8:*12*  10:*10, 12*  25:*5*
**2020**  8:*13*  10:*3, 10, 15*  159:*1, 3*
**2022**  15:*2, 8, 14, 21*  16:*7, 16*  19:*9, 21, 25*  20:*6, 20, 25*  21:*3, 16*  23:*2, 4*  24:*2, 6*  25:*21*  26:*13*  28:*24*  33:*4*  40:*15*  43:*6*  45:*17*  60:*8*  61:*24*  90:*19*  92:*9*  94:*20, 21*  95:*1, 6, 7, 10*  103:*8*  106:*6*  112:*22*  113:*10, 18*  118:*18*  127:*4*  132:*7*  137:*4*  139:*4, 14, 15*  140:*2, 22*  144:*1*  145:*20*  146:*20*  147:*9*  148:*25*  149:*16*  151:*12, 21*  153:*6*  159:*18, 22*  160:*15, 22*  161:*5, 8, 23*  162:*3, 8, 11*  164:*16, 20*  165:*12*  167:*20*  169:*10*  170:*24*  171:*8*  173:*3*  174:*7, 12*  175:*13*  176:*1*  177:*7*  178:*8*

**179:*14*  180:*16*  182:*24**
**2023**  8:*17, 21*  15:*14*  19:*21*  159:*1, 3*  163:*8*
**2024**  8:*22*  163:*8*
**2025**  1:*10, 15*  5:*3*  184:*2*  186:*11*  188:*15*
**203**  4:*8*  187:*13*  188:*1*
**203.3**  188:*12*
**20818**  133:*11*
**20th**  65:*24*  97:*13, 19*  174:*10, 25*  181:*8*
**21**  3:*11*  100:*13*
**21521**  82:*3*
**21525**  84:*5*
**21531**  81:*16*
**22**  69:*4*  74:*24*  87:*7*  88:*9*  176:*9*
**23**  1:*10, 15*  184:*2*  186:*11*
**23190**  118:*13*
**23rd**  5:*3*
**24**  33:*4*  77:*22*  108:*10*
**24210**  94:*24*
**24212**  94:*16*
**25**  33:*1*
**250**  16:*11*  20:*11*
**25801**  103:*5*
**25th**  103:*15*  162:*8*  164:*15, 20*  165:*12*  167:*19*
**26th**  103:*8*  178:*8*
**27**  53:*14*  87:*7*
**271**  48:*14*
**28**  3:*12*  106:*5*  187:*3*
**29th**  188:*14*
**2nd**  98:*1*  169:*10*  171:*8*  177:*14*

**< 3 >**
**3**  3:*12*  21:*11*  28:*9, 10*  43:*3*  45:*22*  164:*13*  166:*20*
**3:07**  1:*15*  183:*10*
**30**  33:*3*
**300**  67:*25*
**31**  73:*16, 17, 18*  95:*4*

**35,000**  24:*13*
**38**  72:*23*
**3800**  1:*17*
**39**  33:*21*  70:8  95:6
**3rd**  21:*16*  177:*7, 14*

**< 4 >**
**4**  3:*13*  41:*13, 14*
43:9  47:*13*  89:*5*
165:*21*  181:*20*
**4/30/27**  187:*21*
188:*21*
**40**  35:*1*  151:*14*
163:*6*
**40s**  149:*14*
**41**  3:*13*
**42**  94:*24*  118:*6*
**420**  2:*7*
**48**  3:*14*  39:*13*  72:22
73:*15, 17*  77:22
81:*13*

**< 5 >**
**5**  3:*4, 14*  28:8  43:*11*
48:*9, 12*  182:*6*  187:*2*
**50**  33:*25*  116:*23*
163:*6*
**51**  70:*10*
**52**  133:*2*
**57**  58:*4*
**58**  3:*15*
**59**  103:*2*

**< 6 >**
**6**  3:*15*  41:*12*  58:*4, 5*
84:*5*
**6:00**  116:*22*
**61**  3:*16*
**63105**  2:*16*
**65**  3:*17*
**67**  3:*18*
**68**  67:*9*
**69**  3:*19*  94:*9*

**< 7 >**
**7**  3:*16*  19:*13*  42:*7*
48:8  61:*13, 14*  166:2
**70**  61:*3, 25*  62:4
95:9  112:*4, 5, 12*

123:*19*
**72**  58:8
**7676**  2:*15*
**7816**  92:*3*

**< 8 >**
**8**  3:*17*  65:*17, 18, 19*
166:*5*
**8:55**  61:*24*
**80**  16:*21*
**8510**  187:*20*  188:*20*
**88**  3:*20, 21*

**< 9 >**
**9**  3:*18*  61:*13*  67:*18,*
*19*  84:*4*
**9:08**  1:*15*  5:*3*
**91**  3:*22*
**93**  3:*23*
**98**  7:*6, 7*
**99**  3:*24*  156:*17*
**997**  100:*19*

**< A >**
**a.m**  1:*15*  5:*3*  61:*24*
116:*22*
**ability**  132:*16, 19*
150:*23*
**able**  31:*18*  32:*12, 17*
70:*7, 9*  71:*15*  148:*20*
**above-styled**  1:*14*
**absence**  172:*19*
**absolutely**  143:*16*
165:*7*  175:*15*  177:*21*
183:*1*
**abundance**  55:*20*
56:*4*
**abusive**  40:*12*
**accelerate**  84:*5, 6*
96:*12*
**accelerated**  80:*24*
**account**  152:*5*
**accountability**  32:*9*
**accountable**  32:*1*
**accumulation**  47:*15,*
*22*  115:*21*  116:*17*
150:*2*
**accurate**  62:*6*  78:*3*
**accurately**  109:*25*

**achieved**  178:*14*
**acknowledge**  148:*2*
**acknowledged**  185:*14*
**acquire**  12:*15*  23:*15*
32:*5*  43:*9*  50:*10*
51:*17, 23*  52:*12*
53:*22*  54:*10*  55:*13*
56:*8, 25*  62:*19*  76:*11,*
*21*  94:*3*  112:*9, 10, 14*
114:*16, 19*  116:*17, 20*
117:*3*  151:*2, 5*
156:*18*  161:*13*  165:*4*
**acquired**  8:*17*
115:*10*  160:*17*  178:*1*
**acquirers**  42:*9*
**acquiring**  12:*13, 15*
43:*21*  66:*5*  68:*20*
78:*2*  79:*13*  84:*19*
99:*15*  111:*3*  114:*13*
115:*2, 4*  116:*11*
117:*10*  124:*3*  128:*12*
161:*24*  177:*16*
**acquisition**  11:*25*
12:*4*  81:*5*  83:*5*
103:*24*  116:*23*  117:*1*
119:*21*  123:*6, 17*
124:*6, 10*  127:*23*
150:*23*  156:*19*  161:*7,*
*11*  170:*10*
**acquisitions**  20:*5, 6*
23:*14*  60:*18, 19*  76:*5*
112:*3*  116:*1*  128:*11*
138:*19*  149:*23*
160:*25*  169:*6*  174:*1*
**acted**  88:*22*
**Action**  1:*3*  49:*9*
50:*4*  60:*1*  64:*12*
186:*3*  187:*9, 11*
**actions**  68:*15*  86:*18,*
*20*  89:*7*  181:*24*
**active**  80:*20*
**activist**  115:*13*
**activities**  11:*25*
60:*20*  67:*3*  80:*3*
**activity**  94:*6*  161:*8*
**actual**  17:*14*  18:*11,*
*12*  41:*22*  59:*6*
106:*16*  116:*8*  132:*15*
180:*8*

**Adam**  126:*22*
179:*16, 18*  181:*17*
**addition**  45:*11*  137:*6*
**additional**  8:*6*  44:*9*
69:*18*  75:*2*  114:*23*
132:*9, 23*  170:*2*
**addressed**  103:*10*
152:*24*
**adds**  45:*12*
**adequate**  32:*19*
**adhered**  54:*4*
**ad-hoc**  9:*6*
**adjustments**  85:*23*
136:*16*
**admired**  27:*11*
**advantage**  82:*12*
**advantageous**  92:*23*
93:*11, 18*  139:*19*
173:*9*
**advice**  49:*25*  98:*13*
152:*3*  168:*13*  171:*21*
175:*6*  176:*6, 10, 17,*
*19, 22*  177:*18, 19, 22,*
*24*  179:*14*  180:*4, 7*
**advise**  78:*7*
**advised**  40:*19, 23*
77:*6*  84:*15*  150:*1*
178:*23*
**adviser**  8:*21, 25*  9:*3*
158:*20*  169:*1*
**advisers**  78:*10*  82:*23*
84:*15*  167:*21, 25*
168:*7*
**adviser's**  50:*5*
**advising**  9:*6*
**affect**  14:*7*  142:*6*
161:*8*
**affirmative**  79:*11, 20*
**affirmed**  172:*12*
**affix**  185:*2*
**afield**  164:*7*
**afternoon**  28:*19*
119:*1*
**agenda**  89:*7*  181:*24*
**aggressive**  43:*22*
60:*1*  81:*7*  85:*13*
114:*18*
**aggressively**  81:*10*
84:*7*
**aggressiveness**  77:*8*

Deposition of Eric Starkloff                    In Re National Instruments Corporation Securities Litigation

**ago** 8:*1* 21:*22* 48:*6* 156:*16*
**agree** 57:*7* 73:*15* 82:*7* 87:*12* 90:*2* 95:*12* 111:*23* 123:*17* 124:*14* 129:*3, 9, 10, 11* 141:*23* 148:*4* 165:*6*
**agreed** 82:*23* 119:*24* 123:*11, 15* 125:*20* 136:*7*
**agreement** 30:*13* 96:*24*
**ahead** 24:*25* 27:*8* 35:*5* 93:*14* 133:*9*
**Alex** 10:*14*
**aligned** 126:*24*
**allocate** 23:*17* 173:*18*
**Allocation** 18:*1* 19:*12* 138:*13* 144:*22* 173:*11, 14*
**allow** 40:*3* 75:*2*
**allowed** 172:*14*
**allude** 45:*20*
**allusion** 46:*20*
**alternative** 20:*14, 16*
**alternatives** 169:*5*
**ambiguity** 102:*25*
**ambiguous** 35:*3* 39:*11* 54:*14* 140:*11*
**America** 64:*20, 24* 65:*4, 8, 14* 66:*4* 104:*25* 125:*4* 150:*17* 168:*5, 17, 22*
**amount** 21:*1* 22:*17* 38:*11* 39:*9, 18* 70:*2* 86:*15, 16* 117:*23* 124:*13* 160:*6* 186:*25*
**amounted** 12:*25* 52:*14*
**amounts** 80:*18*
**ample** 151:*2*
**Ana** 2:*5*
**analysis** 104:*25* 105:*17* 151:*1* 168:*24* 169:*4*
**analysts** 104:*1, 18* 106:*16, 25*
**analyze** 150:*17*
**and/or** 66:*4*

**announce** 30:*12* 92:*18* 93:*14, 21, 23* 128:*11*
**announced** 116:*22* 124:*10*
**announcing** 93:*19* 124:*5*
**answer** 13:*3, 4, 16, 24* 34:*24* 35:*6, 17* 36:*1, 3, 6, 10, 11, 25* 37:*3, 8, 14* 38:*10, 17* 40:*1* 71:*15, 21, 23* 72:*3, 22* 73:*2, 3, 23* 74:*1, 6, 20, 22* 91:*15* 113:*16* 140:*18* 142:*13, 15, 16* 146:*23, 25*
**answered** 34:*23* 35:*4, 7, 23* 36:*9, 12* 37:*5, 21* 38:*23* 50:*12, 21* 51:*19, 25* 52:*19* 53:*3, 24* 54:*1, 8, 14* 56:*15* 57:*6* 63:*24* 64:*8, 15* 65:*12* 66:*15* 71:*25* 72:*8, 21* 73:*5, 12, 21, 22* 81:*2* 90:*21* 93:*9* 97:*5* 102:*17* 116:*13* 122:*1* 142:*1* 145:*5, 15, 24* 146:*22* 147:*13, 15*
**answering** 34:*15* 35:*13* 73:*9* 91:*13*
**anticipated** 136:*8, 23*
**anyway** 10:*6* 56:*4*
**apologize** 166:*4*
**appeared** 104:*12* 185:*10*
**appears** 21:*25* 42:*4* 69:*16* 70:*23* 102:*5* 134:*21*
**Apple** 91:*10*
**Application** 6:*19* 7:*4* 158:*16*
**applied** 172:*2*
**applying** 172:*3*
**appointed** 10:*4*
**appreciate** 54:*19, 21, 22, 23* 179:*8*
**approach** 14:*20* 40:*15, 16, 18* 48:*21* 55:*25* 60:*23* 64:*21*

78:*22* 80:*6, 21* 84:*10* 90:*20* 109:*13* 125:*22* 128:*8* 161:*9* 163:*25* 164:*5* 180:*19*
**approached** 11:*23* 12:*17* 25:*21* 161:*4, 15*
**approaches** 59:*21* 140:*15*
**appropriate** 37:*6* 43:*8* 50:*4, 8* 52:*25* 56:*5* 138:*22* 147:*3* 148:*11* 152:*9* 172:*5*
**appropriately** 148:*23*
**approval** 32:*12* 89:*4* 96:*6* 97:*3*
**approve** 88:*21* 89:*2* 96:*22*
**approved** 15:*9* 88:*19* 96:*21* 97:*2*
**approximately** 6:*21, 22* 7:*6, 12, 24* 8:*10* 15:*12* 33:*21* 71:*1* 136:*11* 151:*13, 21* 152:*1* 163:*2*
**arbitrary** 72:*15* 73:*13*
**area** 157:*24*
**argument** 81:*8* 84:*13* 85:*3* 103:*24* 105:*12, 13*
**argumentative** 39:*1* 73:*12* 74:*10, 17* 88:*5* 116:*5* 132:*3* 144:*6* 149:*6*
**arrow** 42:*14*
**ascertain** 47:*5*
**Aside** 176:*17, 22*
**asked** 32:*14* 34:*23* 35:*3, 22* 38:*22* 50:*12, 21* 51:*19, 25* 52:*19* 53:*3, 24* 54:*13* 56:*15* 57:*5* 63:*24* 64:*8, 15* 65:*12* 66:*14* 71:*19, 24* 72:*7, 21* 73:*5, 12, 20* 74:*17* 81:*1* 87:*22* 90:*21* 93:*8* 102:*17* 116:*13* 121:*25* 126:*10, 13* 129:*1* 141:*25* 145:*5, 15, 24*

146:*21* 147:*13, 15* 166:*9* 169:*8*
**asking** 19:*9* 26:*4* 27:*5* 34:*7, 13* 37:*6, 13* 38:*8* 39:*4* 56:*21* 72:*22, 25* 79:*20* 83:*5* 86:*24* 91:*19* 102:*12, 15* 110:*14* 139:*7* 142:*18* 143:*1* 146:*2, 15* 148:*21* 149:*7* 157:*21* 160:*13*
**as-needed** 9:*8*
**associating** 34:*8*
**Association** 10:*25*
**assume** 21:*19* 30:*9* 42:*24* 46:*5* 76:*15* 112:*20* 113:*4, 7* 152:*21* 165:*17* 166:*22*
**assumed** 32:*15* 112:*17* 171:*18*
**assumes** 130:*7* 147:*14*
**assuming** 14:*21*
**assumption** 43:*1*
**attach** 92:*23*
**attached** 1:*20* 103:*5* 188:*4*
**attempt** 162:*17*
**attempting** 12:*15*
**attendance** 181:*11*
**attended** 103:*14* 182:*21*
**attending** 5:*12* 10:*22, 23, 24* 11:*12* 181:*15*
**attention** 83:*12* 129:*16, 23, 25*
**attorney** 186:*20* 188:*7*
**attorneys** 46:*14*
**attractive** 31:*19*
**Audax** 9:*4*
**August** 92:*17* 95:*21* 127:*4, 14, 21* 131:*6* 132:*7* 137:*8, 12, 14* 138:*8* 139:*4* 140:*22* 143:*25* 144:*15* 145:*2, 20* 146:*19* 147:*8* 148:*13, 25* 149:*16* 151:*12, 21* 153:*6*

169:*10*  171:*8*  176:*9, 15, 16*  177:5, *7, 14*  178:*8*
**Austin**  1:*18*  5:*12*  6:*17*  24:*21*
**authorization**  15:*25*  16:*11*  17:*8, 9, 12*  20:*11*  98:*10*  172:*16, 22, 25*  173:*3, 4, 5*
**authorizations**  17:*3*  173:*1*
**automation**  164:*2, 6*
**available**  134:*15*
**Avenue**  2:*7*
**aware**  9:*25*  11:*25*  51:*9*  122:*14, 21*  140:*8, 14*
**awareness**  140:*12*

**< B >**
**B.S**  6:*3*
**back**  9:*9*  10:*17*  20:*22*  29:*5*  45:*22*  47:*13*  57:*12, 16*  62:*18*  63:*1, 8, 17, 21*  64:*6*  67:*16*  78:*21*  79:*24*  85:*4*  93:*4*  94:*2*  104:*10*  105:*21*  108:*17*  109:*19*  111:*3*  112:*23, 25*  113:*24, 25*  118:*3*  121:*7, 11, 16, 21, 23*  123:*4*  128:*17*  129:*3, 22*  130:*6*  131:*13*  133:*1*  134:*8, 14*  135:*13, 18*  139:*20, 24*  141:*14*  144:*9*  149:*13*  150:*20*  151:*11, 20*  153:*23*  171:*4, 16*  173:*6, 21, 23, 25*  177:*19*
**background**  157:*18*
**backlog**  80:*18*  86:*17*  87:*1, 2, 4*
**bag**  117:*15*
**balance**  138:*23*  174:*4*
**balancing**  173:*19*
**Bank**  64:*20, 24*  65:*4, 8, 14*  66:*3*  104:*25*  125:*4*  150:*17*  168:*4, 17, 22*

**bargain**  31:*8*  162:*10, 17*
**Barra**  24:*16, 18, 20*  25:*10, 22*
**base**  20:*17*  32:*14*  68:*10*
**based**  22:*25*  38:*8, 9*  43:*14*  51:*14*  53:*20*  96:*10*  136:*16*  142:*22*  163:*22*
**basic**  12:*24*
**basically**  13:*8*  45:*7*
**basis**  9:*7, 8*  85:*24*  101:*15*  104:*24*  105:*4*  125:*9*  173:*21*
**Bates**  181:*21*
**bear**  45:*8, 11*  166:*10, 11, 13, 16*  167:*1, 5*
**beginning**  8:*22*
**begins**  5:*1*  17:*25*  18:*1, 5*  75:*7*  89:*6*
**behalf**  5:*7*  12:*12*  24:*9*  29:*19*  77:*2*
**Belgium**  156:*19*
**belief**  85:*1*
**beliefs**  85:*8*
**believe**  7:*13*  15:*23*  16:*1*  17:*16*  25:*5, 25*  29:*2, 9, 15*  32:*16*  33:*25*  41:*13*  42:*22*  44:*19*  49:*3*  53:*11*  55:*17*  58:*15*  59:*15*  61:*21*  62:*22*  67:*3*  68:*3*  76:*10*  79:*3*  83:*3*  98:*9*  103:*2*  105:*2*  107:*19*  112:*2, 24*  115:*18, 23*  123:*18*  126:*4*  135:*19*  137:*11*  139:*9*  151:*15*  152:*13*  160:*7*  162:*19*  171:*3*  178:*25*  179:*15*  180:*15, 16, 20*
**believed**  83:*21*  105:*18*  135:*7*
**benefit**  117:*6, 7, 16*
**benefited**  115:*14*
**BENNETT**  2:*14*  5:*11*
**best**  23:*13*  59:*13*  76:*2, 4*  113:*7*  116:*4*  120:*24*  178:*10*

**bet**  113:*20*  114:*8*  115:*12*  141:*10*
**better**  115:*10*  128:*18*
**betting**  113:*10, 19*
**beyond**  165:*9*
**bid**  82:*5*  94:*7*
**big**  57:*22*  86:*12*  132:*15*  163:*5*  164:*10*
**bigger**  85:*19*
**biggest**  90:*25*
**birth**  7:*14*
**bit**  20:*8*  24:*1*  68:*15*  80:*13*  81:*24*  159:*22*  164:*4*  175:*1*
**bless**  36:*16*
**block**  115:*22*
**board**  9:*3, 6, 24*  10:*5, 15, 22, 23, 24*  11:*12, 16, 20*  15:*5, 8, 19*  18:*11, 12, 13, 20, 21, 23*  19:*1*  20:*14*  24:*15*  25:*2, 3, 4*  30:*12, 17*  40:*15, 19, 24*  41:*2, 7, 11, 24*  42:*19, 20*  43:*1*  48:*19*  50:*4, 19*  52:*4, 9, 13*  53:*23*  55:*23*  57:*14, 22*  58:*16*  59:*16, 19*  60:*7*  78:*7, 9, 13, 14*  81:*20, 23*  89:*15, 20*  92:*12*  94:*17, 20*  97:*1, 2, 7, 9, 14*  98:*5, 11*  99:*1*  103:*23*  105:*8*  117:*13*  119:*2, 7*  124:*23, 24*  125:*16*  126:*15*  127:*22*  134:*4, 5, 13, 16, 20*  136:*4, 21*  138:*15, 19*  139:*3, 7, 10*  141:*22*  142:*10*  144:*25*  152:*2, 11, 15, 17, 20, 23*  153:*2*  154:*11*  158:*23*  161:*16*  168:*10, 19, 24*  171:*3*  174:*6, 14, 20*  179:*14*  181:*7*  182:*13, 24*
**boil**  39:*25*
**boilerplate**  42:*23*
**bolster**  81:*6*
**book**  94:*17*

**bookings**  87:*2, 5, 7*  160:*6, 10*  163:*18*
**bother**  128:*2*
**bottom**  19:*14*  22:*5*  41:*17*  42:*15*  47:*13*  59:*25*  61:*23*  75:*22*  89:*6*  92:*16*  103:*7*  126:*21*  164:*23*  181:*9*
**bought**  140:*3*  151:*17*  161:*2*
**Boulevard**  1:*18*  2:*15*
**box**  59:*24*  67:*10, 11*
**break**  55:*4*  56:*18*  57:*8*  153:*19*
**briefly**  5:*20*  6:*24*  108:*11*
**broad**  15:*25*  20:*12*  42:*1*  44:*7, 8, 20*  66:*16*  67:*23*  107:*5*  138:*10*  141:*7*  146:*3*
**broader**  34:*10*  39:*2*  68:*15*  147:*20*
**broadly**  17:*2*  52:*20*  66:*18*  126:*12*  138:*5*  144:*20, 22*  145:*9*
**brought**  114:*22*  122:*9*  134:*2*
**building**  9:*9*  159:*10*
**bullet**  59:*25*  82:*6, 18*  119:*18*  123:*5*  125:*21*
**bunch**  38:*5*  94:*9*  116:*6*
**business**  6:*4, 6*  14:*7*  21:*8*  22:*3*  24:*10*  67:*6, 7*  79:*2*  85:*20, 22*  86:*12, 19, 20*  87:*3, 9, 10, 20*  94:*5*  104:*23*  107:*12*  111:*20*  130:*1*  135:*8, 10*  152:*25*  154:*6*  156:*17, 23, 25*  159:*4, 19*  160:*2*  163:*23*  164:*2, 6, 7*  172:*20*  180:*8*
**businesses**  9:*5*  12:*13*  85:*22*
**busy**  131:*24*
**buy**  12:*6, 10*  17:*8*  52:*25*  60:*18*  71:*3*  99:*23*  109:*20*  111:*10*  132:*19*  139:*19, 24*

140:*16*, *21*  148:*11*
156:*24*  159:*25*
161:*20*  169:*6*  173:*6*, *23*  178:*6*
**buyback**  15:*18*  16:*4*
17:*1*, *3*, *5*, *14*  137:*18*
144:*23*  172:*21*
173:*23*  174:*17*
**buybacks**  15:*9*, *13*, *21*
17:*2*, *3*  22:*18*  23:*22*
53:*16*  54:*5*  61:*4*
62:*4*, *14*  137:*13*, *16*, *23*, *24*  138:*1*, *3*, *6*, *10*, *11*, *15*, *20*, *21*, *23*, *25*
139:*4*, *14*, *15*  140:*3*
176:*8*, *14*
**buyer**  146:*3*
**buying**  66:*25*  79:*25*
80:*24*  86:*9*  87:*17*
90:*4*, *10*  93:*6*  140:*9*
148:*6*  160:*24*  161:*19*
174:*1*  178:*19*

**< C >**
**cabinet**  156:*5*
**cadence**  106:*7*
**call**  27:*14*, *19*, *23*
28:*6*, *18*, *19*, *21*, *23*
29:*1*, *2*, *7*, *9*, *13*  89:*22*
92:*19*, *20*  93:*19*
98:*21*  99:*1*, *3*, *6*, *9*, *19*
100:*7*  101:*1*  102:*7*, *9*
104:*3*  105:*22*, *25*
106:*3*, *4*, *11*  107:*2*, *16*, *21*  108:*6*  109:*7*
125:*12*, *13*  127:*5*, *10*, *21*  128:*1*  130:*16*
131:*4*  133:*20*  168:*3*
**called**  9:*5*  24:*23*
**calling**  160:*12*, *13*
**calls**  13:*2*, *15*  14:*25*
34:*5*  35:*2*  38:*2*, *3*
39:*11*, *12*  49:*23*  51:*5*, *11*  52:*18*  53:*2*, *25*
54:*12*, *13*  56:*14*  57:*4*, *5*  63:*3*, *10*, *23*  64:*7*, *14*  71:*17*, *18*  72:*6*, *7*, *19*, *20*  73:*19*, *20*
75:*13*  76:*12*  83:*17*
84:*1*, *20*  102:*10*

107:*3*  109:*21*  111:*12*
113:*1*  114:*4*  115:*6*
116:*12*  117:*4*  121:*9*, *18*  123:*12*  127:*12*
128:*6*, *20*  130:*19*
131:*2*  140:*25*  141:*1*, *24*, *25*  143:*10*, *11*
144:*4*, *5*, *17*, *18*
145:*14*, *22*  147:*12*
148:*14*  150:*5*  154:*17*
155:*5*
**campus**  64:*2*
**cancel**  178:*24*
**canceled**  178:*22*
**capability**  31:*15*  40:*3*
**capable**  31:*10*, *14*
32:*14*  34:*15*  35:*13*
**capacities**  11:*13*
**capacity**  88:*23*
**Capital**  18:*1*  19:*12*
132:*9*, *16*, *19*, *23*
137:*19*  138:*13*
144:*22*  151:*2*  173:*11*, *13*
**captured**  104:*13*
**capturing**  104:*11*
**car**  160:*1*
**carbon**  118:*19*
**card**  185:*12*
**career**  10:*3*
**cars**  23:*5*
**case**  5:*22*  15:*24*
17:*7*  18:*18*  20:*17*
23:*1*  55:*22*  56:*16*
70:*23*  88:*6*  98:*25*
100:*2*, *9*, *10*, *11*  107:*6*, *7*  122:*5*  125:*10*, *11*
128:*14*, *25*  129:*14*
132:*13*  136:*21*  156:*8*, *9*  157:*14*  173:*22*
180:*3*
**cases**  20:*18*
**cash**  17:*4*  20:*3*
22:*19*, *24*  23:*3*, *8*, *10*, *18*, *25*  29:*21*  30:*1*
31:*25*  32:*15*  83:*7*
95:*1*  138:*19*  173:*21*, *25*
**category**  46:*14*
166:*25*

**cause**  1:*14*  7:*18*
143:*16*
**caused**  86:*15*
**caution**  55:*18*, *20*
56:*5*
**caveated**  44:*19*, *22*
**cc'd**  100:*21*  125:*11*
**cell**  154:*3*, *5*
**cent**  37:*25*
**Centerview**  75:*21*
**cents**  116:*23*
**century**  23:*5*
**CEO**  6:*25*  8:*14*, *17*
10:*4*, *14*, *15*  15:*4*
24:*3*  25:*16*, *18*  31:*16*
32:*1*, *9*  88:*21*  144:*25*
154:*1*  158:*20*, *21*
160:*15*  161:*22*  162:*7*
164:*16*  178:*17*
**certain**  20:*7*  24:*13*
39:*14*  63:*7*  135:*14*
173:*10*  178:*13*
**certainly**  11:*9*  26:*1*
28:*5*  29:*11*  61:*1*
76:*19*  119:*8*, *12*
120:*3*, *15*  129:*10*
138:*24*  168:*5*
**Certificate**  4:*7*  186:*8*
187:*4*  188:*12*
**certificates**  158:*10*
**certification**  4:*8*
187:*12*  188:*1*
**Certified**  186:*13*
187:*15*  188:*14*
**certify**  186:*14*  187:*7*
**cetera**  111:*21*
**Chad**  2:*3*  5:*6*
**chain**  21:*15*  23:*5*, *20*
85:*20*  86:*6*  87:*20*
89:*8*  91:*3*  107:*13*
125:*2*  136:*17*  159:*23*
162:*12*, *13*  163:*4*
**chair**  135:*4*
**chairman**  80:*13*
81:*4*  82:*11*
**challenge**  23:*7*  59:*6*
90:*25*  107:*11*
**challenges**  79:*1*
136:*16*

**challenging**  11:*20*
160:*11*  163:*9*
**chance**  14:*19*  48:*15*
58:*8*  67:*21*  81:*16*
92:*5*  100:*19*  118:*14*
133:*12*
**change**  124:*19*
177:*24*  178:*2*  184:*4*
**changed**  8:*8*  24:*22*
81:*8*  138:*10*  155:*4*
**Changes**  4:*5*  76:*15*
85:*17*  86:*2*  135:*15*, *17*  136:*17*  184:*3*
188:*4*, *5*
**changing**  24:*1*  80:*6*
86:*6*
**characterize**  114:*9*
**charges**  188:*8*
**chart**  96:*2*, *3*, *5*, *16*
97:*2*
**check**  15:*16*  20:*24*
71:*3*
**checked**  19:*3*
**chief**  8:*13*  9:*10*  21:*4*
**chime**  119:*10*, *11*
**chiming**  119:*15*
**chips**  23:*6*  160:*1*, *14*
**choose**  42:*10*
**choosing**  72:*14*  73:*14*
**Chris**  22:*8*
**Christopher**  2:*4*
**Chuck**  25:*15*
**circulated**  88:*25*
**circumstances**  17:*10*
40:*20*  53:*1*  55:*25*
91:*9*  110:*11*  149:*17*
**Civil**  1:*3*, *19*  186:*3*
187:*13*
**cjohnson@rgrdlaw.co
m**  2:*9*
**clarifying**  27:*9*
**clarity**  110:*15*
**class**  146:*4*, *10*, *11*
**classes**  158:*9*
**clean**  178:*19*
**clear**  26:*13*  31:*14*, *17*
84:*16*  102:*22*  111:*8*
112:*18*  174:*22*
176:*11*  177:*3*

