# EXHIBIT 7

# FILED UNDER SEAL

UNITED STATES DISTRICT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:23-cv-10488-DLC

IN RE: NATIONAL INSTRUMENTS CORPORATION

SECURITIES LITIGATION

_____/

VIDEOTAPED DEPOSITION OF SHANE GOODWIN, Ph.D.

APPEARING REMOTELY

Friday, October 17, 2025

9:11 a.m. Central Time

Job #46412

REPORTED BY:

Cheri L. Poplin, CSR-5132, RPR, CRR

APPEARING REMOTELY FROM WAYNE COUNTY, MICHIGAN

REMOTE APPEARANCES:


        FOR PLAINTIFF:


                FRANCIS KARAM
                Robbins Geller Rudman & Dowd, LLP
                58 South Service Road
                Suite 200
                Melville, New York 11747
                631.367.7100
                fkaram@rgrdlaw.com

                ALYSSA H. PLASCOFF
                JAI CHANDRASEKHAR
                CHRISTOPHER T. GILROY
                Robbins Geller Rudman & Dowd, LLP
                420 Lexington Avenue
                Suite 1832
                New York, New York 10170
                212.432.5100
                aplascoff@rgrdlaw.com
                jaic@rgrdlaw.com
                cgilroy@rgrdlaw.com


        FOR DEFENDANTS:

                JOHN D. COMERFORD
                JEREMY M. HOFMAN
                Dowd Bennett, LLP
                7676 Forsyth Boulevard
                Suite 1900
                St. Louis, Missouri 63105
                314.889.7300
                jcomerford@dowdbennett.com
                jhofman@dowdbennett.com


ALSO PRESENT:

        Matthew Cain
        Alex Held, Video Technician

TABLE OF CONTENTS

WITNESS                                                    PAGE

SHANE GOODWIN, Ph.D.

EXAMINATION BY MR. KARAM                                    5

EXAMINATION BY MR. COMERFORD                              275

RE-EXAMINATION BY MR. KARAM                               283

EXHIBITS

(Exhibits attached to transcript.)

MARKED                    DESCRIPTION                      PAGE

EXHIBIT 1        Expert Report of Shane Goodwin
                 6/16/25                                    7

EXHIBIT 2        Expert Report of Shane Goodwin
                 8/27/25                                    7

EXHIBIT 3        Expert Report of Matthew D. Cain,
                 Ph.D. 7/28/25                              7

EXHIBIT 4        Antolini v. McCloskey Opinion and
                 Order                                     44

EXHIBIT 5        In re Rezulin Products Liability
                 Litigation Pretrial Order No. 12          46

EXHIBIT 6        Castellano v. Young & Rubicam, Inc.
                 Printout                                  65

EXHIBIT 7        Court's Opinion and Order                103

EXHIBIT 8        Emerson News Release
                 Bates BofA_003270 - 3293                 113

EXHIBIT 9        Email string 6/22/22 - 7/7/22 re:
                 Follow-up to NI letter dated June 16
                 Bates NAT-SL-00001250 - 1251             129

EXHIBIT 10        Does Revlon Matter? An Empirical and
                  Theoretical Study                              171

EXHIBIT 11        Applied Mergers & Acquisitions by
                  Robert F. Bruner                              178

EXHIBIT 12        Project Wolverine Discussion
                  Materials June 2022
                  Bates NAT-SL-00001513 - 1545                  189

EXHIBIT 13        BofA Securities engagement letter
                  6/10/22
                  Bates NAT-SL-00001554 - 1566                  193

EXHIBIT 14        Directors' Duties for M&A, Takeover
                  and Activism Preparedness, Wachtell
                  May 2022
                  Bates NAT-SL-00025277 - 25308                 201

EXHIBIT 15        Project Wolverine: Meeting of the
                  Board of Directors, Wachtell June
                  14, 2022
                  Bates NAT-SL-00020537 - 20557                 216

EXHIBIT 16        Email string 9/1/22 re: NATI -
                  Broadridge NOBO/privileged and
                  confidential (8/29/22 record date)
                  Bates NAT-SL-00010806 - 10807                 227

EXHIBIT 17        Email 9/19/22 from Eddie Dixon re:
                  Board Exec Session re
                  Wolvering/10:30 am CST (11:30 EST;
                  8:30 PST)/privileged and
                  confidential
                  Bates NAT-SL-00023189 - 23190                 228

Page 5

REPORTED REMOTELY FROM WAYNE COUNTY, MICHIGAN

Friday, October 17, 2025, 9:11 a.m. Central Time

VIDEO TECHNICIAN:  We are now on the record.  Today's date is October 17th, 2025.  The time is 9:11 a.m. Eastern [sic] time.  This is the recorded video deposition of Shane Goodwin being taken In Re: National Instruments Corporation Securities Litigation filed in the United States District Court for the Southern District of New York, Civil Action Number 1:23-cv-10488-DLC.

My name is Alex Held and I am the videographer.  The court reporter is Cheri Poplin.  We are both from Everest Court Reporting.  All counsel appearing today will be noted on the stenographic record.  And will the court reporter please swear in the witness.

SHANE GOODWIN, Ph.D., was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. KARAM:

Q.  Good morning, Dr. Goodwin.  My name is Francis Karam.

Page 6

I represent the lead plaintiffs in this case.  I'm with the law firm of Robbins Geller Rudman & Dowd.  With me in the room is Alyssa Plascoff, and other members of my team are doing this deposition remotely.

So you have before you your June 16th expert report, do you not?

A.  I do.

Q.  All right.  And can you please confirm for me that this is the expert report that you produced to be filed with the court?

A.  Yes.  It appears so.  Yes.

Q.  I'm going to ask you to -- can you see on the top of the document there's a -- there's a court notation?  Is that on your copy?  And it has page numbers on there?

A.  It does.

Q.  Do you see that?  All right.  I'm going to ask you to turn to Appendix A of your report, and go to Page 41 of 48.

A.  Okay.  Yes, sir.

MR. KARAM:  So we -- before we start, let's -- we're going to mark that as Exhibit Number 1.  And then we're going to mark your reply report as Exhibit Number 2.  And we're going to mark Dr. Cain's report as Exhibit Number 3.

Page 7

VIDEO TECHNICIAN:  And, counsel, are these all located in Tab A?

MS. PLASCOFF:  Tab A contains both of Goodwin's exhibit reports, and Tab B is Cain's July report.

VIDEO TECHNICIAN:  Thank you.

(Marked EXHIBITS 1 - 3 for identification)

BY MR. KARAM:

Q.  And just look up when you're -- when you're ready.

A.  Oh.  I'm ready.

Q.  Okay.  Good.  All right.  So this page, which is A-6 in your report, sets out your educational background, does it not?

A.  It does.

Q.  You have a bachelor's degree from University of Tulsa; is that right?

A.  Yes.

Q.  An MBA from Northwestern with coursework at the University of Chicago; correct?

A.  Correct.

Q.  Ph.D. from Oklahoma State?

A.  Correct.

Q.  Postdoctoral work at Harvard?

A.  Correct.

Q.  And then the most interesting to me you have a Master

Page 8

of Law from SMU Dedman School of Law; right?

A.  I do.

Q.  Okay.  Do you -- you obtained this Master of Law without having a JD; is that correct?

A.  That is correct.

Q.  All right.  Can you explain that to me?  I'm really not familiar with anybody who has a Master of Law without first obtaining a JD or equivalent.

A.  Sure.  So it actually depends on the school.  Other schools will actually allow certain individuals to do an LL.M. without getting a JD.  University of Pennsylvania, for instance, has -- if you have another -- what they would say another terminal degree, so most likely a Ph.D., or if you can approve equivalence of knowledge in another -- in another capacity.  SMU is one of those schools.  This actually came to me by -- when I was at Columbia.  Somebody mentioned to me that, I believe, and I don't know the person who did it, but someone at Columbia has also done it as well.  So you can obtain a master's without a JD if the school is willing to grant it.

Q.  In that master's pro -- in that LL.M. program, you -- you read case law like a -- I mean, I went to a regular law school.  It's a long time ago.  But the professors would assign us cases to read and we would

Page 9

read them and brief them and then answer questions in class. Is that the type of program this was?

A.   Yes. I mean, it's very much taking a lot of similar courses, the normal JD, I guess you would call it, equivalent courses with a -- more of a focus on specialization, and so for me I was able to take a lot more corporate law or securities as opposed to maybe taking a lot more federal, you know, evidence and things like that. So really what it does it just allows you to tailor your education to your specific needs knowing full well, as you know, Mr. Karam, is that I'm not a practicing attorney. I'm not eligible to really sit for a bar nor do I want to. It's not what my -- my desires were. So it was really about how do I fulfill some of the knowledge I was seeking in a tailored way.

Q.   So you have taken courses on securities law?

A.   I have.

Q.   And in those courses was the concept of materiality discussed?

A.   I presume it would have been because we talk about, you know, the very classic maybe insider trading and do their cases, the very standard cases of Texas Gulf and Chiarella and Dirks and things like that.

Q.   So you mentioned you're not admitted to any bar; is

Page 10

that right?

A.   I am not. No, I am not.

Q.   And have you ever written a brief that was presented to a court or participated in the writing of a brief by writing a section of a brief that actually was presented to court?

A.   I can't recall. Nothing comes to mind at the -- at all in that regard, no.

Q.   Can you describe for me any practical experience that has put your LL.M. -- in which you have used your LL.M.?

A.   Well, from a practical standpoint, you know, as I said, I've really pursued this, you know, as a first generation college student. It was something that I wanted to do at some particular point, and a lot of the stuff that I've done, as you probably have seen from my background, was around M&A, and, as you know well, Mr. Karam, is that M&A is not only just a business part of an interdisciplinary approach, it also really touches upon the legal frameworks as well, and so I just wanted to be much more well-versed in that because, as you can see from my background, I am not a full-time practicing, you know, practitioner in M&A as far as a banker anymore. My goals and what I'm doing are in the classroom with students and also to

Page 11

do some writing, and I felt like I wanted to learn more so I could add some more value in that regard.

Q.   So please turn to Page 44 of 48. And you describe your publications and working papers on this page.

A.   Yes.

Q.   So do any of these papers deal with quantitative studies on how information enters markets?

     MR. COMERFORD: Object to form.

A.   Can you just be a little bit more specific, Mr. Karam, as far as when you say enters markets and the information?

BY MR. KARAM:

Q.   The -- you're aware of an area of finance that is interested in how markets respond to information?

A.   Yes.

Q.   And maybe a subcategory of market efficiency? Do you understand that?

A.   I do.

Q.   Do any of your papers deal with the quantitative aspect of that subject?

     MR. COMERFORD: Form.

A.   Well, definitely Number 16. You know, anything related to probably the things that I've done related to my dissertation is -- as you probably are aware, a dissertation particularly in finance and focused on

Page 12

finance was around shareholder activism. It is an empirical work.

BY MR. KARAM:

Q.   So I'm going to refer you to Number 12, which is "hedge Fund Activists That Seek Board Seats [that] Generate Long-Term Value."

A.   Yes.

Q.   Can you just briefly summarize that paper?

A.   Sure.

     MR. COMERFORD: Form. Object to the form. Go ahead.

A.   Well, actually that was not a paper. That was actually an article written by Bloomberg that cited my dissertation.

BY MR. KARAM:

Q.   I see that. Thank you. I stand corrected.

A.   Okay.

Q.   So is it correct that on this subject there are occasions when hedge fund activists acquire stock in a company with the intention of putting up candidates for board seats in order to change corporate direction or strategy?

     MR. COMERFORD: Form.

A.   The work that I did in my dissertation, again, my dissertation, there were a number of approaches that

Deposition of Shane Goodwin, Ph.D.   In Re National Instruments Corporation Securities Litigation

Page 13

an activist can take as far as their tactics, one of which, as you highlighted, Mr. Karam, is to seek board seats if they felt they needed to to ultimately effect their objective.

BY MR. KARAM:

Q.   Do any of your papers -- for the purpose of any of these papers, have you created an event study?  In other words, do any of these papers contain an event study that you yourself created?

MR. COMERFORD:  Object to form.

A.   The -- well, my dissertation, as I mentioned, and the corporate governance and hedge fund activism as I note here that's published in SSRN, Number 16, I don't have it in front of me, but I'm quite confident that those -- that the dissertation I certainly know has event studies in there.

BY MR. KARAM:

Q.   And you created those event studies?  You did that work yourself?

A.   I did.

Q.   Okay.  And since your dissertation, do any of these other papers contain event studies that you yourself created?

MR. COMERFORD:  Form.

A.   I think only the -- with respect to an event study

Page 14

that was done really was part of my dissertation, so if there were any references to my dissertation, that would be the link to the -- to the event study.

BY MR. KARAM:

Q.   Let's turn to Page 45 of 48, which is your past expert testimony.

A.   Okay.

Q.   Hold on a second.  Let me just change the view so I can see you.  All right.  That will be good for the time being.  We'll change it later.

So this VLSI Technology case you testified about alternative assets, private equity, M&A, and corporate governance; is that right?

A.   Yes.  That is correct.

Q.   Was -- was materiality or an event study a part of that testimony?

MR. COMERFORD:  Form.

A.   An event study was not.  Yeah.  I can't speak to whether materiality was part of it.  The -- I can't speak for sure if it was part of materiality in that regard.

BY MR. KARAM:

Q.   In the Omni Newco case, it was about the termination of a merger agreement.  Same question.  Was materiality or an event study a part of that

Page 15

testimony?

A.   An event study was not.  You know, I can't be sure whether materiality was part of this.

Q.   And then the third case, United States versus Martino-Fleming.  The same question.  Was materiality or an event study a part of that testimony by you?

MR. COMERFORD:  Form.

A.   I did not conduct an event study, but, yeah, I can't be sure about the materiality question.

BY MR. KARAM:

Q.   So would it be correct that in the three times you have testified you have not created an event study for the purpose of your expert testimony?

MR. COMERFORD:  Form.

A.   In these three situations I did not conduct an event study.

BY MR. KARAM:

Q.   And just looking back on the entirety of your resume, I know you have a lot of investment banking experience, have you ever been asked to give a formal opinion on the subject of materiality in any of your investment banking or corporate experience?

MR. COMERFORD:  Form.  Calls for a legal conclusion.

A.   Can you be more specific, Mr. Karam, with respect to

Page 16

like a formal opinion?

BY MR. KARAM:

Q.   Sure.  For example, if you're an investment banker, has any -- have you been asked to present to a board of directors about the materiality of any information?

MR. COMERFORD:  Form.

Go ahead.

A.   Inclusive in our work, investment banking and particularly what was happening here around fairness opinions, which I have done plenty of, part of those discussions are somewhat inclusive.  It's not necessarily individually highlighted, but it is inclusive and robust or what I'd say is holistic within the work we do.

BY MR. KARAM:

Q.   So you're talking about fairness opinions, but have you ever given an opinion about whether a specific item of information is or is not material?

MR. COMERFORD:  Form.

A.   I can't recall if I've ever provided a specific isolated opinion just with respect to materiality.

BY MR. KARAM:

Q.   All right.  So now turn to Page 46 of 48.  This is Appendix B, the materials that you considered.

Dr. Goodwin, is it your testimony that this

Page 17

is the entire universe of documents that you considered for the preparation of your June 16th report?

A.   These are the materials that I've highlighted here in Appendix B as what I've considered.

Q.   And you didn't withhold anything?

A.   No.

Q.   You've turned over everything to us that you've considered; correct?

A.   If I cited it and considered it, then it is definitely included in here.

Q.   So you looked at -- under "Legal Filings" you looked at the legal filings in this particular case; correct?

A.   Yes.

Q.   And you cite three legal opinions regarding the definition of materiality; is that right?

A.   Yes.

Q.   And you've read all of those three cases?

A.   I've looked through those three cases.

Q.   And your legal education has helped you to understand those cases?

        MR. COMERFORD:  Form.

A.   I can't isolate what helped me.  As I mentioned before, I've been involved in corporate finance as a practitioner, as a board member, as an academic and --

Page 18

for over 30 years, and so I'd rely on all of my experience, not just what I formally did at law school.

BY MR. KARAM:

Q.   But it's not the first time you've read legal cases?

A.   It wasn't the first time I've read a legal case in law school either.  I've read legal cases before that.

Q.   Did you -- did you understand those three legal opinions?

        MR. COMERFORD:  Form.

A.   I don't mean to be cute here, Dr. Karam, but, I mean, I've read them.  I guess I don't -- when you say did I understand them, I've read them.

BY MR. KARAM:

Q.   Many a law student has said that.

        All right.  So then you list three SEC filings of National Instruments; right?

A.   Yes.

Q.   And you list Emerson's public disclosures; correct?

A.   Yes.

Q.   And then you have a list of documents, "Emerson-National Instruments Communications"; correct?

A.   Yes.

Q.   And then you list "National Instruments Internal

Page 19

Documents"; right?

A.   Yes.

Q.   And if you count those, there are eight National Instruments internal documents that you have reviewed?

A.   That is correct.

Q.   Then you have the next a list of "Publicly Available Materials" which are some papers and some articles; correct?

A.   That is correct.

Q.   And there are -- there are ten of those; right?

A.   That is correct.

Q.   You do not list any securities analysts reports for National Instruments; is that right?

        MR. COMERFORD:  Form.

A.   I did not list any security analysts papers or their reports.

BY MR. KARAM:

Q.   And you're aware that a number of sell-side security analysts followed National Instruments during this time period; right?

        MR. COMERFORD:  Form.

A.   I know there were security analysts that covered National Instruments.

BY MR. KARAM:

Q.   And have you before you wrote your report spoken to

Page 20

any of the National Instruments management, executives, or board members to get their account of the events in question?

A.   I did not.

Q.   So you've never spoken to Mr. Starkloff; is that right?

A.   I did not.

Q.   And nor Mr. McGrath; right?

A.   That's correct.

Q.   Ms. Rapp you've never spoken to?

A.   That's correct.

Q.   Mr. Dixon you've never spoken to?

A.   That's correct.

Q.   Mr. Ilcisin?  Same thing?

A.   Correct.

Q.   Have you read or reviewed any written statements by any of these individuals about the events in question?

        MR. COMERFORD:  Form.

A.   Well, yes, I have.  I've reviewed some of their depositions since I wrote my first report.

BY MR. KARAM:

Q.   Okay.  But before you wrote -- I'm talking about before you wrote your first report.  Did counsel, for example, provide you with interview statements or the equivalent other than the emails you have listed here?

Page 21

MR. COMERFORD:  Form.

A.  It would be the internal communication or the emails that I have listed.

BY MR. KARAM:

Q.  Has counsel orally discussed with you and relayed to you the statements or information from the executives in question?

MR. COMERFORD:  Form.

A.  Not that I recall.  Again, I reviewed the documents, the produced documents that I've listed here.

BY MR. KARAM:

Q.  Okay.  Let's go to the -- go back to the "National Instruments Internal Document" list, these eight documents.

A.  Okay.

Q.  How were those documents selected?

A.  When I was asked to consider this particular matter, as I always do, I think about the scope of work that I'm going to be doing and make a request, some of this was already available for obvious reasons, about, you know, information that would be helpful for me as I do my work, so I requested any kind of internal communications, emails of that matter.

Q.  And your request was of that nature.  Any kind of relevant internal documents; right?

Page 22

A.  Well, I don't know specifically, sir, Mr. Karam, if it was worded like that, the way that you said.  It would be to really support, I guess, my assignment that obviously I had agreed to undertake.

Q.  And you made this request of counsel?

A.  Yes.

Q.  Who -- what counsel did you -- were you dealing with?

A.  The law firm of Dowd Bennett.

Q.  Okay.  Any individuals?

A.  Yeah.  As -- well, as you're probably asking, those individuals are no longer part of Dowd Bennett.

Q.  Okay.  And was that an oral conversation or was that in writing by email, if you can remember?

A.  I actually can't recall, sir.

Q.  So you said in sum and substance, I don't want to put words in your mouth, but you said something like please provide me with all the relevant documents in order for me to write an expert report?

MR. COMERFORD:  Form.

A.  Well, maybe I'll characterize it as any time I start any particular project, not just working on something like this, I think about the information I will need, obviously the information as you characterized, Mr. Karam, that would be relevant to what I want to accomplish, and any internal documents obviously as I

Page 23

cited here that they felt would be relevant and that I would need and that I would also, quite frankly, make suggestions about things that I would want as well, and that would be more of a general ask that I would probably do.

BY MR. KARAM:

Q.  Okay.  So you had read the Complaint in this case before you had this conversation with counsel?

A.  Yes.

Q.  So you basically knew what the case was about?  You had read other documents, the Court's decision on motion to dismiss, et cetera?

MR. COMERFORD:  Form.

A.  I certainly know I read the Complaint because that's usually the first thing that I always look at to understand the matter at hand and obviously what the nature of the action is.  I can't recall if I read the motion to dismiss and others during that particular time.

BY MR. KARAM:

Q.  Okay.  And -- and so it was counsel who selected these eight documents and provided them to you?

A.  Counsel would have had to select and then share that information with me since I didn't have access to it.

Q.  How did they do that?  Was it -- did they send you an

Page 24

email with attachments or did they give you access to a folder, a system?

A.  Those were probably provided through a link, not directly to Dowd Bennett, but to a firm as I highlighted in my report that I worked with, Analysis Group, and I rely on them to aggregate data and create a folder as well so that my link and access to the actual documents were through Analysis Group.

Q.  And did you have any assistance or help from Analysis Group by an individual or more -- or other individuals?

A.  A number of individuals.

Q.  What were their -- what were their roles?  What did they do?

A.  They work at my direction, quite frankly, and under my supervision.  They are a team led by Nick Crew that allows -- really affords me the ability to, as I did in my career, have a team to work with me so I can at their -- my direction to them to gather information, do some analysis, perhaps even, you know, check citations and things like that.

Q.  Did any of those individuals draft a portion of your report?

A.  If they drafted any original or any documents, it was actually at my discretion, but the actual final

Page 25

version, the signed final version are all my words.

Q.   When you say all your words, if somebody else drafted it, then, by your words, you mean you approved their draft or -- and made edits to it; is that correct?

A.   Generally, unfortunately, much to the chagrin of people on my team, I make edits, so I don't blanket ever approve anything, so that's why I said I made edits and then the final version was mine.

Q.   All right.  Let's go back to the eight internal documents that counsel provided to the access group.
     When you received those documents, you reviewed them, did you not?

A.   I did.

Q.   Did you then make a follow-up request to counsel for any additional documents?

A.   What I would say, Mr. Karam, is I don't know the order of sequence, so when -- you know, I wouldn't assume that they just supplied all of these all at once.  It may have been four, and as I made other requests, I received other information, so it wasn't here you go, you're done.  It was this is the final, as I've highlighted here, but that doesn't mean this was what they provided up front.

Q.   Do you remember what they provided up front?

A.   I can't recall exactly.

Page 26

Q.   Do you remember asking for something that you felt was not provided?

A.   No.  Anything that I've asked for I've been able to obtain.

Q.   But I mean in the first round.

A.   If it's available.  If it's available.

Q.   Okay.  But in the first round you said it might have been four documents.  Do you remember which documents, if any, you asked for in the second round?

A.   No.  And, again, just to be a little bit more specific, it might have been a second or a third request.  I -- as you know very well, these are very iterative.  It's not static as far as when I start I have all the information and I'm done.  It's an ongoing process and very iterative.

Q.   So as a result of this iterative process, these eight documents, you were satisfied that they provided you with the documents that you needed in order to provide an expert opinion in this case?

A.   The information that I provided in Appendix B, Mr. Karam, is the information I did -- I needed to provide my opinion.

Q.   Let's now go down to the "Publicly Available Materials."  I don't want to get ahead of ourselves, but during your report you refer to something called

Page 27

the "Just Say No" defense; is that right?

A.   That is correct.

Q.   Do any of these ten publicly available materials provide a statistical analysis of the probability of success of the "Just Say No" defense?

     MR. COMERFORD:  Form.

A.   I don't know, Mr. Karam.

BY MR. KARAM:

Q.   Okay.  All right.  Now I'm going to ask you to go to Dr. Cain's report, which is Exhibit 3.

A.   Okay.

Q.   And to page -- Appendix B, Page 71 of that report.

A.   Okay.  I'm there.

Q.   So you see Dr. Cain refers to court filings and then in the next subheading a court -- one court decision, and then he has a heading that says "Academic Literature"; right?

A.   He does, yes.

Q.   And he cites or refers to -- forgive me.  I counted these.  There's a lot of them, but you can take my word for it or not, counsel can check my arithmetic, but there are 25 academic articles that he cites.

A.   I can see the list.  I don't know if it's 25, but I'll stipulate that if your math is correct.

Q.   Okay.  And then there are six SEC filings; right?

Page 28

A.   I can do that math.  Yes.

Q.   And then he has a list of documents produced in discovery, and this is -- once again, I took the time to enumerate these -- this list, and he refers to 163 documents.

A.   I see the list.

Q.   And you referred to eight documents, eight internal documents that were produced in discovery.

A.   The eight internal documents as it relates to National Instruments.

Q.   So you wrote a reply report; right?

A.   I did.

Q.   And in the process of creating that reply report, you looked at all of the documents that Dr. Cain cited; right?

A.   I did.  Part of my assignment on the reply report was to reply or respond to Dr. Cain's report.

Q.   And is it correct that none of these 163 documents cited by Dr. Cain caused you to change your opinion in your reply report?

A.   None of those documents that I reviewed and obviously as noted in my reply report from August 27 has caused me to change my opinion.

Q.   You had not read these documents before you arrived at your original opinion in your June report?

Page 29

A.   That's correct.  Or else they would be noted.

Q.   So having read all of this new evidence that you had not known about before reaching your first opinion, you confirmed your first opinion and did not change it; is that right?

A.   Yes.  My opinion that I -- in my expert report from July 16th is still my opinion.

Q.   Did you do anything, for example, consult with colleagues at Analysis Group or anywhere else, to assure yourself that you were not biased about holding your first opinion in the face of new evidence?

        MR. COMERFORD:  Form.

A.   There are discussions that I had with the team, particularly the team at Analysis Group, that I wanted to ensure obviously as I reviewed the additional materials that were cited in Dr. Cain's report if there was going to be a change, then those were maybe just part of discussions, but, as I mentioned earlier, Mr. Karam, I reviewed those and my opinion still stands.

BY MR. KARAM:

Q.   Are you familiar with the term "confirmation bias"?

A.   I am.

Q.   What is that?  How do you understand that?

A.   Well, confirmation bias, again, I'm not going to hold

Page 30

myself out as a -- an expert in this part of the field, but it's a term particularly used sometimes in behavioral economics in which an individual may confirm their own opinions or something in a matter based on even new available information that they receive.

Q.   It's a natural human tendency when one forms an opinion to hold that opinion even when new evidence may subvert it or contradict it; right?

A.   I can't attest to whether it's a human condition.  I have not studied it.  I just cited to you what I do know the definition of it is.

Q.   But it's pretty well-known in behavioral finance; right?

A.   It is a stream of theory within the finance world, but obviously there's a whole stream of theory particularly at the Chicago school under -- with Eugene Fama and others that are much more of a market efficient approach and would dismiss behavioral finance.

Q.   Are you familiar with the term "availability bias" or "sampling bias"?

A.   I am familiar with those terms.

Q.   What's your understanding of that -- the meaning of those?

Page 31

A.   As I mentioned, Mr. Karam, there's a stream of behavioral finance -- and this obviously extends into psychology as well, so this isn't just within finance, but our -- these heuristics that people may rely on that can influence decisions, but I -- you know, just to be clear, that is a stream of research.  I'm just describing it to you.  I'm not saying I hold this opinion.  I'm not saying I validate it.  But there's also a stream of thought within the corporate finance world, you know, the market efficiency world as far as Eugene Fama and others that dismiss heuristics as well.

Q.   Sampling bias generally, and I'm not an expert in it either, but when a sample is self-selected, that can influence the way that a conclusion is drawn from that data; correct?

        MR. COMERFORD:  Form.

A.   As I mentioned, I'm not a behavioral finance person, so I understand it the way you've described it.

BY MR. KARAM:

Q.   And so in this instance, counsel and yourself have selected eight documents; right?

        MR. COMERFORD:  Form.

A.   I'm not sure I'd characterize it as just selected eight documents.  As I mentioned, I've requested

Page 32

documents, and then through an iterative process we -- I ended up, as I said, considering or relying on those eight documents.

BY MR. KARAM:

Q.   Between yourself and counsel; right?  Counsel selected some, you asked for others; right?

        MR. COMERFORD:  Form.

A.   As I mentioned, it was a -- more of an iterative process to get there, but we ended up, as you noted, with eight.

BY MR. KARAM:

Q.   And did you question with your team whether this selection of small group of documents influenced the outcome of your report?

        MR. COMERFORD:  Form.

A.   I can't recall all the conversations I had with my team.

BY MR. KARAM:

Q.   So in your first report you claim that you were able to reach a correct decision without having reviewed at least 155 of these 163 documents that Cain reviewed for his report; right?

        MR. COMERFORD:  Form.

A.   Mr. Karam, could you please repeat that question?  Sorry.

Page 33

BY MR. KARAM:

Q. Sure. Sure. So you see Dr. Cain has 163 documents here; right?

A. Correct.

Q. You cited eight documents; right?

MR. COMERFORD: Form.

A. I included eight documents in my materials considered.

BY MR. KARAM:

Q. Right.

A. Well, eight documents as produced documents by internal communication with --

Q. Internal documents. And he has the same thing. He has documents produced in discovery, the internal documents; right?

A. Well, he has produced documents of internal discovery. I don't know if they're all internal just to National Instruments, but . . .

Q. But you read them all?

A. The ones that he provided after -- or the ones that are listed here, the 163 that you had mentioned? Yes, I've gone through those. Yes.

Q. Okay. So I'm just going to do some lawyer arithmetic here. 163 minus eight equals 155; right?

MR. COMERFORD: Object to form.

A. I think that math is correct.

Page 34

BY MR. KARAM:

Q. Okay. Thank you. Because it's always dangerous when lawyers do math.

And I'm presuming your eight documents are included in this 163; right?

A. I did not confirm whether the ones that I put in my -- or listed here, the eight that you're referencing, are exactly the same as the ones that he's referencing.

Q. Right. You know, once again, I'm doing some arithmetic here, but eight is about five or six percent of 163; right?

MR. COMERFORD: Object to the form.

A. Mr. Karam, I agree with the math that you've just described, but creating, you know, a larger pool of documents doesn't mean they're relevant documents. It just means it's a larger pool of documents.

BY MR. KARAM:

Q. Okay. But you -- you reached your opinion on about five percent of the reviewed documents that Dr. Cain used to reach his conclusion; right?

MR. COMERFORD: Form.

A. Mr. Karam, you know, again, I'll just go back to that whether you want to include an enumerator or denominator as far as the size, it doesn't make the size of the sample, any of those documents any more

Page 35

relevant. The documents that I've cited as I put in my Exhibit B are documents that helped me with my judgment form my opinion, which has not changed, and after reviewing those 163 or maybe the additional 155, it didn't change my opinion, so adding more documents doesn't mean they're relevant to changing my opinion.

BY MR. KARAM:

Q. So you reached your opinion on about five percent of the documents that Dr. Cain reviewed; right?

MR. COMERFORD: Form.

A. You know, again, Mr. Karam, I -- I -- the math of eight into hundred -- is not -- you know, there's another part of finance and economics we have as well which is parsimony, which is can you actually get to your decision with as least amount of variables as possible. Adding a bunch of more variables actually just conflates and confounds the actual output. I would argue that parsimony is what we should be striving for, not just a lot of data that's not relevant.

BY MR. KARAM:

Q. Okay. No. We'll get to that.

A. All right.

Q. So you had already reached your opinion based on the eight documents that you reviewed; right?

Page 36

MR. COMERFORD: Form.

A. I reached my conclusion on -- on what I've cited in Exhibit B as my materials that I considered.

BY MR. KARAM:

Q. Right. The -- you know, the academic articles, et cetera, but I'm talking about internal discovery documents. Those eight. Right?

A. The internal documents that I listed are the ones that I considered.

Q. And then when Dr. Cain filed his report, you reviewed the 163; right?

MR. COMERFORD: Object to the form.

A. Yes. As I mentioned, Mr. Karam, my assignment obviously was to respond to Dr. Cain's report, and the only way to do that was obviously review the materials that he included in his documents produced.

BY MR. KARAM:

Q. And your -- you mentioned that none of those 163 did you consider relevant, right, the ones that Dr. Cain cited?

MR. COMERFORD: Form. Mischaracterizes the previous testimony.

A. Mr. Karam, that's not what I stated. I think I, apologize for making a confusing statement earlier, is I was talking in general, just adding documents that

Page 37

may not be relevant may increase your sample pool and therefore you can play with the math and the percentages. It doesn't mean those additional documents that you're adding in have any really relevance. That's -- that was my statement to that.

BY MR. KARAM:

Q. And is it your position that that is what Dr. Cain did, that he just stuffed -- you know, stuffed the ballot box with extra documents that were not particularly relevant?

A. I -- no. That's not what I stated.

Q. But you certainly reached your first -- you finished your first report without having reviewed these 163; right?

MR. COMERFORD: Form.

A. I submitted my first report on June 16th. After reviewing the materials that I considered that I've outlined in Exhibit B and, as I further mentioned, after reviewing Dr. Cain's report and also the information that he produced, it did not change my opinion at all.

BY MR. KARAM:

Q. So have you read Arthur Conan Doyle, the Sherlock Holmes stories?

MR. COMERFORD: I object to the form.

Page 38

Object to the relevance. It's harassing.

MR. KARAM: You consider a question about having read Conan Doyle as harassment?

MR. COMERFORD: Are you -- are you going to stick with this?

BY MR. KARAM:

Q. Dr. Goodwin, do you consider me asking you about Sherlock Holmes as harassing?

MR. COMERFORD: I consider it a waste of time, Mr. Karam.

MR. KARAM: Counsel, no -- counsel, no speaking objections, please.

MR. COMERFORD: Move on to a substantive question, please.

MR. KARAM: Counsel, you have your objection.

MR. COMERFORD: Let's -- why don't we take a break, Mr. Karam, so you can formulate a substantive question.

MR. KARAM: No. No. I'm going to ask my questions, counsel. And you can object -- counsel, you're admitted pro hac vice in the Southern District of New York. You're bound by the Rules of Evidence and the local rules as to objections.

MR. COMERFORD: I want you to --

Page 39

MR. KARAM: I'm asking you to do that.

MR. COMERFORD: I want you to articulate any relevance to the question that you're -- that you currently posed to this case.

MR. KARAM: Counsel, you're making a speaking objection. Relevance objections are not appropriate in depositions. I would hope that you know that. But I guess you don't -- you either don't know that or you're intentionally trying to obstruct this deposition. Which is it?

MR. COMERFORD: Continue to ask a question of substance and not ask the witness --

MR. KARAM: Counsel, you're speaking. You're speaking. You're speaking.

MR. COMERFORD: Let me -- let me finish before you cut me off, Mr. Karam.

MR. KARAM: No. No. Because -- because you're not making appropriate objections.

MR. COMERFORD: Let me -- let me finish my objection before you speak over me and cut me off, Mr. Karam.

MR. KARAM: Sir, sir, the word "objection" finishes your objection.

MR. COMERFORD: We're going to take a break until you agree with me that you're not going to speak

Page 40

over me while I'm speaking.

MR. KARAM: There's a question pending. Are you asking to take a break in the middle of a question?

MR. COMERFORD: The question pending is have you read Arthur Conan Doyle, and that is --

MR. KARAM: That's the question.

MR. COMERFORD: -- a question of no relevance to this case and I object to it and I'm asking you to move on and ask some substantive questions.

MR. KARAM: I don't have to obey your request.

MR. COMERFORD: Are you going to withdraw that question?

MR. KARAM: No.

BY MR. KARAM:

Q. Dr. Goodwin, Sherlock Holmes made a statement "It is a capital mistake to theorize before one has [all the] data. Insensibly one begins to twist facts to suit theories, instead of theories to suit facts."

Have you ever heard that saying by Sherlock Holmes?

MR. COMERFORD: Object to the form of the question.

Page 41

BY MR. KARAM:

Q. You can answer.

A. I don't know.

MR. COMERFORD: Mr. Karam --

BY MR. KARAM:

Q. You have -- you have in your report theorized before you have all the data; correct?

MR. COMERFORD: Object to the form.

A. Absolutely not.

BY MR. KARAM:

Q. You did not have the 163 documents that Dr. Cain cited; correct?

MR. COMERFORD: Object to the form. Mr. Karam, you are mischaracterizing these reports --

MR. KARAM: Counsel, you're having speaking objections. That's not appropriate.

MR. COMERFORD: You are mischaracterizing these reports in every way, Mr. Karam, and I don't even think you understand that you're doing it.

BY MR. KARAM:

Q. Dr. Goodwin --

MR. COMERFORD: Do you want to take a break and kind of orient yourself onto what these reports are, Mr. Karam?

MR. KARAM: Counsel --

Page 42

MR. COMERFORD: Because I feel like you're wasting everyone's time.

MR. KARAM: Your behavior is inappropriate.

MR. COMERFORD: Let's -- let's take a break.

MR. KARAM: No. We'll take a break when I agree to take a break.

MR. COMERFORD: We've been going for an hour, over an hour.

MR. KARAM: As soon as this line of questioning is over we can take a break.

MR. COMERFORD: You're telling me that you are --

MR. KARAM: Counsel, you're speaking. You're doing too much speaking. This is inappropriately obstructing the deposition.

MR. COMERFORD: Okay. I object that you are mischaracterizing the reports, you're asking irrelevant questions.

MR. KARAM: Counsel, stop talking.

BY MR. KARAM:

Q. So, Mr. Holmes uses the word "insensibly." Do you understand that word?

MR. COMERFORD: Object to the form.

BY MR. KARAM:

Page 43

Q. Do you understand what the word "insensibly" means?

MR. COMERFORD: Object to the form. It's vague and ambiguous. It has no relevance to this case.

BY MR. KARAM:

Q. Do you -- can you please answer the question?

A. Yeah. Mr. Karam, I'm not sure in what context you -- yeah.

Q. Okay. Insensibly means --

MR. COMERFORD: Mr. Karam, with that, we are going to take a break. And we're taking a break now. Let's go off the record.

MR. KARAM: I don't consent to taking a break.

MR. COMERFORD: Well, there's not much you can do about it. We're taking a break. And we'll be back in five minutes. Thank you.

MR. KARAM: Court reporter, please note that Mr. Comerford is walking out of the deposition.

VIDEO TECHNICIAN: Counsel, would you like to go off the record?

MS. PLASCOFF: Yes.

MR. KARAM: Reluctantly, yes.

VIDEO TECHNICIAN: Okay. Off the record. The time is 10:11.

Page 44

(Recess taken at 10:11 a.m.)

(Back on the record at 10:22 a.m.)

VIDEO TECHNICIAN: The time is 10:22. We're back on the record.

MR. KARAM: We are going to mark as Exhibit 4 the case of Antolini v. McCloskey.

MS. PLASCOFF: And that's DD.

MR. KARAM: 2021 Westlaw 5411176.

(Marked EXHIBIT 4 for identification)

MR. KARAM: And this is for Mr. Comerford particularly. Let's turn to Page 12. I'm sorry. Turn to Page 7 of the case. Alex, you're familiar with legal -- the page numbers are in bold at the top of the paragraph, so that's Page 11, 10 and 11, so go a couple pages earlier. Okay. Next page. Is that the right one?

MS. PLASCOFF: Yeah.

MR. KARAM: All right. So I'm just going to read this information into the record. So this -- this case refers to Federal Rule of Civil Procedure 30(c)(2). It says, "In order to avoid the use of speaking objections, courts have instructed counsel to object to a deposition question not calling for privileged information using the single word, 'objection,' or at most a short phrase." And it

Page 45

quotes Syntel Best Shores Mauritius versus TriZetto.

It cites another case. "'[C]ounsel ... shall refrain from making speaking objections when defending depositions.... Objections as to the form of the question shall be made by opposing counsel, who shall simply state, 'Objection.' The objecting counsel shall not speak any additional words concerning the basis of the objection unless a clarification is requested.')"

More citations.

"('Objections as to the form of the question shall be made by opposing counsel ..., who shall simply state, 'Objection.' The objection" -- "The objecting counsel ... shall not speak any additional words concerning the basis of the objection unless a clarification is requested.')"

More citations.

"('The parties shall henceforth state the bases for their objection with only a single word or, if necessary, a short phrase (e.g., 'compound question')."

And then finally, "('To ensure a fair deposition, it is best if counsel state objections to a question with a single word or phrase.')"

And in that case there were sanctions

Page 46

imposed on the counsel for repeated speaking objections.

We're going to mark as Number 5 In re Rezulin Products Liability Litigation.

MS. PLASCOFF: Which is EE.

(Marked EXHIBIT 5 for identification)

BY MR. KARAM:

Q. Please go to the -- it's the third page. The pages are not numbered on this. Where it says 1.8 -- the next page, Alex. Okay. So there's a paragraph that says "Objections." And in the middle of that paragraph it says, "Any objections that are made during the deposition must be stated concisely in a non-argumentative . . . non-suggestive manner, such as would be appropriate if the examination were conducted before a judicial officer. A party may instruct a deponent not to answer a question only when necessary . . ."

Then the next paragraph says, "Speaking Objections. No speaking objections shall be allowed. All objections as to relevance and admissibility shall be preserved until later ruling of the Court or time of trial. Objections as to the form of the question shall be made by any one opposing counsel, who shall simply state, 'Objection.' The objecting counsel

Page 47

shall not speak any additional words concerning the basis of the objection unless the examining counsel requests a clarification. Any clarification as to the basis of the objection shall be stated as succinctly as possible, e.g., 'Argumentative,' or 'Ambiguous.'"

I think I've made my record, and if counsel has any contrary authority that allows Mr. Comerford the type of objections that you're making, I'm very interested to see it, but I don't think it exists.

BY MR. KARAM:

Q. Dr. Goodwin, let's go to your June report, which is Page 8 of 48.

A. Okay. I'm there.

Q. So Paragraph 13 says, "I have been asked by Counsel to:

Subparagraph (i) Describe generally, based on my experience, the process and potential outcomes when a potential target is approached by an acquirer expressing an interest in acquiring a target."

Do you see that?

A. I do.

Q. Okay. And by that, that's like -- he's asking you for a narrative of how acquisitions generally happen; is that right?

MR. COMERFORD: Object to the form.

Page 48

A. I'm not sure he -- I mean, when you say he, but actually when counsel at Bennett, when we discussed the assignment, this was what -- part of the assignment was to describe the process and the potential outcomes of a potential target is approached.

BY MR. KARAM:

Q. Okay. And then (ii), which is Roman small Numeral ii, is "Analyze the indicia of probability and assess the probability of Emerson acquiring NI after NI sent its letter on August 2nd, 2022 rejecting Emerson's second proposal and whether this probability was higher than it was before on May 16th when Emerson first contacted NI with an unsolicited proposal to acquire all of NI's shares at $48 per share."

Do you see that?

A. I do see that.

Q. Okay. Did your assignment encompass or require you, ask you to do anything other than these two things?

A. No. This was the assignment that counsel asked me to conduct as part of my expert opinion.

Q. Okay. So -- so if you don't mind, it's a -- it's a long sentence, so I'm going to try to break it up into two parts. Right? So the first part is analyze the indicia of probability and assess the probability of

Page 49

Emerson acquiring NI after NI sent its August 2nd letter; right?

A.  Yes.

Q.  And you -- you did that, right, in your report?

A.  I did.

Q.  The second part I'm going to ask you to help me understand because I don't -- it's not clear to me. "Whether this probability was higher than it was before May 16th, 2022." What does that mean? Can you explain that to me?

MR. COMERFORD:  Form.

A.  Well, in very simplistic layman's terms is was the probability higher of a potential acquisition upon rejecting the second proposal by Emerson on August 2nd relative to May 16th or just prior to any engagement with Emerson.

BY MR. KARAM:

Q.  Okay.  That's helpful.  So -- so your -- your brief or your assignment was before May 16th there was zero probability because Emerson wasn't on the -- in the picture; right?

A.  I don't know if I would ever just say zero, but it's -- it's -- there was obviously very low probability of an Emerson acquisition because that's what the prob -- that's what I'm analyzing --

Page 50

Q.  Okay.

A.  -- up to May 16th.  When you say they weren't in the picture, clearly they are a market participant.

Q.  Right.  Okay.  But would it be correct is you were asked to compare no offer or pre offer with the status after the second rejection letter; right?

MR. COMERFORD:  Form.

A.  Mr. Karam, I guess I just want to make sure I'm careful on the wording and not to certainly paraphrase, so . . . Counsel asked me, as I've noted here, to analyze the indicia of probability and then assess that probability of Emerson acquiring NI after NI sent its August 2nd, 2022, rejection and what -- and Emerson's second proposal, so it was the second rejection, and whether that probability or -- was higher than it was before May 16th.

BY MR. KARAM:

Q.  Right.  Than no offer at all?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  There was no offer on the table before May 16th; right?

A.  From the evidence and the produced documents that I have reviewed, from my understanding, there was no offer on the table before May 16th around that time.

Page 51

Q.  Okay.  So then let's turn to in the -- on the ECF line it's Page 9 of 48 but on your report it's Page 6.

A.  I'm on Page 6 of 48 of my report.

Q.  Okay.  That's entitled "Summary of Opinions"?

A.  Oh, I'm sorry.  That's Page 9.  Okay.

Q.  Yeah.  No.  On your actual report I have it as Page 6, but on the court notation at the top it's 9 of 48.

A.  I do have that page.

Q.  Okay.  So in Paragraph 18, Subparagraph 1), you state, "Although Emerson had submitted two unsolicited, non-binding, and contingent proposals in May and June [of] 2022 to acquire National Instruments at $48 per share, the probability of an acquisition occurring as of the start of the Proposed Class Period was negligible."

Do you see that?

A.  I do see that.

Q.  Okay.  The term "negligible," can you -- can you quantify that?  Because you're talking about -- you're using a term "probability"; right?

A.  The probability of an acquisition occurring as of the start date of the proposed class period was negligible.  So, yes, probability.

Q.  Have you -- in my experience, maybe yours is different, but probability is generally expressed as a

Page 52

percentage or in a number; right?

MR. COMERFORD:  Form.

A.  Not always.

BY MR. KARAM:

Q.  Okay.  Can you put a number on -- on negligible in terms of probability?

A.  I did not specify a numerical value with respect to negligible.

Q.  And you don't -- you don't want to do that now?

A.  No.  My report is the report, which I still stand by, from June 16th, and, as I've mentioned, I did not put a numerical value on the word "negligible."

Q.  Well, what is, I mean, here I'm sitting now in Manhattan, is the chance of Manhattan being destroyed by a meteorite?  Is that negligible?

MR. COMERFORD:  Form.  Argumentative.

A.  Mr. Karam, I -- you know, I can't opine to that.

BY MR. KARAM:

Q.  The chance of the Dallas Cowboys winning the Super Bowl?

A.  I might have a view on that, but, no.  I can't opine to that.

Q.  Negligible?

MR. COMERFORD:  Same objections.

BY MR. KARAM:

Deposition of Shane Goodwin, Ph.D.      In Re National Instruments Corporation Securities Litigation

Page 53

Q.  All right.  Let's go back to the assignment, which is Page 5.

How were -- how was this assignment presented to you?  In other words, was -- did counsel email you this exact language or was there a phone conversation or in-person meeting where -- where the assignment was discussed?

MR. COMERFORD:  Form.  Compound.

BY MR. KARAM:

Q.  All right.  I'll withdraw it.

How was this assignment presented to you?

A.  When I started my conversations with counsel about this matter, and, as you can see from my history, I don't do this for a living and it's not my intended living, so I've been very particular about understanding the real nature of the assignment.  That's one of the things I've come to -- to appreciate is understanding what the scope really is and whether I truly believe I can add value and be a part of that process, and so I'm very particular on understanding this, and I don't know if this was the exact wording when we first sat down and had a conversation or we ended up there, but I'm very particular about the assignments that I take because I need to know if I can be -- add value and if I can ultimately complete

Page 54

the assignment.  So this -- this is, as I've put in here on June 16th, this is my assignment.

Q.  Was it an in-person meeting at which you were given this assignment?

A.  No.

Q.  Was it a conference call?

A.  There were definitely conference calls, Zoom calls, and then communications otherwise.

Q.  Emails?

MR. COMERFORD:  Form.

A.  I would imagine emails.  I mean, nothing comes to mind, but, like I said, other forms of communication, but definitely a conference call for sure in the very beginning.

BY MR. KARAM:

Q.  Okay.  Who drafted, in particular I'm -- I'm interested in Paragraph 13, Subparagraph (ii)?

MR. COMERFORD:  Form.  Vague.

A.  I don't know exactly -- I mean, I can tell you that the words on the page ultimately are mine because obviously, as I said, I signed it and I agreed to undertake this assignment.  Mr. Karam, I can't tell you exactly who drafted every single word on here.

BY MR. KARAM:

Q.  I'm interested to know -- you said "I've been asked by

Page 55

counsel," so I would -- is it correct that at least in sum and substance the words in 13 Sub (ii) originated with counsel in some form?

MR. COMERFORD:  Form.

A.  I can't answer that specifically.  As I mentioned, the process was I was contacted to see if I have an interest.  As you can see, I don't do this for a living, meaning being an expert witness.  I'm very selective because I have other -- a lot of other obligations.  And I'm very particular on the assignment, and when I mean that is do I believe I can add value, do I have knowledge, and so I'm very careful about what I'm undertaking and whether it's going to fit within my scope of duties.

BY MR. KARAM:

Q.  Did counsel ask you to opine on anything else that you felt you were not prepared to opine on?

A.  No.  Nothing comes to mind at all.

Q.  Okay.  So would it be correct that counsel did not ask you to opine on the significance of a possible acquisition by Emerson to National Instruments?

MR. COMERFORD:  Objection.  Form.

A.  I'm sorry, Mr. Karam.  Can you repeat that, please?

BY MR. KARAM:

Q.  Sure.

Page 56

MR. KARAM:  Can we have the court reporter read that back?

COURT REPORTER:  So would it be correct that counsel did not ask you to opine on the significance of a possible acquisition by Emerson to National Instruments?

MR. COMERFORD:  Form.

A.  Yeah.  I mean, the word in there of like "significance," I guess I don't -- so the answer is I don't recall, know, or have any understanding of any of those conversations about the word "significance."

BY MR. KARAM:

Q.  Okay.  So is it correct that counsel did not ask you to opine on the possibility of Emerson increasing its offer after the August 2nd rejection?

MR. COMERFORD:  Form.

A.  Mr. Karam, could you just repeat that so I just make sure I track?

BY MR. KARAM:

Q.  Sure.  Is it correct that counsel did not ask you to opine on the possibility of Emerson increasing its offer after the August 2nd rejection?

MR. COMERFORD:  Form.

A.  The only thing I can be very specific about that I know to be the fact is what is listed here under my

Page 57

assignment under Number 13 Roman Numeral (ii) of my assignment.

BY MR. KARAM:

Q. So the possibility of Emerson increasing its offer was not part of this assignment; right?

MR. COMERFORD: Form.

A. The assignment was to analyze the indicia of probability and assess the probability of Emerson acquiring NI after NI sent its letter on August 2nd, 2022, rejecting Emerson's second proposal and whether this probability was higher than it was before on May 16th, 2022.

BY MR. KARAM:

Q. So the answer to the question is no; right?

MR. COMERFORD: Form. Argumentative.

A. I'm just trying to be precise, Mr. Karam, in that --

BY MR. KARAM:

Q. I understand. But this is the precise question. You were not asked to opine on the possibility of Emerson increasing its offer after August 2nd?

MR. COMERFORD: Form.

BY MR. KARAM:

Q. Correct?

A. I did not opine to that in any way. What I opined to or what my assignment was is specifically denoted here

Page 58

in 13 (i) and (ii).

Q. Okay. So you were not asked to opine on it and you did not opine on it?

MR. COMERFORD: Form.

A. I opined exactly to the two questions that were posed to me by counsel in 13 (i) and (ii).

BY MR. KARAM:

Q. Okay. So the answer is you did not?

MR. COMERFORD: Object to form.

BY MR. KARAM:

Q. So you were also not asked to opine on the possibility of Emerson escalating its acquisition efforts in a more hostile manner; is that correct?

MR. COMERFORD: Form.

A. I apologize if I'm going to be repetitive here, but I -- I -- my assignment as delineated here in 13 (i) and (ii) is exactly what I opined to.

BY MR. KARAM:

Q. Okay. Right. So it's just what's written here and nothing else; right?

A. What's contained here was my assignment, and obviously the rest of my analysis and everything is part of the body of the report.

Q. Okay. But I want to just clarify and nail it down. You did not opine or were not asked to opine on the

Page 59

possibility of Emerson escalating its efforts to acquire in a more hostile way; is that right?

MR. COMERFORD: Form.

A. I'm just going to stick with what I've mentioned previously, which was my assignments were noted here in 13 (i) and (ii).

BY MR. KARAM:

Q. Dr. Goodwin, I'm allowed to probe --

A. Yeah.

Q. -- what your assignment was and what it was not. That's part of the information that the Court may be interested in.

A. Okay.

Q. So you were also asked -- not asked to opine on the possibility of Emerson taking its offer public to National Instruments' shareholders; correct?

MR. COMERFORD: Object to the form.

A. Well, is it -- I just want to make sure I'm tracking with what you're asking here. Obviously, as I mentioned, Mr. Karam, that my assignment is -- I believe I thought was very clear, so if it's not, I apologize. But what are -- I guess specifically you're I guess asking, then, as far as -- I just want to make sure I can be responsive to your question.

BY MR. KARAM:

Page 60

Q. I'm trying to find out what you opined about, what you were asked to opine about, and what you were not asked to opine about, --

A. My --

Q. -- that you did not opine on. I'm sorry. I didn't mean to interrupt you.

A. Oh, no, no. That's okay.

MR. COMERFORD: Form. Vague. Ambiguous.

A. So my -- the summary of my opinions which are listed in here, again, I'm just detailing what my assignment was and --

BY MR. KARAM:

Q. That's all -- I'm just interested in the assignment for now. We'll get to your opinions in a few minutes.

A. Okay. Then I -- if -- if it's clear, I hope it's clear, that this is the assignment, and I didn't list all of the things that may or may not have been an assignment, so this is specifically the assignment.

Q. Okay. That's why I'm asking you. You were not asked to opine on the probability or possibility of Emerson going public with its acquisition efforts?

MR. COMERFORD: Object to the form.

BY MR. KARAM:

Q. That was not part of your assignment?

MR. COMERFORD: Object to the form.

Page 61

A.   Mr. Karam, what -- I guess I'm -- I'm sorry if I'm not tracking, but I specifically responded to the assignment that was provided to me by counsel as noted here in 13 (i) and (ii), and -- and what I would say, I don't say that's it, but that's what I responded to, not all these other potential alternatives.  I just focused on what this assignment was.

BY MR. KARAM:

Q.   Okay.  And not on the possibility -- you were not asked to opine on the possibility or probability of Emerson accumulating stock as a takeover tactic; right?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   That's not in your assignment?  You were not asked to do that?

MR. COMERFORD:  Form.

A.   I was asked what I put down here in 13 Roman Numeral (i) and (ii) exactly what my assignment was.

BY MR. KARAM:

Q.   You were not asked to opine on the possibility of Emerson accumulating stock and threatening to run for board seats; right?  That was not part of your assignment?

MR. COMERFORD:  Form.

Page 62

A.   My -- I guess we'll keep doing this.  My assignment is exactly what I've listed here.  And I did not list all of the things that I did not -- were not part of an assignment, if you will.

BY MR. KARAM:

Q.   Okay.  Of which acquiring stock and threatening for board seats was one of the things that you were not asked to opine on?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   Right?

A.   I opined exactly to the assignment that I was provided with counsel that I've noted here in 13 (i) and (ii).

Q.   You were not asked to opine on the magnitude or significance of an acquisition to National Instruments; right?

MR. COMERFORD:  Form.  Asked and answered.

BY MR. KARAM:

Q.   That was not part of your assignment?

MR. COMERFORD:  Form.

A.   I've responded directly to the assignment that I was provided in 13 (i) and (ii), Mr. Karam.

BY MR. KARAM:

Q.   Of which the magnitude and significance of a takeover to National Instruments was not set out in 13

Page 63

Sub (ii); right?  That's not written down there?

MR. COMERFORD:  Form.

A.   The words "magnitude" is not written in my 13 Sub (ii).

BY MR. KARAM:

Q.   And "significance" is not written there either; right?

MR. COMERFORD:  Form.

A.   The word "significance" is not in that paragraph.

BY MR. KARAM:

Q.   Okay.  You were not asked to analyze the balance of the probability of an acquisition in connection with the magnitude or significance of an acquisition to the company; right?  That is not written here?

MR. COMERFORD:  Form.

A.   Mr. Karam, can you repeat that?  I missed the first couple of words.

BY MR. KARAM:

Q.   Sure.  You were not asked to opine on the balance or analysis of the probability of an acquisition compared to the significance or magnitude of the acquisition to the company, National Instruments?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   That's also -- that's also not written down in your assignment?

Page 64

MR. COMERFORD:  Form.

A.   Again, those words that you just stated are not written in 13 Sub (ii).

BY MR. KARAM:

Q.   Okay.  And that was your assignment; right?  Your assignment was set out in 13 Sub (ii)?

MR. COMERFORD:  Object to the form.

A.   Well, when you say set out, as I've mentioned, that was the assignment that I agreed to work with to analyze the -- the record and the produced documents and then provide my judgment to draft the report.

MR. KARAM:  Okay.  So this will be -- we're going to mark Number 5; right?  Is that 5?  No.  It's 6.  This is 6.

BY MR. KARAM:

Q.   Dr. Goodwin, if you recall, you don't have to look at it unless you want to, in your materials considered, one of them -- one of the items that you considered is the legal case of Castellano v. Young & Rubicam; is that correct?

A.   That is listed, yes.

MR. KARAM:  Okay.  So we are marking Number 6, which is --

MS. PLASCOFF:  C.  C.

MR. KARAM:  Yeah.  Tab C, Alex.

Page 65

(Marked EXHIBIT 6 for identification)

BY MR. KARAM:

Q.   And this is a Westlaw printout of the case of Castellano versus Young & Rubicam.  And I'd like you to look before we get to that at Paragraph 11 of your report which is on Page 4 of the report itself, Page 7 of 48 in the ECF notation.

A.   I'm there.

Q.   Okay.  So this -- in this paragraph you say -- you know, you talk about what your understanding is from Dowd & Bennett; right?

A.   Yeah.  Counsel provided the definitions for me with respect to this.

Q.   Okay.  They provided the definition of material non-public information; right?

A.   They did.

Q.   And you're basing your -- you at some point in your -- your report you actually make an opinion on the term whether information was material or not; right?  We'll get to it later, but I'm just asking as a general matter.

A.   Yes.

Q.   And your opinion on the issue of materiality is based on this definition provided to you by counsel?

MR. COMERFORD:  Form.

Page 66

A.   Well, again, they provided the definition of material non-public information and obviously the context in which it pertains to.  My analysis was really through my years of practice and academia and serving as a board member when I formed my opinion.  It wasn't just solely based on the words written here.

BY MR. KARAM:

Q.   But in terms of the -- did you abide by this definition of materiality?  Was that -- does that -- does that comport with your experience that you also brought in to give your opinion?

MR. COMERFORD:  Form.

A.   I did rely on the definition that they provided for me, and when I say rely, it's what they provided for me as the definition for material non-public information is what I relied on.

BY MR. KARAM:

Q.   Okay.  And so in the second sentence down there you say, "I further understand from counsel that for omitted information to be 'material,' there must be a 'substantial likelihood' that the information 'would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information available."

Do you see that?

Page 67

A.   I do.

Q.   And you used that definition of materiality to opine in your report, did you not?

A.   I did.

Q.   Okay.  So then there's another sentence that says, "In the context of contingent or speculative events, such as merger" -- "such as a merger, materiality 'depends on the probability that the event will be consummated, and its significance to the issuer of securities'" -- "'of the securities.'"

Do you see that?

A.   I do.

Q.   And that's -- you have a footnote there, a citation, and you cite the Castellano case; right?

A.   I do.

Q.   But as we discussed a few minutes ago, you were not asked to opine on the significance to the issuer of securities as part of your assignment?  That was not written in your assignment; correct?

MR. COMERFORD:  Object to the form.  Mischaracterizes reports.

A.   Yeah.  No.  Mr. Karam, that's not accurate.

BY MR. KARAM:

Q.   Well, let's go back to your assignment and you can show me where you were asked to opine on the

Page 68

significance to the issuer of securities in your assignment.

MR. COMERFORD:  Object to the form of the question.  It's misleading.

BY MR. KARAM:

Q.   I'm looking at Paragraph 13 Sub (ii); right?

A.   I am there.

Q.   The word "significance" is not in that assignment?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   Significance to the issuer of the securities.  It's not in -- it's not in the assignment.

A.   The words that you have just mentioned, significance is not listed here, but it's analyze the indicia of probability and assess the probability of Emerson acquiring, and so there are a lot of words that are not listed here in the assignment that go into the nature of reviewing and forming an opinion.

Q.   Right.  And some of those words are significance to the issuer of the securities; right?

MR. COMERFORD:  Form.

A.   That goes to the definition of materiality that was provided to me by counsel.

BY MR. KARAM:

Q.   It certainly does, and you were not asked to opine on

Page 69

it; right?

MR. COMERFORD: Form.

A. Well, I . . . My -- the analysis of indicia probability, the evidence of the probability and assess that probability, again, to be very succinct, that's what it says here, but inclusive in that is to do the analysis which obviously has to apply material non-public information, which, again, was provided to me in the context or by counsel, so even though the word "significance" may not show up here, it's part of the rest of the report as far as to do my analysis.

BY MR. KARAM:

Q. Do you know how many times the word "significance" appears in your report?

MR. COMERFORD: Object to the form of the question. Misleading.

A. I do not.

BY MR. KARAM:

Q. Once. In Paragraph 11 where you quote the Castellano case. That's the only time you discuss the significance to the issue -- issuer of securities and it's only to quote the Castellano case. Do you understand that? Do you realize that?

MR. COMERFORD: I object. It is misleading. Object to the form.

Page 70

A. It -- it's listed here, as I said, because, you know, this was provided to me, and, as I stated earlier, notwithstanding my background, I'm not an attorney, I don't practice as an attorney, and they provided to me the definition of material non-public information, and obviously this is referenced, as you mentioned, in the Castellano case.

BY MR. KARAM:

Q. And counsel did not ask you to opine on the significance to the issuer of the securities as part of your assignment; right?

MR. COMERFORD: Object to the form. Mischaracterizes the reports. Mischaracterizes the evidence.

A. I can only be repetitive again, Mr. Karam, as far as what my assignment was, but just because the word "significance," if you will, does not show up there, I still analyze what I would say the indicia of probability and assess that probability, and part of my work was to rely on counsel's definition that was provided to me.

BY MR. KARAM:

Q. But the whole sentence says "depends on the probability that the event will be consummated," which you spent a lot of time talking about and which you

Page 71

gave your opinion on; correct?

MR. COMERFORD: Form.

BY MR. KARAM:

Q. You gave an opinion on the probability that the event will be consummated; right?

MR. COMERFORD: Form.

A. Just to be very specific, Mr. Karam, I -- I did do that, but I don't recall spending a lot of time talking about that.

BY MR. KARAM:

Q. It's written in your report --

A. It is.

Q. -- seriatim. Right? Forgive me. I looked up -- you know, I did the word search on these things. I think the word "probability" is mentioned about 19 times in your original report, so you talked a little bit about probability in your report; right?

MR. COMERFORD: Objection. Mischaracterizes reports.

A. I did not do a word search on probability, so I guess I don't know how many times it showed up.

BY MR. KARAM:

Q. Okay. But this says "depends on the probability that the event will be consummated, and its significance to the issuer of securities"; right? So that's a --

Page 72

that's a sentence, is it not, in the English language; right?

MR. COMERFORD: Object to the form. It's compound, vague, misleading.

A. I'm sorry, Mr. Karam. Could you just repeat that so I can --

BY MR. KARAM:

Q. I'm just asking you, it's a sentence that's written -- it's taken from the Castellano case; right?

MR. COMERFORD: Form.

A. It is a, -- well, it's part of a sentence. It's quoted in quotations there where it says "depends on the probability that the event will be consummated, and its significance to the issuer of securities."

BY MR. KARAM:

Q. Okay. So there's two parts to this sentence or the fragment of it that's quoted here. There's "probability that the event will be consummated, and its significance to the issuer of securities"; right? Two things.

MR. COMERFORD: Form.

A. "And" is conjunctive, so yeah.

BY MR. KARAM:

Q. So it's two things, two parts?

MR. COMERFORD: Form. Mischaracterizes

Page 73

reports.

A.  It -- I guess I'll just say it again.  It depends on the probability of the event but that the event will be consummated and its significance to the issuer of securities.

BY MR. KARAM:

Q.  And you only opine on half of that question?

MR. COMERFORD:  Form.  Mischaracterizes reports.

A.  I opined to what I discussed a little bit earlier, Mr. Karam, as far as under 13 (i) and (ii) as to my assignment.

BY MR. KARAM:

Q.  So counsel only asked you to opine on probability and not significance; right?

MR. COMERFORD:  Object to the form. Mischaracterizes reports.

A.  I opined exactly what I described in my assignment as I put in there.

BY MR. KARAM:

Q.  Which is probability and not significance in your assignment?  Significance is not in your assignment?

MR. COMERFORD:  Objection. Mischaracterizes reports.

BY MR. KARAM:

Page 74

Q.  Yes or no?

A.  I'm reviewing, please.

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  By the way, the word "magnitude" appears nowhere in your original report.

MR. COMERFORD:  Objection. Form.

A.  Now that I'm looking at it, I apologize.  I forgot the question you actually asked.

MR. KARAM:  I'm having a senior moment. Can we ask the court reporter to read that question back?

COURT REPORTER:  The last question is:  By the way, the word "magnitude" appears nowhere in your original report.  You want before that?

MR. KARAM:  The one before that.

COURT REPORTER:  Okay.  The last question is:  So counsel only asked you to opine on probability and not significance; right?

There was an objection.

Answer:  I opined exactly what I described in my assignment as I put in there.

Question:  Which is probability and not significance in your assignment?  Significance is not in your assignment?

Page 75

BY MR. KARAM:

Q.  Is that correct?

MR. COMERFORD:  Object to the form. Mischaracterizes reports.

A.  So, Mr. Karam, again, I guess I'll just have to point you back to 13 (i) and (ii) for my assignment, and my opinions are fully disclosed in there, and I'm sure we'll get to those, and, as I mentioned, 11, Paragraph 11, as you're referring to, is the definition of material non-public information that was provided to me that I used in my analysis holistically.

BY MR. KARAM:

Q.  You can't bring yourself to admit that the word "significance" is not part of the assignment that counsel gave to you?  You're trying to evade that -- saying that; isn't that right?

MR. COMERFORD:  Object to the form. Argumentative.  Harassing.  Abusive.

A.  I'm not trying to avoid it.  Mr. Karam, I guess I was trying to be very specific to your question.

BY MR. KARAM:

Q.  Okay.  But my specific question is significance was not part of the written assignment that counsel gave to you, right, that's set out in Paragraph 13

Page 76

Sub (ii)?

MR. COMERFORD:  Object to the form. Mischaracterizes reports.

A.  Mr. Karam --

BY MR. KARAM:

Q.  Let me try to make -- I'm sorry.  Let me try to make it easy.  The word "significance" does not occur in Paragraph 13 Sub (ii); correct?

A.  The actual word "significance" does not appear in 13 Sub (ii) of my assignment, but what does is the, you know, analyzing the indicia probability so --

Q.  Right.  Probability is there but significance is not. That's the point I'm trying to make.  Do you understand that?

A.  And assess the probability.  When I'm doing my analysis and I relied on the information that was provided to me by counsel, that's the work that I undertook.

Q.  That work did not include analyzing the significance of the event to the company?

MR. COMERFORD:  Object.  It mischaracterizes the reports.

A.  I hate to admit this, Mr. Karam, but I think I'm having a senior moment.  I think I'm kind of lost on where we are on this.

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

Page 77

BY MR. KARAM:

Q.   Okay.  I tried to make it simple.  You're familiar -- it's right up here at 13 (ii); right?

A.   Yes.

Q.   It's too bad you couldn't do a word search.  If we did a word search for the word "significance" in Paragraph 13 Sub (ii), would we find the word "significance" in that paragraph?  I think the -- we would both agree that, senior moments that we have, the word "significance" is not in that paragraph?

A.   I said --

Q.   You looked at what counsel gave to you.

        MR. COMERFORD:  Object to the form.  Mischaracterizes the reports and mischaracterizes the assignment.

A.   Yeah.  As I said, Mr. Karam, the actual letters and words of "significance" are -- I certainly will stipulate they're not spelled out here, but that doesn't mean that it's not somewhat still applied, if you will, through the work that I did and then relying on the material non-public information definition and everything that we just talked about was provided to me by counsel, so, I mean, it's a lot more holistic than just saying do some words show up in a paragraph.

BY MR. KARAM:

Page 78

Q.   Right.  And you say you may have applied it somewhere in your report, but it's not mentioned anywhere in your report except for Paragraph 11, right, the word "significance"?

        MR. COMERFORD:  Object to the form.  Mischaracterizes the reports.

BY MR. KARAM:

Q.   Dr. Goodwin, we'll be taking breaks.  You can look through your report at one of these breaks, and if you find the word "significance" elsewhere than Paragraph 11, you can come back to me and point it out to me.

        All right.  Let's -- let's move on to the Castellano case.

        MR. COMERFORD:  I object that the prior question mischaracterizes Dr. Goodwin's reports.

BY MR. KARAM:

Q.   So let's go to Page 162 -- 172 of Castellano, and there's -- there's a series of head notes.  Do you see those?

A.   They're on the screen.  I don't have this printed out I don't believe, so -- so if --

Q.   Well, okay.

A.   -- that can be -- there's no way I can read that.

Q.   Okay.

Page 79

A.   Even with my glasses.

        MR. KARAM:  All right.  Alex, can you help us here?

        VIDEO TECHNICIAN:  You said Page 162?

        MR. KARAM:  172.

        VIDEO TECHNICIAN:  172.

BY MR. KARAM:

Q.   Do you want to -- if you want to take a short break, we can email this to your counsel and maybe he can print it out and that will make things a little easier.

A.   Maybe -- yeah.  Short break.  I know that we have seven hours, and I'm perfectly fine doing all of that, but I -- my daughter's in the hospital, so I do need to get home tonight and I have a 7:30 flight, so if we can just be mindful.  I'm willing to just keep going if possible.

Q.   Okay.  Well, let's -- let's take a short break.  I mean, my depositions rarely go the full seven hours on the record.

A.   Okay.

Q.   You know, I'm very mindful of people's time.  But obviously we have some ground to cover, so . . .

A.   Oh, yeah.  No.  That's what I said.  I don't --

Q.   I'll do my best.

Page 80

A.   You have your -- and I just want to -- I'm willing to forego, you know, my lunches and all that if we can do that if possible.

Q.   All right.  We'll try to keep things to the minimum, but I think we need to go through some things on this document, so let us take five.  We'll email it to you and counsel can print it out for you.

A.   Perfect.

        VIDEO TECHNICIAN:  Okay.  Off the record.  The time is 11:16.

        (Recess taken at 11:16 a.m. )

        (Back on the record at 11:29 a.m.)

        VIDEO TECHNICIAN:  The time is 11:29.  Back on the record.

BY MR. KARAM:

Q.   So, Dr. Goodwin, you have a printed copy of the Castellano versus Young case?

A.   I do.

Q.   All right.  Go to Page 172, Note 10.  So there's a -- what that note says is "For undisclosed fact to be "material" for purposes of Section 10(b) and Rule 10b-5, there must be substantial likelihood that disclosure of omitted fact would have been viewed by [a] reasonable investor as having significantly altered [the] total mix of information made

Page 81

available."

Do you see that?

A.   No.  I apologize.  What -- just I'm trying to orient myself here.

Q.   It's Page 172 and there's a series of notes that are numbered.

A.   Yep.

Q.   And this is Note Number 10.

A.   Oh, Note Number 10.  Okay.  Yes.  For materiality.  I see that.

Q.   All right.  And do you agree with that?  Is that correct?

MR. COMERFORD:  Objection.  Calls for legal conclusions.  Form.

A.   The only thing I can agree to is that's what this states.

BY MR. KARAM:

Q.   Well, that -- that's -- you were given a definition of materiality; right?

A.   That is -- that is correct.

MR. COMERFORD:  Calls for legal conclusions.

BY MR. KARAM:

Q.   And that comports with the definition of materiality you were given by counsel; right?

Page 82

MR. COMERFORD:  Objection.  Calls for legal conclusions.  Form.

A.   I'm sorry, Mr. Karam.  I did read it, but what specifically is the question?

BY MR. KARAM:

Q.   Is that consistent with the definition of materiality that you were given by counsel?

MR. COMERFORD:  Form.  Calls for legal conclusions.

A.   The words appear to be similar.

BY MR. KARAM:

Q.   And did you use that definition in sum and substance in your report to reach conclusions about materiality?

MR. COMERFORD:  Form.

A.   I used the, as I've noted here on Number -- Paragraph 11 in my first report, the definition that was provided to me by counsel.

BY MR. KARAM:

Q.   Right.  And that came from the Castellano case; right?

A.   That was cited from the Castellano case.

Q.   And this is -- this is the Castellano case that we're talking about here; right?

A.   That is.  Correct.

Q.   Okay.  So did you read -- how did you learn about the Castellano case to mention it in your materials

Page 83

reviewed?

A.   Well, some of this obviously, as I mentioned, was provided by counsel.  I didn't make this definition up.

Q.   No.  But counsel said take a look at this case, this Castellano case, we're going to be discussing it or you may -- you may use it?

MR. COMERFORD:  Form.

A.   I'm not sure if they said you may use it.  As I mentioned, they provided the definitions to me and obviously their citations, if you will, referencing where they would actually -- where they used it and that's what --

BY MR. KARAM:

Q.   So they cited the Castellano case and then did you look it up?  Did you have access to Lexis or Westlaw?  Or did they send you a copy of the Castellano case?

MR. COMERFORD:  Form.  Compound.

A.   Yeah.  I can't recall -- actually can you be -- there's two questions there, so I don't know which one to answer.

BY MR. KARAM:

Q.   All right.  Forgive me.  That's a correct objection, counsel.  Good job.

How did you get the copy of the Castellano

Page 84

case?

A.   I can't recall if they gave me a copy, but I -- I do have access to LexisNexis and Westlaw, so I may have looked it up.  I just don't -- I can't recall if they sent it to me or not.

Q.   And you read the Castellano case when you obtained it; correct?

A.   I did.

Q.   Was that before you were given your assignment or after you were given your assignment?

MR. COMERFORD:  Form.

A.   To be honest, I -- I can't recall if this were -- was a case that I've actually read previously.  As I mentioned, there are some classic insider trading cases like Chiarella and Dirks and Texas Gulf and a bunch of others that I know I read.  I can't recall if I've read this one prior to that.

BY MR. KARAM:

Q.   Okay.  I don't mean in your background or education.

A.   Oh.  Oh.

Q.   I mean specific to this assignment.  At some point you received the case or -- or -- or looked it up yourself and read it; right?

A.   Yes.  At some point.

Q.   And then so my question is was that before counsel

Page 85

gave you the assignment in Paragraph 13 Sub (ii) or after counsel gave you the assignment?

MR. COMERFORD: Form. Vague. Ambiguous.

A. I honestly couldn't recall. There's no way I can remember that.

BY MR. KARAM:

Q. Okay. All right. Let's go to Page 173.

A. Okay.

Q. Note Number 19.

A. Okay.

Q. And that note says, "There is no requirement that transaction need be probable for negotiations and preparations regarding this transaction to be 'material' under federal securities laws."

Do you see that?

A. I see the words. I see Note 19. Yes.

Q. All right. Were you aware of that statement before you were given your assignment?

MR. COMERFORD: Object to the form. Calls for legal conclusions.

A. I -- I don't know. And, I mean, I just can't recall.

BY MR. KARAM:

Q. Well, this statement makes your complete report irrelevant; right?

MR. COMERFORD: Objection.

Page 86

Mischaracterizes the opinion. Form.

A. I don't consider my opinion that I -- you know, well, first of all, I do want to be very clear. Obviously I know we're talking about my June 16th report right now.

BY MR. KARAM:

Q. Correct.

A. Yeah. So we -- hopefully we will get to it when we talk about my rebuttal report where we do talk a lot more about these issues. So I am being very specific to your questions on the June 16th report. And, no, I do stand by everything that I have in there.

Q. But this says there's no requirement that a transaction need be probable; right? That's what the first couple words of that note say.

MR. COMERFORD: Objection. Mischaracterizes --

BY MR. KARAM:

Q. Yes or no?

MR. COMERFORD: -- the case. The head note is not part of the case. Form.

MR. KARAM: Counsel, these are speaking objections, my friend.

MR. COMERFORD: You're mischaracterizing a head note and claiming it's part of the opinion.

Page 87

MR. KARAM: I didn't say that.

MR. COMERFORD: That's exactly what you said, Mr. Karam.

MR. KARAM: Counsel, no speaking objections, please.

MR. COMERFORD: I'm responding to your comments. I'm not objecting at this point. I'm responding to your comments.

MR. KARAM: Counsel, you're speaking.

MR. COMERFORD: You -- you made a comment to me and I'm responding to your comment. I'm not objecting to a question at this point.

MR. KARAM: You're speaking.

BY MR. KARAM:

Q. This says, "There is no requirement that transaction need be probable for negotiations . . ."

Do you see that?

MR. COMERFORD: Objection. Counsel is referring to a head note rather than the opinion.

BY MR. KARAM:

Q. That's what this says; right?

MR. COMERFORD: Form. Same objections.

A. Those -- what you just read, it's exactly the words that I'm reading, so, I mean, I agree that those are the words on this page. That's all I can agree to.

Page 88

BY MR. KARAM:

Q. Okay. And you were asked to opine on probability; right?

A. That was part of my assignment.

Q. The next Number 20 note says, "As materiality of company's negotiations and preparations regarding transaction is determined by considering both probability of event and its potential magnitude, relatively improbable event of significant [sic] magnitude could potentially be 'material' under federal securities laws . . ."

Do you see that?

MR. COMERFORD: Form.

A. I see the words that you just read, Mr. Karam, yes.

BY MR. KARAM:

Q. And did you have an understanding of that when you were writing your report?

MR. COMERFORD: Form.

A. Well, maybe a couple of things, Mr. Karam. So, first of all, I know you moved on from Number 19. I just want to make sure we're clear when you said you thought that this -- this note here, Number 19 head note, somehow, and I can't remember the term you used, but somehow made my opinions irrelevant or neutered them, how -- I don't know how you phrased it. I know

Deposition of Shane Goodwin, Ph.D.          In Re National Instruments Corporation Securities Litigation

Page 89

those weren't the words. I absolutely unequivocally reject what you just said. I do not believe -- my opinions still hold, what I said, and the fact that you read that to me does not change my view at all. I just want to make sure that's clear.

With respect to Note 20, you know, again, we're talking and you've been referencing my report from June 16th. That's not all my work. As I put in my note earlier, my work continues and obviously it did continue when I responded to Dr. Cain's report where some of these things that you're talking about are being addressed, and so I guess I just want to make sure I'm on the same page with you so I can be responsive to your questions.

BY MR. KARAM:

Q. Okay. Turn to Page 180.

A. Okay.

Q. So it's Paragraphs 10 and 11 -- or Pages 10 and 11. Do you see that? That's the heading in bold.

A. Let me just get there first.

Okay.

Q. So midway there there's a sentence that says, "Material facts include those that 'affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the

Page 90

company's securities."

Do you see that? And it cites the Texas Gulf Sulphur case.

A. I see those words.

Q. All right. Do you accept that definition of material facts?

MR. COMERFORD: Objection. Form.

A. Mr. Karam, I did my analysis and work and rendered my opinion from the information -- as I said, I relied on counsel. I -- I do want to make crystal-clear, as I apologize for the confusion for everyone I know causes that, I'm not a lawyer. I'm not -- I don't practice. And so I'm relying on the definition they gave me, and I'm not going to render any kind of opinions on anything related to the legal context at all.

BY MR. KARAM:

Q. Maybe you misunderstood my question. The question is, did they give you this information?

MR. COMERFORD: Form.

A. Well, sorry to be very precise. That was not your question. Your question was do I agree with it.

BY MR. KARAM:

Q. So did they give you -- did counsel give you this information in terms of your defi -- your use of the word "materiality" in your report?

Page 91

MR. COMERFORD: Form.

A. The definition that I used in Paragraph 11 is what counsel provided.

BY MR. KARAM:

Q. And these words were not in Paragraph 11; correct? They're not written in Paragraph 11?

MR. COMERFORD: Form.

A. What I cited in Paragraph 11 is what I have from -- from counsel.

BY MR. KARAM:

Q. And so your testimony is that other than what's in Paragraph 11, you did not use holdings or legal principles from the Castellano case?

MR. COMERFORD: Form. Mischaracterizes testimony.

A. Mr. Karam, can you repeat that, please? I didn't track that.

BY MR. KARAM:

Q. Sure. Sure. You just said that you got -- what you got from counsel is your understanding of materiality; right?

A. Correct.

Q. And it's set out in Paragraph 11; right?

A. That is correct.

Q. So other than that quote in Paragraph 11, you did not

Page 92

use any of the holdings or language from the Castellano case to form your opinion on materiality?

MR. COMERFORD: Object to the form.

A. I -- as disclosed in Paragraph 11 here, I relied on what counsel provided for me as far as the definition for material non-public information, and that is obviously, as you noted here, cited in actually two different cases, the IBW and Castellano.

BY MR. KARAM:

Q. Did counsel instruct or suggest that you read Castellano and use that as the basis for your materiality opinions?

MR. COMERFORD: Form.

A. I relied on counsel for the definition of material non-public information because I -- again, I know it's very confusing and I -- but I'm not a lawyer, I don't practice law, I don't intend to practice law, and I have to defer to legal counsel when it comes to these matters.

BY MR. KARAM:

Q. So the answer is you did not rely on any of the information in Castellano other than what counsel provided you as reflected in Paragraph 11?

MR. COMERFORD: Object to the form. Mischaracterizes prior testimony.

Page 93

A.  I relied on, as I mentioned, Mr. Karam, counsel's definition of what they provided me for material non-public information, and that's I think fully disclosed here in Paragraph 11 in my opening report.

BY MR. KARAM:

Q.  Okay.  So look down a little farther and it says, "When contingent or speculative events are at issue, the materiality of those events depends upon 'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity.'"
    Do you see that?

A.  I see those words.

Q.  Okay.  And that's another thing that you did not -- you were either not aware of or did not employ in your report because counsel did not tell you about it?

    MR. COMERFORD:  Object to the form. Mischaracterizes testimony.

A.  No.  And, again, I -- I -- it's not -- actually could you repeat that?  I guess I'm sorry.  I didn't track all that.  I just want to make sure I'm being responsive to your question, Mr. Karam.

BY MR. KARAM:

Q.  Right.  Okay.  So I'll state the question again. When -- this is what the case says.  "When contingent

Page 94

or speculative events are at issue, the materiality of these events" -- "those events depends upon 'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity.'"
    Do you see that?

A.  I do see those words.

Q.  All right.  Those words are written down here in the Castellano case; right?

A.  Those words are part of the Castellano case.

Q.  Those words are not written down in Paragraph 11 of your report; correct?

    MR. COMERFORD:  Form.

A.  Those words are not specifically written down in -- in my -- the Paragraph 11.

BY MR. KARAM:

Q.  And those -- and those words are not written down in your assignment in Paragraph 13 Sub (ii)?

    MR. COMERFORD:  Object to the form. Mischaracterizes reports.

A.  Even though it's not written down in my assignment, and, again, I -- you're referencing mine, I'm trying to just be very focused with you on my opening report, but, as you know, I have a whole other report that I've responded to Dr. Cain which some of these

Page 95

obviously get addressed, but I'm trying to stay focused on some of the questions you're asking specifically about my opening report, but as I mentioned even in my opening report, my work will continue as -- as needed and my work did continue for my second report.  So I just want to make sure we're -- we're -- I'm going to answer your questions, but you're isolating on a very small piece of it and it just -- it doesn't feel like we're -- you know, it characterizes everything in its totality that I've done.

BY MR. KARAM:

Q.  Dr. -- Dr. Goodwin, I would like to finish this deposition as efficiently as possible.  I -- when I ask you a specific question, I request that you respond specifically to that question.  If you want to say something or add something, your counsel will have the opportunity to ask you questions --

A.  Okay.

Q.  -- after.

A.  Okay.

Q.  That's when you can volunteer information.

A.  Okay.

Q.  But this will go much more quickly if you listen closely to my question and answer my question with

Page 96

nothing else.

A.  Okay.

Q.  Okay.  So I'm going to refer you to the phrase in that sentence "totality of the company activity."  Right? Do you see that?

A.  "Totality of the company activity."  I see those words.

Q.  Okay.  And would you agree that 163 documents better reflects the totality of the company activity than eight documents?

    MR. COMERFORD:  Object to the form. Argumentative.  Misleading.

A.  No, I do not.

BY MR. KARAM:

Q.  Okay.  Go to Page 181.  And it's Paragraph Number 13 with the heading 13.

A.  Okay.

Q.  So that says, "Under the materiality test set out in Basic, the potential significance of a merger is considered in light of the likelihood that it will occur."  Then it says, "A merger is often of tremendous significance to shareholders; indeed, a merger in which a corporation is bought out has been called 'the most important event that can occur in a ... corporation's life, to wit, its death.'"

Page 97

Do you see that?

A.  I see those words on -- under 13, yes.

Q.  And you did not quote that language in your report; correct?

MR. COMERFORD:  Object to the form.

A.  I did not quote that specific language.

BY MR. KARAM:

Q.  And you did not employ that in your -- you did not consider that in coming to your opinion; right?

MR. COMERFORD:  Objection. Mischaracterizes testimony.

A.  No.  Actually I would not say that.

BY MR. KARAM:

Q.  You did consider this in reaching your opinion?

A.  I considered a lot of things.

Q.  Dr. Goodwin, forgive me for interrupting.  Did you consider this language in reaching your opinion?

MR. COMERFORD:  Form.

A.  So let me just . . .

So I'm just looking at the first sentence where it says the potential significance of a merger is considered in likelihood of the event will occur. That's really the core crux of everything that I -- was part of my analysis.

BY MR. KARAM:

Page 98

Q.  Absolutely.  No dispute there.

A.  Okay.

Q.  And -- and the second can we both agree was absolutely not considered whatsoever in your analysis?

MR. COMERFORD:  Object to the form. Mischaracterizes reports.

A.  So yeah.  I guess I -- maybe if you say you didn't see that spelled out, I'm not sure I spelled out the words there, but, you know, as a banker for over 25 years and working tons of M&A deals and as a board member today, I still work on M&A deals as a board member, and my analysis and my judgment of all of this is in light of the impact that it does have M&A on a business, so I guess I would reject your characterization that it is not included because that is something that I consider all the time and it is a very important event within a company.  So I guess I would -- I don't agree with what you're suggesting.

BY MR. KARAM:

Q.  You just didn't put the words of it in your report; right?

MR. COMERFORD:  Form.

A.  I didn't put those words listed here, but the substance of everything that I've concluded is how the significance and impact of a -- that would be and

Page 99

something we haven't talked about, but I've been teaching M&A for years, decades, quite frankly, and I still teach it full time.  This is a very important topic.  It actually doesn't get discussed that much because I think most people intuitively understand that an acquisition or a merger, if you will, is a very significant event for a company.  So, no, I didn't put the words on the page, sorry, Mr. Karam, but it is part of my analysis.

BY MR. KARAM:

Q.  But you can't point to where you used the word "significance"; right?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  Except in Paragraph 11?

A.  Well, and when we get there, I can point it out to you in my other report because I do talk a lot more, because I'm obviously responding a lot more to Dr. Cain's, I do talk a lot more about significance there.  But, you know, again, the purpose of the first report, as you know, was not addressing some of these issues.  It was really getting into -- and, again, I apologize if I don't understand the -- what the timing was, but it was really around what I believe was the formation or trying to address the class

Page 100

certification, so it was not to get into some of these other issues, which I do subsequently later.

Q.  Go to Page 185 and in the right-hand column.  And about one-third of the way down there's a sentence that says, "As materiality in such" -- "such a circumstance is determined by considering both the probability of an event and its potential magnitude, a relatively improbable event of sufficient magnitude could potentially be material, since a factfinder might find it likely to have been viewed by a reasonable investor as significantly altering the total mix of information available."

Do you see that?

THE WITNESS:  Could -- whoever is controlling the screen, can they just point to that on the screen and that way I can just orient myself?  I just . . .

BY MR. KARAM:

Q.  It's in the right-hand column.  It's about, you know, two -- two to three inches down.

A.  Okay.  And which -- where did you start at?  The given or . . .?

Q.  No.  "As materiality in such circumstance is determined by considering both the probability of an event and its potential magnitude, a relatively

Page 101

improbable event of sufficient magnitude could potentially be material . . ."

MR. COMERFORD: I object. You said right column and you mean left column.

A. Oh, I'm sorry. I was --

MR. COMERFORD: Not you. Mr. Karam.

BY MR. KARAM:

Q. I'm sorry. It's in the right column on my copy.

A. Okay. Sorry.

Q. All right. Let's start --

A. Yeah. I just could not see those words. All right. Okay.

Q. Very sorry. We have I guess different printouts.

A. Okay. I see that "As materiality." Okay. I got it. Okay.

Q. Once again, that -- that language is not in your report?

MR. COMERFORD: Object to the form.

A. Well, if you're saying in specific words, I don't know if I used those specific words that is highlighted here, but the concepts are, and we can talk about those, but no, I do -- I guess I'm -- I do reject the fact that you're saying I don't discuss this. I do. It may not be the exact same wording on this page.

BY MR. KARAM:

Page 102

Q. Well, you discuss the probability a lot; right?

A. I discuss the probability but also in, and, again, I'm assuming we'll get to it, in my other report when I'm addressing a lot of Dr. Cain's, it does get a lot more into the significance of the event, and, again, my analysis is really tied to the significance of an event because how else could you actually think about this without actually considering that part, so . . .

Q. But you didn't mention the word "significance" in your first report at all.

MR. COMERFORD: Object to the form.

A. Well --

BY MR. KARAM:

Q. And you said you didn't change your opinion.

A. Well, okay. Well, I think -- and I did not do a look-up, but I'll trust you if you say it's one time in the report for the first one. But both can be true. All right? I mean, maybe I used it once, but I -- you're correct. I did not change my opinion because I didn't see anything on the produced documents that Dr. Cain cited which, to be honest, I just thought there were just a lot of things that weren't relevant at all. So we can list 200 items. It just -- it doesn't mean it will change my view just because you have more of it.

Page 103

MR. KARAM: Okay. Let's mark, this will be Number 7. And it's Tab D, as in David.

(Marked EXHIBIT 7 for identification)

BY MR. KARAM:

Q. Dr. Cain, have you read the Court's opinion and order in this case about class certification?

A. I believe you mean me, Goodwin; right? I think --

Q. I'm sorry. Dr. Goodwin.

A. I think Dr. Cain looks like he's on here, which I didn't realize that can happen, but --

Q. Yeah. Experts are allowed to view one another's depositions.

A. Okay. I --

Q. I know you didn't take civil procedure, but that's okay.

A. Yeah. Exactly. Not only that, I haven't done this very much and it's not my job, so . . . So I have reviewed this.

Q. And has this -- so this came I think after your second report. This came after your reply report, right, which was in August?

A. Yes.

Q. I think August 27th; right?

A. That is correct.

Q. Has -- has reading the Court's opinion caused you to

Page 104

change or reevaluate your opinion?

A. It did not.

Q. Do you dispute or disagree with anything in the Court's opinion?

MR. COMERFORD: Form.

A. I don't believe that I'm in a position to question a federal judge's opinion in that regard of what was in there.

BY MR. KARAM:

Q. None of us are. That was a good answer. So go to Page 12 of 19.

A. Okay.

Q. So on Page 12 of 19 the Court sets -- in the middle of that paragraph it says, "In support of that argument, Dr. Goodwin opines the prospect of a deal was 'negligible' at the beginning of the class period because the Board had twice rejected Emerson's offer of an acquisition at $48 per share, and that disclosure of Emerson's offers 'would not have had a significant impact on NI's stock price.'"

Do you see that?

A. I do.

Q. And does that fairly state your position?

MR. COMERFORD: Form.

A. I'm trying to read this on the screen here, but . . .

Page 105

If it's in quotes, then, you know, I didn't go back and check everything, but I would assume that that's quoted correctly.

BY MR. KARAM:

Q. Then the judge says, "This argument does not defeat certification. The offers Emerson made on May 25th and June 22nd to purchase stock at $48 per share" -- "purchase NI stock at $48 per share could be found to reflect a [sic] serious interest in acquiring NI."

Do you agree with that? Is that true?

MR. COMERFORD: Form.

A. Could you high -- or just orient me on the page where that was so I can --

BY MR. KARAM:

Q. Sure. It's on the next page, 13 of 19.

A. I don't have it in front of me, so I'm just looking at it the screen, so I'm just going to follow from the screen. Okay. Can we take up the highlight so -- sorry. Okay. Thanks.

I see those words, yes.

Q. Isn't it correct that both the May 25th and June 22nd offers by Emerson could be found by an investor to reflect serious interest in acquiring NI?

MR. COMERFORD: Form. Calls for legal conclusions.

Page 106

A. That's not what I concluded. That's not my opinion. I -- again, I understand that this is what the Court wrote here, but, again, that's not my conclusion.

BY MR. KARAM:

Q. Okay. And then the next sentence is "A reasonable investor may well have concluded that $48 was only Emerson's opening bid."

Agree or disagree?

MR. COMERFORD: Form.

A. I see those words on the page here. I -- when you say agree or disagree, that's what it says or are you asking me what my opinion is?

BY MR. KARAM:

Q. I'm asking you if the idea expressed here, if you agree with it or not.

MR. COMERFORD: Form.

A. No. Because my opinions are otherwise. Again, I understand that the -- the judge -- this -- this was obviously her opinion, but I -- my -- that is not my opinion.

BY MR. KARAM:

Q. But it is, in fact, true that the $48 bids, both May and June, were Emerson's opening offer and Emerson later increased its offer; correct?

MR. COMERFORD: Form.

Page 107

A. What is true is Emerson submitted an offer in May at $48 per share and also in June at $48 a share, which NI rejected both of those. Only later in November was -- did Emerson I guess submit another offer.

BY MR. KARAM:

Q. So Emerson raised its offer?

MR. COMERFORD: Form.

A. Emerson increased its offer in November. Several months after. Several months --

BY MR. KARAM:

Q. Which is after -- which is after May and June; right? I think we can both agree on that. Right?

MR. COMERFORD: Form.

BY MR. KARAM:

Q. Would you agree?

A. In the same year. Not if it was the preceding year, but, yes, I understand what you're saying. Yes.

Q. And, you know, in these negotiations usually the higher offer comes after the lower offer, right, in time?

A. No. That's -- I mean, if we want to start talking about this, we can start talking about how the M&A process works, but that's not always the way it works.

Q. In this particular case the later offer was higher?

MR. COMERFORD: Form.

Page 108

A. In May Emerson submitted a $48 per share bid, and in June, as you certainly are aware, they submitted a bid with the exact same price. Both were rejected after NI, with the advice of counsel and bankers, rejected both of those. Only months later did Emerson make a third proposal, which was obviously $53 a share. So I do agree that that is higher than 48.

BY MR. KARAM:

Q. And the June $48 offer was at a 51 percent premium to the stock price because the stock had gone down after the May offer; correct?

MR. COMERFORD: Form.

A. I don't have that. I don't know what the exact percentage is. I don't have that in front of me.

BY MR. KARAM:

Q. Okay. All right. Let's -- so then the Court says, "The swift rejection of those early offers by NI's Board does not prevent them from being found material."

Do you see that?

A. Okay. The swift . . . I see those words, yes.

Q. You absolutely disagree with that; right?

MR. COMERFORD: Form.

A. Well, I -- you know, again, I understand this is a judge's opinion, but it -- we certainly note I have a

Page 109

differing view.

BY MR. KARAM:

Q.   You disagree with that statement?

A.   Well, I -- you know, for one, I'm not sure it's a swift rejection, to be honest.  Obviously Emerson even complained about the timing.  So I think they did exactly what, in my experience of working on hundreds of M&A deals, what a good sound board does by hiring bankers and lawyers and taking their time.  I don't consider those swift rejections at all.  I think they did exactly what a good board does in those situations.

Q.   But that's even reinforcing what the Court is saying even if it were not swift; right?

        MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   Let me withdraw that question.  Let's leave out the word "swift" that you really like to talk about here.  The rejection of those early offers by NI's board does not prevent them from being material.  That contradicts the fundamental premise of your -- both your first report and your 112-page second report, does it not?

        MR. COMERFORD:  Form.

A.   Yeah.  I might characterize it differently, Mr. Karam,

Page 110

as far as contradict.  I think the judge, and I don't know how to pronounce her last name, if it's Cote or Cote, but has a different conclusion.  I come to a very different conclusion based on my 30 plus years of doing M&A and working exclusively as a banker on M&A, advising on over 250 plus deals.  I still serve on boards where we're doing M&A.  I advise CEOs currently around M&A.  This is something I've done for a very long time.  I teach it.  I've studied on it.  And I come to a different conclusion.

BY MR. KARAM:

Q.   But we would all agree federal judges tend to be very smart people, very experienced, and she's in the Southern District of New York.  We have a lot of financial cases here in the Southern district.  Right?

        MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   The judge has a lot of experience too.

        MR. COMERFORD:  Form.

A.   Actually I -- again, I don't know the judge, so I can't speak to her capabilities at all.

BY MR. KARAM:

Q.   But I think you just agreed with me that you -- the -- the rejection of those early offers does not prevent them from being found material.  That concept is

Page 111

fundamentally in disagreement with both of your reports?

        MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   I think you've just said that; right?

A.   If that's -- I mean, I can read it back to you the way it is.  I guess the way you're answering it I want to make sure it's just very clear.  Yes, I -- I come to a different conclusion than the judge as far as this being found material.

Q.   Okay.  Then the next sentence says, "It remained entirely plausible that Emerson would return with an improved offer or take its offer public."

        You agree with that; right?

A.   I see those words on the page.  That's -- that's what I agree to.

Q.   Just -- just that it's written here, but you don't agree that it's entirely plausible that Emerson, you know, putting yourself at the time that it remained plausible that Emerson would return with an improved offer or take its offer public?

        MR. COMERFORD:  Form.

A.   Yeah.  I didn't opine to the likelihood because obviously I can't project or make projections particularly about the future and --

Page 112

BY MR. KARAM:

Q.   You're quoting -- you're quoting Yogi Berra; right?  Predictions are hard especially about the future.

A.   He did.  So I couldn't predict whether, you know, a potential acquiror would, you know, again, come back.  Obviously that's something you can't do.  And it's like if you want to say that means it's plausible or likely, I don't know.  But I certainly couldn't opine to whether they would or couldn't.

Q.   You just opined on the probability of the deal?

A.   Of the deal.  Yes.

Q.   Right.  But you couldn't opine on the probability or possibility of Emerson coming back with a higher offer?  You think that's out of human capability?

        MR. COMERFORD:  Form.

A.   I don't -- I won't speak for every other human.  I will speak for myself and say that I think it's hard to predict what other companies will do in certain situations, and I -- you know, and, again, I didn't opine on that and I don't think, you know, I would.

BY MR. KARAM:

Q.   Well, there were certainly hints during the class period that Emerson could possibly go public, right, before and during the class period?

        MR. COMERFORD:  Form.

Page 113

A.  If you have specific examples you want to discuss, I'm happy to discuss those.

BY MR. KARAM:

Q.  Okay.  You can't recall any of those off the top of your head?

MR. COMERFORD:  Form.

A.  Again, I'm happy to discuss those, Mr. Karam.

MR. KARAM:  Okay.  We can put that aside. We're going to another document, which -- Number 8?

MS. PLASCOFF:  Yeah.  8.

MR. KARAM:  All right.  This will be -- mark this as Number 8.  And this is Bates number BofA_003270, and it is an Emerson -- appears to be an Emerson press release.  It is dated -- there's -- looks like it's dated January 17th or thereabouts.

(Marked EXHIBIT 8 for identification)

A.  Okay.  I have that actually.

BY MR. KARAM:

Q.  Okay.  So -- so I printed this out.  This is the whole -- this is where Mr. Karsanbhai kind of gives an historical rendition.  But I'm going to refer you to Bates Number 3274 which contains the -- it's headed "Emerson's Correspondence with NI, May 25th, 2022."

A.  Okay.

Q.  So you're familiar with this document?

Page 114

A.  I am.

Q.  Is it correct that this represents Mr. Karsanbhai, the CEO of Emerson's first formal offer to acquire National Instruments?

MR. COMERFORD:  I'm going to object to the form.

A.  Yeah.  This is the first, you know, the letter of May 25th, at least as we're talking about this particular matter.  I have no idea if they had conversations previously as it relates to this matter. So, yes, I -- this is the letter that Mr. Karsanbhai sent over, and I did review this.

BY MR. KARAM:

Q.  Okay.  So go down to the heading "Valuation."  Do you see that?

A.  I do.

Q.  So he makes -- he says here, "Emerson proposes to purchase 100% of the outstanding common stock of NI for $48 in cash per common share, which implies an equity valuation [sic] of $6.49 billion and an enterprise valuation [sic] of $6.67 billion."

Do you see that?

A.  I do.

Q.  So this is an all cash offer, is it not?

A.  It is.

Page 115

Q.  And in your experience, is a cash offer, does that have a higher probability of successful deal completion than stock or a mixed offer?

A.  An all cash offer, particularly when it's fully financed, can be generally viewed as maybe a higher likelihood.  I don't know if that's one percent or half a percent or two percent, but generally more than a -- an all stock deal because of the -- some of the considerations that can happen.

Q.  Okay.  So, and he talks about the enterprise value of National Instruments that a $48 offer would achieve. Do you see that?

A.  I do.

Q.  Do you know what the enterprise value of Emerson was at the time it made this offer?

MR. COMERFORD:  Form.

A.  I don't know exactly.

BY MR. KARAM:

Q.  Would the figure approximately $50 billion be consistent with your understanding of the relative size of the parties?

MR. COMERFORD:  Form.

A.  As I said, I don't know -- I can't remember exactly, but I know Emerson is a -- you know, a company with significant size.

Page 116

BY MR. KARAM:

Q.  So then the first bullet point says it's "A 39% premium to NI's closing share price as of May 24, 2022."  Right?

A.  Yes.  That's what it says.  Yes.

Q.  Then on the next page, the third bullet point says it's "A 4% premium to the 52 week high trading price as of May 24, 2022."

Do you see that?

A.  I do.

Q.  Do you have any understanding of a connection between the price premium to current stock price and deal success?

MR. COMERFORD:  Form.

A.  Can you be more specific?

BY MR. KARAM:

Q.  Yeah.  I guess my question is, would it be correct that the higher the premium offered, the more likely a deal is to be concluded?

MR. COMERFORD:  Form.

A.  You know, maybe this is -- probably something I always hear lawyers always say, but it depends, so I guess I'll get to live in that world here.  It really is context and fact specific to every unique situation. A 30 percent premium, I've seen deals never happen

Page 117

because -- for various reasons.  So, no, it -- it doesn't signal that just because you have a certain level of premium that that's going to indicate success in a deal.

BY MR. KARAM:

Q.  Okay.  So, and the four percent premium to the 52-week high, are you -- are you aware of any information indicating that may be an indicator of deal success?

A.  Again, it's not in the sense -- just to be very clear, and I teach valuation and I have for decades, premium is a byproduct or an output.  It's not a valuation metric.  It is absolutely not a valuation metric.  It is -- we use different standards to value companies, and the premium is just an output, and sometimes that gets conflated I know, but it is not a valuation methodology, and those in my class that actually do that end up failing when they con -- when they conflate those.

Q.  Down at -- under the heading "Timing" it says here, "Our strong preference is to work constructively and expeditiously with you and your board to announce a Definitive Agreement."
        Do you see that?

A.  I do.

Q.  Okay.  And then the next paragraph says, "The Proposal

Page 118

has been reviewed with Emerson's board of directors who summit the proposed transaction."
        Do you see that?

A.  I do.

Q.  And then under the heading "Other," on the top of the next page it says, "To reiterate, our Proposal - all cash consideration with no financing contingency and no substantive regulatory requirements [sic] - provides both significant value and certainty to NI's shareholders."
        Do you see that?

A.  I see that.

Q.  Okay.  Oh, I'm sorry.  Go back to the timing.  It's -- and that -- I read the wrong sentence there.  It says, "We have no current plan to disclose this letter and assume that you do not intend to either."
        Do you see that?

A.  I do.

Q.  So is -- would you agree that Mr. Karsanbhai is saying to Mr. Starkloff that at this time Emerson does not intend to go public?

        MR. COMERFORD:  Form.

A.  I can't get into the head of Mr. Karsanbhai.  All I can do is just read the words on the page, and I don't know what he meant.  I think obviously, and I don't

Page 119

mean this tongue-in-cheek, but he's probably the best person to ask what he meant by that.

BY MR. KARAM:

Q.  I'm not asking you to mind read Mr. Karsanbhai, but I'm asking you to read the English language and as an M&A expert tell me if this letter is saying that Mr. Karsanbhai has no plan to disclose the letter.

        MR. COMERFORD:  Form.

A.  That's what the words say.  He has no plan to disclose this.

BY MR. KARAM:

Q.  And if he's being truthful, that means he's not going to go public with the offer at that -- as of that date?

        MR. COMERFORD:  Form.

A.  Yeah.  I have no -- I have no basis to question his integrity, so I assume he meant that he had no plans to go public at that point.

BY MR. KARAM:

Q.  Okay.  All right.  Go to the June 22nd, 2022, letter which is on Bates Number 3277.

A.  Okay.  I'm there.

Q.  So -- well, in the meantime we can look at the June 16th letter just for background.

A.  Okay.

Page 120

Q.  So National Instruments wrote this letter saying the board and management team -- "The Board has determined unanimously that your letter does not provide a basis for further discussions."  Right?

A.  Yes.  Those are -- those words are there, yes.

Q.  Okay.  So then June 22nd Karsanbhai writes another letter.

A.  I do have that in front of me.

Q.  All right.  So he reiterates the offer for $48; right?

A.  Yep.  $48 per share for an all cash offer.

Q.  Then he has a series of bullet points; right?

A.  He does, yes, four of those.

Q.  And he points out that this offer is a 51 percent premium to the closing share price as of June 21st, 2022; right?

A.  That's what the bullet says.  I'm going to assume they did the math correctly.  I don't know.  But I will assume so.

Q.  All right.  Well, that -- that implies that, even though he's offering the same $48, 51 percent premium would imply that between the May and June letters National Instruments' stock price declined and that's why the premium is higher; right?

A.  That would be the implication of the math if you kept the constant of 48.

Page 121

Q.  Okay.  And, once again, he says it's a four percent premium to the 52-week high trading price; right?

A.  He has that bullet, yes, down here.

Q.  Okay.  So look to the next page after the bullet points are over.  I'm sorry.  Look at the last -- the last bullet point.

A.  Okay.

Q.  It says, "The top 10 active shareholders as of the end of Q1 2021 owned approximately 19% of the company with an estimated weighted average cost basis of 35."

    Do you see that?

A.  I do.

Q.  Did you check any of this, any of his representations here?

    MR. COMERFORD:  Form.

A.  No.  Not -- I -- in my work I've definitely reviewed and looked to see who the shareholders were at the time, and not surprising who they were, but did not confirm their cost basis and things like that.

BY MR. KARAM:

Q.  Okay.  Did counsel or any -- anybody whatsoever from NI have any dispute about the accuracy of these representations --

    MR. COMERFORD:  Object to form.

BY MR. KARAM:

Page 122

Q.  -- and bring it to your attention?

    MR. COMERFORD:  Same objection.

A.  Again, I've read this in the letter when I -- when I received this and, no, I don't think we've had conversations about anyone.

BY MR. KARAM:

Q.  Then he says in that same paragraph, "Over the past year, 8 of those 10 shareholders have reduced their positions and sold stock materially below the price [that] we are offering."

    Do you see that?

A.  I see those words, yes.

Q.  Were you able to confirm or dispute that statement?

    MR. COMERFORD:  Form.

A.  No.  I did not either confirm or dispute it.

BY MR. KARAM:

Q.  You said you were aware of who the top ten active shareholders were of NI during this time period; right?

A.  No.  That -- that -- I probably said that inaccurately.  I had -- their -- given their size and then I went in and looked.  I said it wasn't surprising who their -- I should probably say their top shareholders.  When I think of the top, I think of the maybe top three to five, and a lot of them are

Page 123

what we refer to as kind of passive funds, the big three, BlackRock, State Street, and Vanguard.  That's what I was referring to.

Q.  Did you contact any shareholder and ask them about what their opinion was if -- on a 30 -- on a $48 deal?

    MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  Whether it would have been material to their investing decision?

A.  No.

Q.  And you said the top three were maybe passive, implying index type funds; is that right?

A.  Generally when we refer to passive, it's I guess common nomenclature, exactly, Mr. Karam, which is more of an index fund related investor.

Q.  Did you contact any active investors to discuss whether a $48 offer would have been material to them at the time of June 22nd, 2022?

    MR. COMERFORD:  Form.

A.  No.  I mean, I -- I thought your question earlier was did I contact any shareholders, so I didn't contact any, so I didn't contact active or, you know, passive.

BY MR. KARAM:

Q.  Okay.  So in -- right below that there's a paragraph that says, "We prefer to engage in collaborative,

Page 124

bilateral discussions with minimal distraction to your management team to reach an agreement privately."

    Do you see that?

A.  I do.

Q.  So he's saying he would prefer to reach an agreement privately; right?

    MR. COMERFORD:  Form.

A.  I see the words on the page, and I -- I think that's what he's saying.  He'd like to reach an agreement privately.

BY MR. KARAM:

Q.  Okay.  Then at the bottom of that paragraph he said, "We look forward to learning more about your internal plan and are confident that with access to limited non-public information after signing an NDA, we could work with you to find additional value that would allow us to increase our Proposal."

    Do you see that?

A.  I see that sentence.

Q.  And he uses the phrase "increase our Proposal"; correct?

A.  Again, Mr. Karam, I see the sentence and he does use those words.

Q.  Are you implying that you don't understand what those words mean?

Deposition of Shane Goodwin, Ph.D.    In Re National Instruments Corporation Securities Litigation

Page 125

A.   No.  I do.  I'm just saying I see the words and I see what they say.

Q.   Okay.  And they say he could increase his proposal; right?

A.   That's what I -- I'm sorry if we're talking past each other.  I'm agreeing that that's what's written down here.

Q.   Okay.  And another paraphrase of that is raise the price; right?  He's saying we can raise our price, we can raise the $48 price; right?

A.   Again, I'm -- I'm just saying what I see on the page here what he wrote down is that, obviously I won't -- we look forward to working together and we could work to find additional value that if you would allow us to increase -- or that would allow us to increase our proposal.

Q.   Right.  Which means he could raise the price, raise the $48 price?  That's what he's saying; right?  Do you deny that?

A.   I think it says, yeah, we could work with you, which that would allow us to increase our price, which also means we may not, we may also lower our price.

Q.   You think he's -- this -- this is suggesting -- he doesn't use the word "lower" in here, does he?  He uses the word "increase."

Page 126

A.   No.  I agreed with you, Mr. Karam.  He does use the word "increase," yes.

Q.   Right.  And that means raise the price, which Emerson, in fact, did in November; right?  It raised the price?

          MR. COMERFORD:  Form.

A.   Well, I'm not sure if you're -- there are a number of things in there if you just allow me, Mr. Karam.  His comment here is -- from June is to work together to hopefully for them to raise the price.  Just to be very clear, and I'm sure you've seen this plenty of times as well, this is very somewhat standard language you will put into a proposal because you're trying to have -- extend an olive branch to a party to say let's try to find ways of working together.  I don't -- I wouldn't connect this to their offer in November because this didn't happen.  They did not work together.  So I think the two are kind of conflating and they're not really connected.

BY MR. KARAM:

Q.   Okay.  They did not work together, but Emerson raised the price.  Would you agree with that?

          MR. COMERFORD:  Form.

A.   Emerson submitted a third proposal in November to $53 a share, so, yes, that's higher than the 48, but I -- it's not tied to what he wrote here because he was

Page 127

saying if we work together, we may find this additional value.

BY MR. KARAM:

Q.   All right.  Then in Number 8 -- I'm sorry.  Down at the bottom of this page there's a sentence that says, "Emerson considers this Proposal to be of the highest strategic priority."

          Do you see that?

A.   I do.

Q.   And would it be correct that a proposal of highest strategic priority would be something that an investor would consider in making an investment decision to buy, sell, or hold?

          MR. COMERFORD:  Form.

A.   Honestly I don't think the -- they're linked.  I think what they're saying here is, and I'll just take them explicitly at their word, which is they think this proposal is of high strategic priority, and I think that's -- those are the words on the page, and that's the only inference I would draw from them.

BY MR. KARAM:

Q.   So let's say Emerson made a public statement.  We offered $48 for National Instruments, they rejected our offer, we considered the proposal our desire to acquire National Instruments to be highest strategic

Page 128

priority.  If that were a public statement, are you saying that an investor would not find that as significant information in the mix as to whether to buy, sell, or hold the stock?

          MR. COMERFORD:  Objection.  Mischaracterizes evidence.  Incomplete and improper hypothetical.

A.   There was a lot there, Mr. Karam, but . . .  So without you repeating it, I definitely understand kind of the gist of what you were trying to get to, but I can't opine on that.  I'd need a little bit more time to think through that.  But just to be very responsive to your earlier question is the words, you know, "Emerson considers this proposal to be the highest strategic priority," I think it's exactly what he meant.  I just wouldn't really extend that any further other than that it's an important priority for them.

BY MR. KARAM:

Q.   So you're aware that the Court thought that there was a meaningful possibility that Emerson would continue its efforts to acquire NI after it indicated serious interest; right?  That was one of the factors that the judge considered in her materiality determination?

          MR. COMERFORD:  Form.

A.   I'm sorry.  What's the question in there?  I'm not

Page 129

trying to be -- I just didn't understand it.

BY MR. KARAM:

Q. Having -- we can go back and look at the Court's decision again, but do you recall that the Court referred to Emerson's serious interest as a factor in whether an investor would be interested and consider this information in the mix?

A. Could -- could we pull that up again so I can --

Q. Sure. Sure.

MR. COMERFORD: Form.

BY MR. KARAM:

Q. It's on Page 11.

A. I don't have that in front of me, so whoever is controlling the screen, if they can pull it --

Q. That's okay. We'll move on from that.

A. Oh, okay.

Q. I'll withdraw the question. All right. So after this letter . . .

MR. KARAM: Let's mark I -- or H. This is H. All right. This is an email -- it's a string of emails starting with one from Mr. Karsanbhai to Mr. Starkloff. It's NAT-SL-00001250.

(Marked EXHIBIT 9 for identification)

A. Okay. Which date is this? I have some printouts here, but let me . . .

Page 130

BY MR. KARAM:

Q. Oh. This is --

MS. PLASCOFF: It won't be printed out.

BY MR. KARAM:

Q. This is July 7, 2022.

A. Okay.

Q. I don't know if you have this in -- we haven't sent this document.

A. Oh, okay. Okay.

Q. So if you can read the middle paragraph of Mr. Karsanbhai's letter.

A. Okay.

Q. It says, "As I highlighted in our prior communication dated June 22nd, we prefer to keep our conversations private, however for that to remain feasible we need relative expedience from NI's Board."

Do you see that?

A. I do.

Q. So in his first letter he said we want to keep this completely private; right?

MR. COMERFORD: Form.

A. I don't know about the completely private. He said --

BY MR. KARAM:

Q. He said he wanted to keep it private.

A. He said we have no current plans to disclose this

Page 131

letter.

Q. Okay. Would you agree that, given your difficulty in reading what other people wrote and understanding it, would you agree that he's suggesting here a little less subtly that he would like to keep it private but he could go public?

MR. COMERFORD: Object. Form. Abusive. Harassing.

BY MR. KARAM:

Q. Doctor, do you feel abused? Forgive me. I don't want to abuse you. You're a football player. I don't want to --

A. No. I -- I'm just trying to be very accurate with the language and not getting into people's head, so I'm trying to be very precise, so . . . I do agree that he did not intend to disclose that first letter, and, you know, here obviously, you know, the words, you know, "for us to keep our conversations private," he's obviously saying, you know, he wants to see some -- a little bit more speed from NI's board.

Q. Okay. So it would not be a threat? It might be more like an intimation?

MR. COMERFORD: Form.

A. I think he's conveying that he would like to see some -- a little bit more expediency.

Page 132

BY MR. KARAM:

Q. Okay.

MR. KARAM: Alex, can you give us a time for the amount of time we've been on the record?

VIDEO TECHNICIAN: Sure. Would you like to go off the record?

MR. KARAM: Yeah. Let's -- let's take a short break.

VIDEO TECHNICIAN: Okay. The time is 12:47. Off the record.

(Recess taken at 12:47 p.m.)

(Back on the record at 1:16 p.m.)

VIDEO TECHNICIAN: Back on the record. The time is 1:16.

BY MR. KARAM:

Q. Dr. Goodwin, please go to Page 6 of your report, Paragraph 18.

A. Of my first report?

Q. Correct.

A. Okay.

Okay. Yes. I'm there.

Q. So in Paragraph 18 you say, "As I discuss in detail in this report, based on my experience, and my review and analysis, I have reached the following opinions."

So the first opinion is "Although Emerson

Deposition of Shane Goodwin, Ph.D.    In Re National Instruments Corporation Securities Litigation

Page 133

had submitted two unsolicited, non-binding . . . proposals, the probability of an acquisition occurring as of the start of the Proposed Class Period was negligible."

Do you see that?

A.  I do.

Q.  And, you know, you expand on that a little further; right?  And then the last sentence is "These unequivocal rejections constituted classic 'Just Say No' responses, signaling the absence of any meaningful engagement or likelihood of a transaction under the terms offered."

Do you see that?

A.  I do.

Q.  Okay.  So you cite your experience as one of the bases for this opinion; correct?

A.  Yes.

Q.  In this paragraph you don't cite any academic articles or any statistical studies; right?

MR. COMERFORD:  Form.

A.  In this paragraph I do not cite any statistical studies.

BY MR. KARAM:

Q.  So under the -- and you don't cite any studies on the success -- statistical -- I'm talking about surveys or

Page 134

statistical analysis of the success of the "Just Say No" defense; is that correct?

A.  Well, I -- I do -- this is obviously a summary, Mr. Karam, of my opinions.  Obviously I do and later when I expand on it cite academic literature and other things.  Right?  I didn't put it in the summary, but I -- if you want to flip to where the substance if it is, we can talk about that.

Q.  Okay.  We'll go -- we'll go to that.  I'm aware of those.

A.  Okay.

Q.  But I guess my question is, are there any statistical studies saying like we surveyed a thousand transactions of the "Just Say No" defense and it succeeded in this percentage?  Are you aware of any such studies?

You know what?  Why don't we go to your -- your list of studies in your -- at the end of your report.  Is that what -- Dr. Goodwin, you're --

A.  Yep.

Q.  -- looking for something that you cited?  Is that what you're trying to do?

A.  Well, I was going to get to the -- Dr. Bruner's work, and I just needed to --

Q.  Okay.  We'll get to that.  So -- so you're going to --

Page 135

you say that Bruner had a statistical study of the success of the "Just Say No" defense?

A.  He discusses it in his -- in his book from 2004.

Q.  He mentions it; right?  But he doesn't have a survey or a list of statistical studies about it; right?  We'll look at Bruner later.

A.  Okay.

Q.  You don't assert that he did a statistical study, do you?

A.  I'm not asserting that he does, but he -- but, again, just because, you know, numerical or empirical work doesn't negate the fact of someone else's research.  It can be qualitative studies that can be done as well.

Q.  Okay.  Okay.  All right.  So then going to the last sentence you say, "'Just Say No' responses, signaling the absence of any meaningful engagement or likelihood . . . under the terms offered"; right?  You use that phrase?

A.  "Meaningful engagement or likelihood of a transaction under the terms offered."  Yes.

Q.  Right.  But, in fact, the deal did close under different terms; right?

A.  Emerson acquired and obviously announced it in May of 2023 and ultimately closed in October of '23 under

Page 136

different terms.

Q.  Right.  Under a higher price; right?

A.  It was a higher price.

Q.  Okay.  So even though -- I'm trying to understand how you take that into account.  You say it's a negligible probability, yet you say under the terms offered, implying that different terms could allow for a deal to close.

MR. COMERFORD:  Form.

A.  I'm sorry.  Maybe it's -- I didn't track that.  I think -- yeah.  I'm talking my comments here with respect to the proposed class period, the start of the proposed class period is really referencing the May and June, both $48, so they have equivalent value.  That is what I was referring to when I talk about negligible, not ultimately when the deal closed at a higher price.

BY MR. KARAM:

Q.  Right.  So you don't take into account the possibility or probability that Emerson would raise its price; right?  That's not part of your calculation here?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  You just -- you just consider the 40 -- the second $48, right, as of August 2nd rejection and to be

Deposition of Shane Goodwin, Ph.D.                In Re National Instruments Corporation Securities Litigation

Page 137

completely static after that; right?

MR. COMERFORD: Form.

A. So the reason I reference "Just Say No," and you're probably familiar with it, it's -- I mean, it's -- it's really just a -- when a company, particularly the companies we're talking about here, or, well, let's just stick with NI, incorporated in -- in Delaware, it's been, you know, long held that the judgment of the board, particularly whether they want to transact or not, you know, rests -- the business and affairs rests within the board, and their -- their review of the board activities have been reviewed extensively by the courts in Delaware, as I'm sure you certainly know, that when a company wants to remain independent and pursue their own long-term strategy, that's been upheld, and so many in the market, from my perspective, again, I'll just speak from my perspective, understand that when a company follows that, they have very strong standing to remain independent.

BY MR. KARAM:

Q. So are you saying that the "Just Say No" defense is a legal defense against a takeover?

MR. COMERFORD: Objection. Calls for a legal conclusion. Form.

Page 138

A. No. No, no. I'm sorry.

MR. KARAM: Counsel, he just cited Delaware cases. He just talked about Delaware cases.

A. No. What I was saying is is that when -- and what I will say, though, which is in business, as you certainly know, Mr. Karam, you have to understand not just the business, the finance, the accounting, you have to understand all of the other implications that are surrounding your -- which includes the legal part of it. So you do have business people out there, quite frankly, that have to understand the legal aspects. So what I was talking about is boards are -- are going through decisions like this all the time. Not every person on a board, good or bad, I'm not drawing any judgments, are lawyers. They make business decisions, and they're influenced by what has happened because of those legal decisions, and they're getting counsel, as they did here from Wachtell, about that, so I'm just referencing what that means.

BY MR. KARAM:

Q. Okay.

A. I'm not giving a legal opinion in any way.

Q. All right. But you're saying it's a negligible probability under the terms offered; right?

A. Under the terms that start of the class period.

Page 139

Q. Right. But, in fact, you did not consider the possibility that Emerson would come back with a higher offer; right?

MR. COMERFORD: Form.

BY MR. KARAM:

Q. You considered that "Just Say No" was the end and that Emerson would not come back with a higher offer? That was -- that was the basis for this opinion; right?

MR. COMERFORD: Form.

A. Not -- not exactly, Mr. Karam. It -- I wasn't, as I mentioned before, I can't anticipate whether and project whether someone would come back or not. I -- you just can't do that. We don't know. What I do know is when a board has reviewed twice the exact same offer at $48 a share and determined in their best judgment that they're not going to proceed but proceed with their own standalone business plan, that that is a very strong stance of a company saying we're going to proceed with our own business plan moving forward.

BY MR. KARAM:

Q. Well, the Court certainly considered that the two $48 offers could have been improved on, right, and that a reasonable investor would have plausibly believed that another higher offer was possible? That's what the Court's decision said; right?

Page 140

MR. COMERFORD: Form.

A. Well, again, I can't get into the -- I certainly wouldn't question a federal judge and their views of how they view it. I was giving and rendering my opinion based on my experience and based on what I was looking at. I don't -- well, I'll just leave it there.

BY MR. KARAM:

Q. Okay. And in this paragraph do you rule out the possibility of a hostile takeover, of an escalation using various tactics that companies use to accomplish hostile takeovers?

A. Yeah. I can't rule that out because, again, as I've mentioned, I couldn't anticipate whether a company would or would not escalate. That's -- obviously that's something you have no control over.

Q. Right. But you do rule it out by saying the probability is negligible. You rule -- you're saying the probability is negligible of a friendly takeover. Isn't that what you're really saying?

MR. COMERFORD: Form.

BY MR. KARAM:

Q. At 48.

A. No. To be very specific, I'm -- I'm saying that at the beginning of the proposed class period around

Page 141

October 12, based on all the information that I reviewed, that the probability of an acquisition occurring was negligible. I wasn't antic -- like I said, I did not try to forecast and project whether Emerson was going to come back and be hostile later or not or, quite frankly, whether there was another party out there. I'm just saying at that particular point, based on the evidence that I've reviewed, that the probability of an acquisition by Emerson was negligible.

Q. Okay. But so you did not consider at the beginning of the class period that Emerson would come back with a higher price; correct? Because you say that can't be predicted; right?

MR. COMERFORD: Form.

A. I agree. I can't predict whether they were going to come back or not.

BY MR. KARAM:

Q. And you -- you could not also predict whether they would go public to the shareholders; right?

MR. COMERFORD: Form.

A. I'm sorry. Could you say that last part?

BY MR. KARAM:

Q. You also rule out or do not consider whether they were going to go public as of the start of the class

Page 142

period?

MR. COMERFORD: Form.

A. Right. Well, let me just --

BY MR. KARAM:

Q. Because you're saying that it's a negligible probability, so --

A. It is.

Q. -- but if it goes public, the ball is still rolling; right?

A. No. So that's what I said. In its totality as I'm looking at this, like I say, holistically, and when I talk about "Just Say No," there are signals, notwithstanding that Emerson definitely came back with a third offer even though there was no communication, which they acknowledge between, you know, August 2nd and November, there are -- and this is from my experience of working on a lot of deals like this, when there is a company not willing to want to engage with you, and I think the terms that Dr. Cain used about engagement, they're not signing an NDA, they're not extending in any way, they're not obviously allowing you to do due diligence, that is a strong message or signal to another party that they don't want to move forward in any way. I -- again, my experience is many companies at that point stop

Page 143

proceeding because they have other things, other opportunities that they need to work on, and not all these do they want to pursue. So that -- I'm using my context in that regard.

Q. All right. So what you're -- what you're -- those processes that you just described, NDAs, meetings, et cetera, those are all aspects of a friendly takeover; right?

MR. COMERFORD: Form.

BY MR. KARAM:

Q. What you're saying is "Just Say No" ends a friendly takeover because the board is strong in their position that they don't want to be taken over; right?

A. No. Not necessarily. Because had this November 3rd, again, with a "Just Say No," they did enter into, as you know, in December with an NDA which was done privately with Emerson. So it wasn't public at that point.

Q. But your opinion does not foresee that; right? 18 Sub (i) you do not say they could raise -- if they came in with a higher price, the board would have a fiduciary obligation to consider a price that they considered reasonable; right?

MR. COMERFORD: Form.

A. Actually if you could just repeat that, Mr. Karam.

Page 144

BY MR. KARAM:

Q. Yeah. You're -- this first subparagraph does not consider that there could be a hostile takeover or there could be a friendly takeover at a higher price. It states neither of those possibilities?

A. Well, again, you're isolating this paragraph, and what I will say is, like I said, we're -- you're focusing --

Q. Well, let's take it step by step. I'm asking you a question.

A. Yep.

Q. I request that you give me an answer because, you know, you want to get out of here and if -- if you don't answer my specific questions, I'm going to keep asking them.

A. Yeah, yeah. I understand. I completely understand. But I said you're focusing on this as a summary, and obviously all the work is later in the -- so if you want me to get more specific, I can, as opposed to just parsing a few lines on the summary opinion. So I guess I -- if you want me to address whether I thought that --

Q. Accepting -- this is my question.

A. Yeah.

Q. Does the "Just Say No" defense foreclose a hostile

Page 145

acquisition? Let me -- let me rephrase that.

The "Just Say No" defense does not foreclose a hostile acquisition; isn't that correct?

MR. COMERFORD: Form.

A. A "Just Say No" we'll call it response here, whether you want to call it a defense or response, doesn't necessarily foreclose a potential acquiror from engaging in any other way. They could send over, as you just stated earlier, or as Emerson did another private letter. They could certainly go public. What I was giving you reference to was based on my experience. Many companies, in my -- my experience, having been on both sides of this working with acquirors and obviously working with target companies or sellers, many acquirors will not proceed once a company decides that they really don't want to do any work because they have a lot of firm grounding, and, again, I'm not playing the lawyer here, everyone knows this, particularly business judgment and the like in Delaware, if they don't want to proceed, there's a lot of safe ground and harbor for those directors. Therefore, companies think about their time judiciously and may not want to proceed. That's what I was saying as far as --

BY MR. KARAM:

Page 146

Q. Yeah. I understand that.

A. Okay. Okay.

Q. Just so you know, scares off some companies; right? Some companies may not want to pursue after the board said no; right? But other companies do. To quote another, you know, philosopher, Mike Tyson, everybody has a plan until they get smashed in the face. Right? So if there's a -- the board's saying "Just Say No" will only -- we don't want a friendly offer doesn't foreclose the possibility of a hostile offer; right?

A. A just so -- a "Just Say No" response does not preclude a potential acquiror from, again, going private, you know, what they did here, continue with a private form, or, which they did not really do, go public. You know, as you know, NI is the one that obviously launched the public part of it. So Emerson did not do that.

Q. All right. Let's go to Subparagraph 2), which is at the top of the next page, and this is essentially saying something similar to what you said in Subparagraph 1); right? That there was a "Just Say No" defense and which the board did twice. Then the friendly merger process stops absent further developments. Right? That's what you're saying?

A. That's what I -- yes.

Page 147

Q. Right. And in this case there were, in fact, further developments; right?

MR. COMERFORD: Form.

A. Well, there was a -- certainly a break for a period between August 2nd and November -- and early November when Emerson submitted their other proposal if that's what you're saying a later development.

BY MR. KARAM:

Q. Right. There were further developments after a break?

A. After the break from August 2nd until November, which was, as you know, in the proxy.

Q. Right. All right. Subparagraph 3). I think -- I don't think it's in dispute that the board after the August 2nd was not interested in pursuing a merger. We agree on that; right?

A. Based on my review of the evidence, yes.

Q. Okay. And then these -- these things that you list, those are -- those are procedures in a friendly merger; right?

MR. COMERFORD: Form.

A. Not necessarily. I mean, you may -- if you're under an attack in a hostile fashion without any friendly, you would be hiring a financial advisor and the like.

BY MR. KARAM:

Q. And so you would or would not?

Page 148

A. You would. So I'm saying -- I thought you said these were only for friendly, but I would say that this could also pertain to a hostile as well. Right? If you're attacked and you weren't prepared, you'd seek out help from an investment bank and lawyers and the like.

Q. So you have here Roman Numeral v in that subparagraph on the next page.

A. Yes.

Q. "After rejecting Emerson's second proposal, NI did not adopt any anti-takeover defenses such as a shareholder rights plan"; right?

A. That is correct.

Q. And that -- that's -- that's known as a poison pill; right?

A. That is correct.

Q. And that -- that would have to be disclosed to shareholders; correct?

A. It is a disclosurable event, yes.

Q. Right. So if they said we're, you know, we're rejecting this takeover and we're going to adopt a poison pill, that would have been public disclosure; right?

MR. COMERFORD: Form.

A. Implementing a shareholder rights plan, we'll just

Page 149

call it a pill, is definitely an event that needs to be disclosed to your shareholders.

BY MR. KARAM:

Q.   All right.  And National Instruments did not want this offer by Emerson made public; correct?

MR. COMERFORD:  Form.

A.   No.  What I'm saying here is that they did not feel the need or the threat as even in the materials provided by Wachtell of why a company, and I've worked on many of these, why a company would want to implement a pill for a defensive measure, because if they feel like there's a threat to the corporate franchise, that's when they would do it.  It's not about disclosing the event.  It's about did they feel the need to protect the corporate franchise from what they believe is going to be an accumulation by another investor.

BY MR. KARAM:

Q.   Right.  All right.  So Paragraph 4 you're saying, "As the probability of Emerson acquiring NI was negligible as of the start of the Proposed Class Period given the facts at the time, Plaintiff's claim that NI possessed 'material non-public information' about Emerson's offers over the Proposed Class Period is speculative and flawed."

Page 150

Do you see that?

A.   I do.

Q.   And as we discussed at length this morning, this does not consider the magnitude.  This understanding of materiality only considers the probability event and not the magnitude or significance of the event; isn't that right?

MR. COMERFORD:  Form.  Misstates prior testimony.

A.   No.  No.  I'm sorry, Mr. Karam.  If I said anything related to what you just said, then that was not true, because I -- you know, again, inclusive, when I'm applying the definition of material non-public information that was supplied to me by counsel, I would view that in its totality, which absent the word you were looking for in that assignment of the word "significance," it is part of my analysis.  I'm considering everything that would actually satisfy the definition that was provided to me.

BY MR. KARAM:

Q.   Well, you used the phrase "as the probability was negligible"; right?  That's what you say.

A.   If -- are you going back to my --

Q.   I'm reading from 18 Sub iv.

A.   Yes.

Page 151

Q.   "As the probability of Emerson acquiring NI was negligible," you do not say and as the significance of a merger to NI was also low or negligible.  You don't say that.  That's not written here; right?

MR. COMERFORD:  Form.

A.   No.

BY MR. KARAM:

Q.   Okay.  That's good.  It's not written here.

A.   Well, no.  Again, what's written there is the probability -- because I -- at least if it's not clear, but what I make clear before was my view on the probability of Emerson acquiring NI was negligible, and I laid out before that why I believed it was negligible.

Q.   Right.  Right.  And as we argued endlessly this morning, your opinion on the significance of the merger to National Instruments is not only negligible, it's just not here?  It's imaginary?

MR. COMERFORD:  Form.  Misstates --

BY MR. KARAM:

Q.   You do not say it.

MR. COMERFORD:  Form.  Mischaracterizes the reports.

BY MR. KARAM:

Q.   You don't base your opinion on it?

Page 152

MR. COMERFORD:  Same objections.

A.   I'm sorry.  Can you repeat that?  When you said imaginary, I'm not -- I didn't track.

BY MR. KARAM:

Q.   You're saying somehow the word "significance" is in here, but nobody can see it.

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   The word "significance" is not in that paragraph; right?

A.   As I mentioned earlier, yes, I will agree with you that the word "significance" is not here, but that doesn't mean it's not part of my analysis when I'm actually reviewing things.  A lot of things go into my analysis, and --

Q.   Right.

A.   -- whether I stated the actual word "significance," it does -- again, I apply the definition that was provided to me by counsel.  It is -- as it says in there, the word "significance," I applied that.  So whether I wrote the word down after, it's -- it's in part of my analysis.

Q.   All right.  You say you imply it.  You just didn't write it anywhere?

MR. COMERFORD:  Form.

Page 153

A.  Well, I ended up -- well, when we get there in my next report, you'll see it written there a lot more as I'm responding to Dr. Cain.

BY MR. KARAM:

Q.  Yeah.  But that's -- that's not in your original report?

MR. COMERFORD:  Form.

A.  My original report was also in a different context as well, apologize if I don't get the right terminology, was for class certification, so it was a very different context versus responding to the merit reports of Dr. Cain.

BY MR. KARAM:

Q.  So Subparagraph 5) you say that -- you summarize after the board unanimously rejected the two offers, "such a disclosure would have been economically immaterial and would not have had a significant impact on NI's stock price."

Do you see that?

A.  I do.

Q.  And you did not base this on an event study, this opinion?

MR. COMERFORD:  Form.

A.  Yeah.  Maybe we'll get to this as well.  You -- it's kind of tough to do an event study on something that

Page 154

didn't happen and the applicability of it and how it can be relevant.  So no.

BY MR. KARAM:

Q.  And you talked about Bruner; right?  You cite the Bruner -- not -- you did not cite Bruner in this report; right?

A.  I don't believe I cited Bruner in here.  I --

Q.  You cite it in your reply; right?

A.  In the reply because it was also -- Dr. Cain actually cited it, and I thought that if we were going to cite Dr. Bruner, who I've had the pleasure of knowing and stuff, I thought, and somebody whose book going back a long ways is very good, I thought it would be very worthwhile to use.

Q.  All right.  But Bruner says that merger offers are material?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  Right?

MR. COMERFORD:  Incomplete.

A.  Can you show me where he says that?

BY MR. KARAM:

Q.  Are you not familiar with it?

A.  I'd love for you to show me that, please.  I'm very familiar with Dr. Bruner's work.

Page 155

Q.  We'll look at it, but you can't say off the top of your head whether his opinion or his research shows that merger offers are material?

MR. COMERFORD:  Form.  Incomplete.

A.  I've cited Dr. Bruner's work, and, again, I'm very familiar with it, so if you have something there that he says that an offer is material, I'd be very curious to see it.

BY MR. KARAM:

Q.  Are you familiar with the -- there was a table of studies, like a meta-analysis, right, in Bruner that Dr. Cain cites?

A.  On the meta studies?  Yeah.  Yes.  I'm sure you're familiar with what meta studies are as well.  But yes.

Q.  There were more than 25 studies indicating merger offers are material to the target firm; right?

MR. COMERFORD:  Form.

A.  Well, if you want to flip to those really quickly, we can go down those or I'll just give you a general comment why the 163 items that you listed were kind of what I determined completely irrelevant.  This is an example of it.  I'm just going to be very candid.  Tender offers from 1963 to 1986, completely irrelevant.  So all these citing -- first of all, this is not about a tender offer.  Tender offers, as you

Page 156

probably know very well, fail to really exist because of Section Delaware 203.  Once we had Delaware 203 in 1988 and then when we started the pill in the '80s, why don't you see tender offers?  Because they went away.  Citing a bunch of work from like 50 years ago is not relevant.  So, I mean, we can get into them individually, but they're not relevant.

BY MR. KARAM:

Q.  You deny that a merger offer would have a positive effect on the -- on the -- the public disclosure of merger offer would have a positive effect on the stock price of a target company?

MR. COMERFORD:  Form.

A.  In what situation and who's making the offer?

BY MR. KARAM:

Q.  In general.  Statistically --

A.  I'm not here to talk --

Q.  Statistically over -- over, you know, thousands of stock -- if you did a statistical study of merger offers at a price higher than the stock price, than the current stock price, you deny that such a -- public disclosure of such an offer would have a material impact on the price of the target company?

A.  If you have a study that I can look at, I'm happy to look at it.

Page 157

Q.  I'm just asking you -- you're basing a lot of this on your experience.  In your experience, do public disclosures of merger offers at prices higher than the current stock price have a material effect on the stock price?

MR. COMERFORD:  Form.

A.  You know, again, if you have a study or something you want me to look at or a case you want me to look at, I'm happy to do that.  But I can't just hypothetically agree to a, you know, a question like that.

BY MR. KARAM:

Q.  Okay.  Subparagraph 70 you say, "Based on my experience, when a company receives an unsolicited, non-binding acquisition proposal in the ordinary course of business - particularly when it is not actively pursuing a sale process - and summarily rejects the proposal . . . it is not customary for the company to publicly disclose the existence or rejection of that proposal."

Do you say that -- see that?

A.  I do.

Q.  And what -- what is your citation for that?

A.  Well, the first four words of there is "based on my experience."  I didn't cite anyone.  I cite my 30 plus years of work and involved in a lot of transactions

Page 158

over my -- plenty of those years and not just as a banker for 25 years, but in the last ten years I've still maintained active board roles.  I've still advised companies.  I still get very involved.  I teach M&A.  I've done research on it.  I'm very involved in this.  And so my statement here is supported by my experience.

Q.  But you don't give examples from your experience; correct?

A.  I didn't list experience -- I didn't list specific examples in here.

Q.  And isn't it correct that here that's not the question?  Simple disclosure is not the question; right?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  How is this relevant to the present case?

MR. COMERFORD:  Form.

A.  I'm not sure how you're saying it's not.

BY MR. KARAM:

Q.  This case involves failure to disclose while trading stock, while buying -- while a corporation is buying back stock; correct?

MR. COMERFORD:  Form.  Mischaracterizes the pleadings.

Page 159

A.  Well, there's a lot more to it.  Obviously I'm just looking at the -- for the background from the -- what I've cited here from the Complaint.  There's obviously a violation of 10(b) and Rule 10b-5 from failing to abstain from trading in NI's securities or disclose -- or to disclose an un -- material non-public information.  So I guess as I'm looking at what we're talking about under Number 7, Mr. Karam, I'm trying to reference here that -- and, again, in my experience, because the reason why you're not going to see a citation here in an academic study, and, again, I spend my time in academia now, so I have a lot of good friends in it, and I'm -- it's the world I live in now, but they can only study things that are somewhat publicly available unless they obviously get private information and stuff.  You can't study this if you don't know about it.  The only way you're going to know about this is being a part of it and being involved in it.  So that's why it's based on my experience.

BY MR. KARAM:

Q.  But my question is, your opinion in this subparagraph does not say whether it's customary for a company to disclose when it is trading stock?

MR. COMERFORD:  Form.

Page 160

A.  I guess the words on the page, I did not say the last part, but what I am talking about here is based on my experience, and, again, I'm not claiming I'm the legal disclosure expert, but what I've seen and what I've seen that counsel has provided, guidance, and I'm sure we'll get to it, you saw that Wachtell obviously provides the guidance here as well, it's not customary for the company to disclose these early, very early stage of non-binding, you know, contingent proposals.

BY MR. KARAM:

Q.  Even when trading stock?

A.  I'm just -- I'm talking about the disclosure with respect to this.

Q.  Right.  You're not talking about disclosure in this paragraph.  This does not address disclosure while trading stock; right?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  Dr. Goodwin, it clearly doesn't.

A.  Well, I know it doesn't, but I guess I'm just saying --

Q.  You don't have to rack your brain.  It doesn't -- it doesn't disclose -- you know, it doesn't address it.  It just doesn't.

A.  I'm not -- I wasn't thinking about how to respond to

Page 161

your question because the words aren't there. It's just that if you feel like you don't have any MNPI based on this and because you've received that guidance from counsel, which, again, my experience, because I'm not the one that would make that judgment call, it would be based on the advice of counsel that would be working with you at the time and all the facts and circumstances specific to your unique situation. I have -- like I said, based on my experience, it is not customary that it would be done. Therefore, they're not in possession of MNPI. Therefore, they don't have to -- I shouldn't say have to. Therefore, as they're trading, if you will, into securities, they still don't have the MNPI.

Q. You don't say any of that here and you don't refer to any of it?

MR. COMERFORD: Form.

A. I don't have those words on the page, but that's my -- what I --

BY MR. KARAM:

Q. I understand. In Subparagraph 8), right, you say, "Accordingly" -- and this is the second sentence. "Accordingly, a target company typically refrains from disclosing unsolicited proposals unless merger discussions have advanced significantly."

Page 162

Right? That's what you say?

MR. COMERFORD: Form.

A. I do. Actually there's the word "significantly" if you were keeping . . .

BY MR. KARAM:

Q. Okay. Unless discussions have advanced significantly; right? It doesn't talk about the significance of the merger to the company.

A. Yes. I was -- sorry.

Q. So by using the word "typically," once again, you're relying on your experience; right?

A. In -- yes. In my experience, you know, target companies refrain from disclosing these unless they've really advanced to a much further stage.

Q. And in this -- you implied in Paragraph -- Subparagraph 7 that you assumed that there would be legal opinion for non-disclosure, supporting non-disclosure? Isn't that what you said?

A. No. I didn't say that because, again, I -- I know my LL.M. is very confusing. I'm not a lawyer. I'm not practicing to be a lawyer. I was saying that companies -- and I do it today as a board member. We have counsel. I rely on them all the time. We don't have -- we don't always get like formal legal opinion. We're obviously getting advice and counsel. So if --

Page 163

I did not mean that you get a legal opinion to actually support that. You could just get the advice from your lawyers that could actually inform your opinion.

Q. And, once again, for Paragraph -- Subparagraph 8) you don't -- you don't rely on any studies or statistical analyses here?

A. So, again, this is why, to be very candid, you have to have actually practitioners that can only opine on this because you can't have an academic study unless people are willing to -- because there's nothing publically available to share, so unless somebody is willing to allow you and participate in some kind of study, more qualitatively, I guess, and they're willing to share that information with you, you won't be able to get -- you won't be able to do this work because this is all done privately and not publicly.

Q. Okay. Going back to Paragraph 5), Subparagraph 5). You say that in the last sentence, ". . . such a disclosure" -- there's no basis for such a dis -- that such a disclosure would have been economically -- I'm sorry. I'm misreading. Let me start over.

It's a long sentence here. All right. Let me just summarize it. You're saying in this paragraph that if there were a disclosure, it would have been

Page 164

economically immaterial and it would not have had a significant impact on NI's stock price. Is that the essence of what you're saying here?

A. Yeah. I would -- yes. Such a disclosure, the way you characterize it, yes. And then such a disclosure would have had a -- I put the down the term "economically immaterial and would not have a significant impact on NI's stock price." That is correct.

Q. Okay. Dr. Cain does an event study, does he not, in his report? You can take a look at his report --

A. Okay.

Q. -- at Pages 105 and 106.

A. Okay.

Q. So on Page 106 there's a summary of the event study results; right?

A. There -- his Exhibit 1 if what you're showing here on the screen here is a -- yes, it's a graph of -- of an event study that he --

Q. The next page is a summary of the event study. Can you read that?

A. Yes.

MR. KARAM: Alex, can we magnify that a little bit?

BY MR. KARAM:

Page 165

Q.  So is it correct on January 13th National Instruments made an announcement that it was considering strategic actions or strategic alternatives?

A.  On -- yeah.  January 13th they made an announcement that they were going to explore strategic alternatives.

Q.  Right.  So there was no mention of a price; right?

A.  I'd have to go back and look.  I don't recall there was a mention of a price at that point, but obviously the announcement of the strategic and explore -- explore possible alternatives.

Q.  So just a simple announcement that it was considering the possibility of a strategic change in the company, whether that be a merger, an acquisition, you know, somebody taking a stake, et cetera, caused a 16 percent increase in the stock price; right?

    MR. COMERFORD:  Form.

A.  Before I respond to that, I really do want to see the announcement again just to make sure I'm speaking specifically about the announcement.  I don't have it in front of me.  I don't know if the -- the person who's controlling the screen has the actual announcement.

BY MR. KARAM:

Q.  National Instruments made an announcement on

Page 166

January 13th; right?

A.  No, no.  No.  I understand that.  I just said I'd like to see the full announcement before I actually --

Q.  I don't have -- I don't have the announcement with me at the moment.  So let's go to the stock chart, which is 105.  So there was some announcement made.  Has to do -- by National Instruments.  Has to do with exploring strategic alternatives, right, forming a committee?

A.  They had already formed a committee, but yes.

Q.  But they announced it on January 13th; right?

A.  The announcement was on January 13th, but they were exploring it because of -- due to a sale, yes.

Q.  All right.  And whatever that announcement said, it caused the stock to go up; right?

A.  I can see the chart here.  I have not done normally what you should do here, and Dr. Cain knows this as well, is you want to do this relative to the market and others to make sure you kind of get an abnormal return because there could be market fluctuations, but, yes, there is a movement here on the stock price on their announcement.

Q.  All right.  So if you want to look back at Dr. Cain's summary, there was an abnormal return of 16.3 percent; right?

Page 167

A.  Again, I know that this event study was done.  I'm -- I'm not debating that he did -- that he did an event study.  I actually didn't go back and check his work.  I'm sure it was perfectly fine.  I -- so I don't know -- I'm not trying to be difficult, but I'm not sure what the question is.

Q.  Okay.  The question is, when National Instruments made the public announcement that it was simply reviewing strategic alternatives, there was an abnormal stock return of 16.3 percent; isn't that correct?

A.  Again, that's why I would want to see that -- what else was in that announcement.  I know that was the day of the announcement.  I know they -- well, I shouldn't say know.  I'm pretty sure they didn't talk obviously about specific prices at that point because that would be a couple days later.  The 17th is when Emerson disclosed.  But I don't want to commit and say anything until I see the rest of the wording within their announcement.

Q.  Well, then Emerson did disclose -- make a disclosure on January 17th; right?

A.  And then they did.  Emerson did it on the 17th.

Q.  And they talked about the $53 price; right?

A.  They did.

Q.  And that caused a ten percent abnormal return on that

Page 168

day; right?

    MR. COMERFORD:  Form.

A.  Again, I'd want to see the full announcement.  I know -- again, just I don't have it in front of me because I don't have all the materials here.  I do know that, yes, on the 13th they said they were exploring strategic alternatives.  On the 17th Emerson followed up with their announcement.  I do know that they did disclose their $53 offer in May, and they also disclosed that they, you know, had conversations with them, you know, going back to May or at least made their very first offer, and they also cited that there was no engagement by the company.  Yeah.  Again, I apologize, Mr. Karam.  Is -- aside from agreeing that Dr. Cain did these studies, is there a question?  I'm just trying to -- I'm just not --

BY MR. KARAM:

Q.  I'm just asking you if those things were reported on those days and there was corresponding stock movements.

A.  There appears to be.  I did not do an event study on this because it's not relevant.  I guess it goes back to my question of the relevance part.  Taking an event study of an announcement of a company exploring and selling themselves and then obviously another one

Page 169

where a company said we're trying -- we want to acquire them has no bearing on a potential disclosure of a company that would have said we just rejected two proposals at the exact same price. They're not congruent. I mean, I would have -- I could have done an event study on the tariff impact on Apple. I think it would have had the same impact. It's just not relevant.

Q. You understand that you just gave a legal opinion? You understand that there is legal case law that decides whether a subsequent disclosure matches a prior omission?

A. I wasn't giving a legal opinion. I can't because I'm not a lawyer.

Q. I'm just asking you a question. In your LL.M. studies or your conversations with counsel, did you ever get an understanding that there was a significant body of case law, legal case law that determines whether a later disclosure of information matches a prior omission of information that's alleged to be securities fraud?

MR. COMERFORD: Form. Beyond the scope of the pleadings. Calls for legal conclusions.

MR. KARAM: It does call for -- I'm asking him if he's aware of that body of law.

Page 170

A. Yeah. I'm not -- like I said, I'm not a lawyer. I'm not familiar with that and -- and that's why even as a board member I'm smart enough to make sure that we get good counsel to advise us.

BY MR. KARAM:

Q. Right. So would you agree that if the judge decides that there is a correspondence between the omission and the later disclosure, then you'll abide by that? You won't dispute that?

MR. COMERFORD: Form. Hypothetical.

A. Mr. Karam, I don't think that would be for me to make that decision or even abide by it. That's just not for me to obviously consider.

BY MR. KARAM:

Q. All right. But you had -- you had no idea that that was a legal question, that matching the omission to the disclosure is a legal question? You were not aware of that? You were just looking at it from a business point of view?

A. As I always do. I -- you know, I'm not an expert in a lot of things, and what I do I think wisely, as most board members would do or even bankers, is you rely on subject matter experts to help guide you and then you use your judgment to inform your decisions.

MR. KARAM: Let's go to Tab I.

Page 171

(Marked EXHIBIT 10 for identification)

A. Okay.

BY MR. KARAM:

Q. Are you familiar with this paper, Dr. Cain -- Dr. Goodwin?

A. Yes. I -- yes.

Q. Had you --

A. I read it after I saw that it was cited.

Q. Okay. Had you read it before you wrote your first opinion?

A. I can't recall, but I don't think so.

Q. You certainly didn't cite it in your first opinion?

A. I didn't cite it, no.

Q. Okay. So you have read it, though, since then?

A. I did.

Q. And I'm trying to -- I'm trying to be quick. If you need to -- I'm going to focus in on specific things. If you need to read, you know, paragraphs before and after, you're free to do that, but, as I said, I want this thing to move along a little bit.

So on the front page of this, 1683, they talk about in the middle of the italics paragraph, it says they looked into mergers between 2003 and 2017 into a dataset of 1913 unique transactions.

Do you see that?

Page 172

A. I do.

Q. Okay. So go to Page 1705. And there's a table there. Can you read it? I can actually see it, so . . .

A. Can you make it just a little bit larger, please? Okay.

Q. All right. And it talks about offer premium. The bottom row is "Offer Premium"; right?

A. I see that.

Q. And it says the mean -- the summary is the mean offer premium on these deals is 34 percent. Do you see that? .34.

MR. COMERFORD: Form.

A. I mean, I do see that.

BY MR. KARAM:

Q. All right. So in these deals that the authors, one of whom is Dr. Cain, studied, they found that in these 1913 transactions the median offer premium was 34 percent; right?

A. All I can agree to is that that -- the work they did in the study is that's what it is. I can't say that that's correct or accurate. I didn't verify the report. I just --

Q. No. I'm just asking you if this is -- that's what the published study says.

A. That's what the published study shows.

Page 173

Q.  Okay.  So let's go to the next page, 1706, which talks about the number of bidding rounds; right?  The table at the top and then the paragraph underneath that starts with Table 1.  And you can read that if you need to.

A.  Okay.  I mean, I -- I think I remember he's talking about the number of rounds of bidding.

Q.  Okay.  So it says there the number of bidding rounds ranges from a minimum of one to a maximum of 30.  Have you ever had in your -- however many mergers you were involved in, have you ever had a merger concluded after one round, one offer?

MR. COMERFORD:  Object to the form.

A.  Honestly I can't recall.

BY MR. KARAM:

Q.  Okay.  It says maximum of 30 with a median of five.  Do you see that?

A.  Where -- oh, I was looking at the chart.  Well, I can see the words.  Okay.

Q.  Okay.  So would you agree that this study finds that the median number of bidding rounds in the transactions they studied was five?

MR. COMERFORD:  Form.

A.  I mean, if that's the work they concluded.  I don't -- you know, I don't know what to say other than it looks

Page 174

like they did some work and they concluded that.  I don't know if you're asking me a question about it or if I'm just -- I'm not agreeing with it because I can't because I didn't study it, you know, and I didn't do the analysis.

BY MR. KARAM:

Q.  Right.  You don't have to agree.

A.  Okay.

Q.  This is a published paper.

A.  Yeah.

Q.  California Law Review.

A.  Yeah.

Q.  Are you familiar with it?

A.  I am.

Q.  Do you accept it as a professional publication relied on by financial experts?

A.  To be honest, I don't know about financial experts, but I do respect the California Law Review.

Q.  Okay.  And it's published; right?  And peers are free to comment on such things; right?

MR. COMERFORD:  Form.

A.  Absolutely.

BY MR. KARAM:

Q.  If I publish in the California Law Review and I do bad work, I'm going to hear from doctors, lawyers, and

Page 175

Indian chiefs, right, criticizing me?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  So it says that the median number of rounds in the cases that they study is five; right?

A.  I mean, that's what it says there, yes.

Q.  Is that consistent with your experience, that there are a number of rounds somewhere between one and 30?

A.  I could never recall anything about 30, so I have no idea about --

Q.  Well, you would agree that in these merger negotiations, these are sophisticated parties on both sides; right?

A.  I -- I would stipulate they're both sophisticated.

Q.  And they're sophisticated in the art of negotiation; right?

MR. COMERFORD:  Form.

A.  That I don't know.  I mean, that I don't know.

BY MR. KARAM:

Q.  And that both sides are trying to maximize value for their side; correct?

A.  I think that as a general premise, and this is probably more from the econ side of the world that I live in, I think they are trying to maximize the value for themselves and their shareholders.

Page 176

Q.  And that these negotiations routinely -- are routinely back and forth?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  Nobody accepts the first bid.  They try to -- you know, they say, oh, that's too low, and then, you know, a person might come back with another bid and, no, that's too low and so on for four or five rounds at least; right?  Not uncommon.

A.  Well, again, if you're talking in generalities versus are you talking specifics about what happened here?  Because those are two different things.  And so I said if you believe people negotiate and then there are, and I don't know if I'd call them multiple rounds, but obviously different views on value along the way, that's one thing to talk about it in generalities.  If I do this for class, I would talk about it very loosely in generalities.  That's very different than the facts that we're talking about here.  So I just want to make sure that as I'm looking at this and talking with you about it, Mr. Karam, that we're not conflating the two because they're still very separate.

Q.  Well, in this one there was an offer at 48 at a 30 -- 39 percent premium that was rejected; right?

Page 177

A.   The May offer at 48 was rejected.

Q.   Then the June offer at 48 at a 51 percent premium was rejected; correct?

A.   The June proposal at $48, which, to be honest, in my opinion, is the exact same price because that is the merger consideration, and, as you know, in the proxy that's what we call it, merger consideration, was the exact same, so it was a rejection of the exact same price.

Q.   Okay.  And then Emerson came back with a $53 offer; correct?

          MR. COMERFORD:  Form.

A.   After the second rejection and several months in between, no communication at all between the parties, Emerson came back in November with another proposal.

BY MR. KARAM:

Q.   Then there was another round of negotiations that finally got the price up to 60; right?

A.   Or even several I would say.

Q.   Right.  Back and forth.  Okay.

A.   Because they ran a process.  Exactly.  So then they entered into the NDA.  They ran a process.  They had seven buyers, got it down to four, down to two, and then finally the final deal in May.

Q.   Okay.  So that's what happened specifically in this

Page 178

case; right?

A.   That was the sequence of events that eventually culminated into the deal in May of 2023.

Q.   Okay.

          MR. KARAM:  All right.  Let's go to J.  Now, this is the -- this is the Bruner excerpts that we're talking about.

A.   Okay.

          (Marked EXHIBIT 11 for identification)

BY MR. KARAM:

Q.   This is Number 11.  There's no Bates number on this.  All right.  Go to Page 36, which should be the next page.  This is just excerpts from Bruner.  You said you're familiar with the textbook.  Go to the next page.  Okay.  This is one.

          All right.  So this -- this is cited by Dr. Cain; right?

A.   He cited Dr. Bruner's work, yes.

Q.   Right.  And the first sentence says, "Target firm shareholders enjoy returns that are significantly and materially positive."  Right?

A.   Well, I mean, again, that's the sentence.  I have no idea what that pertains to, though.

Q.   Okay.  But it seems pretty clear in English.  It says, "Target firm shareholders enjoy returns that are

Page 179

significantly and materially positive."  Right?

A.   Again, I'm not trying to be difficult, Mr. Karam.  But, I mean, I see the words and what it says, but it -- you can't -- I have no context in what way that is applying.

Q.   Okay.  Well, you said you were familiar with the textbook; right?

A.   It's over 20 years -- it's over -- it's over 20 years old.  I haven't read it in a long time, to be honest.

Q.   Okay.  All right.  And then so we talked about on the next three pages or four pages there are -- there are some studies from -- ranging from the '70s through 2003 --

A.   Actually it starts at 1929.

Q.   That you say are outdated; right?

A.   Well, I mean, 1929 is nearly a hundred years old, so . . . I think things have changed.

Q.   Well, 2003 is not a hundred years; right?  So you had a chance in your -- your reply to dispute this statement from Dr. Bruner that target firm's shareholders enjoy materially positive, significant positive returns; right?

A.   Did you say I refuted it or --

Q.   You had a chance to refute it?

A.   I refuted a lot of things he said.  I don't know

Page 180

specifically on this.  But I -- I -- I mean, again --

Q.   That's my question.  Do you deny the statement that when there's a merger, a bid, or offer that the target firm statistically enjoys positive returns?

          MR. COMERFORD:  Form.

A.   What I need --

BY MR. KARAM:

Q.   Yes, no, or I don't know.

          MR. COMERFORD:  Form.

A.   Can you repeat the question so --

BY MR. KARAM:

Q.   Do you agree with this sentence?  If you can't -- if you don't have sufficient information or you think it needs more context, you just say I can't -- I can't opine, I don't know.

A.   I can't opine.

Q.   Okay.  You don't know.

A.   I can't opine to this particular sentence the way that you're just isolating the sentence.

Q.   Okay.

A.   That I cannot opine.

Q.   All right.

A.   Only to that.

Q.   If I -- if I went down to Wall Street and asked somebody do you think a firm being publicly disclosed

Page 181

as a merger target would be good for the stock, do you think I couldn't get a person to say yes?

MR. COMERFORD: Form.

BY MR. KARAM:

Q. I'll withdraw it. Okay. So you then -- you cited some other -- in your reply you cited some other parts of Dr. Bruner; right?

A. In my reply, yes.

Q. Okay. So -- so I'm going to refer you to Page 690, I think, and I think you cited that.

A. In my report or --

Q. I think -- I think you cited it in your report.

MR. COMERFORD: Your --

THE WITNESS: No, no. I know. I thought he said 690. I don't know where that is.

MR. COMERFORD: 69.

THE WITNESS: Oh, 69. I'm sorry.

BY MR. KARAM:

Q. Oh, I'm sorry. I must have written the wrong page down. That's the one that says "Discussions: Gaining an Early Sense of the Possibilities." Based on --

A. Do you have a paragraph number, Mr. Karam?

Q. Hold on. Let me ask my . . .

MS. PLASCOFF: Okay. So 690, if you are looking at the printout, it's after 736, which is like

Page 182

(inaudible) page and then it's out of order, so 690 is after 736.

MR. COMERFORD: What exhibit are you referring to?

MS. PLASCOFF: It's Exhibit 11.

MR. COMERFORD: Okay. So we're back on this.

A. Oh. Oh. Oh. Oh, we're still back on Bruner's stuff. Oh, I'm sorry. I thought you said in my report.

MR. COMERFORD: I object to this exhibit if it's a compilation and an incomplete snippet of an article that's out of order.

THE WITNESS: I don't have a page number.

MR. COMERFORD: I don't either.

MR. KARAM: Yeah. I think we need -- I think it's -- go down a little more, Alex. Keep going.

MR. COMERFORD: The second to last piece of paper. Okay.

MR. KARAM: Keep going.

VIDEO TECHNICIAN: This is the last page of the document.

MS. PLASCOFF: Do you want to take a break? Because that shouldn't --

MR. KARAM: Yeah. Give us five minutes to

Page 183

get this organized here. We're going to take a break.

VIDEO TECHNICIAN: Okay. Off the record. The time is 2:27.

(Recess taken at 2:27 p.m.)

(Back on the record at 2:42 p.m.)

VIDEO TECHNICIAN: The time is 2:42. Back on the record.

BY MR. KARAM:

Q. So, Dr. Goodwin, this is the Bruner section that talks about the "Just Say No" defense.

A. Okay. Was this in the materials that were sent over or . . .?

Q. No. I don't --

MS. PLASCOFF: Yes, it was.

BY MR. KARAM:

Q. Oh, yes it was. Yes, it was. I have a printout of it.

A. It's initiating discussions. Okay.

Q. Right.

A. I have a printout of what was sent. I'm just finding it. Initiating discussions. Okay. Yes. Initiating discussion.

Q. All right. So let's go down to the bottom. You can -- have you read this paragraph before? Because I think you refer to it in your reply.

Page 184

A. Yes. I recognize it from the reply, but -- I'm sorry. Yes.

Q. Okay. So actually I think you quote toward the bottom, it's the second paragraph there, "Following a rejection, most merger proposals die."

A. I did quote that.

Q. Okay. So you quote that in support of the strength of the "Just Say No" defense; correct?

A. Yes.

Q. But you did not quote the next -- the next sentences in that paragraph. "But some buyers may elect to appeal directly to the board of directors in the form of a 'bear hug' proposal, or directly to the shareholders in the form of a hostile tender offer." Correct?

A. Those are the words, and I did not -- did not cite that specifically.

Q. Okay. So go now to Page 701. I think -- hold on. Yes. That's the page. All right. Go down to Footnote 4. Begins "1983, First Lady Nancy Reagan."

A. Okay.

Q. All right. So that talks about Nancy Reagan invented the phrase "Just say no"; right? We're going to give her credit for that.

A. Right.

Page 185

Q. Okay. And then the last sentence says, "Thus, the defense of a firm but simple rejection" -- I think that's a misprint, I think it's "by simple rejection - 'just say no' - was born. The effectiveness of this defense relies on the firm's past financial performance and the height of its share price. Poorly performing targets rarely fend off an insistent suitor by just saying no."

Do you see that?

A. I see the quote.

Q. Okay. Is it correct that National Instruments had a plan to raise its stock price into the mid 50s? Its internal plan? That was its strategic plan; right?

A. Well, I don't -- I think you're paraphrasing, and I appreciate that. I don't think their plan was to raise the stock price into the mid 50s. That was their strategic plan. They had a strategic plan, at least that I reviewed, about improving margins that hopefully would be reflected eventually or imputed into the stock price.

Q. All right. The November $53 offer came after first -- after National Instruments reported earnings; correct?

A. Do you mean the earnings at the end of July?

Q. No. November.

A. I would have to check the date if it came back -- I

Page 186

don't have it in front of me if that date it was submitted was right after their earnings announcement.

Q. Okay. Go to Page 807. And the paragraph under the heading "Bargaining Tactics." It says, "Looking at the similarity of targets in hostile and friendly deals, Schwert (2000) concluded that hostility was merely in the eyes of the beholder and that 'hostility reflect[s] strategic choices made by the bidder or the target firm to maximize their respective gains from a potential transaction . . .'"

Do you see that?

A. I see it. I don't have that in front of me. Let me just try to look at the screen here. Do we have that? I couldn't find it.

MR. COMERFORD: I don't think that's in the document that we were --

MS. PLASCOFF: It is.

MR. COMERFORD: It is?

MS. PLASCOFF: Should be.

MR. COMERFORD: Do you have the page?

MS. PLASCOFF: It would be the -- 807 would be in the last page in that PDF I sent.

A. Oh, okay. It's a little cut off on its side. That's why I couldn't -- yep. Thank you. All right.

BY MR. KARAM:

Page 187

Q. And then it says, "Strategic bargaining is the motivation for hostility. This is consistent with the two previous chapters that characterized negotiation, auction, and hostile bids as segments of a spectrum of bargaining approaches to a deal."

Do you see that?

A. I see the words related to this.

Q. Okay. And do these -- are these words consistent with your experience that there is a spectrum that goes from friendly to hostile and it's not necessarily a bright line?

MR. COMERFORD: Form.

A. Well, when you say a spectrum, the vast majority of transactions, by far the vast, try to start in a friendly way, meaning in this situation, as we have, between an outreach between two CEOs. That is definitely a very standard approach to having and starting and facilitating a dialogue. I would still submit that what transpired in May and June as far as sending a letter the first time in May is very standard. What I would tell you is extremely atypical in my experience, and, to be honest, I've never seen it and I would never advise a potential buyer to do this, would be to ever send over another proposal that just got rejected a couple days earlier with the exact

Page 188

same price. That is atypical. But this notion that there -- and I don't know if you were implying, so maybe I shouldn't put words in your mouth, but the spectrum doesn't necessarily mean it always moves into hostile. Hostile deals, quite frankly, are rare relative to the other, you know, transactions that we work on. They're just rare. And, again, part of it is because all these other -- and, again, Bruner, you know, obviously he wrote his book a long time ago, and the cases that he had cited and the cases -- the academic work that Dr. Cain cited about tenders and all that, those just don't really exist in our market anymore because we've had so many changes. So I think you have to take everything into context about what the situation is, and the situation that we're talking about specifically within I is very different than the generalities that are discussed in the book.

BY MR. KARAM:

Q. Okay. So let's move on, and I'd like you to go to Page 14 of your original report.

A. Okay.

Q. So this is a table that you kind of reproduced or took data from another document; right?

A. From the BofA football field, yes.

Q. Okay. And you cite here price projections or

Page 189

valuations, right, Discounted Cash Flow Analysis, Excl. Synergies, Implied Terminal LTM, et cetera?

A.   Yeah.  These were for the most part, as you stated, Mr. Karam, this is a reproduction of, I'm sure you've heard it, the football field that BofA actually included.

Q.   Okay.  So it has a low of -- low valuation of $50.75, high of $78, midpoint of 64.63; right?

A.   For the DCF.

Q.   Okay.  And that was based on management's internal numbers; correct?

A.   It is based on management's -- the projections that they provided to BofA and --

Q.   Okay.  That's -- you answered my question.  I don't mean to cut you off, but we need to move along here.

        MR. KARAM:  So let's -- let's mark this as Number 12.  And it is NAT-SL-00001513.

        (Marked EXHIBIT 12 for identification)

BY MR. KARAM:

Q.   Do you recognize this?

A.   I think we were just talking about it.

Q.   Okay.  Good.  So go to Slide Number 5.  Okay.  Right there.  So you based your -- the table that you reproduced on the top part of this?

A.   On the top part.  Yeah.  I mean, the data that they'd

Page 190

shown in their -- the football field, as we call it, football field.

Q.   Okay.  You did not include in your report the material that's in the gray box here; right?

A.   That material I did not include.  I didn't think it --

Q.   Go ahead.  That's the analysts' consensus projections; right?

A.   Those were the analysts' projections.

Q.   All right.  And those were -- ranged from in 2022 $32.50 to $39.75, 2023 $33.75 to $42.25; right?

A.   I actually can't see it.  I will just --

Q.   There you go.  There you go.

A.   Yeah.  The 33.75 to 42.25 for the adjusted EBITDA for 2023.

Q.   Okay.  So those are lower than the BofA projections based on what management gave to BofA; right?

A.   The consensus projections by analysts, and, again, just doing an implied valuation because that's all they've done here is an implied valuation, they're not -- they didn't actually use price targets here because price targets was listed on the other part of the football field, so this is just an implied valuation based on BofA's analysis using consensus EBITDA and EPS numbers.

Q.   So that was lower than the one based on management's

Page 191

projections?

        MR. COMERFORD:  Form.

A.   Those numbers are lower than what management has for their adjusted plan of, yes, PoR.

BY MR. KARAM:

Q.   And if you can zoom back out a little bit.  So you see on the -- on the right-hand side below the bar chart there's a notation NI's stock price as of 6/9/22 $34.49; right?

A.   I do see that.

Q.   Okay.

A.   I'm sorry.  Was there a question with that or just --

Q.   No.  No.  That was -- that was what the stock price was at the time; right?

A.   Well, again, I'm going to assume BofA got it right, but, yeah, that's what they've -- that's what they're trying to show here is that's what the stock price is at that time.

Q.   Right.  Right.  And, you know, BofA was, based on management, was valuing the company between $50 and $78; right?

A.   I don't know what BofA judgment was.  I think you're picking out the DCF that they did.  But one of the things I will say is valuation is not one methodology.  It's based on judgment.  So you look at -- you can

Page 192

certainly include the DCF.  You would also include, and particularly in this regard, the precedent transactions because the precedent transactions particularly in M&A are really what matters because that's what includes a control premium.

Q.   Okay.  Turn to Page 12, Paragraph 26 of your report.

        MR. COMERFORD:  The first one?

A.   The first one?

BY MR. KARAM:

Q.   Always referring to the first report unless I say differently.

        In the middle of that you say, "In contrast, in a defensive engagement, which in my view the BofA engagement letter was, a company is not interested in selling itself to a prospective buyer, and the financial advisor is not incentivized through a success fee to identify prospective buyers."

        Do you see that?

A.   Yes.

Q.   And then in Footnote 22 you say, ███████████ ████████████████████████████ ████████████████████████████ ███████████"

        Do you see that?

A.   Yes.

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

Page 193

Q.   And -- and do you agree that ████████ ███████████████████████; right?

A.   I don't have that in front of me, but -- so before I say yes, let me --

MR. KARAM:  Okay.  Let's -- let's mark as 13 NAT-SL-00001554.

(Marked EXHIBIT 13 for identification)

A.   Okay.

BY MR. KARAM:

Q.   Go to the bottom of the first page.

A.   Yes. ███████████████████ ████████████.

Q.   All right. ████████████████ ██████████████████. Right?

A.   I do see that.

Q.   All right.  So they sent the second rejection on August 2nd, 2022; right?

A.   Yes.

Q.   And you're saying the deal was dead, probability is negligible at that time; right?

MR. COMERFORD:  Form.

A.   What I said was is that the probability of an acquisition occurring at the start of the proposed class period was negligible.

BY MR. KARAM:

Page 194

Q.   All right.  National Instruments did not discharge Bank of America after -- at the start of the class period; right?

A.   Not from what I observed.  Obviously continuing involvement with BofA, so I --

Q.   They continued -- they continued ██████████ ████████████████████████, in your opinion, the chance of a transaction was negligible as of August 10th or 12th; right?

A.   No.  So the ████

Q.   They stopped paying Bank of America?

A.   Well, couple things if I can finish, please.

Q.   Let me just -- they did not discharge Bank of America; right?

MR. COMERFORD:  Form.

A.   No.  Sir, can I finish the question you asked?  You said, first of all, that ██████████████ ████████████████████ ████████████

BY MR. KARAM:

Q.   I'm sorry.  I stand corrected.

A.   And then you asked about did they pay.  I have no idea if they actually paid or honored their commitment. All I know is what they've agreed to in their letter.

Q.   Okay.  Okay.  Good.  All right.  So turn to the next

Page 195

page, Paragraph 4.

A.   Okay.

Q.   It says ████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████ . . ."

Do you see that?

A.   I do see that.

Q.   So BofA is saying here and this agreement says that ████████████████████████████ ██████████████; right?

MR. COMERFORD:  Form.

A.   Well, just for -- for context, this is what -- and I've executed a lot of these.  These are kind of anti-raid letters.  To be honest, we actually tried to put these in place with companies on clear days, meaning nothing going on with them, so that we can actually work with them as opposed to doing it purely in a defensive.  Like I said, I'm very familiar with this style of letter.  I've executed them.  And what you're trying to do is exactly what BofA did here,

Page 196

which is ████████████████████████ ██████████████████████████ ████████████████████████ ██████████████████████████ ████████████████████ .

BY MR. KARAM:

Q.   Okay.  And then they say, ████████████████ ████████████████████████████ ██████████████████████████

Do you see that?

A.   Yes.

Q.   That bulge bracket investment banks on the successful completion of a merger get a success fee, do they not?

A.   They get -- they negotiate for a success fee.

Q.   Okay.  Thank you.  And Bank of America did, in fact, get a $51 million success fee, did it not?

MR. COMERFORD:  Form.

A.   Well, again, to be very precise, I did see that in the proxy agreement.  I don't know ultimately what they received at the end.

BY MR. KARAM:

Q.   So in Paragraph 31 you say it is highly unlikely that NI's Board would have approved or recommended to NI's shareholders to vote in favor of $48 a share; right?

Page 197

A.  I did say that.

Q.  Okay.  And then you said or that BofA would have issued a fairness opinion based on $48 a share; right?

A.  I did say that.

Q.  So is it your testimony that if the board had believed or felt that $48 was a fair offer and accepted it that BofA would not have issued a fairness opinion?

A.  So, and this probably was a little bit too confusing here, but this is something I do actually teach in my class because I have a whole section on fairness opinions, and my comment to this, and as somebody who's actually been on fairness committees and someone who's delivered fairness opinions but also someone who has not delivered fairness opinions on certain situations, the challenge for BofA, again, being in part of these investment committees or we call them fairness committees, would have been putting something like this in front of the board if they felt like they were not going to get comfortable at a certain level. Why?  Because the board would have -- obviously you saw the DCF ranges.  The board would have never been -- or the fairness committee would have never been comfortable issuing a fairness opinion at a level of -- at this delta between these.  So that was my opinion based on that.  Because you have -- I'm sorry.

Page 198

Can I just finish one thing here?  Because what you have is even on the low end, as you noted, Mr. Karam, the $48 -- and the only two really important metrics on this page when I go back to Table 1 is that the low end is at $50.75 and the low end is at 49.88.  The $48 is even below the low end on their valuation.  They would have not been able to issue a fairness opinion to support the board.

Q.  All right.  Did you read the Cain and Denis paper, Information Production by Investment Banks: Evidence from Fairness Opinions?

A.  I -- maybe I flipped through it, but I don't think I -- I'm not sure I've read it closely.  If you have a specific question, I'm happy to --

Q.  Yeah.  My question is, did you -- in their survey which -- they found that there was no instance in a completed deal -- we find that in every fairness opinion, in the sample, the fairness opinion deems the transaction fair.  So, in other words, there's never -- they didn't find any instance where the bank did not issue a fairness opinion, where the board accepted the offer and believed it was carrying out its fiduciary duties and, you know, believed it was doing the right thing using its business judgment.

A.  Yep.  I'm saying yes, I'm listening to you.  I'm

Page 199

sorry.  I didn't mean to agree.  But yes.  Yes.  I'm sorry.  Is there a question with that?  I apologize.

Q.  Have you -- have you read the paper?

A.  I did not read the paper, and, to be honest, I don't need to because, based on what you just said, you know, again, with all due respect to my colleagues in academia, they're not sure what they're looking at, meaning of course they're going to find a fairness opinion that says a fair -- the fairness from a financial point of view.  Why?  Because that's what we're issuing.  What they can't see are when we don't issue it because we can't get there.  So I'm saying they can't do the counterfactual, and that's why you have to understand the full process to understand and go, oh, look at all these fairness opinions that were issued.  They said that was fair.  Well, of course because they issued it.  What they don't see is when they don't get issued because they can't do it because there's a problem.  I know that because I've been part of that in practice.  So I don't understand --

Q.  Listen, Doctor, I know you have to make a flight, and I say this -- and, counsel, you can make all the objections you want.  I'm going to explain this to you.  I'm trying to keep my questions specific that most of them can result in a yes or no answer.

Page 200

A.  Okay.

Q.  You are absolutely free to talk as much as you want. I'm not going to interrupt -- I'm sitting here in Manhattan.  I'm a quick subway ride away from home.  I don't care how long this thing goes.

A.  Okay.

Q.  So I just want to make you aware of that.  My -- my associate thinks you might be talking a little too much, but, you know, that's just her opinion.

A.  Okay.

Q.  I'm not going to issue an opinion on that.
     You didn't give examples of cases where banks have denied or suggested they would not issue a fairness opinion; right?
     MR. COMERFORD:  Form.

A.  Because they're not public.

BY MR. KARAM:

Q.  Well, you said, you know -- you could have said in my experience I'm aware of six or seven instances where banks refused to issue fairness opinions.  You did not say that; right?
     MR. COMERFORD:  Form.

A.  I did not put those words on the page.
     MR. KARAM:  Okay.  This will be P.  This is Exhibit 14.



Page 201

(Marked EXHIBIT 14 for identification)

BY MR. KARAM:

Q. All right. You recognize this, Dr. Goodwin?

A. I do.

Q. Okay. So you're familiar with this? This is a presentation that Wachtell Lipton made to the National Instruments board in late May of 2022?

A. Yes.

Q. After the first Karsanbhai letter?

A. Correct. Yes.

Q. Okay. So go to Slide Number 7. Are you familiar with this slide?

A. I am.

Q. And I think you may have stated Wachtell Lipton is a premier merger advisory firm?

A. I'm not sure if I stated it, but I would agree with that statement.

Q. Okay. And so what they do is they -- this appears to be eleven -- they have eleven numbered sentences here; right?

A. Correct.

Q. And it's -- the title of the slide is " █████████ ███████████████████ " Do you see that?

A. I do see that.

Page 202

Q. So would you agree that this is a slide █████ ████████████████████ ██████████

MR. COMERFORD: Form.

A. I think this is a slide that Wachtell uses for that purpose.

BY MR. KARAM:

Q. Okay. So ██████████████████████ ████████ ; right?

A. That is correct.

Q. So that happened in this case?

A. Correct.

Q. ████ I'm not sure could happen. ████████ ████████████████ . Do you see that?

A. Yes. ████████████ .

Q. Okay. ████████████████████ ████████████████████ ████

Right? Do you see that?

A. I see the ████████ yes.

Q. And you understand what that means; right?

MR. COMERFORD: Form.

A. Yes. I do understand what that means.

BY MR. KARAM:

Page 203

Q. And is it correct that █████████ ████████████████████████ ████

A. From my understanding and what they've disclosed even in -- ████████████████████

Q. So it was before the class period started; right?

A. It was before the class period, proposed class period.

Q. And National Instruments knew about it on August 10th, right, before the class period started?

A. They were informed on August 10th.

Q. Okay. And then, you know, there are other -- so then there's a line that says " ████████████ ." Do you see that?

A. I do.

Q. All right. So █████████████████████ ████████████████

Do you see that?

A. Yes.

Q. Would that be consistent with Emerson's January 17th letter?

MR. COMERFORD: Form.

A. It all -- I think it all depends on whose -- your definition of what bear hug is. Their January 17th letter was public.

BY MR. KARAM:

Page 204

Q. Okay. All right. So go to Slide Number 8. And it talks ████████████████████████ ."

A. Yes.

Q. So see the -- under " ████████████ "? Do you see that? It's the second to last one on the top row.

A. I do see that.

Q. It says, " ████████████████████ ████████████████████ . . ."

Do you see that? That happened; right?

MR. COMERFORD: Form. Mischaracterizes evidence.

A. Yeah. I'm sorry. Well, I -- I don't have that January 17th letter in front of me, but I don't think they were reiterating their price and their interest and everything at that particular point. They were obviously -- I think they were expressing their frustration maybe with NI about moving into a process.

BY MR. KARAM:

Q. Well, even the May 22nd -- the May 25th and June 22nd letters were private letters to the target CEO and board proposing a specific transaction price; right?

MR. COMERFORD: Form.

A. I'm sorry. I thought you were talking about the January letter still.

BY MR. KARAM:

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

Page 205

Q.  No.  Both the May and the June letters went to the board and the CEO and proposed a specific transaction price; right?

MR. COMERFORD:  Form.  Mischaracterizes the evidence.

A.  I'm sorry, Mr. Karam.  I've lost track.  Can you just repeat that for me, please?

BY MR. KARAM:

Q.  I'm saying the June 22nd letters -- let's talk about the June 22nd letter.  Went to the CEO, did it not?

MR. COMERFORD:  Form.

A.  The June 22nd letter was addressed to, yes, the CEO of NI.

BY MR. KARAM:

Q.  And also to Mr. McGrath; right?

A.  I believe he was copied on it as well.

Q.  All right.  The board.  Proposed a specific transaction price, correct, $48?

A.  It had the $48 per share.

Q.  All right.  Requested timely response; correct?

MR. COMERFORD:  Form.

A.  I believe -- I don't have it in front of me, but I believe they requested.  I know that they followed up in an email later, but there was a, you know, request to respond.

Page 206

BY MR. KARAM:

Q.  Possibly threatening public disclosure; right?  There was a subtle hint of threatening public disclosure?

MR. COMERFORD:  Form?

BY MR. KARAM:

Q.  Agree or disagree?

A.  Well, again, I --

Q.  You can do either one.

A.  Yeah.  I was going to say it's a matter of interpretation whether you believe that that was really threatening or was it, as you mentioned, I think, subtle disclosure.

Q.  Okay.  Go to Slide Number 9.  "█████████████  Do you see that?

A.  I do.

Q.  In the top left-hand corner, "█████████
███████████████████████████
████████"

Do you see that?

A.  I do see that.

Q.  All right.  Slide Number 10.  The first check mark in the upper left-hand corner, "████████████
████████████████████████
████████████████████████
███████████████



Page 207

Do you see that?

A.  I see that.

Q.  Okay.  So, and National Instruments followed that advice.  They were quite discouraging in both of their response letters; right?

MR. COMERFORD:  Form.

A.  I -- well, I've seen these presentations not just from Wachtell, but I think they're just putting together a --

BY MR. KARAM:

Q.  That's not -- that's not the question.  The question is, you read the two letters that National Instruments sent to Karsanbhai in response to his offers; right?

A.  I did read those letters.

Q.  Those offers -- those letters were discouraging to Karsanbhai, were they not?

MR. COMERFORD:  Form.

A.  I don't know what Mr. Karsanbhai was discouraged or not.

BY MR. KARAM:

Q.  That's not the question.  The letters -- ███████
█████████████  and the letters were, in fact, discouraging.  I don't understand why you have to dance around a question like that.  It's pretty simple.

Page 208

MR. COMERFORD:  Foundation.  Calls for speculation.

A.  Well, you said was he discouraged, and I can't speak --

BY MR. KARAM:

Q.  No, no.  I didn't say that.  I said were the letters discouraging ███████████████?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  All I can tell you is the letters were rejecting the proposal.

BY MR. KARAM:

Q.  All right.  Go down to the second last check from the bottom.  It says, "████████████████████
██████████  right?

A.  I do see that.

Q.  And, in fact, National Instruments retained a firm called Mackenzie ████████████; right?

A.  They did.

Q.  All right.  Go to Slide Number 14.  The third bullet point under Point Number 3.  ████████████████
████████████████████████
████████████████████████
████████████████████████

Deposition of Shane Goodwin, Ph.D.    In Re National Instruments Corporation Securities Litigation

Page 209

████████████████."

Do you see that?

A.  I do see that.

Q.  Is that customary in your experience?

MR. COMERFORD:  Form.

A.  I think it's customary and good practice even on a clear day, not just in a situation like this.

BY MR. KARAM:

Q.  And you said at the start you -- you don't know what these private oral conversations were between the CEO and the board during this time; right?

MR. COMERFORD:  Form.  Assumes facts not in evidence.

BY MR. KARAM:

Q.  You want me to re-ask it?  You haven't talked to Mr. Karsanbhai, you haven't talked to Mr. Starkloff -- putting Karsanbhai aside.  You haven't talked to Starkloff, McGrath, Rapp, Ilcisin, any of those people; right?

A.  No.  As I've stated earlier, I did not have any conversations with them.

Q.  And you see no records of the oral conversations that they were having in the background of making a decision on these offers; right?

MR. COMERFORD:  Form.  Assumes facts not in

Page 210

evidence.

A.  Well, I -- and I think also Dr. Cain, there were obviously, as you know, a number of emails and some communication that would go to understanding that.

BY MR. KARAM:

Q.  That's not my question.

A.  Then I'm sorry.  Then I missed it.  I thought you said --

Q.  There were -- this is suggesting that there were conversations among the board and the CEO that were not put in email or texts; right?

MR. COMERFORD:  Objection.  Mischaracterizes the document.  Assumes facts not in evidence.

A.  Yeah.  I mean, I know what the words on the page say here, which, again, I would say is not only good advice during a situation but probably on a clear day.  I have no idea if that's what you're asking.

BY MR. KARAM:

Q.  My question is, are you aware of any of these conversations that took place without being written down?

MR. COMERFORD:  Objection.  Assumes facts not in evidence.  Form.

A.  You know, again, I wasn't there, so, no, I don't know

Page 211

what conversations happened if I didn't see any evidence of it.

BY MR. KARAM:

Q.  All right.  That answers part of my question.

Is it customary for boards and CEOs to have these conversations without committing them to writing?

MR. COMERFORD:  Form.

A.  Well, as you're obviously very well aware I'm sure, Mr. Karam, boards have a lot of interaction and communication and obviously there's -- appropriately they'll have minutes and things to support that.  Whether they have conversations outside of that, again, that's going to depend on whoever the people are involved.

BY MR. KARAM:

Q.  Well, you just said it's not only customary but it's best practice not to write down your discussions about sensitive merger transactions; right?

A.  No.  I didn't -- sorry.

MR. COMERFORD:  No.  Go ahead.

A.  No.  I did not say that.  I said that, you know, one should obviously be very mindful of what they're putting in emails and texts, but a board, as you certainly know, particularly with a company like this,

Page 212

are going to have a secretary and minutes to actually record the information.  So I never said not to do all that because obviously you have to do that.  That is obviously part of not only good corporate governance but actually required to actually have board minutes.

BY MR. KARAM:

Q.  And board minutes really contain all of the statements and they're like a transcript; right?  Or are they a very light summary?

MR. COMERFORD:  Form.  Hypothetical.

BY MR. KARAM:

Q.  Board minutes don't contain every statement made by every board member; right?  You've read -- I've read a lot of board minutes.

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  I'm sure you have too.

A.  I have and I've been a part --

Q.  There's stuff that goes on that's not written down?

MR. COMERFORD:  Form.  Assumes facts not in evidence.

A.  Yeah.  Again, I don't know how to answer that, Mr. Karam.  I mean . . .

BY MR. KARAM:

Q.  All right.  But you agree that you are -- you don't

Page 213

know what was said at these board meetings that was not written down?

MR. COMERFORD: Assumes facts not in evidence. Form.

Go ahead.

A. If you're asking me do I agree that two people that I didn't even know had these conversations and what they talked about and I wasn't there, therefore I don't know what they talked about, yeah, I'll stipulate that to every single conversation. I guess I'm just not -- I'm just not tracking what you're asking me to agree to.

BY MR. KARAM:

Q. Go to Slide Number 20. It says ███████ ████████ right?

A. I do see that.

Q. Okay. And then the second bullet point in the left column from the bottom, "████████████ ████████"

Do you see that?

A. Okay. Yes.

Q. Slide 26.

A. I'm sorry. Was there a question there I was supposed to answer? I missed it.

Q. No. Just -- just note that Wachtell ███████

Page 214

███████████; right? It's on the slide.

A. Well, actually that was related to activists.

Q. To activists. Right. But they still -- stock ████████████

A. Related to activists.

Q. Right. They're presenting to the board. There was -- do we know if there was an activist out there? We don't know. But they're monitoring stock accumulation; right?

A. Well, not Wachtell, █████████████ -- and, quite frankly, a lot of good companies, and you probably know this as well, Mr. Karam, they're following their stock very closely for these kind of accumulations even on a clear day.

Q. Okay. Go to Slide Number 26. It's entitled "████ █████████████," and on the right-hand column it says, "████████████ █████████████ █████████████ █████████████ █████████████"

Do you see that?

A. I do see it.

Q. Okay.

A. I'm sorry. Was there a question with that or am I --

Page 215

Q. No. I wanted you to note ████████ ████████████

A. Well, I think what they're -- obviously this is relating to when they first got this is --

Q. You're not being responsive to the question.

A. Oh. Okay. Well, you're asking me do I see those words on a page. I see the words on a page.

Q. That's all I asked.

A. Okay. Okay.

Q. Slide Number 30. "███████████████."
Do you see that?

A. Not yet. Okay. Now I do.

Q. The fourth bullet point down, "█████████ █████████████."

Do you see that?

A. I see the bullet and the words on the page.

Q. Okay. So Wachtell presented that language to National Instruments' board of directors; isn't that correct?

A. This was a presentation that Wachtell made I assume to the full board because I don't know who was there or not, but to the board, and I have no idea if they actually got through this whole presentation or not.

Q. Materials would be routinely provided to the board; right?

A. I'm going to assume the board had all the materials.

Page 216

MR. KARAM: Okay. This is Q.

MS. PLASCOFF: 15.

MR. KARAM: This is Number 15, NAT-SL-00020537.

(Marked EXHIBIT 15 for identification)

BY MR. KARAM:

Q. So having reviewed that May presentation, would you agree that the ██████████████ ████████████?

A. I didn't count.

Q. I showed you a number of times, more than once; right?

A. ██████████████ ██████████, as you referenced through there, but, again, they were in different contexts. You know, it related to an activist. It related to a potential for. So, I mean, you know, again, I'll let you keep asking the questions, but I think you're just mischaracterizing the context of all this, but I'll let you keep going.

Q. The words -- well, isn't it correct ██████ █████████████ ██████

A. In various contexts, again, from a company or an --

Q. Yes or -- yes or no? Yes or no?

A. In various contexts, yes.

Page 217

Q. And one of those pertained to activists; right?

A. At least one.

Q. Only one?

A. That I don't know. I'd have to go through the whole presentation, but at least one.

Q. All right. This is a June 14th, 2022, document. It's also a presentation to the board by Wachtell. Go to Slide Number 5.

MR. COMERFORD: Can we identify the beginning Bates number for the record, please?

MR. KARAM: I think I did. I definitely did, but I'll do it again. NAT-SL-00020537.

BY MR. KARAM:

Q. So you see this box on the left-hand side; right?

A. On the left, yeah. ███████████ ███████████████████ right?

A. Yes.

Q. So that -- that is, in fact, the path that National Instruments took; right?

A. Well, I don't know. Let me see what . . .

Q. It says, "███████████."

A. They did reject, and this was a response to the May 20 -- yes. So there was a rejection of the May proposal.

Q. Well, but they also did the same thing with the

Page 218

June 22nd proposal; right?

A. They did.

Q. I mean, they could be taking Wachtell's advice to draft their June 22nd proposal; right?

A. I don't know if they took their advice at all. I think, and I'll speak for myself and my experience, a board gets advice from all its advisors, and then as a board, and I'm -- I don't know for sure, but I can only imagine this is a very competent board, that they deliberated after getting subject matter experts and made their own decision, not just took Wachtell's advice.

Q. The next bullet point says, "█████████████ ██████ So National Instruments did that both in May and June, right, for the August response and the June response; right?

A. I think those were short responses.

Q. Said, "███████████████████████ ███████████████████████ ███████████████████████ ███████████████████ ████████

Do you see that?

A. I do.

Q. Do you remember what the rejection letters from NI

Page 219

said?

A. Not specifically.

Q. Okay. Then the next bullet point is ████████████ ███████

Do you see that?

A. I do see that.

Q. Then the next bullet point after that -- and that's -- that's the "Just Say No" principle; right? You send a sharp rejection and you hope that the -- you terminate discussions; right?

A. That is a, you know, again, obviously is a title, and you characterized it as the illustrative responses that in this case Nuthatch to Nuthatch. Yes. I mean, may terminate the discussions.

Q. Okay. Then it also says, "████████████████ ████████████████████

Do you see that?

A. I see that bullet.

Q. And, in fact, over time it did ███████████ █████████████████████████ right?

MR. COMERFORD: Form.

A. I would characterize it differently.

BY MR. KARAM:

Q. How would you characterize it?

A. I would characterize it as, well, Nuthatch, but

Page 220

Emerson made a proposal in May at $48 that was rejected, a proposal in June of $48, the exact same value, that was rejected, and then -- and I think, as you characterized it, took a break for a period from August to November before Emerson made their third proposal.

Q. I don't think I used the word "took a break" because they were doing something between August and -- and I think the end of September; right? They were not taking a break.

MR. COMERFORD: Form.

BY MR. KARAM:

Q. Isn't that correct?

MR. COMERFORD: Assumes facts not in evidence.

BY MR. KARAM:

Q. What was Emerson doing starting in July until the end of September?

MR. COMERFORD: Form. Foundation. Calls for speculation. Assumes facts not in evidence.

A. I don't know specifically what -- if you have a -- I think I know what you're alluding to if you want to ask the question. But I don't know what Emerson --

BY MR. KARAM:

Q. Tell me what I'm alluding to.

Page 221

A.   Yeah.  I thought you were going to tell me.  I'm sorry.  I don't --

MR. COMERFORD:  Objection.  Calls for speculation.

BY MR. KARAM:

Q.   What was Emerson doing with respect to National Instruments between late July and the end of September?

MR. COMERFORD:  Same objections.

A.   Well, I don't know.  That's -- I . . .

BY MR. KARAM:

Q.   You don't know?

A.   I don't know what Emerson was doing in 2022 in there.

Q.   Okay.  Let's go to Slide Number 6.  And this is a repeat of the same slide that we looked at earlier; correct?

MR. COMERFORD:  Form.

A.   It's very similar.  I think they've used Nuthatch and a bunch of other things in the title, at least the one I think you referenced earlier didn't have as much, but it's similar.

BY MR. KARAM:

Q.   And Step Number 4 is "███████████████ ████████████████████████████ ████ right?

Page 222

A.   Number 4 says exactly what you just stated.

Q.   Slide Number 7, Sentence Number 3, bullet point under that says, "████████████████████ ███████████████████████████████ ███████████."

Do you see that?

A.   I'm sorry.  Which under there?  Okay.

Q.   First bullet point under Number 3.

A.   Again, I can see the words on the page.  I -- I agree it says those words.

Q.   But you don't know if that actually happened?

MR. COMERFORD:  Form.

A.   I was -- yeah.  I'm just going to read the statement, but obviously I wasn't there.

BY MR. KARAM:

Q.   Right.  So you don't know if the National Instruments board or CEO had phone conversations without writing them down; correct?

MR. COMERFORD:  Form.  Assumes facts not in evidence.

A.   I don't know how to answer other than I obviously wasn't there.

BY MR. KARAM:

Q.   The answer is you don't know?  That's the correct answer, is it not?

Page 223

A.   I wasn't there, so I --

Q.   So you don't know; right?

A.   That's correct.

Q.   Okay.  I don't have to pull it out of you every -- these are simple questions.

All right.  Let's go to Slide Number 12.

So Nuthatch is the code name for Emerson; right?

A.   Yes.

Q.   So this slide ████████████████████ ████████████████████████, is it not?

MR. COMERFORD:  Form.

A.   ██████████████████████████████ ██████

BY MR. KARAM:

Q.   So, and the first bullet point is ████████ ██████████████████████████████████ █████████████████████████ █████████████████████████████████"; right?

A.   That's what this says, yes.

Q.   All right.  So that describes ██████████████ ██████████████████████████████████ ██████  That's what that language says.

MR. COMERFORD:  Objection.

Page 224

Mischaracterizes the document.  Foundation.  Calls for speculation.

A.   I see what the words say there.  I don't understand the several years when it talks -- when I see the ████████████████████████████

BY MR. KARAM:

Q.   Okay.  So ████████████████████████ ███████████████ right?

A.   That's what's on this page.

Q.   Okay.  So it's ████████████████████████; correct?

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   ██████████████████████████████████ ████████ right?

A.   Yes.  ██████████████████████.

Q.   All right.  And then there's -- ████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████████

Do you see that?

A.   ██████████████████████████████████ ████████  I do see that -- those words.

Q.   In this case there was no public formal statement by Emerson that it was withdrawing its offer; correct?

Page 225

MR. COMERFORD: Form.

A. I'm not that familiar with this other than what I'm reading, so I don't --

BY MR. KARAM:

Q. I'm asking about this case, Emerson and National Instruments. Emerson never made a public statement that it was withdrawing its public offer; isn't that correct?

A. Emerson did not publicly state that it was willing to -- or willing -- or not willing but withdrawing its proposal.

Q. Go to Slide Number 15. And it's entitled

Do you see that?

A. I do see that.

Q. It says,

."

Do you see that?

A. I do.

Q. So Wachtell is presenting to National Instruments' board a ?

A. I've read this, and I do know Wachtell put this

Page 226

together for them. So yes.

Q. And it said,

Do you see that?

A. I see those words.

Q. Okay. And then . Do you see that?

A. I see the on the --

Q. Right. And this was presented to the National Instruments board; right?

MR. COMERFORD: Form.

A. I presume so. It was a presentation dated to the board.

BY MR. KARAM:

Q. Okay. You want to take a short break, a five-minute break?

A. I'm fine if you want to keep going for a while.

MR. KARAM: Okay. Alex, can we -- can we have a time estimate on the amount we've been on the record?

VIDEO TECHNICIAN: Yes. We're at five

Page 227

hours 24 minutes currently.

MR. KARAM: Okay. Yeah. Let's -- let's take a five-minute break, and I want to plan for the remaining time.

MR. COMERFORD: Okay. We'll -- we'll be ready to go in five minutes, so we'll be keeping it short.

VIDEO TECHNICIAN: Off the record. The time is 3:44.

(Recess taken at 3:44 p.m.)

(Back on the record at 4:00 p.m.)

VIDEO TECHNICIAN: The time is four p.m. Back on the record.

MR. KARAM: All right. This is Exhibit Number 16, NAT-SL-00010806. Can we put that up, please?

(Marked EXHIBIT 16 for identification)

BY MR. KARAM:

Q. Dr. Goodwin, as we discussed earlier,

is that correct?

A.

.

Q. Okay. And so this is September -- this is an email dated September 1st from Mr. White of Mackenzie to

Page 228

Mr. Dixon and others. Do you see that?

A. Oh, the one below. I'm sorry. I was looking at -- I thought the other was from -- okay. Yeah. This one is from Kevin White from Mackenzie to Mr. Dixon.

Q. All right. And it indicates

correct?

A.

MR. KARAM: All right. This is document CC.

(Marked EXHIBIT 17 for identification)

BY MR. KARAM:

Q. Are you familiar with this document?

MR. COMERFORD: Bates label, please?

MR. KARAM: I'm sorry. Bates number NAT-SL-00023189.

MR. COMERFORD: 189.

A. Yeah. I mean, I recognize some of the -- the wording.

BY MR. KARAM:

Q. Do you remember citing this document in your report?

A. I would have to take a look. I mean, I recognize some of the wording, so let me just make sure if I have it in my . . .

Q. You know what? It's not that important. I'm going to

Page 229

withdraw that question because I want to kind of get through this.

A. Okay.

Q. So it's from Eddie Dixon, who was Chief Legal Officer of National Instruments at this time; isn't that correct?

A. Yeah. From my understanding, he was the chief legal officer.

Q. And it's to Niles Sabastian, who was Wachtell; right?

A. Niles is at -- or I'm sorry. Sabastian is at Wachtell.

Q. He was at that time. Shawn Liu is Bank of America; correct?

A. Yes.

Q. And it copies Mr. Starkloff, Mr. Ilcisin, Mr. Dixon, and Ms. Rapp; correct?

A. That is correct.

Q. All right. And the subject is "Board Executive Session with Wolverine"; right?

A. That is the subject title.

Q. All right. And it's -- it's signed by Mr. Dixon, Eddie; right?

A. I'm not sure what you mean by signed. It's an --

Q. Did -- the name at the bottom --

A. Oh, I don't see the bottom.

Page 230

Q. You can't see -- you can't see Eddie, "Regards, Eddie"?

A. I do now. It wasn't on the screen. But I do now.

Q. All right. And there's a number of bullet points here; right?

A. Yes.

Q. So the first one is "Wolverine's tactics are rare - particularly, the purchase of a target's shares." Right? The top line. That's what it says?

A. The top line does say that.

Q. And yet we saw the two Wachtell presentations to the board ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ right?

A. The presentation that Wachtell provided talked about a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Q. Okay. It says, "Wolverine's ownership" -- oh, they changed the code name from Nuthatch to Wolverine; right?

A. I recognize that.

Q. Okay. "Wolverine's ownership does not provide any meaningful rights that would assist in their effort to acquire."

Is that -- do you believe that's a correct statement?

Page 231

MR. COMERFORD: Form.

A. I'm not sure what Mr. Dixon is referring to or writing about here.

BY MR. KARAM:

Q. Isn't it correct that accumulation of sufficient shares could allow a third party to run -- to propose board members, to run for board seats?

MR. COMERFORD: Form.

A. Can you be more specific about with respect to running -- when you talked about running a board seat or by basically a proxy fight? What exactly do you -- are you referencing?

BY MR. KARAM:

Q. I'm asking you in general. Is it correct that accumulation of a substantial number of shares could be a prelude to somebody running for board seats?

MR. COMERFORD: Form.

A. It may or may not.

BY MR. KARAM:

Q. Okay. That's -- that's -- that's a good answer. That's all I need to know.

MR. COMERFORD: Were you done answering?

THE WITNESS: No.

BY MR. KARAM:

Q. You want to talk some more? You're welcome to.

Page 232

MR. COMERFORD: If he's not done answering and you cut him off, I don't think that --

MR. KARAM: I just -- I just told him if he wants to talk as long as he wants, I'm happy to hear him.

A. It wasn't kind of a speech. I was saying that -- well, first of all, you said a substantial stake, and I assume you're implying that, you know, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I don't think it is. So that's what I was going to clarify in that when I said they may or may not, just because someone has an ownership interest doesn't mean that they are automatically going to have a proxy fight and put boards on the seat. In fact, we have a lot of companies out there that own significant shares and they don't actually run a proxy fight.

Q. Okay. So the next bullet point is "Speculation is that the purchase of shares was intended to signal that they are serious about the potential for an acquisition."

Do you see that?

A. I see those words on -- on this email.

Q. And that reflects Mr. Dixon's speculation that the purchase of shares is a signal that Emerson is serious about an acquisition; right?

Page 233

A.   I can only read the words.  Obviously he typed those words.

Q.   Okay.  And -- or he dictated them, right, using speech dictation; right?
          The next bullet point, "NI is on Wolverine's acquisition pipeline list and there is no evidence that Wolverine's interest has petered out."
          Do you see that?

A.   I see those words.

Q.   And is that correct as far as you know?

          MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.   No.  I mean, I -- I can see that Mr. Dixon typed those words.

BY MR. KARAM:

Q.   But you don't know if that -- if the facts are correct or not?

          MR. COMERFORD:  Objection.  Form.

A.   I don't know as of -- obviously, again, this is like September 1st.

BY MR. KARAM:

Q.   September 19th.

A.   Oh, I'm sorry.  September 19th.  Yeah.  I mean, these are Mr. Dixon's words.

Q.   Presumably Mr. Dixon was a professional and did his

Page 234

research; right?

          MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   He's sending this letter to the CEO; right?  It's safe to assume he checked his facts?

A.   You know, again, I don't know Mr. Dixon.  I can't -- but I can see that he wrote this email.

Q.   Okay.  And you didn't research to find out whether National Instruments was on Emerson's pipeline list at that time; right?  You didn't do that research on your own?

A.   No, I did not.

Q.   And another -- he says another evidence that interest has petered out might be, for example, Wolverine selling its shares or announcing another large acquisition making NI unaffordable.
          Do you see that?

A.   Let's see.  Evidence might be . . .  You know, again, I can see the words that he put on the page here.

Q.   All right.  My question is, Emerson had not sold its shares in National Instruments by September 19th; correct?

A.   From what I reviewed, they did not.

Q.   And Emerson did not announce another large acquisition during this time frame; isn't that correct?

Page 235

          MR. COMERFORD:  Form.

A.   I don't know.  I didn't research that.  But I don't believe that's the case, but I could -- I just didn't research that.

BY MR. KARAM:

Q.   Go to Page 27, Paragraph -- Paragraphs 44 and 45 of your original report.

A.   Okay.

Q.   So in Paragraph 45 you say, "The steps that parties take in merger negotiations depend on whether the potential acquirer's interest is friendly or hostile."  Right?

A.   Yes.

Q.   And so -- and just as background, this is under the heading of the November 3rd Emerson communication?

A.   This is for the November 3rd proposal.

Q.   All right.  So you say, "After its friendly outreach had failed, on November 3rd, Emerson sent a third unsolicited non-binding contingent proposal to NI.  In its November 3rd Letter, Emerson increased its offer from $48 to $53 per share . . ."
          Do you see that?

A.   I do.

Q.   And isn't it correct that Mr. Karsanbhai's June 22nd letter stated that he was willing to increase the

Page 236

price, in so many words?

          MR. COMERFORD:  Form.

A.   Well, yeah.  I just want to be more precise about that.  It was -- I under -- I don't have it in front of me, but what he stated, which, again, is a very standard language we put in letters, again, to extend the olive branch, is if we're able to work together in a friendly way, I may find ways of finding additional value.

BY MR. KARAM:

Q.   Okay.  Then he said in the next clause here, "'was prepared to run a slate of directors targeting two members of the Board up for re-election at NI's next annual meeting . . .'"
          Do you see that?

A.   I do see that.

Q.   And then -- so then that notes -- Footnote Number 59 it says, "The November 3rd Letter stated: '[I]n preparation for all options, Emerson had accumulated 2.3 million NI shares in the open market and intended to file for approval under the Hart-Scott-Rodino Antitrust Improvements Act to facilitate additional purchases, and Emerson was prepared to run a slate of directors targeting two members of the Board . . ."  Right?

Page 237

A.  Yes.

Q.  Okay.  So the -- ████████████████ ██████████████████████████ ████████████████████████ right?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  I don't know that to be true.  I mean, I don't know what was their motivation and intent from when they ████████████████████.  I can't speculate that that was their end goal in any way because I certainly don't know that.

BY MR. KARAM:

Q.  Well, they certain -- they certainly couldn't make a credible threat to run for board seats without a ████████████████; right?

A.  ████████████████████████████ so -- but I -- but they would need some ownership. Actually it's not a lot, as you probably know, to actually put forth a slate of directors if that's -- if they so inclined.

Q.  Well, ████████████████████████; right?

A.  I will trust Mackenzie.  I didn't go back and check, but they were -- ██████████████████ ████████████████.

Q.  And in the footnote it said they're going to --

Page 238

they're going to buy more?  They're prepared to buy more; right?

A.  I don't believe they did, but I think they stated they would.

Q.  So before the class period started, we agree that National Instruments was aware that ████████████ ████████████████ right?

MR. COMERFORD:  Form.

A.  ████████████████████████████████ ████████████████████████████████ ████████████████████████.

BY MR. KARAM:

Q.  Okay.  Then up at the -- in the next sentence it says, "While Emerson's third proposal was confidential, indicating Emerson's continued interest in a friendly acquisition, it also indicated Emerson's willingness to go public with its offer . . ."

Do you see that?

A.  Yes, I do see that.

Q.  And that -- Emerson's willingness to go public or the possibility that it would go public was, in fact, suggested in Karsanbhai's June 22nd letter and his July 7th email that we looked at earlier; isn't that correct?

MR. COMERFORD:  Form.

Page 239

A.  No.  I think you're -- his comment -- and let me just -- if I have that letter here.  Let me just pull it.

BY MR. KARAM:

Q.  Take a look at the July 7th email.

A.  What are you referring to, Mr. Karam?  July 7th?

Q.  Yes.

A.  Where do we find that?  July 6th?

Q.  It's in both -- it's both in the BofA documents and it's -- and I gave you a copy of it.  I forget what number it is.  It's on Bates Number 3279, July 6th.

MR. COMERFORD:  The Bates numbers aren't on what you gave us.

MR. KARAM:  I'm sorry.

MS. PLASCOFF:  They are.

MR. KARAM:  Hold on a second.

A.  Oh, July 6th email.  Is that what you meant or . . .?

BY MR. KARAM:

Q.  Yes.  I'll read it to you.  "As highlighted in our prior communication, . . . we prefer to keep our conversations private, however for that to remain feasible we need relative expedience from NI's board"; right?

MR. COMERFORD:  We don't know what you're looking at or what you're reading that from,

Page 240

Mr. Karam.  You said July 7th.

A.  We have a July 6th email.  Oh, yeah.  You have it on the screen.  That's what I have in front of me as well, but I didn't see those words.

BY MR. KARAM:

Q.  No.  It's a different exhibit.

A.  Oh.

MR. COMERFORD:  Just let him direct us to what he wants us to look at.

MS. PLASCOFF:  Can you pull up Exhibit 9, please?

MR. KARAM:  Exhibit 9.

A.  I see it on the screen here.

BY MR. KARAM:

Q.  Okay.  The middle par -- it's from Karsanbhai to Starkloff.  Middle paragraph says, "As I highlighted in our prior communications dated June 22nd, we prefer to keep our conversations private, however for that to remain feasible we need relative expedience . . ."

A.  Yes.  I do see those words that he communicated.

Q.  Okay.  Okay.  We're going to move on to your reply report.

A.  Okay.

Q.  So as we discussed earlier, you are not changing your opinion that the proba -- that the probability of a

Page 241

transaction as of the beginning of the class period was negligible; correct?

A.  I am not changing my opinion, and I did not change it obviously from my report and nor did I change it in my August and nor do I change it today.

Q.  Okay.  So on Page 6 of your reply report --

A.  Okay.  I'm on there.

Q.  -- you give a summary of your opinions; correct?

A.  Yes.

Q.  Okay.  So Number 2 you say Dr. -- Dr. Cain "Posits a fundamentally flawed claim that, even after NI rejected both of Emerson's preliminary confidential May and June 22nd proposals, 'National Instruments remained actively engaged with the prospect of a transaction . . . throughout the Class Period."

Do you see that?

A.  I do see that.

Q.  And then -- then you in parenthesis use the phrase "(henceforth Dr. Cain's," quote in capitals, 'Active Engagement Claim).'"

Do you see that?

A.  I do.

Q.  All right.  What -- how do you define the term "active engagement" as you are using it in this paragraph?

MR. COMERFORD:  Form.

Page 242

BY MR. KARAM:

Q.  Let me withdraw that question.

Did you state anywhere in your report your definition of the term "active engagement"?  Can you point me to somewhere in this reply report where you define that term?

A.  Well, I was just about -- so what I referenced here, and that's -- it took me -- I just wanted to make sure I get the right -- in Appendix C of Dr. Cain's report where he's replying to my report and I think Dr. Denis's report, I note under Paragraph 3 and then also Paragraph 11 Dr. Cain talks about these internal documents and academic literature lead to a clear conclusion that they remained actively engaged with the prospect.  I define this that what I was referring to Dr. Cain's report was a continued engagement the way that I think he reflects it, and so I'm -- that's the way that I think about what I've defined it for him as a constant engagement, a constant working between NI and Emerson, and I obviously, as you can read through my report, I don't believe that's the case.

Q.  Okay.  Do you mind if I stop you there --

A.  Yes.

Q.  -- and ask a question?

Page 243

A.  Yes.

Q.  So you -- you define active engagement as actual back and forth communications between National Instruments and Emerson; correct?

MR. COMERFORD:  Form.

A.  Well, it doesn't have to be actual dialogue.  You know, Dr. Cain talked about these internal documents and this academic literature to describe this understanding that there's a constant engagement, and I guess what I would characterize it as they're still having conversations, they're still working together, they're still engaged in something to a -- to a goal, and I -- as I put down, I disagree with that.

BY MR. KARAM:

Q.  Okay.  That's how you define it; right?

A.  Well, that's how I defined it, yes.

Q.  Dr. Cain does not define -- when he -- by the way, I -- forgive me for doing these word searches.

A.  Yep.

Q.  He used the term four times in his appendix.  He didn't use it anywhere else.

A.  Okay.

Q.  You use it 86 times in your report.  Is that consistent with your understanding?  You talked about it a lot in your report.

Page 244

A.  I -- I did not do a word search, and I can't do it here since I don't have that ability.

Q.  All right.  I'm sure your counsel will check me if I'm wrong.

A.  Okay.

Q.  Did he -- he did not at any point define his use of the term "active engagement" as communication, conversations, dialogue between Emerson and National Instruments; isn't that correct?

MR. COMERFORD:  Form.  The Cain report speaks for itself.

MR. KARAM:  Counsel, you want me to cite some cases on how the document speaks for itself is an improper objection?  I have a couple cases here.  You want me to do that?

MR. COMERFORD:  Not really.

MR. KARAM:  Will you acknowledge that the document speaks for itself is not a proper objection under the Rules of Evidence?

MR. COMERFORD:  No.  What's improper is that you're asking Dr. Goodwin whether Dr. Cain -- how many times he used that term in a -- in a document that's --

MR. KARAM:  That's not what I asked.  I asked if he -- if he understood what Dr. Cain's

Page 245

definition of the term was.  He spent 112 pages replying to it.

MR. COMERFORD:  I believe that my objection is proper and nothing you ask Dr. Goodwin is going to change what's written in Dr. Cain's report.

BY MR. KARAM:

Q.  Where in his report does Dr. Cain define active engagement as conversations --

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   -- between Emerson and National Instruments?

Dr. Goodwin, I'll save you some time.  He does not -- isn't it correct that Dr. Cain does not, as he uses that term, define actively engaged as actual conversations?

MR. COMERFORD:  Form.

A.  No.  I'm not going to agree to that.  So, I mean, I'm looking through it, if you want me to answer the question.  But I'm -- I'm not going to agree to it.  I don't do this a lot, but, I mean, I would never just agree blanketly to something that I don't have a chance to review closely.

BY MR. KARAM:

Q.  Well, you reviewed his --

A.  I did.  But I --

Page 246

Q.  You wrote 112 pages on it; right?

A.  I did.  But not picking out the word "conversation." I don't have an ability to word search and stuff, so I'm looking.

Q.  I think you know what you did in your reply report. You gave the def -- you in your own mind have the definition of active engagement as actual negotiations and conversations back and forth, which you just testified about earlier, did you not?

MR. COMERFORD:  Form.

A.  I'm sorry, Mr. Karam.  What was that last --

BY MR. KARAM:

Q.  Is it correct -- I asked you this already and you already answered it.  I hope you won't change your answer.

Isn't it correct that your definition or understanding of the term "active engagement" is actual conversations going back and forth between the parties?

A.  No.  I expanded on that.  I said --

Q.  Tell me what else it means too.

A.  Well, it can include a lot of things.  I mean, it's not the actual conversation.  It could be email communication.  It could be somehow still collaborating and working towards it.  It means did we

Page 247

sign an NDA?  Are we actually having our teams do due diligence?  Are there things that would suggest two parties are actually engaging and working together?

Q.  That's -- we can quote you on that?  That's your definition of active engagement; correct?

MR. COMERFORD:  Form.

A.  That is part of it.  What I'm saying is --

BY MR. KARAM:

Q.  Keep going.  Give me -- give me as much as you want on it.

MR. COMERFORD:  I object.  The question's confusing, misleading, vague, ambiguous.  Object to the form.

MR. KARAM:  I asked him what his definition of active engagement is.  He uses the term 86 times, counsel.

MR. COMERFORD:  The term that's used is Dr. Cain's active engagement claim.  You're now trying to turn it around.

MR. KARAM:  I certainly am.

MR. COMERFORD:  Very misleading.  It's improper.

A.  So the way I've -- again, reading Dr. Cain's report, and, again --

BY MR. KARAM:

Page 248

Q.  I'm asking you for your definition as you use the term that you put in quotes and capitalized.  What is -- and you gave me your definition, and it was a kind of paragraph about communications, emails, dialogue, you know, dis -- you know, review of documents, NDAs, all types of stuff; right?  That's all in your definition of active engagement; right?

MR. COMERFORD:  Form.  Mischaracterizes prior testimony.  Misleading.  Vague.  Ambiguous.

A.  So when I reviewed Dr. Cain's report, he was obviously refuting what I had already stated, and he, again, defines it here as that my conclusion is flawed because I overlooked some evidence, as he puts in there, including these internal documents that National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the class period.  That's in Dr. Cain's report.

BY MR. KARAM:

Q.  Right.

A.  So he's to me stating they're actively engaged by doing all these things.  I've just said if he's going to take a position that this is active engagement, that they're still working, my position is the absence of an NDA, the absence of back and forth diligence, any communication in any way is not engagement.

Page 249

They're not engaged at all with Emerson in any capacity.

Q.  So you disagree with Dr. Cain on the definition of active engagement; right?

MR. COMERFORD:  Form.

A.  My definition, as I mentioned to you, is if you're monitoring, as I highlighted in here, if you are being -- preparing for whatever event it is, could be related to this, could be related to cyber security, that's not engagement, per se.  That's actually just being a prudent steward, and that's different than engaging with the other party.  That's just monitoring.

BY MR. KARAM:

Q.  Is active engagement, is that a term of art within mergers and acquisitions?  Do you teach that in any of your courses?

A.  I'm not sure I would consider it a term of art.  It's something that I think Dr. Cain clearly highlighted that there was still constant engagement from NI, and he clearly states that in Paragraph 3 on Page 79 and goes on on to two pages as well.  I'm suggesting that that's, in my opinion, that's not engagement when you're monitoring and when you're being a good prudent steward to provide oversight, that that is engagement.

Page 250

That's just doing what a good board and a good management team would do in these situations.

Q.  But you don't say that?

A.  Sure I do.

Q.  And you don't -- you don't -- what you're doing is --

A.  I think my report --

Q.  -- you're criticizing -- you're criticizing Dr. Cain for using the term "active engagement," but you're not responding to the way that he uses it.  You're saying I'm going to use my own definition of active engagement, not yours, Dr. Cain.  Isn't that what you're saying?

MR. COMERFORD:  Form.

A.  No.  I don't think I was criticizing -- I think what I was trying to do is be very clear and delineate that there's a significant engagement claim that I believe Dr. Cain was making in his report to suggest there's somehow a continuation of involvement between NI and Emerson, and I'm saying the parts of what he brought up in the produced documents as far as an email saying let's work, let's look at, you know, monitoring, that's what a good prudent company does.  That's not engagement with the other side.

BY MR. KARAM:

Q.  Okay.

Page 251

A.  I'm just being very clear about --

Q.  Let's go to -- let's go to Dr. Cain's report, Page -- Page 5.

A.  Okay.

Q.  And it's entitled "Summary of Opinions."  Do you have that?

A.  I do.

Q.  Okay.  Opinion Number 1.  Do you see the term "active engagement" anywhere in Opinion Number 1?

A.  I don't think he put those words in his Opinion Number 1.

Q.  The next page.  Opinion Number 2.  Isn't it correct that this does not rely on the active engagement claim?

A.  Well, it's implicit in there; right?  Because he's having a continuation of the events.  So I think his -- his active engagement claim is, although the words are not spelled out, if he's continuing into January and -- of the following year, he's made references throughout the rest of his report that they've continued this engagement.  So it's implicit in there whether he spells it out in the summary of opinions or not.

Q.  Does he lie, does he misrepresent any facts that he claims were engagement?

Page 252

A.  I never said he lied.  I'm just saying this is a summary of opinions and he summarized his opinion, but that doesn't mean it's not implicit in the rest of his body of work that he provided.

Q.  So it's not here, but it's -- you can imagine it's somewhere; right?  It's not written in words in the English language in any of these opinions; right?

A.  I -- yeah.  No, I didn't imagine it because I've already pointed it out to you, Mr. Karam, in Appendix C under Paragraph 3 and Paragraph 11 where he talks about it, and I could continue to read.

Q.  Dr. -- Dr. Goodwin, I'm asking you about his -- his opinions, his actual opinions, not his response to you.  Opinion Number 3 does not use the words "active engagement"; correct?

MR. COMERFORD:  Form.

A.  Opinion Number 3.

Mr. Karam, if you're asking me very specifically in his Opinion Number 3 does he use those words specifically in there, I don't see them there, but, again, that doesn't mean that behind that, and it's not imaginary because this is a summary, it doesn't mean that he didn't include that as part of his thoughts.

Q.  Opinion Number 4.  Same question.  Do you see active

Page 253

engagement or actively engaged in there?  Is that a premise to any of these opinions?

A.  As I stated, I don't see his words on here, but this is a summary for it might be very implicit in his assumptions as he's drawing it since he's just summarizing his opinions.

Q.  Okay.  Opinion Number 5.  Is that based on the active engagement claim that you refer to?

MR. COMERFORD:  Form.  Foundation.  Calls for speculation.

A.  I guess I would say the same, which is I don't see the words "active engagement" in his Opinion Number 5.  I don't see those words, but that doesn't mean it's not part of his analysis when he's made his assumptions.

BY MR. KARAM:

Q.  Okay.  So under your definition of active engagement, you do not consider paying a firm to monitor Emerson's buying of National Instruments' stock to be active engagement; correct?

MR. COMERFORD:  Form.  Mischaracterizes prior testimony.  Mischaracterizes report.

A.  Could you just repeat that, Mr. Karam?

BY MR. KARAM:

Q.  Yeah.  Yeah.  Under your definition of active engagement, you do not consider paying Mackenzie to

Page 254

monitor Emerson's stock buys as coming under your definition of active engagement; correct?

MR. COMERFORD:  Same objections.

A.  Yes.  If -- having monitoring and being prepared and having a stock watch firm does not mean active engagement.

BY MR. KARAM:

Q.  So you have a higher threshold definition of active engagement than Dr. Cain; isn't that correct?

MR. COMERFORD:  Form.

A.  I don't know what his actual threshold is, so I can't determine whether it's higher or lower.  I can just tell you that --

BY MR. KARAM:

Q.  Your whole report replying to him.

MR. COMERFORD:  Mr. Karam --

BY MR. KARAM:

Q.  You're telling me you don't know what he's talking about and you used the term 86 times?

MR. COMERFORD:  Mr. Karam, you just cut off the witness mid sentence while he was responding to your question.

BY MR. KARAM:

Q.  I apologize.

A.  I was just going to finish up by saying I -- paying,

Page 255

as you said, Mackenzie to monitor does not imply in any way to me any kind of engagement.  It's what a very good company would do in a very prudent way to monitor a situation, and, quite frankly, the only thing I'll add to that is companies do that even in the absence of a potential transaction in any way.  They always -- they may retain a stock watch firm to always be prepared.

Q.  So your definition of active engagement has a higher threshold than the one Dr. Cain was using in his report?

MR. COMERFORD:  Objection.

BY MR. KARAM:

Q.  Isn't that correct?

MR. COMERFORD:  Form.  Asked and answered.

A.  Mr. Karam, again, I can't tell you one's higher or -- I can just tell you what I consider, and just to be very responsive to your question when you said does hiring Mackenzie, a stock watch firm, does that constitute engagement, and I thought I answered it, but I'll be very clear, no, that is not engagement.  That's just being a very prudent manager.

BY MR. KARAM:

Q.  Your definition requires some type of communication between the parties; correct?

Page 256

MR. COMERFORD:  Form.  Foundation.  Mischaracterizes report.

A.  It requires more than just being a good prudent manager monitoring, you know, stock --

BY MR. KARAM:

Q.  This is the question, Dr. Goodwin.  Please answer the question I ask you.

Your definition of active engagement requires some form of communication between the parties; right?

MR. COMERFORD:  Form.

A.  I think there are a number of different ways that can be.  Obviously we've already talked about this --

BY MR. KARAM:

Q.  It's just a yes or no question.  You just gave five different types of communication, --

A.  Well, that's what I was going to --

Q.  -- emails, conver -- communication's a general term.  It requires some type of communication; correct?

MR. COMERFORD:  Form.  Mischaracterizes prior testimony.  Asked and answered.

A.  I'm not just going to say correct because I don't think it's just that simple, so if you want me to explain it I can, but if you want me to stop, I'll stop.

Page 257

BY MR. KARAM:

Q.  You can say yes with an explanation.

MR. COMERFORD:  Form.

A.  Or I can give you an explanation.

BY MR. KARAM:

Q.  But the answer is yes and then if you want to give me an explanation, go ahead.

A.  No.

Q.  But the answer is yes.

A.  I didn't say the answer was --

Q.  There has to be some kind of communication. Communication is the broadest term.

A.  No.  I would --

MR. COMERFORD:  Form.

BY MR. KARAM:

Q.  Can you have -- this is -- let me put it different. Can you have active engagement without any communication?

MR. COMERFORD:  Form.  Calls for speculation.  Foundation.  Mischaracterizes prior testimony.  Asked and answered.

A.  I was -- I was giving examples earlier, Mr. Karam, of what I considered -- considered those as far --

BY MR. KARAM:

Q.  You haven't answered my question.  You're just being non-responsive to my question.

Page 258

A.  I'm not -- well, you just want me to say yes, and I said no, I can't just say yes because there's more to it, but I'm not just going to say yes.

Q.  Can you have active engagement without communication?

MR. COMERFORD:  Objection.  Asked and answered.  I think you're badgering the witness at this point.  Form.

BY MR. KARAM:

Q.  Can you answer that question?

MR. COMERFORD:  Same objections.

A.  I'm just going to go with an I don't know just because you don't want me to explain, so I'll just say I don't know.

BY MR. KARAM:

Q.  Did Dr. Cain ever assert that there were communications between Emerson and National Instruments between August 2nd and November 3rd? Let me rephrase it.  Isn't it correct that Dr. Cain did not assert that there were communications of any kind, no NDAs, no emails, no phone calls, between the dates of August 4th and November 3rd, 2022?

MR. COMERFORD:  Form.

A.  I don't recall him stating that because obviously

Page 259

Emerson and their proxy made it very clear that there was zero communication from August 2nd to November 3rd.

BY MR. KARAM:

Q.  So we can agree there were zero communications between August 2nd and November 3rd; correct?

MR. COMERFORD:  Form.

A.  Emerson, yeah, made it clear that that was no communication.

BY MR. KARAM:

Q.  And under your definition of active engagement, that meant there was no active engagement; correct?

MR. COMERFORD:  Form.  Foundation. Mischaracterizes prior testimony.  Asked and answered.

MR. KARAM:  Asked and evaded.

MR. COMERFORD:  There's no question pending.

MR. KARAM:  Can we have the question read back?

COURT REPORTER:  Question:  And under your definition of active engagement, that meant there was no active engagement; correct?

MR. COMERFORD:  Same objections.

A.  I'm sorry.  I apologize.  I could -- was that -- I'm sorry.  Can you repeat --

Page 260

BY MR. KARAM:

Q.  Let me -- let me -- let me re -- re-ask the question. I'm going to re-ask the same question. Under your definition of active engagement -- well, you stated that there was no communication between National Instruments and Emerson between August 2nd and November 3rd; right?  We have established that.

A.  Well, actually I -- all I'm doing is basically saying what Emerson disclosed in their proxy.  Yes.  That's what I'm --

Q.  Do you know something different?

A.  No.  That's why I said all I can tell you is what they disclosed.

Q.  Did you see any communication?  Are you aware of any in all the documents that you've reviewed?

A.  No, I'm not.  That's why I said I can only tell you what I've reviewed and what Emerson disclosed as of -- in their proxy --

Q.  Any reason -- any reason to believe Emerson's proxy statement is false?

MR. COMERFORD:  Form.  Calls for speculation.

A.  Yeah.  I -- I -- no.  I don't have any reason to believe.

Page 261

BY MR. KARAM:

Q. Okay. So we can agree, can we not, that there was no communication between Emerson and National Instruments between August 2nd and November 3rd of 2022; right?

MR. COMERFORD: Asked and answered.

A. Yeah. I guess I'm struggling why this is hard because I'm really just saying that they disclosed in their proxy that they had absolutely no engagement with them from August 2nd to November 3rd. I agree with that. That was their disclosure.

BY MR. KARAM:

Q. Okay. All right. All you had to do was say yes.

Does Dr. Cain assert that there was communication between Emerson and National Instruments between the dates of August 3rd and November 3rd -- August 2nd and November 3rd?

MR. COMERFORD: Form. Asked and answered.

A. I don't think it's the communication. I think he established -- well, I shouldn't say established. He has a lot of information in his opinion and what he would characterize as active engagement because he basically said the active engagement would be the monitoring the stock. I don't see it that way. There were several emails he referenced and he thought that that was active engagement. I don't consider it

Page 262

active engagement. So he does reference it.

BY MR. KARAM:

Q. Right. So your definition of active engagement is different than his; right?

MR. COMERFORD: Form. Asked -- asked and answered. Mischaracterizes prior testimony.

BY MR. KARAM:

Q. You just in so many words said you have a different definition of active engagement from Dr. Cain; right?

A. My review of the produced documents and everything that we -- at least the documents I've read led me to believe that -- well, first of all, what I've reviewed was not engagement, from what I -- as I stated, that I would consider, which they noted as well, there's no communication, and the monitoring and being a prudent diligent monitor does not constitute engagement with another party.

Q. Right. And Cain never said that there was communication; right?

A. I would have to do, and I don't have it in front of me, a word search. I don't know if he said the word "communication." But that doesn't mean he didn't allude to -- and I shouldn't even say allude, he specifically talked about active engagement as I note in Paragraph 3.

Page 263

Q. Isn't it true that he has a definition of active engagement that doesn't require what your definition of active engagement requires? That's -- I mean, that doesn't seem controversial.

MR. COMERFORD: Form.

A. It doesn't feel controversial. I'm -- we have a differing opinion about what active engagement was. He talked about it as monitoring, therefore they're still engaged. I absolutely don't agree to that.

BY MR. KARAM:

Q. Okay. So you don't consider the National Instruments' CEO listening to Emerson earning calls as being engaged; right?

MR. COMERFORD: Form.

A. So Mr. Starkloff listened to a competitor's earnings call?

BY MR. KARAM:

Q. Emerson's earnings call.

A. Yeah. A competitor.

Q. Somebody who made a bid for the company who was threatening to go public. Don't be disingenuous, Dr. Goodwin.

A. I'm not being disingenuous. I -- I -- I have a lot of friends who are CEOs. They actually do listen to competitors' earnings calls all the time. They want

Page 264

to know -- it's a competitive intelligence process.

Q. So the answer is you don't consider Starkloff listening to Emerson's earnings calls as being actively engaged?

MR. COMERFORD: Form. Asked and answered.

A. No. Not even close. I think that's what it --

BY MR. KARAM:

Q. Okay. And you don't consider the CEO drafting an email preparing for Emerson to make a public offer as being actively engaged; right?

MR. COMERFORD: Form.

A. Do you have a -- that email I can look at?

BY MR. KARAM:

Q. No.

A. Oh.

Q. I'm asking you a question. You don't consider the CEO spending time to draft an email for the contingency of Emerson making a public offer, you don't consider that active engagement?

MR. COMERFORD: Form. Foundation. Asked and answered.

A. Yeah. I consider that being a very prudent diligent manager.

BY MR. KARAM:

Q. But not being actively engaged; right?

Page 265

MR. COMERFORD:  Same objections.

A.  I think it means you're being very prudent.

BY MR. KARAM:

Q.  And you don't consider National Instruments ▮▮▮▮ ▮▮▮▮▮▮▮▮ as being actively engaged; right?

MR. COMERFORD:  Form.

A.  I think --

MR. COMERFORD:  Go ahead.

A.  As we stated earlier, that -- those are done on clear days without any events, and even in this situation it's what a good prudent manager would do to make sure that they are being good stewards and obviously to even discharge their fiduciary duties.

BY MR. KARAM:

Q.  So, and you don't consider Bank of America making what are called firepower presentations to the board, National Instruments' board, as being actively engaged?

MR. COMERFORD:  Form.

A.  No.  It would be very similar in that I think that's what a good steward and a finance -- you know, somebody who's a fiduciary would actually be sure that they're monitoring a situation to be prepared for any event.

Page 266

BY MR. KARAM:

Q.  So we looked at the Court's class certification decision earlier, did we not?

A.  We --

Q.  That's -- what is that?  Exhibit --

MS. PLASCOFF:  That is Exhibit 7.

BY MR. KARAM:

Q.  That's Exhibit 7.

A.  Yes, we did.

Q.  So is -- is that term -- is that a legal term, "active engagement"?  Have you ever come across that in your legal studies?

MR. COMERFORD:  Form.

A.  I don't know.  I mean, I -- I don't know.

BY MR. KARAM:

Q.  So if you were using your definition of active engagement, meaning communication --

MR. COMERFORD:  Object.  Mischaracterizes prior testimony.

BY MR. KARAM:

Q.  -- and -- and that was the definition and you got into an argument with somebody who had a different definition, your definition would be the right one; right?

MR. COMERFORD:  Form.  Vague.  Confusing.

Page 267

Misleading.  Misstates prior testimony.

BY MR. KARAM:

Q.  In other words, if Dr. Cain believes active engagement is just monitoring and you believe that active engagement requires some back and forth between the companies, you have different definitions; right?

MR. COMERFORD:  Objection.  Misstates prior testimony.  Misstates opinions.  Form.

A.  Mr. Karam, I thought we --

BY MR. KARAM:

Q.  Go ahead.

A.  I thought that we already agreed that we have different views on what probably active engagement means.

Q.  Right.  And isn't it correct that in your reply report every time you use the term "active en" -- "Cain's active engagement claim," you're using your definition and not his definition?

MR. COMERFORD:  Form.

A.  Well, I'm trying to distinguish between the two in that where he believed, Dr. Cain believed, you know, an email or hiring BofA or hiring Mackenzie is somehow engagement, I'm making it very clear that that is not.  That's what a good financial steward would do.  That's what a prudent person would do.  I wouldn't expect

Page 268

anything other than that.  And that to me is not engagement with a party in any other way.  So we are different in that regard.

BY MR. KARAM:

Q.  Right.  So he never once asserted that his understanding of active engagement was communication?

MR. COMERFORD:  Form.

A.  Again, I can't, unless you want me to, but search his whole report if he ever used the word "communication."  I do know that he used emails between NI themselves or the hiring of BofA, the hiring of Mackenzie or even Wachtell, even email communication was all, quote, active engagement under his term, and I don't view it that way at all.  I view it as a good prudent diligent person who's acting as a fiduciary, who's discharging their duties, and that in no way means that they are engaged with another party in a transaction.

BY MR. KARAM:

Q.  So you created a standard of active engagement that Dr. Cain can't meet?

MR. COMERFORD:  Form.  Misstates testimony.  Misstates opinions.  Misstates report.

A.  I don't know if Dr. Cain could meet that standard.  I -- I can just tell you based on my experience of working on deals for over 30 years and what I have

Page 269

seen parties diligently moving forward to doing a deal versus when they're not, and it was very clear to me that August 2nd of 2022 when they sent over that rejection to the June proposal, that that "Just Say No" was a "Just Say No" and they proceeded and moved forward in the ordinary course of business, and all that stuff in between, and I won't -- you know, we can get into the details, is just being a diligent prudent financial manager.

BY MR. KARAM:

Q.   And isn't it true, having read the Court's opinion, the Court did not require active engagement for a finding of materiality; right?

        MR. COMERFORD:  Form.  Vague.

A.   You would have to pull that opinion up again.

BY MR. KARAM:

Q.   Yeah.  Let's do that.  It's Number 6 I think.  Not -- that's the Cast -- I'm sorry.  It must be the --

        MS. PLASCOFF:  The class cert opinion, 7.

BY MR. KARAM:

Q.   7.  I'm sorry.  Exhibit 7.

A.   Okay.

Q.   And go to Page 13 of 19.  The Court never used the term "active engagement" in its opinion; correct?

A.   Let me just read this here.  Sorry.

Page 270

        MR. COMERFORD:  Form.

A.   I mean, the paragraph that I'm only seeing on the screen right now, I -- can I see the paragraph before it?  Is it possible to see the paragraph before -- sorry.  Yeah.  Okay.  Thank you.

        Okay.  And can you scroll down, please, then?

        The judge here did not use those words if that's what you're showing me on this page.

BY MR. KARAM:

Q.   Not only did the judge not use those words, the judge did not require what your definition of active engagement was; right?

        MR. COMERFORD:  Form.  Calls for legal conclusions.  Opinion speaks for itself.

A.   You know, again, this -- I just don't want to overstep my bounds here, Mr. Karam.  I mean, obviously I can't make a legal conclusion on this.  I mean, I can see that the words are not there, but I don't know if that's required.

BY MR. KARAM:

Q.   Isn't it true -- I mean, the judge knew that there were no communications between Emerson and National Instruments between August 4 or August, whatever it was, August 2 and November 3; right?  The judge knew

Page 271

that.

A.   I don't know that.  I don't know if she knew that.  I don't know why you're laughing.  I don't know she --

Q.   Well, the judge -- the judge knew a lot of stuff.  And yet she rejected your opinion?

        MR. COMERFORD:  Form.

BY MR. KARAM:

Q.   She found that the offers -- the offers Emerson made on June 25th and 22nd to purchase NI stock at 48 could be found to reflect its serious interest in acquiring NI.  Right?  So the judge probably considered that active engagement; right?

        MR. COMERFORD:  Form.  Calls for speculation and lacks foundation.  Calls for legal conclusions.

BY MR. KARAM:

Q.   So what I'm trying to say here is you've constructed a straw man.  You've made this definition of active engagement that Cain did not use.  It's a different definition.  And we've just established that.  Cain's definition of active engagement is monitoring, and you say no, that's not active engagement, my definition of active engagement is talking back and forth and some kind of communication --

A.   I never said that.

Page 272

Q.   -- and when you were told that didn't happen; right?

        MR. COMERFORD:  Counsel, that misstates prior testimony, misstates the opinions, and misstates the report.

BY MR. KARAM:

Q.   You know that there was no communication; right?

        MR. COMERFORD:  Objection.  Asked and answered.  Argumentative.

A.   Mr. Karam, what I -- all I can tell you, as you certainly know, I wasn't there, is what Emerson stated very clearly in their proxy.

BY MR. KARAM:

Q.   Right.  The SEC filed proxy that requires truthful statements; right?

        MR. COMERFORD:  Form.

A.   Emerson made it very clear in their proxy that they -- they submitted another proposal in November and made it very clear even in their letters in January that there was no -- they even used the words "engagement" by NI from August 2nd, so I can only take their word -- I can only take them at their words, and, yes, I believe they're truthful.

BY MR. KARAM:

Q.   Right.  So, but Cain used engagement to mean monitoring and doing what prudent corporate stewards

Page 273

do; right? That's the way Cain used the term "active engagement."

MR. COMERFORD: Form. Misstates evidence.

A. The way that I read Mr. -- or Dr. Cain's report was that he interpreted what we were just talking about, hiring BofA, hiring Wachtell, or hiring Mackenzie, he viewed that as a continued engagement, meaning working towards a deal with the other side, and I'm just basing this on my 30 plus years of experience working on deals and I'm just -- as a practitioner and as a board member today, and we're going through a deal that I'm on a board of, there is no way that monitoring is anywhere like engagement, and I'm just making that very clear.

BY MR. KARAM:

Q. Okay. So under your definition of active engagement, it was not happening, so it's so easy -- it's a really easy task for you to prove there was no active engagement; right?

MR. COMERFORD: Form.

BY MR. KARAM:

Q. Using your definition.

MR. COMERFORD: Form. Misstates prior testimony. Misstates the definition. Vague. Ambiguous.

Page 274

A. I don't know if you mean -- why would that be easy? All I was do --

BY MR. KARAM:

Q. Well, because -- because I think we both agreed there was no active engagement under your definition; right?

MR. COMERFORD: Objection.

BY MR. KARAM:

Q. So you create this definition that's not Cain's. You create your own definition and then you spend, you know, 112 pages proving that your straw man definition is correct?

MR. COMERFORD: Form. Misstates testimony. Compound.

BY MR. KARAM:

Q. Isn't that what you're doing?

MR. COMERFORD: Vague and ambiguous. Misstates opinions and misstates the report.

BY MR. KARAM:

Q. And your definition is not accepted by the Court; isn't that correct?

MR. COMERFORD: Objection.

BY MR. KARAM:

Q. And it's not -- it was not the definition that was put forth by Dr. Cain; isn't that correct?

MR. COMERFORD: Objection. Calls for legal

Page 275

conclusions. Asked and answered. Vague. Ambiguous. Misstates testimony.

MR. KARAM: Okay. I think I'm about finished. I'm going to consult with my team, so let's take a short break.

MR. COMERFORD: Thank you.

VIDEO TECHNICIAN: Off the record. The time is 5:11.

(Recess taken at 5:11 p.m.)

(Back on the record at 5:14 p.m.)

VIDEO TECHNICIAN: Back on the record. The time is 5:14.

MR. COMERFORD: I think we're on the record now, Mr. Karam, if you want to speak.

MR. KARAM: Yeah. I'm concluding my direct questioning.

MR. COMERFORD: Okay. Thank you. This is John Comerford. I represent the defendants.

EXAMINATION

BY MR. COMERFORD:

Q. Dr. Goodwin, I just want to ask you a few questions to clear something up.

Exhibit 3 to your deposition is the extra report of Dr. Cain dated July 28th, 2025. Do you see that?

Page 276

A. Yes.

Q. Okay. And do you understand that this is Dr. Cain's merits report?

A. Yes.

Q. I want to direct your attention to the bottom of Page 30, which is part of Paragraph 73. Let me know when you're there.

A. Okay.

Q. And at the bottom of Page 30 Dr. Cain writes, "These meetings indicate that National Instruments and its advisors remained actively engaged in connection with a potential transaction with Emerson during the same period in which the Company was preparing to repurchase shares."

Do you see that?

A. Yes.

Q. Okay. And then in your report you refer to Dr. Cain's active engagement claim; correct?

A. I do.

Q. Okay. And, now, is what I just read from Dr. Cain's report in Paragraph 73 an example of his -- of what you refer to as his active engagement claim?

A. That is one of the examples, yes.

Q. Okay. And then let me ask you to look at Dr. Cain's report, Page 79.

Page 277

A.  Okay.

Q.  We are in Appendix C to Dr. Cain's report, which he titles "Replies to the Goodwin Report and the Denis Report."  Do you see that?

A.  I do.

Q.  Okay.  And then Subsection A is responses to the Goodwin report, and in Paragraph 3 on Page 79 Dr. Cain writes, "Professor Goodwin's claims rest on a common but flawed premise: that NI's rejections of Emerson's offers marked a definitive end to engagement, rendering the likelihood of a transaction 'negligible' at the start of the Class Period.  This conclusion is flawed because it overlooks multiple pieces of evidence, including internal documents, showing that National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period."
        Do you see where I read that?

A.  I do.

Q.  And is that an example of something that you characterized as Dr. Cain's active engagement claim?

A.  It is.

Q.  Okay.  And then, again, on Page 83 of Dr. Cain's report, Paragraph 11, at the top of Page 83.  Do you see that?

Page 278

A.  I do.

Q.  And in the first part of Paragraph 11 that Dr. Cain wrote there, is that another example of what you characterize as Dr. Cain's active engagement claim?

A.  Yes.

Q.  All right.  And then on Page 86 of Dr. Cain's report, I'm looking at Paragraph 18, at the end of Paragraph 18 he writes a sentence that says, "These actions confirm that National Instruments remained actively engaged with the likelihood of a potential transaction."
        Do you see that?

A.  I do see that.

Q.  And is that another example of something that Dr. Cain said in his report that you then characterized as his active engagement claim?

A.  That is correct.

Q.  All right.  And then, now, let's look at your report dated August 27th, 2025, which has been marked as Exhibit 2 to your deposition.

A.  Okay.

Q.  Is it fair to characterize this as your response to Dr. Cain's report dated July 28th, 2025?

A.  It is.

Q.  Okay.  And in the Table of Contents there's a

Page 279

Section VI.  Do you see that?

A.  Yes.

Q.  And you have a heading that says, "Dr. Cain's review of internal documents is flawed and incomplete and does not support his claim that 'a potential deal with Emerson remained under active consideration' throughout the Proposed Class Period."
        Do you see that?

A.  I do see that.

Q.  Okay.  So do you feel that your report of August 27th, 2025, was responding accurately to what Dr. Cain had said in his report about this topic of active engagement?

A.  It is.  I do.

Q.  Okay.  And then if we look at some examples of where you talk about the active engagement claim, let me direct you to Page 18 of your report dated August 27th.  There's that heading VI again at the top of the page.

A.  Yes.

Q.  Which I think is the same as what I just read.
        "Dr. Cain's review of internal documents is flawed and incomplete and does not support his claim that 'a potential deal with Emerson remained under active consideration' throughout the Proposed Class

Page 280

Period."
        Do you see that?

A.  I do see that.

Q.  And do you agree with me that that is what you are referring to as the active engagement claim?

A.  It is.

Q.  All right.  Let's move on to Page 22 of your report.  And you have a heading A where you write, "Category A (August 2nd, 2022 and earlier) documents do not support Dr. Cain's Active Engagement Claim."
        Do you see that?

A.  Yes.

Q.  And below that in Paragraph 32 you write, "Dr. Cain claims that 'internal documents confirm that a potential deal with Emerson remained under active consideration throughout the Class Period.'"
        Do you see that?

A.  Yes.

Q.  Okay.  And so is that -- is that the statement from Dr. Cain that you are labeling and responding to when you talk about the active engagement claim?

A.  It is.

Q.  All right.  And then in Paragraph 33 on the same page, at the end you're quoting Dr. Cain and saying, in quotation marks, "a potential deal with Emerson

Page 281

remained under active consideration throughout the Class Period."

Is that another example of you discussing Dr. Cain's active engagement plan?

A.   It is.

Q.   All right.  And, now, I'll just point out some other examples.  Page 25 of your report, Paragraph 37.

A.   Yep.

Q.   Is that a reference to Dr. -- what you call Dr. Cain's active engagement claim?

A.   It is.

Q.   Page 28, Footnote 95.  You have -- you have a quote in that Footnote 95 that you attribute to Dr. Cain's report; correct?

A.   I do.

Q.   And is that another example of what you have referred to as Dr. Cain's active engagement plan?

A.   It is.

Q.   And Page 38.  Strike that.  Page 48, Paragraph 89.

A.   Okay.

Q.   You write, "Further, internal assessments of whether NI possessed MNPI regarding Emerson's previously rejected proposals do not and cannot prove Dr. Cain's Active Engagement Claim.  The facts in evidence I discussed in my First Report unambiguously confirm

Page 282

that no 'potential deal with Emerson remained under active consideration' after August 2nd, 2022 and through August 12th, 2022, the start of the Proposed Class Period."

Do you see that?

A.   I do.

Q.   All right.  And then on Page 56 of your report, Paragraph 103, you write, "None of these documents alters my conclusion that the facts in evidence I have discussed at length in Section III of my First Report unambiguously confirm that no 'potential deal with Emerson remained under active consideration' after August 2nd, 2022 and throughout the Proposed Class Period."

Do you see that?

A.   I do.

Q.   And that quoted language is language that you referred to as Dr. Cain's active engagement claim; correct?

A.   It is.

Q.   Okay.  Do you feel that your report and your opinions expressed in your report accurately address Dr. Cain's language that he used in his report about active consideration and active engagement?  After reviewing all that, are you satisfied --

A.   I'm a hundred percent satisfied with what I drafted

Page 283

here is still my view on active engagement claim.

Q.   Okay.

MR. COMERFORD:  Those are the only questions I have.

THE WITNESS:  Okay.  Thank you.

RE-EXAMINATION

BY MR. KARAM:

Q.   Dr. Cain, in any of those paragraphs that counsel referred you to -- Dr. Goodwin, I'm sorry, did Dr. Cain ever claim that there were communications --

MR. COMERFORD:  Objection.  Asked and answered.

BY MR. KARAM:

Q.   -- between National Instruments and Emerson between August 2nd and November 3rd?

MR. COMERFORD:  Asked and answered.

A.   I didn't do a search in his document, but I think, as we talked about earlier, Emerson in their proxy made it clear there were no communications.

BY MR. KARAM:

Q.   Right.  And in all those paragraphs that counsel just showed you, there was no -- Cain made no reference to communications; right?

MR. COMERFORD:  Asked and answered.

A.   Well, he made reference to a -- what he considered an

Page 284

active engagement progressing to a deal based on what his review of the work was.

BY MR. KARAM:

Q.   Right.  But he doesn't say active engagement was communications?

MR. COMERFORD:  Asked and answered.

A.   Again, I didn't have time to because I don't have the ability to do a word search, so I don't know if he said those words exactly.

BY MR. KARAM:

Q.   Okay.

A.   But I think it's clear that Emerson made it clear that they didn't have a communication.

MR. KARAM:  Okay.  Thank you.  No further questions.

MR. COMERFORD:  Okay.  We will read and sign.

VIDEO TECHNICIAN:  Okay.  The time is 5:25 p.m.  This concludes the deposition.  Off the record.

(Deposition concluded at 5:25 p.m. Central Time.  Signature of the witness was requested.)

IN RE: NATIONAL INSTRUMENTS CORPORATION

SECURITIES LITIGATION

_____/


                    VERIFICATION OF DEPONENT


          I, having read the foregoing deposition

    consisting of my testimony at the aforementioned time

    and place, do hereby attest to the correctness and

    truthfulness of the transcript.




                    _____

                    SHANE GOODWIN, Ph.D.

                    Dated:

ERRATA SHEET

PAGE      LINE      CORRECTION

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )

                 ) SS

COUNTY OF WAYNE    )

I, CHERI L. POPLIN, certify that this deposition was taken remotely before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

Cheri L. Poplin, CSR 5132, RPR, CRR

Notary Public,

Wayne County, Michigan.

My Commission expires:  August 21, 2031

## WORD INDEX

**< $ >**
**$250,000**  192:*22* 193:*1*  194:*17, 19* 196:*2*
**$32.50**  190:*10*
**$33.75**  190:*10*
**$34.49**  191:*9*
**$39.75**  190:*10*
**$42.25**  190:*10*
**$48**  48:*15*  51:*12* 104:*18*  105:*7, 8* 106:*6, 22*  107:*2* 108:*1, 9*  114:*19* 115:*11*  120:*9, 10, 20* 123:*5, 17*  125:*10, 18* 127:*23*  136:*14, 25* 139:*15, 21*  177:*4* 196:*25*  197:*3, 6* 198:*3, 5*  205:*18, 19* 220:*1, 2*  235:*21*
**$50**  115:*19*  191:*20*
**$50.75**  189:*7*  198:*5*
**$51**  196:*17*
**$53**  108:*6*  126:*23* 167:*23*  168:*9*  177:*10* 185:*21*  235:*21*
**$6.49**  114:*20*
**$6.67**  114:*21*
**$78**  189:*8*  191:*21*

**< 1 >**
**1**  3:*13*  6:*22*  7:*7* 51:*9*  146:*21*  164:*17* 173:*4*  198:*4*  202:*8* 251:*8, 9, 11*
**1.72**  232:*9*
**1.73**  228:*8*  237:*16*
**1.8**  46:*9*
**1:16**  132:*12, 14*
**1:23-cv-10488-DLC** 1:*4*  5:*11*
**10**  4:*1*  44:*14*  80:*19* 81:*8, 9*  89:*18*  121:*8* 122:*8*  171:*1*  206:*21*
**10(b**  80:*21*  159:*4*
**10:11**  43:*25*  44:*1*
**10:22**  44:*2, 3*

**100**  114:*18*
**10170**  2:*10*
**103**  3:*22*  282:*8*
**105**  164:*13*  166:*6*
**106**  164:*13, 15*
**10807**  4:*14*
**10b-5**  80:*22*  159:*4*
**10th**  194:*9*  203:*8, 10* 238:*9*
**11**  4:*1*  44:*14*  65:*5* 69:*19*  75:*8, 9*  78:*3, 11*  82:*16*  89:*18*  91:*2, 5, 6, 8, 12, 23, 25*  92:*4, 23*  93:*4*  94:*11, 15* 99:*15*  129:*12*  178:*9, 11*  182:*5*  242:*12* 252:*10*  277:*24*  278:*2*
**11:16**  80:*10, 11*
**11:29**  80:*12, 13*
**11:30**  4:*16*
**112**  245:*1*  246:*1* 274:*10*
**112-page**  109:*22*
**113**  3:*23*
**11747**  2:*5*
**12**  3:*19*  4:*4*  12:*4* 44:*11*  104:*11, 13* 141:*1*  189:*17, 18* 192:*6*  223:*6*
**12:47**  132:*10, 11*
**1251**  3:*25*
**129**  3:*25*
**12-month**  195:*3*
**12th**  194:*9*  227:*22* 238:*11*  282:*3*
**13**  4:*6*  47:*14*  54:*17* 55:*2*  57:*1*  58:*1, 6, 16* 59:*6*  61:*4, 18*  62:*13, 22, 25*  63:*3*  64:*3, 6* 68:*6*  73:*11*  75:*6, 25* 76:*8, 10*  77:*3, 7*  85:*1* 94:*18*  96:*15, 16*  97:*2* 105:*15*  193:*6, 7* 269:*23*
**13th**  165:*1, 4*  166:*1, 11, 12*  168:*6*
**14**  4:*8, 11*  188:*20* 200:*25*  201:*1*  208:*20*
**14th**  217:*6*

**15**  4:*9*  216:*2, 3, 5* 225:*12*
**1545**  4:*5*
**155**  32:*21*  33:*23* 35:*4*
**1566**  4:*7*
**16**  3:*25*  4:*13*  11:*22* 13:*13*  165:*16*  227:*15, 17*
**16.3**  166:*24*  167:*10*
**162**  78:*18*  79:*4*
**163**  28:*4, 18*  32:*21* 33:*2, 20, 23*  34:*5, 11* 35:*4*  36:*11, 18*  37:*13* 41:*11*  96:*8*  155:*20*
**1683**  171:*21*
**16th**  6:*5*  17:*2*  29:*7* 37:*16*  48:*13*  49:*9, 15, 19*  50:*2, 16, 21, 25* 52:*11*  54:*2*  57:*12* 86:*4, 11*  89:*8*  119:*24*
**17**  1:*13*  4:*14*  5:*2* 228:*12*
**1705**  172:*2*
**1706**  173:*1*
**171**  4:*1*
**172**  78:*18*  79:*5, 6* 80:*19*  81:*5*
**173**  85:*7*
**178**  4:*3*
**17th**  5:*5*  113:*15* 167:*16, 21, 22*  168:*7* 203:*19, 23*  204:*13*
**18**  51:*9*  132:*17, 22* 143:*20*  150:*24*  278:*7, 8*  279:*17*
**180**  89:*16*
**181**  96:*15*
**1832**  2:*10*
**185**  100:*3*
**189**  4:*5*  228:*18*
**18th**  226:*8*
**19**  71:*15*  85:*9, 16* 88:*20, 22*  104:*11, 13* 105:*15*  121:*9*  269:*23*
**1900**  2:*17*
**1913**  171:*24*  172:*17*
**1929**  179:*14, 16*
**193**  4:*7*

**1963**  155:*23*
**1983**  184:*20*
**1986**  155:*23*
**1988**  156:*3*
**19th**  233:*22, 23* 234:*21*
**1st**  227:*25*  233:*20*

**< 2 >**
**2**  3:*13*  6:*24*  146:*18* 202:*13*  241:*10* 251:*12*  270:*25* 278:*20*
**2,288,000**  228:*6*
**2.3**  236:*20*
**2:27**  183:*3, 4*
**2:42**  183:*5, 6*
**20**  88:*5*  89:*6*  179:*8* 213:*14*  217:*23*
**200**  2:*5*  102:*23*
**2000**  186:*6*
**2003**  171:*23*  179:*13, 18*
**2004**  135:*3*
**2008**  225:*19*  226:*8*
**201**  4:*9*
**2010**  225:*19*  226:*3, 8*
**2017**  171:*23*  223:*19* 224:*7, 8*
**2021**  44:*8*  121:*9*
**2022**  4:*4, 9, 11*  48:*11* 49:*9*  50:*13*  51:*12* 57:*10, 12*  113:*23* 116:*4, 8*  119:*20* 120:*15*  123:*18*  130:*5* 190:*9*  193:*12, 17* 201:*7*  217:*6*  221:*13* 258:*23*  261:*4*  269:*3* 280:*9*  282:*2, 3, 13*
**2023**  135:*25*  178:*3* 190:*10, 14*
**2025**  1:*13*  5:*2, 5* 275:*24*  278:*19, 23* 279:*11*
**203**  156:*2*
**2031**  287:*25*
**20557**  4:*12*
**21**  287:*25*
**212.432.5100**  2:*11*

**216**  4:*12*
**21st**  120:*14*
**22**  192:*20*  280:*7*
**227**  4:*14*
**228**  4:*18*
**22nd**  105:*7*, *21*
119:*20*  120:*6*  123:*18*
130:*14*  204:*19*  205:*9*,
*10*, *12*  218:*1*, *4*
235:*24*  238:*22*
240:*17*  241:*13*  271:*9*
**23**  135:*25*
**23190**  4:*18*
**24**  116:*3*, *8*  227:*1*
**25**  27:*22*, *23*  98:*9*
155:*15*  158:*2*  281:*7*
**250**  110:*6*  194:*7*, *10*
265:*5*
**25308**  4:*9*
**25th**  105:*6*, *21*
113:*23*  114:*8*  204:*19*
271:*9*
**26**  192:*6*  213:*22*
214:*15*
**27**  28:*22*  235:*6*
**275**  3:*7*
**27th**  103:*23*  278:*19*
279:*10*, *18*
**28**  224:*8*  281:*12*
**283**  3:*8*
**28th**  224:*22*  275:*24*
278:*23*
**2nd**  48:*11*  49:*1*, *14*
50:*13*  56:*15*, *22*  57:*9*,
*20*  136:*25*  142:*15*
147:*5*, *10*, *14*  193:*17*
258:*18*  259:*2*, *6*
260:*7*  261:*4*, *9*, *16*
269:*3*  272:*20*  280:*9*
282:*2*, *13*  283:*15*

**< 3 >**
**3**  3:*16*  6:*25*  7:*7*
27:*10*  147:*12*  202:*13*
208:*21*  222:*2*, *8*
242:*11*  249:*21*
252:*10*, *14*, *17*, *19*
262:*25*  270:*25*
275:*23*  277:*7*
**3:44**  227:*9*, *10*

**30**  18:*1*  110:*4*
116:*25*  123:*5*  157:*24*
173:*9*, *16*  175:*8*, *9*
176:*24*  215:*10*
268:*25*  273:*9*  276:*6*,
*9*
**30(c)(2**  44:*21*
**31**  196:*23*
**314.889.7300**  2:*18*
**31st**  193:*2*, *12*
**32**  280:*13*
**3274**  113:*22*
**3277**  119:*21*
**3279**  239:*11*
**3293**  3:*23*
**33**  280:*23*
**33.75**  190:*13*
**34**  172:*10*, *11*, *18*
**35**  121:*10*
**36**  178:*12*
**37**  281:*7*
**38**  281:*19*
**39**  116:*2*  176:*25*
**3rd**  143:*14*  226:*8*
235:*15*, *16*, *18*, *20*
236:*18*  258:*18*, *22*
259:*3*, *6*  260:*7*  261:*4*,
*9*, *15*, *16*  283:*15*

**< 4 >**
**4**  3:*16*  44:*6*, *9*  65:*6*
116:*7*  149:*19*  184:*20*
195:*1*  202:*17*, *21*
221:*23*  222:*1*  252:*25*
270:*24*
**4:00**  227:*11*
**40**  136:*24*
**41**  6:*18*
**42.25**  190:*13*
**420**  2:*9*
**44**  3:*18*  11:*3*  235:*6*
**45**  14:*5*  235:*6*, *9*
**46**  3:*19*  16:*23*
**46412**  1:*22*
**48**  6:*19*  11:*3*  14:*5*
16:*23*  47:*12*  51:*2*, *3*,
*7*  65:*7*  108:*7*  120:*25*
126:*24*  140:*23*
176:*24*  177:*1*, *2*

271:*9*  281:*19*
**49.88**  198:*5*
**4th**  258:*22*

**< 5 >**
**5**  3:*6*, *19*  46:*3*, *6*
53:*2*  64:*13*  153:*14*
163:*18*  189:*22*
202:*19*  217:*8*  221:*25*
251:*3*  253:*7*, *12*
**5:11**  275:*8*, *9*
**5:14**  275:*10*, *12*
**5:25**  284:*19*, *21*
**50**  156:*5*
**50s**  185:*12*, *16*
**51**  108:*9*  120:*13*, *20*
177:*2*
**5132**  287:*22*
**52**  116:*7*
**52-week**  117:*6*  121:*2*
**5411176**  44:*8*
**56**  282:*7*
**58**  2:*4*
**59**  236:*17*

**< 6 >**
**6**  3:*19*  51:*2*, *3*, *6*
64:*14*, *23*  65:*1*
132:*16*  221:*14*  241:*6*
269:*17*
**6/10/22**  4:*6*
**6/16/25**  3:*13*
**6/22/22**  3:*23*
**6/9/22**  191:*8*
**60**  177:*18*
**631.367.7100**  2:*6*
**63105**  2:*17*
**64.63**  189:*8*
**65**  3:*21*
**69**  181:*16*, *17*
**690**  181:*9*, *15*, *24*
182:*1*
**6th**  239:*8*, *11*, *17*
240:*2*

**< 7 >**
**7**  3:*13*, *15*, *16*, *22*
44:*12*  65:*6*  103:*2*, *3*
130:*5*  159:*8*  162:*16*

**201**:*11*  203:*15*  222:*2*
266:*6*, *8*  269:*19*, *21*
**7/28/25**  3:*16*
**7/7/22**  3:*23*
**7:30**  79:*15*
**70**  157:*12*
**701**  184:*18*
**70s**  179:*12*
**71**  27:*12*
**73**  276:*6*, *21*
**736**  181:*25*  182:*2*
**7676**  2:*16*
**79**  249:*21*  276:*25*
277:*7*
**7th**  238:*23*  239:*5*, *6*
240:*1*

**< 8 >**
**8**  3:*23*  47:*12*  113:*9*,
*10*, *12*, *16*  122:*8*
127:*4*  161:*21*  163:*5*
204:*1*
**8/27/25**  3:*15*
**8/29/22**  4:*14*
**8:30**  4:*17*
**807**  186:*3*, *21*
**80s**  156:*3*
**83**  277:*23*, *24*
**86**  243:*23*  247:*15*
254:*19*  278:*6*
**89**  281:*19*

**< 9 >**
**9**  3:*23*  51:*2*, *5*, *7*
129:*23*  206:*13*  228:*6*,
*9*  237:*21*, *24*  240:*10*,
*12*
**9/1/22**  4:*13*
**9/19/22**  4:*14*
**9:11**  1:*14*  5:*2*, *6*
**95**  281:*12*, *13*

**< A >**
**a.m**  1:*14*  5:*2*, *6*
44:*1*, *2*  80:*11*, *12*
**A-6**  7:*11*
**ABB**  226:*4*
**abide**  66:*8*  170:*8*, *12*
**ability**  24:*17*  196:*3*
244:*2*  246:*3*  284:*8*

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

**able** 9:*6* 26:*3* 32:*19* 122:*13* 163:*16* 198:*7* 236:*7*
**abnormal** 166:*19, 24* 167:*9, 25*
**absence** 133:*10* 135:*17* 248:*23, 24* 255:*6*
**absent** 146:*23* 150:*15*
**Absolutely** 41:*9* 89:*1* 98:*1, 3* 108:*22* 117:*12* 174:*22* 200:*2* 261:*8* 263:*9*
**abstain** 159:*5*
**abuse** 131:*11*
**abused** 131:*10*
**Abusive** 75:*19* 131:*7*
**academia** 66:*4* 159:*12* 199:*7*
**academic** 17:*25* 27:*16, 22* 36:*5* 133:*18* 134:*5* 159:*11* 163:*10* 188:*11* 242:*13* 243:*8*
**accept** 90:*5* 174:*15*
**accepted** 197:*6* 198:*22* 274:*19*
**Accepting** 144:*23*
**accepts** 176:*5*
**access** 23:*24* 24:*1, 7* 25:*10* 83:*16* 84:*3* 124:*14*
**accomplish** 22:*25* 140:*11*
**account** 20:*2* 136:*5, 19*
**accounting** 138:*7*
**Accumulate** 213:*18* 227:*20*
**accumulated** 228:*6* 236:*19*
**accumulating** 61:*11, 22* 227:*23* 238:*7*
**accumulation** 149:*16* 208:*15* 214:*1, 4, 9, 19* 215:*2* 216:*8, 12, 13, 21* 230:*13, 16* 231:*5, 15* 238:*10*
**accumulations**

214:*14* 215:*14*
**accuracy** 121:*22*
**accurate** 67:*22* 131:*13* 172:*21*
**accurately** 279:*11* 282:*21*
**achieve** 115:*11*
**acknowledge** 142:*15* 244:*17*
**acquire** 12:*19* 48:*14* 51:*12* 59:*2* 114:*3* 127:*25* 128:*21* 169:*2* 202:*17* 206:*16* 221:*23* 223:*13* 225:*18* 230:*23*
**acquired** 135:*24*
**acquirer** 47:*18*
**acquirer's** 235:*11*
**acquiring** 47:*19* 48:*10* 49:*1* 50:*12* 57:*9* 62:*6* 68:*16* 105:*9, 23* 149:*20* 151:*1, 12* 203:*2* 237:*9* 271:*10*
**acquiror** 112:*5* 145:*7* 146:*12*
**acquirors** 145:*14, 15* 201:*23* 202:*2*
**acquisition** 49:*13, 24* 51:*13, 21* 55:*21* 56:*5* 58:*12* 60:*21* 62:*15* 63:*11, 12, 19, 20* 99:*6* 104:*18* 133:*3* 141:*2, 9* 145:*1, 3* 157:*14* 165:*14* 193:*23* 195:*10* 225:*13* 232:*20, 25* 233:*6* 234:*16, 24* 238:*16*
**Acquisitions** 4:*1* 47:*23* 203:*5* 249:*16*
**act** 195:*6, 14* 236:*22*
**acting** 268:*15*
**Action** 1:*4* 5:*10* 23:*17* 219:*16, 20*
**actions** 165:*3* 278:*9*
**active** 121:*8* 122:*17* 123:*16, 22* 158:*3* 241:*19, 23* 242:*4* 243:*2* 244:*7* 245:*7* 246:*7, 17* 247:*5, 15,*

*18* 248:*7, 22* 249:*4, 15* 250:*8, 10* 251:*8, 13, 17* 252:*14, 25* 253:*7, 12, 16, 18, 24* 254:*2, 5, 8* 255:*9* 256:*8* 257:*17* 258:*5* 259:*11, 12, 21, 22* 260:*4* 261:*21, 22, 25* 262:*1, 3, 9, 24* 263:*1, 3, 7* 264:*19* 266:*10, 16* 267:*3, 4, 13, 16, 17* 268:*6, 13, 19* 269:*12, 24* 270:*12* 271:*12, 18, 21, 22, 23* 273:*1, 16, 18* 274:*5* 276:*18, 22* 277:*21* 278:*4, 16* 279:*6, 12, 16, 25* 280:*5, 10, 15, 21* 281:*1, 4, 10, 17, 24* 282:*2, 12, 18, 22, 23* 283:*1* 284:*1, 4*
**actively** 157:*16* 241:*14* 242:*14* 245:*14* 248:*15, 20* 253:*1* 264:*4, 10, 25* 265:*5, 18* 276:*11* 277:*15* 278:*10*
**Activism** 4:*8* 12:*1* 13:*12*
**activist** 13:*1* 213:*14* 214:*7* 216:*15*
**Activists** 12:*5, 19* 214:*2, 3, 5* 217:*1*
**activities** 137:*12*
**activity** 93:*11* 94:*5* 96:*4, 6, 9*
**activity/substantial** 215:*14*
**actual** 24:*8, 25* 35:*17* 51:*6* 76:*9* 77:*16* 152:*17* 165:*22* 243:*2, 6* 245:*15* 246:*7, 18, 23* 252:*13* 254:*11*
**add** 11:*2* 53:*19, 25* 55:*12* 95:*17* 255:*5*
**adding** 35:*5, 16* 36:*25* 37:*4*
**additional** 25:*15* 29:*15* 35:*4* 37:*3*

45:*7, 15* 47:*1* 124:*16* 125:*14* 127:*2* 236:*8, 22*
**address** 99:*25* 144:*21* 160:*15, 23* 282:*21*
**addressed** 89:*12* 95:*1* 205:*12*
**addressing** 99:*21* 102:*4*
**adjusted** 190:*13* 191:*4*
**admissibility** 46:*21*
**admit** 75:*14* 76:*23*
**admitted** 9:*25* 38:*22*
**adopt** 148:*11, 21*
**advanced** 161:*25* 162:*6, 14*
**advice** 108:*4* 161:*6* 162:*25* 163:*2* 207:*4* 208:*7* 210:*17* 218:*3, 5, 7, 12*
**advise** 110:*7* 170:*4* 187:*23*
**advised** 158:*4*
**advising** 110:*6*
**advisor** 147:*23* 192:*16* 195:*7, 8, 14*
**advisors** 218:*7* 276:*11*
**advisory** 201:*15*
**affairs** 137:*10*
**affect** 89:*23, 24*
**affiliates** 195:*5, 8*
**affords** 24:*17*
**aforementioned** 285:*8*
**aggregate** 24:*6*
**aggressive** 219:*16, 20*
**aggressively** 226:*3*
**ago** 8:*24* 67:*16* 156:*5* 188:*9*
**agree** 34:*13* 39:*25* 42:*7* 77:*9* 81:*11, 15* 87:*24, 25* 90:*21* 96:*8* 98:*3, 18* 105:*10* 106:*8, 11, 15* 107:*12, 15* 108:*7* 110:*12* 111:*14, 16, 18* 118:*19* 126:*21* 131:*2, 4, 15* 141:*16* 147:*15*

152:*11*  157:*10*  170:*6*
172:*19*  173:*20*  174:*7*
175:*11*  180:*12*  193:*1*
199:*1*  201:*16*  202:*1*
206:*6*  212:*25*  213:*6,*
*11*  216:*8*  222:*9*
238:*5*  245:*17, 19, 21*
259:*5*  261:*2, 9*  263:*9*
280:*4*
**agreed**  22:*4*  54:*21*
64:*9*  110:*23*  126:*1*
194:*24*  267:*12*  274:*4*
**agreeing**  125:*6*
168:*14*  174:*3*
**agreement**  14:*24*
117:*22*  124:*2, 5, 9*
195:*13*  196:*20*
**ahead**  12:*11*  16:*7*
26:*24*  190:*6*  211:*21*
213:*5*  257:*7*  265:*9*
267:*11*
**Alex**  2:*22*  5:*12*
44:*12*  46:*10*  64:*25*
79:*2*  132:*3*  164:*23*
182:*16*  226:*22*
**alleged**  169:*20*
**allow**  8:*10*  124:*17*
125:*14, 15, 21*  126:*7*
136:*7*  163:*13*  231:*6*
**allowed**  46:*20*  59:*8*
103:*11*
**allowing**  142:*22*
**allows**  9:*10*  24:*17*
47:*7*
**allude**  262:*23*
**alluding**  220:*22, 25*
**altered**  66:*23*  80:*25*
**altering**  100:*11*
**alternative**  14:*12*
**alternatives**  61:*6*
165:*3, 6, 11*  166:*8*
167:*9*  168:*7*
**alters**  282:*9*
**ALYSSA**  2:*6*  6:*3*
**ambiguous**  43:*3*
47:*5*  60:*8*  85:*3*
247:*12*  248:*9*  273:*25*
274:*16*  275:*1*

**America**  194:*2, 7, 11,*
*13*  195:*4*  196:*16*
229:*12*  265:*5, 16*
**amount**  35:*15*  132:*4*
226:*23*
**analyses**  163:*7*
**Analysis**  24:*5, 8, 9, 20*
27:*4*  29:*9, 14*  58:*22*
63:*19*  66:*3*  69:*3, 7,*
*11*  75:*11*  76:*16*  90:*8*
97:*24*  98:*4, 12*  99:*9*
102:*6*  132:*24*  134:*1*
150:*17*  152:*13, 15, 22*
174:*5*  189:*1*  190:*23*
253:*14*
**analysts**  19:*12, 15, 19,*
*22*  190:*6, 8, 17*
**Analyze**  48:*9, 24*
50:*11*  57:*7*  63:*10*
64:*10*  68:*14*  70:*18*
**analyzing**  49:*25*
76:*11, 19*
**announce**  117:*21*
234:*24*
**announced**  135:*24*
166:*11*
**announcement**  165:*2,*
*4, 10, 12, 19, 20, 23, 25*
166:*3, 4, 6, 12, 14, 22*
167:*8, 12, 13, 19*
168:*3, 8, 24*  186:*2*
**announcing**  234:*15*
**annual**  236:*14*
**another's**  103:*11*
**answer**  9:*1*  41:*2*
43:*6*  46:*17*  55:*5*
56:*9*  57:*14*  58:*8*
74:*21*  83:*21*  92:*21*
95:*7, 25*  104:*10*
144:*12, 14*  199:*25*
212:*22*  213:*24*
222:*21, 24, 25*  231:*20*
245:*18*  246:*15*  256:*6*
257:*6, 9, 10*  258:*10*
264:*2*
**answered**  62:*17*
189:*14*  246:*14*
255:*15, 20*  256:*21*
257:*21, 25*  258:*7*
259:*14*  261:*5, 17*

262:*6*  264:*5, 21*
272:*8*  275:*1*  283:*12,*
*16, 24*  284:*6*
**answering**  111:*7*
231:*22*  232:*1*
**answers**  211:*4*  287:*9*
**antic**  141:*3*
**anticipate**  139:*11*
140:*14*
**anticipated**  93:*10*
94:*4*
**anti-raid**  195:*19*
**anti-takeover**  148:*11*
**Antitrust**  236:*22*
**Antolini**  3:*16*  44:*6*
**anybody**  8:*7*  121:*21*
**anymore**  10:*24*
188:*13*
**aplascoff@rgrdlaw.co
m**  2:*11*
**apologize**  36:*24*
58:*15*  59:*22*  74:*8*
81:*3*  90:*11*  99:*23*
153:*9*  168:*14*  199:*2*
254:*24*  259:*24*
**appeal**  184:*12*
**appear**  76:*9*  82:*10*
**APPEARANCES**  2:*1*
**APPEARING**  1:*11,*
*25*  5:*15*
**appears**  6:*11*  69:*14*
74:*5, 14*  113:*13*
168:*21*  201:*18*
**Appendix**  6:*18*
16:*24*  17:*5*  26:*20*
27:*12*  242:*9*  243:*20*
252:*10*  277:*2*
**Apple**  169:*6*
**applicability**  154:*1*
**Applied**  4:*1*  77:*19*
78:*1*  152:*20*
**apply**  69:*7*  152:*18*
**applying**  150:*13*
179:*5*
**appreciate**  53:*17*
185:*15*
**approach**  10:*19*
30:*19*  187:*17*  204:*2*
**approached**  47:*18*
48:*6*

**approaches**  12:*25*
187:*5*
**appropriate**  39:*7, 18*
41:*16*  46:*15*
**appropriately**  211:*11*
**approval**  236:*21*
**approve**  8:*14*  25:*7*
**approved**  25:*3*
196:*24*
**approximately**
115:*19*  121:*9*
**area**  11:*13*
**argue**  35:*18*
**argued**  151:*15*
**argument**  104:*14*
105:*5*  266:*22*
**Argumentative**  47:*5*
52:*16*  57:*15*  75:*19*
96:*12*  272:*8*
**arithmetic**  27:*21*
33:*22*  34:*10*
**arrived**  28:*24*
**art**  175:*15*  249:*15, 18*
**Arthur**  37:*23*  40:*6*
**article**  12:*13*  182:*12*
**articles**  19:*7*  27:*22*
36:*5*  133:*18*
**articulate**  39:*2*
**aside**  113:*8*  168:*14*
209:*17*
**asked**  15:*20*  16:*4*
21:*17*  26:*3, 9*  32:*6*
47:*14*  48:*20*  50:*5, 10*
54:*25*  57:*19*  58:*2, 11,*
*25*  59:*14*  60:*2, 19*
61:*10, 15, 18, 21*  62:*8,*
*14, 17*  63:*10, 18*
67:*17, 25*  68:*25*
73:*14*  74:*9, 18*  88:*2*
180:*24*  194:*16, 22*
215:*8*  244:*24, 25*
246:*13*  247:*14*
255:*15*  256:*21*
257:*21*  258:*6*  259:*14,*
*15*  261:*5, 17*  262:*5*
264:*5, 20*  272:*7*
275:*1*  283:*11, 16, 24*
284:*6*
**asking**  22:*10*  26:*1*
38:*7*  39:*1*  40:*3, 10*

42:*18*  47:*22*  59:*19*, *23*  60:*19*  65:*20*  72:*8*  95:*2*  106:*12*, *14*  119:*4*, *5*  144:*9*, *15*  157:*1*  168:*18*  169:*15*, *24*  172:*23*  174:*2*  210:*18*  213:*6*, *11*  215:*6*  216:*17*  225:*5*  231:*14*  244:*21*  248:*1*  252:*12*, *18*  264:*16*
**aspect**  11:*20*
**aspects**  138:*12*  143:*7*
**assert**  135:*8*  258:*16*, *20*  261:*13*
**asserted**  268:*5*
**asserting**  135:*10*
**assess**  48:*9*, *25*  50:*12*  57:*8*  68:*15*  69:*5*  70:*19*  76:*15*
**assessments**  281:*21*
**assets**  14:*12*
**assign**  8:*25*
**assignment**  22:*3*  28:*16*  36:*13*  48:*3*, *4*, *18*, *20*  49:*19*  53:*1*, *3*, *7*, *11*, *16*  54:*1*, *2*, *4*, *22*  55:*11*  57:*1*, *2*, *5*, *7*, *25*  58:*16*, *21*  59:*10*, *20*  60:*10*, *13*, *16*, *18*, *24*  61:*3*, *7*, *15*, *19*, *24*  62:*1*, *4*, *12*, *19*, *21*  63:*25*  64:*5*, *6*, *9*  67:*18*, *19*, *24*  68:*2*, *8*, *12*, *17*  70:*11*, *16*  73:*12*, *18*, *22*  74:*22*, *24*, *25*  75:*6*, *15*, *24*  76:*10*  77:*15*  84:*9*, *10*, *21*  85:*1*, *2*, *18*  88:*4*  94:*18*, *21*  150:*16*
**assignments**  53:*24*  59:*5*
**assist**  230:*22*
**assistance**  24:*9*
**associate**  200:*8*
**assume**  25:*17*  105:*2*  118:*16*  119:*17*  120:*16*, *18*  191:*15*  215:*19*, *25*  232:*8*  234:*5*
**assumed**  162:*16*

**Assumes**  209:*12*, *25*  210:*13*, *23*  212:*20*  213:*3*  220:*14*, *20*  222:*19*
**assuming**  102:*3*
**assumptions**  253:*5*, *14*
**assure**  29:*10*
**attached**  3:*11*
**attachments**  24:*1*
**attack**  147:*22*
**attacked**  148:*4*
**Attempt**  195:*10*  223:*13*
**attempting**  223:*17*, *23*
**attention**  122:*1*  276:*5*
**attest**  30:*10*  285:*9*
**attorney**  9:*12*  70:*3*, *4*
**attribute**  281:*13*
**atypical**  187:*21*  188:*1*
**auction**  187:*4*
**August**  28:*22*  48:*11*  49:*1*, *14*  50:*13*  56:*15*, *22*  57:*9*, *20*  103:*21*, *23*  136:*25*  142:*15*  147:*5*, *10*, *14*  193:*2*, *12*, *17*  194:*9*  203:*8*, *10*  218:*15*  220:*5*, *8*  223:*19*  224:*5*, *7*, *13*, *15*  238:*9*, *11*  241:*5*  258:*18*, *22*  259:*2*, *6*  260:*7*  261:*4*, *9*, *15*, *16*  269:*3*  270:*24*, *25*  272:*20*  278:*19*  279:*10*, *18*  280:*9*  282:*2*, *3*, *13*  283:*15*  287:*25*
**authority**  47:*7*
**authors**  172:*15*
**automatically**  232:*13*
**Automation**  223:*11*, *17*
**availability**  30:*21*
**Available**  19:*6*  21:*20*  26:*6*, *23*  27:*3*  30:*5*  66:*24*  81:*1*  100:*12*  159:*15*  163:*12*
**Avenue**  2:*9*
**average**  121:*10*
**avoid**  44:*21*  75:*20*

**aware**  11:*13*, *24*  19:*18*  85:*17*  93:*15*  108:*2*  117:*7*  122:*17*  128:*19*  134:*9*, *15*  169:*25*  170:*18*  200:*7*, *19*  210:*20*  211:*9*  238:*6*  260:*15*

**< B >**
**bachelor's**  7:*15*
**back**  15:*18*  21:*12*  25:*9*  34:*22*  43:*17*  44:*2*, *4*  53:*1*  56:*2*  67:*24*  74:*12*  75:*6*  78:*11*  80:*12*, *13*  105:*1*  111:*6*  112:*5*, *13*  118:*13*  129:*3*  132:*12*, *13*  139:*2*, *7*, *12*  141:*5*, *12*, *17*  142:*13*  150:*23*  154:*12*  158:*23*  163:*18*  165:*8*  166:*23*  167:*3*  168:*11*, *22*  176:*2*, *7*  177:*10*, *15*, *20*  182:*6*, *8*  183:*5*, *6*  185:*25*  191:*6*  198:*4*  206:*25*  227:*11*, *13*  237:*22*  243:*2*  246:*8*, *18*  248:*24*  259:*19*  267:*5*  271:*23*  275:*10*, *11*
**background**  7:*12*  10:*17*, *22*  70:*3*  84:*19*  119:*24*  159:*2*  209:*23*  235:*14*
**bad**  77:*5*  138:*14*  174:*24*
**badgering**  258:*7*
**balance**  63:*10*, *18*
**balancing**  93:*9*  94:*3*
**ball**  142:*8*
**ballot**  37:*9*
**bank**  148:*5*  194:*2*, *6*, *11*, *13*  195:*4*  196:*16*  198:*20*  229:*12*  265:*5*, *16*
**banker**  10:*24*  16:*3*  98:*9*  110:*5*  158:*2*
**bankers**  108:*4*  109:*9*  170:*22*

**banking**  15:*19*, *22*  16:*8*
**banks**  196:*10*, *13*  198:*10*  200:*13*, *20*
**bar**  9:*13*, *25*  191:*7*
**Bargaining**  186:*4*  187:*1*, *5*
**base**  151:*25*  153:*21*  214:*18*
**based**  30:*5*  35:*24*  47:*16*  65:*23*  66:*6*  110:*4*  132:*23*  140:*5*  141:*1*, *8*  145:*11*  147:*16*  157:*12*, *23*  159:*19*  160:*2*  161:*3*, *6*, *9*  181:*21*  189:*10*, *12*, *23*  190:*16*, *23*, *25*  191:*19*, *25*  197:*3*, *25*  199:*5*  253:*7*  268:*24*  284:*1*
**bases**  45:*19*  133:*15*
**Basic**  96:*19*
**basically**  23:*10*  231:*11*  260:*9*  261:*22*
**basing**  65:*17*  157:*1*  273:*9*
**basis**  45:*8*, *15*  47:*2*, *4*  92:*11*  119:*16*  120:*3*  121:*10*, *19*  139:*8*  163:*20*  218:*19*
**Bates**  3:*23*, *25*  4:*5*, *7*, *9*, *12*, *14*, *18*  113:*12*, *22*  119:*21*  178:*11*  217:*10*  228:*15*, *16*  239:*11*, *12*
**bear**  184:*13*  203:*15*, *23*  204:*4*
**bearing**  169:*2*
**began**  203:*2*  227:*19*
**beginning**  54:*14*  104:*16*  140:*25*  141:*11*  193:*11*  217:*10*  241:*1*
**begins**  40:*20*  184:*20*
**behavior**  42:*3*
**behavioral**  30:*3*, *13*, *19*  31:*2*, *18*
**beholder**  186:*7*
**believe**  8:*18*  53:*19*  55:*11*  59:*21*  78:*22*

89:2  99:24  103:7
104:6  149:16  154:7
176:13  205:16, 22, 23
206:10  230:24  235:3
238:3  242:21  245:3
250:16  260:20, 25
262:12  267:4  272:22
**believed**  139:23
151:13  197:5  198:22,
23  267:21
**believes**  267:3
**Bennett**  2:16  22:8,
11  24:4  48:2  65:11
**Berra**  112:2
**Best**  45:1, 23  79:25
119:1  139:15  211:18
218:20
**better**  96:8  208:22
**Beyond**  169:22
**bias**  29:22, 25  30:21,
22  31:13
**biased**  29:10
**bid**  106:7  108:1, 2
176:5, 7  180:3
223:11  226:3  263:20
**bidder**  186:8
**bidding**  173:2, 7, 8, 21
**bids**  106:22  187:4
**big**  123:1
**bilateral**  124:1
**billion**  114:20, 21
115:19
**bit**  11:9  26:10
71:16  73:10  128:11
131:20, 25  164:24
171:20  172:4  191:6
197:8
**BlackRock**  123:2
**blanket**  25:6
**blanketly**  245:21
**Bloomberg**  12:13
**Board**  4:11, 16  12:5,
21  13:2  16:4  17:25
20:2  61:23  62:7
66:5  98:10, 11
104:17  108:18  109:8,
11, 19  117:21  118:1
120:2  130:16  131:20
137:9, 11, 12  138:14
139:14  143:12, 21

146:4, 22  147:13
153:15  158:3  162:22
170:3, 22  184:12
196:24  197:5, 18, 20,
21  198:8, 21  201:7
204:7, 21  205:2, 17
206:24  209:11
210:10  211:24  212:5,
7, 12, 13, 14  213:1
214:6  215:18, 20, 21,
23, 25  217:7  218:7, 8,
9  222:17  224:19
225:23  226:14, 17
229:18  230:12  231:7,
10, 16  236:13, 24
237:14  239:22  250:1
265:17, 18  273:11, 12
**boards**  110:7  138:12
211:5, 10  232:14
**board's**  146:8
**body**  58:23  169:17,
25  252:4
**BofA**  4:6  188:24
189:5, 13  190:15, 16
191:15, 19, 22  192:14,
20  193:13  194:5
195:5, 13, 14, 25
197:2, 7, 15  239:9
267:22  268:11  273:6
**BofA_003270**  3:23
113:13
**BofA's**  190:23
**bold**  44:13  89:19
**book**  135:3  154:12
188:9, 17
**born**  185:4
**bottom**  124:12  127:5
172:7  183:23  184:4
193:10  208:14
213:18  229:24, 25
276:5, 9
**bought**  96:23
**Boulevard**  2:16
**bound**  38:23
**bounds**  270:17
**Bowl**  52:20
**box**  37:9  190:4
217:14
**bracket**  196:10, 13

**brain**  160:22
**branch**  126:13  236:7
**break**  38:18  39:24
40:3  41:22  42:5, 6, 7,
11  43:11, 14, 16
48:23  79:8, 12, 18
132:8  147:4, 9, 10
182:23  183:1  220:4,
7, 10  226:19, 20
227:3  275:5
**breaks**  78:8, 9
**brief**  9:1  10:3, 4, 5
49:18  223:10
**briefly**  12:8
**bright**  187:11
**bring**  75:14  122:1
**broadest**  257:12
**Broadridge**  4:13
**brought**  66:11
250:19
**Bruner**  4:3  135:1, 6
154:4, 5, 7, 11, 15
155:11  178:6, 13
179:20  181:7  183:9
188:8
**Bruner's**  134:23
154:25  155:5  178:18
182:8
**bulge**  196:9, 13
**bullet**  116:2, 6
120:11, 16  121:3, 4, 6
208:20  213:17
215:13, 16  218:13
219:3, 7, 18  222:2, 8
223:16  230:4  232:17
233:5
**bunch**  35:16  84:16
156:5  221:19
**business**  10:19  98:14
137:10  138:5, 7, 10,
16  139:17, 19  145:19
157:15  170:19
198:24  269:6
**buy**  89:25  127:13
128:4  223:19  238:1
**buyer**  187:23  192:15
**buyers**  177:23
184:11  192:17
**buying**  158:22  237:2

253:18
**buys**  254:1
**byproduct**  117:11


< C >
**C]ounsel**  45:2
**Cain**  2:19  3:16
27:14  28:14, 19
32:21  33:2  34:19
35:9  36:10, 19  37:7
41:11  94:25  102:21
103:5, 9  142:19
153:3, 12  154:9
155:12  164:10
166:17  168:15  171:4
172:16  178:17
188:11  198:9  210:2
241:10  242:12  243:7,
17  244:10, 21  245:7,
13  249:3, 19  250:7,
11, 17  254:9  255:10
258:16, 20  261:13
262:9, 18  267:3, 21
268:20, 23  271:19
272:24  273:1  274:24
275:24  276:9  277:7
278:2, 14  279:11
280:13, 20, 24  283:8,
10, 22
**Cain's**  6:24  7:4
27:10  28:17  29:16
36:14  37:19  89:10
99:19  102:4  166:23
241:19  242:9, 16
244:25  245:5  247:18,
23  248:10, 17  251:2
267:16  271:20  273:4
274:8  276:2, 17, 20,
24  277:2, 21, 23
278:4, 6, 23  279:3, 22
280:10  281:4, 9, 13,
17, 23  282:18, 21
**calculation**  136:21
**California**  174:11, 18,
24
**call**  9:4  54:6, 13
145:5, 6  149:1  161:6
169:24  176:14  177:7
190:1  197:16  263:16,
18  281:9

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

**called** 5:*19* 26:*25* 96:*24* 208:*18* 265:*17*
**calling** 44:*23*
**Calls** 15:*23* 54:*7* 81:*13*, *21* 82:*1*, *8* 85:*19* 105:*24* 137:*24* 169:*23* 208:*1*, *8* 220:*19* 221:*3* 224:*1* 233:*11* 237:*5* 253:*9* 257:*19* 258:*21* 260:*22* 263:*12*, *25* 264:*3* 270:*14* 271:*13*, *14* 274:*25*
**candid** 155:*22* 163:*8*
**candidates** 12:*20*
**capabilities** 110:*21*
**capability** 112:*14*
**capacity** 8:*16* 249:*2*
**capital** 40:*19*
**capitalized** 248:*2*
**capitals** 241:*19*
**care** 200:*5*
**career** 24:*18*
**careful** 50:*9* 55:*13*
**carrying** 198:*22*
**case** 6:*1* 8:*23* 14:*11*, *23* 15:*4* 17:*13* 18:*6* 23:*7*, *10* 26:*19* 39:*4* 40:*9* 43:*4* 44:*6*, *12*, *20* 45:*2*, *25* 64:*19* 65:*3* 67:*14* 69:*20*, *22* 70:*7* 72:*9* 78:*14* 80:*17* 82:*19*, *20*, *21*, *25* 83:*5*, *6*, *15*, *17* 84:*1*, *6*, *13*, *22* 86:*20*, *21* 90:*3* 91:*13* 92:*2* 93:*25* 94:*9*, *10* 103:*6* 107:*24* 147:*1* 157:*8* 158:*17*, *21* 169:*10*, *18* 178:*1* 195:*4* 202:*11* 219:*13* 223:*10* 224:*24* 225:*5*, *23* 226:*11* 235:*3* 242:*22*
**cases** 8:*25* 9:*23* 17:*18*, *19*, *21* 18:*5*, *7* 84:*15* 92:*8* 110:*15* 138:*3* 175:*5* 188:*10* 200:*12* 244:*13*, *14*

**cash** 114:*19*, *24* 115:*1*, *4* 118:*7* 120:*10* 189:*1*
**Cast** 269:*18*
**Castellano** 3:*19* 64:*19* 65:*4* 67:*14* 69:*19*, *22* 70:*7* 72:*9* 78:*14*, *18* 80:*17* 82:*19*, *20*, *21*, *25* 83:*6*, *15*, *17*, *25* 84:*6* 91:*13* 92:*2*, *8*, *11*, *22* 94:*9*, *10*
**Category** 280:*8*
**cause** 195:*5* 287:*14*
**caused** 28:*19*, *22* 103:*25* 165:*15* 166:*15* 167:*25*
**causes** 90:*11*
**CC** 228:*11*
**Central** 1:*14* 5:*2* 284:*21*
**CEO** 114:*3* 204:*7*, *20* 205:*2*, *10*, *12* 209:*10* 210:*10* 222:*17* 234:*4* 263:*12* 264:*8*, *16*
**CEOs** 110:*7* 187:*16* 202:*9* 211:*5* 263:*24*
**cert** 269:*19*
**certain** 8:*10* 112:*18* 117:*2* 197:*14*, *19* 237:*13*
**certainly** 13:*15* 23:*14* 37:*12* 50:*9* 68:*25* 77:*17* 108:*2*, *25* 112:*8*, *22* 137:*13* 138:*6* 139:*21* 140:*2* 145:*10* 147:*4* 171:*12* 192:*1* 211:*25* 237:*11*, *13* 247:*20* 272:*10*
**certainty** 118:*9*
**CERTIFICATE** 287:*1*
**certification** 100:*1* 103:*6* 105:*6* 153:*10* 266:*2*
**certify** 287:*6*
**cetera** 23:*12* 36:*6* 143:*7* 165:*15* 189:*2*

**cgilroy@rgrdlaw.com** 2:*12*
**chagrin** 25:*5*
**challenge** 197:*15*
**chance** 52:*14*, *19* 179:*19*, *24* 194:*8* 245:*22*
**CHANDRASEKHAR** 2:*8*
**change** 12:*21* 14:*8*, *10* 28:*19*, *23* 29:*4*, *17* 35:*5* 37:*20* 89:*4* 102:*14*, *19*, *24* 104:*1* 165:*13* 195:*9*, *15* 241:*3*, *4*, *5* 245:*5* 246:*14*
**changed** 35:*3* 179:*17* 230:*18*
**changes** 188:*13* 214:*17*
**changing** 35:*6* 240:*24* 241:*3*
**chapters** 187:*3*
**characterization** 98:*15*
**characterize** 22:*20* 31:*24* 109:*25* 164:*5* 219:*22*, *24*, *25* 237:*16* 243:*10* 261:*21* 278:*4*, *22*
**characterized** 22:*23* 187:*3* 219:*12* 220:*4* 277:*21* 278:*15*
**characterizes** 95:*10*
**charged** 196:*9*
**chart** 166:*5*, *16* 173:*18* 191:*7*
**check** 24:*20* 27:*21* 105:*2* 121:*13* 167:*3* 185:*25* 206:*21* 208:*13* 237:*22* 244:*3*
**checked** 234:*5*
**Cheri** 1:*24* 5:*13* 287:*6*, *22*
**Chiarella** 9:*24* 84:*15*
**Chicago** 7:*19* 30:*17*
**Chief** 229:*4*, *7*
**chiefs** 175:*1*
**Chloride** 225:*14*, *18*

226:*4*
**choices** 186:*8*
**Choose** 201:*23*
**CHRISTOPHER** 2:*8*
**circumstance** 100:*6*, *23*
**circumstances** 161:*8*
**citation** 67:*13* 157:*22* 159:*11*
**citations** 24:*21* 45:*10*, *17* 83:*11*
**cite** 17:*15* 67:*14* 133:*15*, *18*, *21*, *24* 134:*5* 154:*4*, *5*, *8*, *10* 157:*24* 171:*12*, *13* 184:*16* 188:*25* 244:*12*
**cited** 12:*13* 17:*10* 23:*1* 28:*14*, *19* 29:*16* 30:*11* 33:*5* 35:*1* 36:*2*, *20* 41:*12* 82:*20* 83:*15* 91:*8* 92:*7* 102:*21* 134:*21* 138:*2* 154:*7*, *10* 155:*5* 159:*3* 168:*12* 171:*8* 178:*16*, *18* 181:*5*, *6*, *10*, *12* 188:*10*, *11*
**cites** 27:*19*, *22* 45:*2* 90:*2* 155:*12*
**citing** 155:*24* 156:*5* 228:*21*
**Civil** 1:*4* 5:*10* 44:*20* 103:*14*
**claim** 32:*19* 149:*22* 241:*11*, *20* 247:*18* 250:*16* 251:*14*, *17* 253:*8* 267:*17* 276:*18*, *22* 277:*21* 278:*4*, *16* 279:*5*, *16*, *23* 280:*5*, *10*, *21* 281:*10*, *24* 282:*18* 283:*1*, *10*
**claiming** 86:*25* 160:*3*
**claims** 251:*25* 277:*8* 280:*14*
**clarification** 45:*9*, *16* 47:*3*
**clarify** 58:*24* 232:*10*
**class** 9:*2* 51:*14*, *22* 99:*25* 103:*6* 104:*16* 112:*22*, *24* 117:*16*

133:*4* 136:*12, 13* 138:*25* 140:*25* 141:*12, 25* 149:*21, 24* 153:*10* 176:*17* 193:*24* 194:*2* 197:*10* 203:*2, 6, 7, 9* 238:*5* 241:*1, 15* 248:*17* 266:*2* 269:*19* 277:*12, 17* 279:*7, 25* 280:*16* 281:*2* 282:*4, 13*

**classic** 9:*22* 84:*14* 133:*9*

**classroom** 10:*25*

**clause** 236:*11*

**clear** 31:*6* 49:*7* 59:*21* 60:*15, 16* 86:*3* 88:*21* 89:*5* 111:*8* 117:*9* 126:*10* 151:*11* 178:*24* 195:*20* 209:*7* 210:*17* 214:*14* 242:*13* 250:*15* 251:*1* 255:*21* 259:*1, 8* 265:*10* 267:*23* 269:*2* 272:*16, 18* 273:*14* 275:*22* 283:*19* 284:*12*

**clearly** 50:*3* 160:*19* 249:*19, 21* 272:*11*

**close** 135:*22* 136:*8* 264:*6*

**closed** 135:*25* 136:*16*

**closely** 95:*25* 198:*13* 214:*13* 245:*22*

**closing** 116:*3* 120:*14*

**code** 223:*7* 230:*18*

**collaborating** 246:*25*

**collaborative** 123:*25*

**colleagues** 29:*9* 199:*6*

**college** 10:*14*

**Columbia** 8:*17, 19*

**column** 100:*3, 19* 101:*4, 8* 213:*18* 214:*16*

**combination** 224:*20*

**come** 53:*17* 78:*11* 110:*3, 10* 111:*8* 112:*5* 139:*2, 7, 12* 141:*5, 12, 17* 176:*7* 266:*11*

**COMERFORD** 2:*15* 3:*7* 11:*8, 21* 12:*10, 23* 13:*10, 24* 14:*17* 15:*7, 14, 23* 16:*6, 19* 17:*22* 18:*10* 19:*14, 21* 20:*18* 21:*1, 8* 22:*19* 23:*13* 27:*6* 29:*12* 31:*17, 23* 32:*7, 15, 23* 33:*6, 24* 34:*12, 21* 35:*10* 36:*1, 12, 21* 37:*15, 25* 38:*4, 9, 13, 17, 25* 39:*2, 11, 15, 19, 24* 40:*5, 8, 14, 24* 41:*4, 8, 13, 17, 22* 42:*1, 4, 8, 12, 17, 24* 43:*2, 10, 15, 19* 44:*10* 47:*7, 25* 49:*11* 50:*7, 19* 52:*2, 16, 24* 53:*8* 54:*10, 18* 55:*4, 22* 56:*7, 16, 23* 57:*6, 15, 21* 58:*4, 9, 14* 59:*3, 17* 60:*8, 22, 25* 61:*13, 17, 25* 62:*9, 17, 20* 63:*2, 7, 14, 22* 64:*1, 7* 65:*25* 66:*12* 67:*20* 68:*3, 9, 21* 69:*2, 15, 24* 70:*12* 71:*2, 6, 18* 72:*3, 10, 21, 25* 73:*8, 16, 23* 74:*3, 7* 75:*3, 18* 76:*2, 21* 77:*13* 78:*5, 15* 81:*13, 21* 82:*1, 8, 14* 83:*8, 18* 84:*11* 85:*3, 19, 25* 86:*16, 20, 24* 87:*2, 6, 10, 18, 22* 88:*13, 18* 90:*7, 19* 91:*1, 7, 14* 92:*3, 13, 24* 93:*17* 94:*13, 19* 96:*11* 97:*5, 10, 18* 98:*5, 22* 99:*13* 101:*3, 6, 18* 102:*11* 104:*5, 24* 105:*11, 24* 106:*9, 16, 25* 107:*7, 13, 25* 108:*12, 23* 109:*15, 24* 110:*16, 19* 111:*3, 22* 112:*15, 25* 113:*6* 114:*5* 115:*16, 22* 116:*14, 20* 118:*22* 119:*8, 15* 121:*15, 24* 122:*2, 14* 123:*6, 19* 124:*7* 126:*5, 22*

127:*14* 128:*5, 24* 129:*10* 130:*21* 131:*7, 23* 133:*20* 136:*9, 22* 137:*2, 24* 139:*4, 9* 140:*1, 21* 141:*15, 21* 142:*2* 143:*9, 24* 145:*4* 147:*3, 20* 148:*24* 149:*6* 150:*8* 151:*5, 19, 22* 152:*1, 7, 25* 153:*7, 23* 154:*17, 20* 155:*4, 17* 156:*13* 157:*6* 158:*15, 18, 24* 159:*25* 160:*17* 161:*17* 162:*2* 165:*17* 168:*2* 169:*22* 170:*10* 172:*12* 173:*13, 23* 174:*21* 175:*2, 17* 176:*3* 177:*12* 180:*5, 9* 181:*3, 13, 16* 182:*3, 6, 10, 14, 18* 186:*15, 18, 20* 187:*12* 191:*2* 192:*7* 193:*21* 194:*15* 195:*16* 196:*18* 200:*15, 22* 202:*4, 23* 203:*21* 204:*10, 22* 205:*4, 11, 21* 206:*4* 207:*6, 17* 208:*1, 8* 209:*5, 12, 25* 210:*12, 23* 211:*8, 21* 212:*10, 15, 20* 213:*3* 217:*9* 219:*21* 220:*11, 14, 19* 221:*3, 9, 17* 222:*12, 19* 223:*12, 25* 224:*11* 225:*1* 226:*15* 227:*5* 228:*15, 18* 231:*1, 8, 17, 22* 232:*1* 233:*11, 18* 234:*2* 235:*1* 236:*2* 237:*5* 238:*8, 25* 239:*12, 24* 240:*8* 241:*25* 243:*5* 244:*10, 16, 20* 245:*3, 9, 16* 246:*10* 247:*6, 11, 17, 21* 248:*8* 249:*5* 250:*13* 252:*16* 253:*9, 20* 254:*3, 10, 16, 20* 255:*12, 15* 256:*1, 11, 20* 257:*3, 14, 19* 258:*6, 11, 24* 259:*7, 13, 16, 23* 260:*22* 261:*5, 17* 262:*5*

263:*5, 14* 264:*5, 11, 20* 265:*1, 7, 9, 20* 266:*13, 18, 25* 267:*7, 19* 268:*7, 21* 269:*14* 270:*1, 14* 271:*6, 13* 272:*2, 7, 15* 273:*3, 20, 23* 274:*6, 12, 16, 21, 25* 275:*6, 13, 17, 18, 20* 283:*3, 11, 16, 24* 284:*6, 16*

**comes** 10:*7* 54:*11* 55:*18* 92:*18* 107:*19*

**comfortable** 197:*19, 23*

**coming** 97:*9* 112:*13* 254:*1*

**comment** 87:*10, 11* 126:*8* 155:*20* 174:*20* 197:*11* 239:*1*

**comments** 87:*7, 8* 136:*11*

**Commission** 287:*25*

**commit** 167:*17*

**commitment** 194:*23*

**committee** 166:*9, 10* 197:*22*

**committees** 197:*12, 16, 17*

**committing** 211:*6*

**common** 114:*18, 19* 123:*14* 277:*8*

**communicated** 240:*20*

**communication** 21:*2* 33:*11* 54:*12* 130:*13* 142:*14* 177:*14* 210:*4* 211:*11* 235:*15* 239:*20* 244:*7* 246:*24* 248:*25* 255:*24* 256:*9, 16, 19* 257:*11, 12, 18* 258:*5* 259:*2, 9* 260:*6, 15* 261:*3, 14, 18* 262:*15, 19, 22* 266:*17* 268:*6, 9, 12* 271:*24* 272:*6* 284:*13*

**Communications** 18:*22* 21:*23* 54:*8* 222:*4* 240:*17* 243:*3* 248:*4* 258:*17, 20* 259:*5* 270:*23* 283:*10, 19, 23* 284:*5*

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

**communication's** 256:*18*
**companies** 112:*18* 117:*13* 137:*6* 140:*11* 142:*25* 145:*12, 14, 22* 146:*3, 4, 5* 158:*4* 162:*13, 22* 195:*20* 214:*11* 232:*15* 255:*5* 267:*6*
**company** 12:*20* 63:*13, 21* 76:*20* 89:*24* 93:*11* 94:*5* 96:*4, 6, 9* 98:*17* 99:*7* 115:*24* 121:*9* 137:*5, 14, 18* 139:*18* 140:*14* 142:*18* 145:*16* 149:*9, 10* 156:*12, 23* 157:*13, 18* 159:*23* 160:*8* 161:*23* 162:*8* 165:*13* 168:*13, 24* 169:*1, 3* 191:*20* 192:*14* 195:*7* 202:*18* 208:*14* 211:*25* 216:*23* 221:*24* 223:*19* 225:*18* 228:*7* 250:*22* 255:*3* 263:*20* 276:*13*
**company's** 88:*6* 90:*1*
**compare** 50:*5*
**compared** 63:*19*
**competent** 218:*9*
**competitive** 196:*9* 264:*1*
**competitor** 263:*19*
**competitors** 263:*25*
**competitor's** 263:*15*
**compilation** 182:*11*
**complained** 109:*6*
**Complaint** 23:*7, 14* 159:*3*
**complete** 53:*25* 85:*23*
**completed** 198:*17*
**completely** 130:*20, 22* 137:*1* 144:*16* 155:*21, 23*
**completion** 115:*3* 196:*14*
**comport** 66:*10*
**comports** 81:*24*

**compound** 45:*20* 53:*8* 72:*4* 83:*18* 274:*13*
**computer** 287:*10*
**con** 117:*17*
**Conan** 37:*23* 38:*3* 40:*6*
**concept** 9:*19* 110:*25*
**concepts** 101:*21*
**concerning** 45:*8, 15* 47:*1*
**concisely** 46:*13*
**concluded** 98:*24* 106:*1, 6* 116:*19* 173:*11, 24* 174:*1* 186:*6* 284:*21*
**concludes** 284:*19*
**concluding** 275:*15*
**conclusion** 15:*24* 31:*15* 34:*20* 36:*2* 106:*3* 110:*3, 4, 10* 111:*9* 137:*25* 242:*14* 248:*12* 270:*18* 277:*12* 282:*9*
**conclusions** 81:*14, 22* 82:*2, 9, 13* 85:*20* 105:*25* 169:*23* 270:*15* 271:*15* 275:*1*
**condition** 30:*10*
**conduct** 15:*8, 15* 48:*21* 208:*22*
**conducted** 46:*15*
**conference** 54:*6, 7, 13*
**confident** 13:*14* 124:*14*
**confidential** 4:*14, 17* 238:*14* 241:*12*
**confirm** 6:*8* 30:*4* 34:*6* 121:*19* 122:*13, 15* 278:*9* 280:*14* 281:*25* 282:*11*
**confirmation** 29:*22, 25*
**confirmed** 29:*4*
**conflate** 117:*18*
**conflated** 117:*15*
**conflates** 35:*17*
**conflating** 126:*17* 176:*22*
**confounds** 35:*17*

**confusing** 36:*24* 92:*16* 162:*20* 197:*8* 247:*12* 266:*25*
**confusion** 90:*11*
**congruent** 169:*5*
**conjunctive** 72:*22*
**connect** 126:*15*
**connected** 126:*18*
**connection** 63:*11* 116:*11* 276:*11*
**consensus** 190:*6, 17, 23*
**consent** 43:*13*
**consider** 21:*17* 36:*19* 38:*2, 7, 9* 86:*2* 97:*9, 14, 17* 98:*16* 109:*10* 127:*12* 129:*6* 136:*24* 139:*1* 141:*11, 24* 143:*22* 144:*3* 150:*4* 170:*13* 249:*18* 253:*17, 25* 255:*17* 261:*25* 262:*14* 263:*11* 264:*2, 8, 16, 18, 22* 265:*4, 16*
**consideration** 118:*7* 177:*6, 7* 279:*6, 25* 280:*16* 281:*1* 282:*2, 12, 23*
**considerations** 115:*9*
**considered** 16:*24* 17:*2, 5, 9, 10* 33:*7* 36:*3, 9* 37:*17* 64:*17, 18* 96:*20* 97:*15, 22* 98:*4* 127:*24* 128:*23* 139:*6, 21* 143:*23* 257:*23* 271:*11* 283:*25*
**considering** 32:*2* 88:*7* 100:*6, 24* 102:*8* 150:*18* 165:*2, 12*
**considers** 127:*6* 128:*14* 150:*5*
**consistent** 82:*6* 115:*20* 175:*7* 187:*2, 8* 203:*19* 243:*24*
**consisting** 285:*8*
**constant** 120:*25* 242:*19* 243:*9* 249:*20*
**constitute** 255:*20*

262:*16*
**constituted** 133:*9*
**constructed** 271:*17*
**constructively** 117:*20*
**consult** 29:*8* 275:*4*
**consummated** 67:*8* 70:*24* 71:*5, 24* 72:*13, 18* 73:*4*
**contact** 123:*4, 16, 21, 22*
**contacted** 48:*13* 55:*6*
**contain** 13:*8, 22* 212:*7, 12*
**contained** 58:*21*
**contains** 7:*3* 113:*22*
**CONTENTS** 3:*1* 278:*25*
**context** 43:*7* 66:*2* 67:*6* 69:*9* 90:*15* 116:*24* 143:*4* 153:*8, 11* 179:*4* 180:*14* 188:*14* 195:*17* 216:*18*
**contexts** 216:*14, 22, 23, 25*
**contingency** 118:*7* 264:*17*
**contingent** 51:*11* 67:*6* 93:*7, 25* 160:*9* 235:*19*
**continuation** 250:*18* 251:*16*
**Continue** 39:*11* 89:*10* 95:*5* 128:*20* 146:*13* 252:*11*
**continued** 194:*6* 224:*22* 238:*15* 242:*16* 251:*21* 273:*7*
**continues** 89:*9*
**Continuing** 193:*13* 194:*4* 251:*18*
**contradict** 30:*9* 110:*1*
**contradicts** 109:*21*
**contrary** 47:*7*
**contrast** 192:*13*
**control** 140:*16* 192:*5* 195:*9, 15*
**controlling** 100:*15*

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

129:*14*  165:*22*
**controversial**  263:*4*, *6*
**conver**  256:*18*
**conversation**  22:*12*
23:*8*  53:*6*, *22*  202:*8*
213:*10*  246:*2*, *23*
**conversations**  32:*16*
53:*12*  56:*11*  114:*10*
122:*5*  130:*14*  131:*18*
168:*10*  169:*16*
209:*10*, *21*, *22*  210:*10*,
*21*  211:*1*, *6*, *13*  213:*7*
222:*17*  239:*21*
240:*18*  243:*11*  244:*8*
245:*8*, *15*  246:*8*, *18*
**convey**  208:*25*
**conveying**  131:*24*
**copied**  205:*16*
**copies**  229:*15*
**copy**  6:*14*  80:*16*
83:*17*, *25*  84:*2*  101:*8*
239:*10*
**core**  97:*23*
**corner**  206:*16*, *22*
**corporate**  9:*7*  12:*21*
13:*12*  14:*13*  15:*22*
17:*24*  31:*9*  149:*12*,
*15*  212:*4*  272:*25*
**CORPORATION**  1:*6*
5:*8*  96:*23*  158:*22*
285:*1*
**corporation's**  96:*25*
**correct**  7:*19*, *20*, *22*,
*24*  8:*4*, *5*  12:*18*
14:*14*  15:*11*  17:*9*, *13*
18:*19*, *23*  19:*5*, *8*, *9*,
*11*  20:*9*, *11*, *13*, *15*
25:*4*  27:*2*, *24*  28:*18*
29:*1*  31:*16*  32:*20*
33:*4*, *25*  41:*7*, *12*
50:*4*  55:*1*, *19*  56:*3*,
*13*, *20*  57:*23*  58:*13*
59:*16*  64:*20*  67:*19*
71:*1*  75:*2*  76:*8*
81:*12*, *20*  82:*23*
83:*23*  84:*7*  86:*7*
91:*5*, *22*, *24*  94:*12*
97:*4*  102:*19*  103:*24*
105:*21*  106:*24*
108:*11*  114:*2*  116:*17*

124:*21*  127:*10*
132:*19*  133:*16*  134:*2*
141:*13*  145:*3*  148:*13*,
*16*, *18*  149:*5*  158:*9*,
*12*, *23*  164:*9*  165:*1*
167:*10*  172:*21*
175:*21*  177:*3*, *11*
184:*8*, *15*  185:*11*, *22*
189:*11*  194:*18*
201:*10*, *21*  202:*10*, *12*
203:*1*  205:*18*, *20*
215:*18*  216:*20*
220:*13*  221:*16*
222:*18*, *24*  223:*3*
224:*10*, *25*  225:*8*
227:*21*  228:*7*  229:*6*,
*13*, *16*, *17*  230:*24*
231:*5*, *14*  233:*10*, *16*
234:*22*, *25*  235:*24*
238:*24*  241:*2*, *8*
243:*4*  244:*9*  245:*13*
246:*13*, *16*  247:*5*
251:*12*  252:*15*
253:*19*  254:*2*, *9*
255:*14*, *25*  256:*19*, *22*
258:*19*  259:*6*, *12*, *22*
267:*15*  269:*24*
274:*11*, *20*, *24*  276:*18*
278:*17*  281:*14*
282:*18*  287:*11*
**corrected**  12:*16*
194:*21*
**CORRECTION**
286:*2*
**correctly**  105:*3*
120:*17*
**correctness**  285:*9*
**Correspondence**
113:*23*  170:*7*
**corresponding**  168:*19*
**cost**  121:*10*, *19*
**Cote**  110:*2*, *3*
**counsel**  5:*14*  7:*1*
20:*23*  21:*5*  22:*5*, *7*
23:*8*, *21*, *23*  25:*10*, *14*
27:*21*  31:*21*  32:*5*
38:*11*, *15*, *21*  39:*5*, *13*
41:*15*, *25*  42:*14*, *20*
43:*20*  44:*23*  45:*5*, *7*,
*12*, *14*, *23*  46:*1*, *24*, *25*

47:*2*, *6*, *14*  48:*2*, *20*
50:*10*  53:*4*, *12*  55:*1*,
*3*, *16*, *19*  56:*4*, *13*, *20*
58:*6*  61:*3*  62:*13*
65:*12*, *24*  66:*19*
68:*23*  69:*9*  70:*9*
73:*14*  74:*18*  75:*16*,
*24*  76:*17*  77:*12*, *23*
79:*9*  80:*7*  81:*25*
82:*7*, *17*  83:*3*, *5*, *24*
84:*25*  85:*2*  86:*22*
87:*4*, *9*, *18*  90:*10*, *23*
91:*3*, *9*, *20*  92:*5*, *10*,
*14*, *18*, *22*  93:*16*
95:*17*  108:*4*  121:*21*
138:*2*, *18*  150:*14*
152:*19*  160:*5*  161:*4*,
*6*  162:*23*, *25*  169:*16*
170:*4*  199:*22*  244:*3*,
*12*  247:*16*  272:*2*
283:*8*, *21*  287:*13*
**counsel's**  70:*20*  93:*1*
**count**  19:*3*  216:*10*
**counted**  27:*19*
**counterfactual**  199:*13*
**COUNTY**  1:*25*  5:*1*
287:*4*, *24*
**couple**  44:*15*  63:*16*
86:*15*  88:*19*  167:*16*
187:*25*  194:*12*
244:*14*
**course**  157:*15*  199:*8*,
*16*  269:*6*
**courses**  9:*4*, *5*, *17*, *19*
249:*17*
**coursework**  7:*18*
**Court**  5:*9*, *13*, *14*, *16*
6:*10*, *13*  10:*4*, *6*
27:*14*, *15*  43:*18*
46:*22*  51:*7*  56:*1*, *3*
59:*11*  74:*11*, *13*, *17*
104:*13*  106:*2*  108:*16*
109:*13*  128:*19*  129:*4*
139:*21*  259:*20*
269:*12*, *23*  274:*19*
**courts**  44:*22*  137:*13*
**Court's**  3:*22*  23:*11*
103:*5*, *25*  104:*4*
129:*3*  139:*25*  266:*2*

269:*11*
**cover**  79:*23*
**covered**  19:*22*  195:*8*
**Cowboys**  52:*19*
**create**  24:*6*  274:*8*, *9*
**created**  13:*7*, *9*, *18*,
*23*  15:*12*  268:*19*
**creating**  28:*13*  34:*14*
**credible**  237:*14*
**credit**  184:*24*
**Crew**  24:*16*
**criticizing**  175:*1*
250:*7*, *14*
**CRR**  1:*24*  287:*22*
**crux**  97:*23*
**crystal-clear**  90:*10*
**CSR**  287:*22*
**CSR-5132**  1:*24*
**CST**  4:*16*
**culminated**  178:*3*
**curious**  155:*7*
**current**  116:*12*
118:*15*  130:*25*
156:*21*  157:*4*
**currently**  39:*4*  110:*7*
227:*1*
**customary**  157:*17*
159:*23*  160:*7*  161:*10*
196:*8*  209:*4*, *6*  211:*5*,
*17*
**cut**  39:*16*, *20*  186:*23*
189:*15*  232:*2*  254:*20*
**cute**  18:*11*
**cyber**  249:*9*

**< D >**
**Dallas**  52:*19*
**dance**  207:*24*
**dangerous**  34:*2*
**data**  24:*6*  31:*16*
35:*19*  40:*20*  41:*7*
188:*23*  189:*25*
**dataset**  171:*24*
**date**  4:*14*  5:*5*  51:*22*
119:*14*  129:*24*
185:*25*  186:*1*  227:*22*
228:*5*  287:*7*
**dated**  3:*25*  113:*14*,
*15*  130:*14*  226:*16*
227:*25*  240:*17*

275:*24*  278:*19, 23*  279:*17*  285:*15*

**dates** 226:*10* 258:*22* 261:*15*

**daughter's** 79:*14*

**David** 103:*2*

**day** 167:*13* 168:*1* 193:*11* 209:*7* 210:*17* 214:*14*

**days** 167:*16* 168:*19* 187:*25* 195:*20* 265:*11*

**DCF** 189:*9* 191:*23* 192:*1* 197:*21*

**DD** 44:*7*

**dead** 193:*19*

**deal** 11:*6, 19* 104:*15* 112:*10, 11* 115:*2, 8* 116:*12, 19* 117:*4, 8* 123:*5* 135:*22* 136:*7, 16* 177:*24* 178:*3* 187:*5* 193:*19* 198:*17* 226:*4* 269:*1* 273:*8, 11* 279:*5, 24* 280:*15, 25* 282:*1, 11* 284:*1*

**dealing** 22:*7*

**deals** 98:*10, 11* 109:*8* 110:*6* 116:*25* 142:*17* 172:*10, 15* 186:*6* 188:*5* 268:*25* 273:*10*

**death** 96:*25*

**debating** 167:*2*

**decades** 99:*2* 117:*10*

**December** 143:*16*

**decides** 145:*16* 169:*11* 170:*6*

**decision** 23:*11* 27:*15* 32:*20* 35:*15* 123:*9* 127:*12* 129:*4* 139:*25* 170:*12* 209:*24* 218:*11* 266:*3*

**decisions** 31:*5* 138:*13, 16, 17* 170:*24*

**declined** 120:*22*

**Dedman** 8:*1*

**deems** 198:*18*

**def** 246:*6*

**defeat** 105:*5*

**DEFENDANTS** 2:*14* 275:*18*

**defending** 45:*4*

**defense** 27:*1, 5* 134:*2, 14* 135:*2* 137:*22, 23* 144:*25* 145:*2, 6* 146:*22* 183:*10* 184:*8* 185:*2, 5*

**defenses** 148:*11*

**defensive** 149:*11* 192:*13* 195:*23*

**defer** 92:*18*

**defi** 90:*24*

**define** 241:*23* 242:*6, 15* 243:*2, 15, 17* 244:*6* 245:*7, 14*

**defined** 242:*18* 243:*16*

**defines** 248:*12*

**definitely** 11:*22* 17:*10* 54:*7, 13* 121:*16* 128:*9* 142:*13* 149:*1* 187:*17* 217:*11*

**definition** 17:*16* 30:*12* 65:*14, 24* 66:*1, 9, 13, 15* 67:*2* 68:*22* 70:*5, 20* 75:*10* 77:*21* 81:*18, 24* 82:*6, 12, 16* 83:*3* 90:*5, 13* 91:*2* 92:*5, 14* 93:*2* 150:*13, 19* 152:*18* 203:*23* 242:*4* 245:*1* 246:*7, 16* 247:*5, 14* 248:*1, 3, 6* 249:*3, 6* 250:*10* 253:*16, 24* 254:*2, 8* 255:*9, 24* 256:*8* 259:*11, 21* 260:*4* 262:*3, 9* 263:*1, 2* 266:*16, 21, 23* 267:*17, 18* 270:*12* 271:*18, 20, 21, 22* 273:*16, 22, 24* 274:*5, 8, 9, 10, 19, 23*

**definitions** 65:*12* 83:*10* 267:*6*

**Definitive** 117:*22* 277:*10*

**degree** 7:*15* 8:*14*

**Delaware** 137:*7, 13* 138:*2, 3* 145:*20* 156:*2*

**deliberated** 218:*10*

**delineate** 250:*15*

**delineated** 58:*16*

**delivered** 197:*13, 14*

**delta** 197:*24*

**denied** 200:*13*

**Denis** 198:*9* 277:*3*

**Denis's** 242:*11*

**denominator** 34:*24*

**denoted** 57:*25*

**deny** 125:*19* 156:*9, 21* 180:*2*

**depend** 211:*14* 235:*10*

**depends** 8:*9* 67:*7* 70:*23* 71:*23* 72:*12* 73:*2* 93:*8* 94:*2* 116:*22* 203:*22*

**deponent** 46:*17* 285:*5*

**DEPOSITION** 1:*10* 5:*7* 6:*4* 39:*10* 42:*16* 43:*19* 44:*23* 45:*23* 46:*13* 95:*14* 275:*23* 278:*20* 284:*19, 21* 285:*7* 287:*7*

**depositions** 20:*20* 39:*7* 45:*4* 79:*19* 103:*12*

**derivatives** 213:*19*

**describe** 10:*9* 11:*3* 47:*16* 48:*4* 243:*8*

**described** 31:*19* 34:*14* 73:*18* 74:*21* 143:*6*

**describes** 223:*22*

**describing** 31:*7* 202:*1* 226:*12*

**DESCRIPTION** 3:*12*

**desire** 89:*25* 127:*24*

**desires** 9:*14*

**destroyed** 52:*14*

**detail** 132:*22*

**detailing** 60:*10*

**details** 269:*8*

**determination** 128:*23*

**determine** 254:*12*

**determined** 88:*7* 100:*6, 24* 120:*2* 139:*15* 155:*21*

**determines** 169:*18*

**development** 147:*7*

**developments** 146:*24* 147:*2, 9*

**dialogue** 187:*18* 243:*6* 244:*8* 248:*4*

**dictated** 233:*3*

**dictation** 233:*4*

**die** 184:*5*

**different** 51:*25* 92:*8* 101:*13* 110:*3, 4, 10* 111:*9* 117:*13* 135:*23* 136:*1, 7* 153:*8, 11* 176:*12, 15, 18* 188:*16* 216:*14* 240:*6* 249:*11* 256:*12, 16* 257:*16* 260:*12* 262:*4, 8* 266:*22* 267:*6, 13* 268:*3* 271:*19*

**differently** 109:*25* 192:*11* 219:*22*

**differing** 109:*1* 263:*7*

**difficult** 167:*5* 179:*2*

**difficulty** 131:*2*

**diligence** 142:*22* 247:*2* 248:*24*

**diligent** 262:*16* 264:*22* 268:*14* 269:*8*

**diligently** 269:*1*

**direct** 240:*8* 275:*15* 276:*5* 279:*17*

**direction** 12:*21* 24:*15, 19*

**directly** 24:*4* 62:*21* 184:*12, 13*

**Directors** 4:*8, 11* 16:*5* 118:*1* 145:*21* 184:*12* 215:*18* 236:*12, 24* 237:*19*

**Dirks** 9:*24* 84:*15*

**dis** 163:*20* 248:*5*

**disagree** 104:*3* 106:*8, 11* 108:*22* 109:*3* 206:*6* 243:*13* 249:*3*

**disagreement** 111:*1*

**disappointed** 224:*19*

discharge 194:*1*, *13* 265:*14*

discharging 268:*15*

disclose 118:*15* 119:*7, 9* 130:*25* 131:*16* 157:*18* 158:*21* 159:*5, 6, 24* 160:*8, 23* 167:*20* 168:*9*

disclosed 75:*7* 92:*4* 93:*4* 148:*17* 149:*2* 167:*17* 168:*10* 180:*25* 203:*4, 15* 260:*10, 14, 18* 261:*7*

disclosing 149:*14* 161:*24* 162:*13*

disclosurable 148:*19*

disclosure 80:*23* 104:*19* 148:*22* 153:*16* 156:*10, 22* 158:*13* 160:*4, 12, 14, 15* 163:*20, 21, 25* 164:*4, 5* 167:*20* 169:*2, 11, 19* 170:*8, 17* 206:*2, 3, 12* 261:*10*

disclosure/notification 202:*18* 221:*24*

disclosures 18:*19* 157:*3*

Discounted 189:*1*

discouraged 207:*18* 208:*3*

discouraging 206:*23* 207:*4, 15, 22, 23* 208:*7*

discovery 28:*3, 8* 33:*13, 15* 36:*6*

discretion 24:*25*

discuss 69:*20* 101:*23* 102:*1, 2* 113:*1, 2, 7* 123:*16* 132:*22* 206:*24* 208:*24* 224:*20*

discussed 9:*20* 21:*5* 48:*2* 53:*7* 67:*16* 73:*10* 99:*4* 150:*3* 188:*17* 216:*21* 227:*19* 240:*24*

281:*25* 282:*10*

discusses 135:*3*

discussing 83:*6* 281:*3*

Discussion 4:*4* 183:*22* 224:*23*

discussions 16:*11* 29:*13, 18* 120:*4* 124:*1* 161:*25* 162:*6* 181:*20* 183:*18, 21* 208:*23* 211:*18* 218:*19* 219:*4, 10, 14*

disingenuous 263:*21, 23*

dismiss 23:*12, 18* 30:*19* 31:*11*

dispute 98:*1* 104:*3* 121:*22* 122:*13, 15* 147:*13* 170:*9* 179:*19*

dissertation 11:*24, 25* 12:*14, 24, 25* 13:*11, 15, 21* 14:*1, 2*

distinguish 267:*20*

distraction 124:*1*

DISTRICT 1:*1, 2* 5:*9, 10* 38:*22* 110:*14, 15*

Dixon 4:*14* 20:*12* 228:*1, 4* 229:*4, 15, 21* 231:*2* 233:*13, 25* 234:*6*

Dixon's 232:*23* 233:*24*

Doctor 131:*10* 199:*21*

doctors 174:*25*

document 6:*13* 21:*13* 80:*6* 113:*9, 25* 130:*8* 182:*22* 186:*16* 188:*23* 210:*13* 217:*6* 224:*1* 228:*10, 14, 21* 244:*13, 18, 22* 283:*17*

documents 17:*1* 18:*21* 19:*1, 4* 21:*9, 10, 14, 16, 25* 22:*17, 25* 23:*11, 22* 24:*8, 24* 25:*10, 11, 15* 26:*8, 17, 18* 28:*2, 5, 7, 8, 9, 14, 18, 21, 24* 31:*22, 25* 32:*1, 3, 13, 21* 33:*2, 5, 7, 10, 12, 13, 14, 15*

34:*4, 15, 16, 19, 25* 35:*1, 2, 5, 9, 25* 36:*7, 8, 16, 25* 37:*4, 9* 41:*11* 50:*23* 64:*10* 96:*8, 10* 102:*21* 239:*9* 242:*13* 243:*7* 248:*5, 14* 250:*20* 260:*16* 262:*10, 11* 277:*14* 279:*4, 22* 280:*9, 14* 282:*8*

doing 6:*4* 10:*25* 21:*19* 34:*9* 41:*19* 42:*15* 62:*1* 76:*15* 79:*13* 110:*5, 7* 190:*18* 195:*22* 198:*24* 220:*8, 17* 221:*6, 13* 243:*18* 248:*21* 250:*1, 5* 260:*9* 269:*1* 272:*25* 274:*15*

Dowd 2:*4, 9, 16* 6:*2* 22:*8, 11* 24:*4* 65:*11*

Doyle 37:*23* 38:*3* 40:*6*

dozen 216:*9*

Dr 5:*25* 6:*24* 16:*25* 18:*11* 27:*10, 14* 28:*14, 17, 19* 29:*16* 33:*2* 34:*19* 35:*9* 36:*10, 14, 19* 37:*7, 19* 38:*7* 40:*18* 41:*11, 21* 47:*11* 59:*8* 64:*16* 78:*8, 16* 80:*16* 89:*10* 94:*25* 95:*13* 97:*16* 99:*19* 102:*4, 21* 103:*5, 8, 9* 104:*15* 132:*16* 134:*19, 23* 142:*19* 153:*3, 12* 154:*9, 11, 25* 155:*5, 12* 160:*19* 164:*10* 166:*17, 23* 168:*15* 171:*4, 5* 172:*16* 178:*17, 18* 179:*20* 181:*7* 183:*9* 188:*11* 201:*3* 210:*2* 227:*19* 241:*10, 19* 242:*9, 11, 12, 16* 243:*7, 17* 244:*21, 25* 245:*4, 5, 7, 12, 13* 247:*18, 23* 248:*10, 17* 249:*3, 19*

250:*7, 11, 17* 251:*2* 252:*12* 254:*9* 255:*10* 256:*6* 258:*16, 20* 261:*13* 262:*9* 263:*22* 267:*3, 21* 268:*20, 23* 273:*4* 274:*24* 275:*21, 24* 276:*2, 9, 17, 20, 24* 277:*2, 7, 21, 23* 278:*2, 4, 6, 14, 23* 279:*3, 11, 22* 280:*10, 13, 20, 24* 281:*4, 9, 13, 17, 23* 282:*18, 21* 283:*8, 9, 10*

draft 24:*22* 25:*4* 64:*11* 218:*4* 264:*17*

drafted 24:*24* 25:*2* 54:*16, 23* 282:*25*

drafting 264:*8*

draw 127:*20*

drawing 138:*15* 253:*5*

drawn 31:*15*

due 142:*22* 166:*13* 199:*6* 247:*1*

duly 5:*20*

duration 192:*22*

Duties 4:*8* 55:*14* 198:*23* 265:*14* 268:*16*

< E >

e.g 45:*20* 47:*5*

earlier 29:*18* 36:*24* 44:*15* 70:*2* 73:*10* 89:*9* 123:*20* 128:*13* 145:*9* 152:*11* 187:*25* 209:*20* 221:*15, 20* 227:*19* 238:*23* 240:*24* 246:*9* 257:*22* 265:*10* 266:*3* 280:*9* 283:*18*

early 108:*17* 109:*19* 110:*24* 147:*5* 160:*8* 181:*21* 214:*15*

earning 263:*12*

earnings 185:*22, 23* 186:*2* 263:*15, 18, 25* 264:*3*

easier 79:*11*

Eastern 5:*6*

**easy** 76:7 273:17, 18 274:1
**EBITDA** 190:13, 24
**ECF** 51:1 65:7
**econ** 175:23
**economically** 153:16 163:21 164:1, 7
**economics** 30:3 35:13
**Eddie** 4:14 229:4, 22 230:1, 2
**edits** 25:4, 6, 8
**education** 9:10 17:20 84:19
**educational** 7:12
**EE** 46:5
**effect** 13:3 156:10, 11 157:4
**effectiveness** 185:4
**efficiency** 11:16 31:10
**efficient** 30:19
**efficiently** 95:14
**effort** 225:17, 19 230:22
**efforts** 58:12 59:1 60:21 128:21
**eight** 19:3 21:13 23:22 25:9 26:16 28:7, 9 31:22, 25 32:3, 10 33:5, 7, 10, 23 34:4, 7, 10 35:12, 25 36:7 96:10
**either** 18:7 31:14 39:8 63:6 93:15 118:16 122:15 182:14 206:8 287:13
**elect** 184:11
**eleven** 201:19
**eligible** 9:12
**else's** 135:12
**Email** 3:23 4:13, 14 22:13 24:1 53:5 79:9 80:6 129:20 205:24 210:11 227:24 232:22 234:7 238:23 239:5, 17 240:2 246:23 250:20 264:9, 12, 17 267:22 268:12

**emails** 20:25 21:2, 23 54:9, 11 129:21 210:3 211:24 222:3 248:4 256:18 258:21 261:24 268:10
**E-mails** 208:21 209:1
**Emerson** 3:23 48:10, 13 49:1, 14, 16, 20, 24 50:12 51:10 55:21 56:5, 14, 21 57:4, 8, 19 58:12 59:1, 15 60:20 61:11, 22 68:15 105:6, 22 106:23 107:1, 4, 6, 8 108:1, 5 109:5 111:12, 18, 20 112:13, 23 113:13, 14 114:17 115:14, 24 118:20 126:3, 20, 23 127:6, 22 128:14, 20 132:25 135:24 136:20 139:2, 7 141:5, 9, 12 142:13 143:17 145:9 146:16 147:6 149:5, 20 151:1, 12 167:17, 20, 22 168:7 177:10, 15 203:1 220:1, 5, 17, 23 221:6, 13 223:7, 22 224:25 225:5, 6, 9, 23 227:19 228:5 232:24 234:20, 24 235:15, 18, 20 236:19, 23 237:4 238:6, 10 242:20 243:4 244:8 245:11 248:16 249:1 250:19 258:17 259:1, 8 260:6, 10, 18 261:3, 14 263:12 264:9, 18 270:23 271:8 272:10, 16 276:12 277:16 279:6, 24 280:15, 25 282:1, 12 283:14, 18 284:12
**Emerson-National** 18:22
**Emerson's** 18:19 48:11 50:14 57:10 104:17, 19 106:7, 23 113:23 114:3 118:1 129:5 148:10 149:23

203:19 223:10, 13 225:13 226:11, 12 234:9 238:14, 15, 16, 20 241:12 253:17 254:1 260:20 263:18 264:3 277:9 281:22
**Empirical** 4:1 12:2 135:11
**employ** 93:15 97:8
**en** 267:16
**encompass** 48:18
**ended** 32:2, 9 53:23 153:1
**endlessly** 151:15
**ends** 143:11
**engage** 123:25 142:18 223:17, 23 224:22 225:24
**engaged** 225:17 241:14 242:14 243:12 245:14 248:15, 20 249:1 253:1 263:9, 13 264:4, 10, 25 265:6, 19 268:17 276:11 277:15 278:10
**engagement** 4:6 49:15 133:11 135:17, 20 142:20 168:13 192:13, 14, 23 193:14 241:20, 24 242:4, 16, 19 243:2, 9 244:7 245:8 246:7, 17 247:5, 15, 18 248:7, 22, 25 249:4, 10, 15, 20, 23, 25 250:8, 11, 16, 23 251:9, 13, 17, 21, 25 252:15 253:1, 8, 12, 16, 19, 25 254:2, 6, 9 255:2, 9, 20, 21 256:8 257:17 258:5 259:11, 12, 21, 22 260:5 261:8, 21, 22, 25 262:1, 3, 9, 13, 16, 24 263:2, 3, 7 264:19 266:11, 17 267:3, 5, 13, 17, 23 268:2, 6, 13, 19 269:12, 24 270:13 271:12, 19, 21, 22, 23 272:19, 24 273:2, 7,

13, 16, 19 274:5 276:18, 22 277:10, 21 278:4, 16 279:13, 16 280:5, 10, 21 281:4, 10, 17, 24 282:18, 23 283:1 284:1, 4
**engaging** 145:8 247:3 249:12
**English** 72:1 119:5 178:24 252:7
**enjoy** 178:20, 25 179:21
**enjoys** 180:4
**ensure** 29:15 45:22
**enter** 143:15
**entered** 177:22
**enterprise** 114:21 115:10, 14
**enters** 11:7, 10
**entire** 17:1
**entirely** 111:12, 18
**entirety** 15:18
**entitled** 51:4 214:15 225:12 251:5
**enumerate** 28:4
**enumerator** 34:23
**EPS** 190:24
**equals** 33:23
**equity** 14:12 114:20
**equivalence** 8:15
**equivalent** 8:8 9:5 20:25 136:14
**ERRATA** 286:1
**escalate** 140:15 201:24 202:3
**escalating** 58:12 59:1
**escalation** 140:10
**especially** 112:3
**essence** 164:3
**essentially** 146:19
**EST** 4:16
**established** 260:8 261:19 271:20
**estimate** 226:23
**estimated** 121:10
**et** 23:12 36:5 143:6 165:15 189:2
**Eugene** 30:18 31:11
**evade** 75:16
**evaded** 259:15

event  13:7, 8, 16, 18, 22, 25  14:3, 15, 18, 25  15:2, 6, 8, 12, 15  67:8  70:24  71:4, 24  72:13, 18  73:3  76:20  88:8, 9  93:10, 11  94:4, 5  96:24  97:22  98:17  99:7  100:7, 8, 25  101:1  102:5, 7  148:19  149:1, 14  150:5, 6  153:21, 25  164:10, 15, 19, 20  167:1, 2  168:21, 23  169:6  208:24  249:8  265:25  287:13

events  20:3, 17  67:6  93:7, 8  94:1, 2  178:2  251:16  265:11

eventually  178:2  185:19

Everest  5:14

everybody  146:6

everyone's  42:2

evidence  9:8  29:2, 11  30:8  38:23  50:23  69:4  70:14  128:6  141:8  147:16  198:10  204:11  205:5  209:13  210:1, 14, 24  211:2  212:21  213:4  220:15, 20  222:20  233:7  234:13, 18  244:19  248:13  273:3  277:14  281:24  282:9

exact  53:5, 21  101:24  108:3, 13  139:14  169:4  177:5, 8  187:25  220:2

exactly  25:25  34:8  54:19, 23  58:5, 17  61:19  62:2, 12  73:18  74:21  87:2, 23  103:16  109:7, 11  115:17, 23  123:14  128:15  139:10  177:21  195:25  208:18  222:1  231:11  284:9

EXAMINATION  3:6,

7  5:23  46:15  275:19

examined  5:22

examining  47:2

example  16:3  20:24  29:8  155:22  234:14  276:21  277:20  278:3, 14  281:3, 16

examples  113:1  158:8, 11  200:12  257:22  276:23  279:15  281:7

excerpts  178:6, 13

Excl  189:2

exclusively  110:5

Exec  4:16

executed  195:18, 24

Executive  229:18

executives  20:2  21:6

EXHIBIT  3:13, 16, 19, 22, 23  4:1, 4, 6, 8, 9, 13, 14  6:22, 24, 25  7:4  27:10  35:2  36:3  37:18  44:6, 9  46:6  65:1  103:3  113:16  129:23  164:17  171:1  178:9  182:3, 5, 10  189:18  193:7  200:25  201:1  216:5  227:14, 17  228:12  240:6, 10, 12  266:5, 6, 8  269:21  275:23  278:20

EXHIBITS  3:10, 11  7:7

exist  156:1  188:12

existence  157:18

exists  47:9

expand  133:7  134:5

expanded  246:20

expect  267:25

expedience  130:16  239:22  240:19

expediency  131:25

expeditiously  117:21

experience  10:9  15:20, 22  18:2  47:17  51:24  66:10  109:7  110:18  115:1  132:23  133:15  140:5  142:17, 25  145:12  157:2, 13, 24  158:7, 8, 10  159:9,

20  160:3  161:4, 10  162:11, 12  175:7  187:9, 22  200:19  209:4  218:6  268:24  273:9

experienced  110:13

Expert  3:13, 16  6:6, 9  14:5  15:13  22:18  26:19  29:6  30:1  31:13  48:21  55:8  119:6  160:4  170:20

Experts  103:11  170:23  174:16, 17  218:10

expires  287:25

explain  8:6  49:10  199:23  256:24  258:13

explanation  257:2, 4, 7

explicitly  127:17

explore  165:5, 10, 11

exploring  166:8, 13  168:7, 24

expressed  51:25  106:14  282:21

expressing  47:19  204:16

extend  126:13  128:16  236:6

extending  142:21

extends  31:2

extensively  137:12

extent  195:7  196:4

extra  37:9  275:23

extremely  187:21

eyes  186:7


< F >

face  29:11  146:7

facilitate  236:22

facilitating  187:18

fact  56:25  80:20, 23  89:3  101:23  106:22  116:24  126:4  135:12, 22  139:1  147:1  196:16  207:22  208:17  217:18  219:19  232:14  237:3

238:21

factfinder  100:9

factor  129:5

factors  128:22

facts  40:20, 21  89:23  90:6  149:22  161:8  176:19  209:12, 25  210:13, 23  212:20  213:3  220:14, 20  222:19  233:16  234:5  251:24  281:24  282:9

fail  156:1

failed  235:18

failing  117:17  159:4

failure  158:21

fair  45:22  197:6  198:19  199:9, 16  278:22

fairly  104:23

fairness  16:9, 16  197:3, 7, 10, 12, 13, 14, 17, 22, 23  198:7, 11, 17, 18, 21  199:8, 9, 15  200:14, 20

false  260:21

Fama  30:18  31:11

familiar  8:7  29:22  30:21, 23  44:12  77:2  113:25  137:4  154:23, 25  155:6, 10, 14  170:2  171:4  174:13  178:14  179:6  195:23  201:5, 11  225:2  228:14

far  10:24  11:10  13:1  26:13  31:10  34:24  59:23  69:11  70:15  73:11  92:5  110:1  111:9  145:24  187:14, 19  233:10  250:20  257:23

farther  93:6

fashion  147:22

favor  196:25

feasible  130:15  239:22  240:19

federal  9:8  44:20  85:14  88:11  104:7  110:12  140:3

**fee** 192:*17, 21* 196:*14, 15, 17*
**feel** 42:*1* 95:*9* 131:*10* 149:*7, 12, 14* 161:*2* 263:*6* 279:*10* 282:*20*
**fees** 196:*9*
**felt** 11:*1* 13:*3* 23:*1* 26:*1* 55:*17* 197:*6, 18*
**fend** 185:*7*
**fiduciary** 143:*22* 198:*23* 265:*14, 23* 268:*15*
**field** 30:*2* 188:*24* 189:*5* 190:*1, 2, 22*
**fight** 231:*11* 232:*13, 16*
**figure** 115:*19*
**file** 236:*21*
**filed** 5:*9* 6:*10* 36:*10* 272:*13*
**Filings** 17:*12, 13* 18:*17* 27:*14, 25*
**final** 24:*25* 25:*1, 8, 21* 177:*24*
**finally** 45:*22* 177:*18, 24*
**finance** 11:*13, 25* 12:*1* 17:*24* 30:*13, 15, 20* 31:*2, 3, 9, 18* 35:*13* 138:*7* 265:*22*
**financed** 115:*5*
**financial** 110:*15* 147:*23* 174:*16, 17* 185:*5* 192:*16* 195:*7, 8, 14* 199:*10* 267:*24* 269:*9*
**financing** 118:*7*
**find** 60:*1* 77:*7* 78:*10* 100:*10* 124:*16* 125:*14* 126:*14* 127:*1* 128:*2* 186:*14* 198:*17, 20* 199:*8* 234:*8* 236:*8* 239:*8*
**finding** 183:*20* 236:*8* 269:*13*
**finds** 173:*20*
**fine** 79:*13* 167:*4* 226:*21*

**finish** 39:*15, 19* 95:*13* 194:*12, 16* 198:*1* 254:*25*
**finished** 37:*12* 275:*4*
**finishes** 39:*23*
**firepower** 265:*17*
**firm** 6:*2* 22:*8* 24:*4* 145:*17* 155:*16* 178:*19, 25* 180:*4, 25* 185:*2* 186:*9* 201:*15* 208:*17* 253:*17* 254:*5* 255:*7, 19*
**Firmly** 217:*21*
**firmness** 203:*16*
**firm's** 179:*20* 185:*5*
**first** 5:*20* 8:*8* 10:*13* 18:*5, 6* 20:*20, 23* 23:*15* 26:*5, 7* 29:*3, 4, 11* 32:*19* 37:*12, 13, 16* 48:*13, 24* 53:*22* 63:*15* 82:*16* 86:*3, 15* 88:*19* 89:*20* 97:*20* 99:*20* 102:*10, 17* 109:*22* 114:*3, 7* 116:*2* 130:*19* 131:*16* 132:*18, 25* 144:*2* 155:*24* 157:*23* 168:*12* 171:*9, 12* 176:*5* 178:*19* 184:*20* 185:*21* 187:*20* 192:*7, 8, 10* 193:*1, 10, 11* 194:*17* 201:*9* 206:*21* 215:*4* 222:*8* 223:*16, 18* 230:*7* 232:*7* 262:*12* 278:*2* 281:*25* 282:*10*
**fit** 55:*14*
**five** 34:*10, 19* 35:*8* 43:*17* 80:*6* 122:*25* 173:*16, 22* 175:*5* 176:*8* 182:*25* 203:*2* 226:*25* 227:*6* 256:*15*
**five-minute** 226:*19* 227:*3*
**fixed** 192:*21*
**fkaram@rgrdlaw.com** 2:*6*
**flawed** 149:*25* 241:*11* 248:*12* 277:*9,*

*13* 279:*4, 23*
**Flexibility** 201:*23*
**flight** 79:*15* 199:*21*
**flip** 134:*7* 155:*18*
**flipped** 198:*12*
**Flow** 189:*1*
**fluctuations** 166:*20*
**focus** 9:*5* 171:*17*
**focused** 11:*25* 61:*7* 94:*23* 95:*2*
**focusing** 144:*8, 17*
**folder** 24:*2, 7*
**follow** 105:*17*
**followed** 19:*19* 168:*8* 205:*23* 207:*3*
**following** 132:*24* 184:*4* 208:*7* 214:*13* 251:*19*
**follows** 5:*22* 137:*18*
**Follow-up** 3:*25* 25:*14*
**football** 131:*11* 188:*24* 189:*5* 190:*1, 2, 22*
**footnote** 67:*13* 184:*20* 192:*20* 236:*17* 237:*25* 281:*12, 13*
**forecast** 141:*4*
**foreclose** 144:*25* 145:*3, 7* 146:*10*
**forego** 80:*2*
**foregoing** 285:*7* 287:*8*
**foresee** 143:*19*
**forget** 239:*10*
**forgive** 27:*19* 71:*13* 83:*23* 97:*16* 131:*10* 243:*18*
**forgot** 74:*8*
**form** 11:*8, 21* 12:*10, 23* 13:*10, 24* 14:*17* 15:*7, 14, 23* 16:*6, 19* 17:*22* 18:*10* 19:*14, 21* 20:*18* 21:*1, 8* 22:*19* 23:*13* 27:*6* 29:*12* 31:*17, 23* 32:*7, 15, 23* 33:*6, 24* 34:*12, 21* 35:*3, 10* 36:*1, 12, 21* 37:*15, 25* 40:*24* 41:*8, 13* 42:*24* 43:*2*

45:*4, 11* 46:*23* 47:*25* 49:*11* 50:*7, 19* 52:*2, 16* 53:*8* 54:*10, 18* 55:*3, 4, 22* 56:*7, 16, 23* 57:*6, 15, 21* 58:*4, 9, 14* 59:*3, 17* 60:*8, 22, 25* 61:*13, 17, 25* 62:*9, 17, 20* 63:*2, 7, 14, 22* 64:*1, 7* 65:*25* 66:*12* 67:*20* 68:*3, 9, 21* 69:*2, 15, 25* 70:*12* 71:*2, 6* 72:*3, 10, 21, 25* 73:*8, 16* 74:*3, 7* 75:*3, 18* 76:*2* 77:*13* 78:*5* 81:*14* 82:*2, 8, 14* 83:*8, 18* 84:*11* 85:*3, 19* 86:*1, 21* 87:*22* 88:*13, 18* 90:*7, 19* 91:*1, 7, 14* 92:*2, 3, 13, 24* 93:*17* 94:*13, 19* 96:*11* 97:*5, 18* 98:*5, 22* 99:*13* 101:*18* 102:*11* 104:*5, 24* 105:*11, 24* 106:*9, 16, 25* 107:*7, 13, 25* 108:*12, 23* 109:*15, 24* 110:*16, 19* 111:*3, 22* 112:*15, 25* 113:*6* 114:*6* 115:*16, 22* 116:*14, 20* 118:*22* 119:*8, 15* 121:*15, 24* 122:*14* 123:*6, 19* 124:*7* 126:*5, 22* 127:*14* 128:*24* 129:*10* 130:*21* 131:*7, 23* 133:*20* 136:*9, 22* 137:*2, 25* 139:*4, 9* 140:*1, 21* 141:*15, 21* 142:*2* 143:*9, 24* 145:*4* 146:*14* 147:*3, 20* 148:*24* 149:*6* 150:*8* 151:*5, 19, 22* 152:*7, 25* 153:*7, 23* 154:*17* 155:*4, 17* 156:*13* 157:*6* 158:*15, 18, 24* 159:*25* 160:*17* 161:*17* 162:*2* 165:*17* 168:*2* 169:*22* 170:*10* 172:*12* 173:*13, 23* 174:*21* 175:*2, 17*

176:*3*  177:*12*  180:*5, 9*  181:*3*  184:*12, 14*  187:*12*  191:*2*  193:*21*  194:*15*  195:*16*  196:*18*  200:*15, 22*  202:*4, 23*  203:*21*  204:*10, 22*  205:*4, 11, 21*  206:*4*  207:*6, 17*  208:*8*  209:*5, 12, 25*  210:*24*  211:*8*  212:*10, 15, 20*  213:*4*  219:*21*  220:*11, 19*  221:*17*  222:*12, 19*  223:*12*  224:*11*  225:*1*  226:*15*  231:*1, 8, 17*  233:*11, 18*  234:*2*  235:*1*  236:*2*  237:*5*  238:*8, 25*  241:*25*  243:*5*  244:*10*  245:*9, 16*  246:*10*  247:*6, 13*  248:*8*  249:*5*  250:*13*  252:*16*  253:*9, 20*  254:*10*  255:*15*  256:*1, 9, 11, 20*  257:*3, 14, 19*  258:*8, 24*  259:*7, 13*  260:*22*  261:*17*  262:*5*  263:*5, 14*  264:*5, 11, 20*  265:*7, 20*  266:*13, 25*  267:*8, 19*  268:*7, 21*  269:*14*  270:*1, 14*  271:*6, 13*  272:*15*  273:*3, 20, 23*  274:*12*

**formal**  15:*20*  16:*1*  114:*3*  162:*24*  223:*19*  224:*24*

**formally**  18:*2*

**formation**  99:*25*

**formed**  66:*5*  166:*10*

**forming**  68:*18*  166:*8*

**forms**  30:*7*  54:*12*

**formulate**  38:*18*

**Forsyth**  2:*16*

**forth**  176:*2*  177:*20*  237:*19*  243:*3*  246:*8, 18*  248:*24*  267:*5*  271:*23*  274:*24*  287:*8*

**forward**  124:*13*  125:*13*  139:*19*  142:*24*  269:*1, 6*

**found**  105:*8, 22*  108:*18*  110:*25*  111:*10*  172:*16*  198:*16*  238:*9*  271:*8, 10*

**Foundation**  208:*1, 8*  220:*19*  224:*1*  233:*11*  237:*5*  253:*9*  256:*1*  257:*20*  259:*13*  264:*20*  271:*14*

**four**  25:*19*  26:*8*  117:*6*  120:*12*  121:*1*  157:*23*  176:*8*  177:*23*  179:*11*  224:*13*  227:*12*  243:*20*

**fourth**  215:*13*

**fragment**  72:*17*

**frame**  234:*25*

**frameworks**  10:*20*

**franchise**  149:*13, 15*

**FRANCIS**  2:*1*  5:*25*

**frankly**  23:*2*  24:*15*  99:*2*  138:*11*  141:*6*  188:*5*  214:*11*  255:*4*

**fraud**  169:*21*

**free**  171:*19*  174:*19*  200:*2*

**Friday**  1:*13*  5:*2*

**friend**  86:*23*

**friendly**  140:*19*  143:*7, 11*  144:*4*  146:*9, 23*  147:*18, 22*  148:*2*  186:*5*  187:*10, 15*  226:*4*  235:*11, 17*  236:*8*  238:*15*

**friends**  159:*13*  263:*24*

**front**  13:*14*  25:*23, 24*  105:*16*  108:*14*  120:*8*  129:*13*  165:*21*  168:*4*  171:*21*  186:*1, 12*  193:*3*  197:*18*  204:*13*  205:*22*  236:*4*  240:*3*  262:*20*

**frustration**  204:*17*

**fulfill**  9:*15*

**full**  9:*11*  79:*19*  99:*3*  166:*3*  168:*3*  199:*14*  215:*20*  287:*11*

**full-time**  10:*23*

**fully**  75:*7*  93:*3*  115:*4*

**Fund**  12:*5, 19*  13:*12*  123:*15*

**fundamental**  109:*21*

**fundamentally**  111:*1*  241:*11*

**funds**  123:*1, 12*

**further**  37:*18*  66:*19*  120:*4*  128:*16*  133:*7*  146:*23*  147:*1, 9*  162:*14*  281:*21*  284:*14*

**future**  89:*24*  111:*25*  112:*3*

**< G >**

**Gaining**  181:*20*

**gains**  186:*9*

**gather**  24:*19*

**Geller**  2:*4, 9*  6:*2*

**general**  23:*4*  36:*25*  65:*20*  155:*19*  156:*16*  175:*22*  231:*14*  256:*18*

**generalities**  176:*10, 16, 18*  188:*17*

**Generally**  25:*5*  31:*13*  47:*16, 23*  51:*25*  115:*5, 7*  123:*13*

**Generate**  12:*6*

**generation**  10:*14*

**getting**  8:*11*  99:*22*  131:*14*  138:*18*  162:*25*  218:*10*

**GILROY**  2:*8*

**gist**  128:*10*

**give**  15:*20*  24:*1*  66:*11*  90:*18, 23*  132:*3*  144:*12*  155:*19*  158:*8*  182:*25*  184:*23*  200:*12*  241:*8*  247:*9*  257:*4, 6*

**given**  16:*17*  54:*3*  81:*18, 25*  82:*7*  84:*9, 10*  85:*18*  100:*21*  122:*21*  131:*2*  149:*21*

**gives**  113:*20*

**giving**  138:*22*  140:*4*  145:*11*  169:*13*  257:*22*

**glasses**  79:*1*

**go**  6:*18*  12:*11*  16:*7*  21:*12*  25:*9, 20*  26:*23*  27:*9*  34:*22*  43:*12, 21*  44:*14*  46:*8*  47:*11*  53:*1*  67:*24*  68:*17*  78:*18*  79:*19*  80:*5, 19*  85:*7*  95:*24*  96:*15*  100:*3*  104:*10*  105:*1*  112:*23*  114:*14*  118:*13, 21*  119:*13, 18, 20*  129:*3*  131:*6*  132:*6, 16*  134:*9, 17*  141:*20, 25*  145:*10*  146:*14, 18*  152:*14*  155:*19*  165:*8*  166:*5, 15*  167:*3*  170:*25*  172:*2*  173:*1*  178:*5, 12, 14*  182:*16*  183:*23*  184:*18, 19*  186:*3*  188:*19*  189:*22*  190:*6, 12*  193:*10*  198:*4*  199:*15*  201:*11*  204:*1*  206:*13*  208:*13, 20*  210:*4*  211:*21*  213:*5, 14*  214:*15*  217:*4, 7*  221:*14*  223:*6*  225:*12*  226:*2*  227:*6*  235:*6*  237:*22*  238:*17, 20, 21*  251:*2*  257:*7*  258:*12*  263:*21*  265:*9*  267:*11*  269:*23*

**goal**  237:*10*  243:*12*

**goals**  10:*24*

**goes**  68:*22*  142:*8*  168:*22*  187:*9*  200:*5*  212:*19*  249:*22*

**going**  6:*12, 17, 22, 23, 24*  12:*4*  21:*19*  27:*9*  29:*17, 25*  33:*22*  38:*4, 20*  39:*24, 25*  40:*14*  42:*8*  43:*11*  44:*5, 18*  46:*3*  48:*23*  49:*6*  55:*14*  58:*15*  59:*4*  60:*21*  64:*13*  79:*16*  83:*6*  90:*14*  95:*7*  96:*3*  105:*17*  113:*9,*

*21* 114:*5* 117:*3* 119:*12* 120:*16* 134:*23, 25* 135:*15* 138:*13* 139:*16, 18* 141:*5, 16, 25* 144:*14* 146:*12* 148:*21* 149:*16* 150:*23* 154:*10, 12* 155:*22* 159:*10, 17* 163:*18* 165:*5* 168:*11* 171:*17* 174:*25* 181:*9* 182:*17, 20* 183:*1* 184:*23* 191:*15* 195:*21* 196:*1, 2* 197:*19* 199:*8, 23* 200:*3, 11* 206:*9* 211:*14* 212:*1* 215:*25* 216:*19* 221:*1* 222:*13* 224:*5* 226:*21* 228:*25* 232:*10, 13* 237:*25* 238:*1* 240:*21* 245:*4, 17, 19* 246:*18* 247:*9* 248:*21* 250:*10* 254:*25* 256:*17, 22* 258:*4, 12* 260:*3* 273:*11* 275:*4*

**Good** 5:*25* 7:*11* 14:*9* 83:*24* 104:*10* 109:*8, 11* 138:*14* 151:*8* 154:*13* 159:*12* 170:*4* 181:*1* 189:*22* 194:*25* 209:*6* 210:*16* 212:*4* 214:*11* 231:*20* 249:*24* 250:*1, 22* 255:*3* 256:*3* 265:*12, 13, 22* 267:*24* 268:*14*

**GOODWIN** 1:*10* 3:*4, 13* 5:*7, 18, 25* 16:*25* 38:*7* 40:*18* 41:*21* 47:*11* 59:*8* 64:*16* 78:*8* 80:*16* 95:*13* 97:*16* 103:*7, 8* 104:*15* 132:*16* 134:*19* 160:*19* 171:*5* 183:*9* 201:*3* 227:*19* 244:*21* 245:*4, 12* 252:*12* 256:*6* 263:*22* 275:*21* 277:*3, 7* 283:*9* 285:*14*

**Goodwin's** 7:*4* 78:*16* 277:*8*

**governance** 13:*12* 14:*13* 212:*4*
**grand** 194:*7* 265:*5*
**grant** 8:*21*
**graph** 164:*18*
**gray** 190:*4*
**ground** 79:*23* 145:*21*
**grounding** 145:*17*
**Group** 24:*6, 8, 10* 25:*10* 29:*9, 14* 32:*13* 225:*18*
**guess** 9:*4* 18:*12* 22:*3* 39:*8* 50:*8* 56:*9* 59:*22, 23* 61:*1* 62:*1* 71:*20* 73:*2* 75:*5, 20* 89:*12* 93:*20* 98:*7, 14, 17* 101:*13, 22* 107:*4* 111:*7* 116:*17, 22* 123:*13* 134:*12* 144:*21* 159:*7* 160:*1, 20* 163:*14* 168:*22* 213:*10* 243:*10* 253:*11* 261:*6*
**guidance** 160:*5, 7* 161:*4*
**guide** 170:*23*
**Gulf** 9:*23* 84:*15* 90:*3*

**< H >**
**hac** 38:*22*
**half** 73:*7* 115:*7* 216:*9*
**hand** 23:*16*
**happen** 47:*23* 103:*10* 115:*9* 116:*25* 126:*16* 154:*1* 202:*13* 272:*1*
**happened** 138:*17* 176:*11* 177:*25* 202:*11* 204:*9* 211:*1* 222:*11*
**happening** 16:*9* 273:*17*
**happens** 196:*4*
**happy** 113:*2, 7* 156:*24* 157:*9* 198:*14* 232:*4*
**harassing** 38:*1, 8*

75:*19* 131:*8*
**harassment** 38:*3*
**harbor** 145:*21*
**hard** 112:*3, 17* 261:*6*
**Hart-Scott-Rodino** 236:*21*
**Harvard** 7:*23*
**hate** 76:*23*
**head** 78:*19* 86:*20, 25* 87:*19* 88:*22* 113:*5* 118:*23* 131:*14* 155:*2*
**headed** 113:*22*
**heading** 27:*16* 89:*19* 96:*16* 114:*14* 117:*19* 118:*5* 186:*4* 235:*15* 279:*3, 18* 280:*8*
**hear** 116:*22* 174:*25* 232:*4*
**heard** 40:*22* 189:*5*
**He'd** 124:*9*
**hedge** 12:*5, 19* 13:*12*
**height** 185:*6*
**Held** 2:*22* 5:*12* 137:*8*
**help** 24:*9* 49:*6* 79:*2* 148:*5* 170:*23*
**helped** 17:*20, 23* 35:*2*
**helpful** 21:*21* 49:*18*
**henceforth** 45:*18* 241:*19*
**hereinafter** 195:*3*
**hereinbefore** 287:*8*
**hereunder** 193:*14*
**heuristics** 31:*4, 11*
**high** 105:*12* 116:*7* 117:*7* 121:*2* 127:*18* 189:*8*
**higher** 48:*12* 49:*8, 13* 50:*16* 57:*11* 107:*19, 24* 108:*7* 112:*13* 115:*2, 5* 116:*18* 120:*23* 126:*24* 136:*2, 3, 17* 139:*2, 7, 24* 141:*13* 143:*21* 144:*4* 156:*20* 157:*3* 254:*8, 12* 255:*9, 16*
**highest** 127:*6, 10, 25* 128:*14*

**highlight** 105:*18* 218:*19*
**highlighted** 13:*2* 16:*12* 17:*4* 24:*5* 25:*22* 101:*20* 130:*13* 239:*19* 240:*16* 249:*7, 19*
**highly** 196:*23*
**hint** 206:*3*
**hints** 112:*22*
**hiring** 109:*8* 147:*23* 255:*19* 267:*22* 268:*11* 273:*6*
**historical** 113:*21* 214:*21*
**history** 53:*13* 225:*23* 226:*11*
**HOFMAN** 2:*15*
**Hold** 14:*8* 29:*25* 30:*8* 31:*7* 89:*3, 25* 127:*13* 128:*4* 181:*23* 184:*18* 239:*16*
**holder** 228:*9*
**holding** 29:*10*
**holdings** 91:*12* 92:*1*
**holistic** 16:*13* 77:*23*
**holistically** 75:*12* 142:*11*
**Holmes** 37:*24* 38:*8* 40:*18, 23* 42:*22*
**home** 79:*15* 200:*4*
**honest** 84:*12* 102:*21* 109:*5* 174:*17* 177:*4* 179:*9* 187:*22* 195:*19* 199:*4*
**honestly** 85:*4* 127:*15* 173:*14*
**honored** 194:*23*
**hope** 39:*7* 60:*15* 219:*9* 246:*14*
**hopefully** 86:*8* 126:*9* 185:*19*
**hospital** 79:*14*
**hostile** 58:*13* 59:*2* 140:*10, 12* 141:*5* 144:*3, 25* 145:*3* 146:*10* 147:*22* 148:*3* 184:*14* 186:*5* 187:*4, 10* 188:*5* 201:*22*

202:2  225:*13*  226:*3*
235:*11*  237:*4*
**hostility**  186:*6, 7*
187:*2*
**hour**  42:*9*
**hours**  79:*13, 19*
227:*1*
**hug**  184:*13*  203:*16,
23*  204:*4*
**human**  30:*7, 10*
112:*14, 16*
**hundred**  35:*12*
179:*16, 18*  282:*25*
**hundreds**  109:*7*
**hypothetical**  128:*7*
170:*10*  212:*10*
**hypothetically**  157:*9*

< I >
**I]n**  236:*18*
**IBW**  92:*8*
**idea**  106:*14*  114:*9*
170:*15*  175:*10*
178:*23*  194:*22*
210:*18*  215:*21*  216:*8*
**identification**  7:*7*
44:*9*  46:*6*  65:*1*
103:*3*  113:*16*  129:*23*
171:*1*  178:*9*  189:*18*
193:*7*  201:*1*  216:*5*
227:*17*  228:*12*
**identify**  192:*17*  217:*9*
**ii**  48:*8*  54:*17*  55:*2*
57:*1*  58:*1, 6, 17*  59:*6*
61:*4, 19*  62:*13, 22*
63:*1, 4*  64:*3, 6*  68:*6*
73:*11*  75:*6*  76:*1, 8,
10*  77:*3, 7*  85:*1*
94:*18*
**III**  282:*10*
**Ilcisin**  20:*14*  209:*18*
229:*15*
**Illustrative**  215:*10*
219:*12*
**imaginary**  151:*18*
152:*3*  252:*22*
**imagine**  54:*11*  218:*9*
252:*5, 8*
**immaterial**  153:*16*
164:*1, 7*

**impact**  98:*13, 25*
104:*20*  153:*17*
156:*23*  164:*2, 8*
169:*6, 7*
**implement**  149:*11*
**Implementing**  148:*25*
**implication**  120:*24*
**implications**  138:*8*
**implicit**  251:*15, 21*
252:*3*  253:*4*
**implied**  162:*15*
189:*2*  190:*18, 19, 22*
**implies**  114:*19*
120:*19*
**imply**  120:*21*  152:*23*
255:*1*
**implying**  123:*12*
124:*24*  136:*7*  188:*2*
232:*8*
**important**  96:*24*
98:*17*  99:*3*  128:*17*
198:*3*  228:*25*
**imposed**  46:*1*
**improbable**  88:*9*
100:*8*  101:*1*
**improper**  128:*6*
244:*14, 20*  247:*22*
**improved**  111:*13, 20*
139:*22*
**Improvements**  236:*22*
**improving**  185:*18*
**imputed**  185:*19*
**inaccurately**  122:*21*
**inappropriate**  42:*3*
**inappropriately**  42:*16*
**inaudible**  182:*1*
**incentivized**  192:*16*
**inches**  100:*20*
**inclined**  237:*20*
**include**  34:*23*  76:*19*
89:*23*  190:*3, 5*  192:*1*
214:*17*  246:*22*
252:*23*
**included**  17:*11*  33:*7*
34:*5*  36:*16*  98:*15*
189:*6*
**includes**  138:*9*  192:*5*
**including**  213:*18*
248:*14*  277:*14*

**Inclusive**  16:*8, 11, 13*
69:*6*  150:*12*
**Incomplete**  128:*6*
154:*20*  155:*4*  182:*11*
279:*4, 23*
**incorporated**  137:*7*
**increase**  37:*1*  124:*17,
20*  125:*3, 15, 21, 25*
126:*2*  165:*16*  219:*15,
19*  235:*25*
**increased**  106:*24*
107:*8*  235:*20*
**increases**  214:*19, 20*
**increasing**  56:*14, 21*
57:*4, 20*
**independent**  137:*14,
20*
**index**  123:*12, 15*
**Indian**  175:*1*
**indicate**  117:*3*
276:*10*
**indicated**  93:*9*  94:*3*
128:*21*  238:*16*
**indicates**  228:*5*
**indicating**  117:*8*
155:*15*  238:*15*
**indicator**  117:*8*
**indicia**  48:*9, 25*
50:*11*  57:*7*  68:*14*
69:*3*  70:*18*  76:*11*
**individual**  24:*10*  30:*3*
**individually**  16:*12*
156:*7*
**individuals**  8:*10*
20:*17*  22:*9, 11*  24:*11,
12, 22*
**inference**  127:*20*
**influence**  31:*5, 15*
**influenced**  32:*13*
138:*16*
**inform**  163:*3*  170:*24*
**information**  11:*7, 11,
14*  16:*5, 18*  21:*6, 21*
22:*22, 23*  23:*24*
24:*19*  25:*20*  26:*14,
20, 21*  30:*5*  37:*20*
44:*19, 24*  59:*11*
65:*15, 19*  66:*2, 16, 20,
21, 23*  69:*8*  70:*5*
75:*10*  76:*16*  77:*21*

**Inclusive**

80:*25*  90:*9, 18, 24*
92:*6, 15, 22*  93:*3*
95:*22*  100:*12*  117:*7*
124:*15*  128:*3*  129:*7*
141:*1*  149:*23*  150:*14*
159:*7, 16*  163:*15*
169:*19, 20*  180:*13*
198:*10*  212:*2*  261:*20*
**informed**  203:*10*
**Initial**  206:*22*
**initiating**  183:*18, 21*
**in-person**  53:*6*  54:*3*
**Insensibly**  40:*20*
42:*22*  43:*1, 9*
**insider**  9:*22*  84:*14*
**insistent**  185:*7*
**instance**  8:*12*  31:*21*
198:*16, 20*
**instances**  200:*19*
**instruct**  46:*16*  92:*10*
**instructed**  44:*22*
**INSTRUMENTS**  1:*6*
5:*8*  18:*17, 22, 25*
19:*4, 13, 19, 23*  20:*1*
21:*13*  28:*10*  33:*17*
51:*12*  55:*21*  56:*6*
59:*16*  62:*16, 25*
63:*21*  114:*4*  115:*11*
120:*1, 22*  127:*23, 25*
149:*4*  151:*17*  165:*1,
25*  166:*7*  167:*7*
185:*11, 22*  194:*1*
201:*7*  203:*8*  207:*3,
12*  208:*17*  215:*18*
217:*19*  218:*14*  221:*7*
222:*16*  225:*6, 22*
226:*13*  227:*21*  229:*5*
234:*9, 21*  238:*6*
241:*13*  243:*3*  244:*9*
245:*11*  248:*15*
253:*18*  258:*18*  260:*6*
261:*3, 14*  263:*11*
265:*4, 18*  270:*24*
276:*10*  277:*15*  278:*9*
283:*14*  285:*1*
**integrity**  119:*17*
**intelligence**  264:*1*
**intend**  92:*17*  118:*16,
21*  131:*16*

**intended** 53:*14* 232:*18* 236:*20*
**intent** 237:*8*
**intention** 12:*20*
**intentionally** 39:*9*
**interaction** 211:*10*
**interdisciplinary** 10:*19*
**interest** 47:*19* 55:*7* 105:*9, 23* 128:*22* 129:*5* 204:*14* 232:*12* 233:*7* 234:*13* 235:*11* 238:*15* 271:*10*
**interested** 11:*14* 47:*9* 54:*17, 25* 59:*12* 60:*13* 129:*6* 147:*14* 192:*15* 287:*13*
**interesting** 7:*25*
**interests** 218:*21*
**Internal** 18:*25* 19:*4* 21:*2, 13, 22, 25* 22:*25* 25:*9* 28:*7, 9* 33:*11, 12, 13, 15, 16* 36:*6, 8* 124:*13* 185:*13* 189:*10* 208:*23* 242:*12* 243:*7* 248:*14* 277:*14* 279:*4, 22* 280:*14* 281:*21*
**interpretation** 206:*10*
**interpreted** 273:*5*
**interrupt** 60:*6* 200:*3*
**interrupting** 97:*16*
**interview** 20:*24*
**intimation** 131:*22*
**intuitively** 99:*5*
**invented** 184:*22*
**investing** 123:*8*
**investment** 15:*19, 22* 16:*3, 8* 127:*12* 148:*5* 196:*10, 13* 197:*16* 198:*10*
**investor** 66:*22* 80:*24* 100:*11* 105:*22* 106:*6* 123:*15* 127:*11* 128:*2* 129:*6* 139:*23* 149:*17*
**investors** 89:*25* 123:*16*
**involved** 17:*24* 157:*25* 158:*4, 6*

159:*19* 173:*11* 211:*15*
**involvement** 194:*5* 250:*18*
**involves** 158:*21*
**irrelevant** 42:*19* 85:*24* 88:*24* 155:*21, 24*
**isolate** 17:*23*
**isolated** 16:*21*
**isolating** 95:*8* 144:*6* 180:*19*
**issue** 65:*23* 69:*21* 93:*7* 94:*1* 198:*7, 21* 199:*12* 200:*11, 13, 20*
**issued** 197:*3, 7* 199:*16, 17, 18*
**issuer** 67:*9, 17* 68:*1, 11, 20* 69:*21* 70:*10* 71:*25* 72:*14, 19* 73:*4*
**issues** 86:*10* 99:*22* 100:*2*
**issuing** 197:*23* 199:*11*
**italics** 171:*22*
**item** 16:*18*
**items** 64:*18* 102:*23* 155:*20*
**iterative** 26:*13, 15, 16* 32:*1, 8*
**its** 48:*10* 49:*1* 50:*13* 56:*14, 21* 57:*4, 9, 20* 58:*12* 59:*1, 15* 60:*21* 67:*9* 71:*24* 72:*14, 19* 73:*4* 88:*8* 95:*10* 96:*25* 100:*7, 25* 106:*24* 107:*6, 8* 111:*13, 21* 128:*21* 136:*20* 142:*10* 150:*15* 185:*6, 12, 13* 186:*23* 192:*21, 22* 195:*5, 7* 198:*23, 24* 218:*7, 21* 223:*18* 224:*18, 25* 225:*7, 10* 226:*3* 234:*15, 20* 235:*17, 20* 238:*17* 269:*24* 271:*10* 276:*10*
**iv** 150:*24*

**< J >**
**JAI** 2:*8*
**jaic@rgrdlaw.com** 2:*12*
**January** 113:*15* 165:*1, 4* 166:*1, 11, 12* 167:*21* 203:*19, 23* 204:*13, 24* 251:*19* 272:*18*
**jcomerford@dowdben nett.com** 2:*18*
**JD** 8:*4, 8, 11, 21* 9:*4*
**JEREMY** 2:*15*
**jhofman@dowdbennet t.com** 2:*19*
**Job** 1:*22* 83:*24* 103:*17*
**JOHN** 2:*15* 275:*18*
**judge** 105:*5* 106:*18* 110:*1, 18, 20* 111:*9* 128:*23* 140:*3* 170:*6* 270:*8, 11, 22, 25* 271:*4, 11*
**judges** 110:*12*
**judge's** 104:*7* 108:*25*
**judgment** 35:*3* 64:*11* 98:*12* 137:*8* 139:*16* 145:*19* 161:*5* 170:*24* 191:*22, 25* 198:*24*
**judgments** 138:*15*
**judicial** 46:*16*
**judiciously** 145:*23*
**July** 7:*4* 29:*7* 130:*5* 185:*23* 203:*5* 220:*17* 221:*7* 227:*20, 22* 237:*3, 9* 238:*23* 239:*5, 6, 8, 11, 17* 240:*1, 2* 275:*24* 278:*23*
**June** 3:*25* 4:*4, 11* 6:*5* 17:*2* 28:*25* 37:*16* 47:*11* 51:*12* 52:*11* 54:*2* 86:*4, 11* 89:*8* 105:*7, 21* 106:*23* 107:*2, 11* 108:*2, 9* 119:*20, 24* 120:*6, 14, 21* 123:*18* 126:*8* 130:*14* 136:*14*

177:*2, 4* 187:*19* 204:*19* 205:*1, 9, 10, 12* 217:*6* 218:*1, 4, 15* 220:*2* 235:*24* 238:*22* 240:*17* 241:*13* 269:*4* 271:*9*

**< K >**
**KARAM** 2:*1* 3:*6, 8* 5:*24, 25* 6:*21* 7:*8* 9:*11* 10:*18* 11:*9, 12* 12:*3, 15* 13:*2, 5, 17* 14:*4, 22* 15:*10, 17, 25* 16:*2, 15, 22* 18:*4, 11, 14* 19:*17, 24* 20:*21* 21:*4, 11* 22:*1, 24* 23:*6, 20* 25:*16* 26:*21* 27:*7, 8* 29:*19, 21* 31:*1, 20* 32:*4, 11, 18, 24* 33:*1, 8* 34:*1, 13, 17, 22* 35:*7, 11, 21* 36:*4, 13, 17, 23* 37:*6, 22* 38:*2, 6, 10, 11, 15, 18, 20* 39:*1, 5, 13, 16, 17, 21, 22* 40:*2, 7, 12, 16, 17* 41:*1, 4, 5, 10, 14, 15, 18, 20, 24, 25* 42:*3, 6, 10, 14, 20, 21, 25* 43:*5, 7, 10, 13, 18, 23* 44:*5, 8, 10, 18* 46:*7* 47:*10* 48:*7* 49:*17* 50:*8, 17, 20* 52:*4, 17, 18, 25* 53:*9* 54:*15, 22, 24* 55:*15, 23, 24* 56:*1, 12, 17, 19* 57:*3, 13, 16, 17, 22* 58:*7, 10, 18* 59:*7, 20, 25* 60:*12, 23* 61:*1, 8, 14, 20* 62:*5, 10, 18, 22, 23* 63:*5, 9, 15, 17, 23* 64:*4, 12, 15, 22, 25* 65:*2* 66:*7, 17* 67:*22, 23* 68:*5, 10, 24* 69:*12, 18* 70:*8, 15, 22* 71:*3, 7, 10, 22* 72:*5, 7, 15, 23* 73:*6, 11, 13, 20, 25* 74:*4, 10, 16* 75:*1, 5, 13, 20, 22* 76:*4, 5, 23* 77:*1, 16, 25* 78:*7, 17* 79:*2, 5, 7* 80:*15*

81:*17, 23*  82:*3, 5, 11, 18*  83:*14, 22*  84:*18*  85:6, *22*  86:6, *18, 22*  87:*1, 3, 4, 9, 13, 14, 20*  88:*1, 14, 15, 19*  89:*15*  90:8, *16, 22*  91:*4, 10, 16, 18*  92:9, *20*  93:*1, 5, 22, 23*  94:*16*  95:*12*  96:*14*  97:7, *13, 25*  98:*19*  99:8, *10, 14*  100:*18*  101:6, *7, 25*  102:*13*  103:*1, 4*  104:*9*  105:4, *14*  106:4, *13, 21*  107:*5, 10, 14*  108:8, *15*  109:2, *16, 25*  110:*11, 17, 22*  111:*4*  112:*1, 21*  113:*3, 7, 8, 11, 18*  114:*13*  115:*18*  116:*1, 16*  117:*5*  119:*3, 11, 19*  121:*20, 25*  122:6, *16*  123:7, *14, 23*  124:*11, 22*  126:*1, 7, 19*  127:*3, 21*  128:8, *18*  129:2, *11, 19*  130:*1, 4, 23*  131:*9*  132:*1, 3, 7, 15*  133:*23*  134:*4*  136:*18, 23*  137:*21*  138:2, *6, 20*  139:5, *10, 20*  140:8, *22*  141:*18, 23*  142:*4*  143:*10, 25*  144:*1*  145:*25*  147:8, *24*  149:*3, 18*  150:*10, 20*  151:*7, 20, 24*  152:*4, 8*  153:*4, 13*  154:*3, 18, 22*  155:*9*  156:8, *15*  157:*11*  158:*16, 20*  159:8, *21*  160:*10, 18*  161:*20*  162:5  164:*23, 25*  165:*24*  168:*14, 17*  169:*24*  170:5, *11, 14, 25*  171:*3*  172:*14*  173:*15*  174:6, *23*  175:3, *19*  176:4, *21*  177:*16*  178:5, *10*  179:2  180:7, *11*  181:*4, 18, 22*  182:*15, 20, 25*  183:8, *15*  186:*25*  188:*18*  189:*4, 16, 19*  191:5  192:*9*  193:5, *9, 25*  194:*20*  196:7, *22*  198:*2*  200:*17, 24*  201:*2*  202:7, *25*  203:*25*  204:*18, 25*  205:6, *8, 14*  206:*1, 5*  207:*10, 20*  208:5, *12*  209:8, *14*  210:5, *19*  211:*3, 10, 16*  212:6, *11, 16, 23, 24*  213:*13*  214:*12*  216:*1, 3, 6*  217:*11, 13*  219:*23*  220:*12, 16, 24*  221:*5, 11, 22*  222:*15, 23*  223:*15*  224:6, *12*  225:*4*  226:*18, 22*  227:*2, 14, 18*  228:*10, 13, 16, 20*  231:*4, 13, 19, 24*  232:*3*  233:*15, 21*  234:*3*  235:*5*  236:*10*  237:*12*  238:*12*  239:*4, 6, 14, 16, 18*  240:*1, 5, 12, 14*  242:*1*  243:*14*  244:*12, 17, 24*  245:6, *10, 23*  246:*11, 12*  247:8, *14, 20, 25*  248:*18*  249:*14*  250:*24*  252:9, *18*  253:*15, 22, 23*  254:*7, 14, 16, 17, 20, 23*  255:*13, 16, 23*  256:5, *14*  257:*1, 5, 15, 22, 24*  258:9, *15*  259:*4, 10, 15, 18*  260:*1*  261:*1, 11*  262:2, *7*  263:*10, 17*  264:*7, 13, 24*  265:*3, 15*  266:*1, 7, 15, 20*  267:*2, 9, 10*  268:*4, 18*  269:*10, 16, 20*  270:*10, 17, 21*  271:*7, 16*  272:5, *9, 12, 23*  273:*15, 21*  274:*3, 7, 14, 18, 22*  275:*3, 14, 15*  283:*7, 13, 20*  284:*3, 10, 14*

**Karsanbhai** 113:*20*  114:*2, 11*  118:*19, 23*  119:*4, 7*  120:6  129:*21*  201:*9*  207:*13, 16, 18*  209:*16, 17*  240:*15*

**Karsanbhai's** 130:*11*  235:*24*  238:*22*

**keep** 62:*1*  79:*16*  80:*4*  130:*14, 19, 24*  131:*5, 18*  144:*14*  182:*16, 20*  199:*24*  216:*17, 19*  226:*21*  239:*20*  240:*18*  247:*9*

**keeping** 162:*4*  227:*6*

**kept** 120:*24*

**Kevin** 228:*4*

**Key** 213:*15*

**kind** 21:*22, 24*  41:*23*  76:*24*  90:*14*  113:*20*  123:*1*  126:*17*  128:*9*  153:*25*  155:*20*  163:*13*  166:*19*  188:*22*  195:*18*  214:*13*  229:*1*  232:*6*  248:*3*  255:*2*  257:*11*  258:*21*  271:*24*

**knew** 23:*10*  203:*8*  270:*22, 25*  271:*2, 4*

**know** 8:*18*  9:8, *11, 22*  10:*12, 13, 17, 23*  11:*22*  13:*15*  15:2, *19*  19:*22*  21:*21*  22:*1*  23:*14*  24:*20*  25:*16, 17*  26:*12*  27:*7, 23*  30:*12*  31:5, *10*  33:*16*  34:9, *14, 22*  35:*11, 12*  36:*5*  37:*8*  39:*8, 9*  41:*3*  49:*22*  52:*17*  53:*21, 24*  54:*19, 25*  56:*10, 25*  65:*10*  69:*13*  70:*1*  71:*14, 21*  76:*11*  79:*12, 22*  80:*2*  83:*20*  84:*16*  85:*21*  86:2, *4*  88:*20, 25*  89:*6*  90:*11*  92:*15*  94:*24*  95:*9*  98:*9*  99:*20, 21*  100:*19*  101:*19*  103:*14*  105:*1*  107:*18*  108:*13, 24*  109:*4*  110:2, *20*  111:*19*  112:*4, 5, 8, 19, 20*  114:*7*  115:*6, 14, 17, 23, 24*  116:*21*

117:*15*  118:*25*  120:*17*  123:*22*  128:*13*  130:*7, 22*  131:*17, 18, 19*  133:*7*  134:*17*  135:*11*  137:*8, 10, 14*  138:*6*  139:*13, 14*  142:*15*  143:*16*  144:*13*  146:*3, 6, 13, 15*  147:*11*  148:*20*  150:*12*  156:*1, 18*  157:*7, 10*  159:*17, 18*  160:*9, 20, 23*  162:*12, 19*  165:*14, 21*  167:*1, 5, 12, 13, 14*  168:*4, 6, 8, 10, 11*  170:*20*  171:*18*  173:*25*  174:*2, 4, 17*  175:*18*  176:*6, 7, 14*  177:*6*  179:*25*  180:8, *15, 17*  181:*14, 15*  188:*2, 6, 9*  191:*19, 22*  194:*24*  196:*1, 20*  198:*23*  199:*6, 19, 21*  200:*9, 18*  203:*11*  205:*23, 24*  207:*18*  209:*9*  210:*3, 15, 25*  211:*22, 25*  212:*22*  213:*1, 7, 9*  214:*7, 8, 12*  215:*20*  216:*12, 15, 16*  217:*4, 20*  218:*5, 8*  219:*11*  220:*21, 22, 23*  221:*10, 12, 13*  222:*11, 16, 21, 24*  223:*2*  225:*25*  226:*12*  228:*25*  231:*21*  232:*8*  233:*10, 16, 19*  234:*6, 18*  235:*2*  237:*7, 11, 18*  239:*24*  243:*7*  246:*5*  248:*5*  250:*21*  254:*11, 18*  256:*4*  258:*12, 14*  260:*12*  262:*21*  264:*1*  265:*22*  266:*14*  267:*21*  268:*10, 23*  269:*7*  270:*16, 19*  271:*2, 3*  272:*6, 10*  274:*1, 10*  276:*6*  284:*8*

**knowing** 9:*11*  154:*11*

**knowledge** 8:*15*  9:*15*  55:*12*

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

**known** 29:*3* 148:*14*
**knows** 145:*18* 166:*17*

**< L >**
**label** 228:*15*
**labeling** 280:*20*
**lacks** 271:*14*
**Lady** 184:*20*
**laid** 151:*13*
**language** 53:*5* 72:*1*
92:*1* 97:*3, 6, 17*
101:*16* 119:*5* 126:*11*
131:*14* 215:*17*
223:*24* 224:*17* 236:*6*
252:*7* 282:*17, 22*
**large** 214:*19* 234:*15,*
*24*
**larger** 34:*14, 16*
172:*4*
**late** 201:*7* 221:*7*
227:*20*
**laughing** 271:*3*
**launched** 146:*16*
**law** 6:*2* 8:*1, 3, 7, 23,*
*24* 9:*7, 17* 18:2, *6, 15*
22:*8* 92:*17* 169:*10,*
*18, 25* 174:*11, 18, 24*
**laws** 85:*14* 88:*11*
**lawyer** 33:*22* 90:*12*
92:*16* 145:*18* 162:*20,*
*21* 169:*14* 170:*1*
**lawyers** 34:*3* 109:*9*
116:*22* 138:*15* 148:*5*
163:*3* 174:*25*
**layman's** 49:*12*
**lead** 6:*1* 242:*13*
**learn** 11:*1* 82:*24*
**learning** 124:*13*
**leave** 109:*17* 140:*6*
**led** 24:*16* 262:*11*
**left** 101:*4* 213:*17*
217:*15*
**left-hand** 206:*16, 22*
217:*14*
**legal** 10:*20* 15:*23*
17:*12, 13, 15, 20* 18:*5,*
*6, 7, 8* 44:*13* 64:*19*
81:*13, 21* 82:*1, 8*
85:*20* 90:*15* 91:*12*
92:*18* 105:*24* 137:*23,*

*25* 138:*9, 11, 17, 22*
160:*3* 162:*17, 24*
163:*1* 169:*9, 10, 13,*
*18, 23* 170:*16, 17*
229:*4, 7* 266:*10, 12*
270:*14, 18* 271:*14*
274:*25*
**length** 150:*3* 282:*10*
**letter** 3:*25* 4:*6*
48:*11* 49:*2* 50:*6*
57:*9* 114:*7, 11*
118:*15* 119:*6, 7, 20,*
*24* 120:*1, 3, 7* 122:*3*
129:*18* 130:*11, 19*
131:*1, 16* 145:*10*
187:*20* 192:*14*
194:*24* 195:*24* 201:*9*
202:*14, 16* 203:*16, 20,*
*24* 204:*7, 13, 24*
205:*10, 12* 218:*14*
234:*4* 235:*20, 25*
236:*18* 238:*22* 239:*2*
**letters** 77:*16* 120:*21*
195:*19* 204:*20* 205:*1,*
*9* 207:*5, 12, 14, 15, 21,*
*22* 208:*6, 10* 218:*25*
236:*6* 272:*18*
**level** 117:*3* 197:*19,*
*23*
**levels** 214:*21*
**Lexington** 2:*9*
**Lexis** 83:*16*
**LexisNexis** 84:*3*
**Liability** 3:*19* 46:*4*
**lie** 251:*24*
**lied** 252:*1*
**life** 96:*25*
**light** 93:*11* 94:*5*
96:*20* 98:*13* 212:*9*
**likelihood** 66:*21*
80:*22* 96:*20* 97:*22*
111:*23* 115:*6* 133:*11*
135:*18, 20* 277:*11*
278:*10*
**limited** 124:*14*
**line** 42:*10* 51:*1*
187:*11* 203:*12* 230:*9,*
*10* 286:*2*
**lines** 144:*20*

**link** 14:*3* 24:*3, 7*
**linked** 127:*15*
**Lipton** 201:*6, 14*
**list** 18:*16, 19, 21, 25*
19:*6, 12, 15* 21:*13*
27:*23* 28:2, *4, 6*
60:*16* 62:*2* 102:*23*
134:*18* 135:*5* 147:*17*
158:*10* 233:*6* 234:*9*
**listed** 20:*25* 21:*3, 10*
33:*20* 34:*7* 36:*8*
56:*25* 60:*9* 62:*2*
64:*21* 68:*14, 17* 70:*1*
98:*23* 155:*20* 190:*21*
**listen** 95:*24* 199:*21*
263:*24*
**listened** 263:*15*
**listening** 198:*25*
263:*12* 264:*3*
**Literature** 27:*17*
134:*5* 242:*13* 243:*8*
**LITIGATION** 1:*7*
3:*19* 5:*8* 46:*4* 285:*2*
**little** 11:*9* 26:*10*
71:*16* 73:*10* 79:*10*
93:*6* 128:*11* 131:*4,*
*20, 25* 133:*7* 164:*24*
171:*20* 172:*4* 182:*16*
186:*23* 191:*6* 197:*8*
200:*8*
**Liu** 229:*12*
**live** 116:*23* 159:*13*
175:*24*
**living** 53:*14, 15* 55:*8*
**LL.M** 8:*11, 22* 10:*10,*
*11* 162:*20* 169:*15*
**LLP** 2:*4, 9, 16*
**local** 38:*24*
**located** 7:*2*
**long** 8:*24* 48:*23*
110:*9* 137:*8* 154:*13*
163:*23* 179:*9* 188:*9*
200:*5* 232:*4*
**longer** 22:*11*
**Long-Term** 12:*6*
137:*15*
**look** 7:*9* 23:*15*
64:*16* 65:*5* 78:*8*
83:*5, 16* 93:*6* 119:*23*
121:*4, 5* 124:*13*

125:*13* 129:*3* 135:*6*
155:*1* 156:*24, 25*
157:*8* 164:*11* 165:*8*
166:*23* 186:*13*
191:*25* 199:*15*
228:*22* 239:*5* 240:*9*
250:*21* 264:*12*
276:*24* 278:*18*
279:*15*
**looked** 17:*12, 19*
28:*14* 71:*13* 77:*12*
84:*4, 22* 121:*17*
122:*22* 171:*23*
221:*15* 238:*23* 266:*2*
**looking** 15:*18* 68:*6*
74:*8* 97:*20* 105:*16*
134:*21* 140:*6* 142:*11*
150:*16* 159:*2, 7*
170:*18* 173:*18*
176:*20* 181:*25* 186:*4*
199:*7* 228:*2* 239:*25*
245:*18* 246:*4* 278:*7*
**looks** 103:*9* 113:*15*
173:*25*
**look-up** 102:*16*
**loosely** 176:*18*
**lost** 76:*24* 205:*6*
**lot** 9:*3, 6, 8* 10:*15*
15:*19* 27:*20* 35:*19*
55:*9* 68:*16* 70:*25*
71:*8* 77:*23* 86:*9*
97:*15* 99:*17, 18, 19*
102:*1, 4, 22* 110:*14,*
*18* 122:*25* 128:*8*
142:*17* 145:*17, 20*
152:*14* 153:*2* 157:*1,*
*25* 159:*1, 12* 170:*21*
179:*25* 195:*18* 196:*2,*
*3* 211:*10* 212:*14*
214:*11* 232:*14*
237:*18* 243:*25*
245:*20* 246:*22*
261:*20* 263:*23* 271:*4*
**Louis** 2:*17*
**love** 154:*24*
**low** 49:*23* 151:*3*
176:*6, 8* 189:*7* 198:*2,*
*4, 5, 6*

**lower** 107:*19* 125:*22, 24* 190:*15, 25* 191:*3* 254:*12*
**LTM** 189:*2*
**lunches** 80:*2*

**< M >**
**M&A** 4:*8* 10:*17, 18, 24* 14:*12* 98:*10, 11, 13* 99:*2* 107:*22* 109:*8* 110:*5, 7, 8* 119:*6* 158:*5* 192:*4*
**Mackenzie** 208:*18* 227:*25* 228:*4* 237:*22* 253:*25* 255:*1, 19* 267:*22* 268:*11* 273:*6*
**magnify** 164:*23*
**magnitude** 62:*14, 24* 63:*3, 12, 20* 74:*5, 14* 88:*8, 10* 93:*10* 94:*4* 100:*7, 8, 25* 101:*1* 150:*4, 6*
**maintained** 158:*3*
**majority** 187:*13*
**making** 36:*24* 39:*5, 18* 45:*3* 47:*8* 127:*12* 156:*14* 203:*5* 209:*23* 234:*16* 250:*17* 264:*18* 265:*16* 267:*23* 273:*14*
**man** 271:*18* 274:*10*
**management** 20:*1* 120:*2* 124:*2* 190:*16* 191:*3, 20* 250:*2*
**management's** 189:*10, 12* 190:*25*
**manager** 255:*22* 256:*4* 264:*23* 265:*12* 269:*9*
**Manhattan** 52:*14* 200:*4*
**manner** 46:*14* 58:*13*
**March** 226:*8*
**margins** 185:*18*
**mark** 6:*22, 23, 24* 44:*5* 46:*3* 64:*13* 103:*1* 113:*12* 129:*19* 189:*16* 193:*5* 206:*21*
**MARKED** 3:*12* 7:*7* 44:*9* 46:*6* 65:*1*

103:*3* 113:*16* 129:*23* 171:*1* 178:*9* 189:*18* 193:*7* 201:*1* 214:*20* 216:*5* 227:*17* 228:*12* 277:*10* 278:*19*
**market** 11:*16* 30:*18* 31:*10* 50:*3* 137:*16* 166:*18, 20* 188:*12* 206:*17* 236:*20*
**markets** 11:*7, 10, 14*
**marking** 64:*22*
**marks** 280:*25*
**Martino-Fleming** 15:*5*
**Master** 7:*25* 8:*3, 7*
**master's** 8:*20, 22*
**matches** 169:*11, 19*
**matching** 170:*16*
**material** 16:*18* 65:*14, 19* 66:*1, 15, 20* 69:*7* 70:*5* 75:*10* 77:*21* 80:*21* 85:*14* 88:*10* 89:*23* 90:*5* 92:*6, 14* 93:*2* 100:*9* 101:*2* 108:*19* 109:*20* 110:*25* 111:*10* 123:*8, 17* 149:*23* 150:*13* 154:*16* 155:*3, 7, 16* 156:*23* 157:*4* 159:*6* 190:*3, 5*
**materiality** 9:*19* 14:*15, 19, 20, 25* 15:*3, 5, 9, 21* 16:*5, 21* 17:*16* 65:*23* 66:*9* 67:*2, 7* 68:*22* 81:*9, 19, 24* 82:*6, 13* 88:*5* 90:*25* 91:*20* 92:*2, 12* 93:*8* 94:*1* 96:*18* 100:*5, 23* 101:*14* 128:*23* 150:*5* 269:*13*
**materially** 122:*9* 178:*21* 179:*1, 21*
**Materials** 4:*4* 16:*24* 17:*4* 19:*7* 26:*24* 27:*3* 29:*16* 33:*7* 36:*3, 15* 37:*17* 64:*17* 82:*25* 149:*8* 168:*5* 183:*11* 215:*23, 25*
**math** 27:*24* 28:*1* 33:*25* 34:*3, 13* 35:*11* 37:*2* 120:*17, 24*

**Matter** 4:*1* 21:*17, 23* 23:*16* 30:*4* 53:*13* 65:*21* 114:*9, 10* 170:*23* 206:*9* 218:*10*
**matters** 92:*19* 192:*4* 208:*24*
**Matthew** 2:*19* 3:*16*
**Mauritius** 45:*1*
**maximize** 175:*20, 24* 186:*9*
**maximum** 173:*9, 16*
**MBA** 7:*18*
**McCloskey** 3:*16* 44:*6*
**McGrath** 20:*8* 205:*15* 209:*18*
**mean** 8:*23* 9:*3* 18:*11* 25:*3, 22* 26:*5* 34:*15* 35:*6* 37:*3* 48:*1* 49:*9* 52:*13* 54:*11, 19* 55:*11* 56:*8* 60:*6* 77:*19, 23* 79:*19* 84:*19, 21* 85:*21* 87:*24* 101:*4* 102:*18, 24* 103:*7* 107:*21* 111:*6* 119:*1* 123:*20* 124:*25* 137:*4* 147:*21* 152:*13* 156:*6* 163:*1* 169:*5* 172:*9, 13* 173:*6, 24* 175:*6, 18* 178:*22* 179:*3, 16* 180:*1* 185:*23* 188:*4* 189:*15, 25* 199:*1* 210:*15* 212:*23* 216:*16* 218:*3* 219:*13* 228:*19, 22* 229:*23* 232:*12* 233:*13, 23* 237:*7* 245:*17, 20* 246:*22* 252:*3, 21, 23* 253:*13* 254:*5* 262:*22* 263:*3* 266:*14* 270:*2, 17, 18, 22* 272:*24* 274:*1*
**meaning** 30:*24* 55:*8* 187:*15* 195:*21* 199:*8* 266:*17* 273:*7*
**meaningful** 128:*20* 133:*10* 135:*17, 20* 230:*22*
**means** 34:*16* 43:*1, 9* 112:*7* 119:*12* 125:*17,*

22 126:*3* 138:*19* 202:*22, 24* 246:*21, 25* 265:*2* 267:*14* 268:*16*
**meant** 118:*25* 119:*2, 17* 128:*16* 239:*17* 259:*12, 21*
**measure** 149:*11*
**median** 172:*17* 173:*16, 21* 175:*4*
**meet** 268:*20, 23*
**Meeting** 4:*9* 53:*6* 54:*3* 236:*14*
**meetings** 143:*6* 213:*1* 276:*10*
**Melville** 2:*5*
**member** 17:*25* 66:*5* 98:*10, 11* 162:*22* 170:*3* 212:*13* 273:*11*
**members** 6:*4* 20:*2* 170:*22* 231:*7* 236:*13, 24*
**mention** 82:*25* 102:*9* 165:*7, 9* 215:*1*
**mentioned** 8:*18* 9:*25* 13:*11* 17:*23* 29:*18* 31:*1, 18, 25* 32:*8* 33:*20* 36:*13, 18* 37:*18* 52:*11* 55:*5* 59:*4, 20* 64:*8* 68:*13* 70:*6* 71:*15* 75:*8* 78:*2* 83:*2, 10* 84:*14* 93:*1* 95:*4* 139:*11* 140:*14* 152:*11* 206:*11* 213:*25* 214:*4* 216:*9* 230:*12* 249:*6*
**mentions** 135:*4*
**merely** 186:*7*
**merger** 14:*24* 67:*7* 96:*19, 21, 23* 97:*21* 99:*6* 146:*23* 147:*14, 19* 151:*3, 17* 154:*15* 155:*3, 15* 156:*9, 11, 19* 157:*3* 161:*24* 162:*8* 165:*14* 173:*11* 175:*11* 177:*6, 7* 180:*3* 181:*1* 184:*5* 196:*14* 201:*15* 211:*19* 235:*10*
**Mergers** 4:*1* 171:*23*

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

173:*10*  249:*16*
**merit**  153:*11*
**merits**  276:*3*
**message**  142:*23*
**messages**  208:*21*
**Messaging**  218:*18*, *22*
**meta**  155:*13*, *14*
**meta-analysis**  155:*11*
**meteorite**  52:*15*
**methodology**  117:*16*
191:*24*
**metric**  117:*12*
**metrics**  198:*3*
**MICHIGAN**  1:*25*
5:*1*  287:*2*, *24*
**mid**  185:*12*, *16*
203:*5*  254:*21*
**middle**  40:*3*  46:*11*
104:*13*  130:*10*
171:22  192:*12*
214:*18*  240:*15*, *16*
**midpoint**  189:*8*
**midway**  89:*22*
**Mike**  146:*6*
**million**  196:*17*
236:*20*
**mind**  10:*7*  48:*22*
54:*12*  55:*18*  119:*4*
242:*23*  246:*6*
**mindful**  79:*16*, *22*
211:*23*  222:*3*
**mine**  25:*8*  54:*20*
94:*22*
**minimal**  124:*1*
**minimum**  80:*4*  173:*9*
**minus**  33:*23*
**minutes**  43:*17*  60:*14*
67:*16*  182:*25*  211:*12*
212:*1*, *5*, *7*, *12*, *14*
227:*1*, *6*
**Mischaracterizes**
36:*21*  67:*21*  70:*13*
71:*19*  72:*25*  73:*8*, *17*,
*24*  75:*4*  76:*3*, *22*
77:*14*  78:*6*, *16*  86:*1*,
*17*  91:*14*  92:*25*
93:*18*  94:*20*  97:*11*
98:*6*  128:*6*  151:*22*
158:*24*  204:*10*  205:*4*
210:*13*  224:*1*  248:*8*

253:*20*, *21*  256:*2*, *20*
257:*20*  259:*14*  262:*6*
266:*18*
**mischaracterizing**
41:*14*, *17*  42:*18*
86:*24*  216:*18*
**misconstrued**  208:*22*
222:*4*
**misleading**  68:*4*
69:*16*, *25*  72:*4*  96:*12*
247:*12*, *21*  248:*9*
267:*1*
**misprint**  185:*3*
**misreading**  163:*22*
**misrepresent**  251:*24*
**missed**  63:*15*  210:*7*
213:*24*
**Missouri**  2:*17*
**Misstates**  150:*8*
151:*19*  267:*1*, *7*, *8*
268:*21*, *22*  272:*2*, *3*
273:*3*, *23*, *24*  274:*12*,
*17*  275:*2*
**mistake**  40:*19*
**misunderstood**  90:*17*
**mix**  66:*23*  80:*25*
100:*12*  128:*3*  129:*7*
**mixed**  115:*3*
**MNPI**  161:*2*, *11*, *14*
281:*22*
**moment**  74:*10*  76:*24*
166:*5*
**moments**  77:*9*
**Monitor**  208:*14*
253:*17*  254:*1*  255:*1*,
*4*  262:*16*
**monitoring**  214:*8*
249:*7*, *13*, *24*  250:*21*
254:*4*  256:*4*  261:*23*
262:*15*  263:*8*  265:*24*
267:*4*  271:*21*  272:*25*
273:*13*
**month**  193:*11*  194:*7*,
*18*
**months**  107:*9*  108:*5*
177:*13*  224:*10*, *14*
**morning**  5:*25*  150:*3*
151:*16*
**motion**  23:*12*, *18*

**motivation**  187:*2*
237:*8*
**mouth**  22:*16*  188:*3*
**Move**  38:*13*  40:*10*
78:*13*  129:*15*  142:*24*
171:*20*  188:*19*
189:*15*  240:*21*  280:*7*
**moved**  88:*20*  269:*5*
**movement**  166:*21*
**movements**  168:*20*
**moves**  188:*4*
**moving**  139:*19*
204:*17*  269:*1*
**multiple**  176:*14*
277:*13*
**multi-year**  225:*17*

**< N >**
**nail**  58:*24*
**name**  5:*12*, *25*  110:*2*
223:*7*  229:*24*  230:*18*
**Nancy**  184:*20*, *22*
**narrative**  47:*23*
**NATI**  4:*13*
**NATIONAL**  1:*6*  5:*8*
18:*17*, *25*  19:*3*, *13*, *19*,
*23*  20:*1*  21:*12*  28:*9*
33:*16*  51:*12*  55:*21*
56:*6*  59:*16*  62:*15*, *25*
63:*21*  114:*4*  115:*11*
120:*1*, *22*  127:*23*, *25*
149:*4*  151:*17*  165:*1*,
*25*  166:*7*  167:*7*
185:*11*, *22*  194:*1*
201:*6*  203:*8*  207:*3*,
*12*  208:*17*  215:*17*
217:*18*  218:*14*  221:*6*
222:*16*  225:*5*, *22*
226:*13*  227:*20*  229:*5*
234:*9*, *21*  238:*6*
241:*13*  243:*3*  244:*8*
245:*11*  248:*15*
253:*18*  258:*17*  260:*6*
261:*3*, *14*  263:*11*
265:*4*, *18*  270:*23*
276:*10*  277:*15*  278:*9*
283:*14*  285:*1*
**NAT-SL-00001250**
3:*25*  129:*22*

**NAT-SL-00001513**
4:*5*  189:*17*
**NAT-SL-00001554**
4:*7*  193:*6*
**NAT-SL-00010806**
4:*14*  227:*15*
**NAT-SL-00020537**
4:*12*  216:*4*  217:*12*
**NAT-SL-00023189**
4:*18*  228:*17*
**NAT-SL-00025277**
4:*9*
**natural**  30:*7*
**nature**  21:*24*  23:*17*
53:*16*  68:*18*
**NDA**  124:*15*  142:*20*
143:*16*  177:*22*  247:*1*
248:*24*
**NDAs**  143:*6*  248:*5*
258:*21*
**nearly**  179:*16*
**necessarily**  16:*12*
143:*14*  145:*7*  147:*21*
187:*10*  188:*4*
**necessary**  45:*20*
46:*18*
**need**  22:*22*  23:*2*
53:*24*  79:*14*  80:*5*
85:*12*  86:*14*  87:*16*
128:*11*  130:*15*  143:*2*
149:*8*, *15*  171:*17*, *18*
173:*5*  180:*6*  182:*15*
189:*15*  199:*5*  206:*24*
231:*21*  237:*17*
239:22  240:*19*
**needed**  13:*3*  26:*18*,
*21*  95:*5*  134:*24*
**needs**  9:*11*  149:*1*
180:*14*
**negate**  135:*12*
**negligible**  51:*15*, *18*,
*23*  52:*5*, *8*, *12*, *15*, *23*
104:*16*  133:*4*  136:*5*,
*16*  138:*23*  140:*18*, *19*
141:*3*, *10*  142:*5*
149:*20*  150:*22*  151:*2*,
*3*, *12*, *14*, *17*  193:*20*,
*24*  194:*8*  241:*2*
277:*11*

negotiate 176:*13* 196:*15*
negotiated 206:*17*
negotiation 175:*15* 187:*3*
negotiations 85:*12* 87:*16* 88:*6* 107:*18* 175:*12* 176:*1* 177:*17* 235:*10* 246:*7*
neither 144:*5*
neutered 88:*24*
neutral 206:*23*
never 20:*5, 10, 12* 116:*25* 175:*9* 187:*22, 23* 197:*21, 22* 198:*20* 212:*2* 225:*6* 245:*20* 252:*1* 262:*18* 268:*5* 269:*23* 271:*25*
NEW 1:*2* 2:*5, 10* 5:*10* 29:*2, 11* 30:*5, 8* 38:*23* 110:*14*
Newco 14:*23*
News 3:*23*
NI 3:*25* 48:*10, 14* 49:*1* 50:*12, 13* 57:*9* 105:*8, 9, 23* 107:*3* 108:*4* 113:*23* 114:*18* 121:*22* 122:*18* 128:*21* 137:*7* 146:*15* 148:*10* 149:*20, 22* 151:*1, 3, 12* 204:*17* 205:*13* 218:*21, 25* 233:*5* 234:*16* 235:*19* 236:*20* 238:*9* 241:*11* 242:*20* 249:*20* 250:*18* 268:*10* 271:*9, 11* 272:*20* 281:*22*
Nick 24:*16*
Niles 229:*9, 10*
NI's 48:*14* 104:*20* 108:*17* 109:*19* 116:*3* 118:*9* 130:*16* 131:*20* 153:*17* 159:*5* 164:*2, 8* 191:*8* 196:*24* 236:*13* 239:*22* 277:*9*
NOBO/privileged 4:*13*
nomenclature 123:*14*
non-argumentative 46:*14*

non-binding 51:*11* 133:*2* 157:*14* 160:*9* 235:*19*
non-disclosure 162:*17, 18*
non-public 65:*15* 66:*2, 15* 69:*8* 70:*5* 75:*10* 77:*21* 92:*6, 15* 93:*3* 124:*15* 149:*23* 150:*13* 159:*6*
non-responsive 258:*1*
non-suggestive 46:*14*
normal 9:*4*
normally 166:*16*
Northwestern 7:*18*
NOTARY 287:*1, 23*
notation 6:*13* 51:*7* 65:*7* 191:*8*
note 13:*12* 43:*18* 80:*19, 20* 81:*8, 9* 85:*9, 11, 16* 86:*15, 20, 25* 87:*19* 88:*5, 22, 23* 89:*6, 9* 108:*25* 213:*25* 215:*1* 242:*11* 262:*24*
noted 5:*15* 28:*22* 29:*1* 32:*9* 50:*10* 59:*5* 61:*3* 62:*13* 82:*15* 92:*7* 198:*2* 262:*14*
notes 78:*19* 81:*5* 208:*22* 236:*17* 287:*12*
notion 188:*1*
notwithstanding 70:*3* 142:*13*
November 107:*3, 8* 126:*4, 15, 23* 142:*16* 143:*14* 147:*5, 10* 177:*15* 185:*21, 24* 220:*5* 224:*5, 8, 13, 15, 22* 235:*15, 16, 18, 20* 236:*18* 258:*18, 22* 259:*3, 6* 260:*7* 261:*4, 9, 15, 16* 270:*25* 272:*17* 283:*15*
Number 5:*10* 6:*22, 24, 25* 11:*22* 12:*4, 25* 13:*13* 19:*18* 24:*12* 46:*3* 52:*1, 5* 57:*1*

64:*13, 22* 81:*8, 9* 82:*15* 85:*9* 88:*5, 20, 22* 96:*15* 103:*2* 113:*9, 12, 22* 119:*21* 126:*6* 127:*4* 159:*8* 173:*2, 7, 8, 21* 175:*4, 8* 178:*11* 181:*22* 182:*13* 189:*17, 22* 201:*11* 202:*21* 203:*15* 204:*1* 206:*13, 21* 208:*20, 21* 210:*3* 213:*14* 214:*15* 215:*10* 216:*3, 11* 217:*8, 10* 221:*14, 23* 222:*1, 2, 8* 223:*6* 225:*12* 227:*15* 228:*6, 9, 16* 230:*4, 12, 15* 231:*15* 236:*17* 237:*21, 24* 239:*11* 241:*10* 251:*8, 9, 11, 12* 252:*14, 17, 19, 25* 253:*7, 12* 256:*12* 269:*17*
numbered 46:*9* 81:*6* 201:*19*
numbers 6:*14* 44:*13* 189:*11* 190:*24* 191:*3* 239:*12*
Numeral 48:*8* 57:*1* 61:*19* 148:*7*
numerical 52:*7, 12* 135:*11*
Nuthatch 219:*13, 16, 20, 25* 221:*18* 223:*7, 18* 224:*18* 225:*17* 226:*2* 230:*18*
Nuthatch's 225:*13*

< O >
obey 40:*12*
Object 11:*8* 12:*10* 13:*10* 33:*24* 34:*12* 36:*12* 37:*25* 38:*1, 21* 40:*9, 24* 41:*8, 13* 42:*17, 24* 43:*2* 44:*23* 47:*25* 58:*9* 59:*17* 60:*22, 25* 64:*7* 67:*20* 68:*3* 69:*15, 24, 25* 70:*12* 72:*3* 73:*16* 75:*3, 18* 76:*2, 21*

77:*13* 78:*5, 15* 85:*19* 92:*3, 24* 93:*17* 94:*19* 96:*11* 97:*5* 98:*5* 101:*3, 18* 102:*11* 114:*5* 121:*24* 131:*7* 173:*13* 182:*10* 247:*11, 12* 266:*18*
objecting 45:*6, 14* 46:*25* 87:*7, 12*
objection 38:*16* 39:*6, 20, 22, 23* 44:*25* 45:*6, 8, 13, 15, 19* 46:*25* 47:*2, 4* 55:*22* 71:*18* 73:*23* 74:*7, 20* 81:*13* 82:*1* 83:*23* 85:*25* 86:*16* 87:*18* 90:*7* 97:*10* 122:*2* 128:*5* 137:*24* 210:*12, 23* 221:*3* 223:*25* 233:*18* 244:*14, 18* 245:*3* 255:*12* 258:*6* 267:*7* 272:*7* 274:*6, 21, 25* 283:*11*
objections 38:*12, 24* 39:*6, 18* 41:*16* 44:*22* 45:*3, 4, 11, 23* 46:*2, 11, 12, 20, 21, 23* 47:*8* 52:*24* 86:*23* 87:*5, 22* 152:*1* 199:*23* 221:*9* 254:*3* 258:*11* 259:*23* 265:*1*
objective 13:*4*
obligation 143:*22* 195:*6*
obligations 55:*10*
observed 194:*4*
obstruct 39:*9*
obstructing 42:*16*
obtain 8:*20* 26:*4*
obtained 8:*3* 84:*6*
obtaining 8:*8*
obvious 21:*20*
obviously 22:*4, 23, 25* 23:*16* 28:*21* 29:*15* 30:*16* 31:*2* 36:*14, 15* 49:*23* 54:*21* 58:*21* 59:*19* 66:*2* 69:*7* 70:*6* 79:*23* 83:*2, 11* 86:*3* 89:*9* 92:*7* 95:*1* 99:*18* 106:*19* 108:*6*

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

109:*5*  111:*24*  112:*6*
118:*25*  125:*12*
131:*17, 19*  134:*3, 4*
135:*24*  140:*15*
142:*21*  144:*18*
145:*14*  146:*16*  159:*1,*
*3, 15*  160:*6*  162:*25*
165:*9*  167:*15*  168:*25*
170:*13*  176:*15*  188:*9*
194:*4*  197:*20*  204:*16*
210:*3*  211:*9, 11, 23*
212:*3, 4*  215:*3*
219:*11*  222:*14, 21*
233:*1, 19*  241:*4*
242:*20*  248:*10*
256:*13*  258:*25*
265:*13*  270:*17*
**occasions**  12:*19*
**occur**  76:*7*  93:*10*
94:*4*  96:*21, 24*  97:*22*
**occurring**  51:*13, 21*
133:*3*  141:*3*  193:*23*
**October**  1:*13*  5:*2, 5*
135:*25*  141:*1*  224:*13*
**offer**  50:*5, 18, 21, 25*
56:*15, 22*  57:*4, 20*
59:*15*  104:*17*  106:*23,*
*24*  107:*1, 4, 6, 8, 19,*
*24*  108:*9, 11*  111:*13,*
*21*  112:*14*  114:*3, 24*
115:*1, 3, 4, 11, 15*
119:*13*  120:*9, 10, 13*
123:*17*  126:*15*
127:*24*  139:*3, 7, 15,*
*24*  142:*14*  146:*9, 10*
149:*5*  155:*7, 25*
156:*9, 11, 14, 22*
168:*9, 12*  172:*6, 7, 9,*
*17*  173:*12*  176:*24*
177:*1, 2, 10*  180:*3*
184:*14*  185:*21*  197:*6*
198:*22*  217:*21*
223:*19*  224:*18, 25*
225:*7*  235:*20*  238:*17*
264:*9, 18*
**offered**  116:*18*
127:*23*  133:*12*
135:*18, 21*  136:*6*
138:*24*

**offeree**  202:*14*
**offerer**  202:*14*
**offering**  120:*20*
122:*10*
**offers**  104:*19*  105:*6,*
*22*  108:*17*  109:*19*
110:*24*  139:*22*
149:*24*  153:*15*
154:*15*  155:*3, 16, 23,*
*25*  156:*4, 20*  157:*3*
207:*13, 15*  209:*24*
271:*8*  277:*10*
**officer**  46:*16*  229:*4, 8*
**Oh**  7:*10*  51:*5*  60:*7*
79:*24*  81:*9*  84:*20*
101:*5*  118:*13*  129:*16*
130:*2, 9*  173:*18*
176:*6*  181:*17, 19*
182:*8, 9*  183:*16*
186:*23*  199:*15*  215:*6*
228:*2*  229:*25*  230:*17*
233:*23*  239:*17*  240:*2,*
*7*  264:*15*
**Okay**  6:*20*  7:*11*  8:*3*
12:*17*  13:*21*  14:*7*
20:*22*  21:*12, 15*  22:*9,*
*12*  23:*7, 21*  26:*7*
27:*9, 11, 13, 25*  33:*22*
34:*2, 18*  35:*22*  42:*17*
43:*9, 24*  44:*15*  46:*10*
47:*13, 22*  48:*8, 18, 22*
49:*18*  50:*1, 4*  51:*1, 4,*
*5, 9, 18*  52:*5*  54:*16*
55:*19*  56:*13*  58:*2, 8,*
*19, 24*  59:*13*  60:*7, 15,*
*19*  61:*9*  62:*6*  63:*10*
64:*5, 12, 22*  65:*9, 14*
66:*18*  67:*5*  71:*23*
72:*16*  74:*17*  75:*23*
77:*2*  78:*23, 25*  79:*18,*
*21*  80:*9*  81:*9*  82:*24*
84:*19*  85:*7, 8, 10*
88:*2*  89:*16, 17, 21*
93:*6, 14, 24*  95:*19, 21,*
*23*  96:*2, 3, 8, 15, 17*
98:*2*  100:*21*  101:*9,*
*12, 14, 15*  102:*15*
103:*1, 13, 15*  104:*12*
105:*18, 19*  106:*5*
108:*16, 21*  111:*11*

113:*4, 8, 17, 19, 24*
114:*14*  115:*10*  117:*6,*
*25*  118:*13*  119:*20, 22,*
*25*  120:*6*  121:*1, 4, 7,*
*21*  123:*24*  124:*12*
125:*3, 8*  126:*20*
129:*15, 16, 24*  130:*6,*
*9, 12*  131:*2, 21*  132:*2,*
*9, 20, 21*  133:*15*
134:*9, 11, 25*  135:*7,*
*15*  136:*4*  138:*21*
140:*9*  141:*11*  146:*2*
147:*17*  151:*8*  157:*12*
162:*6*  163:*18*  164:*10,*
*12, 14*  167:*7*  171:*2, 9,*
*14*  172:*2, 5*  173:*1, 6,*
*8, 16, 19, 20*  174:*8, 19*
177:*10, 20, 25*  178:*4,*
*8, 15, 24*  179:*6, 10*
180:*17, 20*  181:*5, 9,*
*24*  182:*6, 19*  183:*2,*
*11, 18, 21*  184:*3, 7, 18,*
*21*  185:*1, 11*  186:*3,*
*23*  187:*8*  188:*19, 21,*
*25*  189:*7, 10, 14, 22*
190:*3, 15*  191:*11*
192:*6*  193:*5, 8*
194:*25*  195:*2*  196:*8,*
*16*  197:*2*  200:*1, 6, 10,*
*24*  201:*5, 11, 18*
202:*8, 17*  203:*11*
204:*1*  206:*13*  207:*3*
213:*17, 21*  214:*15, 24*
215:*6, 9, 12, 17*  216:*1*
219:*3, 15*  221:*14*
222:*7*  223:*4*  224:*7,*
*10*  226:*7, 19, 22*
227:*2, 5, 24*  228:*3*
229:*3*  230:*17, 21*
231:*20*  232:*17*  233:*3*
234:*8*  235:*8*  236:*11*
237:*2*  238:*13*  240:*15,*
*21, 23*  241:*6, 7, 10*
242:*23*  243:*15, 22*
244:*5*  250:*25*  251:*4,*
*8*  253:*7, 16*  261:*2, 12*
263:*11*  264:*8*  269:*22*
270:*5, 6*  273:*16*
275:*3, 17*  276:*2, 8, 17,*
*20, 24*  277:*1, 6, 23*

278:*21, 25*  279:*10, 15*
280:*19*  281:*20*
282:*20*  283:*2, 5*
284:*11, 14, 16, 18*
**Oklahoma**  7:*21*
**old**  179:*9, 16*
**olive**  126:*13*  236:*7*
**omission**  169:*12, 20*
170:*7, 16*
**omitted**  66:*20*  80:*23*
**Omni**  14:*23*
**once**  25:*18*  28:*3*
34:*9*  69:*19*  101:*16*
102:*18*  121:*1*  145:*15*
156:*2*  162:*10*  163:*5*
216:*11*  268:*5*
**ones**  33:*19*  34:*6, 8*
36:*8, 19*
**one's**  255:*16*
**one-third**  100:*4*
**ongoing**  26:*15*
**open**  206:*17*  236:*20*
**opening**  93:*4*  94:*23*
95:*3, 4*  106:*7, 23*
**opine**  52:*17, 21*
55:*16, 17, 20*  56:*4, 14,*
*21*  57:*19, 24*  58:*2, 3,*
*11, 25*  59:*14*  60:*2, 3,*
*5, 20*  61:*10, 21*  62:*8,*
*14*  63:*18*  67:*2, 17, 25*
68:*25*  70:*9*  73:*7, 14*
74:*18*  88:*2*  111:*23*
112:*8, 12, 20*  128:*11*
163:*9*  180:*15, 16, 18,*
*21*
**opined**  57:*24*  58:*5,*
*17*  60:*1*  62:*12*  73:*10,*
*18*  74:*21*  112:*10*
**opines**  104:*15*
**Opinion**  3:*16, 22*
15:*21*  16:*1, 17, 21*
26:*19, 22*  28:*19, 23,*
*25*  29:*3, 4, 6, 7, 11, 19*
30:*8*  31:*8*  34:*18*
35:*3, 5, 6, 8, 24*  37:*21*
48:*21*  65:*18, 23*  66:*5,*
*11*  68:*18*  71:*1, 4*
86:*1, 2, 25*  87:*19*
90:*9*  92:*2*  97:*9, 14,*
*17*  102:*14, 19*  103:*5,*

25 104:*1, 4, 7* 106:*1, 12, 19, 20* 108:*25* 123:*5* 132:*25* 133:*16* 138:*22* 139:*8* 140:*5* 143:*19* 144:*20* 151:*16, 25* 153:*22* 155:*2* 159:*22* 162:*17, 24* 163:*1, 4* 169:*9, 13* 171:*10, 12* 177:*5* 194:*8* 197:*3, 7, 23, 25* 198:*7, 18, 21* 199:*9* 200:*9, 11, 14* 240:*25* 241:*3* 249:*23* 251:*8, 9, 10, 12* 252:*2, 14, 17, 19, 25* 253:*7, 12* 261:*20* 263:*7* 269:*11, 15, 19, 24* 270:*15* 271:*5*

**opinions** 16:*10, 16* 17:*15* 18:*9* 30:*4* 51:*4* 60:*9, 14* 75:*7* 88:*24* 89:*3* 90:*14* 92:*12* 106:*17* 132:*24* 134:*4* 197:*11, 13, 14* 198:*11* 199:*15* 200:*20* 241:*8* 251:*5, 23* 252:*2, 7, 13* 253:*2, 6* 267:*8* 268:*22* 272:*3* 274:*17* 282:*20*

**opportunities** 143:*2*

**opportunity** 95:*18*

**opposed** 9:*7* 144:*19* 195:*22*

**opposing** 45:*5, 12* 46:*24*

**options** 236:*19*

**oral** 22:*12* 209:*10, 22*

**orally** 21:*5*

**Order** 3:*18, 19, 22* 12:*21* 22:*18* 25:*16* 26:*18* 44:*21* 103:*5* 182:*1, 12*

**ordinary** 157:*14* 269:*6*

**organized** 183:*1*

**orient** 41:*23* 81:*3* 100:*16* 105:*12*

**original** 24:*24* 28:*25* 71:*16* 74:*6, 15* 153:*5,*

8 188:*20* 235:*7*

**originated** 55:*2*

**outcome** 32:*14*

**outcomes** 47:*17* 48:*5*

**outdated** 179:*15*

**outlined** 37:*18*

**output** 35:*17* 117:*11, 14*

**outreach** 187:*16* 235:*17*

**Outright** 217:*15, 16*

**outside** 211:*13*

**outstanding** 114:*18*

**overlooked** 248:*13*

**overlooks** 277:*13*

**oversight** 249:*25*

**overstep** 270:*16*

**overview** 223:*13*

**owned** 121:*9*

**ownership** 230:*17, 21* 232:*12* 237:*17*


**< P >**

**p.m** 132:*11, 12* 183:*4, 5* 227:*10, 11, 12* 275:*9, 10* 284:*19, 21*

**PAGE** 3:*3, 12* 6:*14, 18* 7:*11* 11:*3, 4* 14:*5* 16:*23* 27:*12* 44:*11, 12, 13, 14, 15* 46:*8, 10* 47:*12* 51:*2, 3, 5, 6, 8* 53:*2* 54:*20* 65:*6* 78:*18* 79:*4* 80:*19* 81:*5* 85:*7* 87:*25* 89:*13, 16* 96:*15* 99:*8* 100:*3* 101:*24* 104:*11, 13* 105:*12, 15* 106:*10* 111:*15* 116:*6* 118:*6, 24* 121:*4* 124:*8* 125:*11* 127:*5, 19* 129:*12* 132:*16* 146:*19* 148:*8* 160:*1* 161:*18* 164:*15, 20* 171:*21* 172:*2* 173:*1* 178:*12, 13, 15* 181:*9, 19* 182:*1, 13, 21* 184:*18, 19* 186:*3, 20, 22* 188:*20* 192:*6* 193:*10* 195:*1* 198:*4*

200:*23* 210:*15* 215:*7, 16* 222:*9* 224:*9* 234:*19* 235:*6* 241:*6* 249:*21* 251:*2, 3, 12* 269:*23* 270:*9* 276:*6, 9, 25* 277:*7, 23, 24* 278:*6* 279:*17, 19* 280:*7, 23* 281:*7, 12, 19* 282:*7* 286:*2*

**pages** 44:*15* 46:*8* 89:*18* 164:*13* 179:*11* 245:*1* 246:*1* 249:*22* 274:*10*

**paid** 194:*23*

**paper** 12:*8, 12* 171:*4* 174:*9* 182:*19* 198:*9* 199:*3, 4*

**papers** 11:*4, 6, 19* 13:*6, 7, 8, 22* 19:*7, 15*

**par** 240:*15*

**paragraph** 44:*14* 46:*10, 12, 19* 47:*14* 51:*9* 54:*17* 63:*8* 65:*5, 9* 68:*6* 69:*19* 75:*9, 25* 76:*8* 77:*7, 8, 10, 24* 78:*3, 11* 82:*16* 85:*1* 91:*2, 5, 6, 8, 12, 23, 25* 92:*4, 23* 93:*4* 94:*11, 15, 18* 96:*15* 99:*15* 104:*14* 117:*25* 122:*7* 123:*24* 124:*12* 130:*10* 132:*17, 22* 133:*18, 21* 140:*9* 144:*6* 149:*19* 152:*9* 160:*15* 162:*15* 163:*5, 18, 24* 171:*22* 173:*3* 181:*22* 183:*24* 184:*4, 11* 186:*3* 192:*6* 195:*1* 196:*23* 235:*6, 9* 240:*16* 241:*24* 242:*11, 12* 248:*4* 249:*21* 252:*10* 262:*25* 270:*2, 3, 4* 276:*6, 21* 277:*7, 24* 278:*2, 7, 8* 280:*13, 23* 281:*7, 19* 282:*8*

**Paragraphs** 89:*18* 171:*18* 235:*6* 283:*8, 21*

**paraphrase** 50:*10* 125:*8*

**paraphrasing** 185:*14*

**parenthesis** 241:*18*

**parsimony** 35:*14, 18*

**parsing** 144:*20*

**part** 10:*19* 14:*1, 15, 19, 20, 25* 15:*3, 6* 16:*10* 22:*11* 28:*16* 29:*18* 30:*1* 35:*13* 48:*3, 21, 24* 49:*6* 53:*19* 57:*5* 58:*22* 59:*11* 60:*24* 61:*23* 62:*3, 19* 67:*18* 69:*10* 70:*10, 19* 72:*11* 75:*15, 24* 86:*21, 25* 88:*4* 94:*10* 97:*24* 99:*9* 102:*8* 136:*21* 138:*9* 141:*22* 146:*16* 150:*17* 152:*13, 22* 159:*18* 160:*2* 168:*23* 188:*7* 189:*3, 24, 25* 190:*21* 196:*4* 197:*16* 199:*19* 211:*4* 212:*4, 18* 247:*7* 252:*23* 253:*14* 276:*6* 278:*2*

**participant** 50:*3*

**participate** 163:*13*

**participated** 10:*4*

**particular** 10:*15* 17:*13* 21:*17* 22:*21* 23:*18* 53:*15, 20, 23* 54:*16* 55:*10* 107:*24* 114:*9* 141:*7* 180:*18* 196:*5* 204:*15* 238:*10*

**particularly** 11:*25* 16:*9* 29:*14* 30:*2, 17* 37:*10* 44:*11* 111:*25* 115:*4* 137:*5, 9* 145:*19* 157:*15* 192:*2, 4* 211:*25* 230:*8*

**parties** 45:*18* 115:*21* 175:*12* 177:*14* 235:*9* 246:*19* 247:*3* 255:*25* 256:*10* 269:*1*

**parts** 48:*24* 72:*16, 24* 181:*6* 250:*19*

**party** 46:*16* 126:*13* 141:*6* 142:*23* 231:*6*

Deposition of Shane Goodwin, Ph.D.    In Re National Instruments Corporation Securities Litigation

249:*12*  262:*17*  268:*2, 17*  287:*13*
**passive**  123:*1, 11, 13, 22*
**path**  217:*18*
**pay**  194:6, *22*  196:*1*
**Payable**  193:*11*
**paying**  194:*11, 17* 253:*17, 25*  254:*25* 265:*4*
**payment**  193:*2*
**PDF**  186:*22*
**peers**  174:*19*  214:*21*
**pending**  40:2, *5* 259:*17*
**Pennsylvania**  8:*12*
**people**  25:*6*  31:*4* 99:*5*  110:*13*  131:*3* 138:*10*  163:*11* 176:*13*  209:*19* 211:*14*  213:*6*
**people's**  79:*22* 131:*14*
**percent**  34:*11, 19* 35:*8*  108:*9*  115:6, *7* 116:*25*  117:*6*  120:*13, 20*  121:*1*  165:*16* 166:*24*  167:*10, 25* 172:*10, 18*  176:*25* 177:*2*  203:*3*  228:*8* 232:8, *9*  237:*16* 282:*25*
**percentage**  52:*1* 108:*14*  134:*15*
**percentages**  37:*3*
**Perfect**  80:*8*
**perfectly**  79:*13*  167:*4*
**performance**  185:*6*
**performing**  185:*7*
**period**  19:*20*  51:*14, 22*  104:*16*  112:*23, 24* 122:*18*  133:*4*  136:*12, 13*  138:*25*  140:*25* 141:*12*  142:*1*  147:*4* 149:*21, 24*  193:*24* 194:*3*  195:*3*  203:2, *6, 7, 9*  220:*4*  238:*5* 241:*1, 15*  248:*17* 276:*13*  277:*12, 17*

279:*7*  280:*1, 16* 281:*2*  282:*4, 14*
**person**  8:*19*  31:*18* 119:*2*  138:*14*  165:*21* 176:*7*  181:*2*  208:*23* 267:*25*  268:*15*
**perspective**  137:*17, 18*
**pertain**  148:*3*
**pertained**  217:*1*
**pertains**  66:*3*  178:*23*
**petered**  233:*7*  234:*14*
**Ph.D**  1:*10*  3:*4, 16* 5:*18*  7:*21*  8:*14* 285:*14*
**philosopher**  146:*6*
**phone**  53:*5*  208:*23* 222:5, *17*  258:*21*
**phrase**  44:*25*  45:*20, 24*  96:*3*  124:*20* 135:*19*  150:*21* 184:*23*  241:*18*
**phrased**  88:*25*
**pick**  222:*5*
**picking**  191:*23*  246:*2*
**picture**  49:*21*  50:*3*
**piece**  95:*8*  182:*18*
**pieces**  277:*13*
**pill**  148:*14, 22*  149:*1, 11*  156:*3*
**pipeline**  233:*6*  234:*9*
**place**  193:*2*  195:*20* 210:*21*  237:*2*  285:*9*
**PLAINTIFF**  2:*1*
**plaintiffs**  6:*1*
**Plaintiff's**  149:*22*
**plan**  118:*15*  119:7, *9* 124:*14*  139:*17, 19* 146:*7*  148:*12, 25* 185:*12, 13, 15, 17* 191:*4*  227:*3*  281:*4, 17*
**plans**  119:*17*  130:*25*
**PLASCOFF**  2:*6*  6:*3* 7:*3*  43:*22*  44:*7, 17* 46:*5*  64:*24*  113:*10* 130:*3*  181:*24*  182:*5, 23*  183:*14*  186:*17, 19, 21*  216:*2*  239:*15* 240:*10*  266:*6*  269:*19*

**plausible**  111:*12, 18, 20*  112:*7*
**plausibly**  139:*23*
**play**  37:*2*  215:*10*
**Playbook**  213:*14*
**player**  131:*11*
**playing**  145:*18*
**plc**  225:*18*
**pleadings**  158:*25* 169:*23*
**please**  5:*16*  6:*8* 11:*3*  22:*17*  32:*24* 38:*12, 14*  43:6, *18* 46:*8*  55:*23*  74:*2* 87:*5*  91:*16*  132:*16* 154:*24*  172:*4*  194:*12* 205:*7*  217:*10*  227:*16* 228:*15*  240:*11*  256:*6* 270:*6*
**pleasure**  154:*11*
**plenty**  16:*10*  126:*10* 158:*1*
**plus**  110:4, *6*  157:*24* 273:*9*
**point**  10:*15*  65:*17* 75:*5*  76:*13*  78:*11* 84:*21, 24*  87:7, *12* 99:*11, 16*  100:*15* 116:2, *6*  119:*18* 121:*6*  141:*7*  142:*25* 143:*18*  165:*9*  167:*15* 170:*19*  199:*10* 204:*15*  208:*21* 213:*17*  215:*13* 218:*13*  219:3, *7* 222:2, *8*  223:*16* 232:*17*  233:*5*  238:*10* 242:*5*  244:*6*  258:*8* 281:*6*
**pointed**  252:*9*
**points**  120:*11, 13* 121:*5*  230:*4*
**poison**  148:*14, 22*
**pool**  34:*14, 16*  37:*1*
**Poorly**  185:*6*
**Poplin**  1:*24*  5:*13* 287:6, *22*
**PoR**  191:*4*
**portion**  24:*22*
**posed**  39:*4*  58:*5*

**position**  37:*7*  104:6, *23*  143:*12*  237:*15* 248:*22, 23*
**positions**  122:*9*
**positive**  156:9, *11* 178:*21*  179:*1, 21, 22* 180:*4*
**Posits**  241:*10*
**possessed**  149:*22* 281:*22*
**possession**  161:*11*
**possibilities**  144:*5* 181:*21*
**possibility**  56:*14, 21* 57:*4, 19*  58:*11*  59:*1, 15*  60:*20*  61:9, *10, 21* 112:*13*  128:*20* 136:*19*  139:*2*  140:*10* 146:*10*  165:*13* 238:*21*
**possible**  35:*16*  47:*5* 55:*20*  56:*5*  79:*17* 80:*3*  95:*14*  139:*24* 165:*11*  202:*2*  270:*4*
**possibly**  112:*23* 206:*2*
**Postdoctoral**  7:*23*
**potential**  47:*17, 18* 48:*5*  49:*13*  61:*6* 88:*8*  96:*19*  97:*21* 100:7, *25*  112:*5* 145:*7*  146:*12*  169:*2* 186:*10*  187:*23* 216:*16*  224:*20* 230:*15*  232:*19* 235:*11*  255:*6*  276:*12* 278:*10*  279:5, *24* 280:*15, 25*  282:*1, 11*
**potentially**  88:*10* 100:*9*  101:*2*
**practical**  10:9, *12*
**practice**  66:*4*  70:*4* 90:*12*  92:*17*  199:*20* 209:*6*  211:*18*
**practicing**  9:*12* 10:*23*  162:*21*
**practitioner**  10:*23* 17:*25*  273:*10*
**practitioners**  163:*9*

**pre** 50:*5*
**precedent** 192:*2, 3*
**preceding** 107:*16*
**precise** 57:*16, 18*
90:*20* 131:*15* 196:*19*
236:*3*
**preclude** 146:*12*
**predict** 112:*4, 18*
141:*16, 19*
**predicted** 141:*14*
**Predictions** 112:*3*
**prefer** 123:*25* 124:*5*
130:*14* 239:*20*
240:*17*
**preference** 117:*20*
**preliminary** 241:*12*
**prelude** 231:*16*
**premier** 201:*15*
**premise** 109:*21*
175:*22* 253:*2* 277:*9*
**premium** 108:*9*
116:*3, 7, 12, 18, 25*
117:*3, 6, 10, 14*
120:*14, 20, 23* 121:*2*
172:*6, 7, 10, 17*
176:*25* 177:*2* 192:*5*
**preparation** 17:*2*
236:*19* 237:*4*
**preparations** 85:*13*
88:*6*
**prepared** 55:*17*
148:*4* 236:*12, 23*
238:*1* 254:*4* 255:*8*
265:*24*
**Preparedness** 4:*8*
**preparing** 249:*8*
264:*9* 276:*13*
**PRESENT** 2:*19*
16:*4* 158:*17*
**presentation** 201:*6*
215:*19, 22* 216:*7*
217:*5, 7* 226:*16*
230:*14*
**presentations** 207:*7*
230:*11* 265:*17*
**presented** 10:*3, 6*
53:*4, 11* 215:*17*
226:*13*
**presenting** 214:*6*

225:*22*
**preserved** 46:*22*
**preserving** 196:*6*
**press** 113:*14*
**Pressure** 201:*24*
202:*3*
**Presumably** 233:*25*
**presume** 9:*21* 226:*16*
**presuming** 34:*4*
**Pretrial** 3:*19*
**pretty** 30:*13* 167:*14*
178:*24* 207:*24*
**prevent** 108:*18*
109:*20* 110:*24*
**previous** 36:*22* 187:*3*
**previously** 59:*5*
84:*13* 114:*10* 281:*22*
**price** 104:*20* 108:*3,*
*10* 116:*3, 7, 12*
120:*14, 22* 121:*2*
122:*9* 125:*9, 10, 17,*
*18, 21, 22* 126:*3, 4, 9,*
*21* 136:*2, 3, 17, 20*
141:*13* 143:*21, 22*
144:*4* 153:*18* 156:*12,*
*20, 21, 23* 157:*4, 5*
164:*2, 8* 165:*7, 9, 16*
166:*21* 167:*23* 169:*4*
177:*5, 9, 18* 185:*6, 12,*
*16, 20* 188:*1, 25*
190:*20, 21* 191:*8, 13,*
*17* 204:*8, 14, 21*
205:*3, 18* 236:*1*
**prices** 157:*3* 167:*15*
**principle** 219:*8*
**principles** 91:*13*
**print** 79:*10* 80:*7*
**printed** 78:*21* 80:*16*
113:*19* 130:*3*
**Printout** 3:*21* 65:*3*
181:*25* 183:*16, 20*
**printouts** 101:*13*
129:*24*
**prior** 49:*15* 78:*15*
84:*17* 92:*25* 130:*13*
150:*8* 169:*12, 19*
239:*20* 240:*17* 248:*9*
253:*21* 256:*21*
257:*20* 259:*14* 262:*6*

266:*19* 267:*1, 7*
272:*3* 273:*23*
**priority** 127:*7, 11, 18*
128:*1, 15, 17*
**private** 14:*12* 130:*15,*
*20, 22, 24* 131:*5, 18*
145:*10* 146:*13, 14*
159:*15* 202:*8, 14, 16*
204:*7, 20* 209:*10*
239:*21* 240:*18*
**Private/Public** 203:*12*
**privately** 124:*2, 6, 10*
143:*17* 163:*17*
206:*17* 223:*18*
**privileged** 44:*24*
**pro** 8:*22* 38:*22*
**prob** 49:*25*
**proba** 240:*25*
**probability** 27:*4*
48:*9, 10, 12, 25* 49:*8,*
*13, 20, 24* 50:*11, 12,*
*15* 51:*13, 20, 21, 23,*
*25* 52:*6* 57:*8, 11*
60:*20* 61:*10* 63:*11,*
*19* 67:*8* 68:*15* 69:*4,*
*5* 70:*19, 24* 71:*4, 15,*
*17, 20, 23* 72:*13, 18*
73:*3, 14, 21* 74:*18, 23*
76:*11, 12, 15* 88:*2, 8*
93:*9* 94:*3* 100:*7, 24*
102:*1, 2* 112:*10, 12*
115:*2* 133:*2* 136:*6,*
*20* 138:*24* 140:*18, 19*
141:*2, 9* 142:*6*
149:*20* 150:*5, 21*
151:*1, 10, 12* 193:*19,*
*22* 219:*15, 20* 240:*25*
**probable** 85:*12*
86:*14* 87:*16* 89:*24*
**probably** 10:*16*
11:*23, 24* 22:*10* 23:*5*
24:*3* 116:*21* 119:*1*
122:*20, 23* 137:*4*
156:*1* 175:*23* 197:*8*
210:*17* 214:*12*
237:*18* 267:*13*
271:*11*
**probe** 59:*8*
**problem** 199:*19*

**Procedure** 44:*21*
103:*14*
**procedures** 147:*18*
**proceed** 139:*16, 19*
145:*15, 20, 23*
**proceeded** 269:*5*
**proceeding** 143:*1*
**process** 26:*15, 16*
28:*13* 32:*1, 9* 47:*17*
48:*4* 53:*20* 55:*6*
107:*23* 146:*23*
157:*16* 177:*21, 22*
199:*14* 204:*17* 264:*1*
**processes** 143:*6*
**produced** 6:*9* 21:*10*
28:*2, 8* 33:*10, 13, 15*
36:*16* 37:*20* 50:*23*
64:*10* 102:*20* 250:*20*
262:*10*
**Production** 198:*10*
**Products** 3:*19* 46:*4*
**professional** 174:*15*
233:*25*
**Professor** 277:*8*
**professors** 8:*25*
**program** 8:*22* 9:*2*
**progressing** 284:*1*
**Project** 4:*4, 9* 22:*21*
111:*24* 139:*12* 141:*4*
**projections** 111:*24*
188:*25* 189:*12* 190:*6,*
*8, 15, 17* 191:*1*
**pronounce** 110:*2*
**proper** 244:*18* 245:*4*
**proposal** 48:*12, 14*
49:*14* 50:*14* 57:*10*
108:*6* 117:*25* 118:*6*
124:*17, 20* 125:*3, 16*
126:*12, 23* 127:*6, 10,*
*18, 24* 128:*14* 147:*6*
148:*10* 157:*14, 17, 19*
177:*4, 15* 184:*13*
187:*24* 208:*11*
217:*24* 218:*1, 4, 18,*
*20* 220:*1, 2, 6* 225:*11*
235:*16, 19* 238:*14*
269:*4* 272:*17*
**proposals** 51:*11*
133:*2* 160:*9* 161:*24*

169:*4*  184:*5*  241:*13*  281:*23*

**propose**  231:*6*
**Proposed**  51:*14, 22*  118:*2*  133:*3*  136:*12, 13*  140:*25*  149:*21, 24*  193:*23*  203:7  205:*2, 17*  279:*7, 25*  282:*3, 13*
**proposes**  114:*17*
**proposing**  204:*8, 21*
**prospect**  104:*15*  241:*14*  242:*15*  248:*16*  277:*16*
**prospective**  192:*15, 17*
**protect**  149:*15*
**prove**  273:*18*  281:*23*
**provide**  20:*24*  22:*17*  26:*18, 22*  27:*4*  64:*11*  120:*3*  218:*19*  230:*21*  249:*25*
**provided**  16:*20*  23:22  24:*3*  25:*10, 23, 24*  26:*2, 17, 20*  33:*19*  61:*3*  62:*12, 22*  65:*12, 14, 24*  66:*1, 13, 14*  68:*23*  69:*8*  70:*2, 4, 21*  75:*11*  76:*17*  77:*22*  82:*17*  83:*3, 10*  91:*3*  92:*5, 23*  93:*2*  149:*9*  150:*19*  152:*19*  160:*5*  189:*13*  215:*23*  230:*14*  252:*4*
**provides**  118:*9*  160:*7*
**proving**  274:*10*
**proxy**  147:*11*  177:*6*  196:*20*  231:*11*  232:*13, 16*  259:*1*  260:*10, 19, 20*  261:*8*  272:*11, 13, 16*  283:*18*
**prudent**  249:*11, 24*  250:22  255:*3, 22*  256:*3*  262:*15*  264:*22*  265:*2, 12*  267:*25*  268:*14*  269:*8*  272:*25*
**PST)/privileged**  4:*17*
**psychology**  31:*3*
**public**  18:*19*  59:*15*  60:*21*  111:*13, 21*  112:*23*  118:*21*

119:*13, 18*  127:*22*  128:*1*  131:*6*  141:*20, 25*  142:*8*  143:*17*  145:*10*  146:*15, 16*  148:22  149:*5*  156:*10, 22*  157:*2*  167:*8*  200:*16*  202:*17*  203:*24*  206:*2, 3*  221:*23*  224:*24*  225:*6, 7, 18*  226:*2*  238:*17, 20, 21*  263:*21*  264:*9, 18*  287:*23*
**publically**  163:*12*
**publication**  174:*15*
**publications**  11:*4*
**Publicly**  19:*6*  26:*23*  27:*3*  157:*18*  159:*15*  163:*17*  180:*25*  203:*15*  225:*9*
**publish**  174:*24*
**published**  13:*13*  172:*24, 25*  174:*9, 19*
**pull**  129:*8, 14*  223:*4*  239:*2*  240:*10*  269:*15*
**purchase**  105:*7, 8*  114:*18*  230:*8*  232:*18, 24*  271:*9*
**purchases**  206:*18*  236:23
**purely**  195:*22*
**purpose**  13:*6*  15:*13*  99:*20*  202:*6*
**purposes**  80:*21*
**pursue**  137:*15*  143:*3*  146:*4*
**pursued**  10:*13*
**pursuing**  147:*14*  157:*16*  218:*20*
**put**  10:*10*  22:*15*  34:*6*  35:*1*  52:*5, 11*  54:*1*  61:*18*  73:*19*  74:22  89:*8*  98:*20, 23*  99:*8*  113:*8*  126:*12*  134:*6*  164:*6*  188:*3*  195:*20*  200:*23*  210:*11*  225:*25*  227:*15*  232:*13*  234:*19*  236:*6*  237:*19*  243:*13*  248:*2*  251:*10*

257:*16*  274:*23*
**puts**  248:*13*
**putting**  12:*20*  111:*19*  197:*17*  207:*8*  209:*17*  211:*24*

**< Q >**
**Q1**  121:*9*
**qualitative**  135:*13*
**qualitatively**  163:*14*
**quantify**  51:*19*
**quantitative**  11:*6, 19*
**quarter**  192:22  194:*19*  196:*2*  265:*5*
**question**  14:*24*  15:*5, 9*  20:*3, 17*  21:*7*  32:*12, 24*  38:*2, 14, 19*  39:*3, 11*  40:*2, 4, 5, 7, 8, 15, 25*  43:*6*  44:*23*  45:*5, 12, 21, 24*  46:*17, 23*  57:*14, 18*  59:*24*  68:*4*  69:*16*  73:*7*  74:*9, 11, 13, 17, 23*  75:*21, 23*  78:*16*  82:*4*  84:*25*  87:*12*  90:*17, 21*  93:*22, 24*  95:*15, 16, 25*  104:*6*  109:*17*  116:*17*  119:*16*  123:*20*  128:*13, 25*  129:*17*  134:*12*  140:*3*  144:*10, 23*  157:*10*  158:*13*  159:*22*  161:*1*  167:*6, 7*  168:*15, 23*  169:*15*  170:*16, 17*  174:*2*  180:*2, 10*  189:*14*  191:*12*  194:*16*  198:*14, 15*  199:*2*  207:*11, 21, 24*  210:*6, 20*  211:*4*  213:*23*  214:*25*  215:*5*  220:*23*  229:*1*  234:*20*  242:*2, 25*  245:*19*  252:25  254:22  255:*18*  256:*6, 7, 15*  257:*25*  258:*1, 10*  259:*16, 18, 20*  260:*2, 3*  264:*16*
**questioning**  42:*11*  275:*16*

**questions**  9:*1*  38:*21*  40:*11*  42:*19*  58:*5*  83:*20*  86:*11*  89:*14*  95:*2, 7, 18*  144:*14*  199:*24*  216:*17*  223:*5*  275:*21*  283:*4*  284:*15*  287:*8*
**question's**  247:*11*
**quick**  171:*16*  200:*4*
**quickly**  95:*24*  155:*18*
**quite**  13:*14*  23:*2*  24:*15*  99:*2*  138:*11*  141:*6*  188:*5*  207:*4*  214:*11*  255:*4*
**quotation**  280:*25*
**quotations**  72:*12*
**quote**  69:*19, 22*  91:*25*  97:*3, 6*  146:*5*  184:*3, 6, 7, 10*  185:*10*  241:*19*  247:*4*  268:*12*  281:*12*
**quoted**  72:*12, 17*  105:*3*  282:*17*
**quotes**  45:*1*  105:*1*  248:*2*
**quoting**  112:*2*  280:*24*

**< R >**
**rack**  160:22
**raise**  125:*8, 9, 10, 17*  126:*3, 9*  136:*20*  143:*20*  185:*12, 16*
**raised**  107:*6*  126:*4, 20*
**ran**  177:*21, 22*
**ranged**  190:*9*
**ranges**  173:*9*  197:*21*
**ranging**  179:*12*
**Rapp**  20:*10*  209:*18*  229:*16*
**rare**  188:*5, 7*  230:*7*
**rarely**  79:*19*  185:*7*
**reach**  32:*20*  34:*20*  82:*13*  124:*2, 5, 9*
**reached**  34:*18*  35:*8, 24*  36:*2*  37:*12*  132:*24*
**reaching**  29:*3*  97:*14, 17*

read 8:23, 25  9:1 17:18  18:5, 6, 7, 12, 13  20:16  23:7, 11, 14, 17  28:24  29:2  33:18 37:23  38:3  40:6 44:19  56:2  74:11 78:24  82:3, 24  84:6, 13, 16, 17, 23  87:23 88:14  89:4  92:10 103:5  104:25  111:6 118:14, 24  119:4, 5 122:3  130:10  164:21 171:8, 9, 14, 18  172:3 173:4  179:9  183:24 198:9, 13  199:3, 4 207:12, 14  212:13 222:13  225:25  233:1 239:19  242:21 252:11  259:18 262:11  269:11, 25 273:4  276:20  277:18 279:21  284:16  285:7

reading 87:24 103:25  131:3  150:24 225:3  239:25  247:23

ready 7:9, 10  227:6

Reagan 184:20, 22

real 53:16

realize 69:23  103:10

really 8:6  9:9, 13, 14 10:13, 20  14:1  22:3 24:17  37:4  53:18 66:3  97:23  99:22, 24 102:6  109:18  116:23 126:18  128:16 136:13  137:5  140:20 145:16  146:14 155:18  156:1  162:14 165:18  188:12  192:4 198:3  206:11  212:7 244:16  261:7  273:17

re-ask 209:15  260:2, 3

reason 137:3  159:10 260:20, 24

reasonable 66:22 80:24  100:11  106:5 139:23  143:23

reasons 21:20  117:1

rebuttal 86:9

recall 10:7  16:20 21:9  22:14  23:17 25:25  32:16  56:10 64:16  71:8  83:19 84:2, 4, 12, 16  85:4, 21  113:4  129:4 165:8  171:11  173:14 175:9  258:25

receive 30:6  192:21

received 25:11, 20 84:22  122:4  161:3 196:21

receives 157:13

Recess 44:1  80:11 132:11  183:4  227:10 275:9

recognize 184:1 189:20  201:3  228:19, 22  230:20

recommended 196:24

record 4:14  5:5, 16 43:12, 21, 24  44:2, 4, 19  47:6  64:10  79:20 80:9, 12, 14  132:4, 6, 10, 12, 13  183:2, 5, 7 212:2  217:10  226:24 227:8, 11, 13  275:7, 10, 11, 13  284:20

recorded 5:6  287:9

records 209:22

reduced 122:8 287:10

re-election 236:13

reevaluate 104:1

RE-EXAMINATION 3:8  283:6

refer 12:4  26:25 96:3  113:21  123:1, 13  161:15  181:9 183:25  253:8  276:17, 22

reference 137:3 145:11  159:9  262:1 281:9  283:22, 25

referenced 70:6 216:13  221:20  242:7 261:24

references 14:2 251:20

referencing 34:7, 8 83:11  89:7  94:22 136:13  138:19 231:12

referred 28:7  129:5 281:16  282:17  283:9

referring 75:9  87:19 123:3  136:15  182:4 192:10  231:2  239:6 242:15  280:5

refers 27:14, 19  28:4 44:20

reflect 105:9, 23 271:10

reflect[s 186:8

reflected 92:23 185:19

reflects 96:9  232:23 242:17

refrain 45:3  162:13

refrains 161:23

refused 200:20 224:19

refute 179:24

refuted 179:23, 25

refuting 248:11

regard 10:8  11:2 14:21  104:7  143:4 192:2  268:3

regarding 17:15 85:13  88:6  281:22

Regards 230:1

regular 8:24

regulatory 118:8

reinforcing 109:13

reiterate 118:6

reiterates 120:9

reiterating 204:14

reject 89:2  98:14 101:22  217:21, 22

rejected 104:17 107:3  108:3, 4 127:23  153:15  169:3 176:25  177:1, 3 187:25  220:2, 3 241:12  271:5  281:23

rejecting 48:11 49:14  57:10  148:10, 21  208:10

rejection 50:6, 13, 15 56:15, 22  108:17 109:5, 19  110:24 136:25  157:19  177:8, 13  184:5  185:2, 3 193:16  217:15, 16, 23 218:25  219:9  269:4

rejections 109:10 133:9  277:9

rejects 157:17

related 11:23  90:15 123:15  150:11  187:7 195:10  214:2, 5 216:15  249:9  287:12

relates 28:9  114:10

relating 215:4

relative 49:15 115:20  130:16 166:18  188:6  239:22 240:19

relatively 88:9  100:8, 25

relayed 21:5

Release 3:23  113:14

relevance 37:5  38:1 39:3, 6  40:9  43:3 46:21  168:23

relevant 21:25  22:17, 24  23:1  34:15  35:1, 6, 20  36:19  37:1, 10 102:23  154:2  156:6, 7  158:17  168:22 169:8

relied 66:16  76:16 90:9  92:4, 14  93:1 174:15

relies 185:5

Reluctantly 43:23

rely 18:1  24:6  31:4 66:13, 14  70:20 92:21  162:23  163:6 170:22  251:13

relying 32:2  77:20 90:13  162:11

remain 130:15 137:14, 19  239:21 240:19

remained 111:11, 19 241:14  242:14 248:15  276:11

277:*15*  278:*9*  279:*6, 24*  280:*15*  281:*1*  282:*1, 12*
**remaining**  227:*4*
**remember**  22:*13*  25:*24*  26:*1, 8*  85:*5*  88:*23*  115:*23*  173:*6*  218:*25*  228:*21*
**REMOTE**  2:*1*
**REMOTELY**  1:*11, 25*  5:*1*  6:*4*  287:*7*
**render**  90:*14*
**rendered**  90:*8*
**rendering**  140:*4*  277:*11*
**rendition**  113:*21*
**repeat**  32:*24*  55:*23*  56:*17*  63:*15*  72:*5*  91:*16*  93:*20*  143:*25*  152:*2*  180:*10*  205:*7*  221:*15*  253:*22*  259:*25*
**repeated**  46:*1*
**repeatedly**  216:*21*
**repeating**  128:*9*
**repetitive**  58:*15*  70:*15*
**rephrase**  145:*1*  258:*19*
**Replies**  277:*3*
**reply**  6:*23*  28:*11, 13, 16, 17, 20, 22*  103:*20*  154:8, *9*  179:*19*  181:6, *8*  183:*25*  184:*1*  218:*13*  240:*21*  241:6  242:5  246:5  267:*15*
**replying**  242:*10*  245:2  254:*15*
**Report**  3:*13, 16*  6:6, *9, 18, 23, 25*  7:5, *12*  17:*3*  19:*25*  20:20, *23*  22:*18*  24:5, *23*  26:*25*  27:*10, 12*  28:*11, 13, 16, 17, 20, 22, 25*  29:6, *16*  32:*14, 19, 22*  36:*10, 14*  37:*13, 16, 19*  41:6  47:*11*  49:*4*  51:2, *3, 6*  52:*10*  58:*23*  64:*11*  65:6, *18*

67:*3*  69:*11, 14*  71:*11, 16, 17*  74:6, *15*  78:2, *3, 9*  82:*13, 16*  85:*23*  86:4, *9, 11*  88:*17*  89:*7, 10*  90:*25*  93:*4, 16*  94:*12, 23, 24*  95:*3, 4, 6*  97:*3*  98:*20*  99:*17, 21*  101:*17*  102:*3, 10, 17*  103:*20*  109:*22*  132:*16, 18, 23*  134:*19*  153:*2, 6, 8*  154:6  164:*11*  172:*22*  181:*11, 12*  182:*9*  188:*20*  190:*3*  192:*6, 10*  228:*21*  235:*7*  240:*22*  241:*4, 6*  242:*3, 5, 9, 10, 11, 16, 21*  243:*23, 25*  244:*10*  245:5, *7*  246:*5*  247:*23*  248:*10, 17*  250:6, *17*  251:*2, 20*  253:*21*  254:*15*  255:*11*  256:2  267:*15*  268:*9, 22*  272:*4*  273:*4*  274:*17*  275:*24*  276:*3, 17, 21, 25*  277:*2, 3, 4, 7, 24*  278:*6, 15, 18, 23*  279:*10, 12, 17*  280:*7*  281:*7, 14, 25*  282:*7, 10, 20, 21, 22*
**REPORTED**  1:*23*  5:*1*  168:*18*  185:*22*
**reportedly**  223:*16*
**reporter**  5:*13, 16*  43:*18*  56:*1, 3*  74:*11, 13, 17*  259:*20*
**Reporting**  5:*14*
**reports**  7:4  19:*12, 16*  41:*14, 18, 23*  42:*18*  67:*21*  70:*13*  71:*19*  73:*1, 9, 17, 24*  75:*4*  76:*3, 22*  77:*14*  78:*6, 16*  94:*20*  98:*6*  111:*2*  151:*23*  153:*12*
**represent**  6:*1*  275:*18*
**representations**  121:*13, 23*
**represents**  114:*2*

**reproduced**  188:*22*  189:*24*
**reproduction**  189:*4*
**repurchase**  276:*14*
**request**  21:*19, 24*  22:*5*  25:*14*  26:*12*  40:*13*  95:*15*  144:*12*  205:*24*
**requested**  21:*22*  31:*25*  45:*9, 16*  205:*20, 23*  284:*23*
**requests**  25:*19*  47:*3*
**require**  48:*18*  263:*2*  269:*12*  270:*12*
**required**  212:*5*  270:*20*
**requirement**  85:*11*  86:*13*  87:*15*
**requirements**  118:*8*
**requires**  255:*24*  256:*3, 9, 19*  263:*3*  267:*5*  272:*13*
**research**  31:*6*  135:*12*  155:*2*  158:*5*  234:*1, 8, 10*  235:*2, 4*
**respect**  13:*25*  15:*25*  16:*21*  52:*7*  65:*13*  89:*6*  136:*12*  160:*13*  174:*18*  199:*6*  221:*6*  231:*9*
**respective**  186:*9*
**respond**  11:*14*  28:*17*  36:*14*  95:*16*  160:*25*  165:*18*  205:*25*
**responded**  61:*2, 5*  62:*21*  89:*10*  94:*25*
**responding**  87:*6, 8, 11*  99:*18*  153:*3, 11*  250:*9*  254:*21*  279:*11*  280:*20*
**response**  145:*5, 6*  146:*11*  205:*20*  206:*22*  207:*5, 13*  217:*22*  218:*13, 15, 16*  252:*13*  278:*22*
**responses**  133:*10*  135:*16*  218:*17*  219:*12*  277:*6*

**responsive**  59:*24*  89:*14*  93:*22*  128:*12*  215:*5*  255:*18*
**rest**  58:*22*  69:*11*  167:*18*  251:*20*  252:*3*  277:*8*
**rests**  137:*10, 11*
**result**  26:*16*  199:*25*
**results**  164:*16*
**resume**  15:*18*
**retain**  195:*8*  255:*7*
**retained**  208:*17*
**retainer**  192:*21*  194:*18*
**return**  111:*12, 20*  166:*20, 24*  167:*10, 25*
**returns**  178:*20, 25*  179:*22*  180:*4*
**review**  36:*15*  114:*12*  132:*23*  137:*11*  147:*16*  174:*11, 18, 24*  245:*22*  248:*5*  262:*10*  279:*3, 22*  284:*2*
**reviewed**  19:*4*  20:*16, 19*  21:*9*  25:*12*  28:*21*  29:*15, 19*  32:*20, 21*  34:*19*  35:*9, 25*  36:*10*  37:*13*  50:*24*  83:*1*  103:*18*  118:*1*  121:*16*  137:*12*  139:*14*  141:*2, 8*  185:*18*  216:*7*  234:*23*  245:*24*  248:*10*  260:*16, 18*  262:*12*
**reviewing**  35:*4*  37:*17, 19*  68:*18*  74:*2*  152:*14*  167:*8*  282:*23*
**Revlon**  4:*1*
**Rezulin**  3:*19*  46:*4*
**ride**  200:*4*
**right**  6:8, *17*  7:*11, 16*  8:*1, 6*  10:*1*  14:*9, 13*  16:*23*  17:*16*  18:*16, 17*  19:*1, 10, 13, 20*  20:*6, 8*  21:*25*  25:*9*  27:*1, 9, 17, 25*  28:*11, 15*  29:*5*  30:*9, 14*  31:*22*  32:*5, 6, 22*  33:*3, 5, 9, 14, 23*  34:*5, 9, 11, 20*  35:*9, 23, 25*

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

36:5, 7, 11, 19  37:14 44:16, 18  47:24 48:24  49:2, 4, 21 50:4, 6, 18, 22  51:20 52:1  53:1, 10  57:5, 14  58:19, 20  59:2 61:12, 23  62:11, 16 63:1, 6, 13  64:5, 13 65:11, 15, 19  67:14 68:6, 19, 20  69:1 70:11  71:5, 13, 17, 25 72:2, 9, 19  73:15 74:19  75:17, 25 76:12  77:3  78:1, 3, 13  79:2  80:4, 19 81:11, 19, 25  82:19, 22  83:23  84:23  85:7, 17, 24  86:4, 14  87:21 88:3  90:5  91:21, 23 93:24  94:8, 9  96:4 97:9  98:21  99:12 101:3, 8, 10, 11  102:1, 18  103:7, 20, 23 107:11, 12, 19  108:16, 22  109:14  110:15 111:5, 14  112:2, 12, 23  113:11  116:4 119:20  120:4, 9, 11, 15, 19, 23  121:2 122:19  123:12, 24 124:6  125:4, 9, 10, 17, 18  126:3, 4  127:4 128:22  129:17, 20 130:20  133:8, 19 134:6  135:4, 5, 15, 18, 22, 23  136:2, 19, 21, 25  137:1  138:23, 24 139:1, 3, 8, 22, 25 140:17  141:14, 20 142:3, 9  143:5, 8, 13, 19, 23  146:3, 5, 7, 10, 18, 21, 24  147:1, 2, 9, 12, 15, 19  148:3, 12, 15, 20, 23  149:4, 19 150:7, 22  151:4, 15 152:10, 16, 23  153:9 154:4, 6, 8, 15, 19 155:11, 16  158:14 160:14, 16  161:21 162:1, 7, 11  163:23

164:16  165:7, 16 166:1, 8, 11, 14, 15, 23, 25  167:21, 23  168:1 170:6, 15  172:6, 7, 15, 18  173:2  174:7, 19, 20  175:1, 5, 13, 16 176:9, 25  177:18, 20 178:1, 5, 12, 16, 17, 19, 21  179:1, 7, 10, 15, 18, 22  180:22  181:7 183:19, 23  184:19, 22, 23, 25  185:13, 21 186:2, 24  188:23 189:1, 8, 22  190:4, 7, 9, 10, 16  191:9, 14, 15, 19, 21  193:2, 13, 14, 16, 17, 20  194:1, 3, 9, 14, 25  195:6, 14, 15 196:6, 25  197:3 198:9, 24  200:14, 21 201:3, 20  202:9, 20, 22  203:6, 9, 15  204:1, 9, 21  205:3, 15, 17, 20 206:2, 21  207:5, 13 208:13, 15, 18, 20 209:11, 19, 24  210:11 211:4, 19  212:8, 13, 25  213:15  214:1, 3, 6, 9  215:24  216:11 217:1, 6, 14, 16, 19 218:1, 4, 15, 16  219:8, 10, 20  220:9  221:25 222:16  223:2, 6, 8, 20, 22, 24  224:8, 14, 16 226:11, 14  227:14 228:5, 10  229:9, 18, 19, 21, 22  230:4, 5, 9, 13, 19  232:25  233:3, 4  234:1, 4, 10, 20 235:12, 17  236:25 237:4, 15, 21  238:2, 7 239:23  241:23  242:9 243:15  244:3  246:1 248:6, 7, 19  249:4 251:15  252:6, 7 256:10  260:7  261:4, 12  262:3, 4, 9, 18, 19 263:13  264:10, 25 265:6  266:23, 24 267:6, 15  268:5

269:13  270:3, 13, 25 271:11, 12  272:1, 6, 13, 14, 24  273:1, 19 274:5  278:6, 18 280:7, 23  281:6 282:7  283:21, 23 284:4

**right-hand**  100:3, 19 191:7  214:16  224:16

**rights**  148:12, 25 230:22

**Road**  2:4

**Robbins**  2:4, 9  6:2

**Robert**  4:3

**robust**  16:13

**Rockwell**  223:11, 14, 17, 23  224:19

**roles**  24:13  158:3

**rolling**  142:8

**Roman**  48:8  57:1 61:18  148:7

**room**  6:3

**round**  26:5, 7, 9 173:12  177:17

**rounds**  173:2, 7, 8, 21 175:4, 8  176:8, 14

**routinely**  176:1 215:23

**row**  172:7  204:5

**RPR**  1:24  287:22

**Rubicam**  3:19  64:19 65:4

**Rudman**  2:4, 9  6:2

**Rule**  44:20  80:22 140:9, 13, 17, 18 141:24  159:4

**Rules**  38:23, 24 244:19

**ruling**  46:22

**run**  61:22  231:6, 7 232:16  236:12, 23 237:14

**running**  231:10, 16

**runs**  226:7

**< S >**

**Sabastian**  229:9, 10

**safe**  145:21  234:4

**sale**  157:16  166:13

**sample**  31:14  34:25 37:1  198:18

**sampling**  30:22 31:13

**sanctions**  45:25

**sat**  53:22

**satisfied**  26:17 282:24, 25

**satisfy**  150:18

**save**  245:12

**saw**  160:6  171:8 197:21  230:11

**saying**  31:7, 8  40:22 75:17  77:24  101:19, 23  107:17  109:13 118:19  119:6  120:1 124:5, 9  125:1, 9, 11, 18  127:1, 16  128:2 131:19  134:13 137:22  138:4, 23 139:18  140:17, 18, 20, 24  141:7  142:5 143:11  145:24  146:8, 20, 24  147:7  148:1 149:7, 19  152:5 158:19  160:21 162:21  163:24  164:3 185:8  193:19  195:13 198:25  199:12  205:9 207:22  224:18  232:6 247:7  250:9, 12, 19, 20  252:1  254:25 260:9  261:7  280:24

**says**  27:16  44:21 46:9, 11, 12, 19  47:14 67:5  69:6  70:23 71:23  72:12  80:20 85:11  86:13  87:15, 21  88:5  89:22  93:6, 25  96:18, 21  97:21 100:5  104:14  105:5 106:11  108:16 111:11  114:17  116:2, 5, 6  117:19, 25  118:6, 14  120:16  121:1, 8 122:7  123:25  125:20 127:5  130:13  152:19 154:15, 21  155:7 171:23  172:9, 24 173:8, 16  175:4, 6

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

178:*19, 24*  179:*3*
181:*20*  185:*1*  186:*4*
187:*1*  195:*3, 13*
199:*9*  203:*12*  204:7
208:*14*  213:*14*
214:*17*  217:*21*
218:*13*  219:*15*  222:*1,*
*3, 10*  223:*21, 24*
225:*17*  230:*9, 17*
234:*13*  236:*18*
238:*13*  240:*16*  278:8
279:*3*
scares  146:*3*
Scenarios  215:*10*
School  8:*1, 9, 21, 24*
18:*3, 7*  30:*17*
schools  8:*10, 16*
Schwert  186:*6*
scope  21:*18*  53:*18*
55:*14*  169:*22*
screen  78:*21*  100:*15,*
*16*  104:*25*  105:*17, 18*
129:*14*  164:*18*
165:*22*  186:*13*  230:*3*
240:*3, 13*  270:*3*
scroll  270:*6*
se  249:*10*
search  71:*14, 20*
77:*5, 6*  244:*1*  246:*3*
262:*21*  268:8  283:*17*
284:8
searches  243:*18*
seat  231:*10*  232:*14*
Seats  12:*5, 21*  13:*3*
61:*23*  62:7  231:*7, 16*
237:*14*
SEC  18:*16*  27:*25*
272:*13*
second  14:*8*  26:*9, 11*
48:*11*  49:*6, 14*  50:*6,*
*14*  57:*10*  66:*18*  95:*6*
98:*3*  103:*19*  109:*22*
136:*24*  148:*10*
161:*22*  177:*13*
182:*18*  184:*4*  193:*16*
204:*5*  208:*13*  213:*17*
239:*16*
secretary  212:*1*

section  10:*5*  80:*21*
156:*2*  183:*9*  197:*10*
279:*1*  282:*10*
**SECURITIES**  1:*7*
4:*6*  5:*8*  9:*7, 17*
19:*12*  67:*9, 10, 18*
68:*1, 11, 20*  69:*21*
70:*10*  71:*25*  72:*14,*
*19*  73:*5*  85:*14*  88:*11*
90:*1*  159:*5*  161:*14*
169:*21*  193:*14*  195:*5*
285:*2*
security  19:*15, 18, 22*
249:*9*
see  6:*12, 17*  10:*22*
12:*16*  14:*9*  27:*14, 23*
28:*6*  33:*2*  47:*9, 20*
48:*16, 17*  51:*16, 17*
53:*13*  55:*6, 7*  66:*25*
67:*11*  78:*19*  81:*2, 10*
85:*15, 16*  87:*17*
88:*12, 14*  89:*19*  90:*2,*
*4*  93:*12, 13*  94:*6, 7*
96:*5, 6*  97:*1, 2*  98:*7*
100:*13*  101:*11, 14*
102:*20*  104:*21*
105:*20*  106:*10*
108:*20, 21*  111:*15*
114:*15, 22*  115:*12*
116:*9*  117:*23*  118:*3,*
*11, 12, 17*  121:*11, 17*
122:*11, 12*  124:*3, 8,*
*18, 19, 22*  125:*1, 11*
127:*8*  130:*17*  131:*19,*
*24*  133:*5, 13*  150:*1*
152:*6*  153:*2, 19*
155:*8*  156:*4*  157:*20*
159:*10*  165:*18*  166:*3,*
*16*  167:*11, 18*  168:*3*
171:*25*  172:*3, 8, 10,*
*13*  173:*17, 19*  179:*3*
185:*9, 10*  186:*11, 12*
187:*6, 7*  190:*11*
191:*6, 10*  192:*18, 24*
193:*15*  195:*11, 12*
196:*11, 19*  199:*11, 17*
201:*24, 25*  202:*14, 20,*
*21*  203:*13, 17*  204:*4,*
*6, 9*  206:*14, 19, 20*
207:*1, 2*  208:*16*

209:*2, 3, 22*  211:*1*
213:*16, 20*  214:*22, 23*
215:*6, 7, 11, 15, 16*
217:*14, 20*  218:*23*
219:*5, 6, 17, 18*  222:*6,*
*9*  224:*3, 4, 21, 23*
225:*15, 16, 20*  226:*5,*
*6, 8, 10*  228:*1*  229:*25*
230:*1*  232:*21, 22*
233:8, *9, 13*  234:7, *17,*
*18, 19*  235:*22*  236:*15,*
*16*  238:*18, 19*  240:*4,*
*13, 20*  241:*16, 17, 21*
251:8  252:*20, 25*
253:*3, 11, 13*  260:*15*
261:*23*  270:*3, 4, 18*
275:*24*  276:*15*  277:*4,*
*18, 25*  278:*12, 13*
279:*1, 8, 9*  280:*2, 3,*
*11, 17*  282:*5, 15*
seeing  270:*2*
**Seek**  12:*5*  13:*2*
148:*4*
seeking  9:*15*
seen  10:*16*  116:*25*
126:*10*  160:*4, 5*
187:*22*  207:*7*  269:*1*
segments  187:*4*
select  23:*23*
selected  21:*16*  23:*21*
31:*22, 24*  32:*5*
selection  32:*13*
selective  55:*9*
self-selected  31:*14*
sell  89:*25*  127:*13*
128:*4*
sellers  145:*15*
selling  168:*25*
192:*15*  234:*15*
sell-side  19:*18*
send  23:*25*  83:*17*
145:8  187:*24*  219:8
sending  187:*20*  234:*4*
senior  74:*10*  76:*24*
77:*9*
sense  117:*9*  181:*21*
sensitive  208:*24*
211:*19*
sent  48:*10*  49:*1*
50:*13*  57:*9*  84:*5*

114:*12*  130:*7*  183:*11,*
*20*  186:*22*  193:*16*
207:*13*  235:*18*  269:*3*
sentence  48:*23*  66:*18*
67:*5*  70:*23*  72:*1, 8,*
*11, 16*  89:*22*  96:*4*
97:*20*  100:*4*  106:*5*
111:*11*  118:*14*
124:*19, 22*  127:*5*
133:8  135:*16*  161:*22*
163:*19, 23*  178:*19, 22*
180:*12, 18, 19*  185:*1*
222:*2*  238:*13*  254:*21*
278:8
sentences  184:*10*
201:*19*
separate  176:*23*
September  220:*9, 18*
221:8  224:*13*  226:8
227:*24, 25*  233:*20, 22,*
*23*  234:*21*  237:*3*
sequence  25:*17*  178:*2*
seriatim  71:*13*
series  78:*19*  81:*5*
120:*11*
serious  105:*9, 23*
128:*21*  129:*5*  232:*19,*
*24*  271:*10*
serve  110:*6*
Service  2:*4*
services  192:*21*
196:*10*
serving  66:*4*
Session  4:*16*  229:*19*
set  62:*25*  64:*6, 8*
75:*25*  91:*23*  96:*18*
287:8
sets  7:*12*  104:*13*
seven  79:*13, 19*
177:*23*  200:*19*
**SHANE**  1:*10*  3:*4, 13*
5:*7, 18*  285:*14*
share  23:*23*  48:*15*
51:*13*  104:*18*  105:*7,*
*8*  107:*2*  108:*1, 6*
114:*19*  116:*3*  120:*10,*
*14*  126:*24*  139:*15*
163:*12, 15*  185:*6*
196:*25*  197:*3*  205:*19*

Deposition of Shane Goodwin, Ph.D.        In Re National Instruments Corporation Securities Litigation

216:*21*  230:*13, 15*
235:*21*
**shareholder**  12:*1*
123:*4*  148:*11, 25*
214:*18*  228:*7*  237:*21,*
*24*
**shareholders**  59:*16*
96:*22*  118:*10*  121:*8,*
*17*  122:*8, 18, 24*
123:*21*  141:*20*
148:*18*  149:*2*  175:*25*
178:*20, 25*  179:*21*
184:*14*  196:*25*
218:*21*
**shares**  48:*15*  206:*16*
215:*2*  227:*20, 23*
228:*6*  230:*8*  231:*6,*
*15*  232:*15, 18, 24*
234:*15, 21*  236:*20*
237:*9*  276:*14*
**sharp**  219:*9*
**Shawn**  229:*12*
**SHEET**  286:*1*
**Sherlock**  37:*23*  38:*8*
40:*18, 22*
**Shores**  45:*1*
**short**  44:*25*  45:*20*
79:*8, 12, 18*  132:*8*
218:*13, 17*  226:*19*
227:*7*  275:*5*
**show**  67:*25*  69:*10*
70:*17*  77:*24*  154:*21,*
*24*  191:*17*
**showed**  71:*21*
216:*11*  283:*22*
**showing**  164:*17*
270:*9*  277:*14*
**shown**  190:*1*
**shows**  155:*2*  172:*25*
**sic**  5:*6*  88:*9*  105:*9*
114:*20, 21*  118:*8*
**side**  175:*21, 23*
186:*23*  191:*7*  217:*14*
250:*23*  273:*8*
**sides**  145:*13*  175:*13,*
*20*
**sign**  247:*1*  284:*17*
**signal**  117:*2*  142:*23*
232:*18, 24*

**signaling**  133:*10*
135:*16*
**signals**  142:*12*
**Signature**  284:*22*
**signed**  25:*1*  54:*21*
229:*21, 23*
**significance**  55:*20*
56:*5, 9, 11*  62:*15, 24*
63:*6, 8, 12, 20*  67:*9,*
*17*  68:*1, 8, 11, 13, 19*
69:*10, 13, 21*  70:*10,*
*17*  71:*24*  72:*14, 19*
73:*4, 15, 21, 22*  74:*19,*
*24*  75:*15, 23*  76:*7, 9,*
*12, 19*  77:*6, 8, 10, 17*
78:*4, 10*  96:*19, 22*
97:*21*  98:*25*  99:*12,*
*19*  102:*5, 6, 9*  150:*6,*
*17*  151:*2, 16*  152:*5, 9,*
*12, 17, 20*  162:*7*
**significant**  88:*9*  99:*7*
104:*20*  115:*25*  118:*9*
128:*3*  153:*17*  164:*2,*
*8*  169:*17*  179:*21*
214:*20*  232:*15*
250:*16*
**significantly**  66:*23*
80:*24*  100:*11*  161:*25*
162:*3, 6*  178:*20*
179:*1*
**signing**  124:*15*
142:*20*
**signs**  214:*17*
**similar**  9:*3*  82:*10*
146:*20*  196:*10*
218:*21*  221:*18, 21*
265:*21*
**similarity**  186:*5*
**simple**  77:*2*  158:*13*
165:*12*  185:*2, 3*
207:*25*  223:*5*  256:*23*
**simplistic**  49:*12*
**simply**  45:*6, 13*
46:*25*  167:*8*
**single**  44:*24*  45:*19,*
*24*  54:*23*  213:*10*
**sir**  6:*20*  22:*1, 14*
39:*22*  194:*16*
**sit**  9:*13*
**sitting**  52:*13*  200:*3*

**situation**  116:*24*
156:*14*  161:*9*  187:*15*
188:*15*  209:*7*  210:*17*
255:*4*  265:*11, 24*
**situations**  15:*15*
109:*12*  112:*19*
197:*15*  250:*2*
**six**  27:*25*  34:*10*
200:*19*
**size**  34:*24, 25*  115:*21,*
*25*  122:*21*
**slate**  236:*12, 23*
237:*19*
**Slide**  189:*22*  201:*11,*
*12, 22*  202:*1, 5*  204:*1*
206:*13, 21*  208:*20*
213:*14, 22*  214:*1, 15*
215:*10*  217:*8*  221:*14,*
*15*  222:*2*  223:*6, 10*
225:*12*
**small**  32:*13*  48:*8*
95:*8*
**smart**  110:*13*  170:*3*
**smashed**  146:*7*
**SMU**  8:*1, 16*
**snippet**  182:*11*
**sold**  122:*9*  234:*20*
**solely**  66:*6*
**Somebody**  8:*17*  25:*2*
154:*12*  163:*12*
165:*15*  180:*25*
197:*11*  231:*16*
263:*20*  265:*23*
266:*22*
**somewhat**  16:*11*
77:*19*  126:*11*  159:*14*
**soon**  42:*10*
**sophisticated**  175:*12,*
*14, 15*
**Sorry**  32:*25*  44:*11*
51:*5*  55:*23*  60:*5*
61:*1*  72:*5*  76:*6*  82:*3*
90:*20*  93:*20*  99:*8*
101:*5, 8, 9, 13*  103:*8*
105:*19*  118:*13*  121:*5*
125:*5*  127:*4*  128:*25*
136:*10*  138:*1*  141:*22*
150:*10*  152:*2*  162:*9*
163:*22*  181:*17, 19*
182:*9*  184:*1*  191:*12*

194:*21*  197:*25*  199:*1,*
*2*  204:*12, 23*  205:*6*
210:*7*  211:*20*  213:*23*
214:*25*  221:*2*  222:*7*
228:*2, 16*  229:*10*
233:*23*  239:*14*
246:*11*  259:*24, 25*
269:*18, 21, 25*  270:*5*
283:*9*
**sound**  109:*8*
**sounds**  196:*2*
**South**  2:*4*
**SOUTHERN**  1:*2*
5:*10*  38:*22*  110:*14,*
*15*
**speak**  14:*18, 20*
39:*20, 25*  45:*7, 14*
47:*1*  110:*21*  112:*16,*
*17*  137:*17*  208:*4*
218:*6*  275:*14*
**speaking**  38:*12*  39:*6,*
*13, 14*  40:*1*  41:*15*
42:*14, 15*  44:*22*  45:*3*
46:*1, 19, 20*  86:*22*
87:*4, 9, 13*  165:*19*
**speaks**  244:*11, 13, 18*
270:*15*
**specialization**  9:*6*
**specific**  9:*10*  11:*9*
15:*25*  16:*17, 20*
26:*11*  56:*24*  71:*7*
75:*21, 23*  84:*21*
86:*10*  95:*15*  97:*6*
101:*19, 20*  113:*1*
116:*15, 24*  140:*24*
144:*14, 19*  158:*10*
161:*8*  167:*15*  171:*17*
198:*14*  199:*24*  204:*8,*
*21*  205:*2, 17*  231:*9*
**specifically**  22:*1*
55:*5*  57:*25*  59:*22*
60:*18*  61:*2*  82:*4*
94:*14*  95:*3, 16*
165:*20*  177:*25*  180:*1*
184:*17*  188:*16*  219:*2*
220:*21*  252:*19, 20*
262:*24*
**specifics**  176:*11*
**specify**  52:*7*

Deposition of Shane Goodwin, Ph.D.                   In Re National Instruments Corporation Securities Litigation

---

**spectrum**  187:*4, 9, 13*
188:*4*
**speculate**  237:*9*
**speculation**  208:*2, 9*
220:*20*  221:*4*  224:*2*
232:*17, 23*  233:*12*
237:*6*  253:*10*  257:*20*
260:*23*  271:*14*
**speculative**  67:*6*
93:*7*  94:*1*  149:*24*
**speech**  232:*6*  233:*3*
**speed**  131:*20*
**spelled**  77:*18*  98:*8*
251:*18*
**spells**  251:*22*
**spend**  159:*12*  274:*9*
**spending**  71:*8*  264:*17*
**spent**  70:*25*  225:*23*
245:*1*
**spoken**  19:*25*  20:*5,*
*10, 12*
**SS**  287:*3*
**SSRN**  13:*13*
**St**  2:*17*
**stage**  160:*9*  162:*14*
**stake**  165:*15*  213:*18*
232:*7*
**stakes**  214:*20*
**stance**  139:*18*
**stand**  12:*16*  52:*10*
86:*12*  194:*21*
**standalone**  139:*17*
**standard**  9:*23*
126:*11*  187:*17, 21*
236:*6*  268:*19, 23*
**standards**  117:*13*
**standing**  137:*19*
**standpoint**  10:*12*
**stands**  29:*20*
**Starkloff**  20:*5*
118:*20*  129:*22*
209:*16, 18*  229:*15*
240:*16*  263:*15*  264:*2*
**start**  6:*21*  22:*20*
26:*13*  51:*14, 22*
100:*21*  101:*10*
107:*21, 22*  133:*3*
136:*12*  138:*25*
141:*25*  149:*21*
163:*22*  187:*14*

193:*23*  194:*2*  203:*1*
209:*9*  277:*12*  282:*3*
**started**  53:*12*  156:*3*
203:*5, 6, 9*  227:*23*
237:*9*  238:*5*
**starting**  129:*21*
187:*18*  202:*16*
220:*17*
**starts**  173:*4*  179:*14*
**State**  7:*21*  45:*6, 13,*
*18, 23*  46:*25*  51:*9*
93:*24*  104:*23*  123:*2*
218:*18*  225:*9*  242:*3*
287:*2*
**stated**  36:*23*  37:*11*
46:*13*  47:*4*  64:*2*
70:*2*  145:*9*  152:*17*
189:*3*  201:*14, 16*
209:*20*  222:*1*  235:*25*
236:*5, 18*  237:*23*
238:*3*  248:*11*  253:*3*
260:*5*  262:*13*  265:*10*
272:*10*
**statement**  36:*24*
37:*5*  40:*18*  85:*17, 23*
109:*3*  122:*13*  127:*22*
128:*1*  158:*6*  179:*20*
180:*2*  201:*17*  212:*12*
222:*13*  224:*24*  225:*6*
230:*25*  260:*21*
280:*19*
**statements**  20:*16, 24*
21:*6*  212:*7*  272:*14*
**STATES**  1:*1*  5:*9*
15:*4*  81:*16*  144:*5*
249:*21*
**static**  26:*13*  137:*1*
**stating**  248:*20*
258:*25*
**statistical**  27:*4*
133:*19, 21, 25*  134:*1,*
*12*  135:*1, 5, 8*  156:*19*
163:*6*
**Statistically**  156:*16,*
*18*  180:*4*
**status**  50:*5*
**stay**  95:*1*
**stenographic**  5:*15*
287:*11*

**stenographically**
287:*9*
**step**  144:*9*  202:*8, 13,*
*17*  221:*23*  237:*4*
**steps**  235:*9*
**steward**  249:*11, 25*
265:*22*  267:*24*
**stewards**  265:*13*
272:*25*
**stick**  38:*5*  59:*4*
137:*7*
**stipulate**  27:*24*
77:*18*  175:*14*  213:*9*
**stock**  12:*19*  61:*11,*
*22*  62:*6*  104:*20*
105:*7, 8*  108:*10*
114:*18*  115:*3, 8*
116:*12*  120:*22*  122:*9*
128:*4*  153:*17*  156:*11,*
*19, 20, 21*  157:*4, 5*
158:*22, 23*  159:*24*
160:*11, 16*  164:*2, 8*
165:*16*  166:*5, 15, 21*
167:*9*  168:*19*  181:*1*
185:*12, 16, 20*  191:*8,*
*13, 17*  202:*17*  203:*2*
208:*14*  214:*1, 3, 8, 13*
216:*8, 13*  221:*23*
237:*2, 15*  238:*7*
253:*18*  254:*1, 5*
255:*7, 19*  256:*4*
261:*23*  271:*9*
**stop**  42:*20*  142:*25*
242:*23*  256:*24, 25*
**stopped**  194:*11*
**stops**  146:*23*
**stories**  37:*24*
**strategic**  127:*7, 11,*
*18, 25*  128:*15*  165:*2,*
*3, 5, 10, 13*  166:*8*
167:*9*  168:*7*  185:*13,*
*17*  186:*8*  187:*1*
**strategy**  12:*22*
137:*15*
**straw**  271:*18*  274:*10*
**stream**  30:*15, 16*
31:*1, 6, 9*
**Street**  123:*2*  180:*24*
**strength**  184:*7*
**Strike**  281:*19*

**string**  3:*23*  4:*13*
129:*20*
**striving**  35:*19*
**strong**  117:*20*
137:*19*  139:*18*
142:*22*  143:*12*  204:*4*
**struggling**  261:*6*
**student**  10:*14*  18:*15*
**students**  10:*25*
**studied**  30:*11*  110:*9*
172:*16*  173:*22*
**studies**  11:*7*  13:*16,*
*18, 22*  133:*19, 22, 24*
134:*13, 16, 18*  135:*5,*
*13*  155:*11, 13, 14, 15*
163:*6*  168:*15*  169:*15*
179:*12*  266:*12*
**Study**  4:*1*  13:*7, 9, 25*
14:*3, 15, 18, 25*  15:*2,*
*6, 8, 12, 16*  135:*1, 8*
153:*21, 25*  156:*19, 24*
157:*7*  159:*11, 14, 16*
163:*10, 14*  164:*10, 15,*
*19, 20*  167:*1, 3*
168:*21, 24*  169:*6*
172:*20, 24, 25*  173:*20*
174:*4*  175:*5*  223:*10*
**stuff**  10:*16*  154:*12*
159:*16*  182:*8*  212:*19*
246:*3*  248:*6*  269:*7*
271:*4*
**stuffed**  37:*8*
**style**  195:*24*
**Sub**  55:*2*  63:*1, 4*
64:*3, 6*  68:*6*  76:*1, 8,*
*10*  77:*7*  85:*1*  94:*18*
143:*20*  150:*24*
**subcategory**  11:*16*
**subheading**  27:*15*
**subject**  11:*20*  12:*18*
15:*21*  170:*23*  218:*10*
229:*18, 20*
**submit**  107:*4*  187:*19*
**submitted**  37:*16*
51:*10*  107:*1*  108:*1, 2*
126:*23*  133:*1*  147:*6*
186:*2*  272:*17*
**Subparagraph**  47:*16*
51:*9*  54:*17*  144:*2*
146:*18, 21*  147:*12*

---

148:*7*  153:*14*  157:*12*  159:*22*  161:*21*  162:*16*  163:*5*, *18*
**Subsection**  277:*6*
**subsequent**  169:*11*
**subsequently**  100:*2*
**substance**  22:*15*  39:*12*  55:*2*  82:*12*  98:*24*  134:*7*  208:*25*
**substantial**  66:*21*  80:*22*  231:*15*  232:*7*, *9*  237:*15*, *16*
**substantive**  38:*13*, *18*  40:*10*  118:*8*
**subtle**  206:*3*, *12*
**subtly**  131:*5*
**subvert**  30:*9*
**subway**  200:*4*
**succeeded**  134:*15*
**success**  27:*5*  116:*13*  117:*3*, *8*  133:*25*  134:*1*  135:*2*  192:*17*  196:*14*, *15*, *17*
**successful**  115:*2*  196:*13*
**succinct**  69:*5*
**succinctly**  47:*4*
**sufficient**  100:*8*  101:*1*  180:*13*  231:*5*
**suggest**  92:*10*  247:*2*  250:*17*
**suggested**  200:*13*  214:*10*  238:*22*
**suggesting**  98:*18*  125:*23*  131:*4*  210:*9*  249:*22*
**suggestions**  23:*3*
**suit**  40:*20*, *21*
**Suite**  2:*5*, *10*, *17*
**suitor**  185:*7*
**Sulphur**  90:*3*
**sum**  22:*15*  55:*2*  82:*12*
**summarily**  157:*16*
**summarize**  12:*8*  153:*14*  163:*24*
**summarized**  252:*2*
**summarizing**  253:*6*
**Summary**  51:*4*  60:*9*  134:*3*, *6*  144:*17*, *20*

164:*15*, *20*  166:*24*  172:*9*  212:*9*  241:*8*  251:*5*, *22*  252:*2*, *22*  253:*4*
**summit**  118:*2*
**Super**  52:*19*
**supervision**  24:*16*
**supplied**  25:*18*  150:*14*
**support**  22:*3*  104:*14*  163:*2*  184:*7*  198:*8*  211:*12*  279:*5*, *23*  280:*10*
**supported**  158:*7*
**supporting**  162:*17*
**supposed**  213:*23*
**Sure**  8:*9*  12:*9*  14:*20*  15:*2*, *9*  16:*3*  31:*24*  33:*2*  43:*7*  48:*1*  50:*8*  54:*13*  55:*25*  56:*18*, *20*  59:*18*, *24*  63:*18*  75:*7*  83:*9*  88:*21*  89:*5*, *13*  91:*19*  93:*21*  95:*6*  98:*8*  105:*15*  109:*4*  111:*8*  126:*6*, *10*  129:*9*  132:*5*  137:*13*  155:*13*  158:*19*  160:*5*  165:*19*  166:*19*  167:*4*, *6*, *14*  170:*3*  176:*20*  189:*4*  198:*13*  199:*7*  201:*16*  202:*13*  211:*9*  212:*17*  218:*8*  228:*23*  229:*23*  231:*2*  242:*8*  244:*3*  249:*18*  250:*4*  265:*12*, *23*
**surprising**  121:*18*  122:*23*
**surrounding**  138:*9*
**survey**  135:*4*  198:*15*
**surveyed**  134:*13*
**surveys**  133:*25*
**swear**  5:*16*
**swift**  108:*17*, *21*  109:*5*, *10*, *14*, *18*
**sworn**  5:*20*
**Synergies**  189:*2*
**Syntel**  45:*1*
**system**  24:*2*

**< T >**
**Tab**  7:*2*, *3*, *4*  64:*25*  103:*2*  170:*25*
**TABLE**  3:*1*  50:*21*, *25*  155:*10*  172:*2*  173:*2*, *4*  188:*22*  189:*23*  198:*4*  278:*25*
**tactic**  61:*11*  230:*12*  237:*3*
**tactics**  13:*1*  140:*11*  186:*4*  204:*2*  206:*13*  213:*15*  226:*13*  230:*7*
**tailor**  9:*10*
**tailored**  9:*16*
**take**  9:*6*  13:*1*  27:*20*  38:*17*  39:*24*  40:*3*  41:*22*  42:*4*, *6*, *7*, *11*  43:*11*  53:*24*  79:*8*, *18*  80:*6*  83:*5*  103:*14*  105:*18*  111:*13*, *21*  127:*16*  132:*7*  136:*5*, *19*  144:*9*  164:*11*  182:*23*  183:*1*  188:*14*  193:*2*  226:*19*  227:*3*  228:*22*  235:*10*  239:*5*  248:*22*  272:*20*, *21*  275:*5*
**taken**  5:*7*  9:*17*  44:*1*  72:*9*  80:*11*  132:*11*  143:*13*  183:*4*  227:*10*  275:*9*  287:*7*, *12*
**Takeover**  4:*8*  61:*11*  62:*24*  137:*23*  140:*10*, *19*  143:*7*, *12*  144:*3*, *4*  148:*21*  204:*2*  206:*13*  225:*19*, *24*  226:*12*
**takeovers**  140:*12*
**talk**  9:*21*  65:*10*  86:*9*  99:*17*, *19*  101:*21*  109:*18*  134:*8*  136:*15*  142:*12*  156:*17*  162:*7*  167:*14*  171:*22*  176:*16*, *17*  200:*2*  205:*9*  231:*25*  232:*4*  279:*16*  280:*21*
**talked**  71:*16*  77:*22*  99:*1*  138:*3*  154:*4*  167:*23*  179:*10*  209:*15*, *16*, *17*  213:*8*,

*9*  230:*14*  231:*10*  243:*7*, *24*  256:*13*  262:*24*  263:*8*  283:*18*
**talking**  16:*16*  20:*22*  36:*6*, *25*  42:*20*  51:*19*  70:*25*  71:*9*  82:*22*  86:*4*  89:*7*, *11*  107:*21*, *22*  114:*8*  125:*5*  133:*25*  136:*11*  137:*6*  138:*12*  159:*8*  160:*2*, *12*, *14*  173:*6*  176:*10*, *11*, *19*, *21*  178:*7*  188:*15*  189:*21*  200:*8*  204:*23*  254:*18*  271:*23*  273:*5*
**talks**  115:*10*  172:*6*  173:*1*  183:*9*  184:*22*  204:*2*  224:*4*  242:*12*  252:*11*
**target**  47:*18*, *19*  48:*5*  145:*14*  155:*16*  156:*12*, *23*  161:*23*  162:*12*  178:*19*, *25*  179:*20*  180:*3*  181:*1*  186:*9*  204:*7*, *20*  206:*16*
**targeting**  236:*12*, *24*
**targets**  185:*7*  186:*5*  190:*20*, *21*
**target's**  230:*8*
**tariff**  169:*6*
**task**  273:*18*
**teach**  99:*3*  110:*9*  117:*10*  158:*5*  197:*9*  249:*16*
**teaching**  99:*2*
**team**  6:*4*  24:*16*, *18*  25:*6*  29:*13*, *14*  32:*12*, *17*  120:*2*  124:*2*  238:*9*  250:*2*  275:*4*
**teams**  247:*1*
**Technician**  2:*22*  5:*4*  7:*1*, *6*  43:*20*, *24*  44:*3*  79:*4*, *6*  80:*9*, *13*  132:*5*, *9*, *13*  182:*21*  183:*2*, *6*  226:*25*  227:*8*, *12*  275:*7*, *11*  284:*18*
**Techniques**  201:*23*

202:2
**Technology** 14:*11*
**tell** 54:*19*, *22* 93:*16*
119:*6* 187:*21* 208:*10*
220:*25* 221:*1* 246:*21*
254:*13* 255:*16*, *17*
260:*13*, *17* 268:*24*
272:*9*
**telling** 42:*12* 254:*18*
**ten** 19:*10* 27:*3*
122:*17* 158:*2* 167:*25*
**tend** 110:*12*
**tendency** 30:*7*
**Tender** 155:*23*, *25*
156:*4* 184:*14*
**tenders** 188:*11*
**term** 29:*22* 30:*2*, *21*
51:*18*, *20* 65:*18*
88:*23* 164:*6* 241:*23*
242:*4*, *6* 243:*20*
244:*7*, *22* 245:*1*, *14*
246:*17* 247:*15*, *17*
248:*1* 249:*15*, *18*
250:*8* 251:*8* 254:*19*
256:*18* 257:*12*
266:*10* 267:*16*
268:*13* 269:*24* 273:*1*
**terminal** 8:*13* 189:*2*
**terminate** 219:*3*, *9*, *14*
**termination** 14:*23*
193:*13* 195:*4*
**terminology** 153:*9*
**terms** 30:*23* 49:*12*
52:*6* 66:*8* 90:*24*
133:*12* 135:*18*, *21*, *23*
136:*1*, *6*, *7* 138:*24*, *25*
142:*19*
**test** 96:*18*
**testified** 5:*22* 14:*11*
15:*12* 246:*9*
**testify** 5:*20*
**testimony** 14:*6*, *16*
15:*1*, *6*, *13* 16:*25*
36:*22* 91:*11*, *15*
92:*25* 93:*18* 97:*11*
150:*9* 197:*5* 248:*9*
253:*21* 256:*21*
257:*21* 259:*14* 262:*6*
266:*19* 267:*1*, *8*

268:*21* 272:*3* 273:*24*
274:*12* 275:*2* 285:*8*
**Texas** 9:*23* 84:*15*
90:*2*
**text** 208:*21*
**textbook** 178:*14*
179:*7*
**texts** 209:*1* 210:*11*
211:*24* 222:*3*
**Thank** 7:*6* 12:*16*
34:*2* 43:*17* 186:*24*
196:*16* 270:*5* 275:*6*,
*17* 283:*5* 284:*14*
**Thanks** 105:*19*
**Theoretical** 4:*1*
**theories** 40:*21*
**theorize** 40:*19*
**theorized** 41:*6*
**theory** 30:*15*, *16*
**thereabouts** 113:*15*
**thing** 20:*14* 23:*15*
33:*12* 56:*24* 81:*15*
93:*14* 171:*20* 176:*16*
198:*1*, *24* 200:*5*
217:*25* 255:*5*
**things** 9:*9*, *24* 11:*23*
23:*3* 24:*21* 48:*19*
53:*17* 60:*17* 62:*3*, *7*
71:*14* 72:*20*, *24*
79:*10* 80:*4*, *5* 88:*19*
89:*11* 97:*15* 102:*22*
121:*19* 126:*7* 134:*6*
143:*1* 147:*17* 152:*14*
159:*14* 168:*18*
170:*21* 171:*17*
174:*20* 176:*12*
179:*17*, *25* 191:*24*
194:*12* 211:*12*
221:*19* 230:*15*
246:*22* 247:*2* 248:*21*
**think** 13:*25* 21:*18*
22:*22* 33:*25* 36:*23*
41:*19* 47:*6*, *9* 71:*14*
76:*23*, *24* 77:*8* 80:*5*
93:*3* 99:*5* 102:*7*, *15*
103:*7*, *9*, *19*, *23*
107:*12* 109:*6*, *10*
110:*1*, *23* 111:*5*
112:*14*, *17*, *20* 118:*25*
122:*4*, *24* 124:*8*

125:*20*, *23* 126:*17*
127:*15*, *17*, *18* 128:*12*,
*15* 131:*24* 136:*11*
142:*19* 145:*22*
147:*12*, *13* 169:*6*
170:*11*, *21* 171:*11*
173:*6* 175:*22*, *24*
179:*17* 180:*13*, *25*
181:*2*, *10*, *12* 182:*15*,
*16* 183:*25* 184:*3*, *18*
185:*2*, *3*, *14*, *15*
186:*15* 188:*13*
189:*21* 190:*5* 191:*22*
198:*12* 201:*14* 202:*5*
203:*22* 204:*13*, *16*
206:*12* 207:*8* 209:*6*
210:*2* 215:*3* 216:*17*
217:*11* 218:*6*, *17*
220:*3*, *7*, *9*, *22* 221:*18*,
*20* 232:*2*, *9* 238:*3*
239:*1* 242:*10*, *17*, *18*
246:*5* 249:*19* 250:*6*,
*14* 251:*10*, *16* 256:*12*,
*23* 258:*7* 261:*18*
264:*6* 265:*2*, *8*, *21*
269:*17* 274:*4* 275:*3*,
*13* 279:*21* 283:*17*
284:*12*
**thinking** 160:*25*
208:*25*
**thinks** 200:*8*
**third** 15:*4* 26:*11*
46:*8* 108:*6* 116:*6*
126:*23* 142:*14*
208:*20* 220:*5* 231:*6*
235:*18* 238:*14*
**thought** 31:*9* 59:*21*
88:*22* 102:*22* 123:*20*
128:*19* 144:*21* 148:*1*
154:*10*, *12*, *13* 181:*14*
182:*9* 204:*23* 210:*7*
221:*1* 227:*22* 228:*3*
255:*20* 261:*24* 267:*9*,
*12*
**thoughts** 252:*24*
**thousand** 134:*13*
**thousands** 156:*18*
**threat** 131:*21* 149:*8*,
*12* 237:*14*

**threatening** 61:*22*
62:*6* 206:*2*, *3*, *11*
263:*21*
**three** 15:*11*, *15*
17:*15*, *18*, *19* 18:*8*, *16*
100:*20* 122:*25* 123:*2*,
*11* 179:*11* 224:*10*
**threshold** 254:*8*, *11*
255:*10*
**tied** 102:*6* 126:*25*
**Time** 1:*14* 5:*2*, *5*, *6*
8:*24* 14:*10* 18:*5*, *6*
19:*20* 22:*20* 23:*19*
28:*3* 38:*10* 42:*2*
43:*25* 44:*3* 46:*22*
50:*25* 69:*20* 70:*25*
71:*8* 79:*22* 80:*10*, *13*
98:*16* 99:*3* 102:*16*
107:*20* 109:*9* 110:*9*
111:*19* 115:*15*
118:*20* 121:*18*
122:*18* 123:*18*
128:*11* 132:*3*, *4*, *9*, *14*
138:*13* 145:*22*
149:*22* 159:*12* 161:*7*
162:*23* 179:*9* 183:*3*,
*6* 187:*20* 188:*9*
191:*14*, *18* 193:*20*
209:*11* 218:*20*
219:*19* 226:*23* 227:*4*,
*9*, *12* 229:*5*, *12*
234:*10*, *25* 245:*12*
263:*25* 264:*17*
267:*16* 275:*8*, *12*
284:*7*, *18*, *22* 285:*8*
**timeline** 224:*5*, *7*, *17*
226:*7*, *10*
**timely** 205:*20*
**times** 15:*11* 69:*13*
71:*15*, *21* 126:*11*
216:*9*, *11* 230:*12*
243:*20*, *23* 244:*22*
247:*15* 254:*19*
**timing** 99:*23* 109:*6*
117:*19* 118:*13*
**title** 201:*22* 219:*11*
221:*19* 229:*20*
**titles** 277:*3*
**today** 5:*15* 98:*11*

162:22  241:5  273:11
**Today's**  5:5
**told**  232:3  272:1
**tone**  203:16
**tongue-in-cheek**  119:1
**tonight**  79:15
**tons**  98:10
**top**  6:12  44:13  51:7
113:4  118:5  121:8
122:17, 24, 25  123:11
146:19  155:1  173:3
189:24, 25  204:5
206:16  226:3  230:9,
10  277:24  279:18
**topic**  99:4  279:12
**total**  66:23  80:25
100:12
**totality**  93:11  94:5
95:10  96:4, 6, 9
142:10  150:15
**touches**  10:20
**tough**  153:25
**track**  56:18  91:17
93:20  136:10  152:3
205:6
**tracking**  59:18  61:2
213:11
**trading**  9:22  84:14
116:7  121:2  158:21
159:5, 24  160:11, 16
161:13  208:14
214:19, 20  215:13
**transact**  137:9
**transaction**  85:12, 13
86:14  87:15  88:7
118:2  133:11  135:20
186:10  194:8  195:9
196:5  198:19  204:8,
21  205:2, 18  241:1,
15  248:16  255:6
268:17  276:12
277:11, 16  278:11
**transactions**  134:14
157:25  171:24
172:17  173:22
187:14  188:6  192:3
211:19
**transcript**  3:11
212:8  285:10  287:11

**transcription**  287:10
**transpired**  187:19
**tremendous**  96:22
**trial**  46:23
**tried**  77:2  195:19
**Triggers**  214:16
**TriZetto**  45:1
**true**  102:18  105:10
106:22  107:1  150:11
237:7  263:1  269:11
270:22  287:11
**truly**  53:19
**trust**  102:16  237:22
**truth**  5:20, 21
**truthful**  119:12
272:13, 22
**truthfulness**  285:10
**try**  48:23  76:6  80:4
126:14  141:4  176:5
186:13  187:14
**trying**  39:9  57:16
60:1  75:16, 20, 21
76:13  81:3  94:22
95:1  99:25  104:25
126:12  128:10  129:1
131:13, 15  134:22
136:4  159:8  167:5
168:16  169:1  171:16
175:20, 24  179:2
191:17  195:25
199:24  225:24
247:18  250:15
267:20  271:17
**Tulsa**  7:15
**turn**  6:18  11:3  14:5
16:23  44:11, 12  51:1
89:16  192:6  194:25
247:19
**turned**  17:8
**twice**  104:17  139:14
146:22
**twist**  40:20
**two**  48:19, 24  51:10
58:5  72:16, 20, 24
83:20  92:7  100:20
115:7  126:17  133:1
139:21  153:15  169:3
176:12, 22  177:23
187:3, 16  198:3
202:9  207:12  213:6

225:23  230:11
236:12, 24  247:2
249:22  267:20
**type**  9:2  47:8
123:12  204:2  255:24
256:19
**typed**  233:1, 13
**types**  248:6  256:16
**typically**  161:23
162:10
**Tyson**  146:6

**< U >**
**UK**  225:18
**ultimately**  13:3
53:25  54:20  135:25
136:16  196:20
**un**  159:6
**unaffordable**  234:16
**unambiguously**
281:25  282:11
**unanimously**  120:3
153:15
**uncommon**  176:9
**underneath**  173:3
**understand**  11:17
17:20  18:8, 13  23:16
29:24  31:19  41:19
42:23  43:1  49:7
57:18  66:19  69:23
76:14  99:5, 23  106:2,
18  107:17  108:24
124:24  128:9  129:1
136:4  137:18  138:6,
8, 11  144:16  146:1
161:21  166:2  169:9,
10  199:14, 20  202:22,
24  207:23  224:3
276:2
**understanding**  30:24
50:24  53:16, 18, 20
56:10  65:10  88:16
91:20  115:20  116:11
131:3  150:4  169:17
203:4  210:4  229:7
243:9, 24  246:17
268:6
**understood**  244:25
**undertake**  22:4

54:22
**undertaking**  55:13
**undertook**  76:18
**undisclosed**  80:20
**unequivocal**  133:9
**unequivocally**  89:1
**unfortunately**  25:5
**unique**  116:24  161:8
171:24
**UNITED**  1:1  5:9
15:4
**universe**  17:1
**University**  7:15, 19
8:11
**unsolicited**  48:14
51:10  133:1  157:13
161:24  225:19, 24
235:19
**unusual**  215:13
**unwillingness**  224:22
**upheld**  137:16
**upper**  206:22
**use**  44:22  82:12
83:7, 9  90:24  91:12
92:1, 11  117:13
124:22  125:24  126:1
135:19  140:11
154:14  170:24
190:20  202:2  241:18
243:21, 23  244:6
248:1  250:10  252:14,
19  267:16  270:8, 11
271:19
**uses**  42:22  124:20
125:25  202:5  245:14
247:15  250:9
**usually**  23:15  107:18

**< V >**
**vague**  43:3  54:18
60:8  72:4  85:3
247:12  248:9  266:25
269:14  273:24
274:16  275:1
**validate**  31:8
**Valuation**  114:14, 20,
21  117:10, 11, 12, 15
189:7  190:18, 19, 23
191:24  198:6
**valuations**  189:1

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

**value** 11:*2* 12:*6* 52:*7*, *12* 53:*19*, *25* 55:*12* 115:*10*, *14* 117:*13* 118:*9* 124:*16* 125:*14* 127:*2* 136:*14* 175:*20*, *24* 176:*15* 220:*3* 236:*9*
**valuing** 191:*20*
**Vanguard** 123:*2*
**variables** 35:*15*, *16*
**varies** 203:*16*
**various** 117:*1* 140:*11* 216:*21*, *23*, *25*
**vast** 187:*13*, *14*
**VERIFICATION** 285:*5*
**verify** 172:*21*
**version** 25:*1*, *8*
**versus** 15:*4* 45:*1* 65:*4* 80:*17* 153:*11* 176:*10* 214:*21* 269:*2*
**VI** 279:*1*, *18*
**vice** 38:*22*
**Video** 2:*22* 5:*4*, *7* 7:*1*, *6* 43:*20*, *24* 44:*3* 79:*4*, *6* 80:*9*, *13* 132:*5*, *9*, *13* 182:*21* 183:*2*, *6* 226:*25* 227:*8*, *12* 275:*7*, *11* 284:*18*
**videographer** 5:*13*
**VIDEOTAPED** 1:*10*
**view** 14:*8* 52:*21* 89:*4* 102:*24* 103:*11* 109:*1* 140:*4* 150:*15* 151:*11* 170:*19* 192:*13* 199:*10* 268:*13*, *14* 283:*1*
**viewed** 66:*22* 80:*23* 100:*10* 115:*5* 273:*7*
**views** 140:*3* 176:*15* 267:*13*
**violation** 159:*4*
**VLSI** 14:*11*
**volume** 214:*19*
**volumes** 214:*21*
**volunteer** 95:*22*
**vote** 196:*25*

**< W >**

**Wachtell** 4:*8*, *11* 138:*18* 149:*9* 160:*6* 201:*6*, *14* 202:*5* 207:*8*, *21* 213:*25* 214:*10* 215:*1*, *17*, *19* 216:*20* 217:*7* 225:*22*, *25* 229:*9*, *11* 230:*11*, *14* 268:*12* 273:*6*
**Wachtell's** 208:*7* 218:*3*, *11*
**walking** 43:*19*
**Wall** 180:*24*
**want** 9:*13* 22:*15*, *24* 23:*3* 26:*24* 34:*23* 38:*25* 39:*2* 41:*22* 50:*8* 52:*9* 58:*24* 59:*18*, *23* 64:*17* 74:*15* 79:*8* 80:*1* 86:*3* 88:*21* 89:*5*, *12* 90:*10* 93:*21* 95:*6*, *16* 107:*21* 111:*7* 112:*7* 113:*1* 130:*19* 131:*10*, *11* 134:*7* 137:*9* 142:*18*, *24* 143:*3*, *13* 144:*13*, *19*, *21* 145:*6*, *16*, *20*, *23* 146:*4*, *9* 149:*4*, *10* 155:*18* 157:*8* 165:*18* 166:*18*, *23* 167:*11*, *17* 168:*3* 169:*1* 171:*19* 176:*20* 182:*23* 196:*3* 199:*23* 200:*2*, *7* 209:*15* 220:*22* 226:*19*, *21* 227:*3* 229:*1* 231:*25* 236:*3* 244:*12*, *15* 245:*18* 247:*9* 256:*23*, *24* 257:*6* 258:*2*, *13* 263:*25* 268:*8* 270:*16* 275:*14*, *21* 276:*5*
**wanted** 10:*15*, *21* 11:*1* 29:*14* 130:*24* 215:*1* 242:*8*
**wants** 131:*19* 137:*14* 232:*4* 240:*9*
**Warning** 214:*16*, *17*
**waste** 38:*9*
**wasting** 42:*2*
**watch** 254:*5* 255:*7*, *19*

**way** 9:*16* 22:*2* 31:*15*, *19* 36:*15* 41:*18* 57:*24* 59:*2* 74:*5*, *14* 78:*24* 85:*4* 100:*4*, *16* 107:*23* 111:*6*, *7* 138:*22* 142:*21*, *24* 145:*8* 159:*17* 164:*4* 176:*15* 179:*4* 180:*18* 187:*15* 236:*8* 237:*10* 242:*17*, *18* 243:*17* 247:*23* 248:*25* 250:*9* 255:*2*, *3*, *6* 261:*23* 268:*2*, *14*, *16* 273:*1*, *4*, *12*
**WAYNE** 1:*25* 5:*1* 287:*4*, *24*
**ways** 126:*14* 154:*13* 236:*8* 256:*12*
**week** 116:*7*
**weighted** 121:*10*
**welcome** 231:*25*
**well** 8:*20* 9:*11* 10:*12*, *18*, *20* 11:*22* 12:*12* 13:*11* 20:*19* 22:*1*, *10*, *20* 23:*3* 24:*7* 26:*12* 29:*25* 31:*3*, *12* 33:*10*, *15* 35:*13* 43:*15* 49:*12* 52:*13* 59:*18* 64:*8* 66:*1* 67:*24* 69:*3* 72:*11* 78:*23* 79:*18* 81:*18* 83:*2* 85:*23* 86:*2* 88:*19* 90:*20* 99:*16* 101:*19* 102:*1*, *12*, *15* 106:*6* 108:*24* 109:*4* 112:*22* 119:*23* 120:*19* 126:*6*, *11* 134:*3*, *23* 135:*14* 137:*6* 139:*21* 140:*2*, *6* 142:*3* 144:*6*, *9* 147:*4* 148:*3* 150:*21* 151:*9* 153:*1*, *9*, *24* 155:*14*, *18* 156:*1* 157:*23* 159:*1* 160:*7*, *20* 166:*18* 167:*13*, *20* 173:*18* 175:*11* 176:*10*, *24* 178:*22* 179:*6*, *16*, *18* 185:*14* 187:*13* 191:*15* 194:*12* 195:*17*

196:*19* 199:*16* 200:*18* 204:*12*, *19* 205:*16* 206:*7* 207:*7* 208:*3* 210:*2* 211:*9*, *17* 214:2, *10*, *12* 215:*3*, *6* 216:*20* 217:*20*, *25* 219:*25* 221:*10* 228:*8* 232:*7* 236:*3* 237:*13*, *21* 240:*4* 242:*7* 243:*6*, *16* 245:*24* 246:*22* 249:*22* 251:*15* 256:*17* 258:*2* 260:*5*, *9* 261:*19* 262:*12*, *14* 267:*20* 271:*4* 274:*4* 283:*25*
**well-known** 30:*13*
**well-versed** 10:*21*
**went** 8:*23* 122:*22* 156:*4* 180:*24* 205:*1*, *10*
**we're** 6:*22*, *23*, *24* 39:*24* 43:*11*, *16* 44:*4* 46:*3* 64:*12* 82:*21* 83:*6* 86:*4* 88:*21* 89:*7* 95:*7*, *9* 110:*7* 113:*9* 114:*8* 125:*5* 137:*6* 139:*18* 144:*7* 148:*20*, *21* 159:*7* 162:*25* 169:*1* 176:*19*, *21* 178:*7* 182:*6*, *8* 183:*1* 184:*23* 188:*15* 196:*2* 199:*11* 226:*25* 236:*7* 240:*21* 273:*11* 275:*13*
**Westlaw** 44:*8* 65:*3* 83:*16* 84:*3*
**We've** 42:*8* 122:*4* 132:*4* 188:*13* 226:*23* 256:*13* 271:*20*
**whatsoever** 98:*4* 121:*21*
**White** 227:*25* 228:*4*
**willing** 8:*21* 79:*16* 80:*1* 142:*18* 163:*11*, *13*, *15* 225:*9*, *10* 226:*2* 235:*25*
**willingness** 238:*16*, *20*
**winning** 52:*19*

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

**wisely**  170:*21*
**wit**  96:*25*
**withdraw**  40:*14*
53:*10*  109:*17*  129:*17*
181:*5*  229:*1*  242:*2*
**withdrawing**  224:*25*
225:*7, 10*
**withdraws**  224:*18*
**withhold**  17:*6*
**WITNESS**  3:*3*  5:*17,*
*19*  39:*12*  55:*8*
100:*14*  181:*14, 17*
182:*13*  231:*23*
254:*21*  258:*7*  283:*5*
284:*22*
**Wolverine**  4:*4, 9*
229:*19*  230:*18*
234:*14*
**Wolverine's**  230:*7, 17,*
*21*  233:*6, 7*
**Wolvering/10:30**  4:*16*
**word**  27:*21*  39:*22*
42:*22, 23*  43:*1*  44:*24*
45:*19, 24*  52:*12*
54:*23*  56:*8, 11*  63:*8*
68:*8*  69:*10, 13*  70:*16*
71:*14, 15, 20*  74:*5, 14*
75:*14*  76:*7, 9*  77:*5, 6,*
*7, 10*  78:*3, 10*  90:*25*
99:*11*  102:*9*  109:*18*
125:*24, 25*  126:*2*
127:*17*  150:*15, 16*
152:*5, 9, 12, 17, 20, 21*
162:*3, 10*  220:*7*
243:*18*  244:*1*  246:*2,*
*3*  262:*21*  268:*9*
272:*21*  284:*8*
**worded**  22:*2*
**wording**  50:*9*  53:*21*
101:*24*  167:*18*
228:*19, 23*
**words**  13:*8*  22:*16*
25:*1, 2, 3*  45:*7, 15*
47:*1*  53:*4*  54:*20*
55:*2*  63:*3, 16*  64:*2*
66:*6*  68:*13, 16, 19*
77:*17, 24*  82:*10*
85:*16*  86:*15*  87:*23,*
*25*  88:*14*  89:*1*  90:*4*
91:*5*  93:*13*  94:*7, 8,*

*10, 11, 14, 17*  96:*7*
97:*2*  98:*8, 20, 23*
99:*8*  101:*11, 19, 20*
105:*20*  106:*10*
108:*21*  111:*15*
118:*24*  119:*9*  120:*5*
122:*12*  124:*8, 23, 25*
125:*1*  127:*19*  128:*13*
131:*17*  157:*23*  160:*1*
161:*1, 18*  173:*19*
179:*3*  184:*16*  187:*7,*
*8*  188:*3*  198:*19*
200:*23*  210:*15*  215:*7,*
*16*  216:*12, 20*  222:*9,*
*10*  224:*3, 23*  226:*6*
232:*22*  233:*1, 2, 9, 14,*
*24*  234:*19*  236:*1*
240:*4, 20*  251:*10, 18*
252:*6, 14, 20*  253:*3,*
*12, 13*  262:*8*  267:*3*
270:*8, 11, 19*  272:*19,*
*21*  284:*9*
**work**  7:*23*  12:*2, 24*
13:*19*  16:*8, 14*  21:*18,*
*22*  24:*15, 18*  64:*9*
70:*20*  76:*17, 19*
77:*20*  89:*8, 9*  90:*8*
95:*4, 5*  98:*11*  117:*20*
121:*16*  124:*16*
125:*13, 20*  126:*8, 16,*
*20*  127:*1*  134:*23*
135:*11*  143:*2*  144:*18*
145:*17*  154:*25*  155:*5*
156:*5*  157:*25*  163:*16*
167:*3*  172:*19*  173:*24*
174:*1, 25*  178:*18*
188:*7, 11*  195:*22*
196:*3*  236:*7*  250:*21*
252:*4*  284:*2*
**worked**  24:*5*  149:*9*
**working**  11:*4*  22:*21*
98:*10*  109:*7*  110:*5*
125:*13*  126:*14*
142:*17*  145:*13, 14*
161:*7*  242:*19*  243:*11*
246:*25*  247:*3*  248:*23*
268:*25*  273:*7, 9*
**works**  107:*23*

**world**  30:*15*  31:*10*
116:*23*  159:*13*
175:*23*
**worthwhile**  154:*14*
**write**  22:*18*  152:*24*
211:*18*  280:*8, 13*
281:*21*  282:*8*
**writes**  120:*6*  276:*9*
277:*8*  278:*8*
**writing**  10:*4, 5*  11:*1*
22:*13*  88:*17*  211:*7*
222:*17*  231:*2*
**written**  10:*3*  12:*13*
20:*16*  58:*19*  63:*1, 3,*
*6, 13, 24*  64:*3*  66:*6*
67:*19*  71:*11*  72:*8*
75:*24*  91:*6*  94:*8, 11,*
*14, 17, 21*  111:*17*
125:*6*  151:*4, 8, 9*
153:*2*  181:*19*  210:*21*
212:*19*  213:*2*  245:*5*
252:*6*
**wrong**  118:*14*
181:*19*  244:*4*
**wrote**  19:*25*  20:*20,*
*22, 23*  28:*11*  106:*3*
120:*1*  125:*12*  126:*25*
131:*3*  152:*21*  171:*9*
188:*9*  234:*7*  246:*1*
278:*3*

**< Y >**
**Yeah**  14:*18*  15:*8*
22:*10*  43:*7, 8*  44:*17*
51:*6*  56:*8*  59:*9*
64:*25*  65:*12*  67:*22*
72:*22*  77:*16*  79:*12,*
*24*  83:*19*  86:*8*  98:*7*
101:*11*  103:*11, 16*
109:*25*  111:*23*
113:*10*  114:*7*  116:*17*
119:*16*  125:*20*  132:*7*
136:*11*  140:*13*  144:*2,*
*16, 24*  146:*1*  153:*5,*
*24*  155:*13*  164:*4*
165:*4*  168:*13*  170:*1*
174:*10, 12*  182:*15, 25*
189:*3, 25*  190:*13*
191:*16*  198:*15*
204:*12*  206:*9*  210:*15*

212:*22*  213:*9*  217:*15*
221:*1*  222:*13*  227:*2*
228:*3, 19*  229:*7*
233:*23*  236:*3*  240:*2*
252:*8*  253:*24*  259:*8*
260:*24*  261:*6*  263:*19*
264:*22*  269:*17*  270:*5*
275:*15*
**year**  107:*16*  122:*8*
251:*19*
**years**  18:*1*  66:*4*
98:*9*  99:*2*  110:*4*
156:*5*  157:*25*  158:*1,*
*2*  179:*8, 16, 18*
223:*18, 23*  224:*4*
225:*23*  268:*25*  273:*9*
**Yep**  81:*7*  120:*10*
134:*20*  144:*11*
186:*24*  198:*25*
243:*19*  281:*8*
**Yogi**  112:*2*
**YORK**  1:*2*  2:*5, 10*
5:*10*  38:*23*  110:*14*
**Young**  3:*19*  64:*19*
65:*4*  80:*17*

**< Z >**
**zero**  49:*19, 22*  259:*2,*
*5*
**Zoom**  54:*7*  191:*6*

Deposition of Shane Goodwin, Ph.D.    In Re National Instruments Corporation Securities Litigation

### WORD LIST

**< $ >**
**$250,000**  (*5*)
**$32.50**  (*1*)
**$33.75**  (*1*)
**$34.49**  (*1*)
**$39.75**  (*1*)
**$42.25**  (*1*)
**$48**  (*36*)
**$50**  (*2*)
**$50.75**  (*2*)
**$51**  (*1*)
**$53**  (*7*)
**$6.49**  (*1*)
**$6.67**  (*1*)
**$78**  (*2*)

**< 1 >**
**1**  (*12*)
**1.72**  (*1*)
**1.73**  (*2*)
**1.8**  (*1*)
**1:16**  (*2*)
**1:23-cv-10488-DLC**
 (*2*)
**10**  (*11*)
**10(b**  (*2*)
**10:11**  (*2*)
**10:22**  (*2*)
**100**  (*1*)
**10170**  (*1*)
**103**  (*2*)
**105**  (*2*)
**106**  (*2*)
**10807**  (*1*)
**10b-5**  (*2*)
**10th**  (*4*)
**11**  (*33*)
**11:16**  (*2*)
**11:29**  (*2*)
**11:30**  (*1*)
**112**  (*3*)
**112-page**  (*1*)
**113**  (*1*)
**11747**  (*1*)
**12**  (*11*)
**12:47**  (*2*)
**1251**  (*1*)

**129**  (*1*)
**12-month**  (*1*)
**12th**  (*4*)
**13**  (*34*)
**13th**  (*6*)
**14**  (*6*)
**14th**  (*1*)
**15**  (*5*)
**1545**  (*1*)
**155**  (*3*)
**1566**  (*1*)
**16**  (*7*)
**16.3**  (*2*)
**162**  (*2*)
**163**  (*15*)
**1683**  (*1*)
**16th**  (*19*)
**17**  (*4*)
**1705**  (*1*)
**1706**  (*1*)
**171**  (*1*)
**172**  (*5*)
**173**  (*1*)
**178**  (*1*)
**17th**  (*9*)
**18**  (*8*)
**180**  (*1*)
**181**  (*1*)
**1832**  (*1*)
**185**  (*1*)
**189**  (*2*)
**18th**  (*1*)
**19**  (*10*)
**1900**  (*1*)
**1913**  (*2*)
**1929**  (*2*)
**193**  (*1*)
**1963**  (*1*)
**1983**  (*1*)
**1986**  (*1*)
**1988**  (*1*)
**19th**  (*3*)
**1st**  (*2*)

**< 2 >**
**2**  (*8*)
**2,288,000**  (*1*)
**2.3**  (*1*)
**2:27**  (*2*)

**2:42**  (*2*)
**20**  (*6*)
**200**  (*2*)
**2000**  (*1*)
**2003**  (*3*)
**2004**  (*1*)
**2008**  (*2*)
**201**  (*1*)
**2010**  (*3*)
**2017**  (*4*)
**2021**  (*2*)
**2022**  (*29*)
**2023**  (*4*)
**2025**  (*7*)
**203**  (*2*)
**2031**  (*1*)
**20557**  (*1*)
**21**  (*1*)
**212.432.5100**  (*1*)
**216**  (*1*)
**21st**  (*1*)
**22**  (*2*)
**227**  (*1*)
**228**  (*1*)
**22nd**  (*18*)
**23**  (*1*)
**23190**  (*1*)
**24**  (*3*)
**25**  (*6*)
**250**  (*4*)
**25308**  (*1*)
**25th**  (*6*)
**26**  (*3*)
**27**  (*2*)
**275**  (*1*)
**27th**  (*4*)
**28**  (*2*)
**283**  (*1*)
**28th**  (*3*)
**2nd**  (*27*)

**< 3 >**
**3**  (*19*)
**3:44**  (*2*)
**30**  (*15*)
**30(c)(2**  (*1*)
**31**  (*1*)
**314.889.7300**  (*1*)
**31st**  (*2*)

**32**  (*1*)
**3274**  (*1*)
**3277**  (*1*)
**3279**  (*1*)
**3293**  (*1*)
**33**  (*1*)
**33.75**  (*1*)
**34**  (*3*)
**35**  (*1*)
**36**  (*1*)
**37**  (*1*)
**38**  (*1*)
**39**  (*2*)
**3rd**  (*18*)

**< 4 >**
**4**  (*14*)
**4:00**  (*1*)
**40**  (*1*)
**41**  (*1*)
**42.25**  (*1*)
**420**  (*1*)
**44**  (*3*)
**45**  (*3*)
**46**  (*2*)
**46412**  (*1*)
**48**  (*18*)
**49.88**  (*1*)
**4th**  (*1*)

**< 5 >**
**5**  (*17*)
**5:11**  (*2*)
**5:14**  (*2*)
**5:25**  (*2*)
**50**  (*1*)
**50s**  (*2*)
**51**  (*4*)
**5132**  (*1*)
**52**  (*1*)
**52-week**  (*2*)
**5411176**  (*1*)
**56**  (*1*)
**58**  (*1*)
**59**  (*1*)

**< 6 >**
**6**  (*12*)
**6/10/22**  (*1*)

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| **6/16/25**  *(1)* | **abide**  *(3)* | **activities**  *(1)* | **alternatives**  *(7)* |
| **6/22/22**  *(1)* | **ability**  *(5)* | **activity**  *(5)* | **alters**  *(1)* |
| **6/9/22**  *(1)* | **able**  *(8)* | **activity/substantial**  *(1)* | **ALYSSA**  *(2)* |
| **60**  *(1)* | **abnormal**  *(4)* | **actual**  *(16)* | **ambiguous**  *(9)* |
| **631.367.7100**  *(1)* | **absence**  *(5)* | **add**  *(6)* | **America**  *(9)* |
| **63105**  *(1)* | **absent**  *(2)* | **adding**  *(4)* | **amount**  *(3)* |
| **64.63**  *(1)* | **Absolutely**  *(10)* | **additional**  *(12)* | **analyses**  *(1)* |
| **65**  *(1)* | **abstain**  *(1)* | **address**  *(5)* | **Analysis**  *(31)* |
| **69**  *(2)* | **abuse**  *(1)* | **addressed**  *(3)* | **analysts**  *(7)* |
| **690**  *(4)* | **abused**  *(1)* | **addressing**  *(2)* | **Analyze**  *(8)* |
| **6th**  *(4)* | **Abusive**  *(2)* | **adjusted**  *(2)* | **analyzing**  *(3)* |
| | **academia**  *(3)* | **admissibility**  *(1)* | **announce**  *(2)* |
| **< 7 >** | **academic**  *(11)* | **admit**  *(2)* | **announced**  *(2)* |
| **7**  *(19)* | **accept**  *(2)* | **admitted**  *(2)* | **announcement**  *(22)* |
| **7/28/25**  *(1)* | **accepted**  *(3)* | **adopt**  *(2)* | **announcing**  *(1)* |
| **7/7/22**  *(1)* | **Accepting**  *(1)* | **advanced**  *(3)* | **annual**  *(1)* |
| **7:30**  *(1)* | **accepts**  *(1)* | **advice**  *(11)* | **another's**  *(1)* |
| **70**  *(1)* | **access**  *(7)* | **advise**  *(3)* | **answer**  *(31)* |
| **701**  *(1)* | **accomplish**  *(2)* | **advised**  *(1)* | **answered**  *(21)* |
| **70s**  *(1)* | **account**  *(3)* | **advising**  *(1)* | **answering**  *(3)* |
| **71**  *(1)* | **accounting**  *(1)* | **advisor**  *(5)* | **answers**  *(2)* |
| **73**  *(2)* | **Accumulate**  *(2)* | **advisors**  *(2)* | **antic**  *(1)* |
| **736**  *(2)* | **accumulated**  *(2)* | **advisory**  *(1)* | **anticipate**  *(2)* |
| **7676**  *(1)* | **accumulating**  *(4)* | **affairs**  *(1)* | **anticipated**  *(2)* |
| **79**  *(3)* | **accumulation**  *(16)* | **affect**  *(2)* | **anti-raid**  *(1)* |
| **7th**  *(4)* | **accumulations**  *(2)* | **affiliates**  *(2)* | **anti-takeover**  *(1)* |
| | **accuracy**  *(1)* | **affords**  *(1)* | **Antitrust**  *(1)* |
| **< 8 >** | **accurate**  *(3)* | **aforementioned**  *(1)* | **Antolini**  *(2)* |
| **8**  *(11)* | **accurately**  *(2)* | **aggregate**  *(1)* | **anybody**  *(2)* |
| **8/27/25**  *(1)* | **achieve**  *(1)* | **aggressive**  *(2)* | **anymore**  *(2)* |
| **8/29/22**  *(1)* | **acknowledge**  *(2)* | **aggressively**  *(1)* | **aplascoff@rgrdlaw.com**  *(1)* |
| **8:30**  *(1)* | **acquire**  *(14)* | **ago**  *(4)* | **apologize**  *(12)* |
| **807**  *(2)* | **acquired**  *(1)* | **agree**  *(57)* | **appeal**  *(1)* |
| **80s**  *(1)* | **acquirer**  *(1)* | **agreed**  *(8)* | **appear**  *(2)* |
| **83**  *(2)* | **acquirer's**  *(1)* | **agreeing**  *(3)* | **APPEARANCES**  *(1)* |
| **86**  *(4)* | **acquiring**  *(15)* | **agreement**  *(7)* | **APPEARING**  *(3)* |
| **89**  *(1)* | **acquiror**  *(3)* | **ahead**  *(9)* | **appears**  *(7)* |
| | **acquirors**  *(4)* | **Alex**  *(10)* | **Appendix**  *(9)* |
| **< 9 >** | **acquisition**  *(31)* | **alleged**  *(1)* | **Apple**  *(1)* |
| **9**  *(12)* | **Acquisitions**  *(4)* | **allow**  *(9)* | **applicability**  *(1)* |
| **9/1/22**  *(1)* | **act**  *(3)* | **allowed**  *(3)* | **Applied**  *(4)* |
| **9/19/22**  *(1)* | **acting**  *(1)* | **allowing**  *(1)* | **apply**  *(2)* |
| **9:11**  *(3)* | **Action**  *(5)* | **allows**  *(3)* | **applying**  *(2)* |
| **95**  *(2)* | **actions**  *(2)* | **allude**  *(2)* | **appreciate**  *(2)* |
| | **active**  *(103)* | **alluding**  *(2)* | **approach**  *(4)* |
| **< A >** | **actively**  *(15)* | **altered**  *(2)* | **approached**  *(2)* |
| **a.m**  *(7)* | **Activism**  *(3)* | **altering**  *(1)* | **approaches**  *(2)* |
| **A-6**  *(1)* | **activist**  *(4)* | **alternative**  *(1)* | **appropriate**  *(4)* |
| **ABB**  *(1)* | **Activists**  *(6)* | | |

Deposition of Shane Goodwin, Ph.D.                                In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| appropriately *(1)* | attribute *(1)* | believed *(7)* | brought *(2)* |
| approval *(1)* | atypical *(2)* | believes *(1)* | Bruner *(16)* |
| approve *(2)* | auction *(1)* | Bennett *(6)* | Bruner's *(5)* |
| approved *(2)* | August *(56)* | Berra *(1)* | bulge *(2)* |
| approximately *(2)* | authority *(1)* | Best *(7)* | bullet *(21)* |
| area *(1)* | authors *(1)* | better *(2)* | bunch *(4)* |
| argue *(1)* | automatically *(1)* | Beyond *(1)* | business *(14)* |
| argued *(1)* | Automation *(2)* | bias *(5)* | buy *(6)* |
| argument *(3)* | availability *(1)* | biased *(1)* | buyer *(2)* |
| Argumentative *(6)* | Available *(12)* | bid *(10)* | buyers *(3)* |
| arithmetic *(3)* | Avenue *(1)* | bidder *(1)* | buying *(4)* |
| arrived *(1)* | average *(1)* | bidding *(4)* | buys *(1)* |
| art *(3)* | avoid *(2)* | bids *(2)* | byproduct *(1)* |
| Arthur *(2)* | aware *(19)* | big *(1)* | |
| article *(2)* | | bilateral *(1)* | < C > |
| articles *(4)* | < B > | billion *(3)* | C]ounsel *(1)* |
| articulate *(1)* | bachelor's *(1)* | bit *(12)* | Cain *(71)* |
| aside *(3)* | back *(64)* | BlackRock *(1)* | Cain's *(45)* |
| asked *(62)* | background *(9)* | blanket *(1)* | calculation *(1)* |
| asking *(38)* | bad *(3)* | blanketly *(1)* | California *(3)* |
| aspect *(1)* | badgering *(1)* | Bloomberg *(1)* | call *(15)* |
| aspects *(2)* | balance *(2)* | Board *(92)* | called *(5)* |
| assert *(4)* | balancing *(2)* | boards *(5)* | calling *(1)* |
| asserted *(1)* | ball *(1)* | board's *(1)* | Calls *(29)* |
| asserting *(1)* | ballot *(1)* | body *(4)* | candid *(2)* |
| assess *(8)* | bank *(11)* | BofA *(24)* | candidates *(1)* |
| assessments *(1)* | banker *(5)* | BofA_003270 *(2)* | capabilities *(1)* |
| assets *(1)* | bankers *(3)* | BofA's *(1)* | capability *(1)* |
| assign *(1)* | banking *(3)* | bold *(2)* | capacity *(2)* |
| assignment *(78)* | banks *(5)* | book *(4)* | capital *(1)* |
| assignments *(2)* | bar *(3)* | born *(1)* | capitalized *(1)* |
| assist *(1)* | Bargaining *(3)* | bottom *(12)* | capitals *(1)* |
| assistance *(1)* | base *(3)* | bought *(1)* | care *(1)* |
| associate *(1)* | based *(35)* | Boulevard *(1)* | career *(1)* |
| assume *(11)* | bases *(2)* | bound *(1)* | careful *(2)* |
| assumed *(1)* | Basic *(1)* | bounds *(1)* | carrying *(1)* |
| Assumes *(9)* | basically *(4)* | Bowl *(1)* | case *(67)* |
| assuming *(1)* | basing *(3)* | box *(3)* | cases *(19)* |
| assumptions *(2)* | basis *(12)* | bracket *(2)* | cash *(7)* |
| assure *(1)* | Bates *(17)* | brain *(1)* | Cast *(1)* |
| attached *(1)* | bear *(4)* | branch *(2)* | Castellano *(27)* |
| attachments *(1)* | bearing *(1)* | break *(29)* | Category *(1)* |
| attack *(1)* | began *(2)* | breaks *(2)* | cause *(2)* |
| attacked *(1)* | beginning *(7)* | brief *(6)* | caused *(6)* |
| Attempt *(2)* | begins *(2)* | briefly *(1)* | causes *(1)* |
| attempting *(2)* | behavior *(1)* | bright *(1)* | CC *(1)* |
| attention *(2)* | behavioral *(5)* | bring *(2)* | Central *(3)* |
| attest *(2)* | beholder *(1)* | broadest *(1)* | CEO *(13)* |
| attorney *(3)* | believe *(27)* | Broadridge *(1)* | CEOs *(5)* |

Deposition of Shane Goodwin, Ph.D.                                                In Re National Instruments Corporation Securities Litigation

cert  *(1)*
certain  *(6)*
certainly  *(23)*
certainty  *(1)*
CERTIFICATE  *(1)*
certification  *(5)*
certify  *(1)*
cetera  *(5)*
cgilroy@rgrdlaw.com  *(1)*
chagrin  *(1)*
challenge  *(1)*
chance  *(6)*
CHANDRASEKHAR  *(1)*
change  *(22)*
changed  *(3)*
changes  *(2)*
changing  *(3)*
chapters  *(1)*
characterization  *(1)*
characterize  *(12)*
characterized  *(6)*
characterizes  *(1)*
charged  *(1)*
chart  *(4)*
check  *(10)*
checked  *(1)*
Cheri  *(4)*
Chiarella  *(2)*
Chicago  *(2)*
Chief  *(2)*
chiefs  *(1)*
Chloride  *(3)*
choices  *(1)*
Choose  *(1)*
CHRISTOPHER  *(1)*
circumstance  *(2)*
circumstances  *(1)*
citation  *(3)*
citations  *(4)*
cite  *(18)*
cited  *(33)*
cites  *(5)*
citing  *(3)*
Civil  *(4)*
claim  *(26)*
claiming  *(2)*
claims  *(3)*

clarification  *(4)*
clarify  *(2)*
class  *(42)*
classic  *(3)*
classroom  *(1)*
clause  *(1)*
clear  *(34)*
clearly  *(5)*
close  *(3)*
closed  *(2)*
closely  *(4)*
closing  *(2)*
code  *(2)*
collaborating  *(1)*
collaborative  *(1)*
colleagues  *(2)*
college  *(1)*
Columbia  *(2)*
column  *(7)*
combination  *(1)*
come  *(14)*
COMERFORD  *(444)*
comes  *(5)*
comfortable  *(2)*
coming  *(3)*
comment  *(7)*
comments  *(3)*
Commission  *(1)*
commit  *(1)*
commitment  *(1)*
committee  *(3)*
committees  *(3)*
committing  *(1)*
common  *(4)*
communicated  *(1)*
communication  *(38)*
Communications  *(15)*
communication's  *(1)*
companies  *(19)*
company  *(51)*
company's  *(2)*
compare  *(1)*
compared  *(1)*
competent  *(1)*
competitive  *(2)*
competitor  *(1)*
competitors  *(1)*
competitor's  *(1)*
compilation  *(1)*

complained  *(1)*
Complaint  *(3)*
complete  *(2)*
completed  *(1)*
completely  *(6)*
completion  *(2)*
comport  *(1)*
comports  *(1)*
compound  *(5)*
computer  *(1)*
con  *(1)*
Conan  *(3)*
concept  *(2)*
concepts  *(1)*
concerning  *(3)*
concisely  *(1)*
concluded  *(9)*
concludes  *(1)*
concluding  *(1)*
conclusion  *(15)*
conclusions  *(11)*
condition  *(1)*
conduct  *(4)*
conducted  *(1)*
conference  *(3)*
confident  *(2)*
confidential  *(4)*
confirm  *(10)*
confirmation  *(2)*
confirmed  *(1)*
conflate  *(1)*
conflated  *(1)*
conflates  *(1)*
conflating  *(2)*
confounds  *(1)*
confusing  *(6)*
confusion  *(1)*
congruent  *(1)*
conjunctive  *(1)*
connect  *(1)*
connected  *(1)*
connection  *(3)*
consensus  *(3)*
consent  *(1)*
consider  *(35)*
consideration  *(10)*
considerations  *(1)*
considered  *(24)*
considering  *(8)*

considers  *(3)*
consistent  *(7)*
consisting  *(1)*
constant  *(5)*
constitute  *(2)*
constituted  *(1)*
constructed  *(1)*
constructively  *(1)*
consult  *(2)*
consummated  *(7)*
contact  *(5)*
contacted  *(2)*
contain  *(4)*
contained  *(1)*
contains  *(2)*
CONTENTS  *(2)*
context  *(14)*
contexts  *(4)*
contingency  *(2)*
contingent  *(6)*
continuation  *(2)*
Continue  *(7)*
continued  *(7)*
continues  *(1)*
Continuing  *(3)*
contradict  *(2)*
contradicts  *(1)*
contrary  *(1)*
contrast  *(1)*
control  *(4)*
controlling  *(3)*
controversial  *(2)*
conver  *(1)*
conversation  *(8)*
conversations  *(27)*
convey  *(1)*
conveying  *(1)*
copied  *(1)*
copies  *(1)*
copy  *(7)*
core  *(1)*
corner  *(2)*
corporate  *(11)*
CORPORATION  *(5)*
corporation's  *(1)*
correct  *(154)*
corrected  *(2)*
CORRECTION  *(1)*
correctly  *(2)*

Deposition of Shane Goodwin, Ph.D.                    In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| correctness  *(1)* | date  *(10)* | denominator  *(1)* | disclose  *(14)* |
| Correspondence  *(2)* | dated  *(12)* | denoted  *(1)* | disclosed  *(14)* |
| corresponding  *(1)* | dates  *(3)* | deny  *(4)* | disclosing  *(3)* |
| cost  *(2)* | daughter's  *(1)* | depend  *(2)* | disclosurable  *(1)* |
| Cote  *(2)* | David  *(1)* | depends  *(10)* | disclosure  *(26)* |
| counsel  *(114)* | day  *(6)* | deponent  *(2)* | disclosure/notification |
| counsel's  *(2)* | days  *(5)* | DEPOSITION  *(16)* | *(2)* |
| count  *(2)* | DCF  *(4)* | depositions  *(5)* | disclosures  *(2)* |
| counted  *(1)* | DD  *(1)* | derivatives  *(1)* | Discounted  *(1)* |
| counterfactual  *(1)* | dead  *(1)* | describe  *(5)* | discouraged  *(2)* |
| COUNTY  *(4)* | deal  *(31)* | described  *(5)* | discouraging  *(6)* |
| couple  *(8)* | dealing  *(1)* | describes  *(1)* | discovery  *(5)* |
| course  *(4)* | deals  *(12)* | describing  *(3)* | discretion  *(1)* |
| courses  *(5)* | death  *(1)* | DESCRIPTION  *(1)* | discuss  *(12)* |
| coursework  *(1)* | debating  *(1)* | desire  *(2)* | discussed  *(14)* |
| Court  *(31)* | decades  *(2)* | desires  *(1)* | discusses  *(1)* |
| courts  *(2)* | December  *(1)* | destroyed  *(1)* | discussing  *(2)* |
| Court's  *(9)* | decides  *(3)* | detail  *(1)* | Discussion  *(3)* |
| cover  *(1)* | decision  *(12)* | detailing  *(1)* | discussions  *(16)* |
| covered  *(2)* | decisions  *(5)* | details  *(1)* | disingenuous  *(2)* |
| Cowboys  *(1)* | declined  *(1)* | determination  *(1)* | dismiss  *(4)* |
| create  *(3)* | Dedman  *(1)* | determine  *(1)* | dispute  *(8)* |
| created  *(6)* | deems  *(1)* | determined  *(6)* | dissertation  *(10)* |
| creating  *(2)* | def  *(1)* | determines  *(1)* | distinguish  *(1)* |
| credible  *(1)* | defeat  *(1)* | development  *(1)* | distraction  *(1)* |
| credit  *(1)* | DEFENDANTS  *(2)* | developments  *(3)* | DISTRICT  *(7)* |
| Crew  *(1)* | defending  *(1)* | dialogue  *(4)* | Dixon  *(11)* |
| criticizing  *(4)* | defense  *(15)* | dictated  *(1)* | Dixon's  *(2)* |
| CRR  *(2)* | defenses  *(1)* | dictation  *(1)* | Doctor  *(2)* |
| crux  *(1)* | defensive  *(3)* | die  *(1)* | doctors  *(1)* |
| crystal-clear  *(1)* | defer  *(1)* | different  *(31)* | document  *(19)* |
| CSR  *(1)* | defi  *(1)* | differently  *(3)* | documents  *(84)* |
| CSR-5132  *(1)* | define  *(9)* | differing  *(2)* | doing  *(26)* |
| CST  *(1)* | defined  *(2)* | difficult  *(2)* | Dowd  *(8)* |
| culminated  *(1)* | defines  *(1)* | difficulty  *(1)* | Doyle  *(3)* |
| curious  *(1)* | definitely  *(10)* | diligence  *(3)* | dozen  *(1)* |
| current  *(5)* | definition  *(76)* | diligent  *(4)* | Dr  *(145)* |
| currently  *(3)* | definitions  *(3)* | diligently  *(1)* | draft  *(5)* |
| customary  *(9)* | Definitive  *(2)* | direct  *(4)* | drafted  *(5)* |
| cut  *(6)* | degree  *(2)* | direction  *(3)* | drafting  *(1)* |
| cute  *(1)* | Delaware  *(7)* | directly  *(4)* | draw  *(1)* |
| cyber  *(1)* | deliberated  *(1)* | Directors  *(10)* | drawing  *(2)* |
| | delineate  *(1)* | Dirks  *(2)* | drawn  *(1)* |
| < D > | delineated  *(1)* | dis  *(2)* | due  *(4)* |
| Dallas  *(1)* | delivered  *(2)* | disagree  *(8)* | duly  *(1)* |
| dance  *(1)* | delta  *(1)* | disagreement  *(1)* | duration  *(1)* |
| dangerous  *(1)* | denied  *(1)* | disappointed  *(1)* | Duties  *(5)* |
| data  *(7)* | Denis  *(2)* | discharge  *(3)* | |
| dataset  *(1)* | Denis's  *(1)* | discharging  *(1)* | < E > |

Deposition of Shane Goodwin, Ph.D.     In Re National Instruments Corporation Securities Litigation

e.g  *(2)*
earlier  *(23)*
early  *(8)*
earning  *(1)*
earnings  *(7)*
easier  *(1)*
Eastern  *(1)*
easy  *(4)*
EBITDA  *(2)*
ECF  *(2)*
econ  *(1)*
economically  *(4)*
economics  *(2)*
Eddie  *(5)*
edits  *(3)*
education  *(3)*
educational  *(1)*
EE  *(1)*
effect  *(4)*
effectiveness  *(1)*
efficiency  *(2)*
efficient  *(1)*
efficiently  *(1)*
effort  *(3)*
efforts  *(4)*
eight  *(23)*
either  *(10)*
elect  *(1)*
eleven  *(2)*
eligible  *(1)*
else's  *(1)*
Email  *(25)*
emails  *(14)*
E-mails  *(2)*
Emerson  *(135)*
Emerson-National  *(1)*
Emerson's  *(34)*
Empirical  *(3)*
employ  *(2)*
en  *(1)*
encompass  *(1)*
ended  *(4)*
endlessly  *(1)*
ends  *(1)*
engage  *(6)*
engaged  *(20)*
engagement  *(126)*
engaging  *(3)*
English  *(4)*

enjoy  *(3)*
enjoys  *(1)*
ensure  *(2)*
enter  *(1)*
entered  *(1)*
enterprise  *(3)*
enters  *(2)*
entire  *(1)*
entirely  *(2)*
entirety  *(1)*
entitled  *(4)*
enumerate  *(1)*
enumerator  *(1)*
EPS  *(1)*
equals  *(1)*
equity  *(2)*
equivalence  *(1)*
equivalent  *(4)*
ERRATA  *(1)*
escalate  *(3)*
escalating  *(2)*
escalation  *(1)*
especially  *(1)*
essence  *(1)*
essentially  *(1)*
EST  *(1)*
established  *(4)*
estimate  *(1)*
estimated  *(1)*
et  *(5)*
Eugene  *(2)*
evade  *(1)*
evaded  *(1)*
event  *(60)*
events  *(11)*
eventually  *(2)*
Everest  *(1)*
everybody  *(1)*
everyone's  *(1)*
evidence  *(33)*
exact  *(12)*
exactly  *(27)*
EXAMINATION  *(5)*
examined  *(1)*
examining  *(1)*
example  *(11)*
examples  *(8)*
excerpts  *(2)*
Excl  *(1)*

exclusively  *(1)*
Exec  *(1)*
executed  *(2)*
Executive  *(1)*
executives  *(2)*
EXHIBIT  *(55)*
EXHIBITS  *(3)*
exist  *(2)*
existence  *(1)*
exists  *(1)*
expand  *(2)*
expanded  *(1)*
expect  *(1)*
expedience  *(3)*
expediency  *(1)*
expeditiously  *(1)*
experience  *(39)*
experienced  *(1)*
Expert  *(17)*
Experts  *(5)*
expires  *(1)*
explain  *(5)*
explanation  *(3)*
explicitly  *(1)*
explore  *(3)*
exploring  *(4)*
expressed  *(3)*
expressing  *(2)*
extend  *(3)*
extending  *(1)*
extends  *(1)*
extensively  *(1)*
extent  *(2)*
extra  *(2)*
extremely  *(1)*
eyes  *(1)*

< F >
face  *(2)*
facilitate  *(1)*
facilitating  *(1)*
fact  *(20)*
factfinder  *(1)*
factor  *(1)*
factors  *(1)*
facts  *(21)*
fail  *(1)*
failed  *(1)*
failing  *(2)*

failure  *(1)*
fair  *(6)*
fairly  *(1)*
fairness  *(21)*
false  *(1)*
Fama  *(2)*
familiar  *(23)*
far  *(19)*
farther  *(1)*
fashion  *(1)*
favor  *(1)*
feasible  *(3)*
federal  *(7)*
fee  *(5)*
feel  *(10)*
fees  *(1)*
felt  *(7)*
fend  *(1)*
fiduciary  *(5)*
field  *(6)*
fight  *(3)*
figure  *(1)*
file  *(1)*
filed  *(4)*
Filings  *(5)*
final  *(5)*
finally  *(3)*
finance  *(14)*
financed  *(1)*
financial  *(12)*
financing  *(1)*
find  *(16)*
finding  *(3)*
finds  *(1)*
fine  *(3)*
finish  *(7)*
finished  *(2)*
finishes  *(1)*
firepower  *(1)*
firm  *(17)*
Firmly  *(1)*
firmness  *(1)*
firm's  *(2)*
first  *(68)*
fit  *(1)*
five  *(15)*
five-minute  *(2)*
fixed  *(1)*
fkaram@rgrdlaw.com

*(1)*
**flawed** *(7)*
**Flexibility** *(1)*
**flight** *(2)*
**flip** *(2)*
**flipped** *(1)*
**Flow** *(1)*
**fluctuations** *(1)*
**focus** *(2)*
**focused** *(4)*
**focusing** *(2)*
**folder** *(2)*
**follow** *(1)*
**followed** *(4)*
**following** *(5)*
**follows** *(2)*
**Follow-up** *(2)*
**football** *(6)*
**footnote** *(7)*
**forecast** *(1)*
**foreclose** *(4)*
**forego** *(1)*
**foregoing** *(2)*
**foresee** *(1)*
**forget** *(1)*
**forgive** *(6)*
**forgot** *(1)*
**form** *(348)*
**formal** *(6)*
**formally** *(1)*
**formation** *(1)*
**formed** *(2)*
**forming** *(2)*
**forms** *(2)*
**formulate** *(1)*
**Forsyth** *(1)*
**forth** *(11)*
**forward** *(6)*
**found** *(10)*
**Foundation** *(12)*
**four** *(12)*
**fourth** *(1)*
**fragment** *(1)*
**frame** *(1)*
**frameworks** *(1)*
**franchise** *(2)*
**FRANCIS** *(2)*
**frankly** *(8)*
**fraud** *(1)*

**free** *(3)*
**Friday** *(2)*
**friend** *(1)*
**friendly** *(17)*
**friends** *(2)*
**front** *(19)*
**frustration** *(1)*
**fulfill** *(1)*
**full** *(8)*
**full-time** *(1)*
**fully** *(3)*
**Fund** *(4)*
**fundamental** *(1)*
**fundamentally** *(2)*
**funds** *(2)*
**further** *(11)*
**future** *(3)*

**< G >**
**Gaining** *(1)*
**gains** *(1)*
**gather** *(1)*
**Geller** *(3)*
**general** *(8)*
**generalities** *(4)*
**Generally** *(8)*
**Generate** *(1)*
**generation** *(1)*
**getting** *(6)*
**GILROY** *(1)*
**gist** *(1)*
**give** *(18)*
**given** *(12)*
**gives** *(1)*
**giving** *(5)*
**glasses** *(1)*
**go** *(102)*
**goal** *(2)*
**goals** *(1)*
**goes** *(7)*
**going** *(108)*
**Good** *(31)*
**GOODWIN** *(39)*
**Goodwin's** *(3)*
**governance** *(3)*
**grand** *(2)*
**grant** *(1)*
**graph** *(1)*
**gray** *(1)*

**ground** *(2)*
**grounding** *(1)*
**Group** *(8)*
**guess** *(37)*
**guidance** *(3)*
**guide** *(1)*
**Gulf** *(3)*

**< H >**
**hac** *(1)*
**half** *(3)*
**hand** *(1)*
**happen** *(8)*
**happened** *(7)*
**happening** *(2)*
**happens** *(1)*
**happy** *(6)*
**harassing** *(4)*
**harassment** *(1)*
**harbor** *(1)*
**hard** *(3)*
**Hart-Scott-Rodino** *(1)*
**Harvard** *(1)*
**hate** *(1)*
**head** *(9)*
**headed** *(1)*
**heading** *(11)*
**hear** *(3)*
**heard** *(2)*
**He'd** *(1)*
**hedge** *(3)*
**height** *(1)*
**Held** *(3)*
**help** *(5)*
**helped** *(3)*
**helpful** *(2)*
**henceforth** *(2)*
**hereinafter** *(1)*
**hereinbefore** *(1)*
**hereunder** *(1)*
**heuristics** *(2)*
**high** *(6)*
**higher** *(29)*
**highest** *(4)*
**highlight** *(2)*
**highlighted** *(11)*
**highly** *(1)*
**hint** *(1)*
**hints** *(1)*

**hiring** *(10)*
**historical** *(2)*
**history** *(3)*
**HOFMAN** *(1)*
**Hold** *(11)*
**holder** *(1)*
**holding** *(1)*
**holdings** *(2)*
**holistic** *(2)*
**holistically** *(2)*
**Holmes** *(5)*
**home** *(2)*
**honest** *(9)*
**honestly** *(3)*
**honored** *(1)*
**hope** *(4)*
**hopefully** *(3)*
**hospital** *(1)*
**hostile** *(23)*
**hostility** *(3)*
**hour** *(2)*
**hours** *(3)*
**hug** *(4)*
**human** *(4)*
**hundred** *(4)*
**hundreds** *(1)*
**hypothetical** *(3)*
**hypothetically** *(1)*

**< I >**
**I]n** *(1)*
**IBW** *(1)*
**idea** *(9)*
**identification** *(15)*
**identify** *(2)*
**ii** *(27)*
**III** *(1)*
**Ilcisin** *(3)*
**Illustrative** *(2)*
**imaginary** *(3)*
**imagine** *(4)*
**immaterial** *(3)*
**impact** *(9)*
**implement** *(1)*
**Implementing** *(1)*
**implication** *(1)*
**implications** *(1)*
**implicit** *(4)*
**implied** *(5)*

implies  *(2)*
imply  *(3)*
implying  *(5)*
important  *(6)*
imposed  *(1)*
improbable  *(3)*
improper  *(4)*
improved  *(3)*
Improvements  *(1)*
improving  *(1)*
imputed  *(1)*
inaccurately  *(1)*
inappropriate  *(1)*
inappropriately  *(1)*
inaudible  *(1)*
incentivized  *(1)*
inches  *(1)*
inclined  *(1)*
include  *(10)*
included  *(6)*
includes  *(2)*
including  *(3)*
Inclusive  *(5)*
Incomplete  *(6)*
incorporated  *(1)*
increase  *(13)*
increased  *(3)*
increases  *(2)*
increasing  *(4)*
independent  *(2)*
index  *(2)*
Indian  *(1)*
indicate  *(2)*
indicated  *(4)*
indicates  *(1)*
indicating  *(3)*
indicator  *(1)*
indicia  *(8)*
individual  *(2)*
individually  *(2)*
individuals  *(7)*
inference  *(1)*
influence  *(2)*
influenced  *(2)*
inform  *(2)*
information  *(58)*
informed  *(1)*
Initial  *(1)*
initiating  *(3)*

in-person  *(2)*
Insensibly  *(4)*
insider  *(2)*
insistent  *(1)*
instance  *(4)*
instances  *(1)*
instruct  *(2)*
instructed  *(1)*
INSTRUMENTS  *(72)*
integrity  *(1)*
intelligence  *(1)*
intend  *(4)*
intended  *(3)*
intent  *(1)*
intention  *(1)*
intentionally  *(1)*
interaction  *(1)*
interdisciplinary  *(1)*
interest  *(13)*
interested  *(10)*
interesting  *(1)*
interests  *(1)*
Internal  *(29)*
interpretation  *(1)*
interpreted  *(1)*
interrupt  *(2)*
interrupting  *(1)*
interview  *(1)*
intimation  *(1)*
intuitively  *(1)*
invented  *(1)*
investing  *(1)*
investment  *(10)*
investor  *(11)*
investors  *(2)*
involved  *(7)*
involvement  *(2)*
involves  *(1)*
irrelevant  *(5)*
isolate  *(1)*
isolated  *(1)*
isolating  *(3)*
issue  *(10)*
issued  *(5)*
issuer  *(11)*
issues  *(3)*
issuing  *(2)*
italics  *(1)*
item  *(1)*

items  *(3)*
iterative  *(5)*
its  *(59)*
iv  *(1)*

< J >
JAI  *(1)*
jaic@rgrdlaw.com  *(1)*
January  *(13)*
jcomerford@dowdben
nett.com  *(1)*
JD  *(5)*
JEREMY  *(1)*
jhofman@dowdbennet
t.com  *(1)*
Job  *(3)*
JOHN  *(2)*
judge  *(17)*
judges  *(1)*
judge's  *(2)*
judgment  *(11)*
judgments  *(1)*
judicial  *(1)*
judiciously  *(1)*
July  *(22)*
June  *(50)*

< K >
KARAM  *(592)*
Karsanbhai  *(16)*
Karsanbhai's  *(3)*
keep  *(18)*
keeping  *(2)*
kept  *(1)*
Kevin  *(1)*
Key  *(1)*
kind  *(23)*
knew  *(6)*
know  *(267)*
knowing  *(2)*
knowledge  *(3)*
known  *(2)*
knows  *(2)*

< L >
label  *(1)*
labeling  *(1)*
lacks  *(1)*
Lady  *(1)*

laid  *(1)*
language  *(18)*
large  *(3)*
larger  *(3)*
late  *(3)*
laughing  *(1)*
launched  *(1)*
law  *(22)*
laws  *(2)*
lawyer  *(8)*
lawyers  *(7)*
layman's  *(1)*
lead  *(2)*
learn  *(2)*
learning  *(1)*
leave  *(2)*
led  *(2)*
left  *(3)*
left-hand  *(3)*
legal  *(46)*
length  *(2)*
letter  *(45)*
letters  *(18)*
level  *(3)*
levels  *(1)*
Lexington  *(1)*
Lexis  *(1)*
LexisNexis  *(1)*
Liability  *(2)*
lie  *(1)*
lied  *(1)*
life  *(1)*
light  *(5)*
likelihood  *(11)*
limited  *(1)*
line  *(8)*
lines  *(1)*
link  *(3)*
linked  *(1)*
Lipton  *(2)*
list  *(22)*
listed  *(16)*
listen  *(3)*
listened  *(1)*
listening  *(3)*
Literature  *(4)*
LITIGATION  *(5)*
little  *(19)*
Liu  *(1)*

live  (3)
living  (3)
LL.M  (6)
LLP  (3)
local  (1)
located  (1)
long  (10)
longer  (1)
Long-Term  (2)
look  (34)
looked  (14)
looking  (22)
looks  (3)
look-up  (1)
loosely  (1)
lost  (2)
lot  (50)
Louis  (1)
love  (1)
low  (10)
lower  (7)
LTM  (1)
lunches  (1)

< M >
M&A  (18)
Mackenzie  (10)
magnify  (1)
magnitude  (17)
maintained  (1)
majority  (1)
making  (15)
man  (2)
management  (7)
management's  (3)
manager  (5)
Manhattan  (3)
manner  (2)
March  (1)
margins  (1)
mark  (12)
MARKED  (19)
market  (10)
markets  (3)
marking  (1)
marks  (1)
Martino-Fleming  (1)
Master  (3)
master's  (2)

matches  (2)
matching  (1)
material  (37)
materiality  (36)
materially  (4)
Materials  (18)
math  (9)
Matter  (12)
matters  (3)
Matthew  (2)
Mauritius  (1)
maximize  (3)
maximum  (2)
MBA  (1)
McCloskey  (2)
McGrath  (3)
mean  (85)
meaning  (7)
meaningful  (5)
means  (16)
meant  (7)
measure  (1)
median  (4)
meet  (2)
Meeting  (4)
meetings  (3)
Melville  (1)
member  (8)
members  (6)
mention  (5)
mentioned  (37)
mentions  (1)
merely  (1)
merger  (34)
Mergers  (4)
merit  (1)
merits  (1)
message  (1)
messages  (1)
Messaging  (2)
meta  (2)
meta-analysis  (1)
meteorite  (1)
methodology  (2)
metric  (2)
metrics  (1)
MICHIGAN  (4)
mid  (4)
middle  (9)

midpoint  (1)
midway  (1)
Mike  (1)
million  (2)
mind  (7)
mindful  (4)
mine  (3)
minimal  (1)
minimum  (2)
minus  (1)
minutes  (12)
Mischaracterizes  (40)
mischaracterizing  (5)
misconstrued  (2)
misleading  (9)
misprint  (1)
misreading  (1)
misrepresent  (1)
missed  (3)
Missouri  (1)
Misstates  (18)
mistake  (1)
misunderstood  (1)
mix  (5)
mixed  (1)
MNPI  (4)
moment  (3)
moments  (1)
Monitor  (6)
monitoring  (15)
month  (3)
months  (6)
morning  (3)
motion  (2)
motivation  (2)
mouth  (2)
Move  (10)
moved  (2)
movement  (1)
movements  (1)
moves  (1)
moving  (3)
multiple  (2)
multi-year  (1)

< N >
nail  (1)
name  (6)
Nancy  (2)

narrative  (1)
NATI  (1)
NATIONAL  (71)
NAT-SL-00001250  (2)
NAT-SL-00001513  (2)
NAT-SL-00001554  (2)
NAT-SL-00010806  (2)
NAT-SL-00020537  (3)
NAT-SL-00023189  (2)
NAT-SL-00025277  (1)
natural  (1)
nature  (4)
NDA  (6)
NDAs  (3)
nearly  (1)
necessarily  (6)
necessary  (2)
need  (25)
needed  (5)
needs  (3)
negate  (1)
negligible  (30)
negotiate  (2)
negotiated  (1)
negotiation  (2)
negotiations  (9)
neither  (1)
neutered  (1)
neutral  (1)
never  (18)
NEW  (11)
Newco  (1)
News  (1)
NI  (46)
Nick  (1)
Niles  (2)
NI's  (18)
NOBO/privileged  (1)
nomenclature  (1)
non-argumentative
  (1)
non-binding  (5)
non-disclosure  (2)
non-public  (14)
non-responsive  (1)
non-suggestive  (1)
normal  (1)
normally  (1)
Northwestern  (1)

Deposition of Shane Goodwin, Ph.D.                                    In Re National Instruments Corporation Securities Litigation

NOTARY  *(2)*
notation  *(4)*
note  *(23)*
noted  *(12)*
notes  *(5)*
notion  *(1)*
notwithstanding  *(2)*
November  *(36)*
Number  *(95)*
numbered  *(3)*
numbers  *(6)*
Numeral  *(4)*
numerical  *(3)*
Nuthatch  *(12)*
Nuthatch's  *(1)*

< O >
obey  *(1)*
Object  *(57)*
objecting  *(5)*
objection  *(47)*
objections  *(29)*
objective  *(1)*
obligation  *(2)*
obligations  *(1)*
observed  *(1)*
obstruct  *(1)*
obstructing  *(1)*
obtain  *(2)*
obtained  *(2)*
obtaining  *(1)*
obvious  *(1)*
obviously  *(75)*
occasions  *(1)*
occur  *(6)*
occurring  *(5)*
October  *(6)*
offer  *(80)*
offered  *(7)*
offeree  *(1)*
offerer  *(1)*
offering  *(2)*
offers  *(23)*
officer  *(3)*
Oh  *(33)*
Okay  *(326)*
Oklahoma  *(1)*
old  *(2)*
olive  *(2)*

omission  *(4)*
omitted  *(2)*
Omni  *(1)*
once  *(13)*
ones  *(6)*
one's  *(1)*
one-third  *(1)*
ongoing  *(1)*
open  *(2)*
opening  *(6)*
opine  *(44)*
opined  *(9)*
opines  *(1)*
Opinion  *(113)*
opinions  *(36)*
opportunities  *(1)*
opportunity  *(1)*
opposed  *(3)*
opposing  *(3)*
options  *(1)*
oral  *(3)*
orally  *(1)*
Order  *(11)*
ordinary  *(2)*
organized  *(1)*
orient  *(4)*
original  *(9)*
originated  *(1)*
outcome  *(1)*
outcomes  *(2)*
outdated  *(1)*
outlined  *(1)*
output  *(3)*
outreach  *(2)*
Outright  *(2)*
outside  *(1)*
outstanding  *(1)*
overlooked  *(1)*
overlooks  *(1)*
oversight  *(1)*
overstep  *(1)*
overview  *(1)*
owned  *(1)*
ownership  *(4)*

< P >
p.m  *(11)*
PAGE  *(117)*
pages  *(10)*

paid  *(1)*
paper  *(8)*
papers  *(9)*
par  *(1)*
paragraph  *(93)*
Paragraphs  *(5)*
paraphrase  *(2)*
paraphrasing  *(1)*
parenthesis  *(1)*
parsimony  *(2)*
parsing  *(1)*
part  *(66)*
participant  *(1)*
participate  *(1)*
participated  *(1)*
particular  *(17)*
particularly  *(17)*
parties  *(10)*
parts  *(5)*
party  *(10)*
passive  *(4)*
path  *(1)*
pay  *(3)*
Payable  *(1)*
paying  *(6)*
payment  *(1)*
PDF  *(1)*
peers  *(2)*
pending  *(3)*
Pennsylvania  *(1)*
people  *(11)*
people's  *(2)*
percent  *(26)*
percentage  *(3)*
percentages  *(1)*
Perfect  *(1)*
perfectly  *(2)*
performance  *(1)*
performing  *(1)*
period  *(39)*
person  *(10)*
perspective  *(2)*
pertain  *(1)*
pertained  *(1)*
pertains  *(2)*
petered  *(2)*
Ph.D  *(7)*
philosopher  *(1)*
phone  *(5)*

phrase  *(9)*
phrased  *(1)*
pick  *(1)*
picking  *(2)*
picture  *(2)*
piece  *(2)*
pieces  *(1)*
pill  *(5)*
pipeline  *(2)*
place  *(5)*
PLAINTIFF  *(1)*
plaintiffs  *(1)*
Plaintiff's  *(1)*
plan  *(19)*
plans  *(2)*
PLASCOFF  *(22)*
plausible  *(4)*
plausibly  *(1)*
play  *(2)*
Playbook  *(1)*
player  *(1)*
playing  *(1)*
plc  *(1)*
pleadings  *(2)*
please  *(25)*
pleasure  *(1)*
plenty  *(3)*
plus  *(4)*
point  *(41)*
pointed  *(1)*
points  *(4)*
poison  *(2)*
pool  *(3)*
Poorly  *(1)*
Poplin  *(4)*
PoR  *(1)*
portion  *(1)*
posed  *(2)*
position  *(7)*
positions  *(1)*
positive  *(7)*
Posits  *(1)*
possessed  *(2)*
possession  *(1)*
possibilities  *(2)*
possibility  *(19)*
possible  *(11)*
possibly  *(2)*
Postdoctoral  *(1)*

| | | | |
|---|---|---|---|
| **potential** *(31)* | **printed** *(4)* | **proving** *(1)* | **raised** *(3)* |
| **potentially** *(3)* | **Printout** *(5)* | **proxy** *(15)* | **ran** *(2)* |
| **practical** *(2)* | **printouts** *(2)* | **prudent** *(14)* | **ranged** *(1)* |
| **practice** *(8)* | **prior** *(21)* | **PST)/privileged** *(1)* | **ranges** *(2)* |
| **practicing** *(3)* | **priority** *(6)* | **psychology** *(1)* | **ranging** *(1)* |
| **practitioner** *(3)* | **private** *(19)* | **public** *(43)* | **Rapp** *(3)* |
| **practitioners** *(1)* | **Private/Public** *(1)* | **publically** *(1)* | **rare** *(3)* |
| **pre** *(1)* | **privately** *(7)* | **publication** *(1)* | **rarely** *(2)* |
| **precedent** *(2)* | **privileged** *(1)* | **publications** *(1)* | **reach** *(6)* |
| **preceding** *(1)* | **pro** *(2)* | **Publicly** *(9)* | **reached** *(6)* |
| **precise** *(6)* | **prob** *(1)* | **publish** *(1)* | **reaching** *(3)* |
| **preclude** *(1)* | **proba** *(1)* | **published** *(5)* | **read** *(77)* |
| **predict** *(4)* | **probability** *(81)* | **pull** *(6)* | **reading** *(7)* |
| **predicted** *(1)* | **probable** *(4)* | **purchase** *(7)* | **ready** *(3)* |
| **Predictions** *(1)* | **probably** *(19)* | **purchases** *(2)* | **Reagan** *(2)* |
| **prefer** *(5)* | **probe** *(1)* | **purely** *(1)* | **real** *(1)* |
| **preference** *(1)* | **problem** *(1)* | **purpose** *(4)* | **realize** *(2)* |
| **preliminary** *(1)* | **Procedure** *(2)* | **purposes** *(1)* | **really** *(37)* |
| **prelude** *(1)* | **procedures** *(1)* | **pursue** *(3)* | **re-ask** *(3)* |
| **premier** *(1)* | **proceed** *(6)* | **pursued** *(1)* | **reason** *(5)* |
| **premise** *(4)* | **proceeded** *(1)* | **pursuing** *(3)* | **reasonable** *(6)* |
| **premium** *(21)* | **proceeding** *(1)* | **put** *(33)* | **reasons** *(2)* |
| **preparation** *(3)* | **process** *(17)* | **puts** *(1)* | **rebuttal** *(1)* |
| **preparations** *(2)* | **processes** *(1)* | **putting** *(6)* | **recall** *(24)* |
| **prepared** *(8)* | **produced** *(14)* | | **receive** *(2)* |
| **Preparedness** *(1)* | **Production** *(1)* | **< Q >** | **received** *(6)* |
| **preparing** *(3)* | **Products** *(2)* | **Q1** *(1)* | **receives** *(1)* |
| **PRESENT** *(3)* | **professional** *(2)* | **qualitative** *(1)* | **Recess** *(6)* |
| **presentation** *(8)* | **Professor** *(1)* | **qualitatively** *(1)* | **recognize** *(6)* |
| **presentations** *(3)* | **professors** *(1)* | **quantify** *(1)* | **recommended** *(1)* |
| **presented** *(6)* | **program** *(2)* | **quantitative** *(2)* | **record** *(34)* |
| **presenting** *(2)* | **progressing** *(1)* | **quarter** *(4)* | **recorded** *(2)* |
| **preserved** *(1)* | **Project** *(6)* | **question** *(119)* | **records** *(1)* |
| **preserving** *(1)* | **projections** *(8)* | **questioning** *(2)* | **reduced** *(2)* |
| **press** *(1)* | **pronounce** *(1)* | **questions** *(19)* | **re-election** *(1)* |
| **Pressure** *(2)* | **proper** *(2)* | **question's** *(1)* | **reevaluate** *(1)* |
| **Presumably** *(1)* | **proposal** *(43)* | **quick** *(2)* | **RE-EXAMINATION** *(2)* |
| **presume** *(2)* | **proposals** *(8)* | **quickly** *(2)* | |
| **presuming** *(1)* | **propose** *(1)* | **quite** *(10)* | **refer** *(12)* |
| **Pretrial** *(1)* | **Proposed** *(17)* | **quotation** *(1)* | **reference** *(7)* |
| **pretty** *(4)* | **proposes** *(1)* | **quotations** *(1)* | **referenced** *(5)* |
| **prevent** *(3)* | **proposing** *(2)* | **quote** *(15)* | **references** *(2)* |
| **previous** *(2)* | **prospect** *(5)* | **quoted** *(4)* | **referencing** *(8)* |
| **previously** *(4)* | **prospective** *(2)* | **quotes** *(3)* | **referred** *(5)* |
| **price** *(66)* | **protect** *(1)* | **quoting** *(3)* | **referring** *(10)* |
| **prices** *(2)* | **prove** *(2)* | | **refers** *(4)* |
| **principle** *(1)* | **provide** *(10)* | **< R >** | **reflect** *(3)* |
| **principles** *(1)* | **provided** *(42)* | **rack** *(1)* | **reflect[s** *(1)* |
| **print** *(2)* | **provides** *(2)* | **raise** *(11)* | **reflected** *(2)* |

Deposition of Shane Goodwin, Ph.D.                                    In Re National Instruments Corporation Securities Litigation

reflects  (3)
refrain  (2)
refrains  (1)
refused  (2)
refute  (1)
refuted  (2)
refuting  (1)
regard  (7)
regarding  (4)
Regards  (1)
regular  (1)
regulatory  (1)
reinforcing  (1)
reiterate  (1)
reiterates  (1)
reiterating  (1)
reject  (5)
rejected  (16)
rejecting  (6)
rejection  (23)
rejections  (3)
rejects  (1)
related  (14)
relates  (2)
relating  (1)
relative  (7)
relatively  (3)
relayed  (1)
Release  (2)
relevance  (8)
relevant  (18)
relied  (7)
relies  (1)
Reluctantly  (1)
rely  (11)
relying  (4)
remain  (5)
remained  (14)
remaining  (1)
remember  (10)
REMOTE  (1)
REMOTELY  (5)
render  (1)
rendered  (1)
rendering  (2)
rendition  (1)
repeat  (14)
repeated  (1)
repeatedly  (1)

repeating  (1)
repetitive  (2)
rephrase  (2)
Replies  (1)
reply  (21)
replying  (3)
Report  (170)
REPORTED  (4)
reportedly  (1)
reporter  (9)
Reporting  (1)
reports  (25)
represent  (2)
representations  (2)
represents  (1)
reproduced  (2)
reproduction  (1)
repurchase  (1)
request  (9)
requested  (7)
requests  (2)
require  (4)
required  (2)
requirement  (3)
requirements  (1)
requires  (7)
research  (9)
respect  (12)
respective  (1)
respond  (7)
responded  (5)
responding  (10)
response  (13)
responses  (5)
responsive  (6)
rest  (6)
rests  (2)
result  (2)
results  (1)
resume  (1)
retain  (2)
retained  (1)
retainer  (2)
return  (6)
returns  (4)
review  (14)
reviewed  (32)
reviewing  (8)
Revlon  (1)

Rezulin  (2)
ride  (1)
right  (500)
right-hand  (5)
rights  (3)
Road  (1)
Robbins  (3)
Robert  (1)
robust  (1)
Rockwell  (5)
roles  (2)
rolling  (1)
Roman  (4)
room  (1)
round  (5)
rounds  (8)
routinely  (3)
row  (2)
RPR  (2)
Rubicam  (3)
Rudman  (3)
Rule  (8)
Rules  (3)
ruling  (1)
run  (7)
running  (3)
runs  (1)

< S >
Sabastian  (2)
safe  (2)
sale  (2)
sample  (4)
sampling  (2)
sanctions  (1)
sat  (1)
satisfied  (3)
satisfy  (1)
save  (1)
saw  (4)
saying  (67)
says  (89)
scares  (1)
Scenarios  (1)
School  (7)
schools  (2)
Schwert  (1)
scope  (4)
screen  (14)

scroll  (1)
se  (1)
search  (10)
searches  (1)
seat  (2)
Seats  (8)
SEC  (3)
second  (26)
secretary  (1)
section  (7)
SECURITIES  (27)
security  (4)
see  (219)
seeing  (1)
Seek  (3)
seeking  (1)
seen  (8)
segments  (1)
select  (1)
selected  (5)
selection  (1)
selective  (1)
self-selected  (1)
sell  (3)
sellers  (1)
selling  (3)
sell-side  (1)
send  (5)
sending  (2)
senior  (3)
sense  (2)
sensitive  (2)
sent  (14)
sentence  (33)
sentences  (2)
separate  (1)
September  (12)
sequence  (2)
seriatim  (1)
series  (3)
serious  (7)
serve  (1)
Service  (1)
services  (2)
serving  (1)
Session  (2)
set  (7)
sets  (2)
seven  (4)

Deposition of Shane Goodwin, Ph.D.                              In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| **SHANE** *(7)* | **snippet** *(1)* | **starting** *(4)* | **submit** *(2)* |
| **share** *(26)* | **sold** *(2)* | **starts** *(2)* | **submitted** *(10)* |
| **shareholder** *(8)* | **solely** *(1)* | **State** *(14)* | **Subparagraph** *(15)* |
| **shareholders** *(19)* | **Somebody** *(11)* | **stated** *(24)* | **Subsection** *(1)* |
| **shares** *(17)* | **somewhat** *(4)* | **statement** *(20)* | **subsequent** *(1)* |
| **sharp** *(1)* | **soon** *(1)* | **statements** *(5)* | **subsequently** *(1)* |
| **Shawn** *(1)* | **sophisticated** *(3)* | **STATES** *(6)* | **substance** *(7)* |
| **SHEET** *(1)* | **Sorry** *(61)* | **static** *(2)* | **substantial** *(7)* |
| **Sherlock** *(4)* | **sound** *(1)* | **stating** *(2)* | **substantive** *(4)* |
| **Shores** *(1)* | **sounds** *(1)* | **statistical** *(11)* | **subtle** *(2)* |
| **short** *(11)* | **South** *(1)* | **Statistically** *(3)* | **subtly** *(1)* |
| **show** *(7)* | **SOUTHERN** *(5)* | **status** *(1)* | **subvert** *(1)* |
| **showed** *(3)* | **speak** *(14)* | **stay** *(1)* | **subway** *(1)* |
| **showing** *(3)* | **speaking** *(19)* | **stenographic** *(2)* | **succeeded** *(1)* |
| **shown** *(1)* | **speaks** *(4)* | **stenographically** *(1)* | **success** *(11)* |
| **shows** *(2)* | **specialization** *(1)* | **step** *(8)* | **successful** *(2)* |
| **sic** *(6)* | **specific** *(33)* | **steps** *(1)* | **succinct** *(1)* |
| **side** *(7)* | **specifically** *(20)* | **steward** *(4)* | **succinctly** *(1)* |
| **sides** *(3)* | **specifics** *(1)* | **stewards** *(2)* | **sufficient** *(4)* |
| **sign** *(2)* | **specify** *(1)* | **stick** *(3)* | **suggest** *(3)* |
| **signal** *(4)* | **spectrum** *(4)* | **stipulate** *(4)* | **suggested** *(3)* |
| **signaling** *(2)* | **speculate** *(1)* | **stock** *(64)* | **suggesting** *(5)* |
| **signals** *(1)* | **speculation** *(13)* | **stop** *(5)* | **suggestions** *(1)* |
| **Signature** *(1)* | **speculative** *(4)* | **stopped** *(1)* | **suit** *(2)* |
| **signed** *(4)* | **speech** *(2)* | **stops** *(1)* | **Suite** *(3)* |
| **significance** *(63)* | **speed** *(1)* | **stories** *(1)* | **suitor** *(1)* |
| **significant** *(14)* | **spelled** *(4)* | **strategic** *(18)* | **Sulphur** *(1)* |
| **significantly** *(8)* | **spells** *(1)* | **strategy** *(2)* | **sum** *(3)* |
| **signing** *(2)* | **spend** *(2)* | **straw** *(2)* | **summarily** *(1)* |
| **signs** *(1)* | **spending** *(2)* | **stream** *(5)* | **summarize** *(3)* |
| **similar** *(8)* | **spent** *(3)* | **Street** *(2)* | **summarized** *(1)* |
| **similarity** *(1)* | **spoken** *(4)* | **strength** *(1)* | **summarizing** *(1)* |
| **simple** *(8)* | **SS** *(1)* | **Strike** *(1)* | **Summary** *(17)* |
| **simplistic** *(1)* | **SSRN** *(1)* | **string** *(3)* | **summit** *(1)* |
| **simply** *(4)* | **St** *(1)* | **striving** *(1)* | **Super** *(1)* |
| **single** *(5)* | **stage** *(2)* | **strong** *(6)* | **supervision** *(1)* |
| **sir** *(6)* | **stake** *(3)* | **struggling** *(1)* | **supplied** *(2)* |
| **sit** *(1)* | **stakes** *(1)* | **student** *(2)* | **support** *(9)* |
| **sitting** *(2)* | **stance** *(1)* | **students** *(1)* | **supported** *(1)* |
| **situation** *(11)* | **stand** *(4)* | **studied** *(4)* | **supporting** *(1)* |
| **situations** *(5)* | **standalone** *(1)* | **studies** *(21)* | **supposed** *(1)* |
| **six** *(3)* | **standard** *(7)* | **Study** *(41)* | **Sure** *(65)* |
| **size** *(5)* | **standards** *(1)* | **stuff** *(9)* | **surprising** *(2)* |
| **slate** *(3)* | **standing** *(1)* | **stuffed** *(2)* | **surrounding** *(1)* |
| **Slide** *(22)* | **standpoint** *(1)* | **style** *(1)* | **survey** *(2)* |
| **small** *(3)* | **stands** *(1)* | **Sub** *(14)* | **surveyed** *(1)* |
| **smart** *(2)* | **Starkloff** *(9)* | **subcategory** *(1)* | **surveys** *(1)* |
| **smashed** *(1)* | **start** *(22)* | **subheading** *(1)* | **swear** *(1)* |
| **SMU** *(2)* | **started** *(8)* | **subject** *(7)* | **swift** *(6)* |

sworn  (1)
Synergies  (1)
Syntel  (1)
system  (1)

< T >
Tab  (6)
TABLE  (11)
tactic  (3)
tactics  (8)
tailor  (1)
tailored  (1)
take  (40)
taken  (12)
Takeover  (16)
takeovers  (1)
talk  (23)
talked  (20)
talking  (37)
talks  (9)
target  (18)
targeting  (2)
targets  (4)
target's  (1)
tariff  (1)
task  (1)
teach  (6)
teaching  (1)
team  (13)
teams  (1)
Technician  (23)
Techniques  (2)
Technology  (1)
tell  (16)
telling  (2)
ten  (5)
tend  (1)
tendency  (1)
Tender  (5)
tenders  (1)
term  (33)
terminal  (2)
terminate  (3)
termination  (3)
terminology  (1)
terms  (15)
test  (1)
testified  (4)
testify  (1)

testimony  (29)
Texas  (3)
text  (1)
textbook  (2)
texts  (4)
Thank  (11)
Thanks  (1)
Theoretical  (1)
theories  (2)
theorize  (1)
theorized  (1)
theory  (2)
thereabouts  (1)
thing  (13)
things  (43)
think  (130)
thinking  (3)
thinks  (1)
third  (12)
thought  (22)
thoughts  (1)
thousand  (1)
thousands  (1)
threat  (4)
threatening  (6)
three  (13)
threshold  (3)
tied  (2)
Time  (76)
timeline  (5)
timely  (1)
times  (13)
timing  (4)
title  (4)
titles  (1)
today  (5)
Today's  (1)
told  (2)
tone  (1)
tongue-in-cheek  (1)
tonight  (1)
tons  (1)
top  (23)
topic  (2)
total  (3)
totality  (8)
touches  (1)
tough  (1)
track  (6)

tracking  (3)
trading  (14)
transact  (1)
transaction  (27)
transactions  (10)
transcript  (4)
transcription  (1)
transpired  (1)
tremendous  (1)
trial  (1)
tried  (2)
Triggers  (1)
TriZetto  (1)
true  (10)
truly  (1)
trust  (2)
truth  (3)
truthful  (3)
truthfulness  (1)
try  (9)
trying  (36)
Tulsa  (1)
turn  (11)
turned  (1)
twice  (3)
twist  (1)
two  (34)
type  (6)
typed  (2)
types  (2)
typically  (2)
Tyson  (1)

< U >
UK  (1)
ultimately  (6)
un  (1)
unaffordable  (1)
unambiguously  (2)
unanimously  (2)
uncommon  (1)
underneath  (1)
understand  (44)
understanding  (21)
understood  (1)
undertake  (2)
undertaking  (1)
undertook  (1)
undisclosed  (1)

unequivocal  (1)
unequivocally  (1)
unfortunately  (1)
unique  (3)
UNITED  (3)
universe  (1)
University  (3)
unsolicited  (8)
unusual  (1)
unwillingness  (1)
upheld  (1)
upper  (1)
use  (30)
uses  (7)
usually  (2)

< V >
vague  (12)
validate  (1)
Valuation  (13)
valuations  (1)
value  (20)
valuing  (1)
Vanguard  (1)
variables  (2)
varies  (1)
various  (5)
vast  (2)
VERIFICATION  (1)
verify  (1)
version  (3)
versus  (9)
VI  (2)
vice  (1)
Video  (24)
videographer  (1)
VIDEOTAPED  (1)
view  (15)
viewed  (5)
views  (3)
violation  (1)
VLSI  (1)
volume  (1)
volumes  (1)
volunteer  (1)
vote  (1)

< W >
Wachtell  (26)

**Wachtell's**  (*3*)
**walking**  (*1*)
**Wall**  (*1*)
**want**  (*91*)
**wanted**  (*7*)
**wants**  (*5*)
**Warning**  (*2*)
**waste**  (*1*)
**wasting**  (*1*)
**watch**  (*3*)
**way**  (*45*)
**WAYNE**  (*4*)
**ways**  (*4*)
**week**  (*1*)
**weighted**  (*1*)
**welcome**  (*1*)
**well**  (*140*)
**well-known**  (*1*)
**well-versed**  (*1*)
**went**  (*6*)
**we're**  (*45*)
**Westlaw**  (*4*)
**We've**  (*7*)
**whatsoever**  (*2*)
**White**  (*2*)
**willing**  (*12*)
**willingness**  (*2*)
**winning**  (*1*)
**wisely**  (*1*)
**wit**  (*1*)
**withdraw**  (*7*)
**withdrawing**  (*3*)
**withdraws**  (*1*)
**withhold**  (*1*)
**WITNESS**  (*14*)
**Wolverine**  (*5*)
**Wolverine's**  (*5*)
**Wolvering/10:30**  (*1*)
**word**  (*60*)
**worded**  (*1*)
**wording**  (*6*)
**words**  (*109*)
**work**  (*54*)
**worked**  (*2*)
**working**  (*19*)
**works**  (*2*)
**world**  (*6*)
**worthwhile**  (*1*)
**write**  (*7*)

**writes**  (*4*)
**writing**  (*8*)
**written**  (*33*)
**wrong**  (*3*)
**wrote**  (*16*)

**< Y >**
**Yeah**  (*79*)
**year**  (*4*)
**years**  (*20*)
**Yep**  (*8*)
**Yogi**  (*1*)
**YORK**  (*7*)
**Young**  (*4*)

**< Z >**
**zero**  (*4*)
**Zoom**  (*2*)

**ERRATA SHEET FOR THE DEPOSITION OF SHANE GOODWIN, PH.D.**
**Taken on October 17, 2025**

| Page | Line | CURRENT TEXT | CORRECTED TEXT | REASON FOR CHANGE |
|------|------|--------------|----------------|-------------------|
| 8 | 14 | "approve" | "prove" | Transcription Error |
| 25 | 6 – 7 | "I don't blanket ever approve anything" | "I don't ever blanket approve anything" | Clarification |
| 34 | 23 | "an enumerator" | "a numerator" | Transcription Error |
| 48 | 5 | "of" | "when" | Clarification |
| 55 | 11 | "and when I mean that is" | "and what I mean is" | Clarification |
| 63 | 3 | "The words" | "The word" | Clarification |
| 89 | 2 – 3 | "I do not believe – my opinions still hold," | "I believe my opinions still hold," | Clarification |
| 101 | 20 | "that is" | "that are" | Clarification |
| 138 | 25 | "Under the terms that start of the class period" | "Under the terms at the start of the class period" | Clarification |
| 188 | 16 | "about specifically within I is very different" | "about specifically is very different" | Clarification |
| 190 | 21 | "price targets was listed" | "price targets were listed" | Clarification |
| 207 | 18 | "what" | "if" | Clarification |
| 232 | 14 | "boards on the seat" | "seats on the board" | Clarification |
| 237 | 20 | "they so inclined" | "they were so inclined" | Clarification |

Shane Goodwin, Ph.D.
December 19, 2025

1