# EXHIBIT 8

# FILED UNDER SEAL

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X

IN RE NATIONAL INSTRUMENTS
CORPORATION SECURITIES
LITIGATION

Case No. 1:23-cv-10488 (DLC)

------------------------------------------X

** CONFIDENTIAL **

DATE: November 14, 2025
TIME: 9:05 a.m.

VIDEOTAPED DEPOSITION of DR. MATTHEW CAIN, taken by the Defendants, pursuant to a Notice, held at the offices of Robbins Geller Rudman & Dowd LLP, 420 Lexington Avenue, Suite 1832, New York, New York 10170, before Nicole Veltri, (appearing via Zoom) RPR, CRR, a Notary Public of the State of New York.

CONFIDENTIAL

Page 2

A  P  P  E  A  R  A  N  C  E  S:

ROBBINS GELLER RUDMAN & DOWD LLP
   Attorneys for the Plaintiffs
   420 Lexington Avenue, Suite 1832
   New York, New York 10170
   BY: NOAM MANDEL, ESQ.
       DESIREE CUMMINGS, ESQ.
       FRANCIS P. KARAM, ESQ.
       CHRISTOPHER GILROY, ESQ.
       ALYSSA PLASCOFF, ESQ.
       (via videoconference)
       ANA AVALOS CUELLAR, ESQ.
       (via videoconference)
       CALI GIUGGIO, ESQ.
       (via videoconference)

DOWD BENNETT LLP
   Attorneys for the Defendants
   NATIONAL INSTRUMENTS CORPORATION, ERIC
   STARKLOFF, AND MICHAEL MCGRATH
   7676 Forsyth Boulevard, Suite 1900
   Clayton, Missouri 63105
   BY: JOHN D. COMERFORD, ESQ.

ALSO PRESENT:
COREY WAINAINA, Videographer

        *        *        *

CONFIDENTIAL

Page 3

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*     *     *     *

CONFIDENTIAL

Page 4

DR. M. CAIN - CONFIDENTIAL

VIDEOGRAPHER:  Good morning, everyone.  We are going on the record at 9:05 a.m. on Friday, November 14th, 2025.

This is media unit one of the video-recorded deposition of Dr. Matthew Cain in the matter of In Re National Instruments Corporation Securities Litigation.

My name is Corey Wainaina, representing Veritext Legal Solutions, and I'm the videographer. The court reporter is Nicole Veltri, also from the firm Veritext Legal Solutions.

I am not authorized to administer an oath.  I am not related to any party in this action nor am I financially interested in the outcome.

Are we doing stenographic record appearances?

MR. COMERFELD:  Yes.

VIDEOGRAPHER:  Okay.  Please be

CONFIDENTIAL

Page 5

DR. M. CAIN - CONFIDENTIAL

aware all appearances and affiliations will be noted on the stenographic record, and will the court reporter please swear in the witness.

MATTHEW CAIN, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. COMERFORD:

Q.    Good morning, Dr. Cain.

A.    Good morning.

Q.    Okay.  I think that you're familiar with the deposition process in general.  Is that fair?

A.    Yes.

Q.    Okay.  How many times have you been deposed?

A.    I think it's somewhere -- probably somewhere between 30 and 35 times.

Q.    Okay.  I will ask questions as we go through the day.  I'll do my best to ask questions that are understandable, but

CONFIDENTIAL

Page 6

DR. M. CAIN - CONFIDENTIAL

if you don't understand my question, please let me know and I'll try to ask it a different way.

A.    Yes.

Q.    Is there anything going on today that will prevent you from giving your full attention to the deposition?

A.    No.

Q.    Are you on any medication that would affect your ability to recall past events or things like that?

A.    No.

MR. COMERFORD:  Let me hand you what I've marked as Exhibit 1, which is your report dated July 28th, 2025.

(Whereupon, Expert Report of Matthew D. Cain, Ph.D., July 28, 2025 was marked as Cain Exhibit 1 for identification as of this date.)

Q.    I understand that you refer to this as your Merits Report.  Is that correct?

A.    Yes.

MR. COMERFORD:  All right.  And

CONFIDENTIAL

Page 7

DR. M. CAIN - CONFIDENTIAL

I'm also going to hand you what I've marked as Exhibit 2, which is your report dated November 10th, 2025.

(Whereupon, Reply Expert Report of Matthew D. Cain, Ph.D., November 10, 2025 was marked as Cain Exhibit 2 for identification as of this date.)

Q.    And I understand you refer to this as your Reply Report.  Is that correct?

A.    Yes.  That is correct.

Q.    All right.  And you -- you submitted a first report in this case that I'm not going to mark it as an exhibit. You've already had your deposition taken by colleagues from my firm about that report.

Do you recall that?

A.    I do.

Q.    Okay.  Is there anything about the testimony that you gave in your first deposition that you would like to change?

A.    No.

Q.    Okay.  Let me ask you to look at Page 64 of your Merits Report, which is

CONFIDENTIAL

Page 8

DR. M. CAIN - CONFIDENTIAL
marked as Appendix A.  What are we looking
at in Appendix A?

A.    This is my CV.

Q.    All right.  Now, this was
submitted in July 2025.  Is this up to date
today?

A.    I've got a more current one
included in my Reply Report that was
submitted at the beginning of this week.

Q.    Okay.  Can you direct me to
that?  Is that at the end?

A.    Should be similar to
Appendix A.  But let me just turn to that
real quick.  Yeah, that's on Page 49 of
Appendix A.

Q.    Okay.  And it looks like you
added a new publication from 2025?

A.    Yes.

Q.    Called, "What is price impact"
and it goes on from there?

A.    Yes.

Q.    Are there any other updates to
your CV that you can recall?

A.    I know that I've added any

CONFIDENTIAL

Page 9

DR. M. CAIN - CONFIDENTIAL

additional testimony later on in my CV in terms of reports or depositions.  It's actually current as of this week.  But I don't recall any other changes to my CV since July.

Q.    I would like to turn to Page 52 of your Reply Report where there's a heading called "Expert Witness Experience."

Do you see that?

A.    Yes.

Q.    And so you've added a few cases there?

A.    Cases and potentially additional reports or depositions from prior cases that I already had been working on, yes.

Q.    So it looks to me like since July 2025 through the present, I'm counting eight cases.

MR. MANDEL:  For the record, the banging is an old radiator in an old New York building.

A.    So if I look at my July report, I think the top bullet point in the expert

CONFIDENTIAL

Page 10

DR. M. CAIN - CONFIDENTIAL witness testimony was that -- involved the Estée Lauder company, and if I look in the November report, one, two, three, four, I see six bullet points above that. So there would be potentially six new cases, plus potentially additional reports or depositions from preexisting cases.

Q. All right. Are the cases listed in the expert witness experience section cases where you've been retained to render an opinion as an expert witness?

A. Everything that's disclosed would be something that I have formed expert opinions and submitted a report or provided deposition or trial testimony, yes.

Q. Of this list of expert witness experience, how many of these cases do you consider to be active and ongoing?

A. Off the top of my head, I don't know. I think sometimes that can be difficult for me to assess, but I can try and go through and do a quick approximate count of any cases that I'm not aware of

Page 11

DR. M. CAIN - CONFIDENTIAL

those cases having either settled or -- I know there's some cases that may have been dismissed that are on appeal.  I don't know if you would count that as active or ongoing.

Just, you want to clarify if I should include dismissed cases that are on appeal?

Q.    Well, it looks to me like you've added six cases to your expert witness experience list since your July 28th, '25 report.  Is that fair?

A.    I believe so.  I believe so.

Q.    And I'm looking at your Reply Report under Expert Witness Experience and I'm counting 15 cases that have a 2025 date associated with them.

Do you see that?

MR. MANDEL:  Object to form.

A.    Yes.  And maybe -- maybe a few additional ones, like, the bottom of Page 53 I had a deposition and I had some other reports for Exxon.  There might be because I see one more deposition on

CONFIDENTIAL

Page 12

DR. M. CAIN - CONFIDENTIAL

Page 54 for the ChemoCentryx. So that might bump it a little above 15, like 17. But, yes, that's in the ballpark.

Q. I see In Re Turquoise Hill looks like a deposition March 2025?

A. Which page is that on?

Q. Fifty-four.

A. That's correct. Yes.

Q. And then what was the other one you mentioned? ChemoCentryx?

A. ChemoCentryx, yes.

Q. Okay. So by my count, that takes it up to 18 cases, which includes this one, where you have activity in 2025. Is that fair?

A. I believe so, yes.

Q. Okay. Are there additional cases where you had activity personally in 2025 beyond the 18 that we've noted in your Reply Report?

MR. MANDEL: Object to form.

A. I think that's reached a point of public disclosure.

Q. All right. Is that a lot of

CONFIDENTIAL

Page 13

DR. M. CAIN - CONFIDENTIAL

workload on you, 18 cases in 2025?

MR. MANDEL:  Object to form.

A.     I don't bear all of the workload of cases that I work on.  I have people who assist me on the cases, but I do feel that 2025 has been a busy year, yes.

Q.     Is there a group or an entity that assists you with your extra work?

A.     Yes.  A couple of different things to talk about.

Q.     Okay.

A.     In, I think the early -- roughly late winter/early string of '25, I entered into an exclusivity agreement with Fideres Partners.  On any new cases that I started since then, I rely on those staff members for support.

Prior to that time, I would -- I was not exclusive with any one firm, so I would work with a couple of different firms, including my own staff, as I did for this case that we're talking about today.

Q.     And is that your -- your own staff, are you referring to NYU law folks?

CONFIDENTIAL

Page 14

DR. M. CAIN - CONFIDENTIAL

A.    The staff that I've used in this case are, over the past several months, accounting professors at -- one is at UC Berkeley and one is at UC Irvine in California.

Q.    Do you have a formal written agreement with them about the work that you do together?

A.    I believe that we have signed some sort of paperwork previously, yes.  I would have to go back and look, but I believe we have an overarching confidentiality agreement in place.

Q.    And is the arrangement that you are paid by clients for extra witness work and then you compensate those people for assisting you?

A.    Yes.

Q.    And are you currently working at NYU Law School?

A.    I have senior fellowship with NYU.

Q.    Just kind of on average, I want to get a sense of how you spend your time.

CONFIDENTIAL

Page 15

DR. M. CAIN - CONFIDENTIAL

How much time are you spending on your position at NYU Law and how much are you spending on expert witness work?

MR. MANDEL:  Object to form.

A.    I would say I spend at least 95 percent of my time on expert witness work and roughly 5 percent of my time on academic work, which includes research and teaching and other academic activities.

Q.    Do you know how many hours a week you work typically?  Is it possible to say?

MR. MANDEL:  Object to form.

A.    All I can do is sort of give you a rough guess on that, but it varies by week; but I would say it probably between 40 and 80 hours in a typical week.

Q.    What is the arrangement for your work in this case?  And by "arrangement," I mean, are you working on that through Fideres Partners or through some other arrangement?

A.    It's in -- I disclosed that.  I think in the beginning of my reports, but

DR. M. CAIN - CONFIDENTIAL

I'm assisted by those two staff members that I referred to, the accounting professors, and my engagement is through -- is with counsel.  It's -- so I'm not utilizing Fideres Partners in this case.

Q.   All right.  Can you tell me the names of the two people who have assisted you on this case?

A.   Yes.  Omri Even-Tov.  First name is spelled O-M-R-I, last name is E-V-E-N - T-O-V.

And the other staff member is Ben Lourie, L-O-U-R-I-E.

Q.   L-O-U-R-I-E?

A.   I believe it's L-O-U-R-I-E.

And it's possible that I may have at the efficiency report stage used somebody else, but those are the two staff members that I recall working with on both of these reports that we're talking about today.

Q.   How many expert reports have you submitted total, do you think, since you started serving as an expert witness in

CONFIDENTIAL

Page 17

DR. M. CAIN - CONFIDENTIAL litigation?

A.    Well, we would have to go through and count up all these bullet points so I don't know what that adds up to.  But I would guess that it might be somewhere, I don't know, maybe between 50 and 150.  Just however many reports are disclosed here.  That would be the number.

Q.    And in your Reply Report, you list this case.  I think you don't list your Reply Report as a separate report and I don't think you list your first report, separate report.  I think you just list your Merits Report and I'll ask you more about that.

So I guess my question is, are these specific reports or are these cases where there may have been more than one report like this case?

A.    So you're talking about the bullet point at the bottom of Page 52?

Q.    Yes.

A.    I believe that I've listed everything in this bullet point that I have

CONFIDENTIAL

Page 18

DR. M. CAIN - CONFIDENTIAL
done up to the point of signing the Reply Report.  So I believe the May report is the Market Efficiency Report, and then I had a deposition after that, and then I submitted the Merits Report that is the July 2025 report.

So I believe that is a complete listing of all the work -- all of the testimony that had been publicly disclosed up to the point of working on this Reply Report.

Q.   Okay.  I do see that.  So in these bullet points, you have, where appropriate, it said you've done two reports on that case, if that's the --

A.   I've tried to -- to the best of my ability, keep track of those things.

Q.   Okay.

A.   Which I think is more than is required in terms of disclosure requirements.  But to the best of my ability, I try to put those things in these bullet points.

Q.   Have you ever had an opinion

CONFIDENTIAL

Page 19

DR. M. CAIN - CONFIDENTIAL
excluded by a Court?

MR. MANDEL:  Object to form.

A.    I don't believe that I've ever had any opinions excluded based on the substance or content of those opinions.  I think there were -- I can think of two cases in which the Court said something like the schedule did not permit submission of reports or something procedural.

So, I think one case was, like, a reply report, and the judge said that the schedule did not allow for the submission of reply reports by that point in time.  So the judge ignored the report purely based on the scheduling, the Court's schedule.

And then I had another case where I believe the plaintiffs attached a declaration to a complaint and the judge said they were not permitted to attach an expert declaration to a complaint so ignored it on those grounds.

Q.    Can you tell me the name of those two cases?

A.    Yeah.  The first one was

CONFIDENTIAL

Page 20

DR. M. CAIN - CONFIDENTIAL

Toshiba and the second one was Facebook.

Q.    Any other instances where your opinion was excluded by a court?

A.    Nothing comes to mind.

Q.    Have you ever been found by a court to be not qualified to render the opinions?

MR. MANDEL:  Object to form.

A.    I don't believe so.

Q.    Have you worked with the Robbins Geller Rudman & Dowd law firm before?

A.    Yes.

Q.    Out of the matters that are listed in your Reply Report on Pages 52 through 56, how many of those involve the Robbins Geller Rudman & Dowd law firm?

MR. MANDEL:  Object to form.

Q.    And maybe instead of asking you a number, can you just identify for me by name the matters that involve the Robbins Geller Rudman Dowd firm?

A.    Yeah.  I'll go through the bullet points.  It's with the caveat it's

Pohlman, A Veritext Company     877-421-0099
www.veritext.com

DR. M. CAIN - CONFIDENTIAL
to the best of my recollection and it's possible that I will get a couple of them wrong since I don't have all the details in front of me, but I'll do my best and start at the top.

On Page 52, Virtu.

Possibly DocGo.

National Instruments.

Q.    DocGo is the Genesee County employees versus DocGo?

A.    Yes.

Q.    Thank you.

A.    That's why I'm not -- I would have to go back and look at my records for that.

Page 53, San Antonio Fire versus Dentsply.

Possibly Upstart.

Q.    That's In Re Upstart Holdings?

A.    Yes.

Q.    All right.

A.    Page 54, towards the bottom, Delaware County versus AdaptHealth.

Page 55, Under Armour.

Page 22

DR. M. CAIN - CONFIDENTIAL

Oracle.

Abu Dahbi versus Mylan.

Mark Stoyas versus Toshiba.

I believe Novo Nordisk.

That's it off the top of my head. Like I said, I may be getting a few wrong. I don't have everything memorized.

Q. I believe we identified eleven. Does that sound right?

A. Probably.

Q. Are there any law firms that you worked with as an expert witness more than the Robbins Geller law firm?

MR. MANDEL: Object to form.

A. Certainly also worked on a number of matters with several other law firms including Bernstein Litowitz and Pomerantz. So those would be a couple of possibilities.

And I've worked with a variety of other firms but probably unlikely to have done more than ten publicly disclosed cases at this point with the other firms.

Q. Okay. Are those plaintiff side

CONFIDENTIAL

Page 23

DR. M. CAIN - CONFIDENTIAL

firms or defense firms?

A.    Those are plaintiff side firms.

Q.    Out of the experience that you list on Page 52 through 56 of your Reply Report, how much of it is for -- were you retained by plaintiff side firms versus defense side firms?

MR. MANDEL:  Object to form.

A.    Well, I think there's a number of bullet points that don't fall under either of those categories.  But setting those cases aside, I know that one of these cases was for a defense side firm.  That was Page 56, Bank of California.

And then there's, like I said, other matters, like working for the SEC or some other cases.  But in terms of the securities class action cases, I think the Bank of California is a defense side case. And I think, to the best of my recollection, the other security class actions that are publicly disclosed here are on the plaintiff side.

Q.    All right.  I'll just start

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

asking some questions about testimony in the Reply Report.  You cite testimony from Eckwin's (phonetic) depositions in this case, right?

MR. MANDEL:  Object to form.

A.    And defendants, too, but, yes.

Q.    That's on Page 5 Summary of Additional Discovery.  It goes through Page -- looks like it ends on Page 17?

A.    Yes.

Q.    All right.  Did you review the entirety of all of the depositions that are cited?

MR. MANDEL:  Object to form.

A.    I believe that I skimmed through all of those.  I would have to go back and look at my records; but to the best of my recollection, I at least skimmed through those entire transcripts.

Q.    Okay.  Did anyone provide you with highlighting of deposition transcripts for use in your report or snippets of deposition transcript?

MR. MANDEL:  Object to form.

CONFIDENTIAL

Page 25

DR. M. CAIN - CONFIDENTIAL

A.   Other than some conversations that I had with counsel, I don't recall anything outside of that scope.

Q.   Is it fair to say that counsel for the plaintiffs in this case directed you to specific deposition testimony than you cite in your Reply Report?

MR. MANDEL:  I'm going to object on privilege grounds.  Direct the witness not to answer the question.  I think those are privileged communications.

MR. COMERFELD:  Well, I'm asking about the materials relied on, and I think I'm required to ask about materials he relied on.  That's the way I'm trying to frame the question. Let me ask it again in a -- maybe in a different way.

Q.   Were you provided the deposition transcripts of these witnesses that you cite in your Reply Report where certain testimony was highlighted?

MR. MANDEL:  I feel this is

CONFIDENTIAL

Page 26

DR. M. CAIN - CONFIDENTIAL

really close to, rely, and I'm going to object on privileged ground.

Q.    And did you rely on it in forming your opinions?

MR. MANDEL:    I'm going to object on privilege grounds.

A.    I don't believe that any of the transcripts that I received had highlighting in those.

Q.    Did anyone provide you with copies of the deposition transcripts that you cited in your Reply Report where testimony was marked in any way --

MR. MANDEL:    I'm going to object.

Q.    -- and you relied on it?

MR. MANDEL:    I'm going to object to these questions.  I'm going to continue to object to these questions.  I think you're asking for privileged information, and I'm going to ask the witness not to answer the questions.  If we have a dispute about whether these are privileged,

CONFIDENTIAL

Page 27

DR. M. CAIN - CONFIDENTIAL

we can talk about that off the record or whatever.  We can look at cases. I think these are privileged questions you're asking, privileged information.

MR. COMERFELD:  I just want to be clear, I'm not trying to invade the privilege.  I think it's fair to ask about materials he relied on, so I'm trying to frame the question that way rather than a privileged communication.

MR. MANDEL:  I understand you're trying to frame the question that way but what you're asking about is whether -- is about, like, communications between counsel and the witness, yeah.  And the witness is an expert witness.  There are certain things that are fair game and certain things that aren't.  I don't think this is fair game.

MR. COMERFELD:  Are you going to permit him to testify subject to

Page 28

DR. M. CAIN - CONFIDENTIAL

the objection?

MR. MANDEL:  No.  I don't think he should answer the question.  I mean, you're asking for privileged information.

MR. COMERFELD:  Okay.

Q.    You cite testimony from Michael McGrath.  Do you know who Mr. McGrath is?

A.    I believe he was chairman of the board of National Instruments.

Q.    Okay.  So I'm going to hand you a part of Mr. McGrath's deposition (handing).  I've just printed the first page and then some relevant testimony.

MR. MANDEL:  I'm going to object to this exhibit as a partial exhibit.

(Whereupon, Transcript of September 30, 2025 Videotaped Deposition of Michael McGrath was marked as Cain Exhibit 3 for identification as of this date.)

Q.    So in your report --

MR. MANDEL:  Just for the

CONFIDENTIAL

Page 29

DR. M. CAIN - CONFIDENTIAL

record, this is marked Exhibit 3.  It

says --

A.    Oh.  This is my report.

Q.    Okay.  So in your Reply Report

at the top of Page 11, let's look at that

first.

A.    Okay.

Q.    You, you know, your section on

Michael McGrath begins at the bottom of

Page 10.  You quote an answer where he

says:  It was an unsolicited offer and, you

know, we weren't satisfied with it so

obviously we were considering hostile

takeover actions.

Do you see that?

MR. MANDEL:  I'm going to

object to the form.

A.    I see that.

Q.    And then at the top of Page 11

it says:  Regarding Board's determination

to reject offer during June 14, 2022

special board meeting -- that's in

brackets.

And then there's a question:

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

At this point the board understood that Emerson might respond with a higher offer, is that right?

Answer:  I guess so, yes.  I mean, that's logical that we would --

Question:  It was simply logical that they might respond with a higher offer, right?

Answer:  Correct.

Do you see all that?

A.    I do.

Q.    All right.  And that's -- and there's a footnote they're citing Page 106 of -- to 107 of Mr. McGrath's deposition.

Do you see that?

A.    Yes.

Q.    All right.  Now, I put in front of you Exhibit 3 to your deposition, which is some pages from Michael McGrath's deposition transcript, and you can see on Page 98 that, just to orient you, Mr. Mandel has shown Mr. McGrath a document which I believe is meeting minutes of the June 14th, 2022 board of directors meeting.

CONFIDENTIAL

Page 31

DR. M. CAIN - CONFIDENTIAL

It's on Page 98.  Do you see that?

MR. MANDEL:  Can I just object for the record that this exhibit appears to have highlighting that was added to it.  I just want to note that on the record.

A.   Okay.  I see the meeting on Page 98.

Q.   All right.  And then let's go to Page 106.  Mr. McGrath is being asked about the June 14th, 2022 board meeting and Page 106, Line 18, the question is:

And the board understood that Emerson could respond with a higher offer, is that right?

Answer:  They could, but they didn't.

Do you see that?

A.   I do.

Q.   All right.  Did you put that in your report?

A.   I don't think this particular quote is in my report.

Q.   Is there a reason for that?

CONFIDENTIAL

Page 32

DR. M. CAIN - CONFIDENTIAL

A.    Yes.

MR. MANDEL:  Object to form.

Q.    What's the reason?

A.    Yeah.  So in Paragraph 21, I'm introducing these quotes with an introductory sentence that states:  Members of NI's management and the chairman of NI's board also testified regarding the potential for continued escalation by Emerson, including the possibility of increasing their offer price, taking their offer public and the threat of a hostile takeover attempt.

So I'm providing selected quotes from deposition testimony that are consistent with that description.

Q.    Okay.  And you agree with me that when we give opinions about National Instruments management and board in this case, we need to focus on what they knew at the time they took certain actions, right?

MR. MANDEL:  Object to form and it's calling for testimony maybe outside the witness' area of

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

expertise.

A.   I'm not opining on what anyone knew or what their mental state was at any point in time, so that's not an opinion that I'm providing in this report.

Q.   Okay.  So you're not -- you agree with me that events that occurred later, such as Emerson raising its offer in November 2022, should not be taken into account when we look at what NI's board and management did in earlier periods of time, correct?

MR. MANDEL:  Object to form.

A.   I don't think I have a specific opinion on that particular question.  If you want to point me to a certain part of my report, I would be happy to look at the opinions I'm providing and attempt to evaluate that type of question.

Q.   Well, would you agree with me that when you're giving opinions about economic materiality of information, it's improper to look at events that occurred later to buttress your opinion that certain

CONFIDENTIAL

Page 34

DR. M. CAIN - CONFIDENTIAL

things were economically material at the time, right?

MR. MANDEL:  Object to form.

A.    I would completely disagree with that actually.

Q.    Why?

A.    That's something I explain in my report that -- in both of my reports. In virtually -- well, I would say in the vast majority of securities cases I've worked on, we will frequently look at later disclosures of information and we might measure the stock price impact from those disclosures that occurred in the future as one piece of evidence of the economic materiality of the information.

So the vast majority of securities cases, there's an allegation that some portion of the relevant truth was either misstated, misrepresented or omitted earlier in the class period.  And so by looking at subsequent disclosure of that type of information and whether that had an impact on stock prices, that's one example

Page 35

DR. M. CAIN - CONFIDENTIAL
of ways in which experts in the vast
majority of securities cases will help with
the evaluation of the economic materiality
of information.

Q.    So in Paragraph 21 of your
Reply Report, you're putting in testimony
from fact witnesses regarding the potential
for continued escalation by Emerson.  We've
already agreed on that, right?

MR. MANDEL:  Object to form.

A.    I am giving some quotes along
those lines, yes.

Q.    Okay.  And that is simply
looking at witnesses and looking at answers
they gave to questions where they were
being asked to sort of speculate about what
Emerson was going to do in the future.  Do
you agree with that?

MR. MANDEL:  Object to form.

Q.    That's what "potential
escalation" means, right?

MR. MANDEL:  Object to form.

A.    I don't recall them being asked
to speculate in their answers to these

Page 36

DR. M. CAIN - CONFIDENTIAL deposition questions.

Q. Okay. Let me ask you to look at Mr. McGrath's testimony that we marked as Exhibit 3 and Page 334 of it.

Do you see that?

A. I see that.

Q. All right. And so Mr. McGrath was asked: Emerson offered $48 per share to buy National Instruments twice. When they, when the company, Emerson, offered $48 per share the second time, how did that impact your thinking about a potential transaction with Emerson?

Answer: It solidified our thinking that $48 was their max and that 48 was not a credible offer and that they may try to make a hostile takeover at $48 a share and so it kind of solidified that. There was no indication that they came back at 50 or 55 or something from that. They -- they stayed at 48.

Do you see that?

A. Yes. I do.

Q. Okay. Is that testimony that

CONFIDENTIAL

Page 37

DR. M. CAIN - CONFIDENTIAL
is about the potential for continued
escalation by Emerson?

A.    Sorry.  Are you talking about a
certain portion of my report or just --

Q.    Your report, Paragraph 21, says
that you are citing testimony from NI's
management and the chairman of NI's board
regarding the potential for continued
escalation by Emerson, right?

MR. MANDEL:  Well, I'm just
going to object because, if you read
the rest of the sentence, it says
more.

Q.    Including the possibility of
increasing their offer price, taking their
offer public and the threat of hostile
takeover attempt, right?  What you're doing
in Paragraph 21?

A.    I do explain one piece of that
in terms of the threat of a hostile
takeover attempt, which he is talking about
in this answer.

Q.    He's also talking about the
possibility of Emerson increasing their

Page 38

DR. M. CAIN - CONFIDENTIAL

offer price, right?

A.    I don't see where he says --
where he talks about increasing their offer
in the future.

Q.    Well, the question was when
they offered $48 a second time, how did
that impact your thinking, and he said it
solidified our thinking that 48 was their
max.

That's testimony about the
possibility that Emerson will continue to
increase its offer price.

Do you agree with me?

MR. MANDEL:  Object to form.

A.    I'm not attempting to provide
any interpretation on what he was thinking
when he gave this testimony.  So I think
that question is outside the scope of my --
my report.

Q.    Well, why did you put testimony
in your Reply Report from fact witnesses,
including Eric Starkloff and Mike McGrath,
the individual defendants, where you say
they testified regarding the potential for

Page 39

DR. M. CAIN - CONFIDENTIAL
continued escalation by Emerson if that's not part of your opinions?

MR. MANDEL:  Object to form.

A.    I guess what I'm trying to explain is that I'm not attempting to provide interpretation of what they were thinking when they provided their testimony.  But I'm copying and pasting certain answers that are consistent with my descriptions such as my description in Paragraph 21.

Q.    So when Michael McGrath testified in his deposition on Page 334 of the transcript that Emerson's offering of $48 twice solidified his thinking that $48 was Emerson's max, that's relevant to what he thought about the possibility of Emerson increasing its offer price, right?

MR. MANDEL:  Object to form.

A.    So are you -- so it sounds like you're trying to imply that he said that $48 was their max forever into the future and that they would never increase above that.

CONFIDENTIAL

Page 40

DR. M. CAIN - CONFIDENTIAL

But I don't see where he says that. I guess that's maybe where I'm not attempt -- like I said before, I'm not attempting to interpret his state of mind with what he was thinking. Either at that point in time or during his deposition testimony. It's outside my scope.

Q. Okay. Before you submitted your Reply Report, did you read Page 334 of Michael McGrath's deposition?

A. I believe that I skimmed through the entire deposition to the best of my recollection.

Q. All right. Paragraph 86 of your Reply Report, you make a reference to damages calculations.

A. Sorry, which paragraph?

Q. Page 86 of your Reply Report.

A. Paragraph 86, I see that.

Q. Did you make any calculations of damages?

A. As you know, in my Merits Report I did calculate artificial deflation as the difference between -- well, I won't,

CONFIDENTIAL

Page 41

DR. M. CAIN - CONFIDENTIAL

I guess, go through all of those calculations. Those are laid out in my Merits Report.

Q. But you didn't make any mathematical calculations you just simply used the words you just used, right?

MR. MANDEL: Object to form.

A. No. I think there's a lot of data and evidence in the Merits Report I would point you to.

Q. Did you do any mathematical calculations to arrive at a damages figure?

MR. MANDEL: Object to form.

Q. In your work on this case.

MR. MANDEL: Object to form.

A. You mean -- what do you mean? Do you mean aggregate damages or --

Q. Well, it sounds like you're just giving an opinion that damages are measured a certain way but you didn't actually do any mathematical calculations; is that fair?

MR. MANDEL: Object to form.

A. No. I don't think that's

CONFIDENTIAL

Page 42

DR. M. CAIN - CONFIDENTIAL

accurate.

Q.    What mathematical calculations did you do regarding damages in this case?

A.    So I guess I'll pull up my Merits Report, Exhibit 1.  So on Paragraph 134 is where I pick up with the calculation of artificial deflation and that precedes from all of the work that I had done, as summarized up to that point in my Merits Report.  And I explained that the -- my analysis in Section V of the Merits Report indicates that the applied value of National Instruments common stock would have been at least $48 per share.

And so I then calculate the level of artificial deflation as the difference between $48 per share and class members sale prices during that class period.

Q.    Did you do any mathematical calculations to get the $48 number or is that simply the number that Emerson offered?

MR. MANDEL:  Object to form.

Page 43

DR. M. CAIN - CONFIDENTIAL

A.    Like I said, I did a lot of work up to that point in my report to explain both the economic materiality, evaluate the expected valuation effects from the information environment that was allegedly omitted in order to arrive at the implied but-for price of at least $48 per share.

Q.    Did any of that work involve doing mathematical calculations?

MR. MANDEL:  Object to form.

A.    I think so.  I do point to academic research on things like arbitrage spreads, on toeholds on the number of rounds of merger negotiations, on the research for the academic publications on merger offers, those impacts on stock prices.

So I looked at a lot of both qualitative and quantitative evidence as part of my analyses up to this point in the Merits Report.  It's not just -- it's not just saying simply, well, they offered $48 per share so that's what I think the

Page 44

DR. M. CAIN - CONFIDENTIAL

implied value would have been.

Q.    So tell me the mathematical calculation or the mathematical formula that you applied in this case to apply at the $48 per share number?

MR. MANDEL:  Object to form.

Q.    I don't want opinions in words. I want actual math.

MR. MANDEL:  Object to form.

Q.    Plus, minus, some multiplication, division, et cetera.

MR. MANDEL:  I think he's already testified about subtraction, right?  Just a few minutes ago.

MR. COMERFELD:  But I'm just asking about the $48 number.

A.    So I think that that --

MR. MANDEL:  Object to form. That really lacks foundation.

A.    I think this analysis that I did and the calculations that I did that begin with Section IV of my Merits Report and providing an overview of the allegations in the background of the case.

CONFIDENTIAL

Page 45

DR. M. CAIN - CONFIDENTIAL

Q.    Is it your testimony that that involves math?

MR. MANDEL:  Object to form.

A.    Sorry.  I wasn't finished with my answer.  So I'll start over.

In Section 4 of my report, I begin with the relevant background and the summary of the alleged omissions, so understanding the nature of the allegations in this case.

And then in Section V, I move into a summary of the timeline, the relevant timeline leading up to and including the class period in the case.

In Section V-B, I discuss fundamental principles of finance and valuation analysis, as well as mergers and acquisitions analysis.

Subsection C, subsection 5, I provide calculations using an events study.

So I point to the two disclosures in January of 2023, which does include a lot of calculations.  And I then proceed to summarize other evidence from

Page 46

DR. M. CAIN - CONFIDENTIAL research analysts, financial media.

And then in Section VI, I go on in terms of applying all of those principles that I've detailed in Section V to the matter at hand about calculation works out.

In Section VI and VII, I then explain that the calculation really is the -- the mathematical calculation is the difference between $48 per share and the class members' sale prices during the class period.

Q.    Is there any mathematical formula that you used to get $48 per share?

MR. MANDEL:  Object to form. Asked and answered.  Outside the scope, lacks foundation, et cetera.

A.    There's a lot of math that I just described, so some of that is included in the events study.  So the mathematical formulas would be running regressions, estimating the beta coefficients, calculating abnormal returns around these two disclosure dates in January,

CONFIDENTIAL

Page 47

DR. M. CAIN - CONFIDENTIAL calculating the statistical significance of those, and I would be happy to walk through the specific details of those calculations.

Q.    Did you make those calculations?

MR. MANDEL:  Object to form.

A.    Yes, I did.

Q.    You did that work?

A.    Yes.

Q.    Where is it?

A.    So we can turn to Page 47.  So on Paragraph 122, I explain that I've relied on the same event study methodology that I employed in my previous Market Efficiency Report.  All of that was turned over to you in conjunction with the Efficiency Report in terms of the code, the data, the output of that.

But I briefly summarized the parameters here, so starting in Paragraph 123, I estimate the beta coefficients over 120 trading days prior to each date in which I'm going to calculate an abnormal return.

DR. M. CAIN - CONFIDENTIAL

Q.    Where are you reading beta coefficients?

A.    That's in Paragraph 123, so that's what I'm referring to with the estimation window.  That's where we estimate the beta coefficient between the May stock return and that of the market and the industry indices.

Q.    All right.

A.    And like I said, I point to the longer description of the event study methodology in Paragraph 122 that's included in my previous Market Efficiency Report since I'm relying on the same event study approach.

Q.    Okay.  And the event study that you did was based on the January 13th, 2023, and January 17th, 2023 disclosures, right?

A.    Yes.  Exhibit 2 reports the results from the event study in exhibit -- in that exhibit.

Q.    Okay.  And did you do any event studies that helped you arrive at the $48

CONFIDENTIAL

Page 49

DR. M. CAIN - CONFIDENTIAL number?

A.    This is one of the elements that I considered as -- or calculations that I considered in arriving at the opinion that the but-for price would have been at least $48 per share had the allegedly omitted information been disclosed.

Q.    Okay.  But you don't have a mathematical answer.  You have -- you're saying at least 48, but what I understand you to be saying is at least 48, if not higher, but you don't have a specific number for me.  Is that fair?

MR. MANDEL:  Object to form.

A.    That is incorrect because what I then explain is that I take a conservative approach and calculate the artificial deflation as the difference between $48 per share and class members actual sale prices during the class period.

Q.    I understand that part but I'm talking about the starting point of $48, and what I hear you saying to me is that

CONFIDENTIAL

Page 50

DR. M. CAIN - CONFIDENTIAL
it's at least $48 but you don't have a specific exact number to give me; is that true?

MR. MANDEL:  Object to form.

A.    What I do explain is that the floor would have been $48 per share, so that's the number that I conservatively adopt for purposes of calculating artificial deflation.

Q.    48.00, zero cents, right?

A.    Yes.  That is correct.

Q.    Okay.  Where is the mathematical calculation that -- where there's an equal sign and then it says $48 and zero cents?

MR. MANDEL:  Object to form.

A.    So, again, that's what I explain in Paragraph 134 of my Merits Report.  So I say that it would have traded in at least 48, but I'm going to conservatively identify it as $48 per share, and then the difference between that and the sale price.

And that, like I said earlier,

DR. M. CAIN - CONFIDENTIAL
is based on all of the work that preceded
the -- this paragraph in the report.

Q.    Right.

A.    I won't run through all that,
but it relies on a lot of different
analyses.

Q.    The event study that you did in
this case was based on a public disclosure
of a $53-per-share offer, correct?

MR. MANDEL:  Object to form.

A.    That was part of it.  It was
other information that I considered as part
of the event study analysis.  That was one
of the components.

Q.    The $53-per-share offer, right?

A.    That was one of the components.

Q.    Okay.  So I still don't see a
mathematical calculation where you get to
$48 and zero cents as the floor.  I
understand that that was the offer that
Emerson made twice.  I get that, but I
don't see the mathematical calculation
where you get to $48 and zero cents?

MR. MANDEL:  Object to form.

CONFIDENTIAL

Page 52

DR. M. CAIN - CONFIDENTIAL

Is that a question even?

MR. COMERFELD:  Yes.

Q.    Do you agree with me?

MR. MANDEL:  Object to form.
Asked and answered.

A.    I disagree, because I think one of the things that I explain is that the -- in the report is really the importance of evaluating the information environment, and one of the things I explain in the report was that the second offer conveyed the potential for a higher offer above $48 per share.

And so I kind of disagree with your characterization and your question of that.  But that's -- that evaluation of the information environment is an important element of my analysis in forming my opinions here.

Q.    Is that a mathematical formula?

MR. MANDEL:  Object to form.

A.    Like I said, I think these are mathematical calculations, yes.

Q.    Okay.  Let's talk about your

CONFIDENTIAL

Page 53

DR. M. CAIN - CONFIDENTIAL
experience with mergers and acquisitions
and the process around it, okay?

Have you ever worked as an
adviser to a company that was a target in
an M&A proposal?

MR. MANDEL:  Object to form.

A.    I've worked in an analyst
capacity in conjunction with M&A
transactions.

Q.    Who did you work for?

MR. MANDEL:  Object to form.

A.    It was National City Bank so
that's on Page 64 of my Merits Report,
Appendix A.

Q.    Analyst, Debt Capital Markets?

A.    Yes.

Q.    2001 to 2003?

A.    Yes.

Q.    All right.  And you're telling
me that you worked as an adviser to a
company that was a target of an acquisition
proposal in that job?

A.    I worked as -- in conjunction
with raising debt and equity capital for

CONFIDENTIAL

Page 54

DR. M. CAIN - CONFIDENTIAL

companies that were involved in M&A.  I was not a financial adviser, but I was on the financing side of multiple transactions.

Q.   Okay.  Have you ever, in a professional role, talked to a company that was a target of an acquisition proposal and helped them evaluate what they should do?

MR. MANDEL:  Object to form.

A.   As part of my work as an analyst we did talk with company executives who are involved and engaged in mergers and acquisitions.

Q.   Including as a target?

A.   Yes.

Q.   Have you ever worked as an adviser to a company that was a target of an acquisition proposal that wanted to reject a proposal?

MR. MANDEL:  Object to form.

A.   I don't recall the specific conversations that I had back -- back then, but I certainly am quite familiar with the negotiating strategies and the spectrum of friendliness versus hostility as a

CONFIDENTIAL

Page 55

DR. M. CAIN - CONFIDENTIAL
component of those negotiations.

Q.    Through academic work or through real world work?

MR. MANDEL:  Object to form.

A.    Both.

Q.    And that would -- the real world work would be the two years you spent as an analyst in Cleveland?

MR. MANDEL:  Object to form.

A.    Yes.

Q.    You have a bachelor's degree in finance from Grove City College in Grove City, Pennsylvania, right?

A.    Yes.

Q.    How big a school is that?

A.    I guess --

MR. MANDEL:  Object to form.

A.    I would guess that the undergrad or the total student population is probably somewhere in the ballpark of 2,500 students.

Q.    Had you ever worked with an investment bank that had been retained as a financial adviser for a target?

CONFIDENTIAL

Page 56

DR. M. CAIN - CONFIDENTIAL

A.    Yes.  We interacted with those types of entities as my work -- through my work as an analyst.

Q.    And I think you told me earlier that you didn't work as a financial adviser to a company, though, that was a target; is that right?

MR. MANDEL:  Object to form.

A.    Right.  I was on the financing side so I was -- which is, I think, related but slightly different from the financial advisory engagements.

Q.    Okay.  You know that there was a -- that Bank of America was involved as an adviser to National Instruments in this matter, right?

A.    Yes.

Q.    And you read the testimony of a gentleman named Shawn Liu who was a corporate representative for Bank of America?

A.    Yes.

Q.    And what I understand is that in a professional role, you have not done

CONFIDENTIAL

Page 57

DR. M. CAIN - CONFIDENTIAL

the job that Shawn Liu was doing for Bank of America in this case; is that fair?

MR. MANDEL:  Object to form.

A.    Yeah.  I think my role was -- interacted with that but it was a slightly different element of the M&A process.

Q.    Have you ever personally worked on a valuation presentation for a target company?

MR. MANDEL:  Object to form.

Q.    Like the one that Bank of America did in this case.

A.    I've worked on a lot of valuations, so I did do valuation work as part of that analyst role.  I've also done academic work on hundreds of fairness opinion valuations.

I've also taught mergers and acquisition valuation to graduate level students, so I've done a lot of work involving valuation analysis.

Q.    Do you have any opinions about the valuation work that Bank of America did for National Instruments?

CONFIDENTIAL

Page 58

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to form.

A.    I think I do point to some of those valuations in my reports, so I would be happy to turn to those with you if you want to look at those ways that I'm pointing to those valuations.

Q.    Well, do you have any criticisms of the work that Bank of America did for National Instruments?

MR. MANDEL:  Object to form.

A.    I don't think that I've attempted to form any opinions, one way or another, about the actual work that was done.

Q.    Okay.  You have not been asked to form those opinions and you have not formed those opinions, fair?

A.    I think that's --

MR. MANDEL:  Object to form.

A.    I think that's fair, yes.

Q.    Have you ever worked as a trade surveillance person?

MR. MANDEL:  Object to form.

A.    I have worked with -- I have

CONFIDENTIAL

Page 59

DR. M. CAIN - CONFIDENTIAL

worked for companies that -- that are involved with trade and surveillance, yes.

Q.    Are those on your professional and academic experience list?

A.    Those do not require public disclosure.  I was -- I'm happy to talk about it, but it was a confidential engagement with Broadridge Financial Solutions.

Q.    Did you become an employee with Broadridge?

A.    I was a contractor with them.

Q.    When was that?

A.    I think it was in 2018.

Q.    How long did that last?

A.    I don't recall precisely, but I would guess that it lasted into 2019.

Q.    And what were you doing for them just generally?

A.    Yeah.  I was doing a few different things.  They generate an incredible amount of data so I was helping them with data analysis and working on internal and potentially external-facing

CONFIDENTIAL

Page 60

DR. M. CAIN - CONFIDENTIAL publications that summarized data.

I also published an academic research publication based on their data on virtually all retail investors in the United States and their stock holdings and trading activity and how they voted the shares that they held.

Q. Have you personally ever done any trade surveillance work?

A. Well, I said I did have access to data on virtually all United States retail investors. I was anonymized; but it did cover their trading or at least their holdings on a regular basis, which I think is related to trade surveillance.

Q. And I understand you were given access to that information, but did you ever personally do trade surveillance yourself?

A. I was not involved with realtime surveillance of investor trading, no.

Q. Has any of your work as an expert witness prior to this case focused

CONFIDENTIAL

Page 61

DR. M. CAIN - CONFIDENTIAL
on the disclosure of information in an M&A
context?

I didn't mean to speak over you.

MR. MANDEL:  Object to form.

(Reporter clarification.)

MR. MANDEL:  We were having a back and forth.  Do you want to ask the question again?

MR. COMERFELD:  Yeah.  I'll just ask it again.

Q.    Do you have any experience working as an expert witness in a case where you gave opinions about the disclosure of information in an M&A context?

A.    Yes.

Q.    What cases?

A.    So obviously I've taught and researched mergers and acquisitions and disclosures.  But in terms of expert witness work, I worked on a number of insider trading cases that involved the disclosures of information relating to

CONFIDENTIAL

Page 62

DR. M. CAIN - CONFIDENTIAL

mergers and acquisitions and the expected positive stock price impacts from those types of disclosures.

And then -- and so those would be any of the cases or many of the cases involving the Securities and Exchange Commission. I also worked on additional cases with the Securities and Exchange Commission that I did not provide public testimony on.

So those would not be listed under the public testimony. It's very possible that some of the other securities matters that I've worked on -- I do believe several additional cases involved mergers and acquisitions and disclosures of that information, some valuation and appraisal types of cases.

Q. All right. I do see cases on your list of experience where the plaintiff is listed as the Securities and Exchange Commission. And what I hear you saying is that you serve as an expert witness for the SEC in those cases?

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

A.    In the ones that are publicly disclosed, yes.  I've also worked against the SEC on cases that were settled or dropped prior to public disclosure, but I believe that the ones where I have public testimony, that those were on behalf of the SEC here.

Q.    Do you have any knowledge that the SEC looked at anything having to do with National Instruments?

MR. MANDEL:  Object to form.

Q.    In the 2022 to 2025 time frame?

MR. MANDEL:  Object to form.

A.    I have no knowledge one way or another.

Q.    All right.  Do you understand there was -- well, we'll get to the Bank of America engagement in a little bit.  I'll ask you about that.  All right.

In either of your reports that I put in front of you, your Merits Report or your Reply Report, you specifically identify the material nonpublic information that you say that National Instruments

DR. M. CAIN - CONFIDENTIAL
should have disclosed.

MR. MANDEL:  Object to form.

A.    One of the things that I explain in my Reply Report is that it's not my role to articulate the precise wording of what the but-for disclosure should have been, but I just point to the allegations as set forth in the Complaint.

Q.    And so just so the jury understands, when you use the term "but-for disclosure," what does that mean in plain English?

A.    Yeah.  So what could or should the company have said at the start of the class period at the time that they were going to engage in repurchase activity.  In terms of the allegedly omitted information, how could or should the company have disclosed that.

Q.    Okay.  So when you and I use that term "but-for disclosure," we're talking about what you think should have been disclosed by National Instruments at the beginning of the class period if

CONFIDENTIAL

Page 65

DR. M. CAIN - CONFIDENTIAL

National Instruments was going to trade, correct?

MR. MANDEL:  Object to form.

A.    Well, again, I'm not forming an opinion on what I think they should have disclosed, but that's what we're talking about, yes.

Q.    Yes.  I do see you saying things in your Merits Report like National Instruments should have disclosed the relevant truth.

Do you remember using that phrase?

A.    Can you -- I guess I would ask you to point me to my Merits Report where I used -- where that specific phrase.

Q.    Okay.  It's going to take me a minute because I don't have it listed, but I think what you've -- what we've agreed on is that you have not identified specifically:  Here is what National Instruments should have said before it started retrading as of the beginning of the class period.

CONFIDENTIAL

Page 66

DR. M. CAIN - CONFIDENTIAL

We agree on that, right?

MR. MANDEL:  Object to form.

Misstates the record.

A.    What I said is I point to the allegations as set forth in the Complaint and I rely on the Plaintiffs' allegations in the Complaint.  I'm happy to -- I think Paragraph 25 of my Reply Report points to that, and -- sorry, Paragraph 27 of my Reply Report.

So then I provide a direct quote out of the Complaint in Paragraph 27 of my Reply Report so that's -- I'm relying on the allegedly omitted information as set forth in the Complaint.

Q.    All right.  And so you don't have any opinions about what the allegedly omitted information is.  You simply take what's written in the Plaintiffs' Complaint and assume that that is the allegedly omitted information, fair?

MR. MANDEL:  Object to form.

A.    I assume that ultimate -- you know, all of my opinions are premised upon

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL
plaintiffs proving their allegations and
I'm not attempting to provide any opinions
regarding how those allegations, you know,
ultimately differ from how it's set forth
in the Complaint.  I'm relying on the
complaint's allegations.

Q.    Okay.  And so you assume that
anything Plaintiffs mention in the
Complaint, in Paragraphs 82 through 96 of
the Complaint, are things that National
Instruments should have disclosed before it
started repurchasing shares.

Is that fair?

MR. MANDEL:  Object to form.

A.    No.

Q.    Okay.  Why not?

A.    Well, we could look at the
Complaint.  My recollection is that the
Complaint includes certain alleged
misstatements that -- my recollection is
that some of those were found not to be
actionable in the motion to dismiss
opinion, so I'm focusing on the allegedly
omitted information that's described in the

Page 68

DR. M. CAIN - CONFIDENTIAL
Complaint which, again, I copy and paste those quotes into Paragraph 27 of my Reply Report, for example.

MR. MANDEL:  Would it make sense, in a couple minutes, can we take a little break?  We've been going a little over an hour.

MR. COMERFELD:  Yes.  Let me just finish this one line of thought.

Q.    In Paragraph 27 of your Reply Report, you say:  For example, the Complaint alleges Defendants were aware of material information concerning Emerson's offer to acquire National Instruments, including that Emerson was offering a large premium for the company shares and that Emerson's all-cash offer came with substantial certainty from a highly motivated buyer with the funds to complete the transaction, close quote.

And that, quote:  National Instruments repurchased over $2.3 million of its shares at prices well below Emerson's offer.  And then it goes on from

Page 69

DR. M. CAIN - CONFIDENTIAL

there.

I don't think that's -- that's not part of what you think should have been disclosed.

MR. MANDEL:  Object to form.

Q.    So point to me in Paragraph 27 where you lay out the material information that you say National Instruments should have disclosed prior to trading at the beginning of the class period?

MR. MANDEL:  Object to form.

A.    Again, I -- I think you're continuing --

MR. MANDEL:  Misstates the testimony.

A.    You're continuing to mischaracterize my reports as if I am offering an opinion on what they should have disclosed, and I repeatedly explained that that's not part of my opinions but rather that I'm just relying on Plaintiffs' allegations, which are set forth in the Complaint.

Q.    Okay.  So you're not offering

CONFIDENTIAL

Page 70

DR. M. CAIN - CONFIDENTIAL
an opinion that any particular piece of information is economically material, correct?

MR. MANDEL:  Object to form.

A.    I guess I would disagree with that because a very big part of my Merits Report opinions do explain that the allegedly omitted information was economically material.

Q.    Okay.  So the information that you're saying is economically material is the information that the Plaintiffs put in the Complaint that you think is actionable. Is that what I hear?

MR. MANDEL:  Object to the form.  Misstates testimony.

A.    I'm not providing opinions on what is or isn't actionable.  Again, my understanding from how Plaintiffs explained to me the motion to dismiss opinion, and we've also had a subsequent granting of class certification for certain portions of the originally pled class period, and so they've helped me to understand the

CONFIDENTIAL

Page 71

DR. M. CAIN - CONFIDENTIAL Complaint, the motion to dismiss opinion, the class certification, or the granting certification.

I'm not attempting to provide any sort of interpretation of the Court's opinions, but rather taking the Complaint's allegations and then understanding how those allegations were narrowed based on the motion to dismiss opinion and the class certification order focusing on the allegedly omitted information, which includes Emerson's -- well, what I explain in paragraph -- in 27, which includes Emerson's offers to acquire National Instruments, the large premium, the all-cash offer with substantial certainty from a highly motivated buyer, funds to complete the transaction that this type of allegedly omitted information that's described in the Complaint was economically material.

Q.    So is it your opinion that before engaging in share repurchases in August and September of 2022, National

CONFIDENTIAL

Page 72

DR. M. CAIN - CONFIDENTIAL

Instruments should have publicly disclosed that it had received two offers from a highly motivated buyer?

MR. MANDEL:  Object to form.

A.   So, again, I think ultimately my understanding is for the jury to determine whether there's liability. Whether the company should have given these types of disclosures.  I'm not offering an opinion on what they should have done. That's outside the scope of my reports.

Q.   So you have no opinion on whether National Instruments should have disclosed at the beginning of the class period, prior to engaging in share repurchases, that it had received two offers from a highly motivated buyer, correct?

MR. MANDEL:  Object to form. This is outside the scope.  Asked and answered.

A.   Again, I'm not offering any opinions on what they should have done but rather I'm relying on Plaintiffs proving

CONFIDENTIAL

Page 73

DR. M. CAIN - CONFIDENTIAL
their allegations as set forth in the
Complaint.

Q.    Okay.  Do you have any opinion
in this case that, before engaging in share
repurchases in August and September of
2022, National Instruments should have
publicly disclosed that it had received two
offers from a buyer with the funds to
complete the transaction?

MR. MANDEL:  Object to form.
Misstating the record.  Outside the
scope.

A.    Again, I'm not offering any
sort of legal opinions on what the company
should have done or should have disclosed.
I would refer to ultimately the jury to
reach opinions regarding liability but
rather I'm only pointing to the allegations
as set forth in the Complaint.

Q.    Okay, all right.

MR. COMERFELD:  I'm happy to
take a break now.

VIDEOGRAPHER:  We are off the
record.  The time is 10:18 a.m.

CONFIDENTIAL

Page 74

DR. M. CAIN - CONFIDENTIAL

(Whereupon, a short recess was taken.)

VIDEOGRAPHER:  We are back on the record.  The time is 10:29 a.m.

MR. COMERFORD:  Mr. Cain, I'm handing you what I've marked as Exhibit 4 which is the Amended Complaint in this case dated March 29th, 2024.

(Whereupon, Amended Complaint for Violations of the Federal Securities Laws was marked as Cain Exhibit 4 for identification as of this date.)

BY MR. COMERFORD:

Q.    And if I understand from Paragraph 87 of your Reply Report is that you refer to the Complaint's allegations and you cite Paragraphs 82 through 96 of the Complaint, which you identify as Doc 29, and I've put Doc 29 in front of you as Exhibit 4.

A.    I see that.

Q.    You do see all that?

CONFIDENTIAL

Page 75

DR. M. CAIN - CONFIDENTIAL

A.    Yes.

Q.    So let's look at Paragraph 82 through 96 of the Complaint.  Paragraph 82 it says:  Beginning in May 2022, Defendants were aware of material information concerning Emerson's offer to acquire National Instruments, including that Emerson was offering a large premium for the company's shares and that Emerson's all-cash offer came with substantial certainty from a highly motivated buyer with the funds to complete the transaction.

The paragraph goes on, and then it refers to:  Otherwise materially representing the reality concerning Emerson's offer, National Instruments' response to that offer -- and then goes on from there.

So what I've tried to do is read to you from Paragraph 82 of the Complaint, the omissions.

Is there anything else in Paragraph 82 that is an omission that you're giving an opinion about?

Page 76

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to the form.

A.   So, again, I'm not giving an opinion about Plaintiffs allegations.  I do also, I think, point out a few additional things in Paragraph 29 of my Reply Report.

But I'm just, again, according to the Complaint, my understanding is that this is the case involving alleged scheme liability and allegedly omitted information.  I'm pointing to the Complaint, but I'm not attempting to provide any sort of legal interpretation or guidance of Plaintiffs' allegations in this matter.

Q.   All right.  So you're not offering an opinion that any of these things are economically material; you're simply just assuming that they're economically material, right?

MR. MANDEL:  Object to form.  Misstates the record and testimony.

A.   No.  As I explained before the break, I do have a significant opinion

DR. M. CAIN - CONFIDENTIAL within my report that the allegedly omitted information was economically material, and that is based on my analysis that we were talking about earlier.

Q.   Okay.  And so do I understand you're assuming that all of this information that Plaintiffs have laid out in the Complaint should have been disclosed and you're not giving any opinions about other information that should or should not have been disclosed; is that fair?

MR. MANDEL:  Object to form. Misstates the record and testimony. Asked and answered.

A.   Again, I'm -- my understanding of the Complaint is that Plaintiffs allege that the company could and should have disclosed allegedly omitted information that's discussed throughout the Complaint.

I point to that throughout my reports, but I'm not providing any further interpretation or guidance or opinions regarding exactly how the company should have provided those types of disclosures.

CONFIDENTIAL

Page 78

DR. M. CAIN - CONFIDENTIAL

Q. Okay. Do you assume that National Instruments should have disclosed that it had rejected Emerson's offers before it engaged in share repurchasing in August and September of 2022?

MR. MANDEL: Object to form.

A. Again, I'm not -- like I said before, I'm not providing opinions on exactly how the company should have provided a disclosure.

Q. Okay. So do you have an opinion about whether the fact that National Instruments have rejected Emerson's offers twice prior to the start of the class period was economically material?

A. I'm not providing opinions on like a sentence-by-sentence breakdown of what a hypothetical disclosure could or should have been but rather my opinions about economic materiality relate to the information that Plaintiffs allege was omitted.

Q. So I'm just -- I guess I'm just

CONFIDENTIAL

Page 79

DR. M. CAIN - CONFIDENTIAL struggling with how you can offer opinions that information was economically material if you can't offer an opinion that it should or should not have been disclosed prior to the class period?

MR. MANDEL:  Object to form.

And also that's not a question.

A.    What I explain in my reports is that Plaintiffs allege that this information could and should have been disclosed, so I'm assuming I'm taking Plaintiffs' allegations as given.  My opinions are premised upon Plaintiffs ultimately proving liability, proving their case, and what I explain is if Plaintiffs succeed in their case, then this allegedly omitted information was economically material, meaning it would have impacted the stock price of National Instruments. It would have caused the stock price to increase to at least $48 per share throughout the class period.

Q.    In Paragraph 29 of your Reply Report toward the end you're giving a list

CONFIDENTIAL

Page 80

DR. M. CAIN - CONFIDENTIAL
of numerous material facts that National
Instruments allegedly failed to disclose,
and then you list certain things.  And then
you write "and so forth."

Do you see that?

A.    I do.

Q.    What do you mean by "and so forth"?

A.    Again, I'm pointing to the allegations that are set forth in the Complaint.  I'm not providing this specific wording or the exact phrasing of what the company should have disclosed at the start of the class period, but rather I'm pointing to the allegations that Plaintiffs set forth in the Complaint.

Q.    All right.  You have the Complaint in front of you as Exhibit 4. Can you look at Paragraph 4, please?

A.    (Witness complies.)

Q.    Paragraph 4 says:  National Instruments made no disclosure concerning Emerson's offer for approximately eight months during which National Instruments

DR. M. CAIN - CONFIDENTIAL
purchased millions of its own shares at prices far below Emerson's offer while engaging in a deliberate pattern of behavior to delay, impede, and obstruct Emerson's efforts to acquire National Instruments.

And I'll stop there.  Do you see where I read that?

A.    I do.

Q.    As part of your analysis in this case, have you assumed it is true that National Instruments engaged in a pattern of behavior to delay, impede, and obstruct Emerson's efforts to acquire National Instruments?

A.    I would say that it's thinking everything that the Complaint sets forth as true.  I'm not providing any opinions, one way or another, on whether any elements of the Complaint are true or not.  I'm also, like I said, considering the interpretation of the motion to dismiss opinion and the class certification order as well.

Q.    All right.  I think that's a

CONFIDENTIAL

Page 82

DR. M. CAIN - CONFIDENTIAL

yes. You don't have any reason to -- you're not going to offer any opinions -- strike that. Let me start over.

You're not offering any opinions in this case that are going to say that Emerson -- strike that.

You're not offering any opinions in this case that National Instruments did anything other than try to delay, impede, and obstruct Emerson's efforts to acquire National Instruments, correct?

MR. MANDEL: Object to form. Misstates the record and testimony.

A.    I -- well, I'm offering the opinions that are provided in my report and I'm not -- in all three of my reports, and I'm not offering any opinions at this point in time that are not disclosed and contained within those three reports.

And I would agree with you that I'm not offering any opinions in any of my reports about the extent to which National Instruments engaged in a pattern of

CONFIDENTIAL

Page 83

DR. M. CAIN - CONFIDENTIAL
behavior to delay, impede, or obstruct
Emerson's efforts to acquire National
Instruments.

Q.    Okay.  So you have assumed it
is true that National Instruments' board
and management was trying to delay, impede,
and obstruct Emerson's efforts to acquire
National Instruments, fair?

MR. MANDEL:  Object to form.
Outside the scope.

A.    Again, I'm -- I'm taking all of
the -- the entirety of the Complaint, I'm
assuming that it's true for -- for my
purposes.

Q.    All right.  There were two
offers by Emerson prior to August 2022 and
they were both for $48 per share to acquire
National Instruments, correct?

MR. MANDEL:  Object to form.

A.    One of the things that I
explain in my reports is that the second
offer was at a higher premium but also
conveyed willingness to go above $48 per
share at an increased price.  But I do

CONFIDENTIAL

Page 84

DR. M. CAIN - CONFIDENTIAL

agree that both of those offers did talk about a $48 per share price.

Q. Okay. And the premium associated with the $48 per share offer is related to general market conditions, right?

MR. MANDEL: Object to form.

A. Well, it's relative to the company's current trading price.

Q. Okay. And so if overall market conditions are causing National Instruments' stock price to be depressed, then that can affect the premium, right?

MR. MANDEL: Object to form.

A. I'm not really sure what you mean by "depressed."

Q. Well, maybe lower than what management and the board think the true value of the company is.

MR. MANDEL: Object to form.

A. I guess -- well, I guess what I would say is that the premium is calculated as the percentage amount by which the offer price exceeds the current trading price, so

CONFIDENTIAL

Page 85

DR. M. CAIN - CONFIDENTIAL

that could interact with a lot of things. That could interact with market conditions, fundamental value of the company. That could also interact with the beliefs held by management or the board of directors.

Q.    Why would it be important for National Instruments to disclose the amount of the premium rather than just the $48 per share price?

MR. MANDEL:  Object to form.

A.    I guess I'm not really sure what you're pointing to within my opinions for that question. I don't see how that interacts with my opinions.

Q.    If National Instruments had hypothetically disclosed the fact that Emerson had made a $48 per share price at any given date, then any person could have calculated the premium for themselves. Isn't that fair?

MR. MANDEL:  Object to form.

A.    When you say they could have disclosed $48 per share at any date, do you mean that what -- I'm not -- do you mean

Page 86

DR. M. CAIN - CONFIDENTIAL

that they could have made that disclosure at any date or that that was the information that -- because I guess I would not agree that that was necessarily the totality of the allegedly omitted information throughout the class period if that's what you were getting at.

Q.    Okay.  So let's just assume that, hypothetically, National Instruments had disclosed on August 1st, 2022, the fact that Emerson had made offers of $48 per share on May 5th, 2022, and June 22nd, 2022.

You with me?

A.    Yes.

Q.    But National Instruments did not disclose the premium of those offers, okay?

A.    Okay.

Q.    Would the omission of the premium be economically material in your opinion?

MR. MANDEL:  Object to form.

A.    Well, that's a -- I guess

Page 87

DR. M. CAIN - CONFIDENTIAL

that's a hypothetical question that I haven't attempted to answer in my report at this point in time.

Q.    Do you agree with me that hypothetically, if National Instruments had made the disclosure that I just described, the two offers from Emerson occurring in May and June of 2022, that anyone could have calculated the premium of those offers by comparing the offer date with the share price that National Instruments was trading on that date against the $48 offer price. Isn't that fair?

MR. MANDEL:  I'm going to object to form.  And this is an incomplete hypothetical.

A.    So, again, I think it's important for me to explain that I don't think that this hypothetical really interacts with the allegedly omitted information in this case, but if you were to look at some sort of hypothetical situation outside the context of this case, investors are -- I would agree that

CONFIDENTIAL

Page 88

DR. M. CAIN - CONFIDENTIAL investors are able to calculate the applied premiums of offers that are made for companies based on the disclosed offer values.

Q.    Okay.  Have you ever seen in the real world a target company make a public disclosure that includes as much information as the Plaintiffs say it should have included?

MR. MANDEL:  Object to form.

A.    I have seen this type of information being disclosed in the real world in terms of press releases or other types of disclosures, yes, by both target companies, acquirers, hostile bidders, tender offers, things like that.

Q.    I understand you've seen this type of information disclosed, but have you ever seen an instance in the real world where a target company disclosed all of the information that the Plaintiffs say National Instruments should have disclosed?

MR. MANDEL:  Object to form.

A.    It's possible.  I've

Page 89

DR. M. CAIN - CONFIDENTIAL
reviewed -- I've reviewed hundreds of
merger transactions in their negotiation
history, including their disclosures, but I
don't have all of those memorized.

I do recall seeing, like I
said, this type of information being
frequently disclosed, but I don't have all
of those details of the hundreds of
transactions that I've studied, you know,
memorized off the top of my head.

Q.   Okay.  Is it fair to say that
as you sit here, you can't identify a
specific instance where a target company
disclosed as much detail as the Plaintiffs
are alleging National Instruments should
have disclosed before it resumed share
repurchases?

MR. MANDEL:  Object to form.

A.   Well, again, I do think -- like
I said, in my professional experience, this
type of information is frequently disclosed
but I don't have those disclosures
memorized off the top of my head to --

Q.   Okay.  So the answer to my

CONFIDENTIAL

Page 90

DR. M. CAIN - CONFIDENTIAL
question is yes, you cannot identify a
specific instance, correct?

A.    I'll just stick with my
previous answer.

(Whereupon, May 25, 2022
Emerson letter was marked as Cain
Exhibit 5 for identification as of
this date.)

Q.    Okay.  I'm handing you what
I've marked as Exhibit 5, which is the
May 25th, 2022 letter from Emerson CEO to
Eric Starkloff, the CEO of National
Instruments (handing).

(Whereupon, June 22, 2022
Emerson letter was marked as Cain
Exhibit 6 for identification as of
this date.)

Q.    I'm also handing you what I've
marked as Exhibit 6, which is the
May 22nd -- excuse me, you're right,
June 22nd, 2022 letter from Emerson CEO to
Eric Starkloff and Michael McGrath.

You see that?

A.    Yes.

CONFIDENTIAL

Page 91

DR. M. CAIN - CONFIDENTIAL

Q.    Do you see at the top of May 25th, 2022 letter Emerson wrote, in all capital letters, underlined the words "Strictly Private And Confidential"?

A.    I do.

Q.    And then on the June 22nd, 2022 letter, the same words were written, "Strictly Private And Confidential," right?

A.    Yes.

Q.    In your experience, what does that mean when a offerer sends a proposal and labels it "Strictly Private And Confidential"?

MR. MANDEL:  Object to form.

A.    Yeah, one of the things I explain in my report, I cite to the Bruner textbook, for example, is the parties take multiple steps to attempt to keep these types of offers confidential because they are expected to have a price impact on company stock prices if this type of information is made public.

And so that's one of the things they do is engage in, or at least explain

CONFIDENTIAL

Page 92

DR. M. CAIN - CONFIDENTIAL
the importance of privacy, confidentiality,
talking in code names, things like that,
because the expected economic materiality
of the information contained in these types
of letters.

Q.    Your opinion in this case is
that in general, I guess, is that it would
have been good for holders of National
Instruments stock to have this information
disclosed?

MR. MANDEL:  Object to form.

A.    Well, I don't think I used that
phrasing.  What I explain is that the
allegedly omitted information would have
caused National Instruments' stock price to
increase to at least $48 per share.

Q.    And I mean, in general that is
good for people who already hold the stock
when it goes up, right?

MR. MANDEL:  Object to form.

A.    If I hold stock, I would say I
would like the stock to have a higher
value.

Q.    Yeah.

CONFIDENTIAL

Page 93

DR. M. CAIN - CONFIDENTIAL

A.    So I think at a general level, very frequently -- obviously there can be exceptions.  So you could have a short seller who, it's not good for their short seller if the stock price goes up or it could be bad for an acquirer who's looking to purchase a company's stock if there's a run-up in the stock price because of leakage, so it kind of depends on the context, I suppose.

Q.    Right.  But the allegation in this case is not about short sellers or anything like that.  It's about people who had purchased the stock prior to the start of the class period and then sold it during the class period?

A.    That's my understanding of the definition of the class, yes.

Q.    And so your opinion is that if National Instruments had disclosed the May 25th proposal and the June 22nd proposal from Emerson, those disclosures would have caused the stock price of National Instruments to go up?

CONFIDENTIAL

Page 94

DR. M. CAIN - CONFIDENTIAL

A.    I think that's part of it. Again, I would just point to the allegedly omitted information which is a little bit different from just publicly disclosing these letters, but do think that these are definitely a component of that allegedly omitted information that would have impacted the stock price, yes.

Q.    And you know that National Instruments rejected both of these proposals prior to -- prior to August of 2020 -- well, let me say that again.

You know that National Instruments rejected the May 25th, 2022 proposal on June 16th, 2022, and you know that National Instruments rejected the June 22nd proposal on August 3rd, 2022 -- August 2nd, 2022?

MR. MANDEL:  Object to form.

A.    I don't have the dates memorized, but that sounds right to me.

Q.    Okay.  And we agree that National Instruments then on August 3rd, 2022, hypothetically, had disclosed

CONFIDENTIAL

Page 95

DR. M. CAIN - CONFIDENTIAL
Emerson's proposals and the fact that National Instruments had rejected those proposals, there would have been some impact on the stock price of National Instruments.  Is that what you're saying?

MR. MANDEL:  Object to form.

A.    Well, I guess I would point you to my opinions in my reports, which are premised upon the allegedly omitted information which is, I think, a little bit different from this question.

I also explain that it's different from the summaries of that information.  It's provided in the Denis reports and the Goodman reports, so I'm not providing separate opinions on let's suppose hypothetically that they had just disclosed simply two rejections.

Like, I think that's outside the scope of my opinions.  I'm just opining on the totality of the allegedly omitted information having price impact.

Q.    Okay.  Those are truth acts what I said to you, that Emerson made

CONFIDENTIAL

Page 96

DR. M. CAIN - CONFIDENTIAL

proposals in May and June, National Instruments rejected the proposals in June and August of 2022.

We agree that those are the facts, right?

MR. MANDEL:  Object to form.

A.    My recollection is that they did reject both of those offers, yeah.

Q.    So hypothetically, if National Instruments had publicly disclosed Emerson's proposals of May and June and National Instruments rejections of June and August, could that have caused any problems for National Instruments based on your experience?

MR. MANDEL:  Object to form.

A.    I'm not sure what you're asking in terms of "problems."

Q.    Accusations of stock manipulation by National Instruments?

MR. MANDEL:  Object to form. Outside the scope.

A.    I have not attempted to ask and answer that question in my analyses at this

CONFIDENTIAL

Page 97

DR. M. CAIN - CONFIDENTIAL

point in time, so I don't have any opinions one way or another.

Q.    Have you ever come across that concept in your professional life?

A.    The concept of --

MR. MANDEL:  Object to form.

THE WITNESS:  Sorry.

A.    The concept of market manipulation?

Q.    Yes.

A.    I have worked on market manipulation cases, yes.

Q.    Don't you think if National Instruments had disclosed on August 3rd, 2022 the things that had happened up until that point that Emerson had made two proposals at $48 per share and National Instruments had rejected them both, that National Instruments could have been accused of trying to manipulate its own stock price because its stock price is trading at lower than $48 at that point, right?

MR. MANDEL:  I object to the

CONFIDENTIAL

Page 98

DR. M. CAIN - CONFIDENTIAL

form of all this.

A.    I agree that National Instruments' stock price was trading below $48 during this time period.

Q.    Do you agree with me that some person could have accused National Instruments of trying to manipulate its stock price and -- by disclosing this information?

MR. MANDEL:  Object to the form.  This is very far outside the scope of this expert's expertise.

A.    Again, I have not attempted to form any sort of opinions along those lines at this point in time.

Q.    I understand that, but I'm asking you, based on your experience, do you think that that would have been a credible concern for the management and the board of National Instruments?

MR. MANDEL:  Object to form. Again, for the same reasons.

A.    I don't have any opinions on that question.

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

Q.    Just can't say whether you disagree or agree, right?

MR. MANDEL:  Object.

A.    I just don't have any opinions one way or another.

Q.    Hypothetically, if National Instruments on August 3rd, 2022 had disclosed the fact that Emerson had made these two offers, had publicly disclosed the proposals themselves, the actual letters so the public could see all the statements in Emerson's letters and disclosed the fact that National Instruments had rejected those letters, do you have an opinion on what the impact on the stock price would have been?

MR. MANDEL:  Object to form.

A.    I think that's a component that's part of the allegedly released -- related to the allegedly released information that I explain would have caused the stock price to increase above $48 per share, or to at least that amount.

But beyond that, I have not

DR. M. CAIN - CONFIDENTIAL
attempted to parse out or break down that information to subcomponents, so I don't have any opinions on an alternative world where they would have only disclosed part of the allegedly omitted information.

Q.    Well, I'm not trying to ask you a question where my hypothetical is National Instruments only discloses part of the hypothetically relevant information.

I'm saying that National Instruments makes Emerson's letters publicly available so it can see all the statements that Emerson is making about how highly motivated Emerson is and how it's all cash and all those things, and then the fact that National Instruments rejected both the May 25th proposal and the June 22nd proposal, that is also disclosed.

And let's just say hypothetically that National Instruments discloses those things on August 3rd, 2022. Do you have an opinion of what would happen to National Instruments' stock price?  What would the but-for stock price be?

CONFIDENTIAL

Page 101

DR. M. CAIN - CONFIDENTIAL

A.     Yeah, so --

MR. MANDEL:  Object to form.

A.     -- to the extent that you said you're not attempting to limit the disclosed information to something less than what was allegedly omitted, then my opinion is that had that information been disclosed at the beginning of August that it would have caused National Instruments' stock price to increase to at least $48 per share.

Q.     Even though National Instruments had rejected both offers?

A.     We -- I agree, we do know that National Instruments had rejected both those offers at that point in time, yes.

Q.     And your opinion is that the stock price of National Instruments would have gone to at least $48 anyway even though National Instruments had rejected the proposals?

MR. MANDEL:  Object to form.

A.     Yeah, that's absolutely part of the information environment that I

Page 102

DR. M. CAIN - CONFIDENTIAL
considered in my analyses.

Q.    And that doesn't depend on whether National Instruments then engaged a share repurchasing, right?

MR. MANDEL:  Object to the form.

A.    What -- I'm sorry.  What doesn't depend on the --

Q.    Your opinion that if National Instruments had made the disclosures we've been talking about on August 3rd, 2022, and it also disclosed the fact that it had rejected Emerson's proposals, your opinion is that the stock price of National Instruments would then go to at least $48 per share, irrespective of whether National Instruments then subsequently began to repurchase its own shares, correct?

MR. MANDEL:  Object to form.

A.    Yes.

Q.    And so you calculate damages for the class members just based on the alleged omission of the information that we've been talking about and not based on

CONFIDENTIAL

Page 103

DR. M. CAIN - CONFIDENTIAL whether or not National Instruments then engaged the share repurchasing during the class period.  Is that fair?

MR. MANDEL:  Object to form.

A.    Well, it's based on all of the information that I discuss in my Merits Report and Reply Report and it includes the allegations of the Complaint.

So I have not, you know, one of the things I explain in my Reply Report is I have not considered some sort of alternate world where there were no repurchases.  You know, like I said before, I'm taking the allegations as set forth in the Complaint, which do include those repurchases.

Q.    Okay.  So the fact that National Instruments was making repurchases during the class period didn't impact the but-for price of National Instruments stock at the beginning of the class period, correct?

MR. MANDEL:  Object to form.

A.    Right.  Those occurred over the

DR. M. CAIN - CONFIDENTIAL
course of the class period, but what I explain is that the artificial deflation would have been present as of the start of the class period before the repurchases took place.

Q.   And so what you're saying and planning, which is that the thing that caused the class members to suffer damages, when they sold their shares during the class period, was the omission of the information by National Instruments and not the repurchasing of shares by National Instruments; is that fair?

MR. MANDEL:  Object to form.

A.   I don't think that's accurate, because like I said, I do point to the allegations in the Complaint.  The Complaint alleges that -- my understanding of the allegations is that Plaintiffs allege a violation of disclosure requirements because of their repurchases that they engaged in.  So I do think that's an element of the case that is contained within the Complaint.

DR. M. CAIN - CONFIDENTIAL

But beyond that, I'm not -- obviously, I'm not providing any sort of legal opinions about -- from a legal standpoint what causes damages. I'm just pointing to the economic materiality of the information itself.

Q. So the information that was available to the class members during the class period was -- for your analysis, was set as of the beginning of the class period and did not depend on events that occurred during the class period or after the class period. Is that fair?

MR. MANDEL: Object to form.

A. No. I don't think that's correct.

Q. You have been telling me that your calculation is that the stock price of National Instruments would have gone to at least $48 per share then as of the beginning of the class period if the allegedly omitted information had been disclosed.

And then you set that as of the

Page 106

DR. M. CAIN - CONFIDENTIAL
beginning of the class period that there's deflation from the stock price, where it was trading, and $48 where it should have been trading.

And so how does anything that happened during the class period then affect the damages to the class members?

MR. MANDEL:  Object to form.

A.    Because the deflation or the deflation ribbon, the artificial deflation ribbon is the difference between $48 and investors, class members' sale prices and those sale prices fluctuate over the course of the class period because the company's stock price fluctuates due to -- as in any securities class action case, due to non-fraud-related factors.

And so the company could announce earnings.  Company could engage in repurchase activity that may move the stock price around.  The investors may trade other market movements or industry movements may cause changes in the stock price.  So my calculation strips all of

CONFIDENTIAL

Page 107

DR. M. CAIN - CONFIDENTIAL
that non-fraud-related information out of the damages calculation.  And damages are only the difference between their sale price and what the price would have traded had the allegedly -- omitted information been disclosed going up to at least $48 per share.

But whether their sale price was $30 or $33 or $35, that fluctuates due to non-fraud-related information over the course of the class period and investors are not being compensated in the form of a damages calculation based on all of those other non-fraud-related pieces of information that moved the stock price.

Q.   So you're saying that there should be offsets based on market fluctuations during the class period that caused the difference between $48 per share and the class member sale price to be greater than it would have been at the beginning of the class period.  Is that fair?

MR. MANDEL:  Object to the

Page 108

DR. M. CAIN - CONFIDENTIAL

form.  And misstates the record testimony.

A.    No.  That's not at all what I'm saying.  What I'm saying is that all of that non-fraud-related information is already stripped out of the damages calculation because that moves their -- the stock price around and their damages are only driven by the difference between their sale price and the but-for price of $48 per share.  It's only the allegedly fraud-related information that goes into the damages calculation.

Q.    How does market fluctuation during the class period get stripped out of the damages calculation?

A.    Because I'm subtracting out the stock price, so it's $48 minus the sale price, which the sale price fluctuates due to market movements, industry movements, other non-fraud-related information, so that's being subtracted off.  It's explicitly excluded from the damages.

Q.    Okay.  So the class period

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

starts August 12th, 2022, right?

A.    Yes.

Q.    So let's say there's an investor named John Smith and he has a hundred shares of National Instruments that he purchased prior to the beginning of the class period and then he sells during the class period, hypothetically, at a price of $30 per share?

A.    Okay.

Q.    And then a week or two goes by and the stock price, hypothetically, of National Instruments stock goes down because of market fluctuations that are not based on any conduct of National Instruments.  And now the stock hypothetically is $20 per share.

A.    Mm-hmm.

Q.    And Jane Doe, who also bought a hundred shares of National Instruments before the class period began.  She then sells, and she's a class member, too.  So both of my hypothetical people are class members.  One sold at $30, and one sold at

Page 110

DR. M. CAIN - CONFIDENTIAL

$20.

And what I understand you to be saying is that the first person, John Smith, the delta between 48 and 30 is 18 bucks per share, $1,800 of damages, right?

A.    Yes.

MR. MANDEL:   Object to form.

A.    Yes.

Q.    And the delta between Jane Doe's sale price of $20 and the but-for price of $48 is $28 so she has $2,800 in damages, right?

MR. MANDEL:   Object to form.

A.    Under this hypothetical. Again, I don't think those were actually realistic stock prices but under the hypothetical, yes, that's correct.

Q.    So one class member is damaged in the amount of $1,800 in my hypothetical and another class member is damaged in the amount of $2,800 in my hypothetical due to -- and the difference is due to factors that are not due to any bad conduct of National Instruments, fair?

CONFIDENTIAL

Page 111

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to form.

A.    Well, the entirety -- those are two different numbers in terms of damages but the entirety of that damages is caused by the fact that National Instruments' stock price would have traded at $48 per share or above and each of those investors would have sold at $48 per share or above.

So the fact that they sold at different prices for each of those is reflective of their damages caused by the alleged omissions.

Q.    But the difference in their damages is not caused by National Instruments, correct?

MR. MANDEL:  Object to form.

A.    No.  Again, the entirety of the damages for each investor is caused by the alleged omissions in my calculations.

Q.    Shouldn't the but-for price of $48 per share also fluctuate with the market?

MR. MANDEL:  Object to form.

A.    So that's one of the things I

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL
explain in my reports is that once investors start trading a stock based on the expectation of a takeover premium or a takeover price, that becomes the driving force for the value of the stock.  It's really looking at the takeout price, and so you typically have a change whereas prior to any information about merger or acquisition activity, it's -- the driving force is the fundamental value of the company earnings announcements, market movements, industry movements.  But once there's an expectation of receiving a takeover premium, then that's what drives the price.

And so that's why I explained that the price may have had some fluctuations but those would have remained above $48 per share throughout the class period.

Q.   So in your -- your but-for world, the price would be $48 if the alleged omissions had been disclosed and not lower ever, even though -- even if the

DR. M. CAIN - CONFIDENTIAL

market goes up and down?

MR. MANDEL: Object to form.

A. I would have -- what I say is it would have been at least $48 per share, so --

Q. But never less?

A. I certainly acknowledge that a jury could conclude that it would have been higher than $48 per share but I conservatively limit my calculation to $48 per share.

Like I said, it could have fluctuated. It could have been $53 on certain days or it could have even gone above that if investors expected further increases in the offer value, but I conservatively cap it at $48 per share in my calculations.

Q. Okay. Let's talk about the fact that National Instruments began making share repurchases in the class period. I'm looking at your Merits Report and I'm looking at Paragraph 39 of Appendix C, which is on Page 97 of the report.

DR. M. CAIN - CONFIDENTIAL

And you write: Importantly, repurchases and dividends can have materially different implications for a firm value. For example, Bond and Zhong 2016 develop a theoretical model in which firms with private information about undervaluation repurchase shares in advance of a Seasoned Equity Offering, SEO. In their framework, the repurchase serves as a signal of private information reducing perceived mispricing and increasing investor confidence.

You wrote that?

A. Yes.

Q. So do you agree with me that the repurchases that National Instruments engaged in during the class period had a positive effect on the stock price of National Instruments?

MR. MANDEL: Object to form.

A. I guess what I would explain is this study is looking at a different context, and I'm pointing to this in response to some arguments that Professor

Page 115

DR. M. CAIN - CONFIDENTIAL

Denis was putting forth in a different context.

But what I would say in the context of National Instruments and their repurchases and their repurchase activity during the -- during the class period, that it is possible that those have an impact on the stock price but, again, that's what I'm ignoring for purposes of the damage calculation because I'm subtracting off the national stock price.

Q.    Okay.  And the share repurchasing by National Instruments during the class period is one of the things that the Plaintiffs are alleging was wrong in this case, correct?

MR. MANDEL:  Object to form.

A.    Well, I guess you would have to point me to the Complaint.  My recollection is that the key allegation is the omission of information while they were conducting repurchases.

Q.    Okay.  You agree with me that when a company repurchases its shares, that

CONFIDENTIAL

Page 116

DR. M. CAIN - CONFIDENTIAL

can have a positive signalling effect to the market as a general proposition?

A.    There are times -- the academic research shows, for example, that when companies announce large repurchases publicly, that that can serve as a signal of private information about the investment opportunities being valuable for a company.

So there are times when that has an impact upon those announcements, yes.

Q.    Okay.  Do you have any opinion that National Instruments, by engaging in repurchasing during the class period, gained anything?

MR. MANDEL:  Object to form.

A.    So I have a rebuttal opinion to Professor Denis in my reports, both of my reports, so I do talk about that in the context of Professor Denis attempting to put forward an alternative damages, some sort of alternative damages view or methodology that's based on profits gained from repurchase activity.

CONFIDENTIAL

Page 117

DR. M. CAIN - CONFIDENTIAL

And I explain in my reports that to the extent that a company is able to repurchase its shares at a lower price relative to a higher price, then they're using less cash.  So that could be viewed as a benefit.

But ultimately I'm not putting forward a damages methodology that's based on the framework that Professor Denis was advocating for, so my opinions are really just rebuttal opinions explaining the flaws in what he's put forward in his reports.

Q.    Have you ever worked on an insider trading case where the damages were measured by discouragement of the person who's trading with inside information and their ill-gotten gains?

MR. MANDEL:  Object to form.

A.    I worked on several Securities and Exchange Commission insider trading cases in which the remedy was the discouragement of ill-gotten gains, plus a penalty or some multiple in terms of penalties, yes.

CONFIDENTIAL

Page 118

DR. M. CAIN - CONFIDENTIAL

Q.    You feel that is not an appropriate damages model in this case?

MR. MANDEL:  Object to form.

A.    Well, I'm putting forward the out-of-pocket damages methodology based on the -- my understanding of Plaintiffs' allegations set forth in the Complaint.

But, beyond that, I'm not offering any legal opinions about the appropriateness of any remedies.

Q.    In any of the insider trading cases that you worked on for the SEC, did you work on analyzing damages to people who traded, who did not have the material nonpublic information like the alleged class members in this case?

MR. MANDEL:  Object to form.

A.    I do think that is the underlying assumption behind the discouragement calculations in the Securities and Exchange Commission insider trading cases.

Q.    The discouragement, though, is based on the gain to the person or entity

DR. M. CAIN - CONFIDENTIAL

that was trading while in possession of material nonpublic information, right?

A. It is, but under the theory that that gain came at the expense of other investors who were trading in the marketplace who did not have access to that same degree of information.

Q. And are the other investors, did they receive compensation in those cases?

MR. MANDEL: Object to form.

A. I think sometimes they take the discouragement and penalty payment and put those into a fund to distribute to harmed investors. That is my understanding, yes.

Q. Let me ask you about this idea that National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the class period. That's one of the things you write about in your reports, fair?

A. What I explain is I don't put forward a formal opinion the way that Professor Goodwin attempts to manufacture.

DR. M. CAIN - CONFIDENTIAL

But I do talk in a few sentences characterizing certain documents or pieces of evidence as reflecting the continued engagement with the prospect of a transaction.

Q.    Right.  We'll just read one of your sentences from your Merits Report, Appendix C, Paragraph 3.  Just so we're sure we're talking about the same thing, and it's on Page 79.

Second sentence of Paragraph 3 says:  This conclusion is flawed because it overlooks multiple pieces of evidence, including internal documents, showing that National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the class period.

Do you see that in your report?

A.    Yes, I do.

Q.    All right.  So this idea that a target company remained actively engaged with the prospect of a transaction, are you aware of any sources that you consider authoritative that talk about that concept?

CONFIDENTIAL

Page 121

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to form.

A.    I guess I would point to --
actually, I do point to a lot of academic
research on merger negotiations.  For
example, the Bruner textbook as well as I
think that cites an academic study by
Comment and Schwert which describe merger
negotiations as having a spectrum of --
merger bargaining as having a spectrum of
friendliness and hostility.  That's also
consistent with my own academic research on
hundreds of merger transactions which
documents multiple rounds of rejections.

And so even though you've got
rejections, that's just part of the overall
process, and that's what I'm describing in
my reports when I talk about being engaged
with the prospect of a transaction is that
even in a rejection framework or hostile
takeover framework, there is still the
concept of that transaction having an
overhang or affecting the information
that's at the disposal of the parties who
are involved.

CONFIDENTIAL

Page 122

DR. M. CAIN - CONFIDENTIAL

Q.    Is it your testimony that if a company is actively engaged with the prospect of a transaction where another company will acquire it, that means the target company is in possession of material nonpublic information?

MR. MANDEL:  Object to form.

A.    I don't believe that I've offered any opinions or interpretive guidance on the definition of material nonpublic information.  My understanding is it involves a legal question and I'm not opining on any sort of legal opinions.

Q.    Okay.  And we already looked at the Complaint in Paragraph 4 that we talked about earlier where the Plaintiffs allege that National Instruments was engaging in a pattern of behavior to delay, impede, obstruct Emerson's efforts to acquire National Instruments, correct?

A.    Well, that was --

MR. MANDEL:  Object to form.

A.    That was a sentence in the Complaint.

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

Q.    Okay.

A.    I do recall that.

Q.    And so if we take that sentence from the Complaint that says National Instruments was trying to delay, impede, and obstruct Emerson's efforts to acquire National Instruments, and we put that together with your statement that National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the class period, the picture we get is that National Instruments is defensive when it's actively engaged and it is monitoring Emerson but it's not wanting to do a deal with Emerson.

Do we agree on that?

MR. MANDEL:  Object to the form.  Long story.

A.    I guess there's a lot going on in that question and so I think some of that is outside the scope of both of my reports.

I'm certainly not opining on National Instruments or Emerson's state of

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

mind at any point during this process, but one of the things I do explain in my report is that Professor Goodwin attempts to define some sort of active engagement claim that's based on friendly, ongoing friendly discussions, any -- seems to ignore any sort of evidence of hostility or ongoing monitoring within the hostile takeover context.

But I do explain in both of my reports that the evidence that National Instruments was monitoring all the different aspects of hostility throughout the class period, that those are consistent with my description here in this paragraph of them being engaged with the prospect of a transaction.

So I'm certainly not limiting engagements-only evidence of friendly negotiations. I do include the monitoring of all of these aspects and involving hostility or the possibility that Emerson could take their offer public to shareholders as still being consistent with

CONFIDENTIAL

Page 125

DR. M. CAIN - CONFIDENTIAL
this recognition or engagement with the
prospect of a transaction affecting the --
ultimately affecting the market prices of
National Instruments.

Q.    So you use the word
"negotiations" as you're answering my
question, right?

A.    I think I was sort of driving a
distinction between friendly negotiations
versus hostile -- and you could even -- you
could talk about hostile negotiations or
just hostile evidence in terms of more
indirect monitoring.

Q.    Would you agree with me that in
order for two companies to negotiate, they
have to communicate?

MR. MANDEL:  Object to form.

A.    What do you mean -- I guess --
what do you mean by "communicate"?

Q.    Well, can you think of -- I
mean, speak or write and otherwise convey
words and thoughts and ideas to one
another.

A.    Oh.

CONFIDENTIAL

Page 126

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to form.

A.     I would actually disagree with that.  I think the empirical evidence would point to examples such as making a tender offer.  That's a component of, you know, that's a component of negotiations.  When a company takes an offer directly to shareholders, that's exerting pressure.  It's coercive.  It's hostile.  It's putting pressure on a target company to decide how to respond, and that under the umbrella of hostility, that's still part of the overall, long run negotiating process where many transactions end up on friendly terms.

Q.     When did that happen in this case?

MR. MANDEL:  Object to form.

A.     So, again, I'm pointing to academic research on hostile takeovers; but my recollection is that in January, Emerson publicly announced an offer at $53 per share.

Q.     And that's January 2023 after the class period was over?

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

A.    Correct.

Q.    So do you agree with me that National Instruments communicated to Emerson on August 2nd, 2022, and rejected Emerson's second proposal?

MR. MANDEL:  Object to form.

Q.    Like, we've already talked about that, right?

A.    That's -- I don't -- again, I don't have the dates memorized so if you want to point me to a specific document -- but I do recall us talking about a National Instruments rejecting the offer.

Q.    And are you aware that Emerson made a third proposal, communicated a third proposal to National Instruments on November 3rd, 2023?

A.    I do remember it, a $53 per share offer in November of 2022, but I don't recall the exact date off the top of my head.

MR. MANDEL:  Object to form. You said 2023.

MR. COMERFELD:  Sorry, 2022.

Page 128

DR. M. CAIN - CONFIDENTIAL

November 3rd, 2022, for the record was Emerson's third proposal.

MR. MANDEL:  Okay.

Q.    Are you aware of any communications between National Instruments and Emerson between the dates of August 2nd, 2022 and November 3rd, 2022?

MR. MANDEL:  Object to form.

A.    I point to a lot of internal documents during that time period.  So whether some of that may have constituted indirect communication through financial advisers or monitoring, I think there's internal documents that talk about these types of things.

But I'm not, off the top of my head, able to point you to any specific internal documents with -- that points out direct communication between the two parties off the top of my head.

Q.    Right.  And I'm not limiting my question to internal documents.  I'm asking about direct communications between anyone at Emerson and anyone at National

CONFIDENTIAL

Page 129

DR. M. CAIN - CONFIDENTIAL

Instruments about the prospect of acquisition between the dates of August 2nd, 2022, and November 3rd, 2022, and what I'm hearing you say is you're not aware of any such direct communications between Emerson and National Instruments, correct?

MR. MANDEL:  Object to form.

A.    Yes, I'm -- off the top of my head, I'm not aware whether or not they had any direct communications during that time period.

Q.    Okay.  How does your opinion about the economic materiality of omitted information relate to the idea that National Instruments was actively engaged with the prospect of a transaction with Emerson through the class period?

MR. MANDEL:  Object to form.

A.    Yeah.  So in, I guess, I point you to Section V-A in terms of that timeline of my Merits Report, there's numerous internal documents indicating that National Instruments was actively

Page 130

DR. M. CAIN - CONFIDENTIAL monitoring Emerson's cumulation of shares, the toehold stake.  They were acting with financial advisers, legal advisors, proxy solicitors, public relations firms.  They were preparing potential slides or videos to provide to investors if Emerson went public with their offer.

There's deposition testimony that I cite in my Reply Report that's all consistent with all of this.  So these are a lot of the internal documents that -- in the discovery record that I point to that's consistent with that description.

Q.    And so what is your opinion about how those facts shed light on the economic materiality of the omitted information?

MR. MANDEL:  Object to form.

A.    Yeah, so I guess what I explain, for example, in Paragraph 18 of my Merits Report is that the alleged omissions were economically material and that they relate to information that would affect reasonable investor's investment decisions,

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL including the process at which they traded National Instruments common stock.

And, for example, in my Reply Report, I give deposition quotes that are consistent with that expected price impact if, for example, if Emerson had gone public during this time period.

Q.    Right.  But my question is how did the things that National Instruments did during the class period to monitor Emerson to listen to its press, you know, its earnings call to, you know, talk to a PR firm or whatever it did, how does that make the alleged omitted information as of this start of the class period any more or less economically material or just as have an impact, is what it sounds like to me?

MR. MANDEL:  Object to form.

A.    No.  That's certainly not what I said.  So it's demonstrating and characterizing the nonpublic information environment throughout the class period and is providing multiple pieces of evidence that this was still a live transaction

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

under consideration within National Instruments throughout the class period.

It's quite different than let's suppose some hypothetical world where National Instruments says no, and then Emerson says okay, fine, we're going to walk away and never talk to you again.

I think the evidence that I'm pointing to throughout the class period is quite the opposite. In fact, National Instruments and the company, the management, the board, that they were continuing to talk about this as having significant threat to the company, potential impact on the stock price, the likelihood that this was going to move forward that it was going to escalate, that it was going to become public.

So, these things all speak to that information environment, the economic materiality and the probability of that information throughout the class period.

Q.   So from, let's assume that all facts are as we know them to be as of

DR. M. CAIN - CONFIDENTIAL August 12th, 2022, the beginning of the class period. Emerson has made two proposals, National Instruments has rejected them. None of that has been disclosed. Those -- that's all kind of the fact environment of this case.



Do you recall that generally?

A. I recall the ████ ████ ████████ and this was part of the information at this point in time, yes.

Q. Okay. And what you're saying is that there was economically material information that had not been disclosed at this point in time as of the start of the class period and it's the information that we've been talking about?

MR. MANDEL: Object to form.

CONFIDENTIAL

Page 134

DR. M. CAIN - CONFIDENTIAL

A.    Yes.  It includes all this information we're talking about.

Q.    Okay.  Now, I want you to assume that nothing else changes in those underlying facts.  Emerson doesn't buy any more shares.  Emerson just doesn't do anything.  It -- other than what it has already done.  And the only thing that changes is that time marches on.

So, no new facts, and Emerson doesn't write a letter saying it withdraws its offer, you know, withdraws its proposal.  Nothing happens other than time marches on, okay?  So that's my hypothetical for you.

A.    Okay.

MR. MANDEL:  I object to the form; and I do not understand the hypothetical, yeah.

MR. COMERFELD:  Okay.

Q.    So my question for you is, at what point does the information that the Plaintiffs are alleging should have been disclosed become not economically material

CONFIDENTIAL

Page 135

DR. M. CAIN - CONFIDENTIAL anymore?

MR. MANDEL:  Object to form.

A.    If that was the factual record that I evaluated, I would conduct all of the analysis using the same tools and techniques that I've employed that I would attempt to reach an opinion.  That's quite different from the factual record that I've evaluated for purposes of forming the opinions in my report.

So, ultimately I don't have -- I have not formed an opinion in your hypothetical scenario.

Q.    So tell me how you would go about calculating the date at which there is no longer undisclosed economically material information in the possession of National Instruments?

MR. MANDEL:  Object to form. Assumes facts not in evidence.

A.    Again, I would begin with the allegations that would be set forth in the Complaint.

I would incorporate any

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL understanding provided or guidance provided by the motion to dismiss opinion, by a class certification opinion.

I would gain any additional understanding from counsel. And then I would look at the, the information environment itself and the factual record and attempting --

And I would -- I guess I would go through the same objective methodologies that I summarized, for example, in Paragraph 18 of my Merits Report.

I would look at that timeline of the information environment.

I would apply the fundamental principles of finance, economics valuation and mergers and acquisitions analysis, but consider whether there was an event study analysis that would interact with the hypothetical scenario.

I would look at evidence from financial analysts or financial media.

So the same tools and techniques, but applying that to a

CONFIDENTIAL

Page 137

DR. M. CAIN - CONFIDENTIAL
completely different setting to form the opinions.

Q.    And what you would be trying to do is to calculate the date at which the information that has not been disclosed becomes no longer economically material, right?

MR. MANDEL:  Object to form. Assumes facts.

Q.    Because that's what I'm asking you to do?

A.    Well, again, if that was my -- if that was the scope of my engagement, then I would attempt to do that.  But that's not the scope of any engagement in this case, so I can't.

Q.    Are you aware of any academic source that addresses the question of when undisclosed economically material information becomes no longer economically material solely due to the passage of time?

MR. MANDEL:  Object to form.

A.    Well, I think -- I think that the academic research does speak to this

DR. M. CAIN - CONFIDENTIAL type of question, so it depends on the context or the setting.

So, you've got research studies on earnings announcements, or guidance updates or repetition of sale information, redisclosure or repackaging of sale information. There's studies on long run returns, you know, decaying models, leakage models. There's a lot of studies.

But, again, I think the -- my starting point in this case is the allegations that are laid out in the Complaint that this information was allegedly omitted throughout the class period and I'm not providing any sort of legal conclusions. I defer to the jury and the finder of fact in terms of that actual question of was there, in fact, liability related to that, that question, over the course of my period of time.

Q. So do I understand you to be saying that you did not attempt in your work in this case to determine when the allegedly undisclosed information would

DR. M. CAIN - CONFIDENTIAL

become no longer economically material due to the passage of time?

MR. MANDEL:  Object to form.

A.    Well, what I conclude is that the information was economically material throughout the class period in this case, and I quantify the impact on the stock price throughout the class period in this case.  I also explain that in January of 2023, that disclosures were made, that provided information into the stock price.

But beyond that, I'm not offering any opinions outside the scope of my report.

THE WITNESS:  And in the next few minutes would probably be a good time for another break.

MR. MANDEL:  I was just going to say that, can we take a break?

MR. COMERFELD:  Yes.  Let me just ask one or two more questions.

Q.    So you don't have any opinion about when the information that is at issue in this case that's allegedly undisclosed

CONFIDENTIAL

Page 140

DR. M. CAIN - CONFIDENTIAL

would have become no longer economically material due to the passage of time?

MR. MANDEL:   Object to form.

Q.    Is that correct?

A.    Well, I do have the opinion that the economic materiality persisted throughout the class period in this case, and that obviously after the end of the class period, the information environment continued to evolve, right, in terms of additional higher offers and things of that nature.

So, that's all certainly consistent with my analysis really through, certainly through January 2023 with the event study analysis which demonstrates the economic materiality of the information as of January 2023.

And then obviously then the ultimate stock price paid of $60 per share. So that's all -- all the way through the end in this case, all the way through the end of the class period, there's price impact based on other things, like the

Page 141

DR. M. CAIN - CONFIDENTIAL
public announcement of $53 per share, the increased offer price at $60 per share, but those things go beyond the class period.

So, my opinions about the economic materiality of the alleged omissions and the impact on the price covered the class period in this case.

Q.    Right.  And you didn't make any effort to study or analyze the point in time at which the allegedly undisclosed material information would become no longer economically material just due to the passage of time?

MR. MANDEL:  Object to form. Including it's asked and answered.

Q.    I understand your answer to be no, and I just want to make sure the answer is no.

You have not studied that, you're not offering an opinion about that, you weren't asked to offer an opinion about that, correct?

MR. MANDEL:  Object to form.

A.    That's not correct.  So I point

CONFIDENTIAL

Page 142

DR. M. CAIN - CONFIDENTIAL

you to my previous answer.  I do explain that the economic materiality certainly persisted throughout the entire class period in this case in that that same level of price impact is also supported through January and beyond, but ultimately the opinions about damages aren't limited to the class period.

Q.    Right.  But as far as reaching an end date of when the undisclosed information would become no longer economically material, you didn't do that, right?

MR. MANDEL:  Object to form.  Again, asked and answered.

A.    Again, in this particular case, it's certainly material, economically material through January 2023 when public disclosure was made and beyond that point in time it's in the stock price at that point.

Q.    After the disclosures in January 2023?

A.    Correct.

CONFIDENTIAL

Page 143

DR. M. CAIN - CONFIDENTIAL

Q.    Right.

A.    And what I'm saying is, it's economically material through that point in time.

Q.    Right.  But you weren't asked to calculate and you didn't try to calculate the point in time at which, if no other facts changed, if the January disclosures had not been made, just time marches on with the fact of the May 2022 offer and the June 2022 rejection and then the June 2022 offer and the August 3rd -- 2nd, 2022, rejection and the facts surrounding those two proposals and rejections, if those facts that were not disclosed during the class period just persisted and nothing else changed and then ████ ██████ ████ ███████ ██████████ ███████ █████, that's now in the fact record but nothing else changes and time marches on.

At what point do those undisclosed facts become no longer economically material, and what you're

DR. M. CAIN - CONFIDENTIAL

telling me is you haven't analyzed that, right?

MR. MANDEL: Objection. Asked and answered. Mischaracterizes the record.

A.    So I did answer -- we've talked about this with the previous questions, so if you're talking about some other hypothetical situation that's quite different from this situation, I would agree that I have not evaluated some other hypothetical scenario. But I have evaluated the factual record in this particular case.

Q.    Right. But you didn't evaluate the hypothetical situation that I've been asking you about, which is if no facts change and time marches on, when does the information become stale? When does it become no longer economically material?

And what I hear you saying is you just didn't analyze that; is that fair?

MR. MANDEL: Objection. Asked and answered. Misstates the record.

CONFIDENTIAL

Page 145

DR. M. CAIN - CONFIDENTIAL

A.    Again, it's the same answer as I've previously given.  You keep asking me the same questions over and over.

MR. MANDEL:  We would like to take a break, John.

MR. COMERFELD:  I know.  But I feel like I just want to tie this off.

Q.    So either you looked at it, you didn't look at it, or you couldn't -- you just can't tell me.  I just want to know when.

Did you figure out when the information would become no longer economically material?

MR. MANDEL:  Objection.  Same thing.  Assumes facts.

A.    In this particular case, given everything we know about this case, I've concluded that the information was economically material throughout the class period and continuing through the public disclosures in January 2023.

Q.    Okay.  So -- but beyond the

CONFIDENTIAL

Page 146

DR. M. CAIN - CONFIDENTIAL

class period, if no -- no facts had changed, the January disclosures had not happened and just time marches on past the class period, you don't have an end date to tell me where this information that was not disclosed becomes no longer economically material, correct?

MR. MANDEL:  Objection.  Same series of objections.  It's asked and answered now like a dozen times.

A.    What I've said is I have not evaluated some other hypothetical situation that differs from the facts at evidence in this case.

Q.    Okay.  I understand that to be -- to mean you don't know when this information would be no longer economically material in the hypothetical the way I've posed it, fair?

MR. MANDEL:  Objection.  The witness doesn't know about your understanding.

A.    It's the same answers as before.  I'll stick with those.

CONFIDENTIAL

Page 147

DR. M. CAIN - CONFIDENTIAL

Q.    Okay.

MR. COMERFELD:  We can go off the record.

MR. MANDEL:  Let's go off the record.

VIDEOGRAPHER:  We are off the record.  The time is 11:49 a.m.

(Whereupon, a short recess was taken.)

VIDEOGRAPHER:  We are back on the record.  The time is 12 p.m.

MR. COMERFORD:  Dr. Cain, I'm handing you what I've marked as Exhibit 7 to your deposition (handing).

(Whereupon, Handwritten notes was marked as Cain Exhibit 7 for identification as of this date.)

Q.    These are handwritten notes front and back.  There's a date written on the first page of June 14th, 2022.

Do you see that?

A.    I do.

Q.    Okay.  And did you look at this

Page 148

DR. M. CAIN - CONFIDENTIAL document in forming your opinions in this case?

A.    Yes.

Q.    And this date of June 14th, 2022, is after Emerson made its first proposal on May 25th, 2022 and it's before National Instruments conveyed its first rejection on June 16th, 2022.

Do you agree with that?

MR. MANDEL:  Object to form.

A.    I do recall -- I believe those dates are consistent with my recollection.

Q.    Okay.  And so what's your understanding of this document?

A.    So these are handwritten notes. I think I talk about these in Paragraph 47 of my Merits Report.  I explain that these internal notes appear to outline alternative scenarios for how the transaction might progress, and including the contemplation of a second rejection, followed by the possibility of a public bid eventually increased -- Emerson increasing their offer, culminating in a transaction.

CONFIDENTIAL

Page 149

DR. M. CAIN - CONFIDENTIAL

And these notes further underscore that a proposed transaction remained active and unresolved.

Q.    And that's -- that phrase you write in your report, you say that this document that was created on or about June 14th, 2022 underscores the proposed deal remained active and unresolved.  It is limited to the date this document was created, right?

MR. MANDEL:  Object to form.

A.    Well, it's certainly a characterization I give of that document.

I also have a footnote that is from an internal document on September 13th, 2022, which says next wine night is on me regardless of what Nuthatch does to both of our paths.  So I think I do kind of connect it to some later pieces of evidence.

But, yes, I do recall these notes being dated as of June 14th.

Q.    Okay.  And so what these notes mean is that as of June 14th, the -- a

DR. M. CAIN - CONFIDENTIAL proposed deal between National Instruments and Emerson remained active and unresolved, right?

MR. MANDEL: Object to form.

A. Well, the notes say what they say. I'm not providing any further interpretations, but that is one of the things that I describe from the notes, yes.

Q. Okay. And so these -- these were created, one page was created by Karen Rapp and the other page was created by Kevin Ilcisin and they were both employees of National Instruments; do you understand that?

MR. MANDEL: Object to form.

A. That is my understanding, yes.

Q. And I want you to assume anything on these pages was created on or about June 14th, 2022, okay?

A. All right.

Q. All right. And these people don't have any supernatural powers that you're aware of, right?

MR. MANDEL: Object to form.

CONFIDENTIAL

Page 151

DR. M. CAIN - CONFIDENTIAL

Assumes facts not in evidence.

A.    Not that I'm aware of.

Q.    So if you're sitting there on June 14th, 2022, creating this document, you have no idea what's going to happen the next day.  It's just, Emerson could have said you know what, forget it, we withdraw our proposal.

Like, that would be in the realm of possibility when you're sitting here on June 14th, 2022, creating this document.  Is that fair?

MR. MANDEL:  Object to form.

A.    I'm not providing any sort of opinions on the state of mind of any of these individuals at this point in time or any point in time.

Q.    Okay.  All this document shows is that as of June 14th, 2022, two people were making guesses about what was going to happen in the future, right?

MR. MANDEL:  Object to form.

A.    No.  I think that's inconsistent with my description in

CONFIDENTIAL

Page 152

DR. M. CAIN - CONFIDENTIAL

Paragraph 47.

Q.    How so?

A.    So I was explaining that this -- these notes provide details of their forecast for how alternative scenarios might progress, including participated timing, pricing, revised offer, increasing offer, potential to go public.

So those are the types of things I'm pointing to from the notes.

Q.    Right.  And when these two people created these notes on June 14th, 2022, they didn't have any information about what would actually happen after they created the notes, right?

MR. MANDEL:  Object to form.

A.    But, again, I think that's outside the scope of my opinions.

Q.    Okay.  You understand the nature of this document is this is a guess, maybe it's a best guess.  But it's -- it's a guess made on June 14th, 2022, about what would happen in the future; is that fair?

CONFIDENTIAL

Page 153

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to form.

A.    No.  I'm just going to stick with my previous answers.  I'm not opining about their state of mind, but I -- again, I think that this reflects some forecasting of alternative scenarios, how that can play out.

But beyond that, I'm not opining on their state of mind when they were writing this down in terms of whether they were making guesses or not.

Q.    Okay.  This document gets created on June 14th, 2022, and then it -- then it exists and it doesn't live -- it doesn't change after June 14th, 2022.  Do you agree with that?

MR. MANDEL:  Object to form.

A.    Well, again, I do document some evidence --

Q.    Hang on --

A.    -- in September a bit --

Q.    That's a super simple question.

A.    Sorry.  I wasn't finished with my answer.

CONFIDENTIAL

Page 154

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Let him finish.

A.    So I do document some evidence going forward to September 13th of 2022 that is still commenting on these --

Q.    That's a different document.

A.    -- topics.  I agree that is a different document.

Q.    Okay.  So the document that we marked as Exhibit 7, which was created on June 14th, 2022, there's no testimony that was altered before June 14th, 2022, correct?

MR. MANDEL:  Object to form.

A.    I don't know one way or another.

Q.    Okay.  How does this shed any light on future events on what happened afterwards?

MR. MANDEL:  Object --

Q.    It's just a document that's created at a point in time upon June 14th, 2022, right?

MR. MANDEL:  Object to form.

A.    Okay.  So I guess what I would

CONFIDENTIAL

Page 155

DR. M. CAIN - CONFIDENTIAL

say is that this document is consistent with my opinions on the economic materiality of the alleged omissions, and it's also consistent with my opinion that -- my ultimate opinion that the stock price would have traded at at least $48 per share had the allegedly omitted information been disclosed.  The forecasts of how this -- these alternative scenarios could play out are all consistent with that.

For example, on the first page, they have a final price of $61 per share, on the second page forecasted the final price of $58.50 per share, which is right around where the ultimate offer ended up at $60 per share.

So this is all consistent with -- you know, one of the things that I talk about throughout my reports is that merger transactions along that spectrum of friendliness and hostility still go through multiple rounds of offer rejections before reaching a final price on average.

And so this is one of those

CONFIDENTIAL

Page 156

DR. M. CAIN - CONFIDENTIAL documents that's consistent with those types of things I'm explaining in my reports.

Q. The testimony from the witnesses was that this was an attempt to forecast what would happen if a deal was struck?

MR. MANDEL: Object to form.

Q. Are you aware of that?

MR. MANDEL: Mischaracterizes the record.

A. I don't recall. I don't have their testimony memorized. You would have to point me to it.

Q. Okay. As of August 12, 2022, first date of the class period, would you agree with me that the predictions in this document that was created on June 14th, 2022 were inaccurate?

MR. MANDEL: Object to form.

A. I'm not really sure what you mean, but --

Q. Were the predictions that were made on June 14th, 2022 correct as of

CONFIDENTIAL

Page 157

DR. M. CAIN - CONFIDENTIAL

August 12th, 2022?

MR. MANDEL:  Object to form.

A.    That's not an opinion I attempted to form one way or another.

Q.    All right.  You talk about -- in your Reply Report you talk about the fact that National Instruments raised its guidance in 2022, and I'll take you to Paragraph 56 of your Reply Report.  It's on Page 33 and there was a heading that says, "NI's 2022 Q2 Earnings Release on July 28th, 2022."

Do you see where I read that?

A.    Yes.

Q.    And then you write:  Professor Goodwin claims that NI's decision to raise its guidance in the Q2 2022 earnings release would reduce the likelihood of a merger, but as noted in my Merits Report, Emerson explicitly cited NI's raised guidance as part of its rationale for increasing its offer to $53 per share on November 3rd, 2022.  Accordingly, this guidance is consistent with the economic

CONFIDENTIAL

Page 158

DR. M. CAIN - CONFIDENTIAL
materiality of the allegedly omitted
information to investors.

Q.    Do you see that?

A.    Yes.

Q.    Okay.  Help me understand what
you mean by that.

A.    Yeah, so in this section of my
report, I'm responding to Professor
Goodwin's second report and I go throughout
this section and respond to a number of
Professor Goodwin's points when he attempts
to provide a certain sort of subjective
interpretation of internal documents.

So, for example, he speculates
that National Instruments' guidance
revision would have reduced the likelihood
of a merger.  And what I explain is that in
fact Emerson actually pointed to the
guidance as part of its rationale for
increasing its offer price to $53 per
share, and this is consistent with the
economic materiality of the allegedly
omitted information, the price impact that
is expected as of the class period, and it

DR. M. CAIN - CONFIDENTIAL
also supports my opinion that the stock price would have traded at $48 or higher.

Q.     Isn't it reasonable to think that if a company without increased guidance causes its share price to go up that that would deter a potential acquirer because now it has to pay more for the company it's trying to acquire?

MR. MANDEL:  Object to form.

A.     No.  I don't think that's necessarily a conclusion that would follow from that sort of hypothetical question.

Q.     Would it be reasonable, though, to think that?

MR. MANDEL:  Object to form.

A.     I think there's a lot of different possibilities.  So, for example, when an acquirer purchases a target company, they're purchasing something that they perceive as having a certain value.

So if a target company is perceived as being more valuable than the principles of finance and valuation analysis and mergers and acquisitions

CONFIDENTIAL

Page 160

DR. M. CAIN - CONFIDENTIAL

analysis that I explain in my reports would indicate that they're able to pay more money for a company.

So that a company is more valuable than they -- are potentially going to be willing to pay more money to get that value, so it really just depends on the specific circumstances.

Q.    Do you think it's unreasonable in early August of 2022 for someone at National Instruments to believe that the increased guidance and the increased stock price of National Instruments made a transaction with Emerson less likely?

MR. MANDEL:  Object to form.

A.    So ultimately I'm not opining on the state of mind of anyone at National Instruments.  I do know that there's -- there were internal documents.  They may have debated whether this could be part of a strategy to extract a higher offer from Emerson which, again, to the extent that guidance change was in any way driven by information that they had about Emerson's

DR. M. CAIN - CONFIDENTIAL interest in acquiring the company, that only serves to further underscore and strengthen my opinion that that information was important and economically material to the company and its investors.

If they're making decisions about guidance with Emerson in mind, that strengthens the connection between the allegedly omitted information and the stock price itself.

Q.    I don't think there's been any testimony about that at all.

MR. MANDEL:  Object to form and misstates the record.

MR. COMERFELD:  Well, I'm just putting it on the record that I don't think the witness' characterization of the fact witness's testimony is accurate.

MR. MANDEL:  Same objection.

A.    Is that a question?  Do you want me to go through my reports to point you to it or --

Q.    No.

CONFIDENTIAL

Page 162

DR. M. CAIN - CONFIDENTIAL

A.    Okay.

Q.    All right.  Let's talk about the event study that you did.  You studied two dates, January 13th, 2023 and January 17th, 2023, right?

A.    Yes.

Q.    And I'm going to hand you a document that I'm marking as Exhibit 8. This is a National Instruments press release dated January 13th, 2023, the title of which is, "NI Announces Commencement of Strategic Review Process."

(Whereupon, Press release, "NI Announces Commencement of Strategic Review Process" was marked as Cain Exhibit 8 for identification as of this date.)

Q.    Do you see that?

A.    Yes, I do.

Q.    Okay.  Is this the disclosure of information on January 13th, 2023 that you analyze in your event study?

A.    I believe so, yes.

Q.    And what National Instruments

CONFIDENTIAL

Page 163

DR. M. CAIN - CONFIDENTIAL

is saying here is that it is:  Announcing that its board of directors has initiated a review and evaluation of strategic options in consultation with its financial and legal advisers with the intent to unlock and maximize shareholder value.  The comprehensive review will include consideration of a full range of available strategic business and financial alternatives, including solicitation of interest from potential acquirers and other transaction partners, some of whom have already approached the company.

Do you see that?

A.    Yes.

Q.    Okay.  So, but -- in plain English, what National Instruments is saying at the end of that first paragraph is someone has already approached us about a strategic business or financial alternative or a potential acquisition or transaction.  Is that just a fair kind of paraphrasing of it?

MR. MANDEL:  Object to the

CONFIDENTIAL

Page 164

DR. M. CAIN - CONFIDENTIAL

form.  Misstates the document.

A.    Well, part of what they're saying in this paragraph is they're open to considering opportunities including, you know, potential sale of the company to an acquirer.

Q.    And they're also saying here someone has already approached us about something.  Fair?

MR. MANDEL:  Object to form. Misstates the document.

A.    I do say some of whom have already approached the company.

Q.    Okay.  So that was information that had not been disclosed previously by National Instruments, right?

MR. MANDEL:  Object to form.

A.    Not to the best of my recollection.

Q.    Okay.  And this is after Emerson had delivered its third proposal to National Instruments on November 3rd, 2022, where it increased its offer price to $53 per share, correct?

CONFIDENTIAL

Page 165

DR. M. CAIN - CONFIDENTIAL

A.    I believe so, yes.

MR. COMERFORD:  All right.  And then I'm going to hand you what we'll mark as Exhibit 9 (handing).

(Whereupon, SEC Schedule 14A Proxy Statement was marked as Cain Exhibit 9 for identification as of this date.)

Q.    This is -- you recognize this document?

And before you say anything, I printed the first roughly eight pages of this.  It's a much longer document.  I just printed the first eight pages and then I stopped printing to make it shorter.

This is a SEC Schedule 14A proxy statement filed by Emerson Electric Co.

Do you see all that?

A.    Yes.

MR. MANDEL:  Can I ask how long the original document was?

MR. COMERFELD:  Longer than this.  I only printed the first, I

CONFIDENTIAL

Page 166

DR. M. CAIN - CONFIDENTIAL

think, eight pages.

MR. MANDEL:  But this is a substantially longer document.  The real one is a lot.  It's not just like a couple of pages that are missing.

MR. COMERFELD:  Correct.

MR. MANDEL:  Okay.  Thank you.

Q.    And the longer one is available to counsel, and I just printed the first several pages because that's all I want to ask you about.  So we see on the sixth page which is labeled as Exhibit 1 to Schedule 14A, an announcement by Emerson, right?

A.    Yes.

Q.    And there's a byline, St. Louis, Missouri, 2023.

Do you see that?

A.    Yes.

Q.    Yes.  And the title of this is, "Emerson Announces Premium All-Cash Proposal To Acquire National Instruments for $53 Per Share."

That's at the very top.

CONFIDENTIAL

Page 167

DR. M. CAIN - CONFIDENTIAL

A.    Yes.

Q.    All right.  And it notes that that is a cash premium of 32 percent over NI's closing share price on January 12th, 2023.

Do you see that?

A.    Yes.

Q.    Okay.  And is it fair to say that this is the January 17th, 2023 information disclosure that you studied in your event study?

A.    Yes, it is.

Q.    All right.  So at this point in time, my understanding of the facts is that Emerson had made a third proposal to National Instruments in November of 2023 after the class period where it -- where it had raised its proposed price at $53 per share, and National Instruments had not taken action on that proposal at this point of January 13th, 2023.  Is that fair?

MR. MANDEL:  Object to form.

A.    They have not accepted the proposal.  That's my recollection.

CONFIDENTIAL

Page 168

DR. M. CAIN - CONFIDENTIAL

Q. Okay. I -- my understanding of the facts is that NI had not communicated back to Emerson anything of substance regarding the November 3rd, 2022 proposal by this point in January of 2023. Is that fair?

MR. MANDEL: Object to form and misstates the facts.

A. I don't recall that. That goes beyond the class period information environment that I've been focused on in my reports.

Q. Okay. And it's -- all right.

Do you agree with me that the information that National Instruments disclosed on January 13th was different than the information that it could have chosen to disclose at the beginning of class period in August of 2022?

MR. MANDEL: Object to form.

And I'm sorry, your question pertains to January 13 you said or January 17?

MR. COMERFELD: January 13th.

CONFIDENTIAL

Page 169

DR. M. CAIN - CONFIDENTIAL

A.    I would agree that this is not a mirror image disclosure, but I'm not sure -- if there's a certain portion of this that you think the company could not have disclosed previously, I would be happy to look at that with you.

Q.    Well, in August of 2022, National Instruments had not initiated or reviewed an evaluation of strategic options, right?

MR. MANDEL:  Object to form.

A.    I don't -- off the top of my head, I don't know if they had been engaged in any strategic evaluations of options at that point in time.

Q.    Okay.  And in August of 2022, National Instruments had not decided to solicit interest from potential acquirers or other transaction partners, correct?

MR. MANDEL:  Object to form.

A.    Again, I don't know if they had decided to solicit any interest from other acquirers at any point in time.

Q.    Well, in January 13, 2023, NI

Page 170

DR. M. CAIN - CONFIDENTIAL
is announcing to the world that it has decided to solicit interest from potential acquirers and other transaction partners, correct?

A.    That's part of what they announce, yes.

Q.    Okay.  And that's different than what could have been announced by National Instruments in August of 2022 under the facts that existed at that time, right?

A.    Again, I --

MR. MANDEL:  Object to form.

A.    I don't have knowledge of whether they had decided or could have decided to engage in solicitation from other acquirers so I -- ultimately, I don't have an opinion on that question one way or another.

Q.    Okay.  Now I want to ask you about Emerson's disclosure of information on January 17th, 2023, which we've marked as Exhibit 9.  The disclosure that Emerson makes here of the fact that it had made a

CONFIDENTIAL

Page 171

DR. M. CAIN - CONFIDENTIAL

proposal to acquire National Instruments for $53 per share is different than the information that National Instruments could have disclosed as of the beginning of the class period in August of 2022.

Is that fair?

MR. MANDEL:  Object to form.

A.    I would agree that it's not a mirror image disclosure, but I do think that it has some of the same information included in it that Plaintiffs allege could have been disclosed as of the start of the class period.

Q.    But share price was different.

A.    The offer price was higher at this point in time.

Q.    All right.  So for purposes of your event study, you're analyzing the disclosure of information in January of 2023 that is different than the allegedly omitted information that existed in August of 2022, fair?

MR. MANDEL:  Object to form.

A.    Again, some of it is the same

CONFIDENTIAL

Page 172

DR. M. CAIN - CONFIDENTIAL

and some of it is different.  It's not a mirror image but the economic -- there are many economic components that are the same.

Q.    And the price of the proposal that was disclosed in -- that you put into your event study was $53 per share, correct?

A.    The event study does measure the full disclosure in January, which was at a price -- well, it included the previous offers of $48 per share but it also included a $53 per share offer.

Q.    Your event study includes a disclosure of a $48 per share offer?

A.    No.  The disclosure itself on January 17th --

Q.    Yeah.

A.    -- does include the initial $48 offer on May 25th, 2022.  That includes a statement that it's not subject to any financing conditions, includes indications of their interest in acquiring the company.

So, like I said previously, it includes many of the pieces of information

CONFIDENTIAL

Page 173

DR. M. CAIN - CONFIDENTIAL

that were allegedly omitted as of the start of the class period.

Q. Okay. And you agree with me that you were using this event study where an offer price of $53 was disclosed, and you're saying that that's relevant to the alleged omissions, the August 2022 period, where there was a much lower proposal that had been put in front of National Instruments and that National Instruments had already rejected, fair?

A. I think what I'm saying is a little bit different from that.

Q. How so? How is it different?

A. So what I'm saying is that information that was disclosed on January 17th includes some of the allegedly omitted information, as would the start of the class period, but it's not a mirror image disclosure. It includes other information, but that an event study analysis is still relevant for assessing the economic materiality of the alleged omissions.

CONFIDENTIAL

Page 174

DR. M. CAIN - CONFIDENTIAL

So, asking questions like do investors find its value relevant that another company is interested in acquiring National Instruments at a premium to the current stock price, and it's very clear from the event study results that the answer is yes, that that type of information is value relevant for investors.

Q.    Which economic components are -- of the $53 per offer per share proposal are the same as the economic components of the two $48 per share proposals?

MR. MANDEL:  Object to form.

A.    Sure.  So the previous proposals, my recollection is that they communicated an offer of $48 per share and another offer of $48 per share, as well as a willingness to increase the offer above that price, that there was -- that these were cash offers, that they were substantial financial certainty, ability to pay interest in acquiring the company.

And so there's a lot of overlap

CONFIDENTIAL

Page 175

DR. M. CAIN - CONFIDENTIAL with these pieces of allegedly omitted information and what was included in this July 17th disclosure.

Q.    Do you have an opinion as to whether the $53 per share proposal that was made in November of 2022 was better, worse, or the same as the $48 per share proposal that was made earlier in May and June of 2022?

MR. MANDEL:  Object to form.

A.    Well, I don't have an explicit opinion in my reports, but I would certainly agree that $53 is higher than 48 or 48-plus something.  It's not explicitly calculated at that point in time.

Q.    So the question of whether one proposal is improved over the other is reflection of the price per share?

MR. MANDEL:  Object to form.

A.    That can be part of it.  Also, you can look at the premium.  You can look at financing -- our ability to pay.  You can look at toeholds, stakes in the company.  Interest level, regulatory

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL
requirements.  So there's a lot of
different factors that can go into
evaluating different proposals.

Q.    You cite some academic
literature in your reports, and I wanted to
as you a few questions about it.

You cite some studies that talk
about stock pricing having a positive
reaction to tender offers, correct?

A.    I believe so.

Q.    And there was no tender offer
before or during the class period in this
case, correct?

MR. MANDEL:  Object to form.

A.    I believe that is correct.
There's same type of economic information
in terms of taking an offer to
shareholders, but I believe that it was
completed through a merger transaction and
not a tender offer.  That's my
recollection.

Q.    Right, okay.  And then let me
ask you about the, the event study again.

You -- do you agree with me

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

that a difference between the two $48 proposals and the $53 proposal was that the two $48 proposals had already been rejected at the beginning of the class period, whereas the $53 proposal had not been rejected as of the date of the event study? Do you agree that that's the difference?

MR. MANDEL:  Object to form.

A.    Well, I think there are a lot of differences between all three of those proposals, but I think that the implication is that in this January 17th disclosure, the implication was that National Instruments has also not accepted the $53 proposal and that's why they're taking it to go public with the offer.

Q.    Okay.  All right.  So back to some of the studies.  In your Merits Report, I want to ask you to look at Paragraph 108, which is on Page 43.  And you talk about market re-evaluation in response to acquisition interest.  Sort of the topic that's going on here; is that fair?

CONFIDENTIAL

Page 178

DR. M. CAIN - CONFIDENTIAL

A.    Yes.

Q.    And you cite a study from Jindra and Walkling, right?

A.    Yes.

Q.    Okay.  And I think you say -- you go on in Paragraph 108 to say:  These market dynamics reflect investors' expectations that the initial offer may undervalue the firm and that additional bids or improvements are likely.  The authors also find this effect is more pronounced in hostile deals and when bidders employ toehold strategies.  These findings underscore the importance of acquisition offers, not only as standalone events but also as signals that initiate further market activity and repricing.

Do you see all that?

A.    I do.

Q.    And what you're citing for that is Jindra and Walkling from 2024?

A.    2004.

Q.    2004, thank you.

A.    Yup.

CONFIDENTIAL

Page 179

DR. M. CAIN - CONFIDENTIAL

Q.    All right.  So basically you're saying a target company's share price typically rises when news of a tender offer and merger completion is made public, right?

MR. MANDEL:  Object to form.

A.    Well, what I'm explaining in this section of my report is that information about acquirers' interest in paying a premium to obtain a target company, that information is economically material.  That has an impact on company stock prices.

And in this particular paragraph, I'm explaining that frequently target companies' stock prices increase above a current offer price because there's an expectation that there's going to be additional bidding rounds that will take place in the public sphere.

Q.    And is that true even when a proposal has been rejected twice?

MR. MANDEL:  Object to form.

A.    Absolutely.  That's something I

DR. M. CAIN - CONFIDENTIAL document in my own academic research. I've studies hundreds of merger and acquisition transactions and a typical transaction goes through multiple stages of offer rejections and increased prices.

And that's actually why we frequently see the target stock prices going up higher than current offer prices because investors understand there is a likelihood that offers will be rejected and bidders will be required to provide higher prices.

Q. Have you cited any sources that specifically studied what happens to a stock price when two proposals have been made and the target company has rejected both of them?

MR. MANDEL: Object to form.

A. Well, those types of cases would be included in my own research as discussed in Paragraph 107, and those types of cases would also be included in this study, Paragraph 108, and many of these other academic studies.

CONFIDENTIAL

Page 181

DR. M. CAIN - CONFIDENTIAL

Because, again, after studying hundreds of transactions and the negotiations that take place, it's very, very common to have multiple rounds of rejections as part of the longer process of engaging with a transaction.

Q.    Which study that you consider authoritative looks at the effect on the target company's stock at the time where two proposals have been made and there have been rejections of both those proposals, which studies look at the effect of a stock price at that point in time?

MR. MANDEL:    Object to form.

A.    So, again, many -- Bruner, the textbook somewhere is there's 25 different academic studies, so hostile -- some of those relate to hostile takeover attempts and tender offers, which virtually always -- well, very, very frequently comes after target or multiple target rejections of an acquirer's interest in purchasing a target company.

(Whereupon, "Applied Mergers &

CONFIDENTIAL

Page 182

DR. M. CAIN - CONFIDENTIAL

Acquisitions," Robert F. Bruner, was marked as Cain Exhibit 10 for identification as of this date.)

Q.    All right.  So you're referring to Bruner.  I printed a portion of the -- I want to ask you about this.  I tried to print enough of the beginning so you can see that this is from copyright 2004, Robert F. Bruner, and then I've printed a selection of pages and put it in front of you.

And you have pages from this textbook in the materials that you relied on, right?

A.    Yes.

Q.    Okay.  So I want to ask you to look at Page 690 of this textbook which I've printed, and I'm acknowledging I have not put the whole textbook in front of you so we're going to start with Page 690.

A.    Okay.

Q.    There is this section called, "Initiating discussions, gaining an early sense of the possibilities."

CONFIDENTIAL

Page 183

DR. M. CAIN - CONFIDENTIAL

And the second paragraph says: The target's response to the buyer's initial pitch is a crucial inflection point.

Let me stop you there.

Do you consider this text to be authoritative in your field?

A.    Well, I would say that there are many findings that are discussed in the text that are relevant.  That type doesn't mean that I would accept everything that's cited in this or any textbook without, you know, further consideration.

Q.    Okay.  You do cite this textbook in your reports, correct?

A.    Yes, I do.

Q.    And you consider this to be an authoritative text in your field?

A.    Again, I consider it to be reliable, but I wouldn't just accept everything that's said at face value without further consideration of the context.

Q.    Okay.  So Bruner writes on

CONFIDENTIAL

Page 184

DR. M. CAIN - CONFIDENTIAL

Page 690:  If the target CEO is neutral or favorably disposed to the pitch, he or she will typically ask for time to consult advisers and propose a meeting in a few days or weeks.  This hiatus will give the target time to engage advisers to submit initial research on the buyer, brief the board, and set strategy.

Now, let me stop there.

Do you agree with me that in this case, where we're talking about National Instruments, that was not the CEO's behavior.  He -- he, Eric Starkloff, did not ask for time.  He simply wrote back and rejected the proposal, fair?

MR. MANDEL:  Object to form.

A.    My recollection is that the board of directors was involved with the rejections in this case.

But I guess what I would say is, this section of the textbook is not really engaging with the facts of this case because this -- these paragraphs are talking about friendly negotiations.  I

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

point out in my reports the different section of this textbook that talks about hostile attempts, which is very different from this -- this section and I think different, you know, like I said, the facts of this case involve an element of hostility.

Q.    Well, the next sentence of the paragraph we're reading from in this section says:  If the target has a strong desire -- strong prior desire to remain independent, or at least not to merge with the buyer, the target CEO will express a strong and clear no.  This is the famous "just say no" defense.  It must be grounded in some belief that transaction is not in the interest of the target's shareholders and/or that the target has some other strategy that dominates the buyer's idea.

Now, that is what happened in this case regarding the first two proposals from Emerson that were sent in May and June of 2022.

Do you agree with that?

CONFIDENTIAL

Page 186

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to form.

A.    No.  I disagree.

Q.    Why?

A.    So this is something I explain in my Reply Report, because Professor Goodwin attempts to characterize this case as falling under Bruner's description of the "just say no" defense.  But if you look at, there's a Footnote 4 in this paragraph, and if you look at Page 701, the last page you printed out in Footnote 1, Bruner describes this "just say no" characterization as CEO's rejecting merger proposals without bringing them to the board of directors.  My recollection is that the board of directors was involved in this -- in the timeline that was present in this case.

Q.    Okay.  So you think that the "just say no" defense involves only the CEO making the decision without consulting the board.  Is that fair?

A.    No.  What I'm explaining is that Professor Goodwin relies on this

Page 187

DR. M. CAIN - CONFIDENTIAL
characterization of the "just say no"
defense.  He points these cites explicitly
to the Bruner textbook, and what I'm
explaining in my Reply Reports is he's
mistaken when he's providing that type of
characterization.

Q.    Have you heard this "just say
no" phrase in the mergers and acquisitions
context prior to this case?

A.    I have heard it, yes.

Q.    What do you understand it
means?

A.    I have not attempted to form an
explicit definition of that phrase.

Q.    Okay.  Do you have an opinion
on whether the "just say no" defense must
involve the board's consideration or not?

A.    I don't have an opinion, one
way or another, outside the -- again, my
opinions are really on this topic in terms
of rebuttal opinions responding to
Professor Goodwin.

Q.    Okay.  Bruner on 690, at the
beginning of the third paragraph, writes:

CONFIDENTIAL

Page 188

DR. M. CAIN - CONFIDENTIAL
Following your rejection, most merger proposals die.

Do you see that?

A.    Yes, I do.

Q.    Do you agree with that statement?

A.    I think it's possible that within certain contexts, again, Bruner is talking about purely friendly negotiations. I suppose if he's setting this up to be limited to purely friendly negotiations, then a rejection within that context of a friendly negotiation would constitute an end to those friendly negotiations.

But I think, again, this is something that Professor Goodwin takes completely out of context in attempting to characterize this as having broader applicability outside of that very narrow scope of purely friendly negotiations in which these paragraphs are discussing.

MR. MANDEL:  I just want to object that the question itself takes that sentence you're asking about out

CONFIDENTIAL

Page 189

DR. M. CAIN - CONFIDENTIAL

of context.

Q. So the second paragraph here on Page 690 says: If the target has a strong prior desire to remain independent or at least not to merge with the buyer, the target CEO will express a strong and clear no. This is the famous "just say no" defense -- and then the sentence goes on from there.

My question is, is a -- when the response is no to a proposal, is that part of a friendly negotiation?

A. Well, I think what -- in this paragraph, Bruner seems to be describing an end to friendly negotiations if a target says no. And he goes on to talk about buyers going to the board, directly to shareholders, hostile takeovers, and then that leads into this other section of the textbook which certainly interacts with the timeline of events in this case.

So, I think it's important to keep all of those things in mind when looking at this section of his textbook.

DR. M. CAIN - CONFIDENTIAL

Q.    Okay.  So if what Bruner writes here is true, that following a rejection most merger proposals die, wouldn't it be even more true that following two rejections of proposals that were made at the same price per share, that those merger proposals definitely die?

MR. MANDEL:  Object to form.  Misstates the record.

A.    So one of the --

MR. MANDEL:  Incomplete hypothetical.  Lacks foundation, et cetera.

A.    One of the things that I explain is my own academic research documents on average merger negotiations go through at least five rounds of rejections before they reach an agreed upon offer price.

So I think that Professor Goodwin is really trying to take this sentence completely out of context, and I explain that, in fact, my own research studying hundreds of transactions

Page 191

DR. M. CAIN - CONFIDENTIAL
demonstrates that on average the typical
transaction actually has multiple rounds of
rejections before being signed in terms of
an agreement.

Q.    You think most transactions
involve one or more rejections initially?

A.    My research documents on
average over five rounds of rejections, so
for the average across over a thousand
different merger negotiations.

Q.    Okay.  At the bottom of
Page 690, Bruner writes:  Up to this point,
the two sides have little to show for their
efforts but an agree on the oral agreement
of the possibilities of merger.

And what he's talking about is
the point at which an offer and a target
will be doing first-round documents?

Is that a fair description?

MR. MANDEL:  Object to form.

A.    So I think that, again, he's --
this is a continuation of the previous
section that's talking about purely
friendly negotiations.  But he's talking

CONFIDENTIAL

Page 192

DR. M. CAIN - CONFIDENTIAL about oral agreement, possibilities of a merger, and then he goes on to talk about different documents that they may sign within that purely friendly timeline.

(Reporter clarification.)

In the context of a friendly timeline.

MR. COMERFORD:  I want to show you what I'm marking as Exhibit 11.

(Whereupon, "Mergers Acquisitions and Corporate Restructurings" was marked as Cain Exhibit 11 for identification as of this date.)

Q.    This is a text called, "Mergers Acquisitions and Corporate Restructurings." Author is Patrick Gaughan.

Do you see that?

A.    Yes.

Q.    Are you familiar with this text?

A.    Yes.

Q.    This is 2007?

A.    Yes.

CONFIDENTIAL

Page 193

DR. M. CAIN - CONFIDENTIAL

Q.    Yes.  And do you consider this text to be authoritative in your field?

A.    I have reviewed it previously. I prefer the Bruner text.  I think the Bruner text is more on point with a number of documents, but certainly I'm sure that there's things within the Gaughan textbook that I would still agree with.

Q.    Okay.  On Page 230, which is -- 230 and 231 are the only pages of this text that I printed for you today.

A.    Okay.

Q.    There's a section called "Just Say No" in quotation marks, and Gaughan writes:  In the most basic form of antitakeover defense, the target refuses to be taken over, simply hiding behind its poison pills and other defenses and stating that it will not deactivate them.  It will not bring the offer before the shareholders.

How does that relate to what happened in this case?

A.    I guess this description of the

CONFIDENTIAL

Page 194

DR. M. CAIN - CONFIDENTIAL
defense seems not consistent with the
factual record that I reviewed, because
it's talking about a poison pill that's
been issued and outstanding and stating
publicly that it has more optimistic plans
for the future of the company.

So I do think this description
of that defense seems to not fit the actual
record here.

Q.    Well, we know that National
Instruments rejected Emerson's proposals
that were made in May and June, and then we
know that National Instruments issued
improved guidance in late July 2022
regarding its plans for the future of the
company, right?

MR. MANDEL:  Object to form.

A.    That's part of their takeover
defenses?

Q.    No.  As part of issuing
guidance to the public.

MR. MANDEL:  Object to form.

A.    My recollection was that there
was some discussion that that may have been

CONFIDENTIAL

Page 195

DR. M. CAIN - CONFIDENTIAL

part of their strategy in dealing with Emerson, so I'm not sure that I could entirely agree with your characterization.

Q.    All right.  Look at Page 231 of the Gaughan text.  It says, "Just Say No Reconciled With Revlon Duties.  The "just say no" defense allows directors to reject a bid as inadequate or not in the company's long-term interests without putting the company up for sale in an auction.  The just say no defense is a post-Revlon concept that target company directors often rally toward when confronted with an unwanted takeover bid.

Do you see that?

A.    I see that.

Q.    Okay.  Do you agree with me that this text says that the "just say no" defense is something that can involve the board of directors and not merely the CEO?

MR. MANDEL:  Object to form.
Takes this out of context.

A.    Well, I guess in the context of this paragraph, it's referring to directors

CONFIDENTIAL

Page 196

DR. M. CAIN - CONFIDENTIAL

rejecting one bid in favor of a different bid, which would -- I think be the context that seems to be discussing this in this paragraph.

Q.   My question is simply, do we agree that the "just say no" defense as it's talked about in the academic literature, can involve the target CEO and can also involve action by the target's board?

MR. MANDEL:  Object to form. Misstates the record.  Misstates the literature.

A.   I think I would just stick with my rebuttal opinions against Professor Goodwin in terms of characterizing National Instruments as engaging in the "just say no" defense as defined by the Bruner textbook.

Q.   You're just not going to react to what the Gaughan text says?

A.   Well --

MR. MANDEL:  Object to form. Argumentative.

CONFIDENTIAL

Page 197

DR. M. CAIN - CONFIDENTIAL

A.    I'm reacting to -- ultimately that portion of my report is reacting to Professor Goodwin's opinions.  My -- I guess what I would say is my opinions are not contingent upon the definition of the "just say no" defense because what I explain in my report is that -- and Bruner explains this, that throughout the process, people tend to use confidentiality.  They use code names.  They engage in a lot of strategies to attempt to keep information from becoming public because they recognize that that will have an impact on stock prices.

So, ultimately elements of hostility are still consistent with my opinions on the economic materiality of the allegedly omitted information in this case.

Q.    Okay.  You refer to the fact that you have done research that shows that many acquisitions involved up to five rounds or an average of five rounds.

A.    I think it was an average of a little over five rounds.  Some go through

DR. M. CAIN - CONFIDENTIAL

far more.  Some go through less.

Q.    Is it true that the transactions that you studied were all transactions where an acquisition was consummated?

MR. MANDEL:  Object to form.

A.    I would have to go back and look at the study.  I think some of those may have included failed transactions as well, but I would to go back and check.

Q.    Do you agree with me that there are many instances where a strictly confidential and private proposal was sent, like Emerson did on May 25th, 2022 and June 22nd, 2022, and the target company rejects the confidential and private offer and no one ever learns of it.  Do you agree that sometimes that happens?

MR. MANDEL:  Object to form.

A.    Well, it's a little difficult to agree that something happens that nobody is ever able to observe.  But I do -- I would say that -- I would not rule out on the possibility that there are certainly

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

cases in which a target says no and the acquirer says okay.

They walk away, they turn their backs and then there's no further monitoring or engagement or further steps of escalation or anything like that. I'm sure those types of things may happen.

Q. And will you agree with me that in your academic research it's not possible to take those instances into account because they don't become publicly known?

MR. MANDEL: Object to form.

A. I disagree. I've observed when I was conducting my study of hundreds of merger negotiations, those are disclosed in the background of the merger sections of proxy statements. They will also provide many times further histories that go further back in time.

And so they'll say that party A approached us. We met for dinner. We said no. We are interested in remaining independent, not interested in your outreach. And then the two parties have no

CONFIDENTIAL

Page 200

DR. M. CAIN - CONFIDENTIAL
further meetings or discussions after that point in time.

Q. So what you're saying is that sometimes private proposals that are rejected end up being disclosed maybe in an anonymized way in a proxy statement?

A. Yes. And that actually happened in the National Instruments proxy statement as well. They talk about a party A and other anonymized bids that were taking place during the overall process here.

Q. Do you agree with me that it's possible that there are many private proposals that are rejected that don't end up then some day being publicly disclosed in a proxy statement?

MR. MANDEL: Object to form.

A. Well, I would have to speculate on that question.

Q. Okay. Would that throw off the percentages in your research?

MR. MANDEL: Object to form. Lacks foundation.

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

A.    No.  I don't believe so.  I think that my percentages are accurate for what I'm -- how I'm characterizing the study.

So I would say that the description of the study is for transactions that proceeded to that point of public disclosure.  Here is how the rounds of offers and rejections look, and within that sample.

Q.    Okay.  So someone looking at that sample needs to be mindful of the fact that there may be many private proposals that were rejected by the target that just never see the light of day and therefore they are not taken into account in your study, fair?

A.    Well, that would be a different sample.  That's not the focus of our study.

Q.    Okay.

A.    But I certainly agree that there are -- and I've reviewed evidence of this multiple times when one party approaches another they say no and they

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

part ways and there's no further discussions.

Q.    You were saying earlier that the Bruner text only deals with purely friendly negotiations.

Did you say that?

MR. MANDEL:  Object to form.

A.    Well, I said that that paragraph that you were issue did that Goodwin is pointing to and Denis -- that they're pointing to is talking about friendly negotiations.

But then at the end that opens the door to hostility, and there's a separate section in the textbook that talks about friendliness and hostility being a spectrum of bargaining tactics which -- with further support for what I explain in my report.

Q.    As for the start of the class period, August 12th, 2022, would you characterize Emerson's approach to National Instruments as purely friendly?

MR. MANDEL:  Object to form.

CONFIDENTIAL

Page 203

DR. M. CAIN - CONFIDENTIAL

A.    So I guess I would point you to that section of the Bruner text that talks about really friendliness or hostility are in the eyes of beholder, and those are just bargaining tactics that different parties employ in an attempt to maximize their gains from mergers.

So I think that there's not a black and white.  The Bruner text and the Comment and Schwert paper would explain that there's not a black and white distinction between friendliness and hostility.  There's really a spectrum.

Like I've said, I think my own research demonstrates that even in friendly mergers, there's an element of hostility because of those rejections that take place over the course of negotiations.

So I think in this case, this is very consistent with that research all points to in terms of rejections constituting some degree of hostility.

Q.    So was -- how would you characterize Emerson, Emerson's approach as

CONFIDENTIAL

Page 204

DR. M. CAIN - CONFIDENTIAL

of August 12th, 2022?

MR. MANDEL:  Object to form.

Q.    In terms of friendly, hostile, or somewhere in between?

A.    I don't believe that I asked that specific question in either of my reports.

Q.    How would you characterize Emerson's approach as of its November 3rd, 2022 proposal of $53 per share in terms of whether it was friendly, hostile, or somewhere in between?

MR. MANDEL:  Object to form.

A.    Again, I have not attempted to answer that specific question in my reports.

Q.    Okay.

MR. MANDEL:  We should take our lunch break, too, whenever is a good moment.

MR. COMERFELD:  Now is fine if you guys want to.

MR. MANDEL:  Sure.

VIDEOGRAPHER:  We are off the

CONFIDENTIAL

Page 205

DR. M. CAIN - CONFIDENTIAL

record.  The time is 1:04 p.m.

(Whereupon, a short recess was taken.)

VIDEOGRAPHER:  We are back on the record.  The time is 1:35 p.m.

MR. COMERFORD:  Okay, Dr. Cain. I want to hand you what I'm marking as Exhibit 12.

(Whereupon, Presentation, "Project Wolverine, Meeting of the Board of Directors, Wachtell Lipton Rosen & Katz, June 14th, 2022 was marked as Cain Exhibit 12 for identification as of this date.)

Q.    This is a presentation titled, "Project Wolverine, Meeting of the Board of Directors, Wachtell Lipton Rosen & Katz, dated June 14th, 2022."

Do you see that?

A.    Yes.

Q.    And is this your understanding that this is a presentation that lawyers from the Wachtell law firm gave to the National Instruments Board of Directors at

DR. M. CAIN - CONFIDENTIAL

a meeting on June 14th, 2022?

A.    I believe so, yes.

Q.    Okay.  So I want to ask you to go back to the page, it's marked NAT-SL-22998.  It's Page 12 of the presentation.

A.    Okay.

Q.    Have you reviewed this document before?

A.    Yes.

Q.    So what I understand this to be is lawyers from the Wachtell law firm are giving a presentation to the National Instruments Board of Directors, and they're giving the directors some background information ██████ █ ██████ ████ ███████ ██ ████ █ ██████ ███████ ██████████ .

Is that how you understand it?

MR. MANDEL:  Object to form.

A.    Give me just a second to skim this slide (perusing).  Okay.  Yes, I think that's a fair summary of the slide.

Q.    Okay.  And do you share my understanding that this were -- Nuthatch

DR. M. CAIN - CONFIDENTIAL

was a code name for Emerson?

A.    Yes.

Q.    All right.  So what the lawyers from the Wachtell Lipton law firm are telling the directors of National Instruments here is ███ ███████ ██ ████████ ████████ ████████ ████████ █ ████ ████ ██ ████ █ ████████ █ ████████ ████████ ████████ ██ ████ ██ ████ █████ , that I'm reading the first bullet point.

Do you see that?

A.    I do.

Q.    And then the second bullet point says: ███ ███████ ███████ ████ ████ ███████ ████ ██ ████ █ ████████ ████████ ████████ ████ ██ ████ ████████ ████████ ████████ .

Do you see that?

A.    Yes.

Q.    Okay.  And then it goes on to say that: ███ ████████ ████ ███████ ████ █ ████████ ████ ██ ████ ████████ .

Do you see that?

DR. M. CAIN - CONFIDENTIAL

A.    So I see ███ ████ ███████ ██ ███████ ██████ ███████ ██ ███████ ████ █ ███████ ██████ ██ ███████ ██ █ █ ███████ ███████ █ ███████ █████ █ ███████ ██████ yes.

Q.    Okay.  And it says:  ██ ███████ █████ ███████ ████ ███████ ███████ █████ ███████ █████ ████ █ █ ██ ██ █████ █ ██████

Do you see that?

A.    Yes.

Q.    And then the last bullet point says:    ██ ███████ ████ ███████ ███████ ██ ██ ████ ███████ ███████ ███████ ███████ █ ████ █ ███████ ██ █ ███████ ██████ █ ███████ ██████████.

Do you see that?

A.    Yes.

Q.    Okay.  So do we agree that on June 14th, 2022, the lawyers that had been retained by National Instruments were telling the board of directors of National Instruments that ██████ ███ ██ ██████ ████ ██████ ██ ██ ████ ████ ████ ███████ ████ █

Page 209

DR. M. CAIN - CONFIDENTIAL

███████ █ █ ███████ ████ █ █████ █

█ ██████ ███ ██████ █████ ██████

█ ██ ███ █████ ██ █ █████ █

█ █████ ██████ █ ████ █

█ ███████ ████ █ ██████

█ ████████

MR. MANDEL:  Object to form.

A.    So I agree these summarized this transaction.  I don't think that the last bullet point necessarily gives the totality of the information around that withdrawal.  It does cite one of those points.

But, yes, they are describing one historical example from ██████

█ ██████ ██ █████ ██████

Q.    And do you know whether Emerson ever reengaged with Rockwell Automation after November 28th, 2017?

A.    I don't know one way or another.

Q.    In your work in this case and generally, have you seen instances where a company makes a proposal to a target

DR. M. CAIN - CONFIDENTIAL company and the target rejects the proposal and then the company making the proposal just withdraws and never returns?

MR. MANDEL: Object to form.

Q. You have seen that multiple times, right?

A. Well, I think what we were talking about before the break was in the private, nonpublic context, and I think here this is different in the sense that there was a public disclosure and potentially significant parties impact from the public disclosure still impacting the price.

But I have seen, like I said before, I have seen instances of withdrawn transactions, and those are included in some of my own empirical academic work.

Q. Okay. Let's go two more pages, and then in the lawyer's presentation to the board on June 14th, 2022, they -- the lawyers talk ████ █ ██████ ████ ████ ██████ ███ █████████ ██ ██ ██████ ."

Do you see that?

DR. M. CAIN - CONFIDENTIAL

A.   Yes.

Q.   And the lawyers say: ▮ ▮
▮ ▮ ▮ ▮ ▮ ▮ ▮
▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮
▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮
▮ ▮ ▮ ▮ ▮ ▮ ▮
▮ ▮ ▮ ▮ ▮ ▮
▮ ▮

        Do you see all that?

A.   Yes, I do.

Q.   And it goes on from there to talk about ▮ ▮ ▮ ▮ ▮
▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮
▮ ▮ ▮ ▮ ▮ ▮
▮ ▮ ▮ ▮ ▮ ▮
▮ ▮ ▮ ▮ ▮ ▮ ▮
▮ ▮ ▮

        Do you see that?

        MR. MANDEL:  Object to form.
Mischaracterizes the document.

A.   I see ▮ ▮ ▮ ▮ ▮
▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮
▮ ▮

Q.   Okay.  In August and September

CONFIDENTIAL

Page 212

DR. M. CAIN - CONFIDENTIAL
of 2022, did National Instruments know
whether Emerson was going to make a third
proposal?

MR. MANDEL:  Object to form.

A.    I cite to certain documents in
my reports that include testimony from
executives, management and executives that
talk about their expectation of increased
offers.  We talked about the handwritten
notes that talked about scenarios that
included increased offers.  But beyond
that, I don't have any opinions about what,
in fact, management knew inside of their
head at any point in time.

Q.    All right.  One thing you talk
about in your reports is the idea of
toehold.

What's a toehold?

A.    A toehold is when a company
acquires a stake or a number of shares of
another company's stock.

Q.    Okay.  And I think you -- you
render -- I don't know if it's -- well, let
me ask.

DR. M. CAIN - CONFIDENTIAL

Is it an opinion or just a statement that ███████ ████████████ ██ █ █ █████████ ██ █ ████████  Are you just kind of offering that as a rebuttal to go by, or is that one of your opinions?

MR. MANDEL: Object to form.

A. So I talked in a few different places in my reports about the toeholds. In my Opening Merits Report, in Paragraph 135, I note that academic research documents that target stock prices frequently trade above offer prices. This is more pronounced in hostile transactions when bidders accumulate target share ownership, which is a toehold. The economic materiality of the allegedly admitted information, as well as my calculation of the but-for price, also includes the fact that National Instruments had retained MacKenzie to monitor the accumulation of that toehold in the company's shares.

So that is some of the information that is included in what I'm

CONFIDENTIAL

Page 214

DR. M. CAIN - CONFIDENTIAL
pointing to when I form my opinions about the economic materiality of the alleged omissions.

Q.   Okay.   Let me ask you to look at Paragraph 109 of your Merits Report, which is on Page 44.

A.   Okay.

Q.   And you say:  Toeholds also play a meaningful role in the probability of deal completion.  Academic research finds that when a bidder holds an ownership stake in the target, prior to or during negotiations, the likelihood of a successful acquisition increases.  Betton and Eckbo, 2000, report that "the probability of a successful single bid contest increases with the toehold."  Similarly, Walking, 1985, concludes that "increased ownership of target firm shares by the bidder increases the probability of success."

Do you see all that?

A.   Yes.

Q.   All right.  And in

CONFIDENTIAL

Page 215

DR. M. CAIN - CONFIDENTIAL

Paragraph 110, you say:  Toehold investments also provide bidders with strategic advantages.  They can acquire shares at a lower average price before a formal bid is made and gain voting rights to influence corporate governance. ████████ ████████████ ██ █ ███████ █ █ ███████████ █████████████is therefore not only consistent with these findings but also would enhance the credibility of its offer by signalling serious intent and increasing the likelihood of a successful engagement.

Do you see all that?

A.    Yes.

Q.    All right.  Now, the studies that you're citing, as I understanding it, the Betton and Eckbo study and the Walkling study were in the context of public tender offer situations, right?

MR. MANDEL:  Object to form.

A.    I would have to look back at their specific example and definitions to refresh my memory of exactly how they defined their samples.

CONFIDENTIAL

Page 216

DR. M. CAIN - CONFIDENTIAL

MR. COMERFORD:  Okay.  Let me hand you what I'm marking as Exhibit 13 to your deposition.

(Whereupon, "Toeholds, Bid Jumps and Expected Payoffs in Takeovers" was marked as Cain Exhibit 13 for identification as of this date.)

Q.    This is from your file.  It's Bates numbered starting with CAIN 991.  Is this the paper from Sandra Betton and B. Espin Eckbo that you cite in your Merits Report?

A.    Yes.

Q.    And the title is, "Toeholds, Bid Jumps and Expected Payoffs in Takeovers."

Right?

A.    Yes.

Q.    And you can see that this was published in 2000.  That's down at the bottom, right?

A.    Yes.

Q.    Okay.  And then the small print

CONFIDENTIAL

Page 217

DR. M. CAIN - CONFIDENTIAL
at the beginning, it's kind of a smaller
font size.  Is that the -- would you call
that an abstract?

        A.    Yes.

        Q.    All right.  And the authors
say:  We estimate sequentially outcome
probabilities and expected payoffs
associated with first, second, and final
bids and a large sample of tender offer
contests.

              Do you see that?

        A.    Yes.

        Q.    All right.  And on Page 842,
second full paragraph, they write:  This
article provides evidence on the size and
impact of premiums and toeholds on outcome
probabilities and expected payoffs using a
comprehensive sample of 2,335 takeover bids
taking place in 1,353 tender offer contests
from 1971 to 1990.

              Do you see that?

        A.    Yes.

        Q.    All right.  So do you agree
with me that the Betton and Eckbo source is

CONFIDENTIAL

Page 218

DR. M. CAIN - CONFIDENTIAL
about the effect of toeholds and tender
offer contests?

    A.    Well, it includes, certainly
includes tender offers.  It may also
include tender offers that proceeded to
tender offer for final completion.  And
they're also pointing to numerous other
academic studies that echo the topics here
in the broader mergers and acquisitions
context as well.

            So I think it's important to
recognize that this study is building on
the existing academic literature on the
economic significance of toeholds.

    Q.    Are you aware of anything that
would make you think that the Betton and
Eckbo paper that you rely on is analyzing
any data other than tender offer contests?

            MR. MANDEL:  Object to form.

    A.    So, again, so if you were to
turn to Page 846, they describe their
sample as a bidder filing of 14d statement
with the SEC which forms the initial sample
source.

CONFIDENTIAL

Page 219

DR. M. CAIN - CONFIDENTIAL

So, like I said previously, many times those tender offers actually form the completion of a merger -- a friendly negotiated merger transactions, so that's -- this certainly would not -- even if a merger is completed via tender offer, those friendly negotiated mergers would still be part of this type of sample.

Q.    And the sentence you just read from on Page 846 is in a section called, "Sample Selection and Contest Characteristics" and then "Sample of Tender Offer Contests."

Do you see that?

A.    Yes.

Q.    All right.  So do you agree with me that, as of the class period and throughout the class period in this case, which is certain dates in August and September of 2022, there was no tender offer involved between Emerson and National Instruments?

MR. MANDEL:  Object to form.

A.    I believe there was no formal

Page 220

DR. M. CAIN - CONFIDENTIAL

tender offer, but it would include the types of information environment described in this sample at the bottom of Page 46.

Q.   All right.

A.   So it discusses -- it says: Their procedure identifies all bids for the target during a moving 7-month window including unsuccessful initial merger bids that were followed by a 14d tender offer.

So it does clarify that it would include those types of rejections that are at issue in this case.

Q.   Only if they made it to the tender offer stage?

A.   If they made it to the tender offer stage, then those previous merger bids that were rejected would be included, yes.

Q.   So I'm going to ask you the same question again.

If we go through the end of the class period, there was no tender offer bid in this case, right?

A.   That's my recollection.

Page 221

DR. M. CAIN - CONFIDENTIAL

Q.    All right.  Now, you know ████ ████ ████ ████ ████ █ ████ ████ ████  Do you agree with me it was after it made its proposals on May 25th, 2022, and June 22nd, 2022?

A.    Top of my head, I don't have the exact date memorized ███ ███ ███ █ ████ ███ ████

Q.    Do you agree with me that Emerson never informed National Instruments, either prior to or during the class period, that ████ ██ ████ █ █ ████ ██ ████ ████ ?

MR. MANDEL:  Object to form.

A.    I recall National Instruments getting information about that, but my recollection is that that information did not come directly from Emerson.

Q.    I think the record shows that at some point in time, prior to the beginning of the class period, ████ █ ████ ████ ████ ████ █ █ ████ █ ████ ████ ████ █ █ █ ████ ████ █ ████ ████

CONFIDENTIAL

Page 222

DR. M. CAIN - CONFIDENTIAL

Are you familiar with that?

A.    I am -- I am familiar with ███████ ████████ ████████ , yes.

Q.    ███ ███ ████ ████ ███████ ███ ███ ████████ ████ ████ to be a significant toehold?

MR. MANDEL:   Object to form.

A.    What do you mean by "significant"?

Q.    I mean, how would you characterize that in relation to the other toeholds that you have looked at in the literature in your own work?

A.    Okay.

Q.    Are you looking at the Betton and Eckbo paper?

A.    Yes.  So one of the things that I explain in Paragraph 78 of my Reply Report is that this toehold size of between 1.3 percent falls within the range of toehold studied in the academic literature. So this is consistent with toeholds.  One of the things the study also explains is they have greater data availability on

CONFIDENTIAL

Page 223

DR. M. CAIN - CONFIDENTIAL
toeholds that exceed the reporting requirements.

So if a bidder acquires a stake of over 5 percent and if that triggers a public disclosure, then it's easier to disclose toeholds that are larger. But even on that smaller spectrum, this range does fall within the samples that are studied in academic literature on toeholds.

Q.    Do you agree that even if a bidder begins to acquire a toehold and has a toehold, that doesn't mean that the bidder is going to be successful in acquiring the target, right?

A.    Yes. I would agree that there are times where bidders are ultimately unsuccessful in acquiring targets even though they have substantial ownership in the target companies.

Q.    On Page 850 of the Betton and Eckbo paper, bottom paragraph, they write: We classify a target management reaction to bids based on information in the WSJI and the 14d filings.

Page 224

DR. M. CAIN - CONFIDENTIAL

Do you see that?

A.    Yes.

Q.    And then they -- they have three ways they categorize the target company's management response; supportive, neutral, or opposed, right?

A.    Yes.

Q.    And they say:  Opposed is when the target management states that the offer is unfair, fraudulent, inadequate, unfriendly, that it is suing or otherwise intending to fight the takeover or that it is received or been denied in injunction against the bidder.

Do you see that?

A.    Yes.

Q.    Then they write:  With these definitions, target management a poses the initial bid and 30 percent of the total sample.

Is that right?

A.    That's what they say, yes.

Q.    Okay.  And do you agree with me that, in this case, that we're talking

DR. M. CAIN - CONFIDENTIAL about involving Emerson and National Instruments, National Instruments is the target and management opposed the initial bid, fair?

A.    I think that's fair, yes.

Q.    Okay.  So that only happened in 30 percent of the sample that was studied in this paper, right?

A.    Well, it's actually quite different, I think, because this is based on public -- public disclosures and how the target company responded publicly.

But I do agree that -- and actually one of the things that I explain in my reports is that management opposition is actually part of a -- frequently part of a bargaining strategy to extract a higher offer from a company and that the research shows that target company stock prices tend to rise even higher and extract higher takeover premiums when they do employ some amount of resistance.

So I think even though this is a different study in a different context, I

CONFIDENTIAL

Page 226

DR. M. CAIN - CONFIDENTIAL

think that the resistance is -- I do agree that there was certainly an element of resistance in the National Instruments case.

Q.   Let me ask you to look at Page 858 of the Betton and Eckbo paper, and what it is is the second part of Table 4 of the paper.

A.   Okay.

Q.   The first part of Table 4 is on 857 and the second part is on 858?

A.   Okay.

Q.   And the way I understand this is they're providing data about these tender offer contests that they studied and in Section 3, they talk about target management opposed scenarios.

A.   Yes.

Q.   And then they have columns under single bid contests, right?

A.   Yes.

Q.   And then on the far left column, it says 0 equals X and there's numbers wherein a column marked SU and all.

CONFIDENTIAL

Page 227

DR. M. CAIN - CONFIDENTIAL

Do you see that?

A.    Yes.

Q.    And then 0 less than X, less than five is the next row.

Do you see that?

A.    Yes.

Q.    All right.  So the way I'm reading this table is that what they're trying to do is put their -- the data that they studied into a table where they're talking about the initial bidder toehold percentage being listed in the first column and characterizing it as 0 or as between 0 and 5 or between 5 and 20, et cetera.

Do you agree with me?

A.    Yes.

Q.    All right.  And so in this instance involving Emerson and National Instruments, ███ ████ █ ██████ █ ███ ██ ███ ███ █ █████ █████ █████ ██ ██████ █ █████ █ ██ █ █████, fair?

A.    Again, not withstanding that I don't think this transaction has all the identical characteristics to fit into these

CONFIDENTIAL

Page 228

DR. M. CAIN - CONFIDENTIAL

categories but, yes, I think  ▆▆▆ ▆▆▆▆▆▆ ▆ ▆ ▆▆▆ ▆ ▆▆ ▆▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆ ▆▆▆▆ ▆▆▆ ▆ ▆▆▆ ▆ ▆ ▆▆▆▆▆

Q.    And then what they indicate is that of the 15 single bid contests that they studied, five were situations where the first bidder wins the contest and ten were situations where no bidder wins the contest and the target is not taken over. Is that correct?

A.    I believe so.

Q.    All right. So based on this study, from in a tender offer contest where the toehold is between 0 and 5 percent, the bidder only won in 5 out of 15 times. Is that a fair interpretation of this part of the paper?

MR. MANDEL:  Object to form.

A.    I think in contests where there was only one bid, which obviously is different, there's separate columns for multiple bid contests which would be more relevant to this case. But in those other single bid contests, it looks like 5 out of

DR. M. CAIN - CONFIDENTIAL
15 or 33 percent of those resulted in a successful take over.  Probability is obviously much higher a multiple bid contest like this one.

Q.     As I understand it, omitted ████████████████ ████ ██ ██████████ ██████ ██ ██ ████ ████████ ██ ██ ██████ ██████ ████ ████ , and National Instruments became aware of it.  Is that also how you understand the facts?

MR. MANDEL:  Object to form.

A.     That's my recollection.

Q.     And is it your -- do you have an opinion that ████ ██████ ██ ████████████ ██ ██████ ███████ ████████ was part of the allegedly omitted information that's at issue in this case?

MR. MANDEL:  Object to form.

A.     Well, I think it's something I explain is, provides further support for the economic materiality of that information.  You know, I cite to internal documents, deposition testimony, describing the Emerson's approach is coercive, hostile, exerting pressure, and expecting

DR. M. CAIN - CONFIDENTIAL
to have an impact on the stock price.

So I think it's related to your question, but I don't recall an explicit allegation in the Complaint that National Instruments was required to disclose the toehold in a vacuum.

Q.   Okay.  So Emerson's toehold is not part of the alleged omissions that you've been analyzing in this case then; do we agree with that?

MR. MANDEL:  Object to form.

A.   Like I said, I think it certainly interacts with the alleged omissions in terms of the economic materiality.

Q.   Do you contend ███ ████████ ██ ████ ██████ ████████ █ ███████ █████████ ██ ██ ██ ███████ █████ █████ was nonpublic information?

MR. MANDEL:  Object to form.

A.   My recollection is that it was not publicly known at that point in time.

Q.   How did National Instruments become aware of it?

CONFIDENTIAL

Page 231

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to form.

Q.    If you know.

A.    It's something, I think, that I point to in my report, so on Paragraph 74 of my Merits Report I state that on █████████ █████ ████ █████ ████████████ ███ █ ███████ ██ █████████ ██████ ██ ███████ █ ████ ██████ ██ ████████ ████████ ██ █████████ ████ ██ █ █████████ █ ██████ ████████████ ██ █████ ██ █ ████ █ ████ █ ████████████.

Q.    So would you agree with me that because of a third party is informing National Instruments of this fact that it's not nonpublic information?

MR. MANDEL:  Object to form.

A.    Can you -- couple negatives.  I want to make sure I understand what you're asking, so --

Q.    Yes.  You understand that the allegation in the Complaint is that there was material nonpublic information that was not disclosed by National Instruments prior to and during the class period, right?

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

A.    Yes.

Q.    Okay.  Do you agree with me that ███  ████  ███  ██████  ███  ███████ █ ██████  ██████  █  ███  ███████████  ██████  █ █ █████████  ██████████  ██  █  ██████  ██████ ██ , was not nonpublic information because MacKenzie Partners knew it, Emerson knew it?

MR. MANDEL:  Object to form. Calls for legal conclusions.

A.    I don't believe -- I'm not aware of that information having been publicly disclosed by that point in time to investors in a public forum.

Q.    If something is known to a stock surveillance firm like MacKenzie Partners though, does it qualify as material nonpublic information in your view?

MR. MANDEL:  Object to form. Calls for legal conclusions.

A.    I'm not qualified to provide any assessment of material nonpublic information or the legal definition of

DR. M. CAIN - CONFIDENTIAL

that.

Q.    All right.  Are you aware that National Instruments contends that it disclosed to the Wachtell Lipton Katz & Rosen law firm ███ ████ ███ ██████ ███ ███████ █ ██████ ██████ ███ ███████ ███ ███████ ██ ██ ████ ████ ███?

MR. MANDEL:  Object to form.
      Misstates the record, assumes facts
       not in evidence.

A.    I think I would have to have you point me to specific documents.  I don't recall off the top of my head.

Q.    Did you read the deposition of Eddie Dixon?

A.    Yes.

Q.    Do you remember Mr. Dixon testifying that Wachtell was informed of what National Instruments had learned that ███ ██ ████ █████ ██ █████ ███ ██ ██ ██████ ██ ██ ████ █████?

MR. MANDEL:  Object to form.

A.    I don't have his deposition memorized, so I guess I would need you to

CONFIDENTIAL

Page 234

DR. M. CAIN - CONFIDENTIAL

put that in front of me if you want me to take a look at it.

Q.    Okay.  Are you aware that Mr. Dixon and others who have been deposed in this case testified in substance that after ███████ ████████ ██ ██████████ █████████ ██ ██ ████ ████ ██████ █████ ██ ██ ██ ████ ████ █ ███ , the lawyers at Wachtell told National Instruments that it was okay to resume its share repurchasing; are you aware of that testimony?

MR. MANDEL:  Object to form.

A.    Again, I don't have everybody's testimony memorized so I would need you to point me to it.

Q.    All right.  Do you know ███ ████ ████████ ████████ ██ ██ ████ █ ██████ ██████ ██ ████ ██████ ████████ ? 

A.    █ ██████ ████████ ██ ██████ █████████ ████████ █ ████ ████ ██████████ ██████ █ ██████ █████████ ██████████ █ ████ ██  Beyond that, I would have to look at additional documents to refresh my recollection.

Page 235

DR. M. CAIN - CONFIDENTIAL

████████ off the top of my head.

Q. Okay. If Emerson did not ████████ ████ ████████ ████ █████ ████ ███████ █ ████ , you know, until basically the transaction happened, would that indicate that Emerson had lost interest and it was no longer pursuing National Instruments?

MR. MANDEL: Object to form. Incomplete hypothetical, assume facts not in evidence.

A. So I guess I would give you a two-part answer. The first part is I am not opining on what anyone thought at any point in time. The second thing that I would point you to is just examples of testimony that I have quoted in my Reply Report of Paragraph 18 in which Dixon, Kevin Ilcisin, Michael McGrath, Shawn Liu, stated that ██████ ██████ ███████ █

Page 236

DR. M. CAIN - CONFIDENTIAL
coercive tactic and a hostile strategy to
apply added pressure on the target company,
and that they were advised that the
████████████ ██ ████ █ █ ███████
█ ██████ ████████ ██ ██ ██ ██ █
█ ██████ ███ █ █████ ████ █████, but
I'm certainly just quoting what they've
said; and I'm not providing any sort of
opinions on their state of mind.

Q.    Okay.  All right.  I want to
ask you about Bank of America's engagement
because you talk about this a little bit in
your report.

MR. COMERFORD:  I'm going to
mark the June 10th, 2022 letter from
Bank of America to National
Instruments as Exhibit 14.

(Whereupon, June 10, 2022
letter was marked as Cain Exhibit 14
for identification as of this date.)

Q.    Have you seen this before?
A.    Yes.
Q.    Do you know that this letter
has a ██████ █ ████ ████████ ████ █

Page 237

DR. M. CAIN - CONFIDENTIAL

████████ █ ███████ █ ███████ █████████ ?

A.    Yes.

Q.    And you've read Paragraph 4 of this letter prior to the deposition today, right?

A.    Yes.

Q.    Okay.  So in Paragraph 4, Bank of America says that: ████ ██ ███████

Page 238

DR. M. CAIN - CONFIDENTIAL

███████  ██████  █████████  ███████  ██████  ██████████

██  ███████  ████  █████  █████  █████████████

Do you see that?

A.    I do.

Q.    Would you agree with me that what that is is fairly characterized as an agreement to agree?

MR. MANDEL:  Object to form. Calls for legal conclusions.  Is asking the economist expert witness to interpret a contract.

A.    No.  I don't think that I would agree to that characterization.

Q.    Why not?  They're referring to

████████  ████████  ██████  █████  ██████  █████  ██████  ██████  █████

██  █████████  ███████  ██████████  █████  █████  ██████

██  ██████  █████  █████████  ███  █████████  █████  ████████

██  ████████████  Is that fair?

MR. MANDEL:  Same objection. Misstates the document and calls for legal conclusions.

A.    I think I would just stick with the words that are on the paper here.

Q.    The June 10th, 2022 engagement

DR. M. CAIN - CONFIDENTIAL letter between Bank of America and National Instruments does not set the fee that Bank of America will be paid in the event there's a change of control transaction in the next 12 months.

Do you agree with that?

MR. MANDEL:  Object to form and all the same objections I've been listing.  You're mischaracterizing the document and asking for legal conclusions.

A.    You know, the words on the paper say that █████ █████ ██ █████████ █████ ███ ████████████ ███ █████████ ██ ███ ███████ ██ ██████ ████████ ██████ █████ ██ ███ ████████ ███████ ██ ████████

So, again, I would just stick with the words on the document.

Q.    That leaves a lot of room for interpretation, though, right?

MR. MANDEL:  Object to form. Lacks foundation.

A.    That I don't have an opinion on one way or another.

CONFIDENTIAL

Page 240

DR. M. CAIN - CONFIDENTIAL

Q.    I mean, what's customary in the eyes of beholder to you may be different than what's customary to me, fair?

MR. MANDEL:  Object to form if for numerous reasons.

A.    Again, I don't have an opinion on that.

Q.    There's no specific dollar amount in the June 10th, 2022 engagement letter regarding the fee to be paid if there's a change of control transaction, correct?

A.    It does not explicitly state the dollar amount of the point to customary fees.

Q.    It's basically saying ██ ██
██ ████████ ██ ██ █ █████ █ █████ ██████████
██ █████████ █████ █████ █ ███ █ ███
██ █████ ████ ████ ██ ██ █ ██ ██ ███
██ ████ █ ███ ████ ██ ████ █ ███████ ██
██ ████ █ ███ █████ ███ ███████ █ ██████
██ ████████ ████ ██ ██ █ ████ █████?

MR. MANDEL:  Object to form. Mischaracterizes the document.  Calls

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

for a legal conclusion and interpretation is outside the scope of the witness' expertise, et cetera.

A.   Again, I have not formed that type of opinion one way or another.

Q.   Do you agree with me that as of June 10th, 2022, if National Instruments thought that a change of control transaction was likely, it would have been specific about what the fee in such a -- such a situation would be with Bank of America, right?

MR. MANDEL:  Object to form. Calls for speculation.  Calls for him to read the mind of National Instruments, et cetera.

A.   I think that you're asking me about their state of mind, which is outside the scope of my opinions.

Q.   Do you think that the June 10th, 2022 engagement letter described an engagement by Bank of America that was defensive in nature?

MR. MANDEL:  Object to form.

Page 242

DR. M. CAIN - CONFIDENTIAL

A.    Can you explain what you mean by that?

Q.    So did you read the deposition testimony of Shawn Liu from Bank of America?

A.    Yes.

Q.    And did you see that he said ███ █ ███ ███ ███ ███ ███ █ ███ ███ █ ███ ████ ███ █ █ ▌ ████ █ ████ ██ ██ █ ████ █ █ ████ █ ██ █████ ██ ████ █████

MR. MANDEL:  Object to form.

A.    I don't -- like with the other ones, I don't have the whole testimony memorized but I would be happy to look at it if you want to put it in front of me.

Q.    Well, why don't you assume for a moment that Shawn Liu testified that way, that ██ ███ ██ ██ █████ █████ █ ████ ████ ████, okay?  Do you have any reason to dispute that?

MR. MANDEL:  Object to form, vague, lacking foundation.

A.    Again, I would have to know

CONFIDENTIAL

Page 243

DR. M. CAIN - CONFIDENTIAL
what he was actually saying and what he
meant or implied by describing it as
defensive, I don't think I've formed an
explicit opinion about this.  I mean, I
guess this is -- there is something in
relation to that that I explain in my
reports that Professor Goodwin attempts to
characterize this as purely defensive.

And I go on to address that in
my reports, but I explain even the notion
of hostility or defensiveness does not in
any way undermine the economic materiality
of the alleged omissions in this case.  In
fact, it only further supports the expected
price impact that the omitted information
allegedly omitted would have had on the
stock price of National Instruments.

Q.   As a general proposition, which
type of M&A transactions actually get
finished more frequently, friendly ones or
hostile ones?

MR. MANDEL:  Object to form.

A.   I mean, I think this kind of
goes back to a question you asked earlier,

Page 244

DR. M. CAIN - CONFIDENTIAL
which is when one party approaches another party and that party says no and they agree to part ways, we may not observe -- observe those, and I think that they can affect the measurement of the probabilities of completion.

But I think that if we were to look at the Bruner textbook, I think on average there's a higher completion rate in deals that a characterized as friendly versus deals that are characterized as unfriendly. Part of that is endogenous, just reflects the attitudes of the parties who are negotiating. So I think they're friendly versus hostility is just part of the spectrum of negotiating tactics.

Q. Okay. So we're still talking about this Bank of America engagement letter. I want you to look at Page 83 of your Merits Report and specifically Paragraph 12. And let me know when you're there.

A. Okay.

Q. So you -- you write: Professor

CONFIDENTIAL

Page 245

DR. M. CAIN - CONFIDENTIAL

Goodwin characterizes NI's engagement of Bank of America as merely defensive pointing to the absence of a success-based fee and the use of a flat retainer structure which could indicate that the company is not seeking a sale but merely seeks limited guidance.  This conclusion is flawed because it misrepresents the engagement letter and overlooks academic research on how firms engage financial advisers in the context of participated or ongoing M&A activity.  As discussed below in Section V, both the June 10th, 2022 engagement letter with B and A and NI's contemporaneous actions suggest a broader and more strategic mandate.

Do you see where I read that?

A.    Yes.

Q.    Okay.  So how is Professor Goodwin's characterization of the engagement of Bank of America flawed when he says that it is defensive?

A.    Well, one of the things I explain is that he says that there is an

DR. M. CAIN - CONFIDENTIAL absence of a success-based fee, which I explain is not the case. You can -- we just looked at the paragraph that talks about a contemplation of a success fee.

Q. But there's no success fee in the engagement letter; we've agreed on that, right?

MR. MANDEL: Object to form. Argumentative.

A. I don't think that we agreed on that.

Q. No. You very much agreed with me -- well, strike that.

Point to me in the Bank of America engagement letter dated June 10th, 2022, the identification of a success fee if there's a change in control transaction?

A. That was described in very long Paragraph 4 of this -- of the letter.

Q. So point out the success fee.

A. Well, it's a whole paragraph, but part of what I've explained was a sentence that says: ███ ██ █ ████ ████ ████

██ ████ ██ ██ ██ ██████ ██████ ██ ██

Page 247

DR. M. CAIN - CONFIDENTIAL

████████ ██ ████████ █████████████ ████████ ██ ██

█ ████████████ ████████ ██ █████████ █████

█ ████ ███ █████████ █████ ███ ████████ ██

█ ██████ ████████ █████████ █████ ███ █████████

█ ████████ .

Q. All right. So there is no fee amount in the June 10th, 2022 engagement letter in the event that there's a change of control transaction, correct?

MR. MANDEL: Object to form.

A. So, again, I think we talked about this earlier. It does state ████████ ████ but it does not put an exact dollar amount or percentage amount as many of these work out to be.

Q. So what I said is correct, right?

MR. MANDEL: Object to form.

A. I'm just going to stick with my previous answers.

Q. I know you don't want to say yes or no, but it's -- I can't believe that we're quibbling over whether the amount of fee for a change of control transaction is

DR. M. CAIN - CONFIDENTIAL
in the June 10th, 2022 engagement letter.
It's very simple that the amount of the fee
is not specified.  It says ███ ███ █
█ ████ █ ███ █ ████ █ █ ████
█ ███ █ ██ ████ , right?

MR. MANDEL:  Object to form.
Argumentative.  Asked and answered.
He told you he doesn't have a
specific dollar amount or percentage.

Q.   I just don't understand why you
can't just say yeah, I agree with you,
there's no dollar amount in there.

MR. MANDEL:  That's not a
question.

Q.   So, again, what I'm getting at
is, what is it in the B of A engagement
letter of June 10th, 2022 that you would
point to to support your -- the proposition
that it is anything other than an offensive
engagement?

MR. MANDEL:  Object to form.

A.   So I guess I would point you to
the things that I'm describing in my report
on Page 83, starting with Paragraph 12

DR. M. CAIN - CONFIDENTIAL
continuing through Paragraph 15.  One of the things that I explain in Paragraph 14 is that this fee structure is consistent with the composition arrangements for financial advisers that I've documented in my own research.  I explained that the engagement letter contemplates ██ ████████ ████████ ████████ ██ ████████ ██ ████████ ████ ████ which contradicts Professor Goodwin's assertion that essentially the company just said no and that put an end to any sort of engagement that the fact that ███ ███ ██ ██ █ ████████ ███████ █████████ █ ██ ████ ████ ███ ███ ████ ███ ████ ██ ███████ is inconsistent with Professor Goodwin's view.

Q.    How so?

A.    And then I also, in Paragraph 15, talk about the interplay between engagement letter and other evidence in the factual record in terms of discussions about scenario planning, communication strategies, board level

CONFIDENTIAL

Page 250

DR. M. CAIN - CONFIDENTIAL
coordination throughout the class period
being inconsistent with Professor Goodwin's
opinions about the transaction as having a
negligible probability.

Q.    You do agree with me that a
20 -- or a ████████  ████████   ████████   is
much more indicative of adviser services in
a defensive engagement than it is a change
of control transaction success fee type
thing, right?

MR. MANDEL:  Object to form.

A.    I'm not really sure I'm
following your --

Q.    Do you think Bank of America
would ever have agreed to ████████  ██
█████████for a change of control transaction
based on your experience?

MR. MANDEL:  Object to form.
Calls for speculation.

A.    So in my academic research on
compensation of investment banks, I do
point to flat fees.  So what you described
would not be inconsistent with how some
investment banks are compensated.

CONFIDENTIAL

Page 251

DR. M. CAIN - CONFIDENTIAL

Q.    You think a ██████ ██ ██ ██████ ██ ███ would be how Bank of America would agree to be compensated for a change of control transaction?

MR. MANDEL:  Object to form.

A.    Well, I guess what I've explained is that in this transaction they agreed to a success fee which was significantly higher than that amount.

Q.    A success fee that was determined long after the class period, right?

MR. MANDEL:  Object to form.

A.    Again, we've already talked about --

Q.    Am I right?

A.    We've already talked about that.  I'll stick with my previous answers.

Q.    Is what I say correct?

MR. MANDEL:  Object to form.

Q.    I've never asked you this before.

Was the success fee between Bank of America and National Instruments

CONFIDENTIAL

Page 252

DR. M. CAIN - CONFIDENTIAL
determined after the class period?

MR. MANDEL:  Object to form.

A.    That's outside the scope of my
review of the factual record.

Q.    So you have no answer to that?

A.    It's not a question I have
attempted to answer.

Q.    Okay.  So you are referring to
your Merits Report on Page 84,
Paragraph 14, where you write:  The fee
structure is consistent with a compensation
arrangements documented in my own published
research with Professor Denis from 2013,
correct?

A.    Yes.

Q.    All right.  So let's turn to
that.  I have the printout here with me, I
will have marked as Exhibit 15.

(Whereupon, 2013 Cain and Denis
paper was marked as Cain Exhibit 15
for identification as of this date.)

Q.    Is this the 2013 Cain and Denis
paper that you refer to in your Merits
Report?

CONFIDENTIAL

Page 253

DR. M. CAIN - CONFIDENTIAL

A.    Yes.

Q.    All right.  And I want to ask you to look at Page 254, and there's a table there, Table 1, right?

A.    Yes.

Q.    And in this published research, you studied transactions, right?

A.    Yes.

Q.    And the transaction value mean was $2,496,700,000 on average in size.  Is that fair?

MR. MANDEL:  Object to form.

A.    Yes.  It's roughly $2.5 billion on average, yes.

Q.    Okay.  So in this 2013 paper, the average transaction size of the transactions you looked at was 2.5 billion roughly?

A.    Yes.

Q.    Okay.  Do you agree with me that that's a few million or billion smaller than the transaction that we're talking about in this case where Emerson ultimately acquired National Instruments

CONFIDENTIAL

Page 254

DR. M. CAIN - CONFIDENTIAL

for over $8 billion?

        A.    I think you would have to inflation-adjust the figures because this is from a time period of 1998 to 2005 so the real value in 2023 dollars would be significantly higher.

            But I guess what I would say is that the sample size has a max of $113.6 billion in our study so it encompassed a wide variety of transaction sizes.

        Q.    Okay.  Let me direct you to Page 257 of the report, the paper that you put out with Dr. Denis.  This is Table 4 titled, "Adviser Client Relationships" and I want to ask you about the target advisers column which is on the right because Bank of America was engaged as a target adviser. Is that fair?

        A.    Yes.

        Q.    So the first set of rows deals with adviser fee structure and you have a row for percentage fee and it looks like that was 33.1 percent of the target adviser

CONFIDENTIAL

Page 255

DR. M. CAIN - CONFIDENTIAL
engagements that you studied?

A.    Yes.

Q.    And then you have a row called Success Fee and that was 49.2 percent of the target adviser engagements that you studied, right?

A.    Yes.

Q.    And then as I understand it, the next row was all contingent fees, and that says it's 82.2 percent of all target adviser engagements that you studied, right?

A.    That's just the sum of the two numbers above, yes.

Q.    Okay.  The percentage fee engagements and the success fee engagements were 82.2 percent of the target adviser engagements that you studied?

A.    Yes.

Q.    Okay.  So what that means by implication is that 17.8 percent of the target adviser engagements that you studied did not involve a contingent fee arrangement, fair?

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

A.    Yeah.  Those would be the two rows below, fee or flat fee or no fees other than --

(Reporter clarification.)

Those would be flat fees or no other fees other than a fairness opinion fee.

Q.    So do you agree that -- well, which -- how would you characterize Bank of America's engagement by a National Instruments in June of 2022 in relation to the table you have here?

MR. MANDEL:  Object to form.

A.    Well, I would have to look at the proxy statement to see how they describe it in the proxy statement because that's how I collected the data in Table 4 of this academic study.

Q.    Did Bank of America agree to work on a flat fee in June of 2022?

MR. MANDEL:  Object to form.

A.    I have not attempted to answer that question at this point in time.

Q.    Would you agree with me that

CONFIDENTIAL

Page 257

DR. M. CAIN - CONFIDENTIAL

when it ███ █ █ ████████ ██████ ████████ ███ ██████ ███ █ ███ ████████ ██ █ ███ ███

MR. MANDEL:  Object to form.

Mischaracterizing the letter.

A.    Again, this table that I'm providing here relates to the compensation of advisers providing fairness opinions.

So, again, I would have to I think this engagement letter doesn't really quite fit into the framework that we were coding here.  But I do think that the -- what I explain in my reports is that nonetheless, the fee structure is still consistent with what we find, which is that very high proportion of financial advisers do receive some sort of contingent fee as part of their engagement.

Q.    Okay.  And you agree that as of June 10th, 2022, Bank of America was not asking for a contingent fee for its work. Instead, it was ████ ██ ████████ ██ ████████ ████ ██ █ ███ ██ , right?

MR. MANDEL:  Object to form.

CONFIDENTIAL

Page 258

DR. M. CAIN - CONFIDENTIAL

Mischaracterize the document.

A.    No.   That's not how I've described the letter previously.

Q.    Okay.  Well, we can show you the letter in court and we'll see if you still disagree with how I described it.

So do you agree with me that the date of the Bank of America engagement letter of June 10th, 2022, is prior to when National Instruments rejected Emerson's first proposal because that happened on June 16th, 2022?

MR. MANDEL:  Object to form.

A.    I think it was June 14th, 2022, but I would agree that June 10th is before June 14th.

Q.    Okay.  Where are you reading that?

A.    Paragraph 46 of my Merits Report.  Sorry.  I guess what I would say is that's the board meeting and then there's the actual letter to Emerson that I described in Paragraph 49 on June 16th.

Q.    Okay.

CONFIDENTIAL

Page 259

DR. M. CAIN - CONFIDENTIAL

A.    Yeah.

Q.    So I agree with you. June 14th, 2022, NI's board voted to reject Emerson's first proposal, and then June 16th, 2022 NI communicated the rejection to Emerson.  We're on the same page about that, right?

MR. MANDEL:  Object to form.

A.    I believe so.

Q.    Okay.  In your paper that you did with Dr. Denis, do you draw any correlation between the size of the transaction and whether a success fee or a flat fee was paid?  Basically I'm asking you to compare Table 1 of your paper with Table 4.

MR. MANDEL:  Object to form.

A.    I don't recall doing that type of correlation.

Q.    So in Table 4, it says that 18 percent of target advisers were paid a flat fee or no other fees.  It could be that those were in the much smaller deals, smaller than the average of 2.5 billion

Page 260

DR. M. CAIN - CONFIDENTIAL

that you studied and you just don't have any way to know.  Is that fair?

MR. MANDEL:  Object to form.

A.    Well, I mean, I collected all of the data that goes into the -- this study.  So, I read hundreds of proxy statements to code up the data back in the day.

So I do recall that there's sort of a distribution of how target companies elect to pay advisers sometimes for very large deals they would state a flat fee because a percentage would apply to a hundred billion dollar deal would just be massive, but then there are also times when, even for the very largest deals, they do elect to calculate on a percentage basis.

So you tend to see these types of fee structures spread around a variety of different deal sizes.

Q.    Okay.

MR. MANDEL:  Can we take a quick break in a couple minutes?

CONFIDENTIAL

Page 261

DR. M. CAIN - CONFIDENTIAL

MR. COMERFELD:  Yeah.  We can take a break now.

VIDEOGRAPHER:  We are off the record.  The time is 2:41.

(Whereupon, a short recess was taken.)

VIDEOGRAPHER:  We are back on the record.  The time is 2:54 p.m.

BY MR. COMERFORD:

Q.    Okay, Dr. Cain.  In your Merits Report, on Page 43, Paragraph 108, you say something that I would like to ask you about.

You write:  This expectation of market re-evaluation in response to acquisition interest is further reinforced by the findings of Jindra and Walkling 2004.  Their study shows target stock prices frequently rise above the initial offer price, a phenomenon known as negative arbitrage spread, indicating that investors anticipate increased offers or competing bids.

Let me stop there.

CONFIDENTIAL

Page 262

DR. M. CAIN - CONFIDENTIAL

Characterizing negative arbitrage spread as happening frequently, is that what you're saying?

MR. MANDEL:  Object to form.

Q.    Are you sticking with that?

A.    That is something that I state in this paragraph, yes.

Q.    And the -- you go on to say that what you mean by frequently is that it happens 23 percent of the time, right?

A.    I say on average 23 percent of targets with the rate exceeding 40 percent in certain years.  But then I go on to explain sort of the underlying reasons for why that is the case such as toeholds, hostile bids, expectations of multiple bid contests, increased bids, initial things like that.  It goes on in this section.

Q.    Right.  And during the class period, all that had happened was two proposals from Emerson that had been rejected and ███████ ██ ████████ █ █████ █ ████████, right?

MR. MANDEL:  Object to the

CONFIDENTIAL

Page 263

DR. M. CAIN - CONFIDENTIAL

form.   Mischaracterize the record.

A.    No.   I disagree.

Q.    Well, there was no -- there was no hostile public announcement prior to or during the class period, right?

A.    I agree there was no public announcement of the allegedly omitted information.

MR. COMERFORD:   Okay.   Handing you what I have marked as Exhibit 16 (handing).

(Whereupon, Paper, "Speculation spreads and the market pricing of proposed acquisitions," was marked as Cain Exhibit 16 for identification as of this date.)

Q.    This is the Jindra and Walkling paper from 2004, I believe?

A.    Yes.

Q.    And this is what you cite in Paragraph 108 of your Merits Report, right?

A.    Yes.

Q.    And so in the abstract, the authors say that this paper examines

CONFIDENTIAL

Page 264

DR. M. CAIN - CONFIDENTIAL
speculation spreads following initial acquisition announcements in 362 cash tender offers spanning the 1981 through 1985 period.

So would you characterize Emerson's proposals in May and June of 2022 as tender offers?

A.    Emerson's -- no.  I would characterize those as nonpublic offer letters that they sent to National Instruments.

Q.    Okay.  So then the authors go on to write:  Speculation spreads and acquisitions defined as the percentage difference between the bid price and the market price one day after the initial announcement are the starting point for arbitrage returns, a subject receiving increased attention and practice and in the literature speculation spreads exhibit a positive mean with considerable cross-sectional variation.  In fact, over 23 percent of the speculation spreads are negative indicating a post-announcement

Page 265

DR. M. CAIN - CONFIDENTIAL

price greater than the initial bid price.

Right?

A.    Yes.

Q.    Okay.  And so your opinion in this case is that if National Instruments had disclosed Emerson's May and June 2022 offers, or proposals, I should say, and National Instruments rejections of those proposals, the stock price would have gone to at least the proposal price or more, right?  And that would be what they're -- these authors are talking about as negative arbitrage spread, right?

MR. MANDEL:  Object to form.

A.    So my opinion is that if the allegedly omitted information had been publicly disclosed, that that would have caused National Instruments' stock price to increase to at least $48 per share and -- if not higher than that amount, and I agree with you that they're talking about a negative arbitrage spread as an increase in the stock price above the prevailing offer price for a company.

CONFIDENTIAL

Page 266

DR. M. CAIN - CONFIDENTIAL

Q.    Okay.  And so you -- your opinion in this case is that that's what would have happened if National Instruments had disclosed the allegedly omitted information; you say the stock price would have gone to the offer price at least if not higher, right?

A.    Well, what I explain is that it would have risen to at least $48 per share. What we've talked about today in my reports is that the second offer was $48 per share, plus a willingness to increase above that amount.

So I think that's a little bit different from characterizing it as only $48 per share.

Q.    Correct.  At least 48, if not higher, is your opinion?

MR. MANDEL:  Object to form.

A.    What I said is -- what I meant was, that's different from characterizing the second offer as only $48 per share.

Q.    Because Emerson said if we find additional value we could potentially make

CONFIDENTIAL

Page 267

DR. M. CAIN - CONFIDENTIAL

our offer higher?

A.    Something along those lines, yes.

Q.    Something along those lines. And you agree with me, according to the paper that you cited, it only happens 23 percent of the time where the target stock price goes higher than the offer price?

MR. MANDEL:  Object to form.

Q.    Isn't that what this paper is saying?

A.    No.  It -- so the paper documents that in some years, 43 percent, for example, like I say in my report, that that rate exceeds 40 percent in certain years.  So it was as high as 43 percent in one year during the sample period of the study.

Q.    On average between 1981 and 1995, the average was 23 percent of cases went above the offer price?

A.    I think that's right on average.  It was 23 percent.

CONFIDENTIAL

Page 268

DR. M. CAIN - CONFIDENTIAL

Q.    Okay.  I think that's what you're saying would have happened in this case if National Instruments had disclosed the allegedly omitted information prior to the class period, right?

A.    Again, what I'm saying is a little bit different because the second offer actually conveyed something of value that was potentially notably higher than $48 per share, so if National Instruments' stock price had increased to, let's say, $50 per share, that's not necessarily a negative arbitrage spread if investors viewed the offer as having an expected value of $50 per share just as one illustration of that.

Q.    So you're referring to the June 22nd, 2022 proposal from Emerson CEO when you talk about this idea that Emerson could go higher than $48 per share?

A.    Yes.

Q.    All right.  And it's on Page 2 in the paragraph that begins, "We prefer"?

MR. MANDEL:  It's Exhibit 6.

CONFIDENTIAL

Page 269

DR. M. CAIN - CONFIDENTIAL

Q.    This is Exhibit 6.  The Emerson CEO writes:  We look forward to learning more about your internal plan and are confident that with access to limited nonpublic information after signing the NDA, we could work with you to find additional value that would allow us to increase our proposal.

MR. MANDEL:  Give him a minute to look at the exhibit.

A.    This is 9.

Q.    It's Emerson letterhead.

A.    Oh, I got it.

Q.    June '22.

A.    Let's start over.

Q.    So second page, the paragraph that begins:  We prefer to engage?

A.    Yes.

Q.    All right.  And then at the end of that paragraph, it says:  We could work with you to find additional value that would allow us to increase our proposal.

Do you see that?

A.    I do.

DR. M. CAIN - CONFIDENTIAL

Q. So is that what you were referring to a moment ago when you said Emerson hinted it could go higher than 48?

MR. MANDEL: Object to form.

A. I don't know if I used those exact words, but I think what I characterized this section of, this is implying a value that was potentially notably higher than 48.

Q. Is the fact that Emerson CEO made this statement that I just read, we could work with you to find additional value that would allow us to increase our proposal.

Do you consider that to be part of allegedly omitted information?

MR. MANDEL: Object to form.

A. So I guess I'm going to point you to Paragraphs 27 and 29 of my Reply Report. I'm just pointing back to the allegations in the Complaint which is that Emerson was offering a large premium for the company's shares. The offer came with, you know, substantial certainty and so

CONFIDENTIAL

Page 271

DR. M. CAIN - CONFIDENTIAL
forth, so I'm not breaking down the
Plaintiff's allegations into what the
precise disclosure, how exactly they should
have or could have disclosed the allegedly
omitted information.  This is obviously
part of what the Complaint is pointing to
in terms of the offer letters.

Q.    Okay.  I want to ask you about
your event study.  You -- on Table A in
your Merits Report and it's on Page 61.
Let me know when you're there.

A.    This is -- it's not -- this is
not an event study table but there's Table
A in my Merits Report.  I'm there.

Q.    This is -- what is Table A?

A.    This is reporting the 90-day
lookback, average rolling place that's
calculated under the PSLRA.

Q.    Okay.  So Emerson disclosed the
fact that it had made a $53 per share
proposal on January 17th, 2023, in that,
that document we looked at earlier, right?

A.    Yes.

Q.    And then we can see in your

CONFIDENTIAL

Page 272

DR. M. CAIN - CONFIDENTIAL

table here that on January 17th, 2023, the closing price of National Instruments stock was $52.04, right?

A.    Right.

Q.    And that's below the offer price of $53 per share that Emerson had publicly disclosed on that date, right?

A.    Yes.

Q.    Okay.  And then one day after Emerson's disclosure of its $53 per share proposal, which was January 18th, 2023, we can see that National Instruments' stock price closed at $52.50 per share, right?

A.    Yes.

Q.    So that's also below the price that was disclosed by Emerson of $53, right?

A.    Yes.

Q.    Do you have an explanation for why the market did not go to 53 or higher?

MR. MANDEL:  Object to form.

A.    Yes.

Q.    What is it?

A.    Yes.  So what I explain in both

CONFIDENTIAL

Page 273

DR. M. CAIN - CONFIDENTIAL

of my reports is that as of the start of the class period, Emerson had provided two offer letters, and the second one provided an offer of $48 per share with significant upside potential to that to increase that above $48 per share.

The July -- sorry, the January 17th offer, my recollection was I guess we could go back to the exhibit, what was it, a different type of public disclosure in Exhibit 9.

Q.    This is the proxy statement.

A.    This is the -- yeah, Emerson's 14a.  This disclosure was a little bit different.  Obviously it included the previous $48 per share information, but it did not explicitly state potential increase above $53 per share at this point in time.

It also noted that this already represented a $5 per share improvement over the previous offer of $48 per share, so this is consistent with what had been provided in the second offer letter.  But it's also different.

CONFIDENTIAL

Page 274

DR. M. CAIN - CONFIDENTIAL

And so I'm not opining that as of January 17th, there would have necessarily been a negative arbitrage spread after January 17th, even though obviously we know they eventually did go up significantly from their $60 per share.

So that's -- that's what I would point you to is some differences between January 17th and the class period, the second offer.

Q.    Wouldn't you agree that when you give the opinion that the share price of National Instruments would have gone to at least $48 or more had National Instruments disclosed the two $48 offers that had been rejected you're speculating?

MR. MANDEL:  Object to form.

A.    No.  That's what I explained in my reports is that I've gone through a wide variety of analyses leading up to that calculation and that opinion.

Q.    The $48 proposals had both been rejected by National Instruments and the $53 proposal had not been rejected by

CONFIDENTIAL

Page 275

DR. M. CAIN - CONFIDENTIAL

National Instruments as of January 17th and January 18th, 2023; isn't that true?

MR. MANDEL:  Object to form.

A.    I would agree that the first two offers were rejected by National Instruments as inadequate, which also conveys their belief that the value of the company is worth above $48 per share.

I think there is certainly very strong implication on Emerson's letter on January 17th that National Instruments had implicitly rejected.  There's -- on -- towards the end of it that talks about for eight months NI is delayed and refused to engage meaningfully.

And so I think there's the implication that it's been rejected but I would agree that it's not explicitly.

Q.    Okay.

MR. MANDEL:  And as I noted before, the document that we're looking at here is missing a lot of other pages which go to the point Dr. Cain was just making.

CONFIDENTIAL

Page 276

DR. M. CAIN - CONFIDENTIAL

Q.    In the June 22nd, 2022 letter that we marked as Exhibit 6, a moment ago you told me that Emerson conveyed willingness to make a significant increase in its proposal price.

Do you remember saying that word "significant"?

A.    That was my, I think, general characterization.  Obviously the letter speaks for itself.

Q.    So where do you see the word "significant" in the letter?

MR. MANDEL:  Object to form.

A.    So I think what I said was the $53 per share offer represented a significant increase of about $48 per share.  But the words on Page 2 state additional value that would allow us to increase our proposal.

Q.    So we're looking at Page 2 of the June 22nd, '22 letter from Emerson?

A.    Yes.

Q.    And do you agree that it's a noncommittal statement.  It doesn't say,

Page 277

DR. M. CAIN - CONFIDENTIAL

"We will work with you," "We shall work with you."  It says, "We could work with you"?

MR. MANDEL:  Object to form.

Q.    To find additional value, right?  That's a maybe?

A.    It does say we could work with you to find additional value that would allow us to increase our proposal.

Q.    Okay.  So it's certainly not a promise to increase the proposal.  Would you agree with that?

MR. MANDEL:  Object to form.

A.    I would agree it's certainly not a signed definitive merger agreement.

MR. COMERFORD:  Okay.  Let's go off the record real quick because I lost my place.

VIDEOGRAPHER:  We are off the record.  The time is 3:14 p.m.

(Whereupon, a short recess was taken.)

VIDEOGRAPHER:  We are back on the record.  The time is 3:15 p.m.

CONFIDENTIAL

Page 278

DR. M. CAIN - CONFIDENTIAL

BY MR. COMERFORD:

Q.    All right.  I want to ask you about a statement in your Reply Report that is Paragraph 83, which is on Page 45.

So you're talking about the second report from Dr. Denis who's one of the Defendants, retained by the Defendants in this case, right?

A.    Yes.

Q.    And you say he points to an academic study of failed M&A transactions by Even-Tov published in 2024, right?

A.    Yes.

Q.    And that is Omri Even-Tov, and Ben Lourie and two other authors, correct?

A.    Yes.

Q.    I'll just put this in front of you so we won't have to -- all right.

MR. COMERFORD:  So I'm handing you what I've marked as Exhibit 17 (handing).

(Whereupon, Paper, "Failed acquisition offers:  The impact of failure reasons on target evaluation"

CONFIDENTIAL

Page 279

DR. M. CAIN - CONFIDENTIAL

was marked as Cain Exhibit 17 for

identification as of this date.)

Q.    This is a 2024 paper called,

"Failed acquisition offers:  The impact of

failure reasons on target evaluation."

Right?

A.    Yes.

Q.    And the first two authors

listed are the people that you mentioned to

me earlier in your deposition are the

people who had been working with you to

form your opinions and write your reports

in this case, fair?

A.    Yes.

Q.    Okay.  So Dr. Denis is pointing

to this paper that these people that you're

working with wrote then, right?  And it's a

paper about failed acquisition offers,

correct?

MR. MANDEL:  Object to form.

A.    It's failed acquisitions, yeah.

I think all of those were signed merger

agreements that were publicly announced and

then subsequently terminated, yes.

CONFIDENTIAL

Page 280

DR. M. CAIN - CONFIDENTIAL

Q.    So, you know, obviously we've been over this many times, but as of the start of the class period, we know that there had been two proposals made and they had both been rejected by National Instruments.  And as of the beginning of the class period and throughout the whole class period, there were no additional proposals by Emerson until November 2023, which is after the class period, right?

MR. MANDEL:  Object to form.

A.    I think that's correct, yes.

Q.    Do you agree with me that during the entire class period in this case, there was no proposal from Emerson to National Instruments that was pending or under consideration?

MR. MANDEL:  Object to form.

Q.    By National Instruments?

MR. MANDEL:  Object to form.

A.    Well, I do talk about extensive evidence in the record of the consideration that National Instruments was giving to the threat posed or potential to a transaction

CONFIDENTIAL

Page 281

DR. M. CAIN - CONFIDENTIAL

with Emerson, so I guess I would disagree with that description.

Q.    I mean, the company National Instruments acted on the proposals from Emerson through votes of supportive directors and National Instruments, fair?

A.    My recollection is they did involve votes at the board level.

Q.    And we know that the board of directors of National Instruments had a formal vote on or about July 20th, 2022, where the board voted to reject Emerson's second proposal that Emerson had delivered on June 22nd, '22, is that fair?

MR. MANDEL:  Object to form.

A.    Did you say July 19th?  My recollection is that July 19th, the board reaffirmed their decision that $48 was inadequate.

Q.    Okay.  Not to quibble with you, but I think it was, like, a two-day board meeting.  It was July 19th and 20th?

A.    Okay.

Q.    It was one of those two dates

CONFIDENTIAL

Page 282

DR. M. CAIN - CONFIDENTIAL

that the board voted to reject Emerson's second proposal of $58 per share. Is that your understanding of the facts?

MR. MANDEL: Object to form.

A. I think that is consistent with my understanding.

Q. Okay. And so if someone said on August 11th, 2022, the day before the class period started, that Emerson had made a failed attempt to acquire National Instruments, would that be a reasonable thing to say?

MR. MANDEL: Object to form.

A. I don't have an opinion about whether or not that would be reasonable for someone to make that as a disclosure.

Q. There were certainly a gap in communication between National Instruments and Emerson, and I'm talking about direct communication, between August 2nd, 2022, and November 3rd, 2022. During which there was no offer from Emerson on the table that had not been rejected by National Instruments, fair?

CONFIDENTIAL

Page 283

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to form.

A.    I do think that's consistent with my previous response where I -- I'm not aware of anything in the factual record demonstrating direct communication between National Instruments and Emerson during that time period.

Q.    Okay.  And so that's roughly a three-month time period where, between National Instruments rejection of the second proposal and Emerson coming back with a third proposal, and I'm measuring from August 3rd, 2022, to November or August 2nd, 2022, to November 3rd, 2022?

MR. MANDEL:  Object to form.

Q.    Roughly three months?

A.    That sounds like roughly three months, and obviously there are many other things happening during that time period. But in terms of the explicit communication, I think that's right.

Q.    Okay.  So you talk about this idea of failed M&A transactions and the fact that they have been studied in

CONFIDENTIAL

Page 284

DR. M. CAIN - CONFIDENTIAL

academia and Dr. Denis points to this paper that we have marked as Exhibit 17 which is the two first authors or the people you're working with on the case, right?

MR. MANDEL:  Object to form.

A.    Yes.

Q.    All right.  And what I understand your Reply Report to be saying is this paper studies starkly different facts.  I think you say that in Paragraph 83 somewhere?

A.    Yes.

Q.    Why do you say that?

A.    Yeah.  Well, I guess there's a few things that I explain.  First thing, one of the things that I explain is that this academic study looked at mergers that were publicly announced when a deal has been signed and agreed upon and then subsequently were terminated and completely finished.  And that's different from the setting here where there -- during the class period there was not the signing of an agreed upon merger agreement that was

CONFIDENTIAL

Page 285

DR. M. CAIN - CONFIDENTIAL
publicly announced and then terminated.

But the second thing that I mention is, even within that sample of failed deals, the authors of this study actually document that there is a price impact from these public disclosures on the target company's stock prices.

And so this study is actually consistent with the economic materiality of the alleged omissions in this matter. I don't rely on it for purposes of measuring artificial deflation, but it's certainly additional support for the economic materiality for this type of information.

Q. So when did you start working with Omri Even-Tov and Ben Lourie on this particular case?

A. I believe it was around the time of working on my Merits Report. So the Merits Report is dated July of 2025. I think that we worked for several months so I -- prior to the completion of the report, so I would -- I would have to go back and look at my records but my best guess would

CONFIDENTIAL

Page 286

DR. M. CAIN - CONFIDENTIAL

be sometime around early -- sometime in the first few months of 2025 would be my best guess.

Q.    And when you started working with Even-Tov and Lourie?

A.    On this particular matter?

Q.    On this particular case.

A.    Again, I would have to go back and review my records to be more precise, but that's my best recollection.

Q.    Okay.  So I'm going to read the abstract of this paper.  It says:  Using a large hand-collected sample of 1,246 failed acquisition offers from 1979 to 2016, we examined the effects of failure reasons on the revaluation of target firms.  We found a negative revaluation of minus 16 percent for failures not caused by target rejection, suggesting exposure of adverse information about the targets economic conditions.  Conversely, targets declining offers show a positive revaluation of plus 7 percent, indicating target managements, private information about the firm's

CONFIDENTIAL

Page 287

DR. M. CAIN - CONFIDENTIAL
superior prospects.  These revaluation effects are stronger for hard-to-value targets consistent with failure reasons revealing more information when there is greater uncertainty about the target's value.

Do you see all that?

A.    Yes.

Q.    Let me ask you about that phrase, hard-to-value targets.  Would that be privately held companies?

A.    No.  You wouldn't be able to study these returns on private companies without stock prices.

Q.    So these are all publicly traded companies?  I'm just wondering what's meant by hard to value.

A.    Right.  Give me a second.  I can see how they measure hard-to-value companies in this study.  Often academics talk about information asymmetry where there's information that's difficult for investors to get all the information they would like in terms of valuing a company

Page 288

DR. M. CAIN - CONFIDENTIAL

but -- it will take me a few minutes to find this but I'll work on it.

So they talk about on Page 2 on the second full paragraph, they say -- they're talking about the targets in the rejection group that have that increase in value, and they say likely due to the market perceiving the market's rejection as a signal of positive internal information. This information may reflect the target managements private insights into the firm's positive outlook.

So they -- and then they go on to talk about proxies for valuation uncertainty in the next paragraph.  So they have -- they look at higher research and development expenditures lower profit and poor financial reporting quality so that's how they proxy for what they refer to as hard to value.

So it's sort of this concept of, you know, management rejecting an offer because they feel that the offer undervalues the target company and so that

CONFIDENTIAL

Page 289

DR. M. CAIN - CONFIDENTIAL
rejection can convey that believe and information to investors and cause that positive increase in the stock price.

Q. And the positive increase in the stock price is 7 percent according to this study?

A. After the -- after the deals have completely terminated, yes?

Q. And that's for targets that declined offers?

MR. MANDEL: Object to form.

A. Well, they originally -- I believe they originally announced offers and then they subsequently rejected them.

Q. Okay. And so the 7 percent, is that 7 percent over what the offer price was or is it 7 percent over something else?

A. It's, I believe, 7 percent relative to 25 days prior to the public announcement of a merger transaction. So think of it, targets trading, a merger is announced. The price goes up. It's up for a while. And then there's a termination. The price eventually comes down and there's

CONFIDENTIAL

Page 290

DR. M. CAIN - CONFIDENTIAL

a complete termination.  And where the price comes back down is still 7 percent higher than it was before the entire transaction was publicly announced.

Q.    Okay.  So this paper only looks at transactions where a -- an agreed upon merger had been publicly announced and then subsequently failed for some reason?

A.    I believe so, yes.

Q.    So what is meant by the phrase "target's declining offers"?

A.    In which --

Q.    In the abstract?

A.    Oh.  In the abstract.

Q.    Because I understand this to be failures not -- there's a category of failures not caused by target rejection, and then there's another category where they looked at targets declining offers, so I don't understand how there's an announced merger when the target is declining the offer?

A.    Okay.  Let me see if I can find an explanation for that in the paper here

Page 291

DR. M. CAIN - CONFIDENTIAL

(perusing).

Q. There's this Appendix A on Page 8 that I'll refer you to.

A. Okay. So if you look in Appendix A under Step 1, it says: SDC sample that satisfies the following criteria.

And the first step of that is the merger or acquisition is announced between these dates, so they start with publicly announced mergers and they -- but they start measuring the returns, 25 trading days prior to that merger announcement and they go through the -- I think 25 trading days after the terminations.

Q. So help me understand where they account for target's declining offers. I understand that to mean the target company declines the offer to be acquired.

A. I don't think that's what they're saying, but let me -- I think there's an explanation of this.

So, one of the things that

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

they're looking at is whether the target is subsequently acquired by a different bidder, so I think that it looks like some of these are rejected to potentially accept higher offers, although I think that they put those into a different bucket of the measurements.

But ultimately, it's, I would say it's unclear exactly how those are. They don't provide, I would say, clarity on that step 1 of the merger announcements, like, what's the breakdown of those merger announcements. And does it include -- I guess what you're getting at is the question of does it include hostile takeover attempts and it's not clear from this.

Q.    You know, in the introduction on Page 1 in the second paragraph, they say:  We categorize failure reasons into two groups, offers rejected by the target and they call that the rejection group and all other reasons without explicit target objections.  And then --

CONFIDENTIAL

Page 293

DR. M. CAIN - CONFIDENTIAL

But then I understand that in Appendix A they say they started by looking at where a merger or acquisition is announced, so I'm having trouble following what they're doing in this paper.

A.    I think it's a little unclear in the paper itself, what the sample is comprised of, there's a lack of clarity here.

Q.    Can we get back to the 7 percent price impact?  You're telling me that that's measured from the trading price 25 days prior to the public disclosure?

A.    That's what they say, yes.

Q.    Okay.  And so does that mean that -- and that's 7 -- it's a 7 percent increase after the failure of the deal?

A.    Correct, yeah.

Q.    All right.  Dr. Denis calculated some alternative but-for share prices of $43.09 and $42.37?

A.    I remember his calculations but I don't remember him opining that those were his actual presentations of the

CONFIDENTIAL

Page 294

DR. M. CAIN - CONFIDENTIAL
but-for price.

Q.    But he -- you do know that he was the opinion that the but-for price would be less than $48.  Is that fair or do you know?

MR. MANDEL:  Object to form.

A.    I remember him providing a lot of rebuttal opinions in pointing to this study, but I don't recall him explicitly opining on the level of artificial deflation or damages.

Again, he was frequently pointing to an alternative methodology based on the company's repurchases but I would be happy to look through his report with you if I want.

Q.    Okay.  What's the authoritative source or literature that specifically analyzed the effect on the target's share price after a rejected proposal is made public?

MR. MANDEL:  Oath.

A.    I think I point to a lot of academic resources in my -- both of my

CONFIDENTIAL

Page 295

DR. M. CAIN - CONFIDENTIAL reports, including the Bruner text on numerous academic studies which include hostile takeover attempts, include textbooks cite to Bruner on hostile takeovers resulting in higher premiums and the impact of those premiums on target companies stock prices and a number of academic studies.  Happy to look through any of those --

Q.    And are you aware of -- can you identify any of those that specifically study the fact pattern where a company makes a private proposal and the target company rejects it and then that -- the fact of the proposal and the rejection is disclosed publicly and there's an effect on the stock price.

Does any paper deal with that fact pattern?

MR. MANDEL:  Object to form.

A.    I believe that a number of those studies, including the hostile takeover attempts, and I think we also looked at Wachtell slides previously in

CONFIDENTIAL

Page 296

DR. M. CAIN - CONFIDENTIAL

Exhibit 12 but they give four different case studies.

This was -- starts on Page 12 of the Wachtell slides in Exhibit No. 12. This is something I point to in my reports as well. When you look at these types of hostile takeover situations, they typically begin with target rejections of acquirer offers and then that becomes public at some point and has a very measurement impact on the target company's stock price for some time. And sometimes ultimately those are successful and sometimes ultimately they're not successful, but regardless of that eventual outcome, they still have impacts on the company's stock prices.

Q.    So what page of the Wachtell presentation are you looking at?

A.    Starting with the case studies on Page 12, so it's the Bates number ending in 998.

Q.    And are you saying that this is something that studies the effect on a target company's share price when a private

CONFIDENTIAL

Page 297

DR. M. CAIN - CONFIDENTIAL

offer is made the target company rejects it and then the fact the proposal and the rejection becomes public?

MR. MANDEL:  Object to form.

A.    This is what I'm explaining is, these case studies are of hostile takeover attempts of companies, and those are in academic studies of hostile takeover attempts, so you can actually see that.

And those types of disclosures are very reflective of the types of questions you're asking about.

Q.    Okay.  Do you consider this Wachtell presentation to be an authoritative source that you rely on in your work?

A.    Well, it's an internal document that I do rely on in my reports and I point to these case studies as examples of, you know, economic materiality of this type of information.

Q.    Okay.  Does anything on Page 12 of the Wachtell presentation to the NI board talk about what happened to the

DR. M. CAIN - CONFIDENTIAL

██████ ██████ ███ ████ ████ ████

█ █████ ███ █████ ███ ████████ ████████

█ ██ ██████ ?

A.     I don't believe that they quantified the stock price impact on this slide.

Q.     Okay.  So I'm asking you for the identification of a source that you consider authoritative that looks at what happens to a target company's share price when a proposal is made, a proposal is rejected, and then the fact that the proposal and rejection is publicly disclosed?

MR. MANDEL:  Object to form.

A.     All right.  So we have an example of that January 17th in this case, 2023, when Emerson disclosed that information publicly.  And my event study shows a significant impact on National Instruments' stock price.

I point to numerous academic studies in my report, including the Bruner textbook which summarizes dozens of those

Page 299

DR. M. CAIN - CONFIDENTIAL studies, providing the conclusion that this type of information is economically material to investors.

So there's numerous academic studies on this type of evidence.

Q.    Are you talking about the Bruner textbook and saying that it specifically addresses what happens to the target company share price after a proposal and a rejection are publicly disclosed?

MR. MANDEL:  Object to form.

A.    Those -- like I said, those type of case studies are in the academic studies such as the slides here, these are publicly observable data points that go into the empirical samples of these studies in terms of mergers and acquisitions.

I remember using the Air Products/Airgas takeover battle as an example when I was teaching mergers and acquisitions at the University of Notre Dame.

So this is an example where after the Airgas board of directors had

CONFIDENTIAL

Page 300

DR. M. CAIN - CONFIDENTIAL
repeatedly said no, that there was a public
battle, and I do recall from teaching this
case study that there was an impact on the
stock price.

Q.    What was it?

A.    I would have to go back to the
data and look at it, but what I'm
explaining is that these are the -- these
are the mergers and acquisitions data
points that are in the empirical academic
studies that show and demonstrate the
economic materiality of demonstration.

Q.    Did you look and see if you can
find a specific academic study that looked
at the cases where a proposal was made, the
target company rejected it, and then the
fact of the proposal and the rejection was
made public?

MR. MANDEL:  Object to form.

Q.    To see what happened to the
target company stock price?

A.    Again, those examples are in my
own academic research that I've talked
about earlier today.

CONFIDENTIAL

Page 301

DR. M. CAIN - CONFIDENTIAL

Q.    So what are they?  What are the examples?

A.    There's hundreds of examples.

Q.    What's one?

A.    In the academic research.

Q.    Name a paper that studies what I have been asking you about.

A.    So I would say the Bruner textbook summarizes dozens of academic studies.  My own study, what was the Revlon study, includes numerous examples.  My fairness opinion papers includes those type of examples, dozen event study looking at the disclosures of those proxy statements to investors.

So there's -- these are the underlying data points in the empirical academic research.

Q.    Okay.  The -- this Even-Tov and Ben Lourie paper that we've marked as Exhibit 17 published in 2024, you -- are you saying that this is relevant to this case or not relevant?

A.    Well, I guess --

CONFIDENTIAL

Page 302

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to form.

A.    If you look at any reports and responding to it because Professor Denis relies on the study and then he sort of, I think, misinterprets the takeaways of the study.

But what I explain in my reports is that it is not the appropriate way to quantify artificial deflation in the National Instruments' stock price during the class period.  Nonetheless, it does provide evidence that is consistent with the economic materiality of the alleged omissions in this matter.

Q.    Why didn't you use this data in your own reports if you had it?

A.    Like I said --

MR. MANDEL:  Object to form.

A.    There's dozens of academic studies, and I didn't feel the need to -- there's probably hundreds of academic studies that consistently show and demonstrate the economic materiality of merger negotiations, hostile takeover

CONFIDENTIAL

DR. M. CAIN - CONFIDENTIAL

contests, offers, on stock prices outside of many of those studies, but I did not find it necessary to cite every possible study in existence.

Q.    But, I mean, this isn't every possible study.  This is a study that happened to be done and published in 2024 by two men that you're working with on this case, right?

MR. MANDEL:  Object to form.

A.    It is a study on, again, like I explained earlier, transactions that were merger transactions that were publicly announced and then terminated, which I think is markedly different from the situation here in this case.

Q.    Okay.  And we've agreed that when the people that you are working with on this case, Omri Evan-Tov and Ben Lourie write -- one of the categories that they're analyzing is offers rejected by the target, you're telling me that you have no idea what that means?

MR. MANDEL:  Object to form.

CONFIDENTIAL

Page 304

DR. M. CAIN - CONFIDENTIAL

Q.   We've already talked about that.

MR. MANDEL:   Mischaracterize the testimony.

A.   I don't think that that's what I said before.

Q.   I think you said the paper is not clear.

A.   I do agree there's some ambiguity in how the paper describes its empirical sample.

Q.   Okay.  So you -- you opine in your Merits Report that there is artificial deflation in the stock price of National Instruments as of the beginning of the class period, right?

A.   Yes.

Q.   And you say that deflation before the class period is zero.  Right?

MR. MANDEL:   Object to form.

Q.   I'll point it out.  It's your Merits Report, Page 56, Footnote 178.  And you write:  Artificial deflation is zero dollars prior to the start of the class

CONFIDENTIAL

Page 305

DR. M. CAIN - CONFIDENTIAL period, i.e., prior to the start of the actionable alleged omissions.  NI's common stock prices remained artificially deflated until the January 17, 2023 disclosure described in Sections 4 and 5.

Do you see where I read that?

A.    Yes.

Q.    Okay.  What do you mean when you say that artificial deflation of National Instruments stock is zero prior to August 12th, 2022?

A.    Like I said, it's the same with any other securities class action that I've worked on where I've constructed an artificial inflation ribbon in those other cases, which is that I'm not opining that there was any inflation or deflation prior to the start of actionable alleged misrepresentations or omissions at the start of a class period.

So my understanding is that Plaintiffs allege that the relevant truth could have been -- or the relevant omissions could have been disclosed and

CONFIDENTIAL

Page 306

DR. M. CAIN - CONFIDENTIAL
should have been disclosed on day one of
the class period, August 12th, 2022, but
the -- any investors who sold shares prior
to that date are not part of the class and
they're not eligible for damages and
therefore there's no deflation applied to
their sales prior to August 12th, 2022.

Q.    So you're -- when you say that
artificial deflation is zero dollars prior
to the class period, you're not basing that
on the facts of this case.  You're basing
it on when the class period starts and what
the plaintiff attorneys told you to do; is
that right?

MR. MANDEL:  Object to form.
Misstates testimony mischaracterize
the record.

A.    No.  I don't think that's what
I was saying.

Q.    Okay.  Do you think that on
August 10th, 2022, the stock price of
National Instruments was artificially
deflated because National Instruments had
not disclosed certain facts?

CONFIDENTIAL

Page 307

DR. M. CAIN - CONFIDENTIAL

MR. MANDEL:  Object to the form.

A.    I'm not providing any opinions about the dates prior to the start of the class period.

Q.    Well, I don't agree with that because you say it's zero prior to the start of the class period.  You say it in Footnote 178.

A.    Okay.  Well, let me qualify. I'm not providing opinions that are responsive to your question about days prior to the class period.

Q.    Other than to say what you've already said, which is that the artificial deflation is zero?

A.    That is correct.

Q.    Okay.  And now is that an opinion that you hold based on facts and evidence or is it an opinion you hold because that's what you were told to do because that's before the class period starts?

MR. MANDEL:  Object to the

CONFIDENTIAL

Page 308

DR. M. CAIN - CONFIDENTIAL

form.

A.    So it's an opinion that starts with a complaint.  It then continues with the motion to dismiss opinion, and then it proceeds with my loss causation and damages analyses.  And then it is further limited by the Court's class certification decision which certified a subclass of dates, not the entirety of the dates that were alleged in the class when I worked on my Merits Report.

So it is an opinion that I've reached based on my loss causation and damages analyses, but it is also premised upon Plaintiffs proving their case as narrowed by the Court's order.

Q.    What happened on August 12th, 2022, which is the start of the class period, that introduced artificial deflation into the stock price of National Instruments stock?

MR. MANDEL:  Object to form.

A.    My understanding is the company engaged in stock repurchases.

DR. M. CAIN - CONFIDENTIAL

Q.    And you're telling me that introduced deflation into the stock price?

MR. MANDEL:  Object to form.

A.    Based on Plaintiffs' theory of liability, yes.

Q.    How did it introduce deflation into the stock price on August 12th, 2022?

A.    My understanding -- understanding is that Plaintiffs allege that the company had a duty to disclose the allegedly omitted information because they did not do that while they were engaging in repurchasing activity that that caused stock prices to be deflated for investors who sold shares on that day.

Q.    Okay.  And you say that the artificial deflation in the NI stock price remained until January of 2023, correct?

A.    Yes.

Q.    Is it possible that a member of the class could be better off as a result of purchasing NI stock during the class period at these allegedly deflated prices and then selling after the deflation had

CONFIDENTIAL

Page 310

DR. M. CAIN - CONFIDENTIAL
dissipated after January 2023?

MR. MANDEL:  Object to form.

A.    I'm not offering any opinions about that.  What I would say is that I work on a wide variety of securities cases. There was a concept of offsetting of gains, so if investors had -- if you think about the typical artificial inflation case, if an investor purchased shares prior to the start of a class period and then sold them at inflated prices during the class period, does that represent a gain to investors.

Ultimately, I defer to the Court's guidance on answering those types of questions.

MR. COMERFELD:  Okay.  Why don't we take a break.  I'm going to look at my notes.

MR. MANDEL:  Okay.

VIDEOGRAPHER:  We are off the record.  The time is 3:54 p.m.

(Whereupon, a short recess was taken.)

VIDEOGRAPHER:  We are back on

CONFIDENTIAL

Page 311

DR. M. CAIN - CONFIDENTIAL
the record.  The time is 4:03 p.m.

MR. COMERFELD:  I don't have
any more questions for you, Dr. Cain.

MR. MANDEL:  We have no
questions, so we can conclude the
deposition here.

VIDEOGRAPHER:  We are off the
record.  The time is 4:03 p.m.  This
concludes today's testimony.  Thank
you, everyone, and take care.

MR. MANDEL:  Mark the
transcript confidential.

We'll take a rough draft.

MR. COMERFELD:  I'll take a
rough draft, too.

Original stickered exhibits
retained by defense counsel.

(Whereupon, at 4:04 p.m. the
Examination of this witness was
concluded.)


o          o          o          o

CONFIDENTIAL

Page 312

I N D E X

WITNESS                                              PAGE

MATTHEW CAIN

  By Mr. Comerford                                     5


              E X H I B I T S

CAIN

EXHIBIT          DESCRIPTION                    PAGE

Exhibit 1       Expert Report of                 6
                Matthew D. Cain,
                Ph.D., July 28, 2025

Exhibit 2       Reply Expert Report of           7
                Matthew D. Cain,
                Ph.D., November 10,
                2025

Exhibit 3       Transcript of                    28
                September 30, 2025
                Videotaped Deposition
                of Michael McGrath

Exhibit 4       Amended Complaint for            74
                Violations of the
                Federal Securities
                Laws

Exhibit 5       May 25, 2022 Emerson             90
                letter

Exhibit 6       June 22, 2022 Emerson            90
                letter

Exhibit 7       Handwritten notes                147


                           (Continued)

CONFIDENTIAL

Page 313

E X H I B I T S

CAIN

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | Press release, "NI Announces Commencement of Strategic Review Process" | 162 |
| Exhibit 9 | SEC Schedule 14A Proxy Statement | 165 |
| Exhibit 10 | "Applied Mergers & Acquisitions," Robert F. Bruner | 181 |
| Exhibit 11 | "Mergers Acquisitions and Corporate Restructurings" | 192 |
| Exhibit 12 | Presentation, "Project Wolverine, Meeting of the Board of Directors, Wachtell Lipton Rosen & Katz, June 14th, 2022 | 205 |
| Exhibit 13 | "Toeholds, Bid Jumps and Expected Payoffs in Takeovers" | 216 |
| Exhibit 14 | June 10, 2022 letter | 236 |
| Exhibit 15 | 2013 Cain and Denis paper | 252 |
| Exhibit 16 | Paper, "Speculation spreads and the market pricing of proposed acquisitions" | 263 |

(Continued)

CONFIDENTIAL

Page 314

E X H I B I T S

CAIN

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 17 | Paper, "Failed acquisition offers: The impact of failure reasons on target evaluation" | 279 |

CONFIDENTIAL

Page 315

C E R T I F I C A T E

STATE OF NEW YORK        )
                         :  SS.:
COUNTY OF SUFFOLK        )


        I, NICOLE VELTRI, RPR, CRR, a Notary Public for and within the State of New York, do hereby certify:

        That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

        I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of November 2025.

                    NICOLE VELTRI, RPR, CRR

11/14/2025

CONFIDENTIAL

Page 316

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

December 2, 2025

To: John D. Comerford Esq.

Case Name: In Re:  National Instruments Corporation Securities Litigation v.

Veritext Reference Number: 7748266

Witness:  Dr. Matthew Cain     Deposition Date:  11/14/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

CONFIDENTIAL

Page 317

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7748266
CASE NAME: In Re:  National Instruments Corporation
Securities Litigation v.
DATE OF DEPOSITION: 11/14/2025
WITNESS' NAME: Dr. Matthew Cain

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_____              _____
Date                          Dr. Matthew Cain

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
        Statement; and
Their execution of this Statement is of
        their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20_____.

                    _____
                    Notary Public
                    _____
                    Commission Expiration Date

CONFIDENTIAL

Page 318

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7748266
CASE NAME: In Re:  National Instruments Corporation
Securities Litigation v.
DATE OF DEPOSITION: 11/14/2025
WITNESS' NAME: Dr. Matthew Cain
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
I request that these changes be entered
as part of the record of my testimony.

I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.

_____          _____
Date                      Dr. Matthew Cain

Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
They have read the transcript;
They have listed all of their corrections
in the appended Errata Sheet;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.
I have affixed my name and official seal
this _____ day of_____, 20_____.
_____
Notary Public

_____
Commission Expiration Date

CONFIDENTIAL

Page 319

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 7748266

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____

Date                    Dr. Matthew Cain

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

                    _____

                    Notary Public


                    _____

                    Commission Expiration Date

CONFIDENTIAL

**[& - 17]**                                             Page 1

| **&** | | | |
|---|---|---|---|
| **&**  1:18 2:4 3:9 20:12,18 181:25 205:13 205:18 233:5 313:8,14 | **10170**  1:20 2:5<br>**10488**  1:6<br>**106**  30:14 31:11,13<br>**107**  30:15 180:22<br>**108**  177:21 178:7 180:24 261:12 263:22<br>**109**  214:6<br>**10:18**  73:25<br>**10:29**  74:5<br>**10th**  7:4 229:8 230:19 231:7 232:6 233:8 234:8 236:16 238:25 240:10 241:8,22 242:9 245:14 246:16 247:8 248:2,18 257:21 258:10 258:16 306:22<br>**11**  29:6,20 192:10,14 313:10<br>**11/14/2025** 315:25 316:9 317:3 318:3<br>**110**  215:2<br>**1100**  316:1<br>**113.6**  254:10<br>**11:49**  147:8<br>**11th**  234:8 282:9 | **12**  147:12 156:16 205:9 205:14 206:6 237:9 239:6 244:22 248:25 296:2,4,5,21 297:23 313:12<br>**120**  47:23<br>**122**  47:13 48:13<br>**123**  47:22 48:4<br>**12th**  109:2 133:2 157:2 167:5 202:22 204:2 305:12 306:3,8 308:18 309:8<br>**13**  168:23 169:25 216:4,8 313:16<br>**134**  42:7 50:19<br>**135**  213:11<br>**13th**  48:18 149:17 154:4 162:5,11,22 167:22 168:17 168:25<br>**14**  1:11 29:22 236:18,20 249:3 252:11 313:18<br>**147**  312:22<br>**14a**  165:6,17 166:15 273:15 | 313:7<br>**14d**  218:23 220:10 223:25<br>**14th**  4:5 30:25 31:12 147:22 148:5 149:8,23 149:25 150:20 151:5,12,20 152:14,24 153:14,16 154:11,12,22 156:19,25 205:13,19 206:2 208:21 210:22 258:15 258:17 259:4 313:15 315:20<br>**15**  11:17 12:3 228:6,16 229:2 249:2,21 252:19,21 313:19<br>**150**  17:8<br>**16**  263:11,16 286:18 313:20<br>**162**  313:4<br>**165**  313:7<br>**16th**  94:16 148:9 207:22 208:4 258:13 258:24 259:6<br>**17**  12:3 24:10 168:24 278:21 279:2 284:3 |
| **0** | | | |
| **0**  226:24 227:4 227:14,14,22 228:4,15<br>**0.97**  221:24 222:5 229:8,15 230:18 232:5 233:7 | | | |
| **1** | | | |
| **1**  3:9 6:15,19 42:6 166:14 186:12 231:10 253:5 259:16 291:6 292:12 292:20 312:9<br>**1,246**  286:14<br>**1,353**  217:20<br>**1,800**  110:6,20<br>**1.26**  231:9<br>**1.3**  222:21<br>**1.73**  228:3 234:21<br>**10**  7:7 29:11 182:3 236:19 312:12 313:8 313:18 | | | |

CONFIDENTIAL

**[17 - 2022]**

Page 2

301:22 305:5
314:4
**17.8** 255:22
**178** 304:23
307:10
**17th** 48:19
162:6 167:10
170:23 172:17
173:18 175:4
177:13 271:22
272:2 273:9
274:3,5,10
275:2,12
298:18
**18** 12:14,20
13:2 31:13
110:5 130:21
136:13 235:23
259:22
**181** 313:8
**1820** 316:2
**1832** 1:19 2:5
**18th** 272:12
275:3
**1900** 2:14
**192** 313:10
**1971** 217:21
**1979** 286:15
**1981** 264:4
267:21
**1985** 214:19
264:5
**1990** 217:21

**19900** 315:22
**1995** 267:22
**1998** 254:5
**19th** 281:17,18
281:23
**1:04** 205:2
**1:23** 1:6
**1:35** 205:6
**1st** 86:11

**2**

**2** 7:3,7 48:21
268:23 276:18
276:21 288:4
312:11 316:4
**2,335** 217:19
**2,496,700,000**
253:11
**2,500** 55:22
**2,800** 110:12,22
**2.2** 235:4
**2.3** 68:23
**2.5** 253:14,18
259:25
**20** 109:18
110:2,11
227:15 250:7
317:16 318:22
319:22
**200** 207:10
**2000** 214:16
216:22
**2001** 53:18

**2003** 53:18
**2004** 178:23,24
182:9 261:19
263:19
**2005** 254:5
**2007** 192:24
**2009** 211:4
**2013** 252:14,20
252:23 253:16
313:19
**2016** 114:6
286:15
**2017** 207:9
209:20
**2018** 59:15
**2019** 59:18
**2020** 94:13
**2022** 29:22
30:25 31:12
33:10 63:13
71:25 73:7
75:5 78:6
83:17 86:11,13
86:14 87:9
90:6,12,15,22
91:3,7 94:15
94:16,18,19,25
96:4 97:16
99:8 100:22
102:12 109:2
127:5,20,25
128:2,8,8
129:4,4 133:2
143:11,12,13

143:14 147:22
148:6,7,9
149:8,17
150:20 151:5
151:12,20
152:15,24
153:14,16
154:4,11,12,23
156:16,20,25
157:2,9,12,13
157:18,24
160:11 164:23
168:5,20 169:8
169:17 170:10
171:6,23
172:20 173:8
175:7,10
185:24 194:15
198:15,16
202:22 204:2
204:11 205:13
205:19 206:2
208:21 210:22
212:2 219:21
221:6,6 229:8
230:19 231:7
232:7 233:8
234:8 235:9
236:16,19
238:25 240:10
241:8,22 242:9
245:14 246:17
247:8 248:2,18
249:10,16

CONFIDENTIAL

**[2022 - 3rd]**

Page 3

256:12,21
257:21 258:10
258:13,15
259:4,6 264:7
265:7 268:19
276:2 281:12
282:9,21,22
283:14,15,15
305:12 306:3,8
306:22 308:19
309:8 312:19
312:20 313:15
313:18
**2023** 45:23
48:19,19
126:24 127:18
127:24 139:11
140:16,19
142:19,24
145:24 162:5,6
162:11,22
166:18 167:6
167:10,17,22
168:6 169:25
170:23 171:21
254:6 271:22
272:2,12 275:3
280:10 298:19
305:5 309:19
310:2
**2024** 74:10
178:22 278:13
279:4 301:22
303:8

**2025** 1:11 4:5
6:16,18 7:4,7
8:6,18 9:19
11:17 12:6,15
12:20 13:2,7
18:6 28:20
63:13 285:21
286:3 312:10
312:13,14
315:20 316:4
**205** 313:12
**20th** 281:12,23
**21** 32:5 35:6
37:6,19 39:12
**216** 313:16
**216-523-1313**
316:3
**22** 90:15
269:15 276:22
281:15 312:20
**22998** 206:6
**22nd** 86:13
90:21,22 91:7
93:22 94:18
100:19 198:16
208:8 221:6
268:19 276:2
276:22 281:15
**23** 262:11,12
264:24 267:8
267:22,25
**230** 193:10,11
**231** 193:11
195:5

**236** 313:18
**25** 11:13 13:14
66:9 90:6
181:17 231:12
289:20 291:13
291:16 293:14
312:19
**250,000** 250:7
250:16 251:2
257:3,23
**252** 313:19
**254** 253:4
**257** 254:14
**25th** 90:12 91:3
93:22 94:15
100:18 148:7
172:20 198:15
221:5
**263** 313:20
**27** 66:10,13
68:3,11 69:7
71:14 270:20
**279** 314:4
**28** 6:18 110:12
312:10,14
**28th** 6:16 11:13
157:13 208:14
209:20
**29** 74:22,22
76:7 79:24
270:20
**29th** 74:10
234:23

**2:41** 261:5
**2:54** 261:9
**2nd** 94:19
127:5 128:8
129:4 143:14
282:21 283:15

**3**

**3** 28:22 29:2
30:19 36:5
120:9,12
226:17 312:14
**30** 3:9 5:22
28:20 107:10
109:10,25
110:5 224:20
225:8 312:14
**31st** 208:4
249:10,16
**32** 167:4
**33** 107:10
157:11 229:2
**33.1** 254:25
**334** 36:5 39:14
40:10
**35** 5:22 107:10
**362** 264:3
**39** 113:24
**3:14** 277:21
**3:15** 277:25
**3:54** 310:22
**3rd** 94:18,24
97:15 99:8
100:22 102:12

CONFIDENTIAL

**[3rd - 7]**

Page 4

127:18 128:2,8 129:4 143:13 157:24 164:23 168:5 204:10 282:22 283:14 283:15

**4**

**4**   45:7 74:8,14 74:23 80:19,20 80:22 122:16 186:10 226:8 226:11 236:25 237:4,8 246:20 254:15 256:18 259:17,21 305:6 312:16
**40**   15:18 262:13 267:17
**42.37**   293:22
**420**   1:18 2:5
**43**   177:21 261:12 267:15 267:18
**43.09**   293:22
**44**   214:7
**44114**   316:2
**45**   278:5
**46**   220:4 258:20
**47**   47:12 148:17 152:2
**48**   36:9,12,16 36:16,18,22

38:7,9 39:16 39:16,23 42:15 42:18,22 43:8 43:24 44:6,17 46:11,15 48:25 49:7,12,13,21 49:24 50:2,7 50:15,21,22 51:20,24 52:13 79:22 83:18,24 84:3,5 85:9,18 85:24 86:12 87:13 92:17 97:18,23 98:5 99:24 101:11 101:20 102:16 105:21 106:4 106:12 107:7 107:20 108:11 108:19 110:5 110:12 111:7,9 111:22 112:20 112:23 113:5 113:10,11,18 155:7 159:3 172:12,15,19 174:14,18,19 175:8,14,15 177:2,4 265:20 266:10,12,17 266:18,23 268:11,21 270:4,10 273:5 273:7,17,22

274:15,16,23 275:9 276:17 281:19 294:5
**48.00**   50:11
**49**   8:15 258:24
**49.2**   255:5
**4:03**   311:2,9
**4:04**   311:19

**5**

**5**   15:8 24:8 45:20 90:8,11 223:5 227:15 227:15,22 228:4,15,16,25 273:21 305:6 312:5,19
**50**   17:7 36:21 268:13,16
**52**   9:7 17:22 20:16 21:7 23:5
**52.04**   272:4
**52.50**   272:14
**53**   11:23 21:17 51:10,16 113:14 126:22 127:19 141:2 157:23 158:21 164:24 166:24 167:19 171:3 172:7,13 173:6 174:12 175:6 175:14 177:3,6

177:15 204:11 271:21 272:7 272:11,17,21 273:19 274:25 276:16
**54**   12:2 21:23
**55**   21:25 36:21
**56**   20:17 23:5 23:15 157:10 304:23
**58**   282:3
**58.50**   155:15
**5th**   86:13

**6**

**6**   90:17,20 268:25 269:2 276:3 312:9,20
**60**   140:21 141:3 155:17 274:7
**61**   155:13 271:11
**63105**   2:15
**64**   7:25 53:14
**690**   182:18,21 184:2 187:24 189:4 191:13

**7**

**7**   133:14 147:15,18 154:10 220:8 286:24 289:6 289:16,17,18

CONFIDENTIAL

**[7 - accused]**

289:19 290:3 293:11,17,17 312:11,22
**701** 186:11
**74** 231:5 312:16
**7676** 2:14
**7748266** 316:8 317:2 318:2 319:2
**78** 222:19
**79** 120:11

**8**

**8** 162:9,17 254:2 291:4 313:4
**80** 15:18
**82** 67:10 74:20 75:3,4,21,24
**82.2** 255:11,18
**83** 244:20 248:25 278:5 284:12
**84** 235:2 252:10
**842** 217:14
**846** 218:22 219:11
**850** 223:21
**857** 226:12
**858** 226:7,12
**86** 40:15,19,20

**87** 74:18

**9**

**9** 133:13 165:5 165:8 170:24 269:12 273:12 313:7
**90** 271:17 312:19,20
**95** 15:7
**96** 67:10 74:20 75:4
**97** 113:25
**98** 30:22 31:2,9
**991** 216:11
**998** 296:22
**9:05** 1:12 4:4

**a**

**a.m.** 1:12 4:4 73:25 74:5 147:8
**ability** 6:11 18:18,23 174:23 175:23
**able** 88:2 117:3 128:18 160:3 198:23 287:13
**abnormal** 46:24 47:25
**above** 10:5 12:3 39:24 52:13 83:24 99:23 111:8,9 112:20 113:16

174:20 179:18 213:13 255:15 261:20 265:24 266:13 267:23 273:7,19 275:9 316:17
**absence** 245:4 246:2
**absolutely** 101:24 179:25
**abstract** 217:4 263:24 286:13 290:14,15
**abu** 22:3
**academia** 284:2
**academic** 15:9 15:10 43:14,17 55:3 57:17 59:5 60:3 116:4 121:4,7 121:12 126:20 137:18,25 176:5 180:2,25 181:18 190:16 196:8 199:10 210:19 213:11 214:11 218:9 218:14 222:22 223:10 245:10 250:21 256:19 278:12 284:18 294:25 295:3,9 297:9 298:23

299:5,14 300:11,15,24 301:6,10,19 302:20,22
**academics** 287:21
**accept** 183:12 183:21 292:5
**accepted** 167:24 177:15
**access** 60:11,18 119:7 269:5
**accommodati...** 209:7
**accordance** 317:5 318:5
**account** 33:11 199:11 201:17 291:19
**accounting** 14:4 16:3
**accumulate** 213:15
**accumulation** 213:3,22 215:8 235:3 236:5
**accurate** 42:2 104:16 161:20 201:3
**accusations** 96:20
**accused** 97:21 98:7

CONFIDENTIAL

**[acknowledge - administer]**                                    Page 6

**acknowledge**
113:8 317:11
318:16
**acknowledging**
182:19
**acquire** 68:15
71:15 75:7
81:6,15 82:12
83:3,8,18
122:5,20 123:7
159:9 166:23
171:2 206:18
207:9 209:17
211:5 215:4
223:12 282:11
**acquired** 133:8
221:24 231:9
232:4 233:7,21
253:25 291:21
292:3
**acquirer** 93:7
159:7,19 164:7
199:3 236:6
296:9
**acquirer's**
181:23
**acquirers**
88:16 163:12
169:19,24
170:4,18
179:10
**acquires**
212:21 223:4

**acquiring**
161:2 172:23
174:4,24 221:3
221:9,13
223:15,18
**acquisition**
53:22 54:7,18
57:20 112:10
129:3 163:22
177:23 178:16
180:3 198:5
214:15 237:19
247:3 261:17
264:3 278:24
279:5,19
286:15 291:10
293:4 314:5
**acquisitions**
45:19 53:2
54:13 61:21
62:2,17 136:18
159:25 182:2
187:9 192:12
192:17 197:22
218:10 263:15
264:15 279:22
299:18,22
300:10 313:9
313:10,22
**act** 237:14
246:25 317:14
318:20
**acted** 281:5

**acting** 130:3
**action** 4:19
23:19 106:17
167:21 196:10
305:14 315:16
**actionable**
67:23 70:14,19
305:3,19
**actions** 23:23
29:15 32:22
245:16
**active** 10:20
11:5 124:5
149:4,9 150:3
**actively** 119:18
120:16,22
122:3 123:10
123:14 129:17
129:25
**activities** 15:10
**activity** 12:15
12:19 60:7
64:17 106:21
112:10 115:6
116:25 178:18
245:13 309:14
**acts** 95:24
**actual** 44:9
49:22 58:14
99:11 138:18
194:9 258:23
293:25
**actually** 9:4
34:6 41:22

110:16 121:4
126:3 152:16
158:19 180:7
191:3 200:8
219:3 225:10
225:15,17
243:2,20 268:9
285:6,9 297:10
**adapthealth**
21:24
**added** 8:18,25
9:12 11:11
31:6 236:3
**additional** 9:2
9:15 10:7
11:22 12:18
24:9 62:8,16
76:6 136:5
140:12 178:10
179:20 234:24
266:25 269:8
269:22 270:13
276:19 277:6,9
280:9 285:14
**address** 243:10
316:16
**addresses**
137:19 236:25
299:9
**adds** 17:5
**adjust** 254:4
**administer** 3:6
4:18

CONFIDENTIAL

**[admitted - alleged]**                                                      Page 7

**admitted**
213:18
**adopt** 50:9
**advance** 114:8
**advantages**
215:4
**adverse** 286:20
**advised** 236:4
**adviser** 53:5,21
54:3,17 55:25
56:6,16 237:15
237:16 242:11
246:25 250:8
254:16,19,23
254:25 255:6
255:12,18,23
**advisers** 128:14
130:4 163:6
184:5,7 245:12
249:6 254:17
257:9,17
259:22 260:12
**advisors** 130:4
**advisory** 56:13
**advocating**
117:11
**affect** 6:11
84:14 106:8
130:24 244:5
**affecting**
121:23 125:3,4
**affiliates**
237:13,16

**affiliations** 5:3
**affixed** 317:15
318:21
**aggregate**
41:18
**ago** 44:15
270:3 276:3
**agree** 32:18
33:8,21 35:19
38:14 52:4
66:2 82:22
84:2 86:5 87:5
87:25 94:23
96:5 98:3,6
99:3 101:15
114:16 115:24
123:17 125:15
127:3 144:12
148:10 153:17
154:7 156:18
168:15 169:2
171:9 173:4
175:14 176:25
177:8 184:11
185:25 188:6
191:15 193:9
195:4,18 196:7
198:12,18,22
199:9 200:14
201:22 208:20
209:9 217:24
219:17 221:4
221:10 223:11
223:16 224:24

225:14 226:2
227:16 230:11
231:13 232:3
238:6,8,14,16
239:7 240:21
240:22 241:7
244:3 248:5,12
250:6 251:4
253:21 256:9
256:20,25
257:20 258:8
258:16 259:3
263:7 265:21
267:6 274:12
275:5,19
276:24 277:13
277:15 280:14
304:10 307:7
**agreed** 3:3,11
35:10 65:20
190:19 238:2
246:7,11,13
250:16 251:9
284:20,25
290:7 303:18
**agreement**
13:15 14:8,14
191:5,15 192:2
238:8 277:16
284:25
**agreements**
279:24
**air** 210:24
211:4,23

299:19
**airgas** 210:24
211:5,6,8
299:20,25
**allegation**
34:19 93:12
115:21 230:5
231:22
**allegations**
44:25 45:10
64:8 66:6,7
67:2,4,7 69:23
71:8,9 73:2,19
74:19 76:5,15
79:13 80:11,16
103:9,15
104:18,20
118:8 135:23
138:13 270:22
271:3
**allege** 77:17
78:23 79:10
104:21 122:17
171:12 305:23
309:10
**alleged** 45:9
67:20 76:10
102:24 111:13
111:20 112:24
118:16 130:22
131:15 141:6
155:4 173:8,24
214:3 230:9,14
243:14 285:11

CONFIDENTIAL

**[alleged - answer]**                                                    Page 8

302:14 305:3
305:19 308:10
**allegedly** 43:7
49:8 64:18
66:15,18,21
67:24 70:9
71:12,20 76:11
77:2,19 79:17
80:3 86:6
87:21 92:15
94:3,7 95:10
95:22 99:20,21
100:6 101:7
105:23 107:6
108:12 138:15
138:25 139:25
141:11 155:8
158:2,23
161:10 171:21
173:2,18 175:2
197:19 213:17
229:16 243:17
263:8 265:17
266:5 268:5
270:17 271:5
309:12,24
**alleges** 68:13
104:19
**alleging** 89:16
115:16 134:24
**allow** 19:13
269:8,23
270:14 276:19
277:10

**allows** 195:8
**altered** 154:12
**alternate**
103:13
**alternative**
100:4 116:22
116:23 148:20
152:6 153:7
155:10 163:22
293:21 294:14
**alternatives**
163:11
**alyssa** 2:8
**ambiguity**
304:11
**amended** 74:8
74:11 312:16
**america** 56:15
56:22 57:3,13
57:24 58:9
63:19 236:17
237:9,12 239:2
239:4 241:13
241:23 242:6
242:11 244:19
245:3,22
246:16 250:15
251:4,25
254:19 256:20
257:21 258:9
**america's**
236:12 256:11
**amount** 59:23
84:24 85:8

99:24 110:20
110:22 225:23
237:24 240:10
240:15 247:8
247:15,15,24
248:3,10,13
251:10 265:21
266:14
**ana** 2:9
**analyses** 43:22
51:7 96:25
102:2 274:21
308:7,15
**analysis** 42:12
44:21 45:18,19
51:14 52:19
57:22 59:24
77:4 81:11
105:10 135:6
136:18,20
140:15,17
159:25 160:2
173:23
**analyst** 53:8,16
54:11 55:9
56:4 57:16
**analysts** 46:2
136:23
**analyze** 141:10
144:23 162:23
**analyzed** 144:2
294:20
**analyzing**
118:14 171:19

218:18 230:10
303:22
**announce**
106:20 116:6
170:7
**announced**
126:22 170:9
208:3 279:24
284:19 285:2
289:14,23
290:5,8,21
291:10,12
293:5 303:15
**announcement**
141:2 166:15
263:5,8 264:18
264:25 289:21
291:15
**announcements**
112:12 116:11
138:5 264:3
292:12,14
**announces**
162:12,15
166:22 313:5
**announcing**
163:2 170:2
**anonymized**
60:13 200:7,11
**answer** 25:11
26:23 28:4
29:11 30:5,10
31:17 36:15
37:23 45:6

CONFIDENTIAL

49:11 87:3
89:25 90:5
96:25 141:17
141:18 142:2
144:7 145:2
153:25 174:8
204:16 235:18
252:6,8 256:23
**answered**
46:17 52:6
72:22 77:15
141:16 142:16
144:5,25
146:11 248:8
**answering**
125:7 310:15
**answers**  35:15
35:25 39:10
146:24 153:4
247:21 251:19
**anticipate**
261:23
**antitakeover**
193:17
**antonio**  21:17
**anymore**  135:2
**anyway**  101:20
**appeal**  11:4,9
**appear**  148:19
317:11 318:15
**appearances**
4:23 5:2
**appearing**  1:21

**appears**  31:5
**appended**
318:11,18
**appendix**  8:2,3
8:14,16 53:15
113:24 120:9
291:3,6 293:3
**applicability**
188:20
**applied**  42:13
44:5 88:2
181:25 306:7
313:8
**apply**  44:5
136:16 236:3
260:14
**applying**  46:4
136:25
**appraisal**  62:18
**approach**
48:16 49:19
202:23 203:25
204:10 229:24
**approached**
163:14,20
164:9,14
199:22 207:8
298:3
**approaches**
201:25 244:2
**appropriate**
18:15 118:3
302:9

**appropriaten...**
118:11
**approximate**
10:24
**approximately**
80:24
**arbitrage**  43:14
261:22 262:3
264:19 265:14
265:23 268:14
274:4
**area**  32:25
**argumentative**
196:25 246:10
248:8
**arguments**
114:25
**armour**  21:25
**arrangement**
14:15 15:19,21
15:23 255:25
**arrangements**
249:5 252:13
**arrive**  41:13
43:7 48:25
**arriving**  49:5
**article**  217:16
**articulate**  64:6
**artificial**  40:24
42:8,17 49:20
50:10 104:3
106:11 285:13
294:11 302:10
304:14,24

305:10,16
306:10 307:16
308:20 309:18
310:9
**artificially**
305:4 306:23
**aside**  23:13
**asked**  31:11
35:17,24 36:9
46:17 52:6
58:16 72:21
77:15 141:16
141:22 142:16
143:6 144:4,24
146:10 204:6
243:25 248:8
251:22
**asking**  20:20
24:2 25:15
26:21 27:5,16
28:5 44:17
96:18 98:18
128:23 137:11
144:18 145:3
174:2 188:25
231:20 238:11
239:11 241:18
257:22,23
259:15 297:13
298:8 301:8
**aspects**  124:14
124:22
**assertion**
249:11

CONFIDENTIAL

**[assess - avoidance]**                                                   Page 10

| | | | |
|---|---|---|---|
| **assess**  10:23 | **attach**  19:20 | **attorneys**  2:4 | 294:18 297:16 |
| **assessing** | **attached**  19:18 | 2:13 306:14 | 298:10 |
| 173:23 | 318:7 | **auction**  195:11 | **authorize** |
| **assessment** | **attempt**  32:14 | **august**  71:25 | 318:11 |
| 232:24 | 33:19 37:18,22 | 73:6 78:6 | **authorized**  3:6 |
| **assignment** | 40:4 91:19 | 83:17 86:11 | 4:17 |
| 317:2 318:2 | 135:8 137:15 | 94:12,18,19,24 | **authors**  178:12 |
| 319:2 | 138:23 156:6 | 96:4,14 97:15 | 217:6 263:25 |
| **assist**  13:6 | 197:12 203:7 | 99:8 100:22 | 264:13 265:13 |
| **assisted**  16:2,8 | 209:17 237:19 | 101:9 102:12 | 278:16 279:9 |
| **assisting**  14:18 | 247:3 282:11 | 109:2 127:5 | 284:4 285:5 |
| **assists**  13:9 | **attempted** | 128:8 129:4 | **automation** |
| **associated** | 58:13 87:3 | 133:2,12,12 | 206:18 207:8 |
| 11:18 84:5 | 96:24 98:14 | 143:13 156:16 | 207:10 209:19 |
| 217:9 | 100:2 157:5 | 157:2 160:11 | 298:2 |
| **assume**  66:21 | 187:14 204:15 | 168:20 169:8 | **availability** |
| 66:24 67:8 | 252:8 256:23 | 169:17 170:10 | 222:25 |
| 78:2 86:9 | **attempting** | 171:6,22 173:8 | **available** |
| 132:24 134:5 | 38:16 39:6 | 202:22 204:2 | 100:13 105:9 |
| 150:18 235:15 | 40:5 67:3 71:5 | 207:9 211:25 | 163:9 166:10 |
| 242:18 | 76:13 101:5 | 219:20 229:8 | **avalos**  2:9 |
| **assumed**  81:12 | 116:21 136:9 | 230:19 231:7 | **ave**  316:1 |
| 83:5 | 188:18 | 232:6 233:8 | **avenue**  1:19 2:5 |
| **assumes**  135:21 | **attempts** | 234:8 235:9 | **average**  14:24 |
| 137:10 145:18 | 119:25 124:4 | 249:10,16 | 155:24 190:17 |
| 151:2 233:10 | 158:12 181:19 | 282:9,21 | 191:2,9,10 |
| **assuming**  76:20 | 185:4 186:7 | 283:14,15 | 197:23,24 |
| 77:7 79:12 | 243:8 292:17 | 305:12 306:3,8 | 215:5 244:10 |
| 83:14 | 295:4,24 297:8 | 306:22 308:18 | 253:11,15,17 |
| **assumption** | 297:10 | 309:8 | 259:25 262:12 |
| 118:20 | **attention**  6:8 | **author**  192:18 | 267:21,22,25 |
| **asymmetry** | 264:20 | **authoritative** | 271:18 |
| 287:22 | **attitudes** | 120:25 181:9 | **avoidance** |
| | 244:14 | 183:8,19 193:3 | 237:24 |

CONFIDENTIAL

**aware** 5:2 10:25 68:13 75:6 120:24 127:15 128:5 129:6,11 137:18 150:24 151:3 156:10 218:16 229:9 230:25 232:13 233:3 234:4,11 283:5 295:11

**b**

**b** 45:16 216:12 238:3 245:15 246:24 248:17 312:7 313:2 314:2

**bachelor's** 55:12

**back** 14:12 21:15 24:18 36:20 54:22,22 61:9 74:4 147:11,21 168:4 177:18 184:15 198:8 198:11 199:20 205:5 206:5 215:22 243:25 260:8 261:8 270:21 273:10 277:24 283:12 285:24 286:9

290:3 293:11 300:7 310:25 316:16

**background** 44:25 45:8 199:17 206:16

**backs** 199:5

**bad** 93:7 110:24

**ballpark** 12:4 55:21

**banging** 9:22

**bank** 23:15,20 53:13 55:24 56:15,21 57:2 57:12,24 58:9 63:18 236:12 236:17 237:8 237:12 239:2,3 241:12,23 242:5,11 244:19 245:3 245:22 246:15 250:15 251:3 251:25 254:18 256:10,20 257:21 258:9

**banks** 237:22 239:16 247:5 250:22,25

**bargaining** 121:10 202:18 203:6 225:18

**based** 19:5,15 48:18 51:2,9 60:4 71:9 77:4 88:4 96:15 98:18 102:23 102:25 103:6 107:14,18 109:16 112:3 116:24 117:9 118:6,25 124:6 140:25 223:24 225:11 228:13 245:4 246:2 250:18 294:15 307:20 308:14 309:5

**basic** 193:16

**basically** 179:2 235:9 240:17 259:15

**basing** 306:11 306:12

**basis** 60:15 260:19

**bates** 216:11 296:21

**battle** 299:20 300:3

**bear** 13:4

**becoming** 197:13

**began** 102:18 109:22 113:21 133:11 221:3,8

**beginning** 8:10 15:25 64:25 65:24 69:11 72:15 75:5 101:9 103:22 105:11,22 106:2 107:23 109:7 133:2 168:19 171:5 177:5 182:8 187:25 217:2 221:22 233:22 249:9,15 280:7 304:16

**begins** 29:10 223:12 268:24 269:18

**behalf** 63:7

**behavior** 81:5 81:14 83:2 122:19 184:14

**beholder** 203:5 240:3

**belief** 185:17 275:8

**beliefs** 85:5

**believe** 11:14 11:14 12:17 14:10,13 16:16 17:24 18:3,8 19:4,18 20:10 22:5,9 24:16 26:8 28:10 30:24 40:12

CONFIDENTIAL

**[believe - broader]**                                                          Page 12

62:15 63:6
122:9 148:12
160:12 162:24
165:2 176:11
176:16,19
201:2 204:6
206:3 219:25
228:12 232:12
247:23 259:10
263:19 285:19
289:2,14,19
290:10 295:22
298:5
**believing**  211:7
**ben**  16:14
278:16 285:17
301:21 303:20
**benefit**  117:7
**bennett**  2:12
**berkeley**  14:5
**bernstein**  22:18
**best**  5:24 18:17
18:22 21:2,5
23:21 24:19
40:13 152:23
164:19 257:3
285:25 286:3
286:11
**beta**  46:23
47:22 48:2,7
**better**  175:7
309:22
**betton**  214:15
215:18 216:12

217:25 218:17
222:16 223:21
226:7
**beyond**  12:20
99:25 105:2
118:9 139:13
141:4 142:7,20
145:25 153:9
168:11 212:12
234:23
**bid**  148:23
195:9,15 196:2
196:3 210:24
211:17 214:17
215:6 216:5,17
220:23 224:20
225:5 226:21
228:6,21,23,25
229:4 262:17
264:16 265:2
313:16
**bidder**  214:12
214:21 218:23
223:4,12,14
224:15 227:12
227:21 228:8,9
228:16 292:4
**bidders**  88:16
178:14 180:12
213:15 215:3
223:17
**bidding**  179:20
**bids**  178:11
200:11 217:10

217:19 220:7,9
220:18 223:24
261:24 262:17
262:18
**big**  55:16 70:7
**billion**  253:14
253:18,22
254:2,10
259:25 260:15
**bit**  63:19 94:4
95:11 153:22
173:14 236:13
266:15 268:8
273:15
**black**  203:10
203:12
**blood**  315:16
**board**  28:11
29:23 30:2,25
31:12,14 32:9
32:20 33:11
37:8 83:6
84:19 85:6
98:21 132:13
163:3 184:9,19
186:16,17,23
189:18 195:21
196:11 205:12
205:17,25
206:15 208:8
208:23 210:22
211:6,15
249:25 258:22
259:4 281:9,10

281:13,18,22
282:2 297:25
299:25 313:13
**board's**  29:21
187:18 237:13
**bond**  114:5
**bottom**  11:22
17:22 21:23
29:10 191:12
216:23 220:4
223:22
**bought**  109:20
**boulevard**  2:14
**bracket**  237:22
239:16 247:5
**brackets**  29:24
**break**  68:7
73:23 76:25
100:2 139:18
139:20 145:6
204:20 210:9
260:25 261:3
310:18
**breakdown**
78:19 292:13
**breaking**  271:2
**brief**  184:8
**briefly**  47:20
**bring**  193:21
**bringing**
186:15
**broader**  188:19
218:10 245:16

CONFIDENTIAL

**[broadridge - cain]**                                    Page 13

**broadridge**
  59:9,12
**bruner**  91:17
  121:6 181:16
  182:2,6,10
  183:25 186:12
  187:4,24 188:9
  189:15 190:2
  191:13 193:5,6
  196:19 197:8
  202:5 203:3,10
  244:9 295:2,5
  298:24 299:8
  301:9 313:9
**bruner's**  186:8
**bucket**  292:7
**bucks**  110:6
**build**  262:23
**building**  9:23
  218:13
**bulge**  237:22
  239:15 247:5
**bullet**  9:25 10:5
  17:4,22,25
  18:14,24 20:25
  23:11 207:11
  207:14 208:13
  209:11
**bump**  12:3
**business**
  163:10,21
**busy**  13:7
**buttress**  33:25

**buy**  36:10
  134:6
**buyer**  68:20
  71:18 72:4,18
  73:9 75:12
  184:8 185:14
  189:6
**buyer's**  183:3
  185:20
**buyers**  189:18
**byline**  166:17

**c**

**c**  2:2 45:20
  113:24 120:9
  315:2,2
**ca**  316:25
**cain**  1:16 4:1,8
  5:1,7,13 6:1,18
  6:19 7:1,6,7
  8:1 9:1 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  28:22 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1

48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
74:6,13 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
90:7,16 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1

130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1,13
147:18 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1,16
163:1 164:1
165:1,7 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1,3
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1,13
193:1 194:1
195:1 196:1

CONFIDENTIAL

**[cain - case]**                                                    Page 14

| | | | |
|---|---|---|---|
| 197:1 198:1 | 261:1,11 262:1 | 102:22 137:5 | 192:16 193:14 |
| 199:1 200:1 | 263:1,16 264:1 | 143:7,8 260:18 | 219:11 255:4 |
| 201:1 202:1 | 265:1 266:1 | **calculated** | 279:4 |
| 203:1 204:1 | 267:1 268:1 | 84:23 85:20 | **calling** 32:24 |
| 205:1,7,14 | 269:1 270:1 | 87:10 175:16 | **calls** 232:11,22 |
| 206:1 207:1 | 271:1 272:1 | 271:19 293:21 | 238:10,21 |
| 208:1 209:1 | 273:1 274:1 | **calculating** | 240:25 241:15 |
| 210:1 211:1 | 275:1,25 276:1 | 46:24 47:2 | 241:15 250:20 |
| 212:1 213:1 | 277:1 278:1 | 50:9 135:16 | **cap** 113:18 |
| 214:1 215:1 | 279:1,2 280:1 | **calculation** | **capacity** 53:9 |
| 216:1,7,11 | 281:1 282:1 | 42:8 44:4 46:6 | 237:20 |
| 217:1 218:1 | 283:1 284:1 | 46:9,10 50:14 | **capital** 53:16 |
| 219:1 220:1 | 285:1 286:1 | 51:19,23 | 53:25 91:4 |
| 221:1 222:1 | 287:1 288:1 | 105:19 106:25 | **care** 311:11 |
| 223:1 224:1 | 289:1 290:1 | 107:3,14 108:8 | **case** 1:6 7:14 |
| 225:1 226:1 | 291:1 292:1 | 108:14,17 | 13:23 14:3 |
| 227:1 228:1 | 293:1 294:1 | 113:11 115:11 | 15:20 16:6,9 |
| 229:1 230:1 | 295:1 296:1 | 213:19 274:22 | 17:11,20 18:16 |
| 231:1 232:1 | 297:1 298:1 | **calculations** | 19:11,17 23:20 |
| 233:1 234:1 | 299:1 300:1 | 40:17,21 41:3 | 24:5 25:6 |
| 235:1 236:1,20 | 301:1 302:1 | 41:6,13,22 | 32:21 41:15 |
| 237:1 238:1 | 303:1 304:1 | 42:3,22 43:11 | 42:4 44:5,25 |
| 239:1 240:1 | 305:1 306:1 | 44:22 45:21,24 | 45:11,15 51:9 |
| 241:1 242:1 | 307:1 308:1 | 47:4,6 49:4 | 57:3,13 60:25 |
| 243:1 244:1 | 309:1 310:1 | 52:24 111:20 | 61:14 73:5 |
| 245:1 246:1 | 311:1,4 312:4 | 113:19 118:21 | 74:9 76:10 |
| 247:1 248:1 | 312:8,10,12 | 293:23 | 79:16,17 81:12 |
| 249:1 250:1 | 313:3,19 314:3 | **cali** 2:10 | 82:6,9 87:22 |
| 251:1 252:1,20 | 316:9 317:4,9 | **california** 14:6 | 87:24 92:7 |
| 252:21,23 | 318:4,13 | 23:15,20 | 93:13 104:24 |
| 253:1 254:1 | 319:20 | **call** 131:13 | 106:17 115:17 |
| 255:1 256:1 | **calculate** 40:24 | 217:3 292:23 | 117:15 118:3 |
| 257:1 258:1 | 42:16 47:24 | **called** 5:7 8:20 | 118:17 126:17 |
| 259:1 260:1 | 49:19 88:2 | 9:9 182:23 | 133:7 137:17 |

CONFIDENTIAL

**[case - chairman]**

138:12,24
139:7,10,25
140:8,23 141:8
142:5,17
144:15 145:19
145:20 146:15
148:3 176:14
184:12,20,23
185:7,22 186:7
186:19 187:10
189:22 193:24
197:19 203:20
209:23 219:19
220:13,24
224:25 226:5
228:24 229:17
230:10 234:6
237:11,19
243:14 246:3
253:24 262:16
265:6 266:3
268:4 278:9
279:14 280:16
284:5 285:18
286:8 296:3,20
297:7,20
298:18 299:14
300:4 301:24
303:10,17,20
306:12 308:16
310:9 316:6
317:3 318:3
**cases** 9:12,14
9:16,20 10:6,8

10:9,11,19,25
11:2,3,8,11,17
12:14,19 13:2
13:5,6,16
17:18 19:8,24
22:24 23:13,14
23:18,19 27:3
34:11,19 35:3
61:19,24 62:6
62:6,9,16,19,20
62:25 63:4
97:13 117:22
118:13,23
119:11 180:20
180:23 199:2
267:22 300:16
305:17 310:6
**cash** 68:18
71:17 75:11
100:16 117:6
166:22 167:4
174:22 211:5
264:3
**categories**
23:12 228:2
303:21
**categorize**
224:5 292:21
**category**
290:17,19
**causation**
308:6,14
**cause** 106:24
289:3

**caused** 79:21
92:16 93:24
96:14 99:23
101:10 104:9
107:20 111:5
111:12,15,19
265:19 286:19
290:18 309:14
**causes** 105:5
159:6
**causing** 84:12
**caveat** 20:25
**cents** 50:11,16
51:20,24
**ceo** 90:12,13,22
184:2 185:14
186:21 189:7
195:21 196:9
268:19 269:3
270:11
**ceo's** 184:14
186:14
**certain** 25:24
27:21,22 32:22
33:17,25 37:5
39:10 41:21
67:20 70:23
80:4 113:15
120:3 158:13
159:21 169:4
188:9 212:6
219:20 262:14
267:17 306:25

**certainly** 22:16
54:23 113:8
123:24 124:19
131:20 140:14
140:16 142:3
142:18 149:13
175:14 189:21
193:7 198:25
201:22 218:4
219:6 226:3
230:14 236:8
275:10 277:11
277:15 282:18
285:13
**certainty** 68:19
71:17 75:12
174:23 270:25
**certificate**
318:11
**certification**
3:5 70:23 71:3
71:4,11 81:24
136:4 308:8
317:1 318:1
**certified** 308:9
**certify** 315:9,14
**cetera** 44:12
46:18 190:14
227:15 241:4
241:17
**chairman**
28:10 32:8
37:8

CONFIDENTIAL

**change** 7:22
112:8 144:19
153:16 160:24
237:2,17
238:18 239:5
240:12,18
241:9 246:18
247:2,9,25
250:9,17 251:5
316:14,15
318:8 319:3
**changed** 143:9
143:18 146:3
**changes** 9:5
106:24 134:5
134:10 143:21
316:13 317:7
318:7,9
**characteristics**
219:13 227:25
**characterizati...**
52:16 149:14
161:18 186:14
187:2,7 195:4
238:14 245:21
276:10
**characterize**
186:7 188:19
202:23 203:25
204:9 222:12
243:9 256:10
264:6,10
**characterized**
238:7 244:11

244:12 257:4
270:8
**characterizes**
245:2
**characterizing**
120:3 131:22
196:17 201:4
227:14 262:2
266:16,22
**charge** 237:21
**charged** 239:15
247:4
**check** 198:11
**chemocentryx**
12:2,11,12
**chosen** 168:19
**christopher** 2:7
**circumstances**
160:9
**cite** 24:3 25:8
25:23 28:8
74:20 91:17
130:10 176:5,8
178:3 183:15
209:13 212:6
216:13 229:22
263:21 295:5
303:4
**cited** 24:14
26:13 157:21
180:14 183:13
267:7
**cites** 121:7
187:3

**citing** 30:14
37:7 178:21
208:15 215:17
**city** 53:13
55:13,14
**civil** 317:5
318:5
**claim** 124:5
**claims** 157:17
**clarification**
61:7 192:6
256:5
**clarify** 11:7
220:11
**clarity** 292:11
293:9
**class** 23:19,22
34:22 42:18,19
45:15 46:12,12
49:21,22 64:16
64:25 65:25
69:11 70:23,24
71:3,10 72:15
78:16 79:6,23
80:15 81:24
86:7 93:16,17
93:19 102:23
103:4,20,22
104:2,5,9,11
105:9,10,11,13
105:13,22
106:2,7,8,13,15
106:17 107:12
107:19,21,23

108:16,25
109:8,9,22,23
109:24 110:19
110:21 112:20
113:22 114:18
115:7,15
116:15 118:17
119:20 120:18
123:12 124:15
126:25 129:19
131:11,16,23
132:3,10,23
133:3,11,23
136:4 138:15
139:7,9 140:8
140:10,24
141:4,8 142:4
142:9 143:17
145:22 146:2,5
156:17 158:25
167:18 168:11
168:20 171:6
171:14 173:3
173:20 176:13
177:5 202:21
219:18,19
220:23 221:13
221:22 231:25
233:22 234:19
235:5 249:16
250:2 251:12
252:2 262:20
263:6 268:6
273:3 274:10

CONFIDENTIAL

**[class - company]**                                    Page 17

280:4,8,9,11,15
282:10 284:24
302:12 304:17
304:20,25
305:14,21
306:3,5,11,13
307:6,9,14,23
308:8,11,19
309:22,23
310:11,12
**classify**  223:23
**clayton**  2:15
**clear**  27:8
    174:6 185:15
    189:7 292:17
    304:9
**cleveland**  55:9
    316:2
**client**  254:16
**clients**  14:16
**close**  26:2
    68:21
**closed**  272:14
**closing**  167:5
    272:3
**code**  47:18 92:3
    197:11 207:2
    260:8
**coding**  257:13
**coefficient**  48:7
**coefficients**
    46:23 47:23
    48:3

**coercive**  126:10
    229:24 236:2
**colleagues**  7:17
**collected**
    256:18 260:5
    286:14
**college**  55:13
**column**  226:24
    226:25 227:13
    254:18
**columns**
    226:20 228:22
**combination**
    208:17
**combined**
    207:17
**come**  97:4
    221:19
**comerfeld**  4:24
    25:14 27:7,24
    28:7 44:16
    52:3 61:11
    68:9 73:22
    127:25 134:21
    139:21 145:7
    147:3 161:16
    165:24 166:8
    168:25 204:22
    261:2 310:17
    311:3,15
**comerford**  2:15
    5:12 6:14,25
    74:6,16 147:13
    165:3 192:9

205:7 216:2
    236:15 261:10
    263:10 277:17
    278:2,20 312:5
    316:5
**comes**  20:5
    181:21 289:25
    290:3
**coming**  283:12
**commencem...**
    162:12,15
    313:5
**comment**  121:8
    203:11
**commenting**
    154:5
**commission**
    62:8,10,23
    117:21 118:22
    317:19 318:25
    319:25
**common**  42:14
    131:3 181:5
    305:3
**communicate**
    125:17,20
**communicated**
    127:4,16 168:3
    174:18 259:6
**communication**
    27:13 128:13
    128:20 249:25
    282:19,21
    283:6,21

**communicati...**
    25:13 27:18
    128:6,24 129:6
    129:12
**companies**  54:2
    59:2 88:4,16
    116:6 125:16
    179:17 223:20
    231:12 260:12
    287:12,14,17
    287:21 295:8
    297:8
**company**  10:3
    36:11 53:5,22
    54:6,11,17
    56:7 57:10
    64:15,19 68:17
    72:9 73:15
    77:18,24 78:10
    80:14 84:20
    85:4 88:7,21
    89:14 91:22
    106:19,20
    112:12 115:25
    116:9 117:3
    120:22 122:3,5
    122:6 126:8,11
    132:12,15
    159:5,9,20,22
    160:4,5 161:2
    161:6 163:14
    164:6,14 169:5
    172:23 174:4
    174:24 175:25

CONFIDENTIAL

**[company - conducting]**                          Page 18

179:12,13
180:17 181:24
194:7,17
195:11,13
198:16 207:18
209:2,4,25
210:2,3 211:17
212:20 225:13
225:19,20
236:3 237:15
238:2 245:7
249:12 265:25
275:9 281:4
287:25 288:25
291:21 295:13
295:15 297:2
299:10 300:17
300:22 308:24
309:11
**company's**
75:10 84:10
93:8 106:15
179:3 181:10
195:9 211:15
212:22 213:23
224:6 270:24
285:8 294:15
296:12,17,25
298:11
**compare**
259:16
**compared**
227:20

**comparing**
87:11
**compensate**
14:17
**compensated**
107:13 250:25
251:4
**compensation**
119:10 250:22
252:12 257:8
**competing**
261:23
**competitive**
237:21 239:15
247:4
**complaint**
19:19,21 64:9
66:6,8,13,16,20
67:6,10,11,19
67:20 68:2,13
69:24 70:14
71:2,21 73:3
73:20 74:9,11
74:21 75:4,22
76:9,13 77:9
77:17,20 80:12
80:17,19 81:18
81:21 83:13
103:9,16
104:18,19,25
115:20 118:8
122:16,25
123:5 135:24
138:14 230:5

231:22 270:22
271:7 308:4
312:16
**complaint's**
67:7 71:7
74:19
**complete** 18:8
68:20 71:19
73:10 75:13
290:2
**completed**
176:20 219:7
316:16
**completely**
34:5 137:2
188:18 190:23
284:21 289:9
**completion**
179:5 214:11
218:7 219:4
244:7,10
285:23
**complies** 80:21
**component**
55:2 94:7
99:19 126:6,7
**components**
51:15,17 172:4
174:11,13
**composition**
249:5
**comprehensive**
163:8 217:19

**comprised**
293:9
**concept** 97:5,6
97:9 120:25
121:22 195:13
288:22 310:7
**concern** 98:20
**concerning**
68:14 75:7,16
80:23
**concessions**
207:17
**conclude** 113:9
139:5 311:6
**concluded**
145:21 311:21
**concludes**
214:19 311:10
**conclusion**
120:13 159:12
241:2 245:8
299:2
**conclusions**
138:17 232:11
232:22 238:10
238:22 239:12
**conditions** 84:6
84:12 85:3
172:22 286:22
**conduct** 109:16
110:24 135:5
**conducting**
115:22 199:15

CONFIDENTIAL

**[confidence - confidential]**                                        Page 19

| | | | |
|---|---|---|---|
| **confidence** 114:13 | 91:14,20 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 | 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 | 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 |
| **confident** 269:5 | | | |
| **confidential** 1:9 4:1 5:1 6:1 | 101:1 102:1 | 169:1 170:1 | 236:1 237:1 |
| 7:1 8:1 9:1 | 103:1 104:1 | 171:1 172:1 | 238:1 239:1 |
| 10:1 11:1 12:1 | 105:1 106:1 | 173:1 174:1 | 240:1 241:1 |
| 13:1 14:1 15:1 | 107:1 108:1 | 175:1 176:1 | 242:1 243:1 |
| 16:1 17:1 18:1 | 109:1 110:1 | 177:1 178:1 | 244:1 245:1 |
| 19:1 20:1 21:1 | 111:1 112:1 | 179:1 180:1 | 246:1 247:1 |
| 22:1 23:1 24:1 | 113:1 114:1 | 181:1 182:1 | 248:1 249:1 |
| 25:1 26:1 27:1 | 115:1 116:1 | 183:1 184:1 | 250:1 251:1 |
| 28:1 29:1 30:1 | 117:1 118:1 | 185:1 186:1 | 252:1 253:1 |
| 31:1 32:1 33:1 | 119:1 120:1 | 187:1 188:1 | 254:1 255:1 |
| 34:1 35:1 36:1 | 121:1 122:1 | 189:1 190:1 | 256:1 257:1 |
| 37:1 38:1 39:1 | 123:1 124:1 | 191:1 192:1 | 258:1 259:1 |
| 40:1 41:1 42:1 | 125:1 126:1 | 193:1 194:1 | 260:1 261:1 |
| 43:1 44:1 45:1 | 127:1 128:1 | 195:1 196:1 | 262:1 263:1 |
| 46:1 47:1 48:1 | 129:1 130:1 | 197:1 198:1,14 | 264:1 265:1 |
| 49:1 50:1 51:1 | 131:1 132:1 | 198:17 199:1 | 266:1 267:1 |
| 52:1 53:1 54:1 | 133:1 134:1 | 200:1 201:1 | 268:1 269:1 |
| 55:1 56:1 57:1 | 135:1 136:1 | 202:1 203:1 | 270:1 271:1 |
| 58:1 59:1,8 | 137:1 138:1 | 204:1 205:1 | 272:1 273:1 |
| 60:1 61:1 62:1 | 139:1 140:1 | 206:1 207:1 | 274:1 275:1 |
| 63:1 64:1 65:1 | 141:1 142:1 | 208:1 209:1 | 276:1 277:1 |
| 66:1 67:1 68:1 | 143:1 144:1 | 210:1 211:1 | 278:1 279:1 |
| 69:1 70:1 71:1 | 145:1 146:1 | 212:1 213:1 | 280:1 281:1 |
| 72:1 73:1 74:1 | 147:1 148:1 | 214:1 215:1 | 282:1 283:1 |
| 75:1 76:1 77:1 | 149:1 150:1 | 216:1 217:1 | 284:1 285:1 |
| 78:1 79:1 80:1 | 151:1 152:1 | 218:1 219:1 | 286:1 287:1 |
| 81:1 82:1 83:1 | 153:1 154:1 | 220:1 221:1 | 288:1 289:1 |
| 84:1 85:1 86:1 | 155:1 156:1 | 222:1 223:1 | 290:1 291:1 |
| 87:1 88:1 89:1 | 157:1 158:1 | 224:1 225:1 | 292:1 293:1 |
| 90:1 91:1,5,9 | 159:1 160:1 | 226:1 227:1 | 294:1 295:1 |

CONFIDENTIAL

296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1,13
**confidentiality**
14:14 92:2
197:10
**confronted**
195:14
**conjunction**
47:17 53:9,24
**connect** 149:20
**connection**
161:9
**conservative**
49:19
**conservatively**
50:8,22 113:11
113:18
**consider** 10:20
120:24 136:19
181:8 183:7,18
183:20 193:2
270:16 297:14
298:10
**considerable**
264:22
**consideration**
132:2 163:9
183:14,23

187:18 280:18
280:23
**considered**
49:4,5 51:13
102:2 103:12
**considering**
29:14 81:22
164:5
**consistent**
32:17 39:10
121:12 124:15
124:25 130:11
130:14 131:6
140:15 148:13
155:2,5,11,18
156:2 157:25
158:22 194:2
197:17 203:21
215:10 222:23
249:4 252:12
257:16 273:23
282:6 283:3
285:10 287:4
302:13
**consistently**
302:23
**constitute**
188:14
**constituted**
128:12
**constituting**
203:23
**constructed**
305:15

**consult** 184:4
**consultation**
163:5
**consulting**
186:22
**consummated**
198:6
**contained**
82:21 92:5
104:24
**contemplates**
249:8
**contemplation**
148:22 246:5
**contemporan...**
245:16
**contend** 230:17
**contends** 233:4
**content** 19:6
**contest** 214:18
219:12 228:8
228:10,14
229:5
**contests** 217:11
217:20 218:3
218:19 219:14
226:16,21
228:6,20,23,25
262:18 303:2
**context** 61:3,17
87:24 93:11
114:24 115:3,5
116:21 124:10
138:3 183:24

187:10 188:13
188:18 189:2
190:23 192:7
195:23,24
196:3 210:10
215:19 218:11
225:25 245:12
**contexts** 188:9
**contingent**
197:6 255:10
255:24 257:18
257:22
**continuation**
191:23
**continue** 26:20
38:12
**continued**
32:10 35:9
37:2,9 39:2
120:4 140:11
208:15 209:5
235:3 312:25
313:25
**continues**
308:4
**continuing**
69:14,17
132:14 145:23
249:2
**contract**
238:12
**contractor**
59:13

CONFIDENTIAL

**[contradicts - d]**                                    Page 21

**contradicts**
  249:10
**control**  237:2
  237:18 238:18
  239:5 240:12
  240:18 241:9
  246:18 247:2
  247:10,25
  250:10,17
  251:5
**conversations**
  25:2 54:22
**conversely**
  286:22
**convey**  125:22
  289:2
**conveyed**  52:12
  83:24 148:8
  268:9 276:4
**conveys**  275:8
**coordination**
  250:2
**copies**  26:12
**copy**  3:8,9 68:2
**copying**  39:9
**copyright**
  182:9
**corey**  2:19 4:11
**corporate**
  56:21 192:12
  192:17 215:7
  313:11
**corporation**
  1:5 2:13 4:9

316:6 317:3
318:3
**correct**  6:23
  7:11,12 12:9
  30:10 33:13
  50:12 51:10
  65:3 70:4
  72:19 82:13
  83:19 90:3
  102:19 103:23
  105:17 110:18
  111:16 115:17
  122:21 127:2
  129:8 140:5
  141:23,25
  142:25 146:8
  154:13 156:25
  164:25 166:8
  169:20 170:5
  172:8 176:10
  176:14,16
  183:16 228:11
  240:13 247:10
  247:17 251:20
  252:15 266:18
  278:16 279:20
  280:13 293:19
  307:18 309:19
**corrections**
  316:13 318:17
**correlation**
  259:13,20
**counsel**  3:4,9
  16:5 25:3,5

27:18 136:6
  166:11 311:18
**count**  10:25
  11:5 12:13
  17:4
**counting**  9:19
  11:17
**county**  21:10
  21:24 315:4
  317:10 318:15
**couple**  13:10,21
  21:3 22:19
  68:6 166:6
  209:2 231:18
  260:25
**course**  104:2
  106:14 107:12
  138:21 203:19
**court**  1:2 3:7
  4:14 5:5 19:2,8
  20:4,7 211:23
  258:6 317:7
**court's**  19:16
  71:6 308:8,17
  310:15
**cover**  60:14
**covered**  141:8
  237:17
**created**  149:7
  149:11 150:11
  150:11,12,19
  152:14,17
  153:14 154:10
  154:22 156:19

**creating**  151:5
  151:12
**credibility**
  215:11
**credible**  36:17
  98:20
**criteria**  291:8
**criticisms**  58:9
**cross**  264:23
**crr**  1:21 315:7
  315:23
**crucial**  183:4
**cuellar**  2:9
**culminating**
  148:25
**cummings**  2:6
**cumulation**
  130:2
**current**  8:8 9:4
  84:10,25 174:6
  179:18 180:9
**currently**  14:20
**customary**
  237:20 239:14
  240:2,4,15,21
  247:3,14
**cv**  1:6 8:4,24
  9:2,5

|  **d**  |
| --- |
| **d**  2:15 3:2 6:18 |
| 7:6 312:2,10 |
| 312:12 316:5 |

CONFIDENTIAL

**dahbi** 22:3
**damage** 115:10
**damaged**
  110:19,21
**damages** 40:17
  40:22 41:13,18
  41:20 42:4
  102:22 104:9
  105:5 106:8
  107:3,3,14
  108:7,9,14,17
  108:24 110:6
  110:13 111:4,5
  111:12,15,19
  116:22,23
  117:9,15 118:3
  118:6,14 142:8
  294:12 306:6
  308:6,15
**dame** 299:23
**data** 41:10
  47:19 59:23,24
  60:2,4,12
  218:19 222:25
  226:15 227:10
  256:18 260:6,8
  299:16 300:8
  300:10 301:18
  302:16
**date** 1:11 6:20
  7:8 8:6 11:17
  28:23 47:24
  74:15 85:19,24
  86:3 87:11,13

  90:9,18 127:21
  135:16 137:5
  142:11 146:5
  147:19,21
  148:5 149:10
  156:17 162:18
  165:9 177:7
  182:4 192:15
  205:15 216:9
  221:8 236:21
  237:10 252:22
  258:9 263:17
  272:8 279:3
  306:5 316:9
  317:3,9,19
  318:3,13,25
  319:20,25
**dated** 6:16 7:4
  74:9 149:23
  162:11 205:19
  246:16 285:21
**dates** 46:25
  94:21 127:11
  128:7 129:3
  148:13 162:5
  219:20 281:25
  291:11 307:5
  308:9,10
**day** 5:24 151:7
  200:17 201:16
  260:9 264:17
  271:17 272:10
  281:22 282:9
  306:2 309:16

  315:20 317:16
  318:22 319:22
**days** 3:9 47:23
  113:15 184:6
  289:20 291:14
  291:16 293:14
  307:13 316:19
**deactivate**
  193:20
**deal** 123:16
  149:9 150:2
  156:7 214:11
  260:15,22
  284:19 293:18
  295:19
**dealing** 195:2
**deals** 178:13
  202:5 244:11
  244:12 254:22
  259:24 260:13
  260:17 285:5
  289:8
**dear** 316:10
**debated** 160:21
**debt** 53:16,25
**decaying** 138:9
**december**
  316:4
**decide** 126:11
**decided** 169:18
  169:23 170:3
  170:16,17
**decision** 157:17
  186:22 281:19

  308:8
**decisions**
  130:25 161:7
**declaration**
  19:19,21
**declined**
  289:11
**declines** 291:21
**declining**
  286:22 290:12
  290:20,22
  291:19
**deed** 317:14
  318:20
**deemed** 316:20
**defendants**
  1:16 2:13 24:7
  38:24 68:13
  75:5 278:8,8
**defense** 23:2,8
  23:14,20
  185:16 186:9
  186:21 187:3
  187:17 189:9
  193:17 194:2,9
  195:8,12,20
  196:7,19 197:7
  311:18
**defenses**
  193:19 194:20
**defensive**
  123:14 241:24
  242:10,20
  243:4,9 245:3

CONFIDENTIAL

245:23 250:9
**defensiveness**
243:12
**defer** 138:17
310:14
**define** 124:5
**defined** 196:19
215:25 264:15
**definitely** 94:7
190:8
**definition**
93:19 122:11
187:15 197:6
232:25
**definitions**
215:23 224:19
**definitive**
277:16
**deflated** 305:4
306:24 309:15
309:24
**deflation** 40:24
42:8,17 49:20
50:10 104:3
106:3,10,11,11
285:13 294:12
302:10 304:15
304:19,24
305:10,18
306:7,10
307:17 308:21
309:3,7,18,25
**degree** 55:12
119:8 203:23

**delaware** 21:24
**delay** 81:5,14
82:11 83:2,7
122:19 123:6
**delayed** 275:15
**deliberate** 81:4
**delivered**
164:22 281:14
**delta** 110:5,10
**demonstrate**
300:12 302:24
**demonstrates**
140:17 191:2
203:16
**demonstrating**
131:21 283:6
**demonstration**
300:13
**denied** 224:14
**denis** 95:15
115:2 116:19
116:21 117:10
202:11 252:14
252:20,23
254:15 259:12
278:7 279:16
284:2 293:20
302:4 313:19
**dentsply** 21:18
**department**
316:22
**depend** 102:3,9
105:12

**depends** 93:10
138:2 160:8
**deposed** 5:20
234:5
**deposition** 1:15
3:5,5,8 4:7
5:16 6:8 7:16
7:22 10:16
11:23,25 12:6
18:5 24:22,24
25:7,22 26:12
28:13,21 30:15
30:19,21 32:16
36:2 39:14
40:7,11,13
130:9 131:5
147:15 216:4
229:23 233:15
233:24 237:5
242:4 279:11
311:7 312:15
316:9,12 317:1
317:3 318:1,3
**depositions** 9:3
9:15 10:8 24:4
24:13
**depressed**
84:13,17
**describe** 121:8
150:9 218:22
235:2 256:17
**described**
46:20 67:25
71:21 87:7

220:3 241:22
246:19 250:23
258:4,7,24
305:6
**describes**
186:13 304:11
**describing**
121:17 189:15
209:15 229:23
243:3 248:24
**description**
32:17 39:11
48:12 124:16
130:14 151:25
186:8 191:20
193:25 194:8
201:7 281:3
312:8 313:3
314:3
**descriptions**
39:11
**desire** 185:12
185:12 189:5
**desiree** 2:6
**detail** 89:15
**detailed** 46:5
**details** 21:4
47:4 89:9
152:5
**deter** 159:7
**determination**
29:21
**determine** 72:8
138:24 238:17

CONFIDENTIAL

**[determine - disclosure]**                               Page 24

| | | | |
|---|---|---|---|
| 240:22 248:5 | 176:3,4 181:17 | 207:6 208:23 | 105:24 107:7 |
| **determined** | 185:2,4,6 | 211:6 281:7,11 | 112:24 133:6 |
| 238:2 251:12 | 191:11 192:4 | 299:25 313:14 | 133:21 134:25 |
| 252:2 | 196:2 201:19 | **disagree**  34:5 | 137:6 143:17 |
| **develop**  114:6 | 203:6 210:11 | 52:7,15 70:6 | 146:7 155:9 |
| **development** | 213:8 225:11 | 99:3 126:3 | 164:16 168:17 |
| 288:18 | 225:25,25 | 186:3 199:14 | 169:6 171:5,13 |
| **die**  188:3 190:4 | 228:22 240:3 | 258:7 263:3 | 172:6 173:6,17 |
| 190:8 | 260:22 266:16 | 281:2 | 199:16 200:6 |
| **differ**  67:5 | 266:22 268:8 | **disclose**  80:3 | 200:17 231:24 |
| **difference** | 273:11,16,25 | 85:8 86:18 | 232:14 233:5 |
| 40:25 42:18 | 284:10,22 | 168:19 223:7 | 265:7,18 266:5 |
| 46:11 49:20 | 292:3,7 296:2 | 230:6 309:11 | 268:4 271:5,20 |
| 50:23 106:12 | 303:16 | **disclosed**  10:13 | 272:8,17 |
| 107:4,20 | **differs**  146:14 | 15:24 17:9 | 274:16 295:17 |
| 108:10 110:23 | **difficult**  10:23 | 18:10 22:23 | 298:15,19 |
| 111:14 177:2,8 | 198:21 287:23 | 23:23 49:9 | 299:11 305:25 |
| 264:16 | **dinner**  199:22 | 63:3 64:2,20 | 306:2,25 |
| **differences** | **direct**  8:11 | 64:24 65:7,11 | **discloses**  100:9 |
| 177:11 274:9 | 25:10 66:12 | 67:12 69:5,10 | 100:22 |
| **different**  6:4 | 128:20,24 | 69:20 72:2,15 | **disclosing**  94:5 |
| 13:10,21 25:20 | 129:6,12 | 73:8,16 77:9 | 98:9 |
| 51:6 56:12 | 254:13 282:20 | 77:12,19 78:3 | **disclosure** |
| 57:7 59:22 | 283:6 | 79:5,12 80:14 | 12:24 18:21 |
| 94:5 95:12,14 | **directed**  25:6 | 82:20 85:17,24 | 34:23 46:25 |
| 111:4,11 114:4 | **directly**  126:8 | 86:11 88:4,13 | 51:9 59:7 61:2 |
| 114:23 115:2 | 189:18 221:19 | 88:19,21,23 | 61:16 63:5 |
| 124:14 132:4 | **directors**  30:25 | 89:8,15,17,22 | 64:7,12,22 |
| 135:9 137:2 | 85:6 163:3 | 92:11 93:21 | 78:11,20 80:23 |
| 144:11 154:6,8 | 184:19 186:16 | 94:25 95:19 | 86:2 87:7 88:8 |
| 159:18 168:17 | 186:17 195:8 | 96:11 97:15 | 104:21 142:20 |
| 170:8 171:3,15 | 195:13,21,25 | 99:9,10,14 | 162:21 167:11 |
| 171:21 172:2 | 205:12,18,25 | 100:5,19 101:6 | 169:3 170:22 |
| 173:14,15 | 206:15,16 | 101:9 102:13 | 170:24 171:10 |

CONFIDENTIAL

**[disclosure - dr]** Page 25

171:20 172:10 172:15,16 173:21 175:4 177:13 201:9 210:12,14 223:6 271:4 272:11 273:12 273:15 282:17 293:14 305:5

**disclosures** 34:13,15 45:23 48:19 61:22,25 62:4,17 72:10 77:25 88:15 89:4,23 93:23 102:11 139:11 142:23 143:10 145:24 146:3 225:12 285:7 297:11 301:15

**discouragem...** 117:16,23 118:21,24 119:14

**discovery** 24:9 130:13

**discuss** 45:16 103:7

**discussed** 77:20 180:22 183:10 245:13

**discusses** 220:6

**discussing** 188:22 196:4

**discussion** 194:25

**discussions** 124:7 182:24 200:2 202:3 208:16 209:6 249:24

**dismiss** 67:23 70:21 71:2,10 81:23 136:3 308:5

**dismissed** 11:4 11:8

**displayed** 209:4

**disposal** 121:24

**disposed** 184:3

**dispute** 26:24 242:22

**dissipated** 310:2

**distinction** 125:10 203:13

**distribute** 119:15

**distribution** 260:11

**district** 1:2,2

**dividends** 114:3

**division** 44:12

**dixon** 233:16 233:18 234:5 235:23

**dlc** 1:6

**doc** 74:21,22

**docgo** 21:8,10 21:11

**document** 30:23 127:12 148:2,15 149:7 149:10,14,16 151:5,13,19 152:22 153:13 153:19 154:3,6 154:8,9,21 155:2 156:19 162:9 164:2,12 165:11,14,23 166:4 180:2 206:9 211:21 238:21 239:11 239:19 240:25 258:2 271:23 275:22 285:6 297:18

**documented** 249:6 252:13

**documents** 120:3,15 121:14 128:11 128:15,19,23 129:24 130:12 156:2 158:14 160:20 190:17 191:8,19 192:4 193:7 212:6 213:12 229:23

233:13 234:24 267:15

**doe** 109:20

**doing** 4:22 37:18 43:11 57:2 59:19,21 191:19 259:19 293:6

**dollar** 240:9,15 247:15 248:10 248:13 260:15

**dollars** 254:6 304:25 306:10

**dominates** 185:20

**door** 202:15

**doubt** 237:24

**dowd** 1:18 2:4 2:12 20:12,18 20:23

**dozen** 146:11 301:14

**dozens** 298:25 301:10 302:20

**dr** 1:15 4:1,8 5:1,13 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1

CONFIDENTIAL

**[dr - driven]**                                                    Page 26

| | | | |
|---|---|---|---|
| 32:1 33:1 34:1 | 122:1 123:1 | 190:1 191:1 | 258:1 259:1,12 |
| 35:1 36:1 37:1 | 124:1 125:1 | 192:1 193:1 | 260:1 261:1,11 |
| 38:1 39:1 40:1 | 126:1 127:1 | 194:1 195:1 | 262:1 263:1 |
| 41:1 42:1 43:1 | 128:1 129:1 | 196:1 197:1 | 264:1 265:1 |
| 44:1 45:1 46:1 | 130:1 131:1 | 198:1 199:1 | 266:1 267:1 |
| 47:1 48:1 49:1 | 132:1 133:1 | 200:1 201:1 | 268:1 269:1 |
| 50:1 51:1 52:1 | 134:1 135:1 | 202:1 203:1 | 270:1 271:1 |
| 53:1 54:1 55:1 | 136:1 137:1 | 204:1 205:1,7 | 272:1 273:1 |
| 56:1 57:1 58:1 | 138:1 139:1 | 206:1 207:1 | 274:1 275:1,25 |
| 59:1 60:1 61:1 | 140:1 141:1 | 208:1 209:1 | 276:1 277:1 |
| 62:1 63:1 64:1 | 142:1 143:1 | 210:1 211:1 | 278:1,7 279:1 |
| 65:1 66:1 67:1 | 144:1 145:1 | 212:1 213:1 | 279:16 280:1 |
| 68:1 69:1 70:1 | 146:1 147:1,13 | 214:1 215:1 | 281:1 282:1 |
| 71:1 72:1 73:1 | 148:1 149:1 | 216:1 217:1 | 283:1 284:1,2 |
| 74:1 75:1 76:1 | 150:1 151:1 | 218:1 219:1 | 285:1 286:1 |
| 77:1 78:1 79:1 | 152:1 153:1 | 220:1 221:1 | 287:1 288:1 |
| 80:1 81:1 82:1 | 154:1 155:1 | 222:1 223:1 | 289:1 290:1 |
| 83:1 84:1 85:1 | 156:1 157:1 | 224:1 225:1 | 291:1 292:1 |
| 86:1 87:1 88:1 | 158:1 159:1 | 226:1 227:1 | 293:1,20 294:1 |
| 89:1 90:1 91:1 | 160:1 161:1 | 228:1 229:1 | 295:1 296:1 |
| 92:1 93:1 94:1 | 162:1 163:1 | 230:1 231:1 | 297:1 298:1 |
| 95:1 96:1 97:1 | 164:1 165:1 | 232:1 233:1 | 299:1 300:1 |
| 98:1 99:1 | 166:1 167:1 | 234:1 235:1 | 301:1 302:1 |
| 100:1 101:1 | 168:1 169:1 | 236:1 237:1 | 303:1 304:1 |
| 102:1 103:1 | 170:1 171:1 | 238:1 239:1 | 305:1 306:1 |
| 104:1 105:1 | 172:1 173:1 | 240:1 241:1 | 307:1 308:1 |
| 106:1 107:1 | 174:1 175:1 | 242:1 243:1 | 309:1 310:1 |
| 108:1 109:1 | 176:1 177:1 | 244:1 245:1 | 311:1,4 316:9 |
| 110:1 111:1 | 178:1 179:1 | 246:1 247:1 | 317:4,9 318:4 |
| 112:1 113:1 | 180:1 181:1 | 248:1 249:1 | 318:13 319:20 |
| 114:1 115:1 | 182:1 183:1 | 250:1 251:1 | **draft** 311:14,16 |
| 116:1 117:1 | 184:1 185:1 | 252:1 253:1 | **draw** 259:12 |
| 118:1 119:1 | 186:1 187:1 | 254:1,15 255:1 | **driven** 108:10 |
| 120:1 121:1 | 188:1 189:1 | 256:1 257:1 | 160:24 |

CONFIDENTIAL

**[drives - emerson]**                                    Page 27

**drives** 112:15
**driving** 112:5
  112:10 125:9
**dropped** 63:5
**due** 106:16,17
  107:10 108:20
  110:22,23,24
  137:22 139:2
  140:3 141:13
  288:8
**duly** 5:8 315:11
**duties** 195:7
**duty** 309:11
**dynamics**
  178:8

**e**

**e** 2:2,2 3:2,2
  16:12,12,14,15
  16:16 312:2,7
  313:2 314:2
  315:2,2
**earlier** 33:12
  34:22 50:25
  56:5 77:5
  122:17 175:9
  202:4 243:25
  247:13 271:23
  279:11 300:25
  303:13
**early** 13:13,14
  133:12 160:11
  182:24 286:2

**earnings**
  106:20 112:12
  131:13 138:5
  157:12,18
**easier** 223:6
**echo** 218:9
**eckbo** 214:16
  215:18 216:13
  217:25 218:18
  222:17 223:22
  226:7
**eckwin's** 24:4
**economic** 33:23
  34:16 35:4
  43:4 78:22
  92:4 105:6
  129:15 130:17
  132:21 140:7
  140:18 141:6
  142:3 155:3
  157:25 158:23
  172:3,4 173:24
  174:11,13
  176:17 197:18
  213:17 214:3
  218:15 229:21
  230:15 243:13
  285:10,14
  286:21 297:21
  300:13 302:14
  302:24
**economically**
  34:2 70:3,10
  70:12 71:21

  76:19,21 77:3
  78:16 79:3,18
  86:22 130:23
  131:17 133:20
  134:25 135:17
  137:7,20,21
  139:2,6 140:2
  141:13 142:13
  142:18 143:4
  143:25 144:21
  145:16,22
  146:7,18 161:5
  179:12 299:3
**economics**
  136:17
**economist**
  238:11
**eddie** 233:16
**effect** 3:7,8
  114:19 116:2
  178:12 181:9
  181:13 218:2
  294:20 295:17
  296:24
**effects** 43:5
  286:16 287:3
**efficiency**
  16:18 18:4
  47:16,18 48:14
**effort** 141:10
  206:17
**efforts** 81:6,15
  82:12 83:3,8
  122:20 123:7

  191:15
**eight** 9:20
  80:24 165:13
  165:15 166:2
  275:15
**either** 11:2
  23:12 34:21
  40:6 63:21
  145:10 204:7
  221:12
**elect** 260:12,18
**electric** 165:18
**element** 52:19
  57:7 104:24
  185:7 203:17
  226:3
**elements** 49:3
  81:20 197:16
**eleven** 22:9
**eligible** 306:6
**email** 316:17
**emerson** 30:3
  31:15 32:11
  33:9 35:9,18
  36:9,11,14
  37:3,10,25
  38:12 39:2,18
  42:23 51:22
  68:16 75:9
  82:7 83:17
  85:18 86:12
  87:8 90:7,12
  90:16,22 91:3
  93:23 95:25

CONFIDENTIAL

97:17 99:9
100:14,15
119:20 120:18
123:11,15,16
124:23 126:21
127:5,15 128:7
128:25 129:7
129:19 130:7
131:7,12 132:7
133:3,8 134:6
134:7,11 148:6
148:24 150:3
151:7 157:21
158:19 160:15
160:23 161:8
164:22 165:18
166:15,22
167:16 168:4
170:24 185:23
195:3 198:15
203:25 206:17
207:2,7,16,18
207:22 208:5
208:14,25
209:18 212:3
219:22 221:3
221:11,13,19
221:23 225:2
227:19 231:8
232:4,8 233:6
233:21 235:7
235:11 253:24
258:23 259:7
262:22,23

266:24 268:19
268:20 269:2
269:13 270:4
270:11,23
271:20 272:7
272:17 273:3
276:4,22
280:10,16
281:2,6,14
282:10,20,23
283:7,12 298:3
298:19 312:19
312:20
**emerson's**
39:15,17 68:14
68:18,25 71:13
71:15 75:7,10
75:17 78:4,15
80:24 81:3,6
81:15 82:11
83:3,8 95:2
96:12 99:13
100:12 102:14
122:20 123:7
123:25 127:6
128:3 130:2
160:25 170:22
194:12 202:23
203:25 204:10
208:9 209:16
213:3 215:8
229:14,24
230:8,17 234:7
234:18 235:25

258:11 259:5
264:7,9 265:7
272:11 273:14
275:11 281:13
282:2
**empirical** 126:4
210:19 299:17
300:11 301:18
304:12
**employ** 178:14
203:7 225:22
**employed**
47:15 135:7
**employee** 59:11
**employees**
21:11 150:13
**enclosed**
316:12
**encompassed**
254:11
**ended** 155:16
**endogenous**
244:13
**ends** 24:10
**engage** 64:17
91:25 106:20
170:17 184:7
197:11 208:16
209:5 245:11
269:18 275:16
**engaged** 54:12
78:5 81:13
82:25 102:4
103:3 104:23

114:18 119:19
120:17,22
121:18 122:3
123:10,14
124:17 129:17
169:14 254:19
308:25
**engagement**
16:4 59:9
63:19 120:5
124:5 125:2
137:14,16
199:6 215:13
236:12 237:12
238:25 240:10
241:22,23
242:10,11,21
244:19 245:2
245:10,15,22
246:7,16 247:8
248:2,17,21
249:8,13,22
250:9 256:11
257:2,11,19
258:9
**engagements**
56:13 124:20
255:2,6,12,17
255:17,19,23
**engaging** 71:24
72:16 73:5
81:4 116:14
122:18 181:7
184:23 196:18

CONFIDENTIAL

309:13
english 64:13
  163:18
enhance 215:11
entered 13:15
  242:9 318:9
entire 24:20
  40:13 142:4
  280:15 290:4
  317:5 318:5
entirely 195:4
entirety 24:13
  83:13 111:3,5
  111:18 308:10
entities 56:3
entity 13:8
  118:25
environment
  43:6 52:10,18
  101:25 131:23
  132:21 133:7
  136:8,15
  140:10 168:12
  220:3
equal 50:15
equals 226:24
equity 53:25
  114:9
eric 2:13 38:23
  90:13,23
  184:14
errata 316:14
  316:19 318:7
  318:10,18

319:1
escalate 132:18
escalation
  32:10 35:9,22
  37:3,10 39:2
  199:7 236:7
espin 216:13
esq 2:6,6,7,7,8
  2:9,10,15
  316:5
essentially
  249:12
estimate 47:22
  48:7 217:7
estimating
  46:23
estimation 48:6
estée 10:3
et 44:12 46:18
  190:13 227:15
  241:4,17
evaluate 33:20
  43:5 54:8
  144:16
evaluated
  135:5,10
  144:12,14
  146:13
evaluating
  52:10 176:4
evaluation 35:4
  52:17 163:4
  169:10 177:22
  261:16 278:25

279:6 314:6
evaluations
  169:15
evan 303:20
event 47:14
  48:12,15,17,22
  48:24 51:8,14
  136:19 140:17
  162:4,23
  167:12 171:19
  172:7,9,14
  173:5,22 174:7
  176:24 177:7
  239:4 247:9
  271:10,14
  298:20 301:14
events 6:12
  33:8,24 45:21
  46:21 105:12
  154:18 178:17
  189:22
eventual
  296:16
eventually
  148:24 274:6
  289:25
everybody's
  234:14
evidence 34:16
  41:10 43:21
  45:25 120:4,14
  124:8,12,20
  125:13 126:4
  131:24 132:9

135:21 136:22
  146:14 149:21
  151:2 153:20
  154:3 201:23
  217:16 233:11
  235:16 249:23
  280:23 299:6
  302:13 307:21
evolve 140:11
exact 50:3
  80:13 127:21
  221:8 247:14
  270:7
exactly 77:24
  78:10 215:24
  271:4 292:10
examination
  5:11 311:20
  315:10,12
examined 5:9
  286:16
examines
  263:25
example 34:25
  68:4,12 91:18
  114:5 116:5
  121:6 130:21
  131:4,7 136:12
  155:12 158:15
  159:18 209:16
  210:23 215:23
  267:16 298:18
  299:21,24

CONFIDENTIAL

**[examples - explain]**                                            Page 30

| | | | |
|---|---|---|---|
| **examples** 126:5 | 48:21,22,23 | 179:19 212:9 | **expert's** 98:13 |
| 235:21 297:20 | 74:8,14,23 | 261:15 | **expertise** 33:2 |
| 300:23 301:3,4 | 80:19 90:8,11 | **expectations** | 98:13 241:4 |
| 301:12,14 | 90:17,20 | 178:9 262:17 | **experts** 35:2 |
| **exceed** 223:2 | 147:15,18 | **expected** 43:5 | **expiration** |
| **exceeding** | 154:10 162:9 | 62:2 91:21 | 317:19 318:25 |
| 262:13 | 162:17 165:5,8 | 92:4 113:16 | 319:25 |
| **exceeds** 84:25 | 166:14 170:24 | 131:6 158:25 | **explain** 34:8 |
| 267:17 | 182:3 192:10 | 216:6,17 217:8 | 37:20 39:6 |
| **except** 3:11 | 192:14 205:9 | 217:18 243:15 | 43:4 46:9 |
| 237:10 | 205:14 216:4,7 | 268:15 313:16 | 47:13 49:18 |
| **exceptions** 93:4 | 236:18,20 | **expecting** | 50:6,19 52:8 |
| **exchange** 62:7 | 252:19,21 | 229:25 | 52:11 64:5 |
| 62:9,22 117:21 | 263:11,16 | **expenditures** | 70:8 71:13 |
| 118:22 | 264:21 268:25 | 288:18 | 79:9,16 83:22 |
| **excluded** 19:2,5 | 269:2,11 | **expense** 119:5 | 87:19 91:17,25 |
| 20:4 108:24 | 273:10,12 | **experience** 9:9 | 92:14 95:13 |
| **exclusive** 13:20 | 276:3 278:21 | 10:10,19 11:12 | 99:22 103:11 |
| **exclusivity** | 279:2 284:3 | 11:16 23:4 | 104:3 112:2 |
| 13:15 | 296:2,5 301:22 | 53:2 59:5 | 114:22 117:2 |
| **excuse** 90:21 | 312:8,9,11,14 | 61:13 62:21 | 119:23 124:3 |
| **executed** | 312:16,19,20 | 89:21 91:11 | 124:11 130:21 |
| 318:10 | 312:22 313:3,4 | 96:16 98:18 | 139:10 142:2 |
| **execution** | 313:7,8,10,12 | 250:18 | 148:18 158:18 |
| 317:14 318:19 | 313:16,18,19 | **expert** 6:17 7:5 | 160:2 186:5 |
| **executives** | 313:20 314:3,4 | 9:9,25 10:10 | 190:16,24 |
| 54:11 212:8,8 | **exhibits** 311:17 | 10:12,15,18 | 197:8 202:19 |
| **exerting** 126:9 | **existed** 170:11 | 11:11,16 15:4 | 203:11 222:19 |
| 229:25 | 171:22 | 15:7 16:23,25 | 225:15 229:20 |
| **exhibit** 6:15,19 | **existence** 303:5 | 19:21 22:13 | 242:2 243:7,11 |
| 7:3,7,15 28:17 | **existing** 218:14 | 27:20 60:25 | 245:25 246:3 |
| 28:18,22 29:2 | **exists** 153:15 | 61:14,22 62:24 | 249:3 257:14 |
| 30:19 31:4 | **expectation** | 238:11 312:9 | 262:15 266:9 |
| 36:5 42:6 | 112:4,14 | 312:11 | 272:25 284:16 |

CONFIDENTIAL

**[explain - fairness]**                                              Page 31

284:17 302:8
**explained**
42:11 69:20
70:20 76:24
112:17 246:23
249:7 251:8
274:19 303:13
**explaining**
117:12 152:4
156:3 179:8,16
186:24 187:5
297:6 300:9
**explains** 197:9
222:24
**explanation**
272:20 290:25
291:24
**explicit** 175:12
187:15 230:4
243:5 283:21
292:24
**explicitly**
108:24 157:21
175:15 187:3
240:14 273:18
275:19 294:10
**exposure**
286:20
**express** 185:14
189:7
**extensive**
280:22
**extent** 82:24
101:4 117:3

160:23 237:15
**external** 59:25
**extra** 13:9
14:16
**extract** 160:22
225:18,21
**exxon** 11:24
**eyes** 203:5
240:3

**f**

**f** 3:2 182:2,10
313:9 315:2
**face** 183:22
**facebook** 20:2
**facing** 59:25
**fact** 35:8 38:22
78:13 85:17
86:11 95:2
99:9,14 100:17
102:13 103:18
111:6,10
113:21 132:11
133:7 138:18
138:19 143:11
143:20 157:8
158:19 161:19
170:25 190:24
197:20 201:13
212:14 213:20
229:14 231:15
232:4 233:6
243:15 249:14
264:23 270:11

271:21 283:25
295:13,16,20
297:3 298:3,13
300:18
**factors** 106:18
110:23 176:3
**facts** 80:2 96:6
130:16 132:25
134:6,11
135:21 137:10
143:9,14,16,24
144:18 145:18
146:2,14 151:2
167:15 168:3,9
170:11 184:23
185:6 229:10
233:10 235:15
282:4 284:11
306:12,25
307:20
**factual** 135:4,9
136:8 144:14
194:3 249:23
252:5 283:5
**failed** 80:3
198:10 278:12
278:23 279:5
279:19,22
282:11 283:24
285:5 286:14
290:9 314:4
**failure** 278:25
279:6 286:16
287:4 292:21

293:18 314:5
**failures** 286:19
290:17,18
**fair** 5:17 11:13
12:16 25:5
27:9,21,23
41:23 49:15
57:3 58:18,21
66:22 67:14
77:12 83:9
85:21 87:14
89:12 103:4
104:14 105:14
107:24 110:25
119:22 144:23
146:20 151:13
152:25 163:23
164:10 167:9
167:22 168:7
171:7,23
173:12 177:25
184:16 186:23
191:20 201:18
206:23 225:5,6
227:22 228:17
238:19 240:4
253:12 254:20
255:25 260:3
279:14 281:7
281:15 282:25
294:5
**fairly** 238:7
**fairness** 57:17
256:7 257:9

CONFIDENTIAL

**[fairness - first]**                                                            Page 32

301:13

**fall**  23:11 223:9

**falling**  186:8

**falls**  222:21

**familiar**  5:16
54:23 192:21
222:2,3

**famous**  185:15
189:8

**far**  81:3 98:12
142:10 198:2
226:23

**favor**  196:2

**favorably**
184:3

**federal**  74:12
312:17

**fee**  239:3
240:11,20
241:11 245:5
246:2,5,6,17,21
247:7,14,25
248:3 249:4,9
250:10 251:3,9
251:11,24
252:11 254:23
254:24 255:5
255:16,17,24
256:3,3,8,21
257:4,15,18,22
257:24 259:14
259:15,23
260:14,21

**feel**  13:7 25:25
118:2 145:8
288:24 302:21

**fees**  236:25
237:20,25
238:16,17
239:15 240:16
247:3 249:14
250:23 255:10
256:3,6,7
259:23

**fellowship**
14:22

**fideres**  13:16
15:22 16:6

**field**  183:8,19
193:3

**fifty**  12:8

**fight**  211:14,15
224:13

**figure**  41:13
145:14

**figures**  254:4

**file**  216:10

**filed**  165:18

**filing**  3:4
218:23

**filings**  223:25

**final**  155:13,14
155:24 211:17
217:9 218:7

**finance**  45:17
55:13 136:17
159:24

**financial**  46:2
54:3 55:25
56:6,12 59:9
128:13 130:4
136:23,23
163:5,10,21
174:23 237:14
237:16 245:11
246:25 249:6
257:17 288:19

**financially**  4:20

**financing**  54:4
56:10 172:22
175:23

**find**  174:3
178:12 257:16
266:24 269:7
269:22 270:13
277:6,9 288:3
290:24 300:15
303:4 316:12

**finder**  138:18

**findings**  178:15
183:10 215:10
261:18

**finds**  214:12

**fine**  132:7
204:22

**finish**  68:10
154:2

**finished**  45:5
153:24 243:21
284:22

**fire**  21:17

**firm**  4:15 7:17
13:20 20:12,18
20:23 22:14
23:14 114:5
131:14 178:10
205:24 206:13
207:5 214:20
232:17 233:6

**firm's**  286:25
288:13

**firms**  13:22
22:12,18,22,24
23:2,2,3,7,8
114:7 130:5
245:11 286:17

**first**  5:8 7:14
7:21 16:10
17:13 19:25
28:14 29:7
110:4 147:22
148:6,8 155:12
156:17 163:19
165:13,15,25
166:11 185:22
191:19 207:11
217:9 226:11
227:13 228:8
235:18 254:22
258:12 259:5
275:5 279:9
284:4,16 286:3
291:9

CONFIDENTIAL

**[fit - form]**                                                    Page 33

| | | | |
|---|---|---|---|
| **fit** 194:9 227:25 257:12 | **focusing** 67:24 71:11 | 24:6,15,25 29:18 32:3,23 | 99:18 101:3,23 102:7,20 103:5 |
| **five** 190:18 191:9 197:22 197:23,25 227:5 228:7 | **folks** 13:25 **follow** 159:12 **followed** 148:23 220:10 | 33:14 34:4 35:11,20,23 38:15 39:4,20 41:8,14,16,24 | 103:24 104:15 105:15 106:9 107:13 108:2 110:8,14 111:2 |
| **flat** 245:5 250:23 251:3 256:3,6,21 257:4,24 259:15,23 260:14 | **following** 188:2 190:3,5 237:10 250:14 264:2 291:7 293:5 | 42:25 43:12 44:7,10,19 45:4 46:16 47:7 49:16 | 111:17,24 113:3 114:21 115:18 116:17 117:19 118:4 |
| **flawed** 120:13 245:9,22 | **follows** 5:10 **font** 217:3 | 50:5,17 51:11 51:25 52:5,22 | 118:18 119:12 121:2 122:8,23 |
| **flaws** 117:12 | **footnote** 30:14 149:15 186:10 | 53:7,12 54:9 54:20 55:5,10 | 123:19 125:18 126:2,18 127:7 |
| **floor** 50:7 51:20 | 186:12 304:23 307:10 | 55:18 56:9 57:4,11 58:2 | 127:23 128:9 129:9,20 |
| **fluctuate** 106:14 111:22 | **force** 3:8 112:6 112:11 | 58:11,13,17,20 58:24 61:6 | 130:19 131:19 133:25 134:19 |
| **fluctuated** 113:14 | **forecast** 152:6 156:7 | 63:12,14 64:3 65:4 66:3,23 | 135:3,20 137:2 137:9,23 139:4 |
| **fluctuates** 106:16 107:10 108:20 | **forecasted** 155:14 | 67:15 69:6,12 70:5,17 72:5 | 140:4 141:15 141:24 142:15 |
| **fluctuation** 108:15 | **forecasting** 153:6 | 72:20 73:11 76:3,22 77:13 | 148:11 149:12 150:5,16,25 |
| **fluctuations** 107:19 109:15 112:19 | **forecasts** 155:9 **foregoing** 317:13 318:18 | 78:7 79:7 82:14 83:10,20 84:8,15,21 | 151:14,23 152:18 153:2 153:18 154:14 |
| **focus** 32:21 201:20 | **forever** 39:23 **forget** 151:8 | 85:11,22 86:24 87:16 88:11,24 | 154:24 156:9 156:21 157:3,5 |
| **focused** 60:25 168:12 | **form** 3:11 11:20 12:22 13:3 15:5,14 19:3 20:9,19 22:15 23:9 | 89:19 91:15 92:12,21 94:20 95:7 96:7,17 96:22 97:7 98:2,12,15,22 | 159:10,16 160:16 161:14 164:2,11,18 167:23 168:8 168:21 169:12 |

CONFIDENTIAL

**[form - friendly]** Page 34

169:21 170:14
171:8,24
174:15 175:11
175:20 176:15
177:9 179:7,24
180:19 181:15
184:17 186:2
187:14 190:9
191:21 193:16
194:18,23
195:22 196:12
196:24 198:7
198:20 199:13
200:19,24
202:8,25 204:3
204:14 206:20
209:8 210:5
211:20 212:5
213:7 214:2
215:21 218:20
219:4,24
221:15 222:8
228:19 229:11
229:18 230:12
230:21 231:2
231:17 232:10
232:21 233:9
233:23 234:13
235:14 238:9
239:8,22 240:5
240:24 241:14
241:25 242:13
242:23 243:23
246:9 247:11

247:19 248:7
248:22 250:12
250:19 251:6
251:14,21
252:3 253:13
256:14,22
257:5,25
258:14 259:9
259:18 260:4
262:5 263:2
265:15 266:20
267:11 270:5
270:18 272:22
274:18 275:4
276:14 277:5
277:14 279:13
279:21 280:12
280:19,21
281:16 282:5
282:14 283:2
283:16 284:6
289:12 294:7
295:21 297:5
298:16 299:12
300:20 302:2
302:19 303:11
303:25 304:21
306:16 307:3
308:2,23 309:4
310:3
**formal**  14:7
119:24 215:6
219:25 281:12

**formed**  10:14
58:18 135:13
241:5 243:4
**forming**  26:5
52:19 65:5
135:10 148:2
**forms**  218:24
**formula**  44:4
46:15 52:21
**formulas**  46:22
**forsyth**  2:14
**forth**  61:9 64:9
66:6,16 67:5
69:23 73:2,20
80:5,9,11,17
81:18 103:15
115:2 118:8
135:23 271:2
315:11
**forum**  232:15
**forward**  116:22
117:9,13 118:5
119:24 132:18
154:4 269:3
316:16
**found**  20:6
67:22 286:17
**foundation**
44:20 46:18
190:13 200:25
239:23 242:24
**four**  10:4 12:8
296:2

**frame**  25:18
27:11,15 63:13
**framework**
114:10 117:10
121:20,21
257:12
**francis**  2:7
**fraud**  106:18
107:2,11,15
108:6,13,22
**fraudulent**
224:11
**free**  317:14
318:20
**frequently**
34:12 89:8,22
93:3 179:16
180:8 181:21
213:13 225:17
243:21 261:20
262:3,10
294:13
**friday**  4:4
**friendliness**
54:25 121:11
155:22 202:17
203:4,13
**friendly**  124:6
124:6,20
125:10 126:15
184:25 188:10
188:12,14,15
188:21 189:13
189:16 191:25

CONFIDENTIAL

**[friendly - going]**                                              Page 35

192:5,7 202:6
202:13,24
203:16 204:4
204:12 219:5,8
243:21 244:11
244:16
**front** 21:5
30:18 63:22
74:22 80:19
147:21 173:10
182:11,20
234:2 242:17
278:18
**full** 6:8 163:9
172:10 217:15
288:5
**fund** 119:15
**fundamental**
45:17 85:4
112:11 136:16
**funds** 68:20
71:18 73:9
75:13
**further** 3:11
77:22 113:16
149:2 150:7
161:3 178:18
183:14,23
199:5,6,19,20
200:2 202:2,19
229:20 235:8
243:15 261:17
308:7 315:14

**future** 34:15
35:18 38:5
39:23 151:22
152:25 154:18
194:7,16 248:6

**g**

**gain** 118:25
119:5 136:5
215:6 310:13
**gained** 116:16
116:24
**gaining** 182:24
**gains** 117:18,23
203:8 310:7
**game** 27:21,23
**gap** 282:18
**gaughan**
192:18 193:8
193:15 195:6
196:22
**geller** 1:18 2:4
20:12,18,23
22:14
**general** 5:17
84:6 92:8,18
93:2 116:3
243:19 276:9
**generally** 59:20
133:15 209:24
**generate** 59:22
**genesee** 21:10
**gentleman**
56:20

**getting** 22:7
86:8 221:17
248:16 292:15
**gilroy** 2:7
**giuggio** 2:10
**give** 15:15
32:19 50:3
131:5 149:14
184:6 206:21
235:17 269:10
274:13 287:19
296:2
**given** 60:17
72:9 79:13
85:19 145:3,19
315:13
**gives** 208:10
209:11
**giving** 6:7
33:22 35:12
41:20 75:25
76:4 77:10
79:25 206:14
206:16 280:24
**go** 5:24 10:24
14:12 17:3
20:24 21:15
24:17 31:10
41:2 46:3
83:24 93:25
102:16 135:15
136:11 141:4
147:3,5 152:9
155:22 158:10

159:6 161:23
176:3 177:17
178:7 190:17
197:25 198:2,8
198:11 199:19
206:5 210:20
213:5 220:22
228:3 243:10
262:9,14
264:13 268:21
270:4 272:21
273:10 274:6
275:24 277:17
285:24 286:9
288:14 291:15
299:16 300:7
**goes** 8:21 24:9
68:25 75:14,18
92:20 93:6
108:13 109:12
109:14 113:2
168:10 180:4
189:9,17 192:3
207:21 211:12
243:25 260:6
262:19 267:9
289:23
**going** 4:3 6:6
7:2,15 25:9
26:2,6,15,18,19
26:22 27:24
28:12,16 29:17
35:18 37:12
47:24 50:21

CONFIDENTIAL

**[going - happy]**                                                              Page 36

64:17 65:2,18
68:8 82:3,6
87:15 107:7
123:20 132:7
132:17,18,19
139:19 151:6
151:21 153:3
154:4 160:6
162:8 165:4
177:24 179:19
180:9 182:21
189:18 196:21
212:3 220:20
223:14 236:15
240:19,20
247:20 248:4
270:19 286:12
310:18
**good** 4:2 5:13
5:14 92:9,19
93:5 139:17
204:20
**goodman** 95:16
**goodwin**
119:25 124:4
157:17 186:7
186:25 187:23
188:17 190:22
196:17 202:11
243:8 245:2
**goodwin's**
158:10,12
197:4 245:21
249:11,18

250:3
**gotten** 117:18
117:23
**governance**
215:7
**graduate** 57:20
**granting** 70:22
71:3
**greater** 107:22
222:25 265:2
287:6
**ground** 26:3
**grounded**
185:16
**grounds** 19:22
25:10 26:7
**group** 13:8
288:7 292:23
**groups** 292:22
**grove** 55:13,13
**guess** 15:16
17:6,17 30:5
39:5 40:3 41:2
42:5 55:17,19
59:18 65:15
70:6 78:25
84:22,22 85:12
86:4,25 92:8
95:8 114:22
115:19 121:3
123:20 125:19
129:21 130:20
136:10 152:22
152:23,24

154:25 184:21
193:25 195:24
197:5 203:2
233:25 235:17
243:6 248:23
251:7 254:8
258:21 270:19
273:10 281:2
284:15 285:25
286:4 292:15
301:25
**guesses** 151:21
153:12
**guidance** 76:15
77:23 122:11
136:2 138:5
157:9,18,22,25
158:16,20
159:6 160:13
160:24 161:8
194:15,22
245:8 310:15
**guys** 204:23

**h**

**h** 312:7 313:2
314:2
**hand** 6:14 7:2
28:12 46:6
162:8 165:4
205:8 216:3
286:14 315:20
**handing** 28:14
74:7 90:10,14

90:19 147:14
147:16 165:5
263:10,12
278:20,22
**handwritten**
147:17,20
148:16 212:10
312:22
**hang** 153:21
**happen** 100:23
126:16 151:6
151:22 152:16
152:25 156:7
199:8
**happened**
97:16 106:7
146:4 154:18
185:21 193:24
200:9 211:13
225:7 235:10
258:12 262:21
266:4 268:3
297:25 300:21
303:8 308:18
**happening**
262:3 283:20
**happens**
134:14 180:15
198:19,22
262:11 267:7
298:11 299:9
**happy** 33:18
47:3 58:5 59:7
66:8 73:22

CONFIDENTIAL

**[happy - idea]**                                                    Page 37

169:6 242:16 294:16 295:9

**hard** 287:3,11 287:18,20 288:21

**harmed** 119:15

**head** 10:21 22:7 89:11,24 127:22 128:18 128:21 129:11 169:14 212:15 221:7 233:14 235:6

**heading** 9:9 157:11

**hear** 49:25 62:23 70:15 144:22

**heard** 187:8,11

**hearing** 129:5

**held** 1:17 60:8 85:5 287:12

**help** 35:3 158:6 291:18

**helped** 48:25 54:8 70:25

**helping** 59:23

**hereinbefore** 315:11

**hereunto** 315:19

**hiatus** 184:6

**hiding** 193:18

**high** 234:18 257:17 267:18

**higher** 30:4,9 31:15 49:14 52:13 83:23 92:23 113:10 117:5 140:12 159:3 160:22 171:16 175:14 180:9,12 208:6 225:18,21,21 229:4 244:10 251:10 254:7 265:21 266:8 266:19 267:2,9 268:10,21 270:4,10 272:21 288:17 290:4 292:6 295:6

**highlighted** 25:24

**highlighting** 24:22 26:10 31:5

**highly** 68:19 71:18 72:4,18 75:12 100:15

**hill** 12:5

**hinted** 270:4

**historical** 209:16

**histories** 199:19

**history** 89:4

**hmm** 109:19

**hold** 92:19,22 307:20,21

**holders** 92:9

**holdings** 21:20 60:6,15

**holds** 214:12

**hostile** 29:14 32:13 36:18 37:17,21 88:16 121:20 124:9 125:11,12,13 126:10,20 178:13 181:18 181:19 185:4 189:19 204:4 204:12 213:14 229:25 236:2 243:22 262:17 263:5 292:16 295:4,5,23 296:8 297:7,9 302:25

**hostility** 54:25 121:11 124:8 124:14,23 126:13 155:22 185:8 197:17 202:15,17 203:4,14,17,23 243:12 244:16

**hour** 68:8

**hours** 15:11,18

**hundred** 109:6 109:21 260:15

**hundreds** 57:17 89:2,9 121:13 180:3 181:3 190:25 199:15 260:7 301:4 302:22

**hypothetical** 78:20 87:2,17 87:20,23 100:8 109:24 110:15 110:18,20,22 132:5 134:16 134:20 135:14 136:21 144:10 144:13,17 146:13,19 159:13 190:13 235:15

**hypothetically** 85:17 86:10 87:6 94:25 95:18 96:10 99:7 100:10,21 109:9,13,18

i

**i.e.** 305:2

**idea** 119:17 120:21 129:16 151:6 185:20 212:17 268:20

CONFIDENTIAL

**[idea - incomplete]**                                    Page 38

283:24 303:23
**ideas** 125:23
**identical**
   227:25
**identification**
   6:20 7:8 28:23
   74:14 90:8,17
   147:19 162:17
   165:8 182:4
   192:14 205:15
   216:8 236:21
   246:17 252:22
   263:16 279:3
   298:9
**identified** 22:9
   65:21
**identifies** 220:7
**identify** 20:21
   50:22 63:24
   74:21 89:13
   90:2 295:12
**ignore** 124:7
**ignored** 19:15
   19:22
**ignoring**
   115:10
**ilcisin** 150:13
   235:24
**illustration**
   268:17
**image** 169:3
   171:10 172:3
   173:21

**impact** 8:20
   34:14,25 36:13
   38:8 91:21
   95:5,23 99:16
   103:20 115:8
   116:11 131:6
   131:18 132:16
   139:8 140:25
   141:7 142:6
   158:24 179:13
   197:14 210:13
   217:17 230:2
   243:16 278:24
   279:5 285:7
   293:12 295:7
   296:11 298:6
   298:21 300:4
   314:5
**impacted** 79:19
   94:9
**impacting**
   210:14
**impacts** 43:18
   62:3 296:16
**impede** 81:5,14
   82:11 83:2,7
   122:19 123:6
**implication**
   177:12,14
   255:22 275:11
   275:18
**implications**
   114:4

**implicitly**
   275:13
**implied** 43:8
   44:2 243:3
**imply** 39:22
**implying** 270:9
**importance**
   52:9 92:2
   178:15
**important**
   52:18 85:7
   87:19 161:5
   189:23 218:12
**importantly**
   114:2
**improper** 33:24
**improved**
   175:18 194:15
**improvement**
   273:21
**improvements**
   178:11
**inaccurate**
   156:20
**inadequate**
   195:9 224:11
   275:7 281:20
**incidence**
   208:25
**include** 11:8
   45:24 103:16
   124:21 163:8
   172:19 212:7
   218:6 220:2,12

292:14,16
295:3,4
**included** 8:9
   46:20 48:14
   88:10 171:12
   172:11,13
   175:3 180:21
   180:23 198:10
   210:18 212:12
   213:25 220:18
   273:16 316:14
**includes** 12:14
   15:9 67:20
   71:13,14 88:8
   103:8 134:2
   172:14,20,22
   172:25 173:18
   173:21 213:20
   218:4,5 301:12
   301:13
**including** 13:22
   22:18 32:11
   37:15 38:23
   45:15 54:14
   68:16 75:8
   89:4 120:15
   131:2 141:16
   148:21 152:7
   163:11 164:5
   207:17 220:9
   295:2,23
   298:24
**incomplete**
   87:17 190:12

CONFIDENTIAL

**[incomplete - information]**                                    Page 39

| | | | |
|---|---|---|---|
| 235:15 | **increasing** | **industry**  48:9 | 101:25 102:24 |
| **inconsistent** | 32:12 37:16,25 | 106:23 108:21 | 103:7 104:12 |
| 151:25 249:17 | 38:4 39:19 | 112:13 | 105:7,8,23 |
| 250:3,24 | 114:12 133:17 | **inflated**  310:12 | 107:2,6,11,16 |
| **incorporate** | 148:24 152:9 | **inflation**  254:4 | 108:6,13,22 |
| 135:25 | 157:23 158:21 | 305:16,18 | 112:9 114:7,11 |
| **incorporated** | 215:12 | 310:9 | 115:22 116:8 |
| 318:12 | **incredible** | **inflection**  183:4 | 117:17 118:16 |
| **incorrect**  49:17 | 59:23 | **influence**  215:7 | 119:3,8 121:23 |
| **increase**  38:13 | **independent** | **information** | 122:7,12 |
| 39:24 79:22 | 185:13 189:5 | 26:22 27:6 | 129:16 130:18 |
| 92:17 99:23 | 199:24 | 28:6 33:23 | 130:24 131:15 |
| 101:11 174:20 | **indicate**  160:3 | 34:13,17,24 | 131:22 132:21 |
| 179:17 235:8 | 228:5 235:11 | 35:5 43:6 49:8 | 132:23 133:18 |
| 265:20,23 | 245:6 | 51:13 52:10,18 | 133:21,23 |
| 266:13 269:9 | **indicates**  42:13 | 60:18 61:2,16 | 134:3,23 |
| 269:23 270:14 | **indicating** | 61:25 62:18 | 135:18 136:7 |
| 273:6,18 276:5 | 129:24 261:22 | 63:24 64:18 | 136:15 137:6 |
| 276:17,20 | 264:25 286:24 | 66:15,19,22 | 137:21 138:6,8 |
| 277:10,12 | 316:14 | 67:25 68:14 | 138:14,25 |
| 288:7 289:4,5 | **indication** | 69:8 70:3,9,11 | 139:6,12,24 |
| 293:18 | 36:20 | 70:13 71:12,20 | 140:10,18 |
| **increased** | **indications** | 75:6 76:12 | 141:12 142:12 |
| 83:25 141:3 | 172:22 | 77:3,8,11,19 | 144:20 145:15 |
| 148:24 159:5 | **indicative** | 78:23 79:3,11 | 145:21 146:6 |
| 160:13,13 | 250:8 | 79:18 86:4,7 | 146:18 152:15 |
| 164:24 180:6 | **indices**  48:9 | 87:22 88:9,13 | 155:8 158:3,24 |
| 212:9,12 | **indirect**  125:14 | 88:19,22 89:7 | 160:25 161:4 |
| 214:20 261:23 | 128:13 | 89:22 91:23 | 161:10 162:22 |
| 262:18 264:20 | **individual** | 92:5,10,15 | 164:15 167:11 |
| 268:12 | 38:24 | 94:4,8 95:11 | 168:11,16,18 |
| **increases** | **individuals** | 95:15,23 98:10 | 170:22 171:4 |
| 113:17 214:15 | 151:17 | 99:22 100:3,6 | 171:11,20,22 |
| 214:18,21 | | 100:10 101:6,8 | 172:25 173:17 |

CONFIDENTIAL

**[information - instruments]**                                              Page 40

| | | | |
|---|---|---|---|
| 173:19,22 | 227:12,21 | 75:8,17 78:3 | 124:13 125:5 |
| 174:9 175:3 | 261:20 262:18 | 78:14 79:20 | 127:4,14,17 |
| 176:17 179:10 | 264:2,17 265:2 | 80:3,23,25 | 128:6 129:2,7 |
| 179:12 197:12 | **initially** 191:7 | 81:7,13,16 | 129:17,25 |
| 197:19 206:17 | **initiate** 178:17 | 82:10,12,25 | 131:3,10 132:3 |
| 209:12 213:18 | **initiated** 163:3 | 83:4,6,9,19 | 132:6,12 133:4 |
| 213:25 220:3 | 169:9 | 84:13 85:8,16 | 133:9,10 |
| 221:17,18 | **initiating** | 86:10,17 87:6 | 135:19 143:19 |
| 223:24 229:7 | 182:24 | 87:12 88:23 | 148:8 150:2,14 |
| 229:16,22 | **injunction** | 89:16 90:14 | 157:8 158:16 |
| 230:20 231:16 | 224:14 | 92:10,16 93:21 | 160:12,14,19 |
| 231:23 232:7 | **inside** 117:17 | 93:25 94:11,15 | 162:10,25 |
| 232:13,19,25 | 212:14 | 94:17,24 95:3 | 163:18 164:17 |
| 243:16 263:9 | **insider** 61:24 | 95:6 96:3,11 | 164:23 166:23 |
| 265:17 266:6 | 117:15,21 | 96:13,15,21 | 167:17,20 |
| 268:5 269:6 | 118:12,22 | 97:15,19,20 | 168:16 169:9 |
| 270:17 271:6 | **insights** 288:12 | 98:4,8,21 99:8 | 169:18 170:10 |
| 273:17 285:15 | **instance** 88:20 | 99:15 100:9,12 | 171:2,4 173:11 |
| 286:21,25 | 89:14 90:3 | 100:17,21,24 | 173:11 174:5 |
| 287:5,22,23,24 | 227:19 | 101:10,14,16 | 177:15 184:13 |
| 288:10,11 | **instances** 20:3 | 101:19,21 | 194:12,14 |
| 289:3 297:22 | 198:13 199:11 | 102:4,11,16,18 | 196:18 200:9 |
| 298:20 299:3 | 209:24 210:17 | 103:2,19,21 | 202:24 205:25 |
| 309:12 | **instruments** | 104:12,14 | 206:15 207:7 |
| **informed** | 1:4 2:13 4:9 | 105:20 109:6 | 208:22,24 |
| 221:11 231:8 | 21:9 28:11 | 109:14,17,21 | 212:2 213:20 |
| 233:19 234:7 | 32:20 36:10 | 110:25 111:6 | 215:9 219:23 |
| **informing** | 42:14 56:16 | 111:16 113:21 | 221:4,12,14,16 |
| 231:14 | 57:25 58:10 | 114:17,20 | 221:23,25 |
| **initial** 172:19 | 63:11,25 64:24 | 115:5,14 | 225:3,3 226:4 |
| 178:9 183:4 | 65:2,11,23 | 116:14 119:18 | 227:20 229:9 |
| 184:8 218:24 | 67:12 68:15,23 | 120:16 122:18 | 230:6,18,24 |
| 220:9 222:4 | 69:9 71:16 | 122:21 123:6,8 | 231:7,15,24 |
| 224:20 225:4 | 72:2,14 73:7 | 123:10,13,25 | 232:6 233:4,8 |

CONFIDENTIAL

233:20 234:10 234:22 235:13 236:18 239:3 241:8,17 242:12 243:18 251:25 253:25 256:12 258:11 264:12 265:6,9 265:19 266:4 268:4,11 272:3 272:13 274:14 274:16,24 275:2,7,12 280:7,17,20,24 281:5,7,11 282:12,19,25 283:7,11 298:22 302:11 304:16 305:11 306:23,24 308:22 316:6 317:3 318:3

**intending** 224:13

**intent** 163:6 215:12

**interact** 85:2,3 85:5 136:20

**interacted** 56:2 57:6

**interacts** 85:15 87:21 189:21 230:14

**interest** 161:2 163:12 169:19 169:23 170:3 172:23 174:24 175:25 177:23 179:10 181:23 185:18 235:11 261:17

**interested** 4:20 174:4 199:23 199:24 315:17

**interests** 195:10

**internal** 59:25 120:15 128:10 128:15,19,23 129:24 130:12 148:19 149:16 158:14 160:20 229:22 269:4 288:10 297:18

**interplay** 249:21

**interpret** 40:5 238:12

**interpretation** 38:17 39:7 71:6 76:14 77:23 81:22 158:14 228:17 239:21 241:3

**interpretations** 150:8

**interpretive** 122:10

**introduce** 309:7

**introduced** 308:20 309:3

**introducing** 32:6

**introduction** 292:19

**introductory** 32:7

**invade** 27:8

**investment** 55:24 116:8 130:25 237:22 239:16 247:5 250:22,25

**investments** 215:3

**investor** 60:22 109:5 111:19 114:13 310:10

**investor's** 130:25

**investors** 60:5 60:13 87:25 88:2 106:13,22 107:12 111:8 112:3 113:16 119:6,9,16 130:7 158:3 161:6 174:3,10 178:8 180:10

232:15 261:22 268:14 287:24 289:3 299:4 301:16 306:4 309:15 310:8 310:13

**involve** 20:17 20:22 43:10 185:7 187:18 191:7 195:20 196:9,10 255:24 281:9

**involved** 10:2 54:2,12 56:15 59:3 60:21 61:24 62:16 121:25 184:19 186:17 197:22 219:22

**involves** 45:3 122:13 186:21

**involving** 57:22 62:7 76:10 124:22 225:2 227:19

**irrespective** 102:17

**irvine** 14:5

**issue** 139:24 202:10 220:13 229:17

**issued** 194:5,14

**issuing** 194:21

CONFIDENTIAL

**iv** 44:23

**j**

**jane** 109:20
110:10

**january** 45:23
46:25 48:18,19
126:21,24
139:10 140:16
140:19 142:7
142:19,24
143:9 145:24
146:3 162:5,6
162:11,22
167:5,10,22
168:6,17,23,24
168:25 169:25
170:23 171:20
172:10,17
173:18 177:13
271:22 272:2
272:12 273:9
274:3,5,10
275:2,3,12
298:18 305:5
309:19 310:2

**jindra** 178:4,22
261:18 263:18

**job** 53:23 57:2

**john** 2:15 109:5
110:4 145:6
316:5

**joint** 237:20

**judge** 3:7 19:12
19:15,19

**july** 6:16,18 8:6
9:6,19,24
11:13 18:6
157:13 175:4
194:15 234:23
273:8 281:12
281:17,18,23
285:21 312:10

**jumps** 216:6,17
313:16

**june** 29:22
30:25 31:12
86:13 87:9
90:15,22 91:7
93:22 94:16,18
96:2,3,12,13
100:19 143:12
143:13 147:22
148:5,9 149:8
149:23,25
150:20 151:5
151:12,20
152:14,24
153:14,16
154:11,12,22
156:19,25
175:9 185:23
194:13 198:16
205:13,19
206:2 208:21
210:22 221:6
236:16,19

238:25 240:10
241:8,22 242:9
245:14 246:16
247:8 248:2,18
256:12,21
257:21 258:10
258:13,15,16
258:17,24
259:4,6 264:7
265:7 268:19
269:15 276:2
276:22 281:15
312:20 313:15
313:18

**jury** 64:10 72:7
73:17 113:9
138:17

**k**

**karam** 2:7

**karen** 150:11

**katz** 205:13,18
233:5 313:14

**keep** 18:18
91:19 145:3
189:24 197:12

**kevin** 150:13
235:24

**key** 115:21

**kind** 14:24
36:19 52:15
93:10 133:6
149:20 163:23
213:4 217:2

243:24

**knew** 32:21
33:4 212:14
232:8,8

**know** 6:3 8:25
10:22 11:3,4
15:11 17:5,7
23:13 28:9
29:9,13 40:23
56:14 66:25
67:4 89:10
94:10,14,16
101:15 103:10
103:14 126:6
131:12,13
132:25 134:13
138:9 145:7,12
145:20 146:17
146:22 151:8
154:15 155:19
160:19 164:6
169:14,22
183:14 185:6
194:11,14
209:18,21
212:2,24 221:2
229:22 231:3
234:17 235:9
236:24 239:13
242:25 244:22
247:22 260:3
270:6,25
271:12 274:6
280:2,4 281:10

CONFIDENTIAL

**[know - lipton]** Page 43

288:23 292:19
294:3,6 297:21
**knowledge**
63:9,15 170:15
**known** 199:12
230:23 232:16
261:21

**l**

**l** 3:2,2 16:14,15
16:16
**labeled** 166:14
**labels** 91:13
**lack** 293:9
**lacking** 242:24
**lacks** 44:20
46:18 190:13
200:25 239:23
**laid** 41:3 77:8
138:13
**large** 68:16
71:16 75:9
116:6 217:10
260:13 270:23
286:14
**larger** 223:7
**largest** 234:21
260:17
**lasted** 59:18
**late** 13:14
194:15 211:3
**latest** 208:9
**lauder** 10:3

**law** 13:25
14:21 15:3
20:12,18 22:12
22:14,17
205:24 206:13
207:5 233:6
**laws** 74:13
312:18
**lawyer's**
210:21
**lawyers** 205:23
206:13 207:4
208:21 210:23
211:3 234:9
**lay** 69:8
**lead** 237:19,20
**leading** 45:14
274:21
**leads** 189:20
**leakage** 93:10
138:9
**learned** 133:10
221:23 233:20
**learning** 269:3
**learns** 143:20
198:18
**leaves** 239:20
**left** 226:23
**legal** 4:12,15
73:15 76:14
105:4,4 118:10
122:13,14
130:4 138:17
163:6 232:11

232:22,25
238:10,22
239:11 241:2
316:1 319:1
**letter** 90:7,12
90:16,22 91:3
91:8 134:12
207:23 208:5
236:7,16,20,24
237:5,10 239:2
240:11 241:22
242:10,21
244:20 245:10
245:15 246:7
246:16,20
247:9 248:2,18
249:8,22 257:2
257:6,11 258:4
258:6,10,23
273:24 275:11
276:2,10,13,22
312:19,21
313:18 316:20
**letterhead**
269:13
**letters** 91:4
92:6 94:6
99:12,13,15
100:12 264:11
271:8 273:4
**level** 42:17
57:20 93:2
142:5 175:25
249:25 281:9

294:11
**lexington** 1:19
2:5
**liability** 72:8
73:18 76:11
79:15 138:19
309:6
**life** 97:5
**light** 130:16
154:18 201:16
**likelihood**
132:17 157:19
158:17 180:11
214:14 215:13
**likely** 160:15
178:11 241:10
288:8
**limit** 101:5
113:11
**limited** 142:8
149:10 188:12
245:8 269:5
308:7
**limiting** 124:19
128:22
**line** 31:13
68:10 316:14
318:7 319:3
**lines** 35:13
98:15 267:3,5
**lipton** 205:12
205:18 207:5
233:5 313:14

CONFIDENTIAL

**list**  10:18 11:12 17:11,11,13,14 23:5 59:5 62:21 79:25 80:4

**listed**  10:10 17:24 20:16 62:12,22 65:19 227:13 279:10 318:7,17

**listen**  131:12

**listing**  18:9 239:10 318:7

**literature**  176:6 196:9,14 218:14 222:14 222:22 223:10 264:21 294:19

**litigation**  1:5 4:10 17:2 316:7 317:3 318:3

**litowitz**  22:18

**little**  12:3 63:19 68:7,8 94:4 95:11 173:14 191:14 197:25 198:21 236:13 266:15 268:8 273:15 293:7

**liu**  56:20 57:2 235:24 242:5 242:19

**live**  131:25 153:15

**llp**  1:18 2:4,12

**logical**  30:6,8

**long**  59:16 123:19 126:14 138:8 165:22 195:10 246:19 251:12

**longer**  48:12 135:17 137:7 137:21 139:2 140:2 141:12 142:12 143:24 144:21 145:15 146:7,18 165:14,24 166:4,10 181:6 235:12

**look**  7:24 9:24 10:3 14:12 21:15 24:18 27:3 29:6 33:11,18,24 34:12 36:3 58:6 67:18 75:3 80:20 87:23 136:7,14 136:22 145:11 147:25 169:7 175:22,22,24 177:20 181:13 182:18 186:9 186:11 195:5

198:9 201:10 214:5 215:22 226:6 234:3,24 242:16 244:9 244:20 253:4 256:15 269:3 269:11 285:25 288:17 291:5 294:16 295:9 296:7 300:8,14 302:3 310:19

**lookback**  271:18

**looked**  43:20 63:10 122:15 145:10 222:13 246:4 253:18 271:23 284:18 290:20 295:25 300:15

**looking**  8:2 11:15 34:23 35:15,15 93:7 112:7 113:23 113:24 114:23 189:25 201:12 222:16 275:23 276:21 292:2 293:3 296:19 301:14

**looks**  8:17 9:18 11:10 12:6 24:10 181:9 228:25 254:24

290:6 292:4 298:10

**losing**  211:14

**loss**  308:6,14

**lost**  235:11 277:19

**lot**  12:25 41:9 43:2,20 45:24 46:19 51:6 57:14,21 85:2 121:4 123:20 128:10 130:12 138:10 159:17 166:5 174:25 176:2 177:10 197:11 239:20 275:23 294:8 294:24

**louis**  166:18

**lourie**  16:14 278:16 285:17 286:6 301:21 303:20

**lower**  84:18 97:23 112:25 117:4 173:9 215:5 288:18

**lunch**  204:20

**m**

**m**  4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1

CONFIDENTIAL

**[m - m]**                                                                    Page 45

| | | | |
|---|---|---|---|
| 16:1,11 17:1 | 111:1 112:1 | 179:1 180:1 | 247:1 248:1 |
| 18:1 19:1 20:1 | 113:1 114:1 | 181:1 182:1 | 249:1 250:1 |
| 21:1 22:1 23:1 | 115:1 116:1 | 183:1 184:1 | 251:1 252:1 |
| 24:1 25:1 26:1 | 117:1 118:1 | 185:1 186:1 | 253:1 254:1 |
| 27:1 28:1 29:1 | 119:1 120:1 | 187:1 188:1 | 255:1 256:1 |
| 30:1 31:1 32:1 | 121:1 122:1 | 189:1 190:1 | 257:1 258:1 |
| 33:1 34:1 35:1 | 123:1 124:1 | 191:1 192:1 | 259:1 260:1 |
| 36:1 37:1 38:1 | 125:1 126:1 | 193:1 194:1 | 261:1 262:1 |
| 39:1 40:1 41:1 | 127:1 128:1 | 195:1 196:1 | 263:1 264:1 |
| 42:1 43:1 44:1 | 129:1 130:1 | 197:1 198:1 | 265:1 266:1 |
| 45:1 46:1 47:1 | 131:1 132:1 | 199:1 200:1 | 267:1 268:1 |
| 48:1 49:1 50:1 | 133:1 134:1 | 201:1 202:1 | 269:1 270:1 |
| 51:1 52:1 53:1 | 135:1 136:1 | 203:1 204:1 | 271:1 272:1 |
| 54:1 55:1 56:1 | 137:1 138:1 | 205:1 206:1 | 273:1 274:1 |
| 57:1 58:1 59:1 | 139:1 140:1 | 207:1 208:1 | 275:1 276:1 |
| 60:1 61:1 62:1 | 141:1 142:1 | 209:1 210:1 | 277:1 278:1 |
| 63:1 64:1 65:1 | 143:1 144:1 | 211:1 212:1 | 279:1 280:1 |
| 66:1 67:1 68:1 | 145:1 146:1 | 213:1 214:1 | 281:1 282:1 |
| 69:1 70:1 71:1 | 147:1 148:1 | 215:1 216:1 | 283:1 284:1 |
| 72:1 73:1 74:1 | 149:1 150:1 | 217:1 218:1 | 285:1 286:1 |
| 75:1 76:1 77:1 | 151:1 152:1 | 219:1 220:1 | 287:1 288:1 |
| 78:1 79:1 80:1 | 153:1 154:1 | 221:1 222:1 | 289:1 290:1 |
| 81:1 82:1 83:1 | 155:1 156:1 | 223:1 224:1 | 291:1 292:1 |
| 84:1 85:1 86:1 | 157:1 158:1 | 225:1 226:1 | 293:1 294:1 |
| 87:1 88:1 89:1 | 159:1 160:1 | 227:1 228:1 | 295:1 296:1 |
| 90:1 91:1 92:1 | 161:1 162:1 | 229:1 230:1 | 297:1 298:1 |
| 93:1 94:1 95:1 | 163:1 164:1 | 231:1 232:1 | 299:1 300:1 |
| 96:1 97:1 98:1 | 165:1 166:1 | 233:1 234:1 | 301:1 302:1 |
| 99:1 100:1 | 167:1 168:1 | 235:1 236:1 | 303:1 304:1 |
| 101:1 102:1 | 169:1 170:1 | 237:1 238:1 | 305:1 306:1 |
| 103:1 104:1 | 171:1 172:1 | 239:1 240:1 | 307:1 308:1 |
| 105:1 106:1 | 173:1 174:1 | 241:1 242:1 | 309:1 310:1 |
| 107:1 108:1 | 175:1 176:1 | 243:1 244:1 | 311:1 |
| 109:1 110:1 | 177:1 178:1 | 245:1 246:1 | |

CONFIDENTIAL

**m&a** 53:6,9 54:2 57:7 61:2 61:16 243:20 245:13 278:12 283:24

**mackenzie** 213:21 231:8 232:8,17

**madam** 316:10

**made** 51:22 80:23 85:18 86:2,12 87:7 88:3 91:23 95:25 97:17 99:9 102:11 127:16 133:3 139:11 142:20 143:10 148:6 152:24 156:25 160:14 167:16 170:25 175:7,9 179:5 180:17 181:11 190:6 194:13 206:18 207:9 208:25 209:2 211:4 215:6 220:14 220:16 221:5 270:12 271:21 280:5 282:10 294:21 297:2 298:12 300:16 300:19 317:7

**majority** 34:11 34:18 35:3

**make** 36:18 40:16,21 41:5 47:5 68:5 88:7 131:15 141:9 141:18 165:16 212:3 218:17 231:19 266:25 276:5 282:17

**makes** 100:12 170:25 209:25 295:14

**making** 100:14 103:19 113:21 126:5 151:21 153:12 161:7 186:22 210:3 211:17 234:21 275:25

**management** 32:8,20 33:12 37:8 83:7 84:19 85:6 98:20 132:13 212:8,14 223:23 224:6 224:10,19 225:4,16 226:18 288:23

**managements** 286:24 288:12

**mandate** 245:17

**mandel** 2:6 9:21 11:20 12:22 13:3 15:5,14 19:3 20:9,19 22:15 23:9 24:6,15 24:25 25:9,25 26:6,15,18 27:14 28:3,16 28:25 29:17 30:23 31:3 32:3,23 33:14 34:4 35:11,20 35:23 37:11 38:15 39:4,20 41:8,14,16,24 42:25 43:12 44:7,10,13,19 45:4 46:16 47:7 49:16 50:5,17 51:11 51:25 52:5,22 53:7,12 54:9 54:20 55:5,10 55:18 56:9 57:4,11 58:2 58:11,20,24 61:6,8 63:12 63:14 64:3 65:4 66:3,23 67:15 68:5 69:6,12,15 70:5,16 72:5 72:20 73:11

76:2,22 77:13 78:7 79:7 82:14 83:10,20 84:8,15,21 85:11,22 86:24 87:15 88:11,24 89:19 91:15 92:12,21 94:20 95:7 96:7,17 96:22 97:7,25 98:11,22 99:4 99:18 101:3,23 102:6,20 103:5 103:24 104:15 105:15 106:9 107:25 110:8 110:14 111:2 111:17,24 113:3 114:21 115:18 116:17 117:19 118:4 118:18 119:12 121:2 122:8,23 123:18 125:18 126:2,18 127:7 127:23 128:4,9 129:9,20 130:19 131:19 133:25 134:18 135:3,20 137:9 137:23 139:4 139:19 140:4 141:15,24 142:15 144:4

CONFIDENTIAL

**[mandel - marketplace]**                                            Page 47

| | | | |
|---|---|---|---|
| 144:24 145:5 | 206:20 209:8 | 276:14 277:5 | 26:14 28:22 |
| 145:17 146:9 | 210:5 211:20 | 277:14 279:21 | 29:2 36:4 74:7 |
| 146:21 147:5 | 212:5 213:7 | 280:12,19,21 | 74:13 90:7,11 |
| 148:11 149:12 | 215:21 218:20 | 281:16 282:5 | 90:16,20 |
| 150:5,16,25 | 219:24 221:15 | 282:14 283:2 | 147:14,18 |
| 151:14,23 | 222:8 228:19 | 283:16 284:6 | 154:10 162:16 |
| 152:18 153:2 | 229:11,18 | 289:12 294:7 | 165:7 170:23 |
| 153:18 154:2 | 230:12,21 | 294:23 295:21 | 182:3 192:13 |
| 154:14,20,24 | 231:2,17 | 297:5 298:16 | 205:14 206:5 |
| 156:9,11,21 | 232:10,21 | 299:12 300:20 | 216:7 226:25 |
| 157:3 159:10 | 233:9,23 | 302:2,19 | 236:20 252:19 |
| 159:16 160:16 | 234:13 235:14 | 303:11,25 | 252:21 263:11 |
| 161:14,21 | 238:9,20 239:8 | 304:4,21 | 263:15 276:3 |
| 163:25 164:11 | 239:22 240:5 | 306:16 307:2 | 278:21 279:2 |
| 164:18 165:22 | 240:24 241:14 | 307:25 308:23 | 284:3 301:21 |
| 166:3,9 167:23 | 241:25 242:13 | 309:4 310:3,20 | **markedly** |
| 168:8,21 | 242:23 243:23 | 311:5,12 | 303:16 |
| 169:12,21 | 246:9 247:11 | **manipulate** | **market**  18:4 |
| 170:14 171:8 | 247:19 248:7 | 97:21 98:8 | 47:15 48:8,14 |
| 171:24 174:15 | 248:14,22 | **manipulation** | 84:6,11 85:3 |
| 175:11,20 | 250:12,19 | 96:21 97:10,13 | 97:9,12 106:23 |
| 176:15 177:9 | 251:6,14,21 | **manufacture** | 107:18 108:15 |
| 179:7,24 | 252:3 253:13 | 119:25 | 108:21 109:15 |
| 180:19 181:15 | 256:14,22 | **march**  12:6 | 111:23 112:12 |
| 184:17 186:2 | 257:5,25 | 74:10 | 113:2 116:3 |
| 188:23 190:9 | 258:14 259:9 | **marches** | 125:4 177:22 |
| 190:12 191:21 | 259:18 260:4 | 134:10,15 | 178:8,18 |
| 194:18,23 | 260:24 262:5 | 143:11,21 | 261:16 263:14 |
| 195:22 196:12 | 262:25 265:15 | 144:19 146:4 | 264:17 272:21 |
| 196:24 198:7 | 266:20 267:11 | **mark**  7:15 22:4 | 288:9 313:21 |
| 198:20 199:13 | 268:25 269:10 | 165:5 236:16 | **market's**  288:9 |
| 200:19,24 | 270:5,18 | 311:12 | **marketplace** |
| 202:8,25 204:3 | 272:22 274:18 | **marked**  6:15 | 119:7 |
| 204:14,19,24 | 275:4,21 | 6:19 7:3,7 8:2 | |

CONFIDENTIAL

**[markets - media]**

**markets**  53:16
**marking**  162:9
  192:10 205:8
  216:3
**marks**  193:15
**marriage**
  315:16
**massive**  260:16
**material**  34:2
  63:24 68:14
  69:8 70:3,10
  70:12 71:22
  75:6 76:19,21
  77:3 78:17
  79:3,19 80:2
  86:22 118:15
  119:3 122:6,11
  130:23 131:17
  133:20 134:25
  135:18 137:7
  137:20,22
  139:2,6 140:3
  141:12,13
  142:13,18,19
  143:4,25
  144:21 145:16
  145:22 146:8
  146:19 161:5
  179:13 231:23
  232:19,24
  299:4
**materiality**
  33:23 34:17
  35:4 43:4

78:22 92:4
105:6 129:15
130:17 132:22
140:7,18 141:6
142:3 155:4
158:2,23
173:24 197:18
213:17 214:3
229:21 230:16
243:13 285:10
285:15 297:21
300:13 302:14
302:24
**materially**
  75:15 114:4
**materials**  25:15
  25:17 27:10
  182:14
**math**  44:9 45:3
  46:19
**mathematical**
  41:6,12,22
  42:3,21 43:11
  44:3,4 46:10
  46:14,21 49:11
  50:14 51:19,23
  52:21,24
**matter**  4:8 46:6
  56:17 76:16
  285:11 286:7
  302:15 315:18
**matters**  20:15
  20:22 22:17
  23:17 62:15

**matthew**  1:16
  4:8 5:7 6:18
  7:6 312:4,10
  312:12 316:9
  317:4,9 318:4
  318:13 319:20
**max**  36:16
  38:10 39:17,23
  254:9
**maximize**
  163:7 203:7
**maximum**
  235:5
**mcgrath**  2:14
  28:9,9,21
  29:10 30:23
  31:11 36:8
  38:23 39:13
  90:23 235:24
  312:15
**mcgrath's**
  28:13 30:15,20
  36:4 40:11
**mean**  15:21
  28:5 30:6
  41:17,17,18
  61:4 64:12
  80:8 84:17
  85:25,25 91:12
  92:18 125:19
  125:20,22
  146:17 149:25
  156:23 158:7
  183:12 222:9

222:11 223:13
240:2 242:2
243:5,24
253:10 260:5
262:10 264:22
281:4 291:20
293:16 303:6
305:9
**meaning**  79:19
**meaningful**
  214:10
**meaningfully**
  275:16
**means**  35:22
  122:5 187:13
  255:21 303:24
**meant**  243:3
  266:21 287:18
  290:11
**measure**  34:14
  172:9 287:20
**measured**
  41:21 117:16
  293:13
**measurement**
  244:6 296:11
**measurements**
  292:8
**measuring**
  283:13 285:12
  291:13
**media**  4:6 46:2
  136:23

CONFIDENTIAL

**medication**
  6:10
**meeting**  29:23
  30:24,25 31:8
  31:12 184:5
  205:11,17
  206:2 258:22
  281:23 313:13
**meetings**  200:2
**member**  16:13
  107:21 109:23
  110:19,21
  309:21
**members**  13:18
  16:2,20 32:7
  42:19 46:12
  49:21 102:23
  104:9 105:9
  106:8,13
  109:25 118:17
**memorized**
  22:8 89:5,11
  89:24 94:22
  127:11 156:14
  221:8 233:25
  234:15 242:16
**memory**  215:24
**men**  303:9
**mental**  33:4
**mention**  67:9
  285:4
**mentioned**
  12:11 279:10

**merely**  195:21
  245:3,7
**merge**  185:13
  189:6
**merger**  43:16
  43:18 89:3
  112:9 121:5,8
  121:10,13
  155:20 157:20
  158:18 176:20
  179:5 180:3
  186:14 188:2
  190:4,7,17
  191:11,16
  192:3 199:16
  199:17 219:4,5
  219:7 220:9,17
  277:16 279:23
  284:25 289:21
  289:22 290:8
  290:22 291:10
  291:14 292:12
  292:13 293:4
  302:25 303:14
**mergers**  45:18
  53:2 54:12
  57:19 61:21
  62:2,16 136:18
  159:25 181:25
  187:9 192:11
  192:16 203:8
  203:17 218:10
  219:8 284:18
  291:12 299:18

  299:21 300:10
  313:8,10
**merits**  6:22
  7:25 17:15
  18:6 40:23
  41:4,10 42:6
  42:11,13 43:23
  44:23 50:19
  53:14 63:22
  65:10,16 70:7
  103:7 113:23
  120:8 129:23
  130:22 136:13
  148:18 157:20
  177:19 213:10
  214:6 216:13
  231:6 244:21
  252:10,24
  258:20 261:11
  263:22 271:11
  271:15 285:20
  285:21 304:14
  304:23 308:11
**met**  199:22
**methodologies**
  136:11
**methodology**
  47:14 48:13
  116:24 117:9
  118:6 294:14
**michael**  2:14
  28:8,21 29:10
  30:20 39:13
  40:11 90:23

  235:24 312:15
**midwest**
  316:17 319:1
**mike**  38:23
**million**  68:23
  231:9 253:22
**millions**  81:2
**mind**  20:5 40:5
  124:2 151:16
  153:5,10
  160:18 161:8
  189:24 236:10
  241:16,19
**mindful**  201:13
**minus**  44:11
  108:19 286:18
**minute**  65:19
  269:10
**minutes**  30:24
  44:15 68:6
  139:17 260:25
  288:2
**mirror**  169:3
  171:10 172:3
  173:20
**mischaracteri...**
  69:18 258:2
  263:2 304:4
  306:17
**mischaracteri...**
  144:5 156:11
  211:21 240:25
**mischaracteri...**
  239:10 257:6

CONFIDENTIAL

**[misinterprets - national]**                    Page 50

**misinterprets**
  302:6
**mispricing**
  114:12
**misrepresent...**
  305:20
**misrepresented**
  34:21
**misrepresents**
  245:9
**missing**  166:7
  275:23
**missouri**  2:15
  166:18
**misstated**
  34:21
**misstatements**
  67:21
**misstates**  66:4
  69:15 70:17
  76:23 77:14
  82:15 108:2
  144:25 161:15
  164:2,12 168:9
  190:10 196:13
  196:13 233:10
  238:21 306:17
**misstating**
  73:12
**mistaken**  187:6
**mm**  109:19
**model**  114:6
  118:3

**models**  138:9
  138:10
**moment**  204:21
  242:19 270:3
  276:3
**money**  160:4,7
**monitor**  131:11
  213:21
**monitoring**
  123:15 124:9
  124:13,21
  125:14 128:14
  130:2 199:6
**month**  220:8
  283:10
**months**  14:4
  80:25 237:9
  239:6 275:15
  283:17,19
  285:22 286:3
**morning**  4:2
  5:13,14
**motion**  67:23
  70:21 71:2,10
  81:23 136:3
  308:5
**motivated**
  68:20 71:18
  72:4,18 75:12
  100:15
**move**  45:12
  106:21 132:17
**moved**  107:16

**movements**
  106:23,24
  108:21,21
  112:13,13
**moves**  108:8
**moving**  220:8
**multiple**  54:4
  91:19 117:24
  120:14 121:14
  131:24 155:23
  180:5 181:5,22
  191:3 201:24
  210:6 228:23
  229:4 262:17
**multiplication**
  44:12
**mylan**  22:3

**n**

**n**  2:2 3:2 16:12
  312:2
**name**  4:11
  16:11,11 19:23
  20:22 207:2
  301:7 316:6
  317:3,4,15
  318:3,4,21
**named**  56:20
  109:5
**names**  16:8
  92:3 197:11
**narrow**  188:20
**narrowed**  71:9
  308:17

**nat**  206:6
**national**  1:4
  2:13 4:9 21:9
  28:11 32:19
  36:10 42:14
  53:13 56:16
  57:25 58:10
  63:11,25 64:24
  65:2,10,22
  67:11 68:15,22
  69:9 71:15,25
  72:14 73:7
  75:8,17 78:3
  78:14 79:20
  80:2,22,25
  81:6,13,15
  82:9,12,24
  83:3,6,9,19
  84:12 85:8,16
  86:10,17 87:6
  87:12 88:23
  89:16 90:13
  92:9,16 93:21
  93:25 94:10,14
  94:17,24 95:3
  95:5 96:2,10
  96:13,15,21
  97:14,18,20
  98:3,7,21 99:7
  99:14 100:9,11
  100:17,21,24
  101:10,13,16
  101:19,21
  102:4,10,15,17

CONFIDENTIAL

**[national - ni's]**                                    Page 51

| | | | |
|---|---|---|---|
| 103:2,19,21 | 202:23 205:25 | **nature** 45:10 | **negotiations** |
| 104:12,13 | 206:14 207:6 | 140:13 152:22 | 43:16 55:2 |
| 105:20 109:6 | 208:22,23 | 241:24 | 121:5,9 124:21 |
| 109:14,16,21 | 212:2 213:20 | **nda** 269:7 | 125:7,10,12 |
| 110:25 111:6 | 215:9 219:22 | **nearly** 231:10 | 126:7 181:4 |
| 111:15 113:21 | 221:3,11,14,16 | **necessarily** | 184:25 188:10 |
| 114:17,20 | 221:22,25 | 86:5 159:12 | 188:12,15,21 |
| 115:5,12,14 | 225:2,3 226:4 | 209:11 268:13 | 189:16 190:17 |
| 116:14 119:18 | 227:19 229:9 | 274:4 | 191:11,25 |
| 120:16 122:18 | 230:5,18,24 | **necessary** | 199:16 202:6 |
| 122:21 123:5,8 | 231:7,15,24 | 303:4 | 202:13 203:19 |
| 123:9,13,25 | 232:6 233:4,7 | **need** 32:21 | 214:14 302:25 |
| 124:12 125:5 | 233:20 234:9 | 233:25 234:15 | **neutral** 184:2 |
| 127:4,13,17 | 234:22 235:12 | 302:21 | 224:7 |
| 128:6,25 129:7 | 236:17 239:2 | **needs** 201:13 | **never** 39:24 |
| 129:17,25 | 241:8,16 | **negative** | 113:7 132:8 |
| 131:3,10 132:2 | 242:12 243:18 | 261:21 262:2 | 201:16 210:4 |
| 132:6,11 133:4 | 251:25 253:25 | 264:25 265:13 | 221:11 251:22 |
| 133:9,9 135:19 | 256:11 258:11 | 265:23 268:14 | **new** 1:2,19,19 |
| 143:19 148:8 | 264:11 265:6,9 | 274:4 286:18 | 1:22 2:5,5 5:9 |
| 150:2,14 157:8 | 265:19 266:4 | **negatives** | 8:18 9:23 10:6 |
| 158:16 160:12 | 268:4,11 272:3 | 231:18 | 13:16 134:11 |
| 160:14,18 | 272:13 274:14 | **negligible** | 315:3,8 |
| 162:10,25 | 274:15,24 | 250:5 | **news** 179:4 |
| 163:18 164:17 | 275:2,6,12 | **negotiate** | **ni** 162:12,14 |
| 164:23 166:23 | 280:6,17,20,24 | 125:16 | 168:3 169:25 |
| 167:17,20 | 281:4,7,11 | **negotiated** | 259:6 275:15 |
| 168:16 169:9 | 282:11,19,24 | 219:5,8 | 297:24 309:18 |
| 169:18 170:10 | 283:7,11 | **negotiating** | 309:23 313:4 |
| 171:2,4 173:10 | 298:21 302:11 | 54:24 126:14 | **ni's** 32:8,8 |
| 173:11 174:5 | 304:15 305:11 | 244:15,17 | 33:11 37:7,8 |
| 177:14 184:13 | 306:23,24 | **negotiation** | 157:12,17,21 |
| 194:11,14 | 308:21 316:6 | 89:3 188:14 | 167:5 245:2,15 |
| 196:17 200:9 | 317:3 318:3 | 189:13 | 259:4 305:3 |

CONFIDENTIAL

**[nicole - object]**                                              Page 52

**nicole**  1:20 4:14
  315:7,23
**night**  149:18
**ninth**  234:21
**noam**  2:6
**non**  106:18
  107:2,11,15
  108:6,22
**noncommittal**
  276:25
**nonpublic**
  63:24 118:16
  119:3 122:7,12
  131:22 210:10
  230:19 231:16
  231:23 232:7
  232:19,24
  264:10 269:6
**nordisk**  22:5
**notably**  268:10
  270:10
**notarized**
  316:15
**notary**  1:21 5:8
  315:7 316:25
  317:10,18
  318:15,23
  319:23
**note**  31:6
  213:11 316:13
**noted**  5:3 12:20
  157:20 273:20
  275:21

**notes**  147:17,20
  148:16,19
  149:2,23,24
  150:6,9 152:5
  152:12,14,17
  167:3 212:11
  310:19 312:22
**notice**  1:17
**notion**  243:11
**notre**  299:22
**november**  1:11
  4:5 7:4,6 10:4
  33:10 127:18
  127:20 128:2,8
  129:4 157:24
  164:23 167:17
  168:5 175:7
  204:10 207:22
  208:4,8,14
  209:20 280:10
  282:22 283:14
  283:15 312:12
  315:20
**novo**  22:5
**number**  17:9
  20:21 22:17
  23:10 42:22,23
  43:15 44:6,17
  49:2,15 50:3,8
  61:23 158:11
  193:6 212:21
  295:8,22
  296:21 316:8
  316:14

**numbered**
  216:11
**numbers**  111:4
  226:25 255:15
  318:7
**numerous**  80:2
  129:24 218:8
  240:6 295:3
  298:23 299:5
  301:12
**nuthatch**
  149:18 206:25
**nyu**  13:25
  14:21,23 15:3

———— **o** ————

**o**  3:2 16:11,12
  16:14,15,16
**oath**  3:7 4:18
  294:23
**object**  11:20
  12:22 13:3
  15:5,14 19:3
  20:9,19 22:15
  23:9 24:6,15
  24:25 25:10
  26:3,7,16,19,20
  28:17 29:18
  31:3 32:3,23
  33:14 34:4
  35:11,20,23
  37:12 38:15
  39:4,20 41:8
  41:14,16,24

42:25 43:12
44:7,10,19
45:4 46:16
47:7 49:16
50:5,17 51:11
51:25 52:5,22
53:7,12 54:9
54:20 55:5,10
55:18 56:9
57:4,11 58:2
58:11,20,24
61:6 63:12,14
64:3 65:4 66:3
66:23 67:15
69:6,12 70:5
70:16 72:5,20
73:11 76:2,22
77:13 78:7
79:7 82:14
83:10,20 84:8
84:15,21 85:11
85:22 86:24
87:16 88:11,24
89:19 91:15
92:12,21 94:20
95:7 96:7,17
96:22 97:7,25
98:11,22 99:4
99:18 101:3,23
102:6,20 103:5
103:24 104:15
105:15 106:9
107:25 110:8
110:14 111:2

CONFIDENTIAL

**[object - offer]**

| | | | |
|---|---|---|---|
| 111:17,24 | 180:19 181:15 | 257:5,25 | **obligation** |
| 113:3 114:21 | 184:17 186:2 | 258:14 259:9 | 237:14 |
| 115:18 116:17 | 188:24 190:9 | 259:18 260:4 | **observable** |
| 117:19 118:4 | 191:21 194:18 | 262:5,25 | 299:16 |
| 118:18 119:12 | 194:23 195:22 | 265:15 266:20 | **observe**  198:23 |
| 121:2 122:8,23 | 196:12,24 | 267:11 270:5 | 244:4,4 |
| 123:18 125:18 | 198:7,20 | 270:18 272:22 | **observed** |
| 126:2,18 127:7 | 199:13 200:19 | 274:18 275:4 | 199:14 |
| 127:23 128:9 | 200:24 202:8 | 276:14 277:5 | **obstruct**  81:5 |
| 129:9,20 | 202:25 204:3 | 277:14 279:21 | 81:14 82:11 |
| 130:19 131:19 | 204:14 206:20 | 280:12,19,21 | 83:2,8 122:20 |
| 133:25 134:18 | 209:8 210:5 | 281:16 282:5 | 123:7 |
| 135:3,20 137:9 | 211:20 212:5 | 282:14 283:2 | **obtain**  179:11 |
| 137:23 139:4 | 213:7 215:21 | 283:16 284:6 | **obviously** |
| 140:4 141:15 | 218:20 219:24 | 289:12 294:7 | 29:14 61:20 |
| 141:24 142:15 | 221:15 222:8 | 295:21 297:5 | 93:3 105:3 |
| 148:11 149:12 | 228:19 229:11 | 298:16 299:12 | 140:9,20 |
| 150:5,16,25 | 229:18 230:12 | 300:20 302:2 | 228:21 229:4 |
| 151:14,23 | 230:21 231:2 | 302:19 303:11 | 271:6 273:16 |
| 152:18 153:2 | 231:17 232:10 | 303:25 304:21 | 274:6 276:10 |
| 153:18 154:14 | 232:21 233:9 | 306:16 307:2 | 280:2 283:19 |
| 154:20,24 | 233:23 234:13 | 307:25 308:23 | **occurred**  33:8 |
| 156:9,21 157:3 | 235:14 238:9 | 309:4 310:3 | 33:24 34:15 |
| 159:10,16 | 239:8,22 240:5 | **objection**  28:2 | 103:25 105:12 |
| 160:16 161:14 | 240:24 241:14 | 144:4,24 | **occurring**  87:8 |
| 163:25 164:11 | 241:25 242:13 | 145:17 146:9 | **october**  208:4 |
| 164:18 167:23 | 242:23 243:23 | 146:21 161:21 | **offensive** |
| 168:8,21 | 246:9 247:11 | 238:20 | 248:20 |
| 169:12,21 | 247:19 248:7 | **objections**  3:11 | **offer**  29:12,22 |
| 170:14 171:8 | 248:22 250:12 | 146:10 239:9 | 30:4,9 31:15 |
| 171:24 174:15 | 250:19 251:6 | 292:25 | 32:12,13 33:9 |
| 175:11,20 | 251:14,21 | **objective** | 36:17 37:16,17 |
| 176:15 177:9 | 252:3 253:13 | 136:11 | 38:2,4,13 |
| 179:7,24 | 256:14,22 | | 39:19 51:10,16 |

CONFIDENTIAL

**[offer - okay]**                                                    Page 54

| | | | |
|---|---|---|---|
| 51:21 52:12,13 | 220:2,10,15,17 | 83:17 84:2 | 18:13,19 22:25 |
| 68:15,18,25 | 220:23 224:10 | 86:12,18 87:8 | 24:21 28:7,12 |
| 71:17 75:7,11 | 225:19 226:16 | 87:10 88:3,17 | 29:5,8 31:8 |
| 75:17,18 79:2 | 228:14 236:7 | 91:20 96:9 | 32:18 33:7 |
| 79:4 80:24 | 261:21 264:10 | 99:10 101:14 | 35:14 36:3,25 |
| 81:3 82:3 | 265:24 266:7 | 101:17 140:12 | 40:9 48:17,24 |
| 83:23 84:5,24 | 266:12,23 | 172:12 174:22 | 49:10 50:13 |
| 87:11,13 88:4 | 267:2,9,23 | 176:10 178:16 | 51:18 52:25 |
| 113:17 124:24 | 268:9,15 | 180:11 181:20 | 53:3 54:5 |
| 126:6,8,22 | 270:24 271:8 | 201:10 212:10 | 56:14 58:16 |
| 127:14,20 | 272:6 273:4,5 | 212:12 218:5,6 | 64:21 65:18 |
| 130:8 134:13 | 273:9,22,24 | 219:3 261:23 | 67:8,17 69:25 |
| 141:3,22 | 274:11 276:16 | 264:4,8 265:8 | 70:11 73:4,21 |
| 143:12,13 | 282:23 288:23 | 274:16 275:6 | 77:6 78:2,12 |
| 148:25 152:9,9 | 288:24 289:17 | 278:24 279:5 | 83:5 84:4,11 |
| 155:16,23 | 290:23 291:21 | 279:19 286:15 | 86:9,19,20 |
| 157:23 158:21 | 297:2 | 286:23 289:11 | 88:6 89:12,25 |
| 160:22 164:24 | **offered**   36:9,11 | 289:14 290:12 | 90:10 94:23 |
| 171:16 172:13 | 38:7 42:24 | 290:20 291:19 | 95:24 103:18 |
| 172:15,20 | 43:24 122:10 | 292:6,22 | 108:25 109:11 |
| 173:6 174:12 | 207:16 | 296:10 303:2 | 113:20 115:13 |
| 174:18,19,20 | **offerer**   91:12 | 303:22 314:5 | 115:24 116:13 |
| 176:12,18,21 | **offering**   39:15 | **offices**   1:17 | 122:15 123:2 |
| 177:17 178:9 | 68:16 69:19,25 | **official**   317:15 | 128:4 129:14 |
| 179:4,18 180:5 | 72:10,23 73:14 | 318:21 | 132:7 133:19 |
| 180:9 190:19 | 75:9 76:18 | **offsets**   107:18 | 134:4,15,17,21 |
| 191:18 193:21 | 82:5,8,16,19,23 | **offsetting**   310:7 | 145:25 146:16 |
| 198:17 207:16 | 114:9 118:10 | **oh**   29:4 125:25 | 147:2,25 |
| 208:9,15 | 139:14 141:21 | 269:14 290:15 | 148:14 149:24 |
| 213:13 215:11 | 213:5 270:23 | **ohio**   316:2 | 150:10,20 |
| 215:20 217:10 | 310:4 | **okay**   4:25 5:15 | 151:19 152:21 |
| 217:20 218:3,7 | **offers**   43:18 | 5:19,23 7:20 | 153:13 154:9 |
| 218:19 219:7 | 71:15 72:3,18 | 7:24 8:11,17 | 154:17,25 |
| 219:14,22 | 73:9 78:4,15 | 12:13,18 13:12 | 156:16 158:6 |

CONFIDENTIAL

**[okay - opinion]**                                        Page 55

| | | | |
|---|---|---|---|
| 162:2,21 | 258:18,25 | **omitted** 34:21 | **open** 164:4 |
| 163:17 164:15 | 259:11 260:23 | 43:7 49:8 | **opening** 213:10 |
| 164:21 166:9 | 261:11 263:10 | 64:18 66:15,19 | **opens** 202:14 |
| 167:9 168:2,14 | 264:13 265:5 | 66:22 67:25 | **opine** 304:13 |
| 169:17 170:8 | 266:2 268:2 | 70:9 71:12,20 | **opining** 33:3 |
| 170:21 173:4 | 271:9,20 | 76:11 77:2,19 | 95:21 122:14 |
| 176:23 177:18 | 272:10 275:20 | 78:24 79:18 | 123:24 153:4 |
| 178:6 182:17 | 277:11,17 | 86:6 87:21 | 153:10 160:17 |
| 182:22 183:15 | 279:16 281:21 | 92:15 94:4,8 | 235:19 274:2 |
| 183:25 186:20 | 281:24 282:8 | 95:10,22 100:6 | 293:24 294:11 |
| 187:16,24 | 283:9,23 | 101:7 105:23 | 305:17 |
| 190:2 191:12 | 286:12 289:16 | 107:6 129:15 | **opinion** 10:12 |
| 193:10,13 | 290:6,24 291:5 | 130:17 131:15 | 18:25 20:4 |
| 195:18 197:20 | 293:16 294:18 | 138:15 155:8 | 33:5,16,25 |
| 199:3 200:22 | 297:14,23 | 158:2,24 | 41:20 49:6 |
| 201:12,21 | 298:8 301:20 | 161:10 171:22 | 57:18 65:6 |
| 204:18 205:7 | 303:18 304:13 | 173:2,19 175:2 | 67:24 69:19 |
| 206:4,8,22,24 | 305:9 306:21 | 197:19 229:6 | 70:2,21 71:2 |
| 207:21 208:7 | 307:11,19 | 229:16 243:16 | 71:10,23 72:11 |
| 208:20 210:20 | 309:17 310:17 | 243:17 263:8 | 72:13 73:4 |
| 211:25 212:23 | 310:20 | 265:17 266:5 | 75:25 76:5,18 |
| 214:5,8 216:2 | **old** 9:22,23 | 268:5 270:17 | 76:25 78:13 |
| 216:25 222:15 | **omission** 75:24 | 271:6 309:12 | 79:4 81:23 |
| 224:24 225:7 | 86:21 102:24 | **omri** 16:10 | 86:23 92:7 |
| 226:10,13 | 104:11 115:21 | 278:15 285:17 | 93:20 99:16 |
| 230:8 232:3 | **omissions** 45:9 | 303:20 | 100:23 101:8 |
| 234:4,10 235:7 | 75:22 111:13 | **once** 112:2,13 | 101:18 102:10 |
| 236:11 237:8 | 111:20 112:24 | **ones** 11:22 63:2 | 102:14 116:13 |
| 242:21 244:18 | 130:22 141:7 | 63:6 242:15 | 116:18 119:24 |
| 244:24 245:20 | 155:4 173:8,25 | 243:21,22 | 129:14 130:15 |
| 252:9 253:16 | 214:4 230:9,15 | **ongoing** 10:20 | 135:8,13 136:3 |
| 253:21 254:13 | 243:14 285:11 | 11:6 124:6,8 | 136:4 139:23 |
| 255:16,21 | 302:15 305:3 | 245:13 249:8 | 140:6 141:21 |
| 257:20 258:5 | 305:20,25 | | 141:22 155:5,6 |

CONFIDENTIAL

**[opinion - page]**                                      Page 56

157:4 159:2
161:4 170:19
175:5,13
187:16,19
213:2 229:14
239:24 240:7
241:6 243:5
256:7 265:5,16
266:3,19
274:13,22
282:15 294:4
301:13 307:20
307:21 308:3,5
308:13
**opinions**   10:15
19:5,6 20:8
26:5 32:19
33:19,22 39:3
44:8 52:20
57:23 58:13,17
58:18 61:15
66:18,25 67:3
69:21 70:8,18
71:7 72:24
73:15,18 77:10
77:23 78:9,18
78:21 79:2,14
81:19 82:3,6,9
82:17,19,23
85:13,15 95:9
95:17,21 97:2
98:15,24 99:5
100:4 105:4
117:11,12

118:10 122:10
122:14 135:11
137:3 139:14
141:5 142:8
148:2 151:16
152:20 155:3
187:21,22
196:16 197:4,5
197:18 212:13
213:6 214:2
236:10 241:20
250:4 257:9
279:13 294:9
307:4,12 310:4
**opportunities**
116:9 164:5
**opposed**   224:7
224:9 225:4
226:18
**opposite**
132:11
**opposition**
225:16
**optimistic**
194:6
**options**   163:4
169:11,15
**oracle**   22:2
**oral**   191:15
192:2
**order**   43:7
71:11 81:24
125:16 308:17

**orient**   30:22
**original**   3:5,9
165:23 311:17
**originally**
70:24 289:13
289:14
**outcome**   4:21
217:7,17
296:16 315:17
**outline**   148:19
**outlook**   288:13
**output**   47:19
**outreach**
199:25
**outside**   25:4
32:25 38:19
40:8 46:17
72:12,21 73:12
83:11 87:24
95:20 96:23
98:12 123:22
139:14 152:20
187:20 188:20
241:3,19 252:4
303:2
**outstanding**
194:5 221:25
222:6 231:11
232:5
**overall**   84:11
121:16 126:14
200:12
**overarching**
14:13

**overhang**
121:23
**overlap**   174:25
**overlooks**
120:14 245:10
**overview**   44:24
**own**   13:22,24
81:2 97:21
102:19 121:12
180:2,21
190:16,24
203:15 210:19
222:14 249:7
252:13 300:24
301:11 302:17
**ownership**
213:16 214:12
214:20 223:19
229:7 235:8

**p**

**p**   2:2,2,7 3:2
**p.m.**   147:12
205:2,6 261:9
277:21,25
310:22 311:2,9
311:19
**page**   7:25 8:15
9:7 11:23 12:2
12:7 17:22
21:7,17,23,25
23:5,15 24:8
24:10,10 28:15
29:6,11,20

CONFIDENTIAL

**[page - part]**                                                    Page 57

| | | | |
|---|---|---|---|
| 30:14,22 31:2 | 165:13,15 | 37:19 39:12 | 261:12 262:8 |
| 31:9,11,13 | 166:2,6,12 | 40:15,18,20 | 263:22 268:24 |
| 36:5 39:14 | 182:11,13 | 42:7 47:13,22 | 269:17,21 |
| 40:10,19 47:12 | 193:11 210:20 | 48:4,13 50:19 | 278:5 284:12 |
| 53:14 113:25 | 275:24 | 51:3 66:9,10 | 288:5,16 |
| 120:11 147:22 | **paid**  14:16 | 66:13 68:3,11 | 292:20 |
| 150:11,12 | 140:21 239:4 | 69:7 71:14 | **paragraphs** |
| 155:12,14 | 240:11 259:15 | 74:18 75:3,4 | 67:10 74:20 |
| 157:11 166:13 | 259:22 | 75:14,21,24 | 184:24 188:22 |
| 177:21 182:18 | **paper**  203:11 | 76:7 79:24 | 270:20 |
| 182:21 184:2 | 216:12 218:18 | 80:20,22 | **parameters** |
| 186:11,11 | 222:17 223:22 | 113:24 120:9 | 47:21 |
| 189:4 191:13 | 225:9 226:7,9 | 120:12 122:16 | **paraphrasing** |
| 193:10 195:5 | 228:18 238:24 | 124:16 130:21 | 163:24 |
| 206:5,6 214:7 | 239:14 252:21 | 136:13 148:17 | **parse**  100:2 |
| 217:14 218:22 | 252:24 253:16 | 152:2 157:10 | **part**  28:13 |
| 219:11 220:4 | 254:14 259:11 | 163:19 164:4 | 33:17 39:3 |
| 223:21 226:7 | 259:16 263:13 | 177:21 178:7 | 43:22 49:23 |
| 244:20 248:25 | 263:19,25 | 179:16 180:22 | 51:12,13 54:10 |
| 252:10 253:4 | 267:7,12,14 | 180:24 183:2 | 57:16 69:4,21 |
| 254:14 259:8 | 278:23 279:4 | 185:10 186:10 | 70:7 81:11 |
| 261:12 268:23 | 279:17,19 | 187:25 189:3 | 94:2 99:20 |
| 269:17 271:11 | 284:2,10 | 189:15 195:25 | 100:5,9 101:24 |
| 276:18,21 | 286:13 290:6 | 196:5 202:10 | 121:16 126:13 |
| 278:5 288:4 | 290:25 293:6,8 | 213:11 214:6 | 133:17 157:22 |
| 291:3 292:20 | 295:19 301:7 | 215:2 217:15 | 158:20 160:21 |
| 296:4,18,21 | 301:21 304:8 | 222:19 223:22 | 164:3 170:6 |
| 297:23 304:23 | 304:11 313:19 | 231:5 235:2,23 | 175:21 181:6 |
| 312:3,8 313:3 | 313:20 314:4 | 236:25 237:4,8 | 189:13 194:19 |
| 314:3 316:14 | **papers**  301:13 | 244:22 246:4 | 194:21 195:2 |
| 316:16 318:7 | **paperwork** | 246:20,22 | 202:2 219:9 |
| 319:3 | 14:11 | 248:25 249:2,3 | 225:17,17 |
| **pages**  20:16 | **paragraph** | 249:21 252:11 | 226:8,11,12 |
| 30:20 150:19 | 32:5 35:6 37:6 | 258:20,24 | 228:17 229:15 |

CONFIDENTIAL

**[part - period]**

230:9 235:18
235:18 244:4
244:13,16
246:23 257:19
270:16 271:7
306:5 318:9
**partial** 28:17
**participated**
152:8 245:12
**particular**
31:23 33:16
70:2 142:17
144:15 145:19
179:15 285:18
286:7,8
**parties** 3:4
91:18 121:24
128:21 199:25
203:6 210:13
244:14 315:15
**partners** 13:16
15:22 16:6
163:13 169:20
170:4 231:8
232:8,18
**party** 4:19
199:21 200:10
201:24 231:14
244:2,3,3
**passage** 137:22
139:3 140:3
141:14
**past** 6:11 14:3
146:4 208:25

**paste** 68:2
**pasting** 39:9
**paths** 149:19
**patrick** 192:18
**pattern** 81:4,13
82:25 122:19
295:13,20
**pay** 159:8
160:3,7 174:24
175:23 260:12
**paying** 179:11
**payment**
119:14
**payoffs** 216:6
216:17 217:8
217:18 313:16
**penalties**
117:25
**penalty** 117:24
119:14
**pending** 280:17
**pennsylvania**
55:14
**people** 13:6
14:17 16:8
92:19 93:14
109:24 118:14
150:22 151:20
152:14 197:10
279:10,12,17
284:4 303:19
**perceive**
159:21

**perceived**
114:12 159:23
**perceiving**
288:9
**percent** 15:7,8
133:13,14
167:4 221:24
222:5,21 223:5
224:20 225:8
227:22,22
228:3,4,15
229:2,8,15
230:18 231:10
232:5 233:7
234:21 254:25
255:5,11,18,22
259:22 262:11
262:12,13
264:24 267:8
267:15,17,18
267:22,25
286:18,24
289:6,16,17,18
289:19 290:3
293:12,17
**percentage**
84:24 227:13
234:19 235:5
247:15 248:10
254:24 255:16
260:14,18
264:15
**percentages**
200:23 201:3

**period** 34:22
42:20 45:15
46:13 49:22
64:16,25 65:25
69:11 70:24
72:16 78:16
79:6,23 80:15
86:7 93:16,17
98:5 103:4,20
103:22 104:2,5
104:11 105:10
105:11,13,14
105:22 106:2,7
106:15 107:12
107:19,23
108:16,25
109:8,9,22
112:21 113:22
114:18 115:7
115:15 116:15
119:20 120:18
123:12 124:15
126:25 128:11
129:13,19
131:8,11,16,23
132:3,10,23
133:3,11,23
138:16,21
139:7,9 140:8
140:10,24
141:4,8 142:5
142:9 143:17
145:23 146:2,5
156:17 158:25

CONFIDENTIAL

**[period - point]**                                    Page 59

| | | | |
|---|---|---|---|
| 167:18 168:11 168:20 171:6 171:14 173:3,8 173:20 176:13 177:5 202:22 219:18,19 220:23 221:13 221:22 231:25 233:22 234:19 235:6 249:17 250:2 251:12 252:2 254:5 262:21 263:6 264:5 267:19 268:6 273:3 274:10 280:4,8 280:9,11,15 282:10 283:8 283:10,20 284:24 302:12 304:17,20 305:2,21 306:3 306:11,13 307:6,9,14,23 308:20 309:24 310:11,12 **periods** 33:12 **permit** 19:9 27:25 **permitted** 19:20 **persisted** 140:7 142:4 143:18 | **person** 58:23 85:19 98:7 110:4 117:16 118:25 **personally** 12:19 57:8 60:9,19 317:11 318:15 **pertains** 168:23 **perusing** 206:22 291:2 **ph.d.** 6:18 7:6 312:10,12 **phenomenon** 261:21 **phone** 316:3 **phonetic** 24:4 **phrase** 65:14 65:17 149:5 187:9,15 287:11 290:11 **phrasing** 80:13 92:14 **pick** 42:7 **picture** 123:12 **piece** 34:16 37:20 70:2 **pieces** 107:15 120:3,14 131:24 149:20 172:25 175:2 **pill** 194:4 211:22 | **pills** 193:19 **pitch** 183:4 184:3 **place** 14:14 104:6 179:21 181:4 200:12 203:18 217:20 271:18 277:19 **places** 213:9 **placing** 231:11 **plain** 64:12 163:17 **plaintiff** 22:25 23:3,7,24 62:21 306:14 **plaintiff's** 271:3 **plaintiffs** 2:4 19:18 25:6 66:7,20 67:2,9 69:22 70:13,20 72:25 76:5,15 77:8,17 78:23 79:10,13,14,16 80:16 88:9,22 89:15 104:20 115:16 118:7 122:17 134:24 171:12 305:23 308:16 309:5 309:10 **plan** 211:8,23 269:4 | **planning** 104:8 249:24 **plans** 194:6,16 **plascoff** 2:8 **play** 153:7 155:11 214:10 **please** 4:25 5:5 6:2 80:20 316:12,12 **pled** 70:24 **plus** 10:6 44:11 117:23 175:15 266:13 286:23 **pocket** 118:6 **point** 9:25 12:23 17:22,25 18:2,11 19:14 22:24 30:2 33:5,17 40:7 41:11 42:10 43:3,13,22 45:22 48:11 49:24 58:3 64:8 65:16 66:5 69:7 76:6 77:21 82:19 87:4 94:3 95:8 97:2,17,23 98:16 101:17 104:17 115:20 121:3,4 124:2 126:5 127:12 128:10,18 129:21 130:13 |

CONFIDENTIAL

133:13,14,18
133:22 134:23
138:12 141:10
141:25 142:20
142:22 143:4,8
143:23 151:17
151:18 154:22
156:15 161:23
167:14,21
168:6 169:16
169:24 171:17
175:16 181:14
183:5 185:2
191:13,18
193:6 200:3
201:8 203:2
207:11,15
208:13 209:11
212:15 221:21
230:23 231:5
232:14 233:13
234:16 235:20
235:21 240:15
240:23 246:15
246:21 248:6
248:19,23
250:23 256:24
264:18 270:19
273:19 274:9
275:24 294:24
296:6,11
297:19 298:23
304:22

**pointed** 158:19
**pointing** 58:7
73:19 76:12
80:10,16 85:13
105:6 114:24
126:19 132:10
152:12 202:11
202:12 214:2
218:8 234:20
245:4 270:21
271:7 279:16
294:9,14
**points** 10:5
17:5 18:14,24
20:25 23:11
66:9 128:19
158:12 187:3
203:22 209:14
278:11 284:2
299:16 300:11
301:18
**poison** 193:19
194:4 211:22
**pomerantz**
22:19
**poor** 288:19
**population**
55:20
**portion** 34:20
37:5 169:4
182:6 197:3
**portions** 70:23
**posed** 146:20
280:25

**poses** 224:19
**position** 15:3
**positive** 62:3
114:19 116:2
176:9 264:22
286:23 288:10
288:13 289:4,5
**possession**
119:2 122:6
135:18
**possibilities**
22:20 159:18
182:25 191:16
192:2
**possibility**
32:11 37:15,25
38:12 39:18
124:23 148:23
151:11 198:25
**possible** 15:12
16:17 21:3
62:14 88:25
115:8 188:8
199:10 200:15
303:4,7 309:21
**possibly** 21:8
21:19
**post** 195:12
264:25
**potential** 32:10
35:8,21 36:13
37:2,9 38:25
52:13 130:6
132:16 152:9

159:7 163:12
163:22 164:6
169:19 170:3
208:17 209:6
236:5 273:6,18
280:25
**potentially**
9:14 10:6,7
59:25 160:6
210:13 266:25
268:10 270:9
292:5
**powers** 150:23
**pr** 131:14
**practice** 264:20
**preceded** 51:2
**precedes** 42:9
**precise** 64:6
271:4 286:10
**precisely** 59:17
**predictions**
156:18,24
**preexisting**
10:8
**prefer** 193:5
268:24 269:18
**premised** 66:25
79:14 95:10
308:15
**premium** 68:17
71:16 75:9
83:23 84:4,14
84:23 85:9,20
86:18,22 87:10

CONFIDENTIAL

**[premium - principles]**                                          Page 61

| | | | |
|---|---|---|---|
| 112:4,15 | 220:17 247:21 | 111:7,21 112:5 | 289:17,23,25 |
| 166:22 167:4 | 251:19 273:17 | 112:7,16,18,23 | 290:3 293:12 |
| 174:5 175:22 | 273:22 283:4 | 114:19 115:9 | 293:13 294:2,4 |
| 179:11 270:23 | **previously** | 115:12 117:4,5 | 294:21 295:18 |
| **premiums**  88:3 | 14:11 145:3 | 131:6 132:16 | 296:12,25 |
| 217:17 225:22 | 164:16 169:6 | 139:9,12 | 298:2,6,11,22 |
| 295:6,7 | 172:24 193:4 | 140:21,24 | 299:10 300:5 |
| **preparing** | 219:2 258:4 | 141:3,7 142:6 | 300:22 302:11 |
| 130:6 | 295:25 | 142:21 155:7 | 304:15 306:22 |
| **present**  2:18 | **price**  8:20 | 155:13,15,24 | 308:21 309:3,8 |
| 9:19 104:4 | 32:12 34:14 | 158:21,24 | 309:18 |
| 186:18 | 37:16 38:2,13 | 159:3,6 160:14 | **prices**  34:25 |
| **presentation** | 39:19 43:8 | 161:11 164:24 | 42:19 43:19 |
| 57:9 205:10,16 | 49:6 50:24 | 167:5,19 | 46:12 49:22 |
| 205:23 206:7 | 62:3 79:20,21 | 171:15,16 | 68:24 81:3 |
| 206:14 210:21 | 83:25 84:3,10 | 172:5,11 173:6 | 91:22 106:13 |
| 296:19 297:15 | 84:13,25,25 | 174:6,21 | 106:14 110:17 |
| 297:24 313:12 | 85:10,18 87:12 | 175:19 179:3 | 111:11 125:4 |
| **presentations** | 87:13 91:21 | 179:18 180:16 | 179:14,17 |
| 293:25 | 92:16 93:6,9 | 181:14 190:7 | 180:6,8,9,13 |
| **press**  88:14 | 93:24 94:9 | 190:20 207:16 | 197:15 213:12 |
| 131:12 162:10 | 95:5,23 97:22 | 208:6 210:15 | 213:13 225:20 |
| 162:14 313:4 | 97:22 98:4,9 | 213:19 215:5 | 261:20 285:8 |
| **pressure**  126:9 | 99:17,23 | 230:2 243:16 | 287:15 293:22 |
| 126:11 229:25 | 100:24,25 | 243:18 261:21 | 295:8 296:17 |
| 236:3 | 101:11,19 | 264:16,17 | 303:2 305:4 |
| **prevailing** | 102:15 103:21 | 265:2,2,10,11 | 309:15,24 |
| 265:24 | 105:19 106:3 | 265:19,24,25 | 310:12 |
| **prevent**  6:7 | 106:16,22,25 | 266:6,7 267:9 | **pricing**  152:8 |
| **previous**  47:15 | 107:5,5,9,16,21 | 267:10,23 | 176:9 263:14 |
| 48:14 90:5 | 108:9,11,11,19 | 268:12 272:3,7 | 313:21 |
| 142:2 144:8 | 108:20,20 | 272:14,16 | **principles** |
| 153:4 172:12 | 109:9,13 | 274:13 276:6 | 45:17 46:5 |
| 174:16 191:23 | 110:11,12 | 285:6 289:4,6 | 136:17 159:24 |

CONFIDENTIAL

**[print - proposal]**

Page 62

print 182:8
216:25
printed 28:14
165:13,15,25
166:11 182:6
182:10,19
186:12 193:12
printing 165:16
printout
252:18
prior 9:16
13:19 47:23
60:25 63:5
69:10 72:16
78:15 79:6
83:17 93:15
94:12,12 109:7
112:8 185:12
187:10 189:5
214:13 221:12
221:21 231:24
233:21 237:5
258:10 263:5
268:5 285:23
289:20 291:14
293:14 304:25
305:2,11,18
306:4,8,10
307:5,8,14
310:10
privacy 92:2
private 91:5,9
91:13 114:7,11
116:8 198:14

198:17 200:5
200:15 201:14
210:10 236:7
286:25 287:14
288:12 295:14
296:25
privately 207:8
287:12
privilege 25:10
26:7 27:9
privileged
25:13 26:3,22
26:25 27:4,5
27:12 28:5
probabilities
217:8,18 244:6
probability
132:22 214:10
214:17,21
229:3 250:5
probably 5:22
15:17 22:11,22
55:21 139:17
302:22
problems 96:14
96:19
procedural
19:10
procedure
220:7 317:5
318:5
proceed 45:25
proceeded
201:8 218:6

proceeds 308:6
process 5:16
53:3 57:7
121:17 124:2
126:14 131:2
162:13,16
181:6 197:9
200:12 313:6
production
316:16,17,22
products
210:24 211:4
211:23 299:20
professional
54:6 56:25
59:4 89:21
97:5
professor
114:25 116:19
116:21 117:10
119:25 124:4
157:16 158:9
158:12 186:6
186:25 187:23
188:17 190:21
196:16 197:4
243:8 244:25
245:20 249:11
249:17 250:3
252:14 302:4
professors 14:4
16:4
profit 288:18

profits 116:24
progress
148:21 152:7
project 205:11
205:17 313:12
promise 277:12
pronounced
178:13 213:14
proportion
257:17
proposal 53:6
53:23 54:7,18
54:19 91:12
93:22,23 94:16
94:18 100:18
100:19 127:6
127:16,17
128:3 134:14
148:7 151:9
164:22 166:23
167:16,21,25
168:5 171:2
172:5 173:9
174:12 175:6,8
175:18 177:3,6
177:16 179:23
184:16 189:12
198:14 204:11
207:9,24 209:2
209:25 210:2,3
211:5,16,18
212:4 258:12
259:5 265:11
268:19 269:9

CONFIDENTIAL

**[proposal - publicly]**                                           Page 63

269:23 270:15
271:22 272:12
274:25 276:6
276:20 277:10
277:12 280:16
281:14 282:3
283:12,13
294:21 295:14
295:16 297:3
298:12,12,14
299:10 300:16
300:18
**proposals**
94:12 95:2,4
96:2,3,12
97:18 99:11
101:22 102:14
133:4 143:15
174:14,17
176:4 177:3,4
177:12 180:16
181:11,12
185:22 186:15
188:3 190:4,6
190:8 194:12
200:5,16
201:14 209:3
221:5 262:22
264:7 265:8,10
274:23 280:5
280:10 281:5
**propose** 184:5
**proposed** 149:3
149:8 150:2

167:19 263:15
313:21
**proposition**
116:3 243:19
248:19
**prospect**
119:19 120:5
120:17,23
121:19 122:4
123:11 124:17
125:3 129:2,18
**prospects**
211:9 287:2
**provide** 24:21
26:11 38:16
39:7 45:21
62:10 66:12
67:3 71:5
76:14 130:7
152:5 158:13
180:12 199:18
215:3 232:23
292:11 302:13
**provided** 10:16
25:21 39:8
77:25 78:11
82:17 95:15
136:2,2 139:12
273:3,4,24
**provides**
217:16 229:20
**providing**
32:15 33:6,19
44:24 70:18

77:22 78:9,18
80:12 81:19
95:17 105:3
131:24 138:16
150:7 151:15
187:6 226:15
236:9 257:8,9
294:8 299:2
307:4,12
**proving** 67:2
72:25 79:15,15
308:16
**proxies** 288:15
**proxy** 130:4
165:7,18
199:18 200:7,9
200:18 211:14
211:14 256:16
256:17 260:7
273:13 288:20
301:15 313:7
**pslra** 271:19
**public** 1:22 5:8
12:24 32:13
37:17 51:9
59:6 62:10,13
63:5,6 88:8
91:23 99:12
124:24 130:5,8
131:7 132:19
141:2 142:19
145:23 148:23
152:10 177:17
179:5,21

194:22 197:13
201:9 207:23
208:5 210:12
210:14 215:19
223:6 225:12
225:12 232:15
263:5,7 273:11
285:7 289:20
293:14 294:22
296:10 297:4
300:2,19 315:8
317:10,18
318:15,23
319:23
**publication**
8:18 60:4
**publications**
43:17 60:2
**publicly** 18:10
22:23 23:23
63:2 72:2 73:8
94:5 96:11
99:10 100:13
116:7 126:22
194:6 199:12
200:17 208:3
225:13 230:23
232:14 265:18
272:8 279:24
284:19 285:2
287:16 290:5,8
291:12 295:17
298:14,20
299:11,16

CONFIDENTIAL

**[publicly - rate]**                                  Page 64

303:14
**published**  60:3
216:22 252:13
253:7 278:13
301:22 303:8
**pull**  42:5
**purchase**  93:8
**purchased**  81:2
93:15 109:7
310:10
**purchases**
159:19
**purchasing**
159:20 181:23
309:23
**purely**  19:15
188:10,12,21
191:24 192:5
202:5,24 243:9
**purposes**  50:9
83:15 115:10
135:10 171:18
285:12
**pursuant**  1:17
**pursuing**
235:12
**put**  18:23 30:18
31:21 38:21
63:22 70:13
74:22 116:22
117:13 119:14
119:23 123:8
172:6 173:10
182:11,20

227:10 234:2
242:17 247:14
249:13 254:15
278:18 292:7
**putting**  35:7
115:2 117:8
118:5 126:10
161:17 195:10

**q**

**q2**  157:12,18
**qualified**  20:7
232:23
**qualify**  232:18
307:11
**qualitative**
43:21
**quality**  288:19
**quantified**
298:6
**quantify**  139:8
302:10
**quantitative**
43:21
**quarter**  250:17
251:3 257:3,24
**quarterly**
249:9,15 250:7
**question**  6:2
17:17 25:12,18
27:11,15 28:4
29:25 30:7
31:13 33:16,20
38:6,19 52:2

52:16 61:10
79:8 85:14
87:2 90:2
95:12 96:25
98:25 100:8
122:13 123:21
125:8 128:23
131:9 134:22
137:19 138:2
138:19,20
153:23 159:13
161:22 168:22
170:19 175:17
188:24 189:11
196:6 200:21
204:7,16
220:21 230:4
243:25 248:15
252:7 256:24
292:16 307:13
**questions**  5:23
5:25 24:2
26:19,21,24
27:5 35:16
36:2 139:22
144:8 145:4
174:2 176:7
297:13 310:16
311:4,6
**quibble**  281:21
**quibbling**
247:24
**quick**  8:15
10:24 260:25

277:18
**quite**  54:23
132:4,11 135:8
144:10 225:10
257:12
**quotation**
193:15
**quote**  29:11
31:24 66:13
68:21,22
208:10
**quoted**  235:22
**quotes**  32:6,16
35:12 68:3
131:5
**quoting**  236:8

**r**

**r**  2:2 3:2 16:11
16:14,15,16
315:2
**radiator**  9:22
**raise**  157:17
**raised**  157:8,21
167:19 207:16
**raising**  33:9
53:25
**rally**  195:14
**range**  163:9
222:21 223:8
228:4
**rapp**  150:12
**rate**  244:10
262:13 267:17

CONFIDENTIAL

**rather** 27:12 69:22 71:7 72:25 73:19 78:21 80:15 85:9

**rationale** 157:22 158:20

**reach** 73:18 135:8 190:19

**reached** 12:23 235:5 308:14

**reaching** 142:10 155:24

**react** 196:21

**reacting** 197:2 197:3

**reaction** 176:10 223:23

**read** 37:12 40:10 56:19 75:21 81:9 120:7 157:14 219:10 233:15 237:4 241:16 242:4 245:18 260:7 270:12 286:12 305:7 317:5,6,12 318:5,6,17

**reading** 48:2 185:10 207:11 227:9 258:18 316:20

**reaffirmed** 281:19

**real** 8:15 55:4,7 88:7,13,20 166:5 254:6 277:18

**realistic** 110:17

**reality** 75:16

**really** 26:2 44:20 46:9 52:9 84:16 85:12 87:20 112:7 117:11 140:15 156:22 160:8 184:23 187:21 190:22 203:4,14 250:13 257:11

**realm** 151:11

**realtime** 60:22

**reason** 31:25 32:4 82:2 242:22 290:9 316:15 318:8 319:3

**reasonable** 130:25 159:4 159:14 282:12 282:16

**reasons** 98:23 240:6 262:15 278:25 279:6 286:16 287:4 292:21,24

314:6

**rebuttal** 116:18 117:12 187:22 196:16 213:5 294:9

**recall** 6:11 7:18 8:24 9:5 16:20 25:3 35:24 54:21 59:17 89:6 123:3 127:13,21 133:15,16 148:12 149:22 156:13 168:10 221:16 230:4 233:14 234:20 235:4 259:19 260:10 294:10 300:3

**receipt** 316:19

**receive** 119:10 257:18

**received** 26:9 72:3,17 73:8 224:14

**receiving** 112:14 264:19

**recess** 74:2 147:9 205:3 261:6 277:22 310:23

**recognition** 125:2

**recognize** 165:10 197:13 218:13

**recollection** 21:2 23:22 24:19 40:14 67:19,21 96:8 115:20 126:21 148:13 164:20 167:25 174:17 176:22 184:18 186:16 194:24 220:25 221:18 229:12 230:22 234:25 273:9 281:8,18 286:11

**reconciled** 195:7

**record** 4:3,23 5:4 9:21 27:2 29:2 31:4,7 66:4 73:12,25 74:5 76:23 77:14 82:15 108:2 128:2 130:13 135:4,9 136:8 143:20 144:6,14,25 147:4,6,8,12 156:12 161:15 161:17 190:10 194:3,10 196:13 205:2,6

CONFIDENTIAL

**[record - related]** Page 66

221:20 233:10
249:23 252:5
261:5,9 263:2
277:18,21,25
280:23 283:5
306:18 310:22
311:2,9 315:12
318:9
**recorded** 4:7
**records** 21:15
24:18 285:25
286:10
**redisclosure**
138:7
**reduce** 157:19
**reduced** 158:17
**reducing**
114:11
**reengaged**
209:19
**refer** 6:21 7:9
73:17 74:19
197:20 252:24
288:20 291:4
**reference** 40:16
316:8 317:2
318:2
**referenced**
317:11 318:15
**referred** 16:3
**referring** 13:25
48:5 182:5
195:25 238:15
252:9 268:18

270:3
**refers** 75:15
**reflect** 178:8
288:11
**reflecting**
120:4
**reflection**
175:19
**reflective**
111:12 297:12
**reflects** 153:6
244:14
**refresh** 215:24
234:24
**refused** 275:15
**refuses** 193:17
**regarding**
29:21 32:9
35:8 37:9
38:25 42:4
67:4 73:18
77:24 168:5
185:22 194:16
240:11 242:20
**regardless**
149:18 296:15
**regressions**
46:22
**regular** 60:15
**regulatory**
175:25
**reinforced**
261:17

**reject** 29:22
54:19 96:9
195:8 259:4
281:13 282:2
**rejected** 78:4
78:14 94:11,15
94:17 95:3
96:3 97:19
99:15 100:17
101:14,16,21
102:14 127:5
133:5 173:12
177:4,7 179:23
180:11,17
184:16 194:12
200:6,16
201:15 207:15
208:9 211:16
220:18 258:11
262:23 274:17
274:24,25
275:6,13,18
280:6 282:24
289:15 292:5
292:22 294:21
298:13 300:17
303:22
**rejecting**
127:14 186:14
196:2 288:23
**rejection**
121:20 143:12
143:14 148:9
148:22 188:2

188:13 190:3
208:3 259:7
283:11 286:20
288:7,9 289:2
290:18 292:23
295:16 297:4
298:14 299:11
300:18
**rejections**
95:19 96:13
121:14,16
143:16 155:23
180:5 181:6,12
181:22 184:20
190:6,18 191:4
191:7,9 201:10
203:18,22
220:12 265:9
296:9
**rejects** 198:17
210:2 295:15
297:2
**relate** 78:22
129:16 130:24
181:19 193:23
**related** 4:18
56:11 60:16
84:6 99:21
106:18 107:2
107:11,15
108:6,13,22
138:20 230:3
237:18 247:2
315:15

CONFIDENTIAL

**[relates - report]** Page 67

relates 257:8

relating 61:25

relation 222:12
243:7 256:12

relations 130:5

relationships
254:16

relative 84:9
117:5 289:20

release 157:12
157:19 162:11
162:14 313:4

released 99:20
99:21

releases 88:14

relevant 28:15
34:20 39:17
45:8,14 65:12
100:10 173:7
173:23 174:3,9
183:11 228:24
301:23,24
305:23,24

reliable 183:21

relied 25:15,17
26:17 27:10
47:14 182:14

relies 51:6
186:25 302:5

rely 13:17 26:2
26:4 66:7
218:18 285:12
297:16,19

relying 48:15
66:14 67:6
69:22 72:25

remain 185:12
189:5

remained
112:19 119:18
120:16,22
123:10 149:4,9
150:3 305:4
309:19

remaining
199:23

remedies
118:11

remedy 117:22

remember
65:13 127:19
233:18 276:7
293:23,24
294:8 299:19

renaming
207:17

render 10:12
20:7 212:24

repackaging
138:7

repeatedly
69:20 300:2

repetition
138:6

reply 7:5,10 8:9
9:8 11:15
12:21 17:10,12

18:2,11 19:12
19:14 20:16
23:5 24:3 25:8
25:23 26:13
29:5 35:7
38:22 40:10,16
40:19 63:23
64:5 66:9,11
66:14 68:3,11
74:18 76:7
79:24 103:8,11
130:10 131:4
157:7,10 186:6
187:5 222:19
235:22 270:20
278:4 284:9
312:11

report 6:16,17
6:22 7:4,5,10
7:14,17,25 8:9
9:8,24 10:4,15
11:13,16 12:21
16:18 17:10,12
17:12,13,14,15
17:20 18:3,3,4
18:6,7,12
19:12,15 20:16
23:6 24:3,23
25:8,23 26:13
28:24 29:4,5
31:22,24 33:6
33:18 34:9
35:7 37:5,6
38:20,22 40:10

40:16,19,24
41:4,10 42:6
42:11,13 43:3
43:23 44:23
45:7 47:16,18
48:15 50:20
51:3 52:9,11
53:14 63:22,23
64:5 65:10,16
66:9,11,14
68:4,12 70:8
74:18 76:7
77:2 79:25
82:17 87:3
91:17 103:8,8
103:11 113:23
113:25 120:8
120:19 124:3
129:23 130:10
130:22 131:5
135:11 136:13
139:15 148:18
149:6 157:7,10
157:20 158:9
158:10 177:20
179:9 186:6
197:3,8 202:20
213:10 214:6
214:16 216:14
222:20 231:5,6
235:23 236:14
244:21 248:24
252:10,25
254:14 258:21

CONFIDENTIAL

**[report - resulting]**                                      Page 68

261:12 263:22
267:16 270:21
271:11,15
278:4,7 284:9
285:20,21,23
294:16 298:24
304:14,23
308:12 312:9
312:11
**reporter** 4:14
5:5 61:7 192:6
256:5 317:7
**reporting**
223:2 271:17
288:19
**reports** 9:3,15
10:7 11:24
15:25 16:21,23
17:8,18 18:16
19:10,14 34:9
48:21 58:4
63:21 69:18
72:12 77:22
79:9 82:18,21
82:24 83:22
95:9,16,16
112:2 116:19
116:20 117:2
117:13 119:22
121:18 123:23
124:12 155:20
156:4 160:2
161:23 168:13
175:13 176:6

183:16 185:2
187:5 204:8,17
212:7,17 213:9
225:16 243:8
243:11 257:14
266:11 273:2
274:20 279:13
295:2 296:6
297:19 302:3,9
302:17
**represent**
310:13
**representative**
56:21
**represented**
235:25 236:6
273:21 276:16
**representing**
4:12 75:16
231:10
**repricing**
178:18
**repurchase**
64:17 102:19
106:21 114:8
114:10 115:6
116:25 117:4
**repurchased**
68:23
**repurchases**
71:24 72:17
73:6 89:18
103:14,17,19
104:5,22

113:22 114:3
114:17 115:6
115:23,25
116:6 294:15
308:25
**repurchasing**
67:13 78:5
102:5 103:3
104:13 115:14
116:15 234:11
309:14
**request** 318:9
318:11
**require** 59:6
**required** 18:21
25:16 180:12
230:6 316:25
**requirements**
18:22 104:22
176:2 223:3
**research** 15:9
43:14,17 46:2
60:4 116:5
121:5,12
126:20 137:25
138:4 180:2,21
184:8 190:16
190:24 191:8
197:21 199:10
200:23 203:16
203:21 213:12
214:11 225:19
245:11 249:7
250:21 252:14

253:7 288:17
300:24 301:6
301:19
**researched**
61:21
**reserved** 3:12
**resistance**
225:23 226:2,4
**resources**
294:25
**respective** 3:4
**respond** 30:3,8
31:15 126:12
158:11
**responded**
225:13
**responding**
158:9 187:22
302:4
**response** 75:18
114:25 177:23
183:3 189:12
224:6 261:16
283:4
**responsive**
307:13
**rest** 37:13
**restructurings**
192:13,17
313:11
**result** 309:22
**resulted** 229:2
**resulting** 295:6

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **results** 48:22 174:7 | **reviewed** 89:2 89:2 169:10 193:4 194:3 201:23 206:9 | 103:25 109:2 110:6,13 119:3 120:7,21 125:8 127:9 128:22 | 231:25 233:3 234:17 236:11 237:6,13 239:21 241:13 |
| **resume** 234:10 | **revised** 152:8 | 131:9 133:10 | 246:8,25 247:7 |
| **resumed** 89:17 | **revision** 158:17 | 137:8 140:11 | 247:18 248:6 |
| **retail** 60:5,13 | **revlon** 195:7,12 301:11 | 141:9 142:10 142:14 143:2,6 | 250:11 251:13 251:17 252:17 |
| **retain** 237:16 | | | |
| **retained** 10:11 23:7 55:24 208:22 213:21 278:8 311:18 | **ribbon** 106:11 106:12 305:16 | 144:3,16 149:11 150:4 150:21,22,24 | 253:3,5,8 254:18 255:7 255:13 257:24 |
| **retainer** 245:5 249:9,15 250:7 | **right** 6:25 7:13 8:5 10:9 12:25 16:7 21:22 | 151:22 152:13 152:17 154:23 155:15 157:6 | 259:8 262:11 262:20,24 263:6,22 265:3 |
| **retrading** 65:24 | 22:10 23:25 24:5,12 30:4,9 | 162:3,6 164:17 165:3 166:15 | 265:12,14 266:8 267:24 |
| **return** 47:25 48:8 | 30:13,18 31:10 31:16,21 32:22 | 167:3,14 168:14 169:11 | 268:6,23 269:20 271:23 |
| **returned** 316:19 | 34:3 35:10,22 36:8 37:10,18 | 170:12 171:18 176:23 177:18 | 272:4,5,8,14,18 277:7 278:3,9 |
| **returns** 46:24 138:9 210:4 264:19 287:14 291:13 | 38:2 39:19 40:15 41:7 44:15 48:10,20 50:11 51:4,16 | 178:4 179:2,6 182:5,15 194:17 195:5 207:4 210:7 | 278:13,19 279:7,18 280:11 283:22 284:5,8 287:19 |
| **revaluation** 286:17,18,23 287:2 | 53:20 55:14 56:8,10,17 | 212:16 214:25 215:16,20 | 293:20 298:17 303:10 304:17 |
| **revealed** 298:4 | 62:20 63:17,20 66:2,17 73:21 | 216:19,23 217:6,14,24 | 304:20 306:15 |
| **revealing** 287:5 | 76:17,21 80:18 | 219:17 220:5 | **rights** 215:6 |
| **review** 24:12 162:13,16 163:4,8 252:5 286:10 313:5 316:13 317:1 318:1 | 81:25 83:16 84:7,14 90:21 91:9 92:20 93:12 94:22 96:6 97:24 99:3 102:5 | 220:24 221:2 223:15 224:7 224:22 225:9 226:21 227:8 227:18 228:13 | **rise** 225:21 261:20 **risen** 266:10 **rises** 179:4 **robbins** 1:18 2:4 20:12,18 |

CONFIDENTIAL

20:22 22:14
**robert** 182:2,10
  313:9
**rockwell**
  206:18 207:8
  207:10,15,18
  207:23 208:2,5
  209:17,19
  298:2,3
**rockwell's**
  208:8,15
**role** 54:6 56:25
  57:5,16 64:6
  214:10
**rolling** 271:18
**room** 239:20
**rosen** 205:13
  205:18 233:6
  313:14
**rough** 15:16
  311:14,16
**roughly** 13:14
  15:8 165:13
  253:14,19
  283:9,17,18
**round** 191:19
**rounds** 43:16
  121:14 155:23
  179:20 181:5
  190:18 191:3,9
  197:23,23,25
  201:10
**row** 227:5,21
  254:24 255:4

255:10
**rows** 254:22
  256:3
**rpr** 1:21 315:7
  315:23
**rudman** 1:18
  2:4 20:12,18
  20:23
**rule** 198:24
**rules** 317:5
  318:5
**run** 51:5 93:9
  126:14 138:8
**running** 46:22

**s**

**s** 2:2 3:2,2
  312:7 313:2
  314:2 316:16
  318:8,8 319:3
**sale** 42:19
  46:12 49:22
  50:24 106:13
  106:14 107:4,9
  107:21 108:11
  108:19,20
  110:11 138:6,7
  164:6 195:11
  245:7
**sales** 306:8
**sample** 201:11
  201:13,20
  217:10,19
  218:23,24

219:9,12,13
220:4 224:21
225:8 254:9
267:19 285:4
286:14 291:7
293:8 304:12
**samples** 215:25
  223:9 299:17
**san** 21:17
**sandra** 216:12
**satisfied** 29:13
**satisfies** 291:7
**saying** 43:24
  49:12,13,25
  62:23 65:9
  70:12 95:6
  100:11 104:7
  107:17 108:5,5
  110:4 133:19
  134:12 138:23
  143:3 144:22
  163:2,19 164:4
  164:8 173:7,13
  173:16 179:3
  200:4 202:4
  240:17 243:2
  262:4 267:13
  268:3,7 276:7
  284:9 291:23
  296:23 299:8
  301:23 306:20
**says** 29:3,12,21
  37:6,13 38:3
  40:2 50:15

75:5 80:22
120:13 123:5
132:6,7 149:17
157:11 183:2
185:11 189:4
189:17 195:6
195:19 196:22
199:2,3 207:15
208:2,7,14
220:6 226:24
237:9 244:3
245:23,25
246:24 248:4
255:11 257:2
259:21 269:21
277:3 286:13
291:6
**scenario**
  135:14 136:21
  144:13 249:24
**scenarios**
  148:20 152:7
  153:7 155:10
  212:11 226:18
**schedule** 19:9
  19:13,16 165:6
  165:17 166:14
  313:7
**scheduling**
  19:16
**scheme** 76:10
**school** 14:21
  55:16

CONFIDENTIAL

**[schwert - sentence]**

| | | | |
|---|---|---|---|
| **schwert** 121:8 203:11 | 273:4,24 274:11 278:7 281:14 282:3 283:12 285:3 287:19 288:5 292:20 | **security** 23:22 **see** 9:10 10:5 11:19,25 12:5 18:13 29:16,19 30:11,16,21 31:2,8,19 36:6 36:7,23 38:3 | 260:20 269:24 271:25 272:13 276:12 287:8 287:20 290:24 297:10 300:14 300:21 305:7 |
| **scope** 25:4 38:19 40:8 46:18 72:12,21 73:13 83:11 95:21 96:23 98:13 123:22 137:14,16 139:14 152:20 188:21 241:3 241:20 252:4 | **section** 10:11 29:9 42:12 44:23 45:7,12 45:16 46:3,5,8 129:22 158:8 158:11 179:9 182:23 184:22 185:3,5,11 189:20,25 191:24 193:14 | 40:2,20 51:18 51:23 62:20 65:9 74:24,25 80:6 81:9 85:14 90:24 91:2 99:12 100:13 120:19 147:23 157:14 158:4 162:19 163:15 165:20 166:13,19 | **seeing** 89:6 **seeking** 245:7 **seeks** 245:8 **seems** 124:7 189:15 194:2,9 196:4 **seen** 88:6,12,18 88:20 209:24 210:6,16,17 236:22 |
| **sdc** 291:6 **seal** 317:15 318:21 | 202:16 203:3 219:11 226:17 245:14 262:19 270:8 | 167:7 178:19 180:8 182:9 188:4 192:19 | **selected** 32:15 **selection** 182:11 219:12 |
| **sealing** 3:4 **seasoned** 114:9 **sec** 23:17 62:25 63:4,8,10 118:13 165:6 165:17 218:24 313:7 | **sectional** 264:23 **sections** 199:17 305:6 **securities** 1:5 4:10 23:19 34:11,19 35:3 | 195:16,17 201:16 205:20 207:12,19,25 208:2,11,18 210:25 211:10 211:19,22 214:23 215:14 | **seller** 93:5,6 **sellers** 93:13 **selling** 309:25 **sells** 109:8,23 **sends** 91:12 **senior** 14:22 |
| **second** 20:2 36:12 38:7 52:12 83:22 120:12 127:6 148:22 155:14 158:10 183:2 189:3 206:21 207:14 217:9 217:15 226:8 226:12 235:20 266:12,23 268:8 269:17 | 62:7,9,14,22 74:13 106:17 117:20 118:22 237:12 238:3 305:14 310:6 312:17 316:6 317:3 318:3 | 216:21 217:12 217:22 219:15 224:2,16 227:2 227:6 238:4 242:8 245:18 256:16 258:6 | **sense** 14:25 68:6 182:25 210:11 **sent** 185:23 198:14 207:22 264:11 **sentence** 32:7 37:13 78:19,19 120:12 122:24 |

CONFIDENTIAL

**[sentence - shorter]**                                          Page 72

123:4 185:9
188:25 189:9
190:23 219:10
246:24
**sentences**  120:2
120:8
**seo**  114:9
**separate**  17:12
17:14 95:17
202:16 228:22
**september**
28:20 71:25
73:6 78:6
149:17 153:22
154:4 211:25
219:21 312:14
**sequentially**
217:7
**series**  146:10
**serious**  215:12
**serve**  62:24
116:7
**serves**  114:10
161:3
**service**  3:9
**services**  237:23
239:17 247:6
250:8
**serving**  16:25
**set**  64:9 66:6,15
67:5 69:23
73:2,20 80:11
80:17 103:15
105:11,25

118:8 135:23
184:9 208:5
239:3 249:14
254:22 315:11
315:20
**sets**  81:18
**setting**  23:12
137:2 138:3
188:11 284:23
**settled**  11:2
63:4
**several**  14:3
22:17 62:16
117:20 166:12
285:22
**share**  36:9,12
36:19 42:15,18
43:9,25 44:6
46:11,15 49:7
49:21 50:7,23
51:10,16 52:14
71:24 72:16
73:5 78:5
79:22 83:18,25
84:3,5 85:10
85:18,24 86:13
87:11 89:17
92:17 97:18
99:24 101:12
102:5,17 103:3
105:21 107:8
107:20 108:12
109:10,18
110:6 111:8,9

111:22 112:20
113:5,10,12,18
113:22 115:13
126:23 127:20
140:21 141:2,3
155:8,13,15,17
157:23 158:22
159:6 164:25
166:24 167:5
167:20 171:3
171:15 172:7
172:12,13,15
174:12,14,18
174:19 175:6,8
175:19 179:3
190:7 204:11
206:24 207:10
213:15 234:11
265:20 266:10
266:12,17,23
268:11,13,16
268:21 271:21
272:7,11,14
273:5,7,17,19
273:21,22
274:7,13 275:9
276:16,18
282:3 293:21
294:20 296:25
298:2,11
299:10
**shareholder**
163:7 234:22

**shareholders**
124:25 126:9
176:19 185:18
189:19 193:22
231:12
**shares**  60:8
67:13 68:17,24
75:10 81:2
102:19 104:10
104:13 109:6
109:21 114:8
115:25 117:4
130:2 133:8
134:7 212:21
213:23 214:20
215:5 221:3,25
222:6 231:9,10
232:5 235:4
270:24 306:4
309:16 310:10
**shawn**  56:20
57:2 235:24
242:5,19
**shed**  130:16
154:17
**sheet**  316:14
318:7,10,18
319:1
**short**  74:2 93:4
93:5,13 147:9
205:3 261:6
277:22 310:23
**shorter**  165:16

CONFIDENTIAL

**show** 191:14 192:9 258:5 286:23 300:12 302:23

**showing** 120:15

**shown** 30:23 316:16

**shows** 116:5 151:19 197:21 221:20 225:20 261:19 298:21

**side** 22:25 23:3 23:7,8,14,20,24 54:4 56:11

**sides** 191:14

**sign** 50:15 192:4

**signal** 114:11 116:7 213:4 288:10

**signalling** 116:2 215:12

**signals** 178:17

**signature** 315:22 316:15

**signed** 3:6,7,8 14:10 191:4 277:16 279:23 284:20 317:13 318:18

**significance** 47:2 218:15

**significant** 76:25 132:15

210:13 222:6 222:10 273:5 276:5,8,13,17 298:21

**significantly** 251:10 254:7 274:7

**signing** 18:2 269:6 284:24 316:20

**similar** 8:13 237:22 239:16 247:5

**similarly** 214:19

**simple** 153:23 248:3

**simply** 30:7 35:14 41:6 42:23 43:24 66:19 76:20 95:19 184:15 193:18 196:6

**sincerely** 316:21

**single** 214:17 226:21 228:6 228:25

**sir** 316:10

**sit** 89:13

**sitting** 151:4,11

**situation** 87:24 144:10,11,17 146:13 240:19

241:12 303:17

**situations** 215:20 228:7,9 296:8

**six** 10:5,6 11:11

**sixth** 166:13

**size** 217:3,16 222:20 253:11 253:17 254:9 259:13

**sizes** 254:12 260:22

**skim** 206:21

**skimmed** 24:16 24:19 40:12

**sl** 206:6

**slide** 206:22,23 298:7

**slides** 130:6 295:25 296:5 299:15

**slightly** 56:12 57:6

**small** 216:25

**smaller** 217:2 223:8 253:23 259:24,25

**smith** 109:5 110:5

**snippets** 24:23

**sold** 93:16 104:10 109:25 109:25 111:9 111:10 306:4

309:16 310:11

**solely** 137:22

**solicit** 169:19 169:23 170:3

**solicitation** 163:11 170:17

**solicitors** 130:5

**solidified** 36:15 36:19 38:9 39:16

**solutions** 4:13 4:16 59:10 316:1 319:1

**somebody** 16:19

**sorry** 37:4 40:18 45:5 66:10 97:8 102:8 127:25 153:24 168:22 258:21 273:8

**sort** 14:11 15:15 35:17 71:6 73:15 76:14 87:23 98:15 103:12 105:3 116:23 122:14 124:5,8 125:9 138:16 151:15 158:13 159:13 177:23 236:9 249:13 257:18 260:11 262:15 288:22

CONFIDENTIAL

**[sort - statement]**                                                    Page 74

| | | | |
|---|---|---|---|
| 302:5 | **specified** 248:4 | **st** 166:17 | 291:11,13 |
| **sound** 22:10 | **spectrum** 54:24 | **staff** 13:17,22 | 304:25 305:2 |
| **sounds** 39:21 | 121:9,10 | 13:25 14:2 | 305:19,21 |
| 41:19 94:22 | 155:21 202:18 | 16:2,13,19 | 307:5,9 308:19 |
| 131:18 283:18 | 203:14 223:8 | **stage** 16:18 | 310:11 |
| **source** 137:19 | 244:17 | 220:15,17 | **started** 13:17 |
| 217:25 218:25 | **speculate** 35:17 | **stages** 180:5 | 16:25 65:24 |
| 294:19 297:16 | 35:25 200:20 | **stake** 130:3 | 67:13 262:23 |
| 298:9 | **speculates** | 133:12,16 | 282:10 286:5 |
| **sources** 120:24 | 158:15 | 212:21 214:13 | 293:3 |
| 180:14 | **speculating** | 221:24 223:4 | **starting** 47:21 |
| **southern** 1:2 | 274:17 | 229:7 230:18 | 49:24 138:12 |
| **spanning** 264:4 | **speculation** | 233:7 235:8 | 216:11 248:25 |
| **speak** 61:4 | 241:15 250:20 | **stakes** 175:24 | 264:18 296:20 |
| 125:22 132:20 | 263:13 264:2 | **stale** 144:20 | **starts** 109:2 |
| 137:25 | 264:14,21,24 | **standalone** | 296:4 306:13 |
| **speaks** 276:11 | 313:20 | 178:16 | 307:24 308:3 |
| **special** 29:23 | **spelled** 16:11 | **standpoint** | **state** 1:22 5:9 |
| **specific** 17:18 | **spend** 14:25 | 105:5 | 33:4 40:5 |
| 25:7 33:15 | 15:6 | **starkloff** 2:14 | 123:25 151:16 |
| 47:4 49:14 | **spending** 15:2 | 38:23 90:13,23 | 153:5,10 |
| 50:3 54:21 | 15:4 | 184:14 | 160:18 231:6 |
| 65:17 80:12 | **spent** 55:8 | **starkly** 284:10 | 236:10 240:14 |
| 89:14 90:3 | **sphere** 179:21 | **start** 21:5 | 241:19 247:13 |
| 127:12 128:18 | **spread** 260:21 | 23:25 45:6 | 260:13 262:7 |
| 160:9 204:7,16 | 261:22 262:3 | 64:15 78:15 | 273:18 276:18 |
| 215:23 233:13 | 265:14,23 | 80:14 82:4 | 315:3,8 317:10 |
| 240:9 241:11 | 268:14 274:5 | 93:15 104:4 | 318:15 |
| 248:10 300:15 | **spreads** 43:15 | 112:3 131:16 | **stated** 235:25 |
| **specifically** | 263:14 264:2 | 133:22 171:13 | **statement** |
| 63:23 65:22 | 264:14,21,24 | 173:2,19 | 123:9 165:7,18 |
| 180:15 244:21 | 313:21 | 182:21 202:21 | 172:21 188:7 |
| 294:19 295:12 | **ss** 315:4 | 269:16 273:2 | 200:7,10,18 |
| 299:9 | | 280:4 285:16 | 213:3 218:23 |

CONFIDENTIAL

**[statement - studied]**                                    Page 75

256:16,17
270:12 273:13
276:25 278:4
313:7 317:13
317:14 318:19
318:19

**statements**
99:13 100:14
199:18 260:8
301:15

**states** 1:2 32:7
60:6,12 224:10

**stating** 193:19
194:5

**statistical** 47:2

**stayed** 36:22

**steadfastly**
211:7

**stenographic**
4:22 5:4

**step** 236:6
291:6,9 292:12

**steps** 91:19
199:6

**stick** 90:4
146:25 153:3
196:15 238:23
239:18 247:20
251:19

**stickered**
311:17

**sticking** 262:6

**stipulated** 3:3
3:11

**stock** 34:14,25
42:14 43:18
48:8 60:6 62:3
79:20,21 84:13
91:22 92:10,16
92:19,22,23
93:6,8,9,15,24
94:9 95:5
96:20 97:22,22
98:4,9 99:17
99:23 100:24
100:25 101:11
101:19 102:15
103:21 105:19
106:3,16,21,24
107:16 108:9
108:19 109:13
109:14,17
110:17 111:7
112:3,6 114:19
115:9,12 131:3
132:16 139:8
139:12 140:21
142:21 155:6
159:2 160:13
161:10 174:6
176:9 179:14
179:17 180:8
180:16 181:10
181:13 197:14
212:22 213:12
225:20 230:2
232:17 236:5
243:18 261:19

265:10,19,24
266:6 267:9
268:12 272:3
272:13 285:8
287:15 289:4,6
295:8,18
296:12,17
298:6,22 300:5
300:22 302:11
303:2 304:15
305:4,11
306:22 308:21
308:22,25
309:3,8,15,18
309:23

**stop** 81:8 183:6
184:10 261:25

**stopped** 165:16

**story** 123:19

**stoyas** 22:4

**strategic**
162:13,15
163:4,10,21
169:10,15
215:4 245:17
313:5

**strategies**
54:24 178:14
197:12 249:25

**strategy** 160:22
184:9 185:20
195:2 225:18
236:2

**strengthen**
161:4

**strengthens**
161:9

**strictly** 91:5,9
91:13 198:13

**strike** 82:4,7
246:14

**string** 13:14

**stripped** 108:7
108:16

**strips** 106:25

**strong** 185:11
185:12,15
189:4,7 275:11

**stronger** 287:3

**struck** 156:8

**structure**
237:25 245:6
249:4 252:12
254:23 257:15

**structures**
260:21

**struggling** 79:2

**student** 55:20

**students** 55:22
57:21

**studied** 89:10
141:20 162:4
167:11 180:15
198:4 222:22
223:10 225:8
226:16 227:11
228:7 253:8

CONFIDENTIAL

**[studied - supportive]**                                    Page 76

255:2,7,12,19
255:23 260:2
283:25
**studies**  48:25
138:4,8,10
176:8 177:19
180:3,25
181:13,18
215:16 218:9
284:10 295:3,9
295:23 296:3
296:20,24
297:7,9,20
298:24 299:2,6
299:14,15,17
300:12 301:7
301:11 302:21
302:23 303:3
**study**  45:21
46:21 47:14
48:12,16,17,22
51:8,14 114:23
121:7 136:19
140:17 141:10
162:4,23
167:12 171:19
172:7,9,14
173:5,22 174:7
176:24 177:7
178:3 180:24
181:8 198:9
199:15 201:5,7
201:18,20
215:18,19

218:13 222:24
225:25 228:14
254:10 256:19
260:7 261:19
267:20 271:10
271:14 278:12
284:18 285:5,9
287:14,21
289:7 294:10
295:13 298:20
300:4,15
301:11,12,14
302:5,7 303:5
303:7,7,12
**studying**  181:2
190:25
**su**  226:25
**subclass**  308:9
**subcompone...**
100:3
**subject**  27:25
172:21 264:19
**subjective**
158:13
**submission**
19:9,13
**submit**  184:7
**submitted**  7:14
8:6,10 10:15
16:24 18:5
40:9
**subscribed**
317:10 318:14
319:21

**subsection**
45:20,20
**subsequent**
34:23 70:22
**subsequently**
102:18 279:25
284:21 289:15
290:9 292:3
**substance**  19:6
168:4 234:6
**substantial**
68:19 71:17
75:11 174:23
223:19 270:25
**substantially**
166:4
**subtracted**
108:23
**subtracting**
108:18 115:11
**subtraction**
44:14
**succeed**  79:17
**success**  214:22
245:4 246:2,5
246:6,17,21
250:10 251:9
251:11,24
255:5,17
259:14
**successful**
214:15,17
215:13 223:14
229:3 296:14

296:15
**suffer**  104:9
**suffolk**  315:4
**suggest**  245:16
**suggesting**
286:20
**suing**  224:12
**suite**  1:19 2:5
2:14 316:2
**sum**  255:14
**summaries**
95:14
**summarize**
45:25
**summarized**
42:10 47:20
60:2 136:12
209:9
**summarizes**
298:25 301:10
**summary**  24:8
45:9,13 206:23
**super**  153:23
**superior**  211:8
287:2 316:1
**supernatural**
150:23
**support**  13:18
202:19 229:20
248:19 285:14
**supported**
142:6
**supportive**
224:6 281:6

CONFIDENTIAL

**[supports - target]**                                          Page 77

| | | | |
|---|---|---|---|
| **supports** 159:2 243:15 | 259:17,21 271:10,14,14 271:16 272:2 282:23 | 112:5,15 121:21 124:9 181:19 194:19 195:15 217:19 | 287:22 288:4 288:15 297:25 |
| **suppose** 93:11 95:18 132:5 188:11 | **tactic** 236:2 | 224:13 225:22 292:17 295:4 | **talked** 54:6 122:16 127:8 144:7 196:8 |
| **sure** 84:16 85:12 96:18 120:10 141:18 156:22 169:4 174:16 193:7 195:3 199:8 204:24 231:19 250:13 | **tactics** 202:18 203:6 244:17 | 295:24 296:8 297:7,9 299:20 302:25 | 212:10,11 213:8 247:12 251:15,18 266:11 300:24 304:2 |
| | **take** 49:18 65:18 66:19 68:7 73:23 91:18 119:13 123:4 124:24 139:20 145:6 157:9 179:20 181:4 190:22 199:11 203:18 204:19 229:3 234:3 260:24 261:3 288:2 310:18 311:11 311:14,15 | **takeovers** 126:20 189:19 216:7,18 295:6 313:17 | **talking** 13:23 16:21 17:21 37:4,22,24 49:24 64:23 65:7 77:5 92:3 102:12,25 120:10 127:13 133:24 134:3 144:9 184:12 184:25 188:10 191:17,24,25 194:4 202:12 210:9 224:25 227:12 244:18 253:24 265:13 265:22 278:6 282:20 288:6 299:7 |
| **surrounding** 143:15 | | **takes** 12:14 126:8 188:17 188:24 195:23 | |
| **surveillance** 58:23 59:3 60:10,16,19,22 232:17 | | **talk** 13:11 27:2 52:25 54:11 59:7 84:2 113:20 116:20 120:2,25 121:18 125:12 128:15 131:13 132:8,14 148:17 155:19 157:6,7 162:3 176:8 177:22 189:17 192:3 200:10 210:23 211:13 212:9 212:16 226:17 236:13 240:19 249:21 268:20 280:22 283:23 | |
| **swear** 5:5 | | | |
| **sworn** 3:6 5:8 315:11 317:10 317:13 318:14 318:18 319:21 | **takeaways** 302:6 | | |
| **t** | **taken** 1:16 7:16 33:10 74:3 147:10 167:21 193:18 201:17 205:4 228:10 261:7 277:23 310:24 | | |
| **t** 3:2,2 16:12 312:7 313:2 314:2 315:2,2 | | | **talks** 38:4 185:3 202:16 203:3 246:4 275:14 |
| **table** 226:8,11 227:9,11 253:5 253:5 254:15 256:13,18 257:7 259:16 | **takeout** 112:7 | | |
| | **takeover** 29:15 32:14 36:18 37:18,22 112:4 | | **target** 53:5,22 54:7,14,17 |

CONFIDENTIAL

**[target - testimony]**

55:25 56:7 57:9 88:7,15 88:21 89:14 120:22 122:6 126:11 159:19 159:22 179:3 179:11,17 180:8,17 181:10,22,22 181:24 184:2,7 185:11,14,19 189:4,7,16 191:18 193:17 195:13 196:9 198:16 199:2 201:15 209:4 209:25 210:2 211:15 213:12 213:15 214:13 214:20 220:8 223:15,20,23 224:5,10,19 225:4,13,20 226:17 228:10 236:3 254:17 254:19,25 255:6,11,18,23 259:22 260:11 261:19 267:8 278:25 279:6 285:8 286:17 286:19,24 288:11,25 290:18,22

291:20 292:2 292:22,24 295:7,14 296:9 296:12,25 297:2 298:11 299:10 300:17 300:22 303:22 314:6

**target's** 183:3 185:18 196:10 287:6 290:12 291:19 294:20

**targets** 223:18 262:13 286:21 286:22 287:4 287:11 288:6 289:10,22 290:20

**taught** 57:19 61:20

**teaching** 15:10 299:21 300:3

**techniques** 135:7 136:25

**tell** 16:7 19:23 44:3 135:15 145:12 146:6

**telling** 53:20 105:18 144:2 207:6 208:23 293:12 303:23 309:2

**ten** 22:23 228:8

**tend** 197:10 225:20 260:20

**tender** 88:17 126:5 176:10 176:12,21 179:4 181:20 215:19 217:10 217:20 218:2,5 218:6,7,19 219:3,7,13,21 220:2,10,15,16 220:23 226:16 228:14 264:4,8

**term** 64:11,22 195:10

**terminated** 279:25 284:21 285:2 289:9 303:15

**termination** 237:11 289:24 290:2

**terminations** 291:17

**terms** 9:3 18:21 23:18 37:21 46:4 47:18 61:22 64:18 88:14 96:19 111:4 117:24 125:13 126:15 129:22 138:18 140:11 153:11 176:18 187:21

191:4 196:17 203:22 204:4 204:11 230:15 234:18 249:23 271:8 283:21 287:25 299:18

**testified** 5:10 32:9 38:25 39:14 44:14 234:6 242:19

**testify** 27:25

**testifying** 233:19

**testimony** 7:21 9:2 10:2,16 18:10 24:2,3 25:7,24 26:14 28:8,15 32:16 32:24 35:7 36:4,25 37:7 38:11,18,21 39:9 40:8 45:2 56:19 62:11,13 63:7 69:16 70:17 76:23 77:14 82:15 108:3 122:2 130:9 154:11 156:5,14 161:13,19 212:7 229:23 234:12,15 235:22 242:5 242:15 304:5

CONFIDENTIAL

**[testimony - think]** Page 79

| | | | |
|---|---|---|---|
| 306:17 311:10 | 285:3 | 23:21 25:12,16 | 169:5 171:10 |
| 315:13 317:6,7 | **things** 6:12 | 26:21 27:4,9 | 173:13 177:10 |
| 318:6,9,12 | 13:11 18:18,23 | 27:23 28:3 | 177:12 178:6 |
| **text** 183:7,11 | 27:21,22 34:2 | 31:23 33:15 | 185:5 186:20 |
| 183:19 192:16 | 43:14 52:8,11 | 38:18 41:9,25 | 188:8,16 |
| 192:22 193:3,5 | 59:22 64:4 | 43:13,25 44:13 | 189:14,23 |
| 193:6,11 195:6 | 65:10 67:11 | 44:18,21 52:7 | 190:21 191:6 |
| 195:19 196:22 | 76:7,19 80:4 | 52:23 56:5,11 | 191:22 193:5 |
| 202:5 203:3,10 | 83:21 85:2 | 57:5 58:3,12 | 194:8 196:3,15 |
| 295:2 | 88:17 91:16,24 | 58:19,21 59:15 | 197:24 198:9 |
| **textbook** 91:18 | 92:3 97:16 | 60:15 64:23 | 201:3 203:9,15 |
| 121:6 181:17 | 100:16,22 | 65:6,20 66:8 | 203:20 206:22 |
| 182:14,18,20 | 103:11 111:25 | 69:3,4,13 | 209:10 210:8 |
| 183:13,16 | 115:15 119:21 | 70:14 72:6 | 210:10 212:23 |
| 184:22 185:3 | 124:3 128:16 | 76:6 81:25 | 218:12,17 |
| 187:4 189:21 | 131:10 132:20 | 84:19 87:18,20 | 221:20 225:6 |
| 189:25 193:8 | 140:12,25 | 89:20 92:13 | 225:11,24 |
| 196:20 202:16 | 141:4 150:9 | 93:2 94:2,6 | 226:2 227:24 |
| 244:9 298:25 | 152:12 155:19 | 95:11,20 97:14 | 228:2,20 |
| 299:8 301:10 | 156:3 189:24 | 98:19 99:19 | 229:19 230:3 |
| **textbooks** | 190:15 193:8 | 104:16,23 | 230:13 231:4 |
| 295:5 | 199:8 222:18 | 105:16 110:16 | 233:12 238:13 |
| **thank** 21:13 | 222:24 225:15 | 118:19 119:13 | 238:23 241:18 |
| 166:9 178:24 | 245:24 248:24 | 121:7 123:21 | 241:21 243:4 |
| 311:10 | 249:3 262:18 | 125:9,21 126:4 | 243:24 244:5,8 |
| **theoretical** | 283:20 284:16 | 128:14 132:9 | 244:9,15 |
| 114:6 | 284:17 291:25 | 133:10 137:24 | 246:11 247:12 |
| **theory** 119:4 | **think** 5:15,21 | 137:24 138:11 | 250:15 251:2 |
| 309:5 | 9:25 10:22 | 148:17 149:19 | 254:3 257:11 |
| **thing** 104:8 | 12:23 13:13 | 151:24 152:19 | 257:13 258:15 |
| 120:10 134:9 | 15:25 16:24 | 153:6 159:4,11 | 266:15 267:24 |
| 145:18 212:16 | 17:11,13,14 | 159:15,17 | 268:2 270:7 |
| 235:20 250:11 | 18:20 19:7,7 | 160:10 161:12 | 275:10,17 |
| 282:13 284:16 | 19:11 23:10,19 | 161:18 166:2 | 276:9,15 |

CONFIDENTIAL

279:23 280:13
281:22 282:6
283:3,22
284:11 285:22
289:22 291:16
291:22,23
292:4,6 293:7
294:24 295:24
302:6 303:16
304:6,8 306:19
306:21 310:8
**thinking**   36:13
36:16 38:8,9
38:17 39:8,16
40:6 81:17
**third**   127:16,16
128:3 164:22
167:16 187:25
212:3 231:14
283:13
**thirty**   316:19
**thought**   39:18
68:10 235:19
241:9
**thoughts**
125:23
**thousand**
191:10
**threat**   32:13
37:17,21
132:15 280:25
**three**   10:4
82:18,21
177:11 224:5

283:10,17,18
**throw**   200:22
**tie**   145:8
**time**   1:12 3:12
13:19 14:25
15:2,7,8 19:14
32:22 33:5,12
34:3 36:12
38:7 40:7
63:13 64:16
73:25 74:5
82:20 87:4
97:2 98:5,16
101:17 128:11
129:12 131:8
133:18,22
134:10,14
137:22 138:21
139:3,18 140:3
141:11,14
142:21 143:5,8
143:10,21
144:19 146:4
147:8,12
151:17,18
154:22 167:15
169:16,24
170:11 171:17
175:16 181:10
181:14 184:4,7
184:15 199:20
200:3 205:2,6
212:15 221:21
230:23 232:14

235:20 254:5
256:24 261:5,9
262:11 267:8
273:19 277:21
277:25 283:8
283:10,20
285:20 296:13
310:22 311:2,9
**timeline**   45:13
45:14 129:23
136:14 186:18
189:22 192:5,8
**times**   5:19,22
116:4,10
146:11 199:19
201:24 210:7
219:3 223:17
228:16 260:16
280:3
**timing**   152:8
**title**   162:11
166:21 210:24
216:16
**titled**   205:16
254:16
**today**   6:7 8:7
13:23 16:22
193:12 237:5
266:11 300:25
**today's**   311:10
**toehold**   130:3
143:19 178:14
212:18,19,20
213:4,16,22

214:18 215:2,8
221:9,14 222:4
222:7,20,22
223:12,13
227:12,21
228:2,15
229:15 230:7,8
233:21 234:7
234:18 235:25
262:24
**toeholds**   43:15
175:24 213:9
214:9 216:5,16
217:17 218:2
218:15 222:13
222:23 223:2,7
223:10 262:16
313:16
**together**   14:9
123:9
**told**   56:5 234:9
248:9 276:4
306:14 307:22
**took**   32:22
104:6
**tools**   135:6
136:24
**top**   9:25 10:21
21:6 22:6 29:6
29:20 89:11,24
91:2 127:21
128:17,21
129:10 166:25
169:13 221:7

CONFIDENTIAL

**[top - two]**                                        Page 81

231:12 233:14
235:6
**topic** 177:24
187:21
**topics** 154:7
218:9
**toshiba** 20:2
22:4
**total** 16:24
55:20 133:16
224:20
**totality** 86:6
95:22 209:12
**tov** 16:10
278:13,15
285:17 286:6
301:20 303:20
**toward** 79:25
195:14
**towards** 21:23
275:14
**track** 18:18
**trade** 58:22
59:3 60:10,16
60:19 65:2
106:22 213:13
**traded** 50:20
107:5 111:7
118:15 131:2
155:7 159:3
287:17
**trading** 47:23
60:7,14,22
61:24 69:10

84:10,25 87:12
97:23 98:4
106:4,5 112:3
117:15,17,21
118:12,23
119:2,6 289:22
291:14,16
293:13
**transaction**
36:14 68:21
71:19 73:10
75:13 119:19
120:6,17,23
121:19,22
122:4 123:11
124:18 125:3
129:18 131:25
148:21,25
149:3 160:15
163:13,23
169:20 170:4
176:20 180:4
181:7 185:17
191:3 209:10
227:24 235:10
237:2,17,18
238:19 239:5
240:12,18
241:10 246:18
247:2,10,25
250:4,10,17
251:5,8 253:10
253:17,23
254:11 259:14

280:25 289:21
290:5
**transactions**
53:10 54:4
89:3,10 121:13
126:15 155:21
180:4 181:3
190:25 191:6
198:4,5,10
201:8 210:18
213:14 219:5
243:20 253:8
253:18 278:12
283:24 290:7
303:13,14
**transcribed**
317:7
**transcript**
24:24 28:19
30:21 39:15
311:13 312:14
316:12,13
317:5,12 318:5
318:11,17
**transcripts**
24:20,22 25:22
26:9,12
**trial** 3:12 10:16
**tried** 18:17
75:20 182:7
**triggers** 223:5
**trouble** 293:5
**true** 50:4 81:12
81:19,21 83:6

83:14 84:19
179:22 190:3,5
198:3 275:3
315:12
**truth** 34:20
65:12 95:24
305:23
**try** 6:3 10:23
18:23 36:18
82:10 143:7
**trying** 25:18
27:8,11,15
39:5,22 83:7
97:21 98:8
100:7 123:6
137:4 159:9
190:22 227:10
**turn** 8:14 9:7
47:12 58:5
199:4 218:22
252:17
**turned** 47:16
**turquoise** 12:5
**twice** 36:10
39:16 51:22
78:15 179:23
**two** 10:4 16:2,8
16:19 18:15
19:7,24 45:22
46:25 55:8
72:3,17 73:8
83:16 87:8
95:19 97:17
99:10 109:12

CONFIDENTIAL

111:4 125:16
128:20 133:3
139:22 143:15
151:20 152:13
162:5 174:14
177:2,4 180:16
181:11 185:22
190:5 191:14
199:25 210:20
235:18 255:14
256:2 262:21
273:3 274:16
275:6 278:16
279:9 280:5
281:22,25
284:4 292:22
303:9

**type**   33:20
34:24 71:19
88:12,19 89:7
89:22 91:22
138:2 174:8
176:17 183:11
187:6 219:9
241:6 243:20
250:10 259:19
273:11 285:15
297:21 299:3,6
299:14 301:13

**types**   56:3 62:4
62:19 72:10
77:25 88:15
91:20 92:5
128:16 152:11

156:3 180:20
180:22 199:8
220:3,12
260:20 296:7
297:11,12
310:15

**typical**   15:18
180:4 191:2
310:9

**typically**   15:12
112:8 179:4
184:4 296:8

**u**

**u**   3:2 16:14,15
16:16

**uc**   14:5,5

**ultimate**   66:24
140:21 155:6
155:16

**ultimately**   67:5
72:6 73:17
79:15 117:8
125:4 135:12
142:7 160:17
170:18 197:2
197:16 209:3
223:17 253:25
292:9 296:13
296:14 310:14

**umbrella**
126:12

**unanimously**
208:8 211:16

**uncertainty**
287:6 288:16

**unclear**   292:10
293:7

**under**   11:16
21:25 23:11
62:13 110:15
110:17 119:4
126:12 132:2
170:11 186:8
226:21 271:19
280:18 291:6

**undergrad**
55:20

**underlined**
91:4

**underlying**
118:20 134:6
262:15 301:18

**undermine**
243:13

**underscore**
149:3 161:3
178:15

**underscores**
149:8

**understand**   6:2
6:21 7:9 27:14
49:12,23 51:21
56:24 60:17
63:17 70:25
74:17 77:6
88:18 98:17
110:3 134:19

138:22 141:17
146:16 150:14
152:21 158:6
180:10 187:12
206:12,19
226:14 229:6
229:10 231:19
231:21 248:11
255:9 284:9
290:16,21
291:18,20
293:2

**understandable**
5:25

**understanding**
45:10 70:20
71:8 72:7 76:9
77:16 93:18
104:19 118:7
119:16 122:12
136:2,6 146:23
148:15 150:17
167:15 168:2
205:22 206:25
215:17 282:4,7
305:22 308:24
309:9,10

**understands**
64:11

**understood**
30:3 31:14
237:23

**undervaluation**
114:8

CONFIDENTIAL

**[undervalue - violation]**                                    Page 83

| | | | |
|---|---|---|---|
| **undervalue** 178:10 | **upheld** 211:23 | 159:24 288:15 | **veritext** 4:12,15 |
| **undervalues** 288:25 | **upside** 273:6 | **valuations** 57:15,18 58:4 | 316:1,8 319:1 |
| **undisclosed** | **upstart** 21:19 21:20 | 58:7 | **veritext.com.** 316:17 |
| 135:17 137:20 | **use** 24:23 64:11 | **value** 42:14 | **versus** 21:11,18 |
| 138:25 139:25 | 64:21 125:6 | 44:2 84:20 | 21:24 22:3,4 |
| 141:11 142:11 | 197:10,11 | 85:4 92:24 | 23:7 54:25 |
| 143:24 | 245:5 302:16 | 112:6,11 | 125:11 244:12 |
| **unfair** 224:11 | **used** 3:8 14:2 | 113:17 114:5 | 244:16 |
| **unfriendly** | 16:18 41:7,7 | 159:21 160:8 | **vi** 46:3,8 |
| 224:12 244:13 | 46:15 65:17 | 163:7 174:3,9 | **video** 4:7 |
| **unit** 4:6 | 92:13 242:20 | 183:22 211:8 | **videoconfere...** |
| **united** 1:2 60:6 | 270:6 | 253:10 254:6 | 2:8,9,10 |
| 60:12 | **using** 45:21 | 266:25 268:9 | **videographer** |
| **university** | 65:13 117:6 | 268:16 269:8 | 2:19 4:2,13,25 |
| 299:22 | 135:6 173:5 | 269:22 270:9 | 73:24 74:4 |
| **unlock** 163:6 | 217:18 286:13 | 270:14 275:8 | 147:7,11 |
| **unreasonable** | 299:19 | 276:19 277:6,9 | 204:25 205:5 |
| 160:10 | **utilizing** 16:6 | 287:3,7,11,18 | 261:4,8 277:20 |
| **unresolved** | | 287:20 288:8 | 277:24 310:21 |
| 149:4,9 150:3 | **v** | 288:21 | 310:25 311:8 |
| **unsigned** 3:8 | **v** 16:12,12 | **values** 88:5 | **videos** 130:6 |
| **unsolicited** | 42:12 45:12,16 | **valuing** 287:25 | **videotaped** |
| 29:12 211:4 | 46:5 129:22 | **variation** | 1:15 28:20 |
| **unsuccessful** | 245:14 316:7 | 264:23 | 312:15 |
| 220:9 223:18 | 317:3 318:3 | **varies** 15:16 | **view** 116:23 |
| **unwanted** | **vacuum** 230:7 | **variety** 22:21 | 222:5 232:20 |
| 195:15 | **vague** 242:24 | 254:11 260:21 | 249:18 |
| **unwillingness** | **valuable** 116:9 | 274:21 310:6 | **viewed** 117:6 |
| 208:16 209:5 | 159:23 160:6 | **vast** 34:11,18 | 268:15 |
| **updated** 207:23 | **valuation** 43:5 | 35:2 | **vii** 46:8 |
| **updates** 8:23 | 45:18 57:9,15 | **veltri** 1:20 4:14 | **violation** |
| 138:6 | 57:20,22,24 | 315:7,23 | 104:21 |
| | 62:18 136:17 | | |

CONFIDENTIAL

**[violations - witness]**                                    Page 84

| | | | |
|---|---|---|---|
| **violations** 74:12 312:17 | 61:9 127:12 134:4 141:18 145:8,12 150:18 161:23 166:12 170:21 177:20 182:7 182:17 188:23 192:9 204:23 205:8 206:4 231:19 234:2 236:11 242:17 244:20 247:22 253:3 254:17 271:9 278:3 294:17 | **ways** 35:2 58:6 202:2 224:5 244:4 | **winter** 13:14 |
| **virtu** 21:7 | | **we've** 12:20 35:9 65:20 68:7 70:22 102:11,25 127:8 133:24 144:7 170:23 246:7 251:15 251:18 266:11 280:2 301:21 303:18 304:2 | **withdraw** 151:8 |
| **virtually** 34:10 60:5,12 181:20 | | | **withdrawal** 209:13 |
| **vote** 281:12 | | | **withdrawn** 210:17 |
| **voted** 60:7 259:4 281:13 282:2 | | | **withdraws** 134:12,13 210:4 |
| **votes** 281:6,9 | | | **withdrew** 208:14 209:3 211:18,24 |
| **voting** 215:6 | | **week** 8:10 9:4 15:12,17,18 109:12 | |
| **w** | | | **withstanding** 227:23 |
| **wachtell** 205:12,18,24 206:13 207:5 233:5,19 234:9 295:25 296:5 296:18 297:15 297:24 313:14 | **wanted** 54:18 176:6 | **weeks** 184:6 | **witness** 3:6,9 3:10 5:6,7 9:9 10:2,10,12,18 11:12,16 14:16 15:4,7 16:25 22:13 25:11 26:23 27:19,19 27:20 32:25 60:25 61:14,23 62:24 80:21 97:8 139:16 146:22 161:18 238:11 241:4 311:20 312:3 315:10,13,19 316:9,12 317:1 317:4,11 318:1 318:4,15 |
| | **wanting** 123:15 | **went** 130:7 267:23 | |
| | **way** 6:4 25:18 25:20 26:14 27:12,16 41:21 58:13 63:15 81:20 97:3 99:6 119:24 140:22,23 146:19 154:15 157:5 160:24 170:19 187:20 200:7 209:21 226:14 227:8 239:25 241:6 242:19 243:13 260:3 302:10 315:17 | **whereof** 315:19 | |
| **wainaina** 2:19 4:11 | | **white** 203:10 203:12 | |
| **waived** 3:5 316:20 | | **wide** 254:11 274:20 310:6 | |
| **walk** 47:3 132:8 199:4 | | **willing** 160:7 | |
| **walking** 214:19 | | **willingness** 83:24 174:20 266:13 276:5 | |
| **walkling** 178:4 178:22 215:18 261:18 263:18 | | **wind** 240:18 | |
| | | **window** 48:6 220:8 | |
| **want** 11:7 14:24 27:7 31:6 33:17 44:8,9 58:6 | | **wine** 149:17 | |
| | | **wins** 228:8,9 | |

CONFIDENTIAL

**[witness's - zoom]**                                         Page 85

| | | | |
|---|---|---|---|
| **witness's** 161:19 | 138:24 209:23 210:19 222:14 247:16 256:21 257:22 269:7 269:21 270:13 277:2,2,3,8 288:3 297:17 310:6 | 170:2 | **y** |
| **witnesses** 25:22 35:8,15 38:22 156:6 | | **worse** 175:7 | **yeah** 8:15 19:25 20:24 27:19 32:5 57:5 59:21 61:11 64:14 91:16 92:25 96:9 101:2,24 129:21 130:20 134:20 158:8 172:18 248:12 256:2 259:2 261:2 273:14 279:22 284:15 293:19 |
| | | **worth** 275:9 | |
| **witness'** 316:15 | | **write** 80:5 114:2 119:21 125:22 134:12 149:6 157:16 217:15 223:22 224:18 244:25 252:11 261:15 264:14 279:13 303:21 304:24 | |
| **wolverine** 205:11,17 313:13 | | | |
| | **worked** 20:11 22:13,16,21 34:12 53:4,8 53:21,24 54:16 55:23 57:8,14 58:22,25 59:2 61:23 62:8,15 63:3 97:12 117:14,20 118:13 285:22 305:15 308:11 | | |
| **won** 228:16 | | | |
| **wondering** 287:17 | | | |
| **word** 125:6 242:20 276:8 276:12 | | **writes** 183:25 187:25 190:2 191:13 193:16 269:3 | **year** 13:7 211:6 267:19 |
| **wording** 64:6 80:13 | | | **years** 55:8 262:14 267:15 267:18 |
| | **working** 9:16 14:20 15:21 16:20 18:11 23:17 59:24 61:14 279:12 279:18 284:5 285:16,20 286:5 303:9,19 | **writing** 153:11 | |
| **words** 41:7 44:8 91:4,8 125:23 238:24 239:13,19 270:7 276:18 | | **written** 14:7 66:20 91:8 147:21 | **york** 1:2,19,20 1:22 2:5,5 5:9 9:23 315:3,9 |
| | | **wrong** 21:4 22:8 115:16 | **yup** 178:25 |
| **work** 13:5,9,21 14:8,16 15:4,8 15:9,12,20 18:9 41:15 42:9 43:3,10 47:9 51:2 53:11 54:10 55:3,4,8 56:3,4 56:6 57:15,17 57:21,24 58:9 58:14 60:10,24 61:23 118:14 | **workload** 13:2 13:5 | **wrote** 91:3 114:14 184:15 279:18 | **z** |
| | | **wsji** 223:24 | **zero** 50:11,16 51:20,24 304:20,24 305:11 306:10 307:8,17 |
| | **works** 46:7 | **x** | |
| | **world** 55:4,8 88:7,14,20 100:4 103:13 112:23 132:5 | **x** 1:3,7 226:24 227:4 312:2,7 313:2 314:2 | **zhong** 114:5 |
| | | | **zoom** 1:21 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

CONFIDENTIAL
ERRATA SHEET
WITNESS:  DR. MATTHEW CAIN
DEPOSITION DATE: NOVEMBER 14, 2025
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 7748266

| Page | Line | From | To | Reason |
|------|------|------|----|--------|
| 13 | 14 | string | spring | transcription error |
| 42 | 13 | applied | implied | transcription error |
| 43 | 15 | toeholds | toeholds, | transcription error |
| 45 | 21 | events | event | transcription error |
| 46 | 6 | about calculation | and the calculation | transcription error |
| 46 | 21 | events | event | transcription error |
| 48 | 8 | May | Company | transcription error |
| 60 | 13 | I | It | transcription error |
| 71 | 19 | transaction | transaction, | transcription error |
| 81 | 17 | thinking | taking | transcription error |
| 88 | 2 | applied | implied | transcription error |
| 89 | 3 | in | and | transcription error |
| 99 | 20 | released | omitted | transcription error, clarification |
| 99 | 21 | released | omitted | transcription error, clarification |
| 106 | 22 | trade | trade, | transcription error |
| 112 | 12 | company | company, | transcription error |
| 117 | 23 | discouragement | disgorgement | transcription error |
| 118 | 21 | discouragement | disgorgement | transcription error |
| 119 | 14 | discouragement | disgorgement | transcription error |
| 124 | 7 | any -- seems | and seems | transcription error |
| 127 | 13 | about a National | about National | transcription error |
| 130 | 2 | cumulation | accumulation | transcription error |
| 131 | 2 | process | prices | transcription error |
| 138 | 6 | sale | stale | transcription error |
| 138 | 7 | sale | stale | transcription error |
| 142 | 8 | aren't | are | transcription error |
| 152 | 8 | participated | anticipated | transcription error |
| 173 | 19 | would | of | transcription error |
| 174 | 24 | pay | pay, | transcription error |
| 175 | 4 | July | January | transcription error |
| 180 | 3 | studies | studied | transcription error |

| 183 | 11 | that type doesn't | that doesn't | transcription error |
|---|---|---|---|---|
| 187 | 3 | points these cites | points -- he cites | transcription error |
| 198 | 11 | I would to go back | I would need to go back | transcription error |
| 229 | 4 | higher a | higher in a | transcription error |
| 229 | 20 | explain is, provides | explain provides | transcription error |
| 229 | 23-4 | describing the Emerson's approach is coercive | describing Emerson's approach as coercive | transcription error |
| 244 | 11 | a | are | transcription error |
| 249 | 5 | composition | compensation | transcription error |
| 271 | 18 | place | price | transcription error |
| 276 | 17 | of about | over | transcription error |
| 289 | 2 | believe | belief | transcription error |
| 296 | 11 | measurement | measurable | transcription error |
| 299 | 14 | type | types | transcription error |
| 300 | 13 | demonstration | information | transcription error |

Dec. 31, 2025
_____

Date                                Dr. Matthew Cain

SUBSCRIBED AND SWORN TO BEFORE ME THIS ___31st___

DAY OF _December_____, 20_25___.

Notary Public

SELENA M COULOUFACOS
Notary Public - State of New York
NO. 01CO6421724
Qualified in Westchester County
My Commission Expires Sep 7, 2029

Commission Expiration Date