# EXHIBIT 9

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:23-cv-10488-DLC

IN RE:  NATIONAL INSTRUMENTS    )
CORPORATION SECURITIES          )
LITIGATION                      )

VIDEOTAPED DEPOSITION OF DAVID J. DENIS, Ph.D.

TAKEN ON BEHALF OF PLAINTIFF

NOVEMBER 24, 2025

VOLUME II

Reported by Celena D. Davis, RPR, CCR

INDEX OF EXAMINERS

DEPOSITION OF DAVID J. DENIS, Ph.D.

Page:

Questions by Mr. Mandel . . . . . . . . .   6


EXHIBITS

Denis Exhibit 1. . . . . . . . . . . . . . . . . . .   7
        (Proxy Statement)
Denis Exhibit 2. . . . . . . . . . . . . . . . . .  24
        (8/27/25 report of David Denis)
Denis Exhibit 3. . . . . . . . . . . . . . . . . .  82
        (Bates No. NAT-SL-22986)
Denis Exhibit 4. . . . . . . . . . . . . . . . . .  95
        (Bates No. NAT-SL-023189)
Denis Exhibit 5. . . . . . . . . . . . . . . . . . .107
        (7/28/25 report of Matthew Cain)
Denis Exhibit 6. . . . . . . . . . . . . . . . . . .123
        (Even-Tov article)
Denis Exhibit 7. . . . . . . . . . . . . . . . . . .161
        (Betton and Eckbo study)
Denis Exhibit 8. . . . . . . . . . . . . . . . . . .228
        (Cain, et al. study)
Denis Exhibit 9. . . . . . . . . . . . . . . . . . .238
        (Bruner study)

(The exhibits are attached.)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:23-cv-10488-DLC

IN RE:  NATIONAL INSTRUMENTS    )
CORPORATION SECURITIES          )
LITIGATION                      )

IT IS STIPULATED AND AGREED by and between

counsel for Plaintiff and counsel for Defendant that the

deposition of DAVID J. DENIS, Ph.D. may be taken for

Discovery purposes by and on behalf of the Plaintiff,

pursuant to the provisions of the Supreme Court Rules

pertaining to depositions taken for the Plaintiff on

November 24, 2025, at the law offices of Dowd Bennett,

7676 Forsyth Boulevard, Suite 1900, in the City of St.

Louis, State of Missouri, before CELENA D. DAVIS,

Registered Professional Reporter and Certified Court

Reporter within and for the State of Missouri.

APPEARANCES


COUNSEL FOR THE PLAINTIFF:
ROBBINS GELLER RUDMAN & DOWD, LLP
by Mr. Noam Mandel (via Zoom)
and Ms. Desiree Cummings (via Zoom)
and Ms. Alyssa Plascoff (via Zoom)
and Ms. Ana Avalos Cueller (via Zoom)
and Ms. Cali Giuggio (via Zoom)
and Mr. Christoper T. Gilroy (via Zoom)
420 Lexington Avenue - Suite 1832
New York, New York 10170
noam@rgrdlaw.com
dcummings@rgrdlaw.com
cgilroy@rgrdlaw.com
aplascoff@rgrdlaw.com
aavalos@rgrdlaw.com
cgiuggio@rgrdlaw.com


COUNSEL FOR THE DEFENDANT:
DOWD & BENNETT
by Mr. John D. Comerford
and Mr. Jeremy M. Hofman
7676 Forsyth Boulevard - Suite 1900
St. Louis, Missouri 63105
jcomerford@dowdbennett.com
jhofman@dowdbennett.com


REGISTERED PROFESSIONAL REPORTER
CERTIFIED COURT REPORTER (MO)
CERTIFIED SHORTHAND REPORTER (IL)
CERTIFIED SHORTHAND REPORTER (KS)
CERTIFIED SHORTHAND REPORTER (CA)
CERTIFIED SHORTHAND REPORTER (TN)
CERTIFIED LIVENOTE REPORTER
EVEREST COURT REPORTING LLC
Celena D. Davis

Also Present:  Ed Foppe, Videographer
               Matt Cain (via Zoom)
               Jeff Schoemer, Exhibit Technician

Deposition of David J. Denis, Ph.D., Vol. II                In Re National Instruments Corporation Securities Litigation

Page 114

VIDEOGRAPHER: We are now on the record. Today's date is November 24th, 2025. The time is 9:22 a.m. Central Standard time.

This is the recorded video deposition of Dr. David Denis. This deposition is in reference to the National Instruments Corporation Securities Litigation. This matter is pending in the United States District Court, Southern District of New York, Civil Action No. 1:23-cv-10488-DLC.

This deposition is being held at Dowd Bennett, located at 7676 Forsyth Boulevard, Suite 1900, St. Louis, Missouri.

My name is Ed Foppe, representing Everest Court Reporting; and the court reporter is Celena Davis, also with Everest Court Reporting.

Do you want everyone to make an audible announcement of their presence or will they all be reflected on the stenographic record?

REPORTER: I will reflect everyone on Zoom on the stenographic record if that works for counsel.

MR. MANDEL: Either way.

THE VIDEOGRAPHER: The court reporter will now swear in the witness.

(Witness sworn.)

***

Page 115

DAVID J. DENIS, Ph.D., duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

QUESTIONS BY MR. MANDEL:

Q. Thank you very much.

Good morning, Dr. Denis. How are you?

A. Good morning. Not bad. How are you?

Q. Pretty good. Pretty good. It's nice to see you again.

A. Hasn't been too long.

Q. Hasn't been too long, that's right.

Have you done any other depositions since we last met?

A. No, I don't believe I've done any depositions since then.

Q. Okay. So, you know, same ground rules, et cetera. If you've got any issues or questions about that, let's work them out. Other than that, why don't we just get right into it.

So if we could put up our first exhibit. This is going to be from our tab 5.

I'd like to ask you a little bit about this document.

For the record, this is the proxy statement

Page 116

issued to National Instruments shareholders in connection with the acquisition of National Instruments buyers.

So are you able to see the document?

A. Okay. I'm going to move this laptop a little closer.

(Denis Exhibit 1 was marked for identification.)

BY MR. MANDEL:

Q. Okay.

A. I can see it, yes.

Q. Okay. Do you recognize this document?

A. I do.

Q. This is a document that's listed as one of the documents you considered in connection with your most recent report; is that right?

A. That's correct.

Q. So you reviewed this document in connection with preparing your report; is that correct?

A. I did.

Q. Okay. What is this document?

A. Well, it's as you described it to be, a proxy statement related to the acquisition of National Instruments.

Q. This concerns Emerson's acquisition of

Page 117

National Instruments for $60 a share; is that right?

A. That's my recollection, yes.

Q. Okay. And the document is dated May 25th, 2023; is that right?

You can see that on the second page of the PDF.

A. I see that now, yes. May -- I'm sorry. Did you say May 23rd or May 25th of 2023?

Q. May 25th, 2023; right?

A. Okay. That's correct.

Q. Okay. Now, if we could turn to what's page 25 of the document, it ought to be around 33 of the PDF, I'll ask you some questions about that.

Yes, right there.

A. Would it be possible just to blow that up a little bit?

Q. Yeah.

MR. MANDEL: And, in fact, I think the witness can just take control of the document, is that right, Jeff, using his mouse so he can really blow it up, zoom as might be comfortable for him. Or he can ask you to do it, I think.

Is that right, Jeff?

EXHIBIT TECHNICIAN: Yeah, I can give remote control. It just depends on what's most

Page 118

comfortable for Dr. Denis.

BY MR. MANDEL:

Q. So, Dr. Denis, whatever you prefer: If you'd like to take control of the document, that's all good; if you'd like us to navigate it for you, that's fine as well.

A. This size is good for me at the moment, so --

Q. Okay.

A. -- we can go ahead.

Q. Can you see that there's a heading there that says "Background of the Merger"?

A. I see that, yes.

Q. Okay. This describes the background of this merger; is that right?

MR. COMERFORD: Form.

A. It represents -- says the "Background of the Merger", yes.

BY MR. MANDEL:

Q. Got it.

The background of what merger is described here?

A. The merger that is being described in this proxy statement, Emerson.

Q. The acquisition of National Instruments by

Page 119

Emerson for $60 a share, is that the merger that's being described here?

A. The acquisition of National Instruments by Emerson for $60 a share.

Q. Okay. Now, if you look right there on that page, there's a paragraph beginning "On May 25th."

Do you see that?

A. I do.

Q. Okay. So this describes a May 25th letter from Emerson proposing to acquire all the outstanding shares of National Instruments for $48 a share; is that right?

MR. COMERFORD: Form.

A. That's correct. The second sentence describes a proposal to acquire all the outstanding shares of National Instruments, or abbreviated as NI sometimes, for $48 per share.

BY MR. MANDEL:

Q. Got it.

Is there an earlier offer to buy National Instruments described in this proxy?

MR. COMERFORD: Form.

A. No, I don't believe so.

BY MR. MANDEL:

Q. So this is the first proposal to acquire

Page 120

National Instruments by Emerson described in this proxy; is that right?

A. That's my recollection, yes.

Q. And that was a proposal to acquire for $48 a share, as we just mentioned; right?

A. Correct.

Q. Okay. Now, if you go to the next page, you'll see a paragraph near the top beginning with the words "On June 22nd." If you could flip to the next page.

And do you see there that there's a paragraph beginning "On June 22nd"?

A. That was an illustration of why it's perhaps not the best for me to have control of the document, since I almost rolled right past it. Okay.

I'm sorry. You said the paragraph beginning "On June 22nd"?

Q. Yeah. Do you see that?

A. I see this, yes.

Q. And this paragraph describes a June 22nd letter.

Do you see that?

A. I do.

Q. And this -- and according to this proxy, this letter again offered to acquire National

Page 121

Instruments' outstanding shares for $48 a share; is that right?

MR. COMERFORD: Form.

A. This letter, as it says, reiterated their proposal to acquire NI for $48 per share.

BY MR. MANDEL:

Q. Right. So this describes a second letter coming on June 22nd that states a $48 offer to buy the outstanding shares; is that correct?

A. That's correct.

Q. Okay. Now, if you look a little further down the page, there's a paragraph beginning on November 3rd.

Do you see that?

A. I see that, yes.

Q. Now, this describes what's called the November 3rd letter; is that right?

A. Correct.

Q. And the November 3rd letter, according to this, offered to buy National Instruments' outstanding shares now for $53 a share; is that correct?

MR. COMERFORD: Form.

A. That is correct.

BY MR. MANDEL:

Q. Okay. So this is the third communication

Page 122

that we've seen proposing to acquire National Instruments described in this section of the proxy; is that right?

A. That's correct.

Q. Now, if you would jump ahead a couple of pages to -- it's page 30 of -- the page number listed on the page is 30. It will be page 38 of the PDF. It will be near the top there.

But three or four paragraphs down, there's a paragraph beginning with the words "following the call."

Do you see that?

A. Yes, I do.

Q. Okay. So this paragraph describes a January 11th letter; is that right?

A. That's correct.

Q. And the January 11th letter, according to this, proposed to acquire 100 percent of the outstanding common stock of National Instruments, again, for $53 a share; is that correct?

A. That's correct.

Q. So this is the fourth letter that we're seeing described in this proxy proposing to acquire all the outstanding shares of National Instruments by Emerson; is that correct?

Page 123

MR. COMERFORD: Form.

A. That is correct.

BY MR. MANDEL:

Q. Now, if you skip ahead a few pages to what's page 34 of the document, it's -- should be PDF 42.

Do you see there all the way at the top, there's a paragraph, "In the afternoon of April 5th."

Do you see that?

A. I do.

Q. And this states that Emerson submitted on this date another proposal to acquire National Instruments, this time for $57 a share in cash; is that correct?

MR. COMERFORD: Object to the form.

A. This is stating that Emerson submitted a proposal to acquire NI for $57 a share -- sorry -- to purchase NI for $57 a share, yes.

BY MR. MANDEL:

Q. Okay. Now if you go to the next page, top of the page, do you see it starts, "On April 10th, 2023."

Do you see that?

A. I do.

Q. It states that Emerson submitted another

Page 124

proposal to acquire National Instruments, this time for $57.75 a share; is that right?

MR. COMERFORD: Form.

A. That is correct.

BY MR. MANDEL:

Q. And then further down on that page, there's a paragraph beginning, "On the afternoon of April 11th."

Do you see that?

A. I do.

Q. So this paragraph indicates that on April 11th, Emerson submitted another proposal to acquire National Instruments, this time for $59.50 a share; is that right?

MR. COMERFORD: Form.

A. That is correct.

BY MR. MANDEL:

Q. And then if you -- if we can just scroll down a little bit so we can see the bottom of the same paragraph.

Do you see near the bottom of that paragraph, it says that, later in the afternoon of April 11th, Emerson submitted another bid to acquire National Instruments, this time for $60 a share; is that correct?

MR. COMERFORD: Form.

Page 125

A. That is correct.

BY MR. MANDEL:

Q. And that's the price that ultimately was accepted and that the acquisition of National Instruments by Emerson was carried out at; is that correct?

A. That's my recollection, yes.

Q. So the bidding -- the bidding history we've just been over described in this background of the merger section, that resulted in the merger agreement here; is that right?

MR. COMERFORD: Form.

A. I'm not sure I understood that question.

BY MR. MANDEL:

Q. Well, we just looked at the background of the acquisition of National Instruments by Emerson described in this proxy; is that right?

A. We just looked at their description of that, yes.

Q. Right.

And that bidding history described -- do you agree with me that we just went over a bidding history described in that background of the merger section?

MR. COMERFORD: Form.

Page 126

A. Yes, I would agree that we've just gone over Emerson's description of the history of their involvement, yes.

BY MR. MANDEL:

Q. To be clear, we're reading a statement by National Instruments, not Emerson.

Do you understand that?

A. Yes.

Q. So this is National Instruments' description of the history of this transaction; is that right?

A. Fair enough, yes.

Q. Okay. And this background, this bidding history, resulted in a merger between these two companies; is that right?

MR. COMERFORD: Form.

A. The end result is that the two companies merged, yes.

BY MR. MANDEL:

Q. Right. There was a merger agreement that's disclosed with this proxy; is that right?

A. Correct.

Q. And this bidding history and negotiation history resulted in that merger agreement; is that right?

Page 127

MR. COMERFORD: Form.

A. Well, I'm not sure I can say how one thing led to another. I can say that the end result is there is a merger for $60.

BY MR. MANDEL:

Q. Okay. And this -- in addition to a merger agreement, this proxy includes a fairness opinion; is that correct?

A. I believe it did, yes.

Q. And this -- what we're reading here, this proxy, this is an SEC filing; is that correct?

MR. COMERFORD: Form.

A. That is correct.

BY MR. MANDEL:

Q. And so this merger agreement and fairness opinion and this background of the merger section are all set forth in an SEC filing; that's correct?

A. Everything we see here is part of the SEC filing, yes.

Q. Well, we're not looking right now at the fairness opinion of the merger agreement, but this -- you'll agree with me that this SEC filing includes a fairness opinion as well as a merger agreement; right?

A. That was my recollection, yes.

MR. MANDEL: Okay. Now, if we would look

Page 128

at the paragraph -- sorry, page 37, two pages further in the proxy. One more page.

Yeah, if we could scroll down a little more so we can see that. Yeah, "reasons for the merger" is where I'll start.

BY MR. MANDEL:

Q. So you see here there's a heading that says "Reasons for the Merger"?

Do you see that?

A. I see that.

Q. And, again, we're talking about the same merger whereby Emerson acquired National Instruments for $60 a share; is that right?

A. That's right.

Q. Okay. So if you look at the bullet, there's a bullet beginning with the words that "Emerson stated."

Do you see that?

A. I do.

Q. And in that bullet, it describes some of the bidding history we just went over.

Do you agree with me?

MR. COMERFORD: Form.

A. I -- it describes some of the prior prices that have been offered.

Page 129

BY MR. MANDEL:

Q. Right.

So it describes the $60 per share ultimate offer that was accepted; is that correct?

A. Yes.

Q. And it describes the -- it mentions the $57 offer, the 57.75 offer, and the 59.50 offer; is that right?

A. That's correct.

Q. And it notes that the ultimate $60 per share in cash price was a significant increase over Emerson's original offer to acquire NI at $48 a share; is that right?

MR. COMERFORD: Form.

A. That's what it reads.

BY MR. MANDEL:

Q. Do you dispute the accuracy of anything we've just read?

A. No, I do not.

Q. Okay. And then if we look at the bottom, the last bullet there, the one that begins that "the board has conducted."

Do you see that?

A. I see that.

Q. And it's describing extensive deliberations

Page 130

over a period of 11 total months since Emerson's first offer to acquire NI.

Do you see that?

A. You're looking at the third line of that?

Q. Yeah. The third line to the end of that bullet described --

A. I see it.

Q. -- an 11-month period, extensive deliberations over a period of 11 months.

You see that; right?

A. I see that.

Q. And the date of this document we saw was May 25th of 2023; correct?

A. That's correct.

Q. So what is 11 months before May 25th, 2023?

MR. COMERFORD: Form.

A. That would be June 25th of 2022.

BY MR. MANDEL:

Q. So before the class period in this case starts; is that right?

A. That's correct.

Q. So this is describing extensive deliberations over a period beginning before the class period in this case starts; that's right?

A. I think it's clear that the board

Page 131

extensively deliberated each proposal.

Q. But just to be clear, the 11 months we're talking about starts out, according to this, before the class period in this case; is that correct? Do you agree with me?

MR. COMERFORD: Form, foundation.

A. I agree the first two proposals took place before the class period and the board extensively considered those at that time and rejected them.

BY MR. MANDEL:

Q. And despite those rejections, the "Background of the Mergers" section proxy shows that the bidding continued; is that right?

MR. COMERFORD: Form.

A. Well, we know after the fact, yes, that Emerson did come back.

BY MR. MANDEL:

Q. And, ultimately, all that bidding culminated in this transaction; is that right?

MR. COMERFORD: Form.

A. Ultimately, the transaction took place at $60 a share, yes.

BY MR. MANDEL:

Q. And so you're not willing to say that the transaction took place as a result of all this bidding

Page 132

history that we've just described which culminated in a $60-a-share offer?

MR. COMERFORD: Form.

A. I mean, I'm not willing to tie some causal connection between specific prices and the ultimate price of 60. I'm just saying that a number of proposals took place. In the end, the two companies agreed to a $60 price.

BY MR. MANDEL:

Q. Well, how would you be able to tell whether an ultimate transaction resulted from its bidding history?

MR. COMERFORD: Form.

A. I think it's very difficult to tell. I mean, the companies potentially could have arrived at a merger price of $60 a share without any such bidding history. So it's not clear that the bidding history is an important element in determining that in the end the companies merge at $60 a share. That's all I'm saying.

BY MR. MANDEL:

Q. Okay. I guess, let's turn -- let's move on from this document right now. Let's turn to your report. If we could put your report up that's our tab 1.

I understand you have a printed copy of

Page 133

your report?

A. And just to be clear, we're talking about the second report that I filed in this matter.

Q. Yes, sir. The more recent --

A. August 27th date?

Q. Yes. August, yes.

A. Got it.

Q. So this is your report. You recognize the document on your screen?

MR. MANDEL: This will be our Exhibit 2; is that right?

That is not a question for you, Dr. Denis. This will be our Exhibit 2.

(Denis Exhibit 2 was marked for identification.)

BY MR. MANDEL:

Q. Now, did you write this report?

A. I did.

Q. About how much time did you spend writing this report?

A. I'm not 100 percent sure. I have been engaged on the matter for a while, and I haven't split up the time amongst the reports, but -- so I would just be speculating. I'm not sure I want to go there.

Q. Okay. Well, this report is responding to a

Page 134

report issued by Dr. Cain on July 28th, 2025; is that right?

A. That's -- that sounds correct. I can verify that by looking at my report, but that date sounds right.

Q. So you issued this report that we're talking about about 30 days after Dr. Cain's report to which you're responding; is that right?

A. Correct.

Q. So, presumably, you didn't work on this before receiving Dr. Cain's report; is that right?

A. That's correct.

Q. So you prepared this report during the 30 days after receiving Dr. Cain's report; is that right?

A. That's correct.

Q. Is this the only thing you worked on during that 30-day period?

A. Are you talking about all the work that I do or on this particular matter?

Q. Yeah. Did you work full-time on this report and nothing else during that 30-day period?

A. No. I'm a full-time academic, so I'm working on many other things.

Q. So you were teaching and taking care of

Page 135

your other academic responsibilities during that 30-day period; is that right?

A. I was not teaching during that 30-day period, but, yes, I was working on other academic things.

Q. Fair enough.

Did you do any other expert witness work during that period?

A. I believe I did since I testified in a sentencing hearing in September, so I would have been doing some work on that in advance.

Q. You were preparing to testify in a case during the same period?

A. Part of that same -- part of that same period.

Q. What case is that?

A. It's a case that's listed in Appendix B of my report on page B1, No. 6, United States versus Nader Pourhassan.

Q. And what was the date of that testimony? Is that listed here? I haven't found the page yet.

A. No, at the time of this report, I had not testified at that point yet.

Q. I see.

A. So the dates that are listed are things

Page 136

that I had done prior to that point. The sentencing hearing itself, if I recall correctly, was in late September of 2025.

Q. Did anybody help you write this report?

A. I had assistance in the analysis from the Analysis Group, team at Analysis Group.

Q. Anyone else?

A. No.

Q. Did counsel assist you in writing this report?

A. Well, counsel had some editorial comments once I drafted the report, but I don't know how you would view that as help.

Q. Now, your report expresses several opinions; is that right?

A. Correct.

Q. Do you intend to testify about any opinions other than those identified in your report?

A. Well, I have opinions that were expressed in my first report. So those are potentially items I could testify on as well. And to the extent any new information comes -- comes up and I'm asked to do additional work to render an opinion, I could potentially do that.

But at this -- at this point in time, the

Page 137

two reports contain my opinions in this matter.

Q. Understood.

Have you -- is there anything at this point that you'd like to change about any of the opinions you've set forth in either of your reports?

A. No, I would not.

Q. Have you reviewed Dr. Cain's reply report?

A. I have.

Q. Nothing in there made you want to change anything in your report?

A. Nothing in that alters any of the opinions I've expressed, no.

Q. Do you recall that Dr. Cain cites deposition testimony in his report?

A. Deposition testimony in general? Do you have a specific deposition testimony?

Q. Well, in his reply report, do you recall that he cites any deposition testimony?

A. I do.

Q. Okay. Did you review that section of his report?

A. I did.

Q. And nothing in there makes you change any of your opinions?

A. No, nothing.

Page 138

Q. Did you review the deposition transcripts themselves?

A. I did not review the full deposition transcripts. I reviewed the passages that were referred to.

Q. Okay. So you've not read the deposition transcripts in this case --

MR. COMERFORD: Form.

BY MR. MANDEL:

Q. -- is that correct?

A. I've read deposition transcripts. I've not read the full transcripts that Dr. Cain is alluding to in his most recent report.

Q. Did you -- you read Dr. Cain's quotes from the transcripts, or you actually read transcripts?

A. I read Dr. Cain's quotes from the transcripts.

Q. Understood. I appreciate the clarification.

We might as well do this now as you referred us to the exhibit.

The -- if we go to your Appendix C, which is, I guess, around page 52 of the PDF -- 51, rather, this is the appendix where you list the documents considered in your report; is that correct?

Page 139

A. That is correct.

Q. Does this Appendix C contain a correct list of the documents you reviewed for your report?

A. I believe so.

Q. And are there any other materials or other documents that you considered that you did not list here?

A. Not to my knowledge, no.

Q. So, for example, there's a list beginning at the bottom of this page that goes onto the next page listing academic literature that you considered.

That's a complete list of all the academic literature you considered in connection with preparing this report; is that correct?

A. That's a correct statement in the sense of the literature that I'm specifically citing to in my report.

To say that I haven't considered all the academic literature that I've read over my entire career, that would be incorrect, and I wouldn't -- I wouldn't list them all here, obviously. But those things are a cumulative body of knowledge that I've accumulated.

Q. Right. I'm not asking whether you're listing every piece of academic literature that, you

Page 140

know, forms the basis of your expertise over your long career.

I'm saying in connection with this report, this is a complete list of the academic literature you considered; is that fair?

MR. COMERFORD: Form.

A. I think that's fair, yes.

BY MR. MANDEL:

Q. Okay. Let's just -- like legal documents at the top of this page, is this the -- an entire list of the legal documents that you considered in preparing this opinion?

A. I believe so.

Q. Okay. And I assume the same is true for all the other categories on this page, is that right, that these are complete lists of the materials you considered; is that right?

A. I believe so, yes.

Q. So, for example, we were just talking before about whether you've reviewed any deposition testimony.

You list here only the -- your earlier deposition testimony and Dr. Cain's deposition testimony from June 3rd; is that right?

A. That's correct.

Page 141

Q. Consistent with what you just told me, that you didn't review any other deposition transcripts; right?

A. Not the transcripts themselves, no.

Q. Understood.

If we scroll down a little bit, there's produced case documents. These are documents that are produced in discovery in this case.

Is that a correct understanding?

A. That's my understanding, yes.

Q. And is this a complete list of all the discovery documents that you considered in this case?

MR. COMERFORD: Form.

A. It's a complete list of the documents themselves that I've reviewed. There are references to other documents in, say, Dr. Cain's reports. I considered those references.

BY MR. MANDEL:

Q. But you've not reviewed any other produced case documents than are listed here; is that right?

MR. COMERFORD: Form.

A. For the purpose of this specific report, no.

BY MR. MANDEL:

Q. And you mentioned a moment ago that

Page 142

Dr. Cain references produced case documents as well; is that right?

A. He does reference some, yes.

Q. And you said that you reviewed those references; is that right?

A. That's correct. And I reviewed some of the documents themselves in the context of my prior report.

Q. Right.

So documents that are identified in your prior report are documents you considered. And documents identified here, produced case documents, are documents you considered.

But beyond those two lists of produced case documents, you did not consider other documents produced in this case in preparing your report; is that right?

MR. COMERFORD: Form.

A. I believe that's correct.

BY MR. MANDEL:

Q. Okay. So did you ask for any of the documents that Dr. Cain -- other than the ones you're identifying here in produced case documents, did you ask to see any of the other documents that Dr. Cain cites or references in his report?

A. I must not have. If I asked to see any documents, they were made available to me. So documents

Page 143

that I have considered are ones that I asked to see.

Q. I see.

So you did not ask to see the factual case-produced documents that Dr. Cain is discussing in his report other than, perhaps, what you've identified in your produced case documents; is that correct?

MR. COMERFORD: Form.

A. Well, again, I have to draw a distinction between are you asking about this particular report or are you asking about both reports combined? Because I've looked at a number of produced case documents.

Were those specific ones considered in the context of this report? Perhaps not.

BY MR. MANDEL:

Q. Understood.

But to be clear, there's a list of produced case documents in this report and in your earlier class certification report. And if we combine those lists, they represent the sum total of produced case documents that you have reviewed in connection with both of your reports; is that correct?

MR. COMERFORD: Form, mischaracterizes prior testimony.

A. I believe that's -- that's correct.

BY MR. MANDEL:

Page 144

Q. Okay. Now, if we can go to your report, to page 3 of your report, it's page 5 of the PDF, I'm going to ask you about paragraph 8 of your report.

We'll have a look, and I'm going to ask you about that.

Now, you're describing in this paragraph 8 an instruction from counsel; is that correct?

A. That's correct.

Q. This is an instruction from which counsel?

A. I'm not sure what you mean by "which counsel."

Q. Who instructed you? You're saying counsel has instructed. Who? Which counsel?

A. My discussions with Mr. Comerford, primarily.

Q. So Mr. Comerford instructed you to make this assumption that's described here in this paragraph 8; is that correct?

A. I believe that's correct, yes.

Q. And this is an assumption -- I'm sorry. I didn't meant to interrupt.

A. I said to the best of my recollection, yes.

Q. Okay. Now this assumption is an assumption about what information is alleged in this case; is that right?

Page 145

MR. COMERFORD: Form.

A. This is an assumption about what the alleged omitted information would include.

BY MR. MANDEL:

Q. So this is an assumption about what is alleged in this case; is that right?

MR. COMERFORD: Object to the form, calls for legal conclusions, foundation.

A. I mean, the -- if I can back up a second. I mean, the -- the issue here, it begins with the fact that Dr. Cain has not really identified what information has been allegedly omitted. And so for me to proceed in analysis, I need to make some assumption about what that would be.

I'm obviously not a lawyer, so I rely on counsel to instruct me as to what the nature of that alleged omitted information would be.

BY MR. MANDEL:

Q. Did counsel give you this assumption in writing?

A. I don't actually recall whether it was specifically in writing or if we were discussing it over the phone and I'm writing it down as we're discussing it.

Q. So it's possible -- you don't recall is

Page 146

what you're saying; is that right?

A. I don't recall off the top of my head the exact way it took place.

Q. Got it.

So it could be that counsel actually provided this block quote to you in writing; is that right?

MR. COMERFORD: Object to form, calls for speculation.

A. Yeah, it could be, because I don't recall exactly the way it came. I think it could be that we had a discussion, I wrote down my understanding of the discussion, it gets edited, moving back and forth with counsel. That -- all of that is possible.

BY MR. MANDEL:

Q. Got it.

Okay. Now, do you believe that this assumption regarding the allegations of this case given to you by counsel is true?

MR. COMERFORD: Form.

A. I believe it matches the facts in the case as I've reviewed them: That there were, in fact, two unsolicited proposals that were received. I've seen evidence that the board carefully considered this in conjunction with discussions with financial advisors and

Page 147

lawyers. I've seen the letters in which they communicated to Emerson that they were rejecting these proposals, and that they didn't see any basis for further discussion.

So all that fits my understanding of the fact patterns in this matter.

BY MR. MANDEL:

Q. Okay. You just said that you've seen letters in which they communicated to Emerson that they were rejecting these proposals; is that right?

A. I've seen copies of the letters themselves.

Q. Yeah. Well, you just said it was the Emerson. You mentioned Emerson just now; right?

A. I did.

Q. So does the assumption about alleged information that could have been -- that was withheld from investors, according to this, does it mention Emerson?

MR. COMERFORD: Form.

A. I'm sorry. Could you repeat that again?

BY MR. MANDEL:

Q. Well, you're telling me you know that Emerson was the offeror.

Is the fact that Emerson was the offeror included in your assumption about the withheld

Page 148

information?

MR. COMERFORD: Form.

A. No. The assumption is more general than that.

BY MR. MANDEL:

Q. I see.

So you know it is a fact that Emerson was the offeror here; is that right?

A. I've seen evidence to that, and we've gone through some evidence today. I --

Q. And you've reviewed the complaints in this case -- oh, I'm sorry. Go ahead.

A. I said we've discussed earlier the -- the history of Emerson in this merger, ultimate merger of the two companies, yes.

Q. And you've reviewed a complaint in this case; is that right?

A. I have.

Q. And the complaint alleges that Emerson was the offeror; is that right?

MR. COMERFORD: Form, foundation.

A. As I recall, it does specifically mention Emerson.

BY MR. MANDEL:

Q. And that information was not disclosed to

Page 149

shareholders during the class period at issue in this case; is that correct?

A. That's my understanding, yes.

Q. Okay. So you know of facts that are alleged to have been withheld in the complaint and that are not included in your assumption provided by counsel about what information was withheld; is that correct?

MR. COMERFORD: Form, calls for legal conclusions.

A. I am aware that Emerson was the party to make proposals to National Instruments. I'm not offering any opinion on what sort of disclosure should be made in such a situation. That's -- that's not an expert opinion, that's a legal opinion.

BY MR. MANDEL:

Q. Sure. But you're making an assumption about what information NI is alleged to have withheld; right? It says it in the first sentence of the block quote assumption right there; right?

A. That first sentence, yes.

Q. And that assumption is provided by counsel; right?

A. That is correct.

Q. And that assumption does not include that Emerson was the offeror; is that correct?

Page 150

A.   That's correct.

Q.   Okay.  What was the nature of the consideration offered?

MR. COMERFORD:  Form.

A.   You have to be a little more specific than that.  I don't have --

BY MR. MANDEL:

Q.   Did they offer securities?  Did they offer to buy the company for $48 worth of stock?

A.   They being?

Q.   Did Emerson -- Emerson, the offeror that's not mentioned in your assumption, did that offeror offer a certain form of consideration in this case?

MR. COMERFORD:  Form, calls for legal conclusions.

A.   My recollection is that their offer was cash.

BY MR. MANDEL:

Q.   It was a cash offer; right?  Is that fact mentioned in this assumption?

A.   That fact is not specifically mentioned here.  But in -- the purpose of my report, remember, is that I'm evaluating Dr. Cain's assessment of economic materiality.  He is factoring in some of these things that you're mentioning, and so I'm assessing whether he

Page 151

has established that materiality or not.  So this particular assumption doesn't affect that analysis.

Q.   I'm not sure I understood that question -- that answer.  Sorry.

You employed an assumption here provided by counsel about what information NI is alleged to have withheld from investors.  The consideration of this deal with cash that's alleged in the complaint -- we can go over that if you'd like -- is it included in your assumption; yes or no?

MR. COMERFORD:  Form.

A.   It is not mentioned in this paragraph, no.  They had received two unsolicited, nonbinding proposals, is the way that assumption is characterized in the proposals.

BY MR. MANDEL:

Q.   Got it.

So your assumption excludes who the offeror was, as well as the fact that this was a cash consideration offer; is that correct?

MR. COMERFORD:  Form.

A.   Those two are not mentioned in this list of assumptions.  Again, as I was just saying in my earlier response is that those con- -- the economic materiality of those factors do get considered in the analysis in my

Page 152

report.

BY MR. MANDEL:

Q.   Sure.  But as to my question, you're directed to assume something by counsel.  That assumption doesn't include facts alleged in this case; is that correct?

MR. COMERFORD:  Objection, mischaracterizes testimony, asked and answered, form.

A.   I mean, I think the paragraph speaks for itself as to what the assumption is.

BY MR. MANDEL:

Q.   Okay.  The complaint alleges that Emerson told National Instruments that acquiring National Instruments was Emerson's, quote, highest strategic priority, end quote.

Is there anything about that in your assumption here?

MR. COMERFORD:  Form.

A.   That's not mentioned in this paragraph, no.

BY MR. MANDEL:

Q.   Okay.  So it's not part of the assumption that counsel directed you to make here; is that correct?

MR. COMERFORD:  Form.

A.   That's correct.  But, again, I'd say it becomes irrelevant once you take into account the -- the

Page 153

double rejection of these -- of these two proposals.  Some of these individual characteristics of the proposal become economically immaterial.

BY MR. MANDEL:

Q.   The complaint alleges that Emerson had informed National Instruments that it was prepared to move very quickly to do a transaction.

Do you recall that from the complaint?

MR. COMERFORD:  Form.

A.   I do recall that being alleged, yes.

BY MR. MANDEL:

Q.   Okay.  Do you recall that from the letters that Emerson submitted to National Instruments, that you considered it in connection with preparing this report?

MR. COMERFORD:  Form.

A.   I recall reading language to that effect.

BY MR. MANDEL:

Q.   Okay.  So that information is also not included in the assumption counsel directed you to make about the information that NI is alleged to have withheld; is that correct?

MR. COMERFORD:  Form.

A.   I mean, there's sort of an overarching statement here about two unsolicited proposals.  I don't have an opinion about the granularity of what the

Page 154

disclosure about those proposals would be. But that specific aspect of it is not included in this paragraph, that's correct.

BY MR. MANDEL:

Q. Okay. So you read the complaint; right?

A. I did.

Q. You read the complaint before you wrote this report; right?

A. I did.

Q. You understand that a complaint is full of allegations; is that right?

MR. COMERFORD: Form, legal conclusions.

A. My understanding is that there are many allegations, yes.

BY MR. MANDEL:

Q. All right. And so you were -- you were aware that the complaint alleges that the information that was withheld from investors included that Emerson was the offeror, this was a cash offer, and that Emerson stated that the transaction was its highest strategic priority and was prepared to move quickly; is that right?

MR. COMERFORD: Form, asked and answered.

A. I'm aware that those things were mentioned by Emerson. I'm also aware that they become less -- far

Page 155

less salient once the company has considered all these things, taken it to the board, taken it to his financial advisors, consulted with their counsel, and decided that transaction is not in the best interest of the shareholders and that they see no basis for further discussion. That renders those other elements immaterial.

BY MR. MANDEL:

Q. I understand you want to say all of that, but I'm not actually even asking you about your materiality opinion or whatever, which we'll turn to. I'm only asking you just about this assumption.

And counsel directed you to assume that there were certain allegations in this case about what information was withheld; is that correct?

MR. COMERFORD: Form.

A. Counsel has given me instructions as to what information is allegedly withheld from investors.

BY MR. MANDEL:

Q. And you read a complaint filled with allegations, including allegations of other information that was withheld from NI investors; is that correct?

MR. COMERFORD: Form.

A. That is correct. But, again, this assumption is made for the purposes of my analysis.

Page 156

That analysis is going to assessing Dr. Cain's opinions on economic materiality, loss causation, damages.

And so for that purpose, I need an assumption that captures the salient features, in my opinion, of what's going to be important to investors.

BY MR. MANDEL:

Q. So this isn't your first expert opinion; right?

A. Correct.

Q. Have you ever been involved in another case where counsel directed you to make an assumption about what is alleged in the case that's different from what was actually alleged in the complaint?

MR. COMERFORD: Form, mischaracterizes evidence, mischaracterizes testimony.

A. I think in this case, as I was getting at before, the issue is how do I respond to Dr. Cain's report. That's my assignment, is to respond to the opinions that he's given in his report.

In his report, he speaks to the economic materiality of alleged omissions. He doesn't define for me what those are.

Counsel has offered a blanket statement of -- or assumption, sorry, as to -- as to what that alleged omitted information would include. That's

Page 157

what -- that's what's listed here.

As I proceeded in the report, though, this assumption is not -- is not critical in the sense that I'm evaluating what Dr. Cain did. I'm not offering an opinion in the end of economic materiality; I'm offering an opinion on whether Dr. Cain demonstrated economic materiality.

BY MR. MANDEL:

Q. Right. You're saying that this assumption is not critical to your analysis. Just now you testified to that; is that right?

A. There's a lot of the analysis in -- in this report for which this isn't critical. It is, as I said before, capturing what I would consider as an expert the most salient part of the information that investors would want to know in this matter, which is that these two proposals were considered by the board and ultimately rejected by the board with, in their opinion, no basis for further discussion.

Q. You created a defined term here in paragraph 8, actually three defined terms, right, which you use interchangeably: Alleged omitted information, alleged omissions, and material nonpublic information, MNPI; is that right?

A. Those -- those terms are all in this

Page 158

paragraph, yes.

Q. Right.

And they are in quotes, meaning you're sort of establishing them as defined terms in this paragraph; is that right?

A. I think they're in quotes because they are the phrases that are used in Dr. Cain's report.

Q. Doctor -- I'm sorry. I don't believe that's correct that Dr. Cain made these capitalized terms in his report.

A. No, I don't think so.

Q. No.

And Dr. Cain certainly didn't define these terms the way you're defining them in this paragraph; is that right?

A. No. And I think that's -- that's part of the problem, is that he uses these terms not in capitals as you pointed out. He uses them in what appears to be an interchangeable manner in the report, but he's very unclear on -- on what they are.

Q. I see.

Now you use these defined terms repeatedly throughout the rest of your report; is that right?

A. I think I use these terms throughout the report, yes.

Page 159

Q. Now, you refer back to these defined terms that are defined by this assumption from counsel; is that right?

MR. COMERFORD: Form.

A. I do.

BY MR. MANDEL:

Q. You do so numerous times in this report; is that right?

A. I do. And, again, primarily what I'm referring to is -- is the -- is what I've described as the most salient aspect of this assumption, is that these proposals were rejected.

Q. Looking back at this -- the paragraph with the assumption, do you see there it says, "Received a $48 per share offer in May and June 2022."

Do you see that?

A. I see that, yes.

Q. It doesn't mention what date in May or June, does it?

A. It doesn't.

Q. So could -- with this information -- the complaint alleges the specific date of these $40 per share offers; is that correct?

MR. COMERFORD: Form.

A. As I recall, the complaint had specific

Page 160

dates, yes.

BY MR. MANDEL:

Q. Now, to measure the premium of an offer compared to the immediately preceding stock price, you'd need to know the date of the $48 per share offer; is that correct?

MR. COMERFORD: Form.

A. If you're measuring the premium the way I think you just described it, which is the premium relative to the most recent price. That's not always the way premium is measured, however.

BY MR. MANDEL:

Q. Well, in this case, do you recall whether the premium over the previous date's price was, say, included in Emerson's offer letters?

A. Off the top of my head, I'm not remembering that, no.

Q. Okay. I'll represent to you that it was. It's -- we've been over that -- those documents numerous times in depositions in this case.

So an investor who hasn't been told this allegedly omitted information could not have determined the premium of the $48 offer price over the most recent trading price of the stock; is that right?

MR. COMERFORD: Form, foundation, calls for

Page 161

speculation, hypothetical.

A. They wouldn't -- if they didn't know the date, they wouldn't be able to calculate the premium relative to the previous day's close. They could have calculated in a different way, which is oftentimes the way it's done.

BY MR. MANDEL:

Q. But before you were testifying that -- something to the effect that this assumption set forth in this block quote is the most salient information. You said something like that.

Do you know what I'm talking about?

A. I think I referred to the fact that National Instruments' board rejected each of these proposals as being the most salient.

Q. No. When I was asking you about, you know, this doesn't include that Emerson was the offeror, this doesn't include the fact that it was cash, all these pieces of information it doesn't include, your response was that this includes what was most salient; is that right?

A. I did say that I considered the fact that they were rejected to be the most salient piece of information, yes.

Q. Is the -- this notion that what you have

Page 162

here is the most salient information, was that an assumption provided by counsel?

MR. COMERFORD: Form.

A. I don't believe counsel ever -- ever used those terms, no.

BY MR. MANDEL:

Q. So it's your expert opinion that what's included in this paragraph is what's most salient?

MR. COMERFORD: Form.

A. Yes. It goes back to what I was describing earlier in terms of assessing Dr. Cain's report. There could be many features of the offer, including the identity of the offeror, or the consideration that's being offered, the price that's being offered.

But if, in the end, the board takes all that information into account and rejects these proposals and says there's no basis for further discussion, that renders those features unimportant.

BY MR. MANDEL:

Q. So it's your expert opinion that the fact that Emerson was the offeror is not salient information?

A. I don't believe it's something investors would have considered important once they understood that these proposals had been rejected.

Q. And the fact that this is a cash offer, not

Page 163

salient?

A. That's information that the board had considered. Taking that into account, they had determined that this is not in the best interest of the shareholders, and they rejected the proposal.

Q. Before you testified, your words were "most salient," that this includes what was most salient.

Is it your view that the fact that Emerson was the offeror is not salient information at all, or is it salient but just not the most salient?

MR. COMERFORD: Form.

A. I've seen no evidence that would lead me to believe that it is an economically material aspect of this. And Dr. Cain is not offering any.

BY MR. MANDEL:

Q. Did counsel use the word "salient"?

MR. COMERFORD: Form.

A. I don't recall him ever using that word, but I can't reject the possibility that they at some time used that word.

BY MR. MANDEL:

Q. Did counsel use a word similar to "salient"?

MR. COMERFORD: I'm going to object. I think you're intruding on privilege at some point here.

Page 164

BY MR. MANDEL:

Q. So counsel did use a word similar to "salient," I guess, but we can move on.

MR. COMERFORD: Form.

BY MR. MANDEL:

Q. Now, let's turn to page 4 of your opinion, which will be the next page.

Now, here, you have a section called "Summary of Opinions"; is that right?

A. That's correct.

Q. This section contains summaries of your opinions expressed in this report; is that correct?

A. Yeah. It's certainly encapsulating the opinions that I'm offering in this report that are explained in more detail elsewhere in the report.

Q. Right. I mean, you use the word "summary of opinions" here. That's all I'm just latching on to.

Each of the bullets in this paragraph 11 represents a summary of an opinion that you provide later in greater detail; is that right?

MR. COMERFORD: Form.

A. I think that's fair.

BY MR. MANDEL:

Q. You think -- I seem to recall in our last deposition, we had a whole back-and-forth about what was

Page 165

a summary and what isn't a summary. So I'm just trying to make sure we're using the terms fairly and consistently.

A. Fair enough.

Q. So let's look at the first bullet here, the first summary of an opinion in the paragraph beginning, "Dr. Cain has not established."

So are you offering an opinion that the information omitted in this case was not material?

MR. COMERFORD: Form.

A. No. I'm offering an opinion, as I explained before, about whether Dr. Cain has established the materiality of the alleged omissions.

BY MR. MANDEL:

Q. Right. So the extent of your opinion on this point is your view that Dr. Cain has not shown materiality, not that materiality doesn't exist here; is that correct?

MR. COMERFORD: Form.

A. I think that's fair.

BY MR. MANDEL:

Q. Have you made any assessment of materiality in this case independent of Dr. Cain's opinion?

A. Not independent of Dr. Cain's opinion. I think that would require a more full-blown analysis that

Page 166

I haven't been asked to do and I haven't done.

Q. So in your view, to provide an opinion concerning whether the omitted information here was material would require a more full-blown analysis, to use your words, than you've done thus far; is that correct?

A. I think I'd have to think very carefully about how best to do that. And that's just not something I've done at this point.

Q. Understood.

How would you go about determining if omitted information was material if you were offering such an opinion?

A. Well, I'd --

MR. COMERFORD: Form.

A. As I just explained, I would need to -- I'd need to step back and think very carefully about the whole thing. And I haven't done that yet, so I really can't answer that question.

BY MR. MANDEL:

Q. So you've given no thought to how you would determine whether the information at issue here was immaterial; is that fair?

MR. COMERFORD: Form.

A. Well, to the extent that Dr. Cain has done

Page 167

a fair amount of analysis, and I'm evaluating that analysis, I've put considerable thought into -- into certain things that could be done.

BY MR. MANDEL:

Q. Do you have a definition of materiality?

A. I would need to make one if I were to do that, sir, an analysis. In this case, I see how Dr. Cain has defined economic materiality. I understand there are differences at times between the definitions of economic materiality and the legal definition of materiality.

I'm not really getting into that at all. I'm accepting what Dr. Cain has defined as economic materiality and then assessing whether he has shown that it exists or not.

Q. Understood.

So you are opining that Dr. Cain has not shown materiality here, but you have no independent definition of economic materiality; is that correct?

A. I'm not independently defining it. I'm observing how Dr. Cain has defined it, which I think is a fairly standard definition of economic materiality. And I'm simply assessing whether his evidence demonstrates that this information would be economically material.

Page 168

Q. Got it.

So if we look at paragraph 13, which is on the next page, just -- I'll come back to this in a second, but paragraph 13 on page 5, which is the next page, looking at the bottom --

MR. MANDEL: Can we navigate the document to the next page near the bottom, please? A little more. Nope, nope. To the bottom of page 5 and onto the next page. There we go.

BY MR. MANDEL:

Q. Right there, that paragraph 13, that's the definition of economic materiality that we were just referring to that Dr. Cain informs; is that right?

A. That's correct.

Q. And I think you just testified that this is a relatively standard definition of materiality -- of economic materiality.

Do you agree with that?

A. I think it is, yes.

Q. If you were asked to prepare an opinion about materiality, do you think you would use a definition that was in words or substance consistent with this definition?

A. Sitting here today, I don't have one in mind that would be substantively different from this

Page 169

one.

Q. So your report is tied to this definition of materiality, not another one; is that correct?

MR. COMERFORD: Form.

A. I think that's fair in the sense that I'm responding to Dr. Cain's report, and this is how he's defined it.

BY MR. MANDEL:

Q. Got it.

And we'll turn to -- it says here, if we go back to page 4, to the summary page, what --

MR. MANDEL: Jeff, are you with us?

EXHIBIT TECHNICIAN: Yeah. Sorry.

MR. MANDEL: Okay. So when I say can we navigate to something, I'm kind of asking you to do it if I don't say your name. So if we can scroll back a page to page 4 -- yeah, here we go -- to these summaries.

BY MR. MANDEL:

Q. So, again -- and we'll turn to it in a minute. But just to connect the dots for us, this opinion that we were just looking at, the first opinion described in paragraph 11, section 3 of the report is where you fleshed that out in greater detail; is that right?

Page 170

A. I'm sorry. Fleshed what out in greater detail?

Q. Your first opinion.

Your opinion -- you have an opinion here in the first bullet of paragraph 11 that Dr. Cain has not established that the alleged omissions -- again, there is your defined term -- were economically material. And I'm just confirming your opinions on your -- your opinion is described in greater detail and in support in section 3 of this report; is that right?

A. That's correct, yeah.

Q. Okay. Good. So we'll turn to that shortly. I just wanted to lay that groundwork.

Let's look at the top of the next page. It's another one of your opinions, so...

A. This is the top -- the top of page 5?

Q. Yes, sir. The opinion beginning with the words "Even if I assume."

Okay. So there's various things you say before this about, you know, materiality and causation and so forth. And you say here, you know, assuming -- even if I'm wrong about all of the things I've just said, you conclude that there is no economic basis -- there's still no economic basis for Dr. Cain's speculative but-for price of $48 a share.

Page 171

Do you see that?

MR. COMERFORD: Form.

A. Yeah. I mean, you didn't read the entire part before that, but, yes, I see that.

BY MR. MANDEL:

Q. Correct. No, I'm just summarizing it and focusing you in on it.

So here, your opinion is that Dr. Cain's $48 per share but-for price is wrong; is that right?

MR. COMERFORD: Form.

A. That's fair, yes, in that sentence.

BY MR. MANDEL:

Q. Yes. Yes. Understood.

Are you providing an opinion about what the correct but-for price was?

A. No, I am not offering an opinion about the -- what the correct but-for price is.

Q. And are you offering an opinion on how to calculate damages based on a but-for price?

A. Well, I've offered opinions about alternative but-for worlds that Dr. Cain hasn't considered that would make the damages equal to zero.

So in these scenarios, you know, the but-for price is exactly what the actual price was. That's in a prior bullet point.

Page 172

Q. Understood, yeah.

But leaving that aside, I'm talking just about this. Are you -- this is describing -- are you offering a different but-for price in this opinion discussed in this paragraph?

A. I have not calculated in this paragraph an alternative but-for price. I've illustrated one using a different research article that I think is closer to the facts in this matter than some that Dr. Cain is appealing to.

But I'm not characterizing it as my opinion that that's the appropriate but-for price, as I do point out that it's not an exact replica of the situation we're looking at here.

Q. So just to be clear, you're not offering an opinion about an alternative but-for price. Your opinion here, rather, is that Dr. Cain's $48 per share but-for price is speculative; is that right?

A. It's not just speculative, but I think "incorrect" was the term you used.

Q. Yeah. Wrong -- it's disagreeable?

A. There's no economic basis for that price, is what my opinion is saying.

Q. Understood.

But your opinion -- I'm just trying to

Page 173

establish that your opinion is that you disagree with Dr. Cain's opinion here, and you think he's wrong. You're not offering an alternative opinion about what the right but-for price is; is that fair?

MR. COMERFORD: Form.

A. Well, if you take the conditional statement that begins that paragraph, that is correct. So even if I were to assume that he had established economic materiality, I've offered the opinion that he hasn't, in which case there wouldn't be damages. But even if I assume that he has, this price is speculative, and there's no economic basis for it.

MR. MANDEL: Can we take like a very short break here, please?

MR. COMERFORD: Sure.

VIDEOGRAPHER: We are going off the record at 10:36 a.m.

(A break was taken.)

VIDEOGRAPHER: We are back on the record at 10:46 a.m.

BY MR. MANDEL:

Q. Dr. Denis, have you ever heard -- you've heard the term "M&A"; is that right?

A. I have, yes.

Q. It's for mergers and acquisitions; correct?

Page 174

A. Correct. That's the way I interpret it.

Q. I'm sorry?

A. That's the way I interpret it, yes.

Q. Fair. Fair.

It's a term -- you define it as a term in your report. It's used throughout the literature.

What is M&A?

MR. COMERFORD: Form.

A. Mergers and acquisitions is how I refer to a broad spectrum of transactions. Different people use the term differently. Some are very technical about referring to simply mergers and tender offers. Others are going to encapsulate other types of restructurings that could include leveraged buyouts, leveraged restructurings. It tends to be a bit of a catch-all term.

BY MR. MANDEL:

Q. Broadly speaking, does M&A refer to the process of buying or combining with companies through financial transactions?

MR. COMERFORD: Form.

BY MR. MANDEL:

Q. Is that a fair working definition of M&A?

A. Yes, it's reasonable enough. Not necessarily financial transactions, per se, but --

Page 175

Q. But through transactions --

MR. COMERFORD: Form.

BY MR. MANDEL:

Q. -- Fair?

A. Okay. Sure.

Q. Thank you.

So M&A has to do with buying companies; is that right?

MR. COMERFORD: Form.

A. There are purchases that are made in M&A, yes.

BY MR. MANDEL:

Q. Right.

Like in this particular case, how would you describe the -- Emerson's acquisition of National Instruments? What type of M&A transaction was it?

A. It was a transaction in which they offered $60, ultimately, in cash for the shares of National Instruments.

Q. They acquired all -- they acquired the company by acquiring all the outstanding shares of the company; is that right?

A. Yes.

Q. That's an acquisition; is that right?

A. Yes.

Page 176

Q. And then they -- and then they merged that entity into the new parent company, Emerson; is that right?

MR. COMERFORD: Form.

A. There may be some legal definitions of mergers that are met or not met in this case; I'm not sure. But they essentially incorporated National Instruments into the existing company of Emerson.

BY MR. MANDEL:

Q. So what are the ways in which an acquirer can buy all the outstanding shares of a company?

MR. COMERFORD: Form.

A. They can offer cash for those. They can offer something else for the shares.

But if what your -- your question, as I understand it, is saying that they are ultimately acquiring the shares, then they need to offer some consideration for those shares in exchange for those shares.

Q. Now, an acquirer can do that through negotiations with the company's management and board; is that correct?

A. It could.

Q. Is that what happened in this case?

MR. COMERFORD: Form.

Page 177

A. Ultimately, I'd have to go back to -- to review the proxy to say exactly what happened in those last couple of rounds. But -- but that does happen.

BY MR. MANDEL:

Q. Are there ways in which an acquirer can buy all the company's outstanding shares not through negotiations with company's management and the board?

A. An acquirer could make an offer directly to existing shareholders.

Q. Is a tender offer an example of an offer directly to the shareholders like you're describing?

A. It is.

Q. A tender offer is another way in which an acquirer can buy all the outstanding shares of a target company's stock; is that correct?

A. That's correct.

Q. Would you agree that mergers and acquisitions are generally transformative events for companies?

MR. COMERFORD: Form.

A. I would say they are sometimes transformative events. They can be transformative in a positive way or a negative way. And other times, they're not particularly transformative.

BY MR. MANDEL:

Page 178

Q. What would be an example of a merger acquisition that was not transformative?

A. A good example of one would be one in which a party that's being acquired is a relatively insignificant part of the -- of the new combined business once the deal has been done.

Q. So that might -- so would the -- in the factual scenario you're just describing, would M&A be a transformative event for the acquired company?

MR. COMERFORD: Form.

A. I'm unclear whether it's transformative for the acquired company.

BY MR. MANDEL:

Q. Well, a company would be independent, and then it would be owned by another company.

Is that transformative?

MR. COMERFORD: Form.

A. It may or may not be transformative. You know, it would depend on the prior ownership structure and what's different now that it's owned by this company versus however it was owned before.

BY MR. MANDEL:

Q. Okay. Do you agree with me that M&A has serious repercussions for firms or their investors?

MR. COMERFORD: Form.

Page 179

A. Oftentimes, yes.

BY MR. MANDEL:

Q. So M&A can have very serious percussions -- repercussions for investors, for example?

MR. COMERFORD: Form.

A. Are you talking about investors in general? Investors of the acquirer? Investors in the target? Which investors?

BY MR. MANDEL:

Q. Well, I mean, so let's say for now we're talking about investors of the target company.

Is a -- is a merger or acquisition of a company an event with serious repercussions for the investors in that target company?

A. On average, the evidence has shown that successful deals are associated with significant changes in the value of the target's shares.

Q. And, you know, in -- in the scenario we were just talking about, the acquired company's shareholders and that they'd not be shareholders of that company because it was acquired, and they would have received some other form of consideration; is that fair -- is that a fair description of reality?

MR. COMERFORD: Form.

A. I'm not -- I'm not sure I understood that.

Page 180

BY MR. MANDEL:

Q. So the target company's shareholders, when a target company is acquired, end up in a position where they're no longer the target company's shareholders; is that right?

A. They may still be indirectly, depending on the consideration that's paid. But their -- their -- their relationship is different than what it was before.

Q. Right.

In that instance, the one you're describing, if they've received shares, they are no longer direct shareholders of the company that was acquired, they'd now, for example, be shareholders of the acquiror and, thereby, have an indirect interest in the acquired company.

That's what you mean?

A. That's correct, yes.

Q. And, of course, if they were to receive cash consideration, then M&A would have serious repercussions for those target company investors; is that right?

MR. COMERFORD: Form.

A. Well, I guess I don't know what you mean by "serious repercussions" in that -- in that instance.

BY MR. MANDEL:

Page 181

Q. Well, the acquired company's shareholders would no longer be shareholders of the company and would, instead, own cash; is that right?

A. That's a correct description, yes.

Q. So M&A would have real repercussions for those investors; is that right?

MR. COMERFORD: Form.

A. They would have repercussions in the sense that they would now own a different asset than they owned before. They own cash; whereas, before, they owned shares in -- in the target company.

BY MR. MANDEL:

Q. Now, if an acquired -- if a target of an acquisition proposal rejects the acquisition proposal, does that mean that the acquirer cannot acquire the company?

MR. COMERFORD: Form, hypothetical.

A. In general, it wouldn't necessarily mean that, no.

BY MR. MANDEL:

Q. An acquiring company can proceed to acquire its target even if the target rejects an acquisition proposal; is that correct?

MR. COMERFORD: Form.

A. It depends on the nature of the rejection

Page 182

and what the -- what sort of actions the target takes.

BY MR. MANDEL:

Q. Well, is there a scenario in which a rejected offer can totally stop an acquirer from proceeding to acquire the company?

A. Can't stop an acquirer from having interest in acquiring a company. But if the company has the ability to -- to just reject offer after offer, if they have the ability to erect defensive measures that would block any hostile transaction, then they can effectively block a particular acquirer from ultimately acquiring the firm, if they wish.

Q. Sir, you're mentioning other defensive mechanisms and things like that, but I'm talking about simply a rejection. Acquirer makes a proposal; target says, I reject your proposal. I don't want to be acquired.

Can that alone prevent an acquirer from successfully acquiring that target?

MR. COMERFORD: Form.

A. I mean, there are -- there are different ways that a target can -- can reject proposals. And simply rejecting it is -- is not, in and of itself, something that's precluding an acquirer from coming back and making an offer.

Page 183

So you see -- we see rejections all the time. Some of them ultimately lead to successful offers down the road, others don't. It really just depends on -- on the target management's preferences with respect to the acquisition proposals that are on the table.

BY MR. MANDEL:

Q. So an acquirer facing -- an acquirer that's made a proposal and it's been rejected has tools at its disposal to continue attempting to acquire a target company, even though its proposal has been rejected; is that correct?

MR. COMERFORD: Form.

A. I'm not sure what you mean by "tools at its disposal."

BY MR. MANDEL:

Q. Well, are there things an acquirer can do to continue in an effort to acquire a target company even if the target had said, "We reject your proposal"?

MR. COMERFORD: Form.

A. An acquirer can certainly try to re-engage with the company and have further discussions. Then it's up to the target company as to how they respond to that.

That's sort of the issue in this case, is

Page 184

that NI -- NI's board said they didn't see any basis for further discussions, and there weren't any further discussions prior to the beginning of the class period.

BY MR. MANDEL:

Q. So an acquirer whose acquisition proposal is rejected could, for example, offer more consideration for the shares; is that correct?

MR. COMERFORD: Form.

A. They certainly could. There's nothing stopping them from making a different offer.

BY MR. MANDEL:

Q. And that's, in fact, what happened here; is that right? Emerson came back and offered more; is that right?

A. Ultimately, three months later, after the end of the class period.

Q. And an acquirer could accumulate shares of the target corporation to exert pressure on the target corporation in an effort to acquire the company after a rejected acquisition proposal; is that correct?

MR. COMERFORD: Form.

A. I mean, I can't speak to them exerting pressure, but they can certainly acquire shares in the open market, like any investor could, up to a limit, by which time they have to disclose it. But they certainly

Page 185

could buy shares. That might signal their interest.

BY MR. MANDEL:

Q. And once disclosed, they can continue buying the shares; is that right?

A. They can as long as they adhere to securities laws about disclosures.

Q. But you were just referring right there to -- I think it's the 5 percent line, where if an acquirer is buying at least 5 percent and intends to try and acquire the target, they have certain disclosure obligations. That's what you were just referring to?

A. Correct, yes.

THE REPORTER: Can I have just a second, Counsel? I'm sorry. My power is going --

MR. MANDEL: No problem.

THE REPORTER: -- dead.

(Brief pause.)

THE REPORTER: Okay. We're good. Sorry about that.

MR. MANDEL: No problem.

BY MR. MANDEL:

Q. Continuing with the discussion we were just having, an acquirer could launch a proxy contest to try to obtain seats on the target company's board; is that right?

Page 186

MR. COMERFORD:  Form.

A.  It could.

BY MR. MANDEL:

Q.  And that's another means through which an acquirer could go about continuing to attempt to acquire the target even after the target has rejected an acquisition proposal; is that correct?

MR. COMERFORD:  Form.

A.  Well, I'm not sure if the proxy would necessarily be leading to a takeover, but it is a mechanism that an acquirer could use.

BY MR. MANDEL:

Q.  And, of course, I think we mentioned this before, an acquirer could go directly to shareholders with an offer; is that right?

A.  They could.

Q.  Could offer cash directly to shareholders to acquire all the outstanding shares of the company directly from them, even though the acquirer had rejected earlier acquisition proposals; is that correct?

A.  That's correct.  It could happen.

Q.  And an acquirer could make the same offer, rather than with cash, with securities; is that correct?

A.  It could.

Q.  And it could offer directly to shareholders

Page 187

a combination of cash or securities to buy the shares directly from them; is that right?

A.  That's correct.

Q.  Are there any other ways that you can think of than the several that we've gone through here in which an acquirer could continue attempting to acquire a target company, even though the target company has rejected earlier acquisition proposals?

A.  I mean, there could be more.  But I think you've hit -- you've hit the main ones.  But, again, the issue is ultimately the target's response.  I mean, they may have rejected these first two proposals, but they also have the ability to -- to block any subsequent proposals.  So the tone that they set is important in these.

Q.  How can they block subsequent proposals?

A.  I'm sorry.  They're not blocking the proposal itself, but blocking the success of the proposal.

Q.  So can the target board prevent the acquirer from achieving the acquisition if the target board wants to?

A.  There are certain defensive measures that could be used to effectively block hostile acquisitions, yes.

Page 188

Q.  So is it your testimony that if the target board wants to prevent an acquirer from acquiring a target company, they have -- there are steps that they could take that will 100 percent block the acquirer from acquiring the target?

MR. COMERFORD:  Form.

A.  Well, a shareholder writes plans which are sometimes referred to as poison pills that are viewed as the most effective defense.  And if the target board exercises that shareholder rights plan, it's virtually impossible to successfully complete an acquisition.  I'm not aware of acquisitions that have ever been completed in that scenario.

BY MR. MANDEL:

Q.  Does National Instruments at any point put in place a poison pill shareholder rights plan?

A.  They -- they began the process of having a shareholder rights plan in January of 2023.

Q.  When you say "they began the process of having a shareholder rights plan," what do you mean by that?  Are you drawing a distinction between -- are you saying they didn't have a shareholder rights plan?  They didn't put one into place?

A.  I'm trying to draw the distinction between having a shareholder rights plan and then using the

Page 189

shareholder rights plan in context of a hostile offer.  Many companies -- in fact, the overwhelming majority of public companies in the US -- have a shareholder rights plan, but you don't see them exercising the pill, so to speak.  So I'm drawing that distinction.

Q.  Okay.  So in this particular instance, National Instruments announced that it had implemented a shareholder rights plan on January 13th, 2023; is that right?

A.  That's correct.

Q.  And Emerson still ultimately acquired National Instruments; is that correct?

A.  That's correct.

Q.  So this would be an instance where despite implementation of a poison pill, the acquirer actually successfully acquired the target; is that right?

A.  I think I would change the word implementation to adoption.  So adoption of the plan, they are not -- they elected not to use it in this instance.

Q.  How would they have used it?  What do you mean?

A.  The plan gives the company the ability to offer to the shareholders these so-called shareholder rights that gives the shareholders the ability to

Deposition of David J. Denis, Ph.D., Vol. II                In Re National Instruments Corporation Securities Litigation

Page 190

purchase shares in the company at a dramatically discounted price, but doesn't give that ability to the hostile parties interested in acquiring them.

So to have a shareholder rights plan simply gives the board the ability to issue the rights at their discretion. Most companies do not issue those rights. When they do, it effectively blocks the acquisition.

So that's the sense in which a company with a shareholder rights plan would have the ability to block an acquisition that is deemed not in the interest of the shareholders by the board.

Q. I understand all of that. But communicating the rejection of an acquisition proposal to a potential acquirer, that's not a shareholder rights plan; correct?

A. That's correct. That's simply communicating that we rejected this proposal in this case, also communicating we see no basis for further discussion. And that's what's been -- that's what could be communicated to investors around the time of the -- of the beginning of the class period.

Q. Let's just put up a document real quick while we're on this subject. This is our tab --

MR. MANDEL: Tab 18, please.

Page 191

(Denis Exhibit 3 was marked for identification.)

BY MR. MANDEL:

Q. For the record, this is NAT-SL-22986 is the beginning Bates number. This is a presentation by Wachtell to the board of directors of National Instruments given on June 14th, 2022. And for the record, this is one of the documents identified in your "Considered Documents" list in Exhibit C of your report.

So just have a quick look, and let me know if you're familiar with this document.

A. I'm just looking at the title page, but yes, I recall this document.

Q. Now, if we would look at page 5 of the document. It's 6 of the PDF. It's page Bates 22991. Yeah, here we go.

MR. COMERFORD: Is this Exhibit --

BY MR. MANDEL:

Q. Do you recognize the page?

MR. COMERFORD: Is this Exhibit 3?

MR. MANDEL: Yes. Thank you, John.

A. I'm sorry. Your question just before that was?

BY MR. MANDEL:

Q. Do you recognize this page? Do you

Page 192

remember this slide?

A. I do, yes.

Q. Now, you see there in the -- on the left-hand column refers to ▮▮▮▮▮▮; do you see that?

A. I do.

Q. Do you remember quoting this ever in your report?

A. I do.

Q. Okay. So this column is describing what we've been talking about, right, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ is that right?

A. It's describing ▮▮▮▮▮▮▮▮, yes.

Q. Right. What they're describing is an ▮▮▮▮▮▮; right?

A. Correct.

Q. And it's your view that that's what occurred in this case; right?

A. Well, when you compare the ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ to the actual language in the letter, yes, the two match.

Q. Right.

And you see there where it says near -- there's ▮▮▮▮▮▮▮

Page 193

"▮▮▮▮▮" column.

Do you see that?

A. I do.

Q. And you see there it says that ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ right?

A. Correct.

Q. And it also says that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮

Do you see that?

A. I do.

Q. Do you understand that Nuthatch refers to Emerson in this document?

A. Yes.

Q. So what this is saying is that ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ is that right?

A. It is speculating that there is some positive probability that that could happen.

Q. Right. It's identifying that ▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮; is that right?

A. That's correct.

Q. Okay. So this is consistent with what we've been talking about; right? Rejecting a proposal

Page 194

does not stop an acquirer from continuing to attempt to acquire the target; correct?

A. No. I'd say the same thing, that an acquirer can continue showing its interest, and what's important is how the target responds to that. And this -- this outright rejection takes place in the context of the company considering this possibility; they may take more aggressive action and everything about their discussion is how do we defend against that action.

Q. So just to be clear, again, according to this document, the acquirer can continue attempting to acquire the company after an outright rejection; is that right?

A. Sure. The acquirer can continue to attempt.

Q. And the acquirer could succeed in that attempt; is that correct?

MR. COMERFORD: Form.

A. That's going to depend ultimately on the target's response.

BY MR. MANDEL:

Q. Right. It will depend on future events; right?

A. It's going to depend on future unknown

Page 195

events, but the likelihood of those events are informed by the target's actions at this time.

Q. Understood.

And in assessing the likelihood, this document states ███████████ ████████████████████████████████ ████████████████████████████; is that correct?

A. If you're looking at this document in isolation, that's a correct statement. But if you look at this document in conjunction with the other actions and discussions that management and the board have had, those are geared towards combating any such aggressive action by Emerson and ultimately remaining independent.

Q. Understood.

You're saying here that other discussions that management and the board had you're saying are geared towards combating any such aggressive action; right?

MR. COMERFORD: Form.

A. My --

BY MR. MANDEL:

Q. Those are the words you used.

A. My -- my reading is that the stated purpose of them is -- is -- is to do that, to combat any such

Page 196

aggressive action.

Q. Got it.

Had any of those actions occurred as of this point in time?

A. To my knowledge, no, because they had simply made an outright rejection, said there's no basis for further discussions and no further discussions had happened.

Q. And so as of this time, all we're talking about is a rejection and the impact of a rejection in this document --

A. Well, excuse me. Sorry. Go ahead. You were about to say something.

Q. Oh, no, please, go ahead.

A. I just want to clarify: When you say "this time," what exactly is the time we're talking about, then?

Q. Well, we're talking here about June 14th, 2022 --

A. Okay.

Q. -- the date of this document.

At this time, there had been one rejection, right, of the May 25th offer?

A. That's correct.

Q. Oh, no. I'm -- I'm sorry. I'm sorry. I

Page 197

got that wrong.

This is a couple of days before the initial rejection. I'm sorry. I just confused my timeline.

This is a couple of days before the first letter rejecting the May 25th proposal, which was sent on June 16th, which is also part of your report.

So we're talking about this time. This is a document in which they are planning that letter.

A. Uh-huh.

Q. As you noted, the language in the letter is very similar to ███████████████████████ ███████████████████████," and that's what we're talking about.

That rejection is all they're talking about as of this time; is that right?

A. That's correct.

Q. And as of this time, there had been no other action taken by the company geared toward preventing an acquisition; is that correct?

MR. COMERFORD: Form.

A. I don't think that's quite correct in the sense that this company, like many companies, has a wide array of defensive mechanisms already in place.

So when they had actually taken those actions, I'm not sure. I hadn't analyzed that. But

Page 198

they did have them in place.

BY MR. MANDEL:

Q. Okay. So with those things in place, this ██████████████████████████████████ ████████████████████████████; correct?

A. That's correct. We speculate that that's a possibility.

Q. Is it true to say, then, that an outright rejection would not necessarily end the bidding process for this target company by the acquirer?

MR. COMERFORD: Form, calls for speculation.

A. Again, your question is an outright rejection?

BY MR. MANDEL:

Q. Doesn't put it to an end, the bidding process, for this company by the acquirer; is that true?

MR. COMERFORD: Same objections.

A. I mean, I think we've been through this already, that an outright rejection does not preclude the acquirer from making another proposal.

BY MR. MANDEL:

Q. And that's, in fact, what happened here; right? The acquirer did make another proposal; is that

Page 199

right?

A. They did make another proposal at the same price.

Q. And they made many more proposals. We saw eight earlier.

Do you recall that?

Eight total earlier bids; correct?

A. I think we did, yes.

Q. So this outright rejection did not prevent all those later bids from occurring; correct?

A. It doesn't. But you have to keep in mind the different circumstances that -- you know, as I've alluded to before, that the target's response is important here.

The target in these first two proposals is characterizing them as outright rejections with no further discussion. And then by the time of the class period, no such discussion had taken place.

By the time we get to most of the other proposals that you're referring to, those are coming after a time period in which the company had undertaken a strategic review and indicated that they were open to -- to other proposals, and that they had already received the November proposal from Emerson.

Q. So, wait. November 3rd, Emerson increased

Page 200

its offer by $5 a share; correct?

A. That's the November proposal I'm talking about, yes.

Q. Okay. As of that time, Emerson had rejected the previous proposal; is that correct?

A. I don't believe Emerson had ever rejected it.

Q. I'm sorry.

National Instruments had rejected the previous proposal; is that correct?

A. That's correct.

Q. So at the time Emerson returned with an increased bid, there had been no indication from the company that they were interested in such a negotiation; is that correct?

A. That's correct. That's exactly what I said is that most -- not including the November -- but most came after the January 13th disclosure.

Q. All right. So to be clear, after a rejection, the acquirer did, in fact, come back and offer more money for the shares; is that correct?

A. They did.

Q. And when they did that, according to you, the target company, National Instruments, had not expressed any different sentiment about a potential

Page 201

transaction other than the outright rejection that they had communicated in their letters; is that correct?

A. Well, again, I think the point I was making before is that it's the information that they're communicating just before the beginning of the class period that's relevant here.

At that point, they had communicated not just an outright rejection, but they had also communicated that the board saw no reason or basis for further discussion. And some time had elapsed by the start of the class period, and no further discussion had taken place.

Q. And, nevertheless, even though the company had said they rejected it and saw no basis for further discussion, Emerson returned with a higher offer; is that correct?

A. Three months later, they came back with another offer, yes.

Q. Let's look at the next page of this document quickly.

Do you remember this slide?

A. I do.

Q. This slide shows what I'll call ███████ ██████████████████████████████████████████████ ████████████████████████████████████████████; is

Page 202

that correct?

A.  I think that's a fair characterization, yes.

Q.  And this identifies [REDACTED] [REDACTED]; is that right?

A.  True, yes.

Q.  Like, for example, like let's just go all the way to 11.  This one goes up to 11; right?

The --

A.  This final column.

Q.  That's right.

The -- the [REDACTED] [REDACTED].

An acquirer could escalate all the way to that level despite a rejection; is that correct?

A.  In theory, they could, sure.

Q.  And all -- pretty much [REDACTED] [REDACTED] [REDACTED]; is that correct?

A.  That's correct.  In theory, they could.

Q.  So there's nothing about a rejection that prevents an acquirer from continuing to attempt to acquire a company and ultimately succeeding in acquiring

Page 203

a company; is that correct?

MR. COMERFORD:  Form.

A.  That's not correct.  I think I've agreed many times now that there's nothing to prevent the acquirer from continuing to propose offers.  They could be the same, they could be different.

There are things that targets can do to prevent the success of those offers and --

BY MR. MANDEL:

Q.  Sure.

But to be clear, my question was not are there things a target can do.

My question was:  So there's nothing about a rejection that prevents an acquirer from continuing to attempt to acquire a company and ultimately succeeding in acquiring a company; is that correct?

MR. COMERFORD:  Form, foundation, calls for speculation.

A.  I mean, a rejection, per se, if you're thinking the words "I reject this."

But, again, as I said, it depends on how the target views the rejection and what they're communicating with respect to their desire to remain independent.  The fact that they can remain independent if they want is important here.

Page 204

And, empirically, as I point out in my report, that most situations in which the target is opposed to the deal, that's the end of the deal.  It ends.

So could some of these things happen?  Yes.

Are they likely?  No.

BY MR. MANDEL:

Q.  Let's look at another document.  This will be our tab 19.  This is NAT-SL-023189.  This will be Exhibit 4.

(Denis Exhibit 4 was marked for identification.)

BY MR. MANDEL:

Q.  Do you recognize this document?

A.  I believe I've seen this.

Q.  Well, this is not listed on the documents considered.

A.  Uh-huh.

Q.  Are you sure you've seen this document?

A.  No, I'm not sure.  It's possible I've just seen passages from the document in Dr. Cain's report.  So I can't be sure.

Q.  Got it.

So this is an e-mail dated September 19th written by National Instruments' general counsel,

Page 205

Eddie Dixon.

Do you see that?

A.  I see that.

Q.  Okay.  And it's -- you know, it's written to people at Wachtell and it's cc'ing other members of management at the company.

Do you see that?

A.  I do.

Q.  So the date of this document is September 19th.  So when was Emerson -- National Instruments' most recent rejection of Emerson's offer before this date?

MR. COMERFORD:  Form.

A.  I believe the date was August 2nd.

BY MR. MANDEL:

Q.  Okay.  So this is about six weeks or so after that last rejection; is that correct?

A.  That's about right.

Q.  Okay.  And you see there one, two, three, four bullets down in what he's describing there, he says -- now Wolverine, just to be clear, are you aware that Wolverine was sometimes used in this case to refer to Emerson?

A.  Yes, I recall that.

Q.  Okay.  So just that that reference to

Page 206

Wolverine there is a reference to Emerson; right?

A. Correct.

Q. Okay. So in that bullet, it says, "NI was on Wolverine's acquisition pipeline list, and there's no evidence that Wolverine's interest has petered out."

Do you see that?

A. I see that.

Q. So this is identifying that, despite the fact that a rejection of the proposal had occurred about six weeks earlier, that Wolverine's -- that's National Instruments remains on Emerson's acquisition pipeline; is that right?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I mean, I can see the words that these individuals are speculating that that's the case.

BY MR. MANDEL:

Q. Right. But this is the general counsel of the company writing this.

Do you understand that?

A. I do.

Q. And he's writing that even though there has been a rejection, that National Instruments remains on Emerson's acquisition pipeline list; right?

MR. COMERFORD: Form, foundation, calls for

Page 207

speculation.

A. I mean, I see that's what they've said, yes.

BY MR. MANDEL:

Q. So this document is consistent with the idea that post-rejection, the acquirer can continue attempting to acquire the target company; is that right?

MR. COMERFORD: Form, speculation, calls for speculation.

A. Again, I think I've testified to that a number of times now, that they could, sure.

BY MR. MANDEL:

Q. Sure. But I'm asking you whether what's stated in this document is consistent with that.

MR. COMERFORD: Same objections.

A. It's consistent with these individuals believing that Emerson is still interested.

BY MR. MANDEL:

Q. Right. So, again, consistent with the idea that even though they rejected Emerson's proposals, that they could still be on Emerson's acquisition pipeline; correct?

MR. COMERFORD: Same objections.

A. Emerson could certainly be thinking about wanting to complete an acquisition, thinking about how

Page 208

they might do it. National Instruments could be considering that and thinking about ways to remain independent. That's exactly the -- the type of decisionmaking that I've described so far.

BY MR. MANDEL:

Q. And it goes on to say, "Speculation is that Wolverine will likely approach National Instruments privately again before going public."

Do you see that?

A. I see that.

Q. Consistent with the idea that Emerson could continue making acquisition proposals even though there had been a rejection; is that correct?

MR. COMERFORD: Form, foundation, calls for speculation.

A. It's consistent with the fact that they could, but it's not telling me anything about whether anything has changed about National Instruments' decision. There's no basis for further discussion.

BY MR. MANDEL:

Q. Now, is there a reason you didn't review this document when you were preparing your reports?

A. Well, again, as I said before, I'm reviewing what Dr. Cain has proposed as evidence of economic materiality and responding to that.

Page 209

Q. Did Dr. Cain cite this document?

A. I believe he might have, and that's why the words might look familiar to me.

Q. But Dr. Cain used this document as evidence regarding materiality?

A. I think Dr. Cain points to a number of different documents that demonstrate that in his -- in his view, that Emerson remained interested in purchasing National Instruments. And my point is that doesn't tell me anything. That's not informative about the likelihood that a deal would actually get done. In fact, what it is informative of is how National Instruments responds.

And to that point, they have given no basis for further discussion. And, in fact, there hadn't been further discussion.

Q. So --

A. This is taking place after the beginning of the class period.

Q. So is it your testimony that Emerson's continued interest in acquiring National Instruments tells you nothing about materiality in this case?

MR. COMERFORD: Form.

A. What I'm saying is that it can't be viewed in isolation. You know, it's --

Page 210

BY MR. MANDEL:

Q.  Well, I mean, you just testified like, you know -- I'm quoting you, "I think Dr. Cain points to a number of different documents that demonstrates that, in his view, that Emerson remained interested in purchasing National Instruments.  And my point is that doesn't tell me anything."

I just want to understand, is that true? Does the fact that Emerson had a continuing interest in acquiring National Instruments tell you nothing about materiality in this case?

MR. COMERFORD:  Form.

A.  Again, as I was just saying that that's -- if you take that in isolation, you're going to draw a different inference from taking that in conjunction with the other information that would be known by investors at the start of the class period.

BY MR. MANDEL:

Q.  Well, I'm not asking you whether -- if you take it in conjunction with other things, whatever.

You're testifying that that fact, the fact that Emerson was interested in this acquisition, tells you nothing about materiality.

Do you agree with that?

A.  Again --

Page 211

Q.  It's got to tell you something about materiality; no?

A.  To evaluate the economic materiality, you have to evaluate how meaningful that piece of information would be to investors at a particular point in time.  And so that's why the totality of the information is important.

If it is the case that Emerson remains interested, but it also is the case that National Instruments remains adamantly opposed, then the fact that they're interested is not evidence of economic materiality.

Q.  So, again, it's your opinion that Emerson's interest in acquiring National Instruments tells us nothing about whether information concerning Emerson's proposal to acquire National Instruments was material; is that right?

MR. COMERFORD:  Form, asked and answered.

A.  I don't think that's quite the way you asked the question before.  What I'm saying is that to the extent that you had information that Emerson remained interested in the possibility of acquiring National Instruments after the second outright rejection, that in and of itself does not demonstrate economic materiality.

Page 212

If investors knew that information, but also had information as to the target, in this case, National Instruments' response, that's important, the totality of the information that would be taken into account.

BY MR. MANDEL:

Q.  So information concerning Emerson's continued interest in acquiring National Instruments could tell you something about materiality; is that correct?

MR. COMERFORD:  Form.

A.  I mean, if we were in a different hypothetical situation in which, you know, Emerson had continued interest and National Instruments had indicated perhaps, going back to the Wachtell presentation, ▇▇▇▇▇ then their continued interest could conceivably be viewed as economically material.

BY MR. MANDEL:

Q.  So it's your testimony that because National Instruments had rejected Emerson's earlier proposals, that Emerson's continued interest in acquiring National Instruments is irrelevant to materiality?

MR. COMERFORD:  Form.

Page 213

A.  Not completely.  That's an element of it, obviously, is that they have rejected those proposals. But they've also said that they did not see any basis for further discussions and given every indication that their desire was to remain independent and block any sort of subsequent hostile actions that could come about.

It's that totality of information that matters.

BY MR. MANDEL:

Q.  So in effect, you're saying that the target's preferences regarding a potential transaction can override the significance of the acquirer's intentions for purposes of a materiality analysis?

A.  I'm saying in this case, for -- in conducting this assessment of materiality, as Dr. Cain has done, the fact that he's ignored the outright rejection and the signals sent by the target company, that has an important impact on the economic materiality.  It's situation-specific.

Q.  So to see if I understand, you're saying that Emerson's -- that an acquirer's interest in acquiring a company after rejection of an earlier proposal can be material information depending on the facts of the case; is that correct?

Page 214

A.   That's fair.

Q.   And you're saying here your assessment of the facts of this case are that the target's rejection overrides the significance of the acquirer's desire to continue acquiring the company for purposes of the materiality analysis here; is that correct?

MR. COMERFORD:  Form.

A.   I think that's by and large correct, in the sense that what I'm saying is that you're assessing economic materiality, you're assessing this from a standpoint of investors, would investors consider this piece of information economically material.

And whether they do or not certainly depends on the behavior of the target's board and what they are -- what information they are conveying to the investors.

And so it's important to take that into account here that they have twice rejected the offer, and they have said there's no basis for further discussion.  It's not in the interest of shareholders.

BY MR. MANDEL:

Q.   So your conclusion that the acquirer's interest in acquiring the target is not relevant to the materiality analysis is fact specific to this fact pattern in this case; is that correct?

Page 215

MR. COMERFORD:  Form.

A.   Yeah.  I think I would say that the fact pattern in this case makes a difference.  And because Dr. Cain has ignored certain facts, that leads to my conclusion that he hasn't demonstrated that this particular observation that Emerson's desire to continue with the acquisition process is economically material.  He hasn't demonstrated that.

MR. MANDEL:  Okay.  This is a decent breaking point.  Let's take a quick five.

VIDEOGRAPHER:  We are going off the record at 11:41 a.m.

(A break was taken.)

VIDEOGRAPHER:  We are back on the record at 11:50 a.m.

BY MR. MANDEL:

Q.   Now, if we could turn to section VI of your report, this is a section entitled, "Dr. Cain's measurement of economic losses and corresponding damages analysis are both flawed."

(Reporter clarification.)

BY MR. MANDEL:

Q.   Now, in this -- we can go down -- let's just go to page 23 of this document, which has paragraph 47 on it.

Page 216

Well, in fact, actually, let's just pause here.  We'll come right back to this.

Let's put up another document.  This is going to be our Exhibit 5, and this going to be our tab 2, which is the -- Dr. Cain's most recent report.

(Denis Exhibit 5 was marked for identification.)

BY MR. MANDEL

Q.   Now, if we could turn to page 56 of this report, it's page 58 of the PDF.

MR. COMERFORD:  Mr. Mandel, let me -- let me just say for the record, I think you referred to this as Dr. Cain's most recent report, and I -- I don't think --

MR. MANDEL:  I'm sorry.  You're right.  You're right.

MR. COMERFORD:  Okay.

MR. MANDEL:  Timelines are always a problem for me.

This is the July 28th, 2025 report of Dr. Cain.  The most recent one was dated November 10th.

Thank you, John.  Sorry about that.

BY MR. MANDEL:

Q.   So this is the section of Dr. Cain's report where he articulates his opinion regarding the level of

Page 217

artificial deflation but-for price of $48 or more; is that right?

MR. COMERFORD:  Form.

A.   That's correct.

BY MR. MANDEL:

Q.   He says there, he concludes that -- I'm going to leave some of the sentence out with ellipses, but, "NI common stock would have traded at or above $48 a share throughout the class period."

He says, "In other words, the but-for price equals at least $48 a share."

That's where he articulates that opinion; is that correct?

A.   I see that, yes.

Q.   Now, if we look at the next page -- we have paragraph 135.

Now, on this page, Dr. Cain --

MR. MANDEL:  If we could scroll a little bit more so we can see a little bit more of the page.  It goes up to I and we only see up to H right there.  Okay.  If we can just look at that.

BY MR. MANDEL:

Q.   So this paragraph here identifies multiple pieces of evidence that Dr. Cain uses to base his opinion on about the $48 share but-for price; is that

Page 218

correct?

MR. COMERFORD:  Form.

A.  Could you repeat that?

BY MR. MANDEL:

Q.  This page identifies numerous pieces of evidence upon which Dr. Cain bases his opinion about the $48 per share but-for price?

MR. COMERFORD:  Form.

A.  I think that's a fair characterization, yes.

BY MR. MANDEL:

Q.  Okay.  And it's A through I.  So how many -- if we count each one as an independent piece of evidence, it's nine different pieces of evidence that he's identifying here to support his opinion about the $48 but-for price; is that correct?

MR. COMERFORD:  Form.

A.  He's -- he's citing nine different categories of evidence, yes.

BY MR. MANDEL:

Q.  Okay.  Now, if we can go back to your report, which was the previous exhibit, which is our Exhibit 2, yeah.

And if we can go back a couple of pages, actually, to page 21 -- page 22 of the document, rather.

Page 219

Yeah, right there.

So right here in paragraph 45, you identify one of the pieces of evidence that Dr. Cain cites in the paragraph we were just looking at in his report; is that correct?

We can go back and look at it if you'd like.

A.  I'm citing one, yes.

Q.  Okay.  So this is the section of your report that we're looking at here in which you express your opinion that his conclusion about the $48 but-for price is incorrect in your view; is that correct?

A.  I'm sorry.  Could you repeat that for me?

Q.  This is the section of your report --

A.  My report.  Okay.

Q.  Your report, the section we're looking at here, it begins on paragraph 44 on the previous page.

This is a section of your report in which you state your opinion that Dr. Cain's conclusions about the $48 but-for price are not correct; is that right?

A.  Yeah, my conclusion that it's a speculative number.

Q.  Okay.  The only piece of evidence that Dr. Cain identified in his report that we just looked at to support this $48 but-for price that you are

Page 220

addressing in this section is the one listed here in paragraph 45; is that right?

MR. COMERFORD:  Form.

A.  That's -- that's the only one I've directly addressed here.  You have to keep in mind that the bullet points -- the nine different bullet points that Dr. Cain is referring to in paragraph 135 of his report that we just went through are points that he made with respect to the economic materiality issue, which I address earlier in the report.  So those -- those have been addressed in my report.

What I'm addressing here is how he could possibly be getting to a $48 price.  Even if he believes economic materiality, how do you -- how does that translate into a $48 price, which is a price that is at or above the offer -- offer price.

And the only piece of evidence that he offers that seems to touch on that particular issue is -- is what I've cited here.

BY MR. MANDEL:

Q.  Okay.  So to be clear --

MR. MANDEL:  Let's do a split screen here.  Let's -- Jeff, can you please put up on one side of the screen Dr. Cain's report, Exhibit 5, showing me page 57, and on the other side of the screen, this page here from

Page 221

Dr. Denis's report?

EXHIBIT TECHNICIAN:  Give me a second.  Let me try to work out how to do that with Adobe --

MR. MANDEL:  I assumed you'd know how to do that.  The techs in other cases are like super good at that.  If it's like too difficult, we can go back and forth.

EXHIBIT TECHNICIAN:  There is a software that makes it easier, but I just don't have that queued up.

MR. MANDEL:  All right.  You don't know how to do it.

EXHIBIT TECHNICIAN:  I don't have it queued up right now.

MR. MANDEL:  Do me a favor, learn it for the next time we do a deposition.

Let's go back to Exhibit 5 to that page.

BY MR. MANDEL:

Q.  Right.  So E on this page, that's the one you actually addressed in this section of your report; is that right?

MR. COMERFORD:  Form.

A.  E is getting to the -- its conclusion that the price is at least 48, so at or above the offer price.

Page 222

BY MR. MANDEL:

Q. Well, E there is referencing academic research; is that right?

A. Correct.

Q. Right.

The -- there's other evidence he cites here to support his opinion; is that right?

A. None of the other evidence speaks directly to the $48 price. The -- what I'm getting at here in -- in my report is his selection of the $48 price, how does he get there.

Q. Okay. But he writes --

A. This is the -- this is the only part that I can see that could speak remotely to the level of the price as opposed to the issue of economic materiality, which is, you know, what I've addressed before.

He's very quick. He learns things fast. Look at this.

Q. I see that. I see that.

Right. So he says in paragraph 135 --

MR. MANDEL: If we scroll up slightly. Thank you, Jeff. If we scroll up slightly on that page.

BY MR. MANDEL:

Q. Right. He says that, "The but-for implied price of $48 per share is illustrated by evidence,

Page 223

including" and he lists all of these things; right?

He's not including the stuff in here as evidence of materiality. He's specifically saying that all of this other evidence that he talks about here in his opinion supports the $48 per share but-for price; is that correct?

MR. COMERFORD: Form.

A. That -- that is correct. But as I said earlier in my report, I'm addressing these different issues on the issue of economic materiality. And if those are not economically material, they can't speak to having a price -- a but-for price of $48.

BY MR. MANDEL:

Q. Okay. So just to be clear, you don't make any point about any of the evidence that he cites here, other than from paragraph 135E of his report, in your entire section about the but-for price; is that correct?

MR. COMERFORD: Form.

A. I'm going to have to ask you to repeat that again. Sorry.

BY MR. MANDEL:

Q. Well, in your section addressing the but-for price of $48, you don't refer to any of the other evidence identified in Dr. Cain's paragraph 135 other than from 135E; is that correct?

Page 224

MR. COMERFORD: Form.

A. Well, you know, as that says pretty clearly in my report, what I'm finding puzzling is that he has not cited specific academic literature to support that price. And that's a place in which there is academic literature that he could be using to support that price would be what's contained in E. That's what I'm going on to assess in paragraph 46.

BY MR. MANDEL:

Q. I understand that and we'll discuss that.

But that is what you are saying in this section of your report. You're articulating your view that academic research doesn't support this conclusion.

But with the exception of addressing that specific evidence that Dr. Cain identified in his report, this section of your opinion doesn't address any of the other evidence that he considers; is that right?

MR. COMERFORD: Form.

A. It's right I'm not repeating what I already said in the earlier part of the report as to the economic importance of the other evidence.

I've already said at that point that they're not informative with respect to the economic materiality question, which implies that they're not informative for assessing the but-for price.

Page 225

BY MR. MANDEL:

Q. Got it.

But your report doesn't actually explain any of that in the section about the but-for price; right?

A. In this section, I haven't repeated myself, no.

Q. Well, you've addressed one piece of evidence and none of the others, is that right, in this section?

MR. COMERFORD: Objection, asked and answered.

A. As I said, I've addressed the one piece that I think could be used to try to get at the specific number that he's used as the but-for price. He hasn't made a calculation of any sort to get to $48. $48 is the offer price.

Why might he select that? He could be appealing to this particular piece of academic evidence, and that's why I go on to assess that at this point.

BY MR. MANDEL:

Q. Okay. So just to be clear, this section assesses that evidence and none other; is that correct?

MR. COMERFORD: Object to form, asked and answered.

Page 226

A.  This section is just addressing that particular piece of academic evidence.  The other academic evidence and its lack of informativeness to materiality has already been addressed in the report.

BY MR. MANDEL:

Q.  I see.  But looking here to the left of the page to Dr. Cain's paragraph 135, you just said, well, I addressed the academic literature elsewhere.  Again, like let's look at D, the timeline of the transaction including all the things that are referenced there.

Dr. Cain cites that as evidence of his $48 per share but-for price.  You don't address that in challenging his conclusion that $48 is the proper but-for price; is that correct?

MR. COMERFORD:  Form.

A.  I've already addressed that academic evidence and its lack of evidence in the earlier --

BY MR. MANDEL:

Q.  I understand.  You addressed it in your materiality section.  I'm saying here, where you're opining that $48 is not a legitimate but-for price, you don't address that; is that right?

MR. COMERFORD:  Form, asked and answered.

A.  I mean, it's not repeated.  As I said, those points have already been made.

Page 227

BY MR. MANDEL:

Q.  So you don't repeat any points in this section that you've made in other sections?

MR. COMERFORD:  Form.

A.  I've made some of the same points with respect to the arbitrage spreads.  But this one, in particular, I focused on because that's the one that most directly, as far as I can tell, can speak to the selection of the $48 price.

But, again, I repeat that it's not at all obvious how that price is arrived it.  It certainly doesn't stem directly from the academic evidence that I've refuted in the earlier part of the report.  So this is what I was left with as a possibility.  Maybe he's thinking this, so let me address that directly.

BY MR. MANDEL:

Q.  So this section doesn't address, for example, any of the facts in the record; is that right?

MR. COMERFORD:  Form.

BY MR. MANDEL:

Q.  This section is addressing one argument, your argument that the academic literature he cites doesn't show what he says it shows --

MR. COMERFORD:  Form.

BY MR. MANDEL:

Page 228

Q.  -- is that right?

A.  Well, this section begins with a discussion of the lack of economic logic that is attached to a $48 price, when I go through the discussion of what a but-for price would be reflecting if the probability of a successful offer at $48 weighted by the probability of an unsuccessful offer and, therefore, a standalone price.

So the implication of a $48 price is economically illogical given everything that I've said up to that point in the report about the materiality of the different pieces of evidence that are in paragraph 135 of Dr. Cain's report.

Q.  Right.  So just to be clear, again, the opinion you're articulating in the section about the but-for price addresses the things that you were just talking about, but it doesn't address A through I of paragraph 135 of Dr. Cain's report, with the exception of E about the academic research?

MR. COMERFORD:  Form, asked and answered.

BY MR. MANDEL:

Q.  Is that right?  It seems obviously right.  Is that correct or no?

A.  A through I are implicitly part of it all the way throughout.  I mean, the fact that I'm deducing

Page 229

this as economically illogical is repeating the arguments that I used in discussing the economic materiality of the alleged omitted information.  So --

Q.  I see.

A.  -- I haven't repeated specifically and gone down bullet point by bullet point in 135 and addressed those yet again, but it's implicitly part of my discussion of the -- what the -- what the price would represent as a weighted average of the two possibilities.

Q.  Got it.

So what you're saying is that your analysis here in this section of your opinion implied discussion of everything here in A through I.  It's just not actually in there; is that right?

MR. COMERFORD:  Objection, mischaracterizes his testimony.

A.  I think, as I said -- as I said, I've already addressed the economic materiality of that information, the fact it is correct, but I haven't readdressed it in this section.  I'm simply trying to get at a discussion of how Dr. Cain may have arrived at the $48 price.

MR. MANDEL:  Let's turn -- we can get rid of the exhibit on the left side of the page there.  I

Page 230

want to thank you again, Jeff, for figuring that out. If we can focus only on Exhibit 2 right now, now let's look at the next page of Exhibit 2. Here we go.

BY MR. MANDEL:

Q. Now, I want to focus on paragraph 47 here when you cite an article by Even-Tov, et al. from 2024.

Do you see that?

A. I see that, paragraph 47.

Q. Yes.

Now, you cited this document in the first instance in the back-and-forth with Dr. Cain here; is that right?

A. Are you asking was I the first one to cite this?

Q. That's basically what I'm saying. You introduced this article into the discussion, not Dr. Cain; is that fair?

A. Yes, that's fair.

Q. Okay. That's what I thought was the case.

Now, you acknowledge that the Even-Tov article is not consistent with the facts of this case; is that right?

MR. COMERFORD: Form.

A. I acknowledge in here that it is perhaps the most consistent with the facts in this case of any

Page 231

of the academic literature that I could find and that Dr. Cain has cited. But it's still not a perfect reflection of the facts.

BY MR. MANDEL:

Q. Okay. You write that it does not fully reflect the facts and circumstances of this case; right? You write that in paragraph 47 of the next page. It carries over.

Do you remember writing that?

A. I do.

Q. And paragraph 42, similarly, you note that it's not quite specific to NI's circumstances.

Do you see that?

A. You said in paragraph 42?

Q. Yes. You make a similar point in paragraph 42.

A. Yes.

Q. So Even-Tov's article is entitled "Failed Acquisition Offers: The Impact of Failure Reasons on Target Valuation."

Is that correct?

MR. COMERFORD: Form.

A. I can double-check that, but it sounds right.

MR. MANDEL: Why don't we pull it up.

Page 232

Let's put up the Even-Tov article that is our tab 6, please. This would be Exhibit 6. Here we go.

(Denis Exhibit 6 was marked for identification.)

BY MR. MANDEL:

Q. I was reading the title of the article. Did I read it correctly?

A. That's correct.

Q. Okay. So this is an article focused on failed acquisition offers; is that right?

A. That is their goal, yes.

Q. Does this case involve a failed acquisition offer?

A. Well, at the time of the beginning of the class period, what we have are two offer -- two proposals that have been rejected. So at that point, it's a failure.

Q. How is that? Did the deal at issue in this case fail?

MR. COMERFORD: Form.

A. I'm not sure what you were referring to as the deal.

BY MR. MANDEL:

Q. We looked at a proxy before in which the background of the merger was described.

Page 233

Do you remember that?

A. I do.

Q. A merger actually happened; right?

A. It did.

Q. Right. If you look at page 2 of this report --

A. Of this article?

Q. Yeah. Sorry.

MR. MANDEL: If we could scroll to page 2 of this article, it's in the section on data. Lower down, yeah.

BY MR. MANDEL:

Q. You see that the dataset here excludes successful acquisitions; right?

A. That's correct.

Q. And this case involves a successful acquisition; is that correct?

MR. COMERFORD: Objection, form.

A. Ultimately, this company was acquired, as is true with some of the firms and their data as well.

BY MR. MANDEL:

Q. So they excluded any transaction involving a successful acquisition here.

Do you see that?

MR. COMERFORD: Form.

Page 234

A. Well, they begin with acquisition offers, specific acquisition offers. They exclude any in which those offers ultimately were successful. So if the --

BY MR. MANDEL:

Q. All right. Do they --

A. If the company was later -- was acquired by somebody else, perhaps they could still be in this dataset.

Q. So in this case, we wouldn't have excluded this case; right? This article would not have excluded this case, the deal in this case; is that right?

MR. COMERFORD: Form.

BY MR. MANDEL:

Q. Because the deal in this case was successful; is that right?

MR. COMERFORD: Form, foundation.

A. I mean, ultimately, an acquisition was done in this case. All right. But, again, what we're trying to do is assess the economic materiality of certain omissions at the start of the class period.

And so what this article is informative to is if the target opposes and the company isn't acquired, is that information itself economically material. And this article is making it clear, as have other articles, that when an acquisition is opposed, that has valuation

Page 235

consequences with the target shareholders. Prices are going to revert down below what the offer price was. That is the situation that we have here.

BY MR. MANDEL:

Q. I understand that, but I don't think that's what I'm asking you. I'm not asking you to explain how it is you're using this article. We're probably going to get to that.

But I'm just asking about, you know, the -- you know, the facts of the circumstances addressed in this article and the extent to which they are similar in any way to the facts in our case.

And so this is an article that is expressly and explicitly about failed acquisition offers, and this article excluded successful acquisitions. And so I'm asking you whether that is a difference from the facts at issue in this case --

MR. COMERFORD: Form.

BY MR. MANDEL:

Q. -- because this case involved a successful acquisition.

MR. COMERFORD: Form, asked and answered.

A. I think we --

MR. MANDEL: Not answered, sir.

Unanswered.

Page 236

MR. COMERFORD: It's definitely answered.

A. I think, as we've discussed, this is -- this is a data point that would not have ended up in their sample. But what we're trying to assess is the situation as of -- as of the start of the class period.

And in that sense, this is a much better fit than any of the articles that look at public offers of a set of deals, some of which might turn out to be unsuccessful, but at the time of -- of the information disclosure, that's not known.

BY MR. MANDEL:

Q. So even though this article does not fully reflect the facts and circumstances in this case, you regard it as relevant economic evidence; is that right?

A. I regard it as far more relevant economic evidence than the articles that Dr. Cain cites is an important piece of evidence.

Q. Sure. But that's not my question.

My question is whether you regard this study as being relevant to this case, even though it, quote, does not fully reflect the facts and circumstances in this case.

MR. COMERFORD: Form, asked and answered.

A. Yes, I do -- I do view it as -- as relevant in this matter to a very important piece in this case,

Page 237

which is the rejection of the offer.

BY MR. MANDEL:

Q. So you accept that an economics paper could be relevant to this case, even if it, quote, "does not fully reflect the facts and circumstances in this case"; is that correct?

A. Yeah.

MR. COMERFORD: Form.

A. I think as an expert, you have to assess the degree to which certain articles are providing evidence that's relevant to the question at hand.

This one has some evidence that's relevant to the question at hand.

Is it -- is it a perfect -- it's -- a perfect reflection of the facts? No. I'm very clear about that.

We talked earlier about how I wouldn't necessarily use it to judge what the but-for price is. But it's much closer to the facts in the sense that we have a proposal. The proposal has been rejected. We can observe how prices respond to the rejection of proposals.

Now, I will say, too, that Dr. Cain has mischaracterized this study in the sense that he's characterized it as a set of deals that were already

Page 238

agreed upon.  That's not correct.  These are -- these are proposals that have been made that ultimately are unsuccessful.

BY MR. MANDEL:

Q.  Now, turning to the points you were just making there, why don't we look at -- because I want to understand exactly what's going on in this article, if you can help me understand it.  So let's turn to paragraph -- page 5 of this article.

Now, page 5 there has two panels.  Panel A is a non-rejection group.  Panel B is the rejection group.  It's the rejection group that you say is relevant to the analysis here; is that right?

A.  Correct.

Q.  Okay.  So if we can just try to understand this chart together, you've got A -- along the bottom axis, you've got A and F.  And I take A to refer to the announcement of a transaction and F to refer to when the transaction fails.

Am I getting that right?

A.  I would say A is -- is -- is the date on which the offer is made, it's publicly revealed.  It's not --

Q.  And --

A.  A transaction hasn't been done.

Page 239

Q.  Understood.  Yeah, I understand there's some ambiguity.  There's different interpretations of this.  I'm just trying to understand your understanding.

So your understanding is that A is where an offer is publicly announced; is that right?

A.  Correct.

Q.  Okay.  And what we see there is, on average, when an offer is announced, there's a very significant increase in stock price; is that right?

A.  That's correct.  And other literature has documented that.

Q.  Understood.

Now, at F, is it your understanding that the failure -- that F is where an announcement is made -- some public information is released that the deal is not going to happen, the deal fails?

Is that more or less correct?

A.  Yes.

Q.  Okay.  Now, when in this timeline is the rejection of the offer taking place, according to you?

A.  Well, we can't tell from -- from this particular study.  I mean, they are -- they are as -- I mean, like all large sample studies have to do, they have to group a lot of different observations together and try to -- to formulate a way to -- to represent it.

Page 240

So they may have some in which there's no rejection that's been made until what they're calling a failure date.  There may be some in which some indication of rejection happened at a different point in time.  We can't tell from their data or I couldn't tell from their description of the data when that might be.

Q.  So this data set could include rejection contemporaneous with announcement of the offer as far as you know; is that right?

A.  As I recall the way they worded it, that didn't seem like that that was likely.  But I -- sitting here right now, I can't say for sure.

Q.  So it might be the case -- and you can take a look at the article again if you need to to figure this out.

But it could be the case that the announcement and a rejection of the offer are taking place at the same time at point A in this chart; is that right?

A.  Like I said, I don't -- I don't think that they refer specifically to that, but, you know, I can say, from having done work in this area myself, is that that's a rare occurrence.

Q.  But to be clear, it could be that at the point of announcement, there's also a rejection

Page 241

announced.  But at the very least, the rejection occurs sometime between A and F, inclusive of both A and F; is that right?

MR. COMERFORD:  Form.

A.  Yes.  There's lots of different types of rejections, and I think I've talked about that in my report.  It's one of the reasons why this isn't a perfect reflection, is that some of these rejections that might be done here are soft rejections.  Even the failure could be sort of a soft failure, and so leaves -- leaves some room open.  And so it's not exact mirror image of the facts in this case.

But it is indicating that when investors see the likelihood of a deal getting done being reduced to zero, prices revert.

BY MR. MANDEL:

Q.  So to the point of a reversion, as we had just discussed, typically, according to this and according to other research of yours that you mentioned, or the other research generally that you mentioned where you have a potential M&A deal announced, you typically see a significant increase in the stock at that -- irrespective of the question of a rejection.

Because when there is an announcement of a potential M&A deal, you typically see a nice increase

Page 242

with stock; is that right?

A. That's correct, a -- significant statistically.

Q. Understood.

And that's what is reflected there in panel B, rejection group, where we see in panel A, the stock pops up; right?

A. Right.

Q. Okay. And this article, then, concludes that when there is a -- according to what I understand your interpretation of the article to be, when there is a rejection that is -- that leads to deal failure, to the deal not going through, the stock price falls back down again; is that right?

It reverts, in your words; is that right?

A. That's correct.

Q. Okay. So that is to say announcement of a potential deal tends to increase the stock price. Announcement of a rejection of the deal and failure of the deal leads to a downward correction, let's call it, of the stock price, but not to the level it was before the offer; is that right?

A. On average, that is correct. I mean, there's obviously a large distribution around that average effect. And that's what I'm getting at in terms

Page 243

of, you know, what sort of rejection are we talking about.

Is it outright rejection? Is it a soft rejection? Would investors interpret this as having room for the possibility of another offer? So on.

Q. And so what this article finds is that after a deal is announced, and then subsequently rejected by the target leading to a failure of the deal, that the stock price generally is higher than where it was before the offer was announced; is that right?

A. On average, that's correct, yes.

Q. It says in the -- if we look at the first page of the document in the abstract, I think it sort of summarizes this point where it says, "Targets declining offers" --

MR. MANDEL: Could we go to the first page of the document, please?

Right there.

BY MR. MANDEL:

Q. In the abstract, there's a sentence right in the middle beginning with the word "Conversely."

Do you see it says, "Conversely, targets declining offers show a positive revaluation of plus 7 percent."

Do you see that?

Page 244

A. I do.

Q. And the authors conclude that that indicates target management's private information about the firm's superior prospects; is that right?

A. I see that that's their interpretation, yes.

Q. So what this study is saying is that where you have an announced deal, and that deal subsequently fails due to the target rejections, that you still see a significant positive revaluation in the target stock price; is that correct?

MR. COMERFORD: Form.

A. Yes, I see that in their data. On average, that is the result.

BY MR. MANDEL:

Q. Right. They say, for example --

MR. MANDEL: If we go to page 2, the next page...

BY MR. MANDEL:

Q. Right there in the paragraph beginning with the words "In contrast" near the top there, say -- it sort of articulates further the point we just read from the abstract: "Targets in the rejection group experience a significant positive revaluation of around plus 7 percent over the proposal period."

Page 245

Right?

A. I see that.

Q. So -- so this is saying that publicly announced offers coupled with rejections of that offer still leads to a significant positive revaluation of the target company stock on average; is that correct?

MR. COMERFORD: Form.

A. On average, that's correct. And, you know, I point out how this 7 percent would lead to a much different but-for price than Dr. Cain has used.

BY MR. MANDEL:

Q. Well, we'll turn to that in a minute, but --

A. I would add a couple of things to that, I think. One is that these authors are offering a particular interpretation about information. There are other explanations that involve restructurings after the failure of the bid, which we don't see any evidence of taking place here.

So -- and, again, I'll reiterate the fact that this is a large sample study. There's lots of reasons for the rejection, some of which make it more likely than others that a subsequent deal might get done at a premium. So all that is embedded into this post-failure price.

Page 246

Q. Do you disagree with any of the conclusions in this article?

A. Well, there are conclusions and there are interpretations. I'm not sure how you're using those terms.

A conclusion about what's the average reversion and the 7 percent figure, I'm not disputing that number. They've offered one interpretation of what that means, that 7 percent number means.

And I've given other interpretations that have been offered in the literature for why the price may be above the preannouncement price, even after rejection of it.

Q. So this article, in the sentence we just read to you, I think it's fair to say, based on what you just said, concludes that targets in the rejection group experience a significant positive revaluation.

Do you disagree with that?

MR. COMERFORD: Form.

A. I don't disagree that the targets in this sample exhibit a significant increase in price before the announcement of the deal to after the rejection of the deal. That's a correct statement.

BY MR. MANDEL:

Q. So after rejection of the deal, we'd still

Page 247

see significant positive revaluation; correct?

MR. COMERFORD: Form.

A. You do. And, again, I'd have to emphasize, as you pointed out yourself, that this is not a perfect mirror image that we have in this case. So it's not perfect, but it gives you some indicators of the factors that are important, one of which being that the rejection of the deal leads to a reversion in the price. It doesn't stay up at or above the offer price.

BY MR. MANDEL:

Q. Well -- I'm sorry, what? The deal doesn't stay up above the offer price? Do you know what the offer price was from this data?

A. Well, I do know -- I don't know specifically from this data. I can combine these results with other evidence that Dr. Cain has pointed to as well about what -- our typical arbitrage spread.

So an average, the price at the announcement doesn't go all the way up to the offer price. So if it's not there to begin with, it tends to drop once the offer has been rejected, all of which is making it far less economically plausible that, you know, the beginning of the class period in this matter, that the but-for price would be $48 or above.

Q. I'm sorry. Does this study address offer

Page 248

prices at all?

MR. COMERFORD: Form.

A. This study doesn't. I don't know what you mean by address it, but it takes those into account. There are offers. Based on those offers, they measure the stock price reaction.

BY MR. MANDEL:

Q. Right. They're measuring the stock price of the stock, and they're measuring the extent to which offers and rejections change the stock price. They're not assessing offer prices in that regard. They are not, for example, assessing whether a stock price trades at or above an offer price.

What they're saying simply is when there's an announcement of an offer, the stock price itself tends to go up a lot. And when there is a deal failure because the offer is rejected, the stock price drops, but not down to the level it was before the announcement of a potential transaction. It still stays above that.

Am I accurately describing this study?

MR. COMERFORD: Form.

A. That is all correct. What you're omitting is my -- what my further discussion was was putting this in the context of the other literature as well. But when we see that significant stock price reaction upon

Page 249

announcement, how does that compare with the offer price itself?

On average, it's below the offer price. And Dr. Cain has referred to that -- that literature himself. So that announcement price that you see in this data, based on other literature, would be below the offer price. It then falls further upon rejection.

BY MR. MANDEL:

Q. Okay. So you're telling me all this stuff about offer price and other stuff. That's got nothing to do with the Even-Tov article that we're talking about here; right? There's no information about what the offered prices were in this Even-Tov article; is that correct?

A. I'm giving you the collective view of the literature on that. The Even-Tov article, as you say, does not directly incorporate the offer price into this.

Q. And could we look at -- okay. Let's go to your report. Let's look at paragraph 47 quickly. We'll come right back to this.

Go back to Exhibit 2, at paragraph 47 on page 23. Right. It's 23 to 24. If you can take a look at the paragraph, you know, you've got in your hand in front of you.

Paragraph 47 is the paragraph where you

Page 250

address the Even-Tov article; is that right?

A. That's correct.

Q. Okay. Are you citing any of this other wealth of literature that you're referring to in that paragraph?

A. No.

MR. COMERFORD: Form.

A. I don't need to to make the points I'm making in this paragraph.

BY MR. MANDEL:

Q. Okay. So if we turn back to the article, the Even-Tov article you were just looking at, which is Exhibit 6, if we go right back to where we were, you were drawing a distinction a moment ago between conclusions and interpretations.

You were saying you agree with the conclusions of the article, but maybe not the interpretations; is that fair?

MR. COMERFORD: Form.

A. That's fair. I'm not -- I'm agreeing or not disputing the numbers that they calculated that the -- following the failure, the price remains above the preannouncement price. They then are interpreting that as what does that mean.

Their interpret -- preferred interpretation

Page 251

seems to be if the market is inferring some information that reflects positive internal information about what investors ultimately perceive about the intrinsic value of the firm.

BY MR. MANDEL:

Q. Right.

A. That may be -- that's an interpretation that's consistent with the data. I don't dispute that.

Q. Understood.

So you're referring, for example, later in this paragraph where it says that the findings that we were just talking about about the rejected deals still trading above the pre-offer price, they write that those findings suggest that, despite the failure, the initial offer premium does not fully disappear, likely due to the market perceiving the target's rejection as a signal of positive internal information. And they go on to say that this information may reflect the target management's private insight into the firm's positive outlook.

Is that what you're referring to as an interpretation that's -- that you view as consistent with the data?

MR. COMERFORD: Form.

A. Yes.

Page 252

BY MR. MANDEL:

Q. You disagree with that interpretation?

A. I'm saying it's just one interpretation. There may be others.

Q. Do you posit another?

A. I did explain another before when -- another possibility is that the original offer itself led to the target company undertaking some sort of internal restructuring that creates value, and now the stock price reflects that increased value.

Q. Well, presumably, in that scenario where the target companies engaged in some kind of restructuring, the insiders at that company know what they're doing; is that right?

MR. COMERFORD: Form, foundation, calls for speculation.

A. I would presume that if they're conducting a restructuring, they're doing it for purpose, if that's your question.

BY MR. MANDEL:

Q. And they know that they're doing a restructuring; right?

A. Yes.

Q. Right. They know the facts supporting whatever their plan is; right?

Page 253

A. I don't know that I'd refer to them as facts. Any company doing a restructuring is making some forecasts of the value impacts of that restructuring. So they would have something in mind, yes.

Q. Right. So the restructuring would be a function of management's private insights into the firm; is that right?

A. Yeah. I might say -- you call them "private insights." When you say "private insights," it implies private information. They may not have private information, but they have subjective judgments about what the outcome of such a restructuring would be.

Q. Just to be clear, private insights is -- I'm quoting Even-Tov --

A. Right.

Q. -- from the paragraph we were just reading.

A. Right.

Q. And so your view that it maybe doesn't -- that a rejection maybe doesn't signal positive insight information to the market, you know, your example for that seems to me to be an example that's directly in line with what they're talking about here. You gave an example of private insights that management has about what they're going to do with the company that provides added value; no?

Page 254

A.  I'm trying to draw the distinction between -- and perhaps it's too fine a line.  But there's a distinction between the managers having private insights about what the true intrinsic value of the company is and then having to convince investors of that versus a restructuring in which they're actually going to change what the company is, which could also lead to a subsequent change in value.

Q.  Okay.  So just taking a step back here in simple terms in terms of what's really going on with this study, and we can look at page 5, right, with the two tables.  Let's wait until -- yeah, here.

So what's going on here is you're comparing deals that failed because the target rejected it versus other reasons for deal failure; is that right?

A.  That's one of the analyses they do, yes.

Q.  Right.  So other reasons for deal failure include things like the acquirer deciding not to proceed with the transaction; is that right?

A.  That would be in that group, yes.

Q.  So what they find is that when the acquirer is rejecting the offer, you tend to have positive stock revaluation even after reversion because, as they hypothesized, the rejection itself communicates that the market -- the likelihood that management has private

Page 255

insights that are unavailable to the market; is that right?

A.  No, that's incorrect.  It's the other way around.  It's not when the acquirer rejects the --

Q.  What did I say?  Same question, switch it around.  So I'm just going to ask it again off of realtime.

What they say in this article is that when a target is rejecting an offer, you tend to have positive stock revaluation even after reversion because, as the authors of the study hypothesized, the rejection itself communicates to the market the likelihood that management has private insights that are unavailable to the market; is that right?

MR. COMERFORD:  Form.

A.  That's, I think, a correct characterization of the result.

BY MR. MANDEL:

Q.  And what they find --

A.  The interpretation of their result, I should say.

Q.  And what they find with respect to the nonrejection group is that where the reason for the deal failure is not the target rejections but, for example, the acquirer withdrawing the offer, you tend to see a

Page 256

downward dip in the price to below the pre-offer price of the stock; is that right?

A.  That's correct.  If -- in -- in a global sense.  If you look at all the -- all the failures that are not due to the target rejecting together, then that result is as you described it.  The reversion goes below what the preannouncement price was.

Q.  So the point is:  When a target rejects an offer, you have, generally, a positive impact on the stock price, a positive -- significant positive revaluation, as they call it.

And for all other reasons that a deal fails, you don't have that; is that right?

MR. COMERFORD:  Form.

A.  On average, that's correct.  I mean, that's not true of every individual case, obviously.  There's different nuanced reasons for the failures, and that's why just looking at the study is not quite enough, in and of itself, to draw an inference.

But it's, nonetheless, informative that there is this reversion when there's a rejection of an offer.

BY MR. MANDEL:

Q.  So when an offeror is rejecting an offer, you tend to have a significant positive revaluation due

Page 257

to possibly the market's interpretation that the rejection of an offer signals that management knows something the rest of the market doesn't know; is that right?

MR. COMERFORD:  Form.

A.  That is their interpretation.  It may -- it may signal that the manager's private views of the value is higher.

BY MR. MANDEL:

Q.  All right.  And you don't disagree with that interpretation, do you?

A.  As I said, that's one possible interpretation.  It is consistent with this -- with this overall data.

You know, in this particular instance, I think there is evidence that the managers had forecasts of performance that was better than that of the market and, yet, market price didn't -- didn't reflect that.  So...

Q.  Did you review any evidence standing for the proposition you just articulated?

A.  I seem to recall that evidence being mentioned in -- in at least one of the reports that I -- that I reviewed.

Q.  You say there's evidence that managers had

Page 258

forecasts of performance that was better than that of the market.

What are you talking about?

A.  I think I've seen reference to NI managers believing that they had a strategic plan that could create more value for the company than would the offers that were on the table from Emerson as part of their discussion of rejecting the bid.

Now, that's not an uncommon view that managers would have.  But the issue is can they ultimately convince investors that that -- that that -- that that's the plan.

Q.  Did you review any evidence in this case supporting anything you just said?

A.  Other than the statements of managers in rejecting the proposals, I don't think I can point to any, no.

Q.  I see.

So you're basing this idea that the managers, in fact, knew stuff, based on --

A.  I'm not -- I'm not claiming that they know things.  And this is the distinction I was trying to draw before.

I'm not claiming that they know things in a nonpublic information sense.  Most managers, I would

Page 259

say -- and I'm speaking in generalities now.

Most managers believe in the strategic plan they have for the company, and oftentimes believe that the market is not representing what they think is the full value of the strategic opportunities.

They don't have facts that say this is what the strategic plan is going to produce.  They have subjective judgments in their role as the managers, and they believe in those plans.  But that doesn't necessarily mean that the market believes in those plans.  That's all I'm saying.

Q.  So you're making sort of a general statement about what most managers might have or know.  You haven't reviewed any evidence in this case to support --

A.  Like I said, other than the statements that NI made in response to -- to the proposals that they rejected in which they -- they believed that their plans would create greater long-run value for shareholders than this $48 proposal would, other than that, no.

Q.  Okay.  Understood.

Now, in your report, you -- let's just look quickly at paragraph 47 again, your report.

MR. MANDEL:  If we can toggle back to Exhibit 2.  Okay.  If we can look at the next page where

Page 260

the paragraph carries on.

BY MR. MANDEL:

Q.  So there's a sentence beginning with the word, "Using the average and the median cumulative abnormal return."

Do you see that?

A.  I do.

Q.  Okay.  So the Even-Tov study finds that after there's a stock price pop on the announcement and then a rejection and a failure and a reversion of the stock price, that after that reversion, the stocks are, on average, 7.34 percent higher in price; is that correct?

A.  That's correct.

Q.  That's an average number; correct?

A.  Correct.

Q.  And 5.56 is the median number; is that correct?

A.  Correct.  And only one qualification to that that I'd make is that it's not pure percentage change in the prices, but it's adjusting for market movements during that time period.

These are cumulative abnormal returns.

Q.  So it's not saying that it's 7 percent higher in price; it's saying that -- what is it saying?

Page 261

Clarify --

A.  It's saying once you adjust for all percentage movement you might expect, given the market movements during that time, this is 7.34 percent above that.

Q.  So it's just saying, in effect, if you have normal returns, 7.34 percent; is that right?

A.  Cumulative abnormal return, yes.

Q.  Understood.

And basically same questions for the median number, the 5.56 median, that's a median of abnormal return, cumulative abnormal return, not an increase or decrease in stock price itself; is that right?

A.  Correct.

Q.  Understood.  That's an important distinction.  Thank you.

So when you are -- when you suggest here -- you take those -- that average and median number and you apply it to the facts of this case to say that that data implies a but-for price of, you say $43.09 and $42.37 respectively; is that right?

A.  Correct.  If I were to use those -- those estimates, yes.

Q.  So what you're doing there is you're taking the average number from the Even-Tov study and just

Page 262

applying it to the National Instruments closing price the day before the start of the class period; is that right?

MR. COMERFORD:  Form.

BY MR. MANDEL:

Q.  And if you look at your Footnote 102, I think it helps explain that, which is lower on this page.  We can't see.

A.  Yes, that's correct.  Yeah, the August 11th price.

Q.  Okay.  So you are not offering an opinion here that this is the correct but-for price, that these numbers you're citing here are the correct but-for price, are you?

A.  No, I'm not.  I think we discussed this before.  I'm not calculating a but-for price.  I'm simply saying that this is a study that comes closest to the situation in this matter.  It implies but-for prices that are well below the $48 that Dr. Cain uses.

But I'm issuing the caveat that this is not a perfect one for one, either, and that could very well be much lower than that because of the fact that this is an outright rejection.

Q.  So -- and so to arrive at these numbers, you're simply applying the average and median number

Page 263

from the Even-Tov study; is that right?

A.  I am.

Q.  Okay.  If you were offering an opinion on damages, it would not be proper to make that determination based on this average number, would it?

MR. COMERFORD:  Form.

A.  Well, as I'm saying in the subsequent sentence, I would be considering other offer-specific rejection-specific characteristics, which may very well be important; and I've argued earlier in the report are important in terms of the economic materiality of these alleged omissions.

So it's not -- the study is not quite close enough, in my opinion, to just be used to generate but-for prices.

BY MR. MANDEL:

Q.  If we go back to the study and look at page 4 of the study.

MR. MANDEL:  Again, that's Exhibit 6.  If you go to the previous page.  Right there.

BY MR. MANDEL:

Q.  So if we look at Table 2 there, if you look along one, two, three, four, five -- six down the left-hand side, you see CAR, A minus 25, F plus 25.

Do you see that?

Page 264

A.  I do.

Q.  And that is where you're getting those mean and median numbers; right?

The 7.34 percent is the mean figure for this time range, and the 5.56 percent is the median figure for this particular time range; is that correct?

A.  That's right.

Q.  All right.  And those are just averages there, an average and a median.

Now, I see in the right-hand column there is a reference to a standard deviation of 31.7 percent.

Do you see that?

A.  To the rejection group you're referring to?

Q.  Yeah.  I'm looking -- sorry.  I'm -- the rejection group is the one you say is the pertinent group; right?

A.  Uh-huh.

Q.  Right.

So I'm looking at the rejection group, looking at minus 25, plus 25, so that's the relevant -- the same comparators, the relevant time period we're talking about that you cite in the study.

And that -- you know, the 7.34 percent average and the 5.56 percent median come from that line in the study; is that right?

Page 265

A.  That's right.

Q.  And it identifies in the next column over to the right a standard deviation of 31.7 percent; is that right?

A.  That's right.

Q.  So that standard deviation in sort of simple, nonstatistician's terms, that's referring to the extent to which individual results, the individual inputs into the study, vary from the average; is that right?

A.  That is -- roughly speaking, yes.  It's, roughly speaking, a measure of the variability of this -- of this return across the sample.

Q.  So a very low standard deviation would suggest that the data inputted into this study would be clustered around the 7.34 percent; is that right?

A.  Right.  So if a standard deviation was zero, for example, that would mean that every observation have a return of 7.34 percent over this interval.

Q.  Got it.

And the larger the standard deviation gets, the more widespread is the range of the actual inputs that lead to this average; is that right?

A.  That's right.

Page 266

Q.   Okay.  So a 31.7 percent standard deviation, does that indicate to you that the actual results in the study were not clustered around 7.34 percent but were distributed more widely?

A.   No.  I think I referred to that before, that there is variability around this adverse result.  And that's why they need to use that variability to determine whether that 7.34 percent, for example, is different from zero.  And the answer is yes.

Q.   Understood.  Thank you for that.  And thank you for bearing with my clumsy statistical ways of describing.

A.   Well, you bear enough of my clumsy description of legal terms, so fair is fair.

Q.   Fair enough.

MR. COMERFORD:  Mr. Mandel, do you think we could consider taking a short break for lunch?

MR. MANDEL:  Absolutely.  I don't even know -- I was so riveted by this discussion, I was -- I lost track of time.  I'm happy to take a break.  Sure.

VIDEOGRAPHER:  We are going off the record at 12:58 p.m.

(A break was taken.)

VIDEOGRAPHER:  We are back on the record at 1:38 p.m.

Page 267

BY MR. MANDEL:

Q.   Welcome back, Dr. Denis.

A.   Thank you.

Q.   If we could just go -- put back the last exhibit on the screen, Exhibit 6, the Even-Tov article, I've got another question about it.  If we could go to the first page of that article.

Do you see the first sentence on this article, Dr. Denis?

A.   I do.

Q.   First sentence, in the introduction states, "Mergers and acquisition, M&A, are transformative events with significant repercussions for firms and investors."

Do you see that?

A.   I see that.

Q.   Do you agree with that?

MR. COMERFORD:  Form.

A.   I think we talked about this before.  I think they can be transformative and they can have significant repercussions.  They don't always.  So, you know, this is a blanket statement they are making.

BY MR. MANDEL:

Q.   Well, you introduced this article into this case; is that right?  We talked about that before, too; right?

Page 268

A.   I am the first one to reference this article in this case, yes.

Q.   Right.  Right.

And so you are advancing this economics paper as informative evidence in this case; is that right?

MR. COMERFORD:  Form.

A.   I am.  This first sentence of the article has no bearing, really, on the analysis that they do or conclusions that you draw from it.  They're just going on that part of the paper.

BY MR. MANDEL:

Q.   The first sentence has no bearing on it?

A.   Has no bearing on the -- the impact that it has on this case and how I'm referring to it.

Q.   Does this sentence support the conclusion that the information about mergers and acquisitions in general is material information for investors?

MR. COMERFORD:  Form.

A.   I don't -- I think you'd have to look at the evidence that they're offering as -- as answering that question, as opposed to some broad, general statement that they're using to try to introduce what they're ultimately going to be studying in this article.

BY MR. MANDEL:

Page 269

Q.   Okay.  Let's take this down, and let's go back to your report, which is Exhibit 2.

Now, if we could go to the immediately preceding page, yeah, right there.  Right there.

So I'm going to ask you about the language on this page from paragraph 46.  So the paragraph begins on the last page, but I want to ask you about something you wrote here on this page.  I'm going to ask you about the toehold literature.

You see where you have a sentence there that begins, "The toehold literature cited by Dr. Cain"?

A.   I see that, yes.

Q.   Okay.  And so you say there -- in the subsequent sentence, you say that, as you discuss above -- and this is discussed in your report -- the toeholds analyzed in those papers, referring to the Walkling 1985 paper and the Betton and Eckbo 2000 paper, you say, "The toehold analyzed in those papers are much larger than Emerson's toehold in this matter."

You see that?

A.   I do.

Q.   Are you sure that's correct?

A.   I'm explaining that statement below in Footnote 98.  So that's a statement about the relative magnitude of the toehold studied in the subset of the

Page 270

data that -- in Betton and Eckbo and Walkling, it is relevant to this matter, as target is opposed. And those, on average, are higher than what we observed in this matter.

Q. Okay. So what you're -- you wrote here that the toehold analyzed in those papers are much larger than Emerson's toehold. And then you just said something about average toeholds discussed by those articles in your answer.

So I'm asking you about what you actually wrote in the body of your report, which is that the toeholds analyzed in those papers are much larger than Emerson's toehold in this matter.

A. Well, again, I think I'd give the same answer, is that the footnote is there to sort of explain what I mean by that statement. And what I mean is that, on average, they are larger.

Q. Okay. If we could just put up the Betton and Eckbo study, which is -- which is our tab 11. This will be Exhibit 7.

(Denis Exhibit 7 was marked for identification.)

BY MR. MANDEL:

Q. Now, if we can go to page 17 of the PDF, it's a document Bates 10 -- ending 1007. It's page 857

Page 271

of the document itself. This is Table 4, which I think you cite for this proposition. Table 4 goes to the next page. I think it's the continuation of the table on the subsequent page that you're actually citing here --

A. Correct.

Q. -- is that right?

A. That's correct. Sorry.

Q. Okay. Now, if we look along the left-hand side of the page, we'll see percentage sizes toehold.

Do you see that?

A. I do.

Q. Okay. So do you see right there, there's one where the toehold equals zero?

A. Yes.

Q. And then there's another where the toehold is between zero and 5 percent; is that right?

A. I see that.

Q. Okay. What was the toehold -- what was ███████████████████████████████ ██ ████████████████

Does that sound familiar?

A. ████████████████████ ███████████████████████████████████ ████████████████████████████████████████ ██ ████████████████████████

Page 272

Q. So the toehold at issue in this case is actually addressed by this Betton and Eckbo study; is that right?

MR. COMERFORD: Form.

A. They have observations in their studies that has toeholds around that amount, sure.

BY MR. MANDEL:

Q. So when you wrote that the toeholds analyzed in those papers are much larger than Emerson's toehold in this matter, at least as to the Betton and Eckbo study, that's not correct; is that right?

MR. COMERFORD: Form.

A. Again, as I explained below, when I make that statement, I'm simply referring to the averages -- the average toeholds. I'll admit I didn't say "average" in that final sentence of paragraph 46.

BY MR. MANDEL:

Q. So the Betton and Eckbo study does actually analyze toeholds of the size at issue in this case; is that correct?

A. It does have those as an element of their study, yes. And as we can see, that the likelihood of success is lower for that range.

Q. In your view, where in this -- on this table would we fall. There's sort of a column for

Page 273

single-bid contests; there's a column for second bid by initial bidder and second bid by rival bidder.

I mean, am I right that we're in the second-bid-by-initial-bidder column here?

A. Yes. I think, technically, we would be on this case. The bid itself was the same dollar amount.

Q. Okay. So --

A. But there were -- there were two proposals.

Q. Right. So if we're looking at that section, then -- we see here is that there were -- out of 99 total instances, 22 of them had toeholds between zero and 5 percent; is that right?

A. Yes, that's correct.

Q. So about 20 percent of the situations considered here had toeholds between zero and 5 percent; is that correct?

A. I'm sorry. Can we go back to your previous question? I'm not sure I answered that one correctly.

Q. Well --

A. When you're referring to, I think, column -- column 5, the S column.

Q. Yes. Okay.

A. And your question is --

Q. So there were -- and if you look at the bottom of that, you'll see the total was 99; right?

Page 274

A. Uh-huh.

Q. And that 99 --

A. Sorry. That's correct.

Q. Right. And so 22 of the 99 considered here had toeholds between zero and 5 percent; is that correct?

A. 22 of the 99 in this column, yes, that's correct.

Q. So that's more than 20 percent had toeholds between zero and 5 percent; is that correct?

A. Correct.

Q. All right. So they are considering toeholds similar in size to the one at issue in this case, in this article; is that right?

MR. COMERFORD: Form.

A. I think I've testified to that, that they are considering and their sample contains toeholds in the range that we see in this matter.

BY MR. MANDEL:

Q. Right. But it's -- in this particular instance where we're talking about the applicable column here, it's not that 1 or 2 percent of the deals has this. It's more than 20 percent of the deals that they're looking at here has a toehold of zero to 5 percent; is that right?

Page 275

A. In that subset of the deals, yes.

Q. Okay. Okay. Let's move on from this subject, and let's turn to your opinion set forth in III of your report, which is beginning on page 5 of your report. So let's go back to Exhibit 2, please.

Now, if we look at your paragraph -- oh, wait. Can we go, please, on the screen to page 5 of this exhibit? That would be page 7 of the PDF, so two later. Yeah. Okay.

So right there, you see Roman numeral III near the bottom of the page there. That's where this section of this opinion begins; is that right?

A. That's correct.

Q. This is where you set forth your opinion and analysis concerning your view that Dr. Cain's opinion about economic materiality is flawed; is that right?

A. That's correct.

Q. Now, in paragraph 13, if we look at where it continues on the next page, you identify four categories of evidence that Dr. Cain bases his conclusions regarding materiality upon; is that right?

A. That's correct.

Q. Now, the first of those categories is review of the timeline of merger and acquisition,

Page 276

M&A-related events; is that right?

A. That's right.

Q. Okay. Now, Dr. Cain cited approximately 80 case-produced documents, documents produced in this case, as evidence regarding that timeline of merger, acquisition-related events; is that right?

MR. COMERFORD: Form.

A. I'm going to have to take your word for it on the number. I don't recall a specific count.

BY MR. MANDEL:

Q. Okay. But he quoted a substantial number of exhibits; is that fair?

A. He did.

Q. A lot of internal case documents produced in this case discussed in Dr. Cain's report; correct?

A. Correct.

Q. And I think you testified earlier that you did not review those documents; is that right?

A. I think I testified that I've seen many of those documents throughout the course of this, my two reports that I've done, and there are other documents that I may not have reviewed completely, but just reviewed Dr. Cain's statements about them.

Q. Right.

So if they're not listed in your reports as

Page 277

documents you considered, you did not look at the actual documents in coming to this opinion; is that right?

MR. COMERFORD: Form.

A. I think that's correct, yes.

BY MR. MANDEL:

Q. Okay.

MR. MANDEL: Let's look at paragraph 16, which is on the next page. One more.

BY MR. MANDEL:

Q. Okay. You write here -- your topic sentence here is, "Dr. Cain's opinions about materiality are flawed."

Do you see that?

A. I do.

Q. You go on to say, "None of Dr. Cain's four categories of evidence establishes the economic materiality of the alleged omission."

Do you see that?

A. I do.

Q. And when you say "none of the four categories," you're including the first one based on Dr. Cain's discussion and review of all of these factual documents produced in this case that you did not review; is that correct?

A. I am reviewing them to the extent that he's

Deposition of David J. Denis, Ph.D., Vol. II                    In Re National Instruments Corporation Securities Litigation

Page 278

described them.

Q. Well, I'm sorry, I don't think that's true.

What do you mean you're reviewing them to the extent he describes them?

You mean you're reading what Dr. Cain wrote about them?

A. Dr. Cain is quoting from the -- from the documents and then drawing inferences about materiality from the information that he's pointing to.

So I'm evaluating his evaluation of the materiality of those passages of those documents.

Q. Understood.

And to come to your conclusions on this, you did not actually review the documents he is citing; correct?

MR. COMERFORD: Form.

A. I think in many cases, that's correct, yes.

BY MR. MANDEL:

Q. Okay. So you write here, "Dr. Cain's lengthy litany of facts provides no economic basis for concluding that the alleged omitted information was economically material."

Do you see that?

A. I see that.

Q. Okay. So to come to that conclusion, you

Page 279

did not actually review the facts; rather, you reviewed what Dr. Cain wrote about them.

Is that correct?

A. That's not entirely correct because Dr. Cain is not just writing about these documents, he's quoting from those documents. And so he's using those passages to draw his inference; I'm evaluating that inference.

Q. Okay. So in evaluating his assessment of that evidence, you did not go and review the actual evidence; is that correct?

A. Well, again, he is -- he is quoting -- he's -- those quotes are the evidence that he's using.

Q. Those quotes come from documents; right?

A. They come from documents.

Q. And you did not go and review those documents; is that correct?

A. In many cases, that's correct. Again --

Q. But you're --

A. -- my assignment here is to evaluate what Dr. Cain has done. Like, he is citing --

Q. Okay. Dr. Cain --

A. -- these passages. I'm evaluating whether he's drawing the correct inference from what he's cited.

Q. Dr. Cain relied on numerous pieces of

Page 280

evidence to support his opinion, and you did not review much of that evidence in assessing his opinion; is that correct?

MR. COMERFORD: Form.

A. I reviewed the evidence that he cites to draw the inferences, the opinion that he makes.

BY MR. MANDEL:

Q. Well, Dr. Cain cites Bates numbers for these documents; is that right?

He's not just quoting the documents. He's citing the documents and providing a list of all the documents relied on; is that right?

A. He's provided a reference from where those quotations come from.

Q. And you didn't review where those quotations came from; correct?

A. In some cases, that's correct.

Q. In almost all cases; is that not right?

A. I mean, I haven't fully analyzed whether it's almost all cases or not. I just haven't put the two --

Q. I mean --

A. -- side by side.

Q. Come on, Dr. Denis. You cite about six documents as relied on in this report. I think there

Page 281

were three in the previous one. In the previous one, none -- Dr. Cain doesn't cite any of the documents, I don't believe, that you cite in your earlier report.

So you identify six documents that you consider. Dr. Cain cites approximately about 80.

You're not willing to say that you did not review most of the documents Dr. Cain cited?

A. Again, as I said, I've seen many of these documents. He refers to them. I've seen that they're there. I've looked at some of them; I can't tell you how many.

But in the end, what I'm doing is evaluating what Dr. Cain has said. And so --

Q. But --

A. -- those documents aren't -- aren't going to appear as documents that I considered formally because I'm considering what he says. He's drawing his opinion based on the quotations that he offers in his report. That's what I am evaluating. That's what he's done.

Q. Dr. Cain cites numerous academic articles in his study; is that correct?

A. He does, yes.

Q. Did you just read what he wrote about them or did you go read those academic studies?

Page 282

A.  I looked at those academic studies.

Q.  Well, why?  I thought you were just opining on what Dr. Cain was saying about things.

A.  Well --

Q.  Why would you go and read those documents?

A.  He's making inferences from academic studies.  I'm looking at that and thinking, I'm not sure that's the inference I would draw, so I'm going to the academic study to -- to evaluate that.

Q.  Okay.  And he's drawing inferences from numerous facts from the record, and you never bothered to review those facts in assessing his opinion; isn't that right?

A.  If he's quoting from a particular document, like I said, in many cases, I've seen these documents.  I've confirmed that that quote is there.  But in the end, I'm evaluating what he's saying about that.

Q.  You're starting to say now that you've seen some of these documents.

What do you mean you've seen these documents?

A.  I mean, there's been a large amount of production in this case.  I've had access to that production.

Q.  You had access to the production, and yet

Page 283

you wrote reports where you listed the documents you considered, and the -- your list of documents you considered does not include most of the documents that Dr. Cain considered; is that wrong?

MR. COMERFORD:  Form.

A.  That may be correct.  But, again, I'm -- I'm evaluating what he's saying, what he's doing.

Q.  Okay.  So in your opinion, to evaluate Dr. Cain's assessment of this evidence, you did not need to review the actual evidence; is that correct?

MR. COMERFORD:  Form, mischaracterizes testimony.

A.  I'm saying in situations in which he has quoted from the evidence, I'm evaluating that evidence and his inference from that evidence.

Those quotes are taken directly from the documents.  So in that sense, I didn't directly consider those documents, but I'm primarily viewing these through the lens of what Dr. Cain has done.

BY MR. MANDEL:

Q.  Okay.  Now, let's just go back to this sentence, "Dr. Cain's lengthy litany effect," you write, "provides no economic basis for concluding that the alleged omitted information was economically material."

I note there you refer to "alleged omitted

Page 284

information."

That's the term of art assumption from your counsel there; is that right?  That's what you're referring to there?

A.  Well, Dr. Cain has -- has alluded to alleged omitted information as well.

Q.  You made it a defined term, and you defined it to be consistent with language from your counsel; is that right?

MR. COMERFORD:  Form, asked and answered.

A.  It's fair I had to make an assumption ultimately since Dr. Cain didn't define this for me.  So counsel has given me this instruction to make this assumption; that's -- that's correct.

BY MR. MANDEL:

Q.  So just to be clear, earlier you were saying, oh, this assumption is not really critical to my analysis.

You know, in this example, you know, your analysis of facts you didn't review is actually tied directly to this assumption, which is also inconsistent with the allegations of the complaint; is that correct?

A.  I mean, I'm -- I'm evaluating what Dr. Cain has -- has listed out as events that took place, that he's inferring from them that they are evidence of

Page 285

economic materiality.  I'm simply saying they are not economically material.

Q.  Are you saying that they're not economically material, or are you saying that there's no economic basis for concluding that the, quote, "alleged omitted information," unquote, was economically material?

A.  I'm, in a sense, saying both.  I mean, he is making claims about economic materiality of certain pieces of information.  I'm evaluating that in the context of my understanding of the alleged omitted information, which would include the rejection of the two proposals.

So in that context, I'm evaluating the economic materiality of other pieces of information that Dr. Cain is referring to.

Q.  Well, hold on a second.  Your statement here is that there's no economic basis for concluding that the defined term "alleged omitted information" was economically material.

You're now testifying that actually you were talking about other alleged omitted material information not included in this assumption; is that correct?

MR. COMERFORD:  Form.

Page 286

A. I think what I'm saying is that I'm evaluating what Dr. Cain has claimed is information consistent with economic materiality. I'm evaluating that in the context of my understanding of what's alleged to have been omitted. And as I've said before, a very salient part of that is the outright rejection.

It's a fact that Dr. Cain has generally ignored that in his evaluation of other pieces of information, and that's important. That's the sense in which they're connected.

BY MR. MANDEL:

Q. Okay. Well, you just said Dr. Cain is ignoring that, so let's move on to paragraph 17 where that's what you said. You say with respect to Dr. Cain's purported application of the fundamental principles of finance, valuation and mergers and analysis is flawed; right?

And you write, "Dr. Cain ignores that NI's board unanimously rejected both of Emerson's proposals and determined that the proposals did not provide a basis for further discussion."

Do you see that?

A. I see that.

Q. So in your view, Dr. Cain ignores that NI's board rejected the offer; is that right?

Page 287

A. As I said before, in certain context, he's ignoring that. He's evaluating certain pieces of information and, as he's putting it, applying principles of finance and M&A to that. He's ignoring the fact that there's another piece to this, which is that NI's board rejected this twice.

Q. Okay. Let's look at Dr. Cain's report, that would be our Exhibit 5.

Okay. Now, if we could please turn -- I'm looking for a page number. If we could turn to page 8 of the report. Now, in page 8 of the report, do you see paragraph 26 there?

A. Yes, I do.

Q. It says specifically there at the end of that paragraph, it's specifically referring to the fact that NI's board rejected Emerson's offer on June 16th, concluding it significantly undervalued the company; do you see that?

A. I see that.

Q. He cites that; right?

A. Right.

Q. Okay. So he doesn't ignore it. It's in his report; is that right?

A. He has listed it out as having happened. When I say he's ignoring it, I'm saying he's ignoring it

Page 288

in applying the principles of financial economics.

Q. Okay. Let's look at paragraph 46, which is on page 15. The paragraph 46 on page 15, you see right there at the beginning, "Later that day, on June 14th, NI's board rejected Emerson's $48 offer, stating that" -- and it goes on from there.

Do you see that?

A. I see that.

Q. He actually quotes NI's letter right there, doesn't he?

A. I believe that's correct, yes.

Q. Right. So, again, it's right there in his report. He's not ignoring it; is that right?

A. His report makes it clear that he's aware that the rejections took place. When he's evaluating the economic materiality, he seems to ignore that. And in my view, that's a very important piece. And academic evidence supports that.

Q. I see.

So your testimony is that he mentions the rejections in his report, but that, in his analysis applying the economic principles, he doesn't address it and ignores it there. Is that what you're saying?

A. I'm saying he's not taking that into account properly as a -- as the economic analysis.

Page 289

Q. Got it.

And here in your report, you wrote that he ignores this; is that right?

A. Correct.

Q. Okay. Let's take a look at page 45 of this document that's up on our screen. We're looking at paragraph 113 there at the bottom. And he writes, and I'll just read it, "The possibility of revised or improved bids is not merely theoretical, it reflects the well-documented reality that M&A negotiations unfold over multiple stages.

"In a large sample, evaluating private merger negotiations, Cain, et al. found that announced transactions typically involve extensive back-and-forth with an average 5.4 rounds of bidding."

Do you see that?

A. I see that.

Q. He goes on to say, "This iterative process, where targets initially reject offers and negotiate for better terms, is common and consistent with the goal of maximizing shareholder value."

Do you see that?

A. I see that.

Q. So he is actually addressing in his application of economic principles initial rejections of

Page 290

offers; is that right?

A. Yes. He has addressed the fact that there are initial rejections. He's using a sample that I talk about in my report as not being really representative of the situation. And part of that unrepresentativeness is the manner of the rejection that took place in this case, which is characterized by the company itself and its advisors as an outright rejection.

Q. Okay. So Dr. Cain did not ignore this fact in his application of economic principles, did he?

MR. COMERFORD: Form.

A. I'm saying he did ignore important aspects of that. He hasn't ignored the fact that there were two bids and they were both rejected. He stated those facts correctly, but it seems to have escaped his analysis of the economic importance.

BY MR. MANDEL:

Q. Well, hold on. You wrote in your report that he ignores it. I showed you instances in which he talks about it. You said, no, no, no, what I mean is that he's ignoring it in the application of the principles.

I'm showing you the section where he's applying the principles and he's not ignoring it, and now you're saying that really what you mean is just that

Page 291

you don't agree with him, not that he ignored it; is that right?

A. No, not completely. Because what I'm saying is that he's ignoring the nature of the rejection. I think we talked earlier about outright rejections versus soft rejections. I just mentioned the fact that the study that he's talking about there that he's done with co-authors is really starting from the standpoint of completed deals and then working backwards and saying, Well, sure, there were multiple rounds.

Okay. That doesn't inform us to this particular situation in which there have been two proposals. They have been rejected with no basis for further discussion. He's ignoring those important aspects of the facts in this matter. That's what I'm getting at.

Q. So when you wrote, "Dr. Cain ignores that NI's board unanimously rejected both of Emerson's proposals," you did not mean that he ignored those facts; is that correct?

MR. COMERFORD: Form.

A. I'm saying that he ignored the -- he essentially ignored the nature of this rejection in his analysis of the -- of the two proposals.

BY MR. MANDEL:

Page 292

Q. I see. But that's not what you wrote here in your report, is it?

A. I was perhaps a little inartful, but it's certainly what is implied by that.

Q. Okay. Let's go back to -- oh, yeah. It's up here on the screen. If you look at the next paragraph, which is paragraph 114, which picks up from the language I just read to you about initial offer rejections, all right, in this he describes -- he discusses various studies and explains that, you know, these findings support the view that rejecting an initial offer is not necessarily a refusal, but rather is commonly part of the deliberate strategic negotiating process, et cetera.

You see that; right?

A. I do.

Q. So he's, in fact, again, in his application of the economic principles, addressing the rejection that you wrote he ignores; is that right?

A. Well, what I discuss in my report, and I think I just mentioned a few minutes ago, is that this particular study is not really a correct way to be looking at that because this study is starting from deals that were done.

Q. We can talk about all those details, but

Page 293

I'm not asking you about your analysis of that study. I'm asking you about what you wrote when you accused Dr. Cain of ignoring facts and analysis that are clearly in his report. I'm not asking you to give me a song and dance about the Cain, et al. article. We'll discuss that. I'm just trying to establish that you accused Dr. Cain of ignoring something he actually addresses in his report.

Is that true, that you accuse him of ignoring things that he actually addresses?

MR. COMERFORD: I object, and specifically to the use of the term "song and dance." I don't think that's appropriate, and I object on that basis.

You can answer the question if you remember.

A. Yeah. I think the point that I'm making, and I think I've said this a few times now, is that he's ignoring the relevant circumstances of this particular rejection.

BY MR. MANDEL:

Q. In fact, this language here about rejecting an initial offer not being a refusal, you quote that language in your report; is that right?

A. I think I did quote that, yes.

Q. Yeah. I think you quote it in two

Page 294

different places in this report. Could that be true?

A. Certainly.

Q. All right. So you are quoting language from Dr. Cain's report addressing rejections while accusing him of ignoring those rejections; is that correct?

MR. COMERFORD: Form.

A. Again, I'm -- as I said before, I think he is -- he's ignoring those rejections in the context of what he's saying in the section of report -- of my report that I'm discussing this.

BY MR. MANDEL:

Q. Okay. Going back to your report, Exhibit 2, I want to wait for it to be on the screen. There we go. Now, if we could look at page 7 of this document, this exhibit, if you scroll to the bottom of it.

Now, paragraph 18, right there, you say that none of the papers cited by Dr. Cain is informative about the probability of deal success or the impact on the stock price, because none of those papers address the situation in which all of the following conditions hold. And then you list three conditions; is that right?

A. That's correct.

Page 295

Q. And the three conditions you list are if the target made an announcement, that the target simultaneously announced the receipt of an offer and its rejection, and the rejection that the target announced pertained to two offers both at the same price; is that correct?

A. That's correct.

Q. So your opinion is that for an academic paper to be informative about the probability of deal success or the impact on a target stock price, the study must address all of these three conditions; is that right?

A. I'm -- no, that isn't what I said. What I'm saying is that the studies that he has cited certainly do not address these three conditions, and because they are so different from these three conditions, they are just not relevant to the question of economic materiality of what could be disclosed in this matter.

Q. Right. So you wrote that all of the expert -- of the academic papers he's relying on are not informative because all of them -- each one doesn't address each of these factors; is that right?

A. None of them addresses these situations I've described here. And I --

Page 296

Q. These three specific conditions; right?

So is it your view that, to be informative on materiality, a study must address these three specific conditions?

A. Well, again, I'm not -- I haven't conducted a full analysis of materiality. I'm analyzing whether what Dr. Cain has referred to is evidence of materiality in this situation. And I'm saying it's not because they are so different from these three conditions that characterize this situation.

Q. But what you wrote here is that none of those studies are informative because none address the situation in which all of those conditions are met.

Does that not mean that, according to you, for a study to be informative on materiality, it would need to address all of those conditions?

A. Again, as I said, I haven't done a full-blown analysis of materiality. But if a study did not address all three of these, I have to assess whether anything could be learned from it.

I've assessed the studies that Dr. Cain has -- has referred to, and they -- they are sufficiently different from the facts in this matter, that I concluded that they are informative.

Q. Okay. So to be clear, a study -- an

Page 297

academic study could be informative on materiality even if it did not address all three of these conditions; is that correct?

A. I can't say, because I haven't really analyzed that particular situation.

What I can say is that I've looked at these studies, and they are not informative because these three conditions exist in this matter. And the studies that are being analyzed in Dr. Cain's reports are studying situations that are sufficiently different from these three conditions so as to be, in my opinion, not informative.

Q. Right.

But over here, you're not saying that these are, you know, too different from what he's addressing. You're writing here three conditions, and you say all of them would need to be addressed in an academic study for that academic study to be relevant.

Is that wrong?

A. Because none of these do address these, they -- they are not informative to me. They are addressing issues in each of those studies that are very different.

Q. So I'm asking you: Can a study be informative on materiality if it does not address all

Page 298

three of these conditions?

A. I'd have to look at the study specifically to know for sure.

Q. So it could be. It could be informative. You don't know; is that right?

A. I'm thinking a case would have to be made to me that it would be close enough to learn something. And the Even-Tov paper might be an example that we learned something, but it's not -- it's not enough to -- to be able to say this is economically material information in this matter.

Q. And the reason for that, according to you, is that the studies he cites don't address all of these three conditions you laid out here; is that correct?

A. Because they don't address these three situations, any of these three, then they are -- they are not informative.

Q. So now you say they don't address any of the three?

A. I'm saying -- I'm saying these studies -- let me back up.

What I'm saying is that, you know, these -- these are studies that Dr. Cain has used to -- to conclude that the information that is alleged to be omitted is economically material. He -- he looks at

Page 299

different aspects of -- of M&A transactions, like the form of payment, like arbitrage spreads, like toeholds.

But the problem is that none of those studies address the situation that we have in this matter, which includes these three bullet points I have here. Because they don't, they are not informative.

Q. So, again, just to be clear, because you were saying "any of these conditions" and then you wrote "all of these conditions," is it your opinion that for a study to be relevant to the question of economic materiality in this case, it would have to address all three of the conditions you lay out?

A. I haven't offered that opinion because, again, as I said, I haven't done a full-blown analysis of what would be required to demonstrate economic materiality.

I've simply analyzed the studies that Dr. Cain refers to. And I'm concluding that they are informative because none of them addresses a situation in which all of these three conditions have been met.

Q. Did you read any analyst reports in preparing your report?

A. Only to the extent that the analyst reports were -- were -- referenced the analyst report subsequent to the January 17th, 2023 announcement.

Page 300

Q. So you did read analyst reports in preparing your opinion?

A. I think I -- this may fall into the category that we were discussing earlier, that I read the analyst commentary that Dr. Cain has quoted. I may have actually confirmed with the analyst report itself.

But, again, my opinion is based on Dr. Cain's analysis of what is said in those analyst reports; his portrayal of what's been said, maybe is a better way to put it.

Q. So if I look at your Appendix C regarding documents considered, I don't see any analyst reports listed there.

Do you agree with me?

A. I do.

Q. So you did not consider analyst reports in preparing this opinion; is that correct?

A. I'm considering what Dr. Cain has quoted from the analyst reports and his inference about economic materiality from that analyst report.

Q. Got it.

So you did not read the actual analyst reports that are cited by Dr. Cain; is that right?

A. I don't recall one way or the other.

Q. And you didn't consider any other analyst

Page 301

reports in preparing your opinion; is that right?

A. Right. I'm reviewing and responding to what Dr. Cain has done.

Q. Got it.

Do you know whether Dr. Cain produced the analyst reports that he was quoting here?

MR. COMERFORD: Form.

A. I can't say with certainty. I mean, my opinion on the analyst reports goes straight to the irrelevance of the analyst report that comes out after announcement of the type that was made on January 17th.

So what that analyst report actually says is -- is not relevant to my opinion.

BY MR. MANDEL:

Q. So do you remember before we discussed there -- you identified four categories of evidence that Dr. Cain uses for support?

A. I would say he identified those four categories.

Q. Sure. He identified them, and you identified them again in your report; fair?

A. Yep.

Q. Okay. So one of those was the factual timeline based on documented evidence produced in this case; is that right?

Page 302

A.  Correct.

Q.  And we agreed before that you didn't review most of that evidence; is that right?

A.  I don't think we agreed on that, but --

Q.  Well, it's a fact that you didn't review most of that evidence; is that right?

A.  I'm not sure I would agree, because that evidence is the evidence that's quoted by Dr. Cain, and I reviewed that thoroughly.

Q.  Okay.  So you didn't review the documents that Dr. Cain is citing as evidence; is that correct?

A.  I didn't review the full documents, no.

Q.  Well, did you review part of the documents? You reviewed Dr. Cain's report quoting it.  You didn't review the documents.  Come on.

A.  As I said before, I think there have been documents produced that I have -- I have looked at in this matter, but I'm -- I'm relying on Dr. Cain's characterization of those in drawing my opinions in this matter.

Q.  Okay.  And one -- another of the four categories is financial analyst reports; is that right?

A.  Dr. Cain purports to be using financial analyst commentary as evidence of economic materiality. And my --

Page 303

Q.  Okay.  So --

A.  My opinion is that that particular commentary, when it's offered, is irrelevant to the discussion of economic materiality.

Q.  So there were four categories of evidence. Two of them are based on documents produced in this case and analyst reports, and you didn't read any of that material; is that correct?

MR. COMERFORD:  Form.

A.  Again, I'm drawing the opinion based on the relevance of that category of information when it comes to the analyst report that's being made on January 17th with respect to an announcement that is containing information that's completely different from any alleged omitted information.

BY MR. MANDEL:

Q.  Sure.

So there are four categories of evidence, and you didn't review the actual underlying documents for two of the four categories; is that right?

A.  I didn't review any analyst report in any detail, no.

Q.  And, also, the facts that he's citing, the case-produced documents, you didn't review those, either; right?

Page 304

MR. COMERFORD:  Form.

A.  I reviewed what Dr. Cain has done, which is my assignment, what inferences he's drawn from that.

He cites --

BY MR. MANDEL:

Q.  Right.

A.  He cites from the documents.  I analyze that information as he's -- as he's interpreted it.

Q.  But you're saying he draws incorrect inferences from the documents, but you haven't reviewed the documents; correct?

A.  He's quoting directly from the documents in the first instance.  Many of those I think I have confirmed those statements are made in documents.  I looked at those documents, but that's not the basis of my opinion.

Basis of my opinion has to do with Dr. Cain's inference from those materials.

Q.  What do you mean you confirmed that the quotes were in the documents and you've seen many of the documents, but you didn't consider those documents in preparing your report?  You didn't include them in your appendix.  You've testified that you didn't review documents that are not in that appendix.

What do you mean telling me now, oh, I

Page 305

looked at them, I saw them, I confirmed.

What are you talking about, Doctor?

A.  I think I'm telling you the same thing, that there are a lot of documents that are produced in this case.  Dr. Cain refers to many of them.  I've looked at some of them.

But to say I formally considered them would be incorrect, I think, because what I'm really formally considering is Dr. Cain's analysis of what is said in those documents.

Q.  Just moving further through the document to the next subject, there's a new heading on the next page.

MR. MANDEL:  If we can scroll down slightly.

BY MR. MANDEL:

Q.  We see on page 8, there's a heading there, "A, Dr. Cain's event study and review of financial analysts and media commentary are irrelevant."

Do you see that?

A.  I do.

Q.  Now, most of the section deals with the event study; is that right?

A.  That's fair to say, yes.

Q.  But you make some comments about the

Page 306

analyst reports; right?

A.   Correct.

Q.   Those are the analyst reports that you didn't read; is that right?

A.   I'm making a commentary about Dr. Cain's use of analyst reports of this nature to draw an inference about economic materiality.  It's because those analyst reports are irrelevant; the content of those analyst reports would not be important to my opinion.

Q.   So you determined that the analyst reports were not relevant without reviewing them; is that correct?

A.   Based on Dr. -- the fact that these are analyst reports that Dr. Cain is reporting, coming out immediately after that January 17th disclosure, which I've already discussed at this point in the report as being irrelevant to determine economic materiality; therefore, the commentary of any analyst about that disclosure is also irrelevant, just follows naturally.

Q.   And you have no idea whether there was anything else in those analyst reports that might be pertinent to this case because you didn't review them; is that right?

A.   I'm only reviewing Dr. Cain's inference

Page 307

about economic materiality.  So if they said something else about some other topic that doesn't pertain to this matter, I wouldn't know that.

Q.   Why do you think Dr. Cain was required to produce all those analyst reports that he cites?

A.   I think you're asking me a legal question there as to what is required to be produced and what's not.  I don't have an opinion on that.

Q.   Could it be because in order to form opinions or respond to opinions to do with those analyst reports, an expert should read those analyst reports?

MR. COMERFORD:  Form.

A.   I would disagree.  You could say someone should do an event study, but if you do an event study of an event that is irrelevant, it doesn't matter to me what the rest of the details on that event study are.  And that's essentially what I'm saying in this section.

BY MR. MANDEL:

Q.   So on the event study, you include in here a criticism of Dr. Cain's analysis of his event study; is that correct?

A.   I think that's a fair to put it -- way to put it.  Sorry.

Q.   Right.  The event study itself, did you review it?

Page 308

A.   And by "the event study itself," are you referring to the quantification of the abnormal returns?

Q.   Yeah.  Yeah.  The actual event study itself, the regression, the quantification, did you review that?

A.   I believe my -- you know, my team, that analysis group confirmed those numbers.  I don't recall if I specifically looked at those numbers myself.  I have no -- I see Dr. Cain's description of what he did.  I have no reason to doubt those numbers.

Q.   Understood.

So you don't doubt the numbers.  You don't say there's any mathematical error in his event study or anything like that; is that right?

A.   That's fair.

Q.   Okay.  Okay.  Dr. Cain's event study concluded that on January 13th, 2023, there was a statistically significant increase in National Instruments' stock price; is that right?

A.   That's correct.

Q.   Do you disagree with that conclusion?

A.   I do not.

Q.   Dr. Cain -- so then study -- Dr. Cain concludes that on January 17th, 2023, there was a statistically significant increase of stock price of

Page 309

National Instruments; is that right?

MR. COMERFORD:  Form.

A.   I don't disagree with that conclusion.

BY MR. MANDEL:

Q.   You're anticipating my next question.

Now, on January 13th, where we see a statistically significant increase in the stock price of National Instruments, what information was disclosed to the market?

A.   As I recall the information -- and I can go specifically to my report if you'd like, but as I recall the information in broad terms was that the company was considering some strategic possibilities, one of which include the sale of the company, that they had received an offer in November of 2022, and that they were at that point considering the adoption of a shareholder rights plan.

Q.   Are you sure that that disclosure revealed that they had received an offer in November of 2022?  I just think as a factual matter, that might not be correct.  That's why I'm asking.

A.   I'm not 100 percent sure.  I'd have to double-check that.

Q.   Is it in your report?

A.   Let me look.

Page 310

I'm not seeing the details right here, but I'm not positive.

Q. Okay. See -- just as a factual matter, I believe what is so, and maybe you'll see this on your report, is that on January 13th, they disclosed, as you said, that the company was considering some strategic possibilities -- I'm quoting you there -- one of which include the sale of the company. Also true that they were at that point considering the adoption of the shareholder rights plan.

But I just do not believe it's correct, this information about them having received an offer in November -- November of '22. I believe that information was disclosed on January 17th.

So if you can just take a moment to assure yourself of these facts from your report, I will ask you about them.

A. I may have misremembered that part of the January 13th disclosure. I think we can proceed from there.

Q. Okay. So -- so the January 13th disclosure included no information that was allegedly omitted here in this case; is that right?

MR. COMERFORD: Form.

BY MR. MANDEL:

Page 311

Q. It did not disclose Emerson; did not disclose Emerson's offer or offers; didn't disclose that there had been a $48 offer; didn't disclose that there had been a $53 offer; didn't disclose any specific information that is allegedly omitted in this case.

Do you agree with that?

A. I think that's fair.

Q. Okay. So the announcement was to consider strategic alternatives, maybe a sale, in considering a shareholder rights.

Did that -- does that information signal to the market the possibility of M&A transactions in the future of the company?

MR. COMERFORD: Form.

A. I think that is information that the market could consider as relevant because it's very different than the information they had before.

BY MR. MANDEL:

Q. Sure. No, no, no. I'm asking you in general, when a company announces, we're considering strategic alternatives, possibly a sale of a company, what's being communicated to the market is that there might be M&A in the company's future; is that right?

A. I think that's fair.

Q. Okay. And on that information being

Page 312

released to the market, even though it had no specific information about Emerson's reverse offer, what Dr. Cain shows empirically is that National Instruments' stock price increased in a statistically significant fashion on that date; is that right?

A. That's correct.

Q. So the market learned information about potential M&A, and the stock price increased in a statistically significant way; is that correct?

MR. COMERFORD: Form.

A. That's correct. And I think the point that I'm making is that that is fundamentally different information that could have been conveyed at the start of the class period.

BY MR. MANDEL:

Q. Does Dr. Cain's empirical conclusion that upon disclosure of M&A-related information, the stock price rose in a statistically significant fashion, does that empirical conclusion support a conclusion that information about mergers and acquisitions is material information for National Instruments' shareholders?

MR. COMERFORD: Form, calls for a legal conclusion, calls for speculation.

A. I'd say if we're talking about economic materiality, information about mergers and acquisitions

Page 313

can be material. I think that's the whole nature of the criticism of the way Dr. Cain has evaluated some of the research in this area. Some information about M&A is material. It's -- some of that information may be negative information about outright rejection, for example, of two proposals, say a price with no room for further bargaining.

So it all depends on what information is being conveyed. In isolation, if a company announces as a surprise to investors that now we're open to the possibility of doing a deal, might the market respond positively? Sure. And that seems to be exactly what happened here in January of 2023.

BY MR. MANDEL:

Q. So empirical evidence that a stock price increased in a statistically significant fashion because of disclosures concerning the possibility of M&A for that company can support a conclusion that information about M&A is material to investors of that company; is that correct?

A. Again, it depends on the pieces of the information. If the information -- and I think the way you've presented the hypothetical is one in which investors are surprised that the likelihood of a deal is now higher than they believed before. Might they view

Page 314

that as material information? I'd say the answer is yes.

If the information was -- you know, in the past we received those two proposals, we rejected them, and we told the potential acquirer we didn't see any basis for further discussion, that's a very different set of information. That's the distinction between what could be conveyed in August of 2022 and what is being conveyed in this January 13th announcement.

Q. Right. In this January 13th announcement, all that was conveyed is that M&A could happen; right? That's the gist of it; right?

A. Right.

Q. And the stock price popped up in a statistically significant way; right?

A. So that tells me that that news on that day, that news was economically material to the investors.

Q. So news about potential M&A in general can be material to investors; is that right?

A. I think I've testified to that, that it can be material. It depends what the information is.

Q. In this case --

A. In this case, we have information that's very different than what could have been conveyed back

Page 315

in August of 2022.

Now, if it were the case that the company had communicated at that time that we're undertaking a strategic review and it may include the sale of the company, my guess is stock prices might have gone up then, too. But that isn't the information that they conveyed to Emerson.

Q. Does Dr. Cain's study with respect to the stock price movement of National Instruments' stock on January 13th, 2023 support the conclusion that information about M&A in general was material to National Instruments' investors?

A. I would say it's supporting the conclusion that that specific information that was being conveyed on that day was judged to be economically material to investors. The study supports that conclusion.

Q. And that information was information in general about M&A; is that right?

A. I'm not sure I'd say in general. I'm saying it's specific to say that we are open to the possibility of being acquired or conducting a merger. That's a little different.

Q. A little different than what?

A. A little different than an announcement that might say we had considered a couple of offers but

Page 316

we've rejected them. Those are fundamentally different pieces of information.

Q. Sure. But I'm not asking you at all about the alleged omission. I'm just simply trying to understand what Dr. Cain's empirical analysis regarding the January 13th stock price movement shows.

And are you saying that that empirical analysis shows only that the precise information disclosed on January 13th was material and has no application to determining whether anything else was material?

A. I think I would say that there is a general notion that if you increase the likelihood of an M&A transaction, given the fact that, on average, such transactions are associated with an increase in the target share price, then one could conclude that this reaction is consistent with those types of announcements being economically material.

Q. Now, as to the January 17th disclosure, that disclosure was more specific about Emerson wanting to acquire National Instruments; is that right?

A. That's correct.

Q. And on that disclosure, stock price also saw a statistically significant decline; is that right -- sorry -- statistically significant increase; is

Page 317

that correct?

A. That's correct.

Q. Now, those two pieces of empirical analysis, they do not address the exact information that could have been disclosed during the class period in this case.

You make that point a lot; right?

A. I'm not sure I got the question there.

Q. Well, the information that came out on January 13th, 2023 and January 17th, 2023, according to your opinion, is different from the information that could have been disclosed during the class period in this case; is that right?

A. That's correct.

Q. Okay. Does the fact that the information considered in the event study is different from the information alleged to have been omitted mean that the event study tells us nothing about materiality of the allegedly omitted information?

A. Well, the market is reacting to the specific information that's being released on January 13th and January 17th. A lot of that information is information that could not have been known back in August of 2022. It also includes some information about the history of the involvement of

Page 318

Emerson and National Instruments.

So investors may be learning that information at that time, and what they're seeing, ultimately, is a stock price reaction to the totality of the information that's being conveyed.

Dr. Cain's event study, and any event study that I can think of around those -- those dates, is unable to parse out what portion of the stock price reaction is due to some information you learned about what happened back in 2022 versus information you're learning right now about the existence of an actual proposal from Emerson.

Q. So because of that, you write in your report that Dr. Cain's event studies reveal nothing about the economic materiality of the alleged omissions.

Do you stand by that?

A. I do.

Q. Reveals nothing, nothing at all, about the materiality analysis in this case?

A. It doesn't tell me anything about whether investors would have reacted to information that could have been disclosed back in August of 2022.

Q. Okay. So just to be very, very clear, your testimony is that event studies here concerning disclosures about M&A in general on the 13th and

Page 319

disclosures specific to Emerson's potential acquisition on January 17th, 2023 tell us absolutely nothing at all about whether the omitted information here was material; is that right?

MR. COMERFORD: Form.

A. I think that's correct. Because the information that's disclosed, even though it's not specific to an offer on January 13th, is specific to the company being open to the possibility of an offer. That's not the information that would have been disclosed back in August of 2022.

So the fact that the market reacted the way it did in January of 2023 can't be taken as indicative of how it would have reacted to fundamentally different information back in August of 2022.

BY MR. MANDEL:

Q. So these event studies tell you nothing about whether the undisclosed information at issue in this case was value-relevant to investors?

MR. COMERFORD: Form.

A. Sorry. What was the start of that again? Was nothing about...

BY MR. MANDEL:

Q. So the event studies here tell you nothing about whether the undisclosed information at issue here

Page 320

was value-relevant for investors?

A. Well, some of the -- of the omitted information could have been that there had been proposals made for National Instruments.

If that was the only information, then a similar sort of proposal in January could give you some indication about whether investors would find that value relevant.

But that's not the set of information that would have been revealed back in August of 2022, because by that time, both proposals had been rejected unanimously by the board, and they left no room for further discussion.

Q. You agreed with me earlier that that rejection would not necessarily have stopped an acquirer from proceeding with its acquisition; right?

A. It doesn't -- I think what I agreed to is that it doesn't stop an acquirer from attempting to proceed with an acquisition.

Q. So in January '13 (sic), the company disclosed information revealing M&A was possible, and the stock price rose in a statistically significant fashion; right?

MR. COMERFORD: Form, asked and answered.

A. That's correct.

Page 321

BY MR. MANDEL:

Q. Okay. And disclosure of Emerson's offer, even with a rejection, would also have signaled to the market that M&A was possible; is that right?

A. It's a fundamentally different nature of the disclosure. I think the academic evidence, much of which Dr. Cain refers to himself, is showing that target management resistance is the most important factor in determining the outcome of a takeover contest.

So the fact that the target management was opposed and didn't see any room for further discussions is a fundamentally different piece of information from a disclosure that says we are now open to the possibility of -- of a transaction.

Q. So is it your testimony that if the company had disclosed Emerson's offer and its rejections of those offers, that the information that would have conveyed to the market is that M&A was not possible?

MR. COMERFORD: Form.

A. It's my testimony that the nature of other rejection is such that you can't conclude from that that that sort of information would have been viewed as economically material to investors.

BY MR. MANDEL:

Q. So you're saying --

Page 322

A.  There's no evidence to --

Q.  So --

A.  -- suggest that.

Q.  So you're saying, in effect, that if the company had disclosed Emerson's offers and its rejections, that the market would have understood that as a statement that M&A is not possible for this company; is that right?

A.  That is not what I said.

Q.  So would it have indicated to the market that M&A was possible, even if there were rejections?

A.  I think what I'm -- what I'm saying is that it is conveying what -- what has -- what is conveyed in this matter is not just a rejection but the nature of the rejection.

And I think we talked about it being in the category of being outright rejection as opposed to a soft rejection.

Does the market necessarily take that as evidence that there is a zero probability of any M&A activity?  No.

Every stock in a stand-alone value has embedded in it some probability that some M&A activity will take place.  That's already in the stock price.

What I'm saying is that the margin --

Page 323

investors would have concluded here that at the margin, there's no economic materiality to this collective set of omitted information.

Q.  So if the company had disclosed during the class period Emerson's offers and its rejection, would the market have understood that disclosure as indicating that M&A transactions were more or less likely for this company?

MR. COMERFORD:  Form.

A.  I think there's no evidence to suggest, given the nature of the rejection, that they would have viewed that collective information as being economically material with respect to the acquisition likelihood.

BY MR. MANDEL:

Q.  So the question was:  If the company had disclosed during the class period Emerson's offer and its rejection, would the market understand that as indicating that M&A was more likely for the company or less likely for the company?

MR. COMERFORD:  Form.

A.  I think there's no evidence that suggests one or the other relative to the pre-contest likelihood.

BY MR. MANDEL:

Q.  So telling people that Emerson wanted to buy the company and that it was its highest strategic

Page 324

priority and that it was ready to move quickly and willing to offer more and all those things, none of that would have indicated to investors that M&A was more likely because it was paired with National Instruments' rejection?

Is that what you're saying?

A.  I'm saying the nature of the rejection tells investors a lot.  In this case, as you point out, Emerson made some comments about if they are given access to non-private information, they felt confident that they could come up with some additional value.

National Instruments took that into account.  They considered it.  They rejected that proposal.  No access to such information was given.

Emerson was told that their -- the board didn't see any basis for further discussions.  So there's no evidence there to suggest to investors that a deal is more likely than it would have been unconditionally before the very first Emerson offer.

Q.  Right.

So just to be totally clear, if the company had disclosed Emerson's offers without its rejections, you agree that would have increased the market's assessment of the likelihood of an M&A deal; is that right?

Page 325

A.  I would guess the evidence would suggest that that's a -- that's a strong possibility, yes.

Q.  Okay.  And what you're saying is that because the company paired it with a rejection, that would do away with the materiality of the information concerning a potential M&A deal; is that right?

A.  I think the market is pricing the -- the probability of a deal as well as the price -- expected price that they may get on the deal.

So if that probability is increased because of some disclosure of a proposal without a disclosure of a rejection, that probability increases, and, most likely, the price increases accordingly.

When companies then turn around and oppose that, they reject the deal, prices come back down.

Q.  So does a rejection of an offer indicate that the probability of the deal proceeding is zero?

A.  It depends, as I've said, on the nature of the rejection.  There are many types of rejections in which signals are essentially sent to the prospective buyer that the target is willing to work with them on finding a price that can ultimately succeed.  And if investors are aware of that, they price the shares accordingly.

If, instead, what investors are being told

Page 326

is -- is that the company has no interest at all in being acquired, and investors believe that the company has the ability to block such an acquisition, then that collective information that combines the proposals and the rejections would, on that, be viewed as -- as zeroing out in terms of economic materiality.

Q.  So, you know, you're talking, in effect, about what you describe as an outright rejection; is that right?

A.  Correct.

Q.  And you're saying that an outright rejection the proposal makes the probability of a deal proceeding zero; is that right?

A.  I'm saying that there -- I think I said this before as well, that there is always a probability of an M&A transaction that's embedded into the stock price occurrence.  That would still be there.  It was there before Emerson came along; it would be there afterwards.

Q.  So if the disclosure about -- if the company made a disclosure that Emerson was offering to buy the company for $48 and such, that would have indicated -- that would have increased the probability of a deal absent a rejection.

Is that what you're saying?

Page 327

A.  I did say that, yes.

Q.  All right.  And you're saying that an outright rejection would totally do away with that increased probability.

Is that what you're saying?

A.  I'm saying that's true if it's accompanied by other information that investors could interpret as indicating that the probability of the deal now goes back down to however small a probability it was before Emerson came along.

Q.  Okay.  So your view is that that outright rejection reduces, potentially eliminates, the probability of the deal, even though you agree with me that a rejection doesn't stop an acquirer from proceeding; is that right?

A.  I agree that it doesn't stop an acquirer from attempting to proceed, yes.

Q.  Right.  So an acquirer could still offer more money, for example, even if there was a rejection; right?

A.  They could.

Q.  Right.  So the possibility of offering more money, that's kind of material for investors, isn't it?

A.  Again, it depends.  It depends if they have any -- any reason to think that the company is willing

Page 328

to accept the subsequent offer that you're hypothetically proposing.

MR. MANDEL:  Okay.  Why don't we take a little break there.  We've been going for a while there, I think.  Let's take a little five-minute break before I move on to another subject; okay?

VIDEOGRAPHER:  We're going off the record at 3:03 p.m.

(A break was taken.)

VIDEOGRAPHER:  We are back on the record at 3:16 p.m.

BY MR. MANDEL:

Q.  Okay.  Dr. Denis, let's --

MR. MANDEL:  Could we please put Dr. Denis's report back up on the screen?  That's Exhibit 2.  All right.  Now, if we can go to page 13 of this document, 13 on the page is PDF page 15.

BY MR. MANDEL:

Q.  Okay.  Now I want to ask you about your paragraph 26 here, about the Cain, et al. article from 2020.

So you say that Cain, et al. sample includes only deals for which a merger agreement was signed and publicly disclosed through SEC filings.

Do you see that?

Page 329

A.  I do.

Q.  Okay.  Did National Instruments ultimately end up being acquired by Emerson?

A.  It did.

Q.  It was a merger agreement, that they agreed; is that right?

A.  Ultimately, yes.

Q.  And that merger agreement was signed and publicly disclosed in SEC filings; is that right?

A.  That is correct.

Q.  Okay.  So we -- and we, in fact, looked at the proxy statement, which is the SEC filing in which that signed merger agreement was included; is that right?

A.  We did.

Q.  Okay.  So this transaction includes -- includes -- this transaction, I should say, involves a merger agreement that was signed publicly and disclosed through SEC filings, which is what you say is true of Dr. Cain's 2020 study; is that right?

A.  That's right.  The difference is that, you know, the Cain study is starting with the sample for which a merger agreement was signed, and the issue here is determining economic materiality of what would be known in August of 2022.

Page 330

There was no such merger agreement that was signed and agreed to. What we had was two rejections.

Q. So just, again, to level set here, it is correct that Dr. Cain's study addresses deals for which there was a merger agreement signed and publicly disclosed to SEC filings, and this deal involved a merger agreement signed and publicly disclosed through an SEC filing; is that true?

A. Ultimately, that is true.

Q. Okay. And that deal was successful; correct?

A. In the sense that the merger agreement was signed, yes.

Q. Okay. You write, "Successful deals that resulted in a merger agreement are irrelevant to this case."

Do you see that?

A. I do.

Q. But this deal -- this case involves a successful deal that resulted in the merger agreement; no?

A. Again, it's the nature of the sample that they're studying. They're starting with deals that were successful, measuring deal premiums and multiple rounds and all of that, conditional on the fact that they know

Page 331

in the end the deal was successful.

Now, we know in this case that there was an ultimate merger agreement, but that would not have been known in August of 2022. And that's the distinction that's important here.

Q. I'm not sure -- I'll get into that.

Dr. Cain's study looks back at successful deals' bidding history; is that right?

MR. COMERFORD: Form.

A. It does, yes.

BY MR. MANDEL:

Q. It concludes that before those deals were successful deals, there were numerous bids on average; is that right?

A. That's right.

Q. Okay. It concludes that there were, on average, what, over five bids per successful deal; is that right?

A. That's my recollection of the data, yes.

Q. And we -- we looked at the proxy statement earlier today, which was consistent with that; right?

A. Right. But, again, the distinction that I'm drawing is the fact that they start with these successful deals and work backwards; right?

We would be dealing with and evaluating the

Page 332

situation where there were two rejected proposals. And as the data suggests in other studies, the rejected proposals are, more often than not, killing the deal. So those aren't showing up in their data.

Q. Okay. So does Dr. Cain's study involve transactions where bids were rejected?

A. Depends on exactly how you use the term "rejected," but I would say yes.

Q. Right. I mean, the reason there's multiple bids is not because earlier bids were accepted; right?

A. That's fair.

Q. Right. The reason there's multiple bids is because bids are rejected and, nevertheless, culminate in successful transactions; correct?

A. Right. I think we've talked about this multiple times, that there are various ways that bids could be rejected.

Q. Right. And so Dr. Cain's study is actually directly relevant to the facts here. It's a successful deal, just like this one disclosed in SEC filings with the merger agreement and in which there were multiple rounds of bidding leading up to that successful deal; is that right?

A. No, that's not right. Because --

Q. What did I say that was wrong?

Page 333

A. What we're assessing and what he's attempting to assess through this part of his report is the economic materiality of what would be disclosed in August of 2022. That's not the fact that there's been a successful deal that ultimately has multiple rounds, which you're alluding to.

What will be evaluated is the fact that there were two proposals, and they were both rejected.

Q. Well, hold on. You're telling me that a rejection of a deal can eliminate materiality concerning that potential deal. But what Dr. Cain's study involves, which you just agreed with me, was a whole bunch of deals where there were rejections and, nevertheless, the deal progressed to an ultimate deal; is that right?

A. Again, they're starting with deals that were successful in the end. So the probability --

Q. Just like this one?

A. -- is one that a successful deal is being done.

The probability has to be assessed in this one in August of 2022, not in May of 2023.

Q. But all the deals identified in Dr. Cain's study where there were rejections because there were multiple bids led to successful deals; right?

Page 334

A.   All the bid -- all the bids in his study end up as successful offers, yes.  It doesn't include the ones that don't.  And what investors would have to assess are likelihoods at the time that these two were outright rejected in August of 2022.

Q.   So the question, then, is how likely is a deal -- an offer that is rejected nevertheless going to end up in a successful deal; is that right?

A.   That's fair.  And I think that's what we've been talking about all along, the nature of the rejection.

Q.   And Dr. Cain's study identifies numerous, numerous instances where, despite early rejections, the deals are successful; is that right?

MR. COMERFORD:  Form.

A.   There are many cases in the study in which there are multiple rounds that fall on the heels of rejection.  And as we've discussed, there are different types of rejections.

BY MR. MANDEL:

Q.   Do you know which types of rejections are considered in Dr. Cain's study from 2022?

A.   I don't know the breakdown in his study, but that's the nature of the selection bias here, is that, ultimately, they're starting with the sample of

Page 335

proposals that out -- a probability of one of being successful.

So that's going to lead to a biased inference upfront about the probability that a deal is going to be done, to the extent that the market can rationally forecast that probability.

Q.   So just to be clear, Dr. Cain's study could have included instances where there were outright rejections of early bids; is that right?

A.   I can't say whether it does or doesn't.  I don't know the language of any of those.

Q.   Okay.  So you have no idea about the nature of the rejection of any of the deals that Dr. Cain's 2020 study is considering; is that right?

MR. COMERFORD:  Form.

A.   I don't know the nature of the rejections in any of those, nor do I know whether the nature of that rejection played a role in the initial stock price response of the deal.

BY MR. MANDEL:

Q.   But for all you know, lots of the cases that are assessed in Dr. Cain's 2020 study involved outright rejections to initial bids; is that right?

A.   Well, two things there, I think:  One is -- one is that -- and I can say from observing data in my

Page 336

own research, you don't see a high probability of them being just like this, and less likely would you observe the disclosure of the bids and the rejection -- outright rejection simultaneously being made.

The sample that he's got, the typical way this is going to go is that you have the announcement of a proposal, it may be resisted later on, but the stock price reaction is conditional on the proposal, it's not conditional on the joint proposal and rejection.

Q.   You made no effort to determine whether the data discussed by Dr. Cain in his 2020 study includes situations where there were outright rejections of proposed acquisitions; is that right?

A.   I don't have access to the specific data points.  And I haven't seen Dr. Cain make any reference to that at all, either.

Q.   And -- well, all of this is drawn from public proxies, in Dr. Cain, et al. study; is that right?

A.   Right.

Q.   Okay.  So one could reconstruct the data set and look at those proxies; right?

A.   In theory.  I'm sure Dr. Cain would agree that would take quite some time, but yes.

Q.   You would expect that those proxies had

Page 337

background and mergers sections, too; right?

A.   I would.

Q.   Those proxies would list the bidding history; is that right?

A.   Usually do.

Q.   In fact, that's where Dr. Cain gets the data to conclude that, on average, these types of deals go through over five bids; is that right?

A.   Again, conditioned on the fact that he sees the end result.  He starts with the end result.  He does not observe those outright rejections that didn't lead anywhere.  And that's the issue.

Q.   Let's just have a quick look at this article, the Cain, et al. study, that is at our tab 10.  This will be Exhibit 8.

(Denis Exhibit 8 was marked for identification.)

BY MR. MANDEL:

Q.   If you could look at page -- it's 22 of the PDF, 1704 on the page.  It's Bates ending 1266.

Do you see where it says "sample set" there?

A.   I do.

THE WITNESS:  Would you mind blowing that up just a little bit?

Page 338

BY MR. MANDEL:

Q. Yeah. I'm only going to ask you about that first paragraph.

MR. MANDEL: So we can zoom in on the paragraph beginning with the words "To assemble."

Yeah.

BY MR. MANDEL:

Q. Is that good? Do you want it larger?

A. No, that's fine. Thank you.

Q. Got it.

So -- okay. This is the criteria that Cain, et al. used to prepare the data set for this study; is that right?

A. It's a description of the data formation, yes.

Q. Okay. So it begins by saying that it considers transactions that were announced during the time period 2003 to 2017.

Do you see that?

A. I do.

Q. Okay. So, obviously, the proxy here was issued in 2023.

So just based on that, this proxy would not -- the proxy that National Instruments issued in this case, the exhibit that we looked at today, would

Page 339

not have been included in this data set because it's outside the time frame; is that right?

A. That's correct.

Q. Okay. Let's look at all the other criteria.

One, the target is a publicly traded US firm.

Is that true here?

A. Yes.

Q. Okay. Two, the deal size, at least 100 million.

True here as well; yes?

A. Yes.

Q. Offer price is at least $5 per share.

True here as well; correct?

A. That is true.

Q. Merger agreement is signed and publicly disclosed through a filing with the Securities Exchange Commission.

Also true here; correct?

A. Ultimately true in May of 2023, not true as of August of 2022.

Q. Well, sure. But this study -- that is true about this deal. We read on the proxy today describing the background of this merger in that SEC filing.

Page 340

All four of these criteria are satisfied such that it would include this case. The proxy in this case and the information in it would have been in the data set here but for the time period; is that right?

MR. COMERFORD: Form.

A. That's correct.

BY MR. MANDEL:

Q. Okay. So, literally, if this study included 2023, this specific deal and this specific proxy with all its information about the bidding history would have actually been part of this study; is that right?

A. I believe it would, yes.

Q. Okay. Now, I want to just go back to your report where, again, you say, "Successful deals that resulted in a merger agreement are irrelevant to this case."

And you say that, "Papers that analyze such deals are also irrelevant to this case"; is that right?

A. They are irrelevant to the question that's being addressed in this case.

Q. Okay. So it is not correct that this study is irrelevant to this case, is it?

MR. COMERFORD: Form.

A. No, I -- I disagree with that. I mean,

Page 341

this study contains some useful descriptive information about successful mergers. The question --

BY MR. MANDEL:

Q. Like this one.

A. The question that we're asking here is not whether this was a successful merger or what is the typical premium that's being offered or how many rounds were there.

The question is: At the time of the beginning of the class period, was the alleged omitted information or would the alleged omitted information be judged economically material to investors.

This study doesn't tell us anything about that.

Q. This study addresses successful deals that resulted in a merger; yes or no?

MR. COMERFORD: Form.

A. This study does. This study being --

BY MR. MANDEL:

Q. Cain.

A. -- the Cain, et al. paper.

Q. This case -- yes, correct.

This case involves a successful deal that resulted in a merger agreement; yes or no?

MR. COMERFORD: Form.

Page 342

A.  Yes.

BY MR. MANDEL:

Q.  Okay.  Nevertheless, you say that this study is irrelevant to this case; correct?

MR. COMERFORD:  Form.

A.  Because the relevance to this case, as it's being used by Dr. Cain, has to do with the economic materiality of the alleged omitted information.  This study of his is not addressing that sort of time frame at all.

BY MR. MANDEL:

Q.  So you're pointing to some sort of time mismatch; is that right?

A.  There is a time mismatch, for sure. There's a sampling mismatch as well that I was getting at before.

Q.  Does Dr. Cain's study, the 2020 study, consider the bidding history during the period of time leading up to the successful merger announcement?

A.  It documents a number of rounds that take place for a sample of successful mergers.  It does not document the frequency with which the initial one was rejected.  And it's specifically outright rejected twice and -- and see what the -- the stock price reaction to that is.

Page 343

Q.  Got it.

A.  And that's the relevance.

Q.  So in the end, your opinion is that, even though this specific proxy and the bidding history would have been included in the Cain study, the Cain 2020 study, if it governed this time period, you still conclude somehow that study is irrelevant to this case; is that right?

A.  Not somehow.  Specifically the ways I just laid out for you.  It's not relevant to judge --

Q.  So you think it's irrelevant to this case, even though it involves, like this case, a successful merger that resulted in the merger agreement, that was disclosed in an SEC filing, et cetera; is that right?

A.  My conclusion is that it doesn't tell us anything about the economic materiality of what would be disclosed in the earlier point of the context.

Q.  Okay.  Moving forward, the next paragraph there, 27, we're talking about the Bruner study there.

Do you see that, Bruner 2004?

A.  I do.

Q.  And you say that -- and Bruner includes -- it's a study of studies; right?

It includes analysis of 25 different academic studies; right?

Page 344

A.  Right.

Q.  And you say that Dr. Cain hasn't provided evidence that those studies fit the facts of this matter; right?

A.  Right.

Q.  And you go on to say that, "Studies which consider mergers," among a whole bunch of other types of things, quote, "do not closely mirror the alleged omitted information here."

Do you see that?

A.  I do.

Q.  All right.  So, again, you're tying this analysis to that assumption provided to you by counsel, alleged omitted information; is that right?

A.  Yes.  I'm tying it to the facts of the matter as well.  These are studies of public announcements of these types of transactions that are ultimately successful.  The issue here are two private proposals, both of which were rejected.

Q.  Yeah, I understand.

I'm just asking your analysis here in this paragraph concerning whether the Bruner studies are informative or relevant here is anchored in that assumption from counsel about what is alleged to have been omitted that we discussed this morning; is that

Page 345

correct?

A.  I think that assumption is capturing what I think are the important elements.  And, yes, these -- these do not speak to those elements.

Q.  I'm sorry.  I didn't ask you about whether you thought the assumption was, you know, discussing important elements or anything like that.

Dr. Denis, I'm trying to help you make your flight here.

A.  I appreciate that.  I'm trying -- I'm trying to answer the questions --

Q.  Let's answer the questions without dancing, and we can get there.

A.  I'm trying to answer the questions --

Q.  All right?

A.  -- to the best of my ability.

Q.  Okay.  So just to be clear, again, counsel provided you with an assumption about alleged omitted information, like we talked about this morning, and the analysis here about Bruner is tied to that assumption; yes or no?

A.  Yeah.  Yes.  But I was adding that I --

Q.  Let's move on.

A.  -- think it's tied to other things as well.

Q.  Okay.  So the answer to my question is yes.

Page 346

Let's move on and get you to your flight.

Now, you say here in this paragraph that the studies in Bruner are not relevant, let's say. They don't closely mirror the alleged omitted information here. And you note that those studies consider mergers; right?

A. That's one, yes.

Q. Okay. Was this case -- did this case involve a merger?

A. This case ultimately involves a merger. At the time --

Q. And what was proposed by Emerson was a merger; is that right?

A. That's fair.

Q. Okay. And you say, well, this is different because, here, initially the merger proposal was rejected; is that right?

A. There's also the private versus public distinction.

Q. What do you mean by that?

A. These are private proposals, as opposed to these studies picking up on announcements of public disclosure of deals.

Q. So let's just take a look at the Bruner study. This is going to be -- the Bruner text, I should

Page 347

say. Let's make sure I've got the right document. Yeah, this is going to be our tab 7, please. It's going to be Exhibit 9.

(Denis Exhibit 9 was marked for identification.)

MR. MANDEL: There we go. Now, if we could go to page -- the third page of the PDF, it's Bates ending 1197. Let's just pause right there.

BY MR. MANDEL:

Q. Do you see there's a heading there, "Returns to Target Firm"; do you see that?

A. I do.

Q. And this is where he, Dr. Bruner, lays out, you know, what he's summarizing in Exhibit 3.3, which is a table we'll look at in a minute, the findings of the 25 studies we were just talking about; is that right?

A. That's a fair description, yeah.

Q. And he concludes, based on the study of those 25 studies, of all different types of deals, quote, "In short, the M&A transaction delivers a premium return to target firm shareholders"; is that correct?

A. That's what it reads, yes.

Q. That's his summary, let's call it, of the results of these 25 studies; is that right?

A. That's correct.

Page 348

Q. Okay. Now, let's look at the next page, which is where, in this production that Exhibit 3.3 is -- exists.

MR. MANDEL: So if we can go to the next page, please, Jeff. Thank you.

BY MR. MANDEL:

Q. Now, this is a page that's turned on its side, but we can see all of it here on this the screen.

Okay. Now as we see here, if you look along the right-hand side of the column, a lot of these studies deal with mergers; is that right?

A. A number of them do, yes.

Q. Yeah. The first one, Langetieg, deals with mergers; is that right?

A. Yes.

Q. Harris Franks, 1991, deals with mergers and tender offers; right?

A. Correct.

Q. Servaes, 1991 -- I don't know if I'm pronouncing that correctly -- deals with mergers and tender offers as well; right?

A. Correct.

Q. Okay. Healy deals with the largest US mergers during the study period; correct?

A. Correct.

Page 349

Q. I could go on from there.

The point is a lot of these studies you acknowledge deal with mergers; right?

A. They do.

Q. And this case involved a merger; correct?

A. This case ultimately does, yes.

Q. Okay. You say that, "These studies are different because our case involved rejections of earlier offers"; is that right?

A. That's partly the selection bias that we're talking about here, yeah.

Q. Okay. How do you know that all these cases, studies here, involving discussing mergers don't involve situations in which there were earlier rejections?

A. They might ultimately have earlier rejections and subsequently get completed. This is picking up the announcement return. You can see that window date for all of these around the announcement of what we know to be ultimately successful deals.

Q. So just to be clear, all these cases -- case studies considering mergers might involve mergers where there were earlier rejections; is that correct?

A. They could be. And I think we've talked about this numerous times today, that there --

Page 350

Q. Well, we're talking about this study in particular. You said that this case is different from all the data here in the study because this case involves rejections.

Well, now you're telling me that for all you know, all of these also involve rejections. How am I getting this wrong, Dr. Denis?

MR. COMERFORD: Form.

A. These are -- these are public announcements of deals that are ultimately done. Could there have been --

BY MR. MANDEL:

Q. Well, our deal was publicly announced, too, wasn't it? National Instruments' deal was publicly announced; isn't that right?

A. Not as of August of 2022.

Q. Is there some criteria here in these studies about when the studies were announced?

MR. COMERFORD: Form.

A. What these studies are picking up is the announcement date effect on the target shareholders of deals that we know are ultimately completed. These are public announcements of those. We don't have an August 2022 public announcement. What we're hypothesizing is what would happen if they were to

Page 351

announce that we had had two private proposals and they were both rejected with no basis for further discussion. That's very different from the situation that these studies are documenting.

BY MR. MANDEL:

Q. Well, how do you know that? You don't know that. You don't know whether the situations being documented in all of these studies are different or the same from our facts; is that right?

A. But we do know from Bruner himself that the typical outcome once the managers object to a proposal is that the deal is done. If that's true, they're gone from this sample. And so if this market sees --

Q. That's totally nonresponsive to my question. This is totally nonresponsive.

You say that these 20 -- that Bruner's citation of these 25 studies is not relevant here because you say facts unique to this case are not present in these studies, the rejection, and yet you don't know whether that's true.

And for all you know, these studies could include earlier rejections; yes or no?

A. They could include earlier rejection that the -- that the target left open the door to subsequent deals. And a deal, obviously, is done here in this

Page 352

case.

Q. They could have also included outright rejections; no?

A. In this case, what we're seeing is that an outright rejection with the board concluding unanimously that they don't see any basis for further discussions.

What you'd like to know is if there is such a subset in these studies that has that set of facts, what was the response to that. That's not what we see in this. We see the entire set, which is biased towards successful deals. And so that's going to give us a very misleading indication of what the economic relevance of the alleged omitted information here would be.

Q. So you'd like to know whether there were earlier rejections, and you'd like to know the nature of those rejections, but you don't know anything about whether those objections occurred or what their nature was in all of the deals looked at in these 25 studies; yes or no?

A. What I'm saying is that Dr. Cain would need to know that sort of information in order to determine the economic materiality. He doesn't know that. I don't know it, either. And so I can't conclude from this data that the alleged omitted information in this case would have been economically material.

Page 353

Q. So, again, just to be clear, you're saying that this study -- that Dr. Bruner's study is not relevant here because of factual distinctions that you do not know existed; is that correct?

A. I don't know what subset of the data has the characteristics that fit the case at hand here and what their -- what their stock returns would be in those situations. And Dr. Cain has not shown that. What he's shown is a conglomeration of stock price announcement effects that he hasn't shown have any similarity to the facts at hand here.

So I can't conclude from looking at that anything about economic materiality of the alleged omitted information here. That's what I'm expressing.

Q. And, yet, it is so -- yet, it is so that Dr. Bruner, reviewing all these 25 studies, looking at all different types of deals and acquisitions, all different types of fact patterns, he concludes, quote, "In short, the M&A transaction delivers a premium return target firm shareholders."

Do I have that right?

A. You have that correct.

Q. Okay. Let's move on from this document.

I'm going to ask you next about -- let's go back to your report, Exhibit 2. There we go. Thank

Page 354

you. Let's just scroll down to the next page, please.

Okay. Now I'm going to ask you about paragraph 28. This is concerning the paper written by Cain and Denis, 2023, which I assume you're familiar with?

A. I am, yes.

Q. Yeah. So you say that this study, let's just say, is not relevant, is not informative as to the issues here.

You say, quote, because, quote, "This paper is based on a sample of successful negotiated mergers that disclosed fairness opinions."

Do you see that?

A. I do.

Q. Did this deal at issue in this case involve a successful negotiated merger that disclosed a fairness opinion?

A. In 2023, it did, yes.

Q. So would this case have been -- would this proxy have been included and the proxy studied in the Cain and Denis article?

A. I don't remember any size constraints or other limitations. I'd have to double-check that. But I think there's a good chance it would be included, yes.

Q. Right. So long as the time period covered

Page 355

2023, this proxy would have been included in the Cain and Denis analysis; is that right?

A. Right. Which is the proxy related to the successful merger in 2023 to be able to --

Q. Right. And that proxy describes a background of eight bids, including the ones in May and June, does it not?

A. It includes the fact that there were proposals.

Q. Yeah. Were those proposals to do with some different deal?

A. It's a different deal, yes.

Q. You think so? The early proposals here in May and June were about a different deal than the one National Instruments ultimately did with Emerson?

A. I don't know how you're defining a deal, but --

Q. Well, hold on a second. We looked at the proxy this morning, did we not?

A. Uh-huh.

Q. We looked at a section called "Background of the Merger," did we not?

A. Yes.

Q. The merger, the background of which was set forth in that proxy, is the successful merger between

Page 356

Emerson and National Instruments; correct?

A. Correct.

Q. Correct.

The background of that deal, as disclosed by the defendants here, included the May and June bids; correct?

A. All that's correct, yes.

Q. These are not some other deal or other negotiation about some other deal that's described in the proxy, is it?

A. These are the same two priorities. The only distinction I was drawing there is that in defining a deal, you may be talking about the terms of the deal. They are different at different points in time.

So one could view those economically as constituting different deals. That's the only distinction I'm trying to make.

Q. So, again, you're just distinguishing, you're saying that the Cain and Denis article isn't informative here because of a distinction that does not exist; is that right?

A. No, that's not right.

Q. What you're saying, this paper is based on a sample of successful negotiated mergers that disclosed fairness opinion.

Page 357

How is that not our deal --

MR. COMERFORD: Form.

BY MR. MANDEL:

Q. -- the National Instruments deal we're talking about?

A. Because what we're trying to assess is the economic material -- materiality of information that would be disclosed at a time period before any such successful deal; in fact, disclosed after two outright rejections in which the board is saying we don't see any basis for further discussion.

Q. Okay.

A. That's going to produce a very different price reaction than the price reaction to a successful deal.

Q. Okay. The Cain and Denis study used proxies for its data set; right?

A. Correct.

Q. Now, those proxies may have disclosed a bidding history leading up to the successful deal; is that right?

A. They may have, yeah.

Q. Many of them probably did; is that right?

MR. COMERFORD: Form, calls for speculation.

Page 358

A. I would speculate that they do.

BY MR. MANDEL:

Q. Well, does Dr. Cain's 2020 study not provide evidence suggesting, in fact, that, on average, all of those deals disclosed in the proxy would have gone through at least five rounds of bidding?

A. All those successful deals, yes.

Q. Right.

A. It's not disclosing the unsuccessful ones.

Q. And in distinguishing the Cain and Denis study, you have not gone and made any effort to determine whether any of the deals included in the Cain and Denis study involved earlier rejections; is that right?

A. Again, I'm just assessing whether the evidence that Dr. Cain has provided demonstrates economic materiality. And I'm offering the opinion that this does not, for the reasons we've just been talking about.

Q. So for all you know, the proxies included in the Cain and Denis study included numerous instances where initial offers were rejected by targets; is that right?

A. Again, it's the same answer as before. There could be many, many types of rejections that could

Page 359

be offered. We know there's a small percentage that are withdrawn in this case -- in this sample -- sorry.

Q. Right.
But with the exception of the small percentage of withdrawn offers, you do not know whether all the deals discussed here in this study, in the Cain and Denis study, involved rejections before, ultimately, a successful deal was formed; is that right?

A. I don't know how many rejections, the nature of those rejections. But as I've said, the response to the other -- other -- other papers, Dr. Cain hasn't done that separation either to demonstrate that the fact pattern that we see in this case is associated with an economically material price response.

MR. MANDEL: Okay. Let's break here for a minute. I'm like very close to done, if not done. Let me just consult with my team, all in an effort to get you on your plane.

VIDEOGRAPHER: We are going off the record at 3:57 p.m.

(A break was taken.)

VIDEOGRAPHER: We are back on the record at 4:01 p.m.

MR. MANDEL: Dr. Denis, thank you very much for your time today. We have no further questions at

Page 360

this time, and I hope you make your flight. Thank you for your attention today.

THE WITNESS: Thank you and happy Thanksgiving.

MR. COMERFORD: Thank you. We'll read and sign.

VIDEOGRAPHER: This is the end of the deposition. The time is 4:02 p.m. We're going off the record.

THE REPORTER: Mr. Mandel, I have down that you need this tomorrow?

MR. MANDEL: I don't need it tomorrow, but by the end of the week would be great.

MR. COMERFORD: We will take a regular copy, no rush.

CERTIFICATE OF REPORTER

I, Celena D. Davis, Registered Professional Reporter and Certified Court Reporter within and for the State of Missouri do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties of the action in which this deposition was taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

CELENA D. DAVIS, RPR, CCR
License No. 700

                    DEPOSITION ERRATA SHEET

Case Caption:  In Re: National Instruments Corporation
Securities Litigation

            DECLARATION UNDER PENALTY OF PERJURY

            I declare under penalty of perjury
that I have read the entire transcript of
my Deposition taken in the captioned matter
or the same has been read to me, and
the same is true and accurate, save and
except for changes and/or corrections, if
any, as indicated by me on the DEPOSITION
ERRATA SHEET hereof, with the understanding
that I offer these changes as if still under
oath.
        Signed on the _____ day of
_____, 20____.


_____
            DAVID J. DENIS, Ph.D.

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____
            DAVID J. DENIS, Ph.D.

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____
          DAVID J. DENIS, Ph.D.

Deposition of David J. Denis, Ph.D., Vol. II                    In Re National Instruments Corporation Securities Litigation

## WORD INDEX

**< $ >**
**$40** 159:*22*
**$42.37** 261:*20*
**$43.09** 261:*20*
**$48** 119:*11, 17* 120:*4*
121:*1, 5, 8* 129:*12*
150:*9* 159:*15* 160:*5,
23* 170:*25* 171:*9*
172:*17* 217:*1, 8, 11,
25* 218:*7, 16* 219:*11,
20, 25* 220:*13, 15*
222:*9, 10, 25* 223:*5,
12, 23* 225:*16* 226:*11,
13, 21* 227:*9* 228:*3, 6,
9* 229:*23* 247:*24*
259:*20* 262:*19* 288:*5*
311:*3* 326:*22*
**$5** 200:*1* 339:*14*
**$53** 121:*21* 122:*19*
311:*4*
**$57** 123:*13, 17, 18*
129:*6*
**$57.75** 124:*2*
**$59.50** 124:*12*
**$60** 117:*1* 119:*1, 4*
124:*23* 127:*4* 128:*13*
129:*3, 10* 131:*22*
132:*8, 16, 19* 175:*18*
**$60-a-share** 132:*2*

**< 1 >**
**1** 111:*7* 116:*7*
132:*24* 271:*25*
274:*22*
**1.73** 271:*20*
**1:23-cv-10488-DLC**
110:*1* 112:*1* 114:*9*
**1:38** 266:*25*
**10** 270:*25* 337:*14*
**10:36** 173:*17*
**10:46** 173:*20*
**100** 122:*18* 133:*21*
188:*4* 309:*22* 339:*11*
**1007** 270:*25*
**10170** 113:*7*
**102** 262:*6*
**107** 111:*11*
**10th** 123:*21* 216:*21*

**11** 130:*1, 9, 15* 131:*2*
164:*18* 169:*23* 170:*5*
202:*9* 270:*19*
**11:41** 215:*12*
**11:50** 215:*15*
**113** 289:*7*
**114** 292:*7*
**1197** 347:*8*
**11-month** 130:*8*
**11th** 122:*15, 17*
124:*7, 11, 22* 262:*9*
**12:58** 266:*22*
**123** 111:*12*
**1266** 337:*20*
**13** 168:*2, 4, 11*
275:*19* 320:*20*
328:*16, 17*
**135** 217:*16* 220:*7*
222:*20* 223:*24* 226:*7*
228:*13, 18* 229:*6*
**135E** 223:*16, 25*
**13th** 189:*8* 200:*18*
308:*17* 309:*6* 310:*5,
19, 21* 314:*9, 10*
315:*10* 316:*6, 9*
317:*10, 22* 318:*25*
319:*8*
**14th** 191:*7* 196:*18*
288:*4*
**15** 288:*3* 328:*17*
**16** 277:*7*
**161** 111:*13*
**16th** 197:*6* 287:*16*
**17** 270:*24* 286:*13*
**1704** 337:*20*
**17th** 299:*25* 301:*11*
303:*12* 306:*16*
308:*24* 310:*14*
316:*19* 317:*10, 22*
319:*2*
**18** 190:*24* 294:*18*
**1832** 113:*7*
**19** 204:*9*
**1900** 112:*13* 113:*14*
114:*11*
**1985** 269:*17*
**1991** 348:*16, 19*
**19th** 204:*24* 205:*10*

**< 2 >**

**2** 111:*8* 133:*10, 13,
14* 216:*5* 218:*23*
230:*2, 3* 233:*5, 9*
244:*17* 249:*21*
259:*25* 263:*22* 269:*2*
274:*22* 275:*5* 294:*14*
328:*16* 353:*25*
**20** 273:*14* 274:*9, 23*
351:*16* 362:*10*
**2000** 269:*17*
**2003** 338:*18*
**2004** 343:*20*
**2017** 338:*18*
**2020** 328:*21* 329:*20*
335:*14, 22* 336:*11*
342:*17* 343:*5* 358:*3*
**2022** 130:*17* 159:*15*
191:*7* 196:*19* 309:*15,
19* 314:*8* 315:*1*
317:*24* 318:*10, 22*
319:*11, 15* 320:*10*
329:*25* 331:*4* 333:*4,
22* 334:*5, 22* 339:*22*
350:*16, 24*
**2023** 117:*4, 8, 9*
123:*22* 130:*13, 15*
188:*18* 189:*8* 299:*25*
308:*17, 24* 313:*13*
315:*10* 317:*10* 319:*2,
13* 333:*22* 338:*22*
339:*21* 340:*9* 354:*4,
18* 355:*1, 4*
**2024** 230:*6*
**2025** 110:*11* 112:*12*
114:*2* 134:*1* 136:*3*
216:*20*
**21** 218:*25*
**22** 218:*25* 273:*11*
274:*4, 7* 310:*13*
337:*19*
**228** 111:*14*
**22991** 191:*15*
**22nd** 120:*9, 12, 17, 20*
121:*8*
**23** 215:*24* 249:*22*
**238** 111:*15*
**23rd** 117:*8*
**24** 110:*11* 111:*8*
112:*12* 249:*22*
**24th** 114:*2*

**25** 117:*12* 263:*24*
264:*20* 343:*24*
347:*16, 19, 24* 351:*17*
352:*18* 353:*16*
**25th** 117:*3, 8, 9*
119:*6, 9* 130:*13, 15,
17* 196:*23* 197:*5*
**26** 287:*12* 328:*20*
**27** 343:*19*
**27th** 133:*5*
**28** 354:*3*
**28th** 134:*1* 216:*20*
**2nd** 205:*14*

**< 3 >**
**3** 111:*9* 144:*2*
169:*23* 170:*10* 191:*1,
20*
**3.3** 347:*14* 348:*2*
**3:03** 328:*8*
**3:16** 328:*11*
**3:57** 359:*20*
**30** 122:*6, 7* 134:*7, 14*
**30-day** 134:*18, 22*
135:*1, 3*
**31.7** 264:*11* 265:*3*
266:*1*
**33** 117:*12*
**34** 123:*5*
**37** 128:*1*
**38** 122:*7*
**3rd** 121:*13, 17, 19*
140:*24* 199:*25*

**< 4 >**
**4** 111:*10* 164:*6*
169:*11, 17* 204:*10, 11*
263:*18* 271:*1, 2*
**4:01** 359:*23*
**4:02** 360:*8*
**42** 123:*6* 231:*11, 14,
16*
**420** 113:*7*
**44** 219:*17*
**45** 219:*2* 220:*2*
289:*5*
**46** 224:*8* 269:*6*
272:*16* 288:*2, 3*

**47** 215:*25* 230:*5, 8*
231:*7* 249:*19, 21, 25*
259:*23*
**48** 221:*24*

**< 5 >**
**5** 111:*11* 115:*22*
144:*2* 168:*4, 8*
170:*16* 185:*8, 9*
191:*14* 216:*4, 6*
220:*24* 221:*17* 238:*9,*
*10* 254:*11* 271:*16*
273:*12, 15, 21* 274:*5,*
*10, 25* 275:*4, 7* 287:*8*
**5.4** 289:*15*
**5.56** 260:*17* 261:*11*
264:*5, 24*
**51** 138:*23*
**52** 138:*23*
**56** 216:*9*
**57** 220:*24*
**57.75** 129:*7*
**58** 216:*10*
**59.50** 129:*7*
**5th** 123:*8*

**< 6 >**
**6** 111:*4, 12* 135:*18*
191:*15* 232:*1, 2, 3*
250:*13* 263:*19* 267:*5*
**60** 132:*6*
**63105** 113:*15*

**< 7 >**
**7** 111:*7, 13* 243:*24*
244:*25* 245:*9* 246:*7,*
*9* 260:*24* 270:*20, 21*
275:*8* 294:*15* 347:*2*
**7.34** 260:*12* 261:*4, 7*
264:*4, 23* 265:*16, 19*
266:*4, 8*
**7/28/25** 111:*11*
**700** 361:*21*
**7676** 112:*13* 113:*14*
114:*11*

**< 8 >**
**8** 111:*14* 144:*3, 6, 18*
157:*21* 287:*10, 11*

305:*17* 337:*15, 16*
**8/27/25** 111:*8*
**80** 276:*3* 281:*5*
**82** 111:*9*
**857** 270:*25*

**< 9 >**
**9** 111:*15* 347:*3, 4*
**9:22** 114:*3*
**95** 111:*10*
**98** 269:*24*
**99** 273:*11, 25* 274:*2,*
*4, 7*

**< A >**
**a.m** 114:*3* 173:*17, 20*
215:*12, 15*
**aavalos@rgrdlaw.com**
113:*10*
**abbreviated** 119:*16*
**ability** 182:*8, 9*
187:*13* 189:*23, 25*
190:*2, 5, 9* 326:*3*
345:*16* 361:*9*
**able** 116:*4* 132:*10*
161:*3* 298:*10* 355:*4*
**abnormal** 260:*5, 23*
261:*8, 11, 12* 308:*2*
**absent** 326:*24*
**Absolutely** 266:*18*
319:*2*
**abstract** 243:*13, 20*
244:*23*
**academic** 134:*23*
135:*1, 4* 139:*11, 12,*
*19, 25* 140:*4* 222:*2*
224:*4, 5, 13* 225:*19*
226:*2, 3, 8, 16* 227:*12,*
*22* 228:*19* 231:*1*
281:*21, 25* 282:*1, 6, 9*
288:*17* 295:*8, 21*
297:*1, 17, 18* 321:*6*
343:*25*
**accept** 237:*3* 328:*1*
**accepted** 125:*4*
129:*4* 332:*10*
**accepting** 167:*13*
**access** 282:*23, 25*
324:*10, 14* 336:*14*
**accompanied** 327:*6*

**account** 152:*25*
162:*16* 163:*3* 212:*5*
214:*18* 248:*4* 288:*25*
324:*13*
**accumulate** 184:*17*
**accumulated** 139:*23*
**accuracy** 129:*17*
**accurate** 362:*6*
**accurately** 248:*20*
**accuse** 293:*9*
**accused** 293:*2, 6*
**accusing** 294:*5*
**achieving** 187:*21*
**acknowledge** 230:*20,*
*24* 349:*3*
**acquire** 119:*10, 15,*
*25* 120:*4, 25* 121:*5*
122:*1, 18, 23* 123:*12,*
*17* 124:*1, 12, 22*
129:*12* 130:*2* 181:*15,*
*21* 182:*5* 183:*10, 18*
184:*19, 23* 185:*10*
186:*5, 18* 187:*6*
194:*2, 13* 201:*25*
202:*25* 203:*15* 207:*7*
211:*16* 316:*21*
**acquired** 128:*12*
175:*20* 178:*4, 9, 12*
179:*19, 21* 180:*3, 13,*
*15* 181:*1, 13* 182:*17*
189:*11, 16* 233:*19*
234:*6, 22* 315:*21*
326:*2* 329:*3*
**acquirer** 176:*10, 20*
177:*5, 8, 14* 179:*7*
181:*15* 182:*4, 6, 11,*
*15, 18, 24* 183:*8, 17,*
*21* 184:*5, 17* 185:*9,*
*23* 186:*5, 11, 14, 19,*
*22* 187:*6, 21* 188:*2, 4*
189:*15* 190:*14* 194:*1,*
*4, 12, 15, 17* 195:*7*
198:*11, 18, 22, 25*
200:*20* 201:*24* 202:*5,*
*15, 19, 24* 203:*5, 14*
207:*6* 254:*18, 21*
255:*4, 25* 314:*5*
320:*15, 18* 327:*14, 16,*
*18*

**acquirer's** 192:*12*
213:*13, 22* 214:*4, 22*
**acquiring** 152:*13*
175:*21* 176:*17*
181:*21* 182:*7, 11, 19*
188:*2, 5* 190:*3*
202:*25* 203:*16*
209:*21* 210:*10*
211:*14, 22* 212:*8, 23*
213:*23* 214:*5, 23*
**acquiror** 180:*14*
**acquisition** 116:*2, 23,*
*25* 118:*25* 119:*3*
125:*4, 16* 175:*15, 24*
178:*2* 179:*12* 181:*14,*
*22* 183:*5* 184:*5, 20*
186:*7, 20* 187:*8, 21*
188:*11* 190:*7, 10, 13*
197:*19* 206:*4, 11, 24*
207:*21, 25* 208:*12*
210:*22* 215:*7* 231:*19*
232:*10, 12* 233:*17, 23*
234:*1, 2, 17, 25*
235:*14, 21* 267:*12*
275:*25* 319:*1* 320:*16,*
*19* 323:*13* 326:*3*
**acquisition-related**
276:*6*
**acquisitions** 173:*25*
174:*9* 177:*18* 187:*24*
188:*12* 193:*21*
233:*14* 235:*15*
268:*17* 312:*20, 25*
336:*13* 353:*17*
**Action** 110:*1* 112:*1*
114:*8* 193:*8, 17, 22*
194:*8, 10* 195:*7, 14,*
*18* 196:*1* 197:*18*
361:*12, 16*
**actions** 182:*1* 195:*2,*
*11* 196:*3* 197:*25*
198:*5* 213:*6*
**activity** 322:*21, 23*
**actual** 171:*24*
192:*21* 265:*23* 266:*2*
277:*1* 279:*10* 283:*10*
300:*22* 303:*19* 308:*3*
318:*11*
**adamantly** 211:*10*

**add** 245:*14*
**added** 253:*25*
**adding** 345:*22*
**addition** 127:*6*
**additional** 136:*23* 324:*11*
**address** 220:*10* 224:*16* 226:*12*, *22* 227:*15*, *17* 228:*17* 247:*25* 248:*4* 250:*1* 288:*22* 294:*21* 295:*11*, *15*, *23* 296:*3*, *12*, *16*, *19* 297:*2*, *20*, *25* 298:*13*, *15*, *18* 299:*4*, *11* 317:*4*
**addressed** 220:*5*, *11* 221:*20* 222:*16* 225:*8*, *13* 226:*4*, *8*, *16*, *19* 229:*6*, *19* 235:*10* 272:*2* 290:*2* 297:*17* 340:*21*
**addresses** 228:*16* 293:*7*, *10* 295:*24* 299:*19* 330:*4* 341:*15*
**addressing** 220:*1*, *12* 223:*9*, *22* 224:*14* 226:*1* 227:*21* 289:*24* 292:*18* 294:*4* 297:*15*, *22* 342:*9*
**adhere** 185:*5*
**adjust** 261:*2*
**adjusting** 260:*21*
**admit** 272:*15*
**Adobe** 221:*3*
**adoption** 189:*18* 309:*16* 310:*9*
**advance** 135:*11*
**advancing** 268:*4*
**adverse** 266:*6*
**advisors** 146:*25* 155:*3* 290:*8*
**affect** 151:*2*
**afternoon** 123:*8* 124:*7*, *21*
**aggressive** 193:*8*, *16*, *22* 194:*8* 195:*7*, *13*, *18* 196:*1* 198:*5*
**ago** 141:*25* 250:*14* 292:*21*

**agree** 125:*22* 126:*1* 127:*22* 128:*22* 131:*5*, *7* 168:*18* 177:*17* 178:*23* 210:*24* 250:*16* 267:*16* 291:*1* 300:*14* 302:*7* 311:*6* 324:*23* 327:*13*, *16* 336:*23*
**AGREED** 112:*6* 132:*7* 203:*3* 238:*1* 302:*2*, *4* 320:*14*, *17* 329:*6* 330:*2* 333:*12*
**agreeing** 250:*20*
**agreement** 125:*10* 126:*20*, *24* 127:*7*, *15*, *21*, *23* 328:*23* 329:*5*, *8*, *13*, *18*, *23* 330:*1*, *5*, *7*, *12*, *15*, *20* 331:*3* 332:*21* 339:*17* 340:*16* 341:*24* 343:*13*
**ahead** 118:*10* 122:*5* 123:*4* 148:*12* 196:*12*, *14*
**al** 111:*14* 230:*6* 289:*13* 293:*5* 328:*20*, *22* 336:*18* 337:*14* 338:*12* 341:*21*
**allegations** 146:*18* 154:*11*, *14* 155:*14*, *21* 284:*22*
**alleged** 144:*24* 145:*3*, *6*, *17* 147:*15* 149:*5*, *17* 151:*6*, *8* 152:*5* 153:*10*, *20* 156:*12*, *13*, *21*, *25* 157:*22*, *23* 165:*13* 170:*6* 229:*3* 263:*12* 277:*17* 278:*21* 283:*24*, *25* 284:*6* 285:*5*, *11*, *19*, *22* 286:*5* 298:*24* 303:*14* 316:*4* 317:*17* 318:*15* 341:*10*, *11* 342:*8* 344:*8*, *14*, *24* 345:*18* 346:*4* 352:*13*, *24* 353:*13*
**allegedly** 145:*12* 155:*18* 160:*22* 310:*22* 311:*5* 317:*19*

**alleges** 148:*19* 152:*12* 153:*5* 154:*17* 159:*22*
**alluded** 199:*13* 284:*5*
**alluding** 138:*12* 333:*6*
**alternative** 171:*21* 172:*7*, *16* 173:*3*
**alternatives** 311:*9*, *21*
**alters** 137:*11*
**Alyssa** 113:*5*
**ambiguity** 239:*2*
**amount** 167:*1* 272:*6* 273:*6* 282:*22*
**Ana** 113:*5*
**analyses** 254:*16*
**analysis** 136:*5*, *6* 145:*13* 151:*2*, *25* 155:*25* 156:*1* 157:*10*, *12* 165:*25* 166:*4* 167:*1*, *2*, *7* 213:*14* 214:*6*, *24* 215:*20* 229:*12* 238:*13* 268:*9* 275:*15* 284:*18*, *20* 286:*17* 288:*21*, *25* 290:*15* 291:*24* 293:*1*, *3* 296:*6*, *18* 299:*14* 300:*8* 305:*9* 307:*20* 308:*7* 316:*5*, *8* 317:*4* 318:*19* 343:*24* 344:*13*, *21* 345:*20* 355:*2*
**analyst** 299:*21*, *23*, *24* 300:*1*, *5*, *6*, *8*, *12*, *16*, *19*, *20*, *22*, *25* 301:*6*, *9*, *10*, *12* 302:*22*, *24* 303:*7*, *12*, *21* 306:*1*, *3*, *6*, *8*, *9*, *11*, *15*, *19*, *22* 307:*5*, *10*, *11*
**analysts** 305:*19*
**analyze** 272:*19* 304:*7* 340:*18*
**analyzed** 197:*25* 269:*16*, *18* 270:*6*, *12* 272:*9* 280:*19* 297:*5*, *9* 299:*17*
**analyzing** 296:*6*
**anchored** 344:*23*
**and/or** 362:*7*
**announce** 351:*1*

**announced** 189:*7* 239:*5*, *8* 241:*1*, *21* 243:*7*, *10* 244:*8* 245:*4* 289:*13* 295:*3*, *4* 338:*17* 350:*13*, *15*, *18*
**announcement** 114:*17* 238:*18* 239:*14* 240:*8*, *17*, *25* 241:*24* 242:*17*, *19* 246:*22* 247:*19* 248:*15*, *18* 249:*1*, *5* 260:*9* 295:*2* 299:*25* 301:*11* 303:*13* 311:*8* 314:*9*, *10* 315:*24* 336:*6* 342:*19* 349:*18*, *19* 350:*21*, *24* 353:*9*
**announcements** 316:*17* 344:*17* 346:*22* 350:*9*, *23*
**announces** 311:*20* 313:*9*
**answer** 151:*4* 166:*19* 266:*9* 270:*9*, *15* 293:*14* 314:*1* 345:*11*, *12*, *14*, *25* 358:*24*
**answered** 152:*8* 154:*23* 211:*18* 225:*12*, *25* 226:*23* 228:*20* 235:*22*, *24* 236:*1*, *23* 273:*18* 284:*10* 320:*24*
**answering** 268:*21*
**anticipating** 309:*5*
**anybody** 136:*4*
**aplascoff@rgrdlaw.com** 113:*9*
**appealing** 172:*10* 225:*19*
**appear** 281:*16*
**APPEARANCES** 113:*1*
**appears** 158:*18* 361:*7*
**Appendix** 135:*17* 138:*22*, *24* 139:*2* 300:*11* 304:*23*, *24*
**applicable** 274:*21*

Deposition of David J. Denis, Ph.D., Vol. II                    In Re National Instruments Corporation Securities Litigation

**application** 286:*15* 289:*25* 290:*10*, *21* 292:*17* 316:*10*

**apply** 261:*19*

**applying** 262:*1*, *25* 287:*3* 288:*1*, *22* 290:*24*

**appreciate** 138:*18* 345:*10*

**approach** 208:*7*

**appropriate** 172:*12* 293:*13*

**approximately** 276:*3* 281:*5*

**April** 123:*8*, *21* 124:*7*, *11*, *22*

**arbitrage** 227:*6* 247:*17* 299:*2*

**area** 240:*22* 313:*3*

**argued** 263:*10*

**argument** 227:*21*, *22*

**arguments** 229:*2*

**array** 197:*23*

**arrive** 262:*24*

**arrived** 132:*15* 227:*11* 229:*22*

**art** 284:*2*

**article** 111:*12* 172:*8* 230:*6*, *16*, *21* 231:*18* 232:*1*, *6*, *9* 233:*7*, *10* 234:*10*, *21*, *24* 235:*7*, *11*, *13*, *15* 236:*12* 238:*7*, *9* 240:*14* 242:*9*, *11* 243:*6* 246:*2*, *14* 249:*11*, *13*, *16* 250:*1*, *11*, *12*, *17* 255:*8* 267:*5*, *7*, *9*, *23* 268:*2*, *8*, *24* 274:*14* 293:*5* 328:*20* 337:*14* 354:*21* 356:*19*

**articles** 234:*24* 236:*7*, *16* 237:*10* 270:*9* 281:*21*

**articulated** 257:*21*

**articulates** 216:*25* 217:*12* 244:*22*

**articulating** 224:*12* 228:*15*

**artificial** 217:*1*

**aside** 172:*2*

**asked** 136:*22* 142:*24* 143:*1* 152:*8* 154:*23* 166:*1* 168:*20* 211:*18*, *20* 225:*11*, *24* 226:*23* 228:*20* 235:*22* 236:*23* 284:*10* 320:*24*

**asking** 139:*24* 143:*9*, *10* 155:*10*, *12* 161:*16* 169:*15* 207:*13* 210:*19* 230:*13* 235:*6*, *9*, *16* 270:*10* 293:*1*, *2*, *4* 297:*24* 307:*6* 309:*21* 311:*19* 316:*3* 341:*5* 344:*21*

**aspect** 154:*2* 159:*11* 163:*13*

**aspects** 290:*12* 291:*15* 299:*1*

**assemble** 338:*5*

**assess** 224:*8* 225:*20* 234:*19* 236:*4* 237:*9* 296:*19* 333:*2* 334:*4* 357:*6*

**assessed** 296:*21* 333:*21* 335:*22*

**assesses** 225:*23*

**assessing** 150:*25* 156:*1* 162:*11* 167:*14*, *23* 195:*4* 214:*9*, *10* 224:*25* 248:*11*, *12* 280:*2* 282:*12* 333:*1* 358:*15*

**assessment** 150:*23* 165:*22* 213:*16* 214:*2* 279:*9* 283:*9* 324:*24*

**asset** 181:*9*

**assignment** 156:*18* 279:*20* 304:*3*

**assist** 136:*9*

**assistance** 136:*5*

**associated** 179:*16* 316:*15* 359:*13*

**assume** 140:*14* 152:*4* 155:*13* 170:*18* 173:*8*, *11* 354:*4*

**assumed** 221:*4*

**assuming** 170:*21*

**assumption** 144:*17*, *20*, *23* 145:*2*, *5*, *13*, *19*

146:*18* 147:*15*, *25* 148:*3* 149:*6*, *16*, *19*, *21*, *24* 150:*12*, *20* 151:*2*, *5*, *10*, *14*, *18* 152:*5*, *10*, *17*, *21* 153:*19* 155:*12*, *25* 156:*4*, *11*, *24* 157:*3*, *9* 159:*2*, *11*, *14* 161:*9* 162:*2* 284:*2*, *11*, *14*, *17*, *21* 285:*23* 344:*13*, *24* 345:*2*, *6*, *18*, *20*

**assumptions** 151:*23*

**assure** 310:*15*

**attached** 111:*17* 228:*3*

**attempt** 186:*5* 194:*1*, *16*, *18* 202:*24* 203:*15*

**attempting** 183:*10* 187:*6* 194:*12* 201:*25* 207:*7* 320:*18* 327:*17* 333:*2*

**attention** 360:*2*

**attorney** 361:*14*

**audible** 114:*16*

**August** 133:*5*, *6* 205:*14* 262:*9* 314:*8* 315:*1* 317:*24* 318:*22* 319:*11*, *15* 320:*10* 329:*25* 331:*4* 333:*4*, *22* 334:*5* 339:*22* 350:*16*, *24*

**authors** 244:*2* 245:*15* 255:*11*

**available** 142:*25*

**Avalos** 113:*5*

**Avenue** 113:*7*

**average** 179:*15* 229:*9* 239:*8* 242:*23*, *25* 243:*11* 244:*13* 245:*6*, *8* 246:*6* 247:*18* 249:*3* 256:*15* 260:*4*, *12*, *15* 261:*18*, *25* 262:*25* 263:*5* 264:*9*, *24* 265:*9*, *24* 270:*3*, *8*, *17* 272:*15* 289:*15* 316:*14* 331:*13*, *17* 337:*7* 358:*4*

**averages** 264:*8* 272:*14*

**aware** 149:*10* 154:*17*, *24*, *25* 188:*12* 205:*21* 288:*14* 325:*23*

**axis** 238:*17*

**< B >**

**B1** 135:*18*

**back** 131:*16* 145:*9* 146:*13* 159:*1*, *13* 162:*10* 166:*17* 168:*3* 169:*11*, *16* 173:*19* 177:*1* 182:*24* 184:*13* 200:*20* 201:*17* 212:*15* 215:*14* 216:*2* 218:*21*, *24* 219:*6* 221:*6*, *17* 242:*13* 249:*20*, *21* 250:*11*, *13* 254:*9* 259:*24* 263:*17* 266:*24* 267:*2*, *4* 269:*2* 273:*17* 275:*5* 283:*21* 292:*5* 294:*13* 298:*21* 314:*25* 317:*24* 318:*10*, *22* 319:*11*, *15* 320:*10* 325:*15* 327:*9* 328:*10*, *15* 331:*7* 340:*14* 353:*25* 359:*22*

**back-and-forth** 164:*25* 230:*11* 289:*14*

**Background** 118:*12*, *14*, *17*, *21* 125:*9*, *15*, *23* 126:*13* 127:*16* 131:*12* 232:*25* 337:*1* 339:*25* 355:*6*, *21*, *24* 356:*4*

**backwards** 291:*9* 331:*24*

**bad** 115:*8*

**bargaining** 313:*7*

**base** 217:*24*

**based** 171:*19* 246:*15* 248:*5* 249:*6* 258:*20* 263:*5* 277:*21* 281:*18* 300:*7* 301:*24* 303:*6*, *10* 306:*14* 338:*23* 347:*18* 354:*11* 356:*23*

**bases** 218:*6* 275:*21*

**basically** 230:*15*
261:*10*
**basing** 258:*19*
**basis** 140:*1* 147:*3*
155:*5* 157:*19* 162:*17*
170:*23*, *24* 172:*22*
173:*12* 184:*1* 190:*18*
196:*6* 201:*9*, *14*
208:*19* 209:*14* 213:*3*
214:*19* 278:*20*
283:*23* 285:*5*, *18*
286:*21* 291:*13*
293:*13* 304:*15*, *17*
314:*6* 324:*16* 351:*2*
352:*6* 357:*11*
**Bates** 111:*9*, *10*
191:*5*, *15* 270:*25*
280:*8* 337:*20* 347:*7*
**bear** 266:*13*
**bearing** 266:*11*
268:*9*, *13*, *14*
**began** 188:*17*, *19*
271:*24*
**beginning** 119:*6*
120:*8*, *12*, *17* 121:*12*
122:*10* 124:*7* 128:*16*
130:*23* 139:*9* 165:*6*
170:*17* 184:*3* 190:*21*
191:*5* 201:*5* 209:*18*
232:*14* 243:*21*
244:*20* 247:*23* 260:*3*
275:*4* 288:*4* 338:*5*
341:*10*
**begins** 129:*21*
145:*10* 173:*7* 219:*17*
228:*2* 269:*6*, *11*
275:*12* 338:*16*
**begun** 271:*23*
**BEHALF** 110:*10*
112:*9*
**behavior** 214:*14*
**believe** 115:*15*
119:*23* 127:*9* 135:*9*
139:*4* 140:*13*, *18*
142:*17* 143:*24*
144:*19* 146:*17*, *21*
158:*8* 162:*4*, *22*
163:*13* 200:*6* 204:*15*
205:*14* 209:*2* 259:*2*,
*3*, *9* 281:*3* 288:*11*

**308**:*6* 310:*4*, *11*, *13*
326:*2* 340:*13*
**believed** 259:*18*
313:*25*
**believes** 220:*13*
259:*10*
**believing** 207:*17*
258:*5*
**Bennett** 112:*12*
113:*13* 114:*11*
**best** 120:*14* 144:*22*
155:*4* 163:*4* 166:*8*
345:*16* 361:*9*
**better** 236:*6* 257:*17*
258:*1* 289:*20* 300:*10*
**Betton** 111:*13*
269:*17* 270:*1*, *18*
272:*2*, *10*, *18*
**beyond** 142:*13*
**bias** 334:*24* 349:*10*
**biased** 335:*3* 352:*10*
**bid** 124:*22* 200:*13*
245:*18* 258:*8* 273:*1*,
*2*, *6* 334:*1*
**bidder** 273:*2*
**bidding** 125:*8*, *21*, *22*
126:*13*, *23* 128:*21*
131:*13*, *18*, *25* 132:*11*,
*16*, *17* 198:*10*, *17*
289:*15* 331:*8* 332:*22*
337:*3* 340:*10* 342:*18*
343:*4* 357:*20* 358:*6*
**bids** 199:*7*, *10* 289:*9*
290:*14* 331:*13*, *17*
332:*6*, *10*, *12*, *13*, *16*
333:*25* 334:*1* 335:*9*,
*23* 336:*3* 337:*8*
355:*6* 356:*5*
**bit** 115:*23* 117:*16*
124:*18* 141:*6* 174:*15*
217:*19* 337:*25*
**blanket** 156:*23*
267:*21*
**block** 146:*6* 149:*18*
161:*10* 182:*10*, *11*
187:*13*, *16*, *24* 188:*4*
190:*10* 213:*5* 326:*3*
**blocking** 187:*17*, *18*
**blocks** 190:*7*

**blow** 117:*15*, *20*
**blowing** 337:*24*
**board** 129:*22* 130:*25*
131:*8* 146:*24* 155:*2*
157:*17*, *18* 161:*14*
162:*15* 163:*2* 176:*21*
177:*7* 184:*1* 185:*24*
187:*20*, *22* 188:*2*, *9*
190:*5*, *11* 191:*6*
195:*12*, *17* 201:*9*
214:*14* 286:*19*, *25*
287:*5*, *16* 288:*5*
291:*18* 320:*12*
324:*15* 352:*5* 357:*10*
**body** 139:*22* 270:*11*
**bothered** 282:*11*
**bottom** 124:*18*, *20*
129:*20* 139:*10* 168:*5*,
*7*, *8* 238:*16* 273:*25*
275:*11* 289:*7* 294:*16*
**Boulevard** 112:*13*
113:*14* 114:*11*
**break** 173:*14*, *18*
215:*13* 266:*17*, *20*, *23*
328:*4*, *5*, *9* 359:*15*, *21*
**breakdown** 334:*23*
**breaking** 215:*10*
**Brief** 185:*17*
**broad** 174:*10* 268:*22*
309:*12*
**Broadly** 174:*18*
**Bruner** 111:*15*
343:*19*, *20*, *22* 344:*22*
345:*20* 346:*3*, *24*, *25*
347:*13* 351:*10*
353:*16*
**Bruner's** 351:*16*
353:*2*
**bullet** 128:*15*, *16*, *20*
129:*21* 130:*6* 165:*5*
170:*5* 171:*25* 206:*3*
220:*6* 229:*6* 299:*5*
**bullets** 164:*18*
192:*25* 205:*20*
**bunch** 333:*13* 344:*7*
**business** 178:*6*
**but-for** 170:*25* 171:*9*,
*15*, *17*, *19*, *21*, *24*
172:*4*, *7*, *12*, *16*, *18*
173:*4* 217:*1*, *10*, *25*

**218**:*7*, *16* 219:*11*, *20*,
*25* 222:*24* 223:*5*, *12*,
*17*, *23* 224:*25* 225:*4*,
*15* 226:*12*, *14*, *21*
228:*5*, *16* 237:*18*
245:*10* 247:*24*
261:*20* 262:*12*, *13*, *16*,
*18* 263:*15*
**buy** 119:*20* 121:*8*,
*20* 150:*9* 176:*11*
177:*5*, *14* 185:*1*
187:*1* 323:*25* 326:*22*
**buyer** 325:*21*
**buyers** 116:*3*
**buying** 174:*19* 175:*7*
185:*4*, *9*
**buyouts** 174:*14*

**< C >**
**CA** 113:*20*
**Cain** 111:*11*, *14*
113:*23* 134:*1* 137:*13*
138:*12* 142:*1*, *20*, *22*
143:*4* 145:*11* 157:*4*,
*6* 158:*9*, *13* 163:*14*
165:*7*, *12*, *16* 166:*25*
167:*8*, *13*, *17*, *21*
168:*13* 170:*5* 171:*21*
172:*9* 208:*24* 209:*1*,
*4*, *6* 210:*3* 213:*16*
215:*4* 216:*21* 217:*17*,
*24* 218:*6* 219:*3*, *24*
220:*7* 224:*15* 226:*11*
229:*22* 230:*11*, *17*
231:*2* 236:*16* 237:*23*
245:*10* 247:*16* 249:*4*
262:*19* 269:*11*
275:*21* 276:*3* 278:*5*,
*7* 279:*2*, *5*, *21*, *22*, *25*
280:*8* 281:*2*, *5*, *7*, *13*,
*21* 282:*3* 283:*4*, *19*
284:*5*, *12*, *23* 285:*16*
286:*2*, *7*, *12*, *18*, *24*
289:*13* 290:*9* 291:*17*
293:*3*, *5*, *7* 294:*19*
296:*7*, *21* 298:*23*
299:*18* 300:*5*, *18*, *23*
301:*3*, *5*, *17* 302:*8*, *11*,
*23* 304:*2* 305:*5*
306:*15* 307:*4* 308:*23*

312:2  313:2  321:7
328:20, 22  329:22
336:11, 15, 18, 23
337:6, 14  338:12
341:20, 21  342:7
343:5  344:2  352:20
353:8  354:4, 21
355:1  356:19  357:16
358:10, 12, 16, 21
359:6, 11
**Cain's**  134:7, 11, 14
137:7  138:14, 16
140:23  141:16
150:23  156:1, 17
158:7  162:11  165:23,
24  169:6  170:24
171:8  172:17  173:2
204:21  215:18  216:5,
13, 24  219:19  220:24
223:24  226:7  228:13,
18  275:15  276:15, 23
277:11, 15, 22  278:19
283:9, 22  286:15
287:7  294:4  297:9
300:8  302:14, 18
304:18  305:9, 18
306:5, 25  307:20
308:9, 16  312:16
315:8  316:5  318:6,
14  329:20  330:4
331:7  332:5, 18
333:11, 23  334:12, 22
335:7, 13, 22  342:17
358:3
**calculate**  161:3
171:19
**calculated**  161:5
172:6  250:21
**calculating**  262:16
**calculation**  225:16
**Cali**  113:6
**call**  122:11  201:23
242:20  253:8  256:11
347:23
**called**  121:16  164:8
355:21
**calling**  240:2
**calls**  145:7  146:8
149:8  150:14  160:25
198:12  203:17

206:13, 25  207:8
208:14  252:15
312:22, 23  357:24
**capitalized**  158:9
**capitals**  158:17
**Caption**  362:2
**captioned**  362:5
**captures**  156:4
**capturing**  157:14
345:2
**CAR**  263:24
**care**  134:25
**career**  139:20  140:2
**carefully**  146:24
166:7, 17
**carried**  125:5
**carries**  231:8  260:1
**case**  130:19, 24
131:4  135:12, 16, 17
138:7  141:7, 8, 12, 20
142:1, 11, 13, 15, 21
143:6, 11, 17, 19
144:24  145:6  146:18,
21  148:12, 17  149:2
150:13  152:5  155:14
156:10, 12, 16  160:13,
20  165:9, 23  167:7
173:10  175:14  176:6,
24  183:25  190:18
192:19  205:22
206:16  209:22
210:11  211:8, 9
212:2  213:15, 25
214:3, 25  215:3
230:19, 21, 25  231:6
232:12, 19  233:16
234:9, 10, 11, 14, 18
235:12, 17, 20  236:13,
20, 22, 25  237:4, 5
240:13, 16  241:12
247:5  256:16  258:13
259:14  261:19
267:24  268:2, 5, 15
271:19  272:1, 19
273:6  274:14  276:5,
14, 15  277:23  282:23
290:7  298:6  299:11
301:25  303:6  305:5
306:23  310:23  311:5
314:23, 24  315:2

317:6, 13  318:19
319:19  324:8  330:16,
19  331:2  338:25
340:2, 3, 17, 19, 21, 23
341:22, 23  342:4, 6
343:7, 11, 12  346:8,
10  349:5, 6, 8, 22
350:2, 3  351:18
352:1, 4, 25  353:6
354:15, 19  359:2, 13
362:2
**case-produced**  143:4
276:4  303:24
**cases**  221:5  278:17
279:18  280:17, 18, 20
282:15  334:16
335:21  349:13, 21
**cash**  123:13  129:11
150:17, 19  151:8, 19
154:19  161:18
162:25  175:18
176:13  180:19  181:3,
10  186:17, 23  187:1
**catch-all**  174:15
**categories**  140:15
218:19  275:21, 24
277:16, 21  301:16, 19
302:22  303:5, 18, 20
**category**  300:4
303:11  322:17
**causal**  132:4
**causation**  156:2
170:20
**caveat**  262:20
**cc'ing**  205:5
**CCR**  110:21  361:20
**Celena**  110:21
112:14  113:22
114:14  361:4, 20
**Central**  114:3
**certain**  150:13
155:14  167:3  185:10
187:23  215:4  234:19
237:10  285:9  287:1,
2
**certainly**  158:13
164:13  183:21  184:9,
23, 25  207:24  214:13
227:11  292:4  294:2

295:15
**certainty**  301:8
**CERTIFICATE**
361:1
**certification**  143:18
**Certified**  112:15
113:18, 19, 20, 21
361:5
**certify**  361:6
**cetera**  115:18  292:14
343:14
**cgilroy@rgrdlaw.com**
113:9
**cgiuggio@rgrdlaw.co
m**  113:10
**challenging**  226:13
**chance**  354:24
**change**  137:4, 9, 23
189:17  248:10  254:7,
8  260:21  363:4, 7, 10,
13, 16, 19, 22  364:4, 7,
10, 13, 16, 19, 22
**changed**  208:18
**changes**  179:16
362:7, 8
**characteristics**  153:2
263:9  353:6
**characterization**
202:2  218:9  255:16
302:19
**characterize**  296:10
**characterized**  151:14
237:25  290:7
**characterizing**
172:11  199:16
**chart**  202:19  238:16
240:18
**Christoper**  113:6
**circumstances**  199:12
231:6, 12  235:10
236:13, 22  237:5
293:18
**citation**  351:17
**cite**  209:1  230:6, 13
264:22  271:2  280:24
281:2, 3
**cited**  220:19  224:4
230:10  231:2  269:11
276:3  279:24  281:7

294:*19*  295:*14*
300:*23*

**cites**  137:*13*, *18*
142:*22*  219:*3*  222:*6*
223:*15*  226:*11*
227:*22*  236:*16*  280:*5*,
*8*  281:*5*, *21*  287:*20*
298:*13*  304:*4*, *7*
307:*5*

**citing**  139:*16*  218:*18*
219:*8*  250:*3*  262:*13*
271:*4*  278:*14*  279:*21*
280:*11*  302:*11*
303:*23*

**City**  112:*13*

**Civil**  110:*1*  112:*1*
114:*8*

**claimed**  286:*2*

**claiming**  258:*21*, *24*

**claims**  285:*9*

**clarification**  138:*19*
215:*21*

**clarify**  196:*15*  261:*1*

**class**  130:*19*, *23*
131:*4*, *8*  143:*17*
149:*1*  184:*3*, *16*
190:*21*  199:*17*  201:*5*,
*11*  209:*19*  210:*17*
217:*9*  232:*15*  234:*20*
236:*5*  247:*23*  262:*2*
271:*23*, *24*  312:*14*
317:*5*, *12*  323:*5*, *16*
341:*10*

**clear**  126:*5*  130:*25*
131:*2*  132:*17*  133:*2*
143:*16*  172:*15*
194:*11*  200:*19*
203:*11*  205:*21*
220:*21*  223:*14*
225:*22*  228:*14*
234:*24*  237:*15*
240:*24*  253:*13*
284:*16*  288:*14*
296:*25*  299:*7*  318:*23*
324:*21*  335:*7*  345:*17*
349:*21*  353:*1*

**clearly**  224:*2*  293:*3*

**close**  161:*4*  263:*13*
298:*7*  359:*16*

**closely**  344:*8*  346:*4*

**closer**  116:*6*  172:*8*
237:*19*

**closest**  262:*17*

**closing**  262:*1*

**clumsy**  266:*11*, *13*

**clustered**  265:*16*
266:*3*

**co-authors**  291:*8*

**coercive**  201:*24*

**collective**  249:*15*
323:*2*, *12*  326:*4*

**column**  192:*4*, *10*
193:*1*  197:*11*  198:*4*
202:*11*  264:*10*  265:*2*
272:*25*  273:*1*, *4*, *21*
274:*7*, *21*  348:*10*

**combat**  195:*25*

**combating**  195:*13*, *18*

**combination**  187:*1*

**combine**  143:*18*
247:*15*

**combined**  143:*10*
178:*5*

**combines**  326:*4*

**combining**  174:*19*

**come**  131:*16*  168:*3*
200:*20*  213:*6*  216:*2*
249:*20*  264:*24*
278:*13*, *25*  279:*14*, *15*
280:*14*, *24*  302:*15*
324:*11*  325:*15*

**Comerford**  113:*13*
118:*16*  119:*13*, *22*
121:*3*, *22*  123:*1*, *15*
124:*3*, *14*, *25*  125:*12*,
*25*  126:*16*  127:*1*, *12*
128:*23*  129:*14*
130:*16*  131:*6*, *14*, *20*
132:*3*, *13*  138:*8*
140:*6*  141:*13*, *21*
142:*16*  143:*7*, *22*
144:*14*, *16*  145:*1*, *7*
146:*8*, *20*  147:*19*
148:*2*, *21*  149:*8*
150:*4*, *14*  151:*11*, *21*
152:*7*, *18*, *23*  153:*9*,
*15*, *22*  154:*12*, *23*
155:*16*, *23*  156:*14*
159:*4*, *24*  160:*7*, *25*
162:*3*, *9*  163:*11*, *17*,

*24*  164:*4*, *21*  165:*10*,
*19*  166:*15*, *24*  169:*4*
171:*2*, *10*  173:*5*, *15*
174:*8*, *21*  175:*2*, *9*
176:*4*, *12*, *25*  177:*20*
178:*10*, *17*, *25*  179:*5*,
*24*  180:*22*  181:*7*, *17*,
*24*  182:*20*  183:*13*, *20*
184:*8*, *21*  186:*1*, *8*
188:*6*  191:*17*, *20*
194:*19*  195:*20*
197:*20*  198:*12*, *19*
203:*2*, *17*  205:*13*
206:*13*, *25*  207:*8*, *15*,
*23*  208:*14*  209:*23*
210:*12*  211:*18*
212:*11*, *25*  214:*7*
215:*1*  216:*11*, *17*
217:*3*  218:*2*, *8*, *17*
220:*3*  221:*22*  223:*7*,
*18*  224:*1*, *18*  225:*11*,
*24*  226:*15*, *23*  227:*4*,
*19*, *24*  228:*20*  229:*16*
230:*23*  231:*22*
232:*20*  233:*18*, *25*
234:*12*, *16*  235:*18*, *22*
236:*1*, *23*  237:*8*
241:*4*  244:*12*  245:*7*
246:*19*  247:*2*  248:*2*,
*21*  250:*7*, *19*  251:*24*
252:*15*  255:*15*
256:*14*  257:*5*  262:*4*
263:*6*  266:*16*  267:*17*
268:*7*, *19*  272:*4*, *12*
274:*15*  276:*7*  277:*3*
278:*16*  280:*4*  283:*5*,
*11*  284:*10*  285:*25*
290:*11*  291:*21*
293:*11*  294:*7*  301:*7*
303:*9*  304:*1*  307:*12*
309:*2*  310:*24*  311:*14*
312:*10*, *22*  319:*5*, *20*
320:*24*  321:*19*  323:*9*,
*20*  331:*9*  334:*15*
335:*15*  340:*5*, *24*
341:*17*, *25*  342:*5*
350:*8*, *19*  357:*2*, *24*
360:*5*, *14*

**comes**  136:*22*  262:*17*
301:*10*  303:*11*

**comfortable**  117:*21*
118:*1*

**coming**  121:*8*
182:*24*  199:*20*  277:*2*
306:*15*

**commentary**  300:*5*
302:*24*  303:*3*  305:*19*
306:*5*, *19*

**comments**  136:*11*
305:*25*  324:*9*

**Commission**  339:*19*

**common**  122:*19*
217:*8*  289:*20*

**commonly**  292:*13*

**communicated**  147:*2*,
*9*  190:*20*  201:*2*, *7*, *9*
311:*22*  315:*3*

**communicates**  254:*24*
255:*12*

**communicating**
190:*13*, *17*, *18*  201:*5*
203:*23*

**communication**
121:*25*

**companies**  126:*15*, *17*
132:*7*, *15*, *19*  148:*15*
174:*19*  175:*7*  177:*19*
189:*2*, *3*  190:*6*
197:*22*  252:*12*
325:*14*

**company**  150:*9*
155:*1*  175:*21*, *22*
176:*2*, *8*, *11*  178:*9*, *12*,
*14*, *15*, *20*  179:*11*, *13*,
*14*, *21*  180:*3*, *12*, *15*,
*20*  181:*2*, *11*, *16*, *21*
182:*5*, *7*  183:*11*, *18*,
*22*, *23*  184:*19*  186:*18*
187:*7*  188:*3*  189:*23*
190:*1*, *8*  193:*21*
194:*7*, *13*  197:*18*, *22*
198:*11*, *18*  199:*21*
200:*14*, *24*  201:*13*, *25*
202:*25*  203:*1*, *15*, *16*
205:*6*  206:*19*  207:*7*
213:*18*, *23*  214:*5*
233:*19*  234:*6*, *22*
245:*6*  252:*8*, *13*
253:*2*, *24*  254:*5*, *7*
258:*6*  259:*3*  287:*17*

290:*7*  309:*12*, *14*
310:*6*, *8*  311:*13*, *20*,
*21*  313:*9*, *18*, *19*
315:*2*, *5*  319:*9*
320:*20*  321:*15*  322:*5*,
*8*  323:*4*, *8*, *15*, *18*, *19*,
*25*  324:*21*  325:*4*
326:*1*, *2*, *21*, *22*
327:*25*
**company's**  176:*21*
177:*6*, *7*, *15*  179:*19*
180:*2*, *4*  181:*1*
185:*24*  311:*23*
**comparators**  264:*21*
**compare**  192:*20*
249:*1*
**compared**  160:*4*
**comparing**  254:*13*
**complaint**  148:*16*, *19*
149:*5*  151:*8*  152:*12*
153:*5*, *8*  154:*5*, *7*, *10*,
*17*  155:*20*  156:*13*
159:*22*, *25*  284:*22*
**complaints**  148:*11*
**complete**  139:*12*
140:*4*, *16*  141:*11*, *14*
188:*11*  207:*25*
**completed**  188:*12*
291:*9*  349:*17*  350:*22*
**completely**  213:*1*
276:*22*  291:*3*  303:*14*
**con**  151:*24*
**conceivably**  212:*18*
**concerning**  166:*3*
211:*15*  212:*7*  275:*15*
313:*17*  318:*24*  325:*6*
333:*10*  344:*22*  354:*3*
**concerns**  116:*25*
**conclude**  170:*23*
244:*2*  298:*24*  316:*16*
321:*21*  337:*7*  343:*7*
352:*23*  353:*12*
**concluded**  296:*24*
308:*17*  323:*1*
**concludes**  217:*6*
242:*9*  246:*16*  308:*24*
331:*12*, *16*  347:*18*
353:*18*

**concluding**  278:*21*
283:*23*  285:*5*, *18*
287:*17*  299:*18*  352:*5*
**conclusion**  214:*22*
215:*5*  219:*11*, *21*
221:*23*  224:*13*
226:*13*  246:*6*  268:*16*
278:*25*  308:*21*  309:*3*
312:*16*, *19*, *23*  313:*18*
315:*10*, *13*, *16*  343:*15*
**conclusions**  145:*8*
149:*9*  150:*15*  154:*12*
219:*19*  246:*1*, *3*
250:*15*, *17*  268:*10*
275:*22*  278:*13*
**conditional**  173:*6*
330:*25*  336:*8*, *9*
**conditioned**  337:*9*
**conditions**  294:*22*, *23*
295:*1*, *11*, *15*, *17*
296:*1*, *4*, *9*, *13*, *16*
297:*2*, *8*, *11*, *16*  298:*1*,
*14*  299:*8*, *9*, *12*, *20*
**conducted**  129:*22*
296:*5*
**conducting**  213:*16*
252:*17*  315:*21*
**confident**  324:*10*
**confirmed**  282:*16*
300:*6*  304:*14*, *19*
305:*1*  308:*7*
**confirming**  170:*8*
**confused**  197:*3*
**conglomeration**  353:*9*
**conjunction**  146:*25*
195:*11*  210:*15*, *20*
**connect**  169:*21*
**connected**  286:*10*
**connection**  116:*2*, *15*,
*18*  132:*5*  139:*13*
140:*3*  143:*20*  153:*14*
**consequences**  235:*1*
**consider**  142:*14*
157:*14*  214:*11*
266:*17*  281:*5*  283:*17*
300:*16*, *25*  304:*21*
311:*8*, *16*  342:*18*
344:*7*  346:*5*
**considerable**  167:*2*

**consideration**  150:*3*,
*13*  151:*7*, *20*  162:*13*
176:*18*  179:*22*  180:*7*,
*19*  184:*6*
**considered**  116:*15*
131:*9*  138:*25*  139:*6*,
*11*, *13*, *18*  140:*5*, *11*,
*17*  141:*12*, *17*  142:*10*,
*12*  143:*1*, *12*  146:*24*
151:*25*  153:*14*  155:*1*
157:*17*  161:*22*
162:*23*  163:*3*  171:*22*
191:*9*  204:*17*  273:*15*
274:*4*  277:*1*  281:*16*
283:*2*, *3*, *4*  300:*12*
305:*7*  315:*25*  317:*16*
324:*13*  334:*22*
**considering**  194:*7*
208:*2*  263:*8*  274:*12*,
*17*  281:*17*  300:*18*
305:*9*  309:*13*, *16*
310:*6*, *9*  311:*9*, *20*
335:*14*  349:*22*
**considers**  224:*17*
338:*17*
**Consistent**  141:*1*
168:*22*  193:*24*  207:*5*,
*14*, *16*, *19*  208:*11*, *16*
230:*21*, *25*  251:*8*, *22*
257:*13*  284:*8*  286:*3*
289:*20*  316:*17*
331:*21*
**consistently**  165:*3*
**constituting**  356:*16*
**constraints**  354:*22*
**consult**  359:*17*
**consulted**  155:*3*
**contain**  137:*1*  139:*2*
**contained**  224:*7*
**containing**  303:*13*
**contains**  164:*11*
274:*17*  341:*1*
**contemporaneous**
240:*8*
**content**  306:*8*
**contest**  185:*23*  321:*9*
**contests**  273:*1*
**context**  142:*7*  143:*13*
189:*1*  194:*7*  248:*24*

285:*11*, *14*  286:*4*
287:*1*  294:*9*  343:*17*
**continuation**  271:*3*
**continue**  183:*10*, *18*
185:*3*  187:*6*  194:*4*,
*12*, *15*  207:*6*  208:*12*
214:*5*  215:*6*
**continued**  131:*13*
209:*21*  212:*8*, *14*, *17*,
*22*
**continues**  275:*20*
**Continuing**  185:*22*
186:*5*  194:*1*  202:*24*
203:*5*, *14*  210:*9*
**contrast**  244:*21*
**control**  117:*19*, *25*
118:*4*  120:*14*
**Conversely**  243:*21*, *22*
**conveyed**  312:*13*
313:*9*  314:*8*, *9*, *11*, *25*
315:*7*, *14*  318:*5*
321:*18*  322:*13*
**conveying**  214:*15*
322:*13*
**convince**  254:*5*
258:*11*
**copies**  147:*11*
**copy**  132:*25*  360:*15*
**CORPORATION**
110:*4*  112:*4*  114:*6*
184:*18*, *19*  362:*2*
**correct**  116:*17*, *19*
117:*10*  119:*14*  120:*6*
121:*9*, *10*, *18*, *21*, *23*
122:*4*, *16*, *20*, *21*, *25*
123:*2*, *14*  124:*4*, *15*,
*24*  125:*1*, *6*  126:*22*
127:*8*, *11*, *13*, *17*
129:*4*, *9*  130:*13*, *14*,
*21*  131:*4*  134:*3*, *9*, *12*,
*16*  136:*16*  138:*10*, *25*
139:*1*, *2*, *14*, *15*
140:*25*  141:*9*  142:*6*,
*17*  143:*6*, *21*, *24*
144:*7*, *8*, *18*, *19*  149:*2*,
*7*, *23*, *25*  150:*1*
151:*20*  152:*6*, *22*, *24*
153:*21*  154:*3*  155:*15*,
*22*, *24*  156:*9*  158:*9*
159:*23*  160:*6*  164:*10*,

12  165:*18*  166:*6*
167:*19*  168:*14*  169:*3*
170:*11*  171:*6, 15, 17*
173:*7, 25*  174:*1*
176:*22*  177:*15, 16*
180:*17*  181:*4, 23*
183:*12*  184:*7, 20*
185:*12*  186:*7, 20, 21,
23*  187:*3*  189:*10, 12,
13*  190:*15, 16*  192:*17*
193:*6, 23*  194:*2, 18*
195:*8, 10*  196:*24*
197:*16, 19, 21*  198:*6,
7*  199:*7, 10*  200:*1, 5,
10, 11, 15, 16, 21*
201:*2, 16*  202:*1, 16,
21, 22*  203:*1, 3, 16*
205:*17*  206:*2*  207:*22*
208:*13*  212:*10*
213:*25*  214:*6, 8, 25*
217:*4, 13*  218:*1, 16*
219:*5, 12, 20*  222:*4*
223:*6, 8, 17, 25*
225:*23*  226:*14*
228:*23*  229:*20*
231:*21*  232:*8*  233:*15,
17*  237:*6*  238:*1, 14*
239:*6, 10, 17*  242:*2,
16, 23*  243:*11*  244:*11*
245:*6, 8*  246:*23*
247:*1*  248:*22*  249:*14*
250:*2*  255:*16*  256:*3,
15*  260:*13, 14, 15, 16,
18, 19*  261:*14, 22*
262:*9, 12, 13*  264:*6*
269:*22*  271:*5, 7*
272:*11, 20*  273:*13, 16*
274:*3, 6, 8, 10, 11*
275:*13, 18, 23*  276:*15,
16*  277:*4, 24*  278:*15,
17*  279:*3, 4, 11, 17, 18,
24*  280:*3, 16, 17*
281:*22*  283:*6, 10*
284:*14, 22*  285:*24*
288:*11*  289:*4*  291:*20*
292:*22*  294:*6, 25*
295:*6, 7*  297:*3*
298:*14*  300:*17*  302:*1,
11*  303:*8*  304:*11*
306:*2, 13*  307:*21*

308:*20*  309:*21*
310:*11*  312:*6, 9, 11*
313:*20*  316:*22*  317:*1,
2, 14*  319:*6*  320:*25*
326:*10*  329:*10*  330:*4,
11*  332:*14*  339:*3, 15,
20*  340:*6, 22*  341:*22*
342:*4*  345:*1*  347:*21,
25*  348:*18, 22, 24, 25*
349:*5, 23*  353:*4, 22*
356:*1, 2, 3, 6, 7*
357:*18*
**correction**  242:*20*
**corrections**  362:*7*
**correctly**  136:*2*
232:*7*  271:*24*  273:*18*
290:*15*  348:*20*
**corresponding**  215:*19*
**counsel**  112:*7*  113:*3,
10*  114:*20*  136:*9, 11*
144:*7, 9, 11, 12, 13*
145:*16, 19*  146:*5, 14,
19*  149:*6, 21*  151:*6*
152:*4, 22*  153:*19*
155:*3, 13, 17*  156:*11,
23*  159:*2*  162:*2, 4*
163:*16, 22*  164:*2*
185:*14*  204:*25*
206:*18*  284:*3, 8, 13*
344:*13, 24*  345:*17*
361:*11, 14*
**count**  218:*13*  276:*9*
**couple**  122:*5*  177:*3*
197:*2, 4*  218:*24*
245:*14*  315:*25*
**coupled**  245:*4*
**course**  180:*18*
186:*13*  276:*20*
**COURT**  110:*1*
112:*1, 10, 15*  113:*18,
21*  114:*8, 14, 15, 22*
361:*5*
**covered**  354:*25*
**create**  258:*6*  259:*19*
**created**  157:*20*
**creates**  252:*9*
**criteria**  338:*11*
339:*5*  340:*1*  350:*17*
**critical**  157:*3, 10, 13*
284:*17*

**criticism**  307:*20*
313:*2*
**Cueller**  113:*5*
**culminate**  332:*13*
**culminated**  131:*19*
132:*1*
**Cummings**  113:*4*
**cumulative**  139:*22*
260:*4, 23*  261:*8, 12*

**< D >**
**damages**  156:*2*
171:*19, 22*  173:*10*
215:*19*  263:*4*
**dance**  293:*5, 12*
**dancing**  345:*12*
**data**  233:*10, 20*
236:*3*  240:*5, 6, 7*
244:*13*  247:*13, 15*
249:*6*  251:*8, 23*
257:*14*  261:*19*
265:*15*  270:*1*  331:*19*
332:*2, 4*  335:*25*
336:*11, 14, 21*  337:*7*
338:*12, 14*  339:*1*
340:*4*  350:*3*  352:*24*
353:*5*  357:*17*
**dataset**  233:*13*  234:*8*
**date**  114:*2*  123:*12*
130:*12*  133:*5*  134:*4*
135:*20*  159:*18, 22*
160:*5*  161:*3*  196:*21*
205:*9, 12, 14*  238:*21*
240:*3*  312:*5*  349:*19*
350:*21*
**dated**  117:*3*  204:*24*
216:*21*
**dates**  135:*25*  160:*1*
318:*7*
**date's**  160:*14*
**DAVID**  110:*9*  111:*2,
8*  112:*8*  114:*5*  115:*1*
362:*11*  363:*23*
364:*23*
**Davis**  110:*21*  112:*14*
113:*22*  114:*14*  361:*4,
20*
**day**  262:*2*  288:*4*
314:*17*  315:*15*  362:*9*

**days**  134:*7, 14*  197:*2,
4*
**day's**  161:*4*
**dcummings@rgrdlaw.
com**  113:*8*
**dead**  185:*16*
**deal**  151:*7*  178:*6*
192:*12*  204:*3*  209:*11*
232:*18, 22*  234:*11, 14*
239:*16*  241:*14, 21, 25*
242:*12, 13, 18, 19, 20*
243:*7, 8*  244:*8*
245:*23*  246:*22, 23, 25*
247:*8, 11*  248:*16*
254:*15, 17*  255:*23*
256:*12*  294:*20*  295:*9*
313:*11, 24*  324:*18, 24*
325:*6, 8, 9, 15, 17*
326:*12, 24*  327:*8, 13*
330:*6, 10, 19, 20, 24*
331:*1, 17*  332:*3, 20,
22*  333:*5, 10, 11, 14,
19*  334:*7, 8*  335:*4, 19*
339:*10, 24*  340:*9*
341:*23*  348:*11*  349:*3*
350:*13, 14*  351:*12, 25*
354:*15*  355:*11, 12, 14,
16*  356:*4, 8, 9, 13*
357:*1, 4, 9, 15, 20*
359:*8*
**dealing**  331:*25*
**deals**  179:*16*  236:*8*
237:*25*  251:*12*
254:*14*  274:*22, 23*
275:*1*  291:*9*  292:*24*
305:*22*  328:*23*  330:*4,
14, 23*  331:*8, 12, 13,
24*  333:*13, 16, 23, 25*
334:*14*  335:*13*  337:*7*
340:*15, 19*  341:*15*
346:*23*  347:*19*
348:*13, 16, 20, 23*
349:*20*  350:*10, 22*
351:*25*  352:*11, 18*
353:*17*  356:*16*  358:*5,
7, 12*  359:*6*
**decent**  215:*9*
**decided**  155:*3*
**deciding**  254:*18*

decision 208:*19*
decisionmaking 208:*4*
**DECLARATION** 362:2
declare 362:2
decline 316:*24*
declining 243:*14, 23*
decrease 261:*13*
deducing 228:*25*
deemed 190:*10*
defend 194:*9*
**Defendant** 112:*7* 113:*10*
defendants 356:*5*
defense 188:*9*
defensive 182:*9, 13* 187:*23* 197:*23*
define 156:*21* 158:*13* 174:*5* 284:*12*
defined 157:*20, 21* 158:*4, 22* 159:*1, 2* 167:*8, 13, 21* 169:*7* 170:*7* 284:*7* 285:*19*
defining 158:*14* 167:*20* 355:*16* 356:*12*
definitely 236:*1*
definition 167:*5, 10, 19, 22* 168:*12, 16, 22, 23* 169:*2* 174:*23*
definitions 167:*9* 176:*5*
deflation 217:*1*
degree 237:*10*
deliberate 292:*13*
deliberated 131:*1*
deliberations 129:*25* 130:*9, 23*
delivers 347:*20* 353:*19*
demonstrate 209:*7* 211:*24* 299:*15* 359:*12*
demonstrated 157:*6* 215:*5, 8*
demonstrates 167:*24* 210:*4* 358:*16*
**DENIS** 110:*9* 111:*2, 7, 8, 9, 10, 11, 12, 13, 14, 15* 112:*8* 114:*5*

115:*1, 7* 116:*7* 118:*1, 3* 133:*12, 14* 173:*22* 191:*1* 204:*11* 216:*6* 232:*3* 267:*2, 9* 270:*21* 280:*24* 328:*13* 337:*16* 345:*8* 347:*4* 350:*7* 354:*4, 21* 355:*2* 356:*19* 357:*16* 358:*10, 13, 21* 359:*7, 24* 362:*11* 363:*23* 364:*23*
**Denis's** 221:*1* 328:*15*
depend 178:*19* 194:*20, 23, 25*
depending 180:*6* 213:*24*
depends 117:*25* 181:*25* 183:*3* 203:*21* 214:*14* 313:*8, 21* 314:*22* 325:*18* 327:*24* 332:*7*
**DEPOSITION** 110:*9* 111:*2* 112:*8* 114:*4, 5, 10* 137:*14, 15, 16, 18* 138:*1, 3, 6, 11* 140:*20, 23* 141:*2* 164:*25* 221:*16* 360:*8* 361:*7, 12* 362:*1, 5, 7* 363:*1* 364:*1*
depositions 112:*11* 115:*13, 16* 160:*20*
describe 175:*15* 326:*8*
described 116:*22* 118:*21, 23* 119:*2, 21* 120:*1* 122:*2, 23* 125:*9, 17, 21, 23* 130:*6* 132:*1* 144:*17* 159:*10* 160:*9* 169:*23* 170:*9* 208:*4* 232:*25* 256:*6* 278:*1* 295:*25* 356:*9*
describes 118:*14* 119:*9, 15* 120:*20* 121:*7, 16* 122:*14* 128:*20, 24* 129:*3, 6* 278:*4* 292:*9* 355:*5*
describing 129:*25* 130:*22* 144:*6* 162:*10* 172:*3* 177:*11* 178:*8*

180:*11* 192:*10, 14, 15* 205:*20* 248:*20* 266:*12* 339:*24*
description 125:*18* 126:*2, 10* 179:*23* 181:*4* 240:*6* 266:*14* 308:*9* 338:*14* 347:*17*
descriptive 341:*1*
desire 203:*23* 213:*5* 214:*4* 215:*6*
**Desiree** 113:*4*
despite 131:*11* 189:*14* 202:*16* 206:*8* 251:*14* 334:*13*
detail 164:*15, 20* 169:*24* 170:*2, 9* 303:*22*
details 292:*25* 307:*16* 310:*1*
determination 263:*5*
determine 166:*22* 266:*8* 306:*18* 336:*10* 352:*21* 358:*12*
determined 160:*22* 163:*4* 286:*20* 306:*11*
determining 132:*18* 166:*11* 316:*10* 321:*9* 329:*24*
deviation 264:*11* 265:*3, 6, 14, 17, 22* 266:*2*
difference 215:*3* 235:*16* 329:*21*
differences 167:*9*
different 156:*12* 161:*5* 168:*25* 172:*4, 8* 174:*10* 178:*20* 180:*8* 181:*9* 182:*21* 184:*10* 199:*12* 200:*25* 203:*6* 209:*7* 210:*4, 15* 212:*12* 218:*14, 18* 220:*6* 223:*9* 228:*12* 239:*2, 24* 240:*4* 241:*5* 245:*10* 256:*17* 266:*9* 294:*1* 295:*16* 296:*9, 23* 297:*10, 15, 23* 299:*1* 303:*14* 311:*16* 312:*12* 314:*6, 25* 315:*22, 23, 24* 316:*1*

317:*11, 16* 319:*14* 321:*5, 12* 334:*18* 343:*24* 346:*15* 347:*19* 349:*8* 350:*2* 351:*3, 8* 353:*17, 18* 355:*11, 12, 14* 356:*14, 16* 357:*13*
differently 174:*11*
difficult 132:*14* 221:*6*
dip 256:*1*
direct 180:*12*
directed 152:*4, 22* 153:*19* 155:*13* 156:*11*
direction 361:*10*
directly 177:*8, 11* 186:*14, 17, 19, 25* 187:*2* 220:*4* 222:*8* 227:*8, 12, 15* 249:*17* 253:*21* 283:*16, 17* 284:*21* 304:*12* 332:*19*
directors 191:*6*
disagree 173:*1* 246:*1, 18, 20* 252:*2* 257:*10* 307:*13* 308:*21* 309:*3* 340:*25*
disagreeable 172:*21*
disappear 251:*15*
disclose 184:*25* 311:*1, 2, 3, 4*
disclosed 126:*21* 148:*25* 185:*3* 295:*18* 309:*8* 310:*5, 14* 316:*9* 317:*5, 12* 318:*22* 319:*7, 11* 320:*21* 321:*16* 322:*5* 323:*4, 16* 324:*22* 328:*24* 329:*9, 18* 330:*6, 7* 332:*20* 333:*3* 339:*18* 343:*14, 17* 354:*12, 16* 356:*4, 24* 357:*8, 9, 19* 358:*5*
disclosing 358:*9*
disclosure 149:*12* 154:*1* 185:*10* 200:*18* 236:*10* 306:*16, 20* 309:*18* 310:*19, 21* 312:*17* 316:*19, 20, 23*

321:2, *6*, *13*   323:*6*
325:*11*   326:*20*, *21*
336:*3*   346:*23*
**disclosures**   185:*6*
313:*17*   318:*25*   319:*1*
**discounted**   190:*2*
**Discovery**   112:*9*
141:*8*, *12*
**discretion**   190:*6*
**discuss**   224:*10*
269:*14*   292:*20*   293:*5*
**discussed**   148:*13*
172:*5*   236:*2*   241:*18*
262:*15*   269:*15*   270:*8*
276:*15*   301:*15*
306:*17*   334:*18*
336:*11*   344:*25*   359:*6*
**discusses**   292:*10*
**discussing**   143:*4*
145:*22*, *23*   229:*2*
294:*11*   300:*4*   345:*6*
349:*13*
**discussion**   146:*12*, *13*
147:*4*   155:*6*   157:*19*
162:*18*   185:*22*
190:*19*   194:*9*   199:*17*,
*18*   201:*10*, *11*, *15*
208:*19*   209:*15*, *16*
214:*20*   228:*2*, *4*
229:*8*, *13*, *22*   230:*16*
248:*23*   258:*8*   266:*19*
277:*22*   286:*21*
291:*14*   303:*4*   314:*6*
320:*13*   351:*2*   357:*11*
**discussions**   144:*14*
146:*25*   183:*22*   184:*2*,
*3*   193:*5*   195:*6*, *12*, *16*
196:*7*   213:*4*   321:*11*
324:*16*   352:*6*
**disposal**   183:*10*, *15*
**dispute**   129:*17*   251:*8*
**disputing**   246:*7*
250:*21*
**distinction**   143:*8*
188:*21*, *24*   189:*5*
250:*14*   254:*1*, *3*
258:*22*   261:*16*   314:*7*
331:*4*, *22*   346:*19*
356:*12*, *17*, *20*
**distinctions**   353:*3*

**distinguishing**   356:*18*
358:*10*
**distributed**   266:*4*
**distribution**   242:*24*
**DISTRICT**   110:*1*
112:*1*   114:*7*, *8*
**Dixon**   205:*1*
**Doctor**   158:*8*   305:*2*
**document**   115:*24*
116:*4*, *12*, *14*, *18*, *21*
117:*3*, *12*, *19*   118:*4*
120:*15*   123:*5*   130:*12*
132:*22*   133:*9*   168:*6*
190:*22*   191:*11*, *13*, *15*
193:*13*   194:*12*   195:*5*,
*9*, *11*   196:*11*, *21*
197:*8*   201:*20*   204:*8*,
*14*, *19*, *21*   205:*9*
207:*5*, *14*   208:*22*
209:*1*, *4*   215:*24*
216:*3*   218:*25*   230:*10*
243:*13*, *17*   270:*25*
271:*1*   282:*14*   289:*6*
294:*16*   305:*11*
328:*17*   342:*22*   347:*1*
353:*23*
**documented**   239:*11*
301:*24*   351:*8*
**documenting**   351:*4*
**documents**   116:*15*
138:*24*   139:*3*, *6*
140:*9*, *11*   141:*7*, *12*,
*14*, *16*, *20*   142:*1*, *7*, *9*,
*10*, *11*, *12*, *14*, *20*, *21*,
*22*, *25*   143:*4*, *6*, *11*, *17*,
*19*   160:*19*   191:*8*, *9*
204:*16*   209:*7*   210:*4*
276:*4*, *14*, *18*, *20*, *21*
277:*1*, *2*, *23*   278:*8*, *11*,
*14*   279:*5*, *6*, *14*, *15*, *17*
280:*9*, *10*, *11*, *12*, *25*
281:*2*, *4*, *7*, *9*, *15*, *16*
282:*5*, *15*, *19*, *21*
283:*1*, *2*, *3*, *17*, *18*
300:*12*   302:*10*, *12*, *13*,
*15*, *17*   303:*6*, *19*, *24*
304:*7*, *10*, *11*, *12*, *14*,
*15*, *20*, *21*, *24*   305:*4*,
*10*   342:*20*

**doing**   135:*11*   252:*14*,
*18*, *21*   253:*2*   261:*24*
281:*12*   283:*7*   313:*11*
**dollar**   273:*6*
**door**   351:*24*
**dots**   169:*21*
**double**   153:*1*
**double-check**   231:*23*
309:*23*   354:*23*
**doubt**   308:*10*, *12*
**Dowd**   112:*12*   113:*3*,
*13*   114:*10*
**downward**   242:*20*
256:*1*
**Dr**   114:*5*   115:*7*
118:*1*, *3*   133:*12*
134:*1*, *7*, *11*, *14*   137:*7*,
*13*   138:*12*, *14*, *16*
140:*23*   141:*16*   142:*1*,
*20*, *22*   143:*4*   145:*11*
150:*23*   156:*1*, *17*
157:*4*, *6*   158:*7*, *9*, *13*
162:*11*   163:*14*   165:*7*,
*12*, *16*, *23*, *24*   166:*25*
167:*8*, *13*, *17*, *21*
168:*13*   169:*6*   170:*5*,
*24*   171:*8*, *21*   172:*9*,
*17*   173:*2*, *22*   204:*21*
208:*24*   209:*1*, *4*, *6*
210:*3*   213:*16*   215:*4*,
*18*   216:*5*, *13*, *21*, *24*
217:*17*, *24*   218:*6*
219:*3*, *19*, *24*   220:*7*,
*24*   221:*1*   223:*24*
224:*15*   226:*7*, *11*
228:*13*, *18*   229:*22*
230:*11*, *17*   231:*2*
236:*16*   237:*23*
245:*10*   247:*16*   249:*4*
262:*19*   267:*2*, *9*
269:*11*   275:*15*, *21*
276:*3*, *15*, *23*   277:*11*,
*15*, *22*   278:*5*, *7*, *19*
279:*2*, *5*, *21*, *22*, *25*
280:*8*, *24*   281:*2*, *5*, *7*,
*13*, *21*   282:*3*   283:*4*, *9*,
*19*, *22*   284:*5*, *12*, *23*
285:*16*   286:*2*, *7*, *12*,
*15*, *18*, *24*   287:*7*
290:*9*   291:*17*   293:*3*,

*7*   294:*4*, *19*   296:*7*, *21*
297:*9*   298:*23*   299:*18*
300:*5*, *8*, *18*, *23*   301:*3*,
*5*, *17*   302:*8*, *11*, *14*, *18*,
*23*   304:*2*, *18*   305:*5*, *9*,
*18*   306:*5*, *14*, *15*, *25*
307:*4*, *20*   308:*9*, *16*,
*23*   312:*2*, *16*   313:*2*
315:*8*   316:*5*   318:*6*,
*14*   321:*7*   328:*13*, *15*
329:*20*   330:*4*   331:*7*
332:*5*, *18*   333:*11*, *23*
334:*12*, *22*   335:*7*, *13*,
*22*   336:*11*, *15*, *18*, *23*
337:*6*   342:*7*, *17*
344:*2*   345:*8*   347:*13*
350:*7*   352:*20*   353:*2*,
*8*, *16*   358:*3*, *16*
359:*11*, *24*
**drafted**   136:*12*
**dramatically**   190:*1*
**draw**   143:*8*   188:*24*
210:*14*   254:*1*   256:*19*
258:*23*   268:*10*   279:*7*
280:*6*   282:*8*   306:*6*
**drawing**   188:*21*
189:*5*   250:*14*   278:*8*
279:*24*   281:*17*
282:*10*   302:*19*
303:*10*   331:*23*
356:*12*
**drawn**   304:*3*   336:*17*
**draws**   304:*9*
**drop**   247:*21*
**drops**   248:*17*
**due**   244:*9*   251:*15*
256:*5*, *25*   318:*9*
**duly**   115:*2*   361:*8*

**< E >**
**earlier**   119:*20*
140:*22*   143:*17*
148:*13*   151:*23*
162:*11*   186:*20*   187:*8*
199:*5*, *7*   206:*10*
212:*21*   213:*23*
220:*10*   223:*9*   224:*20*
226:*17*   227:*13*
237:*17*   263:*10*
276:*17*   281:*3*   284:*16*

291:*5*  300:*4*  320:*14*  331:*21*  332:*10*  343:*17*  349:*9, 14, 16, 23*  351:*22, 23*  352:*15*  358:*13*

**early**  334:*13*  335:*9*  355:*13*

**easier**  221:*9*

**Eckbo**  111:*13*  269:*17*  270:*1, 19*  272:*2, 11, 18*

**economic**  150:*23*  151:*24*  156:*2, 20*  157:*5, 6*  167:*8, 10, 13, 19, 22*  168:*12, 17*  170:*23, 24*  172:*22*  173:*8, 12*  208:*25*  211:*3, 11, 25*  213:*19*  214:*10*  215:*19*  220:*9, 14*  222:*15*  223:*10*  224:*21, 23*  228:*3*  229:*2, 19*  234:*19*  236:*14, 15*  263:*11*  275:*16*  277:*16*  278:*20*  283:*23*  285:*1, 5, 9, 15, 18*  286:*3*  288:*16, 22, 25*  289:*25*  290:*10, 16*  292:*18*  295:*18*  299:*10, 15*  300:*20*  302:*24*  303:*4*  306:*7, 18*  307:*1*  312:*24*  318:*15*  323:*2*  326:*6*  329:*24*  333:*3*  342:*7*  343:*16*  352:*12, 22*  353:*13*  357:*7*  358:*17*

**economically**  153:*3*  163:*13*  167:*24*  170:*7*  212:*18*  214:*12*  215:*7*  223:*11*  228:*10*  229:*1*  234:*23*  247:*22*  278:*22*  283:*24*  285:*2, 4, 6, 20*  298:*10, 25*  314:*17*  315:*15*  316:*18*  321:*23*  323:*12*  341:*12*  352:*25*  356:*15*  359:*14*

**economics**  237:*3*

268:*4*  288:*1*

**Ed**  113:*23*  114:*13*

**Eddie**  205:*1*

**edited**  146:*13*

**editorial**  136:*11*

**effect**  153:*16*  161:*9*  213:*11*  242:*25*  261:*6*  283:*22*  322:*4*  326:*7*  350:*21*

**effective**  188:*9*

**effectively**  182:*10*  187:*24*  190:*7*

**effects**  353:*10*

**effort**  183:*18*  184:*19*  336:*10*  358:*11*  359:*17*

**eight**  199:*5, 7*  355:*6*

**Either**  114:*21*  137:*5*  262:*21*  303:*25*  336:*16*  352:*23*  359:*12*

**elapsed**  201:*10*

**elected**  189:*19*

**element**  132:*18*  213:*1*  272:*21*

**elements**  155:*6*  345:*3, 4, 7*

**eliminate**  333:*10*

**eliminates**  327:*12*

**ellipses**  217:*7*

**e-mail**  204:*24*

**embedded**  245:*24*  322:*23*  326:*16*

**Emerson**  118:*24*  119:*1, 4, 10*  120:*1*  122:*25*  123:*11, 16, 25*  124:*11, 22*  125:*5, 16*  126:*6*  128:*12, 16*  131:*16*  147:*2, 9, 13, 18, 23, 24*  148:*7, 14, 19, 23*  149:*10, 25*  150:*11*  152:*12*  153:*5, 13*  154:*18, 19, 25*  161:*17*  162:*21*  163:*8*  176:*2, 8*  184:*13*  189:*11*  193:*13, 17, 22*  195:*14*  198:*5*  199:*24, 25*  200:*4, 6, 12*  201:*15*  205:*10, 23*  206:*1*  207:*17, 24*

208:*11*  209:*8*  210:*5, 9, 22*  211:*8, 21*  212:*13*  258:*7*  311:*1*  315:*7*  316:*20*  318:*1, 12*  323:*24*  324:*9, 15, 19*  326:*18, 21*  327:*10*  329:*3*  346:*12*  355:*15*  356:*1*

**Emerson's**  116:*25*  126:*2*  129:*12*  130:*1*  152:*14*  160:*15*  175:*15*  193:*21*  205:*11*  206:*11, 24*  207:*20, 21*  209:*20*  211:*13, 15*  212:*7, 21, 22*  213:*22*  215:*6*  269:*19*  270:*7, 13*  271:*19*  272:*9*  286:*19*  287:*16*  288:*5*  291:*18*  311:*2*  312:*2*  319:*1*  321:*2, 16*  322:*5*  323:*5, 16*  324:*22*

**emphasize**  247:*3*

**empirical**  312:*16, 19*  313:*15*  316:*5, 7*  317:*3*

**empirically**  204:*1*  312:*3*

**employed**  151:*5*  361:*11, 14*

**employee**  361:*13*

**encapsulate**  174:*13*

**encapsulating**  164:*13*

**ended**  236:*3*

**ends**  204:*4*

**engaged**  133:*22*  252:*12*

**entire**  139:*19*  140:*10*  171:*3*  223:*17*  352:*10*  362:*5*

**entirely**  279:*4*

**entitled**  215:*18*  231:*18*

**entity**  176:*2*

**equal**  171:*22*

**equals**  217:*11*  271:*13*

**erect**  182:*9*

**ERRATA**  362:*1, 8*  363:*1*  364:*1*

**error**  308:*13*

**escalate**  202:*15*

**escaped**  290:*15*

**essentially**  176:*7*  291:*23*  307:*17*  325:*20*

**establish**  173:*1*  293:*6*

**established**  151:*1*  165:*7, 12*  170:*6*  173:*8*

**establishes**  277:*16*

**establishing**  158:*4*

**estimates**  261:*23*

**et**  111:*14*  115:*18*  230:*6*  289:*13*  292:*14*  293:*5*  328:*20, 22*  336:*18*  337:*14*  338:*12*  341:*21*  343:*14*

**evaluate**  211:*3, 4*  279:*20*  282:*9*  283:*8*

**evaluated**  313:*2*  333:*7*

**evaluating**  150:*23*  157:*4*  167:*1*  278:*10*  279:*7, 9, 23*  281:*13, 19*  282:*17*  283:*7, 14*  284:*23*  285:*10, 14*  286:*2, 3*  287:*2*  288:*15*  289:*12*  331:*25*

**evaluation**  278:*10*  286:*8*

**event**  178:*9*  179:*13*  305:*18, 23*  307:*14, 15, 16, 19, 20, 24*  308:*1, 3, 13, 16*  317:*16, 18*  318:*6, 14, 24*  319:*17, 24*

**Even-Tov**  111:*12*  230:*6, 20*  232:*1*  249:*11, 13, 16*  250:*1, 12*  253:*14*  260:*8*  261:*25*  263:*1*  267:*5*  298:*8*

**Even-Tov's**  231:*18*

**events**  177:*18, 22*  194:*23*  195:*1*  267:*12*  276:*1, 6*  284:*24*

**EVEREST** 113:*21* 114:*13*, *15*
**evidence** 146:*24* 148:*9*, *10* 156:*15* 163:*12* 167:*23* 179:*15* 206:*5* 208:*24* 209:*4* 211:*11* 217:*24* 218:*6*, *14*, *19* 219:*3*, *23* 220:*17* 222:*6*, *8*, *25* 223:*3*, *4*, *15*, *24* 224:*15*, *17*, *21* 225:*9*, *19*, *23* 226:*2*, *3*, *11*, *17* 227:*12* 228:*12* 236:*14*, *16*, *17* 237:*11*, *12* 245:*18* 247:*16* 257:*16*, *20*, *22*, *25* 258:*13* 259:*14* 268:*5*, *21* 275:*21* 276:*5* 277:*16* 279:*10*, *11*, *13* 280:*1*, *2*, *5* 283:*9*, *10*, *14*, *15* 284:*25* 288:*18* 296:*7* 301:*16*, *24* 302:*3*, *6*, *8*, *11*, *24* 303:*5*, *18* 313:*15* 321:*6* 322:*1*, *20* 323:*10*, *21* 324:*17* 325:*1* 344:*3* 358:*4*, *16*
**exact** 146:*3* 172:*13* 241:*11* 317:*4*
**exactly** 146:*11* 171:*24* 177:*2* 196:*16* 200:*16* 208:*3* 238:*7* 313:*12* 332:*7*
**EXAMINATION** 115:*4*
**EXAMINERS** 111:*1*
**example** 139:*9* 140:*19* 177:*10* 178:*1*, *3* 179:*4* 180:*13* 184:*6* 202:*8* 227:*18* 244:*16* 248:*12* 251:*10* 253:*20*, *21*, *23* 255:*24* 265:*18* 266:*8* 284:*19* 298:*8* 313:*6* 327:*19*
**exception** 224:*14* 228:*18* 359:*4*
**exchange** 176:*18*

339:*18*
**exclude** 234:*2*
**excluded** 233:*22* 234:*9*, *10* 235:*15*
**excludes** 151:*18* 233:*13*
**excuse** 196:*12*
**exercises** 188:*10*
**exercising** 189:*4*
**exert** 184:*18*
**exerting** 184:*22*
**Exhibit** 111:*7*, *8*, *9*, *10*, *11*, *12*, *13*, *14*, *15* 113:*24* 115:*21* 116:*7* 117:*24* 133:*10*, *13*, *14* 138:*21* 169:*13* 191:*1*, *9*, *17*, *20* 204:*10*, *11* 216:*4*, *6* 218:*22*, *23* 220:*24* 221:*2*, *8*, *13*, *17* 229:*25* 230:*2*, *3* 232:*2*, *3* 246:*21* 249:*21* 250:*13* 259:*25* 263:*19* 267:*5* 269:*2* 270:*20*, *21* 275:*5*, *8* 287:*8* 294:*14*, *16* 328:*16* 337:*15*, *16* 338:*25* 347:*3*, *4*, *14* 348:*2* 353:*25*
**EXHIBITS** 111:*6*, *17* 276:*12*
**exist** 165:*17* 297:*8* 356:*21*
**existed** 353:*4*
**existence** 318:*11*
**existing** 176:*8* 177:*9*
**exists** 167:*15* 348:*3*
**expect** 261:*3* 336:*25*
**expected** 325:*8*
**experience** 244:*24* 246:*17*
**expert** 135:*7* 149:*14* 156:*7* 157:*14* 162:*7*, *20* 237:*9* 295:*21* 307:*11*
**expertise** 140:*1*
**explain** 225:*3* 235:*6* 252:*6* 262:*7* 270:*15*

**explained** 164:*15* 165:*12* 166:*16* 272:*13*
**explaining** 269:*23*
**explains** 292:*10*
**explanations** 245:*17*
**explicitly** 235:*14*
**express** 219:*10*
**expressed** 136:*19* 137:*12* 164:*12* 200:*25*
**expresses** 136:*14*
**expressing** 353:*14*
**expressly** 235:*13*
**extensive** 129:*25* 130:*8*, *22* 289:*14*
**extensively** 131:*1*, *8*
**extent** 136:*21* 165:*15* 166:*25* 211:*21* 235:*11* 248:*9* 265:*8* 277:*25* 278:*4* 299:*23* 335:*5*

**< F >**
**facing** 183:*8*
**fact** 117:*18* 131:*15* 145:*10* 146:*22* 147:*6*, *24* 148:*7* 150:*19*, *21* 151:*19* 161:*13*, *18*, *22* 162:*20*, *25* 163:*8* 184:*12* 189:*2* 198:*24* 200:*20* 203:*24* 206:*9* 208:*16* 209:*12*, *15* 210:*9*, *21* 211:*10* 213:*17* 214:*24* 215:*2* 216:*1* 228:*25* 229:*20* 245:*20* 258:*20* 262:*22* 286:*7* 287:*4*, *15* 290:*2*, *9*, *13* 291:*7* 292:*17* 293:*21* 302:*5* 306:*14* 316:*14* 317:*15* 319:*12* 321:*10* 329:*11* 330:*25* 331:*23* 333:*4*, *7* 337:*6*, *9* 353:*18* 355:*8* 357:*9* 358:*4* 359:*13*
**factor** 321:*8*
**factoring** 150:*24*

**factors** 151:*25* 247:*6* 295:*23*
**facts** 146:*21* 149:*4* 152:*5* 172:*9* 213:*25* 214:*3* 215:*4* 227:*18* 230:*21*, *25* 231:*3*, *6* 235:*10*, *12*, *16* 236:*13*, *21* 237:*5*, *15*, *19* 241:*12* 252:*24* 253:*2* 259:*6* 261:*19* 278:*20* 279:*1* 282:*11*, *12* 284:*20* 290:*14* 291:*15*, *20* 293:*3* 296:*23* 303:*23* 310:*16* 332:*19* 344:*3*, *15* 351:*9*, *18* 352:*8* 353:*11*
**factual** 143:*3* 178:*8* 277:*22* 301:*23* 309:*20* 310:*3* 353:*3*
**fail** 232:*19*
**Failed** 231:*18* 232:*10*, *12* 235:*14* 254:*14*
**fails** 238:*19* 239:*16* 244:*9* 256:*13*
**Failure** 231:*19* 232:*17* 239:*14* 240:*3* 241:*10* 242:*12*, *19* 243:*8* 245:*18* 248:*16* 250:*22* 251:*14* 254:*15*, *17* 255:*24* 260:*10*
**failures** 256:*4*, *17*
**Fair** 126:*12* 135:*6* 140:*5*, *7* 164:*22* 165:*4*, *20* 166:*23* 167:*1* 169:*5* 171:*11* 173:*4* 174:*4*, *23* 175:*4* 179:*23* 202:*2* 214:*1* 218:*9* 230:*17*, *18* 246:*15* 250:*18*, *20* 266:*14*, *15* 276:*12* 284:*11* 301:*21* 305:*24* 307:*22* 308:*15* 311:*7*, *24* 332:*11* 334:*9* 346:*14* 347:*17*
**fairly** 165:*2* 167:*22*

**fairness** 127:*7, 15, 21, 23* 354:*12, 16* 356:*25*
**fall** 272:*25* 300:*3* 334:*17*
**falls** 242:*13* 249:*7*
**familiar** 191:*11* 209:*3* 271:*21* 354:*4*
**far** 154:*25* 166:*5* 208:*4* 227:*8* 236:*15* 240:*8* 247:*22*
**fashion** 312:*4, 18* 313:*16* 320:*23*
**fast** 222:*17*
**favor** 221:*15*
**features** 156:*4* 162:*12, 18*
**felt** 324:*10*
**figure** 240:*14* 246:*7* 264:*4, 6*
**figuring** 230:*1*
**filed** 133:*3*
**filing** 127:*11, 17, 19, 22* 329:*12* 330:*8* 339:*18, 25* 343:*14*
**filings** 328:*24* 329:*9, 19* 330:*6* 332:*20*
**filled** 155:*20*
**final** 202:*11* 272:*16*
**finance** 286:*16* 287:*4*
**financial** 146:*25* 155:*2* 174:*20, 25* 288:*1* 302:*22, 23* 305:*18*
**financially** 361:*15*
**find** 231:*1* 254:*21* 255:*19, 22* 320:*7*
**finder** 202:*14*
**finding** 224:*3* 325:*22*
**findings** 251:*11, 14* 292:*11* 347:*15*
**finds** 243:*6* 260:*8*
**fine** 118:*6* 254:*2* 338:*9*
**firm** 182:*12* 251:*4* 253:*6* 339:*7* 347:*11, 21* 353:*20*
**firms** 178:*24* 233:*20* 267:*13*
**firm's** 244:*4* 251:*19*

**first** 115:*21* 119:*25* 130:*1* 131:*7* 136:*20* 149:*18, 20* 156:*7* 165:*5, 6* 169:*22* 170:*3, 5* 187:*12* 197:*4* 199:*15* 230:*10, 13* 243:*12, 16* 267:*7, 8, 11* 268:*1, 8, 13* 275:*24* 277:*21* 304:*13* 324:*19* 338:*3* 348:*13*
**fit** 236:*7* 344:*3* 353:*6*
**fits** 147:*5*
**five** 192:*25* 215:*10* 263:*23* 331:*17* 337:*8* 358:*6*
**five-minute** 328:*5*
**flawed** 215:*20* 275:*16* 277:*12* 286:*17*
**fleshed** 169:*24* 170:*1*
**flight** 345:*9* 346:*1* 360:*1*
**flip** 120:*9*
**focus** 230:*2, 5*
**focused** 227:*7* 232:*9*
**focusing** 171:*7*
**following** 122:*10* 250:*22* 294:*22*
**follows** 115:*3* 306:*20*
**Footnote** 262:*6* 269:*24* 270:*15*
**Foppe** 113:*23* 114:*13*
**forecast** 335:*6*
**forecasts** 253:*3* 257:*16* 258:*1*
**foregoing** 361:*7*
**Form** 118:*16* 119:*13, 22* 121:*3, 22* 123:*1, 15* 124:*3, 14, 25* 125:*12, 25* 126:*16* 127:*1, 12* 128:*23* 129:*14* 130:*16* 131:*6, 14, 20* 132:*3, 13* 138:*8* 140:*6* 141:*13, 21* 142:*16* 143:*7, 22* 145:*1, 7* 146:*8, 20* 147:*19* 148:*2, 21* 149:*8* 150:*4, 13, 14*

151:*11, 21* 152:*8, 18, 23* 153:*9, 15, 22* 154:*12, 23* 155:*16, 23* 156:*14* 159:*4, 24* 160:*7, 25* 162:*3, 9* 163:*11, 17* 164:*4, 21* 165:*10, 19* 166:*15, 24* 169:*4* 171:*2, 10* 173:*5* 174:*8, 21* 175:*2, 9* 176:*4, 12, 25* 177:*20* 178:*10, 17, 25* 179:*5, 22, 24* 180:*22* 181:*7, 17, 24* 182:*20* 183:*13, 20* 184:*8, 21* 186:*1, 8* 188:*6* 194:*19* 195:*20* 197:*20* 198:*12* 203:*2, 17* 205:*13* 206:*13, 25* 207:*8* 208:*14* 209:*23* 210:*12* 211:*18* 212:*11, 25* 214:*7* 215:*1* 217:*3* 218:*2, 8, 17* 220:*3* 221:*22* 223:*7, 18* 224:*1, 18* 225:*24* 226:*15, 23* 227:*4, 19, 24* 228:*20* 230:*23* 231:*22* 232:*20* 233:*18, 25* 234:*12, 16* 235:*18, 22* 236:*23* 237:*8* 241:*4* 244:*12* 245:*7* 246:*19* 247:*2* 248:*2, 21* 250:*7, 19* 251:*24* 252:*15* 255:*15* 256:*14* 257:*5* 262:*4* 263:*6* 267:*17* 268:*7, 19* 272:*4, 12* 274:*15* 276:*7* 277:*3* 278:*16* 280:*4* 283:*5, 11* 284:*10* 285:*25* 290:*11* 291:*21* 294:*7* 299:*2* 301:*7* 303:*9* 304:*1* 307:*9, 12* 309:*2* 310:*24* 311:*14* 312:*10, 22* 319:*5, 20* 320:*24* 321:*19* 323:*9, 20* 331:*9* 334:*15* 335:*15* 340:*5, 24* 341:*17, 25* 342:*5* 350:*8, 19* 357:*2, 24*

**formally** 281:*16* 305:*7, 8*
**formation** 338:*14*
**formed** 359:*8*
**forms** 140:*1*
**formulate** 239:*25*
**Forsyth** 112:*13* 113:*14* 114:*11*
**forth** 127:*17* 137:*5* 146:*13* 161:*9* 170:*21* 221:*7* 275:*3, 14* 355:*25*
**forward** 343:*18*
**found** 135:*21* 289:*13*
**foundation** 131:*6* 145:*8* 148:*21* 160:*25* 203:*17* 206:*13, 25* 208:*14* 234:*16* 252:*15*
**four** 122:*9* 192:*25* 205:*20* 263:*23* 275:*20* 277:*15, 20* 301:*16, 18* 302:*21* 303:*5, 18, 20* 340:*1*
**fourth** 122:*22*
**frame** 339:*2* 342:*9*
**Franks** 348:*16*
**frequency** 342:*22*
**front** 249:*24*
**full** 138:*3, 12* 154:*10* 259:*5* 296:*6* 302:*12*
**full-blown** 165:*25* 166:*4* 296:*18* 299:*14*
**full-time** 134:*21, 23*
**fully** 231:*5* 236:*12, 21* 237:*5* 251:*15* 280:*19*
**function** 253:*6*
**fundamental** 286:*15*
**fundamentally** 312:*12* 316:*1* 319:*14* 321:*5, 12*
**further** 121:*11* 124:*6* 128:*1* 147:*4* 155:*5* 157:*19* 162:*17* 183:*22* 184:*2* 190:*18* 196:*7* 199:*17* 201:*10, 11, 14* 208:*19* 209:*15, 16* 213:*4* 214:*19* 244:*22* 248:*23* 249:*7*

286:*21*  291:*14*
305:*11*  313:*7*  314:*6*
320:*13*  321:*11*
324:*16*  351:*2*  352:*6*
357:*11*  359:*25*
361:*13*
**future**  194:*23, 25*
311:*13, 23*

**< G >**
**geared**  195:*13, 18*
197:*18*
**GELLER**  113:*3*
**general**  137:*15*
148:*3*  179:*6*  181:*18*
204:*25*  206:*18*
259:*12*  268:*18, 22*
311:*20*  314:*19*
315:*11, 18, 19*  316:*12*
318:*25*
**generalities**  259:*1*
**generally**  177:*18*
241:*20*  243:*9*  256:*9*
286:*7*
**generate**  263:*14*
**getting**  156:*16*
167:*12*  220:*13*
221:*23*  222:*9*  238:*20*
241:*14*  242:*25*  264:*2*
291:*16*  342:*15*  350:*7*
**Gilroy**  113:*6*
**gist**  314:*12*
**Giuggio**  113:*6*
**give**  117:*24*  145:*19*
190:*2*  221:*2*  270:*14*
293:*4*  320:*6*  352:*11*
**given**  146:*18*  155:*17*
156:*19*  166:*21*  191:*7*
209:*14*  213:*4*  228:*10*
246:*10*  261:*3*  284:*13*
316:*14*  323:*11*  324:*9,
14*
**gives**  189:*23, 25*
190:*5*  247:*6*
**giving**  249:*15*
**global**  256:*3*
**go**  118:*10*  120:*7*
123:*20*  133:*24*
138:*22*  144:*1*  148:*12*
151:*8*  166:*11*  168:*9*

169:*10, 17*  177:*1*
186:*5, 14*  191:*16*
196:*12, 14*  202:*8*
215:*23, 24*  218:*21, 24*
219:*6*  221:*6, 17*
225:*20*  228:*4*  230:*3*
232:*2*  243:*16*  244:*17*
247:*19*  248:*16*
249:*18, 21*  250:*13*
251:*17*  263:*17, 20*
267:*4, 6*  269:*1, 3*
270:*24*  273:*17*  275:*5,
7*  277:*15*  279:*10, 16*
281:*25*  282:*5*  283:*21*
292:*5*  294:*15*  309:*10*
328:*16*  336:*6*  337:*8*
340:*14*  344:*6*  347:*6,
7*  348:*4*  349:*1*
353:*24, 25*
**goal**  232:*11*  289:*20*
**goes**  139:*10*  162:*10*
202:*9*  208:*6*  217:*20*
256:*6*  271:*2*  288:*6*
289:*18*  301:*9*  327:*8*
**going**  115:*22*  116:*5*
144:*2, 4*  156:*1, 5*
163:*24*  173:*16*
174:*13*  185:*14*
194:*20, 25*  208:*8*
210:*14*  212:*15*
215:*11*  216:*4*  217:*7*
223:*19*  224:*7*  235:*2,
7*  238:*7*  239:*16*
242:*13*  253:*24*  254:*7,
10, 13*  255:*6*  259:*7*
266:*21*  268:*10, 24*
269:*5, 8*  276:*8*
281:*15*  282:*8*  294:*13*
328:*4, 7*  334:*7*  335:*3,
5*  336:*6*  338:*2*
346:*25*  347:*2*  352:*11*
353:*24*  354:*2*  357:*13*
359:*19*  360:*8*
**Good**  115:*7, 8, 9*
118:*5, 7*  170:*12*
178:*3*  185:*18*  221:*5*
338:*8*  354:*24*
**governed**  343:*6*
**granularity**  153:*25*
**great**  360:*13*

**greater**  164:*20*
169:*24*  170:*1, 9*
259:*19*
**ground**  115:*17*
**groundwork**  170:*13*
**Group**  136:*6*  238:*11,
12*  239:*24*  242:*6*
244:*23*  246:*16*
254:*20*  255:*23*
264:*13, 15, 16, 19*
308:*7*
**guess**  132:*21*  138:*23*
164:*3*  180:*23*  315:*5*
325:*1*

**< H >**
**hand**  237:*11, 13*
249:*23*  353:*6, 11*
**happen**  177:*3*
186:*21*  193:*19*  204:*5*
239:*16*  314:*11*
350:*25*
**happened**  176:*24*
177:*2*  184:*12*  196:*8*
198:*24*  233:*3*  240:*4*
287:*24*  313:*13*
318:*10*
**happy**  266:*20*  360:*3*
**Harris**  348:*16*
**head**  146:*2*  160:*16*
**heading**  118:*11*
128:*7*  305:*12, 17*
347:*10*
**Healy**  348:*23*
**heard**  173:*22, 23*
**hearing**  135:*10*  136:*2*
**heels**  334:*17*
**held**  114:*10*
**help**  136:*4, 13*  238:*8*
345:*8*
**helps**  262:*7*
**hereof**  362:*8*
**high**  336:*1*
**higher**  201:*15*  243:*9*
257:*8*  260:*12, 25*
270:*3*  313:*25*
**highest**  152:*14*
154:*20*  323:*25*
**history**  125:*8, 21, 23*
126:*2, 10, 14, 23, 24*

**greater**  128:*21*  132:*1, 12, 17*
148:*14*  317:*25*  331:*8*
337:*4*  340:*10*  342:*18*
343:*4*  357:*20*
**hit**  187:*10*
**Hofman**  113:*14*
**hold**  285:*17*  290:*18*
294:*23*  333:*9*  355:*18*
**hope**  360:*1*
**hostile**  182:*10*
187:*24*  189:*1*  190:*3*
213:*6*
**hypothesized**  254:*24*
255:*11*
**hypothesizing**  350:*25*
**hypothetical**  161:*1*
181:*17*  212:*13*
313:*23*
**hypothetically**  328:*2*

**< I >**
**idea**  207:*6, 19*
208:*11*  258:*19*
306:*21*  335:*12*
**identification**  116:*8*
133:*15*  191:*2*  204:*12*
216:*7*  232:*4*  270:*22*
337:*17*  347:*5*
**identified**  136:*18*
142:*9, 11*  143:*5*
145:*11*  191:*8*  219:*24*
223:*24*  224:*15*
271:*19*  301:*16, 18, 20,
21*  333:*23*
**identifies**  202:*4*
217:*23*  218:*5*  265:*2*
334:*12*
**identify**  219:*2*
275:*20*  281:*4*
**identifying**  142:*21*
193:*20*  206:*8*  218:*15*
**identity**  162:*13*
**ignore**  287:*22*
288:*16*  290:*9, 12*
**ignored**  213:*17*
215:*4*  286:*8*  290:*13*
291:*1, 19, 22, 23*
**ignores**  286:*18, 24*
288:*23*  289:*3*  290:*19*
291:*17*  292:*19*

**ignoring** 286:*13* 287:2, *4, 25* 288:*13* 290:*21, 24* 291:*4, 14* 293:*3, 7, 10, 18* 294:*5, 9*

**II** 110:*12*

**III** 275:*3, 10*

**IL** 113:*19*

**illogical** 228:*10* 229:*1*

**illustrated** 172:*7* 222:*25*

**illustration** 120:*13*

**image** 241:*12* 247:*5*

**immaterial** 153:*3* 155:*7* 166:*23*

**immediately** 160:*4* 269:*3* 306:*16*

**impact** 196:*10* 213:*19* 231:*19* 256:*9* 268:*14* 294:*20* 295:*10*

**impacts** 253:*3*

**implementation** 189:*15, 18*

**implemented** 189:*7*

**implication** 228:*9*

**implicitly** 228:*24* 229:*7*

**implied** 222:*24* 229:*13* 292:*4*

**implies** 224:*24* 253:*10* 261:*20* 262:*18*

**importance** 224:*21* 290:*16*

**important** 132:*18* 156:*5* 162:*23* 187:*14* 194:*5* 199:*14* 203:*25* 211:*7* 212:*3* 213:*19* 214:*17* 236:*17, 25* 247:*7* 261:*15* 263:*10, 11* 286:*9* 288:*17* 290:*12* 291:*14* 306:*9* 321:*8* 331:*5* 345:*3, 7*

**impossible** 188:*11*

**improved** 289:*9*

**inartful** 292:*3*

**include** 145:*3* 149:*24* 152:*5* 156:*25* 161:*17, 18, 19* 174:*14*

240:*7* 254:*18* 283:*3* 285:*12* 304:*22* 307:*19* 309:*14* 310:*8* 315:*4* 334:*2* 340:*2* 351:*22, 23*

**included** 147:*25* 149:*6* 151:*9* 153:*19* 154:*2, 18* 160:*15* 162:*8* 285:*23* 310:*22* 329:*13* 335:*8* 339:*1* 340:*9* 343:*5* 352:*2* 354:*20, 24* 355:*1* 356:*5* 358:*12, 20, 21*

**includes** 127:*7, 22* 161:*20* 163:*7* 299:*5* 317:*24* 328:*23* 329:*16, 17* 336:*11* 343:*22, 24* 355:*8*

**including** 155:*21* 162:*12* 200:*17* 223:*1, 2* 226:*10* 277:*21* 355:*6*

**inclusive** 241:*2*

**inconsistent** 284:*21*

**incorporate** 249:*17*

**incorporated** 176:*7*

**incorrect** 139:*20* 172:*20* 219:*12* 255:*3* 304:*9* 305:*8*

**increase** 129:*11* 193:*8, 16* 195:*6* 198:*4* 239:*9* 241:*22, 25* 242:*18* 246:*21* 261:*12* 308:*18, 25* 309:*7* 316:*13, 15, 25*

**increased** 199:*25* 200:*13* 252:*10* 312:*4, 8* 313:*16* 324:*23* 325:*10* 326:*23* 327:*4*

**increases** 325:*12, 13*

**independent** 165:*23, 24* 167:*18* 178:*14* 195:*14* 203:*24* 208:*3* 213:*5* 218:*13*

**independently** 167:*20*

**INDEX** 111:*1*

**indicate** 266:*2* 325:*16*

**indicated** 199:*22* 212:*15* 322:*10* 324:*3* 326:*23* 362:*7*

**indicates** 124:*10* 244:*3*

**indicating** 241:*13* 323:*6, 18* 327:*8*

**indication** 200:*13* 213:*4* 240:*4* 320:*7* 352:*12*

**indicative** 319:*13*

**indicators** 247:*6*

**indirect** 180:*14*

**indirectly** 180:*6*

**individual** 153:*2* 256:*16* 265:*8*

**individuals** 206:*16* 207:*16*

**inference** 210:*15* 256:*19* 279:*7, 8, 24* 282:*8* 283:*15* 300:*19* 304:*18* 306:*7, 25* 335:*4*

**inferences** 278:*8* 280:*6* 282:*6, 10* 304:*3, 10*

**inferring** 251:*1* 284:*25*

**inform** 291:*11*

**information** 136:*22* 144:*24* 145:*3, 11, 17* 147:*16* 148:*1, 25* 149:*7, 17* 151:*6* 153:*18, 20* 154:*17* 155:*15, 18, 21* 156:*25* 157:*15, 22, 23* 159:*21* 160:*22* 161:*10, 19, 24* 162:*1, 16, 21* 163:*2, 9* 165:*9* 166:*3, 12, 22* 167:*24* 201:*4* 210:*16* 211:*5, 7, 15, 21* 212:*1, 2, 4, 7* 213:*8, 24* 214:*12, 15* 229:*3, 20* 234:*23* 236:*9* 239:*15* 244:*3* 245:*16* 249:*12* 251:*1, 2, 17, 18* 253:*10, 11, 20* 258:*25* 268:*17, 18* 278:*9, 21* 283:*24* 284:*1, 6* 285:*6, 10, 12, 15, 19,*

*23* 286:*2, 9* 287:*3* 298:*11, 24* 303:*11, 14, 15* 304:*8* 309:*8, 10, 12* 310:*12, 13, 22* 311:*5, 11, 15, 17, 25* 312:*2, 7, 13, 17, 20, 21, 25* 313:*3, 4, 5, 8, 18, 22* 314:*1, 3, 7, 22, 24* 315:*6, 11, 14, 17* 316:*2, 8* 317:*4, 9, 11, 15, 17, 19, 21, 23, 25* 318:*3, 5, 9, 10, 21* 319:*3, 7, 10, 15, 18, 25* 320:*3, 5, 9, 21* 321:*12, 17, 22* 323:*3, 12* 324:*10, 14* 325:*5* 326:*4* 327:*7* 340:*3, 10* 341:*1, 11* 342:*8* 344:*9, 14* 345:*19* 346:*4* 352:*13, 21, 24* 353:*14* 357:*7*

**informative** 209:*10, 12* 224:*23, 25* 234:*21* 256:*20* 268:*5* 294:*19* 295:*9, 22* 296:*2, 12, 15, 24* 297:*1, 7, 12, 21, 25* 298:*4, 17* 299:*6, 19* 344:*23* 354:*8* 356:*20*

**informativeness** 226:*3*

**informed** 153:*6* 195:*1*

**informs** 168:*13*

**initial** 197:*2* 251:*14* 273:*2* 289:*25* 290:*3* 292:*8, 12* 293:*22* 335:*18, 23* 342:*22* 358:*22*

**initially** 289:*19* 346:*16*

**inputs** 265:*9, 23*

**inputted** 265:*15*

**insiders** 252:*13*

**insight** 251:*19* 253:*19*

**insights** 253:*6, 9, 13, 23* 254:*4* 255:*1, 13*

**insignificant** 178:*5*

**instance** 180:*10, 24* 189:*6, 14, 20* 230:*11*

257:*15*  274:*21*
304:*13*
**instances**  273:*11*
290:*19*  334:*13*  335:*8*
358:*21*
**instruct**  145:*16*
**instructed**  144:*12, 13,*
*16*
**instruction**  144:*7, 9*
284:*13*
**instructions**  155:*17*
**INSTRUMENTS**
110:*1*  112:*1*  114:*6*
116:*1, 2, 24*  117:*1*
118:*25*  119:*3, 11, 16,*
*21*  120:*1*  121:*1, 20*
122:*2, 19, 24*  123:*13*
124:*1, 12, 23*  125:*5,*
*16*  126:*6, 9*  128:*12*
149:*11*  152:*13, 14*
153:*6, 13*  161:*14*
175:*16, 19*  176:*8*
188:*15*  189:*7, 12*
191:*7*  200:*9, 24*
204:*25*  205:*11*
206:*11, 23*  208:*1, 7,*
*18*  209:*9, 13, 21*
210:*6, 10*  211:*10, 14,*
*16, 23*  212:*3, 8, 14, 21,*
*23*  262:*1*  308:*19*
309:*1, 8*  312:*3, 21*
315:*9, 12*  316:*21*
318:*1*  320:*4*  324:*4,*
*12*  329:*2*  338:*24*
350:*14*  355:*15*  356:*1*
357:*4*  362:*2*
**intend**  136:*17*
**intends**  185:*9*
**intentions**  213:*14*
**interchangeable**
158:*19*
**interchangeably**
157:*22*
**interest**  155:*4*  163:*4*
180:*14*  182:*6*  185:*1*
190:*10*  194:*4*  206:*5*
209:*21*  210:*9*  211:*14*
212:*8, 14, 17, 22*
213:*22*  214:*20, 23*
326:*1*

**interested**  190:*3*
200:*14*  207:*17*  209:*8*
210:*5, 22*  211:*9, 11,*
*22*  361:*15*
**internal**  251:*2, 17*
252:*9*  276:*14*
**interpret**  174:*1, 3*
243:*4*  250:*25*  327:*7*
**interpretation**  242:*11*
244:*5*  245:*16*  246:*8*
250:*25*  251:*7, 22*
252:*2, 3*  255:*20*
257:*1, 6, 11, 13*
**interpretations**  239:*2*
246:*4, 10*  250:*15, 18*
**interpreted**  304:*8*
**interpreting**  250:*24*
**interrupt**  144:*21*
**interval**  265:*20*
**intrinsic**  251:*3*  254:*4*
**introduce**  268:*23*
**introduced**  230:*16*
267:*23*
**introduction**  267:*11*
**intruding**  163:*25*
**investor**  160:*21*
184:*24*
**investors**  147:*17*
151:*7*  154:*18*  155:*18,*
*22*  156:*5*  157:*15*
162:*22*  178:*24*  179:*4,*
*6, 7, 8, 11, 14*  180:*20*
181:*6*  190:*20*  210:*16*
211:*5*  212:*1*  214:*11,*
*16*  241:*13*  243:*4*
251:*3*  254:*5*  258:*11*
267:*13*  268:*18*
313:*10, 19, 24*  314:*18,*
*20*  315:*12, 16*  318:*2,*
*21*  319:*19*  320:*1, 7*
321:*23*  323:*1*  324:*3,*
*8, 17*  325:*23, 25*
326:*2*  327:*7, 23*
334:*3*  341:*12*
**involve**  232:*12*
245:*17*  289:*14*  332:*5*
346:*9*  349:*14, 22*
350:*6*  354:*15*
**involved**  156:*10*
235:*20*  330:*6*  335:*22*

349:*5, 8*  358:*13*
359:*7*
**involvement**  126:*3*
317:*25*
**involves**  233:*16*
329:*17*  330:*19*
333:*12*  341:*23*
343:*12*  346:*10*  350:*4*
**involving**  233:*22*
349:*13*
**irrelevance**  301:*10*
**irrelevant**  152:*25*
212:*23*  303:*3*  305:*19*
306:*8, 18, 20*  307:*15*
330:*15*  340:*16, 19, 20,*
*23*  342:*4*  343:*7, 11*
**irrespective**  241:*23*
**isolation**  195:*10*
209:*25*  210:*14*  313:*9*
**issue**  145:*10*  149:*1*
156:*17*  166:*22*
183:*25*  187:*11*  190:*5,*
*6*  220:*9, 18*  222:*15*
223:*10*  232:*18*
235:*17*  258:*10*  272:*1,*
*19*  274:*13*  319:*18, 25*
329:*23*  337:*12*
344:*18*  354:*15*
**issued**  116:*1*  134:*1,*
*6*  338:*22, 24*
**issues**  115:*18*  223:*10*
297:*22*  354:*9*
**issuing**  262:*20*
**items**  136:*20*
**iterative**  289:*18*
**its**  132:*11*  154:*20*
181:*22*  183:*9, 11, 14*
194:*4*  200:*1*  221:*23*
226:*3, 17*  290:*8*
295:*3*  320:*16*  321:*16*
322:*5*  323:*5, 17, 25*
324:*22*  340:*10*  348:*7*
357:*17*

**< J >**
**January**  122:*15, 17*
188:*18*  189:*8*  200:*18*
299:*25*  301:*11*
303:*12*  306:*16*
308:*17, 24*  309:*6*

310:*5, 14, 19, 21*
313:*13*  314:*9, 10*
315:*10*  316:*6, 9, 19*
317:*10, 22*  319:*2, 8,*
*13*  320:*6, 20*
**jcomerford@dowdben
nett.com**  113:*15*
**Jeff**  113:*24*  117:*20,*
*23*  169:*12*  220:*23*
222:*22*  230:*1*  348:*5*
**Jeremy**  113:*14*
**jhofman@dowdbennet
t.com**  113:*16*
**John**  113:*13*  191:*21*
216:*22*
**joint**  336:*9*
**judge**  237:*18*  343:*10*
**judged**  315:*15*
341:*12*
**judgments**  253:*11*
259:*8*
**July**  134:*1*  216:*20*
**jump**  122:*5*
**June**  120:*9, 12, 17, 20*
121:*8*  130:*17*  140:*24*
159:*15, 19*  191:*7*
196:*18*  197:*6*  287:*16*
288:*4*  355:*7, 14*
356:*5*

**< K >**
**keep**  199:*11*  220:*5*
**killing**  332:*3*
**kind**  169:*15*  252:*12*
327:*23*
**knew**  212:*1*  258:*20*
**know**  115:*17*  131:*15*
136:*12*  140:*1*  147:*22*
148:*7*  149:*4*  157:*16*
160:*5*  161:*2, 12, 16*
170:*20, 21*  171:*23*
178:*19*  179:*18*
180:*23*  191:*10*
199:*12*  205:*4*  209:*25*
210:*3*  212:*13*  221:*4,*
*11*  222:*16*  224:*2*
235:*9, 10*  240:*9, 21*
243:*1*  245:*8*  247:*12,*
*14, 23*  248:*3*  249:*23*
252:*13, 21, 24*  253:*1,*

20   257:3, 15   258:21, 24   259:13   264:23   266:19   267:21   284:19   292:10   297:15   298:3, 5, 22   301:5   307:3   308:6   314:3   326:7   329:22   330:25   331:2   334:21, 23   335:11, 16, 17, 21   345:6   347:14   348:19   349:12, 20   350:6, 22   351:6, 7, 10, 20, 21   352:7, 14, 15, 16, 21, 22, 23   353:4, 5   355:16   358:20   359:1, 5, 9

**knowledge**   139:8, 22   196:5

**known**   210:16   236:10   317:24   329:25   331:4

**knows**   257:2

**KS**   113:19

**< L >**

**lack**   226:3, 17   228:3

**laid**   298:14   343:10

**Langetieg**   348:13

**language**   153:16   192:21, 22   197:10, 11   269:5   284:8   292:8   293:21, 23   294:3   335:11

**laptop**   116:5

**large**   214:8   239:23   242:24   245:21   282:22   289:12

**larger**   265:22   269:19   270:7, 12, 17   272:9   338:8

**largest**   348:23

**latching**   164:17

**late**   136:2

**launch**   185:23

**law**   112:12

**laws**   185:6

**lawyer**   145:15

**lawyers**   147:1

**lay**   170:13   299:12

**lays**   347:13

**lead**   163:12   183:2   245:9   254:8   265:24   335:3   337:11

**leading**   186:10   243:8   332:22   342:19   357:20

**leads**   215:4   242:12, 20   245:5   247:8

**learn**   221:15   298:7

**learned**   296:20   298:9   312:7   318:9

**learning**   318:2, 11

**learns**   222:17

**leave**   217:7

**leaves**   241:11

**leaving**   172:2

**led**   127:3   252:8   333:25

**left**   226:6   227:14   229:25   320:12   351:24

**left-hand**   192:4   197:12   263:24   271:8

**legal**   140:9, 11   145:8   149:8, 14   150:14   154:12   167:10   176:5   266:14   307:6   312:22

**legitimate**   226:21

**lengthy**   278:20   283:22

**lens**   283:19

**letter**   119:9   120:21, 25   121:4, 7, 17, 19   122:15, 17, 22   192:22   197:5, 8, 10   288:9

**letters**   147:1, 9, 11   153:12   160:15   201:2

**level**   202:16   216:25   222:14   242:21   248:18   330:3

**leveraged**   174:14

**Lexington**   113:7

**License**   361:21

**likelihood**   195:1, 4   209:11   241:14   254:25   255:12   272:22   313:24   316:13   323:13, 22   324:24

**likelihoods**   334:4

**limit**   184:24

**limitations**   354:23

**line**   130:4, 5   185:8   253:22   254:2   264:24

**list**   138:24   139:2, 6, 9, 12, 21   140:4, 10, 22   141:11, 14   143:16   151:22   191:9   206:4, 24   280:11   283:2   294:23   295:1   337:3

**listed**   116:14   122:6   135:17, 21, 25   141:20   157:1   202:19   204:16   220:1   276:25   283:1   284:24   287:24   300:13

**listing**   139:11, 25

**lists**   140:16   142:13   143:18   223:1

**litany**   278:20   283:22

**literally**   340:8

**literature**   139:11, 13, 16, 19, 25   140:4   174:6   224:4, 6   226:8   227:22   231:1   239:10   246:11   248:24   249:4, 6, 16   250:4   269:9, 11

**LITIGATION**   110:4   112:4   114:6   362:2

**little**   115:23   116:6   117:16   121:11   124:18   128:3   141:6   150:5   168:7   217:18, 19   271:25   292:3   315:22, 23, 24   328:4, 5   337:25

**LIVENOTE**   113:21

**LLC**   113:21

**LLP**   113:3

**located**   114:11

**logic**   228:3

**long**   115:11, 12   140:1   185:5   354:25

**longer**   180:4, 12   181:2

**long-run**   259:19

**look**   119:5   121:11   127:25   128:15   129:20   144:4   165:5

168:2   170:14   191:10, 14   195:10   201:19   204:8   209:3   217:15, 21   219:6   222:18   226:9   230:3   233:5   236:7   238:6   240:14   243:12   249:18, 19, 22   254:11   256:4   259:22, 25   262:6   263:17, 22   268:20   271:8   273:24   275:6, 19   277:1, 7   287:7   288:2   289:5   292:6   294:15   298:2   300:11   309:25   336:22   337:13, 19   339:4   346:24   347:15   348:1, 9

**looked**   125:15, 18   143:11   219:24   232:24   281:10   282:1   297:6   302:17   304:15   305:1, 6   308:8   329:11   331:20   338:25   352:18   355:18, 21

**looking**   127:20   130:4   134:4   159:13   168:5   169:22   172:14   191:12   195:9   219:4, 10, 16   226:6   250:12   256:18   264:14, 19, 20   273:9   274:24   282:7   287:10   289:6   292:23   353:12, 16

**looks**   298:25   331:7

**loss**   156:2

**losses**   215:19

**lost**   266:20

**lot**   157:12   239:24   248:16   276:14   305:4   317:7, 22   324:8   348:10   349:2

**lots**   241:5   245:21   335:21

**Louis**   112:14   113:15   114:12

**low**   265:14

**Lower**   233:10   262:7, 22   272:23

**lunch**  266:*17*

**< M >**
**M&A**  173:*23*  174:*7,
18, 23*  175:*7, 10, 16*
178:*8, 23*  179:*3*
180:*19*  181:*5*  241:*21,
25*  267:*12*  287:*4*
289:*10*  299:*1*  311:*12,
23*  312:*8*  313:*3, 17,
19*  314:*11, 19*  315:*11,
18*  316:*13*  318:*25*
320:*21*  321:*4, 18*
322:*7, 11, 20, 23*
323:*7, 18*  324:*3, 24*
325:*6*  326:*16*  347:*20*
353:*19*
**M&A-related**  276:*1*
312:*17*
**magnitude**  269:*25*
**main**  187:*10*
**majority**  189:*2*
**making**  149:*16*
182:*25*  184:*10*
198:*22*  201:*3*  208:*12*
234:*24*  238:*6*  247:*22*
250:*9*  253:*2*  259:*12*
267:*21*  282:*6*  285:*9*
293:*16*  306:*5*  312:*12*
**management**  176:*21*
177:*7*  195:*12, 17*
205:*6*  253:*23*  254:*25*
255:*13*  257:*2*  321:*8,
10*
**management's**  183:*4*
244:*3*  251:*19*  253:*6*
**managers**  254:*3*
257:*16, 25*  258:*4, 10,
15, 20, 25*  259:*2, 8, 13*
351:*11*
**manager's**  257:*7*
**Mandel**  111:*4*  113:*4*
114:*21*  115:*5*  116:*9*
117:*18*  118:*2, 19*
119:*18, 24*  121:*6, 24*
123:*3, 19*  124:*5, 16*
125:*2, 14*  126:*4, 19*
127:*5, 14, 25*  128:*6*
129:*1, 16*  130:*18*
131:*10, 17, 23*  132:*9,

20*  133:*10, 16*  138:*9*
140:*8*  141:*18, 24*
142:*18*  143:*14, 25*
145:*4, 18*  146:*15*
147:*7, 21*  148:*5, 24*
149:*15*  150:*7, 18*
151:*16*  152:*2, 11, 20*
153:*4, 11, 17*  154:*4,
15*  155:*8, 19*  156:*6*
157:*8*  159:*6*  160:*2,
12*  161:*7*  162:*6, 19*
163:*15, 21*  164:*1, 5,
23*  165:*14, 21*  166:*20*
167:*4*  168:*6, 10*
169:*8, 12, 14, 19*
171:*5, 12*  173:*13, 21*
174:*17, 22*  175:*3, 12*
176:*9*  177:*4, 25*
178:*13, 22*  179:*2, 9*
180:*1, 25*  181:*12, 20*
182:*2*  183:*7, 16*
184:*4, 11*  185:*2, 15,
20, 21*  186:*3, 12*
188:*14*  190:*24*  191:*3,
18, 21, 24*  194:*22*
195:*22*  198:*2, 16, 23*
203:*9*  204:*7, 13*
205:*15*  206:*17*  207:*4,
12, 18*  208:*5, 20*
210:*1, 18*  212:*6, 19*
213:*10*  214:*21*  215:*9,
16, 22*  216:*8, 11, 15,
18, 23*  217:*5, 18, 22*
218:*4, 11, 20*  220:*20,
22*  221:*4, 11, 15, 18*
222:*1, 21, 23*  223:*13,
21*  224:*9*  225:*1, 21*
226:*5, 18*  227:*1, 16,
20, 25*  228:*21*  229:*24*
230:*4*  231:*4, 25*
232:*5, 23*  233:*9, 12,
21*  234:*4, 13*  235:*4,
19, 24*  236:*11*  237:*2*
238:*4*  241:*16*  243:*16,
19*  244:*15, 17, 19*
245:*11*  246:*24*
247:*10*  248:*7*  249:*8*
250:*10*  251:*5*  252:*1,
20*  255:*18*  256:*23*
257:*9*  259:*24*  260:*2*

262:*5*  263:*16, 19, 21*
266:*16, 18*  267:*1, 22*
268:*12, 25*  270:*23*
272:*7, 17*  274:*19*
276:*10*  277:*5, 7, 9*
278:*18*  280:*7*  283:*20*
284:*15*  286:*11*
290:*17*  291:*25*
293:*20*  294:*12*
301:*14*  303:*16*  304:*5*
305:*14, 16*  307:*18*
309:*4*  310:*25*  311:*18*
312:*15*  313:*14*
319:*16, 23*  321:*1, 24*
323:*14, 23*  328:*3, 12,
14, 18*  331:*11*  334:*20*
335:*20*  337:*18*  338:*1,
4, 7*  340:*7*  341:*3, 19*
342:*2, 11*  347:*6, 9*
348:*4, 6*  350:*12*
351:*5*  357:*3*  358:*2*
359:*15, 24*  360:*10, 12*
**manner**  158:*19*  290:*6*
**margin**  322:*25*  323:*1*
**marked**  116:*7*
133:*14*  191:*1*  204:*11*
216:*6*  232:*3*  270:*21*
337:*16*  347:*4*
**market**  184:*24*  251:*1,
16*  253:*20*  254:*25*
255:*1, 12, 14*  257:*3,
17, 18*  258:*2*  259:*4,
10*  260:*21*  261:*3*
309:*9*  311:*12, 15, 22*
312:*1, 7*  313:*11*
317:*20*  319:*12*  321:*4,
18*  322:*6, 10, 19*
323:*6, 17*  325:*7*
335:*5*  351:*13*
**market's**  257:*1*
324:*23*
**match**  192:*22*
**matches**  146:*21*
**material**  157:*23*
163:*13*  165:*9*  166:*4,
12*  167:*25*  170:*7*
211:*16*  212:*18*
213:*24*  214:*12*  215:*7*
223:*11*  234:*23*
268:*18*  278:*22*

283:*24*  285:*2, 4, 7, 20,
22*  298:*10, 25*  303:*8*
312:*20*  313:*1, 4, 19*
314:*1, 17, 20, 22*
315:*11, 15*  316:*9, 11,
18*  319:*3*  321:*23*
323:*13*  327:*23*
341:*12*  352:*25*  357:*7*
359:*14*
**materiality**  150:*24*
151:*1, 24*  155:*11*
156:*2, 21*  157:*5, 7*
165:*13, 17, 22*  167:*5,
8, 10, 11, 14, 18, 19, 22*
168:*12, 16, 17, 21*
169:*3*  170:*20*  173:*9*
208:*25*  209:*5, 22*
210:*11, 23*  211:*2, 3,
12, 25*  212:*9, 24*
213:*14, 16, 20*  214:*6,
10, 24*  220:*9, 14*
222:*15*  223:*3, 10*
224:*24*  226:*4, 20*
228:*11*  229:*3, 19*
234:*19*  263:*11*
275:*16, 22*  277:*11, 17*
278:*8, 11*  285:*1, 9, 15*
286:*3*  288:*16*  295:*18*
296:*3, 6, 7, 15, 18*
297:*1, 25*  299:*11, 16*
300:*20*  302:*24*  303:*4*
306:*7, 18*  307:*1*
312:*25*  317:*18*
318:*15, 19*  323:*2*
325:*5*  326:*6*  329:*24*
333:*3, 10*  342:*8*
343:*16*  352:*22*
353:*13*  357:*7*  358:*17*
**materials**  139:*5*
140:*16*  304:*18*
**mathematical**  308:*13*
**Matt**  113:*23*
**matter**  114:*7*  133:*3,
22*  134:*20*  137:*1*
147:*6*  157:*16*  172:*9*
236:*25*  247:*23*
262:*18*  269:*19*  270:*2,
4, 13*  272:*10*  274:*18*
291:*15*  295:*19*
296:*23*  297:*8*  298:*11*

299:*5* 302:*18, 20* 307:*3, 15* 309:*20* 310:*3* 322:*14* 344:*4, 16* 362:*5*

**matters** 213:*9*

**Matthew** 111:*11*

**maximizing** 289:*21*

**mean** 132:*4, 15* 144:*10* 145:*9, 10* 152:*9* 153:*23* 164:*16* 171:*3* 179:*10* 180:*16, 23* 181:*15, 18* 182:*21* 183:*14* 184:*22* 187:*9, 11* 188:*20* 189:*22* 198:*20* 203:*19* 206:*15* 207:*2* 210:*2* 212:*12* 226:*24* 228:*25* 234:*17* 239:*22, 23* 242:*23* 248:*4* 250:*24* 256:*15* 259:*10* 264:*2, 4* 265:*18* 270:*16* 273:*3* 278:*3, 5* 280:*19, 22* 282:*20, 22* 284:*23* 285:*8* 290:*20, 25* 291:*19* 296:*14* 301:*8* 304:*19, 25* 317:*17* 332:*9* 340:*25* 346:*20*

**meaning** 158:*3*

**meaningful** 211:*4*

**means** 186:*4* 246:*9*

**meant** 144:*21*

**measure** 160:*3* 248:*5* 265:*12*

**measured** 160:*11*

**measurement** 215:*19*

**measures** 182:*9* 187:*23*

**measuring** 160:*8* 248:*8, 9* 330:*24*

**mechanism** 186:*11*

**mechanisms** 182:*14* 197:*23*

**media** 305:*19*

**median** 260:*4, 17* 261:*10, 11, 18* 262:*25* 264:*3, 5, 9, 24*

**members** 205:*5*

**mention** 147:*17* 148:*22* 159:*18*

**mentioned** 120:*5* 141:*25* 147:*13* 150:*12, 20, 21* 151:*12, 22* 152:*19* 154:*24* 186:*13* 241:*19, 20* 257:*23* 291:*6* 292:*21*

**mentioning** 150:*25* 182:*13*

**mentions** 129:*6* 288:*20*

**merely** 289:*9*

**merge** 132:*19*

**merged** 126:*18* 176:*1*

**Merger** 118:*12, 15, 18, 21, 23* 119:*1* 125:*10, 23* 126:*14, 20, 24* 127:*4, 6, 15, 16, 21, 23* 128:*4, 8, 12* 132:*16* 148:*14* 178:*1* 179:*12* 232:*25* 233:*3* 275:*25* 276:*5* 289:*13* 315:*21* 328:*23* 329:*5, 8, 13, 18, 23* 330:*1, 5, 7, 12, 15, 20* 331:*3* 332:*21* 339:*17, 25* 340:*16* 341:*6, 16, 24* 342:*19* 343:*13* 346:*9, 10, 13, 16* 349:*5* 354:*16* 355:*4, 22, 24, 25*

**Mergers** 131:*12* 173:*25* 174:*9, 12* 176:*6* 177:*17* 267:*12* 268:*17* 286:*16* 312:*20, 25* 337:*1* 341:*2* 342:*21* 344:*7* 346:*5* 348:*11, 14, 16, 20, 24* 349:*3, 13, 22* 354:*11* 356:*24*

**met** 115:*14* 176:*6* 296:*13* 299:*20*

**middle** 243:*21*

**million** 339:*11*

**mind** 168:*25* 199:*11* 220:*5* 253:*4* 337:*24*

**minus** 263:*24* 264:*20*

**minute** 169:*21* 245:*12* 347:*15* 359:*16*

**minutes** 292:*21*

**mirror** 241:*12* 247:*5* 344:*8* 346:*4*

**mischaracterized** 237:*24*

**mischaracterizes** 143:*22* 152:*7* 156:*14, 15* 229:*16* 283:*11*

**misleading** 352:*12*

**mismatch** 342:*13, 14, 15*

**misremembered** 310:*18*

**Missouri** 112:*14, 16* 113:*15* 114:*12* 361:*6*

**MNPI** 157:*24*

**MO** 113:*18*

**moment** 118:*7* 141:*25* 250:*14* 310:*15*

**money** 200:*21* 327:*19, 23*

**months** 130:*1, 9, 15* 131:*2* 184:*15* 201:*17*

**morning** 115:*7, 8* 344:*25* 345:*19* 355:*19*

**mouse** 117:*20*

**move** 116:*5* 132:*21* 153:*7* 154:*21* 164:*3* 275:*2* 286:*13* 324:*1* 328:*6* 345:*23* 346:*1* 353:*23*

**movement** 261:*3* 315:*9* 316:*6*

**movements** 260:*22* 261:*4*

**moving** 146:*13* 305:*11* 343:*18*

**multiple** 217:*23* 289:*11* 291:*10* 330:*24* 332:*9, 12, 16, 21* 333:*5, 25* 334:*17*

**< N >**

**Nader** 135:*18*

**name** 114:*13* 169:*16*

**NATIONAL** 110:*1* 112:*1* 114:*6* 116:*1, 2, 23* 117:*1* 118:*25* 119:*3, 11, 16, 20*

120:*1, 25* 121:*20* 122:*1, 19, 24* 123:*12* 124:*1, 12, 23* 125:*4, 16* 126:*6, 9* 128:*12* 149:*11* 152:*13* 153:*6, 13* 161:*14* 175:*15, 18* 176:*7* 188:*15* 189:*7, 12* 191:*6* 200:*9, 24* 204:*25* 205:*10* 206:*10, 23* 208:*1, 7, 18* 209:*9, 12, 21* 210:*6, 10* 211:*9, 14, 16, 23* 212:*3, 8, 14, 21, 23* 262:*1* 308:*18* 309:*1, 8* 312:*3, 21* 315:*9, 12* 316:*21* 318:*1* 320:*4* 324:*4, 12* 329:*2* 338:*24* 350:*14* 355:*15* 356:*1* 357:*4* 362:*2*

**NAT-SL-023189** 111:*10* 204:*9*

**NAT-SL-22986** 111:*9* 191:*4*

**naturally** 306:*20*

**nature** 145:*16* 150:*2* 181:*25* 291:*4, 23* 306:*6* 313:*1* 321:*5, 20* 322:*14* 323:*11* 324:*7* 325:*18* 330:*22* 334:*10, 24* 335:*12, 16, 17* 352:*15, 17* 359:*10*

**navigate** 118:*5* 168:*6* 169:*15*

**near** 120:*8* 122:*8* 124:*20* 168:*7* 192:*24* 244:*21* 275:*11*

**necessarily** 174:*25* 181:*18* 186:*10* 198:*10* 237:*18* 259:*10* 292:*12* 320:*15* 322:*19*

**need** 145:*13* 156:*3* 160:*5* 166:*16, 17* 167:*6* 176:*17* 240:*14* 250:*8* 266:*7* 283:*9* 296:*16* 297:*17* 352:*20* 360:*11, 12*

**negative** 177:*23*

313:*5*
**negotiate** 289:*19*
**negotiated** 354:*11, 16* 356:*24*
**negotiating** 292:*13*
**negotiation** 126:*23* 200:*14* 356:*9*
**negotiations** 176:*21* 177:*7* 289:*10, 13*
**neither** 361:*11*
**never** 282:*11*
**nevertheless** 201:*13* 332:*13* 333:*14* 334:*7* 342:*3*
**NEW** 110:*1* 112:*1* 113:*7* 114:*8* 136:*21* 176:*2* 178:*5* 305:*12*
**news** 314:*16, 17, 19*
**NI** 119:*16* 121:*5* 123:*17, 18* 129:*12* 130:*2* 149:*17* 151:*6* 153:*20* 155:*22* 184:*1* 206:*3* 217:*8* 258:*4* 259:*17*
**nice** 115:*9* 241:*25*
**nine** 218:*14, 18* 220:*6*
**NI's** 184:*1* 231:*12* 286:*18, 24* 287:*5, 16* 288:*5, 9* 291:*18*
**No.____Change** 363:*2, 5, 8, 11, 14, 17, 20* 364:*2, 5, 8, 11, 14, 17, 20*
**No.____Line** 363:*2, 5, 8, 11, 14, 17, 20* 364:*2, 5, 8, 11, 14, 17, 20*
**Noam** 113:*4*
**noam@rgrdlaw.com** 113:*8*
**nonbinding** 151:*13*
**non-private** 324:*10*
**nonpublic** 157:*23* 258:*25*
**nonrejection** 255:*23*
**non-rejection** 238:*11*
**nonresponsive** 351:*14, 15*
**nonstatistician's**

265:*7*
**Nope** 168:*8*
**normal** 261:*7*
**note** 231:*11* 283:*25* 346:*5*
**noted** 197:*10*
**notes** 129:*10*
**noting** 198:*4*
**notion** 161:*25* 316:*13*
**NOVEMBER** 110:*11* 112:*12* 114:*2* 121:*13, 17, 19* 199:*24, 25* 200:*2, 17* 216:*21* 309:*15, 19* 310:*13*
**nuanced** 256:*17*
**number** 122:*6* 132:*6* 143:*11* 191:*5* 207:*11* 209:*6* 210:*4* 219:*22* 225:*15* 246:*8, 9* 260:*15, 17* 261:*11, 18, 25* 262:*25* 263:*5* 276:*9, 11* 287:*10* 342:*20* 348:*12*
**numbers** 250:*21* 262:*13, 24* 264:*3* 280:*8* 308:*7, 8, 10, 12*
**numeral** 275:*10*
**numerous** 159:*7* 160:*19* 202:*4* 218:*5* 279:*25* 281:*21* 282:*11* 331:*13* 334:*12, 13* 349:*25* 358:*21*
**Nuthatch** 193:*9, 12*

**< O >**
**oath** 362:*9*
**Object** 123:*15* 145:*7* 146:*8* 163:*24* 225:*24* 293:*11, 13* 351:*11*
**Objection** 152:*7* 225:*11* 229:*16* 233:*18*
**objections** 198:*19* 207:*15, 23* 352:*17*
**obligations** 185:*11*
**observation** 215:*6* 265:*19*
**observations** 239:*24* 272:*5*

**observe** 237:*21* 336:*2* 337:*11*
**observed** 270:*3*
**observing** 167:*21* 335:*25*
**obtain** 185:*24*
**obvious** 227:*11*
**obviously** 139:*21* 145:*15* 213:*2* 228:*22* 242:*24* 256:*16* 338:*21* 351:*25*
**occurred** 192:*19* 196:*3* 206:*9* 352:*17*
**occurrence** 240:*23* 326:*17*
**occurring** 199:*10*
**occurs** 241:*1*
**offer** 119:*20* 121:*8* 129:*4, 7, 12* 130:*2* 132:*2* 150:*8, 12, 16, 19* 151:*20* 154:*19* 159:*15* 160:*3, 5, 15, 23* 162:*12, 25* 176:*13, 14, 17* 177:*8, 10, 13* 182:*4, 8, 25* 184:*6, 10* 186:*15, 17, 22, 25* 189:*1, 24* 196:*23* 200:*1, 21* 201:*15, 18* 202:*14* 205:*11* 214:*18* 220:*16* 221:*24* 225:*17* 228:*6, 7* 232:*13, 15* 235:*2* 237:*1* 238:*22* 239:*5, 8, 20* 240:*8, 17* 242:*22* 243:*5, 10* 245:*4* 247:*9, 12, 13, 19, 21, 25* 248:*11, 13, 15, 17* 249:*1, 3, 7, 10, 17* 251:*15* 252:*7* 254:*22* 255:*9, 25* 256:*9, 22, 24* 257:*2* 286:*25* 287:*16* 288:*5* 292:*8, 12* 293:*22* 295:*3* 309:*15, 19* 310:*12* 311:*2, 3, 4* 312:*2* 319:*8, 9* 321:*2, 16* 323:*16* 324:*2, 19* 325:*16* 327:*18* 328:*1* 334:*7* 339:*14* 362:*8*

**observe** — continued

**offered** 120:*25* 121:*20* 128:*25* 150:*3* 156:*23* 162:*14* 171:*20* 173:*9* 175:*17* 184:*13* 246:*8, 11* 249:*13* 299:*13* 303:*3* 341:*7* 359:*1*
**offering** 149:*12* 157:*4, 5* 163:*14* 164:*14* 165:*8, 11* 166:*12* 171:*16, 18* 172:*4, 15* 173:*3* 245:*15* 262:*11* 263:*3* 268:*21* 326:*21* 327:*22* 358:*17*
**offeror** 147:*23, 24* 148:*8, 20* 149:*25* 150:*11, 12* 151:*18* 154:*19* 161:*17* 162:*13, 21* 163:*9* 256:*24*
**offers** 159:*23* 174:*12* 183:*2* 203:*5, 8* 220:*18* 231:*19* 232:*10* 234:*1, 2, 3* 235:*14* 236:*7* 243:*15, 23* 245:*4* 248:*5, 10* 258:*6* 281:*18* 289:*19* 290:*1* 295:*5* 311:*2* 315:*25* 321:*17* 322:*5* 323:*5* 324:*22* 334:*2* 348:*17, 21* 349:*9* 358:*22* 359:*5*
**offer-specific** 263:*8*
**offices** 112:*12*
**oftentimes** 161:*5* 179:*1* 259:*3*
**oh** 148:*12* 196:*14, 25* 275:*6* 284:*17* 292:*5* 304:*25*
**Okay** 115:*17* 116:*5, 10, 12, 21* 117:*3, 10, 11* 118:*9, 14* 119:*5, 9* 120:*7, 15* 121:*11, 25* 122:*14* 123:*20* 126:*13* 127:*6, 25* 128:*15* 129:*20* 132:*21* 133:*25* 137:*20* 138:*6* 140:*9, 14* 142:*19* 144:*1, 23*

146:*17*  147:*8*  149:*4*
150:*2*  152:*12*, *21*
153:*12*, *18*  154:*5*
160:*18*  169:*14*
170:*12*, *19*  175:*5*
178:*23*  185:*18*  189:*6*
192:*10*  193:*24*
196:*20*  198:*3*  200:*4*
205:*4*, *16*, *19*, *25*
206:*3*  215:*9*  216:*17*
217:*21*  218:*12*, *21*
219:*9*, *15*, *23*  220:*21*
222:*12*  223:*14*
225:*22*  230:*19*  231:*5*
232:*9*  238:*15*  239:*7*,
*19*  242:*9*, *17*  249:*9*,
*18*  250:*3*, *11*  254:*9*
259:*21*, *25*  260:*8*
262:*11*  263:*3*  266:*1*
269:*1*, *13*  270:*5*, *18*
271:*8*, *12*, *18*  273:*7*,
*22*  275:*2*, *9*  276:*3*, *11*
277:*6*, *10*  278:*19*, *25*
279:*9*, *22*  282:*10*
283:*8*, *21*  286:*12*
287:*7*, *9*, *22*  288:*2*
289:*5*  290:*9*  291:*11*
292:*5*  294:*13*  296:*25*
301:*23*  302:*10*, *21*
303:*1*  308:*16*  310:*3*,
*21*  311:*8*, *25*  317:*15*
318:*23*  321:*2*  325:*3*
327:*11*  328:*3*, *6*, *13*,
*19*  329:*2*, *11*, *16*
330:*10*, *14*  331:*16*
332:*5*  335:*12*  336:*21*
338:*11*, *16*, *21*  339:*4*,
*10*  340:*8*, *14*, *22*
342:*3*  343:*18*  345:*17*,
*25*  346:*8*, *15*  348:*1*, *9*,
*23*  349:*7*, *12*  353:*23*
354:*2*  357:*12*, *16*
359:*15*
**omission**  277:*17*
316:*4*
**omissions**  156:*21*
157:*23*  165:*13*  170:*6*
234:*20*  263:*12*
318:*15*

**omitted**  145:*3*, *12*, *17*
156:*25*  157:*22*
160:*22*  165:*9*  166:*3*,
*12*  229:*3*  278:*21*
283:*24*, *25*  284:*6*
285:*6*, *11*, *19*, *22*
286:*5*  298:*25*  303:*15*
310:*22*  311:*5*  317:*17*,
*19*  319:*3*  320:*2*
323:*3*  341:*10*, *11*
342:*8*  344:*9*, *14*, *25*
345:*18*  346:*4*  352:*13*,
*24*  353:*14*
**omitting**  248:*22*
**once**  136:*12*  152:*25*
155:*1*  162:*23*  178:*6*
185:*3*  247:*21*  261:*2*
351:*11*
**ones**  142:*20*  143:*1*,
*12*  187:*10*  334:*3*
355:*6*  358:*9*
**open**  184:*24*  199:*22*
241:*11*  313:*10*
315:*20*  319:*9*  321:*13*
351:*24*
**opining**  167:*17*
226:*21*  282:*2*
**opinion**  127:*7*, *16*, *21*,
*23*  136:*23*  140:*12*
149:*12*, *14*  153:*25*
155:*11*  156:*5*, *7*
157:*5*, *6*, *18*  162:*7*, *20*
164:*6*, *19*  165:*6*, *8*, *11*,
*15*, *23*, *24*  166:*2*, *13*
168:*20*  169:*22*  170:*3*,
*4*, *9*, *17*  171:*8*, *14*, *16*,
*18*  172:*4*, *11*, *16*, *17*,
*23*, *25*  173:*1*, *2*, *3*, *9*
211:*13*  216:*25*
217:*12*, *25*  218:*6*, *15*
219:*11*, *19*  222:*7*
223:*5*  224:*16*  228:*15*
229:*13*  262:*11*  263:*3*,
*14*  275:*3*, *12*, *14*, *16*
277:*2*  280:*1*, *2*, *6*
281:*18*  282:*12*  283:*8*
295:*8*  297:*11*  299:*9*,
*13*  300:*2*, *7*, *17*  301:*1*,
*9*, *13*  303:*2*, *10*
304:*16*, *17*  306:*10*

307:*8*  317:*11*  343:*3*
354:*17*  356:*25*
358:*17*
**opinions**  136:*15*, *17*,
*19*  137:*1*, *4*, *11*, *24*
156:*1*, *19*  164:*9*, *12*,
*14*, *17*  170:*8*, *15*
171:*20*  277:*11*
302:*19*  307:*10*
354:*12*
**opportunities**  259:*5*
**oppose**  325:*14*
**opposed**  204:*3*
211:*10*  222:*15*
234:*25*  268:*22*  270:*2*
321:*11*  322:*17*
346:*21*
**opposes**  234:*22*
**order**  307:*9*  352:*21*
**original**  129:*12*  252:*7*
**ought**  117:*12*
**outcome**  253:*12*
321:*9*  351:*11*  361:*16*
**outlook**  251:*20*
**outright**  192:*4*, *16*
193:*1*, *4*, *7*, *15*  194:*6*,
*13*  196:*6*  197:*12*
198:*4*, *9*, *14*, *21*  199:*9*,
*16*  201:*1*, *8*  211:*23*
212:*16*  213:*17*  243:*3*
262:*23*  286:*6*  290:*8*
291:*5*  313:*5*  322:*17*
326:*8*, *11*  327:*3*, *11*
334:*5*  335:*8*, *23*
336:*3*, *12*  337:*11*
342:*23*  352:*2*, *5*
357:*9*
**outside**  339:*2*
**outstanding**  119:*10*,
*15*  121:*1*, *9*, *20*
122:*18*, *24*  175:*21*
176:*11*  177:*6*, *14*
186:*18*
**overall**  257:*14*
**overarching**  153:*23*
**override**  213:*13*
**overrides**  214:*4*
**overwhelming**  189:*2*
**owned**  178:*15*, *20*, *21*

181:*10*, *11*
**ownership**  178:*19*

**< P >**
**p.m**  266:*22*, *25*
328:*8*, *11*  359:*20*, *23*
360:*8*
**Page**  111:*3*  117:*5*, *12*
119:*6*  120:*7*, *10*
121:*12*  122:*6*, *7*
123:*5*, *20*, *21*  124:*6*
128:*1*, *2*  135:*18*, *21*
138:*23*  139:*10*
140:*10*, *15*  144:*2*
164:*6*, *7*  168:*3*, *4*, *5*, *7*,
*8*, *9*  169:*11*, *17*
170:*14*, *16*  191:*12*, *14*,
*15*, *19*, *25*  201:*19*
215:*24*  216:*9*, *10*
217:*15*, *17*, *19*  218:*5*,
*25*  219:*17*  220:*24*, *25*
221:*17*, *19*  222:*22*
226:*7*  229:*25*  230:*3*
231:*7*  233:*5*, *9*  238:*9*,
*10*  243:*13*, *16*  244:*17*,
*18*  249:*22*  254:*11*
259:*25*  262:*8*  263:*18*,
*20*  267:*7*  269:*4*, *6*, *7*,
*8*  270:*24*, *25*  271:*3*, *4*,
*9*  275:*4*, *7*, *8*, *11*, *20*
277:*8*  287:*10*, *11*
288:*3*  289:*5*  294:*15*
305:*13*, *17*  328:*16*, *17*
337:*19*, *20*  347:*7*
348:*1*, *5*, *7*  354:*1*
363:*2*, *5*, *8*, *11*, *14*, *17*,
*20*  364:*2*, *5*, *8*, *11*, *14*,
*17*, *20*
**pages**  122:*6*  123:*4*
128:*1*  218:*24*
**paid**  180:*7*
**paired**  324:*4*  325:*4*
**Panel**  238:*10*, *11*
242:*5*, *6*
**panels**  238:*10*
**paper**  237:*3*  268:*5*,
*11*  269:*17*  295:*9*
298:*8*  341:*21*  354:*3*,
*10*  356:*23*

Deposition of David J. Denis, Ph.D., Vol. II                In Re National Instruments Corporation Securities Litigation

papers 269:*16*, *18* 270:*6*, *12* 272:*9* 294:*19*, *21* 295:*21* 340:*18* 359:*11*
paragraph 119:*6* 120:*8*, *12*, *16*, *20* 121:*12* 122:*10*, *14* 123:*8* 124:*7*, *10*, *19*, *21* 128:*1* 144:*3*, *6*, *18* 151:*12* 152:*9*, *19* 154:*2* 157:*21* 158:*1*, *4*, *14* 159:*13* 162:*8* 164:*18* 165:*6* 168:*2*, *4*, *11* 169:*23* 170:*5* 172:*5*, *6* 173:*7* 215:*24* 217:*16*, *23* 219:*2*, *4*, *17* 220:*2*, *7* 222:*20* 223:*16*, *24* 224:*8* 226:*7* 228:*12*, *18* 230:*5*, *8* 231:*7*, *11*, *14*, *15* 238:*9* 244:*20* 249:*19*, *21*, *23*, *25* 250:*5*, *9* 251:*11* 253:*16* 259:*23* 260:*1* 269:*6* 272:*16* 275:*6*, *19* 277:*7* 286:*13* 287:*12*, *15* 288:*2*, *3* 289:*7* 292:*7* 294:*18* 328:*20* 338:*3*, *5* 343:*18* 344:*22* 346:*2* 354:*3*
paragraphs 122:*9*
parent 176:*2*
parse 318:*8*
part 127:*18* 135:*14* 152:*21* 157:*15* 158:*16* 171:*4* 178:*5* 197:*6* 222:*13* 224:*20* 227:*13* 228:*24* 229:*7* 258:*7* 268:*11* 286:*6* 290:*5* 292:*13* 302:*13* 310:*18* 333:*2* 340:*11*
particular 134:*20* 143:*9* 151:*2* 175:*14* 182:*11* 189:*6* 211:*5* 215:*6* 220:*18* 225:*19* 226:*2* 227:*7* 239:*22* 245:*16* 257:*15* 264:*6* 274:*20* 282:*14* 291:*12* 292:*22*

293:*18* 297:*5* 303:*2* 350:*2*
particularly 177:*24*
parties 190:*3* 361:*12*, *14*
partly 349:*10*
party 149:*10* 178:*4*
passages 138:*4* 204:*21* 278:*11* 279:*7*, *23*
pattern 214:*25* 215:*3* 359:*13*
patterns 147:*6* 353:*18*
pause 185:*17* 216:*1* 347:*8*
payment 299:*2*
PDF 117:*6*, *13* 122:*7* 123:*5* 138:*23* 144:*2* 191:*15* 216:*10* 270:*24* 275:*8* 328:*17* 337:*20* 347:*7*
PENALTY 362:*2*
pending 114:*7*
people 174:*10* 205:*5* 323:*24*
perceive 251:*3*
perceiving 251:*16*
percent 122:*18* 133:*21* 185:*8*, *9* 188:*4* 243:*24* 244:*25* 245:*9* 246:*7*, *9* 260:*12*, *24* 261:*4*, *7* 264:*4*, *5*, *11*, *23*, *24* 265:*3*, *16*, *19* 266:*1*, *4*, *8* 271:*16*, *20*, *25* 273:*12*, *14*, *15* 274:*5*, *9*, *10*, *22*, *23*, *25* 309:*22*
percentage 260:*20* 261:*3* 271:*9* 359:*1*, *5*
percussions 179:*3*
perfect 231:*2* 237:*14*, *15* 241:*8* 247:*4*, *6* 262:*21*
performance 257:*17* 258:*1*
period 130:*1*, *8*, *9*, *19*, *23*, *24* 131:*4*, *8* 134:*18*, *22* 135:*2*, *4*, *8*,

*13*, *15* 149:*1* 184:*3*, *16* 190:*21* 199:*18*, *21* 201:*6*, *11* 209:*19* 210:*17* 217:*9* 232:*15* 234:*20* 236:*5* 244:*25* 247:*23* 260:*22* 262:*2* 264:*21* 271:*23*, *24* 312:*14* 317:*5*, *12* 323:*5*, *16* 338:*18* 340:*4* 341:*10* 342:*18* 343:*6* 348:*24* 354:*25* 357:*8*
PERJURY 362:*2*
pertain 307:*2*
pertained 295:*5*
pertaining 112:*11*
pertinent 264:*15* 306:*23*
petered 206:*5*
Ph.D 110:*9* 111:*2* 112:*8* 115:*1* 362:*11* 363:*23* 364:*23*
phone 145:*23*
phrases 158:*7*
picking 346:*22* 349:*18* 350:*20*
picks 292:*7*
piece 139:*25* 161:*23* 211:*4* 214:*12* 218:*13* 219:*23* 220:*17* 225:*8*, *13*, *19* 226:*2* 236:*17*, *25* 287:*5* 288:*17* 321:*12*
pieces 161:*19* 217:*24* 218:*5*, *14* 219:*3* 228:*12* 279:*25* 285:*10*, *15* 286:*8* 287:*2* 313:*21* 316:*2* 317:*3*
pill 188:*16* 189:*4*, *15*
pills 188:*8*
pipeline 206:*4*, *11*, *24* 207:*21*
place 131:*7*, *21*, *25* 132:*7* 146:*3* 188:*16*, *23* 194:*6* 197:*23* 198:*1*, *3* 199:*18* 201:*12* 209:*18* 224:*5* 239:*20* 240:*18* 245:*19* 284:*24*

288:*15* 290:*6* 322:*24* 342:*21*
places 294:*1*
PLAINTIFF 110:*10* 112:*7*, *9*, *11* 113:*3*
plan 188:*10*, *16*, *18*, *20*, *22*, *25* 189:*1*, *4*, *8*, *18*, *23* 190:*4*, *9*, *15* 252:*25* 258:*5*, *12* 259:*2*, *7* 309:*17* 310:*10*
plane 359:*18*
planning 197:*8*
plans 188:*7* 259:*9*, *11*, *18*
Plascoff 113:*5*
plausible 247:*22*
played 335:*18*
please 168:*7* 173:*14* 190:*24* 196:*14* 220:*23* 232:*2* 243:*17* 275:*5*, *7* 287:*9* 328:*14* 347:*2* 348:*5* 354:*1*
plus 202:*14* 243:*23* 244:*25* 263:*24* 264:*20*
point 135:*23* 136:*1*, *25* 137:*3* 163:*25* 165:*16* 166:*9* 171:*25* 172:*12* 188:*15* 196:*4* 201:*3*, *7* 204:*1* 209:*9*, *14* 210:*6* 211:*5* 215:*10* 223:*15* 224:*22* 225:*20* 228:*11* 229:*6* 231:*15* 232:*16* 236:*3* 240:*4*, *18*, *25* 241:*17* 243:*14* 244:*22* 245:*9* 256:*8* 258:*16* 271:*22* 293:*16* 306:*17* 309:*16* 310:*9* 312:*11* 317:*7* 324:*8* 343:*17* 349:*2*
pointed 158:*18* 247:*4*, *16*
pointing 278:*9* 342:*12*
points 209:*6* 210:*3* 220:*6*, *8* 226:*25*

227:2, *5*  238:*5*  250:*8*
299:*5*  336:*15*  356:*14*
**poison**  188:*8, 16*
189:*15*
**pop**  260:*9*
**popped**  314:*14*
**pops**  242:*7*
**portion**  318:*8*
**portrayal**  300:*9*
**posit**  252:*5*
**position**  180:*3*
**positive**  177:*23*
193:*19*  243:*23*
244:*10, 24*  245:*5*
246:*17*  247:*1*  251:*2,*
*17, 19*  253:*19*  254:*22*
255:*10*  256:*9, 10, 25*
310:*2*
**positively**  313:*12*
**possibilities**  229:*10*
309:*13*  310:*7*
**possibility**  163:*19*
194:*7*  198:*8*  211:*22*
227:*14*  243:*5*  252:*7*
289:*8*  311:*12*  313:*11,*
*17*  315:*21*  319:*9*
321:*13*  325:*2*  327:*22*
**possible**  117:*15*
145:*25*  146:*14*
204:*20*  257:*12*
320:*21*  321:*4, 18*
322:*7, 11*
**possibly**  220:*13*
257:*1*  311:*21*
**post-failure**  245:*25*
**post-rejection**  202:*20*
207:*6*
**potential**  190:*14*
195:*7*  200:*25*  202:*20*
213:*12*  241:*21, 25*
242:*18*  248:*19*  312:*8*
314:*5, 19*  319:*1*
325:*6*  333:*11*
**potentially**  132:*15*
136:*20, 24*  327:*12*
**Pourhassan**  135:*19*
**power**  185:*14*
**preannouncement**
246:*12*  250:*23*  256:*7*

**preceding**  160:*4*
269:*4*
**precise**  316:*8*
**preclude**  198:*21*
**precluding**  182:*24*
**pre-contest**  323:*22*
**prefer**  118:*3*
**preferences**  183:*4*
213:*12*
**preferred**  250:*25*
**premium**  160:*3, 8, 9,*
*11, 14, 23*  161:*3*
245:*24*  251:*15*  341:*7*
347:*20*  353:*19*
**premiums**  330:*24*
**pre-offer**  251:*13*
256:*1*
**prepare**  168:*20*
338:*12*
**prepared**  134:*13*
153:*6*  154:*21*
**preparing**  116:*19*
135:*12*  139:*13*
140:*11*  142:*15*
153:*14*  208:*22*
299:*22*  300:*2, 17*
301:*1*  304:*22*
**presence**  114:*17*
**Present**  113:*23*
351:*19*
**presentation**  191:*5*
192:*21*  212:*16*
**presented**  313:*23*
**pressure**  184:*18, 23*
**presumably**  134:*10*
252:*11*
**presume**  252:*17*
**Pretty**  115:*9*  202:*18*
224:*2*
**prevent**  182:*18*
187:*20*  188:*2*  199:*9*
203:*4, 8*
**preventing**  197:*19*
**prevents**  202:*24*
203:*14*
**previous**  160:*14*
161:*4*  200:*5, 10*
218:*22*  219:*17*
263:*20*  273:*17*  281:*1*

**price**  125:*3*  129:*11*
132:*6, 8, 16*  160:*4, 10,*
*14, 23, 24*  162:*14*
170:*25*  171:*9, 15, 17,*
*19, 24*  172:*4, 7, 12, 16,*
*18, 22*  173:*4, 11*
190:*2*  199:*3*  217:*1,*
*10, 25*  218:*7, 16*
219:*12, 20, 25*  220:*13,*
*15, 16*  221:*24, 25*
222:*9, 10, 15, 25*
223:*5, 12, 17, 23*
224:*5, 6, 25*  225:*4, 15,*
*17*  226:*12, 14, 21*
227:*9, 11*  228:*4, 5, 8,*
*9, 16*  229:*8, 23*  235:*2*
237:*18*  239:*9*  242:*13,*
*18, 21*  243:*9*  244:*11*
245:*10, 25*  246:*11, 12,*
*21*  247:*8, 9, 12, 13, 18,*
*20, 24*  248:*6, 8, 10, 12,*
*13, 15, 17, 25*  249:*1, 3,*
*5, 7, 10, 17*  250:*22, 23*
251:*13*  252:*10*  256:*1,*
*7, 10*  257:*18*  260:*9,*
*11, 12, 25*  261:*13, 20*
262:*1, 10, 12, 14, 16*
294:*21*  295:*5, 10*
308:*19, 25*  309:*7*
312:*4, 8, 18*  313:*6, 15*
314:*14*  315:*9*  316:*6,*
*16, 23*  318:*4, 8*
320:*22*  322:*24*  325:*8,*
*9, 13, 22, 23*  326:*17*
335:*18*  336:*8*  339:*14*
342:*24*  353:*9*  357:*14*
359:*14*
**prices**  128:*24*  132:*5*
235:*1*  237:*21*  241:*15*
248:*1, 11*  249:*13*
260:*21*  262:*18*
263:*15*  315:*5*  325:*15*
**pricing**  325:*7*
**primarily**  144:*15*
159:*9*  283:*18*
**principles**  286:*16*
287:*3*  288:*1, 22*
289:*25*  290:*10, 22, 24*
292:*18*
**printed**  132:*25*

**prior**  128:*24*  136:*1*
142:*7, 10*  143:*23*
171:*25*  178:*19*  184:*3*
**priorities**  356:*11*
**priority**  152:*15*
154:*21*  324:*1*
**private**  244:*3*  251:*19*
253:*6, 9, 10, 13, 23*
254:*4, 25*  255:*13*
257:*7*  289:*12*  344:*18*
346:*18, 21*  351:*1*
**privately**  208:*8*
**privilege**  163:*25*
**probability**  193:*8, 16,*
*19*  195:*6*  198:*5*
228:*5, 6*  294:*20*
295:*9*  322:*20, 23*
325:*8, 10, 12, 17*
326:*12, 15, 23*  327:*4,*
*8, 9, 13*  333:*17, 21*
335:*1, 4, 6*  336:*1*
**probably**  235:*7*
357:*23*
**problem**  158:*17*
185:*15, 20*  216:*18*
299:*3*
**proceed**  145:*12*
181:*21*  254:*18*
310:*19*  320:*19*
327:*17*
**proceeded**  157:*2*
**proceeding**  182:*5*
320:*16*  325:*17*
326:*13*  327:*15*
**process**  174:*19*
188:*17, 19*  198:*10, 18*
215:*7*  289:*18*  292:*14*
**produce**  259:*7*  307:*5*
357:*13*
**produced**  141:*7, 8, 19*
142:*1, 11, 13, 14, 21*
143:*6, 11, 16, 19*
276:*4, 14*  277:*23*
301:*5, 24*  302:*17*
303:*6*  305:*4*  307:*7*
**production**  282:*23,*
*24, 25*  348:*2*
**Professional**  112:*15*
113:*18*  361:*4*

**progressed** 333:*14*
**pronouncing** 348:*20*
**proper** 226:*13* 263:*4*
**properly** 288:*25*
**proposal** 119:*15, 25*
120:*4* 121:*5* 123:*12,
17* 124:*1, 11* 131:*1*
153:*2* 163:*5* 181:*14,
23* 182:*15, 16* 183:*9,
11, 19* 184:*5, 20*
186:*7* 187:*18, 19*
190:*13, 17* 192:*12*
193:*25* 197:*5* 198:*22,
25* 199:*2, 24* 200:*2, 5,
10* 206:*9* 211:*16*
213:*24* 237:*20*
244:*25* 259:*20*
318:*12* 320:*6* 324:*14*
325:*11* 326:*12* 336:*7,
8, 9* 346:*16* 351:*11*
**proposals** 131:*7*
132:*6* 146:*23* 147:*3,
10* 149:*11* 151:*13, 15*
153:*1, 24* 154:*1*
157:*17* 159:*12*
161:*15* 162:*17, 24*
182:*22* 183:*5* 186:*20*
187:*8, 12, 14, 16*
193:*21* 199:*4, 15, 20,
23* 207:*20* 208:*12*
212:*22* 213:*2* 232:*16*
237:*22* 238:*2* 258:*16*
259:*17* 273:*8* 285:*13*
286:*19, 20* 291:*13, 19,
24* 313:*6* 314:*4*
320:*4, 11* 326:*4*
332:*1, 3* 333:*8* 335:*1*
344:*19* 346:*21* 351:*1*
355:*9, 10, 13*
**propose** 203:*5*
**proposed** 122:*18*
208:*24* 336:*13*
346:*12*
**proposing** 119:*10*
122:*1, 23* 192:*13*
328:*2*
**proposition** 257:*21*
271:*2*
**prospective** 325:*20*
**prospects** 244:*4*

**provide** 164:*19*
166:*2* 286:*20* 358:*4*
**provided** 146:*6*
149:*6, 21* 151:*5*
162:*2* 280:*13* 344:*2,
13* 345:*18* 358:*16*
**provides** 253:*24*
278:*20* 283:*23*
**providing** 171:*14*
237:*10* 280:*11*
**provisions** 112:*10*
**proxies** 336:*18, 22, 25*
337:*3* 357:*17, 19*
358:*20*
**Proxy** 111:*7* 115:*25*
116:*23* 118:*24*
119:*21* 120:*1, 24*
122:*2, 23* 125:*17*
126:*21* 127:*7, 11*
128:*2* 131:*12* 177:*2*
185:*23* 186:*9* 202:*14*
232:*24* 329:*12*
331:*20* 338:*21, 23, 24*
339:*24* 340:*2, 10*
343:*4* 354:*20* 355:*1,
3, 5, 19, 25* 356:*10*
358:*5*
**public** 189:*3* 202:*13*
208:*8* 236:*7* 239:*15*
336:*18* 344:*16*
346:*18, 22* 350:*9, 23,
24*
**publicly** 238:*22*
239:*5* 245:*3* 328:*24*
329:*9, 18* 330:*5, 7*
339:*6, 17* 350:*13, 14*
**pull** 231:*25*
**purchase** 123:*18*
190:*1*
**purchases** 175:*10*
**purchasing** 209:*8*
210:*5*
**pure** 260:*20*
**purported** 286:*15*
**purports** 302:*23*
**purpose** 141:*22*
150:*22* 156:*3* 195:*24*
252:*18*
**purposes** 112:*9*

155:*25* 213:*14* 214:*5*
**pursuant** 112:*10*
**put** 115:*21* 132:*23*
167:*2* 188:*15, 23*
190:*22* 198:*17* 216:*3*
220:*23* 232:*1* 267:*4*
270:*18* 280:*20*
300:*10* 307:*22, 23*
328:*14*
**putting** 248:*23* 287:*3*
**puzzling** 224:*3*

**< Q >**
**qualification** 260:*19*
**quantification** 308:*2,
4*
**question** 125:*13*
133:*12* 151:*3* 152:*3*
166:*19* 176:*15*
191:*22* 198:*14*
203:*11, 13* 211:*20*
224:*24* 236:*18, 19*
237:*11, 13* 241:*23*
252:*19* 255:*5* 267:*6*
268:*22* 273:*18, 23*
293:*14* 295:*17*
299:*10* 307:*6* 309:*5*
317:*8* 323:*15* 334:*6*
340:*20* 341:*2, 5, 9*
345:*25* 351:*15*
**Questions** 111:*4*
115:*5, 18* 117:*13*
261:*10* 345:*11, 12, 14*
359:*25*
**queued** 221:*9, 13*
**quick** 190:*22* 191:*10*
215:*10* 222:*17*
337:*13*
**quickly** 153:*7*
154:*21* 201:*20*
249:*19* 259:*23* 324:*1*
**quite** 197:*21* 211:*19*
231:*12* 256:*18*
263:*13* 336:*24*
**quotations** 280:*14, 16*
281:*18*
**quote** 146:*6* 149:*19*
152:*14, 15* 161:*10*
236:*21* 237:*4* 282:*16*
285:*5* 293:*22, 24, 25*

344:*8* 347:*20* 353:*18*
354:*10*
**quoted** 276:*11*
283:*14* 300:*5, 18*
302:*8*
**quotes** 138:*14, 16*
158:*3, 6* 279:*13, 14*
283:*16* 288:*9* 304:*20*
**quoting** 192:*7* 210:*3*
253:*14* 278:*7* 279:*6,
12* 280:*10* 282:*14*
294:*3* 301:*6* 302:*14*
304:*12* 310:*7*

**< R >**
**range** 264:*5, 6*
265:*23* 272:*23*
274:*18*
**rare** 240:*23*
**rationally** 335:*6*
**reacted** 318:*21*
319:*12, 14*
**reacting** 317:*20*
**reaction** 248:*6, 25*
316:*17* 318:*4, 9*
336:*8* 342:*24* 357:*14*
**read** 129:*18* 138:*6,
11, 12, 14, 15, 16*
139:*19* 154:*5, 7*
155:*20* 171:*3* 232:*7*
244:*22* 246:*15*
281:*24, 25* 282:*5*
289:*8* 292:*8* 299:*21*
300:*1, 4, 22* 303:*7*
306:*4* 307:*11* 339:*24*
360:*5* 362:*5, 6*
**readdressed** 229:*21*
**reading** 126:*5*
127:*10* 153:*16*
195:*24* 232:*6* 253:*16*
278:*5*
**reads** 129:*15* 347:*22*
**ready** 324:*1*
**real** 181:*5* 190:*22*
**reality** 179:*23* 289:*10*
**really** 117:*20* 145:*11*
166:*18* 167:*12* 183:*3*
254:*10* 268:*9* 284:*17*
290:*4, 25* 291:*8*

**292**:*22* **297**:*4* **305**:*8*
**realtime** **255**:*7*
**reason** **201**:*9* **208**:*21*
**255**:*23* **298**:*12*
**308**:*10* **327**:*25* **332**:*9,
12* **363**:*4, 7, 10, 13, 16,
19, 22* **364**:*4, 7, 10, 13,
16, 19, 22*
**reasonable** **174**:*24*
**reasons** **128**:*4, 8*
**231**:*19* **241**:*7* **245**:*22*
**254**:*15, 17* **256**:*12, 17*
**358**:*18*
**recall** **136**:*2* **137**:*13,
17* **145**:*21, 25* **146**:*2,
10* **148**:*22* **153**:*8, 10,
12, 16* **159**:*25* **160**:*13*
**163**:*18* **164**:*24*
**191**:*13* **199**:*6* **205**:*24*
**240**:*10* **257**:*22* **276**:*9*
**300**:*24* **308**:*7* **309**:*10,
11*
**receipt** **295**:*3*
**receive** **180**:*18*
**received** **146**:*23*
**151**:*13* **159**:*14*
**179**:*22* **180**:*11*
**199**:*24* **309**:*14, 19*
**310**:*12* **314**:*4*
**receiving** **134**:*11, 14*
**recognize** **116**:*12*
**133**:*8* **191**:*19, 25*
**204**:*14*
**recollection** **117**:*2*
**120**:*3* **125**:*7* **127**:*24*
**144**:*22* **150**:*16*
**331**:*19*
**reconstruct** **336**:*21*
**record** **114**:*1, 18, 20*
**115**:*25* **173**:*16, 19*
**191**:*4, 8* **215**:*11, 14*
**216**:*12* **227**:*18*
**266**:*21, 24* **282**:*11*
**328**:*7, 10* **359**:*19, 22*
**360**:*9*
**recorded** **114**:*4*
**reduced** **241**:*14*
**361**:*10*
**reduces** **327**:*12*
**re-engage** **183**:*21*

**refer** **159**:*1* **174**:*9, 18*
**205**:*22* **223**:*23*
**238**:*17, 18* **240**:*21*
**253**:*1* **283**:*25*
**reference** **114**:*5*
**142**:*3* **205**:*25* **206**:*1*
**258**:*4* **264**:*11* **268**:*1*
**280**:*13* **336**:*15*
**referenced** **226**:*10*
**299**:*24*
**references** **141**:*15, 17*
**142**:*1, 5, 23*
**referencing** **222**:*2*
**referred** **138**:*4, 21*
**161**:*13* **188**:*8* **216**:*12*
**249**:*4* **266**:*5* **296**:*7,
22*
**referring** **159**:*10*
**168**:*13* **174**:*12* **185**:*7,
11* **199**:*20* **220**:*7*
**232**:*21* **250**:*4* **251**:*10,
21* **264**:*13* **265**:*7*
**268**:*15* **269**:*16*
**272**:*14* **273**:*20* **284**:*4*
**285**:*16* **287**:*15* **308**:*2*
**refers** **192**:*4* **193**:*12*
**281**:*9* **299**:*18* **305**:*5*
**321**:*7*
**reflect** **114**:*19* **231**:*6*
**236**:*13, 21* **237**:*5*
**251**:*18* **257**:*18*
**reflected** **114**:*18*
**242**:*5*
**reflecting** **228**:*5*
**reflection** **231**:*3*
**237**:*15* **241**:*8*
**reflects** **251**:*2* **252**:*10*
**289**:*9*
**refusal** **292**:*12*
**293**:*22*
**refuted** **227**:*13*
**regard** **236**:*14, 15, 19*
**248**:*11*
**regarding** **146**:*18*
**209**:*5* **213**:*12* **216**:*25*
**275**:*22* **276**:*5* **300**:*11*
**316**:*5*
**Registered** **112**:*15*
**113**:*18* **361**:*4*

**regression** **308**:*4*
**regular** **360**:*14*
**reiterate** **245**:*20*
**reiterated** **121**:*4*
**reject** **163**:*19* **182**:*8,
16, 22* **183**:*19* **203**:*20*
**289**:*19* **325**:*15*
**rejected** **131**:*9*
**157**:*18* **159**:*12*
**161**:*14, 23* **162**:*24*
**163**:*5* **182**:*4* **183**:*9,
11* **184**:*6, 20* **186**:*6,
20* **187**:*8, 12* **190**:*17*
**200**:*5, 6, 9* **201**:*14*
**207**:*20* **212**:*21* **213**:*2*
**214**:*18* **232**:*16*
**237**:*20* **243**:*8* **247**:*21*
**248**:*17* **251**:*12*
**254**:*14* **259**:*18*
**286**:*19, 25* **287**:*6, 16*
**288**:*5* **290**:*14* **291**:*13,
18* **314**:*4* **316**:*1*
**320**:*11* **324**:*13* **332**:*1,
2, 6, 8, 13, 17* **333**:*8*
**334**:*5, 7* **342**:*23*
**344**:*19* **346**:*17* **351**:*2*
**358**:*22*
**rejecting** **147**:*2, 10*
**182**:*23* **193**:*25* **197**:*5*
**254**:*22* **255**:*9* **256**:*5,
24* **258**:*8, 16* **292**:*11*
**293**:*21*
**rejection** **153**:*1*
**181**:*25* **182**:*15*
**190**:*13* **192**:*4, 11, 14,
16* **193**:*1, 5, 7, 16*
**194**:*6, 13* **195**:*5*
**196**:*6, 10, 22* **197**:*3,
12, 14* **198**:*4, 10, 15,
21* **199**:*9* **200**:*20*
**201**:*1, 8* **202**:*5, 16, 23*
**203**:*14, 19, 22* **205**:*11,
17* **206**:*9, 23* **208**:*13*
**211**:*24* **212**:*16, 17*
**213**:*18, 23* **214**:*3*
**237**:*1, 21* **238**:*11, 12*
**239**:*20* **240**:*2, 4, 7, 17,
25* **241**:*1, 23* **242**:*6,
12, 19* **243**:*1, 3, 4*
**244**:*23* **245**:*22*

**246**:*13, 16, 22, 25*
**247**:*8* **249**:*7* **251**:*16*
**253**:*19* **254**:*24*
**255**:*11* **256**:*21* **257**:*2*
**260**:*10* **262**:*23*
**264**:*13, 15, 19* **285**:*12*
**286**:*6* **290**:*6, 8* **291**:*5,
23* **292**:*18* **293**:*19*
**295**:*4* **313**:*5* **320**:*15*
**321**:*3, 21* **322**:*14, 15,
17, 18* **323**:*5, 11, 17*
**324**:*5, 7* **325**:*4, 12, 16,
19* **326**:*8, 12, 24*
**327**:*3, 12, 14, 19*
**333**:*10* **334**:*11, 18*
**335**:*13, 18* **336**:*3, 4, 9*
**351**:*19, 23* **352**:*5*
**rejections** **131**:*11*
**183**:*1* **199**:*16* **241**:*6,
8, 9* **244**:*9* **245**:*4*
**248**:*10* **255**:*24*
**288**:*15, 21* **289**:*25*
**290**:*3* **291**:*6* **292**:*9*
**294**:*4, 5, 9* **321**:*16*
**322**:*6, 11* **324**:*22*
**325**:*19* **326**:*5* **330**:*2*
**333**:*13, 24* **334**:*13, 19,
21* **335**:*9, 16, 23*
**336**:*12* **337**:*11* **349**:*8,
15, 17, 23* **350**:*4, 6*
**351**:*22* **352**:*3, 15, 16*
**357**:*10* **358**:*13, 25*
**359**:*7, 9, 10*
**rejection-specific**
**263**:*9*
**rejects** **162**:*16*
**181**:*14, 22* **193**:*21*
**255**:*4* **256**:*8*
**related** **116**:*23* **355**:*3*
**361**:*11*
**relationship** **180**:*8*
**relative** **160**:*10*
**161**:*4* **269**:*24* **323**:*22*
**361**:*13*
**relatively** **168**:*16*
**178**:*4*
**released** **239**:*15*
**312**:*1* **317**:*21*
**relevance** **303**:*11*
**342**:*6* **343**:*2* **352**:*12*

**relevant** 201:*6*
214:*23* 236:*14, 15, 20, 24* 237:*4, 11, 12*
238:*13* 264:*20, 21*
270:*2* 293:*18* 295:*17*
297:*18* 299:*10*
301:*13* 306:*12*
311:*16* 320:*8* 332:*19*
343:*10* 344:*23* 346:*3*
351:*17* 353:*3* 354:*8*
**relied** 279:*25* 280:*12, 25*
**rely** 145:*15*
**relying** 295:*21*
302:*18*
**remain** 203:*23, 24*
208:*2* 213:*5*
**remained** 209:*8*
210:*5* 211:*22*
**remaining** 195:*14*
**remains** 206:*11, 23*
211:*8, 10* 250:*22*
**remember** 150:*22*
192:*1, 7* 201:*21*
231:*9* 233:*1* 293:*15*
301:*15* 354:*22*
**remembering** 160:*16*
271:*24*
**remote** 117:*25*
**remotely** 222:*14*
**render** 136:*23*
**renders** 155:*6* 162:*18*
**repeat** 147:*20* 218:*3*
219:*13* 223:*19* 227:*2, 10*
**repeated** 225:*6*
226:*24* 229:*5*
**repeatedly** 158:*22*
**repeating** 224:*19*
229:*1*
**repercussions** 178:*24*
179:*4, 13* 180:*20, 24*
181:*5, 8* 267:*13, 20*
**replica** 172:*13*
**reply** 137:*7, 17*
**report** 111:*8, 11*
116:*16, 19* 132:*23*
133:*1, 3, 8, 17, 20, 25*
134:*1, 4, 6, 7, 11, 13, 14, 22* 135:*18, 22*

136:*4, 10, 12, 14, 18, 20* 137:*7, 10, 14, 17, 21* 138:*13, 25* 139:*3, 14, 17* 140:*3* 141:*22*
142:*7, 10, 15, 23*
143:*5, 9, 13, 17, 18*
144:*1, 2, 3* 150:*22*
152:*1* 153:*14* 154:*8*
156:*18, 19, 20* 157:*2, 13* 158:*7, 10, 19, 23, 25* 159:*7* 162:*11*
164:*12, 14, 15* 169:*2, 6, 23* 170:*10* 174:*6*
191:*9* 192:*8* 197:*6*
204:*2, 21* 215:*18*
216:*5, 10, 13, 20, 24*
218:*22* 219:*4, 10, 14, 15, 16, 18, 24* 220:*7, 10, 11, 24* 221:*1, 20*
222:*10* 223:*9, 16*
224:*3, 12, 16, 20*
225:*3* 226:*4* 227:*13*
228:*11, 13, 18* 233:*6*
241:*7* 249:*19* 259:*22, 23* 263:*10* 269:*2, 15*
270:*11* 271:*20* 275:*4, 5* 276:*15* 280:*25*
281:*3, 19* 287:*7, 11, 23* 288:*13, 14, 21*
289:*2* 290:*4, 18*
292:*2, 20* 293:*4, 8, 23*
294:*1, 4, 10, 11, 13*
299:*22, 24* 300:*6, 20*
301:*10, 12, 21* 302:*14*
303:*12, 21* 304:*22*
306:*17* 309:*11, 24*
310:*5, 16* 318:*14*
328:*15* 333:*2* 340:*15*
353:*25*
**Reported** 110:*21*
**Reporter** 112:*15, 16*
113:*18, 19, 20, 21*
114:*14, 19, 22* 185:*13, 16, 18* 215:*21* 360:*10*
361:*1, 5*
**REPORTING** 113:*21*
114:*14, 15* 306:*15*
**reports** 133:*23* 137:*1, 5* 141:*16* 143:*10, 21*
208:*22* 257:*23*

276:*21, 25* 283:*1*
297:*9* 299:*21, 23*
300:*1, 9, 12, 16, 19, 23*
301:*1, 6, 9* 302:*22*
303:*7* 306:*1, 3, 6, 8, 9, 11, 15, 22* 307:*5, 11*
**represent** 143:*19*
160:*18* 229:*9* 239:*25*
**representative** 290:*4*
**representing** 114:*13*
259:*4*
**represents** 118:*17*
164:*19*
**require** 165:*25* 166:*4*
**required** 299:*15*
307:*4, 7*
**research** 172:*8*
222:*3* 224:*13* 228:*19*
241:*19, 20* 313:*3*
336:*1*
**resistance** 321:*8*
**resisted** 336:*7*
**respect** 183:*5* 203:*23*
220:*9* 224:*23* 227:*6*
255:*22* 286:*14*
303:*13* 315:*8* 323:*13*
**respectively** 261:*21*
**respond** 156:*17, 18*
183:*23* 237:*21*
307:*10* 313:*11*
**responding** 133:*25*
134:*8* 169:*6* 208:*25*
301:*2*
**responds** 194:*5*
209:*13*
**response** 151:*24*
161:*19* 187:*11*
194:*21* 199:*13* 212:*3*
259:*17* 335:*19* 352:*9*
359:*11, 14*
**responsibilities** 135:*1*
**rest** 158:*23* 257:*3*
307:*16*
**restructuring** 252:*9, 13, 18, 22* 253:*2, 3, 5, 12* 254:*6*
**restructurings** 174:*13, 15* 245:*17*
**result** 126:*17* 127:*3*
131:*25* 244:*14*

255:*17, 20* 256:*6*
266:*6* 337:*10*
**resulted** 125:*10*
126:*14, 24* 132:*11*
330:*15, 20* 340:*16*
341:*16, 24* 343:*13*
**results** 247:*16* 265:*8*
266:*3* 347:*24*
**return** 260:*5* 261:*8, 12* 265:*13, 19* 347:*21*
349:*18* 353:*19*
**returned** 200:*12*
201:*15*
**returns** 260:*23*
261:*7* 308:*2* 347:*11*
353:*7*
**revaluation** 243:*23*
244:*10, 24* 245:*5*
246:*17* 247:*1* 254:*23*
255:*10* 256:*11, 25*
**reveal** 318:*14*
**revealed** 238:*22*
309:*18* 320:*10*
**revealing** 320:*21*
**Reveals** 318:*18*
**reverse** 312:*2*
**reversion** 241:*17*
246:*7* 247:*8* 254:*23*
255:*10* 256:*6, 21*
260:*10, 11*
**revert** 235:*2* 241:*15*
**reverts** 242:*15*
**review** 137:*20* 138:*1, 3* 141:*2* 177:*2*
199:*22* 208:*21*
257:*20* 258:*13*
275:*25* 276:*18*
277:*22, 23* 278:*14*
279:*1, 10, 16* 280:*1, 15* 281:*7* 282:*12*
283:*10* 284:*20* 302:*2, 5, 10, 12, 13, 15*
303:*19, 21, 24* 304:*23*
305:*18* 306:*23*
307:*25* 308:*5* 315:*4*
**reviewed** 116:*18*
137:*7* 138:*4* 139:*3*
140:*20* 141:*15, 19*
142:*4, 6* 143:*20*
146:*22* 148:*11, 16*

Deposition of David J. Denis, Ph.D., Vol. II                    In Re National Instruments Corporation Securities Litigation

257:*24*  259:*14*  276:22, *23*  279:*1*  280:*5*  302:9, *14*  304:2, *10*

**reviewing**  208:*24*  277:*25*  278:*3*  301:*2*  306:*12, 25*  353:*16*

**revised**  289:*8*

**rid**  229:*24*

**right**  115:*12, 20*  116:*16*  117:*1, 4, 9, 14, 20, 23*  118:*15*  119:5, *12*  120:2, *5, 15*  121:2, *7, 17*  122:*3, 15*  124:2, *13*  125:*11, 17, 20*  126:*11, 15, 20, 21, 25*  127:20, *23*  128:*13, 14*  129:2, *8, 13*  130:*10, 20, 24*  131:*13, 19*  132:22  133:*11*  134:2, *5, 8, 11, 15*  135:2  136:*15*  139:*24*  140:*15, 17, 24*  141:*3, 20*  142:2, *5, 8, 15*  144:*25*  145:*6*  146:*1, 7*  147:*10, 13*  148:8, *17, 20*  149:*18, 19, 22*  150:*19*  154:5, *8, 11, 16, 22*  156:8  157:9, *11, 21, 24*  158:2, *5, 15, 23*  159:3, *8*  160:*24*  161:*21*  164:9, *16, 20*  165:*15*  168:*11, 13*  169:25  170:*10*  171:*9*  172:*18*  173:*4, 23*  175:8, *13, 22, 24*  176:*3*  180:5, *9, 21*  181:*3, 6*  184:*13, 14*  185:*4, 7, 25*  186:*15*  187:2  189:9, *16*  192:*11, 13, 15, 16, 19, 23*  193:5, *17, 20, 22, 25*  194:*14, 23, 24*  195:*19*  196:*23*  197:*15*  198:*25*  199:*1*  200:*19*  202:6, *9, 12*  205:*18*  206:*1, 12, 18, 24*  207:7, *19*  211:*17*  216:2, *15, 16*  217:2, *20*  219:*1, 2, 20*  220:2

221:*11, 14, 19, 21*  222:*3, 5, 7, 20, 24*  223:*1*  224:*17, 19*  225:*5, 9*  226:22  227:*18*  228:*1, 14, 22*  229:*15*  230:2, *12, 22*  231:6, *24*  232:*10*  233:*3, 5, 14*  234:*5, 10, 11, 15, 18*  236:*14*  238:*13, 20*  239:5, *9*  240:9, *12, 19*  241:*3*  242:*1, 7, 8, 14, 15, 22*  243:*10, 18, 20*  244:*4, 16, 20*  245:*1*  248:8  249:*12, 20, 22*  250:*1, 13*  251:6  252:*14, 22, 24, 25*  253:5, *7, 15, 17*  254:*11, 15, 17, 19*  255:2, *14*  256:2, *13*  257:*4, 10*  261:7, *13, 21*  262:*3*  263:*1, 20*  264:*3, 7, 8, 16, 18, 25*  265:*1, 3, 4, 5, 10, 16, 17, 24, 25*  267:*24, 25*  268:*3, 6*  269:*4*  271:*6, 12, 16*  272:*3, 11*  273:*3, 9, 12, 25*  274:*4, 12, 14, 20, 25*  275:*10, 12, 17, 22*  276:*1, 2, 6, 18, 24*  277:*2*  279:*14*  280:9, *12, 18*  282:*13*  284:*3, 9*  286:*17, 25*  287:20, *21, 23*  288:*3, 9, 12, 13*  289:*3*  290:*1*  291:2  292:9, *15, 19*  293:23  294:*3, 18, 24*  295:*12, 20, 23*  296:*1*  297:*13*  298:5  300:*23*  301:*1, 2, 25*  302:*3, 6, 22*  303:20, *25*  304:6  305:23  306:*1, 4, 24*  307:*24*  308:*14, 19*  309:*1*  310:*1, 23*  311:*23*  312:*5*  314:*10, 11, 12, 13, 15, 20*  315:*18*  316:*21, 25*  317:7, *13*  318:*11*  319:*4*  320:*16, 23*  321:*4*  322:8  324:*20, 25*  325:6  326:*9, 13*

327:2, *15, 18, 20, 22*  328:*16*  329:6, *9, 14, 20, 21*  331:8, *14, 15, 18, 21, 22, 24*  332:9, *10, 12, 15, 18, 23, 24*  333:*15, 25*  334:8, *14*  335:9, *14, 23*  336:*13, 19, 20, 22*  337:*1, 4, 8*  338:*13*  339:2  340:*4, 12, 19*  342:*13*  343:8, *14, 23, 25*  344:*1, 4, 5, 12, 14*  345:*15*  346:*6, 13, 17*  347:*1, 8, 16, 24*  348:*11, 14, 17, 21*  349:*3, 9*  350:*15*  351:9  353:*21*  354:*25*  355:2, *3, 5*  356:*21, 22*  357:*17, 21, 23*  358:8, *14, 23*  359:*3, 8*

**right-hand**  264:*10*  348:*10*

**rights**  188:*10, 16, 18, 20, 22, 25*  189:*1, 3, 8, 25*  190:*4, 5, 6, 9, 14*  309:*16*  310:*10*  311:*10*

**rival**  273:*2*

**riveted**  266:*19*

**road**  183:*3*

**ROBBINS**  113:*3*

**role**  259:*8*  335:*18*

**rolled**  120:*15*

**Roman**  275:*10*

**room**  241:*11*  243:*5*  313:6  320:*12*  321:*11*

**rose**  312:*18*  320:22

**roughly**  265:*11, 12*

**rounds**  177:*3*  289:*15*  291:*10*  330:*24*  332:22  333:*5*  334:*17*  341:*7*  342:*20*  358:6

**RPR**  110:*21*  361:*20*

**RUDMAN**  113:*3*

**Rules**  112:*10*  115:*17*

**rush**  360:*15*

**< S >**

**sale**  309:*14*  310:*8*  311:*9, 21*  315:*4*

**salient**  155:*1*  156:*4*  157:*15*  159:*11*  161:*10, 15, 20, 23*  162:*1, 8, 21*  163:*1, 7, 9, 10, 16, 23*  164:*3*  286:*6*

**sample**  236:*4*  239:*23*  245:*21*  246:*21*  265:*13*  274:*17*  289:*12*  290:*3*  328:22  329:22  330:22  334:*25*  336:*5*  337:*21*  342:*21*  351:*13*  354:*11*  356:*24*  359:*2*

**sampling**  342:*15*

**satisfied**  340:*1*

**save**  362:*6*

**saw**  130:*12*  199:*4*  201:9, *14*  305:*1*  316:*24*

**saying**  132:6, *19*  140:*3*  144:*12*  146:*1*  151:*23*  157:*9*  172:*23*  176:*16*  188:22  192:*12*  193:*15*  195:*16, 17*  209:*24*  210:*13*  211:*20*  213:*11, 15, 21*  214:*2, 9*  223:*3*  224:*11*  226:20  229:*12*  230:*15*  244:*7*  245:*3*  248:*14*  250:*16*  252:*3*  259:*11*  260:*24, 25*  261:2, *6*  262:*17*  263:7  282:*3, 17*  283:7, *13*  284:*17*  285:*1, 3, 4, 8*  286:*1*  287:25  288:*23, 24*  290:*12, 25*  291:*4, 10, 22*  294:*10*  295:*14*  296:8  297:*14*  298:*20, 22*  299:*8*  304:*9*  307:*17*  315:*20*  316:*7*  321:*25*  322:*4, 12, 25*  324:*6, 7*  325:*3*  326:*11, 14, 25*  327:*2, 5, 6*  338:*16*  352:*20*  353:*1*  356:*19, 23*  357:*10*

**says** 118:*12, 17*
121:*4* 124:*21* 128:*7*
149:*18* 159:*14*
162:*17* 169:*10*
182:*16* 192:*24* 193:*4,
7* 205:*21* 206:*3*
217:*6, 10* 222:*20, 24*
224:*2* 227:*23* 243:*12,
14, 22* 251:*11* 281:*17*
287:*14* 301:*12*
321:*13* 337:*21*

**scenario** 178:*8*
179:*18* 182:*3* 188:*13*
252:*11*

**scenarios** 171:*23*
**Schoemer** 113:*24*
**screen** 133:*9* 220:*22,
24, 25* 267:*5* 275:*7*
289:*6* 292:*6* 294:*14*
328:*15* 348:*8*

**scroll** 124:*17* 128:*3*
141:*6* 169:*16* 217:*18*
222:*21, 22* 233:*9*
294:*16* 305:*14* 354:*1*

**se** 174:*25* 203:*19*
**seats** 185:*24*
**SEC** 127:*11, 17, 18,
22* 328:*24* 329:*9, 12,
19* 330:*6, 8* 332:*20*
339:*25* 343:*14*

**second** 117:*5* 119:*14*
121:*7* 133:*3* 145:*9*
168:*4* 185:*13* 211:*23*
221:*2* 273:*1, 2*
285:*17* 355:*18*

**second-bid-by-initial-
bidder** 273:*4*

**section** 122:*2* 125:*10,
24* 127:*16* 131:*12*
137:*20* 164:*8, 11*
169:*23* 170:*10*
215:*17, 18* 216:*24*
219:*9, 14, 16, 18*
220:*1* 221:*20* 223:*17,
22* 224:*12, 16* 225:*4,
6, 10, 22* 226:*1, 20*
227:*3, 17, 21* 228:*2,
15* 229:*13, 21* 233:*10*
273:*10* 275:*12*
290:*23* 294:*10*

305:*22* 307:*17*
355:*21*

**sections** 227:*3* 337:*1*
**SECURITIES** 110:*4*
112:*4* 114:*6* 150:*8*
185:*6* 186:*23* 187:*1*
339:*18* 362:*2*

**see** 115:*10* 116:*4, 11*
117:*5, 7* 118:*11, 13*
119:*7* 120:*8, 11, 18,
19, 22* 121:*14, 15*
122:*12* 123:*7, 9, 21,
23* 124:*8, 18, 20*
127:*18* 128:*4, 7, 9, 10,
18* 129:*23, 24* 130:*3,
7, 10, 11* 135:*24*
142:*22, 24* 143:*1, 2, 3*
147:*3* 148:*6* 155:*5*
158:*21* 159:*14, 16, 17*
167:*7* 171:*1, 4* 183:*1*
184:*1* 189:*4* 190:*18*
192:*3, 5, 24* 193:*2, 4,
10* 205:*2, 3, 7, 19*
206:*6, 7, 15* 207:*2*
208:*9, 10* 213:*3, 21*
217:*14, 19, 20* 222:*14,
19* 226:*6* 229:*4*
230:*7, 8* 231:*13*
233:*13, 24* 239:*7*
241:*14, 22, 25* 242:*6*
243:*22, 25* 244:*5, 9,
13* 245:*2, 18* 247:*1*
248:*25* 249:*5* 255:*25*
258:*18* 260:*6* 262:*8*
263:*24, 25* 264:*10, 12*
267:*8, 14, 15* 269:*10,
12, 20* 271:*9, 10, 12,
17* 272:*22* 273:*10, 25*
274:*18* 275:*10*
277:*13, 18* 278:*23, 24*
286:*22, 23* 287:*11, 18,
19* 288:*3, 7, 8, 19*
289:*16, 17, 22, 23*
292:*1, 15* 300:*12*
305:*17, 20* 308:*9*
309:*6* 310:*3, 4* 314:*5*
321:*11* 324:*16*
328:*25* 330:*17* 336:*1*
337:*21* 338:*19*
342:*24* 343:*20*

344:*10* 347:*10, 11*
348:*8, 9* 349:*18*
352:*6, 9, 10* 354:*13*
357:*10* 359:*13*

**seeing** 122:*23* 310:*1*
318:*3* 352:*4*

**seen** 122:*1* 146:*23*
147:*1, 8, 11* 148:*9*
163:*12* 204:*15, 19, 21*
258:*4* 276:*19* 281:*8,
9* 282:*15, 18, 20*
304:*20* 336:*15*

**sees** 337:*9* 351:*13*
**select** 225:*18*
**selection** 222:*10*
227:*9* 334:*24* 349:*10*

**sense** 139:*15* 157:*3*
169:*5* 181:*8* 190:*8*
197:*22* 214:*9* 236:*6*
237:*19, 24* 256:*4*
258:*25* 283:*17* 285:*8*
286:*9* 330:*12*

**sent** 197:*5* 213:*18*
325:*20*

**sentence** 119:*14*
149:*18, 20* 171:*11*
217:*7* 243:*20* 246:*14*
260:*3* 263:*8* 267:*8,
11* 268:*8, 13, 16*
269:*10, 14* 272:*16*
277:*11* 283:*22*

**sentencing** 135:*10*
136:*1*

**sentiment** 200:*25*
**separation** 359:*12*
**September** 135:*10*
136:*3* 204:*24* 205:*10*

**serious** 178:*24* 179:*3,
13* 180:*19, 24*

**Servaes** 348:*19*
**set** 127:*17* 137:*5*
161:*9* 187:*14* 236:*8*
237:*25* 240:*7* 275:*3,
14* 314:*7* 320:*9*
323:*2* 330:*3* 336:*22*
337:*21* 338:*12* 339:*1*
340:*4* 352:*8, 10*
355:*24* 357:*17*

**share** 117:*1* 119:*1, 4,
11, 17* 120:*5* 121:*1, 5,*

21* 122:*20* 123:*13, 17,
18* 124:*2, 13, 23*
128:*13* 129:*3, 11, 12*
131:*22* 132:*16, 19*
159:*15, 23* 160:*5*
170:*25* 171:*9* 172:*17*
200:*1* 217:*9, 11, 25*
218:*7* 222:*25* 223:*5*
226:*12* 316:*16*
339:*14*

**shareholder** 188:*7, 10,
16, 18, 20, 22, 25*
189:*1, 3, 8, 24* 190:*4,
9, 14* 289:*21* 309:*16*
310:*10* 311:*10*

**shareholders** 116:*1*
149:*1* 155:*5* 163:*5*
177:*9, 11* 179:*20*
180:*2, 4, 12, 13* 181:*1,
2* 186:*14, 17, 25*
189:*24, 25* 190:*11*
214:*20* 235:*1* 259:*19*
312:*21* 347:*21*
350:*21* 353:*20*

**shares** 119:*11, 16*
121:*1, 9, 21* 122:*24*
175:*18, 21* 176:*11, 14,
17, 18, 19* 177:*6, 14*
179:*17* 180:*11*
181:*11* 184:*7, 17, 23*
185:*1, 4* 186:*18*
187:*1* 190:*1* 200:*21*
325:*23*

**SHEET** 362:*1, 8*
363:*1* 364:*1*

**short** 173:*13* 266:*17*
347:*20* 353:*19*

**SHORTHAND**
113:*19, 20*

**shortly** 170:*13*
**show** 227:*23* 243:*23*
**showed** 290:*19*
**showing** 194:*4*
220:*24* 290:*23* 321:*7*
332:*4*

**shown** 165:*16*
167:*14, 18* 179:*15*
353:*8, 9, 10*

shows 131:*12* 201:*23* 227:*23* 312:*3* 316:*6, 8*

sic 320:*20*

side 197:*12* 220:*23, 25* 229:*25* 263:*24* 271:*9* 280:*23* 348:*8, 10*

sign 360:*6*

signal 185:*1* 251:*16* 253:*19* 257:*7* 311:*11*

signaled 321:*3*

signals 213:*18* 257:*2* 325:*20*

SIGNATURE:_____ _____DA

TE 363:*23* 364:*23*

signed 328:*24* 329:*8, 13, 18, 23* 330:*2, 5, 7, 13* 339:*17* 362:*9*

significance 213:*13* 214:*4*

significant 129:*11* 179:*16* 239:*9* 241:*22* 242:*2* 244:*10, 24* 245:*5* 246:*17, 21* 247:*1* 248:*25* 256:*10, 25* 267:*13, 20* 308:*18, 25* 309:*7* 312:*4, 9, 18* 313:*16* 314:*15* 316:*24, 25* 320:*22*

significantly 287:*17*

similar 163:*22* 164:*2* 197:*11* 231:*15* 235:*11* 274:*13* 320:*6*

similarity 353:*10*

similarly 231:*11*

simple 254:*10* 265:*7*

simply 167:*23* 174:*12* 182:*15, 23* 190:*4, 16* 196:*6* 229:*21* 248:*14* 262:*17, 25* 272:*14* 285:*1* 299:*17* 316:*4*

simultaneously 295:*3* 336:*4*

single-bid 273:*1*

sir 133:*4* 167:*7* 170:*17* 182:*13*

235:*24*

Sitting 168:*24* 240:*11*

situation 149:*13* 172:*13* 212:*13* 235:*3* 236:*5* 262:*18* 290:*5* 291:*12* 294:*22* 296:*8, 10, 13* 297:*5* 299:*4, 19* 332:*1* 351:*3*

situations 204:*2* 273:*14* 283:*13* 295:*24* 297:*10* 298:*16* 336:*12* 349:*14* 351:*7* 353:*8*

situation-specific 213:*20*

six 205:*16* 206:*10* 263:*23* 280:*24* 281:*4*

size 118:*7* 272:*19* 274:*13* 339:*10* 354:*22*

sizes 271:*9*

skip 123:*4*

slide 192:*1* 201:*21, 23*

slightly 222:*21, 22* 305:*15*

small 327:*9* 359:*1, 4*

so-called 189:*24*

soft 212:*16* 241:*9, 10* 243:*3* 291:*6* 322:*18*

software 221:*8*

somebody 234:*7*

song 293:*4, 12*

sorry 117:*7* 120:*16* 123:*17* 128:*1* 144:*20* 147:*20* 148:*12* 151:*4* 156:*24* 158:*8* 169:*13* 170:*1* 174:*2* 185:*14, 18* 187:*17* 191:*22* 196:*12, 25* 197:*3* 200:*8* 216:*15, 22* 219:*13* 223:*20* 233:*8* 247:*11, 25* 264:*14* 271:*7* 273:*17* 274:*3* 278:*2* 307:*23* 316:*25* 319:*21* 345:*5* 359:*2*

sort 149:*12* 153:*23* 158:*3* 182:*1* 183:*25* 213:*6* 225:*16* 241:*10* 243:*1, 13* 244:*22*

252:*8* 259:*12* 265:*6* 270:*15* 272:*25* 320:*6* 321:*22* 342:*9, 12* 352:*21*

sound 271:*21*

sounds 134:*3, 5* 231:*23*

SOUTHERN 110:*1* 112:*1* 114:*8*

speak 184:*22* 189:*5* 222:*14* 223:*11* 227:*8* 345:*4*

speaking 174:*18* 259:*1* 265:*11, 12*

speaks 152:*9* 156:*20* 222:*8*

specific 132:*5* 137:*16* 141:*22* 143:*12* 150:*5* 154:*2* 159:*22, 25* 214:*24* 224:*4, 15* 225:*14* 231:*12* 234:*2* 276:*9* 296:*1, 4* 311:*4* 312:*1* 315:*14, 20* 316:*20* 317:*21* 319:*1, 8* 336:*14* 340:*9* 343:*4*

specifically 139:*16* 145:*22* 148:*22* 150:*21* 223:*3* 229:*5* 240:*21* 247:*15* 287:*14, 15* 293:*11* 298:*2* 308:*8* 309:*11* 342:*23* 343:*9*

spectrum 174:*10* 201:*23*

speculate 198:*7* 358:*1*

speculating 133:*24* 193:*18* 206:*16*

speculation 146:*9* 161:*1* 198:*13* 203:*18* 206:*14* 207:*1, 8, 9* 208:*6, 15* 252:*16* 312:*23* 357:*25*

speculative 170:*25* 172:*18, 19* 173:*11* 219:*21*

spend 133:*19*

split 133:*22* 220:*22*

spread 247:*17*

spreads 227:*6* 299:*2*

St 112:*13* 113:*15* 114:*12*

stages 289:*11*

stand 318:*16*

standalone 228:*7*

stand-alone 322:*22*

Standard 114:*3* 167:*22* 168:*16* 264:*11* 265:*3, 6, 14, 17, 22* 266:*1*

standing 257:*20*

standpoint 214:*11* 291:*9*

start 128:*5* 201:*11* 210:*17* 234:*20* 236:*5* 262:*2* 312:*13* 319:*21* 331:*23*

starting 282:*18* 291:*8* 292:*23* 329:*22* 330:*23* 333:*16* 334:*25*

starts 123:*21* 130:*20, 24* 131:*3* 337:*10*

State 112:*14, 16* 219:*19* 361:*6*

stated 128:*17* 154:*20* 195:*24* 207:*14* 290:*14*

Statement 111:*7* 115:*25* 116:*23* 118:*24* 126:*5* 139:*15* 153:*24* 156:*23* 173:*6* 195:*10* 246:*23* 259:*13* 267:*21* 268:*23* 269:*23, 24* 270:*16* 272:*14* 285:*17* 322:*7* 329:*12* 331:*20*

statements 258:*15* 259:*16* 276:*23* 304:*14*

STATES 110:*1* 112:*1* 114:*7* 121:*8* 123:*11, 25* 135:*18* 195:*5* 267:*11*

stating 123:*16* 288:*5*

statistical 266:*11*

**statistically** 242:*3* 308:*18, 25* 309:*7* 312:*4, 9, 18* 313:*16* 314:*15* 316:*24, 25* 320:*22*

**stay** 247:*9, 12*

**stays** 248:*19*

**stem** 227:*12*

**stenographic** 114:*18, 20*

**step** 166:*17* 254:*9*

**steps** 188:*3* 201:*24* 202:*4, 19*

**STIPULATED** 112:*6*

**stock** 122:*19* 150:*9* 160:*4, 24* 177:*15* 217:*8* 239:*9* 241:*22* 242:*1, 6, 13, 18, 21* 243:*9* 244:*10* 245:*6* 248:*6, 8, 9, 10, 12, 15, 17, 25* 252:*10* 254:*22* 255:*10* 256:*2, 10* 260:*9, 11* 261:*13* 294:*21* 295:*10* 308:*19, 25* 309:*7* 312:*3, 8, 17* 313:*15* 314:*14* 315:*5, 9* 316:*6, 23* 318:*4, 8* 320:*22* 322:*22, 24* 326:*16* 335:*18* 336:*7* 342:*24* 353:*7, 9*

**stocks** 260:*11*

**stop** 182:*4, 6* 194:*1* 320:*18* 327:*14, 16*

**stopped** 320:*15*

**stopping** 184:*10*

**straight** 301:*9*

**strategic** 152:*14* 154:*20* 199:*22* 258:*5* 259:*2, 5, 7* 292:*13* 309:*13* 310:*6* 311:*9, 21* 315:*4* 323:*25*

**strong** 325:*2*

**structure** 178:*19*

**studied** 269:*25* 354:*20*

**studies** 239:*23* 272:*5* 281:*25* 282:*1, 7* 292:*10* 295:*14* 296:*12, 21* 297:*7, 8,*

22 298:*13, 20, 23* 299:*4, 17* 318:*14, 24* 319:*17, 24* 332:*2* 343:*23, 25* 344:*3, 6, 16, 22* 346:*3, 5, 22* 347:*16, 19, 24* 348:*11* 349:*2, 7, 13, 22* 350:*18, 20* 351:*4, 8, 17, 19, 21* 352:*8, 18* 353:*16*

**study** 111:*13, 14, 15* 236:*20* 237:*24* 239:*22* 244:*7* 245:*21* 247:*25* 248:*3, 20* 254:*11* 255:*11* 256:*18* 260:*8* 261:*25* 262:*17* 263:*1, 13, 17, 18* 264:*22, 25* 265:*9, 15* 266:*3* 270:*19* 272:*2, 11, 18, 22* 281:*22* 282:*9* 291:*7* 292:*22, 23* 293:*1* 295:*10* 296:*3, 15, 18, 25* 297:*1, 17, 18, 24* 298:*2* 299:*10* 305:*18, 23* 307:*14, 16, 19, 20, 24* 308:*1, 3, 13, 16, 23* 315:*8, 16* 317:*16, 18* 318:*6* 329:*20, 22* 330:*4* 331:*7* 332:*5, 18* 333:*11, 24* 334:*1, 12, 16, 22, 23* 335:*7, 14, 22* 336:*11, 18* 337:*14* 338:*13* 339:*23* 340:*8, 11, 22* 341:*1, 13, 15, 18* 342:*4, 9, 17* 343:*5, 6, 7, 19, 23* 346:*25* 347:*18* 348:*24* 350:*1, 3* 353:*2* 354:*7* 357:*16* 358:*3, 11, 13, 21* 359:*6, 7*

**studying** 268:*24* 297:*10* 330:*23*

**stuff** 223:*2* 249:*9, 10* 258:*20*

**subject** 190:*23* 275:*3* 305:*12* 328:*6*

**subjective** 253:*11* 259:*8*

**submitted** 123:*11, 16, 25* 124:*11, 22* 153:*13*

**subsequent** 187:*13, 16* 213:*6* 245:*23* 254:*8* 263:*7* 269:*14* 271:*4* 299:*24* 328:*1* 351:*24*

**subsequently** 243:*7* 244:*8* 349:*17*

**subset** 269:*25* 275:*1* 352:*8* 353:*5*

**substance** 168:*22*

**substantial** 276:*11*

**substantively** 168:*25*

**succeed** 194:*17* 325:*22*

**succeeding** 202:*25* 203:*15*

**success** 187:*18* 203:*8* 272:*23* 294:*20* 295:*10*

**successful** 179:*16* 183:*2* 228:*6* 233:*14, 16, 23* 234:*3, 15* 235:*15, 20* 330:*10, 14, 20, 24* 331:*1, 7, 13, 17, 24* 332:*14, 19, 22* 333:*5, 17, 19, 25* 334:*2, 8, 14* 335:*2* 340:*15* 341:*2, 6, 15, 23* 342:*19, 21* 343:*12* 344:*18* 349:*20* 352:*11* 354:*11, 16* 355:*4, 25* 356:*24* 357:*9, 14, 20* 358:*7* 359:*8*

**successfully** 182:*19* 188:*11* 189:*16*

**sufficiently** 296:*23* 297:*10*

**suggest** 251:*14* 261:*17* 265:*15* 322:*3* 323:*10* 324:*17* 325:*1*

**suggested** 192:*20*

**suggesting** 358:*4*

**suggests** 323:*21* 332:*2*

**Suite** 112:*13* 113:*7, 14* 114:*11*

**sum** 143:*19*

**summaries** 164:*11* 169:*18*

**summarizes** 243:*14*

**summarizing** 171:*6* 347:*14*

**Summary** 164:*9, 16, 19* 165:*1, 6* 169:*11* 347:*23*

**super** 221:*5*

**superior** 244:*4*

**support** 170:*9* 218:*15* 219:*25* 222:*7* 224:*4, 6, 13* 259:*15* 268:*16* 280:*1* 292:*11* 301:*17* 312:*19* 313:*18* 315:*10*

**supporting** 252:*24* 258:*14* 315:*13*

**supports** 223:*5* 288:*18* 315:*16*

**Supreme** 112:*10*

**sure** 125:*13* 127:*2* 133:*21, 24* 144:*10* 149:*16* 151:*3* 152:*3* 165:*2* 173:*15* 175:*5* 176:*7* 179:*25* 183:*14* 186:*9* 194:*15* 197:*25* 202:*17* 203:*10* 204:*19, 20, 22* 207:*11, 13* 232:*21* 236:*18* 240:*12* 246:*4* 266:*20* 269:*22* 272:*6* 273:*18* 282:*7* 291:*10* 298:*3* 301:*20* 302:*7* 303:*17* 309:*18, 22* 311:*19* 313:*12* 315:*19* 316:*3* 317:*8* 331:*6* 336:*23* 339:*23* 342:*14* 347:*1*

**surprise** 313:*10*

**surprised** 313:*24*

**swear** 114:*23*

**switch** 255:*5*

**sworn** 114:*24* 115:*2* 361:*8*

**< T >**

**tab** 115:*22* 132:*24* 190:*23, 24* 204:*9* 216:*5* 232:*1* 270:*19* 337:*14* 347:*2*

Deposition of David J. Denis, Ph.D., Vol. II                    In Re National Instruments Corporation Securities Litigation

**table** 183:*6* 258:*7* 263:22 271:*1, 2, 3* 272:25 347:*15*

**tables** 254:*12*

**take** 117:*19* 118:*4* 152:25 173:*6, 13* 188:*4* 193:22 194:*8* 201:25 202:5, *20* 210:*14, 20* 214:*17* 215:*10* 238:17 240:*13* 249:22 261:*18* 266:20 269:*1* 276:8 289:*5* 310:*15* 322:*19, 24* 328:*3, 5* 336:24 342:20 346:24 360:*14*

**TAKEN** 110:*10* 112:8, *11* 155:2 173:*18* 197:*18, 24* 199:*18* 201:*12* 212:*4* 215:*13* 266:23 283:*16* 319:*13* 328:9 359:*21* 361:9, *13* 362:5

**takeover** 186:*10* 321:9

**takes** 162:*15* 182:*1* 194:6 248:*4*

**talk** 290:*3* 292:25

**talked** 237:*17* 241:*6* 267:*18, 24* 291:*5* 322:16 332:15 345:*19* 349:24

**talking** 128:*11* 131:*3* 133:2 134:7, *19* 140:*19* 161:*12* 172:2 179:6, *11, 19* 182:*14* 192:*11* 193:25 196:*9, 16, 18* 197:7, *13, 14* 200:2 228:*17* 243:*1* 249:*11* 251:*12* 253:22 258:*3* 264:22 274:*21* 285:22 291:7 305:2 312:24 326:7 334:*10* 343:*19* 347:*16* 349:*11* 350:*1* 356:*13* 357:5 358:*18*

**talks** 223:*4* 290:*20*

**target** 177:*14* 179:7, *11, 14* 180:2, *3, 4, 20*

181:*11, 13, 22* 182:*1, 15, 19, 22* 183:*4, 10, 18, 19, 23* 184:*18* 185:*10, 24* 186:6 187:7, *20, 21* 188:*1, 3, 5, 9* 189:*16* 194:2, *5* 198:*11* 199:*15* 200:24 201:25 202:20 203:*12, 22* 204:2 207:7 212:2 213:*18* 214:23 231:20 234:22 235:*1* 243:8 244:*3, 9, 10* 245:6 251:*18* 252:8, *12* 254:*14* 255:9, *24* 256:5, *8* 270:2 295:2, *4, 10* 316:*16* 321:7, *10* 325:21 339:6 347:*11, 21* 350:21 351:24 353:20

**targets** 203:7 243:*14, 22* 244:23 246:*16, 20* 289:*19* 358:22

**target's** 179:*17* 187:*11* 194:*21* 195:2 199:*13* 213:*12* 214:*3, 14* 251:*16*

**teaching** 134:*25* 135:*3*

**team** 136:6 308:6 359:*17*

**technical** 174:*11*

**technically** 273:5

**Technician** 113:*24* 117:*24* 169:*13* 221:2, *8, 13*

**techs** 221:5

**tell** 115:2 132:*10, 14* 209:9 210:6, *10* 211:*1* 212:9 227:8 239:*21* 240:5 271:20 281:*10* 318:20 319:2, *17, 24* 341:*13* 343:*15*

**telling** 147:22 208:*17* 249:9 304:25 305:3 323:24 333:9 350:5

**tells** 209:22 210:22 211:*14* 314:*16* 317:*18* 324:8

**tend** 254:22 255:9, *25* 256:25

**tender** 174:*12* 177:*10, 13* 202:14 348:*17, 21*

**tends** 174:*15* 242:*18* 247:20 248:*16*

**term** 157:*20* 170:7 172:20 173:*23* 174:5, *11, 16* 284:2, 7 285:*19* 293:*12* 332:7

**terminate** 193:*5* 195:5

**terms** 157:*21, 25* 158:*4, 10, 14, 17, 22, 24* 159:*1* 162:5, *11* 165:2 242:25 246:5 254:*10* 263:*11* 265:7 266:14 289:20 309:*12* 326:6 356:*13*

**testified** 115:*3* 135:9, *23* 157:*11* 163:6 168:*15* 207:*10* 210:2 274:*16* 276:*17, 19* 304:23 314:*21*

**testify** 135:*12* 136:*17, 21*

**testifying** 161:8 210:*21* 285:*21*

**testimony** 135:20 137:*14, 15, 16, 18* 140:*21, 23* 143:*23* 152:8 156:*15* 188:*1* 209:20 212:20 229:17 283:*12* 288:20 318:24 321:*15, 20* 361:7, 8

**text** 346:*25*

**Thank** 115:6 175:6 191:*21* 216:22 222:22 230:*1* 261:*16* 266:10 267:*3* 338:9 348:5 353:25 359:24 360:*1, 3, 5*

**Thanksgiving** 360:*4*

**theoretical** 289:9

**theory** 202:*17, 22* 336:23

**thereto** 361:*15*

**thing** 127:*2* 134:*17* 166:*18* 194:*3* 305:*3*

**things** 134:*24* 135:5, *25* 139:22 150:24 154:24 155:2 167:*3* 170:*19, 22* 182:*14* 183:*17* 198:*3* 203:7, *12* 204:5 210:*20* 222:*17* 223:1 226:*10* 228:*16* 245:*14* 254:*18* 258:22, *24* 282:*3* 293:*10* 324:2 335:24 344:8 345:24

**think** 117:*18, 22* 130:25 132:*14* 140:7 146:*11* 152:9 156:*16* 158:6, *11, 16, 24* 160:9 161:*13* 163:25 164:22, *24* 165:20, *25* 166:7, *17* 167:*21* 168:*15, 19, 21* 169:5 172:8, *19* 173:2 185:8 186:*13* 187:4, *9* 189:*17* 197:*21* 198:*20* 199:8 201:*3* 202:2 203:*3* 207:*10* 209:6 210:*3* 211:*19* 214:8 215:2 216:*12, 14* 218:9 225:*14* 229:18 235:5, *23* 236:2 237:9 240:*20* 241:6 243:*13* 245:*15* 246:*15* 255:*16* 257:16 258:4, *16* 259:4 262:7, *15* 266:5, *16* 267:*18, 19* 268:*20* 270:*14* 271:*1, 3, 22* 273:5, *20* 274:*16* 276:*17, 19* 277:4 278:2, *17* 280:25 286:*1* 291:5 292:*21* 293:*12, 16, 17, 24, 25* 294:8 300:*3* 302:4, *16* 304:*13* 305:3, *8* 307:4, *6, 22* 309:*20* 310:*19* 311:7, *15, 24* 312:*11* 313:*1, 22* 314:*21* 316:*12* 318:7 319:6 320:*17* 321:6 322:*12, 16*

323:*10*, *21*  325:*7*
326:*14*  327:*25*  328:*5*
332:*15*  334:*9*  335:*24*
343:*11*  345:2, *3*, *24*
349:24  354:*24*
355:*13*
**thinking**  203:2*0*
207:*24*, *25*  208:*2*
227:*15*  282:*7*  298:*6*
**third**  121:*25*  130:*4*,
*5*  347:*7*
**thoroughly**  302:*9*
**thought**  166:*21*
167:*2*  230:*19*  282:*2*
345:*6*
**three**  122:*9*  157:*21*
184:*15*  192:*25*
201:*17*  205:*19*
263:*23*  281:*1*  294:*23*
295:*1*, *11*, *15*, *16*
296:*1*, *3*, *9*, *19*  297:*2*,
*8*, *11*, *16*  298:*1*, *14*, *15*,
*16*, *19*  299:*5*, *12*, *20*
**tie**  132:*4*
**tied**  169:*2*  284:2*0*
345:2*0*, *24*
**time**  114:*2*, *3*  123:*13*
124:*1*, *12*, *23*  131:*9*
133:*19*, *23*  135:*22*
136:*25*  163:*20*  183:*2*
184:*25*  190:*20*  195:*2*
196:*4*, *9*, *16*, *22*  197:*7*,
*15*, *17*  199:*17*, *19*, *21*
200:*4*, *12*  201:*10*
211:*6*  221:*16*  232:*14*
236:*9*  240:*5*, *18*
260:*22*  261:*4*  264:*5*,
*6*, *21*  266:*20*  271:*22*
315:*3*  318:*3*  320:*11*
334:*4*  336:*24*  338:*18*
339:*2*  340:*4*  341:*9*
342:*9*, *12*, *14*, *18*
343:*6*  346:*11*  354:*25*
356:*14*  357:*8*  359:*25*
360:*1*, *8*
**timeline**  197:*3*  226:*9*
239:*19*  275:*25*  276:*5*
301:*24*
**Timelines**  216:*18*

**times**  159:*7*  160:2*0*
167:*9*  177:*23*  203:*4*
207:*11*  293:*17*
332:*16*  349:*25*
**title**  191:*12*  232:*6*
**TN**  113:2*0*
**today**  148:*10*  168:*24*
331:*21*  338:*25*
339:*24*  349:*25*
359:*25*  360:*2*
**Today's**  114:*2*
**toehold**  269:*9*, *11*, *18*,
*19*, *25*  270:*6*, *7*, *13*
271:*9*, *13*, *15*, *18*, *19*
272:*1*, *10*  274:*24*
**toeholds**  269:*16*
270:*8*, *12*  272:*6*, *8*, *15*,
*19*  273:*11*, *15*  274:*5*,
*9*, *13*, *17*  299:*2*
**toggle**  259:*24*
**told**  141:*1*  152:*13*
160:2*1*  314:*5*  324:*15*
325:*25*
**tomorrow**  360:*11*, *12*
**tone**  187:*14*
**tools**  183:*9*, *14*
**top**  120:*8*  122:*8*
123:*7*, *20*  140:*10*
146:*2*  160:*16*  170:*14*,
*16*  244:*21*
**topic**  277:*10*  307:*2*
**total**  130:*1*  143:*19*
199:*7*  273:*11*, *25*
**totality**  211:*6*  212:*4*
213:*8*  318:*4*
**totally**  182:*4*  324:*21*
327:*3*  351:*14*, *15*
**touch**  220:*18*
**track**  266:*20*
**traded**  217:*8*  339:*6*
**trades**  248:*12*
**trading**  160:*24*
251:*13*
**transaction**  126:*10*
131:*19*, *21*, *25*  132:*11*
153:*7*  154:*20*  155:*4*
175:*16*, *17*  182:*10*
201:*1*  213:*12*  226:*9*
233:*22*  238:*18*, *19*, *25*
248:*19*  254:*19*

316:*14*  321:*14*
326:*16*  329:*16*, *17*
347:*20*  353:*19*
**transactions**  174:*10*,
*20*, *25*  175:*1*  289:*14*
299:*1*  311:*12*  316:*15*
323:*7*  332:*6*, *14*
338:*17*  344:*17*
**transcript**  362:*5*
**transcripts**  138:*1*, *4*,
*7*, *11*, *12*, *15*, *17*  141:*2*,
*4*
**transformative**
177:*18*, *22*, *24*  178:*2*,
*9*, *11*, *16*, *18*  267:*12*,
*19*
**translate**  220:*15*
**true**  140:*14*  146:*19*
198:*9*, *18*  202:*7*
210:*8*  233:*20*  254:*4*
256:*16*  278:*2*  293:*9*
294:*1*  310:*8*  327:*6*
329:*19*  330:*8*, *9*
339:*8*, *12*, *15*, *16*, *20*,
*21*, *23*  351:*12*, *20*
362:*6*
**truth**  115:*2*, *3*
**try**  183:*21*  185:*9*, *23*
221:*3*  225:*14*  238:*15*
239:*25*  268:*23*
**trying**  165:*1*  172:*25*
188:*24*  229:*21*
234:*18*  236:*4*  239:*3*
254:*1*  258:*22*  293:*6*
316:*4*  345:*8*, *10*, *11*,
*14*  356:*17*  357:*6*
**turn**  117:*11*  132:*21*,
*22*  155:*11*  164:*6*
169:*10*, *20*  170:*12*
215:*17*  216:*9*  229:*24*
236:*8*  238:*8*  245:*12*
250:*11*  275:*3*  287:*9*,
*10*  325:*14*
**turned**  348:*7*
**turning**  238:*5*
**twice**  214:*18*  287:*6*
342:*23*
**two**  126:*14*, *17*  128:*1*
131:*7*  132:*7*  137:*1*
142:*13*  146:*22*

148:*15*  151:*13*, *22*
153:*1*, *24*  157:*17*
187:*12*  192:*22*, *25*
199:*15*  205:*19*  229:*9*
232:*15*  238:*10*
254:*12*  263:*23*  273:*8*
275:*8*  276:*20*  280:*21*
285:*13*  290:*13*
291:*12*, *24*  293:*25*
295:*5*  303:*6*, *20*
313:*6*  314:*4*  317:*3*
330:*2*  332:*1*  333:*8*
334:*4*  335:*24*  339:*10*
344:*18*  351:*1*  356:*11*
357:*9*
**tying**  344:*12*, *15*
**type**  175:*16*  192:*14*
208:*3*  301:*11*
**types**  174:*13*  241:*5*
316:*17*  325:*19*
334:*19*, *21*  337:*7*
344:*7*, *17*  347:*19*
353:*17*, *18*  358:*25*
**typewriting**  361:*10*
**typical**  247:*17*  336:*5*
341:*7*  351:*11*
**typically**  241:*18*, *21*,
*25*  289:*14*

< U >
**Uh-huh**  197:*9*
204:*18*  264:*17*  274:*1*
355:*20*
**ultimate**  129:*3*, *10*
132:*5*, *11*  148:*14*
331:*3*  333:*14*
**ultimately**  125:*3*
131:*18*, *21*  157:*18*
175:*18*  176:*16*  177:*1*
182:*11*  183:*2*  184:*15*
187:*11*  189:*11*
194:*20*  195:*14*
202:*25*  203:*15*
233:*19*  234:*3*, *17*
238:*2*  251:*3*  258:*11*
268:*24*  284:*12*  318:*4*
325:*22*  329:*2*, *7*
330:*9*  333:*5*  334:*25*
339:*21*  344:*18*
346:*10*  349:*6*, *16*, *20*

350:*10, 22*   355:*15*
359:*7*
**unable**   318:*8*
**unanimously**   286:*19*
291:*18*   320:*12*   352:*5*
**Unanswered**   235:*25*
**unavailable**   255:*1, 13*
**unclear**   158:*20*
178:*11*
**uncommon**   258:*9*
**unconditionally**
324:*19*
**underlying**   303:*19*
**understand**   126:*7*
132:*25*   154:*10*   155:*9*
167:*8*   176:*16*   190:*12*
193:*12*   206:*20*   210:*8*
213:*21*   224:*10*
226:*19*   235:*5*   238:*7,*
*8, 15*   239:*1, 3*   242:*10*
316:*5*   323:*17*   344:*20*
**understanding**   141:*9,*
*10*   146:*12*   147:*5*
149:*3*   154:*13*   239:*3,*
*4, 13*   285:*11*   286:*4*
362:*8*
**understood**   125:*13*
137:*2*   138:*18*   141:*5*
143:*15*   151:*3*   162:*23*
166:*10*   167:*16*
171:*13*   172:*1, 24*
179:*25*   195:*3, 15*
239:*1, 12*   242:*4*
251:*9*   259:*21*   261:*9,*
*15*   266:*10*   278:*12*
308:*11*   322:*6*   323:*6*
**undertaken**   199:*21*
**undertaking**   252:*8*
315:*3*
**undervalued**   287:*17*
**undisclosed**   319:*18,*
*25*
**unfold**   289:*10*
**unimportant**   162:*18*
**unique**   351:*18*
**UNITED**   110:*1*
112:*1*   114:*7*   135:*18*
**unknown**   194:*25*
**unquote**   285:*6*

**unrepresentativeness**
290:*5*
**unsolicited**   146:*23*
151:*13*   153:*24*
**unsuccessful**   228:*7*
236:*9*   238:*3*   358:*9*
**upfront**   335:*4*
**use**   157:*22*   158:*22,*
*24*   163:*16, 22*   164:*2,*
*16*   166:*5*   168:*21*
174:*10*   186:*11*
189:*19*   237:*18*
261:*22*   266:*7*   293:*12*
306:*6*   332:*7*
**useful**   341:*1*
**uses**   158:*17, 18*
217:*24*   262:*19*
301:*17*
**Usually**   337:*5*

**< V >**
**Valuation**   231:*20*
234:*25*   286:*16*
**value**   179:*17*   251:*3*
252:*9, 10*   253:*3, 25*
254:*4, 8*   257:*7*   258:*6*
259:*5, 19*   289:*21*
320:*7*   322:*22*   324:*11*
**value-relevant**   319:*19*
320:*1*
**variability**   265:*12*
266:*6, 7*
**various**   170:*19*
292:*10*   332:*16*
**vary**   265:*9*
**verify**   134:*4*
**versus**   135:*18*
178:*21*   254:*6, 14*
291:*6*   318:*10*   346:*18*
**VI**   215:*17*
**video**   114:*4*
**Videographer**   113:*23*
114:*1, 22*   173:*16, 19*
215:*11, 14*   266:*21, 24*
328:*7, 10*   359:*19, 22*
360:*7*
**VIDEOTAPED**   110:*9*
**view**   136:*13*   163:*8*
165:*16*   166:*2*   192:*18*
209:*8*   210:*5*   219:*12*

224:*12*   236:*24*
249:*15*   251:*22*
253:*18*   258:*9*   272:*24*
275:*15*   286:*24*
288:*17*   292:*11*   296:*2*
313:*25*   327:*11*
356:*15*
**viewed**   188:*8*   209:*24*
212:*18*   321:*22*
323:*12*   326:*5*
**viewing**   283:*18*
**views**   203:*22*   257:*7*
**virtually**   188:*10*
**VOLUME**   110:*12*

**< W >**
**Wachtell**   191:*6*
192:*21*   205:*5*   212:*15*
**wait**   199:*25*   254:*12*
275:*7*   294:*14*
**Walkling**   269:*17*
270:*1*
**want**   114:*16*   133:*24*
137:*9*   155:*9*   157:*16*
182:*16*   192:*12*
196:*15*   203:*25*   210:*8*
230:*1, 5*   238:*6*   269:*7*
294:*14*   328:*19*   338:*8*
340:*14*
**wanted**   170:*13*
323:*24*
**wanting**   207:*25*
316:*20*
**wants**   187:*22*   188:*2*
**way**   114:*21*   123:*7*
146:*3, 11*   151:*14*
158:*14*   160:*8, 11*
161:*5, 6*   174:*1, 3*
177:*13, 23*   202:*9, 15*
211:*19*   228:*25*
235:*12*   239:*25*
240:*10*   247:*19*   255:*3*
292:*22*   300:*10, 24*
307:*22*   312:*9*   313:*2,*
*22*   314:*15*   319:*12*
336:*5*
**ways**   176:*10*   177:*5*
182:*22*   187:*4*   208:*2*
266:*11*   332:*16*   343:*9*

**wealth**   250:*4*
**week**   360:*13*
**weeks**   205:*16*   206:*10*
**weighted**   228:*6*   229:*9*
**Welcome**   267:*2*
**Well**   116:*22*   118:*6*
125:*15*   127:*2, 20, 23*
131:*15*   132:*10*
133:*25*   136:*11, 19, 21*
137:*17*   138:*20*   142:*1*
143:*8*   147:*12, 22*
151:*19*   160:*13*
166:*14, 25*   171:*20*
173:*6*   178:*14*   179:*10*
180:*23*   181:*1*   182:*3*
183:*17*   186:*9*   188:*7*
192:*20*   196:*12, 18*
201:*3*   204:*16*   208:*23*
210:*2, 19*   216:*1*
222:*2*   223:*22*   224:*2*
225:*8*   226:*7*   228:*2*
232:*14*   233:*20*   234:*1*
239:*21*   245:*12*   246:*3*
247:*11, 14, 17*   248:*24*
252:*11*   262:*19, 21*
263:*7, 9*   266:*13*
267:*23*   270:*14*
273:*19*   278:*2*   279:*12*
280:*8*   282:*2, 4*   284:*5,*
*6*   285:*17*   286:*12*
290:*18*   291:*10*
292:*20*   296:*5*   302:*5,*
*13*   317:*9, 20*   320:*2*
325:*8*   326:*15*   333:*9*
335:*24*   336:*17*
339:*12, 15, 23*   342:*15*
344:*16*   345:*24*
346:*15*   348:*21*   350:*1,*
*5, 13*   351:*6*   355:*18*
358:*3*
**well-documented**
289:*10*
**went**   125:*22*   128:*21*
220:*8*
**we're**   122:*22*   126:*5*
127:*10, 20*   128:*11*
131:*2*   133:*2*   134:*6*
145:*23*   165:*2*   172:*14*
179:*10*   185:*18*
190:*23*   196:*9, 16, 18*

Deposition of David J. Denis, Ph.D., Vol. II                    In Re National Instruments Corporation Securities Litigation

197:*7, 13*  219:*10, 16*
234:*18*  235:*7*  236:*4*
249:*11*  264:*21*  273:*3,
9*  274:*21*  289:*6*
311:*20*  312:*24*
313:*10*  315:*3*  328:*7*
333:*1*  341:*5*  343:*19*
349:*10*  350:*1, 24*
352:*4*  357:*4, 6*  360:*8*
**we've**  122:*1*  125:*8*
126:*1*  129:*18*  132:*1*
148:*9, 13*  160:*19*
187:*5*  192:*11*  193:*25*
198:*20*  236:*2*  316:*1*
328:*4*  332:*15*  334:*9,
18*  349:*24*  358:*18*
**wide**  197:*22*
**widely**  266:*4*
**widespread**  265:*23*
**willing**  131:*24*  132:*4*
281:*6*  324:*2*  325:*21*
327:*25*
**window**  349:*19*
**wish**  182:*12*
**withdrawing**  255:*25*
**withdrawn**  359:2, *5*
**withheld**  147:*16, 25*
149:*5, 7, 17*  151:*7*
153:*21*  154:*18*
155:*15, 18, 22*
**witness**  114:*23, 24*
117:*19*  135:*7*  337:*24*
360:*3*  361:*6, 8*
**Wolverine**  205:*21, 22*
206:*1*  208:*7*
**Wolverine's**  206:*4, 5,
10*
**word**  163:*16, 18, 20,
22*  164:2, *16*  189:*17*
243:*21*  260:*4*  276:*8*
**worded**  240:*10*
**words**  120:*9*  122:*10*
128:*16*  163:*6*  166:*5*
168:*22*  170:*18*
195:*23*  203:*20*
206:*15*  209:*3*  217:*10*
242:*15*  244:*21*  338:*5*
**work**  115:*19*  134:*10,
19, 21*  135:*7, 11*

136:*23*  221:*3*  240:*22*
325:*21*  331:*24*
**worked**  134:*17*
**working**  134:*24*
135:*4*  174:*23*  291:*9*
**works**  114:*20*
**worlds**  171:*21*
**worth**  150:*9*
**write**  133:*17*  136:*4*
231:*5, 7*  251:*13*
277:*10*  278:*19*
283:*22*  286:*18*
318:*13*  330:*14*
**writes**  188:*7*  222:*12*
289:*7*
**writing**  133:*19*
136:*9*  145:*20, 22, 23*
146:*6*  206:*19, 22*
231:*9*  279:*5*  297:*16*
**written**  204:*25*  205:*4*
354:*3*
**wrong**  170:*22*  171:*9*
172:*21*  173:*2*  197:*1*
283:*4*  297:*19*  332:*25*
350:*7*
**wrote**  146:*12*  154:*7*
269:*8*  270:*5, 11*
272:*8*  278:*5*  279:*2*
281:*24*  283:*1*  289:*2*
290:*18*  291:*17*  292:*1,
19*  293:*2*  295:*20*
296:*11*  299:*8*

**< Y >**
**Yeah**  117:*17, 24*
120:*18*  128:*3, 4*
130:*5*  134:*21*  146:*10*
147:*12*  164:*13*
169:*13, 17*  170:*11*
171:*3*  172:*1, 21*
191:*16*  215:*2*  218:*23*
219:*1, 21*  233:*8, 11*
237:*7*  239:*1*  253:*8*
254:*12*  262:*9*  264:*14*
269:*4*  275:*9*  292:*5*
293:*16, 25*  308:*3*
338:*2, 6*  344:*20*
345:*22*  347:*2, 17*
348:*13*  349:*11*  354:*7*

355:*10*  357:*22*
**Yep**  301:*22*
**YORK**  110:*1*  112:*1*
113:*7*  114:*8*

**< Z >**
**zero**  171:*22*  241:*15*
265:*18*  266:*9*  271:*13,
16*  273:*12, 15*  274:*5,
10, 24*  322:*20*  325:*17*
326:*13*
**zeroing**  326:*6*
**Zoom**  113:*4, 5, 6, 23*
114:*19*  117:*21*  338:*4*

Deposition of David J. Denis, Ph.D., Vol. II  In Re National Instruments Corporation Securities Litigation

## WORD LIST

**< $ >**
**$40**  (*1*)
**$42.37**  (*1*)
**$43.09**  (*1*)
**$48**  (*47*)
**$5**  (*2*)
**$53**  (*3*)
**$57**  (*4*)
**$57.75**  (*1*)
**$59.50**  (*1*)
**$60**  (*13*)
**$60-a-share**  (*1*)

**< 1 >**
**1**  (*5*)
**1.73**  (*1*)
**1:23-cv-10488-DLC**
 (*3*)
**1:38**  (*1*)
**10**  (*2*)
**10:36**  (*1*)
**10:46**  (*1*)
**100**  (*5*)
**1007**  (*1*)
**10170**  (*1*)
**102**  (*1*)
**107**  (*1*)
**10th**  (*2*)
**11**  (*10*)
**11:41**  (*1*)
**11:50**  (*1*)
**113**  (*1*)
**114**  (*1*)
**1197**  (*1*)
**11-month**  (*1*)
**11th**  (*6*)
**12:58**  (*1*)
**123**  (*1*)
**1266**  (*1*)
**13**  (*7*)
**135**  (*8*)
**135E**  (*2*)
**13th**  (*16*)
**14th**  (*3*)
**15**  (*3*)
**16**  (*1*)
**161**  (*1*)

**16th**  (*2*)
**17**  (*2*)
**1704**  (*1*)
**17th**  (*10*)
**18**  (*2*)
**1832**  (*1*)
**19**  (*1*)
**1900**  (*3*)
**1985**  (*1*)
**1991**  (*2*)
**19th**  (*2*)

**< 2 >**
**2**  (*20*)
**20**  (*5*)
**2000**  (*1*)
**2003**  (*1*)
**2004**  (*1*)
**2017**  (*1*)
**2020**  (*8*)
**2022**  (*23*)
**2023**  (*25*)
**2024**  (*1*)
**2025**  (*6*)
**21**  (*1*)
**22**  (*6*)
**228**  (*1*)
**22991**  (*1*)
**22nd**  (*5*)
**23**  (*3*)
**238**  (*1*)
**23rd**  (*1*)
**24**  (*4*)
**24th**  (*1*)
**25**  (*12*)
**25th**  (*10*)
**26**  (*2*)
**27**  (*1*)
**27th**  (*1*)
**28**  (*1*)
**28th**  (*2*)
**2nd**  (*1*)

**< 3 >**
**3**  (*6*)
**3.3**  (*2*)
**3:03**  (*1*)
**3:16**  (*1*)
**3:57**  (*1*)

**30**  (*4*)
**30-day**  (*4*)
**31.7**  (*3*)
**33**  (*1*)
**34**  (*1*)
**37**  (*1*)
**38**  (*1*)
**3rd**  (*5*)

**< 4 >**
**4**  (*9*)
**4:01**  (*1*)
**4:02**  (*1*)
**42**  (*4*)
**420**  (*1*)
**44**  (*1*)
**45**  (*3*)
**46**  (*5*)
**47**  (*8*)
**48**  (*1*)

**< 5 >**
**5**  (*26*)
**5.4**  (*1*)
**5.56**  (*4*)
**51**  (*1*)
**52**  (*1*)
**56**  (*1*)
**57**  (*1*)
**57.75**  (*1*)
**58**  (*1*)
**59.50**  (*1*)
**5th**  (*1*)

**< 6 >**
**6**  (*10*)
**60**  (*1*)
**63105**  (*1*)

**< 7 >**
**7**  (*13*)
**7.34**  (*9*)
**7/28/25**  (*1*)
**700**  (*1*)
**7676**  (*3*)

**< 8 >**
**8**  (*10*)
**8/27/25**  (*1*)

**80**  (*2*)
**82**  (*1*)
**857**  (*1*)

**< 9 >**
**9**  (*3*)
**9:22**  (*1*)
**95**  (*1*)
**98**  (*1*)
**99**  (*5*)

**< A >**
**a.m**  (*5*)
**aavalos@rgrdlaw.com**
 (*1*)
**abbreviated**  (*1*)
**ability**  (*11*)
**able**  (*5*)
**abnormal**  (*6*)
**absent**  (*1*)
**Absolutely**  (*2*)
**abstract**  (*3*)
**academic**  (*34*)
**accept**  (*2*)
**accepted**  (*3*)
**accepting**  (*1*)
**access**  (*5*)
**accompanied**  (*1*)
**account**  (*8*)
**accumulate**  (*1*)
**accumulated**  (*1*)
**accuracy**  (*1*)
**accurate**  (*1*)
**accurately**  (*1*)
**accuse**  (*1*)
**accused**  (*2*)
**accusing**  (*1*)
**achieving**  (*1*)
**acknowledge**  (*3*)
**acquire**  (*35*)
**acquired**  (*22*)
**acquirer**  (*61*)
**acquirer's**  (*5*)
**acquiring**  (*21*)
**acquiror**  (*1*)
**acquisition**  (*52*)
**acquisition-related**  (*1*)
**acquisitions**  (*13*)
**Action**  (*15*)

actions  (7)
activity  (2)
actual  (11)
adamantly  (1)
add  (1)
added  (1)
adding  (1)
addition  (1)
additional  (2)
address  (28)
addressed  (17)
addresses  (7)
addressing  (13)
adhere  (1)
adjust  (1)
adjusting  (1)
admit  (1)
Adobe  (1)
adoption  (4)
advance  (1)
advancing  (1)
adverse  (1)
advisors  (3)
affect  (1)
afternoon  (3)
aggressive  (9)
ago  (3)
agree  (20)
AGREED  (11)
agreeing  (1)
agreement  (25)
ahead  (6)
al  (10)
allegations  (7)
alleged  (48)
allegedly  (6)
alleges  (5)
alluded  (2)
alluding  (2)
alternative  (4)
alternatives  (2)
alters  (1)
Alyssa  (1)
ambiguity  (1)
amount  (4)
Ana  (1)
analyses  (1)
analysis  (48)
analyst  (34)

analysts  (1)
analyze  (3)
analyzed  (10)
analyzing  (1)
anchored  (1)
and/or  (1)
announce  (1)
announced  (16)
announcement  (31)
announcements  (5)
announces  (2)
answer  (12)
answered  (14)
answering  (1)
anticipating  (1)
anybody  (1)
aplascoff@rgrdlaw.com  (1)
appealing  (2)
appear  (1)
APPEARANCES  (1)
appears  (2)
Appendix  (7)
applicable  (1)
application  (6)
apply  (1)
applying  (6)
appreciate  (2)
approach  (1)
appropriate  (2)
approximately  (2)
April  (5)
arbitrage  (3)
area  (2)
argued  (1)
argument  (2)
arguments  (1)
array  (1)
arrive  (1)
arrived  (3)
art  (1)
article  (48)
articles  (6)
articulated  (1)
articulates  (3)
articulating  (2)
artificial  (1)
aside  (1)
asked  (17)

asking  (25)
aspect  (3)
aspects  (3)
assemble  (1)
assess  (9)
assessed  (3)
assesses  (1)
assessing  (15)
assessment  (7)
asset  (1)
assignment  (3)
assist  (1)
assistance  (1)
associated  (3)
assume  (7)
assumed  (1)
assuming  (1)
assumption  (53)
assumptions  (1)
assure  (1)
attached  (2)
attempt  (6)
attempting  (8)
attention  (1)
attorney  (1)
audible  (1)
August  (19)
authors  (3)
available  (1)
Avalos  (1)
Avenue  (1)
average  (35)
averages  (2)
aware  (8)
axis  (1)

< B >
B1  (1)
back  (57)
back-and-forth  (3)
Background  (17)
backwards  (2)
bad  (1)
bargaining  (1)
base  (1)
based  (17)
bases  (2)
basically  (2)
basing  (1)

basis  (32)
Bates  (8)
bear  (1)
bearing  (4)
began  (3)
beginning  (26)
begins  (9)
begun  (1)
BEHALF  (2)
behavior  (1)
believe  (31)
believed  (2)
believes  (2)
believing  (2)
Bennett  (3)
best  (7)
better  (5)
Betton  (7)
beyond  (1)
bias  (2)
biased  (2)
bid  (8)
bidder  (2)
bidding  (24)
bids  (20)
bit  (8)
blanket  (2)
block  (12)
blocking  (2)
blocks  (1)
blow  (2)
blowing  (1)
board  (35)
body  (2)
bothered  (1)
bottom  (12)
Boulevard  (3)
break  (11)
breakdown  (1)
breaking  (1)
Brief  (1)
broad  (3)
Broadly  (1)
Bruner  (12)
Bruner's  (2)
bullet  (14)
bullets  (3)
bunch  (2)
business  (1)

but-for  (*43*)
buy  (*11*)
buyer  (*1*)
buyers  (*1*)
buying  (*4*)
buyouts  (*1*)

< C >
CA  (*1*)
Cain  (*140*)
Cain's  (*74*)
calculate  (*2*)
calculated  (*3*)
calculating  (*1*)
calculation  (*1*)
Cali  (*1*)
call  (*6*)
called  (*3*)
calling  (*1*)
calls  (*15*)
capitalized  (*1*)
capitals  (*1*)
Caption  (*1*)
captioned  (*1*)
captures  (*1*)
capturing  (*2*)
CAR  (*1*)
care  (*1*)
career  (*2*)
carefully  (*3*)
carried  (*1*)
carries  (*2*)
case  (*154*)
case-produced  (*3*)
cases  (*11*)
cash  (*17*)
catch-all  (*1*)
categories  (*12*)
category  (*3*)
causal  (*1*)
causation  (*2*)
caveat  (*1*)
cc'ing  (*1*)
CCR  (*2*)
Celena  (*6*)
Central  (*1*)
certain  (*11*)
certainly  (*12*)
certainty  (*1*)

CERTIFICATE  (*1*)
certification  (*1*)
Certified  (*8*)
certify  (*1*)
cetera  (*3*)
cgilroy@rgrdlaw.com  (*1*)
cgiuggio@rgrdlaw.com  (*1*)
challenging  (*1*)
chance  (*1*)
change  (*22*)
changed  (*1*)
changes  (*3*)
characteristics  (*3*)
characterization  (*4*)
characterize  (*1*)
characterized  (*3*)
characterizing  (*2*)
chart  (*3*)
Christoper  (*1*)
circumstances  (*8*)
citation  (*1*)
cite  (*8*)
cited  (*11*)
cites  (*18*)
citing  (*11*)
City  (*1*)
Civil  (*3*)
claimed  (*1*)
claiming  (*2*)
claims  (*1*)
clarification  (*2*)
clarify  (*2*)
class  (*28*)
clear  (*29*)
clearly  (*2*)
close  (*4*)
closely  (*2*)
closer  (*3*)
closest  (*1*)
closing  (*1*)
clumsy  (*2*)
clustered  (*2*)
co-authors  (*1*)
coercive  (*2*)
collective  (*4*)
column  (*17*)
combat  (*1*)

combating  (*2*)
combination  (*1*)
combine  (*2*)
combined  (*2*)
combines  (*1*)
combining  (*1*)
come  (*16*)
Comerford  (*221*)
comes  (*5*)
comfortable  (*2*)
coming  (*5*)
commentary  (*6*)
comments  (*3*)
Commission  (*1*)
common  (*3*)
commonly  (*1*)
communicated  (*8*)
communicates  (*2*)
communicating  (*5*)
communication  (*1*)
companies  (*15*)
company  (*105*)
company's  (*10*)
comparators  (*1*)
compare  (*2*)
compared  (*1*)
comparing  (*1*)
complaint  (*16*)
complaints  (*1*)
complete  (*7*)
completed  (*4*)
completely  (*4*)
con  (*1*)
conceivably  (*1*)
concerning  (*10*)
concerns  (*1*)
conclude  (*9*)
concluded  (*3*)
concludes  (*8*)
concluding  (*7*)
conclusion  (*21*)
conclusions  (*12*)
conditional  (*4*)
conditioned  (*1*)
conditions  (*21*)
conducted  (*2*)
conducting  (*3*)
confident  (*1*)
confirmed  (*6*)

confirming  (*1*)
confused  (*1*)
conglomeration  (*1*)
conjunction  (*4*)
connect  (*1*)
connected  (*1*)
connection  (*8*)
consequences  (*1*)
consider  (*14*)
considerable  (*1*)
consideration  (*10*)
considered  (*40*)
considering  (*16*)
considers  (*2*)
Consistent  (*19*)
consistently  (*1*)
constituting  (*1*)
constraints  (*1*)
consult  (*1*)
consulted  (*1*)
contain  (*2*)
contained  (*1*)
containing  (*1*)
contains  (*3*)
contemporaneous  (*1*)
content  (*1*)
contest  (*2*)
contests  (*1*)
context  (*11*)
continuation  (*1*)
continue  (*11*)
continued  (*6*)
continues  (*1*)
Continuing  (*7*)
contrast  (*1*)
control  (*4*)
Conversely  (*2*)
conveyed  (*11*)
conveying  (*2*)
convince  (*2*)
copies  (*1*)
copy  (*2*)
CORPORATION  (*6*)
correct  (*296*)
correction  (*1*)
corrections  (*1*)
correctly  (*6*)
corresponding  (*1*)
counsel  (*45*)

Deposition of David J. Denis, Ph.D., Vol. II                    In Re National Instruments Corporation Securities Litigation

count  (2)
couple  (7)
coupled  (1)
course  (3)
COURT  (12)
covered  (1)
create  (2)
created  (1)
creates  (1)
criteria  (4)
critical  (4)
criticism  (2)
Cueller  (1)
culminate  (1)
culminated  (2)
Cummings  (1)
cumulative  (5)

< D >
damages  (6)
dance  (2)
dancing  (1)
data  (32)
dataset  (2)
date  (19)
dated  (3)
dates  (3)
date's  (1)
DAVID  (9)
Davis  (6)
day  (5)
days  (4)
day's  (1)
dcummings@rgrdlaw.
com  (1)
dead  (1)
deal  (96)
dealing  (1)
deals  (47)
decent  (1)
decided  (1)
deciding  (1)
decision  (1)
decisionmaking  (1)
DECLARATION  (1)
declare  (1)
decline  (1)
declining  (2)
decrease  (1)

deducing  (1)
deemed  (1)
defend  (1)
Defendant  (2)
defendants  (1)
defense  (1)
defensive  (4)
define  (4)
defined  (14)
defining  (4)
definitely  (1)
definition  (10)
definitions  (2)
deflation  (1)
degree  (1)
deliberate  (1)
deliberated  (1)
deliberations  (3)
delivers  (2)
demonstrate  (4)
demonstrated  (3)
demonstrates  (3)
DENIS  (48)
Denis's  (2)
depend  (4)
depending  (2)
depends  (12)
DEPOSITION  (28)
depositions  (4)
describe  (2)
described  (25)
describes  (14)
describing  (15)
description  (10)
descriptive  (1)
desire  (4)
Desiree  (1)
despite  (6)
detail  (6)
details  (3)
determination  (1)
determine  (6)
determined  (4)
determining  (5)
deviation  (7)
difference  (3)
differences  (1)
different  (69)
differently  (1)

difficult  (2)
dip  (1)
direct  (1)
directed  (5)
direction  (1)
directly  (19)
directors  (1)
disagree  (10)
disagreeable  (1)
disappear  (1)
disclose  (6)
disclosed  (37)
disclosing  (1)
disclosure  (24)
disclosures  (4)
discounted  (1)
Discovery  (3)
discretion  (1)
discuss  (4)
discussed  (14)
discusses  (1)
discussing  (8)
discussion  (35)
discussions  (15)
disposal  (2)
dispute  (2)
disputing  (2)
distinction  (16)
distinctions  (1)
distinguishing  (2)
distributed  (1)
distribution  (1)
DISTRICT  (6)
Dixon  (1)
Doctor  (2)
document  (55)
documented  (3)
documenting  (1)
documents  (96)
doing  (9)
dollar  (1)
door  (1)
dots  (1)
double  (1)
double-check  (3)
doubt  (2)
Dowd  (4)
downward  (2)
Dr  (210)

drafted  (1)
dramatically  (1)
draw  (11)
drawing  (11)
drawn  (2)
draws  (1)
drop  (1)
drops  (1)
due  (5)
duly  (2)

< E >
earlier  (37)
early  (3)
easier  (1)
Eckbo  (7)
economic  (77)
economically  (29)
economics  (3)
Ed  (2)
Eddie  (1)
edited  (1)
editorial  (1)
effect  (9)
effective  (1)
effectively  (3)
effects  (1)
effort  (5)
eight  (3)
Either  (7)
elapsed  (1)
elected  (1)
element  (3)
elements  (4)
eliminate  (1)
eliminates  (1)
ellipses  (1)
e-mail  (1)
embedded  (3)
Emerson  (86)
Emerson's  (39)
emphasize  (1)
empirical  (6)
empirically  (2)
employed  (3)
employee  (1)
encapsulate  (1)
encapsulating  (1)
ended  (1)

Deposition of David J. Denis, Ph.D., Vol. II                              In Re National Instruments Corporation Securities Litigation

ends  (1)
engaged  (2)
entire  (6)
entirely  (1)
entitled  (2)
entity  (1)
equal  (1)
equals  (2)
erect  (1)
ERRATA  (4)
error  (1)
escalate  (1)
escaped  (1)
essentially  (4)
establish  (2)
established  (5)
establishes  (1)
establishing  (1)
estimates  (1)
et  (13)
evaluate  (5)
evaluated  (2)
evaluating  (21)
evaluation  (2)
event  (23)
Even-Tov  (15)
Even-Tov's  (1)
events  (9)
EVEREST  (3)
evidence  (92)
exact  (4)
exactly  (9)
EXAMINATION  (1)
EXAMINERS  (1)
example  (23)
exception  (3)
exchange  (2)
exclude  (1)
excluded  (4)
excludes  (2)
excuse  (1)
exercises  (1)
exercising  (1)
exert  (1)
exerting  (1)
Exhibit  (62)
EXHIBITS  (3)
exist  (3)
existed  (1)

existence  (1)
existing  (2)
exists  (2)
expect  (2)
expected  (1)
experience  (2)
expert  (9)
expertise  (1)
explain  (5)
explained  (4)
explaining  (1)
explains  (1)
explanations  (1)
explicitly  (1)
express  (1)
expressed  (4)
expresses  (1)
expressing  (1)
expressly  (1)
extensive  (4)
extensively  (2)
extent  (11)

< F >
facing  (1)
fact  (66)
factor  (1)
factoring  (1)
factors  (3)
facts  (44)
factual  (7)
fail  (1)
Failed  (5)
fails  (4)
Failure  (17)
failures  (2)
Fair  (41)
fairly  (2)
fairness  (7)
fall  (3)
falls  (2)
familiar  (4)
far  (7)
fashion  (4)
fast  (1)
favor  (1)
features  (3)
felt  (1)
figure  (4)

figuring  (1)
filed  (1)
filing  (9)
filings  (5)
filled  (1)
final  (2)
finance  (2)
financial  (8)
financially  (1)
find  (5)
finder  (1)
finding  (2)
findings  (4)
finds  (2)
fine  (3)
firm  (7)
firms  (3)
firm's  (2)
first  (32)
fit  (3)
fits  (1)
five  (6)
five-minute  (1)
flawed  (4)
fleshed  (2)
flight  (3)
flip  (1)
focus  (2)
focused  (2)
focusing  (1)
following  (3)
follows  (2)
Footnote  (3)
Foppe  (2)
forecast  (1)
forecasts  (3)
foregoing  (1)
Form  (206)
formally  (3)
formation  (1)
formed  (1)
forms  (1)
formulate  (1)
Forsyth  (3)
forth  (9)
forward  (1)
found  (2)
foundation  (10)
four  (14)

fourth  (1)
frame  (2)
Franks  (1)
frequency  (1)
front  (1)
full  (6)
full-blown  (4)
full-time  (2)
fully  (6)
function  (1)
fundamental  (1)
fundamentally  (5)
further  (38)
future  (4)

< G >
geared  (3)
GELLER  (1)
general  (16)
generalities  (1)
generally  (5)
generate  (1)
getting  (12)
Gilroy  (1)
gist  (1)
Giuggio  (1)
give  (8)
given  (15)
gives  (4)
giving  (1)
global  (1)
go  (68)
goal  (2)
goes  (11)
going  (57)
Good  (12)
governed  (1)
granularity  (1)
great  (1)
greater  (5)
ground  (1)
groundwork  (1)
Group  (16)
guess  (6)

< H >
hand  (5)
happen  (7)
happened  (10)

Deposition of David J. Denis, Ph.D., Vol. II | In Re National Instruments Corporation Securities Litigation

**happy**  (2)
**Harris**  (1)
**head**  (2)
**heading**  (5)
**Healy**  (1)
**heard**  (2)
**hearing**  (2)
**heels**  (1)
**held**  (1)
**help**  (4)
**helps**  (1)
**hereof**  (1)
**high**  (1)
**higher**  (7)
**highest**  (3)
**history**  (21)
**hit**  (2)
**Hofman**  (1)
**hold**  (5)
**hope**  (1)
**hostile**  (5)
**hypothesized**  (2)
**hypothesizing**  (1)
**hypothetical**  (4)
**hypothetically**  (1)

**< I >**
**idea**  (6)
**identification**  (9)
**identified**  (15)
**identifies**  (5)
**identify**  (3)
**identifying**  (4)
**identity**  (1)
**ignore**  (4)
**ignored**  (8)
**ignores**  (7)
**ignoring**  (16)
**II**  (1)
**III**  (2)
**IL**  (1)
**illogical**  (2)
**illustrated**  (2)
**illustration**  (1)
**image**  (2)
**immaterial**  (3)
**immediately**  (3)
**impact**  (7)
**impacts**  (1)

**implementation**  (2)
**implemented**  (1)
**implication**  (1)
**implicitly**  (2)
**implied**  (3)
**implies**  (4)
**importance**  (2)
**important**  (26)
**impossible**  (1)
**improved**  (1)
**inartful**  (1)
**include**  (21)
**included**  (23)
**includes**  (13)
**including**  (8)
**inclusive**  (1)
**inconsistent**  (1)
**incorporate**  (1)
**incorporated**  (1)
**incorrect**  (6)
**increase**  (17)
**increased**  (10)
**increases**  (2)
**independent**  (10)
**independently**  (1)
**INDEX**  (1)
**indicate**  (2)
**indicated**  (6)
**indicates**  (2)
**indicating**  (4)
**indication**  (5)
**indicative**  (1)
**indicators**  (1)
**indirect**  (1)
**indirectly**  (1)
**individual**  (4)
**individuals**  (2)
**inference**  (12)
**inferences**  (6)
**inferring**  (2)
**inform**  (1)
**information**  (175)
**informative**  (26)
**informativeness**  (1)
**informed**  (2)
**informs**  (1)
**initial**  (12)
**initially**  (2)
**inputs**  (2)

**inputted**  (1)
**insiders**  (1)
**insight**  (2)
**insights**  (8)
**insignificant**  (1)
**instance**  (9)
**instances**  (5)
**instruct**  (1)
**instructed**  (3)
**instruction**  (3)
**instructions**  (1)
**INSTRUMENTS**  (83)
**intend**  (1)
**intends**  (1)
**intentions**  (1)
**interchangeable**  (1)
**interchangeably**  (1)
**interest**  (19)
**interested**  (10)
**internal**  (4)
**interpret**  (5)
**interpretation**  (14)
**interpretations**  (5)
**interpreted**  (1)
**interpreting**  (1)
**interrupt**  (1)
**interval**  (1)
**intrinsic**  (2)
**introduce**  (1)
**introduced**  (2)
**introduction**  (1)
**intruding**  (1)
**investor**  (2)
**investors**  (56)
**involve**  (9)
**involved**  (8)
**involvement**  (2)
**involves**  (8)
**involving**  (2)
**irrelevance**  (1)
**irrelevant**  (16)
**irrespective**  (1)
**isolation**  (4)
**issue**  (24)
**issued**  (5)
**issues**  (4)
**issuing**  (1)
**items**  (1)
**iterative**  (1)

**its**  (23)

**< J >**
**January**  (32)
**jcomerford@dowdben**
**nett.com**  (1)
**Jeff**  (8)
**Jeremy**  (1)
**jhofman@dowdbennet**
**t.com**  (1)
**John**  (3)
**joint**  (1)
**judge**  (2)
**judged**  (2)
**judgments**  (2)
**July**  (2)
**jump**  (1)
**June**  (17)

**< K >**
**keep**  (2)
**killing**  (1)
**kind**  (3)
**knew**  (2)
**know**  (101)
**knowledge**  (3)
**known**  (5)
**knows**  (1)
**KS**  (1)

**< L >**
**lack**  (3)
**laid**  (2)
**Langetieg**  (1)
**language**  (12)
**laptop**  (1)
**large**  (6)
**larger**  (7)
**largest**  (1)
**latching**  (1)
**late**  (1)
**launch**  (1)
**law**  (1)
**laws**  (1)
**lawyer**  (1)
**lawyers**  (1)
**lay**  (2)
**lays**  (1)
**lead**  (7)

**leading**  (5)
**leads**  (5)
**learn**  (2)
**learned**  (4)
**learning**  (2)
**learns**  (1)
**leave**  (1)
**leaves**  (2)
**leaving**  (1)
**led**  (3)
**left**  (5)
**left-hand**  (4)
**legal**  (12)
**legitimate**  (1)
**lengthy**  (2)
**lens**  (1)
**letter**  (15)
**letters**  (6)
**level**  (6)
**leveraged**  (2)
**Lexington**  (1)
**License**  (1)
**likelihood**  (12)
**likelihoods**  (1)
**limit**  (1)
**limitations**  (1)
**line**  (6)
**list**  (21)
**listed**  (15)
**listing**  (2)
**lists**  (4)
**litany**  (2)
**literally**  (1)
**literature**  (21)
**LITIGATION**  (4)
**little**  (19)
**LIVENOTE**  (1)
**LLC**  (1)
**LLP**  (1)
**located**  (1)
**logic**  (1)
**long**  (5)
**longer**  (3)
**long-run**  (1)
**look**  (60)
**looked**  (19)
**looking**  (26)
**looks**  (2)
**loss**  (1)

**losses**  (1)
**lost**  (1)
**lot**  (10)
**lots**  (3)
**Louis**  (3)
**low**  (1)
**Lower**  (4)
**lunch**  (1)

**< M >**
**M&A**  (45)
**M&A-related**  (2)
**magnitude**  (1)
**main**  (1)
**majority**  (1)
**making**  (18)
**management**  (11)
**management's**  (4)
**managers**  (12)
**manager's**  (1)
**Mandel**  (286)
**manner**  (2)
**margin**  (2)
**marked**  (9)
**market**  (35)
**market's**  (2)
**match**  (1)
**matches**  (1)
**material**  (46)
**materiality**  (100)
**materials**  (3)
**mathematical**  (1)
**Matt**  (1)
**matter**  (33)
**matters**  (1)
**Matthew**  (1)
**maximizing**  (1)
**mean**  (62)
**meaning**  (1)
**meaningful**  (1)
**means**  (3)
**meant**  (1)
**measure**  (3)
**measured**  (1)
**measurement**  (1)
**measures**  (2)
**measuring**  (4)
**mechanism**  (1)
**mechanisms**  (2)

**media**  (1)
**median**  (11)
**members**  (1)
**mention**  (3)
**mentioned**  (16)
**mentioning**  (2)
**mentions**  (2)
**merely**  (1)
**merge**  (1)
**merged**  (2)
**Merger**  (65)
**Mergers**  (27)
**met**  (5)
**middle**  (1)
**million**  (1)
**mind**  (5)
**minus**  (2)
**minute**  (4)
**minutes**  (1)
**mirror**  (4)
**mischaracterized**  (1)
**mischaracterizes**  (6)
**misleading**  (1)
**mismatch**  (3)
**misremembered**  (1)
**Missouri**  (5)
**MNPI**  (1)
**MO**  (1)
**moment**  (4)
**money**  (3)
**months**  (6)
**morning**  (5)
**mouse**  (1)
**move**  (12)
**movement**  (3)
**movements**  (2)
**moving**  (3)
**multiple**  (11)

**< N >**
**Nader**  (1)
**name**  (2)
**NATIONAL**  (83)
**NAT-SL-023189**  (2)
**NAT-SL-22986**  (2)
**naturally**  (1)
**nature**  (22)
**navigate**  (3)
**near**  (7)

**necessarily**  (9)
**need**  (16)
**negative**  (2)
**negotiate**  (1)
**negotiated**  (3)
**negotiating**  (1)
**negotiation**  (3)
**negotiations**  (4)
**neither**  (1)
**never**  (1)
**nevertheless**  (5)
**NEW**  (9)
**news**  (3)
**NI**  (15)
**nice**  (2)
**nine**  (3)
**NI's**  (9)
**No.____Change**  (14)
**No.____Line**  (14)
**Noam**  (1)
**noam@rgrdlaw.com**  (1)
**nonbinding**  (1)
**non-private**  (1)
**nonpublic**  (2)
**nonrejection**  (1)
**non-rejection**  (1)
**nonresponsive**  (2)
**nonstatistician's**  (1)
**Nope**  (2)
**normal**  (1)
**note**  (3)
**noted**  (1)
**notes**  (1)
**noting**  (1)
**notion**  (2)
**NOVEMBER**  (15)
**nuanced**  (1)
**number**  (23)
**numbers**  (9)
**numeral**  (1)
**numerous**  (12)
**Nuthatch**  (2)

**< O >**
**oath**  (1)
**Object**  (8)
**Objection**  (4)
**objections**  (4)

Deposition of David J. Denis, Ph.D., Vol. II                    In Re National Instruments Corporation Securities Litigation

| | | | |
|---|---|---|---|
| **obligations**  *(1)* | **overwhelming**  *(1)* | **phrases**  *(1)* | **pre-contest**  *(1)* |
| **observation**  *(2)* | **owned**  *(5)* | **picking**  *(3)* | **prefer**  *(1)* |
| **observations**  *(2)* | **ownership**  *(1)* | **picks**  *(1)* | **preferences**  *(2)* |
| **observe**  *(3)* | | **piece**  *(16)* | **preferred**  *(1)* |
| **observed**  *(1)* | **< P >** | **pieces**  *(14)* | **premium**  *(12)* |
| **observing**  *(2)* | **p.m**  *(7)* | **pill**  *(3)* | **premiums**  *(1)* |
| **obtain**  *(1)* | **Page**  *(129)* | **pills**  *(1)* | **pre-offer**  *(2)* |
| **obvious**  *(1)* | **pages**  *(4)* | **pipeline**  *(4)* | **prepare**  *(2)* |
| **obviously**  *(8)* | **paid**  *(1)* | **place**  *(23)* | **prepared**  *(3)* |
| **occurred**  *(4)* | **paired**  *(2)* | **places**  *(1)* | **preparing**  *(12)* |
| **occurrence**  *(2)* | **Panel**  *(4)* | **PLAINTIFF**  *(5)* | **presence**  *(1)* |
| **occurring**  *(1)* | **panels**  *(1)* | **plan**  *(21)* | **Present**  *(2)* |
| **occurs**  *(1)* | **paper**  *(11)* | **plane**  *(1)* | **presentation**  *(3)* |
| **offer**  *(121)* | **papers**  *(10)* | **planning**  *(1)* | **presented**  *(1)* |
| **offered**  *(18)* | **paragraph**  *(93)* | **plans**  *(4)* | **pressure**  *(2)* |
| **offering**  *(20)* | **paragraphs**  *(1)* | **Plascoff**  *(1)* | **presumably**  *(2)* |
| **offeror**  *(14)* | **parent**  *(1)* | **plausible**  *(1)* | **presume**  *(1)* |
| **offers**  *(36)* | **parse**  *(1)* | **played**  *(1)* | **Pretty**  *(4)* |
| **offer-specific**  *(1)* | **part**  *(23)* | **please**  *(14)* | **prevent**  *(6)* |
| **offices**  *(1)* | **particular**  *(24)* | **plus**  *(5)* | **preventing**  *(1)* |
| **oftentimes**  *(3)* | **particularly**  *(1)* | **point**  *(47)* | **prevents**  *(2)* |
| **oh**  *(7)* | **parties**  *(3)* | **pointed**  *(3)* | **previous**  *(10)* |
| **Okay**  *(176)* | **partly**  *(1)* | **pointing**  *(2)* | **price**  *(157)* |
| **omission**  *(2)* | **party**  *(2)* | **points**  *(13)* | **prices**  *(13)* |
| **omissions**  *(7)* | **passages**  *(5)* | **poison**  *(3)* | **pricing**  *(1)* |
| **omitted**  *(39)* | **pattern**  *(3)* | **pop**  *(1)* | **primarily**  *(3)* |
| **omitting**  *(1)* | **patterns**  *(2)* | **popped**  *(1)* | **principles**  *(9)* |
| **once**  *(9)* | **pause**  *(3)* | **pops**  *(1)* | **printed**  *(1)* |
| **ones**  *(7)* | **payment**  *(1)* | **portion**  *(1)* | **prior**  *(8)* |
| **open**  *(8)* | **PDF**  *(13)* | **portrayal**  *(1)* | **priorities**  *(1)* |
| **opining**  *(3)* | **PENALTY**  *(2)* | **posit**  *(1)* | **priority**  *(3)* |
| **opinion**  *(98)* | **pending**  *(1)* | **position**  *(1)* | **private**  *(18)* |
| **opinions**  *(21)* | **people**  *(3)* | **positive**  *(19)* | **privately**  *(1)* |
| **opportunities**  *(1)* | **perceive**  *(1)* | **positively**  *(1)* | **privilege**  *(1)* |
| **oppose**  *(1)* | **perceiving**  *(1)* | **possibilities**  *(3)* | **probability**  *(28)* |
| **opposed**  *(9)* | **percent**  *(38)* | **possibility**  *(16)* | **probably**  *(2)* |
| **opposes**  *(1)* | **percentage**  *(5)* | **possible**  *(10)* | **problem**  *(5)* |
| **order**  *(2)* | **percussions**  *(1)* | **possibly**  *(3)* | **proceed**  *(6)* |
| **original**  *(2)* | **perfect**  *(7)* | **post-failure**  *(1)* | **proceeded**  *(1)* |
| **ought**  *(1)* | **performance**  *(2)* | **post-rejection**  *(2)* | **proceeding**  *(5)* |
| **outcome**  *(4)* | **period**  *(49)* | **potential**  *(15)* | **process**  *(8)* |
| **outlook**  *(1)* | **PERJURY**  *(2)* | **potentially**  *(4)* | **produce**  *(3)* |
| **outright**  *(42)* | **pertain**  *(1)* | **Pourhassan**  *(1)* | **produced**  *(21)* |
| **outside**  *(1)* | **pertained**  *(1)* | **power**  *(1)* | **production**  *(4)* |
| **outstanding**  *(12)* | **pertaining**  *(1)* | **preannouncement**  *(3)* | **Professional**  *(3)* |
| **overall**  *(1)* | **pertinent**  *(2)* | **preceding**  *(2)* | **progressed**  *(1)* |
| **overarching**  *(1)* | **petered**  *(1)* | **precise**  *(1)* | **pronouncing**  *(1)* |
| **override**  *(1)* | **Ph.D**  *(7)* | **preclude**  *(1)* | **proper**  *(2)* |
| **overrides**  *(1)* | **phone**  *(1)* | **precluding**  *(1)* | **properly**  *(1)* |

**proposal** (*53*)
**proposals** (*59*)
**propose** (*1*)
**proposed** (*4*)
**proposing** (*5*)
**proposition** (*2*)
**prospective** (*1*)
**prospects** (*1*)
**provide** (*4*)
**provided** (*10*)
**provides** (*3*)
**providing** (*3*)
**provisions** (*1*)
**proxies** (*7*)
**Proxy** (*38*)
**public** (*12*)
**publicly** (*12*)
**pull** (*1*)
**purchase** (*2*)
**purchases** (*1*)
**purchasing** (*2*)
**pure** (*1*)
**purported** (*1*)
**purports** (*1*)
**purpose** (*5*)
**purposes** (*4*)
**pursuant** (*1*)
**put** (*17*)
**putting** (*2*)
**puzzling** (*1*)

**< Q >**
**qualification** (*1*)
**quantification** (*2*)
**question** (*37*)
**Questions** (*9*)
**queued** (*2*)
**quick** (*5*)
**quickly** (*6*)
**quite** (*6*)
**quotations** (*3*)
**quote** (*17*)
**quoted** (*5*)
**quotes** (*9*)
**quoting** (*13*)

**< R >**
**range** (*5*)
**rare** (*1*)

**rationally** (*1*)
**reacted** (*3*)
**reacting** (*1*)
**reaction** (*9*)
**read** (*31*)
**readdressed** (*1*)
**reading** (*7*)
**reads** (*2*)
**ready** (*1*)
**real** (*2*)
**reality** (*2*)
**really** (*14*)
**realtime** (*1*)
**reason** (*22*)
**reasonable** (*1*)
**reasons** (*10*)
**recall** (*26*)
**receipt** (*1*)
**receive** (*1*)
**received** (*10*)
**receiving** (*2*)
**recognize** (*5*)
**recollection** (*7*)
**reconstruct** (*1*)
**record** (*20*)
**recorded** (*1*)
**reduced** (*2*)
**reduces** (*1*)
**re-engage** (*1*)
**refer** (*10*)
**reference** (*9*)
**referenced** (*2*)
**references** (*5*)
**referencing** (*1*)
**referred** (*9*)
**referring** (*21*)
**refers** (*6*)
**reflect** (*7*)
**reflected** (*2*)
**reflecting** (*1*)
**reflection** (*3*)
**reflects** (*3*)
**refusal** (*2*)
**refuted** (*1*)
**regard** (*4*)
**regarding** (*8*)
**Registered** (*3*)
**regression** (*1*)
**regular** (*1*)

**reiterate** (*1*)
**reiterated** (*1*)
**reject** (*8*)
**rejected** (*60*)
**rejecting** (*13*)
**rejection** (*129*)
**rejections** (*53*)
**rejection-specific** (*1*)
**rejects** (*6*)
**related** (*3*)
**relationship** (*1*)
**relative** (*5*)
**relatively** (*2*)
**released** (*3*)
**relevance** (*4*)
**relevant** (*28*)
**relied** (*3*)
**rely** (*1*)
**relying** (*2*)
**remain** (*4*)
**remained** (*3*)
**remaining** (*1*)
**remains** (*5*)
**remember** (*9*)
**remembering** (*2*)
**remote** (*1*)
**remotely** (*1*)
**render** (*1*)
**renders** (*2*)
**repeat** (*6*)
**repeated** (*3*)
**repeatedly** (*1*)
**repeating** (*2*)
**repercussions** (*9*)
**replica** (*1*)
**reply** (*2*)
**report** (*171*)
**Reported** (*1*)
**Reporter** (*20*)
**REPORTING** (*4*)
**reports** (*36*)
**represent** (*4*)
**representative** (*1*)
**representing** (*2*)
**represents** (*2*)
**require** (*2*)
**required** (*3*)
**research** (*8*)
**resistance** (*1*)

**resisted** (*1*)
**respect** (*10*)
**respectively** (*1*)
**respond** (*6*)
**responding** (*5*)
**responds** (*2*)
**response** (*11*)
**responsibilities** (*1*)
**rest** (*3*)
**restructuring** (*9*)
**restructurings** (*3*)
**result** (*10*)
**resulted** (*10*)
**results** (*4*)
**return** (*9*)
**returned** (*2*)
**returns** (*5*)
**revaluation** (*10*)
**reveal** (*1*)
**revealed** (*3*)
**revealing** (*1*)
**Reveals** (*1*)
**reverse** (*1*)
**reversion** (*9*)
**revert** (*2*)
**reverts** (*1*)
**review** (*38*)
**reviewed** (*23*)
**reviewing** (*7*)
**revised** (*1*)
**rid** (*1*)
**right** (*460*)
**right-hand** (*2*)
**rights** (*18*)
**rival** (*1*)
**riveted** (*1*)
**road** (*1*)
**ROBBINS** (*1*)
**role** (*2*)
**rolled** (*1*)
**Roman** (*1*)
**room** (*5*)
**rose** (*2*)
**roughly** (*2*)
**rounds** (*10*)
**RPR** (*2*)
**RUDMAN** (*1*)
**Rules** (*2*)
**rush** (*1*)

Deposition of David J. Denis, Ph.D., Vol. II                    In Re National Instruments Corporation Securities Litigation

< S >
sale  (5)
salient  (21)
sample  (19)
sampling  (1)
satisfied  (1)
save  (1)
saw  (6)
saying  (89)
says  (30)
scenario  (5)
scenarios  (1)
Schoemer  (1)
screen  (11)
scroll  (11)
se  (2)
seats  (1)
SEC  (13)
second  (13)
second-bid-by-initial-bidder  (1)
section  (44)
sections  (2)
SECURITIES  (9)
see  (173)
seeing  (4)
seen  (19)
sees  (2)
select  (1)
selection  (4)
sense  (16)
sent  (3)
sentence  (19)
sentencing  (2)
sentiment  (1)
separation  (1)
September  (4)
serious  (5)
Servaes  (1)
set  (22)
share  (39)
shareholder  (18)
shareholders  (27)
shares  (28)
SHEET  (4)
short  (4)
SHORTHAND  (4)
shortly  (1)

show  (2)
showed  (1)
showing  (5)
shown  (7)
shows  (6)
sic  (1)
side  (10)
sign  (1)
signal  (5)
signaled  (1)
signals  (3)
SIGNATURE:_____
_____DA
TE  (2)
signed  (11)
significance  (2)
significant  (27)
significantly  (1)
similar  (7)
similarity  (1)
similarly  (1)
simple  (2)
simply  (15)
simultaneously  (2)
single-bid  (1)
sir  (5)
Sitting  (2)
situation  (17)
situations  (10)
situation-specific  (1)
six  (5)
size  (5)
sizes  (1)
skip  (1)
slide  (3)
slightly  (3)
small  (3)
so-called  (1)
soft  (6)
software  (1)
somebody  (1)
song  (2)
sorry  (39)
sort  (21)
sound  (1)
sounds  (3)
SOUTHERN  (3)
speak  (6)
speaking  (4)

speaks  (3)
specific  (30)
specifically  (16)
spectrum  (2)
speculate  (2)
speculating  (3)
speculation  (13)
speculative  (5)
spend  (1)
split  (2)
spread  (1)
spreads  (2)
St  (3)
stages  (1)
stand  (1)
standalone  (1)
stand-alone  (1)
Standard  (10)
standing  (1)
standpoint  (2)
start  (9)
starting  (7)
starts  (5)
State  (4)
stated  (5)
Statement  (22)
statements  (4)
STATES  (9)
stating  (2)
statistical  (1)
statistically  (12)
stay  (2)
stays  (1)
stem  (1)
stenographic  (2)
step  (2)
steps  (5)
STIPULATED  (1)
stock  (58)
stocks  (1)
stop  (6)
stopped  (1)
stopping  (1)
straight  (1)
strategic  (14)
strong  (1)
structure  (1)
studied  (2)
studies  (50)

study  (120)
studying  (3)
stuff  (4)
subject  (4)
subjective  (2)
submitted  (6)
subsequent  (11)
subsequently  (3)
subset  (4)
substance  (1)
substantial  (1)
substantively  (1)
succeed  (2)
succeeding  (2)
success  (5)
successful  (51)
successfully  (3)
sufficiently  (2)
suggest  (7)
suggested  (1)
suggesting  (1)
suggests  (2)
Suite  (4)
sum  (1)
summaries  (2)
summarizes  (1)
summarizing  (2)
Summary  (8)
super  (1)
superior  (1)
support  (15)
supporting  (3)
supports  (3)
Supreme  (1)
sure  (50)
surprise  (1)
surprised  (1)
swear  (1)
switch  (1)
sworn  (3)

< T >
tab  (10)
table  (8)
tables  (1)
take  (32)
TAKEN  (20)
takeover  (2)
takes  (4)

Deposition of David J. Denis, Ph.D., Vol. II    In Re National Instruments Corporation Securities Litigation

talk  *(2)*
talked  *(9)*
talking  *(42)*
talks  *(2)*
target  *(81)*
targets  *(8)*
target's  *(9)*
teaching  *(2)*
team  *(3)*
technical  *(1)*
technically  *(1)*
Technician  *(6)*
techs  *(1)*
tell  *(20)*
telling  *(8)*
tells  *(6)*
tend  *(4)*
tender  *(6)*
tends  *(4)*
term  *(13)*
terminate  *(2)*
terms  *(23)*
testified  *(13)*
testify  *(3)*
testifying  *(3)*
testimony  *(22)*
text  *(1)*
Thank  *(17)*
Thanksgiving  *(1)*
theoretical  *(1)*
theory  *(3)*
thereto  *(1)*
thing  *(5)*
things  *(31)*
think  *(136)*
thinking  *(7)*
third  *(4)*
thoroughly  *(1)*
thought  *(5)*
three  *(29)*
tie  *(1)*
tied  *(4)*
time  *(64)*
timeline  *(6)*
Timelines  *(1)*
times  *(9)*
title  *(2)*
TN  *(1)*
today  *(8)*

Today's  *(1)*
toehold  *(16)*
toeholds  *(14)*
toggle  *(1)*
told  *(6)*
tomorrow  *(2)*
tone  *(1)*
tools  *(2)*
top  *(11)*
topic  *(2)*
total  *(5)*
totality  *(4)*
totally  *(5)*
touch  *(1)*
track  *(1)*
traded  *(2)*
trades  *(1)*
trading  *(2)*
transaction  *(27)*
transactions  *(13)*
transcript  *(1)*
transcripts  *(10)*
transformative  *(11)*
translate  *(1)*
true  *(28)*
truth  *(3)*
try  *(8)*
trying  *(17)*
turn  *(19)*
turned  *(1)*
turning  *(1)*
twice  *(3)*
two  *(50)*
tying  *(2)*
type  *(4)*
types  *(13)*
typewriting  *(1)*
typical  *(4)*
typically  *(4)*

< U >
Uh-huh  *(5)*
ultimate  *(7)*
ultimately  *(41)*
unable  *(1)*
unanimously  *(4)*
Unanswered  *(1)*
unavailable  *(2)*
unclear  *(2)*

uncommon  *(1)*
unconditionally  *(1)*
underlying  *(1)*
understand  *(23)*
understanding  *(12)*
understood  *(27)*
undertaken  *(1)*
undertaking  *(2)*
undervalued  *(1)*
undisclosed  *(2)*
unfold  *(1)*
unimportant  *(1)*
unique  *(1)*
UNITED  *(4)*
unknown  *(1)*
unquote  *(1)*
unrepresentativeness  *(1)*
unsolicited  *(3)*
unsuccessful  *(4)*
upfront  *(1)*
use  *(18)*
useful  *(1)*
uses  *(5)*
Usually  *(1)*

< V >
Valuation  *(3)*
value  *(16)*
value-relevant  *(2)*
variability  *(3)*
various  *(3)*
vary  *(1)*
verify  *(1)*
versus  *(7)*
VI  *(1)*
video  *(1)*
Videographer  *(14)*
VIDEOTAPED  *(1)*
view  *(23)*
viewed  *(6)*
viewing  *(1)*
views  *(2)*
virtually  *(1)*
VOLUME  *(1)*

< W >
Wachtell  *(4)*
wait  *(4)*

Walkling  *(2)*
want  *(18)*
wanted  *(2)*
wanting  *(2)*
wants  *(2)*
way  *(34)*
ways  *(8)*
wealth  *(1)*
week  *(1)*
weeks  *(2)*
weighted  *(2)*
Welcome  *(1)*
Well  *(103)*
well-documented  *(1)*
went  *(3)*
we're  *(45)*
we've  *(20)*
wide  *(1)*
widely  *(1)*
widespread  *(1)*
willing  *(6)*
window  *(1)*
wish  *(1)*
withdrawing  *(1)*
withdrawn  *(2)*
withheld  *(11)*
witness  *(8)*
Wolverine  *(4)*
Wolverine's  *(3)*
word  *(10)*
worded  *(1)*
words  *(15)*
work  *(11)*
worked  *(1)*
working  *(4)*
works  *(1)*
worlds  *(1)*
worth  *(1)*
write  *(11)*
writes  *(3)*
writing  *(11)*
written  *(3)*
wrong  *(9)*
wrote  *(19)*

< Y >
Yeah  *(47)*
Yep  *(1)*
YORK  *(5)*

**< Z >**
**zero**  *(14)*
**zeroing**  *(1)*
**Zoom**  *(10)*

DEPOSITION ERRATA SHEET

Page No._155_Line No._2___Change:_"his" to "its"__

_____

Reason for change:_Transcription error_____

Page No._188_Line No._7___Change:_"writes" to "rights"_____

Reason for change:_Transcription error_____

Page No._233_Line No._20__Change:_"and" to "in"___

_____

Reason for change:_Transcription error_____

Page No._247_Line No._18__Change:_"an" to "on"____

_____

Reason for change:_Transcription error_____

Page No._265_Line No._19__Change:_"have" to "has"_____

Reason for change:_Transcription error_____

Page No._266_Line No._6___Change:_"adverse" to "average"_____

Reason for change:_Transcription error_____

Page No._296_Line No._24__Change:_"informative" to "uninformative"_____

Reason for change:_Transcription error_____

SIGNATURE:_____  DATE: 12-19-25
          DAVID J. DENIS, Ph.D.

DEPOSITION ERRATA SHEET

Page No._299_Line No._19__Change:_"informative" to "uninformative"_____

Reason for change:_Transcription error_____

Page No._321_Line No._20__Change:_"other" to "offer"_____

Reason for change:_Transcription error_____

Page No._351_Line No._12__Change:_"done" to "dead"_____

Reason for change:_Transcription error_____

Page No._____Line No._____Change:_____

_____

Reason for change:_____

Page No._____Line No._____Change:_____

_____

Reason for change:_____

Page No._____Line No._____Change:_____

_____

Reason for change:_____

Page No._____Line No._____Change:_____

_____

Reason for change:_____

SIGNATURE:_____DATE: 12-19-25
                DAVID J. DENIS, Ph.D.