UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| In re NATIONAL INSTRUMENTS CORPORATION SECURITIES LITIGATION | : <br> : <br> : <br> : <br> : <br> x | Civil Action No. 1:23-cv-10488-DLC <br><br> <u>CLASS ACTION</u> |

**LEAD PLAINTIFF'S (I) RESPONSE TO DEFENDANTS' LOCAL
RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT AND
(II) COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Local Rule 56.1, Lead Plaintiff submits the following objections and responses to Defendants' statement of undisputed material facts in support of their motion for summary judgment ("Defendants' Statement").

## GENERAL OBJECTIONS AND QUALIFICATIONS

1. These objections and responses are made in connection with, and for the purpose of opposing Defendants' motion for summary judgment. Any failure to deny or qualify a statement is not an admission that such statement is undisputed. Plaintiff reserves the right to dispute any facts in connection with any subsequent proceeding or stage of this litigation, including trial.

2. Plaintiff objects to Defendants' Statement and any individual statement therein to the extent they contain opinion or otherwise purport to characterize documents, testimony or facts.

3. Plaintiff objects to Defendants' Statement and any individual statement therein to the extent they advance legal arguments.

4. In responding to Defendants' Statement or any individual statements set forth therein, Plaintiff does not waive but rather intends to preserve and is preserving:

(a) All objections as to the competence, relevance, materiality, and admissibility of any of the statements, documents or testimony cited therein;

(b) All objections to the form of the statement;

(c) All rights to object on any ground to any of the statements or documents cited therein and their subject matter at any subsequent proceeding or stage of this litigation, including trial;

(d) The right to supplement or amend these responses; and

(e) Any and all rights and privileges under the applicable Federal Rules of Civil Procedure, Federal Rules of Evidence, Local Rules of this Court, or any other statute, guideline or common law.

## RESPONSES AND OBJECTIONS

1.    Up to and during the Class Period,[1] Defendant National Instruments Corporation ("NI") was a producer of automated test equipment and virtual instrumentation software. Ex. 1, NI Proxy Statement (May 25, 2023), at 11; Ex. 2, Starkloff Dep., at 159:4-16.[2]

**Response to Paragraph 1**: Undisputed.

2.    Up to and during the Class Period, NI was a publicly traded corporation. Ex. 1, NI Proxy Statement (May 25, 2023).

**Response to Paragraph 2**: Undisputed.

3.    Defendant Eric Starkloff was the Chief Executive Officer of NI from 2020 to October 2023. Ex. 2, Starkloff Dep., at 8:10-22.

**Response to Paragraph 3**: Undisputed.

4.    Defendant Michael McGrath was the Chairman of the Board of NI beginning October 2018 through at least May 2023. Ex. 3, McGrath Dep., at 24:12-16; Ex. 1, NI Proxy Statement (May 25, 2023), at 4.

**Response to Paragraph 4**: Undisputed.

5.    In 2019, NI's Board authorized a stock repurchase program. Amended Complaint ("Compl.") ¶ 22 n.1; Ex. 4, January 2022 Board Meeting Minutes and Exhibit G, at 15.

---

[1] Defined in Defendants' Statement, at 1, as: "'The Class Period' refers to the Court's definition of the Class Period in its September 19, 2025 Opinion and Order, ECF 105 – 'between August 12, 2022 and August 30, 2022 and/or between September 12, 2022 and September 28, 2022.'"

[2] Citations to "Def. Ex. __" refer to exhibits to the Declaration of James F. Bennett filed in support of Defendants' Statement. Citations to "Pl. Ex. __" refer to exhibits to the Declaration of Noam Mandel filed in support of Plaintiff's Responses and Objections.

**Response to Paragraph 5**: Undisputed.

6.     That stock repurchase program authorized NI to "repurchase shares of [NI's] common stock . . . from time to time up to a maximum number of shares of 3,794,324 shares." *Id.*

**Response to Paragraph 6**: Undisputed.

7.     By January 19, 2022, only 270,445 shares remained available for repurchase under this stock repurchase program. *Id.*

**Response to Paragraph 7**: Undisputed.

8.     On January 19, 2022, NI's Board approved a new stock repurchase program authorizing NI to repurchase up to $250 million worth of common stock, effective immediately (the "2022 Program"). Ex. 4, January 2022 Board Meeting Minutes and Exhibit G, at 6, 15; Ex. 45, Percival Decl. ¶ 9.

**Response to Paragraph 8**: Undisputed.

9.     NI publicly disclosed the 2022 Program in its SEC Form 10-K for the fiscal year ended December 31, 2021. Ex. 5, NATI Form 10-K (February 22, 2022), at 26 n.1.

**Response to Paragraph 9**: Undisputed.

10.     In approving the 2022 Program, the Board stated it "believes it would be in the best interests of the Company [NI] and the stockholders for the Company to repurchase additional shares of the Common Stock in the open market for the following reasons among others: 1. Partially offsetting dilution to stockholders resulting from issuance of Common Stock under the Company's equity incentive plans; 2. Increasing earnings per share; and 3. Utilizing the Company's cash flow from operations." Ex. 4, January 2022 Board Meeting Minutes and Exhibit G, at 15.

**Response to Paragraph 10**: Undisputed.

2

11.     The 2022 Program, as approved by the Board, "authorized, empowered and directed" the "Authorized Officers" to "determine and approve the quantity, timing, price and other terms" of the 2022 Program. *Id.* at 16. "Authorized Officers" included NI's President, Chief Executive Officer, Chief Financial Officer, and "such other officers of [NI] as may be designated by the President and Chief Executive Officer or the Chief Financial Officer." *Id.*

**Response to Paragraph 11**: Undisputed.

12.     Under the 2022 Program, decisions by NI's management about "the amount that [NI] spent on share buybacks" were "correlated . . . to a longer term view of cash generation," focused on NI's access to cash over a year or two years. Ex. 2, Starkloff Dep., at 22:17-23:19. NI's available cash in a quarter was only a "very minor factor" for management when determining the amount of buybacks to conduct. *Id.*

**Response to Paragraph 12**: Disputed. NI's management developed a "quarterly plan" for the timing and amount of repurchases, and such plans were made in light of "cash outflows[.]" Pl. Ex. 25, NAT-SL-00011283-1287, at -1283.  NI leadership had conflicting views on whether to repurchase stock while in a poor cash position during the relevant period. On August 7, 2022, McGrath relayed to Starkloff that certain directors believed "[w]ith almost no cash and negative cash flow, we sure the hell shouldn't be buying back stock[.]" Pl. Ex. 45, NAT-SL-00001276-1278, at -1276.

13.     In the view of NI's Chief Financial Officer, Karen Rapp, NI's repurchases of its own Common Stock caused shareholders' stakes in NI to increase, and NI did not benefit as a company when it repurchased its own shares because repurchased shares became treasury shares, and thus NI was not an owner of its own Common Stock. Ex. 6, Rapp Dep., at 165:1-166:9.

**Response to Paragraph 13**: Disputed. Defendants' August 11, 2022 plan included a trading matrix in which the Company purchased more stock when the stock price was lower and less stock when the stock price was higher. Def. Ex. 41, at -0771. NI's CFO Karen Rapp requested a clarification in the matrix to ensure that NI would not be obligated to purchase stock if the market price was $45 per share or above. *See* Pl. Counterstatement, ¶83; Pl. Ex. 54, NAT-SL-00017097-7099, at -7097 (August 11, 2022).

14.     In 2022, up to and during the Class Period, NI had an Insider Trading Policy. Ex. 7, Dixon Dep., at 70:12-71:7; Ex. 8, Insider Trading Policy.

**Response to Paragraph 14**: Undisputed.

15.     NI's Insider Trading Policy stated it "is illegal for anyone to trade in securities on the basis of material nonpublic information." Ex. 8, Insider Trading Policy, at 1. It also stated that officers, directors, employees, and other NI representatives covered by the policy could not use material nonpublic information to transact in securities of NI or to express an opinion or make a recommendation about trading in NI's securities. *Id.*

**Response to Paragraph 15:** Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document. However, Lead Plaintiff disputes any purported limitation of the policy to "officers, directors, employees, and other NI representatives[.]" Such limitation is not included in the Policy. The Policy extends to "anyone" and notes that "the Company, as well as individual directors, officers, and other supervisory personnel, could face liability." Def. Ex. 8, at -1247.

16.     In the view of NI's Board Chair, Michael McGrath, NI's directors, officers, employees, and other representatives were all advised of this prohibition on trading on material nonpublic information. Ex. 3, McGrath Dep., at 28:5-10.

4

**Response to Paragraph 16**: Undisputed.

17.    NI's Insider Trading Policy listed as an example of "material" information, "significant corporate events, such as a pending or proposed merger, joint venture or tender offer, a significant investment, the acquisition or disposition of a significant business or asset or a change in control of" NI. Ex. 8, Insider Trading Policy, at 2-3.

**Response to Paragraph 17**: Undisputed.

18.    NI worked to "ensure that [it was] compliant with all insider trading laws" and took "a very stark and strong approach to . . . being compliant with the law and ensur[ed] that all [NI] employees did the same." Ex. 7, Dixon Dep., at 306:19-307:3.

**Response to Paragraph 18**: Disputed. Lead Plaintiff does not dispute the accuracy of the transcription, but Lead Plaintiff disputes the contention above as misleading.  As presented above, the statement is not qualified by time period or topic, even though the quoted testimony was provided in response to a question about the May 27, 2022 trading restriction. Pl. Ex. 3, Dixon Tr., at 306:20-22. Additionally, Defendants sought a "legitimate argument" that NI was not in possession of MNPI. Def. Ex. 33, at -5029. Chief Legal Officer Eddie Dixon testified that he "[didn't] recall" (i) whether he reviewed any written legal advice from Wachtell on this issue, (ii) whether he reviewed any case law on this issue, or (iii) whether he conducted any independent diligence on this issue. Pl. Ex. 3, Dixon Tr. at 208:10-209:14. Further, Lead Plaintiff disputes this contention for the reasons stated in the Response to Paragraph 34.

19.    In 2022, NI's Board Chairman and management viewed NI as undervalued in part because there was a supply chain crisis in 2021 and 2022. Ex. 3, McGrath Dep., at 101:18-103:9; Ex. 2, Starkloff Dep., at 22:17-23:13, 90:17-91:12.

**Response to Paragraph 19**: Disputed. Lead Plaintiff does not dispute that Defendants McGrath and Starkloff testified to this effect but disputes any implication of this testimony that the supply chain crisis was the sole or primary reason that NI's stock was undervalued after May 25, 2022. After this date, the stock's value was suppressed primarily because of the nondisclosure of the material nonpublic information concerning Emerson's offer. Pl. Counterstatement, at ¶¶48, 52; Pl. Ex. 36, NAT-SL-00021516-1531, at -1525 (Defendant McGrath arguing that NI should work to improve the stock price "without the price being based on a potential sale of the company").

20.    In 2022, NI's revenue was suppressed because NI had strong demand for its products and received orders from customers but could not ship sufficient product to fulfill these orders and generate the corresponding revenue. Ex. 3, McGrath Dep., at 101:18-103:9; Ex. 2, Starkloff Dep., at 90:17-91:12.

**Response to Paragraph 20**: Disputed. Lead Plaintiff does not dispute that Defendants McGrath and Starkloff testified to this effect but disputes any implication of this testimony that the alleged revenue suppression was the sole or primary reason that NI's stock was undervalued after May 25, 2022.  After this date, the stock's value was suppressed primarily because of the nondisclosure of the material non-public information concerning Emerson's offer. Pl. Counterstatement, at ¶¶48, 52; Pl. Ex. 36, NAT-SL-00021516-1531, at -1525 (Defendant McGrath arguing that NI should work to improve the stock price "without the price being based on a potential sale of the company").

21.    In 2022, up to and throughout the Class Period, NI was not interested in being acquired by another company. Ex. 2, Starkloff Dep., at 160:15-21; Ex. 9, Ilcisin Dep., at 240:15-18; Ex. 7, Dixon Dep., at 52:24-53:8, 246:15-25, 298:16-20.

**Response to Paragraph 21**: Disputed. Lead Plaintiff disputes this contention as misleading to the extent it confuses NI's interest in a potential transaction with the subjective preferences of Defendants and NI management, and as misleading to the extent it implies that NI had no interest in any transaction. The record shows that Defendants and NI's management preferred not to be acquired at $48 because it undervalued NI. Def. Ex. 1; McGrath Tr. at 103:10-19; Def. Ex. 29 at -1460-61. The record also shows that the Defendants understood, notwithstanding their subjective preferences, that they owed a duty to shareholders under Delaware law, which imposes obligations on fiduciaries irrespective of their subjective preferences. Def. 15, NAT-SL-00016117; Def Ex. 21, NAT-SL-00016757-758. Further, NI's NI management showed interest in conducting a transaction in which NI would be acquired. For example, as of June 14, 2022, NI's CFO Karen Rapp and NI's VP of Corporate Strategy Kevin Ilcisin engaged in a "wine bet" in which Rapp and Ilcisin bet on the final closing price for the sale of NI to Emerson. Pl. Ex. 26, NAT-SL-00008520-8521 (June 14, 2022); Pl. Counterstatement ¶¶29-32. On August 10, 2022, one day before NI entered into the alleged 10b5-1 plan and two days before NI engaged in open market purchases, Kevin Ilcisin wrote to BofA: "[t]his just got interesting!!" in response to news that Emerson had accumulated 1.25 million shares of NI stock and was now within the "[t]top 25 shareholders." Pl. Ex. 50, NAT-SL-00011768. Wachtell advised Defendants that ███████████ ███████████████████████████████████████████████ █████████████ " Def. Ex. 21, at -6760. Dr. Cain explained in his report that, according to academic research, a "target company's rejection is frequently an optimal negotiating strategy to maximize the expected payoff[.]" Decl. of J. Bennett in support of Defendants Mot. to Exclude, Ex. C, Expert Report of Matthew D. Cain, Ph.D (November 10, 2025) ¶41.

7

22.     Prior to May 16, 2022, NI's CEO at the time, Eric Starkloff, and Board Chair at the time, Michael McGrath, were not aware of any interest from Emerson Electric Co. ("Emerson") in acquiring NI. Ex. 2, Starkloff Dep., at 161:22-162:1; Ex. 3, McGrath Dep., at 333:16-20.

**Response to Paragraph 22**: Undisputed.

23.     On May 16, 2022, Emerson's CEO Lal Karsanbhai contacted Starkloff regarding Emerson's potential interest in an acquisition of NI. Ex. 1, NI Proxy Statement (May 25, 2023), at 35.

**Response to Paragraph 23**: Undisputed.

24.     On May 25, 2022, Karsanbhai and Starkloff spoke by phone, and Karsanbhai indicated Emerson was interested in a potential acquisition of NI. *Id.*; Ex. 10, May 25 Letter.

**Response to Paragraph 24**: Undisputed.

25.     After the May 25, 2022 call between Karsanbhai and Starkloff, there were no phone calls between Karsanbhai and Starkloff until at least November 3, 2022, which is after the Class Period. Ex. 2, Starkloff Dep., at 28:18-29:15.

**Response to Paragraph 25**: Undisputed.

26.     Also on May 25, 2022, Karsanbhai emailed a letter (the "May 25 Letter") to Starkloff. Ex. 10, May 25 Letter.

**Response to Paragraph 26**: Undisputed.

27.     The top of the first page of the May 25 Letter stated, "<u>STRICTLY PRIVATE AND CONFIDENTIAL</u>." *Id.* Emerson's May 25 Letter also stated, "[w]e have no current plan to disclose this letter and assume that you do not intend to either." *Id.* at 1-2.

**Response to Paragraph 27**: Disputed. Lead Plaintiff does not dispute the quoted language appears in the cited document. However, Lead Plaintiff disputes this contention as incomplete and

misleading. The full paragraph reads: "[w]e have no current plan to disclose this letter and assume that you do not intend to either. Our strong preference is to work constructively and expeditiously with you and your board to announce a Definitive Agreement." Def. Ex. 10, at -1265 (May 25, 2022). Defendant Starkloff explained that NI and its counsel at Wachtell interpreted this language as "a coded statement of a public disclosure threat." Pl. Ex. 4, Starkloff Tr., at 46:1-14.

28.     The May 25 Letter stated, "Emerson proposes to purchase 100% of the outstanding common stock of NI for $48 in cash per common share." *Id.*

**Response to Paragraph 28**: Undisputed.

29.     Further, the May 25 Letter stated, "This Proposal constitutes neither an offer nor evidence of the existence of an offer, and is not intended to be and does not create a binding legal obligation on any party and no party will have any obligation or liability with respect to the Proposal, unless and until the execution of the Definitive Agreement by the parties hereto and then subject to the terms thereof." *Id.*

**Response to Paragraph 29**: Disputed. While Lead Plaintiff does not dispute that the quoted language appears in the cited document, Lead Plaintiff disputes this contention as incomplete and misleading. NI leadership understood the May 25 Letter as an offer, regardless of the lack of any legal obligations. *See e.g.*, Pl. Ex. 4, Starkloff Tr. at 43:5-8, Pl. Ex. 2, McGrath Tr., at 64:10-22; Pl. Ex. 3, Dixon Tr., at 92:10-12; Pl. Ex. 1, Rapp Tr., at 20:14-17.

