UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| In re NATIONAL INSTRUMENTS CORPORATION SECURITIES LITIGATION | : : : : : : x | Civil Action No. 1:23-cv-10488-DLC <br><br> <u>CLASS ACTION</u> |

## LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS'
## <u>MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. MATTHEW CAIN</u>

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................................ 1

II.  LEGAL STANDARD ........................................................................................................ 2

III.  ARGUMENT .................................................................................................................... 3

   A.  Dr. Cain's Undisputed Qualifications .................................................................. 3

   B.  Dr. Cain's Opinions Regarding Economic Materiality ....................................... 4

      1.  Dr. Cain's Identification of the Undisclosed Information ............................... 6

      2.  Dr. Cain's Consideration of NI's Rejection of Emerson's Offers .................. 8

      3.  Dr. Cain's Discussion of Evidence in the Record ........................................... 9

      4.  Dr. Cain's Assessment of the Academic Literature ...................................... 11

      5.  Dr. Cain's Event Study and Assessment of Securities-Analyst Reports ...... 15

   C.  Dr. Cain's Opinions Regarding Artificial Deflation and Damages ................... 19

   D.  Dr. Cain's Loss-Causation and Damages Opinions Fit Plaintiff's Theory of Liability .... 24

   E.  Dr. Cain's Unchallenged Efficiency and Damages Opinions ........................... 26

IV.  CONCLUSION ............................................................................................................... 27

**TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
    707 F. Supp. 3d 309 (S.D.N.Y. 2023)...............................................................15

*Alves v. Affiliated Care of Putnam, Inc.*,
    2022 WL 1002817 (S.D.N.Y. Mar. 30, 2022)...................................................15

*In re Am. Bus. Computs. Corp. Sec. Litig.*,
    1994 WL 848690 (S.D.N.Y. Feb. 24, 1994).....................................................25

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)........................................................................2, 12

*In re Apple Inc. Sec. Litig.*,
    2023 WL 4556765 (N.D. Cal. July 17, 2023) .....................................................7

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014), *report and recommendation
    adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ...................................15

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014).............................................................................17

*Daniels-Feasel v. Forest Pharms., Inc.*,
    2021 WL 4037820 (S.D.N.Y. Sep. 21, 2021), *aff'd*, 2023 WL 4837521 (2d
    Cir. July 28, 2023) .........................................................................................15

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ....................................................................................3, 17

*Electro–Miniatures Corp. v. Wendon Co.*,
    771 F.2d 23 (2d Cir. 1985)..............................................................................24

*In re Exec. Telecard, Ltd. Sec. Litig.*,
    979 F. Supp. 1021 (S.D.N.Y. 1997).................................................................17

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009).................................................................3

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................................17

*FTC v. Quincy Bioscience Holding Co.*,
    646 F. Supp. 3d 518 (S.D.N.Y. 2022)..............................................................10

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..................................................................................................12, 17

*Gross v. GFI Grp., Inc.*,
  310 F. Supp. 3d 384 (S.D.N.Y. 2018), *aff'd*, 784 F. App'x 27 (2d Cir. 2019) ...........17

*Gruber v. Gilbertson*,
  628 F. Supp. 3d 472 (S.D.N.Y. 2022)....................................................................22, 24

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................................................22

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
  923 F. Supp. 2d 511 (S.D.N.Y. 2013) ...........................................................................23

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ................17

*Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*,
  2025 WL 2592224 (S.D.N.Y. Sep. 8, 2025) ...........................................................10, 25

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  638 F. Supp. 3d 227 (E.D.N.Y. 2022)............................................................................10

*In re Peters*,
  642 F.3d 381 (2d Cir. 2011).............................................................................................24

*Raishevich v. Foster*,
  247 F.3d 337 (2d Cir. 2001).............................................................................................24

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
  988 F. Supp. 2d 395 (S.D.N.Y. 2013).........................................................................9, 10

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  495 F.2d 228 (2d Cir. 1974).............................................................................................25

*In re Under Armour Sec. Litig.*,
  730 F. Supp. 3d 172 (D. Md. 2024)...................................................................................7

*US Airways, Inc. v. Sabre Holdings Corp.*,
  2022 WL 986232 (S.D.N.Y. Apr. 1, 2022) .......................................................................9

*United States v. Gushlak*,
  728 F.3d 184 (2d Cir. 2013).............................................................................................22

*United States v. Litvak*,
  808 F.3d 160 (2d Cir. 2015)...............................................................................................2

*United States Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004)............................................................15

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)............................................................23

*Wilson v. Comtech Telecomm. Corp.*,
    648 F.2d 88 (2d Cir. 1981)............................................................25

**Rules**

Fed. R. Evid. 401 ............................................................2

Fed. R. Evid. 702 ............................................................2

**Other Authorities**

Baker, M., Pan, X., & Wurgler, J. (2012), The effect of reference point prices on mergers and acquisitions, *J. Fin. Econ.*, 106(1)............................................................14

Branch, B., & Yang, T. (2003), Predicting Successful Takeovers and Risk Arbitrage, *Quarterly J. Bus. & Econ.*............................................................13

Cain, Matthew D. & Denis, David J. (2013), "Information Production by Investment Banks: Evidence from Fairness Opinions," *J. Law & Econ.*, vol. 56, no. 1, February 2013............................................................3

Cain, Matthew D., et al., "Does *Revlon* Matter? An Empirical and Theoretical Study," *Cal. L. Rev.*, vol. 108, no. 6, 2020............................................................3

Even-Tov, Omri, et al., "Failed Acquisition Offers: The Impact of Failure Reasons on Target Valuation," *Fin. Research Letters*, vol. 63, May 2024............................................................14

## I.    INTRODUCTION

Dr. Matthew Cain, a highly qualified financial economist, intends to offer to the jury his well-founded expert opinions supporting the claims of Plaintiff and the Class.  These include his opinions that Emerson's undisclosed premium proposals to acquire National Instruments ("NI") were economically material while NI was engaged in stock repurchases, that the omission of this material information artificially deflated NI's stock price, and that jurors can reliably measure this deflation and the amount of damages suffered by Class members who sold NI stock using the straightforward formula Dr. Cain provides. In his July 28, 2025 Expert Report ("Cain Expert Report"), Declaration of James Bennett, Dkt. 116 ("Bennett Dec.") Ex. A, and his November 10, 2025 Reply Expert Report ("Cain Reply Report"), Bennett Dec. Ex. C, Dr. Cain applies principles of financial economics to facts in the record, draws insights from academic studies, and conducts a quantitative event study.  The opinions Dr. Cain formulated using these reliable methodologies will be helpful to the jury in assessing materiality, loss causation, and damages.

