# EXHIBIT 46

# EXHIBIT E

Case 1:23-cv-09488-DLC    Document 148-5    Filed 02/23/26    Page 2 of 51

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BENJAMIN GROSS, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiff,<br><br>  vs.<br><br>GFI GROUP, INC., COLIN HEFFRON, and MICHAEL GOOCH,<br><br>         Defendants. | Case No. 1:14-cv-09438-WHP<br><br><br>**JURY TRIAL DEMANDED** |

## <u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>

August 7, 2017

# Table of Contents

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   SUMMARY OF OPINIONS ......................................................................... 2

III.  OVERVIEW OF GFI AND PLAINTIFFS' ALLEGATIONS ........................... 7

IV.  MATERIALITY .......................................................................................... 10

    A.  ANALYST REPORTS ....................................................................... 10

    B.  DEPOSITION TRANSCRIPTS .......................................................... 12

    C.  THE ECONOMICS AND FINANCE ACADEMIC LITERATURE SHOWS THAT COMPETITIVE BIDS INCREASE TARGET PRICES ............................... 18

    D.  EVENT STUDY .............................................................................. 19

V.   LOSS CAUSATION ................................................................................... 20

VI.  CALCULATING DEFLATION PER SHARE AND DAMAGES FOR GFI COMMON STOCK ................................................................................... 25

    A.  DEFLATION PER SHARE ................................................................ 25

    B.  DAMAGES ..................................................................................... 27

    C.  ADAPTATION TO ALTERNATIVE DETERMINATIONS BY THE FINDER OF FACT ......................................................................... 28

## I. INTRODUCTION

1.  My name is Chad Coffman. I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, litigation.

2.  I have previously filed a report in this matter (*i.e.*, my "Market Efficiency Report"), in which I concluded that the market for GFI common stock ("Common Stock") was efficient during the Class Period[1] and that damages in this matter are subject to a common methodology under Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 adopted thereunder (collectively, "Section 10(b)"). I continue to hold the opinions expressed in my Market Efficiency Report and reiterate them here by incorporating that report by reference.[2]

3.  I have been asked by counsel for the Lead Plaintiff in this matter to offer additional opinions on: (1) whether the alleged misstatements and/or omissions were material; (2) whether investor losses were proximately caused by Defendants' alleged misrepresentations and/or omissions (*i.e.*, loss causation); (3) quantification of the amount of loss attributable to the revelation of the allegedly misrepresented and/or omitted facts; (4) quantification of the artificial deflation per share for GFI Common Stock for each day of the Class Period attributable to the alleged misrepresentations and/or omissions; and (5) the proper method to quantify Rule 10b-5 damages for each Class Member.

4.  In formulating my opinions set forth in this Loss Causation and Damages Report, I have been asked to assume that Plaintiffs will prove Defendants made misrepresentations and/or

---

[1] The Class Period is July 30, 2014 through September 8, 2014 (Complaint at p. 1). Throughout this report, the term "efficiency" refers to "semi-strong form" efficiency as defined in the Market Efficiency Report (¶¶ 18-19).

[2] *See* ECF No. 82-1.

omissions with scienter as described herein. I also continue to rely on the event study

methodology already described at length in my Market Efficiency Report,[3] as well as my

knowledge, experience, and formal training in economics, finance, and statistics, and my

understanding of the allegations and facts set forth in this lawsuit. All of the materials I

considered in forming my opinions are identified in **Appendix A** to this report. Global

Economics Group is being compensated at $600 per hour for my work on this matter and at

standard hourly rates for work performed by members of my staff acting under my supervision

and direction. Neither my compensation nor the compensation of my firm is in any way

contingent upon the outcome of this case or upon the opinions I express. My qualifications were

detailed in my Market Efficiency Report and an updated version of my curriculum vitae is

attached as **Appendix B**.

5.      I reserve the right to amend this report to reflect new information that becomes

available to me in light of the discovery process and/or future rulings from the Court.

## II.      SUMMARY OF OPINIONS

6.      My opinions regarding materiality, loss causation, and damages arising under Rule

10b-5 are premised upon Defendants being found liable under the Securities Exchange Act

of 1934 for knowing or recklessly disregarding that they issued false and misleading statements

in the July 30, 2014, press release, and/or omitting related material facts during the Class Period,

including presenting the CME merger deal as a unique opportunity for shareholders and

Defendants' prevention of a competitive bidding process. In fact, Defendants had been advised

by Jefferies that the process for maximizing the sale price of the company would be through a

combination with another IDB firm that could yield synergies from the combination, while

---

[3] Market Efficiency Report § VII.F.

2

retaining the option to sell the Trayport and Fenics portions of GFI to another strategic buyer. When the Board and Greenhill & Company ("Greenhill"), an investment bank hired to advise the GFI Special Committee,[4] tried to find a better deal, Defendants effectively shut down such efforts.[5]

7.    The alleged misstatements and omissions in this case are material. I base my materiality opinion on: (1) commentary by securities analysts that covered the Company; (2) deposition testimony given in this matter; (3) support in the economics and finance literature regarding mergers and acquisitions; and (4) my event study analysis that demonstrates statistically significant increases in the price of GFI Common Stock upon correction of the misstatements and/or omissions.

8.    Based on the alleged misrepresentations and omissions and my understanding of loss causation principles, I have identified an event that represents the disclosure of the relevant truth concealed by the alleged misrepresentations and/or omissions, and that, based on an event study, also resulted in statistically significant increases in the price of GFI Common Stock, and thus demonstrates loss causation for the Class. An event was identified as a corrective disclosure of the relevant truth if, in addition to being associated with a statistically significant increase in the market price of GFI Common Stock after controlling for the day-over-day percentage change in United States 1-Year T-Bill rates, it revealed the relevant economic truth about Defendants' attempts to prevent a competitive bidding process.

9.    The corrective event ("Corrective Disclosure Event") I identified affected the market price of GFI Common Stock on September 8 and 9, 2014:

---

[4] Deposition of Robert Smith, June 7, 2017 ("Smith Deposition"), 10:15-19.
[5] Smith Deposition, 117:15 – 118:20.

- September 8, 2014: News leaked of BGC's intent to acquire GFI, ahead of the official announcement, partially revealing the relevant truth that had been concealed by the alleged misrepresentations and/or omissions.

- September 9, 2014: After market close on September 8, a Wall Street Journal article announced BGC's intention to bid for GFI, followed up by a public announcement by BGC at 8:00 a.m. on September 9. BGC's announcement revealed the relevant truth that had been concealed by the alleged misrepresentations and/or omissions, including that on July 29, 2014, BGC had issued a letter to GFI detailing its interest in acquiring GFI and had expected to engage in a discussion about doing so. The July 29, 2014 letter stated that BGC saw potential synergies in a merger and was "confident [it could] offer a price per share substantially in excess of GFI's current trading price."[6]

- The abnormal price increases in GFI Common Stock observed on September 8 and September 9, 2014, would have occurred earlier but-for the alleged misrepresentations and/or omissions.

