UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| _____x | | |
| In re NATIONAL INSTRUMENTS | : | Civ. A. No. 1:23-cv-10488-DLC |
| CORPORATION SECURITIES LITIGATION | : | |
| _____x | | CLASS ACTION |

**DEFENDANTS' RESPONSE TO LEAD PLAINTIFF'S
COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Local Rule 56.1, Defendants submit the following responses to Lead Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment and Counterstatement of Additional Material Facts (the "Counterstatement"). Plaintiff's Counterstatement fails to comply with Local Civil Rule 56.1 because Plaintiff's "facts" are not material facts, and many are not supported by admissible evidence. *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 408 (S.D.N.Y. 2018) ("A fact is 'material' if it 'might affect the outcome of the suit under the governing law'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).[1]

Further, Plaintiff's responses to Defendants' Rule 56.1 Statement likewise fail to comply with the Local Rules, including because the majority of Plaintiff's "disputes" do not include citations to admissible evidence controverting Defendants' material facts, but instead improperly insert tangential, additional statements and argument. For the reasons explained in Defendants' Reply in Support of their Motion for Summary Judgment, Defendants' facts should be deemed admitted where Plaintiff has failed to cite evidence controverting the stated facts. *See also* Local Civil Rule 56.1(b)-(d).[2]

## I.    "Emerson's Offer and Outreach"[3]

---

[1] As an illustrative example, Plaintiff lists a series of "facts" from between August 26 and September 26, 2022, even though all of NI's Class Period repurchases after August 26 were pursuant to NI's 10b5-1 Repurchase Plan Agreement, and information from that time is irrelevant to whether NI knowingly possessed material non-public information when they executed the 10b5-1 Plan on August 11, 2022. Def. Ex. 41, 42.

[2] Appendix A hereto sets forth the paragraphs of the facts asserted by Defendants and improperly disputed by Plaintiff that should be deemed admitted for the purpose of Defendants' Motion for Summary Judgment.

[3] Defendants include the headings and sub-headings from Lead Plaintiff's Counterstatement. However, as these heading are not factual assertions or supported by record evidence, Defendants do not respond to them, other than to note that the insertion of legal contentions and argument through headings and sub-headings is improper under Local Civil Rule 56.1.

### a. "Emerson's May 25 Letter"

1.      In Emerson's May 25, 2022 offer letter to NI, Emerson explained that its offer to "purchase 100% of the outstanding common stock of NI for $48 in cash per common share . . . provides significant value to [NI's] shareholders[,]" including "[a] 39% premium to NI's closing share price as of May 24, 2022[.]" Def. Ex. 10, at -1265.

**Response to paragraph 1:** Disputed. Defendants dispute only that Emerson's May 25, 2022 letter to NI was an "offer letter" or "offer." The May 25 Letter stated, "This Proposal constitutes neither an offer nor evidence of the existence of an offer, and is not intended to be and does not create a binding legal obligation on any party and no party will have any obligation or liability with respect to the Proposal, unless and until the execution of the Definitive Agreement by the parties hereto and then subject to the terms thereof." Def. Ex. 10; Defendants' Rule 56.1 Statement ¶ 29. Defendants do not dispute that paragraph 1 quotes a portion of the May 25 Letter.

2.      Emerson's offer letter continued: "Our Proposal is not subject to any financing condition and would be financed from cash on hand, committed lines of credit and/or other available sources of financing." *Id.*

**Response to paragraph 2:** Disputed. Defendants dispute only that Emerson's May 25, 2022 letter was an "offer letter," for the reasons explained in Defendants' Response to paragraph 1. Defendants do not dispute that paragraph 2 quotes a portion of the May 25 Letter.

3.      Emerson's offer letter stated that there were no "substantive" regulatory "impediments to closing," and noted "the complementary nature of" Emerson's and NI's "respective businesses." *Id.*

**Response to paragraph 3:** Disputed. Defendants dispute that Emerson's May 25, 2022 letter was an "offer letter," for the reasons explained in Defendants' Response to paragraph 1.

2

Defendants do not dispute that paragraph 3 quotes a portion of the May 25 Letter, or that Emerson said it viewed Emerson's and NI's respective business as complementary. Defendants dispute Plaintiff's contention that Emerson's and NI's respective businesses were actually "complementary." Mr. Starkloff testified that he did not think NI's business would be a "natural fit with Emerson" because he "understood Emerson to be in the industrial automation business," while "NI was a test [and] measurement company, which is quite different." Pl. Ex. 4, at 163:22-164:11.

4.      Emerson's letter further stated that its offer "is based on publicly available information under the assumption that it presents fairly and completely NI and its businesses and its outstanding debt and share count. It is subject to the completion of customary and confirmatory due diligence (e.g., tax, environmental, legal, etc.). We are prepared to move quickly to complete such due diligence when appropriate." *Id.*

**Response to paragraph 4:** Disputed. Defendants dispute only that Emerson's May 25, 2022 letter was an "offer," for the reasons explained in Defendants' Response to paragraph 1. Defendants do not dispute that paragraph 4 quotes a portion of the May 25 Letter.

5.      As to timing, Emerson's letter further stated: "Emerson is prepared to proceed immediately to work with NI and its advisors to complete due diligence and to negotiate a mutually agreeable merger agreement (the 'Definitive Agreement') in parallel." *Id.* The letter specified Emerson's "expectation that the signing of the Definitive Agreement and announcement can be achieved in 4-6 weeks." *Id.*

**Response to paragraph 5:** Defendants do not dispute that paragraph 5 quotes a portion of the May 25 Letter.

6.      The letter also stated: "We have no current plan to disclose this letter and assume that you do not intend to either. Our strong preference is to work constructively and expeditiously with you and your board to announce a Definitive Agreement." *Id.*

**Response to paragraph 6:** Defendants do not dispute that paragraph 6 quotes a portion of the May 25 Letter.

7.      Defendant Starkloff, Emerson's CEO, testified that NI and their counsel at Wachtell interpreted this language as "a coded statement of a public disclosure threat." Pl. Ex. 4, Starkloff Tr. at 46:1-14.

**Response to paragraph 7:** Disputed. In addition to the quoted statement in paragraph 7, Mr. Starkloff testified that NI and Wachtell "were trying to interpret what possibly could be [Emerson's] intent" and that threatening public disclosure "could" have been Emerson's intent. Pl. Ex. 4, at 46:23-47:5. Mr. Starkloff similarly testified that Emerson's intent with certain language in the May 25 Letter "might" have included a threat to go public, but that Mr. Starkloff "didn't think Emerson would actually do it, though." *Id.* at 47:6-11.

8.      Emerson's letter continued: "To reiterate, our Proposal – all cash consideration with no financing contingency and no substantive regulatory impediments – provides both significant value and certainty to NI's shareholders. We are prepared to move very quickly to complete our due diligence and sign definitive agreements." Def. Ex. 10, at -1266.

**Response to paragraph 8:** Defendants do not dispute that paragraph 8 quotes a portion of the May 25 Letter.

9.      The letter also stated: "We are highly enthusiastic about the prospects of what we can achieve together." *Id.*

**Response to paragraph 9:** Defendants do not dispute that paragraph 9 quotes a portion of the May 25 Letter.

10.    According to Kevin Ilcisin, NI's, advisors told NI management after receipt of this letter that Emerson would most likely "come back once privately before they would go public." Pl. Ex. 6, Ilcisin Tr. at 251:6-15.

**Response to paragraph 10:** Disputed. In the quoted testimony, Mr. Ilcisin testified about notes he wrote documenting advice from the bankers at Bank of America as of June 2, 2022. Pl. Ex. 6, at 248:21-251:10. Mr. Ilcisin specifically testified that his notes read, "[m]ost likely they will come back once." *Id.* at 251:6-10. Mr. Ilcisin also testified about notes he created dated August 11, 2022—also after receipt of the June 22 letter—reflecting further advice from NI's advisors that, "more often than not, . . . [the] acquiring company decides it's not worth [it] to keep going." *Id.* at 251:17-252:19.