**clearly**  172:*13*

**Clerk**  187:*6*  188:*13*

**clients**  42:*24*

**close**  43:*11*  56:*3*
175:*25*

**closing**  8:*20*  33:*4*
70:*9*

**cloud**  155:*2*

**coach**  54:*16*

**coaching**  54:*17*

**code**  48:*21*, *24*  49:*2*
59:*3*, *4*  187:*13*

**coded**  46:*8*

**coercive**  42:*15*  43:*15*,
*23*  44:*12*  45:*4*
114:*18*  117:*12*

**coincided**  7:*14*

**colleague**  5:*13*

**colleagues**  5:*8*

**collectively**  78:*9*
82:*23*

**college**  5:*23*  158:*13*

**colorful**  25:*15*

**column**  47:*14*, *18*
59:*24*  166:*16*

**columns**  19:*18*  45:*8*
166:*11*

**come**  38:*5*  63:*1*, *8*,
*17*, *21*  64:*5*  78:*21*
79:*8*, *24*  93:*4*  94:*2*
109:*19*  111:*3*  112:*25*
113:*24*, *25*  116:*4*, *25*
121:*6*, *11*, *21*, *23*
128:*17*  129:*3*, *22*
130:*6*  131:*13*  141:*14*
148:*17*  163:*17*
171:*16*  181:*18*

**Comerford**  2:*12*  3:*5*,
*7*  5:*10*  13:*1*, *14*, *23*
14:*15*, *24*  15:*15*, *22*
20:*23*  24:*11*  25:*12*,
*24*  26:*17*  27:*3*, *8*
28:*3*  29:*6*  30:*23*
31:*4*, *12*  32:*21*  33:*17*,
*23*  34:*5*, *16*, *22*  35:*2*,
*10*, *16*, *22*  36:*2*, *8*
37:*1*, *4*, *12*  38:*1*, *14*,
*20*, *22*  39:*1*, *10*, *20*
40:*7*, *11*  42:*21*  43:*17*,
*25*  44:*5*, *17*  46:*18*

47:*8*  49:*22*  50:*12*, *21*
51:*5*, *11*, *19*, *25*  52:*16*,
*18*  53:*2*, *17*, *24*  54:*12*,
*17*, *21*, *24*  55:*1*, *15*
56:*12*, *17*  57:*3*, *25*
60:*3*  62:*15*, *21*  63:*3*,
*10*, *18*, *23*  64:*7*, *14*, *23*
65:*6*, *12*  66:*6*, *14*
67:*2*  68:*9*, *22*  69:*19*,
*24*  70:*15*  71:*17*, *24*
72:*6*, *19*  73:*1*, *4*, *11*,
*19*, *25*  74:*7*, *10*, *12*, *16*,
*21*  75:*13*, *25*  76:*7*, *12*
77:*9*  78:*23*  79:*14*, *19*
80:*8*  81:*1*  83:*14*, *17*
84:*1*, *20*  85:*15*  86:*23*
88:*5*  90:*6*, *12*, *21*
91:*14*  93:*7*  94:*4*
96:*7*, *18*  97:*16*  99:*11*,
*16*, *25*  100:*8*  101:*7*,
*13*, *25*  102:*10*, *17*
104:*8*  105:*9*  106:*12*,
*23*  107:*3*, *8*  108:*2*, *11*
109:*21*  110:*8*, *13*
111:*12*, *24*  112:*16*
113:*1*  114:*2*, *20*
115:*5*  116:*5*, *12*
117:*4*  119:*22*, *25*
120:*18*  121:*1*, *9*, *18*,
*25*  123:*1*, *12*, *16*
127:*1*  128:*20*  129:*7*,
*18*, *24*  130:*7*  132:*2*,
*10*  135:*16*, *24*  136:*9*,
*24*  137:*10*  138:*2*, *17*
140:*11*, *17*, *25*  141:*4*,
*16*, *24*  142:*4*, *12*
143:*4*, *10*, *13*, *21*
144:*4*, *17*  145:*3*, *5*, *14*,
*22*  146:*1*, *21*  147:*10*,
*12*  148:*7*, *14*  149:*5*,
*18*  150:*5*, *13*  151:*24*
154:*17*  155:*5*, *16*
157:*12*, *13*  163:*11*
169:*22*  175:*16*, *24*
180:*23*  181:*2*  183:*2*
187:*3*

**coming**  23:*22*  27:*15*
121:*16*

**comment**  22:*1*  27:*14*,

17, 18  54:22

**comments**  55:*3*  58:*13*

**Commission**  185:*23*

**committee**  94:*20*

**common**  18:22
29:*21*  125:*10*  173:2

**commune**  176:*5*

**communicate**  97:*22*
99:*4*  100:*5*

**communicated**  27:*6*
59:*18*

**communicating**  75:*11*
126:*15*

**communication**  22:*12*
79:*25*  98:*6*  117:*14*
130:*13*  179:*21*

**communications**
49:*16*, *18*  169:*9*, *17*
175:*11*

**companies**  9:*1*, *2*, *7*
24:*13*  112:*4*, *6*, *19*
123:*20*  124:*8*  161:*1*
174:*2*

**company**  8:*22*  9:*4*,
*11*, *13*  11:*11*  20:*21*
21:*3*  22:*18*, *19*  23:*15*
24:*14*, *17*  25:*14*
27:*12*, *16*, *22*  31:*10*,
*16*  32:*1*, *2*  43:*11*
47:*15*  52:*25*  53:*11*,
*15*  60:*13*  61:*3*  62:*4*
64:*21*  79:*11*  83:*25*
86:*16*, *17*, *18*  89:*11*,
*22*  90:*4*, *19*  91:*11*
93:*6*  95:*5*, *7*, *25*  99:*9*,
*23*  101:*3*, *16*  104:*23*
105:*1*, *17*, *19*  106:*10*
109:*20*  111:*4*  114:*19*
116:*17*, *22*  117:*11*
127:*19*  128:*7*, *12*
131:*7*  132:*8*, *12*
135:*22*  136:*5*, *13*, *22*
137:*9*, *15*  139:*13*
140:*2*, *5*, *10*, *21*
144:*25*  148:*6*  149:*22*
150:*1*, *17*  151:*5*, *17*
152:*3*, *25*  153:*5*, *25*
154:*2*, *3*, *13*, *14*, *19*
155:*11*  156:*2*, *6*, *18*
159:*6*, *20*  160:*4*, *10*,

17, 19, 24  161:*4*, *13*,
*15*, *16*, *17*, *19*, *20*
162:*16*  163:*18*  164:*3*
168:*25*  169:*3*, *17*
172:*4*, *15*  174:*2*, *18*
178:*17*

**company's**  8:*17*  23:2
53:*7*, *10*  62:*24*  89:*23*
90:*5*  99:*5*, *14*  104:*16*
180:*13*

**compare**  18:*14*

**compared**  91:*4*

**comparing**  72:*11*, *12*

**comparison**  72:*15*
73:*13*

**compelling**  170:*20*

**competitive**  116:*25*

**complete**  30:*5*

**completed**  137:*16*
142:*16*

**completely**  44:*10*
117:*20*, *21*

**complex**  39:*22*  141:*6*
165:*8*

**complexity**  107:*11*

**complicated**  79:*17*
148:*22*

**complied**  187:*14*

**comport**  147:*19*

**comports**  19:*8*  126:*2*

**compound**  14:*25*
111:*24*  136:*9*

**computerized**  1:*17*

**concept**  11:*9*  12:*25*
13:*12*

**concepts**  6:*9*  9:*19*
10:*20*  11:*14*  12:*18*,
*21*

**concern**  131:*17*

**concerned**  30:*4*  95:*4*

**concluded**  44:*11*
89:*16*  183:*12*

**concludes**  183:*9*

**concluding**  14:*22*

**conclusion**  34:*6*, *10*
39:*4*  72:*7*  73:*20*
77:*13*  116:*2*  126:*19*
139:*10*  143:*6*  144:*18*
145:*23*  148:*15*, *17*

**conclusions** 13:*2*, *15* 14:*25* 35:*3* 38:*3* 39:*12* 49:*23* 51:*6*, *12* 52:*19* 53:*3*, *25* 54:*13* 56:*14* 57:*5* 71:*18* 72:*20* 145:*15* 147:*13*
**conclusive** 120:*14*
**concrete** 11:*18*
**condition** 30:*1*
**conditions** 80:*16*
**conduct** 180:*8*
**confer** 14:*19*
**conference** 26:*15* 90:*9*, *18*, *23* 91:*20*, *24* 92:*17*, *24* 93:*3*, *21*
**conferences** 90:*14*
**confidential** 156:*4*
**confirmed** 176:*15*
**confused** 133:*16*, *23*
**confusion** 159:*2*
**Congratulations** 7:*15*
**connected** 106:*5*
**connecting** 102:*6*
**connection** 12:*16* 99:*22* 106:*10* 107:*14* 136:*20*
**cons** 109:*6*
**consequence** 138:*25*
**conservative** 55:*17*, *25*
**consider** 43:*14* 50:*5* 52:*4*, *13* 107:*20*, *24*, *25*
**consideration** 55:*24* 107:*18* 185:*15*
**considered** 78:*14* 108:*5*
**considering** 50:*14*, *16*, *19* 52:*10* 53:*23* 144:*14* 145:*1*, *19* 146:*19*
**consistent** 42:*19* 43:*20* 69:*6* 104:*6*, *21* 117:*2* 173:*18*
**constantly** 174:*3*
**consternation** 134:*7*
**constitutes** 164:*24*
**constructively** 46:*7*
**consult** 14:*10*
**consulted** 179:*21*

**consulting** 14:*1*
**consummating** 165:*7*
**contact** 24:*6* 26:*2* 139:*8* 175:*25*
**contacted** 24:*3*
**contacting** 117:*19*
**contain(s** 188:*5*
**contemplated** 15:*12*, *19* 139:*22*
**contents** 134:*25* 155:*18*
**context** 9:*21* 10:*19* 13:*21* 33:*24* 34:*2* 38:*16* 39:*2* 40:*5* 44:*7*, *8* 65:*15* 67:*25* 68:*16* 69:*18*, *22* 78:*25* 79:*2* 82:*10* 84:*13* 85:*19* 87:*21* 91:*1* 106:*17* 130:*18* 131:*20* 150:*22*
**contexts** 9:*22*, *23*
**continue** 37:*6* 63:*1*, *8* 76:*10* 94:*5*
**continued** 8:*16* 78:*24* 79:*3*, *12* 80:*21* 137:*18* 138:*11*
**continuing** 110:*18* 116:*10*
**contrary** 96:*20* 147:*22*
**conversation** 21:*21* 26:*12*, *22* 27:*2*, *7* 110:*18* 124:*24* 153:*2* 180:*2*
**conversations** 22:*2* 124:*21* 125:*1* 126:*19* 137:*21* 174:*19*
**convey** 91:*12* 107:*11* 108:*4*
**conveyed** 42:*18*, *19* 99:*9* 114:*24*
**conveys** 43:*19*
**COO** 9:*17* 10:*11*, *12*
**copied** 118:*19*
**copies** 188:*10*
**copy** 154:*14* 187:*4* 188:*12*
**core** 17:*4*
**Corporate** 11:*1* 60:*16*

**CORPORATION** 1:*3* 80:*10* 186:*3*
**Correct** 8:*19* 10:*10* 15:*7*, *11*, *14* 21:*20* 22:*1* 26:*5* 29:*15*, *23* 31:*6* 33:*7*, *8*, *10*, *11*, *13*, *22* 40:*22* 45:*2*, *5* 48:*23* 52:*6* 57:*20* 60:*12* 61:*5* 66:*1* 69:*2*, *20* 70:*19* 71:*14* 75:*12* 81:*3* 84:*3*, *12* 89:*9*, *13* 92:*14*, *21* 93:*1* 95:*11*, *13*, *20*, *23* 96:*21* 97:*20* 100:*24* 103:*12* 106:*8* 124:*25* 127:*5* 130:*18* 132:*21* 136:*1*, *2*, *3* 149:*25* 150:*25* 151:*4*, *7*, *10* 152:*1* 155:*13* 157:*7* 159:*16* 161:*5*, *6* 167:*15*, *18* 169:*11* 170:*7* 174:*11* 182:*4*, *14* 185:*3*
**corrections** 4:*5*
**correctly** 13:*11* 89:*1* 95:*3* 98:*1*, *11* 159:*10*
**correlated** 22:*21*, *22*, *23*
**cost** 80:*6*, *12*, *25* 81:*7* 83:*24* 85:*13*, *17*, *18*, *25* 86:*3* 134:*8*, *11* 135:*10* 137:*1*, *3*
**costs** 81:*10*
**counsel** 5:*3* 11:*16* 13:*18* 14:*2*, *10*, *20* 27:*19* 40:*19* 49:*25* 75:*16* 91:*14* 137:*21* 147:*2*, *5* 172:*10* 176:*4* 187:*7*
**counsel's** 46:*11*
**count** 75:*18*
**COUNTY** 185:*8*
**couple** 7:*18* 125:*12* 138:*4* 168:*23*
**course** 9:*14* 15:*13* 16:*23* 17:*2* 22:*3* 27:*23* 33:*19* 56:*22* 67:*5* 73:*15* 80:*4* 111:*18* 125:*24* 128:*7*,

*23* 144:*13* 151:*9* 155:*18* 163:*8* 171:*16*
**courses** 6:*7*, *8*
**COURT** 1:*1* 5:*5* 48:*11* 74:*5*, *6* 87:*11*, *13* 94:*12* 100:*15* 108:*12*, *21*, *25* 118:*8*, *10* 122:*13*, *21* 123:*3* 133:*5*, *8* 157:*5* 186:*1*
**Court's** 122:*4*, *17*
**cover** 6:*8* 18:*2* 28:*18* 29:*16* 41:*15* 164:*16*
**COVID** 162:*12* 163:*3*
**craft** 98:*7*
**crafted** 110:*5*
**crafting** 97:*24*
**create** 107:*24*, *25*
**created** 165:*24*
**creates** 109:*9*
**creation** 67:*6* 160:*21*
**credible** 76:*6*
**credit** 96:*24*
**crises** 163:*10*
**criteria** 175:*5*
**CRR** 1:*16* 187:*20* 188:*20*
**CSR** 1:*16* 187:*20* 188:*20*
**Cueller** 2:*5*
**current** 30:*9* 46:*5* 97:*4* 165:*16* 166:*22* 167:*13*
**currently** 24:*23*
**Custodial** 188:*7*
**customers** 160:*12*
**cut** 136:*7*, *11*
**cuts** 135:*22* 136:*22*
**cutting** 80:*6*, *25* 81:*7*, *10* 83:*24* 85:*13*, *18* 86:*3* 134:*8*, *11* 135:*10* 136:*6*
**cycle** 130:*20*

**< D >**
**D.C** 157:*24*
**data** 111:*14*, *17*, *19*, *22* 112:*1*, *5* 150:*10*
**date** 5:*2* 62:*23* 71:*6*,

**7** 77:7  128:19
**dated** 74:24
**dates** 178:7
**daughter** 7:14
**Davern** 10:14
**Davis** 75:21
**day** 27:25  28:4, 5, 22
47:25  67:25  69:2, 3
72:14, 16  116:22
171:12  185:9, 18
187:15  188:14
**days** 56:3  69:9  70:1,
3, 5  73:7  78:6
177:15
**day's** 162:15
**dead** 23:11  171:18
**deal** 99:14  132:17
165:6
**dealing** 60:22  101:6
**dealings** 12:3  24:10
140:9  144:2  148:5
**debate** 80:9, 15, 20
134:7
**debated** 80:13  81:24
85:11
**debating** 134:17
**December** 29:3, 9
**decided** 23:15  49:25
53:9  97:9  98:5, 11
107:19
**decision** 16:3  39:22,
24  51:21  53:15, 20
59:16, 18, 19  98:10
105:5  146:10  169:2
175:1
**decisions** 11:21
22:25  85:16, 23
122:4, 18, 19  145:10
**deck** 18:11, 20, 21, 23
19:1  43:1
**decline** 71:10, 13
**declined** 70:22  71:1,
5
**deemed** 49:10
**deeper** 83:24  86:3
135:22  136:22
**default** 14:20
**defaulted** 14:21, 22
**defend** 64:21  84:18
90:3, 19

**DEFENDANTS** 2:11
5:11  157:14
**defenses** 116:16
**define** 14:5
**definitely** 137:21
**definition** 31:13
**definitive** 16:2  30:12
**degree** 5:25  6:6, 7
158:7
**delegate** 130:23, 25
**delivered** 188:6, 11
**demand** 91:5  160:4,
11  163:18
**deny** 66:22
**depend** 22:18  38:15
**depending** 17:10
**depends** 31:13
**deposed** 156:8
**DEPOSITION** 1:8,
12  5:2  157:2, 3, 4
164:15  165:21  181:4
183:9, 12  185:2
186:9, 17, 19, 23
187:1  188:2, 3, 6, 8,
10, 11
**depth** 136:6  152:18,
20
**describe** 43:5  178:10
**described** 162:9
**describes** 181:10
**describing** 92:1
**description** 185:12
**designation** 58:7
61:16  67:19
**desire** 117:2
**desk** 154:2  155:24
**despite** 62:24  122:22
**destroyed** 16:23
155:10, 12, 15
**detail** 153:13
**details** 106:19
**determination** 50:23,
25  51:1, 14  97:14
176:14
**determinations**
120:24
**determine** 60:10
147:5
**determined** 122:22

151:2
**determining** 92:12
**detrimental** 136:12
**developed** 131:24
**developing** 86:7
**development** 8:7
60:16
**differ** 81:25  84:9, 11
**differed** 81:10
**difference** 16:12
37:25  38:11  48:5
87:1  141:9
**different** 7:19  8:23,
25  18:25  23:17  37:8,
14  38:5  49:18  51:7
59:17, 21  63:14
65:13  67:4, 7  69:22
72:4  79:3  83:7, 20
84:11  111:6  120:22
121:4  124:8  125:6
128:6  139:22, 23
142:21, 22  164:3
177:23
**differently** 17:9
105:11  110:6, 17
142:22
**differing** 80:14
**difficult** 55:11  91:8
114:25  160:9, 12
**diligence** 30:6  89:17
**Diligent** 18:20
154:12
**dimensions** 67:7
**direct** 128:7
**directed** 126:14
**directing** 103:18
**direction** 55:21
124:18
**directly** 6:16  21:5
139:8
**director** 7:11  10:1, 4,
15  88:23  158:25
159:3
**directors** 9:24  11:1
88:24  89:3  158:24
168:10  172:2
**disagree** 39:2  76:25
82:19, 22  97:5  120:2,
3, 4  124:14  146:12

**disagreed** 90:15
96:16  125:19  134:23,
25  135:1, 19
**disagreeing** 96:19
**disagreement** 104:12
134:8, 12  135:11
136:14
**disclose** 30:9  46:5
51:3  165:16  166:22
167:14
**disclosure** 43:10, 22
45:13  46:3, 9  56:9
57:1  166:18
**discounted** 162:16
**discretion** 17:13
**discuss** 25:22  42:20
47:3  57:15  58:17
65:4  103:23  132:24
**discussed** 19:9  40:15
53:14  54:2  61:9
78:9  86:21, 24  89:21
105:3  114:21  115:8
126:4  132:21  152:15,
16, 19, 20  153:8, 13
165:23
**discussing** 40:18
62:13  80:11  136:4
167:9
**Discussion** 17:19
21:14  28:15  41:2
48:13  58:6  67:12
68:4  81:14  87:16
88:13  91:2  94:14
119:12  126:18
136:21  137:1, 5
**discussions** 11:14
53:6, 7  60:5  63:2, 9
66:3, 12, 16  89:17
92:8  93:5  104:22
152:6, 7, 12  153:10
166:14  167:7, 16
169:24  170:2  171:3
174:25  175:10
**dismissed** 122:13, 15
**displaced** 23:3
**disposal** 132:12
**dispute** 62:3  106:1
156:17
**disruption** 23:5
85:20  87:19  88:8

Deposition of Eric Starkloff                                  In Re National Instruments Corporation Securities Litigation

91:*4*  159:*23*  162:*12, 13*  163:*5, 6*
**distinction**  16:*25*  129:*5*
**distinguish**  86:*8*  146:*2*
**DISTRICT**  1:*1, 2*  36:*18*  186:*1, 2*
**diversification**  164:*10*
**dividend**  96:*25*  138:*23*  173:*20*
**division**  24:*21, 23*
**divisional**  24:*20*
**Divisions**  24:*22*
**Dixon**  118:*25*  119:*5*  124:*19*  125:*3*  126:*22*
**Dixon's**  124:*14*
**document**  17:*22, 25*  21:*10, 11*  22:*6*  28:*12*  41:*25*  42:*3, 4*  44:*23*  48:*10*  52:*21*  56:*3*  61:*12, 15*  82:*2*  83:*22*  93:*8*  127:*2*  133:*21*  181:*6*  185:*12*
**documents**  58:*3*  94:*9*  105:*15*  114:*4*  121:*2*  155:*19, 22*  174:*9*
**doing**  16:*9*  50:*7*  55:*24*  67:*3*  111:*20, 21*  114:*25*  120:*24*  126:*11*  132:*5*  137:*7*  140:*5*  144:*1*  159:*19*  160:*25*
**dollars**  16:*16*  20:*7, 21*  34:*17*  151:*14*
**dot**  104:*4*
**doubled**  34:*1*
**doubt**  13:*18*  31:*14*  32:*18*  36:*18*  77:*11*
**DOWD**  2:*6, 14*  5:*10*
**downloaded**  155:*2*
**dozen**  130:*19, 25*
**dozens**  124:*8*
**draft**  41:*22, 24*  42:*5*  81:*19, 22*  126:*18*  131:*19, 22*
**drafting**  131:*7*
**dramatic**  86:*17*

**drawing**  16:*13*  17:*1*
**driven**  139:*17*
**driver**  86:*19*
**due**  30:*6*  85:*18*  98:*7*  107:*12*
**duly**  1:*13*  5:*15*  186:*16, 19*
**duties**  9:*19*  10:*20*  11:*14*  40:*20*  144:*11, 14, 24*  145:*21*  146:*7, 18*  147:*5*  148:*3*
**duty**  6:*8*
**dynamics**  86:*6*

**< E >**
**Eagle**  58:*18, 24*
**earlier**  50:*2*  54:*7, 8*  127:*14*  165:*23*  181:*23*
**early**  9:*25*  15:*8*  92:*17*  132:*6*  155:*8*  156:*16*  176:*14, 16*  177:*5*  180:*15*
**earnings**  89:*22*  92:*19, 20*  98:*20*  99:*1, 3, 5, 9, 19*  100:*7*  101:*1*  102:*7, 9*  104:*3*  105:*22, 25*  106:*3, 4, 11*  107:*1*  127:*5, 10, 12, 20*  128:*1, 6*  130:*16, 19*  131:*2, 4*
**easier**  6:*23*  7:*2*
**easiest**  159:*7*
**easily**  23:*11*
**Eddie**  27:*19*  100:*21*  103:*11*  118:*25*  135:*2*
**Eddie's**  119:*8, 9, 12, 16*  120:*4*
**edits**  126:*16*
**education**  157:*25*  158:*6*
**effect**  13:*11*  53:*14*  58:*21*  60:*2*  78:*20*  180:*8*
**efficiency**  30:*14*
**efficient**  173:*24*
**effort**  85:*13*  86:*3*
**efforts**  90:*3*  94:*2*  99:*14*  112:*14*
**eight**  45:*6*

**either**  20:*8*  29:*2*  30:*10*  46:*6*  55:*21*  83:*19*  101:*19*  115:*10*  124:*18*  128:*17*  130:*25*  155:*22*  165:*17*  166:*23*
**Electric**  161:*4*
**electrical**  6:*3*  158:*3, 7*
**electronic**  159:*8, 14*
**electronics**  159:*11*
**email**  18:*2, 11, 19*  21:*15, 20*  22:*7, 11*  23:*20*  26:*3*  28:*1, 18*  29:*16*  41:*15*  48:*18*  49:*6*  53:*14*  57:*19*  59:*11*  61:*20, 21, 24*  66:*8*  67:*25*  92:*15*  103:*7, 8, 17*  109:*3, 23*  110:*5, 12, 16*  118:*17*  125:*2, 7, 11, 12*  126:*12, 14*  131:*7, 19, 23*  133:*17*  134:*21*  155:*18*  164:*16*
**Email/PowerPoint**  3:*10*
**emails**  67:*25*  154:*6, 10*
**Emerson**  11:*22, 23*  12:*3, 11, 17*  24:*3, 10, 13, 16, 19*  25:*4, 11, 20, 23*  29:*5, 19*  30:*5, 8, 17, 21*  31:*9, 18, 25*  32:*4, 18*  33:*21*  39:*6*  40:*14*  43:*6, 16*  45:*16*  46:*2, 15*  47:*23*  49:*2, 4*  51:*17, 23*  52:*11*  53:*21*  54:*9*  55:*12*  56:*8, 24*  58:*25*  59:*2*  63:*1, 5, 8, 17, 21*  64:*5, 22*  65:*5*  69:*1, 15*  70:*21*  74:*24, 25*  75:*11, 20*  76:*10*  77:*1, 2*  78:*12, 21*  79:*12, 24*  80:*21*  82:*3, 20, 25*  83:*2, 9, 10, 12*  85:*18*  89:*16, 18*  90:*3, 20*  92:*23*  93:*4, 16, 18*  94:*2*  97:*22*  98:*6, 20*  99:*5, 23*  100:*5*  101:*6,

22*  102:*4, 7*  103:*24*  109:*18*  111:*2, 9, 20*  112:*13, 15, 23, 24*  113:*24, 25*  114:*12*  115:*3*  116:*2, 11, 19*  119:*2, 7*  121:*6, 23*  122:*24*  124:*2, 5, 11*  127:*13*  128:*4, 15, 16*  129:*2, 17, 21, 23*  130:*6, 21*  131:*4, 8, 12*  132:*8, 22*  140:*9*  141:*14, 21*  142:*9*  149:*1, 24*  150:*3*  151:*2, 5, 17*  152:*5*  161:*3, 22, 24*  162:*7*  163:*24*  164:*1, 5, 10, 17*  167:*20*  169:*10, 13, 17*  170:*4, 8, 10, 19, 21*  171:*4, 8, 10*  175:*11*  177:*16*  178:*1*  180:*19*  182:*3*
**Emerson's**  29:*20*  30:*11*  31:*1*  33:*1*  40:*18*  48:*2, 21*  50:*9*  51:*3, 10*  57:*15*  58:*17*  60:*10, 23*  62:*19, 25*  64:*19*  65:*3, 10, 22*  66:*5, 13, 23, 25*  68:*7, 18, 20*  76:*20*  78:*12*  80:*23*  84:*18*  86:*9*  87:*17*  89:*10*  90:*10*  92:*12*  97:*9, 14*  98:*5*  99:*14*  101:*4*  104:*16*  105:*21*  107:*15*  108:*1*  109:*10, 17*  114:*11*  117:*1*  122:*23*  123:*6, 7, 17, 20*  124:*15*  125:*17*  127:*5, 22*  130:*16*  132:*19*  140:*15, 20*  143:*19*  144:*2*  148:*5*  150:*2, 18, 23*  161:*9*  162:*2*  171:*24*  179:*4, 6*
**Emmerick**  179:*16*  181:*18*
**emphasizing**  90:*4*
**employed**  187:*8*
**enabled**  173:*5*
**ended**  161:*15*

engage  13:12  75:8
80:25  83:24  93:4
94:2  135:22  137:9,
15  152:4  167:21
engaged  48:6  75:20
112:13  114:13
engagement  143:19
engaging  89:17
137:15
engineer  6:19  7:4
158:16
engineering  6:3
158:3, 7
engineers  159:8
enormous  94:16
entire  7:23
entirely  121:5, 23
122:23  128:16  129:2,
16, 23
entirety  94:18
entitled  36:20
entry  158:16
equity  9:4
ERIC  1:9, 12  3:3
5:2, 14  104:1  119:10
183:9  184:1  185:1, 5,
10  186:10, 16
errors  110:19
escalate  42:10
escalating  44:22
escalation  65:5
especially  128:10
essentially  97:12
established  140:12
et  111:21
evaluate  141:20
evaluating  67:6
evasive  38:25
evening  134:4
event  126:8
events  49:9  64:2, 17
eventually  10:25
170:10
everyday  159:12
evidence  56:13  57:4
112:17  114:3  115:6
123:7, 20, 23  124:4,
15, 18  125:17  127:11,
25  130:8  147:15

164:25
exacerbated  80:15
exact  47:4, 25  61:20
105:10  114:23
136:10  156:22
exactly  16:10  22:9
48:4, 6  60:6  66:20
69:25  83:2  97:24
101:19  102:13  104:9,
11, 12, 20  114:25
115:19  126:16
Examination  3:4, 5, 6,
7  5:16  157:11
179:11  181:1  186:21
example  11:11, 17, 19,
21  17:6  22:24  23:15
32:10  44:8, 21  76:15
88:7  110:14  124:4
128:12  156:5
exchange  61:21
exchanged  151:9
execute  17:9  96:9
137:18  172:20
178:12
executed  185:14
execution  17:14
executive  8:14  33:13
Exhibit  3:10, 11, 12,
13, 14, 15, 16, 17, 18,
19, 20, 21, 22, 23, 24,
25  4:1, 2, 3  17:18
18:10  21:12, 13  28:9,
10  41:13, 14  45:22
47:13  48:9, 12  58:4,
5  61:13, 14  65:17, 18,
19  67:18, 19  69:11,
12  88:11, 12  92:3, 4
94:11, 13  97:11
103:2, 3  108:20, 22
118:7, 12  123:4
133:3, 10  164:12
165:21  166:20  181:3
EXHIBITS  3:9
88:15  134:2  188:10
existence  164:25
existing  81:6  134:10
expect  14:11  57:16
109:18  179:24
expectation  140:22

expected  132:13, 14
expeditiously  46:7
expense  84:7  136:22
expenses  84:6  85:2
135:23  136:6, 7
experience  35:13, 20
38:9  40:3  43:21
49:12  77:21  161:20
experienced  87:24, 25
159:25
experiential  11:21
expert  38:3  39:12
54:13  56:14  57:5
71:18  72:7, 20  73:20
87:24  141:1, 25
143:11
experts  114:23
Expiration  187:21
188:21
Expires  185:23
explain  41:3
explosions  64:1
exposed  10:19  12:5
exposure  9:18
express  78:13  125:6,
13
expressed  160:24
185:16
expressing  29:20
expression  30:20
extent  63:19  97:4
168:1
external  50:5  169:1
Ezurio  9:5, 6