30.     Emerson's May 2022 proposal to acquire NI was unsolicited. Ex. 3, McGrath Dep., at 333:3-7; Ex. 2, Starkloff Dep., at 162:2-5; Ex. 9, Ilcisin Dep., at 241:14-19; Ex. 7, Dixon Dep., at 298:21-299:1.

**Response to Paragraph 30**: Undisputed.

31.     NI's Board Chairman and CEO believed Emerson's $48 per share proposal price in the May 25 Letter was not credible, substantially undervalued NI, and was "just an attempt to look for a bargain in the market." Ex. 3, McGrath Dep., at 101:11-103:19; Ex. 2, Starkloff Dep., at 162:6-17.

**Response to Paragraph 31**: Disputed. Lead Plaintiff does not dispute the accuracy of the transcription, but Lead Plaintiff disputes the credibility of this testimony. The May 25 Letter offered to purchase all outstanding shares of NI stock in an all-cash transaction, with no financing condition, for a 39% premium to NI's stock price. Pl. Counterstatement ¶1-2, Def. Ex. 1. McGrath acknowledged that Emerson was "serious" about the offer made in this letter, and Starkloff stated that he "viewed [the letter] as sincere interest[.]" Pl. Ex. 2, McGrath Tr. at 93:13-18; Pl. Ex. 4; Starkloff Tr., at 30:20-31:6. Further, Defendant McGrath also acknowledged that, even if Defendants believed Emerson's offer was too low, Emerson might have "take[n] hostile actions at $48 a share." Pl. Ex. 2, McGrath Tr., at 118:1-16.

32.     NI's Board members understood they had a responsibility to shareholders to consider and evaluate Emerson's acquisition proposal. Ex. 3, McGrath Dep., at 99:9-20.

**Response to Paragraph 32**: Undisputed.

33.     After Emerson's initial outreach to NI in May 2022, NI engaged the law firm Wachtell, Lipton, Rosen & Katz ("Wachtell") to give legal advice to NI in connection with Emerson's unsolicited offer. Ex. 7, Dixon Dep., at 303:19-304:13; Ex. 45, Percival Decl. ¶ 11.

**Response to Paragraph 33**: Undisputed.

34.     In executing their roles and providing advice to employees, officers, and directors at NI, NI's Chief Legal Officer, Eddie Dixon, and Legal Senior Director of Corporate, Albert

10

Percival, frequently engaged with outside counsel and relied on their expertise and advice, including oral advice. Ex. 7, Dixon Dep., at 210:1-12; Ex. 45, Percival Decl. ¶ 10.

**Response to Paragraph 34**: Disputed. Lead Plaintiff disputes this contention as misleading and incomplete to the extent it suggests that Defendants sought and relied in good faith on the legal advice of fully informed and disinterested counsel concerning NI's repurchases and disclosure obligations. Dixon, the Company's Chief Legal Officer, testified that ████████████ ████████████████████████████████████████████████. Ex. 3, Dixon Tr. at 52:18-54:1. Dixon also testified that he was not aware that the Company planned to repurchase $80 million of stock in August and September 2022. *Id.* at 174:20-175:2, 211:23-212:2. There is no record evidence to show that Wachtell was ever informed of this fact. Defendants assert that Wachtell advised them to conduct "business as usual" but the Company's sudden and unprecedented $80 million expenditure on repurchases was not "business as usual" because it deviated significantly from the Company's business plan. Ex. 2, McGrath Tr. at 313:3-314:2; Bennett Ex. G; Ex. 63, NAT-SL-00006122; Ex. 65, at 11. Moreover, Dixon testified that he "didn't engage . . . directly" with Morrison & Foerster, the law firm that aided National Instruments in drafting its purported 10b5-1 plan. *Id.* at 24:5-14; Pl. Ex. 55, NAT-SL-00022559-2561 (August 11, 2022).

35.    NI engaged Wachtell in May 2022 to "defend against an acquisition" and "because [NI] had no interest in selling and [NI] wanted to engage a firm that provided that sort of expertise in defense of an unsolicited offer." Ex. 7, Dixon Dep., at 303:19-305:2.

**Response to Paragraph 35**: Disputed. Lead Plaintiff does not dispute the accuracy of the transcription but disputes the credibility of Dixon's testimony. Specifically, for the reasons stated in the Response to Paragraph 21, Lead Plaintiff disputes the contention that NI had no interest in

11

selling. Further, Lead Plaintiff disputes any implication that Wachtell was retained solely to defend against a transaction. For example, Dixon sent an email on June 4, 2022 ███████████████ ████████████████████████████" Pl. Ex. 24, WLRK-00002802-2804, at -2802 (June 4, 2022). Dixon also testified that ████████████████████████████████████ ████████████████████████. Pl. Ex. 3, Dixon Tr. at 52:18-54:1.

36.     NI's Chief Legal Officer, Eddie Dixon, viewed Wachtell as "the absolute best firm" with "expertise in defense of an unsolicited offer." Ex. 7, Dixon Dep., at 21:6-17, 302:25-303:11, 303:19-304:13.

**Response to Paragraph 36**: Disputed. Although Lead Plaintiff does not dispute the accuracy of the transcription, Lead Plaintiff disputes any implication that Wachtell was retained solely to defend against a transaction. For example, Dixon sent an email on June 4, 2022 ████████████████████████████████ Pl. Ex. 24, WLRK-00002802-2804, at -2802 (June 4, 2022). Dixon also testified that ████████████████ ████████████████████████. Pl. Ex. 3, Dixon Tr. at 52:18-54:1.

37.     NI's Legal Senior Director of Corporate, Albert Percival, referred to Wachtell as "the guru here" in an email exchange with Dixon discussing potential responses by NI to Emerson's May 2025 Letter. Ex. 11, Percival Email (June 8, 2022).

**Response to Paragraph 37**: Undisputed.

38.     Percival believed Wachtell and its attorneys had experience and expertise in advising companies in receipt of unsolicited acquisition offers and they were retained based on this experience and expertise. Ex. 45, Percival Decl. ¶ 12.

**Response to Paragraph 38**: Disputed. Lead Plaintiff disputes this contention because Defendants offer only untested inadmissible hearsay (the Percival Declaration) in support.

39.     On May 20, 2022—four days after Emerson's initial outreach to NI—Dixon emailed Sabastian Niles, an attorney at Wachtell, about a draft shareholder rights plan previously reviewed by NI's Board so NI had a "draft plan on the shelf." Ex. 7, Dixon Dep., at 314:1-3; Ex. 12, Dixon and Niles Email Chain (May 25, 2022).

**Response to Paragraph 39**: Disputed. While Lead Plaintiff does not dispute that the quoted language appears in the cited document, Lead Plaintiff disputes this contention for the reasons stated in Response to Paragraph 40.

40.     In response, Niles noted potential legal issues with the draft sent by Dixon, and wrote to Dixon, "we can talk through it later (will have a full pill package if we ever actually need it)." *Id.*

**Response to Paragraph 40**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document. However, Lead Plaintiff disputes this contention as incomplete and misleading. The cited document includes a response from Dixon, which reads: "I would be interested to know about the areas that create risk regardless of the need." Def. Ex. 12, at -7404.

41.     On May 25, 2022, prior to the call between Karsanbhai and Starkloff on that date, Niles sent an email to NI executives, including Starkloff and Dixon, with "█████████████████ ███████████████████████████████. Ex. 13, Niles Email (May 25, 2022). In that email, Niles wrote, "███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████." *Id.*

13

**Response to Paragraph 41**: Undisputed.

42.    On May 26, 2022, NI's Board of Directors held a special meeting via video conference. Ex. 14, Board Meeting Minutes (May 26, 2022).

**Response to Paragraph 42**: Undisputed.

43.    Present at the May 26 special meeting were all of NI's Directors—including Eric Starkloff—as well as Eddie Dixon, and two Wachtell partners—Adam O. Emmerich and Sabastian Niles. *Id.*

**Response to Paragraph 43**: Undisputed.

44.    At the May 26 special meeting, Eric Starkloff "outlined the outreach from Wolverine and the contents of the subsequently received related letter from Wolverine," the May 25 Letter, "which letter had been provided to the Board." *Id.*

**Response to Paragraph 44**: Undisputed.

45.    "Wolverine" was a term used by NI and its advisors to refer both to Emerson and to the "project" regarding NI's review of Emerson's acquisition proposals to NI. Ex. 3, McGrath Dep., at 100:19-101:10; Ex. 2, Starkloff Dep., at 48:20-23.

**Response to Paragraph 45**: Undisputed. However, Lead Plaintiffs note that at least ███  ████████████████████████. Pl Ex. 5, BofA Tr. at 31:2-7.

46.    At the May 26 special meeting, Wachtell attorneys "outlined the Board's fiduciary duty in [the] context" of Emerson's outreach and May 25 Letter, "various legal and practical considerations in the context of receiving Wolverine's proposal and potential go-forward scenarios." Ex. 14, Board Meeting Minutes (May 26, 2022).

**Response to Paragraph 46**: Undisputed.

47.    At the May 26 special meeting, Wachtell attorneys gave a presentation titled, "█████████████████████████████████." Ex. 3, McGrath Dep., at 81:2-17; Ex. 15, Wachtell Presentation (May 26, 2022).

**Response to Paragraph 47**: Undisputed.

48.    Wachtell's presentation at the May 26 special meeting addressed Directors' fiduciary duties under Delaware law in the █████████████████." *Id.* at 2-3. The presentation advised the Board, █████████████████████████████████████████████████████████████████████████████████████████████ *Id.* at 4.

**Response to Paragraph 48**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document. However, Lead Plaintiff disputes this contention as incomplete and misleading because Wachtell █████████████████████████████████████████████████████████████████████████. For instance, Wachtell noted in the same presentation that ███████████████████████████████████████████████████████████████████[.]" Def. Ex. 15, at -6122; *see also* Paragraph 52 and the Response to Paragraph 52.

49.    Wachtell's presentation at the May 26 special meeting also advised the Board, ████ ███████████████████████████ *Id.* at 6.

**Response to Paragraph 49**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document. However, Lead Plaintiff disputes the above contention as incomplete and misleading. The quoted slide was shared in the context of Emerson's approach and was titled "███████████████████[.]" Def. Ex. 15, at -6120.  An additional slide in this exhibit ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████." *Id.* at -6128. NI's

Chief Legal Officer, Eddie Dixon, also advised NI's directors and officers to limit their written

communications about Emerson and buybacks due to the sensitive nature of the information. Pl.

Ex. 3, Dixon Tr., at 153:13-154:18; *See also* Pl. Ex. 35, NAT-SL-00023205-3206.

50.    Wachtell's presentation at the May 26 special meeting also described tactics that

may be taken by potential acquirers towards a target. *Id.* at 7-9.

**Response to Paragraph 50**: Disputed. Lead Plaintiff disputes the above contention

because it is vague and ambiguous. Wachtell's presentation included a slide titled "████████

███████████████████████████████████████████" Def. Ex. 15, at -6121.

This slide displays ████████████████████████████████████████████████

██████████████████████████. *Id.*; Pl. Ex. 2, McGrath Tr., at 83:2-5. The slide lists ████████

█████████████████████████████████████████████████████

████████████████████████ Def. Ex. 15, at -6121.

51.    Dixon understood the "purpose" of Wachtell's presentation to be "educating NI's

board once [NI] got an unsolicited offer," as opposed to determining where NI stood with respect

to Emerson and whether Emerson was deploying any of the listed tactics. Ex. 7, Dixon Dep., at

93:3-20.

**Response to Paragraph 51**: Disputed. While Lead Plaintiff does not dispute the accuracy

of the transcription, Lead Plaintiff disputes this contention as incomplete and misleading. Dixon

also acknowledged that NI "would be looking for" Emerson's use of ███████████████████

█████████████████████ Pl. Ex. 3, Dixon Tr. at 96:7-97:16. Additionally, Lead

16

Plaintiff disputes the accuracy of Dixon's statements themselves. Defendant McGrath testified that, because of this presentation, he understood that Emerson was at ███████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████. Def. Ex. 15, at -6121; Pl. Ex. 2, McGrath Tr., at 83:6-19.

52.     Wachtell's presentation at the May 26 special meeting described multiple ███████

███████████" Ex. 15, Wachtell Presentation (May 26, 2022), at 8-9. One listed "█████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████" The presentation described the "█████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████" *Id.* at 8. Another listed ████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████." The presentation described the ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████." *Id.* The presentation also described "████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████" *Id.* at 9. The presentation described the "█████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████." *Id.*



**Response to Paragraph 52**: Disputed. Although Lead Plaintiff does not dispute that the quoted language appears in the cited document, Lead Plaintiff disputes the above contention because it is incomplete and misleading. The slides referenced in Paragraph 52 are titled ████████

17

████████ Def. Ex. 15, at -6122-23. Defendant McGrath testified that he understood that the outreach from Emerson would "most likely" be classified as a "████████████████████ ████████████████████████████████ Pl. Ex. 2, McGrath Tr. at 84:2-7, 83:6-19. After receiving Emerson's June 22 Letter, NI hired MacKenzie Partners to monitor share accumulation. Def. Ex. 27. When████████████████████████ ████████████████████, Dixon noted that the "probability of [Emerson] going public [was] much higher[.]" Def. Ex. 39.

53.    At the May 26 special meeting, "[t]he Board and management discussed the proposal from Wolverine, current Company strategy and business performance as well as prior discussions that had been had with the Board regarding the Company's strong prospects and positions, engagement of outside advisors and other next steps." Ex. 14, Board Meeting Minutes (May 26, 2022).

**Response to Paragraph 53**: Undisputed.

54.    At the May 26 special meeting, "[t]he Board agreed to reconvene in June to continue the discussion, including with the assistance of outside financial advisors and its legal advisors at [Wachtell], and make related determinations." *Id.*

**Response to Paragraph 54**: Undisputed.

55.    After receiving the May 25 Letter, and before there was any "other engagement" between NI and Emerson, NI's Chief Legal Officer, Eddie Dixon, concluded that those who were aware of "Project Wolverine" were in possession of material non-public information. Ex. 7, Dixon Dep., at 108:2-6.

**Response to Paragraph 55**: Undisputed.

18

56.     On May 27, 2022, Eddie Dixon sent an email to NI's Directors, Officers, and employees who were aware of "Project Wolverine" announcing a "Project Wolverine trading restriction," and directing the recipients "not [to] trade in NATI Common Stock until [the recipient] receive[s] a notification from" Dixon lifting the restriction. Ex. 16, Dixon Email (May 27, 2022).

**Response to Paragraph 56**: Undisputed.

57.     NI executed an Engagement Letter with BofA Securities, Inc. ("BofA"), dated June 10, 2022. Ex. 17, BofA Engagement Letter.

**Response to Paragraph 57**: Undisputed.

58.     NI engaged BofA to "██████████████████████████████ ██████████████████████████████████████████████████████████████ ██████." Ex. 17, BofA Engagement Letter, at 1; Ex. 9, Ilcisin Dep., at 242:4-10; Ex., 7, Dixon Dep., at 300:2-13.

**Response to Paragraph 58**: Disputed. While Lead Plaintiff does not dispute that the quoted language appears in the cited document, Lead Plaintiff disputes this contention as incomplete and misleading to the extent it omits the facts set forth in Paragraph 60 and the Response to Paragraph 60.

59.     Under the June 10 Engagement Letter, NI agreed to pay BofA a ██████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████ Ex. 17, BofA Engagement Letter, at 1.

**Response to Paragraph 59**: Disputed. Lead Plaintiff does not dispute that this contention reflects some of the terms in the June 10 Engagement Letter. However, Lead Plaintiff disputes this

19

contention as incomplete and misleading because it omits the facts set forth in Paragraph 60 and the Response to Paragraph 60.

60.    Under the June 10 Engagement Letter, BofA  . The Engagement Letter explained, under such circumstances, BofA would

*Id.* at 2.

**Response to Paragraph 60**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document, but Lead Plaintiff disputes this contention as incomplete and misleading. BofA ultimately acted as NI's financial advisor when Emerson acquired NI, and BofA was compensated for this work with a success fee of $51 million. Pl. Ex. 5, BofA Tr., 55:3-23; Def. Ex. 1, at 46.

61.    The

. *Id.*; Ex. 18, BofA Dep., at 58:5-9.

**Response to Paragraph 61**: Disputed. Lead Plaintiff disputes that  " As cited in Paragraph 60, the agreement " Def. Ex. 17, at -1555.  Additionally, this contention mischaracterizes the testimony provided by BofA's Rule 30(b)(6) witness, Shawn Liu. In response to the question,



.” Pl. Ex. 5, BofA Tr. at 58:5-9. This testimony was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

62.    The June 10 Engagement Letter was not a "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 18, BofA Dep., at 55:25-56:21, 156:18-23.

**Response to Paragraph 62**: Disputed. Lead Plaintiff does not dispute the accuracy of the transcription, but Lead Plaintiff disputes the accuracy of Mr. Liu's statement itself. The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, as explained in Paragraph 60 and the Response to Paragraph 60.