In their Motion to Exclude ("Mot."), Defendants largely repeat their meritless arguments that the Court rejected at the class-certification stage.  For example, the Court has already correctly rejected Defendants' argument that a damages model must account for a hypothetical but-for world in which NI neither disclosed Emerson's offers nor repurchased stock. Opinion and Order, September 19, 2025, Dkt. 105 ("Class Cert. Op.") at 16-17. Accordingly, the Court recognized that Dr. Cain's proposed damages model based on artificial deflation of at least (i) $48 per share minus (ii) the investor's sale price "provides a foundational model for determining damages that result from the asserted theory of injury[.]" *Id.* at 15.  And with respect to materiality, the Court rightly observed:

> The offers Emerson made on May 25 and June 22 to purchase NI stock at $48 per share could be found to reflect its serious interest in acquiring NI.  A reasonable

1

> investor may well have concluded that $48 was only Emerson's opening bid.  The swift rejection of those early offers by NI's Board does not prevent them from being found material.  It remained entirely plausible that Emerson would return with an improved offer or take its offer public.  That is what NI's Board contemplated in June and July of 2022, when it concluded that the $48 offer "substantially undervalue[d]" NI and discussed "the potential for [Emerson] to change its offer."

*Id.* at 13.  Dr. Cain's expert opinion that information regarding Emerson's May and June 2022 offers was economically material throughout the Class Period[1] strongly supports the Court's intuitive understanding of that reality, and his analysis will be highly valuable to a lay jury without expertise in corporate transactions.  *See United States v. Litvak*, 808 F.3d 160, 182 (2d Cir. 2015) (holding that district court exceeded its discretion by excluding expert whose testimony "would have been highly probative of materiality, the central issue in the case").

The Court should deny in full Defendants' motion to exclude Dr. Cain's expert testimony.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 provides that expert testimony is admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  In assessing the relevance of expert testimony, a court examines whether it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 401).  "The flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact."  *Id.* at 267.

---

[1] The certified Class Period is August 12-30 and September 12-28, 2022, inclusive.

Because "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony," a supposed "lack of textual support" for a particular methodology "may go to the weight, not the admissibility of the expert's testimony." *Id.* (omitting internal quotation marks). Likewise, any supposed "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" disputed expert evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

Here, Defendants have not come close to demonstrating that Dr. Cain's expert testimony is so irrelevant or unreliable that it should be kept from the jury.

## III.    ARGUMENT

### A.    Dr. Cain's Undisputed Qualifications

"The strength of an expert's qualifications provides circumstantial evidence of reliability." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 179 (S.D.N.Y. 2009). Defendants do not challenge Dr. Cain's qualifications, for good reason. *See* Cain Expert Report ¶¶6-13. Dr. Cain holds a Ph.D. in Finance from Purdue University and is a Senior Fellow at New York University School of Law, where he conducts academic research concerning corporate finance, mergers and acquisitions, and other topics that are directly relevant to this case. Indeed, two of the pertinent academic studies discussed in both sides' expert reports were authored by Dr. Cain.[2] Dr. Cain also served as a Financial Economist at the U.S. Securities and Exchange Commission ("SEC"), where he provided economic analysis and expert witness testimony, and was an advisor to an SEC

---

[2] Cain, Matthew D. and Denis, David J., "Information Production by Investment Banks: Evidence from Fairness Opinions," *J. Law & Econ.*, vol. 56, no. 1, February 2013; Cain, Matthew D., et al., "Does *Revlon* Matter? An Empirical and Theoretical Study," *Cal. L. Rev.*, vol. 108, no. 6, 2020.

Commissioner.  Dr. Cain has been permitted to testify at trial concerning economic materiality in multiple insider-trading cases.[3]  Previously, Dr. Cain taught courses in Mergers and Acquisitions as an Assistant Professor of Finance at Notre Dame.  Dr. Cain's opinions are based on a solid foundation of both academic study and the practical application of economic principles, and he is highly qualified to render the opinions he is offering here.

### B.    Dr. Cain's Opinions Regarding Economic Materiality

In the field of financial economics, information is considered "economically material" if it would be expected to "affect the valuation of a security and investors' decisions to buy or sell the security."  Cain Expert Report ¶36.[4]  As applied to this case, "the relevant question is whether the allegedly omitted information about Emerson's offers to acquire NI Common Stock would have been expected to alter investors' assessment of NI's value, and thereby influence investors' trading decisions and their sale prices."  *Id.*  After examining multiple sources of evidence, Dr. Cain determined that Emerson's offers to acquire NI were economically material during the Class Period.  As Dr. Cain explains: "In corporate finance, credible acquisition offers are widely recognized as economically material because they serve as external market signals, revealing how third parties assess the target's underlying value.  Markets react strongly to such offers, particularly because acquirers are typically willing to pay a premium above the target's prevailing market price."  *Id.* ¶106.

Dr. Cain's opinions are particularly salient in evaluating Defendants' core argument that "during the Class Period, the prospect of a transaction between Emerson and NI was dead[.]"  Motion for Summary Judgment at 8.  According to Defendants, after NI rejected Emerson's May

---

[3] *See, e.g.*, *S.E.C. v. Clark, et al*, No. 1:20-cv-01529 (E.D. Va.); *S.E.C. v. Pirrello*, No. 1:16-cv-02459-WMR (N.D. Ga.); *S.E.C. v. Huang*, No. 2:15-cv-00269-MAK (E.D. Pa.).

[4] Dr. Cain is not opining on whether the legal definition of materiality is satisfied in this case.  *Id.*

and June 2022 offers to acquire NI for $48 per share, there was no meaningful likelihood of a deal between Emerson and NI.  In response, Dr. Cain draws upon academic research and economic principles to observe the "well-documented reality that M&A negotiations often unfold over multiple stages," with an "average of 5.4 rounds of bidding."  Cain Expert Report ¶113.  According to Dr. Cain, "[t]his iterative process, where targets initially reject offers and negotiate for better terms, is common and consistent with the goal of maximizing shareholder value."  Id.  Further, as Dr. Cain details, the academic literature confirms that "hostility is a frequent part of the bargaining spectrum," meaning that "elements of resistance do not contradict or undermine the economic materiality of the allegedly omitted information."  Cain Reply Report ¶¶32-33.