10.    There is a clear economic link between the alleged misrepresentations and/or omissions and the foreseeable investor losses that occurred as a result of selling prior to the Corrective Disclosure Event. For example, if Plaintiffs' allegations are correct that Defendants knew that the CME acquisition did not represent a singular and unique opportunity to optimize GFI's value for stockholders (since Defendants had effectively shut down efforts to find a better deal for shareholders), but instead knew, or were reckless in not knowing, that as part of a competitive bidding process, parties other than CME could have bid for Trayport and Fenics, or that parties other than Defendants Gooch and Heffron could have bid for the inter-dealer broker business ("Brokerage Business" or "IDB Business"), it was foreseeable at the time of such misstatements and/or omissions that when the truth became known that other firms were willing

---

[6] Deposition of Howard Lutnick, June 21, 2017 ("Lutnick Deposition"), Exhibit 15 (BGC-GROSS-0001218).

to pay more to acquire GFI, in whole or in parts, the value of the Company and its Common Stock would rise. Investors that sold GFI Common Stock while this misinformation was in the market suffered a loss by selling shares at a price that otherwise would have been higher, and therefore the misrepresentations and/or omissions represent the but-for cause of Plaintiffs' economic losses.

11.    According to my event study, the Corrective Disclosure Event identified above was also associated with a statistically significant abnormal price increase in GFI Common Stock.

12.    I reviewed the relevant news, analyst reports, and other pertinent documents released during the Class Period and Corrective Disclosure Event and did not find any confounding information unrelated to Plaintiffs' claims released on September 8 or September 9, 2014. The amount of artificial deflation revealed on the Corrective Disclosure Event can be summarized as follows, and will be explained in detail in **Section V** of this report:

**GFI Group**
**Artificial Deflation per Share Dissipated on**
**Corrective Disclosure Events**

| Date | Artificial Deflation |
|---|---|
| September 8, 2014 | $0.47 |
| September 9, 2014 | $0.65 |
| Total | $1.13 |

13.    Based on my understanding of Plaintiffs' allegations, my review of GFI-specific news released to the public, analyst commentary, GFI public filings, GFI internal documents, and testimony from depositions in this case, I conclude that the full amount of artificial deflation revealed on the Corrective Disclosure Event extends back to the beginning of the Class Period.

The table below summarizes the artificial deflation for GFI Common Stock during the Class Period based on the artificial deflation per share dissipated on the Corrective Disclosure Event:

**GFI Group**
**Artificial Deflation per Share Acquired before July 30, 2014,**
**and Sold in the Time Period Specified**

| Date Range | Artificial Deflation |
| --- | --- |
| July 30, 2014 - September 7, 2014 | $1.13 |
| September 8, 2014 | $0.65 |

14. Damages per share (prior to statutory limitations) for any class member under Rule 10b-5 are calculated as the difference between deflation in the security price at purchase and deflation in the security price at sale (where artificial deflation per share is $0 before and after the Class Period). In this particular case, an investor must have purchased shares before the beginning of the Class Period and sold before the relevant truth had been fully revealed in order to be damaged. For example, if an investor bought GFI Common Stock on or before July 29, 2014, when the price deflation due to the fraud was $0 and sold it during the Class Period on September 8, 2014, when there was $0.65 of deflation in the shares, the investor was harmed by $0.65 per share ($0 deflation per share at purchase *minus* $0.65 deflation per share at sale, for a net loss of $0.65 per share as a result of the fraud). This standard damages methodology is flexible enough to incorporate alternative findings regarding the degree and timing of artificial deflation.

15. The remainder of this report is organized as follows: **Section III** presents the general background of the case and certain facts and assumptions upon which I rely with regard to materiality, loss causation, and damages. **Section IV** explains why the misstatements and/or

6

omissions alleged in the Complaint were material. **Section V** discusses loss causation generally and connects alleged misstatements and/or omissions with the associated statistically significant abnormal price increases on the Corrective Disclosure Event. Finally, **Section VI** presents the resulting artificial deflation per share and damages methodology.

### III.    OVERVIEW OF GFI AND PLAINTIFFS' ALLEGATIONS

16.    GFI was founded in 1987 and became a Delaware Corporation in 2001 as a holding company for its subsidiaries. The Company described itself as follows in its Form 10-K for the period ending December 31, 2014:

> We provide brokerage and trade execution services, clearing services, market data and trading platform and other software products to institutional customers in markets for a range of fixed income, financial, equity and commodity instruments. We provide execution services for our institutional wholesale customers by either matching their trading needs with counterparties having reciprocal interests or directing their orders to an exchange or other trading venue. We have focused historically on more complex, and often less commoditized, markets for sophisticated financial instruments, primarily OTC derivatives, that offer an opportunity for higher commissions per transaction than the markets for more standardized financial instruments. In recent years, we have developed other businesses that complement our brokerage of OTC derivatives, such as cash bond and futures contracts brokerage services, clearing services and analytical and trading software businesses. We have been recognized by various industry publications as a leading provider of institutional brokerage and other services for a broad range of products in the fixed income, financial, equity and commodity markets on which we focus.[7]

17.    In fiscal year 2014, the Company generated $634.9 million in total brokerage revenues, $881 million in total revenues, and net income was -$108 million.[8] As of December 31, 2014, the Company had 1,984 employees, of which 1,025 were brokerage personnel.[9] Its shares traded on the NYSE under the ticker "GFIG."

---

[7] GFI Group 2014 10-K, filed March 13, 2015, p. 6.

[8] GFI Group 2014 10-K, pp. 62-63.

[9] GFI Group 2014 10-K, p. 32.

18.     Plaintiffs' Complaint alleges that GFI issued false and misleading statements and omitted material information during the Class Period, ultimately causing damages to *sellers* of GFI Common Stock who unknowingly sold GFI Common Stock at artificially deflated prices and were therefore damaged due to the concealed information.[10]

19.     More specifically, the Complaint alleges that false and misleading statements and material omissions were made with respect to a merger agreement with CME Group, Inc. ("CME"). On July 30, 2014, GFI announced that it had entered into a stock-for-stock merger agreement with CME (the "CME Deal"). Pursuant to this agreement, CME would acquire all outstanding shares of GFI, but would immediately turn around and sell the Brokerage Business to a group headed by Defendants Colin Heffron (GFI's Chief Executive Officer) and Michael Gooch (GFI's founder and Executive Chairman of GFI's Board of Directors). The deal was to be worth $4.55 per share to Company stockholders.

20.     According to the Complaint, this deal was not a "singular and unique opportunity to return value" and did not maximize shareholder value as stated by Defendants.[11] In fact, Defendants allegedly concealed that they had steered the process leading to the CME Deal to avoid other potentially higher bidders,[12] had shut down an outreach process soliciting competitive bids desired by a special committee of directors and its advisors (contrary to their bankers' advice),[13] and had concealed that before and during the Class Period, BGC Group, Inc. ("BGC"), a competitor inter-dealer broker, had expressed interest in acquiring GFI based on the

---

[10] Complaint ¶¶ 1-2.

[11] Complaint ¶¶ 6, 8, 14, 56, 98.

[12] Complaint ¶ 98 ("…bankers had been instructed to avoid certain competitors even though they were likely to offer a higher price").