### b. "Emerson's June 22 Letter"

11.    In its June 22 letter again offering to purchase all outstanding stock of NI at $48 per share in an all-cash transaction, Emerson stated:

> We are highly confident your shareholders would view our cash offer favorably and recent market data points reinforce this view, including:
>
> - The last time NI's share price closed above $48 was on December 6th, 2018. NI's share price has underperformed both the broader market and its key peer, Keysight, since then, with the stock down 34% in a period where the NASDAQ Index gained 54% and Keysight gained 125%;
> - Four of the six brokers who cover NI have reduced their 12 month forward price targets following your Ql earnings with the median price target being reduced from $50 to $43.50; and
> - The top 10 active shareholders as of the end of Q1 202l owned approximately 19% of the company with an estimated weighted average cost basis of $35. Over the past year, 8 of those 10 shareholders have reduced their positions and sold stock materially below the price we are offering.

5

Def. Ex. 24, at -2993.

**Response to paragraph 11:** Disputed. Defendants dispute only that Emerson's June 22, 2022 letter to NI was an "offer[]." The June 22 Letter stated, "This Proposal constitutes neither an offer nor evidence of the existence of an offer, and is not intended to be and does not create a binding legal obligation on any party and no party will have any obligation or liability with respect to the Proposal, unless and until the execution of the Definitive Agreement by the parties hereto and then subject to the terms thereof." Def. Ex. 24; Rule 56.1 Statement ¶ 87. Defendants do not dispute that paragraph 11 quotes a portion of the June 22 Letter.

12.    Emerson's letter further stated: "We prefer to engage in collaborative, bilateral discussions with minimal distraction to your management team to reach an agreement privately . . . . We look forward to learning more about your internal plan and are confident that with access to limited non-public information after signing an NDA, we could work with you to find additional value that would allow us to increase our Proposal." *Id.*

**Response to paragraph 12:** Defendants do not dispute that paragraph 12 quotes a portion of the June 22 Letter.

13.    The June 22 Letter also stated: "We have performed extensive outside-in due diligence on NI over an extended period . . . [W]e have limited and specific confirmatory due diligence requirements . . . We are ready to begin our confirmatory due diligence exercise and we would work towards signing and announcing a definitive agreement within four weeks." *Id.*

**Response to paragraph 13:** Defendants do not dispute that paragraph 13 quotes a portion of the June 22 Letter.

14.    Emerson also wrote in this letter: "Our Proposal is not subject to any financing condition and would be financed from cash on hand, committed lines of credit and/or other available sources of financing, Emerson is an A2/A rated company with a strong balance sheet. We have obtained a Highly Confident Letter from Goldman Sachs." *Id.*

**Response to paragraph 14:** Defendants do not dispute that paragraph 14 quotes a portion of the June 22 Letter.

15.    The letter continued: "*Certainty*: Our Board of Directors has reviewed and supports the proposed transaction. Emerson shareholder approval will not be required." *Id.*

**Response to paragraph 15:** Defendants do not dispute that paragraph 15 quotes a portion of the June 22 Letter.

16.    Emerson further stated: "Emerson considers this Proposal to be of the highest strategic priority. We are very motivated to conclude a transaction that benefits both companies as well as our respective shareholders." *Id.* at -2994.

**Response to paragraph 16:** Defendants do not dispute that paragraph 16 quotes a portion of the June 22 Letter.

17.    After reviewing the June 22 letter, Dixon noted that the letter "indicated a significant level of [due diligence][.]" Pl. Ex. 30, NAT-SL-00016089.

**Response to paragraph 17:** Disputed. Mr. Dixon testified about the email he drafted that is cited as Pl. Ex. 30 and explained that his email noted only that Emerson stated in the June 22 Letter it had conducted a significant level of due diligence, not that Mr. Dixon knew from the June 22 Letter that Emerson had, in fact, conducted a significant level of due diligence. Mr. Dixon testified that he "didn't know what [Emerson] did," and that his email just "repeated that's what [Emerson was] saying that they did." Pl. Ex. 3, at 140:2-18 (testifying his email "repeated what

the letter said"). Defendants do not dispute that the quoted language in paragraph 17 appears in Pl. Ex. 30.

18.     Eddie Dixon, NI's Chief Legal Officer, also sent additional notes that summarized the June 22 Letter and Ilcisin's and Dixon's perspectives. This summary acknowledged multiple points conveyed in the letter, including that there was "[n]o change in offer – suggesting original offer is attractive to shareholders"; that Emerson had hired advisors; that Emerson made "references to the premium at various price time frames"; that Emerson "[i]ndicated they 'prefer to engage collaboratively' and . . . could potentially unlock additional value to increase their proposal" if provided with "limited non-public info"; and that Emerson requested a response by July 11. Pl. Ex. 31, NAT-SL-00017152-7155, at -7152.

**Response to paragraph 18:** Defendants do not dispute only that paragraph 18 quotes and paraphrases portions of Mr. Dixon's June 23, 2022 email in Pl. Ex. 31. Defendants dispute that Dixon or Ilcisin "acknowledged" Emerson's assertions as fact because Mr. Dixon explained, when testifying about the cited email, "Kevin [Ilcisin] basically repeated what was in the letter and [Mr. Dixon] confirmed that." Pl. Ex. 3, at 142:15-145:14.

19.     In connection with Emerson's May 25 and June 22 offer, Wachtell advised ███████ ████████████████████████ because, as Defendant McGrath understood from Wachtell's May 26 presentation, ████████████████████████████████████████████ ████████████████████████████████████████████████████ ███" Def. Ex. 15, at -6121; Def. Ex. 21, at -6761; Pl Ex. 2, McGrath Tr. 83:15-19; Pl. Ex. 6, Ilcisin Tr. at 62:15-63:17.

**Response to paragraph 19:** Disputed. Defendants dispute that Emerson's May 25 and June 22 Letters were "offers" for the reasons explained in response to paragraphs 1 and 11.

Defendants dispute that the cited slides from Wachtell's presentations reflect an "escalatory scale" with sequential "steps." Def. Ex. 15, at -16121; Def. Ex. 21, at -16761. The slide is titled, "█████



████████████████████████████████████████" *Id.* Mr. Starkloff testified that Wachtell ████████████████████████████████████████

████████████████████████████████████████

Pl. Ex. 3, at 44:14-45:1.

20.    Defendants were also advised by Wachtell: "████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████." Def. Ex. 15, at 6128.

**Response to paragraph 20:** Defendants do not dispute that paragraph 20 quotes a portion of Wachtell's May 26 presentation.

21.    NI's Chief Legal Officer, Eddie Dixon, also advised NI's directors and officers to limit their written communications about Emerson and stock buybacks due to the sensitive nature of the information. Pl. Ex. 3, Dixon Tr. at 153:13-154:18.

**Response to paragraph 21:** Disputed. The cited excerpt of Mr. Dixon's testimony does not support the proposition in paragraph 21. In this excerpt of Mr. Dixon's testimony, he answers questions about an email he sent (Exhibit 17 to Mr. Dixon's deposition) discussing a presentation made by Mr. McGrath (Exhibit 16). Nowhere in Mr. Dixon's testimony regarding either of these documents does Mr. Dixon refer to "sensitive" information or share buybacks/repurchases.

### c. "July 7 Email from Emerson"

22.     On July 7, 2022, Emerson CEO Lal Karsanbhai emailed Starkloff and expressed that he was "disappointed" that NI would not be providing a response to Emerson until after NI's scheduled Board meeting. Karsanbhai stated: "We prefer to keep our conversations private, however for that to remain feasible we need relative expedience from NI's Board." Pl. Ex. 34, NAT-SL-00015203-5205, at -5204 (July 7, 2022).

**Response to paragraph 22:** Defendants do not dispute that paragraph 22 quotes a portion of a July 7, 2022 email from Mr. Karsanbhai to Mr. Starkloff.