< F >
face  79:2  82:13
167:2, 4
faced  136:16  138:14
fact  17:3  36:16
50:9, 18  51:3  52:3,
11, 12, 22  53:21, 22
54:9  55:10, 12  56:8,
10, 24  57:1  76:22
77:15  86:9  91:3
105:24  123:24
124:12  125:15, 16, 19
126:13  127:8  128:3
130:15  132:22
135:11  139:15, 18

140:20  148:9  149:8
153:4, 12  165:24
169:9  170:8, 17
171:1, 17  177:25
179:25
factor  23:14, 18  52:2,
10
factors  23:18  39:24
50:24  51:14, 20, 22
54:2  106:19  142:6
facts  70:13, 18, 19, 20
130:7  131:24  143:12,
19  147:14  148:25
factually  33:7, 8, 10,
11, 13, 22
fair  12:4, 5, 6, 14
13:10  14:14  22:4, 17
29:14  31:3  33:22
41:4  43:5, 14  45:1, 4
47:7  59:22  76:6
121:20  175:24
fairly  19:11  27:23
77:16
faith  52:4
familiarity  24:16
fancy  173:15
far  30:4  95:4
111:22  116:9  143:22
164:6
faster  83:24  135:22
136:22
favor  137:14  138:3,
5, 7, 9, 11, 24, 25
139:4  140:5
feel  175:7
felt  81:9  121:12
139:19
fiduciary  6:8  9:19
10:20  11:14, 17
40:20  144:10, 13, 24
145:9, 21  146:5, 7, 18
147:5, 18, 20  148:3
fifth  19:16
figure  68:13  120:10
figures  33:5, 7
file  21:10, 11  28:8
58:3  61:12  67:9
69:10  94:8  100:12
103:1  108:9  156:5

**filed** 187:*5* 188:*13*
**files** 155:*9*
**final** 18:*21, 23*
126:*19*
**financed** 30:*1*
**financial** 21:*4* 31:*15*
89:*24* 159:*20*
**financially** 187:*10*
**financing** 30:*1* 32:*15*
**find** 36:*19* 38:*6*
73:*13* 75:*1, 3* 76:*17*
83:*7* 131:*25* 142:*20*
**finish** 88:*2* 113:*15*
**finished** 142:*13*
**firepower** 32:*16*
150:*18, 22*
**fires** 64:*1*
**firm** 40:*23* 48:*7*
114:*23* 137:*1* 149:*22*
165:*25* 168:*14*
169:*20* 171:*23*
174:*13* 181:*15*
182:*21*
**firmly** 101:*14*
**first** 5:*15* 7:*14* 11:*4*
12:*4* 19:*7* 20:*20, 25*
21:*17* 23:*23* 25:*9*
26:*2* 28:*13* 33:*10*
41:*19* 46:*15* 48:*15*
58:*9* 61:*23* 67:*11, 22*
70:*4, 6, 7, 21* 76:*15*
82:*6, 10* 88:*16* 92:*6,*
*16, 19* 94:*19* 95:*5, 9*
97:*12* 109:*2, 3, 4*
118:*15* 122:*23* 126:*5*
127:*3, 14, 21* 128:*5*
131:*6* 132:*7* 133:*13*
137:*8* 138:*8* 150:*21*
158:*12, 15* 164:*19*
170:*12, 25* 182:*5*
**fit** 31:*18* 83:*9*
163:*23*
**five** 55:*4* 82:*3*
**flexibility** 23:*12*
42:*10*
**flipping** 94:*23*
**flow** 23:*25*
**focus** 93:*23* 159:*17*
168:*8* 177:*4*

**focused** 99:*2* 160:*20*
**focusing** 82:*18*
**folder** 17:*16* 41:*12*
48:*8* 61:*13* 65:*17*
81:*13* 88:*11* 92:*2*
118:*6* 133:*2*
**folks** 58:*13*
**follow** 168:*13*
**followed** 41:*16* 136:*5*
**following** 103:*22*
125:*21* 186:*15, 25*
**follows** 5:*15*
**follow-up** 56:*20*
107:*16, 21* 109:*7*
**foolish** 121:*14*
**forecast** 95:*14, 24*
139:*13*
**foregoing** 182:*11*
185:*1, 13*
**forget** 116:*19* 156:*22*
167:*8*
**form** 13:*1, 14* 14:*24*
15:*15, 22* 20:*23*
24:*11* 25:*12, 24*
26:*18* 27:*3, 8* 28:*3*
29:*6* 30:*23* 31:*4, 12*
32:*21* 33:*17, 23* 34:*5*
35:*2* 36:*22* 38:*1*
39:*10* 42:*5, 21, 25*
43:*17, 25* 44:*5, 17*
46:*18* 47:*8* 49:*23*
50:*12, 21* 51:*5, 11, 19,*
*25* 52:*16* 53:*3, 17, 24*
54:*12, 20* 56:*13* 57:*3,*
*25* 60:*3* 62:*15, 21*
63:*3, 10, 18, 23* 64:*7,*
*14, 23* 65:*6, 12* 66:*6,*
*14* 67:*2* 68:*9, 22*
69:*19, 24* 70:*15*
71:*17* 72:*6, 19* 73:*12,*
*19* 74:*12, 16* 75:*13,*
*25* 76:*7, 12* 77:*9*
78:*23* 79:*14, 19* 80:*8*
81:*1* 83:*15* 84:*1, 20*
85:*15* 86:*23* 90:*6, 12,*
*21* 93:*7* 94:*4* 96:*7,*
*18* 97:*16* 99:*11, 16,*
*25* 100:*8* 101:*7, 13,*
*25* 102:*10, 17* 104:*8*
105:*9* 106:*12, 23*

107:*3* 108:*2* 109:*21*
110:*8, 13* 111:*12, 24*
112:*16* 113:*1* 114:*2,*
*20* 115:*5* 116:*5, 12*
117:*4* 119:*25* 120:*18*
121:*1, 9, 18* 123:*1, 12*
127:*2* 128:*20* 129:*7,*
*18, 24* 130:*7* 132:*2,*
*10* 135:*16, 24* 136:*9,*
*24* 137:*10* 138:*2, 17*
140:*11, 17, 25* 141:*16,*
*24* 143:*10, 21* 144:*4*
145:*14* 148:*7, 14*
149:*18* 150:*5* 151:*24*
154:*17* 155:*5, 16*
162:*25* 169:*19*
175:*14, 21*
**formal** 82:*4, 21* 97:*3*
158:*6, 10*
**formalized** 168:*6*
**former** 24:*14*
**Forsyth** 2:*15*
**forth** 104:*11* 112:*23*
134:*14* 135:*13, 18*
**Forty-eight** 34:*17*
**forward** 77:*2* 104:*24*
177:*15* 178:*25*
**found** 132:*4*
**foundation** 13:*2, 15*
14:*24* 32:*21* 33:*23*
35:*2* 38:*2* 44:*17*
56:*13* 63:*3, 10, 23*
64:*7, 14* 66:*14* 70:*15*
71:*18* 72:*6* 76:*12*
84:*1, 20* 102:*10*
106:*12, 23* 107:*3*
109:*21* 111:*12* 113:*1*
114:*5* 116:*12* 117:*4*
121:*9, 18* 123:*1, 12*
128:*20* 132:*10*
135:*16* 140:*25*
141:*24* 143:*10* 144:*4*
150:*5* 154:*17* 155:*5*
**four** 19:*18* 36:*9*
43:*9* 56:*3*
**frankly** 36:*15* 85:*20*
106:*14, 19* 171:*18*
174:*5* 180:*1*
**frequent** 176:*4*

**frequently** 176:*21*
179:*20*
**friendly** 139:*24*
**front** 17:*22* 35:*25*
36:*4* 37:*3* 71:*6* 74:*5,*
*6, 9, 15, 20* 98:*2*
130:*3* 181:*4*
**fruition** 112:*11*
163:*17*
**frustrated** 82:*16*
83:*22* 134:*11*
**fuel** 85:*3*
**full** 57:*14, 22* 60:*7*
78:*13, 14* 94:*17*
**fully** 102:*24*
**fund** 150:*23*
**Further** 3:*6, 7* 4:*8*
64:*21* 90:*20* 93:*5*
94:*2* 107:*25* 109:*9*
137:*9* 152:*4* 157:*8*
169:*24* 179:*11* 181:*1*
183:*2* 187:*7, 9, 12*
188:*1*
**future** 39:*23* 148:*19*

**< G >**
**garbage** 132:*12*
**GELLER** 2:*6* 5:*7*
**general** 27:*24* 78:*25*
119:*1* 138:*3* 159:*21*
**generalization** 136:*1*
**generally** 14:*4* 19:*8,*
*23* 49:*7* 58:*24* 136:*2*
150:*8* 155:*7*
**generation** 22:*24*
23:*3, 8*
**generic** 44:*1*
**getting** 33:*18* 79:*21*
101:*16* 158:*21* 160:*6*
175:*6*
**giant** 87:*19*
**Gilroy** 2:*4*
**gist** 26:*11*
**give** 23:*11* 32:*10*
36:*1* 113:*16* 142:*8*
143:*8* 168:*9, 18*
**given** 22:*20* 23:*8, 12*
37:*9* 39:*13* 50:*3*
52:*23* 59:*3* 74:*22*
78:*11* 91:*5* 127:*16*

128:*3*  140:*24*  148:*9, 25*  150:2  168:*14*  185:*17*  186:*18, 23*
**gives**  33:*5*
**giving**  35:*17*  36:*6, 10*  38:*16*  39:*2*  77:*21*  142:*13*  179:*14*
**glaring**  88:*8*
**global**  8:*3*
**GM**  91:*10*
**go**  5:*23*  24:*25*  27:*8*  35:*5*  45:*22*  46:*16*  47:*7*  51:*8*  52:*25*  55:*21*  82:*4, 20*  83:*11, 19*  84:*14*  92:*22, 23*  93:*13, 18*  105:*25*  106:*2*  108:*11*  112:*10*  121:*7, 13*  126:*5, 7*  128:*18*  133:*9*  143:*16*  148:*11*  166:*2, 5*  177:*18*
**God**  36:*16*
**goes**  37:*23*  102:*7*  142:*11*  143:*9*  165:*1*
**Going**  9:*9, 13*  16:*15*  19:*6*  21:*17*  27:*21*  28:*13*  36:*1, 4*  37:*2, 4, 7*  38:*5*  41:*18, 19*  47:*13*  48:*16*  49:*22*  52:*4, 13*  55:*2*  56:*3*  57:*9*  59:*20*  61:*18*  62:*13*  67:*13*  74:*4, 5, 8, 14, 19*  78:*5*  81:*16*  82:*20, 25*  83:*3, 10, 12*  85:*4*  88:*15, 16*  94:*18*  100:*20, 24*  103:*6*  104:*24*  108:*14*  115:*10*  117:*16, 25*  118:*15*  121:*6, 15*  125:*23*  126:*6, 7*  128:*11*  133:*1, 13*  134:*7, 13*  153:*20*  163:*12*  170:*10, 18*  171:*16, 19*  175:*3, 10*  180:*23*  183:*9*
**Goldman**  75:*21*
**Good**  5:*18, 19*  7:*3*  27:*12*  40:*5*  52:*4*  54:*25*  83:*8*  99:*18*

**gosh**  7:*25*
**grabbing**  108:*12*
**graduate**  6:*12*  158:*4*
**graduating**  158:*13*
**grammar**  100:*25*
**grammatical**  110:*19*
**great**  27:*11*
**greatest**  46:*13*
**grew**  157:*23*
**grid**  153:*9*
**group**  7:*9*  107:*24*  125:*8*  147:*18*
**growing**  160:*7*
**growth**  87:*7, 8*  163:*20*
**guess**  16:*25*  22:*1*  58:*20*  61:*7*  68:*14*  69:*9*  84:*22, 23*  95:*17*  98:*3*  105:*24*  120:*7*  141:*12*  148:*20*  158:*9*  167:*23*
**guidance**  107:*1*  153:*17*

**< H >**
**habit**  131:*15*
**half**  20:*20*  21:*22*  48:*6*  55:*2*  95:*9*  127:*3, 14, 21*  131:*6*  132:*7*  137:*8*  138:*8*  139:*12*
**hand**  83:*11*  160:*3*  185:*17*
**handled**  36:*17*
**hands**  96:*5*
**happen**  9:*21*  27:*21*  44:*4, 7, 16*  55:*23*  56:*22*  82:*9*  106:*17*  115:*21*  120:*25*  128:*23*  129:*12*  141:*21*  154:*16*  170:*10, 19*
**Happened**  31:*6*  115:*23*  119:*3, 13*  125:*14*  126:*9, 20*  155:*3*  163:*2, 5, 10*
**happening**  79:*7*  80:*9*  85:*19*  86:*12*  88:*9*  91:*2*  98:*17*  106:*18*

107:*11*  171:*9*
**happens**  155:*7*
**harassing**  40:*12*
**hard**  18:*17*  91:*7*  141:*11*
**hardware**  159:*9*
**Hatch**  48:*25*  49:*1*
**he/she**  185:*14*
**head**  101:*20*
**heading**  165:*13*
**headline**  78:*17*
**headquartered**  24:*21*
**hear**  57:*17*  109:*14*  124:*9*
**heard**  26:*22*  37:*10, 11*  139:*2, 9*
**hearing**  77:*3*
**hears**  102:*9*
**heavily**  168:*16*
**hedge**  115:*8, 11*
**held**  6:*24*  10:*6*  11:*24*  98:*20*  124:*7*  135:*3*  151:*8*
**help**  16:*12*  41:*3*  64:*20*  66:*2*  75:*3*  79:*11*  84:*18*  90:*19*  93:*3*  130:*5*  172:*18*
**helped**  131:*18*
**helping**  146:*10*
**hereto**  1:*20*
**hesitating**  167:*24*
**hey**  27:*20*  44:*20*  115:*20*
**high**  64:*11, 17*  105:*18*  112:*8*  113:*25*  124:*9, 13*  157:*25*  160:*11*
**higher**  29:*5, 11*  34:*4, 11, 14, 17, 20*  35:*1, 8, 11, 14, 18, 21, 24*  71:*16*  72:*5, 18, 22, 24*  73:*10, 16, 17, 18*  84:*17*  88:*3*  112:*25*  121:*7*  128:*18*  141:*15*  169:*3, 24*  170:*2*
**highest**  160:*3*
**highlight**  89:*23*
**highlighted**  97:*11*
**highlights**  52:*21*

**highly**  136:*12*
**hindsight**  117:*7, 17*
**hint**  169:*23*  170:*1*
**hired**  149:*22*
**historic**  31:*7*
**history**  23:*2*  25:*14*  87:*9*
**Hoffman**  5:*13*
**Hofman**  2:*13*
**hold**  36:*13*  133:*8*  178:*5*
**holding**  105:*21*
**honest**  29:*8*  58:*20*  62:*6*  167:*9*
**honestly**  79:*21*  101:*9*  155:*25*
**hope**  99:*8*
**hopefully**  17:*24*  18:*5*
**hopes**  37:*7*
**hoping**  37:*13*
**hostile**  42:*9*
**hour**  55:*2*
**hours**  77:*22*  125:*13*  187:*2*
**hug**  45:*8, 9, 11*  166:*10, 11, 13, 16, 25*  167:*1, 5*
**huge**  85:*21*  154:*9*
**hundred**  16:*15, 21*  20:*7*  61:*11*  160:*20*
**hundreds**  11:*8*  138:*4*
**hunting**  31:*8*  162:*10*
**hurting**  146:*10*
**hypothetical**  38:*2*  39:*11*  131:*8*  143:*15*  144:*19*  145:*23*  147:*14*  148:*16*  151:*25*

**< I >**
**idea**  16:*3*  62:*9*  63:*14*  120:*16*  141:*3*  161:*24*
**identification**  17:*18*  21:*13*  28:*10*  41:*14*  48:*12*  58:*5*  61:*14*  65:*18*  67:*18*  69:*12*  88:*12*  92:*4*  94:*13*  103:*3*  108:*22*  118:*12*

133:*10*
**identified**  54:*7*
**identifies**  119:*5*
**identify**  5:*4, 8*  6:*24*
9:*2*  181:*6*
**identifying**  45:*3*
**identity**  185:*12*
**ignore**  87:*19*
**Ilcisin's**  60:*13*
**Illcisin**  113:*10, 19*
118:*23, 24, 25*  119:*15*
125:*3*
**immediate**  77:*12*
**immediately**  30:*5*
**impact**  23:*16*  57:*1*
85:*21*  170:*9*
**impacting**  56:*10*
**impacts**  86:*18*
**implausible**  129:*15*
**implement**  85:*12*
**implemented**  86:*3*
**implementing**  86:*2*
**implies**  68:*12, 14*
167:*17*
**implying**  110:*25*
**importance**  105:*3*
**important**  59:*12, 14*
147:*1*  169:*2*
**impossible**  87:*24*
88:*6*  116:*15, 16*
143:*2, 3*  146:*12*
**imprecise**  110:*19*
**impression**  42:*23*
50:*2*  129:*8*
**impressions**  25:*11, 13*
**improper**  36:*20*  37:*9,
15*  38:*2*  39:*11*
144:*18*  145:*23*
147:*14*  148:*15*
151:*25*
**improved**  122:*24*
170:*25*
**improving**  90:*5*
**inability**  80:*17*  86:*14*
91:*6*
**inadvertently**  170:*1*
**inappropriate**  87:*21*
135:*4*
**incapable**  73:*8*

**include**  47:*6*  51:*22*
145:*12*  180:*7*
**included**  50:*1*  52:*1,
3*  60:*16*  80:*5, 16*
90:*4*  103:*19*  109:*9*
130:*5*  145:*16*  147:*6*
**includes**  103:*22*
147:*24*  186:*25*
**including**  15:*8, 19*
33:*16*  40:*5, 20*  85:*24*
182:*8*
**incomplete**  145:*24*
147:*14*  148:*15*
151:*25*
**inconclusive**  116:*7*
**incorrect**  45:*18*
**increase**  59:*25*  75:*2*
101:*5*  115:*14*  174:*2*
**incredible**  88:*8*
**indefinitely**  175:*4*
**independent**  176:*4*
**independently**  180:*1,
5*
**indicate**  19:*23*  20:*2,
17*  95:*3*  112:*7*
124:*13*  167:*1*
**indicated**  76:*20*
115:*2*  116:*10*  125:*16*
150:*12*  169:*2, 12*
171:*4*
**indicates**  20:*3*  29:*24*
30:*8, 11, 16*  120:*20*
**indicating**  23:*21*
152:*24*
**indication**  117:*11*
120:*15*
**indications**  114:*12*
**industrial**  164:*2*
**industries**  112:*20*
**industry**  9:*8*  159:*5*
**inequity**  142:*7*
**inevitable**  110:*24*
111:*1*
**infer**  84:*24*
**inferring**  167:*2*
**inflect**  163:*19*
**information**  13:*9, 13*
38:*17*  39:*4*  49:*21*
50:*11, 18*  52:*15, 22*
76:*17*  82:*11*  99:*9*

106:*10*  112:*13*
115:*19*  148:*4, 8*
156:*4*  175:*10*  176:*12,
25*  177:*9, 12*  178:*4*
186:*23*
**informed**  122:*12*
125:*17*  153:*5*
**ingredients**  32:*16*
**inherent**  168:*25*
**in-house**  176:*19*
**initial**  50:*2*  57:*15*
64:*19*  65:*3, 23*  66:*13,
23*
**initially**  164:*8*  168:*8*
**initiate**  82:*4, 21*
**input**  50:*5*  174:*4*
**inside**  128:*6*
**insider**  12:*22, 25*
13:*6, 7, 12*
**insiders**  13:*8*
**Insinkerator**  132:*12*
**insinuate**  84:*25*
**insinuating**  129:*8*
**instance**  1:*13*
**instrument**  185:*14*
**INSTRUMENTS**  1:*3*
6:*17, 25*  9:*14, 18*
11:*23, 24*  12:*12, 13,
18*  15:*5*  23:*11*  24:*9*
29:*21*  30:*22*  31:*11,
23*  32:*7, 20*  39:*7*
43:*16*  47:*21*  48:*22*
50:*10*  51:*9, 18, 24*
52:*12*  53:*1, 22*  54:*10*
55:*13*  56:*9, 25*  60:*23*
62:*20*  63:*2*  66:*5, 24*
67:*1*  68:*5, 6, 8, 20*
70:*21, 25*  71:*12*
72:*13*  76:*11, 21*  78:*2*
79:*13*  80:*1, 24*  84:*18,
19*  85:*12*  86:*10*
87:*18*  90:*3, 11*  93:*5*
94:*3*  99:*10, 15*  100:*6*
111:*3, 10*  112:*15*
114:*13*  115:*2, 4*
116:*2, 11, 20*  117:*3*
122:*22*  123:*5*  124:*3*
125:*23*  127:*22*  128:*3,
17*  131:*9*  132:*20*
140:*15, 16*  143:*20*

144:*3, 11*  146:*8*
148:*6, 12*  149:*23*
150:*2, 24*  151:*3*
154:*1*  157:*15*  158:*14,
19, 24*  159:*5, 19*
160:*16, 17, 22*  161:*4,
7, 10, 25*  162:*3, 22*
163:*12, 22*  165:*5*
167:*20*  168:*18*  169:*9,
23*  171:*7, 21, 23*
174:*6*  175:*8, 19, 25*
176:*7, 19, 24*  177:*8,
15*  178:*2, 3, 7*  182:*25*
186:*3*
**insufficient**  50:*15*
**intend**  30:*10*  36:*7*
46:*6*  153:*5*  165:*17*
166:*23*
**intended**  119:*19*
**intent**  47:*1, 2, 4, 5, 6*
75:*16*  101:*9, 14*
102:*24*  110:*2*  111:*25*
112:*1*  113:*8*  116:*8*
123:*25*  126:*4*  137:*24*
**intention**  19:*23*
169:*16*
**interact**  21:*7*
**interaction**  115:*12*
**interest**  23:*13*  27:*22*
28:*1*  29:*20*  30:*21, 25*
31:*2*  66:*5, 25*  68:*7,
20*  76:*11*  78:*2*  80:*24*
84:*18*  86:*9*  87:*17*
90:*4, 10*  99:*14*
116:*11*  123:*7, 21*
124:*2, 16*  125:*18*
128:*9, 13*  145:*10*
160:*24*
**interested**  79:*12*
115:*4*  127:*17*  128:*15*
160:*16*  161:*24*
187:*10*
**interesting**  132:*23*
**interests**  76:*21*
123:*23*
**interpret**  47:*2*  95:*8*
101:*16*  114:*25*
142:*24*
**interpretation**  46:*11,
22*  102:*18, 19, 21*

**interpretations** 78:*15*, *17*
**interpreted** 46:*2* 77:*17, 25*
**interrupt** 91:*16*
**interrupted** 91:*15* 142:*14*
**introduced** 12:*18, 21*
**invent** 143:*14*
**inventory** 86:*16*
**investing** 11:*11*
**investor** 11:*2* 90:*9, 13, 18, 23* 91:*19, 24* 92:*17* 93:*3, 21* 104:*3* 115:*13*
**investors** 5:*21* 11:*5, 7, 8* 112:*18* 143:*24*
**involve** 91:*17*
**involved** 11:*2* 12:*12* 66:*24*
**issue** 50:*11* 55:*20* 85:*23* 86:*12* 105:*7* 134:*8, 10* 136:*1* 147:*1* 153:*13* 174:*17* 176:*7, 20*
**issues** 40:*24* 52:*9* 55:*17*
**item** 43:*2, 9* 47:*14* 84:*5* 89:*7* 181:*24*
**items** 42:*13, 14*
**iterations** 18:*19* 137:*3* 161:*18*
**its** 34:*1* 42:*5* 47:*22* 70:*21* 76:*10, 20* 82:*20* 83:*12* 87:*9* 113:*25* 122:*25* 124:*2, 5* 128:*18* 140:*15* 155:*17* 163:*23*

**< J >**
**jack** 99:*10*
**January** 19:*9* 29:*8, 10* 74:*3* 173:*3*
**jcomerford@dowdben nett.com** 2:*17*
**Jeremy** 2:*13* 5:*13*
**job** 6:*11* 8:*23* 78:*24* 158:*12*
**jobs** 8:*24*

**John** 2:*12* 5:*10* 24:*16, 18, 20* 36:*13, 15* 40:*9* 54:*15* 55:*7* 157:*13* 179:*9*
**Johnson** 2:*3* 3:*4, 6* 5:*6, 17* 13:*5, 20* 14:*9, 17* 15:*2, 18* 16:*5* 17:*20* 21:*2, 15* 24:*18* 25:*17* 26:*2, 21* 27:*5* 28:*7, 11, 16* 29:*12* 31:*1, 9, 21* 32:*25* 33:*20* 34:*3, 12, 19, 24* 35:*5, 12, 19, 25* 36:*5, 13, 23* 37:*2, 10, 16, 18* 38:*8, 18, 21, 24* 39:*6, 16* 40:*2, 9, 13, 14* 41:*15* 43:*2, 20* 44:*3, 14, 25* 46:*23* 47:*12* 48:*14* 50:*9, 17* 51:*2, 7, 16, 22* 52:*3, 17, 23* 53:*5, 13, 19* 54:*6, 15, 18, 20, 23, 25* 55:*2, 6, 10* 56:*7, 18, 19, 21* 57:*8, 14* 58:*1, 7* 60:*6* 61:*15, 17* 62:*17, 24* 63:*6, 16, 20* 64:*4, 11, 18* 65:*2, 9, 16, 20* 66:*10, 22* 67:*8, 19* 68:*10, 24* 69:*14, 21* 70:*3, 17* 71:*20* 72:*3, 11, 24* 73:*3, 8, 15, 23* 74:*4, 11, 14, 18, 23* 75:*19* 76:*2, 9, 19* 77:*14* 79:*10, 17, 23* 80:*23* 81:*12, 15* 83:*23* 84:*4* 85:*5* 86:*1* 87:*12, 15* 88:*10, 14* 90:*8, 17* 91:*16, 21* 92:*5* 93:*15* 94:*8, 15* 96:*15, 20* 97:*18* 99:*13, 21* 100:*3, 12, 16, 18* 101:*11, 21* 102:*1, 14* 103:*1, 4* 104:*14* 105:*20* 106:*21, 25* 107:*7, 14* 108:*9, 13, 19, 23* 109:*1* 110:*4, 11, 21* 111:*18* 112:*12, 22* 113:*9* 114:*6* 115:*1* 116:*1, 9, 19* 117:*9, 22*

118:*5, 9, 13* 119:*24* 120:*2, 23* 121:*5, 15, 22* 122:*3* 123:*4, 14* 124:*1* 127:*3* 129:*1, 15, 21* 130:*4, 11* 132:*6, 18* 133:*6, 11* 135:*21* 136:*3, 20* 137:*6, 14* 138:*7* 139:*2* 140:*14, 20* 141:*3, 13, 19* 142:*3, 16* 143:*5, 12, 18, 24* 144:*8, 24* 145:*8, 18, 25* 146:*6, 23* 147:*22* 148:*9, 21* 149:*10, 21* 150:*11, 16* 152:*2* 153:*25* 154:*21* 155:*8* 156:*7* 162:*25* 169:*19* 175:*14, 21* 179:*10, 12* 180:*22, 25* 183:*4, 5, 7* 187:*2*
**joined** 25:*2*
**Judge** 74:*9*
**judging** 14:*2*
**judgment** 34:*7* 46:*14* 55:*18, 20* 150:*9*
**July** 77:*4* 81:*20* 88:*19* 92:*9, 10* 94:*21* 95:*19, 21, 24* 97:*7, 19* 103:*8, 15* 106:*5* 111:*15* 139:*12* 174:*7, 10, 25* 176:*8* 179:*13* 181:*7* 182:*22*
**June** 48:*5* 60:*8* 61:*3, 24* 62:*17* 65:*24, 25* 69:*4, 5* 74:*3, 24* 150:*21* 169:*10* 170:*24*
**jury** 36:*1, 4* 37:*3* 74:*9, 15, 20* 157:*18* 161:*3* 173:*13*
**justified** 105:*18*
**justify** 20:*11* 83:*20* 134:*10*

**< K >**
**Karen** 21:*2* 22:*7* 62:*6* 97:*4*
**Karsanbhai** 24:*3, 6* 25:*18, 21* 26:*3, 12*

28:*1, 24* 29:*14, 19, 24* 30:*16* 33:*2* 57:*16* 62:*18* 68:*25* 69:*17* 77:*2* 107:*17, 21* 161:*22* 164:*16* 168:*3*
**Karsanbhai's** 164:*20* 165:*12* 166:*21* 167:*11*
**Katz** 165:*25* 171:*22* 174:*13* 182:*7*
**keen** 82:*14*
**keep** 36:*10* 160:*10* 172:*5* 175:*3*
**keeping** 154:*15*
**Kevin** 118:*21, 22, 23, 24* 119:*10*
**key** 119:*5* 138:*12*
**Kim** 17:*16* 67:*10* 94:*11* 100:*14* 108:*20* 117:*23* 118:*6* 123:*14* 133:*3, 6*
**Kimberly** 1:*16* 186:*13* 187:*19, 20* 188:*19, 20*
**kind** 10:*17* 44:*21* 49:*17* 55:*18* 59:*15, 18* 60:*20* 67:*5* 75:*17* 115:*15, 20* 117:*15* 128:*9* 134:*6, 13* 135:*5* 150:*9* 155:*21* 157:*23* 159:*11* 163:*15, 17* 168:*15* 178:*18* 180:*4*
**kinds** 79:*1* 111:*6* 142:*20*
**knew** 50:*14* 105:*20* 115:*16, 24* 141:*8* 143:*19* 149:*1* 170:*19* 175:*2*
**Knight** 25:*15*
**know** 7:*24* 8:*7* 11:*7, 9* 18:*12, 15, 17* 19:*2* 20:*6, 11* 27:*6* 33:*18* 36:*5, 15, 21* 38:*9* 41:*23* 44:*6, 8, 12* 45:*3* 47:*4* 50:*15* 55:*1, 22* 56:*16, 22* 61:*8* 62:*10, 16, 22* 63:*7, 12* 64:*9* 65:*9* 66:*19, 21* 69:*25* 71:*4*