63.    Sabastian Niles of Wachtell advised Eddie Dixon on June 3, 2022 that a draft of BofA's June 10 Engagement Letter "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 19, Niles Email Chain (June 3, 2022).

**Response to Paragraph 63**: Undisputed.

64.    On June 14, 2022, NI's Board of Directors held a special meeting. Ex. 20, Board Meeting Minutes (June 14, 2022).

**Response to Paragraph 64**: Undisputed.

65.    Present at the June 14 special meeting were all of NI's Directors—including Eric Starkloff—as well as Eddie Dixon, Kevin Ilcisin (NI's Senior Vice President, Corporate Strategy),

21

Karen Rapp (NI's Chief Financial Officer), two Wachtell partners—Adam O. Emmerich and Sabastian Niles—and four representatives of BofA, including Shawn Liu. *Id.* at 1.

**Response to Paragraph 65**: Undisputed.

66.    At the June 14 special meeting, Wachtell again advised the Board on its "fiduciary duties . . , legal and practical considerations in the context of receiving Wolverine's proposal and potential go-forward scenarios." Wachtell's attorneys also responded to questions from members of NI's Board. *Id.* at 1.

**Response to Paragraph 66**: Undisputed.

67.    Wachtell's presentation to the Board at the June 14 special meeting included a slide titled, "█████████████████████████████████████████████." Ex. 21, Wachtell Presentation (June 14, 2022), at 5. That slide stated, ██████████████████████████████████ ████████████████████████" That slide also included three columns, each describing a different "█████████████." The enumerated "████████████" were "██████████," ████████████████████████████████████████████ ███████████ The description of "████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████." *Id.*

**Response to Paragraph 67**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document, but Lead Plaintiff disputes this contention as misleading and incomplete. This slide also stated: "████████████████████████████████ ████████████████████████████████████████████████████."

22

Def. Ex. 21, at -6760 (June 14, 2022). The slide further stated: "

." *Id.* Further, Defendant McGrath

acknowledged that after this presentation, he understood that the "

" regardless of NI's response. Pl. Ex. 2, McGrath Tr., 118:1-16, 124:6-15.

68.    "Nuthatch" is another term that NI used to refer to Emerson. Ex. 3, McGrath Dep., at 113:13-15.

**Response to Paragraph 68**: Undisputed.

69.    Also at the June 14 special meeting, representatives of BofA "presented the Board various financial analyses concerning the Company and the proposal from Wolverine." Ex. 20, Board Meeting Minutes (June 14, 2022), at 1.

**Response to Paragraph 69**: Undisputed.

70.    At the June 14 special meeting, "BofA provided their assessment of the Wolverine proposal, including as to how the various valuation frameworks and methodologies used by BofA presented values for [NI] that exceeded Wolverine's offer." *Id.* at 1.

**Response to Paragraph 70**: Undisputed.

71.    BofA also presented the Board with "financing capacity analyses of Wolverine," including BofA's conclusion that Emerson had "ample capacity to pursue M&A." *Id.* at 1; Ex. 3, McGrath Dep., at 113:23-114:10.

**Response to Paragraph 71**: Undisputed.

72.    As part of the financing capacity analyses, BofA presented a slide showing that, if Emerson sold a business it owned called InSinkErator, that sale would increase Emerson's capacity to do M&A. Ex. 3, McGrath Dep., at 115:15-22.

**Response to Paragraph 72**: Undisputed.

73.    After receipt of Emerson's May 25 Letter, representatives of NI, including Eric Starkloff and Michael McGrath, did not "question[ Emerson's] ability to have the capital to do a deal" with NI. Ex. 2, Starkloff Dep., at 132:6-21; Ex. 3, McGrath Dep., at 114:7-10.

**Response to Paragraph 73**: Undisputed.

74.    At the June 14 special meeting, following the presentations by Wachtell and BofA, the Board discussed

> Wolverine's proposal, [NI's] strategy, performance and valuation considerations, and potential responses. Directors referenced prior meetings of the Board where [NI's] business, prospects, opportunities and risks had been thoroughly discussed, noted that the strength of [NI's] performance and prospects and highlighted that supply chain challenges ha[d] been hampering translation of increased bookings into revenue and that the results of [NI's] strategic plan ha[d] yet to be realized. Directors also discussed that the proposal did not provide a basis for further discussions and how the timing of the proposal was opportunistic, including taking into account broader market and industry volatility and especially company-specific circumstances, such as, among others, that [NI's] strategic plan [wa]s in the early stages of realization and that the proposal substantially undervalue[d] [NI], including relative to the value able to be realized and unlocked from execution of [NI's] strategic plan and relative to the valuation methodologies presented by BofA and discussed with the Board. In addition, the directors discussed the lack of apparent synergies for Wolverine with respect to [NI], especially relative to other potential strategic partners.

Ex. 20, Board Meeting Minutes (June 14, 2022), at 2.

**Response to Paragraph 74**: Undisputed.

75.    "Upon conclusion of discussion, the directors unanimously determined to reject Wolverine's proposal and that it would direct management to convey this determination to Wolverine." *Id.* at 2.

**Response to Paragraph 75**: Undisputed.

24

76.      "The directors then discussed the potential response to Wolverine and authorized Messrs. McGrath, Starkloff, Dixon and representatives of [Wachtell] to prepare and deliver a responsive letter to Wolverine." *Id.* at 2.

**Response to Paragraph 76**: Undisputed.

77.      "The directors then discussed potential courses of action in the event Wolverine were to escalate the matter publicly or otherwise, respond with a higher offer or if other scenarios were to occur and determined that any material developments could be discussed at the regularly scheduled meeting of the Board in July." *Id.* at 2.

**Response to Paragraph 77:** Undisputed.

78.      Further, "[m]aterials regarding a potential shareholder rights plan were provided to the Board by [Wachtell] and referenced by representatives of [Wachtell] in the discussion." *Id.* at 2.

**Response to Paragraph 78**: Undisputed.

79.      Representatives of NI worked with attorneys at Wachtell to prepare a response to the May 25 Letter. Ex. 22, Dixon and Niles Email Chain (June 14, 2022).

**Response to Paragraph 79**: Undisputed.

80.      In drafting NI's response to the May 25 Letter, NI and its outside counsel at Wachtell intended to send the message to Emerson that NI was not interested in engaging and intended to avoid language or content that Emerson would construe as an invitation to re-bid or as a suggestion that NI was for sale. *Id.*; Ex. 11, Percival Email (June 8, 2022); Ex. 45, Percival Decl. ¶ 14.

**Response to Paragraph 80**: Disputed. Lead Plaintiff disputes any implication that NI was not interested in any transaction in which Emerson acquired NI for the reasons stated in Response

to Paragraph 21. Additionally, Wachtell advised Defendants that ██████████████ ███████████████████████████████████████████████████████████████."

Def. Ex. 21, at -6760. Lead Plaintiff also disputes this contention to the extent it relies on inadmissible hearsay (the Percival Declaration) for support.

81.    On June 16, 2022, NI responded to Emerson's May 25 Letter with a letter to Lal Karsanbhai signed by Eric Starkloff and Michael McGrath rejecting Emerson's acquisition proposal ("June 16 Letter"). Ex. 23, June 16 Letter.

**Response to Paragraph 81**: Undisputed.

82.    The June 16 Letter stated, "The Board of Directors (the 'Board') of National Instruments Corporation ('NI') has carefully reviewed your letter dated May 25, 2022, with the assistance of our financial and legal advisors. The Board has unanimously determined that your letter does not provide a basis for further discussions. NI's Board and management team will remain focused, without distraction, on executing our strategies that are producing a significant and steady increase in bookings and revenue, strengthened operational performance, and advances in technology." *Id.*

**Response to Paragraph 82**: Undisputed.

83.    NI's statement in the June 16 Letter that the May 25 Letter did "not provide a basis" for further discussions matches ███████████████████████████ ██████████████████████████████████████████." Ex. 21, Wachtell Presentation (June 14, 2022), at 5.

**Response to Paragraph 83**: Disputed. Lead Plaintiff does not dispute that ████████ ████████████████████████████████████ However, Lead Plaintiff disputes this contention because it is incomplete and misleading for the reasons stated in the Response to Paragraph 67.

26

84.    On June 22, 2022, Lal Karsanbhai emailed Eric Starkloff and Michael McGrath with Emerson's response to NI's June 16 Letter. That email attached a letter addressed to Starkloff and McGrath from Karsanbhai dated June 22, 2022 (the "June 22 Letter"). Ex. 24, June 22 Letter.

**Response to Paragraph 84**: Undisputed.

85.    The June 22 Letter reiterated Emerson's proposal to acquire all of NI's outstanding shares at $48 per share in cash. *Id.* at 1.

**Response to Paragraph 85**: Disputed. Lead Plaintiff does not dispute that the proposal was for Emerson to acquire NI for $48 per share in cash. However, Lead Plaintiff disputes the use of the term "reiterated" as misleading because of the facts stated in Pl. Counterstatement ¶¶11-16. For example, the $48 per share price represented a 39% premium as of the May 25 Letter, but because of decreases in NI's stock price over the period between the May 25 Letter and the June 22 Letter, the $48 per share offer represented a 51% premium to NI's share price as of June 22. Def Ex. 24, at -2992. Additionally, in the June 22 Letter, Emerson stated: "[W]e could work with you to find additional value that would allow us to increase our Proposal." *Id.* at -2993.

86.    The top of the June 22 Letter stated, "STRICTLY PRIVATE AND CONFIDENTIAL." *Id.*

**Response to Paragraph 86**: Undisputed.

87.    Further, the June 22 Letter stated, "This Proposal constitutes neither an offer nor evidence of the existence of an offer, and is not intended to be and does not create a binding legal obligation on any party and no party will have any obligation or liability with respect to the Proposal, unless and until the execution of the Definitive Agreement by the parties hereto and then subject to the terms thereof." *Id.* at 3.

27

**Response to Paragraph 87**: Disputed. While Lead Plaintiff does not dispute that the quoted language appears in the document, Lead Plaintiff disputes this contention as incomplete and misleading. NI's leadership understood the June 22 Letter as an offer, regardless of the lack of any legal obligations. *See, e.g.*, Pl. Ex. 4, Starkloff Tr. at 69:14-16, Pl. Ex. 2, McGrath Tr. at 126:16-18; Pl. Ex. 3, Dixon Tr. at 128:2-129:1; Pl. Ex. 6, Ilcisin Tr. at 191:25-192:3.

88.    The June 22 Letter stated, "[we] are confident that with access to limited non-public information after signing an NDA, we could work with you to find additional value that would allow us to increase our Proposal." *Id.* at 2.

**Response to Paragraph 88**: Undisputed.

89.    NI's CEO understood from counsel that this type of statement is often included in proposal letters but cannot be relied upon. Ex. 2, Starkloff Dep., at 75:10-18.

**Response to Paragraph 89**: Disputed. Lead Plaintiff does not dispute that Defendant Starkloff, NI's CEO, testified to this effect but disputes the credibility of this testimony and any implication that Emerson's statement was in fact unreliable. NI's financial advisor recognized that Emerson had "ample capacity" to purchase NI. *See* Paragraph 71; Pl. Ex. 25, NAT-SL-00001513-NAT-SL-00001545, at -1529. Starkloff testified that he "never questioned [Emerson's] ability to have the capital to do a deal." Pl Ex. 4, Starkloff Tr. at 132:6-21. In addition, Defendant McGrath testified that he understood this language at the time he received this letter to indicate that Emerson could find additional value and increase its proposal. Pl. Ex. 2, McGrath Tr. at 145:21-146:1.

90.    The June 22 Letter also stated, "[w]e have engaged Goldman Sachs & Co. LLC and Centerview Partners LLC as our financial advisors and Davis Polk Wardwell LLC as our legal counsel." Ex. 24, June 22 Letter, at 2.

**Response to Paragraph 90**: Undisputed.

91.    NI's CEO assumed before the June 22 Letter that Emerson was working with advisors, and he did not view the June 22 Letter as providing any new information. Ex. 2, Starkloff Dep., at 76:9-18.

**Response to Paragraph 91**: Disputed. Lead Plaintiff does not dispute that Defendant Starkloff, NI's CEO, testified to this effect but disputes the credibility of this testimony in light of the additional facts stated in Pl. Counterstatement ¶¶11-17. As mentioned in Paragraph 88, Emerson stated in the June 22 Letter that it was willing to increase its offer price. Def Ex. 24, at -2993. Emerson did not express this willingness in the May 25 Letter. *See* Def. Ex. 10. The June 22 Letter also stated that Emerson had "performed extensive outside-in due diligence on NI" and had since "obtained a Highly Confident Letter from Goldman Sachs." Def Ex. 24, at -2993. Additionally, NI's Chief Legal Officer, Dixon, noted that Emerson's June 22 letter "indicated a significant level of [due diligence][.]" Pl. Ex. 30, NAT-SL-00016089 (June 23, 2022); Pl. Ex. 3, Dixon Tr. at 139:23-140:21. Dixon also identified as among the "most relevant" features of Emerson's June 22 letter that: "Goldman Sachs and Centerview ha[d] been retained as financial advisors and Davis Polk Wardwell for legal advisors," Emerson had made multiple "references to the premium to various price time frames, relative stock performance in the last several years to Nasdaq, competitors, etc.," Emerson "could potentially unlock additional value to increase their proposal," and Emerson had requested a response by July 11.  Pl. Ex. 31, NAT-SL-00017152-7155 at -7152.

92.    When Emerson reiterated its $48 per share acquisition proposal, it caused NI's CEO and Chief Legal Officer to believe that $48 was the maximum price Emerson would offer to acquire NI, that Emerson was less serious about the prospects of acquiring NI on June 22 than it

29

was on May 25, and that an acquisition of NI by Emerson was not likely. Ex. 2, Starkloff Dep., at 75:10-76:25, 78:1-6, 170:4-171:6; Ex. 7, Dixon Dep., at 191:21-192:11, 309:1-11.

**Response to Paragraph 92**: Disputed. Lead Plaintiff disputes that Paragraph 92 accurately summarizes the cited testimony. Additionally, Lead Plaintiff disputes this contention because it is incomplete and misleading. In the June 22, 2022 letter, Emerson stated that it  was willing to "work with [NI] to find additional value that would allow us to increase our Proposal." Def. Ex. 24, at -2993. ████████████████████████████████████████████████████████████████████ ██████████████████████████████████ Pl. Ex. 32, WLRK-00001575-1578. Further, Starkloff anticipated that Emerson could choose to go public the week of July 11—the date by which Emerson requested a response in its June 22 Letter. Def. Ex. 25, at -6234; Def. Ex. 24, at -2994. On July 7, 2022, Lal Karsanbhai responded to an email from Starkloff stating: "[a]s I highlighted in my prior communication dated June 22, we prefer to keep our conversations private, however for that to remain feasible we need relative expedience from NI's board" and "[m]y offer to meet, or have our advisors speak with your advisors . . . still stands . . ." Pl. Ex. __ (NAT-SL-00015203-5205). McGrath stated that Emerson's July 7, 2022 "response indicates intention/threat to go public with its offer." Pl. Ex. 36, NAT-SL-00021516-1531 at -1519; Pl. Ex. 38, NAT-SL-00020795-0819 at -0798. Dixon testified that he understood that, throughout this process, potential escalation by Emerson was "certainly a possibility." Pl. Ex. 3, Dixon Tr. at 121:12-15. Starkloff testified that, after NI sent the August 2 Letter, Starkloff "thought [it] could be possible" that Emerson would come back with another offer or go public with its offer. Pl. Ex. 4, Starkloff Tr. at 128:14-23.

30

93.    Shawn Liu of BofA, who advised NI at the time, believed Emerson was ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" because the June 22 Letter contained the same proposed acquisition price as the May 25 Letter. Ex. 18, BofA Dep., at 208:18-209:22.

**Response to Paragraph 93**: Disputed. Although Lead Plaintiff does not dispute the accuracy of the transcription, Lead Plaintiff disputes this contention because it is incomplete and misleading. In the June 22, 2022 letter, Emerson indicated that it was willing to increase its offer. Def. Ex. 24, at -2993. Shortly after giving the testimony quoted in Paragraph 93, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Pl. Ex. 5, BofA Tr. at 210:4-7. Additionally, BofA continued to advise NI on this transaction well after receipt of this letter, including in the days before NI began repurchasing. Pl. Counterstatement ¶¶57, 59, 63. In fact, BofA provided NI with an updated analysis of Emerson's financial "firepower" on September 21, 2022. Pl. Counterstatement ¶75; Pl. Ex. 61, NAT-SL-00012292-2295, at -2292.

94.    NI worked with its advisors, including Wachtell, BofA, and FGS Global, to be prepared for various possible scenarios regarding Emerson, including ensuring NI was prepared "should [Emerson] cho[o]se to go public." Ex. 25, Starkloff Email (June 30, 2022).