Dr. Cain also draws parallels between facts in this case and factors identified in the academic literature that increase the likelihood of a deal being completed.  For example, after NI rejected its offers, ████████████████████████████████████ "a meaningful role in the probability of deal completion."  Cain Expert Report ¶109.  As Dr. Cain explains, "[a]cademic research finds that when a bidder holds an ownership stake in the target prior to or during negotiations, the likelihood of a successful acquisition increases."  Id. ¶¶109-110.  Further, according to academic research, cash offers like Emerson's offers to NI are "associated with a higher probability of completion relative to stock or mixed consideration."  Id. ¶111.[5]  Likewise, drawing upon academic research, Dr. Cain finds that the amount of consideration Emerson was offering – specifically, the 36% and 41% premiums to NI's stock price represented by Emerson's May and June 2022 offers, respectively, and the fact that Emerson's offers exceeded NI's 52-week

---

[5] Defendants' expert Dr. Shane Goodwin acknowledged that "[a]n all cash offer, particularly when it's fully financed, can be generally viewed as maybe [having] a higher likelihood" of completion. Deposition of Dr. Shane Goodwin ("Goodwin Tr.") at 115:1:9.

high – increased the credibility of Emerson's offers and the likelihood of deal completion. *Id.*

¶112. Based on this application of economic principles to the facts of this case, Dr. Cain concludes:

> Takeover bids with the types of characteristics documented in the Emerson offers to acquire National Instruments Common Stock and the M&A events associated with those offers, including meaningful offer premiums, toehold accumulation, initial target resistance, and all-cash consideration, have been repeatedly shown to influence investor expectations and firm valuation. These features not only signal offeror seriousness but also increase the probability of successful deal completion and raise investor expectations of potential offer values. If Plaintiff ultimately proves their allegation that material information regarding Emerson's proposal and related developments was withheld from the market during a period in which National Instruments was repurchasing its own shares, then based on fundamental valuation principles, investors would have viewed that information as value-relevant and thus, material from an economic perspective.

*Id.* ¶115. Additionally, Dr. Cain conducted a quantitative event study and assessed securities-analyst reactions to announcements concerning the transaction process, which further confirmed his opinion that Emerson's offers to NI were economically material during the Class Period. *Id.* ¶¶116-127.

Dr. Cain's expert opinions on economic materiality are based on reliable methodologies and should not be excluded. Defendants' arguments are wrong on the merits and at most go to the weight, not admissibility, of his testimony.

### 1.    Dr. Cain's Identification of the Undisclosed Information

Defendants contend that Dr. Cain's opinions should be excluded because he supposedly has not sufficiently identified the economically material information that NI failed to disclose while it engaged in repurchases. Mot. at 6-7. This argument is meritless. Dr. Cain clearly explains that his analysis concerns "the economic materiality of Emerson's offers to acquire National Instruments Common Stock[.]" Cain Expert Report ¶135. To evaluate the economic materiality of those offers, Dr. Cain properly places them in their factual context, including "that Emerson was the offeror, that it had ample financial capacity, that its offers were in cash, that it was offering

a significant premium, that it had indicated that acquiring National Instrument was its 'highest strategic priority,' that it had expressed a willingness to increase its offer price, and so forth." Cain Reply Report ¶29.

None of these facts, or any facts at all about Emerson's offers, were disclosed during the Class Period. Thus, whether a particular undisclosed fact about those offers is considered part of the omitted information itself, or is considered a separate fact that, together with other facts, rendered Emerson's offers economically material, is an irrelevant semantic game. Regardless of how any particular fact is categorized, Dr. Cain appropriately opines on the economic materiality of Emerson's offers by applying principles of financial economics to the facts of this case. In offering that assessment, there is no need for Dr. Cain to further opine on "the precise wording of a but-for disclosure of the relevant truth at the start of a class period." Cain Reply Report ¶70; *see In re Under Armour Sec. Litig.*, 730 F. Supp. 3d 172, 181-82 (D. Md. 2024) (rejecting argument that Dr. Cain's opinion should be excluded because he purportedly did not identify "the specific information that should have been disclosed earlier"); *In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *10 (N.D. Cal. July 17, 2023) (excluding expert opinion that a "'key step in assessing loss causation is to determine the but-for disclosure'" because it "misleadingly implies that but-for causation is the legal standard").

Ultimately, there is no confusion about the subject of Dr. Cain's economic materiality opinion. The Court correctly identified the materiality inquiry as addressing "the defendants' failure to disclose Emerson's offers to acquire NI while repurchasing NI stock[.]" Class Cert. Op. at 11. Indeed, Defendants' expert Dr. David Denis acknowledged that the precise definition of the omitted information "doesn't affect the analysis" and is "not critical" because Dr. Cain makes clear which facts he is opining contributed to the economic materiality of Emerson's offers. Deposition

7

of Dr. David Denis ("Denis Tr.") at 150:19-151:2, 157:2-7.  There is no ground to exclude Dr. Cain's opinions on this basis.

### 2. Dr. Cain's Consideration of NI's Rejection of Emerson's Offers

According to Defendants, Dr. Cain's opinions should be excluded because he purportedly "ignored" that NI rejected Emerson's offers.  Mot. at 7-8.  Defendants' premise is wrong.  Dr. Cain specifically acknowledges NI's responses to Emerson's offers.  *See, e.g.*, Cain Expert Report ¶46 ("on June 14, 2022, NI's Board rejected Emerson's $48 offer, stating that it 'substantially undervalues the Company'").  In fact, a principal focus of his reports is evaluating the economic materiality of Emerson's offers in a factual context that includes, but is not limited to, those rejections.  *See, e.g.*, *id.* ("The record indicates that, despite NI's formal rejection of the proposal, the Board was actively preparing for further developments with Emerson.").  Dr. Cain applies economic principles to those facts by drawing on academic literature finding that M&A negotiations commonly involve an initial rejection, followed by further rounds of negotiation.  *Id.* ¶113.  Further, Dr. Cain cites his own published study where he found that, particularly for deals like this one governed by Delaware law, "hostile transactions typically involve more rounds of bidding, longer timelines, and higher final offers."  *Id.* ¶114.

Dr. Cain's opening report also includes an appendix in which he further explains why it would be wrong to assert that NI's rejections meant that the likelihood of a transaction was "negligible" at the start of the Class Period:

> This conclusion is flawed because it overlooks multiple pieces of evidence, including internal documents, showing that National Instruments remained actively engaged with the prospect of a transaction with Emerson throughout the Class Period.  It also ignores internal assessments that the probability of Emerson taking its offer public had increased significantly—a development which carried market implications regardless of whether the Board was engaged in formal negotiations.  Finally, it disregards well-established academic research on the structure and dynamics of merger negotiations.