[13] Complaint ¶¶ 6, 74, 81.

synergies they saw in such an arrangement.[14] Instead, Defendants allegedly prevented

competitive bidding for the Company so that they could take the Brokerage Business private at a

discounted price at the expense of shareholders.[15]

21.    Plaintiffs allege that the statements made by Defendants gave the market the false

impression that management had explored all relevant opportunities to maximize shareholder

value, when in fact they explicitly failed to consider other alternatives in order to acquire the

Brokerage Business at a discounted price. Indeed, Plaintiffs allege that potential deals with other

IDB parties would have generated substantial synergies that would have been reflected in any

alternative deal, while there were no such synergies to be unlocked by the CME deal, in which

Defendants Gooch and Heffron's management consortium would take the Brokerage Business

private.[16] Therefore, the merger with CME did not represent a "singular and unique opportunity

to return value" and the statement claiming otherwise was false and misleading.

22.    The relevant truth allegedly began to emerge on September 8, 2014. After market

hours, a Wall Street Journal article announced that BGC was anticipated to make a $675 million

all-cash tender offer for GFI (or $5.25 per share);[17] BGC's Chairman confirmed the news on the

morning of September 9, 2014.[18] The evidence suggests that prior to BGC's official

announcement, news had already begun to leak into the marketplace during market hours on

September 8, 2014. On September 9, 2014, the market learned of BGC's official offer of $5.25

per share, 15% higher than the $4.55 per share implied by the CME Deal, and GFI's stock price

---

[14] Complaint ¶ 6.

[15] Complaint ¶¶ 2, 97.

[16] Complaint ¶ 76.

[17] "BGC Partners to Make Bid for Rival Broker GFI; All-Cash Offer of $675 Million Would Trump CME Group's Bid," *The Wall Street Journal*, September 8, 2014, 4:04 pm.

[18] BGC Partners, Inc. Form 8-K, filed September 9, 2014.

rose to reflect this value. As a result, investors who sold their shares between the time of Defendants' false statements and the revelation of the relevant truth were economically harmed as a result of selling at an artificially deflated stock price. Indeed, once GFI was known to be publicly "in play," there were ultimately eight increasing bids to acquire the Company and a deal with BGC was ultimately consummated in February 2015 at $6.10 per share in cash, 34% more valuable to shareholders than the CME deal.[19]

## IV.    MATERIALITY

23.    The alleged misstatements and omissions in this case were material. For purposes of my analysis, I adopt the definition of "material" as articulated by the Supreme Court: An omitted fact is "material" for purposes of Section 10(b) if there is a "substantial likelihood" that its disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[20]

24.    I conclude that the alleged misrepresentations and omissions would have been viewed by a reasonable investor as significantly altering the "total mix" of information. I base my materiality opinion on: (1) analyst commentary; (2) deposition transcripts; (3) support in the economics and finance literature regarding mergers and acquisitions; and (4) my event study analysis that demonstrates statistically significant increases in the price of GFI Common Stock upon correction of the misstatements and/or omissions.

### A.    ANALYST REPORTS

25.    As evidence of why a reasonable investor would find it important to receive accurate information regarding a competitive bidding process (or lack thereof) and know of

---

[19] Complaint ¶¶ 1-17.

[20] *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011).

BGC's interest in acquiring GFI Group before the announcement of the CME Deal, analysts prior to and during the Class Period considered how merger activity (hypothetically) would affect GFI's value. This demonstrates that any information regarding actual or potential bids for the Company would have been considered material information to analysts and investors.

26. For example, BMO Capital Markets issued several reports over a two-year period speculating on a possible acquisition scenario. A BMO report on January 12, 2012 stated:

> ***We also believe GFI is potentially an attractive takeout target at some point in the future.*** The company has struggled with right sizing its broking cost structure following the financial crisis; we see an opportunity for an IDB acquirer to extract significant cost synergies from GFI.
>
> …
>
> Though we expect a transaction is unlikely in the near term, major M&A activity could provide unforeseen upside for GFI.[21]

27. On February 18, 2013, the BMO Capital Markets analyst said:

> While we don't see a transaction as imminent, we think in an acquisition scenario GFI's value could be between $5 and $6 per share.[22]

28. Then on April 26, 2013, the BMO Capital Markets analyst even speculated as to hypothetical BGC interest in GFI:

> Ultimately though there are several of GFI's peers that would be interested in acquiring the operation (certainly ICAP and potentially BGC now that it has a chunk of cash on hand) and likely an even larger group that would seriously look at Trayport…[23]

29. Additionally, on May 29, 2014, a Morningstar analyst speculated about whether BGC would be interested in merging with GFI:

> One scenario that could play out is industry consolidation. Though this has been talked about for years, the large influx of cash at peer BGC Partners, a

---

[21] "Initiating Coverage with MARKET PERFORM," *BMO Capital Markets*, January 12, 2012 (emphasis added).

[22] "4Q Miss; 1Q Revenue Trending Down 6% Y/Y," *BMO Capital Markets*, February 18, 2013.

[23] "1Q In Line; GFI Not for Sale, Making Progress on Cost Base," *BMO Capital Markets*, April 26, 2013.

change in GFI Group's management, or the potential for a prolonged period of low earnings that won't significantly improve with another round of cost-saving initiatives could finally lead to deals being done.[24]

30.  Analyst reports issued after the announcement of the CME Deal shed additional light on what facts analysts and investors would have considered material. For instance, a Sandler O'Neill and Partners analyst report stated that a competing bid would be beneficial to the stock value: "On the positive side, a competing bid for the Trayport and FENICS businesses could come at a premium to CME's agreed price."[25]

31.  These analyst statements show that knowledge of the bidding process and whether there were other parties besides CME interested in acquiring all or part of GFI would have a substantial effect on the stock price and thus would be material to investors.

**B.    DEPOSITION TRANSCRIPTS**

32.  It is widely understood that a competitive bidding process will result in higher returns for target shareholders.[26] Deposition testimony in this matter shows that it would have been material to GFI investors to know whether a competitive bidding process was being conducted, that BCG had informed GFI of its willingness to pay a premium for GFI stock, and that GFI management was preventing a competitive bidding process from occurring.

33.  For example, Robert Smith, who during the Class Period was a managing director responsible for financial services M&A at Greenhill[27] testified as to the importance of a competitive bidding process for improving shareholder outcomes:

---

[24] "We Still Don't Foresee GFI Group Having Material Earnings for a Number of Years," *Morningstar*, May 29, 2014.

[25] "A Fair Price for Valuable Trayport and FENICS Assets," *Sandler O'Neill and Partners*, July 30, 2014.

[26] Burch (2001), p. 104 ("…competition for a target is traditionally thought to result in a higher bid premium…").

[27] Smith Deposition, 9:10-12, 10:15-19.