23.     Starkloff forwarded this response to Dixon and Niles and wrote: "Let's think of strategies to keep some convo going." *Id.* at -5203. Starkloff then suggested a "friendly response showing I'm doing what I can to get board together . . . commit to response by Aug 1" and "[p]otentially offer a call prior[.]" *Id*. Dixon responded: "Probably worth a brief discussion rather than email exchange." *Id.*

**Response to paragraph 23:** Defendants do not dispute that paragraph 23 quotes a portion of email correspondence among Mr. Starkloff, Mr. Dixon, and Mr. Niles.

24.     When asked if Karsanbhai's July 7 email conveyed a threat, Defendant McGrath testified: "I didn't understand the sole purpose of that to communicate a threat under the basis that we already knew a threat existed . . . [a threat] existed around that time, before that time, after that time. You can go back to the original briefing that we had in June from our attorneys advising us about the potential for, you know, a hostile takeover threat." Pl. Ex. 2, McGrath Tr. at 150:7-18. When asked if he understood NI to be under a threat of Emerson going public at all times, McGrath responded: "[A]t most times[.]" *Id.*, at 150:19-21.

**Response to paragraph 24:** Disputed. Mr. McGrath's full statement was, "At – at most times. I don't know if I would say all times, but most times, you know. By this time," referring to July 7, 2022. Pl. Ex. 2, at 150:19-22.

## II.    "The Definition of Material Nonpublic Information"

25.    NI's Insider Trading Policy defined "material information" as:

> [I]nformation that a reasonable investor would be substantially likely to consider important in deciding whether to buy, hold or sell securities of the Company or view as significantly altering the total mix of information available in the marketplace about the Company as an issuer of the securities. In general, any information that could reasonably be expected to affect the market price of a security is likely to be material.

Def. Ex. 8, at -1248.

**Response to paragraph 25:** Defendants do not dispute that paragraph 25 quotes a portion of NI's Insider Trading Policy.

26.    The Insider Trading Policy also stated: "As a rule of thumb, if you think something might be material nonpublic information, you should treat it as such. You can always reach out to the Compliance Officer if you have questions." *Id.* at -1249.

**Response to paragraph 26:** Defendants do not dispute that paragraph 26 quotes a portion of NI's Insider Trading Policy.

27.    Dr. Goodwin, Defendants' expert, testified: "I think most people intuitively understand that an acquisition or a merger . . . is a very significant event for a company." Pl. Ex. 7, Goodwin Tr. at 99:5-7.

**Response to paragraph 27:** Defendants do not dispute that paragraph 27 quotes a portion of Dr. Goodwin's deposition testimony.

11

28.     Dr. Denis, Defendants' expert, testified: "I would say that there is a general notion that if you increase the likelihood of an M&A transaction, given the fact that, on average, such transactions are associated with an increase in the target share price, then one could conclude that this reaction [i.e., NI's stock price reaction on January 13, 2023] is consistent with those types of announcements being economically material." Pl. Ex. 3, Denis Tr. at 316:3-18.

**Response to paragraph 28:** Defendants do not dispute that paragraph 28 quotes a portion of Dr. Goodwin's deposition testimony.

### III.    "Defendants' Additional Actions Related to Emerson's Offers"

#### a. "The 'Wine Bet'"

29.     On June 14, 2022, NI's CFO Rapp and NI's VP of Corporate Strategy Ilcisin drafted handwritten notes reflecting their "wine bet." This wine bet contemplates additional bidding by Emerson after rejection by NI. Specifically, the bet consisted of a wager over the timing and final price of Emerson's acquisition of NI. Pl. Ex. 26, NAT-SL-00008520-8521; Pl. Ex. 1, Rapp Tr. at 93:15-98:19, 99:14-16; Pl. Ex. 6, Ilcisin Tr. at 119:23-130:21. The first page is in Ilcisin's handwriting and conveys Ilcisin's wager, and the second page is in Rapp's handwriting and conveys Rapp's wager. Pl. Ex. 1, Rapp Tr. at 91:12-15; 94:7-98:12.

**Response to paragraph 29:** Disputed. Ms. Rapp testified that the "wine bet" did not contemplate or predict that the written events would actually occur, but instead "assumed . . . that an acquisition occurs" and asked how Ms. Rapp and Mr. Ilcisin thought "it would play out[.]" Pl. Ex. 1, at 166:18-167:5.

30.     At the top of the first page, the wine bet reads "winner chooses wine" and "loser buys[.]" Pl. Ex. 26, NAT-SL-00008520-8521, at -8520.

**Response to paragraph 30:** Defendants do not dispute that paragraph 30 quotes a portion of Ms. Rapp's and Mr. Ilcisin's June 14, 2022 notes.

31.    Ilcisin's wager contemplated that Emerson would return with additional interest in late June and ultimately go public in late August 2022 with an offer of $55 per share. He speculated that the "final price" would be $61. *Id.* at -8520.

**Response to paragraph 31:** Disputed. For the reasons explained in Defendants' response to paragraph 29, the "wine bet" did not contemplate or predict that the written events would actually occur.

32.    Rapp's wager contemplated that Emerson would make an additional private offer in late June and go public by July 31, 2022, and all the top shareholders would accept the offer. She speculated that the final price would be $58.50. *Id.* at -8521.

**Response to paragraph 32:** Disputed. For the reasons explained in Defendants' response to paragraph 29, the "wine bet" did not contemplate or predict that the written events would actually occur.

### b. "NI's Monitoring of Emerson and Related Actions"

33.    Defendant McGrath testified that after Wachtell's presentation at NI's June 14, 2022 Board meeting, he understood that an "outright rejection" of Emerson's offer may increase the probability of aggressive action by Emerson and that Emerson "may take hostile takeover actions" regardless of NI's response. Pl. Ex. 2, McGrath Tr. at 118:1-16, 124:6-15.

**Response to paragraph 33:** Disputed. Defendants dispute that Emerson's May 25 Letter was an "offer" for the reasons explained in response to paragraph 1. Further, Mr. McGrath did not testify that Emerson "'may take hostile takeover actions' regardless of NI's response." In the

quoted testimony, Mr. McGrath specifically testified about the situation as of June 14, 2022 and agreed that rejecting the proposal "didn't necessarily end the matter," and that Emerson "may take hostile takeover actions at $48 a share." Pl. Ex. 2, at 116:6-118:16.

34. After BofA's June 14, 2022 presentation concerning Emerson's "firepower," Defendant McGrath knew that a sale of Emerson's InSinkErator asset for about $3 billion would "obviously" increase Emerson's capacity to pursue M&A. Pl. Ex. 2, McGrath Tr. at 114:3-10; 261:21-262:13.

**Response to paragraph 34:** Defendants do not dispute that paragraph 34 quotes and accurately paraphrases a portion of McGrath's deposition testimony.

35. On June 16, 2022, Ilcisin sent a meeting invitation for June 20, 2022, to NI executives and representatives of BofA and Wachtell with the subject line "Projective Wolverine – Potential Next Steps Discussion." Pl. Ex. 27, NAT-SL-00010389. ████████████████

████████████████████████████████████████████

████████████████████████████████. Pl. Ex. 29, WLRK00001596-1611, at -1596.

**Response to paragraph 35:** Defendants do not dispute that paragraph 35 quotes and accurately paraphrases a portion of a June 16, 2022 meeting invitation, BofA slides, and an email from a representative of BofA.

36. On June 23, 2022, the day following Emerson's second offer letter, NI began the process of hiring a stock surveillance firm, with ████████████████████

████████████████████████████████████████████

██████." Pl. Ex. 32, WLRK-00001575, at -1575; Pl. Ex. 6, Ilcisin Tr. 74:10-75:15.

**Response to paragraph 36:** Disputed. Defendants dispute that Emerson's June 22 Letter was an "offer letter" for the reasons explained in response to paragraph 11. Defendants also dispute that June 23, 2022 was the date on which NI "began the process of hiring a stock surveillance firm." As reflected in Pl. Ex. 32, WLRK-00001575, at -1577, █████████████████████ ████████████████████████████████. Defendants do not dispute that paragraph 36 accurately quotes a June 23, 2022 email from Sabastian Niles.