72:*15*  75:*15*  76:2, *3, 4*  77:*10*  79:8, *15*  81:3, 8, *23*  83:2  84:*23*  88:*3*  92:6  98:*15, 16*  99:*17*  100:*16*  101:8, *9, 19*  102:*13, 20*  107:*9*  111:5, *7*  113:8, *9, 18*  114:*6, 7, 8*  115:*9, 21, 23*  116:3, *21, 24*  120:*21*  122:*12, 15*  123:3  124:*11*  125:9, *15*  127:*15*  128:*23*  131:5  133:6  135:*17*  136:*10, 25*  137:*3, 4*  139:*16*  140:*19*  141:2, *18*  143:22, *23*  145:8  149:*3*  152:6  153:*4, 7, 12, 15*  154:*14*  155:9, *19, 24, 25*  164:*10*  170:*14*  171:*14*  172:*18*  174:*21*  175:2, *17*  180:*3, 4*

**knowing**  63:5
**knowledge**  20:*13*  144:*1*  153:*16*
**known**  14:7  185:*10*
**knows**  171:*16*

**< L >**
**labeled**  18:*21*  47:*18*  48:9  59:*24*  87:*15, 16*  181:*21*
**Lacks**  114:*4*
**laid**  109:6
**LALL**  123:*19*
**Lamar**  1:*18*
**language**  124:*23*  166:*10, 13*  167:2, *4*
**laptop**  155:*17*
**large**  80:*18*  112:*3*  124:6
**largest**  86:*15, 16*
**late**  26:*15, 24*  29:3  43:6  92:9, *17*
**latest**  77:3  97:*18*
**law**  165:*25*  168:*14*  171:22  174:*13*  181:*15*  182:*21*

**lawsuit**  122:8  156:*21, 25*  157:*1*
**lawyer**  5:*21*  14:*13*  36:*16*
**lawyers**  5:*21*  174:*12*  175:*9, 17*  176:*1, 18, 19, 22, 23*  179:*13*
**lawyer's**  58:*12*
**lay**  110:*15*
**laying**  109:*23*
**leader**  24:*15*
**leading**  60:*20*
**learn**  11:9  177:*16*
**learned**  6:*10*  132:6  164:*4*  178:*1*
**leaving**  139:*10*
**Led**  7:22  54:2  137:5
**left**  8:22  16:*24*  25:4  98:*12*  154:*13*  155:*10*  156:5  158:*19, 20*  182:*17*
**left-hand**  47:*14*
**legal**  13:2, *15*  14:2, *25*  34:5  35:*3*  38:2  39:*11*  49:*23*  51:5, *11*  52:*19*  53:2, *25*  54:*13*  56:*14*  57:5  71:*17*  72:7, *20*  73:*20*  144:*18*  145:*15, 23*  147:2, *4, 12*  148:*10, 14*  182:8
**legendary**  25:*16*
**length**  153:*14*
**letter**  3:*19*  27:*21*  28:*1*  29:*17, 24*  30:8, *9, 10, 17*  33:*1*  43:*3, 5, 6, 15, 23*  45:*12, 17, 21*  46:*1, 5, 15*  48:*3*  57:*21*  62:*18*  68:*25*  69:*15*  70:9  74:*23, 24*  75:*19*  76:*14, 18*  77:*1, 7*  78:*11*  89:*12*  98:7  101:*4, 22, 23*  102:*4, 6*  105:*21, 25*  127:*16*  143:*23*  164:*16, 21, 24*  165:*12, 16*  166:*21, 22*  167:*14*  171:*4, 8, 13*
**letters**  22:*4*  111:*21*  161:*16*  170:3

**level**  32:*14*  152:*16*  158:*16*
**Lexington**  2:7
**life**  159:*12*
**lift**  147:*3*  152:9  174:22  176:*13*
**lifted**  137:*12*  149:*13*
**lifting**  152:8
**liked**  96:*13*
**likelihood**  63:*1, 7, 15*  78:5  112:8  129:*21*  141:7
**limited**  109:2
**line**  19:*10, 17, 20*  20:*4*  38:4, *6*  43:9  48:*20*  68:*11, 12, 14*  143:*15*  184:4
**linear**  44:*10, 23*
**Lipton**  40:*23*  66:4  114:*17*  125:4  165:*25*  171:22  174:*13*  182:7
**list**  42:*13*  44:*10*  117:*13, 14*  123:6, *18, 19*  130:4
**listed**  181:*14*
**listen**  128:5  131:3
**listened**  127:*4, 10, 12*  128:*1*  130:*16, 19*
**listening**  127:*20*  131:*1*
**LITIGATION**  1:5  110:5  186:5
**little**  39:3  121:*14*  133:*16*  158:*10*  159:*1*  164:4  170:*13*  175:*1*
**live**  172:9, *12*
**LLP**  2:6, *14*  5:*11*
**loaded**  18:*23*
**location**  17:*21*
**logic**  106:*1*
**logical**  140:22
**long**  6:*20*  8:*1*  68:24  77:*16*  80:*11*  117:*19*  156:*16*  172:5
**longer**  22:24  124:*11*  172:8, *9, 12*  176:*12*
**long-standing**  168:*4*
**long-term**  22:*23*  136:*13*  160:*19, 21*  162:*16*

**look**  16:22  18:*25*  20:*4*  21:*17*  28:7, *12*  34:*10*  41:*12, 18*  42:6  44:6  48:8, *15*  58:*3, 8*  61:*12, 18*  65:*16*  67:8, *21*  77:2  81:*12, 16*  87:*23*  88:6, *7, 10*  92:2, *6*  94:8  100:*12, 19*  103:*1*  108:9  118:5, *14*  121:*14*  124:22  133:*1, 12*  162:*17*  164:*20*  165:*11*  166:*20*  181:*20*
**looked**  55:*16*  67:*23*  174:9  181:*23*
**looking**  75:5  83:*4*  112:6, *19*  117:6  124:8  150:9  161:*1*  169:6  174:*18*
**looks**  19:*11*  118:*19*  181:*18*
**lost**  124:2
**lot**  25:*15*  38:*15*  63:*13*  77:*17*  86:*13*  91:2, *12*  115:*10, 15, 24*  121:*3*  126:*17*  128:5  130:2  168:*15*
**lots**  23:6  63:*25*  64:*16*  65:*13*  66:*16*  85:22
**Louis**  2:*16*
**low**  17:7  31:7  63:*25*  64:5, *16*  79:6  96:*11, 13*  129:22  139:*18, 25*
**luck**  40:5  54:*25*
**lunch**  117:22

**< M >**
**machine**  1:*17*
**majority**  129:*25*
**making**  13:8  17:*11*  23:25  39:*21*  41:4  50:23  85:*17, 22*  102:22  105:5  107:*16*  124:6  135:2, *5, 11*  136:*15, 22*  150:8  161:*16*
**managed**  7:*10*

**management** 17:*13* 20:*14* 89:*21* 97:*1* 135:*6* 168:*19* 173:*5* 175:*8* 182:*12*

**manager** 7:*5, 10, 20*

**margin** 89:*24*

**marked** 17:*18* 21:*11, 13* 28:*10* 41:*13, 14* 48:*12* 58:*5* 61:*14* 65:*18* 67:*18* 69:*12* 88:*12* 92:*4* 94:*13* 103:*3* 108:*22* 118:*12* 133:*10*

**market** 17:*6* 31:*6* 33:*25* 56:*11* 70:*24* 71:*11* 80:*16* 86:*6* 91:*7, 9* 96:*10, 11, 13* 102:*8* 105:*3, 5* 106:*9, 18* 139:*18, 25* 141:*10, 12* 142:*6* 162:*11, 17, 18, 21, 22* 163:*5, 9*

**marketing** 7:*4, 9, 11, 18, 21, 22, 23* 8:*3*

**markets** 57:*2*

**market's** 141:*7*

**material** 13:*9, 13* 14:*14, 19, 22, 23* 37:*24* 38:*11, 19* 39:*9, 17, 18* 42:*2* 49:*21* 50:*10, 17* 52:*14, 22* 54:*10* 55:*13* 56:*9, 25* 126:*18* 176:*12, 25* 177:*9, 12* 178:*4*

**materiality** 12:*19* 13:*21, 25* 14:*2, 4, 6, 12* 38:*6*

**materially** 34:*3, 14, 20* 35:*1, 8, 14, 21* 40:*4* 71:*16* 72:*5, 18, 24, 25* 73:*9, 18* 88:*3*

**materials** 10:*24* 18:*12, 13* 41:*10, 22* 59:*6* 81:*22* 89:*18*

**math** 34:*7* 39:*22* 71:*4* 95:*9* 151:*16* 152:*1*

**Mathematically** 34:*19*

**matter** 18:*15* 58:*22* 61:*7*

**mattered** 99:*24*

**matters** 21:*8* 89:*25* 122:*6* 182:*8*

**maximized** 139:*25*

**McGrath** 59:*11* 62:*19* 81:*20* 82:*2* 83:*10, 18, 23* 84:*9, 16* 98:*19* 100:*4, 23* 102:*3* 103:*7, 14* 104:*7, 15* 134:*14* 135:*14, 21* 137:*5* 139:*3* 157:*15*

**McGrath's** 85:*6* 136:*5*

**McKenzie** 149:*21, 22* 150:*1, 9*

**mean** 9:*14* 21:*21* 27:*4* 31:*13* 44:*4, 11* 45:*19* 69:*25* 75:*10* 78:*24* 79:*15, 16* 88:*22* 96:*5, 20* 97:*1* 98:*15* 101:*11* 105:*24* 107:*5* 109:*23* 110:*9* 113:*3* 120:*8, 19* 124:*10* 165:*3* 180:*13*

**meaning** 31:*25* 92:*23* 93:*19* 167:*12* 176:*11*

**means** 5:*20* 16:*10* 19:*10* 81:*5* 111:*1* 116:*3* 120:*19* 134:*10*

**meant** 13:*21* 55:*11* 59:*1* 101:*19, 20* 110:*20* 115:*25* 120:*13* 122:*11* 150:*3* 176:*2*

**measurement** 164:*3*

**measures** 135:*10*

**meet** 60:*7*

**meeting** 11:*10* 57:*15, 22* 58:*17* 68:*17, 18* 88:*19* 89:*2* 97:*8* 99:*1* 103:*14, 18, 23* 104:*7, 15* 105:*8* 134:*5* 136:*19* 152:*2, 11, 15, 20, 23* 153:*3* 174:*7, 14, 20* 179:*14, 17* 181:*7, 11, 15, 19* 182:*18, 24*

**meetings** 9:*24* 10:*22, 23, 24* 11:*12* 65:*7, 13*

**matters** 94:*21* 97:*8* 138:*4* 179:*16*

**member** 9:*3* 10:*5, 15, 25* 24:*15* 60:*8* 139:*3* 144:*25* 175:*23* 176:*3*

**members** 48:*19* 130:*9* 131:*1, 3* 138:*19* 139:*7, 10* 144:*8* 152:*17* 182:*13*

**memory** 182:*20*

**mention** 10:*2*

**mentioned** 10:*22* 46:*21* 50:*1* 71:*8* 85:*21* 112:*2* 120:*10* 155:*8* 162:*18* 163:*18*

**mentioning** 93:*15*

**mentions** 87:*22*

**mentor** 24:*15* 25:*7*

**merely** 20:*5* 43:*23*

**merger** 11:*25* 12:*4* 130:*2*

**mergers** 60:*17, 19* 76:*5* 174:*1*

**merit** 89:*16*

**message** 91:*8* 101:*17* 108:*6* 119:*1* 120:*11*

**messaging** 154:*10*

**met** 5:*20* 11:*8* 64:*19, 24, 25* 65:*4, 14*

**metrics** 135:*8*

**Michael** 98:*12* 100:*21* 134:*3, 9* 138:*18, 24*

**mid** 9:*25* 11:*4* 91:*15*

**middle** 45:*7* 75:*1* 109:*3*

**million** 15:*13, 20* 16:*6, 11, 16* 19:*24* 20:*7* 22:*13* 23:*21, 24* 61:*3, 4, 11, 25* 62:*1, 4* 95:*4, 6, 9, 15, 25* 139:*13* 140:*3* 151:*18, 22* 173:*4, 6*

**millions** 20:*21*

**mind** 56:*17* 62:*10* 84:*17* 110:*18* 130:*3* 133:*24* 148:*11*

**mine** 5:*8* 16:*23* 119:*16* 180:*12*

**minor** 23:*18*

**Minutes** 3:*20* 55:*4* 88:*18, 21* 89:*14, 20* 103:*19* 152:*21* 171:*2* 181:*7, 21* 187:*2, 3*

**mischaracterization** 110:*10*

**mischaracterizes** 46:*19* 47:*9* 114:*3* 115:*6* 121:*2, 19* 127:*2*

**misinterpreting** 93:*10*

**misleading** 33:*9, 12, 14* 34:*9* 70:*18* 87:*21*

**missed** 119:*10*

**Missouri** 2:*16*

**misstates** 56:*12, 13* 57:*4* 83:*14* 93:*8* 128:*21* 141:*16*

**mistaken** 25:*5* 179:*1*

**mixed** 117:*15*

**model** 16:*13, 20* 20:*5, 10*

**modeling** 15:*24* 16:*9*

**models** 16:*2* 20:*14, 16*

**modestly** 22:*21*

**modified** 126:*14*

**momentum** 89:*23*

**money** 62:*13* 173:*16, 17*

**monitor** 47:*14* 149:*22*

**monitoring** 47:*21*

**month** 127:*5* 128:*24*

**months** 84:*14* 104:*1, 17* 129:*14* 134:*18* 158:*21* 171:*17*

**morning** 5:*18, 19*

**motivation** 84:*16*

**motive** 82:*15, 16*

**move** 115:*15* 131:*19* 177:*14*

**moved** 69:*21* 106:*22* 155:*3*

**multiple** 8:*25* 9:*7, 23* 41:*5* 42:*24* 64:*25* 136:*17* 137:*3* 152:*7* 168:*12* 172:*13* 173:*1* 174:*19*

< N >
NACD  10:24, 25
naive  143:7, 17
name  48:21, 24  49:3
59:3, 4, 8  157:13
185:13
named  24:16
narrow  147:17, 23, 25
NASDAQ  34:1, 2
71:5
NATI  18:1
NATIONAL  1:3
6:16, 24  9:14, 18
10:25  11:23, 24
12:12, 13, 17  15:4
24:9  29:20  30:21
31:10, 22  32:7, 20
39:7  43:16  47:21
48:22  50:10  51:9, 18,
24  52:12, 25  53:22
54:10  55:13  56:8, 25
60:23  62:19  63:2
66:5, 24  67:1  68:5, 6,
7, 20  70:21, 25  71:12
72:12  76:11, 21  78:2
79:13, 25  80:24
84:17, 19  85:12  86:9
87:17  90:2, 10  93:5
94:3  99:10, 15  100:6
111:3, 10  112:15
114:13  115:2, 4
116:2, 11, 20  117:3
122:22  123:5  124:3
125:23  127:21  128:3,
17  131:9  132:19
140:15, 16  143:19
144:2, 11  146:7
148:5, 12  149:23
150:2, 23  151:3
154:1  157:15  158:14,
19, 24  159:4, 19
160:16, 22  161:4, 7, 9,
25  162:3, 22  163:11,
22  165:4, 5  167:20
168:18  169:9, 23
171:7, 21, 23  174:6
175:8, 18, 25  176:7,
19, 24  177:8, 15

178:2, 3, 7  182:24
186:3
NAT-SL-00001263
3:12  28:16
NAT-SL-00001457
3:21  88:14
NAT-SL000016270
3:14
NAT-SL-000016270
48:14
NAT-SL-00001696
3:16  61:16
NAT-SL-00005984
3:11  22:5
NAT-SL-00011671
3:15  58:8
NAT-SL-00016112
3:13  41:17
NAT-SL-00021516
81:15
NAT-SL-00021956
3:18  67:20
NATSL1460  181:21
NAT-SL-16996  3:24
100:18
NAT-SL-18070  4:1
109:1
NAT-SL-20795
133:11
NAT-SL-20796  4:3
NAT-SL-23189
118:13
NAT-SL-24106  3:23
94:16
NAT-SL-25798  3:25
103:4
NAT-SL-7815  3:22
92:3
natural  128:8  163:23
nature  66:17, 19
156:22, 24  163:23
168:21
near  22:11  31:5
necessarily  44:11
56:23  64:5  112:8
116:14
necessary  14:13
49:10
necessitated  49:9

need  21:16  32:11
75:4  92:18  98:7
102:1  117:23  143:14
needed  31:16  131:23
147:4
neither  164:25  187:7
network  156:2
never  132:15, 18
148:19  157:5
NEW  1:2  2:8  36:16,
18  76:17  155:3
177:19  186:2
newest  173:3
news  132:15  142:22,
24
NI  26:15  27:11
31:19  33:20  58:18
66:7  123:17  124:6,
11  158:17  159:7, 9
162:14  164:2
night  103:15
Niles  179:15  181:17
182:12, 17, 21
NI's  33:4  159:12
non-public  13:9, 13
49:21  50:11, 17
52:14, 22  176:12, 25
177:9, 12  178:4
normal  67:5  80:9
106:7
normally  53:9  87:4
North  1:18
NOTARY  185:21
note  18:7, 24  20:16
23:24  56:2  59:5
89:14, 20  90:14
Noted  40:13  44:10
185:3
notes  15:16  16:22,
23  75:20  155:9
notification  43:10
notion  17:5
November  29:2, 9
117:18
number  18:15  19:20
20:12  23:17  25:13
28:8  33:24  42:7
43:3  44:7, 10, 13
58:3  61:8  76:23
78:4  91:25  94:15

100:18  103:4  112:4
123:19  139:17
154:23, 25  161:1
numbered  1:14
17:17  19:13  21:11
28:8  45:6  82:3  84:4,
5  94:23
numbers  22:5  38:5
41:16  61:16  72:4
108:24  118:7, 9
133:7
numerical  72:16
numerous  152:12
Nut  48:24  49:1

< O >
oath  185:11
Object  14:24  26:17
33:17  37:4  40:8, 11
49:22  53:2  54:12
61:10  62:15  114:2
115:5  121:1  127:1
132:2  145:14  151:24
Objection  13:1, 14
34:22  36:22  38:1
39:1, 10  46:18  47:8
52:16, 18  54:20
56:12  57:3  62:8
64:25  71:24  72:19
73:11, 19  74:7, 10, 16
81:1  83:14  88:5
93:7  107:8  144:17
145:22  146:21
147:10  162:25
169:19  175:14, 21
objections  13:23
14:15  34:16  35:10,
16, 22  36:2, 8, 17, 21
38:14, 20, 22  39:20
54:18  55:15  73:1, 4,
25  74:21  121:25
123:16  141:4  142:4
143:4, 13  145:3
146:1  149:5  150:13
objective  82:12, 14
85:1, 2  160:19
objectively  72:9
objectives  85:18
110:16

**obtain** 5:*25* 80:*17*
**obvious** 14:*12*
**obviously** 51:*1* 59:*7*
112:*9* 116:*24* 132:*4*
140:*8*
**occasional** 11:*5*
**occasionally** 11:*15*
**occasions** 41:*5*
125:*14* 168:*12*
169:*13*
**occupied** 131:*21*
**occurred** 187:*14*
**OCTOBER** 1:*10, 15*
5:*2* 8:*21* 29:*13*
184:*2* 186:*11* 188:*14*
**Offer** 3:*19* 27:*15*
29:*5, 11* 30:*25* 33:*1,
3* 39:*14* 46:*17* 47:*7*
50:*2, 3, 10, 14, 18, 19*
51:*3, 10, 17, 23* 52:*5,
12, 13* 53:*21, 23* 54:*9*
55:*13* 56:*8, 24* 57:*15*
58:*17* 60:*10* 62:*19,
25* 64:*19* 65:*3, 10, 23*
66:*13, 23* 68:*18, 25*
69:*14, 18, 20* 70:*4, 6,
7, 8, 9, 10, 21* 72:*1, 9,
10, 13* 73:*6* 74:*1, 2,
24* 75:*12* 76:*24* 77:*7,
22* 78:*6, 18* 79:*7*
82:*4, 20* 85:*18* 89:*12*
92:*13* 97:*9, 12, 15, 22*
98:*5* 100:*6* 101:*4, 14*
102:*24* 103:*24*
104:*16* 105:*22*
107:*15* 111:*16, 17*
112:*25* 113:*5, 7, 25*
114:*12* 115:*21* 121:*7,
8, 13, 17, 24* 122:*25*
128:*18* 131:*9* 141:*6,
15* 144:*7* 148:*18*
150:*4* 161:*14, 17*
162:*2* 164:*25* 165:*1,
4, 9* 169:*21* 170:*7, 11,
12, 14, 20, 25* 171:*2, 6,
24* 172:*8, 9, 13*
177:*13* 179:*4, 6*
**offered** 31:*2* 32:*23*
39:*6* 170:*5, 17, 21*

**offeree** 43:*3, 7, 24*
114:*17*
**offerer** 43:*3, 7, 24*
45:*1* 60:*1* 114:*16*
117:*11*
**offering** 31:*11* 32:*20*
33:*22* 143:*7*
**offers** 72:*11* 122:*23*
124:*12* 127:*23*
140:*16, 21* 141:*21*
142:*10*
**office** 119:*16* 185:*17*
**officer** 8:*13, 14* 9:*10*
21:*4* 186:*24* 188:*3*
**officer's** 188:*8*
**official** 18:*20*
**oftentimes** 23:*1*
**Oh** 7:*25* 22:*7* 58:*23,
25* 59:*3* 68:*12* 72:*25*
102:*2* 103:*10* 107:*9*
122:*6, 11* 133:*22*
149:*2, 4* 165:*7* 167:*4,
12*
**Okay** 10:*13, 17* 12:*3,
8, 11* 13:*6* 15:*3*
17:*24* 19:*5* 21:*23*
22:*7, 10, 17* 26:*2, 11,
20* 27:*1* 28:*7, 18, 23*
29:*12* 30:*16* 33:*7, 16*
36:*20* 37:*22* 46:*10,
15* 47:*12* 52:*11, 23*
54:*23* 56:*17* 57:*8*
58:*25* 59:*4, 8* 65:*2,
19, 25* 68:*4* 69:*5, 10,
13* 70:*17* 71:*10* 72:*4*
74:*4, 19* 75:*10* 93:*23*
95:*14* 97:*7, 18, 21*
102:*6* 103:*13* 109:*1,
6* 117:*9* 121:*15*
122:*3* 123:*11* 130:*11*
132:*18* 133:*19, 23*
143:*5* 145:*12* 155:*14*
157:*8, 10, 15* 158:*12,
18, 23* 159:*4, 13*
160:*15, 22* 162:*6*
163:*11* 164:*12, 19*
165:*3* 166:*20* 167:*6,
19* 168:*8, 13, 17, 21*
169:*8, 16, 22* 171:*20*
173:*10* 174:*16*

175:*24* 177:*3, 22, 25*
178:*6, 10* 179:*7, 9*
180:*22* 181:*9, 14, 20*
182:*5, 10, 20* 183:*2*
**once** 23:*4* 79:*8*
81:*22* 137:*22* 156:*13,
14*
**ones** 112:*21* 151:*14*
**ongoing** 112:*14*
117:*2*
**on-hand** 30:*2*
**open** 43:*11* 53:*9*
55:*6* 169:*23* 170:*1*
**operating** 8:*13* 9:*10*
84:*6* 89:*24* 135:*8*
**opinion** 14:*16* 32:*22*
44:*23, 24* 54:*13*
56:*15* 57:*5* 71:*18*
72:*7, 20* 73:*20* 81:*11*
83:*6, 20* 84:*12, 23*
87:*24, 25* 125:*13*
134:*9, 11* 135:*3*
141:*1, 25* 143:*11*
144:*5* 150:*15* 177:*2,
7, 11* 178:*2, 5*
**opinions** 38:*3* 39:*12*
80:*14* 176:*23* 179:*25*
**opportunistic** 16:*4*
**opportunities** 79:*1*
**opportunity** 41:*6*
88:*25* 102:*8* 105:*4*
141:*20*
**opposed** 18:*11*
126:*18* 135:*5* 146:*3*
167:*17, 18*
**opposite** 108:*6*
**options** 63:*14*
**ORAL** 1:*8, 12* 186:*9*
**order** 7:*21* 32:*5*
44:*15, 21* 89:*7* 126:*8*
181:*24*
**ordered** 45:*5*
**orders** 107:*12* 160:*6*
**organization** 80:*12*
**organizations** 75:*24*
76:*6*
**orient** 159:*18*
**original** 188:*2, 6, 9*
**originally** 157:*22*
**outbid** 116:*21*

**outcome** 136:*4, 10*
141:*11, 14* 187:*11*
**outlook** 103:*25*
104:*17* 105:*13, 14, 18*
**outreach** 24:*5*
**outright** 59:*24*
**outside** 9:*7* 11:*16*
49:*25* 128:*6* 176:*18*
**overall** 49:*5* 71:*11*
86:*18* 87:*20*
**owed** 145:*21*
**owned** 151:*10*
**owners** 32:*2*

**< P >**
**p.m** 1:*15* 103:*9*
**PAGE** 3:*2* 18:*1*
22:*4, 6* 23:*23* 33:*2*
48:*9* 61:*23* 75:*1, 22*
89:*5, 6, 15* 92:*16*
94:*19* 103:*8* 109:*3*
164:*20, 23* 165:*11*
166:*2, 5* 181:*20*
182:*6* 184:*4*
**page(s** 188:*5*
**pages** 18:*15*
**papers** 159:*25*
**paragraph** 46:*4* 75:*7*
126:*21* 165:*15*
181:*10* 182:*5, 10*
**paren** 43:*11*
**part** 6:*4* 10:*23*
11:*12* 15:*18* 20:*25*
22:*19* 37:*22* 39:*16,
24* 40:*18* 41:*1* 50:*24*
51:*17* 68:*10* 71:*12*
76:*20* 77:*24* 78:*13*
86:*1* 89:*14* 90:*2, 9*
107:*1* 111:*10* 119:*3*
128:*16* 133:*23* 152:*6*
153:*10* 166:*14, 17*
169:*2* 172:*15* 181:*11*
**participated** 9:*23*
89:*3*
**particular** 17:*10*
21:*23* 59:*14* 66:*20*
71:*7* 77:*7* 107:*6, 7*
110:*22* 117:*23* 138:*8*
141:*11* 144:*23* 146:*3*
147:*18* 161:*11* 168:*7*

Deposition of Eric Starkloff

**particularly** 49:*11* 70:*1* 77:*24* 83:*8*
**parties** 186:*25* 187:*5, 8* 188:*13*
**Partners** 75:*21* 76:*16*
**parts** 135:*18*
**party** 102:*23* 187:*1*
**passed** 70:*1, 4, 5*
**passing** 109:*10*
**pause** 10:*7* 53:*15*
**paused** 53:*11* 137:*20* 172:*17*
**pay** 31:*18* 163:*17* 170:*15* 173:*21*
**PDF** 133:*20*
**peak** 34:*1* 163:*1*
**Pedro** 22:*7*
**penny** 37:*24* 38:*10, 18* 39:*7, 19*
**people** 11:*10* 66:*7* 116:*4* 128:*6* 136:*11* 147:*24* 179:*19, 20*
**perceived** 31:*7* 162:*9* 169:*1*
**perceiving** 148:*1*
**percent** 34:*25* 87:*6* 160:*7*
**perception** 142:*23*
**perform** 115:*10*
**performance** 39:*23* 89:*25* 101:*15, 18* 135:*8* 136:*13* 159:*15, 20*
**period** 11:*7* 17:*13* 19:*25* 26:*9* 34:*10* 48:*1* 65:*1* 66:*17* 71:*8* 77:*16* 85:*24* 86:*13* 91:*1, 3* 98:*18* 99:*2* 104:*1* 111:*15* 115:*22* 117:*18, 19* 127:*13* 138:*11* 143:*25* 145:*20* 148:*25* 149:*17* 151:*12* 153:*6* 161:*1, 2* 173:*7* 175:*23* 178:*14*
**person** 181:*17, 19* 185:*13*

**personal** 24:*15* 154:*3, 4* 176:*24* 179:*3* 180:*14*
**personally** 149:*7, 9, 14* 172:*3* 178:*6* 180:*13* 185:*10*
**perspective** 125:*6*
**perspectives** 182:*8*
**pertinent** 175:*9*
**Peter** 2:*21*
**petered** 123:*7, 21* 124:*16* 125:*18*
**phone** 26:*4, 6* 153:*25* 154:*2, 3, 5, 11, 15, 16, 20, 22, 24* 155:*1, 3*
**phones** 155:*4*
**phrase** 173:*11* 180:*10*
**physical** 155:*22*
**picture** 175:*22*
**pill** 116:*16*
**pipeline** 112:*3* 123:*6, 18* 128:*10*
**place** 53:*12* 54:*3, 4* 55:*19* 56:*1, 6* 87:*10* 102:*7* 106:*5* 112:*23* 162:*22* 172:*2, 5* 175:*3* 180:*11, 12*
**Plaintiff** 1:*13*
**PLAINTIFFS** 2:*2* 5:*7*
**plan** 15:*9, 12, 19* 16:*6, 8, 10, 16, 20* 30:*9* 46:*5* 62:*9* 92:*16* 130:*13* 137:*2, 3, 19* 139:*21* 140:*1* 149:*12* 153:*15* 160:*19, 20* 165:*16* 166:*22* 167:*13* 178:*12, 15, 16, 23, 24* 180:*11*
**planned** 61:*4, 10* 62:*1* 85:*14* 92:*24* 136:*23*
**planning** 60:*17*
**plans** 80:*6, 25* 104:*2*
**Platform** 7:*19* 154:*11*

**plausible** 121:*6, 23* 122:*24* 127:*6* 128:*16* 129:*2, 6* 131:*12*
**play** 74:*19* 149:*13* 164:*6*
**please** 5:*4* 10:*18* 42:*6* 48:*11* 87:*14* 158:*1* 181:*3*
**plural** 97:*8*
**plus** 160:*7*
**point** 7:*10* 8:*6* 15:*5* 17:*7, 11* 19:*4* 22:*20* 23:*25* 24:*2* 25:*8, 20* 34:*1, 9* 37:*12, 14* 38:*7* 39:*8, 21* 47:*24, 25* 49:*1, 3, 7* 51:*4, 10* 59:*25* 61:*1, 7* 63:*14* 65:*2* 71:*5* 74:*19* 76:*25* 77:*12* 81:*6* 82:*19* 83:*4, 21* 85:*14* 86:*2, 4* 87:*23* 88:*9* 90:*24* 94:*19* 95:*14, 17* 110:*22, 25* 111:*14, 17* 112:*5, 25* 119:*18* 120:*8* 123:*5, 18* 125:*21* 128:*22* 130:*14* 135:*14* 137:*12, 16* 139:*18* 144:*7* 162:*23* 172:*7, 11* 174:*23* 177:*20*
**pointed** 91:*21*
**points** 14:*10* 16:*19* 41:*3* 85:*8* 109:*24* 110:*16* 111:*19, 22* 112:*1* 119:*5, 6* 126:*22* 173:*10* 178:*13, 14*
**poison** 116:*15*
**policy** 144:*22*
**Polk** 75:*21*
**portfolio** 9:*5*
**portion** 94:*17, 18*
**position** 6:*18, 20* 16:*24* 22:*19* 25:*2, 3* 79:*11* 81:*8* 110:*3* 124:*7* 137:*25* 138:*10* 148:*20* 158:*16* 171:*5* 174:*20*
**positions** 6:*24* 11:*24*