**Response to Paragraph 94**: Disputed. Although Lead Plaintiff does not dispute that the quoted language appears in the cited document, Lead Plaintiff disputes this contention as incomplete and misleading. The full sentence the language appears in reads as follows: "[w]e'll also likely want to meet with this team next week to be fully prepared should [Emerson] cho[o]se to go public the week of the 11th." Def. Ex. 25, at -6234. According to Emerson's June 22 Letter, July 11 was the date by which Emerson expected a response from NI. Def. Ex. 24, at -2994.

95.    NI engaged FGS Global to advise NI on strategic communications related to Emerson. Ex. 26, FGS Memorandum.

**Response to Paragraph 95**: Undisputed.

96.    As of July 18, 2022, FGS worked with NI, Wachtell, and BofA to develop a scenario plan for NI related to Emerson. *Id.*

**Response to Paragraph 96**: Undisputed.

97.    FGS described its work for NI as "███████████████," during which FGS anticipated "████████████," "████████████" related to strategic communications, and ███████████████████████████ *Id.*

**Response to Paragraph 97:** Undisputed.

98.    FGS also indicated on July 18, 2022 that, if Emerson ████████████," then ███████████████████████." *Id.*

**Response to Paragraph 98**: Disputed. While Lead Plaintiff does not dispute that the quoted language appears in the cited document, Lead Plaintiff disputes the contention as incomplete and misleading. The FGS scenario plan stated: "███████████████ ███████████████████ ███████████████." Def. Ex. 26, at -2657. ███████████ ███████████████████ ███████████████████ ████████████" *Id.* at -2658. In such a scenario, ███████████████ ███████████████." *Id.* at 2657.

99.    After receiving the June 22 Letter, around June 28, 2022, NI engaged MacKenzie Partners, Inc., a company that does stock surveillance, to monitor NI's Common Stock for changes,

including accumulations, and report on such changes to NI. Ex. 27, MacKenzie Partners Engagement Letter.

**Response to Paragraph 99**: Disputed. Lead Plaintiff does not dispute that NI engaged MacKenize, Partners, Inc. on this date. However, Lead Plaintiff disputes this contention as incomplete and misleading. MacKenzie Partners is also a proxy solicitation firm, and when discussing NI's retention of MacKenzie Partners, Sebastian Niles of Wachtell explained: ███████

███████████████████████████████████████

███████████████ ". Pl. Ex. 32, WLRK-00001575-1578, at -1575; Pl. Ex. 6, Ilcisin Tr. at 74:10-75:15. Additionally, MacKenzie Partners was specifically hired in response to the Emerson offer. Pl. Ex. 6, Ilcisin Tr. at 73:13-74:20.

100.    On July 6, 2022, Starkloff responded to Karsanbhai's June 22 email and stated that NI would be discussing the June 22 Letter at its regularly scheduled Board meeting at the end of July. Ex. 28, Karsanbhai and Starkloff Email Chain (July 6, 2022).

**Response to Paragraph 100**: Disputed. Lead Plaintiff disputes this contention because it is incomplete and misleading. In response to the email referenced in Paragraph 100, Karsanbhai wrote the following day: "we prefer to keep our conversations private, however for that to remain feasible we need relative expedience from NI's Board." Pl. Ex. 34, NAT-SL-00015203-5205, at -5204. Starkloff forwarded this response to Dixon and Niles and wrote: "Let's think of strategies to keep some convo going." *Id.* at -5203. Starkloff then suggested a "friendly response showing I'm doing what I can to get board together . . . commit to response by Aug 1" and "potentially offer a call prior[.]" *Id.* Dixon responded: "[p]robably worth a brief discussion rather than email exchange." *Id.*

33

101.    On July 19 and 20, 2022, NI's Board of Directors held a regularly scheduled meeting. Ex. 29, Board Meeting Minutes (July 19, 2022).

**Response to Paragraph 101**: Undisputed.

102.    Attendees of the July 19 and 20 meeting included all of NI's Directors—including Eric Starkloff—as well as Eddie Dixon, Karen Rapp, and Albert Percival of NI, and Sabastian Niles of Wachtell. *Id.*; Ex. 45, Percival Decl. ¶ 15.

**Response to Paragraph 102**: Undisputed.

103.    At the meeting, on July 19, Starkloff led a discussion of Emerson's June 22 Letter. "It was noted that the letter from Wolverine did not present an increased offer and the letter proposed the same pricing and terms as had been previously reviewed and rejected, unanimously, by the Board." Ex. 29, Board Meeting Minutes (July 19, 2022), at 1.

**Response to Paragraph 103**: Disputed. While Lead Plaintiff does not dispute that the quoted language appears in the cited document, Lead Plaintiff disputes any implication that Emerson's June 22 Letter "did not present an increased offer and the letter proposed the same pricing and terms as had been previously reviewed and rejected" for the reasons stated in the Responses to Paragraphs 85 and 89.

104.    On July 20, "Board members discussed various aspects of Wolverine's outreach, including Wolverine having simply reaffirmed their prior inadequate offer, the potential for Wolverine to change their offer and the degree of seriousness with which Wolverine would pursue the potential transaction, the potential for entry into an NDA and engaging in due diligence and negotiations with Wolverine, and various strategic and financial alternatives." *Id.* at 4.

**Response to Paragraph 104**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document. However, Lead Plaintiff disputes any implication that

34

Emerson "reaffirmed their prior inadequate offer" for the same reasons as stated in the Responses to Paragraphs 85 and 89.

105.    Also on July 20, "[t]he Board members reaffirmed their view that the Wolverine proposal is not in the best interests of [NI] and its shareholders, does not reflect the value that is expected to be generated by [NI's] businesses strategies, which continues to show positive momentum and that the timing was inopportune for such a proposal from [NI's] perspective, including taking into account how supply chain constraints were impacting backlog and revenue conversion and [NI's] plans for addressing such matters. The Board also concluded following discussion that the proposal from Wolverine did not merit engaging in discussions with or providing diligence materials to Wolverine." *Id.* at 4-5; Ex. 45, Percival Decl. ¶ 16.

**Response to Paragraph 105**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document. However, Lead Plaintiff disputes this contention as incomplete and misleading. Immediately following the quoted language above, the minutes state:

> These conclusions also referenced and took into account the discussions and materials previously reviewed with the Board. The Board also discussed with management the potential steps the Company could take at the upcoming earnings call to highlight the Company's strong momentum, prospects, margin priorities and other financial and operating performance matters. Various elements of the Company's strategic plan, including potential acquisitions by the Company and their benefits, were also discussed. Representatives of WLRK provided perspectives, including as to legal matters.

Def. Ex. 29, at -1461. Additionally, Lead Plaintiff disputes this contention as incomplete and misleading because it does not contain the facts set forth in Pl. Counterstatement ¶¶39-45.

106.    "Following discussion, upon a motion duly made and seconded, the Board unanimously voted to reaffirm their continued rejection of the Wolverine proposal and authorized Mr. McGrath, Mr. Starkloff and Mr. Dixon to determine the precise manner and content for

35

communicating the reaffirmed rejection to Wolverine." Ex. 29, Board Meeting Minutes (July 19, 2022), at 5.

**Response to Paragraph 106**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document. However, Lead Plaintiff disputes the contention as complete and misleading because it omits the following language: "The Board also discussed with management the potential steps the Company could take at the upcoming earnings call to highlight the Company's strong momentum, prospects, margin priorities and other financial and operating performance matters." Def. Ex. 29, at -1461.

107.    As part of the Board's discussion on July 20, "[r]epresentatives of [Wachtell] provided perspectives, including as to legal matters." *Id.* at 5.

**Response to Paragraph 107**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document. However, Lead Plaintiff disputes the contention as incomplete and misleading because the quoted language follows the additional language cited in the Response to Paragraph 105.

108.    During the Board's discussions regarding Emerson on both July 19 and July 20, Sabastian Niles of Wachtell "responded to questions from members of the Board." *Id.* at 1, 5.

**Response to Paragraph 108**: Disputed. While Plaintiff does not dispute that the quoted language appears in the cited document, Plaintiff disputes this paragraph as incomplete and misleading. The document states that "management and Mr. Niles responded to questions from members of the Board." Def. Ex. 29, at -1461.

109.    At a Board meeting, NI's Board was advised by outside counsel at Wachtell to "return to business as usual" after rejecting Emerson's $48 per share acquisition proposal from the June 22 Letter. Ex. 3, McGrath Dep., at 283:24-284:20; 286:12-16.

36

**Response to Paragraph 109**: Disputed. Lead Plaintiff does not dispute the accuracy of the transcription, but Lead Plaintiff disputes the credibility of Defendant McGrath's testimony. Defendants have provided no written evidence of this purported advice. Defendant McGrath was not aware of when this alleged advice was conveyed. Pl. Ex. 2, McGrath Tr. at 286:12-287:17. Additionally, when asked about this alleged advice, Chief Legal Officer Eddie Dixon "[couldn't] recall explicitly whether we used those phrases or not." Pl. Ex. 3, Dixon Tr. at 182:6-13. Likewise, CEO Eric Starkloff "[didn't] remember if they used that phrase[.]" Pl. Ex. 4, Starkloff Tr. at 180:7-10.

110.    At the Board meeting, Wachtell was asked whether the "business as usual" advice included NI conducting stock repurchases, and Wachtell's advice indicated to NI's Board that NI should continue stock repurchases as part of "business as usual" after rejecting Emerson's proposal in the June 22 Letter. Ex. 3, McGrath Dep., at 283:24-284:20; 285:24-286:11.

**Response to Paragraph 110**: Disputed. Lead Plaintiff does not dispute the accuracy of the transcription but disputes this contention for the reasons stated in the Response to Paragraph 109.

111.    Based on Wachtell's "business as usual" advice, the Board understood that NI was cleared to conduct repurchases after rejecting Emerson's proposal in the June 22 Letter, and that NI had an obligation to return to usual business practices, including conducting repurchases, after such rejection. Ex. 3, McGrath Dep., at 283:24-284:20; 286:4-11.

**Response to Paragraph 111**: Disputed. Lead Plaintiff disputes this contention for the reasons stated in the Response to Paragraph 109. Even if this advice was in fact provided, Lead Plaintiff disputes any implication that such advice was followed. As of July 2022, NI planned to purchase $10 million in stock in the third quarter of 2022.  Pl. Ex. 40, NAT-SL-00024106-212, at -4210. Instead, NI purchased $80 million in NI stock from August 12 to September 26 –a period

37

of 15 market days. Pl. Counterstatement, ¶100. Thus, Lead Plaintiffs' dispute that NI's repurchases constituted "business as usual." Additionally, Defendant McGrath acknowledged that Wachtell did not render this purported advice – to conduct "business as usual" – in response to NI asking if the Company was in possession of MNPI in early August; in Defendant McGrath's words, whether the company had MNPI "wasn't the question[.]" Pl. Ex. 2, McGrath Dep., at 288:11-18. Plaintiff also disputes that NI had any "obligation . . . to return to conducting repurchases." To the contrary, NI had an obligation not to conduct repurchases while in knowing possession of material nonpublic information about Emerson's offer.

112.    On July 25, 2022, NI's Board of Directors held a special meeting via video conference. Ex. 30, Board Meeting Minutes (July 25, 2022).

**Response to Paragraph 112**: Undisputed.

113.    Present at the July 25 special meeting were all of NI's Directors—including Eric Starkloff—as well as Eddie Dixon and Karen Rapp. *Id.*

**Response to Paragraph 113**: Undisputed.

114.    At the July 25 special meeting, the Board discussed NI's "very positive outlook for the next 18 months" and that NI's positive outlook was a factor considered by the Board in its decision on July 20 to unanimously reaffirm its rejection of Emerson's $48 proposal. *Id.*

**Response to Paragraph 114**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document. During this time, NI was struggling with its cash position. *See* Pl. Ex. 2, McGrath Tr. 191:24-192:18, 193:1-4, 194:1-13. As Defendant McGrath conveyed on August 7, 2022, the Board was concerned regarding the "negative cash flow from operations and [NI's] precarious cash position at the end of the [second] quarter." Pl. Ex. 45, NAT-SL-00001276-1278, at -1276; *See also* Pl. Counterstatement ¶82.

38

115.    On August 2, 2022, Eric Starkloff sent an email to Lal Karsanbhai attaching a letter from Starkloff and Michael McGrath (the "August 2 Letter") in response to Emerson's June 22 Letter. Ex. 31, August 2 Letter.

**Response to Paragraph 115**: Undisputed.

116.    The August 2 Letter stated, "Our Board of Directors has carefully reviewed your letter dated June 22, 2022, with the assistance of our financial and legal advisors. The Board remains unanimously of the view that your proposal is not in the best interests of NI and its shareholders." *Id.*

**Response to Paragraph 116**: Undisputed.

117.    NI was advised by Wachtell attorneys in drafting the August 2 Letter. Ex. 32, Niles Email (July 26, 2022).

**Response to Paragraph 117**: Undisputed.

118.    NI intended for the August 2 Letter to indicate to Emerson that NI was not interested in being acquired. Ex. 7, Dixon Dep., at 308:7-25; Ex. 2, Starkloff Dep., at 169:8-170:3.

**Response to Paragraph 118**: Disputed. Lead Plaintiff disputes any implication of this testimony as to Defendants' subjective interest for the reasons set forth in the Response to Paragraph 21.

119.    During 2022, ███████████████████████████████ ████████ Ex. 18, BofA Dep., at 212:10-15.

**Response to Paragraph 119**: Disputed. Lead Plaintiff disputes this contention as misrepresentative of the testimony. The ████████████████████████ ████████████████████████████████████ ████████████████████ Pl. Ex. 5, BofA Tr. at 208:18-209:1, 212:10-15.

39

Additionally, Lead Plaintiff disputes any implication in this contention as to Defendants' subjective interest in a transaction for the reasons stated in the Response to Paragraph 21.

120.    Representatives of NI, including Eric Starkloff, Kevin Ilcisin, Eddie Dixon, Karen Rapp, and Michael McGrath, instead ██████████████████████████████ ██████████ *Id.* at 213:5-23.

**Response to Paragraph 120**: Disputed. Lead Plaintiff disputes this contention for the reasons stated in the Responses to Paragraphs 21 and 119.

121.    These representatives of NI also told BofA ███████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* at 212:17-213:11.

**Response to Paragraph 121**: Disputed. Lead Plaintiff disputes this contention for the reasons stated in the Responses to Paragraphs 21 and 119.

122.    After NI sent the August 2 Letter to Emerson, NI believed that there was no prospect of a deal wherein Emerson would acquire NI and NI "assumed that [the prospect of a transaction with Emerson] was dead." Ex. 7, Dixon Dep., at 177:20-178:14, 309:12-16; Ex. 2, Starkloff Dep., at 171:7-19; Ex. 3, McGrath Dep., at 104:18-105:23.

**Response to Paragraph 122**: Disputed. Defendant Starkloff testified that after August 2, it was possible that Emerson would come back with another offer or go public with its offer to date. Pl. Ex. 4, Starkloff Tr. at 128:14-23. Further, Dixon wrote on August 10, "the probability of [Emerson] going public is much higher now," and in September, "NI is on Wolverine's pipeline list and there is no evidence that Wolverine's interest petered out." Def. Ex. 39; Pl. Ex. 59, NAT-SL-00023189-3190, at -3189. Additionally, Lead Plaintiff disputes this contention as incomplete and misleading because it omits the contrary facts listed in Pl. Counterstatement ¶¶57-76.

40

123. After NI sent the August 2 Letter to Emerson, NI believed it would have been inappropriate to disclose Emerson's proposals and NI's rejections because NI believed Emerson's acquisition proposal did not present a credible offer, there was no offer outstanding after NI rejected Emerson's proposal, NI had no expectation of Emerson returning with another offer, NI had no expectation of negotiating with Emerson and understood it was not obligated to negotiate with Emerson, and Emerson requested that NI keep its proposals confidential. Ex. 3, McGrath Dep., at 104:18-105:23.

**Response to Paragraph 123**: Disputed. Lead Plaintiff disputes this contention because, consistent with the facts set forth in the Response to Paragraph 122 and Pl. Counterstatement ¶¶57-76, NI understood there was a material possibility that Emerson would return with another offer or go public. Lead Plaintiff also disputes the contention that NI failed to disclose Emerson's offer purely because NI leadership believed such disclosure was "inappropriate." Disclosing Emerson's offer would have counteracted Defendant McGrath's plan to raise the stock price *without* any increase in the stock being based on a potential sale of the Company. Pl. Ex. 36, NAT-SL-00021516-1531, at -1525; Pl. Counterstatement ¶¶46-48.

124. After NI sent the August 2 Letter to Emerson, there was no direct communication between NI and Emerson until November 3, 2022, which is after the Class Period. Ex. 3, McGrath Dep., at 317:2-10; Ex. 7, Dixon Dep., at 311:8-12.

**Response to Paragraph 124**: Undisputed.

125. After NI sent the August 2 Letter to Emerson, NI continued to pay attention to Emerson by, for example, watching or reading the transcript of Emerson's earnings call, consistent with NI's practice of monitoring competitors and being "prepared for anything." Ex. 7, Dixon Dep., at 190:16-192:11; Ex. 2, Starkloff Dep., at 130:15-131:2.