8

*Id.* App. C ¶3; *see also id.* ¶¶4-11, 23-26 (analyzing this evidence in detail). Then, in his Reply Report, Dr. Cain included a section entitled "NI's Resistance to a Potential Hostile Takeover by Emerson is Consistent with Economic Materiality of the Alleged Omissions," which further addressed the academic literature on that topic. Cain Reply Report ¶¶32-36. Defendants may disagree with the degree of significance Dr. Cain ascribes to NI's rejection of Emerson's offers, along with the Court's observation that "[t]he swift rejection of those early offers by NI's Board does not prevent them from being found material," Class Cert. Op. at 13, but the assertion that Dr. Cain ignored that rejection is false.

### 3.    Dr. Cain's Discussion of Evidence in the Record

Contradicting their argument that Dr. Cain has not sufficiently identified the material facts that NI failed to disclose, Defendants seek to exclude Dr. Cain's identification of the very facts to which he applied his expert analysis. Mot. at 19-20. Such facts "simply provide the foundation" for an expert's opinion, and once "supported by admissible evidence" at trial, the expert can "present these facts as the predicate for his opinion testimony." *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 986232, at *1 (S.D.N.Y. Apr. 1, 2022) (permitting expert to recite the "facts on which [he] relied as the basis for his opinions"). For example, before opining based on the academic literature that Emerson's toehold investment increased the likelihood that Emerson would consummate a deal with NI, Cain Expert Report ¶¶109-110, Dr. Cain appropriately identified that the toehold investment was made in the first place and that Eddie Dixon, NI's Chief Legal Officer, wrote internally at the time that the "[p]robability of [Emerson] going public is much higher now." *Id.* ¶¶74-75.

Defendants also contend that Dr. Cain's description of relevant facts is incomplete. The argument that an expert's report purportedly "omits important facts" is a subject that "may be

9

explored on cross-examination," but those omissions "do not affect the admissibility" of the expert's opinion. *Reach Music*, 988 F. Supp. 2d at 405; *see also Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*, 2025 WL 2592224, at *17 (S.D.N.Y. Sep. 8, 2025) ("'[t]he appropriate response to the experts' choice of omissions [of certain deposition testimony] is to test that opinion at trial through cross examination'") (quoting *FTC v. Quincy Bioscience Holding Co.*, 646 F. Supp. 3d 518, 529 (S.D.N.Y. 2022)); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 263-64 (E.D.N.Y. 2022) (facts not addressed by expert are "a proper subject for cross-examination" but are not a "sufficient basis for exclusion"); *id.* at 294-95 (expert's citation to only two out of hundreds of depositions went to weight, not admissibility).

In any event, Defendants are wrong on the merits. Dr. Cain addresses the relevant facts head-on, including NI's rejection of Emerson's offers, as discussed above. The one example of purported cherry-picking that Defendants muster is that when citing certain testimony by Defendant McGrath, NI's Board Chair, Dr. Cain did not specifically quote McGrath's testimony that NI believed that $48 per share was Emerson's "max." Mot. at 20. That testimony lacks the significance that Defendants ascribe to it. In his Reply Report, Dr. Cain cites testimony "regarding the potential for continued escalation by Emerson, including the possibility of increasing their offer price, taking their offer public, and the threat of a hostile takeover attempt." Cain Reply Report ¶21. In that regard, Dr. Cain cites testimony from four witnesses, including McGrath's testimony agreeing that "[i]t was simply logical that [Emerson] might respond with a higher offer," and his testimony that NI was also concerned that Emerson might attempt a hostile takeover at $48 per share. *Id.* Dr. Cain was not required to add a compendium of all of McGrath's testimony, attempt to resolve contradictions between different parts of that testimony, or give greater weight to self-serving testimony (that NI believed $48 per share was Emerson's "max") than to a party admission

10

(that "[i]t was simply logical that [Emerson] might respond with a higher offer"). Nor was Dr. Cain required to resolve contradictions between McGrath's testimony and documentary evidence, such as Emerson's June 22, 2022 statement to NI that it was "confident" that with due diligence "we could work with you to find additional value that would allow us to increase our Proposal." Cain Expert Report ¶50.

Moreover, even if McGrath genuinely believed that $48 per share was Emerson's "max," that belief would not logically imply that Emerson's offers were economically immaterial at a time when NI's stock was trading well below that value. While accusing Dr. Cain of improperly omitting deposition testimony, Defendants themselves omit part of the *same sentence* of McGrath's testimony, in which McGrath stated that Emerson's offer indicated that it "may try to make a hostile takeover at $48 a share[.]" *Compare* Mot. at 20 with McGrath Dep., Ex. 2, at 334:16-21.[6] Such a hostile takeover attempt at a value significantly above NI's stock price would have been highly material, even before considering that "Emerson indicated that it was willing to raise its offer (as it indeed did), and public disclosure of Emerson's offer was likely to prompt competing, higher offers (as it indeed did)." Cain Expert Report ¶21.

Defendants twist Dr. Cain's words to suggest that he was "cherry-picking" evidence, but in fact, Dr. Cain appropriately identified Defendants' own admissions that provided further support for his opinions. That Dr. Cain did not quote self-serving testimony that Defendants prefer to focus on may be the subject of cross-examination, but it is not a basis for exclusion.

### 4.    Dr. Cain's Assessment of the Academic Literature

Defendants also argue that Dr. Cain has not properly applied the academic literature to the facts at issue. Mot. at 16-19. As described above, Dr. Cain cites studies that demonstrate, among

---

[6] "Ex. __" refers to exhibits to the Declaration of Noam Mandel filed contemporaneously.

other things, that (1) acquisitions are generally associated with positive returns for target-firm shareholders; (2) target-firm stock prices frequently rise above the initial offer price, indicating that investors expect improved bids; (3) particular features of Emerson's offers, such as the proposed premium and the all-cash consideration, along with Emerson's ███████████, increased the probability of Emerson acquiring NI; and (4) hostility by the target firm is frequently part of an iterative negotiation process that results in higher acquisition premiums compared to purely friendly deals.  Cain Expert Report ¶¶107-115; Cain Reply Report ¶¶32-36, 78-79.[7]

Defendants criticize Dr. Cain for citing studies involving a public announcement of a transaction or of a tender offer, in which a potential acquirer offers to purchase shares of the target directly from stockholders.  Defendants assert that the subjects of those studies are distinct from this situation, in which Emerson's offers to NI were undisclosed during the Class Period.  In making this argument, Defendants ignore the reality that information that is kept secret generally does not impact market prices in a manner that is directly observable, nor would it likely be known to academics in the first place.  *See* Goodwin Tr. at 159:14-15 (academics "can only study things that are somewhat publicly available").  Thus, it is appropriate for an expert seeking to understand the economic materiality of undisclosed information to draw analogies to situations in which similar information was disclosed and the market impact of such disclosure has been studied. "Trained experts commonly extrapolate from existing data," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), and an expert is not required to "back his or her opinion with published studies that unequivocally support his or her conclusions." *Amorgianos*, 303 F.3d at 266.