Q. Why does maintaining competitive tension maximize likely offer prices?

… A. That's I think generally true and self-evident in any kind of process or endeavor where you're trying to maximize value or maximize an outcome. ***Having a competitive process generally will result in a better outcome than otherwise, generally speaking***.[28]

34.    According to Smith, the GFI management team should have contacted additional potential buyers when considering a merger:

But at the same time, based on what we had learned about the process that had been undertaken prior to our engagement, the process undertaken by Jefferies and the management team, we felt there were additional parties that should have been contacted for the purposes of the special committee evaluating any transaction.[29]

35.    Smith also indicated that if GFI had been open to other bids, a higher price would likely be obtained, whereas a lack of an alternative bid to CME's would not maximize shareholder value:

A. Well, just by virtue of the fact that making the mechanics around a superior proposal -- if another bidder showed up and wanted to buy the company, to the extent that the mechanics were difficult is less -- less helpful than if they were easier and more straightforward. And one of the factors -- well, I'll leave it at that.

Q. Is the reason that the disinterested shareholders would prefer it to be easier to consider an unsolicited bid so that they could obtain the highest possible price for their shares?

…

A. Well, I don't know what shareholders would be thinking, but yes. If the mechanics that would potentially enable a third-party bidder to come into a situation and make a proposal, if those mechanics were less onerous, then it would be easier for the disinterested GFI shareholders to get a higher price, yes.[30]

---

[28] Smith Deposition, 22:18 – 23:2 (emphasis added).

[29] Smith Deposition, 57:15-21.

[30] Smith Deposition, 113:5-25 (emphasis added).

36.    Furthermore, Smith testified that GFI management prevented the special committee from seeking competitive bids via a go-shop period which would have opened up the possibility for alternative, higher bids and a better outcome for shareholders:

> Q. What is a go-shop period?
>
> A. A go-shop period refers to a period of time that's set out in a merger agreement that allows for a period of time after the agreement is signed and announced to enable the company, GFI and/or its advisors, to go out and proactively solicit potential buyers, to make outgoing calls and have discussions with potential buyers.
>
> *Q. Why did you want there to be a go-shop provision in the CME agreement?*
>
> *A. Because of the fact that, as you'll recall, we had felt that other parties should have been contacted but weren't and the fact that we were prevented from pursuing those additional discussions that we thought should have taken place.*
>
> *And so if -- and so we thought it was appropriate and desirable to have the ability to continue that process of checking the market to see if there were other potential buyers out there that would provide a better outcome for the shareholders.*[31]

37.    Frank Fanzilli, a member of the GFI Special Committee evaluating the CME Deal, concurred that a competitive bidding process would have been beneficial to shareholders. He testified that the ultimate metric of whether a deal maximizes shareholder value is to look at the total price being paid for the shares, and moreover that seeking potential alternate bidders is part of the standard process of attaining this higher value.[32] According to Plaintiffs' allegations, Defendants misstatements and/or omissions include misleading shareholders regarding the CME deal, which, far from being a unique opportunity for shareholders, was the result of a process that did not seek to maximize shareholder value, and this information would have been material to investors.

---

[31] Smith Deposition, 117:15 – 118:12 (emphasis added).

[32] Deposition of Frank Fanzilli, June 6, 2017 ("Fanzilli Deposition"), 70:4 – 71:12.

38.    Furthermore, Colin Ruegsegger, a researcher at Glass Lewis & Co. ("Glass Lewis"), an independent proxy advisory service, authored a report discussing the CME Deal ("Proxy Report")[33] in which he described Gooch's deliberate attempt to prevent GFI from exploring other potential deals.[34] Ruegsegger's testimony provides direct evidence that the type of information Defendants misrepresented and/or omitted from the market is used by investors in consideration of merger scenarios (*i.e.*, what investors consider material):

> Q. And when you looked into that – that recommendation, could you describe for me the results of your research?
>
> A. It's spelled out in the report. ***I believe our concern was at length the board's process was conflicted and largely inadequate for purposes of our own standards, which ultimately led to our recommendation in this regard.***
>
> Q. Could you describe what was inadequate about that process?
>
> A. Sure. There are a number of facets to that. ***Principally, as far as our previously described policy, what we're looking for is an independent and thorough process. And our concern in this regard was that it was neither of those things, that the process was largely governed by Mr. Gooch and perhaps his interest in executing a specific type of transaction.***
>
> ***And that that -- in addition to that, there was an effort -- an active effort to blunt the market check process from occurring. And he also contributed to that impression by expressly stating he would oppose any arrangement that was not executed with CME.***
>
> ***And given his voting interest in the company, we believed that knowingly indicated he was telling the company that no other transaction would be possible.***

---

[33] Institutional investors in GFI hired Glass Lewis for the Proxy Report, which is further proof that the process that led to the CME deal was material to investors.

[34] "Proxy Paper: GFI Group Inc.", Glass Lewis, January 21, 2015 (Exhibit 189 to Deposition of Colin Ruegsegger ("Ruegsegger Deposition"), June 29, 2017; GL_00000831-38) ("…any semblance of an open review process was all but blocked…Michael Gooch – the founder and executive chairman of GFI and controlling owner of Jersey Partners Inc. ("JPI") – stated that while JPI would respect the special committee's ability to say "no" to any transaction, the special committee should understand that if CME raised its offer price for GFI, JPI…intended to vote against any other transaction presented to GFI shareholders…the disclosed position of Mr. Gooch places the GFI special committee…in a very poor position to derive meaningful value from an active solicitation of other prospectively interested buyers, including BGC.")

15

Q. So you said that, in your opinion, it was neither -- the process was neither independent nor thorough; is that right?

A. That's correct.

Q. And so what was not independent about it?

A. I believe -- and again, I'm citing, in part, from my best recollection here, but I believe Mr. Gooch was allowed to run a process of evaluating his preferred transaction for nearly a year before informing the board expressly that he was seeking that type of transaction.

We would prefer to see board involvement much earlier than that. There is no -- again, no bright-line test in that regard. ***But in our view, the CEO undertaking a review of a transaction that expressly, in this case, would have allowed him to purchase a portion of the company after the fact at a price that it appears was below the value of that asset without informing the board, and then ultimately, upon informing the board, indicating that he would oppose any other transaction, we believed that significantly undermined any effort to undertake a real thorough independent review.***[35]

39.    Ruegsegger further explained the importance of a market check to investors and detailed how investors are harmed when alternate bids are not sought:

Q. Why would the board of a selling company be in a superior position if a market check had been conducted?

A. Because conceivably, you have an understanding of the maximum number of bidders and their maximum potential bid that they're willing to offer. In our experience, firms -- competing firms, buying firms, will offer greater value when forced to compete with other firms for the same asset.

Q. So without a market check here, was GFI in a weaker position to attain value for itself, in your opinion?

… [A.] We believe the special committee would be operating from a disadvantaged position, generally.

Q. … In this particular instance, with respect to the proposed GFI/CME deal, was the lack of a market check important to you?

A. In the context of our other concerns, yes.

Q. Would it be important to GFI shareholders, in your opinion?

---

[35] Ruegsegger Deposition, 40:14 – 42:14 (emphasis added). *See also* Fanzilli Deposition, 123:5 – 124:3.

… [A.] Yes.

…Q. And why?