37.    As early as June 29, 2022, NI was working with FGS Global, a strategic communications firm, on a ██████████████████████████████████ ████████████████████████████████████████." Pl. Ex. 33, WLRK-00000700. ██████████████████ ████████████████████████████████." *Id.* at -0703.

**Response to paragraph 37:** Disputed. Defendants dispute that Emerson's May 25 and June 22 Letters were "offers," for the reasons explained in response to paragraphs 1 and 11. Defendants also dispute that the communications were drafted for "two scenarios." ████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████" Pl. Ex. 33, WLRK-00000700, at -0703. Defendants do not dispute that paragraph 37 quotes a portion of FGS's draft communications materials.

38.    NI engaged FGS Global to advise NI on strategic communications for the "███ ████████████████████████████████████████████

███████████████████████████████████████ [.]" Def. Ex. 26, at -2657.

**Response to paragraph 38:** Disputed. Defendants do not dispute that NI engaged FGS Global to advise NI on strategic communications for the "████████████████ ████████████████████████" Defendants dispute that FGS was engaged for the purpose of advising on the other scenarios enumerated in Def. Ex. 26, including ████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████." Def. Ex. 26, at -12657. As explained by FGS, ████████████████████████████ ██████████████████████████████████████████████████████" *Id.* Thus, NI engaged FGS to ████████████████████████████████████ ████████████████████████████████████, but it did not engage FGS to advise on situations that did not exist at the time.

### c. "McGrath's Presentation to the Board"

39.     In July 2022, Defendant McGrath created a presentation titled "Board Discussion of Project Wolverine" that he presented during NI's July 19, 2022 Board Meeting. Ex. 38, NATSL-00020795-0819 at -0796; Ex. 2, McGrath Tr. at 189:13-22.

**Response to paragraph 39:** Undisputed.

40.     In this presentation, McGrath presented the July 7 email from Karsanbhai and wrote: "Most recent response indicates intention/threat to go public with its offer[.]" *Id.* at -0798.

**Response to paragraph 40:** Defendants do not dispute that paragraph 40 quotes a portion of Mr. McGrath's July 19, 2022 presentation.

41.    McGrath continued: "[Emerson] seems likely to go public with this offer and could initiate a formal bid. Note: It has nothing to lose if this triggers bidding[.]" *Id.* at -0800.

**Response to paragraph 41:** Defendants do not dispute that paragraph 41 quotes a portion of Mr. McGrath's July 19, 2022 presentation.

42.    McGrath also wrote: "Defending this offer publicly . . . is different that rejecting the offer privately . . . If [Emerson] uses the argument that we have not managed operating expenses sufficiently, it will be a significant embarrassment[.]" *Id.* at -0802.

**Response to paragraph 42:** Defendants do not dispute that paragraph 42 quotes a portion of Mr. McGrath's July 19, 2022 presentation.

43.    McGrath continued: "We need to go 'all in[.]' Delaying revenue or investing more in the future is not as important[.]" *Id.*

**Response to paragraph 43:** Defendants do not dispute that paragraph 43 quotes a portion of Mr. McGrath's July 19, 2022 presentation.

44.    The presentation listed seven "potential responses to [Emerson's] public argument[.]" *Id.* at -0803-04.

**Response to paragraph 44:** Defendants do not dispute that paragraph 44 quotes a portion of Mr. McGrath's July 19, 2022 presentation.

45.    The seventh potential response was labeled "[a]ccelerate our operating expense reductions more aggressively," which McGrath described as the "best possible defense" because, among other reasons, it "[w]ould both increase the stock price required and reduce the cost reduction opportunities for [Emerson]. At $65 per share, [Emerson] would most likely not be able to achieve its objective." *Id.* at 0804.

17

**Response to paragraph 45:** Defendants do not dispute that paragraph 45 quotes a portion of Mr. McGrath's July 19, 2022 presentation.

46. Defendant McGrath sent a draft of this presentation to Defendant Starkloff on July 10, 2022. Pl. Ex. 36, NAT-SL-00021516-1531.

**Response to paragraph 46:** Undisputed.

47. This draft included a different seventh "potential response" from that outlined in the final version. This draft "response" reads: "If we implement cost reductions, we should disclose our new plan[.]" *Id.* at -1525.

**Response to paragraph 47:** Defendants do not dispute that paragraph 47 quotes a portion of Mr. McGrath's July 10, 2022 draft presentation.

48. Under this seventh "potential response," McGrath wrote in this draft: "We need to get our stock price into the mid-40s, preferably 50s, as soon as possible without the price being based on a potential sale of the company[.]" *Id.*

**Response to paragraph 48:** Defendants do not dispute that paragraph 48 quotes a portion of Mr. McGrath's July 10, 2022 draft presentation.

49. On July 12, 2022, Eddie Dixon, NI's Chief Legal Officer, wrote to Defendant Starkloff: "I was thinking about how you might suggest to Michael [McGrath] that it is not a good idea to create materials like those he shared with you - especially with something like Wolverine in play . . . I don't think Michael would want his materials made public[.]" Pl. Ex. 37, NAT-SL00027877-7878, at -7877.

**Response to paragraph 49:** Defendants do not dispute that paragraph 49 quotes a portion of an email from Mr. Dixon to Mr. Starkloff.

50.     In discussing this email and the presentation, Dixon testified that McGrath should have "absolutely not" written down this information down [sic] because, in Dixon's view, "[NI's leadership] should be having conversations" instead. Pl. Ex. 3, Dixon Tr. at 154:4-18.

**Response to paragraph 50:** Disputed. When specifically asked for the reason why he did not believe Mr. McGrath should have written down the presentation, Mr. Dixon testified that it was because "[w]e don't want documents getting out that might be misinterpreted as to their meaning." Pl. Ex. 3, at 154:4-12.

### d. "  and NI's Earnings Release"

51.     In July 2022, NI was contemplating ███████████████████████ ███████. Pl. Ex. 3, Dixon Tr. at 159:22-25; Pl. Ex. 1, Rapp Tr. at 100:8-11.

**Response to paragraph 51:** Undisputed.

52.     As of July 14, 2022, there was "a relatively aligned consensus" between NI's advisors "that an investment in NI ████████████████████████████ Nuthatch [i.e. Emerson] goes public before the deal is inked (based on resulting stock price increase)[.]" Pl. Ex. 39, NAT-SL-00023167-3168, at -3167; Pl. Ex. 5, Ilcisin Tr. at 193:1-195:11.

**Response to paragraph 52:** Disputed. Defendants do not dispute that the quoted language appears in Pl. Ex. 39. Defendants dispute that the referenced "consensus" view of NI advisors was that Emerson going public would result in a stock price increase. When specifically asked if the cited email indicated that "disclosure of a Nuthatch deal would ████████████████ unattractive because it would result in an increase in the price of National Instruments," Mr. Ilcisin testified that "the consensus of the advisors [wa]s that ████████████████ becomes unattractive if Emerson goes public and the stock price increases." Pl. Ex. 6, at 194:15-195:4.

53.     During the NI Board's discussion concerning the Emerson offers at the July 19-20, 2022 Board meeting, the Board "discussed with management the potential steps the Company could take at the upcoming earnings call to highlight the Company's strong momentum[.]" Def. Ex. 29, at -1461.

**Response to paragraph 53:** Defendants do not dispute that paragraph 53 quotes a portion of the minutes of NI's July 19-20 Board Meeting.