**positive** 103:*25* 104:*17, 23* 105:*13* 163:*20*
**positively** 99:*18*
**possession** 13:*8* 156:*4* 176:*12, 25* 177:*8, 12* 178:*3*
**possibilities** 67:*6* 80:*4* 121:*4* 130:*2*
**possibility** 47:*22* 63:*17, 21* 78:*21* 79:*12, 24* 80:*3* 93:*4* 94:*1* 107:*16* 130:*6, 14* 131:*8*
**possible** 18:*24* 29:*7* 56:*23* 90:*19* 110:*1* 116:*6* 120:*20* 121:*4, 11, 12* 122:*2, 3* 128:*23* 129:*3, 6, 11* 149:*23* 178:*19*
**possibly** 39:*12* 45:*13* 46:*3* 47:*2* 75:*12* 140:*9* 147:*9* 148:*6* 166:*17* 170:*15*
**post** 162:*12*
**potential** 65:*5* 89:*21* 110:*1* 112:*3, 4* 119:*20* 123:*20* 128:*10*
**potentially** 78:*16*
**PowerPoint** 4:*2* 17:*25* 18:*5* 41:*16* 81:*19* 103:*5* 133:*22* 135:*15*
**practice** 88:*20* 173:*2*
**precise** 35:*17* 44:*23* 115:*18*
**precisely** 115:*24*
**preclude** 177:*9*
**predated** 80:*10, 20*
**pre-dating** 25:*17*
**predicated** 141:*6*
**preface** 13:*24*
**prefer** 75:*8*
**preference** 30:*11* 46:*6*
**preferred** 136:*6* 138:*18, 20, 21*
**premise** 146:*13, 14*

**premium** 33:*4* 70:*8, 10* 162:*14*
**preparation** 58:*16*
**prepare** 63:*13* 64:*12* 65:*5* 79:*24* 93:*3* 130:*5*
**prepared** 30:*5* 63:*25* 64:*1, 3, 16* 79:*1* 96:*16*
**preparedness** 67:*4* 79:*4*
**preparing** 63:*16* 66:*24* 111:*6* 121:*4* 188:*9*
**preponderance** 105:*15*
**PRESENT** 2:*20* 5:*7* 11:*16* 20:*14* 44:*18*
**presentation** 18:*5* 19:*12* 41:*16* 66:*20* 82:*11, 15* 86:*22, 25* 103:*5* 104:*3* 134:*4, 13, 19, 24* 135:*1, 2, 5, 12, 15, 20* 150:*21* 182:*11*
**presentations** 11:*13* 168:*9, 18, 22*
**presented** 20:*15, 19* 41:*7, 23* 44:*24* 46:*13* 76:*17* 78:*19* 81:*23* 124:*22, 23* 135:*20* 146:*14*
**presenting** 126:*17*
**president** 7:*18, 21, 22* 8:*2, 12, 14* 9:*10, 17* 10:*4, 11, 12* 24:*20* 60:*15, 16*
**pressure** 42:*11*
**pretense** 135:*1*
**pretty** 64:*2* 83:*6* 90:*13, 24* 93:*13* 125:*9* 128:*8* 163:*25* 164:*10* 171:*13*
**prevent** 177:*1*
**previous** 25:*16* 53:*6* 74:*2* 134:*1* 171:*13* 179:*6*
**previously** 24:*7* 28:*20* 76:*16* 77:*20*

115:*12* 134:*2* 136:*8, 23* 157:*5* 171:*6*
**price** 31:2, *11, 19* 32:*11, 20, 23* 33:*4* 39:*7, 9, 19* 50:*3* 56:*10* 57:*2* 70:*9, 22* 71:*1* 72:*12* 73:*13* 75:*12* 84:*17* 99:*10* 101:*5* 106:*17, 22* 115:*14* 139:*25* 140:*23* 141:*8, 23* 142:*11* 143:*9* 162:*14, 15* 169:*24* 170:*2* 178:*13* 179:*1*
**prices** 139:*23* 142:*7, 21*
**pricing** 96:*10*
**primarily** 60:*17* 80:*15* 159:*11*
**primary** 11:*6* 86:*19* 103:*23* 108:*3* 135:*11* 168:*23* 181:*17*
**principal** 179:*19*
**prior** 24:5, *10* 41:*10* 47:*9* 56:*13* 57:*4* 73:*7* 78:*6* 82:*12* 83:*15* 85:*2* 93:*8* 128:*21* 134:*15, 22* 141:*16* 142:*13* 161:8, *22*
**priorities** 89:*24* 173:*19, 20* 174:*4, 5*
**priority** 124:*13*
**private** 9:*4* 43:*3, 6, 15, 23* 45:*12* 166:*14* 167:*7, 16, 17, 18*
**privately** 125:*23* 126:*6, 7* 167:*9*
**pro** 109:*13*
**probability** 60:*1* 64:*1, 5, 9, 11, 16, 17* 79:*7* 124:*9*
**probably** 6:*22* 7:*19, 20, 22* 8:*11* 9:*23* 11:*3* 32:*12* 38:*3* 42:*24* 58:*21* 68:*23* 85:*24* 94:*9* 98:*2* 121:*21* 124:*24* 127:*12* 130:*18*

132:*11* 134:*17* 150:*20*
**problem** 34:*7*
**Procedure** 1:*19* 187:*13*
**proceed** 30:*5* 152:*25*
**proceeding** 187:*9*
**process** 89:*4* 97:*3* 114:*18* 116:*25* 117:*20* 160:*23*
**procure** 86:*14*
**produced** 1:*12*
**product** 7:*4, 9* 80:*17*
**products** 86:*15* 91:*5* 159:*5, 12, 14, 16* 160:*9, 13*
**profit** 80:*19*
**profitability** 135:*9*
**program** 172:*21*
**Project** 48:*20* 49:*5* 60:*21* 87:*16* 95:*1*
**projection** 96:*8* 97:*4*
**projections** 20:*3*
**promptly** 97:*21*
**proper** 54:*18, 20*
**proposal** 29:*25* 75:*3* 89:*16* 162:*2, 7* 164:*24* 167:*20*
**proposals** 169:*13*
**proposed** 30:*18* 170:*5, 8*
**pros** 109:*6, 9*
**prospect** 171:*9*
**prospects** 89:*23* 90:*5* 101:*15, 17* 105:*6* 136:*13*
**proved** 128:*24* 185:*10*
**provide** 153:*17*
**provided** 107:*1* 175:*8* 182:*8*
**providing** 89:*17* 150:*10*
**provisions** 1:*19*
**proxy** 116:*24*
**public** 20:*22* 31:*15* 32:*1* 33:*16* 43:*10, 22* 45:*13* 46:*3, 9, 16* 47:*7* 51:*4* 56:*11* 57:*2* 61:*7* 72:*12*

82:*4, 20* 83:*4, 11, 19* 84:*14* 90:*5* 92:*24* 93:*18* 106:*4* 112:*2* 116:*17, 23* 121:*7, 13, 16* 122:*25* 125:*24* 126:*5, 7* 127:*18* 128:*18* 131:*9* 132:*14* 140:*14, 22* 141:*5, 8, 19* 142:9, *22, 23* 143:*20, 22, 24* 144:*8, 14, 25* 145:*13, 18* 146:*18* 147:*8* 148:*3, 24* 149:*3* 161:*13, 21* 165:*8* 166:*18* 167:*12, 17, 18* 178:*17* 185:*21*
**publicly** 14:*8* 123:*19* 127:*18* 128:*9* 138:*12*
**pull** 17:*16* 21:*10* 32:*13* 164:*12* 165:*20* 181:*3*
**punchline** 59:*19*
**purchase** 20:*21* 32:*19* 119:*19*
**purchased** 148:*24* 149:*16*
**purchases** 53:*8, 10, 11* 139:*22* 140:*1* 171:*24*
**purchasing** 29:*20* 30:*21* 31:*10* 68:*7* 96:*12*
**pure** 164:*5*
**purpose** 103:*22* 126:*23* 185:*15*
**purposes** 126:*15* 154:*15*
**pursuant** 1:*18* 186:*23* 187:*12*
**pushback** 138:*14*
**pushed** 137:*8*
**put** 51:*7, 15* 55:*19* 56:*1, 5* 75:*17* 106:*10* 180:*11, 12*
**putting** 54:*2* 130:*13*

**< Q >**
**Q1** 87:*7*
**qualitatively** 106:*15*
**quality** 159:*10*

Deposition of Eric Starkloff                                   In Re National Instruments Corporation Securities Litigation

**quantitatively** 106:*14* 153:*8*

**quarter** 17:*10* 23:*9, 12, 13, 18* 94:*20* 95:*1, 6, 7, 15, 19, 21* 139:*14, 15* 140:*2*

**quarterly** 173:*21*

**question** 10:*18* 13:*25* 18:*7* 21:*17* 26:*18, 19, 20* 28:*13* 34:*15* 35:*7* 36:*3, 25* 37:*3, 5, 7, 13, 21* 38:*10, 17* 40:*8* 41:*19* 45:*25* 55:*6, 8* 56:*20, 23* 58:*9* 71:*15, 19* 72:*3, 17, 23* 73:*22* 74:*9, 13* 76:*24* 79:*18* 85:*5* 87:*14* 90:*16* 91:*13, 17* 109:*4* 113:*16* 126:*10* 129:*20* 142:*13* 146:*17* 147:*17* 148:*1, 21* 164:*19* 166:*25* 175:*18*

**questioned** 132:*16, 18*

**questioning** 38:*4* 139:*6*

**questions** 36:*20* 109:*2* 157:*17* 166:*9* 168:*9* 169:*8* 171:*20* 179:*7* 180:*24* 182:*12* 183:*3, 6*

**quibble** 70:*13*

**quick** 10:*7* 55:*4* 109:*23* 171:*13* 179:*10*

**quickly** 90:*15* 136:*8*

**quite** 18:*24* 20:*8* 24:*1* 25:*19* 39:*14* 55:*17* 71:*20* 75:*11* 80:*13* 81:*24* 82:*16* 113:*6* 114:*24* 116:*24* 125:*10* 139:*19* 164:*3* 170:*3*

**quizzical** 115:*15*

**quote** 126:*23*

**quote/unquote** 165:*9*

**< R >**

**raise** 75:*12*

**raised** 132:*8, 22*

**ran** 56:*10* 146:*7, 18*

**range** 78:*14, 15, 17* 80:*3* 83:*5* 112:*19* 120:*12, 21* 129:*12* 142:*6*

**rapidly** 86:*7* 110:*17*

**Rapp** 62:*8* 113:*10, 19* 125:*3*

**Rapp's** 21:*2* 61:*24*

**reach** 25:*22* 126:*6, 7*

**reached** 12:*11*

**reaching** 161:*23* 162:*13*

**react** 106:*9* 141:*5*

**reacted** 141:*12* 142:*21*

**reaction** 162:*6*

**read** 10:*24* 46:*21* 100:*17* 101:*11* 103:*9* 108:*24* 118:*9* 122:*4, 17, 19* 123:*2* 133:*7* 159:*24* 165:*18* 185:*1*

**reading** 58:*11* 74:*25* 77:*13* 89:*15* 95:*3* 100:*10*

**reads** 166:*16*

**ready** 108:*23* 118:*11*

**real** 10:*7* 56:*10* 75:*16* 130:*6* 179:*10*

**realistic** 62:*25* 63:*7, 21*

**reality** 18:*14* 51:*23* 99:*22* 111:*19* 115:*3*

**really** 30:*13* 75:*18* 76:*14* 81:*7* 85:*1* 88:*23* 96:*13* 120:*13, 21* 122:*11* 124:*7* 134:*7* 135:*7, 9, 18* 143:*3* 148:*22* 163:*19* 173:*16*

**realm** 55:*25*

**reason** 14:*10* 21:*24* 32:*18* 39:*16* 41:*21* 49:*24* 62:*3* 63:*12* 70:*13* 91:*25* 98:*4, 8, 9* 122:*9* 175:*17* 178:*21* 184:*4*

**reasonable** 31:*19* 43:*1* 68:*15* 109:*18* 112:*24* 113:*3, 6* 120:*24*

**reasoning** 90:*23*

**reasons** 54:*6* 56:*7, 24* 90:*18* 91:*24* 93:*2* 101:*3* 107:*23* 138:*4* 188:*5*

**recall** 6:*10* 7:*3* 8:*4, 9, 20* 14:*16* 15:*23* 16:*8, 9, 19, 21* 20:*9, 15, 18, 24* 21:*1* 23:*4* 26:*1, 14* 29:*8* 41:*8* 44:*19* 47:*24* 48:*4, 6* 50:*22, 24* 55:*9, 22* 58:*11, 14* 60:*24* 61:*1, 6, 20* 65:*7, 14* 66:*18* 69:*2* 70:*25* 77:*6, 10* 85:*17* 86:*5* 90:*22* 91:*23, 25* 92:*8* 96:*19* 97:*17, 25* 98:*9, 11, 17, 22* 99:*7, 12, 17, 19* 100:*1, 11* 102:*19* 104:*9, 10, 20* 106:*1, 6, 13, 14, 19, 21, 24* 107:*9, 13* 114:*15, 22* 115:*17, 20* 119:*11, 17* 120:*1, 12* 122:*15* 124:*21* 125:*1, 15, 19, 20* 126:*16* 127:*24* 136:*10* 137:*1* 139:*6, 17* 141:*18* 149:*12* 150:*7* 152:*10, 18, 19, 22, 23* 153:*2, 10, 18* 157:*3* 169:*14* 178:*11* 180:*2*

**receive** 176:*18* 177:*19*

**received** 27:*25* 42:*3, 4* 48:*18* 49:*6* 67:*25* 68:*3* 69:*15* 72:*1, 10* 99:*18* 118:*17* 171:*21, 22* 176:*6, 17, 22, 23* 177:*23* 180:*24*

**receiving** 167:*19*

**Recess** 57:*11* 67:*15* 108:*16* 118:*2* 153:*22*

**recipient** 102:*14*

**recognize** 21:*18, 19* 28:*14* 41:*20, 25* 48:*16* 58:*10* 61:*19* 67:*22* 81:*17* 88:*17* 92:*7* 100:*20* 109:*4* 118:*15* 133:*13*

**recognized** 121:*22*

**recognizing** 120:*9*

**recollection** 15:*17* 27:*10, 22* 49:*24* 53:*18* 66:*11* 69:*7* 71:*10* 108:*8* 134:*3* 162:*21* 163:*6* 179:*18*

**recommendation** 176:*16*

**record** 1:*20* 5:*4, 9* 17:*19* 21:*14* 28:*15* 48:*13* 57:*9, 12* 58:*6* 61:*7* 67:*12, 13, 16* 81:*14* 88:*13* 94:*14* 108:*12, 14, 17* 117:*25* 118:*3* 153:*20, 23* 154:*15* 183:*10* 186:*17, 25*

**recounting** 103:*17* 105:*7*

**recovered** 163:*4, 8*

**reduce** 85:*2*

**reduction** 80:*19* 137:*2*

**reductions** 84:*7*

**reengaging** 139:*4*

**refer** 9:*13* 59:*1*

**reference** 69:*23*

**references** 28:*18*

**referred** 49:*2, 4* 52:*21* 58:*18* 150:*18* 172:*22*

**referring** 31:*22, 24* 32:*13* 34:*2* 45:*24* 62:*9* 77:*4* 92:*19* 103:*15* 109:*17* 122:*7, 8, 14* 123:*18* 132:*11* 137:*11* 149:*9* 167:*10*

**refers** 22:*12* 33:*3* 42:*14* 94:*20* 118:*23* 150:*22*

**reflect** 152:*21*

**reflected** 104:*25*

Deposition of Eric Starkloff

In Re National Instruments Corporation Securities Litigation

105:*15*

**reflective** 68:*4* 119:*6*
**refresh** 66:*11* 182:*20*
**refreshed** 177:*19*
**regard** 68:*7, 19*
109:*19* 126:*11*
127:*11*
**regarding** 66:*12*
119:*1*
**regards** 128:*10*
**regular** 13:*7* 22:*3*
85:*24* 125:*9*
**regularly** 21:*7*
**reinforce** 110:*3*
**reiterate** 101:*18*
**reiterated** 69:*20*
111:*16*
**reiterating** 69:*17*
170:*13*
**reject** 60:*10* 79:*9*
92:*12* 97:*9, 14* 98:*5,*
*12* 101:*14* 102:*24*
**rejected** 39:*13, 14, 17*
65:*3, 22* 70:*5* 73:*7*
74:*2* 78:*6, 19* 79:*8*
97:*23* 127:*22* 141:*9,*
*22* 142:*10* 144:*7*
148:*18* 171:*6* 172:*9,*
*13* 177:*13* 179:*6*
**rejecting** 62:*19*
64:*19* 65:*10* 66:*12,*
*23* 68:*18* 105:*21*
107:*15* 114:*11*
169:*12* 171:*5, 24*
**rejection** 59:*25*
62:*25* 65:*25* 76:*23*
98:*12* 99:*5* 100:*5*
101:*18* 102:*22, 25*
104:*24* 105:*25* 108:*5*
143:*23* 169:*20* 171:*8*
174:*21*
**rejections** 122:*22*
**relate** 174:*16*
**related** 15:*9* 25:*23*
66:*4, 25* 85:*23* 89:*10*
156:*20* 187:*8*
**relations** 11:*2*
**relationship** 25:*6*
104:*15* 168:*4, 6*

**relationships** 167:*25*
**release** 106:*4* 172:*14*
**relevant** 73:*14* 94:*1*
99:*13* 101:*6* 175:*18*
**remain** 70:*18* 156:*4*
**remained** 122:*23*
123:*23* 139:*18, 25*
**remember** 7:*16*
21:*20, 23* 27:*18* 28:*4*
42:*1* 57:*18* 67:*24*
69:*8* 75:*5* 85:*16*
100:*3* 105:*10* 119:*9*
126:*11, 13, 19* 127:*7,*
*9* 132:*9* 150:*11, 14*
152:*14* 155:*11* 163:*3*
180:*10*
**remind** 66:*2* 73:*23*
118:*6* 133:*3*
**reminder** 11:*16*
**remotely** 91:*17*
**remove** 175:*5*
178:*17, 18*
**render** 180:*4*
**rendered** 179:*25*
**rendering** 150:*15*
**repeat** 87:*13*
**report** 21:*5*
**reported** 1:*17*
**reporter** 5:*5* 48:*11*
87:*11, 13* 94:*12*
100:*15* 108:*12, 21, 25*
118:*8, 10* 133:*5, 8*
186:*13*
**Reporter's** 4:*7* 186:*8*
**represent** 145:*10*
157:*14*
**representation** 124:*25*
**representatives** 182:*7*
**represented** 89:*1*
**representing** 5:*11, 21*
**represents** 59:*15*
61:*21*
**repurchase** 19:*17*
153:*6* 172:*16* 174:*17*
**repurchases** 19:*25*
20:*25* 95:*4, 16, 25*
96:*9* 137:*9* 152:*4*
172:*23* 176:*8*
**repurchasing** 175:*19*
**reputable** 75:*24*

**requesting** 45:*12*
46:*2* 166:*14, 17*
167:*7*
**require** 157:*1*
**required** 86:*14*
**requirements** 187:*12*
**requiring** 72:*17*
**research** 8:*7*
**respect** 11:*5, 6* 36:*15*
61:*10* 111:*25* 112:*1*
168:*15*
**respond** 40:*4* 98:*20*
101:*4* 102:*8* 165:*5*
**responded** 182:*12*
**responding** 119:*15*
131:*8*
**responds** 100:*7, 25*
**response** 45:*12* 46:*2*
59:*21* 77:*7, 23* 86:*5*
89:*11* 97:*25* 98:*1*
137:*5* 140:*23* 166:*17*
171:*14* 182:*2*
**responsibilities** 11:*17*
131:*22* 145:*9* 146:*5*
147:*23* 168:*11*
**responsibility** 8:*7*
9:*25* 60:*25* 61:*2*
147:*18, 20*
**responsive** 35:*19*
**rest** 134:*5, 20* 168:*10*
175:*7*
**restate** 55:*8* 102:*2*
129:*19*
**restated** 76:*23* 78:*4*
**restrict** 50:*8*
**restriction** 49:*10, 11*
51:*15* 53:*12, 13* 54:*3,*
*4, 5* 55:*19* 56:*1, 5*
137:*12, 20, 22, 23*
147:*3* 149:*13* 152:*9,*
*10, 18* 153:*14* 172:*2,*
*14, 17, 20* 174:*22*
175:*3* 176:*13*
**restrictions** 53:*8*
**restroom** 55:*5*
**result** 134:*12* 135:*13*
136:*25* 156:*19*
**resulted** 80:*18*
161:*18*
**results** 151:*1*

**resume** 137:*23*
138:*15* 171:*23*
175:*19* 176:*8, 13*
**resumed** 137:*13*
**resuming** 138:*1*
**retired** 25:*3, 4*
**return** 17:*4* 122:*24*
137:*19* 172:*18*
173:*25* 186:*21*
**returned** 188:*2, 4, 6*
**returns** 173:*24*
**revenue** 87:*2, 5, 8*
91:*4* 107:*12* 159:*20*
160:*10*
**review** 88:*20* 89:*3*
**reviewed** 41:*10*
58:*14* 88:*19*
**reviewing** 57:*21*
66:*20* 104:*2*
**rewrite** 110:*12, 21*
**right** 8:*16, 18* 15:*6,*
*10, 21* 17:*15* 19:*16*
20:*22* 22:*11* 24:*3*
26:*4* 28:*2* 29:*16, 22*
34:*13, 19* 39:*9, 19*
40:*2, 14, 16, 21, 24*
41:*7* 44:*14, 16* 45:*17*
46:*17, 24* 47:*19*
48:*25* 50:*20* 51:*18*
52:*5, 15* 53:*16* 54:*7*
56:*11* 57:*2, 17, 19, 24*
58:*1, 2, 17* 59:*8* 60:*2,*
*11* 62:*20* 63:*9, 17, 22*
64:*13, 22* 65:*5, 23*
66:*2* 67:*1* 68:*21*
69:*1, 18, 22, 23* 70:*22*
71:*4, 13* 73:*16* 75:*24*
76:*21* 80:*7, 25* 81:*21*
86:*4, 10* 89:*8, 12*
90:*11, 20* 92:*9, 13*
93:*6* 94:*3* 95:*19, 22*
96:*1, 6, 17* 97:*10*
101:*6, 23* 102:*4, 9*
103:*15* 105:*23*
107:*17, 21* 108:*1, 20*
109:*7, 20* 110:*6*
111:*11* 113:*15*
114:*14, 19* 117:*3, 12*
119:*21* 120:*17, 25*
126:*3* 127:*23* 129:*3,*

*17* 130:*6, 17, 23, 24*
131:*10, 14* 132:*1, 24*
134:*16, 20* 135:*15, 21*
137:*9, 17* 138:*8, 16*
139:*5* 140:*3, 4, 6, 10,*
*16* 141:*15* 142:*17*
143:*20* 144:*3* 145:*13,*
*21, 25* 148:*6* 149:*24*
150:*4* 151:*3, 6, 9, 13,*
*18, 19, 23* 154:*21*
157:*6* 158:*15* 159:*17*
165:*20, 25* 167:*13*
181:*12* 182:*3* 183:*8*
**rights** 178:*23*
**risk** 56:*10* 57:*1* 81:*4*
**ROBBINS** 2:*6* 5:*6*
**role** 8:*20* 11:*4* 21:*2*
60:*13, 20, 22* 154:*14*
158:*15, 18*
**roles** 9:*9* 10:*6*
**Rosen** 165:*25*
171:*22* 174:*13* 182:*7*
**roughly** 44:*21* 45:*5*
87:*5*
**RPR** 1:*16* 187:*20*
188:*20*
**RUDMAN** 2:*6*
**Rule** 4:*8* 187:*13*
188:*1, 11*
**Rules** 1:*19*
**run** 7:*1* 144:*14, 25*
**runs** 182:*6*

**< S >**
**Sachs** 75:*21*
**Saint** 2:*16*
**sale** 151:*16* 179:*2*
**sales** 8:*3* 178:*13*
**saw** 41:*9* 114:*17*
134:*19* 159:*2*
**saying** 13:*11, 25*
32:*4* 34:*13* 64:*4, 9*
87:*19* 93:*11, 12, 13*
101:*8* 102:*3, 5* 105:*2,*
*12* 110:*2* 127:*18*
128:*9, 15* 134:*23*
**says** 20:*4* 41:*24*
60:*2, 4, 5* 61:*25*
74:*25* 77:*2* 82:*2*
84:*5* 100:*23* 118:*21*

123:*5, 24* 124:*4*
125:*21* 133:*16*
164:*24* 165:*16* 166:*7,*
*13* 167:*8, 13* 182:*11,*
*17*
**scarcely** 87:*9*
**scenario** 20:*3* 79:*4*
142:*8* 143:*8*
**scenarios** 15:*24* 67:*4*
79:*5* 142:*21* 143:*15*
**school** 158:*1*
**scientists** 159:*9*
**screen** 18:*4*
**seal** 185:*17*
**Sean** 126:*22*
**Sebastian** 126:*22*
179:*15, 18* 181:*16, 19*
**second** 33:*1* 36:*14*
46:*4* 48:*11* 67:*10, 11*
68:*25* 69:*14* 74:*23,*
*24, 25* 78:*11* 89:*11*
92:*12* 94:*9* 95:*7*
97:*9, 14, 22* 100:*5*
101:*4* 103:*8* 105:*22*
107:*15* 114:*11*
139:*12* 165:*15*
170:*11, 22* 171:*7, 24*
173:*23* 174:*21*
**section** 89:*6, 10*
165:*13, 15*
**SECURITIES** 1:*5*
13:*22* 51:*9* 186:*5*
**see** 7:*3* 8:*5* 17:*21*
18:*21* 19:*7, 16, 21*
22:*11, 15* 30:*2, 3, 6,*
*14, 18, 24* 33:*5* 37:*23*
38:*7, 24* 39:*21* 41:*6*
42:*11, 16* 43:*2, 9, 12*
45:*9, 13* 47:*15* 56:*2*
58:*12* 61:*23* 62:*1, 2*
66:*7, 8* 70:*10* 75:*3, 9,*
*19, 22* 76:*19* 77:*4, 5*
82:*5* 84:*7, 19, 22, 24*
87:*6* 88:*8* 89:*5, 18,*
*25* 92:*25* 94:*21*
100:*23, 24, 25* 101:*1,*
*4* 103:*19, 21* 104:*4, 5*
106:*16* 109:*10, 12, 14*
119:*18, 23* 123:*4, 8, 9,*
*10* 125:*21, 24* 126:*1,*

*21, 24* 164:*23* 165:*1,*
*17* 166:*18, 23* 181:*14,*
*25* 182:*6, 10, 15*
**seeing** 100:*6* 160:*16*
**seek** 147:*4*
**seeking** 77:*7*
**seen** 87:*25* 119:*14*
**sell** 144:*15* 145:*1, 19*
147:*9* 149:*8, 10*
178:*6*
**seller** 146:*3*
**selling** 124:*5* 143:*25*
146:*19* 178:*19*
**semi-conductor**
163:*10*
**semi-conductors**
80:*17* 86:*14* 160:*9,*
*13*
**send** 49:*25* 101:*22,*
*23* 102:*4* 108:*6*
120:*11*
**sending** 43:*23* 58:*15*
**senior** 7:*22* 8:*2*
60:*15*
**sense** 44:*1* 66:*16*
100:*4* 107:*5* 138:*10*
**sensible** 84:*10*
**sent** 48:*19* 51:*1*
62:*17* 69:*9* 81:*20*
98:*1, 6* 102:*13*
127:*17* 169:*9, 17*
171:*4, 7, 13*
**sentence** 123:*24*
124:*1*
**September** 92:*18*
95:*22* 118:*18* 143:*25*
144:*15* 145:*2, 20*
146:*20* 147:*9* 148:*13,*
*25* 149:*16* 151:*12, 21*
153:*6* 176:*9* 178:*8*
**series** 157:*17*
**serious** 30:*25* 32:*23*
50:*3* 78:*1, 15, 16*
119:*20*
**seriously** 13:*19*
**seriousness** 76:*20, 24*
78:*12*
**serve** 158:*23*
**served** 187:*4* 188:*12*

**server** 155:*19, 20, 21*
**service** 25:*3*
**set** 51:*14, 20* 110:*15*
122:*12*
**share** 15:*9* 19:*17, 24*
20:*25* 22:*18* 29:*21*
33:*3, 4* 34:*3, 4, 14, 17,*
*18, 20* 35:*8, 9, 14, 15*
38:*12* 53:*15* 56:*10*
57:*2* 61:*4* 62:*20*
69:*18* 70:*8, 10* 71:*1,*
*2, 16* 72:*5, 10, 17, 18*
73:*9, 10* 74:*1, 2* 95:*4,*
*15, 25* 96:*9, 12*
105:*14* 115:*14* 121:*8*
137:*9* 140:*21, 23, 24*
141:*22* 149:*23* 151:*6,*
*9, 13, 15, 21* 152:*4*
162:*7* 170:*5, 7, 9, 21,*
*25* 171:*23* 172:*16, 23*
174:*17* 175:*3, 19*
176:*8* 179:*1, 3, 4*
**shared** 15:*13, 21*
102:*18, 20* 116:*17*
134:*20* 153:*9*
**shareholder** 31:*17, 21*
32:*5, 8, 12, 19* 139:*23*
156:*21*
**shareholders** 17:*5*
23:*13* 31:*22* 32:*10*
96:*13* 104:*1, 18*
137:*19* 138:*5, 20, 21*
144:*21* 145:*11, 13, 16,*
*18* 146:*4* 147:*19*
168:*11* 172:*19* 173:*9,*
*21, 25* 174:*5*
**shareholder's** 173:*17*
**shares** 20:*22* 53:*1*
115:*2* 116:*2* 117:*1,*
*10* 119:*19* 124:*5*
143:*25* 144:*15* 145:*2,*
*19* 147:*9* 148:*11, 24*
149:*16* 151:*8, 10, 11,*
*17, 20* 153:*5* 177:*16*
178:*1, 6, 15, 20*
**sharing** 103:*25*
104:*16* 105:*12*
**ship** 23:*6* 80:*17*
86:*15* 91:*6* 160:*9, 12*