41

**Response to Paragraph 125**: Disputed. Just two days after this letter, Starkloff sent an email to Ilcisin, Dixon, and Rapp calling the fact that Emerson announced its dividend "a week prior" to its earnings call "interesting[.]" Pl. Ex. 44, NAT-SL-00011781-1785, at -1782. Ilcisin shared BofA's insight on this decision with Starkloff and stated, "per your question, definitely an anomaly. Will be an interesting call. We should do a earnings call party if the timing works [smiley face emoticon][.]" *Id.* at -1781. Lead Plaintiff also disputes this contention as incomplete and misleading because it omits the facts set forth in Pl. Counterstatement ¶¶58-62, 65, 71-72.

126.    NI wanted to resume repurchases after sending the August 2 Letter because shareholders were in favor of repurchases, repurchases were a key tenet of NI's capital allocation strategy, and NI wanted to offset dilution caused by share grants to employees. Ex. 2, Starkloff Dep., at 137:14-24; Ex. 3, McGrath Dep., at 342:5-19.

**Response to Paragraph 126**: Disputed. Lead Plaintiff disputes this contention as incomplete and misleading. NI was aware of the "signal sent to the market when [the company] [does] share buybacks (that NI views their own stock as inexpensive)[.]" Pl. Ex. 22, NAT-SL-00007287-7290, at -7287. Shawn Liu ███████████████████████ ███████████████████████████████ ████████████████████████ Pl. Ex. 5, BofA Tr. at 117:13-24. On June 18, 2022, BofA, in ████████████████████████████████ ████████████████████████████████ ██████████████████████. Pl. Ex. 28, BofA_000156-0160, at -157 (June 19, 2022), at -0158; Pl. Ex. 5, BofA Tr. at 105:23-106:4. Additionally, in July 2022, McGrath expressed that in light of the Emerson offer, NI "need[ed] to get [the] stock price into the mid-40s, preferably 50s,

as soon as possible without the price being based on a potential sale of the company[.]" Pl. Ex. 36, NAT-SL-00021516-1531, at -1525; Pl. Counterstatement ¶¶46-48.

127.    On August 4, 2022, Karen Rapp emailed Albert Percival and Eddie Dixon asking what NI could do to "put a plan in place for stock repurchases given the current situation," meaning the situation involving NI's recent August 2 Letter which rejected Emerson's $48 per share proposal for a second time. Ex. 33, Dixon, Rapp, and Percival Email Chain (August 4, 2022); Ex. 7, Dixon Dep., at 177:11-178:14; Ex. 45, Percival Decl. ¶ 18.

**Response to Paragraph 127**: Disputed. Lead Plaintiff does not dispute that the cited document includes the quoted language, but Lead Plaintiff disputes Defendants' definition of the "current situation" to which Rapp refers. Karen Rapp, the author of the quoted email, testified that she couldn't "remember the conversations that led up to deciding to use a plan," but she interpreted the purpose of the cited emails as conveying that "there was material and nonpublic information, and [NI was] . . . in this time period, trying to understand" if the company was still in possession of material nonpublic information. Pl. Ex. 1, Rapp Tr. at 106:18-107:11, 114:15-115:15.

128.    In response to Karen Rapp's email on August 4, Eddie Dixon stated that the question was when the "nuthatch engagement become[s] stale so [there is a] legitimate argument that" NI did not possess material non-public information. Ex. 33, Dixon, Rapp, and Percival Email Chain (August 4, 2022).

**Response to Paragraph 128**: Disputed. Eddie Dixon's statement reads: "I think the question is when does the nuthatch engagement become stale so legitimate argument that we don't have MNPI when the plan is in in place, but will let Albert [Percival] confirm with WLRK." Def. Ex. 33, at -5029.

129.    In response to Karen Rapp's email on August 4, Albert Percival at first believed that NI was in a "gray area" regarding when it could resume stock repurchases after sending the August 2 letter to Emerson. *Id.*; Ex. 45, Percival Decl. ¶ 20.

**Response to Paragraph 129**: Disputed. Albert Percival's full email reads: "I'll need to discuss with WLRK. We still have the Nuthatch letter 'overhang' or perhaps 'hangover', so I believe we are in a gray area." *Id.* at -5029. Additionally, Lead Plaintiff disputes any implication that this belief was limited in time to the extent Defendants offer untested hearsay (the Percival Declaration) in support.

130.    Thus, Percival was going to carefully consider the situation before coming to a final conclusion that would be communicated to the business leaders of NI. Ex. 45, Percival Decl. ¶ 20.

**Response to Paragraph 130**: Disputed. Lead Plaintiff disputes this contention as incomplete and misleading. Percival's declaration states that he "provided [his] own, independent legal advice"; however, the Chief Legal Officer, Dixon, could not say whether he or Percival ever conducted research on these issues. Pl. Ex. 3, Dixon Tr. at 208:17-209:11; Def. Ex. 45, Percival Decl. ¶ 10. Additionally, Lead Plaintiff disputes this contention because Defendants offer only inadmissible hearsay (the Percival Declaration) in support.

131.    In response to Karen Rapp's email on August 4, Albert Percival decided to seek the advice of Wachtell attorneys about NI's ability to resume repurchases. Ex. 33, Dixon, Rapp, and Percival Email Chain (August 4, 2022); Ex. 45, Percival Decl. ¶ 21.

**Response to Paragraph 131**: Disputed. Lead Plaintiff does not dispute that Percival decided to consult Wachtell. However, Lead Plaintiff disputes this contention as misleading and incomplete to the extent it suggests that Defendants sought and relied in good faith on the legal advice of fully informed and disinterested counsel concerning NI's repurchases and disclosure

44

obligations. Dixon testified that Wachtell ███████████████████████████ for advising NI in connection with the Emerson acquisition. Pl. Ex. 3, Dixon Tr. at 52:18-54:1. Dixon also testified that he was not aware that the Company planned to repurchase $80 million of stock in August and September 2022. *Id.* at 174:20-175:2, 211:23-212:2. There is no record evidence to show that Wachtell was ever informed of this fact. Defendants assert that Wachtell advised them to conduct "business as usual" but the Company's sudden and unprecedented $80 million expenditure on repurchases was not "business as usual" because it deviated significantly from the Company's business plan. Ex. 2, McGrath Tr. at 313:3-314:2; Bennett Ex. G; Pl. Ex. 63, NAT-SL-00006122; Pl. Ex. 65, at 11. In addition, Lead Plaintiff further disputes this contention because it cites inadmissible hearsay in support thereof.

132.    Dixon agreed Percival should discuss the issue with Wachtell, and that the purpose of the discussion would be obtaining "advice from Wachtell whether [NI] could implement [repurchases] or not." Ex. 33, Dixon, Rapp, and Percival Email Chain (August 4, 2022); *see also* Ex. 7, Dixon Dep., at 182:23-183:18.

**Response to Paragraph 132**: Disputed. Lead Plaintiff does not dispute that Dixon agreed that Percival should consult with Wachtell. However, Lead Plaintiff disputes this contention as misleading and incomplete to the extent it suggests that Defendants sought and relied in good faith on the legal advice of fully informed and disinterested counsel concerning NI's repurchases and disclosure obligations. Dixon testified that ███████████████████████████ for advising NI in connection with the Emerson acquisition. Pl. Ex. 3, Dixon Tr. at 52:18-54:1. Dixon also testified that he was not aware that the Company planned to repurchase $80 million of stock in August and September 2022. *Id.* at 174:20-175:2, 211:23-212:2. There is no record evidence to show that Wachtell was ever informed of this fact. Defendants assert that Wachtell advised them

45

to conduct "business as usual" but the Company's sudden and unprecedented $80 million expenditure on repurchases was not "business as usual" because it deviated significantly from the Company's business plan. Pl. Ex. 2, McGrath Tr. at 313:3-314:2; Bennett Ex. G; Ex. 63, NAT-SL-00006122; Ex. 65, at 11.

133.    The structure and amount of Wachtell's compensation from NI was not impacted by NI's share repurchases or NI's decision to, or decision not to, repurchase its Common Stock. Ex. 45, Percival Decl. ¶ 22.

**Response to Paragraph 133**: Disputed. During the relevant period, . Pl. Ex. 24, WLRK-00002802-2804, at -2802. NI's Chief Legal Officer, Eddie Dixon, testified that

Pl. Ex. 3, Dixon Tr. at 52:18-55:4. According to Dixon,

" *Id.* at 53:15-20.

The price of a deal could be impacted by any positive impact on the share price from repurchases. *See* Response to Paragraph 126.

" Pl. Ex. 3, Dixon Tr. at 54:23-24.

134.    Percival viewed Wachtell as the appropriate firm for NI to consult due to their experience in situations such as that facing NI. Wachtell was the law firm retained to address any issues related to Emerson. Ex. 45, Percival Decl. ¶ 22.

**Response to Paragraph 134**: Disputed. This contention is incomplete and misleading because Morrison & Foerster, not Wachtell, advised NI as to the purported 10b5-1 plan. Pl. Ex. 55,

46

NAT-SL-00022559-2561. Lead Plaintiff also disputes this contention because Defendants offer only inadmissible hearsay in support thereof.

135.     On August 4, 2022, Albert Percival emailed Wachtell attorneys Sabastian Niles and Kwon-Yong Jin, stating that NI sent its rejection letter to Emerson two days earlier and asking for advice from Wachtell about NI implementing a repurchase plan. Ex. 34, Wachtell, Dixon, and Percival Email Chain (August 4-9, 2022); Ex. 45, Percival Decl. ¶ 23.

**Response to Paragraph 135**: Disputed. Lead Plaintiff does not dispute that Percival sent this email. However, Lead Plaintiff disputes this contention as misleading and incomplete to the extent it suggests that Defendants sought and relied in good faith on the legal advice of fully informed and disinterested counsel concerning NI's repurchases and disclosure obligations.  Dixon testified that ███████████████████████████████ for advising NI in connection with the Emerson acquisition. Pl. Ex. 3, Dixon Tr. at 52:18-54:1. Dixon also testified that he was not aware that the Company planned to repurchase $80 million of stock in August and September 2022. *Id.* at 174:20-175:2, 211:23-212:2. There is no record evidence to show that Wachtell was ever informed of this fact. Defendants assert that Wachtell advised them to conduct "business as usual" but the Company's sudden and unprecedented $80 million expenditure on repurchases was not "business as usual" because it deviated significantly from the Company's business plan.  Ex. 2, McGrath Tr. at 313:3-314:2; Bennett Ex. G; Ex. 63, NAT-SL-00006122; Ex. 65, at 11. Lead Plaintiff further disputes this contention to the extent it cites to inadmissible hearsay in support thereof.

136.     On August 5, 2022, Albert Percival sent a Microsoft Teams Meeting invitation to Sabastian Niles, Kwon-Yong Jin, and Wayne Carlin of Wachtell and Eddie Dixon of NI. Ex. 35,

47

Percival Email (August 5, 2022); Ex. 45, Percival Decl. ¶ 24. The subject of the email stated, "NI Stock Trading Plan." Ex. 35, Percival Email (August 5, 2022).

**Response to Paragraph 136**: Disputed. Lead Plaintiff does not dispute that Def. Ex. 35 contains the quoted language, but Lead Plaintiff disputes this contention to the extent that Defendants offer untested hearsay (the Percival Declaration) in support.

137.    On August 4 and 5, 2022, Wachtell attorneys sent emails discussing a call with NI to discuss Percival's August 4 email. Ex. 34, Wachtell, Dixon, and Percival Email Chain (August 4-9, 2022). Kwon-Yong Jin ████████████████████████████████████ ███████████████████████████████████████████████████ *Id.*; Ex. 7, Dixon Dep., at 208:4-6.

**Response to Paragraph 137**: Undisputed.

138.    On a subsequent call, Percival was part of a conversation with Jin wherein it was discussed that NI would consider resuming repurchases by August 15, so long as NI did not receive further outreach from Emerson. Ex. 45, Percival Decl. ¶ 26.

**Response to Paragraph 138**: Disputed. Lead Plaintiff disputes this contention as vague and as misleading and incomplete to the extent it suggests that Defendants sought and relied in good faith on the legal advice of fully informed and disinterested counsel concerning NI's repurchases and disclosure obligations. Dixon testified that ███████████████████ ████████ or advising NI in connection with the Emerson acquisition. Pl. Ex. 3, Dixon Tr. at 52:18-54:1. Dixon also testified that he was not aware that the Company planned to repurchase $80 million of stock in August and September 2022. *Id.* at 174:20-175:2, 211:23-212:2. There is no record evidence to show that Wachtell was ever informed of this fact. Defendants assert that Wachtell advised them to conduct "business as usual" but the Company's sudden and

unprecedented $80 million expenditure on repurchases was not "business as usual" because it deviated significantly from the Company's business plan.  Ex. 2, McGrath Tr. at 313:3-314:2; Bennett Ex. G; Ex. 63, NAT-SL-00006122; Ex. 65, at 11. Lead Plaintiff further disputes this contention because Defendants offer only inadmissible hearsay in support thereof.

.

139.    Sabastian Niles asked Kown-Yong Jin on August 9, 2022, "███████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████" Ex. 34, Wachtell, Dixon, and Percival Email Chain (August 4-9, 2022).

**Response to Paragraph 139**: Disputed. Lead Plaintiff disputes this contention as misleading and incomplete to the extent it suggests that Defendants sought and relied in good faith on the legal advice of fully informed and disinterested counsel concerning NI's repurchases and disclosure obligations. Dixon, the Company's Chief Legal Officer, testified that ███████████ ████████████████ for advising NI in connection with the Emerson acquisition.  Pl. Ex. 3, Dixon Tr. at 52:18-54:1. Dixon also testified that he was not aware that the Company planned to repurchase $80 million of stock in August and September 2022. *Id.* at 174:20-175:2, 211:23-212:2. There is no record evidence to show that Wachtell was ever informed of this fact. Defendants assert that Wachtell advised them to conduct "business as usual" but the Company's sudden and unprecedented $80 million expenditure on repurchases was not "business as usual" because it deviated significantly from the Company's business plan.  Ex. 2, McGrath Tr. at 313:3-314:2; Bennett Ex. G; Ex. 63, NAT-SL-00006122; Ex. 65, at 11. Moreover, Dixon testified that he "didn't engage . . . directly" with Morrison & Foerster, the law firm that aided National Instruments in drafting its purported 10b5-1 plan. *Id.* at 24:5-14; Pl. Ex. 55, NAT-SL-00022559-2561.

140.    On August 8, 2022, it was announced that Emerson was selling its InSinkErator business. Sabastian Niles emailed the announcement to Eric Starkloff, Eddie Dixon, Karen Rapp, Kevin Ilcisin, and Albert Percival, and copied other Wachtell attorneys, including Adam Emmerich and Kwon-Yong Jin. Ex. 36, Niles Email (August 8, 2022); Ex. 45, Percival Decl. ¶ 27.

**Response to Paragraph 140**: Disputed. Lead Plaintiff does not dispute this paragraph's summary of Def. Ex. 36 but disputes this contention to the extent that Defendants offer untested hearsay (the Percival Declaration) in support.

141.    On the morning of August 10, 2022, NI learned from MacKenzie Partners that Emerson had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 37, Ilcisin Email (August 10, 2022). That same morning, Kevin Ilcisin forwarded this information to Sabastian Niles and Adam Emmerich at Wachtell. *Id.*

**Response to Paragraph 141**: Undisputed.

142.    In seeking advice from Wachtell attorneys regarding whether NI was in possession of material non-public information that would prevent it from conducting repurchases without public disclosure, NI provided Wachtell with all relevant information about Emerson, its outreach to NI, and Emerson's rejected, proposed acquisition of NI, with the goal of ensuring that Wachtell had all potentially relevant information to assess whether NI possessed material non-public information. Ex. 7, Dixon Dep., at 221:17-222:7, 317:4-9; Ex. 2, Starkloff Dep., at 175:7-23; Ex. 45, Percival Decl. ¶ 25.

**Response to Paragraph 142**: Disputed. Lead Plaintiff disputes this contention as misleading and incomplete to the extent it suggests that Defendants sought and relied in good faith on the legal advice of disinterested counsel concerning Emerson's offer and NI's repurchases and disclosure obligations. Dixon testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for

50

advising NI in connection with the Emerson acquisition. Ex. __, Dixon Tr. at 52:18-54:1. Dixon also testified that he was not aware of the fact that NI would be repurchasing approximately $80 million worth of stock in the third quarter of 2022 and therefore, could not have and "would not have" communicated that information to Wachtell. Pl. Ex. 3, Dixon Tr. at 211:4-212:7.

143.    A Microsoft Teams call was scheduled for the afternoon of August 10, 2022, with "required attendees" including Eric Starkloff, Eddie Dixon, Karen Rapp, representatives of BofA, and Sabastian Niles and Adam Emmerich of Wachtell. Ex. 38, Microsoft Teams Invite (August 10, 2022).  The subject of the call invite was, "Wolverine Call-Mackenzie Update." *Id.*

**Response to Paragraph 143**: Disputed. While Lead Plaintiff does not dispute that a Microsoft Teams call invite with this subject was scheduled and sent to the stated individuals, Lead Plaintiff disputes any implication that such a call took place at this date and time and that any of these specific individuals were on this call. For instance, Karen Rapp testified that she has no recollection of attending a call with Wachtell on the subject of buybacks around this time. Pl. Ex. 1, Rapp Tr. at 129:17-131:12.