---

[7] Despite moving to exclude Dr. Cain's testimony based on their interpretation of certain academic studies, Defendants failed to provide those studies to the Court.  For the Court's convenience, those studies are attached to the Declaration of Noam Mandel as Exs. 10-20.

Dr. Cain's reasoned extrapolations from existing data are appropriate. As he explains, tender offers provide the "same type of economic information" as acquisition proposals made privately to a company's board, Deposition of Dr. Matthew Cain ("Cain Tr.") at 176:16-22, and can be a method of completing a merger in which the acquirer's offer was initially rejected. *Id.* at 219:2-9, 219:25-19. While Defendants highlight that this case does not involve a tender offer, they never explain why that distinction makes a significant difference in assessing economic materiality. Moreover, the transaction at issue here would likely have been included in the samples used in studies Dr. Cain cites, depending on the timeframe studied, as Defendants' expert Dr. Denis acknowledged. Denis Tr. at 340:8-13, 354:19-355:3. These studies, considered together, cover a range of transaction types, *see* Mot. at 17, and illustrate economic principles that Dr. Cain properly applies to the facts at issue. Thus, in evaluating the economic materiality of Emerson's undisclosed proposals, Dr. Cain's methodology of examining academic studies concerning the disclosure of analogous information is reliable.

Defendants also criticize Dr. Cain's citation to Branch and Yang (2003) because he cites that study's finding that "a cash payment is likely to improve the probability of merger completion/success, as compared with a stock payment offer," without also citing to a separate finding concerning bid premiums.[8] Cain Expert Report ¶111. However, it is not necessary for an expert to "address every relevant counterexample" in order to avoid cherry-picking studies. *Payment Card*, 638 F. Supp. 3d at 282. Moreover, Dr. Cain cites a later paper addressed to the more specific point that "the probability of deal success increases discontinuously by 4.4–6.4% when the bidder makes an offer price even slightly above the target's 52-week high," as Emerson

---

[8] Branch, B., & Yang, T. (2003), Predicting Successful Takeovers and Risk Arbitrage, *Quarterly J. Bus. & Econ.*, 3-18 (Ex. 12).

did here.  Cain Expert Report ¶112.[9]  Dr. Cain also explains that the 36% and 41% premiums that Emerson was offering NI on May 25 and June 22, 2022, respectively, are "greater than both the 29.19% median premium reported across more than 7,000 deals in the Baker, et al. sample, and the 34% average premium noted by Cain, et al. (2020)."  *Id.*  These specific findings, which place Emerson's offers directly in the zone of successful deals, are far more compelling than the more general finding concerning bid premiums in Branch and Yang.

Defendants also assert that Dr. Cain erred because his opening report did not address a specific paper, Even-Tov, et al. (2024).[10]  But Defendants acknowledge that "the circumstances studied in that paper are not an exact match for this case[.]"  Mot. at 18.  As Dr. Cain discusses in his Reply Report, Even-Tov is inapposite because it addresses the failure of previously announced M&A transactions, a circumstance not at issue here.  Cain Reply Report ¶83.  Accordingly, Dr. Denis admits that the transaction in this case would not have been included in the sample of deals studied in the Even-Tov paper.  Denis Tr. at 235:13-236:4.

Dr. Cain further explains that, even among the failed deals studied in the Even-Tov paper, the value of the target generally remained higher after deal failure than it had been before the original public announcement of the deal.  Cain Reply Report ¶83; *see also* Denis Tr. at 242:9-16 (acknowledging this result).  Thus, to the extent Even-Tov should be considered at all, it supports the economic materiality of the undisclosed information at issue, as it makes clear that even deals whose failure has been publicly announced still have a positive impact on the target firm's stock price.  Cain Tr. at 284:8-285:15.  If Defendants disagree, "their experts can testify about the

---

[9] Citing Baker, M., Pan, X., & Wurgler, J. (2012), "The effect of reference point prices on mergers and acquisitions," *J. Fin. Econ.*, 106(1), 49-71, pp. 50, 64 (Ex. 13).

[10] Even-Tov, Omri, et al., "Failed Acquisition Offers: The Impact of Failure Reasons on Target Valuation," *Fin. Research Letters*, vol. 63, May 2024 (Ex. 14).

contrary interpretation, and they can challenge [Dr. Cain's] conclusions on cross examination," but that is no reason to exclude his testimony. *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 231 (S.D.N.Y. 2004).[11]

### 5.    Dr. Cain's Event Study and Assessment of Securities-Analyst Reports

As part of his economic materiality analysis, Dr. Cain also conducted an event study that examined NI's stock-price reaction to post-Class Period public disclosures related to the transaction process.  In particular, Dr. Cain examined NI's stock price movements after NI's January 13, 2023 announcement of a strategic review to explore a potential sale, and Emerson's January 17, 2023 announcement of its offer to acquire NI for $53 per share and publication of its prior correspondence with NI.

As Dr. Cain explains, "[e]vent studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information."  Cain Expert Report ¶117.  Accordingly, "[t]o determine whether NI's Common Stock price movements on any given date are statistically significant," Dr. Cain "performed an event study using generally accepted economic methods," *id.* ¶118, which isolated the impact of company-specific news from market-wide and industry-wide factors.  *Id.* ¶120.  The results of this analysis were that "both the announcement of NI's strategic review on January 13, 2023, and Emerson's public offer on January 17, 2023, resulted in statistically significant increases in National Instruments Common Stock

---

[11] Defendants cite *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309 (S.D.N.Y. 2023) and *Daniels-Feasel v. Forest Pharms., Inc.*, 2021 WL 4037820 (S.D.N.Y. Sep. 21, 2021), *aff'd*, 2023 WL 4837521 (2d Cir. July 28, 2023), which involved medical experts whose opinions directly contradicted the FDA and other public-health authorities.  707 F. Supp. 3d at 355; 2021 WL 4037820, at *12.  There is no parallel to those facts here.  Moreover, in contrast to those cases, "[d]eference to experts is particularly appropriate when expert testimony concerns 'soft sciences' like economics," where the scope for professional judgment and differing conclusions is greater.  *Alves v. Affiliated Care of Putnam, Inc.*, 2022 WL 1002817, at *7 (S.D.N.Y. Mar. 30, 2022) (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015)).

prices[.]" *Id.* ¶124; *see also id.* Ex. 2 (detailing event-study results).  Dr. Cain concluded from these findings that "the release of information concerning potential M&A in general, and concerning a potential acquisition by Emerson specifically, each resulted in significant stock price increases, reflecting the economic materiality of such information" and supporting the economic materiality of the undisclosed information during the Class Period.  *Id.* ¶124.  This conclusion is further supported by Dr. Cain's evaluation of securities-analyst and financial-press commentary, which linked NI's significant stock-price increases to these January 2023 announcements.  *Id.* ¶¶125-127.