A. Because at the time, there was clearly interest from other potential bidders. And again, we believed that exploration of that alternative interest was obstructed at the board level, and that *it was not possible for shareholders to reasonably ascertain that the greatest possible value had been obtained through the pre-execution process*.[36]

40.    Finally, BCG Chairman Howard Lutnick stated that BGC was excluded from the merger process at a detriment to shareholders:

Q. Yes. I'm referring to the portion of the statement at the end that says, The GFI board's flawed and conflicted process failed to extract any significant semblance of maximum value or favorable price and further failed to fully incorporate those bidders willing to offer decidedly greater value to GFI investors.

… A. Post the July 30 bid by the CME, the answer is yes, it could be BGC was willing to offer decidedly greater value to GFI investors; and I thought it was flawed and conflicted that they did not include us in the process, didn't give us diligence, didn't give us access, and I thought that was wrong and inappropriate.[37]

41.    The above testimony demonstrates that the mechanics of the merger process, including the number of potential bidders sought, the active discouragement of the Board to search for the best deal for shareholders, and the failure to consider BCG's superior offer had ramifications for GFI's stock price and thus investors' evaluation of GFI common stock when the CME Deal was presented. Therefore, such misstatement and/or omissions would have been material to investors' evaluation of the CME Deal and GFI Common stock.

---

[36] Ruegsegger Deposition, 52:2-53:11 (emphasis added).

[37] Lutnick Deposition, 144:4-21.

17

## C.    THE ECONOMICS AND FINANCE ACADEMIC LITERATURE SHOWS THAT COMPETITIVE BIDS INCREASE TARGET PRICES

42.    Academic research has shown that a competitive market for a target company, such as GFI in this matter, is associated with higher bids. Thus, any misstatement that indicated to investors that such a competitive process resulted in the CME bid when no such process occurred would be material.

43.    Jarrell and Bradley document that since 1968, when Congress enacted a law which instituted disclosure requirements and regulated the minimum tender period, target shareholders have benefitted by an increase in premiums paid by the acquiring companies, rising from 32 percent prior to the Williams Act to 53 percent after its passage, and further increased after similar state law regulations followed. The authors state:

> Disclosure requirements and the delay of execution caused by minimum offer periods and legal actions freely provide potential competing bidders with time and information. The successful bidder, under the regulations, is forced to pay higher premiums to outbid this increased competition for the target.[38]

44.    Thus, when multiple potential acquirers have an opportunity to bid on a target firm, outcomes are better for target firm shareholders.[39]

45.    Schwert (1996) notes the benefit to target firms (like GFI) of having multiple bidders: "Such a multiple bid auction usually leads to higher control premiums than when the initial bid is successful."[40] Bradley et al. (1982) demonstrate "evidence that successful acquiring

---

[38] Jarrell and Bradley (1980), p. 373.

[39] *See also*, Jarrell et al. (1988), p. 54: "For example, Jarrell and Bradley (1980) demonstrate that Federal (Williams Act) and state regulations of tender offers have this effect because they impose disclosure and delay rules that foster multiple-bidder, auction contests and preemptive bidding." This idea was also presented in the Fanzilli deposition and Smith deposition [*See* Fanzilli Deposition, 114:2 – 115:4; Smith Deposition, 22:18 – 23:2].

[40] Schwert (1996), p. 3.

18

firms possess specialized resources that allow for a profitable acquisition…"[41] Bradley et al. (1988) provide both theoretical and empirical evidence that "the dollar gains to target stockholders will be greater in multiple-bidder contests than in single-bidder contests."[42] Walkling and Edmister (1985) provide further evidence that the emergence of multiple bidders results in higher premiums for target shareholders: "The most dramatic difference involves the case where two or more bidders compete for a target. In the 19 offers where this occurred [among the sample studied], bid premiums were 30 percentage points higher."[43]

46.    Thus, the academic literature supports that it would be material to investors in evaluating GFI common stock to know that management was not engaged in a process to maximize value.

### D.    EVENT STUDY

47.    A technique often relied upon both inside and outside of the context of litigation to establish a causal connection between new company-specific news events and movements in the market price is called the "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices. Event studies have been used for over 40 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.

48.    An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements

---

[41] Bradley, Desai, and Kim (1982), p. 186.

[42] Bradley, Desai, and Kim (1988), p. 18.

[43] Walkling and Edmister (1985), p. 34.

conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large so that simple random movement can be rejected as the cause.

49.    Here, as in my Market Efficiency Report, I performed an event study. In the current context, the event study is used to determine whether GFI's Common Stock reacted to the release of corrective information in a statistically significant manner after controlling for the day-over-day percentage change in United States 1-Year T-Bill rates. **Exhibit 1** summarizes the results of my event study and demonstrates that there were statistically significant positive price movements in response to the Corrective Disclosure Event. This provides direct scientific evidence of materiality of the alleged misstatements (the linkage between the misrepresentations and omissions and the disclosures is discussed in greater detail in **Section V**).[44]

50.    The fact that GFI's stock price reacted in a statistically significant and positive manner to events that provided the market new Company-specific information about BGC's intent to acquire GFI Group at a premium, synergy driven price is additional evidence that the misstatements and/or omissions were material. Therefore, the results of my event study provide additional empirical evidence that the alleged misstatements and omissions were material to investors. I discuss the Corrective Disclosure Event in greater detail in **Section V**.

51.    For all the reasons discussed above, disclosure of the relevant truth concealed by the alleged misstatements and/or omissions would have been viewed by a reasonable investor as having significantly altered the total mix of information available.

## V.    LOSS CAUSATION

52.    Loss causation is the causal link between the alleged misrepresentations and/or omissions and the resulting economic losses suffered by investors. For purposes of my report, I

---

[44] The underlying regression model used for the event study remains unchanged from my prior report. For further details about the event study, see my Market Efficiency Report § VII.F.

20

consider loss causation to be a combination of the "but-for" test (would the loss have occurred but-for the alleged violations), and the "foreseeability" test (was the loss a foreseeable consequence of the violations). The roles for economists in this type of inquiry include evaluating the economic impact of the alleged violations and determining whether there is economic evidence to link price increases (if any) to the revelation of the relevant truth concealed by the prior misstatements and omissions.

53.    I have been asked to evaluate loss causation for Defendants' alleged misrepresentations and omissions concerning Defendants' attempts to prevent a competitive bidding process. The market price increase caused by the revelation of BGC's bid on September 8 and 9, 2014, would have occurred earlier but-for the alleged misstatements and omissions. Thus, investors who sold GFI Common Stock while there was misinformation in the market suffered a loss because the sales price was lower than it otherwise would have been, and therefore the misrepresentations and omissions represent the but-for cause of the Plaintiffs' economic losses.

54.    Based on the evidence, the market learned of BGC's intent to acquire GFI over two days, September 8, 2014 through September 9, 2014. On September 8, 2014, at 4:04 pm, the Wall Street Journal published an article announcing BGC's interest in acquiring GFI:

> BGC Partners Inc. is expected to make an unsolicited $675 million all-cash offer for rival GFI Group Inc., according to people familiar with the matter. The takeover would bolster BGC, the second-largest broker by market capitalization, at a time of soft trading revenues and often-placid markets.
>
> The bid, for $5.25 a share, could derail GFI's July agreement to sell itself to Chicago exchange operator CME Group Inc. for $580 million in stock, or $4.55 a share.[45]

---

[45] "BGC Partners to Make Bid for Rival Broker GFI; All-Cash Offer of $675 Million Would Trump CME Group's Bid," *The Wall Street Journal*, September 8, 2014, 4:04 pm.