54.     On July 28, 2022, NI reported earnings and hosted an earnings call for its investors. Pl. Ex. 41.

**Response to paragraph 54:** Undisputed.

55.     In the press release associated with the July 28, 2022 earnings call, NI stated it was "increas[ing its] expectations for 2023," and Defendant Starkloff noted that NI's "focused strategy" and second quarter "[m]omentum" were resulting in management's "increased confidence in achieving revenue growth and earnings per share in line with current consensus estimate." *Id.*

**Response to paragraph 55:** Disputed. Defendants dispute only the accuracy of Plaintiff's quotation. Pl. Ex. 41 refers to "expectations for full year 2023." *Id.* at 6 of 14.

56.     On July 31, 2022, Defendant McGrath wrote to Starkloff and Rapp: "It looks like from the analyst reports that they either didn't listen to your 2023 guidance or didn't give it credibility." Pl. Ex. 42, NAT-SL-00002982-2983, at -2982.

**Response to paragraph 56:** Defendants do not dispute that paragraph 56 quotes a portion of an email from Mr. McGrath to Mr. Starkloff and Ms. Rapp.

IV.     **"Defendants' Continued Engagement with the Prospect of an Emerson Acquisition"**

20

57. On August 4, 2022, Starkloff sent an email to Ilcisin, Dixon, and Rapp calling the fact that Emerson announced its dividend "a week prior" to Emerson's earnings call "interesting[.]" Pl. Ex. 44, NAT-SL-00011781-1785, at -1782. Ilcisin shared BofA's insight on this decision with Starkloff and stated, "per your question, definitely an anomaly. Will be an interesting call. We should do a earnings call party if the timing works [smiley face emoticon][.]" *Id.* at -1781.

**Response to paragraph 57:** Defendants do not dispute that paragraph 57 quotes a portion of an email chain among Mr. Starkloff, Mr. Ilcisin, Mr. Dixon, and Ms. Rapp.

58. On August 8, 2022, Niles of Wachtell emailed Defendant Starkloff, Dixon, Rapp, Ilcisin, and Percival press releases announcing Emerson's sale of InSinkErator and noted: "Wolverine moving forward with portfolio realignment (selling InSinkErator $3B to Whirlpool / 18. lx EBITDA). (Another reason why Lal [Kharsanbai] may have been a bit busy past few days)." Def. Ex. 36, at -6260.

**Response to paragraph 58:** Defendants do not dispute that paragraph 58 quotes a portion of an email from Mr. Niles to Mr. Starkloff, Mr. Dixon, Ms. Rapp, Mr. Ilcisin, and Mr. Percival.

59. In response to Shawn Liu of BofA circulating a Reuters article covering Emerson's sale of InSinkErator, ██████████████████████████████████ ██████████████████████████████." Pl. Ex. 47, NAT-SL-00018186-8187, at -8186 (ellipses in original). ██████████████████████████████████████ ██████████████████████?" *Id.*

**Response to paragraph 59:** Disputed. Defendants dispute paragraph 59 to the extent Plaintiff indicates that Pl. Ex. 47 refers only to Emerson, as this is not supported by the document and witness testimony. Mr. Ilcisin testified that the "something with us" language could have

21

related to "another transaction . . . in the same time scale" ███████████ Pl. Ex. 6, at 211:17-212:9.

60. Also responding to Emerson's announcement of the InSinkErator sale on August 8, Niles of Wachtell told NI: "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.'" Pl. Ex. 46, NAT-SL-00017263-7267, at -7264 (ellipses in original). Ilcisin responded: "There is probably a discussion there. The BoA team has had some thoughts related to the impact of the cash generation event[.] *Id.* Ilcisin followed up with Eddie Dixon and stated: "I was talking to BoA on the weekend and they suggested a call in general related to earnings, this news is key in their thinking." *Id.* at 7263.

**Response to paragraph 60:** Defendants do not dispute that paragraph 60 quotes a portion of email correspondence among Mr. Niles and Mr. Ilcisin and an email from Mr. Ilcisin to Mr. Dixon.

61. On August 9, 2022, Defendant Starkloff wrote: "I listened to [Emerson's earnings] call live. Not a great quarter for them." Pl. Ex. 49, NAT-SL-00023501-502, at -3501. In response, Defendant McGrath wrote: "Think that will make them more or less eager?" *Id.*

**Response to paragraph 61:** Defendants do not dispute that paragraph 61 quotes a portion of email correspondence between Mr. Starkloff and Mr. McGrath.

62. That same day, August 9, Defendants hosted a "Wolverine check in call" with BofA and Wachtell to discuss "recent Nuthatch announcements and earnings call" and "[p]reparedness for any disclosures[,]" including the readiness of BofA's "fight deck[.]" Pl. Ex. 48, NAT-SL00010395; Pl. Ex. 5, BofA Tr. at 148:24-151:14.

**Response to paragraph 62:** Disputed. Pl. Ex. 48 is an invite for a call with the subject line, "Wolverine check in call," with a list of "agenda" items. Neither Pl. Ex. 48 nor the cited excerpt of Pl. Ex. 5 establishes that this call actually occurred or that the listed "agenda" items were actually discussed on that date. Further, the "agenda" in Pl. Ex. 48 did not include "readiness of BofA's 'fight deck,'" but instead simply noted, "[p]reparedness for any disclosures BoA fight deck." Pl. Ex. 48, at -10395.

63.    On August 10, 2022,



: "This just got interesting!!" Pl. Ex. 50, NAT-SL-00011768.

**Response to paragraph 63:** Defendants do not dispute that the quoted language appears in Pl. Ex. 50.

64.    On the day ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, and after meeting with NI's advisors, Dixon sent an email to himself in which Dixon wrote that "the probability of [Emerson] going public is much higher now." Def. Ex. 39; Pl. Ex. 3, Dixon Tr. at 217:1-15.

**Response to paragraph 64:** Defendants do not dispute that paragraph 64 quotes a portion of Mr. Dixon's August 10, 2022 email memorandum to himself documenting multiple statements from NI's advisors on that date.

65.    Also on August 10, 2022, Defendant Starkloff sent himself a draft communication to share with NI employees in the event Emerson went public with its offer. Pl. Ex. 53, NAT-SL00021470.

**Response to paragraph 65:** Disputed. Defendants dispute Plaintiff's reference to "its offer," both because the May 25 and June 22 Letters were not "offers" for the reasons explained in response to paragraphs 1 and 11, and because as of August 10, 2022, NI had twice rejected

Emerson's proposal, and there was no outstanding proposal from Emerson after NI's August 2, 2022 rejection. Def. Ex. 23; Def. Ex. 31; Pl. Ex. 4, at 171:7-19 (Mr. Starkloff testifying that "[a]fter [NI] sent a second rejection letter to Emerson on August 2nd, 2022," NI "assumed that [the prospect of a transaction happening with Emerson] was dead"); Pl. Ex. 5, at 207:18-24 (█████

████████████████████████████████████████████████████████████████████

███████████████████████████ ").

66.     Ilcisin acknowledged that ████████████████████████████████

████████████████████████████████████████████████ . Pl. Ex. 6, Ilcisin

Tr. at 218:2-13.

**Response to paragraph 66:** Defendants do not dispute that paragraph 66 accurately paraphrases a portion of Mr. Ilcisin's testimony.

67.     On or around August 11, 2022, at least one of NI's advisors "viewed" ███████

█████████████ as "hostile." Pl. Ex. 6, Ilcisin Tr. at 221:10-25.

**Response to paragraph 67:** Disputed. Mr. Ilcisin testified only that "[o]ne of these advisors had made a statement that they viewed this as hostile." Pl. Ex. 6, at 221:10-25. Further, Plaintiff does not cite any admissible evidence establishing the date of this single statement referenced by Mr. Ilcisin. The cited excerpt of Mr. Ilcisin's testimony does not include the date, nor does Mr. Ilcisin testify to the date on which he noted this "statement" in the surrounding portions of his testimony. *Id.* at 219:10-221:25 (only reference to date is statement made by counsel that is not part of question or the witness's testimony).

68.     BofA's representative ████████████████████████████████████

████████████████████████████████████████████████ " Pl. Ex. 5,

BofA Tr. at 66:17-67:3.