**short** 28:*5* 41:*15* 83:*23* 99:2 170:*3*
**shortage** 107:*13*
**Shorthand** 186:*13*
**Shortly** 114:*11*
**short-term** 80:*19*
**show** 16:22 37:22 66:*10* 69:*4* 87:*1* 109:*14*
**showed** 42:*24* 77:*11* 97:5
**showing** 41:22 44:25 57:*19*
**shown** 33:*24* 95:*18* 96:2, *3* 104:*10* 187:5 188:*13*
**shredded** 155:*23* 156:*1*
**sic** 88:*11*
**side** 12:7, *10* 60:*19* 77:*21* 161:*20* 169:6
**sign** 163:*20*
**signal** 119:*20*
**Signature** 4:*6* 164:*21* 184:*3* 185:2 186:*21* 188:*4*
**significant** 70:2 134:6 163:*20*
**significantly** 14:7 106:22 139:*16* 162:*11* 163:7
**similar** 49:*8* 71:*21* 115:*13*
**Similarly** 20:*4*
**simple** 32:*10* 40:*1* 72:*16*, *17* 143:*15* 146:*17* 165:9 173:*16*
**simplistic** 143:*17*
**simply** 35:*13* 141:22 146:*14* 165:6
**sincere** 30:*21*, 25 31:2 76:*10* 116:*10* 117:2
**sincerely** 115:*4*
**sincerity** 85:5
**singular** 97:8
**sir** 58:2 157:22 179:8
**sitting** 23:*6* 102:*20*

**situation** 12:5 49:*17* 86:7 96:*10* 119:7 152:5
**situations** 12:*17* 14:*11* 49:*14*, *19* 142:*20*
**six** 69:9 70:*1*, *3*, 5 89:7 181:*24*
**skeptical** 139:8
**slash** 43:*10* 92:*17* 119:*1* 126:22
**slide** 19:*13* 20:*16* 42:6, *9*, *23*, 25 43:*2*, *14*, *18* 44:*20* 45:6 47:*12*, *13* 59:*12*, *14*, *15* 77:*11* 82:2 84:*4* 86:*25* 87:7 94:*23* 114:*21* 166:*10*
**slides** 41:*3*, 6, *9* 165:*24* 166:*4*, 5
**slightly** 105:*11*
**small** 27:5, *10* 87:*4*
**smart** 116:*4*
**software** 27:*12* 159:*9*
**sold** 24:*12*, *14* 132:8 149:*14*, *19* 151:*11*, *12*, *14*, *20* 178:*14*, 25 179:*1*
**sole** 52:2
**solely** 14:2
**solicited** 162:*3*
**somebody** 96:*15* 130:*23*
**somewhat** 69:22 70:22
**sorry** 24:*25* 45:*19* 47:*12* 58:*12* 74:*3* 84:*6* 98:*25* 102:*2* 113:*23* 118:*21* 120:7 122:*11* 123:*14* 129:*19* 130:*13* 132:7 149:*21* 159:*1*
**sort** 7:*20* 11:*18*, *21* 27:*14*, *18* 39:*3* 43:*18* 44:*9*, *20*, *22* 46:*13* 55:*21*, *25* 66:*18* 67:*4* 78:*16* 79:6 80:*14* 81:*4* 87:5 88:*25* 96:*10* 97:*24* 108:*4* 109:*23* 115:*16* 120:8,

*9, 10* 123:*24*, 25 131:*18* 134:5 152:*19* 156:*23*, 25 161:*12* 162:*15* 163:8 168:5 169:*1* 172:8, *9*, *10* 178:*17* 179:*16*, 25
**sought** 147:2
**sound** 27:*15* 58:*1* 69:6 151:*23*
**sounds** 15:*17* 38:25 57:*18*, *24* 58:2 71:*4* 106:7, 8 127:6 130:22 140:*4* 147:*25* 151:*19* 152:*1*
**SOUTHERN** 1:2 36:*17* 186:2
**space** 128:7
**speak** 135:*3* 174:*13*
**speaking** 17:*1* 36:*21* 52:*20* 66:*18* 144:*20*
**specific** 21:*21* 50:*24* 65:7 67:*24* 82:*16* 83:6 91:*24* 122:*16* 125:*1*, *10* 127:*10* 137:5 153:2
**Specifically** 87:22 127:*24* 137:2 152:*8* 169:*25* 180:2
**specifics** 16:*20* 50:22
**spectrum** 45:*4*
**speculate** 102:*12* 142:*18* 143:*1*, 2
**speculated** 115:*15* 116:6
**speculating** 115:*16* 120:9, *21* 123:*25* 141:*13*
**speculation** 63:4, *11*, *24* 64:8, *15* 75:*14* 76:*13* 83:*17* 84:*2*, *21* 102:*11* 107:*4* 109:22 111:*13* 113:2 114:*4* 115:7, *25* 116:*13* 117:5 119:*19*, 22 120:7, *13*, *16*, *19* 121:*10*, *19* 123:*13* 125:22 128:*21* 141:*1*, *25* 143:*11* 144:5, *18* 150:6 154:*18* 155:6

**speech** 91:*18*
**speed** 136:6
**spend** 61:*4* 95:*15* 139:*13*
**spending** 86:*13* 130:*1*, *9* 136:*16*
**spent** 20:*6* 22:*18* 60:*18* 61:*3*, 6 62:*4* 95:5, *6*, 25 97:*24* 139:*15* 140:*3*
**spoke** 118:*25*
**spoken** 156:7
**spokesperson** 11:5, *6*
**staff** 66:*9*
**stage** 163:*16*
**stages** 163:*15*
**STARKLOFF** 1:9, *12* 3:*3* 5:2, *14*, *18* 17:*21* 28:*12* 36:*14*, *23* 37:*18* 38:*24* 56:22 58:*9* 61:*18* 67:22 88:*16* 92:*6* 111:*23* 118:*15* 133:*12* 142:*12* 148:*22* 157:*9*, *13* 183:*9* 184:*1* 185:*1*, 5, *10* 186:*10*, *16*
**start** 6:*18* 81:*17* 100:*20*
**started** 110:2 114:*12*
**starting** 9:*24* 11:*3* 163:*17*, *19* 175:2
**starts** 126:22
**State** 1:*16* 10:*18* 84:*25* 185:7, *22* 186:*14*
**stated** 1:*20* 16:*1* 104:7, *9* 138:*12* 142:5 143:*17*
**statement** 40:*11* 46:8, *21* 75:*17* 82:*24* 90:*16* 93:*11*, *17* 103:*18*, *19* 105:*11* 124:*15* 139:7 150:*8*
**statements** 33:*14*
**STATES** 1:1 186:*1*
**stats** 163:*1*
**stenotype** 1:*17*
**step** 108:*1* 109:*10*, *17*, *19* 110:*1*, *23*

111:*1*, *10*   114:*18*
144:*9*
**steps**  64:*20*  65:*4*
66:*4*, *12*, *25*  68:*6*, *19*
79:*11*, *21*  89:*21*
97:*22*  130:*5*
**stick**  36:*7*  59:*4*  74:*5*,
*14*
**stock**  17:*8*  31:*6*
33:*20*  39:*8*, *9*, *18*
43:*9*, *21*  47:*15*, *22*
70:*22*  71:*1*  84:*17*
99:*10*  100:*7*, *25*
101:*5*  106:*16*, *22*
114:*13*, *16*  139:*18*, *20*,
*22*, *24*, *25*  141:*23*
142:*10*, *21*  143:*8*, *16*
146:*19*  149:*8*, *10*, *24*
150:*3*  161:*17*  162:*11*,
*18*, *22*  173:*6*, *24*, *25*
178:*2*, *7*  179:*3*
**stockholders**  20:*22*
144:*11*, *14*  145:*1*
146:*8*, *18*  147:*8*
148:*3*, *12*, *24*
**stop**  36:*22*  37:*13*
78:*20*
**stopped**  117:*21*
**stories**  25:*15*
**strange**  116:*18*
159:*22*
**strategic**  31:*18*
60:*17*  83:*9*  163:*12*,
*16*  169:*5*
**Strategy**  18:*2*  84:*15*
116:*18*  138:*13*  160:*5*
173:*11*, *14*, *18*
**street**  99:*18*
**strength**  108:*5*
**strike**  138:*22*
**stroke**  20:*12*
**strokes**  42:*1*  44:*20*
67:*23*
**strong**  30:*11*  45:*8*,
*11*  46:*6*  89:*23*  91:*5*
101:*15*, *18*  166:*10*, *16*
167:*1*
**strongly**  81:*9*  160:*7*
**structure**  80:*12*

**struggle**  91:*11*
**studies**  6:*5*
**study**  6:*4*  158:*10*
**stuff**  155:*23*  169:*6*
**style**  14:*3*  180:*1*
**sub**  170:*12*
**subheading**  33:2
**subject**  29:*25*  48:*20*
53:*8*, *10*  68:*11*, *12*, *13*
152:*17*
**submit**  123:*22*
**submitted**  186:*19*
**submitting**  97:*2*
**subscribed**  185:*13*
**subsequent**  104:*3*
119:*9*  126:*20*  136:*18*
**subsequently**  163:*7*
**substance**  27:*1*, *4*
42:*18*  104:*6*, *14*
124:*20*  126:*11*
172:*25*
**Substantially**  71:*21*
78:*18*  81:*25*  171:*2*, *5*
**substantive**  135:*18*
**suburban**  157:*23*
**sued**  156:*11*
**sufficient**  31:*3*, *5*
**suggest**  21:*24*
112:*13*  167:*5*, *6*, *14*
**suggested**  77:*8*
78:*12*  107:*16*
**suggesting**  44:*15*
147:*4*
**suggestion**  107:*20*
115:*1*
**suggests**  124:*2*
**Suite**  1:*18*  2:*7*, *15*
**summary**  11:*16*  89:*6*
119:*9*  120:*4*  181:*24*
**summer**  112:*22*
113:*10*, *18*
**supply**  23:*5*  85:*20*
86:*6*  87:*20*  89:*8*
91:*3*  107:*12*  136:*17*
159:*23*  162:*12*, *13*
163:*4*
**support**  23:*24*  31:*17*,
*21*  32:*19*
**supported**  23:*21*

30:*17*
**supportive**  144:*22*
**supposed**  90:*5*
**suppressed**  91:*4*
**Sure**  9:*3*  10:*8*, *9*, *21*
11:*8*  13:*7*, *20*  16:*5*, *9*,
*14*, *17*  19:*3*  25:*13*
37:*19*  38:*13*  45:*23*
50:*6*  57:*19*  63:*19*
67:*11*  76:*4*, *8*  91:*7*
99:*21*  100:*22*  102:*22*
108:*13*  110:*4*  126:*23*
129:*4*  143:*18*  147:*2*,
*24*  154:*8*  156:*3*
157:*19*  159:*9*, *22*, *24*
164:*14*  169:*25*  177:*6*
**surprise**  127:*11*, *25*
164:*11*
**surprised**  163:*25*
**surprising**  170:*13*
**surveillance**  48:*7*
**suspect**  142:*20*
**swear**  5:*5*
**sworn**  1:*14*  5:*15*
186:*16*
**systems**  159:*8*

**< T >**
**tactic**  44:*9*
**tactics**  115:*13*  166:*7*
**Take**  21:*16*  28:*12*
41:*18*  55:*4*  56:*18*
57:*8*  68:*19*  79:*10*
82:*13*  84:*10*  89:*22*
97:*21*  105:*7*  109:*19*
111:*9*  117:*22*  118:*5*
119:*8*, *13*  122:*25*
130:*5*  133:*1*  153:*19*
154:*14*  166:*7*
**taken**  1:*14*  19:*4*
30:*13*  64:*20*  68:*6*
89:*7*  110:*3*  115:*13*
181:*24*  186:*24*  187:*9*
**takes**  102:*7*
**talk**  11:*22*  13:*18*
26:*4*, *6*  27:*6*, *10*  50:*6*
59:*9*  86:*25*  137:*25*
168:*3*  175:*2*
**talked**  25:*14*  27:*11*,
*13*  53:*20*  106:*15*

119:*17*  137:*7*  138:*21*
144:*21*  168:*2*  179:*24*
**talking**  10:*2*  19:*3*
28:*19*  30:*14*  41:*9*
91:*11*  93:*20*  101:*21*
115:*20*  125:*8*  130:*15*
164:*5*  175:*6*  176:*21*
179:*23*  180:*5*  182:*2*
**talks**  42:*9*
**tape**  37:*22*
**target**  83:*7*  124:*11*
**targets**  83:*5*
**team**  7:*10*  17:*14*
110:*15*  130:*9*  131:*1*,
*3*  132:*24*  135:*23*
152:*12*  173:*5*  175:*8*,
*23*  176:*3*
**teams**  7:*11*
**technically**  10:*5*
50:*16*
**techniques**  42:*10*
**tell**  27:*10*  58:*20*
62:*12*  74:*19*  133:*18*
173:*13*
**telling**  86:*11*  98:*6*
**ten**  160:*20*
**tend**  22:*25*
**tenet**  17:*4*  138:*12*
**tens**  20:*21*
**term**  22:*24*  173:*15*
**terminate**  60:*5*
**terms**  16:*3*  102:*21*
130:*13*  159:*5*, *19*, *21*
**test**  159:*8*  164:*3*
**testified**  5:*15*  157:*5*
**testify**  157:*1*
**testifying**  122:*9*
**testimony**  46:*19*
47:*9*  56:*13*  57:*4*
83:*15*  93:*8*  114:*4*
115:*6*  121:*2*, *19*
128:*21*  141:*17*  144:*5*
186:*18*, *24*
**testing**  159:*13*, *15*
**Texas**  1:*17*, *18*, *19*
5:*12*  186:*14*  187:*13*,
*20*  188:*20*
**text**  59:*11*  154:*9*, *10*
**texter**  154:*9*
**texting**  154:*6*, *8*

**Thank** 10:*16* 157:*8* 183:*4*

**thanks** 179:*9*

**theory** 170:*16*

**thereabouts** 25:*5*

**therefor** 188:*5*

**thing** 11:*18* 24:*23* 59:*10* 82:*1* 87:*16* 88:*16* 129:*13* 134:*1* 159:*10* 168:*23*

**things** 7:*16* 40:*19* 44:*15*, *21* 45:*7* 52:*1*, *9*, *20* 63:*25* 64:*18* 66:*10*, *17*, *18* 82:*1* 87:*2* 92:*15* 98:*17* 111:*6* 116:*7* 120:*22* 122:*12*, *14*, *16* 126:*17* 127:*18* 129:*12* 130:*4* 131:*25* 132:*5* 137:*7* 168:*23* 172:*1*

**thing's** 143:*18*

**think** 6:*10* 7:*13* 8:*3*, *19* 11:*19* 20:*8* 22:*5* 24:*22* 25:*1* 26:*18* 27:*20* 32:*22* 34:*8*, *21* 36:*9* 37:*6*, *9* 38:*4*, *15*, *16* 39:*3*, *21* 43:*8*, *18* 44:*1*, *6*, *9*, *18*, *19* 45:*20* 47:*10* 48:*4*, *9* 49:*1* 50:*13*, *23* 52:*8*, *10*, *20* 53:*3* 55:*3* 58:*4* 59:*1* 61:*13* 65:*17* 69:*10* 77:*12* 78:*3*, *14* 79:*3* 80:*2*, *10* 81:*3*, *7*, *24* 82:*23*, *25* 83:*18*, *21* 88:*11* 91:*2*, *14* 92:*3*, *18* 93:*10* 96:*22*, *23* 98:*13* 100:*24* 102:*18* 103:*6* 104:*22* 105:*14* 107:*18*, *22* 108:*3*, *19* 109:*2* 110:*23*, *25* 112:*3* 113:*4*, *6* 116:*23* 119:*4* 120:*5*, *20* 121:*20* 122:*20* 124:*18*, *23*, *24* 125:*9*, *14* 131:*11*, *20* 132:*11*, *12*, *13*, *15* 133:*25* 135:*2*, *19*, *25* 136:*1* 138:*9* 140:*12* 141:*5*

142:*19* 143:*1*, *6*, *14*, *15* 145:*4*, *7* 146:*4*, *11*, *12*, *24* 147:*17* 148:*8* 149:*19* 150:*20* 154:*19*, *20*, *24* 155:*7* 156:*1*, *24* 157:*4* 158:*21* 159:*7* 161:*12* 162:*24* 163:*1*, *22* 165:*23* 168:*2* 173:*10* 174:*9*, *19* 175:*4*, *16*, *20*, *22* 176:*14* 180:*12*, *20*

**thinking** 23:*9* 78:*20* 102:*22* 108:*4* 121:*3* 131:*16* 146:*9* 148:*18* 154:*7* 161:*9*, *12* 170:*9* 172:*4* 174:*3*

**third** 22:*6* 78:*21* 79:*25* 94:*20* 95:*15*, *19*, *21* 119:*18* 139:*14*, *15* 140:*2* 174:*1* 181:*9*, *10*

**thought** 31:*5* 50:*7* 55:*24* 56:*4* 77:*15* 78:*1* 82:*7*, *9*, *10* 83:*6*, *10*, *11*, *18*, *19* 96:*17* 108:*6* 111:*2*, *5* 113:*17* 115:*9* 121:*13*, *15*, *20* 122:*13* 128:*8*, *22* 129:*13* 131:*17* 135:*4* 136:*12* 146:*5*, *6* 162:*13* 164:*9* 171:*11*

**thoughtfully** 50:*5*

**thousand** 136:*11*

**threat** 46:*9*, *24* 47:*7* 81:*5*

**threatening** 45:*13* 46:*3*, *16* 166:*18*

**three** 21:*21*, *22* 48:*5* 76:*1* 77:*18* 158:*20* 164:*20* 173:*19*, *20* 180:*24*

**three-ish** 77:*18*

**Thursday's** 104:*2*

**ticker** 71:*3*

**tied** 137:*2*

**time** 5:*3* 6:*25* 8:*1* 10:*11*, *14* 11:*7* 21:*16* 23:*2*, *3* 25:*18*, *19*

29:*4* 31:*6*, *20* 33:*20* 34:*10* 39:*8* 50:*13* 57:*10*, *13* 58:*19* 60:*14*, *18*, *25* 61:*18* 62:*4* 63:*22* 65:*3*, *15* 66:*17* 67:*14*, *17* 69:*21* 70:*2*, *20* 71:*11* 77:*13*, *15*, *23*, *25* 79:*6* 80:*12*, *16*, *22* 85:*19*, *24* 86:*2*, *11*, *12*, *13* 90:*9* 92:*11* 95:*17* 96:*4*, *12* 97:*24* 98:*4*, *16*, *18* 99:*2*, *24* 102:*19* 105:*1*, *16* 108:*1*, *15*, *18* 109:*10* 110:*23* 111:*15* 115:*22* 117:*8*, *18*, *19*, *23* 118:*1*, *4* 120:*6* 126:*2* 127:*13* 128:*22* 129:*10* 130:*1*, *3*, *10* 131:*15*, *22*, *25* 132:*4* 138:*16* 139:*19* 140:*19* 146:*9* 147:*3* 148:*19*, *25* 151:*8* 152:*9* 153:*21*, *24* 156:*16* 161:*1*, *2* 162:*10*, *23* 163:*9*, *13* 164:*9* 170:*22* 171:*12*, *14*, *16*, *25* 173:*4*, *7* 174:*24* 177:*11* 178:*22* 183:*10* 186:*24* 187:*1*

**timeframe** 65:*8* 107:*10* 140:*17* 144:*16* 145:*2* 148:*13* 149:*8* 163:*3* 176:*9* 177:*4*

**timeline** 10:*3*, *10* 80:*11*

**timely** 45:*12* 46:*2* 166:*17*

**times** 11:*20* 17:*6* 36:*9* 37:*5* 64:*25* 81:*9* 172:*13* 181:*18*

**timing** 16:*3* 30:*4* 46:*4* 106:*2* 165:*13*, *15* 173:*8*

**title** 8:*4*, *8*, *15* 18:*1* 20:*4*

**titles** 7:*19*

**today** 36:*6* 74:*20* 102:*20* 122:*10* 155:*9* 165:*23* 169:*8* 173:*10* 181:*23*

**Today's** 5:*2*

**told** 85:*10* 100:*3* 117:*10* 128:*3* 142:*9*

**tone** 82:*17* 104:*22* 171:*3*

**tonight's** 103:*23*

**tools** 44:*25*

**top** 19:*17* 42:*14* 89:*15* 94:*19* 116:*25*

**topic** 114:*24* 134:*17* 152:*7*, *13*, *24* 179:*22*

**total** 15:*20* 19:*24* 22:*13*

**Totally** 162:*5*

**trace** 157:*25*

**trade** 13:*8* 51:*8*, *13*, *16* 148:*20* 152:*8*, *10*

**trades** 115:*19*

**trading** 12:*22*, *25* 13:*6*, *12*, *13*, *22* 33:*21* 39:*8* 47:*15*, *22* 49:*9*, *10* 50:*8* 51:*15* 53:*8* 54:*3*, *4* 55:*19* 56:*1* 72:*12* 137:*12*, *20*, *22*, *23* 139:*21* 140:*24* 147:*3* 149:*12* 152:*17* 153:*9*, *14* 172:*2*, *14*, *17*, *19* 174:*22* 176:*13* 177:*1*, *10* 178:*12*, *15*, *16*

**training** 13:*7*

**trajectory** 163:*21*

**transaction** 8:*20* 30:*18* 32:*13*, *17* 132:*15* 141:*8* 161:*21* 165:*8* 170:*18* 171:*9*

**transactions** 12:*9*

**transcript** 186:*17*, *19*

**transformation** 163:*13*, *16*

**transformed** 160:*5*

**transitioned** 8:*19*

**travel** 98:*16*

**traveled** 98:*15*

**TRCP** 4:*8* 188:*1*

Deposition of Eric Starkloff                    In Re National Instruments Corporation Securities Litigation

treat  110:*16*
trial  157:*2*
tried  63:*13*
triggers  172:*6*
trouble  131:*7, 13*
true  117:*17*  143:*22*
 185:*3*  186:*17*
trust  62:*23*
trusted  46:*14*
try  7:*3*  38:*6*  55:*18*
 74:*4*  112:*9*
trying  14:*5*  18:*10*
 39:*25*  47:*1, 4*  68:*13*
 84:*22, 25*  86:*8*  94:*5*
 99:*23*  110:*15*  111:*10*
 112:*10*  114:*19*
 120:*10, 11*  138:*22*
 141:*10*  147:*17, 23, 25*
 156:*18, 23*  161:*13, 20*
 169:*22, 25*
turn  15:*2*  83:*12*
turned  129:*14, 16, 22*
 155:*12, 14, 17, 23, 25*
 156:*1*
Twenty  34:*25*
twice  32:*11*  113:*6*
 127:*22*  128:*4*  141:*9*
 144:*7*  170:*6, 7, 9*
 172:*9*  177:*13*
two  10:*6*  16:*19*
 17:*13*  23:*10*  44:*10,*
 *13*  45:*7*  52:*8*  76:*1*
 87:*6*  122:*23*  124:*12*
 133:*17*  141:*21*  168:*6*
 172:*1*  173:*7*  179:*10,*
 *20*  180:*23*
type  11:*18*  42:*1*
types  49:*18*
typical  19:*11*  87:*3*
 90:*13, 24*  93:*13*  96:*9*
 150:*19*
typically  17:*6*  41:*11*
 62:*6*  77:*22*  88:*22*
 99:*2, 17, 18*  180:*3*
typo  58:*21*

< U >
Uh-huh  9:*12*  22:*14*
 29:*18*  60:*9*  89:*13*
 94:*25*  101:*24*  125:*5*

132:*22*  157:*16*
 162:*20*  164:*22*  166:*1,*
 *8, 15*  170:*23*  174:*8*
ultimately  11:*6*  26:*6*
 59:*16*  60:*6*  107:*15*
 116:*20*  172:*18*
 173:*17*
unaffordable  124:*6*
unambiguous  169:*20*
unaware  114:*9*
uncertainty  14:*18*
 55:*23*
uncommon  44:*2, 3*
 49:*11*  96:*11*
uncompelling  111:*17*
underlies  91:*1*
underlying  82:*14*
understand  14:*9*
 16:*12*  18:*10*  34:*12,*
 *13*  44:*4*  45:*24*  46:*1*
 49:*7*  51:*2, 8*  59:*10*
 62:*8*  63:*6*  79:*21*
 105:*6*  157:*18*  165:*3*
 168:*25*  172:*11*
understanding  12:*24*
 13:*6, 11, 17, 21*  19:*8*
 24:*19*  46:*12*  52:*17,*
 *24*  58:*19*  59:*13*  96:*4*
 105:*3*  147:*20*  170:*4*
understands  161:*3*
Understood  9:*16*
 14:*4*  17:*12*  19:*2, 6*
 31:*16*  44:*2*  46:*16*
 47:*6*  49:*20*  51:*13*
 54:*11*  55:*14*  75:*10,*
 *16*  91:*7*  102:*15, 16,*
 *23*  109:*18*  164:*1, 8*
 173:*8*
underway  86:*4*
unique  49:*17*
UNITED  1:*1*  186:*1*
universe  142:*19*
University  5:*24*  6:*5,*
 *12*  158:*2, 8*
unknown  125:*24*
unnatural  112:*20*
unprecedented  87:*8*
unprofessional  54:*24*
 55:*3*
unreasonable  113:*4*

unsolicited  77:*22*
 94:*7*  161:*14, 21*
 162:*4, 5*
unusual  23:*4*  91:*9*
 114:*24*
upcoming  58:*16*
 89:*22*
update  89:*8*  119:*2, 6*
 126:*15*
updated  155:*1*
uploading  18:*19*
urgency  77:*17*
urgent  77:*24*
use  16:*6, 15*  19:*24*
 20:*21*  55:*5, 18*  61:*10*
 62:*12*  83:*7*  107:*1*
 117:*16*  138:*19*  154:*4,*
 *5, 6, 8*  159:*9, 11, 12*
user  26:*15*
usual  94:*6*  152:*25*
 172:*20*  180:*9*

< V >
vague  27:*19*  35:*3*
 39:*10*  54:*14*  140:*11*
vaguely  21:*21*  75:*5*
valley  163:*2*
valuation  33:*2*  105:*1,*
 *17*  168:*24*
value  34:*1, 11*  67:*6*
 75:*2*  82:*13*  105:*18*
 160:*21*  162:*16*
 168:*25*  169:*3*  172:*18*
 174:*2*
variations  59:*17*
various  15:*24*  16:*2,*
 *9*  40:*19*  41:*3*  44:*25*
 79:*3*  131:*2*
vast  129:*25*
verbally  108:*4*
version  59:*7*
versions  18:*22*  59:*17*
 133:*17, 19*
versus  67:*11*  152:*11*
vice  7:*17, 21, 22*  8:*2*
 60:*15*
Videographer  2:*21*
 5:*1*  57:*9, 12*  67:*13,*
 *16*  108:*14, 17*  117:*25*

118:*3*  153:*20, 23*
 183:*5, 8*
VIDEOTAPED  1:*8*
 186:*9*
view  22:*24*  30:*20*
 31:*9*  76:*14*  78:*7, 11,*
 *13*  81:*6*  104:*23*
 126:*2*  141:*7*  144:*10*
 148:*23*  149:*15*
 170:*24*  171:*9*  172:*7,*
 *11*  176:*24*
viewed  30:*24*  31:*1*
 73:*6*  78:*18, 24*
 163:*19*  171:*1*  172:*3*
viewing  79:*6*
views  114:*17*
vigorously  80:*22*
 85:*11*
Virginia  5:*24*  6:*5, 13*
 157:*24*  158:*2, 8*
volume  139:*22*
vote  32:*5, 8*
voted  96:*23, 24*

< W >
Wachtell  40:*23*  41:*1,*
 *2*  42:*19, 23*  44:*14*
 46:*12*  66:*4*  77:*6*
 98:*13*  114:*17, 22*
 117:*10*  125:*3*  152:*3,*
 *11, 24*  153:*4, 8, 16*
 165:*25*  168:*2, 8, 9, 14,*
 *16*  171:*22*  174:*13*
 175:*9, 17*  176:*1, 18*
 177:*19*  179:*13*
 181:*15*  182:*7, 21*
Wait  87:*11*  99:*4*
 100:*4, 23, 25*  102:*3, 4*
waited  99:*7*  101:*3*
waiting  98:*19*
 101:*22, 23*
want  7:*1*  10:*9*
 13:*24*  15:*2*  18:*24*
 19:*7*  28:*13*  36:*5*
 46:*1*  59:*10*  61:*18*
 90:*14*  92:*6*  102:*24*
 108:*7*  110:*12*  135:*3*
 137:*18*  148:*2*  159:*17*
 164:*12*  165:*11, 20*
 171:*20, 23*  178:*18*

**wanted** 82:*12* 83:*24* 90:*8, 18* 93:*2* 104:*13* 105:*5, 14* 107:*23* 134:*3* 135:*22, 23* 136:*11* 156:*3* 169:*18, 20* 172:*10*
**wanting** 160:*13*
**was/was** 188:*2*
**Washington** 157:*23*
**wasting** 63:*22*
**way** 7:*2* 14:*12* 17:*4* 19:*16* 26:*12* 32:*22* 35:*20* 44:*18, 22* 45:*5* 51:*8* 55:*16* 63:*5, 13* 77:*17* 98:*10* 101:*12* 112:*14* 124:*17* 136:*18* 137:*19* 139:*24* 141:*5* 142:*6* 146:*4, 9, 12* 148:*18* 150:*11, 20* 152:*14* 159:*7* 163:*3* 169:*23* 173:*24* 178:*16*
**ways** 76:*22* 79:*4* 81:*4* 170:*13*
**weak** 45:*8* 166:*10, 13, 25* 167:*1, 5*
**Wednesday** 119:*2*
**week** 26:*15* 57:*22* 69:*8* 98:*3* 171:*15*
**weeks** 23:*22* 77:*18*
**well** 10:*5* 11:*3, 21* 16:*10* 17:*25* 18:*17* 19:*4* 24:*13* 25:*8* 27:*19* 31:*24* 39:*15* 40:*2* 43:*21* 45:*22* 46:*11, 21* 51:*2* 53:*12* 54:*5* 60:*21* 64:*25* 65:*2* 69:*21* 70:*3* 79:*4, 9* 82:*24* 84:*22* 87:*25* 96:*3, 14* 98:*19* 101:*11, 21* 102:*14* 104:*14* 105:*4* 106:*21* 111:*18* 113:*15* 115:*20* 116:*19* 117:*9* 120:*6* 125:*2* 127:*4, 7, 20* 130:*15* 133:*16* 135:*3* 139:*2* 140:*8* 145:*6, 16* 146:*6, 16* 148:*2* 154:*11* 160:*2* 161:*2* 165:*9* 169:*7*