144.    On an August 10, 2022 call, Sabastian Niles, Adam Emmerich, and Wayne Carlin of Wachtell advised NI's management that NI was not in possession of material non-public information, and therefore NI could conduct repurchases. Ex. 7, Dixon Dep., at 217:16-218:2, 315:18-23; Ex. 2, Starkloff Dep., at 176:6-16.

**Response to Paragraph 144**: Disputed. Lead Plaintiff disputes this contention as misleading and incomplete to the extent it suggests that Defendants sought and relied in good faith on the legal advice of disinterested counsel concerning Emerson's offer and NI's repurchases and disclosure obligations.  Dixon testified that ████████████████████████████ advising NI in connection with the Emerson acquisition.  Pl. Ex. 3, Dixon Tr. at 52:18-54:1. Dixon

51

also testified that he was not aware that the Company planned to repurchase $80 million of stock in August and September 2022. *Id.* at 174:20-175:2, 211:23-212:2. Lead Plaintiff further disputes this contention because Defendants have provided no written record that Wachtell rendered any advice on NI's possession, or lack thereof, of material nonpublic information. Even if Dixon's email cited in Paragraph 145, Paragraph 146, and Response to Paragraph 146 accurately reflected Wachtell's statements, this email does not make any mention of whether Wachtell determined, or conveyed to NI, that NI was not in possession of material nonpublic information, nor does it indicate that Wachtell provided advice concerning NI's disclosure obligations if the Company did in fact repurchase stock. Def. Ex. 39 (August 10, 2022); *see also* Response to Paragraph 145; , *see also* McGrath Tr. at 288:11-18.

145.    Eddie Dixon documented the statements made by Wachtell on the August 10 call in an email memorandum to himself, which he sent to himself on August 10, 2022. Ex. 39, Dixon Email (August 10, 2022); Ex. 7, Dixon Dep., at 206:5-208:9.

**Response to Paragraph 145**: Disputed. Lead Plaintiff does not dispute that Dixon authored this email on that date. However, Lead Plaintiff disputes that Dixon's email "documents" Wachtell's statements. Dixon testified that the email reflected a "recapturing of the conversation" with Wachtell on that day. *See* Pl. Ex. 3, Dixon Tr. 205:12-206:14. Further, Dixon testified: "I don't recall exactly how they said it. All I can recall was just what I captured from their discussion." *Id.* at 206:25-207:2.

146.    Dixon's email memorandum notes that Adam Emmerich, Wayne Carlin, and Sabastian Niles of Wachtell advised NI regarding "buy back," "no material change to situation, implement if desired." Ex. 39, Dixon Email (August 10, 2022).

**Response to Paragraph 146**: Disputed. Although Lead Plaintiff does not dispute that the quoted language appears in the cited document, Lead Plaintiff disputes this contention as incomplete and misleading. Dixon's email also stated: "Putting money where mouth is messaging, ie. Uplift in price is due to them[.]" Def. Ex. 39 (August 10, 2022). Additionally, Dixon wrote: "why now after extended period engagement. Probability of [Emerson] going public is much higher now[.]" *Id.*

147.    NI's executives and Board Chair believed that NI was not in possession of material non-public information on August 10, 2022. Ex. 7, Dixon Dep., at 315:24-316:8; Ex. 2, Starkloff Dep., at 177:7-178:5; Ex. 3, McGrath Dep., at 96:18-97:7; Ex. 45, Percival Decl. ¶ 28.

**Response to Paragraph 147**: Disputed. On August 4, 2022, in-house counsel Dixon stated that NI was in a "gray area" regarding whether they were in possession of MNPI. Def. Ex. 33, at -5029. By August 8, NI knew of Emerson's increased firepower from the sale of its InSinkErator (garbage disposal) business. *See* Paragraph 140; Pl. Counterstatement ¶¶58-60. Then, on August 10, 2022, ███████████████████████████████████ – a tactic that NI management recognized as "coercive." Pl. Counterstatement ¶¶63, 66; Pl. Ex. 50, NAT-SL-00011768 (August 10, 2022); Pl. Ex. 6, Ilcisin Dep., at 218:2-21. That same day, Dixon noted that ███████ ████████ meant the probability of Emerson going public was "much higher now." Pl. Counterstatement ¶64; Def. Ex. 39. Also on August 10, Defendant Starkloff drafted an email to NI employees in preparation for Emerson publicly disclosing its offers. Pl. Counterstatement ¶65. Lead Plaintiff also disputes this contention to the extent Defendants rely on untested hearsay (the Percival Declaration).

53

148.    NI's Chief Legal Officer, Eddie Dixon, would not have allowed NI to engage in stock repurchases after August 10, 2022, if he had any concern that NI was in possession of material non-public information. Ex. 7, Dixon Dep., at 317:11-19.

**Response to Paragraph 148**: Disputed. Lead Plaintiff disputes this contention because it is not a factual contention. Lead Plaintiff also disputes this contention as misleading. Dixon directed Percival to reach out to Wachtell in search of a "legitimate argument" that NI did not have material non-public information. Def. Ex. 33, at -5029.  Dixon "[didn't] recall" (i) whether he reviewed any written legal advice from Wachtell on this issue, (ii) whether he reviewed any case law on this issue, or (iii) whether he conducted any independent diligence on this issue. Pl. Ex. 3, Dixon Tr. at 208:10-209:14.

149.    On August 11, 2022, Albert Percival sent an email to NI's Board members announcing that the Project Wolverine trading restriction was lifted. Ex. 40, Percival Email (August 11, 2022); Ex. 45, Percival Decl. ¶ 30.

**Response to Paragraph 149**: Undisputed.

150.    Through his August 11 email lifting the trading restriction, Percival provided his legal advice that it was appropriate for NI and its Board and officers to engage in open market transactions in NI Common Stock. Percival expected the officers and directors to rely on that advice. Ex. 45, Percival Decl. ¶ 31.

**Response to Paragraph 150**: Disputed. Lead Plaintiff does not dispute that Percival's declaration states that he "provided [his] own, independent legal advice." Def. Ex. 45, Percival Decl. ¶ 10. However, the Chief Legal Officer, Dixon, could not say whether he or Percival ever conducted research on these issues. Pl. Ex. 3, Dixon Tr. at 208:17-209:11; Def. Ex. 45, Percival

54

Decl. ¶ 10. Further, Lead Plaintiff disputes this contention because Defendants offer only inadmissible hearsay in support thereof.

151. Percival would not have sent the August 11, 2022 email lifting the trading restriction unless he personally believed based on his own experience and consultation with Wachtell, as outside counsel, that NI was not in possession of material non-public information. Ex. 45, Percival Decl. ¶ 31.

**Response to Paragraph 151**: Disputed. Lead Plaintiff disputes this contention because it is not a factual contention. Lead Plaintiff also disputes this contention for the reasons stated in the Response to Paragraph 150. Additionally, Lead Plaintiff disputes this contention because Defendants offer only inadmissible hearsay in support thereof.

152. Percival also would not have sent the email had attorneys from Wachtell not advised NI's management on August 10, 2022 that NI did not possess material non-public information that would affect the repurchases. Ex. 45, Percival Decl. ¶ 31.

**Response to Paragraph 152**: Disputed. Lead Plaintiff disputes this contention because it is not a factual contention. Lead Plaintiff also disputes this contention for the reasons stated in the Responses to Paragraphs 144 and 146. Additionally, Albert Percival lacks personal knowledge as he was "out of the office with limited access to email" on August 10 when this alleged advice was rendered. Pl. Ex. 51, NAT-SL-00009621. Additionally, Lead Plaintiff disputes this contention because Defendants offer only inadmissible hearsay in support thereof..

153. On August 11, 2022, NI executed a 10b5-1 Repurchase Plan Agreement with J.P. Morgan Securities LLC ("JPMorgan"). Ex. 41, 10b5-1 Plan Agreement; Ex. 45, Percival Decl. ¶ 32.

**Response to Paragraph 153**: Disputed. Although Lead Plaintiff does not dispute that NI signed a document purporting to signify a 10b5-1 plan on this date, Lead Plaintiff disputes this contention as incomplete and misleading. Lead Plaintiff disputes that this document constituted a valid 10b5-1 repurchase plan because Defendants were in knowing possession of material nonpublic information at the time they executed the document, including information about Emerson's premium cash offer to acquire NI for $48 per share and Emerson's willingness to pay more. Def. Ex. 24. On August 4, 2022, in-house counsel stated that NI was in a "gray area" regarding whether they were in possession of material nonpublic information. Def. Ex. 33, at -5029 (August 4, 2022). By August 8, NI knew of Emerson's increased firepower from the InSinkErator deal. *See* Paragraph 140; Pl. Counterstatement ¶¶58-60. Then, on August 10, 2022, NI learned that ███████████████████████ – a move that NI management recognized as "coercive." Pl. Counterstatement ¶¶63, 66; Pl. Ex. 50, NAT-SL-00011768; Pl. Ex. 6, Ilcisin Tr. at 218:2-21. That same day, Dixon noted that the stock accumulation meant the probability of Emerson going public was "much higher now." Pl. Counterstatement ¶64; Def. Ex. 39. Also on August 10, Defendant Starkloff drafted an email to NI employees in preparation for Emerson publicly disclosing its offers. Pl. Counterstatement ¶65. On August 11, 2022, NI's advisors communicated to NI that the stock accumulation was "hostile." *Id.* ¶67; Pl. Ex. 6, Ilcisin Tr. at 221:10-25. Lead Plaintiff also disputes this contention to the extent that Defendants rely on untested hearsay (the Percival Declaration).

154.    Percival advised Rapp in connection with the finalization and execution of the 10b5-1 Repurchase Plan Agreement. Ex. 45, Percival Decl. ¶ 33.

**Response to Paragraph 154**: Disputed. Lead Plaintiff disputes this contention because it only cites to inadmissible hearsay in support thereof.  Lead Plaintiff also disputes this contention

56

as misleading to the extent it implies that Defendants implemented a valid 10b5-1 repurchase plan because Defendants were in possession of material non-public information when they entered that purported plan, including information about Emerson's premium cash offer to acquire NI for $48, Emerson's willingness to pay more, and ███████████████████████ Def. Ex. 24; Def. Ex. 37.

155.    Percival advised Rapp it was appropriate to execute the 10b5-1 Repurchase Plan Agreement under the securities laws. Ex. 45, Percival Decl. ¶ 33.

**Response to Paragraph 155**: Disputed. Lead Plaintiff disputes this contention because it only cites inadmissible hearsay in support thereof. Lead Plaintiff also disputes this contention for the reasons stated in the Responses to Paragraphs 150 and 153.

156.    Percival would not have advised Rapp or anyone at NI to execute a 10b5-1 Repurchase Plan Agreement if he did not personally believe that NI was not in possession of material non-public information or understand that attorneys from Wachtell advised NI's management on August 10, 2022 that NI did not possess material non-public information. Ex. 45, Percival Decl. ¶ 34.

**Response to Paragraph 156**: Disputed. Lead Plaintiff disputes this contention because it is not a factual contention. Lead Plaintiff also disputes this contention for the reasons stated in the Responses to Paragraphs 150 and 153. Additionally, Lead Plaintiff disputes this contention because Defendants offer only inadmissible hearsay in support thereof. Lead Plaintiff also disputes this contention because Defendants have not submitted any evidence that Percival conducted any legal research, reviewed any written advice from Wachtell, or provided any written legal analysis that would support the belief contended in Paragraph 156. Pl. Ex. 3, Dixon Tr. at 208:10-209:11; s*ee also* Responses to Paragraphs 150 and 152.

157.    Under the 10b5-1 Plan, NI appointed JPMorgan as its exclusive agent to purchase NI's Common Stock pursuant to the plan. The 10b5-1 Plan authorized JPMorgan to begin purchases of NI's Common Stock on September 12, 2022, and was set to terminate upon the earliest of certain enumerated events, including "the completion of all purchases contemplated" under the 10b5-1 Plan. Ex. 41, 10b5-1 Plan Agreement, at 1.

**Response to Paragraph 157**: Disputed.  While Lead Plaintiff does not dispute the accuracy of the date, that JP Morgan was the "exclusive agent" under the purported plan, or that the quoted language appears in the cited document, Lead Plaintiff disputes this contention for the reasons stated in the Response to Paragraph 153.

158.    The 10b5-1 Plan provided that, on each Trading Day, JPMorgan was to "use commercially reasonable efforts to purchase as agent for [NI] and for the account of [NI] the lesser of (i) the maximum number of [shares of NI Common Stock] that [NI] could purchase on such Trading Day in accordance with the volume condition set forth in Rule 10b-18 and (ii) the number of [shares of NI Common Stock] that JPMS is able, subject to market conditions and principles of best execution, to purchase as agent for [NI] and for the account of [NI] on such Trading Day using commercially reasonable means in accordance with the Plan guidelines set forth below." *Id.* at A-1. The referenced "Plan guidelines" set a price schedule, indicating the "daily purchase amount" based on NI's share price on any respective day. *Id.*

**Response to Paragraph 158**: Disputed. While Lead Plaintiff does not dispute that the quoted language appears in the cited document, Lead Plaintiff disputes this contention for the reasons stated in the Response to Paragraph 153. Additionally, Lead Plaintiff disputes this contention as incomplete and misleading because it does not include the fact that the matrix instructed JP Morgan to purchase (i) up to $8 million in a day if the price was $37 or below per

58

share, (ii) up to $6 million in a day if the price was $37 to $39.99 per share, (iii) up to $4 million in a day if the price was $40 to $42.99 per share, and (iv) up to $1 million in a day if the price was $43 to $44.99 per share. Def. Ex. 41, at -0771. If the price was $45.00 or higher per share, JP Morgan was instructed not to make any purchases of NI stock. *Id.*

159.    Under the 10b5-1 Plan, the maximum amount JPMorgan was to spend was $60,000,000. *Id.*

**Response to Paragraph 159**: Disputed. While Lead Plaintiff does not dispute that this contention reflects the maximum figure contained in the document, Lead Plaintiff disputes this contention for the reasons stated in Response to Paragraph 153.

160.    In the 10b5-1 Plan Agreement, NI warranted that, as of August 11, 2022, it was "not aware of any material nonpublic information concerning [NI's Common Stock] or the business, operations or prospects of [NI]." NI also warranted that NI was "engaging [JPMorgan] and entering into this [Plan] Agreement and the Plan in good faith and not as part of a plan or scheme to evade compliance with the federal securities laws, including, without limitation, Rule 10b-5 under the Exchange Act." *Id.* at 3.

**Response to Paragraph 160**: Disputed. Lead Plaintiff does not dispute that the quoted language appears in the cited document or that NI made these warranties. However, Lead Plaintiff disputes that NI was not aware of material nonpublic information or that the purported plan was entered into in good faith. On August 4, 2022, in-house counsel Dixon stated that NI was in a "gray area" regarding whether it was in possession of material nonpublic information. Def. Ex. 33, at -5029. By August 8, NI knew of Emerson's increased firepower from the InSinkErator deal. *See* Paragraph 140; Pl. Counterstatement ¶¶58-60. Then on August 10, 2022, NI learned ███████ ████████████████████████ – a move that NI management recognized as "coercive." Pl.

Counterstatement ¶¶63, 66; Pl. Ex. 50, NAT-SL-00011768 (August 10, 2022); Pl. Ex. 6, Ilcisin Dep., at 218:2-21. That same day, Dixon noted that the stock accumulation meant the probability of Emerson going public was "much higher now." Pl. Counterstatement ¶64; Def. Ex. 39 (August 10, 2022). Also on August 10, Defendant Starkloff drafted an email to NI employees in preparation for Emerson publicly disclosing its offers. Pl. Counterstatement ¶65. On August 11, 2022, NI's advisors communicated that the stock accumulation was "hostile." *Id.* at ¶67; Pl. Ex. 6, Ilcisin Tr. at 221:10-25.

161.    NI did not repurchase any shares of NI Common Stock between May 6, 2022—before Emerson's initial May 16, 2022 outreach to NI—and August 12, 2022. Ex. 42, Trade Confirmation Activity Sheet.

**Response to Paragraph 161**: Undisputed.

162.    On August 12, 2022, NI repurchased 218,623 shares of its Common Stock on the open market at a price per share of $41.3852. Ex. 42, Trade Confirmation Activity Sheet.

**Response to Paragraph 162**: Undisputed.

163.    On August 15, 2022, Eric Starkloff sold 900 shares of NI Common Stock at a price per share of $42. Ex. 43, Starkloff SEC Form 4.

**Response to Paragraph 163**: Undisputed.

164.    Starkloff sold these shares pursuant to a trading plan that would execute sales at certain price points. Starkloff was advised and understood that he could have chosen to cancel the plan, but he chose not to cancel the plan. Ex. 2, Starkloff Dep., at 178:6-179:1.

**Response to Paragraph 164**: Disputed. Lead Plaintiff disputes this contention as incomplete and misleading. Defendant Starkloff entered this plan before the approach by Emerson. Pl. Ex. 4, Starkloff Tr. at 180:11-21.