Defendants do not challenge Dr. Cain's event-study methodology or his findings that these January 2023 announcements caused statistically significant increases in NI's stock price.  Rather, Defendants argue that the event study should be excluded because the information that was announced on January 13 and 17, 2023 was different from information that could have been disclosed during the Class Period.  Mot. at 8-16.  Defendants characterize this as a failure to "disaggregate" confounding information.  *Id.* at 12-16.

Defendants' argument conflates economic materiality and loss causation.  Dr. Cain makes clear that his event study provides additional evidence concerning the economic materiality of the undisclosed information by empirically demonstrating the market's statistically significant response to the disclosure of similar information.  *See, e.g.*, Cain Expert Report ¶124.  None of Defendants' cases that found a mismatch between a misleading statement or omission and a corrective disclosure was addressing materiality.[12]  Dr. Cain is not using his event study to measure

---

[12] *See, e.g.*, *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 398 (S.D.N.Y. 2018), *aff'd*, 784 F. App'x 27 (2d Cir. 2019); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1026 (S.D.N.Y. 1997) (all addressing loss causation and damages).  Indeed, in

artificial deflation, so demanding that his event study disaggregate certain information in order to calculate such deflation makes no sense. And even in the loss-causation context, a corrective disclosure need not be a "mirror image" of the undisclosed truth. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).

Moreover, as discussed below, for purposes of calculating artificial deflation, Dr. Cain opines that the but-for price of NI's stock is at least $48 per share, consistent with Emerson's May and June 2022 offers and the information environment during the Class Period, rather than the higher prices NI's stock reached after the January 2023 disclosures or the higher offers Emerson later communicated. Thus, Dr. Cain's artificial deflation methodology effectively disaggregates the impact of later information because it is based on information Defendants knew but failed to disclose during the Class Period.

Dr. Cain's event study is reliable for its intended purpose, which is to aid in assessing the economic materiality of the undisclosed Class Period information by examining the stock-price impact of the disclosure of similar information. As discussed above with respect to the academic literature, information that is kept secret generally does not impact stock prices in a manner that can be directly studied, so extrapolating from relevant available data is appropriate. *See Gen. Elec.*, 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data."); *see also Daubert*, 509 U.S. at 591 ("it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty[.]").

As Dr. Cain opined, NI's stock-price reaction to the January 13 and 17, 2023 disclosures "is relevant even though these disclosures are not a mirror image of the allegedly omitted

---

*Gross*, the Court *rejected* the defendants' argument that summary judgment should be based on a lack of materiality. *See* 310 F. Supp. 3d at 396.

17

information in this matter." Cain Reply Report ¶38. This is because both sets of information revealed, or would have revealed, that a premium acquisition of NI had become materially more likely. For example, Dr. Cain noted that on June 22, 2022, Emerson communicated not only a proposal to acquire NI for $48 per share but also other facts demonstrating seriousness and credibility, including that it was "willing[] to increase the offer above that price," that the offer was in cash, and that there was substantial certainty about Emerson's ability to pay. Cain Tr. at 174:16-24. Because of these features of Emerson's offer, Dr. Cain noted that "there's a lot of overlap" between the information that was undisclosed during the Class Period and the information that was later revealed in January 2023. *Id.* at 174:25-175:4.

Dr. Cain's analysis of the statistically significant increase in NI's stock price after the January 13, 2023 announcement is particularly instructive because of the limited information that was released on that date. The January 13 disclosure simply revealed that NI was engaged in a strategic review to explore a potential sale, along with the implementation of a shareholder-rights plan (i.e., "poison pill"), and did not specify any offers or Emerson's involvement. Nonetheless, due to that announcement, NI's stock price increased significantly from the previous day's close of $40.17 per share to a close of $46.97 per share on January 13. As Defendants' expert Dr. Denis acknowledged, Dr. Cain's event study showing that this January 13 stock-price increase was statistically significant and was caused by NI's announcement of a strategic review is consistent with the "general notion that if you increase the likelihood of an M&A transaction, given the fact that, on average, such transactions are associated with an increase in the target share price, then one could conclude that this reaction is consistent with those types of announcements being economically material." Denis Tr. at 316:3-18.

18

Likewise, Dr. Cain's analysis of the January 17, 2023 increase in NI's stock price is highly relevant. Emerson's announcement on that date included a detailed account of NI's resistance to Emerson's overtures, and discussed how NI had "continued to resist engaging meaningfully" *even after* Emerson increased its offer, *see* Bennett Dec. Ex. G at CAIN001930-31, but such reported hostility did not undermine the materiality of the disclosure. Rather, NI's stock price responded to Emerson's disclosure with a statistically significant increase, from a previous close of $46.97 per share to a close on January 17 of $52.04 per share. Dr. Cain's event study thus confirms that NI's stated hostility to a transaction with Emerson is perfectly consistent with the market viewing information about Emerson's offer as economically material.

For these reasons, as part of the mosaic of evidence on economic materiality, it will be useful for the jury to understand by means of Dr. Cain's event study that the January 13 and 17, 2023 increases in NI's stock price were statistically significant and were caused by the M&A-related information disclosed on those dates, as opposed to, for example, market or industry-wide factors. Defendants' responses are a matter for cross-examination and do not justify exclusion.

### C.    Dr. Cain's Opinions Regarding Artificial Deflation and Damages

Dr. Cain opines, based on his "review of the relevant information environment," and "assuming that Plaintiff proves that National Instruments omitted material nonpublic information about Emerson's offers to acquire National Instruments Common Stock," that "the Common Stock prices of National Instruments were artificially deflated throughout the Class Period." Cain Expert Report ¶134. In particular, Dr. Cain concludes that "had the relevant truth been disclosed as of the start of the Class Period, NI's Common Stock would have traded at or above $48 per share throughout the Class Period." *Id.* Thus, "investors suffered economic losses by selling their National Instruments shares during the Class Period at prices below $48 per share," and artificial deflation equals the difference between $48 per share and an investor's sale price. *Id.*

19

Dr. Cain highlights the following evidence in support of that conclusion:

(a) As of the start of the Class Period, Emerson executives had offered $48 per share and indicated their willingness to work with National Instruments "to find additional value that would allow [Emerson executives] to increase [their] Proposal."

(b) Emerson's offer was all-cash, not contingent on financing, and not expected to encounter regulatory resistance.  National Instruments tracked Emerson's financial capacity to complete a transaction.  Moreover, NI executives expressed concern that Emerson would take its offer public and acknowledged this would cause NI's Common Stock price to increase.