55.    Not only did the Wall Street Journal article mention the rival bid, it also provided evidence that GFI could have revealed this information earlier:

> BGC has made overtures to GFI in past years that haven't been accepted, one of the people said, including one acquisition proposal the same week in July that GFI announced its deal with CME.[46]

56.    Indeed, GFI could have disclosed the existence of an additional bidder as of the beginning of the Class Period when BGC stated in its July 29, 2014 letter that it would offer a substantial premium for GFI stock due to the operational synergies it saw in such a transaction: "We are confident that a combination of GFI and BGC will produce increased productivity per broker, meaningful synergies and significant cost savings. We therefore continue to seek a negotiated merger with GFI that would provide superior value to your shareholders."[47]

57.    An analyst report published on September 9, 2014, reinforced three key points: (1) the BGC deal was more attractive than the CME deal; (2) the BGC announcement was the cause of the abnormal significant price movement; and (3) GFI knew that a synergistic buyer like BGC was willing pay a higher price earlier than the market did:

> GFI's share price jumped yesterday and reports overnight suggested BGC was about to make an offer…The $5.25 per share offer from BGC (c.$675m) represents a 15% premium to that of CME's, pitched at $4.55. It is a cleaner transaction that looks more attractive relative to the lower alternative that involves receiving stock in CME Group. The proposed two-stage CME transaction involved the acquisition of the GFI Group (in order to secure the Trayport & FENICS business), immediately followed by agreement to sell back the wholesale (voice) broking business to GFI's existing management… In a letter sent to GFI management yesterday and made public by BGC this morning, BGC accuse GFI management of: i) ignoring a discussion of offer letter sent to them on July 29th '14, (the day before the CME offer); & ii) being deeply conflicted with respect to the CME transaction, "*particularly given the*

---

[46] *Ibid.*

[47] Complaint ¶ 53; BGC Partners, Inc. Form 8-K, filed September 9, 2014.

*significant discount agreed to with respect to the purchase of the brokerage and clearing business.*"[48]

58. If Plaintiffs' allegations are correct that Defendants knew that the CME Deal prioritized private control of the Brokerage Business at the expense of shareholders and was not a unique opportunity for Class Members, failed to solicit interest from competing buyers, including BGC, and interfered with the special committee's efforts to find competing bids, then this disclosure provided new GFI-specific news that represented corrective information omitted from Defendants' public statements. Only on this Corrective Disclosure Event did the market learn that at the time of the CME Deal there was another firm that had earlier expressed a willingness to pay more for GFI due to potential synergies.

59. In response to this news, on September 9, 2014, GFI's stock price experienced a positive abnormal return of 12.95%, or $0.65 per share, which is statistically significant at the 99% confidence level with a t-statistic of 20.00 (see **Exhibit 1**). I found no other GFI non-fraud-related (*i.e.*, "confounding") information, and therefore the entire abnormal return on September 9, 2014 was due to the corrective information.

60. Prior to the public announcement at market close on September 8, 2014, it is clear that news of the deal had already begun to leak during market hours that day, and therefore, I also consider the positive abnormal return in GFI common stock on this day as corrective. **Exhibit 2** shows that GFI stock price rose during the day on September 8. The price increase on this day in and of itself (in light of the lack of similar market and industry price movements) is evidence of leakage because according to economic theory (discussed in depth in my Market

---

[48] "GFI Group: BGC trumps CME offer for GFI," *Liberum*, September 9, 2014 (emphasis in original).

Efficiency report), the stock price should not deviate substantially from the deal price in the absence of additional information.[49]

62. In addition, the Wall Street Journal article was detailed, thorough, and published immediately after the market had closed, suggesting that some of the corrective information regarding a rival bid had leaked to at least some people (including the authors of the news story) during the day on September 8.

62. The academic literature discusses the occasional need to consider the return on the day before a corrective disclosure due to information leakage. The general concept of incorporating several days around an important announcement to properly capture the price impact of potential "leakage" of material information is well-established in the academic literature.[50] For example, Alexandros Benos and Michael Rockinger "reject the assumption that markets do not react significantly *before* the official [earnings] announcement. This result is compatible either with rumours hitting the market before the public disclosure or with pure information leakage."[51] Also, multiple day event windows are often observed in the academic literature and routinely employed in the context of analyzing loss causation in class action securities litigation.[52]

---

[49] Market Efficiency Report § VII.F.2.

[50] *See*, *e.g.* William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, (1968), pp. 67-92; Alexandros Benos and Michael Rockinger, "Market Response to Earnings Announcements and Interim Reports: An Analysis of SBF120 Companies," *Annals of Economics and Statistics,* 2000, pp. 151-175.

[51] *Ibid.*

[52] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, No. 1, March 1997; Dmitry Krivin, Robert Patton, Erica Rose, and David Tabak, "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," *NERA Economic Consulting,* November 4, 2003.

63. Moreover, there is no competing alternate explanation for the stock price movement on this day.

64. On September 8, 2014, the new, Company-specific information caused GFI's stock price to increase by 10.41%, or $0.47 per share, after controlling for the day-over-day percentage change in United States 1-Year T-Bill rates. This abnormal price increase is statistically significant at the 99% confidence level with a t-statistic of 16.07 (see **Exhibit 1**). As mentioned above, no additional confounding news was revealed on this day that could have been an alternate explanation for the market price movement, and therefore I attribute the entire abnormal return on September 8, 2014 to corrective information.

65. Based on the information released to the market over the September 8-9, 2014 period, I find that as two individual dates or as a single Corrective Disclosure Event, the abnormal price increase is statistically significant at the 99% confidence level. I attribute the entire abnormal return over this time period to the September 8, 2014 corrective information.

## VI. CALCULATING DEFLATION PER SHARE AND DAMAGES FOR GFI COMMON STOCK

### A. DEFLATION PER SHARE

66. Based on the prior loss causation section, I have concluded that artificial deflation in the following amounts was dissipated from the Common Stock in response to the Corrective Disclosure Event:

**GFI Group**
**Artificial Deflation per Share Dissipated on**
**Corrective Disclosure Events**

| Date | Artificial Deflation |
|------|----------|
| September 8, 2014 | $0.47 |
| September 9, 2014 | $0.65 |
| Total | $1.13 |

67. This analysis, however, does not itself establish how deflation evolved over the Class Period. One standard method often relied upon to evaluate the level of artificial deflation in a stock price is the "constant dollar" method. This method assumes that the amount of artificial stock deflation dissipated in response to the Corrective Disclosure Event was present in the stock price going back to the beginning of the Class Period. For example, this method assumes the $0.65 artificial stock deflation dissipated on September 9, 2014, was present in the stock between July 30, 2014, and September 8, 2014. In other words, this method assumes that if the information revealed during the September 9, 2014 announcement had been revealed on an earlier date, that $0.65 of artificial deflation would have been dissipated on that earlier date instead.[53]

68. Based on my understanding of Plaintiffs' allegations, coupled with my review of the evidence, I conclude that constant dollar deflation is appropriate in this matter. Plaintiffs allege that from the first day of the Class Period Defendants knew that the CME Deal prioritized private control of the Brokerage Business at the expense of shareholders and was not a unique opportunity for Class Members, failed to solicit interest from competing buyers, including BGC

---

[53] Similarly this method assumes the $0.47 artificial stock deflation dissipated on September 8, 2014, was present in the stock between July 30, 2014, and September 7, 2014.