24

**Response to paragraph 68:** Disputed. BofA's representative

. Pl. Ex. 5, at 67:4-12.

."

69.    On August 26, 2022, Marissa Vidaurri, NI's head of investor relations, sent an email to Starkloff, Rapp, Dixon, Liu, and Niles stating that she asked Mackenzie Partners for its

[.]" Pl. Ex. 56, NAT-SL-00017309-7310.

**Response to paragraph 69:** Disputed. Pl. Ex. 56 does not indicate that MacKenzie responded to Ms. Vidaurri with the quoted language. Ms. Vidaurri's email states, "[b]elow is a summary and link to a case study from over ten years ago." Pl. Ex. 56, at -17309. The quoted statements are in a list of items, and Mr. Dixon testified that this list was a "summary of a case study that MacKenzie apparently did ten years ago and that Marissa was summarizing." Pl. Ex. 3, at 234:21-235:1.

70.    On September 1, 2022, MacKenzie Partners emailed Dixon, Rapp, Ilcisin, and Vidaurri and stated: "

." Def. Ex. 44 (September 1, 2022), at -7321. In response to this news, NI's counsel at Wachtell stated: "

." Pl. Ex. 57, WLRK-00002970-2971.

25

**Response to paragraph 70:** Disputed. The quoted statement, "They are coming," was not in response to MacKenzie's email with Mr. Dixon, Ms. Rapp, Mr. Ilcisin, and Ms. Vidaurri. Pl. Ex. 57. Instead, that language is included in an email sent by Sabastian Niles of Wachtell only internally at Wachtell, and not to any of NI's other advisors or any NI personnel. *Id.* Defendants do not dispute that paragraph 70 quotes a September 1, 2022 email from MacKenzie Partners and a September 1, 2022 email from Mr. Niles.

71.    On September 5, 2022, Dixon sent ███████████████████████████ ████████████████████████████████████████████████████ " Pl. Ex. 58, WLRK00002195-2286, at -2195.

**Response to paragraph 71:** Defendants do not dispute that paragraph 71 quotes a portion of an email from Mr. Dixon to Wachtell attorneys.

72.    On September 19, 2022, Dixon sent notes to the NI team summarizing the "key points" for "the general message/Wolverine update to the board" the following Wednesday. Pl. Ex. 59, NAT-SL-00023189-3190, at -3189.

**Response to paragraph 72:** Defendants do not dispute that paragraph 72 quotes a portion of a September 19, 2022 email from Mr. Dixon.

73.    In his September 19, 2022 email, Dixon wrote: "Speculation is that the purchase of shares was intended to signal that they are serious about the potential for an acquisition[.]" *Id.*

**Response to paragraph 73:** Defendants do not dispute that paragraph 73 quotes a portion of a September 19, 2022 email from Mr. Dixon.

74.    Dixon also wrote in the September 19, 2022 email: "NI is on Wolverine's [i.e., Emerson's] acquisition pipeline list and there is no evidence that Wolverine's [i.e., Emerson's

interest has petered out. Evidence might be, for example, Wolverine selling its shares or announcing another large acquisition making NI unaffordable[.]" *Id.*

**Response to paragraph 74:** Defendants do not dispute that paragraph 74 quotes a portion of a September 19, 2022 email from Mr. Dixon.

75.     On September 21, 2022, the day of NI's board

" Pl. Ex. 61, NAT-SL-00012292-2295, at -2292 (referring to Emerson's financial "firepower" to acquire NI). This email attached an updated version of

." *Id.* at -2295.

**Response to paragraph 75:** Disputed. Defendants dispute only that the terms "firepower" and "firepower analysis" referred specifically to "Emerson's financial 'firepower' to acquire NI." Instead, uses of those terms referred to Emerson's capacity to pursue M&A generally, and was not specific to NI. Pl. Ex. 5, at 77:21-25

Defendants otherwise do not dispute that paragraph 75 quotes a portion of an email from BofA and a portion of the analysis attached to that email.

76.     NI and its advisors continued to use code names for Emerson through at least September 2022. *See, e.g.*, Def. Ex. 33; Pl. Ex. 56, NAT-SL-00017309-7310; Pl. Ex. 59, NAT-SL00023189-3190.

**Response to paragraph 76:** Undisputed.

V.    **"Defendants' Repurchases While in Possession of Material Nonpublic Information Concerning Emerson"**

77.    In January 2022, Defendants planned that NI would do $100 million in repurchases for the full year. Pl. Ex. 21, excerpts of NAT-SL-00024256-4417.

**Response to paragraph 77:** Disputed. Defendants did not "plan[]" that NI would do $100 million in repurchases. The slide in Pl. Ex. 21 reflecting $100 million in repurchases for 2022 does not reflect a "plan[]," but is instead labelled, "Scenario of Cash Projections." Pl. Ex. 21, at -24406. Mr. Starkloff testified that Defendants had a "broad authorization" to conduct $250 million in repurchases, and "anything else was just various models of how we may do it." Pl. Ex. 4, at 15:18-16:4. Mr. McGrath testified that "[t]he strategy was 250 million approved by the board over a period of years. The hundred million was not a strategy as much as a forecast." Pl. Ex. 2, at 200:7-12.

78.    In preparation for the June 20, 2022 "Wolverine Potential Next Steps Discussion" with NI, ███████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████?" Pl. Ex. 28, BofA_000156-160, at -0158.

**Response to paragraph 78:** Defendants do not dispute that paragraph 78 quotes a portion of Mr. Daniels's June 18, 2022 email to other representatives of BofA.

79.    BofA's representative testified ████████████████████████ ████████████████████████. Pl. Ex. 5, BofA Tr. at 105:23-106:4.

**Response to paragraph 79:** Disputed. BofA's representative ███████████████

███████████████████████████████████████████." Pl. Ex. 5, BofA

Tr. at 105:23-106:4.

80.    On July 7, 2022, Ilcisin, after reviewing a set of slides from an NI employee, wrote that "opportunistic buy-backs are better not framed as a 'problem[.]'" Pl. Ex. 35, NAT-SL00023205-3206, at -3205 (July 7, 2022). Ilcisin forwarded this email to Rapp and Dixon and stated: "This could be nuthatch discoverable, don't want these listed as problems." *Id.* Dixon responded with a thumbs-up emoticon. *Id.*

**Response to paragraph 80:** Disputed. The full sentence from Mr. Ilcisin's email quoted by Plaintiff in the first sentence of paragraph 80 stated, "Recurring M&A and opportunistic buy-backs are better not framed as a 'problem.'" Pl. Ex. 35, at -23205. In the immediately preceding sentence, Mr. Ilcisin suggested changing a label in the slides being discussed from "Problem Statement" to "Context." *Id.* Mr. Ilcisin testified that "problem statement" has a very specific meaning in "lean methodology" and so his email was "coaching an up-and-coming employee . . . to use the right language and that what he was describing in that section is the context for his presentation, not that it's a problem statement." Pl. Ex. 6, at 179:9-180:11.

81.    As of July 19-20, 2022, NI planned to repurchase $10 million worth of NI stock in the third quarter of 2022. Pl. Ex. 40, excerpts of NAT-SL-00024106-4212, at -4210.

**Response to paragraph 81:** Disputed. Defendants did not "plan[]" that NI would do $100 million in repurchases. The slide in Pl. Ex. 40 indicating $10 million in repurchases for the third quarter does not reflect a "plan," but is instead labelled, "Cash Project by Quarter in 2022." *Id.* at -24210. Mr. Starkloff testified that Defendants had a "broad authorization" to conduct $250 million in repurchases, and "anything else was just various models of how we may do it." Pl. Ex. 4, at

15:18-16:4. Mr. McGrath testified that "[t]he strategy was 250 million approved by the board over a period of years. The hundred million was not a strategy as much as a forecast." Pl. Ex. 2, at 200:7-12.