172:*3, 4* 174:*20* 177:*2* 179:*17* 181:*10*
**went** 10:*17* 41:*10* 50:*25* 51:*21* 90:*15, 23* 106:*2* 117:*17* 131:*6, 9, 13* 137:*4* 142:*19* 149:*13* 156:*23, 25* 158:*2* 161:*17* 163:*3* 171:*12, 14* 178:*24*
**we're** 16:*15* 17:*20* 19:*3* 27:*21* 35:*25* 41:*21* 58:*4* 69:*10* 93:*20* 117:*16* 133:*4* 173:*19*
**We've** 5:*20* 53:*20* 55:*1* 61:*25* 80:*11* 87:*25* 92:*25* 93:*12* 110:*3* 119:*14* 130:*15* 137:*7* 140:*12* 160:*4*
**Wheelis** 1:*16* 186:*13* 187:*19, 20* 188:*19, 20*
**wholly** 36:*19*
**wide** 83:*4* 112:*19* 120:*12*
**willingness** 75:*11* 109:*14*
**window** 56:*3*
**windows** 53:*9, 11*
**witness** 1:*13* 5:*5, 12* 54:*16, 18* 186:*16, 18, 20, 21*
**witnessed** 11:*19*
**WLRK00001596** 3:*17*
**WLRK-00001596** 65:*20*
**Wolverine** 48:*20* 49:*4* 87:*16* 125:*22* 134:*10*
**word** 14:*6* 61:*10* 62:*12* 102:*1* 133:*21*
**worded** 105:*11* 109:*24* 124:*17*
**wording** 98:*12* 110:*19* 124:*20*
**words** 30:*13* 89:*11* 105:*10* 180:*7, 8*
**work** 6:*16* 30:*11* 46:*7* 75:*1*
**worked** 168:*1*

**working** 25:*14* 27:*13* 91:*6* 109:*19* 160:*5* 169:*5*
**works** 159:*10*
**world** 76:*5* 159:*24*
**world's** 46:*13*
**worth** 64:*12*
**write** 110:*6* 131:*18*
**writes** 166:*21*
**writing** 110:*17* 161:*15*
**written** 98:*6* 104:*21* 153:*17* 182:*6*
**wrong** 96:*17*
**wrote** 62:*11* 110:*4* 113:*11, 20*

**< Y >**
**Yeah** 7:*7, 9* 12:*10* 13:*24* 14:*16* 15:*16, 23* 16:*10* 18:*9* 19:*11* 25:*16* 26:*20, 21* 27:*9, 22* 28:*21, 22* 29:*7* 31:*5* 34:*22* 35:*24* 36:*12* 38:*4* 44:*6* 45:*15* 46:*4, 20* 47:*10* 49:*1, 17* 50:*22* 51:*20* 52:*8, 9* 53:*4* 58:*14* 59:*5* 60:*4, 12* 61:*8, 20* 62:*7* 63:*12, 20* 66:*1* 67:*23* 68:*12* 69:*8, 9, 16, 25* 70:*7* 73:*1, 2, 22* 74:*11, 14* 75:*5, 15* 76:*1* 77:*20* 80:*2, 4* 82:*6* 83:*16* 84:*3, 24* 87:*9* 88:*18, 19, 22* 89:*8, 19* 90:*22* 92:*8, 14, 22* 93:*25* 94:*5* 96:*8* 97:*6* 99:*3* 100:*1, 22* 101:*2* 102:*12, 16, 18* 107:*22* 109:*12* 113:*3* 115:*8* 116:*14* 118:*16, 19, 20* 119:*4, 16, 23* 120:*3* 125:*8* 127:*24* 128:*5* 129:*8* 131:*11, 15, 17* 132:*5, 11* 133:*24, 25* 134:*17, 21* 135:*25* 136:*2* 138:*18* 140:*12* 141:*18* 142:*15*

143:*14* 145:*17* 146:*2, 24* 147:*10, 17* 148:*8* 149:*19, 25* 150:*19* 151:*14, 15* 152:*19* 154:*8* 155:*7, 12* 156:*2, 6, 20* 158:*2* 159:*1, 7, 15* 161:*11* 162:*9, 24* 165:*7* 166:*12, 24* 167:*24* 168:*23* 169:*18* 170:*11* 171:*11* 172:*1* 173:*1, 15* 174:*19* 175:*12* 176:*2* 178:*12* 179:*5* 180:*6, 14, 18, 20* 181:*5, 7, 16*
**year** 6:*22* 15:*21* 16:*6* 17:*11, 13* 22:*13* 23:*4, 10* 24:*1* 28:*24* 29:*3, 10* 61:*5, 25* 62:*5* 85:*4* 93:*22* 137:*17* 158:*4* 159:*22, 23* 160:*11, 14, 20* 173:*7*
**years** 15:*13* 21:*22* 23:*10* 48:*6* 92:*25* 93:*12* 106:*20* 173:*2*
**Yep** 42:*8* 48:*17* 77:*5* 92:*11* 95:*2* 109:*8* 126:*25* 164:*18* 165:*2* 166:*6*
**YORK** 1:*2* 2:*8* 36:*16, 18* 186:*2*
**you-all** 119:*6* 126:*24*

**< Z >**
**Zierlein** 2:*21*
**Zoom** 2:*3, 4, 5* 5:*12, 20*

## WORD LIST

**< $ >**
**$10**  *(5)*
**$100**  *(4)*
**$15**  *(1)*
**$250**  *(5)*
**$31**  *(6)*
**$33**  *(1)*
**$40**  *(16)*
**$42**  *(2)*
**$48**  *(34)*
**$5**  *(1)*
**$6**  *(1)*
**$60**  *(2)*
**$80**  *(1)*

**< 0 >**
**07**  *(1)*

**< 1 >**
**1**  *(3)*
**1:23**  *(1)*
**1:23-cv-10488-DLC**
 *(2)*
**10**  *(7)*
**10:35**  *(1)*
**10:48**  *(1)*
**100**  *(3)*
**10170**  *(1)*
**102**  *(1)*
**108**  *(1)*
**10B5**  *(1)*
**11**  *(2)*
**11:08**  *(1)*
**11:10**  *(1)*
**11th**  *(1)*
**12**  *(5)*
**12:22**  *(1)*
**12:23**  *(1)*
**12:37**  *(1)*
**122**  *(1)*
**1266**  *(1)*
**12th**  *(1)*
**13**  *(7)*
**132**  *(1)*
**14**  *(6)*
**1460**  *(1)*
**15**  *(4)*

**150**  *(1)*
**1509**  *(1)*
**156**  *(1)*
**16**  *(5)*
**1611**  *(1)*
**16144**  *(1)*
**1698**  *(1)*
**16th**  *(2)*
**17**  *(4)*
**178**  *(1)*
**18**  *(9)*
**180**  *(1)*
**18072**  *(1)*
**183**  *(1)*
**1832**  *(1)*
**184**  *(1)*
**185**  *(1)*
**187**  *(1)*
**19**  *(10)*
**1900**  *(1)*
**1997**  *(2)*
**19th**  *(4)*

**< 2 >**
**2**  *(5)*
**2:07**  *(1)*
**2:20**  *(1)*
**2:32**  *(1)*
**20**  *(12)*
**200**  *(1)*
**2000**  *(2)*
**2000s**  *(3)*
**2001**  *(1)*
**2003**  *(1)*
**2004**  *(1)*
**2010**  *(1)*
**2014**  *(1)*
**2015**  *(1)*
**2017**  *(4)*
**2020**  *(6)*
**2022**  *(87)*
**2023**  *(7)*
**2024**  *(2)*
**2025**  *(6)*
**203**  *(3)*
**203.3**  *(1)*
**20818**  *(1)*
**20th**  *(6)*
**21**  *(2)*

**21521**  *(1)*
**21525**  *(1)*
**21531**  *(1)*
**22**  *(5)*
**23**  *(4)*
**23190**  *(1)*
**23rd**  *(1)*
**24**  *(3)*
**24210**  *(1)*
**24212**  *(1)*
**25**  *(1)*
**250**  *(2)*
**25801**  *(1)*
**25th**  *(6)*
**26th**  *(2)*
**27**  *(2)*
**271**  *(1)*
**28**  *(3)*
**29th**  *(1)*
**2nd**  *(4)*

**< 3 >**
**3**  *(8)*
**3:07**  *(2)*
**30**  *(1)*
**300**  *(1)*
**31**  *(4)*
**35,000**  *(1)*
**38**  *(1)*
**3800**  *(1)*
**39**  *(3)*
**3rd**  *(3)*

**< 4 >**
**4**  *(8)*
**4/30/27**  *(2)*
**40**  *(3)*
**40s**  *(1)*
**41**  *(1)*
**42**  *(2)*
**420**  *(1)*
**48**  *(7)*

**< 5 >**
**5**  *(8)*
**50**  *(3)*
**51**  *(1)*
**52**  *(1)*
**57**  *(1)*

**58**  *(1)*
**59**  *(1)*

**< 6 >**
**6**  *(5)*
**6:00**  *(1)*
**61**  *(1)*
**63105**  *(1)*
**65**  *(1)*
**67**  *(1)*
**68**  *(1)*
**69**  *(2)*

**< 7 >**
**7**  *(7)*
**70**  *(8)*
**72**  *(1)*
**7676**  *(1)*
**7816**  *(1)*

**< 8 >**
**8**  *(5)*
**8:55**  *(1)*
**80**  *(1)*
**8510**  *(2)*
**88**  *(2)*

**< 9 >**
**9**  *(5)*
**9:08**  *(2)*
**91**  *(1)*
**93**  *(1)*
**98**  *(3)*
**99**  *(2)*
**997**  *(1)*

**< A >**
**a.m**  *(4)*
**ability**  *(3)*
**able**  *(7)*
**above-styled**  *(1)*
**absence**  *(1)*
**absolutely**  *(5)*
**abundance**  *(2)*
**abusive**  *(1)*
**accelerate**  *(3)*
**accelerated**  *(1)*
**account**  *(1)*
**accountability**  *(1)*

Deposition of Eric Starkloff | In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| accountable *(1)* | aggressiveness *(1)* | appropriately *(1)* | bag *(1)* |
| accumulation *(5)* | ago *(4)* | approval *(4)* | balance *(2)* |
| accurate *(2)* | agree *(16)* | approve *(3)* | balancing *(1)* |
| accurately *(1)* | agreed *(6)* | approved *(4)* | Bank *(12)* |
| achieved *(1)* | agreement *(2)* | approximately *(14)* | bargain *(3)* |
| acknowledge *(1)* | ahead *(5)* | arbitrary *(2)* | Barra *(5)* |
| acknowledged *(1)* | Alex *(1)* | area *(1)* | base *(3)* |
| acquire *(30)* | aligned *(1)* | argument *(6)* | based *(10)* |
| acquired *(4)* | allocate *(2)* | argumentative *(9)* | basic *(1)* |
| acquirers *(1)* | Allocation *(6)* | arrow *(1)* | basically *(2)* |
| acquiring *(19)* | allow *(2)* | ascertain *(1)* | basis *(8)* |
| acquisition *(18)* | allowed *(1)* | Aside *(2)* | Bates *(1)* |
| acquisitions *(14)* | allude *(1)* | asked *(47)* | bear *(10)* |
| acted *(1)* | allusion *(1)* | asking *(28)* | beginning *(1)* |
| Action *(8)* | alternative *(2)* | as-needed *(1)* | begins *(6)* |
| actions *(5)* | alternatives *(1)* | associating *(1)* | behalf *(5)* |
| active *(1)* | ambiguity *(1)* | Association *(1)* | Belgium *(1)* |
| activist *(1)* | ambiguous *(4)* | assume *(11)* | belief *(1)* |
| activities *(4)* | America *(12)* | assumed *(3)* | beliefs *(1)* |
| activity *(2)* | amount *(12)* | assumes *(2)* | believe *(50)* |
| actual *(9)* | amounted *(2)* | assuming *(1)* | believed *(3)* |
| Adam *(4)* | amounts *(1)* | assumption *(1)* | benefit *(3)* |
| addition *(2)* | ample *(1)* | attach *(1)* | benefited *(1)* |
| additional *(8)* | Ana *(1)* | attached *(3)* | BENNETT *(2)* |
| addressed *(2)* | analysis *(5)* | attempt *(1)* | best *(9)* |
| adds *(1)* | analysts *(4)* | attempting *(1)* | bet *(4)* |
| adequate *(1)* | analyze *(1)* | attendance *(1)* | better *(2)* |
| adhered *(1)* | and/or *(1)* | attended *(2)* | betting *(2)* |
| ad-hoc *(1)* | announce *(6)* | attending *(6)* | beyond *(1)* |
| adjustments *(2)* | announced *(2)* | attention *(4)* | bid *(2)* |
| admired *(1)* | announcing *(3)* | attorney *(2)* | big *(5)* |
| advantage *(1)* | answer *(41)* | attorneys *(1)* | bigger *(1)* |
| advantageous *(5)* | answered *(47)* | attractive *(1)* | biggest *(1)* |
| advice *(19)* | answering *(4)* | Audax *(1)* | birth *(1)* |
| advise *(1)* | anticipated *(2)* | August *(35)* | bit *(8)* |
| advised *(6)* | anyway *(2)* | Austin *(4)* | bless *(1)* |
| adviser *(5)* | apologize *(1)* | authorization *(14)* | block *(1)* |
| advisers *(6)* | appeared *(2)* | authorizations *(2)* | board *(120)* |
| adviser's *(1)* | appears *(6)* | automation *(2)* | boil *(1)* |
| advising *(1)* | Apple *(1)* | available *(1)* | boilerplate *(1)* |
| affect *(3)* | Application *(3)* | Avenue *(1)* | bolster *(1)* |
| affirmative *(2)* | applied *(1)* | aware *(7)* | book *(1)* |
| affirmed *(1)* | applying *(1)* | awareness *(1)* | bookings *(6)* |
| affix *(1)* | appointed *(1)* | | bother *(1)* |
| afield *(1)* | appreciate *(5)* | < B > | bottom *(14)* |
| afternoon *(2)* | approach *(20)* | B.S *(1)* | bought *(3)* |
| agenda *(2)* | approached *(5)* | back *(63)* | Boulevard *(2)* |
| aggressive *(5)* | approaches *(2)* | background *(1)* | box *(3)* |
| aggressively *(2)* | appropriate *(11)* | backlog *(5)* | break *(4)* |

**briefly** (*3*)
**broad** (*12*)
**broader** (*4*)
**broadly** (*8*)
**brought** (*3*)
**building** (*2*)
**bullet** (*6*)
**bunch** (*3*)
**business** (*39*)
**businesses** (*3*)
**busy** (*1*)
**buy** (*22*)
**buyback** (*11*)
**buybacks** (*32*)
**buyer** (*1*)
**buying** (*14*)

**< C >**
**cabinet** (*1*)
**cadence** (*1*)
**call** (*50*)
**called** (*2*)
**calling** (*2*)
**calls** (*73*)
**campus** (*1*)
**cancel** (*2*)
**canceled** (*1*)
**capability** (*2*)
**capable** (*5*)
**capacities** (*1*)
**capacity** (*1*)
**Capital** (*12*)
**captured** (*1*)
**capturing** (*1*)
**car** (*1*)
**carbon** (*1*)
**card** (*1*)
**career** (*1*)
**cars** (*1*)
**case** (*30*)
**cases** (*2*)
**cash** (*18*)
**category** (*2*)
**cause** (*3*)
**caused** (*1*)
**caution** (*3*)
**caveated** (*2*)
**cc'd** (*2*)
**cell** (*2*)

**cent** (*1*)
**Centerview** (*1*)
**cents** (*1*)
**century** (*1*)
**CEO** (*23*)
**certain** (*7*)
**certainly** (*13*)
**Certificate** (*4*)
**certificates** (*1*)
**certification** (*3*)
**Certified** (*3*)
**certify** (*2*)
**cetera** (*1*)
**Chad** (*2*)
**chain** (*15*)
**chair** (*1*)
**chairman** (*3*)
**challenge** (*4*)
**challenges** (*2*)
**challenging** (*3*)
**chance** (*9*)
**change** (*4*)
**changed** (*5*)
**Changes** (*10*)
**changing** (*3*)
**characterize** (*1*)
**charges** (*1*)
**chart** (*5*)
**check** (*3*)
**checked** (*1*)
**chief** (*4*)
**chime** (*2*)
**chiming** (*1*)
**chips** (*3*)
**choose** (*1*)
**choosing** (*2*)
**Chris** (*1*)
**Christopher** (*1*)
**Chuck** (*1*)
**circulated** (*1*)
**circumstances** (*7*)
**Civil** (*4*)
**cjohnson@rgrdlaw.com** (*1*)
**clarifying** (*1*)
**clarity** (*1*)
**class** (*3*)
**classes** (*1*)
**clean** (*1*)

**clear** (*10*)
**clearly** (*1*)
**Clerk** (*2*)
**clients** (*1*)
**close** (*3*)
**closing** (*3*)
**cloud** (*1*)
**coach** (*1*)
**coaching** (*1*)
**code** (*6*)
**coded** (*1*)
**coercive** (*9*)
**coincided** (*1*)
**colleague** (*1*)
**colleagues** (*1*)
**collectively** (*2*)
**college** (*2*)
**colorful** (*1*)
**column** (*4*)
**columns** (*3*)
**come** (*32*)
**Comerford** (*234*)
**coming** (*3*)
**comment** (*6*)
**comments** (*2*)
**Commission** (*1*)
**committee** (*1*)
**common** (*4*)
**commune** (*1*)
**communicate** (*3*)
**communicated** (*2*)
**communicating** (*2*)
**communication** (*6*)
**communications** (*5*)
**companies** (*11*)
**company** (*120*)
**company's** (*11*)
**compare** (*1*)
**compared** (*1*)
**comparing** (*2*)
**comparison** (*2*)
**compelling** (*1*)
**competitive** (*1*)
**complete** (*1*)
**completed** (*2*)
**completely** (*3*)
**complex** (*3*)
**complexity** (*1*)
**complicated** (*2*)

**complied** (*1*)
**comport** (*1*)
**comports** (*2*)
**compound** (*3*)
**computerized** (*1*)
**concept** (*3*)
**concepts** (*6*)
**concern** (*1*)
**concerned** (*2*)
**concluded** (*3*)
**concludes** (*1*)
**concluding** (*1*)
**conclusion** (*14*)
**conclusions** (*19*)
**conclusive** (*1*)
**concrete** (*1*)
**condition** (*1*)
**conditions** (*1*)
**conduct** (*1*)
**confer** (*1*)
**conference** (*10*)
**conferences** (*1*)
**confidential** (*1*)
**confirmed** (*1*)
**confused** (*2*)
**confusion** (*1*)
**Congratulations** (*1*)
**connected** (*1*)
**connecting** (*1*)
**connection** (*5*)
**cons** (*1*)
**consequence** (*1*)
**conservative** (*2*)
**consider** (*7*)
**consideration** (*3*)
**considered** (*2*)
**considering** (*9*)
**consistent** (*7*)
**constantly** (*1*)
**consternation** (*1*)
**constitutes** (*1*)
**constructively** (*1*)
**consult** (*1*)
**consulted** (*1*)
**consulting** (*1*)
**consummating** (*1*)
**contact** (*4*)
**contacted** (*1*)
**contacting** (*1*)

| | | | |
|---|---|---|---|
| **contain(s** *(1)* | **CRR** *(3)* | **degree** *(4)* | **disagree** *(10)* |
| **contemplated** *(3)* | **CSR** *(5)* | **delegate** *(2)* | **disagreed** *(7)* |
| **contents** *(2)* | **Cueller** *(1)* | **delivered** *(2)* | **disagreeing** *(1)* |
| **context** *(26)* | **current** *(6)* | **demand** *(4)* | **disagreement** *(5)* |
| **contexts** *(2)* | **currently** *(1)* | **deny** *(1)* | **disclose** *(6)* |
| **continue** *(5)* | **Custodial** *(1)* | **depend** *(2)* | **disclosure** *(8)* |
| **continued** *(7)* | **customers** *(1)* | **depending** *(1)* | **discounted** *(1)* |
| **continuing** *(2)* | **cut** *(2)* | **depends** *(1)* | **discretion** *(1)* |
| **contrary** *(2)* | **cuts** *(2)* | **deposed** *(1)* | **discuss** *(8)* |
| **conversation** *(9)* | **cutting** *(12)* | **DEPOSITION** *(23)* | **discussed** *(21)* |
| **conversations** *(6)* | **cycle** *(1)* | **depth** *(3)* | **discussing** *(5)* |
| **convey** *(3)* | | **describe** *(2)* | **Discussion** *(18)* |
| **conveyed** *(4)* | **< D >** | **described** *(1)* | **discussions** *(25)* |
| **conveys** *(1)* | **D.C** *(1)* | **describes** *(1)* | **dismissed** *(2)* |
| **COO** *(3)* | **data** *(7)* | **describing** *(1)* | **displaced** *(1)* |
| **copied** *(1)* | **date** *(6)* | **description** *(1)* | **disposal** *(1)* |
| **copies** *(1)* | **dated** *(1)* | **designation** *(3)* | **dispute** *(3)* |
| **copy** *(3)* | **dates** *(1)* | **desire** *(1)* | **disruption** *(10)* |
| **core** *(1)* | **daughter** *(1)* | **desk** *(2)* | **distinction** *(2)* |
| **Corporate** *(2)* | **Davern** *(1)* | **despite** *(2)* | **distinguish** *(2)* |
| **CORPORATION** *(3)* | **Davis** *(1)* | **destroyed** *(4)* | **DISTRICT** *(5)* |
| **Correct** *(77)* | **day** *(16)* | **detail** *(1)* | **diversification** *(1)* |
| **corrections** *(1)* | **days** *(8)* | **details** *(1)* | **dividend** *(3)* |
| **correctly** *(6)* | **day's** *(1)* | **determination** *(6)* | **division** *(2)* |
| **correlated** *(3)* | **dead** *(2)* | **determinations** *(1)* | **divisional** *(1)* |
| **cost** *(15)* | **deal** *(3)* | **determine** *(2)* | **Divisions** *(1)* |
| **costs** *(1)* | **dealing** *(2)* | **determined** *(2)* | **Dixon** *(5)* |
| **counsel** *(17)* | **dealings** *(5)* | **determining** *(1)* | **Dixon's** *(1)* |
| **counsel's** *(1)* | **debate** *(4)* | **detrimental** *(1)* | **document** *(22)* |
| **count** *(1)* | **debated** *(3)* | **developed** *(1)* | **documents** *(8)* |
| **COUNTY** *(1)* | **debating** *(1)* | **developing** *(1)* | **doing** *(16)* |
| **couple** *(4)* | **December** *(2)* | **development** *(2)* | **dollars** *(5)* |
| **course** *(20)* | **decided** *(7)* | **differ** *(3)* | **dot** *(3)* |
| **courses** *(2)* | **decision** *(14)* | **differed** *(1)* | **doubled** *(1)* |
| **COURT** *(21)* | **decisions** *(8)* | **difference** *(6)* | **doubt** *(5)* |
| **Court's** *(2)* | **deck** *(6)* | **different** *(35)* | **DOWD** *(3)* |
| **cover** *(6)* | **decline** *(2)* | **differently** *(5)* | **downloaded** *(1)* |
| **COVID** *(2)* | **declined** *(3)* | **differing** *(1)* | **dozen** *(2)* |
| **craft** *(1)* | **deemed** *(1)* | **difficult** *(5)* | **dozens** *(1)* |
| **crafted** *(1)* | **deeper** *(4)* | **diligence** *(2)* | **draft** *(8)* |
| **crafting** *(1)* | **default** *(1)* | **Diligent** *(2)* | **drafting** *(1)* |
| **create** *(2)* | **defaulted** *(2)* | **dimensions** *(1)* | **dramatic** *(1)* |
| **created** *(1)* | **defend** *(4)* | **direct** *(1)* | **drawing** *(2)* |
| **creates** *(1)* | **DEFENDANTS** *(3)* | **directed** *(1)* | **driven** *(1)* |
| **creation** *(2)* | **defenses** *(1)* | **directing** *(1)* | **driver** *(1)* |
| **credible** *(1)* | **define** *(1)* | **direction** *(2)* | **due** *(4)* |
| **credit** *(1)* | **definitely** *(1)* | **directly** *(3)* | **duly** *(4)* |
| **crises** *(1)* | **definition** *(1)* | **director** *(7)* | **duties** *(12)* |
| **criteria** *(1)* | **definitive** *(2)* | **directors** *(7)* | **duty** *(1)* |

Deposition of Eric Starkloff                    In Re National Instruments Corporation Securities Litigation

dynamics  (1)

< E >
Eagle  (2)
earlier  (6)
early  (11)
earnings  (31)
easier  (2)
easiest  (1)
easily  (1)
Eddie  (5)
Eddie's  (6)
edits  (1)
education  (2)
effect  (6)
efficiency  (1)
efficient  (1)
effort  (2)
efforts  (5)
eight  (1)
either  (14)
Electric  (1)
electrical  (3)
electronic  (2)
electronics  (1)
email  (47)
Email/PowerPoint  (1)
emails  (3)
Emerson  (175)
Emerson's  (73)
Emmerick  (2)
emphasizing  (1)
employed  (1)
enabled  (1)
ended  (1)
engage  (11)
engaged  (4)
engagement  (1)
engaging  (2)
engineer  (3)
engineering  (4)
engineers  (1)
enormous  (1)
entire  (1)
entirely  (7)
entirety  (1)
entitled  (1)
entry  (1)
equity  (1)

ERIC  (14)
errors  (1)
escalate  (1)
escalating  (1)
escalation  (1)
especially  (1)
essentially  (1)
established  (1)
et  (1)
evaluate  (1)
evaluating  (1)
evasive  (1)
evening  (1)
event  (1)
events  (4)
eventually  (2)
everyday  (1)
evidence  (17)
exacerbated  (1)
exact  (7)
exactly  (18)
Examination  (9)
example  (16)
exchange  (2)
exchanged  (1)
execute  (5)
executed  (1)
execution  (1)
executive  (2)
Exhibit  (62)
EXHIBITS  (4)
existence  (1)
existing  (2)
expect  (4)
expectation  (1)
expected  (2)
expeditiously  (1)
expense  (2)
expenses  (5)
experience  (8)
experienced  (3)
experiential  (1)
expert  (13)
experts  (1)
Expiration  (2)
Expires  (1)
explain  (1)
explosions  (1)
exposed  (2)

exposure  (1)
express  (3)
expressed  (2)
expressing  (1)
expression  (1)
extent  (3)
external  (2)
Ezurio  (2)

< F >
face  (4)
faced  (2)
fact  (50)
factor  (4)
factors  (9)
facts  (10)
factually  (6)
fair  (21)
fairly  (3)
faith  (1)
familiarity  (1)
fancy  (1)
far  (6)
faster  (3)
favor  (10)
feel  (1)
felt  (3)
fiduciary  (18)
fifth  (1)
figure  (2)
figures  (2)
file  (12)
filed  (2)
files  (1)
final  (3)
financed  (1)
financial  (4)
financially  (1)
financing  (2)
find  (9)
finish  (2)
finished  (1)
firepower  (3)
fires  (1)
firm  (12)
firmly  (1)
first  (57)
fit  (3)
five  (2)

flexibility  (2)
flipping  (1)
flow  (1)
focus  (4)
focused  (2)
focusing  (1)
folder  (10)
folks  (1)
follow  (1)
followed  (2)
following  (4)
follows  (1)
follow-up  (4)
foolish  (1)
forecast  (3)
foregoing  (3)
forget  (3)
form  (172)
formal  (5)
formalized  (1)
former  (1)
Forsyth  (1)
forth  (5)
Forty-eight  (1)
forward  (4)
found  (1)
foundation  (45)
four  (4)
frankly  (7)
frequent  (1)
frequently  (2)
friendly  (1)
front  (13)
fruition  (2)
frustrated  (3)
fuel  (1)
full  (6)
fully  (1)
fund  (1)
Further  (20)
future  (3)

< G >
garbage  (1)
GELLER  (2)
general  (5)
generalization  (1)
generally  (8)
generation  (3)

generic  *(1)*
getting  *(6)*
giant  *(1)*
Gilroy  *(1)*
gist  *(1)*
give  *(8)*
given  *(21)*
gives  *(1)*
giving  *(8)*
glaring  *(1)*
global  *(1)*
GM  *(1)*
go  *(34)*
God  *(1)*
goes  *(5)*
Going  *(73)*
Goldman  *(1)*
Good  *(9)*
gosh  *(1)*
grabbing  *(1)*
graduate  *(2)*
graduating  *(1)*
grammar  *(1)*
grammatical  *(1)*
great  *(1)*
greatest  *(1)*
grew  *(1)*
grid  *(1)*
group  *(4)*
growing  *(1)*
growth  *(3)*
guess  *(16)*
guidance  *(2)*

< H >
habit  *(1)*
half  *(14)*
hand  *(3)*
handled  *(1)*
hands  *(1)*
happen  *(17)*
Happened  *(11)*
happening  *(10)*
happens  *(1)*
harassing  *(1)*
hard  *(3)*
hardware  *(1)*
Hatch  *(2)*
he/she  *(1)*

head  *(1)*
heading  *(1)*
headline  *(1)*
headquartered  *(1)*
hear  *(3)*
heard  *(6)*
hearing  *(1)*
hears  *(1)*
heavily  *(1)*
hedge  *(2)*
held  *(7)*
help  *(11)*
helped  *(1)*
helping  *(1)*
hereto  *(1)*
hesitating  *(1)*
hey  *(3)*
high  *(9)*
higher  *(32)*
highest  *(1)*
highlight  *(1)*
highlighted  *(1)*
highlights  *(1)*
highly  *(1)*
hindsight  *(2)*
hint  *(2)*
hired  *(1)*
historic  *(1)*
history  *(3)*
Hoffman  *(1)*
Hofman  *(1)*
hold  *(3)*
holding  *(1)*
honest  *(4)*
honestly  *(3)*
hope  *(1)*
hopefully  *(3)*
hopes  *(1)*
hoping  *(1)*
hostile  *(1)*
hour  *(1)*
hours  *(3)*
hug  *(11)*
huge  *(2)*
hundred  *(5)*
hundreds  *(3)*
hunting  *(2)*
hurting  *(1)*
hypothetical  *(9)*