60

165.    The $42 price at which Starkloff sold shares on August 15, 2022 was $6 less than Emerson's rejected proposal price of $48 per share. *Id.* at 179:2-6.

**Response to Paragraph 165**: Disputed. Although Lead Plaintiff does not dispute the arithmetic, Lead Plaintiff disputes this contention as incomplete and misleading. Although Defendant Starkloff sold those 900 shares for $6 less than the proposal price in accordance with a plan set before the Emerson approach, Defendant Starkloff exchanged 248,908 shares for $60 each when Emerson acquired NI – which constitutes $20 more per share as compared to his sale price for the 900 shares and $12 more than Emerson's original offer price. Pl. Ex. 64; Pl. Counterstatement ¶112; Pl. Ex. 4, Starkloff Tr. at 151:5-152:1.

166.    On August 18, 2022, NI repurchased 87,859 shares of its Common Stock on the open market at a price per share of $42.9920. Ex. 42, Trade Confirmation Activity Sheet.

**Response to Paragraph 166**: Undisputed.

167.    On August 19, 2022, NI repurchased 117,850 shares of its Common Stock on the open market at a price per share of $42.4127. Ex. 42, Trade Confirmation Activity Sheet.

**Response to Paragraph 167**: Undisputed.

168.    On August 26, 2022, NI repurchased 96,570 shares of its Common Stock on the open market at a price per share of $41.3856. Ex. 42, Trade Confirmation Activity Sheet.

**Response to Paragraph 168**: Undisputed.

169.    On August 29, 2022, MacKenzie Partners informed NI that ██████████ ███████████████████████ and that Emerson ██████████████████ ██████████. Ex. 44, Dixon Email Chain (Sept. 1, 2022).

**Response to Paragraph 169**: Undisputed.

170.    In response to the email from MacKenzie Partners, Eddie Dixon recommended a call with NI's advisors to discuss. Eric Starkloff responded to Dixon, "I agree. In particular, when I brought up shareholder rights plans previously the idea that they'd get to 5-10% was perceived as so incredibly unlikely as to not be relevant, but we should ask that question again in light of the new data." *Id.* Dixon responded that he would reach out to Wachtell to schedule a time to discuss with them. *Id.*

**Response to Paragraph 170**: Undisputed.

171.    On September 12, 13, 14, 15, 16, 19, 20, 21, 22, and 23, 2022, JPMorgan purchased shares of NI Common Stock pursuant to NI's 10b5-1 Plan, executed August 11, 2022. Ex. 42, Trade Confirmation Activity Sheet. $59,999,992.63 of the $60,000,000 maximum authorized spend was spent in making these purchases pursuant to the 10b5-1 Plan. *Id.*

**Response to Paragraph 171**: Undisputed.

172.    On November 3, 2022, Emerson emailed a letter to NI proposing to acquire NI for $53 per share. Ex. 1, NI Proxy Statement (May 25, 2023), at 36.

**Response to Paragraph 172**: Undisputed.

173.    NI did not adopt a shareholder rights plan in 2022. Ex. 1, NI Proxy Statement (May 25, 2023), at 40.

**Response to Paragraph 173**: Undisputed.

174.    On January 13, 2023, NI announced the adoption of a shareholder rights plan in connection with a strategic review process, through which it would solicit interest from potential acquirers. *Id.*

**Response to Paragraph 174**: Disputed. Lead Plaintiff disputes the characterization of the document as incomplete and misleading because it omits the facts listed in Pl. Counterstatement ¶¶103-06.

**LEAD PLAINTIFF'S COUNTERSTATEMENT OF ADDITIONAL FACTS**

Lead Plaintiff incorporates all facts, to the extent not disputed, listed in the Paragraphs and Responses above in this Counterstatement of Additional Facts ("Counterstatement"). Lead Plaintiff reserves all rights to introduce facts in later proceedings, including at trial, regardless of whether they are included in this Counterstatement.

## I.    Emerson's Offer and Outreach

### a.    Emerson's May 25 Letter

1.    In Emerson's May 25, 2022 offer letter to NI, Emerson explained that its offer to "purchase 100% of the outstanding common stock of NI for $48 in cash per common share . . . provides significant value to [NI's] shareholders[,]" including "[a] 39% premium to NI's closing share price as of May 24, 2022[.]" Def. Ex. 10, at -1265.

2.    Emerson's offer letter continued: "Our Proposal is not subject to any financing condition and would be financed from cash on hand, committed lines of credit and/or other available sources of financing." *Id.*

3.    Emerson's offer letter stated that there were no "substantive" regulatory "impediments to closing," and noted "the complementary nature of" Emerson's and NI's "respective businesses." *Id.*

4.    Emerson's letter further stated that its offer "is based on publicly available information under the assumption that it presents fairly and completely NI and its businesses and its outstanding debt and share count. It is subject to the completion of customary and confirmatory due diligence (e.g., tax, environmental, legal, etc.). We are prepared to move quickly to complete such due diligence when appropriate." *Id.*

5. As to timing, Emerson's letter further stated: "Emerson is prepared to proceed immediately to work with NI and its advisors to complete due diligence and to negotiate a mutually agreeable merger agreement (the 'Definitive Agreement') in parallel." *Id.* The letter specified Emerson's "expectation that the signing of the Definitive Agreement and announcement can be achieved in 4-6 weeks." *Id.*

6. The letter also stated: "We have no current plan to disclose this letter and assume that you do not intend to either. Our strong preference is to work constructively and expeditiously with you and your board to announce a Definitive Agreement." *Id.*

7. Defendant Starkloff, Emerson's CEO, testified that NI and their counsel at Wachtell interpreted this language as "a coded statement of a public disclosure threat." Pl. Ex. 4, Starkloff Tr. at 46:1-14.

8. Emerson's letter continued: "To reiterate, our Proposal – all cash consideration with no financing contingency and no substantive regulatory impediments – provides both significant value and certainty to NI's shareholders. We are prepared to move very quickly to complete our due diligence and sign definitive agreements." Def. Ex. 10, at -1266.

9. The letter also stated: "We are highly enthusiastic about the prospects of what we can achieve together." *Id.*

10. According to Kevin Ilcisin, NI's, advisors told NI management after receipt of this letter that Emerson would most likely "come back once privately before they would go public." Pl. Ex. 6, Ilcisin Tr. at 251:6-15.

### b. Emerson's June 22 Letter

11. In its June 22 letter again offering to purchase all outstanding stock of NI at $48 per share in an all-cash transaction, Emerson stated:

1

> We are highly confident your shareholders would view our cash offer favorably and recent market data points reinforce this view, including:
>
> - The last time NI's share price closed above $48 was on December 6th, 2018. NI's share price has underperformed both the broader market and its key peer, Keysight, since then, with the stock down 34% in a period where the NASDAQ Index gained 54% and Keysight gained 125%;
> - Four of the six brokers who cover NI have reduced their 12 month forward price targets following your Ql earnings with the median price target being reduced from $50 to $43.50; and
> - The top 10 active shareholders as of the end of Q1 202l owned approximately 19% of the company with an estimated weighted average cost basis of $35. Over the past year, 8 of those 10 shareholders have reduced their positions and sold stock materially below the price we are offering.

Def. Ex. 24, at -2993.

12.    Emerson's letter further stated: "We prefer to engage in collaborative, bilateral discussions with minimal distraction to your management team to reach an agreement privately . . . . We look forward to learning more about your internal plan and are confident that with access to limited non-public information after signing an NDA, we could work with you to find additional value that would allow us to increase our Proposal." *Id.*

13.    The June 22 Letter also stated: "We have performed extensive outside-in due diligence on NI over an extended period . . . [W]e have limited and specific confirmatory due diligence requirements . . . We are ready to begin our confirmatory due diligence exercise and we would work towards signing and announcing a definitive agreement within four weeks." *Id.*

14.    Emerson also wrote in this letter: "Our Proposal is not subject to any financing condition and would be financed from cash on hand, committed lines of credit and/or other available sources of financing, Emerson is an A2/A rated company with a strong balance sheet. We have obtained a Highly Confident Letter from Goldman Sachs." *Id.*

15.    The letter continued: "*Certainty*: Our Board of Directors has reviewed and supports the proposed transaction. Emerson shareholder approval will not be required." *Id.*

2

16.    Emerson further stated: "Emerson considers this Proposal to be of the highest strategic priority. We are very motivated to conclude a transaction that benefits both companies as well as our respective shareholders." *Id.* at -2994.

17.    After reviewing the June 22 letter, Dixon noted that the letter "indicated a significant level of [due diligence][.]" Pl. Ex. 30, NAT-SL-00016089.

18.    Eddie Dixon, NI's Chief Legal Officer, also sent additional notes that summarized the June 22 Letter and Ilcisin's and Dixon's perspectives. This summary acknowledged multiple points conveyed in the letter, including that there was "[n]o change in offer – suggesting original offer is attractive to shareholders"; that Emerson had hired advisors; that Emerson made "references to the premium at various price time frames"; that Emerson "[i]ndicated they 'prefer to engage collaboratively' and . . . could potentially unlock additional value to increase their proposal" if provided with "limited non-public info"; and that Emerson requested a response by July 11. Pl. Ex. 31, NAT-SL-00017152-7155, at -7152.

19.    In connection with Emerson's May 25 and June 22 offer, Wachtell advised ███████ ████████████████████████ because, as Defendant McGrath understood from Wachtell's May 26 presentation, ██████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ██████████████ Def. Ex. 15, at -6121; Def. Ex. 21, at -6761; Pl Ex. 2, McGrath Tr. 83:15-19; Pl. Ex. 6, Ilcisin Tr. at 62:15-63:17.

20.    Defendants were also advised by Wachtell: "█████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████.” Def. Ex. 15, at -6128.

21.    NI's Chief Legal Officer, Eddie Dixon, also advised NI's directors and officers to limit their written communications about Emerson and stock buybacks due to the sensitive nature of the information. Pl. Ex. 3, Dixon Tr. at 153:13-154:18.

### c.  July 7 Email from Emerson

22.    On July 7, 2022, Emerson CEO Lal Karsanbhai emailed Starkloff and expressed that he was "disappointed" that NI would not be providing a response to Emerson until after NI's scheduled Board meeting. Karsanbhai stated: "We prefer to keep our conversations private, however for that to remain feasible we need relative expedience from NI's Board." Pl. Ex. 34, NAT-SL-00015203-5205, at -5204 (July 7, 2022).

23.    Starkloff forwarded this response to Dixon and Niles and wrote: "Let's think of strategies to keep some convo going." *Id.* at -5203. Starkloff then suggested a "friendly response showing I'm doing what I can to get board together . . . commit to response by Aug 1" and "[p]otentially offer a call prior[.]" *Id*. Dixon responded: "Probably worth a brief discussion rather than email exchange." *Id.*

24.    When asked if Karsanbhai's July 7 email conveyed a threat, Defendant McGrath testified: "I didn't understand the sole purpose of that to communicate a threat under the basis that we already knew a threat existed . . . [a threat] existed around that time, before that time, after that time. You can go back to the original briefing that we had in June from our attorneys advising us about the potential for, you know, a hostile takeover threat." Pl. Ex. 2, McGrath Tr. at 150:7-18. When asked if he understood NI to be under a threat of Emerson going public at all times, McGrath responded: "[A]t most times[.]" *Id.*, at 150:19-21.

4

## II.    The Definition of Material Nonpublic Information

25.    NI's Insider Trading Policy defined "material information" as:

[I]nformation that a reasonable investor would be substantially likely to consider important in deciding whether to buy, hold or sell securities of the Company or view as significantly altering the total mix of information available in the marketplace about the Company as an issuer of the securities. In general, any information that could reasonably be expected to affect the market price of a security is likely to be material.

Def. Ex. 8, at -1248.

26.    The Insider Trading Policy also stated: "As a rule of thumb, if you think something might be material nonpublic information, you should treat it as such. You can always reach out to the Compliance Officer if you have questions." *Id.* at -1249.

27.    Dr. Goodwin, Defendants' expert, testified: "I think most people intuitively understand that an acquisition or a merger . . . is a very significant event for a company." Pl. Ex. 7, Goodwin Tr. at 99:5-7.

28.    Dr. Denis, Defendants' expert, testified: "I would say that there is a general notion that if you increase the likelihood of an M&A transaction, given the fact that, on average, such transactions are associated with an increase in the target share price, then one could conclude that this reaction [i.e., NI's stock price reaction on January 13, 2023] is consistent with those types of announcements being economically material." Pl. Ex. 3, Denis Tr. at 316:3-18.

## III.    Defendants' Additional Actions Related to Emerson's Offers

### a.    The "Wine Bet"

29.    On June 14, 2022, NI's CFO Rapp and NI's VP of Corporate Strategy Ilcisin drafted handwritten notes reflecting their "wine bet." This wine bet contemplates additional bidding by Emerson after rejection by NI. Specifically, the bet consisted of a wager over the timing and final

5

price of Emerson's acquisition of NI. Pl. Ex. 26, NAT-SL-00008520-8521; Pl. Ex. 1, Rapp Tr. at 93:15-98:19, 99:14-16; Pl. Ex. 6, Ilcisin Tr. at 119:23-130:21. The first page is in Ilcisin's handwriting and conveys Ilcisin's wager, and the second page is in Rapp's handwriting and conveys Rapp's wager. Pl. Ex. 1, Rapp Tr. at 91:12-15; 94:7-98:12.

30.     At the top of the first page, the wine bet reads "winner chooses wine" and "loser buys[.]" Pl. Ex. 26, NAT-SL-00008520-8521, at -8520.

31.     Ilcisin's wager contemplated that Emerson would return with additional interest in late June and ultimately go public in late August 2022 with an offer of $55 per share. He speculated that the "final price" would be $61. *Id.* at -8520.

32.     Rapp's wager contemplated that Emerson would make an additional private offer in late June and go public by July 31, 2022, and all the top shareholders would accept the offer. She speculated that the final price would be $58.50. *Id.* at -8521.

### b.  NI's Monitoring of Emerson and Related Actions

33.     Defendant McGrath testified that after Wachtell's presentation at NI's June 14, 2022 Board meeting, he understood that an "outright rejection" of Emerson's offer may increase the probability of aggressive action by Emerson and that Emerson "may take hostile takeover actions" regardless of NI's response. Pl. Ex. 2, McGrath Tr. at 118:1-16, 124:6-15.

34.     After BofA's June 14, 2022 presentation concerning Emerson's "firepower," Defendant McGrath knew that a sale of Emerson's InSinkErator asset for about $3 billion would "obviously" increase Emerson's capacity to pursue M&A. Pl. Ex. 2, McGrath Tr. at 114:3-10; 261:21-262:13.

35.     On June 16, 2022, Ilcisin sent a meeting invitation for June 20, 2022, to NI executives and representatives of BofA and Wachtell with the subject line "Projective Wolverine

6

– Potential Next Steps Discussion." Pl. Ex. 27, NAT-SL-00010389. ████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████. Pl. Ex. 29, WLRK-

00001596-1611, at -1596.

36.     On June 23, 2022, the day following Emerson's second offer letter, NI began the

process of hiring a stock surveillance firm, with ███████████████████████

██████████████████████████████████████████████████████████████████

██████" Pl. Ex. 32, WLRK-00001575, at -1575; Pl. Ex. 6, Ilcisin Tr. 74:10-75:15.

37.     As early as June 29, 2022, NI was working with FGS Global, a strategic

communications firm, on a ████████████████████████████████████████

███████████████████████████████████████████████████████████."

Pl. Ex. 33, WLRK-00000700. ████████████████████████████████████

████████████████████████████████████████." *Id.* at -0703.

38.     NI engaged FGS Global to advise NI on strategic communications for the ██████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Def. Ex. 26, at

-2657.

### c.  McGrath's Presentation to the Board

39.     In July 2022, Defendant McGrath created a presentation titled "Board Discussion

of Project Wolverine" that he presented during NI's July 19, 2022 Board Meeting. Ex. 38, NAT-

SL-00020795-0819 at -0796; Ex. 2, McGrath Tr. at 189:13-22.

40.     In this presentation, McGrath presented the July 7 email from Karsanbhai and

wrote: "Most recent response indicates intention/threat to go public with its offer[.]" *Id.* at -0798.

41.    McGrath continued: "[Emerson] seems likely to go public with this offer and could initiate a formal bid. Note: It has nothing to lose if this triggers bidding[.]" *Id.* at -0800.

42.    McGrath also wrote: "Defending this offer publicly . . . is different that rejecting the offer privately . . . If [Emerson] uses the argument that we have not managed operating expenses sufficiently, it will be a significant embarrassment[.]" *Id.* at -0802.

43.    McGrath continued: "We need to go 'all in[.]' Delaying revenue or investing more in the future is not as important[.]" *Id.*

44.    The presentation listed seven "potential responses to [Emerson's] public argument[.]" *Id.* at -0803-04.

45.    The seventh potential response was labeled "[a]ccelerate our operating expense reductions more aggressively," which McGrath described as the "best possible defense" because, among other reasons, it "[w]ould both increase the stock price required and reduce the cost reduction opportunities for [Emerson]. At $65 per share, [Emerson] would most likely not be able to achieve its objective." *Id.* at 0804.