(c) The offer represented a significant premium to the current trading prices of NI's Common Stock.

(d) The timeline of the transaction, including initial target resistance and rejection of an offer as inadequate, is consistent with the typical M&A process documented by peer-reviewed published academic research (including my own).

(e) Academic research documents that target stock prices frequently trade above offer prices, and this effect is more pronounced in hostile transactions and when bidders accumulate target share ownership (*i.e.*, toeholds).

(f) National Instruments had retained MacKenzie Partners to monitor the accumulation of a toehold in the Company's shares.

(g) National Instruments continued to refer to Emerson and the proposed transaction using code names, and did not expose MacKenzie Partners to Emerson's identity.

(h) National Instruments had retained Bank of America, providing ███████ ████████████████████████

(i) NI's Common Stock prices increased by statistically significant amounts following the January 13, 2023 and January 17, 2023 M&A disclosures, and research analysts commented on these important Company developments.

Cain Expert Report ¶135.  As Dr. Cain further explains, "[t]his measure of an investor's damages is conservative, including because NI's Board stated that Emerson's initial $48 offer undervalued NI stock, Emerson stated its willingness to increase its offer, and public disclosure of Emerson's offer was likely to prompt other, higher offers."  Cain Expert Report ¶134.  Dr. Cain also explains

how his methodology disaggregates any unrelated causes of movement in NI's stock price, such as macroeconomic trends, which Defendants have not challenged. *Id.* ¶136. Dr. Cain's methodology for assessing artificial deflation in this case is reliable, and indeed conservative, and should not be excluded.

In arguing that Dr. Cain has not provided a reliable opinion regarding artificial deflation, Defendants pose a series of lengthy rhetorical questions. Mot. at 22. Defendants had every opportunity to ask Dr. Cain those questions at his deposition, and they will have another opportunity to cross-examine him at trial, but Defendants' questions are no reason to exclude Dr. Cain's testimony.

For example, Defendants question how Dr. Cain would address "other facts," such as NI's rejection of Emerson's $48 per share proposals and the timeframe in which Emerson raised its offer price. Mot. at 22. As discussed above, Dr. Cain explicitly discusses and puts in context NI's rejection of those proposals, as well as the period that followed in which, among other things, NI tracked Emerson's ample financial capacity to complete a transaction ███████████████, after which NI's Chief Legal Officer stated internally that the "[p]robability of [Emerson] going public is much higher now." Cain Expert Report ¶75. Defendants may disagree with the significance Dr. Cain ascribes to these facts, but he clearly takes them into account.[13]

Defendants also question how Dr. Cain would address the connection between the academic literature and the circumstances "*in this case*." Mot. at 22 (emphasis in original). Again, as discussed above, Dr. Cain extensively discussed the relevant academic literature and drew

---

[13] Defendants also question how Dr. Cain "account[s] for changing facts during the Class Period[.]" Mot. at 23 n. 9. However, the only "changing fact" that Defendants identify is the passage of a short amount of time, and they do not explain, nor is there any reason, why that would cause the proper measure of damages to deviate from Dr. Cain's formula.

appropriate parallels between those studies and the circumstances at issue, in which the information in question was not disclosed during the Class Period. That the academic community may not have focused on the precise circumstances at issue in a particular case does not preclude relevant and reliable expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999) ("It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist.").

In addition, Defendants criticize Dr. Cain for not using an event study to calculate artificial deflation while, confusingly, further contending that an event study cannot serve that function in this case because the relevant information was not revealed during the Class Period. Mot. at 24-25. While event studies are commonly used to address certain loss-causation inquiries, a "more generalized approach" is justified when suited to the nature of the misconduct. *United States v. Gushlak*, 728 F.3d 184, 201 (2d Cir. 2013). "As contexts vary, it makes little sense to impose some uniform evidentiary standard, such as requiring that plaintiffs perform an event study, so long as they adduce reliable evidence tending to show that the loss was caused by the fraud, rather than other factors." *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 487 (S.D.N.Y. 2022); *see also id.* at 484 n.4 ("the law is clear that [event studies] are not the only reasonable way to evaluate the impact the revelation of a fraud, or of the risks concealed by it, might have on a security's price").

By tying his opinion regarding the but-for value of NI's stock to Emerson's May and June 2022 offer prices of $48 per share and the information environment that existed during the Class Period, Dr. Cain takes a "conservative[]" approach to disaggregating the impact of later-developing or unrelated information. Cain Tr. at 112:22-113:19. At the same time, Dr. Cain cogently explains why, in his opinion, $48 per share is only the minimum but-for price of NI's stock. He notes that

22

"once investors start trading a stock based on the expectation of a takeover premium or a takeover price, that becomes the driving force for the value of the stock." Cain Tr. at 112:2-21; *see also* Cain Expert Report ¶106. Thus, NI's stock price likely would not have fallen below $48 per share had the truth been disclosed, but could have increased above that price "if investors expected further increases in the offer value[.]" Cain Tr. at 113:8-19. This is consistent with the Court's observation that "[i]t remained entirely plausible that Emerson would return with an improved offer or take its offer public" and that this is "what NI's Board contemplated in June and July of 2022, when it concluded that the $48 offer 'substantially undervalue[d]' NI and discussed 'the potential for [Emerson] to change its offer.'" Class Cert. Op. at 13. It is also consistent with record evidence, such as Emerson's express statement that it was willing to increase its offer, and the academic literature discussed above concerning the iterative nature of M&A negotiations, in which a target's stated hostility frequently results in higher bids.

The jury should have the latitude to weigh all of this evidence, including Dr. Cain's testimony, and reach its own conclusion. In securities-fraud cases, plaintiffs are required only to provide evidence that is sufficient to make a "reasonable estimate" of damages. *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 526 (S.D.N.Y. 2013) (denying motion to set aside jury verdict based on "relatively simple method for determining loss causation and damages" because "the law does not require the use of such a fine-grained quantitative method"); *id.* at 532 (noting "the Second Circuit's repeated emphasis that losses resulting from securities fraud need not be proved with mathematical precision."); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 562 (S.D.N.Y. 2011) ("in securities fraud cases, plaintiffs need not prove the amount of loss caused by each misstatement with complete mathematical precision"), *aff'd*, 838 F.3d 223 (2d Cir. 2016).