26

(who could pay a synergy-enhanced price for the Brokerage Business), and interfered with the special committee's efforts to find competing bids. In my view, the most reliable proxy for evaluating how the market would have reacted to such a disclosure at the beginning of the Class Period is to rely upon the abnormal market price increases observed upon disclosure of such information. As described above, on certain of the corrective disclosures my methodology fails to account for such foreseeable effects and is therefore conservative.

69.    Taking the analysis of the Loss Causation Events into account and applying the constant dollar methodology, **Table A** below shows the total artificial deflation per share for GFI's Common Stock during the Class Period:

**Table A**
**GFI Group Artificial Deflation per Share Over Time**

| Date Range | Artificial Deflation |
|---|---|
| July 30, 2014 - September 7, 2014 | $1.13 |
| September 8, 2014 | $0.65 |

## B.    DAMAGES

70.    The standard and well-settled formula for assessing damages for each Class Member under Section 10(b) is the "out-of-pocket" method, which measures damages as the artificial deflation per share at the time of purchase less the artificial deflation at the time of sale. Under this method, one would have to consider any artificial deflation at the time of purchase and also any artificial deflation at the time the security was sold. If the security was purchased before the beginning of the class period, and sold between July 30 and September 7, 2014, then damages per share would be equal to $1.13. If the security was purchased before the beginning of the class period and sold on September 8, 2014, damages per share would be equal to $0.65.

27

However, if the security was purchased on or after July 30, 2014, and sold on any subsequent date (or retained) then it would not be damaged, since the artificial deflation at the time of purchase would always be lower (*i.e.* farther away from the "but-for" price) than the artificial deflation at the time of sale.

### C.    ADAPTATION TO ALTERNATIVE DETERMINATIONS BY THE FINDER OF FACT

71.    The out-of-pocket damages model described above can be adapted to alternative findings by the finder of fact, including but not limited to: (1) the exclusion of a particular corrective disclosure; (2) the date of the first relevant misstatement for a claim or set of claims; (3) alternative valuation of confounding versus corrective information; and (4) how to best properly back-cast deflation over the Class Period. I will describe each variation in turn.

72.    First, in the event that the finder of fact determines that a particular corrective event needs to be excluded, the out-of-pocket model could easily handle that outcome on a class-wide basis by assigning 0% deflation on that day to the alleged newly disclosed corrective information.

73.    Second, in the event that the finder of fact determines that the first relevant misstatement for a claim or set of claims is earlier or later than what I have described above, the out-of-pocket model could easily handle that outcome on a class-wide basis by adjusting the relevant deflation window. As a purely hypothetical example, suppose the finder of fact determines that the $1.13 of artificial deflation dissipated between September 8 and 9, 2014, was first introduced into the stock by a hypothetical alleged misstatement on August 15, 2014. This would have the effect of reducing deflation by $1.13 between July 30, 2014, and August 14, 2014, as compared to Table A above. In this hypothetical example, the artificial deflation present in the stock price over time would be as follows:

28

**GFI Group**
**Hypothetical Artificial Deflation per Share Over Time**

| Date Range | Artificial Deflation |
| --- | --- |
| July 30, 2014 - August 14, 2014 | $0.00 |
| August 15, 2014 - September 7, 2014 | $1.13 |
| September 8, 2014 | $0.65 |

74.    Third, regardless of how the finder of fact ultimately weighs the evidence and determines the appropriate percentage of the abnormal returns attributable to the release of corrective versus confounding information, that percentage can be incorporated easily and mechanically into the standard damages model already identified using a common out-of-pocket formula. For example, assume that an event study analysis determines that there was a $1.00 abnormal increase in the share price on a day in which corrective information was released. Further assume there was some non-culpable (*i.e.*, "non-corrective" or "confounding") information released at the same time. Further, assume that plaintiffs present a loss causation analysis that suggests 80% of the abnormal price movement, or $0.80 per share, is due to the corrective information. Hypothetically, under a constant dollar back-casting methodology, that would imply that $0.80 per share of artificial deflation existed on each day of the Class Period prior to this corrective disclosure going back to the start of the Class Period where the first misrepresentation/omission related to this claim was made. Now assume defendants present a loss causation analysis suggesting that only 30% or $0.30 per share of the abnormal price reaction is due to corrective information. Under a constant dollar back-casting methodology, that would imply that artificial deflation for each preceding day of the Class Period was $0.30 per

29

share going back to the start of the Class Period where the first misrepresentation/omission related to this claim was made. No matter how the finder of fact weighs the evidence, whether they agree with 80%, 30%, or determine that based upon weighing the evidence it is some other percentage (e.g., 40%), the result can easily be applied to any daily deflation table. Indeed, the percentage deflation results of a loss causation/disaggregation analysis or a fact finder's determination could easily and mechanically be converted to per-share deflation on each day of a given Class Period.

75.    Fourth, in the event that the finder of fact determines that true economic deflation was not constant over the Class Period, the out-of-pocket damages model can account for such a circumstance and mechanically calculate damages on a class wide basis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed this 7th day of August, 2017 in Chicago, Illinois

Chad Coffman

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and complete copy of the foregoing and accompanying

exhibits was served this 7th day of August, 2017, via email upon the following:


John F. Lynch
Joshua J. Card
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000
jlynch@wlrk.com
jjcard@wlrk.com

*Attorneys for Defendant GFI Group, Inc.*

Christopher D. Kercher
Lyndsey Keenan
QUINN EMANUEL URQUHART &SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
christopherkercher@quinnemanuel.com
lindseykeenan@quinnemanuel.com

*Attorneys for Defendants Colin Heffron and Michael Gooch*


/s Joseph D. Cohen
Joseph D. Cohen
GLANCY, PRONGAY & MURRAY, LLP

1

**Exhibit 1**
**Event Study Analysis of GFI Corrective Disclosure Events**

| Date | Time | Market Date | Event | Headline | GFIG Price | GFIG Raw Return | Abnormal Return | Abnormal Dollar Change | T-Stat | P-Value | Sig Level[2] |
|------|------|-------------|-------|----------|-----------|-----------------|-----------------|------------------------|--------|---------|--------------|
| | | | | | | | | Regression Model[1] | | | |
| 9/8/2014 | N/A | 9/8/2014 | BGC Deal Leaked | | $5.03 | 10.55% | 10.41% | $0.47 | 16.07 | 0.00 | *** |
| 9/8/2014 | 4:04 PM | 9/9/2014 | BGC Deal Announced | BGC Partners to Make Bid for Rival Broker GFI; All-Cash Offer of $675 Million Would Trump CME Group's Bid | $5.69 | 13.12% | 12.95% | $0.65 | 20.00 | 0.00 | *** |

Source: S&P Capital IQ; GFI Group Inc. Press Releases.