82.      On August 7, 2022, in response to a discussion regarding certain Board members' concerns about NI's stock repurchases, McGrath wrote to Starkloff: "Go ahead with what you are planning . . . . The reaction was to the negative cash flow from operations and our precarious cash position at the end of the quarter. The comment was 'With almost no cash and negative cash flow, we sure the hell shouldn't be buying back stock to make a $10M donation.['] And there was several strong agreements." Pl. Ex. 45, NAT-SL-00001276-1278, at -1276.

**Response to paragraph 82:** Disputed. Defendants do not dispute that Pl. Ex. 45 contains the quoted language, except the document includes the word "making," not "make." Defendants dispute that multiple Board members were concerned, or discussed concerns, about NI's stock repurchases. In his email, Mr. Starkloff refers to input from "'some board members.'" *Id.* at -1277 (quotations in original). Mr. Starkloff testified that Mr. McGrath gave some "pushback" on resuming repurchases, but also that Mr. Starkloff was skeptical that other board members shared Mr. McGrath's views. Pl. Ex. 4, at 138:14-139:11. Due to this skepticism, Mr. Starkloff told Mr. McGrath to have the other concerned board members reach out to Mr. Starkloff, but Mr. Starkloff never "heard from the other board members, leaving [him] with the conclusion that it was" just Mr. McGrath who had this concern. *Id.*

83.      On August 11, 2022, while drafting NI's purported 10b5-1 Plan, Rapp requested refinements to the trading matrix that would clarify that NI would not be obligated to purchase stock if the market price of NI stock was $45 per share or above. Pl. Ex. 54, NAT-SL-000170977099, at -7097.

30

**Response to paragraph 83:** Defendants do not dispute that paragraph 83 accurately summarizes a portion of an August 11, 2022 email from Ms. Rapp directed to Mr. Percival.

84.     On August 11, 2022 Defendants purported to have entered into a 10b5-1 Plan Agreement. This agreement included a trading matrix directing JP Morgan to purchase (i) up to $8 million in a day if the price of NI stock was $37 or below per share, (ii) up to $6 million in a day if the price was $37 to $39.99 per share, (iii) up to $4 million in a day if the price was $40 to $42.99 per share, (iv) up to $1 million in a day if the price was $43 to $44.99 per share. Def. Ex. 41, at -0771. If the price was $45.00 or higher per share, JP Morgan was instructed not to make any purchases of NI stock. *Id.*

**Response to paragraph 84:** Disputed. Defendants dispute only that they "purported to have entered into a 10b5-1 Plan Agreement" to the extent this implies Defendants did not, in fact, execute a valid 10b5-1 Plan Agreement with JP Morgan. Defendants do not dispute that the second sentence of paragraph 84 accurately summarizes a portion of Annex A to NI's 10b5-1 Plan Agreement.

85.     On August 12, 2022, NI spent a total of $9,047,756.58 repurchasing its common stock on the open market. Def. Ex. 42.

**Response to paragraph 85:** Undisputed.

86.     On August 18, 2022, NI spent a total of $3,777,234.13 repurchasing its common stock on the open market. *Id.*

**Response to paragraph 86:** Undisputed.

87.     On August 19, 2022, NI spent a total of $4,998,336.70 repurchasing its common stock on the open market. *Id.*

**Response to paragraph 87:** Undisputed.

31

88.    On August 26, 2022, NI spent a total of $3,996,607.39 repurchasing its common stock on the open market. *Id.*

**Response to paragraph 88:** Undisputed.

89.    On September 12, 2022, NI spent a total of $3,996,530.11 repurchasing 97,260 shares of NI common stock at a price of $41.0912. *Id.*

**Response to paragraph 89:** Undisputed.

90.    On September 13, 2022, NI spent a total of $5,644,344.73 in repurchasing 140,682 shares of NI common stock at a price of $40.1213. *Id.*

**Response to paragraph 90:** Undisputed.

91.    On September 14, 2022, NI spent a total of $5,611,499.28 in repurchasing 140,806 shares of NI common stock at a price of $39.8527. *Id.*

**Response to paragraph 91:** Undisputed.

92.    On September 15, 2022, NI spent a total of $5,549,629.12 repurchasing 140,806 shares of NI common stock at a price of $39.4133. *Id.*

**Response to paragraph 92:** Undisputed.

93.    On September 16, 2022, NI spent a total of $5,472,256.22 repurchasing 140,806 shares of NI common stock at a price of $38.8638. *Id.*

**Response to paragraph 93:** Undisputed.

94.    On September 19, 2022, NI spent a total of $5,996,089.14 repurchasing 150,200 shares of NI common stock at a price of $39.9207. *Id.*

**Response to paragraph 94:** Undisputed.

95.    On September 20, 2022, NI spent a total of $5,996,557.05 repurchasing 150,550 shares of NI common stock at a price of $39.8310. *Id.*

32

**Response to paragraph 95:** Undisputed.

96.    On September 21, 2022, NI spent a total of $5,977,063.00 repurchasing 148,466 shares of NI common stock at a price of $40.2588. *Id.*

**Response to paragraph 96:** Undisputed.

97.    On September 22, 2022, NI spent a total of $5,996,272.32 repurchasing 153,020 shares of NI common stock at a price of $39.1862. *Id.*

**Response to paragraph 97:** Undisputed.

98.    On September 23, 2022, NI spent a total of $5,996,783.50 repurchasing 154,575 shares of NI common stock at a price of $38.7953. *Id.*

**Response to paragraph 98:** Undisputed.

99.    On September 26, 2022, NI spent a total of $3,732,723.50 repurchasing 95,062 shares of NI common stock at a price of $39.2662. *Id.*

**Response to paragraph 99:** Undisputed.

100.    NI purchased over $80 million in NI stock from August 12 to September 26, 2022 – a time period of only 15 market days. Pl. Ex. 62, NAT-SL-00008757-758; Def. Ex 42.

**Response to paragraph 100:** Disputed. Defendants dispute only that the time period from August 12, 2022 to September 26, 2022 was "only 15 market days." Defendants contend there were 31 market days between those two dates.

101.    According to NI's CFO Rapp, Defendants purchased $160 million worth of NI stock throughout 2022, which was $60 million higher than NI's plan. Pl. Ex. 63, NAT-SL-00006122-6123, at -6122.

**Response to paragraph 101:** Disputed. Defendants dispute that it was "NI's plan" to repurchase $100 million in 2022. Mr. Starkloff testified that Defendants had a "broad

authorization" to conduct $250 million in repurchases, and "anything else was just various models of how we may do it." Pl. Ex. 4, at 15:18-16:4. Mr. McGrath testified that "[t]he strategy was 250 million approved by the board over a period of years. The hundred million was not a strategy as much as a forecast." Pl. Ex. 2, at 200:7-12.

102.    The amount that NI spent on repurchases during the third quarter of 2022 constituted the largest quarterly repurchases by dollar amount in NI's history. Pl. Ex. 65, Defendants' Responses and Objections to Lead Plaintiff's Requests for Admission, at 11 (January 7, 2026); Pl. Ex. 2, McGrath Tr. at 313:9-23, 314:1-2.

**Response to paragraph 102**: Undisputed.

### VI.    "Post Class-Period Events"

103.    On January 11, 2023, Starkloff of NI and Karsanbhai of Emerson discussed Emerson's $53 per share offer and the possibility of increasing the offer, and Emerson followed up with a letter reaffirming its $53 per share offer. Def. Ex. 1, at 30.

**Response to paragraph 103:** Undisputed.

104.    On January 12, 2023, NI's Board met and discussed Starkloff's conversation with Karsanbhai and "the shareholder rights plan that it planned to adopt in connection with initiating a strategic review process to ensure an even playing field and that no potential participant would have an unfair advantage in the process by accumulating a large number of shares of NI[.]" *Id.*

**Response to paragraph 104:** Undisputed.

105.    "On the morning of January 13, 2023, NI issued a press release announcing that its Board had initiated a review and evaluation of strategic options . . . and that the comprehensive review would include . . . solicitation of interest from potential acquirers . . . some of whom had already approached NI." *Id.*

**Response to paragraph 105:** Undisputed.

106.     In response to this disclosure, NI's stock closed at $46.97 on January 13, 2023, up from the previous day's per share price of $40.17. Pl. Ex. 67.