< I >
idea  *(6)*
identification  *(17)*
identified  *(1)*
identifies  *(1)*
identify  *(5)*
identifying  *(1)*
identity  *(1)*
ignore  *(1)*
Ilcisin's  *(1)*
Illcisin  *(7)*
immediate  *(1)*
immediately  *(1)*
impact  *(4)*
impacting  *(1)*
impacts  *(1)*
implausible  *(1)*
implement  *(1)*
implemented  *(1)*
implementing  *(1)*
implies  *(3)*
implying  *(1)*
importance  *(1)*
important  *(4)*
impossible  *(7)*
imprecise  *(1)*
impression  *(3)*
impressions  *(2)*
improper  *(10)*
improved  *(2)*
improving  *(1)*
inability  *(3)*
inadvertently  *(1)*
inappropriate  *(2)*
incapable  *(1)*
include  *(4)*
included  *(13)*
includes  *(3)*
including  *(7)*
incomplete  *(4)*
inconclusive  *(1)*
incorrect  *(1)*
increase  *(5)*
incredible  *(1)*
indefinitely  *(1)*
independent  *(1)*
independently  *(2)*
indicate  *(7)*

indicated  *(8)*
indicates  *(6)*
indicating  *(2)*
indication  *(2)*
indications  *(1)*
industrial  *(1)*
industries  *(1)*
industry  *(2)*
inequity  *(1)*
inevitable  *(2)*
infer  *(1)*
inferring  *(1)*
inflect  *(1)*
information  *(25)*
informed  *(3)*
ingredients  *(1)*
inherent  *(1)*
in-house  *(1)*
initial  *(7)*
initially  *(2)*
initiate  *(2)*
input  *(2)*
inside  *(1)*
insider  *(5)*
insiders  *(1)*
Insinkerator  *(1)*
insinuate  *(1)*
insinuating  *(1)*
instance  *(1)*
instrument  *(1)*
INSTRUMENTS
  *(138)*
insufficient  *(1)*
intend  *(6)*
intended  *(1)*
intent  *(17)*
intention  *(2)*
interact  *(1)*
interaction  *(1)*
interest  *(30)*
interested  *(7)*
interesting  *(1)*
interests  *(2)*
interpret  *(5)*
interpretation  *(5)*
interpretations  *(2)*
interpreted  *(3)*
interrupt  *(1)*
interrupted  *(2)*

Deposition of Eric Starkloff                              In Re National Instruments Corporation Securities Litigation

introduced  (2)
invent  (1)
inventory  (1)
investing  (1)
investor  (12)
investors  (6)
involve  (1)
involved  (3)
issue  (13)
issues  (3)
item  (6)
items  (2)
iterations  (3)
its  (17)

< J >
jack  (1)
January  (5)
jcomerford@dowdben
nett.com  (1)
Jeremy  (2)
job  (4)
jobs  (1)
John  (13)
Johnson  (270)
joined  (1)
Judge  (1)
judging  (1)
judgment  (5)
July  (23)
June  (14)
jury  (9)
justified  (1)
justify  (3)

< K >
Karen  (4)
Karsanbhai  (23)
Karsanbhai's  (4)
Katz  (4)
keen  (1)
keep  (4)
keeping  (1)
Kevin  (5)
key  (2)
Kim  (10)
Kimberly  (6)
kind  (25)
kinds  (3)

knew  (9)
Knight  (1)
know  (125)
knowing  (1)
knowledge  (3)
known  (2)
knows  (1)

< L >
labeled  (7)
Lacks  (1)
laid  (1)
LALL  (1)
Lamar  (1)
language  (5)
laptop  (1)
large  (3)
largest  (2)
late  (6)
latest  (2)
law  (6)
lawsuit  (4)
lawyer  (3)
lawyers  (10)
lawyer's  (1)
lay  (1)
laying  (1)
leader  (1)
leading  (1)
learn  (2)
learned  (4)
leaving  (1)
Led  (3)
left  (10)
left-hand  (1)
legal  (30)
legendary  (1)
length  (1)
letter  (57)
letters  (4)
level  (3)
Lexington  (1)
life  (1)
lift  (4)
lifted  (2)
lifting  (1)
liked  (1)
likelihood  (7)
limited  (1)

line  (14)
linear  (2)
Lipton  (8)
list  (8)
listed  (1)
listen  (2)
listened  (6)
listening  (2)
LITIGATION  (3)
little  (8)
live  (2)
LLP  (3)
loaded  (1)
location  (1)
logic  (1)
logical  (1)
long  (8)
longer  (6)
long-standing  (1)
long-term  (5)
look  (45)
looked  (4)
looking  (10)
looks  (3)
lost  (1)
lot  (15)
lots  (6)
Louis  (1)
low  (11)
luck  (2)
lunch  (1)

< M >
machine  (1)
majority  (1)
making  (19)
managed  (1)
management  (9)
manager  (3)
margin  (1)
marked  (19)
market  (30)
marketing  (9)
markets  (1)
market's  (1)
material  (29)
materiality  (8)
materially  (16)
materials  (9)

math  (6)
Mathematically  (1)
matter  (3)
mattered  (1)
matters  (4)
maximized  (1)
McGrath  (23)
McGrath's  (2)
McKenzie  (4)
mean  (29)
meaning  (5)
means  (8)
meant  (11)
measurement  (1)
measures  (1)
meet  (1)
meeting  (35)
meetings  (11)
member  (10)
members  (10)
memory  (1)
mention  (1)
mentioned  (10)
mentioning  (1)
mentions  (1)
mentor  (2)
merely  (2)
merger  (3)
mergers  (4)
merit  (1)
message  (5)
messaging  (1)
met  (7)
metrics  (1)
Michael  (6)
mid  (3)
middle  (3)
million  (29)
millions  (1)
mind  (7)
mine  (4)
minor  (1)
Minutes  (13)
mischaracterization
 (1)
mischaracterizes  (9)
misinterpreting  (1)
misleading  (6)
missed  (1)

Deposition of Eric Starkloff                     In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| **Missouri** *(1)* | **NAT-SL-24106** *(2)* | **obviously** *(6)* | **overall** *(4)* |
| **misstates** *(9)* | **NAT-SL-25798** *(2)* | **occasional** *(1)* | **owed** *(1)* |
| **mistaken** *(2)* | **NAT-SL-7815** *(2)* | **occasionally** *(1)* | **owned** *(1)* |
| **mixed** *(1)* | **natural** *(2)* | **occasions** *(4)* | **owners** *(1)* |
| **model** *(4)* | **nature** *(6)* | **occupied** *(1)* | |
| **modeling** *(2)* | **near** *(2)* | **occurred** *(1)* | **< P >** |
| **models** *(3)* | **necessarily** *(5)* | **OCTOBER** *(8)* | **p.m** *(2)* |
| **modestly** *(1)* | **necessary** *(2)* | **Offer** *(133)* | **PAGE** *(26)* |
| **modified** *(1)* | **necessitated** *(1)* | **offered** *(6)* | **page(s)** *(1)* |
| **momentum** *(1)* | **need** *(8)* | **offeree** *(4)* | **pages** *(1)* |
| **money** *(3)* | **needed** *(3)* | **offerer** *(7)* | **papers** *(1)* |
| **monitor** *(2)* | **neither** *(2)* | **offering** *(4)* | **paragraph** *(8)* |
| **monitoring** *(1)* | **network** *(1)* | **offers** *(8)* | **paren** *(2)* |
| **month** *(4)* | **never** *(4)* | **office** *(2)* | **part** *(34)* |
| **months** *(7)* | **NEW** *(9)* | **officer** *(6)* | **participated** *(2)* |
| **morning** *(2)* | **newest** *(1)* | **officer's** *(1)* | **particular** *(17)* |
| **motivation** *(1)* | **news** *(3)* | **official** *(1)* | **particularly** *(4)* |
| **motive** *(2)* | **NI** *(14)* | **oftentimes** *(1)* | **parties** *(4)* |
| **move** *(3)* | **night** *(1)* | **Oh** *(18)* | **party** *(2)* |
| **moved** *(3)* | **Niles** *(5)* | **Okay** *(115)* | **Partners** *(2)* |
| **multiple** *(13)* | **NI's** *(2)* | **once** *(6)* | **parts** *(1)* |
| | **non-public** *(12)* | **ones** *(2)* | **party** *(2)* |
| **< N >** | **normal** *(3)* | **ongoing** *(2)* | **passed** *(3)* |
| **NACD** *(2)* | **normally** *(2)* | **on-hand** *(1)* | **passing** *(1)* |
| **naive** *(2)* | **North** *(1)* | **open** *(5)* | **pause** *(2)* |
| **name** *(8)* | **NOTARY** *(1)* | **operating** *(6)* | **paused** *(3)* |
| **named** *(1)* | **note** *(9)* | **opinion** *(32)* | **pay** *(4)* |
| **narrow** *(3)* | **Noted** *(3)* | **opinions** *(5)* | **PDF** *(1)* |
| **NASDAQ** *(3)* | **notes** *(5)* | **opportunistic** *(1)* | **peak** *(2)* |
| **NATI** *(1)* | **notification** *(1)* | **opportunities** *(1)* | **Pedro** *(1)* |
| **NATIONAL** *(138)* | **notion** *(1)* | **opportunity** *(5)* | **penny** *(5)* |
| **NAT-SL-00001263** *(2)* | **November** *(3)* | **opposed** *(6)* | **people** *(8)* |
| **NAT-SL-00001457** *(2)* | **number** *(27)* | **opposite** *(1)* | **perceived** *(3)* |
| **NAT-SL000016270** *(1)* | **numbered** *(10)* | **options** *(1)* | **perceiving** *(1)* |
| **NAT-SL-000016270** *(1)* | **numbers** *(9)* | **ORAL** *(3)* | **percent** *(3)* |
| **NAT-SL-00001696** *(2)* | **numerical** *(1)* | **order** *(7)* | **perception** *(1)* |
| **NAT-SL-00005984** *(2)* | **numerous** *(1)* | **ordered** *(1)* | **perform** *(1)* |
| **NAT-SL-00011671** *(2)* | **Nut** *(2)* | **orders** *(2)* | **performance** *(9)* |
| **NAT-SL-00016112** *(2)* | | **organization** *(1)* | **period** *(34)* |
| **NAT-SL-00021516** *(1)* | **< O >** | **organizations** *(2)* | **person** *(3)* |
| **NAT-SL-00021956** *(2)* | **oath** *(1)* | **orient** *(1)* | **personal** *(6)* |
| **NATSL1460** *(1)* | **Object** *(18)* | **original** *(3)* | **personally** *(7)* |
| **NAT-SL-16996** *(2)* | **Objection** *(36)* | **originally** *(1)* | **perspective** *(1)* |
| **NAT-SL-18070** *(2)* | **objections** *(30)* | **outbid** *(1)* | **perspectives** *(1)* |
| **NAT-SL-20795** *(1)* | **objective** *(6)* | **outcome** *(5)* | **pertinent** *(1)* |
| **NAT-SL-20796** *(1)* | **objectively** *(1)* | **outlook** *(6)* | **Peter** *(1)* |
| **NAT-SL-23189** *(1)* | **objectives** *(2)* | **outreach** *(1)* | **petered** *(4)* |
| | **obtain** *(2)* | **outright** *(1)* | **phone** *(16)* |
| | **obvious** *(1)* | **outside** *(5)* | **phones** *(1)* |
| | | | **phrase** *(2)* |

Deposition of Eric Starkloff                                    In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| **physical**  (*1*) | **premise**  (*2*) | **promptly**  (*1*) | |
| **picture**  (*1*) | **premium**  (*4*) | **proper**  (*2*) | **< R >** |
| **pill**  (*1*) | **preparation**  (*1*) | **proposal**  (*7*) | **raise**  (*1*) |
| **pipeline**  (*4*) | **prepare**  (*6*) | **proposals**  (*1*) | **raised**  (*2*) |
| **place**  (*16*) | **prepared**  (*7*) | **proposed**  (*3*) | **ran**  (*3*) |
| **Plaintiff**  (*1*) | **preparedness**  (*2*) | **pros**  (*2*) | **range**  (*11*) |
| **PLAINTIFFS**  (*2*) | **preparing**  (*5*) | **prospect**  (*1*) | **rapidly**  (*2*) |
| **plan**  (*34*) | **preponderance**  (*1*) | **prospects**  (*6*) | **Rapp**  (*4*) |
| **planned**  (*6*) | **PRESENT**  (*5*) | **proved**  (*2*) | **Rapp's**  (*2*) |
| **planning**  (*1*) | **presentation**  (*22*) | **provide**  (*1*) | **reach**  (*3*) |
| **plans**  (*3*) | **presentations**  (*4*) | **provided**  (*3*) | **reached**  (*1*) |
| **Platform**  (*2*) | **presented**  (*13*) | **providing**  (*2*) | **reaching**  (*2*) |
| **plausible**  (*8*) | **presenting**  (*1*) | **provisions**  (*1*) | **react**  (*2*) |
| **play**  (*3*) | **president**  (*14*) | **proxy**  (*1*) | **reacted**  (*2*) |
| **please**  (*7*) | **pressure**  (*1*) | **public**  (*72*) | **reaction**  (*1*) |
| **plural**  (*1*) | **pretense**  (*1*) | **publicly**  (*5*) | **read**  (*15*) |
| **plus**  (*1*) | **pretty**  (*10*) | **pull**  (*6*) | **reading**  (*6*) |
| **point**  (*70*) | **prevent**  (*1*) | **punchline**  (*1*) | **reads**  (*1*) |
| **pointed**  (*1*) | **previous**  (*6*) | **purchase**  (*3*) | **ready**  (*2*) |
| **points**  (*15*) | **previously**  (*10*) | **purchased**  (*2*) | **real**  (*5*) |
| **poison**  (*1*) | **price**  (*39*) | **purchases**  (*6*) | **realistic**  (*3*) |
| **policy**  (*1*) | **prices**  (*3*) | **purchasing**  (*5*) | **reality**  (*5*) |
| **Polk**  (*1*) | **pricing**  (*1*) | **pure**  (*1*) | **really**  (*19*) |
| **portfolio**  (*1*) | **primarily**  (*3*) | **purpose**  (*3*) | **realm**  (*1*) |
| **portion**  (*2*) | **primary**  (*7*) | **purposes**  (*2*) | **reason**  (*17*) |
| **position**  (*16*) | **principal**  (*1*) | **pursuant**  (*3*) | **reasonable**  (*8*) |
| **positions**  (*2*) | **prior**  (*19*) | **pushback**  (*1*) | **reasoning**  (*1*) |
| **positive**  (*6*) | **priorities**  (*5*) | **pushed**  (*1*) | **reasons**  (*10*) |
| **positively**  (*1*) | **priority**  (*1*) | **put**  (*9*) | **recall**  (*112*) |
| **possession**  (*7*) | **private**  (*11*) | **putting**  (*2*) | **receive**  (*2*) |
| **possibilities**  (*5*) | **privately**  (*4*) | | **received**  (*20*) |
| **possibility**  (*13*) | **pro**  (*1*) | **< Q >** | **receiving**  (*1*) |
| **possible**  (*20*) | **probability**  (*9*) | **Q1**  (*1*) | **Recess**  (*5*) |
| **possibly**  (*10*) | **probably**  (*23*) | **qualitatively**  (*1*) | **recipient**  (*1*) |
| **post**  (*1*) | **problem**  (*1*) | **quality**  (*1*) | **recognize**  (*16*) |
| **potential**  (*8*) | **Procedure**  (*2*) | **quantitatively**  (*2*) | **recognized**  (*1*) |
| **potentially**  (*1*) | **proceed**  (*2*) | **quarter**  (*15*) | **recognizing**  (*1*) |
| **PowerPoint**  (*8*) | **proceeding**  (*1*) | **quarterly**  (*1*) | **recollection**  (*13*) |
| **practice**  (*2*) | **process**  (*6*) | **question**  (*54*) | **recommendation**  (*1*) |
| **precise**  (*4*) | **procure**  (*1*) | **questioned**  (*2*) | **record**  (*28*) |
| **precisely**  (*1*) | **produced**  (*1*) | **questioning**  (*2*) | **recounting**  (*2*) |
| **preclude**  (*1*) | **product**  (*3*) | **questions**  (*13*) | **recovered**  (*2*) |
| **predated**  (*2*) | **products**  (*8*) | **quibble**  (*1*) | **reduce**  (*1*) |
| **pre-dating**  (*1*) | **profit**  (*1*) | **quick**  (*5*) | **reduction**  (*2*) |
| **predicated**  (*1*) | **profitability**  (*1*) | **quickly**  (*2*) | **reductions**  (*1*) |
| **preface**  (*1*) | **program**  (*1*) | **quite**  (*18*) | **reengaging**  (*1*) |
| **prefer**  (*1*) | **Project**  (*5*) | **quizzical**  (*1*) | **refer**  (*2*) |
| **preference**  (*2*) | **projection**  (*2*) | **quote**  (*1*) | **reference**  (*1*) |
| **preferred**  (*4*) | **projections**  (*1*) | **quote/unquote**  (*1*) | **references**  (*1*) |

Deposition of Eric Starkloff    In Re National Instruments Corporation Securities Litigation

referred  *(6)*
referring  *(18)*
refers  *(6)*
reflect  *(1)*
reflected  *(2)*
reflective  *(2)*
refresh  *(2)*
refreshed  *(1)*
regard  *(5)*
regarding  *(2)*
regards  *(1)*
regular  *(4)*
regularly  *(1)*
reinforce  *(1)*
reiterate  *(1)*
reiterated  *(2)*
reiterating  *(2)*
reject  *(9)*
rejected  *(23)*
rejecting  *(12)*
rejection  *(17)*
rejections  *(1)*
relate  *(1)*
related  *(8)*
relations  *(1)*
relationship  *(4)*
relationships  *(1)*
release  *(2)*
relevant  *(5)*
remain  *(2)*
remained  *(4)*
remember  *(29)*
remind  *(4)*
reminder  *(1)*
remotely  *(1)*
remove  *(3)*
render  *(1)*
rendered  *(1)*
rendering  *(1)*
repeat  *(1)*
report  *(1)*
reported  *(1)*
reporter  *(14)*
Reporter's  *(2)*
represent  *(2)*
representation  *(1)*
representatives  *(1)*
represented  *(1)*
representing  *(2)*

represents  *(2)*
repurchase  *(4)*
repurchases  *(10)*
repurchasing  *(1)*
reputable  *(1)*
requesting  *(5)*
require  *(1)*
required  *(1)*
requirements  *(1)*
requiring  *(1)*
research  *(1)*
respect  *(7)*
respond  *(5)*
responded  *(1)*
responding  *(2)*
responds  *(2)*
response  *(14)*
responsibilities  *(6)*
responsibility  *(6)*
responsive  *(1)*
rest  *(4)*
restate  *(3)*
restated  *(2)*
restrict  *(1)*
restriction  *(28)*
restrictions  *(1)*
restroom  *(1)*
result  *(4)*
resulted  *(2)*
results  *(1)*
resume  *(6)*
resumed  *(1)*
resuming  *(1)*
retired  *(2)*
return  *(6)*
returned  *(3)*
returns  *(1)*
revenue  *(7)*
review  *(2)*
reviewed  *(3)*
reviewing  *(3)*
rewrite  *(2)*
right  *(163)*
rights  *(1)*
risk  *(3)*
ROBBINS  *(2)*
role  *(9)*
roles  *(2)*
Rosen  *(4)*

roughly  *(3)*
RPR  *(3)*
RUDMAN  *(1)*
Rule  *(4)*
Rules  *(1)*
run  *(3)*
runs  *(1)*

< S >
Sachs  *(1)*
Saint  *(1)*
sale  *(2)*
sales  *(3)*
saw  *(4)*
saying  *(20)*
says  *(25)*
scarcely  *(1)*
scenario  *(5)*
scenarios  *(5)*
school  *(1)*
scientists  *(1)*
screen  *(1)*
seal  *(1)*
Sean  *(1)*
Sebastian  *(6)*
second  *(33)*
section  *(4)*
SECURITIES  *(4)*
see  *(91)*
seeing  *(2)*
seek  *(1)*
seeking  *(1)*
seen  *(2)*
sell  *(7)*
seller  *(1)*
selling  *(4)*
semi-conductor  *(1)*
semi-conductors  *(4)*
send  *(6)*
sending  *(2)*
senior  *(3)*
sense  *(5)*
sensible  *(1)*
sent  *(15)*
sentence  *(2)*
September  *(17)*
series  *(1)*
serious  *(7)*
seriously  *(1)*

seriousness  *(3)*
serve  *(1)*
served  *(2)*
server  *(3)*
service  *(1)*
set  *(4)*
share  *(78)*
shared  *(7)*
shareholder  *(8)*
shareholders  *(25)*
shareholder's  *(1)*
shares  *(27)*
sharing  *(3)*
ship  *(6)*
short  *(5)*
shortage  *(1)*
Shorthand  *(1)*
Shortly  *(1)*
short-term  *(1)*
show  *(6)*
showed  *(3)*
showing  *(3)*
shown  *(7)*
shredded  *(2)*
sic  *(1)*
side  *(6)*
sign  *(1)*
signal  *(1)*
Signature  *(6)*
significant  *(3)*
significantly  *(5)*
similar  *(3)*
Similarly  *(1)*
simple  *(8)*
simplistic  *(1)*
simply  *(4)*
sincere  *(6)*
sincerely  *(1)*
sincerity  *(1)*
singular  *(1)*
sir  *(3)*
sitting  *(2)*
situation  *(6)*
situations  *(5)*
six  *(7)*
skeptical  *(1)*
slash  *(5)*
slide  *(24)*
slides  *(6)*

Deposition of Eric Starkloff                                    In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| slightly *(1)* | stenotype *(1)* | support *(4)* | texter *(1)* |
| small *(3)* | step *(10)* | supported *(2)* | texting *(2)* |
| smart *(1)* | steps *(12)* | supportive *(1)* | Thank *(3)* |
| software *(2)* | stick *(4)* | supposed *(1)* | thanks *(1)* |
| sold *(13)* | stock *(47)* | suppressed *(1)* | theory *(1)* |
| sole *(1)* | stockholders *(10)* | Sure *(42)* | thereabouts *(1)* |
| solely *(1)* | stop *(3)* | surprise *(3)* | therefor *(1)* |
| solicited *(1)* | stopped *(1)* | surprised *(1)* | thing *(10)* |
| somebody *(2)* | stories *(1)* | surprising *(1)* | things *(32)* |
| somewhat *(2)* | strange *(2)* | surveillance *(1)* | thing's *(1)* |
| sorry *(18)* | strategic *(6)* | suspect *(1)* | think *(158)* |
| sort *(48)* | Strategy *(8)* | swear *(1)* | thinking *(14)* |
| sought *(1)* | street *(1)* | sworn *(3)* | third *(14)* |
| sound *(4)* | strength *(1)* | systems *(1)* | thought *(35)* |
| sounds *(14)* | strike *(1)* | | thoughtfully *(1)* |
| SOUTHERN *(3)* | stroke *(1)* | < T > | thousand *(1)* |
| space *(1)* | strokes *(3)* | tactic *(1)* | threat *(4)* |
| speak *(2)* | strong *(11)* | tactics *(2)* | threatening *(4)* |
| speaking *(5)* | strongly *(2)* | Take *(26)* | three *(10)* |
| specific *(14)* | structure *(1)* | taken *(11)* | three-ish *(1)* |
| Specifically *(6)* | struggle *(1)* | takes *(1)* | Thursday's *(1)* |
| specifics *(2)* | studies *(1)* | talk *(12)* | ticker *(1)* |
| spectrum *(1)* | study *(2)* | talked *(11)* | tied *(1)* |
| speculate *(4)* | stuff *(2)* | talking *(17)* | time *(124)* |
| speculated *(2)* | style *(2)* | talks *(1)* | timeframe *(11)* |
| speculating *(5)* | sub *(1)* | tape *(1)* | timeline *(3)* |
| speculation *(40)* | subheading *(1)* | target *(2)* | timely *(3)* |
| speech *(1)* | subject *(8)* | targets *(1)* | times *(8)* |
| speed *(1)* | submit *(1)* | team *(13)* | timing *(7)* |
| spend *(3)* | submitted *(1)* | teams *(1)* | title *(7)* |
| spending *(4)* | submitting *(1)* | technically *(2)* | titles *(1)* |
| spent *(12)* | subscribed *(1)* | techniques *(1)* | today *(9)* |
| spoke *(1)* | subsequent *(4)* | tell *(7)* | Today's *(1)* |
| spoken *(1)* | subsequently *(1)* | telling *(2)* | told *(5)* |
| spokesperson *(2)* | substance *(8)* | ten *(1)* | tone *(3)* |
| staff *(1)* | Substantially *(5)* | tend *(1)* | tonight's *(1)* |
| stage *(1)* | substantive *(1)* | tenet *(2)* | tools *(1)* |
| stages *(1)* | suburban *(1)* | tens *(1)* | top *(5)* |
| STARKLOFF *(32)* | sued *(1)* | term *(2)* | topic *(6)* |
| start *(3)* | sufficient *(2)* | terminate *(1)* | total *(3)* |
| started *(2)* | suggest *(5)* | terms *(6)* | Totally *(1)* |
| starting *(5)* | suggested *(3)* | test *(2)* | trace *(1)* |
| starts *(1)* | suggesting *(2)* | testified *(2)* | trade *(7)* |
| State *(6)* | suggestion *(2)* | testify *(1)* | trades *(1)* |
| stated *(7)* | suggests *(1)* | testifying *(1)* | trading *(44)* |
| statement *(14)* | Suite *(3)* | testimony *(15)* | training *(2)* |
| statements *(1)* | summary *(5)* | testing *(2)* | trajectory *(1)* |
| STATES *(2)* | summer *(3)* | Texas *(8)* | transaction *(10)* |
| stats *(1)* | supply *(12)* | text *(3)* | transactions *(1)* |

Deposition of Eric Starkloff                    In Re National Instruments Corporation Securities Litigation

transcript  (*2*)
transformation  (*2*)
transformed  (*1*)
transitioned  (*1*)
travel  (*1*)
traveled  (*1*)
TRCP  (*2*)
treat  (*1*)
trial  (*1*)
tried  (*1*)
triggers  (*1*)
trouble  (*2*)
true  (*4*)
trust  (*1*)
trusted  (*1*)
try  (*5*)
trying  (*29*)
turn  (*2*)
turned  (*9*)
Twenty  (*1*)
twice  (*11*)
two  (*20*)
type  (*2*)
types  (*1*)
typical  (*7*)
typically  (*9*)
typo  (*1*)

< U >
Uh-huh  (*17*)
ultimately  (*8*)
unaffordable  (*1*)
unambiguous  (*1*)
unaware  (*1*)
uncertainty  (*2*)
uncommon  (*4*)
uncompelling  (*1*)
underlies  (*1*)
underlying  (*1*)
understand  (*20*)
understanding  (*16*)
understands  (*1*)
Understood  (*23*)
underway  (*1*)
unique  (*1*)
UNITED  (*2*)
universe  (*1*)
University  (*5*)
unknown  (*1*)

unnatural  (*1*)
unprecedented  (*1*)
unprofessional  (*2*)
unreasonable  (*1*)
unsolicited  (*6*)
unusual  (*3*)
upcoming  (*2*)
update  (*4*)
updated  (*1*)
uploading  (*1*)
urgency  (*1*)
urgent  (*1*)
use  (*19*)
user  (*1*)
usual  (*4*)

< V >
vague  (*5*)
vaguely  (*3*)
valley  (*1*)
valuation  (*4*)
value  (*12*)
variations  (*1*)
various  (*8*)
vast  (*1*)
verbally  (*1*)
version  (*1*)
versions  (*4*)
versus  (*2*)
vice  (*6*)
Videographer  (*14*)
VIDEOTAPED  (*2*)
view  (*19*)
viewed  (*9*)
viewing  (*1*)
views  (*1*)
vigorously  (*2*)
Virginia  (*6*)
volume  (*1*)
vote  (*2*)
voted  (*2*)

< W >
Wachtell  (*38*)
Wait  (*8*)
waited  (*2*)
waiting  (*3*)
want  (*26*)
wanted  (*17*)

wanting  (*1*)
was/was  (*1*)
Washington  (*1*)
wasting  (*1*)
way  (*36*)
ways  (*4*)
weak  (*6*)
Wednesday  (*1*)
week  (*5*)
weeks  (*3*)
well  (*72*)
went  (*22*)
we're  (*12*)
We've  (*14*)
Wheelis  (*6*)
wholly  (*1*)
wide  (*4*)
willingness  (*2*)
window  (*1*)
windows  (*2*)
witness  (*9*)
witnessed  (*1*)
WLRK00001596  (*1*)
WLRK-00001596  (*1*)
Wolverine  (*5*)
word  (*5*)
worded  (*3*)
wording  (*3*)
words  (*5*)
work  (*4*)
worked  (*1*)
working  (*6*)
works  (*1*)
world  (*2*)
world's  (*1*)
worth  (*1*)
write  (*2*)
writes  (*1*)
writing  (*2*)
written  (*4*)
wrong  (*1*)
wrote  (*4*)

< Y >
Yeah  (*176*)
year  (*26*)
years  (*8*)
Yep  (*10*)
YORK  (*6*)

you-all  (*2*)

< Z >
Zierlein  (*1*)
Zoom  (*5*)

ERIC STARKLOFF

OCTOBER 23, 2025

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 23 | 11 | "dead" should be "debt" | typo |
| 24 | 16,20 | "Barra" should be "Berra" | misspelling |
| 25 | 10,22 | same as above | misspelling |
| 27 | 19 | "by" should be "my" | typo |
| 64 | 25 | "objection" should be "rejection" | typo |
| 92 | 23 | "not attach" should be "Nuthatch" | typo |
| 142 | 7 | "inequity" should be "an equity" | typo |
| 168 | 3 | "talk" should be "took" | typo |
| 176 | 5 | "commune" should be "communication" | typo |
| 177 | 2 | "have" should be "had" | typo |
| 178 | 5 | "hold" should be "held " | typo |
| 179 | 16 | "Emmerick" is "Emmerich" | misspelling |
| 181 | 18 | Same as above | misspelling |

Deposition of Eric Starkloff                                    In Re National Instruments Corporation Securities Litigation

I, ERIC STARKLOFF, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

11/11/2025

ERIC STARKLOFF

THE STATE OF Texas                    )

COUNTY OF Travis                      )

Before me, Possible Chinaka          , on this day 11/11/2025 personally appeared ERIC STARKLOFF, known to me or proved to me on the oath of                    or through License (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this day of 11 November           , 2025.

NOTARY PUBLIC IN AND FOR

THE STATE OF Texas

My Commission Expires: April 3, 2029

POSSIBLE CHINAKA
My Notary ID # 135509655
Expires April 3, 2029