46.    Defendant McGrath sent a draft of this presentation to Defendant Starkloff on July 10, 2022. Pl. Ex. 36, NAT-SL-00021516-1531.

47.    This draft included a different seventh "potential response" from that outlined in the final version. This draft "response" reads: "If we implement cost reductions, we should disclose our new plan[.]" *Id.* at -1525.

48.    Under this seventh "potential response," McGrath wrote in this draft: "We need to get our stock price into the mid-40s, preferably 50s, as soon as possible without the price being based on a potential sale of the company[.]" *Id.*

8

49.     On July 12, 2022, Eddie Dixon, NI's Chief Legal Officer, wrote to Defendant Starkloff: "I was thinking about how you might suggest to Michael [McGrath] that it is not a good idea to create materials like those he shared with you - especially with something like Wolverine in play . . . I don't think Michael would want his materials made public[.]" Pl. Ex. 37, NAT-SL-00027877-7878, at -7877.

50.     In discussing this email and the presentation, Dixon testified that McGrath should have "absolutely not" written down this information down because, in Dixon's view, "[NI's leadership] should be having conversations" instead. Pl. Ex. 3, Dixon Tr. at 154:4-18.

**d.     ██████████████████     and NI's Earnings Release**

51.     In July 2022, NI was contemplating ██████████████████ ██████ Pl. Ex. 3, Dixon Tr. at 159:22-25; Pl. Ex. 1, Rapp Tr. at 100:8-11.

52.     As of July 14, 2022, there was "a relatively aligned consensus" between NI's advisors "that an investment in NI will ██████████████████ ] if Nuthatch [i.e. Emerson] goes public before the deal is inked (based on resulting stock price increase)[.]" Pl. Ex. 39, NAT-SL-00023167-3168, at -3167; Pl. Ex. 5, Ilcisin Tr. at 193:1-195:11.

53.     During the NI Board's discussion concerning the Emerson offers at the July 19-20, 2022 Board meeting, the Board "discussed with management the potential steps the Company could take at the upcoming earnings call to highlight the Company's strong momentum[.]" Def. Ex. 29, at -1461.

54.     On July 28, 2022, NI reported earnings and hosted an earnings call for its investors. Pl. Ex. 41.

55.     In the press release associated with the July 28, 2022 earnings call, NI stated it was "increas[ing its] expectations for 2023," and Defendant Starkloff noted that NI's "focused

9

strategy" and second quarter "[m]omentum" were resulting in management's "increased confidence in achieving revenue growth and earnings per share in line with current consensus estimate." *Id.*

56.     On July 31, 2022, Defendant McGrath wrote to Starkloff and Rapp: "It looks like from the analyst reports that they either didn't listen to your 2023 guidance or didn't give it credibility." Pl. Ex. 42, NAT-SL-00002982-2983, at -2982.

## IV.    Defendants' Continued Engagement with the Prospect of an Emerson Acquisition

57.     On August 4, 2022, Starkloff sent an email to Ilcisin, Dixon, and Rapp calling the fact that Emerson announced its dividend "a week prior" to Emerson's earnings call "interesting[.]" Pl. Ex. 44, NAT-SL-00011781-1785, at -1782. Ilcisin shared BofA's insight on this decision with Starkloff and stated, "per your question, definitely an anomaly. Will be an interesting call. We should do a earnings call party if the timing works [smiley face emoticon][.]" *Id.* at -1781.

58.     On August 8, 2022, Niles of Wachtell emailed Defendant Starkloff, Dixon, Rapp, Ilcisin, and Percival press releases announcing Emerson's sale of InSinkErator and noted: "Wolverine moving forward with portfolio realignment (selling InSinkErator $3B to Whirlpool / 18. lx EBITDA). (Another reason why Lal [Kharsanbai] may have been a bit busy past few days)." Def. Ex. 36, at -6260.

59.     In response to Shawn Liu of BofA circulating a Reuters article covering Emerson's sale of InSinkErator, ███████████████████████████████████████████████████████ ██████████████████████████████████ Pl. Ex. 47, NAT-SL-00018186-8187, at -8186 (ellipses in original). ██████████████████████████████████████████████████ ████████████████████████████ *Id.*

10

60.    Also responding to Emerson's announcement of the InSinkErator sale on August 8, Niles of Wachtell told NI: "██████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████████ .'" Pl. Ex. 46, NAT-SL-00017263-7267, at -7264 (ellipses in original).  Ilcisin responded: "There is probably a discussion there. The BoA team has had some thoughts related to the impact of the cash generation event[.] *Id.* Ilcisin followed up with Eddie Dixon and stated: "I was talking to BoA on the weekend and they suggested a call in general related to earnings, this news is key in their thinking." *Id.* at -7263.

61.    On August 9, 2022, Defendant Starkloff wrote: "I listened to [Emerson's earnings] call live. Not a great quarter for them." Pl. Ex. 49, NAT-SL-00023501-502, at -3501. In response, Defendant McGrath wrote: "Think that will make them more or less eager?" *Id.*

62.    That same day, August 9, Defendants hosted a "Wolverine check in call" with BofA and Wachtell to discuss "recent Nuthatch announcements and earnings call" and "[p]reparedness for any disclosures[,]" including the readiness of BofA's "fight deck[.]" Pl. Ex. 48, NAT-SL-00010395; Pl. Ex. 5, BofA Tr. at 148:24-151:14.

63.    On August 10, 2022, ██████████████████████████ ████████████████████████████████████████████████ ████████████████ : "This just got interesting!!" Pl. Ex. 50, NAT-SL-00011768.

64.    On the day ██████████████████████████████ , and after meeting with NI's advisors, Dixon sent an email to himself in which Dixon wrote that "the probability of [Emerson] going public is much higher now." Def. Ex. 39; Pl. Ex. 3, Dixon Tr. at 217:1-15.

11

65.　　Also on August 10, 2022, Defendant Starkloff sent himself a draft communication to share with NI employees in the event Emerson went public with its offer. Pl. Ex. 53, NAT-SL-00021470.

66.　　Ilcisin acknowledged ███████████████████████████████████████████ ████████████████████████████████████████████████████████. Pl. Ex. 6, Ilcisin Tr. at 218:2-13.

67.　　On or around August 11, 2022, at least one of NI's advisors "viewed" ██████ ████████████████████ as "hostile." Pl. Ex. 6, Ilcisin Tr. at 221:10-25.

68.　　BofA's representative █████████████████████████████████████████ ████████████████████████████████████████████████████." Pl. Ex. 5, BofA Tr. at 66:17-67:3.

69.　　On August 26, 2022, Marissa Vidaurri, NI's head of investor relations, sent an email to Starkloff, Rapp, Dixon, Liu, and Niles stating that she asked Mackenzie Partners for its ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Pl. Ex. 56, NAT-SL-00017309-7310.

70.　　On September 1, 2022, MacKenzie Partners emailed Dixon, Rapp, Ilcisin, and Vidaurri and stated: "████████████████████████████████████████████ ██████████████████████████████████████████████████████." Def. Ex. 44 (September 1, 2022), at -7321. In response to this news, ███████████████████ ██████ Pl. Ex. 57, WLRK-00002970-2971.

12

71. On September 5, 2022, ███████████████████████████

███████████████████████████████████████████████████████ Pl. Ex. 58, WLRK-00002195-2286, at -2195.

72. On September 19, 2022, Dixon sent notes to the NI team summarizing the "key points" for "the general message/Wolverine update to the board" the following Wednesday. Pl. Ex. 59, NAT-SL-00023189-3190, at -3189.

73. In his September 19, 2022 email, Dixon wrote: "Speculation is that the purchase of shares was intended to signal that they are serious about the potential for an acquisition[.]" *Id.*

74. Dixon also wrote in the September 19, 2022 email: "NI is on Wolverine's [i.e., Emerson's] acquisition pipeline list and there is no evidence that Wolverine's [i.e., Emerson's] interest has petered out. Evidence might be, for example, Wolverine selling its shares or announcing another large acquisition making NI unaffordable[.]" *Id.*

75. On September 21, 2022, the day of NI's board meeting, ███████████████████

███████████████████████████████████████████████████████

██████████████████████████ " Pl. Ex. 61, NAT-SL-00012292-2295, at -2292 (referring to Emerson's financial "firepower" to acquire NI). ███████████████████████

███████████████████████████████████████████████████████

██████████████ *Id.* at -2295.

76. NI and its advisors continued to use code names for Emerson through at least September 2022. *See, e.g.*, Def. Ex. 33; Pl. Ex. 56, NAT-SL-00017309-7310; Pl. Ex. 59, NAT-SL-00023189-3190.

**V.    Defendants' Repurchases While in Possession of Material Nonpublic Information Concerning Emerson**

13

77.     In January 2022, Defendants planned that NI would do $100 million in repurchases for the full year. Pl. Ex. 21, excerpts of NAT-SL-00024256-4417.

78.     In preparation for the June 20, 2022 "Wolverine Potential Next Steps Discussion" with NI, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████?" Pl. Ex. 28, BofA_000156-160, at -0158.

79.     BofA's representative ████████████████████████████████████ ████████████████████████████. Pl. Ex. 5, BofA Tr. at 105:23-106:4.

80.     On July 7, 2022, Ilcisin, after reviewing a set of slides from an NI employee, wrote that "opportunistic buy-backs are better not framed as a 'problem[.]'" Pl. Ex. 35, NAT-SL-00023205-3206, at -3205 (July 7, 2022). Ilcisin forwarded this email to Rapp and Dixon and stated: "This could be nuthatch discoverable, don't want these listed as problems." *Id.* Dixon responded with a thumbs-up emoticon. *Id.*

81.     As of July 19-20, 2022, NI planned to repurchase $10 million worth of NI stock in the third quarter of 2022. Pl. Ex. 40, excerpts of NAT-SL-00024106-4212, at -4210.

82.     On August 7, 2022, in response to a discussion regarding certain Board members' concerns about NI's stock repurchases, McGrath wrote to Starkloff: "Go ahead with what you are planning . . . . The reaction was to the negative cash flow from operations and our precarious cash position at the end of the quarter. The comment was 'With almost no cash and negative cash flow, we sure the hell shouldn't be buying back stock to make a $10M donation.['] And there was several strong agreements." Pl. Ex. 45, NAT-SL-00001276-1278, at -1276.

14

83.    On August 11, 2022, while drafting NI's purported 10b5-1 Plan, Rapp requested refinements to the trading matrix that would clarify that NI would not be obligated to purchase stock if the market price of NI stock was $45 per share or above. Pl. Ex. 54, NAT-SL-00017097-7099, at -7097.

84.    On August 11, 2022 Defendants purported to have entered into a 10b5-1 Plan Agreement. This agreement included a trading matrix directing JP Morgan to purchase (i) up to $8 million in a day if the price of NI stock was $37 or below per share, (ii) up to $6 million in a day if the price was $37 to $39.99 per share, (iii) up to $4 million in a day if the price was $40 to $42.99 per share, (iv) up to $1 million in a day if the price was $43 to $44.99 per share. Def. Ex. 41, at -0771. If the price was $45.00 or higher per share, JP Morgan was instructed not to make any purchases of NI stock. *Id.*

85.    On August 12, 2022, NI spent a total of $9,047,756.58 repurchasing its common stock on the open market. Def. Ex. 42.

86.    On August 18, 2022, NI spent a total of $3,777,234.13 repurchasing its common stock on the open market. *Id.*

87.    On August 19, 2022, NI spent a total of $4,998,336.70 repurchasing its common stock on the open market. *Id.*

88.    On August 26, 2022, NI spent a total of $3,996,607.39 repurchasing its common stock on the open market. *Id.*

89.    On September 12, 2022, NI spent a total of $3,996,530.11 repurchasing 97,260 shares of NI common stock at a price of $41.0912. *Id.*

90.    On September 13, 2022, NI spent a total of $5,644,344.73 in repurchasing 140,682 shares of NI common stock at a price of $40.1213. *Id.*

15

91.     On September 14, 2022, NI spent a total of $5,611,499.28 in repurchasing 140,806 shares of NI common stock at a price of $39.8527. *Id.*

92.     On September 15, 2022, NI spent a total of $5,549,629.12 repurchasing 140,806 shares of NI common stock at a price of $39.4133. *Id.*

93.     On September 16, 2022, NI spent a total of $5,472,256.22 repurchasing 140,806 shares of NI common stock at a price of $38.8638. *Id.*

94.     On September 19, 2022, NI spent a total of $5,996,089.14 repurchasing 150,200 shares of NI common stock at a price of $39.9207. *Id.*

95.     On September 20, 2022, NI spent a total of $5,996,557.05 repurchasing 150,550 shares of NI common stock at a price of $39.8310. *Id.*

96.     On September 21, 2022, NI spent a total of $5,977,063.00 repurchasing 148,466 shares of NI common stock at a price of $40.2588. *Id.*

97.     On September 22, 2022, NI spent a total of $5,996,272.32 repurchasing 153,020 shares of NI common stock at a price of $39.1862. *Id.*

98.     On September 23, 2022, NI spent a total of $5,996,783.50 repurchasing 154,575 shares of NI common stock at a price of $38.7953. *Id.*

99.     On September 26, 2022, NI spent a total of $3,732,723.50 repurchasing 95,062 shares of NI common stock at a price of $39.2662. *Id.*

100.    NI purchased over $80 million in NI stock from August 12 to September 26, 2022 – a time period of only 15 market days. Pl. Ex. 62, NAT-SL-00008757-758; Def. Ex 42.

101.    According to NI's CFO Rapp, Defendants purchased $160 million worth of NI stock throughout 2022, which was $60 million higher than NI's plan. Pl. Ex. 63, NAT-SL-00006122-6123, at -6122.

16

102.    The amount that NI spent on repurchases during the third quarter of 2022 constituted the largest quarterly repurchases by dollar amount in NI's history. Pl. Ex. 65, Defendants' Responses and Objections to Lead Plaintiff's Requests for Admission, at 11 (January 7, 2026); Pl. Ex. 2, McGrath Tr. at 313:9-23, 314:1-2.

## VI.    Post Class-Period Events

103.    On January 11, 2023, Starkloff of NI and Karsanbhai of Emerson discussed Emerson's $53 per share offer and the possibility of increasing the offer, and Emerson followed up with a letter reaffirming its $53 per share offer. Def. Ex. 1, at 30.

104.    On January 12, 2023, NI's Board met and discussed Starkloff's conversation with Karsanbhai and "the shareholder rights plan that it planned to adopt in connection with initiating a strategic review process to ensure an even playing field and that no potential participant would have an unfair advantage in the process by accumulating a large number of shares of NI[.]" *Id.*

105.    "On the morning of January 13, 2023, NI issued a press release announcing that its Board had initiated a review and evaluation of strategic options . . . and that the comprehensive review would include . . . solicitation of interest from potential acquirers . . . some of whom had already approached NI." *Id.*

106.    In response to this disclosure, NI's stock closed at $46.97 on January 13, 2023, up from the previous day's per share price of $40.17. Pl. Ex. 67.

107.    This increase in NI's stock price was statistically significant and was caused by NI's January 13, 2022 disclosure concerning a potential transaction. Decl. of J. Bennett in support of Defendants' Mot. to Exclude, Ex. A, Expert Report of Matthew D. Cain, Ph.D. (July 28, 2025) ("Cain Merits Report"), ¶124.

108.    "On the morning of January 17, 2023, Emerson issued a press release announcing that it had submitted a proposal to the Board of NI to acquire NI for $53 per share. The press release stated that the proposal was submitted to NI on November 3, 2022 and represented an improvement over an initial $48 per share proposal submitted on May 25, 2022 and outlined prior engagement between the two companies." Def. Ex. 1, at 31.

109.    In response to this disclosure, NI's stock closed at $52.04, up from the previous trading day's per share price of $46.97.

110.    This increase in NI's stock price was statistically significant and was caused by Emerson's January 17, 2022 disclosure concerning its offers and its engagement with NI, including NI's prior rejection of Emerson's offers. *Id.*, ¶124.

111.    When Emerson acquired NI for $60 per share, Defendant McGrath received approximately $1 million more for the NI shares he personally owned compared with the amount he would have received had he sold all those shares at roughly the same price as Lead Plaintiff. Pl. Ex. 2, McGrath Tr. 326:10-327:7.

112.    When Emerson acquired NI for $60 per share, Defendant Starkloff received approximately $5 million more for the NI shares he personally owned compared with the amount he would have received had he sold all these shares at roughly the same price as Lead Plaintiff. Pl. Ex. 4, Starkloff Tr. 151:5-152:1.

18

DATED: January 26, 2026

**JOHNSON VAN KWAWEGEN LLP**

<u>*s/ Noam Mandel*</u>
Chad Johnson
Noam Mandel
Desiree Cummings
Jonathan Zweig
1120 Avenue of the Americas
New York, NY 10036
Telephone: (646) 836-9630
chad@jvk-law.com
noam@jvk-law.com
desiree@jvk-law.com
jonathan@jvk-law.com

*Lead and Class Counsel*

19