That is particularly so "[i]f the plaintiff's inability to prove an exact amount of damages arises from actions of the defendant," in which case "a factfinder has some latitude to 'make a just and reasonable estimate of damages based on relevant data.'" *Raishevich v. Foster*, 247 F.3d 337, 343 (2d Cir. 2001) (quoting *Electro–Miniatures Corp. v. Wendon Co.*, 771 F.2d 23, 27 (2d Cir. 1985)). Here, any inability to *directly* measure the but-for stock-price impact of the undisclosed information is due to Defendants' wrongful failure to disclose that information while NI was repurchasing stock. Thus, the jury will be able to make a just and reasonable estimate of damages, and in doing so, it will be helpful for them to consider Dr. Cain's expert opinion that $48 per share is a floor, not a ceiling. *See Gruber*, 628 F. Supp. 3d at 489 ("The able members of the jury . . . were not required to act as trained economists, but rather to make reasonable estimates based on evidence they credited.").

### D. Dr. Cain's Loss-Causation and Damages Opinions Fit Plaintiff's Theory of Liability

Defendants contend that Dr. Cain's loss-causation and damages opinions are disconnected from Plaintiff's theory of liability because they purportedly do not sufficiently focus on NI's repurchases, and relatedly, because they are not premised on a but-for world in which NI neither disclosed the relevant information during the Class Period nor engaged in any repurchases. Mot. at 4-6. This is simply a repackaging of failed arguments Defendants made at the class-certification stage, which the Court properly rejected in holding that Dr. Cain's estimate of artificial deflation as the difference between $48 per share and the investor's sale price "provides a foundational model for determining damages that result from the asserted theory of injury[.]" Class Cert. Op. at 15.

Dr. Cain's loss-causation and damages opinions fit Plaintiff's liability theory because they address the artificial deflation in NI's stock, caused by Defendants' failure to disclose economically

24

material information, *during the period in which NI was repurchasing stock*.  This is consistent with the contemporaneous-purchase requirement, which is drawn from the principle that the "duty of disclosure is owed 'to all persons who during the same period' as the defendants traded stock on the open market."  *Id.* at 17 (quoting *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d Cir. 1974)); *see also Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 94–95 (2d Cir. 1981) (the "duty of disclosure is owed only to those investors trading contemporaneously with the insider"); *In re Am. Bus. Computs. Corp. Sec. Litig.*, 1994 WL 848690, at *4 (S.D.N.Y. Feb. 24, 1994) ("[A] class action may be maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information[.]").

The contemporaneous-purchase requirement links NI's repurchases to Defendants' nondisclosure of material information, resulting in the damages upon which Dr. Cain opines. Indeed, the Court has already applied that requirement in limiting the Class Period, at Defendants' request, to investors who sold NI stock within a narrower window around NI's repurchases than Plaintiff had proposed.  *See* Class Cert. Op. at 17-18.

At the same time, the Court properly rejected Defendants' argument that damages should be limited to disgorgement of profits gained and losses avoided.  *See id.* at 15-16.  As the Court held, "[t]he traditional measure of damages in § 10(b) cases is out-of-pocket loss, which is the difference between the price at which a stock is bought or sold and the stock's true value," and the limitations of Section 20A of the Securities Exchange Act do not apply in this case.  *Id.* Defendants' argument that Dr. Cain's loss-causation and damages opinions do not sufficiently focus on NI's trading is effectively an attempt to reassert this failed argument.

Likewise, the Court correctly rejected Defendants' related argument that a damages model must consider a but-for world in which NI neither disclosed Emerson's offers nor repurchased stock. As the Court explained, "[i]t is not necessary for a damages model to account for two but-for worlds at once[.]" *Id.* at 17. In short, Defendants' decision to repurchase NI stock created a duty of disclosure; Defendants failed to abide by that duty; and Dr. Cain properly evaluates damages by considering a but-for world in which the truth was disclosed during the Class Period. There are any number of other conceivable but-for worlds – e.g., if National Instruments had never issued stock in the first place, it presumably would have had no public stockholders who could have been injured – but there is no reason why such hypotheticals should affect damages in this case, nor do they provide a basis to exclude Dr. Cain's opinions. *See, e.g.*, *Patriarch Partners*, 2025 WL 2592224, at *9 (rejecting argument that expert's damages opinions should be excluded based on argument that expert used incorrect "but-for" comparison).

### E. Dr. Cain's Unchallenged Efficiency and Damages Opinions

Defendants do not challenge two of Dr. Cain's opinions. Regardless of how the Court evaluates the arguments in Defendants' motion, Dr. Cain should be permitted to testify regarding these two opinions.

First, on May 2, 2025, Dr. Cain submitted an expert report in support of class certification in which he opined that NI common stock traded in an efficient market throughout the Class Period. In his merits report, Dr. Cain reaffirmed that opinion and expressly reiterated it. Cain Expert Report ¶¶16, 24. Defendants do not challenge the relevance or reliability of this opinion. Market efficiency is foundational to a theory of damages in which the omission of material information results in artificial deflation in NI's stock price, and Dr. Cain should be permitted to provide that efficiency opinion at trial.

Second, Dr. Cain opines regarding the calculation of damages on a per-share basis using an out-of-pocket methodology. Cain Expert Report ¶¶22-23; 139-147. As Dr. Cain explains, this methodology can be used regardless of the jury's finding as to the amount of artificial deflation. ¶144. Other than challenging the artificial deflation that Dr. Cain uses as an input, Mot. at 25-26, Defendants do not dispute the relevance or reliability of this methodology, and Dr. Cain should be permitted to provide this opinion to the jury.

## IV.    CONCLUSION

Defendants' motion to exclude Dr. Cain's expert testimony should be denied in its entirety.

DATED: January 26, 2026

**JOHNSON VAN KWAWEGEN LLP**

*s/ Noam Mandel*
Chad Johnson
Noam Mandel
Desiree Cummings
Jonathan Zweig
1120 Avenue of the Americas
New York, NY 10036
Telephone: (646) 836-9630
chad@jvk-law.com
noam@jvk-law.com
desiree@jvk-law.com
jonathan@jvk-law.com

*Lead and Class Counsel*

## CERTIFICATE OF WORD COUNT

1.      Pursuant to Rule 7.1 of the United States District Court for the Southern District of New York, the undersigned counsel certifies that the foregoing brief was prepared on a computer using Microsoft Word.  A proportionally spaced typeface was used as follows:

> Name of Typeface: Times New Roman
> Point Size in Body: 12 (footnotes, 12)
> Line Spacing in Body: Double (block quotes and footnotes, single)

2.      The total number of words in the brief, inclusive of point headings and footnotes and exclusive of the caption, table of contents, table of authorities, signature block, and this Certification, is 8,746 words.  By operation of Microsoft Word's word-count function, this number includes legal citations and certain forms of punctuation.

*/s/ Noam Mandel*

NOAM MANDEL