Notes:

(1) The event study results are based on a regression estimated over 7/31/14 through 9/9/14 that controls for the percentage change in United States 1-Year T-Bill rates. Key Event Dates have been removed from the estimation period.

(2) "***" Denotes statistical significance at the 99% confidence level or greater, "**" denotes statistical significance at the 95% confidence level or greater, and "*" denotes statistical significance at the 90% confidence level or greater.

# Exhibit 2
## GFI Intraday Price and Volume
## 9/8/2014 - 9/9/2014



Source: TICK Data.

# Appendix A
# Documents Considered

**Prior Reports in this Matter**
- Expert Report of Chad Coffman, CFA, dated May 30, 2017, including all documents included in Appendix A of that report.

**Court Documents**
- Second Amended Class Action Complaint for Violation of the Federal Securities Laws, *Gross, et al. v. GFI Group, Inc.,* dated July 8, 2015.
- Defendants' Motion to Dismiss the Amended Complaint, *Gross, et al. v. GFI Group, Inc.,* filed September 9, 2015.
- Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Complaint, *Gross, et al. v. GFI Group, Inc.,* filed October 28, 2015.
- Defendants' Reply In Support of their Motion to Dismiss, *Gross, et al. v. GFI Group, Inc.,* filed November 11, 2015.
- Memorandum and Order, *Gross, et al. v. GFI Group, Inc.,* dated February 9, 2016.

**Court Decisions and Securities Law**
- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.
- *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011).

**Depositions**
- Deposition of Frank Fanzilli, June 6, 2017.
- Deposition of Robert Smith, June 7, 2017, including related exhibits.
- Deposition of Michael Gooch, June 13, 2017.
- Deposition of Howard Lutnick, June 21, 2017, including related exhibits.
- Deposition of Alexander Yavorsky, June 22, 2017.
- Deposition of John Pietrowicz, June 23, 2017, including related exhibits.
- Deposition of Colin Ruegsegger, June 29, 2017, including related exhibits.

**SEC Filings/Forms**
- GFI Group Form 10-K for the fiscal year ended December 31, 2014, filed with the SEC on March 13, 2015.

- BGC Partners, Inc. Form 8-K, filed with the SEC on September 9, 2014.

## Security Data
- Historical data for GFI Common Stock, members of the Peer Index, the S&P 500 Total Return Index, and risk-free interest rates were obtained from S&P Capital IQ.

## News
- Burne, Katy, "BGC Partners to Make Bid for Rival Broker GFI; All-Cash Offer of $675 Million Would Trump CME Group's Bid," *The Wall Street Journal*, September 8, 2014, 4:04 pm.

## Analyst Reports
- "Initiating Coverage with MARKET PERFORM," *BMO Capital Markets*, January 12, 2012.
- "4Q Miss; 1Q Revenue Trending Down 6% Y/Y," *BMO Capital Markets*, February 18, 2013.
- "1Q In Line; GFI Not for Sale, Making Progress on Cost Base," *BMO Capital Markets*, April 26, 2013.
- "We Still Don't Foresee GFI Group Having Material Earnings for a Number of Years," *Morningstar*, May 29, 2014.
- "A Fair Price for Valuable Trayport and FENICS Assets," *Sandler O'Neill and Partners*, July 30, 2014
- Bates, Justin, "GFI Group: BGC trumps CME offer for GFI," *Liberum*, September 9, 2014.

## Academic Articles/Texts

- Beaver, William H. (1968), "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6.

- Benos, Alexandros and Michael Rockinger (2000), "Market Response to Earnings Announcements and Interim Reports: An Analysis of SBF120 Companies," *Annals of Economics and Statistics,* 2000, pp. 151-175.

- Bradley, Michael, Anand Desai, and E. Han Kim (1988), "Synergistic Gains from Corporate Acquisitions and their Division Between the Stockholders of Target and Acquiring Firms," *Journal of Financial Economics* 21: 3-40.

- Bradley, Michael, Anand Desai, and E. Han Kim (1982), "The Rationale Behind Interfirm Tender Offers," *Journal of Financial Economics* 11: 183-206.

- Burch, Timothy R. (2001), "Locking out rival bidders: The use of lockup options in corporate mergers," *Journal of Financial Economics* 60: 103-141.

- Jarrell, Gregg A. and Michael Bradley (1980), "The Economic Effects of Federal and State Regulations of Cash Tender Offers," *The Journal of Law and* Economics 23(2): 371-407.

- Jarrell, Gregg A., James Brickley, and Jeffry Netter (1988), "The Market for corporate Control: The Empirical Evidence Since 1980," *The Journal of Economic Perspectives* 2(1): 49-68.

- Krivin, Dmitry, Robert Patton, Erica Rose, and David Tabak (2003), "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," *NERA Economic Consulting,* November 4, 2003.

- MacKinlay, A. Craig (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, No. 1, March 1997.

- Schwert, William G (1996), "Markup Pricing in Mergers and Acquisitions," *NBER*.

- Walkling, Ralph and Robert Edmister (1985), "Determinants of Tender Offer Premiums," *Financial Analysis Journal* January-February 1985: 27-37

**Other**
- All data and documents referenced in this report that are not specifically mentioned in this Appendix were also considered.

# Appendix B

**CHAD W. COFFMAN, MPP, CFA**

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:         (815) 382-0092
Email:          ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

**Global Economics Group, LLC**
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

**Market Platform Dynamics, LLC**
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

**Chicago Partners, LLC**
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997

Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

    o   In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation.  Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
    o   In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
    o   In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
    o   In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
    o   Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed rebuttal expert report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2009**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009. Filed rebuttal expert report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed rebuttal expert report July 8, 2010.  Deposition September 1, 2010. Filed supplemental rebuttal expert report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed rebuttal expert report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed rebuttal expert report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed rebuttal expert report September 26, 2011. Filed expert report March 16, 2012. Filed rebuttal expert report April 9, 2012. Filed rebuttal expert report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February

17, 2012. Deposition March 28, 2012. Filed rebuttal expert report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed rebuttal expert report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed rebuttal expert report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed rebuttal expert report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed rebuttal expert report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed rebuttal expert report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed rebuttal expert report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed rebuttal expert report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed rebuttal expert report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed rebuttal expert report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report

September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed rebuttal expert report December 7, 2015. Filed expert report November 18, 2016. Filed expert report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed rebuttal expert report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed rebuttal expert report February 2, 2016. Filed expert reply report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert report February 10, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert report July 26, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts.</u> Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois.</u> Filed expert report April 21, 2017. Deposition June 15, 2017.

- Testifying expert in <u>Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The</u>

Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California. Filed expert report May 19, 2017. Deposition July 20, 2017.

- Testifying expert in <u>Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York</u>. Filed expert report May 30, 2017.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.

- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.