**Response to paragraph 106:** Disputed. Defendants do not dispute the change in stock price noted by Plaintiff in paragraph 106. Defendants dispute only that this change in stock price was "[i]n response to this disclosure," as Plaintiff has provided no evidence in support of that contention.

107.     This increase in NI's stock price was statistically significant and was caused by NI's January 13, 2022 disclosure concerning a potential transaction. Decl. of J. Bennett in support of Defendants' Mot. to Exclude, Ex. A, Expert Report of Matthew D. Cain, Ph.D. (July 28, 2025) ("Cain Merits Report"), ¶124.

**Response to paragraph 107:** Disputed. Defendants dispute that the disclosure at issue occurred on January 13, 2022, and contend that the disclosure Plaintiff is referencing occurred on January 13, 2023. Def. Ex. 1, at 30. Defendants dispute that the change in NI's stock price was "caused by" a disclosure "concerning a potential transaction." The January 13, 2023 disclosure included a wide variety of potentially value-relevant information that could have contributed to the change in NI's stock price on January 13, 2023, including that NI's Board "had initiated a review and evaluation of strategic options, in consultation with its financial and legal advisors, with the intent to unlock and maximize shareholder value," that NI would consider "a full range of available strategic, business and financial alternatives," and that "the Board had adopted a limited duration shareholder rights plan and authorized a dividend distribution of one right for each outstanding share of common stock." *Id.*

108.    "On the morning of January 17, 2023, Emerson issued a press release announcing that it had submitted a proposal to the Board of NI to acquire NI for $53 per share. The press release stated that the proposal was submitted to NI on November 3, 2022 and represented an improvement over an initial $48 per share proposal submitted on May 25, 2022 and outlined prior engagement between the two companies." Def. Ex. 1, at 31.

**Response to paragraph 108:** Undisputed.

109.    In response to this disclosure, NI's stock closed at $52.04, up from the previous trading day's per share price of $46.97.

**Response to paragraph 109**: Disputed. Defendants do not dispute the change in stock price noted by Plaintiff in paragraph 109. While Plaintiff does not cite any evidence in support of paragraph 109, Defendants do not dispute this fact or contend that NI stock closed at any price other than $52.04 on January 17, 2023. Defendants dispute only that this change in stock price was "[i]n response to this disclosure," as Plaintiff has provided no evidence in support of that contention.

110.    This increase in NI's stock price was statistically significant and was caused by Emerson's January 17, 2022 disclosure concerning its offers and its engagement with NI, including NI's prior rejection of Emerson's offers. *Id.*, ¶124.

**Response to paragraph 110:** Disputed. Defendants dispute that the disclosure at issue occurred on January 17, 2022, and contend that the disclosure Plaintiff is referencing occurred on January 17, 2023. Def. Ex. 1, at 31. Defendants dispute that the increase in NI's stock price was "caused by Emerson's January 17, 202[3] disclosure concerning its offers and its engagement with NI, including NI's prior rejection of Emerson's offers." Plaintiff does not cite any evidence supporting this contention. The January 17, 2023 disclosure announced Emerson's offer at $53 per

share and did not announce that NI had rejected that offer. In fact, also on January 17, 2023, "NI issued a press release confirming that it had received the Emerson proposal and stating that NI's Board would evaluate Emerson's proposal within the context of the ongoing strategic review process." *Id.*

111.    When Emerson acquired NI for $60 per share, Defendant McGrath received approximately $1 million more for the NI shares he personally owned compared with the amount he would have received had he sold all those shares at roughly the same price as Lead Plaintiff. Pl. Ex. 2, McGrath Tr. 326:10-327:7.

**Response to paragraph 111:** Disputed. Defendants do not dispute that Mr. McGrath testified to this effect when asked a series of specific question by Plaintiff's counsel, wherein Plaintiff's counsel represented that Lead Plaintiff "sold their shares for about $39 a share." Pl. Ex. 2, at 324:18-22. Defendants dispute that this was "roughly the same price as Lead Plaintiff," as Plaintiff cites no evidence to support this and does not provide any temporal limitation. Plaintiff sold shares on September 22, 2022 at $39.05 per share, but also sold shares on January 13, 2023 at $46.95 per share, March 3, 2023 at $51.18 per share, March 6, 2023 at $51.21 per share, and March 13, 2023 at $48.70 per share. *See* ECF 71-1, Expert Report of David J. Denis, June 16, 2025, at Exhibit 2.

112.    When Emerson acquired NI for $60 per share, Defendant Starkloff received approximately $5 million more for the NI shares he personally owned compared with the amount he would have received had he sold all these shares at roughly the same price as Lead Plaintiff. Pl. Ex. 4, Starkloff Tr. 151:5-152:1.

**Response to paragraph 112:** Disputed. Defendants do not dispute that Mr. Starkloff testified to this effect when asked a series of specific questions by Plaintiff's counsel. Defendants

dispute that this was "roughly the same price as Lead Plaintiff," as Plaintiff cites no evidence to support this and does not provide any temporal limitation. Plaintiff sold shares on September 22, 2022 at $39.05 per share, but also sold shares on January 13, 2023 at $46.95 per share, March 3, 2023 at $51.18 per share, March 6, 2023 at $51.21 per share, and March 13, 2023 at $48.70 per share. *See* ECF 71-1, Expert Report of David J. Denis, June 16, 2025, at Exhibit 2.

Dated: February 23, 2026

By: /s/ *James. F. Bennett*

James F. Bennett (*pro hac vice*)
John D. Comerford (*pro hac vice*)
Jeremy M. Hofman (*pro hac vice*)
Dowd Bennett LLP
7676 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone:  (314) 889-7300
Facsimile:   (314) 863-2111
jbennett@dowdbennett.com
jcomerford@dowdbennett.com
jhofman@dowdbennett.com

Andrew Ditchfield
Davis Polk & Wardwell LLP
450 Lexington Ave
New York, New York 10017
Telephone: (212) 450-4000
andrew.ditchfield@davispolk.com

*Counsel for Defendants National Instruments Corporation, Michael McGrath, and Eric Starkloff*

## APPENDIX A

Paragraphs To Be Deemed Undisputed in Defendants' Rule 56.1 Statement.[4]

| Reason for Plaintiff's Noncompliance with Local Civil Rule 56.1 | Noncompliant Response Paragraphs |
|---|---|
| Fails to cite admissible evidence actually controverting Defendants' stated facts. | 13, 15, 18, 19, 20, 21, 31, 36, 50, 62, 80, 89, 103, 104, 109, 111, 114, 118, 123, 127, 128, 129, 133, 143, 145, 147, 153, 157, 159, 160 |
| "Disputes" facts as "incomplete and misleading" or "misleading and incomplete," while adding narrative or argument and without citing controverting evidence. | 27, 29, 34, 39, 40, 48, 49, 51, 52, 58, 59, 60, 67, 83, 87, 92, 93, 94, 98, 99, 100, 105, 106, 107, 108, 125, 126, 130, 131, 132, 134, 135, 138, 139, 142, 144, 146, 158, 164, 165, 174 |
| Responds with identical, non-responsive narrative about Defendants' good faith reliance on advice-of-counsel, also without citing controverting evidence. | 34, 131, 132, 135, 138, 139, 144 |
| Plaintiff's "dispute" based on erroneous argument about inadmissibility of Albert Percival's testimony. | 38, 80, 129, 130, 134, 136, 138, 140, 147, 150, 151, 152, 154, 155, 156 |

---

[4] *See* Defendants' Reply in Support of their Motion for Summary Judgment, Section III(a).

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 23, 2026, a true and correct copy of the foregoing was filed electronically using the Court's electronic filing system. By operation of that system a notice of electronic filing will be served upon all counsel of record in the case.

*/s/ James F. Bennett*